```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -------------------------------x
                                        15-CR-637(KAM)
 3    UNITED STATES OF AMERICA,
                                        United States Courthouse
 4            Plaintiff,               Brooklyn, New York

 5            -against-                May 12, 2017
                                        10:00 a.m.
 6    MARTIN SHKRELI,

 7            Defendant.

 8    -------------------------------x

 9            TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION HEARING
                   BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                    UNITED STATES DISTRICT JUDGE

11    APPEARANCES

12    For the Government:        BRIDGET M. ROHDE, ESQ.
                                 Acting United States Attorney
13                               Eastern District of New York
                                 271 Cadman Plaza East
14                               Brooklyn, New York 11201
                                 BY:  ALIXANDRA E. SMITH, ESQ.
15                               Assistant United States Attorney

16    For the Defendant:         BRAFMAN & ASSOCIATES, P.C.
                                 BY:  MARC AGNIFILO, ESQ.
17                               BY:  ANDREA ZELLAN, ESQ.
                                 BY:  TENY GEREGOS, ESQ.
18
      For Retrophin:             COOLEY LLP
19                               BY:  WILLIAM J. SCHWARTZ, ESQ.
                                 BY:  IAN SHAPIRO, ESQ.
20                               BY:  NICHOLAS A. FLATH, ESQ.

21
      Court Reporter:            Rivka Teich, CSR, RPR, RMR
22                               Phone:  718-613-2268
                                 Email:  RivkaTeich@gmail.com
23
      Proceedings recorded by mechanical stenography.  Transcript
24    produced by computer-aided transcription.

25
```

Motion Hearing

1          (In open court.)

2          COURTROOM DEPUTY:  All Rise.  This is oral argument

3     on Mr. Shkreli's motion to compel documents, 15-CR-637, United

4     States Versus Martin Shkreli.

5          Will counsel on behalf of the Government state your

6     appearance.

7          MS. SMITH:  Good morning, your Honor, Alixandra

8     Smith on behalf of the United States.

9          THE COURT:  On behalf of non-party Retrophin.

10          MR. SCHWARTZ:  William Schwartz, Nicholas Flath and

11     Ian Shapiro, Cooley LLP for Retrophin.

12          THE COURT:  On behalf of defendant.

13          MR. AGNIFILO:  Mark Agnifilo.  I'm here with

14     Mr. Shkreli and Andrea Zellan and Teny Geregos.

15          THE COURT:  Good morning.  This is the defense

16     motion, so if you would like to be heard first, Mr. Agnifilo.

17          MR. AGNIFILO:  So we're making a motion at this

18     point because we've essentially had a break down in our

19     ability to agree.  I think we agreed on a great deal.  And I

20     know that this issue was teed up for motions in maybe back in

21     November and December.  And to Retrophin's credit and to

22     Cooley's client, we had productive dialogue.  The dialogue

23     broke down a couple of months ago; it's prompted us to today.

24          Ultimately I'm trying to be reasonable.  I think I,

25     probably in good faith, have given some of the case law and

Motion Hearing

1   there is nothing terribly binding.  We have some District

2   Court decisions that I've cited to your Honor.  There is a

3   contrary decision from the Southern District, which we've

4   distinguished in our papers.  But I, in good faith, I could

5   argue for a wholesale waiver of everything.  And obviously I

6   lead with that, but saying I'm not going to do that.

7           THE COURT:  I thought you had done that.  So you're

8   not going to do that?

9           MR. AGNIFILO:  I'm trying to be more surgical.  I

10  think that I can argue for that.  And the tricky thing for

11  someone in my position and this is one of the things I want to

12  throw out to your Honor, because I could see this coming down

13  the pike, we're trying to isolate the things that are most

14  relevant.  And Ms. Zellan put together a colored chart in one

15  of our briefs, that was our way of prioritizing.

16          One of the concerns I have, I'll put it out there

17  now because your Honor might have thoughts about it, is this

18  is how we see the case today based on e-mails that we have and

19  discovery that we have.  We're going to get 3500 material in

20  about a month.  We're going to be getting other information

21  from the Government in about a month.  Maybe nothing will

22  change; maybe we're predicting right, maybe the way we see the

23  case now will be the way we continue to see the case.  But

24  things could change.  And so why I bring up the wholesale

25  waiver, is because that may be easier later.  What I mean by

Motion Hearing

1   that is, we've prioritized now and we're in disagreement about

2   900 or so e-mails.

3          My concern, and I put it on your Honor's radar

4   screen is, I could see a situation where because of the way

5   something develops at the trial that there are e-mails that we

6   haven't been given that maybe with another e-mail puts it into

7   context.  That is really part of what we're trying to do.  And

8   that is part of what our prioritizations have been focused on,

9   things that are going to be important.

10          The capitalization table is important.  It's alleged

11   in the indictment.  A lot of our highest priority requests

12   relate to the capitalization table.  There are e-mails that we

13   think Retrophin gave to the Government that might relate only

14   to one e-mail in that day, when in fact there is a whole

15   string of e-mails leading up to that e-mail; that happens a

16   few times.

17          And so what we're trying to do now, essentially, is

18   look to the future, not so far in the future because the trial

19   is almost upon us.  What is going to come up at the trial and

20   how do we make sure now that we have the e-mails that we think

21   we need to give the Government's evidence context, and to have

22   our own evidence either on cross-examination or on our direct

23   case.

24          So my concern, the reason I led with yes, I do

25   believe that Retrophin -- for the reasons that I put in my

Motion Hearing

1    brief and I don't need to go through them again -- has

2    essentially waived, as to the whole, anything that is a

3    communication involving Martin Shkreli or communications that

4    have to do with legal advice that would be going to Martin

5    Shkreli.

6            THE COURT:  But you know you still have a hurdle

7    under Nixon and Rule 17 to show that it's relevant.  Simply

8    because there is a communication on some other subject it

9    doesn't mean it's relevant to any of the charges or your

10   defenses.

11           MR. AGNIFILO:  That is true.  So and that's why --

12   there is two separate issues, your Honor.  I agree with your

13   Honor, we don't -- just because there is a privilege waiver

14   doesn't mean it's relevant for purposes of Nixon.  I think

15   that's right.  What we tried to do through our prioritizations

16   is address essentially both issues at the same time.  Because

17   the things that we believe are priorities are e-mails that

18   seem to directly relate to issues that are going to be part of

19   Government's case, the capitalization table for one; other

20   e-mails that I think that the Government is going to seek to

21   elicit, for another.  It's hard to speak in the abstract.

22           THE COURT:  You're not speaking in the abstract

23   because you've had the opportunity to review all of these

24   documents.  And what I would have hoped to have had from you

25   is a more specific indication as to why these documents are

Motion Hearing

1   documents that you need.  It seems to me that you painted with

2   a very broad brush saying anything relating to Mr. Shkreli's

3   communications with a lawyer should be produced because it's

4   waived.  And that's where I'm having trouble.

5          I think you're making a little more specific and

6   more articulate showing during the oral argument, but I would

7   say for the most part when you provided color coding for

8   priorities, I didn't get a sense that you had specifically

9   said, this e-mail is important because it's likely to be

10  exculpatory on the point of count whatever it is.  Just trying

11  to explain with more specificity why you need this document.

12         You could probably well imagine that as we have been

13  going through these documents on the privilege log, it's a

14  much harder task.  Because we, unlike the parties, the Court

15  is less familiar with all the players and the nitty gritty of

16  the transactions and the nuances that you might want to tease

17  out of these documents.

18         MR. AGNIFILO:  Can I make a suggestion?

19         THE COURT:  Yes.  But I want to look back, as you

20  know, last evening we did issue an order.  The reason for that

21  order was because our review, and we had gotten through a

22  fairly substantial portion, indicated that there were some

23  inconsistent redactions.  There might have been some

24  overbreadth in terms of wanting to withhold documents that in

25  our view weren't apparently involved in an attorney-client

Motion Hearing

1    communication.  It might have involved an attorney, but it

2    wasn't really for the purpose of seeking or giving legal

3    advice.  It just happened to be a discussion where one of the

4    attorneys was present and speaking with Mr. Shkreli or

5    exchanging e-mails with him.  And I didn't think, at least on

6    Retrophin's part, for some of these documents there had been

7    an adequate showing of privilege in all instances.

8            And the other issue we had, was that we were looking

9    at sometimes three or four versions of the same e-mail train.

10   And in some of those trains a specific e-mail or statement was

11   redacted; but in identical e-mail trains it wasn't redacted.

12   We don't want to look at duplicates, triplicates or even

13   quadruplicates of documents.  It's very difficult and

14   burdensome frankly.  Fortunately my clerks have been involved

15   in document productions, they are aware that there are

16   programs to de-dupe.

17           The reason for the order last night was to say,

18   let's make it easier for everybody by eliminating duplicates,

19   by making sure that your redactions are consistent through

20   your assertions.  And that you identify with better

21   specificity why you think it's privileged.  Because it's not

22   clear to us based on our read of the document that there is

23   anything legal about the nature of the conversations.

24           But, you've seen these documents unlike many

25   defendants in the cases, so you do have the ability to make a

Motion Hearing

1  better showing as to why these documents are important and

2  necessary or implicate Mr. Shkreli's constitutional rights.

3          MR. AGNIFILO:  What I was going to suggest, your

4  Honor, following on what your Honor wrote to us last night, we

5  would be very happy to try to make the Court's job somewhat

6  easier by being more specific document by document.  What I'm

7  wondering is, does it make the most sense to do what your

8  Honor asked in your Honor's order last night?  Meaning, let's

9  de-dupe it and get the number down.  And what I understood

10  your Honor to be asking from Retrophin, as well as this

11  morning, is to have clear showing of why certain things are

12  privileged.  What you're asking is essentially relevance.

13          And so maybe it makes sense to your Honor to set the

14  date of May 17.  If we could have the pare down list, I don't

15  know if it goes from 900 documents to 500 documents.

16          THE COURT:  We're guessing it's going to get that

17  low, we think so when you say 400, 500.

18          Because even you didn't consistently color-code some

19  of these documents.  It might have been a yellow, then orange,

20  then another place the same document was a red.  Because there

21  are duplicates, it's very hard to keep track.  I know these

22  programs could make it easier for everybody.

23          MR. AGNIFILO:  Right.  So what I was going to

24  suggest is, if Retrophin thinks it can meet your Honor's

25  deadline by the 17th, we could then maybe take, I don't know,

Motion Hearing

1    five days or a week to go within that universe of 500 or so

2    documents and say this is really what we need, this is really

3    what we don't need, and try to give a reason to your Honor and

4    to Retrophin.

5            THE COURT:  It also has to, as you know, if we're

6    going to look at Swidler and Judge Furman's discussion, you

7    have to demonstrate what touches on a constitutional right.

8    It has to rise to a need that would -- and I understand the

9    general concept that Mr. Shkreli has a right to present a

10   defense.  But particularly, if you think a document is

11   exculpatory or bears specifically on a defense that he wants

12   to make, I understand that he's making the advice-of-counsel

13   defense.  But it doesn't mean that every single communication

14   with a lawyer is going to be relevant to that defense.

15           MR. AGNIFILO:  I understand.  So what I think would

16   make -- the Court has a lot on its plate with all this, I

17   recognize.

18           THE COURT:  This isn't my only case.

19           MR. AGNIFILO:  I know.  And what I'm hoping --

20   because I think we're okay, I think we're okay with time.  I'm

21   glad we're doing this now rather than taking up a jury's time.

22           If Retrophin could do what it needs to do in a week.

23   If we can take another week and do exactly what your Honor is

24   asking, meaning this we think relates, this we think is

25   relevant because it puts another likely admitted e-mail from

Motion Hearing

1   the Government in context, which might be not as compelling a

2   reason as -- I'll discuss Swidler in a second, I'm surprised

3   quite frankly that that case is invoked.  I'll come back to

4   that in a minute.

5        THE COURT:  They do say there is no reason to treat

6   the attorney-client privilege differently in a civil or

7   criminal case.  But they also do say there may be instances

8   where the need in a criminal case raises constitutional

9   issues.

10       MR. AGNIFILO:  But what is interesting about Swidler

11  is there is a special prosecutor.  The prosecution is saying

12  criminal cases are, for lack of a better word, more important,

13  more compelling, than civil cases.  So then we, the

14  prosecution, we should get access to Vince Foster's lawyer's

15  notes.  There is no tie in to a criminal defendant's Sixth

16  Amendment right in Swidler.  The prosecution wants it.

17       What happened is Judge Furman picked up on it.  I

18  think for the general proposition, that criminal and civil

19  cases aren't on equal footing when it comes to the

20  attorney-client privilege, which may or may not be true.  But

21  what Judge Garaufis and Judge Furman recognize is that in

22  criminal cases the criminal defendant has a Sixth Amendment

23  right, which changes things.  What we'll try to do --

24       THE COURT:  You need to tie in Mr. Shkreli's right,

25  Sixth Amendment right, to present a defense to the specific

Motion Hearing

1    documents that you seek.

2            MR. AGNIFILO:  We'll do that.  What makes the most

3    sense, and hopefully makes everyone's life easier, we can pare

4    things down to five or 600. I think that Retrophin was

5    following our lead to a certain extent in de-duping or not

6    de-duping, there is no blame here.

7            THE COURT:  I'm not blaming anybody.  It was a

8    hellish process.

9            MR. AGNIFILO:  Thank you, your Honor said it.

10           So we can pare this down.  We'll do our part to

11   comply with the Sixth Amendment.  We'll give that list to your

12   Honor.

13           THE COURT:  I think you should work off the cleaned

14   up list that Retrophin hopefully can provide.  You shouldn't

15   work on what is there, because again, your priorities were

16   sometimes inconsistent.  I don't blame you for that, you can't

17   keep track mentally of what you've seen and what you want

18   redacted.

19           Should we hear from Retrophin, Mr. Schwartz?

20           MR. SCHWARTZ:  Good morning, your Honor.  Speaking

21   for my colleague Mr. Flath next to me, we agree this is a

22   hellish process.  I don't know from hell, but he does.

23           I have a few things I'd like to address, your Honor.

24   The first is this notion of general waiver.  While I know

25   you're not getting to that yet, I think it bears some

Rivka Teich CSR, RPR, RMR
Official Court Reporter

Motion Hearing

1      attention.  The argument that's made in Mr. Shkreli's papers

2      is essentially that we have waived, because we turned

3      documents over to the Government, and then somehow fit them

4      into subject matters post facto.  That's absolutely not true.

5              Your Honor has seen all the papers.  We turned

6      documents over.  We did not turn over privileged documents to

7      the Government.  We made a waiver.  We informed the Government

8      of the scope of the waiver and the specific subject matters

9      that were waived.  We were very careful to do it by subject

10     matter.

11             We then waited for the Government to litigate

12     Mr. Shkreli's claim of privilege before Judge Weinstein.  And

13     when Judge Weinstein ruled the first time -- so that's --

14             The notion of the general waiver because we somehow

15     were willy-nilly giving documents to the Government is

16     inaccurate.

17             The second argument that they make is this sword and

18     shield argument.  There was no sword and no shield.  We looked

19     at what the Government had asked us to look at, we waived.

20     Then when Mr. Shkreli came to us with subject matters that he

21     thought were relevant, we made exactly the same kind of

22     assessment that we made with respect to the Government's

23     request, and we waived with respect to ten separate subject

24     matters.  So we've treated both sides exactly the same here.

25             The issue now is, I think it's fair to say, that at

Motion Hearing

1    least the way we look at the case, every privileged

2    communication that is relevant to the charges in the case has

3    been waived and turned over through these 14 different subject

4    matters to the parties. We're now talking about documents

5    that fall, at least in our view, well outside the scope of

6    those subject matters and well outside the scope of what this

7    case is about.

8            THE COURT: I would agree with you. With all do

9    respect to Mr. Agnifilo, I don't believe that there is a

10   general waiver. If you look at the Treacy case, Judge

11   Rakoff's decision. First of all, there are no documents that

12   have been provided by Retrophin only to one party; all

13   documents have been provided to both parties. So it would be

14   unfair to say that they had withheld certain documents from

15   the defense, but only given them to the Government and they

16   are using the documents as a sword and shield.

17           And if there are such documents, you have not

18   identified them, the defense has not identified them. Nor has

19   the defense identified documents in the privilege log that are

20   of the same subject matter that would perhaps warrant

21   consideration under Rule 502(a) as an intentional waiver. And

22   are there still undisclosed documents that bear on the same

23   subject matter that should also be provided.

24           We're now seeing a lot of documents in the

25   privileged documents that could be said to bear on the

Motion Hearing

1   previously disclosed subject matters.  But if there are such

2   documents, certainly you should identify them.

3          MR. SCHWARTZ:  So your Honor, the second point I'd

4   like to discuss, I understand from your order that your Honor

5   may be undertaking some kind of balancing test about whether

6   he should get the documents or not get the documents.  We

7   think that both the Supreme Court and the Second Circuit have

8   been pretty clear that there shouldn't be a balancing test.

9          THE COURT:  Actually they talk about performing a

10  balancing test in weighing a Sixth Amendment right against any

11  other privilege but for the attorney-client privilege, they

12  discourage the balancing test.  So what is a Court left with?

13  I mean, I think that the rule itself says unless required by

14  the Constitution, privileges have to be acknowledged by the

15  Court, Rule 501 I think it is.  So what can Courts do except

16  balance?  I'm not in a position to balance right now.  I don't

17  think either party has made sufficient showings to me.

18         MR. SCHWARTZ:  I understand that, your Honor.  But

19  the argument that is being made here doesn't even go to

20  constitutional rights, it goes to relevance.  The one thing we

21  all know about privilege in every case is that privileged

22  documents -- in all criminal cases there are privileged

23  documents floating around that may be relevant.  Relevance is

24  not the touchstone of anything in this case.  It should not be

25  the touchstone for waiver of attorney-client privilege, even

Motion Hearing

1    if you follow the Weisberg case.  The touchstone is that it's

2    constitutionally compelling, that due process is at stake.

3    Not that the document may bear in some way on the issues

4    tried, but that the defendant is deprived of a fair trial if

5    he does not have access to that document.

6              THE COURT:  I think the defense knows that.  I think

7    he's committed to identifying those documents once you

8    provide.

9              MR. SCHWARTZ:  What I hear from Mr. Agnifilo, from

10   what he's talking, is relevance, relevance, relevance.  That's

11   not the standard that ought to be applied.  If any standard

12   should be applied here it should not be relevance.  The burden

13   on him I think at this point, if we can show that the

14   documents are privileged, is very high.  It is to show that

15   there is a constitutional and compelling reason that he will

16   be deprived of due process if the document is not turned over.

17   I think given knowing what I know about these documents, I

18   think that's a standard that he can't meet.  Obviously he's

19   going to try again.  But I would ask the Court when its

20   reviewing that, to keep that constitutional standard in mind.

21             THE COURT:  We certainly will.

22             Let me ask you, Counsel, is the May 17 date doable?

23             MR. SCHWARTZ:  Let me confer with my colleagues.

24             THE COURT:  My colleague clerks who have been in

25   your colleagues' shoes advised me it should be doable.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

Motion Hearing

1        MR. SHAPIRO:  I think if we're de-duping and sort of

2   reassembling the threads and e-mail chains that are subsets of

3   each other and ensuring each review, we can do that by the

4   17th.

5        THE COURT:  There is another piece, you have the

6   burden to establish that the document is privileged

7   attorney-client communication, and for some of the documents

8   it's just not clear why they are in there.

9        MR. SHAPIRO:  We will go back through every document

10  before the 17th, we can do that.  I think in so far as the

11  order encouraged us to provide more of a description, I think

12  that part becomes hard to do by the 17th.  Perhaps

13  Mr. Agnifilo doesn't need that, at least in the case of all

14  the documents where he already has the document.  So

15  everything else but that last part where we would be

16  supplementing all of the descriptions, is doable by the 17th.

17        I know that there are documents in here I think

18  which Mr. Agnifilo doesn't have because Mr. Shkreli was not a

19  party of the communication and didn't receive it under the

20  Court's prior orders.  We'll supplement those descriptions by

21  the 17th.

22        THE COURT:  Let me confer with my clerk for one

23  minute.

24        I understand that an associate tasked with doing the

25  doc review might have some difficulty, I'm not criticizing

Motion Hearing

1    whoever did this.  But my point is that there were some

2    documents where I think some review should have been made

3    about the designation about an attorney-client privilege

4    document.  The substance of the communications, at least as

5    far as I could tell, was not even remotely in the context of

6    giving or receiving legal advice.

7            I would give you a document number if I could, but

8    we -- I can do that now, maybe you can see my problem.  It's

9    BA0008930, that one was kind of a mystery to us.  Because

10   although it may have involved an attorney and the Retrophin

11   individual, it just wasn't on its face.

12           MR. SHAPIRO:  We'll address all of that.  I totally

13   get what you're saying.  One other point, because the way the

14   documents were produced by Katten, it wasn't possible to avail

15   ourselves of the electronic de-duping software.  We didn't not

16   avail ourselves of that.  We'll now be doing it manually; it's

17   not that big of a deal.  That's why we didn't do it in an

18   automated way, the way your clerks were describing to you.

19           THE COURT:  All right.  Well, maybe you can confer

20   with Katten and ask them to give you some format that would

21   allow it.

22           In any event, I think that if May 17th is a doable

23   date then what would the defense need in terms of time after

24   the 17th to revise its pitch for breach of the attorney-client

25   privilege?

Motion Hearing

1          MR. AGNIFILO:  I think the only wrinkle is, I guess

2     there are certain documents that we don't see, we get

3     descriptions of.  And so I don't know how you guys would do

4     it, it would be easier in time if you do those first, give

5     those to us.  I think we could turn it around in a week.

6          THE COURT:  All right.  I guess at the same time you

7     provide your revised description, you'll give me the documents

8     or identify those by Bates numbers as well so we'll start

9     looking at them.  Because, it's not always clear to us what

10    they have and what they haven't been able to review.

11         MR. SCHWARTZ:  Yes, your Honor.

12         THE COURT:  Okay.

13         MS. SMITH:  Your Honor, from the Government's

14    perspective, obviously we're not involved in the motion, but

15    we're in a very strange position for the Government.  Because

16    the documents went from Katten to Mr. Shkreli.  Then

17    Mr. Shkreli and Retrophin have been discussing what documents

18    are kind of now outside of the privilege.  We have received

19    from defense counsel all of the MSMB documents from Katten

20    where the privilege was waived.  We have not received from

21    defense counsel any Retrophin documents where the privilege

22    was waived.  We would request that when there is the universe

23    of documents from this production related to Retrophin over

24    which the privilege has been waived, that they be then

25    provided to the Government.  Because otherwise we're in a

Motion Hearing

1  position where they have non-privileged documents that they

2  are claiming are relevant to the case to use at trial that

3  they have not produced.

4          THE COURT:  So Retrophin did not give you those

5  documents?

6          MS. SMITH:  They haven't given us yet because we are

7  discussing the final scope.

8          MR. SHAPIRO:  The documents were provided from

9  Katten to Mr. Shkreli.  And then Mr. Shkreli asked us to waive

10 on certain subjects of documents.  But Mr. Shkreli already had

11 all of those documents, so whether Mr. Agnifilo produces them

12 to the Government or we do, we'll work that out.

13         MS. SMITH:  I just wanted to put that on the record.

14         THE COURT:  Thank you.  It was a little strange to

15 serve a subpoena not on Retrophin, but on its former counsel.

16 I know that was done in the Treacy case, but it seems usually

17 you serve the subpoena on the party whom you're seeking

18 documents because they are at a disadvantage when you hit the

19 attorney for the client's documents, just going forward.

20         All right.  Are you going come back for oral

21 argument or once we get squared away move forward on the

22 submissions?

23         MR. SCHWARTZ:  I think at this point, your Honor,

24 why don't we wait and see what everybody submits, then we can

25 let the court know.

Motion Hearing

1           THE COURT:  All right.

2           MR. AGNIFILO:  We're going to try to agree.  I'd

3    rather -- we have bigger battles to fight -- we do, they

4    don't -- in the future.  I'd rather save my powder for those.

5    We'll talk in good faith, as we have, with Retrophin.

6           THE COURT:  All right.  I do appreciate Retrophin's

7    counsel and Retrophin itself in trying to be reasonable and

8    working despite a reasonable view that it could be all of

9    this, but none the less.

10          MR. AGNIFILO:  We don't think so.

11          THE COURT:  I understand.

12          MR. AGNIFILO:  Before we break, at the last court

13   date I requested -- and just in fairness, your Honor didn't

14   rule one way or the other -- that the Government provide us

15   with the subpoenas that are provided to Retrophin.  What they

16   did is they submitted a letter that had I guess the contents

17   of the subpoenas but not the subpoenas.  And the subpoenas

18   themselves are relevant because I think it's relevant to see

19   what they ask for at different times.  What they got at

20   different times.  And so I would just renew that request.

21          MS. SMITH:  Your Honor, the Government doesn't

22   publicly file subpoenas, Grand Jury subpoenas.

23          THE COURT:  They were all Grand Jury?

24          MS. SMITH:  They were all Grand Jury subpoenas.

25   That's why we provided the request and the attachments rather

Motion Hearing

1    than the physical subpoenas.  We're happy to advise defense

2    counsels which dates the various requests were on.

3             MR. AGNIFILO:  I guess what confuses me, there is a

4    subpoena issued four months ago.  There is no Grand Jury

5    sitting four months ago.  I don't understand that part of it.

6             MS. SMITH:  The investigation is ongoing.  And there

7    are other individuals and other issues related to this, even

8    though this particular case with this particular piece of it,

9    this is not the only individual that's connected to this that

10   the Government is still looking at for related issues.

11            MR. AGNIFILO:  One of the concerns I have there,

12   Judge is, as is black letter law, you can't use Grand Jury

13   subpoenas to prepare for trial.  And I'm not besmirching the

14   good faith of the Government, but if the Grand Jury subpoena

15   is issued in January I think it raises the issue of what are

16   they asking for?  What are they investigating?  Is that a good

17   faith use of a Grand Jury subpoena?

18            It's odd.  At this point the superseding indictment

19   had been returned.  A trial was five months away, and there is

20   a Grand Jury subpoena.  It raises a lot of questions.

21            THE COURT:  Well, I trust the Government understands

22   what is proper and what is not.  And they will not be using

23   any documents yielded from the January Grand Jury subpoena in

24   this case.

25            MS. SMITH:  Your Honor, we provided all of those

Motion Hearing

1    documents to the defense.  Most recent subpoenas were actually

2    related to arbitration documents.  I think those are the last

3    few requests that came out, some of which defense counsel

4    already has.

5         Like I said, Mr. Shkreli is not the only person that

6    was looked at in connection with this investigation.  There

7    are ancillary issues.  Certainly to the extent that the

8    documents are relevant for this case, we would be using them.

9    But I think most of the documents are actually just kind of in

10   connection with this particular case, as opposed to the other

11   investigation that might be ongoing or filling in gaps.

12   Frankly, defense itself has asked for documents related to,

13   but that's where we are.

14        MR. AGNIFILO:  I think it's all more important to

15   try to get the subpoenas.  We don't know, there may be a basis

16   legally to challenge the admissibility of any evidence that

17   was gained as a result of the January Grand Jury subpoena.  We

18   don't know what that is.  So I think it's relevant.  And I

19   think it's more relevant than even before we knew this was a

20   Grand Jury subpoena that we get the subpoenas.  We can do it

21   on a protected order, give them to us and not file them

22   publicly.  We'll be happy to agree to such an order to

23   safeguard whatever.  It's a subpoena, so it's not a private

24   document.  It was given to Retrophin.  I don't know what they

25   are trying to protect.  I'm willing to sign a confidentiality

Motion Hearing

1    order.

2            I think it's important that we understand what

3    documents were gathered by what subpoena, especially if a

4    Grand Jury subpoena is being used four months ago.

5            THE COURT:  Well, what is your response, Ms. Smith?

6            MS. SMITH:  We're happy to provide them.  We're not

7    going to file them publicly, which is why we put the request

8    on because obviously those, the face of the subpoena should

9    not be filed publicly.  The most recent one involved the

10   Rosenfeld arbitration, which Mr. Agnifilo has asked for

11   documents on.  I'm not sure what he's talking about in terms

12   of sub-protection.  We can reissue the trial subpoena for the

13   same documents if Mr. Agnifilo would like us to do that.  We

14   will provide the dates and kind of give them that information.

15           MR. AGNIFILO:  I appreciate that.

16           THE COURT:  Is there in anything else?

17           MR. AGNIFILO:  No.  I guess, I'm not sure if we left

18   it what makes the most sense.  We'll get a week, then we'll

19   let your Honor know if we need oral argument?

20           THE COURT:  Seven days after the 17th which brings

21   us to the 24th.

22           MS. ZELLAN:  Your Honor, on a separate issue we've

23   been in discussion with the Government with respect to voir

24   dire.  I think that we have a proposal for the Court to

25   consider with respect to a jury questionnaire.  We can submit

Motion Hearing

1  that either today after court or later, or we could describe

2  it in more detail now, if your Honor would like.

3         THE COURT:  Well, I think I'd like to see it in

4  writing first.  We've asked for 120 jurors, is that enough?

5  Look, we have to pay these people and we have to make sure we

6  use them adequately.  I know in the process of questionnaires

7  we knock out people automatically for whatever reason they

8  cannot sit for the trial.  What I've done in the past is when

9  there are questionnaires we set a date in advance for the

10  jurors to fill them out, then set a short time frame for the

11  parties to confer which of those jurors they agree should be

12  excused for cause or hardship or whatever reason.  And then

13  hopefully we have enough left to do a jury selection.  I'm

14  contemplating four alternates, is that enough?

15         MR. AGNIFILO:  Here's is my question, if we run out

16  what do we do then?  We have to wait two weeks?

17         THE COURT:  No, we borrow from another jury pool.

18  There will be jurors from other trials called in.  Jurors will

19  be randomly selected as to the which will be the 120 to fill

20  out the questionnaires.  If we need more people, we'll pull

21  those who have been excused.

22         MR. AGNIFILO:  I think that's fine.  I think with

23  the summer we're going to hit vacation plans and whatnot.

24  People don't expect four-week trials.  I think that's fine.

25         THE COURT:  Yes.  We found jurors for six-week

Motion Hearing

1    trials in the summer in the past.  I think we can do it again.

2              All right.  Thank you.  I'll get your agreed-upon

3    voir dire for the questionnaire only.

4              MS. ZELLAN:  Yes, the questionnaire only.  We agreed

5    on certain other questions that we asked your Honor to include

6    in your questioning of the perspective jurors.  We'll submit

7    those as well.

8              THE COURT:  All right.  Thank you.  Have a nice day.

9              (Whereupon, the matter was adjourned.)

10

11                    *     *     *     *     *

12

13

14   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

15

16   Rivka Teich, CSR RPR RMR
     Official Court Reporter

17

18

19

20

21

22

23

24

25