```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

UNITED STATES OF AMERICA,
                                              MEMORANDUM AND ORDER
        - against -

MARTIN SHKRELI,                               15-CR-637 (KAM)

                Defendant.

----------------------------------------X
```

**MATSUMOTO, United States District Judge:**

The court assumes familiarity with the facts of this case, which commences on June 26, 2017. Before the court is a request from the Eastern District of New York press pool ("EDNY press pool") to "allow having one pool reporter attend individual *voir dire* of potential jurors at sidebar" to listen and take notes. (Letter from EDNY Press Pool, ECF No. 256.) Neither the government nor Mr. Shkreli initiated a request for closed sidebar, but responded to the court's order to provide their views. The parties have submitted letters on this issue. (Letter in response to request from EDNY press pool ("Gov. Letter"), ECF No. 253; Letter in response to request from EDNY press pool ("Def. Letter"), ECF No. 254.)

At oral argument on June 22, 2017, the court heard arguments from the EDNY press pool through a legal

representative jointly retained by several news organizations, and also heard arguments by the parties.

The defense, citing "unparalleled negative press statements" about Mr. Shkreli, has "vigorously oppose[d]" the presence of a reporter at sidebar, arguing that his Sixth Amendment right to a fair trial will be denied if potential jurors cannot speak freely at sidebar to disclose possible bias without fear that their comments will be reported publicly. (Def. Letter at 1.) The government does not object to having a reporter present at sidebar, but has asked that juror names be withheld by referring to them only by number during the course of the trial. (Gov. Letter at 2-3 (citing *United States v. Blagojevich*, 743 F. Supp. 2d 794, 801 (N.D. Il. 2010)).

For the reasons set forth below, the court grants the press pool request in part. The *voir dire* will be conducted in a public courtroom and the court will conduct the *voir dire* without the necessity of a questionnaire. Although the parties submitted joint questions for use in a potential questionnaire, the court will ask the questions orally. A press pool reporter may be present during *voir dire* sidebars, but the court may, in its discretion, excuse the reporter from portions of the *voir dire* if a juror so requests or if the court determines that the presence of

2

the pool reporter will inhibit a potential juror's candor. Counsel for the EDNY press pool has represented that jurors' names and their private, personal information will not be disclosed. The court and the parties will not refer to jurors by name, but instead will use the numbers randomly assigned by the jury clerk throughout the trial, and the list of jurors will not be released until the end of trial. The press will be provided the opportunity to access the sidebar transcript.

**Introduction**

The EDNY press pool request for access to sidebars during *voir dire* raises important issues concerning the First Amendment right to openness of judicial proceedings and the defendant's Sixth Amendment right to a fair trial. These rights are not necessarily in conflict. The Supreme Court has repeatedly recognized that one "important means of assuring a fair trial is that the process be open to neutral observers." *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 7 (1986) ("*Press-Enterprise II*"). As the Second Circuit has noted, "except in rare circumstances, openness preserves, indeed, is essential to, the realization of [the right of the accused to a fair trial] and to public confidence in the administration of justice." *ABC, Inc. v. Stewart*, 360 F.3d

3

90, 105-06 (2d Cir. 2004).  The presence of the press at trials not only "makes some contribution to the fairness of trials and the perception that justice is done," *United States v. King*, 150 F.3d 76, 83 (2d Cir. 1998) (citing *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 508-10 (1984) ("*Press-Enterprise I*")), but also helps educate the public on the judicial process.  Press coverage of *voir dire*, no less than coverage of opening statements or the cross examination of a key witness, contributes to the fairness of trials.

Nevertheless, the purpose of *voir dire* is to ensure that both parties at trial may meaningfully participate in selecting an unbiased jury that will fairly and impartially hear the evidence and reach their verdict after careful deliberation and on consideration of the evidence.  The court recognizes that, irrespective of length, trials demand much of jurors:  time away from jobs and families; long days demanding unwavering concentration on the evidence presented; potentially lengthy and contentious deliberations; and complex and sometimes unsettling questions of fact.  Despite the best efforts of the court and the parties, *voir dire* itself can be a uniquely uncomfortable experience.  There are few circumstances other than jury selection in which a citizen

4

is called into court, placed under oath, and required to candidly and truthfully answer questions about sensitive personal issues or controversial beliefs or biases.  In most cases, a juror's disclosures are entered into the court transcript and unnoticed by the public, at most only aired on appeal.  In a high-profile case in which there has been ongoing pre-trial media coverage, however, prospective jurors may be subject to having their answers reported and disseminated that same day.  *See King*, 140 F.3d at 83.  A fair and thorough *voir dire* is critical in every case to assure the parties and the public that an impartial jury will perform its solemn duty to decide the facts in dispute, impartially and without prejudice, bias, or sympathy, based solely on the trial evidence and instructions on the law.

**Legal Standard**

In *Press-Enterprise I*, a case involving press access to *voir dire*, the United States Supreme Court made clear that "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Press-Enterprise I*, 464 U.S. at 510 (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982)).  The court must

5

articulate the interest to be protected by the closure and must also issue specific findings. *Id*. Where the overriding interest to be protected is the defendant's right to a fair trial, the court must make specific findings that "there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Stewart*, 360 F.3d at 98-99. The Second Circuit has explained that the party seeking to restrict press access bears a "heavy" burden. *Id.* at 106.

Two Second Circuit cases also provide important guidance. At issue in *United States v. King* was the district court's closure of *voir dire* because "of the substantial amount of publicity, frequently negative, that [the defendant] has attracted and continues to attract, and the fact that he is black." 1998 WL 50221 at *1 (S.D.N.Y. Feb. 5, 1998)), *aff'd* 140 F.3d 76 (2d Cir. 1998). The Second Circuit affirmed, concluding that the *King* case was the "unusual case where the fairness of a trial, or at least the *voir dire* phase, that is usually promoted by public access is seriously at risk of being impaired unless some modest limitation on access is imposed." 140 F.3d at

6

83. The Second Circuit noted that in considering the effect of the presence of a reporter during *voir dire* sidebars, the district court was concerned both with protecting from public disclosure the private, sensitive and personal matters of jurors, as well as the defendant's right to a fair trial by enabling jurors to be fully candid about potential racial bias.  *Id.* at 82-83.

In contrast, in *United States v. Stewart,* the Second Circuit vacated a district court's order denying press access to *voir dire*, which was conducted entirely in the judge's robing room.  The Second Circuit noted that "it was the government, and not the defendant, who first requested closure."  *Stewart*, 360 F.3d at 102.[1]  The Second Circuit then highlighted three reasons that counseled against closure in the *Stewart* case.  First, "[t]he district court . . . did not demonstrate a substantial probability that, absent closure, members of the media would have either disrupted the proceedings or disclosed information that the court had prohibited them from revealing."  *Id.* at 101.  Second, the court noted that the fact that "many venirepersons were likely to have prejudged" the defendant was insufficient grounds for

---

[1] In contrast, although neither party requested closure, Mr. Shkreli "vigorously oppose[s]" the press request in this case.  (Def. Letter at 1.)

7

closure, because "prospective jurors are likely to have preconceptions about the defendants in almost every criminal case that attracts attention."  *Id*.  Third, "the district court did not point to any controversial issue to be probed in *voir dire* that might have impaired the candor of prospective jurors."  The Second Circuit also found that there were alternative, more narrowly tailored methods of ensuring juror candor than complete closure of *voir dire*, such as "concealing the identities of the prospective jurors" or a "partial closure," in which the media would be permitted to access "limited portions of the *voir dire* examinations."  *Id.* at 105.

## Analysis

### A. Mr. Shkreli's Right to a Fair Trial is an Overriding Interest

The court concludes that Mr. Shkreli's right to a fair trial is an overriding interest in this case, and is to a limited degree in opposition to the EDNY press pool's request to have a representative present for the entirety of *voir dire*.  Like the district judge in *King*, this court finds "(1) that candor on the part of prospective jurors is of particularly great importance in this case, and (2) that, absent a degree of juror privacy, such candor is likely to be restricted."  *United States v. King*, 140 F.3d at 79

8

(citing 1998 WL 50221 at *2) (internal quotation marks omitted).

Juror candor is, of course, of critical importance in all cases, and the fact that prospective jurors may have preconceptions about a defendant is not sufficient, in itself, for restricting press access to *voir dire*. *See Stewart*, 360 F.3d at 101. Four related factors, however, counsel in favor of the limited restrictions ordered by this court, specifically that the sidebar reporter must step away from the sidebar if requested, and that names of the venire panel will not be used or released by the court until the conclusion of trial.

First, the defendant has attracted a tremendous amount of negative publicity and notoriety. Indeed, Mr. Shkreli's co-defendant was so concerned about negative press coverage regarding Mr. Shkreli, and about Mr. Shkreli's prior statements, that he filed an extensive appendix of such articles and statements in connection with the defendants' motions for severance. (*See* ECF No. 162.) It is certainly true – as it was for the defendant in *King* – that Mr. Shkreli "has been for a long time . . . the subject of a very substantial amount of publicity, a large proportion of which is negative (although some is positive)." *United States v. King*, No. 94 CR. 455 (LMM),

9

1998 WL 50221, at *6.  Like Mr. King, Mr. Shkreli is also "an extremely controversial person."  *See id.*  He has been described in the media as the "personification of US corporate greed" (ECF No. 162-2 at 28)[2] and as "the most hated man in America" (ECF No. 162-1 at p. 175).  The extent and volume of sensational media coverage risk not only Mr. Shkreli's right to a fair trial, but also the government's ability to present its case to an impartial jury.  Indeed, the defendant himself has publicly joked that he is "spending millions to influence the jury pool in Brooklyn," (ECF No. 162-1 at p. 95) and has speculated that his notoriety, and not the facts of this case, may play a role in convincing jurors to acquit him (ECF No. 162-2 at p. 29).

Second, as in *King*, negative media coverage in this case is related to issues that are wholly irrelevant to the charges, which will not be discussed by either side at trial.  *See King*, 1998 WL 50221, at *6 ("Some of the publicity of which [defendant] has been the subject . . . refers to supposed conduct on his part which, even if factual, is both inadmissible in evidence and highly prejudicial.").  Mr. Shkreli is charged with conspiring to commit securities fraud and wire fraud.  His

---

[2] Page references cited herein refer to the page numbers assigned by the court's ECF system.

notoriety, however, arises from entirely unrelated issues, such as his criticism of specific political candidates, reporters, entertainers, and other individuals. (*See, e.g.*, ECF Nos. 162-1 at pp. 201; 162-3 at pp. 8, 52.) He has also gained notoriety for actions relating to pharmaceutical pricing. Thus, unlike other high profile cases in which the defendant is notorious because of the nature of the charges against him and may challenge the evidence at trial, the defense in this case will not have the opportunity to confront any preconceived notions prospective jurors may have about Mr. Shkreli's public stances on unrelated controversial issues, except through vigorous *voir dire* demanding utmost juror candor.

Third, as in *King*, certain of the issues to be probed at *voir dire* relate to beliefs and actions publicly attributed to Mr. Shkreli concerning polarizing topics, such as race, gender, politics, and class. (*See, e.g.*, ECF Nos. 162-2 at p. 28; 162-3 at pp. 95, 108.) The accuracy of media reports regarding Mr. Shkreli's beliefs and actions and the merit of whatever views Mr. Shkreli may hold are not appropriate considerations for jurors. Mr. Shkreli's extensive expression of views on social media and in the press concern controversial matters that are irrelevant to this case. Yet, the court must ensure that

11

prospective jurors who may have perceptions about Mr. Shkreli's views on these irrelevant subjects are encouraged, and not inhibited, from candidly disclosing their own views, which may reflect bias or an inability to be impartial. To that end, Mr. Shkreli has waived his right to be present at sidebars during voir dire (Def. Letter at 3 n.4), again distinguishing this case from *Stewart*, 360 F.3d at 101. Although the court expects that potential jurors will do their duty and will obey instructions of the court, even the most dutiful venireperson may find it difficult to be entirely forthright about controversial or private issues in the presence of a press reporter.

Fourth, because the *voir dire* transcript will be released to the press, disclosure of juror names would increase the risk that jurors would not be candid, whether or not a reporter is present during the *voir dire* questioning of that prospective juror. Knowledge that their names might be released along with their responses may cause jurors to modify their responses to avoid topics that are either personal or contentious. In addition, releasing juror names poses a significant risk of disruption of the trial process. Although the court trusts in the professionalism of the EDNY press corps, disclosure of juror names would not be limited only to professional

12

press, and other individuals may take advantage of this information in an inappropriate and damaging manner. This risk is heightened in the instant case because of the defendant's controversial and high-profile social and traditional media presence. (*See, e.g.*, ECF Nos. 162-1 at pp. 37, 43, 147, 206; 162-3 at pp. 2, 106.) Mr. Shkreli has many social media "followers," who in the past have been accused by critics of harassing those who are perceived to have criticized him. (*See, e.g.*, ECF No. 162-1 at pp. 176-77; 162-3 at pp. 12, 15.)

### B. Narrow Tailoring

The court's restrictions on press access must be narrowly tailored to ensure juror candor, without infringing on the public's First Amendment interest in open trials.

**1. A reporter will be permitted at sidebar.**

As a general practice, the court conducts *voir dire* in an open public courtroom. For certain case-specific questions, however, the court asks prospective jurors to explain their answers at sidebar, outside of the hearing of the venire. This approach enables the court to fully examine prospective jurors without risk that the rest of the venire will be tainted or adversely influenced by information that would be highly prejudicial and

13

inadmissible at trial.  *See Skilling v. United States*, 561 U.S. 358, 389 (describing with approval the district court's individual examination of "each prospective juror" to "prevent[] the spread of any prejudicial information to other venire members").  As is the court's normal practice, sidebar conversation will not be made audible to observers, but it will be conducted in public, and will be transcribed.

Given the interests to be protected at sidebar, including juror privacy, protection of the defendant's trial right to fully examine the juror, and the prevention of juror taint, the court concludes that the presence of an EDNY pool reporter at sidebar will not generally inhibit juror candor.  The Second Circuit has noted that in certain circumstances, courts should not "expect [prospective jurors] to acknowledge in public that their own candor will be inhibited by questioning in public."  *King*, 140 F.3d at 82.  The court will ensure that prospective jurors are comfortable requesting that the reporter be excused from sidebar, and will also excuse the reporter if the court determines that a juror does not appear comfortable

14

answering questions fully and honestly in the presence of the reporter.[3]

## 2. The partial closure of sidebar will not significantly limit the press's ability to report on *voir dire*.

The court may temporarily excuse the pool reporter when a juror so requests or when the court determines that the reporter's presence is inhibiting a juror's willingness to speak frankly on controversial or personal issues. Reporters in the gallery or in the overflow space will, however, be able to observe *voir dire*, which will be conducted in an open public courtroom, and will be able to observe, though not to hear, the *voir dire* conducted at sidebar. In contrast, in *Stewart*, the district court conducted all of *voir dire* in a robing room, from which both the press and the public were excluded. *Stewart*, 360 F.3d at 95. The manner of "partial closure" to be used by this court is similar to the procedure specifically contemplated by the Second Circuit in its review of the district court's order in *Stewart*, *id.* at 105, and affords the press greater access than in the *King* case, in which individual follow-up questioning of prospective jurors was conducted outside the presence of

---

[3] The court will also excuse the pool reporter, if a prospective juror so requests in order to provide a more fulsome, candid answer, when questioning may elicit issues of a personal or private nature. *See Press-Enterprise I*, 464 U.S. at 512; *Stewart*, 360 F.3d at 105 n.5.

15

the public and the press.  *King*, 140 F.3d at 80.  In addition, the press may receive transcripts of juror sidebars in this case, including portions for which the reporter was excused.  The Second Circuit has cautioned that a transcript is "not a substitute for concurrent access" (*Stewart*, 360 F.3d at 99, quoting *United States v. Antar*, 38 F.3d 1348, 1360 n.3 (3d Cir. 1994)), but in this case, as proposed by counsel for the EDNY press pool, the press pool will also rely on the notes of a single pool reporter, who will be present at sidebar.

## Conclusion

As the Second Circuit has reminded us, "[n]o right is more sacred in our constitutional firmament than that of the accused to a fair trial." *Id.* at 105.  Although openness of proceedings often serves to preserve that sacred right, *see id.*, in this instance, complete openness is likely to inhibit jurors from disclosing their opinions of the defendant's public persona as it relates to unpopular viewpoints or controversial issues.  The court therefore **ORDERS** the narrow restrictions described below to safeguard the defendant's right to a fair trial:

1. The parties shall not use juror names during *voir dire* or during trial.

2. A single pool reporter may attend *voir dire* sidebars to observe and take notes. The reporter may not speak or ask questions. The reporter must leave the sidebar area if the court so orders.

3. The press may request transcripts of the *voir dire* sidebars. The only information that will be redacted will be information that is highly personal and that appears in a context in which it would be possible to identify the venireperson.

4. Within the United States Courthouse for the Eastern District of New York, the press, including representatives of the print and broadcast media, sketch artists, photographers, free-lance journalists, authors, and writers, shall not sketch or photograph any juror or prospective juror.

5. This order will be sent via e-mail to counsel for the EDNY press pool.

**SO ORDERED.**

Dated: June 25, 2017
      Brooklyn, New York

                                    /s/
                            KIYO A. MATSUMOTO
                            United States District Judge
                            Eastern District of New York

17