# EXHIBIT A

1759

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,      : 15-CR-00637(KAM)
4                              :
                               :
5                              :
        -against-             : United States Courthouse
6                              : Brooklyn, New York
                               :
7                              :
                               : Thursday, July 6, 2017
8  MARTIN SHKRELI,             : 9:00 a.m.
                               :
9          Defendant.          :
                               :
10 - - - - - - - - - - - - - - X

11          TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE KIYO A. MATSUMOTO
12          UNITED STATES DISTRICT JUDGE, and a jury

13                A P P E A R A N C E S:

14 For the Government:   BRIDGET M. ROHDE, ESQ.
                         Acting United States Attorney
15                       Eastern District of New York
                         271 Cadman Plaza East
16                       Brooklyn, New York 11201
                   BY:   JACQUELYN M. KASULIS, ESQ.
17                       ALIXANDRA ELEIS SMITH, ESQ.
                         G. KARTHIK SRINIVASAN, ESQ.
18                       Assistant United States Attorneys

19 For the Defendant:    BRAFMAN & ASSOCIATES, P.C.
                         767 Third Avenue
20                       New York, New York 10017
                   BY:   BENJAMIN BRAFMAN, ESQ.
21                       MARC AGNIFILO, ESQ.
                         ANDREA ZELLAN, ESQ.
22                       JACOB KAPLAN, ESQ.

23 Court Reporter:   Stacy A. Mace, RMR, CRR
                     Official Court Reporter
24                   E-mail:  SMaceRPR@gmail.com

25 Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

                SAM     OCR     RMR     CRR     RPR

Rosenwald - direct - Srinivasan                    1944

1    A    I assume so.

2    Q    If MSMB Capital did not have an auditor, would that have

3    affected your investing decision?

4    A    Sure.

5            MR. AGNIFILO:  Object to the form of the question.

6    The hypothetical.  If something, then would that affect.  I

7    know what he's trying to get at.  I'm not trying to get in the

8    way.

9            THE COURT:  I am overruling the objection.

10           You may answer the question, sir.  Do you need it

11   read back?

12           THE WITNESS:  Yes, please.

13           MR. SRINIVASAN:  I can rust re-ask the question.

14   Q    If MSMB Capital did not have an auditor, would that have

15   affected your investing decision?

16   A    Sure.

17   Q    How?

18   A    I probably would not have made the investment.

19           MR. SRINIVASAN:  Now, let's go to Page 35 of the

20   .pdf, so that's Bates Number LR00078, 20 pages from where you

21   are right now.

22   Q    Do you see the paragraph that starts:  Attorneys?

23   A    Yes.

24           MR. SRINIVASAN:  If we can zoom in, Ms. Balbin, on

25   the paragraph that starts:  Attorneys.

2070

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
   - - - - - - - - - - - - - - X
 3
   UNITED STATES OF AMERICA,       : 15-CR-00637(KAM)
 4                                  :
                                    :
 5                                  :
           -against-                : United States Courthouse
 6                                  : Brooklyn, New York
                                    :
 7                                  :
                                    : Friday, July 7, 2017
 8   MARTIN SHKRELI,                : 9:00 a.m.
                                    :
 9           Defendant.             :
                                    :
10   - - - - - - - - - - - - - - X

11            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
             BEFORE THE HONORABLE KIYO A. MATSUMOTO
12           UNITED STATES DISTRICT JUDGE, and a jury

13                  A P P E A R A N C E S :

14   For the Government:   BRIDGET M. ROHDE, ESQ.
                           Acting United States Attorney
15                         Eastern District of New York
                           271 Cadman Plaza East
16                         Brooklyn, New York 11201
                      BY:  JACQUELYN M. KASULIS, ESQ.
17                         ALIXANDRA ELEIS SMITH, ESQ.
                           G. KARTHIK SRINIVASAN, ESQ.
18                         Assistant United States Attorneys

19   For the Defendant:    BRAFMAN & ASSOCIATES, P.C.
                           767 Third Avenue
20                         New York, New York 10017
                      BY:  BENJAMIN BRAFMAN, ESQ.
21                         MARC AGNIFILO, ESQ.
                           ANDREA ZELLAN, ESQ.
22                         JACOB KAPLAN, ESQ.

23   Court Reporter:  Stacy A. Mace, RMR, CRR
                      Official Court Reporter
24                    E-mail:  SMaceRPR@gmail.com

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

SAM      OCR      RMR      CRR      RPR

1   A    Yeah.  It was presented to me originally that I would be

2   able to get my money back within one month if I gave them a

3   head's up one month in advance.

4   Q    And was this important to your investment decision?

5   A    Yes.

6   Q    Would you still have invested in MSMB Healthcare if you

7   couldn't get your money out in a month's time?

8   A    No.  No, because, generally speaking, I have very little

9   cash, so when a project comes up, I need to be able to have

10  money on hand.

11  Q    Before you invested in MSMB Healthcare, did you learn

12  anything about any hedge funds that Martin Shkreli had run

13  before MSMB Healthcare?

14  A    At that time, no.

15  Q    Did the name Elea Capital ever come up in your

16  conversations about MSMB Healthcare?

17  A    Not that I remember.

18  Q    If Mr. Shkreli had a prior hedge fund that had performed

19  poorly, would that have been important for you to know at the

20  time you were making your investment in MSMB Healthcare?

21            MR. BRAFMAN:  Objection, Your Honor.

22            THE COURT:  Overruled.  You can answer the question.

23  A    Yes, of course, it would affect my opinion and judgment.

24  Q    Mr. Kocher, did you sign any documents in connection with

25  your investment?

1   A    Yes.

2   Q    What did you sign?

3   A    A subscription agreement.

4   Q    I am going to show you what has been marked for

5   identification as Government Exhibit 33.  Mr. Kocher, you have

6   two binders in front of you.  There is a larger one and a

7   smaller one.  If you could pull out the larger one for now,

8   and it is tab 33.  I'm sorry, tab 35 in your binder.

9           Do you recognize this document?

10  A    Yes.  This is the subscription agreement.

11  Q    For what entity?

12  A    This is MSMB Healthcare, L.P.

13  Q    Is this your subscription agreement?

14  A    I believe it is.

15          MR. SRINIVASAN:  Your Honor, we move to admit

16  Government Exhibit 33.

17          MR. AGNIFILO:  No objection.

18          THE COURT:  We will admit Government Exhibit 33.

19          (Government's Exhibit 33 was received in evidence.)

20  Q    Now, Mr. Kocher, if we can go to the last page of this

21  document, Bates stamp number R-011888.  I think that is page

22  12, the PDF.

23  A    Yes.  Page 11, actually.

24  Q    Did you sign this document?

25  A    Yes, I did.

2339

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        15-CR-00637(KAM)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4           Plaintiff,                  Brooklyn, New York

5           -against-                   July 10, 2017
                                        9:00 a.m.
6   MARTIN SHKRELI,

7           Defendant.

8   ------------------------------x

9           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE KIYO A. MATSUMOTO
10               UNITED STATES DISTRICT JUDGE
                      BEFORE A JURY
11
    APPEARANCES
12
    For the Government:        BRIDGET M. ROHDE, ESQ.
13                             Acting United States Attorney
                               Eastern District of New York
14                             271 Cadman Plaza East
                               Brooklyn, New York 11201
15                             BY:  JACQUELYN M. KASULIS, ESQ.
                               BY:  ALIXANDRA ELEIS SMITH, ESQ.
16                             BY:  G. KARTHIK SRINIVASAN, ESQ.
                               Assistant United States Attorneys
17

18  For the Defendant:         BRAFMAN & ASSOCIATES, P.C.
19                             767 Third Avenue
                               New York, New York 10017
                               BY:  BENJAMIN BRAFMAN, ESQ.
20                             BY:  MARC AGNIFILO, ESQ.
                               BY:  ANDREA ZELLAN, ESQ.
21                             BY:  JACOB KAPLAN, ESQ.

22
    Court Reporter:            Rivka Teich, CSR, RPR, RMR
23                             Phone:  718-613-2268
                               Email:  RivkaTeich@gmail.com
24
    Proceedings recorded by mechanical stenography.  Transcript
25  produced by computer-aided transcription.

                    Rivka Teich CSR, RPR, RMR
                      Official Court Reporter

2437

MARSHALL — DIRECT — MR. SRINIVASAN

1    approved by the FDA.  So a lot of instances depended on FDA

2    decision, which could be positive or negative.

3    Q    At this point, in about December 2014, had the name Elea

4    Capital came up with your discussion with the defendant?

5    A    No.

6    Q    If the defendant had run a prior hedge fund that had

7    performed poorly, would that have been important for you to

8    know when you make your investment?

9            MR. BRAFMAN:  Objection, your Honor.

10           THE COURT:  I'll overrule the objection.

11   A    Yes, it would have.

12   Q    How so?

13   A    Well, you want to look at the entire track record of the

14   person who is making the security selection.  So if he had a

15   bad run, negative result, in it a prior hedge fund, that would

16   have certainly been something I would have taken into account.

17   Q    You also mentioned that you received a subscription

18   agreement; is that right?

19   A    Yes.

20   Q    I'm showing you what is marked for identification as

21   Government's Exhibit 25, which is tab 16 in your binder.

22   A    Yes, I have it.

23   Q    What is this document?

24   A    It's first a questionnaire, which you have to fill out to

25   show that you're qualified investor for this sort of

2339

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   -------------------------------x
                                         15-CR-00637(KAM)
 3   UNITED STATES OF AMERICA,
                                         United States Courthouse
 4            Plaintiff,                 Brooklyn, New York

 5            -against-                  July 10, 2017
                                         9:00 a.m.
 6   MARTIN SHKRELI,

 7            Defendant.

 8   -------------------------------x

 9           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE KIYO A. MATSUMOTO
10               UNITED STATES DISTRICT JUDGE
                      BEFORE A JURY
11
     APPEARANCES
12
     For the Government:        BRIDGET M. ROHDE, ESQ.
13                              Acting United States Attorney
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  JACQUELYN M. KASULIS, ESQ.
                                BY:  ALIXANDRA ELEIS SMITH, ESQ.
16                              BY:  G. KARTHIK SRINIVASAN, ESQ.
                                Assistant United States Attorneys
17

18   For the Defendant:        BRAFMAN & ASSOCIATES, P.C.
19                              767 Third Avenue
                                New York, New York 10017
                                BY:  BENJAMIN BRAFMAN, ESQ.
20                              BY:  MARC AGNIFILO, ESQ.
                                BY:  ANDREA ZELLAN, ESQ.
21                              BY:  JACOB KAPLAN, ESQ.

22
     Court Reporter:           Rivka Teich, CSR, RPR, RMR
23                             Phone:  718-613-2268
                               Email:  RivkaTeich@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

2475

PROCEEDINGS

1      MR. AGNIFILO:  Your Honor, I have a three-minute

2  objection to make.  I can do it now or at the end of the day.

3      THE COURT:  Let's do it now.  If it's something you

4  would like me to think about I'd rather correct it now rather

5  than wait until the end of the day when the witness is

6  finished testifying.

7      MR. AGNIFILO:  Yes.  We've objected, I think with a

8  number of the witnesses, to questions along the lines of,

9  'would a certain fact or a certain condition have been

10  important to you,' or, 'would this have been an important

11  factor whether or not to invest.'.

12      We've objected to those questions.  There is also

13  sort of a subtle refraining of the question, which is, if you

14  would have known a certain fact would you have invested.

15  We've objected to those with many of the witnesses as well.

16  The reason we're objecting is the question is framed such that

17  the omission is apparently a material term that the witness

18  would have wanted to know.

19      While that's all well and good, under the Supreme

20  Court decision in Matrixx Initiatives Versus Siracusano, 563

21  United States, page 27, 2011, the standard is an objective

22  standard.  It's a reasonable investor.  It's not any one

23  particular investor.  It's not a subjective standard.

24      So it's really irrelevant at the end of the day in

25  terms of the misrepresentation by omission that any particular

2476

PROCEEDINGS

1   investor thinking a particular condition or fact is

2   dispositive of whether he or she would invest.

3           I also note the Supreme Court Basic Versus Levinson,

4   485 United States 224 from 1988, says very clearly that

5   silence absent a duty to disclose is not misleading under

6   10B5, the Securities Laws.  The problem with the questions as

7   being framed is there is no establishment of a duty on the

8   part of Mr. Shkreli or MSMB to say whether or not he was

9   involved in Elea Capital or other things that the prosecution

10  has repeatedly used to frame a question.

11          So that's the basis that we've objected.  But I just

12  want the Court to know why we we've been objecting.

13          THE COURT:  May I, just to make sure I understand.

14  The 10B5 issue comes up with public corporations, these are

15  questions regarding his knowledge or lack of knowledge when he

16  made the investment decision, right, in the hedge fund, who's

17  not a registered security.

18          MR. AGNIFILO:  I don't think that the Supreme Court

19  in Basic or in Matrixx makes the distinction.  They are

20  talking --

21          THE COURT:  You said it was not a violation under

22  10B5, that's why I thought it had to be a publicly-traded

23  corporation.

24          MR. AGNIFILO:  The facts in Basic happened to

25  involve a publicly-traded corporation.  But the Supreme Court

2477

PROCEEDINGS

1  in these two cases, and there are other cases, the point that

2  needs to be made is that an omission is a different type of

3  animal than an affirmative misrepresentation.  There are other

4  requirements that come with an omission that don't exist when

5  someone says something that is arguably false and misleading.

6  And that distinction is being blurred in the way the questions

7  are framed.  And we've been objecting because at the end of

8  the day it suggests that somehow, that someone did something

9  wrong by not, for instance, saying that Martin was with Elea

10  Capital, when in fact, there is no establishment of a duty

11  that he disclose that information.

12          And so to the extent that it's an objective

13  reasonable investor standard, rather than a subjective

14  investor standard, it's really an irrelevant question at the

15  end of the day.

16          Your Honor, so I wanted to introduce that topic.  I

17  think.  That's been the reason we've been objecting to these

18  questions.

19          THE COURT:  All right.  I'll hear from the

20  Government.

21          MS. KASULIS:  Your Honor, we need to look into these

22  two cases that counsel just raised.  We do believe these

23  questions are appropriate.  We have in fact also charged wire

24  fraud, where there is material omissions and

25  misrepresentations, so the omissions piece is important for us

2478

PROCEEDINGS

1   to prove.

2            Additionally, we've been very careful in the way

3   that we're framing the questions.  It's not, 'if you learned

4   X.'  It's, 'if that fact exists but if there was a prior hedge

5   fund that not performed well that the defendant was associated

6   with.'  So we've been careful in the way we've asked the

7   questions purposely.

8            Also, if there is a reasonable investor standard we

9   have to establish the facts to make the argument that a

10  reasonable investor would find these omissions and

11  misrepresentations material.  So some of the questions go to

12  the omissions piece and some of them go to the misrep piece.

13           For example, when the defendant has said he has an

14  auditor, and if we ask, 'if there was no auditor would that

15  have been important to you,' the answer is yes.  The so then

16  it establishes the misrepresentations.  We can go back and

17  look at the law that counsel cites.  We didn't have the notice

18  about the law prior to this point, but we can certainly raise

19  any additional issues with the Court or additional responses.

20  But this is our response now.  We think it's entirely

21  appropriate.  We believe we should be able to continue to ask

22  these questions.

23           THE COURT:  I mean, my understanding is that the

24  Government has the burden to proof beyond a reasonable doubt

25  that whether there were material misstatements or omissions.

2479

PROCEEDINGS

1    Materiality, you say is objective, I agree.  But I think that

2    to ask the investors whether they were aware of, so for

3    example a discrepancy between what they were told and what the

4    facts may be, or whether certain facts had they known whether

5    that would have influenced their investment decision, I think

6    is something that -- again, I will look at the cases -- but it

7    seems to me, in my mind, it was directly relevant to the

8    Government's proof.  I'll look at the cases as you have

9    characterized them.

10         Are we going to expect ongoing objections until this

11   is resolved?  I'll look at the cases.  I can't do it now

12   obviously.

13         It does seem maybe this was an issue you -- it would

14   have been nice to have had some prior notice of it.  We'll

15   look at it as soon as we can.

16         MR. AGNIFILO:  I started doing research when

17   Mr. Brafman objected to it with the witness who is still on

18   the stand.  The objection was overruled.

19         It occurred to me at that point that we, I would

20   look into, dig a little deeper, as to why we've been

21   objecting.

22         THE COURT:  I figure you're objecting for a reason.

23         MR. AGNIFILO:  We tend to try to have a reason.

24         THE COURT:  I would hope so.

25         MR. AGNIFILO:  But I want to give your Honor a

2480

PROCEEDINGS

1    clearer idea of the basis, that's why I'm bringing it up now.

2              MS. KASULIS:  Your Honor, we have been eliciting

3    these questions in the same format with respect to each

4    witness since our first witness, which was about a

5    week-and-a-half ago now.  So we will continue to solicit those

6    sorts of answers unless we hear otherwise from the Court as to

7    those questions.

8              THE COURT:  We'll look into it.  I can't say we'll

9    have an answer for you by the time the next witness is asked a

10   question, but we'll get to it as soon as we can.

11             It would have nice if you raised it even before the

12   lunch hour, I could have looked at the cases then.  But, we

13   have what we have and I'll deal with what you've given me now.

14   All right.

15             MR. AGNIFILO:  I did most the research over the

16   lunch hour.  Judge, as I do further research, I share it with

17   the Court.

18             THE COURT:  I appreciate that.  I'm just saying this

19   has been going on for a week-and-a-half, there are sort of set

20   questions that you can expect.  We've heard again and again,

21   I'm not saying it's rote, but each witness is asked to look at

22   certain documents, and asked what was important to their

23   decision et cetera, et cetera, so I'm just noting that it

24   would have been nice, as I've said before, to hear from you

25   earlier.  But we'll now look into what we have been given and

2481

MARSHALL — CROSS — MR. BRAFMAN

1    I'll try to make a decision before the next witness is asked

2    the series of questions.

3             MR. AGNIFILO:  Thank you, Judge.

4             THE COURT:  Did you want to bring the witness back

5    on the stand, please?

6             MR. BRAFMAN:  Your Honor, when the witness testifies

7    could you just remind him, sometimes he leans back, his voice

8    doesn't get picked up on the microphone, it's hard to hear.

9             THE COURT:  I will.  If I'm having trouble, I'm

10   concerned about everyone else of.

11            MR. BRAFMAN:  Thank you.

12            (Jury enters the courtroom.)

13            THE COURT:  All our jurors are back, sir, you're

14   still under oath.  Please have a seat.

15            You may proceed, Mr. Brafman.

16   CROSS-EXAMINATION

17   BY MR. BRAFMAN:

18   Q    Good afternoon, Mr. Marshall.

19   A    Good afternoon.

20   Q    Mr. Marshall, if you can, I know it's a long day, but if

21   can you speak into the microphone, sometimes your voice

22   doesn't pick up in the back.

23            Sir, my name is Ben Brafman.  We've never met; is

24   that correct?

25   A    That's true.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------------x
     UNITED STATES OF AMERICA
3                                          15 CR 627(KAM)

            versus
4                                          U.S. Courthouse
     MARTIN SHKRELI,                       225 Cadman Plaza East
5                                          Brooklyn, NY 11201
                 Defendant.                July 11th, 2017
6    ------------------------------------x 9:00 a. m.

7           TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
              BEFORE THE HONORABLE KIYO MATSUMOTO
8               UNITED STATES DISTRICT JUDGE

9

10                      APPEARANCES

11   For the Government:    BRIDGET ROHDE
                            UNITED STATES ATTORNEY
12                          EASTERN DISTRICT OF NEW YORK
                            271 Cadman Plaza East
13                          Brooklyn, New York 11201
                            BY: JACQUELYN KASULIS, ESQ.
14                              ALIXANDRA SMITH, ESQ.
                                KARTHIK SRINIVASAN, ESQ.
15                          Assistant United States Attorneys

16   For the Defendant:     BRAFMAN & ASSOCIATES, PC
                            767 Third Avenue
17                          New York, New York 10017
                            BY:  BENJAMIN BRAFMAN,ESQ.
18                               MARC AGNIFILO, ESQ.
                                 ANDREA ZELLAN, ESQ.
19                               JACOB KAPLAN, ESQ.

20

21   Court Reporter:        LISA SCHMID, CCR, RMR
                            Official Court Reporter
22                          225 Cadman Plaza East
                            Brooklyn, New York 11201
23                          Phone:  718-613-2644
                            Fax:  718-613-2379
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

NICOLE CANALES, CSR, RPR

Proceedings

```
 1   (Outside the presence of the jury.)
 2           MS. SMITH:  Your Honor, just so you know, there were
 3   five binders for this witness, so we put three of them on the
 4   side so it's not blocking.
 5           THE COURT:  No problem.
 6           Do the parties have any matters to bring to my
 7   attention?
 8           MS. KASULIS:  Yes, your Honor.  We wanted to briefly
 9   respond to the issue that the defense raised about the
10   hypothetical questions, asking the witnesses about
11   hypothetical questions.  I'm going to let Mr. Srinivasan
12   inform the Court.
13           THE COURT:  All right.  Sure.
14           MR. SRINIVASAN:  So, your Honor, I think there were
15   two issues raised by the defense yesterday, whether it's
16   proper to get into issues like whether the defendant disclosed
17   Alia Capital (phonetic); in other words, information about his
18   track record in the hedge fund industry, and other issues
19   we've been asking on the issue of materiality.  And the
20   second is the form of the questions we've been asking.
21           Mr. Agnifilo cited Basic versus Levenson and Matrix
22   Initiatives, and I think that what those cases stand for is
23   the proposition that silence -- it's true that silence absent
24   a duty to disclose is not necessarily actionable, but where a
25   person makes statements and puts information out there, that
```

Proceedings

1    can generate a duty to disclose the truth if the statements

2    that that person is making are not truthful.  So I think that

3    we've had a lot of evidence in this case about the statements

4    that are made by the defendant; about his track record, about

5    whether Capital had an auditor, so on and so forth.

6          We've been asking the witnesses about these issues,

7    and we think that the evidence is going to prove that the

8    truth was something very, very different.  So I don't think

9    that a duty to disclose is limited to some specific statutory,

10   regulatory or contractual obligation; for example, the PPM, so

11   I think that we have a strong basis under Matrix Initiatives,

12   which says that it's a highly stacked specific inquiry, and I

13   think specific to the investing decisions of these investors.

14         On the second issue, the form of the questions,

15   there's very strong authority -- and I have some cases that I

16   can hand up to your Honor, and I can hand them to defense

17   counsel also -- which say that hypothetical questions are,

18   quote, "plainly relevant and probative when they concern the

19   materiality of the defendant's actions in the context of a

20   securities fraud prosecution.  That's United States versus

21   Hatfield 2010 WL 2541057, and that's a Judge Seebart decision

22   from 2010.

23         And there are a number of other decisions.  In the

24   Second Circuit, for example, there's a case called

25   United States versus Cuti, where in another fraud prosecution

Proceedings

1   the government called the auditors of the company to say,

2   well, you know, if X fact that management had represented to

3   you had been different, would you have handled the financials

4   differently?  And the 2nd Circuit said clearly that those

5   sorts of questions are appropriate.  And the citation for Cuti

6   is 720 F.3d 453.  Again, I have copies I can hand up to the

7   Court.

8           THE COURT:  All right.  Thank you.

9           Mr. Agnifilo.

10          MR. AGNIFILO:  What I'll try to do -- and I'll try

11   to do it over lunch -- is try to take a look at Hatfield and

12   Cuti, and give your Honor a principled answer.

13          THE COURT:  Well, if the question comes up today --

14          MR. AGNIFILO:  I don't think it will come up before

15   lunch.

16          THE COURT:  Okay.

17          MR. AGNIFILO:  Because I believe a witness that's

18   been on the stand all morning is a witness that is bringing in

19   bank records and summarizing them, so I don't think we have an

20   investor before lunch.  If I see that we're going to get it

21   before lunch, I'll try to do some quick research and take a

22   look at some cases.

23          THE COURT:  Thank you.

24          MR. AGNIFILO:  And my colleague has provided me with

25   copies of the case, which I very much appreciate.

Proceedings

1    (Pause in proceedings.)

2          MS. SMITH:  Your Honor, one last thing, before the

3    witness today, we're going to read one other stipulation,

4    which is Government Exhibit 804.

5          THE COURT:  Okay.  Thank you.

6          The jurors are here, so they're coming up.

7    (In the presence of the jury.)

8          THE COURT:  Good morning.  All our jurors are

9    present.

10         Good morning, ladies and gentlemen.  Please have a

11   seat, everyone.  All parties and counsel are also present, and

12   we are ready to proceed with the government's next witness.

13         MS. SMITH:  Your Honor, before the government calls

14   its next witness, we'd like to read one additional stipulation

15   into the record, which is Government Exhibit 804, and we have

16   that on the prosecution laptop.

17         It is hereby stipulated and agreed by and between

18   the undersigned parties that:

19         One, Government Exhibit 117-6 is a true and accurate

20   copy of a settlement agreement between Merrill Lynch Pierce

21   Thenner (phonetic) Smith Inc., Merrill Lynch, and the

22   Defendant Martin Shkreli, Marek Bicek (phonetic), and MSMB

23   Capital Management L.P., dated September 5, 2012, and is

24   admissible in evidence;

25         Two, Exhibit A to Government Exhibit 117-6, which is

PROCEEDINGS

1    waived his presence to be here at oral argument.  We discussed

2    it clearly.

3                THE COURT:  Okay.  I just didn't want to hear

4    later --

5                MR. BRAFMAN:  No, no, no.

6                THE COURT:  -- that he didn't really waive it.

7                Let's go forward.  Both Mr. Agnifilo and Mr. Brafman

8    have confirmed Mr. Shkreli has waived his presence at this

9    argument regarding the questions that the government was

10   asking of certain investors regarding their investment

11   decisions having known certain facts were perhaps different

12   than that the facts that were presented to them in the

13   offering documents.

14               MR. SRINIVASAN:  Your Honor, if I could clarify, I

15   don't think our questions ever said if you knew or if you

16   learned that.  I think we phrased it very carefully to avoid

17   that formulation the assume the fact not in evidence.  It was

18   more if MSMB Capital did not have an auditor.  So it's not --

19   I think Mr. Agnifilo said sometimes we shaded into saying if

20   you had learned that yesterday and I think we were trying to

21   be careful to kind of avoid that formulation in our questions.

22               THE COURT:  All right.  So who wants to be heard

23   from first, Mr. Agnifilo?

24               MR. AGNIFILO:  I'm happy, yes.

25               So I reviewed the cases that the government provided

PROCEEDINGS

1   and I'm grateful they brought the cases.  In regard to the

2   cued decays I think the cued decays is distinct and to sort of

3   highlights the problem that I had with the situation that

4   we've been facing.  In the *Cuti* decision, the Second Circuit

5   relied heavily on the fact that the witnesses were experienced

6   accountants and that the experienced accountants were

7   basically that the hypothetical question there drew on

8   undisputed rules of accounting that these accountants would

9   know, and so when the accountants were asked in substance, you

10  know, would you have done the accounting differently had this

11  been the case instead of this been the case, I think the

12  Second Circuit in *Cuti* was okay with that hypothetical

13  question because, as the Second Circuit put it, there's

14  somewhat of a, I guess continuum between fact and opinion, and

15  because we were talking about experienced accountants and we

16  were talking about accounting rules, this was more along the

17  lines of on the factual side rather than on the side of

18  opinion.

19         My concern with the questions that we've had in this

20  area in the trial is that they're purely subjective opinions.

21  They can't be verified.  They can't be shown to be false.  If

22  someone says, I would not have invested had I known that there

23  was not an auditor, or I would have wanted to know about the

24  Orex trade, or something along those lines, there is no body

25  of information that the questioner could use to show that the

PROCEEDINGS

1   witness is lying or mistaken.  And that's one of the things

2   that the Second Circuit focused on in the *Cuti* decision when

3   they said that there was a way of cross-examining the witness

4   because there was essentially a body of fact, that being the

5   accounting rules, you know, that these particular witnesses

6   were well versed in.

7         My concern here is -- it's really two-fold.  It's

8   one that it's really in the nature of an opinion, but really,

9   and what I was sort of getting at I guess more yesterday, is

10   it is really irrelevant.  I mean, because the standard is an

11   objective standard, it's an objective investor standard.  So

12   whether a particular investor is, you know, specifically

13   concerned about liquidity or specifically concerned about an

14   auditor or is particularly miffed by the fact that the Orex

15   trade wasn't mentioned, is really in a sense misleading.  I

16   mean, because it's suggesting to the jury that something wrong

17   legally was done because Mr. Shkreli didn't inform someone of

18   the Orex trade or didn't inform someone that he managed Elea

19   Capital, and that's not the standard so it's really an

20   irrelevant question.  And none of that situation is not

21   addressed by either of the cases that the government provided.

22         And in regard to the *Hatfield* decision, the *Hatfield*

23   decision is far from a ringing endorsement of the hypothetical

24   questions.  I mean, Judge Seybert was actually quite critical

25   of the government in that case and thought that their

PROCEEDINGS

1   questions were inappropriate, but not inappropriate to the

2   degree where it warranted a mistrial.  So I don't know that

3   the *Hatfield* decision really helps us one way or the other

4   because I thought that Judge Seybert at the end of the day

5   thought that the questioning was not perfect, far from it,

6   because if Your Honor recalled -- and I know we didn't have

7   lot of time to read the cases -- there were two motions

8   pending in the *Hatfield* decision.  The defense was asking for

9   a mistrial and the government is essentially asking for their

10  line of questioning to be essentially blessed by the Court as

11  appropriate and the Court did neither.  The Court didn't grant

12  the defense a mistrial and the Court also didn't bless the

13  questioning, and was quite critical of the questioning toward

14  the end of the decision.

15       So looking at the *Cuti* decision, I don't think that

16  the *Cuti* decision makes this particular questioning of this

17  particular witness appropriate necessarily because they're

18  talking about essentially rank subjective opinion, this is

19  what I believe, this is what I wanted to know.  And with a

20  reasonable objective investor standard that we know exists

21  from the *Matrix* decision and from *Basic* versus *Levinson*, I

22  don't think it's an appropriate question.

23       THE COURT:  Well, you can't just throw the

24  reasonable investor concept in front of the jury and ask them

25  in a vacuum to try to determine what a reasonable investor

PROCEEDINGS

1   would do.  I think one way to get there is to -- just let's

2   note Mr. Shkreli is back with us.  One way to do that, as

3   Judge Seybert noted, was to hear testimony from investors that

4   would help the jury understand what would be important to an

5   investor.  What information would be important, what

6   information influenced their investor decision.  And I believe

7   she noted in *Hatfield* that what influence an investment

8   decision is probative of what a reasonable investor would have

9   considered.

10          So there has to be some way for the government to

11  establish that standard and it seems to me that the jury could

12  listen to those investors and decide whether they exemplify a

13  reasonable investor, maybe they're not, but to understand what

14  facts those investors considered important to their investment

15  decision I think is relevant and material to their burden of

16  proof.

17          How else do you propose that the government

18  establish what a reasonable investor would do?

19          MR. AGNIFILO:  I think they can do it without asking

20  the hypothetical question.  You can say is liquidity important

21  to you?  Yes, you're done.  Is having an auditor important to

22  you?  Yes.  I don't think you can go the next step and say the

23  hypothetical question that they've asked.  That's -- my

24  concern is what the hypothetical -- that's the only thing

25  we've objected to.  We haven't objected to an investor saying

GEORGETTE BETTS, CSR, RPR    OFFICIAL COURT REPORTER

PROCEEDINGS

1    that certain liquidity is important.  Certainly Mr. Kocher was

2    able to testify that liquidity is important to him.  Some

3    other investor witnesses said that AUM was important to them.

4    I think they're permitted to do that.

5            What we objected to is the hypothetical question

6    that follows that up.  And I don't think it's necessary, I

7    don't think it advances the ball.  I think it's an

8    inappropriate question.  I think it suggests the framing of a

9    legal issue that's inaccurate and it frames the legal issue as

10   one of subjectivity and I think it's an inappropriate question

11   for some of the same reasons that Judge Seybert had a problem

12   with the questioning in the *Hatfield* decision.

13           THE COURT:  Well, sir, I know that you cited the

14   fact that the witnesses in *Cuti* were accountants and were

15   applying their accounting principles, but the circuit also

16   said that we hold that the challenged testimony was properly

17   admitted as factual testimony under the alternative holding

18   that it is admissible as lay opinion under Rule 701 which

19   permits layperson to give an opinion, if it is limited to one

20   that is rationally based on the witness' perceptions, i.e.

21   what were they were told, what did they read in this case; B,

22   helpful to clearly understand the witness' testimony or to

23   determining a fact in issue, were they given information that

24   they needed to make an informed investment decision; and C not

25   based on scientific, technical, or other specialized knowledge

PROCEEDINGS

1    within the scope of 702.

2           Here I know that you've made a point that the

3    investors were quite sophisticated, they had previously

4    invested in different investment vehicles including hedge

5    funds and that they knew what some of these terms meant, they

6    knew what the risks were, they were familiar with some of the

7    language, but I do think that it's appropriate to probe the

8    witnesses as to what was important to them when they made

9    their decision.

10          *Cuti* also says when the issue for the fact finder's

11   determination is reduced to impact, that is whether a witness

12   would have acted differently if he had been aware of

13   additional information, the witness so testifying is engaged

14   in a process of reasoning familiar in every day life, so it is

15   not -- and they make the point that the testimony was not

16   rooted exclusively in the witness' expertise and did not

17   address the soundness of accounting rules.  So there was an

18   alternative holding in *Cuti* I think that's applicable here as

19   lay testimony to the extent we've characterized them or we may

20   wish to perceive them as sophisticated investors.

21          MR. AGNIFILO:  One thing I just point out -- I'm not

22   sure if Your Honor was done with the analysis.

23          THE COURT:  No, I just was addressing *Cuti*, but go

24   ahead.

25          MR. AGNIFILO:  Looking at the *Cuti* decision on

PROCEEDINGS

1    page 459 it says, *Cuti* was able to argue that the auditor

2    could not have been deceived about the accounting for that

3    transaction.  And the reason the Court says that is because

4    they're talking about a body of accounting rules.

5            The problem with what we have here, it's really just

6    the subjective operation of the witness' mind in a

7    hypothetical sense.  Had you known this or however they

8    phrased it, you know, would you have invested, no.  It's just

9    not -- it's just not really a probative answer.  I mean, it's

10   a witness answering a hypothetical question, speculating about

11   facts that in fact have not occurred, which is the whole

12   reason they asked the question and then looking back three

13   years and giving a dispositive answer about what seems to be

14   an ultimate issue in the case.

15           So I don't think it's anything -- most respectfully,

16   I don't think it's anything like the decision in *Cuti*.

17   Because what I think the Second Circuit focused on in *Cuti* is

18   that these witnesses were cross-examinable and they're

19   cross-examinable because there is a body of accounting

20   information that the questioner could use to cross-examine

21   them.

22           Here, these answers are virtually bulletproof.  If

23   someone like, you know, Kocher says, yeah, had I known there

24   was no liquidity, I wouldn't have invested, we're stuck with

25   that answer.  There is no way of cross-examining Mr. Kocher

GEORGETTE BETTS, CSR, RPR    OFFICIAL COURT REPORTER

PROCEEDINGS

1    about what was in his mind, which is really in the nature of a

2    pure opinion, so I think it's distinct.

3             Your Honor's insights, yeah, I agree that is

4    certainly part of what the Second Circuit held, but I think

5    the issues are fundamentally distinct.  I think the subject

6    matter of the testimony is fundamentally distinct, and I think

7    the hypothetical questions are, most respectfully,

8    inadmissible.

9             MR. SRINIVASAN:  Your Honor, I think the Court has

10   the issues clear in mind.  The only thing I would add, Your

11   Honor, is the defense has every ability to cross-examine the

12   witnesses about what's going on in their minds and their

13   reactions to this information, the decision to keep investing

14   or not investing, redeeming, I think they've been fully able

15   to do that.

16            When Mr. Agnifilo talks about *Cuti*, in that case the

17   importance of the accounting rules was about the foundation

18   for the auditors' ability to testify.  So they were able to,

19   you know, cross-examine them on the foundation, they were able

20   to compare the rules versus what actually happened, for

21   example.

22            Here we have the investors' actions, they're

23   testifying, they're able to cross-examine them.  I don't want

24   to belabor the point, if the Court has any questions about

25   *Cuti* or *Hatfield* I'm happy to answer them.

GEORGETTE BETTS, CSR, RPR   OFFICIAL COURT REPORTER

PROCEEDINGS

1          THE COURT:  Would you be able to try to craft your

2    questions, as Mr. Agnifilo suggested, that is, would it have

3    been important to you to fully be apprised of the fund

4    manager's background?  Would the statement that he was

5    successful with other funds, was that an important factor, why

6    was it important?  I'm just wondering, the way Mr. Agnifilo is

7    proposing that I guess you want to preclude the government

8    from asking whether if they were aware of other aspects of

9    Mr. Shkreli's background with regards to fund management

10   whether their investment decisions would have been different?

11          MR. AGNIFILO:  Yes, that's the heart of the

12   objection.

13          MR. SRINIVASAN:  Your Honor I think -- I'm sorry if

14   the Court's not finished.

15          THE COURT:  No, go ahead.

16          THE WITNESS:  I think two points, Your Honor.  We

17   have to prove omissions and we have to prove the materiality

18   of those omissions.  So if you look at *Basic* or *Matrix* it's

19   not simply something is important or a witness subjectively

20   something is important to me, we have to establish that it

21   affects the total mix of information that goes in the

22   investing decision.

23          So you could have a situation where a defendant lies

24   about the weather to a witness and the witness comes in and

25   says that was important to me.  You can make an argument that

GEORGETTE BETTS, CSR, RPR    OFFICIAL COURT REPORTER

PROCEEDINGS

1    that had nothing to do with the investing decision.  I think

2    we have to tie those things all together to meet the

3    materiality element in the securities laws.  So that's why in

4    *Cuti*, for example, there are a number of cases cited from the

5    First, Sixth, the Ninth, a number of circuits, *Cuti* itself,

6    *Hatfield*, it allows us to tie that materiality element all

7    together to meet what we're supposed to do under the

8    securities laws.  Because otherwise we just have potentially

9    innocuous misstatements or witnesses making clearly subjective

10   statements about what is important to them and then arguably

11   we might have a problem as far as what a reasonable investor

12   would have considered important or would have affected the

13   total mix.

14           So I think the hypothetical questions are the

15   appropriate way to get to the omissions especially.

16           THE COURT:  In the *Basic* case the Supreme Court

17   discussed its decision in *TSE Industries*, which rose in the

18   context of disclosure statements in a proxy solicitation.  And

19   in *Basic* they noted that in the *TSE* case the Court had

20   explained that to fulfill the materiality requirement, there

21   must be substantial likelihood that the disclosure of the

22   omitted fact would have been viewed by the reasonable investor

23   as having significantly altered the total mix of the

24   information available.  We expressly adopt the *TSE Industries*

25   standard of materiality in the 10B and 10B5 context.  It seems

PROCEEDINGS

1    to me that what the court is doing is saying that, look, that

2    materiality standard that was previously established in *TSE*

3    with regard to disclosure or omissions in proxies now applies

4    in this Rule 10B and 10B5 context.

5            Materiality depends on the significance that the

6    reasonable investor would place on the withheld or

7    misrepresented information.  The fact specific inquiry we

8    endorse is consistent with the approach a number of courts

9    have taken in assessing the materiality of merger

10   negotiations.

11           Again, the facts matter, the witness' statements are

12   directly relevant to the government's burden of proving the

13   materiality of statements or misstatements or omissions.

14           MR. AGNIFILO:  I don't quarrel with any of that.  I

15   think the government can absolutely bring out that someone

16   cared about liquidity, that someone cared about an auditor and

17   we didn't object to any of those questions.  We only objected

18   to the hypothetical question.  That's it.  I mean, I agree

19   completely that they have to show the overall mix of

20   information and how it affected the investor, I agree with it

21   completely.  I think the hypothetical question is a question

22   of a different nature, which is why we only objected to that.

23   We didn't object to the whole line of questioning, we didn't

24   object to the establishment of materiality with direct

25   questions of what they cared about, we only objected to the

PROCEEDINGS

1   hypothetical question.  And I --

2           THE COURT:  Would it make a difference if there was

3   evidence in the record that supported the question and made it

4   not hypothetical, i.e. the Elea Capital problem.

5           MR. AGNIFILO:  *Cuti* says it would make a difference.

6   The Second Circuit in *Cuti* says it would make a difference,

7   correct.  But *Cuti* also doesn't say that one factor is

8   dispositive.  I mean, the way I read the holding in *Cuti* that

9   it was one of three central things that the Court focused on,

10  the other two were the nature of the witnesses which was --

11  and, yes, the investors here are sophisticated, but of a

12  different nature.

13          THE COURT:  They have a specific alternate holding

14  that these were also lay witnesses and they explain why this

15  line of questioning was appropriate.  Whether or not you call

16  them experts or lay witnesses, that wasn't a second holding

17  that they made in assessing that testimony.

18          MR. AGNIFILO:  They essentially said it was

19  admissible lay opinion.  But I think it's admissible lay

20  opinion with the context being accountants and accounting

21  rules.

22          My concern with the hypothetical question that we

23  have here is there's no context for the question, you're just

24  stuck with the answer.  Had you known this, would you have

25  invested?  No.  There's nothing we can do with that.  I mean,

PROCEEDINGS

1    we can say he's lying, we can say he's misremembering kind of

2    what his decision was at the time, but it's void of factual

3    content in a sense, which I think the Court in *Cuti* really

4    focused on by saying you can cross examine these accountants

5    because they're talking about accounting rules, and they're

6    talking about how accounting is done.

7              When one of these witnesses says, had this been

8    different, I wouldn't have invested you're just stuck with the

9    answer.  There is no way of cross-examining because it's the

10   subjective, somewhat hypothetical subjective operation of the

11   person's mind, but it also is sort of dressed up as I think a

12   dispositive issue in the case and that's made us uneasy about

13   it, that's why we think it's inadmissible.

14             I think the government gets everywhere -- and I'm

15   not here to help them, I think they get everywhere they need

16   to be by asking the witnesses what's important to them.  I

17   think they can do that and without the hypothetical question.

18   I don't know really why they need it except that it's sort of

19   like an added little zinger but I think it's an inappropriate

20   zinger.

21             MR. SRINIVASAN:  Your Honor, I think our questions

22   have been crafted not to ask the witness to assume a fact as

23   true.  We've expressly avoided that.  We're not going to get

24   every single fact in the case through one witness.

25             To give you a concrete example, Lindsay Rosenwald,

PROCEEDINGS

1      in the September of 2009 VPM for MSMB Capital, asked is there

2      a representation in there that says Fulvio & Associates are

3      the auditors for MSMB Capital, and so we ask him, you know, is

4      that important to you the presence of an auditor and would

5      that have affected your decision.  Then there is a

6      stipulation, which the defense agreed to, that Fulvio &

7      Associates were not the auditors, were never the auditors and

8      so that ties those things together.  And so we'll do that with

9      stipulations or calling witnesses, but I think we're going to

10     tie those things together and what we're establishing is

11     materiality.  Just getting importance to an investor is not

12     enough.  You have to give context for that.  And we have to be

13     able to lay a factual foundation.

14           I think Mr. Agnifilo talks a lot about the

15     reasonable investor, the objective reasonable investor but we

16     don't deal with hypothetical witnesses in the case, right?  I

17     mean, we have to give the jury a factual context and then

18     they're free to argue that that's not reasonable for the

19     investor to make that statement or to rely on the

20     representation or however they want to argue it it but I don't

21     think that precludes us from using these questions to

22     establish the factual foundation.  I think we made a good

23     faith -- and I think we have a good faith basis to ask these

24     questions that we've seen pretty much every one of these

25     witnesses which will tell the jury and the Court, in

PROCEEDINGS

1    cross-examination or in direct examination, was this thing

2    important to them, was it not important to them, would it have

3    an affect and what kind of affect it would have had on them.

4    They can cross-examine them on every single one of those

5    issues.  So I think that the questions we've been asking are

6    proper and they are the way we can tie out materiality.

7         THE COURT:  Yes, look, I think that what the

8    government is describing is consistent with what Mr. Agnifilo

9    is proposing except to the extent if you have asked, assume a

10   fact X, then would your decision have been different, that

11   would not be appropriate.  But as long as you stick to the

12   formulation you just described I think we're all on the same

13   page that that would be appropriate.

14        MR. SRINIVASAN:  That's correct, Your Honor.  Our

15   formulation is to take auditors, for example, if MSMB Capital

16   did not have an auditor, would that affected your investing

17   decision?  We have not said I'm asking you to assume MSMB

18   Capital doesn't have an auditor or if you learned that MSMB

19   Capital doesn't have auditor, that's for example the

20   formulation that Judge Seybert denied in the *Hatfield* case, if

21   you have that formulation.  I think we tried very carefully to

22   do what *Cuti* says, which is, you know, there's a fact that the

23   witness believes to be true, pose sort of the contrary fact

24   which will the government will then tie out with other

25   evidence and what is the reaction to that.  I think we

PROCEEDINGS

1    followed exactly what *Cuti* says.

2         THE COURT:  What if you asked it, why would the

3    engagement of an auditor or lack of an auditor be important to

4    you, so you're giving them to -- and they can describe, would

5    that be acceptable for Mr. Agnifilo's concerns?

6         MR. SRINIVASAN:  Your Honor, I think at least for

7    the auditors, it's an affirmative misrepresentation which is a

8    little bit different.  But, secondly, I think the witnesses

9    have gone on to explain that.  So you have Schuyler Marshall,

10   for example, the auditor from yesterday talks about having,

11   you know, independent check on financial information was

12   important to him and it's something if it didn't exist he

13   wouldn't have invested.  I think the witnesses are providing

14   that foundation for why these various pieces of information

15   would have affected their decision and how.

16        THE COURT:  Shall we move forward and hope for the

17   best?  It seems to me that they are trying very consciously to

18   not drive the witness to respond to questions that offend what

19   you are trying to prevent.  I think that the government does

20   have to utilize these witnesses to establish what a reasonable

21   investor would consider important to their investment decision

22   and they're conscious of your concerns, and they will do their

23   best to avoid any formulation that would draw concerns, but I

24   think they do have to explore the witnesses whether or not

25   certain facts that were represented were important to their

PROCEEDINGS

1    investment decision --

2            MR. AGNIFILO:  I understand.

3            THE COURT:  -- and to solicit why or why not these

4    facts would be important.  So, for example, I'm trying to

5    remember what drew your objection.  The first one was the

6    thing about the loans but that was discarded, but the second

7    question might have gone to -- do you remember?  Does anyone

8    have a clear recollection?  We can try to look up the

9    transcript, but --

10           MR. AGNIFILO:  I believe we objected during the

11   Kocher --

12           THE COURT:  Is it the Elea Capital question?

13           MR. AGNIFILO:  I think we objected to that.

14           MR. SRINIVASAN:  Yes.

15           MR. AGNIFILO:  I think --

16           THE COURT:  Would the fund manager's success or lack

17   of success have been an important factor in your investment

18   decision, yes or no.  Why would the success be important, why

19   would lack of success be important.  That seems to me to be --

20           MR. SRINIVASAN:  That's right.

21           THE COURT:  -- appropriate so that they could get a

22   sense of -- elicit from the witness why certain disclosures or

23   omissions would have affected your investment decision.

24           MR. AGNIFILO:  I don't want to belabor the point, I

25   think what's different about omissions is omissions are only

PROCEEDINGS

1    actionable in the absence of a duty to disclose.  So they have

2    not -- there is no duty in the record, that's the problem.  So

3    if we get back to the *Cuti* decision --

4            THE COURT:  Well, there is a duty if there is an

5    entry statement of fact, material fact, it becomes important

6    to disclose.

7            MR. AGNIFILO:  I agree.

8            THE COURT:  If you have to make sure that the

9    statement of fact is not misleading.

10           MR. AGNIFILO:  But with the Elea Capital omission

11   there was -- there's been proffered no partial statement that

12   has to be corrected.  It seems to me an omission is actionable

13   criminally if there's a partial statement that is misleading,

14   if there is a duty to disclose like a fiduciary duty or

15   statutory duty to disclose.  In the absence of the three, an

16   omission isn't actionable.  So it's not an appropriate

17   question to ask subjectively, would you have liked to know

18   this.

19           THE COURT:  Well, in this case I think Mr. Marshall

20   just volunteered that if the fund manager had a bad track

21   record it would definitely affect his investment decision.

22           MR. AGNIFILO:  I think that's appropriate.  See,

23   we've only objected when it gets more specific and somewhat

24   hypothetical.  I think a witness has an absolute right to say,

25   this is important to me.  I think they can absolutely say

GEORGETTE BETTS, CSR, RPR    OFFICIAL COURT REPORTER

PROCEEDINGS

1    that.  I think what the government can't do is they can't say

2    specifically would that omission have influenced your

3    investment decision in the absence of establishing a duty,

4    because they are suggesting there is something wrong with it.

5    The very question -- the reason they're asking the question is

6    because it sounds like they did something wrong.  That's why

7    they're insisting on asking the question now.  They want to

8    establish through the question it sounds like you did

9    something wrong, but the law says otherwise, so that's why we

10   object to that line of questioning to actually that specific,

11   the hypothetical question.

12            THE COURT:  Well, in terms of omissions is your main

13   focus on the Elea issue or are there other omissions that are

14   troubling you?

15            MR. AGNIFILO:  The Elea issue is one, I think the

16   Orex trade, you know, would you have liked to have known about

17   the Orex trade, I just don't think it's an appropriate

18   question.  I don't think there is -- there is no duty in the

19   record that a hedge fund manager has an obligation to disclose

20   losses or disclose all the trades.

21            THE COURT:  I think what we have, though, in

22   addition to the lack of disclosure is a performance report

23   saying you're doing great and look at all this money, this

24   entire fund is up above the Standard & Poors 500.  That's --

25            MR. SRINIVASAN:  Exactly, Your Honor.

PROCEEDINGS

1          THE COURT:  -- that's the misstatement.  So I mean

2    whether that's an omission or whether that's a misstatement,

3    it's an issue that they are entitled to present.

4          MR. AGNIFILO:  Listen, what I'll do going forward, I

5    appreciate the time that everyone has taken, if a hypothetical

6    question is asked that I think is objectionable, I'll just

7    object, we don't need to have a sidebar but the basis would be

8    the substance of the discussion.

9          THE COURT:  You can just say the one word

10   "hypothetical" --

11         MR. AGNIFILO:  Very good.

12         THE COURT:  -- and Mr. Srinivasan or whoever else is

13   questioning the witness for the government will know to

14   reformulate the question or elicit the information in some

15   other way that doesn't draw an objection.

16         MR. SRINIVASAN:  Your Honor, I don't think it would

17   necessarily necessitate us to reformulating the question,

18   right?  I mean the questions we've been asking I think are

19   proper under *Cuti* and *Hatfield*.  They've been limited to sort

20   of specific issues that we're alleging misrepresentations and

21   omission that are in the case and are part of the record.

22   We're not sort of free form going into everything about the

23   defendant, you know, if you'd known something about the

24   defendant would have that affected your investing decision.  I

25   mean, issues like, you know, when he talked about his track

GEORGETTE BETTS, CSR, RPR    OFFICIAL COURT REPORTER

PROCEEDINGS

1   record or listening that he I think he described his track

2   record to investors, 12 years as a fund manager, good returns,

3   good performance history, you know, if the defendant had run a

4   prior hedge fund that performed poorly, would have that

5   affected your investing decision.  I think it's word for word

6   the question we asked of Sarah Hassan and that we tried to use

7   it with every single one, but Your Honor overruled the

8   objection on that one.

9           So I don't think we should have to reformulate the

10  question or hypothetical.  I think the questions we've been

11  asking are consistent with the everything the Court has been

12  saying so far in materiality.  If we go far afield and into

13  the subjects that have nothing to do with the case, then I

14  guess that's the relevance objection which is different than

15  the objection Mr. Agnifilo is making now.

16          MR. AGNIFILO:  To answer one of Your Honor's

17  questions, Mr. Kocher was asked, if you had learned of any

18  personal loans to the defendant what, if any, affect would

19  that have --

20          MR. SRINIVASAN:  Which was objected to.

21          THE COURT:  And they withdrew it and circled back.

22          MR. AGNIFILO:  Right, that's right.

23          THE COURT:  So that's off the table.

24          MR. AGNIFILO:  Right.  Well, because it turns out

25  they were trying to link it to something that the defendant

GEORGETTE BETTS, CSR, RPR    OFFICIAL COURT REPORTER

PROCEEDINGS

1    might have said in one of his statements, but that ended up

2    not being admissible.  But my point is --

3                MR. SRINIVASAN:  We pulled back on them, Judge, it's

4    not in the case.

5                MR. AGNIFILO:  I was going to say that.  Yes, I know

6    they withdrew it.

7                THE COURT:  Give me something that we know is going

8    to come up again that's going to cause you to jump up and

9    object.

10               MR. AGNIFILO:  They know what they're going to ask.

11               THE COURT:  Well, no, but in terms of omissions it

12    seems to be the Elea issue.

13               MR. AGNIFILO:  It's Elea but they could

14    theoretically -- I don't know what they're going to ask.  The

15    Elea --

16               THE COURT:  And the other issue about the Orex trade

17    wiping out the entire fund I think, yes, that's an omission

18    but they also have alleged misstatements regarding performance

19    of the fund and the health of the fund.  So I think at the end

20    of the day they don't need to even ask a hypothetical in that

21    manner.

22               MR. AGNIFILO:  I will object sparingly and briefly,

23    I promise.

24               THE COURT:  Okay, let's get the jury back.

25               MR. AGNIFILO:  Your Honor, can I ask -- can we have