3854

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,      : 15-CR-00637(KAM)
4                                  :
                                   :
5                                  :
         -against-                 : United States Courthouse
6                                  : Brooklyn, New York
                                   :
7                                  :
                                   : Monday, July 17, 2017
8    MARTIN SHKRELI,               : 9:00 a.m.
                                   :
9            Defendant.            :
                                   :
10   - - - - - - - - - - - - - - X

11          TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
          BEFORE THE HONORABLE KIYO A. MATSUMOTO
12        UNITED STATES DISTRICT JUDGE, and a JURY

13                 A P P E A R A N C E S :

14   For the Government:   BRIDGET M. ROHDE, ESQ.
                           Acting United States Attorney
15                         Eastern District of New York
                           271 Cadman Plaza East
16                         Brooklyn, New York 11201
                    BY:  JACQUELYN M. KASULIS, ESQ.
17                       ALIXANDRA ELEIS SMITH, ESQ.
                         G. KARTHIK SRINIVASAN, ESQ.
18                       Assistant United States Attorneys

19   For the Defendant:    BRAFMAN & ASSOCIATES, P.C.
                           767 Third Avenue
20                         New York, New York 10017
                    BY: BENJAMIN BRAFMAN, ESQ.
21                       MARC AGNIFILO, ESQ.
                         ANDREA ZELLAN, ESQ.
22                       JACOB KAPLAN, ESQ.

23   Court Reporter:   Richard W. Barry, RPR
                       Official Court Reporter
24                     E-mail:  rwbarrycourtreporter@gmail.com

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

RB        OCR

- Proceedings -                               3855

1          THE COURT:  All parties and counsel are present.  As

2   you know, we had some weekend briefing on an issue regarding

3   Deborah Oremland an employee director of the FINRA Criminal

4   Prosecution Assistance Group.

5          And, the Government is proffering her as a summary

6   fact witness pursuant to Federal Rule of evidence 1006.  She

7   is prohibited from giving opinion testimony, apparently as a

8   FINRA employee and the Government discloses she is to testify

9   about the following:

10          One, the nature and structure and regulation of the

11   securities markets and the role of FINRA and the SEC.

12          Two, descriptions and explanations of certain

13   Securities and Exchange Commission rules, regulations and

14   forms, including rule 144, and schedule 13D and also, that she

15   would explain the purpose of these various rules, regulations

16   and forms.

17          For example, they intend to offer testimony as to

18   why schedule 13D requires the disclosure of the beneficial

19   ownership of more than five percent of a voting class of a

20   company's shares, namely that such a level of ownership could

21   allow an individual to affect the share price and thus the

22   market should be aware of beneficial ownership issues.

23          The third area is the witness would define various

24   terms including terms used in the 1934 act, such as free

25   trading shares, beneficial ownership and reverse mergers.

- Proceedings -                          3856

1        Fourth, that she would testify regarding certain

2  Retrophin filings which the Government plans to introduce

3  through her testimony and fifth, summaries of trading prices

4  and volumes of Retrophin stock trading and testimony regarding

5  the charts she has prepared.

6        My understanding is that the defense does not object

7  to the summary testimony nor the filings.

8             MR. AGNIFILO:  That's correct.

9             THE COURT:  Nor does the defense object to her

10  testimony regarding definitions of various terms or testimony

11  regarding the nature, structure and regulation of the

12  securities markets by FINRA and the SEC and the roles in that

13  process.

14        I think what the defense objects to specifically are

15  the cause part of the regulation testimony.  So for example,

16  the reason that schedule 13D requires disclosure of

17  five percent beneficial ownership is because, that is the part

18  that the defense objects to as opinion testimony proper only

19  for an expert.  And that this witness one, is prohibited from

20  offering expert opinion testimony; and two, that she was not

21  properly disclosed as an expert in advance of the trial.

22        I am assuming that the defense did ask for such

23  disclosures.

24             MR. AGNIFILO:  I believe we did, yes.

25             THE COURT:  And the Government does not-- I ask-- I

- Proceedings -                    3857

1   would say the Government's position is that she is a fact

2   witness, not an expert witness, but if they had to qualify her

3   as an expert they could do so.

4          My concern is that with regard to the objection to

5   the "because" part of the regulations, that she would be

6   offering more opinion testimony than fact testimony.  She

7   would be relying on her expertise and experience as a chief of

8   the Criminal Prosecution Assistance Group at FINRA, and on her

9   experience and knowledge, her specialized knowledge about the

10  regulatory financial aspects of her job, and that the

11  "because" part would tread very closely to linking that

12  testimony to the facts in the case.

13         And, I think that that part of her testimony should

14  be excluded.  It just-- I think runs the risk that she will

15  be-- although not directly linking, ultimate issues with her

16  testimony, it would be too close of a connection for the jury

17  to ignore and would risk usurping the jury's function as the

18  fact finder and the body that would apply the instructions on

19  the law.

20         I do believe that her testimony regarding what the

21  regulations provide would be helpful to the jury, to

22  understand the landscape that would give some background to

23  the testimony that we have been hearing.  The jury must be

24  wondering why all of this focus by the Government and the

25  defense on these various forms and various parts of these

- Proceedings -                                    3858

1    forms that were highlighted for the jury.

2            So, as long as this witness does not testify about

3    the purpose of the regs or you know, paint scenarios about why

4    the regs would be necessary to prevent certain problems that

5    affect the market and the investing public, I think that that

6    testimony should be appropriate.

7            Now, the question is whether we should give some

8    type of instruction to the jury, that obviously I will give

9    them instructions on the law including the regulatory and

10   statutory requirements and prohibitions.

11           And, I think that the limiting instruction if the

12   parties thought it appropriate would just remind the jurors of

13   what my role is vis-a-vis their role as fact finders.

14           I don't know whether the parties have suggestions.

15   I looked at the instruction that Judge Ward gave in a previous

16   case, but it was Varian(phonetic) that was reviewed by the

17   Circuit.  I do think that the difference, the main difference

18   there is that that witness testified as an expert.

19           So, I was going to propose the following and I am

20   open to any discussions.

21           Ms. Oremland will testify as to summaries of various

22   records relevant to this case.  In the course of her

23   testimony, she may also describe and explain her understanding

24   of various regulations and requirements governing the

25   securities industry.  She will also define terms that will be

- Proceedings -                    3859

1    important to understand.

2              Her testimony of any laws or legal requirements is

3    simply reflective of her opinion and you need not accept it as

4    true.  I will instruct you on the applicable law before you

5    begin your deliberations.

6              I don't know whether the parties have any objection

7    to that.

8              MR. AGNIFILO:  I have no problem with it.

9              THE COURT:  I think maybe the word "opinion" would

10   be problematic.

11             MS. KASULIS:  That is our concern.  We had the same

12   concern.

13             THE COURT:  Of her understanding.  Of her knowledge

14   and understanding perhaps --

15             MS. KASULIS:  What was the last sentence again, Your

16   Honor, I'm sorry.

17             THE COURT:  I will instruct you on the applicable

18   law before you begin your deliberations.

19             MS. KASULIS:  The second.

20             THE COURT:  The one I think put up the red flag for

21   both parties, her testimony of any laws or legal requirements

22   is simply reflective of her -- I think we can say, knowledge

23   and understanding perhaps.

24             MS. SMITH:  That is fine.

25             MR. AGNIFILO:  That is fine.

- Proceedings -                    3860

1          THE COURT:  Now the question is, we can do this at

2     the beginning of the testimony if that would be helpful or

3     when she starts to focus on the regs.

4          MS. SMITH:  Beginning.

5          MR. AGNIFILO:  I am assuming the Government will go

6     into it straight away so maybe the beginning is helpful.

7          THE COURT:  Or, rather than you need not accept it

8     as true, I can also say, and you should evaluate her testimony

9     as you would any other witness.

10          MS. KASULIS:  That is what the Government would

11     prefer, Your Honor.

12          THE COURT:  Will that be difficult to refocus your

13     examination of this witness in --

14          MS. KASULIS:  Your Honor, I think she is not going

15     to testify until the afternoon so I can re-work her a little

16     over lunch.  Thank you, Judge.

17          MR. AGNIFILO:  I have a quick issue with Corey

18     Massella whenever you are ready.

19          THE COURT:  I am listening.

20          MR. AGNIFILO:  The Government I think is going to

21     try to put in three exhibits, 123-10, 11, and 12, each of

22     which seem to relate to some type of argument between the

23     defendant and someone named Susan Chew.

24          The reason I raise it now, I believe it is

25     irrelevant.  I would not-- I will wait for Your Honor to get

- Proceedings -                    3861

1    to it.

2              THE COURT:  123 you said?

3              MR. AGNIFILO:  123-10, 11, and 12.

4              THE COURT:  I will get it right now.

5              (Pause.)

6              THE COURT:  All right.  So Susan Chew is who, one of

7    the auditors?  Who is she?

8              MR. AGNIFILO:  Susan Chew is with Citrin Cooperman,

9    with the accounting firm.

10             THE COURT:  Okay.

11             MR. AGNIFILO:  And the E-mail, 123-10 seems-- jumps

12   into the issue.  Mr. Shkreli says to Susan Chew in an E-mail,

13   do you know how I know you are an competent idiot.  You don't

14   know who your general counsel is.

15             I don't know that this has any relevance in this

16   case whatsoever, other than for the Government to instill in

17   the jury that Mr. Shkreli is speaking in what is arguably a

18   very inappropriate tone of voice.  I think other than

19   disparaging him and disparaging his character, which is

20   clearly not an appropriate purpose.  I don't see any relevance

21   to this E-mail or the entire area.

22             If Mr. Shkreli thought that Susan Chew did not know

23   who the general counsel was and she should have, I don't know

24   that that is relevant.  And certainly the way he expressed his

25   displeasure is likewise not relevant.

- Proceedings -                          3862

1          So, I would ask that the government not be permitted

2   to get into this back and forth, because I don't think it

3   plays any role in the case.

4          Specifically-- it looks like 123-11 is not related

5   to that.  So I-- 123-12 is because in 123-12, Mr. Cooperman

6   one of the principals of Citrin Cooperman writes to Martin,

7   basically says you shouldn't have spoken that way to my

8   employee.  I don't think any of it plays any role or relevant

9   aspect of the trial.

10          THE COURT:  Let's just back up.  You don't object to

11   123-11?

12          MR. AGNIFILO:  I don't know-- not for this person.

13   I don't know of what role it plays.  But it is not-- it

14   doesn't seem to be a continuation of-- it is the next day.

15   But it doesn't seem to be a continuation of 123-10.  So, no.

16   But I do object to 123-12.

17          THE COURT:  So 123-12, and 123-10.

18          MR. AGNIFILO:  That's right.  And the area related

19   to both.

20          MS. SMITH:  Your Honor, let me make an offer of

21   proof and give you some context of the area.

22          THE COURT:  Yes.

23          MS. SMITH:  In the spring of 2013, Citrin Cooperman

24   was working on finishing up the financials for Retrophin for

25   2012, and part of that process involved-- just to take a step

- Proceedings -                          3863

1    back.

2          So, when Retrophin went public it didn't have a CFO

3    or an internal accounting department.  So what they did is

4    hired Citrin Cooperman actually as subdivision of Citrin

5    Cooperman called SEC Solutions to try to create the books for

6    the company.

7          THE COURT:  This is Mr. Greebel's recommendation,

8    right?

9          MS. SMITH:  Yes.

10         THE COURT:  There was a relationship.

11         MS. SMITH:  He is the son-in-law I believe of Mr.

12   Citrin one of the founders.

13         So, there is Citrin Cooperman will be acting as

14   internal accounting department and then Marcum is doing the

15   audit.

16         In the spring of 2013, Citrin going public is trying

17   to tie up all the financials from 2012 and they are having a

18   lot of difficulty getting information out of Retrophin and

19   particularly out of Mr. Shkreli.  And there was a series of

20   back and forth where Mr. Shkreli kept pushing back and saying,

21   I don't know why you need all this information, I don't want

22   to give you this information.  You are taking too long.  You

23   know why do we need this much detail, why do I have to explain

24   everything.

25         And basically, he started getting very abusive.  The

RB         OCR

- Proceedings -                                3864

1   E-mail in Government Exhibit 123-10 is probably the best

2   example of Mr. Shkreli being abusive over an E-mail.  He was

3   also abusive verbally and the situation got so bad that Citrin

4   Cooperman actually resigned from the engagement in part

5   because they weren't getting the information they needed.  At

6   which point, you know they stepped down.

7            So, you know, we can focus on 123-10 and maybe not

8   on 123-12, if we wanted to kind of narrow this.  But I think

9   that the circumstances under which Citrin Cooperman resigned

10  are actually very important to the story.

11           And part of the reason like I said, is that they

12  were having troubling getting information out of Mr. Shkreli

13  and out of Retrophin, and getting this kind of push back and

14  it became incredibly verbally abusive.

15           I think actually in the grand scheme of things, that

16  he said in the course of that time period, this is relatively

17  tame.  I don't plan on eliciting other specific, you know,

18  things that he might have said to Mr. Massella or Ms. Chew.

19  But, I do think that getting the jury a flavor of what caused

20  them to resign is significant and important.

21           MR. AGNIFILO:  If I can, Judge.

22           THE COURT:  This testimony will come in through

23  which witness?

24           MS. SMITH:  Mr. Massella who is scheduled to testify

25  next.

- Proceedings -                                    3865

1           THE COURT:  This is Ms. Chew's supervisor.

2           MS. SMITH:  Yes.  So Mr. Massella was kind of the

3    head of the group and Ms. Chew was one of the accountants

4    working on the account.

5           MR. AGNIFILO:  123-10 has nothing to do with the

6    dynamic that was just laid out by the prosecutor that Shkreli

7    is not giving things over.  This is absolutely unrelated and

8    somewhat insulting.  I am not defending-- I'm not defending

9    the E-mail.  I am saying, it is insulting and has no role at

10   the trial.

11          It doesn't advance what the prosecution says they

12   are going to prove in the slightest.  There is no tie in to

13   information not being given over.  It seems to be just

14   something that Mr. Shkreli said in frustration, having nothing

15   to do with the--

16          THE COURT:  What does it have to do with -- he wants

17   to talk to the general counsel today.  This is on April 24th.

18   Was it in the context of the relationship with the accountant?

19          MS. SMITH:  Yes, Your Honor, he said he was going to

20   sue Citrin Cooperman because they weren't moving fast enough.

21          So in terms of moving fast enough means get me my

22   accounting without answering the questions that you want

23   answered.  That is the reason why he is asking for the general

24   counsel's contact information.

25          MR. AGNIFILO:  To put in this E-mail which is--

RB        OCR

- Proceedings -                                    3866

1  doesn't make that-- they can bring that as a general matter if

2  Mr. Massella is knowledgeable about it.  This is an E-mail

3  having nothing to do with that on its face.  And the reason

4  they want it in, if-- let's all be honest, is because it makes

5  Mr. Shkreli look terrible.  It is a-- somewhat of an offensive

6  E-mail, there is no other way to put it.  I'm not defending

7  it, but it plays no role in this trial.

8           The reason they want it in, they plucked this out of

9  thousands and thousands of E-mails they have, is because it

10  makes him look bad and that is precisely what they are not

11  supposed to do.

12          If they wanted to get into the area of things being

13  provided or not being provided or Mr. Shkreli suing Citrin

14  Cooperman, they can do all that.  But they can't do that with

15  this E-mail because this E-mail on its face doesn't do any of

16  those things.  It basically is Mr. Shkreli expressing

17  frustration at Susan Chew.  In ways that probably if you would

18  have had the chance to not hit the send button, you would not

19  have hit the send button.

20          But this plays no role in this trial and this is

21  only going to inflame the jury and make them dislike Mr.

22  Shkreli.  It is a 403 issue.  First of all I don't think it is

23  relevant under 401.  I don't think it plays any role in the

24  issue.

25          THE COURT:  If we are going to be admitting 123-12.

- Proceedings -                          3867

1          MR. AGNIFILO:  I object to both.  They said they
2     would withdraw it.
3          MS. SMITH:  As between the two of them, my
4     understanding is this is the E-mail that originally started,
5     had Citrin Cooperman start thinking about resigning.
6          THE COURT:  The whole scenario that you are
7     describing Ms. Smith is pretty much laid out in 123-12.  There
8     was frustration that this audit was not moving fast enough.
9     There were E-mails by some other person, Leonora Izerne.
10         MS. SMITH:  Mr. Shkreli's sister.
11         MR. AGNIFILO:  From my prospective I have less of a
12    problem with 123-12 than I do with 10.
13         THE COURT:  The thing is though that Mr. Cooperman
14    then E-mails Mr. Shkreli and his sister subsequent to the
15    exchange that we see in 123-10 complaining about the treatment
16    of Ms. Chew.  I think I agree with you it is highly
17    inflammatory.  It is something that would probably upset most
18    people reading or have them view Mr. Shkreli in a very
19    negative light.
20         I think that the 123-12 chain does lay out the whole
21    problem with documents being requested, a view in Mr.
22    Shkreli's office that they have given documents over multiple
23    times and that, you know, the audit needs to be done.  And
24    then there is an E-mail where there is sort of, you can't fire
25    me, I quit kind of exchange.

RB          OCR

- Proceedings -                          3868

1              MS. SMITH:  Yes.

2              THE COURT:  So I think that to the extent you are

3     offering background for the relationship and the relevance of

4     the audit to the overall case that you are presenting, I think

5     that 123-12 would be a better example of showing what was

6     going on.

7              MR. AGNIFILO:  That is fine.

8              THE COURT:  Would that be all right with you?

9              MR. AGNIFILO:  I think that is fine.

10             THE COURT:  I will exclude 123-10 for the reasons

11     stated by the defense.

12             MR. AGNIFILO:  Thank you, Judge.

13             MS. SMITH:  Okay.

14             I do plan then in connection with 123-10-- 123-12

15     without going into the content, to have Mr. Massella explain

16     that this was not the first E-mail along these lines and that

17     Mr. Shkreli had sent E-mails as well.

18             Which I think is frankly stated in Mr. Cooperman's

19     E-mail when he says, I have reviewed your series of E-mails.

20     But I won't go into the language of these E-mails or anything

21     like that.

22             THE COURT:  All right.  Would that be all right?

23             MR. AGNIFILO:  Yes.

24             THE COURT:  He can testify there was a deteriorating

25     relationship.

- Proceedings -                                3869

1          MR. AGNIFILO:  I think that is completely

2     appropriate, yes.

3          THE COURT:  All right.  We will check and see if all

4     the jurors are here now.

5          COURTROOM DEPUTY:  They are.

6          THE COURT:  Are you ready to bring them in?

7          Mr. Agnifilo?

8          MR. AGNIFILO:  Yes, Judge.

9          THE COURT:  Which series of exhibits will we be

10    looking at this morning.

11         MS. SMITH:  It is the 123 and also 119.  Most of the

12    119 we will look at, are already in evidence.

13         THE COURT:  Thank you.

14         Can I ask the parties in the future, if there are

15    issues regarding the evidence that we not have all these

16    weekend submissions.  Let's just get to them.  They should

17    have been really dealt with well in advance of the trial.  I

18    am giving you latitude, but it would be nice to get these

19    clarified during the week and well before the witness testifies.

20         Thank you.

21         (Jury entering.)

22         THE COURT:  We have all our jurors present.

23         Good morning ladies and gentlemen, please have a

24    seat everybody.

25         Is the Government prepared to call their next witness?

Massella - Direct - Smith                    3870

1        MS. SMITH:  Yes, Your Honor, the Government calls
2   Corey Massella.
3        THE COURT:  Mr. Massella, please raise your
4   right-hand.
5   COREY MASSELLA, having been first duly sworn by the Court,
6   took the stand and testified as follows:
7        THE COURT:  Thank you.  Please proceed.
8   DIRECT EXAMINATION BY MS. SMITH:
9   Q    Good morning Mr. Massella.  How old are you?
10  A    56.
11  Q    Where do you currently live?
12  A    Long Island, New York.
13  Q    What is your highest level of education?
14  A    BS in accounting.
15  Q    What school did you go to, to get your Bachelor of
16  Science?
17  A    SUNY at Buffalo.
18  Q    When did you graduate?
19  A    1982.
20  Q    In addition to your college degree, do you have any
21  professional certifications?
22  A    I am a certified public accountant.
23  Q    What does it mean to be a certified public account?
24  A    It means I am able to practice accounting in the public
25  eye, which some of that would be, able to certify financial

RB        OCR

statements and sign tax returns.

Q    What is necessary to get a CPA?

A    A 3-day exam and passing all parts.

Q    Are you licensed in a particular state?

A    Yes, New York State.

Q    What year did you get your license?

A    1984.

Q    Where did you work after college?

A    I worked at-- I started at a small accounting firm,
migrated eventually to a big four accounting firm and then
subsequent to that, became a partner in smaller firms and then
eventually ran my own firm.  Then merged into a larger firm.

       One of my focuses was in securities financial
reporting and accounting.

Q    When you say, a big four accounting firm, what do you mean?

A    I mean the largest accounting firms in the world.  At
that time it was actually there were the big eight, as time
progressed they merged and became four.

Q    Which one were you at?

A    I was at Deloitte.

Q    What company did you found on your own?

A    I founded SEC Solutions Group which was-- then I also had
my accounting firm which was Massella & Associates.

Q    What was SEC Solutions Group?

A    SEC Solutions Group was focused on assisting companies

Massella - Direct - Smith                    3872

1    that-- in securities financial reporting and generally

2    accepted accounting principles reporting and a good portion of

3    the clients we represented were those that were going to be

4    going public or those that were deficient in their financial

5    reporting department.

6    Q    For the companies that SEC Solutions did work on that

7    were going to go public, what kind of work did SEC Solutions

8    do?

9    A    We packaged-- we went through the books and records, we

10   looked over whether they were in compliance with generally

11   accepted accounting principles and also then eventually

12   brought them to the level of SEC for reporting.

13            But at the same time we were trying to package it

14   up, put together a set of financial statements which would be

15   a balance sheet, income statement, cash flows, statements of

16   equity and then footnotes that supported that.  And then

17   behind that we were helping them to support, to put together

18   work papers.  Each engagement depends upon the sophistication

19   of the Accounting Department that the company had.

20   Q    What was your role at SEC Solutions?

21   A    I was the partner in charge.  I led our team.

22   Q    How many people worked at SEC Solutions?

23   A    Approximately six.

24   Q    What was Citrin Cooperman?

25   A    Citrin Cooperman was the accounting firm that I merged in

1  in 2009.  Citrin Cooperman is one of the top 20 accounting

2  firms in the country.

3  Q    What was the relationship when you merged between Citrin

4  Cooperman and SEC Solutions?

5  A    I merged in the accounting firm and Citrin Cooperman

6  became the owner of SEC Solutions Group.

7  Q    How did what work SEC Solutions did change when you

8  became a part of Citrin Cooperman?

9  A    Just additional resources because it was a larger

10  accounting firm to draw from.

11  Q    During your time working for SEC Solutions, how many

12  companies did you work with that were in the process of

13  transitioning from private to public companies?

14  A    Approximately fifty.

15  Q    Are you familiar with the company called Retrophin?

16  A    Yes, I am.

17  Q    How did you first hear of Retrophin?

18  A    I was introduced to Retrophin from Evan Greebel who was

19  an attorney at Katten Muchin and David Bukzin from who is a

20  partner at Marcum, another accounting firm.

21  Q    When did you first meet Evan Greebel?

22  A    I met Evan Greebel at a holiday party with one of our

23  business development personnel at Citrin Cooperman.

24  Q    What if any was Mr. Greebel's connection to Citrin

25  Cooperman?

Massella - Direct - Smith                    3874

1    A    Evan Greebel was the son-in-law of Niles Citrin, the

2    first name in the Citrin Cooperman.

3    Q    Did you and Mr. Greebel discuss Retrophin at the holiday

4    party?

5    A    Not at all.

6    Q    When did he first raise Retrophin to you?

7    A    Sometime, you know probably a month or two before we were

8    engaged which was, it had to be a number of months after.  I

9    don't remember the exact dates.  But it was not immediately.

10   Q    And you mentioned a second individual who also told you

11   about Retrophin, who is that?

12   A    That is David Bukzin who runs the SEC Financial Reporting

13   Department at Marcum and Marcum is actually a larger firm than

14   Citrin is.

15   Q    What was your understanding about what kind of company

16   Retrophin was?

17   A    Retrophin was a company that was going to -- strategy was

18   to raise capital and go public.

19   Q    And did there come a time that you met with anyone at

20   Retrophin?

21   A    There was a time when I met with Martin and Jackson.

22   Q    Who arranged that meeting?

23   A    That is a good question, I think the original contact

24   came from -- David Bukzin made the contact.  We reached out

25   and spoke and then arranged a meeting after we got on the

Massella - Direct - Smith                    3875

1   phone.  I may have spoken to Jackson or Martin, I don't know

2   which one I spoke to.

3   Q    When you say, Martin, are you referring to the defendant,

4   Martin Shkreli?

5   A    Yes.

6   Q    Where did the meeting with the defendant and Jackson Su

7   take place?

8   A    In their office.

9   Q    And what was your understanding of Jackson Su's role at

10  Retrophin at the time of the meeting?

11  A    At the time of the meeting he was the chief operating

12  officer and was going to assist as-- assist us in the

13  accounting.

14  Q    What was your understanding of what Mr. Shkreli's role

15  was at Retrophin at that time?

16  A    He was the CEO and the leader of the company.

17  Q    What was the purpose of the meeting?

18  A    The purpose of the meeting was initially an interview,

19  whether we had the skill sets, and then the second part was

20  whether they would engage us with which at a certain point

21  that did occur.

22  Q    And what was discussed during the meeting?

23  A    What was discussed in the meeting was Martin explained--

24  explained to us what his strategy was, that he was going to--

25  he would have -- formally had been successful as a fund

RB          OCR

Massella - Direct - Smith                    3876

1   manager and that he-- because of his success there, he now

2   wanted to go ahead and go into the live science arena and

3   build a company and raise capital and take his knowledge in

4   that role.

5   Q    What was your impression of the defendant at the meeting?

6   A    I thought that he was-- he did brag a lot in trying-- in

7   impressing me.  Was -- seemed very intelligent, very

8   calculated and that's all I can assess at that meeting really.

9   Q    Was that the first time that you met the defendant in

10  person?

11  A    Yes.

12  Q    Mr. Massella, would you please take a look around the

13  courtroom and tell us if you see the defendant Martin Shkreli?

14  A    Yes.

15  Q    And can you identify him by a piece of clothing he is

16  wearing?

17  A    White shirt, grey suit.

18          THE COURT:  We will note that the witness has

19  identified Mr. Shkreli.

20  Q    Following that initial meeting, what was the next step

21  for SEC Solutions and Retrophin?

22  A    It was to analyze how they had been keeping their

23  accounting records and then to come up with a plan and what we

24  would call an open item list as to how we would proceed.  He

25  would be the point person, which was Jackson Su.

Massella - Direct - Smith                    3877

1   Q    I will show you what is marked as Government

2   Exhibit 119-3, which is behind tab one in your binder.  It is

3   already in evidence.  If we can focus on the top two E-mails.

4           So if we look at the middle E-mail which is on

5   Tuesday January 24th, 2012, from you to Jackson Su.  And you

6   are providing some feedback on the bank statement and some

7   other additional information that you are looking for.

8           What was the purpose of this E-mail?

9   A    Fact gathering, and also the fact that there was the

10  state of the records was-- wasn't put together.  There was no

11  accounting, formal accounting system that they were using.

12  There were just bank statements and the deposits, the wires,

13  hadn't been identified.

14  Q    When you say, "they", do you mean Retrophin?

15  A    Yes.

16  Q    And if you look at the top E-mail which is from Jackson

17  Su to yourself, on January 24th, 2012, it says that there is

18  an engagement letter attached?

19  A    Yes.

20  Q    If you can turn to the third page of your document.

21          What is this document?

22  A    This is -- our engagement letter.

23  Q    What is the date?

24  A    January 19th, 2012.

25  Q    It is addressed to Martin Shkreli, of Retrophin LLC, 330

RB        OCR

Massella - Direct - Smith                3878

1  Madison Avenue, New York, New York.  Was Retrophin a Limited

2  Liability Company or LLC at that point in time?

3  A    Yes.

4  Q    Did it stay an LLC during the entire time that you worked

5  with Retrophin?

6  A    No, it converted to a C Corp.

7  Q    What is a C Corp?

8  A    A C Corp is -- an LLC, is a limited liability

9  corporation, and a C corporation is a different form of legal

10 entity.

11 Q    What is the difference between an LLC and a C

12 corporation?

13 A    The LLC you are able to have partners.  The way you issue

14 ownership is different than a C Corp.  A C Corp has

15 shareholders.  A limited liability company issues units for

16 ownership.

17 Q    Approximately when did Retrophin shift from an LLC to a C

18 Corporation?

19 A    I would say later in that year.  I'm not sure of the

20 exact timing, but later in that year.

21 Q    Was that before or after Retrophin became a public

22 company?

23 A    It was absolutely before it became a public company.  The

24 strategy originally was in the LLC format and that was put on

25 hold and then it eventually changed and converted to a C Corp,

Massella - Direct - Smith                    3879

1    later on.

2    Q    And if we can look at the section in the middle of that

3    page that says, SSG will perform the following services.

4    A    Yes.

5    Q    So, SSG is that SEC Solution Group?

6    A    Yes.

7    Q    And during the time period when you were doing work for

8    Retrophin, were you interchangeably referred to as SEC

9    Solutions Group and Citrin Cooperman?

10   A    No, we were SEC Solutions Group.

11   Q    But at the time you were part of Citrin Cooperman, is

12   that right?

13   A    Absolutely.

14   Q    And so if you can read-- it says SSG will perform the

15   following services.  If you can read that.

16   A    Assist in compiling information you provide with the

17   unaudited financial statements for the year ended December 31,

18   2011.

19   Q    What does it mean by, unaudited financial statements?

20   A    That means that we were compiling-- starts with compiling

21   information, and that means we are putting together

22   information.  And "unaudited" means we are not auditing, not

23   doing additional procedures, we are not testing anything.  We

24   are putting together the books.

25              (Transcript continues on next page.)

Massella - direct - Smith                    3880

1    BY MS. SMITH:  (Continuing)

2    Q    Does that mean you're simply serving as the internal

3    accounting function for the company?

4    A    We are -- well, I wouldn't say internal.  Internally it's

5    Jackson, but we are assembling it to get it ready for the

6    auditors in this case so that it can be packaged and go

7    through the process and also at the same time, we're taking it

8    beyond that, just putting the books together, but we're

9    actually assembling and putting together the financial

10   statements that are a little more complex because we have that

11   skill set to keep them in compliance with generally accepted

12   accounting principles.

13   Q    And so what the difference between what SEC Solutions was

14   doing and what an auditor would ultimately do?

15   A    We were -- I guess, in a sense, we were assisting in

16   guiding them on what was necessary to package up and get ready

17   for an audit.  We were not the auditors and at the same time,

18   we were guiding them through how you would properly record

19   things and also assembling the supporting information and work

20   papers to get through the process.

21   Q    If you can look a little bit further down the page,

22   there's a section that says, "Our engagement is limited."

23   A    Yes.

24   Q    Can you just read that paragraph?

25   A    Our engagement is limited to assisting the company in

Massella - direct - Smith                    3881

1    presenting in the form of financial statements information

2    that is the representation of management.  We will not audit

3    or review the financial statements and, accordingly, will not

4    express an opinion or any other form of assurance on them.

5    The financial statements will not be accompanied by a report.

6    Q    And does that summarize sort of the role of SEC

7    Solutions?

8    A    Yes.

9    Q    If you could turn to page four which is the next page,

10   and then the second paragraph there, if you can read this

11   second paragraph starting with "Our engagement cannot."

12   A    Our engagement cannot be relied upon to disclose errors,

13   fraud or illegal acts that may exist.  However, we will inform

14   the appropriate level of management of any material errors and

15   of any evidence or information that comes to our attention

16   during the performance of our engagement that fraud may have

17   occurred.  In addition, we will report to you any evidence or

18   information that comes to our attention during the performance

19   of our engagement regarding illegal acts that may have

20   occurred unless they are clearly inconsequential.

21   Q    And what does that language mean?

22   A    That means that we're not doing anything related to any

23   audit procedures.  These are management's financial

24   statements, but if we do, we do find evidence or we do come

25   across anything that's of a material nature, we would review

Massella - direct - Smith                    3882

1   it with management and inquire.

2   Q    And when you say "management," what do you mean by

3   management?

4   A    The officers of the company.

5   Q    And if you scroll down further down on the page, there's

6   a section called "What the company will be responsible for."

7   Can you just read that section?

8   A    Keeping the commitments that are made with regard to

9   implementation of ideas and actions that have been agreed to.

10  Although we may advise you about appropriate accounting

11  principles and their application, the collection of the

12  accounting principles used by the company and the method of

13  application are the final responsibilities solely of

14  management.  This final responsibility includes the

15  establishment and maintenance of adequate records and related

16  internal controls, the selection and application of accounting

17  principles and the safeguarding of assets.  In the course of

18  providing our services, we may provide to management proposed

19  adjusting journal entries to the company's books and records,

20  however, the final decision whether or not to accept such

21  entries shall be solely that of management.

22  Q    And so what does it mean, "the company will be

23  responsible for"?

24  A    It means we're going to be -- anything we're working on,

25  whether we're adopting an accounting principle to be in

Massella - direct - Smith                    3883

1  conformity with generally accepted accounting principles,

2  we're going to go over it and review it with management.  If

3  there's a choice, we're going to go over it, but they have to

4  make the selection because they do own those financial

5  statements and also if we come across anything related to the

6  accounting records or the controls or something that has been

7  brought to our attention, we're going to make the

8  recommendations that they still, the final decisions are

9  always their decisions.  And also, when we propose items that

10  we come across that we believe should be adjusted and

11  corrected that they put into their books, we will propose the

12  journal entry, the corrections.  They approve it and then they

13  are recorded.

14  Q    Is the determination of how certain expenses are

15  classified, personal versus business expenses, one of the

16  decisions that ultimately rests with management?

17  A    Yes.

18  Q    And if we can turn to the last page of the document which

19  is page six.  Just zoom in on the top half.

20        Who signed this document on behalf of SEC Solutions?

21  A    Myself.

22  Q    And on behalf of Retrophin, who signed the document?

23  A    Martin.

24  Q    And what's the date?

25  A    January 19, 2012.

Massella - direct - Smith                    3884

1   Q    So what was your role with respect to the Retrophin

2   engagement?

3   A    Initially -- I was the partner.  I had staff that were

4   working on it to move it forward, but initially, I was

5   involved for the planning aspect of what we had to do.

6   Q    Who was your main point of contact at Retrophin when you

7   started the engagement?

8   A    Jackson Su.

9   Q    Was Jackson Su your main point of contact the entire time

10  that SEC Solutions did work for Retrophin?

11  A    No.

12  Q    Who filled Mr. Su's role in later time periods?

13  A    Ron, Ron Tilles, and Marek.  I don't remember Marek's

14  last name.

15  Q    And what did you do at the beginning of your work for

16  Retrophin in early 2012, around the time of this engagement

17  letter?

18  A    We helped them to set up an accounting system.  So, we

19  had them set up QuickBooks.  We initialized it for them, but

20  then we also then had Jackson put in the cash entries because

21  initially, we were trying to just figure out where the cash

22  had gone and he was going to put it in and part of that would

23  be to reconcile the bank accounts to make sure that they, the

24  entries that are in the books and records at least, at a

25  minimum, agree to what's in the bank account.  Then we would

Massella - direct - Smith                    3885

1  post that, then we would review it and start to analyze where

2  things had been posted and then start to ask for supporting

3  documentation.

4  Q    What was your impression of the state of the financials

5  at Retrophin at the beginning of the engagement?

6  A    They were very chaotic.

7  Q    Why do you say that?

8  A    There were a lot of, there was -- nothing had been put in

9  but there are a lot of very, very small entries and a lot of

10 entries that came from debit cards that amounted to a very

11 large amount of entries.

12 Q    When you say a large amount of entries, what do you mean?

13 A    We're talking about cash, cash transactions that went

14 through the bank account that were very de minimus.  There

15 were some that were in the dollar range, $3 and $4 range, that

16 becomes very cumbersome putting them into the books and

17 records.

18 Q    What issues, if any, did you encounter as you started to

19 do work for Retrophin?

20 A    We found that there were a lot of entries that were

21 personal in nature that we had to kind of carve out so we can

22 identify what pertained to the company.

23 Q    Were there any issues with cash control of the company?

24 A    There wasn't -- the only cash control was Martin had,

25 Martin signed -- Martin had the debit card so there was no

Massella - direct - Smith                    3886

1    segregation of duties so Martin did control the cash account.

2    Q    What do you mean by segregation of duties?

3    A    There was nobody that was reviewing the -- as an expense

4    comes up, you would have, somebody would sign a check as in

5    somebody would authorize it or prepare a check or -- it was

6    just one person.

7    Q    What is cash control?

8    A    Cash control is basically to make sure that someone

9    doesn't misappropriate funds.

10   Q    And why is that important?

11   A    Because if no one is -- if one person has control, that

12   person can do what they like with the account, they can

13   transfer the money personally or they could be paying people

14   that are inappropriate.  If you have controls, there's a

15   double check and another person or officers or multiple people

16   that are reviewing this to make sure that the

17   misappropriations don't happen.

18   Q    Did you have any discussions with the defendant about the

19   need for cash control or dealing with some of these smaller

20   expenses?

21   A    We did talk about some of the smaller expenses which, you

22   know, items like, you know, iTunes, Starbucks, many, you know,

23   travel expenses.  So, we really went through it and tried to

24   delineate what was personal in nature versus what was related

25   to the corporation -- I mean the LLC.  I'm sorry.

                        Massella - direct - Smith              3887

1   Q    What was the defendant's response to those discussions?
2   A    Partially, it was kind of irrelevant and distracting, but
3   he eventually went through it, yes.
4   Q    And in terms of the information that was provided to you
5   in connection with the financials, where did that information
6   come from?
7   A    The information was mainly fed to us through Jackson.
8   Q    Where did the information come from originally?
9   A    The information came from the bank accounts and then
10  Jackson was reviewing it with Martin to decide where the
11  classifications would be.
12  Q    And in terms of other, you know, smaller companies that
13  you worked with that you've taken public, were the financials
14  at Retrophin better or worse than the average company at that
15  point in time?
16              MR. AGNIFILIO:  I'm going to --
17              THE COURT:  Excuse me.  There's an objection so I am
18  going to sustain it.
19  Q    I'm going to show you a document that's already in
20  evidence as Government Exhibit 119-4, which is tab 2 in your
21  binder, and if we can focus on the bottom e-mail dated
22  February 16th at 6:38.
23              Who is this bottom e-mail from?
24  A    Evan Greebel.
25  Q    And who is it to?

Massella - direct - Smith                    3888

1    A    Jackson Su.

2    Q    And is the defendant and someone named David Kravitz also

3    copied?

4    A    Yes.

5    Q    And the subject line is:  Retrophin Capitalization Table

6    and Related Vesting Schedule.

7    A    Yes.

8    Q    And can you read the first, the number one bullet point

9    under the section that says, Per your e-mail earlier today?

10   A    The December 31, 2011 capitalization table is attached.

11   We have a more current one that reflects all transactions

12   since December 31, 2011 as well.

13   Q    And then if we can scroll up to the response, the

14   response is from Jackson Su on February 16, 2012 to

15   Mr. Greebel, the defendant and Mr. Kravitz.  What is Jackson

16   Su asking for in this response?

17   A    Please send over the most recent cap. table as well.

18   Q    And then if we can scroll up again to the next e-mail.

19   What law firm is David Kravitz from?

20   A    Katten.

21   Q    And that e-mail is from Mr. Kravitz to Jackson Su,

22   Mr. Greebel and the defendant, and he writes:  Jackson, the

23   most recent cap. table is attached.  Then if we can scroll up

24   to the top e-mail, what does Jackson Su do in the top e-mail?

25   A    He forwards it to my, Susan Chew, who is one of my

Massella - direct - Smith                          3889

1    employees, and myself.

2    Q    And why were you receiving the cap. table in connection

3    with your role with the financials?

4    A    We used the cap. table to, based on the cash

5    transactions, to see that the cash that went through the bank

6    accounts agrees to the ownership and what was paid for the

7    ownership in the company.

8    Q    And if you look at the attachment to that e-mail, it

9    says, Retrophin Capitalization Table revised February 16,

10   2012.  Is that right?

11   A    Yes.

12   Q    If we can turn to page three of the document, this is

13   titled Retrophin LLC Capitalization as of February 16, 2012.

14            What is a capitalization table?

15   A    It shows the ownership structure of the company.

16   Q    And on this particular capitalization table, there are

17   three types of classes, Class A Common Investment unit, class

18   B Common Incentive unit and C, Preferred Unit.

19   A    Yes.

20   Q    What are the differences between those three classes?

21   A    The Common A units in this case were the founders' units.

22   They had full, full control of voting.  The Class B were the

23   Common Incentive units and these were units that were given

24   out as, for services which then vested over time.  The longer

25   you work, the more you vested and actually owned the shares.

Massella - direct - Smith                    3890

1    The Series A Preferred units were investors that put cash in.

2    They were a different class.

3    Q    And why -- do you know why it says unit instead of shares

4    on this table?

5    A    Because it was a limited liability company at that time.

6    Q    So, if we go back up to the Class A, you said those were

7    founders' shares, founders' units.  What is a founders' unit?

8    A    It's when the company was established.

9    Q    And how many founders' units does Mr. Shkreli have on

10   this cap. table?

11   A    290,660.

12   Q    And how many units does MSMB Healthcare LP have?

13   A    30,000.

14   Q    And how about Mark Shkreli?

15   A    1,000.

16   Q    And then if we look down to the Class B Common Incentive

17   unit, you said that these were for individuals who had been,

18   received units in return for services.  Does that mean that

19   they were employees or did work for the company?

20   A    Yes.

21   Q    And can you just explain again what you mean by vesting?

22   A    Vesting?  When you receive the units, they're in the

23   agreement as -- when it says that it's going to be vesting, it

24   means that over time or some threshold, you earn and get to

25   keep the units and you actually own the shares at that time.

Massella - direct - Smith                    3891

1  Q    And if you look at the first line under Class B Common

2  Incentive unit, how many Common Incentive units did

3  Mr. Shkreli have?

4  A    162,140.

5  Q    And then finally, if you look down at the Series A

6  Preferred units, you said these represented individuals or

7  entities that had purchased an equity stake in the company, is

8  that right?

9  A    Yes.

10 Q    And if we can just look here, the first line there says

11 April 20, 2011.  The investor is listed as Steve Richardson

12 and then the amount is $50,000 and the units is 2,500.  Is

13 that right?

14 A    Yes.

15 Q    Then looking down the page, there's also an entry for

16 Dynagrow/Sarah and Fred Hassan on April 28, 2011.  Is that

17 right?

18 A    Yes.

19 Q    And then there are four entries for MSMB Healthcare LP?

20 A    Yes.

21 Q    And the last entry for MSMB Healthcare LP is on

22 February 1, 2012 and is for $900,000 equity investment for a

23 total of 22,500 shares.  Is that right?

24 A    Correct.

25 Q    What was MSMB Healthcare?

Massella - direct - Smith                    3892

1    A    It was the related party that was a fund that Martin was

2    controlling in the past.

3    Q    When you say a fund that Martin controlled in the past,

4    what do you mean?

5    A    I just -- for us, it was a related party that Martin

6    controlled.

7    Q    What is a related party?

8    A    It means that the person controlling the corporation

9    we're working on is also related.  Whatever transactions there

10   are between another party that they control, those are related

11   party transactions that have to be identified.

12   Q    And why do related party transactions have to be

13   identified?

14   A    Because you need to -- the readers and the company need

15   to make sure that they're at an arm's length transaction

16   similar to what an outside party -- the transactions are done

17   the same way they would be done with an outside party.

18   Q    And so is disclosure important to understand that that

19   transaction with a related party may be different than a

20   transaction with an outside party?

21   A    Yes, very important.

22   Q    And what was your understanding of the relationship

23   between MSMB Healthcare and Retrophin?

24   A    My understanding is they were separate entities and it

25   was, there was -- they were an investor and there were funds

Massella - direct - Smith                    3893

1  going back and forth late are on after this.

2  Q    Did you ever see the books and records for MSMB

3  Healthcare?

4  A    No.

5  Q    Did you have an understanding of how many MSMB entities

6  there were?

7  A    At that time no.

8  Q    Did you ever see the books and records of any MSMB

9  entity?

10 A    No.

11 Q    And looking at the capitalization table as of

12 February 16, 2012, are there any other MSMB entities listed on

13 the table?

14 A    No, only MSMB Healthcare.

15 Q    Earlier, you had mentioned that there was an individual

16 from Marcum which is an auditing firm that introduced you in

17 part to Retrophin.  Did Marcum do any work for Retrophin?

18 A    Marcum was the auditors for Retrophin.

19 Q    Who at Marcum worked on Retrophin?

20 A    Ed Hackert.

21 Q    You were originally engaged or SEC Solutions was

22 originally engaged in January of 2012.  How long did

23 SEC Solutions do work for Retrophin after that initial period?

24 A    I think we, I think we carried into 2013.

25 Q    Was there any period of time where SEC Solutions was not

                        Massella - direct - Smith                3894

1   working on Retrophin?

2   A    Yes.

3   Q    And what happened?

4   A    We were -- we had to put the pencils down.  It was a

5   period of time where the engagement and putting the initial

6   December 11th numbers together was stopped.

7   Q    Why was it stopped?

8   A    We were told by the client to stop doing, stop doing

9   work.

10  Q    Did there come a time when SEC Solutions started doing

11  work for Retrophin again?

12  A    Yes.

13  Q    I'm going to show you what's been marked for

14  identification as Government Exhibit 123-14 which is tab 7 in

15  your binder.

16            So what is this document?

17  A    This is a new engagement letter.

18  Q    And what's the date of this document?

19  A    November 1, 2012.

20  Q    And is this in connection with your work for Retrophin?

21  A    Yes.

22            MS. SMITH:  Your Honor, the government moves to

23  admit Government Exhibit 123-14.

24            MR. AGNIFILIO:  I have no objection.  I note that

25  it's not signed by Mr. Shkreli, but I think that they're going

```
                  Massella - direct - Smith                3895
```

1    to cover that.

2            THE COURT:  All right.  We will admit Government's

3    Exhibit 123-14.

4            (So marked.)

5    Q    And is it on your screen as well?

6    A    Yes.

7    Q    So what is this document again?

8    A    It is a new engagement letter to continue work on a new

9    period of financial statements.

10   Q    And what's the date of the engagement letter?

11   A    November 1, 2012.

12   Q    And if you look down the page, there's, again, a section

13   that says, SSG will perform the following services.  If we can

14   zoom in on that.  Can you just read that section?

15   A    Assist in compiling, from information you provide, the

16   unaudited financial statements for the nine months ended

17   September 30, 2012.

18   Q    And so what services were going to be provided in

19   connection with this engagement letter?

20   A    Similar to the December 2011, we were going to compile

21   and put together financial statements.

22   Q    And is the language in this engagement letter the same as

23   the language we saw in the initial engagement letter?

24   A    Yes, it is.

25   Q    And if we turn to the last page, which I believe is page

Massella - direct - Smith                3896

1   four, who signed this letter for SEC Solutions?

2   A    I did.

3   Q    And is there a signature for Mr. Shkreli on this version

4   of the document?

5   A    No, there isn't.

6   Q    Did SEC Solutions, in fact, perform the work outlined in

7   this engagement letter?

8   A    Yes, we did.

9   Q    And was SEC Solutions paid for the work performed in this

10  engagement letter?

11  A    Yes, we were.

12  Q    When SEC Solutions restarted work for Retrophin, was

13  there a timeline for the company to go public?

14  A    Yes.

15  Q    And what was the timeline?

16  A    The timeline would have been February 15th.

17  Q    How are you calculating that time?

18  A    135 days from the financial reporting period which is

19  September 30th.

20  Q    And how -- why is there kind of that time frame from the

21  date of the financials to when a company can go public?

22  A    Because the SEC requires that the numbers, we'll use the

23  word stale, they cannot be -- they have to be within a certain

24  period to -- financial statements that are submitted with the

25  documents that go public, that 135 day rule I just mentioned

Massella - direct - Smith                    3897

1    would be, would come into play.  So, September 30th would be

2    the reporting period for the financial statements and then you

3    just do the calculation.  The SEC has to review the document

4    and clear the document before you can go public.  There's a

5    time frame that you have to go through a process too.

6    Q    And as a result of that time frame, was there some

7    urgency to the work you were doing for Retrophin during that

8    period?

9    A    Yes, it was a short time frame.

10   Q    How was Retrophin going to become a public company?

11   A    At that time?  At that time, they were going to do what's

12   called a reverse merger.

13   Q    What is a reverse merger?

14   A    A reverse merger is a private company merging into a

15   public shell.  A public shell is the company that doesn't have

16   any active form of business and taking control of that public

17   company by legally taking control, then there are shares

18   effectively and then start trading as a public company.

19   Q    Was that the original plan for taking Retrophin public

20   when you started the engagement in January of 2012?

21   A    No, I think they were going for a registration statement

22   at that time.

23   Q    What's a registration statement?

24   A    It's a larger document where you're basically, you're

25   putting together and you're registering as an entity to go

Massella - direct - Smith                    3898

1    public with the SEC.

2    Q    And in the time period that you were working for

3    Retrophin in getting the financials ready to go public, were

4    there any challenges to getting the work done in that time

5    period?

6    A    Yes, there were.

7    Q    What were those challenges?

8    A    Trying to, trying to gather up the information on the

9    capitalization table to get that down.  There was also a

10   conversion from the units to, to stock which is a different

11   form because that was a C corp.  In addition, some questions

12   related to some loans and a lot of cash transactions so we

13   were trying to work through some of those issues.

14   Q    I'm going to show you what's been marked as Government

15   Exhibit 119-13 which is tab 9 and it's already in evidence.

16   This is an e-mail from Jackson Su to you, to Di Jia Liang and

17   to Susan Chew on Wednesday, November 14, 2012.

18           What is the subject of this e-mail from Jackson Su?

19   A    It says the latest cap. table.

20   Q    What's the subject of the e-mail?

21   A    Copy of the November 5th Retrophin Post-Conversion Cap.

22   Table.

23   Q    What does "post-conversion" mean?

24   A    Post-conversion means that they're taking the units and

25   they're converting it to stock, common stock.

Massella - direct - Smith                    3899

1   Q    And is that in connection with the conversion of

2   Retrophin from an LLC to a C corp.?

3   A    Yes.

4   Q    If you can turn to page two of the document.  And so what

5   is this document?

6   A    This document is converting what previously were units

7   into shares into the new C corporation.

8   Q    And if we look down at the bottom left there, there's a

9   section that says, Martin Shkreli votes, and then, Martin

10  Shkreli voting percentage.

11          What is the voting percentage for Martin Shkreli?

12  A    46.46 percent.

13  Q    And what does voting percentage mean?

14  A    It means what percentage of ownership he has.

15  Q    And then if you look down two more lines, there's a

16  section that says Martin Shkreli plus MSMB voting percentage.

17  What is that voting percentage?

18  A    52.36 percent.

19  Q    And what's your understanding of why Martin Shkreli and

20  MSMB are grouped for purposes of voting percentages?

21  A    Because Martin controls MSMB.  So he would vote in line

22  with -- they would vote in line together.

23  Q    And looking at this cap. table up top here, there's an

24  entry for MSMB Healthcare LP.  Are there entries for any other

25  MSMB entities?

1    A    No.

2    Q    If we can turn to the next page which is page three of

3    the document and maybe just focus in on the top half for now.

4    So, what is this document?

5    A    This appears to be the Preferred units because these are

6    the ones that were paid for.

7    Q    And so does this represent investments into the company

8    in exchange for shares?

9    A    Yes.

10   Q    And just taking a look at a few of them, starting at the

11   top there, on April 20, 2011, there's a listing for Steve

12   Richardson for 2,500 shares for a total investment of $50,000

13   and then there's something called a per share price.  What's

14   the per share price?

15   A    Per share price is what would be paid for each individual

16   share.

17   Q    And then looking down the list a little bit, there's an

18   entry on April 28, 2011 for Dynagrow Capital.  Then if you

19   continue to look down the list, there's a couple of entries

20   for MSMB Healthcare LP and I want to ask you about the one for

21   February 1, 2012 for MSMB Healthcare.

22        What's the number of shares for that investment?

23   A    22,500.

24   Q    And what's the total amount of the investment?

25   A    $900,000.

Massella - direct - Smith                    3901

1   Q    And then looking at this page as a whole and then the

2   next page of your document, do you see any entities other than

3   MSMB Healthcare listed in this ledger?

4   A    From what I can see -- you mean any other MSMB --

5   Q    MSMB entities other than MSMB Healthcare?

6   A    No.

7   Q    I'm going to show you what's been marked for

8   identification as Government Exhibit 119-14 which is tab 10 of

9   your binder.  Do you recognize this document?

10  A    Yes.

11  Q    And is this an e-mail with you and with Jackson Su and

12  Susan Chew?

13  A    Yes.

14  Q    And is it related to your work on Retrophin in this time

15  period?

16  A    Yes.

17  Q    Which is November 2012?

18  A    Yes.

19          MS. SMITH:  Your Honor, the government moves to

20  admit Government Exhibit 119-14.

21          MR. AGNIFILIO:  No objection.

22          THE COURT:  We receive 119-14.

23          (So marked.)

24  Q    If we can turn to the second page first and start with

25  the first e-mail in the chain which is November 15, 2012 from

Massella - direct - Smith                          3902

1    Susan Chew to Jackson Su and Corey Massella.

2              What's the subject line for this e-mail?

3    A    Secured promissory note.

4    Q    And then what does Susan write to Jackson?

5    A    I'm looking at the QuickBooks file.  I'm unable to locate

6    the 30,000 from Khun Huang and 900,000 loan from MSMB

7    Healthcare.  Which bank account was the money wired into?

8    Q    In the e-mail itself, it says "QB," right?

9    A    QuickBooks.

10   Q    Is that what "QB" means?

11   A    Yes, it means the accounting system, the QuickBooks file.

12   Q    If you can take a look at the response, scroll up to the

13   response from Jackson Su, it says, The wire for Khun Lee

14   George Huang was wired directly to Ligand to satisfy the

15   remaining up-front royalty payment.

16             Then if we scroll up a little bit more, what is your

17   response there on November 16, 2012 at 8:48 a.m.?

18   A    Where is the copy of the wire and acknowledgment from

19   Ligand?

20   Q    Why did you ask for that information?

21   A    We wanted the support in order to book something that did

22   not go through the books, the bank account of Retrophin.

23   Q    And is this an example of the kind of information that

24   you would request and receive in order to kind of finalize the

25   financials for the company?

Massella - direct - Smith                    3903

1   A    Well, and support, support the entries, yes.

2   Q    And when you say support, what do you mean?

3   A    We need documentation for anything that can't be

4   identified.

5   Q    And when you say something that can't be identified, what

6   kind of documentation are you looking for?

7   A    In this situation, we would look for the wire transfer

8   and then we would also look for the acknowledgment from Ligand

9   from their end basically acknowledging that 30,000 was

10  received because we're mainly trying to prepare for what the

11  auditors are going to be asking when they come in and go over

12  the books.

13  Q    If we can turn to page one very briefly of the document

14  and just at the bottom there, it says -- this is an e-mail

15  from Jackson Su to yourself and Susan Chew on November 16,

16  2012 and 8:50 a.m.  Jackson says, Will forward.  And then if

17  we turn back to page two, and at the top, there's the rest of

18  the e-mail.

19          What does the rest of the e-mail at the top say?

20  A    Also, the 900,000 was wired into 2527 -- which must be a

21  bank account -- on February 3, 2012.

22  Q    And that's the same 900,000 that's referred to in the

23  original e-mail as the 900,000 loan from MSMB Healthcare?

24  A    Correct.

25  Q    And then if we can turn back to page one and look at the

Massella - direct - Smith                    3904

1    final e-mail from the chain.

2              So, this is an e-mail from Susan Chew to Jackson Su

3    and yourself, November 16, 2012 at 2:03 p.m. What does Susan

4    Chew write in this e-mail?

5    A    There was only one $900,000 transaction that came in the

6    month of February.  On February 1, 2012, MSMB Healthcare

7    purchased 22,500 Preferred A units at $40 for 900,000.  Also,

8    on February 1, 2012, MSMB Healthcare had a promissory note of

9    $900,000.  Please let me know what happened.

10   Q    What is Susan Chew asking in this e-mail?

11   A    She's only been able to identify one cash transaction for

12   $900,000, not two $900,000 cash transactions.

13   Q    And if there had been both an equity purchase or a

14   purchase of shares for $900,000 from MSMB Healthcare and a

15   promissory note or a loan for MSMB Healthcare, what would you

16   expect the financial records to actually reflect?

17   A    We would see $1,800,000 in, having come into the bank

18   account.

19   Q    And when you say "having come into the bank account," do

20   you mean coming into Retrophin's bank account from MSMB

21   Healthcare?

22   A    Yes.

23   Q    And that would be both because they've, because MSMB

24   Healthcare would have purchased $900,000 worth of stock and

25   that, in addition, loaned $900,000?

                    Massella - direct - Smith                3905

1   A    Correct.

2   Q    Do you have a memory of how this issue was resolved?

3   A    No.

4   Q    I'm going to ask you to look at what's been marked as

5   Government Exhibit 123-3 and Government Exhibit 119-20 which

6   are tabs 14 and 15 in your binder and they're both for

7   identification.  Do you recognize these two documents?

8   A    Yes.

9   Q    And what are those two documents?

10  A    E-mails.

11  Q    And are they e-mails between you and the defendant and

12  others at Retrophin?

13  A    Yes, and Susan Chew.

14  Q    And are they in the November 2012 time period?

15  A    Yes.

16          MS. SMITH:  Your Honor, the government moves to

17  admit Government Exhibits 123-3 and 119-20 into evidence.

18          MR. AGNIFILIO:  No objection, Your Honor.

19          THE COURT:  We will receive Government's

20  Exhibit 123-3 and 119-20.

21          (So marked.)

22  Q    And if we can start by looking at Government

23  Exhibit 123-3 which is tab 14, and let's start again with the

24  bottom e-mail in the chain on page one.  This is an e-mail

25  from Susan Chew to Jackson Su copying Corey Massella and the

Massella - direct - Smith                    3906

1    defendant.

2              Can you just read what Susan Chew asks for in that

3    first line?

4    A    On February 3, 2012, I see a check cut to MSMB Healthcare

5    management for $200,000 -- in brackets -- miscellaneous

6    expense -- that means that's what it was classified under.

7    What was the wire for?

8    Q    And who would have classified it as a miscellaneous

9    expense?

10   A    Jackson Su.

11   Q    And then if you look up to the next e-mail, the

12   defendant's response.  And this is from the defendant to

13   Ms. Chew and Jackson Su and yourself on November 28, 2012 at

14   6:19 p.m.  What does the defendant respond?

15   A    I am looking into the February 3, 2012 payment and will

16   have an answer shortly.

17   Q    What was your understanding of what the defendant was

18   saying in this e-mail?

19   A    He's going to look into what the payment was for.

20   Q    And was this a common kind of back and forth with

21   Retrophin, that the defendant would go get information and

22   bring it back to you to finalize the financials?

23   A    On the larger transactions, yes.

24   Q    If we can scroll up to the next e-mail.

25              (Continued on next page.)

Massella - direct - Smith                    3907

1    EXAMINATION CONTINUES

2    BY MS. SMITH:

3    Q    And so this is a response from Susan Chew on November

4    29th, one day later, and it says:  Martin, please advise on

5    the 200k.

6              Does 200k means 200,000?

7    A    Yes.

8    Q    And then if we can look at the top e-mail.  And what is

9    the date on the top e-mail?

10   A    November 30th, 2012 at 11:35 a.m.

11   Q    And who is it from?

12   A    Martin.

13   Q    And what does he say in that e-mail?

14   A    This payment was the subject of a loan/promissory note.

15   Jackson will scan and send.

16   Q    And how had that 200,000 been classified originally?

17   A    It was classified as a miscellaneous expense.

18   Q    And if we can turn now to Government Exhibit 119-20,

19   which is behind tab 5.

20              (Exhibit published.)

21   Q    And if we look at this document, is this the bottom

22   portion the same e-mail chain we were just looking at?

23   A    Yes.

24   Q    And, again, the defendant on November 30th says:  The

25   payment was a subject of a loan/promissory note.  Jackson will

Massella - direct - Smith                     3908

1   scan and send.

2           What is the top e-mail in this chain, which is

3   Government Exhibit 119-20?

4   A    It's an e-mail from Jackson Su to Martin, Susan and

5   myself, dated November 30th, 2012 at 12:10 p.m.

6   Q    And in the attachments there are a number of image GIFs.

7   And then the last attachment has a scan 0001.pdf, is that

8   right?

9   A    Correct.

10  Q    And if you can turn to the last page of this e-mail,

11  which is page 7.  And is this the attachment that Jackson Su

12  sent?

13  A    Yes, yes.

14  Q    And what is this document?

15  A    It's a loan from Retrophin to MSMB for $200,000 with

16  terms, 12 percent interest and it was due February 3rd, 2013,

17  dated February 3rd, 2012.

18  Q    And if you look at the first paragraph there, what

19  specific MSMB entity is the subject of this promissory note?

20  A    MSMB Healthcare Management, LLC.

21  Q    And who signs at the bottom for Retrophin, LLC?

22  A    Martin.

23  Q    And who signs for MSMB Healthcare Management, LLC?

24  A    Martin, as managing member.

25  Q    If we can turn now to Government Exhibit 119-15, which is

Massella - direct - Smith                    3909

1    tab 12 in your binder.

2              MS. SMITH:  And it's already in evidence.

3              (Exhibit published.)

4    BY MS. SMITH:

5    Q    And so this is an e-mail from Jackson Su to Evan Greebel,

6    Corey Massella and Susan Chew on November 29th, 2012.  What is

7    the subject line of this e-mail?

8    A    Transfer from Marek Biestek, 4,167 shares.

9    Q    And is that actually in the attachment section of the

10   e-mail?

11   A    Yes.

12   Q    And so what's the subject line of the e-mail?

13   A    Updated cap table.

14   Q    And then the attachments are the Transfer FR Marek

15   Biestek 4167 shares that you just read, right?

16   A    Yes.

17   Q    And then also the Retrophin post conversion cap table?

18   A    Yes.

19   Q    And what does Jackson say in this e-mail?

20   A    Marek transfer to Martin attached.

21   Q    And who was Marek Biestek again?

22   A    He was -- he was close within the -- in the firm.  I

23   don't know what his officer title was, but after Jackson had

24   left, Marek became -- no Ron Tilles, then Marek, became our

25   point person.

SAM      OCR      RMR      CRR      RPR

Massella - direct - Smith                3910

1   Q    And when you say that Marek was close in the firm, do you

2   mean Retrophin?

3   A    He was close to Martin.  I mean part of the, I would call

4   it the management team.

5   Q    For Retrophin?

6   A    Yes.

7   Q    And if you turn to page 2 of this document, which is the

8   attachment, and if we could focus on the top paragraph.

9             So what is the title of this document?

10            (Exhibit published.)

11  A    Transfer and Donee Representation Letter.

12  Q    And can you read just the first paragraph of this letter?

13  A    For value received, Marek does hereby grant, sell,

14  assign, transfer and convey onto Martin, its successors and

15  assigns, all of his right, title and interest to 4,167 Class B

16  common units of Retrophin, LLP, a Delaware limited liability

17  company, to have and to hold forever, and the transferor does

18  hereby warrant and agree to defend title to same against the

19  claims of any person or entity.

20  Q    And so what does the transfer and donee representation

21  letter accomplish?

22  A    It's transferring what Class B shares that Marek owned to

23  Martin.

24  Q    How many shares?

25  A    4,167 shares.

Massella - direct - Smith                3911

1    Q    What was your reaction to receiving this documents?

2    A    Well, frustration because we kept the capitalization

3    table/ownership table kept changing on us and, you know, where

4    did this come from?  Secondly, it says for value received.  So

5    I was a little confused.

6    Q    Why were you confused by for value received?

7    A    Because it's an employee giving it to the CEO and for

8    value, I would think for value there would be some dollar

9    amount or some compensation for that, so.

10   Q    And so in the letter, itself, is there any information

11   about what the defendant would provide to Marek Biestek in

12   return for the shares?

13   A    No.

14   Q    Was there anything unusual about an employee or officer

15   providing shares to the CEO of a company?

16   A    It's unusual from -- from my experience.

17   Q    And why is it unusual?

18   A    Usually, if anything, the CEO would be giving to

19   employees, not the reverse.

20   Q    If we can look at page 4 of the document, which is the

21   signature page.  And if we look at the top here, who are the

22   two signatures for this document?

23   A    It appears to be Marek and Martin.

24   Q    And what is the address, what is the city under Marek's

25   name there?

                    Massella - direct - Smith                3912

1   A    59 Denton Avenue, East Rockaway, and I can't see a city.

2   I mean I can't see a state, but East Rockaway.

3   Q    And then under Mr. Shkreli's name what address is given?

4   A    330 Madison Avenue, New York, New York.

5   Q    And what is the date next to Mr. Shkreli's signature?

6   A    November 29th, 2012.

7   Q    And then if we can scroll down just to the bottom

8   signature.  And who signs this document on behalf of

9   Retrophin?

10  A    Martin.

11  Q    And now I am going to show you what's been marked as

12  Government Exhibit 123-2 for identification.  And it's tab 13

13  in your binder.

14          What is this document?

15  A    It's an e-mail from me to Jackson.

16  Q    And is it in response to the last e-mail that we just

17  looked at?

18  A    Yes.

19  Q    And is it from November of 2012?

20  A    November 29th, 2012, 9 o'clock at night.

21          MS. SMITH:  So, Your Honor, we move to admit

22  Government Exhibit 123-2, which is at tab 13 of your binder,

23  into evidence.

24          MR. AGNIFILO:  No objection.

25          THE COURT:  We will receive 123-2.

                SAM    OCR    RMR    CRR    RPR

Massella - direct - Smith                    3913

1              (Court's Exhibit 123-2 was received in evidence.)

2              MS. SMITH:  If we can focus first on the bottom

3    e-mail.

4              (Exhibit published.)

5    BY MS. SMITH:

6    Q    And, again, is this the same e-mail that we just looked

7    at attaching the Marek Biestek transfer to Martin Shkreli?

8    A    Yes.

9    Q    With the subject line Updated Cap Table?

10   A    Yes.

11   Q    And if we could scroll up to your response.  And what did

12   you write?

13   A    WTF.

14   Q    And is that an acronym?

15   A    Yes.

16   Q    What were you trying to convey with this response?

17   A    What the heck.

18   Q    And why did you have that reaction?

19   A    Out of frustration that everything kept changing and what

20   type of document is this and where did it come from, and --

21   and you saw how it came through with no date.  You know, part

22   of it's missing.  So -- and we were under a timeframe.  So to

23   keep change the thing the -- every time you change the cap

24   table, it takes us days to change financial statements when

25   these things occur.

SAM      OCR      RMR      CRR      RPR

                    Massella - direct - Smith              3914

1   Q    And so what is the impact of a transfer like this on the

2   cap table?

3   A    It moves everything.  And secondly, then we have to

4   figure out how we are going to disclose it and do we disclose

5   out and how do we account for it.

6   Q    And was it unusual to make changes to the cap table this

7   late in the process close to going public?

8              MR. AGNIFILO:  I am going to object to the unusual

9   question.

10             THE COURT:  All right.  Can you rephrase it, please?

11  BY MS. SMITH:

12  Q    In the normal course of a company going public, how far

13  in advance of that event is the cap table usually set?

14  A    It's usually pretty solid before you go public.

15  Q    And why is that?

16  A    Because -- because the cap table not only affects us when

17  we're doing the financial statement, it affects the SEC

18  document when they put it to the -- the lawyers are going to

19  be working with that cap table when they go -- when they go

20  public.  And also for what they're offering and what they're

21  gonna be doing in terms of the reverse merger that affects the

22  percentages of what happens.

23  Q    When you say that affects the percentages, what do you

24  mean?

25  A    I meant on the reverse merger.  If they're going to be

Massella - direct - Smith                    3915

1  giving the public company a percentage of the company,

2  whatever is on that cap table presently is going to affect

3  what occurs and what percentage they're giving up.

4  Q    And did you have a discussion with the defendant or

5  anyone else at Retrophin about how you would account for the

6  share transfer?

7  A    Yeah, we did.  We did have a discussion.

8  Q    And what was the result of that discussion?

9  A    It was supposed to be accounted for as a gift --

10 Q    And who --

11 A    -- outside the company.

12 Q    What does it mean that it's accounted for as a gift

13 outside the company?

14 A    That it was a gift between two individual parties outside

15 the company and just a transfer of ownership.

16 Q    Who made the decision to make it a gift outside the

17 company?

18         MR. AGNIFILO:  I am going to object.  I am not sure

19 what his basis is.  It might be a hearsay basis.

20         THE COURT:  Well --

21 BY MS. SMITH:

22 Q    Was this based on discussions with the management of

23 Retrophin?

24         THE COURT:  She asked a question which you can

25 answer.

SAM      OCR      RMR      CRR      RPR

```
                      Massella - direct - Smith                3916
```

1    A    Okay.

2    Q    Was your understanding of the classification of this

3    transfer as a gift based on your discussions with the

4    management of Retrophin?

5    A    Yes.

6    Q    And as a result of the transfer being a gift, did it need

7    to be disclosed?

8    A    No.

9    Q    And was the decision to classify it as a gift, the

10   decision of the management of Retrophin?

11   A    Yes.

12   Q    I am now going to show you what's been marked as

13   Government Exhibit 119-25, which is tab 16 in your binder and

14   it's already in evidence.

15            (Exhibit published.)

16   BY MS. SMITH:

17   Q    So this is an e-mail from Jackson Su to Susan Chew and

18   yourself on December 3rd, 2012.  And the subject is Share

19   Transfer Documents.

20            And if you could just read the contents of the

21   e-mail?

22   A    Mulleady transfer to Shkreli; Fernandez transfer; void

23   30,000 share transfer; Share transfer; transfer Marek 4,167

24   shares.

25   Q    And are those the attachments to the e-mail?

Massella - direct - Smith                    3917

1    A    Yes.

2    Q    If you can read the content of the e-mail.

3    A    Attached more share transfers, Kevin Mulleady to Martin;

4    Tom Fernandez to Martin; Martin to MSMB; Marek to Martin; and

5    I think you have this already.

6    Q    Who was Kevin Mulleady?

7    A    I'm not sure.  I thought he may have been a consultant or

8    employee.

9    Q    And who was Tom Fernandez?

10   A    I believe the same.

11   Q    And what was your reaction to receiving these additional

12   share transfers?

13   A    The company had made its decision.  It was, again, we're

14   receiving the information after-the-fact and we have to change

15   the cap table again.

16   Q    So let's look at this last share transfer that is

17   attached.  It's described by Jackson Su as Marek Biestek to

18   Martin Shkreli; and then he says, I think you have this

19   already.

20        If you can turn to page 12 of the document, which is

21   Bates numbered RO12850, and it actually should have like a

22   little green tab there.

23        MS. SMITH:  And if we can actually put that on the

24   right side of the screen and put on the left side of the

25   screen Government Exhibit 119-15.

Massella - direct - Smith                    3918

1            So just to be clear, on the left side of the screen

2    is Government Exhibit 119-15 and on the right side of the

3    screen is Government Exhibit 119-25 at page 12.

4    BY MS. SMITH:

5    Q    Is this, the transfer letter that we looked at before,

6    the same as the transfer letter that's attached to Government

7    Exhibit 119-25?

8    A    Yes, the wording matches.

9    Q    And are the number of shares, 4,167, the same?

10   A    Yes.

11   Q    And is it also still a transfer from Marek Biestek to

12   Martin Shkreli?

13   A    Yes.

14           MS. SMITH:  If we can go on the left side of the

15   screen to 119-15 at page 4, and on the right side of the

16   screen to 119-25 at page 14.

17   BY MS. SMITH:

18   Q    And actually, now that the documents are up, we have

19   119-25 page 14 on the left, and 119-15 page 4 on the right.

20           So is the document on the right, Government Exhibit

21   119-15, the share transfer that we looked at originally with

22   the signatures kind of slanted?

23   A    Yes.

24   Q    And the one on the left, is that the one that was

25   attached to the multiple share transfer e-mail?

SAM      OCR      RMR      CRR      RPR

                    Massella - direct - Smith                 3919

1    A    Yes.

2    Q    Okay.  So on the right there, the original one we looked

3    at, what is the date next to Mr. Shkreli's name on the top

4    right?

5    A    November 29th, 2012.

6    Q    And on the left, which is Government Exhibit 119-25, what

7    is the date underneath Mr. Biestek's signatures?

8    A    June 1st, 2012.

9    Q    And what is the date under Mr. Shkreli's signature?

10   A    June 1st, 2012.

11   Q    At the time that you received the second version of the

12   transfer and donee representation letter between the defendant

13   and Marek Biestek, did you notice the change in date?

14   A    I don't recall.

15   Q    Would you have been concerned if you did notice the date

16   had been changed from a later date to an earlier date?

17           MR. AGNIFILO:  Object to the form of the question.

18           THE COURT:  I will overrule it.

19           You can answer, sir.

20   BY MS. SMITH:

21   Q    Do you want me to ask again?

22   A    (Nodding.)

23   Q    Would you have been concerned if you did notice the date

24   had been changed from a later date, November of 2012, to an

25   earlier date in June of 2012?

                    SAM    OCR    RMR    CRR    RPR

Massella - direct - Smith                    3920

1    A    Yes.

2    Q    And why is that?

3    A    Because you can't change the date.  That would be called

4    backdating.

5    Q    What is the problem with backdating?

6    A    It's not allowed and we are not allowed to go back and

7    retroactively change a legal document.

8    Q    What is the effect of backdating a document like this?

9    A    There are SEC rules that just -- just do not allow it

10   legally.

11            MR. AGNIFILO:  Judge, I am objecting to all of this.

12            THE COURT:  All right, we will strike that last

13   response.

14   BY MS. SMITH:

15   Q    I am going to have you look at the next document, which

16   has been marked as Government Exhibit 123-4 for

17   identification, which is tab 17.

18            Do you recognize this document?

19   A    Yes.

20   Q    And what is this document?

21   A    It's an e-mail from me to Jackson.

22   Q    And is it in response to the e-mail that we looked at in

23   Government Exhibit 119-25?

24   A    Yes.

25            MS. SMITH:  Your Honor, the government moves

Massella - direct - Smith                3921

1    Government Exhibit 123-4 into evidence.

2              MR. AGNIFILO:  No objection.

3              THE COURT:  We receive 123-4.

4              (Court's Exhibit 123-4 was received in evidence.)

5              MS. SMITH:  And, again, if we can start with the

6    bottom e-mail.

7              (Exhibit published.)

8    BY MS. SMITH:

9    Q    And is this the same e-mail attaching the share transfer

10   documents that we looked at in Government Exhibit 119-25?

11   A    Yes.

12             MS. SMITH:  And if we can scroll up.

13   Q    What was your response to Jackson Su after receiving that

14   e-mail?

15   A    Every time we receive these it changes everything we

16   created already.  Are these the final transfers?

17   Q    And why were you saying that to Mr. Su?

18   A    Because if -- every time they changed the cap table we

19   have to redo the financial statements and all the supporting

20   documents, and it has a ripple effect.

21   Q    And was this close to the time of the reverse merger?

22   A    Very much so.

23             MS. SMITH:  And now if we can look at Government

24   Exhibit 119-26, which is already in evidence and is tab 18.

25             (Exhibit published.)

SAM      OCR      RMR      CRR      RPR

Massella - direct - Smith                    3922

1   BY MS. SMITH:

2   Q    And, again, if we can look at the bottom e-mail first,

3   just very quickly.  And is this, again, the same e-mail about

4   the share transfer documents?

5   A    Yes.

6   Q    And if we scroll up, what does Ms. Chew say in response

7   to receiving the share transfer documents?

8   A    What was the transfer for?  Services?  With a question

9   mark.

10  Q    What is that question asking?

11  A    She is asking if there is a transfer, was he giving those

12  shares, were the shares going to -- actually, they're going

13  the other way.  Were they given to Martin for services he

14  rendered for the company or for some services that he rendered

15  to these individuals?

16  Q    Why was Susan Chew asking that question?

17  A    Because there's -- what was the value?  Why was it done?

18  So that's why she was asking the question.

19  Q    I am going to show you what's been marked as Government

20  Exhibit 123-5, which is at tab 19 for identification.

21       Do you recognize this document?

22  A    Yes.

23  Q    And is this an e-mail chain with you and the defendant,

24  Mr. Su, Mr. Huang and Susan Chew?

25  A    Yes.

SAM     OCR     RMR     CRR     RPR

Massella - direct - Smith                    3923

1   Q    And is it from December 2012?

2   A    11, 12 -- yes.

3   Q    And is it related to SEC Solution's work for Retrophin?

4   A    Yes.

5        MS. SMITH:  Your Honor, the government moves to

6   admit Government Exhibit 123-5 into evidence?

7        MR. AGNIFILO:  No objection.

8        THE COURT:  We receive 123-5.

9        (Court's Exhibit 123-5 was received in evidence.)

10       MS. SMITH:  If we can turn to the second page of

11  this document and focus on the first e-mail in the chain.

12  BY MS. SMITH:

13  Q    So this is an e-mail dated December 10th, 2012 from Susan

14  Chew and it says:  Jackson, I am waiting on the list of

15  companies that are no longer in business this year -- per our

16  conversation early last week.

17       And then if we can turn to page 1, just for a minute

18  at the bottom.  And then this is an e-mail that -- you

19  forwarded that e-mail to Susan Chew, Jackson Su, George at

20  MSMB Capital and yourself again.  And then if we can look at

21  the next page of the e-mail, itself.

22       What is the subject line of the e-mail that you are

23  sending?

24  A    Due from related.

25  Q    And then what is the content of the e-mail?

                    Massella - direct - Smith              3924

1   A     The content are related-party transactions.

2   Q     And --

3   A     Oh, read it?

4   Q     Read it, yes.

5   A     Sorry; thank you.

6              Need to know if Martin or a related company will

7   repay or the company writes off the receivables as a loss.

8   Need to decide tomorrow early.  Thanks.

9   Q     And then if you can turn back to page 1 and focus on the

10  bottom part there.  If you look at the e-mail from Jackson Su

11  on December 10th, 2012, it's been forwarded from him to

12  Mr. Shkreli, and then Mr. Shkreli's response on December 11th,

13  2012 at 9 a.m. says:  Let me know what I can do on this.

14             MS. SMITH:  And then if we can scroll up to the top

15  part.

16  Q     And Jackson writes in the bottom e-mail on December 11th,

17  2012 at 9:19 a.m.:  Martin -- see below in relation to Corey's

18  question.  And then there are kind of a list of dates and

19  entities and then amounts.

20             What does this list represent?

21  A     These are related-party transactions, payments in and out

22  that were made between the related parties.

23  Q     What do you mean by related-party transactions?

24  A     Companies -- it looks to be all MSMB entities that --

25  that Retrophin transacted with.

                SAM     OCR     RMR     CRR     RPR

Massella - direct - Smith                    3925

1    Q    And when you say transacted with, what do you mean?

2    A    Funds, funds moved between the companies or funds were

3    made on behalf of.

4    Q    And did you understand what MSMB Isotope was?

5    A    No.

6    Q    And what MSMB Capital Management was?

7    A    No.

8    Q    And did you understand the defendant controlled all of

9    those entities?

10   A    If it said MSMB, we -- you can tell by e-mail we did

11   assume that he controlled it.

12   Q    And what are the types of transactions that are being

13   asked about in this chart?

14   A    Appears to be a rent payment to MSMB Capital Management.

15   It's indicated as a rent payment for January through March for

16   11,301.  Again, another rent payment for April through June

17   for 25,259.  Then MSMB, and this is a wire, a security deposit

18   for the new office space, for 137,547.  Another rent payment

19   in September for July through September for $25,220.  And then

20   a February, 2012 MSMB Healthcare note for 200,000.

21   Q    And in your earlier e-mail you had said you need to know

22   if Martin or a related company will repay or the company

23   writes off the receivables as a loss.

24        What are you saying there, why do you need to know

25   who is going to repay?

Massella - direct - Smith                    3926

1    A    If the company doesn't exist and then it won't be repaid,

2    then we would take an expense on the books as a write-off for

3    these payments that were made outside the company.

4              If Martin is guaranteeing them, then Martin would

5    have to, you know -- we put that into the financials that

6    Martin is guaranteeing these previous payments and that the

7    company will be collecting these funds from Martin, not the

8    companies.

9    Q    And when you say the company, do you mean Retrophin?

10   A    Yes, Retrophin.

11   Q    And why is it important to understand whether or not

12   these payments will be repaid or if the company will have to

13   write it off as a loss?

14   A    Because we -- you don't want to overstate the assets of

15   the company, that these monies will be coming back into the

16   company.  So, you know, when they come in for the audit, they

17   are going to have to be -- do some form of work to decide

18   whether it's collectable.

19   Q    And so if the companies here, the MSMB companies, are

20   going to repay Retrophin, does that mean it would be listed,

21   these payments, as assets on Retrophin's books?

22   A    Correct.

23   Q    And if they're not going to be repaid, then either

24   they're written off or it's an amount due, is that right?

25   A    Right, but -- but if it's written off, it's gonna be

Massella - direct - Smith                    3927

1    taken as an expense on the financial statements.

2              MS. SMITH:  And then if we can scroll up to the top

3    e-mail from the defendant there.  And that's dated

4    December 11th, 2012, and the defendant writes:  These

5    companies will pay what they owe Retrophin.

6    BY MS. SMITH:

7    Q    What did you understand the defendant to be saying there?

8    A    That all the companies listed here will be able to pay

9    Retrophin and they're collectable.

10   Q    Earlier you had said that in addition to Jackson Su, you

11   also worked with Ron Tilles and Marek Biestek in terms of

12   getting information for the financials of Retrophin.

13             Did there come a time that Jackson Su no longer

14   worked for Retrophin?

15   A    Yes.

16   Q    Was that close in time to the reverse merger?

17   A    Yes.

18   Q    Who took over for Jackson Su?

19   A    Initially, Ron Tilles.

20   Q    And who was Ron Tilles?

21   A    He was an outside consultant for the company.

22   Q    And what financials were you working on for Retrophin

23   after the reverse merger?

24   A    The September 30th -- after the reverse merger?  We were

25   working on the year-end, I think the calendar year-end post --

SAM      OCR      RMR      CRR      RPR

Massella - direct - Smith                    3928

1    post merger.

2    Q    And so would that have been the calendar year-end through

3    the end of 2012 for Retrophin?

4    A    Yes, yes.

5    Q    And how easy or difficult was it to get information from

6    the defendant about the company's financials in that time

7    period?

8    A    It was very difficult.

9    Q    Why was it difficult?

10   A    A lot of money flowed out post merger and a lot of money

11   had to be identified and delineated and for what purposes.

12   Q    And why was it difficult to get information about that

13   money flow?

14   A    Because there was no documentation as to what they were

15   for.  So there was -- there were payments that -- that didn't

16   go through payroll.  There were no consulting agreements.  So

17   it was -- there was a lot to be identified.

18   Q    I am going to show you what has been marked as Government

19   Exhibit 123-7 and 123-8 for identification.  And those are at

20   tabs 22 and 23 in your binder.

21         Do you recognize these two documents?

22   A    Yes.

23   Q    And are they both e-mail chains where the top e-mail is

24   from the defendant?

25   A    Yes.

SAM      OCR      RMR      CRR      RPR

Massella - direct - Smith                    3929

1    Q    And are they related to the work for Retrophin done by

2    SEC Solutions in the spring of 2013?

3    A    Yes.

4         MS. SMITH:  Your Honor, the government moves to

5    admit Government Exhibit 123-7 and 123-8 into evidence.

6         MR. AGNIFILO:  No objection.

7         THE COURT:  We will receive 123-7 and -8.

8         (Government's Exhibits 123-7 and 123-8 were received

9    in evidence.)

10        MS. SMITH:  So if we can start with Government

11   Exhibit 123-7.  And focus first on the bottom e-mail, the

12   first e-mail of the chain.

13        (Exhibit published.)

14   BY MS. SMITH:

15   Q    This is an e-mail from Susan Chew on Friday, March 29th,

16   2013, and it's to Leonora Izerne with a copy to Mr. Greebel,

17   yourself, Mr. Tilles and the defendant.  And the subject says:

18   Follow-up questions to Gleb list.

19        Who was Leonora Izerne?

20   A    It is Martin's sister.

21   Q    And what role did she play at Retrophin?

22   A    She was assisting with -- she was doing administration.

23   She was assisting to -- to answer our questions.

24   Q    And it says, Follow-Up questions to Gleb list.  Who is

25   Gleb?

Massella - direct - Smith                    3930

1    A    Gleb was a former employee of our firm.

2    Q    And what work did Gleb do on the engagement for

3    Retrophin?

4    A    He went through and went through all the bank statements

5    and -- and the -- and identified all the cash transactions

6    and -- for what needed to be identified.

7    Q    And can you read Susan Chew's e-mail?

8    A    Attached is additional/follow-up questions to Gleb of

9    cash transactions.  Please note that there are three tabs.

10   Two of the three tabs relate to cash transactions and the last

11   tab relates to incentive shares and general request.  Please

12   give Corey or I a call if the request is unclear.

13   Q    And then what is the defendant's response in the top

14   e-mail, if we can scroll up?

15   A    Here are my comments on the list.

16   Q    And what is the attachment to that e-mail that the

17   defendant sends?

18   A    Martin comments of open items - follow-up question to

19   bank activity, March 29th.

20   Q    Does that look like an Excel document that is attached?

21   A    Yes.

22   Q    If we can turn to the next page of the document, page 2.

23   And is this that attachment?

24   A    Yes.

25            MS. SMITH:  And if we can focus on the top portion

SAM     OCR     RMR     CRR     RPR

Massella - direct - Smith                    3931

1    there, in the top left-hand corner.

2    MS. SMITH:

3    Q    What does it say in the top left-hand corner?

4    A    Martin comment.

5    Q    Sorry, in the top left-hand corner.

6    A    Oh, sorry.  Activity from the bank account 3600, open

7    items list.

8    Q    And if we can just look at the columns there.  The first

9    column says Date.  The second column says Bank Description.

10   The third column says Amount.  The fourth column says Company

11   Comment/Response.  The fifth column says Follow-Up Questions.

12   And the last column on the right says Martin Comment.

13              Is that right?

14   A    Correct.

15   Q    And so what information is contained in this Excel

16   spreadsheet?

17   A    Cash transactions that we weren't able to identify.

18   Q    And so is the cash transaction detail the first three

19   columns here, the date, the bank description and the amount?

20   A    Yes.

21   Q    And then this company response comment here, is this

22   information provided by the company?

23   A    Yes.

24              THE COURT:  The company being?

25              THE WITNESS:  Retrophin.

```
                    Massella - direct - Smith              3932
```

1          MS. SMITH:  Sorry, the company being Retrophin.

2          THE COURT:  Thank you.

3    BY MS. SMITH:

4    Q    And then there is a section for Follow-Up Questions.  Who

5    put in the information or the questions in this section?

6    A    Susan Chew.

7    Q    And then the final column is Martin Comment.  Who

8    provided the information in this column?

9    A    Martin.

10   Q    Okay.  And was this kind of a common practice of SEC

11   Solutions to send out this list of open items in an Excel

12   spreadsheet?

13   A    Yes, but probably not this comprehensive.

14   Q    And why do you say that?

15   A    Usually the company is able to identify the transactions.

16   Q    And when you say identify the transactions, what do you

17   mean?

18   A    How to categorize them, or they call us and ask

19   questions.

20   Q    What do you mean by categorize?

21   A    Whether it's an asset, a liability, equity, income or an

22   expense.

23   Q    And if we can just look at a few of the entries.

24          If we look down the page, the second entry on this

25   chart, so we can just focus on a couple at a time.

Massella - direct - Smith                    3933

1          So the second entry on this chart on the left there
2      is dated February 1st, 2013 and it says, Book transfer debit,
3      Leonora Izerne, Long Island City.  If you look at the amount,
4      it says 2500.
5              And if it's in brackets, does that mean money that
6      is going into the bank account or coming out of the bank
7      account?
8      A    That's money going out.
9      Q    And then the company comment says salary, and then there
10     is follow-up questions.
11             Can you read the follow-up questions?
12     A    Is there an Employment Agreement?  Why is salaries not
13     getting paid through Paychex?  Which is a payroll provider.
14     What is the payroll cycle, every two weeks?  Please provide
15     started date of employment.
16     Q    What is Paychex?
17     A    It's a payroll provider.
18     Q    And why do companies use a payroll provider like Paychex?
19     A    They would -- they would monitor and issue the checks and
20     pay the payroll taxes on behalf of the company.
21     Q    And so if a payment is made for salary not made through
22     Paychex, what is the impact?
23     A    That means that it hasn't been -- most likely, it hasn't
24     been reported to the government and payroll taxes weren't
25     withheld from the employee.

Massella - direct - Smith                3934

1           MR. AGNIFILO:  Judge, I am going to move to strike

2     that.  It seems like it's just speculation because he doesn't

3     know the situation.

4           THE COURT:  Well, if you can rephrase it.  He's

5     explaining the difference between something that goes through

6     payroll or it goes to an employee directly as a book transfer

7     debit as seems to be reflected here, is that correct?

8           THE WITNESS:  Yes.

9           THE COURT:  Is that what you were explaining, sir?

10          THE WITNESS:  Yeah, I was explaining what the

11    payroll service provides.  And if you don't use it, what would

12    occur in a company that doesn't have someone that's qualified

13    to do payroll reporting.

14          THE COURT:  All right.

15          Did the company use the Paychex system for its own

16    employees?

17          THE WITNESS:  At that time, I don't believe anyone

18    was on payroll.

19          THE COURT:  I will strike the testimony then.

20          MR. AGNIFILO:  Thanks, Judge.

21          THE COURT:  Thank you.

22    BY MS. SMITH:

23    Q    And so what comment does the defendant provide in the far

24    right corner about this transfer?

25    A    No EA.

Massella - direct - Smith                          3935

1    Q     What does that mean?

2    A     Employment Agreement.

3    Q     And does that mean that the individual receiving this

4    payment doesn't have an Employment Agreement?

5    A     Correct.

6    Q     If we can scroll down to the entry on February 19th,

7    2013.  It's for the Borgata Hotel in Atlantic City.  And so

8    looking at this entry here, again, February 19th, 2013 for the

9    Borgata Hotel, what is the amount that's listed there?

10   A     I believe it says 4830 -- 4130.

11   Q     And so is that the amount that went out of the bank

12   account in connection with this expense?

13   A     Yes.

14   Q     And what is the company comment?

15   A     Martin's trip to Atlantic City.

16   Q     And then what are the follow-up questions that are being

17   asked?

18   A     What was the purpose of the trip?  Please provide detail

19   support for the transaction.  Which company does the expense

20   belong to?

21   Q     And then what is the defendant's comment on that

22   transaction?

23   A     Non-business, Shkreli to refund the company.

24   Q     And earlier you testified that one of the issues you

25   encountered when you were originally trying to put together

Massella - direct - Smith                    3936

1    Retrophin's books was the personal expenditures going through

2    the company.  Did that issue continue after the company went

3    public?

4    A    Yes.

5    Q    And do you know whether or not the defendant, in fact,

6    refunded this money to Retrophin?

7    A    No.

8    Q    If we can now look at a few additional entries --

9            MR. AGNIFILO:  Could we approach for a second?

10           THE COURT:  Yes.

11           We are going to give the jurors a break.  Turn your

12   notebooks face down.  Do not talk about the case, we will

13   retrieve you in 10 to 15 minutes.

14           (Jury exits.)

15

16           (Continued on the following page.)

17

18

19

20

21

22

23

24

25

1       MR. AGNIFILO:  I have an objection.  The reason, I
2   don't think he is charged with any of this, I don't think this
3   is any part of the Government's theory of Count 7.
4       And, since we are going into-- and it suggests that
5   there could be something wrong from a tax perspective and so
6   if the Government agrees with me, that none of this is
7   actually charged conduct, I would like an instruction to the
8   jury along those lines.
9       MS. SMITH:  The next transactions we are going to go
10  to.  I was trying to flush out when he says, personal
11  expenses, and that there is confusion about, you know, what
12  payments are going out of the company, I wanted to actually
13  provide two examples of that.  The next transactions on the
14  next page or the $575,000, and the $773,000, that get
15  transferred to MSMB Healthcare and get used to pay the Merrill
16  Lynch settlement.  I want to put in what the defendant's
17  comments were, explanation for those transfers.  That is the
18  remainder of what I will do with the document.
19      MR. AGNIFILO:  It is now 11 o'clock, we had the
20  witness on the stand for an hour and a half.  I think all of
21  the things about, you know, what this is an expense, is this
22  not an expense, he testified three or four times about
23  personal expenses.  I would like an instruction he is not
24  charged with anything related to personal expenses from
25  Retrophin.  He is not.

- Sidebar -                                          3938

1          MS. SMITH:  Well, I mean I think I take issue with

2     that.  I think the money he is taking out of Retrophin, was in

3     fact, to repay Merrill Lynch, it is funneled through

4     Healthcare.

5          THE COURT:  I think he wants a statement limited to

6     Mr. Shkreli's use of Retrophin funds for personal expenses.

7          MS. SMITH:  Okay.

8          MR. AGNIFILO:  That is perfect.

9          MR. BRAFMAN:  The last answer as it stands, she

10    asked him whether he knows.  He said, no.  I think the answer

11    reflects that this wasn't appropriate.  I think there is some

12    confusion as to the last answer.  Supposed to say, I don't

13    know.  He said, he said, no.  I think the question --

14         THE COURT:  He said, no, I don't know.

15         He said, do you know; he said, no.

16         So the answer was a denial of knowledge as to

17    whether or not he knew.

18         MS. SMITH:  I didn't want to imply he knew one way

19    or the other.

20         MR. BRAFMAN:  The other thing, we should have said

21    something at the time.

22         The witness' testimony concerning payroll taxes, he

23    is just not right as a matter of law.  You can have a payroll

24    system where the money is withdrawn by the payroll company

25    every week, payments made every week or you can have an

- Proceedings -                    3939

1   accountant reconcile those payments and then pay the

2   withholding, pay everything.  It doesn't imply the company is

3   being run illegally as long as the taxes get paid.

4          THE COURT:  I struck the part about his testimony

5   that talked about, you know, withholding --

6          MR. BRAFMAN:  Okay.

7          THE COURT:  -- appropriate amounts.

8          Also, he said, they don't use the system.  I did

9   strike that part of it.

10         MR. BRAFMAN:  Thank you.

11         THE COURT:  So, we will have an instruction that Mr.

12  Shkreli is not being charged with use of Retrophin money for

13  personal expenses, okay.

14         MR. AGNIFILO:  Thank you, Judge.

15         THE COURT:  Okay.

16         We will do that after the break.  Okay.

17         MS. KASULIS:  Thank you.

18         (Recess taken.)

19         (Open Court.)

20         MS. SMITH:  Your Honor, we discussed the limiting

21  instruction, Mr. Agnifilo has it.

22         MR. AGNIFILO:  I hope you can read my handwriting.

23         THE COURT:  I will try.

24         MR. AGNIFILO:  I wrote it quickly.

25         MS. SMITH:  For the record, the reason we wanted to

- Proceedings -                                3940

1  write it this way.  I wanted to make clear the next couple of

2  transactions we will look at are in fact, you know, alleged

3  debt repayment and alleged salary which are in fact used then

4  to repay the Merrill Lynch debt.  So we just wanted to make it

5  clear we were talking about personal expenses, we were talking

6  about things that the defendant classified as personal

7  expenses and not as debt repayment or any of those other

8  categories.

9           THE COURT:  Okay there is a word here, I can't read.

10          MR. AGNIFILO:  I'm surprised it is only one.

Massella - Direct - Smith                    3941

1           (Jury entering.)

2           THE COURT:  All jurors are present.  Please have a

3    seat everybody.

4           The witness is still under oath and before we

5    resume, members of the jury, I am going to instruct you that

6    as you know this witness has discussed certain expenses that

7    were categorized as personal expenses of Mr. Shkreli.

8           I instruct you that Mr. Shkreli is not charged with

9    any crime in regard to these expenses that were categorized by

10   the witness as personal expenses.  So, please bear that in

11   mind as you listen to the evidence.

12          You may resume, ma'am.

13   DIRECT EXAMINATION BY MS. SMITH:(Cont'g.)

14   Q    Before the break, we were looking at Government

15   Exhibit 123-7 and the excel spreadsheet attached to the E-mail

16   with the defendant's comments on certain cash transactions.

17          We are going to start now by looking at page three

18   of that document, which is another page of the excel file.

19          I want to focus on the transaction towards the

20   bottom third of the page, it is a cash transaction from

21   January 13th-- sorry, January 18th, 2013.

22          If you can focus on that top portion.  If we are

23   looking at the top line here, it is January 18th, 2013.  The

24   section describing the transaction, it says it is a wire

25   transfer to MSMB Healthcare LP.

                    Massella - Direct - Smith                3942

1            Do you see that?

2   A    Yes.

3   Q    Then what is the amount of the wire transfer?

4   A    $150,000.

5   Q    Is it possible to scroll.

6            The $150,000, is that money leaving the Retrophin

7   bank account?

8   A    Yes.

9   Q    Going to the Healthcare, MSMB Healthcare bank account?

10  A    Yes.

11  Q    If you look at the far right column for that line, how

12  does the defendant classify that transfer?

13  A    As a debt repayment.

14  Q    I will now look at the next transaction, I guess one more

15  transaction down which is on March 13th, 2013.

16            Sorry, March 4th, 2013.

17            Can you see that transaction?

18  A    Yes.

19  Q    Is that a transaction also from Retrophin to the MSMB

20  Healthcare LP bank account?

21  A    Yes.

22  Q    What is the amount of that transaction?

23  A    $773,000.

24  Q    How does the defendant characterize that transaction?

25  A    As a debt repayment.

Massella - Direct - Smith                    3943

1   Q     Then if we are going to look at the next transaction,

2   also on March 4th, 2013.  That is listed as a transfer to CHK

3   and then it has the number 6097.  Do you see that?

4   A     Yes.

5   Q     What is that transfer to?

6   A     It is $575,000.

7   Q     So that is $575,000 leaving Retrophin and going to that

8   bank account 6097?

9   A     Yes.

10  Q     How does the defendant classify this particular transfer

11  which is the bottom of the two lines on your screen?

12  A     Martin's compensation.

13  Q     Then the last transaction I want to look at is the next

14  one on the list, which is actually March 1, 2013.  That is

15  listed as an online wire transfer to MSMB Healthcare LP, and

16  what is the amount of that transfer?

17  A     $35,000.

18  Q     Again that is money leaving the Retrophin bank account?

19  A     Correct.

20  Q     And how does the defendant characterize that $35,000?

21  A     As a debt repayment.

22  Q     If we can now look at Government Exhibit 123-8, which is

23  in evidence.  It is at tab 23 of your binder.  If we can start

24  with the E-mail in the middle of the page which is the first

25  E-mail.  It is dated April 3rd, 2013, at 9:50 a.m., Susan

Massella - Direct - Smith                    3944

1  Chew.  Can you read what she writes there?

2  A    Evan/Martin, we have a couple of follow up questions in

3  relation to the $575,000 wire on March 4th, 2013, to Martin

4  for compensation.  One, why was it not paid through Paychex;

5  two, employment agreement states annual base salary of

6  $250,000.  Please provide explanation for the difference.

7  Which payroll period is the payment related to.  Can anyone

8  shed some light on this matter.

9  Q    Then if we scroll up to the top there.  This is a

10 response from the defendant on April 3rd, 2013, at 11:47 a.m.,

11 subject line is, re: Wire for 575K.

12        What is the defendant's response?

13 A    We do not always use Paychex.  I will send a breakdown.

14 It includes back pay and bonus pay.  Three, will send.

15 Q    In the spring of 2013, was there a discussion between you

16 and the defendant about what individuals were serving as

17 employees of Retrophin?

18 A    Yes.

19 Q    What do you remember about that conversation?

20 A    We had a discussion about all the payments that had

21 floated out of the company, and whether-- most-- all the

22 payments we were discussing were ones that did not go through

23 a payroll service such as Paychex.

24        So the question was, initially, we were told they

25 were contractors, but if they were contractors, do you have an

RB        OCR

Massella - Direct - Smith                    3945

1    independent contractor agreement with them.  Number one.

2          Number two, do they-- we did ask some questions

3    related to how you would classify an independent contractor

4    and did they qualify, and should they be classified as

5    employees.  Then if they are employees, are there employment

6    agreements and what periods were these payments for, because

7    they were lump sum, so you know where-- for what period were

8    they paid.  So we knew what period to put them in, whether it

9    was backwards or forwards and what it was for.

10         So, yes.

11   Q    What was the defendant's response to your request for

12   additional information about these employees or consultants?

13   A    It was-- he was not happy, but over a lengthy

14   conversation, it was understood why we were challenging along

15   the way, as to why we are asking these questions.

16   Q    And if you can look at the document that is marked as

17   Government Exhibit 123-9 for identification, tab 24.

18         Do you recognize this document?

19   A    Yes.

20   Q    What is this document?

21   A    This is a document-- this is an E-mail from Marek to

22   Susan and me regarding Kevin Mulleady.

23   Q    Is it in connection with your work for Retrophin?

24   A    Yes.

25         MS. SMITH:  Your Honor, the Government moves

RB        OCR

                    Massella - Direct - Smith                3946

1    Government Exhibit 123-9 into evidence.

2              MR. AGNIFILIO:  No objection.

3              THE COURT:  We will receive 123-9.

4              (So marked.)

5    Q    So again, this is an E-mail from Marek Biestek to Susan

6    Chew and Mr. Massella on April 24th, 2013, regarding Kevin

7    Mulleady.  At this point in April of 2013, is Marek Biestek

8    now kind of the main contact person for information from

9    Retrophin?

10   A    Yes.

11   Q    Is this some of the kinds of information you were seeking

12   from the company about employees?

13   A    Yes.

14   Q    And what is given as the termination date from Retrophin

15   for Kevin Mulleady?

16   A    January 30th, 2013.

17   Q    During the spring of 2013, how did you describe the

18   working relationship between SEC Solutions and the defendant?

19   A    It started to become a little contentious.

20   Q    Why would you describe it as contentious?

21   A    Because I would say that he was questioning why we were

22   asking all those questions, why it was taking so long for us

23   to do it, and-- a little bit of the drain on his time.

24   Q    When you say, him, are you referring to the defendant?

25   A    Yes, I am.

Massella - Direct - Smith                    3947

1   Q    I will show you what is marked as Government

2   Exhibit 123-12 which is tab 27 in your binder.  That is for

3   identification.

4            Do you recognize this document?

5   A    Yes.

6   Q    Is this an E-mail from the defendant copying you and

7   others at Citrin as well as at Retrophin?

8   A    Yes.

9   Q    Is it in the spring of 2013 time frame?

10  A    Yes.

11  Q    Is it related to SEC Solutions' work for Retrophin?

12  A    Yes.

13            MS. SMITH:  Your Honor, the Government moves to

14  admit Government Exhibit 123-12 in evidence.

15            MR. AGNIFILIO:  No objection.

16            THE COURT:  We will admit 123-12.

17            (So marked.)

18  Q    Can we start on page two with the first E-mail in the

19  chain.

20            This is an E-mail from Susan Chew on May 7th, 2013.

21  It is sent to an individual at Marcum.  Andrew

22  Kleiman(phonetic), another individual at Marcum, Sunil Jain,

23  Leonora Izerne, the defendant and yourself, as well as Mariell

24  Schlect(phonetic).

25            Who is Sunil Jain?

Massella - Direct - Smith                           3948

1    A    He was the manager in charge of the audit for Marcum.

2    Q    And the subject matter, it says PPM for the fourth

3    quarter, one of two.  What is Susan Chew asking in that

4    E-mail?

5    A    She is asking for a subscription document for Steven

6    Vann.  She is asking Andrew to please-- I am missing the

7    subscription document for Steven Vann please reach out to the

8    company for this one, you should have a total of 14 of 15, see

9    attached.

10   Q    What is Susan Chew referring to in this E-mail?

11   A    Subscription document usually is somebody is investing in

12   the company which the PPM is a private placement memorandum.

13   Q    Is this backup information for a transaction that she

14   would be looking at?

15   A    Yes.

16   Q    Is she attaching here 14 of 15 other PPM's that she has?

17   A    Subscription documents, yes.

18   Q    If we can turn to page 1 of the document and then the

19   bottom which is Ms. Izerne's response.

20        This is an E-mail from Ms. Izerne dated May 7th,

21   2017, to Ms. Chew, and a number of other people including

22   Marek Biestek and yourself.

23        And then she says, we have the Vann agreement and I

24   am almost certain Ron sent it.  How dare you claim that it is

25   missing when you were all the ones that kept requesting so

Massella - Direct - Smith                    3949

1  much of the same information that we had to provide repeatedly

2  and for which we unjustly received criticism for the sloppiest

3  work I have ever witnessed in my lifetime.

4         Then if we turn to page two.  Does the E-mail

5  continue on from there?

6  A   Yes.

7  Q   What is the general kind of tenor of this E-mail?

8  A   Basically that we don't know what we are doing and that

9  we are repeatedly asking for information and that-- just--

10  basically almost saying we are incompetent.

11  Q   Did you feel this was a fair criticism of SEC Solutions'

12  work?

13  A   Absolutely not.  We hadn't received any of the

14  information and we didn't ask repeatedly.

15  Q   When you say you didn't ask repeatedly, did you not ask

16  repeatedly for the same information?

17  A   The same information and we had not been provided.  We

18  were thorough and double checking it because we had had some

19  contentious E-mails prior to this.

20  Q   If we can turn back to page 1.  Look at the middle

21  section.  Who is this an E-mail from?

22  A   This is from Joel Cooperman, the managing partner of

23  Citrin Cooperman.

24  Q   If you can read the first-- second sentence there.  I

25  have reviewed your series?

                        RB        OCR

Massella - Direct - Smith                    3950

1   A    I have reviewed your series of E-mails to Sue Chew which

2   I find to be outrageous, unreasonable and rude beyond anything

3   I have ever seen in 34 years of managing this firm.  We

4   therefore are resigning from the Retrophin engagement

5   effective immediately.

6   Q    This refers to a series of E-mails.  Were some of those

7   E-mails from the defendant?

8   A    Absolutely.

9   Q    Then if you can scroll up to the top.

10          The defendant's response is on May 8th, 2013, to you

11  and others.  He says, hi Joel, we do not need your firm's help

12  in completing the audit.  Your firm has done an awful job for

13  us and has caused irreparable damage to us.

14          Did Citrin Cooperman and SEC Solutions in fact

15  resign from the Retrophin engagement?

16  A    We did resign, but we came to terms on how to exit.

17  Q    What do you mean by, how to exit?

18  A    We would take a -- complete some work.  Pay returns and

19  manner of how they would behave and treat our people.

20  Q    What were those?

21  A    It was, no more contentious or I'll call it harmful

22  E-mails.  And then, that the payments would be timely and that

23  we would try to get them through to the first quarter of their

24  filing of 2013.

25  Q    Around the time that SEC Solutions decided to resign and

Massella - Cross - Agnifilo                3951

1  then exit in the way you described, did Retrophin hire anyone

2  internally to handle the finances?

3  A    Yes, they hired a CFO, I think the name was Marc Panoff.

4  Q    Did you have a meeting with Marc Panoff in connection

5  with transitioning the engagement?

6  A    Yes.

7  Q    What if anything did you tell Mr. Panoff in that meeting?

8  A    We had discussions about to -- submit the areas to be

9  aware of, some of the things that we hadn't resolved.  You

10  know, where he needed to fill in the blanks and to be very

11  cognizant of related party transactions.

12  Q    Following SEC Solutions' decision to resign from the

13  engagement, did you have any further contact with the

14  defendant?

15  A    No.

16          MS. SMITH:  One moment, Your Honor.

17          (Pause.)

18          MS. SMITH:  I have no further questions, Your Honor.

19          THE COURT:  All right.  Thank you.

20          Mr. Agnifilio.

21          MR. AGNIFILIO:  Thank you.

22  CROSS EXAMINATION BY MR. AGNIFILO:

23  Q    Good morning Mr. Massella.  My name is Marc Agnifilo, I

24  will ask you questions.  I don't think you will be on the

25  stand too much longer.  If I ask you a question you don't

Massella - Cross - Agnifilo                3952

1    understand, please ask me to rephrase, I am happy to do that.

2         You still have Government Exhibit 123-12 in front of

3    you?

4    A    Give me a tab.

5         Right here, I do.

6    Q    I wanted to start with that one.  You have it in front of

7    you?

8    A    Yes.

9    Q    I want you to-- it is in evidence.  I want you to look at

10   the first page.  I want to put it up on the screen.

11        Now, I'm talking about that large E-mail there from

12   Joel Cooperman, do you see that in front of you?  You have to

13   answer "yes" or "no"?

14   A    Yes.

15   Q    Joel Cooperman is one of the principals of the accounting

16   firm you were working for at the time, correct?

17   A    Yes.

18   Q    And you see here, the third, actually the fourth

19   paragraph of Mr. Cooperman's E-mail, he says, as of today's

20   date you owe our firm $79,397.

21        Do you see that there?

22   A    Yes.

23   Q    Do you know what your firm had billed Retrophin up to

24   this point?

25   A    No.

Massella - Cross - Agnifilo                    3953

1   Q    Do you know if it was in excess of $100,000 by this
2   point?
3   A    Yes.
4   Q    And the -- approximately have-- we have approximately
5   $20,000 of unbilled time.  We estimate we will have additional
6   $40,000 to complete the project.
7            Do you see that there?
8   A    Yes.
9   Q    Fair to say Mr. Shkreli was frustrated with certain
10  aspects of this process from his perspective, is that fair to
11  say?
12  A    Yes.
13  Q    He expressed frustration to you?
14  A    Yes.
15  Q    I will ask you to take a look.  We will need the tab
16  number, 119-3.
17            MS. SMITH:  Tab 1.
18  Q    I will wait till you get there.
19  A    I am there.
20  Q    I will ask you to look on tab 1 of the fourth page.  Let
21  me know when you are there.  Do you see that?
22  A    Yes.
23  Q    It is in evidence.  I will put it up on the screen.
24            It says, fees for the services described above are
25  estimated to be $10,000.00.  That was in the original retainer

Massella - Cross - Agnifilo                    3954

1   agreement that you sent to Mr. Shkreli, correct?

2   A    No, incorrect.

3   Q    And because of the engagement, obviously the fees went

4   far in excess of $10,000, correct?

5   A    Yes.

6   Q    And from the perspective of your firm, obviously those

7   fees were necessary, correct?

8   A    For this client's sake, yes.

9   Q    I mean the work you were doing, a lot more-- you had to

10  do a lot more work than you thought, correct?

11  A    Yes.

12  Q    So, when you said initially that you thought that the fee

13  for the work you would be doing was $10,000, you didn't know

14  how much work it was going to be, correct?

15  A    Based on initial conversations that is where I came up

16  with the estimate.  When we delved deeper, there were a lot of

17  deficiencies.

18  Q    A lot more work than you thought?

19  A    Yes.

20  Q    And Mr. Shkreli was frustrated that he was paying twenty

21  times what he thought he was going to pay.  Did he ever

22  express that to you?

23            MS. SMITH:  Objection, Your Honor.

24            THE COURT:  Sustained.

25  Q    Did Mr. Shkreli ever express frustration with you that

Massella - Cross - Agnifilo                3955

1    this started to cost so much?

2    A    There was-- at a certain point in time, yes.

3    Q    Now, you met Evan Greebel before you ever met Martin

4    Shkreli, correct?

5    A    Correct.

6    Q    And, how did you know Evan Greebel?

7    A    I was introduced to Evan through-- at a Christmas party

8    through my business development associate.

9    Q    You knew he was a partner at Katten Muchin Rosenman?

10   A    That is where I met him at their Christmas party.

11   Q    You went to the Katten Christmas party?

12   A    Yes.

13   Q    That is an international law firm, you know that?

14   A    Yes.

15   Q    Has offices in many American cities and a few cities

16   overseas?

17   A    I don't know about overseas, I know they are a national

18   firm.

19   Q    Did you meet Evan Greebel for the first time at the

20   Katten Christmas party?

21   A    Yes.

22   Q    You never met him before?

23   A    No.

24   Q    You were talking to him about what, potential business

25   opportunities for yourself?

Massella - Cross - Agnifilo                3956

1  A    He was describing what he does, I was describing what I

2  do, which is normal under circumstances at these Christmas

3  parties that, you know, attorney and accountant.  So, yes.

4  Q    And, he told you that he-- as a partner at Katten he did

5  work with different companies, correct?

6  A    Correct.

7  Q    And he provided legal services to different companies?

8  A    Yes.

9  Q    And did you meet other lawyers at Katten during the

10 Christmas party when you met Evan?

11 A    I believe so, yes.

12 Q    And at one point, Evan Greebel essentially put you in

13 touch with Martin Shkreli, correct?

14 A    Well, he and the partner at Marcum, yes, both.

15 Q    And, did he tell you in essence what Evan Greebel thought

16 that Retrophin needed by way of accounting services?

17        MS. SMITH:  Objection, Your Honor.

18        THE COURT:  Sustained.

19 Q    I am not asking for specifically what he said.  But did

20 he say anything, words in substance that he thought the two of

21 you would be a good fit?

22 A    He thought we can provide the services they needed to go

23 public.

24 Q    And, I think you said on direct testimony, that Citrin

25 Cooperman was one of the top 20 accounting firms, correct?

Massella - Cross - Agnifilo                3957

1   A    Yes.

2   Q    And, by this point in time how long-- how long have you

3   been a practicing accountant as you sit here today?

4   A    Over 30 years.

5   Q    So this was how long ago, eight years ago?  Not that long

6   ago.  This was?

7   A    Five or six years.

8   Q    Five or six years ago, time is flying.

9            So you were a very experienced accountant by then,

10  correct?

11  A    Yes.

12  Q    And, when you got involved with Retrophin, I think you

13  said at the time that things were chaotic, correct?

14  A    Yes.

15  Q    Their finances were chaotic, right?

16  A    The state of the records, yes.

17  Q    And so, they obviously needed your services, from your

18  perspective, correct?

19  A    Yes.

20  Q    And, you were working with Evan Greebel throughout the

21  process that you were working on the finances for Retrophin,

22  correct?

23  A    Not constantly.

24  Q    You spoke to-- you had E-mail correspondence with Mr.

25  Greebel on a weekly or bi-weekly basis fair to say?

                    Massella - Cross - Agnifilo            3958

1    A    I would say that would not be true.

2    Q    How often?

3    A    I can't say directly, but it was during certain periods

4    of the engagement where we needed to go to legal counsel for

5    clarification.

6    Q    Whenever you needed to go to legal counsel for

7    clarification, you would bring Evan Greebel into the mix,

8    correct?

9    A    No, it depended at the time, the period of time.

10   Initially the company, Jackson, was corresponding-- by the

11   E-mails, you can see Jackson was corresponding directly with

12   him, we were going through Jackson, we really weren't speaking

13   to Evan.

14   Q    So Jackson Su was your contact person at the company,

15   correct?

16   A    He was the person that was the person that we were

17   allowed to speak to, yes.

18   Q    Were you not allowed to speak to other people?

19   A    We were told that all questions and all correspondence

20   should go through Jackson.

21            THE COURT:  Who told you that?

22            THE WITNESS:  Martin.

23            THE COURT:  Martin told you that.

24   Q    And he was the chief operating officer, correct?

25   A    Yes.

Massella - Cross - Agnifilo                3959

1    Q    So it made sense that he would-- Jackson Su was the chief

2    operating officer would be your contact, correct?

3    A    Yes.

4    Q    And, you have got a great amount of documentation,

5    Retrophin documentation from Jackson Su, correct?

6    A    Yes.

7    Q    And, he would send it to you by and large by E-mailing it

8    to you with an attachment, correct?

9    A    Yes.

10   Q    And he sent you the bank records, fair to say?

11   A    Yes.

12   Q    And he sent you different invoices, correct?

13   A    Yes.

14   Q    And, by and large you had asked Jackson for a piece of

15   financial documentation and Jackson, if he had it, would send

16   it to you, fair to say?

17   A    Or he would make inquiries.

18   Q    And now when did Marcum start working on the audit in

19   relation to when you started working on the accounting work?

20   A    We would have had to have finished and completed our work

21   and drafted financial statements and we would-- Marcum would

22   start to engage in the audit.  So I'm not sure of the exact

23   time frame.

24              (Transcript continues on next page.)

25

Massella - cross - Agnifilo                    3960

1   BY MR. AGNIFILO:   (Continuing)

2   Q    Now, and you worked pretty closely with the Marcum people

3   once they got involved, correct?

4   A    We definitely corresponded with them, yes.

5   Q    And who were your contacts at Marcum that you would speak

6   to?

7   A    Are you talking at my staff level or myself?

8   Q    Let's start with you.  Who would you personally speak to

9   at Marcum?

10  A    I would probably correspond with the partner at Marcum.

11  Q    And that was who?  Do you remember?

12  A    Ed Hackert.

13  Q    And what was your understanding of Mr. Hackert's role?

14  A    He was the audit partner.

15  Q    What does that mean, what did he have to do?

16  A    He was the partner in charge of the audit.  He had staff

17  that would perform the audit.

18  Q    All right.  And what were your roles and responsibilities

19  in regard to the audit, you personally?

20  A    Well, I had my staff and any major issues, I was the, I

21  was the go-to person to get involved and resolve the tougher

22  issues.

23  Q    Okay.  Now, I think at one point, you discussed on direct

24  testimony consulting agreements.  Do you remember me asking

25  you about consulting agreements?

Massella - cross - Agnifilo                3961

1    A    Yes.

2    Q    Okay.  Do you recall Susan Chew sending Jackson Su an

3    e-mail copying you that referenced consulting agreements on

4    January 31, 2016?  And if you don't, what I'll do is I can

5    show you an e-mail.  It's not in evidence.  I'm just going to

6    show it to the witness.

7         THE COURT:  All right.  Did you misspeak on the

8    date?  You said 2016.

9         MR. AGNIFILO:  Oh, I'm sure I did.  Yes, it's

10   January 31, 2012 at 6:18 p.m.

11        THE COURT:  All right.

12        MR. AGNIFILO:  So, I'm just going to show this to

13   Mr. Massella and it's Defense Exhibit 6507.

14   Q    Do you see the date there, January 31, 2012?

15   A    Yes, I see it now.

16   Q    And Susan Chew sent you an e-mail that had a number of

17   different things listed there, one of them was consulting

18   agreements, correct?

19   A    Yes.

20   Q    All right.  And you were aware, were you not, that

21   Retrophin was using consulting agreements to pay consultants,

22   correct?

23   A    Yes.

24   Q    All right.  And that's something that you knew very well,

25   right?

1   A    That was in January of 2012.

2   Q    Sure.  Right.  That's fine.  Right?  In January 2012, you

3   knew that?

4   A    Right.  That was at the beginning of the engagement.

5   Q    Right.  Now, there were -- Evan Greebel was the one who

6   kept the capitalization table, correct?

7   A    I'm not sure if the company kept it or Evan kept it but

8   according to one of those e-mails, the law firm did send it

9   over.

10  Q    All right.  I'm going to -- this is another -- do you

11  recall getting on numerous occasions different versions of the

12  capitalization table from Evan from the law firm?

13  A    I don't -- it never came directly to me.  Although it

14  could have, a couple of times, but, in general, most times it

15  went through the company first.

16  Q    Do you remember Jackson forwarding you capitalization

17  tables that Evan had sent to Jackson?

18  A    Yes.

19  Q    Okay.  All right.  And do you recall if that happened,

20  among other times, on February 16, 2012?  And if you don't,

21  I'll show you an e-mail.  All right?

22          THE COURT:  What are you showing him, please?

23          MR. AGNIFILO:  It's defense 6509, Judge.

24          MS. SMITH:  Your Honor, what are we refreshing here?

25          MR. AGNIFILO:  Just about the date.

Case 1:15-cr-00637-KAM  Document 297  Filed 08/01/17  Page 110 of 336 PageID #: 4892

1          THE COURT:  Did you ask him a question you're

2    refreshing?

3          MR. AGNIFILO:  He said that Evan sometimes would

4    send the cap. tables to Jackson and Jackson would send them to

5    him and I asked him if that happened in February and he said

6    he didn't know the date so I'm showing him the date.

7    A    Yes, this is -- basically, this is Jackson to me and

8    actually it's not Evan.

9    Q    Look at the bottom.  Look at the bottom.  Right?

10          MS. SMITH:  Your Honor, this isn't in evidence.

11          MR. AGNIFILO:  It's not.  I'm just going to ask him

12    a question.

13    Q    Do you remember as early as February of 2012 if you got

14    capitalization tables through Jackson from Evan, only if you

15    remember?

16    A    Based on -- if I'm looking at this trail, I'm not seeing

17    anything directly from Evan.

18    Q    No, no, that Evan would send it to Jackson.

19    A    Yes.

20    Q    And then Jackson would then forward the e-mail to you?

21    A    Yes.

22    Q    And your recollection is refreshed that happened as early

23    as February 2012?

24    A    Yes.

25    Q    Okay.  Now, do you remember there being a third-party

Massella - cross - Agnifilo                    3964

1    valuation of Retrophin, that a third-party valuation company

2    gave a valuation of Retrophin?  Do you recall?

3    A    It's recently been brought to my attention but I hadn't

4    recalled it, yes.

5    Q    And recently been brought to your attention in what

6    manner?

7    A    The DA had showed me the document.

8    Q    Okay.  The valuation company's report of Retrophin,

9    correct?

10   A    Yes.

11   Q    And it valued Retrophin, do you remember what the value

12   was?

13   A    No, I need to see the document.

14   Q    All right.  I can refresh your recollection.  One second.

15          (Pause.)

16   Q    Do you remember it being a $40 million valuation?  Only

17   if you remember.

18   A    No.

19          THE COURT:  He has to answer out loud.

20          THE WITNESS:  No, I'm sorry.  I just remember.

21          THE COURT:  You don't recall?

22          THE WITNESS:  No, I do not recall.

23   Q    Do you remember seeing a consulting agreement for someone

24   named Ken Banta?

25   A    No.

1             MR. AGNIFILO:  What I'll do -- I have the valuation

2    report, Judge.  You know what I can do?  I can put it just on

3    the witness' screen.  It's part of what's Defense 6518.  It's

4    going to be hard to read.  You know what might be easier,

5    Judge, because it's really small print?  I'll just give it to

6    the witness.

7             THE COURT:  Yes, you can.  This is the one he only

8    saw recently, is that right?

9             MR. AGNIFILO:  Yes.

10   Q    Thank you sir.  It's really small.

11            (Pause.)

12   A    Okay.

13   Q    That's the valuation report?

14   A    I wouldn't say this is a report.  This says it's an

15   investment summary.  If it was a report, it would be thicker.

16   Q    Right.  Right.  And that's the one you said you saw

17   recently?

18   A    Yes.

19   Q    All right.  And do you remember having that being sent to

20   you in about April of 2012?

21   A    Prior to this, I didn't recall, but yes.

22   Q    All right.  And it has -- you said it's an investment

23   summary.  What does that mean?

24   A    Well, reading this, it's based on --

25            MS. SMITH:  Objection, Your Honor.

Massella - cross - Agnifilo                3966

1          THE COURT:  Sustained.

2    Q    I'm not asking you to read it.  You can't read it.  I'm

3    asking you not what it says on that document, but what the

4    nature of that document is.

5    A    Looking at what this document is saying, it's

6    basically -- the valuation --

7          MS. SMITH:  Objection, Your Honor.

8          THE COURT:  Sir, we don't want to know what's in the

9    document.  He's just asking you to describe what it is.

10   A    It's an investment summary.  It's not a valuation report.

11   Q    Okay.  And who's providing the investment summary?

12   A    It looks like it came from VRC.

13   Q    Say that again?

14   A    VRC.

15   Q    What is VRC?

16   A    It's a valuation company.

17   Q    And just so I understand, you say you did receive this in

18   April of 2012 but until recently, you didn't recall that.  Do

19   I understand that right?

20   A    I don't recall for a fact whether I received it.  It's

21   recently been put in front of me.  I don't recall receiving

22   it.

23   Q    In your preparation sessions with the government, it was

24   brought to your attention, correct?

25   A    This document, yes, they showed me this document.

Massella - cross - Agnifilo                    3967

1   Q    All right.  Very good.  All right.

2        Now, I'm going to show you -- you said that you did

3   not remember getting a consulting agreement for Ken Banta, am

4   I correct?

5   A    Correct.

6   Q    I'm showing you what's been marked only for your

7   recollection as 6511.  Do you see 6511 there?  It's only for

8   you.  It's not in evidence.

9        Do you recall getting an e-mail on February 16,

10  2012, from Jackson Su to Susan Chew and yourself?

11  A    Yes, I see it.

12  Q    And one of the attachments was Banta consulting

13  agreement, do you recall that?

14  A    Am I allowed to say what I'm seeing?

15  Q    No, you're not technically allowed to.  It's really only

16  a question as to whether it refreshes your recollection.

17  A    I'm seeing an agreement that has two parts to it.

18        MS. SMITH:  Objection, Your Honor.

19        THE COURT:  All right.

20  Q    It's really -- I'm only -- since you said you didn't

21  remember getting a Banta consulting agreement, I'm giving you

22  a document that the only purpose that's allowed legally is it

23  can only refresh your recollection or not.  If it refreshes

24  your recollection, you can talk about what your recollection

25  is now that it's refreshed.  If it doesn't refresh your

Massella - cross - Agnifilo                    3968

1    recollection, then I have to move on.

2    A    I don't recall the content.

3    Q    Okay.  Very good.  But you recall getting, you recall

4    getting an attachment around that time for something from Ken

5    Banta?

6    A    Based on what you've presented, it appears that I did.

7    Q    All right.  Now, were you familiar with someone named

8    David Kravitz who is also a lawyer at Katten?

9    A    I saw him on e-mails and what was presented, yes.

10   Q    Okay.  And you understood that he worked with Evan

11   Greebel, did you understand that?

12   A    Yes.

13   Q    In addition -- and you spoke to Evan -- in addition to

14   having e-mail correspondence with Evan, is it fair to say that

15   you spoke on the telephone with Evan in 2012?

16   A    Yes.

17   Q    More than a handful of times, fair to say?

18   A    I would say that would be correct.

19   Q    Okay.  And do you know if David Kravitz was on the phone

20   with some of these conversations with Evan?

21   A    I don't recall.

22   Q    All right.  And do you recall having any conversations

23   with David Kravitz without Evan on the phone?

24   A    Potentially, my associate may have and potentially, I may

25   have.  I'm not -- I don't recall them at all.

Massella - cross - Agnifilo                3969

1   Q    Okay.  And in addition to speaking with Evan Greebel at

2   Katten and possibly David Kravitz at Katten, do you have any

3   recollection of speaking with any other partners or associates

4   at the Katten firm?

5   A    I did not.

6   Q    Now, one of the things that you, that you were sent was

7   different invoices from time to time.  Do you recall?

8   A    Yes.

9   Q    All right.  Do you recall an invoice for a Swiss

10  chemistry laboratory called Lonza?  The reason it might stick

11  out in your mind is because the e-mail called for payment in

12  Swiss francs.

13  A    I don't recall.

14  Q    I'm going to show you -- this is just to refresh your

15  recollection, Defense Exhibit 6513.  This is just for you to

16  see.

17          Do you remember an e-mail from Jackson to you and

18  Susan Chew that forwards another e-mail from a company called

19  Lonza that has an invoice for payment to be paid to Lonza in

20  Swiss francs?

21  A    It appears I was, I was cc'd on an e-mail.

22  Q    Okay.  And do you know what Lonza did?  Only if you know.

23  A    I don't recall.

24  Q    Okay.  Do you recall several invoices from Lonza that

25  have to be paid in Swiss francs, this among others?

Massella - cross - Agnifilo                    3970

1   A    No, I don't recall.

2   Q    But you didn't recall this one until I showed it to you,

3   is that fair to say?

4   A    Correct.

5   Q    Okay.  Do you recall a company called NAV Consulting?

6   A    No.

7   Q    No?  All right.  I'm going to show you what's been marked

8   as 6512 just for your own recollection.

9        Do you recall getting an e-mail from Jackson Su to

10  you, Corey Massella, in regard to NAV Consulting Inc.?

11  A    This appears to be related to --

12            MS. SMITH:  Objection, Your Honor.

13            THE COURT:  Yes.  Again, just whether you recall

14  receiving this e-mail.

15  A    Yes, I received this e-mail.

16  Q    Okay.  And do you recall a company NAV Consulting?

17  A    It's amongst many vendors, but ...

18  Q    Okay.  That's fine.  And do you recall a law firm called

19  Kleinberg Kaplan Wolff & Cohen that was paid, that was paid

20  money from Retrophin?

21  A    Again, if it's amongst the vendors.

22  Q    I'm sure.  So, here.  Take a look.  It's an e-mail from

23  Jackson to you and Susan Chew in regard to a law firm called

24  Kleinberg Kaplan Wolff & Cohen, PC.

25            MS. SMITH:  Objection, Your Honor, to

Massella - cross - Agnifilo                    3971

1    mischaracterizing the document.

2         THE COURT:  All right.  Why don't you just show him

3    the document and ask if it refreshes his recollection

4    regarding --

5         MS. SMITH:  It would be regarding a payment to MSMB

6    Consumer.

7         THE COURT:  All right.  Why don't you rephrase your

8    question then.

9         MR. AGNIFILO:  Sure.

10   Q    Do you recall this firm Kleinberg Kaplan Wolff & Cohen?

11   A    No.

12   Q    Okay.  All right.  Is it fair to say there are a lot of

13   vendors and a lot of invoices that Retrophin and the related

14   companies had, correct?

15   A    Yes.

16   Q    All right.  Now, I think you answered on direct

17   examination, you didn't look at the books and records of the

18   MSMB entity, correct?

19   A    Absolutely.

20   Q    Right.  That was not part of your assignment, right?

21   A    Correct.

22   Q    You were hired to look at the books and records of

23   Retrophin, correct?

24   A    Yes.

25   Q    Okay.  You were not asked, you were not hired -- you had

Massella - cross - Agnifilo                3972

1   no responsibility to look at the books and records of MSMB

2   Capital, correct?

3   A    Yes.

4   Q    Or MSMB Healthcare, correct?

5   A    Yes.

6   Q    Or MSMB Isotope, right?

7   A    Yes.

8   Q    Or MSMB Consumer, right?

9   A    Yes.

10  Q    Okay.  So you don't know what was in those books and

11  records because you weren't hired to look into them, fair to

12  say?

13  A    Correct.

14  Q    Now, there are a number of e-mails between you and

15  Jackson Su where you were discussing something called the work

16  papers.  What are the work papers?

17  A    The work papers are what is going to be supporting items

18  for the audit, certain -- whether it's assets, liabilities,

19  equity in the company, that's what work papers are.

20  Q    And in regard to the Retrophin audit that we've been

21  talking about, whose responsibility is it to prepare the work

22  papers?

23  A    We were preparing the work papers and the company did see

24  what we had prepared, yes.

25  Q    Okay.  And you -- what did you do with the work papers

Massella - cross - Agnifilo                3973

1   that you prepared?

2   A    When they were completed?

3   Q    Right.

4   A    We sent them to the auditors.

5   Q    All right.  And that's Marcum, correct?

6   A    Yes.

7   Q    Okay.  So, at this point in time, you were working with

8   Ed Hackert at Marcum, correct?  Once the audit -- you got

9   closer to the audit, so we're talking maybe March, April, May

10  and onward, 2012, correct, and Hackert was involved?

11  A    At my level, yes.

12  Q    Yes.  And then Hackert had a staff, correct?

13  A    Correct.

14  Q    And you had a staff in addition to yourself, correct?

15  A    Yes.

16  Q    And you were aware that Hackert's staff was speaking with

17  your staff, correct?

18  A    Yes.

19  Q    And you were speaking with Hackert?

20  A    When necessary, yes.

21  Q    Right.  Evan Greebel was also adding things from time to

22  time, correct?

23  A    I believe so.

24  Q    Right.  And you said earlier if there was a legal

25  question that you had, you went to Greebel, correct?

Massella - cross - Agnifilo                    3974

1  A    It depends upon the point in time.  At certain points in

2  time, we were going directly to the company.  Later on, there

3  may have been direct contact with Evan if we needed to give

4  something to Marcum, the auditors.

5  Q    Now, Martin Shkreli is not a lawyer; you knew that,

6  right?

7  A    Yes.

8  Q    Martin Shkreli is not an accountant.  You knew that too,

9  right?

10  A    Yes.

11  Q    And Jackson Su is not a trained lawyer, is he?

12  A    Not that I'm aware of.

13  Q    Because you said that sometimes for legal matters, you

14  would go to the company.

15  A    For them to obtain the information.

16  Q    Right, from Greebel?

17  A    Correct.

18  Q    Okay.  There was nobody in the company to your knowledge

19  who was a lawyer, correct?

20  A    Not that I'm aware of.

21  Q    Now, you testified about a document on direct

22  examination.  I'm going to show it to you.  It's Government's

23  Exhibit 119-15.  It's already in evidence.  We're just going

24  to look at the last page of 119-15.  I think it's in your book

25  but I can also put it on the screen.

                    Massella - cross - Agnifilo                3975

1              MS. SMITH:  It's tab 12.
2    Q    This is in evidence so I can put it on the screen.
3              You see there's a signature for Marek Biestek as
4    transferor, you see that, right?
5    A    Yes.
6    Q    And then there's a signature for Martin Shkreli as
7    transferee, you see that, right?
8    A    Yes.
9    Q    And then there's a date, 11/19/12, you see that?
10   A    11/29.
11   Q    I'm sorry.  11/29/12.  You see that, right?
12   A    Yes.
13   Q    And do you know who wrote that date there?
14   A    I don't -- I didn't watch somebody put the signature
15   there but it does go under Martin's name.
16   Q    Right.  So did that lead you to conclude that Martin put
17   the date there?
18   A    Yes.
19   Q    All right.  So you thought Martin Shkreli wrote that
20   date?
21   A    By association of where it was put, yes.
22   Q    Do you have any knowledge if Jackson Su wrote that date?
23   A    No.
24   Q    You don't know that, correct?
25   A    You're correct.

Massella - cross - Agnifilo                3976

1    Q    All right.  And you agree with me that Jackson Su's name

2    appears nowhere on this document, correct?

3    A    Correct.

4    Q    So that's why a minute ago, you thought it made sense

5    that Martin Shkreli would have written that date, right?

6    A    Yes.

7    Q    That was the assumption that you made?

8    A    Correct.

9    Q    Do you know that Jackson Su was an SEC whistleblower?

10            MS. SMITH:  Objection, Your Honor.

11            THE COURT:  Sustained.

12   Q    At any point while Jackson Su was providing you with

13   information from the company, were you aware that Jackson Su

14   was an SEC whistleblower?

15            MS. SMITH:  Objection, Your Honor.

16            THE COURT:  I will sustain the objection.

17   Q    Did you ever ask Martin if he wrote the date?

18   A    No.

19   Q    At one point, you guys were preparing something called a

20   Super 8-K, correct?

21   A    Yes.

22   Q    What's a Super 8-K, just for the jury's benefit?

23   A    It was related to the reverse merger, but it's the filing

24   of the reverse merger to the SEC.

25   Q    And I think you testified on direct examination that you

Massella - cross - Agnifilo                3977

1    were concerned that there were a lot of very small cash, what

2    we call cash transactions having to do with debit cards.  Do

3    you remember that testimony?

4    A    Yes.

5    Q    All right.  And is it fair to say that there were lots of

6    things that were a dollar or $2, $3, $4 that were bought with

7    a debit card, correct?

8    A    Correct.

9    Q    And did you form a belief that this was Martin making

10   small purchases with a debit card?

11   A    We listed them and then inquired of the company.

12   Q    Okay.  And would you view it as a personal expense or a

13   business expense if someone works late into the night and then

14   gets a modestly priced meal because they were working during

15   that period of time?  From your perspective, is that a

16   business expense or a personal expense?

17   A    That is very much judgmental, depending upon where

18   they're working and the company policy.

19   Q    If someone is the CEO or the founder of a company and

20   that person is working late into the night and that person

21   buys a modest meal, $10 meal, $5 meal, would you view that as

22   a business or a personal expense?

23   A    Again, judgmental as to the company.  Some would say no.

24   Some would say yes.

25   Q    And did you have any understanding as to whether it was

Massella - cross - Agnifilo                    3978

1   no or yes with Martin and Retrophin for things like this?

2   A    Well, that's why we identified it and put it in their

3   hands for them to make that judgment.

4   Q    And I think at one point, you pointed out -- we can go

5   back and look at it but I think you might remember it -- there

6   was a trip to Atlantic City that Martin had taken, right?

7   A    Yes.

8   Q    And when asked about it, he said no, that's a personal

9   trip, I'll take it back?

10  A    Correct.

11  Q    And I think you were asked did you know if he ever paid

12  it back and you don't know if he paid it back or not, correct?

13  A    Correct.

14  Q    You weren't saying no, he didn't pay it back, right?

15  A    Absolutely.

16  Q    You're saying you don't know.  He could have paid it

17  back.  He could have not paid it back.  You don't know.

18  A    Correct.

19  Q    All right.  Now, you were shown the e-mail where you were

20  saying, what the heck, right?  It's 123-2 in evidence, right,

21  the "what the heck" e-mail?  What you were upset about was

22  that things kept changing, right?

23  A    Yes.

24  Q    And you were frustrated, right?

25  A    Correct.

Massella - cross - Agnifilo                3979

1   Q    Because things would change and then you would have to

2   redo the figures and the calculations based on how things were

3   changing, right?

4   A    Correct.

5   Q    All right.  And that's the reason you were expressing

6   frustration in this e-mail, correct?

7   A    Well, that and the document that was sent was, for me,

8   was unusual.

9   Q    And the document that was sent that's unusual, just so we

10  make sure what it is, was this document, right?

11           MS. SMITH:  Your Honor, just for the record, that's

12  Government Exhibit 119-15.

13           THE COURT:  Thank you.

14  Q    The document regarding the shares between Biestek and

15  Shkreli, right?  That was the document that was unusual,

16  correct?

17  A    Correct.

18  Q    And so you sent this e-mail, "WTF," after getting this

19  document, right?

20  A    Yes.

21  Q    Now, I think you said that at one point, Jackson Su left

22  and then you were dealing mostly with someone named Ron

23  Tilles, is that fair to say?

24  A    Yes.

25  Q    All right.  And until Jackson Su left, Jackson Su was the

1  one who sent you the vast amount of information that you

2  received from Retrophin, correct?

3  A    Correct.

4  Q    And then after Su left, Tilles filled that same role?

5  A    Limited, but yes.

6  Q    All right.  And at the end of the day, the company went

7  public through a reverse merger, correct?

8  A    Yes.

9  Q    But you said that wasn't always the plan; the plan you

10 initially testified was something different, correct?

11 A    I believe it was to do either a form 10 or S-1.  It was a

12 straight registration.

13 Q    And just for the jury's benefit -- and are you familiar

14 with going through the process of going public in that matter?

15 A    Not every aspect of legalities, but I can speak to some

16 of that process.

17 Q    Okay.  Just very briefly, not exhaustively, just give the

18 jury an idea of what it means to go public in that other way.

19 A    You would have to have audited financial statements and,

20 again, you would have to comply with the financial part of the

21 rules of what's in the document, plus, it's -- I'm not going

22 to know every piece of the legality, but the document is a,

23 it's a registration statement that goes through a very large

24 process of vetting by the SEC.

25 Q    And they did not go public that way; they went through a

Massella - cross - Agnifilo                    3981

1  reverse merger, correct?

2  A    Yes.

3  Q    All right.  And are you familiar with the process of

4  going public by way of a reverse merger?

5  A    Yes.

6  Q    And can you just tell the jury briefly what that is?

7  A    You would file what he referred to as a Super 8-K, and

8  then there would be, the financial statements would be similar

9  to what we, I described before.  There are additional

10 disclosures that go with that and it's a shorter time frame.

11 Q    And you just said in your testimony a couple of times

12 that you're not a lawyer so you don't know the legality of

13 these things, correct?

14 A    That would be correct.

15 Q    It's important to have a lawyer well versed in these

16 matters when you are going public in this way, correct?

17 A    Absolutely.

18 Q    And Evan Greebel was the lawyer from your perspective who

19 was guiding Mr. Shkreli through this process, right?

20           MS. SMITH:  Objection, Your Honor.

21           THE COURT:  Well, I will overrule it.  Go ahead.

22 A    Yes.

23           (Continued on next page.)

24

25

CMH      OCR      RMR      CRR      FCRR

1    EXAMINATION CONTINUES

2    BY MR. AGNIFILO:

3    Q    And you knew that he and the other lawyers at Katten were

4    working with Mr. Shkreli during the reverse merger process,

5    correct?

6    A    Yes.

7    Q    All right.  And you knew that Evan Greebel and the other

8    lawyers of Katten -- at Katten were working with Mr. Shkreli

9    throughout 2012 getting ready for the reverse merger, fair to

10   say?

11   A    Yes.

12   Q    And in regard to the preparation of the Super 8-K you

13   knew Evan Greebel was involved in that, correct?

14   A    Yes.

15   Q    And, in fact, tell me if you recall, he said that he

16   reviewed the Super 8-K and made some changes; only if you

17   recall.

18   A    It's possible.  I don't recall it specifically.

19            MR. AGNIFILO:  Give me one second.

20            (Pause.)

21            MR. AGNIFILO:  Just bear with me one second.  Give

22   me one minute.

23            (Pause.)

24   Q    I am just going to show you what's been marked as 6531,

25   DX 6531, just to refresh your recollection.  And my only

Massella - cross - Agnifilo                3983

1  question to you is whether you recall that Evan Greebel was

2  being asked to send the Super 8-K once he finished his review?

3  Do you recall if Evan reviewed the Super 8-K and then sent it

4  on after he finished his review?

5  A    Having seen this, yes.

6  Q    Okay.  And this is in November of 2012, right?

7  A    Yes.

8  Q    And did you take some comfort in the fact that Evan had

9  reviewed the Super 8-K and in concluding that it was proper to

10 go forward?

11            MS. SMITH:  Objection, Your Honor.

12            THE COURT:  Sustained.

13 BY MR. AGNIFILO:

14 Q    Did you in any way rely on Evan Greebel in regard to

15 legal matters?

16 A    I would -- I wouldn't have to because I wasn't the

17 auditor.

18 Q    But you knew that he was in the e-mail chains in regard

19 to these matters in the fall of 2012, correct?

20 A    Yes.

21 Q    All right.  And just so the jury understands the

22 distinction, what's the difference between you and the auditor

23 in regard to making conclusions on legal matters?

24 A    The auditors -- the auditors have to review the legal

25 exceptions to make sure that they're comfortable on their --

Massella - redirect - Smith                    3984

1    in that Super 8-K document that it's -- it concurs with their

2    audited financial statements or -- that's what it would be.

3    Q    Okay.  And you were aware, because you were on the e-mail

4    traffic, that people from Marcum and you and Evan Greebel were

5    all on the same e-mails with regard to the Super 8-K, fair to

6    say?

7    A    Not always, but -- but yes we were, sometimes.

8    Q    All right.

9              MR. AGNIFILO:  Just give me one second.

10             (Pause.)

11             MR. AGNIFILO:  Mr. Massella, I want to thank you for

12   your time.  I don't have any questions for you.

13             THE WITNESS:  Thank you.

14             THE COURT:  Is there any redirect?

15             MS. SMITH:  Yes, just very briefly, Your Honor.

16             THE COURT:  All right.

17   REDIRECT EXAMINATION

18   BY MS. SMITH:

19   Q    I am going to put up Government Exhibit 119-3 and

20   Mr. Agnifilo asked you about this exhibit on cross, and it's

21   the engagement letter from January of 2012.

22   A    Which tab?

23   Q    It's tab 1.  And if you remember, this is actually the

24   cover e-mail to the engagement letter.

25             MS. SMITH:  If we can go to page, I believe it's

SAM      OCR      RMR      CRR      RPR

Massella - redirect - Smith                3985

1    page 3, and then zoom in on the top half.

2    BY MS. SMITH:

3    Q    And so then again, what was the date of this engagement

4    letter?

5    A    January 19th, 2012.

6    Q    And what's the time period for the work that this

7    engagement letter covers?

8    A    For the year-end December 31st, 2011.

9            MS. SMITH:  And if we can turn to page 4 of the

10   document, which is the next page.

11   Q    At the bottom there, this is the section Mr. Agnifilo

12   asked you about.  It says, Fees for the services described

13   above -- those are the services through December 2011, is that

14   right?

15   A    For that period, yes.

16   Q    -- are estimated to be $10,000 and will be billed at our

17   standard hourly rates which vary, and then there is a bunch of

18   expenses that aren't included in that fee.  Is that right?

19   A    That would be correct.

20   Q    If we can turn now to Government Exhibit 123-14, which is

21   in evidence.

22           (Exhibit published.)

23   Q    And, again, the same top half.  This was the engagement

24   letter for November 1st, 2012, is that right?

25   A    Yes.

Massella - redirect - Smith                    3986

1   Q    What is the time period for the work that's covered in

2   this engagement letter?

3   A    For the nine months ended September 30th, 2012.

4   Q    And that's a different time period than the engagement

5   letter that we just looked at in January of 2012, is that

6   right?

7   A    Yes.

8            MS. SMITH:  And if we can turn to the second page of

9   this document at the bottom.

10  Q    What's the fee associated with this second time period

11  through September 30th, 2012?

12  A    It was estimated to be $40,000.

13  Q    And then there are additional costs and fees that are not

14  included in that estimate, is that right?

15  A    Yes.

16  Q    And the time period for this engagement letter was

17  through September of 2012, right?

18  A    Correct.

19  Q    And in the spring of 2013, you were doing additional work

20  for Retrophin through, at least, the end of 2012; is that

21  right?

22  A    That's correct.

23  Q    And then some additional work for 2013 as well?

24  A    Yes.

25           MS. SMITH:  No further questions, Your Honor.

1          THE COURT:  Anything else, Mr. Agnifilo?

2          MR. AGNIFILO:  Nothing from me.  Thank you, Judge.

3          THE COURT:  All right.  Sir, you're excused.  Have a

4     nice day.

5          THE WITNESS:  Thank you.

6          (Witness steps down.)

7          THE COURT:  Would the jurors like to take their

8     lunch break now before we start with our next witness,

9     otherwise we can continue for another half hour or so?  Is

10    there a preference?  Continue?

11         THE JURY:  Yes.

12         THE COURT:  All right, who is your next witness,

13    please?

14         MR. SRINIVASAN:  John Neill, Your Honor.

15         THE COURT:  All right.

16         (Pause.)

17         THE COURT:  Good afternoon, sir.  Please come on up.

18    You will have to take care stepping up here and once you do,

19    please raise your right hand.

20         (Witness sworn/affirmed by the Court.)

21         THE COURT:  Thank you.  Please have a seat and state

22    and spell your name for the record, please.

23         THE WITNESS:  My name is John Neill, J-O-H-N, N-E-I

24    double L.

25         THE COURT:  Thank you.

1        Please proceed, Mr. Srinivasan.

2        MR. SRINIVASAN:  Thank you, Your Honor.

3   **J O H N   N E I L L,**

4        called as a witness by the Government, having been

5        duly sworn/affirmed, was examined and testified as

6        follows:

7   DIRECT EXAMINATION

8   BY MR. SRINIVASAN:

9   Q    Good afternoon.  How old are you, Mr. Neill?

10  A    I'm 74.

11  Q    Are you married?

12  A    Yes.

13  Q    What's your wife's name?

14  A    Barbara Warner Neill.

15  Q    Do you have any children?

16  A    We have three children.

17  Q    Where do you live?

18  A    We live in Dallas, Texas.

19  Q    How long have you lived there?

20  A    Since 1969.

21  Q    Can you please describe your educational background?

22  A    I grew up in Enid, Oklahoma, small town, went to public

23  schools there.  I then left to go to Yale for four years and

24  got a BA in economics.  After that I went to the University of

25  Oklahoma Law School for one year.  And then went to the

1    Harvard Business School and got an MBA.  Went into the Navy

2    after that, went to supply school in Athens, Georgia, then

3    became a U.S. Navy supply officer.  And after the Navy, I went

4    to El Centro Community College in Dallas and became a nursing

5    home administrator.

6    Q    What did you do after that?

7    A    I started the Telesis Company with my partner, Steve

8    Rush, and we have done retirement-related housing and

9    operations since that time until we sold most of those in

10   2014.

11   Q    When you say retirement-related operations, what does

12   that mean?

13   A    We had retirement apartments.  We had nursing homes.  We

14   had assisted living.  We had Alzheimer's Memory Care and Home

15   Health Agency.  So we had what we call continuing care

16   retirement, so starting with very early onset aging up through

17   very heavy skilled care.

18   Q    Have you found any charitable organizations?

19   A    Yes.  I -- I have founded the Victory Meadow Youth

20   Development Foundation.

21   Q    What is that?

22   A    That is the foundation my wife and I started about ten

23   years ago to help the kids in a very dense neighborhood in

24   Dallas that has a lot of refugees, have the opportunity that

25   our kids had, your kids had, to realize their potential.

1    Q    Do you know an individual named Martin Shkreli?

2    A    Yes, I do.

3    Q    Have you met him in person?

4    A    Yes, I have.

5    Q    About when was the first time you met him?

6    A    Fourth quarter of 2010, I believe.

7    Q    And how do you know him?

8    A    I was introduced to Martin by Darren Blanton, a friend in

9    Dallas.

10   Q    Do you see Martin Shkreli in the courtroom today?

11   A    Yes, I see Martin Shkreli in the courtroom.

12   Q    Can you please point him out and pick him out by a piece

13   of clothing?

14   A    Martin is in a silver suit standing with no tie.

15            THE COURT:  All right, we will note that the witness

16   has identified Mr. Shkreli.

17   BY MR. SRINIVASAN:

18   Q    Where did you first meet the defendant?

19   A    It was in Darren Blanton's office in Dallas, downtown

20   Dallas.

21   Q    What did you talk about with the defendant at that

22   meeting?

23   A    I think I mostly listened to the defendant, and he and

24   Darren talked about biotech shorting primarily, and multiple

25   positions that he had taken and done with -- with Darren.

Neill - direct - Srinivasan                3991

1   Q    And when you say positions, do you mean stocks?

2   A    Stocks.

3   Q    Did you have any other meetings with the defendant in

4   Texas before you invested?

5   A    Shortly thereafter, Darren hosted a dinner with other

6   like-minded investors, and I attended that dinner and Martin

7   was at that dinner.

8   Q    Was some of the discussion at that dinner about MSMB

9   Capital?

10  A    I think so.  It was primarily about different positions,

11  different stocks, different investments, but I did leave

12  knowing that MSMB Capital was a fund.

13  Q    What, if anything, was your understanding of that fund

14  after the dinner?

15  A    My understanding was that it was a fund that Martin ran

16  and that he traded primarily in the biotech space and that it

17  had done very well because he traded both in Europe, in the

18  U.S. and in the Far East.  So that he traded multiple markets

19  and had the opportunity to make better returns than someone

20  just trading the U.S. market would make.

21  Q    You mentioned the returns.  Did you learn anything about

22  the returns of the fund?

23  A    The returns that were discussed that stuck in my mind

24  were 40-percent-a-year kind of returns.  So I -- I expected

25  Martin to produce very high returns from the two meetings that

SAM      OCR      RMR      CRR      RPR

Neill - direct - Srinivasan                    3992

1   we had.

2   Q    What, if anything, did you learn about the defendant's

3   background?

4   A    It was sketchy, but I learned that he had grown up in an

5   apartment in or around New York where his father was the

6   janitor and that he had come through that and went to

7   Columbia.  I thought graduated Columbia at 16 and had then

8   gone to work with Jim Cramer after that.

9   Q    At around the time that you first met the defendant and

10  then had that dinner, had you already invested in any hedge

11  funds?

12  A    I -- I've been investing in hedge funds since about 1980,

13  so I've done a lot of hedge fund investing over the years.

14  Q    What criteria did you use to evaluate a potential hedge

15  fund investment?

16  A    Usually the essence is, Will that person be able to make

17  money going forward?  And so you look at what they've done.

18  You look at what they're doing.  You look at their work ethic.

19  You look at the people who surround them.  And then try to

20  come to a conclusion in your mind of whether you think that

21  person will be able to produce better returns than you'll get

22  just by buying one of the indexes.

23  Q    And when you say what they've done, are you referring to

24  the track record?

25  A    You look at both the track record and what they'll do in

Neill - direct - Srinivasan                3993

1    the future.  So you look at what they've done in the past, and
2    then you want to know what your expectation is that they would
3    do that again in the future.
4    Q    Did you have any views on investing in private equity?
5    A    My partner and I had done quite a bit of private equity
6    over the years, and we had formed a very negative opinion on
7    doing private equity because it takes so long to get your
8    money back.  And we found that in private equity you really
9    needed to be with the very big, the very best, and we weren't
10   big enough to do that.  So we were -- we had a very negative
11   outlook, and I still do, on private equity for a small
12   investor.
13   Q    And what was your understanding of MSMB Capital's
14   investing strategy?
15   A    I thought MSMB was a -- a fund that would be run by
16   Martin, he would be making the decisions, and that we would be
17   doing long and short, but -- it's unusual for somebody to be
18   as good at short as it sounded like Martin was.  So I thought
19   we'd make most of our returns on the short side, but I thought
20   Martin would be able to make money in both an up market and a
21   down market because I thought he would be doing longs and
22   shorts in the biotech space where he seemed like an expert.
23   Q    Was this important to your investing decision?
24   A    Yes.
25   Q    And why is that?

Neill - direct - Srinivasan                    3994

1    A    That's why you invest.  I mean that's why -- that's why I

2    gave him the money was so that he would make the returns in

3    the manner that I thought he would -- he would make them.

4    Q    And was your understanding of MSMB Capital's performance

5    history important to your investing decision?

6    A    It must not have been because I really didn't go through

7    his historical numbers.  I relied on the anecdotal and word of

8    mouth from the people at the dinner.  So I thought his returns

9    were very good, but I, frankly, did not go back and go through

10   them.

11              THE COURT:  May I ask a question --

12              MR. SRINIVASAN:  Yes --

13              THE COURT:  -- of this witness?

14              MR. SRINIVASAN:  -- Your Honor.

15              THE COURT:  You talked about your understanding

16   about MSMB Capital and about Mr. Shkreli.  What was the source

17   of that understanding, was it from your friends who invested

18   with him or was it from Mr. Shkreli or was it from something

19   you read on your own?  What was the basis of your

20   understanding?

21              THE WITNESS:  It was a combination of my meeting

22   with Mr. Shkreli and Darren Blanton that one time.  Then from

23   the dinner where other people were doing most of the talking,

24   but Martin also was talking.  But I did not do a lot of

25   independent research on MSMB or on Martin at that time.

1              THE COURT:  Thank you.

2    BY MR. SRINIVASAN:

3    Q    Did the name Elea Capital come up in your conversations

4    with the defendant before you invested?

5    A    Not to my knowledge.

6    Q    Would information about --

7              MR. BRAFMAN:  Objection, Your Honor.  Can we have a

8    sidebar?

9              THE COURT:  Yes.

10             (Sidebar held outside the hearing of the jury.)

11

12             (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                            Sidebar                          3996
```

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          MR. BRAFMAN:  Your Honor, to go down that path with

4    this investor based on the 3500 material is offensive.  He has

5    told the government that he relied on Darren Blanton, A; B, he

6    relied on Darren Blanton to do the due diligence; and C, he

7    didn't care about anything except that Martin was making a lot

8    of money for Darren Blanton.  So to suggest -- he didn't care

9    about assets under management, he didn't care about any of the

10   normal stuff they've asked everybody about, so to suggest that

11   had he known that Elea Capital didn't do well it would have

12   affected his investment, he never even read the private

13   placement memorandum.  He just threw in $500,000 because he's

14   got that much money and this was like a swinging-for-the-

15   fences bet.

16         I mean to suggest that it would have made a

17   difference to him based on what they know is an inappropriate

18   inference that they're asking the jury to draw from the

19   question, regardless of what the answer is.

20         MR. SRINIVASAN:  Your Honor, I think the witness has

21   testified that his impression from the dinner, including, as

22   Your Honor clarified, discussions with the defendant, was that

23   MSMB Capital was making very good returns.  He thought in the

24   40 percent neighborhood.  He said that he looked at what the

25   manager has done in the past and what he thinks that the

```
                         Sidebar                      3997
```

1   manager is going to do in the past (sic), that includes the

2   investment manager's track record.

3          You know, throughout this case we've established

4   Elea Capital was one of those omissions.  Defendant gave

5   investors the impression that he had a very, very strong track

6   record that was consistent over a number of years, and then

7   didn't disclose, for example, Elea Capital to his investors.

8          So all I was going to ask was one more question,

9   which is whether information about whether a prior hedge fund

10  of the defendant's had been profitable or not would have been

11  important to him.  I am not going down the road.  It's the

12  same question we've been asking of all these investors.  To

13  Mr. Brafman's point, none of the investors knew about Elea

14  Capital and the track record, which is what triggers this type

15  of questioning.

16         MR. BRAFMAN:  No, but what the other --

17         MR. SRINIVASAN:  And Mr. Brafman is able to

18  cross-examine the defendant on the reasons that he invested.

19  He's able to give that in closing argument as to whether the

20  jury should give any weight to this witness' testimony, but I

21  think we have a foundational good faith basis to ask the

22  question.

23         MR. BRAFMAN:  With the other investors you had, at

24  least, a modicum of concern expressed about the track record.

25  This man did zero research into Martin Shkreli or his

```
                          Sidebar                           3998
```

1    background.

2              THE COURT:  But he did specifically testify that the

3    performance in the past and what he believed to be the

4    performance in the future was important to him.  So I think if

5    you have one more question on the subject --

6              MR. SRINIVASAN:  Yes.

7              THE COURT:  -- then move on.  Consistent with the

8    others, I think that is an appropriate question.

9              MR. SRINIVASAN:  Thank you, Your Honor.

10             (Sidebar concluded.)

11

12             (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                      Neill - direct - Srinivasan                3999

1              (In open court - jurors present.)

2              THE COURT:  All right, please proceed.

3              MR. SRINIVASAN:  Thank you, Your Honor.

4    EXAMINATION CONTINUING

5    BY MR. SRINIVASAN:

6    Q     Mr. Neill, would information about whether a prior hedge

7    fund run by the defendant had performed well or poorly have

8    been important to your investing decision?

9    A     Yes, it would have been.

10   Q     Mr. Neill, when did you invest in MSMB Capital?

11   A     I believe it was January 31st, 2011 because I was trying

12   to get in before February 1, 2011.  So it would be right in

13   that range.

14   Q     Did you invest personally or in the name of an entity?

15   A     I invested in the name of my wife's separate property

16   account, Barbara W. Neill Separate Property.

17   Q     Did you manage the Barbara Warner Neill Separate Property

18   Fund?

19   A     Yes, I've always managed that fund.

20

21              (Continued on the following page.)

22

23

24

25

Neill - Direct - Srinivasan                    4000

1    DIRECT EXAMINATION BY MR. SRINIVASAN:(Cont'g.)

2    Q    How much did you invest?

3    A    $500,000.

4    Q    Before you invested, did you receive any documents about

5    MSMB Capital from the defendant?

6    A    Yes.  I received subscription docs, because I remember

7    filling those out and sending them in.

8    Q    Now, I will show you what is marked for identification as

9    Government Exhibit 102-2.  You have a bigger binder and a

10   smaller binder on the ledge to your left.  This is in the

11   bigger binder, tab two.

12          Mr. Neill, what kind of document is this?

13   A    First page is an E-mail from Martin to me.

14          MR. SRINIVASAN:  We move Government Exhibit 102-2

15   into evidence.

16          MR. BRAFMAN:  No objection.

17          THE COURT:  We will receive it.

18          (So marked.)

19   Q    Mr. Neill, if we can focus on the very top part of the

20   E-mail there.  Are there attachments to this E-mail?

21   A    Yes, there are.

22   Q    It says, MSMB Capital Management LP wiring instructions,

23   subscription agreement, private placement memorandum,

24   individual questionnaire.  Do you see those?

25   A    I see those.

RB        OCR

Neill - Direct - Srinivasan                    4001

1    Q    Are those the attachments that are listed here?

2    A    Those are the attachments that are listed here.

3    Q    If we go to the next page, Bates number JN 0533.  What is

4    this document?

5    A    This is called a private placement memorandum, the

6    private offering memo.

7    Q    For what?

8    A    Of MSMB Capital Management.

9    Q    What is the date on this document?

10   A    The date is June 9th, 2010.

11   Q    Now, if you can just put a finger on that document and go

12   to tab 2-A of your binder.

13            I am showing you what is marked for identification

14   as Government Exhibit 13.

15   A    I see that.

16   Q    Mr. Neill, looking at this document that is behind tab

17   2-A, and the attachment we just saw behind Government

18   Exhibit 102-2.  Are they the same documents?

19   A    Looking at the first page it looks like they are the same

20   document.

21   Q    Is it the private placement memorandum dated June 9th,

22   2010?

23   A    Yes.

24            MR. SRINIVASAN:  We move Government Exhibit 13 into

25   evidence.

RB          OCR

Neill - Direct - Srinivasan                    4002

1          MR. BRAFMAN:  No objection.

2          THE COURT:  We will receive Government Exhibit 13.

3          (So marked.)

4    Q    Mr. Neill, did you sign any agreements at the start of

5    your investment?

6    A    I signed the subscription documents that I sent back to

7    Martin to get in, you know, so we could get in the fund.

8    Q    I am showing you what is marked for identification as

9    Government Exhibit 26, which is tab 2-B in your binder.

10   A    Okay.  I have got MSMB Capital Management Subscription

11   docs.

12   Q    Is this the subscription agreement that you signed?

13   A    That's my signature and my wife's signature on page 8, yes.

14         MR. SRINIVASAN:  We move to admit Government

15   Exhibit 26.

16         MR. BRAFMAN:  No objection.

17         THE COURT:  We admit Government Exhibit 26.

18         (So marked.)

19   Q    Now, Mr. Neill, if we can go to I think the page that you

20   are on, the 11th page of the exhibit.  Bates number KAT_0046897.

21   A    I am on 909.

22         THE COURT:  It is the same one, isn't it?

23   A    897.

24         MR. SRINIVASAN:  Government Exhibit 26, yes, Your

25   Honor.

1    A    Are you saying I should be on 0046897?

2    Q    Yes, sir.

3          Is your signature on this page?

4    A    Yes, my signature and my wife's signature is on that page.

5    Q    What is the date that you signed it?

6    A    January 30th, 2011.

7    Q    Just looking down a little bit there, what is the account

8    name that is listed?

9    A    The account name is Barbara Warner Neill separate property.

10   Q    Mr. Neill, after you invested, did you receive periodic

11   performance updates about your investment?

12   A    Yes, I did.

13   Q    Who sent them to you?

14   A    Martin sent them to me in an E-mail.

15   Q    Did you rely on these performance updates?

16   A    Yes.

17   Q    Did you believe them to be generally accurate?

18   A    I believed them to be generally accurate.  He always had

19   qualifiers in the statement that they might not be exact, but

20   in the hedge fund world we receive statements every month, you

21   know, from almost all of our people.  They are usually-- I

22   would expect them to be within two, three percent accurate

23   each month, although you can always have something a little

24   different from a precise number.

25   Q    You have a small binder there in front of you, labeled 82

- Proceedings -                                4004

1   series.  There are 17 tabs in that binder, labeled for

2   identification Government Exhibits 82-1 through 82-17.

3          Can you take a look at those for a second.  Do you

4   recognize them?

5   A    These look like the E-mails that I would receive from

6   Martin giving me the performance of the MSMB funds every month.

7          MR. SRINIVASAN:  Your Honor, we move to admit

8   Government Exhibits 82-1, through 82-17.

9          MR. BRAFMAN:  No objection.

10          THE COURT:  We will receive 82-1 through 17.

11          (So marked.)

12          MR. SRINIVASAN:  Your Honor, I guess we are about to

13   go into a slightly different area, I don't know if you want to

14   break now.

15          THE COURT:  Why don't we give the jurors lunch now.

16          Please leave your notebooks on the chair.  Please

17   don't discuss the case and we will see you, if you can return

18   to the jury room by 2:00 p.m., I would appreciate it.

19          Thank you.

20          (Jurors left the courtroom.)

21          THE COURT:  All right.  Thank you, sir, you may step

22   down.

23          Let's take a lunch break.

24          Is there anything I should address before we

25   adjourn?

- Proceedings -                                    4005

1           MR. AGNIFILIO:  Not from us.

2           THE COURT:  I will see you in an hour.

3           MS. SMITH:  Your Honor, to raise one issue.

4           THE COURT:  Yes.

5           MS. SMITH:  We expect that Timothy Pierotti will be

6    testifying tomorrow, and there was a motion in limine on some

7    aspects of his testimony.  We would like to discuss that with

8    Your Honor to determine what the scope of his testimony is.

9    We can do it at lunch or the end of the day.  I wanted to

10   raise that.

11          THE COURT:  Have you come any closer to reaching

12   some sort of an understanding or an agreement?

13          MR. AGNIFILIO:  Let us talk among ourselves, maybe

14   we can.

15          THE COURT:  All right.  I understand both arguments.

16   It does seem to me to be relevant to the charged conduct.

17   But, you know, I would like you to try to work something out

18   if you can.  I will address it if you can't.

19          MR. AGNIFILIO:  Okay, Judge.

20          MS. SMITH:  Thank you, Your Honor.

21          (Lunch recess taken.)

22          THE COURT:  Did you have anything to discuss between

23   now and your next witness or did you want to talk about the

24   issue with Mr. Pierotti?

25          MR. AGNIFILIO:  We reached a resolution, so there is

- Proceedings -                                    4006

1    not anything to decide.  We can put it on the record or not.

2    We have an understanding between us.

3            THE COURT:  Do you want to put it on the record or

4    not?

5            MS. SMITH:  Yes.

6            MR. AGNIFILO:  We will do it later at the end of the

7    day.

8            MR. BRAFMAN:  Your Honor, if we put it on the record

9    the issue we don't want to come into the trial, the issue will

10   come into the trial, because the press will report on it.  If

11   we reached a resolution, I'm not certain that it makes sense

12   to do that.

13           THE COURT:  All right.  I want to make sure we don't

14   have sidebars where you are fighting about whether you agree

15   to something or not.

16           MR. BRAFMAN:  I think we are okay.

17           THE COURT:  All right.

18           MR. AGNIFILO:  We are okay.

19           MS. SMITH:  We will exchange E-mails so we are clear.

20           THE COURT:  Okay.

21           MR. SRINIVASAN:  Should we bring the witness in?

22           THE COURT:  Sure, he can get situated.

23           (Jury entering.)

24           THE COURT:  All jurors are present.

25           Please have a seat everybody.

Neill - Direct - Srinivasan                4007

1      You are under oath, sir, still and you may resume

2  Mr. Srinivasan.

3          MR. SRINIVASAN:  Thank you, Your Honor.

4  DIRECT EXAMINATION BY MR. SRINIVASAN:(cont'g.)

5  Q    Mr. Neill, before lunch, we were in that thinner binder

6  that you have, the one labeled 82 series.

7          I would like to turn to the first tab, what is in

8  evidence as Government Exhibit 82-1.

9  A    Okay.

10 Q    On what date was this E-mail sent to you?

11 A    It was sent on March 2, 2011.

12          MR. BRAFMAN:  It is difficult hearing the witness.

13          THE COURT:  We are trying.

14          THE WITNESS:  It was sent on March 2nd, 2011.  Can

15 you hear me now?

16          MR. BRAFMAN:  Yes, thank you.

17          MR. SRINIVASAN:  I don't hear the mic.

18          THE COURT:  I know.

19          THE WITNESS:  It was sent on March 2, 2011.

20 Q    What month does this statement cover?

21 A    February 2011.

22 Q    Now, Mr. Neill, the section that is labeled account

23 values.  It says you invested $500,000 on January 28, 2011.

24 The value of this investment is now approximately $521,200,

25 gross fees.

Neill - Direct - Srinivasan                    4008

1          You mentioned earlier that you wanted to invest by

2   February 1, 2011.  Why was that?

3   A    Normally you have to have your money in a fund before the

4   first of a month to allow the manager to invest that money in

5   that following month.

6          So in this case, if I wanted Martin to be investing

7   the money in February, I thought I needed to get it in before

8   February 1st.  Now that varies with different funds, but

9   generally the rules and the administrators particularly want

10  to have the money in before the first of the month because you

11  can have wild aberrations in the market in the first few days.

12  So, they want everybody to be treated fairly.

13         So you have to have your money in before the first

14  of the month and that is why I was trying to get it in.

15  Q    During the course of your investment did the name

16  Orexigen or Orex come up?

17  A    I do not remember Orexigen or Orex.

18  Q    Did the defendant ever say anything about trading in a

19  stock that earned a significant gain or significant loss in

20  February of 2011?

21  A    Not that I recall.  But Martin talked a lot about stocks

22  going up and stocks going down.  So it is possible.  But I--

23  we didn't-- I don't think we talked about anything material in

24  February of '11.

25  Q    Let's go to tab 17 which is in evidence as Government

Neill - Direct - Srinivasan                    4009

1    Exhibit 82-17.

2             What is the date on this E-mail?

3    A    The date is September 9th, 2012.

4    Q    For what month is this statement?

5    A    This statement is for the month of May 2012.

6    Q    And, looking at the account value section.  It says you

7    invested $500,000 on January 28th, 2011.  The value of this

8    investment is now approximately $649,897 net of fees or plus

9    29.98 percent since inception.

10            Mr. Neill, did the timing of these statements make

11   any impression on you?

12   A    The timing of the statements were a problem for me

13   because they started out being very prompt, but as time went

14   on, the statements were delayed, so it was hard for me to do

15   my reporting.  So I would frequently call and say, you know

16   where are the results.

17            So, the-- getting a statement in September for the

18   results of May was out of the norm for most hedge funds.

19   Q    Did you ever speak to the defendant about the performance

20   of the fund, apart from these E-mails?

21   A    Yes.

22   Q    What did he tell you about the fund's performance?

23   A    We generally talked about individual positions that had

24   done well and that he had moved in and out of and that we were

25   making money.  I would-- would be the tone of the

1  conversations that we had.

2         I mean, we talked about this one, he came in and out

3  quickly, and he apologized because the short term gains, but I

4  would say, that is fine if you are making that kind of money,

5  just keep doing it.

6  Q    Now that you mentioned it, during the time you invested,

7  did the defendant ever send you any investment ideas or

8  updates about MSMB Capital's activities?

9  A    Frequently.

10 Q    I will show you what is marked for identification as

11 Government Exhibit 102-5.  You can go back to the bigger

12 binder.  It will be tab five in that binder.

13        What kind of document is this?

14 A    This is an E-mail from Martin to me.

15        MR. SRINIVASAN:  Your Honor, we move to admit

16 Government Exhibit 102-5.

17        MR. BRAFMAN:  No objection.

18        THE COURT:  We will receive it.

19        (So marked.)

20 Q    Mr. Neill, let's focus on the E-mail in the middle sent

21 on April 13th, 2011, at 8:57 a.m..

22 A    I am with you.

23 Q    Mr. Neill, the defendant wrote, I am covering some of our

24 funds CIGX short.  We got in around 4.60 and are covering at

25 3.20, 30 percent return in 10 days.  Moving on to the next

Neill - Direct - Srinivasan                4011

1    idea.  Sorry for the quick trade, sometimes you realize fair

2    value instantly, sometimes it takes years.

3           Based on this E-mail, did you believe that MSMB

4    Capital had taken a short position in this CIGX stock?

5    A    Yes.

6    Q    And what if any impression did this make on you with

7    regard to your investment in MSMB Capital.

8    A    This made me think that MSMB, our fund, had shorted CIGX

9    at 4.60, covered it 3.20, making a very nice return in a short

10   period of time, and that he was moving on, to the next idea

11   which I would hope he would repeat this kind of performance.

12   Q    Now, I'm showing you what is marked for identification as

13   Government Exhibit 102-8, tab 8 in that binder.

14          What kind of document is this?

15   A    This is an E-mail from Martin to me on June 23rd, 2011.

16   Q    Did you receive this E-mail?

17   A    Yes.

18          MR. SRINIVASAN:  Your Honor, we move to admit

19   Government Exhibit 102-8.

20          MR. BRAFMAN:  No objection.

21          THE COURT:  We will admit 102-8.

22          (So marked.)

23   Q    Mr. Neill, focusing on the first two paragraphs.  It

24   starts, MSMB Capital Management a fund specializing in

25   long-term strategic investment in health care and

Neill - Direct - Srinivasan                    4012

1   biotechnology businesses, today announced it has made a

2   proposal to the Board of Directors of SeraCare Life Sciences,

3   Inc., to acquire all the outstanding common stock of SeraCare

4   for 4.25 per share for an aggregate of 82 million.

5           This proposal represents an approximate 22 percent

6   premium above the closing price of SeraCare stock of 3.49 on

7   June 22nd, 2011.

8           MSMB's offer is conditioned upon completion of

9   cursory due diligence and other customary provisions.  MSMB's

10  offer is not subject to any financing condition.

11          Focusing on that last language there, MSMB's offer

12  is not subject to any financing conditions.  What if anything

13  did that mean to you?

14  A    That meant to me that MSMB must be doing pretty well

15  because MSMB could write a check for $82 million, which is

16  quite a bit of money whether you have it in cash or whether

17  you have already arranged the financing with a bank.  And my

18  experience with banks is that they want collateral.

19          So, $82 million was a lot of money.  So MSMB must be

20  doing well.

21  Q    Now, I am showing you what is marked for identification

22  as Government Exhibit 102-15.  What kind of document is this?

23  A    I have got 102-15 as an E-mail from Martin on May 10th,

24  2012, at 9:06 p.m..

25  Q    To you?

RB          OCR

Neill - Direct - Srinivasan                    4013

1  A     Pardon me?

2  Q     Is the E-mail to you?

3  A     An E-mail to me from Martin, yes.

4        MR. SRINIVASAN:  Your Honor, we move Government

5  Exhibit 102-15 into evidence.

6        MR. BRAFMAN:  No objection.

7        THE COURT:  We will receive 102-15.

8  Q   Mr. Neill, let's focus on the second E-mail down in this

9  chain.  The one from you to the defendant dated May 10, 2012,

10  at 10:02 p.m..  Do you see that?

11  A     Yes.

12  Q     What did you write?

13  A     Do you have the 3/31/12 value of my wife's account.

14  Q     Why did you write this on May 10th, 2012?

15  A     We pull financial statements on the 18th of the month

16  after the end of every month.  So, I am looking for the 3/31

17  value on 4/18 and it is not there.  So my accountants are

18  probably nagging at me to get it in and so, I am writing

19  Martin to say, you are late and I need the number because it

20  is now May which is more than a month after the time the

21  results should be in.

22  Q   Going up one E-mail in the chain.  The defendant wrote

23  back on May 10th, 2012.  He wrote, no, we have some bill that

24  accounting is trying to reconcile.  I deeply apologize.  The

25  company we started Retrophin is going through a sale process

Neill - Direct - Srinivasan                    4014

1    and that is a bit of a priority.  Abbott Labs seems to want to

2    acquire it, and if so, there will be a gigantic boost to the

3    fund.  Who knows if they will do it.  The result will be minus

4    1.5 percent or minus 1.6 percent depending on if our

5    accountants think this bill is one time or recurring.

6             Did you have any understanding of what the bill that

7    accounting is trying to reconcile is referring to?

8    A    No, I had no understanding of what bill he was trying to

9    refer to.

10   Q    And there is a reference to Retrophin here.  What was

11   your understanding of Retrophin during your time as an MSMB

12   Capital investor?

13   A    It varied over time because we got different information

14   over time.  But at this point, I think I had received an early

15   E-mail from Martin saying that he had purchased some

16   proprietary information from a university and I assumed that

17   was Retrophin, and then I think he had said they wanted to do

18   a capital raise of 3 to $5 million to do Retrophin.

19            So I thought we probably had taken a position in

20   Retrophin which would be supported by this and that it is

21   something we would sell to Abbott Labs or anybody else who

22   wanted to pay more than we paid for it.  Just another position

23   in the fund.

24            (Transcript continues on next page.)

25

1    BY MR. SRINIVASAN:   (Continuing)

2    Q    And when you say "we," are you referring to the fund?

3    A    Yes.

4    Q    At this point, what, if anything, was your understanding

5    of the size of this stake in Retrophin at this point?

6    A    I think I'd go back to an e-mail I got from Martin which

7    said they were trying to raise 3 to $5 million, and I think

8    there was one where he said they had paid $1 million for their

9    proprietary rights to these drugs and that they were going to

10   then get somebody to manufacture them and get a 15 percent

11   royalty.  So, I think my recollection would be something in

12   that 1 million to 4 million range.

13   Q    And what, if anything, was your reaction to this e-mail?

14   A    Well, 1.8, when you're making $82 million offers on

15   something else, is not something that seems like a big number.

16   I didn't follow this as closely as I should because this is a,

17   this is not a public company and I thought we were doing

18   public stocks in MSMB, but to do a small side pocket was not a

19   big red flag or an alarm.  It would not be unusual for a

20   manager to do a small side pocket in a fund in something.

21   Q    What does that phrase "side pocket" mean?

22   A    Side pocket would be something that you did different

23   from your normal day-to-day investments and you typically tell

24   your investors we want to do this and we'll put it in a side

25   pocket and then we'll wait and see how it plays out and you'll

1  get your return based on how that plays out but, normally, in

2  a side pocket, you have a choice of whether you want to do it

3  or not when they do it.

4  Q    Mr. Neill, did you ever attempt to redeem your investment

5  in MSMB Capital prior to September 2012?

6  A    I did not.

7  Q    Why not?

8  A    Well, in the first year, I think he, his returns were

9  16 percent in the 11 months I was in it.  I was getting

10  statements that showed through September of 2012, I was up

11  right at 40 percent.  So, I was getting good returns even

12  though there were some things that were different than what I

13  expected so it was not something that caused me to say I need

14  to send in a redemption because the performance was there.  I

15  went in for the performance and the performance was there.

16  Q    During the course of your investment, did the defendant

17  ever tell you that redemptions from MSMB Capital were no

18  longer permitted?

19  A    Martin never told me that redemptions were no longer

20  permitted.

21  Q    At some point, did you learn that MSMB Capital was

22  shutting down?

23  A    Yes.

24  Q    I'm showing you what's marked for identification as

25  Government's Exhibit 102-16 and it's tab 16 in your binder.

1    A    I have an e-mail from Martin -- actually, to Martin on

2    September 10th.

3    Q    And did you receive it?

4    A    I received this but, you know, this is not the one I

5    received.  Martin may have just sent it to me but I don't know

6    if you got this from me or not, but, yes, I received this

7    e-mail.  Yes, I remember it well.

8              MR. SRINIVASAN:  Okay.  Your Honor, we move

9    Government's Exhibit 102-16.

10             MR. BRAFMAN:  No objection.

11             THE COURT:  We will receive 102-16.

12             (So marked.)

13   Q    Mr. Neill, we'll start with the first paragraph.  It

14   says, it starts:  I have decided to wind down our hedge fund

15   partnerships with a goal of completing the liquidation of the

16   funds by November or December 1st, 2012.  As you know, MSMB

17   has found increasingly compelling opportunities in private

18   equity.  We are going to focus our efforts on managing money

19   in a hybrid public/private structure, one which is generally

20   not amenable to the open-ended private hedge fund partnership

21   structure.

22             What was your understanding of this in terms of the

23   fund you invested in, the first paragraph?

24   A    The first paragraph says he's going to liquidate the fund

25   is my understanding and that would mean I'd get my money back

Neill - direct - Srinivasan                4018

1   is my understanding.

2   Q    Okay.  Now, going to the second page, focusing on the

3   last paragraph, it starts:  A few operational notes -

4   investors will have their limited partnership interests

5   redeemed by the fund for cash.  Alternatively, investors may

6   ask for a redemption of Retrophin shares, or a combination of

7   Retrophin shares and cash.

8            What was your understanding of this language?

9   A    My understanding of this language is I'm an investor and

10  I will be redeemed by the fund for cash unless I request that

11  they give me Retrophin shares or some combination thereof.

12  Q    In what form do you want your investment redeemed?

13  A    Cash.

14  Q    Did you want stock of Retrophin?

15  A    No.

16  Q    Why not?

17  A    I don't, I don't do stock and I didn't give Martin stock.

18  I gave Martin cash.  And, generally, when a fund changes their

19  direction, style shift, that's fine, but I think they should

20  redeem the initial shareholders or investors with cash and

21  then let them go on and do their own thing.  So, I don't, I

22  don't even have a stock account and I had told Martin that,

23  that I was not interested in stock, that I just wanted cash.

24  Q    Mr. Neill, I'm showing you government's, what's marked

25  for identification as Government's Exhibit 102-20 which is tab

Neill - direct - Srinivasan                    4019

1    20 in your binder.

2          What kind of document is this?

3    A    This is an e-mail from Martin dated January 12, 2013.

4    Q    Did you receive it?

5    A    Yes.

6          MR. SRINIVASAN:  Your Honor, we move to admit

7    Government's Exhibit 102-20.

8          MR. BRAFMAN:  No objection.

9          THE COURT:  We will receive 102-20.

10         (So marked.)

11   Q    Mr. Neill, let's start on the second page which is Bates

12   number JN0060.  If we focus on the e-mail that you sent on

13   January 11th of 2013, at 3:48 p.m., to the defendant, cc to

14   Darren Blanton, what did you write?

15   A    I wrote:  I have received no information regarding the

16   value of the Barbara W. Neill Separate Property position in

17   your fund since 6/30/12.  Please send an update on the value

18   and the status of the fund regarding the liquidation you told

19   me you expected to occur in November of 2012.

20   Q    And going up one e-mail, the defendant wrote this on

21   January 11, 2013, which is reflected on the first page.  If we

22   can go to the body of the e-mail, he wrote:  As per our LPA, I

23   have to make a certified mailing to the partners regarding our

24   shutdown and procedures.  I am doing that.  You will get the

25   updated valuations today by e-mail.  I'm sorry this is taking

1   so long.

2          If we go to the first page, the e-mail just below

3   that one, the one that is January 11, 2013, at 4:34 p.m., what

4   did you write back to the defendant?

5   A    I wrote:  Would you send me a copy of the LPA?  I frankly

6   don't think I received one when we invested or if we did, I

7   don't know where I filed it.

8   Q    And if we go up one more e-mail, this is the defendant

9   writing to you again on January 11, 2013, and he wrote:

10         I will send it over.  One of my meetings went over

11  by about three hours so I will send your statements late

12  tonight or tomorrow.  I have worked my butt off since you

13  invested.  It may not show well, but I do think RTRX will be

14  very successful.  So far, it has been okay.  It only has been

15  public for a few weeks.  I think the opportunity is large,

16  especially for the risk, so I poured all my energy into it and

17  am competent the fund will hopefully show a great return.  It

18  is a departure in the sense of investing that we're not

19  trading stocks anymore, but RTRX is my attempt at creating a

20  Sears, Lowe's or Berkshire.  Unlike an auditor or

21  administrator, stock market popular opinion is what will worry

22  me.

23         With respect to the fund, I plan on liquidating

24  investors with the stock.  I suspect this may not work for

25  you.  In this case, I will make sure the company and/or I, I

Neill - direct - Srinivasan                4021

1   back your stock for cash.  I truly think holding the stock is

2   the best long-term investment.  We are a small public company

3   worth $40 million.  I think it will be worth ten times that

4   over time, but it is up to popular opinion and as you have

5   mentioned, you don't do stocks and you don't even own a

6   brokerage account.  Please keep an eye out for my mailing

7   which will go out on Monday and we'll look for the best way to

8   move forward.  Martin.

9           Mr. Neill, what, if anything, was your reaction to

10  this e-mail?

11  A    Well, the fact that he planned to liquidate investors

12  with stock was a change that was a surprise to me.

13  Q    Had you agreed to be liquidated in stock prior to this

14  point?

15  A    No, and Martin and I had talked about the fact that I

16  wanted cash, I did not do stock, and he understood that.

17  That's why I think he wrote:  I suspect this may not work for

18  you.  That's probably a reference to our conversations.

19  Q    Now, going up one e-mail, you wrote on January 12, 2013,

20  at 10:45 p.m.  What did you write?

21  A    I wrote:  Tomorrow is coming to a close.

22  Q    And then going up to the top e-mail, the defendant wrote

23  back on January 12th at 10:05 p.m.:  Yes, sir.  Working on it.

24          Mr. Neill, I'm showing you now what's marked for

25  identification as Government's Exhibit 102-21.  It's tab 21 of

Neill - direct - Srinivasan                    4022

1   your binder.  What is this document?

2   A    This is an e-mail from Martin, Sunday, January 13, 2013.

3   Q    Did you receive it?

4   A    I received it.

5        MR. SRINIVASAN:  Your Honor, we move Government

6   Exhibit 102-21 in evidence.

7        MR. BRAFMAN:  No objection, Your Honor.

8        THE COURT:  We receive 102-21.

9        (So marked.)

10  Q    The defendant wrote to you:  Hi, John.  Here are the net

11  values of your investment in MSMB Capital Management LP.  July

12  2012, $756,162.  August 2012, $472,601.  September 2012,

13  $472,601.  October 2012, $472,601.  November 2012, $472,401.

14  December 2012, $444,245.

15       He continued:  Through the partnership, your account

16  owns 94,520 shares of Retrophin which now trades publicly as

17  RTRX.  When we decided to focus the partnership on creating

18  Retrophin which will embody all of my investing energy, I had

19  high hopes that the market would value it highly.  In August,

20  we went from valuing Retrophin stock at $40 per share to $25

21  per share private round.  The December 2012 mark is at $4.70.

22  The stock trades at $4 today according to Yahoo Finance.  My

23  plan is to distribute the sole security to the limited

24  partners in accordance with the LPA which I will attach.

25       I understand you do not want the security.

Neill - direct - Srinivasan                    4023

1    Retrophin would be willing to buy back your stock at a market

2    price.  I obviously have a duty to my public shareholders to

3    pay the best price I can and I have to follow the rules on

4    that.  I will speak with my attorney regarding what can or

5    can't be done here.  Another possibility is I can buy the

6    stock from you directly for cash, or some combination of the

7    two.  Finally, given the public nature of the stock, you can

8    certainly sell it yourself or find another buyer.

9            I am around to talk about these possibilities

10   tomorrow.  It may make sense to include Darren Blanton on the

11   line as he is involved in this as well and might have a few

12   ideas on how to maximize the outcome for everyone.  Please let

13   me know if I can be of any help.  I'm sorry if this

14   partnership did not turn out the way you wanted.  My hope was

15   to have RTRX valued in the hundreds of millions.  The market

16   doesn't quite see that yet as it is valuing the company at

17   35 million.  Martin Shkreli.

18           Mr. Neill, what, if anything, was your reaction to

19   this e-mail?

20   A    I have to go back to the context before which is I had

21   not received any information until this January date, and you

22   can tell from the tone, I was starting to ask Martin more

23   about how the fund was doing.  My reaction to this was, first,

24   like the rug had been pulled out from under me because I've

25   got $756,000 in July, but then in December, I've got $440,000

Neill - direct - Srinivasan                    4024

1  which is a significant drop and I had had no communication

2  during this period and normally, when a manager is having a

3  downturn, you talk about it.  You know, they explain what's

4  happening.  But here, I don't think I had that July 756,000

5  number until now, until this e-mail, and then to see that it

6  had dropped to 444 was an unpleasant surprise.

7          Then when I found out the account owned 94,520

8  shares of Retrophin, I didn't know if that was in addition to

9  the 444 or instead of, and I didn't have any idea how they

10 determined that my $500,000 investment would end up with

11 94,520 shares.  I had no, no valuation explanation which would

12 have been normal.  So, I had a lot less money than I thought I

13 had.  Then I had supposedly some shares in a company that I

14 didn't know what they were worth, but if I take Martin's

15 comments here that I've got 94,000 shares and the market is at

16 4 according to Yahoo, then the 444 would really be more like

17 378,000.  So, if the only thing I had which turned out to be

18 was Retrophin shares, I had gone from 756,000 to 378,000 which

19 I didn't like losing, you know, half of my investment in an

20 e-mail that came in after I had been sort of calling him and

21 asking him to send it.  So, I was not a happy camper on this

22 day.

23 Q    After this e-mail, did the defendant, in fact, send you

24 shares?

25 A    Yes.

Neill - direct - Srinivasan                    4025

1    Q    I'm showing you what's marked for identification as

2    Government's Exhibit 102-22, tab 22 of your binder.

3              What is this document?

4    A    This is 94,521 shares of Desert Gateway, Inc. Restricted

5    securities in the name of Barbara Warner Neil Separate

6    Property.

7    Q    And are these the shares the defendant sent you?

8    A    Yes.

9              MR. SRINIVASAN:  Your Honor, we move Government's

10   Exhibit 102-22 in evidence.

11             MR. BRAFMAN:  No objection.

12             THE COURT:  We receive 102-22.

13             (So marked.)

14   Q    Now, Mr. Neill, up at the top, you mentioned it says,

15   Desert Gateway, Inc.  What, if anything, is your understanding

16   of Desert Gateway?

17   A    I thought Desert Gateway was probably a shell that Martin

18   had bought to get a public listing so that he could do a

19   reverse merger with the Retrophin position that he had

20   purchased that was probably a private company at the time.

21   Q    What's the date on this certificate?

22   A    February 19, 2013.

23   Q    At the top, the document is marked Restricted Securities.

24   What did that mean to you?

25   A    That meant to me I couldn't sell it.  That meant to me I

CMH        OCR        RMR        CRR        FCRR

Neill - direct - Srinivasan                4026

1    could not sell it for a year and that was just my

2    understanding of restricted securities.

3    Q    What was your reaction to seeing the label Restricted

4    Securities?

5    A    My reaction was disappointment and that it probably

6    wasn't worth very much because I couldn't sell it.

7    Q    Mr. Neill, did you ever sign a settlement agreement or

8    any other agreement with the defendant regarding your

9    investment in MSMB Capital?

10   A    Other than the subscription document, no, I never signed

11   any sort of settlement agreement with MSMB or Martin.

12   Q    Mr. Neill, after you received these 94,521 shares, did

13   the defendant ever offer you additional shares of Retrophin?

14   A    Yes, he did.

15   Q    How many?

16   A    He offered me 50,000 additional shares.  In his e-mail

17   and correspondence, he said, I know it's ugly and I owe you

18   more shares, and we talked and he said, I'll send you 50,000

19   shares.

20   Q    And did that take place after you received this

21   certificate?

22   A    The offer?  It took place after I received this

23   certificate.

24   Q    And what happened with this offer?

25   A    We visited about it.  I told him it would be better --

1  because it was a very generous offer, I said it would be

2  better if you just gave it to my foundation and that way, you

3  would get the tax deduction for giving that, but then nothing

4  ever happened after that.  So, it was cordial and he was

5  saying, I owe you more stock, and I said I think my foundation

6  would be delighted to get another 50,000 shares and that would

7  give you a tax deduction and then it sort of tapered off.

8  Nothing happened.

9  Q    And nothing happened after that?

10  A    No.

11  Q    Now, focusing on the 94,521 shares that you received, did

12  you eventually sell some or all of these shares?

13  A    I eventually sold some, I gave some and I still have

14  some.

15  Q    And did these -- did they eventually become Retrophin

16  shares?

17  A    Yes.  Yes.  I had, or my people had to go through the

18  brain damage of getting it converted from Desert Gateway to

19  Retrophin but, yes, we sold Retrophin shares.

20  Q    And what did you, what did you sell them for?

21  A    As soon as they became unrestricted, which was about

22  February of the following year, I sold 50,000 shares for about

23  $715,000.  A month later, I gave $350,000 worth of Retrophin

24  to our foundation.  So, if you add those two, I think that's

25  about $1,015,000.  And if I -- we kept 24,521 shares.  If we

1  sold that today or Friday at $19.80, that would be another

2  470,000.

3          So, what I think you're looking at, if I added it

4  all up, I think we'd have about $1,570,000.  I may be off one,

5  you know, piece of it somewhere and you may want to pick, but

6  if I, if I take what I sold when I sold it, what I gave when I

7  gave it, and I valued the 24,521 shares we still have at last

8  Friday's close of 19.80, my total would be right at

9  $1,570,000.

10 Q    And you mentioned your foundation.  Is that the Victory

11 Meadows Foundation we talked about earlier?

12 A    Yes.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

4029

1          THE COURT:  Mr. Srinivasan, there's been a request

2   for a break from the jurors.  So, let's take a quick break.

3   I'm sorry.  We will just return momentarily.  Thank you.

4          Please don't talk about the case.

5          (Jury exits.)

6          THE COURT:  You can step down, sir.

7          (Witness steps down.)

8          THE COURT:  Let's take a quick break.

9          (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Neill - direct - Srinivasan                    4030

1              (In open court - jury enters.)

2              THE COURT:  All jurors are present.  Please have a

3    seat, everybody.

4              You may resume.

5              MR. SRINIVASAN:  Thank you, Your Honor.

6    EXAMINATION CONTINUES

7    BY MR. SRINIVASAN:

8    Q    Mr. Neill, before we broke we were on Government's

9    Exhibit 102-22, which was the share certificate.

10             There is one thing that I wanted to clear up.  When

11   you mentioned that you gave some of the proceeds to your

12   foundation, how much was that?

13   A    That was right at $350,000 worth, 349,643, I think, but

14   350,000, plus change.

15   Q    Okay.  And, Mr. Neill, from the wind-down e-mail that we

16   saw in September 2012 to the time you got these shares, about

17   how much time elapsed?

18   A    Would you state that question again, please?

19   Q    Sure.  Looking at the share certificate, Mr. Neill, from

20   the time that you received that wind-down e-mail in September

21   of 2012 to the date you got this, about how much time elapsed?

22   A    That would be about five months.

23   Q    Thank you.

24             MR. SRINIVASAN:  One moment, Your Honor.

25             (Pause.)

SAM      OCR      RMR      CRR      RPR

1           MR. SRINIVASAN:  No further questions at this time.

2           THE COURT:  All right, Mr. Brafman.

3           MR. BRAFMAN:  Yes, Judge.

4           (Pause.)

5           MR. BRAFMAN:  May I proceed?

6           THE COURT:  Yes.

7    CROSS-EXAMINATION

8    BY MR. BRAFMAN:

9    Q    Good afternoon, sir.

10   A    Good afternoon.

11   Q    Mr. Neill, my name is Ben Brafman, I represent Martin

12   Shkreli.  Other than passing you in the men's room, you and I

13   have never discussed the facts of this case, would that be a

14   fair statement?

15   A    That would be a true statement.

16   Q    Okay, true is good.

17           Sir, you testified for a couple hours, thereabouts,

18   and my questions are going to ask you to think about some of

19   the facts, and if at any time you don't remember and you need

20   something to refresh your recollection, let me know.  Okay?

21   A    Okay.

22   Q    I want to start sort of at the end of the direct

23   examination with the math, if you will.

24           I think you invested $500,000, was that correct?

25   A    That part is correct.

Neill - cross - Brafman                    4032

1   Q    And in total, correct me if I'm wrong, you received back
2   $715,000, plus you gave your foundation $350,000, correct,
3   approximately?
4   A    Approximately.
5   Q    And when I say you gave your foundation, that was as a
6   result of the Retrophin shares that you ultimately received
7   and got the restriction removed, correct?
8   A    That is correct.
9   Q    So the decision to give it to your foundation was yours,
10  is that correct, or your wife's, yours and your wife's?
11  A    Yes.
12  Q    Nevertheless, the total return of Retrophin shares, the
13  95,000, was converted, I think you said, into 715,000 and
14  350,000; and you still retain in the partnership with your
15  wife 224,521, correct?
16  A    No, it's not a partnership with my wife.
17  Q    Okay, I'm sorry.  It's her money?
18  A    It is her separate property.
19  Q    Okay.
20  A    And we still retain 24,000 (sic).
21  Q    And I think you indicated that if you were to sell the,
22  if she were to sell those shares today at about 19-and-change,
23  she would get about $470,000?
24  A    That was the closing price as of last Friday is where I
25  picked that up.

Neill - cross - Brafman                                    4033

1   Q      Okay.

2   A      So --

3   Q      That's all right.  But I'm saying it's --

4   A      It's about that.

5   Q      -- ballpark.  And I think in total I think the number you

6   gave to the government on direct examination was approximately

7   1.5 million; if you add the amount of stock you sold, the

8   amount of stock you gave to your foundation, and the value of

9   the stock that your wife still retains, is that correct?

10  A      I think I said a million-570 plus or minus.

11  Q      Okay.

12  A      So it would be your million-5 plus about 70.

13  Q      And that's after about a five-hundred-thousand-dollar

14  investment, correct?

15  A      Yes, I made a five-hundred-thousand-dollar investment.

16  Q      You made a million dollars on top of that, correct?

17         MR. SRINIVASAN:  Objection, Your Honor; asked and

18  answered.

19         THE COURT:  Sustained.

20  BY MR. BRAFMAN:

21  Q      Well, you've been in hedge funds you said since 1980, is

22  that correct?

23  A      That is correct.

24  Q      That's about 37 years almost, right?

25  A      Yes.

Neill - cross - Brafman                          4034

1   Q    You understand what the rate of return is on an
2   investment?
3   A    Yes, I understand the various rates of return.
4   Q    Okay.  So I understand you had some aggravation, we'll go
5   through that in a minute, but if you just do the math on the
6   five-hundred-thousand-dollar investment and you end up with a
7   million-570,000, what's the rate of return on that?
8   A    The rate of return on that would vary with when you sell
9   the last shares, but I think I'm gonna get where you want to
10  be.  I would use a 33 percent IRR on that investment if I
11  looked at the price I could have sold the stock when I sold it
12  first.  So after the year after the February -- it would have
13  come in about a 33 IRR.
14  Q    And if your wife holds the stock and the share price
15  increases, the rate of return could go significantly higher
16  depending on the share price if it does, in fact, go up,
17  correct, sir?
18  A    Under those facts, that is true.
19  Q    All right.  Now, no one is forcing you or your wife to
20  hold the stock, that's a decision either she or you have made
21  together, correct?
22  A    That is correct.
23  Q    Now, have you followed Retrophin since you now have a
24  number of shares in that company?
25  A    Not closely.

Neill - cross - Brafman                    4035

1    Q    Do you know whether it has a $750 million market cap

2    today?

3    A    No, I do not know that.

4    Q    Okay.  You wouldn't quarrel with that number, though,

5    would you?

6    A    I would not quarrel with that number, I just don't know.

7    Q    Okay.

8    A    It could be higher or lower.

9    Q    All right.  Now, during the course of your relationship

10   with Martin Shkreli, did you ever buy him a book about Steve

11   Jobs, the head of Apple?

12   A    I thought I sent him tapes of the book --

13   Q    Okay.

14   A    -- about Steve Jobs and Apple, but it could well -- it

15   could well have been a book, but it's so thick I don't think

16   I'd want anybody to try and read it.  I think I sent him the

17   tapes of a book on Steve Jobs.

18   Q    So the tapes would be an oral version of the book,

19   correct?

20   A    Yes.

21   Q    And why did you pick Steve Jobs out of all of the people

22   in the world to send to Martin Shkreli, did he remind you of

23   Steve Jobs?

24   A    I picked that because Martin had said he dropped out of

25   college and Steve Jobs also dropped out of college.  So I

Neill - cross - Brafman                    4036

1    thought they were both in sort of high tech areas and they
2    both had dropped out of college, and I thought Martin might
3    find some of the information that Steve presented useful.
4    Q    And obviously, you thought highly of Steve Jobs, correct?
5    A    Yes.
6    Q    Now, would it be correct, sir, that in the course of
7    hedge fund career you invested in 50 to 60 hedge funds,
8    conservative estimate?
9    A    That would be conservative.
10   Q    All right, so then it would be more than 60, if you know?
11   A    Yes.
12   Q    How many hedge funds have you invested in?
13   A    Probably a hundred.
14   Q    And do all of the hedge funds that you have invested in,
15   have all the hedge funds you have invested in given you a 33
16   percent return?
17   A    No, they have not all given me a 33 percent return.
18   Q    And would it be a fair statement that a substantial
19   number of the hedge funds you invested in did not give you
20   anywhere near a 33 percent return?
21   A    That would be a very fair statement.
22   Q    And would it be a fair statement that some of the hedge
23   funds you invested in, you lost all of your money, some of it?
24   A    Some of it.  I don't believe I've ever lost all of it.
25   Q    Okay.  You've done fairly well, without embarrassing you,

Neill - cross - Brafman                                    4037

1    in your investments, correct?

2    A    I've done fairly well in my investments.

3    Q    And you've done fairly well as a general proposition in

4    your investment in hedge funds as well, correct, sir?

5    A    That is correct.

6    Q    And while you don't always hit a homerun, you've hit a

7    lot of homeruns, haven't you?

8    A    Not as many as I'd like.  I have hit multiple homeruns,

9    though.

10   Q    Now, I think you indicated that you graduated from Yale

11   University?

12   A    That is correct.

13   Q    And then you went to law school for a year?

14   A    That is correct.

15   Q    And you dropped out?

16   A    No.

17   Q    You just stopped?

18   A    No.

19   Q    You converted it into an MBA career?

20   A    Yes, I chose to move to Harvard.

21   Q    Okay.  And at Harvard you received an MBA in finance, is

22   that correct?

23   A    Yes.

24   Q    Now, where did you go to law school for that one year?

25   A    University of Oklahoma.

SAM      OCR      RMR      CRR      RPR

Neill - cross - Brafman                    4038

1   Q     So would it be correct for you to say that you went to

2   the University of Oklahoma, but not correct to say that you

3   graduated from University of Oklahoma, correct?

4             MR. SRINIVASAN:  Objection, Your Honor.

5             THE COURT:  Overruled.

6   BY MR. BRAFMAN:

7   Q     Correct, sir?

8   A     That would be correct.

9   Q     Now, I'll move on.  Darren Blanton someone you knew

10  before you met Martin?

11  A     That is correct.

12  Q     Someone you knew from the investment community in Dallas,

13  Texas?

14  A     Yes.

15  Q     And did you ever tell the government, in words or

16  substance, that the hedge fund community in Dallas, Texas is

17  small and a lot of the people knew each other?

18  A     That's something that I would have said, yes.

19  Q     And is Darren Blanton included among the people who you

20  put into sort of the hedge fund community?

21  A     Yes.

22  Q     And is Darren Blanton someone who talks a lot?

23            MR. SRINIVASAN:  Objection, Your Honor.

24            THE COURT:  Sustained.

25  BY MR. BRAFMAN:

Neill - cross - Brafman                                4039

1  Q    Did you ever tell anyone, including Mr. Shkreli, that

2  Darren Blanton was, to use a phrase I guess they use in Texas,

3  long in the tooth?

4            MR. SRINIVASAN:  Objection, Your Honor.

5            THE COURT:  Sustained.

6  BY MR. BRAFMAN:

7  Q    Did you tell Mr. Shkreli that Darren Blanton was long in

8  the tooth?

9            MR. SRINIVASAN:  Objection, Your Honor.

10           MR. BRAFMAN:  Your Honor, may I just subject to

11 connection?

12           THE COURT:  All right.  I mean I think we need to

13 understand what that term means.

14           MR. BRAFMAN:  Well, I'll ask him.  I'll ask him.

15 A    I don't think --

16           MR. SRINIVASAN:  Sidebar, Your Honor?

17           THE COURT:  Wait.

18           Did you want a sidebar?

19           MR. SRINIVASAN:  Yes, Your Honor.

20           THE COURT:  Let's do a sidebar.  Excuse us.

21           (Sidebar held outside the hearing of the jury.)

22

23           (Continued on the following page.)

24

25

```
                         Sidebar                    4040
```

1           (The following sidebar took place outside the

2    hearing of the jury.)

3           MR. SRINIVASAN:  If I can say the basis of the

4    objection, two things.

5           One, Your Honor, it's hearsay when he's saying to

6    Darren Blanton.  And two, I don't see the relevance of any of

7    this, the characterizing of another witness in the case for

8    another investor in the case.

9           MR. BRAFMAN:  It's not going to be hearsay.  We may

10   as well cover this ground now.

11          You will see in a couple of minutes virtually the

12   whole reason he invested in Martin Shkreli was because of

13   Darren Blanton; what he said, the due diligence that Darren

14   Blanton did, and I think that's not hearsay for two reasons.

15   One, it's not being offered for the truth of it, this is what

16   Darren Blanton said.  Second, the effect on the investor,

17   you're talking about him relying on something Martin Shkreli

18   said.  Here's Darren Blanton who told him that Martin Shkreli

19   was a genius and that he should invest, and Darren Blanton

20   told him that he made substantial returns.

21          I think that's relevant as to the state of mind of

22   this man as to why he invested.  I'll withdraw the long in the

23   tooth.

24          THE COURT:  Let's go back to the original objection.

25   It means you are old, doesn't it?

```
                         Sidebar                        4041
```

1           MR. BRAFMAN:  I will withdraw it.

2           MR. SRINIVASAN:  I don't know what it means.

3           MR. BRAFMAN:  The context in which it was used here,

4    just so you don't think I've lost my mind --

5           THE COURT:  No, I do not think that.

6           MR. BRAFMAN:  -- is that he is talkative.  I will

7    withdraw it because there seems to be some confusion as to

8    whether it means you're old or talkative.  Okay?  But in the

9    condition text it was used Darren Blanton is young enough to

10   be his son, so it wasn't being said about Darren since he

11   thought Darren was old.

12          THE COURT:  That's why he was confused.

13          MR. BRAFMAN:  So relax, relax.  It's not going to

14   turn the case.

15          THE COURT:  Why don't you just get to the issues?

16          MR. BRAFMAN:  I will.

17          (Sidebar concluded.)

18

19          (Continued on the following page.)

20

21

22

23

24

25

Neill - cross - Brafman                    4042

1              (In open court - jurors present.)

2    EXAMINATION CONTINUING

3    BY MR. BRAFMAN:

4    Q     Now, I want to just go back a minute to your career and

5    ask you about your company that you formed, Telesis,

6    T-E-L-E-S-I-S.  Is that the correct spelling, sir?

7    A     That is the correct spelling and the correct

8    pronunciation.

9    Q     Okay.  And it dealt with health-related industries like

10   nursing homes or retirement communities, is that correct?

11   A     That was our primary focus, yes.

12   Q     And then it ventured into real estate investments, is

13   that correct?

14   A     No.  They -- they were all combined.  So when we did a

15   nursing home, we would build the real estate and then operate

16   it.  So the real estate was a part of the company always.  We

17   were not -- you know, some people just lease property and

18   operate it.  We owned everything we operated and we operated

19   everything we owned.

20   Q     And the hedge funds that you invested, was that with your

21   partner Mr. Rush, or was Mr. Rush only a partner in Telesis?

22   A     No, Mr. Rush and I were partners in the hedge funds and

23   in the nursing and healthcare and retirement properties.

24   Q     And did there come a time when you and your partner sold

25   Telesis?

Neill - cross - Brafman                    4043

1    A    No.

2    Q    And did you sell the nursing home or retirement part

3    of --

4    A    Yes.

5    Q    -- Telesis?

6    A    Yes.  We sold all of the operating entities in Telesis.

7    Q    And did you then continue being a partner with Mr. Rush?

8    A    Yes, we are still partners to this day.

9    Q    And did you and Mr. Rush continue to invest in hedge

10   funds together after the sale of the healthcare part?

11   A    Yes, we continue to invest in health -- in hedge funds

12   together after the sale of the healthcare part.

13   Q    But not all hedge funds, correct?

14   A    I don't understand that question.  I'm sorry.

15   Q    Well, in some hedge funds you invested or your wife

16   invested and that had nothing to do with Mr. Rush, that's all

17   I'm trying to clarify?

18   A    Let me just clarify.  Steve and I have two entities that

19   do hedge funds, Telesis II and Rush Neill Family Investment

20   Partnership.  That is separate from Barbara W. Neill Separate

21   Property, which is the investment entity that invested money

22   with Martin.

23        Does that answer your question?

24   Q    Yes, sir.

25   A    Okay.

Neill - cross - Brafman                    4044

1   Q    I just wanted to establish in my own difficult way that
2   Mr. Rush had nothing to do with the investment decision with
3   Martin, it was just you on behalf of your wife, correct?
4   A    That is correct.
5   Q    All right.  Now, would it be a fair statement, sir, that
6   before you made the decision to invest in Martin, hence
7   Martin's MSMB fund, or even before you met him, you spoke to
8   Mr. Blanton about it, would that be a fair statement?
9             MR. SRINIVASAN:  Objection, Your Honor; compound.
10            THE COURT:  Yes, why don't you break the question
11  down because there were many parts of that?
12            MR. BRAFMAN:  Yes, Your Honor.
13            THE COURT:  Thank you.
14  BY MR. BRAFMAN:
15  Q    Before you made the decision to invest in MSMB, did you
16  speak to Mr. Blanton?
17  A    Yes.
18  Q    And did Mr. Blanton, in words or substance, tell you that
19  he has already been investing with Martin?
20  A    Yes.
21  Q    And did Mr. Blanton tell you that he was making a lot of
22  money through his investments with Martin?
23  A    Yes.
24  Q    And you knew Mr. Blanton, correct?
25  A    That is correct.

SAM      OCR      RMR      CRR      RPR

Neill - cross - Brafman                          4045

1    Q    Did you know him to be a successful venture capitalist in

2    the Dallas community?

3    A    Yes.

4    Q    And did you know him also to be a successful rancher in

5    the Dallas community?

6    A    Yes.

7    Q    And had you read articles about Mr. Blanton before he

8    told you about Martin Shkreli?

9              MR. SRINIVASAN:  Objection, Your Honor; relevance.

10             THE COURT:  Sustained.

11   BY MR. BRAFMAN:

12   Q    What did you know about Mr. Blanton before he told you

13   that he was successful with his investments with Martin?

14   A    Actually, I knew he was a successful investor,

15   particularly in the biotech space and that he was a champion

16   quarter horse rider in Texas or he had champion quarter horses

17   and that he was an investor in oil and hedge funds; just a

18   diverse investor.

19   Q    And without putting a number on it, did you understand

20   Mr. Blanton to be a rich man?

21             MR. SRINIVASAN:  Objection, Your Honor.

22             THE COURT:  Overruled.

23   Q    You may answer the question.

24   A    Yes.

25   Q    All right.  And did you know the value of his horse

SAM      OCR      RMR      CRR      RPR

1   ranch?

2           MR. SRINIVASAN:  Objection, Your Honor; relevance.

3           THE COURT:  Sustained.

4   BY MR. BRAFMAN:

5   Q    Was it because Mr. Blanton, who you knew to be a rich,

6   successful investor, recommended Martin that you paid

7   attention, in part?

8   A    Yes.

9   Q    And did Mr. Blanton also tell you that Schuyler Marshall

10  was going to invest with Mr. Shkreli?

11          MR. SRINIVASAN:  Objection, hearsay.

12          THE COURT:  I will overrule the objection.

13          MR. BRAFMAN:  Thank you.

14  Q    You may answer.

15  A    I do not remember that.

16  Q    Do you know Schuyler Marshall?

17  A    I know Schuyler.

18  Q    Do you know Schuyler Marshall as someone who was present

19  at the dinner that you described with Mr. Shkreli?

20  A    That's one way I knew Schuyler Marshall.

21  Q    Do you also know him from the business community?

22  A    I knew Schuyler better because we were both on the board

23  of a adoption agency together.

24  Q    And do you know Schuyler Marshall to be a successful

25  investor?

Neill - cross - Brafman                    4047

1    A    I know Schuyler Marshall to be a successful investor.

2    Q    Now, were you told by Mr. Blanton that Martin was very

3    smart?

4    A    Certainly words to that effect.  I think probably a

5    little stronger than that.

6    Q    Brilliant?

7    A    Yes.

8    Q    All right.  And did Blanton tell you approximately how

9    much money he had already made with Martin before he invested

10   in MSMB?

11           MR. SRINIVASAN:  Objection, Your Honor; relevance.

12           THE COURT:  Overruled.

13   BY MR. BRAFMAN:

14   Q    You may answer, sir.

15   A    That's a long time ago, but my impression was that he was

16   making 40 percent a year.  And that's where I got my idea that

17   Martin would probably make 40 percent would be from Darren's

18   comments, but I can't tell you specifically what he said.

19   Q    All right.  And did you understand it to involve

20   investments in biotech stocks?

21   A    I understood it to invest -- to involve investments in

22   biotech stocks, particularly on the short side.

23   Q    Okay.  Now, did you tell the government -- I'm sorry.

24           You've had a phone call with the government about

25   this case and you also met with them in Dallas at the United

                SAM    OCR    RMR    CRR    RPR

Neill - cross - Brafman                    4048

1  States Attorney's office, is that correct, sir?

2  A    (No response.)

3  Q    Let me break it down.

4       Do you remember in about November of 2015 having a

5  telephone call, your lawyer was on the call, representatives

6  of the SEC and the FBI were on the call, and they asked you

7  questions about Martin Shkreli and MSMB?

8  A    I don't remember it, but I don't disagree with it.  I --

9  I remember I had a meeting with them in Dallas, then a meeting

10 here, and if my lawyer was on, okay, yeah, I -- I'll assume

11 that I did have a phone call with them.

12 Q    All right.

13       THE COURT:  Sir.

14 BY MR. BRAFMAN:

15 Q    I am going to show you something that's marked for

16 identification.

17       THE COURT:  Excuse me, I am just trying to admonish

18 the witness not to assume, but rather to testify to the best

19 of his recollection.

20       MR. BRAFMAN:  Sorry, Your Honor.

21 A    I do not recollect the meeting -- I do not recollect a

22 telephone call.

23 Q    All right.  Now, I am going to show you what's been

24 marked for identification 3500-JN-1 and ask you, sir, just to

25 hold it beside you, and I may refer you to it in case I need

Neill - cross - Brafman                    4049

1   to try and refresh your recollection.  Okay?  But don't read

2   it out loud.

3          If you could look at the top of the document and

4   just read it to yourself and tell me whether or not that

5   refreshes your recollection that on November 19th, 2015 you

6   and your attorney had a telephone call with members of the

7   Securities Exchange Commission and a representative of the FBI

8   concerning MSMB and Martin Shkreli?

9   A    I do not remember this phone call.

10  Q    At all?

11  A    (Nodding.)

12  Q    No recollection whatsoever?

13  A    It's a long time ago.  I do not remember --

14  Q    Okay.

15  A    -- that phone call.

16  Q    All right.

17  A    She told me not to assume, and I don't remember.

18  Q    Okay, fair enough.  Let's move on.

19          Do you remember the meeting in Texas?

20  A    Yes, I remember the meeting in Texas.

21  Q    And at the meeting in Texas you had a meeting in person

22  in the United States Attorney's office in Texas, is that

23  correct?

24  A    That is correct.

25  Q    And at that meeting, do you remember either before that

SAM      OCR      RMR      CRR      RPR

Neill - cross - Brafman                          4050

1    meeting or at that meeting telling the government that in this

2    case Darren Blanton did your due diligence on the fund?

3    A     I do not remember saying that.

4    Q     Is that true, though?

5    A     That is not true.  He did part of it --

6    Q     Okay.

7    A     -- but he did not do it all.

8

9               (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Neill - Cross - Brafman                    4051

BY MR. BRAFMAN:

Q    Did you do any due diligence on your own?

A    My due diligence would have come from the other comments
of the people at the dinner where-- Darren sponsored for
Martin.

Q    And did you have any cause or concern about anything that
was said at that meeting?

A    I did not have any negative cause or concern about that
meeting.

Q    Do you remember telling the Government that Martin
impressed you as being smart and hard working?

A    Those are adjectives I would use on Martin.

Q    And, did you tell the Government that-- you never read
the private placement memorandum?

A    I would tell the Government that.

Q    Is it true?

A    That is true.

Q    We will get to that in a minute.

        Did you tell the Government that nobody certainly
not Martin said anything about assets under management?

        MR. SRINIVASAN:  Objection, Your Honor.

        THE COURT:  I will overrule it.

Q    Nobody-- Martin never said anything to you about assets
under management, did he?

A    No.

                        RB        OCR

1   Q    And, Martin never said anything to you about whether the
2   fund had an independent auditor or an independent
3   administrator did he?
4         THE COURT:  Can I just ask, are you focusing the
5   witness on any particular time frame or do you mean ever?
6         MR. BRAFMAN:  Before he invested.
7         THE COURT:  All right.
8   Q    Before you invested, did Martin ever represent to you
9   that the fund had an independent auditor?
10  A    No.
11  Q    Did Martin ever say to you before you invested, that the
12  fund had an independent administrator?
13  A    No.
14  Q    Before you invested, did Mr. Shkreli tell you whether or
15  not he had any particular amount of money under management?
16  A    No, he did not.
17  Q    Now, when you had the dinner meeting, am I correct, given
18  your experience in hedge funds, that you just assumed that it
19  would be a small fund?
20        MR. SRINIVASAN:  Objection.
21        THE COURT:  Overruled.
22  A    That is true.
23  Q    Because you have been to presentations for example by
24  Goldman Sachs, wherein you are not talking about a small fund,
25  correct?

Neill - Cross - Brafman                    4053

1    A    That's correct.

2    Q    And now, you are now 74, sir?

3    A    That is correct.

4    Q    So at the time you met Martin Shkreli, you were about 70,

5    fair?  Little bit younger?

6    A    Going to be 68, this is 2017.

7    Q    So you were 68?

8    A    Yeah.

9    Q    Do you know how old Mr. Shkreli is?

10   A    I think he is in his early 30's.  I thought he was in his

11   20's when I met him at the dinner.

12   Q    Was everybody at the dinner substantially older than Mr.

13   Shkreli to your knowledge?

14            MR. SRINIVASAN:  Objection.

15            THE COURT:  Sustained.

16   Q    Was everyone at the dinner to your knowledge an

17   experienced investor based on what you knew?

18   A    No.

19   Q    Who was at the dinner besides you, Mr. Blanton and Mr.

20   Marshal?

21   A    I think to answer your question, there are always

22   analysts at these meetings and they are young and not

23   experienced investors themselves.  But the people who stood

24   out and to whom I listened, were Skyler Marshal, Darren

25   Blanton and Gloria Martindale Eulich.

Neill - Cross - Brafman                                    4054

1   Q    E-U-L-I-C-H for the reporter?

2   A    Yes.

3   Q    Who is she?

4   A    She is the person who runs Belmont which is an investment

5   fund in Dallas.

6   Q    And, did you tell the Government that the two people who

7   spoke the most at the dinner were Ms. Eulich and Mr. Blanton?

8   A    Yes.

9   Q    And is that correct, sir?

10  A    I think that is correct.

11  Q    And did you speak much or did you just listen mostly?

12  A    I mostly listened.

13  Q    Was Ms. Eulich talking about Martin Shkreli or MSMB?

14            MR. SRINIVASAN:  Objection, hearsay.

15            THE COURT:  Overruled.

16  Q    You may answer.

17  A    Yes.

18  Q    And, was both she and Mr. Blanton saying positive things

19  about Mr. Shkreli's investment strategies and their experience

20  with him?

21  A    Yes and his work ethnic.

22  Q    And did Ms. Eulich purport to know personally about

23  Martin Shkreli's investment experience?

24  A    Yes.

25  Q    And was it on the basis of what Mr. Blanton and Ms.

                              RB        OCR

Neill - Cross - Brafman                    4055

1  Eulich said, in part, that caused you to feel comfortable

2  investing in MSMB?

3  A    Yes.

4  Q    Now, I think on direct examination, Mr. Srinivasan asked

5  you a question about whether somebody told you that Martin--

6  whether Martin told you he graduated from Columbia University,

7  do you remember?

8  A    Yes.

9  Q    It wasn't Martin who told you he graduated from Columbia

10 University, it was Darren Blanton who told you; isn't that

11 correct?

12 A    All I know is the impression I had when I left the

13 dinner.  I cannot remember who told me that.

14 Q    Well, let me ask you if you could, since you remember the

15 meeting in Dallas, I will show you 3500 JN-2.  Hold it by your

16 side, sir and I will try to refer you to something if it helps

17 refresh your recollection.  Okay.

18 A    Okay.

19 Q    Now, I will ask you, sir, if you can-- do you remember

20 whether it was Darren Blanton who told you that Martin had

21 graduated from Columbia?

22 A    I do not remember if it was Darren Blanton who told me

23 Martin had graduated from Columbia.

24 Q    Isn't it true that Mr. Shkreli told you that he had

25 attended Columbia but dropped out when he was 16?

1    A    At what point in time are you referring to that

2    conversation?

3    Q    Well, why don't you see if it can-- during-- before you

4    invested.

5              Let me make it easier.

6    A    What page is it on?

7    Q    Let me make it easier and we will save sometime in the

8    process.

9              I will show you what I marked for identification as

10   Defense Exhibit 3430, formerly marked but not offered as

11   Government Exhibit 102-14.  So look at this document, tell me

12   if there is an E-mail that you received from Mr. Shkreli on

13   January 28th, 2012.

14   A    Yes, I received this E-mail from Martin Shkreli.

15             MR. BRAFMAN:  I offer it into evidence as a

16   defendant exhibit.  What is that number on the end in the blue

17   box?

18             THE WITNESS:  3430.

19             MR. BRAFMAN:  I offer it as Defendant's

20   Exhibit 3430.

21             MR. SRINIVASAN:  No objection.

22             THE COURT:  We will receive defense Exhibit 3430.

23             (So marked.)

24   Q    I will put it up on the screen and I am going to read it

25   to you.  For the benefit of the jury, you can read it along

                        Neill - Cross - Brafman              4057

1   with me from the document that you have.

2           This is an E-mail from Mr. Shkreli to John Neill on

3   Saturday, January 28th, 2012, at 3:09 p.m., correct?

4   A    Correct.

5   Q    Now, this starts on the bottom which is the way these

6   E-mail runs.  I will go to this one first, from Martin Shkreli

7   to you.

8           It says, pleasing to hear he skipped school.  I

9   myself was exempted from four years of unnecessary schooling

10  and was pleased to begin my career with Kramer at age 16,

11  March 1, 2000.  That is something about doing this to a young

12  person that is terrible and great at the same time.  You

13  forever know you are special, but you forever know you are

14  special.  That is in response to your E-mail from the same

15  day-- sorry, from January-- your response January 28th is Bill

16  Gates was also a dropout so you're in good company.

17          And then Mr. Shkreli says, I had a funny situation.

18  I have finished high school a few years early as a serious

19  trouble maker, but good test taker.  I enrolled at Columbia at

20  16 through a special program, the dean who is still a good

21  friend.  I dropped out and got a degree from City College, at

22  night, working for Jim during the day.

23          Did I read that correctly?

24  A    You read that correctly.

25  Q    And the person "Jim" that I am referring to is Jim

Neill - Cross - Brafman                    4058

1   Cramer, the investment guru who has his own T.V. show.  Did

2   you understand that to be him?

3   A    That is how I understood that.

4   Q    And, Bill Gates, what you refer to as the Bill Gates the

5   inventor of Microsoft, the developer of Microsoft, correct?

6   A    That is correct.

7   Q    One of the richest men in the world?

8   A    That is correct.

9   Q    What you were doing was, you were essentially, you know,

10  telling Martin that you know dropping out of college, or being

11  a dropout, you are in good company.  That is the comment you

12  made, right?

13  A    That's the comment I made.

14  Q    So whether it was Mr. Blanton or anyone else at this

15  meeting who suggested to you that Martin graduated Columbia

16  University, on January 28th, Martin makes certain that you

17  understand that he went to Columbia, but he didn't graduate,

18  correct?

19          MR. SRINIVASAN:  Objection, Your Honor, to make

20  certain.

21          THE COURT:  Sustained.  Let's rephrase the question.

22  There is an objection to the form.

23  Q    On January 28th, 2012, Martin tells you quite clearly

24  that he never went to Columbia-- never graduated from

25  Columbia, correct?

1           MR. SRINIVASAN:  Objection, quite clearly.

2           THE COURT:  I will overrule the objection.

3    Q    You may answer.  Does he tell you that?

4    A    He told me that on January 28th, 2012, which is a year

5    later then when you were asking me previously, what I knew

6    after the meeting with Darren Blanton in the fourth quarter of

7    2010.

8    Q    And--

9    A    He clearly told me here that he had dropped out of

10   Columbia but that is in January of 2012.

11   Q    All right.  Then I will refer you back if you could, sir,

12   to-- will you look at the report there of 3500 JN-1.

13          MR. SRINIVASAN:  Objection, there is no question.

14          THE COURT:  Yes.

15   Q    Am I correct that nothing will jog your memory about

16   anything you said in this phone call to the F.B.I., the

17   Securities and Exchange Commission on November 19th, 2015, I

18   shouldn't even try.

19          MR. SRINIVASAN:  Objection, Your Honor.

20          THE COURT:  Well --

21          MR. SRINIVASAN:  Asked and answered.

22          THE COURT:  The question is, whether reviewing 3500

23   JN-1, whether there is anything there that would jog his

24   memory, is that your question?

25          MR. BRAFMAN:  Yes, Your Honor.

Neill - Cross - Brafman                    4060

1              THE COURT:  All right.  I will overrule the

2    objection.

3              MR. BRAFMAN:  Thank you.

4              THE COURT:  You should focus it on a specific area.

5              MR. BRAFMAN:  I am, Your Honor, thank you, I will.

6              THE COURT:  Okay.

7    A    I still don't remember this meeting.

8    Q    Well, the document I just gave you was in January of

9    2012, correct?

10   A    Yes.

11   Q    And in that document, Mr. Shkreli clearly advises you

12   that he did not graduate from Columbia, correct?

13   A    That is correct.

14             THE COURT:  That has been asked and answered, let's

15   move on, please.

16   Q    Did you say anything in words or substance, hey Martin, I

17   thought you were a Columbia grad?

18             MR. SRINIVASAN:  Objection.

19             THE COURT:  Are you referring to--

20   Q    You didn't respond to Martin with dismay or like suddenly

21   this is news to you, did you?

22   A    No.  Because I had learned that earlier.

23   Q    That he didn't go to Columbia?

24   A    Yes.

25   Q    That he did not graduate from Columbia?

1   A    Yes.

2   Q    Who did you learn it from?

3   A    I learned that from Steve Harrison at Belmont.

4   Q    And was Steve Harrison at the meeting?

5   A    Yes.

6   Q    So now I'm sorry.  Let's straighten this out.

7         At the meeting before you invested, Steve Harrison

8   told you that Martin Shkreli did not graduate from Columbia,

9   he went to Columbia but dropped out, is that a fair statement?

10  A    No, it is not a fair statement.

11        MR. SRINIVASAN:  Objection.

12  Q    When did Mr. Harrison tell you this?

13  A    Probably two or three weeks after the meeting, after the

14  dinner at Ocean Grand.

15  Q    Before you invested?

16  A    No, after I invested.

17  Q    And did you withdraw your investment the minute you heard

18  that?

19  A    No, I did not.

20  Q    So the fact was, that the fact that he didn't go to

21  Columbia was not something you relied on, to withdraw your

22  investment, correct?

23  A    That would be correct.

24  Q    Now, there comes a time when-- did Mr. Blanton also

25  describe Martin to be highly energetic and very focused?

Neill - Cross - Brafman                    4062

1           MR. SRINIVASAN:  Objection, time frame.

2   Q    At the meeting when you met with Martin Shkreli, before

3   the dinner, did Mr. Blanton rave about Martin and one of the

4   things he said, he was highly energetic and very focused?

5   A    Yes.

6   Q    What do you understand the characterization of being very

7   focused to mean?

8   A    In the context at that dinner, I thought very focused on

9   biotech and particularly biotech shorting.

10  Q    When you were listening to Martin at the dinner were you

11  impressed?

12  A    Very.

13  Q    And would it be a fair statement that he seemed to know a

14  lot about biotech?

15  A    That would be a very fair statement.

16  Q    You also recognized Mr. Shkreli at the meeting as you

17  described to Blanton or the Government as being very young,

18  correct?

19  A    Yes.

20  Q    Did you know how old he was at the meeting?

21          MR. SRINIVASAN:  Objection.

22          THE COURT:  Sustained.

23  Q    Did you know how old he was at the meeting?

24          THE COURT:  Sustained.  It has been asked and

25  answered, sir.

Neill - Cross - Brafman                    4063

1          MR. BRAFMAN:  Not the age at the meeting.

2          MR. SRINIVASAN:  Yes.

3          THE COURT:  Yes, you covered it.

4   Q    Did you tell the Government at the meeting in Dallas,

5   Texas, that you invested in people, not stocks?

6   A    That is something that I would say.

7   Q    And is that something that you would have said about this

8   investment?

9   A    Yes.

10  Q    You were investing in Martin Shkreli, correct?

11         MR. SRINIVASAN:  Objection, Your Honor.

12         THE COURT:  Overruled.

13  Q    Correct?

14  A    Yes.

15  Q    And you were not only personally impressed, but people

16  whose judgment you trusted, also told you they were impressed,

17  correct?

18  A    That is correct.

19  Q    And, your history in life, that has made you some degree

20  of success, is that you invest in people, not necessarily just

21  stocks, correct?

22  A    That is correct.

23  Q    Now, did you consider the investment in MSMB based on

24  your position in all of the assets that you had, did you

25  characterize it as a small investment?

Neill - Cross - Brafman                    4064

1    A    Yes.

2    Q    So, I don't want to ask you how much money you have, but

3    regardless of how much you have, when you invested $500,000 in

4    MSMB, you characterized that as a small investment, correct?

5    A    That is correct.

6    Q    And, did you make any effort to determine whether the

7    fund was independently audited or not?

8    A    I did not make any effort to do that.

9    Q    Now, various times when after you invested, Mr. Shkreli

10   would E-mail you about particular stocks that he was

11   following, correct?

12   A    Yes.

13   Q    And this went on, this continued on a regular basis for

14   months?

15   A    Yes.

16   Q    And he would sometimes send you detailed E-mails about

17   stocks that he was following and investing in and many times,

18   you did not respond, correct?

19   A    That is correct.

20   Q    And, you have displayed your investment strategy that you

21   really weren't interested in individual positions, taken by

22   the fund manager, correct?

23   A    No, I never said that.

24   Q    Did you say that you had--

25   A    I'm always interested in positions taken by fund

Neill - Cross - Brafman                    4065

1   managers, I just don't want one myself.

2   Q    You don't want what?

3   A    I don't want to take a position but if-- in one of my

4   managers has a position, I am very interested in that

5   position.

6   Q    And in none of the positions that Mr. Shkreli told you

7   about, did you take a personal investment position, correct?

8   A    That is correct.

9   Q    And, do you know whether MSMB invested in any of those

10  companies?

11  A    I do not know that for a fact.  I have not seen his

12  broker statement, so, no, I do not know that.

13  Q    Did you ever tell the Government that you rely on the

14  hedge fund managers to get into the weeds of investments they

15  make?

16  A    That is the sort of statement that I would make.

17  Q    And do you remember making it in connection with this

18  case when you were interviewed by the Government?

19  A    I don't remember it, but that is the sort of statement I

20  would make.

21  Q    And, by that, you mean to say that you know, when you are

22  a limited partner, you are in effect relying on the portfolio

23  manager or general partner to make investments for the fund,

24  correct?

25  A    That is correct.

Neill - Cross - Brafman                    4066

1   Q    Now, you are an experienced hedge fund investor, so let
2   me ask you this question, sir.  Would it be a fair statement
3   that based on your experience and your knowledge about the
4   MSMB, that the manager in this case, Martin Shkreli, had no
5   obligation to call you and get your permission before he made
6   an investment in any given stock, correct?
7   A    That is correct.
8   Q    And, in fact, you had no expectation that Mr. Shkreli
9   would call you and say, I'm about to buy one hundred thousand
10  shares of X, do you think it is a good idea.  He doesn't have
11  that obligation, does he?
12  A    You have used two different phrases, "expectation" and
13  "obligation".
14  Q    Okay.
15  A    I would have had some expectation because Martin is one
16  of the rare managers who talks about stocks and Martin did
17  send those.  But he had absolutely no obligation to send that
18  to me.
19  Q    Now, at the end of the day, do you know what stocks MSMB
20  invested in during its existence?
21  A    I know very little about the stocks he invested in during
22  its existence, and it would be from E-mails that Martin sent
23  to me.  But I have no personal or independent knowledge.
24  Q    Do you know what a reverse merger is?
25  A    I have a general concept of what a reverse merger is.

Neill - Cross - Brafman                4067

1   Q    Let me see if I am right and you tell me if I am wrong.
2   Am I correct that in a reverse merger, a private company
3   mergers with a public company or a shell of a public company
4   as a way of going public quickly, would that be a fair
5   statement?
6   A    I think that is a fair statement.
7   Q    And, have you been involved in any other companies that
8   were involved in a reverse merger in your professional hedge
9   fund life?
10  A    In my professional hedge fund life, I have been.  I have
11  not personally done a reverse merger.  But I have had managers
12  who have done reverse mergers.
13  Q    In many of your hedge funds have nothing to do with
14  Martin Shkreli or MSMB, correct?
15  A    A lot of them-- I don't think that is a fair statement.
16  But several of them have done reverse mergers that I know of.
17  Q    And the reverse merger in itself doesn't suggest to you
18  any type of impropriety, does it?
19  A    No.
20  Q    And, there comes a time when you are sent a liquidation
21  letter; is that correct?
22  A    That is correct.
23  Q    And, the liquidation letter, let me just pull it up so we
24  can talk about the same thing.
25          It is in evidence as Government Exhibit 102-16.  Let

1   me put it up, sir, and instead of going to your binder, if it

2   is easier, you can follow along here.  This is 102-16.  This

3   is a letter that is dated September 10th, 2012.  I think on

4   direct examination, it was described as a liquidation letter;

5   is that correct?

6              MR. SRINIVASAN:  It is tab 16.

7   Q    Do you have it before you, 102-16.

8   A    Yes, I have it before me and I probably did describe that

9   as a liquidation letter when he said, I decided to wind down

10  our hedge fund partnership.

11  Q    It says --

12  A    With a goal of completing the liquidation, so that is

13  probably where I got liquidation.

14  Q    I'm not criticizing, I want to make it obvious, I decided

15  to wind down our hedge fund partnership with the goal of

16  completing liquidation of the funds by November,

17  December 2012.  As you know, MSMB had found increasingly

18  compelling opportunities in private equity.  We are going to

19  focus our efforts on managing money in a hybrid public private

20  structure, one which is not generally amenable to the open

21  ended private hedge fund partnership structure.

22              The next paragraph, tells you very clearly, we have

23  decided the best structure for such an entity is a public

24  company or private corporation.  Retrophin LLC, our MSMB

25  founded by technology operation will be that company.

Neill - Cross - Brafman                    4069

1    Retrophin has made a lot of progress since inception in 2011.

2    Today the company has a full pipeline and several marketed

3    cash generating projects.  Retrophin is currently valued at a

4    modest 80 million.  I personally feel the shares are worth

5    closer to one billion, and will reach that lofty number when

6    all is said and done.  We anticipate taking the company public

7    in the first half of 2013.  We will see what the market thinks

8    then.

9              You got that letter, you read the whole letter, not

10   just the first paragraph, correct?

11   A    That is correct.

12   Q    Now, is it your testimony that that letter is the first

13   time you and Martin have discussed Retrophin?

14   A    No.

15   Q    You knew about Retrophin and you know about Martin's

16   involvement in Retrophin, isn't that true?

17   A    That is true.

18   Q    And, let me show you what is in evidence as 102-15.  In

19   May of 2010, this is Exhibit 102-15.  I think they will tell

20   you what tab it is.

21             Do you know the tab, Mr. Srinivasan?

22             MR. SRINIVASAN:  Tab 15.

23   A    Tab 15, I got it.

24   Q    Thank you, sir, you figured out the system.

25             It is May 10th, 2012, which is several months before

Neill - Cross - Brafman                    4070

1   the liquidation letter.  The subject is account values and it

2   starts at the bottom.  John Neill.  What was the value of my

3   wife's account.  You give the dates.  Mr. Shkreli responds, do

4   not have yet but will have tomorrow or Wednesday.  You then

5   ask, do you have the March 31, '12 value of my wife's account.

6   He then says, no, we have some bill that accounting is trying

7   to reconcile.  I deeply apologize.  The company we started,

8   Retrophin, is going through a sale process, and that is a bit

9   of a priority.  Abbott Labs seems to want to acquire it and if

10  so, that would be a gigantic boost to the fund.  Who knows if

11  they will do it.  The result will be 1.5 or 1.6 percent

12  depending on if our accountants think the bill is one time or

13  recurring.

14          Do you see that?

15  A    I see that.

16  Q    Now, I am pointing to the statement which says, in words

17  or substance, that if you do this, it would be a gigantic

18  boost to the fund.  Did you understand that to mean MSMB?

19  A    Yes.

20  Q    And did you call or write to Martin Shkreli and say at

21  any time, what do you mean Retrophin will be a boost to the

22  fund.  Did you know that Retrophin now made up part of the

23  fund, sir?

24          MR. SRINIVASAN:  Objection, compound.

25          THE COURT:  Sustained.

Neill - Cross - Brafman                    4071

1    Q    Did you know whether Retrophin made up part of the fund

2    or not at that date?

3    A    As of this May date?  Yes, I knew it from this E-mail.

4    Q    And you didn't question it as what do you mean Retrophin

5    is part of the fund, did you?

6    A    No, I don't think I called him and asked him.  I think I

7    knew before this frankly, because I think he sent me a

8    request, several months earlier about whether we wanted to

9    fund a private placement for Retrophin.

10   Q    And you didn't--

11   A    I don't remember the dates on that.

12   Q    You didn't agree to fund the private placement on

13   Retrophin, correct?

14   A    No, I did not.

15   Q    But you didn't move to withdraw from the fund when you

16   realized that Retrophin was going to be part of the fund, did

17   you?

18   A    No, but here, it says, Abbott seems to want to acquire

19   it.

20   Q    I understand.

21   A    It is very possible that he made an investment in

22   Retrophin.  He sells it to Abbott Labs and it would be

23   gigantic boost and we will be happy.

24   Q    My question to you, when you got that E-mail, you made no

25   effort to withdraw from the fund, correct?

1   A    That's correct.

2   Q    Now, I want to ask you to look at 102-8 in evidence.  Do

3   you have that, sir?  Exhibit 102-8.

4            MR. SRINIVASAN:  Tab 8.

5   A    I am with you.

6   Q    Do you have it, sir?

7   A    Tab 8.  The E-mail dated June 23rd, about SeraCare.

8   Q    Yes.

9   A    All right.

10           (Transcript on next page.)

Neill - cross - Brafman                         4073

1    BY MR. BRAFMAN:   (Continuing)

2    Q    All right.  Now, Mr. Srinivasan asked you whether or not

3    you got this.  You identified it as an e-mail you got from

4    Mr. Shkreli, correct?

5    A    Yes.

6    Q    And that talks about potential purchase of SeraCare by

7    MSMB Capital, correct?

8    A    Yes.

9    Q    Do you know whether the sale ever went through?

10   A    I do not know if the sale ever went through.

11   Q    And you don't know whether Mr. Shkreli was going to buy

12   it with money that was being provided by a third party or

13   whether he was going to use MSMB Capital funds, do you?

14   A    I do not know the answer to that.

15   Q    Well, you were shown this portion on direct examination,

16   that MSMB's offer is conditioned on completion of cursory due

17   diligence and other customer provisions and MSMB's offer is

18   not subject to any financing condition.

19        I think on direct examination, you said well that's

20   suggested to you that the company must be doing well if they

21   don't need financing, correct?

22   A    That is what this would suggest to me.

23   Q    All right.  But you don't know whether the purchase price

24   was to be provided by someone other than MSMB who would be

25   willing to put up the money; you just know it wasn't subject

Neill - cross - Brafman                4074

1   to financing, correct?

2           MR. SRINIVASAN:  Objection.  Asked and answered.

3           MR. BRAFMAN:  I didn't ask this question.

4           THE COURT:  I'm going to allow it.

5           MR. BRAFMAN:  Thank you.

6   A    I had no way of knowing if Martin was financing some

7   third party who was going to provide all the money, but that

8   wasn't something that would come to my mind reading this

9   proposal.

10  Q    Now, I want to show you an e-mail that I am just going to

11  put up on the board.  It's not in evidence.  I'm going to ask

12  you to look at this e-mail just to yourself.

13          THE CLERK:  Is it in evidence?

14          THE COURT:  It's identified as Exhibit 3419, defense

15  Exhibit 3419.  That's the number and that is a --

16          THE CLERK:  Is it in?

17          MR. SRINIVASAN:  It's not in evidence.

18          THE COURT:  No, just for identification.

19          MR. BRAFMAN:  I said it's not in evidence.  I said

20  it was marked for identification.

21          THE COURT:  Okay.  Can you give us the number, is it

22  3419, sir?

23          MR. BRAFMAN:  3419 for identification only and I ask

24  the witness to look at this document.

25          THE COURT:  All right.  It's very hard to read.  Can

Neill - cross - Brafman                                    4075

1    you make it bigger?

2              MR. BRAFMAN:  You'll see it on the screen.

3    Q    Do you see it on the screen, sir?  It's 3419.

4    A    I see it on the screen.

5    Q    Do you recognize it as an e-mail you provided to the

6    government and it's from Martin Shkreli?

7    A    It sure looks like it.

8    Q    And it's dated Sunday, February 19, 2012?

9    A    Yes.

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Side Bar                                4076

1              MR. BRAFMAN:  I offer this into evidence, Your

2      Honor.

3              MS. SMITH:  Hearsay.  Objection, Your Honor.

4              MR. BRAFMAN:  I'd like to be heard.

5              THE COURT:  All right.  Let's go to side bar.

6              THE WITNESS:  Can you leave it up so I can read it?

7              THE COURT:  Can you hand him a copy?

8              MR. BRAFMAN:  Yes.

9              (The following occurred at side bar.)

10              THE COURT:  I couldn't see it.

11              MR. BRAFMAN:  Your Honor, the witness has testified

12      that he was sort of surprised when he got Retrophin, when he

13      had information that Retrophin was involved in the stock.

14      This is an e-mail to him when Mr. Shkreli is thanking him for

15      supporting Retrophin.  It's not hearsay.  It's not

16      self-serving.  The witness has a right to say, did you believe

17      you were supporting Retrophin, did you write back and say I

18      wasn't supporting Retrophin.  How is this hearsay?  It's all

19      part of the dialogue with the same investor who claimed on

20      direct examination that getting Retrophin stock in return for

21      his MSMB investment was a shock to him.

22              THE COURT:  Okay.  So, Mr. Neill received this?

23              MR. BRAFMAN:  He said he did.

24              MR. SRINIVASAN:  Your Honor, a few points.

25              One, when Mr. Brafman showed Mr. Neill the e-mail

Side Bar                                4077

1   from May 2012, Mr. Neill volunteered that he had heard about

2   Retrophin before.  There's no inconsistency in his statement.

3   I think he said he was asked about the placement.  I think

4   he's been clear that his knowledge extended each further back.

5            MR. BRAFMAN:  Then there should be no damage or

6   prejudice to the government.

7            THE COURT:  Let him finish.

8            MR. SRINIVASAN:  Secondly, Your Honor, it is

9   hearsay.  It's a statement by the defendant.  It doesn't come

10  in under any exception to the hearsay rule.  It's an objection

11  that we have discussed in the past on multiple occasions.

12           THE COURT:  I think it is being offered for the

13  effect on the reader.

14           MR. BRAFMAN:  Correct.

15           THE COURT:  That is his basis for offering it.

16           MR. BRAFMAN:  Correct.

17           THE COURT:  Which is what I understood to be his

18  basis for the other earlier objections.

19           MR. BRAFMAN:  Correct.

20           MS. SMITH:  It does say friends and shareholders.

21  It doesn't just say shareholders.  The idea that this

22  suggested he should have known that the fund had invested --

23           MR. BRAFMAN:  That's for argument, Judge.  That goes

24  to its weight, not to its admissibility.  If they want to

25  argue that this shouldn't be considered, they can argue that,

Side Bar                                    4078

1  but this witness will tell you that he got this and I will ask

2  him what he understood by the e-mail and then let him answer

3  the question.

4           THE COURT:  All right.  Well, let's have Mr. Brafman

5  question the witness about whether he received it, what his

6  understanding was with regard to the specific areas that he

7  wished to inquire.

8           MR. BRAFMAN:  But I didn't -- in order for me to do

9  this, I need you to rule on the offer into evidence.

10          THE COURT:  I said it would be admitted.

11          MR. BRAFMAN:  Thank you.

12          THE COURT:  Okay.

13          (In open court; side bar ends.)

14          THE COURT:  All right.  So we will receive Defense

15  Exhibit 3419 in evidence.

16          MR. BRAFMAN:  Thank you.  The objection is

17  overruled, Your Honor?

18          THE COURT:  That's why I am receiving it.  Yes, sir.

19          MR. BRAFMAN:  Thank you, Your Honor.

20          (So marked.)

21          (Continued on next page.)

22

23

24

25

CMH      OCR      RMR      CRR      FCRR

1  BY MR. BRAFMAN:

2  Q    Now, it's in evidence so everyone can see it.

3            Have you had a chance to read it, sir?

4  A    Yes, I have.

5  Q    And do you have it before you?

6  A    Yes, I do.

7  Q    And this is a copy of an e-mail that you received from

8  Mr. Shkreli in February of 2012?

9  A    And this is a copy of the e-mail that I referred to you

10  just a few moments ago saying that he said he was hoping to

11  raise 3 million for Retrophin.

12  Q    I think you said that on direct examination, but this is

13  the e-mail I was going to focus you on then.

14            MS. SMITH:  Objection, Your Honor.

15            THE COURT:  Sustained.  Sustained.

16  Q    On direct examination, the government asked you questions

17  about what you thought the value was.  Do you remember that?

18  A    Yes.

19  Q    And you kept saying 1 to 3 million.  Is this the e-mail

20  that you were using to base that on?

21            MR. SRINIVASAN:  Objection, Your Honor.

22  Mischaracterizes the testimony.

23            THE COURT:  All right.  Overruled.  Overruled.  You

24  can go ahead and answer.

25  A    No, that is not the e-mail.  There's another e-mail --

Neill - cross - Brafman                    4080

1    Q    We'll get to it.

2    A    -- where Martin says, I bought this proprietary product

3    from a university for $1 million and I think we'll be able to

4    license it.  That was the one that I was referring to, in

5    addition to this one.

6    Q    All right.  Well, this one is marked in evidence as 3419

7    and now that it's in evidence, I'm going to read it to you in

8    part and then I'm going to ask you some questions, sir.

9          You have a copy with you, is that correct?

10   A    I'm looking at it.

11   Q    All right.  Friends and shareholders.

12         I'm going to stop for a minute.  Did you consider

13   yourself a friend and a shareholder or a friend only?

14   A    At this time, I would have been a friend and investor in

15   MSMB.

16   Q    All right.  Now you got this e-mail in February of 2012

17   and it says:  Please see the attached news indicating

18   Retrophin has completed the license for RE-021 or DARA from

19   Ligand Pharmaceuticals, NASDAQ symbol is LGND.

20         Had you heard of Ligand Pharmaceuticals before?

21   A    No, I had not.

22   Q    I'm continuing to read from the document.

23         I've told some of you about RE-021 before, but allow

24   me to reintroduce the product.  RE-021, an endothelin receptor

25   antagonist and angiotensin receptor blocker, dal acting

Neill - cross - Brafman                    4081

1    receptor antagonist, was developed and discovered by
2    Bristol-Myers and subsequently licensed to Pharmacopeia, where
3    I was a major shareholder.  Pharmacopeia was then purchased by
4    Ligand.  We were successful in licensing the product from
5    Ligand, principally because of our ability to identify an
6    orphan population who could benefit substantially from the
7    drug.
8              I feel the best patient population for RE-021 is the
9    rare nephropathy constellation of diseases, including Focal
10   Segmental Glomerulosclerosis, lgA Nephropathy and others,
11   where patients have a hard time controlling idiopathic
12   proteinuria.  Right now, patients take ARBs and steroids
13   simply to reduce their proteinuria, the marker that physicians
14   watch closely in these diseases.  These patients typically
15   have renal failure within 5 to 10 years of their diagnosis and
16   are a major contributor to ESRD in the US.  There are probably
17   100,000 patients with these diseases in the U.S., and they
18   cost the healthcare system $25,000 to $100,000 annually.
19   These terrible diseases have precious few options - steroids
20   simply don't work in a lot of these patients, unlike nephrotic
21   syndrome secondary to minimal change disease, for instance.
22   Worse yet, transplantations often do not cure the patient and
23   the disease frequently relapses despite this last-ditch
24   effort.  While ARBs lower proteinuria and undoubtedly prolong
25   kidney survival, they are not effective enough.  The hope is

1   that with RE-021, we can lower proteinuria ever further for

2   these patients and extend their kidney survival.  All

3   endothelin receptor antagonists studied in kidney disease show

4   a dramatic decline in proteinuria and I fully expect RE-021 to

5   do so as well.  Safety issues have plagued some companies and

6   company disorganization has hurt others.  DARA happens to be

7   very safe and specific for the right receptors, and we will

8   execute a fast two-trial clinical program to ask for FDA

9   approval.

10          Thank you for supporting Retrophin.  I never thought

11  we would build a company with two very exciting drug

12  candidates in less than 12 months.  Without your support, no

13  matter how large or small, I would have never been able to

14  build this company with you.  We are planning on making two

15  more major news announcements in the next few weeks.  We are

16  also conducting a raise of capital at a $40 million valuation

17  and your participation is encouraged.  We are hoping to raise

18  $3,000,000, maximum allowed $5,000,000, and have raised

19  $1,250,000 so far.

20          It is particularly amazing to me that, without your

21  support, not one, but two drugs would have sat on the shelves

22  and likely never been developed.  RE-021 has the potential to

23  truly change the world for the tens of thousands of patients

24  dying of Duchenne Muscular Dystrophy and your effort took this

25  drug from an idea at a university into a clinical program.

Neill - cross - Brafman                    4083

1    RE-021 is now the second rescued drugs that patients with FSGS

2    desperately need.  Without you, these patients who have never

3    had one FDA-approved drug to use, may now have something to

4    look forward to.  Martin Shkreli.

5              Did I read that letter correctly except for my

6    stumbling over the medical terms?

7    A    Yes.

8    Q    When you got this letter, what was your reaction?

9    A    My reaction was that he's doing a capital raise of

10   $3 million and I did not choose to send any money for that

11   capital raise.

12   Q    But he was thanking all of the people who got this letter

13   for your support, wasn't he?

14   A    Yes.

15   Q    And did you believe that by investing in MSMB, given the

16   information you got so far, you were indirectly supporting

17   Retrophin's research?

18   A    Yes.

19   Q    Thank you.

20   A    But it really came from the e-mail he sent where he said

21   he put $1 million in it.

22   Q    Thank you.  Is that Retrophin?

23   A    I assumed it was because he said it was a proprietary

24   drug from a university.

25   Q    Did Martin ever invite you on occasion to various charity

Neill - cross - Brafman                    4084

1    fundraisers that he was hosting?

2    A    Yes.

3    Q    Did you ever attend any?

4    A    No.

5    Q    Did Martin ever communicate with you about a company

6    called Chelsea Therapeutics?

7    A    I don't remember if he did.

8    Q    Do you remember -- do you know of a company called

9    Chelsea Therapeutics?

10   A    I do not know a company named Chelsea Therapeutics.

11   Q    I want to show you an e-mail marked for identification as

12   Defendant's 3415.  This is only for identification at this

13   time.  3415.  I ask you if you can read the top and it's got

14   your name up there.  Is this one of the e-mails that you

15   produced to the government in connection with Mr. Shkreli?

16   A    Yes.

17   Q    And can you tell it by looking at it, yes or no, whether

18   it relates to Chelsea Therapeutics?

19   A    I can tell it relates to Chelsea Therapeutics.

20   Q    Does this e-mail refresh your recollection that Martin

21   gave you a significant report -- I'm sorry -- a substantive

22   e-mail with respect to Chelsea Therapeutics in July of 2011?

23   A    This makes me realize he did send me this e-mail.

24            (Continued on next page.)

25

Side Bar                    4085

1          MR. BRAFMAN:  I offer this into evidence, Your

2   Honor.

3          MR. SRINIVASAN:  Your Honor, objection on relevance.

4          MR. BRAFMAN:  On relevance?

5          THE COURT:  You want to make a proffer, Mr. Brafman?

6          MR. BRAFMAN:  I don't think I need to, but if that's

7   what Your Honor would like, I will.

8          THE COURT:  Sure.

9          (The following occurred at side bar.)

10          MR. BRAFMAN:  Your Honor, there was a lot of

11   testimony in this trial about Mr. Shkreli and Mr. Austin and

12   the relationship they had in Chelsea Pharmaceutical.

13   Mr. Austin testified that he was its largest shareholder at

14   one point, that he went to a meeting with Chelsea

15   Pharmaceutical with Mr. Shkreli.

16          I think that area was, Chelsea Pharmaceutical was

17   opened by the government on direct, I believe.  The issue of

18   whether Mr. Shkreli was actively working to promote Chelsea

19   Pharmaceuticals I think is relevant because it supports his

20   argument that he was more than making the cavalier suggestion

21   to Mr. Austin that he should buy Chelsea Pharmaceuticals.  I

22   don't think it's introduced for the truth of what's been said

23   and it's certainly what's been said in the dialogue between

24   this witness and Mr. Shkreli during the relevant time period.

25          THE COURT:  Well, a dialogue.  What does he respond?

Side Bar                                                    4086

1  Does he ignore it?

2           MR. BRAFMAN:  He doesn't respond.

3           THE COURT:  Okay.  So that's not dialogue.

4           MR. BRAFMAN:  Well, but he has testified that there

5  are a number of investment opportunities that Mr. Shkreli

6  brings to his attention which he passes on.  Now, whether he

7  passes on them or not is not the issue.  The issue is Martin

8  trying to encourage him to invest in the company.  That

9  establishes Mr. Shkreli's bona fides as an investment guru, if

10 you will, and him thinking that Mr. Shkreli as someone who

11 knows his way around the pharmaceutical industry rather than

12 someone just Blanton considers to be a smart guy.  I don't

13 understand the prejudice to the government and it's not

14 hearsay.

15          MS. SMITH:  It is hearsay.  I mean, this time

16 period --

17          MR. BRAFMAN:  But it's good hearsay.

18          MS. SMITH:  -- years after Mr. Austin and

19 Mr. Shkreli have a relationship.  So I don't know if he is

20 going to ask the witness about Mr. Austin.

21          MR. BRAFMAN:  He already said he doesn't know

22 anything about it.

23          MS. SMITH:  That's right.  He said he's also said

24 Mr. Shkreli provides stock tips and that he doesn't buy

25 individual stocks.  So I'm not sure what this adds or why

1    we're spending time on it.

2           THE COURT:  Does he also say he doesn't recall

3    Chelsea?

4           MR. BRAFMAN:  This refreshed his recollection.

5           THE COURT:  That he received an e-mail about it?

6           MR. BRAFMAN:  Yes, but he's identified the document

7    so we don't know whether, it's not a question of whether he

8    got it or not.  He refreshed his recollection that he got it

9    and I think I have a right to ask him questions about it, but

10   asked this way is to do it with the document rather than point

11   him each time I ask him a question to the paragraph in

12   question.

13          THE COURT:  Well, you know, you read the whole

14   document into evidence.

15          MR. BRAFMAN:  Not this.  No, that was the prior

16   e-mail.

17          THE COURT:  Okay.  This is the Chelsea one.

18          So, are you going to ask him whether he made an

19   investment decision based on this e-mail?

20          MR. BRAFMAN:  I know he didn't.

21          THE COURT:  And whether he invested into Chelsea?

22          MR. BRAFMAN:  I know he didn't.

23          THE COURT:  So, you want to just get that on the

24   record and move on?  Why else would this be relevant?

25          MR. BRAFMAN:  Okay.

```
                            Side Bar                        4088

1          THE COURT:  He got the e-mail.  He didn't do
2   anything about it because he doesn't invest in individual
3   stocks.   That's about all it's relevant for, don't you think?
4          MR. BRAFMAN:  That's fine.
5          THE COURT:  Okay.
6          (End of side bar.)
7          (Continued on next page.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Neill - cross - Brafman                    4089

1    BY MR. BRAFMAN:

2    Q    It's not being introduced but I'm still going to refer to

3    it as marked for identification so you have it, I have it, the

4    government has it, but the jury doesn't see it.

5              So, is this an e-mail about Chelsea that you

6    understood to be a suggestion by Mr. Shkreli that you should

7    invest in Chelsea?

8              MR. SRINIVASAN:  Objection, Your Honor.

9              THE COURT:  Overruled.

10             Did you understand this e-mail to be as Mr. Brafman

11   described it?

12             THE WITNESS:  No.

13   Q    When you got these e-mails from time to time about drug

14   companies from Martin Shkreli, did you think he was just

15   sending them to you out of the blue or did you think he was

16   sending them to you to see if you had any interest in perhaps

17   investing in these companies?

18             MR. SRINIVASAN:  Objection, Your Honor.

19             THE COURT:  Sustained.

20   Q    What did you understand -- what did you think when you

21   got this e-mail about Chelsea Therapeutics?

22   A    Martin was a very prolific information sharing person and

23   when I got this e-mail, I thought he probably had invested

24   MSMB in Chelsea, but he was also sharing it with me.  The

25   "from Martin" probably means he sent them to a lot of people

Neill - cross - Brafman                    4090

1    but I think he was saying this is a really great stock and you

2    should look at it and I think you might want to buy it.

3    Q    Okay.  Did you buy it?

4    A    No.

5    Q    Do you know whether Martin bought it for MSMB?

6    A    No.

7    Q    Okay.  Thank you.  You can put it down, sir.

8              No, I'm going to refer you to Government

9    Exhibit 102-21 in evidence.  If we can have it shown to

10   everyone.  Thank you.  I don't know what tab it is but it's on

11   the screen, sir.

12             MR. SRINIVASAN:  It's tab 21.

13             THE COURT:  Thank you.  Tab 21.

14   Q    Do you have the document, sir?

15   A    I am looking at that document.

16   Q    Okay.  This document was offered by the government on

17   your direct examination.  You discussed it during your

18   testimony.  It's dated Sunday, January 13, 2013, and the

19   heading is, the subject is Partnership Values.  Do you see

20   that?

21   A    Yes.

22   Q    Now, there's an e-mail from Martin to you on

23   January 13th:  Hi John, here are the net values for your

24   investment in MSMB Capital Management LP.  Then I want to read

25   you the rest and you follow along, sir, because then I will

1    have some questions for you.

2           Through the partnership, your account owns 94,520

3    shares of Retrophin, which now trades publicly as RTRX.

4           I want to stop there.  When he refers to the

5    partnership, do you know what he is referring to?  Is it the

6    MSMB partnership?

7    A    That was my assumption.

8    Q    Okay.  Now, did you know that you had that much

9    Retrophin?

10   A    I did not know I had that much Retrophin.

11   Q    Okay.  Now, it says:  When we decided to focus the

12   partnership on creating Retrophin, which would embody all of

13   my investing energy, I had high hopes that the market would

14   value it highly.  In August, we went from valuing Retrophin

15   stock at $40 per share to $25 per share in private rounds.

16   The December 2012 mark is at 4.70.  The stock trades at $4

17   today according to Yahoo finance.

18          My plan is to distribute the sole security to the

19   limited partners in accordance with the limited partnership

20   agreement which I will attach.  I understand you do not want

21   the security.  Retrophin would be willing to buy back your

22   stock at a market price.  I obviously have a duty to my public

23   shareholders to pay the best price I can and have to follow

24   the rules on that.  I will speak with my attorney regarding

25   what can or can't be done here.  Another possibility is I can

1    buy the stock from you directly for cash, or some combination

2    of the two.  Finally, given the public nature of the stock,

3    you can certainly sell it yourself or find another buyer.  I

4    am around to talk about these possibilities tomorrow.  It may

5    make sense to include Darren Blanton on the line as he is

6    involved in this as well and might have a few ideas on how to

7    maximize the outcome for everyone.

8              Please let me know if I can be of any help.  I'm

9    sorry if this partnership did not turn out the way you wanted.

10   My hope was to have Retrophin valued in the hundreds of

11   millions.  The market doesn't quite see that yet as it is

12   valuing the company at 35 million.

13             Now, I've read that to you now.  I have just a

14   couple of questions.  Okay?

15             If you had sold that stock on the date you got this

16   e-mail to Martin Shkreli, you would have gotten $4 a share,

17   correct?

18   A    I don't know that.

19   Q    Well, it says the value of the stock on the NASDAQ, on

20   the stock market and Yahoo Finance was $4 a share that day.

21   Do you have any reason to doubt that?

22   A    I obviously have a duty to my public shareholders to pay

23   the best price I can and to follow the rules on that.  So I'm

24   coming from the context of I was going to get all cash

25   recently and now I'm going to get stock and I've got the

Neill - cross - Brafman                    4093

1    NASDAQ or Yahoo says $4 and then he says, But I have a duty to

2    my public shareholders to pay the best price I can and to

3    follow the rules on that.

4           So I did not receive an offer from Martin for $4 a

5    share for my stock so I don't know what he would have paid me

6    for it.

7    Q    Okay.  You didn't take him up on the offer to buy the

8    stock that day, did you?

9    A    No.

10   Q    You didn't have the shares as of that day, did you?

11   A    No.

12   Q    All right.  Now, ultimately, you sold your own Retrophin

13   shares for substantially more than $4 a share.  Would that be

14   correct?

15          MR. SRINIVASAN:  Objection.

16          THE COURT:  Overruled.

17   A    That is correct.

18   Q    Now, I'm going to go to the end of this:  Again, my hope

19   was to have Retrophin valued in the hundreds of millions.  The

20   market does not quite see that yet as it is valuing the

21   company at 35 million.

22          Did you understand that the way your share of the

23   MSMB partnership was valued took into account the valuation of

24   Retrophin stock?

25          MR. SRINIVASAN:  Objection, Your Honor.

Neill - cross - Brafman                    4094

1          THE COURT:  Sustained.

2    Q    Now, you have in evidence 102-2 which is the e-mail which

3    includes the documents you received.  I think you went through

4    this on direct examination.  January.  It's 102-2.  It's a

5    covering e-mail and it says:  MSMB Capital Management wiring

6    instructions, MSMB Capital Management LP Subscription

7    Agreement, MSMB Capital Management Private Placement

8    Memorandum, 8-3-2010.  MSMB Capital Management Individual

9    Questionnaire.

10          These are the documents you received before

11   investing, correct?

12   A    Correct.

13   Q    These are the documents that you filled out in part

14   before investing, like the subscription agreement, correct?

15   A    Let me be very clear here.  I got the subscription

16   documents.  I got the wiring instructions.  I filled out the

17   subscription documents.  I know I sent the wiring

18   instructions.  I don't remember seeing the private placement

19   memorandum.

20   Q    You never saw the private placement memorandum?

21   A    I don't remember seeing it.

22          MR. SRINIVASAN:  Objection.

23          THE COURT:  Sustained.

24   Q    You don't remember seeing it?  You identified it as

25   Exhibit 13 --

Neill - cross - Brafman                    4095

1    A    Yes.

2    Q    -- for the government.  When did you see this for the

3    first time, if you recall?

4    A    When I went through my e-mails to provide the documents

5    the government requested from me.

6    Q    So you had it in your possession?

7    A    Yes.

8    Q    So you had to have gotten it from MSMB, correct?

9    A    Yes.

10   Q    You didn't see it for the first time when the government

11   was going over it with you preparing for the trial, did you?

12            MR. SRINIVASAN:  Objection, Your Honor.

13            THE COURT:  Sustained.

14   Q    You had this in your possession when you turned over

15   documents relating to this case, correct?

16   A    That is correct.

17   Q    And that came to you from MSMB, correct?

18   A    That's correct.

19   Q    So while you might not have any recollection of having

20   received it, you, in fact, did receive it, correct?

21   A    That is correct.

22   Q    And your testimony is, however, that you did not go

23   through it?

24   A    That is correct.

25   Q    Now, you've been investing in hedge funds and

Neill - cross - Brafman                    4096

1   partnerships for 37 years.  You understand that the details of

2   the fund are laid out either in the subscription agreement and

3   private placement memorandum or the private placement

4   memorandum and the subscription agreement, correct?

5   A    No.

6   Q    Then nothing in the private placement memorandum was

7   going to be of interest to you?

8   A    Oh, yes, it would.  It should have been but it's also in

9   the LPA and it's also generally in the PowerPoint that are

10  provided.

11  Q    All right.  But you didn't read this document, right?

12  A    No, I didn't read it.

13  Q    But you verified that you had in your subscription

14  agreement, didn't you?

15  A    Yes.

16  Q    So the general partner was given a subscription agreement

17  by you which indicated that you had read the private placement

18  memorandum?

19  A    I don't remember that but if --

20  Q    Let's look at your subscription agreement and save

21  ourselves a lot of time.

22        MR. SRINIVASAN:  Objection, Your Honor.

23  Q    The subscription agreement --

24        THE COURT:  Excuse me, sir.  Just ask the question,

25  please.

Neill - cross - Brafman                    4097

1        MR. BRAFMAN:  Yes, Your Honor.

2   Q    The subscription agreement is Exhibit 26.  It's

3   attached -- I'm sorry.  It's in evidence.

4        Do you recognize this document?

5   A    I remember the subscription agreement.

6   Q    Okay.  And on direct examination, you were referred to

7   it, were you not?

8   A    Yes.

9   Q    All right.  And let's take a look at it and see what you

10  read and what you said about it.  It's Exhibit 26.  Do you

11  have it before you, sir?

12  A    Yes, I do.

13  Q    All right.  Let's look at page, the first page after the

14  cover page has the $500,000 number that you invested, correct?

15  A    Yes.

16  Q    And let me read, if I can, part of the first paragraph

17  which is you writing to MSMB Investors.

18        You have informed the undersigned, the subscriber,

19  that MSMB Capital Management has been organized as a Delaware

20  limited partnership, the partnership, of which MSMB Investors

21  LLC is the general partner.  The partnership is to be operated

22  in accordance with the limited partnership agreement of the

23  partnership furnished to the subscriber herewith and the

24  contemplated investment activities of the partnership are set

25  forth in the confidential private offering memorandum

Neill - cross - Brafman                    4098

1    previously furnished to the subscriber.

2              Does it say that?

3    A    Yes.

4    Q    So what it says very clearly, sir, is that the

5    contemplated investment activities of the partnership are set

6    forth in a confidential private offering memorandum, correct?

7    A    Yes.

8    Q    And you never read that before you invested?

9    A    No, I didn't.

10   Q    All right.  So let's look at Exhibit 13, the confidential

11   offering memorandum -- you know what?  Since we're on the

12   subscription agreement, let's stick with this for a minute.

13             Do you have it before you, sir?  It's Exhibit 26.

14   Do you have it, sir?

15   A    I have it before me.

16   Q    All right.  On page three of the exhibit, paragraph F, it

17   says, The subscriber has received and read and is familiar

18   with the partnership agreement, the memorandum and the

19   subscription agreement --

20   A    Wait.  Where are you, on page two?

21   Q    Page three, paragraph F, like in "Frank."  You see it?

22   A    Yes.

23   Q    The subscriber has received and read and is familiar with

24   the partnership agreement, the memorandum and the subscription

25   agreement and confirms that all documents, records and books

CMH      OCR      RMR      CRR      FCRR

Neill - cross - Brafman                    4099

1   pertaining to the investment in the partnership and required

2   by it has been made available or delivered to it.

3           Did I read that correctly?

4   A    You read that correctly.

5   Q    You are confirming in a document that you signed that you

6   read the memorandum of the private placement memorandum,

7   aren't you?

8   A    Yes.

9   Q    And you didn't?

10  A    That's correct.

11  Q    Now, if we can stay with the same document, sir, I think

12  you testified that you were annoyed that you couldn't get cash

13  when you wanted to, correct?

14  A    I was annoyed when Martin told me he would send me cash

15  and then he did not send me cash, yes.

16  Q    All right.  Now, I'm going to read from paragraph K of

17  the subscription agreement which you read and I think you

18  confirmed that you signed it.  Starting at paragraph K, The

19  subscriber acknowledges and is aware of the following.

20          Now, I want to go down to part Roman numeral 6, VI.

21  Do you see it, sir?

22  A    Yes.

23  Q    Except for the rights to withdraw from the partnership,

24  subject to the terms and conditions described in the

25  memorandum and set forth in the partnership agreement, it may

Neill - cross - Brafman                    4100

1   not be possible for the subscriber to liquidate its investment

2   in the partnership at other times unless the general partner

3   consents, and it is under no obligation to do so.  The general

4   partner intends, in general, to reinvest partnership earnings,

5   if any, rather than make cash distributions, and that the

6   subscriber does not expect or require cash distributions from

7   the partnership, and that the subscriber, together with its

8   tax advisors, must analyze fully the tax consequences to it of

9   an investment in the partnership.

10          Did I read that correctly, sir?

11  A    You read that correctly.

12  Q    So, the subscription agreement itself tells you that you

13  may not be able to redeem your shares in cash when you want

14  to, isn't that correct?

15  A    That is correct.

16          MR. SRINIVASAN:  Objection, Your Honor.

17          THE COURT:  Sustained.

18          MR. BRAFMAN:  What is the objection?

19          MR. SRINIVASAN:  It mischaracterizes the document,

20  Your Honor.

21          MR. BRAFMAN:  I'm sorry?

22          THE COURT:  Mischaracterization of the document.

23  Q    Do you understand from what I just read to you that there

24  could come a time when you would want to redeem your

25  investment in cash and the general partner might not be able

Neill - cross - Brafman                    4101

1    to do it?

2            MR. SRINIVASAN:  Objection, Your Honor.

3            THE COURT:  Sustained.  Rephrase.

4    Q    What do you understand from that paragraph?

5    A    What I understand from this paragraph, and this goes to

6    hedge funds in general, is that the general partner has quite

7    a bit of latitude in what they can do and that they put this

8    kind of information in their partnership documents so that in

9    a case where they are unable to refund cash, they can send

10   securities or something else.  That is typical in a hedge fund

11   document, but it is not typical in the actual performance of

12   the hedge fund manager in my experience since 1980.

13           (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

1    EXAMINATION CONTINUES

2    BY MR. BRAFMAN:

3    Q    But you read this?

4    A    I read it.

5    Q    Before you signed it?

6    A    Yes.

7    Q    And you understood it before you signed it?

8    A    Yes.

9    Q    And you're an experienced man in this hedge fund

10   business, correct?

11   A    Yes.

12        MR. SRINIVASAN:  Objection, Your Honor.

13   Q    And now you signed this document at the top of page 6, is

14   that correct?

15   A    Yes.

16   Q    And then on page 10?

17   A    Yes.

18   Q    You have additional information that both you and your

19   wife signed, correct?

20   A    Yes.

21   Q    Now, I want you to turn, if you can, to the private

22   placement memorandum, which is -- I'm sorry, Purchaser

23   Questionnaire, which it should be behind the subscription

24   agreement.

25        Do you have that?

```
                    Neill - cross - Brafman                4103
```

1        MR. BRAFMAN:  Is it in the same tab?

2        MR. SRINIVASAN:  It is.

3   BY MR. BRAFMAN:

4   Q    I'll give you the Bates number, it's 0046.

5   A    Purchaser Questionnaire, I've got it.

6   Q    You've got it.  So that's something which you were asked

7   to fill out, correct?

8   A    Correct.

9   Q    Are you looking at the same document that I'm looking at,

10  sir?

11  A    Yes.

12  Q    I want to look at the purpose of the questionnaire and

13  the first paragraph begins:  Limited partnership interest, the

14  partnership interest in MSMB Capital Management, a Delaware

15  limited partnership, are being offered pursuant to the terms

16  and conditions of the confidential Private Placement

17  Memorandum.

18        Do you see that?

19  A    Yes.

20  Q    So it tells you in this questionnaire that the specific

21  terms of the offering are in the private placement memorandum,

22  correct?

23  A    Correct.

24  Q    And you did not look at the private placement memorandum

25  to --

Neill - cross - Brafman                4104

1          THE COURT:  Sustained.

2          MR. BRAFMAN:  That was asked and answered?

3          THE COURT:  Yes, multiple times.

4    BY MR. BRAFMAN:

5    Q    Now, your personal questionnaire lists your experience,

6    does it not, in investments, in part?

7    A    Yes.

8    Q    Look at page 3.  Page 3, paragraph 3, indicate your

9    present principal business position or other occupation; and

10   you write or someone writes on your behalf:  I have been an

11   investor for over twenty years and my income derives from

12   investments and loans.

13         Did you write that?

14   A    I wrote that.

15   Q    3.2, please summarize briefly your business and financial

16   background.  BSN and MSN and over twenty years investing in

17   hedge funds, private equity and lending.

18         What does BSN and MSN mean?

19   A    That means a Bachelor of Nursing and a Master's of

20   Nursing, which are my wife's degrees.

21   Q    Okay, so this is information about her, is that correct?

22   A    This is information about my wife.

23   Q    And the information about her being an investor for over

24   twenty years and her income derives from investments and

25   loans, is that accurate?

SAM      OCR      RMR      CRR      RPR

                    Neill - cross - Brafman                    4105

1    A    That is correct.

2    Q    And her interest is from that partnership that your wife

3    has?

4    A    That's one of them.

5    Q    Okay.  Now, 3.4 on the bottom says:  Please supply brief

6    information as to any prior investments you have made during

7    the past five years similar to the partnership, such as funds

8    of funds, hedge funds, or other private investment

9    partnerships.  And it's written on behalf of your wife,

10   Barbara W. Neill Separate Property has over $10 million in

11   hedge funds, including Equinox, Marathon, Western, et cetera.

12             Is that accurate information?

13   A    That is accurate information.

14   Q    It has almost -- at that date it had about almost

15   $40 million in assets, didn't it?

16   A    But some of them weren't hedge funds.

17   Q    All right, so it's hard to value the interest in a hedge

18   fund, right?

19   A    Well, this is correct.  She had over 10 million in hedge

20   funds, including these hedge funds.

21   Q    All right.  But what is the value of the partnership at

22   that time, your wife's partnership, approximately $40 million?

23             MR. SRINIVASAN:  Objection; relevance.

24             THE COURT:  Sustained.

25   BY MR. BRAFMAN:

                        Neill - cross - Brafman                    4106

1    Q     Let's turn over the page to page 4.  Question 3.5:

2              Please provide in the space below any additional

3    information which would indicate that you have sufficient

4    knowledge and experience in financial and business matters so

5    that you are capable of evaluating the merits and risks of

6    investing in restricted securities of a private enterprise

7    such as a partnership.

8              And it's filled in here as:  My husband runs hedge

9    fund of funds with his partner of over $350 million and we

10   collaborate on all of my investments.

11             Is that true?

12   A     That is true.

13   Q     And is the value of the fund of funds that you and your

14   partner run in excess of $350 million?

15             MR. SRINIVASAN:  Objection, Your Honor; relevance.

16             THE COURT:  Sustained.

17             MR. BRAFMAN:  Your Honor, may I be heard on that?

18             THE COURT:  Yes.

19             Do the jurors want a quick break while we do this?

20             THE JURY:  Yes.

21             THE COURT:  All right, please do not discuss the

22   case.

23             (Jury exits.)

24             (Sidebar held outside the hearing of the jury.)

25             (Continued on the following page.)

                    SAM      OCR      RMR      CRR      RPR

```
                        Sidebar                        4107
```

1           (The following sidebar took place outside the
2    hearing of the jury.)
3           THE COURT:  Why is the value of the wife's hedge
4    fund relevant?
5           MR. BRAFMAN:  It's not the wife's, she's talking
6    about her husband's in this paragraph.  She says her husband
7    had $350 million and the sophistication and experience of an
8    investor is always relevant to determine whether or not he
9    understood what he was doing and accepted the risk.
10          THE COURT:  Which is why I allowed the questions
11   about his experience to come in.
12          MR. BRAFMAN:  This is his.
13          THE COURT:  But the value of the hedge funds that he
14   manages, I think, is not really relevant to his --
15          MR. BRAFMAN:  It is, Judge.
16          THE COURT:  -- and -- experience.
17          MR. BRAFMAN:  Judge, it does, because he understands
18   the terms due diligence.  He understands the risks involved.
19   The fact that he is so flippant about this that he doesn't
20   even read the investment memorandum is something that I have a
21   right to comment on.  And the fact that he is as wealthy as he
22   is, based on hedge funds.  Now, if he made money selling
23   shoes, I could care less.  But he's running $350 million worth
24   of hedge funds and he's the victim who they're presenting as
25   having been defrauded by my client.  He's 70 years old.  My

Sidebar                                          4108

1   client is in his twenties and he's done this for 37 years.

2           THE COURT:  I think your argument, if I understand

3   it, is that because it is a small investment of only $500,000

4   in proportion to his vast wealth that somehow, whatever the

5   government may or may not prove regarding whether he was

6   defrauded by your client, is relevant because he is a wealthy

7   guy and could take the hit --

8           MR. BRAFMAN:  No, that's not --

9           THE COURT:  -- and it's a small drop in the bucket

10  of what he's worth.

11          MR. BRAFMAN:  Not that he can take the hit.  My

12  client has a right to understand from who he's dealing with

13  that this guy gets it, that he understands the risk.  And my

14  client is not defrauding him out of anything.  And the fact

15  that he runs $350 million worth of hedge funds directly

16  relevant to the crime charged is a hedge fund is relevant on

17  his degree of sophistication.  And when he says when I got

18  this I was shocked, the jury has a right to evaluate that

19  testimony as who is saying that, what is his background, and

20  what is his wealth of experience.  And I think this ties in

21  entirely to the who the investor is and the degree of

22  sophistication.

23          THE COURT:  But you are focusing on the value of the

24  hedge fund.

25          MR. BRAFMAN:  It's what he's running, it's his

1    money.

2            Your Honor, I am asking that question because it's

3    in the subscription agreement, which they put into evidence.

4    So they put it into evidence.  It's in the document.  I would

5    have a right to read it in summation, whether he answers this

6    question or not.  But I have a right because it is in evidence

7    to probe him about this because he's filling it out on behalf

8    of his wife and I need to know that he is telling the general

9    partner that he's got $350 million worth of experience in

10   hedge funds.

11           THE COURT:  All right.

12           MR. SRINIVASAN:  First off, it's in the subscription

13   agreement.  It's right there.  Mr. Brafman asked was it true

14   at the time that he wrote it.  I think the witness' last

15   answer was yes, he confirmed it.  I think what we're getting

16   into is an attempt to embarrass the witness by talking about

17   his net worth, about the wealth that he has, that he's

18   running.  Everything --

19           MR. BRAFMAN:  I should be so embarrassed.

20           MR. SRINIVASAN:  No, but I mean people -- you know,

21   these witnesses come in and, you know, we might have certain

22   judgments about their wealth, but I think they're protective

23   of their privacies and they don't discuss these things

24   necessarily publicly.  This is in a confidential document.

25           MR. BRAFMAN:  Why weren't you worried about that

1    when you offered the document into evidence?

2            MS. KASULIS:  It's cumulative, Your Honor.

3            THE COURT:  Why don't you ask whether at the time he

4    represented his hedge funds that he was operating were worth

5    350 million and leave it at that?  You do not need to go into

6    his overall wealth and Mr. Blanton's wealth.

7            MR. BRAFMAN:  Well, the Blanton wealth questions,

8    most respectfully, were designed to show the Blanton lie to

9    the jury when he said I don't know how much I'm worth, and

10   this guy knew and everybody in Texas knew, but I'll move on,

11   Judge.

12           THE COURT:  All right.  Let's take 5.

13           MS. KASULIS:  Mr. Brafman, I'm sorry.  Just in terms

14   of timing, Your Honor, and scheduling.  Mr. Brafman, how much

15   longer do you think you have?

16           MR. BRAFMAN:  I don't know because I didn't think

17   this would create a sidebar.  So there is no way I can tell.

18   I have go through the Private Placement Memorandum with him.

19           MR. SRINIVASAN:  He's already said he hadn't read

20   the document.

21           MR. BRAFMAN:  No, but that's the point.  The point

22   is had he read it, he wouldn't be surprised when he gets

23   Retrophin stock.  And I have a right to probe him on what's in

24   there.  I don't have to accept his, when I got this I was

25   shocked.  He shouldn't have been shocked.  He should have read

```
                       Sidebar                      4111
```

1    the private placement memorandum.  But if you're asking me how

2    much longer I have, I think I can be finished by 5:30 or 5:20

3    so you can do some redirect.

4           Look, I didn't call these witnesses.  You called

5    the.  I was stunned you were calling him given what there was

6    to cross-examine him with.  But you called him, now I'm doing

7    my job, I'm sorry.

8           MS. KASULIS:  Ben, no one is saying that you don't

9    have the time to do what you're saying.  I am just trying to

10   schedule with our witnesses.

11          MR. BRAFMAN:  I think I will finish today.  I think

12   I will finish today.  Whether you do any redirect is up to

13   you, but I will finish today.

14          MS. SMITH:  We have another witness waiting, so

15   we're just trying to figure out if we can let her go.

16          MR. BRAFMAN:  I'm sorry.

17          MS. SMITH:  We'll let the witness go.

18          MS. KASULIS:  I'm not being critical of Mr. Brafman,

19   he obviously has the right to --

20          MR. BRAFMAN:  You can let her go.  We're not going

21   to get to her today.

22          MS. KASULIS:  All right, that's all.  That's all I

23   was asking, Judge.

24          THE COURT:  Understood.

25          MR. BRAFMAN:  Okay.

```
                         Sidebar                        4112
```

1          THE COURT:  I think we should all dial it down a

2     notch.  I think there is a rising hostility in your tone.

3          MR. BRAFMAN:  It isn't hostility, it's frustration.

4          THE COURT:  Well, she just wants to know as a matter

5     of courtesy.

6          MR. BRAFMAN:  If she had just asked me that in that

7     way, I would have been very happy to answer.  I thought the

8     question was, And what else could you possibly ask?

9          MS. KASULIS:  No, that was not my intention, I'm

10    sorry.

11         MR. BRAFMAN:  It was not my intention to have her

12    hang around for 45 minutes.

13         MS. KASULIS:  Okay, that's all.

14         THE COURT:  All right.

15         MS. KASULIS:  Okay, thank you, Judge.

16         (Sidebar concluded.)

17         (Recess taken.)

18

19         (Continued on the following page.)

20

21

22

23

24

25

```
                         Sidebar                        4113
```

1              (In open court - jury enters.)

2              THE COURT:  Have a seat, everybody.  All the jurors

3    are present.  We will start as soon as the lawyers come back.

4    Sorry about that.

5              Sir, you can have a seat.

6              THE WITNESS:  Okay, thank you.

7              (Pause.)

8              MR. SRINIVASAN:  Sorry, Your Honor.  I think

9    Mr. Brafman is right behind me.

10             THE COURT:  Okay.

11             MR. BRAFMAN:  Sorry to keep everyone waiting.

12   EXAMINATION CONTINUING

13   BY MR. BRAFMAN:

14   Q    Sir, on the wall is page 4.  Do you see it?

15   A    I see it.

16   Q    And is that statement under 3.5:  My husband runs hedge

17   funds or funds of funds with his partner of over 350 million

18   and we collaborate on all of my investments, is that a true

19   statement at the time this was written?

20   A    That was a true statement at the time it was written.

21   Q    Now, if you can turn to page 5, sir.  Do you have that,

22   sir?

23   A    Yes.

24   Q    There is a reference on the bottom of page 5, New issue

25   qualification, please respond to the following questions:

Sidebar                                              4114

1    Note:  The partnership from time to time may invest in new

2    issues as defined in NASD Rule 2790.  In order for the

3    partnership to determine the extent to which you are eligible

4    to participate in profits and losses from such new issues, you

5    must respond to these statements below which apply to you.

6              And then there are a series of questions that this

7    is -- well, do you understand the word new issues to mean new

8    companies?

9    A    I would understand new issue to mean an IPO.

10   Q    Like Retrophin?

11   A    A new IPO.  Pardon me?

12   Q    Would Retrophin qualify as a new issue in your mind?

13             MR. SRINIVASAN:  Objection.

14   A    I don't think so.

15             THE COURT:  Wait, wait, wait.  Overruled.  Go ahead,

16   sir, I'm sorry.

17   A    I think a new issue is something that is an IPO on an

18   exchange.

19   BY MR. BRAFMAN:

20   Q    Okay.  Do you know whether Retrophin at the time you

21   signed this was a new issue or not?

22   A    No.

23   Q    You don't know?

24   A    No.

25   Q    Thank you.  Now, I just want to ask you a general

SAM      OCR      RMR      CRR      RPR

Sidebar                                                      4115

1   question with respect to hedge funds, and then we'll move on

2   to this specific hedge fund.

3            In a hedge fund, based on your experience, if I am

4   the general partner and you are the limited partner, if I as

5   the general partner were to lose all of the hedge fund's money

6   on trade or trades, would I personally be responsible to you

7   to pay you back?

8   A     No.

9   Q     Now, when Martin offered to pay you back personally, did

10  you believe that he had any legal obligation to do so at the

11  time?

12           MR. SRINIVASAN:  Objection, Your Honor.

13           THE COURT:  Sustained.

14  BY MR. BRAFMAN:

15  Q     Going back to my example, you understand that if the

16  general partner screws up, the limited partner has limited

17  recourse, correct?

18  A     That is my understanding with hedge funds.

19  Q     Okay, thank you.  All right, I just want to try to save

20  some time by skipping through.

21           (Pause.)

22  Q     Now, I want to go back for a minute to the private

23  placement memorandum even though you haven't read it.  I just

24  want to go through a couple of different portions with you,

25  just to ask you a question or two.

```
                          Sidebar                          4116
```

1        At page 2 of the document, do you have it before

2   you, sir?

3   A    I do.

4   Q    All right, look to page 2, then I am going to put it on

5   the screen.  It's got highlighting, which is obviously not in

6   your copy, I just want to make it easier for you to find.

7        Do you see the highlighted portion?

8   A    Yes.

9   Q    The private placement memorandum tells you the

10  partnership's investments may also include securities that are

11  thinly-traded and non-publicly-traded or restricted

12  securities.  Do you see that?

13  A    I see that.

14  Q    What does thinly traded as a security mean to you?

15  A    It depends on the fund, but thinly traded would be a

16  small number of shares traded every day.  So you might say --

17  and it varies with funds, but thinly traded to me would be a

18  stock that traded less than $10 million a day in the stock.

19  Q    So if you had a large position it might be hard to sell

20  it, correct?

21  A    Yes.

22  Q    And when it says restricted securities, what do you

23  understand that to mean?

24  A    Restricted securities would be securities like this

25  Desert Gate was that has restricted across the top and you

1  can't sell it.

2  Q    You can't tell sell it until you get the restriction

3  lifted, correct?

4  A    Right.

5  Q    But there's a procedure for lifting the restriction under

6  normal circumstances, correct?

7  A    That is correct.

8  Q    And you actually got it lifted in this case, correct?

9  A    That is correct.

10 Q    And the shares were converted to Retrophin shares and you

11 were able to sell them?

12 A    That is correct.

13 Q    All right, now, if you look at page 8 of what's in

14 evidence as 1022 -- I'm sorry, which is the private placement

15 memorandum.  Do you have that there?

16 A    Yes.

17 Q    The private placement memorandum provides at page 8, in

18 part, I am going to read to you from just the paragraph

19 labeled Initial Public Offerings.

20       A portion of the partnership's portfolio may include

21 stocks purchased in initial public offerings.  In situations

22 when such companies satisfy the advisor's investment

23 methodology, equity securities issued in an IPO, new issues,

24 are subject to certain investment restrictions imposed by the

25 National Association of Securities Dealers, the NASD.  Limited

                            Sidebar                    4118

1    partners who are restricted persons within the meaning of NASD

2    Rule 2790 are currently limited to an aggregate of 10 percent

3    participation in profits and losses resulting from the

4    partnership's investment in any new issues.

5              Do you see that?

6    A    Yes.

7    Q    Do you know what the value of the stock was when you got

8    it?

9              THE COURT:  Overruled.  Sorry.

10             MR. SRINIVASAN:  I didn't make an objection, sorry.

11             THE COURT:  Oh, sorry, I thought I heard it.

12   A    Which stock are you talking about?

13   Q    The Desert Gateway stock.  You didn't know if it had any

14   value when you got it, right?

15   A    I didn't know if it had any value.

16   Q    Thank you.

17             But it was restricted, correct?

18   A    It was restricted.  It was typed restricted on the

19   certificate that I got.

20   Q    And when you say typed, that's normally known as the

21   legend, correct, a legend?

22   A    Yes.

23   Q    And legend is interchangeable with restricted securities,

24   right?

25   A    Yeah.

                  SAM    OCR    RMR    CRR    RPR

Sidebar                                                    4119

1   Q     Now, if you look at page 10, if you will, of that same

2   document towards the bottom.

3           Alternative Investing Generally.  The partnership is

4   designed for investors seeking potential long-term growth from

5   alternative investments, who do not require regular current

6   income and who can accept a high degree of risk in their

7   investments.  Let me stop there.

8           Does that adequately describe your position when you

9   invested, that you don't require regular income from the

10  investment, correct?

11  A     That adequately describes my position.

12  Q     All right.  In view of, among other things, the

13  partnership's ability to invest in a wide range of securities

14  and instruments and to use a broad variety of investment

15  techniques, the partnership may be deemed speculative in

16  nature and is not intended to be a comprehensive investment

17  program.  The partnership is intended for investment solely by

18  sophisticated investors who are accustomed to and fully

19  understand the risks of such investments.

20          Would you characterize yourself at that time as a

21  sophisticated investor?

22  A     Yes.

23  Q     And given that this money was really in your wife's

24  partnership, were you the person who was essentially guiding

25  her in this investment?

Sidebar                                                    4120

1    A    That is correct.

2    Q    So even though maybe if your wife isn't a sophisticated

3    investor, I don't know, she certainly --

4    A    I'll clarify that.  My wife is a sophisticated investor.

5    Q    Good for her, all right, thank you.  And now I want to

6    turn to page 16.

7           Do you see the area marked Conflicts of Interest, a

8    little bit above the middle of the page in bold letters?

9    A    Yes.

10   Q    All right, I am going to read from the second paragraph.

11          Possible conflicts and other investment vehicles or

12   clients.  MSMB may serve as investment advisor to other

13   entities or accounts, some with investment strategies and

14   policies similar to that of the partnership.  MSMB or its

15   affiliates may participate in or sponsor other investment

16   vehicles and possibly have additional advisory clients in the

17   fewer.  The general partner may also determine to engage in

18   other businesses.  The existence of such multiple entities or

19   clients, or other businesses, necessarily create a number of

20   potential conflicts of interest.

21          This is pretty much telling you that the general

22   partner has discretion to invest in other businesses that may

23   or may not pose a potential conflict with the fund, correct?

24   A    That is correct.

25          (Continued on the following page.)

SAM      OCR      RMR      CRR      RPR

Neill - Cross - Brafman                    4121

BY MR. BRAFMAN:

Q    In your experience, that is standard operating procedure
in hedge funds if you know?

A    Yes.

Q    Thank you.

Now, I would like you, sir, to look at page 21.  If
you look under exculpation of the general partner, the advisor
and portfolio manager.

Says the general partner and the advisor as
fiduciaries will have a responsibility to limited partners to
exercise good faith and fairness in all dealings affecting the
partnership.  However the partnership has agreed, in the
partnership agreement to indemnify and exculpate the general
partner, the advisor and respective members, managers,
employees, agents, without limitation.  The portfolio manager.
From any liability for losses, damages, or expenses and then,
just stop there.

You understand that to mean that as a general
partner, because the person has discretion, the general
partner has discretion, that so long as they are acting in
good faith, you really have no legal recourse if they lose the
money; is that correct?

MR. SRINIVASAN:  Objection, Your Honor,
mischaracterizing.

THE COURT:  Sustained.

RB        OCR

Neill - Cross - Brafman                    4122

1   Q     What do you understand that to mean?

2         Let me withdraw that and make it easier.

3         This is among the paragraphs that you didn't read.

4   We don't have to question you on it; is that correct?

5         MR. SRINIVASAN:  Objection.

6         THE COURT:  Sustained.

7   Q     Do you understand what was just read to you?

8   A     Yes, I understand what was just read to me.

9   Q     Am I correct, sir, that when you are a limited partner in

10  a hedge fund, the fund loses money, you don't have recourse

11  against the general partner under normal circumstances, correct?

12        MR. SRINIVASAN:  Objection.

13        THE COURT:  Sustained.

14        MR. BRAFMAN:  Is it to form?

15        THE COURT:  Yes.

16        MR. BRAFMAN:  I will move on.

17  Q     Now, Mr. Srinivasan asked you a question on direct

18  examination as to whether or not it would have been important

19  to you, whether or not the defendant had a prior hedge fund

20  and what the outcome was, correct, do you remember that

21  question?

22  A     Yes, I remember that question.

23  Q     The partnership-- the private placement memorandum on

24  page 22 tells you, that Martin Shkreli, in addition to forming

25  and operating MSMB, Mr. Shkreli is the founder and portfolio

Neill - Cross - Brafman                    4123

1    manager of Elea Capital Management prior to forming MSMB, Mr.

2    Shkreli was a health care and technology analyst with

3    Intrepid.  Prior to that, Mr. Shkreli was employed by Cramer

4    Berkowitz & Company.  Do you see that?

5    A    I see that.

6    Q    Did you make any effort to try to figure out Mr.

7    Shkreli's personal background in the hedge fund industry?

8    A    No, I did not.

9    Q    You were relying in part on what Darren Blanton was

10   telling you about the success?

11   A    What Darren and Gloria, what everybody at the table-- and

12   what Martin was saying.

13   Q    Now, did you understand that Mr. Shkreli as the limited

14   partner had wide discretion?

15   A    I believe he is the general partner and I understand he

16   has wide discretion.  As a limited partner, I don't have any

17   rights.

18   Q    But, Mr. Shkreli had wide discretion?

19   A    I understand that Mr. Shkreli had wide discretion as the

20   general partner.

21   Q    Including what investments to make?

22   A    Yes.

23   Q    Thank you.

24        And with respect to liquidation, you understand that

25   the general partner can determine to liquidate the partnership

1   at any time without asking for the concurrence of the limited

2   partners?

3   A    Yes.

4   Q    Were there periods of time when you and Mr. Shkreli

5   traded E-mails and calls with respect to your effort to get

6   liquidation of your shares-- sorry, liquidation of your

7   position?

8   A    Yes.

9   Q    And now, you testified on direct examination that in

10  addition to the 95 or 94,520 shares, Mr. Shkreli told you at

11  one point that he might-- that he would give you an additional

12  fifty thousand shares, correct?

13  A    Yes.

14  Q    That was in 2013 when he said that; is that correct?

15  A    I believe that is correct.

16  Q    And do you know what date or when the SEC began its

17  investigation into Mr. Shkreli?

18          MR. SRINIVASAN:  Objection, Your Honor.

19          THE COURT:  Sustained.

20  Q    Well, you know that the SEC reached out to talk to you by

21  telephone in 2013, correct?

22  A    No, I do not know that.

23  Q    When do you think for the first time you heard from the

24  SEC?

25  A    I think the first time I heard was 2014.

Neill - Cross - Brafman                    4125

1   Q    And, do you know what the status of the investigation was

2   when Mr. Shkreli offered to give you fifty thousand shares?

3             MR. SRINIVASAN:  Objection.

4             MR. BRAFMAN:  They opened this issue, Your Honor.

5             THE COURT:  Overruled.

6   Q    Do you know what the status of the investigation was when

7   Mr. Shkreli offered to give you the fifty thousand shares?

8             MR. SRINIVASAN:  Your Honor, objection.  I don't

9   know how the door was opened.

10            THE COURT:  All right.

11            MR. BRAFMAN:  May I ask the question, Your Honor.

12            THE COURT:  Well, is this the only question in this

13  area, sir?

14            MR. BRAFMAN:  There is one question after that once

15  he answers this.

16            THE COURT:  All right.

17  Q    You don't know, is that your testimony?

18  A    That is my testimony.  I did not know-- I don't-- didn't

19  connect any of that.

20  Q    Now, you never got the fifty thousand shares, correct?

21  A    That is correct, the additional fifty thousand shares.

22  Q    The additional, correct?

23  A    That's correct.

24  Q    He had-- do you know whether he was able, permitted by

25  law to give you that-- those shares at that time?

Neill - Cross - Brafman                4126

1    MR. SRINIVASAN:  Objection.

2    THE COURT:  Sustained.

3  Q    I want to refer you quickly to 102-20, which I believe is

4  in evidence.  Do you have that up there, sir?

5    What tab is it?

6    MR. SRINIVASAN:  Tab 20.

7  Q    Tab 20, sir.  Thank you.

8  A    Is that the January 12th, 2013, E-mail from Martin to me?

9  Q    Yes, sir.

10  A    Okay.

11  Q    Now, you had been requesting certain materials from Mr.

12  Shkreli during this time, correct?

13    Look at the bottom of the exhibit.  You were asking

14  him to send you a copy of the limited partnership agreement?

15  A    Well, the bottom, I had been asking for the valuation of

16  my wife's separate property position since June 30th.

17  Q    Correct.  He and you have had a series of communications

18  after that as well, correct?

19  A    Yes.

20  Q    And in this E-mail, when you are asking him to send you a

21  copy of the limited partnership agreement, Mr. Shkreli

22  responded as follows:

23    I will send it over.  One of my meetings went over

24  by about three hours, so I will send you your statements late

25  tomorrow, tomorrow-- tonight or tomorrow.  I have worked my

Neill - Cross - Brafman                4127

1   butt off since you invested.  It may not show well but to

2   think Retrophin will be very successful, so far it has been

3   okay.  It only has been public for a few weeks.  I think the

4   opportunity is large, especially for the risk, so I poured all

5   of my energy into it.  I am confident the fund will ultimately

6   show a great return.  It is a departure from the classic sense

7   of investing that we are not trading stocks any more, but

8   Retrophin is my attempt at creating a Sears, Lowes or

9   Berkshire unlike an auditor or administrator, the stock market

10  popular opinion is what will-- let me stop there.

11          Sears, Lowes, Berkshire, you understand those to be

12  large companies?

13  A    Yes.

14  Q    And Berkshire is Berkshire Hathaway?

15  A    Yes.

16  Q    Warren Buffet's investment company?

17  A    Yes.

18  Q    Worth billions of dollars?

19  A    Yes.

20  Q    Now, he is telling you he was working his butt off, he

21  apologizes for not getting you this information.  He then goes

22  on with respect to the fund, I plan on liquidating investors

23  with the stock.  I suspect this may not work for you.  In this

24  case I will make sure the company and/or I buy back your stock

25  for cash.  I truly think holding the stock is the best

Neill - Cross - Brafman                    4128

1   long-term investment.  We are a small public company worth 40

2   million.  I think it is worth ten times that over time.  But

3   it is up to popular opinion and as you have mentioned, you

4   don't own stocks, and don't even own a brokerage account.

5   Keep an eye out for my mailing which will go out on Monday and

6   we can find the best way to move forward.

7           Mr. Shkreli in words or substance is telling you

8   while the stock today, the company today, is valued at 40

9   million, he believes it will be worth ten times that over time

10  isn't that what he says?

11          MR. SRINIVASAN:  Objection.

12          THE COURT:  Overruled.

13  Q    Does he say that?

14          THE COURT:  You may answer.

15  A    Yes, he says that in this E-mail.

16  Q    He says it will be worth ten times 40 million?

17  A    He says I think it will be worth ten times that over time.

18  Q    And has he been proven to be correct?

19          MR. SRINIVASAN:  Objection.

20          THE COURT:  Sustained.

21  Q    Well, your stock increased substantially in value, didn't

22  it?

23          MR. SRINIVASAN:  Asked and answered.

24          THE COURT:  Sustained.

25  Q    I want to show you what I marked for identification, as

- Sidebar -                                              4129

1   3425 for identification only at this time.

2            May I hand it to the witness, Your Honor?

3            THE COURT:  Yes.

4   Q    I ask you to read it to yourself, sir, then I will ask

5   you some questions.

6            Do you recognize that as an E-mail you received from

7   Mr. Shkreli in March of 2013?

8   A    Yes.

9   Q    And as an E-mail you wrote back to Mr. Shkreli in March

10  of 2013?

11  A    Yes.

12  Q    And with the exception of the personal reference to a

13  vacation, this involves Retrophin stock, correct?

14  A    Yes.

15           MR. BRAFMAN:  I offer it into evidence, Your Honor.

16           MR. SRINIVASAN:  Objection, hearsay.

17           THE COURT:  I am going to take a look at this

18  exhibit.

19           MR. BRAFMAN:  Sorry?

20           THE COURT:  Can we take a look at the exhibit at

21  sidebar and discuss it, please.

22           (Sidebar.)

23           THE COURT:  I don't think I have it.

24           MR. BRAFMAN:  Here.

25           THE COURT:  Thank you.

- Sidebar -                                    4130

1          Why is this not hearsay?

2          MR. BRAFMAN:  Because it is during the period.  They

3    referred to this as the period when Martin is attempting to

4    defraud him.  He is asking for his money, he is not getting it

5    back.  They are going to argue in summation that that arm of

6    depriving an investor of his money convicts him of a fraud.

7    This is an ongoing negotiation.

8          And they can't just cherry pick it out an E-mail

9    that sounds bad for the defendant.  They ignore the stuff

10   where it is clear that anyone who reads this, this man is not

11   angry at Martin first of all; and second, he is happy that the

12   price of the stock is trending upwards.

13         They can't just suggest to the jury that Martin

14   didn't give him the stock back, the money back immediately and

15   therefore he has been defrauded when they are cherry picking

16   E-mails from among a series of E-mails which explain and give

17   context to the E-mails that they are offering as admissions.

18         They have offered E-mails from this man during this

19   period to suggest that Martin Shkreli is involved in a fraud.

20   This E-mail is from the same period, to the same person, and

21   it discusses exactly what is happening with the stock.

22         THE COURT:  Sir, I think what you are doing is

23   offering Mr. Shkreli's E-mails for the truth.

24         MR. BRAFMAN:  It is for the effect it has on him,

25   Judge.  Whether it is true or not is something they have to

- Sidebar -                              4131

1  unfortunately deal with.  If I tell you something that is true

2  that impacts on your state of mind, that doesn't mean the

3  document is not admissible.  There can be two reasons why a

4  document is admitted, either as admission or to show the

5  impact on the state of mind of the listener.

6              THE COURT:  So, what is the relevant impact on the

7  state of mind of Mr. Neill at this point?

8              MR. BRAFMAN:  Because this shows that the animus

9  suggested on direct between Mr. Shkreli and this witness, and

10 this witness, because he wasn't paid back early enough or

11 wasn't paid back in cash, is just not-- in fairness, the whole

12 truth or nothing but the truth.  This is part of the back and

13 forth.

14             I don't understand how they can pick an E-mail and

15 suggest the same thing when it is bad for the defendant, and

16 then when we put it in context stand on hearsay.

17             MR. SRINIVASAN:  He got the shares February 19th.

18 Date on the stock certificate, February 19th.  This is dated

19 March 21, 2013.  This is not about the period of redemption at

20 all Your Honor.  And --

21             THE COURT:  This is to show they are still friends

22 after he got the --

23             MR. SRINIVASAN:  This is self serving.

24             MR. BRAFMAN:  He thinks he has got worthless stock.

25 That is what he says.  I put it in a draw.  I don't-- this

- Sidebar -                                    4132

1    shows how the-- the fact that he held the stock and still

2    holds this stock and hasn't sold it, all suggests that any

3    argument that he suffered because he has been deprived of his

4    monies has some response that I think is relevant that these

5    people did not suffer during this period.  That they made

6    decisions and this suggests -- he is not saying I want my

7    money now.  He is happy the trend in prices is up.

8              MR. SRINIVASAN:  It is self serving, exculpatory

9    statement by the defendant after the relevant period, one

10   thing.

11             Two, is the state of mind exception, I think

12   swallows the rule.  Ms. Kasulis is looking it up.  The state

13   of mind exclusion, I think if I remember it correctly

14   precludes the use of the state of mind exception to prove the

15   underlining facts, part of that state of mind.  What they are

16   trying to do is use the statements for the truth of them.

17             MR. BRAFMAN:  I'm not.

18             MR. SRINIVASAN:  Which is exactly --

19             MR. BRAFMAN:  I'm not offering it for the truth.

20             MR. SRINIVASAN:  802.3.

21             MR. BRAFMAN:  I'm not offering it for the fact that

22   the market values is at $70 million.  I am offering his

23   response.

24             MS. SMITH:  You are offering it he made a mistake

25   for the truth.

- Sidebar -                                    4133

1          MR. BRAFMAN:  I just don't understand how this can't

2     be used to ameliorate the impression, inaccurate impression

3     they have created as to this witness' position, that he gets

4     the stock, he thinks is worthless.  He puts it in a draw.  He

5     doesn't know how to sell it.  I don't have a brokerage

6     account.  This guy is watching the stock and happy it is

7     trending higher.

8          MR. SRINIVASAN:  All of this --

9          MR. BRAFMAN:  This is his statement.  It is his

10    statement.  Nice trend, thanks.

11         THE COURT:  At this point he is still locked right?

12         MR. BRAFMAN:  He's still locked but that is

13    important.  Because his position is that when I got stock, it

14    is restricted.  That compounds.  I don't want stock and now I

15    get restricted stock.  That suggests that there are two things

16    wrong, we didn't give him cash, we gave stock and to compound

17    that we gave him restricted stock --

18         MR. SRINIVASAN:  This has nothing to do with that,

19    Judge.  I think they really want this in for the defendant's

20    stated we made some mistakes in fund investing too much in

21    Retrophin and mistakes in how we brought it public.  I think

22    that is what they want it in for.  Not for this witness' state

23    of mind.

24         He can ask him whether he ended up being happy with

25    the investment.  I think this witness, I expect would say,

- Sidebar -                                          4134

1    yes, he was given sort of overall amount he made.  You know,

2    he accepted the shares.  He didn't go into for example,

3    litigation or potential litigation.  I don't think there is

4    any inconsistency or false impression created here.  I think

5    they are really trying to do is swallow the rule.

6               THE COURT:  All right.  I guess I'm not

7    understanding why the defendant would want to have Mr.

8    Shkreli's statement that he made a series of mistakes

9    regarding the Retrophin.

10              MR. SRINIVASAN:  I think what they would argue, it

11   is not an intentional fraud.

12              MR. BRAFMAN:  If you offered this, you would say,

13   admission by him.  That he made mistakes.

14              MR. SRINIVASAN:  We are not offering that.

15              THE COURT:  His characterizing his own conduct is a

16   mistake.

17              MR. BRAFMAN:  He is talking to someone who they

18   claim is a victim of his fraud.  What he says to him from A to

19   Z, is relevant to-- how he reacts to this.  His statement.

20   His state of mind.

21              MR. SRINIVASAN:  The defendant can testify, Your

22   Honor.  That is what--

23              MR. BRAFMAN:  That is not how you resolve

24   evidentiary issues that the defendant can testify.

25              MR. SRINIVASAN:  That is why there is a rule on the

- Sidebar -                                    4135

1   admission of party opponent statements that allows it.  The

2   defendant doesn't get to put in his own statements.

3            THE COURT:  You know, I have given you a lot of

4   latitude to admit documents based on the effect of the

5   witness' state of mind.  But here this is after the fact.

6            MR. BRAFMAN:  It is not.

7            THE COURT:  Well, after he receives restricted

8   shares, which is still restricted.  And, you know --

9            MR. BRAFMAN:  At this point he is still an unhappy

10  investor according to them.  He can't sell the stock or he

11  hasn't-- he has restricted.

12           THE COURT:  You-- what I understand your proffer is

13  that it shows that this witness is actually very happy.  His

14  restricted shares are trending upward.

15           MR. BRAFMAN:  Yes.  I think that is relevant, Your

16  Honor.

17           MS. SMITH:  Ask the question.

18           THE COURT:  Just ask-- I think that is the better

19  way to do it.  Honestly this is hearsay.

20           MR. BRAFMAN:  I made my record.  I don't want to

21  belabor the issue.  There is nothing more I can say.

22           THE COURT:  All right.

23           MR. SRINIVASAN:  Thank you.

24           (Open Court.)

25

Neill - cross - Brafman                    4136

1    BY MR. BRAFMAN:   (Continuing)

2    Q    Do you remember getting an e-mail from Mr. Shkreli in

3    about Thursday, March 21, 2013?

4    A    Yes.

5    Q    Do you remember that conversation or that e-mail without

6    looking at the document?

7              MR. SRINIVASAN:  Objection, Your Honor.  Objection.

8    A    No, but I've got the document.

9    Q    Well, in that period, did you tell Mr. Shkreli that you

10   were happy with the trending price of the stock?

11   A    Yes.

12   Q    So you were watching Retrophin, correct?

13   A    Yes.

14   Q    And it was going up?

15   A    Yes.

16   Q    Okay.  Thank you.

17             Were you being truthful to him when you told him you

18   were happy that the stock was going up?

19             MR. SRINIVASAN:  Objection.

20             THE COURT:  Overruled.

21   A    Yes.  I was gleeful when I told him that the stock that I

22   owned was going up.

23   Q    Okay.  Fair enough.

24             Now, I'm going to show you a document that I've

25   marked as Exhibit, Defense 3400.  Do you recognize this as a

Neill - cross - Brafman                         4137

1    copy of a brokerage statement in your wife's name?

2    A     Yes.

3    Q     Have you seen that document before today?

4    A     Yes.

5                (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                            Side Bar                          4138
```

1              MR. BRAFMAN:  I offer it into evidence, Your Honor.

2              MR. SRINIVASAN:  Objection, Your Honor.

3              THE COURT:  Can you just give me the ground,

4       Mr. Srinivasan?

5              MR. SRINIVASAN:  Hearsay.

6              MR. BRAFMAN:  It's 3400, Your Honor.

7              THE COURT:  In one word, the basis for your

8       objection?

9              MR. SRINIVASAN:  Hearsay and relevance.

10              THE COURT:  This is in the binder for today?

11              MR. BRAFMAN:  Yes, Your Honor.

12              (Pause.)

13              THE COURT:  I'm going to overrule the objection.

14              MR. BRAFMAN:  Thank you.  I offer it into evidence

15       as Defendant's Exhibit 3400.

16              MR. SRINIVASAN:  May we have a side bar?

17              THE COURT:  Excuse us, ladies and gentlemen.

18              (The following occurred at side bar.)

19              THE COURT:  Before we start, what time is his flight

20       tomorrow?

21              MR. SRINIVASAN:  His flight tomorrow?  I have it in

22       my phone.

23              THE COURT:  Okay.

24              MR. BRAFMAN:  I've got 2 minutes.

25              THE COURT:  I was hoping we can finish tonight.

```
                         Side Bar                        4139
```

 1              MR. BRAFMAN:  Just 2 minutes.

 2              THE COURT:  This is the bank statement?

 3              MR. BRAFMAN:  It comes every month.  There's nothing

 4    unusual about this.

 5              MR. SRINIVASAN:  What's the relevance?

 6              MR. BRAFMAN:  The relevance is these are the

 7    Retrophin sales.

 8              MR. SRINIVASAN:  He's already testified to it,

 9    Judge.

10              MR. BRAFMAN:  I understand that.

11              THE COURT:  This is just documentary support for his

12    testimony regarding what went into his account.

13              MS. SMITH:  But it's not redacted.

14              MR. BRAFMAN:  Is that your objection?

15              MS. SMITH:  Whose handwriting is that?

16              MR. BRAFMAN:  It's his.

17              MS. SMITH:  And why do we need the document if he's

18    testified?

19              MR. BRAFMAN:  I don't understand.

20              MS. SMITH:  Why do we have to put the brokerage

21    account into evidence?

22              MR. BRAFMAN:  I'll redact it when it's published to

23    the jury.

24              THE COURT:  I will allow this to be admitted and we

25    will redact the account numbers and other information that's

4140

1    not relevant and highlight just this portion.

2            MR. BRAFMAN:  I'll have it redacted before you use

3    it.

4            THE COURT:  Okay.  You redact it.

5            All right.  Any hope we're going to --

6            MR. BRAFMAN:  I have two questions.

7            THE COURT:  I'm told he has a flight tomorrow.

8            MR. BRAFMAN:  Yes, Your Honor.

9            MR. SRINIVASAN:  I have five minutes of redirect.

10           THE COURT:  Okay.  All right.

11           (In open court; side bar ends.)

12           THE COURT:  Let me just ask the jurors.  Is there

13   anyone who has a difficulty staying an extra 10 or 15 minutes

14   just so we can make sure.  Okay.

15           MR. BRAFMAN:  I have literally two minutes.

16           THE COURT:  Now, just let me say that defense

17   Exhibit 3400 is admitted --

18           MR. BRAFMAN:  Thank you.

19           THE COURT:  -- with redactions.

20           MR. BRAFMAN:  Yes, Your Honor.  I'm trying to do

21   some arts and crafts so I can physically redact it and show it

22   to the defendant and the jury now that it's in evidence

23   without showing any personal information.

24           (So marked.)

25

CMH        OCR        RMR        CRR        FCRR

Neill - cross - Brafman                    4141

1   BY MR. BRAFMAN:

2   Q    You have the full document in unredacted form there?

3   A    Yes, I do.

4   Q    This is your wife's brokerage statement for a period of

5   2/1/14 to 2/28/14?

6   A    Yes.

7   Q    And it shows the Retrophin shares and the Retrophin

8   sales, correct?

9   A    I believe this shows the sale of the 50,000 shares that I

10  told you for $714,763.67.

11  Q    All right.  So, I'm just showing you the redacted portion

12  which is in evidence.  I apologize for the arts and crafts.

13        The quantity here is 6,200 shares at $9.97, correct?

14  A    Correct.

15  Q    And the sales net $61,414.84?

16  A    Yes.

17  Q    And then there's 9,200 shares that you sell at $10.27 a

18  share, correct?

19  A    Yes.

20  Q    And that's $98,393.99 correct?

21  A    Yes.

22        THE COURT:  I'm sorry.

23  Q    And then there's 34,000 shares --

24        THE COURT:  Mr. Brafman, I think you misread the

25  number.  It's 93,000, not 98.

Neill - cross - Brafman                    4142

Q     9,200 shares at $10.27 per share and it's $93,897.99.
Correct, sir?

A     That's correct.

Q     And then you sell 34,600 shares for $16 a share, $16.23,
and that nets $559,455.84.  Correct?

A     That's all correct.

Q     And that totals $714,763.67.  Correct?

A     That's correct.

Q     And without repeating this, this doesn't include the
24,000 you still own and it doesn't include the shares that
you gave to your partnership, to your charity, correct?

A     Just for your numbers, this is 50,000.  I gave 20,000 to
the charity and had 24,521 left.

Q     Okay.  Now, I just want to ask you one more question and
then we're done.

           Do you keep a personal diary that you make notes on
from time to time?

A     I keep a telephone log in my office.

Q     Do you remember I asked you whether or not you received a
telephone call from the SEC on March 14th and you didn't
recall that at all, correct?

A     You said --

           MR. SRINIVASAN:  Objection, Your Honor.  Time frame?

A     You said a year and I didn't think the year was right.

Q     Okay.  Did you remember getting a call from the SEC about

                    Neill - cross - Brafman                    4143

1    Mr. Shkreli and MSMB?

2    A    Yes.

3    Q    Do you remember what year it was?

4    A    I think it was 2014.

5    Q    All right.  And do you remember someone from the SEC

6    named Eric Schmidt asked to interview you?

7    A    Yes.

8    Q    And you declined, correct?

9    A    That is correct.

10         MR. BRAFMAN:  I have nothing further.  Thank you,

11   sir.  Have a safe trip back.

12         THE COURT:  All right.  Thank you.

13         MR. SRINIVASAN:  One moment, Your Honor.

14         (Pause.)

15         THE COURT:  You want me to take your cup away?

16         THE WITNESS:  I appreciate that.  It was strong

17   enough to keep me awake.

18         THE COURT:  Okay.

19         THE WITNESS:  Thank you very much.  That was really

20   thoughtful and I'll turn my phone off this time.

21         MR. SRINIVASAN:  Your Honor, may I proceed?

22         THE COURT:  Yes, you may.

23         MR. SRINIVASAN:  Thank you.

24

25

Neill - redirect - Srinivasan                    4144

1   REDIRECT EXAMINATION

2   BY MR. SRINIVASAN:

3   Q    Mr. Neill, do you recall being asked questions by

4   Mr. Brafman earlier today about investing in Martin Shkreli?

5   A    Yes.

6   Q    And when you were answering those questions, I just

7   wanted to clarify.  Was your understanding of the returns in

8   the fund also important to your investment decision?

9   A    Yes.

10  Q    Now, Mr. Brafman asked you on cross about statements that

11  Darren Blanton made at a meeting in Texas and then at a dinner

12  in Texas.  Do you recall that?

13  A    Yes.

14  Q    And that Darren Blanton had said that the returns were

15  40 percent.  Do you recall being asked about that?

16  A    Yes.

17  Q    Mr. Shkreli was present at both the meeting and the

18  dinner, correct?

19  A    That is correct.

20  Q    Did he disagree with the statements made by Darren

21  Blanton about the 40 percent returns?

22  A    No, no one disagreed with that.

23  Q    Did he disagree with any other positive statements made

24  about MSMB Capital or about himself?

25  A    Not that I recall.

1   Q    Now, Mr. Brafman also asked you on cross about an e-mail

2   where Mr. Shkreli said that he was enrolled at Columbia and

3   then dropped out.  Do you recall that?

4   A    Yes.

5   Q    Do you know if Mr. Shkreli, in fact, enrolled at Columbia

6   University?

7   A    No.

8        MR. BRAFMAN:  Objection.

9   A    No, I did not know that, in fact.

10       THE COURT:  Overruled.

11  Q    Thank you, Mr. Neill.

12       MR. SRINIVASAN:  One moment.

13       (Pause.)

14       MR. SRINIVASAN:  No further questions.  Thank you.

15       MR. BRAFMAN:  Nothing further, Your Honor.

16       THE COURT:  All right.  Sir, have a safe trip home.

17  You are excused.  Thank you.

18       THE WITNESS:  Okay.  Thank you very much.

19       THE COURT:  Have a good evening.

20       THE WITNESS:  I appreciate that.  Do I give these

21  documents back to defense?

22       THE COURT:  Just leave everything there.  They will

23  come and sort it out.  The only thing you need to take with

24  you is your bottle of water.

25            All right.  At this time, we will also excuse the

CMH      OCR      RMR      CRR      FCRR

4146

1    jury for the evening.

2            Please do not talk about the case or read any media

3    coverage about the case or Mr. Shkreli.  Thank you for your

4    attention.  Everybody, have a good night.  Thank you.

5            THE WITNESS:  Thank you, Your Honor.

6            THE COURT:  All right.  Good to see you.

7            (Witness excused.)

8            (Jury exits.)

9            THE COURT:  Is there any need for us to address

10   anything this evening?

11           MR. BRAFMAN:  No, Your Honor.

12           MS. KASULIS:  No, Your Honor.

13           THE COURT:  And you have worked out your

14   differences?

15           MS. SMITH:  We tried.

16           THE COURT:  Okay.  It's always good that you are

17   trying.

18           Thank you, everybody.  Have a good night.

19           (Matter adjourned to July 18, 2017 at 9:00 a.m.)

20

21

22

23

24

25

1                                    **INDEX**

2       **WITNESS:**                                              **PAGE:**

3        C O R E Y   M A S S E L L A

4                DIRECT EXAMINATION BY MS. SMITH          3870
                 CROSS EXAMINATION BY MR. AGNIFILO        3951
5                REDIRECT EXAMINATION BY MS. SMITH        3984

6
         J O H N   N E I L L
7                DIRECT EXAMINATION                       3988
                 BY MR. SRINIVASAN
8                CROSS-EXAMINATION                        4031
                 BY MR. BRAFMAN
9                REDIRECT EXAMINATION                     4144
                 BY MR. SRINIVASAN
10                                 * * * * *

11

12       123-14                                            3895
         119-14                                            3901
13       123-3                                             3905
         119-20                                            3905
14       123-2                                             3913
         123-4                                             3921
15       123-5                                             3923
         123-7 and 123-8                                   3929
16       123-9                                             3946
         123-12                                            3947
17       102-2                                             4000
         13                                                4002
18       26                                                4002
         82-1 through 17                                   4004
19       102-5                                             4010
         102-8                                             4011
20       102-15                                            4013
         102-16                                            4017
21       102-20                                            4019
         102-21                                            4022
22       102-22                                            4025
         Defense 3430                                      4056
23       Defense 3419                                      4078
         Defense 3400                                      4140
24                                 * * * * *

25

## $

**$1,015,000** [1] - 4027:25
**$1,250,000** [1] - 4082:19
**$1,570,000** [2] - 4028:4, 4028:9
**$1,800,000** [1] - 3904:17
**$10** [3] - 3977:21, 4105:10, 4116:18
**$10,000** [3] - 3954:4, 3954:13, 3985:16
**$10,000.00** [1] - 3953:25
**$10.27** [2] - 4141:17, 4142:1
**$100,000** [2] - 3953:1, 4081:18
**$150,000** [2] - 3942:4, 3942:6
**$16** [1] - 4142:4
**$16.23** [1] - 4142:4
**$19.80** [1] - 4028:1
**$20,000** [1] - 3953:5
**$200,000** [2] - 3906:5, 3908:15
**$25** [2] - 4022:20, 4091:15
**$25,000** [1] - 4081:18
**$25,220** [1] - 3925:19
**$250,000** [1] - 3944:6
**$3,000,000** [1] - 4082:18
**$35,000** [2] - 3943:17, 3943:20
**$350** [6] - 4106:9, 4106:14, 4107:7, 4107:23, 4108:15, 4109:9
**$350,000** [3] - 4027:23, 4030:13, 4032:2
**$4.70** [1] - 4022:21
**$40** [8] - 3904:7, 3964:16, 4021:3, 4022:20, 4082:16, 4091:15, 4105:15, 4105:22
**$40,000** [2] - 3953:6, 3986:12
**$440,000** [1] - 4023:25
**$444,245** [1] - 4022:14
**$470,000** [1] - 4032:23
**$472,401** [1] - 4022:13
**$472,601** [3] - 4022:12, 4022:13
**$5,000,000** [1] - 4082:18
**$50,000** [2] - 3891:12, 3900:12
**$500,000** [9] - 3996:13, 4000:3, 4007:23, 4009:7, 4024:10, 4031:24, 4064:3, 4097:14, 4108:3
**$521,200** [1] - 4007:24
**$559,455.84** [1] - 4142:5
**$575,000** [4] - 3937:14, 3943:6, 3943:7, 3944:3
**$61,414.84** [1] - 4141:15
**$649,897** [1] - 4009:8
**$70** [1] - 4132:22
**$714,763.67** [2] - 4141:10, 4142:7
**$715,000** [2] - 4027:23, 4032:2
**$750** [1] - 4035:1
**$756,000** [1] - 4023:25
**$756,162** [1] - 4022:12
**$773,000** [2] - 3937:14, 3942:23
**$79,397** [1] - 3952:20
**$82** [3] - 4012:15, 4012:19, 4015:14
**$9.97** [1] - 4141:13
**$900,000** [9] - 3891:22, 3900:25, 3904:5, 3904:9, 3904:12, 3904:14, 3904:24, 3904:25
**$93,897.99** [1] - 4142:1

**$98,393.99** [1] - 4141:20

## '

**'11** - 4008:24
**'12** - 4070:5

## 0

**0001.pdf** [1] - 3908:7
**0046** [1] - 4103:4
**0046897** [1] - 4003:1
**0533** [1] - 4001:3

## 1

**1** [22] - 3891:22, 3894:19, 3895:11, 3900:21, 3904:6, 3904:8, 3923:17, 3924:9, 3943:14, 3948:18, 3949:20, 3953:17, 3953:20, 3984:23, 3999:12, 4008:2, 4015:8, 4015:12, 4057:11, 4079:19, 4080:3, 4083:21
**1,000** [1] - 3890:15
**1.5** [3] - 4014:4, 4033:7, 4070:11
**1.6** [2] - 4014:4, 4070:11
**1.8** [1] - 4015:14
**10** [12] - 3867:12, 3901:8, 3936:13, 3980:11, 4010:25, 4013:9, 4081:15, 4102:16, 4105:19, 4118:2, 4119:1, 4140:13
**100,000** [1] - 4081:17
**10017** [1] - 3854:20
**1006** [1] - 3855:6
**102-14** [1] - 4056:11
**102-15** [7] - 4012:22, 4012:23, 4013:5, 4013:7, 4069:18, 4069:19, 4147:20
**102-16** [7] - 4016:25, 4017:9, 4017:11, 4067:25, 4068:2, 4068:7, 4147:20
**102-2** [6] - 4000:9, 4000:14, 4001:18, 4094:2, 4094:4, 4147:17
**102-20** [5] - 4018:25, 4019:7, 4019:9, 4126:3, 4147:21
**102-21** [5] - 4021:25, 4022:6, 4022:8, 4090:9, 4147:21
**102-22** [5] - 4025:2, 4025:10, 4025:12, 4030:9, 4147:22
**102-5** [3] - 4010:11, 4010:16, 4147:19
**102-8** [6] - 4011:13, 4011:19, 4011:21, 4072:2, 4072:3, 4147:19
**1022** [1] - 4117:14
**10:02** [1] - 4013:10
**10:05** [1] - 4021:23
**10:45** [1] - 4021:20
**10th** [8] - 3923:13, 3924:11, 4012:23, 4013:14, 4013:23, 4017:2, 4068:3, 4069:25
**11** [8] - 3860:21, 3861:3, 3923:2, 3937:19, 4016:9, 4019:21, 4020:3, 4020:9
**11,301** [1] - 3925:16
**11/19/12** [1] - 3975:9
**11/29** [1] - 3975:10

**11/29/12** [1] - 3975:11
**11201** [1] - 3854:16
**119** [2] - 3869:11, 3869:12
**119-13** [1] - 3898:15
**119-14** [4] - 3901:8, 3901:20, 3901:22, 4147:12
**119-15** [9] - 3908:25, 3917:25, 3918:2, 3918:15, 3918:19, 3918:21, 3974:23, 3974:24, 3979:12
**119-20** [6] - 3905:5, 3905:17, 3905:20, 3907:18, 3908:3, 4147:13
**119-25** [8] - 3916:13, 3918:3, 3918:7, 3918:16, 3918:19, 3919:6, 3920:23, 3921:10
**119-26** [1] - 3921:24
**119-3** [3] - 3877:2, 3953:16, 3984:19
**119-4** [1] - 3887:20
**11:35** [1] - 3907:10
**11:47** [1] - 3944:10
**11th** [6] - 3894:6, 3924:12, 3924:16, 3927:4, 4002:20, 4019:13
**12** [11] - 3860:21, 3861:3, 3908:16, 3909:1, 3917:20, 3918:3, 3923:2, 3975:1, 4019:3, 4021:19, 4082:12
**123** [2] - 3861:2, 3869:11
**123-10** [11] - 3860:21, 3861:3, 3861:11, 3862:15, 3862:17, 3864:1, 3864:7, 3865:5, 3867:15, 3868:10, 3868:14
**123-11** [2] - 3862:4, 3862:11
**123-12** [16] - 3862:5, 3862:16, 3862:17, 3864:8, 3866:25, 3867:7, 3867:12, 3867:20, 3868:5, 3868:14, 3947:2, 3947:14, 3947:16, 3952:2, 4147:16
**123-14** [5] - 3894:14, 3894:23, 3895:3, 3985:20, 4147:12
**123-2** [6] - 3912:12, 3912:22, 3912:25, 3913:1, 3978:20, 4147:14
**123-3** [5] - 3905:5, 3905:17, 3905:20, 3905:23, 4147:13
**123-4** [5] - 3920:16, 3921:1, 3921:3, 3921:4, 4147:14
**123-5** [5] - 3922:20, 3923:6, 3923:8, 3923:9, 4147:15
**123-7** [7] - 3928:19, 3929:5, 3929:7, 3929:8, 3929:11, 3941:15, 4147:15
**123-8** [5] - 3928:19, 3929:5, 3929:8, 3943:22, 4147:15
**123-9** [4] - 3945:17, 3946:1, 3946:3, 4147:16
**12:10** [1] - 3908:5
**12th** [2] - 4021:23, 4126:8
**13** [10] - 3912:12, 3912:22, 4001:14, 4001:24, 4002:2, 4022:2, 4090:18, 4094:25, 4098:10, 4147:17
**135** [2] - 3896:18, 3896:25
**137,547** [1] - 3925:18
**13D** [3] - 3855:14, 3855:18, 3856:16
**13th** [4] - 3941:21, 3942:15, 4010:21, 4090:23
**14** [7] - 3898:17, 3905:6, 3905:23, 3918:16, 3918:19, 3948:8, 3948:16

**144** [1] - 3855:14
**14th** [1] - 4142:20
**15** [9] - 3901:25, 3905:6, 3936:13, 3948:8, 3948:16, 4015:10, 4069:22, 4069:23, 4140:13
**15-CR-00637(KAM** [1] - 3854:3
**15th** [1] - 3896:16
**16** [18] - 3888:14, 3889:9, 3889:13, 3893:12, 3902:17, 3903:15, 3904:3, 3916:13, 3962:20, 3967:9, 3992:7, 4016:9, 4016:25, 4055:25, 4057:10, 4057:20, 4068:6, 4120:6
**162,140** [1] - 3891:4
**16th** [1] - 3887:22
**17** [6] - 3854:7, 3920:17, 4004:1, 4004:10, 4008:25, 4147:18
**18** [2] - 3921:24, 4146:19
**18th** [3] - 3941:21, 3941:23, 4013:15
**19** [4] - 3883:25, 3922:20, 4025:22, 4075:8
**19-and-change** [1] - 4032:22
**19.80** [1] - 4028:9
**1934** [1] - 3855:24
**1969** [1] - 3988:20
**1980** [3] - 3992:12, 4033:21, 4101:12
**1982** [1] - 3870:19
**1984** [1] - 3871:7
**19th** [8] - 3877:24, 3935:6, 3935:8, 3985:5, 4049:5, 4059:17, 4131:17, 4131:18
**1st** [6] - 3919:8, 3919:10, 3933:2, 3985:24, 4008:8, 4017:16

## 2

**2** [10] - 3887:20, 3910:7, 3930:22, 3977:6, 4007:11, 4007:19, 4116:1, 4116:4, 4138:24, 4139:1
**2,500** [2] - 3891:12, 3900:12
**2-A** [2] - 4001:12, 4001:17
**2-B** [1] - 4002:9
**2/1/14** [1] - 4141:5
**2/28/14** [1] - 4141:5
**20** [7] - 3873:1, 3891:11, 3900:11, 3956:25, 4019:1, 4126:6, 4126:7
**20's** [1] - 4053:11
**20,000** [1] - 4142:12
**200,000** [3] - 3907:6, 3907:16, 3925:20
**2000** [1] - 4057:11
**2009** [1] - 3873:1
**200k** [2] - 3907:5, 3907:6
**2010** [5] - 3990:6, 4001:10, 4001:22, 4059:7, 4069:19
**2011** [26] - 3879:18, 3888:10, 3888:12, 3891:11, 3891:16, 3895:20, 3900:11, 3900:18, 3985:8, 3985:13, 3999:11, 3999:12, 4003:6, 4007:11, 4007:14, 4007:19, 4007:21, 4007:23, 4008:2, 4008:20, 4009:7, 4010:21, 4011:15, 4012:7, 4069:1, 4084:22
**2012** [108] - 3862:25, 3863:17, 3877:5,

3877:17, 3877:24, 3883:25, 3884:16, 3888:14, 3889:10, 3889:13, 3891:22, 3893:12, 3893:22, 3894:19, 3895:11, 3895:17, 3897:20, 3898:17, 3900:21, 3901:17, 3901:25, 3902:17, 3903:16, 3903:21, 3904:3, 3904:6, 3904:8, 3905:14, 3906:4, 3906:13, 3906:15, 3907:10, 3908:5, 3908:17, 3909:6, 3912:6, 3912:19, 3912:20, 3916:18, 3919:5, 3919:8, 3919:10, 3919:24, 3919:25, 3923:1, 3923:13, 3924:11, 3924:13, 3924:17, 3925:20, 3927:4, 3928:3, 3961:10, 3961:14, 3962:1, 3962:2, 3962:20, 3963:13, 3963:23, 3965:20, 3966:18, 3967:10, 3968:15, 3973:10, 3982:9, 3983:6, 3983:19, 3984:21, 3985:5, 3985:24, 3986:3, 3986:5, 3986:11, 3986:17, 3986:20, 4009:3, 4009:5, 4012:24, 4013:9, 4013:14, 4013:23, 4016:5, 4016:10, 4017:16, 4019:19, 4022:12, 4022:13, 4022:14, 4022:21, 4030:16, 4031:20, 4056:13, 4057:3, 4058:23, 4059:4, 4059:10, 4060:9, 4068:3, 4068:17, 4069:25, 4075:8, 4077:1, 4079:8, 4080:16, 4091:16
**2013** [46] - 3862:23, 3863:16, 3893:24, 3908:16, 3929:2, 3929:16, 3933:2, 3935:7, 3935:8, 3941:21, 3941:23, 3942:15, 3942:16, 3943:2, 3943:14, 3943:25, 3944:3, 3944:10, 3944:15, 3946:6, 3946:7, 3946:16, 3946:17, 3947:9, 3947:20, 3950:10, 3950:24, 3986:19, 3986:23, 4019:3, 4019:13, 4019:21, 4020:3, 4020:9, 4021:19, 4022:2, 4025:22, 4069:7, 4090:18, 4124:14, 4124:21, 4126:8, 4129:7, 4129:10, 4131:19, 4136:3
**2014** [3] - 3989:10, 4124:25, 4143:4
**2015** [3] - 4048:4, 4049:5, 4059:17
**2016** [2] - 3961:4, 3961:8
**2017** [4] - 3854:7, 3948:21, 4053:6, 4146:19
**21** [6] - 4021:25, 4090:12, 4090:13, 4121:6, 4131:19, 4136:3
**22** [4] - 3928:20, 4012:5, 4025:2, 4122:24
**22,500** [2] - 3891:23, 3900:23, 3904:7
**224,521** [1] - 4032:15
**22nd** [1] - 4012:7
**23** [2] - 3928:20, 3943:23
**23rd** [2] - 4011:15, 4072:7
**24** [1] - 3945:17
**24,000** [2] - 4032:20, 4142:10
**24,521** [3] - 4027:25, 4028:7, 4142:13
**24th** [4] - 3865:17, 3877:5, 3877:17, 3946:6
**25,259** [1] - 3925:17
**2500** [1] - 3933:4
**2527** [1] - 3903:20
**26** [8] - 4002:9, 4002:15, 4002:17,

4002:24, 4097:2, 4097:10, 4098:13, 4147:18
**27** [1] - 3947:2
**271** [1] - 3854:15
**2790** [2] - 4114:2, 4118:2
**28** [4] - 3891:16, 3900:18, 3906:13, 4007:23
**28th** [7] - 4009:7, 4056:13, 4057:3, 4057:15, 4058:16, 4058:23, 4059:4
**29.98** [1] - 4009:9
**290,660** [1] - 3890:11
**29th** [7] - 3907:4, 3909:6, 3912:6, 3912:20, 3919:5, 3929:15, 3930:19
**2:00** [1] - 4004:18
**2:03** [1] - 3904:3
**2nd** [1] - 4007:14

## 3

**3** [14] - 3885:15, 3903:21, 3906:4, 3906:15, 3977:6, 3985:1, 4014:18, 4015:7, 4079:11, 4079:19, 4083:10, 4104:8
**3-day** [1] - 3871:3
**3.2** [1] - 4104:15
**3.20** [2] - 4010:25, 4011:9
**3.4** [1] - 4105:5
**3.49** [1] - 4012:6
**3.5** [2] - 4106:1, 4113:16
**3/31** [1] - 4013:16
**3/31/12** [1] - 4013:13
**30** [3] - 3895:17, 3957:4, 4010:25
**30's** [1] - 4053:10
**30,000** [4] - 3890:13, 3902:6, 3903:9, 3916:23
**30th** [11] - 3896:19, 3897:1, 3907:10, 3907:24, 3908:5, 3927:24, 3946:16, 3986:3, 3986:11, 4003:6, 4126:16
**31** [7] - 3879:17, 3888:10, 3888:12, 3961:4, 3961:10, 3961:14, 4070:5
**31st** [2] - 3985:8, 3999:11
**33** [5] - 4034:10, 4034:13, 4036:15, 4036:17, 4036:20
**330** [2] - 3877:25, 3912:4
**34** [1] - 3950:3
**34,000** [1] - 4141:23
**34,600** [1] - 4142:4
**3400** [5] - 4136:25, 4138:6, 4138:15, 4140:17, 4147:23
**3415** [2] - 4084:12, 4084:13
**3419** [6] - 4074:14, 4074:15, 4074:22, 4074:23, 4075:3, 4078:15, 4080:6, 4147:23
**3425** [1] - 4129:1
**3430** [5] - 4056:10, 4056:18, 4056:20, 4056:22, 4147:22
**349,643** [1] - 4030:13
**35** [3] - 4023:17, 4092:12, 4093:21
**350** [2] - 4110:5, 4113:17
**350,000** [2] - 4030:14, 4032:14
**3500** [4] - 3996:4, 4055:15, 4059:12,

3

4059:22
**3500-JN-1** [1] - 4048:24
**3600** [1] - 3931:6
**37** [3] - 4033:24, 4096:1, 4108:1
**378,000** [2] - 4024:17, 4024:18
**3870** [1] - 4147:4
**3895** [1] - 4147:12
**3901** [1] - 4147:12
**3905** [2] - 4147:13, 4147:13
**3913** [1] - 4147:14
**3921** [1] - 4147:14
**3923** [1] - 4147:15
**3929** [1] - 4147:15
**3946** [1] - 4147:16
**3947** [1] - 4147:16
**3951** [1] - 4147:4
**3984** [1] - 4147:5
**3988** [1] - 4147:7
**3:09** [1] - 4057:3
**3:48** [1] - 4019:13
**3rd** [5] - 3908:16, 3908:17, 3916:18, 3943:25, 3944:10

## 4

**4** [17] - 3885:15, 3911:20, 3918:15, 3918:19, 3977:6, 3985:9, 4015:12, 4022:22, 4024:16, 4091:16, 4092:16, 4092:20, 4093:1, 4093:4, 4093:13, 4106:1, 4113:14
**4,167** [5] - 3909:8, 3910:15, 3910:25, 3916:23, 3918:9
**4.25** [1] - 4012:4
**4.60** [2] - 4010:24, 4011:9
**4.70** [1] - 4091:16
**4/18** [1] - 4013:17
**40** [9] - 3996:24, 4016:11, 4047:16, 4047:17, 4128:1, 4128:8, 4128:16, 4144:15, 4144:21
**40-percent-a-year** [1] - 3991:24
**4000** [1] - 4147:17
**4002** [2] - 4147:17, 4147:18
**4004** [1] - 4147:18
**401** [1] - 3866:23
**4010** [1] - 4147:19
**4011** [1] - 4147:19
**4013** [1] - 4147:20
**4017** [1] - 4147:20
**4019** [1] - 4147:21
**4022** [1] - 4147:21
**4025** [1] - 4147:22
**403** [1] - 3866:22
**4031** [1] - 4147:8
**4056** [1] - 4147:22
**4078** [1] - 4147:23
**4130** [1] - 3935:10
**4140** [1] - 4147:23
**4144** [1] - 4147:9
**4167** [1] - 3909:15
**444** [3] - 4024:6, 4024:9, 4024:16
**45** [1] - 4112:12

**46.46** [1] - 3899:12
**470,000** [1] - 4028:2
**4830** [1] - 3935:10
**4:34** [1] - 4020:3
**4th** [3] - 3942:16, 3943:2, 3944:3

## 5

**5** [8] - 3907:19, 3977:21, 4014:18, 4015:7, 4081:15, 4110:12, 4113:21, 4113:24
**50** [1] - 4036:7
**50,000** [6] - 4026:16, 4026:18, 4027:6, 4027:22, 4141:9, 4142:12
**52.36** [1] - 3899:18
**56** [1] - 3870:10
**575K** [1] - 3944:11
**59** [1] - 3912:1
**5:20** [1] - 4111:2
**5:30** [1] - 4111:2
**5th** [1] - 3898:21

## 6

**6** [2] - 4099:20, 4102:13
**6,200** [1] - 4141:13
**6/30/12** [1] - 4019:17
**60** [2] - 4036:7, 4036:10
**6097** [2] - 3943:3, 3943:8
**6507** [1] - 3961:13
**6509** [1] - 3962:23
**6511** [2] - 3967:7
**6512** [1] - 3970:8
**6513** [1] - 3969:15
**6518** [1] - 3965:3
**6531** [2] - 3982:24, 3982:25
**68** [2] - 4053:6, 4053:7
**6:18** [1] - 3961:10
**6:19** [1] - 3906:14
**6:38** [1] - 3887:22

## 7

**7** [3] - 3894:14, 3908:11, 3937:3
**70** [3] - 4033:12, 4053:4, 4107:25
**715,000** [1] - 4032:13
**74** [2] - 3988:10, 4053:2
**756,000** [2] - 4024:4, 4024:18
**767** [1] - 3854:19
**7th** [2] - 3947:20, 3948:20

## 8

**8** [7] - 3929:7, 4002:13, 4011:13, 4072:4, 4072:7, 4117:13, 4117:17
**8-3-2010** [1] - 4094:8
**8-K** [10] - 3976:20, 3976:22, 3981:7, 3982:12, 3982:16, 3983:2, 3983:3, 3983:9, 3984:1, 3984:5
**80** [1] - 4069:4
**802.3** [1] - 4132:20
**82** [3] - 4003:25, 4007:6, 4012:4
**82-1** [5] - 4004:2, 4004:8, 4004:10,

4007:8, 4147:18
**82-17** [5] - 4004:2, 4004:8, 4009:1
**897** [1] - 4002:23
**8:48** [1] - 3902:17
**8:50** [1] - 3903:16
**8:57** [1] - 4010:21
**8th** [1] - 3950:10

## 9

**9** [3] - 3898:15, 3912:20, 3924:13
**9,200** [2] - 4141:17, 4142:1
**900,000** [5] - 3902:6, 3903:20, 3903:22, 3903:23, 3904:7
**909** [1] - 4002:23
**93,000** [1] - 4141:25
**94,000** [1] - 4024:15
**94,520** [5] - 4022:16, 4024:7, 4024:11, 4091:2, 4124:10
**94,521** [3] - 4025:4, 4026:12, 4027:11
**95** [1] - 4124:10
**95,000** [1] - 4032:13
**98** [1] - 4141:25
**9:00** [2] - 3854:8, 4146:19
**9:06** [1] - 4012:24
**9:19** [1] - 3924:17
**9:50** [1] - 3943:25
**9th** [3] - 4001:10, 4001:21, 4009:3

## A

**a.m** [9] - 3854:8, 3902:17, 3903:16, 3907:10, 3924:13, 3924:17, 3943:25, 3944:10, 4146:19
**a.m.** [1] - 4010:21
**Abbott** [5] - 4014:1, 4014:21, 4070:9, 4071:18, 4071:22
**aberrations** [1] - 4008:11
**ability** [4] - 4081:5, 4119:13
**able** [18] - 3870:24, 3870:25, 3878:13, 3904:11, 3927:8, 3931:17, 3932:15, 3992:16, 3992:21, 3993:20, 3997:17, 3997:19, 4080:3, 4082:13, 4100:13, 4100:25, 4117:11, 4125:24
**absolutely** [9] - 3865:7, 3878:23, 3879:13, 3949:13, 3950:8, 3971:19, 3978:15, 3981:17, 4066:17
**abusive** [4] - 3863:25, 3864:2, 3864:3, 3864:14
**accept** [5] - 3859:3, 3860:7, 3882:20, 4110:24, 4119:6
**accepted** [6] - 3872:2, 3872:11, 3880:11, 3883:1, 4107:9, 4134:2
**accompanied** [1] - 3881:5
**accomplish** [1] - 3910:21
**accordance** [3] - 4022:24, 4091:19, 4097:22
**according** [5] - 3962:8, 4022:22, 4024:16, 4091:17, 4135:10
**accordingly** [1] - 3881:3
**account** [43] - 3865:4, 3870:23, 3884:25, 3885:14, 3886:1, 3886:12,

4

3902:7, 3902:22, 3903:21, 3904:18, 3904:19, 3904:20, 3914:5, 3915:5, 3931:6, 3933:6, 3933:7, 3935:12, 3942:7, 3942:9, 3942:20, 3943:8, 3943:18, 3999:16, 4003:7, 4003:9, 4007:22, 4009:6, 4013:13, 4018:22, 4021:6, 4022:15, 4024:7, 4070:1, 4070:3, 4070:5, 4091:2, 4093:23, 4128:4, 4133:6, 4139:12, 4139:21, 4139:25

**accountant** [7] - 3865:18, 3870:22, 3939:1, 3956:3, 3957:3, 3957:9, 3974:8

**accountants** [4] - 3865:3, 4013:17, 4014:5, 4070:12

**accounted** [2] - 3915:9, 3915:12

**Accounting** [1] - 3872:19

**accounting** [40] - 3861:9, 3863:3, 3863:14, 3865:22, 3870:14, 3870:24, 3871:9, 3871:10, 3871:14, 3871:15, 3871:16, 3871:23, 3872:2, 3872:11, 3872:25, 3873:1, 3873:5, 3873:10, 3873:20, 3875:13, 3876:23, 3877:11, 3880:3, 3880:12, 3882:10, 3882:12, 3882:16, 3882:25, 3883:1, 3883:6, 3884:18, 3902:11, 3952:15, 3956:16, 3956:25, 3959:19, 4013:24, 4014:7, 4070:6

**accounts** [2] - 3884:23, 3887:9, 3889:6, 4120:13

**accurate** [6] - 4003:17, 4003:18, 4003:22, 4104:25, 4105:12, 4105:13

**accustomed** [1] - 4119:18

**acknowledges** [1] - 4099:19

**acknowledging** [1] - 3903:9

**acknowledgment** [2] - 3902:18, 3903:8

**acquire** [4] - 4012:3, 4014:2, 4070:9, 4071:18

**acronym** [1] - 3913:14

**act** [1] - 3855:24

**acting** [3] - 3863:13, 4080:25, 4121:20

**Acting** [1] - 3854:14

**actions** [1] - 3882:9

**active** [1] - 3897:16

**actively** [1] - 4085:18

**activities** [3] - 4010:8, 4097:24, 4098:5

**activity** [2] - 3930:19, 3931:6

**acts** [2] - 3881:13, 3881:19

**actual** [1] - 4101:11

**add** [2] - 4027:24, 4033:7

**added** [1] - 4028:3

**adding** [1] - 3973:21

**addition** [13] - 3870:20, 3881:17, 3898:11, 3904:25, 3927:10, 3968:13, 3969:1, 3973:14, 4024:8, 4080:5, 4122:24, 4124:10

**additional** [19] - 3873:9, 3877:7, 3879:23, 3917:11, 3936:8, 3945:12, 3953:5, 3981:9, 3986:13, 3986:19, 3986:23, 4026:13, 4026:16, 4102:18, 4106:2, 4120:16, 4124:11, 4125:21,

4125:22

**additional/follow** [1] - 3930:8

**additional/follow-up** [1] - 3930:8

**address** [5] - 3911:24, 3912:3, 4004:24, 4005:18, 4146:9

**addressed** [1] - 3877:25

**adds** [1] - 4086:25

**adequate** [1] - 3882:15

**adequately** [2] - 4119:8, 4119:11

**adjectives** [1] - 4051:12

**adjourn** [1] - 4004:25

**adjourned** [1] - 4146:19

**adjusted** [1] - 3883:10

**adjusting** [1] - 3882:19

**administration** [1] - 3929:22

**administrator** [5] - 3989:5, 4020:21, 4052:3, 4052:12, 4127:9

**administrators** [1] - 4008:9

**admissibility** [1] - 4077:24

**admissible** [1] - 4131:3

**admission** [3] - 4131:4, 4134:13, 4135:1

**admissions** [1] - 4130:17

**admit** [17] - 3894:23, 3895:2, 3901:20, 3905:17, 3912:21, 3923:6, 3929:5, 3947:14, 3947:16, 4002:14, 4002:17, 4004:7, 4010:15, 4011:18, 4011:21, 4019:6, 4135:4

**admitted** [4] - 4078:10, 4131:4, 4139:24, 4140:17

**admitting** [1] - 3866:25

**admonish** [1] - 4048:17

**adopting** [1] - 3882:25

**adoption** [1] - 4046:23

**advance** [4] - 3856:21, 3865:11, 3869:17, 3914:13

**advise** [2] - 3882:10, 3907:4

**advises** [1] - 4060:11

**advisor** [4] - 4120:12, 4121:7, 4121:9, 4121:14

**advisor's** [1] - 4117:22

**advisors** [1] - 4100:8

**advisory** [1] - 4120:16

**affect** [3] - 3855:21, 3858:5, 3915:2

**affected** [1] - 3996:12

**affecting** [1] - 4121:11

**affects** [4] - 3914:16, 3914:17, 3914:21, 3914:23

**affiliates** [1] - 4120:15

**after-the-fact** [1] - 3917:14

**afternoon** [5] - 3860:15, 3987:17, 3988:9, 4031:9, 4031:10

**age** [2] - 4057:10, 4063:1

**Agency** [1] - 3989:15

**agency** [1] - 4046:23

**agents** [1] - 4121:15

**aggravation** [1] - 4034:4

**aggregate** [2] - 4012:4, 4118:2

**aging** [1] - 3989:16

**Agnifilio** [1] - 3951:20

**AGNIFILIO** [11] - 3887:16, 3894:24,

3901:21, 3905:18, 3946:2, 3947:15, 3951:21, 4005:1, 4005:13, 4005:19, 4005:25

**AGNIFILO** [63] - 3854:21, 3856:8, 3856:24, 3859:8, 3859:25, 3860:5, 3860:17, 3860:20, 3861:3, 3861:8, 3861:11, 3862:12, 3862:18, 3864:21, 3865:5, 3865:25, 3867:1, 3867:11, 3868:7, 3868:9, 3868:12, 3868:23, 3869:1, 3869:8, 3912:24, 3914:8, 3915:18, 3919:17, 3920:11, 3921:2, 3923:7, 3929:6, 3934:1, 3934:20, 3936:9, 3937:1, 3937:19, 3938:8, 3939:14, 3939:22, 3939:24, 3940:10, 3951:22, 3960:1, 3961:9, 3961:12, 3962:23, 3962:25, 3963:3, 3963:11, 3965:1, 3965:9, 3971:9, 3982:2, 3982:19, 3982:21, 3983:13, 3984:9, 3984:11, 3987:2, 4006:6, 4006:18, 4147:4

**Agnifilo** [6] - 3869:7, 3939:21, 3951:23, 3984:20, 3985:11, 3987:1

**ago** [9] - 3957:5, 3957:6, 3957:8, 3976:4, 3989:23, 4047:15, 4049:13, 4079:10

**agree** [6] - 3867:16, 3884:25, 3910:18, 3976:1, 4006:14, 4071:12

**agreed** [3] - 3882:9, 4021:13, 4121:12

**Agreement** [4] - 3933:12, 3935:2, 3935:4, 4094:7

**agreement** [41] - 3890:23, 3944:5, 3945:1, 3948:23, 3954:1, 3964:23, 3967:3, 3967:13, 3967:17, 3967:21, 4000:23, 4002:12, 4005:12, 4026:7, 4026:8, 4026:11, 4091:20, 4094:14, 4096:2, 4096:4, 4096:14, 4096:16, 4096:20, 4096:23, 4097:2, 4097:5, 4097:22, 4098:12, 4098:18, 4098:19, 4098:24, 4098:25, 4099:17, 4099:25, 4100:12, 4102:24, 4109:3, 4109:13, 4121:13, 4126:14, 4126:21

**agreements** [8] - 3928:16, 3945:6, 3960:24, 3960:25, 3961:3, 3961:18, 3961:21, 4002:4

**agrees** [2] - 3889:6, 3937:6

**ahead** [4] - 3876:2, 3981:21, 4079:24, 4114:15

**aided** [1] - 3854:25

**alarm** [1] - 4015:19

**ALIXANDRA** [1] - 3854:17

**alleged** [2] - 3940:2, 3940:3

**allow** [6] - 3855:21, 3920:9, 4008:4, 4074:4, 4080:23, 4139:24

**allowed** [7] - 3920:6, 3958:17, 3958:18, 3967:14, 3967:15, 3967:22, 4082:18, 4107:10

**allows** [1] - 4135:1

**almost** [6] - 3948:24, 3949:10, 4003:21, 4033:24, 4105:14

**alternative** [2] - 4119:3, 4119:5

**alternatively** [1] - 4018:5

**Alzheimer's** [1] - 3989:14
**amazing** [1] - 4082:20
**ameliorate** [1] - 4133:2
**amenable** [2] - 4017:20, 4068:20
**AMERICA** [1] - 3854:3
**American** [1] - 3955:15
**amount** [19] - 3885:11, 3885:12, 3891:12, 3900:24, 3911:9, 3926:24, 3931:19, 3933:3, 3935:9, 3935:11, 3942:3, 3942:22, 3943:16, 3959:4, 3980:1, 4033:7, 4033:8, 4052:15, 4134:1
**Amount** [1] - 3931:10
**amounted** [1] - 3885:10
**amounts** [2] - 3924:19, 3939:7
**analyst** [1] - 4123:2
**analysts** [1] - 4053:22
**analyze** [3] - 3876:22, 3885:1, 4100:8
**ANDREA** [1] - 3854:21
**Andrew** [2] - 3947:21, 3948:6
**anecdotal** [1] - 3994:7
**angiotensin** [1] - 4080:25
**angry** [1] - 4130:11
**animus** [1] - 4131:8
**announced** [1] - 4012:1
**announcements** [1] - 4082:15
**annual** [1] - 3944:5
**annually** [1] - 4081:18
**answer** [24] - 3906:16, 3915:25, 3919:19, 3929:23, 3938:9, 3938:10, 3938:12, 3938:16, 3952:13, 3964:19, 3996:19, 4043:23, 4045:23, 4046:14, 4047:14, 4053:21, 4054:16, 4059:3, 4073:14, 4078:2, 4079:24, 4109:15, 4112:7, 4128:14
**answered** [9] - 3865:23, 3971:16, 4033:18, 4059:21, 4060:14, 4062:25, 4074:2, 4104:2, 4128:23
**answering** [2] - 3865:22, 4144:6
**answers** [2] - 4109:5, 4125:15
**antagonist** [2] - 4080:25, 4081:1
**antagonists** [1] - 4082:3
**anticipate** [1] - 4069:6
**apart** [1] - 4009:20
**apartment** [1] - 3992:5
**apartments** [1] - 3989:13
**apologize** [3] - 4013:24, 4070:7, 4141:12
**apologized** [1] - 4010:3
**apologizes** [1] - 4127:21
**Apple** [2] - 4035:11, 4035:14
**applicable** [2] - 3859:4, 3859:17
**application** [3] - 3882:11, 3882:13, 3882:16
**apply** [2] - 3857:18, 4114:5
**appreciate** [3] - 4004:18, 4143:16, 4145:20
**approach** [1] - 3936:9
**appropriate** [9] - 3858:6, 3858:12, 3861:20, 3869:2, 3881:14, 3882:10,

3938:11, 3939:7, 3998:8
**approval** [1] - 4082:9
**approve** [1] - 3883:12
**approved** [1] - 4083:3
**approximate** [1] - 4012:5
**April** [14] - 3865:17, 3891:11, 3891:16, 3900:11, 3900:18, 3925:16, 3943:25, 3944:10, 3946:6, 3946:7, 3965:20, 3966:18, 3973:9, 4010:21
**ARBs** [2] - 4081:12, 4081:24
**area** [10] - 3855:23, 3861:21, 3862:18, 3862:21, 3866:12, 4004:13, 4060:4, 4085:16, 4120:7, 4125:13
**areas** [3] - 3951:8, 4036:1, 4078:6
**arena** [1] - 3876:2
**arguably** [1] - 3861:17
**argue** [4] - 4077:25, 4130:5, 4134:10
**argument** [6] - 3860:22, 3997:19, 4077:23, 4085:20, 4108:2, 4132:3
**arguments** [1] - 4005:15
**arm** [1] - 4130:5
**arm's** [1] - 3892:15
**arranged** [3] - 3874:22, 3874:25, 4012:17
**articles** [1] - 4045:7
**arts** [2] - 4140:21, 4141:12
**aspect** [3] - 3862:9, 3884:5, 3980:15
**aspects** [3] - 3857:10, 3953:10, 4005:7
**assembling** [3] - 3880:5, 3880:9, 3880:19
**assess** [1] - 3876:8
**asset** [1] - 3932:21
**assets** [9] - 3882:17, 3926:14, 3926:21, 3972:18, 3996:9, 4051:20, 4051:23, 4063:24, 4105:15
**assign** [1] - 3910:14
**assignment** [1] - 3971:20
**assigns** [1] - 3910:15
**assist** [4] - 3875:12, 3879:16, 3895:15
**Assistance** [2] - 3855:4, 3857:8
**Assistant** [1] - 3854:18
**assisted** [1] - 3989:14
**assisting** [5] - 3871:25, 3880:15, 3880:25, 3929:22, 3929:23
**associate** [2] - 3955:8, 3968:24
**associated** [1] - 3986:10
**ASSOCIATES** [1] - 3854:19
**Associates** [1] - 3871:23
**associates** [1] - 3969:3
**Association** [1] - 4117:25
**association** [1] - 3975:21
**assume** [4] - 3925:11, 4048:10, 4048:18, 4049:17
**assumed** [2] - 4014:16, 4052:18, 4083:23
**assuming** [2] - 3856:22, 3860:5
**assumption** [2] - 3976:7, 4091:7
**assurance** [1] - 3881:4
**Athens** [1] - 3989:2
**Atlantic** [3] - 3935:7, 3935:15, 3978:6
**attach** [2] - 4022:24, 4091:20

**attached** [14] - 3877:18, 3888:10, 3888:23, 3909:20, 3917:3, 3917:17, 3918:6, 3918:25, 3930:8, 3930:20, 3941:15, 3948:9, 4080:17, 4097:3
**attaching** [3] - 3913:7, 3921:9, 3948:16
**attachment** [10] - 3889:8, 3908:7, 3908:11, 3909:9, 3910:8, 3930:16, 3930:23, 3959:8, 3968:4, 4001:17
**attachments** [7] - 3908:6, 3909:14, 3916:25, 3967:12, 4000:20, 4001:1, 4001:2
**attempt** [4] - 4016:4, 4020:19, 4109:16, 4127:8
**attempting** [1] - 4130:3
**attend** [1] - 4084:3
**attended** [2] - 3991:6, 4055:25
**attention** [9] - 3881:15, 3881:18, 3883:7, 3964:3, 3964:5, 3966:24, 4046:7, 4086:6, 4146:4
**attorney** [5] - 3873:19, 3956:3, 4023:4, 4049:6, 4091:24
**Attorney** [1] - 3854:14
**Attorney's** [2] - 4048:1, 4049:22
**Attorneys** [1] - 3854:18
**audit** [20] - 3863:15, 3867:8, 3867:23, 3868:4, 3880:17, 3881:2, 3881:23, 3926:16, 3948:1, 3950:12, 3959:18, 3959:22, 3960:14, 3960:16, 3960:17, 3960:19, 3972:18, 3972:20, 3973:8, 3973:9
**audited** [3] - 3980:19, 3984:2, 4064:7
**auditing** [2] - 3879:22, 3893:16
**auditor** [7] - 3880:14, 3983:17, 3983:22, 4020:20, 4052:2, 4052:9, 4127:9
**auditors** [9] - 3861:7, 3880:6, 3880:17, 3893:18, 3903:11, 3973:4, 3974:4, 3983:24
**August** [4] - 4022:12, 4022:19, 4091:14
**Austin** [5] - 4085:11, 4085:13, 4085:21, 4086:18, 4086:20
**authorize** [1] - 3886:5
**available** [1] - 4099:2
**Avenue** [4] - 3854:19, 3878:1, 3912:1, 3912:4
**average** [1] - 3887:14
**awake** [1] - 4143:17
**aware** [9] - 3855:22, 3951:9, 3961:20, 3973:16, 3974:12, 3974:20, 3976:13, 3984:3, 4099:19
**awful** [1] - 3950:12

**B**

**BA** [1] - 3988:24
**Bachelor** [2] - 3870:15, 4104:19
**backdating** [3] - 3920:4, 3920:5, 3920:8
**background** [8] - 3857:22, 3868:3, 3988:21, 3992:3, 3998:1, 4104:16, 4108:19, 4123:7
**backup** [1] - 3948:13
**backwards** [1] - 3945:9
**bad** [4] - 3864:3, 3866:10, 4130:9,

4131:15

**balance** [1] - 3872:15

**ballpark** [1] - 4033:5

**bank** [28] - 3877:6, 3877:12, 3884:23, 3884:25, 3885:14, 3887:9, 3889:5, 3902:7, 3902:22, 3903:21, 3904:17, 3904:19, 3904:20, 3930:4, 3930:19, 3931:6, 3931:19, 3933:6, 3935:11, 3942:7, 3942:9, 3942:20, 3943:8, 3943:18, 3959:10, 4012:17, 4139:2

**Bank** [1] - 3931:9

**banks** [1] - 4012:18

**Banta** [5] - 3964:24, 3967:3, 3967:12, 3967:21, 3968:5

**bar** [8] - 4076:5, 4076:9, 4078:13, 4085:9, 4088:6, 4138:16, 4138:18, 4140:11

**Barbara** [8] - 3988:14, 3999:16, 3999:17, 4003:9, 4019:16, 4025:5, 4043:20, 4105:10

**Barry** [1] - 3854:23

**base** [2] - 3944:5, 4079:20

**based** [19] - 3889:4, 3915:22, 3916:3, 3954:15, 3963:16, 3965:24, 3968:6, 3979:2, 3996:4, 3996:17, 4011:3, 4016:1, 4053:17, 4063:23, 4066:3, 4087:19, 4107:22, 4115:3, 4135:4

**basis** [11] - 3915:19, 3957:25, 3994:19, 3997:21, 4040:3, 4054:25, 4064:13, 4077:15, 4077:18, 4138:7

**Bates** [5] - 3917:21, 4001:3, 4002:20, 4019:11, 4103:4

**bear** [2] - 3941:10, 3982:21

**became** [12] - 3864:14, 3871:11, 3871:18, 3873:6, 3873:8, 3878:21, 3878:23, 3909:24, 3989:3, 3989:4, 4027:21

**become** [3] - 3897:10, 3946:19, 4027:15

**becomes** [1] - 3885:16

**BEFORE** [1] - 3854:11

**began** [1] - 4124:16

**begin** [3] - 3859:5, 3859:18, 4057:10

**beginning** [6] - 3860:2, 3860:4, 3860:6, 3884:15, 3885:5, 3962:4

**begins** [1] - 4103:13

**behalf** [9] - 3883:20, 3883:22, 3912:8, 3925:3, 3933:20, 4044:3, 4104:10, 4105:9, 4109:7

**behave** [1] - 3950:19

**behind** [7] - 3872:17, 3877:2, 3907:19, 4001:16, 4001:17, 4102:23, 4113:9

**belabor** [1] - 4135:21

**belief** [1] - 3977:9

**believes** [1] - 4128:9

**Belmont** [2] - 4054:4, 4061:3

**belong** [1] - 3935:20

**below** [4] - 3924:17, 4020:2, 4106:2, 4114:5

**Ben** [2] - 4031:11, 4111:8

**beneficial** [4] - 3855:18, 3855:22, 3855:25, 3856:17

**benefit** [4] - 3976:22, 3980:13, 4056:25, 4081:6

**BENJAMIN** [1] - 3854:20

**Berkowitz** [1] - 4123:4

**Berkshire** [5] - 4020:20, 4127:9, 4127:11, 4127:14

**beside** [1] - 4048:25

**best** [13] - 3864:1, 3993:9, 4021:2, 4021:7, 4023:3, 4048:18, 4068:23, 4081:8, 4091:23, 4092:23, 4093:2, 4127:25, 4128:6

**bet** [1] - 3996:15

**better** [8] - 3868:5, 3887:14, 3991:19, 3992:21, 4026:25, 4027:2, 4046:22, 4135:18

**between** [23] - 3860:22, 3867:3, 3873:3, 3878:11, 3880:13, 3889:20, 3892:10, 3892:23, 3905:11, 3915:14, 3919:12, 3924:22, 3925:2, 3934:5, 3944:15, 3946:18, 3972:14, 3979:14, 3983:22, 4005:22, 4006:2, 4085:23, 4131:9

**beyond** [2] - 3880:8, 3950:2

**bi** [1] - 3957:25

**bi-weekly** [1] - 3957:25

**Biestek** [14] - 3909:8, 3909:15, 3909:21, 3911:11, 3913:7, 3917:17, 3918:11, 3919:13, 3927:11, 3946:5, 3946:7, 3948:22, 3975:3, 3979:14

**Biestek's** [1] - 3919:7

**big** [7] - 3871:10, 3871:15, 3871:17, 3993:9, 3993:10, 4015:15, 4015:19

**bigger** [4] - 4000:9, 4000:11, 4010:11, 4075:1

**Bill** [3] - 4057:15, 4058:4

**bill** [6] - 4013:23, 4014:5, 4014:6, 4014:8, 4070:6, 4070:12

**billed** [2] - 3952:23, 3985:16

**billion** [1] - 4069:5

**billions** [1] - 4127:18

**binder** [29] - 3877:2, 3887:21, 3894:15, 3901:9, 3905:6, 3909:1, 3912:13, 3912:22, 3916:13, 3928:20, 3943:23, 3947:2, 4000:9, 4000:10, 4000:11, 4001:12, 4002:9, 4003:25, 4004:1, 4007:5, 4010:12, 4011:13, 4016:25, 4019:1, 4022:1, 4025:2, 4068:1, 4138:10

**biotech** [5] - 3990:24, 3991:16, 3993:22, 4045:15, 4047:20, 4047:22, 4062:9, 4062:14

**biotechnology** [1] - 4012:1

**bit** [12] - 3880:21, 3900:17, 3902:16, 3946:23, 3993:5, 4003:7, 4012:16, 4014:1, 4053:5, 4070:8, 4101:7, 4120:8

**blanks** [1] - 3951:10

**Blanton** [53] - 3990:8, 3994:22, 3996:5, 3996:6, 3996:8, 4019:14, 4023:10, 4038:9, 4038:19, 4038:22, 4039:2, 4039:7, 4040:6, 4040:13, 4040:14, 4040:16, 4040:18, 4040:19, 4041:9,

4044:8, 4044:16, 4044:18, 4044:21, 4044:24, 4045:7, 4045:12, 4045:20, 4046:5, 4046:9, 4047:2, 4047:8, 4050:2, 4053:19, 4053:25, 4054:7, 4054:18, 4054:25, 4055:10, 4055:20, 4055:22, 4058:14, 4059:6, 4061:24, 4062:3, 4062:17, 4086:12, 4092:5, 4110:7, 4110:8, 4123:9, 4144:11, 4144:14, 4144:21

**Blanton's** [2] - 3990:19, 4110:6

**blocker** [1] - 4080:25

**blue** [2] - 4056:16, 4089:15

**board** [2] - 4046:22, 4074:11

**Board** [1] - 4012:2

**body** [2] - 3857:18, 4019:22

**bold** [1] - 4120:8

**bona** [1] - 4086:9

**bonus** [1] - 3944:14

**Book** [1] - 3933:2

**book** [8] - 3902:21, 3934:6, 3974:24, 4035:10, 4035:12, 4035:15, 4035:17, 4035:18

**books** [20] - 3863:5, 3872:9, 3879:24, 3880:8, 3882:19, 3883:11, 3884:24, 3885:16, 3893:2, 3893:8, 3902:22, 3903:12, 3926:2, 3926:21, 3936:1, 3971:17, 3971:22, 3972:1, 3972:10, 4098:25

**boost** [5] - 4014:2, 4070:10, 4070:18, 4070:21, 4071:23

**Borgata** [2] - 3935:7, 3935:9

**bottle** [1] - 4145:24

**bottom** [29] - 3887:21, 3887:23, 3899:8, 3903:14, 3905:24, 3907:21, 3908:21, 3912:7, 3913:2, 3921:6, 3922:2, 3923:18, 3924:10, 3924:16, 3929:11, 3941:20, 3943:11, 3948:19, 3963:9, 3985:11, 3986:9, 4057:5, 4070:2, 4105:5, 4113:24, 4119:2, 4126:13, 4126:18

**bought** [4] - 3977:6, 4025:18, 4080:2, 4090:5

**box** [1] - 4056:17

**brackets** [2] - 3906:5, 3933:5

**Brafman** [16] - 3997:17, 4031:2, 4031:11, 4076:25, 4078:4, 4085:5, 4089:10, 4109:13, 4110:13, 4110:14, 4111:18, 4113:9, 4141:24, 4144:4, 4144:10, 4145:1

**BRAFMAN** [179] - 3854:19, 3854:20, 3938:9, 3938:20, 3939:6, 3939:10, 3995:7, 3996:3, 3996:7, 3997:23, 4000:16, 4002:1, 4002:16, 4004:9, 4006:8, 4006:16, 4007:12, 4007:16, 4010:17, 4011:20, 4013:6, 4017:10, 4019:8, 4022:7, 4025:11, 4031:3, 4031:5, 4031:8, 4033:20, 4038:6, 4038:25, 4039:6, 4039:10, 4039:14, 4040:9, 4041:1, 4041:3, 4041:6, 4041:13, 4041:16, 4042:3, 4044:12, 4044:14, 4045:11, 4046:4, 4046:13,

4047:13, 4048:14, 4048:20, 4051:1, 4052:6, 4056:15, 4056:19, 4059:25, 4060:3, 4060:5, 4063:1, 4073:1, 4074:3, 4074:5, 4074:19, 4074:23, 4075:2, 4076:1, 4076:4, 4076:8, 4076:11, 4076:23, 4077:5, 4077:14, 4077:16, 4077:19, 4077:23, 4078:8, 4078:11, 4078:16, 4078:19, 4079:1, 4085:1, 4085:4, 4085:6, 4085:10, 4086:2, 4086:4, 4086:17, 4086:21, 4087:4, 4087:6, 4087:15, 4087:20, 4087:22, 4087:25, 4088:4, 4089:1, 4097:1, 4100:18, 4100:21, 4102:2, 4103:1, 4103:3, 4104:2, 4104:4, 4105:25, 4106:17, 4107:5, 4107:12, 4107:15, 4107:17, 4108:8, 4108:11, 4108:25, 4109:19, 4109:25, 4110:7, 4110:16, 4110:21, 4111:11, 4111:16, 4111:20, 4111:25, 4112:3, 4112:6, 4112:11, 4113:11, 4113:13, 4114:19, 4115:14, 4121:1, 4122:14, 4122:16, 4125:4, 4125:11, 4125:14, 4129:15, 4129:19, 4129:24, 4130:2, 4130:24, 4131:8, 4131:24, 4132:17, 4132:19, 4132:21, 4133:1, 4133:9, 4133:12, 4134:12, 4134:17, 4134:23, 4135:6, 4135:9, 4135:15, 4135:20, 4136:1, 4138:1, 4138:6, 4138:11, 4138:14, 4138:24, 4139:1, 4139:3, 4139:6, 4139:10, 4139:14, 4139:16, 4139:19, 4139:22, 4140:2, 4140:6, 4140:8, 4140:15, 4140:18, 4140:20, 4141:1, 4143:10, 4145:8, 4145:15, 4146:11, 4147:8

**Brafman's** [1] - 3997:13
**brag** [1] - 3876:6
**brain** [1] - 4027:18
**break** [12] - 3936:11, 3939:16, 3941:14, 3987:8, 4004:14, 4004:23, 4029:2, 4029:8, 4044:10, 4048:3, 4106:19
**breakdown** [1] - 3944:13
**BRIDGET** [1] - 3854:14
**brief** [1] - 4105:5
**briefing** [1] - 3855:2
**briefly** [5] - 3903:13, 3980:17, 3981:6, 3984:15, 4104:15
**brilliant** [1] - 4047:6
**bring** [5] - 3866:1, 3869:6, 3906:22, 3958:7, 4006:21
**brings** [1] - 4086:6
**Bristol** [1] - 4081:2
**Bristol-Myers** [1] - 4081:2
**broad** [1] - 4119:14
**broke** [1] - 4030:8
**broker** [1] - 4065:12
**brokerage** [6] - 4021:6, 4128:4, 4133:5, 4137:1, 4139:20, 4141:4
**Brooklyn** [2] - 3854:6, 3854:16
**brought** [6] - 3872:12, 3883:7, 3964:3, 3964:5, 3966:24, 4133:21
**BS** [1] - 3870:14

**BSN** [2] - 4104:16, 4104:18
**bucket** [1] - 4108:9
**Buffalo** [1] - 3870:17
**Buffet's** [1] - 4127:16
**build** [4] - 3876:3, 4042:15, 4082:11, 4082:14
**Bukzin** [3] - 3873:19, 3874:12, 3874:24
**bullet** [1] - 3888:8
**bunch** [1] - 3985:17
**Business** [1] - 3989:1
**business** [15] - 3873:23, 3883:15, 3897:16, 3923:15, 3935:23, 3955:8, 3955:24, 3977:13, 3977:16, 3977:22, 4046:21, 4102:10, 4104:9, 4104:15, 4106:4
**businesses** [4] - 4012:1, 4120:18, 4120:19, 4120:22
**butt** [3] - 4020:12, 4127:1, 4127:20
**button** [2] - 3866:18, 3866:19
**buy** [13] - 4023:1, 4023:5, 4035:10, 4066:9, 4073:11, 4085:21, 4086:24, 4090:2, 4090:3, 4091:21, 4092:1, 4093:7, 4127:24
**buyer** [2] - 4023:8, 4092:3
**buying** [1] - 3992:22
**buys** [1] - 3977:21
**BY** [68] - 3854:16, 3854:20, 3870:8, 3880:1, 3907:2, 3909:4, 3913:5, 3914:11, 3915:21, 3916:16, 3918:4, 3918:17, 3919:20, 3920:14, 3921:8, 3922:1, 3923:12, 3927:6, 3929:14, 3932:3, 3934:22, 3941:13, 3951:22, 3960:1, 3982:2, 3983:13, 3984:18, 3985:2, 3988:8, 3990:17, 3995:2, 3999:5, 4000:1, 4007:4, 4015:1, 4030:7, 4031:8, 4033:20, 4038:6, 4038:25, 4039:6, 4042:3, 4044:14, 4045:11, 4046:4, 4047:13, 4048:14, 4051:1, 4073:1, 4079:1, 4089:1, 4102:2, 4103:3, 4104:4, 4105:25, 4113:13, 4114:19, 4115:14, 4121:1, 4136:1, 4141:1, 4144:2, 4147:4, 4147:4, 4147:5, 4147:7, 4147:8, 4147:9

## C

**Cadman** [1] - 3854:15
**calculated** [1] - 3876:8
**calculating** [1] - 3896:17
**calculation** [1] - 3897:3
**calculations** [1] - 3979:2
**calendar** [2] - 3927:25, 3928:2
**camper** [1] - 4024:21
**candidates** [1] - 4082:12
**cannot** [4] - 3881:11, 3881:12, 3896:23, 4055:13
**cap** [20] - 3888:17, 3888:23, 3889:2, 3889:4, 3890:10, 3898:19, 3899:23, 3909:13, 3909:17, 3913:23, 3914:2, 3914:6, 3914:13, 3914:16, 3914:19, 3915:2, 3917:15, 3921:18, 3963:4,

4035:1
**Cap** [2] - 3898:21, 3913:9
**capable** [1] - 4106:5
**capital** [6] - 3874:18, 3876:3, 4014:18, 4082:16, 4083:9, 4083:11
**Capital** [39] - 3900:18, 3923:20, 3925:6, 3925:14, 3972:2, 3991:9, 3991:12, 3994:16, 3995:3, 3996:11, 3996:23, 3997:4, 3997:7, 3997:14, 3999:10, 4000:5, 4000:22, 4001:8, 4002:10, 4011:4, 4011:7, 4011:24, 4014:12, 4016:5, 4016:17, 4016:21, 4022:11, 4026:9, 4073:7, 4073:13, 4090:24, 4094:5, 4094:6, 4094:7, 4094:8, 4097:19, 4103:14, 4123:1, 4144:24
**Capital's** [3] - 3993:13, 3994:4, 4010:8
**capitalist** [1] - 4045:1
**Capitalization** [3] - 3888:5, 3889:9, 3889:13
**capitalization** [10] - 3888:10, 3889:14, 3889:16, 3893:11, 3898:9, 3911:2, 3962:6, 3962:12, 3962:16, 3963:14
**card** [3] - 3885:25, 3977:7, 3977:10
**cards** [2] - 3885:10, 3977:2
**care** [9] - 3987:18, 3989:15, 3989:17, 3996:7, 3996:8, 3996:9, 4011:25, 4107:23, 4123:2
**Care** [1] - 3989:14
**career** [4] - 4036:7, 4037:19, 4042:4, 4057:10
**carried** [1] - 3893:24
**carve** [1] - 3885:21
**case** [30] - 3857:12, 3858:16, 3858:22, 3861:16, 3862:3, 3868:4, 3880:6, 3889:21, 3936:12, 3997:3, 4004:17, 4008:6, 4020:25, 4029:4, 4031:13, 4040:7, 4040:8, 4041:14, 4047:25, 4048:25, 4050:2, 4065:18, 4066:4, 4095:15, 4101:9, 4106:22, 4117:8, 4127:24, 4146:2, 4146:3
**cash** [51] - 3872:15, 3884:20, 3884:21, 3885:13, 3885:23, 3885:24, 3886:1, 3886:7, 3886:8, 3886:19, 3889:4, 3889:5, 3890:1, 3898:12, 3904:11, 3904:12, 3930:5, 3930:9, 3930:10, 3931:17, 3931:18, 3941:16, 3941:20, 3977:1, 3977:2, 4012:16, 4018:5, 4018:7, 4018:10, 4018:13, 4018:18, 4018:20, 4018:23, 4021:1, 4021:16, 4023:6, 4069:3, 4092:1, 4092:24, 4099:12, 4099:14, 4099:15, 4100:5, 4100:6, 4100:13, 4100:25, 4101:9, 4127:24, 4131:11, 4133:16
**categories** [1] - 3940:8
**categorize** [2] - 3932:18, 3932:20
**categorized** [2] - 3941:7, 3941:9
**CAUSE** [1] - 3854:11
**caused** [4] - 3864:19, 3950:13, 4016:13, 4055:1
**cavalier** [1] - 4085:20
**cc** [1] - 4019:13

**cc'd** [1] - 3969:21
**Centro** [1] - 3989:4
**CEO** [5] - 3875:16, 3911:7, 3911:15, 3911:18, 3977:19
**certain** [20] - 3855:12, 3856:1, 3858:4, 3875:20, 3883:14, 3896:23, 3941:6, 3941:16, 3948:24, 3953:9, 3955:2, 3958:3, 3972:18, 3974:1, 4006:11, 4058:16, 4058:20, 4109:21, 4117:24, 4126:11
**certainly** [7] - 3861:24, 4023:8, 4047:4, 4051:19, 4085:23, 4092:3, 4120:3
**certificate** [7] - 4025:21, 4026:21, 4026:23, 4030:9, 4030:19, 4118:19, 4131:18
**certifications** [1] - 3870:21
**certified** [3] - 3870:22, 3870:23, 4019:23
**certify** [1] - 3870:25
**cetera** [1] - 4105:11
**CFO** [2] - 3863:2, 3951:3
**chain** [12] - 3867:20, 3901:25, 3904:1, 3905:24, 3907:22, 3908:2, 3922:23, 3923:11, 3929:12, 3947:19, 4013:9, 4013:22
**chains** [2] - 3928:23, 3983:18
**chair** [1] - 4004:16
**challenges** [2] - 3898:4, 3898:7
**challenging** [1] - 3945:14
**champion** [2] - 4045:15, 4045:16
**chance** [2] - 3866:18, 4079:3
**change** [13] - 3873:7, 3913:23, 3913:24, 3917:14, 3919:13, 3920:3, 3920:7, 3979:1, 4021:12, 4030:14, 4081:21, 4082:23
**changed** [4] - 3878:25, 3919:16, 3919:24, 3921:18
**changes** [4] - 3914:6, 3921:15, 3982:16, 4018:18
**changing** [4] - 3911:3, 3913:19, 3978:22, 3979:3
**chaotic** [3] - 3885:6, 3957:13, 3957:15
**character** [1] - 3861:19
**characterization** [1] - 4062:6
**characterize** [4] - 3942:24, 3943:20, 4063:25, 4119:20
**characterized** [1] - 4064:4
**characterizing** [2] - 4040:7, 4134:15
**charge** [3] - 3872:21, 3948:1, 3960:16
**charged** [7] - 3937:2, 3937:7, 3937:24, 3939:12, 3941:8, 4005:16, 4108:16
**charitable** [1] - 3989:18
**charity** [3] - 4083:25, 4142:11, 4142:13
**chart** [3] - 3925:13, 3932:25, 3933:1
**charts** [1] - 3856:5
**check** [6] - 3869:3, 3886:4, 3886:5, 3886:15, 3906:4, 4012:15
**checking** [1] - 3949:18
**checks** [1] - 3933:19
**Chelsea** [18] - 4084:6, 4084:9, 4084:10, 4084:18, 4084:19, 4084:22, 4085:12,

4085:14, 4085:16, 4085:18, 4085:21, 4087:3, 4087:17, 4087:21, 4089:5, 4089:7, 4089:21, 4089:24
**chemistry** [1] - 3969:10
**cherry** [2] - 4130:8, 4130:15
**Chew** [41] - 3860:23, 3861:6, 3861:8, 3861:12, 3861:22, 3864:18, 3865:3, 3866:17, 3867:16, 3888:25, 3898:17, 3901:12, 3902:1, 3903:15, 3904:2, 3904:4, 3904:10, 3905:13, 3905:25, 3906:2, 3907:3, 3909:6, 3916:17, 3922:6, 3922:16, 3922:24, 3923:14, 3923:19, 3929:15, 3932:6, 3944:1, 3946:6, 3947:20, 3948:3, 3948:10, 3950:1, 3961:2, 3961:16, 3967:10, 3969:18, 3970:23
**chew** [2] - 3906:13, 3948:21
**Chew's** [2] - 3865:1, 3930:7
**chief** [4] - 3857:7, 3875:11, 3958:24, 3959:1
**children** [2] - 3988:15, 3988:16
**CHK** [1] - 3943:2
**choice** [2] - 3883:3, 4016:2
**choose** [1] - 4083:10
**chose** [1] - 4037:20
**Christmas** [6] - 3955:7, 3955:10, 3955:11, 3955:20, 3956:2, 3956:10
**CIGX** [3] - 4010:24, 4011:4, 4011:8
**Circuit** [1] - 3858:17
**circumstances** [4] - 3864:9, 3956:2, 4117:6, 4122:11
**cities** [2] - 3955:15
**Citrin** [30] - 3861:8, 3862:6, 3862:23, 3863:4, 3863:12, 3863:13, 3863:16, 3864:3, 3864:9, 3865:20, 3866:13, 3867:5, 3872:24, 3872:25, 3873:1, 3873:3, 3873:5, 3873:8, 3873:23, 3873:24, 3874:1, 3874:2, 3874:14, 3879:9, 3879:11, 3947:7, 3949:23, 3950:14, 3956:24
**city** [2] - 3911:24, 3912:1
**City** [5] - 3933:3, 3935:7, 3935:15, 3978:6, 4057:21
**claim** [2] - 3948:24, 4134:18
**claimed** [1] - 4076:19
**claims** [1] - 3910:19
**clarification** [2] - 3958:5, 3958:7
**clarified** [2] - 3869:19, 3996:22
**clarify** [4] - 4043:17, 4043:18, 4120:4, 4144:7
**class** [3] - 3855:19, 3889:17, 3890:2
**Class** [7] - 3889:17, 3889:22, 3890:6, 3890:16, 3891:1, 3910:15, 3910:22
**classes** [2] - 3889:17, 3889:20
**classic** [1] - 4127:6
**classification** [1] - 3916:2
**classifications** [1] - 3887:11
**classified** [7] - 3883:15, 3906:6, 3906:8, 3907:16, 3907:17, 3940:6, 3945:4
**classify** [3] - 3916:9, 3942:12, 3943:10, 3945:3

**clear** [9] - 3897:4, 3918:1, 3940:1, 3940:5, 4006:19, 4030:10, 4077:4, 4094:15, 4130:10
**clearly** [8] - 3861:20, 3881:20, 4058:23, 4059:1, 4059:9, 4060:11, 4068:22, 4098:4
**CLERK** [2] - 4074:13, 4074:16
**client** [6] - 3894:8, 4107:25, 4108:1, 4108:6, 4108:12, 4108:14
**client's** [1] - 3954:8
**clients** [4] - 3872:3, 4120:12, 4120:16, 4120:19
**clinical** [2] - 4082:8, 4082:25
**close** [9] - 3857:16, 3909:22, 3910:1, 3910:3, 3914:7, 3921:21, 3927:16, 4021:21, 4028:8
**closely** [5] - 3857:11, 3960:2, 4015:16, 4034:25, 4081:14
**closer** [3] - 3973:9, 4005:11, 4069:5
**closing** [3] - 3997:19, 4012:6, 4032:24
**clothing** [2] - 3876:15, 3990:13
**cognizant** [1] - 3883:8
**Cohen** [3] - 3970:19, 3970:24, 3971:2
**collaborate** [2] - 4106:10, 4113:18
**collateral** [1] - 4012:18
**collectable** [2] - 3926:18, 3927:9
**collecting** [1] - 3926:7
**collection** [1] - 3882:11
**college** [6] - 3870:20, 3871:8, 4035:25, 4036:2, 4058:10
**College** [2] - 3989:4, 4057:21
**Columbia** [22] - 3992:7, 4055:6, 4055:9, 4055:21, 4055:23, 4055:25, 4057:19, 4058:15, 4058:17, 4058:24, 4058:25, 4059:10, 4060:12, 4060:17, 4060:23, 4060:25, 4061:8, 4061:9, 4061:21, 4145:2, 4145:5
**column** [9] - 3931:9, 3931:10, 3931:11, 3931:12, 3932:7, 3932:8, 3942:11
**columns** [2] - 3931:8, 3931:19
**combination** [5] - 3994:21, 4018:6, 4018:11, 4023:6, 4092:1
**combined** [1] - 4042:14
**comfort** [1] - 3983:8
**comfortable** [2] - 3983:25, 4055:1
**coming** [5] - 3904:20, 3926:15, 3933:6, 4021:21, 4092:24
**comment** [5] - 3931:4, 3931:21, 3933:9, 3934:23, 3935:14, 3935:21, 4058:11, 4058:13, 4107:21
**Comment** [2] - 3931:12, 3932:7
**Comment/Response** [1] - 3931:11
**comments** [7] - 3930:15, 3930:18, 3937:17, 3941:16, 4024:15, 4047:18, 4051:3
**Commission** [3] - 3855:13, 4049:7, 4059:17
**commitments** [1] - 3882:8
**Common** [7] - 3889:17, 3889:18, 3889:21, 3889:23, 3890:16, 3891:1, 3891:2

**common** [5] - 3898:25, 3906:20, 3910:16, 3932:10, 4012:3
**communicate** [1] - 4084:5
**communication** [1] - 4024:1
**communications** [1] - 4126:17
**communities** [1] - 4042:10
**Community** [1] - 3989:4
**community** [6] - 4038:12, 4038:16, 4038:20, 4045:2, 4045:5, 4046:21
**companies** [25] - 3871:25, 3872:6, 3873:12, 3873:13, 3887:12, 3923:15, 3924:24, 3925:2, 3926:8, 3926:19, 3927:5, 3927:8, 3933:18, 3956:5, 3956:7, 3971:14, 4065:10, 4067:7, 4082:5, 4089:14, 4089:17, 4114:8, 4117:22, 4127:12
**Company** [4] - 3878:2, 3931:10, 3989:7, 4123:4
**company** [134] - 3863:6, 3871:21, 3872:19, 3873:15, 3874:15, 3874:17, 3875:16, 3876:3, 3878:15, 3878:22, 3878:23, 3880:3, 3880:25, 3882:4, 3882:6, 3882:12, 3882:22, 3885:22, 3885:23, 3887:14, 3889:7, 3889:15, 3890:5, 3890:8, 3890:19, 3891:7, 3892:14, 3896:13, 3896:21, 3897:10, 3897:14, 3897:15, 3897:17, 3897:18, 3900:7, 3902:25, 3910:17, 3911:15, 3914:12, 3915:1, 3915:11, 3915:13, 3915:15, 3915:17, 3917:13, 3922:14, 3924:6, 3924:7, 3925:22, 3926:1, 3926:3, 3926:7, 3926:9, 3926:12, 3926:15, 3926:16, 3927:21, 3931:21, 3931:22, 3931:24, 3932:1, 3932:15, 3933:9, 3933:20, 3934:12, 3934:15, 3935:14, 3935:19, 3935:23, 3936:2, 3937:12, 3938:24, 3939:2, 3944:21, 3946:12, 3948:8, 3948:12, 3958:10, 3958:14, 3962:7, 3962:15, 3964:1, 3966:16, 3969:18, 3970:5, 3970:16, 3972:19, 3972:23, 3974:2, 3974:14, 3974:18, 3976:13, 3977:11, 3977:18, 3977:19, 3977:23, 3980:6, 4013:25, 4015:17, 4020:25, 4021:2, 4023:16, 4024:13, 4025:20, 4034:24, 4042:5, 4042:16, 4057:16, 4058:11, 4067:2, 4067:3, 4068:24, 4068:25, 4069:2, 4069:6, 4070:7, 4073:20, 4082:6, 4082:11, 4082:14, 4084:5, 4084:8, 4084:10, 4086:8, 4092:12, 4093:21, 4127:16, 4127:24, 4128:1, 4128:8
**company's** [4] - 3855:20, 3882:19, 3928:6, 3964:8
**compelling** [2] - 4017:17, 4068:18
**compensation** [3] - 3911:9, 3943:12, 3944:4
**competent** [2] - 3861:13, 4020:17
**compile** [1] - 3895:20
**compiling** [4] - 3879:16, 3879:20, 3895:15
**complaining** [1] - 3867:15

**complete** [2] - 3950:18, 3953:6
**completed** [3] - 3959:20, 3973:2, 4080:18
**completely** [1] - 3869:1
**completing** [4] - 3950:12, 4017:15, 4068:12, 4068:16
**completion** [2] - 4012:8, 4073:16
**complex** [1] - 3880:10
**compliance** [2] - 3872:10, 3880:11
**comply** [1] - 3980:20
**compound** [4] - 4044:9, 4070:24, 4133:16
**compounds** [1] - 4133:14
**comprehensive** [2] - 3932:13, 4119:16
**Computer** [1] - 3854:25
**Computer-aided** [1] - 3854:25
**computerized** [1] - 3854:25
**concept** [1] - 4066:25
**concern** [6] - 3857:4, 3859:11, 3859:12, 3997:24, 4051:6, 4051:8
**concerned** [3] - 3919:15, 3919:23, 3977:1
**concerning** [2] - 3938:22, 4049:8
**conclude** [1] - 3975:16
**concluded** [3] - 3998:10, 4041:17, 4112:16
**concluding** [1] - 3983:9
**conclusion** [1] - 3992:20
**conclusions** [1] - 3983:23
**concurrence** [1] - 4124:1
**concurs** [1] - 3984:1
**condition** [3] - 4012:10, 4041:9, 4073:18
**conditioned** [2] - 4012:8, 4073:16
**conditions** [3] - 4012:12, 4099:24, 4103:16
**conduct** [3] - 3937:7, 4005:16, 4134:15
**conducting** [1] - 4082:16
**confident** [1] - 4127:5
**confidential** [5] - 4097:25, 4098:6, 4098:10, 4103:16, 4109:24
**confirmed** [2] - 4099:18, 4109:15
**confirming** [1] - 4099:5
**confirms** [1] - 4098:25
**conflict** [1] - 4120:23
**Conflicts** [1] - 4120:7
**conflicts** [2] - 4120:11, 4120:20
**conformity** [1] - 3883:1
**confused** [3] - 3911:5, 3911:6, 4041:12
**confusion** [3] - 3937:11, 3938:12, 4041:7
**connect** [1] - 4125:19
**connection** [14] - 3857:16, 3868:14, 3873:24, 3887:5, 3889:2, 3894:20, 3895:19, 3899:1, 3935:12, 3945:23, 3951:4, 4039:11, 4065:17, 4084:15
**consents** [1] - 4100:3
**consequences** [1] - 4100:8
**conservative** [2] - 4036:8, 4036:9
**consider** [2] - 4063:23, 4080:12
**considered** [1] - 4077:25

**considers** [1] - 4086:12
**consistent** [2] - 3997:5, 3998:7
**constantly** [1] - 3957:23
**constellation** [1] - 4081:9
**consultant** [2] - 3917:3, 3927:21
**consultants** [2] - 3945:12, 3961:21
**consulting** [10] - 3928:16, 3960:24, 3960:25, 3961:3, 3961:17, 3961:21, 3964:23, 3967:3, 3967:12, 3967:21
**Consulting** [3] - 3970:5, 3970:10, 3970:16
**Consumer** [2] - 3971:6, 3972:8
**contact** [10] - 3865:24, 3874:23, 3874:24, 3884:6, 3884:9, 3946:8, 3951:13, 3958:14, 3959:2, 3974:3
**contacts** [1] - 3960:5
**contained** [1] - 3931:15
**contemplated** [2] - 4097:24, 4098:5
**content** [5] - 3868:15, 3917:2, 3923:25, 3924:1, 3968:2
**contentious** [3] - 3946:19, 3946:20, 3949:19, 3950:21
**contents** [1] - 3916:20
**context** [8] - 3862:21, 3865:18, 4023:20, 4041:3, 4062:8, 4092:24, 4130:17, 4131:16
**continuation** [2] - 3862:14, 3862:15
**continue** [9] - 3895:8, 3900:19, 3936:2, 3949:5, 3987:9, 3987:10, 4043:7, 4043:9, 4043:11
**continued** [10] - 3906:25, 3936:16, 3981:23, 3999:21, 4022:15, 4029:9, 4050:9, 4064:13, 4101:13, 4120:25
**Continued** [12] - 3995:12, 3998:12, 4028:13, 4039:23, 4041:19, 4075:10, 4078:21, 4084:24, 4088:7, 4106:25, 4112:19, 4137:5
**continues** [3] - 3879:25, 3959:24, 4014:24
**CONTINUES** [4] - 3907:1, 3982:1, 4030:6, 4102:1
**continuing** [2] - 3989:15, 4080:22
**CONTINUING** [3] - 3999:4, 4042:2, 4113:12
**Continuing** [5] - 3880:1, 3960:1, 4015:1, 4073:1, 4136:1
**contractor** [2] - 3945:1, 3945:3
**contractors** [1] - 3944:25
**contributor** [1] - 4081:16
**control** [11] - 3885:23, 3885:24, 3886:1, 3886:7, 3886:8, 3886:11, 3886:19, 3889:22, 3892:10, 3897:16, 3897:17
**controlled** [4] - 3892:3, 3892:6, 3925:8, 3925:11
**controlling** [3] - 3892:2, 3892:8, 4081:11
**controls** [4] - 3882:16, 3883:6, 3886:14, 3899:21
**conversation** [5] - 3923:16, 3944:19, 3945:14, 4056:2, 4136:5
**conversations** [6] - 3954:15, 3968:20,

3968:22, 3995:3, 4010:1, 4021:18
**conversion** [5] - 3898:10, 3898:23, 3898:24, 3899:1, 3909:17
**Conversion** [1] - 3898:21
**converted** [6] - 3878:6, 3878:25, 4027:18, 4032:13, 4037:19, 4117:10
**converting** [2] - 3898:25, 3899:6
**convey** [2] - 3910:14, 3913:16
**convicts** [1] - 4130:6
**Cooperman** [30] - 3861:8, 3862:5, 3862:6, 3862:23, 3863:4, 3863:5, 3863:13, 3864:4, 3864:9, 3865:20, 3866:14, 3867:5, 3867:13, 3872:24, 3872:25, 3873:1, 3873:4, 3873:5, 3873:8, 3873:23, 3873:25, 3874:2, 3879:9, 3879:11, 3949:22, 3949:23, 3950:14, 3952:12, 3952:15, 3956:25
**Cooperman's** [2] - 3868:18, 3952:19
**copied** [1] - 3888:3
**copy** [12] - 3898:21, 3902:18, 3929:16, 4020:5, 4076:7, 4079:7, 4079:9, 4080:9, 4116:6, 4126:14, 4126:21, 4137:1
**copying** [3] - 3905:25, 3947:6, 3961:3
**cordial** [1] - 4027:4
**COREY** [1] - 3870:5
**Corey** [7] - 3860:17, 3870:2, 3902:1, 3905:25, 3909:6, 3930:12, 3970:10
**Corey's** [1] - 3924:17
**corner** [4] - 3931:1, 3931:3, 3931:5, 3934:24
**corp** [2] - 3898:11, 3899:2
**Corp** [6] - 3878:6, 3878:7, 3878:8, 3878:14, 3878:25
**corporation** [7] - 3878:9, 3878:12, 3886:25, 3892:8, 3899:7, 4068:24
**Corporation** [1] - 3878:18
**correct** [274] - 3856:8, 3891:24, 3903:24, 3905:1, 3908:9, 3926:22, 3931:14, 3934:7, 3935:5, 3943:19, 3952:16, 3954:1, 3954:4, 3954:7, 3954:10, 3954:14, 3955:4, 3955:5, 3956:5, 3956:6, 3956:13, 3956:25, 3957:10, 3957:13, 3957:18, 3957:22, 3958:8, 3958:15, 3958:24, 3959:2, 3959:5, 3959:8, 3959:12, 3960:3, 3961:18, 3961:22, 3962:6, 3964:9, 3966:24, 3967:4, 3967:5, 3968:18, 3970:4, 3971:14, 3971:18, 3971:21, 3971:23, 3972:2, 3972:4, 3972:13, 3973:5, 3973:8, 3973:10, 3973:12, 3973:13, 3973:14, 3973:17, 3973:22, 3973:25, 3974:17, 3974:19, 3975:24, 3975:25, 3976:2, 3976:3, 3976:8, 3976:20, 3977:7, 3977:8, 3978:10, 3978:12, 3978:13, 3978:18, 3978:25, 3979:4, 3979:6, 3979:16, 3979:17, 3980:2, 3980:3, 3980:7, 3980:10, 3981:1, 3981:13, 3981:14, 3981:16, 3982:5, 3982:13, 3983:19, 3985:19, 3986:18, 3986:22, 4031:24, 4031:25,
**corrected** [1] - 3883:11
**corrections** [1] - 3883:12
**correctly** [8] - 4057:23, 4057:24, 4083:5, 4099:3, 4099:4, 4100:10, 4100:11, 4132:13
**correspond** [1] - 3960:10
**corresponded** [1] - 3960:4
**correspondence** [4] - 3957:24, 3958:19, 3968:14, 4026:17
**corresponding** [2] - 3958:10, 3958:11
**cost** [2] - 3955:1, 4081:18
**costs** [1] - 3986:13
**counsel** [6] - 3855:1, 3861:14, 3861:23, 3865:17, 3958:4, 3958:6
**counsel's** [1] - 3865:24
**Count** [1] - 3937:3
**country** [1] - 3873:2

4032:1, 4032:2, 4032:7, 4032:8, 4032:10, 4032:15, 4033:9, 4033:14, 4033:16, 4033:22, 4033:23, 4034:17, 4034:21, 4034:22, 4035:19, 4036:4, 4036:6, 4037:1, 4037:4, 4037:5, 4037:12, 4037:14, 4037:22, 4038:1, 4038:2, 4038:3, 4038:7, 4038:8, 4038:11, 4042:6, 4042:7, 4042:10, 4042:13, 4043:13, 4044:3, 4044:4, 4044:24, 4044:25, 4048:1, 4049:23, 4049:24, 4052:17, 4052:25, 4053:1, 4053:3, 4054:9, 4054:10, 4055:11, 4057:3, 4057:4, 4058:5, 4058:6, 4058:8, 4058:18, 4058:25, 4059:15, 4060:9, 4060:12, 4060:13, 4061:22, 4061:23, 4062:18, 4063:10, 4063:13, 4063:17, 4063:18, 4063:21, 4063:22, 4064:4, 4064:5, 4064:11, 4064:18, 4064:19, 4064:22, 4065:7, 4065:8, 4065:24, 4065:25, 4066:6, 4066:7, 4067:2, 4067:14, 4067:21, 4067:22, 4068:5, 4069:10, 4069:11, 4071:13, 4071:25, 4072:1, 4073:4, 4073:7, 4073:21, 4074:1, 4077:14, 4077:16, 4077:19, 4080:9, 4092:17, 4093:14, 4093:17, 4094:11, 4094:12, 4094:14, 4095:8, 4095:15, 4095:16, 4095:17, 4095:18, 4095:20, 4095:21, 4095:24, 4096:4, 4097:14, 4098:6, 4099:10, 4099:13, 4100:14, 4100:15, 4102:10, 4102:14, 4102:19, 4103:7, 4103:8, 4103:22, 4103:23, 4104:21, 4105:1, 4105:19, 4115:17, 4116:20, 4117:3, 4117:6, 4117:7, 4117:8, 4117:9, 4117:12, 4118:17, 4118:21, 4119:10, 4120:1, 4120:23, 4120:24, 4121:22, 4122:4, 4122:9, 4122:11, 4122:20, 4124:12, 4124:14, 4124:15, 4124:21, 4125:20, 4125:21, 4125:22, 4125:23, 4126:12, 4126:17, 4126:18, 4128:18, 4129:13, 4136:12, 4141:8, 4141:13, 4141:14, 4141:18, 4141:20, 4142:2, 4142:3, 4142:5, 4142:6, 4142:7, 4142:8, 4142:11, 4142:21, 4143:8, 4143:9, 4144:18, 4144:19
**corrected** [1] - 3883:11
**corrections** [1] - 3883:12
**correctly** [8] - 4057:23, 4057:24, 4083:5, 4099:3, 4099:4, 4100:10, 4100:11, 4132:13
**correspond** [1] - 3960:10
**corresponded** [1] - 3960:4
**correspondence** [4] - 3957:24, 3958:19, 3968:14, 4026:17
**corresponding** [2] - 3958:10, 3958:11
**cost** [2] - 3955:1, 4081:18
**costs** [1] - 3986:13
**counsel** [6] - 3855:1, 3861:14, 3861:23, 3865:17, 3958:4, 3958:6
**counsel's** [1] - 3865:24
**Count** [1] - 3937:3
**country** [1] - 3873:2

**couple** [10] - 3900:19, 3932:25, 3940:1, 3944:2, 3962:14, 3981:11, 4031:17, 4040:11, 4092:14, 4115:24
**course** [8] - 3858:22, 3864:16, 3882:17, 3914:12, 4008:15, 4016:16, 4035:9, 4036:6
**COURT** [320] - 3854:1, 3855:1, 3856:9, 3856:25, 3859:9, 3859:13, 3859:17, 3859:20, 3860:1, 3860:7, 3860:12, 3860:19, 3861:2, 3861:4, 3861:6, 3861:10, 3862:10, 3862:17, 3862:22, 3863:7, 3863:10, 3864:22, 3865:1, 3865:16, 3866:25, 3867:6, 3867:13, 3868:2, 3868:8, 3868:10, 3868:22, 3868:24, 3869:3, 3869:6, 3869:9, 3869:13, 3869:22, 3870:3, 3870:7, 3876:18, 3887:17, 3895:2, 3901:22, 3905:19, 3912:25, 3914:10, 3915:20, 3915:24, 3919:18, 3920:12, 3921:3, 3923:8, 3929:7, 3931:24, 3932:2, 3934:4, 3934:9, 3934:14, 3934:19, 3934:21, 3936:10, 3938:5, 3938:14, 3939:4, 3939:7, 3939:11, 3939:15, 3939:23, 3940:9, 3941:2, 3946:3, 3947:16, 3951:19, 3954:24, 3956:18, 3958:21, 3958:23, 3961:7, 3961:11, 3962:22, 3963:1, 3964:19, 3964:21, 3965:7, 3966:1, 3966:8, 3967:19, 3970:13, 3971:2, 3971:7, 3976:11, 3976:16, 3979:13, 3981:21, 3983:12, 3984:14, 3984:16, 3987:1, 3987:3, 3987:7, 3987:12, 3987:15, 3987:17, 3987:21, 3987:25, 3990:15, 3994:11, 3994:13, 3994:15, 3995:1, 3995:9, 3998:2, 3998:7, 3999:2, 4000:17, 4002:2, 4002:17, 4002:22, 4004:10, 4004:15, 4004:21, 4005:2, 4005:4, 4005:11, 4005:15, 4005:22, 4006:3, 4006:13, 4006:17, 4006:20, 4006:22, 4006:24, 4007:13, 4007:18, 4010:18, 4011:21, 4013:7, 4017:11, 4019:9, 4022:8, 4025:12, 4029:1, 4029:6, 4029:8, 4030:2, 4031:2, 4031:6, 4033:19, 4038:5, 4038:24, 4039:5, 4039:12, 4039:17, 4039:20, 4040:24, 4041:5, 4041:12, 4041:15, 4044:10, 4044:13, 4045:10, 4045:22, 4046:3, 4046:12, 4047:12, 4048:13, 4048:17, 4051:22, 4052:4, 4052:7, 4052:21, 4053:15, 4054:15, 4056:22, 4058:21, 4059:2, 4059:14, 4059:20, 4059:22, 4060:1, 4060:4, 4060:6, 4060:14, 4060:19, 4062:22, 4062:24, 4063:3, 4063:12, 4070:25, 4074:4, 4074:14, 4074:18, 4074:21, 4074:25, 4076:5, 4076:7, 4076:10, 4076:22, 4077:7, 4077:12, 4077:15, 4077:17, 4078:4, 4078:10, 4078:12, 4078:14, 4078:18, 4079:15, 4079:23, 4085:5, 4085:8, 4085:25, 4086:3, 4087:2, 4087:5, 4087:13, 4087:17, 4087:21, 4087:23, 4088:1, 4088:5, 4089:9, 4089:19,

4090:13, 4093:16, 4094:1, 4094:23, 4095:13, 4096:24, 4100:17, 4100:22, 4101:3, 4104:1, 4104:3, 4105:24, 4106:16, 4106:18, 4106:21, 4107:3, 4107:10, 4107:13, 4107:16, 4108:2, 4108:9, 4108:23, 4109:11, 4110:3, 4110:12, 4111:24, 4112:1, 4112:4, 4112:14, 4113:2, 4113:10, 4114:15, 4115:13, 4118:9, 4118:11, 4121:25, 4122:6, 4122:13, 4122:15, 4124:19, 4125:5, 4125:10, 4125:12, 4125:16, 4126:2, 4128:12, 4128:14, 4128:20, 4128:24, 4129:3, 4129:17, 4129:20, 4129:23, 4129:25, 4130:22, 4131:6, 4131:21, 4133:11, 4134:6, 4134:15, 4135:3, 4135:7, 4135:12, 4135:18, 4135:22, 4136:20, 4138:3, 4138:7, 4138:10, 4138:13, 4138:17, 4138:19, 4138:23, 4138:25, 4139:2, 4139:11, 4139:24, 4140:4, 4140:7, 4140:10, 4140:12, 4140:16, 4140:19, 4141:22, 4141:24, 4143:12, 4143:15, 4143:18, 4143:22, 4145:10, 4145:16, 4145:19, 4145:22, 4146:6, 4146:9, 4146:13, 4146:16
**court** [6] - 3999:1, 4030:1, 4042:1, 4078:13, 4113:1, 4140:11
**Court** [6] - 3854:23, 3854:23, 3870:5, 3939:19, 3987:20, 4135:24
**Court's** [3] - 3913:1, 3921:4, 3923:9
**courtesy** [1] - 4112:5
**Courthouse** [1] - 3854:5
**COURTROOM** [1] - 3869:5
**courtroom** [4] - 3876:13, 3990:10, 3990:11, 4004:20
**cover** [5] - 3895:1, 3984:24, 4007:20, 4040:10, 4097:14
**coverage** [1] - 4146:3
**covered** [3] - 3986:1, 4011:9, 4063:3
**covering** [3] - 4010:23, 4010:24, 4094:5
**covers** [1] - 3985:7
**CPA** [1] - 3871:2
**crafts** [2] - 4140:21, 4141:12
**Cramer** [3] - 3992:8, 4058:1, 4123:3
**create** [3] - 3863:5, 4110:17, 4120:19
**created** [3] - 3921:16, 4133:3, 4134:4
**creating** [4] - 4020:19, 4022:17, 4091:12, 4127:8
**crime** [2] - 3941:9, 4108:16
**CRIMINAL** [1] - 3854:11
**Criminal** [2] - 3855:3, 3857:8
**criteria** [1] - 3992:14
**critical** [1] - 4111:18
**criticism** [2] - 3949:2, 3949:11
**criticizing** [1] - 4068:14
**cross** [5] - 3984:20, 3997:18, 4111:6, 4144:10, 4145:1
**CROSS** [4] - 3951:22, 4031:7, 4147:4, 4147:8
**CROSS-EXAMINATION** [2] - 4031:7, 4147:8

**cross-examine** [2] - 3997:18, 4111:6
**cumbersome** [1] - 3885:16
**cumulative** [1] - 4110:2
**cup** [1] - 4143:15
**cure** [1] - 4081:22
**current** [2] - 3888:11, 4119:5
**cursory** [2] - 4012:9, 4073:16
**customary** [1] - 4012:9
**customer** [1] - 4073:17
**cut** [1] - 3906:4
**cycle** [1] - 3933:14

# D

**DA** [1] - 3964:7
**dal** [1] - 4080:25
**Dallas** [15] - 3988:18, 3989:4, 3989:24, 3990:9, 3990:19, 3990:20, 4038:12, 4038:16, 4045:2, 4045:5, 4047:25, 4048:9, 4054:5, 4055:15, 4063:4
**damage** [3] - 3950:13, 4027:18, 4077:5
**damages** [1] - 4121:16
**DARA** [2] - 4080:18, 4082:6
**dare** [1] - 3948:24
**Darren** [38] - 3990:8, 3990:19, 3990:24, 3990:25, 3991:5, 3994:22, 3996:5, 3996:6, 3996:8, 4019:14, 4023:10, 4038:9, 4038:19, 4038:22, 4039:2, 4039:7, 4040:6, 4040:13, 4040:16, 4040:18, 4040:19, 4041:9, 4041:10, 4041:11, 4050:2, 4051:4, 4053:24, 4055:10, 4055:20, 4055:22, 4059:6, 4092:5, 4123:9, 4123:11, 4144:11, 4144:14, 4144:20
**Darren's** [1] - 4047:17
**Date** [1] - 3931:9
**date** [51] - 3877:23, 3883:24, 3894:18, 3895:10, 3896:21, 3907:9, 3912:5, 3913:21, 3919:3, 3919:7, 3919:9, 3919:13, 3919:15, 3919:16, 3919:23, 3919:24, 3919:25, 3920:3, 3931:19, 3933:15, 3946:14, 3952:20, 3961:8, 3961:14, 3962:25, 3963:6, 3975:9, 3975:13, 3975:17, 3975:20, 3975:22, 3976:5, 3976:17, 3985:3, 4001:9, 4001:10, 4003:5, 4007:10, 4009:2, 4009:3, 4023:21, 4025:21, 4030:21, 4071:2, 4071:3, 4092:15, 4105:14, 4124:16, 4131:18
**dated** [16] - 3887:21, 3908:5, 3908:17, 3923:13, 3927:3, 3933:2, 3943:25, 3948:20, 4001:21, 4013:9, 4019:3, 4068:3, 4072:7, 4075:8, 4090:18, 4131:18
**dates** [4] - 3874:9, 3924:18, 4070:3, 4071:11
**David** [9] - 3873:19, 3874:12, 3874:24, 3888:2, 3888:19, 3968:8, 3968:19, 3968:23, 3969:2
**day-to-day** [1] - 4015:23
**days** [4] - 3896:18, 3913:24, 4008:11, 4010:25

**de** [1] - 3885:14
**deal** [1] - 4131:1
**Dealers** [1] - 4117:25
**dealing** [3] - 3886:19, 3979:22, 4108:12
**dealings** [1] - 4121:11
**dealt** [2] - 3869:17, 4042:9
**dean** [1] - 4057:20
**debit** [7] - 3885:10, 3885:25, 3933:2, 3934:7, 3977:2, 3977:7, 3977:10
**Deborah** [1] - 3855:3
**debt** [6] - 3940:3, 3940:4, 3940:7, 3942:13, 3942:25, 3943:21
**December** [20] - 3879:17, 3888:10, 3888:12, 3894:6, 3895:20, 3916:18, 3923:1, 3923:13, 3924:11, 3924:12, 3924:16, 3927:4, 3985:8, 3985:13, 4017:16, 4022:14, 4022:21, 4023:25, 4068:17, 4091:16
**decide** [4] - 3887:10, 3924:8, 3926:17, 4006:1
**decided** [7] - 3950:25, 4017:14, 4022:17, 4068:9, 4068:14, 4068:23, 4091:11
**decision** [16] - 3882:20, 3915:16, 3916:9, 3916:10, 3917:13, 3951:12, 3993:23, 3994:5, 3999:8, 4032:9, 4034:20, 4044:2, 4044:6, 4044:15, 4087:19, 4144:8
**decisions** [5] - 3883:8, 3883:9, 3883:16, 3993:16, 4132:6
**decline** [1] - 4082:4
**declined** [1] - 4143:8
**deduction** [2] - 4027:3, 4027:7
**deemed** [1] - 4119:15
**deeper** [1] - 3954:16
**deeply** [2] - 4013:24, 4070:7
**defend** [1] - 3910:18
**defendant** [84] - 3854:9, 3860:23, 3875:3, 3875:6, 3876:5, 3876:9, 3876:13, 3886:18, 3888:2, 3888:15, 3888:22, 3905:11, 3906:1, 3906:12, 3906:14, 3906:17, 3906:21, 3907:24, 3911:11, 3915:4, 3919:12, 3922:23, 3925:8, 3927:3, 3927:4, 3927:7, 3928:6, 3928:24, 3929:17, 3930:17, 3934:23, 3936:5, 3940:6, 3942:12, 3942:24, 3943:10, 3943:20, 3944:10, 3944:16, 3946:18, 3946:24, 3947:6, 3947:23, 3950:7, 3951:14, 3990:18, 3990:21, 3990:23, 3991:3, 3992:9, 3995:4, 3996:22, 3997:4, 3997:18, 3999:7, 4000:5, 4008:18, 4009:19, 4010:7, 4010:23, 4013:9, 4013:22, 4016:16, 4019:13, 4019:20, 4020:4, 4020:8, 4021:22, 4022:10, 4024:23, 4025:7, 4026:8, 4026:13, 4056:16, 4077:9, 4122:19, 4130:9, 4131:15, 4132:9, 4134:7, 4134:21, 4134:24, 4135:2, 4140:22
**Defendant** [1] - 3854:19
**Defendant's** [3] - 4056:19, 4084:12,

4138:15

**defendant's** [12] - 3887:1, 3906:12, 3930:13, 3935:21, 3937:16, 3941:16, 3944:12, 3945:11, 3950:10, 3992:2, 3997:10, 4133:19

**defending** [3] - 3865:8, 3866:6

**Defense** [9] - 3961:13, 3965:3, 3969:15, 4056:10, 4078:14, 4136:25, 4147:22, 4147:23, 4147:23

**defense** [12] - 3856:6, 3856:9, 3856:14, 3856:18, 3856:22, 3857:25, 3868:11, 3962:23, 4056:22, 4074:14, 4140:16, 4145:21

**deficiencies** [1] - 3954:17

**deficient** [1] - 3872:4

**define** [2] - 3855:23, 3858:25

**defined** [1] - 4114:2

**definitely** [1] - 3960:4

**definitions** [1] - 3856:10

**defraud** [1] - 4130:4

**defrauded** [3] - 4107:25, 4108:6, 4130:15

**defrauding** [1] - 4108:14

**degree** [5] - 3870:20, 4057:21, 4063:19, 4108:17, 4108:21, 4119:6

**degrees** [1] - 4104:20

**Delaware** [3] - 3910:16, 4097:19, 4103:14

**delayed** [1] - 4009:14

**deliberations** [2] - 3859:5, 3859:18

**delighted** [1] - 4027:6

**delineate** [1] - 3886:24

**delineated** [1] - 3928:11

**delivered** [1] - 4099:2

**Deloitte** [1] - 3871:20

**delved** [1] - 3954:16

**denial** [1] - 3938:16

**dense** [1] - 3989:23

**Denton** [1] - 3912:1

**department** [3] - 3863:3, 3863:14, 3872:5

**Department** [2] - 3872:19, 3874:13

**departure** [2] - 4020:18, 4127:6

**depended** [1] - 3958:9

**deposit** [1] - 3925:17

**deposits** [1] - 3877:12

**deprived** [1] - 4132:3

**depriving** [1] - 4130:6

**DEPUTY** [1] - 3869:5

**derives** [2] - 4104:11, 4104:24

**describe** [8] - 3858:23, 3946:17, 3946:20, 3966:9, 3988:21, 4061:25, 4068:8, 4119:8

**described** [10] - 3917:17, 3951:1, 3953:24, 3981:9, 3985:12, 4046:19, 4062:17, 4068:4, 4089:11, 4099:24

**describes** [1] - 4119:11

**describing** [4] - 3867:7, 3941:24, 3956:1

**Description** [1] - 3931:9

**description** [1] - 3931:19

**descriptions** [1] - 3855:12

**Desert** [7] - 4025:4, 4025:15, 4025:16, 4025:17, 4027:18, 4116:25, 4118:13

**designed** [2] - 4110:8, 4119:4

**desperately** [1] - 4083:2

**despite** [1] - 4081:23

**detail** [3] - 3863:23, 3931:18, 3935:18

**detailed** [1] - 4064:16

**details** [1] - 4096:1

**deteriorating** [1] - 3868:24

**determination** [1] - 3883:14

**determine** [6] - 4005:8, 4064:6, 4107:8, 4114:3, 4120:17, 4123:25

**determined** [1] - 4024:10

**developed** [2] - 4081:1, 4082:22

**developer** [1] - 4058:5

**Development** [1] - 3989:20

**development** [2] - 3873:23, 3955:8

**Di** [1] - 3898:16

**diagnosis** [1] - 4081:15

**dial** [1] - 4112:1

**dialogue** [4] - 4076:19, 4085:23, 4085:25, 4086:3

**diary** [1] - 4142:16

**difference** [8] - 3858:17, 3878:11, 3880:13, 3934:5, 3944:6, 3983:22, 3996:17

**differences** [2] - 3889:20, 4146:14

**different** [24] - 3878:9, 3878:14, 3890:2, 3892:19, 3898:10, 3956:5, 3956:7, 3959:12, 3961:17, 3962:11, 3969:7, 3980:10, 3986:4, 3991:10, 3991:11, 4003:24, 4004:13, 4008:8, 4014:13, 4015:22, 4016:12, 4066:12, 4115:24

**difficult** [7] - 3860:12, 3928:5, 3928:8, 3928:9, 3928:12, 4007:12, 4044:1

**difficulty** [2] - 3863:18, 4140:13

**diligence** [8] - 3996:6, 4012:9, 4040:13, 4050:2, 4051:2, 4051:3, 4073:17, 4107:18

**dinner** [24] - 3991:5, 3991:6, 3991:7, 3991:8, 3991:14, 3992:10, 3994:8, 3994:23, 3996:21, 4046:19, 4051:4, 4052:17, 4053:11, 4053:12, 4053:16, 4053:19, 4054:7, 4055:13, 4061:14, 4062:3, 4062:8, 4062:10, 4144:11, 4144:18

**direct** [22] - 3956:24, 3960:23, 3971:16, 3974:3, 3974:21, 3976:25, 4031:22, 4033:6, 4055:4, 4068:4, 4073:15, 4073:19, 4076:20, 4079:12, 4079:16, 4085:17, 4090:17, 4094:4, 4097:6, 4122:17, 4124:9, 4131:9

**DIRECT** [7] - 3870:8, 3941:13, 3988:7, 4000:1, 4007:4, 4147:4, 4147:7

**direction** [1] - 4018:19

**directly** [11] - 3857:15, 3902:14, 3934:6, 3958:3, 3958:11, 3962:13, 3963:17, 3974:2, 4023:6, 4092:1, 4108:15

**director** [1] - 3855:3

**Directors** [1] - 4012:2

**disagree** [3] - 4048:8, 4144:20, 4144:23

**disagreed** [1] - 4144:22

**disappointment** [1] - 4026:5

**disclose** [4] - 3881:12, 3914:4, 3997:7

**disclosed** [2] - 3856:21, 3916:7

**discloses** [1] - 3855:8

**disclosure** [3] - 3855:18, 3856:16, 3892:18

**disclosures** [2] - 3856:23, 3981:10

**discovered** [1] - 4081:1

**discretion** [7] - 4120:22, 4121:19, 4121:20, 4123:14, 4123:16, 4123:18, 4123:19

**discuss** [7] - 3874:3, 4004:17, 4005:7, 4005:22, 4106:21, 4109:23, 4129:21

**discussed** [10] - 3875:22, 3875:23, 3939:20, 3941:6, 3960:23, 3991:23, 4031:13, 4069:13, 4077:11, 4090:17

**discusses** [1] - 4130:21

**discussing** [2] - 3944:22, 3972:15

**discussion** [6] - 3915:4, 3915:7, 3915:8, 3944:15, 3944:20, 3991:8

**discussions** [7] - 3858:20, 3886:18, 3887:1, 3915:22, 3916:3, 3951:8, 3996:22

**disease** [3] - 4081:21, 4081:23, 4082:3

**diseases** [4] - 4081:9, 4081:14, 4081:17, 4081:19

**dislike** [1] - 3866:21

**dismay** [1] - 4060:20

**disorganization** [1] - 4082:6

**disparaging** [2] - 3861:19

**displayed** [1] - 4064:20

**displeasure** [1] - 3861:25

**distinction** [1] - 3983:22

**distracting** [1] - 3887:2

**distribute** [2] - 4022:23, 4091:18

**distributions** [2] - 4100:5, 4100:6

**DISTRICT** [3] - 3854:1, 3854:1, 3854:12

**District** [1] - 3854:15

**ditch** [1] - 4081:23

**diverse** [1] - 4045:18

**docs** [2] - 4000:6, 4002:11

**document** [128] - 3877:20, 3877:21, 3883:18, 3883:20, 3883:22, 3887:19, 3889:12, 3894:16, 3894:18, 3895:7, 3896:4, 3897:3, 3897:4, 3897:24, 3899:4, 3899:5, 3899:6, 3900:3, 3900:4, 3901:2, 3901:9, 3903:13, 3907:21, 3908:14, 3910:7, 3910:9, 3911:20, 3911:22, 3912:8, 3912:14, 3913:20, 3914:18, 3917:20, 3918:20, 3920:7, 3920:8, 3920:15, 3920:18, 3920:22, 3922:21, 3923:11, 3930:20, 3930:22, 3937:18, 3941:18, 3945:16, 3945:18, 3945:20, 3945:21, 3947:4, 3948:5, 3948:7, 3948:11, 3948:18, 3964:7, 3964:13, 3966:3, 3966:4, 3966:5, 3966:9, 3966:25, 3967:22, 3971:1, 3971:3, 3974:21, 3976:2, 3979:7, 3979:9, 3979:10, 3979:14,

3979:15, 3979:19, 3980:21, 3980:22, 3984:1, 3985:10, 3986:9, 4000:12, 4001:4, 4001:9, 4001:11, 4001:16, 4001:20, 4010:13, 4011:14, 4012:22, 4019:2, 4022:1, 4025:3, 4025:23, 4026:10, 4049:3, 4056:11, 4057:1, 4060:8, 4060:11, 4074:24, 4080:22, 4087:6, 4087:10, 4087:14, 4090:14, 4090:15, 4090:16, 4096:11, 4097:4, 4099:5, 4099:11, 4100:19, 4100:22, 4101:11, 4102:13, 4103:9, 4109:4, 4109:24, 4110:1, 4110:20, 4116:1, 4119:2, 4131:3, 4131:4, 4136:6, 4136:8, 4136:24, 4137:3, 4139:17, 4141:2

**documentary** [1] - 4139:11
**documentation** [7] - 3885:3, 3903:3, 3903:6, 3928:14, 3959:4, 3959:5, 3959:15
**documents** [27] - 3867:21, 3867:22, 3896:25, 3905:7, 3905:9, 3911:1, 3918:18, 3921:10, 3921:20, 3922:4, 3922:7, 3928:21, 3948:17, 4000:4, 4001:18, 4002:6, 4094:3, 4094:10, 4094:13, 4094:16, 4094:17, 4095:4, 4095:15, 4098:25, 4101:8, 4135:4, 4145:21
**Documents** [1] - 3916:19
**dollar** [6] - 3885:15, 3911:8, 3977:6, 4033:13, 4033:15, 4034:6
**dollars** [2] - 4033:16, 4127:18
**done** [28] - 3867:23, 3892:16, 3892:17, 3898:4, 3922:17, 3929:1, 3950:12, 3989:8, 3990:25, 3991:17, 3992:13, 3992:17, 3992:23, 3993:1, 3993:5, 3996:25, 4009:24, 4023:5, 4036:25, 4037:2, 4037:3, 4067:11, 4067:12, 4067:16, 4069:6, 4091:25, 4108:1, 4142:15
**Donee** [1] - 3910:11
**donee** [2] - 3910:20, 3919:12
**door** [1] - 4125:9
**double** [3] - 3886:15, 3949:18, 3987:24
**doubt** [1] - 4092:21
**down** [40] - 3864:6, 3880:21, 3882:5, 3890:16, 3891:5, 3891:15, 3894:4, 3895:12, 3898:9, 3898:8, 3899:15, 3900:17, 3900:19, 3912:7, 3932:24, 3935:6, 3936:12, 3942:15, 3987:6, 3993:21, 3996:3, 3997:11, 4003:7, 4004:22, 4008:22, 4013:8, 4016:22, 4017:14, 4029:6, 4029:7, 4030:15, 4030:20, 4044:11, 4048:3, 4068:9, 4068:15, 4090:7, 4099:20, 4112:1
**downtown** [1] - 3990:19
**downturn** [1] - 4024:3
**drafted** [1] - 3959:21
**drain** [1] - 3946:23
**dramatic** [1] - 4082:4
**draw** [4] - 3873:10, 3996:18, 4131:25, 4133:4

**drop** [2] - 4024:1, 4108:9
**dropout** [2] - 4057:16, 4058:11
**dropped** [10] - 4024:6, 4035:24, 4035:25, 4036:2, 4037:15, 4055:25, 4057:21, 4059:9, 4061:9, 4145:3
**dropping** [1] - 4058:10
**drug** [6] - 4081:7, 4082:11, 4082:25, 4083:3, 4083:24, 4089:13
**drugs** [3] - 4015:9, 4082:21, 4083:1
**Duchenne** [1] - 4082:24
**due** [11] - 3908:16, 3923:24, 3926:24, 3996:6, 4012:9, 4040:13, 4050:2, 4051:2, 4051:3, 4073:16, 4107:18
**duly** [2] - 3870:5, 3988:5
**during** [30] - 3869:19, 3873:11, 3875:22, 3878:4, 3879:7, 3881:16, 3881:18, 3897:7, 3946:17, 3956:9, 3958:3, 3977:14, 3982:4, 4008:15, 4010:6, 4014:11, 4016:16, 4024:2, 4035:9, 4056:3, 4057:22, 4066:20, 4066:21, 4085:24, 4090:17, 4105:6, 4126:12, 4130:2, 4130:18, 4132:5
**duties** [2] - 3886:1, 3886:2
**duty** [4] - 4023:2, 4091:22, 4092:22, 4093:1
**DX** [1] - 3982:25
**dying** [1] - 4082:24
**Dynagrow** [1] - 3900:18
**Dynagrow/Sarah** [1] - 3891:16
**dynamic** [1] - 3865:6
**Dystrophy** [1] - 4082:24

# E

**e-mail** [155] - 3887:21, 3887:23, 3888:9, 3888:18, 3888:21, 3888:24, 3889:8, 3898:16, 3898:18, 3898:20, 3901:11, 3901:25, 3902:2, 3902:8, 3903:14, 3903:18, 3903:19, 3903:23, 3904:1, 3904:2, 3904:4, 3904:10, 3905:24, 3906:11, 3906:18, 3906:24, 3907:8, 3907:9, 3907:13, 3907:22, 3908:2, 3908:4, 3908:10, 3909:5, 3909:7, 3909:10, 3909:12, 3909:19, 3912:15, 3912:16, 3913:3, 3913:6, 3916:17, 3916:21, 3916:25, 3917:2, 3918:25, 3920:21, 3920:22, 3921:6, 3921:9, 3921:14, 3922:2, 3922:3, 3922:23, 3923:11, 3923:13, 3923:18, 3923:19, 3923:21, 3923:22, 3923:25, 3924:10, 3924:16, 3925:10, 3925:21, 3927:3, 3928:23, 3929:11, 3929:12, 3929:15, 3930:7, 3930:14, 3930:16, 3961:3, 3961:5, 3961:16, 3962:21, 3963:20, 3967:9, 3968:14, 3969:11, 3969:17, 3969:18, 3969:21, 3970:9, 3970:14, 3970:15, 3970:22, 3978:19, 3978:21, 3979:6, 3979:18, 3983:18, 3984:3, 3984:24, 4015:6, 4015:13, 4017:1, 4017:7, 4019:3, 4019:12, 4019:20, 4019:22, 4019:25, 4020:2, 4020:8, 4021:10, 4021:19, 4021:22, 4022:2,

4023:19, 4024:5, 4024:20, 4024:23, 4026:16, 4030:15, 4030:20, 4073:3, 4074:10, 4074:12, 4075:5, 4076:24, 4076:25, 4078:2, 4079:7, 4079:9, 4079:13, 4079:19, 4079:25, 4080:16, 4083:20, 4084:11, 4084:20, 4084:22, 4084:23, 4087:5, 4087:16, 4087:19, 4088:1, 4089:5, 4089:10, 4089:21, 4089:23, 4090:22, 4092:16, 4094:2, 4094:5, 4136:2, 4136:5, 4145:1
**E-mail** [70] - 3854:24, 3861:11, 3861:12, 3861:21, 3864:1, 3864:2, 3865:3, 3865:25, 3866:2, 3866:6, 3866:15, 3867:4, 3867:24, 3868:16, 3868:19, 3877:4, 3877:8, 3877:16, 3941:15, 3943:24, 3943:25, 3945:21, 3946:5, 3947:6, 3947:18, 3947:20, 3948:4, 3948:10, 3948:20, 3949:4, 3949:7, 3949:21, 3952:11, 3952:19, 3957:24, 4000:13, 4000:20, 4003:14, 4007:10, 4009:2, 4010:14, 4010:20, 4011:3, 4011:15, 4011:16, 4012:23, 4013:2, 4013:3, 4013:8, 4013:22, 4014:15, 4056:12, 4056:14, 4057:2, 4057:6, 4057:14, 4064:10, 4071:3, 4071:24, 4072:7, 4126:8, 4126:20, 4128:15, 4129:6, 4129:9, 4130:8, 4130:20, 4131:14
**E-mailing** [1] - 3959:7
**E-mails** [24] - 3866:9, 3867:9, 3867:14, 3868:17, 3868:19, 3868:20, 3877:3, 3949:19, 3950:1, 3950:6, 3950:7, 3950:22, 3958:11, 4004:5, 4006:19, 4009:20, 4064:16, 4066:22, 4124:5, 4130:16, 4130:17, 4130:18, 4130:23
**e-mails** [9] - 3905:10, 3905:11, 3962:8, 3968:9, 3972:14, 3984:5, 4084:14, 4089:13, 4095:4
**EA** [1] - 3934:25
**early** [10] - 3884:16, 3923:16, 3924:8, 3963:13, 3963:22, 3989:16, 4014:14, 4053:10, 4057:18, 4131:10
**earn** [1] - 3890:24
**earned** [1] - 4008:19
**earnings** [1] - 4100:4
**easier** [6] - 3965:4, 4056:5, 4056:7, 4068:2, 4116:6, 4122:2
**East** [4] - 3854:15, 3912:1, 3912:2, 3991:18
**EASTERN** [1] - 3854:1
**Eastern** [1] - 3854:15
**easy** [1] - 3928:5
**economics** [1] - 3988:24
**Ed** [3] - 3893:20, 3960:12, 3973:8
**education** [1] - 3870:13
**educational** [1] - 3988:21
**effect** [8] - 3920:8, 3921:20, 4040:16, 4047:4, 4065:22, 4077:13, 4130:24, 4135:4
**effective** [2] - 3950:5, 4081:25
**effectively** [1] - 3897:18

**effort** [7] - 4064:6, 4064:8, 4071:25, 4081:24, 4082:24, 4123:6, 4124:5
**efforts** [2] - 4017:18, 4068:19
**eight** [2] - 3871:17, 3957:5
**either** [6] - 3926:23, 3980:11, 4034:20, 4049:25, 4096:2, 4131:4
**El** [1] - 3989:4
**elapsed** [2] - 4030:17, 4030:21
**Elea** [6] - 3995:3, 3996:11, 3997:4, 3997:7, 3997:13, 4123:1
**ELEIS** [1] - 3854:17
**eliciting** [1] - 3864:17
**eligible** [1] - 4114:3
**embarrass** [1] - 4109:16
**embarrassed** [1] - 4109:19
**embarrassing** [1] - 4036:25
**embody** [2] - 4022:18, 4091:12
**employed** [1] - 4123:3
**employee** [9] - 3855:3, 3855:8, 3862:8, 3911:7, 3911:14, 3917:8, 3930:1, 3933:25, 3934:6
**employees** [10] - 3889:1, 3890:19, 3911:19, 3934:16, 3944:17, 3945:5, 3945:12, 3946:12, 4121:15
**Employment** [3] - 3933:12, 3935:2, 3935:4
**employment** [3] - 3933:15, 3944:5, 3945:5
**encounter** [1] - 3885:18
**encountered** [1] - 3935:25
**encourage** [1] - 4086:8
**encouraged** [1] - 4082:17
**end** [18] - 3903:9, 3927:25, 3928:2, 3928:3, 3980:6, 3985:8, 3986:20, 4005:9, 4006:6, 4013:16, 4024:10, 4031:22, 4034:6, 4056:16, 4066:19, 4088:6, 4093:18
**ended** [6] - 3879:17, 3985:16, 3986:3, 4017:20, 4068:21, 4133:24
**endothelin** [2] - 4080:24, 4082:3
**ends** [2] - 4078:13, 4140:11
**energetic** [2] - 4061:25, 4062:4
**energy** [4] - 4020:16, 4022:18, 4091:13, 4127:5
**engage** [3] - 3875:20, 3959:22, 4120:17
**engaged** [3] - 3874:8, 3893:21, 3893:22
**engagement** [40] - 3864:4, 3872:18, 3877:18, 3877:22, 3880:22, 3880:25, 3881:11, 3881:12, 3881:16, 3881:19, 3884:2, 3884:7, 3884:16, 3885:5, 3894:5, 3894:17, 3895:8, 3895:10, 3895:19, 3895:22, 3895:23, 3896:7, 3896:10, 3897:20, 3930:2, 3950:4, 3950:15, 3951:5, 3951:13, 3954:3, 3958:4, 3962:4, 3984:21, 3984:24, 3985:3, 3985:7, 3985:23, 3986:2, 3986:4, 3986:16
**Enid** [1] - 3988:22
**enrolled** [3] - 4057:19, 4145:2, 4145:5
**entering** [3] - 3869:21, 3941:1, 4006:23
**enterprise** [1] - 4106:6

**enters** [2] - 4030:1, 4113:1
**entire** [3] - 3861:21, 3878:4, 3884:9
**entirely** [1] - 4108:21
**entities** [14] - 3891:7, 3892:24, 3893:5, 3893:12, 3899:25, 3901:2, 3901:5, 3924:19, 3924:24, 3925:9, 4043:6, 4043:18, 4120:13, 4120:18
**entity** [9] - 3878:10, 3893:9, 3897:25, 3908:19, 3910:19, 3971:18, 3999:14, 4043:21, 4068:23
**entries** [15] - 3882:19, 3882:21, 3884:20, 3884:24, 3885:9, 3885:10, 3885:11, 3885:12, 3885:20, 3891:19, 3899:24, 3900:19, 3903:1, 3932:23, 3936:8
**entry** [9] - 3883:12, 3891:15, 3891:21, 3899:24, 3900:18, 3932:24, 3933:1, 3935:6, 3935:8
**Equinox** [1] - 4105:11
**equity** [15] - 3872:16, 3891:7, 3891:22, 3904:13, 3932:21, 3972:19, 3993:4, 3993:5, 3993:7, 3993:8, 3993:11, 4017:18, 4068:18, 4104:17, 4117:23
**Eric** [1] - 4143:6
**errors** [2] - 3881:12, 3881:14
**especially** [2] - 4020:16, 4127:4
**ESQ** [8] - 3854:14, 3854:16, 3854:17, 3854:17, 3854:20, 3854:21, 3854:21, 3854:22
**ESRD** [1] - 4081:16
**essence** [2] - 3956:15, 3992:16
**essentially** [3] - 3956:12, 4058:9, 4119:24
**establish** [1] - 4044:1
**established** [2] - 3890:8, 3997:3
**establishes** [1] - 4086:9
**establishment** [1] - 3882:15
**estate** [3] - 4042:12, 4042:15, 4042:16
**estimate** [4] - 3953:5, 3954:16, 3986:14, 4036:8
**estimated** [3] - 3953:25, 3985:16, 3986:12
**et** [1] - 4105:11
**ethic** [1] - 3992:18
**ethnic** [1] - 4054:21
**Eulich** [5] - 4053:25, 4054:7, 4054:13, 4054:22, 4055:1
**EULICH** [1] - 4054:1
**Europe** [1] - 3991:17
**evaluate** [3] - 3860:8, 3992:14, 4108:18
**evaluating** [1] - 4106:5
**Evan** [42] - 4073:18, 3873:21, 3873:22, 3874:1, 3887:24, 3909:5, 3955:3, 3955:6, 3955:7, 3955:19, 3956:10, 3956:12, 3956:15, 3957:20, 3958:7, 3958:13, 3962:5, 3962:7, 3962:12, 3962:17, 3963:3, 3963:8, 3963:14, 3963:17, 3963:18, 3968:10, 3968:13, 3968:14, 3968:15, 3968:20, 3968:23, 3969:1, 3973:21, 3974:3, 3981:18, 3982:7, 3982:13, 3983:1, 3983:3,

3983:8, 3983:14, 3984:4
**Evan/Martin** [1] - 3944:2
**evening** [3] - 4145:19, 4146:1, 4146:10
**event** [1] - 3914:13
**eventually** [8] - 3871:10, 3871:12, 3872:11, 3878:25, 3887:3, 4027:12, 4027:13, 4027:15
**evidence** [72] - 3855:6, 3869:12, 3869:15, 3877:3, 3881:15, 3881:17, 3881:24, 3887:20, 3898:15, 3905:17, 3909:2, 3912:23, 3913:1, 3916:14, 3921:1, 3921:4, 3921:24, 3923:6, 3923:9, 3929:5, 3929:9, 3941:11, 3943:23, 3946:1, 3947:14, 3952:9, 3953:23, 3961:5, 3963:10, 3967:8, 3974:23, 3975:2, 3978:20, 3985:21, 4000:15, 4001:25, 4007:8, 4008:25, 4013:5, 4022:6, 4025:10, 4056:15, 4067:25, 4069:18, 4072:2, 4074:11, 4074:13, 4074:19, 4076:1, 4078:9, 4078:15, 4079:2, 4080:6, 4080:7, 4085:1, 4087:14, 4090:9, 4094:2, 4097:3, 4109:3, 4109:4, 4109:6, 4110:1, 4117:14, 4126:4, 4129:15, 4138:1, 4138:14, 4139:21, 4140:22, 4141:12
**evidentiary** [1] - 4134:24
**exact** [4] - 3874:9, 3878:20, 3959:22, 4003:19
**exactly** [2] - 4130:21, 4132:18
**exam** [1] - 3871:3
**EXAMINATION** [22] - 3870:8, 3907:1, 3941:13, 3951:22, 3982:1, 3984:17, 3988:7, 3999:4, 4000:1, 4007:4, 4030:6, 4031:7, 4042:2, 4102:1, 4113:12, 4144:1, 4147:4, 4147:4, 4147:5, 4147:7, 4147:8, 4147:9
**examination** [18] - 3860:13, 3971:17, 3974:22, 3976:25, 4031:23, 4033:6, 4055:4, 4068:4, 4073:15, 4073:19, 4076:20, 4079:12, 4079:16, 4090:17, 4094:4, 4097:6, 4122:18, 4124:9
**examine** [2] - 3997:18, 4111:6
**examined** [1] - 3988:5
**example** [9] - 3855:17, 3856:15, 3864:2, 3868:5, 3902:23, 3997:7, 4052:23, 4115:15, 4134:2
**examples** [1] - 3937:13
**excel** [2] - 3941:15, 3941:18
**Excel** [3] - 3930:20, 3931:15, 3932:11
**except** [3] - 3996:7, 4083:5, 4099:23
**exception** [4] - 4077:10, 4129:12, 4132:11, 4132:14
**exceptions** [1] - 3983:25
**excess** [3] - 3953:1, 3954:4, 4106:14
**exchange** [5] - 3867:15, 3867:25, 3900:8, 4006:19, 4114:18
**Exchange** [3] - 3855:13, 4049:7, 4059:17
**exciting** [1] - 4082:11
**exclude** [1] - 3868:10

**excluded** [1] - 3857:14
**exclusion** [1] - 4132:13
**exculpate** [1] - 4121:13
**exculpation** [1] - 4121:7
**exculpatory** [1] - 4132:8
**excuse** [6] - 3887:17, 4039:20, 4048:17, 4096:24, 4138:17, 4145:25
**excused** [3] - 3987:3, 4145:17, 4146:7
**execute** [1] - 4082:8
**exempted** [1] - 4057:9
**exercise** [1] - 4121:11
**exhaustively** [1] - 3980:17
**Exhibit** [106] - 3864:1, 3877:2, 3887:20, 3894:14, 3894:23, 3895:3, 3898:15, 3901:8, 3901:20, 3905:5, 3905:20, 3905:23, 3907:18, 3907:20, 3908:3, 3908:25, 3909:3, 3910:10, 3912:12, 3912:22, 3913:1, 3913:4, 3916:13, 3916:15, 3917:25, 3918:2, 3918:3, 3918:7, 3918:20, 3919:6, 3920:16, 3920:23, 3921:1, 3921:4, 3921:7, 3921:10, 3921:24, 3921:25, 3922:20, 3923:6, 3923:9, 3928:19, 3929:5, 3929:11, 3929:13, 3941:15, 3943:22, 3945:17, 3946:1, 3947:2, 3947:14, 3952:2, 3961:13, 3969:15, 3974:23, 3979:12, 3984:19, 3985:20, 3985:22, 4000:9, 4000:14, 4001:14, 4001:18, 4001:24, 4002:2, 4002:9, 4002:15, 4002:17, 4002:24, 4007:8, 4009:1, 4010:11, 4010:16, 4011:13, 4011:19, 4012:22, 4013:5, 4016:25, 4017:9, 4018:25, 4019:7, 4021:25, 4022:6, 4025:2, 4025:10, 4030:9, 4056:10, 4056:11, 4056:20, 4056:22, 4067:25, 4069:19, 4072:3, 4074:14, 4074:15, 4078:15, 4090:9, 4094:25, 4097:2, 4097:10, 4098:10, 4098:13, 4136:25, 4138:15, 4140:17
**exhibit** [7] - 3984:20, 4002:20, 4056:16, 4098:16, 4126:13, 4129:18, 4129:20
**Exhibits** [4] - 3905:17, 3929:8, 4004:2, 4004:8
**exhibits** [2] - 3860:21, 3869:9
**exist** [2] - 3881:13, 3926:1
**existence** [3] - 4066:20, 4066:22, 4120:18
**exit** [3] - 3950:16, 3950:17, 3951:1
**exits** [4] - 3936:14, 4029:5, 4106:23, 4146:8
**expect** [4] - 3904:16, 4003:22, 4005:5, 4082:4, 4100:6, 4133:25
**expectation** [3] - 3993:2, 4066:8, 4066:12, 4066:15
**expected** [3] - 3991:24, 4016:13, 4019:19
**expenditures** [1] - 3936:1
**expense** [16] - 3886:3, 3906:6, 3906:9, 3907:17, 3926:2, 3927:1, 3932:22, 3935:12, 3935:19, 3937:21, 3937:22, 3977:12, 3977:13, 3977:16, 3977:22

**expenses** [18] - 3883:14, 3883:15, 3886:20, 3886:21, 3886:23, 3937:11, 3937:23, 3937:24, 3938:6, 3939:13, 3940:5, 3940:7, 3941:6, 3941:7, 3941:9, 3941:10, 3985:18, 4121:14
**experience** [18] - 3857:7, 3857:9, 3911:16, 4012:18, 4052:18, 4054:19, 4054:23, 4066:3, 4101:12, 4104:5, 4106:4, 4107:7, 4107:11, 4107:16, 4108:20, 4109:9, 4115:3, 4121:2
**experienced** [5] - 3957:9, 4053:17, 4053:23, 4066:1, 4102:9
**expert** [7] - 3856:19, 3856:20, 3856:21, 3857:2, 3857:3, 3858:18, 3993:22
**expertise** [1] - 3857:7
**explain** [7] - 3855:15, 3858:23, 3863:23, 3868:15, 3890:21, 4024:3, 4130:16
**explained** [2] - 3875:23, 3875:24
**explaining** [3] - 3934:5, 3934:9, 3934:10
**explanation** [3] - 3937:17, 3944:6, 4024:11
**explanations** [1] - 3855:12
**express** [3] - 3881:4, 3954:22, 3954:25
**expressed** [3] - 3861:24, 3953:13, 3997:24
**expressing** [2] - 3866:16, 3979:5
**extend** [1] - 4082:2
**extended** [1] - 4077:4
**extent** [2] - 3868:2, 4114:3
**extra** [1] - 4140:13
**eye** [3] - 3870:25, 4021:6, 4128:5

## F

**F.B.I** [1] - 4059:16
**face** [3] - 3866:3, 3866:15, 3936:12
**fact** [34] - 3855:6, 3857:1, 3857:6, 3857:18, 3858:13, 3877:9, 3896:6, 3917:14, 3936:5, 3938:3, 3940:2, 3940:3, 3950:14, 3966:20, 3982:15, 3983:8, 4021:11, 4021:15, 4024:23, 4034:16, 4061:20, 4065:11, 4066:8, 4095:20, 4107:19, 4107:21, 4108:14, 4132:1, 4132:21, 4135:5, 4145:5, 4145:9
**facts** [5] - 3857:12, 4031:13, 4031:19, 4034:18, 4132:15
**failure** [1] - 4081:15
**fair** [33] - 3949:11, 3953:9, 3953:10, 3957:25, 3959:10, 3959:16, 3968:14, 3968:17, 3970:3, 3971:12, 3972:11, 3977:5, 3979:23, 3982:9, 3984:5, 4011:1, 4031:14, 4036:18, 4036:21, 4036:22, 4044:5, 4044:8, 4049:18, 4053:5, 4061:9, 4061:10, 4062:13, 4062:15, 4066:2, 4067:4, 4067:6, 4067:15, 4136:23
**fairly** [4] - 4008:12, 4036:25, 4037:2, 4037:3
**fairness** [2] - 4121:11, 4131:11
**faith** [3] - 3997:21, 4121:11, 4121:21

**fall** [1] - 3983:19
**false** [1] - 4134:4
**familiar** [6] - 3873:15, 3968:7, 3980:13, 3981:3, 4098:17, 4098:23
**Family** [1] - 4043:19
**Far** [1] - 3991:18
**far** [8] - 3914:12, 3934:23, 3942:11, 3954:4, 4020:14, 4082:19, 4083:16, 4127:2
**fast** [4] - 3865:20, 3865:21, 3867:8, 4082:8
**father** [1] - 3992:5
**FBI** [2] - 4048:6, 4049:7
**FDA** [2] - 4082:8, 4083:3
**FDA-approved** [1] - 4083:3
**February** [40] - 3887:22, 3888:14, 3889:9, 3889:13, 3891:22, 3893:12, 3896:16, 3900:21, 3903:21, 3904:6, 3904:8, 3906:4, 3906:15, 3908:16, 3908:17, 3925:20, 3933:2, 3935:6, 3935:8, 3962:20, 3963:5, 3963:13, 3963:23, 3967:9, 3999:12, 4007:21, 4008:2, 4008:7, 4008:8, 4008:20, 4008:24, 4025:22, 4027:22, 4034:12, 4075:8, 4079:8, 4080:16, 4131:17, 4131:18
**fed** [1] - 3887:7
**Federal** [1] - 3855:6
**fee** [3] - 3954:12, 3985:18, 3986:10
**feedback** [1] - 3877:6
**Fees** [1] - 3985:12
**fees** [6] - 3953:24, 3954:3, 3954:7, 3986:13, 4007:25, 4009:8
**fences** [1] - 3996:15
**Fernandez** [3] - 3916:22, 3917:4, 3917:9
**few** [15] - 3900:10, 3932:23, 3936:8, 3955:15, 4008:11, 4018:3, 4020:15, 4023:11, 4057:18, 4076:24, 4079:10, 4081:19, 4082:15, 4092:6, 4127:3
**fewer** [1] - 4120:17
**fides** [1] - 4086:9
**fiduciaries** [1] - 4121:10
**fifth** [2] - 3856:3, 3931:11
**fifty** [6] - 3873:14, 4124:12, 4125:2, 4125:7, 4125:20, 4125:21
**fighting** [1] - 4006:14
**figure** [4] - 3884:21, 3914:4, 4111:15, 4123:6
**figured** [1] - 4069:24
**figures** [1] - 3979:2
**file** [4] - 3902:5, 3902:11, 3941:18, 3981:7
**filed** [1] - 4020:7
**filing** [2] - 3950:24, 3976:23
**filings** [2] - 3856:2, 3856:7
**fill** [2] - 3951:10, 4103:7
**filled** [3] - 3884:12, 3980:4, 4094:13, 4094:16, 4106:8
**filling** [2] - 4000:7, 4109:7
**final** [7] - 3882:13, 3882:14, 3882:20,

3883:8, 3904:1, 3921:16, 3932:7
**finalize** [2] - 3902:24, 3906:22
**finally** [3] - 3891:5, 4023:7, 4092:2
**finance** [2] - 4037:21, 4091:17
**Finance** [2] - 4022:22, 4092:20
**finances** [3] - 3951:2, 3957:15, 3957:21
**Financial** [1] - 3874:12
**financial** [34] - 3857:10, 3870:25, 3871:13, 3872:1, 3872:4, 3872:14, 3879:17, 3879:19, 3880:9, 3881:1, 3881:3, 3881:5, 3881:23, 3883:4, 3895:9, 3895:16, 3895:21, 3896:18, 3896:24, 3897:2, 3904:16, 3913:24, 3914:17, 3921:19, 3927:1, 3959:15, 3959:21, 3980:19, 3980:20, 3981:8, 3984:2, 4013:15, 4104:15, 4106:4
**financials** [14] - 3862:24, 3863:17, 3885:4, 3887:5, 3887:13, 3889:3, 3896:21, 3898:3, 3902:25, 3906:22, 3926:5, 3927:12, 3927:22, 3928:6
**financing** [7] - 4012:10, 4012:12, 4012:17, 4073:18, 4073:21, 4074:1, 4074:6
**finder** [1] - 3857:18
**finders** [1] - 3858:13
**fine** [9] - 3859:24, 3859:25, 3868:7, 3868:9, 3962:2, 3970:18, 4010:4, 4018:19, 4088:4
**finger** [1] - 4001:11
**finish** [5] - 4077:7, 4111:11, 4111:12, 4111:13, 4138:25
**finished** [5] - 3959:20, 3983:2, 3983:4, 4057:18, 4111:2
**finishing** [1] - 3862:24
**FINRA** [5] - 3855:3, 3855:8, 3855:11, 3856:12, 3857:8
**fire** [1] - 3867:24
**firm** [31] - 3861:9, 3871:9, 3871:10, 3871:12, 3871:15, 3871:23, 3872:25, 3873:5, 3873:10, 3873:20, 3874:13, 3888:19, 3893:16, 3909:22, 3910:1, 3930:1, 3950:3, 3950:12, 3952:16, 3952:20, 3952:23, 3954:6, 3955:13, 3955:18, 3962:8, 3962:12, 3969:4, 3970:18, 3970:23, 3971:10
**firm's** [1] - 3950:11
**firms** [4] - 3871:11, 3871:16, 3873:2, 3956:25
**first** [62] - 3866:22, 3868:16, 3870:5, 3873:17, 3873:21, 3874:2, 3874:6, 3876:9, 3888:8, 3891:1, 3891:10, 3901:24, 3901:25, 3906:3, 3908:18, 3910:12, 3913:2, 3922:2, 3923:11, 3929:11, 3929:12, 3931:8, 3931:18, 3943:24, 3947:18, 3949:24, 3950:23, 3952:10, 3955:19, 3962:15, 3990:5, 3990:18, 3992:9, 4000:13, 4001:19, 4007:7, 4008:4, 4008:10, 4008:11, 4008:13, 4011:23, 4016:8, 4017:13, 4017:23, 4017:24, 4019:21, 4020:2, 4023:23, 4034:12, 4057:6, 4069:7,

4069:10, 4069:12, 4095:3, 4095:10, 4097:13, 4097:16, 4103:13, 4109:12, 4124:23, 4124:25, 4130:11
**fit** [1] - 3956:21
**five** [11] - 3855:19, 3856:17, 3957:7, 3957:8, 4010:12, 4030:22, 4033:13, 4033:15, 4034:6, 4105:7, 4140:9
**five-hundred-thousand-dollar** [3] - 4033:13, 4033:15, 4034:6
**flag** [2] - 3859:20, 4015:19
**flavor** [1] - 3864:19
**flight** [3] - 4138:19, 4138:21, 4140:7
**flippant** [1] - 4107:19
**floated** [1] - 3944:21
**flow** [1] - 3928:13
**flowed** [1] - 3928:10
**flows** [1] - 3872:15
**flush** [1] - 3937:10
**flying** [1] - 3957:8
**Focal** [1] - 4081:9
**focus** [26] - 3857:24, 3860:3, 3864:7, 3877:3, 3887:21, 3900:3, 3910:8, 3913:2, 3923:11, 3924:9, 3929:11, 3930:25, 3932:25, 3941:19, 3941:22, 4000:19, 4010:20, 4013:8, 4017:18, 4019:12, 4022:17, 4042:11, 4060:4, 4068:19, 4079:13, 4091:11
**focused** [5] - 3871:25, 4061:25, 4062:4, 4062:7, 4062:8
**focuses** [1] - 3871:13
**focusing** [6] - 4011:23, 4012:11, 4018:2, 4027:11, 4052:4, 4108:23
**follow** [13] - 3929:18, 3930:18, 3933:10, 3933:11, 3935:16, 3944:2, 4015:16, 4023:3, 4068:2, 4090:25, 4091:23, 4092:23, 4093:3
**Follow** [3] - 3929:24, 3931:11, 3932:4
**follow-up** [5] - 3929:18, 3930:18, 3933:10, 3933:11, 3935:16
**Follow-Up** [3] - 3929:24, 3931:11, 3932:4
**followed** [1] - 4034:23
**following** [29] - 3855:9, 3858:19, 3876:20, 3879:3, 3879:15, 3895:13, 3936:16, 3951:12, 3995:12, 3996:1, 3998:12, 3999:21, 4008:5, 4027:22, 4039:23, 4040:1, 4041:19, 4050:9, 4064:11, 4064:17, 4076:9, 4085:9, 4099:19, 4106:25, 4107:1, 4112:19, 4113:25, 4122:25, 4138:18
**follows** [3] - 3870:6, 3988:6, 4126:22
**footnotes** [1] - 3872:16
**FOR** [1] - 3854:11
**forcing** [1] - 4034:19
**forever** [3] - 3910:17, 4057:13
**form** [13] - 3878:9, 3881:1, 3881:4, 3897:16, 3898:11, 3919:17, 3926:17, 3977:9, 3980:11, 4018:12, 4058:22, 4122:14, 4141:2
**formal** [1] - 3877:11
**formally** [1] - 3875:25

**format** [1] - 3878:24
**formed** [2] - 3993:6, 4042:5
**former** [1] - 3930:1
**formerly** [1] - 4056:10
**forming** [2] - 4122:24, 4123:1
**forms** [4] - 3855:14, 3855:16, 3857:25, 3858:1
**forth** [8] - 3862:2, 3863:20, 3893:1, 3906:20, 4097:25, 4098:6, 4099:25, 4131:13
**forward** [8] - 3884:4, 3903:16, 3963:20, 3983:10, 3992:17, 4021:8, 4083:4, 4128:6
**forwarded** [2] - 3923:19, 3924:11
**forwarding** [1] - 3962:16
**forwards** [3] - 3888:25, 3945:9, 3969:18
**Foundation** [2] - 3989:20, 4028:11
**foundation** [10] - 3989:22, 4027:2, 4027:5, 4027:24, 4028:10, 4030:12, 4032:2, 4032:5, 4032:9, 4033:8
**foundational** [1] - 3997:21
**founded** [3] - 3871:22, 3989:19, 4068:25
**founder** [2] - 3977:19, 4122:25
**founders** [1] - 3863:12
**founders'** [5] - 3889:21, 3890:7, 3890:9
**four** [9] - 3871:10, 3871:15, 3871:18, 3881:9, 3891:19, 3896:1, 3937:22, 3988:23, 4057:9
**fourth** [7] - 3856:1, 3931:10, 3948:2, 3952:18, 3953:20, 3990:6, 4059:6
**FR** [1] - 3909:14
**frame** [10] - 3896:20, 3897:5, 3897:6, 3897:9, 3947:9, 3959:23, 3981:10, 4052:5, 4062:1, 4142:23
**francs** [3] - 3969:12, 3969:20, 3969:25
**Frank** [1] - 4098:21
**frankly** [4] - 3868:18, 3994:9, 4020:5, 4071:7
**fraud** [6] - 3881:13, 3881:16, 4130:6, 4130:19, 4134:11, 4134:18
**Fred** [1] - 3891:16
**free** [1] - 3855:24
**frequently** [3] - 4009:15, 4010:9, 4081:23
**Friday** [3] - 3929:15, 4028:1, 4032:24
**Friday's** [1] - 4028:8
**friend** [3] - 3990:8, 4057:21, 4080:13, 4080:14
**friends** [4] - 3994:17, 4077:20, 4080:11, 4131:21
**front** [6] - 3902:15, 3952:2, 3952:6, 3952:12, 3966:21, 4003:25
**frustrated** [3] - 3953:9, 3954:20, 3978:24
**frustration** [9] - 3865:14, 3866:17, 3867:8, 3911:2, 3913:19, 3953:13, 3954:25, 3979:6, 4112:3
**FSGS** [1] - 4083:1
**full** [4] - 3889:22, 4069:2, 4141:2
**fully** [3] - 4082:4, 4100:8, 4119:18

**function** [2] - 3857:17, 3880:3
**Fund** [1] - 3999:18
**fund** [91] - 3875:25, 3892:1, 3892:3, 3991:12, 3991:13, 3991:15, 3991:22, 3992:13, 3992:15, 3993:15, 3997:9, 3999:7, 3999:19, 4002:7, 4003:20, 4008:3, 4009:20, 4011:8, 4011:24, 4014:3, 4014:23, 4015:2, 4015:20, 4017:14, 4017:20, 4017:23, 4017:24, 4018:5, 4018:10, 4018:18, 4019:17, 4019:18, 4020:17, 4020:23, 4023:23, 4036:7, 4038:16, 4038:20, 4044:7, 4050:2, 4052:2, 4052:9, 4052:12, 4052:19, 4052:24, 4054:5, 4064:7, 4064:22, 4064:25, 4065:14, 4065:23, 4066:1, 4067:9, 4067:10, 4068:10, 4068:15, 4068:21, 4070:10, 4070:18, 4070:22, 4070:23, 4071:1, 4071:5, 4071:9, 4071:12, 4071:15, 4071:16, 4071:25, 4077:22, 4096:2, 4101:10, 4101:12, 4102:9, 4105:18, 4106:9, 4106:13, 4107:4, 4108:16, 4108:24, 4115:2, 4115:3, 4116:15, 4120:23, 4122:10, 4122:19, 4123:7, 4127:5, 4127:22, 4133:20, 4144:8
**fund's** [2] - 4009:22, 4115:5
**fundraisers** [1] - 4084:1
**funds** [59] - 3886:9, 3892:25, 3925:2, 3926:7, 3938:6, 3992:11, 3992:12, 4004:6, 4008:8, 4009:18, 4010:24, 4017:16, 4033:21, 4036:7, 4036:12, 4036:14, 4036:15, 4036:19, 4036:23, 4037:4, 4042:20, 4042:22, 4043:10, 4043:11, 4043:13, 4043:15, 4043:19, 4045:17, 4052:18, 4067:13, 4068:16, 4073:13, 4095:25, 4101:6, 4104:17, 4105:7, 4105:8, 4105:11, 4105:16, 4105:20, 4106:9, 4106:13, 4107:13, 4107:22, 4107:24, 4108:15, 4109:10, 4110:4, 4113:17, 4115:1, 4115:18, 4116:17, 4121:3
**funneled** [1] - 3938:3
**funny** [1] - 4057:17
**furnished** [2] - 4097:23, 4098:1
**future** [4] - 3869:14, 3993:1, 3993:3, 3998:4

## G

**gain** [1] - 4008:19
**gains** [1] - 4010:3
**Gate** [1] - 4116:25
**Gates** [3] - 4057:16, 4058:4
**Gateway** [6] - 4025:4, 4025:15, 4025:16, 4025:17, 4027:18, 4118:13
**gather** [1] - 3898:8
**gathering** [1] - 3877:9
**general** [35] - 3861:14, 3861:23, 3865:17, 3865:23, 3866:1, 3930:11, 3949:7, 3962:14, 4037:3, 4065:23, 4066:25, 4096:16, 4097:21, 4100:2, 4100:3, 4100:4, 4100:25, 4101:6,

4109:8, 4114:25, 4115:4, 4115:5, 4115:16, 4120:17, 4120:21, 4121:7, 4121:9, 4121:13, 4121:18, 4121:19, 4122:11, 4123:15, 4123:20, 4123:25
**generally** [12] - 3872:1, 3872:10, 3880:11, 3883:1, 4003:17, 4003:18, 4008:9, 4009:23, 4017:19, 4018:18, 4068:20, 4096:9
**Generally** [1] - 4119:3
**generating** [1] - 4069:3
**generous** [1] - 4027:1
**genius** [1] - 4040:19
**gentlemen** [2] - 3869:23, 4138:17
**George** [2] - 3902:14, 3923:19
**Georgia** [1] - 3989:2
**GIFs** [1] - 3908:6
**gift** [7] - 3915:9, 3915:12, 3915:14, 3915:16, 3916:3, 3916:6, 3916:9
**gigantic** [4] - 4014:2, 4070:10, 4070:17, 4071:23
**given** [18] - 3865:13, 3867:22, 3889:23, 3912:3, 3922:13, 3946:14, 4023:7, 4036:15, 4036:17, 4052:17, 4066:6, 4083:15, 4092:2, 4096:16, 4111:5, 4119:23, 4134:1, 4135:3
**Gleb** [6] - 3929:18, 3929:24, 3929:25, 3930:1, 3930:2, 3930:8
**gleeful** [1] - 4136:21
**Glomerulosclerosis** [1] - 4081:10
**Gloria** [2] - 4053:25, 4123:11
**go-to** [1] - 3960:21
**goal** [3] - 4017:15, 4068:12, 4068:15
**Goldman** [1] - 4052:24
**gonna** [3] - 3914:21, 3926:25, 4034:9
**governing** [1] - 3858:24
**Government** [92] - 3854:14, 3855:5, 3855:8, 3856:2, 3856:25, 3857:24, 3860:5, 3860:10, 3860:20, 3861:16, 3864:1, 3869:25, 3870:1, 3877:1, 3887:20, 3894:14, 3894:23, 3898:14, 3901:8, 3901:20, 3905:5, 3905:17, 3905:22, 3907:18, 3908:3, 3908:25, 3912:12, 3912:22, 3916:13, 3917:25, 3918:2, 3918:3, 3918:6, 3918:20, 3919:6, 3920:16, 3920:23, 3921:1, 3921:10, 3921:23, 3922:19, 3923:6, 3928:18, 3929:5, 3929:10, 3937:6, 3941:14, 3943:22, 3945:17, 3945:25, 3946:1, 3947:1, 3947:13, 3947:14, 3952:2, 3979:12, 3984:19, 3985:20, 3988:4, 4000:9, 4000:14, 4001:14, 4001:17, 4001:24, 4002:2, 4002:9, 4002:14, 4002:17, 4004:2, 4004:8, 4007:8, 4008:25, 4010:11, 4010:16, 4011:13, 4011:19, 4012:22, 4013:4, 4022:5, 4051:10, 4051:13, 4051:15, 4051:19, 4054:6, 4056:11, 4062:17, 4063:4, 4065:13, 4065:18, 4067:25, 4090:8
**government** [28] - 3862:1, 3894:22, 3901:19, 3905:16, 3920:25, 3923:5,

3929:4, 3933:24, 3966:23, 3996:5, 4002:24, 4033:6, 4038:15, 4047:23, 4047:24, 4050:1, 4075:6, 4077:6, 4079:16, 4084:15, 4085:17, 4086:13, 4089:4, 4090:16, 4095:2, 4095:5, 4095:10, 4108:5
**government's** [1] - 4018:24
**Government's** [14] - 3857:1, 3895:2, 3905:19, 3929:8, 3937:3, 3974:22, 4016:25, 4017:9, 4018:25, 4019:7, 4021:25, 4025:2, 4025:9, 4030:8
**grad** [1] - 4060:17
**graduate** [5] - 3870:18, 4058:17, 4060:12, 4060:25, 4061:8
**graduated** [9] - 3992:7, 4037:10, 4038:3, 4055:6, 4055:9, 4055:21, 4055:23, 4058:15, 4058:24
**grand** [1] - 3864:15
**Grand** [1] - 4061:14
**grant** [1] - 3910:13
**great** [5] - 3959:4, 4020:17, 4057:12, 4090:1, 4127:6
**Greebel** [30] - 3873:18, 3873:21, 3873:22, 3874:1, 3874:3, 3887:24, 3888:15, 3888:22, 3909:5, 3929:16, 3955:3, 3955:6, 3955:19, 3956:12, 3956:15, 3957:20, 3957:25, 3958:7, 3962:5, 3968:11, 3969:1, 3973:21, 3973:25, 3974:16, 3981:18, 3982:7, 3982:13, 3983:1, 3983:14, 3984:4
**Greebel's** [2] - 3863:7, 3873:24
**green** [1] - 3917:22
**grew** [1] - 3988:22
**grey** [1] - 3876:17
**gross** [1] - 4007:25
**ground** [2] - 4040:10, 4138:3
**Group** [9] - 3855:4, 3857:8, 3871:22, 3871:24, 3871:25, 3873:6, 3879:5, 3879:9, 3879:10
**group** [1] - 3865:3
**grouped** [1] - 3899:20
**grown** [1] - 3992:4
**growth** [1] - 4119:4
**guaranteeing** [2] - 3926:4, 3926:6
**guess** [5] - 3880:15, 3942:14, 4004:12, 4039:2, 4134:6
**guiding** [3] - 3880:16, 3880:18, 3981:19, 4119:24
**guru** [2] - 4058:1, 4086:9
**guy** [5] - 4086:12, 4108:7, 4108:13, 4110:10, 4133:6
**guys** [1] - 3976:19

## H

**Hackert** [6] - 3893:20, 3960:12, 3973:8, 3973:10, 3973:12, 3973:19
**Hackert's** [2] - 3960:13, 3973:16
**half** [8] - 3883:19, 3900:3, 3937:20, 3985:1, 3985:23, 3987:9, 4024:19, 4069:7
**hand** [7] - 3870:4, 3931:1, 3931:3,

3931:5, 3987:19, 4076:7, 4129:2

**handful** [1] - 3968:17

**handle** - 3951:2

**hands** [1] - 3978:3

**handwriting** [2] - 3939:22, 4139:15

**hang** [1] - 4112:12

**happy** [12] - 3945:13, 3952:1, 4024:21, 4071:23, 4112:7, 4130:11, 4132:7, 4133:6, 4133:24, 4135:13, 4136:10, 4136:18

**hard** [7] - 3965:4, 4009:14, 4051:11, 4074:25, 4081:11, 4105:17, 4116:19

**harmful** [1] - 3950:21

**Harrison** [4] - 4061:3, 4061:4, 4061:7, 4061:12

**Harvard** [3] - 3989:1, 4037:20, 4037:21

**Hassan** [1] - 3891:16

**Hathaway** [1] - 4127:14

**head** [2] - 3865:3, 4035:11

**heading** [1] - 4090:19

**health** [4] - 4011:25, 4042:9, 4043:11, 4123:2

**Health** [1] - 3989:15

**health-related** [1] - 4042:9

**Healthcare** [32] - 3890:12, 3891:19, 3891:21, 3891:25, 3892:23, 3893:3, 3893:14, 3899:24, 3900:20, 3900:21, 3901:3, 3901:5, 3902:7, 3903:23, 3904:6, 3904:8, 3904:14, 3904:15, 3904:21, 3904:24, 3906:4, 3908:20, 3908:23, 3925:20, 3937:15, 3938:4, 3941:25, 3942:9, 3942:20, 3943:15, 3972:4

**healthcare** [4] - 4042:23, 4043:10, 4043:12, 4081:18

**hear** [4] - 3873:17, 4007:15, 4007:17, 4057:8

**heard** [8] - 4061:17, 4076:4, 4077:1, 4080:20, 4106:17, 4118:11, 4124:23, 4124:25

**hearing** [8] - 3857:23, 3995:10, 3996:2, 4007:12, 4039:21, 4040:2, 4106:24, 4107:2

**hearsay** [20] - 3915:19, 4040:5, 4040:9, 4040:14, 4046:11, 4054:14, 4076:3, 4076:15, 4076:18, 4077:9, 4077:10, 4086:14, 4086:15, 4086:17, 4129:16, 4130:1, 4131:16, 4135:19, 4138:5, 4138:9

**heavy** [1] - 3989:17

**heck** [3] - 3913:17, 3978:20, 3978:21

**hedge** [70] - 3992:10, 3992:12, 3992:13, 3992:14, 3997:9, 3999:6, 4003:20, 4009:18, 4017:14, 4017:20, 4033:21, 4036:7, 4036:12, 4036:14, 4036:15, 4036:19, 4036:22, 4037:4, 4038:16, 4038:20, 4042:20, 4042:22, 4043:9, 4043:11, 4043:13, 4043:15, 4043:19, 4045:17, 4052:18, 4065:14, 4066:1, 4067:8, 4067:10, 4067:13, 4068:10, 4068:15, 4068:21, 4095:25, 4101:6,

4101:10, 4101:12, 4102:9, 4104:17, 4105:8, 4105:11, 4105:16, 4105:17, 4105:19, 4105:20, 4106:8, 4107:3, 4107:13, 4107:22, 4107:24, 4108:15, 4108:16, 4108:24, 4109:10, 4110:4, 4113:16, 4115:1, 4115:2, 4115:3, 4115:5, 4115:18, 4121:3, 4122:10, 4122:19, 4123:7

**held** [4] - 3995:10, 4039:21, 4106:24, 4132:1

**help** [4] - 3950:11, 3989:23, 4023:13, 4092:8

**helped** [1] - 3884:18

**helpful** [3] - 3857:21, 3860:2, 3860:6

**helping** [1] - 3872:17

**helps** [1] - 4055:16

**hence** [1] - 4044:6

**hereby** [2] - 3910:13, 3910:18

**herewith** [1] - 4097:23

**hi** [2] - 3950:11, 4090:23

**Hi** [1] - 4022:10

**high** [6] - 3991:25, 4022:19, 4036:1, 4057:18, 4091:13, 4119:6

**higher** [3] - 4034:15, 4035:8, 4133:7

**highest** [1] - 3870:13

**highlight** [1] - 4140:1

**highlighted** [2] - 3858:1, 4116:7

**highlighting** [1] - 4116:5

**highly** [6] - 3867:16, 4022:19, 4036:4, 4061:25, 4062:4, 4091:14

**himself** [1] - 4144:24

**hire** [1] - 3951:1

**hired** [5] - 3863:4, 3951:3, 3971:22, 3971:25, 3972:11

**historical** [1] - 3994:7

**history** [2] - 3994:5, 4063:19

**hit** [7] - 3866:18, 3866:19, 4037:6, 4037:8, 4108:7, 4108:11

**hold** [5] - 3878:25, 3910:17, 4034:20, 4048:25, 4055:15

**holding** [2] - 4021:1, 4127:25

**holds** [2] - 4034:14, 4132:2

**holiday** [2] - 3873:22, 3874:3

**home** [4] - 3989:5, 4042:15, 4043:2, 4145:16

**Home** [1] - 3989:14

**homerun** [1] - 4037:6

**homeruns** [2] - 4037:7, 4037:8

**homes** [2] - 3989:13, 4042:10

**honest** [1] - 3866:4

**honestly** [1] - 4135:19

**Honor** [139] - 3859:16, 3860:11, 3860:14, 3860:25, 3862:20, 3865:19, 3870:1, 3894:22, 3901:19, 3905:16, 3905:18, 3912:21, 3920:25, 3923:5, 3929:4, 3939:20, 3945:25, 3947:13, 3951:16, 3951:18, 3954:23, 3956:17, 3962:24, 3963:10, 3965:25, 3966:7, 3967:18, 3970:12, 3970:25, 3976:10, 3976:15, 3979:11, 3981:20, 3983:11, 3984:15, 3986:25, 3987:14, 3988:2,

3994:14, 3995:7, 3996:3, 3996:20, 3996:22, 3998:9, 3999:3, 4002:25, 4004:7, 4004:12, 4005:3, 4005:8, 4005:20, 4006:8, 4007:3, 4010:15, 4011:18, 4013:4, 4017:8, 4019:6, 4022:5, 4022:7, 4025:9, 4030:5, 4030:24, 4033:17, 4038:4, 4038:23, 4039:4, 4039:9, 4039:10, 4039:16, 4039:19, 4040:5, 4044:9, 4044:12, 4045:9, 4045:21, 4046:2, 4047:11, 4048:20, 4051:21, 4058:19, 4059:19, 4059:25, 4060:5, 4063:11, 4076:2, 4076:3, 4076:11, 4076:24, 4077:8, 4078:17, 4078:19, 4079:14, 4079:21, 4085:2, 4085:3, 4085:7, 4085:10, 4089:8, 4089:18, 4093:25, 4095:12, 4096:22, 4097:1, 4100:16, 4100:20, 4101:2, 4102:12, 4106:15, 4106:17, 4109:2, 4110:2, 4110:14, 4113:8, 4115:12, 4121:23, 4124:18, 4125:4, 4125:8, 4125:11, 4129:2, 4129:15, 4131:20, 4134:22, 4135:16, 4136:7, 4138:1, 4138:2, 4138:6, 4138:11, 4140:8, 4140:20, 4142:23, 4143:13, 4143:21, 4145:15, 4146:5, 4146:11, 4146:12

**HONORABLE** [1] - 3854:11

**hope** [7] - 3939:22, 4011:11, 4023:14, 4081:25, 4092:10, 4093:18, 4140:5

**hopefully** [1] - 4020:17

**hopes** [2] - 4022:19, 4091:13

**hoping** [3] - 4079:10, 4082:17, 4138:25

**horse** [2] - 4045:16, 4045:25

**horses** [1] - 4045:16

**hosted** [1] - 3991:5

**hostility** [2] - 4112:2, 4112:3

**hosting** [1] - 4084:1

**Hotel** [2] - 3935:7, 3935:9

**hour** [3] - 3937:20, 3987:9, 4005:2

**hourly** [1] - 3985:17

**hours** [3] - 4020:11, 4031:17, 4126:24

**housing** [1] - 3989:8

**Huang** [3] - 3902:6, 3902:14, 3922:24

**hundred** [5] - 4033:13, 4033:15, 4034:6, 4036:13, 4066:9

**hundreds** [3] - 4023:15, 4092:10, 4093:19

**hurt** [1] - 4082:6

**husband** [3] - 4106:8, 4107:6, 4113:16

**husband's** [1] - 4107:6

**hybrid** [2] - 4017:19, 4068:19

---

## I

**idea** [8] - 3980:18, 4011:1, 4011:10, 4024:9, 4047:16, 4066:10, 4077:21, 4082:25

**ideas** [4] - 3882:9, 4010:7, 4023:12, 4092:6

**identification** [31] - 3894:14, 3901:8, 3905:7, 3912:12, 3920:17, 3922:20, 3928:19, 3945:17, 3947:3, 4000:8,

4001:13, 4002:8, 4004:2, 4010:10, 4011:12, 4012:21, 4016:24, 4018:25, 4021:25, 4025:1, 4048:16, 4048:24, 4056:9, 4074:18, 4074:20, 4074:23, 4084:11, 4084:12, 4089:3, 4128:25, 4129:1
**identified** [16] - 3876:19, 3877:13, 3892:11, 3892:13, 3903:4, 3903:5, 3928:11, 3928:17, 3930:5, 3930:6, 3978:2, 3990:16, 4073:3, 4074:14, 4087:6, 4094:24
**identify** [7] - 3876:15, 3885:22, 3904:11, 3931:17, 3932:15, 3932:16, 4081:5
**idiopathic** [1] - 4081:11
**idiot** [1] - 3861:13
**ignore** [3] - 3857:17, 4086:1, 4130:9
**II** [1] - 4043:19
**illegal** [2] - 3881:13, 3881:19
**illegally** [1] - 3939:3
**image** [1] - 3908:6
**immediately** [3] - 3874:9, 3950:5, 4130:14
**impact** [4] - 3914:1, 3933:22, 4131:5, 4131:6
**impacts** [1] - 4131:2
**implementation** [1] - 3882:9
**imply** [2] - 3938:18, 3939:2
**important** [16] - 3859:1, 3864:10, 3864:20, 3886:10, 3892:18, 3892:21, 3926:11, 3981:15, 3993:23, 3994:5, 3997:11, 3998:4, 3999:8, 4122:18, 4133:13, 4144:8
**imposed** [1] - 4117:24
**impressed** [4] - 4051:11, 4062:11, 4063:15, 4063:16
**impressing** [1] - 3876:7
**impression** [11] - 3876:5, 3885:4, 3996:21, 3997:5, 4009:11, 4011:6, 4047:15, 4055:12, 4133:2, 4134:4
**impropriety** [1] - 4067:18
**inaccurate** [1] - 4133:2
**inappropriate** [3] - 3861:18, 3886:14, 3996:17
**Inc** [4] - 3970:10, 4012:3, 4025:4, 4025:15
**Incentive** [5] - 3889:18, 3889:23, 3890:16, 3891:2
**incentive** [1] - 3930:11
**inception** [2] - 4009:9, 4069:1
**include** [6] - 4023:10, 4092:5, 4116:10, 4117:20, 4142:9, 4142:10
**included** [3] - 3985:18, 3986:14, 4038:19
**includes** [4] - 3882:14, 3944:14, 3997:1, 4094:3
**including** [10] - 3855:14, 3855:24, 3858:9, 3948:21, 3996:21, 4039:1, 4081:9, 4105:11, 4105:20, 4123:21
**income** [6] - 3872:15, 3932:21, 4104:11, 4104:24, 4119:6, 4119:9
**incompetent** [1] - 3949:10

**inconsequential** [1] - 3881:20
**inconsistency** [2] - 4077:2, 4134:4
**incorrect** [1] - 3954:2
**increased** [1] - 4128:21
**increases** [1] - 4034:15
**increasingly** [2] - 4017:17, 4068:17
**incredibly** [1] - 3864:14
**indemnify** [1] - 4121:13
**independent** [8] - 3945:1, 3945:3, 3994:25, 4052:2, 4052:9, 4052:12, 4066:23
**independently** [1] - 4064:7
**INDEX** [1] - 4147:1
**indexes** [1] - 3992:22
**indicate** [2] - 4104:8, 4106:3
**indicated** [4] - 3925:15, 4032:21, 4037:10, 4096:17
**indicating** [1] - 4080:17
**indirectly** [1] - 4083:16
**individual** [14] - 3855:21, 3874:10, 3893:15, 3900:15, 3915:14, 3935:3, 3947:21, 3947:22, 3990:1, 4000:24, 4009:23, 4064:21, 4086:25, 4088:2
**Individual** [1] - 4094:8
**individuals** [4] - 3890:17, 3891:6, 3922:15, 3944:16
**industries** [1] - 4042:9
**industry** [3] - 3858:25, 4086:11, 4123:7
**inference** [1] - 3996:18
**inflame** [1] - 3866:21
**inflammatory** [1] - 3867:17
**inform** [1] - 3881:13
**information** [69] - 3863:18, 3863:21, 3863:22, 3864:5, 3864:12, 3865:13, 3865:24, 3877:7, 3879:16, 3879:21, 3879:22, 3880:19, 3881:1, 3881:15, 3881:18, 3887:4, 3887:5, 3887:7, 3887:8, 3887:9, 3895:15, 3898:8, 3902:20, 3902:23, 3906:21, 3911:10, 3917:14, 3927:12, 3928:5, 3928:12, 3931:15, 3931:22, 3932:5, 3932:8, 3945:12, 3946:8, 3946:11, 3948:13, 3949:1, 3949:9, 3949:14, 3949:16, 3949:17, 3974:15, 3976:13, 3980:1, 3995:6, 3997:9, 3999:6, 4014:13, 4014:16, 4019:15, 4023:21, 4036:3, 4076:13, 4083:16, 4089:22, 4101:8, 4102:18, 4104:21, 4104:22, 4104:23, 4105:6, 4105:12, 4105:13, 4106:3, 4127:21, 4139:25, 4140:23
**informed** [1] - 4097:18
**Initial** [1] - 4117:19
**initial** [7] - 3876:20, 3893:23, 3894:5, 3895:23, 3954:15, 4018:20, 4117:21
**initialized** [1] - 3884:19
**inquire** [2] - 3882:1, 4078:7
**inquired** [1] - 3977:11
**inquiries** [1] - 3959:17
**instance** [1] - 4081:21
**instantly** [1] - 4011:2
**instead** [3] - 3890:3, 4024:9, 4068:1

**instill** [1] - 3861:16
**instruct** [4] - 3859:4, 3859:17, 3941:5, 3941:8
**instruction** [7] - 3858:8, 3858:11, 3858:15, 3937:7, 3937:23, 3939:11, 3939:21
**instructions** [6] - 3857:18, 3858:9, 4000:22, 4094:6, 4094:16, 4094:18
**instruments** [1] - 4119:14
**insulting** [2] - 3865:8, 3865:9
**intelligent** [1] - 3876:7
**intend** [1] - 3855:17
**intended** [2] - 4119:16, 4119:17
**intends** [1] - 4100:4
**intention** [2] - 4112:9, 4112:11
**intentional** [1] - 4134:11
**interchangeable** [1] - 4118:23
**interchangeably** [1] - 3879:8
**interest** [9] - 3908:16, 3910:15, 4089:16, 4096:7, 4103:13, 4103:14, 4105:2, 4105:17, 4120:20
**Interest** [1] - 4120:7
**interested** [4] - 4018:23, 4064:21, 4064:25, 4065:4
**interests** [1] - 4018:4
**internal** [5] - 3863:3, 3863:14, 3880:2, 3880:4, 3882:16
**internally** [2] - 3880:4, 3951:2
**international** [1] - 3955:13
**interview** [2] - 3875:18, 4143:6
**interviewed** [1] - 4065:18
**Intrepid** [1] - 4123:3
**introduce** [1] - 3856:2
**introduced** [6] - 3873:18, 3893:16, 3955:7, 3990:8, 4085:22, 4089:2
**inventor** [1] - 4058:5
**invest** [20] - 3994:1, 3999:10, 3999:14, 4000:2, 4008:1, 4008:4, 4040:19, 4043:9, 4043:11, 4044:6, 4044:15, 4046:10, 4047:21, 4063:20, 4086:8, 4088:2, 4089:7, 4114:1, 4119:13, 4120:22
**invested** [49] - 3991:4, 3992:10, 3994:17, 3995:4, 3997:18, 3999:15, 4000:4, 4003:10, 4007:23, 4009:7, 4010:6, 4017:23, 4020:6, 4020:13, 4031:24, 4036:7, 4036:12, 4036:14, 4036:15, 4036:19, 4036:23, 4040:12, 4040:22, 4042:20, 4043:15, 4043:16, 4043:21, 4047:9, 4052:6, 4052:8, 4052:11, 4052:14, 4056:4, 4061:7, 4061:15, 4061:16, 4063:5, 4064:3, 4064:9, 4065:9, 4066:20, 4066:21, 4077:22, 4087:21, 4089:23, 4097:14, 4098:8, 4119:9, 4127:1
**investigation** [3] - 4124:17, 4125:1, 4125:6
**investing** [27] - 3858:5, 3948:11, 3992:12, 3992:13, 3993:4, 3993:14, 3993:23, 3994:5, 3999:8, 4008:6, 4020:18, 4022:18, 4044:19, 4055:2,

4063:10, 4064:17, 4083:15, 4089:17, 4091:13, 4094:11, 4094:14, 4095:25, 4104:16, 4106:6, 4127:7, 4133:20, 4144:4

**Investing** [1] - 4119:3

**investment** [80] - 3891:22, 3900:12, 3900:22, 3900:24, 3965:15, 3965:22, 3966:10, 3966:11, 3992:15, 3996:12, 3997:2, 4002:5, 4003:11, 4007:24, 4008:15, 4009:8, 4010:7, 4011:7, 4011:25, 4016:4, 4016:16, 4018:12, 4021:2, 4022:11, 4024:10, 4024:19, 4026:9, 4033:14, 4033:15, 4034:2, 4034:6, 4034:10, 4037:4, 4038:12, 4043:21, 4044:2, 4054:4, 4054:19, 4054:23, 4058:1, 4061:17, 4061:22, 4063:8, 4063:23, 4063:25, 4064:4, 4064:20, 4065:7, 4066:6, 4071:21, 4076:21, 4086:5, 4086:9, 4087:19, 4090:24, 4097:24, 4098:5, 4099:1, 4100:1, 4100:9, 4100:25, 4105:8, 4107:20, 4108:3, 4117:22, 4117:24, 4118:4, 4119:10, 4119:14, 4119:16, 4119:17, 4119:25, 4120:11, 4120:12, 4120:13, 4120:15, 4127:16, 4128:1, 4133:25, 4144:8

**Investment** [2] - 3889:17, 4043:19

**investments** [23] - 3900:7, 3991:11, 4015:23, 4037:1, 4037:2, 4042:12, 4044:22, 4045:13, 4047:20, 4047:21, 4065:14, 4065:23, 4104:6, 4104:12, 4104:24, 4105:6, 4106:10, 4113:18, 4116:10, 4119:5, 4119:7, 4119:19, 4123:21

**investor** [27] - 3891:11, 3892:25, 3993:12, 3996:4, 4014:12, 4018:9, 4040:8, 4040:16, 4045:14, 4045:17, 4045:18, 4046:6, 4046:25, 4047:1, 4053:17, 4066:1, 4076:19, 4080:14, 4104:11, 4104:23, 4107:8, 4108:21, 4119:21, 4120:3, 4120:4, 4130:6, 4135:10

**Investors** [2] - 4097:17, 4097:20

**investors** [17] - 3890:1, 3991:6, 3997:5, 3997:7, 3997:12, 3997:13, 3997:23, 4015:24, 4018:4, 4018:5, 4018:20, 4020:24, 4021:11, 4053:23, 4119:4, 4119:18, 4127:22

**invite** [1] - 4083:25

**invoice** [2] - 3969:9, 3969:19

**invoices** [4] - 3959:12, 3969:7, 3969:24, 3971:13

**involve** [2] - 4047:19, 4047:21

**involved** [14] - 3862:25, 3884:5, 3957:12, 3960:3, 3960:21, 3973:10, 3982:13, 4023:11, 4067:7, 4067:8, 4076:13, 4092:6, 4107:18, 4130:19

**involvement** [1] - 4069:16

**involves** [1] - 4129:13

**IPO** [4] - 4114:9, 4114:11, 4114:17, 4117:23

**IRR** [2] - 4034:10, 4034:13

**irrelevant** [2] - 3860:25, 3887:2

**irreparable** [1] - 3950:13

**Island** [2] - 3870:12, 3933:3

**Isotope** [2] - 3925:4, 3972:6

**issue** [24] - 3855:2, 3860:17, 3861:12, 3866:22, 3866:24, 3878:13, 3905:2, 3933:19, 3936:2, 3938:1, 4005:3, 4005:24, 4006:9, 4085:17, 4086:7, 4113:24, 4114:9, 4114:12, 4114:17, 4114:21, 4125:4, 4135:21

**issued** [1] - 4117:23

**issues** [18] - 3855:22, 3857:15, 3869:15, 3878:15, 3885:18, 3885:23, 3898:13, 3935:24, 3960:20, 3960:22, 4041:15, 4082:5, 4114:2, 4114:4, 4114:7, 4117:23, 4118:4, 4134:24

**item** [1] - 3876:24

**items** [6] - 3883:9, 3886:22, 3930:18, 3931:7, 3932:11, 3972:17

**itself** [5] - 3902:8, 3911:10, 3923:21, 4067:17, 4100:12

**iTunes** [1] - 3886:22

**Izerne** [6] - 3867:9, 3929:16, 3929:19, 3933:3, 3947:23, 3948:20

**Izerne's** [1] - 3948:19

## J

**Jackson** [82] - 3874:21, 3875:1, 3875:6, 3875:9, 3876:25, 3877:5, 3877:16, 3880:5, 3884:8, 3884:9, 3884:20, 3887:7, 3887:10, 3888:1, 3888:14, 3888:15, 3888:21, 3888:22, 3888:24, 3898:16, 3898:18, 3901:11, 3902:1, 3902:4, 3902:13, 3903:15, 3903:16, 3904:2, 3905:25, 3906:10, 3906:13, 3907:15, 3907:25, 3908:4, 3908:11, 3909:5, 3909:19, 3909:23, 3912:15, 3916:17, 3917:17, 3920:21, 3921:13, 3923:14, 3923:19, 3924:10, 3924:16, 3927:10, 3927:13, 3927:18, 3958:10, 3958:11, 3958:12, 3958:14, 3958:20, 3959:1, 3959:5, 3959:14, 3959:15, 3961:2, 3962:16, 3962:17, 3963:4, 3963:7, 3963:14, 3963:18, 3963:20, 3967:10, 3969:17, 3970:9, 3970:23, 3972:15, 3974:11, 3975:22, 3976:1, 3976:9, 3976:12, 3976:13, 3979:21, 3979:25

**JACOB** [1] - 3854:22

**JACQUELYN** [1] - 3854:16

**Jain** [2] - 3947:22, 3947:25

**janitor** [1] - 3992:6

**January** [45] - 3877:5, 3877:17, 3877:24, 3883:25, 3893:22, 3897:20, 3925:15, 3941:21, 3941:23, 3946:16, 3961:4, 3961:10, 3961:14, 3962:1, 3962:2, 3984:21, 3985:5, 3986:5, 3999:11, 4003:6, 4007:23, 4009:7, 4019:3, 4019:13, 4019:21, 4020:3, 4020:9, 4021:19, 4021:23, 4022:2, 4023:21, 4056:13, 4057:3, 4057:15,

4058:16, 4058:23, 4059:4, 4059:10, 4060:8, 4090:18, 4090:23, 4094:4, 4126:8

**Jia** [1] - 3898:16

**Jim** [3] - 3992:8, 4057:22, 4057:25

**JN** [1] - 4001:3

**JN-1** [2] - 4059:12, 4059:23

**JN-2** [1] - 4055:15

**JN0060** [1] - 4019:12

**job** [3] - 3857:10, 3950:12, 4111:7

**Jobs** [7] - 4035:11, 4035:14, 4035:17, 4035:21, 4035:23, 4035:25, 4036:4

**Joel** [4] - 3949:22, 3950:11, 3952:12, 3952:15

**jog** [2] - 4059:15, 4059:23

**John** [6] - 3987:14, 3987:23, 4022:10, 4057:2, 4070:2, 4090:23

**JOHN** [1] - 3987:23

**journal** [2] - 3882:19, 3883:12

**Judge** [21] - 3858:15, 3860:16, 3864:21, 3868:12, 3869:8, 3934:20, 3939:14, 3962:23, 3965:2, 3965:5, 3987:2, 4005:19, 4031:3, 4077:23, 4107:15, 4110:11, 4111:23, 4112:15, 4130:25, 4133:19, 4139:9

**judge** [3] - 3920:11, 3934:1, 4107:17

**JUDGE** [1] - 3854:12

**judgment** [2] - 3978:3, 4063:16

**judgmental** [2] - 3977:17, 3977:23

**judgments** [1] - 4109:22

**July** [7] - 3854:7, 3925:19, 4022:11, 4023:25, 4024:4, 4084:22, 4146:19

**jumps** [1] - 3861:11

**June** [10] - 3919:8, 3919:10, 3919:25, 3925:16, 4001:10, 4001:21, 4011:15, 4012:7, 4072:7, 4126:16

**jurors** [16] - 3858:12, 3869:4, 3869:22, 3936:11, 3941:2, 3987:7, 3999:1, 4004:15, 4004:20, 4006:24, 4029:2, 4030:2, 4042:1, 4106:19, 4113:2, 4140:12

**Jury** [3] - 3936:14, 4029:5, 4146:8

**jury** [36] - 3857:16, 3857:21, 3857:23, 3858:1, 3858:8, 3861:17, 3864:19, 3866:21, 3869:21, 3937:8, 3941:1, 3941:5, 3980:18, 3981:6, 3983:21, 3995:10, 3996:2, 3996:18, 3997:20, 4004:18, 4006:23, 4030:1, 4039:21, 4040:2, 4056:25, 4089:4, 4106:23, 4106:24, 4107:2, 4108:18, 4110:9, 4113:1, 4130:13, 4139:23, 4140:22, 4146:1

**JURY** [3] - 3854:12, 3987:11, 4106:20

**jury's** [3] - 3857:17, 3976:22, 3980:13

## K

**KAPLAN** [1] - 3854:22

**Kaplan** [3] - 3970:19, 3970:24, 3971:10

**KARTHIK** [1] - 3854:17

**Kasulis** [1] - 4132:12

**KASULIS** [16] - 3854:16, 3859:11,

3859:15, 3859:19, 3860:10, 3860:14, 3939:17, 4110:2, 4110:13, 4111:8, 4111:18, 4111:22, 4112:9, 4112:13, 4112:15, 4146:12

**KAT_0046897** [1] - 4002:20

**Katten** [14] - 3873:19, 3888:20, 3955:9, 3955:11, 3955:20, 3956:4, 3956:9, 3968:8, 3969:2, 3969:4, 3982:3, 3982:8

**keep** [10] - 3880:11, 3890:25, 3913:23, 4010:5, 4021:6, 4113:11, 4128:5, 4142:16, 4142:18, 4143:17

**keeping** [2] - 3876:22, 3882:8

**Ken** [3] - 3964:24, 3967:3, 3968:4

**kept** [11] - 3863:20, 3911:2, 3911:3, 3913:19, 3948:25, 3962:6, 3962:7, 3978:22, 4027:25, 4079:19

**Kevin** [5] - 3917:3, 3917:6, 3945:22, 3946:6, 3946:15

**Khun** [2] - 3902:6, 3902:13

**kidney** [4] - 4081:25, 4082:2, 4082:3

**kids** [3] - 3989:23, 3989:25

**kind** [27] - 3864:8, 3864:13, 3865:2, 3867:25, 3872:7, 3874:15, 3885:21, 3887:2, 3896:20, 3902:23, 3902:24, 3903:6, 3906:20, 3918:22, 3924:18, 3932:10, 3946:8, 3949:7, 3991:24, 4000:12, 4010:4, 4010:13, 4011:11, 4011:14, 4012:22, 4019:2, 4101:8

**kinds** [1] - 3946:11

**KIYO** [1] - 3854:11

**Kleiman(phonetic** [1] - 3947:22

**Kleinberg** [3] - 3970:19, 3970:24, 3971:10

**knowing** [2] - 3991:12, 4074:6

**knowledge** [15] - 3857:9, 3859:13, 3859:22, 3876:3, 3938:16, 3974:18, 3975:22, 3995:5, 4053:13, 4053:16, 4066:3, 4066:23, 4077:4, 4106:4

**knowledgeable** [1] - 3866:2

**known** [3] - 3996:11, 4077:22, 4118:20

**knows** [4] - 3938:10, 4014:3, 4070:10, 4086:11

**Kramer** [1] - 4057:10

**Kravitz** [8] - 3888:2, 3888:15, 3888:19, 3888:21, 3968:8, 3968:19, 3968:23, 3969:2

# L

**label** [1] - 4026:3

**labeled** [5] - 4003:25, 4004:1, 4007:6, 4007:22, 4117:19

**laboratory** [1] - 3969:10

**Labs** [4] - 4014:1, 4014:21, 4070:9, 4071:22

**ladies** [2] - 3869:23, 4138:17

**laid** [3] - 3865:6, 3867:7, 4096:2

**landscape** [1] - 3857:22

**language** [7] - 3868:20, 3881:21, 3895:22, 3895:23, 4012:11, 4018:8, 4018:9

**large** [11] - 3885:11, 3885:12, 3952:11, 3959:7, 3959:14, 3980:23, 4020:15, 4082:13, 4116:19, 4127:4, 4127:12

**larger** [5] - 3871:12, 3873:9, 3874:13, 3897:24, 3906:23

**largest** [2] - 3871:16, 4085:13

**last** [24] - 3859:15, 3883:18, 3884:14, 3891:21, 3895:25, 3908:7, 3908:10, 3912:16, 3917:16, 3920:12, 3923:16, 3930:10, 3931:12, 3938:9, 3938:12, 3943:13, 3974:24, 4012:11, 4018:3, 4028:7, 4032:24, 4034:9, 4081:23, 4109:14

**last-ditch** [1] - 4081:23

**late** [7] - 3893:1, 3914:7, 3977:13, 3977:20, 4013:19, 4020:11, 4126:24

**latest** [1] - 3898:19

**latitude** [3] - 3869:18, 4101:7, 4135:4

**Law** [1] - 3988:25

**law** [16] - 3857:19, 3858:9, 3859:4, 3859:18, 3863:11, 3874:1, 3888:19, 3938:23, 3955:13, 3962:8, 3962:12, 3970:18, 3970:23, 4037:13, 4037:24, 4125:25

**laws** [2] - 3859:2, 3859:21

**lawyer** [9] - 3968:8, 3974:5, 3974:11, 3974:19, 3981:12, 3981:15, 3981:18, 4048:5, 4048:10

**lawyers** [5] - 3914:18, 3956:9, 3982:3, 3982:8, 4113:3

**lay** [1] - 3867:20

**lead** [1] - 3975:16

**leader** [1] - 3875:16

**learn** [4] - 3991:21, 3992:2, 4016:21, 4061:2

**learned** [3] - 3992:4, 4060:22, 4061:3

**lease** [1] - 4042:17

**least** [3] - 3884:24, 3986:20, 3997:24

**leave** [5] - 3991:11, 4004:16, 4076:6, 4110:5, 4145:22

**leaving** [3] - 3942:6, 3943:7, 3943:18

**led** [1] - 3872:21

**ledge** [1] - 4000:10

**ledger** [1] - 3901:3

**Lee** [1] - 3902:13

**left** [20] - 3899:8, 3909:24, 3917:24, 3918:1, 3918:14, 3918:19, 3918:24, 3919:6, 3931:1, 3931:3, 3931:5, 3933:1, 3979:21, 3979:25, 3980:4, 3988:23, 4000:10, 4004:20, 4055:12, 4142:13

**left-hand** [3] - 3931:1, 3931:3, 3931:5

**legal** [14] - 3859:2, 3859:21, 3878:9, 3920:7, 3956:7, 3958:4, 3958:6, 3973:24, 3974:13, 3983:15, 3983:23, 3983:24, 4115:10, 4121:21

**legalities** [1] - 3980:15

**legality** [2] - 3980:22, 3981:12

**legally** [3] - 3897:17, 3920:10, 3967:22

**legend** [3] - 4118:21, 4118:23

**lending** [1] - 4104:17

**length** [1] - 3892:15

**lengthy** [1] - 3945:13

**Leonora** [5] - 3867:9, 3929:16, 3929:19, 3933:3, 3947:23

**less** [5] - 3867:11, 4024:12, 4082:12, 4107:23, 4116:18

**letter** [38] - 3877:18, 3877:22, 3884:17, 3894:17, 3895:8, 3895:10, 3895:19, 3895:22, 3895:23, 3896:1, 3896:7, 3896:10, 3910:12, 3910:21, 3911:10, 3918:5, 3918:6, 3919:12, 3984:21, 3984:24, 3985:4, 3985:7, 3985:24, 3986:2, 3986:5, 3986:16, 4067:21, 4067:23, 4068:3, 4068:4, 4068:9, 4069:9, 4069:12, 4070:1, 4083:5, 4083:8, 4083:12

**Letter** [1] - 3910:11

**letters** [1] - 4120:8

**level** [6] - 3855:20, 3870:13, 3872:12, 3881:14, 3960:7, 3973:11

**IgA** [1] - 4081:10

**LGND** [1] - 4080:19

**liabilities** [1] - 3972:18

**Liability** [1] - 3878:2

**liability** [6] - 3878:8, 3878:15, 3890:5, 3910:16, 3932:21, 4121:16

**Liang** [1] - 3898:16

**license** [3] - 3871:6, 4080:4, 4080:18

**licensed** [2] - 3871:4, 4081:2

**licensing** [1] - 4081:4

**lie** [1] - 4110:8

**life** [4] - 4063:19, 4067:9, 4067:10

**Life** [1] - 4012:2

**lifetime** [1] - 3949:3

**lifted** [2] - 4117:3, 4117:8

**lifting** [1] - 4117:5

**Ligand** [1] - 3902:14, 3902:19, 3903:8, 4080:19, 4080:20, 4081:4, 4081:5

**light** [2] - 3867:19, 3944:8

**like-minded** [1] - 3991:6

**likely** [2] - 3933:23, 4082:22

**likewise** [1] - 3861:25

**limine** [1] - 4005:6

**limitation** [1] - 4121:15

**Limited** [1] - 3878:1

**limited** [29] - 3878:8, 3878:15, 3880:22, 3880:25, 3890:5, 3910:16, 3938:5, 3980:5, 4018:4, 4022:23, 4065:22, 4091:19, 4097:20, 4097:22, 4103:13, 4103:15, 4115:4, 4115:16, 4117:25, 4118:2, 4121:10, 4122:9, 4123:13, 4123:16, 4124:1, 4126:14, 4126:21

**limiting** [2] - 3858:11, 3939:20

**line** [16] - 3888:5, 3891:1, 3891:10, 3899:21, 3899:22, 3902:2, 3906:3, 3909:7, 3909:12, 3913:9, 3923:22, 3941:23, 3942:11, 3944:11, 4023:11, 4092:5

**lines** [2] - 3868:16, 3899:15, 3937:8, 3943:11

**linking** [2] - 3857:11, 3857:15

**liquidate** [4] - 4017:24, 4021:11, 4100:1, 4123:25
**liquidated** [1] - 4021:13
**liquidating** [2] - 4020:23, 4127:22
**liquidation** [13] - 4017:15, 4019:18, 4067:20, 4067:23, 4068:4, 4068:9, 4068:12, 4068:13, 4068:16, 4070:1, 4123:24, 4124:6
**list** [12] - 3876:24, 3900:17, 3900:19, 3923:14, 3924:18, 3924:20, 3929:18, 3929:24, 3930:15, 3931:7, 3932:11, 3943:14
**listed** [13] - 3891:11, 3893:12, 3901:3, 3926:20, 3927:8, 3935:9, 3943:2, 3943:15, 3961:17, 3977:11, 4001:1, 4001:2, 4003:8
**listen** [2] - 3941:11, 4054:11
**listened** [3] - 3990:23, 4053:24, 4054:12
**listener** [1] - 4131:5
**listening** [2] - 3860:19, 4062:10
**listing** [2] - 3900:11, 4025:18
**lists** [1] - 4104:5
**literally** [1] - 4140:15
**litigation** [2] - 4134:3
**live** [4] - 3870:11, 3876:2, 3988:17, 3988:18
**lived** [1] - 3988:19
**living** [1] - 3989:14
**LLC** [16] - 3877:25, 3878:2, 3878:4, 3878:8, 3878:11, 3878:13, 3878:17, 3878:24, 3886:25, 3889:13, 3899:2, 3908:20, 3908:21, 3908:23, 4068:24, 4097:21
**LLP** [1] - 3910:16
**loan** [4] - 3902:6, 3903:23, 3904:15, 3908:15
**loan/promissory** [2] - 3907:14, 3907:25
**loaned** [1] - 3904:25
**loans** [3] - 3898:12, 4104:12, 4104:25
**locate** [1] - 3902:5
**locked** [2] - 4133:11, 4133:12
**lofty** [1] - 4069:5
**log** [1] - 4142:18
**long-term** [4] - 4011:25, 4021:2, 4119:4, 4128:1
**longs** [1] - 3993:21
**Lonza** [5] - 3969:10, 3969:19, 3969:22, 3969:24
**look** [95] - 3866:5, 3866:10, 3869:12, 3876:12, 3877:4, 3877:16, 3879:2, 3880:21, 3889:8, 3890:16, 3891:1, 3891:5, 3891:10, 3895:12, 3899:8, 3899:15, 3900:10, 3900:19, 3902:12, 3903:7, 3903:8, 3903:25, 3905:4, 3906:11, 3906:19, 3907:8, 3907:21, 3908:18, 3911:20, 3911:21, 3917:16, 3920:15, 3921:23, 3922:2, 3923:20, 3924:10, 3930:20, 3931:8, 3932:23, 3932:24, 3933:3, 3936:8, 3940:2, 3942:11, 3942:14, 3943:1, 3943:13, 3943:22, 3945:16, 3949:20, 3952:9,

3953:15, 3953:20, 3963:9, 3970:22, 3971:17, 3971:22, 3972:1, 3972:11, 3974:24, 3978:5, 3992:17, 3992:18, 3992:19, 3992:25, 3993:1, 4004:3, 4004:5, 4021:7, 4049:3, 4056:11, 4059:12, 4072:2, 4074:12, 4074:24, 4083:4, 4090:2, 4096:20, 4097:9, 4097:13, 4098:10, 4103:12, 4103:24, 4104:8, 4111:4, 4116:4, 4117:13, 4119:1, 4121:6, 4121:7, 4126:13, 4129:17, 4129:20
**looked** [12] - 3858:15, 3872:10, 3912:17, 3913:6, 3918:5, 3918:21, 3919:2, 3920:22, 3921:10, 3986:5, 3996:24, 4034:11
**looking** [33] - 3869:10, 3877:7, 3891:15, 3893:11, 3899:23, 3900:17, 3901:1, 3902:5, 3903:6, 3905:22, 3906:15, 3907:22, 3935:8, 3941:14, 3941:17, 3941:23, 3948:14, 3963:16, 3966:5, 4001:16, 4001:19, 4003:7, 4009:6, 4013:16, 4028:3, 4030:19, 4080:10, 4084:17, 4090:15, 4103:9, 4132:12, 4136:6
**looks** [5] - 3862:4, 3924:24, 3966:12, 4001:19, 4075:7
**lose** [2] - 4115:5, 4121:21
**loses** [1] - 4122:10
**losing** [1] - 4024:19
**loss** [4] - 3924:7, 3925:23, 3926:13, 4008:19
**losses** [3] - 4114:4, 4118:3, 4121:16
**lost** [3] - 4036:23, 4036:24, 4041:4
**loud** [2] - 3964:19, 4049:2
**Lowe's** [1] - 4020:20
**lower** [3] - 4035:8, 4081:24, 4082:1
**Lowes** [2] - 4127:8, 4127:11
**LP** [12] - 3890:12, 3891:19, 3891:21, 3899:24, 3900:20, 3941:25, 3942:20, 3943:15, 4000:22, 4022:11, 4090:24, 4094:6
**LPA** [4] - 4019:22, 4020:5, 4022:24, 4096:9
**lump** [1] - 3945:7
**lunch** [7] - 3860:16, 3987:8, 4004:15, 4004:23, 4005:9, 4005:21, 4007:5
**Lynch** [3] - 3937:16, 3938:3, 3940:4

**M**

**ma'am** [1] - 3941:12
**Madison** [2] - 3878:1, 3912:4
**mail** [225] - 3854:24, 3861:11, 3861:12, 3861:21, 3864:1, 3864:2, 3865:9, 3865:25, 3866:2, 3866:6, 3866:15, 3867:4, 3867:24, 3868:16, 3868:19, 3877:4, 3877:8, 3877:16, 3887:21, 3887:23, 3888:9, 3888:18, 3888:21, 3888:24, 3889:8, 3898:16, 3898:18, 3898:20, 3901:11, 3901:25, 3902:2, 3902:8, 3903:14, 3903:18, 3903:19, 3903:23, 3904:1, 3904:2, 3904:4,

3904:10, 3905:24, 3906:11, 3906:18, 3906:24, 3907:8, 3907:9, 3907:13, 3907:22, 3908:2, 3908:4, 3908:10, 3909:5, 3909:7, 3909:10, 3909:12, 3909:19, 3912:15, 3912:16, 3913:3, 3913:6, 3916:17, 3916:21, 3916:25, 3917:2, 3918:25, 3920:21, 3920:22, 3921:6, 3921:9, 3921:14, 3922:2, 3922:3, 3922:23, 3923:11, 3923:13, 3923:18, 3923:19, 3923:21, 3923:22, 3923:25, 3924:10, 3924:16, 3925:10, 3925:21, 3927:3, 3928:23, 3929:11, 3929:12, 3929:15, 3930:7, 3930:14, 3930:16, 3941:15, 3943:24, 3943:25, 3945:21, 3946:5, 3947:6, 3947:18, 3947:20, 3948:4, 3948:10, 3948:20, 3949:4, 3949:7, 3949:21, 3952:11, 3952:19, 3957:24, 3961:3, 3961:5, 3961:16, 3962:21, 3963:20, 3967:9, 3968:14, 3969:11, 3969:17, 3969:18, 3969:21, 3970:9, 3970:14, 3970:15, 3970:22, 3978:19, 3978:21, 3979:6, 3979:18, 3983:18, 3984:3, 3984:24, 4000:13, 4000:20, 4003:14, 4007:10, 4009:2, 4010:14, 4010:20, 4011:3, 4011:15, 4011:16, 4012:23, 4013:2, 4013:3, 4013:8, 4013:22, 4014:15, 4015:6, 4015:13, 4017:1, 4017:7, 4019:3, 4019:12, 4019:20, 4019:22, 4019:25, 4020:2, 4020:8, 4021:10, 4021:19, 4021:22, 4022:2, 4023:19, 4024:5, 4024:20, 4024:23, 4026:16, 4030:15, 4030:20, 4056:12, 4056:14, 4057:2, 4057:6, 4057:14, 4064:10, 4071:3, 4071:24, 4072:7, 4073:3, 4074:10, 4074:12, 4075:5, 4076:14, 4076:25, 4078:2, 4079:7, 4079:9, 4079:13, 4079:19, 4079:25, 4080:16, 4083:20, 4084:11, 4084:20, 4084:22, 4084:23, 4087:5, 4087:16, 4087:19, 4088:1, 4089:5, 4089:10, 4089:21, 4089:23, 4090:22, 4092:16, 4094:2, 4094:5, 4126:8, 4126:20, 4128:15, 4129:6, 4129:9, 4130:8, 4130:20, 4131:14, 4136:2, 4136:5, 4145:1
**mailing** [4] - 3959:7, 4019:23, 4021:6, 4128:5
**mails** [33] - 3866:9, 3867:9, 3867:14, 3868:17, 3868:19, 3868:20, 3877:3, 3905:10, 3905:11, 3949:19, 3950:1, 3950:6, 3950:7, 3950:22, 3958:11, 3962:8, 3968:9, 3972:14, 3984:5, 4004:5, 4006:19, 4009:20, 4064:16, 4066:22, 4084:14, 4089:13, 4095:4, 4124:5, 4130:16, 4130:17, 4130:18, 4130:23
**main** [4] - 3858:17, 3884:6, 3884:9, 3946:8
**maintenance** [1] - 3882:15
**major** [4] - 3960:20, 4081:3, 4081:16, 4082:15
**maker** [1] - 4057:19

man [6] - 3997:25, 4040:22, 4045:20, 4102:9, 4130:10, 4130:18
manage [1] - 3999:17
managed [1] - 3999:19
management [19] - 3881:2, 3881:14, 3882:1, 3882:2, 3882:3, 3882:14, 3882:18, 3882:21, 3883:2, 3883:16, 3906:5, 3910:4, 3915:22, 3916:4, 3916:10, 3996:9, 4051:20, 4051:24, 4052:15
Management [17] - 3908:20, 3908:23, 3925:6, 3925:14, 4002:4, 4001:8, 4002:10, 4011:24, 4022:11, 4090:24, 4094:5, 4094:6, 4094:7, 4094:8, 4097:19, 4103:14, 4123:1
management's [1] - 3881:23
manager [14] - 3876:1, 3948:1, 3996:25, 3997:1, 4008:4, 4015:20, 4024:2, 4064:22, 4065:23, 4066:4, 4101:12, 4121:8, 4121:15, 4123:1
manager's [1] - 3997:2
managers [6] - 4065:1, 4065:4, 4065:14, 4066:16, 4067:11, 4121:14
manages [1] - 4107:14
managing [5] - 3908:24, 3949:22, 3950:3, 4017:18, 4068:19
manner [3] - 3950:19, 3964:6, 3994:3
manufacture [1] - 4015:10
Marathon [1] - 4105:11
Marc [3] - 3951:3, 3951:4, 3951:23
MARC [1] - 3854:21
March [19] - 3925:15, 3929:15, 3930:19, 3942:15, 3942:16, 3943:2, 3943:14, 3944:3, 3973:9, 4007:11, 4007:14, 4007:19, 4057:11, 4070:5, 4129:7, 4129:9, 4131:19, 4136:3, 4142:20
Marcum [22] - 3863:14, 3873:20, 3874:13, 3893:16, 3893:17, 3893:18, 3893:19, 3947:21, 3947:22, 3948:1, 3956:14, 3959:18, 3959:21, 3960:2, 3960:5, 3960:9, 3960:10, 3973:5, 3973:8, 3974:4, 3984:4
Marek [24] - 3884:13, 3909:8, 3909:14, 3909:20, 3909:21, 3909:24, 3910:1, 3910:13, 3910:22, 3911:11, 3911:23, 3913:7, 3916:23, 3917:4, 3917:17, 3918:11, 3919:13, 3927:11, 3945:21, 3946:5, 3946:7, 3948:22, 3975:3
Marek's [2] - 3884:13, 3911:24
Mariell [1] - 3947:23
Mark [1] - 3890:14
mark [3] - 3922:9, 4022:21, 4091:16
marked [55] - 3877:1, 3894:13, 3895:4, 3898:14, 3901:7, 3901:23, 3905:4, 3905:21, 3912:11, 3916:12, 3920:16, 3922:19, 3928:18, 3945:16, 3946:4, 3947:1, 3947:17, 3967:6, 3970:7, 3982:24, 4000:8, 4000:18, 4001:13, 4002:3, 4002:8, 4002:18, 4004:11, 4010:10, 4010:19, 4011:12, 4011:22, 4012:21, 4016:24, 4017:12, 4018:24,

4019:10, 4021:24, 4022:9, 4025:1, 4025:13, 4025:23, 4048:15, 4048:24, 4056:9, 4056:10, 4056:23, 4074:20, 4078:20, 4080:6, 4084:11, 4089:3, 4120:7, 4128:25, 4136:25, 4140:24
marker [1] - 4081:13
market [20] - 3855:22, 3858:5, 3991:20, 3993:20, 3993:21, 4008:11, 4020:21, 4022:19, 4023:1, 4023:15, 4024:15, 4035:1, 4069:7, 4091:13, 4091:22, 4092:11, 4092:20, 4093:20, 4127:9, 4132:22
marketed [1] - 4069:2
markets [3] - 3855:11, 3856:12, 3991:18
married [1] - 3988:11
marshal [1] - 4053:20
Marshal [1] - 4053:24
Marshall [6] - 4046:9, 4046:16, 4046:18, 4046:20, 4046:24, 4047:1
Martin [195] - 3862:6, 3874:21, 3875:1, 3875:3, 3875:4, 3875:23, 3876:13, 3877:25, 3883:23, 3885:24, 3885:25, 3886:1, 3887:10, 3892:1, 3892:3, 3892:5, 3899:9, 3899:11, 3899:16, 3899:19, 3899:21, 3907:4, 3907:12, 3908:4, 3908:22, 3908:24, 3909:20, 3910:3, 3910:14, 3910:23, 3911:23, 3912:10, 3913:7, 3917:3, 3917:4, 3917:18, 3918:12, 3922:13, 3924:6, 3924:17, 3925:22, 3926:4, 3926:6, 3926:7, 3930:18, 3931:4, 3931:12, 3932:7, 3932:9, 3944:3, 3955:3, 3956:13, 3958:23, 3974:5, 3974:8, 3975:6, 3975:16, 3975:19, 3976:5, 3976:17, 3977:9, 3978:1, 3978:6, 3990:1, 3990:8, 3990:10, 3990:11, 3990:14, 3991:6, 3991:15, 3991:25, 3993:16, 3993:18, 3993:20, 3994:24, 3994:25, 3996:7, 3997:25, 4000:13, 4002:7, 4003:14, 4004:6, 4008:6, 4008:21, 4010:14, 4011:15, 4012:23, 4013:3, 4013:19, 4014:15, 4015:6, 4016:19, 4017:1, 4017:5, 4018:17, 4018:18, 4018:22, 4019:3, 4021:8, 4021:15, 4022:2, 4023:17, 4023:22, 4025:17, 4026:11, 4031:11, 4035:10, 4035:22, 4035:24, 4036:2, 4038:10, 4040:12, 4040:17, 4040:18, 4043:22, 4044:3, 4044:6, 4044:19, 4044:22, 4045:8, 4045:13, 4046:6, 4047:2, 4047:9, 4047:17, 4048:7, 4049:8, 4051:5, 4051:10, 4051:12, 4051:20, 4051:23, 4052:1, 4052:8, 4052:11, 4053:4, 4054:13, 4054:23, 4055:5, 4055:6, 4055:9, 4055:20, 4055:23, 4056:14, 4057:6, 4058:10, 4058:15, 4058:16, 4058:23, 4060:16, 4060:20, 4061:8, 4061:25, 4062:2, 4062:3, 4062:10, 4063:10, 4066:4, 4066:15, 4066:16, 4066:22, 4067:14, 4069:13, 4070:20, 4074:6, 4075:6, 4080:2, 4083:4, 4083:25, 4084:5, 4084:20,

4086:7, 4089:14, 4089:22, 4089:25, 4090:5, 4090:22, 4092:16, 4093:4, 4099:14, 4115:9, 4122:24, 4123:12, 4126:8, 4130:3, 4130:11, 4130:13, 4130:19, 4144:4, 4144:4
MARTIN [1] - 3854:8
martin [1] - 3958:22
Martin's [7] - 3929:20, 3935:15, 3943:12, 3975:15, 4024:14, 4044:7, 4069:15
Martindale [1] - 4053:25
MASSELLA [1] - 3870:5
Massella [19] - 3860:18, 3864:18, 3864:24, 3865:2, 3866:2, 3868:15, 3870:2, 3870:3, 3870:9, 3871:23, 3876:12, 3902:1, 3905:25, 3909:6, 3946:6, 3951:23, 3961:13, 3970:10, 3984:11
Master's [1] - 4104:19
matches [1] - 3918:8
material [4] - 3881:14, 3881:25, 3996:4, 4008:23
materials [1] - 4126:11
math [2] - 4031:23, 4034:5
MATSUMOTO [1] - 3854:11
matter [8] - 3866:1, 3938:23, 3944:8, 3948:2, 3980:14, 4082:13, 4112:4, 4146:19
matters [6] - 3974:13, 3981:16, 3983:15, 3983:19, 3983:23, 4106:4
maximize [2] - 4023:12, 4092:7
maximum [1] - 4082:18
MBA [3] - 3989:1, 4037:19, 4037:21
Meadow [1] - 3989:19
Meadows [1] - 4028:11
meal [4] - 3977:14, 3977:21
mean [5] - 3870:23, 3871:15, 3871:16, 3877:14, 3879:19, 3880:2, 3881:21, 3882:2, 3882:22, 3885:12, 3886:2, 3886:25, 3890:18, 3890:21, 3892:4, 3898:23, 3899:13, 3901:4, 3903:2, 3904:20, 3912:2, 3910:3, 3912:2, 3914:24, 3915:12, 3924:23, 3925:1, 3926:9, 3926:20, 3932:17, 3932:20, 3933:5, 3935:1, 3935:3, 3938:1, 3950:17, 3954:9, 3960:15, 3965:23, 3989:12, 3991:1, 3994:1, 3996:16, 4010:2, 4012:13, 4015:21, 4017:25, 4025:24, 4039:12, 4052:5, 4062:7, 4065:21, 4070:18, 4070:21, 4071:4, 4086:15, 4104:18, 4109:20, 4114:7, 4114:9, 4116:14, 4116:23, 4121:18, 4122:1, 4131:2
meaning [1] - 4118:1
means [23] - 3865:21, 3870:24, 3879:20, 3879:21, 3879:22, 3881:22, 3882:24, 3890:24, 3892:8, 3898:24, 3899:14, 3902:10, 3902:11, 3906:6, 3907:6, 3933:23, 3980:18, 4039:13, 4040:25, 4041:2, 4041:8, 4089:25, 4104:19

**meant** [4] - 3914:25, 4012:14, 4025:25
**media** [1] - 4146:2
**medical** [1] - 4083:6
**meet** [4] - 3873:21, 3955:19, 3956:9, 3990:18
**meeting** [45] - 3874:22, 3874:25, 3875:6, 3875:10, 3875:11, 3875:17, 3875:18, 3875:22, 3875:23, 3876:5, 3876:8, 3876:20, 3951:4, 3951:7, 3990:22, 3994:21, 4048:9, 4048:21, 4049:19, 4049:20, 4049:21, 4049:25, 4050:1, 4051:7, 4051:9, 4052:17, 4055:15, 4058:15, 4059:6, 4060:7, 4061:4, 4061:7, 4061:13, 4062:2, 4062:16, 4062:20, 4062:23, 4063:1, 4063:4, 4085:14, 4144:11, 4144:17
**meetings** [5] - 3991:3, 3991:25, 4020:10, 4053:22, 4126:23
**member** [1] - 3908:24
**members** [3] - 3941:5, 4049:6, 4121:14
**memo** [1] - 4001:6
**Memorandum** [3] - 4094:8, 4103:17, 4110:18
**memorandum** [30] - 3948:12, 3996:13, 4000:23, 4001:5, 4001:21, 4051:14, 4094:19, 4094:20, 4096:3, 4096:4, 4096:6, 4096:18, 4097:25, 4098:6, 4098:11, 4098:18, 4098:24, 4099:6, 4099:25, 4102:22, 4103:21, 4103:24, 4107:20, 4111:1, 4115:23, 4116:9, 4117:15, 4117:17, 4122:23
**memory** [3] - 3905:2, 4059:15, 4059:24
**Memory** [1] - 3989:14
**men** [1] - 4058:7
**men's** [1] - 4031:12
**mentioned** [11] - 3874:10, 3893:15, 3896:25, 3991:21, 4008:1, 4010:6, 4021:5, 4025:14, 4028:10, 4030:11, 4128:3
**merged** [5] - 3871:12, 3871:18, 3872:25, 3873:3, 3873:5
**merger** [25] - 3897:12, 3897:13, 3897:14, 3914:21, 3914:25, 3921:21, 3927:16, 3927:23, 3927:24, 3928:1, 3928:10, 3976:23, 3976:24, 3980:7, 3981:1, 3981:4, 3982:4, 3982:9, 4025:19, 4066:24, 4066:25, 4067:2, 4067:8, 4067:11, 4067:17
**mergers** [4] - 3855:25, 4067:3, 4067:12, 4067:16
**merging** [1] - 3897:14
**merits** [1] - 4106:5
**Merrill** [3] - 3937:15, 3938:3, 3940:4
**met** [18] - 3873:22, 3874:19, 3874:21, 3876:9, 3955:3, 3955:10, 3955:22, 3956:10, 3990:3, 3990:5, 3992:9, 4038:10, 4044:7, 4047:25, 4053:4, 4053:11, 4062:2
**method** [1] - 3882:12
**methodology** [1] - 4117:23
**mic** [1] - 4007:17

**Microsoft** [2] - 4058:5
**middle** [6] - 3877:4, 3879:2, 3943:24, 3949:20, 4010:20, 4120:8
**might** [16] - 3864:18, 3915:19, 3965:4, 3969:10, 3978:5, 4003:19, 4023:11, 4036:2, 4090:2, 4092:6, 4095:19, 4100:25, 4109:21, 4116:16, 4116:19, 4124:11
**migrated** [1] - 3871:10
**million** [41] - 3964:16, 4012:4, 4012:15, 4012:19, 4014:18, 4015:7, 4015:8, 4015:12, 4015:14, 4023:1, 4023:17, 4033:7, 4033:16, 4035:1, 4069:4, 4079:11, 4079:19, 4080:3, 4082:16, 4083:10, 4083:21, 4092:12, 4093:21, 4105:10, 4105:15, 4105:19, 4105:22, 4106:9, 4106:14, 4107:7, 4107:23, 4108:15, 4109:9, 4110:5, 4113:17, 4116:18, 4128:2, 4128:9, 4128:16, 4132:22
**million-5** [1] - 4033:12
**million-570** [1] - 4033:10
**million-570,000** [1] - 4034:7
**millions** [3] - 4023:15, 4092:11, 4093:19
**mind** [18] - 3941:11, 3969:11, 3991:23, 3992:20, 4040:21, 4041:4, 4074:8, 4114:12, 4131:2, 4131:5, 4131:7, 4132:11, 4132:13, 4132:14, 4132:15, 4133:23, 4134:20, 4135:5
**minded** [1] - 3991:6
**minimal** [1] - 4081:21
**minimum** [1] - 3884:25
**minimus** [1] - 3885:14
**minus** [3] - 4014:3, 4014:4, 4033:10
**minute** [10] - 3923:17, 3976:4, 3982:22, 4034:5, 4042:4, 4051:18, 4061:17, 4080:12, 4098:12, 4115:22
**minutes** [8] - 3936:13, 4040:11, 4112:12, 4138:24, 4139:1, 4140:9, 4140:13, 4140:15
**misappropriate** [1] - 3886:9
**misappropriations** [1] - 3886:17
**miscellaneous** [3] - 3906:5, 3906:8, 3907:17
**mischaracterization** [1] - 4100:22
**mischaracterizes** [2] - 4079:22, 4100:19
**mischaracterizing** [2] - 3971:1, 4121:24
**misread** [1] - 4141:24
**missing** [3] - 3913:22, 3948:6, 3948:25
**misspeak** [1] - 3961:7
**mistake** [2] - 4132:24, 4134:16
**mistakes** [4] - 4133:20, 4133:21, 4134:8, 4134:13
**mix** [1] - 3958:7
**modest** [2] - 3977:21, 4069:4
**modestly** [1] - 3977:14
**modicum** [1] - 3997:24
**moment** [4] - 3951:16, 4030:24, 4143:13, 4145:12
**momentarily** [1] - 4029:3

**moments** [1] - 4079:10
**Monday** [2] - 4021:7, 4128:5
**money** [54] - 3886:13, 3902:17, 3928:10, 3928:13, 3933:5, 3933:8, 3936:6, 3938:2, 3938:24, 3939:12, 3942:6, 3943:18, 3970:20, 3992:17, 3993:8, 3993:20, 3994:2, 3996:8, 3996:14, 4008:3, 4008:4, 4008:7, 4008:10, 4008:13, 4009:25, 4010:4, 4012:16, 4012:19, 4017:18, 4017:25, 4024:12, 4032:17, 4036:23, 4043:21, 4044:22, 4047:9, 4052:15, 4064:2, 4068:19, 4073:12, 4073:25, 4074:7, 4083:10, 4107:22, 4109:1, 4115:5, 4119:23, 4121:22, 4122:10, 4130:4, 4130:6, 4130:14, 4132:7
**monies** [2] - 3926:15, 4132:4
**monitor** [1] - 3933:19
**month** [17] - 3874:7, 3904:6, 4003:20, 4003:23, 4004:6, 4007:20, 4008:4, 4008:5, 4008:10, 4008:14, 4009:4, 4009:5, 4013:15, 4013:16, 4013:20, 4027:23, 4139:3
**months** [9] - 3874:8, 3895:16, 3986:3, 4016:9, 4030:22, 4064:14, 4069:25, 4071:8, 4082:12
**morning** [4] - 3869:10, 3869:23, 3870:9, 3951:23
**most** [13] - 3867:17, 3869:11, 3888:17, 3888:23, 3933:23, 3944:21, 3962:14, 3989:9, 3993:19, 3994:23, 4009:18, 4054:7, 4110:8
**mostly** [4] - 3979:22, 3990:23, 4054:11, 4054:12
**motion** [1] - 4005:6
**mouth** [1] - 3994:8
**move** [27] - 3884:4, 3912:21, 3934:1, 3968:1, 3998:7, 4000:14, 4001:24, 4002:14, 4004:7, 4010:15, 4011:18, 4013:4, 4017:8, 4019:6, 4021:8, 4022:5, 4025:9, 4037:20, 4038:9, 4049:18, 4060:15, 4071:15, 4087:24, 4110:10, 4115:1, 4122:16, 4128:6
**moved** [2] - 3925:2, 4009:24
**moves** [9] - 3894:22, 3901:19, 3905:16, 3914:3, 3920:25, 3923:5, 3929:4, 3945:25, 3947:13
**moving** [5] - 3865:20, 3865:21, 3867:8, 4010:25, 4011:10
**MR** [392] - 3856:8, 3856:24, 3859:8, 3859:25, 3860:5, 3860:17, 3860:20, 3861:3, 3861:8, 3861:11, 3862:12, 3862:18, 3864:21, 3865:5, 3865:25, 3867:1, 3867:11, 3868:7, 3868:9, 3868:12, 3868:23, 3869:1, 3869:8, 3887:16, 3894:24, 3901:21, 3905:18, 3912:24, 3914:8, 3915:18, 3919:17, 3920:11, 3921:2, 3923:7, 3929:6, 3934:1, 3934:20, 3936:9, 3937:1, 3937:19, 3938:8, 3938:9, 3938:20, 3939:6, 3939:10, 3939:14, 3939:22, 3939:24, 3940:10, 3946:2, 3947:15,

3951:21, 3951:22, 3960:1, 3961:9,
3961:12, 3962:23, 3962:25, 3963:3,
3963:11, 3965:1, 3965:9, 3971:9,
3982:2, 3982:19, 3982:21, 3983:13,
3984:9, 3984:11, 3987:2, 3987:14,
3988:2, 3988:8, 3990:17, 3994:12,
3994:14, 3995:2, 3995:7, 3996:3,
3996:20, 3997:16, 3997:17, 3997:23,
3998:6, 3998:9, 3999:3, 3999:5,
4000:1, 4000:14, 4000:16, 4001:24,
4002:1, 4002:14, 4002:16, 4002:24,
4004:7, 4004:9, 4004:12, 4005:1,
4005:13, 4005:19, 4005:25, 4006:6,
4006:8, 4006:16, 4006:18, 4006:21,
4007:3, 4007:4, 4007:12, 4007:16,
4007:17, 4010:15, 4010:17, 4011:18,
4011:20, 4013:4, 4013:6, 4015:1,
4017:8, 4017:10, 4019:6, 4019:8,
4022:5, 4022:7, 4025:9, 4025:11,
4030:5, 4030:7, 4030:24, 4031:1,
4031:3, 4031:5, 4031:8, 4033:17,
4033:20, 4038:4, 4038:6, 4038:23,
4038:25, 4039:4, 4039:6, 4039:9,
4039:10, 4039:14, 4039:16, 4039:19,
4040:3, 4040:9, 4041:1, 4041:2,
4041:3, 4041:6, 4041:13, 4041:16,
4042:3, 4044:9, 4044:12, 4044:14,
4045:9, 4045:11, 4045:21, 4046:2,
4046:4, 4046:11, 4046:13, 4047:11,
4047:13, 4048:14, 4048:20, 4051:1,
4051:21, 4052:6, 4052:20, 4053:14,
4054:14, 4056:15, 4056:19, 4056:21,
4058:19, 4059:1, 4059:13, 4059:19,
4059:21, 4059:25, 4060:3, 4060:5,
4060:18, 4061:11, 4062:1, 4062:21,
4063:1, 4063:2, 4063:11, 4068:6,
4069:22, 4070:24, 4072:4, 4073:1,
4074:2, 4074:3, 4074:5, 4074:17,
4074:19, 4074:23, 4075:2, 4076:1,
4076:4, 4076:8, 4076:11, 4076:23,
4076:24, 4077:5, 4077:8, 4077:14,
4077:16, 4077:19, 4077:23, 4078:8,
4078:11, 4078:16, 4078:19, 4079:1,
4079:21, 4085:1, 4085:3, 4085:4,
4085:6, 4085:10, 4086:2, 4086:4,
4086:17, 4086:21, 4087:4, 4087:6,
4087:15, 4087:20, 4087:22, 4087:25,
4088:4, 4089:1, 4089:8, 4089:18,
4090:12, 4093:15, 4093:25, 4094:22,
4095:12, 4096:22, 4097:1, 4100:16,
4100:18, 4100:19, 4100:21, 4101:2,
4102:2, 4102:12, 4103:1, 4103:2,
4103:3, 4104:2, 4104:4, 4105:23,
4105:25, 4106:15, 4106:17, 4107:5,
4107:12, 4107:15, 4107:17, 4108:8,
4108:11, 4108:25, 4109:12, 4109:19,
4109:20, 4109:25, 4110:7, 4110:16,
4110:19, 4110:21, 4111:11, 4111:16,
4111:20, 4111:25, 4112:3, 4112:6,
4112:11, 4113:8, 4113:11, 4113:13,
4114:13, 4114:19, 4115:12, 4115:14,
4118:10, 4121:1, 4121:23, 4122:5,

4122:12, 4122:14, 4122:16, 4124:18,
4125:3, 4125:4, 4125:8, 4125:11,
4125:14, 4126:1, 4126:6, 4128:11,
4128:19, 4128:23, 4129:15, 4129:16,
4129:19, 4129:24, 4130:2, 4130:24,
4131:8, 4131:17, 4131:23, 4131:24,
4132:8, 4132:17, 4132:18, 4132:19,
4132:20, 4132:21, 4133:1, 4133:8,
4133:9, 4133:12, 4133:18, 4134:10,
4134:12, 4134:14, 4134:17, 4134:21,
4134:23, 4134:25, 4135:6, 4135:9,
4135:15, 4135:20, 4135:23, 4136:1,
4136:7, 4136:19, 4138:1, 4138:2,
4138:5, 4138:6, 4138:9, 4138:11,
4138:14, 4138:16, 4138:21, 4138:24,
4139:1, 4139:3, 4139:5, 4139:6,
4139:8, 4139:10, 4139:14, 4139:16,
4139:19, 4139:22, 4140:2, 4140:6,
4140:8, 4140:9, 4140:15, 4140:18,
4140:20, 4141:1, 4142:23, 4143:10,
4143:13, 4143:21, 4143:23, 4144:2,
4145:8, 4145:12, 4145:14, 4145:15,
4146:11, 4147:4, 4147:7, 4147:8,
4147:9

**MS** [127] - 3859:11, 3859:15, 3859:19,
3859:24, 3860:4, 3860:10, 3860:14,
3862:20, 3862:23, 3863:9, 3863:11,
3864:24, 3865:2, 3865:19, 3867:3,
3867:10, 3868:1, 3868:13, 3869:11,
3870:1, 3870:8, 3880:1, 3894:22,
3901:19, 3905:16, 3907:2, 3909:2,
3909:4, 3912:21, 3913:2, 3913:5,
3914:11, 3915:21, 3916:16, 3917:23,
3918:4, 3918:14, 3918:17, 3919:20,
3920:14, 3920:25, 3921:5, 3921:8,
3921:12, 3921:23, 3922:1, 3923:5,
3923:10, 3923:12, 3924:14, 3927:2,
3927:6, 3929:4, 3929:10, 3929:14,
3930:25, 3931:2, 3932:1, 3932:3,
3934:22, 3937:9, 3938:1, 3938:7,
3938:18, 3939:17, 3939:20, 3939:25,
3941:13, 3945:25, 3947:13, 3951:16,
3951:18, 3953:17, 3954:23, 3956:17,
3962:24, 3963:10, 3965:25, 3966:7,
3967:18, 3970:12, 3970:25, 3971:5,
3975:1, 3976:10, 3976:15, 3979:11,
3981:20, 3983:11, 3984:15, 3984:18,
3984:25, 3985:2, 3985:9, 3986:8,
3986:25, 4003:5, 4005:5, 4005:20,
4006:5, 4006:19, 4076:3, 4077:20,
4079:14, 4086:15, 4086:18, 4086:23,
4110:2, 4110:13, 4111:8, 4111:14,
4111:17, 4111:18, 4111:22, 4112:9,
4112:13, 4112:15, 4132:24, 4135:17,
4139:13, 4139:15, 4139:17, 4139:20,
4146:12, 4146:15, 4147:4, 4147:5

**MSMB** [129] - 3890:12, 3891:19,
3891:21, 3891:25, 3892:23, 3893:2,
3893:5, 3893:8, 3893:12, 3893:14,
3899:16, 3899:20, 3899:21, 3899:24,
3899:25, 3900:20, 3900:21, 3901:3,
3901:4, 3901:5, 3902:6, 3903:23,

3904:6, 3904:8, 3904:14, 3904:15,
3904:20, 3904:23, 3906:4, 3908:15,
3908:19, 3908:20, 3908:23, 3917:4,
3923:20, 3924:24, 3925:4, 3925:6,
3925:10, 3925:14, 3925:17, 3925:20,
3926:19, 3937:15, 3941:25, 3942:9,
3942:19, 3943:15, 3971:5, 3971:18,
3972:1, 3972:4, 3972:6, 3972:8,
3991:8, 3991:12, 3993:13, 3993:15,
3994:4, 3994:16, 3994:25, 3996:23,
3999:10, 4000:5, 4000:22, 4001:8,
4002:10, 4004:6, 4010:8, 4011:3,
4011:7, 4011:8, 4011:24, 4012:14,
4012:15, 4012:19, 4014:11, 4015:18,
4016:5, 4016:17, 4016:21, 4017:16,
4022:11, 4026:9, 4026:11, 4044:7,
4044:15, 4047:10, 4048:7, 4049:8,
4054:13, 4055:2, 4063:23, 4064:4,
4065:9, 4066:4, 4066:19, 4067:14,
4068:17, 4068:24, 4070:18, 4073:7,
4073:13, 4073:24, 4076:21, 4080:15,
4083:15, 4089:24, 4090:5, 4090:24,
4091:6, 4093:23, 4094:5, 4094:6,
4094:7, 4094:8, 4095:8, 4095:17,
4097:17, 4097:19, 4097:20, 4103:14,
4120:12, 4120:14, 4122:25, 4123:1,
4143:1, 4144:24

**MSMB's** [5] - 4012:8, 4012:9, 4012:11,
4073:16, 4073:17

**MSN** [2] - 4104:16, 4104:18

**Muchin** [2] - 3873:19, 3955:9

**Mulleady** [6] - 3916:22, 3917:3, 3917:6,
3945:22, 3946:7, 3946:15

**multiple** [9] - 3867:22, 3886:15,
3918:25, 3990:24, 3991:18, 4037:8,
4077:11, 4104:3, 4120:18

**Muscular** [1] - 4082:24

**must** [8] - 3857:23, 3903:20, 3994:6,
4012:14, 4012:19, 4073:20, 4100:8,
4114:5

**Myers** [1] - 4081:2

## N

**nagging** [1] - 4013:18
**name** [22] - 3874:2, 3884:14, 3911:25,
3912:3, 3919:3, 3951:3, 3951:23,
3975:15, 3976:1, 3987:22, 3987:23,
3988:13, 3995:3, 3999:14, 3999:15,
4003:8, 4003:9, 4008:15, 4025:5,
4031:11, 4084:14, 4137:1
**named** [8] - 3860:23, 3888:2, 3964:24,
3968:7, 3979:22, 3990:1, 4084:10,
4143:6
**namely** [1] - 3855:20
**narrow** [1] - 3864:8
**NASD** [3] - 4114:2, 4117:25, 4118:1
**NASDAQ** [3] - 4080:19, 4092:19, 4093:1
**national** [1] - 3955:17
**National** [1] - 4117:25
**nature** [9] - 3855:10, 3856:11, 3881:25,
3885:21, 3886:24, 3966:4, 4023:7,

4092:2, 4119:16
**NAV** [3] - 3970:5, 3970:10, 3970:16
**Navy** [3] - 3989:1, 3989:3
**near** [1] - 4036:20
**necessarily** [3] - 4063:20, 4109:24, 4120:19
**necessary** [5] - 3858:4, 3871:2, 3880:16, 3954:7, 3973:20
**need** [30] - 3859:3, 3860:7, 3863:21, 3863:23, 3886:19, 3892:14, 3903:3, 3916:6, 3924:6, 3924:8, 3925:21, 3925:24, 3950:11, 3953:15, 3964:13, 4013:19, 4016:13, 4031:19, 4039:12, 4048:25, 4073:21, 4078:9, 4083:2, 4085:6, 4109:8, 4110:5, 4139:17, 4145:23, 4146:9
**needed** [11] - 3864:5, 3930:6, 3951:10, 3956:16, 3956:22, 3957:17, 3958:4, 3958:6, 3974:3, 3993:9, 4008:7
**needs** [1] - 3867:23
**negative** [4] - 3867:19, 3993:6, 3993:10, 4051:8
**negotiation** [1] - 4130:7
**NEI** [1] - 3987:23
**neighborhood** [2] - 3989:23, 3996:24
**Neil** [1] - 4025:5
**Neill** [48] - 3987:14, 3987:23, 3988:9, 3988:14, 3999:6, 3999:10, 3999:16, 3999:17, 4000:12, 4000:19, 4001:16, 4002:4, 4002:19, 4003:9, 4003:10, 4007:5, 4007:22, 4009:10, 4010:20, 4010:23, 4011:23, 4013:8, 4016:4, 4017:13, 4018:24, 4019:11, 4019:16, 4021:9, 4021:24, 4023:18, 4025:14, 4026:7, 4026:12, 4030:8, 4030:15, 4030:19, 4031:11, 4043:19, 4043:20, 4057:2, 4070:2, 4076:22, 4076:25, 4077:1, 4105:10, 4131:7, 4144:3, 4145:11
**nephropathy** [1] - 4081:9
**Nephropathy** [1] - 4081:10
**nephrotic** [1] - 4081:20
**net** [5] - 4009:8, 4022:10, 4090:23, 4109:17, 4141:15
**nets** [1] - 4142:5
**never** [19] - 3955:22, 3962:13, 3996:12, 4016:19, 4026:10, 4031:13, 4051:13, 4051:23, 4052:1, 4058:24, 4064:23, 4082:10, 4082:13, 4082:22, 4083:2, 4094:20, 4098:8, 4125:20
**nevertheless** [1] - 4032:12
**new** [16] - 3894:17, 3895:8, 3899:7, 3925:18, 4114:1, 4114:4, 4114:7, 4114:9, 4114:11, 4114:12, 4114:17, 4114:21, 4117:23, 4118:4
**NEW** [1] - 3854:1
**New** [13] - 3854:6, 3854:15, 3854:16, 3854:20, 3870:12, 3871:5, 3878:1, 3912:4, 3992:5, 4113:24
**news** [3] - 4060:21, 4080:17, 4082:15
**next** [45] - 3862:14, 3864:25, 3869:25,

3876:20, 3879:25, 3881:9, 3888:18, 3900:2, 3901:2, 3906:11, 3906:24, 3906:25, 3912:5, 3919:3, 3920:15, 3923:21, 3930:22, 3937:9, 3937:13, 3937:14, 3940:1, 3942:14, 3943:1, 3943:13, 3959:24, 3981:23, 3985:10, 3987:8, 3987:12, 4001:3, 4005:23, 4010:25, 4011:10, 4014:24, 4028:13, 4029:9, 4068:22, 4072:10, 4075:10, 4078:21, 4082:15, 4084:24, 4088:7, 4101:13, 4137:5
**nice** [4] - 3869:18, 3987:4, 4011:9, 4133:10
**night** [6] - 3912:20, 3977:13, 3977:20, 4057:22, 4146:4, 4146:18
**Niles** [1] - 3874:1
**nine** [2] - 3895:16, 3986:3
**nobody** [4] - 3886:3, 3974:18, 4051:19, 4051:23
**non** [2] - 3935:23, 4116:11
**non-business** [1] - 3935:23
**non-publicly-traded** [1] - 4116:11
**none** [3] - 3937:6, 3997:13, 4065:6
**norm** [1] - 4009:18
**normal** [7] - 3914:12, 3956:2, 3996:10, 4015:23, 4024:12, 4117:6, 4122:11
**normally** [4] - 4008:3, 4016:1, 4024:2, 4118:20
**notch** [1] - 4112:2
**note** [12] - 3876:18, 3894:24, 3902:3, 3904:8, 3904:15, 3907:14, 3907:25, 3908:19, 3925:20, 3930:9, 3990:15, 4114:1
**notebooks** [2] - 3936:12, 4004:16
**notes** [2] - 4018:3, 4142:16
**nothing** [19] - 3865:5, 3865:14, 3866:3, 3885:8, 3987:2, 4027:3, 4027:8, 4027:9, 4043:16, 4044:2, 4059:15, 4067:13, 4096:6, 4131:12, 4133:18, 4135:21, 4139:3, 4143:10, 4145:15
**notice** [3] - 3919:13, 3919:15, 3919:23
**November** [30] - 3894:19, 3895:11, 3898:17, 3898:21, 3901:17, 3901:25, 3902:17, 3903:15, 3904:3, 3905:14, 3906:13, 3907:3, 3907:10, 3907:24, 3908:5, 3909:6, 3912:6, 3912:19, 3912:20, 3919:5, 3919:24, 3983:6, 3985:24, 4017:16, 4019:19, 4022:13, 4048:4, 4049:5, 4059:17, 4068:16
**nowhere** [1] - 3976:2
**number** [36] - 3874:8, 3888:8, 3900:22, 3908:6, 3918:9, 3943:3, 3945:1, 3945:2, 3948:21, 3953:16, 3961:16, 3972:14, 3997:6, 4001:3, 4002:20, 4003:24, 4013:19, 4015:15, 4019:12, 4024:5, 4033:5, 4034:24, 4035:4, 4035:6, 4036:19, 4045:19, 4056:16, 4069:5, 4074:15, 4074:21, 4086:5, 4097:14, 4103:4, 4116:16, 4120:19, 4141:25
**numbered** [1] - 3917:21

**numbers** [5] - 3894:6, 3896:22, 3994:7, 4139:25, 4142:12
**numeral** [1] - 4099:20
**numerous** [1] - 3962:11
**Nursing** [2] - 4104:19, 4104:20
**nursing** [6] - 3989:4, 3989:13, 4042:10, 4042:15, 4042:23, 4043:2

## O

**o'clock** [2] - 3912:20, 3937:19
**oath** [2] - 3941:4, 4007:1
**object** [8] - 3856:6, 3856:9, 3862:10, 3862:16, 3867:1, 3914:8, 3915:18, 3919:17
**objecting** [1] - 3920:11
**objection** [111] - 3857:4, 3859:6, 3887:17, 3894:24, 3901:21, 3905:18, 3912:24, 3921:2, 3923:7, 3929:6, 3937:1, 3946:2, 3947:15, 3954:23, 3956:17, 3965:25, 3966:7, 3967:18, 3970:12, 3970:25, 3976:10, 3976:15, 3976:16, 3981:20, 3983:11, 3995:7, 4000:16, 4002:1, 4002:16, 4004:9, 4010:17, 4011:20, 4013:6, 4017:10, 4019:8, 4022:7, 4025:11, 4033:17, 4038:4, 4038:23, 4039:4, 4039:9, 4040:4, 4040:24, 4044:9, 4045:9, 4045:21, 4046:2, 4046:11, 4046:12, 4047:11, 4051:21, 4052:20, 4053:14, 4054:14, 4056:21, 4058:19, 4058:22, 4059:1, 4059:2, 4059:13, 4059:19, 4060:2, 4060:18, 4061:11, 4062:1, 4062:21, 4063:11, 4070:24, 4074:2, 4076:3, 4077:10, 4078:16, 4079:14, 4079:21, 4085:3, 4089:8, 4089:18, 4093:15, 4093:25, 4094:22, 4095:12, 4096:22, 4100:16, 4100:18, 4101:2, 4102:12, 4105:23, 4106:15, 4114:13, 4115:12, 4118:10, 4121:23, 4122:5, 4122:12, 4124:18, 4125:3, 4125:8, 4126:1, 4128:11, 4128:19, 4129:16, 4136:7, 4136:19, 4138:2, 4138:8, 4138:13, 4139:14, 4142:23, 4145:8
**objections** [1] - 4077:18
**objects** [2] - 3856:14, 3856:18
**obligation** [5] - 4066:5, 4066:11, 4066:17, 4100:3, 4115:10
**obligation"** [1] - 4066:13
**obtain** [1] - 3974:15
**obvious** [1] - 4068:14
**obviously** [10] - 3858:8, 3954:3, 3954:6, 3957:17, 4023:2, 4036:4, 4091:22, 4092:22, 4111:19, 4116:5
**occasion** [1] - 4083:25
**occasions** [2] - 3962:11, 4077:11
**occupation** [1] - 4104:9
**occur** [4] - 3875:21, 3913:25, 3934:12, 4019:19
**occurred** [5] - 3881:17, 3881:20, 4076:9, 4085:9, 4138:18
**occurs** [1] - 3915:3

**Ocean** [1] - 4061:14
**October** [1] - 4022:13
**OF** [3] - 3854:1, 3854:3, 3854:11
**offensive** [2] - 3866:5, 3996:4
**offer** [21] - 3855:17, 3862:20, 4012:8, 4012:10, 4012:11, 4026:13, 4026:22, 4026:24, 4027:1, 4056:15, 4056:19, 4073:16, 4073:17, 4076:1, 4078:9, 4085:1, 4093:4, 4093:7, 4129:15, 4138:1, 4138:14
**offered** [12] - 4026:16, 4040:15, 4056:10, 4077:12, 4090:16, 4103:15, 4110:1, 4115:9, 4125:2, 4125:7, 4130:18, 4134:12
**offering** [17] - 3856:20, 3857:6, 3868:3, 3914:20, 4001:6, 4077:15, 4097:25, 4098:6, 4098:11, 4103:21, 4130:17, 4130:23, 4132:19, 4132:21, 4132:22, 4132:24, 4134:14
**Offerings** [1] - 4117:19
**offerings** [1] - 4117:21
**offers** [1] - 4015:14
**office** [7] - 3867:22, 3875:8, 3925:18, 3990:19, 4048:1, 4049:22, 4142:18
**officer** [6] - 3875:12, 3909:23, 3911:14, 3958:24, 3959:2, 3989:3
**officers** [2] - 3882:4, 3886:15
**offices** [1] - 3955:15
**Official** [1] - 3854:23
**often** [2] - 3958:2, 4081:22
**oil** [1] - 4045:17
**Oklahoma** [5] - 3988:22, 3988:25, 4037:25, 4038:2, 4038:3
**old** [9] - 3870:9, 3988:9, 4040:25, 4041:8, 4041:11, 4053:9, 4062:20, 4062:23, 4107:25
**older** [1] - 4053:12
**omissions** [1] - 3997:4
**once** [5] - 3960:3, 3973:8, 3983:2, 3987:18, 4125:14
**one** [123] - 3855:10, 3856:19, 3859:20, 3861:6, 3862:6, 3863:12, 3865:3, 3871:13, 3871:19, 3873:1, 3873:22, 3875:2, 3877:2, 3883:15, 3886:6, 3886:11, 3888:8, 3888:17, 3888:25, 3900:20, 3903:13, 3903:25, 3904:5, 3904:11, 3905:24, 3907:4, 3918:24, 3919:2, 3935:24, 3938:18, 3940:10, 3942:14, 3943:14, 3944:4, 3945:1, 3948:3, 3948:8, 3951:16, 3952:6, 3952:15, 3956:12, 3956:25, 3960:23, 3961:17, 3962:5, 3962:8, 3964:14, 3965:7, 3965:16, 3967:12, 3969:6, 3970:2, 3976:19, 3978:4, 3979:21, 3980:1, 3982:19, 3982:21, 3982:22, 3984:9, 3988:25, 3992:22, 3994:22, 3997:4, 3997:8, 3998:5, 4002:22, 4005:3, 4007:6, 4010:2, 4013:9, 4013:22, 4014:5, 4015:8, 4017:4, 4017:19, 4019:20, 4020:3, 4020:6, 4020:8, 4020:10, 4021:19, 4028:4,

4030:10, 4030:24, 4034:19, 4037:24, 4040:5, 4040:15, 4046:20, 4057:6, 4058:7, 4062:3, 4065:1, 4065:3, 4066:9, 4066:15, 4068:20, 4069:5, 4070:12, 4076:25, 4080:4, 4080:5, 4080:6, 4082:21, 4083:3, 4084:14, 4085:14, 4087:17, 4105:4, 4111:8, 4124:11, 4125:14, 4126:23, 4132:9, 4138:7, 4142:14, 4143:13, 4144:22, 4145:12
**ones** [3] - 3900:6, 3944:22, 3948:25
**ongoing** [1] - 4130:7
**online** [1] - 3943:15
**onset** [1] - 3989:16
**onward** [1] - 3973:10
**Open** [2] - 3939:19, 4135:24
**open** [13] - 3858:20, 3876:24, 3930:18, 3931:6, 3932:11, 3999:1, 4017:20, 4030:1, 4042:1, 4068:20, 4078:13, 4113:1, 4140:11
**open-ended** [1] - 4017:20
**opened** [3] - 4085:17, 4125:4, 4125:9
**operate** [2] - 4042:15, 4042:18
**operated** [3] - 4042:18, 4097:21
**operating** [7] - 3875:11, 3958:24, 3959:2, 4043:6, 4110:4, 4121:2, 4122:25
**operation** [1] - 4068:25
**operational** [1] - 4018:3
**operations** [2] - 3989:9, 3989:11
**opinion** [12] - 3855:7, 3856:18, 3856:20, 3857:6, 3859:3, 3859:9, 3881:4, 3993:6, 4020:21, 4021:4, 4127:10, 4128:3
**opponent** [1] - 4135:1
**opportunities** [4] - 3955:25, 4017:17, 4068:18, 4086:5
**opportunity** [4] - 3989:24, 3991:19, 4020:15, 4127:4
**options** [1] - 4081:19
**oral** [1] - 4035:18
**order** [4] - 3902:21, 3902:24, 4078:8, 4114:2
**Oremland** [2] - 3855:3, 3858:21
**Orex** [2] - 4008:16, 4008:17
**Orexigen** [2] - 4008:16, 4008:17
**organizations** [1] - 3989:18
**organized** [1] - 4097:19
**original** [6] - 3874:23, 3897:19, 3903:23, 3919:2, 3953:25, 4040:24
**originally** [8] - 3867:4, 3878:24, 3887:8, 3893:21, 3893:22, 3907:16, 3918:21, 3935:25
**orphan** [1] - 4081:6
**otherwise** [1] - 3987:9
**ourselves** [2] - 4005:13, 4096:21
**outcome** [3] - 4023:12, 4092:7, 4122:20
**outlined** [1] - 3896:6
**outlook** [1] - 3993:11
**outrageous** [1] - 3950:2
**outside** [15] - 3892:16, 3892:17,

3892:20, 3915:11, 3915:13, 3915:14, 3915:16, 3926:3, 3926:3, 3927:21, 3995:10, 3996:1, 4039:21, 4040:1, 4106:24, 4107:1
**outstanding** [1] - 4012:3
**overall** [3] - 3868:4, 4110:6, 4134:1
**overrule** [7] - 3919:18, 3981:21, 4046:12, 4051:22, 4059:2, 4060:1, 4138:13
**Overruled** [4] - 4038:5, 4045:22, 4047:12, 4118:9
**overruled** [13] - 4052:21, 4054:15, 4063:12, 4078:17, 4079:23, 4089:9, 4093:16, 4114:15, 4125:5, 4128:12, 4136:20, 4145:10
**overseas** [2] - 3955:16, 3955:17
**overstate** [1] - 3926:14
**owe** [4] - 3927:5, 3952:20, 4026:17, 4027:5
**own** [18] - 3871:12, 3871:21, 3883:4, 3890:25, 3934:15, 3970:8, 3994:19, 4018:21, 4021:5, 4044:1, 4052:2, 4058:1, 4093:12, 4128:4, 4134:15, 4135:2, 4142:10
**owned** [6] - 3889:25, 3910:22, 4024:7, 4042:18, 4042:19, 4136:22
**owner** [1] - 3873:6
**ownership** [12] - 3855:19, 3855:20, 3855:22, 3855:25, 3856:17, 3878:14, 3878:16, 3889:6, 3889:7, 3889:15, 3899:14, 3915:15
**owns** [2] - 4022:16, 4091:2

## P

**P.C** [1] - 3854:19
**p.m** [10] - 3904:3, 3906:14, 3908:5, 3961:10, 4004:18, 4019:13, 4020:3, 4021:20, 4021:23, 4057:3
**p.m.** [2] - 4012:24, 4013:10
**package** [2] - 3872:13, 3880:16
**packaged** [2] - 3872:9, 3880:6
**PAGE** [1] - 4147:2
**page** [119] - 3877:20, 3879:3, 3879:25, 3880:21, 3881:9, 3882:5, 3883:18, 3883:19, 3889:12, 3891:15, 3895:12, 3895:25, 3899:4, 3900:2, 3901:1, 3901:2, 3901:24, 3903:13, 3903:17, 3903:25, 3905:24, 3906:25, 3908:10, 3908:11, 3910:7, 3911:20, 3911:21, 3917:20, 3918:3, 3918:15, 3918:16, 3918:19, 3923:10, 3923:17, 3923:21, 3924:9, 3930:22, 3932:24, 3936:16, 3937:14, 3941:17, 3941:18, 3941:20, 3943:24, 3947:18, 3948:18, 3949:4, 3949:20, 3952:10, 3953:20, 3959:24, 3974:24, 3981:23, 3984:25, 3985:1, 3985:9, 3985:10, 3986:8, 3995:12, 3998:12, 3999:21, 4000:13, 4001:3, 4001:19, 4002:13, 4002:19, 4002:20, 4003:3, 4003:4, 4014:24, 4018:2, 4019:11, 4019:21, 4020:2, 4028:13,

4029:9, 4039:23, 4041:19, 4050:9, 4056:6, 4072:10, 4075:10, 4078:21, 4084:24, 4088:7, 4097:13, 4097:14, 4098:16, 4098:20, 4098:21, 4101:13, 4102:13, 4102:16, 4104:8, 4106:1, 4106:25, 4112:19, 4113:14, 4113:21, 4113:24, 4116:1, 4116:4, 4117:13, 4117:17, 4119:1, 4120:6, 4120:8, 4120:25, 4121:6, 4122:24, 4137:5

**paid** [22] - 3889:6, 3896:9, 3900:6, 3900:15, 3933:13, 3939:3, 3944:4, 3945:8, 3969:19, 3969:25, 3970:19, 3978:11, 3978:12, 3978:16, 3978:17, 4014:22, 4015:8, 4046:6, 4093:5, 4131:10, 4131:11

**paint** [1] - 3858:3

**Panoff** [3] - 3951:3, 3951:4, 3951:7

**papers** [9] - 3872:18, 3880:20, 3972:16, 3972:17, 3972:19, 3972:22, 3972:23, 3972:25

**paragraph** [26] - 3880:24, 3881:10, 3881:11, 3908:18, 3910:8, 3910:12, 3952:19, 4017:13, 4017:23, 4017:24, 4018:3, 4068:22, 4069:10, 4087:11, 4097:16, 4098:16, 4098:21, 4099:16, 4099:18, 4101:4, 4101:5, 4103:13, 4104:8, 4107:6, 4117:18, 4120:10

**paragraphs** [2] - 4011:23, 4122:3

**Pardon** [1] - 4114:11

**pardon** [1] - 4013:1

**part** [46] - 3856:15, 3856:17, 3857:5, 3857:11, 3857:13, 3862:25, 3864:4, 3864:11, 3873:8, 3875:19, 3879:11, 3884:22, 3893:17, 3910:3, 3913:21, 3924:10, 3924:15, 3937:3, 3939:4, 3939:9, 3965:3, 3971:20, 3980:20, 4000:19, 4031:25, 4042:16, 4043:2, 4043:10, 4043:12, 4046:7, 4050:5, 4055:1, 4070:22, 4071:1, 4071:5, 4071:16, 4076:19, 4080:8, 4094:13, 4097:16, 4099:20, 4104:6, 4117:18, 4123:9, 4131:12, 4132:15

**partially** [1] - 3887:2

**participate** [2] - 4114:4, 4120:15

**participation** [2] - 4082:17, 4118:3

**particular** [6] - 3871:4, 3889:16, 3943:10, 4052:5, 4052:15, 4064:10

**particularly** [6] - 3863:19, 4008:9, 4045:15, 4047:22, 4062:9, 4082:20

**parties** [9] - 3855:1, 3858:12, 3858:14, 3859:6, 3859:21, 3869:14, 3915:14, 3924:22, 3956:3

**partner** [48] - 3871:11, 3872:21, 3873:20, 3884:3, 3949:22, 3955:9, 3956:4, 3956:14, 3960:10, 3960:14, 3960:16, 3989:7, 3993:5, 4042:21, 4042:24, 4043:7, 4065:22, 4065:23, 4096:16, 4097:21, 4100:2, 4100:4, 4100:25, 4101:6, 4106:9, 4106:14, 4109:9, 4113:17, 4115:4, 4115:5, 4115:16, 4120:17, 4120:22, 4121:7, 4121:9, 4121:14, 4121:19, 4121:20,

4122:9, 4122:11, 4123:14, 4123:15, 4123:16, 4123:20, 4123:25

**partners** [10] - 3878:13, 3969:3, 4019:23, 4022:24, 4042:22, 4043:8, 4091:19, 4118:1, 4121:10, 4124:2

**partnership** [57] - 4017:20, 4018:4, 4022:15, 4022:17, 4023:14, 4032:14, 4032:16, 4068:10, 4068:15, 4068:21, 4091:2, 4091:5, 4091:6, 4091:12, 4091:19, 4092:9, 4093:23, 4097:20, 4097:21, 4097:22, 4097:23, 4097:24, 4098:5, 4098:18, 4098:24, 4099:1, 4099:23, 4099:25, 4100:2, 4100:4, 4100:7, 4100:9, 4101:8, 4103:13, 4103:14, 4103:15, 4105:2, 4105:7, 4105:21, 4105:22, 4106:7, 4114:1, 4114:3, 4119:3, 4119:15, 4119:17, 4119:24, 4120:14, 4121:12, 4121:13, 4122:23, 4123:25, 4126:14, 4126:21, 4142:11

**Partnership** [2] - 4043:20, 4090:19

**partnership's** [4] - 4116:10, 4117:20, 4118:4, 4119:13

**partnerships** [3] - 4017:15, 4096:1, 4105:9

**parts** [4] - 3857:25, 3871:3, 3967:17, 4044:11

**party** [26] - 3873:22, 3874:4, 3892:1, 3892:5, 3892:7, 3892:10, 3892:11, 3892:12, 3892:16, 3892:17, 3892:19, 3892:20, 3924:1, 3924:21, 3924:23, 3951:11, 3955:7, 3955:10, 3955:11, 3955:20, 3956:10, 3963:25, 3964:1, 4073:12, 4074:7, 4135:1

**passes** [2] - 4086:6, 4086:7

**passing** [2] - 3871:3, 4031:12

**past** [8] - 3892:2, 3892:3, 3993:1, 3996:25, 3997:1, 3998:3, 4077:11, 4105:7

**path** [1] - 3996:3

**patient** [2] - 4081:8, 4081:22

**patients** [9] - 4081:11, 4081:12, 4081:14, 4081:17, 4081:20, 4082:2, 4082:23, 4083:1, 4083:2

**pause** [5] - 3982:20, 3982:23, 3984:10, 3987:16, 4113:7

**Pause** [10] - 3861:5, 3951:17, 3964:15, 3965:11, 4030:25, 4031:4, 4115:21, 4138:12, 4143:14, 4145:13

**pay** [19] - 3927:5, 3927:8, 3933:20, 3937:15, 3939:1, 3939:2, 3944:14, 3950:18, 3954:21, 3961:21, 3978:14, 4014:22, 4023:3, 4091:23, 4092:22, 4093:2, 4115:7, 4115:9

**Paychex** [8] - 3933:13, 3933:16, 3933:18, 3933:22, 3934:15, 3944:4, 3944:13, 3944:23

**paying** [2] - 3886:13, 3954:20

**payment** [15] - 3902:15, 3906:15, 3906:19, 3907:14, 3907:25, 3925:14, 3925:15, 3925:16, 3925:18, 3933:21,

3935:4, 3944:7, 3969:11, 3969:19, 3971:5

**payments** [13] - 3924:21, 3926:3, 3926:6, 3926:12, 3926:21, 3928:15, 3937:12, 3938:25, 3939:1, 3944:20, 3944:22, 3945:6, 3950:22

**payroll** [16] - 3928:16, 3933:13, 3933:14, 3933:17, 3933:18, 3933:20, 3933:24, 3934:6, 3934:11, 3934:13, 3934:18, 3938:22, 3938:23, 3938:24, 3944:7, 3944:23

**PC** [1] - 3970:24

**pencils** [1] - 3894:4

**people** [28] - 3867:18, 3872:22, 3886:13, 3886:15, 3948:21, 3950:19, 3958:18, 3960:2, 3984:4, 3992:19, 3994:8, 3994:23, 4003:21, 4027:17, 4035:21, 4038:17, 4038:19, 4042:17, 4051:4, 4053:23, 4054:6, 4063:5, 4063:15, 4063:20, 4083:12, 4089:25, 4109:20, 4132:5

**per** [11] - 3900:13, 3900:14, 3900:15, 3923:15, 4012:4, 4019:22, 4022:20, 4022:21, 4091:15, 4142:1

**Per** [1] - 3888:9

**percent** [25] - 3855:19, 3856:17, 3899:12, 3899:18, 3908:16, 3996:24, 4003:22, 4009:9, 4010:25, 4012:5, 4014:4, 4015:10, 4016:9, 4016:11, 4034:10, 4036:16, 4036:17, 4036:20, 4047:16, 4047:17, 4070:11, 4118:2, 4144:15, 4144:21

**percentage** [8] - 3899:10, 3899:11, 3899:13, 3899:14, 3899:16, 3899:17, 3915:1, 3915:3

**percentages** [3] - 3899:20, 3914:22, 3914:23

**perfect** [1] - 3938:8

**perform** [5] - 3879:3, 3879:14, 3895:13, 3896:6, 3960:17

**performance** [15] - 3881:16, 3881:18, 3994:4, 3998:3, 3998:4, 4003:11, 4003:15, 4004:6, 4009:19, 4009:22, 4011:11, 4016:14, 4016:15, 4101:11

**performed** [2] - 3896:9, 3999:7

**perhaps** [3] - 3859:14, 3859:23, 4089:16

**period** [39] - 3864:16, 3879:7, 3893:23, 3893:25, 3894:5, 3895:9, 3896:18, 3896:24, 3897:2, 3897:8, 3898:2, 3898:5, 3901:15, 3905:14, 3928:7, 3944:7, 3945:7, 3945:8, 3958:9, 3977:15, 3985:6, 3985:15, 3986:1, 3986:4, 3986:10, 3986:16, 4011:10, 4024:2, 4085:24, 4086:16, 4130:2, 4130:3, 4130:19, 4130:20, 4131:19, 4132:5, 4132:9, 4136:9, 4141:4

**periodic** [1] - 4003:10

**periods** [4] - 3884:12, 3945:6, 3958:3, 4124:4

**permission** [1] - 4066:5

**permitted** [4] - 3862:1, 4016:18, 4016:20, 4125:24
**person** [29] - 3862:12, 3867:9, 3876:10, 3876:25, 3886:6, 3886:11, 3886:12, 3886:15, 3892:8, 3909:25, 3910:19, 3946:8, 3958:14, 3958:16, 3960:21, 3977:20, 3990:3, 3992:16, 3992:21, 4049:21, 4054:4, 4057:12, 4057:25, 4089:22, 4119:24, 4121:19, 4130:20
**personal** [24] - 3883:15, 3885:21, 3886:24, 3936:1, 3937:10, 3937:23, 3937:24, 3938:6, 3939:13, 3940:5, 3940:6, 3941:7, 3941:10, 3977:12, 3977:16, 3977:22, 3978:8, 4065:7, 4066:23, 4104:5, 4123:7, 4129:12, 4140:23, 4142:16
**personally** [10] - 3886:13, 3960:8, 3960:19, 3999:14, 4054:22, 4063:15, 4067:11, 4069:4, 4115:6, 4115:9
**personnel** [1] - 3873:23
**persons** [1] - 4118:1
**perspective** [6] - 3937:5, 3953:10, 3954:6, 3957:18, 3977:15, 3981:18
**pertained** [1] - 3885:22
**pertaining** [1] - 4099:1
**Pharmaceutical** [3] - 4085:12, 4085:15, 4085:16
**pharmaceutical** [1] - 4086:11
**Pharmaceuticals** [4] - 4080:19, 4080:20, 4085:19, 4085:21
**Pharmacopeia** [2] - 4081:2, 4081:3
**phone** [10] - 3875:1, 3968:19, 3968:23, 4047:24, 4048:11, 4049:9, 4049:15, 4059:16, 4138:22, 4143:20
**phrase** [2] - 4015:21, 4039:2
**phrases** [1] - 4066:12
**physically** [1] - 4140:21
**physicians** [1] - 4081:13
**pick** [5] - 3990:12, 4028:5, 4035:21, 4130:8, 4131:14
**picked** [2] - 4032:25, 4035:24
**picking** [1] - 4130:15
**piece** [5] - 3876:15, 3959:14, 3980:22, 3990:12, 4028:5
**Pierotti** [2] - 4005:5, 4005:24
**pipeline** [1] - 4069:2
**place** [6] - 3875:7, 3996:1, 4026:20, 4026:22, 4040:1, 4107:1
**placement** [25] - 3948:12, 3996:13, 4000:23, 4001:5, 4001:21, 4051:14, 4071:9, 4071:12, 4077:3, 4094:18, 4094:20, 4096:3, 4096:6, 4096:17, 4099:6, 4102:22, 4103:21, 4103:24, 4111:1, 4115:23, 4116:9, 4117:14, 4117:17, 4122:23
**Placement** [3] - 4094:7, 4103:16, 4110:18
**plagued** [1] - 4082:5
**plan** [10] - 3864:17, 3868:14, 3876:23, 3897:19, 3980:9, 4020:23, 4022:23, 4091:18, 4127:22

**planned** [1] - 4021:11
**planning** [2] - 3884:5, 4082:14
**plans** [1] - 3856:2
**play** [2] - 3897:1, 3929:21
**plays** [8] - 3862:3, 3862:8, 3862:13, 3866:7, 3866:20, 3866:23, 4015:25, 4016:1
**Plaza** [1] - 3854:15
**pleased** [1] - 4057:10
**pleasing** [1] - 4057:8
**plucked** [1] - 3866:8
**plus** [7] - 3899:16, 3980:21, 4009:8, 4030:14, 4032:2, 4033:10, 4033:12
**pocket** [6] - 4015:18, 4015:20, 4015:21, 4015:22, 4015:25, 4016:2
**point** [38] - 3864:6, 3875:20, 3876:25, 3878:2, 3884:6, 3884:9, 3887:15, 3888:8, 3909:25, 3946:7, 3952:24, 3953:2, 3973:7, 3974:1, 3976:12, 3976:19, 3978:4, 3979:21, 3990:12, 3997:13, 4014:14, 4015:4, 4015:5, 4016:21, 4021:14, 4056:1, 4085:14, 4087:10, 4110:21, 4124:11, 4131:7, 4133:11, 4135:9
**pointed** [1] - 3978:4
**pointing** [1] - 4070:16
**points** [2] - 3974:1, 4076:24
**policies** [1] - 4120:14
**policy** [1] - 3977:18
**poorly** [1] - 3999:7
**popular** [4] - 4020:21, 4021:4, 4127:10, 4128:3
**population** [2] - 4081:6, 4081:8
**portfolio** [5] - 4065:22, 4117:20, 4121:8, 4121:15, 4122:25
**portion** [9] - 3872:2, 3907:22, 3930:25, 3941:22, 4073:15, 4116:7, 4117:20, 4140:1, 4141:11
**portions** [1] - 4115:24
**pose** [1] - 4120:23
**position** [19] - 3857:1, 4011:4, 4014:19, 4014:22, 4019:16, 4025:19, 4063:24, 4065:3, 4065:4, 4065:5, 4065:7, 4104:9, 4116:19, 4118:9, 4119:11, 4124:7, 4126:16, 4133:3, 4133:13
**positions** [7] - 3990:25, 3991:1, 3991:10, 4009:23, 4064:21, 4064:25, 4065:6
**positive** [2] - 4054:18, 4144:23
**possession** [2] - 4095:6, 4095:14
**possibilities** [2] - 4023:9, 4092:4
**possibility** [2] - 4023:5, 4091:25
**possible** [6] - 3942:5, 3982:18, 4008:22, 4071:21, 4102:11, 4122:11
**possibly** [3] - 3969:2, 4112:8, 4120:16
**Post** [1] - 3898:21
**post** [7] - 3885:1, 3898:23, 3898:24, 3909:17, 3927:25, 3928:1, 3928:10
**Post-Conversion** [1] - 3898:21
**post-conversion** [2] - 3898:23, 3898:24

**posted** [1] - 3885:2
**potential** [9] - 3955:24, 3989:25, 3992:14, 4073:6, 4082:22, 4119:4, 4120:20, 4120:23, 4134:3
**potentially** [2] - 3968:24
**poured** [2] - 4020:16, 4127:4
**PowerPoint** [1] - 4096:9
**PPM** [2] - 3948:2, 3948:12
**PPM's** [1] - 3948:16
**practice** [2] - 3870:24, 3932:10
**practicing** [1] - 3957:3
**precious** [1] - 4081:19
**precise** [1] - 4003:24
**precisely** [1] - 3866:10
**precludes** [1] - 4132:14
**prefer** [1] - 3860:11
**preference** [1] - 3987:10
**Preferred** [5] - 3889:18, 3890:1, 3891:6, 3900:5, 3904:7
**prejudice** [2] - 4077:6, 4086:13
**premium** [1] - 4012:6
**preparation** [2] - 3966:23, 3982:12
**prepare** [3] - 3886:5, 3903:10, 3972:21
**prepared** [4] - 3856:5, 3869:25, 3972:24, 3973:1
**preparing** [3] - 3972:23, 3976:19, 4095:11
**present** [11] - 3855:1, 3869:22, 3941:2, 3999:1, 4006:24, 4030:2, 4042:1, 4046:18, 4104:9, 4113:3, 4144:17
**presentations** [1] - 4052:23
**presented** [3] - 3968:6, 3968:9, 4036:3
**presenting** [3] - 3868:4, 3881:1, 4107:24
**presently** [1] - 3915:2
**press** [1] - 4006:10
**pretty** [5] - 3867:7, 3914:14, 3960:2, 4012:14, 4120:21
**prevent** [1] - 3858:4
**previous** [2] - 3858:15, 3926:6
**previously** [3] - 3899:6, 4059:5, 4098:1
**price** [18] - 3855:21, 3900:13, 3900:14, 3900:15, 4012:6, 4023:2, 4023:3, 4032:24, 4034:11, 4034:14, 4034:16, 4073:23, 4091:22, 4091:23, 4092:23, 4093:2, 4130:12, 4136:10
**priced** [1] - 3977:14
**prices** [2] - 3856:3, 4132:7
**primarily** [3] - 3990:24, 3991:10, 3991:16
**primary** [1] - 4042:11
**principal** [1] - 4104:9
**principally** [1] - 4081:5
**principals** [2] - 3862:6, 3952:15
**principle** [1] - 3882:25
**principles** [7] - 3872:2, 3872:11, 3880:12, 3882:11, 3882:12, 3882:17, 3883:1
**print** [1] - 3965:5
**priority** [2] - 4014:1, 4070:9
**privacies** [1] - 4109:23

**Private** [3] - 4094:7, 4103:16, 4110:18
**private** [47] - 3873:13, 3897:14, 3948:12, 3993:4, 3993:5, 3993:7, 3993:8, 3993:11, 3996:12, 4000:23, 4001:5, 4001:6, 4001:21, 4017:17, 4017:20, 4022:21, 4025:20, 4051:14, 4067:2, 4068:18, 4068:19, 4068:21, 4068:24, 4071:9, 4071:12, 4091:15, 4094:18, 4094:20, 4096:3, 4096:6, 4096:17, 4097:25, 4098:6, 4099:6, 4102:21, 4103:21, 4103:24, 4104:17, 4105:8, 4106:6, 4111:1, 4115:22, 4116:9, 4117:14, 4117:17, 4122:23
**probe** [2] - 4109:7, 4110:23
**problem** [5] - 3859:8, 3867:12, 3867:21, 3920:5, 4009:12
**problematic** [1] - 3859:10
**problems** [1] - 3858:4
**procedure** [2] - 4117:5, 4121:2
**procedures** [3] - 3879:23, 3881:23, 4019:24
**proceed** [6] - 3870:7, 3876:24, 3988:1, 3999:2, 4031:5, 4143:21
**Proceedings** [1] - 3854:25
**proceeds** [1] - 4030:11
**process** [18] - 3856:13, 3862:25, 3873:12, 3880:7, 3880:20, 3897:5, 3914:7, 3953:10, 3957:21, 3980:14, 3980:16, 3980:24, 3981:3, 3981:19, 3982:4, 4013:25, 4056:8, 4070:8
**produce** [2] - 3991:25, 3992:21
**produced** [2] - 3854:25, 4084:15
**product** [3] - 4080:2, 4080:24, 4081:4
**professional** [3] - 3870:21, 4067:8, 4067:10
**proffer** [2] - 4085:5, 4135:12
**proffering** [1] - 3855:5
**profitable** [1] - 3997:10
**profits** [2] - 4114:4, 4118:3
**program** [4] - 4057:20, 4082:8, 4082:25, 4119:17
**progress** [1] - 4069:1
**progressed** [1] - 3871:18
**prohibited** [2] - 3855:7, 3856:19
**prohibitions** [1] - 3858:10
**project** [1] - 3953:6
**projects** [1] - 4069:3
**prolific** [1] - 4089:22
**prolong** [1] - 4081:24
**promissory** [4] - 3902:3, 3904:8, 3904:15, 3908:19
**promote** [1] - 4085:18
**prompt** [1] - 4009:13
**pronunciation** [1] - 4042:8
**proof** [1] - 3862:21
**proper** [2] - 3856:18, 3983:9
**properly** [2] - 3856:21, 3880:18
**properties** [1] - 4042:23
**property** [5] - 3999:15, 4003:9, 4032:18, 4042:17, 4126:16
**Property** [6] - 3999:16, 3999:17,

4019:16, 4025:6, 4043:21, 4105:10
**proportion** [1] - 4108:4
**proposal** [2] - 4012:2, 4012:5, 4074:9
**propose** [3] - 3858:19, 3883:9, 3883:11
**proposed** [1] - 3882:18
**proposition** [1] - 4037:3
**proprietary** [4] - 4014:16, 4015:9, 4080:2, 4083:23
**Prosecution** [2] - 3855:4, 3857:8
**prosecution** [1] - 3865:11
**prosecutor** [1] - 3865:6
**prospective** [1] - 3867:11
**protective** [1] - 4109:22
**proteinuria** [5] - 4081:12, 4081:13, 4081:24, 4082:1, 4082:4
**prove** [3] - 3865:12, 4108:5, 4132:14
**proven** [1] - 4128:18
**provide** [15] - 3857:21, 3879:16, 3882:18, 3895:15, 3911:11, 3933:14, 3934:23, 3935:18, 3937:13, 3944:6, 3949:1, 3956:22, 4074:7, 4095:4, 4106:2
**provided** [12] - 3866:13, 3887:4, 3895:18, 3931:22, 3932:8, 3949:17, 3956:7, 4073:12, 4073:24, 4075:5, 4096:10
**provider** [3] - 3933:13, 3933:17, 3933:18
**provides** [3] - 3934:11, 4086:24, 4117:17
**providing** [5] - 3877:6, 3882:18, 3911:15, 3966:11, 3976:12
**provisions** [2] - 4012:9, 4073:17
**public** [60] - 3858:5, 3863:2, 3863:16, 3870:22, 3870:23, 3870:24, 3872:4, 3872:7, 3873:13, 3874:18, 3878:21, 3878:23, 3887:13, 3896:13, 3896:21, 3896:25, 3897:4, 3897:10, 3897:15, 3897:16, 3897:18, 3897:19, 3898:1, 3898:3, 3914:7, 3914:12, 3914:14, 3914:20, 3915:1, 3936:3, 3956:23, 3980:7, 3980:14, 3980:18, 3980:25, 3981:4, 3981:16, 3988:22, 4015:17, 4015:18, 4020:15, 4021:2, 4023:2, 4023:7, 4025:18, 4067:3, 4067:4, 4068:19, 4068:23, 4069:6, 4091:22, 4092:2, 4092:22, 4093:2, 4117:21, 4127:3, 4128:1, 4133:21
**Public** [1] - 4117:19
**public/private** [1] - 4017:19
**publicly** [4] - 4022:16, 4091:3, 4109:24, 4116:11
**published** [10] - 3907:20, 3909:3, 3910:10, 3913:4, 3916:15, 3921:7, 3921:25, 3929:13, 3985:22, 4139:22
**pull** [2] - 4013:15, 4067:23
**pulled** [1] - 4023:24
**purchase** [4] - 3904:13, 3904:14, 4073:6, 4073:23
**purchased** [7] - 3891:7, 3904:7, 3904:24, 4014:15, 4025:20, 4081:3,

4117:21
**Purchaser** [1] - 4102:22
**purchaser** [1] - 4103:5
**purchases** [1] - 3977:10
**purport** [1] - 4054:22
**purpose** [9] - 3855:15, 3858:3, 3861:20, 3875:17, 3875:18, 3877:8, 3935:18, 3967:22, 4103:12
**purposes** [2] - 3899:20, 3928:11
**pursuant** [2] - 3855:6, 4103:15
**push** [1] - 3864:13
**pushing** [1] - 3863:20
**put** [55] - 3859:20, 3860:21, 3865:25, 3866:6, 3872:14, 3872:17, 3877:10, 3878:24, 3883:11, 3884:20, 3884:22, 3885:8, 3890:1, 3894:4, 3895:21, 3914:18, 3917:23, 3917:24, 3926:5, 3932:5, 3935:25, 3937:16, 3945:8, 3952:10, 3953:23, 3956:12, 3965:2, 3966:21, 3974:25, 3975:2, 3975:14, 3975:16, 3975:21, 3978:2, 3984:19, 4001:11, 4006:1, 4006:3, 4006:8, 4015:24, 4038:20, 4056:24, 4068:1, 4073:25, 4074:11, 4083:21, 4090:7, 4101:7, 4109:3, 4109:4, 4116:4, 4131:16, 4131:25, 4135:2, 4139:20
**puts** [1] - 4133:4
**putting** [8] - 3879:21, 3879:24, 3880:8, 3880:9, 3885:16, 3894:5, 3897:25, 4045:19

## Q

**QB** [2] - 3902:8, 3902:10
**qualification** [1] - 4113:25
**qualified** [1] - 3934:12
**qualifiers** [1] - 4003:19
**qualify** [3] - 3857:2, 3945:4, 4114:12
**quantity** [1] - 4141:13
**quarrel** [2] - 4035:4, 4035:6
**quarter** [6] - 3948:3, 3950:23, 3990:6, 4045:16, 4059:6
**questioning** [2] - 3946:21, 3997:15
**Questionnaire** [3] - 4094:9, 4102:23, 4103:5
**questionnaire** [4] - 4000:24, 4103:12, 4103:20, 4104:5
**questions** [37] - 3865:22, 3898:11, 3929:18, 3929:23, 3929:24, 3930:8, 3932:5, 3932:19, 3933:10, 3933:11, 3935:16, 3944:2, 3945:2, 3945:15, 3946:22, 3951:18, 3951:24, 3958:19, 3984:12, 3986:25, 4031:1, 4031:18, 4048:7, 4079:16, 4080:8, 4087:9, 4091:1, 4092:14, 4107:10, 4110:7, 4113:25, 4114:6, 4129:5, 4140:6, 4144:3, 4144:6, 4145:14
**Questions** [2] - 3931:11, 3932:4
**quick** [5] - 3860:17, 4011:1, 4029:2, 4029:8, 4106:19
**QuickBooks** [4] - 3884:19, 3902:5, 3902:9, 3902:11

**quickly** [5] - 3922:3, 3939:24, 4010:3, 4067:4, 4126:3
**quit** [1] - 3867:25
**quite** [8] - 3993:5, 4012:16, 4023:16, 4058:23, 4059:1, 4092:11, 4093:20, 4101:6

# R

**R012850** [1] - 3917:21
**raise** [15] - 3860:24, 3870:3, 3874:6, 3874:18, 3876:3, 3987:19, 4005:3, 4005:10, 4014:18, 4015:7, 4079:11, 4082:16, 4082:17, 4083:9, 4083:11
**raised** [1] - 4082:18
**ran** [2] - 3871:12, 3991:15
**ranch** [1] - 4046:1
**rancher** [1] - 4045:4
**range** [5] - 3885:15, 3999:13, 4015:12, 4119:13
**rare** [2] - 4066:16, 4081:9
**rate** [4] - 4034:1, 4034:7, 4034:8, 4034:15
**rates** [2] - 3985:17, 4034:3
**rather** [5] - 3860:7, 4048:18, 4086:11, 4087:10, 4100:5
**rave** [1] - 4062:3
**re** [2] - 3860:15, 3944:11
**RE-021** [8] - 4080:18, 4080:23, 4080:24, 4081:8, 4082:1, 4082:4, 4082:22, 4083:1
**re-work** [1] - 3860:15
**reach** [2] - 3948:7, 4069:5
**reached** [4] - 3874:24, 4005:25, 4006:11, 4124:20
**reaching** [1] - 4005:11
**reaction** [11] - 3911:1, 3913:18, 3917:11, 4015:13, 4021:9, 4023:18, 4023:23, 4026:3, 4026:5, 4083:8, 4083:9
**reacts** [1] - 4134:19
**read** [76] - 3879:14, 3879:15, 3880:24, 3881:10, 3882:7, 3888:8, 3895:14, 3906:2, 3909:15, 3910:12, 3916:20, 3917:2, 3924:3, 3924:4, 3930:7, 3933:11, 3939:22, 3940:9, 3944:1, 3949:24, 3965:4, 3966:2, 3994:19, 3996:12, 4035:16, 4045:7, 4049:1, 4049:4, 4051:13, 4056:24, 4056:25, 4057:23, 4057:24, 4069:9, 4074:25, 4076:6, 4079:3, 4080:7, 4082:22, 4083:5, 4084:13, 4087:13, 4090:24, 4092:13, 4096:11, 4096:12, 4096:17, 4097:10, 4097:16, 4098:8, 4098:17, 4098:23, 4099:3, 4099:4, 4099:6, 4099:16, 4099:17, 4100:10, 4100:11, 4100:23, 4102:3, 4102:4, 4107:20, 4109:5, 4110:19, 4110:22, 4110:25, 4115:23, 4117:18, 4120:10, 4122:3, 4122:7, 4122:8, 4129:4, 4146:2
**reader** [1] - 4077:13
**readers** [1] - 3892:14

**reading** [3] - 3867:18, 3965:24, 4074:8
**reads** [1] - 4130:10
**ready** [6] - 3860:18, 3869:6, 3880:5, 3880:16, 3898:3, 3982:9
**real** [3] - 4042:12, 4042:15, 4042:16
**realize** [3] - 3989:25, 4011:1, 4084:23
**realized** [1] - 4071:16
**really** [20] - 3869:17, 3876:8, 3886:23, 3958:12, 3965:5, 3965:10, 3967:15, 3967:20, 3993:8, 3994:6, 4024:16, 4064:21, 4083:20, 4090:1, 4107:14, 4119:23, 4121:21, 4133:19, 4134:5, 4143:19
**reason** [12] - 3856:16, 3860:24, 3864:11, 3865:23, 3866:3, 3866:8, 3937:1, 3939:25, 3969:10, 3979:5, 4040:12, 4092:2
**reasons** [4] - 3868:10, 3997:18, 4040:14, 4131:3
**recalled** [1] - 3964:4
**receivables** [2] - 3924:7, 3925:23
**receive** [32] - 3890:22, 3901:22, 3902:24, 3905:19, 3912:25, 3921:3, 3921:15, 3923:8, 3929:7, 3946:3, 3966:17, 4000:4, 4000:17, 4002:2, 4003:10, 4003:20, 4004:5, 4004:10, 4010:18, 4011:16, 4013:7, 4017:3, 4017:11, 4019:4, 4019:9, 4022:3, 4022:8, 4025:12, 4056:22, 4078:14, 4093:4, 4095:20
**received** [45] - 3890:18, 3903:10, 3910:13, 3911:4, 3911:6, 3913:1, 3919:11, 3921:4, 3923:9, 3929:8, 3949:2, 3949:13, 3966:20, 3970:15, 3980:2, 4000:6, 4014:14, 4017:4, 4017:5, 4017:6, 4019:15, 4020:6, 4022:4, 4023:21, 4026:12, 4026:20, 4026:22, 4027:11, 4030:20, 4032:1, 4032:6, 4037:21, 4056:12, 4056:14, 4076:22, 4078:5, 4079:7, 4087:5, 4094:3, 4094:10, 4095:20, 4098:17, 4098:23, 4129:6, 4142:19
**receives** [1] - 4135:7
**receiving** [10] - 3889:2, 3911:1, 3917:11, 3917:14, 3921:13, 3922:7, 3935:3, 3966:21, 3970:14, 4078:18
**recent** [2] - 3888:17, 3888:23
**recently** [7] - 3964:3, 3964:5, 3965:8, 3965:17, 3966:18, 3966:21, 4092:25
**receptor** [4] - 4080:24, 4080:25, 4081:1, 4082:3
**receptors** [1] - 4082:7
**Recess** [2] - 3939:18, 4112:17
**recess** [1] - 4005:21
**recognize** [12] - 3901:9, 3905:7, 3920:18, 3922:21, 3928:21, 3945:18, 3947:4, 4004:4, 4075:5, 4097:4, 4129:6, 4136:25
**recognized** [1] - 4062:16
**recollect** [2] - 4048:21
**recollection** [24] - 3963:22, 3964:14,

3967:7, 3967:16, 3967:23, 3967:24, 3968:1, 3969:3, 3969:15, 3970:8, 3971:3, 3982:25, 4015:11, 4031:20, 4048:19, 4049:1, 4049:5, 4049:12, 4055:17, 4084:20, 4087:4, 4087:8, 4095:19
**recommendation** [1] - 3863:7
**recommendations** [1] - 3883:8
**recommended** [1] - 4046:6
**reconcile** [5] - 3884:23, 3939:1, 4013:24, 4014:7, 4070:7
**record** [15] - 3880:18, 3939:25, 3979:11, 3987:22, 3992:24, 3992:25, 3997:2, 3997:6, 3997:14, 3997:24, 4006:1, 4006:3, 4006:8, 4087:24, 4135:20
**recorded** [2] - 3854:25, 3883:13
**records** [19] - 3858:22, 3872:9, 3876:23, 3877:10, 3882:15, 3882:19, 3883:6, 3884:24, 3885:17, 3893:2, 3893:8, 3904:16, 3957:16, 3959:10, 3971:17, 3971:22, 3972:1, 3972:11, 4098:25
**recourse** [3] - 4115:17, 4121:21, 4122:10
**recurring** [2] - 4014:5, 4070:13
**red** [2] - 3859:20, 4015:19
**redact** [4] - 4139:22, 4139:25, 4140:4, 4140:21
**redacted** [4] - 4139:13, 4140:2, 4141:11
**redactions** [1] - 4140:19
**redeem** [4] - 4016:4, 4018:20, 4100:13, 4100:24
**redeemed** [3] - 4018:5, 4018:10, 4018:12
**redemption** [3] - 4016:14, 4018:6, 4131:19
**redemptions** [2] - 4016:17, 4016:19
**redirect** [4] - 3984:14, 4111:3, 4111:12, 4140:9
**REDIRECT** [4] - 3984:17, 4144:1, 4147:5, 4147:9
**redo** [2] - 3921:19, 3979:2
**reduce** [1] - 4081:13
**refer** [8] - 4014:9, 4048:25, 4055:16, 4058:4, 4059:11, 4089:2, 4090:8, 4126:3
**reference** [4] - 4014:10, 4021:18, 4113:24, 4129:12
**referenced** [1] - 3961:3
**referred** [6] - 3879:8, 3903:22, 3981:7, 4079:9, 4097:6, 4130:3
**referring** [11] - 3875:3, 3946:24, 3948:10, 3992:23, 4014:7, 4015:2, 4056:1, 4057:25, 4060:19, 4080:4, 4091:5
**refers** [2] - 3950:6, 4091:4
**reflect** [1] - 3904:16
**reflected** [2] - 3934:7, 4019:21
**reflective** [2] - 3859:3, 3859:22
**reflects** [2] - 3888:11, 3938:11
**refocus** [1] - 3860:12
**refresh** [9] - 3964:14, 3967:23, 3967:25,

3969:14, 3982:25, 4031:20, 4049:1, 4055:17, 4084:20
**refreshed** [4] - 3963:22, 3967:25, 4087:4, 4087:8
**refreshes** [4] - 3967:16, 3967:23, 3971:3, 4049:5
**refreshing** [2] - 3962:24, 3963:2
**refugees** [1] - 3989:24
**refund** [2] - 3935:23, 4101:9
**refunded** [1] - 3936:6
**regard** [14] - 3857:4, 3882:8, 3941:9, 3960:19, 3970:10, 3970:23, 3972:20, 3982:12, 3983:14, 3983:18, 3983:23, 3984:5, 4011:7, 4078:6
**regarding** [22] - 3855:2, 3856:1, 3856:4, 3856:10, 3856:11, 3857:20, 3869:15, 3881:19, 3945:22, 3946:6, 3971:4, 3971:5, 3979:14, 4019:15, 4019:18, 4019:23, 4023:4, 4026:8, 4091:24, 4108:5, 4134:9, 4139:12
**regardless** [2] - 3996:19, 4064:3
**registering** [1] - 3897:25
**registration** [4] - 3897:21, 3897:23, 3980:12, 3980:23
**regs** [3] - 3858:3, 3858:4, 3860:3
**regular** [3] - 4064:13, 4119:5, 4119:9
**regulation** [3] - 3855:10, 3856:11, 3856:15
**regulations** [5] - 3855:13, 3855:15, 3857:5, 3857:21, 3858:24
**regulatory** [2] - 3857:10, 3858:9
**reintroduce** [1] - 4080:24
**reinvest** [1] - 4100:4
**relapses** [1] - 4081:23
**relate** [2] - 3860:22, 3930:10
**related** [35] - 3862:4, 3862:18, 3881:22, 3882:15, 3883:5, 3886:24, 3892:1, 3892:5, 3892:7, 3892:9, 3892:10, 3892:12, 3892:19, 3898:12, 3901:14, 3923:3, 3923:24, 3924:1, 3924:18, 3924:21, 3924:22, 3924:23, 3925:22, 3929:1, 3937:24, 3944:7, 3945:3, 3947:11, 3951:11, 3970:11, 3971:13, 3976:23, 3989:8, 3989:11, 4042:9
**Related** [1] - 3888:6
**related-party** [3] - 3924:1, 3924:21, 3924:23
**relates** [3] - 3930:11, 4084:18, 4084:19
**relating** [1] - 4095:15
**relation** [3] - 3924:17, 3944:3, 3959:19
**relationship** [10] - 3863:10, 3865:18, 3868:3, 3868:25, 3873:3, 3892:22, 3946:18, 4035:9, 4085:12, 4086:19
**relatively** [1] - 3864:16
**relax** [2] - 4041:13
**relevance** [14] - 3861:15, 3861:20, 3868:3, 4040:6, 4045:9, 4046:2, 4047:11, 4085:3, 4085:4, 4105:23, 4106:15, 4138:9, 4139:5, 4139:6
**relevant** [23] - 3858:22, 3861:24, 3861:25, 3862:8, 3866:23, 4005:16,

4040:21, 4085:19, 4085:24, 4087:24, 4088:3, 4107:4, 4107:8, 4107:14, 4108:6, 4108:16, 4131:6, 4132:4, 4132:9, 4134:19, 4135:15, 4140:1
**relied** [5] - 3881:12, 3994:7, 3996:5, 3996:6, 4061:21
**rely** [3] - 3983:14, 4003:15, 4065:13
**relying** [4] - 3857:7, 4040:17, 4065:22, 4123:9
**remainder** [1] - 3937:18
**remaining** [1] - 3902:15
**remember** [63] - 3874:9, 3884:13, 3944:19, 3960:11, 3960:24, 3962:16, 3963:13, 3963:15, 3963:25, 3964:11, 3964:16, 3964:17, 3964:20, 3964:23, 3965:19, 3967:3, 3967:21, 3969:17, 3977:3, 3978:5, 3984:23, 4000:6, 4008:17, 4017:7, 4031:19, 4046:15, 4048:4, 4048:8, 4048:9, 4049:9, 4049:13, 4049:17, 4049:19, 4049:20, 4049:25, 4050:3, 4051:10, 4055:7, 4055:13, 4055:14, 4055:19, 4055:22, 4060:7, 4065:17, 4065:19, 4071:11, 4079:17, 4084:7, 4084:8, 4094:18, 4094:21, 4094:24, 4096:19, 4097:5, 4122:20, 4122:22, 4132:13, 4136:2, 4136:5, 4142:19, 4142:25, 4143:3, 4143:5
**remind** [2] - 3858:12, 4035:22
**removed** [1] - 4032:7
**renal** [1] - 4081:15
**rendered** [2] - 3922:14
**rent** [4] - 3925:14, 3925:15, 3925:16, 3925:18
**repaid** [3] - 3926:1, 3926:12, 3926:23
**repay** [6] - 3924:7, 3925:22, 3925:25, 3926:20, 3938:3, 3940:4
**repayment** [5] - 3940:3, 3940:7, 3942:13, 3942:25, 3943:21
**repeat** [1] - 4011:11
**repeatedly** [3] - 3949:1, 3949:9, 3949:14, 3949:15, 3949:16
**repeating** [1] - 4142:9
**rephrase** [5] - 3914:10, 3934:4, 3952:1, 3971:7, 4058:21, 4101:3
**report** [11] - 3881:5, 3881:17, 3964:8, 3965:2, 3965:13, 3965:14, 3965:15, 3966:10, 4006:10, 4059:12, 4084:21
**reported** [1] - 3933:24
**Reporter** [3] - 3854:23, 3854:23
**reporter** [1] - 4054:1
**reporting** [9] - 3871:14, 3872:1, 3872:2, 3872:5, 3872:12, 3896:18, 3897:2, 3934:13, 4009:15
**Reporting** [1] - 3874:12
**represent** [4] - 3900:7, 3924:20, 4031:11, 4052:8
**Representation** [1] - 3910:11
**representation** [3] - 3881:2, 3910:20, 3919:12
**representative** [1] - 4049:7

**representatives** [1] - 4048:5
**represented** [3] - 3872:3, 3891:6, 4110:4
**represents** [1] - 4012:5
**request** [9] - 3902:24, 3930:11, 3930:12, 3945:11, 4018:10, 4029:1, 4071:8
**requested** [2] - 3867:21, 4095:5
**requesting** [2] - 3948:25, 4126:11
**require** [3] - 4100:6, 4119:5, 4119:9
**required** [1] - 4099:1
**requirements** [4] - 3858:10, 3858:24, 3859:2, 3859:21
**requires** [3] - 3855:18, 3856:16, 3896:22
**rescued** [1] - 4083:1
**research** [3] - 3994:25, 3997:25, 4083:17
**resign** [5] - 3864:20, 3950:15, 3950:16, 3950:25, 3951:12
**resigned** [2] - 3864:4, 3864:9
**resigning** [2] - 3867:5, 3950:4
**resolution** [2] - 4005:25, 4006:11
**resolve** [2] - 3960:21, 4134:23
**resolved** [2] - 3905:2, 3951:9
**resources** [1] - 3873:9
**respect** [7] - 3884:1, 4020:23, 4084:22, 4115:1, 4123:24, 4124:5, 4127:22
**respectfully** [1] - 4110:8
**respective** [1] - 4121:14
**respond** [7] - 3906:14, 4060:20, 4064:18, 4085:25, 4086:2, 4113:25, 4114:5
**responded** [1] - 4126:22
**responds** [1] - 4070:3
**response** [29] - 3887:1, 3888:13, 3888:14, 3888:16, 3902:12, 3902:13, 3902:17, 3906:12, 3907:3, 3912:16, 3913:11, 3913:16, 3920:13, 3920:22, 3921:13, 3922:6, 3924:12, 3930:13, 3931:21, 3944:10, 3944:12, 3945:11, 3948:19, 3950:10, 4048:2, 4057:14, 4057:15, 4132:4, 4132:23
**responsibilities** [2] - 3882:13, 3960:18
**responsibility** [4] - 3882:14, 3972:1, 3972:21, 4121:10
**responsible** [3] - 3882:6, 3882:23, 4115:6
**rest** [3] - 3903:17, 3903:19, 4090:25
**restarted** [1] - 3896:12
**restricted** [19] - 4025:4, 4026:2, 4106:6, 4116:11, 4116:22, 4116:24, 4116:25, 4118:1, 4118:17, 4118:18, 4118:23, 4133:14, 4133:15, 4133:17, 4135:7, 4135:8, 4135:11, 4135:14
**Restricted** [2] - 4025:23, 4026:3
**restriction** [3] - 4032:7, 4117:2, 4117:5
**restrictions** [1] - 4117:24
**rests** [1] - 3883:16
**result** [6] - 3897:6, 3915:8, 3916:6, 4014:3, 4032:6, 4070:11

**resulting** [1] - 4118:3
**results** [3] - 4009:16, 4009:18, 4013:21
**resume** [4] - 3941:5, 3941:12, 4007:1, 4030:4
**retain** [2] - 4032:14, 4032:20
**retainer** [1] - 3953:25
**retains** [1] - 4033:9
**retirement** [7] - 3989:8, 3989:11, 3989:13, 3989:16, 4042:10, 4042:23, 4043:2
**retirement-related** [2] - 3989:8, 3989:11
**retrieve** [1] - 3936:13
**retroactively** [1] - 3920:7
**Retrophin** [194] - 3856:2, 3856:4, 3862:24, 3863:2, 3863:18, 3864:13, 3873:15, 3873:17, 3873:18, 3874:3, 3874:6, 3874:11, 3874:16, 3874:17, 3874:20, 3875:10, 3875:15, 3876:21, 3877:14, 3877:25, 3878:1, 3878:5, 3878:17, 3878:21, 3879:8, 3883:22, 3884:1, 3884:6, 3884:10, 3884:16, 3885:5, 3885:19, 3887:14, 3888:5, 3889:9, 3889:13, 3892:23, 3893:17, 3893:18, 3893:19, 3893:23, 3894:1, 3894:11, 3894:20, 3896:12, 3897:7, 3897:10, 3897:19, 3898:3, 3898:21, 3899:2, 3901:14, 3902:22, 3905:12, 3906:21, 3908:15, 3908:21, 3909:17, 3910:2, 3910:5, 3910:16, 3912:9, 3915:5, 3915:23, 3916:4, 3916:10, 3923:3, 3924:25, 3926:9, 3926:10, 3926:20, 3927:5, 3927:9, 3927:12, 3927:14, 3927:22, 3928:3, 3929:1, 3929:21, 3930:3, 3931:25, 3932:1, 3936:6, 3937:25, 3938:2, 3938:6, 3939:12, 3942:6, 3942:19, 3943:7, 3943:18, 3944:17, 3945:23, 3946:9, 3946:14, 3947:7, 3947:11, 3950:4, 3950:15, 3951:1, 3952:23, 3956:16, 3957:12, 3957:21, 3959:5, 3961:21, 3964:1, 3964:2, 3964:8, 3964:11, 3970:20, 3971:13, 3971:23, 3972:20, 3978:1, 3980:2, 3986:20, 4013:25, 4014:10, 4014:11, 4014:17, 4014:18, 4014:20, 4015:5, 4018:6, 4018:7, 4018:11, 4018:14, 4022:16, 4022:18, 4022:20, 4023:1, 4024:8, 4024:18, 4025:19, 4026:13, 4027:15, 4027:19, 4027:23, 4032:6, 4032:12, 4034:23, 4068:24, 4069:1, 4069:3, 4069:13, 4069:15, 4069:16, 4070:8, 4070:21, 4070:22, 4071:1, 4071:4, 4071:9, 4071:13, 4071:16, 4071:22, 4076:12, 4076:13, 4076:15, 4076:17, 4076:18, 4076:20, 4077:2, 4079:11, 4080:18, 4082:10, 4083:22, 4091:3, 4091:9, 4091:10, 4091:12, 4091:14, 4091:21, 4092:10, 4093:12, 4093:19, 4093:24, 4110:23, 4114:10, 4114:12, 4114:20, 4117:10, 4127:2, 4127:8, 4129:13, 4133:21, 4134:9, 4136:12, 4139:7, 4141:7

**Retrophin's** [4] - 3904:20, 3926:21, 3936:1, 4083:17
**return** [19] - 3890:18, 3911:12, 4004:17, 4010:25, 4011:9, 4016:1, 4020:17, 4029:3, 4032:12, 4034:1, 4034:3, 4034:7, 4034:8, 4034:15, 4036:16, 4036:17, 4036:20, 4076:20, 4127:6
**returns** [19] - 3871:1, 3950:18, 3991:19, 3991:21, 3991:22, 3991:23, 3991:24, 3991:25, 3992:21, 3993:19, 3994:2, 3994:8, 3996:23, 4016:8, 4016:11, 4040:20, 4144:7, 4144:14, 4144:21
**reverse** [27] - 3855:25, 3897:12, 3897:13, 3897:14, 3911:19, 3914:21, 3914:25, 3921:21, 3927:16, 3927:23, 3927:24, 3976:23, 3976:24, 3980:7, 3981:1, 3981:4, 3982:4, 3982:9, 4025:19, 4066:24, 4066:25, 4067:2, 4067:8, 4067:11, 4067:12, 4067:16, 4067:17
**review** [8] - 3881:3, 3881:25, 3883:2, 3885:1, 3897:3, 3983:2, 3983:4, 3983:24
**reviewed** [7] - 3858:16, 3868:19, 3949:25, 3950:1, 3982:16, 3983:3, 3983:9
**reviewing** [4] - 3886:3, 3886:16, 3887:10, 4059:22
**revised** [1] - 3889:9
**rich** [2] - 4045:20, 4046:5
**Richard** [1] - 3854:23
**Richardson** [2] - 3891:11, 3900:12
**richest** [1] - 4058:7
**rider** [1] - 4045:16
**right-hand** [1] - 3870:4
**rights** [3] - 4015:9, 4099:23, 4123:17
**ripple** [1] - 3921:20
**rising** [1] - 4112:2
**risk** [7] - 3857:14, 3857:17, 4020:16, 4107:9, 4108:13, 4119:6, 4127:4
**risks** [3] - 4106:5, 4107:18, 4119:19
**road** [1] - 3997:11
**Rockaway** [2] - 3912:1, 3912:2
**ROHDE** [1] - 3854:14
**role** [21] - 3855:11, 3858:13, 3862:3, 3862:8, 3862:13, 3865:9, 3866:7, 3866:20, 3866:23, 3872:20, 3875:9, 3875:14, 3876:4, 3881:6, 3884:1, 3884:12, 3889:3, 3929:21, 3960:13, 3980:4
**roles** [2] - 3856:12, 3960:18
**Roman** [1] - 4099:20
**Ron** [8] - 3884:13, 3909:24, 3927:11, 3927:19, 3927:20, 3948:24, 3979:22
**room** [2] - 4004:18, 4031:12
**Rosenman** [1] - 3955:9
**round** [1] - 4022:21
**rounds** [1] - 4091:15
**royalty** [2] - 3902:15, 4015:11
**RPR** [1] - 3854:23
**RTRX** [5] - 4020:13, 4020:19, 4022:17,

4023:15, 4091:3
**rude** [1] - 3950:2
**rug** [1] - 4023:24
**Rule** [3] - 3855:6, 4114:2, 4118:2
**rule** [7] - 3855:14, 3896:25, 4077:10, 4078:9, 4132:12, 4134:5, 4134:25
**rules** [9] - 3855:13, 3855:15, 3920:9, 3980:21, 4008:9, 4023:3, 4091:24, 4092:23, 4093:3
**run** [4] - 3939:3, 3993:15, 3999:7, 4106:14
**running** [3] - 4107:23, 4108:25, 4109:18
**runs** [7] - 3857:14, 3874:12, 4054:4, 4057:6, 4106:8, 4108:15, 4113:16
**rush** [7] - 4042:21, 4042:22, 4043:7, 4043:9, 4043:16, 4044:2
**Rush** [2] - 3989:8, 4043:19
**rwbarrycourtreporter@gmail.com** [1] - 3854:24

**S**

**S-1** [1] - 3980:11
**Sachs** [1] - 4052:24
**safe** [3] - 4082:7, 4143:11, 4145:16
**safeguarding** [1] - 3882:17
**Safety** [1] - 4082:5
**sake** [1] - 3954:8
**salaries** [1] - 3933:12
**salary** [4] - 3933:9, 3933:21, 3940:3, 3944:5
**sale** [7] - 4013:25, 4043:10, 4043:12, 4070:8, 4073:9, 4073:10, 4141:9
**sales** [3] - 4139:7, 4141:8, 4141:15
**sat** [1] - 4082:21
**satisfy** [2] - 3902:14, 4117:22
**Saturday** [1] - 4057:3
**save** [3] - 4056:7, 4096:20, 4115:19
**saw** [8] - 3895:23, 3913:21, 3965:8, 3965:16, 3968:9, 4001:17, 4030:16, 4094:20
**scan** [1] - 3907:15, 3908:1, 3908:7
**scenario** [1] - 3867:6
**scenarios** [1] - 3858:3
**schedule** [4] - 3855:14, 3855:18, 3856:16, 4111:10
**Schedule** [1] - 3888:6
**scheduled** [1] - 3864:24
**scheduling** [1] - 4110:14
**scheme** [1] - 3864:15
**Schlect(phonetic)** [1] - 3947:24
**Schmidt** [1] - 4143:6
**School** [2] - 3988:25, 3989:1
**school** [6] - 3870:15, 3989:2, 4037:13, 4037:24, 4057:8, 4057:18
**schooling** [1] - 4057:9
**schools** [1] - 3988:23
**Schuyler** [8] - 4046:9, 4046:16, 4046:17, 4046:18, 4046:20, 4046:22, 4046:24, 4047:1
**Science** [1] - 3870:16

**science** [1] - 3876:2
**Sciences** [1] - 4012:2
**scope** [1] - 4005:8
**screen** [19] - 3895:5, 3917:24, 3917:25, 3918:1, 3918:3, 3918:15, 3918:16, 3943:11, 3952:10, 3953:23, 3965:3, 3974:25, 3975:2, 4056:24, 4075:2, 4075:3, 4075:4, 4090:11, 4116:5
**screws** [1] - 4115:16
**scroll** [18] - 3882:5, 3888:13, 3888:18, 3888:23, 3902:12, 3902:16, 3906:24, 3912:7, 3913:11, 3921:12, 3922:6, 3924:14, 3927:2, 3930:14, 3935:6, 3942:5, 3944:9, 3950:9
**Sears** [3] - 4020:20, 4127:8, 4127:11
**seat** [7] - 3869:24, 3941:3, 3987:21, 4006:25, 4030:3, 4113:2, 4113:5
**SEC** [57] - 3855:11, 3856:12, 3863:5, 3871:22, 3871:24, 3871:25, 3872:6, 3872:7, 3872:12, 3872:20, 3872:22, 3873:4, 3873:6, 3873:7, 3873:11, 3874:12, 3876:21, 3879:5, 3879:8, 3879:10, 3880:13, 3881:6, 3883:20, 3884:10, 3893:21, 3893:23, 3893:25, 3894:10, 3896:1, 3896:6, 3896:9, 3896:12, 3896:22, 3897:3, 3898:1, 3914:17, 3920:9, 3923:3, 3929:2, 3932:10, 3946:18, 3947:11, 3949:11, 3950:14, 3950:25, 3951:12, 3976:9, 3976:14, 3976:24, 3980:24, 4048:6, 4124:16, 4124:20, 4124:24, 4142:20, 4142:25, 4143:5
**second** [27] - 3859:19, 3874:10, 3875:19, 3881:10, 3881:11, 3901:24, 3919:11, 3923:10, 3931:9, 3932:24, 3933:1, 3936:9, 3949:24, 3964:14, 3982:19, 3982:21, 3984:9, 3986:8, 3986:10, 4004:3, 4013:8, 4018:2, 4019:11, 4040:16, 4083:1, 4120:10, 4130:11
**secondary** [1] - 4081:21
**secondly** [3] - 3911:4, 3914:3, 4077:8
**section** [17] - 3879:2, 3880:22, 3882:6, 3882:7, 3888:9, 3895:12, 3895:14, 3899:9, 3899:16, 3909:9, 3932:4, 3932:5, 3941:24, 3949:21, 3985:11, 4007:22, 4009:6
**secured** [1] - 3902:3
**securities** [17] - 3855:11, 3856:12, 3858:25, 3871:13, 3872:1, 4025:5, 4026:2, 4101:10, 4106:6, 4116:10, 4116:12, 4116:22, 4116:24, 4117:23, 4118:23, 4119:13
**Securities** [6] - 3855:13, 4025:23, 4026:4, 4049:7, 4059:17, 4117:25
**security** [6] - 3925:17, 4022:23, 4022:25, 4091:18, 4091:21, 4116:14
**see** [81] - 3861:20, 3867:15, 3869:3, 3876:13, 3889:5, 3893:2, 3893:8, 3901:2, 3901:4, 3904:17, 3906:4, 3912:1, 3912:2, 3924:17, 3942:1,

3942:17, 3943:3, 3948:8, 3952:12, 3952:18, 3952:21, 3953:7, 3953:21, 3958:11, 3961:14, 3961:15, 3964:13, 3967:7, 3967:11, 3969:16, 3972:23, 3975:3, 3975:4, 3975:7, 3975:9, 3975:11, 3990:10, 3990:11, 4000:24, 4000:25, 4001:15, 4004:17, 4005:2, 4013:10, 4015:25, 4023:16, 4024:5, 4040:6, 4040:11, 4056:3, 4067:1, 4069:7, 4070:14, 4070:15, 4075:2, 4075:3, 4075:4, 4076:10, 4079:2, 4080:17, 4089:4, 4089:16, 4090:19, 4092:11, 4093:20, 4095:2, 4095:10, 4097:9, 4098:21, 4099:21, 4103:18, 4113:14, 4113:15, 4116:7, 4116:12, 4116:13, 4118:5, 4120:7, 4123:4, 4123:5, 4146:6
**seeing** [8] - 3963:16, 3964:23, 3967:14, 3967:17, 4026:3, 4094:18, 4094:21, 4094:24
**seeking** [2] - 3946:11, 4119:4
**seem** [4] - 3860:22, 3862:14, 3862:15, 4005:16
**Segmental** [1] - 4081:10
**segregation** [2] - 3886:1, 3886:2
**selection** [2] - 3882:16, 3883:4
**self** [3] - 4076:16, 4131:23, 4132:8
**self-serving** [1] - 4076:16
**sell** [21] - 3910:13, 4014:21, 4023:8, 4025:25, 4026:1, 4026:6, 4027:12, 4027:20, 4032:21, 4032:22, 4034:8, 4043:2, 4092:3, 4116:19, 4117:1, 4117:2, 4117:11, 4133:5, 4135:10, 4141:17, 4142:4
**selling** [1] - 4107:22
**sells** [1] - 4071:22
**send** [37] - 3866:18, 3866:19, 3888:17, 3907:15, 3908:1, 3932:11, 3944:13, 3944:14, 3959:7, 3959:15, 3962:8, 3963:4, 3963:18, 3983:2, 4010:7, 4016:14, 4019:17, 4020:5, 4020:10, 4020:11, 4024:21, 4024:23, 4026:18, 4035:22, 4064:16, 4066:17, 4083:10, 4084:23, 4099:14, 4099:15, 4101:9, 4126:14, 4126:20, 4126:23, 4126:24
**sending** [5] - 3923:23, 3961:2, 4000:7, 4089:15, 4089:16
**sends** [1] - 3930:17
**sense** [8] - 3880:15, 3959:1, 3976:4, 4006:11, 4020:18, 4023:10, 4092:5, 4127:6
**sent** [36] - 3868:17, 3908:12, 3947:21, 3948:24, 3954:1, 3959:10, 3959:12, 3961:16, 3962:17, 3965:19, 3969:6, 3973:4, 3979:7, 3979:9, 3979:18, 3980:1, 3983:3, 4002:6, 4003:13, 4003:14, 4007:10, 4007:11, 4007:14, 4007:19, 4010:20, 4017:5, 4019:12, 4025:7, 4035:12, 4035:16, 4066:22, 4067:20, 4071:7, 4083:20, 4089:25, 4094:17
**sentence** [2] - 3859:15, 3949:24

**Separate** [6] - 3999:16, 3999:17, 4019:16, 4025:5, 4043:20, 4105:10
**separate** [5] - 3892:24, 3999:15, 4003:9, 4032:18, 4043:20, 4126:16
**September** [18] - 3895:17, 3896:19, 3897:1, 3925:19, 3927:24, 3986:3, 3986:11, 3986:17, 4009:3, 4009:17, 4016:5, 4016:10, 4017:2, 4022:12, 4030:16, 4030:20, 4068:3
**SeraCare** [5] - 4012:2, 4012:3, 4012:6, 4072:7, 4073:6
**series** [12] - 3863:19, 3868:19, 3869:9, 3949:25, 3950:1, 3950:6, 4004:1, 4007:6, 4114:6, 4126:17, 4130:16, 4134:8
**Series** [2] - 3890:1, 3891:5
**serious** [1] - 4057:18
**serve** [1] - 4120:12
**service** [2] - 3934:11, 3944:23
**services** [17] - 3879:3, 3879:15, 3882:18, 3889:24, 3890:18, 3895:13, 3895:18, 3922:8, 3922:13, 3922:14, 3953:24, 3956:7, 3956:16, 3956:22, 3957:17, 3985:12, 3985:13
**serving** [5] - 3880:2, 3944:16, 4076:16, 4131:23, 4132:8
**sessions** [1] - 3966:23
**set** [8] - 3872:14, 3880:11, 3884:18, 3884:19, 3914:13, 4097:24, 4098:5, 4099:25
**sets** [1] - 3875:19
**settlement** [3] - 3937:16, 4026:7, 4026:11
**several** [5] - 3969:24, 4067:16, 4069:2, 4069:25, 4071:8
**shall** [1] - 3882:21
**share** [32] - 3855:21, 3900:13, 3900:14, 3900:15, 3900:16, 3915:6, 3916:23, 3917:3, 3917:12, 3917:16, 3918:21, 3918:25, 3921:9, 3922:4, 3922:7, 4012:4, 4022:20, 4022:21, 4030:9, 4030:19, 4034:14, 4034:16, 4091:15, 4092:16, 4092:20, 4093:5, 4093:13, 4093:22, 4141:18, 4142:1, 4142:4
**Share** [2] - 3916:18, 3916:23
**shareholder** [3] - 4080:13, 4081:3, 4085:13
**shareholders** [9] - 3878:15, 4018:20, 4023:2, 4077:20, 4077:21, 4080:11, 4091:23, 4092:22, 4093:2
**shares** [86] - 3855:20, 3855:25, 3889:25, 3890:3, 3890:7, 3890:25, 3891:23, 3897:17, 3899:7, 3900:8, 3900:12, 3900:22, 3904:14, 3909:8, 3909:15, 3910:22, 3910:24, 3910:25, 3911:12, 3911:15, 3916:24, 3918:9, 3922:12, 3930:11, 3979:14, 4018:6, 4018:7, 4018:11, 4022:16, 4024:8, 4024:11, 4024:13, 4024:15, 4024:18, 4024:24, 4025:4, 4025:7, 4026:12, 4026:13, 4026:16, 4026:18, 4026:19,

4027:6, 4027:11, 4027:12, 4027:16, 4027:19, 4027:22, 4027:25, 4028:7, 4030:16, 4032:6, 4032:12, 4032:22, 4034:9, 4034:24, 4066:10, 4069:4, 4091:3, 4093:10, 4093:13, 4100:13, 4116:16, 4117:10, 4124:6, 4124:10, 4124:12, 4125:2, 4125:7, 4125:20, 4125:21, 4125:25, 4131:17, 4134:2, 4135:8, 4135:14, 4141:7, 4141:9, 4141:13, 4141:17, 4141:23, 4142:1, 4142:4, 4142:10

**sharing** [2] - 4089:22, 4089:24

**shed** [1] - 3944:8

**sheet** [1] - 3872:15

**shell** [4] - 3897:15, 4025:17, 4067:3

**shelves** [1] - 4082:21

**shift** [2] - 3878:17, 4018:19

**shirt** [1] - 3876:17

**Shkreli** [144] - 3861:12, 3861:17, 3861:22, 3863:19, 3863:20, 3864:2, 3864:12, 3865:6, 3865:14, 3866:5, 3866:13, 3866:16, 3866:22, 3867:14, 3867:18, 3868:17, 3875:4, 3876:13, 3876:19, 3877:25, 3890:9, 3890:14, 3891:3, 3894:25, 3896:3, 3899:9, 3899:10, 3899:11, 3899:16, 3899:19, 3913:7, 3916:22, 3917:18, 3918:12, 3924:12, 3935:23, 3939:12, 3941:7, 3941:8, 3953:9, 3954:1, 3954:20, 3954:25, 3955:4, 3956:13, 3974:5, 3974:8, 3975:6, 3975:19, 3976:5, 3979:15, 3981:19, 3982:4, 3982:8, 3990:1, 3990:10, 3990:11, 3990:16, 3994:16, 3994:18, 3994:22, 3997:25, 4023:17, 4031:12, 4035:10, 4035:22, 4039:1, 4039:7, 4040:12, 4040:17, 4040:18, 4045:8, 4046:10, 4046:19, 4048:7, 4049:8, 4052:14, 4053:4, 4053:9, 4053:13, 4054:13, 4055:24, 4056:12, 4056:14, 4057:2, 4057:6, 4057:17, 4060:11, 4061:8, 4062:2, 4062:16, 4063:10, 4064:9, 4065:6, 4066:4, 4066:8, 4067:14, 4070:3, 4070:20, 4073:4, 4073:11, 4075:6, 4076:14, 4079:8, 4083:4, 4084:15, 4085:11, 4085:15, 4085:18, 4085:24, 4086:5, 4086:10, 4086:19, 4086:24, 4089:6, 4089:14, 4092:16, 4122:24, 4122:25, 4123:2, 4123:3, 4123:13, 4123:18, 4123:19, 4124:4, 4124:10, 4124:17, 4125:2, 4125:7, 4126:12, 4126:21, 4128:7, 4129:7, 4129:9, 4130:19, 4131:9, 4136:2, 4136:9, 4143:1, 4144:4, 4144:17, 4145:2, 4145:5, 4146:3

**SHKRELI** [1] - 3854:8

**Shkreli's** [15] - 3867:10, 3867:22, 3875:14, 3912:3, 3912:5, 3919:3, 3919:9, 3924:12, 3938:6, 4054:19, 4054:23, 4086:9, 4123:7, 4130:23, 4134:8

**shock** [1] - 4076:21

**shocked** [3] - 4108:18, 4110:25

**shoes** [1] - 4107:23

**short** [9] - 3897:9, 3993:17, 3993:18, 3993:19, 4010:3, 4010:24, 4011:4, 4011:9, 4047:22

**shorted** [1] - 4011:8

**shorter** [1] - 3981:10

**shorting** [2] - 3990:24, 4062:9

**shortly** [2] - 3906:16, 3991:5

**shorts** [1] - 3993:22

**show** [41] - 3877:1, 3887:19, 3894:13, 3898:14, 3901:7, 3912:11, 3916:12, 3922:19, 3928:18, 3947:1, 3961:5, 3961:6, 3961:12, 3962:21, 3967:2, 3969:14, 3970:7, 3971:2, 3974:22, 3982:24, 4000:8, 4010:10, 4020:13, 4020:17, 4048:15, 4048:23, 4055:15, 4056:9, 4058:1, 4069:18, 4074:10, 4082:3, 4084:11, 4110:8, 4127:1, 4127:6, 4128:25, 4131:4, 4131:21, 4136:24, 4140:21

**showed** [5] - 3964:7, 3966:25, 3970:2, 4016:10, 4076:25

**showing** [14] - 3868:5, 3962:22, 3963:6, 3967:6, 4001:13, 4002:8, 4011:12, 4012:21, 4016:24, 4018:24, 4021:24, 4025:1, 4140:23, 4141:11

**shown** [3] - 3978:19, 4073:15, 4090:9

**shows** [6] - 3889:15, 4131:8, 4132:1, 4135:13, 4141:7, 4141:9

**shutdown** [1] - 4019:24

**shutting** [1] - 4016:22

**sic** [1] - 3997:1

**sic)** [1] - 4032:20

**side** [23] - 3917:24, 3918:1, 3918:2, 3918:14, 3918:15, 3993:19, 4015:18, 4015:20, 4015:21, 4015:22, 4015:24, 4016:2, 4047:22, 4055:16, 4076:5, 4076:9, 4078:13, 4085:9, 4088:6, 4138:16, 4138:18, 4140:11

**sidebar** [8] - 3995:8, 3996:1, 4039:18, 4039:20, 4040:1, 4107:1, 4110:17, 4129:21

**Sidebar** [8] - 3995:10, 3998:10, 4039:16, 4039:21, 4041:17, 4106:24, 4112:16, 4129:22

**sidebars** [1] - 4006:14

**sign** [4] - 3871:1, 3886:4, 4002:4, 4026:7

**signature** [13] - 3896:3, 3911:21, 3912:5, 3912:8, 3919:9, 3975:3, 3975:6, 3975:14, 4002:13, 4003:3, 4003:4

**signatures** [3] - 3911:22, 3918:22, 3919:7

**signed** [16] - 3883:20, 3883:22, 3885:25, 3894:25, 3896:1, 4002:6, 4002:12, 4003:5, 4026:10, 4099:5, 4099:18, 4102:5, 4102:7, 4102:13, 4102:19, 4114:21

**significant** [5] - 3864:20, 4008:19,

4024:1, 4084:21

**significantly** [1] - 4034:15

**signs** [3] - 3908:21, 3908:23, 3912:8

**silver** [1] - 3990:14

**similar** [5] - 3892:16, 3895:20, 3981:8, 4105:7, 4120:14

**simply** [5] - 3859:3, 3859:22, 3880:2, 4081:13, 4081:20

**sister** [3] - 3867:10, 3867:14, 3929:20

**sit** [1] - 3957:3

**situated** [1] - 4006:22

**situation** [4] - 3864:3, 3903:7, 3934:3, 4057:17

**situations** [1] - 4117:21

**six** [4] - 3872:23, 3883:19, 3957:7, 3957:8

**size** [1] - 4015:5

**sketchy** [1] - 3992:4

**skill** [2] - 3875:19, 3880:11

**skilled** [1] - 3989:17

**skipped** [1] - 4057:8

**skipping** [1] - 4115:20

**Skyler** [1] - 4053:24

**slanted** [1] - 3918:22

**slightest** [1] - 3865:12

**slightly** [1] - 4004:13

**sloppiest** [1] - 3949:2

**small** [22] - 3871:9, 3885:9, 3965:5, 3965:10, 3977:1, 3977:10, 3988:22, 3993:11, 4003:25, 4015:18, 4015:20, 4021:2, 4038:17, 4052:19, 4052:24, 4063:25, 4064:4, 4082:13, 4108:3, 4108:9, 4116:16, 4128:1

**smaller** [5] - 3871:11, 3886:19, 3886:21, 3887:12, 4000:10

**smart** [3] - 4047:3, 4051:11, 4086:12

**SMITH** [112] - 3854:17, 3859:24, 3860:4, 3862:20, 3862:23, 3863:9, 3863:11, 3864:24, 3865:2, 3865:19, 3867:3, 3867:10, 3868:1, 3868:13, 3869:11, 3870:1, 3870:8, 3880:1, 3894:22, 3901:19, 3905:16, 3907:2, 3909:2, 3909:4, 3912:21, 3913:2, 3913:5, 3914:11, 3915:21, 3916:16, 3917:23, 3918:4, 3918:14, 3918:17, 3919:20, 3920:14, 3920:25, 3921:5, 3921:8, 3921:12, 3921:23, 3922:1, 3923:5, 3923:10, 3923:12, 3924:14, 3927:2, 3927:6, 3929:4, 3929:10, 3929:14, 3930:25, 3931:2, 3932:1, 3932:3, 3934:22, 3937:9, 3938:1, 3938:7, 3938:18, 3939:20, 3939:25, 3945:25, 3947:13, 3951:16, 3951:18, 3953:17, 3954:23, 3956:17, 3962:24, 3963:10, 3965:25, 3966:7, 3967:18, 3970:12, 3970:25, 3971:5, 3975:1, 3976:10, 3976:15, 3979:11, 3981:20, 3983:11, 3984:15, 3984:18, 3984:25, 3985:2, 3985:9, 3986:8, 3986:25, 4005:3, 4005:5, 4005:20, 4006:5, 4006:19, 4076:3, 4077:20, 4079:14, 4086:15,

4086:18, 4086:23, 4111:14, 4111:17, 4132:24, 4135:17, 4139:13, 4139:15, 4139:17, 4139:20, 4146:15, 4147:4, 4147:5

**Smith** [1] - 3867:7

**SMITH:(Cont'g** [1] - 3941:13

**sold** [15] - 3989:9, 4027:13, 4027:19, 4027:22, 4028:1, 4028:6, 4033:7, 4034:11, 4042:24, 4043:6, 4092:15, 4093:12, 4132:2

**sole** [2] - 4022:23, 4091:18

**solely** [3] - 3882:13, 3882:21, 4119:17

**solid** [1] - 3914:14

**Solution** [1] - 3879:5

**Solution's** [1] - 3923:3

**Solutions** [32] - 3863:5, 3871:22, 3871:24, 3871:25, 3872:6, 3872:7, 3872:20, 3872:22, 3873:4, 3873:6, 3873:7, 3873:11, 3876:21, 3879:9, 3879:10, 3880:13, 3881:7, 3883:20, 3884:10, 3893:21, 3893:23, 3893:25, 3894:10, 3896:1, 3896:6, 3896:9, 3896:12, 3929:2, 3932:11, 3946:18, 3950:14, 3950:25

**Solutions'** [3] - 3947:11, 3949:11, 3951:12

**someone** [20] - 3860:23, 3886:8, 3888:2, 3934:12, 3964:23, 3968:7, 3977:13, 3977:19, 3979:22, 3991:19, 4038:9, 4038:12, 4038:22, 4046:18, 4073:24, 4086:10, 4086:12, 4104:10, 4134:17, 4143:5

**sometime** [2] - 3874:7, 4056:7

**sometimes** [6] - 3963:3, 3974:13, 3984:7, 4011:1, 4011:2, 4064:16

**somewhat** [2] - 3865:8, 3866:5

**somewhere** [1] - 4028:5

**son** [3] - 3863:11, 3874:1, 4041:10

**son-in-law** [2] - 3863:11, 3874:1

**soon** [2] - 4027:21, 4113:3

**sophisticated** [4] - 4119:18, 4119:21, 4120:2, 4120:4

**sophistication** [4] - 3872:18, 4107:7, 4108:17, 4108:22

**sorry** [39] - 3859:16, 3886:25, 3931:5, 3931:6, 3932:1, 3941:21, 3942:16, 3964:20, 3975:11, 4011:1, 4019:25, 4023:13, 4029:3, 4032:17, 4043:14, 4047:23, 4048:20, 4057:15, 4061:6, 4084:21, 4092:9, 4097:3, 4100:21, 4102:22, 4110:13, 4111:7, 4111:16, 4112:10, 4113:4, 4113:8, 4113:11, 4114:16, 4117:14, 4118:9, 4118:10, 4118:11, 4124:6, 4129:19, 4141:22

**Sorry** [1] - 3924:5

**sort** [14] - 3867:24, 3881:6, 4005:12, 4024:20, 4026:11, 4027:7, 4031:22, 4036:1, 4038:20, 4065:16, 4065:19, 4076:12, 4134:1, 4145:23

**sounded** [1] - 3993:18

**sounds** [1] - 4130:9

**source** [1] - 3994:16

**space** [5] - 3925:18, 3991:16, 3993:22, 4045:15, 4106:2

**speaking** [6] - 3861:17, 3958:12, 3969:1, 3969:3, 3973:16, 3973:19

**special** [3] - 4057:13, 4057:14, 4057:20

**specialized** [1] - 3857:9

**specializing** [1] - 4011:24

**specific** [7] - 3864:17, 3908:19, 4060:4, 4078:6, 4082:7, 4103:20, 4115:2

**specifically** [6] - 3856:14, 3862:4, 3956:19, 3982:18, 3998:2, 4047:18

**speculation** [1] - 3934:2

**speculative** [1] - 4119:15

**spell** [1] - 3867:7

**spelling** [2] - 4042:6, 4042:7

**spending** [1] - 4087:1

**spoken** [2] - 3862:7, 3875:1

**sponsor** [1] - 4120:15

**sponsored** [1] - 4051:4

**spreadsheet** [3] - 3931:16, 3932:12, 3941:15

**spring** [7] - 3862:23, 3863:16, 3929:2, 3944:15, 3946:17, 3947:9, 3986:19

**SRINIVASAN** [141] - 3854:17, 3987:14, 3988:2, 3988:8, 3990:17, 3994:12, 3994:14, 3995:2, 3996:20, 3997:17, 3998:6, 3998:9, 3999:3, 3999:5, 4000:14, 4001:24, 4002:14, 4002:24, 4004:7, 4004:12, 4006:21, 4007:3, 4007:17, 4010:15, 4011:18, 4013:4, 4015:1, 4017:8, 4019:6, 4022:5, 4025:9, 4030:5, 4030:7, 4030:24, 4031:1, 4033:17, 4038:4, 4038:23, 4039:4, 4039:9, 4039:16, 4039:19, 4040:3, 4041:2, 4044:9, 4045:9, 4045:21, 4046:2, 4046:11, 4047:11, 4051:21, 4052:20, 4053:14, 4054:14, 4056:21, 4058:19, 4059:1, 4059:13, 4059:19, 4059:21, 4061:11, 4062:1, 4062:21, 4063:2, 4063:11, 4068:6, 4069:22, 4070:24, 4072:4, 4074:2, 4074:17, 4076:24, 4077:8, 4079:21, 4085:3, 4089:8, 4089:18, 4090:12, 4093:15, 4093:25, 4094:22, 4095:12, 4096:22, 4100:16, 4100:19, 4101:2, 4102:12, 4103:2, 4105:23, 4106:15, 4109:12, 4109:20, 4110:19, 4113:8, 4114:13, 4115:12, 4118:10, 4121:23, 4122:5, 4122:12, 4124:18, 4125:3, 4125:8, 4126:1, 4126:6, 4128:11, 4128:19, 4128:23, 4129:16, 4131:17, 4131:23, 4132:8, 4132:18, 4132:20, 4133:8, 4133:18, 4134:10, 4134:14, 4134:21, 4134:25, 4135:23, 4136:7, 4136:19, 4138:2, 4138:5, 4138:9, 4138:16, 4138:21, 4139:5, 4139:8, 4140:9, 4142:23, 4143:13, 4143:21, 4143:23, 4144:2, 4145:12, 4145:14, 4147:7, 4147:9

**Srinivasan** [8] - 3988:1, 4007:2, 4029:1,

4055:4, 4069:21, 4073:2, 4122:17, 4138:4

**SRINIVASAN:(cont'g** [2] - 4000:1, 4007:4

**SSG** [4] - 3879:3, 3879:5, 3879:14, 3895:13

**staff** [8] - 3884:3, 3960:7, 3960:16, 3960:20, 3973:12, 3973:14, 3973:16, 3973:17

**stake** [2] - 3891:7, 4015:5

**stale** [1] - 3896:23

**stand** [4] - 3870:6, 3937:20, 3951:25, 4131:16

**standard** [2] - 3985:17, 4121:2

**standing** [1] - 3990:14

**stands** [1] - 3938:9

**Starbucks** [1] - 3886:22

**start** [23] - 3867:5, 3885:1, 3885:2, 3897:18, 3901:24, 3905:22, 3905:23, 3921:5, 3929:10, 3941:17, 3943:23, 3947:18, 3952:6, 3959:18, 3959:22, 3960:8, 3987:8, 4002:4, 4017:13, 4019:11, 4031:22, 4113:3, 4138:19

**started** [16] - 3863:25, 3867:4, 3871:9, 3884:7, 3885:18, 3894:10, 3897:20, 3933:15, 3946:19, 3955:1, 3959:19, 3989:7, 3989:22, 4009:13, 4013:25, 4070:7

**starting** [5] - 3881:11, 3900:10, 3989:16, 4023:22, 4099:18

**starts** [7] - 3860:3, 3879:20, 4011:24, 4017:14, 4018:3, 4057:5, 4070:2

**state** [18] - 3871:4, 3877:10, 3885:4, 3912:2, 3957:16, 3987:21, 4030:18, 4040:21, 4131:2, 4131:5, 4131:7, 4132:11, 4132:12, 4132:14, 4132:15, 4133:22, 4134:20, 4135:5

**State** [1] - 3871:5

**statement** [44] - 3872:15, 3877:6, 3897:21, 3897:23, 3914:17, 3938:5, 3980:23, 4003:19, 4007:20, 4009:4, 4009:5, 4009:17, 4031:14, 4031:15, 4036:18, 4036:21, 4036:22, 4044:5, 4044:8, 4061:9, 4061:10, 4062:13, 4062:15, 4065:12, 4065:16, 4065:19, 4066:2, 4067:5, 4067:6, 4067:15, 4070:16, 4077:2, 4077:9, 4113:16, 4113:19, 4113:20, 4132:9, 4133:9, 4133:10, 4134:8, 4134:19, 4137:1, 4139:2, 4141:4

**statements** [40] - 3871:1, 3872:14, 3872:15, 3877:12, 3879:17, 3879:19, 3880:10, 3881:1, 3881:3, 3881:5, 3881:24, 3883:5, 3895:9, 3895:16, 3895:21, 3896:24, 3897:2, 3913:24, 3921:19, 3927:1, 3930:4, 3959:21, 3980:19, 3981:8, 3984:2, 4003:20, 4009:10, 4009:12, 4009:14, 4013:15, 4016:10, 4020:11, 4114:5, 4126:24, 4132:16, 4135:1, 4135:2, 4144:10, 4144:20, 4144:23

**STATES** [3] - 3854:1, 3854:3, 3854:12

**states** [1] - 3944:5

**States** [5] - 3854:5, 3854:14, 3854:18, 4048:1, 4049:22

**status** [3] - 4019:18, 4125:1, 4125:6

**statutory** [1] - 3858:10

**stay** [2] - 3878:4, 4099:11

**staying** [1] - 4140:13

**stenography** [1] - 3854:25

**step** [4] - 3862:25, 3876:20, 4004:21, 4029:6

**stepped** [1] - 3864:6

**stepping** [1] - 3987:18

**steps** [2] - 3987:6, 4029:7

**steroids** [2] - 4081:12, 4081:19

**Steve** [15] - 3891:11, 3900:11, 3989:7, 4035:10, 4035:14, 4035:17, 4035:21, 4035:23, 4035:25, 4036:3, 4036:4, 4043:18, 4061:3, 4061:4, 4061:7

**Steven** [2] - 3948:5, 3948:7

**stick** [2] - 3969:10, 4098:12

**still** [22] - 3883:8, 3918:11, 3941:4, 3952:2, 3993:11, 4007:1, 4027:13, 4028:7, 4032:14, 4032:20, 4033:9, 4043:8, 4057:20, 4060:7, 4089:2, 4131:21, 4132:1, 4133:11, 4133:12, 4135:8, 4135:9, 4142:10

**stock** [81] - 3856:4, 3898:10, 3898:25, 3904:24, 4008:19, 4011:4, 4012:3, 4012:6, 4018:14, 4018:17, 4018:22, 4018:23, 4020:21, 4020:24, 4021:1, 4021:12, 4021:13, 4021:16, 4022:20, 4022:22, 4023:1, 4023:6, 4023:7, 4027:5, 4033:7, 4033:8, 4033:9, 4034:11, 4034:14, 4034:20, 4066:6, 4076:13, 4076:20, 4086:24, 4090:1, 4091:15, 4091:16, 4091:22, 4092:1, 4092:2, 4092:15, 4092:19, 4092:20, 4092:25, 4093:5, 4093:8, 4093:24, 4110:23, 4116:18, 4117:8, 4118:12, 4118:13, 4127:9, 4127:23, 4127:24, 4127:25, 4128:8, 4128:21, 4129:13, 4130:12, 4130:14, 4130:21, 4131:18, 4131:24, 4132:1, 4132:2, 4133:4, 4133:6, 4133:13, 4133:14, 4133:15, 4133:16, 4133:17, 4135:10, 4136:10, 4136:18, 4136:21

**stocks** [22] - 3991:1, 3991:2, 3991:11, 4008:21, 4008:22, 4015:18, 4020:19, 4021:5, 4047:20, 4047:22, 4063:5, 4063:21, 4064:10, 4064:17, 4066:16, 4066:19, 4066:21, 4086:25, 4088:3, 4117:21, 4127:7, 4128:4

**stood** [1] - 4053:23

**stop** [7] - 3894:8, 4080:12, 4091:4, 4119:7, 4121:17, 4127:10

**stopped** [3] - 3894:6, 3894:7, 4037:17

**story** [1] - 3864:10

**straight** [2] - 3860:6, 3980:12

**straighten** [1] - 4061:6

**strategic** [1] - 4011:25

**strategies** [2] - 4054:19, 4120:13

**strategy** [5] - 3874:17, 3875:24, 3878:24, 3993:14, 4064:20

**strike** [4] - 3920:12, 3934:1, 3934:19, 3939:9

**strong** [2] - 3997:5, 4143:16

**stronger** [1] - 4047:5

**struck** [1] - 3939:4

**structure** [8] - 3855:10, 3856:11, 3889:15, 4017:19, 4017:21, 4068:20, 4068:21, 4068:23

**stuck** [1] - 3991:23

**studied** [1] - 4082:3

**stuff** [2] - 3996:10, 4130:9

**stumbling** [1] - 4083:6

**stunned** [1] - 4111:5

**style** [1] - 4018:19

**Su** [50] - 3875:6, 3876:25, 3877:5, 3877:17, 3884:8, 3884:9, 3888:1, 3888:14, 3888:16, 3888:21, 3888:24, 3898:16, 3898:18, 3901:11, 3902:1, 3902:13, 3903:15, 3904:2, 3905:25, 3906:10, 3906:13, 3908:4, 3908:11, 3909:5, 3916:17, 3917:17, 3921:13, 3921:17, 3922:24, 3923:19, 3924:10, 3927:10, 3927:13, 3927:18, 3958:14, 3959:1, 3959:5, 3961:2, 3967:10, 3970:9, 3972:15, 3974:11, 3975:22, 3976:9, 3976:12, 3976:13, 3979:21, 3979:25, 3980:4

**Su's** [3] - 3875:9, 3884:12, 3976:1

**subdivision** [1] - 3863:4

**subject** [25] - 3888:5, 3898:18, 3898:20, 3902:2, 3907:14, 3907:25, 3908:19, 3909:7, 3909:12, 3913:9, 3916:18, 3923:22, 3929:17, 3944:11, 3948:2, 3998:5, 4012:10, 4012:12, 4039:10, 4070:1, 4073:18, 4073:25, 4090:19, 4099:24, 4117:24

**submissions** [1] - 3869:16

**submit** [1] - 3951:8

**submitted** [1] - 3896:24

**subscriber** [9] - 4097:18, 4097:23, 4098:1, 4098:17, 4098:23, 4099:19, 4100:1, 4100:6, 4100:7

**subscription** [28] - 3948:5, 3948:7, 3948:11, 3948:17, 4000:6, 4000:23, 4002:6, 4002:12, 4026:10, 4094:14, 4094:15, 4094:17, 4096:2, 4096:4, 4096:13, 4096:16, 4096:20, 4096:23, 4097:2, 4097:5, 4098:12, 4098:19, 4098:24, 4099:17, 4100:12, 4102:23, 4109:3, 4109:12

**Subscription** [2] - 4002:10, 4094:6

**subsequent** [3] - 3867:14, 3871:11

**subsequently** [1] - 4081:2

**substance** [6] - 3956:20, 4038:16, 4044:18, 4060:16, 4070:17, 4128:7

**substantial** [2] - 4036:18, 4040:20

**substantially** [4] - 4053:12, 4081:6, 4093:13, 4128:21

**substantive** [1] - 4084:21

**success** [3] - 3876:1, 4063:20, 4123:10

**successful** [11] - 3875:25, 4020:14, 4045:1, 4045:4, 4045:13, 4045:14, 4046:6, 4046:24, 4047:1, 4081:4, 4127:2

**successors** [1] - 3910:14

**suddenly** [1] - 4060:20

**sue** [1] - 3865:20

**Sue** [1] - 3950:1

**suffer** [1] - 4132:5

**suffered** [1] - 4132:3

**sufficient** [1] - 4106:3

**suggest** [8] - 3996:8, 3996:10, 3996:16, 4067:17, 4073:22, 4130:13, 4130:13, 4131:15

**suggested** [4] - 4058:15, 4073:20, 4077:22, 4131:9

**suggestion** [2] - 4085:20, 4089:6

**suggestions** [1] - 3858:14

**suggests** [4] - 3937:4, 4132:2, 4132:6, 4133:15

**suing** [1] - 3866:13

**suit** [2] - 3876:17, 3990:14

**sum** [1] - 3945:7

**summaries** [2] - 3856:3, 3858:21

**summarize** [1] - 3881:6, 4104:15

**summary** [6] - 3855:5, 3856:7, 3965:15, 3965:23, 3966:10, 3966:11

**summation** [2] - 4109:5, 4130:5

**Sunday** [3] - 4022:2, 4075:8, 4090:18

**Sunil** [2] - 3947:22, 3947:25

**sUNY** [1] - 3870:17

**Super** [10] - 3976:20, 3976:22, 3981:7, 3982:12, 3982:16, 3983:2, 3983:3, 3983:9, 3984:1, 3984:5

**supervisor** [1] - 3865:1

**supply** [3] - 3989:2, 3989:3, 4105:5

**support** [10] - 3872:17, 3902:21, 3903:1, 3903:2, 3935:19, 4082:12, 4082:21, 4083:13, 4139:11

**supported** [2] - 3872:16, 4014:20

**supporting** [9] - 3880:19, 3885:2, 3921:19, 3972:17, 4076:15, 4076:17, 4076:18, 4082:10, 4083:16

**supports** [1] - 4085:19

**supposed** [3] - 3866:11, 3915:9, 3938:12

**supposedly** [1] - 4024:13

**surprise** [2] - 4021:12, 4024:6

**surprised** [3] - 3940:10, 4076:12, 4110:22

**surround** [1] - 3992:19

**survival** [2] - 4081:25, 4082:2

**Susan** [40] - 3860:23, 3861:6, 3861:8, 3861:12, 3861:22, 3866:17, 3888:25, 3898:17, 3901:12, 3902:1, 3902:4, 3903:15, 3904:2, 3904:3, 3904:10, 3905:13, 3905:25, 3906:2, 3907:3, 3908:4, 3909:6, 3916:17, 3922:16, 3922:24, 3923:13, 3923:19, 3929:15,

RB          OCR

3930:7, 3932:6, 3943:25, 3945:22, 3946:5, 3947:20, 3948:3, 3948:10, 3961:2, 3961:16, 3967:10, 3969:18, 3970:23

**suspect** [3] - 4020:24, 4021:17, 4127:23
**sustain** [2] - 3887:18, 3976:16
**Sustained** [21] - 3954:24, 3983:12, 4033:19, 4038:24, 4039:5, 4045:10, 4046:3, 4053:15, 4062:22, 4062:24, 4070:25, 4104:1, 4105:24, 4106:16, 4115:13, 4121:25, 4122:13, 4124:19, 4126:2, 4128:20, 4128:24
**sustained** [13] - 3956:18, 3966:1, 3976:11, 4058:21, 4079:15, 4089:19, 4094:1, 4094:23, 4095:13, 4100:17, 4101:3, 4122:6
**swallow** [1] - 4134:5
**swallows** [1] - 4132:12
**swinging** [1] - 3996:14
**swinging-for-the** [1] - 3996:14
**Swiss** [4] - 3969:9, 3969:12, 3969:20, 3969:25
**sworn** [1] - 3870:5
**sworn/affirmed** [2] - 3987:20, 3988:5
**symbol** [1] - 4080:19
**syndrome** [1] - 4081:21
**system** [8] - 3877:11, 3884:18, 3902:11, 3934:15, 3938:24, 3939:8, 4069:24, 4081:18

---

# T

**T-E-L-E-S-I-S** [1] - 4042:6
**T.V** [1] - 4058:1
**tab** [52] - 3877:2, 3887:20, 3894:14, 3898:15, 3901:8, 3905:23, 3907:19, 3909:1, 3912:12, 3912:22, 3916:13, 3917:22, 3920:17, 3921:24, 3922:20, 3930:11, 3943:23, 3945:17, 3947:2, 3952:4, 3953:15, 3953:17, 3953:20, 3975:1, 3984:22, 3984:23, 4000:1, 4001:12, 4001:16, 4002:9, 4007:7, 4008:25, 4010:12, 4011:13, 4016:25, 4018:25, 4021:25, 4025:2, 4068:6, 4069:20, 4069:21, 4069:22, 4069:23, 4072:4, 4072:7, 4090:10, 4090:12, 4090:13, 4103:1, 4126:5, 4126:6, 4126:7
**table** [29] - 3888:10, 3888:17, 3888:23, 3889:2, 3889:4, 3889:14, 3889:16, 3890:4, 3890:10, 3893:11, 3893:13, 3898:9, 3898:19, 3899:23, 3909:13, 3909:17, 3911:3, 3913:24, 3914:2, 3914:6, 3914:13, 3914:16, 3914:19, 3915:2, 3917:15, 3921:18, 3962:6, 3962:12, 4123:11
**Table** [4] - 3888:5, 3889:9, 3898:22, 3913:9
**table/ownership** [1] - 3911:3
**tables** [3] - 3962:17, 3963:4, 3963:14
**tabs** [5] - 3905:6, 3928:20, 3930:9, 3930:10, 4004:1

**taker** [1] - 4057:19
**talkative** [2] - 4041:6, 4041:8
**talks** [3] - 4038:22, 4066:16, 4073:6
**tame** [1] - 3864:17
**tapered** [1] - 4027:7
**tapes** [3] - 4035:12, 4035:17, 4035:18
**tax** [6] - 3871:1, 3937:5, 4027:3, 4027:7, 4100:8
**taxes** [4] - 3933:20, 3933:24, 3938:22, 3939:3
**team** [2] - 3872:21, 3910:4
**tech** [1] - 4036:1
**technically** [1] - 3967:15
**techniques** [1] - 4119:15
**technology** [2] - 4068:25, 4123:2
**telephone** [7] - 3968:15, 4048:5, 4048:22, 4049:6, 4124:21, 4142:18, 4142:20
**Telesis** [7] - 3989:7, 4042:5, 4042:21, 4042:25, 4043:5, 4043:6, 4043:19
**ten** [6] - 3989:22, 4021:3, 4128:2, 4128:9, 4128:16, 4128:17
**tenor** [1] - 3949:7
**tens** [1] - 4082:23
**term** [6] - 4010:3, 4011:25, 4021:2, 4039:13, 4119:4, 4128:1
**termination** [1] - 3946:14
**terms** [18] - 3855:24, 3856:10, 3858:25, 3865:21, 3887:4, 3887:12, 3908:16, 3914:21, 3927:11, 3950:16, 4017:22, 4083:6, 4099:24, 4103:15, 4103:21, 4107:18, 4110:13
**terrible** [3] - 3866:5, 4057:12, 4081:19
**test** [1] - 4057:19
**testified** [17] - 3858:18, 3870:6, 3935:24, 3937:22, 3974:21, 3976:25, 3980:10, 3988:5, 3996:21, 4031:17, 4076:11, 4085:13, 4086:4, 4099:12, 4124:9, 4139:8, 4139:18
**testifies** [1] - 3869:19
**testify** [11] - 3855:8, 3856:1, 3858:2, 3858:21, 3860:15, 3864:24, 3868:24, 3998:2, 4048:18, 4134:21, 4134:24
**testifying** [1] - 4005:6
**testimony** [43] - 3855:7, 3855:17, 3856:3, 3856:4, 3856:7, 3856:10, 3856:15, 3856:18, 3856:20, 3857:6, 3857:12, 3857:13, 3857:16, 3857:20, 3857:23, 3858:6, 3858:23, 3859:2, 3859:21, 3860:2, 3860:8, 3864:22, 3934:19, 3938:22, 3939:4, 3956:24, 3960:24, 3977:3, 3981:11, 3997:20, 4005:7, 4005:8, 4069:12, 4079:22, 4085:11, 4090:18, 4095:22, 4108:19, 4125:17, 4125:18, 4139:12
**testing** [1] - 3879:23
**Texas** [14] - 3988:18, 3991:4, 4038:13, 4038:16, 4039:2, 4045:16, 4049:19, 4049:20, 4049:21, 4049:22, 4063:5, 4110:10, 4144:11, 4144:12
**text** [1] - 4041:9

**thanking** [2] - 4076:14, 4083:12
**THE** [346] - 3854:11, 3855:1, 3856:9, 3856:25, 3859:9, 3859:13, 3859:17, 3859:20, 3860:1, 3860:7, 3860:12, 3860:19, 3861:2, 3861:4, 3861:6, 3861:10, 3862:10, 3862:17, 3862:22, 3863:7, 3863:10, 3864:22, 3865:1, 3865:16, 3866:25, 3867:6, 3867:13, 3868:2, 3868:8, 3868:10, 3868:22, 3868:24, 3869:3, 3869:6, 3869:9, 3869:13, 3869:22, 3870:3, 3870:7, 3876:18, 3887:17, 3895:2, 3901:22, 3905:19, 3912:25, 3914:10, 3915:20, 3915:24, 3919:18, 3920:12, 3921:3, 3923:8, 3929:7, 3931:24, 3931:25, 3932:2, 3934:4, 3934:8, 3934:9, 3934:10, 3934:14, 3934:17, 3934:19, 3934:21, 3936:10, 3938:5, 3938:14, 3939:4, 3939:7, 3939:11, 3939:15, 3939:23, 3940:9, 3941:2, 3946:3, 3947:16, 3951:19, 3954:24, 3956:18, 3958:21, 3958:22, 3958:23, 3961:7, 3961:11, 3962:22, 3963:1, 3964:19, 3964:20, 3964:21, 3964:22, 3965:7, 3966:1, 3966:8, 3967:19, 3970:13, 3971:2, 3971:7, 3976:11, 3976:16, 3979:13, 3981:21, 3983:12, 3984:13, 3984:14, 3984:16, 3987:1, 3987:3, 3987:5, 3987:7, 3987:11, 3987:12, 3987:15, 3987:17, 3987:21, 3987:23, 3987:25, 3990:15, 3994:11, 3994:13, 3994:15, 3994:21, 3995:1, 3995:9, 3998:2, 3998:7, 3999:2, 4000:17, 4002:2, 4002:17, 4002:22, 4004:10, 4004:15, 4004:21, 4005:2, 4005:4, 4005:11, 4005:15, 4005:22, 4006:3, 4006:13, 4006:17, 4006:20, 4006:22, 4006:24, 4007:13, 4007:14, 4007:18, 4007:19, 4010:18, 4011:21, 4013:7, 4017:11, 4019:9, 4022:8, 4025:12, 4029:1, 4029:6, 4029:8, 4030:2, 4031:2, 4031:6, 4033:19, 4038:5, 4038:24, 4039:5, 4039:12, 4039:17, 4039:20, 4040:24, 4041:5, 4041:12, 4041:15, 4044:10, 4044:13, 4045:10, 4045:22, 4046:3, 4046:12, 4047:12, 4048:13, 4048:17, 4051:22, 4052:4, 4052:7, 4052:21, 4053:15, 4054:15, 4056:18, 4056:22, 4058:21, 4059:2, 4059:14, 4059:20, 4059:22, 4060:1, 4060:4, 4060:6, 4060:14, 4060:19, 4062:22, 4062:24, 4063:3, 4063:12, 4070:25, 4074:4, 4074:13, 4074:14, 4074:16, 4074:18, 4074:21, 4074:25, 4076:5, 4076:6, 4076:7, 4076:10, 4076:22, 4077:7, 4077:12, 4077:15, 4077:17, 4078:4, 4078:10, 4078:12, 4078:14, 4078:18, 4079:15, 4079:23, 4085:5, 4085:8, 4085:25, 4086:3, 4087:2, 4087:5, 4087:13, 4087:17, 4087:21, 4087:23, 4088:1, 4088:5, 4089:9, 4089:12, 4089:19, 4090:13,

4093:16, 4094:1, 4094:23, 4095:13, 4096:24, 4100:17, 4100:22, 4101:3, 4104:1, 4104:3, 4105:24, 4106:16, 4106:18, 4106:20, 4106:21, 4107:3, 4107:10, 4107:13, 4107:16, 4108:2, 4108:9, 4108:23, 4109:11, 4110:3, 4110:12, 4111:24, 4112:1, 4112:4, 4112:14, 4113:2, 4113:6, 4113:10, 4114:15, 4115:13, 4118:9, 4118:11, 4121:25, 4122:6, 4122:13, 4122:15, 4124:19, 4125:5, 4125:10, 4125:12, 4125:16, 4126:2, 4128:12, 4128:14, 4128:20, 4128:24, 4129:3, 4129:17, 4129:20, 4129:23, 4129:25, 4130:22, 4131:6, 4131:21, 4133:11, 4134:6, 4134:15, 4135:3, 4135:7, 4135:12, 4135:18, 4135:22, 4136:20, 4138:3, 4138:7, 4138:10, 4138:13, 4138:17, 4138:19, 4138:23, 4138:25, 4139:2, 4139:11, 4139:24, 4140:4, 4140:7, 4140:10, 4140:12, 4140:16, 4140:19, 4141:22, 4141:24, 4143:12, 4143:15, 4143:16, 4143:18, 4143:19, 4143:22, 4145:10, 4145:16, 4145:18, 4145:19, 4145:20, 4145:22, 4146:5, 4146:6, 4146:9, 4146:13, 4146:16
**themselves** [1] - 4053:23
**theory** [1] - 3937:3
**Therapeutics** [7] - 4084:6, 4084:9, 4084:10, 4084:18, 4084:19, 4084:22, 4089:21
**thereabouts** [1] - 4031:17
**thereafter** [1] - 3991:5
**therefore** [2] - 3950:4, 4130:15
**thereof** [1] - 4018:11
**they've** [5] - 3904:23, 3992:17, 3992:23, 3993:1, 3996:10
**thick** [1] - 4035:15
**thicker** [1] - 3965:15
**thinking** [2] - 3867:5, 4086:10
**thinks** [4] - 3996:25, 4069:7, 4131:24, 4133:4
**thinly** [4] - 4116:11, 4116:14, 4116:15, 4116:17
**thinly-traded** [1] - 4116:11
**thinner** [1] - 4007:5
**Third** [1] - 3854:19
**third** [9] - 3855:23, 3877:20, 3931:10, 3941:20, 3952:18, 3963:25, 3964:1, 4073:12, 4074:7
**third-party** [2] - 3963:25, 3964:1
**thorough** [1] - 3949:18
**thoughtful** [1] - 4143:20
**thousand** [9] - 4033:13, 4033:15, 4034:6, 4066:9, 4124:12, 4125:2, 4125:7, 4125:20, 4125:21
**thousands** [3] - 3866:9, 4082:23
**three** [18] - 3860:21, 3889:12, 3889:17, 3889:20, 3900:2, 3930:9, 3930:10, 3931:18, 3937:22, 3941:17, 3944:14, 3988:16, 4003:22, 4020:11, 4061:13,

4098:16, 4098:21, 4126:24
**threshold** [1] - 3890:24
**threw** [1] - 3996:13
**throughout** [3] - 3957:20, 3982:9, 3997:3
**Thursday** [1] - 4136:3
**tie** [3] - 3863:17, 3865:12, 3990:14
**ties** [1] - 4108:20
**Tilles** [8] - 3884:13, 3909:24, 3927:11, 3927:19, 3927:20, 3929:17, 3979:23, 3980:4
**timeframe** [1] - 3913:22
**timeline** [3] - 3896:13, 3896:15, 3896:16
**timely** [1] - 3950:22
**timing** [4] - 3878:20, 4009:10, 4009:12, 4110:14
**Timothy** [1] - 4005:5
**tips** [1] - 4086:24
**title** [4] - 3909:23, 3910:9, 3910:15, 3910:18
**titled** [1] - 3889:13
**today** [21] - 3865:17, 3888:9, 3957:3, 3990:10, 4012:1, 4019:25, 4022:22, 4028:1, 4032:22, 4035:2, 4069:2, 4091:17, 4111:11, 4111:12, 4111:13, 4111:21, 4128:8, 4137:3, 4138:10, 4144:4
**today's** [1] - 3952:19
**together** [17] - 3872:14, 3872:17, 3877:10, 3879:21, 3879:24, 3880:8, 3880:9, 3894:6, 3895:21, 3897:25, 3899:22, 3935:25, 4034:21, 4043:10, 4043:12, 4046:23, 4100:7
**Tom** [2] - 3917:4, 3917:9
**tomorrow** [13] - 3924:8, 4005:6, 4020:12, 4021:21, 4023:10, 4070:4, 4092:4, 4126:25, 4138:20, 4138:21, 4140:7
**tone** [4] - 3861:18, 4009:25, 4023:22, 4112:2
**tonight** [3] - 4020:12, 4126:25, 4138:25
**took** [8] - 3870:6, 3927:18, 3996:1, 4026:22, 4040:1, 4082:24, 4093:23, 4107:1
**tooth** [3] - 4039:3, 4039:8, 4040:23
**top** [41] - 3873:1, 3877:3, 3877:16, 3883:19, 3888:24, 3899:23, 3900:3, 3900:11, 3903:17, 3903:19, 3907:8, 3907:9, 3908:2, 3910:8, 3911:21, 3919:3, 3924:14, 3927:2, 3928:23, 3930:13, 3930:25, 3931:1, 3931:3, 3931:5, 3941:22, 3941:23, 3944:9, 3950:9, 3956:25, 3985:1, 3985:23, 4000:19, 4021:22, 4025:14, 4025:23, 4033:16, 4040:13, 4102:13, 4116:25
**total** [8] - 3891:23, 3900:12, 3900:24, 3948:8, 4028:8, 4032:1, 4032:12, 4033:5
**totals** [1] - 4142:7
**touch** [1] - 3956:13

**tougher** [1] - 3960:21
**towards** [2] - 3941:19, 4119:2
**town** [1] - 3988:22
**track** [6] - 3992:24, 3992:25, 3997:2, 3997:5, 3997:14, 3997:24
**trade** [2] - 4011:1, 4115:6
**traded** [11] - 3991:16, 3991:17, 3991:18, 4116:11, 4116:14, 4116:15, 4116:16, 4116:17, 4116:18, 4124:5
**trades** [5] - 4022:16, 4022:22, 4091:3, 4091:16, 4115:6
**trading** [8] - 3855:25, 3856:3, 3856:4, 3897:18, 3991:20, 4008:18, 4020:19, 4127:7
**traffic** [1] - 3984:4
**trail** [1] - 3963:16
**trained** [1] - 3974:11
**transacted** [2] - 3924:25, 3925:1
**transaction** [20] - 3892:15, 3892:19, 3892:20, 3904:5, 3904:11, 3931:18, 3935:19, 3935:22, 3941:19, 3941:20, 3941:24, 3942:14, 3942:15, 3942:17, 3942:19, 3942:22, 3942:24, 3943:1, 3943:13, 3948:13
**transactions** [26] - 3885:13, 3888:11, 3889:5, 3892:9, 3892:11, 3892:12, 3892:16, 3898:12, 3904:12, 3906:23, 3924:1, 3924:21, 3924:23, 3925:12, 3930:5, 3930:9, 3930:10, 3931:17, 3932:15, 3932:16, 3937:9, 3937:13, 3940:2, 3941:16, 3951:11, 3977:2
**transcript** [1] - 4072:10
**TRANSCRIPT** [1] - 3854:11
**Transcript** [4] - 3854:25, 3879:25, 3959:24, 4014:24
**Transcription** [1] - 3854:25
**Transfer** [2] - 3909:14, 3916:19
**transfer** [41] - 3886:13, 3903:7, 3909:8, 3909:20, 3910:11, 3910:14, 3910:20, 3913:7, 3914:1, 3915:6, 3915:15, 3916:3, 3916:6, 3916:22, 3916:23, 3917:16, 3918:5, 3918:6, 3918:11, 3918:21, 3918:25, 3919:12, 3921:9, 3922:4, 3922:7, 3922:8, 3922:11, 3933:2, 3934:6, 3934:24, 3941:25, 3942:3, 3942:12, 3943:2, 3943:5, 3943:10, 3943:15, 3943:16
**transferee** [1] - 3975:7
**transferor** [2] - 3910:17, 3975:4
**transferred** [1] - 3937:15
**transferring** [1] - 3910:22
**transfers** [4] - 3917:3, 3917:12, 3921:16, 3937:17
**transitioning** [2] - 3873:13, 3951:5
**transplantations** [1] - 4081:22
**travel** [1] - 3886:23
**tread** [1] - 3857:11
**treat** [1] - 3950:19
**treated** [1] - 4008:12
**treatment** [1] - 3867:15
**trend** [2] - 4132:7, 4133:10

**trending** [4] - 4130:12, 4133:7, 4135:14, 4136:10
**trial** [11] - 3856:21, 3862:9, 3865:10, 3866:7, 3866:20, 3869:17, 4006:9, 4006:10, 4082:8, 4085:11, 4095:11
**TRIAL** [1] - 3854:11
**tried** [2] - 3886:23, 4146:15
**triggers** [1] - 3997:14
**trip** [6] - 3935:15, 3935:18, 3978:6, 3978:9, 4143:11, 4145:16
**trouble** [1] - 4057:19
**troubling** [1] - 3864:12
**true** [21] - 3859:4, 3860:8, 3958:1, 4031:15, 4031:16, 4034:18, 4050:4, 4050:5, 4051:16, 4051:17, 4052:22, 4055:24, 4069:16, 4069:17, 4106:11, 4106:12, 4109:13, 4113:18, 4113:20, 4130:25, 4131:1
**truly** [3] - 4021:1, 4082:23, 4127:25
**trusted** [1] - 4063:16
**truth** [8] - 4040:15, 4085:22, 4130:23, 4131:12, 4132:12, 4132:19, 4132:25
**truthful** [1] - 4136:17
**try** [12] - 3860:21, 3863:5, 3939:23, 3950:23, 3992:19, 4005:17, 4035:16, 4049:1, 4055:16, 4059:18, 4115:19, 4123:6
**trying** [28] - 3863:16, 3872:13, 3876:6, 3884:21, 3898:8, 3898:13, 3903:10, 3913:16, 3935:25, 3937:10, 3999:11, 4007:13, 4008:14, 4013:24, 4014:7, 4014:8, 4015:7, 4043:17, 4048:17, 4070:6, 4086:8, 4111:9, 4111:15, 4132:16, 4134:5, 4140:20, 4146:17
**Tuesday** [1] - 3877:5
**turn** [36] - 3877:20, 3881:9, 3883:18, 3889:12, 3895:25, 3899:4, 3900:2, 3901:24, 3903:13, 3903:17, 3903:25, 3907:18, 3908:10, 3908:25, 3910:7, 3917:20, 3923:10, 3923:17, 3924:9, 3930:22, 3936:11, 3948:18, 3949:4, 3949:20, 3985:9, 3985:20, 3986:8, 4007:7, 4023:14, 4041:14, 4092:9, 4102:21, 4106:1, 4113:21, 4120:6, 4143:20
**turned** [2] - 4024:17, 4095:14
**twenties** [1] - 4108:1
**twenty** [3] - 3954:20, 4104:11, 4104:16, 4104:24
**Two** [1] - 3930:10
**two** [49] - 3855:12, 3856:20, 3867:3, 3874:7, 3877:3, 3899:4, 3899:15, 3903:17, 3904:12, 3905:7, 3905:9, 3911:22, 3915:14, 3928:21, 3933:14, 3937:13, 3943:11, 3944:5, 3945:2, 3947:18, 3948:3, 3949:4, 3956:20, 3967:17, 3991:25, 4000:11, 4003:22, 4011:23, 4023:7, 4027:24, 4040:4, 4040:6, 4040:14, 4043:18, 4054:6, 4061:13, 4066:12, 4082:8, 4082:11, 4082:14, 4082:21, 4092:2, 4098:20,

4115:25, 4131:3, 4132:11, 4133:15, 4140:6, 4140:15
**two-trial** [1] - 4082:8
**type** [5] - 3858:8, 3860:22, 3913:20, 3997:14, 4067:18
**typed** [2] - 4118:18, 4118:20
**types** [2] - 3889:17, 3925:12
**typical** [2] - 4101:10, 4101:11
**typically** [2] - 4015:23, 4081:14

## U

**U.S** [4] - 3989:3, 3991:18, 3991:20, 4081:17
**ugly** [1] - 4026:17
**ultimate** [1] - 3857:15
**ultimately** [5] - 3880:14, 3883:16, 4032:6, 4093:12, 4127:5
**unable** [2] - 3902:5, 4101:9
**unaudited** [4] - 3879:17, 3879:19, 3879:22, 3895:16
**unbilled** [1] - 3953:5
**unclear** [1] - 3930:12
**under** [25] - 3864:9, 3866:23, 3888:9, 3891:1, 3906:6, 3911:24, 3912:3, 3913:22, 3919:9, 3941:4, 3956:2, 3975:15, 3996:9, 4007:1, 4023:24, 4034:18, 4051:20, 4051:24, 4052:15, 4077:10, 4100:3, 4113:16, 4117:5, 4121:7, 4122:11
**underlining** [1] - 4132:15
**underneath** [1] - 3919:7
**undersigned** [1] - 4097:18
**understood** [11] - 3945:14, 3968:10, 4021:16, 4047:21, 4058:3, 4077:17, 4078:2, 4089:6, 4102:7, 4107:9, 4111:24
**undoubtedly** [1] - 4081:24
**unfortunately** [1] - 4131:1
**unhappy** [1] - 4135:9
**unit** [6] - 3889:17, 3889:18, 3890:3, 3890:7, 3890:17, 3891:2
**Unit** [1] - 3889:18
**UNITED** [3] - 3854:1, 3854:3, 3854:12
**United** [5] - 3854:5, 3854:14, 3854:18, 4047:25, 4049:22
**units** [21] - 3878:15, 3889:21, 3889:23, 3890:1, 3890:7, 3890:9, 3890:12, 3890:18, 3890:22, 3890:25, 3891:2, 3891:6, 3891:12, 3898:10, 3898:24, 3899:6, 3900:5, 3904:7, 3910:16
**university** [5] - 4014:16, 4037:25, 4080:3, 4082:25, 4083:24
**University** [4] - 3988:24, 4037:11, 4038:2, 4038:3, 4055:6, 4055:10, 4058:16, 4145:6
**unjustly** [1] - 3949:2
**unless** [3] - 3881:20, 4018:10, 4100:2
**unlike** [3] - 4020:20, 4081:20, 4127:9
**unnecessary** [1] - 4057:9
**unpleasant** [1] - 4024:6

**unreasonable** [1] - 3950:2
**unredacted** [1] - 4141:2
**unrelated** [1] - 3865:7
**unrestricted** [1] - 4027:21
**unusual** [11] - 3911:14, 3911:16, 3911:17, 3914:6, 3914:8, 3979:8, 3979:9, 3979:15, 3993:17, 4015:19, 4139:4
**up** [86] - 3859:20, 3862:10, 3862:24, 3863:17, 3872:14, 3876:23, 3880:16, 3884:18, 3884:19, 3886:4, 3888:13, 3888:18, 3888:23, 3890:6, 3898:8, 3899:23, 3902:12, 3902:15, 3902:16, 3906:11, 3906:24, 3913:11, 3915:3, 3918:18, 3921:12, 3922:6, 3924:14, 3927:2, 3929:18, 3930:8, 3930:14, 3930:18, 3933:10, 3933:11, 3935:16, 3944:2, 3944:9, 3950:9, 3952:10, 3952:23, 3953:23, 3954:15, 3984:19, 3987:17, 3987:18, 3988:22, 3989:16, 3992:4, 3993:20, 3995:3, 4008:16, 4008:22, 4013:22, 4016:10, 4019:20, 4020:8, 4021:4, 4021:19, 4021:22, 4024:10, 4025:14, 4028:4, 4030:10, 4032:25, 4034:6, 4034:16, 4056:24, 4067:23, 4068:1, 4070:22, 4071:1, 4073:25, 4074:11, 4076:6, 4084:14, 4093:7, 4111:12, 4115:16, 4126:4, 4128:3, 4132:7, 4132:12, 4133:24, 4136:14, 4136:18, 4136:22
**Up** [3] - 3929:24, 3931:11, 3932:4
**up-front** [1] - 3902:15
**update** [1] - 4019:17
**updated** [2] - 3909:13, 4019:25
**Updated** [1] - 3913:9
**updates** [3] - 4003:11, 4003:15, 4010:8
**upset** [2] - 3867:17, 3978:21
**upward** [1] - 4135:14
**upwards** [1] - 4130:12
**urgency** [1] - 3897:7
**US** [1] - 4081:16
**useful** [1] - 4036:3
**usurping** [1] - 3857:17

## V

**vacation** [1] - 4129:13
**valuation** [14] - 3964:1, 3964:2, 3964:8, 3964:16, 3965:1, 3965:13, 3966:6, 3966:10, 3966:16, 4024:11, 4082:16, 4093:23, 4126:15
**valuations** [1] - 4019:25
**value** [33] - 3910:13, 3911:4, 3911:6, 3911:8, 3922:17, 3964:11, 4007:24, 4009:6, 4009:7, 4011:2, 4013:13, 4013:17, 4019:16, 4019:17, 4022:19, 4033:8, 4045:25, 4070:2, 4070:5, 4079:17, 4091:14, 4092:19, 4105:17, 4105:21, 4106:13, 4107:3, 4107:13, 4108:23, 4118:7, 4118:14, 4118:15, 4128:21
**valued** [8] - 3964:11, 4023:15, 4028:7,

4069:3, 4092:10, 4093:19, 4093:23, 4128:8

**values** [5] - 4007:23, 4022:11, 4070:1, 4090:23, 4132:22

**Values** [1] - 4090:19

**valuing** [5] - 4022:20, 4023:16, 4091:14, 4092:12, 4093:20

**Vann** [3] - 3948:6, 3948:7, 3948:23

**Varian(phonetic** [1] - 3858:16

**varied** [1] - 4014:13

**varies** [2] - 4008:8, 4116:17

**variety** [1] - 4119:14

**various** [10] - 3855:15, 3855:23, 3856:10, 3857:25, 3858:21, 3858:24, 4034:3, 4064:9, 4083:25

**vary** [2] - 3985:17, 4034:8

**vast** [2] - 3980:1, 4108:4

**vehicles** [2] - 4120:11, 4120:16

**vendors** [3] - 3970:17, 3970:21, 3971:13

**venture** [1] - 4045:1

**ventured** [1] - 4042:12

**verbally** [2] - 3864:3, 3864:14

**verified** [1] - 4096:13

**versed** [1] - 3981:15

**version** [3] - 3896:3, 3919:11, 4035:18

**versions** [1] - 3962:11

**versus** [2] - 3883:15, 3886:24

**vested** [2] - 3889:24, 3889:25

**Vesting** [1] - 3888:6

**vesting** [3] - 3890:21, 3890:22, 3890:23

**vetting** [1] - 3980:24

**VI** [1] - 4099:20

**victim** [2] - 4107:24, 4134:18

**Victory** [2] - 3989:19, 4028:10

**view** [5] - 3867:18, 3867:21, 3977:12, 3977:21, 4119:12

**views** [1] - 3993:4

**virtually** [1] - 4040:11

**vis** [2] - 3858:13

**vis-a-vis** [1] - 3858:13

**visited** [1] - 4026:25

**voice** [1] - 3861:18

**void** [1] - 3916:22

**volumes** [1] - 3856:4

**volunteered** [1] - 4077:1

**vote** [2] - 3899:21, 3899:22

**votes** [1] - 3899:9

**voting** [8] - 3855:19, 3889:22, 3899:10, 3899:11, 3889:13, 3899:16, 3899:17, 3899:20

**VRC** [3] - 3966:12, 3966:14, 3966:15

## W

**wait** [7] - 3860:25, 3953:18, 4015:25, 4098:20, 4114:15

**Wait** [1] - 4039:17

**waiting** [3] - 3923:14, 4111:14, 4113:11

**wall** [1] - 4113:14

**wants** [3] - 3865:16, 3938:5, 4112:4

**Ward** [1] - 3858:15

**Warner** [4] - 3988:14, 3999:17, 4003:9, 4025:5

**warrant** [1] - 3910:18

**Warren** [1] - 4127:16

**watch** [2] - 3975:14, 4081:14

**watching** [2] - 4133:6, 4136:12

**water** [1] - 4145:24

**ways** [1] - 3866:17

**wealth** [7] - 4108:4, 4108:20, 4109:17, 4109:22, 4110:6, 4110:7

**wealthy** [2] - 4107:21, 4108:6

**wearing** [1] - 3876:16

**Wednesday** [3] - 3854:7, 3898:17, 4070:4

**weeds** [1] - 4065:14

**week** [4] - 3869:19, 3923:16, 3938:25

**weekend** [2] - 3855:2, 3869:16

**weekly** [2] - 3957:25

**weeks** [5] - 3933:14, 4020:15, 4061:13, 4082:15, 4127:3

**weight** [2] - 3997:20, 4077:24

**Western** [1] - 4105:11

**whatsoever** [2] - 3861:16, 4049:12

**wherein** [1] - 4052:24

**whistleblower** [2] - 3976:9, 3976:14

**white** [1] - 3876:17

**whole** [7] - 3867:6, 3867:20, 3901:1, 4040:12, 4069:9, 4087:13, 4131:11

**wide** [5] - 4119:13, 4123:14, 4123:16, 4123:18, 4123:19

**wife** [15] - 3989:22, 4032:15, 4032:16, 4033:9, 4034:14, 4034:19, 4043:15, 4044:3, 4102:19, 4104:22, 4105:2, 4105:9, 4109:8, 4120:9, 4120:2, 4120:4

**wife's** [17] - 3988:13, 3999:15, 4002:13, 4003:4, 4013:13, 4032:10, 4070:3, 4070:5, 4104:20, 4105:22, 4037:3, 4107:5, 4119:23, 4126:16, 4137:1, 4141:4

**wild** [1] - 4008:11

**willing** [3] - 4023:1, 4073:25, 4091:21

**wind** [5] - 4017:14, 4030:15, 4030:20, 4068:9, 4068:15

**wind-down** [2] - 4030:15, 4030:20

**wire** [5] - 3902:13, 3902:18, 3903:7, 3906:7, 3925:17, 3941:24, 3942:3, 3943:15, 3944:3, 3944:11

**wired** [3] - 3902:7, 3902:14, 3903:20

**wires** [1] - 3877:12

**wiring** [4] - 4000:22, 4094:5, 4094:16, 4094:17

**wished** [1] - 4078:7

**withdraw** [10] - 3867:2, 4040:22, 4041:1, 4041:7, 4061:17, 4061:21, 4071:15, 4071:25, 4099:23, 4122:2

**withdrawn** [1] - 3938:24

**withheld** [1] - 3933:25

**withholding** [2] - 3939:2, 3939:5

**witness** [50] - 3855:6, 3855:23, 3856:19, 3857:2, 3858:2, 3858:18, 3860:9,

3860:13, 3864:23, 3869:19, 3869:25, 3876:18, 3937:20, 3941:4, 3941:6, 3941:10, 3961:6, 3965:6, 3987:6, 3987:8, 3987:12, 3987:20, 3988:4, 3990:15, 3994:13, 3996:20, 4005:23, 4006:21, 4007:12, 4029:7, 4040:7, 4048:18, 4052:5, 4074:24, 4076:11, 4076:16, 4078:1, 4078:5, 4085:24, 4086:20, 4109:16, 4111:14, 4111:17, 4129:2, 4131:9, 4131:10, 4133:25, 4135:13, 4146:7

**WITNESS** [23] - 3931:25, 3934:8, 3934:10, 3934:17, 3958:22, 3964:20, 3964:22, 3984:13, 3987:5, 3987:23, 3994:21, 4007:14, 4007:19, 4056:18, 4076:6, 4089:12, 4113:6, 4143:16, 4143:19, 4145:18, 4145:20, 4146:5, 4147:2

**witness'** [3] - 3938:22, 3965:3, 3997:20, 4109:14, 4133:3, 4133:22, 4135:5

**witnessed** [1] - 3949:3

**witnesses** [3] - 4109:21, 4111:4, 4111:10

**Wolff** [3] - 3970:19, 3970:24, 3971:10

**wondering** [1] - 3857:24

**word** [6] - 3859:9, 3896:23, 3940:9, 3994:7, 4114:7, 4138:7

**wording** [1] - 3918:8

**words** [7] - 3956:20, 4038:15, 4044:18, 4047:4, 4060:16, 4070:16, 4128:7

**works** [1] - 3977:13

**world** [5] - 3871:16, 4003:20, 4035:22, 4058:7, 4082:23

**worried** [1] - 4109:25

**worry** [1] - 4020:21

**Worse** [1] - 4081:22

**worse** [1] - 3887:14

**worth** [21] - 3904:24, 4021:3, 4024:14, 4026:6, 4027:23, 4030:13, 4069:4, 4107:23, 4108:10, 4108:15, 4109:9, 4109:17, 4110:4, 4110:9, 4127:18, 4128:1, 4128:2, 4128:9, 4128:16, 4128:17

**worthless** [2] - 4131:24, 4133:4

**write** [16] - 3902:4, 3904:4, 3913:12, 3926:2, 3926:13, 3940:1, 4012:15, 4013:12, 4013:14, 4019:14, 4020:4, 4021:20, 4070:20, 4076:17, 4104:10, 4104:13

**write-off** [1] - 3926:2

**writes** [8] - 3862:6, 3888:22, 3924:7, 3924:16, 3925:23, 3927:4, 3944:1, 4104:10

**writing** [3] - 4013:18, 4020:9, 4097:17

**written** [6] - 3926:24, 3926:25, 3976:5, 4105:9, 4113:19, 4113:20

**wrote** [21] - 3939:24, 3975:13, 3975:19, 3975:22, 3976:17, 4010:23, 4013:22, 4013:23, 4019:15, 4019:20, 4019:22, 4020:5, 4020:9, 4021:17, 4021:19, 4021:21, 4021:22, 4022:10, 4104:14,

42

4109:14, 4129:9
**WTF** [2] - 3913:13, 3979:18

## Y

**Yahoo** [5] - 4022:22, 4024:16, 4091:17, 4092:20, 4093:1
**Yale** [2] - 3988:23, 4037:10
**year** [21] - 3871:6, 3878:19, 3878:20, 3879:17, 3923:15, 3927:25, 3928:2, 3985:8, 3988:25, 4016:8, 4026:1, 4027:22, 4034:12, 4037:13, 4037:24, 4047:16, 4059:4, 4142:24, 4143:3
**year-end** [4] - 3927:25, 3928:2, 3985:8
**years** [23] - 3950:3, 3957:4, 3957:5, 3957:7, 3957:8, 3988:23, 3989:23, 3992:13, 3993:6, 3997:6, 4011:2, 4033:24, 4057:9, 4057:18, 4081:15, 4086:18, 4096:1, 4104:11, 4104:16, 4104:24, 4105:7, 4107:25, 4108:1
**YORK** [1] - 3854:1
**York** [12] - 3854:6, 3854:15, 3854:16, 3854:20, 3870:12, 3871:5, 3878:1, 3912:4, 3992:5
**young** [4] - 4041:9, 4053:22, 4057:11, 4062:17
**younger** [1] - 4053:5
**yourself** [19] - 3877:17, 3903:15, 3904:3, 3906:13, 3916:18, 3923:20, 3929:17, 3947:23, 3948:22, 3955:25, 3967:10, 3973:14, 4023:8, 4049:4, 4074:12, 4080:13, 4092:3, 4119:20, 4129:4
**Youth** [1] - 3989:19

## Z

**ZELLAN** [1] - 3854:21
**zero** [1] - 3997:25
**zoom** [3] - 3883:19, 3895:14, 3985:1

RB        OCR