4148

1             UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,      : 15-CR-00637(KAM)
4                                  :
                                   :
5                                  :
        -against-                  : United States Courthouse
6                                  : Brooklyn, New York
                                   :
7                                  :
                                   : Tuesday, July 18, 2017
8   MARTIN SHKRELI,                : 9:00 a.m.
                                   :
9        Defendant.                :
                                   :
10  - - - - - - - - - - - - - - X

11          TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
          BEFORE THE HONORABLE KIYO A. MATSUMOTO
12        UNITED STATES DISTRICT JUDGE, and a JURY

13              A P P E A R A N C E S :

14  For the Government:   BRIDGET M. ROHDE, ESQ.
                          Acting United States Attorney
15                        Eastern District of New York
                          271 Cadman Plaza East
16                        Brooklyn, New York 11201
                     BY:  JACQUELYN M. KASULIS, ESQ.
17                        ALIXANDRA ELEIS SMITH, ESQ.
                          G. KARTHIK SRINIVASAN, ESQ.
18                        Assistant United States Attorneys

19  For the Defendant:    BRAFMAN & ASSOCIATES, P.C.
                          767 Third Avenue
20                        New York, New York 10017
                     BY:BENJAMIN BRAFMAN, ESQ.
21                        MARC AGNIFILO, ESQ.
                          ANDREA ZELLAN, ESQ.
22                        JACOB KAPLAN, ESQ.

23  Court Reporter:  Richard W. Barry, RPR
                     Official Court Reporter
24                   E-mail:  rwbarrycourtreporter@gmail.com

25  Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.

1          (Judge enters Courtroom.)

2          THE COURT:  Do we have any issues we need to discuss

3    before we start?

4          MS. KASULIS:  No, Your Honor.

5          MR. BRAFMAN:  No, Judge.

6          THE COURT:  Who will you be calling?

7          MS. KASULIS:  Deb Oremland, she should be a

8    relatively short witness, Your Honor.

9          THE COURT:  So before she starts, I will give the

10   instruction, is that what the parties want?

11         MS. KASULIS:  Yes.

12         I do have a stipulation, I need to move into

13   evidence and read.

14         THE COURT:  With her?

15         MS. KASULIS:  Yes.  It is just the blue sheet data

16   from the SEC to put that into evidence.

17         THE COURT:  All right.

18         (Jurors entering.)

19         THE COURT:  All the jurors are present, please have

20   a seat everybody.

21         Is the Government prepared with its next witness?

22         MS. KASULIS:  Yes, Your Honor, the Government calls

23   Deborah Oremland to the stand.

24   DEBORAH OREMLAND, having been first duly sworn, took the stand

25   and testified as follows:

- Proceedings -                              4150

1          THE COURT:  Thank you.

2          Before we get started, I would like to instruct the

3    jurors, so please listen carefully.

4          Ms. Oremland will testify as to summaries of various

5    records, relevant to this case.  In the course of her

6    testimony, she may also describe and explain her understanding

7    of various regulations and requirements governing the

8    securities industry.  Her testimony of any laws or legal

9    requirements, is reflective of her knowledge and understanding

10   and you should evaluate this witness' testimony as you would

11   any other witness.

12         As I have told you previously, I will instruct you

13   on the applicable law before you begin your deliberations.

14         Thank you.

15         MS. KASULIS:  Thank you Your Honor.  Before we

16   proceed, I would like to move in a stipulation into evidence

17   and read it for the jury.

18         THE COURT:  Certainly.

19         MS. KASULIS:  Thank you.

20         Government Exhibit 802, it is a stipulation agreed

21   upon by the parties.  If we could publish it for the jury,

22   thank you.

23         The stipulation reads:

24         It is hereby stipulated and agreed by and between

25   the undersigned parties, that Government Exhibit 630, is a

- Proceedings -                                    4151

1   true and accurate copy of blue sheet data, for Desert Gateway

2   and Retrophin, Inc., maintained by the Securities and Exchange

3   Commission, the SEC, for the period November 14th, 2012, to

4   February 20th, 2013, and is admissible in evidence at trial.

5          Government Exhibit 631, is a true and accurate copy

6   of blue sheet data for Retrophin, Inc. maintained by the SEC

7   for the period, February 21, 2013, to November 29th, 2013, and

8   is admissible in evidence at trial.

9          Government Exhibit 632 is a true and accurate copy

10  of blue sheet data, for Retrophin, Inc., maintained by the SEC

11  for the period December 2nd, 2013, to February 28th, 2014, and

12  is admissible in evidence at trial.

13         Government Exhibit 633, is a true and accurate copy

14  of blue sheet data for Retrophin, Inc., maintained by the SEC

15  for the period March 3rd, 2014, to May 15th, 2014, and is

16  admissible in evidence at trial.

17         Government Exhibit 634 is a true and accurate copy

18  of blue sheet data for Retrophin, Inc. maintained by the SEC

19  for the period May 16th, 2014, to September 19th, 2014, and is

20  admissible in evidence at trial.

21         This stipulation marked Government Exhibit 802, is

22  admissible in evidence at trial.

23         It is signed by both parties and dated June 28th,

24  2017.

25         THE COURT:  Thank you.

Oremland - Direct - Kasulis                    4152

1          MS. KASULIS:  Thank you, Your Honor.

2          May I proceed with the witness?

3          THE COURT:  Yes.

4    DIRECT EXAMINATION BY MS. KASULIS:

5    Q    Ms. Oremland, what do you do for work?

6    A    I work at FINRA.

7    Q    What does FINRA stand for?

8    A    FINRA is the Financial Industry Regulatory Authority.

9    Q    What does FINRA do?

10   A    It is what is called a self regulatory organization.  It

11   regulates certain aspects of the securities industry.  It is

12   private, non Government.  It is a membership organization and

13   its members are comprised of broker-dealers and their

14   employees, brokers.

15   Q    What is a broker-dealer?

16   A    A broker-dealer is an entity that is in the business of

17   buying and selling stock for themselves or for customers.

18   Merrill Lynch is a broker dealer.

19   Q    How does FINRA regulate broker-dealers?

20   A    FINRA writes rules to govern our members' behavior.  It

21   conducts examinations to ensure compliance with the rules, and

22   it can also discipline our members.

23          FINRA also oversees trading on the various

24   marketplaces.  And our mission is to provide investor

25   protection and market integrity.

Oremland - Direct - Kasulis                4153

1   Q      Who oversees FINRA?

2   A      The Securities and Exchange Commission or the SEC.

3   Q      What is the SEC?

4   A      The SEC is the Government agency that is tasked with

5   protecting investors by regulating the markets and enforcing

6   the federal securities laws.

7   Q      What is your current position at FINRA?

8   A      I am an attorney.  I work in a small group that's

9   dedicated to providing the Government with assistance in their

10  investigations and their prosecutions involving securities

11  fraud.

12  Q      What are your responsibilities within that group?

13  A      Well it varies depending on what type of assistance is

14  required.  I don't conduct my own investigations.  I solely

15  assist the Government, and generally it involves analysis of

16  trading data, either from public sources or member firms or

17  within FINRA.  Sometimes summarizing that analysis and putting

18  it together in charts or exhibits and testifying to it at

19  trials.

20  Q      For how long have you worked at FINRA?

21  A      Nearly sixteen years.

22  Q      How long have you worked in the group that you are

23  currently assigned to?

24  A      Almost eleven.

25  Q      Prior to the group that you currently work in, where did

Oremland - Direct - Kasulis                    4154

1   you work at FINRA?

2   A    I started in the Market Regulation Department where I

3   conducted fraud surveillance of various markets, just to

4   ensure that the trading wasn't violating any federal

5   securities laws.

6           Then I joined the Enforcement Department where I

7   focused more on our member firm activity.

8   Q    Can you briefly describe your educational background for

9   the jury?

10  A    I have an undergraduate degree from the University of

11  Michigan and a law degree from the American University.

12  Q    Now, in your time at FINRA, have you become familiar with

13  the securities industry in the operations of public securities

14  exchanges?

15  A    Yes.

16  Q    Do you know the defendant Martin Shkreli?

17  A    No.

18  Q    Now, in relation to this case, were you asked to prepare

19  summary charts?

20  A    Yes.

21  Q    Who asked you to do that?

22  A    The Government.

23  Q    And did you create charts?

24  A    I did.

25  Q    How many charts did you create?

Oremland - Direct - Kasulis                    4155

1   A    Three.

2   Q    Were you paid by the United States Attorney's office to

3   do this?

4   A    No.

5   Q    Other than your salary at FINRA, did you receive any

6   additional payment to conduct this analysis?

7   A    No.

8   Q    How many hours approximately did you spend to do this

9   analysis?

10  A    Around ten hours or so.

11  Q    Did you rely on certain materials to prepare your charts?

12  A    Yes.

13  Q    Now, I will direct your attention to a binder that is in

14  front of you.  If you look behind the tab labeled "exhibits",

15  if you can take a look at those tabs, those documents in those

16  tabs.

17          Do you recognize those exhibits?

18  A    Yes.

19  Q    Are these the documents that you used to prepare your

20  charts?

21  A    Yes.

22  Q    Can you please generally describe those documents.

23  A    Sure.  There are some SEC filings, there is price and

24  volume data from Bloomberg and there is some documents from

25  transfer agents.

Oremland - Direct - Kasulis                    4156

1   Q     Separate and apart from the exhibits in your binder, is

2   there any other materials that you reviewed to prepare your

3   charts?

4   A     Yes.

5   Q     What is that?

6   A     I reviewed the blue sheet data.

7   Q     So, let's step through each of the exhibits in your

8   binder.

9         In tab-- behind tab 9 of your binder.  This is

10  Government Exhibit 606, Your Honor, which was admitted

11  pursuant to stipulation, Government Exhibit 805.

12        THE COURT:  Thank you.

13  Q     If we can just zoom in on the top portion for the jury.

14        What is this, what is this document?

15  A     This is price and volume data that I obtained from

16  Bloomberg for Retrophin.

17  Q     What is Bloomberg?

18  A     Bloomberg is a subscription service widely used in the

19  securities industry.  It has a lot of information about public

20  companies including historical price and volume data.

21  Q     This is a multi page pretty lengthy document; is that

22  right.

23  A     That's right.

24  Q     For what period of time does this-- did this document

25  cover?

RB          OCR

Oremland - Direct - Kasulis                    4157

1   A    December 17th, 2012, through September 30th, 2014.

2   Q    Can you please explain the various columns for the jury?

3   A    Sure.  The first column is the date, that is the trade

4   date.  Then you have the closing price.  So that is the price

5   of the stock at the end of the trading day.  And then the last

6   column shows the share volume.  So that is the volume of

7   shares that were traded that day.  It is not the number of

8   trades, it is the amount of shares that went back and forth or

9   bought and sold.

10  Q    Now, if you flipped to tab ten of your binder.  I am

11  showing you what has been marked for identification, this is

12  not in evidence yet as Government Exhibit 125-31.

13        Do you recognize this exhibit?

14  A    Yes.

15  Q    What is it?

16  A    These are transfer agent records.

17        MS. KASULIS:  Your Honor, the Government moves

18  125-31 into evidence subject to connection with the transfer

19  agent's testimony.

20        THE COURT:  Is there any objection?

21        MS. ZELLAN:  Just a moment, Your Honor.

22        No objection, Your Honor.

23        THE COURT:  Ma'am, I think you said, 125-31.

24        MS. KASULIS:  I'm sorry, 123-31, thank you, Your

25  Honor.

Oremland - Direct - Kasulis                    4158

1              THE COURT:  Do you have any objection to 123-31?

2              MS. ZELLAN:  No, Your Honor.

3              THE COURT:  Thank you, we will admit Government

4    Exhibit 123-31.

5              (So marked.)

6              MS. KASULIS:  Sorry, Your Honor.

7    Q    Directing your attention to the third page of this

8    document.  If we can just zoom in a little bit.  Can you just

9    briefly describe what this document reflects?

10   A    This reflects shareholders at a certain period of time

11   for Desert Gateway.

12   Q    Desert Gateway also known as another company?

13   A    Yes.  It is Retrophin, sorry.

14   Q    So, we will go back to this document in a minute.  But to

15   direct your attention to tabs 6 through 8 of your binder.  I

16   am showing you what has been marked for identification as

17   Government Exhibit 601, 603, and 605.

18              Do you recognize these exhibits?

19   A    Yes.

20   Q    What are they?

21   A    These are the SEC filings that I reviewed.  They are a

22   form 8-K and then two schedule 13D's.

23              MS. KASULIS:  The Government moves Government

24   Exhibit 601, 603 and 605 into evidence.

25              MS. ZELLAN:  No objection.

1          THE COURT:  We will receive Government Exhibit 601,

2     603 and 605.

3          (So marked.)

4          MS. KASULIS:  If we can switch to the Elmo briefly.

5     Q    Now, Ms. Oremland, I am showing you a CD that has been

6     labeled United States versus Martin Shkreli and then labeled

7     Government Exhibits 630 through 634 and labeled, blue sheet

8     data.  These exhibits were moved in pursuant to Government

9     exhibit-- stipulation 802, Your Honor, we just read this

10    morning.

11         Ms. Oremland, do you recognize this CD?

12    A    Yes.

13    Q    What is it?

14    A    This is the blue sheet data.

15    Q    I am pointing right here to some handwriting.  What is

16    that?

17    A    Those are my initials.

18    Q    Why did you initial this CD?

19    A    To signify I reviewed it.

20    Q    When you say, blue sheet data, what is blue sheet data?

21    A    That is trading data from a particular type of

22    broker-dealer called a clearing firm.  And it includes, a lot

23    of detailed information about trades, including which customer

24    made the trade.

25    Q    Are the records on this CD, are they voluminous?

Oremland - Direct - Kasulis                4160

1   A    Yes.

2   Q    So again to summarize, did you rely on all this evidence

3   that we just stepped through in preparing your summary charts?

4   A    Yes.

5   Q    Is that evidence collectively voluminous?

6   A    Yes.

7   Q    Now, who provided the underlining data for you to review?

8   A    Some of the data I obtained from public sources, the SEC

9   filings, and I obtained the blue sheet data.  But I got-- I'm

10  sorry, I obtained the Bloomberg price and volume data.  I got

11  the blue sheet data and the transfer agent records from the

12  Government.

13  Q    Now, I am showing you what is marked for identification

14  as Government Exhibits 701, 702, and 703, which are behind

15  tabs three, four, five of your binder.

16        Do you recognize these exhibits?

17  A    Yes.

18  Q    What are they?

19  A    These are the charts that I created.

20  Q    Are these summary charts that fairly and accurately

21  represent the voluminous data that you relied on from the

22  exhibits that we just discussed?

23  A    Yes.

24        MS. KASULIS:  The Government moves to admit Exhibits

25  701, 702 and 703 into evidence.

1            MS. ZELLAN:  No objection, Your Honor.

2            THE COURT:  We will receive 701, 702, and 703.

3            (So marked.)

4    Q    Before we actually go through those charts, let's first

5    talk about some terms that you are familiar with.

6            Now, as part of your work at FINRA, are you familiar

7    with what a stock is?

8    A    Yes.

9    Q    Can you briefly tell us what that is?

10   A    A stock is a type of security.  It represents an

11   ownership interest in a company.

12           So it is also referred to as an equity or share.

13   Q    Can you buy and sell stock?

14   A    Yes.

15   Q    How do you do that?

16   A    You do that on the stock market.  There are a variety of

17   different markets.  You can trade stocks.

18   Q    Before we get to that, what is a shareholder?

19   A    A shareholder is someone who owns shares.  So, when you

20   own stock in a company or shares, you own a little part of

21   that company.

22   Q    Now, you discussed the various markets or exchanges, can

23   you briefly describe those various exchanges for the jury.

24   A    Well, there are what-- there are what is called national

25   securities exchanges and those are the New York Stock Exchange

Oremland - Direct - Kasulis                4162

1   and the NASDAQ for example.  There is also other markets where

2   stocks can trade and those are referred to as over-the-counter

3   markets.

4   Q    What is the difference between the sort of national

5   exchanges and the over-the-counter markets?

6   A    If you want your stock to trade on the NASDAQ, you have

7   to go through really stringent listing requirements.  Your

8   company has to be a certain size, it has to have a certain

9   number of assets.  It has to maintain a certain share price.

10              Now, for the over-the-counter markets, there is

11   really no listing process at all.  For the NASDAQ companies,

12   you have to file documents with the SEC and for the

13   over-the-counter markets, only some of those markets require

14   companies to report to the SEC.

15              So there are various tiers of over-the-counter

16   markets where some of those tiers require reporting and some

17   don't.

18   Q    And if a company wants to move from the over-the-counter

19   markets to the NASDAQ, are there certain SEC filings that are

20   required?

21   A    Well, you have to be a recording company.  You have to

22   make your annual reports and your quarterly reports and any

23   type of material events.

24   Q    And with respect to the filings that we are talking

25   about, the SEC filings, what does the SEC do with these

1    filings?

2    A    They are available publicly on-line.

3    Q    Now, as part of your work, have you examined the movement

4    of stock prices of publicly traded companies?

5    A    Yes.

6    Q    We have been talking about publicly traded companies, are

7    you familiar with the concept of a reverse merger?

8    A    Yes.

9    Q    What is it?

10   A    That is when a private company merges with what is called

11   a publicly traded shell company and then that private company

12   then becomes public.

13            So a shell company is a company that really doesn't

14   have any business, not many assets, maybe some cash.  But, it

15   is trading on the over-the-counter markets.  So that a private

16   company can merge with that shell and then in essence then

17   becomes public that way, on the over-the-counter markets.

18            THE COURT:  May I ask a question about the shell?

19            THE WITNESS:  Yes.

20            THE COURT:  You said it is a public company that has

21   no assets, but it trades.  What does it trade?

22            THE WITNESS:  Well, it has stock that is available

23   to be purchased and sold.  Usually it doesn't trade very

24   often. But it maybe it had at one time traded and it is

25   relatively dormant.  But it still has a ticker, and there is

1  still might be some stock out there that could be bought or

2  sold.  But there is really no active business.

3        THE COURT:  If there is no assets, is there any

4  value to those shares that it is trading?

5        THE WITNESS:  Generally it is not a very valuable

6  stock.

7        THE COURT:  Thank you.

8  BY MS. KASULIS:

9  Q    Now, in this case, in particular, in your review of the

10  materials we discussed, was there a reverse merger that

11  occurred?

12  A    Yes.

13  Q    Can you explain that reverse merger?

14  A    Retrophin, the private company conducted a reverse merger

15  with Desert Gateway.

16  Q    When approximately did that occur?

17  A    Around December 12th, 2012.

18  Q    What was the shell company in this case?

19  A    Desert Gateway.

20  Q    And, which market did the-- did Retrophin then reverse

21  merged into Desert Gateway and become a publicly traded

22  company; is that right?

23  A    That's right.

24  Q    Which market did it then trade on?

25  A    On the over-the-counter QB.

Oremland - Direct - Kasulis                4165

1   Q     What is over-the-counter QB signify?

2   A     That is one of the-- as I mentioned, there are certain

3   tiers of over-the-counter markets.  That is one of the tiers.

4   And on that particular tier, they require companies to file

5   reports with the SEC.

6   Q     Now, did Retrophin ever move to a different market?

7   A     Yes.

8   Q     What market was that?

9   A     To the NASDAQ.

10  Q     When did that occur?

11  A     Around January 2014.

12  Q     Are there any sort of listing requirements for a company

13  before it can move to the NASDAQ, in terms of the amount of

14  time that it is a publicly traded company?

15  A     When a company becomes public by reverse merger, it has

16  to trade on the over-the-counter markets for about a year

17  before it can move up to NASDAQ.

18  Q     Now, are there any SEC filings that need to occur when a

19  reverse merger takes place?

20  A     Yes.  If it is a recording company, they need to report

21  what is called a form 8-K.

22  Q     What is an 8-K?

23  A     8-K is the disclosure document that a company is required

24  to report when anything material occurs at the company or

25  anything important that investors need to know about.

Oremland - Direct - Kasulis                    4166

1   Q    What kind of information generally speaking is in the

2   8-K?

3   A    When there is a reverse merger, there is information

4   about the new public company, the company's business, and it

5   also contains financial information.

6   Q    Directing your attention to what is in evidence as

7   Government Exhibit 601, that is behind tab 6 of your binder.

8          What is this document?

9   A    This is the form 8-K that was filed after the reverse

10  merger between Retrophin and Desert Gateway.

11  Q    Directing your attention to page 75 of 80 of this

12  document.  If we can zoom in on the bottom half of the page.

13  If we look under the section entitled shares eligible for

14  resale.  Can you please read that sentence.

15  A    As of December 17th, 2012, we had outstanding 8,338,837

16  shares of common stock.  Of these shares 5,838,837 are

17  restricted securities under Rule 144, in that they were issued

18  in private transactions not involving a public offering.

19  Q    Just to correct the record, I think I had misread the

20  title, it is "shares eligible for future sale".

21          THE COURT:  Ma'am, you also misstated the page.  You

22  said 75, it is page 72.

23          MS. KASULIS:  Yes, at the very bottom of the

24  exhibit, it has a different-- I will make sure to make clear.

25  The bottom of the exhibit says 75 of 80.  It is page 72 of the

1    actual 8-K.

2            THE COURT:  Thank you.

3            MS. KASULIS:  Thank you, Your Honor.

4    Q    So, according to this sentence, how many total

5    outstanding shares did Desert Gateway have as set forth in the

6    8-K?

7    A    8,338,837 shares.

8    Q    So when we talk about Desert Gateway are we talking about

9    Retrophin?

10   A    Yes.

11   Q    Now, according to the sentences, of that total

12   approximately 8.3 million shares, 5,838,837 shares are

13   restricted securities under Rule 141.

14           What is a restricted security?

15   A    Restricted securities are securities, usually that are

16   issued by the company, not in a public offering.  They are

17   shares that you can't just turn around and sell the next day.

18   There are restrictions on how long you have to hold them

19   before you can sell them.

20   Q    How can you tell if a security is restricted?

21   A    Well, your share certificate, there is a huge legend that

22   says, restricted.  You cannot trade.

23   Q    When you talk about, you said there is a legend.  What is

24   the legend on?

25   A    The stock certificate that you receive from the transfer

Oremland - Direct - Kasulis                    4168

1   agent.

2   Q    What is a transfer agent?

3   A    That is the entity that companies use to-- that keep

4   track of the shares that are issued by the company.  They

5   issue and cancel out share certificates.  And they are also

6   involved in the process of lifting restrictions on your

7   restricted shares, to make that free trading.

8   Q    What is an opinion letter?

9   A    An opinion letter, an attorney opinion letter usually

10  regarding Rule 144 and that is a legal opinion regarding the

11  restricted shares.  And it is sent to the transfer agent when

12  you want to lift the restrictions and get them to become free

13  trading.

14  Q    Now, we just spoke a number of times about Rule 144.

15  What is Rule 144?

16  A    When a company wants to sell its stock under the federal

17  securities laws, they are supposed to register that stock with

18  what is called a registration statement.

19        Now there are certain exceptions and exemptions that

20  companies can use where they don't always have to file a

21  registration statement.  But, it is usually in the context of

22  private offerings, not to a wide spread public.

23        Now, those shares that are not registered, they are

24  unregistered and they are restricted shares.  So, Rule 144

25  governs the resale of those restricted shares and how long you

1   have to keep them.

2   Q     How long do you have to keep them under Rule 144?

3   A     Really depends on who you are and your relationship with

4   the company.  If you are not what is called an affiliate of

5   the company, you have to keep them anywhere from six months to

6   a year.  You have to hold them for a year if the company was

7   ever a shell company.

8   Q     You had mentioned a registration.  What is an S-1

9   registration?

10  A     That is the registration statement.  So that is a lengthy

11  disclosure document that is filed with the SEC.  That is

12  registering the shares.  So when that is filed, the shares are

13  not unregistered any more and if you are not an affiliate, you

14  wouldn't have the restrictions on your -- on the resale of

15  your shares.

16  Q     Now, of the approximately 8.3 million shares listed in

17  the 8-K, it explains that approximately 5.8 million were

18  restricted.  What is the status of the remaining 2.5 million

19  shares?

20  A     Those shares are free traded.

21  Q     What does free trading mean?

22  A     That means there are no restrictions on whether you can

23  sell them.

24  Q     You had mentioned a couple of times, the term

25  "affiliate".  What does it mean to be an affiliate?

Oremland - Direct - Kasulis                4170

1  A     Under Rule 144, an affiliate is someone who can exert a

2  certain amount of control over a company, either they are an

3  officer or director or they own a large amount of shares or

4  they are controlled by someone who is an affiliate.

5  Q     What if any restrictions are there on affiliates

6  regarding their trading and shares of the company?

7  A     Well, affiliates are limited into how many shares they

8  can sell, even if they are not restricted.

9  Q     Have you heard of the expression, "the float"?

10  A     Yes.

11  Q     In the context of the securities industry?

12  A     Yes.

13  Q     What is the float?

14  A     That is just another way to say free trading shares.  The

15  shares that are available to be bought and sold.

16  Q     What is a Form 4?

17  A     Form 4 is another SEC disclosure document where if you

18  are an insider of a company, if you own more than 10 percent

19  of the shares or if you are an officer or director, you are

20  supposed to file a Form 4, whenever you acquire or dispose of

21  securities.  That is filed with the SEC.

22  Q     What is a 10-K filing?

23  A     That is an annual report that companies are required to

24  file with the SEC.  It contains a lot of information about the

25  company, its business, its management, the owners of the

1    company and it also has audited financial statements.

2    Q     What is a 10-Q filing?

3    A     That is a report that needs to be filed at the SEC

4    quarterly about the company.  It doesn't-- it is not as long

5    as the 10-K, it doesn't have to have audited financials.  But

6    it also contains a lot of information about the company.

7    Q     And those documents are filed publicly by the SEC?

8    A     Yes.

9    Q     Are you familiar with Rule 13D of the Securities Exchange

10   Act of 1934?

11   A     Yes.

12   Q     What is it?

13   A     So under 13D, when you own either directly or indirectly

14   five percent or more of a company's stock, you have to file a

15   disclosure document called a schedule 13D, to indicate how

16   many shares you own, and whether you have what is called

17   voting power or investing power with those shares.

18   Q     Have you heard of the expression, beneficial ownership?

19   A     Yes.

20   Q     What does that mean?

21   A     So the beneficial owner is someone who owns either

22   directly or indirectly five percent or more of the company's

23   stock.  So you can't make a contract or an arrangement or put

24   stock in someone else's name when you control the stock to try

25   to get out of filing a 13D.

Oremland - Direct - Kasulis                4172

1    Q    Now, with respect to the free trading shares of Retrophin

2    that are referenced here in this 8-K form, based on your

3    review of the documents, do you know how those shares were

4    distributed around the time of the reverse merger?

5    A    Yes.

6    Q    How do you know that?

7    A    From the transfer agent records.

8    Q    And, did you prepare a summary chart of that share

9    distribution for the jury?

10   A    Yes.

11   Q    I am showing you what is in evidence as Government

12   Exhibit 701.  It is behind tab three of your binder and on the

13   screen in front of you.

14         Can you please describe this chart for the jury.

15   A    This is a chart that I prepared that shows distribution

16   of the free trading shares or two million of the free trading

17   shares to seven individuals or entities listed in the red

18   boxes.

19   Q    As of what date does this chart --

20   A    December 17th, 2012.

21   Q    Can you please step through each one of these individuals

22   listed here and the number of shares they received?

23   A    Sure.  Kevin Mulleady, received 350,000 shares; Thomas

24   Fernandez, received 300,000 shares; Marek Biestek received

25   300,000 shares; Tim Pierotti, received 350,000 shares;

Oremland - Direct - Kasulis                4173

1    Claridge Capital, 350,000 shares; Andrew Vaino, received
2    250,000 shares; and Edmund Sullivan received 100,000 shares.
3    Q    At the bottom of this chart, can you please read for the
4    jury what is contained there?
5    A    Sure.  There is the total Retrophin shares outstanding
6    which is over 8 million, 8.3 million shares.  The total free
7    trading shares were 2.5 million, and the total free trading
8    shares distributed to this group was two million or 80 percent
9    of those free trading shares.
10   Q    What happened with respect to the remaining 20 percent of
11   the free trading shares?
12   A    They went to two other people.  Some of them went to Troy
13   Fearnow and some went to a woman named Ruth Shepley(ph).
14   Q    Did you review any 13D filings-- before we move on.  We
15   see here this RTRX, what is that denote?
16   A    That is Retrophin's ticker symbol.
17   Q    What is a ticker symbol?
18   A    That is the symbol used to identify the company on the
19   markets.
20   Q    Now, did you review any 13D filings in relation to
21   Retrophin?
22   A    Yes.
23   Q    So I am showing you what is already in evidence as
24   Government Exhibit 603, it is behind tab 7 of your binder.
25        Do you recognize this document?

RB          OCR

1    A    Yes.

2    Q    What is it?

3    A    This is the form schedule 13D for Retrophin.  It was

4    filed on December 20th, 2012.

5    Q    Who is the filing for?

6    A    Retrophin.

7    Q    Is it-- who is it filed by?

8    A    Martin Shkreli.

9    Q    If we go to the second page of this document, if we could

10   look at the middle section there.

11        Can you explain this middle portion here, the

12   portion that starts with Martin Shkreli?

13   A    These are the list of the individuals or entities that

14   have disclosures in this document.

15   Q    What is the date of this document?

16   A    December 12th, 2012.

17   Q    If we can go back to the first page very quickly.  In the

18   very middle here it says form SC 13D.  What is form SC mean?

19   A    Schedule.

20   Q    Right underneath that, what does it say in parenthesis?

21   A    Statement of beneficial ownership.

22   Q    Now if we can go to the third page of this document.  You

23   can zoom in on this box.  What is the reporting and sort of

24   item number one, what is the reporting person listed there?

25   A    MSMB Capital Management LP.

1    Q    And then for item four, source of funds, what is listed

2    there?

3    A    WC, which means working capital.

4    Q    What is working capital mean?

5    A    It is just the company's capital.

6    Q    When you say, capital, what do you mean?

7    A    Money.

8    Q    If we go to item 7 in the section that is entitled number

9    of shares beneficially owned by each reporting person with,

10   under the sole voting power, how many shares are listed there?

11   A    375,000.

12              (Transcript continues on next page.)

Oremland - Direct - Kasulis                    4176

1   BY MS. KASULIS:

2   Q    And if we go to Item No. 11, the aggregate amount

3   beneficially owned by each reporting person, what is listed

4   there?

5   A    75,000 shares.

6   Q    And for Item 13, the percent of class represented by

7   amount in Row 11, what is the percentage there?

8   A    4.5 percent.

9   Q    If we go to Page 5 of this document, for Item No. 1 what

10  is the name of the reporting person?

11  A    MSMB Healthcare, LP.

12  Q    And for Item No. 4, what is the source of funds?

13  A    Working capital.

14  Q    And in the section entitled number of shares beneficially

15  owned by each reporting person with Item No. 7, sole voting

16  power, how many shares were listed there?

17  A    473,274 shares.

18  Q    And Item 11, the aggregate amount beneficially owned by

19  each reporting person, how many shares are list there?

20  A    473,274 shares.

21  Q    And Item No. 13, the percent of class represented by

22  amount in Row 11?

23  A    5.68 percent.

24  Q    Now, directing your attention to Page 8 of this document,

25  who is listed there as for Item No. 1 under name of reporting

LAM      OCR      RPR

1    persons?

2    A    Martin Shkreli.

3    Q    And if we go to Item No. 4, source of funds, what is

4    listed there?

5    A    PF, which is personal funds, and O which is other.

6    Q    And in the section entitled number of shares beneficially

7    owned by each reporting person with Item 7, for sole voting

8    power, how many shares are listed there?

9    A    2,531,920 shares.

10   Q    For Item No. 8, shared voting power, what is listed

11   there?

12   A    848,687 shares.

13   Q    And what does the shared voting power section denote?

14   A    That's the amount of other shares that he controls, that

15   the other entities in this document have.

16   Q    And then if we look at the Item 11, aggregate amount

17   beneficially owned by each reporting person, what is listed

18   there?

19   A    3,380,607 shares.

20   Q    And, so, what does this total number of shares mean?

21   A    That's the amount that he owns personally and in the

22   aggregate with all the other entities.

23   Q    And for Item 13, percent of class represented by amount

24   in Row 11, what is listed there?

25   A    40.54 percent.

Oremland - Direct - Kasulis                4178

1    Q    Based on your review of the transfer records in

2    Government Exhibit 608, are there -- are these shares

3    restricted?

4    A    Yes.

5    Q    Let's look at Page 9 of this document.  If we look at the

6    bottom item, number three, Item No. 3 is entitled source and

7    amount of funds or other consideration.  And does this

8    paragraph then explain the reverse merger process that we've

9    discussed this morning?

10   A    Yes.

11   Q    If we go to the next page, the continuation of this

12   section, if we look at the first four paragraphs, it appears

13   that each of these paragraphs explain the number of shares

14   owned or controlled prior to the reverse merger and then after

15   the reverse merger; is that correct?

16   A    Yes.

17   Q    So in the middle of the first paragraph, starting as a

18   result of merger, it states:  As a result of the merger,

19   Mr. Shkreli's Retrophin common stock and unvested shares of

20   Retrophin common stock converted into 2,531,920 shares of

21   common stock.  The shares of Retrophin common stock held by

22   Mr. Shkreli prior to the merger were purchased by Mr. Shkreli

23   with his personal funds.

24              Did I read that correctly?

25   A    Yes.

1  Q    Now, can you please read the next paragraph in its

2  entirety for the jury?

3  A    Immediately prior to the effective time, MSMB Healthcare

4  held 30,000 shares of Retrophin common stock and 46,182 shares

5  of Retrophin preferred stock, which were canceled.  As a

6  result of the merger, MSMB Healthcare's Retrophin common stock

7  in Retrophin preferred stock converted into 473,274 shares of

8  common stock.  The shares of Retrophin common stock and

9  Retrophin preferred stock held by MSMB Healthcare prior to the

10 merger were purchased with working capital.

11 Q    And in the next paragraph, it talks about how MSMB

12 investors have held approximately 59 shares of Retrophin

13 preferred stock which was then converted into 413 shares of

14 common stock; is that right?

15 A    Yes.

16 Q    If we look at the final paragraph can you please read

17 that paragraph to the jury?

18 A    Immediately prior to the effective time, MSMB Capital,

19 LP, held 75,000 shares of Retrophin common stock which were

20 canceled.  As a result of the merger, MSMB Capital, LP's,

21 Retrophin common stock converted into 375,000 shares of common

22 stock.  The shares of Retrophin common stock held by MSMB

23 Capital, LP, prior to the merger were purchased with working

24 capital.

25 Q    And, again, this working capital, what does "working

Oremland - Direct - Kasulis                    4180

1    capital" mean?

2    A    That's money from the company.

3    Q    And if we turn to the next page -- I'm sorry, Page 12 of

4    this document, Item No. 6, just at the very top there, Item

5    No. 6 is contracts, arrangements, understandings, or

6    relationships with respect to securities of the issuer.

7              Can you please read that sentence there?

8    A    There are no contracts, arrangements, understandings, or

9    relationships, legal or otherwise, between the reporting

10   persons and any person with respect to securities of the

11   issuer.

12   Q    And if we turn -- what does that sentence mean?

13   A    It means there are no other arrangements, contracts,

14   between the people listed or entities listed in this filing

15   and anyone else with regard to securities from Retrophin.

16   Q    And if we turn to the next page of this document, this

17   appears to be the signature page.  What is the date on this

18   page?

19   A    December 20, 2012.

20   Q    And for all of the entities listed here, MSMB Capital

21   Management, LLC; MSMB Capital, LP; MSMB Healthcare, LP; MSMB

22   Healthcare Investors, LLC; MSMB Healthcare Management, LLC;

23   and then individually Martin Shkreli, who signs on behalf of

24   all of these entities and Mr. Shkreli as an individual?

25   A    Martin Shkreli.

Oremland - Direct - Kasulis                          4181

1   Q     Now, I'm showing you what's in evidence as Government

2   Exhibits 605.  Can you please explain this document to the

3   jury?

4   A     This is also a Schedule 13 -- it's an amendment to the

5   13D we were just looking at.

6   Q     What does an amendment mean?

7   A     There was a change to the filing.

8   Q     And who is it on behalf of?

9   A     Retrophin.

10  Q     And who is the individual who filed this document?

11  A     Martin Shkreli.

12  Q     Do you have an understanding as to why there was an

13  amendment filed -- first of all, what's the date on this

14  document?

15  A     February 19, 2013.

16  Q     And in your review of the documents in this case, do you

17  have an understanding as to why this amended 13D was filed?

18  A     Yes.  There was a private placement.

19  Q     What is a "private placement"?

20  A     That's when a company sells its shares to a limited

21  amount of people.  It's not a public offering.

22  Q     And under Form SC13D/A, does that signify this is an

23  amendment to the 13D?

24  A     Yes.

25  Q     And in parentheses, it states:  Amended statement of

Oremland - Direct - Kasulis                4182

1    beneficial ownership?

2    A    Yes.

3    Q    Here at the top, it's for Retrophin, Inc.  Is this after

4    Retrophin had officially changed its name?

5    A    Yes.

6    Q    If we go to the second page of this document, the middle

7    of this screen, is this the sort of the same list of entities

8    that had been listed in the prior 13D that we've reviewed?

9    A    Yes.

10   Q    And what is the date of this filing?

11   A    February 14, 2013.

12   Q    If we go to the third page of this document --

13              MS. KASULIS:  We can zoom in a little, please.

14   Q    For Item No. 1, the name of the reporting persons what is

15   listed there?

16   A    MSMB Capital Management, LP.

17   Q    And if we look at Item No. 11, aggregate amount

18   beneficially owned by each reporting person, how many shares

19   are listed there?

20   A    Zero shares.

21   Q    And if we look at Item 13, percent of class represented

22   by amount in Row 11, what is listed there?

23   A    Zero percent.

24   Q    And, so, was there a change between these two filings

25   with respect to MSMB Capital Management's ownership of shares

Oremland - Direct - Kasulis                    4183

1    in Retrophin?

2    A    Yes.

3    Q    And what is that change?

4    A    Well, they had shares previously; and as of this point,

5    they had no shares.

6    Q    If we can go to the fifth page of this document, for Item

7    No. 1, what is the name of the reporting persons listed there?

8    A    MSMB Healthcare, LP.

9    Q    And if we look at the section entitled number of shares

10   beneficially owned by each reporting person with Item No. 7,

11   the sole voting power, how many shares are listed there?

12   A    473,274 shares.

13   Q    And Item No. 11, the aggregate amount beneficially owned

14   by each reporting person?

15   A    473,274 shares.

16   Q    And is this the same number of shares that we saw in the

17   prior 13D filing that we reviewed?

18   A    Yes.

19   Q    And if we look at Item 13, percent of class represented

20   by amount in Row 11, what is listed there?

21   A    4.05 percent.

22   Q    In the prior document, this item number was 5.68 percent.

23   If there's the same number of shares, why is the percentage

24   lower?

25   A    Because the company issued more shares in its private

LAM       OCR       RPR

Oremland - Direct - Kasulis                    4184

1   placement.

2   Q    And if we go to Page 8 of this document, who is listed

3   here under Item 1, name of reporting persons?

4   A    Martin Shkreli.

5   Q    And if we look at the section entitled number of shares

6   beneficially owned by each reporting person with Item 7, what

7   is the sole voting power listed there?

8   A    2,713,520 shares.

9   Q    And for Item 8 it says shared voting power.  What is

10  listed there?

11  A    473,687 shares.

12  Q    And what does that mean again, the shared voting power?

13  A    That's the total amount of shares that are owned by the

14  other entities as documented.

15  Q    And for Item No. 11, aggregate amount beneficially owned

16  by each reporting person, what is listed there?

17  A    3,187,207 shares.

18  Q    And in Item 13, the percent of class represented by

19  amount in Row 11, what is listed there?

20  A    27.17 percent.

21  Q    And, again, why -- based on your review of the documents,

22  why is there a decline in the percentage owned?

23  A    Because there was a private offering.  There were more

24  shares issued.  And then the other shares that MSMB Capital

25  had, it no longer had.

Case 1:15-cr-00637-KAM   Document 298   Filed 08/01/17   Page 38 of 339 PageID #: 5156

1  Q    If we can look at Page 9 of this document, under Item 3,

2  source and amount of funds or other consideration, can you

3  please read the section starting on February 14, 2013?

4  A    On February 14, 2013, Mr. Shkreli purchased 120,000

5  shares of common stock in common stock purchase warrants to

6  purchase 60,000 shares of common stock, the warrants, from the

7  issuer for an aggregate purchase price of $360,000.  The

8  warrants are exercisable at any time upon the election of the

9  holder beginning on the date of issuance and ending on the

10 fifth anniversary of the date of the issuance and initial

11 exercise price per share of $3.16 subject to adjustment as

12 provided therein.  The source of funds used by Mr. Shkreli to

13 purchase such securities was his personal funds.

14 Q    Just very generally, what is a "warrant"?

15 A    Warrant gives you the right, but not the obligation, to

16 purchase stock.

17 Q    And if we can turn, then, to Item 5, the next page of

18 this document, it's entitled interest and securities of the

19 issuer and it lists here the reporting persons and then the

20 beneficial ownership of common stock; do you see that?

21 A    Yes.

22 Q    And all the reporting persons are listed there, including

23 MSMB Capital, LP; MSMB Healthcare; and Martin Shkreli; is that

24 correct?

25 A    Yes.

1  Q    Can you please read this one bullet point underneath this

2  section for the jury?

3  A    Based on 11,672,167 shares of common stock outstanding

4  following the private placement, which figure reflects

5  8,338,836 shares of common stock as reported in the issuer's

6  current report on Form 8K, filed on December 19, 2012; and,

7  two, an aggregate of 3,333,331 shares of common stock issued

8  subsequent thereto as reported in the issuer's current report

9  on Form 8K, filed by the issuer on February 19, 2013,

10  consisting of 272,221 shares of common stock issued in certain

11  private placement transactions in January 2013, and 3,061,110

12  shares of common stock issued in connection with the private

13  placement.

14  Q    And if we then go to the next page, under Item 6,

15  entitled contracts, arrangements, understanding, or

16  relationships with respect to securities of the issuer, it

17  states that Item 4 of Schedule 13D is hereby amended and

18  supplemented as follows, and there's a paragraph here

19  regarding the issuer entering into a registration rights

20  agreement.

21        Can you please explain this paragraph to the jury?

22  A    This is just saying that the company is agreeing to file

23  the registration statement with the SEC for the shares that

24  were issued in the private placement.

25  Q    And based on your review of the documents, was a

1  registration statement filed in relation to these shares?

2  A    Yes.

3  Q    And if we look -- is this in relation to the private

4  placement in February 2013 time period we discussed?

5  A    Yes.

6  Q    And if we look at the last page of this document -- and,

7  again, is this a signature page for the document?

8  A    Yes.

9  Q    And for all of the entities listed, including MSMB

10 Capital Management, LP, and MSMB Healthcare, LP, and for

11 Martin Shkreli, who signs for all of these entities and the

12 individual?

13 A    Martin Shkreli.

14 Q    And what is the date on this document?

15 A    February 19, 2013.

16 Q    We can put this document aside.

17         Ms. Oremland, did you review the trading in

18 Retrophin after the reverse merger?

19 A    Yes.

20 Q    And what data did you rely on for your review?

21 A    Bloomberg price and volume data and blue sheet data.

22 Q    Did you create a summary and chart of your analysis?

23 A    Yes.

24 Q    I'm showing you what's in evidences Government 702.  It's

25 behind Tab 4 of your binder.  This chart is entitled Retrophin

Oremland - Direct - Kasulis                    4188

1   Inc., RTRX --

2              Is that the ticker symbol?

3   A    Yes.

4   Q    Daily closing prices and select account analysis,

5   December 17, 2012 through February 28, 2013.

6              Can you please explain this chart to the jury?

7   A    Sure.  This chart shows the daily closing prices and a

8   comparison of the volume between what some select accounts

9   bought and sold versus the rest of the market.

10             And the way to read this, going from left to right,

11  so the left-hand side, that column refers to the share volume,

12  so the volume of shares that were traded.  And that

13  corresponds with the red and green bars.  So, the green

14  portion of the bars show the trading that's attributable to

15  the select accounts.  These select accounts are listed in the

16  green box on this chart, and they include Martin Shkreli and

17  Kevin Mulleady, Andrew Vaino, Marek Biesteck, Edmund Sullivan,

18  Claridge Capital, LLC, and Thomas Fernandez.

19  Q    And who asked you to isolate these individual accounts in

20  the green box?

21  A    You did.

22  Q    Meaning the Government?

23  A    The Government did.

24             Then if you look at the chart all the way to the

25  right, that corresponds with the closing price.  And that's

LAM      OCR      RPR

Oremland - Direct - Kasulis                    4189

1  shown with the blue line.  So, the blue line tracks the price

2  and the bars track the volume.

3  Q    And, so, the green is the amount for the total.  So, in

4  one of the columns, for example, the green amount denotes the

5  amount of trading attributable to those select accounts and

6  the red amount is attributable to the remainder of the

7  accounts that traded in the stock that day?

8  A    That's right.

9           And of the green select accounts, the last three

10  names listed in the box, they did not trade during this

11  period.  So, Edmund Sullivan, Claridge Capital, Thomas

12  Fernandez, to my knowledge.

13  Q    In terms of this date range, again, why did you select

14  the date range?

15  A    The Government asked me to.  It's right after the reverse

16  merger.

17  Q    And you have -- it looks like four different instances of

18  MS doing trading.  Who is "MS"?

19  A    Martin Shkreli.

20  Q    And for example, this first -- all the way to the left,

21  can you please explain this first trade?

22  A    So on that day, the 17th of the December, 2012, Martin

23  Shkreli bought 100 shares of Retrophin at $7.69, and that

24  trade represented 100 percent of the trades that day.

25  Q    And then if we go to the next Martin Shkreli listing?

Oremland - Direct - Kasulis                4190

1  A     On the 26th of December, he bought 100 shares at $3.55

2  cents.

3  Q     And when you say the 26th of December, is that 2012?

4  A     Yes.

5  Q     And the next indicator for Mr. Shkreli?

6  A     On February 12, 2013, he bought a total of 1,400 shares

7  at -- 1,000 the $3.55 and 400 at $3.75.

8  Q     And the next listing there for Mr. Shkreli?

9  A     February 20, 2013.  He bought 420 shares at $4 and 700

10  shares at $4.26.

11  Q     So, with respect to this first listing for Mr. Shkreli on

12  December 17, 2012, the price was $7.69; is that correct?

13  A     Yes.

14  Q     What is the general trend of the price of Retrophin

15  shares after that on this chart?

16  A     It trends downward from that day, but it generally -- it

17  fluctuates some, but it ranges between $3 and maybe a little

18  bit above $5.

19  Q     Where did it end up according to this chart?

20  A     It ended up around less than 4.50.

21  Q     $4.50 a share?

22  A     Yes.

23  Q     In your experience, is this a heavily-traded stock during

24  this time period.

25  A     No, there's not a lot of share volume.

Oremland - Direct - Kasulis                    4191

1   Q    And were you then able to review the trading in Retrophin

2   shares over a broader period of time?

3   A    Yes.

4   Q    I'm showing you what's in evidence as Government Exhibit

5   703.  It's behind Tab 5 of your binder.

6            (Exhibit published to the jury.)

7   Q    This chart is entitled Retrophin, Inc., RTRX, daily

8   closing prices and share volume, December 17, 2012, through

9   September 30, 2014.  Can you please explain this chart for the

10  jury?

11  A    Sure.  This is the price and volume for Retrophin during

12  this period.  And, again, reading from left to right, the

13  first column refers to the share volume, and that's shown with

14  the blue lines on this chart.  And then all the way on the

15  right, that refers to the closing price and that's shown with

16  the red line.

17            THE COURT:  When you say "first column," do you mean

18  the axis on the vertical?

19            THE WITNESS:  Yes, your Honor.

20  Q    And can you explain the 2013 time period versus the 2014

21  time period on this chart?

22  A    Well, in 2013 -- an extension of what we saw before.  It

23  wasn't very heavily traded and the price, you know, it

24  fluctuated a bit, but it's -- it seemed to trend upwards

25  towards the end of 2013.  But once -- really starting around

1  December, end of December, 2013, going forward, the price and

2  volume increase.

3  Q    And what was the highest share price as listed on this

4  chart?

5  A    It got to a high of $23.36 on April 2, 2014.

6  Q    And what was the trend of the share price after that

7  point in time as listed on the chart?

8  A    It trended downward from there.  And by the end of the

9  period on this chart, it was at less than $10.

10           MS. KASULIS:  One moment, your Honor.

11           (Pause in proceedings.)

12           MS. KASULIS:  No further questions, your Honor.

13           THE COURT:  All right.  Thank you.

14           Would the jurors like a mid-morning break right now?

15           Please don't talk about the case, and we will come

16  retrieve you when you are ready to return.

17           (Jury exits.)

18           THE COURT:  Let's take about ten minutes, please.

19           (Recess taken.)

20           (Jury enters.)

21           THE COURT:  Ms. Zellan, would you like to cross?

22           MS. ZELLAN:  Thank you, your Honor.

23  CROSS-EXAMINATION

24  BY MS. ZELLAN:

25  Q    Good morning, Ms. Oremland.  My name is Susan Zellan, and

Oremland - Cross - Zellan                    4193

1    I'm representing, along with my colleagues, Martin Shkreli.  I

2    just have a few questions for you this morning.  If I say

3    anything or ask you a question that's unclear, please let me

4    know, and I will work to clarify the question.

5    A    Okay.  Thank you.

6    Q    During your direct examination, you went over a number of

7    documents that were filed before the Securities and Exchange

8    Commission; is that correct?

9    A    Yes.

10   Q    And those documents were filed on behalf of Desert

11   Gateway and on behalf of Retrophin; is that correct?

12   A    Yes.

13   Q    And the documents that are filed before the SEC are

14   relied upon by the public; is that right?

15   A    Yes.

16        Actually, they were all Retrophin documents because

17   at that time it had -- the reverse merger had occurred, so,

18   really, it's all Retrophin documents.

19   Q    Fair enough, fair enough.

20        And it's important that documents that are filed

21   with the SEC are accurate; is that right?

22   A    Absolutely.  They have to be accurate and they have to be

23   complete.

24   Q    And the SEC and FINRA and the public all rely on those

25   documents; is that right?

Oremland - Cross - Zellan                4194

1    A    Yes.

2    Q    And a board of directors is obligated to make sure those

3    documents are accurate; is that right?

4    A    I am not sure.  The board of directors of a company might

5    not -- like, each individual of the board might not review all

6    the documents that are filed by the company with the SEC.  The

7    board is kind of -- they're pretty high level.  And the

8    officers and directors of the company, those are the

9    individuals, the CEO and the CFO, they're the ones who are

10   signing the filings before they file them with the SEC.

11        So, I can't say whether all the board reviews them.

12   Q    Let me stop you there.

13        In the event a document is sent to a member of the

14   board of directors, it's important for that particular member

15   if they're being asked to review that document to, in fact,

16   review it; is that fair to say?

17             MS. KASULIS:  Objection, your Honor.

18             THE COURT:  Sustained.  You can rephrase the

19   question, if you can.

20             MS. ZELLAN:  One moment, your Honor, please.

21             (Pause in proceedings.)

22             THE COURT:  You know, Ms. Zellan and the Government,

23   maybe we should have a little sidebar; do you mind?

24

25             (Continued on next page.)

```
                            Sidebar                      4195
```

1          (The following occurred at sidebar.)

2          THE COURT:  My concern is that you have all

3    advocated very well, circumscribed this witness' testimony,

4    and you're seeking what appear to be opinions and her

5    knowledge and experience based on what the market should look

6    like.  So, I don't know whether you really want to go there.

7    I think that if you do, in fairness to the Government, on

8    redirect they will be able to go into some opinions.  So, I

9    just wanted to bring that to your attention.

10          MS. ZELLAN:  I appreciate that.

11          THE COURT:  It's your cross.  You can do what you

12   want as long as it's not an objectionable question, but I

13   think you're treading --

14          MS. ZELLAN:  I'm getting close to the line, in your

15   opinion.  I appreciate that because I don't intend to elicit

16   an opinion.  But I think my view of the question is that it

17   would be something that is basic, the same way a definition of

18   a restricted stock would be basic, whether or not the board of

19   directors would be obligated to disclose it.

20          So, I'll rephrase the question to make it more

21   specific and just ask it in a way that doesn't look for her to

22   offer her opinion.

23          THE COURT:  If there are certain documents that you

24   think required signatures by officers who were also members of

25   the board, that would be all right to focus her because she

Sidebar                                                 4196

1   has looked at that and it's part of her review and she should

2   be competent to testify based on her knowledge and review of

3   the documents.

4         I was concerned in the abstract.  As you were posing

5   the question, it was going a little off the path.

6         MS. ZELLAN:  I could ask if there's a document that

7   is signed by a member of the board, it would be a

8   representation that the board member reviewed the documents

9   for accuracy.

10        THE COURT:  That's sort of too nebulous.  You need

11  to focus her on the document and see what the signature

12  represents based on the language on the document and if it's a

13  filing.

14        MS. ZELLAN:  Okay.

15

16        (Continued on next page.)

17

18

19

20

21

22

23

24

25

Oremland - cross - Zellan                    4197

1          (Sidebar ends; in open court.)

2     BY MS. ZELLAN:

3     Q    Ms. Oremland, do you know whether or not attorneys for

4     Retrophin participated in the preparation and filing of

5     Government Exhibit 601?

6     A    No.

7     Q    Do you know whether or not attorneys for Retrophin

8     participated in the preparation and filing of Government

9     Exhibit 602?

10    A    No.

11    Q    Same question with respect to Government Exhibits 603 and

12    604.

13    A    No.

14    Q    With respect to Government Exhibit 701 that you prepared,

15    you have no understanding as to why the individuals in red

16    were granted stock by Retrophin, do you?

17    A    No.

18    Q    And with respect to the chart you prepared, Government

19    Exhibit 703 --

20          MS. ZELLAN:  It's already been admitted into

21    evidence.

22          (Exhibit published to the jury.)

23    Q    -- the names of the individuals highlighted in green

24    here -- Martin Shkreli, Kevin Mulleady, Andrew Vaino, Marek

25    Biestek, Edward Sullivan, Claridge Capital, Thomas

LAM      OCR      RPR

Oremland - cross - Zellan                    4198

1   Fernandez -- you don't know any of those people?

2   A    No.

3   Q    And you have not talked to any of those people, have you?

4   A    No.

5   Q    You don't know why anyone bought during this period of

6   time, bought Retrophin shares during this period of time, do

7   you?

8   A    No.

9   Q    And you don't know why anybody may have sold during this

10  period of time.

11  A    No, I mean, not beyond maybe they wanted to --

12  Q    No, no, specific.  That's it.

13          With respect to Government Exhibits 630 and 631 that

14  were admitted into evidence during your direct, Government 702

15  is a representation from 630 -- Government Exhibit 630; is

16  that fair to say?

17  A    Is that the blue sheet data?

18  Q    Correct, I'm sorry, Government Exhibit 630 is the blue

19  sheet data from December 17, 2012, through February 28, 2013;

20  is that correct?

21  A    I think that the first -- that that exhibit cuts off on

22  February 20.

23  Q    And then we move to Exhibit 631 to get the remainder of

24  February?

25  A    Yes.

Oremland - cross - Zellan                    4199

1   Q     Correct.  Thank you for the clarification.

2          So, from those two exhibits you prepared Government

3   Exhibit 702.

4   A     Yes, I used that data as well as Bloomberg price and

5   volume data to get the closing prices and total market volume.

6   Q     Those original sheets show buying of Retrophin shares; is

7   that right?

8          Just buying, buying, individual transactions where

9   individuals have made purchases of Retrophin shares, are

10  reflected in Government Exhibits 630 and 631?

11  A     Yeah, it's buying and selling.

12  Q     Is there also short selling reflected in those blue

13  sheets?

14  A     If there was short selling, it would be reflected in the

15  blue sheets.  I just don't recall if there was.

16  Q     The original sheets for the time period reflected in this

17  chart show individual transactions; is that fair?

18  A     Yes.

19  Q     And each transaction represents a buy or a sell or a

20  short sale; is that right?

21  A     Yes.

22

23          (Continued on next page.)

24

25

Oremland - cross - Zellen                    4200

1              (Continuing.)

2    BY MS. ZELLEN:

3    Q    Do you know for this time period how many individual

4    transactions there were?

5    A    No.

6    Q    Would you accept my representation that there were

7    approximately 3,243?

8              MS. KASULIS:  Objection, Your Honor.

9    Q    Approximately.

10             THE COURT:  I'll overrule the objection.

11             If you know.

12   A    I don't know.

13   Q    Do you know whether or not the green bars in your chart

14   when put together would represent 132 transactions?

15   A    I don't know.

16   Q    Did the Government ask you to look at Tim Pierotti?

17   A    No.

18   Q    You're familiar with the SEC whistleblower program; is

19   that correct?

20   A    Generally.

21             MS. KASULIS:  Objection, Your Honor.

22             THE COURT:  Sustained.

23             MS. ZELLEN:  The basis of the objection, Your Honor?

24             MS. KASULIS:  Relevance and foundation.

25             THE COURT:  It goes beyond the direct.

Oremland - cross - Zellen                4201

1         MS. ZELLEN:  May we have a sidebar?

2         THE COURT:  Sure.

3         (Continued on next page.)

```
                         Sidebar                        4202
```

1          (The following occurred at sidebar.)

2          MS. ZELLEN:  There's been testimony about SEC

3    whistle blowers in this case and I anticipate there may be

4    some testimony along those lines with the next witness.

5          This is the last line of questioning I have.  I'm

6    not looking for her to do anything other than ask her four or

7    five questions about the SEC's whistleblower program.

8          MS. KASULIS:  It's outside the scope of the direct.

9    She's not from the SEC.  She's from FINRA.  It's a different

10   private organization separate and apart from the SEC.  It's a

11   private agency that works hand in hand with the SEC.

12         MS. ZELLEN:  But, you know, just what she knows

13   about -- basic information about the whistleblower program;

14   that people can make complaints and if the complaints result

15   in a recovery, people are entitled to make a claim for up to

16   30 percent of what is recovered.

17         THE COURT:  I guess my concern is that she is not

18   part of the SEC.  I don't know if she is authorized by her job

19   to speak with the SEC.  It is a separate, private entity.

20         Do you know whether she is allowed to speak with the

21   SEC?

22         MS. KASULIS:  I do not.

23         THE COURT:  She did testify to some extent about the

24   various forms, so chances are she does know something about

25   the program, but it would be better to have an SEC

                          Sidebar                      4203

1    representative on this issue.

2            MS. KASULIS:  I would say the filings are separate

3    and apart from the SEC program.  The whistleblower program

4    seems to be a separate topic beyond the scope of what her

5    examination was about.

6            MS. ZELLEN:  SEC witnesses are beyond our control,

7    so I don't know --

8            MS. KASULIS:  That's not true.

9            THE COURT:  They can subpoena an SEC witness.  Why

10   don't you do that?  If you need a trial subpoena, I will sign

11   it, but it seems to me it is sort of outside her purview and

12   outside the scope of the direct.

13           I understand the whistleblower program has been

14   raised in this case, but I do not think she is the right

15   witness for this.

16           MR. AGNIFILO:  Would Your Honor be open to a

17   question like, are you familiar with the program, and if the

18   answer is no, we're done?

19           The only reason is that there's certain definitional

20   things you guys got out.  We're not changing the playing field

21   markedly.  We're just adding a concept.

22           MS. ZELLEN:  One additional concept.

23           MR. AGNIFILO:  An and if she says she's familiar --

24           MS. KASULIS:  If you asked me if I was familiar with

25   the whistleblower program, I would say yes because I know of

Sidebar                                          4204

1    it.  I understand it.

2         I think the question is beyond the scope of the

3    direct and it's not within our purview to know the details

4    specifically about broad and general questions about if

5    someone gets -- if there's a claim and if there's money

6    recovered, these sorts of generalities, then could that person

7    receive money.  It's all hypotheticals and I think the

8    hypothetical part of that is a problem.  And separate and

9    apart from that, she's not the witness to have the knowledge

10   to know that.

11        THE COURT:  My concern would be she is making

12   statements that are statements that are part of the public

13   record and she is speaking about a program of an agency that

14   she is not a part of.  Granted, they work together, but her

15   responsibilities are limited to reporting and the analysis of

16   data and enforcement actions.

17        So I am just concerned about the problems it may

18   create for her and her FINRA private agency vis-à-vis the SEC.

19   I think you are better off getting an SEC witness to come in

20   and tell us about that program or is maybe you can stipulate

21   to certain things with the Government.

22        MS. KASULIS:  We can talk.  We can do that.  Thank

23   you, Your Honor.

24        MS. ZELLEN:  Thank you.

25        (End of sidebar.)

Pierotti - direct - Smith                    4205

1   BY MS. ZELLEN:

2   Q    Thank you very much, Ms. Oremland.  I have no further

3   questions.

4              THE COURT:  Is there any redirect?

5              MS. KASULIS:  No, Your Honor.

6              THE COURT:  Ms. Oremland, thank you for your

7   testimony.  You may step down.

8              THE WITNESS:  Thank you, Your Honor.

9              (Witness leaves the stand.)

10             THE COURT:  Who is the Government's next witness?

11             MS. SMITH:  Your Honor, the Government calls Timothy

12  Pierotti.

13  T I M O T H Y   P I E R O T T I,

14             called by the Government, having been

15             first duly sworn, was examined and testified

16             as follows:

17             THE COURTROOM DEPUTY:  State and spell your full

18  name.

19             THE WITNESS:  My name is Timothy Pierotti,

20  T-I-M-O-T-H-Y.  Pierotti is P-I-E-R-O-T-T-I.

21             THE COURT:  Please proceed.

22  DIRECT EXAMINATION

23  BY MS. SMITH:

24  Q    Good morning, Mr. Pierotti.

25  A    Hi.

Pierotti - direct - Smith                    4206

1    Q    How old are you?

2    A    As of yesterday I'm 46 years old.

3    Q    Are you married?

4    A    I am.  I've been married for 21 years.

5    Q    Do you have any children?

6    A    I have four children, ages 20 to 12 or about to be 20 to

7    12.

8    Q    Where do you live?

9    A    I live in Summit, New Jersey.

10   Q    What is your current occupation?

11   A    I am the research product manager for Deutsche Bank.

12   Q    How long have you worked for Deutsche Bank?

13   A    Three and a half years now.

14   Q    Taking a step back, what is your highest level of

15   education?

16   A    I have a BA from Boston College.

17   Q    What is your degree in?

18   A    Political science.

19   Q    When did you graduate?

20   A    '94.

21   Q    What did you do after you graduated from college?

22   A    The first thing after college I worked -- I was leasing

23   apartments and working in politics and I decided that wasn't

24   going to work for very long and I did that only for a year

25   before moving to New York.

SN        OCR        RPR

Pierotti - direct - Smith                    4207

1  Q     What did you do when you moved to New York?

2  A     I got a job at Morgan Stanley.  I started out as a sales

3  assistant in private wealth management.

4  Q     How long were you with Morgan Stanley?

5  A     Seven years.

6  Q     What was the last position that you held with Morgan

7  Stanley?

8  A     I was an equity deal captain which means you work in

9  capital markets and you work on raising money for IPOs and

10  secondaries and then allocating that out to institutions and

11  retail customers.

12  Q     What year did you leave Morgan Stanley?

13  A     2002.

14  Q     Where did you work next?

15  A     Then I took a job with an entity called Victoire Finance.

16  Victoire Finance.  It was a customer that I had covered when I

17  had been in sales and he hired me to be an analyst and

18  portfolio manager.

19  Q     What were you a portfolio manager for?

20  A     Equities.

21  Q     What kinds of equities were in the portfolio?

22  A     All kinds.  It was a diverse book of mostly large cap

23  equities.

24  Q     And was Victoire finance a hedge fund?

25  A     A hedge fund, yes.

Pierotti - direct - Smith                    4208

1   Q      What was the size of the hedge fund?

2   A      It was about $50 million at the time.

3   Q      How long were you at Victoire Finance?

4   A      I was there for three years.

5   Q      And where did you go after Victoire Finance?

6   A      I was hired at the Galleon Group by a former boss at

7   Morgan Stanley who had since gone to Galleon.

8   Q      What was the Galleon Group?

9   A      Galleon Group was a 7 to $8 billion hedge fund.  It was

10  mostly a technology and healthcare fund.  I went there as a

11  consumer analyst and worked on an entity called The Admiral's

12  Fund.

13  Q      What does it mean to be a consumer analyst?

14  A      So I was responsible for looking at companies and making

15  recommendations for consumer statements companies, like

16  Colgate and Procter and Gamble, for building and building

17  products companies like Worldpool and Masco; and then also in

18  the auto space, everything from General Motors to BorgWarner.

19  Q      And how long were you at the Galleon Group?

20  A      I was there for a little less than four years.

21  Q      What were the circumstances that caused you to leave

22  Galleon?

23  A      Galleon's performance was poor in 2008.  My performance

24  was quite good in all the years, but as a portfolio manager in

25  '07 and '08 but they wanted -- like a lot of hedge funds at

1  the time, they had grown so big that they proliferated

2  portfolio managers because portfolio managers start to

3  struggle when the numbers get bigger:  250 million, 300

4  million, and they had grown so fast that they had added a

5  number of portfolio managers.

6          While when the performance weakened and money went

7  out of the fund in late '08, they didn't need as many

8  portfolio managers so they asked a lot of the sort of junior

9  portfolio managers of which I was one, to just go back to an

10 analyst role.  I really felt strongly that I wanted to be a

11 portfolio manager so we mutually agreed that I would leave at

12 the end of '08.

13 Q    While you were at the Galleon Group, were you ever asked

14 to engage in a trade that concerned you?

15 A    I was.

16 Q    What was the trade that concerned you?

17 A    The trade involved Smucker's; you know, the company that

18 sells jams and jellies.

19 Q    Who asked you to make the trade?

20 A    No one asked me to make the trade, but I was asked by the

21 founder of the fund, Raj Rajaratnam, if he was with us in a

22 meeting.  Raj had already made a large trade in Smucker's and

23 had asked me, are you with me, and I said, yes, small.

24 Q    And what about the trade concerned you?

25 A    I knew they were using -- and he told me that they were

Pierotti - direct - Smith                    4210

1   using information that was nonpublic.  I didn't think it was

2   material, but it was nonpublic.

3   Q    And when you say "nonpublic," what do you mean?

4   A    I mean that he had information given to him by a board

5   member of Procter & Gamble who was doing a transaction with

6   Smucker's.

7   Q    After you made the trade with Smucker's did you ever

8   bring your concerns about the trade to anybody?

9   A    I eventually reached out to -- I don't remember if I

10  reached out to the Southern District of New York or if I

11  reached out to the SEC, but I reached out and said I just

12  wanted to come forward and let them know exactly how it

13  occurred.

14  Q    When you say the "Southern District of New York" do you

15  mean the U.S. Attorney's office in Southern District of New

16  York New York?

17  A    Yes, yes.

18  Q    And when you say "the SEC" do you mean the Securities and

19  Exchange Commission?

20  A    I do.

21  Q    And what information did you provide to the SEC?

22  A    I basically told them everything that I knew about how

23  that transaction occurred, why that occurred and how I was

24  involved in it.

25  Q    And what information did you provide to the Southern

Pierotti - direct - Smith                    4211

1    District of New York?

2    A    I just told them the circumstances that occurred -- well,

3    I talked to them about other insider trading that I saw at

4    Galleon, but mostly I talked to them about the situation where

5    I was in the room with Raj Rajaratnam who had told knee in

6    that situation in that room that he had been given that

7    information by Rajat Gupta and that was -- and kind of the

8    circumstances that came to me trading in the is stock.

9    Q    And who is Rajat Gupta?

10   A    Rajat Gupta was a board member of Procter and Gamble and

11   Goldman Sachs and he was famous for being the head of the

12   McKinsey Group locally and he was a friend of Raj's.

13   Q    Was he is the source of the nonpublic information?

14   A    Yes.

15   Q    In connection with speaking to the Southern District of

16   New York, were you asked to testify at a trial?

17   A    I was.

18   Q    Which trial were you asked to testify at?

19   A    The prosecution of Rajat Gupta.

20   Q    And in connection with your anticipated testimony, did

21   you enter into any agreements with the Government?

22   A    I was given a non-prosecution agreement as it related to

23   the trading with Smucker's.

24   Q    And what is a non-prosecution agreement?

25   A    An agreement that as long as I told the truth, I wouldn't

1    be prosecuted for that trade.

2    Q    Did you ask to receive that agreement?

3    A    I don't think I did.  I didn't have an attorney.  I went

4    to the SEC and the DOJ, the Department of Justice, without an

5    attorney because I was anxious just to tell my side of the

6    story because I was concerned that there were others at

7    Galleon who would be less honest.

8    Q    And did you, in fact, testify at that trial?

9    A    I did not.

10   Q    Approximately when had you been scheduled to testify?

11   A    The day after I got the MPA.

12   Q    And do you remember approximately what month or year that

13   was?

14   A    You know, I don't.  I'm terrible with -- I remember

15   everything pretty well, but I don't remember the order of

16   things or the year.  Was it 2012?

17   Q    Is your memory that it was approximately 2012?

18   A    Let's see; yeah, I think it was 2012.

19   Q    Going back to your employment history, where did you work

20   after you were at the Galleon Group?

21   A    So after I left Galleon, a number of people who were

22   former Galleon employees went to work for a prop trading

23   business called Incremental Capital.

24   Q    What is a prop trading fund?

25   A    It's really like a hedge fund except you have a diverse

Pierotti - direct - Smith                              4213

1   group of traders.  Everybody has to be very market neutral.

2   In other words, your long exposure has to be the same as your

3   short exposure.  It's usually a smaller amount of money, but

4   with higher payouts for the traders.

5           So in most ways in the way I conducted my business,

6   it was very similar to how I behaved as a portfolio manager at

7   Galleon.

8   Q    And were you working trading consumer stocks there as

9   well?

10  A    Yes.

11  Q    How long did you work at Incremental?

12  A    About nine months.

13  Q    And why did you leave Incremental?

14  A    The founders of Incremental, one of the founders or two

15  of the founders or, actually, three of the founders, were all

16  prosecuted for insider trading with Raj from Galleon.

17  Q    And were you involved in any aspects of that conduct?

18  A    Zero.

19  Q    Where did you work after you left Incremental?

20  A    So after Incremental shut down with the founders being

21  prosecuted, some friends of mine got together and took a lot

22  of former Galleon traders because a lot people left Galleon,

23  and some of the Incremental traders pulled together a few

24  million dollars and started our own prop trading deck.

25  Q    And what was that called?

Pierotti - direct - Smith                    4214

1    A    Four Points Partners.

2    Q    And what was your role at Four Points Partners?

3    A    I was one of the founders and the manager.

4    Q    And what kind of stocks were you trading there?

5    A    The same thing I've always traded, consumer stocks.

6    Q    Are you familiar with the defendant Martin Shkreli?

7    A    I am.

8    Q    How did you meet Martin Shkreli?

9    A    I was introduced through a find friend of mine in Summit,

10   New Jersey, Tom Quinn.

11   Q    And what did you hear about Martin Shkreli?

12   A    Tom had told me that he was a very odd person, but he was

13   looking for a consumer portfolio manager and Tom gave him my

14   name and then I was also told by a person that I worked with

15   at G-2 -- Four Points Partners kind of took two lives.  We

16   were independent and costs were eating up, beside a bad P&L,

17   we see moved to G-2 where we were on a separate platform.

18   Q    And where did you first meet the defendant?

19   A    At the temporary office spaces that we had on -- that he

20   had on Madison Avenue.

21   Q    Who attended that meeting?

22   A    At the first meeting I think it was just Martin and I.  I

23   met Allison Russo who was his kind of assistant and then if

24   Kevin Mulleady was there, it's possible but I don't remember,

25   but I think I met Martin and Allison Russo that first day.

Pierotti - direct - Smith                    4215

1    Q    Who was Kevin Mulleady?

2    A    Kevin Mulleady was kind of a business manager.  He

3    carried the title of CEO of MSMB or COO of MSMB.

4    Q    So at that initial meeting, what did the defendant tell

5    you about the job for the consumer portfolio manager?

6    A    He told me that he was hiring two people; a consumer

7    portfolio manager and a commodities trader.  I was going to be

8    the consumer portfolio manager.  He wanted to create kind of a

9    suite of funds underneath the sort of MSMB brand.

10   Q    What did he tell you about the MSMB funds already in

11   existence?

12   A    He told me he had about 80 million.  He used -- and I

13   don't remember which number he used at that time, but there

14   were always, I always remember alternating numbers that he had

15   about 80 million or 100 million.

16   Q    Did you have an understanding of how many funds MSMB had

17   at that time?

18   A    I knew there was or I was told that there was his fund,

19   which was the healthcare fund and then there was an Isotope, a

20   fund called Isotope.  There was this guy that he hired to be a

21   CTA which had not yet started.  I think CTA is a commodities

22   trading advisor and you just trade commodities and we were

23   going to start MSMB Consumer.

24   Q    Do you remember whether Retrophin came up at that first

25   meeting?

Pierotti - direct - Smith                    4216

1   A    No, it did not.

2   Q    Did there come a time when you met with the defendant

3   again?

4   A    I would say a week later we had dinner.

5   Q    Who attended the dinner?

6   A    It was Marek Biestek and Kevin Mulleady and Martin.

7   Q    Who was Marek Biestek?

8   A    MSMB was Martin Shkreli Marek Biestek, so it was his

9   partner in the fund.

10  Q    Where did the meeting take place?

11  A    I recall it was an Italian restaurant on the upper east

12  side.

13  Q    Were the other three attendees at dinner Mr. Mulleady,

14  Mr. Biestek and the defendant, were they there the entire

15  time?

16  A    No.  When -- I think I got there first and I was at the

17  table and I saw is Martin and Marek come in and then about ten

18  minutes later -- and they were laughing about the fact that

19  they left Kevin waiting for a cab.  Martin said he got annoyed

20  with Kevin and so he just left him behind and then Kevin

21  showed up ten minutes later kind of like, what's going on, why

22  did you guys leave me.

23  Q    What did you discuss at the dinner?

24  A    We discussed MSMB Consumer and he asked me how much money

25  I could bring to the table and I said none.  He asked me how

Pierotti - direct - Smith                    4217

1    much money that I think I could raise and I made it clear that

2    I didn't think I could raise any money.  He was quite

3    confident that he could start me with $10 million to run a

4    portfolio and then quickly we would be $20 million.

5    Q    Did you and the defendant discuss your time at Galleon,

6    either at the initial meeting or at the dinner?

7    A    I'm sure we did.  Martin actually did a lot of work when

8    I started.  I had a lot of raw numbers of my track record, my

9    history as a portfolio manager, the performance numbers from

10   Galleon and from my previous employer Victoire Finance.

11            And he was very impressed with the numbers.  He was

12   enthusiastic.  He even said, I knew you were from Galleon and

13   I thought we could raise money off that, but now that I see

14   your performance, you know, I'm sure that we can raise money.

15   Q    And at the initial meeting and the dinner, were those the

16   first times you met the defendant in person?

17   A    Yes.

18   Q    Can you take a look around the courtroom and see if you

19   see the defendant here today?

20   A    Yes, he's right there.

21   Q    Can you identify him by a piece of clothing that he is

22   wearing?

23   A    He's standing up with blue shirt on.

24            THE COURT:  We will note that the witness has

25   identified Mr. Shkreli.

Pierotti - direct - Smith                4218

1    Q    After that initial meeting and dinner, did you agree to

2    take the job as the consumer portfolio manager?

3    A    I had another meeting with Kevin Mulleady where we made

4    the details, the compensation details, some up-front money and

5    then at that point we had agreed.

6    Q    I'm going to show you what's been marked for

7    identification as Government Exhibit 120-1 which is tab one in

8    the binder.  What is this document?

9    A    It's a portfolio management agreement where he agrees to

10   give me some up-front money and to pay me a salary.

11   Q    When you say "he," do you mean the defendant?

12   A    I do.

13   Q    Is it dated August 9, 2011?

14   A    Yes.

15        MS. SMITH:  Your Honor, the Government moves to

16   admit Government Exhibit 120-1 into evidence.

17        MR. AGNIFILO:  I object to the characterization of

18   the document that it's between the defendant and this witness.

19   It's between the company and the witness.

20        MS. SMITH:  I can clarify that right now.

21        THE COURT:  Yes, please.

22   BY MS. SMITH:

23   Q    Is this an agreement between MSMB Healthcare Management

24   LLC and yourself?

25   A    Yes.

Pierotti - direct - Smith                    4219

1           MR. AGNIFILO:  I have no objection.

2           THE COURT:  All right, we will admit Government

3    Exhibit 120-1.

4           (Government Exhibit 120-1 received in evidence.)

5    Q    And if we can focus in on the top half, is this the

6    agreement that you signed when you first started working for

7    MSMB Consumer?

8    A    Yes.

9    Q    And what's the date of the agreement?

10   A    August 9, 2011.

11   Q    And it says it's between MSMB Healthcare Management LLC,

12   a Delaware limited liability company with an address of 330

13   Madison Avenue, sixth floor, and yourself.

14           What was MSMB Healthcare?

15   A    My understanding is that was a hedge fund that Martin

16   ran.

17   Q    And is the address 330 Madison Avenue the address of the

18   offices where you worked?

19   A    I believe so, yes.

20   Q    And if you look at the second "Whereas" clause, if you

21   can read that, it says, "Whereas the company desires"?

22   A    "Whereas the company desires to employ the portfolio

23   manager to provide portfolio management services to the

24   company regarding the fund under the supervision of the

25   company on the terms set forth herein, the portfolio manager

Pierotti - direct - Smith                    4220

1    desires to be so employed by the company and act as portfolio

2    manager for the company on such terms."

3    Q    And was that your understanding of the scope of your

4    employment, to run the consumer -- the portfolio?

5    A    Yes.

6    Q    If you can turn to page three of the document and if we

7    can focus in on that middle section.

8    A    Yes.

9    Q    And, so, it says that there will be a base salary of

10   $10,000 per month; is that right?

11   A    Yes.

12   Q    And then there's some notations there that say two

13   checks, $15,000 and $15,000.  What are those referring to?

14   A    That was an up-front payment, a signing bonus, if you will.

15   Q    And who are the signatures on the right-hand side there?

16   A    Tim Pierotti.  I don't know if it's Kevin Mulleady or

17   Martin Shkreli.  That loss like Kevin Mulleady.

18   Q    And if you can look at the final page of the document

19   which is page ten.  And who is the document signed for on

20   behalf of MSMB Healthcare Management?

21   A    Kevin Mulleady.

22   Q    And is that your signature there as well?

23   A    It is.

24   Q    When you started in August of 2011 who else was working

25   in the offices of 330 Madison Avenue?

Pierotti - direct - Smith                    4221

1   A    We had a couple of different iterations of offices.

2   There was one main office that Martin was in that I was in

3   across from him.  Next to Martin -- so there were four people

4   in an office that was, like, 20-by-20 let's say.

5         And my desk faced Martin and then next to me a ways

6   over -- I don't remember if Kevin or Marek was in that desk

7   when I first started, but Allison Russo was in the desk next

8   to Martin.

9         There were four of us were in that room and then

10  there was an extra room where either Kevin or Marek were and

11  then the CTA was in the other room as well.

12  Q    When you say "the CTA," what do you mean?

13  A    I say "CTA."  He was our commodities trader.  He was in

14  that other room.

15  Q    What was his name?

16  A    I don't recall his name.

17  Q    What hours did you generally work during the period when

18  you first started?

19  A    8 to 5.

20  Q    Did you have the opportunity to observe the defendant

21  during the workday?

22  A    Sure.

23  Q    What did you observe him doing?

24  A    Well, at the time there was -- he had made this bid for

25  an entity called Amag Pharmaceuticals.  So he was talking

SN        OCR        RPR

Pierotti - direct - Smith                    4222

1    about Amag.  He was talking about this one company they had a

2    short, Mesoblast in Australia.

3            He was talking to investors.  I didn't see -- he was

4    kind of behind his desk and behind his whole, like, four

5    screens.  So I there was kind of a wall of screens in between

6    us and I had my screens in the same place, so I didn't see him

7    doing a whole lot.

8    Q    Other than the Amag transaction that you talked about and

9    the Mesoblast, did you ever hear him discuss particular stocks

10   or trading activity for his hedge funds?

11   A    I heard him talk about stocks certainly, but I didn't see

12   him trading or talking to brokers or anything like that.

13   Q    Was that different than any other hedge fund managers

14   that you worked with?

15           MR. AGNIFILO:  Objection to the form of the

16   question, on relevance.

17           THE COURT:  Try to rephrase it.

18   BY MS. SMITH:

19   Q    You testified you did not see the defendant trading?

20   A    Yes.

21   Q    What did you mean by that?

22   A    Normally at a hedge fund you would see people managing

23   their positions, managing risk, talking to brokers, buying and

24   selling stocks, things like that.

25   Q    And did you observe the defendant doing those things?

Pierotti - direct - Smith                    4223

1   A    No.

2   Q    Did the defendant ever discuss specific investors in his

3   hedge fund?

4   A    Sure.

5   Q    What investors did he mention?

6   A    He mentioned is Steve Richardson.  He mentioned Lindsay

7   Rosenwald.  He talked about -- it was never clear if people

8   were investors or not.  Colt Ventures guy, Blanton, Darren

9   Blanton.  We went and met with a guy who had a big position.

10  He met with an older gentleman whose name I can't remember.

11  Q    When you first started at MSMB Consumer, did you hear

12  about a company named Retrophin?

13  A    I didn't.

14  Q    When did you first here about Retrophin?

15  A    I don't know exactly when but sort of -- so I was there

16  from -- this agreement -- the agreement to start was August

17  2011.  I didn't start trading until October 2011 and so I

18  would guess I probably started to hear about Retrophin in the

19  spring of 2012, call it sort of March/April.

20  Q    Turning back to MSMB Consumer, you said that you didn't

21  start trading until October of 2012?

22  A    That's correct.

23  Q    Why is that?

24       THE COURT:  '12 or '11?

25  Q    I'm sorry, excuse me, October 2011.

Pierotti - direct - Smith                    4224

1    A     2011.

2    Q     So just --

3    A     Yeah, yeah.

4    Q     So just to make the record clear, you said that you

5    didn't start trading for MSMB Consumer until October of 2011.

6    Why was that?

7    A     Well, in the interim we put together all the different

8    documentation that you need to attract investors, a portfolio

9    management agreement, a pitch book, just the other things that

10   it was required to get a hedge fund up and running.

11   Q     And did those marketing materials include your background

12   at Galleon?

13   A     They did.

14   Q     Approximately how much money was in the fund when you

15   started trading in October of 2011?

16   A     To the best of my recollection it was $4 and a half million.

17   Q     What did the defendant tell you about where that money

18   came from?

19   A     My understanding was it was a carveout from the larger

20   healthcare fund.

21   Q     Were there any investors in MSMB Consumer?

22   A     MSMB Healthcare was the biggest investor and as I recall

23   Steve Richardson had a small investment as well.

24   Q     And what was the fund's -- and by "the fund" I mean MSMB

25   Consumer's, performance in the beginning of your employment

Pierotti - direct - Smith                    4225

1  say between August of 2011 and the end of the year of 2011?

2  A    It was very good because my biggest position -- I had an

3  8 percent position, which would be an unusually large position

4  for that type of portfolio, in a supermarket company called

5  Winn Dixie.

6  Q    How did that particular position perform?

7  A    They were bought so that particular position did very,

8  very well.

9  Q    And how was the performance of MSMB Consumer in the first

10 part of 2012?

11 A    We were approximately flat, as I recall, with the market,

12 so -- and then the money -- and then the market started

13 pulling money back early in the year, to the best of my

14 recollection maybe as early as March, so only five months in.

15 Q    When you say Martin started pulling money back, what do

16 you mean by that?

17 A    He just started redeeming money out of the fund.

18 Q    Did you know where the defendant was putting the money

19 from the fund?

20 A    No, Martin didn't talk to anybody about where money came

21 and went from.

22         THE COURT:  When you say this, you mean MSMB

23 Consumer?

24         THE WITNESS:  Yes.

25         MR. AGNIFILO:  I object.  I move to strike the

Pierotti - direct - Smith                    4226

1    answer of who Martin had spoke to.  If he has personal

2    knowledge of who Martin spoke to --

3               MS. SMITH:  Your Honor, can we do it at sidebar?

4               THE COURT:  Yes.

5               (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Pierotti - direct - Smith                4227

1          MR. AGNIFILO:  The basis of the objection is that

2     this witness blurted out Martin didn't talk to anybody about

3     the money.  He's not qualified to make such a conclusion.

4          THE COURT:  I think the question was did you know

5     what happened to the money that he redeemed and he said no.

6          MR. AGNIFILO:  I have no problem with the question.

7          MS. SMITH:  I can rephrase the question.

8          THE COURT:  Strike the answer.  You can re-pitch the

9     question.

10         MS. SMITH:  You can say did you know where the money

11    that the defendant transferred out of MSMB Consumer went.

12         MR. BRAFMAN:  I think that's what prompted the

13    answer that Martin didn't talk to anybody about --

14         MS. SMITH:  We can ask him yes or no.

15         THE COURT:  It might have been where did the money

16    go or do you know where the money went.  So I will instruct

17    the jury that they should disregard the witness' testimony

18    about Martin not talking to anybody and then you can re-ask

19    the question.  Is that all right?

20         MS. SMITH:  Yes.

21         MR. AGNIFILO:  Thank you, Judge.

22         (Sidebar ends.)

23

24

25

Pierotti - direct - Smith                              4228

1            THE COURT:  The Court will strike the witness'
2    testimony regarding that Martin didn't tell anybody about
3    where the money went.  The jury should disregard it.  It is
4    stricken from the record.
5    BY MS. SMITH:
6    Q    Mr. Pierotti, did the defendant tell you where the money
7    that he took out of MSMB Consumer went?
8    A    No.
9    Q    And after that period where the defendant was taking
10   money out of MSMB Consumer, I believe you said that was around
11   March of 2012; is that right?
12   A    I think so, yes.
13   Q    What happened with MSMB Consumer after that time?
14   A    So I had so little money that it's very hard to get -- if
15   you have $3 million and you want to build a fund, for a fund
16   to have any critical mass where you could make a living off of
17   it, you need at least call it 30 or $40 million.  No investor
18   wants to come in and be right away the largest investors.
19           MR. AGNIFILO:  I'm going to object to this as well.
20   Unless he's an expert witness in this area, what every
21   investor wants to do or not wants to do is not appropriate.
22           THE COURT:  Try to reframe the question as to what
23   his experience are given the facts as he experienced them at
24   MSMB Consumer at the time.
25   BY MS. SMITH:

Pierotti - direct - Smith                    4229

1    Q    Speaking specifically about the MSMB Consumer fund, after

2    the defendant took money out of the MSMB Consumer fund, what

3    was the performance of the fund like over the next few months?

4    A    Well, the performance of the fund was immaterial at that

5    point because what we had decided to do and Martin thought was

6    a great idea, was to go after a single-stock strategy.

7              So it was no longer -- it was no longer a regular

8    hedge fund portfolio.  We decided we were going to own a

9    concentrated position in one stock.

10   Q    What was that one stock?

11   A    The stock was Rick's Cabaret.

12   Q    And during your work at MSMB Consumer were you paid on a

13   regular basis?

14   A    Yeah, for a while.

15   Q    And where did your paychecks come from?

16   A    They would come from different entities and I must add I

17   didn't pay much attention to which entity they would come from.

18             THE COURT:  When you say different entities, do you

19   mean different MSMB entities?

20             THE WITNESS:  Yes.

21   A    Though eventually I think I did get a check from

22   Retrophin.  I think I might have gotten a check from Martin

23   Shkreli.

24   Q    When you say from Martin Shkreli, do you mean him

25   personally?

Pierotti - direct - Smith                4230

1  A    Yes.

2  Q    Returning to the summer of 2012 what happened with MSMB

3  Consumer?

4  A    All I had was the one position.  There was one other tiny

5  position that we had that -- but for the most part it was just

6  Rick's Cabaret and Martin asked me to liquidate that position.

7         So for a couple of days I was slowly selling the

8  position.  We had 200,000 shares, as I recall, of stock and

9  the stock only traded about 20 or 30,000 shares a day.

10        So in order to sell ten days worth of trading you

11 had to sell it very carefully and slowly or you were going to

12 push down the stock.

13 Q    Was there a sense of urgency to the request to liquidate

14 the stock in MSMB Consumer?

15 A    Yeah.  One day Martin came in and said, I want it all

16 sold today.  I need the money.

17 Q    What explanation, if any, did the defendant provide for

18 taking the steps to liquidate MSMB Consumer?

19 A    None that I recall.

20 Q    But after MSMB Consumer was liquidated -- and that was in

21 what time period would that have been?

22 A    July 2012.

23 Q    So after July of 2012, what was your job going to be

24 going forward?

25 A    He decided that we were going to do -- he wanted us --

and when I say "us" I mean me and Marek Biestek.

Q    When you say "he," are you referring to the defendant?

A    The defendant, yes, Martin.

            (Continued on next page.)

Pierotti - Direct - Smith                    4232

BY MS. SMITH:

Q    When you say, he, are you are referring to the defendant?

A    Martin, yes.  Martin wanted us to kind of look for

special projects, health care projects.  And the first one we

looked at was a cabinet maker for health labs.  It was up in

North Green Bay, Wisconsin.  We looked at that very briefly.

        Then, Marek and I spent a lot of time after that,

most of our time after that, looking at an asset in Heber

Springs, Arkansas called Garreco.

Q    Is this all taking place kind of late summer, early fall

of 2012?

A    Yes.

Q    Who was working in the office in that time period?

A    So at some point in that late summer, early fall they

moved the offices from the 330 Madison address to what was it,

right next to Smith & Wolenski on Third Avenue, the Avon

building.

Q    What were the circumstances of the move?

A    I remember coming in sort of midday, I don't know where I

had been in the morning and guys were packing-- their

computers and the flat screens into like rolling suitcases and

walking them out of the building.  Because they told me,

that--

        MR. AGNIFILO:  Objection to what they told him,

hearsay.

Pierotti - Direct - Smith                              4233

1              THE COURT:  Yes.

2    A    -- the people rolling.

3              THE COURT:  Do you know why this was happening?

4              THE WITNESS:  My understanding was the bills had not

5    been paid.

6    Q    When you say, the bills had not been paid, what are you

7    referring to?

8    A    Rent.

9              MR. AGNIFILO:  Your Honor, I am sorry, I object.

10   Can we have a sidebar?

11             THE COURT:  Yes.

12             (Sidebar.)

13

14

15

16

17

18

19

20

21

22

23

24

25

- Sidebar -                                            4234

1      MR. AGNIFILO:  I don't believe this is competent

2  evidence.  I mean he said, they told him.  That is obviously

3  the basis for his understanding, there is no other source for

4  his understanding.  He didn't say the defendant told him.  It

5  is not an admission.  It is hearsay being offered for the

6  truth.

7          The jury is now under the belief because of what

8  this witness testified, that as a matter of fact, these -- the

9  move was because bills were not paid, which is I think

10  something that could cast dispersions on Mr. Shkreli.

11          It is a hearsay answer.  When Your Honor stopped him

12  with the hearsay, he said what he understood.  He clearly

13  understands this based on what other people told him and it is

14  being offered for the truth.  My objection is hearsay.

15          It is also prejudicial and also irrelevant.

16          THE COURT:  I think Mr. Su testified to this

17  already.  Let's hear from the Government.  Can you elicit how

18  he knew this?

19          MS. SMITH:  Yes.  I think it was common knowledge in

20  the office, they were having money problems, generally his

21  fund had been liquidated, there were-- I mean, there is an

22  exhibit around the same time period which I can put in.  I was

23  not planning to.  It says to tighten the belt because there

24  was not a lot of money.

25          THE COURT:  Was that from Mr. Shkreli?

RB        OCR

                          - Sidebar -                    4235

1          MS. SMITH:  Yes.  So it goes to the general kind of

2    time frame.  Just sense of how much money was in the office,

3    then things were tight.

4          MR. AGNIFILO:  But tightening a belt and running out

5    on bills are two different things.  One is somewhat sort of--

6    tightening one's belt is sort of a responsible reaction to

7    lean times, running out on bills is immoral.

8          MR. BRAFMAN:  With respect to the landlord, this is

9    the second time we heard this.  There was a security deposit

10   which the landlord used to pay the final rent.  At the end of

11   the lease there is no rent owed to the landlord is my

12   understanding.

13         THE COURT:  Well, what is the source of his

14   understanding, otherwise we--

15         MS. SMITH:  I think generally the employees in the

16   office and they all -- may have been Marek Biestek.

17         THE COURT:  Neither Mr. Shkreli, Marek Biestek or

18   Mulleady told him.

19         MS. SMITH:  I think probably Marek Biestek or Kevin

20   Mulleady.

21         MR. BRAFMAN:  That is not a coconspirator statement.

22   Part of the conspiracy is not the non payment of rent.  For

23   co-conspiracy.  Is there an exception to hearsay.  Furtherance

24   of the conspiracy.  There is no overt act or method and means

25   that there was a non payment of rent.  It is not a-- it is

- Sidebar -                                              4236

1    gossip.  It is hearsay.

2           MS. SMITH:  Look, I think it goes to the color in

3    the office that there was not a lot of money floating around

4    this is what --

5           THE COURT:  Is it being offered for the truth?

6           MS. SMITH:  Yes, it is being offered for the truth.

7    I think it provides important context for his understanding of

8    how Mr. Shkreli's various businesses were performing.

9           That said, you know, obviously we elicited the facts

10   of the move.  I don't-- we can move on from the rent.

11          MR. AGNIFILO:  I would like his answer stricken.

12          THE COURT:  I will strike the part that says the

13   rent wasn't paid.  How is that?

14          MR. AGNIFILO:  Thank you.

15          MS. SMITH:  Just the specific part about the rent.

16          THE COURT:  Yes.

17          (Open Court.)

18

19

20

21

22

23

24

25

Pierotti - Direct - Smith                    4237

1          THE COURT:  The Court strikes the witness' testimony

2   about the rent, 330 Madison not being paid.  The jury will

3   disregard it.

4   BY MS. SMITH:

5   Q    After the move occurred, who was working in the office,

6   in-- early fall, 2012 time period.

7   A    Let's see, it was as I looked at the office, it was

8   Martin, it was Tom Fernandez, it was Kevin Mulleady, it was

9   Michael Smith, it was Ron Tilles, Martin's sister Lenora,

10  Marek Biestek, myself, I think his name is George Wang, Andy

11  Vaino would be there, infrequently.  He lived in San Diego but

12  he was there sometimes.  I think that is it.  I don't think

13  Jackson Su was still there when we made the move to Third

14  Avenue.

15  Q    Who was Tom Fernandez?

16  A    He was a guy I knew from the Galleon Group.  He raises

17  money for hedge funds.  He was head of investor relations at

18  Galleon.

19  Q    What was he doing in the office?

20  A    He was there to raise money.

21  Q    Was he there to raise money for MSMB or for another

22  entity?

23  A    You know, I guess he was there to raise money for MSMB.

24          MR. AGNIFILO:  I object.

25          THE COURT:  Sir, no guessing, just the best of your

Pierotti - Direct - Smith                    4238

1    recollection, if you know.  If you don't, just say, you don't

2    know.

3    A    He was there to raise money for MSMB when he was first

4    hired.

5    Q    Who was Michael Smith?

6    A    Michael Smith replaced Allison Russo as Martin's

7    assistant.

8    Q    Who was Ron Tilles?

9    A    Ron Tilles was a third party marketer is the term.

10   Somebody who raises money for hedge funds as a consultant who

11   was eventually hired by Martin.

12   Q    Who was George Wang?

13   A    George Wang was a former banker who was there and helped

14   put together the filing documents for what became the reverse

15   merger.

16   Q    Who was Andy Vaino?

17   A    Andy Vaino is a chemist who had worked on MSMB Isotope.

18   I believe later worked for Retrophin.

19   Q    And where were you working in the fall of 2012, were you

20   working in the office or were you traveling, where were you?

21   A    Mark and I had an office that we shared with Andy Vaino

22   when he came to town in the Third Avenue building.  But as we

23   started to work on the Garreco transaction, I was home most

24   days or I was in Arkansas.

25   Q    I am going to show you what is marked as Government

Pierotti - Direct - Smith                    4239

1    Exhibit 120-7 and 120-9 for identification.  Those are behind

2    tabs seven and nine in your binder.

3                Do you recognize these two documents?

4    A    I mean I don't remember this conversation back and forth.

5    Q    Is this an E-mail between-- Government Exhibit 120-7 an

6    E-mail between the defendant, yourself and Jackson Su?

7    A    It looks like it, yeah.

8    Q    Is it from October of 2012?

9    A    That's when it is dated.

10   Q    Does it relate to your severance?

11   A    Looks like it, yeah.

12   Q    If you look at Government Exhibit 120-9, is this an

13   agreement signed by yourself and the defendant?

14   A    Yes.

15   Q    Is it from November of 2012?

16   A    Yes.

17   Q    Does it also relate to your severance from MSMB?

18   A    Yes.

19           MS. SMITH:  The Government moves to admit Government

20   Exhibit 120-7 and 120-9 in evidence.

21           MR. AGNIFILO:  I have no objection to 120-9.  I do

22   object to 120-7 because he says he doesn't recall it.  There

23   is no authenticity established.

24           MS. SMITH:  Your Honor, we can do this at the

25   sidebar?

RB        OCR

Pierotti - Direct - Smith                    4240

1          THE COURT:  All right.

2          MR. AGNIFILO:  You know what, it is fine.  I don't

3     object to either.  Let them come in, that is fine.

4          THE COURT:  The Government will admit 120-7 and

5     120-9 without objection.

6          (So marked)

7          MS. SMITH:  If we can start with Government

8     Exhibit 120-9.

9     Q    What is the date on this document?

10    A    Is this the--

11    Q    This is behind.

12    A    The termination of employment release.

13    Q    Yes.

14    A    That is November 12th, 2012.

15    Q    What is this document?

16    A    It was my-- it was laying out my termination and

17    severance.

18    Q    Can you read the first paragraph starting with this

19    agreement and release?

20    A    This agreement and release will confirm the termination

21    of your employment with MSMB Health Care Management, LLC, and

22    Retrophin, Inc..  Your signature at the end of this agreement

23    will signify your acceptance of an agreement to the provisions

24    set forth herein.

25    Q    Had you worked for Retrophin, Inc. at this point?

Pierotti - Direct - Smith                    4241

1    A    I had never worked for Retrophin.  It is not to say I

2    hadn't gotten checks from Retrophin late, you know, late in my

3    MSMB employment.  But as I said, checks sometimes came from

4    MSMB, from Martin, or from Retrophin.

5    Q    If we can scroll down to the section that says, payment.

6              Section 2(a) on page 1.  Says that you acknowledge

7    receipt of $20,000 as a one time severance payment.  All

8    payments shall be subject to withholding for all applicable

9    taxes.

10             Did you receive a severance of $20,000?

11   A    I did.

12   Q    Did you receive it in one payment here as described here

13   or did you receive it in separate payments?

14   A    No, it was four $5,000 payments, I think that were made

15   weekly.

16   Q    If you can turn to page 6 of the document.  So who signed

17   this document on behalf of MSMB Health Care Management?

18   A    Martin Shkreli.

19   Q    And on behalf of Retrophin Incorporated?

20   A    Martin Shkreli.

21   Q    If we can turn to Government Exhibit 120-7 which is

22   behind tab 7.  Actually if we can look at the whole document

23   for one minute.

24             If you look in the lower right-hand corner, there is

25   a stamp there that says, Pierotti 83.

Pierotti - Direct - Smith                    4242

1    A    Ah-hum.

2    Q    Did this document come from your files, even though you

3    don't remember it?

4    A    I don't know.

5    Q    You don't have a memory of providing documents to the

6    Government?

7    A    I do have a memory of providing documents to the

8    Government, but I don't remember every document that I

9    provided.

10   Q    If you can look at the top part of the E-mail?

11   A    From Martin Shkreli?

12   Q    Yes.  So there is two E-mails.  The first E-mail is from

13   you dated October 25th, 2012, and it is to Martin Shkreli and

14   Jackson Su.  It is dated third of four severance checks.

15        Does this remind you that Mr. Su was still--

16   A    Yes.

17   Q    -- at the company in October of 2012?

18   A    Ah-hum.

19   Q    And, your E-mail says, I'm in the office today, but will

20   not be in tomorrow.  I am hoping I can get a check today.  And

21   the defendant responds, sure, I will be around this afternoon.

22        Was this a reference to the kind of four

23   installments of that $20,000 we talked about?

24   A    It certainly appears to be.

25   Q    And, in addition to that $20,000 that you received for

Pierotti - Direct - Smith                4243

1    severance, did you receive any other payments from the

2    defendant?

3    A    Later on, I got a $5,000 check.

4    Q    What was the reason why the defendant provided you with

5    that payment?

6    A    I would be speculating.

7    Q    After you signed the termination agreement with MSMB and

8    Retrophin, did you make any other agreement to work for

9    Retrophin?

10   A    No.

11   Q    Did you ever consider working for Retrophin?

12   A    No.

13   Q    Why not?

14   A    Because I am a consumer portfolio manager and Retrophin

15   is biotech.

16   Q    And after you signed the termination agreement, did you

17   make any other agreement to work for the defendant?

18   A    No.

19   Q    What did you plan to do after you signed the termination

20   agreement?

21   A    I wanted to buy Garreco.

22   Q    And can you remind the jury what Garreco was again?

23   A    Garreco is a company that makes dental gypsum.

24        So, the way dentures are made, has been the same

25   forever.  So every dentist in the world makes dentures the

Pierotti - Direct - Smith                    4244

1   same way.  There are new technologies changing that.  For the

2   most part, dentists will take a mold, he will send that mold

3   to a dental lab, dental tech, and then they will make the

4   actual dentures.

5           And Garreco had a really dominant business in that

6   niche of selling to dentists very high quality gypsum.  They

7   had long-term agreements with the dental labs and with the

8   dentists.  And it was a really nice company.

9           I happened to know the company because I am

10  originally from Memphis, Tennessee.  People in Memphis

11  vacation in Heber Springs, which is a famous fishing area.  It

12  happened to be where this company was.

13          So Marek and I were looking for entities, we found

14  this entity.  And it was just a really nice prospect for us

15  because it was the right size, it generated incredibly

16  consistent cash flow.  So we could use a lot of debt.  We

17  didn't have much equity.  So that was the idea.

18  Q    And, what was the defendant's role if any going to be in

19  Garreco?

20  A    Nothing.  He had-- he had said early on, as we started

21  looking at Garreco, that he would make a $2 million equity

22  investment, but he never did.

23  Q    The E-mail then is Government Exhibit 120-7, says, I'm in

24  the office today, but will not be in tomorrow.  After you

25  signed your termination agreement, were you going to continue

Pierotti - Direct - Smith                           4245

1    to work from the offices on Third Avenue for Retrophin?

2    A    No, Martin told Marek and I we had no get out of those

3    offices.

4    Q    Why did he tell you, you needed to get out of the

5    offices?

6    A    He was going to be running a business there that we were

7    not going to be part of.

8    Q    What business was that?

9    A    Retrophin.

10   Q    And at this point in the fall of 2012, what was your

11   understanding of what was going with the other MSMB funds?

12   A    I guess my understanding is they all had been liquidated

13   at that point.

14          MR. AGNIFILO:  I object to his understanding, if he

15   knows.

16          THE COURT:  Do you know?

17          THE WITNESS:  My best recollection, does that work?

18          THE COURT:  Yes.

19          THE WITNESS:  They were all liquidated.

20   Q    Did there come a time when there was a plan to take

21   Retrophin public?

22   A    Yes.

23   Q    What was your understanding of how Retrophin was going to

24   become a public company?

25   A    Through a reverse merger into what is called a shell

Pierotti - Direct - Smith                    4246

1    stock which was called Desert Gateway.

2    Q    Were you involved in locating the shell of Desert

3    Gateway?

4    A    I was not.

5    Q    Did the Desert Gateway shell come with any unrestricted

6    shares?

7    A    Yeah, and I am certainly no expert on how shells normally

8    come, but I was told by --

9              MR. AGNIFILO:  I object Judge to what the witness

10   was told.

11             THE COURT:  Let's find out who he was told by.

12             THE WITNESS:  I was told by Ron Tilles.

13             THE COURT:  All right.

14             MR. AGNIFILO:  I object.

15             THE COURT:  Sustained.

16   Q    How many unrestricted shares of the Desert Gateway shell

17   come with?

18   A    I don't know.

19   Q    How did you learn about the unrestricted shares?

20   A    Same answer, I was told by Ron Tilles.

21   Q    And, what was your understanding about the ability to

22   purchase unrestricted shares?

23             MR. AGNIFILO:  If the basis of his knowledge is Ron

24   Tilles, I object to the whole line.

25   Q    Did you have a conversation with Marek Biestek about the

1    unrestricted shares?

2    A    I did.

3    Q    What did Marek Biestek tell you about the unrestricted

4    shares.

5              MR. AGNIFILO:  I object as hearsay.

6              MS. SMITH:  Can we have a sidebar?

7              (Sidebar.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

- Sidebar -                                    4248

1          THE COURT:  He left in October 2012 from the

2    offices, correct?

3          MS. SMITH:  He did not actually leave, no.

4          THE COURT:  So, that is not entirely clear.  He is

5    saying he was told to leave the office.

6          MS. SMITH:  He was told to leave, then he hadn't

7    actually left as you will see--

8          THE COURT:  We didn't establish that, that is why I

9    am confused.

10          MS. SMITH:  I can make sure I can establish he was

11    still in the office on occasion, even though he was told in

12    the future he was going to clear out.  That changes later on.

13          THE COURT:  Mr. Biestek by that time is also

14    terminating his employment in Retrophin.

15          MS. SMITH:  No, he is still in the office as well.

16    He is charged in our indictment as coconspirator number one.

17    I am --

18          MR. AGNIFILO:  The fact you charged him in the

19    indictment doesn't mean you proved at this trial by

20    preponderance of the evidence.  I don't think you have proved

21    by a preponderance of the evidence that Marek Biestek is a

22    coconspirator at this point in time.  I just don't think you

23    have.

24          I mean it is your burden to prove by a preponderance

25    of the evidence, that "A" he is a coconspirator; B, this is a

RB        OCR

- Sidebar -                                          4249

1   conversation in furtherance of a conspiracy, where he is an

2   active coconspirator.  I don't think you established that.

3          MS. SMITH:  This is in relationship to Count Eight,

4   the shares.  As you know, the Fearnow shares were distributed

5   to seven friends, affiliates, employees of Retrophin, and then

6   the allegations are that the defendant sought to control the

7   shares to influence the trading volume and price of Retrophin.

8   They were distributed to a number of individuals including Ron

9   Tilles, who would then move those shares around at the

10  defendant's direction.

11         A lot of that evidence about how the shares were

12  moved, is actually coming in through Amy Merrill who is the

13  standard registrar witness, who talks about how the shares

14  were divided up and who directed the use of the shares and

15  then also, frankly through the case agent because the majority

16  of the evidence on that count, with respect to the defendant's

17  actions and Mr. Greebel's actions are actually through

18  E-mails.

19         So, it is in a sense subject to connection.  I

20  believe that between Amy Merrill and the case agent, we will

21  be able to kind of show what was actually going on with the

22  shares.

23         Mr. Pierotti received them and then he had a number

24  of conversations with the defendant, and I expect he is going

25  to say, is that Marek Biestek told him that Morton was going

- Sidebar -                                    4250

1   to make it possible for him to buy unrestricted shares.

2          MS. KASULIS:  Marek Biestek is one of the recipients

3   Your Honor of the free trading shares, the Fearnow shares as

4   part of that conspiracy.

5          THE COURT:  Right.  But Mr.-- okay.  I accept that.

6          Mr. Agnifilo was saying as of this time, is it your

7   position that Marek Biestek is not a coconspirator or isn't at

8   all?

9          MR. AGNIFILO:  I don't believe they have established

10  that by a preponderance he is a coconspirator.  Also, that

11  there is two layers of hearsay here.

12         There is Marek Biestek is what seems to be some

13  conclusion Martin is going to make this happen.  We don't know

14  how he knows that.  That is a layer of hearsay, and then Marek

15  Biestek to this witness is a second layer of hearsay.  I don't

16  think they have exceptions for each layer.

17         MS. SMITH:  Martin obviously is not hearsay, he is

18  the defendant.

19         MR. AGNIFILO:  He didn't say Martin told him.

20         MS. SMITH:  We are going to get there.  I can go

21  into it in a different way.  I am trying to tell the story

22  that is coherent to the jury.  I can talk about who is sitting

23  in the meeting and circle back, I suppose, to who originally

24  told him who could buy the unrestricted shares.  If you prefer

25  to lay it that way --

- Sidebar -                                         4251

1           THE COURT:  Is he present at meetings where this is

2    discussed?

3           MS. SMITH:  Yes.

4           THE COURT:  Okay.  This is after October 2012?

5           MS. SMITH:  Yes.

6           So I was really trying to set it up frankly we are

7    not driving into it.  But I certainly can, you know, lay a

8    little more foundation and spin it out more if that is what

9    the defense would prefer.

10           MR. AGNIFILO:  I am concerned this is something that

11    the Government is going to contend is direct evidence of the

12    defendant's guilt.  It is coming to the jury in a form of

13    essentially what is double hearsay.  I understand their

14    argument is that each of the hearsay levels having exceptions.

15    I'm not so sure that each level is so clearly within the

16    exception.  That is my objection.

17           THE COURT:  Well one level is Martin to Marek,

18    right?  And the second is Marek Biestek to Pierotti.

19           MR. AGNIFILO:  I respectfully see it differently.  I

20    think what he is going to say, from what I understand from my

21    colleague is, that Marek Biestek had an understanding and that

22    Marek Biestek told this witness--

23           MS. SMITH:  No.  It is based on a conversation that

24    Marek Biestek had.  Like I said, if you want me to kind of

25    slow it down and kind of move around differently, I can do

- Sidebar -                                    4252

1   that.

2          MR. AGNIFILO:  I'm not looking to do your

3   examination.  I am not trying to be an obstructionist for its

4   own sake.

5          MS. SMITH:  I'm telling you the reason I am doing

6   this.  This is a witness who volunteers a lot of information,

7   right.  So I am trying to move this in a way we get out what

8   is permissible and what is not.

9          MR. AGNIFILO:  The reason I object, I think this is

10  going to end up being park land evidence on Count Eight.  I am

11  concerned the way we are going to it.  I am not looking to be

12  difficult.

13         MS. SMITH:  I am just trying to think about it.

14  Like I said, I can back into it in a different way.

15         THE COURT:  All right.

16         Well, we can continue if you would like and you can

17  think about how you want to structure your examination or I

18  can tell the jurors we are going to take a break and think

19  about that.

20         MS. SMITH:  Why don't we do a break and see if I can

21  solidify --

22         MR. AGNIFILO:  The lunch break?

23         THE COURT:  They probably don't want to go too

24  early, I am willing to do it early if you want.

25         MS. SMITH:  That is fine with me.  I can try to work

- Sidebar -                          4253

1   with him so it is tighter to what the defendant said.  That

2   is-- I can try to do that.

3              THE COURT:  To continue, you mean or take a break?

4              MS. SMITH:  I think we should take a short break at

5   least.  I am happy to do the lunch break now too.

6              THE COURT:  Let me ask the jurors.

7              Let's see what they have to say.

8              (Open Court.)

9              THE COURT:  All right.  Members of the jury, there

10  are two options available.  You can take a short break now or

11  take a lunch break now.  What is the majority preference?

12             JURORS:  Short break.

13             THE COURT:  Let's take a short break.  Please don't

14  talk about the case, we will retrieve you shortly.

15             Thank you.

16             (Jurors left the courtroom.)

17             THE COURT:  You may step down.

18             (Witness left the stand.)

19             THE COURT:  All right.  Let's take a few minutes.

20  Thank you.

21             (Recess taken.)

22             (Transcript continues on next page.)

23

24

25

RB          OCR

                    Pierotti - direct - Smith                    4254

1    (Continuing.)

2              MS. SMITH:  I think it might be helpful to go to

3    sidebar to do an offer of proof to clear this up.

4              THE COURT:  All right.  Let's go to sidebar, then.

5              (Jury enters.)

6

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                          4255

1          (The following occurred at sidebar.)

2          MS. SMITH:  So, part of this is that the witness is

3    going to say he had a conversation with Marek, who told him

4    that Martin was going to give him the opportunity to buy some

5    of the shares of Desert Gateway and that he should come into

6    the office.  He goes into the office and has a conversation

7    with Martin about buying the shares.

8               And there's a later conversation that I was going to

9    elicit after the shares are distributed, after Mr. Pierotti

10   starts selling the shares, and Mr. Shkreli gets very upset;

11   that Marek says to him:  You're creating problems for me

12   because I got you into the pool of shares and now things are

13   kind of going sideways.

14              So, this conversation here is kind of part of the

15   conspiracy, I think very clearly, in terms of who was allowed

16   to buy shares.  And then once Mr. Pierotti starts selling

17   shares and is not doing with the shares as the Defendant

18   wanted, there's this other conversation with Mr. Biestek about

19   you're not playing ball, basically.

20          THE COURT:  Okay.

21          MS. SMITH:  So, what I can do is kind of ask him if

22   he had a conversation with Marek about the shares, and he'll

23   say, you know, that Marek told me that Martin is going to give

24   me the opportunity to buy the shares and that you should come

25   into the office, he goes into the office and speaks to the

```
                          Sidebar                          4256
```

1    Defendant.  That's kind of this piece.

2              THE COURT:  Going back, then, in October 2012, he's

3    still at the office occasionally working?

4              MS. SMITH:  Yes.

5              THE COURT:  On what?

6              MS. SMITH:  Yes, I will clear that up.  Basically,

7    he signs the termination agreement, he's working on the

8    Geragos piece, he occasionally goes in the office.

9              THE COURT:  Is Geragos for himself or for MSMB?

10             MS. SMITH:  It's for himself and for Marek.  And

11   then the Defendant was potentially going to be an investor,

12   but he never actually came up with any money.

13             THE COURT:  But it wasn't under any of the MSMB

14   umbrellas.

15             MS. SMITH:  No, but I'll clear that all up.

16             THE COURT:  Were Pierotti and Biestek going to by

17   Geragos the two of them or did they have investors?

18             MS. SMITH:  They were going to get funding, so that

19   was part of it.  And that's where the Defendant said he was

20   going to be -- potentially he would put up $2 million, and he

21   never actually did.

22             And the whole things falls apart, basically, after

23   this kind of dispute between Mr. Pierotti and the Defendant.

24   But that was kind of the idea.

25             THE COURT:  All right.  And this dispute where it

Sidebar                          4257

1   got bad was after the purported affiliated individuals got

2   their shares and then he sold.

3            MS. SMITH:  Exactly.

4            THE COURT:  All right.

5            Is that going to satisfy you, Mr. Agnifilo?

6            MR. AGNIFILO:  From what I understand the Government

7   to be saying is that there's a conversation allegedly directly

8   with the Defendant.  Obviously, that's admissible.

9            And what I'm hearing the Government say to a certain

10  extent is that the Marek conversation sort of sets up the

11  conversation with the Defendant.

12           THE COURT:  It's done at the behest of the

13  Defendant.

14           MS. SMITH:  He tells him to come into the office.

15           MR. AGNIFILO:  I think if it pans out this way --

16  look, I still object, I'm not waiving my objection.  I don't

17  think they've established at this point that Marek is a

18  co-conspirator by the preponderance of the evidence.  So, I'm

19  still objecting on those grounds, but I --

20           THE COURT:  If they don't, then we can direct it

21  stricken from the record.

22           MS. SMITH:  He goes into the office because of this

23  conversation with Marek --

24           (Pause in proceedings.)

25           MS. SMITH:  You know, it's also he wouldn't have

LAM      OCR      RPR

Sidebar                                              4258

1   gone into the office but for this conversation with Marek.

2          MR. AGNIFILO:  One of my concerns -- and it's not a

3   concern directed so much directly at you -- is that you'll ask

4   what is an appropriate question and he will go in right field

5   and say what he has to say.

6          MS. SMITH:  I know.  I tried to hammer out the

7   questions with him just now so we get this in this order.

8   Part of the problem -- and you have every right to object, but

9   if I go a little differently, sometimes I get something I

10  didn't expect.

11         MR. AGNIFILO:  I've had these witnesses myself.

12         MS. SMITH:  So I am trying to kind of, you know...

13         MR. AGNIFILO:  Okay.  Thank you, Judge.

14         THE COURT:  Thank you.

15

16         (Continued on next page.)

17

18

19

20

21

22

23

24

25

Pierotti - direct - Smith                          4259

1              (Sidebar ends; in open court.)

2     BY MS. SMITH:

3     Q     I want to take you back for a minute.  Before we took our

4     quick break we were talking about Geragos.

5     A     Yes.

6     Q     Just to be clear, the Geragos investment, that was

7     something you were working on with Marek Biestek; is that right?

8     A     Correct.

9     Q     And that was not under the umbrella of either MSMB or

10    Retrophin; is that right?

11    A     No, it was not.

12    Q     And the Defendant's involvement in Geragos, if any, was

13    as a potential investor.

14    A     Yes.  He told us that he would do $2 million in equity.

15    Q     And did he, in fact, do $2 million in equity?

16    A     No.  He came up with nothing.

17    Q     So, after the termination agreement in November of 2012,

18    you and Mr. Biestek were working on Geragos; is that right?

19    A     Correct.

20    Q     And during that time period, kind of late November/early

21    December 2012, were you occasionally in the offices of Retrophin?

22    A     Yes.

23    Q     And as you testified earlier, the Defendant had said

24    after a certain point you and Mr. Biestek, to the extent you

25    were working on Geragos, would be no longer allowed to use the

Pierotti - direct - Smith                    4260

1   Retrophin offices; is that right?

2   A    Yes.  To clarify:  I think you guys are going to need to

3   clear out of here.

4            He didn't mean it today.

5   Q    When you say "he," you mean the Defendant?

6   A    I'm sorry, yes.

7   Q    We were also talking before the break about shares of

8   Desert Gateway.

9   A    Yes.

10  Q    Did you have a conversation with Marek Biestek about the

11  possibility of purchasing shares of Desert Gateway?

12  A    Yes.

13  Q    And what was that conversation?

14  A    I remember just a very brief conversation, and it could

15  have even been by text, where he said:  Martin wants to see

16  you.  He's going to make you a part of the buying group of

17  people that are going to buy the shares.

18  Q    What else did Mr. Biestek say to you in that conversation?

19  A    He wants to -- come in the office, he wants to see you.

20  Q    When you say he wants to see you, are you talking about

21  the Defendant?

22  A    Martin, yes.

23  Q    And what conversation, if any, did you have with the

24  Defendant when you went into the office?

25  A    I went in, I saw him, and he said that he wanted me to be

LAM        OCR        RPR

Pierotti - direct - Smith                    4261

1    part of the group that was buying shares in Desert Gateway.

2    Q    What was the group that was buying shares in Desert

3    Gateway?

4    A    It was all kind of friends and associates or former

5    associates.  As I recall, it was me; Andy Vaino; a guy named

6    Edmund Sullivan who had been a broker at Cowan and my

7    understanding was a friend of Martin's; it was his attorney at

8    the time, Evan Greebel; it was Marek; if I said Andy Vaino

9    already, I apologize; Mulleady; Fernandez.

10           I'm not sure if I'm leaving anybody out.  That

11   should have been eight people.

12   Q    Who decided what individuals could purchase these shares

13   of Desert Gateway?

14   A    Essentially, Martin.

15   Q    And I'm going to show you what's been marked for

16   identification as Government Exhibit 120-10, which is Tab 10

17   in your binder.  What is this document?

18   A    This is a bilateral agreement for me to buy shares of

19   Desert Gateway from Michael Fearnow.

20   Q    Is it dated December 11, 2012?

21   A    It is.

22           MS. SMITH:  Your Honor, the Government moves to

23   admit 120-10 in evidence.

24           MR. AGNIFILO:  I have no objection.

25           THE COURT:  We will receive 120-10.

Pierotti - direct - Smith                    4262

1           (Government Exhibit 120-10 so marked.)

2           (Exhibit published to the jury.)

3    Q    If we could focus on the top part, the top "whereas"

4    clauses.

5    A    Yes.

6    Q    So, what kind of document is this?

7    A    Purchase agreement.

8    Q    And what's the date of the agreement?

9    A    December 11, 2012.

10   Q    And who is the agreement between?

11   A    It's between myself and Troy Fearnow.

12   Q    Who is Troy Fearnow?

13   A    To the best I've come to learn, he's a relative of

14   Michael Fearnow.

15           MR. AGNIFILO:  Object to what he's come to learn.

16           THE COURT:  Just what you know.

17   A    He's a relative of Michael Fearnow.

18   Q    Who is Michael Fearnow?

19   A    Michael Fearnow was the owner of Desert Gateway and he

20   was the person from whom Martin bought the shell, Desert

21   Gateway being the shell.

22   Q    And the second whereas clause says:  Whereas, the seller

23   desires to sell 400,000 shares of the common stock par value

24   .0001 per share of the company to the purchaser and purchaser

25   desires to purchase the shares.

LAM      OCR      RPR

Pierotti - direct - Smith                    4263

1          If we can just scroll down to the next paragraph.

2  In paragraph one there, it says:  The seller hereby sells the

3  shares to the purchaser and the purchaser hereby purchases the

4  shares from the seller for a purchase price, which is $400 in

5  the aggregate.

6               And, so, what did this agreement provide in terms of

7  how much you were going to pay for how many shares?

8  A    I was going to pay $400 for 400,000 shares.

9  Q    And what does paragraph two there say?

10 A    The shares are free and clear of any liens, claims,

11 encumbrances, or restrictions on transfer.

12 Q    And is it your understanding that as a result of this

13 they were -- the shares that you were going to purchase were

14 free-trading shares?

15 A    Yes.

16 Q    And if you can turn to Page 2 of the document, who is

17 this document signed by here?

18 A    Myself.

19 Q    And what's the other signature line for the agreement?

20 A    Troy Fearnow.

21 Q    If we can turn to Page 3 of the document, who is the

22 signature line here for?

23 A    Troy Fearnow.

24 Q    Is the Defendant a party to this purchase agreement?

25 A    No.

LAM      OCR      RPR

Pierotti - direct - Smith                    4264

1    Q    Does the Defendant's signature appear anywhere on the

2    agreement?

3    A    No.

4    Q    Who drafted the purchase agreement?

5    A    I believe Evan Greebel.

6    Q    And how was it determined that you could purchase 400,000

7    shares, that specific number?

8    A    That specific number was the same number for sort of all

9    of the people in that buying group.  Everybody was, as I

10   recall, roughly 4.9 percent owners of the entity.

11   Q    And why would you want to be 4.9 percent owners?

12   A    Because you would you not be an insider.  If you own more

13   than 5 percent, you would be an insider and would have to make

14   a filing every time you made a transaction.

15   Q    What did the Defendant tell you about the shares of

16   Desert Gateway that you purchased?

17   A    That they were free to trade.

18   Q    And what conversations did you have with him about the

19   trading of those shares?

20   A    Well, there were several conversations.  And very often

21   they're not conversations, they're more Martin just kind of

22   speaking out loud.  But there were conversations and there

23   were discussions and there were comments by Martin that people

24   who have trading experience should trade the stock; buy it,

25   sell it, buy it, sell it.

Pierotti - direct - Smith                    4265

1    Q    What do you mean by "trade the stock"?

2    A    Stocks are more valuable if they have more liquidity.

3    And the liquidity is measured by the volume of the stock.  So,

4    if a group of people decided to just trade stock back and

5    forth amongst themselves for the purpose of creating volume,

6    that would be insider trading.

7              MR. AGNIFILO:  I object.  I move to strike it and I

8    ask for a sidebar.

9              THE COURT:  All right.

10

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                      4266
```

1           (The following occurred at sidebar.)

2           MR. AGNIFILO:  I'm moving for a mistrial.  I'm

3    moving for a mistrial based on that testimony.  This witness

4    is running roughshod over these proceedings, he's making

5    legal conclusion --

6           THE COURT:  You need to calm down.  Just make a

7    rational legal argument, all right?

8           MR. AGNIFILO:  All right.

9           THE COURT:  Let's not talk in hyperbole.  Tell me

10   why you ask for a mistrial.

11          MR. AGNIFILO:  All right.

12          This witness just told this jury that what my client

13   just did was insider trading.  Flat out.  Now, that's

14   prejudicial.  You can't unring the bell.

15          He's a witness that -- and I don't fault the

16   Government because I don't think the Government has been able

17   to keep him under wraps.  This is about the fourth or fifth

18   sidebar we had to have with this witness.  And now, after all

19   of this, he tells this jury that my client is guilty of

20   insider trading?  It's inappropriate.  It's highly

21   prejudicial.

22          I want the witness admonished at a minimum.  I want

23   the Government to be told to keep this witness under wraps.

24   In front of the jury.  And I'm very concerned about that last

25   answer.

```
                        Sidebar                        4267
```

1      I appreciate your Honor giving me a time out to calm

2   down.

3      THE COURT:  Yes, because I think you make a better

4   argument when you're calm.

5      MR. AGNIFILO:  I appreciate it and you're right.  I

6   think if I was -- obviously, we're all working very hard at

7   this trial and it means a lot to all of us.  I feel like that

8   was an irresponsible and dangerous answer.  We've been so

9   careful to have these proceedings go appropriately and I think

10  that's a very dangerous answer and very prejudicial.  And I

11  appreciate your Honor...

12     MS. SMITH:  Your Honor, I would have no objection to

13  striking the answer, which we've stricken other kind of

14  similar legal conclusions along these lines from other

15  witnesses at other points.  So, I don't think it's overly

16  prejudicial.  I really am trying to keep him to the very

17  specific things.  I am happy, if the defense doesn't object,

18  to try and do it in a more leading fashion.

19         That is not what the question called for.  It really

20  just called for:  What did the Defendant tell you?

21         And the testimony was:  He told us to trade around

22  the stock.

23         And what did that mean?

24         To trade it back and forth.

25         Really, I do understand the concern.  I certainly

```
                    LAM      OCR      RPR
```

Sidebar                                    4268

1   don't think it's basis for a mistrial, but I'm more than happy

2   to try to kind of lead more to -- obviously, we need to get

3   the testimony out of the witness that we have put here and he

4   can be crossed on all of this stuff.  I want to kind of do

5   this in a way that's responsible.  So, if leading the witness

6   would be helpful, I'm more than happy to kind of do that.

7          MR. BRAFMAN:  Your Honor, just striking the

8   testimony as we would with other excess language that someone

9   proposes, I'm not certain that that does it.  So, without

10  waiving the application, if we could at least craft something

11  to give the jury that's stronger than the normal

12  disregard-the-last-statement-of-insider-trading, which is, I

13  think...

14         MS. SMITH:  We can do a limiting instruction, that's

15  fine.  Maybe it makes sense to take a lunch break and then I

16  can work through the rest of this again with the witness and

17  make my questions more leading, with the idea that I'm really

18  trying to cabin this as much as possible to just the facts and

19  what he heard, and, hopefully, keep it very short after the

20  lunch break.

21         MR. BRAFMAN:  I'm all for lunch, but I don't think

22  the jury should be going to lunch thinking --

23         MS. SMITH:  I'm fine with the limiting instruction.

24         MR. BRAFMAN:  -- insider trading.

25         THE COURT:  Respectfully, I'm going to deny your

Sidebar                                                4269

1   request for a mistrial.  I think we can take care of it by

2   limiting instruction and an admonishment to the witness that

3   he should not make conclusions, it is the jury's province to

4   decide what happened.

5           MS. SMITH:  He's also not specifically charged with

6   insider trading.

7           THE COURT:  The other instruction would say that

8   he's not be charged with insider trading.  So, by admonishing

9   him in front of the jury and instructing the jury that they

10  should disregard the conduct and he's not being charged with

11  insider trading, hopefully that will set it right.

12          MS. SMITH:  I have had this conversation, but I will

13  speak to him again about any kind of legal conclusions or

14  phrases along those lines.

15          THE COURT:  I appreciate what you're dealing with.

16  From the early get-go it was clear he's somebody who likes to

17  talk.  So, try to keep him --

18          MS. SMITH:  I don't have much left, so I'll try to

19  keep it as short as possible.

20          THE COURT:  You do want to take the lunch break.

21          MS. SMITH:  I think it would give me the opportunity

22  to kind of corral him.

23          THE COURT:  Would it be okay if she questioned in a

24  more leading form to try to keep him under control?

25          MR. AGNIFILO:  That's fine.  But we want the

Sidebar                                        4270

1   instruction before the lunch.

2            MS. KASULIS:  That's fine.

3            MR. AGNIFILO:  Thank you, Judge.

4

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    4271

1           (Sidebar ends; in open court.)

2           THE COURT:  I'd like to instruct the jury, first of

3    all, that Mr. Shkreli is not being charged with insider

4    trading in this case.

5           Second of all, to the extent the witness has made a

6    statement that concludes that certain facts equal insider

7    trading, you are to disregard the conclusion of the witness.

8    The witness is not here to testify about his opinions or

9    conclusions based on what happened.

10          The comment will be stricken from the record.  You

11   are to disregard it.  Hit the erase button twice and just void

12   it out of your mind.

13          With that, I think what we're going to do at this

14   time is give you a lunch break.  Go out and clear your heads,

15   have a nice lunch, don't talk about the case, and keep an open

16   mind.

17          Thank you very much.

18          THE COURTROOM DEPUTY:  Judge, in one hour?

19          THE COURT:  Yes, one hour, please.

20          (Jury exits.)

21          THE COURT:  All right.  One hour.  I'll see you at

22   1:30.  Thank you.

23

24          (Luncheon recess taken.)

25

LAM        OCR        RPR

Proceedings                                    4272

1        THE COURT:  Before we bring the witness back, did

2   Mr. Agnifilo still want me to admonish the witness?

3        MR. AGNIFILO:  I think it's appropriate, Judge.  I

4   think that this witness is markedly different than every

5   witness in the case up 'til this point.  He's being asked very

6   appropriate questions and taking these as launching pads to go

7   off into things that are not responsive and are highly

8   prejudicial.  He's done it a number of times, the last time

9   being most egregious, so I do think it's appropriate and I do

10  request it.

11       THE COURT:  What would you like me to say to him?

12       MR. AGNIFILO:  Let me consult with my more

13  experienced colleague.

14       MR. BRAFMAN:  I can't answer that question

15  truthfully, Judge, not on the record.

16       MS. KASULIS:  Your Honor, I'm going to ask to wait

17  for Ms. Smith because she's been dealing with him more directly.

18       THE COURT:  Yes, of course.

19       MS. KASULIS:  Thank you, Judge.

20       (Pause in proceedings.)

21       MR. AGNIFILO:  Where we are now, Judge, we agree

22  that an appropriate admonition would be that the witness

23  should answer only the question that is asked.

24       THE COURT:  All right.

25       MR. AGNIFILO:  That the witness -- that seems to be

                    LAM      OCR      RPR

1   easy.

2           THE COURT:  Should I add truthful?  I'm kidding.

3           MR. AGNIFILO:  I wouldn't want to suggest in my

4   cross that the witness is in contempt, although I would have

5   no objection to that, Judge, just to round out the thought.

6           So, I think the idea is that the witness be directed

7   to answer only the question that is asked, that the witness

8   should not give his opinion, and that the witness should not

9   give legal conclusions or make statements of law.

10          THE COURT:  All right.

11          MR. AGNIFILO:  And then the part that I was thinking

12  about is in regard to the last one -- well, never mind, that's

13  fine.  That's it.

14          MS. SMITH:  I think that's it.  That's fine.

15          THE COURT:  I apologize for starting before you were

16  in, Ms. Smith.

17          MS. SMITH:  That's okay.

18          THE COURT:  I just thought I should get right to it

19  and get the jury back.

20          I will make that admonition.

21          MS. KASULIS:  Thank you, your Honor.

22          THE COURT:  Let's have the witness come back before

23  we bring the jury in.

24  **TIMOTHY PIEROTTI**,

25      called as a witness, having been previously duly

Pierotti - direct - Smith                    4274

1      sworn, was examined and testified as follows:

2           THE COURT:  Mr. Pierotti, I wanted to just advise

3   you to please listen carefully to the questions the lawyers

4   are asking you and to answer as best you can only the question

5   that's being asked.  Please don't volunteer or stray beyond

6   the scope of the question and please don't offer your

7   opinions.  What you're being asked to recount is your best

8   recollection of certain events.

9           Also, please don't offer conclusions or make

10  statements about the law.  That would be my job, sir, so I'll

11  take care of that at the end of the trial.  So, if you can

12  just testify to the best of your recollection and listen and

13  answer the questions asked, we'd appreciate it.

14          THE WITNESS:  Okay.

15          THE COURT:  Thank you.

16          (Jury enters.)

17          THE COURT:  All jurors are present.  Please have a

18  seat.

19          Ms. Smith, you may resume your examination.

20  BY MS. SMITH:

21  Q    Before the lunch break, Mr. Pierotti, we had talked about

22  Michael Fearnow.  Who is Michael Fearnow again?

23  A    Michael Fearnow controlled Desert Gateway.

24  Q    And did you ever have a meeting that involved Michael

25  Fearnow?

                    LAM      OCR      RPR

Pierotti - direct - Smith                    4275

1  A    I sat in with a bunch of other people when Martin had a

2  call on speakerphone with Michael Fearnow.

3  Q    Where did that meeting take place?

4  A    In Martin's office on -- the Third Avenue office.

5  Q    To be clear, you and the Defendant and a number of other

6  people were in the room and Mr. Fearnow was on speaker; is

7  that right, a telephone call?

8  A    Yes.

9  Q    And do you remember who else was in the room?

10 A    You know, I really don't.  There were a number of us, but

11 I couldn't tell you who else was in the room.

12 Q    What did the Defendant and Mr. Fearnow discuss on the call?

13 A    They talked about the purchase of Desert Gateway.  And

14 the purchase price I think originally had been 400,000.  They

15 were short on that number, so they discussed adding a bunch of

16 Retrophin shares to the purchase price.

17 Q    After you signed the purchase agreement, how many shares

18 did you actually receive?

19 A    350,000.

20 Q    And how many shares did the purchase agreement provide for?

21 A    400,000.

22 Q    Did you have a conversation about the remaining 50,000

23 shares that you did not receive with the Defendant?

24 A    I didn't have a conversation about those shares with the

25 Defendant, but I was in a room where he said that:  For some

Pierotti - direct - Smith                    4276

1    of you, some shares will be held back, quote/unquote.

2    Q    And did he explain why some shares would be held back?

3    A    I don't recall.

4    Q    I'm going to show you what have been marked for

5    identification as Government Exhibits 120-11 to 120-15, which

6    are Tabs 1 to 15 -- excuse me, Tabs 11 to 15 in your binder.

7              THE COURT:  Before you go into that, may I ask a

8    question of the witness, please?

9              MS. SMITH:  Sure.

10             THE COURT:  You said that you received 350,000

11   shares of Retrophin during the reverse merger; is that right?

12             THE WITNESS:  Well, it was Desert Gateway, that

13   became Retrophin.

14             THE COURT:  Is that a different amount than the

15   400,000-share purchase you discussed earlier or is that

16   350,000 shares out of the 400,000 shares you purchased?

17             THE WITNESS:  I was delivered 350,000 shares of the

18   400,000 that I purchased.

19             THE COURT:  And you actually did purchase those for

20   $400; is that correct?

21             THE WITNESS:  Yes.

22   BY MS. SMITH:

23   Q    And then the 50,000 shares that you just mentioned that

24   were held back, were those the additional 50,000 that made up

25   the difference between the 350 and the 400?

Pierotti - direct - Smith                    4277

1   A    Yes.

2   Q    So, if you can look at the documents that have been

3   marked for identification as Government Exhibits 120-11 to

4   120-15, which are Tabs 11 to 15 in your binder, are these all

5   e-mail communications?

6   A    Yes.

7   Q    And are you on all of the e-mail communications?

8   A    We're just talking about Tab 11 right now?

9   Q    11 to 15?

10  A    Yes, I certainly was on 11; yeah, I was on 12; I don't,

11  you know, Retrophin -- I don't remember this e-mail, but I

12  very well could have been on it.

13              THE COURT:  That was with regard to 120-13 or -14?

14              THE WITNESS:  -13.

15              THE COURT:  Thank you.

16  A    14, yes, I was on it; and 15, I was on it, yeah.

17  Q    And are these e-mails all related to either the shares

18  that you received or to Retrophin generally?

19  A    Yes.

20              MS. SMITH:  Your Honor, I'm going to move into

21  evidence Government 120-11, 120-12, 120-14, and 120-15.

22              MR. AGNIFILO:  No objection.

23              THE COURT:  We will receive Government Exhibit

24  120-11, -12, -14, and -15.

25              (Government Exhibits 120-11, 120-12, 120-14, and

Pierotti - direct - Smith                    4278

1   120-15 so marked.)

2   Q    Let's start with Exhibit 120-11, which is Tab 11, and

3   it's e-mail from Michael Smith on December 11, 2012, to the

4   Defendant, Marek Biestek, yourself, Mr. Fernandez,

5   Mr. Mulleady, Mr. Tilles, Mr. Vaino, and Leonora Izerne.

6            What is the subject line for this message?

7   A    Compliance for personal trading accounts.

8   Q    And then can you read the line that says starting today?

9   A    Starting today, I will need everyone to give me a summary

10  of their holdings every morning.  For the time being, I only

11  need the holding summary of the Scott trade account you

12  recently opened, even if there is nothing in it.  In the

13  future, I may also require holding summaries from any other

14  accounts that are being actively traded.

15  Q    And can you also read the last statement, starting with

16  if in the future?

17  A    If in the future I need a statement from one of your

18  other accounts, you would have to find a statement that lists

19  each of your positions individually.  A statement that lumps

20  all of your stocks in one line item would be insufficient.

21  Thanks for your help.

22            (Continued on next page.)

23

24

25

1          (Continuing.)

2    BY MS. SMITH:

3    Q    And whose idea was it to open Scottrade accounts?

4    A    Martin's.

5    Q    What was going to be put into the Scottrade accounts?

6    A    Retrophin stock.

7    Q    And was that the stock you received pursuant to the

8    purchase agreement?

9    A    Yes.

10   Q    And the other individuals who received this e-mail with

11   the exception of Lenora Izerne, were they also individuals who

12   purchased stock of Desert Gateway in the same manner as you

13   did?

14   A    Yes.

15   Q    Were you able to open the Scottrade accounts as the

16   defendant had directed?

17   A    I was not.

18   Q    Why not?

19   A    Because Scottrade would not open an account with what

20   they dubbed penny stock.

21   Q    And what do you mean by a penny stock?

22   A    You know, I don't know that I know the exact definition

23   of a penny stock.  Maybe it was just pink sheets, which means

24   it's not listed on NASDAQ.

25   Q    If you can turn to tab twelve, and so that's Government

Pierotti - direct - Smith                    4280

1   Exhibit 120-12, and if we can focus on the bottom e-mail to
2   start.
3   A    "I represent that I am not an officer"?
4   Q    Yes.  And so looking at the e-mail, who is that e-mail
5   from?
6   A    That e-mail is from Evan Greebel.
7   Q    And who is Evan Greebel?
8   A    He was Retrophin's attorney or Martin's attorney.
9   Q    And do you know whether he was Retrophin's attorney or
10  Martin's attorney?
11  A    I guess I thought he was both.
12  Q    And the e-mails from Mr. Greeble.  It's on Thursday,
13  December 13, 2012 and it's to is Marek Biestek and Edmund
14  Sullivan.
15  A    "I represent that I am not an officer, director or holder
16  of 10 percent or more of the outstanding equity securities of
17  Desert Gateway and do not alone or together with any other
18  person exercise control over Desert Gateway.  I'm not an
19  affiliate, as such term is defined in the Securities Act of
20  1933, of Desert Gateway.  I am in no position to issue or
21  propose to issue any security relating to Desert Gateway."
22  Q    And then Mr. Greeble asks Marek to have "each of the
23  other investors send the same e-mail to me because it is
24  easier.  Please print it out and have them sign it."
25          And then if we can go up to the next e-mail, or the

SN        OCR        RPR

1  next two e-mails --

2  A    Yes.

3  Q    -- if you look at the middle e-mail there, is that a

4  forward of Mr. Greebel's e-mail from Mr. Biestek to you?

5  A    I think so, yes.

6  Q    And is that on December 14, 2012?

7  A    Yes.

8  Q    And then what does Marek say in response to your e-mail

9  saying that you understood at the top?

10 A    I just see "Understood."

11 Q    Do you see the top e-mail as well?

12 A    Am I not looking at the right thing?  "Reply to Evan" --

13 yeah, "Reply e-mail to Evan" and there's his e-mail address.

14 Q    And so when you said understood, you're responding to

15 Mr. Greebel's statement that you're not an officer or director

16 or affiliate of Desert Gateway; is that right?

17 A    Yes.

18 Q    And at that time were you working for Retrophin or Desert

19 Gateway?

20 A    No.

21 Q    And as a result did you feel comfortable giving that

22 answer?

23 A    Yes.

24 Q    I'm going to direct your attention to Government Exhibit

25 120-14 which is tab 14 in your binder.  And focusing on the

Pierotti - direct - Smith                    4282

1   top e-mail, it's an e-mail from the defendant to a number of

2   individuals including yourself on December 18, 2012.

3          And can you just read what the defendant wrote in

4   this e-mail?

5   A   "Friends and shareholders:  See the new article out on

6   the deal from Forbes.  One of my priorities for the future is

7   increasing the trading volume in the stock.  Anything anyone

8   can do to help in this regard is welcome."

9   Q   And then I'm going to have you take a look -- in your

10  binder there's a tab A, 14-A, which is Government Exhibit

11  105-20 which is already in evidence.

12         Do you see that?

13  A   Yes.

14  Q   If you look at the bottom e-mail, it's an e-mail from the

15  defendant to yourself and a copy to Darren Blanton and the

16  defendant says, "I just want to reintroduce you guys."

17         Who is Darren Blanton?

18  A   Darren Blanton is an investor who runs an entity called

19  Colt Ventures in Dallas.

20  Q   In the first e-mail Mr. Blanton writes to the defendant

21  and yourself at the top -- actually, that ktpierotti@aol

22  e-mail address, what e-mail address is that?

23  A   That was an e-mail address that I had sort of inherited

24  from my wife.  That's the K.  My wife's name is Kristen.  What

25  I was using was my personal e-mail at the time.

Pierotti - direct - Smith                    4283

1   Q     It's an e-mail from Mr. Blanton to the defendant and

2   yourself and Mr. Blanton says, "Try my cell today about the

3   stock."

4         Did you have a conversation with the defendant about

5   Mr. Blanton and your shares that you had received of Desert

6   Gateway?

7   A     Yes.

8   Q     And what did the defendant say to you about the stock

9   with respect to Mr. Blanton?

10  A     There was another e-mail where I said, I don't really

11  want to do business with that guy.

12  Q     So what did the defendant ask you to do with respect to

13  Mr. Blanton and your shares?

14  A     I don't remember him asking me directly, but -- I don't

15  remember the conversation, but I know that he wanted me to

16  sell stock to Darren at a discount.

17  Q     And did you sell stock to Mr. Blanton?

18  A     I did not.

19  Q     If you can turn to Government Exhibit 120-15 which is tab

20  15.

21  A     Yup.

22  Q     And if you look at the bottom e-mail it's an e-mail from

23  Lenora Izerne.  Who is Lenora Izerne again?

24  A     My understanding is it's Martin's sister.

25  Q     And what was her role at Retrophin?

Pierotti - direct - Smith                    4284

1    A    I guess she was an office manager as best I can tell.

2    Q    And are you one of the recipients of this e-mail?

3    A    Yes, I am.

4    Q    And it's dated Thursday, December 20, 2012 and the

5    subject is "Holiday Schedule."  And the e-mail says, "On

6    Jackson's behalf, I would like to inform everyone that our

7    office will be closed beginning next week, Monday, December

8    24th, through Tuesday, January 1st."

9            And then if we can scroll up, the defendant

10   responds, "The office is just closed on the market holidays,

11   the 24th and 25th and 31st."

12           Once you had purchased the shares of Desert Gateway,

13   what did the defendant say to you about where he wanted you to

14   work?

15   A    He wanted -- he said, not just to me but to a broader

16   group of people, that he wanted people to be in the office.

17   Q    Did you have any concerns about being in the office at

18   that point?

19   A    Yes.  I didn't want to be in the office.

20   Q    And why didn't you want to be in the office?

21   A    I felt it would make me privy to nonpublic information,

22   plus I had no reason to be in the office.

23   Q    And why was that?

24   A    Because I was working on a Carico transaction.

25   Q    And was that different, that the defendant wanted you to

Pierotti - direct - Smith                    4285

1  work in the office, from what he had told you previously about

2  wanting to clear out of the office once Retrophin went public?

3  A    Yes.

4  Q    And did you have a conversation with the defendant about

5  the request to work in the office?

6  A    I did.

7  Q    What did he say to you?

8  A    He said if you're uncomfortable with it, with being in

9  the office, and then call the lawyer, Evan Greebel.

10 Q    And did you have a conversation with Mr. Greebel about

11 being in the office?

12 A    I did.

13 Q    And what did he say to you?

14 A    He said, Close the door to that office.

15 Q    And did that answer satisfy your concern about hearing

16 nonpublic information about the Retrophin?

17 A    No.

18 Q    After that conversation, what did you decide to do in

19 terms of coming into the office?

20 A    I was already not coming into the office.

21 Q    Did you continue not coming into the office?

22 A    Yeah, I continued to not come into the office.

23 Q    Earlier we had talked about the Scottrade accounts that

24 you were unable to open for the stock.

25              Did you ultimately open a different account for the

Pierotti - direct - Smith                        4286

1    350,000 shares that you received?

2    A    I did.

3    Q    Where was that account opened?

4    A    It was a little company called MLV & Co.

5    Q    And where was located?

6    A    Midtown.

7    Q    And who did you tell about where you had opened that

8    account?

9    A    Marek Biestek.

10   Q    Did you ever tell the defendant about where that account

11   was?

12   A    I don't think so.

13   Q    And what did you do with the 350,000 shares that you

14   received as a result of the purchase agreement?

15   A    I slowly sold them over time.

16   Q    And you received them in December of 2012; is that right?

17   A    Yes.

18   Q    And why did you sell them over time?

19   A    Well, there was no liquidity to sell them all so if I had

20   tried to sell 350,000 shares when there was very little

21   trading liquidity, it would have crushed the stock and taken

22   the stock much lower.  It would have meant that I would have

23   received less revenues and I also did think to sell it at a

24   really low level would have been injurious to the efforts of

25   creating Retrophin and all the people that I knew working on

                    SN      OCR      RPR

Pierotti - direct - Smith                              4287

1    it.

2    Q    When you said that the stock would be low, do you mean

3    the stock price?

4    A    Yes.

5    Q    And did you start to sell the shares that you received

6    from the purchase agreement shortly after receiving them?

7    A    I did.

8    Q    I'm going to show you what's been marked for

9    identification as Government Exhibit 120-16 which is tab 16.

10          Is this an e-mail from the defendant to yourself at

11   the AOL address that we saw earlier?

12   A    Yes.

13   Q    That's in December 2012?

14   A    Yes.

15   Q    And is it related to the shares that you received from

16   the purchase agreement?

17   A    Yes.

18          MS. SMITH:  Your Honor, I move to admit Government

19   Exhibit 120-16 into evidence.

20          MR. AGNIFILO:  No objection.

21          THE COURT:  We will receive Government 120-16.

22          (Government Exhibit 120-16 received in evidence.)

23   BY MS. SMITH:

24   Q    So if we can start with the bottom e-mail which is on

25   December 28, 2012, the defendant says, "Hey, Tim.  Merry

Pierotti - direct - Smith                    4288

1   Christmas.  I'm going to be in your neck of the woods

2   tomorrow, Princeton, and have some time to pop down if you

3   have a minute."

4          And what did you respond to the defendant?

5   A    "If you need to communicate something to me, talk to

6   Marek.  He and I speak regularly."

7   Q    And then in response on December 30, 2012 what did the

8   defendant say back to you?

9   A    I'll read it?

10  Q    If you can read it.

11  A    "After giving you $5,000 out of my own pocket and getting

12  you into a deal to get 300,000 shares, the least you can do is

13  dane to speak with me.  I have spent a tremendous amount of

14  time thinking about this situation and this is infuriating.  I

15  would like to buy the 300,000 shares from you for the same

16  price you paid for them.  The whole idea of working with you

17  on Retrophin as a project was a big mistake and undoing it is

18  the best solution for everyone involved.  All you have to do

19  is agree to this and this nightmare will end for everyone."

20  Q    Did you know what the defendant meant when he said the

21  whole idea of working with you on Retrophin as a project was a

22  big mistake?

23  A    No.

24  Q    Did you respond to this e-mail?

25  A    I'm sure I didn't.

SN        OCR        RPR

Pierotti - direct - Smith                4289

1    Q     After this e-mail, did you have a phone conversation with

2    the defendant?

3    A     We had one phone conversation.

4    Q     What do you remember about that call?

5    A     A lot of screaming and yelling from Martin.

6    Q     And what specifically did he say to you on that call?

7    A     He demanded that I sell the shares to him at -- you know,

8    at a -- you know, this number, $400 or something like that.

9    Q     And did you tell him on the call that you would sell the

10   shares back?

11   A     No.

12   Q     I'm going to show you what have been marked for

13   identification as Government Exhibits 120-17 and 120-18 is and

14   those are tabs 17 and 18 in your binder.

15          Are both of these documents e-mails from the

16   defendant?

17   A     Yes.

18   Q     And did you receive both e-mails?

19   A     I believe so, yes.

20   Q     And are they both again related to the stock of Retrophin

21   or the shares that you received in the purchase agreement?

22   A     Yes.

23          MS. SMITH:  Your Honor, the Government moves to

24   admit Government Exhibits 120-17 and 120-18 into evidence.

25          MR. AGNIFILO:  No objection.

Pierotti - direct - Smith                    4290

1            THE COURT:  We'll receive 120-17 and -18.

2            (Government Exhibits 120-17 and 120-18 received in

3    evidence.)

4    BY MS. SMITH:

5    Q    Looking first at Government Exhibit 120-17 and focusing

6    on the bottom e-mail, this is an e-mail from the defendant

7    dated December 30, 2012 and it's to you and a number of other

8    people.

9            The other individuals copied on this e-mail are

10   Marek Biestek, Tom Fernandez, Kevin Mulleady, Ron Tilles and

11   Andrew Vaino; is that right?

12   A    Yes.

13   Q    And are those all individuals who had the opportunity to

14   purchase shares from of Desert Gateway from Michael Fearnow?

15   A    Yes.

16   Q    And what is the subject line?

17   A    "Over the wall" in capital letters, "Retrophin marketing

18   pipe."

19   Q    And what does it mean to be over the wall?

20   A    Over the wall means that you are making yourself

21   available to nonpublic, inside information.

22   Q    What does it mean to bring someone over the wall?

23   A    It means that you are giving them inside information

24   which would make it impossible for them to be in the market

25   transacting.

Pierotti - direct - Smith                 4291

1  Q    So would getting nonpublic information about a particular

2  company prevent you from selling shares of that company?

3  A    Yes.

4  Q    And if you can read the final paragraph of that e-mail,

5  it says "Finally, I must admit."

6  A    "Finally, I must admit to you all that I have been

7  extremely stressed about Retrophin.  The declining stock price

8  stock is particularly alarming.  Please consider that if you

9  have deposited your founder's stock that you consider making

10 it unshortable.  This is obviously in all shareholders' best

11 interests as we are contemplating that these financings is not

12 a good for the stock to be declining.  Obviously now that you

13 are 'over the wall' you may not sell any stock until these

14 transactions are completed."

15 Q    What does it mean to make your shares unshortable?

16 A    In order to -- in order to short a stock means you're

17 selling it without owning it.  So you have to borrow that

18 stock from a broker/dealer.

19        The broker/dealer compensates people for lending out

20 their stock.  So if you refuse to lend out your stock, it

21 makes it less possible and more expensive for anybody to try

22 to short it.

23 Q    And if we can just scroll up to the top e-mail, this is

24 another e-mail from the defendant to the same group of people

25 also on December 30, 2012 and he says -- can you just read

Pierotti - direct - Smith                    4292

1   what he wrote here?

2   A    "I still have not received any responses.  Please help as

3   this is an urgent and important matter.  If Retrophin doesn't

4   raise $1 million in the near future, I think you know what the

5   result will be."

6   Q    I'm going to ask you to turn to tab 18 which is

7   Government Exhibit 120-18.  This is an e-mail from the

8   defendant to you and it has your name three times.  Was

9   Tim@MSMBconsumer.com?

10  A    That had been an e-mail that I had used, yes.

11  Q    And who's copied on the e-mail?

12  A    It is to Tim Pierotti, Tim Pierotti, Evan Greebel and

13  Martin Shkreli.

14  Q    And the subject is "Litigation."  And can you just read

15  that first paragraph, "I have decided to commence litigation

16  against you"?

17  A    "I have decided to commence litigation against you for

18  failing to honor the agreement we made in our office on or

19  around December 10th.  You agreed to work for me, growing and

20  managing my investments and engaging with me on new

21  opportunities.  In connection with that, you had the

22  opportunity to purchase Retrophin stock on favorable terms.

23  Instead, you have failed to come to the office.  You have

24  failed to perform the necessary work on the Wentworth

25  transaction.  You have failed to provide services or ideas for

Pierotti - direct - Smith                    4293

1    any of my other endeavors and do not even return my telephone

2    calls.  This is classic, cut-bait fraud.  You cannot agree to

3    take the financial benefits of our relationship and not show

4    up to work and do the services expected of you.  I am going to

5    notify your brokers of this pending litigation and request

6    that they freeze your account and all transfers associated

7    with it.  We are commencing this action in the Southern

8    District of New York and you can expect to be served later

9    this week if we are not able to resolve this situation.

10   Alternatively, you can sign this agreement which I believe you

11   will find to be an effective settlement.  I will let you keep

12   the funds you have received and will also give you $40,000 to

13   end this unfortunate situation for both of us.  I'm sorry our

14   business relationship could not continue further and I wish

15   you the best.  If you have any questions, please let me know,

16   Martin Shkreli."

17   Q    Did you know what agreement -- he references in the

18   e-mail, "an agreement you made in our office on or around

19   December 10th."

20        Do you know what agreement the defendant is

21   referring to here?

22   A    No agreement is listed.

23   Q    He mentioned something called the Wentworth transaction.

24   What is that?

25   A    He's talking about Carico.

Pierotti - direct - Smith                    4294

1  Q    Why is it called Wentworth?

2  A    Marek and I decided to create our own entity.  I live on

3  Wentworth Road in Summit, New Jersey.  The entity that Marek

4  and I were creating was called Wentworth Capital or Wentworth

5  something.

6  Q    And had there ever been any agreement after the

7  termination agreement that you signed in November of 2012 to

8  work for the Defendant?

9  A    No.

10  Q    And had there ever been any agreement to work for

11  Retrophin?

12  A    No.

13  Q    And just if we can go back to Government Exhibit 120-17

14  for just one minute and just focus in on the bottom e-mail.

15        Did you actually read this e-mail which you received

16  it?

17  A    No.

18  Q    I'm going to show you what's --

19        THE COURT:  Can we just clarify the record?

20        MS. SMITH:  Government Exhibit 120-17.

21        THE COURT:  This is the e-mail at 11:57 a.m.?

22        MS. SMITH:  Yes, at 11:57 a.m.

23        THE COURT:  Thank you.

24  BY MS. SMITH:

25  Q    I'm going to show you what's been marked as Government

Pierotti - direct - Smith                    4295

1    Exhibit 120-19 which is tab 19 for identification.

2              MR. AGNIFILO:  What was the number again?

3              MS. SMITH:  Government Exhibit 120-19.

4    Q    What is this document?

5    A    This is a letter that Martin wrote to my wife.

6    Q    And is it addressed to her at your home address?

7    A    It was.

8    Q    And do you remember receiving it?

9    A    I sure do.

10             MS. SMITH:  Your Honor, the Government moves to

11   admit Government Exhibit 120-19 into evidence.

12             MR. AGNIFILO:  No objection.

13             THE COURT:  We will receive Government Exhibit

14   120-19.

15             (Government Exhibit 19 received in evidence.)

16   Q    And is this first page of the document a copy of the

17   envelope of the letter -- the envelope that the letter arrived

18   in?

19   A    Yes.

20   Q    And the address there is 777 Third Avenue.  Is that the

21   address of Retrophin?

22   A    Yes.

23   Q    And, again, who is Kristen Pierotti?

24   A    Kristin is my wife.

25   Q    If we can turn to the second page of the document and

1    focus in on the first three paragraphs.

2            Actually, can we go back to page one for just one

3    minute?  If you look at the post stamp on the letter, what's

4    the date of the post stamp?

5    A    It's Jan 15, 2013.

6    Q    And if you just take a look quickly back at Government

7    Exhibit 120-18 which was the e-mail about litigation, what was

8    the date about that e-mail?

9    A    January 2nd of 2013.

10   Q    So turning back to Government Exhibit 120-19 and the

11   second page -- and you said this was a letter that the

12   defendant sent to your wife?

13   A    Yes.

14   Q    Can you read the first paragraph that says "Hello

15   Kristen"?

16   A    "Hello Kristen.  It was nice to meet you last year at the

17   mid cap event.  Unfortunately I am writing this letter to you

18   under less favorable circumstances.  Your husband has stolen

19   1.6 million from me -- from my organization and I am pursuing

20   legal action to get it back."

21   Q    What was the mis cap event?

22   A    It was -- there was a TV show and this had something --

23   the event had something to do with it.  It was like oh, no, it

24   was -- there was -- maybe there was a Broadway play.  There

25   was a Broadway play and the people from the Broadway play were

Pierotti - direct - Smith                    4297

1   there and there was -- it was somehow tied to a TV show as

2   well, but it was is an event around a Broadway play.  It was a

3   fundraiser.

4   Q    Did you and your wife attend that event?

5   A    We did.

6   Q    And did the defendant attend that event as well?

7   A    Yes.

8   Q    I'm going to read the second paragraph.  "From day one

9   Tim was a terrible employee.  My partners and I see handed Tim

10  a brand new hedge fund and asked him to do what we thought he

11  knew how to do best, trade and invest.  Unfortunately Tim's

12  idea of investment analysis is nothing more than parroting

13  what he read on the news.  I tried to give Tim new training

14  and tools that would make him semi-marketable in the modern

15  investment world.  Tim refused to lift a finger when it came

16  to applying my robust investment methodology.  Instead, Tim

17  chose to leave at 5 p.m. every day expecting his awful method

18  of picking stocks, which hasn't worked his entire career,

19  would somehow start working.  Finally, Tim was asked to market

20  his fund to new investors and failed to do so.  Tim is the

21  kind of person that gives up when the going gets hard and

22  blames others for his shortcomings.  We shut Tim's fund down

23  recently and gave him a reasonable settlement."

24          What was your reaction to this description of your

25  work for MSMB Consumer?

1   A    I mean, should I go sentence by sentence?

2   Q    No, just as a general matter the reaction to --

3   A    It was nonsense.  There's virtually nothing in there

4   that's true.

5   Q    And what had your track record been at Galleon and the

6   other --

7   A    Outstanding -- outstanding.  I had top quartile returns

8   in '07 at Galleon.  I had top quartile returns in '08 at

9   Galleon.  I had a 65 percent positive P&L on trades in the

10  entire time I was at Victoire.

11              (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pierotti - Direct - Smith                    4299

BY MS. SMITH:

Q    And what was the reason that MSMB Consumer stopped operating?

A    There was no capital.

Q    Who had removed the capital from MSMB Consumer?

A    Martin.

Q    The next paragraph reads:

When Tim informed my partner Marek that he was going to quote, sell his wife's jewelry to pay for the mortgage, I immediately summoned Tim to our offices and gave him a personal check for $5,000.  Tim promptly deposited it that day.  Tim likes taking my money and doing nothing for it.  I told Tim that he ever needs funds he can rely on me to provide them for him, provided that he work hard.  Of course Tim doesn't like that part.

Is that reference to a personal check for $5,000, do you know what the defendant is referencing there?

A    Yes.  There was a day he gave me a check for $5,000 post severance agreement.

Q    Did you know why the defendant gave you money at that point?

A    I would be speculating.

Q    Did he give you an explanation for giving you a check?

A    Not that I recall.

Q    The next paragraph says:

Pierotti - Direct - Smith                    4300

1           We recently renegotiated Tim's association with our

2    companies which would provide him in exchange for showing up

3    to work every day and applying his efforts to grow our

4    collective wealth 400,000 shares of Retrophin, the company I

5    started.  Tim took the stock and ran off.  He refuses to

6    return our phone calls, this is called fraud.

7           There is a reference here to renegotiating Tim's

8    association with our companies.  Was that true?

9    A    There was no renegotiation.

10   Q    And the 400,000 shares that you received of Desert

11   Gateway which became Retrophin, was that an agreement between

12   you and the defendant?

13   A    No.  It was an agreement between myself and Michael

14   Fearnow, Joy Fearnow.

15   Q    The next paragraph says, I had Tim's stock account frozen

16   at his brokerage firm.  I'm a very determined person Ms.

17   Pierotti.  Your husband has stolen 1.6 million from me and I

18   will get it back.  I will go to any length necessary to get it

19   back.  Mr. Pierotti has informed my partner, that you or he

20   had some sort of legal counsel to assist you against a quote,

21   frivolous lawsuit.  This is not frivolous.  Your husband has

22   broken a contract that no less than seven people are willing

23   to sign an affidavit attesting to.  I offered your husband

24   $40,000.00 for the safe return or what is rightfully mine and

25   he refused.  Instead he prefers to continue to commit crimes

Pierotti - Direct - Smith                    4301

1    of fraud just as he did at his prior employer at the Galleon

2    Group and probably did at his other employer Incremental.

3           The first sentence talks about having your stock

4    account frozen?

5    A    Yes.

6    Q    What is that a reference to?

7    A    He apparently called MLV & Company and told them that I

8    had stolen this stock from him, and MLV & Company did shut the

9    account down.

10   Q    And MLV & Company is the small brokerage account where

11   you had put the 350,000 shares?

12   A    Yes.

13   Q    The last paragraph if we can scroll down.

14          THE COURT:  May I ask something, you said you put

15   the shares there.  What happened once your account there was

16   shut down.  What happened to the shares.

17          THE WITNESS:  The shares were released to me and I

18   put them in another brokerage account the next day.

19          THE COURT:  Thank you.

20   Q    The last paragraph reads, having already frozen your

21   husband's stock account once, I will do so repeatedly until I

22   get what is mine.  My lawyers believe this-- my lawyers

23   believe -- I -- this is an open and shut case.  Your pathetic

24   excuse of a husband needs to get a real job that does not

25   depend on fraud to succeed.  We have worked hard to build

Pierotti - Direct - Smith                    4302

1   Retrophin into a success, something Tim has had nothing to do

2   with.  Tim did nothing to build his sad fund into something

3   even remotely substantial and I saw no reason to support his

4   lack of effort.

5           After the defendant froze your initial account with

6   the 350,000 shares, did you-- and you moved it to a different

7   account, were you able to sell the shares from that account?

8   A   Yes.

9   Q   And then if we can turn to the last page of the document.

10  This reads:

11          Needless to say, when I initiate my litigation, I

12  will sue both you and your husband for fraud.  I am going to

13  inform the bank who holds your mortgage and local Police

14  Department that you have committed fraud.  I hope to see you

15  and your four children homeless and will do whatever I can to

16  assure this.  Your husband's arrogance is infuriating and

17  making an enemy out of me is a huge mistake.  I am tempted to

18  withdraw my offer for $40,000 to make this all go away, but I

19  implore you to reason with your husband.  $40,000 is enough

20  for him to get off his ass and find a real job, something I

21  know he truly has no interest in doing.  However, I will leave

22  the offer open, as I know you have no interest in you and your

23  husband being sued for fraud and your bank terminating your

24  mortgage, something I assure you, I will stop at nothing to

25  accomplish.

Pierotti - Direct - Smith                    4303

1           Who signs the letter?

2    A    It was unsigned.  He put his name, but he didn't sign it.

3    Q    Following the result of this letter, did the defendant

4    take any legal action with respect to the 350,000 shares of

5    Retrophin that you had received?

6    A    He eventually did.

7    Q    Did he sue you or did Retrophin sue you?

8    A    Retrophin sued me.

9    Q    What law firm handled that suit?

10   A    Katten Muchin.

11   Q    What was the claim in the suit for why you should have to

12   return the shares?

13   A    Because as he claims here, that I had made some agreement

14   to work for him again.

15   Q    Again, did you make an agreement to work for him?

16   A    No.  There was some discussion around the office, that--

17   there would be kind of a family office, people who had

18   invested into the reverse IPO would, you know, at an arms

19   length do business together.  But, that was it.  There was

20   never any agreement, never anything I agreed to.  It was just

21   kind of a discussion that was around.

22   Q    Did you agree to work for Retrophin?

23   A    No.

24   Q    Your purchase agreement for the shares was with Troy

25   Fearnow; is that right?

Pierotti - Direct - Smith                    4304

1  A    Yes.

2  Q    We talked about how it was for 400,000 shares, but you

3  originally only received 350,000 shares; is that right?

4  A    Correct.

5  Q    Did you ever receive the remaining 50,000 shares?

6  A    No.

7  Q    Did you contact the Fearnows about those shares?

8  A    I did.

9  Q    What did Michael Fearnow say about the shares?

10 A    He said he didn't want to get in between the dispute

11 between Martin and I.

12 Q    Did he release those shares to you?

13 A    No, he didn't.

14 Q    Again, was the defendant a party to that purchase

15 agreement between you and Troy Fearnow?

16 A    No.

17 Q    Ultimately was the lawsuit between Retrophin and you

18 settled?

19 A    Yes.

20 Q    What happened to those 50,000 shares as a result of the

21 settlement?

22 A    Those fifty thousand shares which I could not access, I

23 ultimately released any claim on, and he gave me $165,000.

24 Q    When you say, he gave you $165,000, who was that?

25 A    Martin or perhaps Retrophin, I don't recall.

Pierotti - Cross - Agnifilo                    4305

1   Q     Did you sell the other 350,000 shares that you received

2   from the agreement with Troy Fearnow?

3   A     I did.

4   Q     How much money did you earn from the sale of those

5   shares?

6   A     I think ultimately about a million and a half dollars

7   which net to me was after taxes and after legal fees, about

8   half a million dollars.

9   Q     What was the last contact that you had with the defendant?

10  A     When we negotiated the settlement.

11  Q     Was that in early 2014?

12  A     Yeah.

13            MS. SMITH:  Just one moment.

14            Your Honor, I have no further questions.

15            THE COURT:  All right.  Thank you.

16  CROSS EXAMINATION BY MR. AGNIFILO:

17  Q     Good afternoon, Mr. Pierotti.

18  A     Afternoon.

19  Q     My name the Marc Agnifilo, I am one of Martin Shkreli's

20  lawyers.  I will ask you some questions.  If I ask you a

21  question that you don't understand, ask me to rephrase it, I

22  will be happy to do that, okay?

23  A     Okay.

24  Q     You still have Exhibit 120-17 in front of you?

25  A     Yup.

Pierotti - Cross - Agnifilo                    4306

1    Q    And 120-17 is in evidence, so I will put it up on the

2    screen here.  Never mind my highlighting, that is mine.

3              127 in evidence is an E-mail from Martin Shkreli

4    from December 30th, 2012, correct?

5    A    Yup.

6    Q    And it is to you and a number of other people, correct?

7    A    Yes.

8    Q    And it says, "over the wall".

9    A    Yes.

10   Q    "Direct marketing pipe", right?

11   A    Yes.

12   Q    You had just gotten a number of Retrophin shares, correct?

13   A    Yes.

14   Q    How many exactly, 350,000?

15   A    Yes.

16   Q    And, you testified on direct examination that the phrase,

17   "over the wall", is a significant phrase, because it means if

18   you are over the wall, you can't legally trade in a security,

19   correct?

20   A    Actually, if you agree to be brought over the wall it

21   means you can't trade the security.

22   Q    If you are aware of information that causes you to be

23   over the wall, you can't trade in a security, correct?

24   A    I'm not sure.

25   Q    Well, you have committed insider trading, haven't you?

Pierotti - Cross - Agnifilo                    4307

1    A    No.

2    Q    You didn't commit insider trading?

3    A    No.

4    Q    No?

5         You in terms of your-- let's talk about the Galleon,

6    okay, can we do that.

7         When did you start working at Galleon?

8    A    Let's see, 2005.

9    Q    And, you were there until how long?

10   A    The end of 2008.

11   Q    And at some point, Smuckers merged with the Folgers

12   Coffee company, right?

13   A    No.

14   Q    No.  Tell us what happened?

15   A    Smuckers bought Folgers from Procter & Gamble.

16   Q    So Folgers is with Procter & Gamble and Smuckers buys

17   Folgers, correct?

18   A    Yes.

19   Q    And, you knew that you had inside information about this

20   transaction before it happened, correct?

21   A    I did, yes.

22   Q    And, you had information about this transaction before

23   the market had information about this transaction, correct?

24   A    Correct.

25   Q    And you had information that you knew was from an inside

Pierotti - Cross - Agnifilo                    4308

1    source, correct?

2    A    Correct.

3    Q    And so there is no doubt, that you knew you had inside

4    information, right?

5    A    Correct.

6    Q    And what you said on direct examination, you didn't think

7    it was material, right?

8    A    Correct.

9    Q    This is a $3.3 billion deal, right?

10   A    I don't recall the numbers.

11   Q    You don't recall it was $3.3 billion?

12   A    No.

13   Q    Let me see if I can refresh your recollection.

14          It was big news when it happened, wasn't it?

15   A    Not really.

16   Q    It wasn't big news?

17   A    No.

18   Q    Here is what I will do, I will show you something.

19   Actually, I will do it on the screen.  It is not in evidence.

20   This is just to refresh your recollection.

21          Do you remember the date being June 4th, 2008, of

22   this transaction?

23   A    I'm sure it was.

24   Q    You have no doubt, reason to disbelieve that, correct?

25   A    No.

Pierotti - Cross - Agnifilo                    4309

1   Q     Right.

2         And, you remember that Smuckers as you said was

3   merging.  The word here, with P&G, Procter & Gamble, Folgers

4   business, do you remember that?

5   A     Yes.

6   Q     And you remember that there was a fair amount of

7   publicity, a fair amount of reporting on this $3.3 billion

8   transaction?

9   A     I don't remember there being a whole lot of reporting

10  about it.  It wasn't a big deal in the consumer world.

11  Q     No?

12  A     No.

13  Q     Do you remember it being $3.3 billion?

14  A     I don't.  Now that I see it now, I have no reason to

15  doubt it.

16  Q     Did you think it was something different than 3.3 billion

17  dollars until you just saw it?

18  A     No.

19  Q     You didn't think that having inside information about a

20  $3.3 billion transaction was material?

21  A     I didn't think it was material, no.

22  Q     No.

23        And --

24  A     What did the stock do that day?

25  Q     Listen, I ask the questions, you give the answers.  Do we

Pierotti - Cross - Agnifilo                    4310

1    have an understanding about that?

2    A    Sure.

3    Q    What did the stock do that day?

4    A    Nothing.

5    Q    Nothing.

6              And so, it never did anything?

7    A    I don't recall.

8    Q    You don't recall.  You don't recall that the stock,

9    Smucker's stock went up?

10   A    If it went up it went very small.

11   Q    Yeah.

12             Well, what was-- what exactly, because you said on

13   direct examination, these were small transactions, a small

14   trade that you did.  What was the trade that you did in Smuckers?

15   A    I think I had like 20,000 shares on-- of what was the

16   price of the stock?  Was it a $25 stock?  So, 20,000 shares of

17   $25 stock that would have been half a million dollars on a

18   $130 million portfolio.

19   Q    Whose Michael Cardillo?

20   A    Michael Cardillo was a guy who traded for me.

21   Q    Was Michael Cardillo involved in this particular trade?

22   A    Yes.

23   Q    Tell the jury how he was involved.

24   A    How was he involved?

25   Q    Yeah.

1    A    He traded the stock for me.

2    Q    Yeah?

3    A    He was my trader at Galleon.

4    Q    Right, and Cardillo traded, did the Smucker's trade on

5    your behalf, correct?

6    A    Yes.

7    Q    You have a specific recollection of the size of the trade?

8    A    I want to say it was 20,000 shares, but I don't remember

9    exactly.

10   Q    20,000 shares of stock of what value?

11   A    Call it $25, I don't remember exactly.

12   Q    You only did one trade?

13   A    I think it might have been ten and ten.

14   Q    Ten and ten?

15   A    I bought ten and then I bought an additional ten.

16   Q    Ten, what do you mean by ten?

17   A    I'm sorry, ten thousand and then bought an additional ten

18   thousand.

19   Q    At about 25?

20   A    That is how I recall it, yeah.

21   Q    And, who did you get the inside information from?

22   A    Raj Rajaratnan -- actually Raj Rajaratnan's brother, R.K.

23   Rajaratnan.

24   Q    You understand the source of this information, was a

25   Board member of Procter & Gamble, correct?

Pierotti - Cross - Agnifilo                    4312

1    A    Correct.

2    Q    So, Procter & Gamble would have been over the wall, in

3    this scenario, correct?

4    A    Board member of Procter & Gamble would have been over the

5    wall.

6    Q    Right, because in this scenario, Procter & Gamble would

7    have known about this impending transaction, correct?

8    A    They sold it to him.

9    Q    They would know about it, right?

10   A    Of course.

11   Q    That is what it means to be over the wall, the people in

12   Procter & Gamble who knew that this transaction was about to

13   happen, could not trade in any of the companies involved in

14   the transaction, correct?

15   A    You have to repeat the question.

16   Q    Sure.

17             Procter & Gamble, a Board member of Procter & Gamble

18   would know of the impending transaction and therefore could

19   not trade based on it, correct?

20   A    Sure.

21   Q    That is what it means to be over the wall, right?

22   A    That is not the entire definition of over the wall, that

23   would have been over the wall.

24   Q    How about you give us the entire definition of over the

25   wall, go ahead.

RB          OCR

Pierotti - Cross - Agnifilo                    4313

1   A    I don't know it exactly.  The way you are characterizing

2   it in that singular form, I thought was not adequate.

3   Q    So let's go back now to 120-17, where you are being

4   brought over the wall.  We can put that --

5   A    I didn't read the E-mail.

6   Q    Sorry?

7   A    I didn't read the E-mail.

8   Q    You made that clear-- do you think I just asked you that

9   question?

10             MS. SMITH:  Objection, Your Honor.

11             THE COURT:  All right.  Both of you.

12             THE WITNESS:  I understand.

13             THE COURT:  Let's not argue, ask the question,

14   answer the question.  All right.

15   Q    You get this E-mail from Martin Shkreli, right?

16             You have to answer "yes" or "no", someone is writing

17   this down.

18   A    I got an E-mail, I think he sent it to my Facebook as well.

19   Q    Listen, I will ask you a question.  Answer the question,

20   please.

21             You got this E-mail from Martin Shkreli, right?

22   A    I'm trying to answer the whole question.

23   Q    It is a simple question.

24   A    Yeah, I got the E-mail.

25   Q    You got an E-mail to an E-mail address, right?

Pierotti - Cross - Agnifilo                    4314

1   A    I guess so, yeah.

2   Q    Are these your-- Tim Pierotti, you see your name on the

3   E-mail as recipient?

4   A    Yes.

5   Q    Do you have any doubt that you got it?

6   A    No.

7   Q    You said on direct examination, you got it.

8   A    Yeah.

9   Q    Right.  You said you didn't read it, right?

10  A    Correct.

11  Q    That is your testimony, that is your sworn testimony here

12  today, you didn't read this, correct?

13  A    Yeah.

14  Q    So let's see what it says since it is in evidence.

15           Over the wall, in capital letters, you see that, right?

16  A    Yeah.

17  Q    That is a warning to you, do you understand, this is a

18  warning to you, over the wall, is a warning to you?

19  A    I didn't understand it to be a warning.

20  Q    You didn't understand, over the wall, to be a warning?

21  A    I understand it as him trying to bring me over the wall,

22  which I didn't want to be.

23  Q    Now, at this point in time, had you gone to the SEC as a

24  whistle blower, by December 30th, 2012, had you gone to the

25  SEC as a whistle blower in connection with insider trading

1   situation with Smuckers?

2   A    I believe I had at that point.

3   Q    You went in 2010, right?

4   A    Okay.

5   Q    I'm asking you.

6   A    Yes.

7   Q    Yeah, does that sound right?

8   A    That's sounds right.

9   Q    Because the way it was phrased on direct examination, you

10  were asked a question was, was there a-- was there a

11  transaction while you were at Galleon that concerned you?

12  A    Yes.

13  Q    Do you remember that question?

14  A    Yup.

15  Q    You were concerned about this transaction, right?

16  A    Yes.

17  Q    And you were especially concerned with this transaction

18  when Raj Rajaratnan got arrested for it, right?

19  A    Yes.

20  Q    And you didn't go to the SEC before Raj Rajaratnan got

21  arrested for it, right?  You went after.

22  A    Is that correct?  I don't know.  It was right around the

23  same time.

24  Q    Raj Rajaratnan, do you remember him being arrested in 2009?

25  A    Yes.

Pierotti - Cross - Agnifilo                    4316

1   Q    And you went to the SEC in 2010, right?

2   A    Yeah, I think I might have started the process before

3   that though.  I had gone sideways with a lawyer for awhile

4   before firing that lawyer and contacting the SEC myself.

5   Q    So, tell me how the-- you went sideways with a lawyer,

6   you could not go to the SEC, tell us how that worked?

7   A    He wanted to negotiate with the Government.

8           MS. SMITH:  Objection, Your Honor, attorney/client

9   privilege.

10  Q    I will not ask you anything that you said to your lawyer

11  or anything your lawyer said to you.

12          I am following up on what your answer was, you said

13  you went sideways with a lawyer and this process took awhile.

14  So you didn't go to the SEC until 2010.  I just want you to

15  tell the jury what happened.

16  A    I had retained an attorney and he began trying to

17  negotiate for the terms of a proffer.  When you talk to the

18  Government.  And it was holding things up.  I wanted to-- I

19  didn't want things held up, so I fired the lawyer, and I

20  reached out to I guess the SEC or the U.S. Attorney's office

21  directly.

22  Q    Which one?

23  A    I don't remember.

24  Q    You don't remember?

25  A    Ah-hum.

Pierotti - Cross - Agnifilo                    4317

1   Q    It could have been the SEC or it could have been the U.S.

2   Attorney's office?

3   A    Yeah.

4   Q    Either one?

5   A    Ah-hum.

6   Q    Do you remember making a whistle blower complaint

7   specifically?

8   A    Yes.

9   Q    Had you ever tried to make a whistle blower complaint at

10  the U.S. Attorney's office?

11  A    No, the U.S. Attorney was trying the-- I don't remember

12  who I had contacted.  Ultimately the whistle blower is only a

13  SEC program.

14  Q    Right.

15  A    That is not to say I was even aware of that.

16  Q    Were you aware of it?

17  A    Look, all I'm telling you, I called somebody from the

18  Government.  I don't remember if I called the SEC or I called

19  the U.S. Attorney.

20  Q    So, you go to the SEC, you just testified five minutes

21  ago, in 2010, correct?

22  A    Okay, correct.

23  Q    Raj Rajaratnan was arrested in 2009?

24  A    Right.

25  Q    Right?

Pierotti - Cross - Agnifilo                    4318

1    A    Ah-hum.

2    Q    You went to the-- the first time you actually spoke with

3    anyone from the Government was after Raj Rajaratnan had gotten

4    arrested, yes?

5    A    Yes.

6    Q    So, your concern with the transaction is people are now

7    getting arrested for the transaction that you were involved

8    in, that was your concern, fair to say?

9              MS. SMITH:  Objection.

10             THE COURT:  Overruled.

11   Q    You can answer the question, sir.

12   A    People were not getting arrested for that transaction

13   particularly.  As I recall, it was other transactions as well.

14   Q    Right, but one of the transactions that you understood

15   Raj Rajaratnan was arrested for, was the very transaction you

16   were involved in concerning Smuckers and Folgers, correct?

17   A    Yup.

18   Q    That's when you went to the SEC, true?

19   A    True.

20   Q    So, now, here, getting back to 120-17.  This E-mail that

21   I understand you didn't read, is telling you that there is

22   going to be financing conducted with Retrophin, correct?

23   A    Yes.

24   Q    Right, that is what this says?

25   A    Yeah.

Pierotti - Cross - Agnifilo                    4319

1   Q     The same exact thing that happened in regard to the

2   Folgers, Smuckers deal, that there was going to be a

3   transaction that certain people on the inside knew of before

4   it was public, right?

5   A     No, I don't think it is same exact thing.  The situation

6   was different.

7   Q     Here, what Shkreli is telling you in the E-mail that

8   says, over the wall, Retrophin marketing pipe.  What is

9   "marketing pipe" mean?  What did you understand that to mean?

10  A     Trying to sell money in a private placement.

11  Q     Tell the jury --

12  A     Not sell, we are trying to sell shares in a private

13  placement.

14  Q     Tell the jury what that means so they have a better

15  understanding.

16  A     Usually you do a pipe when you do a reverse merger in

17  order to get shares into the market and to raise capital.  It

18  is not an IPO, an IPO has to go through all kinds of

19  documentation, and it is a bigger deal, there is much more

20  documentation.  Whereas a pipe, is a private transaction to

21  certain verified and qualified investors only.

22  Q     And, that is what Shkreli was telling you in this E-mail

23  that was about to happen, correct?

24  A     That is what he was trying to tell me.

25  Q     He wrote it to you and he sent it to you, didn't he?

Pierotti - Cross - Agnifilo                4320

1   A    I remember reading it and seeing, over the wall, and

2   deleting it.

3   Q    So, you saw "over the wall"?

4   A    Yeah.

5   Q    So now you saw "over the wall".  So you read part of the

6   E-mail, you agree with me?

7   A    I read the first three words.

8   Q    Over the wall?

9   A    Yeah.

10  Q    Then you deleted it?

11  A    Yeah.

12  Q    Did you testify on direct examination that you deleted it?

13  A    Wasn't asked.

14  Q    No.

15       And, I didn't ask you either, but you remember now

16  that you specifically recall you deleted it.

17       MS. SMITH:  Objection, Your Honor.

18       THE COURT:  Yes, asked and answer.  He answered the

19  question.

20       MR. AGNIFILO:  That is very good.

21  Q    Did you tell the Government you deleted it at any time?

22  A    I don't recall.

23  Q    No.

24       But you have a specific recollection now that you

25  deleted this, you didn't read anything after "over the wall"?

Pierotti - Cross - Agnifilo                           4321

1   A     No.

2   Q     So, weren't you curious as someone who held 350,000

3   shares of Retrophin stock, and that you now read "over the

4   wall", and do you think it is the responsible thing to delete

5   that E-mail?

6   A     Yeah.

7   Q     Yeah?

8   A     Yeah.

9   Q     You think that is what a responsible person who has

10  received an E-mail that contains inside information does, is

11  they delete the E-mail?

12  A     I didn't want inside information.  I didn't want to be an

13  insider, I didn't want the E-mail, I didn't want that

14  information.  That is why I deleted it.

15  Q     All right.  Now--

16  A     It never happens on Wall Street that somebody tells you

17  that you are going over the wall.  That is not the way it

18  works.  You are asked, may I bring you over the wall.  That is

19  how it works on Wall Street.

20  Q     How many times have you been brought over the wall?

21  A     Plenty.

22  Q     Ten, 20, 100?

23  A     Between ten-- I am brought over the wall all the time.

24  Q     You know exactly the significance of being brought over

25  the wall?

1   A    Sure do.

2   Q    And, you understand that the significance is someone is

3   sharing inside information with you, correct?

4   A    Correct.

5   Q    And, have you ever deleted the communication before when

6   somebody said they were bringing you over the wall?

7   A    Nobody ever tried to bring me over the wall in an E-mail.

8   Q    No?

9   A    That is not the way it works.

10   Q    At this point in time did you agree to meet with Martin

11   Shkreli?

12   A    No.

13   Q    Right. You would not see him, correct?

14   A    That's correct.

15   Q    Do you remember that he volunteered, he says he was

16   around your house in-- I don't think you live in Princeton, he

17   said he was in Princeton?

18   A    Yeah.

19   Q    Your response to him was, talk to Marek, do you remember

20   that?

21   A    I do.

22   Q    So, you are refusing to meet with him at this point in

23   time, correct?

24   A    That's correct.

25   Q    So, he could not speak to you face-to-face if he wanted

Pierotti - Cross - Agnifilo                    4323

1  to, right?

2  A    That's correct.  That is why he tried the E-mail.

3  Q    Right.  Because he wants to tell you, that there is a

4  very important financing coming up with a stock that you have

5  350,000 shares of, right?  Right?

6  A    Yeah, he wanted to tell me.

7  Q    Yeah.

8         What your sworn testimony is to this jury is that

9  you read the words, "over the wall", and deleted it?

10 A    Absolutely.

11 Q    Yeah?

12 A    Yeah.

13 Q    And, did you tell the SEC -- you have been at the SEC,

14 this is after you went to them?

15 A    I have been talking-- I met with the SEC or the, you

16 know, the Eastern District of New York people probably half a

17 dozen times for hours at a time.  I don't remember everything

18 I told them.

19 Q    Did you delete the E-mail and then immediately call the

20 SEC and say, listen guys, I have to tell you what I'm in the

21 middle of, because it could look bad for me.

22         Did you ever contact the SEC about this E-mail?

23 A    No.

24 Q    No.  Did you ever contact the U.S. Attorney's office

25 about the E-mail?

Pierotti - Cross - Agnifilo                    4324

1   A     No.

2   Q     Did you ever contact anybody about this E-mail?

3   A     No.

4   Q     You just deleted it, right?

5   A     Yes.

6   Q     Do you have any way of knowing that other than your word

7   that you deleted it?

8   A     You tell me.

9   Q     I'm asking you.

10  A     I have no idea.

11  Q     Did you write it in a diary, did you send an E-mail, did

12  you do a memo to self, did you do anything?

13  A     No.

14  Q     To signify you are deleting the "over the wall" E-mail

15  regarding the corporation, the company rather, you have

16  350,000 shares of?

17          MS. SMITH:  Objection, Your Honor, compound.

18          THE COURT:  Yes.  Rephrase.  It is compound so

19  rephrase it.

20          MR. AGNIFILO:  Fine.

21          THE COURT:  Mr. Agnifilo, you have covered this

22  multiple sometimes.  So why don't you move on with your

23  questioning.

24          MR. AGNIFILO:  Thank you.

25          THE COURT:  Thank you.

Pierotti - Cross - Agnifilo                4325

1   Q    So, you didn't do any-- you didn't tell anybody no

2   E-mails, no nothing to memorialize that you deleted this

3   E-mail, correct?

4   A    No.

5   Q    We only have your word on that, right?

6            MS. SMITH:  Objection, Your Honor.

7            THE COURT:  Sustained.

8   Q    You consider yourself a careful person when you speak to

9   make sure everything you say is accurate?

10           MS. SMITH:  Objection, Your Honor.

11           MR. AGNIFILO:  I will-- withdrawn.

12  Q    I think you said on direct examination that MSMB Consumer

13  fund had $4.5 million in it?

14  A    At the peak, yes, that is my recollection.

15  Q    And, tell us when the peak was?

16  A    Right when we started, October.

17  Q    You are telling us you have a specific recollection MSMB

18  Consumer had 4.5 million dollars in it?

19  A    That is the number that I remember.

20  Q    Yeah.

21           And, at the time, what was your role with MSMB

22  Consumer?

23  A    To the be the portfolio manager.

24  Q    Were you the portfolio manager of MSMB Consumer and your

25  recollection it had 4.5 million dollars at its peak?

Pierotti - Cross - Agnifilo                    4326

1   A    Yes.

2   Q    You are sure about that?

3   A    I just said, I'm not sure, but that is the best of my

4   recollection.

5   Q    When you were asked on direct examination, and you said

6   that it had 4.5 million dollars in it, did you say you were

7   not sure?

8   A    I would have to see the transcript, I probably said, I

9   think I had.

10  Q    I think you also said you had not heard of Retrophin

11  until the spring of 2012, do you remember that testimony?

12  A    That was the best of my recollection.

13  Q    Do you remember getting an E-mail from Martin about

14  Retrophin on January 5th, 2012?

15  A    No.

16  Q    I will show this, this is not in evidence.  It is defense

17  Exhibit 5590.  It is just for the witness to see and the

18  Government.

19        Do you see an E-mail there, look at your screen from

20  Martin to a number of people including yourself, Tim Pierotti

21  dated January 5th, 2012?

22  A    I do.

23  Q    You see that it discusses the fact that it has been

24  one year since we started Retrophin.  Second line?

25  A    Yeah.

1   Q    You see that there?

2   A    Yeah.

3   Q    Do you recall this E-mail?

4   A    No.

5   Q    You don't recall getting it?

6   A    No.

7   Q    Do you have any doubt that you did get it?

8   A    No.

9   Q    And, did you read it?

10  A    I don't recall.

11  Q    No.

12       Would it have been significant to you that you were

13  getting an E-mail concerning Retrophin as early as January of

14  2012?

15  A    Would it have been significant to me?

16  Q    Yes.

17  A    Not really.

18  Q    No.  You're working with Shkreli, correct?

19  A    Yeah, I am running the consumer fund.

20  Q    Right.

21       And, you know at some point Shkreli is working on a

22  company called Retrophin, correct?

23  A    At some point I learn that, yeah.

24       (Transcript continues on next page.)

25

Pierotti - cross - Agnifilo                    4328

1  BY MR. AGNIFILO:

2  Q    Do you recall at some point that you, yourself, had

3  shares of Retrophin as early as February of 2012?

4  A    No.

5  Q    No?  I'm going to show you -- this is in evidence as

6  Government 1037.

7           (Exhibit published to the jury.)

8  Q    It's a capitalization table.  Let's start in the

9  beginning, on the top.

10           MS. SMITH:  What is the Government exhibit?

11           MR. AGNIFILO:  1037.

12           MS. KASULIS:  103-7.

13           MR. AGNIFILO:  Yes, 103-7.

14  Q    You see at the top it says Retrophin, LLC, capitalization

15  table as of February 16, 2012?

16  A    Yes.

17  Q    And you see your name there, in that first -- under class

18  B column/incentive unit, Tim Pierotti, 500 shares?

19  A    Yes.

20  Q    So, as of February 2012, you have shares of Retrophin,

21  correct?

22  A    According to that document.  I wasn't aware of it, as far

23  as I know.

24  Q    This is the first time you're learning this?

25  A    Yes.

Pierotti - cross - Agnifilo                    4329

1    Q    So, when you said that you didn't hear of Retrophin until

2    the spring of 2012, is that still your answer?

3    A    I don't remember when I first heard about it.  This was

4    what, six years ago?  I don't remember when I first heard

5    about it; whether it was February, whether it was March I have

6    no idea.

7    Q    On direct examination, you were asked the question and

8    your answer was:  I first heard about Retrophin spring of

9    2012.

10          That was your answer; remember that?

11   A    Yeah.

12   Q    Is that true?

13   A    I guess I might have been aware of it earlier.  I don't

14   remember ever seeing that capitalization table in February, so

15   that doesn't prove anything.

16   Q    It doesn't prove anything?

17   A    Was I made aware of this capitalization table?

18   Q    You tell me.

19   A    I don't remember it.

20   Q    My only question to you is whether you knew of -- you did

21   not know of Retrophin until spring of 2012, that's it.

22          MS. SMITH:  Objection, your Honor.

23          THE COURT:  Sustained.

24   Q    You don't have to answer the question.

25          Do you think based on --

LAM        OCR        RPR

Pierotti - cross - Agnifilo                4330

1            MS. SMITH:  We have the full exhibit here, not just

2    the second page.

3            THE COURT:  She has the full exhibit she'd like you

4    to show the witness.

5            MR. AGNIFILO:  I'll circle back.

6            MS. SMITH:  All right.

7    Q    Getting back just to -- this is only for the purpose of

8    refreshing your recollection, this is not in evidence.  This

9    is, again, 5590.  Did you know some of the people here on this

10   e-mail chain?

11           Do you know who Brent Saunders is?

12   A    I do.

13   Q    Who is Brent Saunders?

14   A    He has been the CEO of Bausch & Lomb, he then became the

15   CEO of Octavius.  He's been an incredibly successful specialty

16   fund investor and CEO.

17   Q    Do you know who Sarah Hassan was?

18   A    Once I worked there.  I wouldn't have known who Sarah

19   Hassan was, but I came to know that she's the daughter of Fred

20   Hassan.

21   Q    And did you know Fred Hassan?

22   A    No.  I knew who he was.  He had been the CEO of Schering

23   Plough.

24   Q    How about Robert Bertolini?

25   A    I don't.

LAM      OCR      RPR

Pierotti - cross - Agnifilo                4331

1    Q    Thomas Kessler?

2    A    No.

3    Q    And you said Ed Sullivan you do know?

4    A    Yes.

5    Q    What is Cowan exactly?

6    A    Cowan is a broker-dealer that now kind of specializes in

7    healthcare.

8    Q    And you knew Steve Richardson?

9    A    I did.

10   Q    And Steve Richardson was involved in your consumer fund,

11   correct?

12   A    That's what I recall, yeah.

13   Q    Did you know Steven Richardson to have a personal

14   relationship with Mr. Shkreli?

15             MS. SMITH:  Objection, your Honor.

16             THE COURT:  Sustained.

17             MS. SMITH:  Foundation.

18             MR. AGNIFILO:  Could we approach, your Honor?

19             THE COURT:  Yes.

20

21             (Continued on next page.)

22

23

24

25

```
                         Sidebar                          4332
```

1              (The following occurred at sidebar.)

2              MR. AGNIFILO:  He told the FBI he knows of a

3    personal relationship between Richardson and Shkreli.  I have

4    a right to probe him.  Richardson denied it; I think falsely

5    so.

6              THE COURT:  Well, what does "personal" mean?  Do you

7    mean intimate?

8              MR. AGNIFILO:  I'm going to ask him.

9              THE COURT:  Do you mean sexual?  What do you mean?

10             You can have a personal relationship with someone

11   that means you're good friends.  We have that in the record.

12             What is the innuendo that we're getting at?

13             MR. AGNIFILO:  It's not the innuendo.  Can I just --

14             THE COURT:  Absolutely, you can, but define what you

15   mean by "personal" relationship.

16             MS. SMITH:  Your Honor, I want to make a proffer

17   first.

18             The 302 -- and they policed this very strongly on

19   direct in terms of hearsay -- his only information about any

20   relationship between Mr. Shkreli and Mr. Richardson is based

21   purely on rumor.  He had no conversation with the defendant,

22   no conversation --

23             MR. AGNIFILO:  The 302 says he knows.

24             MS. SMITH:  Then why are we asking about it?

25   Because you're trying to elicit hearsay.

```
                          Sidebar                        4333
```

1          MR. AGNIFILO:  He says he knows they have a personal

2    relation.

3          THE COURT:  He saw them?

4          MR. AGNIFILO:  Judge, I don't know.

5          MS. SMITH:  I can proffer to you that he did not see

6    them, he did not hear that from Mr. Shkreli, he did not hear

7    it from Mr. Richardson.  It was a rumor.

8          MR. AGNIFILO:  Whether it's sexual, that's besides

9    the point.  They had a romantic relationship.  It's

10   significant for two reasons; significant because I believe

11   that Mr. Richardson -- and I'm not faulting him, he's in a

12   relationship -- was not honest about it.  And I think that

13   false statement in the record is always of great concern to

14   all the parties.

15         The reason I think it's relevant is, and we're

16   harkening back to the role of the different -- you know, the

17   role of the importance of the AUM, the importance about all

18   those sort of metrics.  They are less important when people

19   have a romantic -- I know this is ground we've covered many,

20   many times, and I'm just going to ask him that one question.

21         MS. SMITH:  His knowledge is based on hearsay.  If

22   you want to ask him if he had a conversation with the

23   Defendant about a relationship, I think it's irrelevant and I

24   think this is so far afield, but he doesn't actually know, and

25   I'm proffering that now.  So, what you would be eliciting

Sidebar                                    4334

1   would be about a rumor or hearsay.

2          MR. AGNIFILO:  All right.

3          THE COURT:  I think my concern is this:  There's

4   innuendo in saying a personal relationship.  A personal

5   relationship means many things to many people.  And two men

6   who are not intimate can love each other as friends and

7   express that love and it can be a personal relationship.  I

8   just don't know what the innuendo is and --

9          MR. AGNIFILO:  Your Honor, there's no innuendo.

10          THE COURT:  We have the e-mails:  I love you; I love

11   you too; hugs.  That's fine.  Maybe between them it seems

12   usual.  But I don't know what the implication is, that there's

13   somehow something more than just what they described.

14          MR. BRAFMAN:  Judge, most respectfully, you never --

15   rarely do you ever have direct evidence of an intimate

16   personal relationship that two people have because it's

17   usually done behind closed doors, if it's done.

18          We have a very, very good faith basis to believe

19   that there was an intimate personal relationship.  And we have

20   a right to establish that.

21          THE COURT:  Is it based on those e-mails.

22          MR. AGNIFILO:  No.  We have a client.

23          MS. KASULIS:  But they cross-examined --

24          MS. SMITH:  Yeah, I don't know what the purpose of

25   asking this witness is other than to elicit hearsay.

Sidebar                                           4335

1           MR. AGNIFILO:  No.  Let me tell you what the purpose

2    is.

3           We believe Richardson committed perjury because he

4    was embarrassed or concerned that if he had admitted to a

5    personal relationship with Mr. Shkreli, he does have a partner

6    of 25 years.  And I'm not looking to ruin his relationship

7    with his partner.  The fact is that in the position of

8    Mr. Richardson, as chairman of the board, having a

9    relationship with my client, who is half his age and is also a

10   little bit of an oddity, if you will, based on the testimony

11   we've established so far, I think you can establish a personal

12   relationship through circumstantial evidence if the witness

13   denies it.

14          And the fact is that everybody who worked up at

15   Retrophin talked about it all the time because of the things

16   they saw between them.  And I think this is an appropriate

17   question.  And if the next question is how do you know, he

18   says people told me or he says I know from talking to

19   Mr. Richardson or --

20          MS. SMITH:  So you are eliciting hearsay, which is

21   completely inappropriate.

22          THE COURT:  My concern is that you're asking an

23   observer to apply normative values to what they observed or

24   heard and make assumptions when they may or may not have

25   personal knowledge.

```
                        Sidebar                         4336
```

1           If Mr. Shkreli and Mr. Richardson told him we have a

2    personal intimate relationship, that's one thing, that's fair

3    ground.  But just to throw it out as innuendo and ask this

4    witness maybe to make a statement about rumors or hearsay

5    rather than his own personal knowledge--

6           MR. AGNIFILO:  But he might have personal knowledge.

7           MS. SMITH:  You can ask him did you ever have a

8    conversation with the Defendant --

9           MR. AGNIFILO:  My understanding is that they were --

10          MS. SMITH:  I'm proffering to you that he doesn't

11   have personal knowledge.  I've been through this with him.

12          MR. AGNIFILO:  I think just because this witness

13   tells you something, it's a far cry from --

14          MS. SMITH:  Just because your client argues that

15   there's a relationship doesn't mean that there was either.

16          MR. AGNIFILO:  That's why I want to ask him.  That's

17   how we resolve these things.

18          MS. SMITH:  But this isn't Steve Richardson --

19          THE COURT:  Why is his sexual preference even

20   relevant?

21          MR. AGNIFILO:  No, the preference isn't relevant.

22   I'd ask the same question if it was a man and a woman.

23          THE COURT:  I heard two things that trouble me:  The

24   fact that they're two men, the fact that there's an older man

25   and a younger man.  I think there's innuendo here that doesn't

```
                          Sidebar                      4337
```

1  belong.

2          MR. AGNIFILO:  I'd make the same argument if it were

3  a man and a woman.

4          THE COURT:  So, you're saying that Mr. Richardson

5  was love struck with Mr. Shkreli that he made decisions that

6  were not appropriate --

7          MR. AGNIFILO:  No.

8          THE COURT:  -- or at least not those of a prudent

9  investor.

10          MR. AGNIFILO:  No, no.  He made decisions with that

11  as the motive because he was in love with him.

12          MS. SMITH:  He doesn't have any information that

13  he's going to tell you that's going to change that.  All he's

14  going to do is tell you that there's a rumor.  People have

15  rumors about things that are true or not true all the time.

16  It's highly prejudicial, it is based on hearsay, it's

17  inappropriate, and it's irrelevant.

18          THE COURT:  If you want to ask if he has personal

19  knowledge of an intimate relationship between Mr. Shkreli and

20  Mr. Richardson, that is one question.

21          MR. AGNIFILO:  And if he does anything other than

22  that I'll stop him, I'll actually stop him.  I'll say:  Do you

23  have personal knowledge of an intimation relationship between

24  Mr. Shkreli and Mr. Richardson?

25          THE COURT:  Whether or not there was a personal

```
                      Sidebar                    4338
```

1   relationship, not assuming the fact.

2         MS. SMITH:  I'm not sure he's going to know what

3   personal knowledge means.

4         MS. KASULIS:  Personal knowledge doesn't mean

5   rumors.  He's not going to know that personal knowledge

6   doesn't mean rumors.

7         THE COURT:  Did you see any evidence that would lead

8   you to believe that there was a personal --

9         MS. SMITH:  That's concerning.

10         THE COURT:  What does personal relationship mean?

11  If you want to define it --

12         MR. AGNIFILO:  Romantic relationship.

13         MS. SMITH:  Why don't you just know ask:  Do you

14  know if there was a romantic relationship between the

15  Defendant and Mr. Richardson?

16         MR. AGNIFILO:  And then I'm done.

17         MR. BRAFMAN:  Depends on his answer.

18         THE COURT:  You're getting to the emotional bond,

19  not the physical bond.

20         MR. AGNIFILO:  Right.  I've never cared whether or

21  not they've actually been sexually intimate.  I think that the

22  emotional intimacy is the key part for a lot of reasons.

23         MS. SMITH:  I think you've already established

24  emotional intimacy.  I guess my point is I think you can argue

25  this from the information you already have.

```
                          Sidebar                        4339
```

1          MR. AGNIFILO:  I don't think we did, and let me tell

2     you why:  Because Richardson kept saying yes, as a friend;

3     yes, as a friend; yes, as a friend.

4          MS. SMITH:  People can be swayed because they have

5     an emotional relationship and they're friends too.  He may not

6     be a prudent investor.

7          MR. AGNIFILO:  I don't say this in the least bit

8     derogatory:  I think Richardson fundamentally came here to

9     tell the truth.  I think he's unable to be completely truthful

10    on that topic.

11         MS. SMITH:  I guess my point is I can be very, very

12    close friends with Jackie and that can make me not a prudent

13    investor but I'm willing to throw stuff out the window because

14    we're really good friends.  I'm not sure that you don't

15    already have this.

16         MR. AGNIFILO:  I will do this:  What do you want me

17    to do?

18         THE COURT:  I want you to be able to cross-examine

19    this witness.  You may ask whether or not he's aware based on

20    anything he knows by hearing from Mr. Richardson and

21    Mr. Shkreli or seeing that would lead him to believe there was

22    a...

23         MS. KASULIS:  Romantic relationship.

24         THE COURT:  Romantic relationship.

25         MR. AGNIFILO:  Okay.  I got it.

Sidebar                                                4340

1          (Continued on next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pierotti - cross - Agnifilo                    4341

1          (Sidebar ends; in open court.)

2    BY MS. SMITH:

3    Q    Mr. Pierotti, I'm going to ask you a question.  Listen to

4    the question very carefully.

5          Do you know from your own personal observation,

6    based on anything that you saw, or anything that you --

7    anything that you saw or observed personally, that Mr. Shkreli

8    and Mr. Richardson had a romantic relationship?

9    A    No.

10   Q    Now, you talked about something called Garreco, correct?

11   A    Yes.

12   Q    And just tell us, what was the Garreco project that you

13   were involved in?

14   A    Marek and I were working on buying this asset.  It was a

15   dental gypsum company in Heber Springs Arkansas.

16   Q    And what were you trying to -- you were trying to

17   purchase this asset?

18   A    Yes.

19   Q    And you said at one point Mr. Shkreli was talking about

20   giving a $2 million investment?

21   A    Yes.

22   Q    Now, at the time that you discovered this asset, this

23   Garreco company, where were you working?

24   A    I was still at MSMB.

25   Q    And was there discussion as to whether this should have

Pierotti - cross - Agnifilo                    4342

1    been an MSMB corporate opportunity?

2    A    You know, it was not going to be -- as soon as Marek and

3    I got down the road with it, it was seen as Wentworth, it was

4    seen and me and Marek.

5    Q    It was seen by who?

6    A    It was seen by me and Marek as this was going to be our

7    deal.  And it was seen that way, as I recall, by Martin.

8    Q    Did Martin tell you that he saw it that way?

9    A    That's how I remember it.  I'd have to say -- I can't say

10   I remember it, but, really, the conversation I remember about

11   it was him saying:  Yeah, I could probably do $2 million.

12           That was late in the game and I don't remember a lot

13   of other conversation about it.  But it was certainly clear

14   because Marek and I talked about how much ownership should we

15   give Martin even after falling down on the $2 million.  So, it

16   was definitely outside of any MSMB structure.

17   Q    But you agree you and Marek were working at MSMB at the

18   time.

19   A    Yes.

20   Q    And do you remember telling people that you doubted that

21   MSMB would come up with the equity?

22   A    I did.

23   Q    And who is Eric DeRinard?

24   A    He was the business broker down in Arkansas.

25   Q    What business dealings did you have with him?

LAM      OCR      RPR

Pierotti - cross - Agnifilo                    4343

1   A    He was trying to help the sale of the asset.  He was

2   representing the seller.

3   Q    Who is Laurence Coli?

4   A    Coli Laurence is an old friend of mine from Memphis who

5   worked for an entity that does mezzanine detective investment,

6   and he was going to be the mezzanine investor on the

7   transaction.

8   Q    Do you remember having e-mail correspondence with the two

9   of them about Garreco?

10            THE COURT:  The two of who?

11  Q    I'm sorry, of Eric DeRinard and Coli Laurence?

12  A    Yes.  I remember having e-mail correspondence with Eric,

13  I remember having e-mail correspond with Coli.  I don't

14  remember a specific e-mail with both Coli and Eric.

15  Q    And I'm going to show you in terms refreshing your

16  recollection Defendant's Exhibit 4904.

17            MR. AGNIFILO:  Just for the witness.  This is not in

18  evidence.

19  Q    Do you recall an e-mail from you to Coli Laurence on

20  September 26, 2012?  Only if you recall.

21            I'm going to take it out a little bit so you can see

22  the whole thing.  There you go.

23  A    Yes.

24  Q    And, so, tell us exactly what you were doing in September

25  of 2012 in regard to Garreco.

Pierotti - cross - Agnifilo                              4344

1   A    I was still trying to buy the entity.

2   Q    And you were buying it away from MSMB, right?

3   A    Yes.

4   Q    And did you tell Martin you were buying it away from

5   MSMB?

6   A    I didn't have a lot of contact with Martin at this

7   point --

8   Q    Isn't it fair to say were you doing it behind his back?

9   A    No.

10  Q    No?

11  A    No.

12  Q    Did you send him any e-mails telling him of your

13  discussions with Eric DeRinard or with Coli Laurence?

14  A    Yes, and Marek was talking to him I guess, I was talking

15  to him.

16  Q    When you say you guess --

17  A    I don't recall conversations from six years ago exactly.

18  Q    So, when you're testifying in front of this jury, are you

19  testifying to things that you know or are you sometimes

20  testifying to things that you guess?

21       MS. SMITH:  Objection, your Honor.

22       THE COURT:  Sustained.

23  Q    Are you guessing about this particular subject?

24  A    I won't guess.

25  Q    Do you know what you were talking with Coli Laurence and

Pierotti - cross - Agnifilo                    4345

1   Eric DeRinard about in September of 2012?

2   A    Yes.  At this point, it was obvious that there was going

3   to be no more MSMB and there was going to be no $2 million

4   investment.  The problem that we had was that early in the

5   process with Eric, we had said that we were going to have the

6   equity.  It was now clear we weren't going to have the equity.

7   So, I was trying to scramble to salvage something.

8   Q    Now, on direct examination you were asked I think two

9   different times if Martin gave you a $5,000 check, correct?

10  A    Yes.

11  Q    And I think that your answer was:  I would be speculating

12  as to why he gave it to me.

13       Correct?

14  A    Yes.

15  Q    Isn't it true you were running the risk of missing a

16  mortgage payment around that time?

17  A    Yes.

18  Q    And did you discuss with Marek Biestek the fact that you

19  were having a hard time paying your mortgage?

20  A    Yes.

21  Q    And did you tell Marek to talk to Martin and to tell

22  Martin you were having a hard time paying your mortgage?

23  A    That, I don't recall.

24  Q    Do you recall at one point speaking with Marek and asking

25  him:  Perhaps you can speak to Martin for me?

Pierotti - cross - Agnifilo                    4346

1              Only if you remember.

2    A    Yeah, I don't remember.

3    Q    I want to show you for refreshing your recollection 4905.

4              MR. AGNIFILO:  This is just for the witness to see.

5    Q    Do you recall sending Marek an e-mail on September 27,

6    2012 --

7    A    Can I see the bottom of the e-mail?

8    Q    Yes.  It goes all the way back.  Do you see the bottom?

9              Let me bring it out a little bit.  There, I think

10   you can see the whole thing on there.

11             Can you read it?  Take your time.

12   A    From Steve --

13             MS. SMITH:  Your Honor.

14             THE COURT:  We're not reading --

15   Q    This is not in evidence.

16             THE WITNESS:  I'm reading out loud.  I can read

17   quietly.

18             THE COURT:  The question after you've read it is

19   does this refresh your recollection about --

20   Q    What you said to Marek Biestek and then whether you had

21   Marek speak to Martin on your behalf.

22             MS. SMITH:  This is in September of 2012?

23             MR. AGNIFILO:  Yes, September of 2012.

24   A    Yes, I do remember this, yeah.

25   Q    So, fair to say you told Marek that you're running the

Pierotti - cross - Agnifilo                4347

1    risk of missing a mortgage payment, correct?

2    A    Yes.

3    Q    And you said that to Marek in September 2012 by e-mail?

4    A    Yes.

5    Q    And later that same day, you say to Marek:  Perhaps you

6    can speak to Martin for me.

7              Correct?

8    A    Yeah.

9    Q    And then soon thereafter, Martin gave you a check,

10   correct?

11   A    Was the check after September 27?  I guess it was.  The

12   two are unrelated.

13   Q    So, it's unrelated that you had Marek speak to Martin and

14   Martin gave you a check?

15   A    Yeah.  If you see the chain, it starts with from Steve

16   Richardson.  And Marek writes:  Better response than I

17   expected.

18              Steve Richardson was going to invest in Wentworth

19   for the Garreco transaction, and Steve Richardson had

20   committed $75,000 to us, just as an angel investor to keep the

21   lights on.  You can see Marek and I were both broke.

22   Q    You don't disagree with me that on September 27, 2012,

23   you say to Marek you're concerned about missing a mortgage

24   payment.  You do say that, right?

25   A    Yes.

Pierotti - cross - Agnifilo                    4348

1          MS. SMITH:  Objection, your Honor.  He's

2   mischaracterizing the document.  There are two parts to

3   this --

4   Q    I don't want to read it, but did you say:  Yes.  Very

5   good mood from Martin.  Most importantly, I have to get paid

6   or I miss a mortgage payment.

7          Is that what you said?

8   A    That's in the e-mail.

9          THE COURT:  When you say I have to get paid, paid by

10  whom?  Are you still an employee?

11         THE WITNESS:  No.  That's the point I'm trying to

12  make.  The point I'm trying to make is we were trying to get

13  $75,000 from Steve Richardson.  It was my belief at the time

14  that Martin was asking Steve to hold back on that money.

15  Q    That?

16  A    $75,000.  Because he, I thought, needed it to buy Desert

17  Gateway.

18  Q    So, what you wanted to talk to Martin about was basically

19  for Martin to give the okay to Steve Richardson to give you

20  the 75,000?

21  A    That's my recollection of how it went.

22  Q    Do you remember having conversations with Marek for Marek

23  to speak to Martin about giving you a check to help pay with

24  your mortgage?

25  A    No.

Pierotti - cross - Agnifilo                            4349

1   Q    No?  Are you saying it didn't happen?

2   A    I'm saying I don't recall.

3   Q    Do you remember telling Biestek at one point that you

4   were going to have to sell your wife's jewelry?

5   A    Yes.

6   Q    And you told that to Marek?

7   A    Yes.

8   Q    And did you then follow up by telling Marek:  Tell Martin

9   the situation I'm in.

10  A    I don't recall that.

11  Q    But you're not saying it didn't happen.

12  A    I'm not saying it didn't happen.

13  Q    And things were that tight at that period of time?

14  A    Yes.

15  Q    At one point you get the 350,000 shares; right, in

16  December?

17  A    Yes.

18  Q    Now, you said that you were a deal captain at Morgan

19  Stanley, correct?

20  A    Yes.

21  Q    What does that mean in terms of your ability to raise

22  equity?

23  A    I wasn't actually the one that was raising the equity.

24  When you're on -- I was on the syndicate desk, and that means

25  you -- the bankers have already kind of put together the whole

Pierotti - cross - Agnifilo                    4350

1    transaction and the salespeople have gone out and solicited

2    orders to get a deal done, and I'm liasing with the company

3    and also talking about how we're going to allocate those

4    shares to investors.

5    Q    Isn't it true that as a deal captain part of what you do

6    is you're involved in finding investors?

7    A    No.

8    Q    No?  Not at all?

9    A    No.

10   Q    Isn't that what your understanding was that Martin wanted

11   from you in terms of Retrophin?

12   A    No.

13   Q    Didn't Martin ask you at some point to make a list of

14   potential investors?

15   A    I don't remember that.

16   Q    No?

17   A    Look, I told Martin when we first met I couldn't raise

18   money.

19   Q    The question is, do you remember in about December --

20   A    I don't.

21   Q    Let me ask the question.

22          -- in about December 2012 Martin asked you

23   specifically to put a list together of potential investors?

24   A    Yeah, I don't remember that.

25   Q    No?

Pierotti - cross - Agnifilo                    4351

1              Now, at this point in time, December 2012, you and

2       Martin are not particularly friends, right?

3       A     In December of 2012?

4       Q     Yes.

5       A     Well, it was a big month.  A lot happened in

6       December 2012.  It changed radically from the beginning of the

7       moth to the end of the month.

8       Q     Did you ever consider Martin a close friend?

9       A     No.

10      Q     From your perspective, did it seem the way Martin acted

11      towards you that he considered you a close friend?

12      A     No.

13      Q     Did you have any particular trust of Martin?

14      A     No.

15      Q     From the way Martin reacted towards you, did it seem like

16      he trusted you?

17              MS. SMITH:  Objection, your Honor.

18              THE COURT:  Sustained.

19      Q     I mean in your -- you agree with me that only a few

20      months earlier, in September, you were taking this Garreco

21      transaction away from MSMB, correct?

22      A     I wasn't taking it away from MSMB.  MSMB didn't have any

23      capital.

24      Q     Right.  So, you were doing it without including Martin.

25      A     Yes, which he was well aware of.

Pierotti - cross - Agnifilo                    4352

1   Q    So, it's fair to say you and Martin in December 2012 did

2   not have a close personal relationship?

3   A    Yeah, fine.

4   Q    "Yeah, fine," is that the answer?

5   A    Yes.

6   Q    So, there's no reason that you would do any particular

7   favors for Martin Shkreli in December of 2012, correct?

8   A    No, I mean, Martin had -- you know, he had kept me

9   employed longer than he really had to.

10  Q    Why do you say that?

11  A    We were done.  Once the money was gone, the money was

12  gone.  There was no more capital and he kept a lot of people

13  employed.  So, to some degree I was appreciative of that.

14  Q    But you agree that he was no closer with you than he was

15  with some other people, correct?

16  A    No, we weren't close.

17  Q    And you understood, did you not, that the shares were to

18  incentivize you to work hard on behalf of Retrophin?

19  A    No.

20  Q    No?

21  A    No.

22  Q    He just chose you to give 350,000 shares to?

23  A    Appears that way.

24  Q    Yeah?  And I think you said on direct examination that

25  the understanding was you and the others were going to buy and

1  sell and buy and sell and create volume.  Was that your

2  testimony?

3  A    That was one thing that occurred.

4  Q    Did it occur?

5  A    No, it never did, according to Marek Biestek who told me

6  after the fact it never did.

7  Q    Let's go step-by-step because I want to understand your

8  answer.  On direct examination you said that the people

9  involved are going to buy and sell and buy and sell and

10  increase the volume because the volume is good for the stock

11  and then you said that's insider trading.

12              Do you remember that part of your testimony?

13              MS. SMITH:  Objection, your Honor.

14              THE COURT:  Sustained.

15              Jury, hit the erase bouton again.

16              MR. AGNIFILO:  Erase it again.  Third time.

17              MS. SMITH:  Could we do a sidebar, please?

18              THE COURT:  Yes.

19              Jurors, please don't talk about the case.

20              (Jury exits.)

21

22              (Continued on next page.)

23

24

25

```
                          Sidebar                       4354
```

1             (The following occurred at sidebar.)

2             MS. SMITH:  I think this nullifies any mistrial

3    motion.  And if there's going to be wading into this I'd like

4    to go back and actually clarify with my witness and ask what

5    he meant.

6             MR. AGNIFILO:  Your Honor, I want to show this

7    witness is making very, very bold statements with no evidence.

8             MS. SMITH:  You had it struck.  So, to go back to

9    that statement is --

10            MR. AGNIFILO:  It's for a reason.  Yes, I don't have

11   to go back to that part of the statement, but he did say -- I

12   don't know that we did strike.  I don't think we struck --

13            THE COURT:  I struck the insider trading Comment.

14            MS. SMITH:  The trading back and forth comment was

15   the question before.

16            THE COURT:  I didn't strike the part about Martin

17   encouraging them to trade aggressively and drive up the

18   liquidity and volume.  That's in the record.

19            MS. SMITH:  But he's suggesting to go back to

20   suggesting that that's somehow insider trading and we

21   instructed jury to forget that.

22            MR. AGNIFILO:  The jury got it.  What I think I have

23   the right to show is he is making very bold assertions on no

24   evidence.  The entire answer that he gave --

25            THE COURT:  Honestly, that was the worst example.

```
                         Sidebar                           4355
```

1          MR. AGNIFILO:  Okay.  I don't want you to think I've

2     lost my mind completely.

3          MR. SRINIVASIN:  Let the record reflect laughter.

4          MR. AGNIFILO:  Including by the questioner.

5          I understand.

6          MR. BRAFMAN:  You're still employed, don't worry.

7          MS. SMITH:  I actually really cabined the witness'

8     testimony for the rest of direct and made sure there was no --

9     we used the word "nonpublic," you know, we really tried.  If

10    we're going to wade into this, I'll wade into it on redirect.

11    Just fair warning.

12         MR. AGNIFILO:  The objection was sustained.  And I

13    was running the risk of losing my job.

14         MS. KASULIS:  I just don't think we want to be going

15    into the insider trading territory, right?

16         MR. AGNIFILO:  But I do want to ask him, he did say,

17    and it's not struck, that people were encouraged to buy and

18    sell and buy and sell and create volume in the stock because

19    that's good for the stock.

20         THE COURT:  There's e-mail evidence where

21    Mr. Shkreli is directing people to trade aggressively with

22    shares.

23         MS. SMITH:  He's concerned about volume.

24         MR. AGNIFILO:  This was an answer that he gave.  And

25    what he then just went and said:  I found out that didn't

```
                          Sidebar                          4356
```

1    happen submit.

2              MS. SMITH:  He said Marek said it didn't happen.

3              MR. AGNIFILO:  We have the trading records.  We know

4    it didn't happen.  He's hypothesizing on an eventuality that

5    we all now know didn't, in fact, happen.

6              MS. SMITH:  I just don't know what else you're going

7    to then say --

8              MR. AGNIFILO:  So, I mean, I can take him through

9    his own trading records.  They're now in evidence.

10             MS. SMITH:  He sold a lot of stock.  He told us

11   that.

12             MR. AGNIFILO:  Right.  And he knows the other people

13   and they all sold stock based on documents in evidence.

14             MS. SMITH:  I don't think he has any knowledge of

15   anybody else's.  I know -- he said what Marek told him, but he

16   doesn't have any personal knowledge of that.

17             MR. AGNIFILO:  So, I have a couple of more things on

18   this.  I won't mention insider trading, I'll endeavor to keep

19   my job and all that, and move on to the next topic.

20             THE COURT:  On redirect, are you planning to go into

21   this at all?

22             MS. SMITH:  No.

23             MR. BRAFMAN:  Could the lawyers have ten minutes?

24             THE COURT:  Sure.

25             (Recess taken.)

Pierotti - cross - Agnifilo                    4357

1              (jury enters.)

2              THE COURT:  We have all the jurors back.  Please

3      have a seat.

4              Mr. Agnifilo, you may resume.

5      BY MR. AGNIFILO:

6      Q    We're going to start Mr. Pierotti with something already

7      in evidence as Defendant's 120-14.  It's an e-mail to you and

8      other people from Martin dated December 18, 2012.  It's

9      120-14.

10             Do you see that, sir?

11     A    Yeah.

12     Q    Okay.  And you were asked about that on your direct

13     examination.  Do you remember being asked about this?

14     A    Was I asked about this specific e-mail?

15     Q    I thought you were, but let me follow it up.  You're sent

16     this e-mail, you and others from Martin and Martin says, "See

17     the new article out on the deal from Forbes."

18             Do you remember now that you talked about this on

19     direct?

20     A    Yeah, I remember talking about it on direct and I

21     remember the 30 Under 30 thing from Forbes.

22     Q    Right.  Then he says, "One of my priorities for the

23     future is increasing the trading volume in our stock.

24     Anything anyone can do to help in this regard is welcome."

25     Right?  He says that?

Pierotti - cross - Agnifilo                    4358

1   A    Yeah.

2   Q    Okay.  Well, now, he's not asking you to trade with

3   Biestek and Biestek to trade with Mulleady and so forth in

4   this e-mail; correct?

5   A    I don't remember this e-mail, actually.  I mean, I don't

6   remember getting it.  When I said that there was discussions

7   about trading the stock, it's not -- it's unrelated to that

8   e-mail.

9   Q    Then I think you were shown as a follow-up what's been

10  admitted as Government's 105-20 and 105-20 is basically Martin

11  sending an e-mail to you and to Darren Blanton; correct?

12  A    Yes.

13  Q    And he said I wanted to reintroduce you guys; correct?

14  A    Yes.

15  Q    And I think you testified on direct that you didn't

16  really want anything to do with Darren Blanton; correct?

17  A    Correct.

18  Q    And so he was introducing you and Darren so possibly the

19  two of you could do some type of business transactions

20  together; correct?

21  A    That was my understanding.

22  Q    Okay.  And this -- the date of this e-mail is December

23  19, 2012, 11:27 a.m.  Do you see that there?

24  A    Yes.

25  Q    And the date of the prior e-mail, 1/20/14 is the previous

Pierotti - redirect - Smith                    4359

1  day.  December 18, 2012, and do you see that Darren Blanton is

2  on that e-mail along with you and along with other people;

3  correct?

4  A     Yes.

5  Q     All right.  Did I understand is your testimony on direct

6  examination that Evan Greebel got shares of Retrophin?

7  A     That's what I recall, yes.

8  Q     So your recollection that Evan Greebel, the partner at

9  Katten also got these shares that you and Marek and Ed

10 Sullivan got?  He was in that group?

11 A     Yes.

12 Q     Okay.  And you're sure about that?

13 A     I remember seeing the list of the group that was getting

14 it and Evan was on there.

15 Q     Okay.  And that was the basis of your testimony this

16 morning that Evan got shares of Desert Gateway?

17 A     Yes.

18 Q     Give me one second.

19        Mr. Pierotti, I have no further questions at this

20 point?

21             THE COURT:  Ms. Smith, do you have any redirect?

22             MS. SMITH:  Just very briefly, Your Honor.

23 REDIRECT EXAMINATION

24 BY MS. SMITH:

25 Q     Mr. Pierotti, Mr. Agnifilo asked you about this cap table

Yaffe - direct - Smith                    4360

1  here, Government Exhibit 103-7?

2  A    Yes.

3  Q    And I'm showing you the first page of that exhibit which

4  is an e-mail from Mr. Shkreli dated March 16, 2012.  Were you

5  a recipient of this e-mail?

6  A    No.

7           MS. SMITH:  Your Honor, I have no further questions.

8           MR. AGNIFILO:  I have nothing else.

9           THE COURT:  All right.  Thank you, sir.  You are

10  excused.  Have a nice day.

11          (Witness excused.)

12          THE COURT:  Does the Government have another

13  witness?

14          MS. SMITH:  Yes, Your Honor.  The Government calls

15  Lee Yaffe to the stand.

16          THE COURT:  All right, thank you.

17  **L E E   Y A F F E**,

18          called by the Government, having been

19          first duly sworn, was examined and testified

20          as follows:

21          THE COURT:  Please state and spell your full name

22  for the record.

23          THE WITNESS:  Lee Yaffe, L-E-E, Y-A-F-F-E.

24  DIRECT EXAMINATION

25  BY MS. SMITH:

Yaffe - direct - Smith                                    4361

1    Q    Good afternoon, Mr. Yaffe, how old are you?

2    A    Fifty-two.

3    Q    Do you have any children?

4    A    I do.

5    Q    How many children do you have?

6    A    Four.

7    Q    Where do you live?

8    A    In Delray Beach, Florida.

9    Q    What's your highest level of education?

10   A    I have a BA in economics.

11   Q    And where did you go to college?

12   A    Tufts University in Boston.

13   Q    When did you graduate?

14   A    1987.

15   Q    What did you do first after you graduated from college?

16   A    I worked as -- doing some lease accounting in the

17   operations department for a bank in New England and then after

18   that -- I was there for about a year and then I became -- I

19   was a credit analyst at Bay Banks for about a year and then

20   after that I transitioned to a small regional brokerage firm

21   called Fechtor Detwiler in around '89.  And I was at Fechtor

22   Detwiler from '89 to 1995.

23   Q    Where was Fechtor based?

24   A    Out of Boston.

25   Q    What did you do at Fechtor Detwiler?

1  A    I was a -- I was a stockbroker, an investment consultant.

2  Q    And what did you do after you left Fechtor Detwiler in

3  1995?

4  A    In 1995 I left with a bunch of close friends and we

5  started a brokerage firm called Leerink Swann.

6  Q    What was Leerink Swann?

7  A    Leerink Swann was a brokerage firm or investment banking

8  firm that we started in 1995.

9  Q    What did you do at Leerink Swann?

10  A    I was a sales guy or an investment consultant.

11  Q    Was Leerink Swann based out of Boston?

12  A    Leerink Swann was based out of Boston.

13  Q    Did you live in Boston the entire time you worked at

14  Leerink Swann?

15  A    I lived in Boston predominantly when I worked at Leerink

16  Swann, but in you 2005 I transitioned to Florida, Highland

17  Beach, Florida and I worked out of Boca Raton and I still work

18  for Larynx One.

19  Q    And how long did you stay at you Leerink Swann?

20  A    Through 2008.  I was at Leerink Swann from '95 to

21  approximately 2008, 13 years.

22  Q    And what did you do after you left Leerink Swann?

23  A    I got involved in real estate investment and real estate

24  development which I'm still actively involved and in 2012 I

25  set up a business or a conglomerate of companies to focus on

Yaffe - direct - Smith                                    4363

1    substance abuse.

2    Q     And was the real estate investment and the healthcare

3    conglomerate both based in Florida?

4    A     Say that again?

5    Q     When you were doing real estate investment and working on

6    the healthcare conglomerate were you based in Florida?

7    A     Yes.

8    Q     Are you familiar with the defendant Martin Shkreli?

9    A     Yes.

10   Q     Approximately when did you have contact with Martin

11   Shkreli?

12   A     Sometime around 2005.

13   Q     And what form did that first contact take?

14   A     It was a telephone call.

15   Q     What were the circumstances of the phone call?

16   A     I was -- again, I don't recall, although I think I was

17   prospecting and I don't know how I came across Martin's name

18   but we sent a lot of time calling people that were healthcare

19   investors.

20   Q     Was your first contact with the defendant a cold call?

21   A     Correct.

22   Q     And what do you remember about the first phone call with

23   the defendant?

24   A     That he was -- he seemed pretty knowledgeable, pretty

25   astute.  It seemed like he was a good match because he was a

Yaffe - direct - Smith                                    4364

1   healthcare investor and actively looking for opportunities in

2   the healthcare field and thought he would be a good business

3   contact for me.

4   Q    When you made that first phone call in 2005 were you at

5   Leerink Swann?

6   A    I was.

7   Q    Where was the defendant working the first time you spoke

8   to him?

9   A    I don't recall.

10  Q    After that initial call, how often did you have contact

11  with the defendant?

12  A    I spoke with him frequently quite a bit via phone,

13  e-mail, IM, but it was pretty random but we were in close

14  contact.

15  Q    And what did you discuss on those calls in the 2005/2006

16  time period?

17  A    Stocks bid, Leerink Swann might have followed.  Other

18  healthcare investment opportunities.  News flow that came out

19  in the healthcare sector and how that might affect other

20  companies in the sector.  Really, anything related to

21  healthcare stocks and investing.

22  Q    Did you ever meet the defendant in person?

23  A    I did.

24  Q    And when did you meet the defendant in person?

25  A    I don't recall exactly when, but I want to say probably

Yaffe - direct - Smith                    4365

1    somewhere at the end of '05, '06, six or seven months after I

2    established contact with him I did come to New York and I met

3    with him.

4    Q    Where did you meet with him?

5    A    I don't remember the address, but it was in New York

6    somewhere in New York City.

7    Q    And where -- what did you discuss during that meeting?

8    A    Just got to know him, talked a little -- you know,

9    basically about the market and investing and, you know, stocks

10   and different opportunities and trying to get a better idea of

11   what types of opportunities and companies he was looking at

12   and how I would be able to add some value from a coverage

13   perspective.

14   Q    When you say "from a coverage perspective" what do you

15   mean?

16   A    Larynx One is a brokerage firm.  We provide -- it was

17   healthcare centered so we focused on healthcare.  We covered

18   healthcare company, biotech companies and if I knew which

19   companies -- which companies the defendant or other clients

20   were interested in, then any news flow or any information we

21   had on those companies I made sure it got disseminated to them

22   because there was a lot of information coming out of Larynx

23   One company.

24   Q    Did the defendant run any business through Larynx One

25   where Larynx was acting as a broker?

SN        OCR        RPR

Yaffe - direct - Smith                                    4366

1    A    I believe he did run some small trades over the trading

2    desk.

3    Q    And what did the defendant share with you about his work

4    history?

5    A    Not a lot other than he -- I know he worked back in the

6    day, I believe, as an analyst working with Kramer.  He

7    obviously knew a lot of people on the street.  He was

8    articulate.  You was passionate about stocks and the market

9    and healthcare and product development.

10   Q    Did there come a time when the defendant started his own

11   hedge fund?

12   A    Yes.

13   Q    Approximately when did that take place?

14   A    The beginning of 2007 he decided to branch out and set up

15   his own hedge fund.

16   Q    What was the hedge fund called?

17   A    I referred to it as Elea Capital but I believe it was

18   Elea Alpha Fund.

19   Q    What did the defendant tell you about this fund?

20   A    Again, it was going to be a fund that invested in the

21   healthcare sector and it was looking to raise money from /-Z

22   accredited investors and, again, I had gotten to know Martin

23   over the last couple of years and had a lot of confidence in

24   him and spoke to my dad and convinced my dad to invest some

25   money in the fund.

Yaffe - direct - Smith                    4367

1   Q    What is your dad's name?

2   A    George Yaffe.

3   Q    What did the defendant tell you inn terms of what the

4   minimum investment in the fund was?

5   A    The minimum investment was 100,000.

6   Q    Did your father, in fact, invest in Elea?

7   A    He did.

8   Q    And did he invest personally or did he invest through a

9   particular entity?

10  A    He invested through a company called Efay Limited

11  Partnership, which was a family partnership where he was the

12  GP and he controlled and it was used for -- it was an

13  investment vehicle to have invest in stocks and bonds and

14  other investments.

15  Q    And is Efay spelled E-F-A-Y?

16  A    It is.

17  Q    What documents, if any, did the defendant provide in

18  connection with the Elea Fund?

19  A    There was an investor questionnaire.  I believe there was

20  a some information on the actual fund in terms of the

21  specifics of the fund.  I'm trying to think of what else there

22  was.  And a subscription agreement as well.

23  Q    And did you review those documents for your father before

24  he invested through Efay?

25  A    I did.

Yaffe - direct - Smith                    4368

1    Q    What was the management fee and the incentive fee for the

2    Elea Alpha Fund?

3    A    1 percent management fee and 20 percent of the profits.

4    Q    How much money did Efay invest in the Defendant's Elea

5    fund?

6    A    100,000.

7    Q    And was that in 2007?

8    A    It was.

9    Q    And after that investment did either you or your father

10   receive written updates about the performance of the Elea

11   fund?

12   A    No.

13   Q    Did you receive verbal updates from the defendant on the

14   performance of the fund?

15   A    Yes.

16   Q    What did he tell you about the performance of the fund?

17   A    The money, we were up significantly and that the fund was

18   doing well, I believe, somewhere in the 40 to 50 percent in

19   the short period of time, but I spoke to the defendant, you

20   know, quite often and I'd ask him about it and it sounded like

21   everything was going -- everything was going great and the

22   fund was doing well and the investment was doing well, and,

23   again, the investment was with Martin and I wasn't going to

24   question him.  I had a lot of confidence in him.

25   Q    What did the defendant say ultimately happened to the

Yaffe - direct - Smith                          4369

1    Elea Fund?

2    A    Eventually a year -- roughly approximately a year later

3    that he made a leveraged bet on the direction of the market

4    and he was wrong and he basically -- the fund got wiped out

5    and all the investors' money was lost.

6    Q    When you say "a leveraged bet on the direction of the

7    market," what do you mean?

8    A    On Wall Street you can -- you can actually use options

9    where you -- where it's a way to make a big bet and actually

10   borrow to make a bet and you can -- even if you don't have the

11   money you can borrow to make the bet.

12          The problem is if you're wrong, you get what's

13   called a margin call and I believe that's what happened.  I

14   don't know exactly what happened, but that's what I was told

15   happened.  That's what I was told happened.

16   Q    Were you told that by the defendant?

17   A    Yes.

18   Q    What was your -- and, so, as a result of that, did the

19   defendant tell you that all of the investors' money was gone?

20   A    Yes.

21   Q    What was your father's reaction to the loss of the

22   investment?

23          MR. BRAFMAN:  Objection.

24          THE COURT:  Sustained.

25   Q    What was your reaction on the loss in the investment?

1           MR. BRAFMAN:  Objection.

2           THE COURT:  Overruled.

3   A    Obviously I was disappointed.  I was upset.  I was angry.

4   You know, probably the same reaction that anyone else would

5   have to thinking you had an investment that was doing well and

6   realized that the money was gone.  I had a lot of questions

7   and I had to actually have the discussion with my dad which I

8   wasn't too happy about.

9   Q    And what, if anything, did the defendant say about

10  repaying the loss of that investment?

11  A    You no, I think the defendant felt bad, you know, and

12  basically told me that -- obviously I knew he didn't have any

13  money at that point, but that at some time down the road, you

14  know, if he was successful and things went well, you know that

15  he would, you know, that he would make me whole on that

16  investment and I had a lot of confidence in him and I believed

17  him.

18  Q    Following the Elea loss, did there come a time that you

19  learned the defendant had started another hedge fund?

20  A    Yes.

21  Q    What was the name of that fund?

22  A    MSMB.

23  Q    And what did the defendant tell you was the focus of that

24  fund?

25  A    That it was again -- it was another fund that, again, was

Yaffe - direct - Smith                    4371

1    going to be focused on healthcare investment.

2    Q    And did the defendant make a pitch for you to invest in

3    MSMB Capital?

4    A    Not directly.  I think -- you know, I'd say not directly,

5    but he made it -- he made it known that he was raising

6    additional money and he was looking for investors and that he

7    had, you know, he had a lot of smart money investors that

8    would be, you know, be joining him coming into the fund and --

9    Q    Did you invest in MSMB Capital?

10   A    No.

11   Q    Why not?

12              MR. BRAFMAN:  Objection.

13              THE COURT:  Overruled.

14   A    I didn't invest in MSMB Capital because the investment in

15   Elea didn't work out the way that I had planned.  You know, I

16   lost all of my money on that investment and I wasn't willing

17   to put more money into another, you know, investment fund with

18   Martin.

19   Q    Who is Marek Biestek?

20   A    He is the MB in MSMB.

21   Q    And did you ever meet Marek Biestek?

22   A    I did.

23   Q    Where did you meet him?

24   A    At -- I met him at Martin's office when I came to visit

25   inn New York.

Yaffe - direct - Smith                    4372

1   Q    I'm going to show you what's been marked for

2   identification as Government Exhibit 116-4 and Government

3   Exhibit 116-5 and those are tabs four and seven in your

4   binder.

5   A    Okay.

6   Q    Are those e-mail chains between you and the defendant?

7   A    Yes.

8   Q    And do they discuss the repayment of investment in Elea

9   capital?

10  A    Yes.

11          MS. SMITH:  Your Honor, the Government moves to

12  admit Government Exhibit 116-4 and Government Exhibit 116-5.

13          MR. BRAFMAN:  No objection.

14          THE COURT:  We receive 116-4 and -5.

15          (Government Exhibit 116-4 and 116-5 received in

16  evidence.)

17  Q    If we could start with Government Exhibit 116-4 and if we

18  could start with the bottom couple of e-mails.

19  A    Okay.  I apologize.  I'm a little --

20  Q    So it's tab four.

21  A    Tab four.  Okay.

22  Q    So the bottom e-mail there is an e-mail from you to

23  Mr. Shkreli on August 11, 2011 and it says "Forward wiring

24  instructions."  You say, "Dad called me and wire never hit.

25  Did this ever get wired out?  And if you look up again on the

Yaffe - direct - Smith                              4373

1   next day, August 12 2011 you send another e-mail to the

2   defendant saying did you ever wire money over?

3   A    Yeah, I had spoken to Martin and he didn't have a lot of

4   money but in good faith he said he was going to try to get my

5   dad some money and he was going to wire over a little bit of

6   money and at one point he did wire I believe $5,000 over to my

7   dad.

8   Q    And were these e-mail conversations about the potential

9   about getting an additional wire?

10  A    I believe so.

11  Q    If we can scroll up?  Do you see those two e-mails.  You

12  have another e-mail on August 17, 2011 and what do you say in

13  that e-mail, the one on the bottom, "Just curious when this is

14  going to happen"?

15  A    Yeah he -- again, Martin said he was going to wire some

16  money it didn't happen.  I was following up and see if it was

17  going to happen and he was going to wire money.

18  Q    You make references to your father in both of these two

19  e-mails.  Is that because these are repayments in connection

20  with the Elea Capital investment?

21  A    Yes.

22  Q    And then if we can go up to the top e-mail, this is an

23  e-mail from the defendant to you on August 24, 2011?

24  A    Yes.

25  Q    What is the defendant writing?

Yaffe - direct - Smith                    4374

1   A     That the market is not good and barely has enough money

2   to live on, let alone to pay my dad and hopefully he'll have

3   some more positive news in September when some money comes in.

4   Q     And the e-mail says when some new money comes in; right?

5   A     Right.

6   Q     If we can turn to Government Exhibit 116-5 which is tab

7   seven of your binder?  If you look at the bottom e-mail on

8   August 11, is that part of the same chain as the e-mail that

9   we just looked at in Government Exhibit 116-4.

10  A     It is.

11  Q     If we can focus on the middle two e-mails.

12  A     Okay.

13  Q     Mr. Shkreli writes on August 11, 2011 that, the wire

14  didn't hit because of market turmoil and then on January 23,

15  2012, Mr. Shkreli writes, "Why don't we update the promissory

16  note to 250,000.  I should be liquid in a few months."

17          What is the is promissory note that's being referred

18  to here?

19  A     After the Elea investment didn't work out, I was still in

20  close contact with Martin and I wasn't happy about what had

21  happened and I felt from '08 to 2013, but for the better part

22  of that time, I was chasing Martin for money and Martin was

23  basically saying that at some point if he was successful down

24  the road he planned on making my dad whole.

25          He felt bad about everything that happened and,

Yaffe - direct - Smith                          4375

1    again, I believed that.  So as part of that, I kind of pushed
2    Martin and said why don't you sign a promissory note and give
3    my dad a promissory note to pay for the money.  We had
4    numerous conversations that he was going to pay him back and I
5    just said, let's make it a legal document and put it in the
6    promissory note, and Martin -- I think Martin agreed to do
7    that.
8    Q    And the initial investment in Elea by Efay was $100,000;
9    right?
10   A    Correct.
11   Q    But the promissory note is the $250,000.  Who came up
12   with the figure $250,000?
13   A    I don't recall but I know we went back and forth because
14   it was my belief that the money that I gave him went up
15   significantly and you also have the time cost of money.  If
16   you had $100,000, even if it was invested conservatively over
17   the course of seven years or whatever your money should
18   double.
19          In this case on a hedge fund investment which has
20   additional risk but with a good hedge fund manager you're not
21   looking for your 7 or 8 or 9 percent returns.  You're looking
22   for much higher returns and felt -- I felt that that was, you
23   know, a fair amount of money based on what had happened, what
24   had transpired and the time that had gone by.
25   Q    And while the money was invested in Elea, the defendant

Yaffe - direct - Smith                    4376

1    had told you that it had made money; is that right?

2    A    Correct.

3    Q    If we can scroll up to the top two e-mails?  This e-mail

4    is your response on January 24, 2012.  You say, "I basically

5    upgraded the first one and tried to keep it as simple as

6    possible," and then you say, "If you can sign it and have it

7    notarized, I will get to my dad to do the same."

8             Were you negotiating the promissory note on your

9    father's behalf.

10   A    Yes.

11   Q    If you can look at the top e-mail and that's dated

12   January 26, 2012 and Mr. Shkreli writes, "Here is my executed

13   and notarized document," and the attachment says

14   "Shkreli/Yaffe promissory note."

15            I'm going to show you what's been marked as

16   Government Exhibit 116-8 for identification and that is behind

17   tab five of your binder?

18   A    Okay.

19   Q    And do you recognize this document?

20   A    Yes.

21   Q    What is this document?

22   A    It was the promissory note that Martin had signed and had

23   notarized to pay my dad back to $50,000.

24            (Continued on next page.)

25

Yaffe - Direct - Smith                          4377

1   BY MS. SMITH:

2   Q    Did you receive this document from the defendant?

3   A    Yes.

4        MS. SMITH:  Your Honor, the Government moves to

5   admit Government Exhibit 116-18 into evidence.

6        MR. BRAFMAN:  No objection.

7        THE COURT:  We will receive 116-18.

8        (So marked.)

9   BY MS. SMITH:

10  Q    If we can focus on the top part of the document.  This

11  says, that it is between Mr. Shkreli and George Yaffe.

12       Is George Yaffe your father?

13  A    He is.

14  Q    What is the date of the agreement?

15  A    January 24th, 2012.

16  Q    If we can scroll down.  It says here the principal due

17  date is December 31, 2013.  It talks about a compounded annual

18  interest with the note?

19  A    That's correct.

20  Q    Then if we can scroll down even further.

21       Is this note signed by the defendant?

22  A    It is.

23  Q    Was this note repaid by the defendant in 2012?

24       MR. BRAFMAN:  Objection, the due date is 2013.

25       THE COURT:  All right.  Do you want to rephrase your

Yaffe - Direct - Smith                    4378

1   question Ms. Smith.

2   Q    Can we go to the top of the document.

3        Sorry, we need to move it a bit.  The terms and

4   conditions section.

5        The terms and conditions say that the principal due

6   date is December 31, 2013.  Is there any limitation in this

7   document on paying the note prior to that date?

8   A    No.

9   Q    So, was the note repaid in 2012?

10  A    No.

11  Q    Did you continue to be in contact with the defendant

12  throughout 2012?

13  A    Yes.

14  Q    I will show you what has been marked as Government

15  Exhibit 116-10, which is tab 11 in your binder.

16        Is this an E-mail from the defendant to you?

17  A    Yes.

18  Q    Is the subject of the E-mail, Retrophin?

19  A    Yes.

20  Q    Is it from December of 2012?

21  A    Yes.

22        MS. SMITH:  Your Honor, the Government moves to

23  admit Government Exhibit 116-10 in evidence.

24        MR. BRAFMAN:  No objection.

25        THE COURT:  We will receive 116-10.

1          (So marked.)

2    Q    If we can focus on the top half.

3          Though the bottom E-mail here is dated

4    December 18th, 2012, the subject is Retrophin completes

5    reverse merger.  Then if you look at the top, the E-mail is

6    forwarded from the defendant to Lee Yaffe.

7          Is that your E-mail there,

8    leey@visualofficesolutions.com?

9    A    Yes.

10   Q    So, what did you understand Retrophin to be?

11   A    A biotech company that Martin had founded.

12   Q    Did you ever invest in Retrophin?

13   A    No.

14   Q    Did you ever discuss Retrophin with the defendant?

15   A    Yes.

16   Q    What did he say about it?

17   A    He was excited.  I think you know he always wanted to

18   start a biotech company and in license drugs and be the CEO

19   and founder of a biotech company.  He was passionate about it.

20   He was looking at a lot of different opportunities to try to

21   in license drugs and start a biotech company.

22   Q    Did you have any involvement in Retrophin at the time

23   that it was going public as described in this press release?

24   A    No.

25   Q    I will show you what has been marked for identification

Yaffe - Direct - Smith                    4380

1   as Government Exhibit 116-11, it is tab twelve in your binder.

2           Is this document a text message from the defendant?

3   A    Yes.

4   Q    Is it from May 2013?

5   A    It is.

6   Q    Is it to you?

7   A    It is.

8           MS. SMITH:  Your Honor, the Government offers

9   Government Exhibit 116-11 in evidence.

10          MR. BRAFMAN:  No objection.

11          THE COURT:  We will receive 116-11.

12          (So marked.)

13  Q    So this is a text message from May 21, 2013.  It is from

14  the defendant to you.  What is the subject line?

15  A    It says, I have not been around.

16  Q    This is about a little less than six months after the

17  press release for Retrophin went public.  How often were you

18  in communication with the defendant during that period?

19  A    In the 2013 time frame?

20  Q    In the first half of 2013.

21  A    A little bit more frequent because I knew that he, you

22  know, had a publicly traded biotech company where, you know,

23  where he was-- got a substantial amount of shares.  So I

24  thought that he would have some, you know, liquidity and some

25  money to be able to pay me back, pay my dad back.

1    Q    During this time period, were you discussing with him

2    having the promissory note repaid?

3    A    I had always been trying to figure out how to get repaid

4    maybe for the last five years from '08 to all the way through

5    '13.  But just saw Retrophin as a catalyst or a change that

6    would maybe put-- would allow Martin to be in a position to

7    actually be able to pay back the promissory note.

8    Q    I will show you what is marked for identification as

9    116-14, 116-16 and 116-18, which are a tabs 15, 17, 19 of your

10   binder.

11        So, tabs 15, 17, and 19.  Are those three all

12   E-mails between you and the defendant?

13   A    It is hard-- I am having trouble seeing it on here.  I

14   can look in the book.

15   Q    Tabs 15, and then 17, and 19.

16   A    Yes.  Those are E-mails between me and the defendant.

17   Q    Are they from the fall of 2013?

18   A    Yes.

19        MS. SMITH:  Your Honor, the Government moves to

20   admit Government Exhibits 116-14, 116-16, and 116-18 into

21   evidence.

22        MR. BRAFMAN:  No objection.

23        THE COURT:  We will receive 116-14, 116-16 and

24   116-18 in evidence.

25        (So marked.)

Yaffe - Direct - Smith                    4382

1   Q    So let's start with Government Exhibit 116-14 which is

2   tab 15.

3   A    Okay.

4   Q    If we can focus on the bottom E-mail.  We can actually

5   focus on the E-mail itself without the bottom part.

6           Is this an E-mail from you to the defendant on

7   September 12th, 2013?

8   A    Yes.

9   Q    Subject line is, dad's note for 250K, call me when you can.

10          Can you read the E-mail starting with, just wanted

11  to follow up with you.

12  A    Just wanted to follow up with you and put this to bed

13  ASAP.  I spoke with my dad who was extremely happy and

14  appreciative.  In a perfect world would love to have you wire

15  him back 170,000 and gift him 15,000 shares of Retrophin stock

16  and that would fulfill the note obligation and more

17  importantly doing the right thing and manning up as we spoke

18  about.  Let me know your thoughts.  I believe he made the

19  investment out of EFAY Limited Partnership.  If you can wire

20  the money back and have the stock issued in EFAY Limited

21  Partnership's name would be great.  We can wire proceeds to --

22  I gave him the wiring instructions for EFAY which had an

23  account at JP Morgan Chase.  Thoughts.  Best call me to

24  discuss.  Best Lee.

25  Q    The investment you are referring to here is that the

Yaffe - Direct - Smith                    4383

1    investment in Elea Capital?

2    A    Yes.

3    Q    And it says you wanted to follow up with you.  Did you

4    have any phone discussion with the defendant prior to this

5    E-mail?

6    A    Yes.

7    Q    Whose idea was it to have the defendant repay the note

8    with $170,000 and 15,000 shares of stock?

9    A    Martin's.

10   Q    And based on your conversation with the defendant, what

11   was your understanding of the source of the shares and the

12   money that Martin was going to use to repay you in connection

13   with the note?

14   A    I thought it was going to come from Martin personally.

15   Q    We can take a look at Government Exhibit 116-16 in

16   evidence.  That is tab 17.

17          If you look at this E-mail, the bottom E-mail, it is

18   from the defendant and then the subject line is, coming to

19   Boca next Friday, you around?

20          Then you respond on September 28th, 2013, and say,

21   should be in on Friday but planning on going to Orlando over

22   the weekend.

23          Then if we can scroll up to the next E-mail.

24          On September 28th, 2013, the defendant responded.

25   Can you read his response, starts with ah.

Yaffe - Direct - Smith                    4384

1   A    Ah, was hoping for Saturday or Sunday.  I'll be going

2   often.  I have lots of friends there now, including Fred

3   Hassan.  Trying to get in Phil Frost too.

4   Q    If you can scroll up to the final E-mail.

5            That same day you write back to the defendant, maybe

6   we can still catch up on Friday.  Will blow off, if, but

7   promises the kids?

8   A    Yeah, I said maybe we can catch up on Friday, I left it

9   tentative.  I said I would blow it off, but I promised the

10  kids and I am in Costa Rica right now.  So I had to -- I

11  basically told the kids that weekend that he was coming in, I

12  had a conflict.  I promised the kids I would take them to

13  Orlando.  So we never did end up getting together.

14  Q    And this in September of 2013?

15  A    Correct.

16  Q    And this is after those discussions about the promissory

17  note we just looked at?

18  A    Yes.

19  Q    If we can look at Government Exhibit 116-18 which is in

20  evidence.  It is tab 19.

21            If we can start on page two.

22  A    Okay.

23  Q    Is the bottom E-mail of this chain the same E-mail we

24  looked at in Government Exhibit 116-14?

25  A    Yes.

Yaffe - Direct - Smith                          4385

1   Q     And then if we can scroll up.  That E-mail

2   September 12th, 2013.  Then the defendant responds on

3   November 12th, 2013, some two months later.

4            What does he write there?

5   A     Hey man I haven't forgot you, I am in Basel, Switzerland.

6   Q     If we can go to page one of the E-mail chain.  Starting

7   with the bottom E-mail.  Couple of days later on

8   November 19th, 2013, you respond, and what do you say in your

9   E-mail?

10  A     Hey Martin, can we try to get this process moving.  Hope

11  you had fun in Switzerland.  Did you draft a settlement

12  agreement.  When will you be back in Florida?  Let me now,

13  ciao for now.

14  Q     Why were you referring to a settlement agreement here?

15  A     Because I believed it was going to get paid back for the

16  Elea Capital Investment, basically by the promissory note.

17  That would be basically a settlement agreement and that it

18  would be paid for that, made whole on that investment.  That

19  my dad wouldn't.

20  Q     If we can scroll up and look at the next E-mail.

21           The defendant responds on November 19th, I will.

22  Sorry things are jammed up here.  Just reported earnings

23  yesterday.

24           Then if you can scroll up again.

25           Then on November 27th, 2013, you respond.  What is

Yaffe - Direct - Smith                          4386

1    your response?

2    A    Hi Martin, give me a call when you get a chance.  Can you

3    forward over the settlement agreement as discussed.

4    Q    Then can we look at the top two E-mails.

5    A    Yes.  He came back to me on November 27th and said, yeah,

6    sorry about that.

7    Q    Then what was your response in the very top E-mail which

8    was also on November 27th?

9    A    No worries, I know you are busy.  Just one of the many

10   loose ends I'm trying to clean up and dad still all over me as

11   told he would be getting some money finally.  Call me whenever

12   you get a chance.

13   Q    And at this point had the note been repaid?

14   A    No.

15   Q    I will show you some additional documents which have been

16   marked Government Exhibit 116-19, 116-20, and 116-22.  These

17   are tabs 20, 21, and 23.

18   A    Okay.

19   Q    Are all three of those documents E-mails between you and

20   the defendant?

21   A    20 is.

22   Q    So tab 20, tab 21, and tab 23.

23   A    Yes.

24   Q    Are they all from December of 2013?

25   A    Yes.

Yaffe - Direct - Smith                    4387

1    Q    Do they all involve the repayment of the note?

2    A    Yes.

3         MS. SMITH:  Your Honor, the Government moves to

4    admit what has been marked as Government Exhibits 116-19,

5    116-20, and 116-22, in evidence.

6         MR. BRAFMAN:  I have no objection.  But I think you

7    characterized them as they all relate to a certain date and

8    they don't.

9         MS. SMITH:  I said just December of 2013.

10        MR. BRAFMAN:  Okay.

11        THE COURT:  No objection.

12        MR. BRAFMAN:  No objection.

13        THE COURT:  Then we will receive Government Exhibits

14   116-19, 116-20, 116-22.

15        (So marked.)

16   Q    Let's start with Government Exhibit 116-19 which is tab

17   20.  The cover E-mail here is from the defendant to an E-mail

18   address, LeeYaffe45, is that your E-mail address?

19   A    Yes.

20   Q    What is the subject line of the E-mail?

21   A    Agreement doc or agreement.

22   Q    And, what does the defendant write in the E-mail?

23   A    Say it again.

24   Q    What does the defendant write in the E-mail?

25   A    Here you go, let's postpone our 1:00 p.m. call until you

Yaffe - Direct - Smith                    4388

1   digest it and I will call you later today or tomorrow.

2   Q    Is there an attachment to the E-mail?

3   A    There was.

4   Q    And that is titled, Lee Yaffe agreement; is that correct?

5   A    Correct.

6   Q    And, what was your understanding of what the agreement

7   that the defendant was sending you was for?

8   A    The repayment of the promissory note which was to make my

9   dad whole on the Alea Capital Investment.

10  Q    Will you look at page two of the document.  Focus on kind

11  of the top part.

12       What is the title to this document?

13  A    Consulting Agreement.

14       COURTROOM DEPUTY:  Bear with us a second.

15  (Pause.)

16       THE COURT:  All right.  Do you see it?

17       MS. SMITH:  Yes, I do see it.  I just didn't know if

18  we were waiting for the lighting as well.

19       COURTROOM DEPUTY:  Yes, I'll try to do that.

20       MS. SMITH:  Thank you.

21  Q    So, this is page two of Government Exhibit 116-19.  What

22  is the title of this agreement?

23  A    Consulting Agreement.

24  Q    Prior to receiving this document, in December of 2013,

25  had you ever discussed serving as a consultant for Retrophin

Yaffe - Direct - Smith                    4389

1   with the defendant or anybody else?

2   A    No.

3   Q    Had you asked the defendant for a consulting agreement?

4   A    No.

5   Q    Had you ever served in that capacity for a pharmaceutical

6   company before?

7   A    No.

8   Q    If we look at the agreement itself and look at the top

9   portion here.  What is the date on the agreement?

10  A    December 4, 2013.

11  Q    And who is the agreement between?

12  A    Retrophin, myself.

13  Q    Did the defendant explain why this draft agreement was

14  with Retrophin rather than with him personally?

15  A    No.

16  Q    And, let's look at the description of services which is

17  paragraph 1(a).  Can you read that.

18  A    Consultant will serve as an advisor to the company and

19  provide consulting services on cluster headache drug

20  development and other matters to the company.  Consultant

21  shall perform the services as and when requested by the

22  company.  For each project, the company and consultant will

23  agree upon the scope of services, deliverables and timetables.

24  Q    Did you have any experience or expertise on cluster

25  headache drug development?

Yaffe - Direct - Smith                          4390

1   A     No.

2   Q     Did you have any expertise on the development of any kind

3   of drug?

4   A     No.

5   Q     Prior to getting this agreement, had you ever discussed

6   cluster headache drug development with the defendant?

7   A     No.

8   Q     At this point in 2013, are you still at Larry Swan?

9   A     No.

10  Q     Were you working in real estate instead?

11  A     Yes, real estate and I was also running a treatment

12  program.

13  Q     Was that for substance abuse?

14  A     Yes.

15  Q     If we can scroll down in the document to the sections

16  that say compensation and terms.

17          So in the compensation section, can you read part A?

18  A     During the term of this agreement, the company shall pay

19  the consultant $50,000 per month.

20  Q     And then what is the term of the agreement in paragraph

21  3?

22  A     Basically 3-month period.

23  Q     So what was the total payment for this draft agreement if

24  it was 50,000 per month for three months?

25  A     150,000.

1    Q    Then if we can look at page 8 of the agreement, which is

2    the last page.

3              So for this draft agreement, who would be signing

4    the agreement on behalf of Retrophin?

5    A    Martin Shkreli.

6              (Transcript continues on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Yaffe - direct - Smith                    4392

1   BY MR. BRAFMAN:

2   Q     If we can look now at Government Exhibit 116-20, which is

3   Tab 21, and then if we can turn to Page 3 of the e-mail

4   chain --

5   A     Okay.

6   Q     This is an e-mail from Martin to you.  And what do you

7   say in this e-mail?

8   A     It's an e-mail from me to Martin and it said:  I'd like

9   to get executed and get the first chunk of money.  I needed to

10  update with EFAY Limited Partnership and add in the 15,000

11  shares of Retrophin and then execute.  My dad's coming to

12  nature next week, so it would be huge if I could get this done

13  and get some money before he comes down.

14  Q     Why did you want to update the agreement to have it be

15  for EFAY Limited Partnership?

16  A     Because the Elea Capital Investment was made out of EFAY

17  and this repayment really belonged to EFAY, not me.

18  Q     You say:  My dad's coming from Florida next week.  It

19  would be huge...

20        Why are you referencing your dad with respect to the

21  consulting agreement?

22  A     Because I was trying to get Martin to execute the

23  agreement.  And, you know, my dad was upset about it, so I

24  wanted to let him know I was going to be seeing my dad and

25  maybe put a little pressure to get this agreement done.

LAM      OCR      RPR

Yaffe - direct - Smith                    4393

1    Remember, I had been chasing him for money for about five

2    years.

3    Q    So, what was the purpose of the consulting agreement to

4    you?

5    A    To get me -- basically, to repay -- get me money to repay

6    the Elea Capital investment.

7    Q    If we could turn to Page 2 of the document, to the next

8    e-mails up in the chain, and focus on the bottom part.  And in

9    the bottom e-mail, is that -- the very bottom piece, is that

10   the top portion of the e-mail we just looked at with the date

11   of December 11, 2013?

12   A    Yes.

13   Q    And the subject line is:  Any update on EFAY agreement?

14   A    Correct.

15   Q    And then the Defendant writes:  Very jammed announcing

16   big deal today/tomorrow.

17          If we could scroll up to the next section, and then

18   on December 17 you write back to the Defendant and you discuss

19   some additional changes again to the agreement.

20   A    Correct.

21   Q    And then if we can scroll up to the Defendant's response

22   on December 17, he writes:  Appreciate it.  I have this really

23   big announcement to do.  I think doing it on behalf of EFAY

24   would be fine, actually.

25   A    Correct.

Yaffe - direct - Smith                              4394

1    Q    And then if we can go to the top of that page and,

2    actually, it kind of goes over to the first page.  Maybe just

3    look at the bottom.  The header on this e-mail is from you to

4    the Defendant on December 17, 2013, and the subject is:

5    Updated consulting agreement.  And then if we could look at

6    Page 2, at the e-mail itself.

7    A    Okay.

8    Q    So, what did you write at the top of Page 2 there?

9    A    Where it says "cool"?

10   Q    Yes.

11   A    Cool.  Let's see if we can get it buttoned short term.  I

12   know you are busy and need to get it done.  Then I want to

13   pull Swany into the mix.  He can help you guys.  Will fill you

14   in when we speak.

15   Q    Who is Swany?

16   A    Swany is a close friend of my still working at Leerink

17   Swann.  Since I wasn't working at Leerink Swann, I thought

18   that Swany could be a better conduit in terms of helping

19   Martin with research and investment advice and information at

20   that point and that it may be helpful for both Swany to get

21   some business out of it and maybe it would help Martin as

22   well.

23   Q    Was this at all related to the agreement to have your

24   investment repaid from Elea?

25   A    A little bit.  Again, I was trying to put a little bit of

1    pressure on Martin to get an agreement executed as, again, I

2    felt like I had been chasing him for the a while for the money

3    and I was pretty close to at least getting some sort of

4    agreement where I could at least get paid back on the

5    investment.

6    Q    If we could look at Page 1 of the document.  And then the

7    response there from the Defendant says:  Understood, but I'm

8    making a game changing announcement after the close.  Need to

9    focus on that.  Still writing a slide deck.

10           And then in the top e-mails above that, there's some

11   additional back-and-forth between you and the Defendant on

12   December 17, 2013.  And if you can focus on the second to the

13   top e-mail from you to the Defendant, the one that says

14   "cool," you mention your dad again.  You say:  Dad should be

15   rolling into town shortly.

16           Why were you mentioning your dad?

17   A    Again, because it was his money and I wanted to try to

18   get Martin to at least get something executed so I could give

19   him some good news that he was finally going to get paid on

20   his Elea investment.

21   Q    I read all the recent press releases so have some

22   thoughts.  Maybe I can help out that value is recognized by

23   giving me a shot on the consulting side.  Speak with you soon.

24           Did you have any intention on providing consulting

25   services to Retrophin?

Yaffe - direct - Smith                    4396

1    A    No.

2    Q    Why did you say you wanted to get a shot on the

3    consulting side?

4    A    Again, bad judgment on my side.  I think I was -- had

5    been chasing him for so long on the money front that I was

6    just looking to basically get paid back on the investment.

7    And if that was the means for him to pay me back, I was -- you

8    know, I was going -- I kind of accepted it.  But it was wrong.

9    Q    If we can turn to Government Exhibit 116-22, which is Tab

10   23, and if we can start with the bottom two e-mails, this is

11   now -- these e-mails are on December 30, 2013.  And the

12   bottommost e-mail, at 5:37, the Defendant writes:  Can you

13   resend me the most recent board document, not PDF, so I can

14   change it around?

15           And your response is:  Sure.  Will do.  Will be back

16   in home office shortly.

17           And then if we can scroll up to the next e-mail...

18   A    Okay.

19   Q    This is also dated December 30, 2013.  And can you read

20   what you wrote?

21           The subject is:  Still coming up for air.

22           And:  Here you go?

23   A    Here you go.  Guess we need to change the term to four

24   months as we'll be paying me directly but will cover any tax

25   liabilities discussed.  Also need to change to Retrophin

1    common stock but pull out into freely tradable as we'll be

2    restricted.  Just curious how long I have to hold the stock --

3    let's see, just curious how long, but my intent is to hold the

4    stock long-term, don't have that much to begin with.  Checks

5    can be made payable to Lee Yaffe and sent to the following

6    address, which is my home address.

7    Q    Here you're talking about changing the term of the

8    agreement to four months.  Would that have changed the amount

9    that you got paid from the 150,000 to 200,000?

10   A    Yes.

11   Q    And why were you asking to change the term to four

12   months?

13   A    Because I didn't plan on getting paid as income.  And

14   from an income standpoint, I'd have to pay taxes on it, so it

15   would have chewed me up for the taxes.  I wanted the money to

16   go back to EFAY, which it would have been a gain on the

17   investment, which is a much lower tax rate.

18   Q    So, the changing of the term to four months was purely to

19   change the amount of the agreement, not necessarily the length

20   of the agreement?

21   A    Correct.

22   Q    And if we can just scroll up to the top three e-mails.

23   The bottom e-mail there, it's from the Defendant.  He says:  I

24   don't know how the restricted rules work.  Evan, do you want

25   to chime in?  If we give a consultant stock, how long does it

Yaffe - direct - Smith                          4398

1    take to get registered?

2    A    Correct.

3    Q    And then there's a response from somebody named Evan

4    Greebel on December 31, 2013.  Who is Evan Greebel?

5    A    I believe he was counsel or the counsel that was advising

6    or working with Martin.

7    Q    And what does Mr. Greebel write in his e-mail?

8    A    The stock is restricted for six months, after which it

9    can be sold under Rule 144.

10   Q    And then what do you say in the top e-mail, also on

11   December 31, 2013?

12   A    Can you make the changes and execute and send over to me

13   today?  Happy and healthy new year.

14   Q    I'm going to show you what's been marked as Government

15   Exhibit 60 for identification, which is Tab 25.  Do you

16   recognize this document?

17   A    Yes.

18   Q    And is this the final signed agreement that was signed by

19   you and the Defendant?

20   A    Yes.

21   Q    And is it dated December 31, 2013?

22   A    Yes.

23           MS. SMITH:  Your Honor, the Government moves

24   Government Exhibit 60 into evidence.

25           MR. AGNIFILO:  No objection.

                    LAM     OCR     RPR

Yaffe - direct - Smith                          4399

1            THE COURT:  We receive Exhibit 60.

2            (Government Exhibit 60 so marked.)

3            MS. SMITH:  We can focus on the top portion again.

4            (Exhibit published to the jury.)

5     Q     So, again, what's the title of this agreement?

6     A     Consulting agreement.

7     Q     And what's the date?

8     A     December 31, 2013.

9     Q     And it's between Retrophin and yourself; is that right?

10    A     Correct.

11    Q     And, again, can you just read the first sentence of the

12    description of services which is, Paragraph 1(a)?

13    A     Consultant will serve as an advisor to the company and

14    provide consulting services on cost to drive development and

15    other matters to the company.

16    Q     And then if we could look down in the agreement to the

17    compensation section.

18    A     Okay.

19    Q     If you can, just read Paragraph 2(a).

20    A     During this -- during the term of this agreement the

21    company shall pay the consultant $50,000 per month.  In

22    addition, the company shall make a one-time nonreoccurring

23    issuance of 15,000 shares of Retrophin common stock to EFAY

24    Limited Partnership, an entity owned and controlled by the

25    consultant.

Yaffe - direct - Smith                    4400

1    Q    And if we could scroll down one more time to the section

2    that says "term," which is part three, what's the term of this

3    agreement?

4    A    Four months.

5    Q    And, so, under this agreement, what was the total amount

6    of money that you would be receiving?

7    A    200,000 on the consulting agreement.

8    Q    And then what was the total number of shares?

9    A    15,000 shares of Retrophin stock.

10   Q    And if we go back up to the compensation section for one

11   minute, it says:  During the term of the agreement, the

12   company shall pay the consultant $50,000 per month.

13             Did you understand the company to be Retrophin?

14   A    Yes.  Again, I should have -- I'm going to take

15   responsibility for that.

16             MS. KASULIS:  Objection.

17             THE COURT:  Just listen to the question that she

18   asks, sir.

19             THE WITNESS:  Okay.

20   A    Yes.

21   Q    At the time that you signed this agreement, were you

22   focused on where the money for the agreement was coming from?

23   A    No.

24   Q    And were you focused on where the shares were coming from

25   in connection with the agreement?

Yaffe - direct - Smith                    4401

1   A    I mean, per the consulting agreement, yes, I knew they

2   were coming from Retrophin.

3   Q    And from the consulting agreement, did you know the money

4   was coming from Retrophin as well?

5   A    Yes.

6   Q    We can turn to Page 2 of the document, and then can we

7   focus on the section towards the middle that says (b), which

8   is Paragraph 4(b)?

9   A    Okay.

10  Q    Can you read this section here?

11  A    The company represents warrants and covenants to the

12  consultant that the company has the requisite corporate power

13  and authority to enter into and consummate the transaction set

14  forth in this agreement.

15  Q    Did you know whether the Retrophin board of directors

16  approved this agreement?

17  A    No.

18  Q    You can turn to Page 7 of the document.  This is the last

19  page.

20  A    Okay.

21  Q    Who signed this agreement on behalf of the company?

22  A    Martin Shkreli.

23  Q    And is that your signature on this document as well?

24  A    Yes.

25  Q    When you signed this agreement, did you have any

Yaffe - direct - Smith                    4402

1    intention of providing consulting services on cluster headache

2    drug development to Retrophin?

3    A    No.

4    Q    Were you qualified by either your education or experience

5    to provide consulting services on cluster headache drug

6    development to Retrophin?

7    A    No.

8    Q    At the time that you signed the agreement in

9    December 2013, had you known the Defendant approximately eight

10   years?

11   A    Yes.

12   Q    And had you had discussions with him about your

13   educational background and your work history?

14   A    Yes.

15   Q    Did you ever provide consulting services on cluster

16   headache drug development to Retrophin?

17   A    No.

18   Q    Did you ever provide any consulting services to

19   Retrophin?

20   A    No.

21   Q    What was the purpose of this consulting agreement to you?

22        MR. BRAFMAN:  Objection.

23        THE COURT:  You can rephrase the question.

24   Q    What was your understanding of the purpose of the

25   consulting agreement?

Yaffe - direct - Smith                    4403

1   A     To pay back my dad for the Elea Capital investment.

2   Q     Did you ever have any telephone calls with the Defendant

3   related to cluster headaches and this consulting agreement?

4   A     Yes.

5   Q     And approximately how many calls did you have with him?

6   A     Two calls.

7   Q     How long were those calls?

8   A     Brief.  Probably no more than five minutes.

9   Q     And who was on those calls?

10  A     Martin and Marek Biestek.

11  Q     Who suggested that the calls be set up?

12  A     Martin.

13  Q     What was discussed on those calls?

14  A     Just that I'm going to be -- supposed to be consulting on

15  cluster headaches and try to get versed on that, but not much

16  substance on the calls.

17  Q     Did those two brief calls constitute the provision of

18  consulting services to Retrophin?

19  A     No.

20  Q     After you signed the consulting agreement, did you, in

21  fact, receive four months of $50,000 payments in cash from

22  Retrophin?

23  A     Yes.

24  Q     And what about the 15,000 Retrophin shares, did you

25  receive those as well?

Yaffe - direct - Smith                                    4404

1   A    Yes.

2   Q    And did the money and shares that you received from the

3   agreement go back into EFAY?

4   A    Yes.

5   Q    So, turning to January of 2015, did you get a call in

6   January 2015 from an attorney for Retrophin?

7   A    I did.

8   Q    What was discussed on that call?

9   A    Asked me about the consulting agreement and I told him

10  that I was providing consulting services to Retrophin.  And

11  then he asked me about the promissory note to my dad, and I

12  kind of panicked and got off the phone with him fairly

13  quickly.

14  Q    When you said that you provided consulting services to

15  that attorney, was that true?

16  A    No.

17  Q    What contact, if any, did you have with the Defendant

18  after the call with the Retrophin attorney in January 2015?

19  A    My call after that was to Martin, asking him, well, what

20  was going on and letting him know that I received a call from

21  counsel pertaining to Retrophin and the consulting agreement

22  and I was kind of shaken up from it and wanted to kind of know

23  what was going on.  And Martin reassured me that they

24  shouldn't be calling me and it wasn't right and don't worry

25  about it.

Yaffe - direct - Smith                                    4405

1   Q    Did you have any additional conversations with the

2   Defendant about the consulting agreement?

3   A    No.

4   Q    Did you have another conversation with the Defendant in

5   that time period related to the Defendant's company called

6   Turing?

7   A    Yes.

8   Q    What was that conversation?

9   A    I received a call shortly thereafter from him and another

10  attorney, who was in his car, asking -- you know, introducing

11  me and telling the attorney that I was a consultant for

12  Retrophin and I should be hired as a consultant for Turing as

13  well.

14  Q    When you say "him" and the attorney, are you talking

15  about the Defendant?

16  A    The Defendant, correct.

17  Q    Did you agree to be a consultant for Turing?

18  A    No.

19  Q    Turning to the spring of 2015, what happened op April 1,

20  2015?

21  A    It's the worst April Fool's Day I ever had in my life.  I

22  had an unexpected visit from the FBI when I was pulling up

23  with my family.  And I was hoping it was April's Fool joke,

24  but it wasn't.  They were there to ask me about the consulting

25  agreement as well as the promissory note and my dealings with

LAM      OCR      RPR

Yaffe - direct - Smith                    4406

1    Martin and Retrophin.

2    Q    And when you said that they showed up where your family

3    was, was that at your house?

4    A    Yes, it was at my house in Florida.

5    Q    And how many FBI agents were there?

6    A    Two.

7    Q    And were you expecting FBI agents to show up on that day?

8    A    No.

9    Q    You said that they asked you about the consulting

10   agreement and the promissory note?

11   A    Correct.

12   Q    What exactly did they ask you?

13   A    If I provided consulting services for Retrophin and they

14   were asking me about the promissory -- what this promissory

15   note was between -- you know, for the 250,000 between my dad

16   and Martin.

17

18              (Continued on next page.)

19

20

21

22

23

24

25

LAM      OCR      RPR

1    (continuing.)

2   BY MS. SMITH:

3   Q    And what did you say in response to their questions about

4   the consulting agreement?

5   A    I told them I wasn't completely truthful and tried to

6   rationalize and make it seem like I provided consulting

7   services.

8   Q    And was it true that you provided consulting services?

9   A    No.

10   Q    And why did you say that if it wasn't true?

11   A    I panicked a little bit.  I really got caught off guard.

12   I wanted to be able to get paid back on the investment and

13   didn't want to have to pay the money back and I actually

14   wanted to also protect Martin because I had a long

15   relationship with him and I felt that he tried to pay me back

16   and the way he went about it wasn't right.

17   Q    After that initial visit to your house did you have

18   another meeting with the Government in New York?

19   A    Yes.

20   Q    And what did you discuss at that second meeting?

21   A    The same, Retrophin, the consulting agreement, the

22   promissory notes.  It was kind of a follow-up meeting with the

23   one we had with the FBI.

24   Q    Were you completely truthful at that follow-up meeting?

25   A    No.  I was still trying to rationalize what I had done

Yaffe - direct - Smith                    4408

1    for the reasons of wanting to protect Martin and also wanting

2    to get paid back to the investment being I was chasing money

3    for about five years.

4    Q     And did there come a time that you had a third meeting

5    with the Government?

6    A     Yes.

7    Q     And what happened at that third meeting?

8    A     I decided that I needed to come clean.  I needed to be

9    truthful and I was also concerned that I was going to be in

10   trouble as well.

11   Q     And in that conversation and in subsequent conversations

12   with the Government, did you provide truthful information?

13   A     Yes.

14   Q     Are you testifying today pursuant to any kind of

15   agreement?

16   A     I am.

17   Q     What kind of agreement are you testifying pursuant to?

18   A     A non-prosecution agreement.

19   Q     What's your understanding of what a non-prosecution

20   agreement is?

21   A     Basically I come clean and agree to be truthful and tell

22   the truth and the Government has agreed not to prosecute me

23   for taking compensation from Retrophin for the consulting

24   agreement and shares in compensation when I didn't provide any

25   consulting services and for not being truthful to the FBI when

Yaffe - direct - Smith                                    4409

1    they came to my house.

2    Q    And in addition to agreeing to provide truthful

3    information, did you also agree to do anything with the money

4    or shares that you had received from Retrophin?

5    A    Yes.

6    Q    What did you agree to do with those -- that money or

7    shares?

8    A    To pay back all the money I received as consulting income

9    and to pay back all the gains that I received on the stock

10   sale.

11   Q    And you said that part of the agreement was to tell the

12   truth.  Does that include telling the truth to the Government

13   before trial, in the meetings before trial?

14   A    Yes.

15   Q    And does that include telling the truth today in this

16   courtroom whether you're asked questions by the Government, by

17   the court or by defense counsel?

18   A    Yes.

19   Q    And does the agreement protect you if you lied to the

20   government in the meetings prior to trial?

21   A    No.

22   Q    And does the agreement protect you if you lie in

23   connection with your testimony here in this courtroom?

24   A    No.

25   Q    Does it matter to your agreement whether or not the

Yaffe - direct - Smith                    4410

1    defendant is ultimately convicted?

2    A    No.

3    Q    You said that the agreement requires you to repay the

4    money that you had gotten from the consulting agreement.  How

5    much money did you get directly from Retrophin in connection

6    with that agreement?

7    A    355,000 total.  It was $200,000 of consulting income that

8    I received and I sold the shares of Retrophin stock and I

9    realized a profit of 155,000, so 355,000 total.

10   Q    And why did you have to repay the money and the shares

11   that you had received from the consulting agreement?

12          MR. BRAFMAN:  Objection.

13          THE COURT:  Overruled.

14   A    Because I didn't provide any consulting services and,

15   therefore, that money belonged to the Retrophin shareholders

16   and not to me.

17   Q    And have you, in fact, repaid the full amount of the

18   money in shares -- the money and then the profit that you

19   earned from the shares that you received in connection with

20   the consulting agreement?

21   A    Yes.

22          MS. SMITH:  Just one moment, Your Honor.

23          No further questions at the moment, Your Honor.

24          THE COURT:  I'd like to go to 5:30 if the jurors

25   would indulge us.

                    SN        OCR        RPR

Yaffe - cross - Brafman                    4411

1          We'd like to go to 5:30 then.

2          MR. BRAFMAN:  Thank you.

3          THE COURT:  Let's take a few minutes for a break.

4  Please don't talk about the case.

5          (Jury exits.)

6          THE COURT:  All right, let's take that ten minutes,

7  thank you.

8          (Recess taken.)

9          (Jury enters.)

10          THE COURT:  We have all jurors present.  Please have

11  a seat everybody.

12          Sir, you're still under oath.

13          Mr. Brafman, you may commence your cross.

14          MR. BRAFMAN:  Thank you.

15  CROSS-EXAMINATION

16  BY MR. BRAFMAN:

17  Q    Good afternoon, sir.  My name is Ben Brafman.  I'm the

18  attorney for Martin Shkreli.  You and I have never discussed

19  any part of this case; is that a fair statement?

20  A    That's fair.

21  Q    So now let's talk about from the beginning, if we could.

22          I think you testified that you knew Martin for quite

23  some time from the brokerage industry?

24  A    Yes.

25  Q    And during that period you were specializing in

Yaffe - cross - Brafman                    4412

1   healthcare stocks?

2   A     Yes.

3   Q     And you worked with a firm; correct?

4   A     I did, yes.

5   Q     And then you started your own firm?

6   A     Correct.

7   Q     And when you started your own firm, were you handling

8   other people's money or just you and your partner's money.

9   A     Other people's money.

10  Q     And you invested their money primarily in the healthcare

11  sector?

12  A     No.

13  Q     But you knew a lot about the healthcare sector?

14  A     I actually knew a lot more about technology.

15  Q     But you specialized for a period of time in healthcare,

16  did you not?

17  A     Leerink Swann specialized in healthcare.

18  Q     And Leerink Swann was a company you founded; correct?

19  A     Correct.

20  Q     You got to know Mr. Shkreli -- no one introduced you.  It

21  was a cold call; correct?

22  A     Correct.

23  Q     And who called who?

24  A     I believe I called him.

25  Q     And you were looking for people to strike up a business

Yaffe - cross - Brafman                         4413

1   relationship with, would that be a fair statement?

2   A    That's a fair statement.

3   Q    And you spent a lot of time calling people who are in the

4   industry seeing if you could convince them to do business with

5   you; that's what a cold call means; correct?

6   A    Correct.

7   Q    And when you met Mr. Shkreli by telephone, you developed

8   at first a telephone relationship; correct?

9   A    Correct.

10  Q    You would call him and he would call you from time to

11  time?

12  A    Correct.

13  Q    And would it be a fair statement that you became

14  impressed with Mr. Shkreli on the phone?

15  A    Yes.

16  Q    And would it be a fair statement that you became

17  impressed with his knowledge of the healthcare industry?

18  A    Yes.

19  Q    And would it be a fair statement, sir, that you were --

20  ultimately you met Mr. Shkreli; correct?

21  A    Repeat that.

22  Q    Ultimately you met Mr. Shkreli in person?

23  A    Yes.

24  Q    And when you met him in person, this was at least 10, 12

25  years ago; right?

Yaffe - cross - Brafman                          4414

1    A    Yes.

2    Q    And when you met Mr. Shkreli in person 10 or 12 years

3    ago, were you struck by how young he was?

4    A    Yes.

5    Q    Do you know how young he was twelve years ago?

6    A    No.

7    Q    And how old are you, sir?

8    A    52.

9    Q    And despite his youthful age and his youthful appearance,

10   if I may say so, did he strike you as a very impressive young

11   man?

12   A    He did.

13   Q    Did you tell the FBI at some point when you were telling

14   them the truth that he was brilliant?

15   A    I don't know if I used those words, but I think he's a

16   very bright person.

17   Q    And he knows the area of healthcare fairly well?

18   A    Yes.

19   Q    And did you tell them that he was passionate about his

20   business?

21   A    Yes.

22   Q    And he impressed you to such a degree, it was then that

23   you decided that you recommend that your dad invest with

24   Martin; correct?

25   A    Correct.

Yaffe - cross - Brafman                    4415

1  Q    He was starting a hedge fund.  He told you he was

2  starting a hedge fund.  And your dad is George Yaffe; correct?

3  A    Correct.

4  Q    And you were, on this deal at least, his investment

5  advisor.  Would that be a fair statement?

6  A    That would be a fair statement.

7  Q    And you were so taken and impressed with Martin that you

8  suggested to your father that he put in $100,000?

9  A    Correct.

10  Q    And did you read the subscription agreement and the

11  private placement memorandum before your father put the money

12  in?

13  A    I did.

14  Q    And when you read those materials -- you've read

15  materials like that before; correct?

16  A    I have, yes.

17  Q    And you understand without going through them now that

18  they contain certain risk factors that are laid out; correct?

19  A    Well aware of risk factors.

20  Q    And you know when you invest in a hedge fund there are no

21  guarantees; correct?

22  A    Correct.

23  Q    It's a gamble?

24  A    I don't agree that it's a gamble, but there's no

25  guarantees in terms of returns.

Yaffe - cross - Brafman                          4416

1   Q    All right.  Well, then, let me ask you this question.

2   You testified on direct that you had sort of been chasing

3   Martin for eight years for the money you feel he owed your

4   father; right?

5   A    Correct.

6   Q    Now, if way back when Elea lost your dad's money, if

7   Martin had said, hey, it's a hedge fund, I bet wrong, I lost,

8   I'm sorry, would you have had any legal recourse, to your

9   knowledge?

10  A    I believe I would.

11           MS. SMITH:  Objection.

12  Q    You would have legal recourse?

13  A    Yes.

14  Q    Because of the things Martin said to you?

15  A    No.

16  Q    Because of the things he said or did?

17  A    No, but you have a responsibility to manage risk.

18  Q    Okay.  And do you know how much the bet was on the margin

19  call that Martin lost the money on?

20  A    I don't.

21  Q    Do you know what stocks, if any, Martin invested your

22  father's money in?

23  A    No, because I never received a statement.

24  Q    Did you ever ask Martin?

25  A    Yes.

Yaffe - cross - Brafman                    4417

1   Q     And what did Martin say?

2   A     The fund was doing fine.

3   Q     And then when the fund wasn't doing fine, what did he

4   say?

5   A     He told me, he came clean and told me that the fund blew

6   up.

7   Q     Is okay.  Have you ever been in a fund before that blew

8   up?

9   A     No.

10  Q     Have you ever heard of a fund blowing up in your

11  business?

12  A     Yes.

13  Q     Okay.  Now sometimes despite the best management a fund

14  can blow up; would that be a fair statement?

15  A     If you manage the risk correctly, it shouldn't.

16  Q     You remember 2008 when the market crashed?

17  A     Yes.

18  Q     Did a lot of people lose a lot of money?

19  A     Yeah and a lot of hedge funds made a lot of money because

20  they bet on the downside of the market.

21  Q     All right, but a lot of people lost money; correct?

22  A     People lose money and make money every day on Wall

23  Street.

24  Q     Now, you didn't sue Martin for the money he lost, did

25  you?

Yaffe - cross - Brafman                    4418

1    A    No, I didn't.

2    Q    Martin said he would make it right?

3    A    Correct.

4    Q    Martin said to you, I will man up, that's the words he

5    used; correct?

6    A    Correct.

7    Q    And so we're on the same page, when someone says they're

8    going to man up, they're going to do the right thing; right?

9    A    Yes.

10   Q    Now your father invested $100,000, would that be a fair

11   statement?

12   A    Yes.

13   Q    Now I know you had to give the money back and we'll get

14   to that in a minute, but at the end of the day Mr. Shkreli

15   paid you four payments of $50,000; correct?

16        MS. SMITH:  Objection, Your Honor, to Mr. Shkreli

17   paying him.

18        THE COURT:  Yes.

19   Q    Did you get four payments of $50,000, yes or no?  Did you

20   get four payments of $50,000?

21   A    Yes, from Retrophin.

22   Q    Do you know if Retrophin authorized those payments?

23   A    No.

24   Q    Do you know that Mr. Shkreli at the time was the CEO of

25   Retrophin?

Yaffe - cross - Brafman                          4419

1    A    Yes.

2    Q    Do you know if the board authorized those payments?

3    A    No idea.

4    Q    Okay.  Now you also got 15,000 shares; correct?

5    A    Correct.

6    Q    And at the end of the day the $100,000 investment, you

7    got $200,000 in cash; right?

8    A    Yes.

9    Q    And a number of Retrophin shares; correct?

10   A    Correct.

11   Q    And do you know if those were Martin's personal shares?

12   A    No -- according to the consulting agreement they were

13   Retrophin treasury shares.

14   Q    Do you know if Martin put money into Retrophin with his

15   own shares; do you know, yes or no?

16   A    No.

17   Q    So you sold those shares; correct?

18   A    Correct.

19   Q    In the open market; correct?

20   A    Correct.

21   Q    And made approximately $150,000 on the stock; correct?

22   A    155.

23   Q    Okay.  And you had no basis, right?  It didn't cost you

24   anything for that stock?

25   A    Correct.

Yaffe - cross - Brafman                     4420

1   Q    So the 100,000 turned into 355,000; correct?

2   A    Yes.

3   Q    And, now, over the course of the eight years that you

4   were chasing Martin, from time to time to keep you in good

5   will he would send you a small check, wouldn't he?

6   A    He wired one payment of $5,000.

7   Q    Okay.  And at the time he wired the payment of 5,000 that

8   was supposed to go towards your father; right?

9   A    Correct.  It was him showing in good faith that he

10  intended on doing the right thing and paying him back when he

11  had the means to do so.

12  Q    Okay.  So the debt was really $95,000 by the time you

13  settled with Martin; correct?

14  A    Maybe you can explain your accounting.

15  Q    You put in 100; correct?

16  A    Yes.  Also, what the time cost of money?

17  Q    We're not talking about the time cost of money.  I'm

18  talking about dollars and cents, okay?  Dollars and cents you

19  put 100 in, you got five back.  You're out '95; correct?

20  A    Okay.

21  Q    Now you got 355 so you really got substantially more than

22  you put in assuming you didn't have to give it back to the

23  government; correct?

24  A    Correct.

25              (Continued on next page.)

1    BY MR. BRAFMAN:

2    Q    Now, the partnership, I think you mentioned you call it

3    EFAY, E-F-A-Y?

4    A    That's correct.

5    Q    And that is a family partnership, correct?

6    A    Yes.

7    Q    And that is your name backwards, right, Y-A-F-E, is your

8    name, and this is E-F-A-Y, correct?

9    A    Correct.

10   Q    So now, there comes a time when the F.B.I. shows up at

11   your house, right?

12   A    Yes.

13   Q    And Martin didn't tell you what to say when they showed

14   up, he wasn't there.

15   A    Correct.

16   Q    And on April 1st, when the F.B.I. showed up, you said I

17   really don't want to talk to you, right?

18   A    Yes.

19   Q    You made a conscious decision to talk to them, correct?

20   A    Yes.

21   Q    You lied?

22   A    I didn't tell the truth, I panicked, I admit that.

23   Q    I understand you panicked, you made a conscious decision

24   to lie to them, correct?

25   A    Yes.

Yaffe - Cross - Brafman                    4422

1   Q    There is a difference between not telling the whole truth

2   and affirmatively lying, would you agree?

3   A    Yes.

4   Q    Now, they asked you a number of questions and we will see

5   if we can go through some of them.

6          You told them that you were gifted the Retrophin

7   shares; is that correct?

8   A    I don't recall.

9   Q    Well, let's see if we can save a lot of time.  I will

10  show you what is marked for identification as 3500 LY-1 and

11  from time to time, I may refer you to a specific section.  See

12  if it is refreshes your recollection.

13  A    Perfect.

14  Q    Don't read it out loud and don't look at it until I ask

15  you to refresh your recollection.

16  A    Okay.

17  Q    Did you tell the F.B.I. you knew Martin Shkreli for a

18  long time from when he was with MSMB Capital?

19  A    Don't recall talking about MSMB, because I--

20  Q    Look at the third paragraph, read it, the first sentence

21  to yourself.  Tell me if it refreshes your recollection that

22  you told the agents, that you knew Shkreli from when he ran

23  MSMB Capital?

24  A    Yes.

25          MS. SMITH:  Objection, Your Honor.  I am trying to--

Yaffe - Cross - Brafman                     4423

1   the question is not refreshing recollection.

2          MR. BRAFMAN:  I thought I did this right.  If it is

3   not, I will change the format.

4          THE COURT:  Okay.  That is fine.

5   Q    Was that true?

6   A    Can you repeat the question.

7   Q    Did you tell the F.B.I. that you knew Martin from MSMB

8   Capital, yes or no?

9   A    Yes.

10  Q    Was that true?

11  A    Yes, I knew him when he was at MSMB.

12  Q    So you didn't lie to the F.B.I. about everything, you

13  lied to them only about certain things, would that be a fair

14  statement?

15  A    Yes.

16  Q    Now, did you tell the agents that you worked with Martin

17  Shkreli while employed on Wall Street?

18  A    Yes.

19  Q    And was that true?

20  A    Yes.

21  Q    And did you tell the agents that you got a gift of

22  Retrophin shares, you never bought them?

23  A    Yes.

24  Q    Now, did you tell the agents that the $250,000 amount was

25  a loan between your father and Shkreli?

Yaffe - Cross - Brafman                    4424

1   A     It was a promissory note.

2   Q     Did you tell them it was a loan?

3   A     I don't recall.

4   Q     Look at the third-- fourth paragraph, read the first

5   sentence or two to yourself and tell me whether or not it

6   refreshes your recollection that you told the agents that the

7   $250,000 note was a loan between your father and Shkreli.

8   A     Yes, I did.

9   Q     Now, did you tell the agents that you knew that Martin

10  Shkreli had no money and that's why you were talking about a

11  loan?

12          MS. SMITH:  Objection, Your Honor, this is hearsay.

13  He has not testified --

14          MR. BRAFMAN:  It's what?

15          MS. SMITH:  Shall we have a sidebar.

16          THE COURT:  All right.

17          MR. BRAFMAN:  We are almost at the end of the day,

18  we are going to spend it at the sidebar?

19          THE COURT:  Let's have a quick sidebar so we can

20  straighten out the questions.

21          (Sidebar.)

22

23

24

25

- Sidebar -                                    4425

1      MS. SMITH:  Your Honor, this whole thing did you

2  tell the Government this, did you tell the Government that.

3  That is all hearsay.  It is supposed to be, isn't it true that

4  X, isn't it true Y.  If it is inconsistent, you can say

5  April 1st, did you say X.  This idea we-- he might as well

6  read the entire 302.

7      MR. BRAFMAN:  I am happy to do that.  The way to do

8  that if the witness told you I lied today, I didn't do it

9  yesterday.  I didn't lie tomorrow is to confront him what is a

10  lie and what is not.  I don't have to accept his

11  representation that he met with you on the third occasion that

12  is when he came clean.

13      MS. SMITH:  I'm not saying you do.  I guess-- I

14  feel --

15      MR. BRAFMAN:  Each lie is punishable under 1001 as a

16  5-year felony, if we wanted to be specific.  So the fact that

17  this man repeatedly lied about matters that he never discussed

18  with Mr. Shkreli, is not like Mr. Shkreli prepared him to lie.

19      I think I have a right to go through them.  He

20  doesn't remember and I'm not reading the document, I'm asking.

21      MS. SMITH:  He is reading it.  You have to have him

22  put it down.

23      MR. BRAFMAN:  I will tell him put it down.

24      MS. SMITH:  Otherwise he is just saying-- reading.

25      MR. BRAFMAN:  I will ask him to put it down.

```
                        - Sidebar -                    4426

1            THE COURT:  So, Mr. Brafman will ask him whether he

2    ever said "X".

3            MS. SMITH:  To the Government.

4            THE COURT:  To the Government.

5            MS. SMITH:  If he says, no, or doesn't remember then

6    you can refresh his recollection.

7            MR. BRAFMAN:  I will explain it.

8            THE COURT:  All right.

9            (Open Court.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Yaffe - Cross - Brafman                    4427

1    BY MR. BRAFMAN:

2    Q    Mr. Yaffe, this is the procedure we must follow under the

3    rules.  I ask you a question, if you can answer it without

4    looking at the document, answer it.  If you don't know the

5    answer, tell me, and if I want you to use the document to

6    refresh your recollection, you look at it.  If it refreshes

7    your recollection then you can answer the question.  If it

8    doesn't, you say it doesn't, okay?

9    A    Okay.

10   Q    So I will do it slow so nobody gets confused.

11            Now, on April 1st, when you met with the F.B.I., did

12   you tell the agents that you worked for Retrophin between 2013

13   and 2014?

14   A    Yes.

15   Q    And was that true or was that a lie?

16   A    It wasn't true.

17   Q    It wasn't?

18   A    It was a lie.

19   Q    Now, did you tell the agents that you provided cluster

20   headache research for Retrophin?

21   A    Yes.

22   Q    Was that a lie?

23   A    That was a lie.

24   Q    Now, did you tell the agents that Mr. Shkreli wanted

25   research done on cluster headaches which you were going to

Yaffe - Cross - Brafman                    4428

1   perform and you were willing to do it?

2   A    Yes.

3   Q    Was that a lie?

4   A    Yes.

5   Q    Now, did you tell the agents that while you were willing

6   to do the cluster research, you didn't want to do it for free.

7   A    I don't recall that.

8   Q    Look at the bottom of the first page, going onto the top

9   of the second page, read it to yourself and tell me it

10  refreshes your recollection.

11  A    I have read it, but I don't recall saying that.

12  Q    Now, did you tell the agents that the 15,000 shares of

13  Retrophin was to compensate you for your work as a consultant?

14  A    Yes.

15  Q    Was that a lie?

16  A    Yes.

17  Q    And did you tell the agents that you primarily worked

18  with Marek Biestek on the research into cluster headaches, did

19  you tell the agents that?

20  A    Yes.

21  Q    Why didn't you tell them you worked with Mr. Shkreli on

22  the cluster headaches?

23  A    I don't know.  Martin was basically wanted-- I didn't

24  really do any work with anyone.  But Martin and Marek worked

25  closely together.

1  Q    Isn't it true that Martin wanted you to work with Marek

2  Biestek on the cluster headaches and that is why you said that

3  to the agents?

4  A    I don't recall.

5  Q    Well, wait a minute.  You are telling us on direct you

6  never did any work, and this was all a sham, and now you are

7  telling us, you don't recall whether Martin told you to work

8  with Marek Biestek on cluster headaches?

9            MS. SMITH:  Objection.

10 A    Remember this goes back.  This goes back quite sometime.

11 Q    So did your direct testimony based on the same sequence

12 of events go back as long, didn't it?

13           MS. SMITH:  Objection.

14           THE COURT:  All right.  Overruled.

15 Q    Are you telling me that it is harder for you to remember

16 six years ago on cross, than it is on direct?

17 A    No, my interaction with the F.B.I. was-- basically I got

18 back unbeknownst with my family and I panicked and tried to

19 legitimize what happened because to get-- I hadn't received

20 the money back.  I also wanted to protect Martin.

21 Q    So you wanted to protect Martin which is why you said

22 that it was his partner, Marek Biestek who told you to work on

23 cluster headaches, is that your answer?

24 A    Marek Biestek and Martin worked closely together.  Both

25 of them were involved and worked closely together.  I

Yaffe - Cross - Brafman                    4430

1    interacted with Martin all the time, I was on two calls of

2    which Marek was on, that was my interaction with Marek.  I met

3    him once and he was on the two calls with Martin.

4    Q    About cluster headaches?

5    A    Nothing discussed about cluster headaches.

6    Q    You told us on direct that you had two calls about

7    cluster headaches, did you not?

8    A    We had two calls where they came up and said I was hired

9    as a consultant pertaining to cluster headaches, pertaining to

10   consulting services I provided, there was no substance of

11   anything on cluster headaches, and I didn't provide any

12   consulting services on cluster headaches.

13   Q    We will get to that later.

14        My question to you is, when the F.B.I. shows up at

15   your house and asks you, who did you work with on cluster

16   headaches, you say Marek Biestek; isn't that true?

17   A    Again, I don't recall.

18   Q    Look at the top of page two, read it to yourself.

19   A    I have read it and the paper says that, but again, I

20   don't recall telling them that I worked specifically with

21   Marek Biestek on cluster headaches.

22        On the call, Martin said-- Martin did say, that you

23   know, to use Marek as a point person because he was busy doing

24   other things.

25   Q    So you are recalling more about that call now, aren't

Yaffe - Cross - Brafman                    4431

1   you?

2   A    A little bit.

3   Q    On that call, Martin suggested to you that you work with

4   Marek Biestek on the cluster headache issue, didn't he say

5   that?

6   A    Yes.

7   Q    Now, you told the F.B.I. that the 15,000 Retrophin shares

8   were originally issued to you but then you had to reissue to

9   your father's name, is that true?

10  A    No, they were originally reissued to me and they were

11  supposed to be issued to EFAY Limited Partnership which is

12  where the Elea Capital investment came out.  It was not my

13  money, it was EFAY's money.

14  Q    The truth of this is, is that what really happened is the

15  shares were originally issued to you, and you had Martin

16  reissue them to EFAY, would that be a fair statement?

17  A    It was supposed to be issued to EFAY all along.  When

18  they came over they were in my name and I called, I followed

19  up and said, you guys, registered this wrong.  It was supposed

20  to be in EFAY's name and they agreed to re-register them.

21  Q    Did the agent ask you about a settlement agreement?  Not

22  consulting agreement.  Did they ask you about a settlement

23  agreement?

24  A    Again, I don't recall.

25  Q    Well, was there a settlement agreement before the

1  consulting agreement?

2  A    Well, was there a settlement agreement before the

3  consulting agreement?

4  Q    Was there a discussion between you and Martin about a

5  settlement agreement that your father was going to be given

6  instead of a consulting agreement or before a consulting

7  agreement?

8  A    Yes, we refer to it as a settlement agreement.

9  Q    Did you tell the F.B.I. that the settlement agreement

10 referred to past business dealings with Shkreli because you

11 had introduced Shkreli to your father?

12 A    No.

13 Q    Could you look at the second paragraph on page two, read

14 it to yourself and see if it refreshes your recollection as to

15 whether that is what you told the agents.

16 A    Okay, yes.

17 Q    Is that what you told the agents?

18 A    Yes.

19 Q    Was that true?

20 A    Yes.

21 Q    That there was a settlement agreement that was supposed

22 to be-- represent your father's work with Shkreli, is that

23 what you told the agents?

24 A    Correct.

25 Q    That is true?

Yaffe - Cross - Brafman                    4433

1   A    Yes, that was the Elea Capital investment.

2   Q    And then, when you were-- were you shown a copy of the

3   consulting agreement that you ultimately signed by the agents

4   on that day?

5   A    I don't recall.

6   Q    Well look at the last large paragraph on page two, read

7   it to yourself and tell me whether the agents showed you the

8   consulting agreement.

9        Have you read it sir?

10  A    Yes.

11  Q    Does it refresh your recollection that the agents showed

12  you the consulting agreement between you and Mr. Shkreli or

13  you and Retrophin?

14  A    Yes.

15  Q    And when they showed it to you, did you tell the agents

16  that you provided consulting services to Mr. Shkreli in person

17  and over the telephone?

18  A    Yes I tried to rationalize.

19  Q    I'm not asking you to explain.  I am asking, did you tell

20  the agents?

21  A    Yes.

22  Q    That you provided consulting service for Mr. Shkreli?

23  A    Yes.

24  Q    Was that true?

25  A    I didn't provide consulting services.

Yaffe - Cross - Brafman                    4434

1    Q     So the answer was a lie?

2    A     A lie.

3    Q     Did you also tell them, please listen carefully, that Mr.

4    Shkreli wanted you, Yaffe to interface with Biestek because

5    Biestek did a lot of the due diligence on the cluster

6    headaches and Yaffe supported Biestek.  Did you tell the

7    agents that?

8    A     Yes.

9    Q     And again, why did you pick Biestek as having done the

10   due diligence on cluster headaches?

11   A     Because on our call, Martin tried to use, wanted to use

12   Marek Biestek as a point person on the cluster headaches, and

13   again, I wasn't truthful which I have admitted.  Again, I have

14   used bad judgment.

15   Q     We will get to your judgment in a minute.

16         You told the agents that Martin wanted you to

17   interface with Marek Biestek for among other reasons, because

18   it was Biestek who did the due diligence; is that correct?

19   A     I don't recall him saying that he did the due diligence.

20   He probably didn't want to be involved on the consulting

21   agreement side because there were no consulting services being

22   provided.

23   Q     Are you finished?

24   A     Yes.

25         MS. SMITH:  Objection, Your Honor.

Yaffe - Cross - Brafman                    4435

1    Q     The question is?

2           THE COURT:  Overruled.

3           MS. SMITH:  Arguing with the witness.

4           THE COURT:  All right.

5    Q     Did you tell the agents --

6           THE COURT:  Overruled.

7    Q     Did you tell the agent it was Marek Biestek who Martin

8    wanted you to interface with, because Marek Biestek did a lot

9    of the due diligence on the cluster headaches.  Did you say

10   that to the agents, yes or no?

11   A     I don't recall.  But it says it here on the report.

12   Q     It doesn't refresh your recollection?

13   A     I don't remember specifically talking about Marek

14   Biestek, you know.  I do remember them bringing up the

15   consulting agreement.  I do remember them bringing up the

16   promissory note.

17          MR. BRAFMAN:  Your Honor, I want to do one more

18   piece before we break for the day if I may.  It will only take

19   a few minutes.

20          THE COURT:  Sure.

21   Q     I will ask you to look again, sir, at Exhibit 116-19

22   which is in evidence.  Can we put that up, please.  I will put

23   it on the Elmo to save everybody time.

24          Can you see it there, sir?

25   A     Not yet.

Yaffe - Cross - Brafman                                    4436

1   Q    This is in evidence, it was introduced a few minutes ago

2   by Ms. Smith.  It is 116-19.  Do you see it?

3   A    Yes.

4   Q    And this is an E-mail that you-- said came to you and it

5   came with an attachment, and behind it is a draft of a

6   consulting agreement which suggests that you are going to work

7   on cluster headaches; is that correct?

8   A    Correct.

9   Q    And I think you testified, correct me if I am wrong, that

10  before getting this, you had no information whatsoever other

11  than those calls, that you were going to be working on cluster

12  headaches, correct?

13            MS. SMITH:  Objection to the timing of the calls.

14            THE COURT:  Sustained.

15  Q    Did you have-- before you got this consulting agreement,

16  did you have any indication from Martin or Marek Biestek that

17  you were going to be asked to be consulting on cluster

18  headaches?

19  A    I don't recall the timing.

20  Q    Did you remember whether or not you got any information

21  from Marek Biestek about cluster headaches?

22  A    No, I didn't.

23  Q    You didn't.

24  A    Get any information on cluster headaches?

25  Q    You didn't.  Is that your testimony today, sir?

Yaffe - Cross - Brafman                4437

1    A    I don't recall getting any information.

2    Q    Do you recall or definitively saying you didn't?

3    A    I don't recall.  Again, I don't-- I know we had a couple

4    of conversations, but I don't remember the timing of exactly

5    when they were.

6    Q    Did Marek Biestek then send you substantial information

7    concerning cluster headaches?

8    A    Not that I recall.

9    Q    Now, this E-mail is December 4th, 2013.  Correct?

10   A    Correct.

11   Q    Now, I will show you an exhibit that I have marked for

12   identification as Defense Exhibit 100.  I am giving the

13   Government a copy.  I will provide a copy to the Court.  I

14   don't think it is in the book Your Honor.

15            THE COURT:  Thank you.

16   Q    I will give a copy to the witness.

17            Looking at Exhibit 100, do you recognize the top

18   page as an E-mail from Martin Shkreli to you and Marek Biestek

19   with the subject being, thanks.

20            Just look at the top?

21   A    The top E-mail from Martin--

22   Q    It is an E-mail to you, isn't it?

23   A    Yes.  There is no content though.

24   Q    I understand.  It says, thanks.

25            Now, look on the next page 101 for identification.

Yaffe - Cross - Brafman                    4438

1  Is that an E-mail from Mr. Biestek to Martin and you, subject,

2  thanks.  It is on October 9th, 2013, correct?

3  A    Correct.

4         MR. BRAFMAN:  I offer these into evidence Your Honor

5  with the attachments.

6         MS. SMITH:  Your Honor, no objection.

7         THE COURT:  All right.  We will receive Defense

8  Exhibits 100 and 101.

9         (So marked.)

10  Q    Now, I will ask you some questions, you can look up for a

11  moment, sir.

12        The first E-mail is Exhibit 100, all it is is a

13  covering E-mail from Martin to you and Marek Biestek dated

14  October 9th, and it says, thanks.  Correct?

15  A    Yes.

16  Q    Do you know what he is thanking you for?

17  A    No idea.

18  Q    Now, the next document which is in evidence but marked

19  101, is an E-mail from Marek Biestek dated the same day, 2013,

20  to you and Mr. Shkreli, correct?

21  A    Yes.

22  Q    Same subject, thanks, right?

23  A    Yes.

24  Q    And it has a series of attachments, correct?

25  A    Correct.

Yaffe - Cross - Brafman                    4439

1    Q    And one of them at least, I will go through them, marked

2    "Methods and kits for treating cluster headache disorders,

3    2013.PDF", do you see that, do you see it?

4    A    Yes.

5    Q    And, then it says, some information on cluster headaches

6    BOL-148.  Entheogen is the company founded by doctors (plus

7    one finance guy) who ran the study mentioned in the cephalgia

8    paper.  Let me know what you think.

9         It is addressed to you from Marek Biestek, do you

10   see that?

11   A    Yes.

12   Q    Now, let's turn over to the next page.  101-A is a study

13   by the American Academy of Neurology dealing with cluster

14   headaches, correct?

15   A    Yes.

16   Q    And, if you go to 101-B, there is an article described as

17   The non-hallucinogen, 2-bromo-lysergic acid diethylamide as

18   preventative treatment for cluster headache.

19         Do you see that?

20   A    Yes.

21   Q    And then, there is an E-mail, sorry, another article

22   marked 101-C, it is Serotonergic Agents in the Management of

23   Cluster Headaches.  Do you see that?

24   A    I see it.

25   Q    And, then if we go to Exhibit 101-D, it is questions and

Yaffe - Cross - Brafman                    4440

1  answers about the same drug, BOL-148, by Professor Doctor

2  Passic on July 2013, do you see that?

3  A    I see it.

4  Q    Then we go to 101-E, and it is the answers to those

5  questions, correct?

6  A    Yes.

7  Q    And the first one on top is, the answer is, chronic

8  cluster headaches a recognized disease, distinct from episodic

9  cluster headaches.

10         You will agree the questions and the answers at

11  least relate in part to cluster headaches, correct?

12  A    It appears that way.

13  Q    And 101-F, are more answers by another professor from the

14  Hanover Medical School Pain Clinic, do you see that?

15  A    Yes.

16  Q    And 101-G is Comparison of Pharmacological Actions again

17  with respect to BOL-148, correct?

18  A    Yes, what is BOL-148?

19  Q    I will explain that to you in a minute, sir.

20         And 101-H is again a prospectus on the treatment of

21  cluster headaches, because if you look at page ten, they are

22  talking about breakthroughs in cluster headaches.  Do you see

23  that.  It is on the screen, you can look at it right there?

24  A    I see it.

25         (Transcript continues on next page.)

RB        OCR

1    BY MR. BRAFMAN:

2    Q    Now, let me ask you this:  Did you ever go over these

3    documents with the Government?

4    A    No.

5    Q    You told the Government that you got no information from

6    Mr. Shkreli or Mr. Biestek about cluster headaches?

7    A    I don't even recall seeing those documents.

8    Q    But you identified them as coming to your e-mail,

9    correct?

10   A    I'm looking at the information we have in this packet.

11   Q    So let me ask you this --

12   A    Maybe part of it is I have multiple e-mails and you used

13   the GMail account that I don't use very frequently.

14          But, again, it's a bunch of articles, they were sent

15   to my GMail account, but I don't ever recall looking at them,

16   they don't make a lot of sense to me, and I certainly never

17   spoke about them or discussed them with Marek or Martin.

18   Q    So, Marek just sent this to you for practice?

19   A    I don't know why he sent them.

20   Q    Isn't it true that Mr. Shkreli assigned Marek the job of

21   working with you on cluster headaches?

22   A    So, because of some articles in journals and stuff he

23   pulled out of peer review and sent makes me a consultant on

24   cluster headaches?

25   Q    Because that's what you told the FBI, that Marek Biestek

Yaffe - cross - Brafman                    4442

1   was the person you were supposed to consult with about cluster

2   headaches, correct?  Yes or no?

3   A    Again, I don't recall.

4   Q    We just went through it.  You told the FBI --

5            MS. SMITH:  Objection, your Honor.

6            THE COURT:  Excuse me.  He answered the question.

7            Do you want to break here for the evening?

8            MR. BRAFMAN:  I just want to finish this line, your

9   Honor.  It's another minute.

10           THE COURT:  All right.

11  A    So, if Marek -- I would interface with Marek and Martin.

12  If Marek ended up forwarding or sending me e-mails, again, I

13  didn't see these e-mails, but that's possibility.

14  Q    Now, this is the question before you leave:  Isn't it

15  true, sir, that Martin Shkreli believed that Marek and you --

16           MR. BRAFMAN:  Let me ask the question before you

17  jump up, please.  It's really not nice.

18           I'll withdraw it as to form so she doesn't have to

19  jump up.

20  Q    Do you know whether Martin Shkreli assigned this job to

21  Marek Biestek and Marek Biestek and you just ignored your

22  responsibilities?  Do you know?

23           MS. SMITH:  Objection to compound.

24           THE COURT:  Sustained.

25  Q    Did you not do anything in return for getting all that

Yaffe - cross - Brafman                         4443

1  money?

2  A    I didn't.

3  Q    And when you admitted it, the Government said you

4  participated in a fraud; correct?

5  A    Yes.

6  Q    And then they told you to give back the money, right?

7  A    They told me -- yes, they said --

8  Q    And we'll get to this tomorrow because I don't want to

9  keep the jury.  After all of your lies, you got a pass if you

10 came in here and testified against Mr. Shkreli.  Would that be

11 a fair statement?

12 A    No.

13           MS. SMITH:  Objection, your Honor.

14           MR. BRAFMAN:  Thank you.  I'll see you in the

15 morning.

16           THE WITNESS:  I'd like to answer that.

17           MR. BRAFMAN:  You can answer it tomorrow, sir.

18           THE COURT:  Ladies and gentlemen, of the jury, thank

19 you for your attention today.  You are excused.  Please don't

20 talk about the case and please consciously avoid any media

21 coverage of this case, of Mr. Shkreli.  And please remain as

22 open-minded as you have been.  Thank you.

23           (Jury exits.)

24           THE COURT:  There was just one thing I was going to

25 ask, whether the parties would mind having the question

LAM      OCR      RPR

Proceedings                                    4444

1    Mr. Agnifilo asked with the prior witness stricken.  Do you

2    have any objection?

3            The answer, I'm sorry.  You asked a question and

4    there was an objection.  I asked the jurors to hit the erase

5    button.  Should we strike that or do you want it in the

6    record?

7            I guess we should leave it in the record since we

8    had a sidebar about it.

9            MS. KASULIS:  There's a record of what occurred, I

10   guess.

11           MR. AGNIFILO:  That's fine.  Thank you.

12           THE COURT:  Thank you.

13           All right.  I'll see you tomorrow at 9.  You're

14   excused, sir.

15           (Witness excused.)

16

17           (Matter adjourned until Wednesday, July 19, 2017, at

18   9:00 a.m.)

19

20

21

22

23

24

25

                    LAM      OCR      RPR

| | | |
|---|---|---|
| 1 | **<u>INDEX</u>** | |
| 2 | **<u>WITNESS:</u>** | **<u>PAGE:</u>** |

| | | |
|---|---|---|
| 3 | D E B O R A H   O R E M L A N D | |
| | DEBORAH OREMLAND | 4149 |
| 4 | DIRECT EXAMINATION BY MS. KASULIS | 4152 |
| | CROSS-EXAMINATION | 4192 |
| 5 | BY MS. ZELLAN | |
| | **T I M O T H Y   P I E R O T T I** | |
| 6 | DIRECT EXAMINATION | 4205 |
| | BY MS. SMITH | |
| 7 | CROSS EXAMINATION BY MR. AGNIFILO | 4305 |
| | REDIRECT EXAMINATION | 4359 |
| 8 | BY MS. SMITH | |
| | **L E E   Y A F F E** | |
| 9 | DIRECT EXAMINATION | 4360 |
| | BY MS. SMITH | |
| 10 | CROSS-EXAMINATION | 4411 |
| | BY MR. BRAFMAN | |
| 11 | | |
| | * * * * * | |
| 12 | | |
| 13 | 631 | 4151 |
| | 632 | 4151 |
| 14 | 633 | 4151 |
| | 634 | 4151 |
| 15 | 802 | 4151 |
| | 123-31 | 4158 |
| 16 | 601 | 4159 |
| | 603 | 4159 |
| 17 | 605 | 4159 |
| | 701 | 4161 |
| 18 | 702 | 4161 |
| | 703 | 4161 |
| 19 | 120-1 | 4219 |
| | 120-7 | 4240 |
| 20 | 120-9 | 4240 |
| | 120-10 | 4262 |
| 21 | 120-11, 120-12, 120-14, and 120-15 | 4277 |
| | 120-16 | 4287 |
| 22 | 120-17 and 120-18 | 4290 |
| | 19 | 4295 |
| 23 | 116-4 and 116-5 | 4372 |
| | 116-18 | 4377 |
| 24 | 116-10 | 4378 |
| | 116-11 | 4380 |
| 25 | 116-14 | 4381 |
| | 116-16 | 4381 |

4446

```
1    116-18                                              4381
     116-19                                              4387
2    116-20                                              4387
     116-22                                              4387
3    60                                                  4399

4

5    Defense Exhibits
     100
6                                                        4438
     101                                                 4438
7
                              * * * * *
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

**$10** [2] - 4192:9, 4217:3
**$10,000** [1] - 4220:10
**$100,000** [5] - 4375:8, 4375:16, 4415:8, 4418:10, 4419:6
**$130** [1] - 4310:18
**$15,000** [2] - 4220:13
**$150,000** [1] - 4419:21
**$165,000** [2] - 4304:23, 4304:24
**$170,000** [1] - 4383:8
**$20** [1] - 4217:4
**$20,000** [4] - 4241:7, 4241:10, 4242:23, 4242:25
**$200,000** [2] - 4410:7, 4419:7
**$23.36** [1] - 4192:5
**$25** [3] - 4310:16, 4310:17, 4311:11
**$250,000** [4] - 4375:11, 4375:12, 4423:24, 4424:7
**$3.16** [1] - 4185:11
**$3.55** [2] - 4190:1, 4190:7
**$3.75** [1] - 4190:7
**$360,000** [1] - 4185:7
**$4.26** [1] - 4190:10
**$4.50** [1] - 4190:21
**$40** [1] - 4228:17
**$40,000** [3] - 4293:12, 4302:18, 4302:19
**$40,000.00** [1] - 4300:24
**$400** [4] - 4263:4, 4263:8, 4276:20, 4289:8
**$5** [1] - 4190:18
**$5,000** [9] - 4241:14, 4243:3, 4288:11, 4299:11, 4299:16, 4299:18, 4345:9, 4373:6, 4420:6
**$50** [1] - 4208:2
**$50,000** [8] - 4376:23, 4390:19, 4399:21, 4400:12, 4403:21, 4418:15, 4418:19, 4418:20
**$7.69** [1] - 4189:23, 4190:12
**$75,000** [3] - 4347:20, 4348:13, 4348:16
**$95,000** [1] - 4420:12

**'**

**'05** [1] - 4365:1
**'06** [1] - 4365:1
**'07** [2] - 4208:25, 4298:8
**'08** [6] - 4208:25, 4209:7, 4209:12, 4298:8, 4374:21, 4381:4
**'11** [1] - 4223:24
**'12** [1] - 4223:24
**'13** [1] - 4381:5
**'89** [2] - 4361:21, 4361:22
**'94** [1] - 4206:20
**'95** [2] - 4362:20, 4420:19
**'over** [1] - 4291:13

**/**

**/-Z** [1] - 4366:21

**0**

**0001** [1] - 4262:24

**1**

**1** [11] - 4176:9, 4176:25, 4182:14, 4183:7, 4184:3, 4241:6, 4276:6, 4292:4, 4368:3, 4395:6, 4405:19
**1(a** [1] - 4399:12
**1(a)** [1] - 4389:17
**1,000** [1] - 4190:7
**1,400** [1] - 4190:6
**1.6** [2] - 4296:19, 4300:17
**1/20/14** [1] - 4358:25
**10** [5] - 4170:18, 4261:16, 4280:16, 4413:24, 4414:2
**10-K** [2] - 4170:22, 4171:5
**10-Q** [1] - 4171:2
**100** [12] - 4189:23, 4189:24, 4190:1, 4215:15, 4321:22, 4420:15, 4420:19, 4437:12, 4437:17, 4438:8, 4438:12, 4446:5
**100,000** [4] - 4173:2, 4367:5, 4368:6, 4420:1
**1001** [1] - 4425:15
**10017** [1] - 4148:20
**101** [4] - 4437:25, 4438:8, 4438:19, 4446:6
**101-A** [1] - 4439:12
**101-B** [1] - 4439:16
**101-C** [1] - 4439:22
**101-D** [1] - 4439:25
**101-E** [1] - 4440:4
**101-F** [1] - 4440:13
**101-G** [1] - 4440:16
**101-H** [1] - 4440:20
**103-7** [3] - 4328:12, 4328:13, 4360:1
**1037** [2] - 4328:6, 4328:11
**105-20** [3] - 4282:11, 4358:10
**10th** [2] - 4292:19, 4293:19
**11** [26] - 4176:2, 4176:7, 4176:18, 4176:22, 4177:16, 4177:24, 4182:17, 4182:22, 4183:13, 4183:20, 4184:15, 4184:19, 4261:20, 4262:9, 4276:6, 4277:4, 4277:8, 4277:9, 4277:10, 4278:2, 4278:3, 4372:23, 4374:8, 4374:13, 4378:15, 4393:11
**11,672,167** [1] - 4186:3
**11201** [1] - 4148:16
**116-10** [4] - 4378:15, 4378:23, 4378:25, 4445:24
**116-11** [4] - 4380:1, 4380:9, 4380:11, 4445:24
**116-14** [6] - 4381:9, 4381:20, 4381:23, 4382:1, 4384:24, 4445:25
**116-16** [5] - 4381:9, 4381:20, 4381:23, 4383:15, 4445:25
**116-18** [6] - 4377:5, 4377:7, 4381:9, 4381:20, 4381:24, 4384:19, 4445:23, 4446:1
**116-19** [8] - 4386:16, 4387:4, 4387:14,
4387:16, 4388:21, 4435:21, 4436:2, 4446:1
**116-20** [5] - 4386:16, 4387:5, 4387:14, 4392:2, 4446:2
**116-22** [5] - 4386:16, 4387:5, 4387:14, 4396:9, 4446:2
**116-4** [7] - 4372:2, 4372:12, 4372:14, 4372:15, 4372:17, 4374:9, 4445:23
**116-5** [5] - 4372:3, 4372:12, 4372:15, 4374:6, 4445:23
**116-8** [1] - 4376:16
**11:27** [1] - 4358:23
**11:57** [2] - 4294:21, 4294:22
**12** [9] - 4180:3, 4190:6, 4206:6, 4206:7, 4277:10, 4277:24, 4373:1, 4413:24, 4414:2
**120,000** [1] - 4185:4
**120-1** [5] - 4218:7, 4218:16, 4219:3, 4219:4, 4445:19
**120-10** [5] - 4216:16, 4261:23, 4261:25, 4262:1, 4445:20
**120-11** [6] - 4276:5, 4277:3, 4277:21, 4277:24, 4277:25, 4278:2, 4445:21
**120-12** [4] - 4277:21, 4277:25, 4280:1, 4445:21
**120-13** [1] - 4277:13
**120-14** [6] - 4277:21, 4277:25, 4281:25, 4357:7, 4357:9, 4445:21
**120-15** [6] - 4276:5, 4277:4, 4277:21, 4278:1, 4283:19, 4445:21
**120-16** [5] - 4287:9, 4287:19, 4287:21, 4287:22, 4445:21
**120-17** [12] - 4289:13, 4289:24, 4290:1, 4290:2, 4290:5, 4294:13, 4294:20, 4305:24, 4306:1, 4313:3, 4318:20, 4445:22
**120-18** [6] - 4289:13, 4289:24, 4290:2, 4292:7, 4296:7, 4445:22
**120-19** [5] - 4295:1, 4295:3, 4295:11, 4295:14, 4296:10
**120-7** [8] - 4239:1, 4239:5, 4239:20, 4239:22, 4240:4, 4241:21, 4244:23, 4445:19
**120-9** [7] - 4239:1, 4239:12, 4239:20, 4239:21, 4240:5, 4240:8, 4445:20
**123-31** [4] - 4157:24, 4158:1, 4158:4, 4445:15
**125-31** [3] - 4157:12, 4157:18, 4157:23
**127** [1] - 4306:3
**12th** [6] - 4164:17, 4174:16, 4240:14, 4382:7, 4385:2, 4385:3
**13** [10] - 4176:6, 4176:21, 4177:23, 4181:4, 4182:21, 4183:19, 4184:18, 4277:14, 4280:13, 4362:21
**132** [1] - 4200:14
**13D** [14] - 4171:9, 4171:13, 4171:15, 4171:25, 4173:14, 4173:20, 4174:3, 4174:18, 4181:5, 4181:17, 4181:23, 4182:8, 4183:17, 4186:17
**13D's** [1] - 4158:22
**14** [8] - 4182:11, 4185:3, 4185:4,

2

4277:13, 4277:16, 4277:24, 4281:6, 4281:25

**14-A** [1] - 4282:10

**141** [1] - 4167:13

**144** [8] - 4166:17, 4168:10, 4168:14, 4168:15, 4168:24, 4169:2, 4170:1, 4398:9

**14th** [1] - 4151:3

**15** [12] - 4276:6, 4277:4, 4277:9, 4277:16, 4277:24, 4283:20, 4296:5, 4381:9, 4381:11, 4381:15, 4382:2

**15,000** [9] - 4382:15, 4383:8, 4392:10, 4399:23, 4400:9, 4403:24, 4419:4, 4428:12, 4431:7

**15-CR-00637(KAM** [1] - 4148:3

**150,000** [2] - 4390:25, 4397:9

**155** [1] - 4419:22

**155,000** [1] - 4410:9

**15th** [1] - 4151:15

**16** [3] - 4287:9, 4328:15, 4360:4

**16th** [1] - 4151:19

**17** [14] - 4188:5, 4190:12, 4191:8, 4198:19, 4289:14, 4373:12, 4381:9, 4381:11, 4381:15, 4383:16, 4393:18, 4393:22, 4394:4, 4395:12

**170,000** [1] - 4382:15

**17th** [4] - 4157:1, 4166:15, 4172:20, 4189:22

**18** [7] - 4148:7, 4282:2, 4289:14, 4290:1, 4292:6, 4357:8, 4359:1

**18th** [1] - 4379:4

**19** [13] - 4181:15, 4186:6, 4186:9, 4187:15, 4295:1, 4295:15, 4358:23, 4381:9, 4381:11, 4381:15, 4384:20, 4444:17, 4445:22

**1933** [1] - 4280:20

**1934** [1] - 4171:10

**1987** [1] - 4361:14

**1995** [4] - 4361:22, 4362:3, 4362:4, 4362:8

**19th** [3] - 4151:19, 4385:8, 4385:21

**1:00** [1] - 4387:25

**1:30** [1] - 4271:22

**1st** [4] - 4284:8, 4421:16, 4425:5, 4427:11

---

**2**

**2** [14] - 4192:5, 4244:21, 4256:20, 4259:14, 4259:15, 4263:16, 4341:20, 4342:11, 4342:15, 4345:3, 4393:7, 4394:6, 4394:8, 4401:6

**2(a** [1] - 4241:6

**2(a)** [1] - 4399:19

**2,531,920** [2] - 4177:9, 4178:20

**2,713,520** [1] - 4184:8

**2-bromo-lysergic** [1] - 4439:17

**2.5** [2] - 4169:18, 4173:7

**20** [14] - 4173:10, 4189:19, 4190:9, 4198:22, 4206:6, 4230:9, 4284:4, 4321:22, 4368:3, 4386:17, 4386:21,

---

4386:22, 4387:17

**20,000** [4] - 4310:15, 4310:16, 4311:8, 4311:10

**20-by-20** [1] - 4221:4

**200,000** [3] - 4230:8, 4397:9, 4400:7

**2002** [1] - 4207:13

**2005** [4] - 4307:8, 4362:16, 4363:12, 4364:4

**2005/2006** [1] - 4364:15

**2007** [2] - 4366:14, 4368:7

**2008** [6] - 4208:23, 4307:10, 4308:21, 4362:20, 4362:21, 4417:16

**2009** [2] - 4315:24, 4317:23

**2010** [4] - 4315:3, 4316:1, 4316:14, 4317:21

**2011** [16] - 4218:13, 4219:10, 4220:24, 4223:17, 4223:25, 4224:1, 4224:5, 4224:15, 4225:1, 4372:23, 4373:1, 4373:12, 4373:23, 4374:13

**2012** [39] - 4151:3, 4157:1, 4164:17, 4166:15, 4172:20, 4174:4, 4174:16, 4180:19, 4186:6, 4188:5, 4189:22, 4190:3, 4190:12, 4191:8, 4198:19, 4212:16, 4212:17, 4212:18, 4223:19, 4223:21, 4225:10, 4228:11, 4230:2, 4230:22, 4230:23, 4232:11, 4237:6, 4238:19, 4239:8, 4239:15, 4240:14, 4242:13, 4242:17, 4245:10, 4248:1, 4251:4, 4256:2, 4259:17, 4259:21, 4261:20, 4262:9, 4278:3, 4280:13, 4281:6, 4282:2, 4284:4, 4286:16, 4287:13, 4287:25, 4288:7, 4290:7, 4291:25, 4294:7, 4306:4, 4314:24, 4326:11, 4326:14, 4326:21, 4327:14, 4328:3, 4328:15, 4328:20, 4329:2, 4329:9, 4329:21, 4343:20, 4343:25, 4345:1, 4346:4, 4346:22, 4346:23, 4347:3, 4347:22, 4350:22, 4351:1, 4351:3, 4351:6, 4352:1, 4352:7, 4357:8, 4358:23, 4359:1, 4360:4, 4362:24, 4374:15, 4376:4, 4376:12, 4377:15, 4377:23, 4378:9, 4378:12, 4378:20, 4379:4

**2013** [59] - 4151:4, 4151:7, 4151:11, 4181:15, 4182:11, 4185:3, 4185:4, 4186:9, 4186:11, 4187:4, 4187:15, 4188:5, 4190:6, 4190:9, 4191:20, 4191:22, 4191:25, 4192:1, 4198:19, 4296:5, 4296:9, 4374:21, 4377:17, 4377:24, 4378:6, 4380:4, 4380:13, 4380:19, 4380:20, 4381:17, 4382:7, 4383:20, 4383:24, 4384:14, 4385:2, 4385:3, 4385:8, 4385:25, 4386:24, 4387:9, 4388:24, 4389:10, 4390:8, 4393:11, 4394:4, 4395:12, 4396:11, 4396:19, 4398:4, 4398:11, 4398:21, 4399:8, 4402:9, 4427:12, 4437:9, 4438:2, 4438:19, 4440:2

**2013.PDF** [1] - 4439:3

**2014** [2] - 4151:11, 4151:15, 4151:19, 4157:1, 4165:11, 4191:9, 4191:20, 4192:5, 4305:11, 4427:13

---

**2015** [5] - 4404:5, 4404:6, 4404:18, 4405:19, 4405:20

**2017** [3] - 4148:7, 4151:24, 4444:17

**20th** [2] - 4151:4, 4174:4

**21** [6] - 4151:7, 4206:4, 4380:13, 4386:17, 4386:22, 4392:3

**23** [4] - 4374:14, 4386:17, 4386:22, 4396:10

**24** [2] - 4373:23, 4376:4

**24th** [3] - 4284:8, 4284:11, 4377:15

**25** [3] - 4311:19, 4335:6, 4398:15

**250** [1] - 4209:3

**250,000** [3] - 4173:2, 4374:16, 4406:15

**250K** [1] - 4382:9

**25th** [2] - 4242:13, 4284:11

**26** [2] - 4343:20, 4376:12

**26th** [2] - 4190:1, 4190:3

**27** [3] - 4346:5, 4347:11, 4347:22

**27.17** [1] - 4184:20

**271** [1] - 4148:15

**272,221** [1] - 4186:10

**27th** [3] - 4385:25, 4386:5, 4386:8

**28** [3] - 4188:5, 4198:19, 4287:25

**28th** [4] - 4151:11, 4151:23, 4383:20, 4383:24

**29th** [1] - 4151:7

**2nd** [2] - 4151:11, 4296:9

---

**3**

**3** [7] - 4178:6, 4185:1, 4190:17, 4228:15, 4263:21, 4390:21, 4392:3

**3,061,110** [1] - 4186:11

**3,187,207** [1] - 4184:17

**3,243** [1] - 4200:7

**3,333,331** [1] - 4186:7

**3,380,607** [1] - 4177:19

**3-month** [1] - 4390:22

**3.3** [6] - 4308:9, 4308:11, 4309:7, 4309:13, 4309:16, 4309:20

**30** [10] - 4191:9, 4202:16, 4228:17, 4288:7, 4290:7, 4291:25, 4357:21, 4396:11, 4396:19

**30,000** [2] - 4179:4, 4230:9

**300** [1] - 4209:3

**300,000** [4] - 4172:24, 4172:25, 4288:12, 4288:15

**302** [3] - 4332:18, 4332:23, 4425:6

**30th** [3] - 4157:1, 4306:4, 4314:24

**31** [6] - 4377:17, 4378:6, 4398:4, 4398:11, 4398:21, 4399:8

**31st** [1] - 4284:11

**330** [5] - 4219:12, 4219:17, 4220:25, 4232:15, 4237:2

**350** [1] - 4276:25

**350,000** [21] - 4172:23, 4172:25, 4173:1, 4275:19, 4276:10, 4276:16, 4276:17, 4286:1, 4286:13, 4286:20, 4301:11, 4302:6, 4303:4, 4304:3, 4305:1, 4306:14, 4321:2, 4323:5, 4324:16, 4349:15, 4352:22

**3500** [1] - 4422:10
**355** [1] - 4420:21
**355,000** [3] - 4410:7, 4410:9, 4420:1
**375,000** [2] - 4175:11, 4179:21
**3rd** [1] - 4151:15

# 4

**4** [10] - 4170:16, 4170:17, 4170:20, 4176:12, 4177:3, 4186:17, 4187:25, 4190:9, 4224:16, 4389:10
**4(b** [1] - 4401:8
**4.05** [1] - 4183:21
**4.5** [5] - 4176:8, 4325:13, 4325:18, 4325:25, 4326:6
**4.50** [1] - 4190:20
**4.9** [2] - 4264:10, 4264:11
**40** [1] - 4368:18
**40.54** [1] - 4177:25
**400** [2] - 4190:7, 4276:25
**400,000** [10] - 4262:23, 4263:8, 4264:6, 4275:14, 4275:21, 4276:16, 4276:18, 4300:4, 4300:10, 4304:2
**400,000-share** [1] - 4276:15
**413** [1] - 4179:13
**4149** [1] - 4445:3
**4151** [5] - 4445:13, 4445:13, 4445:14, 4445:14, 4445:15
**4152** [1] - 4445:4
**4158** [1] - 4445:15
**4159** [3] - 4445:16, 4445:16, 4445:17
**4161** [3] - 4445:17, 4445:18, 4445:18
**4192** [1] - 4445:4
**420** [1] - 4190:9
**4205** [1] - 4445:6
**4219** [1] - 4445:19
**4240** [2] - 4445:19, 4445:20
**4262** [1] - 4445:20
**4277** [1] - 4445:21
**4287** [1] - 4445:21
**4290** [1] - 4445:22
**4295** [1] - 4445:22
**4305** [1] - 4445:7
**4359** [1] - 4445:7
**4360** [1] - 4445:9
**4372** [1] - 4445:23
**4377** [1] - 4445:23
**4378** [1] - 4445:24
**4380** [1] - 4445:24
**4381** [3] - 4445:25, 4445:25, 4446:1
**4387** [3] - 4446:1, 4446:2, 4446:2
**4399** [1] - 4446:3
**4411** [1] - 4445:10
**4438** [2] - 4446:6, 4446:6
**46** [1] - 4206:2
**46,182** [1] - 4179:4
**473,274** [5] - 4176:17, 4176:20, 4179:7, 4183:12, 4183:15
**473,687** [1] - 4184:11
**4904** [1] - 4343:16
**4905** [1] - 4346:3

**4th** [2] - 4308:21, 4437:9

# 5

**5** [7] - 4176:9, 4185:17, 4191:5, 4221:19, 4264:13, 4297:17, 4372:14
**5,000** [1] - 4420:7
**5,838,837** [2] - 4166:16, 4167:12
**5-year** [1] - 4425:16
**5.68** [2] - 4176:23, 4183:22
**5.8** [1] - 4169:17
**50** [1] - 4368:18
**50,000** [6] - 4275:22, 4276:23, 4276:24, 4304:5, 4304:20, 4390:24
**500** [1] - 4328:18
**52** [1] - 4414:8
**5590** [2] - 4326:17, 4330:9
**59** [1] - 4179:12
**5:30** [2] - 4410:24, 4411:1
**5:37** [1] - 4396:12
**5th** [2] - 4326:14, 4326:21

# 6

**6** [6] - 4158:15, 4166:7, 4180:4, 4180:5, 4186:14, 4241:16
**60** [5] - 4398:15, 4398:24, 4399:1, 4399:2, 4446:3
**60,000** [1] - 4185:6
**601** [6] - 4158:17, 4158:24, 4159:1, 4166:7, 4197:5, 4445:16
**602** [1] - 4197:9
**603** [6] - 4158:17, 4158:24, 4159:2, 4173:24, 4197:11, 4445:16
**604** [1] - 4197:12
**605** [5] - 4158:17, 4158:24, 4159:2, 4181:2, 4445:17
**606** [1] - 4156:10
**608** [1] - 4178:2
**630** [5] - 4150:25, 4159:7, 4198:13, 4198:15, 4198:18, 4199:10
**631** [5] - 4151:5, 4198:13, 4198:23, 4199:10, 4445:13
**632** [2] - 4151:9, 4445:13
**633** [2] - 4151:13, 4445:14
**634** [3] - 4151:17, 4159:7, 4445:14
**65** [1] - 4298:9

# 7

**7** [10] - 4173:24, 4175:8, 4176:15, 4177:7, 4183:10, 4184:6, 4208:9, 4241:22, 4375:21, 4401:18
**700** [1] - 4190:9
**701** [6] - 4160:14, 4160:25, 4161:2, 4172:12, 4197:14, 4445:17
**702** [5] - 4160:14, 4160:25, 4161:2, 4187:24, 4198:14, 4199:3, 4445:18
**703** [6] - 4160:14, 4160:25, 4161:2, 4191:5, 4197:19, 4445:18
**72** [2] - 4166:22, 4166:25
**75** [3] - 4166:11, 4166:22, 4166:25

**75,000** [3] - 4176:5, 4179:19, 4348:20
**767** [1] - 4148:19
**777** [1] - 4295:20

# 8

**8** [11] - 4158:15, 4173:6, 4176:24, 4177:10, 4184:2, 4184:9, 4208:9, 4221:19, 4225:3, 4375:21, 4391:1
**8,338,836** [1] - 4186:5
**8,338,837** [2] - 4166:15, 4167:7
**8-K** [10] - 4158:22, 4165:21, 4165:22, 4165:23, 4166:2, 4166:9, 4167:1, 4167:6, 4169:17, 4172:2
**8.3** [3] - 4167:12, 4169:16, 4173:6
**80** [5] - 4166:11, 4166:25, 4173:8, 4215:12, 4215:15
**802** [4] - 4150:20, 4151:21, 4159:9, 4445:15
**805** [1] - 4156:11
**83** [1] - 4241:25
**848,687** [1] - 4177:12
**8K** [2] - 4186:6, 4186:9

# 9

**9** [7] - 4156:9, 4178:5, 4185:1, 4218:13, 4219:10, 4375:21, 4444:13
**9:00** [2] - 4148:8, 4444:18
**9th** [2] - 4438:2, 4438:14

# A

**a..** [1] - 4339:22
**a.m** [5] - 4148:8, 4294:21, 4294:22, 4358:23, 4444:18
**ability** [2] - 4246:21, 4349:21
**able** [12] - 4191:1, 4195:8, 4249:21, 4266:16, 4279:15, 4293:9, 4302:7, 4339:18, 4365:12, 4380:25, 4381:7, 4407:12
**Absolutely** [2] - 4193:22, 4332:14
**absolutely** [1] - 4323:10
**abstract** [1] - 4196:4
**abuse** [2] - 4363:1, 4390:13
**Academy** [1] - 4439:13
**accept** [3] - 4200:6, 4250:5, 4425:10
**acceptance** [1] - 4240:23
**accepted** [1] - 4396:8
**access** [1] - 4304:22
**accomplish** [1] - 4302:25
**according** [5] - 4167:4, 4167:11, 4190:19, 4353:5, 4419:12
**According** [1] - 4328:22
**account** [21] - 4188:4, 4278:11, 4279:19, 4285:25, 4286:3, 4286:8, 4286:10, 4293:6, 4300:15, 4301:4, 4301:9, 4301:10, 4301:15, 4301:18, 4301:21, 4302:5, 4302:7, 4382:23, 4441:13, 4441:15
**accounting** [2] - 4361:16, 4420:14
**accounts** [14] - 4188:8, 4188:15,

4

4188:19, 4189:5, 4189:7, 4189:9, 4278:7, 4278:14, 4278:18, 4279:3, 4279:5, 4279:15, 4285:23

**accredited** [1] - 4366:22

**accuracy** [1] - 4196:9

**accurate** [9] - 4151:1, 4151:5, 4151:9, 4151:13, 4151:17, 4193:21, 4193:22, 4194:3, 4325:9

**accurately** [1] - 4160:20

**acid** [1] - 4439:17

**acknowledge** [1] - 4241:6

**acquire** [1] - 4170:20

**act** [2] - 4220:1, 4235:24

**Act** [2] - 4171:10, 4280:19

**acted** [1] - 4351:10

**Acting** [1] - 4148:14

**acting** [1] - 4365:25

**action** [3] - 4293:7, 4296:20, 4303:4

**actions** [3] - 4204:16, 4249:17

**Actions** [1] - 4440:16

**active** [2] - 4164:2, 4249:2

**actively** [1] - 4278:14, 4362:24, 4364:1

**activity** [2] - 4154:7, 4222:10

**actual** [3] - 4167:1, 4244:4, 4367:20

**add** [4] - 4229:16, 4273:2, 4365:12, 4392:10

**added** [1] - 4209:4

**adding** [2] - 4203:21, 4275:15

**addition** [3] - 4242:25, 4399:22, 4409:2

**additional** [12] - 4155:6, 4203:22, 4276:24, 4311:15, 4311:17, 4371:6, 4373:9, 4375:20, 4386:15, 4393:19, 4395:11, 4405:1

**address** [18] - 4219:12, 4219:17, 4232:15, 4281:13, 4282:22, 4282:23, 4287:11, 4295:6, 4295:20, 4295:21, 4313:25, 4365:5, 4387:18, 4397:6

**addressed** [2] - 4295:6, 4439:9

**adequate** [1] - 4313:2

**adjourned** [1] - 4444:17

**adjustment** [1] - 4185:11

**Admiral's** [1] - 4208:11

**admissible** [7] - 4151:4, 4151:8, 4151:12, 4151:16, 4151:20, 4151:22, 4257:8

**admission** [1] - 4234:5

**admit** [18] - 4158:3, 4160:24, 4218:16, 4219:2, 4239:19, 4240:4, 4261:23, 4287:18, 4289:24, 4291:5, 4291:6, 4295:11, 4372:12, 4377:5, 4378:23, 4381:20, 4387:4, 4421:22

**admitted** [7] - 4156:10, 4197:20, 4198:14, 4335:4, 4358:10, 4434:13, 4443:3

**admonish** [1] - 4272:2

**admonished** [1] - 4266:22

**admonishing** [1] - 4269:8

**admonishment** [1] - 4269:2

**admonition** [2] - 4272:22, 4273:20

**advice** [1] - 4394:19

**advise** [1] - 4274:2

**advising** [1] - 4398:5

**advisor** [4] - 4215:22, 4389:18, 4399:13, 4415:5

**advocated** [1] - 4195:3

**affect** [1] - 4364:19

**affidavit** [1] - 4300:23

**affiliate** [7] - 4169:4, 4169:13, 4169:25, 4170:1, 4170:4, 4280:19, 4281:16

**affiliate"** [1] - 4169:25

**affiliated** [1] - 4257:1

**affiliates** [3] - 4170:5, 4170:7, 4249:5

**affirmatively** [1] - 4422:2

**afield** [1] - 4333:24

**afternoon** [5] - 4242:21, 4305:17, 4305:18, 4361:1, 4411:17

**age** [2] - 4335:9, 4414:9

**agency** [4] - 4153:4, 4202:11, 4204:13, 4204:18

**agent** [10] - 4157:16, 4160:11, 4168:1, 4168:2, 4168:11, 4172:7, 4249:15, 4249:20, 4431:21, 4435:7

**agent's** [1] - 4157:19

**agents** [29] - 4155:25, 4406:5, 4406:7, 4422:22, 4423:16, 4423:21, 4423:24, 4424:6, 4424:9, 4427:12, 4427:19, 4427:24, 4428:5, 4428:12, 4428:17, 4428:19, 4429:3, 4432:15, 4432:17, 4432:23, 4433:3, 4433:7, 4433:11, 4433:15, 4433:20, 4434:7, 4434:16, 4435:5, 4435:10

**Agents** [1] - 4439:22

**ages** [1] - 4206:6

**aggregate** [10] - 4176:2, 4176:18, 4177:16, 4177:22, 4182:17, 4183:13, 4184:15, 4185:7, 4186:7, 4263:5

**aggressively** [2] - 4354:17, 4355:21

**Agnifilo** [6] - 4250:6, 4257:5, 4272:2, 4305:19, 4324:21, 4444:1

**agnifilo** [2] - 4357:4, 4359:25

**AGNIFILO** [116] - 4148:21, 4203:16, 4203:23, 4218:17, 4219:1, 4222:15, 4225:25, 4227:1, 4227:6, 4227:21, 4228:19, 4232:24, 4233:9, 4234:1, 4235:4, 4236:11, 4236:14, 4237:24, 4239:21, 4240:2, 4245:14, 4246:9, 4246:14, 4246:23, 4247:5, 4248:18, 4250:9, 4250:19, 4251:10, 4251:19, 4252:2, 4252:9, 4252:22, 4257:6, 4257:15, 4258:2, 4258:11, 4258:13, 4261:24, 4262:15, 4265:7, 4266:2, 4266:8, 4266:11, 4267:5, 4269:25, 4270:3, 4272:3, 4272:12, 4272:21, 4272:25, 4273:3, 4273:11, 4277:22, 4287:20, 4289:25, 4295:2, 4295:12, 4305:16, 4320:20, 4324:20, 4324:24, 4325:11, 4328:1, 4328:11, 4328:13, 4330:5, 4331:18, 4332:2, 4332:8, 4332:13, 4332:23, 4333:1, 4333:4, 4333:8, 4334:2, 4334:9, 4334:22, 4335:1, 4336:6, 4336:9, 4336:12, 4336:16, 4336:21, 4337:2, 4337:7,

4337:10, 4337:21, 4338:12, 4338:16, 4338:20, 4339:1, 4339:7, 4339:16, 4339:25, 4343:17, 4346:4, 4346:23, 4353:16, 4354:6, 4354:10, 4354:22, 4355:1, 4355:4, 4355:12, 4355:16, 4355:24, 4356:3, 4356:8, 4356:12, 4356:17, 4357:5, 4360:8, 4398:25, 4444:11, 4445:7

**ago** [8] - 4317:21, 4329:4, 4344:17, 4413:25, 4414:3, 4414:5, 4429:16, 4436:1

**agree** [19] - 4218:1, 4272:21, 4288:19, 4293:2, 4303:22, 4306:20, 4320:6, 4322:10, 4342:17, 4351:19, 4352:14, 4389:23, 4405:17, 4408:21, 4409:3, 4409:6, 4415:24, 4422:2, 4440:10

**agreed** [9] - 4150:20, 4150:24, 4209:11, 4218:5, 4292:19, 4303:20, 4375:6, 4408:22, 4431:20

**agreeing** [2] - 4186:22, 4409:2

**Agreement** [2] - 4388:13, 4388:23

**agreement** [163] - 4186:20, 4211:22, 4211:24, 4211:25, 4212:2, 4218:9, 4218:23, 4219:6, 4219:9, 4223:16, 4224:9, 4239:13, 4240:19, 4240:20, 4240:22, 4240:23, 4243:7, 4243:8, 4243:16, 4243:17, 4243:20, 4244:25, 4256:7, 4259:17, 4261:18, 4262:7, 4262:8, 4262:10, 4263:6, 4263:19, 4263:24, 4264:2, 4264:4, 4275:17, 4275:20, 4279:8, 4286:14, 4287:6, 4287:16, 4289:21, 4292:18, 4293:10, 4293:17, 4293:18, 4293:20, 4293:22, 4294:6, 4294:7, 4294:10, 4299:19, 4300:11, 4300:13, 4303:13, 4303:15, 4303:20, 4303:24, 4304:15, 4305:2, 4367:22, 4377:14, 4385:12, 4385:14, 4385:17, 4386:3, 4387:21, 4388:4, 4388:6, 4388:22, 4389:3, 4389:8, 4389:9, 4389:11, 4389:13, 4390:5, 4390:18, 4390:20, 4390:23, 4391:1, 4391:3, 4391:4, 4392:14, 4392:21, 4392:23, 4392:25, 4393:3, 4393:13, 4393:19, 4394:5, 4394:23, 4395:1, 4395:4, 4397:8, 4397:19, 4397:20, 4398:18, 4399:5, 4399:6, 4399:16, 4399:20, 4400:3, 4400:5, 4400:7, 4400:11, 4400:21, 4400:22, 4400:25, 4401:1, 4401:3, 4401:14, 4401:16, 4401:21, 4401:25, 4402:8, 4402:21, 4402:25, 4403:3, 4403:20, 4404:3, 4404:9, 4404:21, 4405:2, 4405:25, 4406:10, 4407:4, 4407:21, 4408:15, 4408:17, 4408:18, 4408:20, 4408:24, 4409:11, 4409:19, 4409:22, 4409:25, 4410:3, 4410:4, 4410:6, 4410:11, 4410:20, 4415:10, 4419:12, 4431:21, 4431:22, 4431:23, 4431:25, 4432:1, 4432:2, 4432:3, 4432:5, 4432:6, 4432:7, 4432:8, 4432:9, 4432:21, 4433:3, 4433:8, 4433:12, 4434:21, 4435:15, 4436:6, 4436:15

**agreements** [2] - 4211:21, 4244:7
**agrees** [1] - 4218:9
**ah-hum** [5] - 4242:1, 4242:18, 4316:25, 4317:5, 4318:1
**ahead** [1] - 4312:25
**aided** [1] - 4148:25
**air** [1] - 4396:21
**alarming** [1] - 4291:8
**Alea** [1] - 4388:9
**ALIXANDRA** [1] - 4148:17
**allegations** [1] - 4249:6
**allegedly** [1] - 4257:7
**Allison** [4] - 4214:23, 4214:25, 4221:7, 4238:6
**allocate** [1] - 4350:3
**allocating** [1] - 4207:10
**allow** [1] - 4381:6
**allowed** [3] - 4202:20, 4255:15, 4259:25
**almost** [1] - 4153:24, 4424:17
**alone** [2] - 4280:17, 4374:2
**Alpha** [2] - 4366:18, 4368:2
**alternating** [1] - 4215:14
**alternatively** [1] - 4293:10
**Amag** [3] - 4221:25, 4222:1, 4222:8
**amended** [2] - 4181:17, 4186:17
**Amended** [1] - 4181:25
**amendment** [4] - 4181:4, 4181:6, 4181:13, 4181:23
**AMERICA** [1] - 4148:3
**American** [2] - 4154:11, 4439:13
**amount** [38] - 4157:8, 4165:13, 4170:2, 4170:3, 4176:2, 4176:7, 4176:18, 4176:22, 4177:14, 4177:16, 4177:21, 4177:23, 4178:7, 4181:21, 4182:17, 4182:22, 4183:13, 4183:20, 4184:13, 4184:15, 4184:19, 4185:2, 4189:3, 4189:4, 4189:5, 4189:6, 4213:3, 4276:14, 4288:13, 4309:6, 4309:7, 4375:23, 4380:23, 4397:8, 4397:19, 4400:5, 4410:17, 4423:24
**Amy** [2] - 4249:12, 4249:20
**analysis** [8] - 4153:15, 4153:17, 4155:6, 4155:9, 4187:22, 4188:4, 4204:15, 4297:12
**analyst** [6] - 4207:17, 4208:11, 4208:13, 4209:10, 4361:19, 4366:6
**ANDREA** [1] - 4148:21
**Andrew** [4] - 4173:1, 4188:17, 4197:24, 4290:11
**Andy** [6] - 4237:10, 4238:16, 4238:17, 4238:21, 4261:5, 4261:8
**angel** [1] - 4347:20
**angry** [1] - 4370:3
**anniversary** [1] - 4185:10
**announcement** [2] - 4393:23, 4395:8
**announcing** [1] - 4393:15
**annoyed** [1] - 4216:19
**annual** [3] - 4162:22, 4170:23, 4377:17
**answer** [45] - 4203:18, 4226:1, 4227:8, 4227:13, 4234:11, 4236:11, 4246:20, 4266:25, 4267:8, 4267:10, 4267:13,

**answered** [2] - 4320:18, 4442:6
**answers** [5] - 4309:25, 4440:1, 4440:4, 4440:10, 4440:13
**anticipate** [1] - 4202:3
**anticipated** [1] - 4211:20
**anxious** [1] - 4212:5
**AOL** [1] - 4287:11
**apart** [5] - 4156:1, 4202:10, 4203:3, 4204:9, 4256:22
**apartments** [1] - 4206:23
**apologize** [3] - 4261:9, 4273:15, 4372:19
**appear** [2] - 4195:4, 4264:1
**appearance** [1] - 4414:9
**applicable** [2] - 4150:13, 4241:8
**application** [1] - 4268:10
**apply** [1] - 4335:23
**applying** [2] - 4297:16, 4300:3
**Appreciate** [1] - 4393:22
**appreciate** [7] - 4195:10, 4195:15, 4267:1, 4267:5, 4267:11, 4269:15, 4274:13
**appreciative** [2] - 4352:13, 4382:14
**approach** [1] - 4331:18
**appropriate** [8] - 4228:21, 4258:4, 4272:3, 4272:6, 4272:9, 4272:22, 4335:16, 4337:6
**appropriately** [1] - 4267:9
**approved** [1] - 4401:16
**April** [6] - 4192:5, 4405:19, 4405:21, 4421:16, 4425:5, 4427:11
**April's** [1] - 4405:23
**area** [3] - 4228:20, 4244:11, 4414:17
**argue** [2] - 4313:13, 4338:24
**argues** [1] - 4336:14
**arguing** [1] - 4435:3
**argument** [4] - 4251:14, 4266:7, 4267:4, 4337:2
**Arkansas** [4] - 4232:9, 4238:24, 4341:15, 4342:24
**arms** [1] - 4303:18
**arrangement** [1] - 4171:23
**arrangements** [4] - 4180:5, 4180:8, 4180:13, 4186:15
**arrested** [8] - 4315:18, 4315:21, 4315:24, 4317:23, 4318:4, 4318:7, 4318:12, 4318:15
**arrived** [1] - 4295:17
**arrogance** [1] - 4302:16
**article** [4] - 4282:5, 4357:17, 4439:16, 4439:21
**articles** [2] - 4441:14, 4441:22

**articulate** [1] - 4366:8
**ASAP** [1] - 4382:13
**aside** [1] - 4187:16
**aspects** [2] - 4152:11, 4213:17
**ass** [1] - 4302:20
**assertions** [1] - 4354:23
**asset** [5] - 4232:8, 4341:14, 4341:17, 4341:22, 4343:1
**assets** [4] - 4162:9, 4163:14, 4163:21, 4164:3
**assigned** [3] - 4153:23, 4441:20, 4442:20
**assist** [2] - 4153:15, 4300:20
**assistance** [2] - 4153:9, 4153:13
**assistant** [3] - 4207:3, 4214:23, 4238:7
**Assistant** [1] - 4148:18
**associated** [1] - 4293:6
**associates** [2] - 4261:4, 4261:5
**ASSOCIATES** [1] - 4148:19
**association** [2] - 4300:1, 4300:8
**assuming** [1] - 4338:1, 4420:22
**assumptions** [1] - 4335:24
**assure** [2] - 4302:16, 4302:24
**astute** [1] - 4363:25
**attachment** [3] - 4376:13, 4388:2, 4436:5
**attachments** [2] - 4438:5, 4438:24
**attend** [2] - 4297:4, 4297:6
**attended** [2] - 4214:21, 4216:5
**attendees** [1] - 4216:13
**attention** [10] - 4155:13, 4158:7, 4158:15, 4166:6, 4166:11, 4176:24, 4195:9, 4229:17, 4281:24, 4443:19
**attesting** [1] - 4300:23
**Attorney** [3] - 4148:14, 4317:11, 4317:19
**attorney** [17] - 4153:8, 4168:9, 4212:3, 4212:5, 4261:7, 4280:8, 4280:9, 4280:10, 4316:16, 4404:6, 4404:15, 4404:18, 4405:10, 4405:11, 4405:14, 4411:18
**Attorney's** [6] - 4155:2, 4210:15, 4316:20, 4317:2, 4317:10, 4323:24
**attorney/client** [1] - 4316:8
**Attorneys** [1] - 4148:18
**attorneys** [2] - 4197:3, 4197:7
**attract** [1] - 4224:8
**attributable** [3] - 4188:14, 4189:5, 4189:6
**audited** [2] - 4171:1, 4171:5
**August** [11] - 4218:13, 4219:10, 4220:24, 4223:16, 4225:1, 4372:23, 4373:1, 4373:12, 4373:23, 4374:8, 4374:13
**AUM** [1] - 4333:17
**Australia** [1] - 4222:2
**authenticity** [1] - 4239:23
**authority** [1] - 4401:13
**Authority** [1] - 4152:8
**authorized** [3] - 4202:18, 4418:22, 4419:2

auto [1] - 4208:18
available [5] - 4163:2, 4163:22, 4170:15, 4253:10, 4290:21
Avenue [11] - 4148:19, 4214:20, 4219:13, 4219:17, 4220:25, 4232:16, 4237:14, 4238:22, 4245:1, 4275:4, 4295:20
avoid [1] - 4443:20
Avon [1] - 4232:16
aware [9] - 4306:22, 4317:15, 4317:16, 4328:22, 4329:13, 4329:17, 4339:19, 4351:25, 4415:19
awful [1] - 4297:17
awhile [2] - 4316:3, 4316:13
axis [1] - 4191:18

## B

BA [2] - 4206:16, 4361:10
back-and-forth [1] - 4395:11
background [3] - 4154:8, 4224:11, 4402:13
backwards [1] - 4421:7
bad [7] - 4214:16, 4257:1, 4323:21, 4370:11, 4374:25, 4396:4, 4434:14
bait [1] - 4293:2
ball [1] - 4255:19
bank [3] - 4302:13, 4302:23, 4361:17
Bank [2] - 4206:11, 4206:12
banker [1] - 4238:13
bankers [1] - 4349:25
banking [1] - 4362:7
Banks [1] - 4361:19
barely [1] - 4374:1
Barry [1] - 4148:23
bars [4] - 4188:13, 4188:14, 4189:2, 4200:13
base [1] - 4220:9
based [28] - 4172:2, 4184:21, 4186:25, 4195:5, 4196:2, 4196:12, 4234:13, 4251:23, 4266:3, 4271:9, 4312:19, 4329:25, 4332:20, 4333:21, 4334:21, 4335:10, 4337:16, 4339:19, 4341:6, 4356:13, 4361:24, 4362:11, 4362:12, 4363:3, 4363:6, 4375:23, 4383:10, 4429:11
Based [2] - 4178:1, 4186:3
Basel [1] - 4385:5
basic [3] - 4195:17, 4195:18, 4202:13
basis [9] - 4200:23, 4227:1, 4229:13, 4234:3, 4246:23, 4268:1, 4334:18, 4359:15, 4419:23
Bausch [1] - 4330:14
Bay [2] - 4232:6, 4361:19
Beach [2] - 4361:8, 4362:17
bear [1] - 4388:14
became [7] - 4238:14, 4276:13, 4300:11, 4330:14, 4361:18, 4413:13, 4413:16
become [4] - 4154:12, 4164:21, 4168:12, 4245:24

becomes [3] - 4163:12, 4163:17, 4165:15
bed [1] - 4382:12
BEFORE [1] - 4148:11
began [1] - 4316:16
begin [2] - 4150:13, 4397:4
beginning [7] - 4185:9, 4224:25, 4284:7, 4328:9, 4351:6, 4366:14, 4411:21
behalf [15] - 4180:23, 4181:8, 4193:10, 4193:11, 4220:20, 4241:17, 4241:19, 4284:6, 4311:5, 4346:21, 4352:18, 4376:9, 4391:4, 4393:23, 4401:21
behaved [1] - 4213:6
behavior [1] - 4152:20
behest [1] - 4257:12
behind [18] - 4155:14, 4156:9, 4160:14, 4166:7, 4172:12, 4173:24, 4187:25, 4191:5, 4216:20, 4222:4, 4239:1, 4240:11, 4241:22, 4334:17, 4344:8, 4376:16, 4436:5
belief [3] - 4234:7, 4348:13, 4375:14
bell [1] - 4266:14
belong [1] - 4337:1
belonged [2] - 4392:17, 4410:15
belt [3] - 4234:23, 4235:4, 4235:6
Ben [1] - 4411:17
beneficial [3] - 4171:18, 4171:21, 4174:21, 4182:1, 4185:20
beneficially [11] - 4175:9, 4176:3, 4176:14, 4176:18, 4177:6, 4177:17, 4182:18, 4183:10, 4183:13, 4184:6, 4184:15
benefits [1] - 4293:3
BENJAMIN [1] - 4148:20
Bertolini [1] - 4330:24
beside [1] - 4214:16
best [18] - 4224:16, 4225:13, 4237:25, 4245:17, 4262:13, 4274:4, 4274:7, 4274:12, 4284:1, 4288:18, 4291:10, 4293:15, 4297:11, 4326:3, 4326:12, 4382:23, 4382:24, 4417:13
bet [8] - 4369:3, 4369:6, 4369:9, 4369:10, 4369:11, 4416:7, 4416:18, 4417:20
better [7] - 4202:25, 4204:19, 4267:3, 4319:14, 4365:10, 4374:21, 4394:18
Better [1] - 4347:16
between [51] - 4150:24, 4162:4, 4166:10, 4180:9, 4180:14, 4182:24, 4188:8, 4190:17, 4218:18, 4218:19, 4218:23, 4219:11, 4222:5, 4225:1, 4239:5, 4239:6, 4249:20, 4256:23, 4262:10, 4262:11, 4276:25, 4300:11, 4300:13, 4304:10, 4304:11, 4304:15, 4304:17, 4321:23, 4332:3, 4332:20, 4334:11, 4335:16, 4337:19, 4337:23, 4338:14, 4372:6, 4377:11, 4381:12, 4381:16, 4386:19, 4389:11, 4395:11, 4399:9, 4406:15, 4422:1, 4423:25, 4424:7, 4427:12, 4432:4, 4433:12

beyond [6] - 4198:11, 4200:25, 4203:4, 4203:6, 4204:2, 4274:5
bid [2] - 4221:24, 4364:17
Biesteck [1] - 4188:17
Biestek [75] - 4172:24, 4197:25, 4216:6, 4216:7, 4216:8, 4216:14, 4231:1, 4235:16, 4235:17, 4235:19, 4237:10, 4246:25, 4247:3, 4248:13, 4248:21, 4249:25, 4250:2, 4250:7, 4250:12, 4250:15, 4251:18, 4251:21, 4251:22, 4251:24, 4255:18, 4256:16, 4259:7, 4259:18, 4259:24, 4260:10, 4260:18, 4278:4, 4280:13, 4281:4, 4286:9, 4290:10, 4345:18, 4346:20, 4349:3, 4353:5, 4358:3, 4371:19, 4371:21, 4403:10, 4428:18, 4429:2, 4429:8, 4429:22, 4429:24, 4430:16, 4430:21, 4431:4, 4434:4, 4434:5, 4434:6, 4434:9, 4434:12, 4434:17, 4434:18, 4435:7, 4435:8, 4435:14, 4436:16, 4436:21, 4437:6, 4437:18, 4438:1, 4438:13, 4438:19, 4439:9, 4441:6, 4441:25, 4442:21
big [11] - 4209:1, 4223:9, 4288:17, 4288:22, 4308:14, 4308:16, 4309:10, 4351:5, 4369:9, 4393:16, 4393:23
bigger [2] - 4209:3, 4319:19
biggest [2] - 4224:22, 4225:2
bilateral [1] - 4261:18
billion [7] - 4208:9, 4308:9, 4308:11, 4309:7, 4309:13, 4309:16, 4309:20
bills [5] - 4233:4, 4233:6, 4234:9, 4235:5, 4235:7
binder [26] - 4155:13, 4156:1, 4156:8, 4156:9, 4157:10, 4158:15, 4160:15, 4166:7, 4172:12, 4173:24, 4187:25, 4191:5, 4218:8, 4239:2, 4261:17, 4276:6, 4277:4, 4281:25, 4282:10, 4289:14, 4372:4, 4374:7, 4376:17, 4378:15, 4380:1, 4381:10
biotech [7] - 4243:15, 4365:18, 4379:11, 4379:18, 4379:19, 4379:21, 4380:22
bit [15] - 4158:8, 4190:18, 4191:24, 4335:10, 4339:7, 4343:21, 4346:9, 4364:12, 4373:5, 4378:3, 4380:21, 4394:25, 4407:11, 4431:2
blames [1] - 4297:22
Blanton [15] - 4223:8, 4223:9, 4282:15, 4282:17, 4282:18, 4282:20, 4283:1, 4283:2, 4283:5, 4283:9, 4283:13, 4283:17, 4358:11, 4358:16, 4359:1
blew [2] - 4417:5, 4417:7
Bloomberg [6] - 4155:24, 4156:16, 4156:17, 4160:10, 4187:21, 4199:4
bloomberg [1] - 4156:18
blow [3] - 4384:6, 4384:9, 4417:14
blower [5] - 4314:24, 4314:25, 4317:6, 4317:9, 4317:12
blowers [1] - 4202:3
blowing [1] - 4417:10

**blue** [22] - 4149:15, 4151:1, 4151:6, 4151:10, 4151:14, 4151:18, 4156:6, 4159:7, 4159:14, 4159:20, 4160:9, 4160:11, 4187:21, 4189:1, 4191:14, 4198:17, 4198:18, 4199:12, 4199:15, 4217:23
**blurted** [1] - 4227:2
**board** [17] - 4194:2, 4194:4, 4194:5, 4194:7, 4194:11, 4194:14, 4195:18, 4195:25, 4196:7, 4196:8, 4210:4, 4211:10, 4312:4, 4335:8, 4396:13, 4401:15, 4419:2
**Board** [2] - 4311:25, 4312:17
**Boca** [2] - 4362:17, 4383:19
**BOL-148** [4] - 4439:6, 4440:1, 4440:17, 4440:18
**bold** [2] - 4354:7, 4354:23
**bond** [2] - 4338:18, 4338:19
**bonds** [1] - 4367:13
**bonus** [1] - 4220:14
**book** [4] - 4207:22, 4224:9, 4381:14, 4437:14
**BorgWarner** [1] - 4208:18
**borrow** [3] - 4291:17, 4369:10, 4369:11
**boss** [1] - 4208:6
**Boston** [7] - 4206:16, 4361:12, 4361:24, 4362:11, 4362:12, 4362:13, 4362:15
**bottom** [30] - 4166:12, 4166:23, 4166:25, 4173:3, 4178:6, 4280:1, 4282:14, 4283:22, 4287:24, 4290:6, 4294:14, 4346:7, 4346:8, 4372:18, 4372:22, 4373:13, 4374:7, 4379:3, 4382:4, 4382:5, 4383:17, 4384:23, 4385:7, 4393:8, 4393:9, 4394:3, 4396:10, 4397:23, 4428:8
**bottommost** [1] - 4396:12
**bought** [17] - 4157:9, 4164:1, 4170:15, 4188:9, 4189:23, 4190:1, 4190:6, 4190:9, 4198:5, 4198:6, 4225:7, 4262:20, 4307:15, 4311:15, 4311:17, 4423:22
**bouton** [1] - 4353:15
**box** [4] - 4174:23, 4188:16, 4188:20, 4189:10
**boxes** [1] - 4172:18
**BRAFMAN** [50] - 4148:19, 4148:20, 4149:5, 4227:12, 4235:8, 4235:21, 4268:7, 4268:21, 4268:24, 4272:14, 4334:14, 4338:17, 4355:6, 4356:23, 4369:23, 4370:1, 4371:12, 4372:13, 4377:6, 4377:24, 4378:24, 4380:10, 4381:22, 4387:6, 4387:10, 4387:12, 4392:1, 4402:22, 4410:12, 4411:2, 4411:14, 4411:16, 4421:1, 4423:2, 4424:14, 4424:17, 4425:7, 4425:15, 4425:23, 4425:25, 4426:7, 4427:1, 4435:17, 4438:4, 4441:1, 4442:8, 4442:16, 4443:14, 4443:17, 4445:10
**Brafman** [3] - 4411:13, 4411:17, 4426:1
**branch** [1] - 4366:14
**brand** [2] - 4215:9, 4297:10

**break** [21] - 4192:14, 4252:18, 4252:20, 4252:22, 4253:3, 4253:4, 4253:5, 4253:10, 4253:11, 4253:12, 4253:13, 4259:4, 4260:7, 4268:15, 4268:20, 4269:20, 4271:14, 4274:21, 4411:3, 4435:18, 4442:7
**breakthroughs** [1] - 4440:22
**Brent** [2] - 4330:11, 4330:13
**BRIDGET** [1] - 4148:14
**Brief** [1] - 4403:8
**brief** [2] - 4260:14, 4403:17
**briefly** [7] - 4154:8, 4158:9, 4159:4, 4161:9, 4161:23, 4232:6, 4359:22
**bright** [1] - 4414:16
**brilliant** [1] - 4414:14
**bring** [10] - 4195:9, 4210:8, 4216:25, 4272:1, 4273:23, 4290:22, 4314:21, 4321:18, 4322:7, 4346:9
**bringing** [3] - 4322:6, 4435:14, 4435:15
**broad** [1] - 4204:4
**broader** [2] - 4191:2, 4284:15
**Broadway** [4] - 4296:24, 4296:25, 4297:2
**broke** [1] - 4347:21
**broken** [1] - 4300:22
**broker** [10] - 4152:13, 4152:15, 4152:16, 4152:18, 4152:19, 4159:22, 4261:6, 4331:6, 4342:24, 4365:25
**broker-dealer** [4] - 4152:15, 4152:16, 4159:22, 4331:6
**broker-dealers** [2] - 4152:13, 4152:19
**broker/dealer** [2] - 4291:18, 4291:19
**brokerage** [8] - 4300:16, 4301:10, 4301:18, 4361:20, 4362:5, 4362:7, 4365:16, 4411:23
**brokers** [4] - 4152:14, 4222:12, 4222:23, 4293:5
**Brooklyn** [2] - 4148:6, 4148:16
**brother** [1] - 4311:22
**brought** [5] - 4306:20, 4313:4, 4321:20, 4321:23, 4321:24
**build** [3] - 4228:15, 4301:25, 4302:2
**building** [5] - 4208:16, 4232:17, 4232:22, 4238:22
**bullet** [1] - 4186:1
**bunch** [4] - 4275:1, 4275:15, 4362:4, 4441:14
**burden** [1] - 4248:24
**business** [27] - 4152:16, 4163:14, 4164:2, 4164:6, 4170:25, 4212:23, 4213:5, 4215:2, 4244:5, 4245:6, 4245:8, 4283:11, 4293:14, 4303:19, 4309:4, 4342:24, 4342:25, 4358:19, 4362:25, 4364:2, 4365:24, 4394:21, 4412:25, 4413:4, 4414:20, 4417:11, 4432:10
**businesses** [1] - 4236:8
**busy** [3] - 4386:9, 4394:12, 4430:23
**button** [2] - 4271:11, 4444:5
**buttoned** [1] - 4394:11
**buy** [21] - 4161:13, 4199:19, 4243:21,

4250:1, 4250:24, 4255:4, 4255:16, 4255:24, 4260:17, 4261:18, 4264:24, 4264:25, 4288:15, 4344:1, 4348:16, 4352:25, 4353:1, 4353:9, 4355:17, 4355:18
**buying** [14] - 4152:17, 4199:6, 4199:8, 4199:11, 4222:23, 4255:7, 4260:16, 4261:1, 4261:2, 4264:9, 4341:14, 4344:2, 4344:4
**buys** [1] - 4307:16
**BY** [40] - 4148:16, 4148:20, 4152:4, 4164:8, 4176:1, 4192:24, 4197:2, 4205:1, 4205:23, 4218:22, 4228:25, 4232:1, 4237:4, 4259:2, 4274:20, 4276:22, 4287:23, 4290:4, 4294:24, 4299:1, 4305:16, 4328:1, 4341:2, 4357:5, 4359:24, 4360:25, 4377:1, 4377:9, 4392:1, 4411:16, 4421:1, 4427:1, 4441:1, 4445:4, 4445:5, 4445:6, 4445:7, 4445:8, 4445:9, 4445:10

## C

**cab** [1] - 4216:19
**Cabaret** [2] - 4229:11, 4230:6
**cabin** [1] - 4268:18
**cabined** [1] - 4355:7
**cabinet** [1] - 4232:5
**Cadman** [1] - 4148:15
**calm** [3] - 4266:6, 4267:1, 4267:4
**cancel** [1] - 4168:5
**canceled** [2] - 4179:5, 4179:20
**cannot** [2] - 4167:22, 4293:2
**cap** [4] - 4207:22, 4296:17, 4296:21, 4359:25
**capacity** [1] - 4389:5
**Capital** [33] - 4173:1, 4174:25, 4179:18, 4179:20, 4179:23, 4180:20, 4180:21, 4182:16, 4182:25, 4184:24, 4185:23, 4187:10, 4188:18, 4189:11, 4197:25, 4212:23, 4294:4, 4366:17, 4371:3, 4371:9, 4371:14, 4373:20, 4383:1, 4385:16, 4388:9, 4392:16, 4393:6, 4403:1, 4422:18, 4422:23, 4423:8, 4431:12, 4433:1
**capital** [18] - 4175:3, 4175:4, 4175:5, 4175:6, 4176:13, 4179:10, 4179:24, 4179:25, 4180:1, 4207:9, 4290:17, 4299:4, 4299:5, 4314:15, 4319:17, 4351:23, 4352:12, 4372:9
**capitalization** [4] - 4328:8, 4328:14, 4329:14, 4329:17
**captain** [3] - 4207:8, 4349:18, 4350:5
**car** [1] - 4405:10
**Cardillo** [4] - 4310:19, 4310:20, 4310:21, 4311:4
**care** [3] - 4232:4, 4269:1, 4274:11
**Care** [2] - 4240:21, 4241:17
**cared** [1] - 4338:20
**career** [1] - 4297:18
**careful** [2] - 4267:9, 4325:8

**carefully** [5] - 4150:3, 4230:11, 4274:3, 4341:4, 4434:3

**Carico** [2] - 4284:24, 4293:25

**carried** [1] - 4215:3

**carveout** [1] - 4224:19

**case** [21] - 4150:5, 4154:18, 4164:9, 4164:18, 4181:16, 4192:15, 4202:3, 4203:14, 4249:15, 4249:20, 4253:14, 4271:4, 4271:15, 4272:5, 4301:23, 4353:19, 4375:19, 4411:4, 4411:19, 4443:20, 4443:21

**cash** [4] - 4163:14, 4244:16, 4403:21, 4419:7

**cast** [1] - 4234:10

**catalyst** [1] - 4381:5

**catch** [2] - 4384:6, 4384:8

**caught** [1] - 4407:11

**CAUSE** [1] - 4148:11

**caused** [1] - 4208:21

**causes** [1] - 4306:22

**CD** [4] - 4159:5, 4159:11, 4159:18, 4159:25

**cell** [1] - 4283:2

**centered** [1] - 4365:17

**cents** [3] - 4190:2, 4420:18

**CEO** [8] - 4194:9, 4215:3, 4330:14, 4330:15, 4330:16, 4330:22, 4379:18, 4418:24

**cephalgia** [1] - 4439:7

**certain** [24] - 4152:11, 4155:11, 4158:10, 4162:8, 4162:9, 4162:19, 4165:2, 4168:19, 4170:2, 4186:10, 4195:23, 4203:19, 4204:21, 4257:9, 4259:24, 4268:9, 4271:6, 4274:8, 4319:3, 4319:21, 4387:7, 4415:18, 4423:13

**certainly** [9] - 4150:18, 4222:11, 4242:24, 4246:7, 4251:7, 4267:25, 4277:10, 4342:13, 4441:16

**certificate** [2] - 4167:21, 4167:25

**certificates** [1] - 4168:5

**CFO** [1] - 4194:9

**chain** [7] - 4330:10, 4347:15, 4374:8, 4384:23, 4385:6, 4392:4, 4393:8

**chains** [1] - 4372:6

**chairman** [1] - 4335:8

**chance** [2] - 4386:2, 4386:12

**chances** [1] - 4202:24

**change** [11] - 4181:7, 4182:24, 4183:3, 4337:13, 4381:5, 4396:14, 4396:23, 4396:25, 4397:11, 4397:19, 4423:3

**changed** [3] - 4182:4, 4351:6, 4397:8

**changes** [3] - 4248:12, 4393:19, 4398:12

**changing** [5] - 4203:20, 4244:1, 4395:8, 4397:7, 4397:18

**characterization** [1] - 4218:17

**characterized** [1] - 4387:7

**characterizing** [1] - 4313:1

**charged** [6] - 4248:16, 4248:18, 4269:5, 4269:8, 4269:10, 4271:3

**chart** [23] - 4172:8, 4172:14, 4172:15, 4172:19, 4173:3, 4187:22, 4187:25, 4188:6, 4188:7, 4188:16, 4188:24, 4190:15, 4190:19, 4191:7, 4191:9, 4191:14, 4191:21, 4192:4, 4192:7, 4192:9, 4197:18, 4199:17, 4200:13

**charts** [11] - 4153:18, 4154:19, 4154:23, 4154:25, 4155:11, 4155:20, 4156:3, 4160:3, 4160:19, 4160:20, 4161:4

**Chase** [1] - 4382:23

**chasing** [7] - 4374:22, 4393:1, 4395:2, 4396:5, 4408:2, 4416:2, 4420:4

**check** [14] - 4229:21, 4229:22, 4242:20, 4243:3, 4299:11, 4299:16, 4299:18, 4299:23, 4345:9, 4347:9, 4347:11, 4347:14, 4348:23, 4420:5

**Checks** [1] - 4397:4

**checks** [4] - 4220:13, 4241:2, 4241:3, 4242:14

**chemist** [1] - 4238:17

**chewed** [1] - 4397:15

**children** [5] - 4206:5, 4206:6, 4302:15, 4361:3, 4361:5

**chime** [1] - 4397:25

**chose** [2] - 4297:17, 4352:22

**Christmas** [1] - 4288:1

**chronic** [1] - 4440:7

**chunk** [1] - 4392:9

**ciao** [1] - 4385:13

**circle** [2] - 4250:23, 4330:5

**circumscribed** [1] - 4195:3

**circumstances** [6] - 4208:21, 4211:2, 4211:8, 4232:18, 4296:18, 4363:15

**circumstantial** [1] - 4335:12

**City** [1] - 4365:6

**claim** [4] - 4202:15, 4204:5, 4303:11, 4304:23

**claims** [2] - 4263:10, 4303:13

**Claridge** [4] - 4173:1, 4188:18, 4189:11, 4197:25

**clarification** [1] - 4199:1

**clarify** [5] - 4193:4, 4218:20, 4260:2, 4294:19, 4354:4

**class** [7] - 4176:6, 4176:21, 4177:23, 4182:21, 4183:19, 4184:18, 4328:17

**classic** [1] - 4293:2

**clause** [2] - 4219:20, 4262:22

**clauses** [1] - 4262:4

**clean** [5] - 4386:10, 4408:8, 4408:21, 4417:5, 4425:12

**clear** [19] - 4166:24, 4217:1, 4223:7, 4224:4, 4248:4, 4248:12, 4254:3, 4256:6, 4256:15, 4259:6, 4260:3, 4263:10, 4269:16, 4271:14, 4275:5, 4285:2, 4313:8, 4342:13, 4345:6

**clearing** [1] - 4159:22

**clearly** [3] - 4234:12, 4251:15, 4255:15

**client** [5] - 4266:12, 4266:19, 4334:22, 4335:9, 4336:14

**clients** [1] - 4365:19

**Clinic** [1] - 4440:14

**Close** [1] - 4285:14

**close** [12] - 4195:14, 4339:12, 4351:8, 4351:11, 4352:2, 4352:16, 4362:4, 4364:13, 4374:20, 4394:16, 4395:3, 4395:8

**closed** [3] - 4284:7, 4284:10, 4334:17

**closely** [3] - 4428:25, 4429:24, 4429:25

**closer** [1] - 4352:14

**closing** [7] - 4157:4, 4188:4, 4188:7, 4188:25, 4191:8, 4191:15, 4199:5

**clothing** [1] - 4217:21

**cluster** [48] - 4389:19, 4389:24, 4390:6, 4402:1, 4402:5, 4402:15, 4403:3, 4403:15, 4427:19, 4427:25, 4428:6, 4428:18, 4428:22, 4429:2, 4429:8, 4429:23, 4430:4, 4430:5, 4430:7, 4430:9, 4430:11, 4430:12, 4430:15, 4430:21, 4431:4, 4434:5, 4434:10, 4434:12, 4435:9, 4436:7, 4436:11, 4436:17, 4436:21, 4436:24, 4437:7, 4439:2, 4439:5, 4439:13, 4439:18, 4440:8, 4440:9, 4440:11, 4440:21, 4440:22, 4441:6, 4441:21, 4441:24, 4442:1

**Cluster** [1] - 4439:23

**Co** [1] - 4286:4

**co** [2] - 4235:23, 4257:18

**co-conspiracy** [1] - 4235:23

**co-conspirator** [1] - 4257:18

**coconspirator** [7] - 4235:21, 4248:16, 4248:22, 4248:25, 4249:2, 4250:7, 4250:10

**Coffee** [1] - 4307:12

**coherent** [1] - 4250:22

**cold** [3] - 4363:20, 4412:21, 4413:5

**Colgate** [1] - 4208:16

**Coli** [8] - 4343:3, 4343:4, 4343:11, 4343:13, 4343:14, 4343:19, 4344:13, 4344:25

**colleague** [2] - 4251:21, 4272:13

**colleagues** [1] - 4193:1

**collective** [1] - 4300:4

**collectively** [1] - 4160:5

**College** [1] - 4206:16

**college** [4] - 4206:21, 4206:22, 4361:11, 4361:15

**color** [1] - 4336:2

**Colt** [2] - 4223:8, 4282:19

**column** [5] - 4157:3, 4157:6, 4188:11, 4191:13, 4191:17

**column/incentive** [1] - 4328:18

**columns** [2] - 4157:2, 4189:4

**comfortable** [1] - 4281:21

**coming** [19] - 4232:19, 4249:12, 4251:12, 4285:19, 4285:20, 4285:21, 4323:4, 4365:22, 4371:8, 4383:18, 4384:11, 4392:11, 4392:18, 4396:21, 4400:22, 4400:24, 4401:2, 4401:4, 4441:8

**commence** [3] - 4292:15, 4292:17, 4411:13

**commencing** [1] - 4293:7
**comment** [2] - 4271:10, 4354:14
**Comment** [1] - 4354:13
**comments** [1] - 4264:23
**Commission** [4] - 4151:3, 4153:2, 4193:8, 4210:19
**commit** [2] - 4300:25, 4307:2
**committed** [4] - 4302:14, 4306:25, 4335:3, 4347:20
**commodities** [4] - 4215:7, 4215:21, 4215:22, 4221:13
**common** [27] - 4166:16, 4178:19, 4178:20, 4178:21, 4179:4, 4179:6, 4179:8, 4179:14, 4179:19, 4179:21, 4179:22, 4185:5, 4185:6, 4185:20, 4186:3, 4186:5, 4186:7, 4186:10, 4186:12, 4234:19, 4262:23, 4397:1, 4399:23
**communicate** [1] - 4288:5
**communication** [2] - 4322:5, 4380:18
**communications** [2] - 4277:5, 4277:7
**companies** [22] - 4156:20, 4162:11, 4162:14, 4163:4, 4163:6, 4165:4, 4168:3, 4168:20, 4170:23, 4208:14, 4208:15, 4208:17, 4300:2, 4300:8, 4312:13, 4362:25, 4364:20, 4365:11, 4365:18, 4365:19, 4365:21
**Company** [3] - 4301:7, 4301:8, 4301:10
**company** [101] - 4158:12, 4161:11, 4161:20, 4161:21, 4162:8, 4162:18, 4162:21, 4163:10, 4163:11, 4163:13, 4163:16, 4163:20, 4164:14, 4164:18, 4164:22, 4165:12, 4165:14, 4165:15, 4165:20, 4165:23, 4165:24, 4166:4, 4167:16, 4168:4, 4168:16, 4169:4, 4169:5, 4169:6, 4169:7, 4170:2, 4170:6, 4170:18, 4170:25, 4171:1, 4171:4, 4171:6, 4173:18, 4180:2, 4181:20, 4183:25, 4186:22, 4194:4, 4194:6, 4194:8, 4209:17, 4218:19, 4219:12, 4219:21, 4219:22, 4219:24, 4219:25, 4220:1, 4220:2, 4222:1, 4223:12, 4225:4, 4242:17, 4243:23, 4244:8, 4244:9, 4244:12, 4245:24, 4262:24, 4286:4, 4291:2, 4300:4, 4307:12, 4324:15, 4327:22, 4341:15, 4341:23, 4350:2, 4365:18, 4365:23, 4367:10, 4379:11, 4379:18, 4379:19, 4379:21, 4380:22, 4389:6, 4389:18, 4389:20, 4389:22, 4390:18, 4399:13, 4399:15, 4399:21, 4399:22, 4400:12, 4400:13, 4401:11, 4401:12, 4401:21, 4405:5, 4412:18, 4439:6
**company's** [4] - 4166:4, 4171:14, 4171:22, 4175:5
**Comparison** [1] - 4440:16
**comparison** [1] - 4188:8
**compensate** [1] - 4428:13
**compensates** [1] - 4291:19
**compensation** [7] - 4218:4, 4390:16, 4390:17, 4399:17, 4400:10, 4408:23,

4408:24
**competent** [2] - 4196:2, 4234:1
**complaint** [2] - 4317:6, 4317:9
**complaints** [2] - 4202:14
**complete** [1] - 4193:23
**completed** [1] - 4291:14
**completely** [5] - 4335:21, 4339:9, 4355:2, 4407:5, 4407:24
**completes** [1] - 4379:4
**compliance** [1] - 4152:21
**Compliance** [1] - 4278:7
**compound** [3] - 4324:17, 4324:18, 4442:23
**compounded** [1] - 4377:17
**comprised** [1] - 4152:13
**Computer** [1] - 4148:25
**Computer-aided** [1] - 4148:25
**computerized** [1] - 4148:25
**computers** [1] - 4232:21
**concentrated** [1] - 4229:9
**concept** [3] - 4163:7, 4203:21, 4203:22
**concern** [11] - 4195:2, 4202:17, 4204:11, 4258:3, 4267:25, 4285:15, 4318:6, 4318:8, 4333:13, 4334:3, 4335:22
**concerned** [16] - 4196:4, 4204:17, 4209:14, 4209:16, 4209:24, 4212:6, 4251:10, 4252:11, 4266:24, 4315:11, 4315:15, 4315:17, 4335:4, 4347:23, 4355:23, 4408:9
**concerning** [4] - 4318:16, 4327:13, 4338:9, 4437:7
**concerns** [3] - 4210:8, 4258:2, 4284:17
**concludes** [1] - 4271:6
**conclusion** [4] - 4227:3, 4250:13, 4266:5, 4271:7
**conclusions** [6] - 4267:14, 4269:3, 4269:13, 4271:9, 4273:9, 4274:9
**conditions** [2] - 4378:4, 4378:5
**conduct** [4] - 4153:14, 4155:6, 4213:17, 4269:10
**conducted** [4] - 4154:3, 4164:14, 4213:5, 4318:22
**conducts** [1] - 4152:21
**conduit** [1] - 4394:18
**confidence** [3] - 4366:23, 4368:24, 4370:16
**confident** [1] - 4217:3
**confirm** [1] - 4240:20
**conflict** [1] - 4384:12
**confront** [1] - 4425:9
**confused** [2] - 4248:9, 4427:10
**conglomerate** [3] - 4362:25, 4363:3, 4363:6
**connection** [14] - 4157:18, 4186:12, 4211:15, 4211:20, 4249:19, 4292:21, 4314:25, 4367:18, 4373:19, 4383:12, 4400:25, 4409:23, 4410:5, 4410:19
**conscious** [2] - 4421:19, 4421:23
**consciously** [1] - 4443:20
**conservatively** [1] - 4375:16

**consider** [5] - 4243:11, 4291:8, 4291:9, 4325:8, 4351:8
**consideration** [2] - 4178:7, 4185:2
**considered** [1] - 4351:11
**consistent** [1] - 4244:16
**consisting** [1] - 4186:10
**conspiracy** [6] - 4235:22, 4235:23, 4235:24, 4249:1, 4250:4, 4255:15
**conspirator** [1] - 4257:18
**constitute** [1] - 4403:17
**consult** [2] - 4272:12, 4442:1
**consultant** [19] - 4238:10, 4362:1, 4362:10, 4388:25, 4389:18, 4389:20, 4389:22, 4390:19, 4397:25, 4399:21, 4399:25, 4400:12, 4401:12, 4405:11, 4405:12, 4405:17, 4428:13, 4430:9, 4441:23
**Consultant** [1] - 4399:13
**Consulting** [2] - 4388:13, 4399:6
**consulting** [63] - 4388:23, 4389:3, 4389:19, 4392:21, 4393:3, 4394:5, 4395:23, 4395:24, 4396:3, 4399:14, 4400:7, 4401:1, 4401:3, 4402:1, 4402:5, 4402:15, 4402:18, 4402:21, 4402:25, 4403:3, 4403:14, 4403:18, 4403:20, 4404:9, 4404:10, 4404:14, 4404:21, 4405:2, 4405:24, 4406:9, 4406:13, 4407:4, 4407:6, 4407:8, 4410:4, 4410:7, 4410:11, 4410:14, 4410:20, 4419:12, 4430:10, 4430:12, 4431:22, 4432:1, 4432:3, 4432:6, 4433:3, 4433:8, 4433:12, 4433:16, 4433:22, 4433:25, 4434:20, 4434:21, 4435:15, 4436:6, 4436:15, 4436:17
**Consumer** [28] - 4215:23, 4216:24, 4219:7, 4223:11, 4223:20, 4224:5, 4224:21, 4225:9, 4225:23, 4227:11, 4228:7, 4228:10, 4228:13, 4228:24, 4229:1, 4229:2, 4229:12, 4230:3, 4230:14, 4230:18, 4230:20, 4297:25, 4299:2, 4299:5, 4325:12, 4325:18, 4325:22, 4325:24
**consumer** [15] - 4208:11, 4208:13, 4208:15, 4213:8, 4214:5, 4214:13, 4215:5, 4215:6, 4215:8, 4218:2, 4220:4, 4243:14, 4309:10, 4327:19, 4331:10
**Consumer's** [1] - 4224:25
**consummate** [1] - 4401:13
**contact** [16] - 4304:7, 4305:9, 4323:22, 4323:24, 4324:2, 4344:6, 4363:10, 4363:13, 4363:20, 4364:3, 4364:10, 4364:14, 4365:2, 4374:20, 4378:11, 4404:17
**contacted** [1] - 4317:12
**contacting** [1] - 4316:4
**contain** [1] - 4415:18
**contained** [1] - 4173:4
**contains** [4] - 4166:5, 4170:24, 4171:6, 4321:10

**contemplating** [1] - 4291:11
**contempt** [1] - 4273:4
**contend** [1] - 4251:11
**content** [1] - 4437:23
**context** [3] - 4168:21, 4170:11, 4236:7
**continuation** [1] - 4178:11
**continue** [7] - 4244:25, 4252:16, 4253:3, 4285:21, 4293:14, 4300:25, 4378:11
**continued** [4] - 4201:3, 4231:4, 4285:22, 4298:11
**Continued** [15] - 4194:25, 4196:16, 4199:23, 4226:5, 4254:7, 4258:16, 4265:11, 4270:5, 4278:22, 4331:21, 4340:1, 4353:22, 4376:24, 4406:18, 4420:25
**continues** [5] - 4175:12, 4253:22, 4327:24, 4391:6, 4440:25
**continuing** [2] - 4279:1, 4407:1
**Continuing** [2] - 4200:1, 4254:1
**contract** [2] - 4171:23, 4300:22
**contracts** [4] - 4180:5, 4180:8, 4180:13, 4186:15
**control** [6] - 4170:2, 4171:24, 4203:6, 4249:6, 4269:24, 4280:18
**controlled** [5] - 4170:4, 4178:14, 4274:23, 4367:12, 4399:24
**controls** [1] - 4177:14
**conversation** [40] - 4239:4, 4246:25, 4249:1, 4251:23, 4255:3, 4255:6, 4255:8, 4255:14, 4255:18, 4255:22, 4257:7, 4257:10, 4257:11, 4257:23, 4258:1, 4260:10, 4260:13, 4260:14, 4260:18, 4260:23, 4269:12, 4275:22, 4275:24, 4283:4, 4283:15, 4285:4, 4285:10, 4285:18, 4289:1, 4289:3, 4332:21, 4332:22, 4333:22, 4336:8, 4342:10, 4342:13, 4383:10, 4405:4, 4405:8, 4408:11
**conversations** [12] - 4249:24, 4264:18, 4264:20, 4264:21, 4264:22, 4344:17, 4348:22, 4373:8, 4375:4, 4405:1, 4408:11, 4437:4
**converted** [4] - 4178:20, 4179:7, 4179:13, 4179:21
**convicted** [1] - 4410:1
**convince** [1] - 4413:4
**convinced** [1] - 4366:24
**COO** [1] - 4215:3
**cool** [2] - 4394:9, 4395:14
**Cool** [1] - 4394:11
**copied** [2] - 4290:9, 4292:11
**copy** [11] - 4151:1, 4151:5, 4151:9, 4151:13, 4151:17, 4282:15, 4295:16, 4433:2, 4437:13, 4437:16
**corner** [1] - 4241:24
**corporate** [2] - 4342:1, 4401:12
**corporation** [1] - 4324:15
**corral** [1] - 4269:22
**Correct** [13] - 4198:18, 4199:1, 4259:8, 4259:19, 4345:13, 4347:7, 4393:14,

4393:20, 4393:25, 4397:21, 4398:2, 4399:10, 4406:11
**correct** [149] - 4166:19, 4178:15, 4185:24, 4190:12, 4193:8, 4193:11, 4198:20, 4200:19, 4223:22, 4248:2, 4276:20, 4304:4, 4306:4, 4306:6, 4306:12, 4306:19, 4306:23, 4307:17, 4307:20, 4307:23, 4307:24, 4308:1, 4308:2, 4308:5, 4308:8, 4308:24, 4311:5, 4311:25, 4312:1, 4312:3, 4312:7, 4312:14, 4312:19, 4314:10, 4314:12, 4315:22, 4317:21, 4317:22, 4318:16, 4318:22, 4319:23, 4322:3, 4322:4, 4322:13, 4322:14, 4322:23, 4322:24, 4323:2, 4325:3, 4327:18, 4327:22, 4328:21, 4331:11, 4341:10, 4345:9, 4347:1, 4347:10, 4349:19, 4351:21, 4352:7, 4352:15, 4358:4, 4358:11, 4358:13, 4358:16, 4358:17, 4358:20, 4359:3, 4363:21, 4375:10, 4376:2, 4377:19, 4384:15, 4388:4, 4388:5, 4405:16, 4412:3, 4412:6, 4412:18, 4412:19, 4412:21, 4412:22, 4413:5, 4413:6, 4413:8, 4413:9, 4413:12, 4413:20, 4414:24, 4414:25, 4415:2, 4415:3, 4415:9, 4415:15, 4415:18, 4415:21, 4415:22, 4416:5, 4417:21, 4418:3, 4418:5, 4418:6, 4418:15, 4419:4, 4419:5, 4419:9, 4419:10, 4419:17, 4419:18, 4419:19, 4419:20, 4419:21, 4419:25, 4420:1, 4420:9, 4420:13, 4420:15, 4420:19, 4420:23, 4420:24, 4421:4, 4421:5, 4421:8, 4421:9, 4421:15, 4421:19, 4421:24, 4422:7, 4432:24, 4434:18, 4436:7, 4436:8, 4436:9, 4436:12, 4437:9, 4437:10, 4438:2, 4438:3, 4438:14, 4438:20, 4438:24, 4438:25, 4439:14, 4440:5, 4440:11, 4440:17, 4441:9, 4442:2, 4443:4
**correctly** [2] - 4178:24, 4417:15
**correspond** [1] - 4343:13
**correspondence** [2] - 4343:8, 4343:12
**corresponds** [2] - 4188:13, 4188:25
**cost** [5] - 4375:15, 4399:14, 4419:23, 4420:16, 4420:17
**Costa** [1] - 4384:10
**costs** [1] - 4214:16
**counsel** [5] - 4300:20, 4398:5, 4404:21, 4409:17
**Count** [2] - 4249:3, 4252:10
**count** [1] - 4249:16
**counter** [12] - 4162:2, 4162:5, 4162:10, 4162:13, 4162:15, 4162:18, 4163:15, 4163:17, 4164:25, 4165:1, 4165:3, 4165:16
**couple** [8] - 4169:24, 4221:1, 4230:7, 4356:17, 4366:23, 4372:18, 4385:7, 4437:3
**course** [6] - 4150:5, 4272:18, 4299:14, 4312:10, 4375:17, 4420:3
**Court** [8] - 4148:23, 4148:23, 4228:1,

4236:17, 4237:1, 4253:8, 4426:9, 4437:13
**COURT** [240] - 4148:1, 4149:2, 4149:6, 4149:9, 4149:14, 4149:17, 4149:19, 4150:1, 4150:18, 4151:25, 4152:3, 4156:12, 4157:20, 4157:23, 4158:1, 4158:3, 4159:1, 4161:2, 4163:18, 4163:20, 4164:3, 4164:7, 4166:21, 4167:2, 4191:17, 4192:13, 4192:18, 4192:21, 4194:18, 4194:22, 4195:2, 4195:11, 4195:23, 4196:10, 4200:10, 4200:22, 4200:25, 4201:2, 4202:17, 4202:23, 4203:9, 4204:11, 4205:4, 4205:6, 4205:10, 4205:21, 4217:24, 4218:21, 4219:2, 4222:17, 4223:24, 4225:22, 4226:4, 4227:4, 4227:8, 4227:15, 4228:1, 4228:22, 4229:18, 4233:1, 4233:3, 4233:11, 4234:16, 4234:25, 4235:13, 4235:17, 4236:5, 4236:12, 4236:16, 4237:1, 4237:25, 4240:1, 4240:4, 4245:16, 4245:18, 4246:11, 4246:13, 4246:15, 4248:1, 4248:4, 4248:8, 4248:13, 4250:5, 4251:1, 4251:4, 4251:17, 4252:15, 4252:23, 4253:3, 4253:6, 4253:9, 4253:13, 4253:17, 4253:19, 4254:4, 4255:20, 4256:2, 4256:5, 4256:9, 4256:13, 4256:16, 4256:25, 4257:4, 4257:12, 4257:20, 4258:14, 4261:25, 4262:16, 4265:9, 4266:6, 4266:9, 4267:3, 4268:25, 4269:7, 4269:15, 4269:20, 4269:23, 4271:2, 4271:19, 4271:21, 4272:1, 4272:11, 4272:18, 4272:24, 4273:2, 4273:10, 4273:15, 4273:18, 4273:22, 4274:2, 4274:15, 4274:17, 4276:7, 4276:10, 4276:14, 4276:19, 4277:13, 4277:15, 4277:23, 4287:21, 4290:1, 4294:19, 4294:21, 4294:23, 4295:13, 4301:14, 4301:19, 4305:15, 4313:11, 4313:13, 4318:10, 4320:18, 4324:18, 4324:21, 4324:25, 4325:7, 4329:23, 4330:3, 4331:16, 4331:19, 4332:6, 4332:9, 4332:14, 4333:3, 4334:3, 4334:10, 4334:21, 4335:22, 4336:19, 4336:23, 4337:4, 4337:8, 4337:18, 4337:25, 4338:7, 4338:10, 4338:18, 4339:18, 4339:24, 4343:10, 4344:22, 4346:14, 4346:18, 4348:9, 4351:18, 4353:14, 4353:18, 4354:13, 4354:16, 4354:25, 4355:20, 4356:20, 4356:24, 4357:2, 4359:21, 4360:9, 4360:12, 4360:16, 4360:21, 4369:24, 4370:2, 4371:13, 4372:14, 4377:7, 4377:25, 4378:25, 4380:11, 4381:23, 4387:11, 4387:13, 4388:16, 4399:1, 4400:17, 4402:23, 4410:13, 4410:24, 4411:3, 4411:6, 4411:10, 4418:18, 4423:4, 4424:16, 4424:19, 4426:1, 4426:4, 4426:8, 4429:14, 4435:2, 4435:4, 4435:6, 4435:20, 4436:14, 4437:15, 4438:7, 4442:6, 4442:10, 4442:24, 4443:18, 4443:24,

4444:12

**court** [5] - 4197:1, 4259:1, 4271:1, 4341:1, 4409:17

**Courthouse** [1] - 4148:5

**COURTROOM** [4] - 4205:17, 4271:18, 4388:14, 4388:19

**courtroom** [4] - 4217:18, 4253:16, 4409:16, 4409:23

**Courtroom** [1] - 4149:1

**covenants** [1] - 4401:11

**cover** [3] - 4156:25, 4387:17, 4396:24

**coverage** [3] - 4365:12, 4365:14, 4443:21

**covered** [4] - 4207:16, 4324:21, 4333:19, 4365:17

**covering** [1] - 4438:13

**Cowan** [5] - 4261:6, 4331:5, 4331:6

**craft** [1] - 4268:10

**crashed** [1] - 4417:16

**create** [8] - 4154:23, 4154:25, 4187:22, 4204:18, 4215:8, 4294:2, 4353:1, 4355:18

**created** [1] - 4160:19

**creating** [4] - 4255:11, 4265:5, 4286:25, 4294:4

**credit** [1] - 4361:19

**crimes** [1] - 4300:25

**CRIMINAL** [1] - 4148:11

**critical** [1] - 4228:16

**cross** [7] - 4192:21, 4195:11, 4273:4, 4334:23, 4339:18, 4411:13, 4429:16

**CROSS** [6] - 4192:23, 4305:16, 4411:15, 4445:4, 4445:7, 4445:10

**CROSS-EXAMINATION** [4] - 4192:23, 4411:15, 4445:4, 4445:10

**cross-examine** [1] - 4339:18

**cross-examined** [1] - 4334:23

**crossed** [1] - 4268:4

**crushed** [1] - 4286:21

**cry** [1] - 4336:13

**CTA** [5] - 4215:21, 4221:11, 4221:12, 4221:13

**curious** [4] - 4321:2, 4373:13, 4397:2, 4397:3

**current** [4] - 4153:7, 4186:6, 4186:8, 4206:10

**customer** [2] - 4159:23, 4207:16

**customers** [2] - 4152:17, 4207:11

**cut** [1] - 4293:2

**cut-bait** [1] - 4293:2

**cuts** [1] - 4198:21

**D**

**dad** [25] - 4366:24, 4370:7, 4373:5, 4373:7, 4374:2, 4374:24, 4375:3, 4376:7, 4376:23, 4380:25, 4382:13, 4385:19, 4386:10, 4388:9, 4392:20, 4392:23, 4392:24, 4395:14, 4395:16, 4403:1, 4404:11, 4406:15, 4414:23, 4415:2

**Dad** [2] - 4372:24, 4395:14

**dad's** [5] - 4367:1, 4382:9, 4392:11, 4392:18, 4416:6

**Daily** [1] - 4188:4

**daily** [2] - 4188:7, 4191:7

**Dallas** [1] - 4282:19

**dane** [1] - 4288:13

**dangerous** [2] - 4267:8, 4267:10

**Darren** [9] - 4223:8, 4282:15, 4282:17, 4282:18, 4283:16, 4358:11, 4358:16, 4358:18, 4359:1

**data** [30] - 4149:15, 4151:1, 4151:6, 4151:10, 4151:14, 4151:18, 4153:16, 4155:24, 4156:6, 4156:15, 4156:20, 4159:8, 4159:14, 4159:20, 4159:21, 4160:7, 4160:8, 4160:9, 4160:10, 4160:11, 4160:21, 4187:20, 4187:21, 4198:17, 4198:19, 4199:4, 4199:5, 4204:16

**date** [29] - 4157:3, 4157:4, 4172:19, 4174:15, 4180:17, 4181:13, 4182:10, 4185:9, 4185:10, 4187:14, 4189:13, 4189:14, 4219:9, 4240:9, 4262:8, 4296:4, 4296:8, 4308:21, 4358:22, 4358:25, 4377:14, 4377:17, 4377:24, 4378:6, 4378:7, 4387:7, 4389:9, 4393:10, 4399:7

**dated** [17] - 4151:23, 4218:13, 4239:9, 4242:13, 4242:14, 4261:20, 4284:4, 4290:7, 4326:21, 4357:8, 4360:4, 4376:11, 4379:3, 4396:19, 4398:21, 4438:13, 4438:19

**daughter** [1] - 4330:19

**days** [4] - 4230:7, 4230:10, 4238:24, 4385:7

**deal** [14] - 4207:8, 4282:6, 4288:12, 4308:9, 4309:10, 4319:2, 4319:19, 4342:7, 4349:18, 4350:2, 4350:5, 4357:17, 4393:16, 4410:19

**dealer** [5] - 4152:15, 4152:16, 4152:18, 4159:22, 4331:6

**dealers** [2] - 4152:13, 4152:19

**dealing** [3] - 4269:15, 4272:17, 4439:13

**dealings** [3] - 4342:25, 4405:25, 4432:10

**Deb** [1] - 4149:7

**DEBORAH** [2] - 4149:24, 4445:3

**Deborah** [1] - 4149:23

**debt** [2] - 4244:16, 4420:12

**December** [69] - 4151:11, 4157:1, 4164:17, 4166:15, 4172:20, 4174:4, 4174:16, 4180:19, 4186:6, 4188:5, 4189:22, 4190:1, 4190:3, 4190:12, 4191:8, 4192:1, 4198:19, 4259:21, 4261:20, 4262:9, 4278:3, 4280:13, 4281:6, 4282:2, 4284:4, 4284:7, 4286:16, 4287:13, 4287:25, 4288:7, 4290:7, 4291:25, 4292:19, 4293:19, 4306:4, 4314:24, 4349:16, 4350:19, 4350:22, 4351:1, 4351:3, 4351:6, 4352:1, 4352:7, 4357:8, 4358:22,

4359:1, 4377:17, 4378:6, 4378:20, 4379:4, 4386:24, 4387:9, 4388:24, 4389:10, 4393:11, 4393:18, 4393:22, 4394:4, 4395:12, 4396:11, 4396:19, 4398:4, 4398:11, 4398:21, 4399:8, 4402:9, 4437:9

**decide** [2] - 4269:4, 4285:18

**decided** [12] - 4206:23, 4229:5, 4229:8, 4230:25, 4261:12, 4265:4, 4292:15, 4292:17, 4294:2, 4366:14, 4408:8, 4414:23

**decision** [2] - 4421:19, 4421:23

**decisions** [2] - 4337:5, 4337:10

**deck** [2] - 4213:24, 4395:9

**decline** [1] - 4184:22

**declining** [2] - 4291:7, 4291:12

**dedicated** [1] - 4153:9

**defendant** [133] - 4148:9, 4154:16, 4214:6, 4214:18, 4215:4, 4216:2, 4216:14, 4217:5, 4217:16, 4217:19, 4218:11, 4218:18, 4221:20, 4222:19, 4222:25, 4223:2, 4224:17, 4225:18, 4227:11, 4228:6, 4228:9, 4229:2, 4230:17, 4231:2, 4231:3, 4232:2, 4234:4, 4239:6, 4239:13, 4242:21, 4243:2, 4243:4, 4243:17, 4249:6, 4249:24, 4250:18, 4253:1, 4279:16, 4282:1, 4282:3, 4282:15, 4282:16, 4282:20, 4283:1, 4283:4, 4283:8, 4283:12, 4284:9, 4284:13, 4284:25, 4285:4, 4286:10, 4287:10, 4287:25, 4288:4, 4288:8, 4288:20, 4289:2, 4289:16, 4290:6, 4291:24, 4292:8, 4293:20, 4296:12, 4297:6, 4299:17, 4299:20, 4300:12, 4302:5, 4303:3, 4304:14, 4305:9, 4332:21, 4363:8, 4363:20, 4363:23, 4364:7, 4364:11, 4364:22, 4364:24, 4365:19, 4365:24, 4366:3, 4366:10, 4366:19, 4367:3, 4367:17, 4368:13, 4368:19, 4368:25, 4369:16, 4369:19, 4370:9, 4370:11, 4370:19, 4370:23, 4371:2, 4372:6, 4373:2, 4373:23, 4373:25, 4375:25, 4377:2, 4377:21, 4377:23, 4378:11, 4378:16, 4379:6, 4379:14, 4380:2, 4380:14, 4380:18, 4381:12, 4381:16, 4382:6, 4383:4, 4383:7, 4383:10, 4383:18, 4383:24, 4384:5, 4385:2, 4385:21, 4386:20, 4387:17, 4387:22, 4387:24, 4388:7, 4389:1, 4389:3, 4389:13, 4390:6, 4410:1

**Defendant** [41] - 4148:19, 4255:17, 4256:1, 4256:11, 4256:19, 4256:23, 4257:8, 4257:11, 4257:13, 4259:23, 4260:5, 4260:21, 4260:24, 4263:24, 4264:15, 4267:20, 4275:5, 4275:12, 4275:23, 4275:25, 4278:4, 4294:8, 4333:23, 4336:8, 4338:15, 4393:15, 4393:18, 4394:4, 4395:7, 4395:11, 4395:13, 4396:12, 4397:23, 4398:19, 4402:9, 4403:2, 4404:17, 4405:2, 4405:4, 4405:15, 4405:16

**defendant's** [4] - 4244:18, 4249:10, 4249:16, 4251:12
**Defendant's** [7] - 4259:12, 4264:1, 4343:16, 4357:7, 4368:4, 4393:21, 4405:5
**Defense** [3] - 4437:12, 4438:7, 4446:5
**defense** [4] - 4251:9, 4267:17, 4326:16, 4409:17
**define** [2] - 4332:14, 4338:11
**defined** [1] - 4280:19
**definitely** [1] - 4342:16
**definition** [4] - 4195:17, 4279:22, 4312:22, 4312:24
**definitional** [1] - 4203:19
**definitively** [1] - 4437:2
**degree** [5] - 4154:10, 4154:11, 4206:17, 4352:13, 4414:22
**Delaware** [1] - 4219:12
**delete** [3] - 4321:4, 4321:11, 4323:19
**deleted** [11] - 4320:10, 4320:12, 4320:16, 4320:21, 4320:25, 4321:14, 4322:5, 4323:9, 4324:4, 4324:7, 4325:2
**deleting** [2] - 4320:2, 4324:14
**deliberations** [1] - 4150:13
**deliverables** [1] - 4389:23
**delivered** [1] - 4276:17
**Delray** [1] - 4361:8
**demanded** [1] - 4289:7
**denied** [1] - 4332:4
**denies** [1] - 4335:13
**denote** [2] - 4173:15, 4177:13
**denotes** [1] - 4189:4
**dental** [5] - 4243:23, 4244:3, 4244:7, 4341:15
**dentist** [1] - 4243:25
**dentists** [3] - 4244:2, 4244:6, 4244:8
**dentures** [3] - 4243:24, 4243:25, 4244:4
**deny** [1] - 4268:25
**department** [1] - 4361:17
**Department** [4] - 4154:2, 4154:6, 4212:4, 4302:14
**deposit** [1] - 4235:9
**deposited** [2] - 4291:9, 4299:11
**DEPUTY** [4] - 4205:17, 4271:18, 4388:14, 4388:19
**DeRinard** [4] - 4342:23, 4343:11, 4344:13, 4345:1
**derogatory** [1] - 4339:8
**describe** [6] - 4150:6, 4154:8, 4155:22, 4158:9, 4161:23, 4172:14
**described** [4] - 4241:12, 4334:13, 4379:23, 4439:16
**description** [3] - 4297:24, 4389:16, 4399:12
**Desert** [40] - 4151:1, 4158:11, 4158:12, 4164:15, 4164:19, 4164:21, 4166:10, 4167:5, 4167:8, 4193:10, 4246:1, 4246:2, 4246:5, 4246:16, 4255:5, 4260:8, 4260:11, 4261:1, 4261:2, 4261:13, 4261:19, 4262:19, 4262:20,

4264:16, 4274:23, 4275:13, 4276:12, 4279:12, 4280:17, 4280:18, 4280:20, 4280:21, 4281:16, 4281:18, 4283:5, 4284:12, 4290:14, 4300:10, 4348:16, 4359:16
**desires** [5] - 4219:21, 4219:22, 4220:1, 4262:23, 4262:25
**desk** [6] - 4221:5, 4221:6, 4221:7, 4222:4, 4349:24, 4366:2
**despite** [2] - 4414:9, 4417:13
**detailed** [1] - 4159:23
**details** [3] - 4204:3, 4218:4
**detective** [1] - 4343:5
**determined** [2] - 4264:6, 4300:16
**Detwiler** [4] - 4361:21, 4361:22, 4361:25, 4362:2
**Deutsche** [2] - 4206:11, 4206:12
**developed** [1] - 4413:7
**development** [10] - 4362:24, 4366:9, 4389:20, 4389:25, 4390:2, 4390:6, 4399:14, 4402:2, 4402:6, 4402:16
**diary** [1] - 4324:11
**Diego** [1] - 4237:11
**diethylamide** [1] - 4439:17
**difference** [3] - 4162:4, 4276:25, 4422:1
**different** [25] - 4161:17, 4165:6, 4166:24, 4189:17, 4202:9, 4221:1, 4222:13, 4224:7, 4229:16, 4229:18, 4229:19, 4235:5, 4250:21, 4252:14, 4272:4, 4276:14, 4284:25, 4285:25, 4302:6, 4309:16, 4319:6, 4333:16, 4345:9, 4365:10, 4379:20
**differently** [3] - 4251:19, 4251:25, 4258:9
**difficult** [1] - 4252:12
**digest** [1] - 4388:1
**diligence** [5] - 4434:5, 4434:10, 4434:18, 4434:19, 4435:9
**dinner** [7] - 4216:4, 4216:5, 4216:13, 4216:23, 4217:6, 4217:15, 4218:1
**DIRECT** [3] - 4152:4, 4205:22, 4360:24, 4445:4, 4445:6, 4445:9
**direct** [37] - 4155:13, 4158:15, 4193:6, 4198:14, 4200:25, 4202:8, 4203:12, 4204:3, 4251:11, 4257:20, 4281:24, 4306:10, 4306:16, 4308:6, 4310:13, 4314:7, 4315:9, 4320:12, 4325:12, 4326:5, 4329:7, 4332:19, 4334:15, 4345:8, 4352:24, 4353:8, 4355:8, 4357:12, 4357:19, 4357:20, 4358:15, 4359:5, 4416:2, 4429:5, 4429:11, 4429:16, 4430:6
**directed** [4] - 4249:14, 4258:3, 4273:6, 4279:16
**directing** [5] - 4158:7, 4166:6, 4166:11, 4176:24, 4355:21
**direction** [3] - 4249:10, 4369:3, 4369:6
**directly** [11] - 4171:13, 4171:22, 4257:7, 4258:3, 4272:17, 4283:14, 4316:21, 4371:4, 4396:24, 4410:5
**director** [4] - 4170:3, 4170:19, 4280:15,

4281:15
**directors** [6] - 4194:2, 4194:4, 4194:8, 4194:14, 4195:19, 4401:15
**disagree** [1] - 4347:22
**disappointed** [1] - 4370:3
**disbelieve** [1] - 4308:24
**discipline** [1] - 4152:22
**disclose** [1] - 4195:19
**disclosure** [4] - 4165:23, 4169:11, 4170:17, 4171:15
**disclosures** [1] - 4174:14
**discount** [1] - 4283:16
**discovered** [1] - 4341:22
**discuss** [14] - 4149:2, 4216:23, 4217:5, 4222:9, 4223:2, 4275:12, 4345:18, 4364:15, 4365:7, 4372:8, 4379:14, 4382:24, 4393:18, 4407:20
**discussed** [19] - 4160:22, 4161:22, 4164:10, 4178:9, 4187:4, 4216:24, 4251:2, 4275:15, 4276:15, 4386:3, 4388:25, 4390:5, 4396:25, 4403:13, 4404:8, 4411:18, 4425:17, 4430:5, 4441:17
**discusses** [1] - 4326:23
**discussing** [1] - 4381:1
**discussion** [6] - 4303:16, 4303:21, 4341:25, 4370:7, 4383:4, 4432:4
**discussions** [5] - 4264:23, 4344:13, 4358:6, 4384:16, 4402:12
**disease** [1] - 4440:8
**disorders** [1] - 4439:2
**dispersions** [1] - 4234:10
**dispose** [1] - 4170:20
**dispute** [3] - 4256:23, 4256:25, 4304:10
**disregard** [7] - 4227:17, 4228:3, 4237:3, 4268:12, 4269:10, 4271:7, 4271:11
**disregard-the-last-statement-of-insider-trading** [1] - 4268:12
**disseminated** [1] - 4365:21
**distinct** [1] - 4440:8
**distributed** [5] - 4172:4, 4173:8, 4249:4, 4249:8, 4255:9
**distribution** [2] - 4172:9, 4172:15
**DISTRICT** [3] - 4148:1, 4148:1, 4148:12
**District** [5] - 4148:15, 4210:10, 4210:14, 4210:15, 4211:1, 4211:15, 4293:8, 4323:16
**diverse** [2] - 4207:22, 4212:25
**divided** [1] - 4249:14
**Dixie** [1] - 4225:5
**doc** [1] - 4387:21
**Doctor** [1] - 4440:1
**doctors** [1] - 4439:6
**document** [89] - 4156:14, 4156:21, 4156:24, 4158:8, 4158:9, 4158:14, 4165:23, 4166:8, 4166:12, 4169:11, 4170:17, 4171:15, 4173:25, 4174:9, 4174:14, 4174:15, 4174:22, 4176:9, 4176:24, 4177:15, 4178:5, 4180:4, 4180:16, 4181:2, 4181:10, 4181:14, 4182:6, 4182:12, 4183:6, 4183:22,

4184:2, 4185:1, 4185:18, 4187:6, 4187:7, 4187:14, 4187:16, 4194:13, 4194:15, 4196:6, 4196:11, 4196:12, 4218:8, 4218:18, 4220:6, 4220:18, 4220:19, 4240:9, 4240:15, 4241:16, 4241:17, 4241:22, 4242:2, 4242:8, 4261:17, 4262:6, 4263:16, 4263:17, 4263:21, 4295:4, 4295:16, 4295:25, 4302:9, 4328:22, 4348:2, 4375:5, 4376:13, 4376:19, 4376:21, 4377:2, 4377:10, 4378:2, 4378:7, 4380:2, 4388:10, 4388:12, 4388:24, 4390:15, 4393:7, 4395:6, 4396:13, 4398:16, 4401:6, 4401:18, 4401:23, 4425:20, 4427:4, 4427:5, 4438:18

**documentation** [3] - 4224:8, 4319:19, 4319:20

**documented** [1] - 4184:14

**documents** [35] - 4155:15, 4155:19, 4155:22, 4155:24, 4162:12, 4171:7, 4172:3, 4181:16, 4184:21, 4186:25, 4193:7, 4193:10, 4193:13, 4193:16, 4193:18, 4193:20, 4193:25, 4194:3, 4194:6, 4195:23, 4196:3, 4196:8, 4238:14, 4239:3, 4242:5, 4242:7, 4277:2, 4289:15, 4356:13, 4367:17, 4367:23, 4386:15, 4386:19, 4441:3, 4441:7

**DOJ** [1] - 4212:4

**dollars** [10] - 4213:24, 4305:6, 4305:8, 4309:17, 4310:17, 4325:18, 4325:25, 4326:6, 4420:18

**dominant** [1] - 4244:5

**done** [14] - 4203:18, 4257:12, 4272:8, 4334:17, 4338:16, 4350:2, 4352:11, 4392:12, 4392:25, 4394:12, 4407:25, 4427:25, 4434:9

**door** [1] - 4285:14

**doors** [1] - 4334:17

**dormant** [1] - 4163:25

**double** - 4251:13, 4375:18

**doubt** [5] - 4308:3, 4308:24, 4309:15, 4314:5, 4327:7

**doubted** [1] - 4342:20

**down** [29] - 4205:7, 4213:20, 4230:12, 4241:5, 4251:25, 4253:17, 4263:1, 4266:6, 4267:2, 4288:2, 4297:22, 4301:9, 4301:13, 4301:16, 4313:17, 4342:3, 4342:15, 4342:24, 4370:13, 4374:23, 4377:16, 4377:20, 4390:15, 4392:13, 4399:16, 4400:1, 4425:22, 4425:23, 4425:25

**downside** [1] - 4417:20

**downward** [2] - 4190:16, 4192:8

**dozen** [1] - 4323:17

**draft** [5] - 4385:11, 4389:13, 4390:23, 4391:3, 4436:5

**drafted** [1] - 4264:4

**drive** [2] - 4354:17, 4399:14

**driving** [1] - 4251:7

**drug** [8] - 4389:19, 4389:25, 4390:3,

---

4390:6, 4402:2, 4402:5, 4402:16, 4440:1

**drugs** [2] - 4379:18, 4379:21

**dubbed** [1] - 4279:20

**due** [8] - 4377:16, 4377:24, 4378:5, 4434:5, 4434:10, 4434:18, 4434:19, 4435:9

**duly** [4] - 4149:24, 4205:15, 4273:25, 4360:19

**During** [3] - 4193:6, 4399:20, 4400:11

**during** [18] - 4189:10, 4190:23, 4191:11, 4198:5, 4198:6, 4198:9, 4198:14, 4221:17, 4221:21, 4229:12, 4259:20, 4276:11, 4365:7, 4380:18, 4381:1, 4390:18, 4399:20, 4411:25

---

# E

**e-mail** [104] - 4277:5, 4277:7, 4277:11, 4278:3, 4279:10, 4280:1, 4280:4, 4280:6, 4280:23, 4280:25, 4281:3, 4281:4, 4281:8, 4281:11, 4281:13, 4282:1, 4282:4, 4282:14, 4282:20, 4282:22, 4282:23, 4282:25, 4283:1, 4283:10, 4283:22, 4284:2, 4284:5, 4287:10, 4287:24, 4288:24, 4289:1, 4290:6, 4290:9, 4291:4, 4291:23, 4293:18, 4294:14, 4294:15, 4294:21, 4296:7, 4296:8, 4330:10, 4343:8, 4343:12, 4343:13, 4343:14, 4343:19, 4346:5, 4346:7, 4347:3, 4348:8, 4355:20, 4357:7, 4357:14, 4357:16, 4358:4, 4358:5, 4358:8, 4358:11, 4358:22, 4358:25, 4359:2, 4360:4, 4360:5, 4364:13, 4372:6, 4372:22, 4373:1, 4373:8, 4373:12, 4373:13, 4373:22, 4373:23, 4374:4, 4374:7, 4374:8, 4376:3, 4376:11, 4392:3, 4392:6, 4392:7, 4392:8, 4393:9, 4393:10, 4394:3, 4394:6, 4395:13, 4396:12, 4397:23, 4398:7, 4398:10, 4441:8

**E-mail** [77] - 4148:24, 4239:5, 4239:6, 4242:10, 4242:12, 4242:19, 4244:23, 4306:3, 4313:5, 4313:7, 4313:15, 4313:18, 4313:21, 4313:24, 4313:25, 4314:3, 4318:20, 4319:7, 4319:22, 4320:6, 4321:5, 4321:10, 4321:11, 4321:13, 4322:7, 4323:2, 4323:19, 4323:22, 4323:25, 4324:2, 4324:11, 4324:14, 4325:3, 4326:13, 4326:19, 4327:3, 4327:13, 4378:16, 4378:18, 4379:3, 4379:5, 4379:7, 4382:4, 4382:5, 4382:6, 4382:10, 4383:5, 4383:17, 4383:23, 4384:4, 4384:23, 4385:1, 4385:6, 4385:7, 4385:9, 4385:20, 4386:7, 4387:17, 4387:18, 4387:20, 4387:22, 4387:24, 4388:2, 4436:4, 4437:9, 4437:18, 4437:21, 4437:22, 4438:1, 4438:12, 4438:13, 4438:19, 4439:21

---

**e-mail..** [1] - 4396:17

**E-mails** [7] - 4242:12, 4249:18, 4325:2, 4381:12, 4381:16, 4386:4, 4386:19

**e-mails** [21] - 4277:17, 4280:12, 4281:1, 4289:15, 4289:18, 4334:10, 4334:21, 4344:12, 4372:18, 4373:11, 4373:19, 4374:11, 4376:3, 4393:8, 4395:10, 4396:10, 4396:11, 4397:22, 4441:12, 4442:12, 4442:13

**early** [13] - 4225:13, 4225:14, 4232:10, 4232:14, 4237:6, 4244:20, 4252:24, 4269:16, 4305:11, 4327:13, 4328:3, 4345:4

**earn** [1] - 4305:4

**earned** [1] - 4410:19

**earnings** [1] - 4385:22

**easier** [1] - 4280:24

**East** [1] - 4148:15

**east** [1] - 4216:11

**EASTERN** [1] - 4148:1

**Eastern** [2] - 4148:15, 4323:16

**easy** [1] - 4273:1

**eating** [1] - 4214:16

**economics** [1] - 4361:10

**Ed** [2] - 4331:3, 4359:9

**Edmund** [5] - 4173:2, 4188:17, 4189:11, 4261:6, 4280:13

**education** [3] - 4206:15, 4361:9, 4402:4

**educational** [2] - 4154:8, 4402:13

**Edward** [1] - 4197:25

**Efay** [5] - 4367:10, 4367:15, 4367:24, 4368:4, 4375:8

**EFAY** [19] - 4367:15, 4382:19, 4382:20, 4382:22, 4392:10, 4392:15, 4392:16, 4392:17, 4393:13, 4393:23, 4397:16, 4399:23, 4404:3, 4421:3, 4421:8, 4431:11, 4431:16, 4431:17

**EFAY's** [2] - 4431:13, 4431:20

**effective** [3] - 4179:3, 4179:18, 4293:11

**effort** [1] - 4302:4

**efforts** [2] - 4286:24, 4300:3

**egregious** [1] - 4272:9

**Eight** [2] - 4249:3, 4252:10

**eight** [4] - 4261:11, 4402:9, 4416:3, 4420:3

**either** [14] - 4153:16, 4170:2, 4171:13, 4171:21, 4217:6, 4221:10, 4240:3, 4259:9, 4277:17, 4317:4, 4320:15, 4336:15, 4368:9, 4402:4

**Elea** [25] - 4366:17, 4366:18, 4367:6, 4367:18, 4368:2, 4368:4, 4368:10, 4369:1, 4370:18, 4371:15, 4372:8, 4373:20, 4374:19, 4375:8, 4375:25, 4383:1, 4385:16, 4392:16, 4393:6, 4394:24, 4395:20, 4403:1, 4416:6, 4431:12, 4433:1

**election** [1] - 4185:8

**ELEIS** [1] - 4148:17

**eleven** [1] - 4153:24

**elicit** [5] - 4195:15, 4234:17, 4255:9, 4332:25, 4334:25

elicited [1] - 4236:9
eliciting [2] - 4333:25, 4335:20
eligible [2] - 4166:13, 4166:20
Elmo [2] - 4159:4, 4435:23
embarrassed [1] - 4335:4
emotional [4] - 4338:18, 4338:22, 4338:24, 4339:5
employ [1] - 4219:22
employed [5] - 4220:1, 4352:9, 4352:13, 4355:6, 4423:17
employee [2] - 4297:9, 4348:10
employees [4] - 4152:14, 4212:22, 4235:15, 4249:5
employer [3] - 4217:10, 4301:1, 4301:2
employment [7] - 4212:19, 4220:4, 4224:25, 4240:12, 4240:21, 4241:3, 4248:14
encouraged [1] - 4355:17
encouraging [1] - 4354:17
encumbrances [1] - 4263:11
end [21] - 4157:5, 4190:19, 4191:25, 4192:1, 4192:8, 4204:25, 4209:12, 4225:1, 4235:10, 4240:22, 4252:10, 4274:11, 4288:19, 4293:13, 4307:10, 4351:7, 4365:1, 4384:13, 4418:14, 4419:6, 4424:17
endeavor [1] - 4356:18
endeavors [1] - 4293:1
ended [2] - 4190:20, 4442:12
ending [1] - 4185:9
ends [6] - 4197:1, 4227:22, 4259:1, 4271:1, 4341:1, 4386:10
enemy [1] - 4302:17
Enforcement [1] - 4154:6
enforcement [1] - 4204:16
enforcing [1] - 4153:5
engage [1] - 4209:14
engaging [1] - 4292:20
England [1] - 4361:17
ensure [2] - 4152:21, 4154:4
enter [2] - 4211:21, 4401:13
entering [1] - 4149:18, 4186:19
enters [6] - 4149:1, 4192:20, 4254:5, 4274:16, 4357:1, 4411:9
Entheogen [1] - 4439:6
enthusiastic [1] - 4217:12
entire [8] - 4216:14, 4297:18, 4298:10, 4312:22, 4312:24, 4354:24, 4362:13, 4425:6
entirely [1] - 4248:4
entirety [1] - 4179:2
entities [15] - 4172:17, 4174:13, 4177:15, 4177:22, 4180:14, 4180:20, 4180:24, 4182:7, 4184:14, 4187:9, 4187:11, 4229:16, 4229:18, 4229:19, 4244:13
entitled [12] - 4166:13, 4175:8, 4176:14, 4177:6, 4178:6, 4183:9, 4184:5, 4185:18, 4186:15, 4187:25, 4191:7, 4202:15
entity [17] - 4152:16, 4168:3, 4202:19,

4207:15, 4208:11, 4221:25, 4229:17, 4237:22, 4244:14, 4264:10, 4282:18, 4294:2, 4294:3, 4343:5, 4344:1, 4367:9, 4399:24
envelope [2] - 4295:17
episodic [1] - 4440:8
equal [1] - 4271:6
equities [3] - 4207:20, 4207:21, 4207:23
equity [12] - 4161:12, 4207:8, 4244:17, 4244:21, 4259:14, 4259:15, 4280:16, 4342:21, 4345:6, 4349:22, 4349:23
erase [3] - 4271:11, 4353:15, 4444:4
Erase [1] - 4353:16
Eric [7] - 4342:23, 4343:11, 4343:12, 4343:14, 4344:13, 4345:1, 4345:5
especially [1] - 4315:17
ESQ [8] - 4148:14, 4148:16, 4148:17, 4148:17, 4148:20, 4148:21, 4148:21, 4148:22
essence [1] - 4163:16
Essentially [1] - 4261:14
essentially [1] - 4251:13
establish [4] - 4248:8, 4248:10, 4334:20, 4335:11
established [7] - 4239:23, 4249:2, 4250:9, 4257:17, 4335:11, 4338:23, 4365:2
estate [6] - 4362:23, 4363:2, 4363:5, 4390:10, 4390:11
evaluate [1] - 4150:10
Evan [15] - 4261:8, 4264:5, 4280:6, 4280:7, 4281:12, 4281:13, 4285:9, 4292:12, 4359:6, 4359:8, 4359:14, 4359:16, 4397:24, 4398:3, 4398:4
evening [1] - 4442:7
event [7] - 4194:13, 4296:17, 4296:21, 4296:23, 4297:2, 4297:4, 4297:6
events [3] - 4162:23, 4274:8, 4429:12
eventuality [1] - 4356:4
eventually [5] - 4210:9, 4229:21, 4238:11, 4303:6, 4369:2
evidence [75] - 4149:13, 4149:16, 4150:16, 4151:4, 4151:8, 4151:12, 4151:16, 4151:20, 4151:22, 4157:12, 4157:18, 4158:24, 4160:2, 4160:5, 4160:25, 4166:6, 4172:11, 4173:23, 4181:1, 4191:4, 4197:21, 4198:14, 4218:16, 4219:4, 4234:2, 4239:20, 4248:20, 4248:21, 4248:25, 4249:11, 4249:16, 4251:11, 4252:10, 4257:18, 4261:23, 4277:21, 4282:11, 4287:19, 4287:22, 4289:24, 4290:3, 4295:11, 4295:15, 4306:1, 4306:3, 4308:19, 4314:14, 4326:16, 4328:5, 4330:8, 4334:15, 4335:12, 4338:7, 4343:18, 4346:15, 4354:7, 4354:24, 4355:20, 4356:9, 4356:13, 4357:7, 4372:16, 4377:5, 4378:23, 4380:9, 4381:21, 4381:24, 4383:16, 4384:20, 4387:5, 4398:24, 4435:22, 4436:1, 4438:4, 4438:18

evidences [1] - 4187:24
exact [3] - 4279:22, 4319:1, 4319:5
Exactly [1] - 4257:3
exactly [15] - 4210:12, 4223:15, 4306:14, 4310:12, 4311:9, 4311:11, 4313:1, 4321:24, 4331:5, 4343:24, 4344:17, 4364:25, 4369:14, 4406:12, 4437:4
examination [19] - 4193:6, 4203:5, 4252:3, 4252:17, 4274:19, 4306:16, 4308:6, 4310:13, 4314:7, 4315:9, 4320:12, 4325:12, 4326:5, 4329:7, 4345:8, 4352:24, 4353:8, 4357:13, 4359:6
EXAMINATION [14] - 4152:4, 4192:23, 4205:22, 4305:16, 4359:23, 4360:24, 4411:15, 4445:4, 4445:4, 4445:6, 4445:7, 4445:7, 4445:9, 4445:10
examinations [1] - 4152:21
examine [1] - 4339:18
examined [5] - 4163:3, 4205:15, 4274:1, 4334:23, 4360:19
example [4] - 4162:1, 4189:4, 4189:20, 4354:25
except [1] - 4212:25
exception [3] - 4235:23, 4251:16, 4279:11
exceptions [3] - 4168:19, 4250:16, 4251:14
excess [1] - 4268:8
exchange [1] - 4300:2
Exchange [6] - 4151:2, 4153:2, 4161:25, 4171:9, 4193:7, 4210:19
exchanges [5] - 4154:14, 4161:22, 4161:23, 4161:25, 4162:5
excited [1] - 4379:17
excuse [3] - 4223:25, 4276:6, 4301:24
Excuse [1] - 4442:6
excused [5] - 4360:10, 4360:11, 4443:19, 4444:14, 4444:15
execute [3] - 4392:11, 4392:22, 4398:12
executed [4] - 4376:12, 4392:9, 4395:1, 4395:18
exemptions [1] - 4168:19
exercisable [1] - 4185:8
exercise [2] - 4185:11, 4280:18
exert [1] - 4170:1
exhibit [11] - 4157:13, 4159:9, 4166:24, 4166:25, 4198:21, 4234:22, 4328:10, 4330:1, 4330:3, 4360:3, 4437:11
Exhibit [101] - 4150:20, 4150:25, 4151:5, 4151:9, 4151:13, 4151:17, 4151:21, 4156:10, 4156:11, 4157:12, 4158:4, 4158:17, 4158:24, 4159:1, 4166:7, 4172:12, 4173:24, 4178:2, 4191:4, 4191:6, 4197:5, 4197:9, 4197:14, 4197:19, 4197:22, 4198:15, 4198:18, 4198:23, 4199:3, 4218:7, 4218:16, 4219:3, 4219:4, 4239:1, 4239:5, 4239:12, 4239:20, 4240:8, 4241:21, 4244:23, 4261:16, 4262:1,

4262:2, 4277:23, 4278:2, 4280:1, 4281:24, 4282:10, 4283:19, 4287:9, 4287:19, 4287:22, 4290:5, 4292:7, 4294:13, 4294:20, 4295:1, 4295:3, 4295:11, 4295:13, 4295:15, 4296:7, 4296:10, 4305:24, 4326:17, 4328:7, 4343:16, 4360:1, 4372:2, 4372:3, 4372:12, 4372:15, 4372:17, 4374:6, 4374:9, 4376:16, 4377:5, 4378:15, 4378:23, 4380:1, 4380:9, 4382:1, 4383:15, 4384:19, 4384:24, 4386:16, 4387:16, 4388:21, 4392:2, 4396:9, 4398:15, 4398:24, 4399:1, 4399:2, 4399:4, 4435:21, 4437:12, 4437:17, 4438:12, 4439:25

**Exhibits** [18] - 4159:7, 4160:14, 4160:24, 4181:2, 4197:11, 4198:13, 4199:10, 4276:5, 4277:3, 4277:25, 4289:13, 4289:24, 4290:2, 4381:20, 4387:4, 4387:13, 4438:8, 4446:25

**exhibits** [10] - 4153:18, 4155:14, 4155:17, 4156:1, 4156:7, 4158:18, 4159:8, 4160:16, 4160:22, 4199:2

**existence** [1] - 4215:11

**exits** [5] - 4192:17, 4271:20, 4353:20, 4411:5, 4443:23

**expect** [3] - 4249:24, 4258:10, 4293:8

**expected** [2] - 4293:4, 4347:17

**expecting** [2] - 4297:17, 4406:7

**expensive** [1] - 4291:21

**experience** [6] - 4190:23, 4195:5, 4228:23, 4264:24, 4389:24, 4402:4

**experienced** [2] - 4228:23, 4272:13

**expert** [2] - 4228:20, 4246:7

**expertise** [2] - 4389:24, 4390:2

**explain** [18] - 4150:6, 4157:2, 4164:13, 4174:11, 4178:8, 4178:13, 4181:2, 4186:21, 4188:6, 4189:21, 4191:9, 4191:20, 4276:2, 4389:13, 4420:14, 4426:7, 4433:19, 4440:19

**explains** [1] - 4169:17

**explanation** [2] - 4230:17, 4299:23

**exposure** [2] - 4213:2, 4213:3

**express** [1] - 4334:7

**expression** [2] - 4170:9, 4171:18

**extension** [1] - 4191:22

**extent** [4] - 4202:23, 4257:10, 4259:24, 4271:5

**extra** [1] - 4221:10

**extremely** [2] - 4291:7, 4382:13

## F

**F.B.I** [10] - 4421:10, 4421:16, 4422:17, 4423:7, 4423:12, 4427:11, 4429:17, 4430:14, 4431:7, 4432:9

**face** [2] - 4322:25

**face-to-face** [1] - 4322:25

**Facebook** [1] - 4313:18

**faced** [1] - 4221:5

**fact** [19] - 4194:15, 4212:8, 4216:18, 4234:8, 4248:18, 4259:15, 4326:23,

4335:7, 4335:14, 4336:24, 4338:1, 4345:18, 4353:6, 4356:5, 4367:6, 4403:21, 4410:17, 4425:16

**factors** [2] - 4415:18, 4415:19

**facts** [4] - 4228:23, 4236:9, 4268:18, 4271:6

**failed** [4] - 4292:23, 4292:24, 4292:25, 4297:20

**failing** [1] - 4292:18

**Fair** [1] - 4193:19

**fair** [27] - 4193:19, 4194:16, 4198:16, 4199:17, 4309:6, 4309:7, 4318:8, 4336:2, 4344:8, 4346:25, 4352:1, 4355:11, 4375:23, 4411:19, 4411:20, 4413:1, 4413:2, 4413:13, 4413:16, 4413:19, 4415:5, 4415:6, 4417:14, 4418:10, 4423:13, 4431:16, 4443:11

**fairly** [3] - 4160:20, 4404:12, 4414:17

**fairness** [1] - 4195:7

**faith** [3] - 4334:18, 4373:4, 4420:9

**fall** [6] - 4232:10, 4232:14, 4237:6, 4238:19, 4245:10, 4381:17

**falling** [1] - 4342:15

**falls** [1] - 4256:22

**false** [1] - 4333:13

**falsely** [1] - 4332:4

**familiar** [11] - 4154:12, 4161:5, 4161:6, 4163:7, 4171:9, 4200:18, 4203:17, 4203:23, 4203:24, 4214:6, 4363:8

**family** [6] - 4303:17, 4367:11, 4405:23, 4406:2, 4421:5, 4429:18

**famous** [2] - 4211:11, 4244:11

**far** [4] - 4328:22, 4333:24, 4335:11, 4336:13

**fashion** [1] - 4267:18

**fast** [1] - 4209:4

**father** [14] - 4367:6, 4367:23, 4368:9, 4373:18, 4377:12, 4415:8, 4415:11, 4416:4, 4418:10, 4420:8, 4423:25, 4424:7, 4432:5, 4432:11

**father's** [5] - 4369:21, 4376:9, 4416:22, 4431:9, 4432:22

**fault** [1] - 4266:15

**faulting** [1] - 4333:11

**favorable** [2] - 4292:22, 4296:18

**favors** [1] - 4352:7

**FBI** [9] - 4332:2, 4405:22, 4406:5, 4406:7, 4407:23, 4408:25, 4414:13, 4441:25, 4442:4

**Fearnow** [26] - 4173:13, 4249:4, 4250:3, 4261:19, 4262:11, 4262:12, 4262:14, 4262:17, 4262:18, 4262:19, 4263:20, 4263:23, 4274:22, 4274:23, 4274:25, 4275:2, 4275:6, 4275:12, 4290:14, 4300:14, 4303:25, 4304:9, 4304:15, 4305:2

**Fearnows** [1] - 4304:7

**February** [21] - 4151:4, 4151:7, 4151:11, 4181:15, 4182:11, 4185:3, 4185:4, 4186:9, 4187:4, 4187:15, 4188:5, 4190:6, 4190:9, 4198:19, 4198:22,

4198:24, 4328:3, 4328:15, 4328:20, 4329:5, 4329:14

**Fechtor** [5] - 4361:21, 4361:23, 4361:25, 4362:2

**federal** [3] - 4153:6, 4154:4, 4168:16

**fee** [3] - 4368:1, 4368:3

**fees** [1] - 4305:7

**felony** [1] - 4425:16

**felt** [9] - 4209:10, 4284:21, 4370:11, 4374:21, 4374:25, 4375:22, 4395:2, 4407:15

**Fernandez** [9] - 4172:24, 4188:18, 4189:12, 4198:1, 4237:8, 4237:15, 4261:9, 4278:4, 4290:10

**few** [9] - 4193:2, 4213:23, 4229:3, 4253:19, 4351:19, 4374:16, 4411:3, 4435:9, 4436:1

**field** [3] - 4203:20, 4258:4, 4364:2

**fifth** [3] - 4183:6, 4185:10, 4266:17

**fifty** [2] - 4304:22, 4361:2

**fifty-two** [1] - 4361:2

**figure** [3] - 4186:4, 4375:12, 4381:3

**file** [8] - 4162:12, 4165:4, 4168:20, 4170:20, 4170:24, 4171:14, 4186:22, 4194:10

**filed** [19] - 4166:9, 4169:11, 4169:12, 4170:21, 4171:3, 4171:7, 4174:4, 4174:7, 4181:10, 4181:13, 4181:17, 4186:6, 4186:9, 4187:1, 4193:7, 4193:10, 4193:13, 4193:20, 4194:6

**files** [1] - 4242:2

**filing** [6] - 4170:22, 4171:2, 4171:25, 4174:5, 4180:14, 4181:7, 4182:10, 4183:17, 4196:13, 4197:4, 4197:8, 4238:14, 4264:14

**filings** [13] - 4155:23, 4158:21, 4160:9, 4162:19, 4162:24, 4162:25, 4163:1, 4165:18, 4173:14, 4173:20, 4182:24, 4194:10, 4203:2

**fill** [1] - 4394:13

**final** [6] - 4179:16, 4220:18, 4235:10, 4291:4, 4384:4, 4398:18

**Finally** [1] - 4291:5

**finally** [4] - 4291:6, 4297:19, 4386:11, 4395:19

**Finance** [5] - 4207:15, 4207:16, 4208:3, 4208:5, 4217:10

**finance** [2] - 4207:24, 4439:7

**Financial** [1] - 4152:8

**financial** [3] - 4166:5, 4171:1, 4293:3

**financials** [1] - 4171:5

**financing** [2] - 4318:22, 4323:4

**financings** [1] - 4291:11

**fine** [18] - 4240:2, 4240:3, 4252:25, 4268:15, 4268:23, 4269:25, 4270:2, 4273:13, 4273:14, 4324:20, 4334:11, 4352:3, 4352:4, 4393:24, 4417:2, 4417:3, 4423:4, 4444:11

**finger** [1] - 4297:15

**finish** [1] - 4442:8

**finished** [1] - 4434:23

**FINRA** [18] - 4152:6, 4152:7, 4152:8, 4152:9, 4152:19, 4152:20, 4152:23, 4153:1, 4153:7, 4153:17, 4153:20, 4154:1, 4154:12, 4155:5, 4161:6, 4193:24, 4202:9, 4204:18
**fired** [1] - 4316:19
**firing** [1] - 4316:4
**firm** [12] - 4154:7, 4159:22, 4300:16, 4303:9, 4361:20, 4362:5, 4362:7, 4362:8, 4365:16, 4412:3, 4412:5, 4412:7
**firms** [1] - 4153:16
**first** [67] - 4149:24, 4157:3, 4161:4, 4174:17, 4178:12, 4178:17, 4181:13, 4189:20, 4189:21, 4190:11, 4191:13, 4191:17, 4198:21, 4205:15, 4206:22, 4214:18, 4214:22, 4214:25, 4215:24, 4216:16, 4217:16, 4219:6, 4221:7, 4221:18, 4223:11, 4223:14, 4225:9, 4232:4, 4238:3, 4240:18, 4242:12, 4271:2, 4282:20, 4290:5, 4292:15, 4295:16, 4296:1, 4296:14, 4301:3, 4318:2, 4320:7, 4328:17, 4328:24, 4329:3, 4329:4, 4329:8, 4332:17, 4350:17, 4360:3, 4360:19, 4361:15, 4363:13, 4363:20, 4363:22, 4364:4, 4364:7, 4376:5, 4380:20, 4392:9, 4394:2, 4399:11, 4413:8, 4422:20, 4424:4, 4428:8, 4438:12, 4440:7
**fishing** [1] - 4244:11
**five** [12] - 4160:15, 4171:14, 4171:22, 4202:7, 4225:14, 4317:20, 4376:17, 4381:4, 4393:1, 4403:8, 4408:3, 4420:19
**flat** [2] - 4225:11, 4232:21
**Flat** [1] - 4266:13
**flipped** [1] - 4157:10
**float** [2] - 4170:9, 4170:13
**floating** [1] - 4236:3
**floor** [1] - 4219:13
**Florida** [8] - 4361:8, 4362:16, 4362:17, 4363:3, 4363:6, 4385:12, 4392:18, 4406:4
**flow** [3] - 4244:16, 4364:18, 4365:20
**fluctuated** [1] - 4191:24
**fluctuates** [1] - 4190:17
**focus** [21] - 4195:25, 4196:11, 4219:5, 4220:7, 4262:3, 4280:1, 4294:14, 4296:1, 4362:25, 4370:23, 4374:11, 4377:10, 4379:2, 4382:4, 4382:5, 4388:10, 4393:8, 4395:9, 4395:12, 4399:3, 4401:7
**focused** [5] - 4154:7, 4365:17, 4371:1, 4400:22, 4400:24
**focusing** [2] - 4281:25, 4290:5
**Folgers** [7] - 4307:11, 4307:15, 4307:16, 4307:17, 4309:3, 4318:16, 4319:2
**follow** [9] - 4349:8, 4357:15, 4358:9, 4382:11, 4382:12, 4383:3, 4407:22, 4407:24, 4427:2

**follow-up** [3] - 4358:9, 4407:22, 4407:24
**followed** [2] - 4364:17, 4431:18
**following** [12] - 4186:4, 4195:1, 4202:1, 4255:1, 4266:1, 4303:3, 4316:12, 4332:1, 4354:1, 4370:18, 4373:16, 4397:5
**follows** [5] - 4149:25, 4186:18, 4205:16, 4274:1, 4360:20
**Fool** [1] - 4405:23
**Fool's** [1] - 4405:21
**FOR** [1] - 4148:11
**Forbes** [3] - 4282:6, 4357:17, 4357:21
**forever** [1] - 4243:25
**forget** [1] - 4354:21
**forgot** [1] - 4385:5
**form** [14] - 4158:22, 4165:21, 4166:9, 4170:17, 4172:2, 4174:3, 4174:18, 4222:15, 4251:12, 4269:24, 4313:2, 4363:13, 4442:18
**Form** [5] - 4170:16, 4170:20, 4181:22, 4186:6, 4186:9
**format** [1] - 4423:3
**former** [5] - 4208:6, 4212:22, 4213:22, 4238:13, 4261:4
**forms** [1] - 4202:24
**forth** [12] - 4157:8, 4167:5, 4219:25, 4239:4, 4240:24, 4265:5, 4267:24, 4354:14, 4358:3, 4375:13, 4395:11, 4401:14
**forward** [5] - 4192:1, 4210:12, 4230:24, 4281:4, 4386:3
**Forward** [1] - 4372:23
**forwarded** [1] - 4379:6
**forwarding** [1] - 4442:12
**Foundation** [1] - 4331:17
**foundation** [2] - 4200:24, 4251:8
**founded** [3] - 4379:11, 4412:18, 4439:6
**founder** [2] - 4209:21, 4379:19
**founder's** [1] - 4291:9
**founders** [6] - 4213:14, 4213:15, 4213:20, 4214:3
**four** [26] - 4160:15, 4175:1, 4178:12, 4189:17, 4202:6, 4206:6, 4208:20, 4221:3, 4221:9, 4222:4, 4241:14, 4242:14, 4242:22, 4302:15, 4361:6, 4372:3, 4372:20, 4372:21, 4396:23, 4397:8, 4397:11, 4397:18, 4403:21, 4418:15, 4418:19, 4418:20
**Four** [4] - 4214:1, 4214:2, 4214:15, 4400:4
**fourth** [2] - 4266:17, 4424:4
**frame** [2] - 4235:2, 4380:19
**frankly** [2] - 4249:15, 4251:6
**fraud** [10] - 4153:11, 4154:3, 4293:2, 4300:6, 4301:1, 4301:25, 4302:12, 4302:14, 4302:23, 4443:4
**Fred** [3] - 4330:19, 4330:21, 4384:2
**free** [17] - 4168:7, 4168:12, 4169:20, 4169:21, 4170:14, 4172:1, 4172:16, 4173:6, 4173:7, 4173:9, 4173:11,

4250:3, 4263:10, 4263:14, 4264:17, 4428:6
**free-trading** [1] - 4263:14
**freely** [1] - 4397:1
**freeze** [1] - 4293:6
**frequent** [1] - 4380:21
**frequently** [2] - 4364:12, 4441:13
**Friday** [4] - 4383:19, 4383:21, 4384:6, 4384:8
**friend** [10] - 4211:12, 4214:9, 4261:7, 4339:2, 4339:3, 4343:4, 4351:8, 4351:11, 4394:16
**friends** [12] - 4213:21, 4249:5, 4261:4, 4282:5, 4332:11, 4334:6, 4339:5, 4339:12, 4339:14, 4351:2, 4362:4, 4384:2
**frivolous** [2] - 4300:21
**front** [10] - 4155:14, 4172:13, 4218:4, 4218:10, 4220:14, 4266:24, 4269:9, 4305:24, 4344:18, 4396:5
**Frost** [1] - 4384:3
**froze** [1] - 4302:5
**frozen** [3] - 4300:15, 4301:4, 4301:20
**fulfill** [1] - 4382:16
**full** [5] - 4205:17, 4330:1, 4330:3, 4360:21, 4410:17
**fun** [1] - 4385:11
**fund** [74] - 4207:24, 4207:25, 4208:1, 4208:9, 4208:10, 4209:7, 4209:21, 4212:24, 4212:25, 4215:18, 4215:19, 4215:20, 4216:9, 4219:15, 4219:24, 4222:13, 4222:22, 4223:3, 4224:10, 4224:14, 4224:20, 4224:24, 4225:17, 4225:19, 4228:15, 4229:1, 4229:2, 4229:3, 4229:4, 4229:8, 4234:21, 4297:10, 4297:20, 4297:22, 4302:2, 4325:13, 4327:19, 4330:16, 4331:10, 4366:11, 4366:15, 4366:16, 4366:19, 4366:20, 4366:25, 4367:4, 4367:20, 4367:21, 4368:5, 4368:11, 4368:14, 4368:16, 4368:17, 4368:22, 4369:4, 4370:19, 4370:21, 4370:24, 4370:25, 4371:8, 4371:17, 4375:19, 4375:20, 4415:1, 4415:2, 4415:20, 4416:7, 4417:2, 4417:3, 4417:5, 4417:7, 4417:10, 4417:13
**Fund** [5] - 4208:12, 4366:18, 4367:18, 4368:2, 4369:1
**fund's** [1] - 4224:24
**fundamentally** [1] - 4339:8
**funding** [1] - 4256:18
**fundraiser** [1] - 4297:3
**funds** [20] - 4175:1, 4176:12, 4177:3, 4177:5, 4178:7, 4178:23, 4185:2, 4185:12, 4185:13, 4208:25, 4215:9, 4215:10, 4215:16, 4222:10, 4237:17, 4238:10, 4245:11, 4293:12, 4299:13, 4417:19
**furtherance** [2] - 4235:23, 4249:1
**future** [8] - 4166:20, 4248:12, 4278:13, 4278:16, 4278:17, 4282:6, 4292:4,

4357:23

# G

**G-2** [2] - 4214:15, 4214:17
**gain** [1] - 4397:16
**gains** [1] - 4409:9
**Galleon** [30] - 4208:6, 4208:7, 4208:8, 4208:9, 4208:19, 4208:22, 4209:13, 4211:4, 4212:7, 4212:20, 4212:21, 4212:22, 4213:7, 4213:16, 4213:22, 4217:5, 4217:10, 4217:12, 4224:12, 4237:16, 4237:18, 4298:5, 4298:8, 4298:9, 4301:1, 4307:5, 4307:7, 4311:3, 4315:11
**Galleon's** [1] - 4208:23
**gamble** [2] - 4415:23, 4415:24
**Gamble** [13] - 4208:16, 4210:5, 4211:10, 4307:15, 4307:16, 4309:3, 4311:25, 4312:2, 4312:4, 4312:6, 4312:12, 4312:17
**game** [2] - 4342:12, 4395:8
**Garreco** [15] - 4232:9, 4238:23, 4243:21, 4243:22, 4243:23, 4244:5, 4244:19, 4244:21, 4341:10, 4341:12, 4341:23, 4343:9, 4343:25, 4347:19, 4351:20
**Gateway** [40] - 4151:1, 4158:11, 4158:12, 4164:15, 4164:19, 4164:21, 4166:10, 4167:5, 4167:8, 4193:11, 4246:1, 4246:3, 4246:5, 4246:16, 4255:5, 4260:8, 4260:11, 4261:1, 4261:3, 4261:13, 4261:19, 4262:19, 4262:21, 4264:16, 4274:23, 4275:13, 4276:12, 4279:12, 4280:17, 4280:18, 4280:20, 4280:21, 4281:16, 4281:19, 4283:6, 4284:12, 4290:14, 4300:11, 4348:17, 4359:16
**general** [4] - 4190:14, 4204:4, 4235:1, 4298:2
**General** [1] - 4208:18
**generalities** [1] - 4204:6
**generally** [11] - 4153:15, 4155:22, 4164:5, 4166:1, 4185:14, 4190:16, 4200:20, 4221:17, 4234:20, 4235:15, 4277:18
**generated** [1] - 4244:15
**gentleman** [1] - 4223:10
**gentlemen** [1] - 4443:18
**George** [7] - 4237:10, 4238:12, 4238:13, 4367:2, 4377:11, 4377:12, 4415:2
**Geragos** [8] - 4256:8, 4256:9, 4256:17, 4259:4, 4259:6, 4259:12, 4259:18, 4259:25
**get-go** [1] - 4269:16
**gift** [2] - 4382:15, 4423:21
**gifted** [1] - 4422:6
**given** [5] - 4210:4, 4211:6, 4211:22, 4228:23, 4432:5
**GMail** [2] - 4441:13, 4441:15
**Goldman** [1] - 4211:11
**gossip** [1] - 4236:1

**govern** [1] - 4152:20
**governing** [1] - 4150:7
**government** [3] - 4294:20, 4409:20, 4420:23
**Government** [173] - 4148:14, 4149:21, 4149:22, 4150:20, 4150:25, 4151:5, 4151:9, 4151:13, 4151:17, 4151:21, 4152:12, 4153:4, 4153:9, 4153:15, 4154:22, 4156:10, 4156:11, 4157:12, 4157:17, 4158:3, 4158:17, 4158:23, 4159:1, 4159:7, 4159:8, 4160:12, 4160:14, 4160:24, 4166:7, 4172:11, 4173:24, 4178:2, 4181:1, 4187:24, 4188:22, 4188:23, 4189:15, 4191:4, 4194:22, 4195:7, 4197:5, 4197:8, 4197:11, 4197:14, 4197:18, 4198:13, 4198:14, 4198:15, 4198:18, 4199:2, 4199:10, 4200:16, 4204:21, 4205:11, 4205:14, 4211:21, 4218:7, 4218:15, 4218:16, 4219:2, 4219:4, 4234:17, 4238:25, 4239:5, 4239:12, 4239:19, 4240:4, 4240:7, 4241:21, 4242:6, 4242:8, 4244:23, 4251:11, 4257:6, 4257:9, 4261:16, 4261:22, 4262:1, 4266:16, 4266:23, 4276:5, 4277:3, 4277:21, 4277:23, 4277:25, 4279:25, 4281:24, 4282:10, 4283:19, 4287:9, 4287:18, 4287:21, 4287:22, 4289:13, 4289:23, 4289:24, 4290:2, 4290:5, 4292:7, 4294:13, 4294:25, 4295:3, 4295:10, 4295:11, 4295:13, 4295:15, 4296:6, 4296:10, 4316:7, 4316:18, 4317:18, 4318:3, 4320:21, 4326:18, 4328:6, 4328:10, 4360:1, 4360:12, 4360:14, 4360:18, 4372:2, 4372:11, 4372:12, 4372:15, 4372:17, 4374:6, 4374:9, 4376:16, 4377:4, 4377:5, 4378:14, 4378:22, 4378:23, 4380:1, 4380:8, 4380:9, 4381:19, 4381:20, 4382:1, 4383:15, 4384:19, 4384:24, 4386:16, 4387:3, 4387:4, 4387:13, 4387:16, 4388:21, 4392:2, 4396:9, 4398:14, 4398:23, 4398:24, 4399:2, 4407:18, 4408:5, 4408:12, 4408:22, 4409:12, 4409:16, 4425:2, 4426:3, 4426:4, 4437:13, 4441:3, 4441:5, 4443:3
**Government's** [2] - 4205:10, 4358:10
**governs** [1] - 4168:25
**GP** [1] - 4367:12
**graduate** [2] - 4206:19, 4361:13
**graduated** [2] - 4206:21, 4361:15
**granted** [2] - 4197:16, 4204:14
**great** [4] - 4229:6, 4333:13, 4368:21, 4382:21
**Greebel** [12] - 4261:8, 4264:5, 4280:6, 4280:7, 4285:9, 4285:10, 4292:12, 4359:6, 4359:8, 4398:4, 4398:7
**Greebel's** [3] - 4249:17, 4281:4, 4281:15
**Greeble** [2] - 4280:12, 4280:22
**Green** [1] - 4232:6

**green** [9] - 4188:13, 4188:16, 4188:20, 4189:3, 4189:4, 4189:9, 4197:23, 4200:13
**ground** [4] - 4333:19, 4336:3
**grounds** [1] - 4257:19
**Group** [9] - 4208:6, 4208:8, 4208:9, 4208:19, 4209:13, 4211:12, 4212:20, 4237:16, 4301:2
**group** [15] - 4153:8, 4153:12, 4153:22, 4153:25, 4173:8, 4213:1, 4260:16, 4261:1, 4261:2, 4264:9, 4265:4, 4284:16, 4291:24, 4359:10, 4359:13
**grow** [1] - 4300:3
**growing** [1] - 4292:19
**grown** [2] - 4209:1, 4209:4
**guarantees** [2] - 4415:21, 4415:25
**guard** [1] - 4407:11
**Guess** [1] - 4396:23
**guess** [19] - 4202:17, 4223:18, 4237:23, 4245:12, 4280:11, 4284:1, 4314:1, 4316:20, 4329:13, 4338:24, 4339:11, 4344:14, 4344:16, 4344:20, 4344:24, 4347:11, 4425:13, 4444:7, 4444:10
**guessing** [2] - 4237:25, 4344:23
**guilt** [1] - 4251:12
**guilty** [1] - 4266:19
**Gupta** [4] - 4211:7, 4211:9, 4211:10, 4211:19
**guy** [9] - 4215:20, 4223:8, 4223:9, 4237:16, 4261:5, 4283:11, 4310:20, 4362:10, 4439:7
**guys** [9] - 4203:20, 4216:22, 4232:20, 4260:2, 4282:16, 4323:20, 4358:13, 4394:13, 4431:19
**gypsum** [3] - 4243:23, 4244:6, 4341:15

# H

**half** [11] - 4166:12, 4206:13, 4219:5, 4224:16, 4305:6, 4305:8, 4310:17, 4323:16, 4335:9, 4379:2, 4380:20
**hallucinogen** [1] - 4439:17
**hammer** [1] - 4258:6
**hand** [4] - 4188:11, 4202:11, 4220:15, 4241:24
**handed** [1] - 4297:9
**handled** [1] - 4303:9
**handling** [1] - 4412:7
**handwriting** [1] - 4159:15
**Hanover** [1] - 4440:14
**happy** [9] - 4253:5, 4267:17, 4268:1, 4268:6, 4305:22, 4370:8, 4374:20, 4382:13, 4425:7
**Happy** [1] - 4398:13
**hard** [9] - 4228:14, 4267:6, 4297:21, 4299:14, 4301:25, 4345:19, 4345:22, 4352:18, 4381:13
**harder** [1] - 4429:15
**harkening** [1] - 4333:16
**Hassan** [5] - 4330:17, 4330:19, 4330:20, 4330:21, 4384:3

**head** [2] - 4211:11, 4237:17
**headache** [10] - 4389:19, 4389:25, 4390:6, 4402:1, 4402:5, 4402:16, 4427:20, 4431:4, 4439:2, 4439:18
**headaches** [37] - 4403:3, 4403:15, 4427:25, 4428:18, 4428:22, 4429:2, 4429:8, 4429:23, 4430:4, 4430:5, 4430:7, 4430:9, 4430:11, 4430:12, 4430:16, 4430:21, 4434:6, 4434:10, 4434:12, 4435:9, 4436:7, 4436:12, 4436:18, 4436:21, 4436:24, 4437:7, 4439:5, 4439:14, 4440:8, 4440:9, 4440:11, 4440:21, 4440:22, 4441:6, 4441:21, 4441:24, 4442:2
**Headaches** [1] - 4439:23
**header** [1] - 4394:3
**heads** [1] - 4271:14
**health** [2] - 4232:4, 4232:5
**Health** [2] - 4240:21, 4241:17
**healthcare** [25] - 4208:10, 4215:19, 4224:20, 4331:7, 4363:2, 4363:6, 4363:18, 4364:1, 4364:2, 4364:18, 4364:19, 4364:21, 4365:17, 4365:18, 4366:9, 4366:21, 4371:1, 4412:1, 4412:10, 4412:13, 4412:15, 4412:17, 4413:17, 4414:17
**Healthcare** [14] - 4176:11, 4179:3, 4179:9, 4180:21, 4180:22, 4183:8, 4185:23, 4187:10, 4218:23, 4219:11, 4219:14, 4220:20, 4224:22
**Healthcare's** [1] - 4179:6
**healthy** [1] - 4398:13
**hear** [8] - 4214:11, 4222:9, 4223:11, 4223:18, 4234:17, 4329:1, 4333:6
**heard** [12] - 4170:9, 4171:18, 4222:11, 4235:9, 4268:19, 4326:10, 4329:3, 4329:4, 4329:8, 4335:24, 4336:23, 4417:10
**hearing** [3] - 4257:9, 4285:15, 4339:20
**hearsay** [24] - 4232:25, 4234:5, 4234:11, 4234:12, 4234:14, 4235:23, 4236:1, 4247:5, 4250:11, 4250:14, 4250:15, 4250:17, 4251:13, 4251:14, 4332:19, 4332:25, 4333:21, 4334:1, 4334:25, 4335:20, 4336:4, 4337:16, 4424:12, 4425:3
**heavily** [2] - 4190:23, 4191:23
**heavily-traded** [1] - 4190:23
**Heber** [3] - 4232:8, 4244:11, 4341:15
**hedge** [27] - 4207:24, 4207:25, 4208:1, 4208:9, 4208:25, 4212:25, 4219:15, 4222:10, 4222:13, 4222:22, 4223:3, 4224:10, 4229:8, 4237:17, 4238:10, 4297:10, 4366:11, 4366:15, 4366:16, 4370:19, 4375:19, 4375:20, 4415:1, 4415:2, 4415:20, 4416:7, 4417:19
**held** [12] - 4178:21, 4179:4, 4179:9, 4179:12, 4179:19, 4179:22, 4207:6, 4276:1, 4276:2, 4276:24, 4316:19, 4321:2
**Hello** [1] - 4296:14

**hello** [1] - 4296:16
**help** [9] - 4278:21, 4282:8, 4292:2, 4343:1, 4348:23, 4357:24, 4394:13, 4394:21, 4395:22
**helped** [1] - 4238:13
**helpful** [3] - 4254:2, 4268:6, 4394:20
**helping** [1] - 4394:18
**hereby** [4] - 4150:24, 4186:17, 4263:2, 4263:3
**herein** [2] - 4219:25, 4240:24
**hi** [2] - 4205:25, 4386:2
**high** [3] - 4192:5, 4194:7, 4244:6
**higher** [2] - 4213:4, 4375:22
**highest** [3] - 4192:3, 4206:14, 4361:9
**Highland** [1] - 4362:16
**highlighted** [1] - 4197:23
**highlighting** [1] - 4306:2
**highly** [3] - 4266:20, 4272:7, 4337:16
**himself** [2] - 4256:9, 4256:10
**hired** [7] - 4207:17, 4208:6, 4215:20, 4238:4, 4238:11, 4405:12, 4430:8
**hiring** [1] - 4215:6
**historical** [1] - 4156:20
**history** [4] - 4212:19, 4217:9, 4366:4, 4402:13
**hit** [4] - 4353:15, 4372:24, 4374:14, 4444:4
**Hit** [1] - 4271:11
**hold** [5] - 4167:18, 4169:6, 4348:14, 4397:2, 4397:3
**holder** [2] - 4185:9, 4280:15
**holding** [3] - 4278:11, 4278:13, 4316:18
**holdings** [1] - 4278:10
**holds** [1] - 4302:13
**Holiday** [1] - 4284:5
**holidays** [1] - 4284:10
**home** [4] - 4238:23, 4295:6, 4396:16, 4397:6
**homeless** [1] - 4302:15
**honest** [2] - 4212:7, 4333:12
**Honestly** [1] - 4354:25
**Honor** [87] - 4149:4, 4149:8, 4149:22, 4150:15, 4152:1, 4156:10, 4157:17, 4157:21, 4157:22, 4157:25, 4158:2, 4158:6, 4159:9, 4161:1, 4167:3, 4191:19, 4192:10, 4192:12, 4192:22, 4194:17, 4194:20, 4200:8, 4200:21, 4200:23, 4203:16, 4204:23, 4205:5, 4205:8, 4205:11, 4218:15, 4226:3, 4233:9, 4234:11, 4239:24, 4250:3, 4261:22, 4267:1, 4267:12, 4268:7, 4272:16, 4273:21, 4277:20, 4287:18, 4289:23, 4295:10, 4305:14, 4313:10, 4316:8, 4320:17, 4324:17, 4325:6, 4325:10, 4329:22, 4331:15, 4331:18, 4332:16, 4334:9, 4344:21, 4346:13, 4348:1, 4351:17, 4353:13, 4354:6, 4359:22, 4360:7, 4360:14, 4372:11, 4377:4, 4378:22, 4380:8, 4381:19, 4387:3, 4398:23, 4410:22, 4410:23, 4418:16, 4422:25, 4424:12, 4425:1,

4434:25, 4435:17, 4437:14, 4438:4, 4438:6, 4442:5, 4442:9, 4443:13
**honor** [1] - 4292:18
**Honor..** [1] - 4267:11
**HONORABLE** [1] - 4148:11
**hope** [2] - 4302:14, 4385:10
**hopefully** [3] - 4268:19, 4269:11, 4374:2
**hoping** [5] - 4242:20, 4384:1, 4405:23
**hour** [3] - 4271:18, 4271:19, 4271:21
**hours** [4] - 4155:8, 4155:10, 4221:17, 4323:17
**house** [7] - 4322:16, 4406:3, 4406:4, 4407:17, 4409:1, 4421:11, 4430:15
**huge** [3] - 4167:21, 4302:17, 4392:12
**huge..** [1] - 4392:19
**hugs** [1] - 4334:11
**hum** [5] - 4242:1, 4242:18, 4316:25, 4317:5, 4318:1
**husband** [8] - 4296:18, 4300:17, 4300:21, 4300:23, 4301:24, 4302:12, 4302:19, 4302:23
**husband's** [2] - 4301:21, 4302:16
**hyperbole** [1] - 4266:9
**hypothesizing** [1] - 4356:4
**hypothetical** [1] - 4204:8
**hypotheticals** [1] - 4204:7

---

**I**

**idea** [16] - 4229:6, 4244:17, 4256:24, 4268:17, 4273:6, 4279:3, 4288:16, 4288:21, 4297:12, 4324:10, 4329:6, 4365:10, 4383:7, 4419:3, 4425:5, 4438:17
**ideas** [1] - 4292:25
**identification** [19] - 4157:11, 4158:16, 4160:13, 4218:7, 4239:1, 4261:16, 4276:5, 4277:3, 4287:9, 4289:13, 4295:1, 4372:2, 4376:16, 4379:25, 4381:8, 4398:15, 4422:10, 4437:12, 4437:25
**identified** [2] - 4217:25, 4441:8
**identify** [2] - 4173:18, 4217:21
**ignored** [1] - 4442:21
**IM** [1] - 4364:13
**immaterial** [1] - 4229:4
**immediately** [2] - 4299:10, 4323:19
**Immediately** [2] - 4179:3, 4179:18
**immoral** [1] - 4235:7
**impending** [2] - 4312:7, 4312:18
**implication** [1] - 4334:12
**implore** [1] - 4302:19
**importance** [2] - 4333:17
**important** [7] - 4165:25, 4193:20, 4194:14, 4236:7, 4292:3, 4323:4, 4333:18
**importantly** [2] - 4348:5, 4382:17
**impossible** [1] - 4290:24
**impressed** [5] - 4217:11, 4413:14, 4413:17, 4414:22, 4415:7

**impressive** [1] - 4414:10
**inappropriate** [3] - 4266:20, 4335:21, 4337:17
**Inc** [9] - 4151:2, 4151:6, 4151:10, 4151:14, 4151:18, 4182:3, 4188:1, 4191:7, 4240:25
**Inc.** [1] - 4240:22
**incentive** [1] - 4368:1
**incentivize** [1] - 4352:18
**include** [4] - 4188:16, 4224:11, 4409:12, 4409:15
**includes** [1] - 4159:22
**including** [9] - 4156:20, 4159:23, 4185:22, 4187:9, 4249:8, 4282:2, 4326:20, 4351:24, 4384:2
**Including** [1] - 4355:4
**income** [4] - 4397:13, 4397:14, 4409:8, 4410:7
**inconsistent** [1] - 4425:4
**Incorporated** [1] - 4241:19
**increase** [2] - 4192:2, 4353:10
**increasing** [2] - 4282:7, 4357:23
**incredibly** [2] - 4244:15, 4330:15
**Incremental** [8] - 4212:23, 4213:11, 4213:13, 4213:14, 4213:19, 4213:20, 4213:23, 4301:2
**independent** [1] - 4214:16
**INDEX** [1] - 4445:1
**indicate** [1] - 4171:15
**indication** [1] - 4436:16
**indicator** [1] - 4190:5
**indictment** [2] - 4248:16, 4248:19
**indirectly** [2] - 4171:13, 4171:22
**individual** [8] - 4180:24, 4181:10, 4187:12, 4188:19, 4194:5, 4199:8, 4199:17, 4200:3
**individually** [2] - 4180:23, 4278:19
**individuals** [15] - 4172:17, 4172:21, 4174:13, 4194:9, 4197:15, 4197:23, 4199:9, 4249:8, 4257:1, 4261:12, 4279:10, 4279:11, 4282:2, 4290:9, 4290:13
**indulge** [1] - 4410:25
**Industry** [1] - 4152:8
**industry** [8] - 4150:8, 4152:11, 4154:13, 4156:19, 4170:11, 4411:23, 4413:4, 4413:17
**influence** [1] - 4249:7
**inform** [2] - 4284:6, 4302:13
**information** [50] - 4156:19, 4159:23, 4166:1, 4166:3, 4166:5, 4170:24, 4171:6, 4202:13, 4210:1, 4210:4, 4210:21, 4210:25, 4211:7, 4211:13, 4252:6, 4284:21, 4285:16, 4290:21, 4290:23, 4291:1, 4306:22, 4307:19, 4307:22, 4307:23, 4307:25, 4308:4, 4309:19, 4311:21, 4311:24, 4321:10, 4321:12, 4321:14, 4322:3, 4332:19, 4337:12, 4338:25, 4365:20, 4365:22, 4367:20, 4394:19, 4408:12, 4409:3, 4436:10, 4436:20, 4436:24, 4437:1,

4437:6, 4439:5, 4441:5, 4441:10
**informed** [2] - 4299:8, 4300:19
**infrequently** [1] - 4237:11
**infuriating** [2] - 4288:14, 4302:16
**inherited** [1] - 4282:23
**initial** [10] - 4159:18, 4185:10, 4215:4, 4217:6, 4217:15, 4218:1, 4302:5, 4364:10, 4375:8, 4407:17
**initials** [1] - 4159:17
**initiate** [1] - 4302:11
**injurious** [1] - 4286:24
**inn** [2] - 4367:3, 4371:25
**innuendo** [7] - 4332:12, 4332:13, 4334:4, 4334:8, 4334:9, 4336:3, 4336:25
**inside** [11] - 4290:21, 4290:23, 4307:19, 4307:25, 4308:3, 4309:19, 4311:21, 4319:3, 4321:10, 4321:12, 4322:3
**insider** [24] - 4170:18, 4211:3, 4213:16, 4264:12, 4264:13, 4265:6, 4266:13, 4266:20, 4268:12, 4268:24, 4269:6, 4269:8, 4269:11, 4271:3, 4271:6, 4306:25, 4307:2, 4314:25, 4321:13, 4353:11, 4354:13, 4354:20, 4355:15, 4356:18
**installments** [1] - 4242:23
**instances** [1] - 4189:17
**instead** [5] - 4292:23, 4297:16, 4300:25, 4390:10, 4432:6
**institutions** [1] - 4207:10
**instruct** [4] - 4150:2, 4150:12, 4227:16, 4271:2
**instructed** [1] - 4354:21
**instructing** [1] - 4269:9
**instruction** [6] - 4149:10, 4268:14, 4268:23, 4269:2, 4269:7, 4270:1
**instructions** [2] - 4372:24, 4382:22
**insufficient** [1] - 4278:20
**integrity** [1] - 4152:25
**intend** [1] - 4195:15
**intended** [1] - 4420:10
**intent** [1] - 4397:3
**intention** [2] - 4395:24, 4402:1
**interacted** [1] - 4430:1
**interaction** [2] - 4429:17, 4430:2
**interest** [5] - 4161:11, 4185:18, 4302:21, 4302:22, 4377:18
**interested** [1] - 4365:20
**interests** [1] - 4291:11
**interface** [4] - 4434:4, 4434:17, 4435:8, 4442:11
**interim** [1] - 4224:7
**intimacy** [2] - 4338:22, 4338:24
**intimate** [7] - 4332:7, 4334:6, 4334:15, 4334:19, 4336:2, 4337:19, 4338:21
**intimation** [1] - 4337:23
**introduced** [4] - 4214:9, 4412:20, 4432:11, 4436:1
**introducing** [2] - 4358:18, 4405:10
**invest** [14] - 4297:11, 4347:18, 4366:24, 4367:6, 4367:8, 4367:13, 4368:4,

4371:2, 4371:9, 4371:14, 4379:12, 4414:23, 4415:20
**invested** [9] - 4303:18, 4366:20, 4367:10, 4367:24, 4375:16, 4375:25, 4412:10, 4416:21, 4418:10
**investigations** [2] - 4153:10, 4153:14
**investing** [3] - 4171:17, 4364:21, 4365:9
**investment** [54] - 4224:23, 4244:22, 4259:6, 4297:12, 4297:15, 4297:16, 4341:20, 4343:5, 4345:4, 4362:1, 4362:7, 4362:10, 4362:23, 4363:2, 4363:5, 4364:18, 4367:4, 4367:5, 4367:13, 4368:9, 4368:22, 4368:23, 4369:22, 4369:25, 4370:5, 4370:10, 4370:16, 4371:1, 4371:14, 4371:16, 4371:17, 4372:8, 4373:20, 4374:19, 4375:8, 4375:19, 4382:19, 4382:25, 4383:1, 4385:18, 4393:6, 4394:19, 4394:24, 4395:5, 4395:20, 4396:6, 4397:17, 4403:1, 4407:12, 4408:2, 4415:4, 4419:6, 4431:12, 4433:1
**Investment** [3] - 4385:16, 4388:9, 4392:16
**investments** [2] - 4292:20, 4367:14
**investor** [16] - 4152:24, 4224:22, 4228:17, 4228:21, 4237:17, 4256:11, 4259:13, 4282:18, 4330:16, 4337:9, 4339:6, 4339:13, 4343:6, 4347:20, 4364:1, 4367:19
**Investors** [1] - 4180:22
**investors** [22] - 4153:5, 4165:25, 4179:12, 4222:3, 4223:2, 4223:5, 4223:8, 4224:8, 4224:21, 4228:18, 4256:17, 4280:23, 4297:20, 4319:21, 4350:4, 4350:6, 4350:14, 4350:23, 4363:19, 4366:22, 4371:6, 4371:7
**investors'** [2] - 4369:5, 4369:19
**involve** [1] - 4387:1
**involved** [21] - 4168:6, 4209:17, 4210:24, 4213:17, 4246:2, 4274:24, 4288:18, 4310:21, 4310:23, 4310:24, 4312:13, 4318:7, 4318:16, 4331:10, 4341:13, 4350:6, 4353:9, 4362:23, 4362:24, 4429:25, 4434:20
**involvement** [2] - 4259:12, 4379:22
**involves** [1] - 4153:15
**involving** [2] - 4153:10, 4166:18
**IPO** [3] - 4303:18, 4319:18
**IPOs** [1] - 4207:9
**irrelevant** [3] - 4234:15, 4333:23, 4337:17
**irresponsible** [1] - 4267:8
**isolate** [1] - 4188:19
**Isotope** [3] - 4215:19, 4215:20, 4238:17
**issuance** [2] - 4185:9, 4185:10, 4399:23
**issue** [5] - 4168:5, 4203:1, 4280:20, 4280:21, 4431:4
**issued** [14] - 4166:17, 4167:16, 4168:4, 4183:25, 4184:24, 4186:7, 4186:10, 4186:12, 4186:24, 4382:20, 4431:8, 4431:11, 4431:15, 4431:17

**issuer** [7] - 4180:6, 4180:11, 4185:7, 4185:19, 4186:9, 4186:16, 4186:19
**issuer's** [2] - 4186:5, 4186:8
**issues** [1] - 4149:2
**Italian** [1] - 4216:11
**item** [6] - 4174:24, 4175:1, 4175:8, 4178:6, 4183:22, 4278:20
**Item** [32] - 4176:2, 4176:6, 4176:9, 4176:12, 4176:15, 4176:18, 4176:21, 4176:25, 4177:3, 4177:7, 4177:10, 4177:16, 4177:23, 4178:6, 4180:4, 4182:14, 4182:17, 4182:21, 4183:6, 4183:10, 4183:13, 4183:19, 4184:3, 4184:6, 4184:9, 4184:15, 4184:18, 4185:1, 4185:17, 4186:14, 4186:17
**iterations** [1] - 4221:1
**itself** [3] - 4382:5, 4389:8, 4394:6
**Izerne** [4] - 4278:5, 4279:11, 4283:23

## J

**Jackie** [1] - 4339:12
**Jackson** [3] - 4237:13, 4239:6, 4242:14
**Jackson's** [1] - 4284:6
**JACOB** [1] - 4148:22
**JACQUELYN** [1] - 4148:16
**jammed** [2] - 4385:22, 4393:15
**jams** [1] - 4209:18
**Jan** [1] - 4296:5
**January** [14] - 4165:11, 4186:11, 4284:8, 4296:9, 4326:14, 4326:21, 4327:13, 4374:14, 4376:4, 4376:12, 4377:15, 4404:5, 4404:6, 4404:18
**jellies** [1] - 4209:18
**Jersey** [3] - 4206:9, 4214:10, 4294:3
**jewelry** [2] - 4299:9, 4349:4
**job** [13] - 4202:18, 4207:2, 4207:15, 4215:5, 4218:2, 4230:23, 4274:10, 4301:24, 4302:20, 4355:13, 4356:19, 4441:20, 4442:20
**joined** [1] - 4154:6
**joining** [1] - 4371:8
**joke** [1] - 4405:23
**journals** [1] - 4441:22
**Joy** [1] - 4300:14
**JP** [1] - 4382:23
**Judge** [14] - 4149:1, 4149:5, 4227:21, 4246:9, 4258:13, 4270:3, 4271:18, 4272:3, 4272:15, 4272:19, 4272:21, 4273:5, 4333:4, 4334:14
**JUDGE** [1] - 4148:12
**judgment** [3] - 4396:4, 4434:14, 4434:15
**july** [1] - 4230:22
**July** [4] - 4148:7, 4230:23, 4440:2, 4444:17
**jump** [2] - 4442:17, 4442:19
**June** [2] - 4151:23, 4308:21
**junior** [1] - 4209:8
**Jurors** [1] - 4353:19
**JURORS** [1] - 4253:12

**jurors** [12] - 4149:18, 4149:19, 4150:3, 4192:14, 4252:18, 4253:6, 4253:16, 4274:17, 4357:2, 4410:24, 4411:10, 4444:4
**jury** [52] - 4150:17, 4150:21, 4154:9, 4156:13, 4157:2, 4161:23, 4172:9, 4172:14, 4173:4, 4179:2, 4179:17, 4181:3, 4186:2, 4186:21, 4188:6, 4191:6, 4191:10, 4197:22, 4227:17, 4228:3, 4234:7, 4237:2, 4243:22, 4250:22, 4251:12, 4253:9, 4262:2, 4266:12, 4266:19, 4266:24, 4268:11, 4268:22, 4269:9, 4271:2, 4273:19, 4273:23, 4310:23, 4316:15, 4319:11, 4319:14, 4323:8, 4328:7, 4344:18, 4354:21, 4354:22, 4357:1, 4399:4, 4411:5, 4411:9, 4443:9, 4443:18
**JURY** [1] - 4148:12
**Jury** [8] - 4192:17, 4192:20, 4254:5, 4271:20, 4274:16, 4353:15, 4353:20, 4443:23
**jury's** [1] - 4269:3
**Justice** [1] - 4212:4

## K

**KAPLAN** [1] - 4148:22
**KARTHIK** [1] - 4148:17
**KASULIS** [47] - 4148:16, 4149:4, 4149:7, 4149:11, 4149:15, 4149:22, 4150:15, 4150:19, 4152:1, 4152:4, 4157:17, 4157:24, 4158:6, 4158:23, 4159:4, 4160:24, 4164:8, 4166:23, 4167:3, 4176:1, 4182:13, 4192:10, 4192:12, 4194:17, 4200:8, 4200:21, 4200:24, 4202:8, 4202:22, 4203:2, 4203:8, 4203:24, 4204:22, 4205:5, 4250:2, 4270:2, 4272:16, 4272:19, 4273:21, 4328:12, 4334:23, 4338:4, 4339:23, 4355:14, 4400:16, 4444:9, 4445:4
**Katten** [2] - 4303:10, 4359:9
**keep** [18] - 4168:3, 4169:1, 4169:2, 4169:5, 4266:17, 4266:23, 4267:16, 4268:19, 4269:17, 4269:19, 4269:24, 4271:15, 4293:11, 4347:20, 4356:18, 4376:5, 4420:4, 4443:9
**kept** [3] - 4339:2, 4352:8, 4352:12
**Kessler** [1] - 4331:1
**Kevin** [18] - 4172:23, 4188:17, 4197:24, 4214:24, 4215:1, 4216:6, 4216:19, 4216:20, 4218:3, 4220:16, 4220:17, 4220:21, 4221:6, 4221:10, 4235:19, 4237:8, 4290:10
**kevin** [1] - 4215:2
**key** [1] - 4338:22
**kidding** [1] - 4273:2
**kids** [4] - 4384:7, 4384:10, 4384:11, 4384:12
**kind** [51] - 4166:1, 4194:7, 4211:7, 4214:4, 4214:15, 4214:23, 4215:2, 4215:8, 4216:21, 4222:4, 4222:5,

4232:3, 4232:10, 4235:1, 4242:22, 4249:21, 4251:24, 4251:25, 4255:13, 4255:14, 4255:21, 4256:1, 4256:23, 4256:24, 4258:12, 4259:20, 4261:4, 4262:6, 4264:21, 4267:13, 4268:2, 4268:4, 4268:6, 4269:13, 4269:22, 4297:21, 4303:17, 4303:21, 4331:6, 4349:25, 4375:1, 4388:10, 4390:2, 4394:2, 4396:8, 4404:12, 4404:22, 4407:22, 4408:14, 4408:17
**kinds** [3] - 4207:21, 4207:22, 4319:18
**kits** [1] - 4439:2
**KIYO** [1] - 4148:11
**knee** [1] - 4211:5
**know..** [1] - 4258:12
**knowing** [1] - 4324:6
**knowledge** [22] - 4150:9, 4189:12, 4195:5, 4196:2, 4204:9, 4226:2, 4234:19, 4246:23, 4333:21, 4335:25, 4336:5, 4336:6, 4336:11, 4337:19, 4337:23, 4338:3, 4338:4, 4338:5, 4356:14, 4356:16, 4413:17, 4416:9
**knowledgeable** [1] - 4363:24
**known** [5] - 4158:12, 4312:7, 4330:18, 4371:5, 4402:9
**knows** [9] - 4202:12, 4245:15, 4250:14, 4332:2, 4332:23, 4333:1, 4339:20, 4356:12, 4414:17
**Kramer** [1] - 4366:6
**Kristen** [4] - 4282:24, 4295:23, 4296:15, 4296:16
**Kristin** [1] - 4295:24
**ktpierotti@aol** [1] - 4282:21

## L

**lab** [1] - 4244:3
**labeled** [4] - 4155:14, 4159:6, 4159:7
**labs** [2] - 4235:3, 4244:7
**lack** [1] - 4302:4
**Ladies** [1] - 4443:18
**laid** [1] - 4415:18
**land** [1] - 4252:10
**landlord** [3] - 4235:8, 4235:10, 4235:11
**language** [2] - 4196:12, 4268:8
**large** [5] - 4170:3, 4207:22, 4209:22, 4225:3, 4433:6
**larger** [1] - 4224:19
**largest** [1] - 4228:18
**Larry** [1] - 4390:8
**Larynx** [5] - 4362:18, 4365:16, 4365:22, 4365:24, 4365:25
**last** [20] - 4157:5, 4187:6, 4189:9, 4202:5, 4207:6, 4266:24, 4268:12, 4272:8, 4273:12, 4278:15, 4296:16, 4301:13, 4301:20, 4302:9, 4305:9, 4366:23, 4381:4, 4391:2, 4401:18, 4433:6
**late** [7] - 4209:7, 4232:10, 4232:14, 4241:2, 4259:20, 4342:12
**laughing** [1] - 4216:18
**laughter** [1] - 4355:3

**launching** [1] - 4272:6
**Laurence** [6] - 4343:3, 4343:4, 4343:11, 4343:19, 4344:13, 4344:25
**law** [5] - 4150:13, 4154:11, 4273:9, 4274:10, 4303:9
**laws** [4] - 4150:8, 4153:6, 4154:5, 4168:17
**lawsuit** [2] - 4300:21, 4304:17
**lawyer** [4] - 4285:9, 4316:3, 4316:4, 4316:5, 4316:10, 4316:11, 4316:13, 4316:19
**lawyers** [5] - 4274:3, 4301:22, 4305:20, 4356:23
**lay** [2] - 4250:25, 4251:7
**layer** [3] - 4250:14, 4250:15, 4250:16
**layers** [1] - 4250:11
**laying** [1] - 4240:16
**lead** [3] - 4268:2, 4338:7, 4339:21
**leading** [4] - 4267:18, 4268:5, 4268:17, 4269:24
**lean** [1] - 4235:7
**learn** [4] - 4246:19, 4262:13, 4262:15, 4327:23
**learned** [1] - 4370:19
**learning** [1] - 4328:24
**lease** [2] - 4235:11, 4361:16
**leasing** [1] - 4206:22
**least** [13] - 4228:17, 4253:5, 4268:10, 4288:12, 4337:8, 4339:7, 4395:3, 4395:4, 4395:18, 4413:24, 4415:4, 4439:1, 4440:11
**leave** [12] - 4207:12, 4208:21, 4209:11, 4213:13, 4216:22, 4248:3, 4248:5, 4248:6, 4297:17, 4302:21, 4442:14, 4444:7
**leaves** [1] - 4205:9
**leaving** [1] - 4261:10
**LEE** [1] - 4360:23
**Lee** [6] - 4360:15, 4360:23, 4379:6, 4382:24, 4388:4, 4397:5
**Leerink** [17] - 4362:5, 4362:6, 4362:7, 4362:9, 4362:11, 4362:12, 4362:14, 4362:15, 4362:19, 4362:20, 4362:22, 4364:5, 4364:17, 4394:16, 4394:17, 4412:17, 4412:18
**leey@visualofficesolutions.com** [1] - 4379:8
**LeeYaffe45** [1] - 4387:18
**left** [18] - 4188:10, 4188:11, 4189:20, 4191:12, 4212:21, 4213:19, 4213:22, 4216:19, 4216:20, 4248:1, 4248:7, 4253:16, 4253:18, 4269:18, 4362:2, 4362:4, 4362:22, 4384:8
**left-hand** [1] - 4188:11
**legal** [15] - 4150:8, 4168:10, 4180:9, 4266:5, 4266:7, 4267:14, 4269:13, 4273:9, 4296:20, 4300:20, 4303:4, 4305:7, 4375:5, 4416:8, 4416:12
**legally** [1] - 4306:18
**legend** [3] - 4167:21, 4167:23, 4167:24
**legitimize** [1] - 4429:19

**lend** [1] - 4291:20
**lending** [1] - 4291:19
**length** [3] - 4300:18, 4303:19, 4397:19
**lengthy** [2] - 4156:21, 4169:10
**Lenora** [4] - 4237:9, 4279:11, 4283:23
**Leonora** [1] - 4278:5
**less** [10] - 4190:20, 4192:9, 4208:20, 4212:7, 4286:23, 4291:21, 4296:18, 4300:22, 4333:18, 4380:16
**letter** [11] - 4168:8, 4168:9, 4295:5, 4295:17, 4296:3, 4296:11, 4296:17, 4303:1, 4303:3
**letters** [2] - 4290:17, 4314:15
**letting** [1] - 4404:20
**level** [6] - 4194:7, 4206:14, 4251:15, 4251:17, 4286:24, 4361:9
**levels** [1] - 4251:14
**leveraged** [2] - 4369:3, 4369:6
**liabilities** [1] - 4396:25
**liability** [1] - 4219:12
**liasing** [1] - 4350:2
**license** [2] - 4379:18, 4379:21
**lie** [15] - 4409:22, 4421:24, 4423:12, 4425:9, 4425:10, 4425:15, 4425:18, 4427:15, 4427:18, 4427:22, 4427:23, 4428:3, 4428:15, 4434:1, 4434:2
**lied** [5] - 4409:19, 4421:21, 4423:13, 4425:8, 4425:17
**liens** [1] - 4263:10
**lies** [1] - 4443:9
**life** [1] - 4405:21
**lift** [2] - 4168:12, 4297:15
**lifting** [1] - 4168:6
**lighting** [1] - 4388:18
**lights** [1] - 4347:21
**limitation** [1] - 4378:6
**limited** [4] - 4170:7, 4181:20, 4204:15, 4219:12
**Limited** [7] - 4367:10, 4382:19, 4382:20, 4392:10, 4392:15, 4399:24, 4431:11
**limiting** [3] - 4268:14, 4268:23, 4269:2
**Lindsay** [1] - 4223:6
**line** [20] - 4163:2, 4189:1, 4191:16, 4195:14, 4202:5, 4246:24, 4263:19, 4263:22, 4278:6, 4278:8, 4278:20, 4290:16, 4326:24, 4380:14, 4382:9, 4383:18, 4387:20, 4393:13, 4442:8
**lines** [4] - 4191:14, 4202:4, 4267:14, 4269:14
**liquid** [1] - 4374:16
**liquidate** [3] - 4230:6, 4230:13, 4230:18
**liquidated** [4] - 4230:20, 4234:21, 4245:12, 4245:19
**liquidity** [6] - 4265:2, 4265:3, 4286:19, 4286:21, 4354:18, 4380:24
**list** [6] - 4174:13, 4176:19, 4182:7, 4350:13, 4350:23, 4359:13
**listed** [37] - 4169:16, 4172:17, 4172:22, 4174:24, 4175:1, 4175:10, 4176:3, 4176:16, 4176:25, 4177:4, 4177:8,

4177:10, 4177:17, 4177:24, 4180:14, 4180:20, 4182:8, 4182:15, 4182:19, 4182:22, 4183:7, 4183:11, 4183:20, 4184:2, 4184:7, 4184:10, 4184:16, 4184:19, 4185:22, 4187:9, 4188:15, 4189:10, 4192:3, 4192:7, 4279:24, 4293:22
**listen** [8] - 4150:3, 4274:3, 4274:12, 4309:25, 4313:19, 4323:20, 4400:17, 4434:3
**Listen** [1] - 4341:3
**listing** [6] - 4162:7, 4162:11, 4165:12, 4189:25, 4190:8, 4190:11
**lists** [2] - 4185:19, 4278:18
**Litigation** [1] - 4292:14
**litigation** [5] - 4292:15, 4292:17, 4293:5, 4296:7, 4302:11
**live** [7] - 4206:8, 4206:9, 4294:2, 4322:16, 4361:7, 4362:13, 4374:2
**lived** [2] - 4237:11, 4362:15
**lives** [1] - 4214:15
**living** [1] - 4228:16
**LLC** [8] - 4180:21, 4180:22, 4188:18, 4218:24, 4219:11, 4240:21, 4328:14
**loan** [4] - 4423:25, 4424:2, 4424:7, 4424:11
**local** [1] - 4302:13
**locally** [1] - 4211:12
**located** [1] - 4286:5
**locating** [1] - 4246:2
**Lomb** [1] - 4330:14
**long-term** [2] - 4244:7, 4397:4
**Look** [1] - 4350:17
**look** [75] - 4155:14, 4155:15, 4166:13, 4174:10, 4177:16, 4178:5, 4178:12, 4179:16, 4182:17, 4182:21, 4183:9, 4183:19, 4184:5, 4185:1, 4187:3, 4187:6, 4188:24, 4195:5, 4195:21, 4200:16, 4217:18, 4219:20, 4220:18, 4232:3, 4236:2, 4239:12, 4241:22, 4241:24, 4242:10, 4257:16, 4277:2, 4281:3, 4282:9, 4282:14, 4283:22, 4296:3, 4296:6, 4317:17, 4323:21, 4326:19, 4372:25, 4374:7, 4376:11, 4379:5, 4381:14, 4383:15, 4383:17, 4384:19, 4385:20, 4386:4, 4388:10, 4389:8, 4389:16, 4391:1, 4392:2, 4394:3, 4394:5, 4395:6, 4399:16, 4422:14, 4422:20, 4424:4, 4427:6, 4428:8, 4430:18, 4432:13, 4433:6, 4435:21, 4437:20, 4437:25, 4438:10, 4440:21, 4440:23
**looked** [8] - 4196:1, 4232:5, 4232:6, 4237:7, 4374:9, 4384:17, 4384:24, 4393:10
**looking** [26] - 4181:5, 4202:6, 4208:14, 4214:13, 4232:8, 4244:13, 4244:21, 4252:2, 4252:11, 4280:4, 4281:12, 4290:5, 4335:6, 4364:1, 4365:11, 4366:21, 4371:6, 4375:21, 4379:20, 4396:6, 4412:25, 4427:4, 4437:17,

4441:10, 4441:15
**looks** [3] - 4189:17, 4239:7, 4239:11
**loose** [1] - 4386:10
**lose** [2] - 4417:18, 4417:22
**losing** [1] - 4355:13
**loss** [5] - 4220:17, 4369:21, 4369:25, 4370:10, 4370:18
**lost** [8] - 4355:2, 4369:5, 4371:16, 4416:6, 4416:7, 4416:19, 4417:21, 4417:24
**loud** [3] - 4264:22, 4346:16, 4422:14
**love** [7] - 4334:6, 4334:7, 4334:10, 4337:5, 4337:11, 4382:14
**low** [2] - 4286:24, 4287:2
**lower** [4] - 4183:24, 4241:24, 4286:22, 4397:17
**LP** [11] - 4174:25, 4176:11, 4179:19, 4179:23, 4180:21, 4182:16, 4183:8, 4185:23, 4187:10
**LP's** [1] - 4179:20
**lumps** [1] - 4278:19
**lunch** [12] - 4252:22, 4253:5, 4253:11, 4268:15, 4268:20, 4268:21, 4268:22, 4269:20, 4270:1, 4271:14, 4271:15, 4274:21
**Luncheon** [1] - 4271:24
**LY-1** [1] - 4422:10
**lying** [1] - 4422:2
**Lynch** [1] - 4152:18

# M

**ma'am** [2] - 4157:23, 4166:21
**Madison** [6] - 4214:20, 4219:13, 4219:17, 4220:25, 4232:15, 4237:2
**mail** [181] - 4148:24, 4239:5, 4239:6, 4242:10, 4242:12, 4242:19, 4244:23, 4277:5, 4277:7, 4277:11, 4278:3, 4279:10, 4280:1, 4280:4, 4280:6, 4280:23, 4280:25, 4281:3, 4281:4, 4281:8, 4281:11, 4281:13, 4282:1, 4282:4, 4282:14, 4282:20, 4282:22, 4282:23, 4282:25, 4283:1, 4283:10, 4283:22, 4284:2, 4284:5, 4287:10, 4287:24, 4288:24, 4289:1, 4290:6, 4290:9, 4291:4, 4291:23, 4291:24, 4292:7, 4292:10, 4292:11, 4293:18, 4294:14, 4294:15, 4294:21, 4296:7, 4296:8, 4306:3, 4313:5, 4313:7, 4313:15, 4313:18, 4313:21, 4313:24, 4313:25, 4314:3, 4318:20, 4319:7, 4319:22, 4320:6, 4321:5, 4321:10, 4321:11, 4321:13, 4322:7, 4323:2, 4323:19, 4323:22, 4323:25, 4324:2, 4324:11, 4324:14, 4325:3, 4326:13, 4326:19, 4327:3, 4327:13, 4330:10, 4343:8, 4343:12, 4343:13, 4343:14, 4343:19, 4346:5, 4346:7, 4347:3, 4348:8, 4355:20, 4357:7, 4357:14, 4357:16, 4358:4, 4358:5, 4358:8, 4358:11, 4358:22, 4358:25, 4359:2, 4360:4, 4360:5, 4364:13, 4372:6,

4372:22, 4373:1, 4373:8, 4373:12, 4373:13, 4373:22, 4373:23, 4374:4, 4374:7, 4374:8, 4376:3, 4376:11, 4378:16, 4378:18, 4379:3, 4379:5, 4379:7, 4382:4, 4382:5, 4382:6, 4382:10, 4383:5, 4383:17, 4383:23, 4384:4, 4384:23, 4385:1, 4385:6, 4385:7, 4385:9, 4385:20, 4386:7, 4387:17, 4387:18, 4387:20, 4387:22, 4387:24, 4388:2, 4392:3, 4392:6, 4392:7, 4392:8, 4393:9, 4393:10, 4394:3, 4394:6, 4395:13, 4396:12, 4397:23, 4398:7, 4398:10, 4436:4, 4437:9, 4437:18, 4437:21, 4437:22, 4438:1, 4438:12, 4438:13, 4438:19, 4439:21, 4441:8
**mail..** [1] - 4396:17
**mails** [28] - 4242:12, 4249:18, 4277:17, 4280:12, 4281:1, 4289:15, 4289:18, 4325:2, 4334:10, 4334:21, 4344:12, 4372:18, 4373:11, 4373:19, 4374:11, 4376:3, 4381:12, 4381:16, 4386:4, 4386:19, 4393:8, 4395:10, 4396:10, 4396:11, 4397:22, 4441:12, 4442:12, 4442:13
**main** [1] - 4221:2
**maintain** [1] - 4162:9
**maintained** [5] - 4151:2, 4151:6, 4151:10, 4151:14, 4151:18
**majority** [2] - 4249:15, 4253:11
**maker** [1] - 4232:5
**man** [9] - 4336:22, 4336:24, 4336:25, 4337:3, 4385:5, 4414:11, 4418:4, 4418:8, 4425:17
**manage** [2] - 4416:17, 4417:15
**management** [8] - 4170:25, 4207:3, 4218:9, 4219:23, 4224:9, 4368:1, 4368:3, 4417:13
**Management** [11] - 4174:25, 4180:21, 4180:22, 4182:16, 4187:10, 4218:23, 4219:11, 4220:20, 4240:21, 4241:17, 4439:22
**Management's** [1] - 4182:25
**manager** [22] - 4206:11, 4207:18, 4207:19, 4208:24, 4209:11, 4213:6, 4214:3, 4214:13, 4215:2, 4215:5, 4215:7, 4215:8, 4217:9, 4218:2, 4219:23, 4219:25, 4220:2, 4243:14, 4284:1, 4325:23, 4325:24, 4375:20
**managers** [6] - 4209:2, 4209:5, 4209:8, 4209:9, 4222:13
**managing** [3] - 4222:22, 4222:23, 4292:20
**manner** [1] - 4279:12
**manning** [1] - 4382:17
**Marc** [1] - 4305:19
**MARC** [1] - 4148:21
**March** [5] - 4151:15, 4225:14, 4228:11, 4329:5, 4360:4
**March/April** [1] - 4223:19
**Marek** [118] - 4172:24, 4188:17,

4197:24, 4216:6, 4216:7, 4216:8, 4216:17, 4221:6, 4221:10, 4231:1, 4232:7, 4235:16, 4235:17, 4235:19, 4237:10, 4244:13, 4245:2, 4246:25, 4247:3, 4248:21, 4249:25, 4250:2, 4250:7, 4250:12, 4250:14, 4251:17, 4251:18, 4251:21, 4251:22, 4251:24, 4255:3, 4255:11, 4255:22, 4255:23, 4256:10, 4257:10, 4257:17, 4257:23, 4258:1, 4259:7, 4260:10, 4261:8, 4278:4, 4280:13, 4280:22, 4281:8, 4286:9, 4288:6, 4290:10, 4294:2, 4294:3, 4299:8, 4322:19, 4341:14, 4342:2, 4342:4, 4342:6, 4342:14, 4342:17, 4344:14, 4345:18, 4345:21, 4345:24, 4346:5, 4346:20, 4346:21, 4346:25, 4347:3, 4347:5, 4347:13, 4347:16, 4347:21, 4347:23, 4348:22, 4349:6, 4349:8, 4353:5, 4356:2, 4356:15, 4359:9, 4371:19, 4371:21, 4403:10, 4428:18, 4428:24, 4429:1, 4429:8, 4429:22, 4429:24, 4430:2, 4430:16, 4430:21, 4430:23, 4431:4, 4434:12, 4434:17, 4435:7, 4435:8, 4435:13, 4436:16, 4436:21, 4437:6, 4437:18, 4438:13, 4438:19, 4439:9, 4441:17, 4441:18, 4441:20, 4441:25, 4442:11, 4442:12, 4442:15, 4442:21
**margin** [2] - 4369:13, 4416:18
**mark** [1] - 4238:21
**marked** [38] - 4151:21, 4157:11, 4158:5, 4158:16, 4159:3, 4160:13, 4161:3, 4218:6, 4238:25, 4240:6, 4261:15, 4262:1, 4276:4, 4277:3, 4278:1, 4287:8, 4289:12, 4294:25, 4372:1, 4376:15, 4377:8, 4378:14, 4379:1, 4379:25, 4380:12, 4381:8, 4381:25, 4386:16, 4387:4, 4387:15, 4398:14, 4399:2, 4422:10, 4437:11, 4438:9, 4438:18, 4439:1, 4439:22
**markedly** [2] - 4203:21, 4272:4
**market** [26] - 4152:25, 4161:16, 4164:20, 4164:24, 4165:6, 4165:8, 4188:9, 4195:5, 4199:5, 4213:1, 4225:11, 4225:12, 4284:10, 4290:24, 4297:19, 4307:23, 4319:17, 4365:9, 4366:8, 4369:3, 4369:7, 4374:1, 4374:14, 4417:16, 4417:20, 4419:19
**Market** [1] - 4154:2
**marketable** [1] - 4297:14
**marketer** [1] - 4238:9
**marketing** [5] - 4224:11, 4290:17, 4306:10, 4319:8, 4319:9
**marketplaces** [1] - 4152:24
**markets** [18] - 4153:5, 4154:3, 4161:17, 4161:22, 4162:1, 4162:3, 4162:5, 4162:10, 4162:13, 4162:16, 4162:19, 4163:15, 4163:17, 4165:3, 4165:16, 4173:19, 4207:9
**married** [2] - 4206:3, 4206:4
**Martin** [209] - 4154:16, 4159:6, 4174:8, 4174:12, 4177:2, 4180:23, 4180:25,

4181:11, 4184:4, 4185:23, 4187:11,
4187:13, 4188:16, 4189:19, 4189:22,
4189:25, 4193:1, 4197:24, 4214:6,
4214:8, 4214:11, 4214:22, 4214:25,
4216:6, 4216:8, 4216:17, 4217:7,
4219:15, 4220:17, 4221:2, 4221:3,
4221:5, 4221:8, 4225:15, 4225:20,
4226:1, 4226:2, 4227:2, 4227:13,
4227:18, 4228:2, 4229:5, 4229:22,
4229:24, 4230:6, 4230:15, 4231:3,
4232:3, 4237:8, 4238:11, 4241:4,
4241:18, 4241:20, 4242:11, 4242:13,
4245:2, 4250:13, 4250:17, 4250:19,
4251:17, 4255:4, 4255:7, 4255:23,
4260:15, 4260:22, 4261:14, 4262:20,
4264:21, 4264:23, 4275:1, 4289:5,
4292:13, 4293:16, 4295:5, 4299:6,
4304:11, 4304:25, 4305:19, 4306:3,
4313:15, 4313:21, 4322:10, 4326:13,
4326:20, 4342:7, 4342:8, 4342:15,
4344:4, 4344:6, 4345:9, 4345:21,
4345:22, 4345:25, 4346:21, 4347:6,
4347:9, 4347:13, 4347:14, 4348:5,
4348:14, 4348:18, 4348:19, 4348:23,
4349:8, 4350:10, 4350:13, 4350:17,
4350:22, 4351:2, 4351:8, 4351:10,
4351:13, 4351:15, 4351:24, 4352:1,
4352:7, 4352:8, 4354:16, 4357:8,
4357:16, 4358:10, 4363:8, 4363:10,
4366:22, 4368:23, 4371:18, 4373:3,
4373:15, 4374:20, 4374:22, 4375:2,
4375:6, 4376:22, 4379:11, 4381:6,
4383:12, 4383:14, 4385:10, 4386:2,
4391:5, 4392:6, 4392:8, 4392:22,
4394:19, 4394:21, 4395:1, 4395:18,
4398:6, 4401:22, 4403:10, 4403:12,
4404:19, 4404:23, 4406:1, 4406:16,
4407:14, 4408:1, 4411:18, 4411:22,
4414:24, 4415:7, 4416:3, 4416:7,
4416:14, 4416:19, 4416:21, 4416:24,
4417:1, 4417:24, 4418:2, 4418:4,
4419:14, 4420:4, 4420:13, 4421:13,
4422:17, 4423:7, 4423:16, 4424:9,
4428:23, 4428:24, 4429:1, 4429:7,
4429:20, 4429:21, 4429:24, 4430:1,
4430:3, 4430:22, 4431:3, 4431:15,
4432:4, 4434:11, 4434:16, 4435:7,
4436:16, 4437:18, 4437:21, 4438:1,
4438:13, 4441:17, 4442:11, 4442:15,
4442:20
**MARTIN** [1] - 4148:8
**martin** [1] - 4216:19
**martin's** [1] - 4279:4
**Martin's** [11] - 4237:9, 4238:6, 4261:7,
4275:4, 4280:8, 4280:10, 4283:24,
4363:17, 4371:24, 4383:9, 4419:11
**Masco** [1] - 4208:17
**mass** [1] - 4228:16
**match** [1] - 4363:25
**material** [6] - 4162:23, 4165:24, 4210:2,
4308:7, 4309:20, 4309:21
**materials** [6] - 4155:11, 4156:2,

4164:10, 4224:11, 4415:14, 4415:15
**MATSUMOTO** [1] - 4148:11
**matter** [4] - 4234:8, 4292:3, 4298:2,
4409:25
**Matter** [1] - 4444:17
**matters** [3] - 4389:20, 4399:15, 4425:17
**MB** [1] - 4371:20
**McKinsey** [1] - 4211:12
**mean** [63] - 4169:21, 4169:25, 4171:20,
4174:18, 4175:4, 4175:6, 4177:20,
4180:1, 4180:12, 4181:6, 4184:12,
4191:17, 4198:11, 4208:13, 4210:3,
4210:4, 4210:15, 4210:18, 4218:11,
4221:12, 4222:21, 4224:24, 4225:16,
4225:22, 4229:19, 4229:24, 4231:1,
4234:2, 4234:21, 4239:4, 4248:19,
4248:24, 4253:3, 4260:4, 4260:5,
4265:1, 4267:23, 4279:21, 4287:2,
4290:19, 4290:22, 4291:15, 4298:1,
4311:16, 4319:9, 4332:6, 4332:7,
4332:9, 4332:15, 4336:15, 4338:4,
4338:6, 4338:10, 4349:21, 4351:19,
4352:8, 4356:8, 4358:5, 4365:15,
4369:7, 4401:1
**Meaning** [1] - 4188:22
**means** [22] - 4169:22, 4175:3, 4180:13,
4207:8, 4235:24, 4267:7, 4279:23,
4290:20, 4290:23, 4291:16, 4306:17,
4306:21, 4312:11, 4312:21, 4319:14,
4332:11, 4334:5, 4338:3, 4349:24,
4396:7, 4413:5, 4420:11
**meant** [3] - 4286:22, 4288:20, 4354:5
**measured** [1] - 4265:3
**media** [1] - 4443:20
**Medical** [1] - 4440:14
**meet** [10] - 4214:8, 4214:18, 4296:16,
4322:10, 4322:22, 4364:22, 4364:24,
4365:4, 4371:21, 4371:23
**meeting** [20] - 4209:22, 4214:21,
4214:22, 4215:4, 4215:25, 4216:10,
4217:6, 4217:15, 4218:1, 4218:3,
4250:23, 4274:24, 4275:3, 4365:7,
4407:18, 4407:20, 4407:22, 4407:24,
4408:4, 4408:7
**meetings** [4] - 4251:1, 4409:13, 4409:20
**member** [11] - 4153:16, 4154:7,
4194:13, 4194:14, 4196:7, 4196:8,
4210:5, 4211:10, 4311:25, 4312:4,
4312:17
**members** [4] - 4152:13, 4152:22,
4195:24, 4253:9
**members'** [1] - 4152:20
**membership** [1] - 4152:12
**memo** [1] - 4324:12
**memorandum** [1] - 4415:11
**memorialize** [1] - 4325:2
**memory** [3] - 4212:17, 4242:5, 4242:7
**Memphis** [3] - 4244:10, 4343:4
**men** [2] - 4334:5, 4336:24
**mention** [3] - 4223:5, 4356:18, 4395:14
**mentioned** [9] - 4165:2, 4169:8,

4169:24, 4223:6, 4276:23, 4293:23,
4421:2, 4439:7
**mentioning** [1] - 4395:16
**merge** [1] - 4163:16
**merged** [2] - 4164:21, 4307:11
**merger** [27] - 4163:7, 4164:10, 4164:13,
4164:14, 4165:15, 4165:19, 4166:3,
4166:10, 4172:4, 4178:8, 4178:14,
4178:15, 4178:18, 4178:22, 4179:6,
4179:10, 4179:20, 4179:23, 4187:18,
4189:16, 4193:17, 4238:15, 4245:25,
4276:11, 4319:16, 4379:5
**merges** [1] - 4163:10
**merging** [1] - 4309:3
**Merrill** [3] - 4152:18, 4249:12, 4249:20
**Merry** [1] - 4287:25
**Mesoblast** [2] - 4222:2, 4222:9
**message** [4] - 4278:6, 4380:2, 4380:13
**met** [18] - 4214:23, 4214:25, 4216:2,
4217:16, 4223:9, 4223:10, 4323:15,
4350:17, 4365:2, 4371:24, 4413:7,
4413:20, 4413:22, 4413:24, 4414:2,
4425:11, 4427:11, 4430:2
**method** [2] - 4235:24, 4297:17
**methodology** [1] - 4297:16
**Methods** [1] - 4439:2
**metrics** [1] - 4333:18
**mezzanine** [2] - 4343:5, 4343:6
**Michael** [20] - 4237:9, 4238:5, 4238:6,
4261:19, 4262:14, 4262:17, 4262:18,
4262:19, 4274:22, 4274:23, 4274:24,
4275:2, 4278:3, 4290:14, 4300:13,
4304:9, 4310:19, 4310:20, 4310:21
**Michigan** [1] - 4154:11
**mid** [2] - 4192:14, 4296:17
**mid-morning** [1] - 4192:14
**midday** [1] - 4232:19
**middle** [10] - 4174:10, 4174:11,
4174:18, 4178:17, 4182:6, 4220:7,
4281:3, 4323:21, 4374:11, 4401:7
**midtown** [1] - 4286:6
**might** [13] - 4164:1, 4194:4, 4194:5,
4227:15, 4229:22, 4254:2, 4311:13,
4316:2, 4329:13, 4336:6, 4364:17,
4364:19, 4425:5
**million** [40] - 4167:12, 4169:16,
4169:17, 4169:18, 4172:16, 4173:6,
4173:7, 4173:8, 4208:2, 4209:3,
4209:4, 4213:24, 4215:12, 4215:15,
4217:3, 4217:4, 4224:16, 4228:15,
4228:17, 4244:21, 4256:20, 4259:14,
4259:15, 4292:4, 4296:19, 4300:17,
4305:6, 4305:8, 4310:17, 4310:18,
4325:13, 4325:18, 4325:25, 4326:6,
4341:20, 4342:11, 4342:15, 4345:3
**mind** [7] - 4194:23, 4271:12, 4271:16,
4273:12, 4306:2, 4355:2, 4443:25
**minded** [1] - 4443:22
**mine** [6] - 4213:21, 4214:9, 4300:24,
4301:22, 4306:2, 4343:4
**minimum** [3] - 4266:22, 4367:4, 4367:5

minute [12] - 4158:14, 4241:23, 4259:3, 4288:3, 4294:14, 4296:3, 4400:11, 4418:14, 4429:5, 4434:15, 4440:19, 4442:9

minutes [11] - 4192:18, 4216:18, 4216:21, 4253:19, 4317:20, 4356:23, 4403:8, 4411:3, 4411:6, 4435:19, 4436:1

mis [1] - 4296:21

mischaracterizing [1] - 4348:2

misread [1] - 4166:19

miss [1] - 4348:6

missing [3] - 4345:15, 4347:1, 4347:23

mission [1] - 4152:24

misstated [1] - 4166:21

mistake [3] - 4288:17, 4288:22, 4302:17

mistrial [6] - 4266:2, 4266:3, 4266:10, 4268:1, 4269:1, 4354:2

mix [1] - 4394:13

MLV [4] - 4286:4, 4301:7, 4301:8, 4301:10

modern [1] - 4297:14

mold [2] - 4244:2

moment [7] - 4157:21, 4192:10, 4194:20, 4305:13, 4410:22, 4410:23, 4438:11

Monday [1] - 4284:7

money [134] - 4175:7, 4180:2, 4204:5, 4204:7, 4207:9, 4209:6, 4213:3, 4216:24, 4217:1, 4217:2, 4217:13, 4217:14, 4218:4, 4218:10, 4224:14, 4224:17, 4225:12, 4225:13, 4225:15, 4225:17, 4225:18, 4225:20, 4227:3, 4227:5, 4227:10, 4227:15, 4227:16, 4228:3, 4228:6, 4228:10, 4229:2, 4229:2, 4230:16, 4234:20, 4234:24, 4235:2, 4236:3, 4237:17, 4237:20, 4237:21, 4237:23, 4238:3, 4238:10, 4256:12, 4299:12, 4299:20, 4305:4, 4319:10, 4348:14, 4350:18, 4352:11, 4366:21, 4366:25, 4368:4, 4368:17, 4369:5, 4369:11, 4369:19, 4370:6, 4370:13, 4371:6, 4371:7, 4371:16, 4371:17, 4373:2, 4373:4, 4373:5, 4373:6, 4373:16, 4373:17, 4374:1, 4374:3, 4374:4, 4374:22, 4375:3, 4375:14, 4375:15, 4375:17, 4375:23, 4375:25, 4376:1, 4380:25, 4382:20, 4383:12, 4386:11, 4392:9, 4392:13, 4393:1, 4393:5, 4395:2, 4395:17, 4396:5, 4397:15, 4400:6, 4400:22, 4401:3, 4404:2, 4407:13, 4408:2, 4409:3, 4409:6, 4409:8, 4410:4, 4410:5, 4410:10, 4410:15, 4410:18, 4412:8, 4412:9, 4412:10, 4415:11, 4416:3, 4416:6, 4416:19, 4416:22, 4417:18, 4417:19, 4417:21, 4417:22, 4417:24, 4418:13, 4419:14, 4420:16, 4420:17, 4424:10, 4429:20, 4431:13, 4443:1, 4443:6

month [8] - 4212:12, 4220:10, 4351:5,

4351:7, 4390:19, 4390:24, 4399:21, 4400:12

months [17] - 4169:5, 4213:12, 4225:14, 4229:3, 4351:20, 4365:1, 4374:16, 4380:16, 4385:3, 4390:24, 4396:24, 4397:8, 4397:12, 4397:18, 4398:8, 4400:4, 4403:21

mood [1] - 4348:5

Morgan [7] - 4207:2, 4207:4, 4207:6, 4207:12, 4208:7, 4349:18, 4362:2

morning [10] - 4159:10, 4178:9, 4192:14, 4192:25, 4193:2, 4205:24, 4232:20, 4278:10, 4359:16, 4443:15

mortgage [10] - 4299:9, 4302:13, 4302:24, 4345:16, 4345:19, 4345:22, 4347:1, 4347:23, 4348:6, 4348:24

Morton [1] - 4249:25

most [8] - 4213:5, 4230:5, 4232:8, 4238:23, 4244:2, 4272:9, 4334:14, 4396:13

Most [1] - 4348:5

mostly [3] - 4207:22, 4208:10, 4211:4

moth [1] - 4351:7

motion [1] - 4354:3

motive [1] - 4337:11

Motors [1] - 4208:18

move [24] - 4149:12, 4150:16, 4162:18, 4165:6, 4165:13, 4165:17, 4173:14, 4198:23, 4225:25, 4232:18, 4234:9, 4236:10, 4237:5, 4237:13, 4249:9, 4251:25, 4252:7, 4265:7, 4277:20, 4287:18, 4324:22, 4356:19, 4378:3

moved [6] - 4159:8, 4207:1, 4214:17, 4232:15, 4249:12, 4302:6

movement [1] - 4163:3

moves [14] - 4157:17, 4158:23, 4160:24, 4218:15, 4236:9, 4261:22, 4289:23, 4295:10, 4372:11, 4377:4, 4378:22, 4381:19, 4387:3, 4398:23

moving [4] - 4206:25, 4266:2, 4266:3, 4385:10

MPA [1] - 4212:11

MR [164] - 4149:5, 4203:16, 4203:23, 4218:17, 4219:1, 4222:15, 4225:25, 4227:1, 4227:6, 4227:12, 4227:21, 4228:19, 4232:24, 4233:9, 4234:1, 4235:4, 4235:8, 4235:21, 4236:11, 4236:14, 4237:24, 4239:21, 4240:2, 4245:14, 4246:9, 4246:14, 4246:23, 4247:5, 4248:18, 4250:9, 4250:19, 4251:10, 4251:19, 4252:2, 4252:9, 4252:22, 4257:6, 4257:15, 4258:2, 4258:11, 4258:13, 4261:24, 4262:15, 4265:7, 4266:2, 4266:8, 4266:11, 4267:5, 4268:7, 4268:21, 4268:24, 4269:25, 4270:3, 4272:3, 4272:12, 4272:14, 4272:21, 4272:25, 4273:3, 4273:11, 4277:22, 4287:20, 4289:25, 4295:2, 4295:12, 4305:10, 4320:20, 4324:20, 4324:24, 4325:11, 4328:1, 4328:11, 4328:13, 4330:5, 4331:18,

4332:2, 4332:8, 4332:13, 4332:23, 4333:1, 4333:4, 4333:8, 4334:2, 4334:9, 4334:14, 4334:22, 4335:1, 4336:6, 4336:9, 4336:12, 4336:16, 4336:21, 4337:2, 4337:7, 4337:10, 4337:21, 4338:12, 4338:16, 4338:17, 4338:20, 4339:1, 4339:7, 4339:16, 4339:25, 4343:17, 4346:4, 4346:23, 4353:16, 4354:6, 4354:10, 4354:22, 4355:1, 4355:3, 4355:4, 4355:6, 4355:12, 4355:16, 4355:24, 4356:3, 4356:8, 4356:12, 4356:17, 4356:23, 4357:5, 4360:8, 4369:23, 4370:1, 4371:12, 4372:13, 4377:6, 4377:24, 4378:24, 4380:10, 4381:22, 4387:6, 4387:10, 4387:12, 4392:1, 4398:25, 4402:22, 4410:12, 4411:2, 4411:14, 4411:16, 4421:1, 4423:2, 4424:14, 4424:17, 4425:7, 4425:15, 4425:23, 4425:25, 4426:7, 4427:1, 4435:17, 4438:4, 4441:1, 4442:8, 4442:16, 4443:14, 4443:17, 4444:11, 4445:7, 4445:10

MS [243] - 4149:4, 4149:7, 4149:11, 4149:15, 4149:22, 4150:15, 4150:19, 4152:1, 4152:4, 4157:17, 4157:21, 4157:24, 4158:2, 4158:6, 4158:23, 4158:25, 4159:4, 4160:24, 4161:1, 4164:8, 4166:23, 4167:3, 4176:1, 4182:13, 4189:18, 4192:10, 4192:12, 4192:22, 4192:24, 4194:17, 4194:20, 4195:10, 4195:14, 4196:6, 4196:14, 4197:2, 4197:20, 4200:2, 4200:8, 4200:21, 4200:23, 4200:24, 4201:1, 4202:2, 4202:8, 4202:12, 4203:2, 4203:6, 4203:8, 4203:22, 4204:22, 4204:24, 4205:1, 4205:5, 4205:11, 4205:23, 4218:15, 4218:20, 4218:22, 4222:18, 4226:3, 4227:7, 4227:10, 4227:14, 4227:20, 4228:5, 4228:25, 4232:1, 4234:19, 4235:1, 4235:15, 4235:19, 4236:2, 4236:6, 4236:15, 4237:4, 4239:19, 4239:24, 4240:7, 4247:6, 4248:3, 4248:6, 4248:10, 4248:15, 4249:3, 4250:2, 4250:17, 4250:20, 4251:3, 4251:5, 4251:23, 4252:5, 4252:13, 4252:20, 4252:25, 4253:4, 4254:2, 4255:2, 4255:21, 4256:4, 4256:6, 4256:10, 4256:15, 4256:18, 4257:3, 4257:14, 4257:22, 4257:25, 4258:6, 4258:12, 4259:2, 4261:22, 4267:12, 4268:14, 4268:23, 4269:5, 4269:12, 4269:18, 4269:21, 4270:2, 4272:16, 4272:19, 4273:14, 4273:17, 4273:21, 4274:20, 4276:9, 4276:22, 4277:20, 4279:2, 4287:18, 4287:23, 4289:23, 4290:4, 4294:20, 4294:22, 4294:24, 4295:3, 4295:10, 4299:1, 4305:13, 4313:10, 4316:8, 4318:9, 4320:17, 4324:17, 4325:6, 4325:10, 4328:10, 4328:12, 4329:22, 4330:1, 4330:6, 4331:15, 4331:17,

4332:16, 4332:24, 4333:5, 4333:21, 4334:23, 4334:24, 4335:20, 4336:7, 4336:10, 4336:14, 4336:18, 4337:12, 4338:2, 4338:4, 4338:9, 4338:13, 4338:23, 4339:4, 4339:11, 4339:23, 4341:2, 4344:21, 4346:13, 4346:22, 4348:1, 4351:17, 4353:13, 4353:17, 4354:2, 4354:8, 4354:14, 4354:19, 4355:7, 4355:14, 4355:23, 4356:2, 4356:6, 4356:10, 4356:14, 4356:22, 4359:22, 4359:24, 4360:7, 4360:14, 4360:25, 4372:11, 4377:1, 4377:4, 4377:9, 4378:22, 4380:8, 4381:19, 4387:3, 4387:9, 4388:17, 4388:20, 4398:23, 4399:3, 4400:16, 4407:2, 4410:22, 4416:11, 4418:16, 4422:25, 4424:12, 4424:15, 4425:1, 4425:13, 4425:21, 4425:24, 4426:3, 4426:5, 4429:9, 4429:13, 4434:25, 4435:3, 4436:13, 4438:6, 4442:5, 4442:23, 4443:13, 4444:9, 4445:4, 4445:5, 4445:6, 4445:8, 4445:9

**MSMB** [98] - 4174:25, 4176:11, 4179:3, 4179:6, 4179:9, 4179:11, 4179:18, 4179:20, 4179:22, 4180:20, 4180:21, 4180:22, 4182:16, 4182:25, 4183:8, 4184:24, 4185:23, 4187:9, 4187:10, 4215:3, 4215:9, 4215:10, 4215:16, 4215:23, 4216:8, 4216:24, 4218:23, 4219:7, 4219:11, 4219:14, 4220:20, 4223:11, 4223:20, 4224:5, 4224:21, 4224:22, 4224:24, 4225:9, 4225:22, 4227:11, 4228:7, 4228:10, 4228:13, 4228:24, 4229:1, 4229:2, 4229:12, 4229:19, 4230:2, 4230:14, 4230:18, 4230:20, 4237:21, 4237:23, 4238:3, 4238:17, 4239:17, 4240:21, 4241:3, 4241:4, 4241:17, 4243:7, 4245:11, 4256:9, 4256:13, 4259:9, 4297:25, 4299:2, 4299:5, 4325:12, 4325:17, 4325:21, 4325:24, 4341:24, 4342:1, 4342:16, 4342:17, 4342:21, 4344:2, 4344:5, 4345:3, 4351:21, 4351:22, 4370:22, 4371:3, 4371:9, 4371:14, 4371:20, 4422:18, 4422:19, 4422:23, 4423:7, 4423:11

**Muchin** [1] - 4303:10

**Mulleady** [19] - 4172:23, 4188:17, 4197:24, 4214:24, 4215:1, 4215:2, 4216:6, 4216:13, 4218:3, 4220:16, 4220:17, 4220:21, 4235:18, 4235:20, 4237:8, 4261:9, 4278:5, 4290:10, 4358:3

**multi** [1] - 4156:21

**multiple** [2] - 4324:22, 4441:12

**must** [4] - 4229:16, 4291:5, 4291:6, 4427:2

**mutually** [1] - 4209:11

---

# N

---

**name** [32] - 4171:24, 4176:10, 4176:25,

4182:4, 4182:14, 4183:7, 4184:3, 4192:25, 4205:18, 4205:19, 4214:14, 4221:15, 4221:16, 4223:10, 4237:10, 4282:24, 4292:8, 4303:2, 4305:19, 4314:2, 4328:17, 4360:21, 4363:17, 4367:1, 4370:21, 4382:21, 4411:17, 4421:7, 4421:8, 4431:9, 4431:18, 4431:20

**named** [4] - 4173:13, 4223:12, 4261:5, 4398:3

**names** [2] - 4189:10, 4197:23

**NASDAQ** [8] - 4162:1, 4162:6, 4162:11, 4162:19, 4165:9, 4165:13, 4165:17, 4279:24

**national** [2] - 4161:24, 4162:4

**nature** [1] - 4392:12

**near** [1] - 4292:4

**nearly** [1] - 4153:21

**nebulous** [1] - 4196:10

**necessarily** [1] - 4397:19

**necessary** [2] - 4292:24, 4300:18

**neck** [1] - 4288:1

**Need** [1] - 4395:8

**need** [22] - 4149:2, 4149:12, 4165:18, 4165:20, 4165:25, 4196:10, 4203:10, 4209:7, 4224:8, 4228:17, 4230:16, 4260:2, 4266:6, 4268:2, 4278:9, 4278:11, 4278:17, 4288:5, 4378:3, 4394:12, 4396:23, 4396:25

**needed** [5] - 4245:4, 4348:16, 4392:9, 4408:8

**needless** [1] - 4302:11

**needs** [3] - 4171:3, 4299:13, 4301:24

**negotiate** [2] - 4316:7, 4316:17

**negotiated** [1] - 4305:10

**negotiating** [1] - 4376:8

**net** [1] - 4305:7

**Neurology** [1] - 4439:13

**neutral** [1] - 4213:1

**never** [23] - 4223:7, 4241:1, 4244:22, 4256:12, 4256:21, 4273:12, 4303:20, 4306:2, 4310:6, 4321:16, 4334:14, 4338:20, 4353:5, 4353:6, 4372:24, 4384:13, 4411:18, 4416:23, 4423:22, 4423:25, 4427:6, 4441:16

**new** [10] - 4166:4, 4244:1, 4282:5, 4292:20, 4297:10, 4297:13, 4297:20, 4357:17, 4374:4, 4398:13

**NEW** [1] - 4148:1

**New** [25] - 4148:6, 4148:15, 4148:16, 4148:20, 4161:25, 4206:9, 4206:25, 4207:1, 4210:10, 4210:14, 4210:15, 4210:16, 4211:1, 4211:16, 4214:10, 4293:8, 4294:3, 4323:16, 4361:17, 4365:2, 4365:5, 4365:6, 4371:25, 4407:18

**news** [7] - 4297:13, 4308:14, 4308:16, 4364:18, 4365:20, 4374:3, 4395:19

**next** [65] - 4149:21, 4167:17, 4175:12, 4178:11, 4179:1, 4179:11, 4180:3, 4180:16, 4185:17, 4186:14, 4189:25,

4190:5, 4190:8, 4194:25, 4196:16, 4199:23, 4201:3, 4202:4, 4205:10, 4207:14, 4221:3, 4221:5, 4221:7, 4226:5, 4229:3, 4231:4, 4232:16, 4253:22, 4254:7, 4258:16, 4263:1, 4265:11, 4270:5, 4278:22, 4280:25, 4281:1, 4284:7, 4298:11, 4299:7, 4299:25, 4300:15, 4301:18, 4327:24, 4331:21, 4335:17, 4340:1, 4353:22, 4356:19, 4373:1, 4376:24, 4383:19, 4383:23, 4385:20, 4391:6, 4392:12, 4392:18, 4393:7, 4393:17, 4396:17, 4406:18, 4420:25, 4437:25, 4438:18, 4439:12, 4440:25

**nice** [6] - 4244:8, 4244:14, 4271:15, 4296:16, 4360:10, 4442:17

**niche** [1] - 4244:6

**nightmare** [1] - 4288:19

**nine** [2] - 4213:12, 4239:2

**nobody** [2] - 4322:7, 4427:10

**non** [8] - 4152:12, 4211:22, 4211:24, 4235:22, 4235:25, 4408:18, 4408:19, 4439:17

**non-hallucinogen** [1] - 4439:17

**non-prosecution** [4] - 4211:22, 4211:24, 4408:18, 4408:19

**none** [2] - 4216:25, 4230:19

**nonpublic** [9] - 4210:1, 4210:2, 4210:3, 4211:13, 4284:21, 4285:16, 4290:21, 4291:1, 4355:9

**nonreoccurring** [1] - 4399:22

**nonsense** [1] - 4298:3

**normal** [1] - 4268:11

**normally** [2] - 4222:22, 4246:7

**normative** [1] - 4335:23

**North** [1] - 4232:6

**notarized** [2] - 4376:7, 4376:13, 4376:23

**notations** [1] - 4220:12

**note** [33] - 4217:24, 4374:16, 4374:17, 4375:2, 4375:3, 4375:6, 4375:11, 4376:8, 4376:14, 4376:22, 4377:18, 4377:21, 4377:23, 4378:7, 4378:9, 4381:2, 4381:7, 4382:9, 4382:16, 4383:7, 4383:13, 4384:17, 4385:16, 4386:13, 4387:1, 4388:8, 4404:11, 4405:25, 4406:10, 4406:15, 4424:1, 4424:7, 4435:16

**notes** [1] - 4407:22

**nothing** [14] - 4244:20, 4259:16, 4278:12, 4297:12, 4298:3, 4299:12, 4302:1, 4302:2, 4302:24, 4310:4, 4310:5, 4325:2, 4360:8, 4430:5

**notify** [1] - 4293:5

**November** [9] - 4151:3, 4151:7, 4239:15, 4240:14, 4259:17, 4294:7, 4385:3, 4385:8, 4385:21, 4385:25, 4386:5, 4386:8

**November/early** [1] - 4259:20

**nullifies** [1] - 4354:2

**number** [41] - 4157:7, 4162:9, 4168:14,

4172:22, 4174:24, 4175:8, 4176:14,
4177:6, 4177:20, 4178:6, 4178:13,
4183:9, 4183:16, 4183:22, 4183:23,
4184:5, 4193:6, 4209:5, 4212:21,
4215:13, 4248:16, 4249:8, 4249:23,
4264:7, 4264:8, 4272:8, 4275:5,
4275:10, 4275:15, 4282:1, 4289:8,
4290:7, 4295:2, 4306:6, 4306:12,
4325:19, 4326:20, 4400:8, 4419:9,
4422:4
**numbers** [6] - 4209:3, 4215:14, 4217:8,
4217:9, 4217:11, 4308:10
**numerous** [1] - 4375:4

# O

**oath** [1] - 4411:12
**object** [17] - 4218:17, 4225:25, 4228:19,
4233:9, 4237:24, 4239:22, 4240:3,
4245:14, 4246:9, 4246:14, 4246:24,
4247:5, 4252:9, 4257:16, 4258:8,
4265:7, 4267:17
**Object** [1] - 4262:15
**objecting** [1] - 4257:19
**Objection** [12] - 4194:17, 4329:22,
4331:15, 4344:21, 4348:1, 4351:17,
4353:13, 4400:16, 4402:22, 4442:5,
4442:23, 4443:13
**objection** [58] - 4157:20, 4157:22,
4158:1, 4158:25, 4161:1, 4200:8,
4200:10, 4200:21, 4200:23, 4219:1,
4222:15, 4227:1, 4232:24, 4234:14,
4239:21, 4240:5, 4251:16, 4257:16,
4261:24, 4267:12, 4273:5, 4277:22,
4287:20, 4289:25, 4295:12, 4313:10,
4316:8, 4318:9, 4320:17, 4324:17,
4325:6, 4325:10, 4355:12, 4369:23,
4370:1, 4371:12, 4372:13, 4377:6,
4377:24, 4378:24, 4380:10, 4381:22,
4387:6, 4387:11, 4387:12, 4398:25,
4410:12, 4416:11, 4418:16, 4422:25,
4424:12, 4429:9, 4429:13, 4434:25,
4436:13, 4438:6, 4444:2, 4444:4
**objectionable** [1] - 4195:12
**obligated** [2] - 4194:2, 4195:19
**obligation** [2] - 4185:15, 4382:16
**observation** [1] - 4341:5
**observe** [3] - 4221:20, 4221:23, 4222:25
**observed** [2] - 4335:23, 4341:7
**observer** [1] - 4335:23
**obstructionist** [1] - 4252:3
**obtained** [4] - 4156:15, 4160:8, 4160:9,
4160:10
**obvious** [1] - 4345:2
**obviously** [10] - 4234:2, 4236:9,
4250:17, 4267:6, 4268:2, 4291:10,
4291:12, 4366:7, 4370:3, 4370:12
**Obviously** [1] - 4257:8
**occasion** [2] - 4248:11, 4425:11
**occasionally** [3] - 4256:3, 4256:8,
4259:21
**occupation** [1] - 4206:10

**occur** [4] - 4164:16, 4165:10, 4165:18,
4353:4
**occurred** [15] - 4164:11, 4193:17,
4195:1, 4202:1, 4210:13, 4210:23,
4211:2, 4237:5, 4255:1, 4266:1,
4332:1, 4353:3, 4354:1, 4444:9
**occurs** [1] - 4165:24
**Octavius** [1] - 4330:15
**October** [14] - 4223:17, 4223:21,
4223:25, 4224:5, 4224:15, 4239:8,
4242:13, 4242:17, 4248:1, 4251:4,
4256:2, 4325:16, 4438:2, 4438:14
**odd** [1] - 4214:12
**oddity** [1] - 4335:10
**OF** [3] - 4148:1, 4148:3, 4148:11
**offer** [7] - 4195:22, 4254:3, 4274:6,
4274:9, 4302:18, 4302:22, 4438:4
**offered** [5] - 4234:5, 4234:14, 4236:5,
4236:6, 4300:23
**offering** [4] - 4166:18, 4167:16,
4181:21, 4184:23
**offerings** [1] - 4168:22
**offers** [1] - 4380:8
**office** [62] - 4155:2, 4210:15, 4214:19,
4221:2, 4221:4, 4232:13, 4234:20,
4235:2, 4235:16, 4236:3, 4237:5,
4237:7, 4237:19, 4238:20, 4238:21,
4242:19, 4244:24, 4248:5, 4248:11,
4248:15, 4255:6, 4255:25, 4256:3,
4256:8, 4257:14, 4257:22, 4258:1,
4260:19, 4260:24, 4275:4, 4284:1,
4284:7, 4284:10, 4284:16, 4284:17,
4284:19, 4284:20, 4284:22, 4285:1,
4285:2, 4285:5, 4285:9, 4285:11,
4285:14, 4285:19, 4285:20, 4285:21,
4285:22, 4292:18, 4292:23, 4293:18,
4303:16, 4303:17, 4316:20, 4317:2,
4317:10, 4323:24, 4371:24, 4396:16
**officer** [5] - 4170:3, 4170:19, 4280:3,
4280:15, 4281:15
**officers** [2] - 4194:8, 4195:24
**offices** [11] - 4219:18, 4220:25, 4221:1,
4232:15, 4245:1, 4245:3, 4245:5,
4248:2, 4259:21, 4260:1, 4299:10
**Official** [1] - 4148:23
**officially** [1] - 4182:4
**often** [6] - 4163:24, 4264:20, 4364:10,
4368:20, 4380:17, 4384:2
**old** [5] - 4206:1, 4206:2, 4343:4, 4361:1,
4414:7
**older** [2] - 4223:10, 4336:24
**on-line** [1] - 4163:2
**once** [7] - 4191:25, 4255:16, 4284:12,
4285:2, 4301:15, 4301:21, 4430:3
**Once** [2] - 4330:18, 4352:11
**one** [76] - 4163:24, 4165:2, 4165:3,
4172:21, 4174:24, 4186:1, 4189:4,
4203:22, 4209:9, 4209:20, 4213:14,
4214:3, 4218:7, 4221:2, 4222:1,
4229:9, 4229:10, 4230:4, 4230:15,
4232:4, 4235:5, 4241:7, 4241:12,

4241:23, 4248:16, 4250:2, 4251:17,
4263:2, 4271:18, 4271:19, 4273:12,
4278:17, 4278:20, 4282:6, 4284:2,
4289:3, 4294:14, 4296:2, 4297:8,
4305:13, 4305:19, 4311:12, 4316:22,
4317:4, 4318:14, 4326:24, 4333:20,
4336:2, 4337:20, 4341:19, 4345:24,
4349:3, 4349:15, 4349:23, 4353:3,
4359:18, 4373:6, 4373:13, 4376:5,
4385:6, 4386:9, 4395:13, 4399:22,
4400:1, 4400:10, 4407:23, 4410:22,
4412:20, 4420:6, 4435:17, 4439:1,
4439:7, 4440:7, 4443:24
**One** [9] - 4192:10, 4194:20, 4258:2,
4271:21, 4357:22, 4362:18, 4365:16,
4365:23, 4365:24
**one's** [1] - 4235:6
**one-time** [1] - 4399:22
**ones** [1] - 4194:9
**op** [1] - 4405:19
**open** [15] - 4197:1, 4203:16, 4259:1,
4271:1, 4271:15, 4279:3, 4279:15,
4279:19, 4285:24, 4285:25, 4301:23,
4302:22, 4341:1, 4419:19, 4443:22
**Open** [3] - 4236:17, 4253:8, 4426:9
**open-minded** [1] - 4443:22
**opened** [3] - 4278:12, 4286:3, 4286:7
**operating** [1] - 4299:3
**operations** [2] - 4154:13, 4361:17
**opinion** [3] - 4168:8, 4168:9, 4168:10,
4195:15, 4195:16, 4195:22, 4273:8
**opinions** [4] - 4195:4, 4195:8, 4271:8,
4274:7
**opportunities** [6] - 4292:21, 4364:1,
4364:18, 4365:10, 4365:11, 4379:20
**opportunity** [4] - 4221:20, 4255:4,
4255:24, 4269:21, 4290:13, 4292:22,
4342:1
**options** [2] - 4253:10, 4369:8
**order** [12] - 4212:15, 4230:10, 4258:7,
4291:16, 4319:17
**orders** [1] - 4350:2
**Oremland** [8] - 4149:7, 4149:23,
4150:4, 4152:5, 4159:5, 4159:11,
4187:17, 4192:25, 4197:3
**oremland** [2] - 4205:2, 4205:6
**OREMLAND** [2] - 4149:24, 4445:3
**organization** [4] - 4152:10, 4152:12,
4202:10, 4296:19
**original** [2] - 4199:6, 4199:16
**originally** [7] - 4244:10, 4250:23,
4275:14, 4304:3, 4431:8, 4431:10,
4431:15
**Orlando** [2] - 4383:21, 4384:13
**otherwise** [3] - 4180:9, 4235:14,
4425:24
**outside** [4] - 4202:8, 4203:11, 4203:12,
4342:16
**outstanding** [7] - 4166:15, 4167:5,
4173:5, 4186:3, 4280:16, 4298:7
**over-the-counter** [12] - 4162:2, 4162:5,

4162:10, 4162:13, 4162:15, 4162:18, 4163:15, 4164:17, 4164:25, 4165:1, 4165:3, 4165:16
**overly** [1] - 4267:15
**overrule** [1] - 4200:10
**overruled** [7] - 4318:10, 4370:2, 4371:13, 4410:13, 4429:14, 4435:2, 4435:6
**oversees** [2] - 4152:23, 4153:1
**overt** [1] - 4235:24
**owed** [2] - 4235:11, 4416:3
**own** [21] - 4153:14, 4161:20, 4170:3, 4170:18, 4171:13, 4171:16, 4213:24, 4229:8, 4252:4, 4264:12, 4288:11, 4294:2, 4336:5, 4341:5, 4356:9, 4366:10, 4366:15, 4412:5, 4412:7, 4419:15
**owned** [15] - 4175:9, 4176:3, 4176:15, 4176:18, 4177:7, 4177:17, 4178:14, 4182:18, 4183:10, 4183:13, 4184:6, 4184:13, 4184:15, 4184:22, 4399:24
**owner** [2] - 4171:21, 4262:19
**owners** [3] - 4170:25, 4264:10, 4264:11
**ownership** [7] - 4161:11, 4171:18, 4174:21, 4182:1, 4182:25, 4185:20, 4342:14
**owning** [1] - 4291:17
**owns** [3] - 4161:19, 4171:21, 4177:21

**P**

**P&G** [1] - 4309:3
**P&L** [2] - 4214:16, 4298:9
**P-I-E-R-O-T-T-I** [1] - 4205:20
**P.C** [1] - 4148:19
**p.m** [2] - 4297:17, 4387:25
**packet** [1] - 4441:10
**packing** [1] - 4232:20
**pads** [1] - 4272:6
**page** [76] - 4156:21, 4158:7, 4166:11, 4166:12, 4166:21, 4166:22, 4166:25, 4174:9, 4174:17, 4174:22, 4175:12, 4178:11, 4180:3, 4180:16, 4180:17, 4180:18, 4182:6, 4182:12, 4183:6, 4185:17, 4186:14, 4187:6, 4187:7, 4194:25, 4196:16, 4199:23, 4201:3, 4220:6, 4220:18, 4220:19, 4226:5, 4231:4, 4241:6, 4241:16, 4253:22, 4254:7, 4258:16, 4265:11, 4270:5, 4278:22, 4295:16, 4295:25, 4296:2, 4296:11, 4298:11, 4302:9, 4327:24, 4330:2, 4331:21, 4340:1, 4353:22, 4360:3, 4376:24, 4384:21, 4385:6, 4388:10, 4388:21, 4391:1, 4391:2, 4391:6, 4394:1, 4394:2, 4401:19, 4406:18, 4418:7, 4420:25, 4428:8, 4428:9, 4430:18, 4432:13, 4433:6, 4437:18, 4437:25, 4439:12, 4440:21, 4440:25
**PAGE** [1] - 4445:2
**Page** [15] - 4176:9, 4176:24, 4178:5, 4180:3, 4184:2, 4185:1, 4263:16,

4263:21, 4392:3, 4393:7, 4394:6, 4394:8, 4395:6, 4401:6, 4401:18
**paid** [21] - 4155:2, 4229:12, 4233:5, 4233:6, 4234:9, 4236:13, 4237:2, 4288:16, 4348:5, 4348:9, 4385:15, 4385:18, 4395:4, 4395:19, 4396:6, 4397:9, 4397:13, 4407:12, 4408:2, 4418:15
**Pain** [1] - 4440:14
**panicked** [5] - 4404:12, 4407:11, 4421:22, 4421:23, 4429:18
**pans** [1] - 4257:15
**paper** [2] - 4430:19, 4439:8
**par** [1] - 4262:23
**Paragraph** [3] - 4399:12, 4399:19, 4401:8
**paragraph** [27] - 4178:8, 4178:17, 4179:1, 4179:11, 4179:16, 4179:17, 4186:18, 4186:21, 4240:18, 4263:1, 4263:2, 4263:9, 4291:4, 4292:15, 4296:14, 4297:8, 4299:7, 4299:25, 4300:15, 4301:13, 4301:20, 4389:17, 4390:20, 4422:20, 4424:4, 4432:13, 4433:6
**paragraphs** [3] - 4178:12, 4178:13, 4296:1
**parentheses** [1] - 4181:25
**parenthesis** [1] - 4174:20
**park** [1] - 4252:10
**parroting** [1] - 4297:12
**Part** [1] - 4258:8
**part** [44] - 4161:6, 4161:20, 4163:3, 4196:1, 4202:18, 4204:8, 4204:12, 4204:14, 4225:10, 4230:5, 4235:22, 4236:12, 4236:15, 4242:10, 4244:2, 4245:7, 4250:4, 4255:2, 4255:14, 4256:19, 4260:16, 4261:1, 4262:3, 4273:11, 4299:15, 4320:5, 4338:22, 4350:5, 4353:12, 4354:11, 4354:16, 4374:8, 4374:21, 4375:1, 4377:10, 4382:5, 4388:11, 4390:17, 4393:8, 4400:2, 4409:11, 4411:19, 4440:11, 4441:12
**participated** [3] - 4197:4, 4197:8, 4443:4
**particular** [13] - 4159:21, 4164:9, 4165:4, 4194:14, 4222:9, 4225:6, 4225:7, 4291:1, 4310:21, 4344:23, 4351:13, 4352:6, 4367:9
**particularly** [3] - 4291:8, 4318:13, 4351:2
**parties** [6] - 4149:10, 4150:21, 4150:25, 4151:23, 4333:14, 4443:25
**partner** [4] - 4216:9, 4299:8, 4300:19, 4335:5, 4335:7, 4359:8, 4429:22
**partner's** [1] - 4412:8
**partners** [1] - 4297:9
**Partners** [3] - 4214:1, 4214:2, 4214:15
**Partnership** [6] - 4367:11, 4382:19, 4392:10, 4392:15, 4399:24, 4431:11
**partnership** [3] - 4367:11, 4421:2,

4421:5
**Partnership's** [1] - 4382:21
**parts** [1] - 4348:2
**party** [3] - 4238:9, 4263:24, 4304:14
**pass** [1] - 4443:9
**Passic** [1] - 4440:2
**passionate** [3] - 4366:8, 4379:19, 4414:19
**past** [1] - 4432:10
**path** [1] - 4196:5
**pathetic** [1] - 4301:23
**Pause** [5] - 4192:11, 4194:21, 4257:24, 4272:20, 4388:15
**pay** [24] - 4218:10, 4229:17, 4235:10, 4263:7, 4263:8, 4299:9, 4348:23, 4374:2, 4375:3, 4375:4, 4376:23, 4380:25, 4381:7, 4390:18, 4396:7, 4397:14, 4399:21, 4400:12, 4403:1, 4407:13, 4407:15, 4409:8, 4409:9
**payable** [1] - 4397:5
**paychecks** [1] - 4229:15
**paying** [6] - 4345:19, 4345:22, 4378:7, 4396:24, 4418:17, 4420:10
**payment** [15] - 4155:6, 4220:14, 4235:22, 4235:24, 4241:5, 4241:7, 4241:12, 4243:5, 4345:16, 4347:1, 4347:24, 4348:6, 4390:23, 4420:6, 4420:7
**payments** [10] - 4241:8, 4241:13, 4241:14, 4243:1, 4403:21, 4418:15, 4418:19, 4418:20, 4418:22, 4419:2
**payouts** [1] - 4213:4
**PDF** [1] - 4396:13
**peak** [3] - 4325:14, 4325:15, 4325:25
**peer** [1] - 4441:23
**pending** [1] - 4293:5
**penny** [3] - 4279:20, 4279:21, 4279:23
**People** [2] - 4337:14, 4339:4
**people** [60] - 4173:12, 4180:14, 4181:21, 4198:1, 4198:3, 4202:14, 4202:15, 4212:21, 4213:22, 4215:6, 4221:3, 4222:22, 4223:7, 4233:2, 4234:13, 4244:10, 4260:17, 4261:11, 4264:9, 4264:23, 4265:4, 4275:1, 4275:6, 4284:16, 4286:25, 4290:8, 4291:19, 4291:24, 4296:25, 4300:22, 4303:17, 4306:6, 4312:11, 4318:6, 4318:12, 4319:3, 4323:16, 4326:20, 4330:9, 4333:18, 4334:5, 4334:16, 4335:18, 4342:20, 4352:12, 4352:15, 4353:8, 4355:17, 4355:21, 4356:12, 4357:8, 4359:2, 4363:18, 4366:7, 4412:25, 4413:3, 4417:18, 4417:21, 4417:22
**people's** [2] - 4412:8, 4412:9
**per** [8] - 4185:11, 4220:10, 4262:24, 4390:19, 4390:24, 4399:21, 4400:12, 4401:1
**percent** [30] - 4170:18, 4171:14, 4171:22, 4173:8, 4173:10, 4176:6, 4176:8, 4176:21, 4176:23, 4177:23,

4177:25, 4182:21, 4182:23, 4183:19, 4183:21, 4183:22, 4184:18, 4184:20, 4189:24, 4202:16, 4225:3, 4264:10, 4264:11, 4264:13, 4280:16, 4298:9, 4368:3, 4368:18, 4375:21
**percentage** [3] - 4176:7, 4183:23, 4184:22
**perfect** [2] - 4382:14, 4422:13
**perform** [4] - 4225:6, 4292:24, 4389:21, 4428:1
**performance** [12] - 4208:23, 4209:6, 4217:9, 4217:14, 4224:25, 4225:9, 4229:3, 4229:4, 4368:10, 4368:14, 4368:16
**performing** [1] - 4236:8
**perhaps** [1] - 4304:25
**Perhaps** [2] - 4345:25, 4347:5
**period** [36] - 4151:3, 4151:7, 4151:11, 4151:15, 4151:19, 4156:24, 4158:10, 4187:4, 4189:11, 4190:24, 4191:2, 4191:12, 4191:20, 4191:21, 4192:9, 4198:5, 4198:6, 4198:10, 4199:16, 4200:3, 4221:17, 4228:9, 4230:21, 4232:13, 4234:22, 4237:6, 4259:20, 4349:13, 4364:16, 4368:19, 4380:18, 4381:1, 4390:22, 4405:5, 4411:25, 4412:15
**perjury** [1] - 4335:3
**permissible** [1] - 4252:8
**person** [34] - 4174:24, 4175:9, 4176:3, 4176:10, 4176:15, 4176:19, 4177:7, 4177:17, 4180:10, 4182:18, 4183:10, 4183:14, 4184:6, 4184:16, 4204:6, 4214:12, 4214:14, 4217:16, 4262:20, 4280:18, 4297:21, 4300:16, 4321:9, 4325:8, 4364:22, 4364:24, 4413:22, 4413:24, 4414:2, 4414:16, 4430:23, 4433:16, 4434:12, 4442:1
**Personal** [1] - 4338:4
**personal** [37] - 4177:5, 4178:23, 4185:13, 4226:1, 4278:7, 4282:25, 4299:11, 4299:16, 4331:13, 4332:3, 4332:6, 4332:10, 4332:15, 4333:1, 4334:4, 4334:7, 4334:16, 4334:19, 4335:5, 4335:11, 4335:25, 4336:2, 4336:5, 4336:6, 4336:11, 4337:18, 4337:23, 4337:25, 4338:3, 4338:5, 4338:8, 4338:10, 4341:5, 4352:2, 4356:16, 4419:11
**personally** [6] - 4177:21, 4229:25, 4341:7, 4367:8, 4383:14, 4389:14
**persons** [7] - 4177:1, 4180:10, 4182:14, 4183:7, 4184:3, 4185:19, 4185:22
**perspective** [3] - 4351:10, 4365:13, 4365:14
**pertaining** [3] - 4404:21, 4430:9
**PF** [1] - 4177:5
**pharmaceutical** [1] - 4389:5
**Pharmaceuticals** [1] - 4221:25
**Pharmacological** [1] - 4440:16
**Phil** [1] - 4384:3

**phone** [10] - 4289:1, 4289:3, 4300:6, 4363:15, 4363:22, 4364:4, 4364:12, 4383:4, 4404:12, 4413:14
**phrase** [2] - 4306:16, 4306:17
**phrased** [1] - 4315:9
**phrases** [1] - 4269:14
**physical** [1] - 4338:19
**pick** [1] - 4434:9
**picking** [1] - 4297:18
**piece** [5] - 4217:21, 4256:1, 4256:8, 4393:9, 4435:18
**PIEROTTI** [1] - 4273:24
**pierotti** [2] - 4359:19, 4359:25
**Pierotti** [28] - 4172:25, 4200:16, 4205:12, 4205:19, 4205:20, 4205:24, 4220:16, 4228:6, 4241:25, 4249:23, 4251:18, 4255:9, 4255:16, 4256:16, 4256:23, 4274:2, 4274:21, 4292:12, 4295:23, 4300:17, 4300:19, 4305:17, 4314:2, 4326:20, 4328:18, 4341:3, 4357:6
**pink** [1] - 4279:23
**pipe** [6] - 4290:18, 4306:10, 4319:8, 4319:9, 4319:16, 4319:20
**pitch** [3] - 4224:9, 4227:8, 4371:2
**place** [6] - 4165:19, 4216:10, 4222:6, 4232:10, 4275:3, 4366:13
**placement** [11] - 4181:18, 4181:19, 4184:1, 4186:4, 4186:11, 4186:13, 4186:24, 4187:4, 4319:10, 4319:13, 4415:11
**plan** [3] - 4243:19, 4245:20, 4397:13
**planned** [2] - 4371:15, 4374:24
**planning** [3] - 4234:23, 4356:20, 4383:21
**platform** [1] - 4214:17
**play** [4] - 4296:24, 4296:25, 4297:2
**playing** [2] - 4203:20, 4255:19
**Plaza** [1] - 4148:15
**plenty** [1] - 4321:21
**Plough** [1] - 4330:23
**plus** [2] - 4284:22, 4439:6
**pocket** [1] - 4288:11
**point** [46] - 4183:4, 4186:1, 4192:7, 4218:5, 4229:5, 4232:14, 4240:25, 4245:10, 4245:13, 4248:22, 4257:17, 4259:24, 4272:5, 4284:18, 4299:21, 4307:11, 4314:23, 4315:2, 4322:10, 4322:22, 4327:21, 4327:23, 4328:2, 4333:9, 4338:24, 4341:19, 4344:7, 4345:2, 4345:24, 4348:11, 4348:12, 4349:3, 4349:15, 4350:13, 4351:1, 4359:20, 4370:13, 4373:6, 4374:23, 4386:13, 4390:8, 4394:20, 4414:13, 4430:23, 4434:12
**pointing** [1] - 4159:15
**points** [1] - 4293:25, 4395:1
**Points** [3] - 4214:1, 4214:2, 4214:15
**Police** [1] - 4302:13
**policed** [1] - 4332:18
**political** [1] - 4206:18

**politics** [1] - 4206:23
**pool** [1] - 4255:12
**poor** [1] - 4208:23
**pop** [1] - 4288:2
**portfolio** [31] - 4207:18, 4207:19, 4207:21, 4208:24, 4209:2, 4209:5, 4209:8, 4209:9, 4209:11, 4213:6, 4214:13, 4215:5, 4215:7, 4215:8, 4217:4, 4217:9, 4218:2, 4218:9, 4219:22, 4219:23, 4219:25, 4220:1, 4220:4, 4224:8, 4225:4, 4229:8, 4243:14, 4310:18, 4325:23, 4325:24
**portion** [7] - 4156:13, 4174:11, 4174:12, 4188:14, 4389:9, 4393:10, 4399:3
**posing** [1] - 4196:4
**position** [17] - 4153:7, 4207:6, 4223:9, 4225:2, 4225:3, 4225:6, 4225:7, 4229:9, 4230:4, 4230:5, 4230:6, 4230:8, 4250:7, 4280:20, 4335:7, 4381:6
**positions** [2] - 4222:23, 4278:19
**positive** [2] - 4298:9, 4374:3
**possibility** [2] - 4260:11, 4442:13
**possible** [6] - 4214:24, 4250:1, 4268:18, 4269:19, 4291:21, 4376:6
**possibly** [1] - 4358:18
**post** [3] - 4296:3, 4296:4, 4299:18
**postpone** [1] - 4387:25
**potential** [4] - 4259:13, 4350:14, 4350:23, 4373:8
**potentially** [2] - 4256:11, 4256:20
**power** [12] - 4171:17, 4175:10, 4176:16, 4177:8, 4177:10, 4177:13, 4183:11, 4184:7, 4184:9, 4184:12, 4401:12
**practice** [1] - 4441:18
**predominantly** [1] - 4362:15
**prefer** [2] - 4250:24, 4251:9
**preference** [4] - 4253:11, 4336:19, 4336:21
**preferred** [4] - 4179:5, 4179:7, 4179:9, 4179:13
**prefers** [1] - 4300:25
**prejudicial** [7] - 4234:15, 4266:14, 4266:21, 4267:10, 4267:16, 4272:8, 4337:16
**preparation** [2] - 4197:4, 4197:8
**prepare** [5] - 4154:18, 4155:11, 4155:19, 4156:2, 4172:8
**prepared** [6] - 4149:21, 4172:15, 4197:14, 4197:18, 4199:2, 4425:18
**preparing** [1] - 4160:3
**preponderance** [5] - 4248:20, 4248:21, 4248:24, 4250:10, 4257:18
**present** [4] - 4149:19, 4251:1, 4274:17, 4411:10
**press** [3] - 4379:23, 4380:17, 4395:21
**pressure** [2] - 4392:25, 4395:1
**pretty** [7] - 4156:21, 4194:7, 4212:15, 4363:24, 4364:13, 4395:3
**prevent** [1] - 4291:2
**preventative** [1] - 4439:18

**previous** [2] - 4217:10, 4358:25
**previously** [4] - 4150:12, 4183:4, 4273:25, 4285:1
**price** [29] - 4155:23, 4156:15, 4156:20, 4157:4, 4160:10, 4162:9, 4185:7, 4185:11, 4187:21, 4188:25, 4189:1, 4190:12, 4190:14, 4191:11, 4191:15, 4191:23, 4192:1, 4192:3, 4192:6, 4199:4, 4249:7, 4263:4, 4275:14, 4275:16, 4287:3, 4288:16, 4291:7, 4310:16
**prices** [5] - 4163:4, 4188:4, 4188:7, 4191:8, 4199:5
**primarily** [2] - 4412:10, 4428:17
**Princeton** [3] - 4288:2, 4322:16, 4322:17
**principal** [2] - 4377:16, 4378:5
**print** [1] - 4280:24
**priorities** [2] - 4282:6, 4357:22
**private** [25] - 4152:12, 4163:10, 4163:11, 4163:15, 4164:14, 4166:18, 4168:22, 4181:18, 4181:19, 4183:25, 4184:23, 4186:4, 4186:11, 4186:12, 4186:24, 4187:3, 4202:10, 4202:11, 4202:19, 4204:18, 4207:3, 4319:10, 4319:12, 4319:20, 4415:11
**privilege** [1] - 4316:9
**privy** [1] - 4284:21
**probe** [1] - 4332:4
**problem** [5] - 4204:8, 4227:6, 4258:8, 4345:4, 4369:12
**problems** [3] - 4204:17, 4234:20, 4255:11
**procedure** [1] - 4427:2
**proceed** [3] - 4150:16, 4152:2, 4205:21
**proceedings** [6] - 4192:11, 4194:21, 4257:24, 4266:4, 4267:9, 4272:20
**Proceedings** [1] - 4148:25
**proceeds** [1] - 4382:21
**process** [7] - 4162:11, 4168:6, 4178:8, 4316:2, 4316:13, 4345:5, 4385:10
**Procter** [4] - 4208:16, 4210:5, 4211:10, 4307:15, 4307:16, 4309:3, 4311:25, 4312:2, 4312:4, 4312:6, 4312:12, 4312:17
**produced** [1] - 4148:25
**product** [2] - 4206:11, 4366:9
**products** [1] - 4208:17
**Professor** [1] - 4440:1
**professor** [1] - 4440:13
**proffer** [3] - 4316:17, 4332:16, 4333:5
**proffering** [2] - 4333:25, 4336:10
**profit** [2] - 4410:9, 4410:18
**profits** [1] - 4368:3
**program** [13] - 4200:18, 4202:7, 4202:13, 4202:25, 4203:3, 4203:13, 4203:17, 4203:25, 4204:13, 4204:20, 4317:13, 4390:12
**project** [4] - 4288:17, 4288:21, 4341:12, 4389:22
**projects** [2] - 4232:4

**proliferated** [1] - 4209:1
**promised** [2] - 4384:9, 4384:12
**promises** [1] - 4384:7
**promissory** [22] - 4374:15, 4374:17, 4375:2, 4375:3, 4375:6, 4375:11, 4376:8, 4376:14, 4376:22, 4381:2, 4381:7, 4384:16, 4385:16, 4388:8, 4404:11, 4405:25, 4406:10, 4406:14, 4407:22, 4424:1, 4435:16
**prompted** [1] - 4227:12
**promptly** [1] - 4299:11
**proof** [1] - 4254:3
**prop** [3] - 4212:22, 4212:24, 4213:24
**propose** [1] - 4280:21
**proposes** [1] - 4268:9
**prosecute** [1] - 4408:22
**prosecuted** [3] - 4212:1, 4213:16, 4213:21
**prosecution** [5] - 4211:19, 4211:22, 4211:24, 4408:18, 4408:19
**prosecutions** [1] - 4153:10
**prospect** [1] - 4244:14
**prospecting** [1] - 4363:17
**prospectus** [1] - 4440:20
**protect** [6] - 4407:14, 4408:1, 4409:19, 4409:22, 4429:20, 4429:21
**protecting** [1] - 4153:5
**protection** [1] - 4152:25
**prove** [3] - 4248:24, 4329:15, 4329:16
**proved** [2] - 4248:19, 4248:20
**provide** [24] - 4152:24, 4210:21, 4210:25, 4219:23, 4230:17, 4263:6, 4275:20, 4292:25, 4299:13, 4300:2, 4365:16, 4367:17, 4389:19, 4399:14, 4402:5, 4402:15, 4402:18, 4408:12, 4408:24, 4409:2, 4410:14, 4430:11, 4433:25, 4437:13
**provided** [14] - 4160:7, 4185:12, 4242:9, 4243:4, 4299:14, 4404:14, 4406:13, 4407:6, 4407:8, 4427:19, 4430:10, 4433:16, 4433:22, 4434:22
**provides** [1] - 4236:7
**providing** [6] - 4153:9, 4242:5, 4242:7, 4395:24, 4402:1, 4404:10
**province** [1] - 4269:3
**provision** [1] - 4403:17
**provisions** [1] - 4240:23
**prudent** [3] - 4337:8, 4339:6, 4339:12
**public** [22] - 4153:16, 4154:13, 4156:19, 4160:8, 4163:12, 4163:17, 4163:20, 4165:15, 4166:4, 4166:18, 4167:16, 4168:22, 4181:21, 4193:14, 4193:24, 4204:12, 4245:21, 4245:24, 4285:2, 4319:4, 4379:23, 4380:17
**publicity** [1] - 4309:7
**publicly** [7] - 4163:2, 4163:4, 4163:6, 4163:11, 4164:21, 4165:14, 4171:7, 4380:22
**publish** [1] - 4150:21
**published** [5] - 4191:6, 4197:22, 4262:3, 4328:7, 4399:4

**pull** [2] - 4394:13, 4397:1
**pulled** [2] - 4213:23, 4441:23
**pulling** [3] - 4225:13, 4225:15, 4405:22
**punishable** [1] - 4425:15
**purchase** [30] - 4185:5, 4185:6, 4185:7, 4185:13, 4185:16, 4246:22, 4261:12, 4262:25, 4263:4, 4263:13, 4263:24, 4264:4, 4264:6, 4275:13, 4275:14, 4275:16, 4275:17, 4275:20, 4276:15, 4276:19, 4279:8, 4286:14, 4287:6, 4287:16, 4289:21, 4290:14, 4292:22, 4303:24, 4304:14, 4341:17
**Purchase** [1] - 4262:7
**purchased** [10] - 4163:23, 4178:22, 4179:10, 4179:23, 4185:4, 4264:16, 4276:16, 4276:18, 4279:12, 4284:12
**purchaser** [4] - 4262:24, 4263:3
**purchases** [2] - 4199:9, 4263:3
**purchasing** [1] - 4260:11
**purely** [2] - 4332:21, 4397:18
**purported** [1] - 4257:1
**purpose** [7] - 4265:5, 4330:7, 4334:24, 4335:1, 4393:3, 4402:21, 4402:24
**pursuant** [5] - 4156:11, 4159:8, 4279:7, 4408:14, 4408:17
**pursuing** [1] - 4296:19
**purview** [2] - 4203:11, 4204:3
**push** [1] - 4230:12
**pushed** [1] - 4375:1
**put** [35] - 4149:16, 4171:23, 4187:16, 4200:14, 4224:7, 4234:22, 4238:14, 4256:20, 4268:3, 4279:5, 4301:11, 4301:14, 4301:18, 4303:2, 4306:1, 4313:4, 4349:25, 4350:23, 4371:17, 4375:5, 4381:6, 4382:12, 4392:25, 4394:25, 4415:8, 4415:11, 4419:14, 4420:15, 4420:19, 4420:22, 4425:22, 4425:23, 4425:25, 4435:22
**putting** [2] - 4153:17, 4225:18

## Q

**QB** [2] - 4164:25, 4165:1
**qualified** [3] - 4227:3, 4319:21, 4402:4
**quality** [1] - 4244:6
**quarterly** [2] - 4162:22, 4171:4
**quartile** [2] - 4298:7, 4298:8
**questioned** [1] - 4269:23
**questioner** [1] - 4355:4
**questioning** [2] - 4202:5, 4324:23
**questionnaire** [1] - 4367:19
**questions** [26] - 4192:12, 4193:2, 4202:7, 4204:4, 4205:3, 4258:7, 4268:17, 4272:6, 4274:3, 4274:13, 4293:15, 4305:14, 4305:20, 4309:25, 4359:19, 4360:7, 4370:6, 4407:3, 4409:16, 4410:23, 4422:4, 4424:20, 4438:10, 4439:25, 4440:5, 4440:10
**quick** [2] - 4259:4, 4424:19
**quickly** [4] - 4174:17, 4217:4, 4296:6, 4404:13
**quietly** [1] - 4346:17

**Quinn** [1] - 4214:10
**quite** [6] - 4208:24, 4217:2, 4364:12, 4368:20, 4411:22, 4429:10
**quote** [2] - 4299:9, 4300:20
**quote/unquote** [1] - 4276:1

# R

**R.K** [1] - 4311:22
**radically** [1] - 4351:6
**raise** [13] - 4217:1, 4217:2, 4217:13, 4217:14, 4237:20, 4237:21, 4237:23, 4238:3, 4292:4, 4319:17, 4349:21, 4350:17, 4366:21
**raised** [1] - 4203:14
**raises** [2] - 4237:16, 4238:10
**raising** [3] - 4207:9, 4349:23, 4371:5
**Raj** [12] - 4209:21, 4209:22, 4211:5, 4213:16, 4311:22, 4315:18, 4315:20, 4315:24, 4317:23, 4318:3, 4318:15
**Raj's** [1] - 4211:12
**Rajaratnam** [2] - 4209:21, 4211:5
**Rajaratnan** [8] - 4311:22, 4311:23, 4315:18, 4315:20, 4315:24, 4317:23, 4318:3, 4318:15
**Rajaratnan's** [1] - 4311:22
**Rajat** [4] - 4211:7, 4211:9, 4211:10, 4211:19
**ran** [4] - 4219:16, 4300:5, 4422:22, 4439:7
**random** [1] - 4364:13
**range** [2] - 4189:13, 4189:14
**ranges** [1] - 4190:17
**rarely** [1] - 4334:15
**rate** [1] - 4397:17
**rather** [3] - 4324:15, 4336:5, 4389:14
**rational** [1] - 4266:7
**rationalize** [3] - 4407:6, 4407:25, 4433:18
**Raton** [1] - 4362:17
**raw** [1] - 4217:8
**re** [3] - 4227:8, 4227:18, 4431:20
**re-ask** [1] - 4227:18
**re-pitch** [1] - 4227:8
**re-register** [1] - 4431:20
**reached** [5] - 4210:9, 4210:10, 4210:11, 4316:20
**reacted** [1] - 4351:15
**reaction** [6] - 4235:6, 4297:24, 4298:2, 4369:21, 4369:25, 4370:4
**read** [64] - 4149:13, 4150:17, 4159:9, 4166:14, 4173:3, 4178:24, 4179:1, 4179:16, 4180:7, 4185:3, 4186:1, 4188:10, 4219:21, 4240:18, 4278:8, 4278:15, 4282:3, 4288:9, 4288:10, 4291:4, 4291:25, 4292:14, 4294:15, 4296:14, 4297:8, 4297:13, 4313:5, 4313:7, 4314:9, 4314:12, 4318:21, 4320:5, 4320:7, 4320:25, 4323:2, 4323:9, 4327:9, 4346:11, 4346:16, 4346:18, 4348:4, 4382:10, 4383:25,

4389:17, 4390:17, 4395:21, 4396:19, 4399:11, 4399:19, 4401:10, 4415:10, 4415:14, 4422:14, 4422:20, 4424:4, 4425:6, 4428:9, 4428:11, 4430:18, 4430:19, 4432:13, 4433:6, 4433:9
**reading** [7] - 4191:12, 4320:1, 4346:14, 4346:16, 4425:20, 4425:21, 4425:24
**reads** [4] - 4150:23, 4299:7, 4301:20, 4302:10
**ready** [1] - 4192:16
**real** [8] - 4301:24, 4302:20, 4362:23, 4363:2, 4363:5, 4390:10, 4390:11
**realized** [4] - 4370:6, 4410:9
**really** [38] - 4162:7, 4162:11, 4163:13, 4164:2, 4169:3, 4191:25, 4193:18, 4195:6, 4209:10, 4212:25, 4244:5, 4244:8, 4244:14, 4251:6, 4267:16, 4267:19, 4268:17, 4275:10, 4283:10, 4286:24, 4308:15, 4327:17, 4339:14, 4342:10, 4352:9, 4355:7, 4355:9, 4358:16, 4364:20, 4392:17, 4393:22, 4407:11, 4420:12, 4420:21, 4421:17, 4428:24, 4431:14, 4442:17
**Really** [1] - 4267:25
**reason** [13] - 4203:19, 4243:4, 4252:5, 4252:9, 4284:22, 4299:2, 4302:3, 4302:19, 4308:24, 4309:14, 4333:15, 4352:6, 4354:10
**reasonable** [1] - 4297:23
**reasons** [4] - 4333:10, 4338:22, 4408:1, 4434:17
**reassured** [1] - 4404:22
**recalling** [1] - 4430:25
**receipt** [1] - 4241:7
**receive** [32] - 4155:5, 4159:1, 4161:2, 4167:25, 4204:7, 4212:2, 4241:10, 4241:12, 4241:13, 4243:1, 4261:25, 4275:18, 4275:23, 4277:23, 4287:21, 4289:18, 4290:1, 4295:13, 4304:5, 4368:10, 4368:13, 4372:14, 4377:2, 4377:7, 4378:25, 4380:11, 4381:23, 4387:13, 4399:1, 4403:21, 4403:25, 4438:7
**received** [45] - 4172:22, 4172:23, 4172:24, 4172:25, 4173:1, 4173:2, 4219:4, 4242:25, 4249:23, 4276:10, 4277:18, 4279:7, 4279:10, 4283:5, 4286:1, 4286:14, 4286:16, 4286:23, 4287:5, 4287:15, 4287:22, 4289:21, 4290:2, 4292:2, 4293:12, 4294:15, 4295:15, 4300:10, 4303:5, 4304:3, 4305:1, 4321:10, 4372:15, 4404:2, 4404:20, 4405:9, 4409:4, 4409:8, 4409:9, 4410:8, 4410:11, 4410:19, 4416:23, 4429:19
**receiving** [4] - 4287:6, 4295:8, 4388:24, 4400:6
**recent** [2] - 4395:21, 4396:13
**recently** [3] - 4278:12, 4297:23, 4300:1
**recess** [1] - 4271:24
**Recess** [4] - 4192:19, 4253:21, 4356:25,

4411:8
**recipient** [2] - 4314:3, 4360:5
**recipients** [2] - 4250:2, 4284:2
**recognize** [10] - 4155:17, 4157:13, 4158:18, 4159:11, 4160:16, 4173:25, 4239:3, 4376:19, 4398:16, 4437:17
**recognized** [2] - 4395:22, 4440:8
**recollection** [33] - 4224:16, 4225:14, 4238:1, 4245:17, 4274:8, 4274:12, 4308:13, 4308:20, 4311:7, 4320:24, 4325:14, 4325:17, 4325:25, 4326:4, 4326:12, 4330:8, 4343:16, 4346:3, 4346:19, 4348:21, 4359:8, 4422:12, 4422:15, 4422:21, 4423:1, 4424:6, 4426:6, 4427:6, 4427:7, 4428:10, 4432:14, 4433:11, 4435:12
**recommend** [1] - 4414:23
**recommendations** [1] - 4208:15
**record** [18] - 4166:19, 4204:13, 4217:8, 4224:4, 4228:4, 4257:21, 4271:10, 4272:15, 4294:19, 4298:5, 4332:11, 4333:13, 4354:18, 4355:3, 4360:22, 4444:6, 4444:7, 4444:9
**recorded** [1] - 4148:25
**recording** [2] - 4162:21, 4165:20
**records** [8] - 4150:5, 4157:16, 4159:25, 4160:11, 4172:7, 4178:1, 4356:3, 4356:9
**recount** [1] - 4274:7
**recourse** [2] - 4416:8, 4416:12
**recovered** [2] - 4202:16, 4204:6
**recovery** [1] - 4202:15
**red** [5] - 4172:17, 4188:13, 4189:6, 4191:16, 4197:15
**redeemed** [1] - 4227:5
**redeeming** [1] - 4225:17
**REDIRECT** [2] - 4359:23, 4445:7
**redirect** [5] - 4195:8, 4205:4, 4355:10, 4356:20, 4359:21
**refer** [2] - 4422:11, 4432:8
**reference** [4] - 4242:22, 4299:16, 4300:7, 4301:6
**referenced** [1] - 4172:2
**references** [2] - 4293:17, 4373:18
**referencing** [2] - 4299:17, 4392:20
**referred** [5] - 4161:12, 4162:2, 4366:17, 4374:17, 4432:10
**referring** [7] - 4220:13, 4231:2, 4232:2, 4233:7, 4293:21, 4382:25, 4385:14
**refers** [3] - 4188:11, 4191:13, 4191:15
**reflect** [1] - 4355:3
**reflected** [4] - 4199:10, 4199:12, 4199:14, 4199:16
**reflective** [1] - 4150:9
**reflects** [3] - 4158:9, 4158:10, 4186:4
**reframe** [1] - 4228:22
**refresh** [8] - 4308:13, 4308:20, 4346:19, 4422:15, 4426:6, 4427:6, 4433:11, 4435:12
**refreshes** [6] - 4422:12, 4422:21, 4424:6, 4427:6, 4428:10, 4432:14

**refreshing** [4] - 4330:8, 4343:15, 4346:3, 4423:1
**refuse** [1] - 4291:20
**refused** [2] - 4297:15, 4300:25
**refuses** [1] - 4300:5
**refusing** [1] - 4322:22
**regard** [7] - 4180:15, 4273:12, 4277:13, 4282:8, 4319:1, 4343:25, 4357:24
**regarding** [7] - 4168:10, 4170:6, 4186:19, 4219:24, 4228:2, 4324:15
**regional** [1] - 4361:20
**register** [1] - 4168:17, 4431:20
**registered** [3] - 4168:23, 4398:1, 4431:19
**registering** [1] - 4169:12
**registrar** [1] - 4249:13
**registration** [8] - 4168:18, 4168:21, 4169:8, 4169:9, 4169:10, 4186:19, 4186:23, 4187:1
**regular** [2] - 4229:7, 4229:13
**regularly** [1] - 4288:6
**regulate** [1] - 4152:19
**regulates** [1] - 4152:11
**regulating** [1] - 4153:5
**Regulation** [1] - 4154:2
**regulations** [1] - 4150:7
**Regulatory** [1] - 4152:8
**regulatory** [1] - 4152:10
**reintroduce** [2] - 4282:16, 4358:13
**reissue** [2] - 4431:8, 4431:16
**reissued** [1] - 4431:10
**relate** [4] - 4239:10, 4239:17, 4387:7, 4440:11
**related** [8] - 4211:22, 4277:17, 4287:15, 4289:20, 4364:20, 4394:23, 4403:3, 4405:5
**relating** [1] - 4280:21
**relation** [5] - 4154:18, 4173:20, 4187:1, 4187:3, 4333:2
**relations** [1] - 4237:17
**relationship** [37] - 4169:3, 4249:3, 4293:3, 4293:14, 4331:14, 4332:3, 4332:10, 4332:15, 4332:20, 4333:9, 4333:12, 4333:23, 4334:4, 4334:5, 4334:7, 4334:16, 4334:19, 4335:5, 4335:6, 4335:9, 4335:12, 4336:2, 4336:15, 4337:19, 4337:23, 4338:1, 4338:10, 4338:12, 4338:14, 4339:5, 4339:23, 4339:24, 4341:8, 4352:2, 4407:15, 4413:1, 4413:8
**relationships** [3] - 4180:6, 4180:9, 4186:16
**relative** [2] - 4262:13, 4262:17
**relatively** [2] - 4149:8, 4163:25
**release** [6] - 4240:12, 4240:19, 4240:20, 4304:12, 4379:23, 4380:17
**released** [2] - 4301:17, 4304:23
**releases** [1] - 4395:21
**relevance** [2] - 4200:24, 4222:16
**relevant** [4] - 4150:5, 4333:15, 4336:20, 4336:21

**relied** [2] - 4160:21, 4193:14
**rely** [5] - 4155:11, 4160:2, 4187:20, 4193:24, 4299:13
**remain** [1] - 4443:21
**remainder** [2] - 4189:6, 4198:23
**remaining** [4] - 4169:18, 4173:10, 4275:22, 4304:5
**remember** [86] - 4210:9, 4212:12, 4212:14, 4212:15, 4214:24, 4215:13, 4215:14, 4215:24, 4221:6, 4223:10, 4232:19, 4239:4, 4242:3, 4242:8, 4260:14, 4275:9, 4277:11, 4283:14, 4283:15, 4289:4, 4295:8, 4308:21, 4309:2, 4309:4, 4309:6, 4309:9, 4309:13, 4311:8, 4311:11, 4315:13, 4315:24, 4316:23, 4316:24, 4317:6, 4317:11, 4317:18, 4320:1, 4320:15, 4322:15, 4322:19, 4323:17, 4325:19, 4326:11, 4326:13, 4329:3, 4329:4, 4329:10, 4329:14, 4329:19, 4342:9, 4342:10, 4342:12, 4342:20, 4343:8, 4343:12, 4343:13, 4343:14, 4346:1, 4346:2, 4346:24, 4348:22, 4349:3, 4350:15, 4350:19, 4350:24, 4353:12, 4357:13, 4357:18, 4357:20, 4357:21, 4358:5, 4358:6, 4359:13, 4363:22, 4365:5, 4417:16, 4425:20, 4426:5, 4429:10, 4429:15, 4435:13, 4435:14, 4435:15, 4436:20, 4437:4
**Remember** [1] - 4393:1
**remind** [2] - 4242:15, 4243:22
**remotely** [1] - 4302:3
**removed** [1] - 4299:5
**renegotiated** [1] - 4300:1
**renegotiating** [1] - 4300:7
**renegotiation** [1] - 4300:9
**rent** [9] - 4233:8, 4235:10, 4235:11, 4235:22, 4235:25, 4236:10, 4236:13, 4236:15, 4237:2
**repaid** [7] - 4377:23, 4378:9, 4381:2, 4381:3, 4386:13, 4394:24, 4410:17
**repay** [6] - 4383:7, 4383:12, 4393:5, 4410:3, 4410:10
**repaying** [1] - 4370:10
**repayment** [4] - 4372:8, 4387:1, 4388:8, 4392:17
**repayments** [1] - 4373:19
**repeat** [3] - 4312:15, 4413:21, 4423:6
**repeatedly** [2] - 4301:21, 4425:17
**rephrase** [9] - 4194:18, 4195:20, 4222:17, 4227:7, 4305:21, 4324:18, 4324:19, 4377:25, 4402:23
**replaced** [1] - 4238:6
**reply** [1] - 4281:12
**Reply** [1] - 4281:13
**report** [8] - 4162:14, 4165:20, 4165:24, 4170:23, 4171:3, 4186:6, 4186:8, 4435:11
**reported** [3] - 4186:5, 4186:8, 4385:22
**Reporter** [2] - 4148:23, 4148:23
**reporting** [25] - 4162:16, 4174:23,

4174:24, 4175:9, 4176:3, 4176:10, 4176:15, 4176:19, 4176:25, 4177:7, 4177:17, 4180:9, 4182:14, 4182:18, 4183:7, 4183:10, 4183:14, 4184:3, 4184:6, 4184:16, 4185:19, 4185:22, 4204:15, 4309:7, 4309:9
**reports** [3] - 4162:22, 4165:5
**represent** [5] - 4160:21, 4200:14, 4280:3, 4280:15, 4432:22
**representation** [4] - 4196:8, 4198:15, 4200:6, 4425:11
**representative** [1] - 4203:1
**represented** [7] - 4176:6, 4176:21, 4177:23, 4182:21, 4183:19, 4184:18, 4189:24
**representing** [2] - 4193:1, 4343:2
**represents** [4] - 4161:10, 4196:12, 4199:19, 4401:11
**request** [5] - 4230:13, 4269:1, 4272:10, 4285:5, 4293:5
**requested** [1] - 4389:21
**require** [3] - 4162:13, 4162:16, 4165:4, 4278:13
**required** [6] - 4153:14, 4162:20, 4165:23, 4170:23, 4195:24, 4224:10
**requirements** [4] - 4150:7, 4150:9, 4162:7, 4165:12
**requires** [1] - 4410:3
**requisite** [1] - 4401:12
**resale** [3] - 4166:14, 4168:25, 4169:14
**research** [6] - 4206:11, 4394:19, 4427:20, 4427:25, 4428:6, 4428:18
**resend** [1] - 4396:13
**resolve** [2] - 4293:9, 4336:17
**respect** [19] - 4162:24, 4172:1, 4173:10, 4180:6, 4180:10, 4182:25, 4186:16, 4190:11, 4197:11, 4197:14, 4197:18, 4198:13, 4235:8, 4249:16, 4283:9, 4283:12, 4303:4, 4392:20, 4440:17
**respectfully** [2] - 4251:19, 4334:14
**Respectfully** [1] - 4268:25
**respond** [5] - 4288:4, 4288:24, 4383:20, 4385:8, 4385:25
**responded** [1] - 4383:24
**responding** [1] - 4281:14
**responds** [4] - 4242:21, 4284:10, 4385:2, 4385:21
**response** [13] - 4281:8, 4288:7, 4322:19, 4347:16, 4376:4, 4383:25, 4386:1, 4386:7, 4393:21, 4395:7, 4396:15, 4398:3, 4407:3
**responses** [1] - 4292:2
**responsibilities** [3] - 4153:12, 4204:15, 4442:22
**responsibility** [2] - 4400:15, 4416:17
**responsible** [5] - 4208:14, 4235:6, 4268:5, 4321:4, 4321:9
**responsive** [1] - 4272:7
**rest** [3] - 4188:9, 4268:16, 4355:8
**restaurant** [1] - 4216:11
**restricted** [17] - 4166:17, 4167:13,

4167:14, 4167:15, 4167:20, 4167:22, 4168:7, 4168:11, 4168:24, 4168:25, 4169:18, 4170:8, 4178:3, 4195:18, 4397:2, 4397:24, 4398:8
**restrictions** [7] - 4167:18, 4168:6, 4168:12, 4169:14, 4169:22, 4170:5, 4263:11
**result** [12] - 4178:18, 4179:6, 4179:20, 4202:14, 4263:12, 4281:21, 4286:14, 4292:5, 4303:3, 4304:20, 4369:18
**resume** [2] - 4274:19, 4357:4
**retail** [1] - 4207:11
**retained** [1] - 4316:16
**retrieve** [2] - 4192:16, 4253:14
**Retrophin** [181] - 4151:2, 4151:6, 4151:10, 4151:14, 4151:18, 4156:16, 4158:13, 4164:14, 4164:20, 4165:6, 4166:10, 4167:9, 4172:1, 4173:5, 4173:21, 4174:3, 4174:6, 4178:19, 4178:20, 4178:21, 4179:4, 4179:5, 4179:6, 4179:7, 4179:8, 4179:9, 4179:12, 4179:19, 4179:21, 4179:22, 4180:15, 4181:9, 4182:3, 4182:4, 4183:1, 4187:18, 4187:25, 4189:23, 4190:14, 4191:1, 4191:7, 4191:11, 4193:11, 4193:16, 4193:18, 4197:4, 4197:7, 4197:16, 4198:6, 4199:6, 4199:9, 4215:24, 4223:12, 4223:14, 4223:18, 4229:22, 4238:18, 4240:22, 4240:25, 4241:1, 4241:2, 4241:4, 4241:19, 4243:8, 4243:9, 4243:11, 4243:14, 4245:1, 4245:9, 4245:21, 4245:23, 4248:14, 4249:5, 4249:7, 4259:10, 4259:21, 4260:1, 4275:16, 4276:11, 4276:13, 4277:11, 4277:18, 4279:6, 4281:18, 4283:25, 4285:2, 4285:16, 4286:25, 4288:17, 4288:21, 4289:20, 4290:17, 4291:7, 4292:3, 4292:22, 4294:11, 4295:21, 4300:4, 4300:11, 4302:1, 4303:5, 4303:7, 4303:8, 4303:22, 4304:17, 4304:25, 4306:12, 4318:22, 4319:8, 4321:3, 4326:10, 4326:14, 4326:24, 4327:13, 4327:22, 4328:3, 4328:14, 4328:20, 4329:1, 4329:8, 4329:21, 4335:15, 4350:11, 4352:18, 4359:6, 4378:18, 4379:4, 4379:10, 4379:12, 4379:14, 4379:22, 4380:17, 4381:5, 4382:15, 4388:25, 4389:12, 4389:14, 4391:4, 4392:11, 4395:25, 4396:25, 4399:9, 4399:23, 4400:9, 4400:13, 4401:2, 4401:4, 4401:15, 4402:2, 4402:6, 4402:16, 4402:19, 4403:18, 4403:22, 4403:24, 4404:6, 4404:10, 4404:18, 4404:21, 4405:12, 4406:1, 4406:13, 4407:21, 4408:23, 4409:4, 4410:5, 4410:8, 4410:15, 4418:21, 4418:22, 4418:25, 4419:9, 4419:13, 4419:14, 4422:6, 4423:22, 4427:12, 4427:20, 4428:13, 4431:7, 4433:13
**Retrophin's** [3] - 4173:16, 4280:8, 4280:9

**return** [6] - 4192:16, 4293:1, 4300:6, 4300:24, 4303:12, 4442:25
**returning** [1] - 4230:2
**returns** [5] - 4298:7, 4298:8, 4375:21, 4375:22, 4415:25
**revenues** [1] - 4286:23
**reverse** [22] - 4163:7, 4164:10, 4164:13, 4164:14, 4164:20, 4165:15, 4165:19, 4166:3, 4166:9, 4172:4, 4178:8, 4178:14, 4178:15, 4187:18, 4189:15, 4193:17, 4238:14, 4245:25, 4276:11, 4303:18, 4319:16, 4379:5
**review** [19] - 4160:7, 4164:9, 4172:3, 4173:14, 4173:20, 4178:1, 4181:16, 4184:21, 4186:25, 4187:17, 4187:20, 4191:1, 4194:5, 4194:15, 4194:16, 4196:1, 4196:2, 4367:23, 4441:23
**reviewed** [7] - 4156:2, 4156:6, 4158:21, 4159:19, 4182:8, 4183:17, 4196:8
**reviews** [1] - 4194:11
**Rica** [1] - 4384:10
**Richard** [1] - 4148:23
**Richardson** [28] - 4223:6, 4224:23, 4331:8, 4331:10, 4331:13, 4332:3, 4332:4, 4332:20, 4333:7, 4333:11, 4335:3, 4335:8, 4335:19, 4336:1, 4336:18, 4337:4, 4337:20, 4337:24, 4338:15, 4339:2, 4339:8, 4339:20, 4341:8, 4347:16, 4347:18, 4347:19, 4348:13, 4348:19
**Rick's** [2] - 4229:11, 4230:6
**right-hand** [2] - 4220:15, 4241:24
**rightfully** [1] - 4300:24
**rights** [1] - 4186:19
**risk** [9] - 4222:23, 4345:15, 4347:1, 4355:13, 4375:20, 4415:18, 4415:19, 4416:17, 4417:15
**road** [3] - 4342:3, 4370:13, 4374:24
**Road** [1] - 4294:3
**Robert** [1] - 4330:24
**robust** [1] - 4297:16
**ROHDE** [1] - 4148:14
**role** [7] - 4209:10, 4214:2, 4244:18, 4283:25, 4325:21, 4333:16, 4333:17
**rolling** [3] - 4232:21, 4233:2, 4395:15
**romantic** [4] - 4333:9, 4333:19, 4338:14, 4341:8
**Romantic** [3] - 4338:12, 4339:23, 4339:24
**Ron** [8] - 4237:9, 4238:8, 4238:9, 4246:12, 4246:20, 4246:23, 4249:8, 4290:10
**room** [10] - 4211:5, 4211:6, 4221:9, 4221:10, 4221:11, 4221:14, 4275:6, 4275:9, 4275:11, 4275:25
**Rosenwald** [1] - 4223:7
**roughly** [2] - 4264:10, 4369:2
**roughshod** [1] - 4266:4
**round** [1] - 4273:5
**Row** [6] - 4176:7, 4176:22, 4177:24, 4182:22, 4183:20, 4184:19

**RPR** [1] - 4148:23
**RTRX** [3] - 4173:15, 4188:1, 4191:7
**ruin** [1] - 4335:6
**Rule** [10] - 4166:17, 4167:13, 4168:10, 4168:14, 4168:15, 4168:24, 4169:2, 4170:1, 4171:9, 4398:9
**rules** [4] - 4152:20, 4152:21, 4397:24, 4427:3
**rumor** [4] - 4332:21, 4333:7, 4334:1, 4337:14
**rumors** [4] - 4336:4, 4337:15, 4338:5, 4338:6
**run** [4] - 4217:3, 4220:4, 4365:24, 4366:1
**running** [10] - 4224:10, 4235:4, 4235:7, 4245:6, 4266:4, 4327:19, 4345:15, 4346:25, 4355:13, 4390:11
**runs** [1] - 4282:18
**Russo** [4] - 4214:23, 4214:25, 4221:7, 4238:6
**Ruth** [1] - 4173:13
**rwbarrycourtreporter@gmail.com** [1] - 4148:24

**S**

**S-1** [1] - 4169:8
**Sachs** [1] - 4211:11
**sad** [1] - 4302:2
**safe** [1] - 4300:24
**sake** [1] - 4252:4
**salary** [3] - 4155:5, 4218:10, 4220:9
**sale** [4] - 4199:20, 4305:4, 4343:1, 4409:10
**sale"** [1] - 4166:20
**sales** [3] - 4207:2, 4207:17, 4362:10
**salespeople** [1] - 4350:1
**salvage** [1] - 4345:7
**San** [1] - 4237:11
**Sarah** [2] - 4330:17, 4330:18
**sat** [1] - 4275:1
**satisfy** [2] - 4257:5, 4285:15
**Saturday** [1] - 4384:1
**Saunders** [2] - 4330:11, 4330:13
**save** [2] - 4422:9, 4435:23
**saw** [16] - 4183:16, 4191:22, 4211:3, 4216:17, 4260:25, 4287:11, 4302:3, 4309:17, 4320:3, 4320:5, 4333:3, 4335:16, 4341:6, 4341:7, 4342:8, 4381:5
**SC** [2] - 4174:18
**SC13D/A** [1] - 4181:22
**scenario** [2] - 4312:3, 4312:6
**schedule** [4] - 4158:22, 4171:15, 4174:3, 4174:19
**Schedule** [3] - 4181:4, 4186:17, 4284:5
**scheduled** [1] - 4212:10
**Schering** [1] - 4330:22
**School** [1] - 4440:14
**science** [1] - 4206:18
**scope** [7] - 4202:8, 4203:4, 4203:12,

4204:2, 4220:3, 4274:6, 4389:23

**Scott** [1] - 4278:11

**Scottrade** [5] - 4279:3, 4279:5, 4279:15, 4279:19, 4285:23

**scramble** [1] - 4345:7

**screaming** [1] - 4289:5

**screen** [6] - 4172:13, 4182:7, 4306:2, 4308:19, 4326:19, 4440:23

**screens** [4] - 4222:5, 4222:6, 4232:21

**scroll** [20] - 4241:5, 4263:1, 4284:9, 4291:23, 4301:13, 4373:11, 4376:3, 4377:16, 4377:20, 4383:23, 4384:4, 4385:1, 4385:20, 4385:24, 4390:15, 4393:17, 4393:21, 4396:17, 4397:22, 4400:1

**seat** [4] - 4149:20, 4274:18, 4357:3, 4411:11

**SEC** [67] - 4149:16, 4151:3, 4151:6, 4151:10, 4151:14, 4151:18, 4153:2, 4153:3, 4153:4, 4155:23, 4158:21, 4160:8, 4162:12, 4162:14, 4162:19, 4162:25, 4165:5, 4165:18, 4169:11, 4170:17, 4170:21, 4170:24, 4171:3, 4171:7, 4186:23, 4193:13, 4193:21, 4193:24, 4194:6, 4194:10, 4200:18, 4202:2, 4202:9, 4202:10, 4202:11, 4202:18, 4202:19, 4202:21, 4202:25, 4203:3, 4203:6, 4203:9, 4204:18, 4204:19, 4210:11, 4210:18, 4210:21, 4212:4, 4314:23, 4314:25, 4315:20, 4316:1, 4316:4, 4316:6, 4316:14, 4316:20, 4317:1, 4317:13, 4317:18, 4317:20, 4318:18, 4323:13, 4323:15, 4323:20, 4323:22

**SEC's** [1] - 4202:7

**Second** [1] - 4271:5

**second** [18] - 4174:9, 4182:6, 4219:20, 4235:9, 4250:15, 4251:18, 4262:22, 4295:25, 4296:11, 4297:8, 4326:24, 4330:2, 4359:18, 4388:14, 4395:12, 4407:20, 4428:9, 4432:13

**secondaries** [1] - 4207:10

**section** [23] - 4166:13, 4174:10, 4175:8, 4176:14, 4177:6, 4177:13, 4178:12, 4183:9, 4184:5, 4185:3, 4186:2, 4220:7, 4241:5, 4241:6, 4378:4, 4390:17, 4393:17, 4399:17, 4400:1, 4400:10, 4401:7, 4401:10, 4422:11

**sections** [1] - 4390:15

**sector** [5] - 4364:19, 4364:20, 4366:21, 4412:11, 4412:13

**securities** [23] - 4150:8, 4152:11, 4153:6, 4153:10, 4154:5, 4154:13, 4156:19, 4161:25, 4166:17, 4167:13, 4167:15, 4168:17, 4170:11, 4170:21, 4180:6, 4180:10, 4180:15, 4185:13, 4185:18, 4186:16, 4280:19

**Securities** [6] - 4151:2, 4153:2, 4171:9, 4193:7, 4210:18, 4280:19

**security** [8] - 4161:10, 4167:14, 4167:20, 4235:9, 4280:21, 4306:18,

4306:21, 4306:23

**See** [1] - 4357:16

**see** [80] - 4173:15, 4185:20, 4196:11, 4212:18, 4214:17, 4217:13, 4217:18, 4217:19, 4222:3, 4222:6, 4222:11, 4222:19, 4222:22, 4237:7, 4248:7, 4251:19, 4252:20, 4253:7, 4260:15, 4260:19, 4260:20, 4271:21, 4281:10, 4281:11, 4282:5, 4282:12, 4297:9, 4302:14, 4307:8, 4308:13, 4309:14, 4314:2, 4314:14, 4314:15, 4322:13, 4326:8, 4326:17, 4326:19, 4326:23, 4327:1, 4328:14, 4328:17, 4333:5, 4338:7, 4343:21, 4346:4, 4346:7, 4346:8, 4346:10, 4347:15, 4347:21, 4357:10, 4358:23, 4359:1, 4373:11, 4373:16, 4388:16, 4388:17, 4394:11, 4397:3, 4422:4, 4422:9, 4422:11, 4432:14, 4435:24, 4436:2, 4439:3, 4439:10, 4439:19, 4439:23, 4439:24, 4440:2, 4440:3, 4440:14, 4440:22, 4440:24, 4442:13, 4443:14, 4444:13

**seeing** [8] - 4320:1, 4329:14, 4339:21, 4359:13, 4381:13, 4392:24, 4413:4, 4441:7

**seeking** [1] - 4195:4

**seem** [3] - 4351:10, 4351:15, 4407:6

**select** [7] - 4188:4, 4188:8, 4188:15, 4189:5, 4189:9, 4189:13

**self** [2] - 4152:10, 4324:12

**sell** [35] - 4161:13, 4167:17, 4167:19, 4168:16, 4169:23, 4170:8, 4199:19, 4230:10, 4230:11, 4262:23, 4264:25, 4283:16, 4283:17, 4286:18, 4286:19, 4286:20, 4286:23, 4287:5, 4289:7, 4289:9, 4291:13, 4299:9, 4302:7, 4305:1, 4319:10, 4319:12, 4349:4, 4353:1, 4353:9, 4355:18

**seller** [4] - 4262:22, 4263:2, 4263:4, 4343:2

**selling** [11] - 4152:17, 4199:11, 4199:12, 4199:14, 4222:24, 4230:7, 4244:6, 4255:10, 4255:16, 4291:2, 4291:17

**sells** [3] - 4181:20, 4209:18, 4263:2

**semi** [1] - 4297:14

**semi-marketable** [1] - 4297:14

**send** [8] - 4244:2, 4280:23, 4324:11, 4344:12, 4373:1, 4398:12, 4420:5, 4437:6

**sending** [4] - 4346:5, 4358:11, 4388:7, 4442:12

**sense** [5] - 4230:13, 4235:2, 4249:19, 4268:15, 4441:16

**sent** [12] - 4168:11, 4194:13, 4296:12, 4313:18, 4319:25, 4357:15, 4363:18, 4397:5, 4441:14, 4441:18, 4441:19, 4441:23

**sentence** [10] - 4166:14, 4167:4, 4180:7, 4180:12, 4298:1, 4301:3, 4399:11, 4422:20, 4424:5

**sentences** [1] - 4167:11

**separate** [8] - 4156:1, 4202:10, 4202:19, 4203:2, 4203:4, 4204:8, 4214:17, 4241:13

**September** [19] - 4151:19, 4157:1, 4191:9, 4343:20, 4343:24, 4345:1, 4346:5, 4346:22, 4346:23, 4347:3, 4347:11, 4347:22, 4351:20, 4374:3, 4382:7, 4383:20, 4383:24, 4384:14, 4385:2

**sequence** [1] - 4429:11

**series** [2] - 4438:24

**Serotonergic** [1] - 4439:22

**serve** [2] - 4389:18, 4399:13

**served** [2] - 4293:8, 4389:5

**service** [2] - 4156:18, 4433:22

**services** [27] - 4219:23, 4292:25, 4293:4, 4389:16, 4389:19, 4389:21, 4389:23, 4395:25, 4399:12, 4399:14, 4402:1, 4402:5, 4402:15, 4402:18, 4403:18, 4404:10, 4404:14, 4406:13, 4407:7, 4407:8, 4408:25, 4410:14, 4430:10, 4430:12, 4433:16, 4433:25, 4434:21

**serving** [1] - 4388:25

**set** [9] - 4167:5, 4219:25, 4240:24, 4251:6, 4269:11, 4362:25, 4366:14, 4401:13, 4403:11

**sets** [1] - 4257:10

**settled** [2] - 4304:18, 4420:13

**settlement** [16] - 4293:11, 4297:23, 4304:21, 4305:10, 4385:11, 4385:14, 4385:17, 4386:3, 4431:21, 4431:22, 4431:25, 4432:2, 4432:5, 4432:8, 4432:9, 4432:21

**seven** [9] - 4172:17, 4207:5, 4239:2, 4249:5, 4300:22, 4365:1, 4372:3, 4374:7, 4375:17

**several** [1] - 4264:20

**severance** [8] - 4239:10, 4239:17, 4240:17, 4241:7, 4241:10, 4242:14, 4243:1, 4299:19

**sexual** [3] - 4332:9, 4333:8, 4336:19

**sexually** [1] - 4338:21

**shaken** [1] - 4404:22

**shall** [7] - 4241:8, 4389:21, 4390:18, 4399:21, 4399:22, 4400:12, 4424:15

**sham** [1] - 4429:6

**share** [16] - 4157:6, 4161:12, 4162:9, 4167:21, 4168:5, 4172:8, 4185:11, 4188:11, 4190:21, 4190:25, 4191:8, 4191:13, 4192:3, 4192:6, 4262:24, 4366:3

**shared** [5] - 4177:10, 4177:13, 4184:9, 4184:12, 4238:21

**shareholder** [2] - 4161:18, 4161:19

**shareholders** [3] - 4158:10, 4282:5, 4410:15

**shareholders'** [1] - 4291:10

**shares** [271] - 4157:7, 4157:8, 4161:19, 4161:20, 4164:4, 4166:13, 4166:16,

4166:20, 4167:5, 4167:7, 4167:12, 4167:17, 4168:4, 4168:7, 4168:11, 4168:23, 4168:24, 4168:25, 4169:12, 4169:15, 4169:16, 4169:19, 4169:20, 4170:3, 4170:6, 4170:7, 4170:14, 4170:15, 4170:19, 4171:16, 4171:17, 4172:1, 4172:3, 4172:16, 4172:17, 4172:22, 4172:23, 4172:24, 4172:25, 4173:1, 4173:2, 4173:5, 4173:6, 4173:7, 4173:8, 4173:9, 4173:11, 4175:9, 4175:10, 4176:5, 4176:14, 4176:16, 4176:17, 4176:19, 4176:20, 4177:6, 4177:8, 4177:9, 4177:12, 4177:14, 4177:19, 4177:20, 4178:2, 4178:13, 4178:19, 4178:20, 4178:21, 4179:4, 4179:7, 4179:8, 4179:12, 4179:13, 4179:19, 4179:21, 4179:22, 4181:20, 4182:18, 4182:20, 4182:25, 4183:4, 4183:5, 4183:9, 4183:11, 4183:12, 4183:15, 4183:16, 4183:23, 4183:25, 4184:5, 4184:8, 4184:11, 4184:13, 4184:17, 4184:24, 4185:5, 4185:6, 4186:3, 4186:5, 4186:7, 4186:10, 4186:12, 4186:23, 4187:1, 4188:12, 4189:23, 4190:1, 4190:6, 4190:9, 4190:10, 4190:15, 4191:2, 4198:6, 4199:6, 4199:9, 4230:8, 4230:9, 4246:6, 4246:16, 4246:19, 4246:22, 4247:1, 4247:4, 4249:4, 4249:7, 4249:9, 4249:11, 4249:13, 4249:14, 4249:22, 4250:1, 4250:3, 4250:24, 4255:5, 4255:7, 4255:9, 4255:10, 4255:12, 4255:16, 4255:17, 4255:22, 4255:24, 4257:2, 4260:7, 4260:11, 4260:17, 4261:1, 4261:2, 4261:12, 4261:18, 4262:23, 4262:25, 4263:3, 4263:4, 4263:7, 4263:8, 4263:10, 4263:13, 4263:14, 4264:7, 4264:15, 4264:19, 4275:16, 4275:17, 4275:20, 4275:23, 4275:24, 4276:1, 4276:2, 4276:11, 4276:16, 4276:17, 4276:23, 4277:17, 4283:5, 4283:13, 4284:12, 4286:1, 4286:13, 4286:20, 4287:5, 4287:15, 4288:12, 4288:15, 4289:7, 4289:10, 4289:21, 4290:14, 4291:2, 4291:15, 4300:4, 4300:10, 4301:11, 4301:15, 4301:16, 4301:17, 4302:6, 4302:7, 4303:4, 4303:12, 4303:24, 4304:2, 4304:3, 4304:5, 4304:7, 4304:9, 4304:12, 4304:20, 4304:22, 4305:1, 4305:5, 4306:12, 4310:15, 4310:16, 4311:8, 4311:10, 4319:12, 4319:17, 4321:3, 4323:5, 4324:16, 4328:3, 4328:18, 4328:20, 4349:15, 4350:4, 4352:17, 4352:22, 4355:22, 4359:6, 4359:9, 4359:16, 4380:23, 4382:15, 4383:8, 4383:11, 4392:11, 4399:23, 4400:8, 4400:9, 4400:24, 4403:24, 4404:2, 4408:24, 4409:4, 4409:7, 4410:8, 4410:10, 4410:18, 4410:19, 4419:4, 4419:9, 4419:11, 4419:13, 4419:15, 4419:17,

4422:7, 4423:22, 4428:12, 4431:7, 4431:15
**sharing** [1] - 4322:3
**sheet** [16] - 4149:15, 4151:1, 4151:6, 4151:10, 4151:14, 4151:18, 4156:6, 4159:7, 4159:14, 4159:20, 4160:9, 4160:11, 4187:21, 4198:17, 4198:19
**sheets** [5] - 4199:6, 4199:13, 4199:15, 4199:16, 4279:23
**shell** [12] - 4163:11, 4163:13, 4163:16, 4163:18, 4164:18, 4169:7, 4245:25, 4246:2, 4246:5, 4246:16, 4262:20, 4262:21
**shells** [1] - 4246:7
**Shepley(ph)** [1] - 4173:13
**shirt** [1] - 4217:23
**SHKRELI** [1] - 4148:8
**Shkreli** [111] - 4154:16, 4159:6, 4174:8, 4174:12, 4177:2, 4178:22, 4180:23, 4180:24, 4180:25, 4181:11, 4184:4, 4185:4, 4185:12, 4185:23, 4187:11, 4187:13, 4188:16, 4189:19, 4189:23, 4189:25, 4190:5, 4190:8, 4190:11, 4193:1, 4197:24, 4214:6, 4214:8, 4214:11, 4216:8, 4217:25, 4220:17, 4229:23, 4229:24, 4234:10, 4234:25, 4235:17, 4241:18, 4241:20, 4242:11, 4242:13, 4255:10, 4271:3, 4292:13, 4293:16, 4306:3, 4313:15, 4313:21, 4319:7, 4319:22, 4322:11, 4327:18, 4327:21, 4331:14, 4332:3, 4332:20, 4333:6, 4335:5, 4336:1, 4337:5, 4337:19, 4337:24, 4339:21, 4341:7, 4341:19, 4352:7, 4355:21, 4360:4, 4363:8, 4363:11, 4372:23, 4374:13, 4374:15, 4376:12, 4377:11, 4391:5, 4401:22, 4411:18, 4413:7, 4413:14, 4413:20, 4413:22, 4414:2, 4418:14, 4418:16, 4418:24, 4422:17, 4422:22, 4423:17, 4423:25, 4424:7, 4424:10, 4425:18, 4427:24, 4428:21, 4432:10, 4432:11, 4432:22, 4433:12, 4433:16, 4433:22, 4434:4, 4437:18, 4438:20, 4441:6, 4441:20, 4442:15, 4442:20, 4443:10, 4443:21
**shkreli** [1] - 4412:20
**Shkreli's** [3] - 4178:19, 4236:8, 4305:19
**Shkreli/Yaffe** [1] - 4376:14
**short** [17] - 4149:8, 4199:12, 4199:14, 4199:20, 4213:3, 4222:2, 4253:4, 4253:10, 4253:12, 4253:13, 4268:19, 4269:19, 4275:15, 4291:16, 4291:22, 4368:19, 4394:11
**shortcomings** [1] - 4297:22
**shortly** [5] - 4253:14, 4287:6, 4395:15, 4396:16, 4405:9
**shot** [2] - 4395:23, 4396:2
**show** [33] - 4188:14, 4199:6, 4199:17, 4218:6, 4238:25, 4249:21, 4261:15, 4276:4, 4287:8, 4289:12, 4293:3, 4294:18, 4294:25, 4296:22, 4297:1, 4308:18, 4326:16, 4328:5, 4330:4,

4343:15, 4346:3, 4354:6, 4354:23, 4372:1, 4376:15, 4378:14, 4379:25, 4381:8, 4386:15, 4398:14, 4406:7, 4422:10, 4437:11
**showed** [7] - 4216:21, 4406:2, 4421:13, 4421:16, 4433:7, 4433:11, 4433:15
**showing** [12] - 4157:11, 4158:16, 4159:5, 4160:13, 4172:11, 4173:23, 4181:1, 4187:24, 4191:4, 4300:2, 4360:3, 4420:9
**shown** [5] - 4189:1, 4191:13, 4191:15, 4358:9, 4433:2
**shows** [5] - 4157:6, 4172:15, 4188:7, 4421:10, 4430:14
**shut** [5] - 4213:20, 4297:22, 4301:8, 4301:16, 4301:23
**side** [8] - 4188:11, 4212:5, 4216:12, 4220:15, 4395:23, 4396:3, 4396:4, 4434:21
**Sidebar** [7] - 4197:1, 4233:12, 4247:7, 4259:1, 4271:1, 4341:1, 4424:21
**sidebar** [23] - 4194:23, 4195:1, 4201:1, 4202:1, 4204:25, 4226:3, 4227:22, 4233:10, 4239:25, 4247:6, 4254:3, 4254:4, 4255:1, 4265:8, 4266:1, 4266:18, 4332:1, 4353:17, 4354:1, 4424:15, 4424:18, 4424:19, 4444:8
**sideways** [4] - 4255:13, 4316:3, 4316:5, 4316:13
**sign** [7] - 4203:10, 4280:24, 4293:10, 4300:23, 4303:2, 4375:2, 4376:6
**signature** [9] - 4180:17, 4187:7, 4196:11, 4220:22, 4240:22, 4263:19, 4263:22, 4264:1, 4401:23
**signatures** [2] - 4195:24, 4220:15
**signed** [23] - 4151:23, 4196:7, 4219:6, 4220:19, 4239:13, 4241:16, 4243:7, 4243:16, 4243:19, 4244:25, 4263:17, 4275:17, 4294:7, 4376:22, 4377:21, 4398:18, 4400:21, 4401:21, 4401:25, 4402:8, 4403:20, 4433:3
**significance** [2] - 4321:24, 4322:2
**significant** [5] - 4306:17, 4327:12, 4327:15, 4333:10
**significantly** [2] - 4368:17, 4375:15
**signify** [5] - 4159:19, 4165:1, 4181:22, 4240:23, 4324:14
**signing** [3] - 4194:10, 4220:14, 4391:3
**signs** [4] - 4180:23, 4187:11, 4256:7, 4303:1
**similar** [2] - 4213:6, 4267:14
**simple** [2] - 4313:23, 4376:5
**single** [1] - 4229:6
**single-stock** [1] - 4229:6
**singular** [1] - 4313:2
**sister** [2] - 4237:9, 4283:24
**sitting** [1] - 4250:22
**situation** [8] - 4211:4, 4211:6, 4288:14, 4293:9, 4293:13, 4315:1, 4319:5, 4349:9
**six** [7] - 4169:5, 4329:4, 4344:17,

4365:1, 4380:16, 4398:8, 4429:16
**sixteen** [1] - 4153:21
**sixth** [1] - 4219:13
**size** [4] - 4162:8, 4208:1, 4244:15, 4311:7
**slide** [1] - 4395:9
**slow** [2] - 4251:25, 4427:10
**slowly** [3] - 4230:7, 4230:11, 4286:15
**small** [10] - 4153:8, 4209:23, 4224:23, 4301:10, 4310:10, 4310:13, 4361:20, 4366:1, 4420:5
**smaller** [1] - 4213:3
**smart** [1] - 4371:7
**SMITH** [175] - 4148:17, 4205:11, 4205:23, 4218:15, 4218:20, 4218:22, 4222:18, 4226:3, 4227:7, 4227:10, 4227:14, 4227:20, 4228:5, 4228:25, 4232:1, 4234:19, 4235:1, 4235:15, 4235:19, 4236:2, 4236:6, 4236:15, 4237:4, 4239:19, 4239:24, 4240:7, 4247:6, 4248:3, 4248:6, 4248:10, 4248:15, 4249:3, 4250:17, 4250:20, 4251:3, 4251:5, 4251:23, 4252:5, 4252:13, 4252:20, 4252:25, 4253:4, 4254:2, 4255:2, 4255:21, 4256:4, 4256:6, 4256:10, 4256:15, 4256:18, 4257:3, 4257:14, 4257:22, 4257:25, 4258:6, 4258:12, 4259:2, 4261:22, 4267:12, 4268:14, 4268:23, 4269:5, 4269:12, 4269:18, 4269:21, 4273:14, 4273:17, 4274:20, 4276:9, 4276:22, 4277:20, 4279:2, 4287:18, 4287:23, 4289:23, 4290:4, 4294:20, 4294:22, 4294:24, 4295:3, 4295:10, 4299:1, 4305:13, 4313:10, 4316:8, 4318:9, 4320:17, 4324:17, 4325:6, 4325:10, 4328:10, 4329:22, 4330:1, 4330:6, 4331:15, 4331:17, 4332:16, 4332:24, 4333:5, 4333:21, 4334:24, 4335:20, 4336:7, 4336:10, 4336:14, 4336:18, 4337:12, 4338:2, 4338:9, 4338:13, 4338:23, 4339:4, 4339:11, 4341:2, 4344:21, 4346:13, 4346:22, 4348:1, 4351:17, 4353:13, 4353:17, 4354:2, 4354:8, 4354:14, 4354:19, 4355:7, 4355:23, 4356:2, 4356:6, 4356:10, 4356:14, 4356:22, 4359:22, 4359:24, 4360:7, 4360:14, 4360:25, 4372:11, 4377:1, 4377:4, 4377:9, 4378:22, 4380:8, 4381:19, 4387:3, 4387:9, 4388:17, 4388:20, 4398:23, 4399:3, 4407:2, 4410:22, 4416:11, 4418:16, 4422:25, 4424:12, 4424:15, 4425:1, 4425:13, 4425:21, 4425:24, 4426:3, 4426:5, 4429:9, 4429:13, 4434:25, 4435:3, 4436:13, 4438:6, 4442:5, 4442:23, 4443:13, 4445:6, 4445:8, 4445:9
**Smith** [11] - 4232:16, 4237:9, 4238:5, 4238:6, 4272:17, 4273:16, 4274:19, 4278:3, 4359:21, 4378:1, 4436:2
**Smucker's** [7] - 4209:17, 4209:22,

4210:6, 4210:7, 4211:23, 4310:9, 4311:4
**Smuckers** [8] - 4307:11, 4307:15, 4307:16, 4309:2, 4310:14, 4315:1, 4318:16, 4319:2
**sold** [15] - 4157:9, 4163:23, 4164:2, 4170:15, 4188:9, 4198:9, 4230:16, 4257:2, 4286:15, 4312:8, 4356:10, 4356:13, 4398:9, 4410:8, 4419:17
**sole** [5] - 4175:10, 4176:15, 4177:7, 4183:11, 4184:7
**solely** [1] - 4153:14
**solicited** [1] - 4350:1
**solidify** [1] - 4252:21
**solution** [1] - 4288:18
**someone** [13] - 4161:19, 4170:1, 4170:4, 4171:21, 4171:24, 4204:5, 4268:8, 4290:22, 4313:16, 4321:2, 4322:2, 4332:10, 4418:7
**sometime** [2] - 4363:12, 4429:10
**sometimes** [7] - 4153:17, 4237:12, 4241:3, 4258:9, 4324:22, 4344:19, 4417:13
**somewhat** [1] - 4235:5
**somewhere** [3] - 4365:1, 4365:6, 4368:18
**soon** [3] - 4342:2, 4347:9, 4395:23
**sorry** [19] - 4157:24, 4158:6, 4158:13, 4160:10, 4180:3, 4198:18, 4223:25, 4233:9, 4260:6, 4293:13, 4311:17, 4313:6, 4343:11, 4378:3, 4385:22, 4386:6, 4416:8, 4439:21, 4444:3
**sort** [20] - 4162:4, 4165:12, 4174:23, 4182:7, 4196:10, 4203:11, 4209:8, 4215:9, 4223:15, 4223:19, 4232:19, 4235:5, 4235:6, 4257:10, 4264:8, 4282:23, 4300:20, 4333:18, 4395:3, 4416:2
**sorts** [1] - 4204:6
**sought** [1] - 4249:6
**sound** [1] - 4315:7
**sounded** [1] - 4368:20
**sounds** [1] - 4315:8
**source** [12] - 4175:1, 4176:12, 4177:3, 4178:6, 4185:2, 4185:12, 4211:13, 4234:3, 4235:13, 4308:1, 4311:24, 4383:11
**sources** [2] - 4153:16, 4160:8
**Southern** [6] - 4210:10, 4210:14, 4210:15, 4210:25, 4211:15, 4293:7
**space** [1] - 4208:18
**spaces** [1] - 4214:19
**speaker** [1] - 4275:6
**speakerphone** [1] - 4275:2
**speaking** [6] - 4166:1, 4204:13, 4211:15, 4229:1, 4264:22, 4345:24
**speaks** [1] - 4255:25
**special** [1] - 4232:4
**specialized** [2] - 4412:15, 4412:17
**specializes** [1] - 4331:6
**specializing** [1] - 4411:25

**specialty** [1] - 4330:15
**specific** [14] - 4195:21, 4198:12, 4223:2, 4236:15, 4264:7, 4264:8, 4267:17, 4311:7, 4320:24, 4325:17, 4343:14, 4357:14, 4422:11, 4425:16
**specifically** [6] - 4204:4, 4229:1, 4269:5, 4289:6, 4317:7, 4320:16, 4350:23, 4430:20, 4435:13
**specifics** [1] - 4367:21
**speculating** [3] - 4243:6, 4299:22, 4345:11
**spell** [2] - 4205:17, 4360:21
**spelled** [1] - 4367:15
**spend** [2] - 4155:8, 4424:18
**spent** [3] - 4228:13, 4288:13, 4413:3
**spin** [1] - 4251:8
**spoken** [1] - 4373:3
**spread** [1] - 4168:22
**spring** [6] - 4223:19, 4326:11, 4329:2, 4329:8, 4329:21, 4405:19
**Springs** [3] - 4232:9, 4244:11, 4341:15
**SRINIVASAN** [1] - 4148:17
**SRINIVASIN** [1] - 4355:3
**stamp** [3] - 4241:25, 4296:3, 4296:4
**stand** [6] - 4149:23, 4149:24, 4152:7, 4205:9, 4253:18, 4360:15
**standard** [1] - 4249:13
**standing** [1] - 4217:23
**standpoint** [1] - 4397:14
**Stanley** [6] - 4207:2, 4207:4, 4207:7, 4207:12, 4208:7, 4349:19
**start** [25] - 4149:3, 4209:2, 4215:23, 4217:3, 4223:16, 4223:17, 4223:21, 4224:5, 4240:7, 4278:2, 4280:2, 4287:5, 4287:24, 4297:19, 4307:7, 4328:8, 4357:6, 4372:17, 4372:18, 4379:18, 4379:21, 4382:1, 4384:21, 4387:16, 4396:10
**started** [28] - 4150:2, 4154:2, 4207:2, 4213:24, 4215:21, 4217:8, 4219:6, 4220:24, 4221:7, 4221:18, 4223:11, 4223:18, 4224:15, 4225:12, 4225:15, 4225:17, 4238:23, 4244:20, 4300:5, 4316:2, 4325:16, 4326:24, 4362:5, 4362:8, 4366:10, 4370:19, 4412:5, 4412:7
**starting** [11] - 4178:17, 4185:3, 4191:25, 4240:18, 4273:15, 4278:8, 4278:15, 4382:10, 4385:6, 4415:1, 4415:2
**Starting** [1] - 4278:9
**starts** [6] - 4149:9, 4174:12, 4255:10, 4255:16, 4347:15, 4383:25
**state** [2] - 4205:17, 4360:21
**statement** [33] - 4168:18, 4168:21, 4169:10, 4174:21, 4181:25, 4186:23, 4187:1, 4235:21, 4268:12, 4271:6, 4278:15, 4277:8, 4278:18, 4278:19, 4281:15, 4333:13, 4336:4, 4354:9, 4354:11, 4411:19, 4413:1, 4413:2, 4413:13, 4413:16, 4413:19, 4415:5, 4415:6, 4416:23, 4417:14, 4418:11,

4423:14, 4431:16, 4443:11

**statements** [7] - 4171:1, 4204:12, 4208:15, 4273:9, 4274:10, 4354:7

**states** [3] - 4178:14, 4181:25, 4186:17

**STATES** [3] - 4148:1, 4148:3, 4148:12

**States** [5] - 4148:5, 4148:14, 4148:18, 4155:2, 4159:6

**status** [1] - 4169:18

**stay** [1] - 4362:19

**stenography** [1] - 4148:25

**step** [7] - 4156:7, 4172:21, 4205:7, 4206:14, 4253:17, 4353:7

**step-by-step** [1] - 4353:7

**stepped** [1] - 4160:3

**steps** [1] - 4230:18

**Steve** [12] - 4223:6, 4224:23, 4331:8, 4331:10, 4336:18, 4346:12, 4347:15, 4347:18, 4347:19, 4348:13, 4348:14, 4348:19

**Steven** [1] - 4331:13

**still** [26] - 4163:25, 4164:1, 4237:13, 4242:15, 4248:11, 4248:15, 4256:3, 4257:16, 4257:19, 4272:2, 4292:2, 4305:24, 4329:2, 4341:24, 4344:1, 4348:10, 4355:6, 4362:17, 4362:24, 4374:19, 4384:6, 4386:10, 4390:8, 4394:16, 4407:25, 4411:12

**Still** [2] - 4395:9, 4396:21

**stipulate** [1] - 4204:20

**stipulated** [1] - 4150:24

**stipulation** [7] - 4149:12, 4150:16, 4150:20, 4150:23, 4151:21, 4156:11, 4159:9

**stock** [131] - 4152:17, 4157:5, 4161:7, 4161:10, 4161:13, 4161:16, 4161:20, 4162:6, 4163:4, 4163:22, 4164:1, 4164:6, 4166:16, 4167:25, 4168:16, 4168:17, 4171:14, 4171:23, 4171:24, 4178:19, 4178:20, 4178:21, 4179:4, 4179:5, 4179:6, 4179:7, 4179:8, 4179:9, 4179:13, 4179:14, 4179:19, 4179:21, 4179:22, 4185:5, 4185:6, 4185:16, 4185:20, 4186:3, 4186:5, 4186:7, 4186:10, 4186:12, 4189:7, 4190:23, 4195:18, 4197:16, 4211:8, 4229:6, 4229:9, 4229:10, 4229:11, 4230:8, 4230:9, 4230:12, 4230:14, 4246:1, 4262:23, 4264:24, 4265:1, 4265:3, 4265:4, 4267:22, 4279:6, 4279:7, 4279:12, 4279:20, 4279:21, 4279:23, 4282:7, 4283:3, 4283:8, 4283:16, 4283:17, 4285:24, 4286:21, 4286:22, 4287:2, 4287:3, 4289:20, 4291:7, 4291:8, 4291:9, 4291:12, 4291:13, 4291:16, 4291:18, 4291:20, 4292:22, 4300:5, 4300:15, 4301:3, 4301:8, 4301:21, 4309:24, 4310:3, 4310:8, 4310:9, 4310:16, 4310:17, 4311:1, 4311:10, 4321:3, 4323:4, 4353:10, 4355:18, 4355:19, 4356:10, 4356:13, 4357:23, 4358:7, 4382:15,

4382:20, 4383:8, 4397:1, 4397:2, 4397:4, 4397:25, 4398:8, 4399:23, 4400:9, 4409:9, 4410:8, 4419:21, 4419:24

**Stock** [1] - 4161:25

**stockbroker** [1] - 4362:1

**Stocks** [1] - 4265:2

**stocks** [17] - 4161:17, 4162:2, 4213:8, 4214:4, 4214:5, 4222:9, 4222:11, 4222:24, 4278:20, 4297:18, 4364:17, 4364:21, 4365:9, 4366:8, 4367:13, 4412:1, 4416:21

**stolen** [3] - 4296:18, 4300:17, 4301:8

**stop** [4] - 4194:12, 4302:24, 4337:22

**stopped** [2] - 4234:11, 4299:2

**story** [2] - 4212:6, 4250:21

**straighten** [1] - 4424:20

**strategy** [1] - 4229:6

**stray** [1] - 4274:5

**street** [1] - 4366:7

**Street** [5] - 4321:16, 4321:19, 4369:8, 4417:23, 4423:17

**stressed** [1] - 4291:7

**stricken** [6] - 4228:4, 4236:11, 4257:21, 4267:13, 4271:10, 4444:1

**strike** [10] - 4225:25, 4227:8, 4228:1, 4236:12, 4265:7, 4354:12, 4354:16, 4412:25, 4414:10, 4444:5

**strikes** [1] - 4237:1

**striking** [2] - 4267:13, 4268:7

**stringent** [1] - 4162:7

**stronger** [1] - 4268:11

**strongly** [2] - 4209:10, 4332:18

**struck** [6] - 4337:5, 4354:8, 4354:12, 4354:13, 4355:17, 4414:3

**structure** [2] - 4252:17, 4342:16

**struggle** [1] - 4209:3

**study** [2] - 4439:7, 4439:12

**stuff** [3] - 4268:4, 4339:13, 4441:22

**su** [2] - 4234:16, 4242:15

**Su** [3] - 4237:13, 4239:6, 4242:14

**subject** [21] - 4157:18, 4185:11, 4241:8, 4249:19, 4278:6, 4284:5, 4290:16, 4292:14, 4344:23, 4378:18, 4379:4, 4380:14, 4382:9, 4383:18, 4387:20, 4393:13, 4394:4, 4396:21, 4437:19, 4438:1, 4438:22

**submit** [1] - 4356:1

**subpoena** [2] - 4203:9, 4203:10

**subscription** [3] - 4156:18, 4367:22, 4415:10

**subsequent** [2] - 4186:8, 4408:11

**substance** [4] - 4363:1, 4390:13, 4403:16, 4430:10

**substantial** [3] - 4302:3, 4380:23, 4437:6

**substantially** [1] - 4420:21

**succeed** [1] - 4301:25

**success** [1] - 4302:1

**successful** [3] - 4330:15, 4370:14, 4374:23

**sue** [4] - 4302:12, 4303:7, 4417:24

**sued** [2] - 4302:23, 4303:8

**suggest** [1] - 4273:3

**suggested** [3] - 4403:11, 4415:8, 4431:3

**suggesting** [2] - 4354:19, 4354:20

**suggests** [1] - 4436:6

**suit** [2] - 4303:9, 4303:11

**suitcases** [1] - 4232:21

**suite** [1] - 4215:9

**Sullivan** [8] - 4173:2, 4188:17, 4189:11, 4197:25, 4261:6, 4280:14, 4331:3, 4359:10

**summaries** [2] - 4150:4, 4278:13

**summarize** [1] - 4160:2

**summarizing** [1] - 4153:17

**summary** [7] - 4154:19, 4160:3, 4160:20, 4172:8, 4187:22, 4278:9, 4278:11

**summer** [3] - 4230:2, 4232:10, 4232:14

**Summit** [1] - 4206:9, 4214:9, 4294:3

**summoned** [1] - 4299:10

**Sunday** [1] - 4384:1

**supermarket** [1] - 4225:4

**supervision** [1] - 4219:24

**supplemented** [1] - 4186:18

**support** [1] - 4302:3

**supported** [1] - 4434:6

**suppose** [1] - 4250:23

**supposed** [10] - 4168:17, 4170:20, 4403:14, 4420:8, 4425:3, 4431:11, 4431:17, 4431:19, 4432:21, 4442:1

**surveillance** [1] - 4154:3

**Susan** [1] - 4192:25

**sustained** [4] - 4200:22, 4246:15, 4355:12, 4369:24

**Sustained** [9] - 4194:18, 4325:7, 4329:23, 4331:16, 4344:22, 4351:18, 4353:14, 4436:14, 4442:24

**Swan** [1] - 4390:8

**Swann** [17] - 4362:5, 4362:6, 4362:7, 4362:9, 4362:11, 4362:12, 4362:14, 4362:16, 4362:19, 4362:20, 4362:22, 4364:5, 4364:17, 4394:17, 4412:17, 4412:18

**Swany** [5] - 4394:13, 4394:15, 4394:16, 4394:18, 4394:20

**swayed** [1] - 4339:4

**switch** [1] - 4159:4

**Switzerland** [3] - 4385:5, 4385:11

**sworn** [6] - 4149:24, 4205:15, 4274:1, 4314:11, 4323:8, 4360:19

**symbol** [4] - 4173:16, 4173:17, 4173:18, 4188:2

**syndicate** [1] - 4349:24

# T

**T-I-M-O-T-H-Y** [1] - 4205:20

**tab** [29] - 4155:14, 4156:9, 4157:10, 4166:7, 4172:12, 4173:24, 4218:7,

4241:22, 4279:25, 4281:25, 4282:10,
4283:19, 4287:9, 4292:6, 4295:1,
4372:20, 4372:21, 4374:6, 4376:17,
4378:15, 4380:1, 4382:2, 4383:16,
4384:20, 4386:22, 4387:16

**Tab** [8] - 4187:25, 4191:5, 4261:16,
4277:8, 4278:2, 4392:3, 4396:9,
4398:15

**table** [7] - 4216:17, 4216:25, 4328:8,
4328:15, 4329:14, 4329:17, 4359:25

**Tabs** [3] - 4276:6, 4277:4

**tabs** [11] - 4155:15, 4155:16, 4158:15,
4160:15, 4239:2, 4289:14, 4372:3,
4381:9, 4381:11, 4381:15, 4386:17

**talks** [4] - 4179:11, 4249:13, 4301:3,
4377:17

**tasked** [1] - 4153:4

**tax** [2] - 4396:24, 4397:17

**taxes** [4] - 4241:9, 4305:7, 4397:14,
4397:15

**tech** [1] - 4244:3

**technologies** [1] - 4244:1

**technology** [2] - 4208:10, 4412:14

**telephone** [7] - 4275:7, 4293:1,
4363:14, 4403:2, 4413:7, 4413:8,
4433:17

**temporary** [1] - 4214:19

**tempted** [1] - 4302:17

**ten** [22] - 4155:10, 4157:10, 4192:18,
4216:17, 4216:21, 4220:19, 4230:10,
4311:13, 4311:14, 4311:15, 4311:16,
4311:17, 4321:22, 4321:23, 4356:23,
4411:6, 4440:21

**Tennessee** [1] - 4244:10

**tentative** [1] - 4384:9

**term** [16] - 4169:24, 4238:9, 4244:7,
4280:19, 4390:18, 4390:20, 4394:11,
4396:23, 4397:4, 4397:7, 4397:11,
4397:18, 4399:20, 4400:2, 4400:11

**terminating** [2] - 4248:14, 4302:23

**termination** [10] - 4240:12, 4240:16,
4240:20, 4243:7, 4243:16, 4243:19,
4244:25, 4256:7, 4259:17, 4294:7

**terms** [22] - 4161:5, 4165:13, 4189:13,
4219:25, 4220:2, 4255:15, 4263:6,
4285:19, 4292:22, 4307:5, 4316:17,
4332:19, 4343:15, 4349:21, 4350:11,
4367:3, 4367:20, 4378:3, 4378:5,
4390:16, 4394:18, 4415:25

**terrible** [2] - 4212:14, 4297:9

**territory** [1] - 4355:15

**testified** [16] - 4149:25, 4205:15,
4222:19, 4234:8, 4234:16, 4259:23,
4274:1, 4306:16, 4317:20, 4358:15,
4360:19, 4411:22, 4416:2, 4424:13,
4436:9, 4443:10

**testify** [10] - 4150:4, 4196:2, 4202:23,
4211:16, 4211:18, 4212:8, 4212:10,
4271:8, 4274:12, 4320:12

**testifying** [6] - 4153:18, 4344:16,
4344:19, 4344:20, 4408:14, 4408:17

**testimony** [29] - 4150:6, 4150:8,
4150:10, 4157:19, 4195:3, 4202:2,
4202:4, 4205:7, 4211:20, 4227:17,
4228:2, 4237:1, 4266:3, 4267:21,
4268:3, 4268:8, 4314:11, 4323:8,
4326:11, 4335:10, 4353:2, 4353:12,
4355:8, 4359:5, 4359:15, 4409:23,
4429:11, 4436:25

**text** [3] - 4260:15, 4380:2, 4380:13

**thanking** [1] - 4438:16

**THE** [266] - 4148:11, 4149:2, 4149:6,
4149:9, 4149:14, 4149:17, 4149:19,
4150:1, 4150:18, 4151:25, 4152:3,
4156:12, 4157:20, 4157:23, 4158:1,
4158:3, 4159:1, 4161:2, 4163:18,
4163:19, 4163:20, 4163:22, 4164:3,
4164:5, 4164:7, 4166:21, 4167:2,
4191:17, 4191:19, 4192:13, 4192:18,
4192:21, 4194:18, 4194:22, 4195:2,
4195:11, 4195:23, 4196:10, 4200:10,
4200:22, 4200:25, 4201:2, 4202:17,
4202:23, 4203:9, 4204:11, 4205:4,
4205:6, 4205:8, 4205:10, 4205:17,
4205:19, 4205:21, 4217:24, 4218:21,
4219:2, 4222:17, 4223:24, 4225:22,
4225:24, 4226:4, 4227:4, 4227:8,
4227:15, 4228:1, 4228:22, 4229:18,
4229:20, 4233:1, 4233:3, 4233:4,
4233:11, 4234:16, 4234:25, 4235:13,
4235:17, 4236:5, 4236:12, 4236:16,
4237:1, 4237:25, 4240:1, 4240:4,
4245:16, 4245:17, 4245:18, 4245:19,
4246:11, 4246:12, 4246:13, 4246:15,
4248:1, 4248:4, 4248:8, 4248:13,
4250:5, 4251:1, 4251:4, 4251:17,
4252:15, 4252:23, 4253:3, 4253:6,
4253:9, 4253:13, 4253:17, 4253:19,
4254:4, 4255:20, 4256:2, 4256:5,
4256:9, 4256:13, 4256:16, 4256:25,
4257:4, 4257:12, 4257:20, 4258:14,
4261:25, 4262:16, 4265:9, 4266:6,
4266:9, 4267:3, 4268:25, 4269:7,
4269:15, 4269:20, 4269:23, 4271:2,
4271:18, 4271:19, 4271:21, 4272:1,
4272:11, 4272:18, 4272:24, 4273:2,
4273:10, 4273:15, 4273:18, 4273:22,
4274:2, 4274:14, 4274:15, 4274:17,
4276:7, 4276:10, 4276:12, 4276:14,
4276:17, 4276:19, 4276:21, 4277:13,
4277:14, 4277:15, 4277:23, 4287:21,
4290:1, 4294:19, 4294:21, 4294:23,
4295:13, 4301:14, 4301:17, 4301:19,
4305:15, 4313:11, 4313:12, 4313:13,
4318:10, 4320:18, 4324:18, 4324:21,
4324:25, 4325:7, 4329:23, 4330:3,
4331:16, 4331:19, 4332:6, 4332:9,
4332:14, 4333:3, 4334:3, 4334:10,
4334:21, 4335:22, 4336:19, 4336:23,
4337:4, 4337:8, 4337:18, 4337:25,
4338:7, 4338:10, 4338:18, 4339:18,
4339:24, 4343:10, 4344:22, 4346:14,
4346:16, 4346:18, 4348:9, 4348:11,

4351:18, 4353:14, 4353:18, 4354:13,
4354:16, 4354:25, 4355:20, 4356:20,
4356:24, 4357:2, 4359:21, 4360:9,
4360:12, 4360:16, 4360:21, 4360:23,
4369:24, 4370:2, 4371:13, 4372:14,
4377:7, 4377:25, 4378:25, 4380:11,
4381:23, 4387:11, 4387:13, 4388:16,
4399:1, 4400:17, 4400:19, 4402:23,
4410:13, 4410:24, 4411:3, 4411:6,
4411:10, 4418:18, 4423:4, 4424:16,
4424:19, 4426:1, 4426:4, 4426:8,
4429:14, 4435:2, 4435:4, 4435:6,
4435:20, 4436:14, 4437:15, 4438:7,
4442:6, 4442:10, 4442:24, 4443:16,
4443:18, 4443:24, 4444:12

**themselves** [2] - 4152:17, 4265:5

**thereafter** [2] - 4347:9, 4405:9

**therefore** [2] - 4312:18, 4410:15

**therein** [1] - 4185:12

**thereto** [1] - 4186:8

**they've** [2] - 4257:17, 4338:21

**think..** [1] - 4268:13

**thinking** [4] - 4268:22, 4273:11,
4288:14, 4370:5

**Third** [8] - 4148:19, 4232:16, 4237:13,
4238:22, 4245:1, 4275:4, 4295:20,
4353:16

**third** [10] - 4158:7, 4174:22, 4182:12,
4238:9, 4242:14, 4408:4, 4408:7,
4422:20, 4424:4, 4425:11

**Thomas** [5] - 4172:23, 4188:18,
4189:11, 4197:25, 4331:1

**thoughts** [3] - 4382:18, 4382:23,
4395:22

**thousand** [3] - 4304:22, 4311:17,
4311:18

**three** [18] - 4155:1, 4160:15, 4172:12,
4178:6, 4189:9, 4206:13, 4208:4,
4213:15, 4216:13, 4220:6, 4292:8,
4296:1, 4320:7, 4381:11, 4386:19,
4390:24, 4397:22, 4400:2

**throughout** [1] - 4378:12

**throw** [2] - 4336:3, 4339:13

**Thursday** [2] - 4280:12, 4284:4

**ticker** [4] - 4163:25, 4173:16, 4173:17,
4188:2

**tied** [1] - 4297:1

**tier** [1] - 4165:4

**tiers** [4] - 4162:15, 4162:16, 4165:3

**tight** [2] - 4235:3, 4349:13

**tighten** [1] - 4234:23

**tightening** [2] - 4235:4, 4235:6

**tighter** [1] - 4253:1

**Tilles** [9] - 4237:9, 4238:8, 4238:9,
4246:12, 4246:20, 4246:24, 4249:9,
4278:5, 4290:10

**tim** [1] - 4302:2

**Tim** [24] - 4172:25, 4200:16, 4220:16,
4287:25, 4292:12, 4297:9, 4297:13,
4297:15, 4297:16, 4297:19, 4297:20,
4299:8, 4299:10, 4299:11, 4299:12,

4299:13, 4299:14, 4300:5, 4302:1, 4314:2, 4326:20, 4328:18
**Tim's** [5] - 4297:11, 4297:22, 4300:1, 4300:7, 4300:15
**Tim@MSMBconsumer.com** [1] - 4292:9
**timetables** [1] - 4389:23
**timing** [3] - 4436:13, 4436:19, 4437:4
**Timothy** [2] - 4205:11, 4205:19
**TIMOTHY** [1] - 4273:24
**tiny** [1] - 4230:4
**title** [5] - 4166:20, 4215:3, 4388:12, 4388:22, 4399:5
**titled** [1] - 4388:4
**today** [17] - 4217:19, 4230:16, 4242:19, 4242:20, 4244:24, 4260:4, 4278:8, 4278:9, 4283:2, 4314:12, 4388:1, 4398:13, 4408:14, 4409:15, 4425:8, 4436:25, 4443:19
**today/tomorrow** [1] - 4393:16
**together** [16] - 4153:18, 4200:14, 4204:14, 4213:21, 4213:23, 4224:7, 4238:14, 4280:17, 4303:19, 4349:25, 4350:23, 4358:20, 4384:13, 4428:25, 4429:24, 4429:25
**Tom** [6] - 4214:10, 4214:12, 4214:13, 4237:8, 4237:15, 4290:10
**tomorrow** [8] - 4242:20, 4244:24, 4288:2, 4388:1, 4425:9, 4443:8, 4443:17, 4444:13
**took** [9] - 4149:24, 4207:15, 4213:21, 4214:15, 4228:7, 4229:2, 4259:3, 4300:5, 4316:13
**tools** [1] - 4297:14
**top** [41] - 4156:13, 4180:4, 4182:3, 4219:5, 4242:10, 4262:3, 4281:9, 4281:11, 4282:1, 4282:21, 4291:23, 4298:7, 4298:8, 4328:9, 4328:14, 4373:22, 4376:3, 4376:11, 4377:10, 4378:2, 4379:2, 4379:5, 4386:4, 4386:7, 4388:11, 4389:8, 4393:10, 4394:1, 4394:8, 4395:10, 4395:13, 4397:22, 4398:10, 4399:3, 4428:8, 4430:18, 4437:17, 4437:20, 4437:21, 4440:7
**topic** [3] - 4203:4, 4339:10, 4356:19
**total** [15] - 4167:4, 4167:11, 4173:5, 4173:6, 4173:7, 4177:20, 4184:13, 4189:3, 4190:6, 4199:5, 4390:23, 4400:5, 4400:8, 4410:7, 4410:9
**towards** [5] - 4191:25, 4351:11, 4351:15, 4401:7, 4420:8
**town** [2] - 4238:22, 4395:15
**track** [4] - 4168:4, 4189:2, 4217:8, 4298:5
**tracks** [1] - 4189:1
**tradable** [1] - 4397:1
**trade** [47] - 4157:3, 4159:24, 4161:17, 4162:2, 4162:6, 4163:21, 4163:23, 4164:24, 4165:16, 4167:22, 4189:10, 4189:21, 4189:24, 4209:14, 4209:16,

4209:17, 4209:19, 4209:20, 4209:22, 4209:24, 4210:7, 4210:8, 4212:1, 4215:22, 4264:17, 4264:24, 4265:1, 4265:4, 4267:21, 4267:24, 4278:11, 4297:11, 4306:18, 4306:21, 4306:23, 4310:14, 4310:21, 4311:4, 4311:7, 4311:12, 4312:13, 4312:19, 4354:17, 4355:21, 4358:2, 4358:3
**traded** [19] - 4157:7, 4163:4, 4163:6, 4163:11, 4163:24, 4164:21, 4165:14, 4169:20, 4188:12, 4189:7, 4190:23, 4191:23, 4214:5, 4230:9, 4278:14, 4310:20, 4311:1, 4311:4, 4380:22
**trader** [3] - 4215:7, 4221:13, 4311:3
**traders** [4] - 4213:1, 4213:4, 4213:22, 4213:23
**trades** [6] - 4157:8, 4159:23, 4163:21, 4189:24, 4298:9, 4366:1
**trading** [74] - 4152:23, 4153:16, 4154:4, 4157:5, 4159:21, 4163:15, 4164:4, 4168:7, 4168:13, 4169:21, 4170:6, 4170:14, 4172:1, 4172:16, 4173:7, 4173:9, 4173:11, 4187:17, 4188:14, 4189:5, 4189:18, 4191:1, 4211:3, 4211:8, 4211:23, 4212:22, 4212:24, 4213:8, 4213:16, 4213:24, 4214:4, 4215:22, 4222:10, 4222:12, 4222:19, 4223:17, 4223:21, 4224:5, 4224:15, 4230:10, 4249:7, 4250:3, 4263:14, 4264:19, 4264:24, 4265:6, 4266:13, 4266:20, 4268:12, 4268:24, 4269:6, 4269:8, 4269:11, 4271:4, 4271:7, 4278:7, 4282:7, 4286:21, 4306:25, 4307:2, 4314:25, 4353:11, 4354:13, 4354:14, 4354:20, 4355:15, 4356:3, 4356:9, 4356:18, 4357:23, 4358:7, 4366:1
**training** [1] - 4297:13
**transacting** [1] - 4290:25
**transaction** [33] - 4199:19, 4210:5, 4210:23, 4222:8, 4238:23, 4264:14, 4284:24, 4292:25, 4293:23, 4307:20, 4307:22, 4307:23, 4308:22, 4309:8, 4309:20, 4312:7, 4312:12, 4312:14, 4312:18, 4315:11, 4315:15, 4315:17, 4318:6, 4318:7, 4318:12, 4318:15, 4319:3, 4319:20, 4343:7, 4347:19, 4350:1, 4351:21, 4401:13
**transactions** [11] - 4166:18, 4186:11, 4199:8, 4199:17, 4200:4, 4200:14, 4291:14, 4310:13, 4318:13, 4318:14, 4358:19
**Transcript** [5] - 4148:25, 4253:22, 4327:24, 4391:6, 4440:25
**transcript** [2] - 4175:12, 4326:8
**TRANSCRIPT** [1] - 4148:11
**Transcription** [1] - 4148:25
**transfer** [10] - 4155:25, 4157:16, 4157:18, 4160:11, 4167:25, 4168:2, 4168:11, 4172:7, 4178:1, 4263:11
**transferred** [1] - 4227:11
**transfers** [1] - 4293:6

**transitioned** [2] - 4361:20, 4362:16
**transpired** [1] - 4375:24
**traveling** [1] - 4238:20
**treading** [1] - 4195:13
**treasury** [1] - 4419:13
**treating** [1] - 4439:2
**treatment** [3] - 4390:11, 4439:18, 4440:20
**tremendous** [1] - 4288:13
**trend** [3] - 4190:14, 4191:24, 4192:6
**trended** [1] - 4192:8
**trends** [1] - 4190:16
**trial** [16] - 4151:4, 4151:8, 4151:12, 4151:16, 4151:20, 4151:22, 4203:10, 4211:16, 4211:18, 4212:8, 4248:19, 4267:7, 4274:11, 4409:13, 4409:20
**TRIAL** [1] - 4148:11
**trials** [1] - 4153:19
**tried** [13] - 4258:6, 4286:20, 4297:13, 4317:9, 4322:7, 4323:2, 4355:9, 4376:5, 4407:5, 4407:15, 4429:18, 4433:18, 4434:11
**trouble** [3] - 4336:23, 4381:13, 4408:10
**Troy** [8] - 4173:12, 4262:11, 4262:12, 4263:20, 4263:23, 4303:24, 4304:15, 4305:2
**true** [33] - 4151:1, 4151:5, 4151:9, 4151:13, 4151:17, 4203:8, 4298:4, 4300:8, 4318:18, 4318:19, 4329:12, 4337:15, 4345:15, 4350:5, 4404:15, 4407:8, 4407:10, 4423:5, 4423:10, 4423:19, 4425:3, 4425:4, 4427:15, 4427:16, 4429:1, 4430:16, 4431:9, 4432:19, 4432:25, 4433:24, 4441:20, 4442:15
**truly** [1] - 4302:21
**trust** [1] - 4351:13
**trusted** [1] - 4351:16
**truth** [14] - 4211:25, 4234:6, 4234:14, 4236:5, 4236:6, 4339:9, 4408:22, 4409:12, 4409:15, 4414:14, 4421:22, 4422:1, 4431:14
**truthful** [10] - 4273:2, 4339:9, 4407:5, 4407:24, 4408:9, 4408:12, 4408:21, 4408:25, 4409:2, 4434:13
**truthfully** [1] - 4272:15
**Try** [1] - 4283:2
**try** [17] - 4171:24, 4222:17, 4228:22, 4252:25, 4253:2, 4267:18, 4268:2, 4269:17, 4269:18, 4269:24, 4291:21, 4373:4, 4379:20, 4385:10, 4388:19, 4395:17, 4403:15
**trying** [33] - 4250:21, 4251:6, 4252:3, 4252:7, 4252:13, 4258:12, 4267:16, 4268:18, 4313:22, 4314:21, 4316:16, 4317:11, 4319:10, 4319:12, 4319:24, 4332:25, 4341:16, 4343:1, 4344:1, 4345:7, 4348:11, 4348:12, 4365:10, 4367:21, 4381:3, 4384:3, 4386:10, 4392:22, 4394:25, 4407:25, 4422:25
**Tuesday** [2] - 4148:7, 4284:8

**Tufts** [1] - 4361:12
**Turing** [3] - 4405:6, 4405:12, 4405:17
**turmoil** [1] - 4374:14
**turn** [22] - 4167:17, 4180:3, 4180:12, 4180:16, 4185:17, 4220:6, 4241:16, 4241:21, 4263:16, 4263:21, 4279:25, 4283:19, 4292:6, 4295:25, 4302:9, 4374:6, 4392:3, 4393:7, 4396:9, 4401:6, 4401:18, 4439:12
**turned** [1] - 4420:1
**turning** [3] - 4223:20, 4296:10, 4404:5
**Turning** [1] - 4405:19
**TV** [2] - 4296:22, 4297:1
**twelve** [2] - 4279:25, 4380:1, 4414:5
**twice** [1] - 4271:11
**two** [50] - 4158:22, 4172:16, 4173:8, 4173:12, 4182:24, 4186:7, 4199:2, 4213:14, 4214:15, 4215:6, 4220:12, 4253:10, 4256:17, 4263:9, 4281:1, 4333:10, 4334:5, 4334:16, 4336:23, 4336:24, 4343:8, 4343:10, 4345:8, 4347:12, 4348:2, 4358:19, 4361:2, 4373:11, 4373:18, 4374:11, 4376:3, 4384:21, 4385:3, 4386:4, 4388:10, 4388:21, 4396:10, 4403:17, 4424:5, 4430:1, 4430:3, 4430:6, 4430:8, 4430:18, 4432:13, 4433:6
**Two** [2] - 4403:6, 4406:6
**type** [6] - 4153:13, 4159:21, 4161:10, 4162:23, 4225:4, 4358:19
**types** [1] - 4365:11

---

**U**

**U.S** [7] - 4210:15, 4316:20, 4317:1, 4317:10, 4317:11, 4317:19, 4323:24
**ultimately** [10] - 4285:25, 4304:17, 4304:23, 4305:6, 4317:12, 4368:25, 4410:1, 4413:20, 4413:22, 4433:3
**umbrella** [1] - 4259:9
**umbrellas** [1] - 4256:14
**unable** [2] - 4285:24, 4339:9
**unbeknownst** [1] - 4429:18
**unclear** [1] - 4193:3
**uncomfortable** [1] - 4285:8
**under** [27] - 4166:13, 4166:17, 4167:13, 4168:16, 4169:2, 4170:1, 4171:13, 4175:10, 4176:25, 4181:22, 4184:3, 4185:1, 4186:14, 4219:24, 4234:7, 4256:13, 4259:9, 4266:17, 4266:23, 4269:24, 4296:18, 4328:17, 4398:9, 4400:5, 4411:12, 4425:15, 4427:2
**Under** [1] - 4357:21
**undergraduate** [1] - 4154:10
**underlining** [1] - 4160:7
**underneath** [3] - 4174:20, 4186:1, 4215:9
**undersigned** [1] - 4150:25
**understandings** [2] - 4180:5, 4180:8
**understood** [5] - 4234:12, 4281:9, 4281:14, 4318:14, 4352:17

---

**Understood** [2] - 4281:10, 4395:7
**undoing** [1] - 4288:17
**unexpected** [1] - 4405:22
**unfortunate** [1] - 4293:13
**unfortunately** [2] - 4296:17, 4297:11
**unit** [1] - 4328:18
**UNITED** [3] - 4148:1, 4148:3, 4148:12
**United** [5] - 4148:5, 4148:14, 4148:18, 4155:2, 4159:6
**University** [3] - 4154:10, 4154:11, 4361:12
**unless** [1] - 4228:20
**unregistered** [2] - 4168:24, 4169:13
**unrelated** [3] - 4347:12, 4347:13, 4358:7
**unrestricted** [8] - 4246:5, 4246:16, 4246:19, 4246:22, 4247:1, 4247:3, 4250:1, 4250:24
**unring** [1] - 4266:14
**unshortable** [2] - 4291:10, 4291:15
**unsigned** [1] - 4303:2
**unusually** [1] - 4225:3
**unvested** [1] - 4178:19
**up** [103] - 4165:17, 4190:19, 4190:20, 4202:15, 4214:16, 4215:24, 4216:21, 4217:23, 4218:4, 4218:10, 4220:14, 4224:10, 4232:5, 4249:14, 4251:6, 4252:10, 4254:3, 4256:6, 4256:12, 4256:15, 4256:20, 4257:10, 4259:16, 4272:5, 4276:24, 4280:25, 4284:9, 4291:23, 4293:4, 4297:21, 4300:2, 4306:1, 4310:9, 4310:10, 4316:12, 4316:18, 4316:19, 4323:4, 4335:14, 4342:21, 4349:8, 4354:17, 4357:15, 4358:9, 4362:25, 4366:14, 4368:17, 4372:25, 4373:11, 4373:16, 4373:22, 4375:11, 4375:14, 4376:3, 4382:11, 4382:12, 4382:17, 4383:3, 4383:23, 4384:4, 4384:6, 4384:8, 4384:13, 4385:1, 4385:20, 4385:22, 4385:24, 4386:10, 4393:8, 4393:17, 4393:21, 4396:17, 4396:21, 4397:15, 4397:22, 4400:10, 4403:11, 4404:22, 4405:22, 4406:2, 4406:7, 4407:22, 4407:24, 4412:25, 4417:6, 4417:8, 4417:10, 4417:14, 4418:4, 4418:8, 4421:10, 4421:14, 4421:16, 4430:8, 4430:14, 4431:19, 4435:14, 4435:15, 4435:22, 4438:10, 4442:12, 4442:17, 4442:19
**up-front** [3] - 4218:4, 4218:10, 4220:14
**update** [4] - 4374:15, 4392:10, 4392:14, 4393:13
**Updated** [1] - 4394:5
**updates** [2] - 4368:10, 4368:13
**upgraded** [1] - 4376:5
**upper** [1] - 4216:11
**upset** [3] - 4255:10, 4370:3, 4392:23
**upwards** [1] - 4191:24
**urgency** [1] - 4230:13
**urgent** [1] - 4292:3
**usual** [1] - 4334:12

---

**V**

**vacation** [1] - 4244:11
**Vaino** [11] - 4173:1, 4188:17, 4197:24, 4237:11, 4238:16, 4238:17, 4238:21, 4261:5, 4261:8, 4278:5, 4290:11
**valuable** [2] - 4164:5, 4265:2
**value** [5] - 4164:4, 4262:23, 4311:10, 4365:12, 4395:22
**values** [1] - 4335:23
**varies** [1] - 4153:13
**variety** [1] - 4161:16
**various** [10] - 4150:4, 4150:7, 4152:23, 4154:3, 4157:2, 4161:22, 4161:23, 4162:15, 4202:24, 4236:8
**vehicle** [1] - 4367:13
**Ventures** [2] - 4223:8, 4282:19
**verbal** [1] - 4368:13
**verified** [1] - 4319:21
**versed** [1] - 4403:15
**versus** [3] - 4159:6, 4188:9, 4191:20
**vertical** [1] - 4191:18
**via** [1] - 4364:12
**Victoire** [7] - 4207:15, 4207:16, 4207:24, 4208:3, 4208:5, 4217:10, 4298:10
**view** [1] - 4195:16
**violating** [1] - 4154:4
**virtually** [1] - 4298:3
**vis-à-vis** [1] - 4204:18
**visit** [3] - 4371:24, 4405:22, 4407:17
**void** [1] - 4271:11
**volume** [29] - 4155:24, 4156:15, 4156:20, 4157:6, 4160:10, 4187:21, 4188:8, 4188:11, 4188:2, 4189:2, 4190:25, 4191:8, 4191:11, 4191:13, 4192:2, 4199:5, 4249:7, 4265:3, 4265:5, 4282:7, 4353:1, 4353:10, 4354:18, 4355:18, 4355:23, 4357:23
**voluminous** [2] - 4159:25, 4160:5, 4160:21
**volunteer** [1] - 4274:5
**volunteered** [1] - 4322:15
**volunteers** [1] - 4252:6
**voting** [9] - 4171:17, 4175:10, 4176:15, 4177:7, 4177:10, 4177:13, 4183:11, 4184:7, 4184:9, 4184:12

---

**W**

**wade** [2] - 4355:10
**wading** [1] - 4354:3
**wait** [2] - 4272:16, 4429:5
**waiting** [2] - 4216:19, 4388:18
**waiving** [2] - 4257:16, 4268:10
**walking** [1] - 4232:22
**wall** [36] - 4222:5, 4290:17, 4290:19, 4290:20, 4290:22, 4306:17, 4306:18, 4306:20, 4306:23, 4312:2, 4312:5, 4312:11, 4312:21, 4312:22, 4312:23, 4312:25, 4313:4, 4314:15, 4314:18, 4314:20, 4314:21, 4319:8, 4320:1,

4320:3, 4320:8, 4320:25, 4321:4,
4321:17, 4321:18, 4321:20, 4321:23,
4321:25, 4322:6, 4322:7, 4323:9,
4324:14
**Wall** [5] - 4321:16, 4321:19, 4369:8,
4417:22, 4423:17
**wall"** [2] - 4306:8, 4320:5
**wall'** [1] - 4291:13
**Wang** [3] - 4237:10, 4238:12, 4238:13
**wants** [10] - 4162:18, 4168:16, 4228:18,
4228:21, 4260:15, 4260:19, 4260:20,
4323:3
**warning** [6] - 4314:17, 4314:18,
4314:19, 4314:20, 4355:11
**warrant** [1] - 4185:14
**Warrant** [1] - 4185:15
**warrants** [4] - 4185:5, 4185:6, 4185:8,
4401:11
**ways** [2] - 4213:5, 4221:5
**WC** [1] - 4175:3
**weakened** [1] - 4209:6
**wealth** [2] - 4207:3, 4300:4
**wearing** [1] - 4217:22
**Wednesday** [1] - 4444:17
**week** [5] - 4216:4, 4284:7, 4293:9,
4392:12, 4392:18
**weekend** [2] - 4383:22, 4384:11
**weekly** [1] - 4241:15
**welcome** [2] - 4282:8, 4357:24
**Wentworth** [8] - 4292:24, 4293:23,
4294:1, 4294:3, 4294:4, 4342:3,
4347:18
**whatsoever** [1] - 4436:10
**Whereas** [3] - 4219:20, 4219:21,
4262:22
**whereas** [4] - 4219:22, 4262:3, 4262:22,
4319:20
**whistle** [6] - 4202:3, 4314:24, 4314:25,
4317:6, 4317:9, 4317:12
**whistleblower** [6] - 4200:18, 4202:7,
4202:13, 4203:3, 4203:13, 4203:25
**whole** [18] - 4222:4, 4222:7, 4241:22,
4246:24, 4256:22, 4288:16, 4288:21,
4309:9, 4313:22, 4343:22, 4346:10,
4349:25, 4370:15, 4374:24, 4385:18,
4388:9, 4422:1, 4425:1
**wide** [1] - 4168:22
**widely** [1] - 4156:18
**wife** [5] - 4282:24, 4295:5, 4295:24,
4296:12, 4297:4
**wife's** [3] - 4282:24, 4299:9, 4349:4
**willing** [6] - 4252:24, 4300:22, 4339:13,
4371:16, 4428:1, 4428:5
**window** [1] - 4339:13
**Winn** [1] - 4225:5
**wiped** [1] - 4369:4
**wire** [11] - 4372:24, 4373:2, 4373:5,
4373:6, 4373:9, 4373:15, 4373:17,
4374:13, 4382:14, 4382:19, 4382:21
**wired** [3] - 4372:25, 4420:6, 4420:7
**wiring** [2] - 4372:23, 4382:22

**Wisconsin** [1] - 4232:6
**wish** [1] - 4293:14
**withdraw** [2] - 4302:18, 4442:18
**withdrawn** [1] - 4325:11
**withholding** [1] - 4241:8
**witness** [66] - 4149:8, 4149:21, 4150:11,
4152:2, 4202:4, 4203:9, 4203:15,
4204:9, 4204:19, 4205:10, 4217:24,
4218:18, 4218:19, 4227:2, 4228:20,
4234:8, 4246:9, 4249:13, 4250:15,
4251:22, 4252:6, 4253:18, 4255:2,
4266:3, 4266:12, 4266:15, 4266:18,
4266:22, 4266:23, 4268:3, 4268:5,
4268:16, 4269:2, 4271:5, 4271:7,
4271:8, 4272:1, 4272:2, 4272:4,
4272:5, 4272:22, 4272:25, 4273:4,
4273:6, 4273:7, 4273:8, 4273:22,
4273:25, 4276:8, 4326:17, 4330:4,
4334:25, 4335:12, 4336:4, 4336:12,
4339:19, 4343:17, 4346:4, 4354:4,
4354:7, 4360:11, 4360:13, 4425:8,
4435:3, 4437:16, 4444:1
**WITNESS** [6] - 4163:19, 4163:22,
4164:5, 4191:19, 4205:8, 4205:19,
4225:24, 4229:20, 4233:4, 4245:17,
4245:19, 4246:12, 4274:14, 4276:12,
4276:17, 4276:21, 4277:14, 4301:17,
4313:12, 4346:16, 4348:11, 4360:23,
4400:19, 4443:16, 4445:2
**Witness** [2] - 4205:9, 4444:15
**witness'** [6] - 4150:10, 4195:3, 4227:17,
4228:1, 4237:1, 4355:7
**witnesses** [4] - 4203:6, 4258:11,
4267:15
**Wolenski** [1] - 4232:16
**woman** [3] - 4173:13, 4336:22, 4337:3
**woods** [1] - 4288:1
**word** [4] - 4309:3, 4324:6, 4325:5,
4355:9
**words** [5] - 4213:2, 4320:7, 4323:9,
4414:15, 4418:4
**workday** [1] - 4221:21
**works** [4] - 4202:11, 4321:18, 4321:19,
4322:9
**world** [4] - 4243:25, 4297:15, 4309:10,
4382:14
**Worldpool** [1] - 4208:17
**worries** [1] - 4386:9
**worry** [2] - 4355:6, 4404:24
**worst** [2] - 4354:25, 4405:21
**worth** [1] - 4230:10
**wraps** [2] - 4266:17, 4266:23
**write** [8] - 4324:11, 4384:5, 4385:4,
4387:22, 4387:24, 4393:18, 4394:8,
4398:7
**writes** [9] - 4152:20, 4282:20, 4347:16,
4374:13, 4374:15, 4376:12, 4393:15,
4393:22, 4396:12
**writing** [4] - 4296:17, 4313:16, 4373:25,
4395:9
**written** [1] - 4368:10

**wrote** [5] - 4282:3, 4292:1, 4295:5,
4319:25, 4396:20

## X

**X"** [1] - 4426:2

## Y

**Y-A-F-F-E** [1] - 4360:23
**YAFE** [1] - 4421:7
**Yaffe** [13] - 4360:15, 4360:23, 4361:1,
4367:2, 4377:11, 4377:12, 4379:6,
4388:4, 4397:5, 4415:2, 4427:2,
4434:4, 4434:6
**year** [15] - 4165:16, 4169:6, 4206:24,
4207:12, 4212:12, 4212:16, 4225:1,
4225:13, 4296:16, 4326:24, 4361:18,
4361:19, 4369:2, 4398:13
**years** [24] - 4153:21, 4206:2, 4206:4,
4206:13, 4207:5, 4208:4, 4208:20,
4208:24, 4329:4, 4335:6, 4344:17,
4362:21, 4366:23, 4375:17, 4381:4,
4393:2, 4402:10, 4408:3, 4413:25,
4414:2, 4414:5, 4416:3, 4420:3,
4429:16
**yelling** [1] - 4289:5
**yesterday** [3] - 4206:2, 4385:23, 4425:9
**YORK** [1] - 4148:1
**York** [21] - 4148:6, 4148:15, 4148:16,
4148:20, 4161:25, 4206:25, 4207:1,
4210:10, 4210:14, 4210:16, 4211:1,
4211:16, 4293:8, 4323:16, 4365:2,
4365:5, 4365:6, 4371:25, 4407:18
**young** [3] - 4414:3, 4414:5, 4414:10
**younger** [1] - 4336:25
**yourself** [21] - 4218:24, 4219:13,
4239:6, 4239:13, 4278:4, 4282:2,
4282:15, 4282:21, 4283:2, 4287:10,
4290:20, 4325:8, 4326:20, 4328:2,
4399:9, 4422:21, 4424:5, 4428:9,
4430:18, 4432:14, 4433:7
**youthful** [2] - 4414:9
**yup** [5] - 4283:21, 4305:25, 4306:5,
4315:14, 4318:17

## Z

**ZELLAN** [15] - 4148:21, 4157:21,
4158:2, 4158:25, 4161:1, 4192:22,
4192:24, 4194:20, 4195:10, 4195:14,
4196:6, 4196:14, 4197:2, 4197:20,
4445:5
**Zellan** [3] - 4192:21, 4192:25, 4194:22
**ZELLEN** [9] - 4200:2, 4200:23, 4201:1,
4202:2, 4202:12, 4203:6, 4203:22,
4204:24, 4205:1
**Zero** [2] - 4182:20, 4182:23
**zero** [1] - 4213:18
**zoom** [5] - 4156:13, 4158:8, 4166:12,
4174:23, 4182:13