4447

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,      : 15-CR-00637(KAM)
4                                 :
                                  :
5                                 :
        -against-                 : United States Courthouse
6                                 : Brooklyn, New York
                                  :
7                                 :
                                  : Wednesday, July 19, 2017
8   MARTIN SHKRELI,               : 9:00 a.m.
                                  :
9          Defendant.             :
                                  :
10  - - - - - - - - - - - - - - X

11           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
           BEFORE THE HONORABLE KIYO A. MATSUMOTO
12         UNITED STATES DISTRICT JUDGE, and a JURY

13               A P P E A R A N C E S :

14  For the Government:   BRIDGET M. ROHDE, ESQ.
                       Acting United States Attorney
15                     Eastern District of New York
                       271 Cadman Plaza East
16                     Brooklyn, New York 11201
                    BY:  JACQUELYN M. KASULIS, ESQ.
17                     ALIXANDRA ELEIS SMITH, ESQ.
                       G. KARTHIK SRINIVASAN, ESQ.
18                     Assistant United States Attorneys

19  For the Defendant:   BRAFMAN & ASSOCIATES, P.C.
                       767 Third Avenue
20                     New York, New York 10017
                    BY: BENJAMIN BRAFMAN, ESQ.
21                     MARC AGNIFILO, ESQ.
                       ANDREA ZELLAN, ESQ.
22                     JACOB KAPLAN, ESQ.

23  Court Reporter:   Richard W. Barry, RPR
                    Official Court Reporter
24                  E-mail:  rwbarrycourtreporter@gmail.com

25  Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.

- Proceedings -                                    4448

1          THE COURT:  Are counsel ready to start, we have all

2   our jurors present.

3          MS. KASULIS:  Let me check with Ms. Smith, she is

4   with a witness.

5          (Pause.)

6          MR. SRINIVASAN:  She just needs one minute.

7          THE COURT:  We can maybe-- can we have them line up,

8   I don't want them standing around.

9          MS. KASULIS:  We were planning to take a witness out

10  of turn this morning.

11         THE COURT:  Okay.

12         MS. KASULIS:  It is a representative from Columbia

13  University.  Just basically a custodial witness.

14         THE COURT:  All right.

15         May we bring the jurors in?

16         MS. SMITH:  Yes.

17         MR. BRAFMAN:  Can we explain, we are still going to

18  have cross examination, but this witness is being taken out of

19  turn just to accommodate a schedule?

20         THE COURT:  I see.  So we are starting with somebody

21  else today.

22         MR. BRAFMAN:  I don't want them to think we are

23  finished with the cross.

24         MS. SMITH:  It is a custodian from Columbia

25  University, I think it will be five minutes at the most and

Kane - Direct - Smith                                    4449

1    then we can continue with Mr. Agnifilo's cross examination.

2              THE COURT:  Thank you.

3              (Jurors entering.)

4              THE COURT:  Good morning members of the jury.  All

5    are present.  Please have a seat.

6              This morning Mr. Brafman has previously agreed to

7    allow the Government to present a witness out of turn and

8    interrupt his cross examination of Mr. Yaffe.  You will hear

9    from a witness this morning because she has scheduling issues

10   that require her to be present today for testimony.

11             Who is the Government's next witness?

12             MS. SMITH:  Your Honor, the Government calls Barry

13   Kane.

14   BARRY KANE, having been first duly sworn, took the stand and

15   testified as follows:

16             THE COURT:  Thank you, please proceed.

17   DIRECT EXAMINATION BY MS. SMITH:

18   Q    Morning Mr. Kane.

19   A    Good morning.

20   Q    Where do you work?

21   A    I work at Columbia University, in the City of New York.

22   Q    What is Columbia University?

23   A    It is an institution of higher education.

24   Q    Is it a member-- is it considered an ivy league college?

25   A    Yes, it is one of the member schools of the ivy league.

1    Q    What is your job title at Columbia University?

2    A    It is associate vice president and university registrar.

3    Q    Do you work in the registrar's office for Columbia

4    University?

5    A    Yes.

6    Q    What are your job responsibilities?

7    A    They are varied, but I think we can mostly say they fall

8    under the category of records, registration and academic

9    policy.

10   Q    And the registrar's office for Columbia University, does

11   that cover all affiliated schools related to Columbia

12   University?

13   A    Yes.  So we are a central administrative office, so we

14   have oversight of over all of the schools that comprise the

15   university.

16   Q    How many undergraduate schools are under the umbrella of

17   Columbia University?

18   A    There are four altogether.

19   Q    Is part of our job responsibility to maintain the

20   business records related to registration and enrollment and

21   graduation of students at Columbia University?

22   A    Yes, absolutely.  So we would maintain all enrollment

23   records and any records pertaining to conferral of degrees.

24   Q    Are those records kept in the ordinary course of the

25   operation of Columbia University?

Kane - Direct - Smith                    4451

1   A    Yes.

2   Q    In connection with this case, did you conduct a search of

3   those records for an individual named Martin Shkreli?

4   A    Yes.

5   Q    And did that search take place in connection with both

6   the defendant's name, date of birth and Social Security

7   number.

8   A    Yes.

9   Q    What records did you search in connection with this case?

10  A    We searched our entire electronic database for all of the

11  schools of the university.

12  Q    And does that database-- would that database show whether

13  an individual either enrolled at Columbia University or

14  graduated from Columbia University?

15  A    Yes.

16  Q    And in terms of enrollment, do those records show whether

17  an individual has enrolled even for a very short period of

18  time, such as one day?

19  A    Yes.

20  Q    As a result of your search of the electronic records, did

21  you find any records that Martin Shkreli had either enrolled

22  or graduated from any school affiliated with Columbia

23  University?

24  A    No.

25  Q    Do your records reflect whether or not a student might

Kane - Cross - Agnifilo                    4452

1   have sat in on a class at Columbia University?

2   A    If the sitting in of a class was done informally, no,

3   there would have to be an official registration for our

4   records to reflect that.

5   Q    And do any of the undergraduate schools affiliated with

6   Columbia University have official audit programs?

7   A    Not currently, no.

8        THE COURT:  Did they ever have official audit

9   programs.

10       THE WITNESS:  I can't say with certainty, but I

11  think not.

12       THE COURT:  Thank you.

13       MS. SMITH:  Your Honor, no further questions.

14       THE COURT:  All right.  Thank you.

15       Would anyone like to cross examine Mr. Kane.

16       MR. AGNIFILO:  Very briefly.

17  CROSS EXAMINATION BY MR. AGNIFILO:

18  Q    Good morning, sir.

19  A    Good morning.

20  Q    I'm going to ask you a couple of questions and then you

21  will be on your way.

22  A    Okay.

23  Q    My name is Marc Agnifilo, I represent Martin Shkreli.

24       Just so I understand, you said that at the current

25  time there is no official audit program, here in 2017, that is

Kane - Cross - Agnifilo                                    4453

1    the case, correct?

2    A    Correct.

3    Q    And I think the Judge asked you if there has ever been an

4    official audit program, you said you didn't think so.

5              Do you know one way or the other whether there was

6    an official audit program in the fall of 2000, in the spring

7    of 2001?

8    A    No, I can't say with certainty whether there was an

9    official audit program.  What I can tell you is that these

10   undergraduate schools are almost exclusively comprised of

11   degree seeking students and it would be unusual to have that

12   type of an official audit program.

13   Q    At the time a dean in the school was a Dean Roger

14   Lehecka, is that true?

15   A    I don't know the name.

16   Q    Is the name Roger Lehecka a name known to you?

17   A    No.

18   Q    Not at all?

19   A    No.

20   Q    You don't know that he was a dean at Columbia?

21   A    No, it is not a name that is familiar to me.

22   Q    When did you start at Columbia University?

23   A    Six and a half years ago.

24   Q    I see.  So you don't know a dean named Roger Lehecka who

25   retired from Columbia University in 2004?

Kane - Cross - Agnifilo                    4454

1   A    No.

2   Q    Because it is before you started?

3   A    Correct.

4   Q    And so, you would have no way of knowing what Roger

5   Lehecka did and did not authorize in the fall of 2000 and the

6   spring of 2001, correct?

7   A    That's correct.

8   Q    Because you didn't overlap with him, right?

9   A    That's correct.

10  Q    And do you know if at the time in 2000, 2001, if there

11  was-- I would not say an official program, but Dean Lehecka

12  was reaching out to different schools in the city such as a

13  school called City As School?  Do you know an out reach

14  program from Dean Lehecka, in 2000, to 2001, a high school

15  including a school called City As School?

16  A    No, I'm not familiar with that program.

17  Q    Do you know if Martin Shkreli was at City As School in

18  2000, 2001?

19  A    I would not know that, no.

20  Q    So you would not know of any conversations that the

21  principal of City As School had with Roger Lehecka obviously?

22  A    No, right.

23  Q    And, so you can't sit here and conclusively say, can you,

24  that Martin Shkreli did not audit a calculus one class in the

25  fall of 2000 and the spring of 2001, fair to say?

Kane - Cross - Agnifilo                    4455

1  A    What I can say is, that if there was an official

2  enrollment requiring a registration in that course, we would

3  have a record of it.  We do not.

4  Q    I'm not saying enrolled.  I'm not saying that he enrolled

5  at Columbia University.  I am saying that you have no way of

6  knowing if on an unofficial basis, if he would have audited a

7  calculus one class in the fall of 2000, the spring of 2001,

8  you would not know?

9  A    That's correct.

10           MR. AGNIFILO:  One second.

11           Thank you, sir.

12           No further questions, Judge.

13           MS. SMITH:  No further questions, Your Honor.

14           THE COURT:  Sir, you are excused, thank you for your

15  time.

16           THE WITNESS:  Thank you.

17           (Witness excused.)

18           THE COURT:  Are you ready to resume your cross of

19  Mr. Yaffe?

20           MR. BRAFMAN:  Yes, Your Honor, I am trying to get my

21  paperwork in order.

22           Just marking an exhibit, Your Honor.

23           THE COURT:  All right.

24           MR. BRAFMAN:  Is the witness available?

25           THE COURT:  Yes.  I understand he is.

1          Do you want to bring him back onto the stand.

2          MS. KASULIS:  I believe that is where the agents

3    went, Your Honor.

4          THE COURT:  Good morning.

5    LEE YAFEE, having been previously duly sworn, resumed the

6    stand and testified further as follows:

7          MR. BRAFMAN:  May I proceed.

8          THE COURT:  Yes.

9          Mr. Yaffe, is still under oath.  Mr. Brafman will

10   resume his cross examination.

11         MR. BRAFMAN:  Thank you, Your Honor.

12   CROSS EXAMINATION BY MR. BRAFMAN: (Cont'g.)

13   Q    Morning Mr. Yaffe.

14   A    Good morning.

15   Q    Mr. Yaffe, I want to refer you and ask the Government to

16   put up on the screen 116-20, which is in evidence.

17         Your Honor, I have it.  It has some highlighting on

18   it, that will make it easier for the witness to refer.  This

19   is 116-20 in evidence.

20         May I proceed?

21         THE COURT:  Yes.

22   Q    Can you see the document, sir?

23   A    Yes.

24   Q    That is an E-mail from-- on the bottom it starts with

25   you, and the caption is "updated consulting agreement".  Do

Yaffe - Cross - Brafman                    4457

1   you see it?

2   A    Yes.

3   Q    And Mr. Shkreli responds with the same caption.

4   Understood, am I making a game changing announcement after the

5   close.  Need to focus on that.  Still writing slide deck.

6             Do you know what a "slide deck" is?

7   A    Yes.  I believe so.

8   Q    When you are in the health care field and someone makes a

9   presentation, generally it contains like either a power point

10  or a slide deck, correct?

11  A    Correct.

12  Q    And the slide deck would be information concerning the

13  company or the drug in question, correct?

14  A    Correct.

15  Q    Just so it is clear, while you are not a scientist, you

16  have been involved in the health care industry as a stock

17  broker or investor for many years, correct?

18  A    Correct.

19  Q    And you have dealt with a lot of health care companies in

20  terms of investment strategy and sales and marketing, correct?

21  A    Correct.

22  Q    And you also currently are in the health care related

23  industry, correct?

24  A    Not currently.

25  Q    Well, you did start an addiction services center and a

Yaffe - Cross - Brafman                    4458

1   clinic, correct?

2   A    I did.

3   Q    Now, if you look further, Mr. Shkreli says to you on the

4   March 17th, updated consulting agreement.  Should be able to

5   wire you money by Friday.

6          Do you see that?

7          THE COURT:  Sir --

8   A    Yes.

9          THE COURT:  I think you said March, you meant

10  December.

11         MR. BRAFMAN:  Sorry.

12  Q    December 17th, 2013.  He said, should be able to wire you

13  money by Friday.

14         Do you see that?

15  A    Yes, I do.

16  Q    Then your response to Mr. Shkreli, I will read it.

17  December 17th, 2013, just a couple of minutes later.  He

18  writes to you at 10:42 a.m., you respond in 16 minutes, I

19  think the math is correct.

20         Cool, that would be great and most appreciated.  Dad

21  should be rolling into town shortly so that would be huge.

22  Let's catch up tomorrow and also will help you guys.  I read

23  all the recent press releases so have some thoughts and ways I

24  can help out so that value is recognized by giving me a shot

25  on the consulting side.

Yaffe - Cross - Brafman                          4459

1           Do you see that?

2   A    Yes, I do.

3   Q    Now, those are your words, correct?

4   A    Yes, they are.

5   Q    You are referring to the Retrophin, the new company that

6   Martin Shkreli is forming, correct?

7   A    Correct.

8   Q    And the press releases or the press information that you

9   said you were following, were announcements that were coming

10  out of Retrophin, correct?

11  A    Correct.

12  Q    And it announced either new drugs in the pipeline or new

13  work that the company was doing, correct?

14  A    Say that again.

15  Q    And the press releases that you recognized for Retrophin,

16  were announcements by the company concerning work that they

17  were doing or progress they were making, correct?

18  A    Correct.

19  Q    Now, when you say, and as always, I can help and ways I

20  can help, so that value is recognized by giving me a shot on

21  the consulting side.

22           Do you mean value being recognized by Martin and

23  Retrophin?

24  A    Correct.

25  Q    That is in return for your being a consultant?

Yaffe - Cross - Brafman                          4460

1  A    I wasn't a consultant.

2  Q    I'm asking you what this meant when you wrote this.  They

3  are realizing value by consulting services that you would

4  provide, correct?  That is what it says.

5  A    That is what it says.  I think my intent was--

6  Q    Is that what it says?

7  A    That is what it says, yes.

8  Q    You are thanking him for that, correct?

9  A    Yes.

10  Q    Now, I want to put up on the screen what-- sorry, I need

11  the Government to put up Exhibit 116-4 which is already in

12  evidence.  My copy is all marked. -- 106-4, please.  I have a

13  clean copy, sorry to bother you.

14         116-4 is already in evidence.  Do you see that

15  document, 116-4?

16  A    Yes.

17  Q    You recognize this as a series of E-mails between you and

18  Mr. Shkreli, correct?

19  A    Correct.

20  Q    And this was during a time when you were, I think you

21  characterized it, chasing him for money, correct?

22  A    Correct.

23  Q    And, what you say in the middle on August 24th -- 21,

24  2011:  Hi Martin just curious what is going on.  Dad is down

25  in Florida.  Will be seeing him shortly and sure I am going to

                              RB        OCR

Yaffe - Cross - Brafman                4461

1   get an earful.  Let me know.

2          He responds, nada.

3          You understand that means nothing?

4   A    Yes.

5   Q    Market stinks no money for me to live let alone dad.

6   Hopefully will have a more positive update early September

7   with some new money-- when some new money is coming in.

8          I want you to refer to Martin's statement to you, no

9   money for me to live.

10          Do you know whether or not at this time Mr. Shkreli

11  was actually living and sleeping in his office?

12  A    No idea.

13  Q    Now, you did tell the Government however that Martin was

14  not a 9 to 5 guy, he worked incredibly hard; is that correct?

15  A    That's correct.

16  Q    When you told them that, you were telling them the truth,

17  correct?  Based on what you observed?

18  A    Yes.

19  Q    Now, I want to refer you, sir, to 116-18, which is in

20  evidence.  This is a series of E-mails between you and Mr.

21  Shkreli.  On the bottom, you say-- can you see the document,

22  sir?

23  A    Yes, I can.

24  Q    Hi Martin, can we try to get this process moving.

25          Let me stop.  You are talking about the payment,

Yaffe - Cross - Brafman                          4462

1    correct?

2    A    Correct.

3    Q    And then you say, hope you had fun in Switzerland.

4         Do you see that?

5    A    Yes.

6    Q    Do you know whether or not Retrophin was working with the

7    biotech lab named Lonza in Switzerland?

8    A    No, idea.

9    Q    Do you know whether or not Lanza has a biotech lab in

10   Switzerland?

11   A    No.

12   Q    Do you know any lab that you worked with over the years

13   in your health care industry that dealt with biotech labs in

14   different countries?

15   A    No.

16   Q    None?

17   A    Can you repeat that.

18   Q    In all the years you have worked in the health care field

19   and the stocks you have worked with, do you know whether or

20   not some biotech facilities are maintained overseas?

21   A    Yes, I'm sure there are many overseas.

22   Q    Now, you then say to Mr. Shkreli:  Give me a call when

23   you get a chance.  Can you forward over the settlement

24   agreement.

25         Do you see that?

Yaffe - Cross - Brafman                              4463

1   A    Yes.

2   Q    And, you refer to it as a settlement agreement, correct?

3   A    Correct.

4   Q    Now, is that to you the same as the agreement you

5   ultimately got, the consulting agreement?

6   A    No.

7   Q    This is the promissory note that you wanted him and your

8   father to sign?

9   A    The settlement agreement would be payment for the

10  promissory note.

11  Q    But you refer to it-- those are your words, settlement

12  agreement, correct?

13  A    Correct.

14  Q    Now, at the top, you say, no worries, know you are busy.

15         Did you mean to write K-N-O-W, meaning knowledge,

16  knowing you are busy?

17  A    Yes.

18  Q    Did you know what he was busy with?

19  A    No.

20  Q    Did you assume from the press materials that you claim to

21  have read that he was busy with Mr.-- with Retrophin?

22  A    No, I meant it more generic, I knew he had a lot going

23  on, I knew he was involved in a lot of different stuff and I

24  knew he was working on all sorts of different stuff.  So more

25  generic, not anything specific.

Yaffe - Cross - Brafman                         4464

1    Q    Now, I wanted to-- we used the term yesterday "man up" or

2    "manning up", do you recall, sir?

3    A    Yes.

4    Q    By that you mean that Mr. Shkreli should essentially

5    honor the agreement and pay back your father?

6    A    Correct.

7    Q    Now, I want to show you Exhibit 116-14, which is in

8    evidence.  Can you see it on your screen?

9    A    Yes.

10   Q    That is an E-mail chain between Mr. Shkreli, and you and

11   you say to him, here on September 12th, 2013.  Please read

12   along with me.

13            Just wanted to follow up with you and put this to

14   bed ASAP.  I spoke with my dad who was extremely happy and

15   appreciative.  In a perfect world would love to have you wire

16   him back 170,000 and gift him 15,000 shares of Retrophin stock

17   and that would fulfill the note obligation and more

18   importantly doing the right thing and manning up as we spoke

19   about.

20            Did I read that correctly, sir, up to there?

21   A    You did.

22   Q    Now, you described a perfect world, meaning in the

23   context of negotiations would be for you to get back-- your

24   father to get back $170,000 in cash and 15,000 shares,

25   correct?

1  A    Correct.  But that is being pulled a little bit out of

2  context, I am happy to explain.

3  Q    I'm happy to listen, but let me ask you this --

4  A    Yes.

5  Q    You wanted negotiations to stop?

6  A    Yes.

7  Q    And your father get paid?

8  A    Absolutely.

9  Q    On that date if you had come to an agreement, you would

10 have accepted 170,000 for your father?

11 A    170,000 and --

12 Q    And 15,000 shares, correct?

13 A    Yes.

14 Q    Now, ultimately, you got more than 170,000 and 15,000

15 shares, correct?

16 A    Correct.

17 Q    Now, the promissory note between you-- between your dad

18 and Mr. Shkreli, ultimately arrived at the number of $250,000,

19 correct?

20 A    Correct.

21 Q    Whose idea was it to raise the price to $250,000?

22 A    Martin's.

23 Q    I want to show you 116-5, that is in evidence.  Mr.

24 Shkreli in response to you on August 11th, says:  It didn't.

25 The market turmoil, I will try again ASAP.

Yaffe - Cross - Brafman                    4466

1          That refers to the wire you were expecting, correct?

2    A    Correct.

3    Q    And then Mr. Shkreli says on January 23rd, 2012, to you:

4          Why don't we update the promissory note to 250,000,

5    I should be liquid in a few months.

6          Do you see that?

7    A    Yes.

8    Q    And he understands that you and your dad are impatient

9    with all of the waiting, correct?

10   A    I'm not sure on that.  We had been pretty patient.

11   Q    He understands that he still needs to fulfill his

12   obligation to you?

13   A    Yeah.  If he has the wherewithal, I believe he did.

14   Q    And then what he says to you is, he is going to up the

15   price to $250,000, but as a practical matter he needs you to

16   wait a couple of months.

17         Do you see that?

18   A    Yes.

19   Q    A couple of months later he did ultimately resolve it,

20   did he not?

21         MS. SMITH:  Objection.

22         MR. BRAFMAN:  I will withdraw it as to form.

23   Q    In a couple of months, he did ultimately agree on

24   $250,000; is that correct?

25         MS. SMITH:  Objection.  To the settlement.

Yaffe - Cross - Brafman                    4467

1          THE COURT:  Sustained.

2          Why don't you rephrase the question.

3   Q    Am I correct, sir, that ultimately the promissory note

4   that was signed by your father, Mr. Shkreli, was for $250,000?

5   A    Yes.

6   Q    Now, this is in evidence, 116-10.  You told us this

7   morning that you were sort of following the progress with

8   Retrophin; is that correct?  News articles?

9          You told us this morning and yesterday, you were

10  from time to time reading press accounts of Retrophin,

11  correct?

12  A    Yes.

13  Q    Now, this is 116-10, which is in evidence.  This is sent

14  to you, Lee Yaffe, that was one of the E-mail accounts you

15  had, correct?  Lee@visualofficesolutions.com.

16  A    Correct.

17  Q    And it says, friends as the attached-- see the attached

18  press release, many of you know, I started a biotechnology

19  company, Retrophin.  This is my primary focus going forward, I

20  hope you will support me in this new role as I will use my

21  12 years of professional investing in healthcare stocks to

22  guide Retrophin to create shareholder value.

23          Do you see that?

24  A    I do.

25  Q    And that is a press release that you told us on direct

Yaffe - Cross - Brafman                          4468

1    examination that you saw at or about the time it came out,

2    correct?

3    A    Correct.

4    Q    And it announces a complete-- completing a reverse merger

5    with Desert Gateway, correct?

6    A    Yes.

7    Q    It says, creates publicly traded biotechnology company,

8    correct?

9    A    Correct.

10   Q    You know what a reverse merger is, correct, sir?

11   A    Yes.

12   Q    You have seen them over your years, numerous occasions,

13   as an investment advisor, correct?

14   A    Yes.

15   Q    It essentially allows a private company to get public

16   more quickly than following a more traditional route, correct?

17   A    Correct.

18   Q    There is nothing illegal about using a reverse merger to

19   your knowledge, correct?

20   A    Correct.

21   Q    Now, this indicates Desert Gateway; is that correct?

22   A    Correct.

23   Q    And did the stock you get say Desert Gateway or

24   Retrophin?

25   A    Retrophin.

Yaffe - Cross - Brafman                    4469

1   Q     And it came restricted, right?

2   A     Yes.

3   Q     Now, this is dated December 18th, correct?

4   A     Yes.

5   Q     And, in 116-20 that is in evidence-- I have it.

6         116-20 is dated December 17th, 2013?

7   A     Yes.

8   Q     From time to time, Mr. Shkreli would talk to you about

9   announcements concerning Retrophin or confer with you by

10  E-mail?

11  A     Yes.

12  Q     This represents one of those times, is that correct?

13  That he is telling you about announcements concerning what you

14  understood to be Retrophin, correct?

15  A     Correct.

16  Q     And, in this E-mail, 116-20 it starts -- these E-mails,

17  you know, you have to work backwards, the bottom is the first

18  E-mail.  Do you see that?

19  A     Yes.

20  Q     So, I want to turn over to the second page of 116-20 and

21  you say under caption, updated consulting agreement.  Cool.

22  Let's see if we can get buttoned short term as you know, has

23  know you are busy, need to get done.  Then I want to pull

24  Swanny into the mix, he can help you guys.  Will fill you in

25  when we speak.

RB        OCR

Yaffe - Cross - Brafman                    4470

1              Who is Swanny?

2   A    He is a friend of mine who works at Leerink Swann.

3   Q    Swann is the Swanny, correct?

4   A    Correct.

5   Q    He is a partner in the firm that you are in, correct?

6   A    Correct.

7   Q    When you say you are going to pull Swanny in to help you

8   guys, how are you going to use Swanny to help Mr. Shkreli and

9   Retrophin?

10  A    I thought that they could at least talk to Leerink about

11  the Retrophin, about what was going on there, and maybe get

12  some research coverage or exposure if it met their criteria.

13  Q    It is possible that Leerink Swann could make money if

14  they end up working with Retrophin, correct?

15  A    Possibly.

16  Q    Swanny is he pretty much your equivalent in the company,

17  you and he are both partners?

18  A    Yes.

19  Q    They were both founding members of Leerink Swann?

20  A    Yes.

21  Q    Now, I want to show you what is in evidence as Government

22  Exhibit 60, which is the consulting agreement.  I want to get

23  to the tab.  Consulting agreement you signed with Mr. Shkreli,

24  with Retrophin?

25  A    Correct.

Case 1:15-cr-00637-KAM   Document 299   Filed 08/01/17   Page 25 of 165 PageID #: 5482

1   Q    Now, as you sit is here today, you don't know whether

2   Retrophin did or did not approve this agreement based on your

3   own personal knowledge, correct?

4   A    Correct.

5   Q    What it says on the very first page under the description

6   of services.  It is not limited, is it, to work on cluster

7   headaches only, is it?

8   A    No.

9   Q    If you read the paragraph, description of services, small

10  paragraph A.  Consultant will serve as advisor to the company

11  and provide consulting services on cluster headache drug

12  development and other matters to the company.  Consultant

13  shall perform the services as and when requested by the

14  company for each project.  Company, consultant will agree upon

15  the scope of service, deliverables and timetable, correct?

16  A    Correct.

17  Q    So you were signing up in this agreement not exclusively

18  to work on cluster headaches, but to be available to the

19  company as a consultant, correct?

20  A    Correct.

21  Q    And when you say in Exhibit 116-20, thank you for giving

22  me a shot on the consulting side, were you being truthful?

23  A    No.

24  Q    Why did you say it?  Not to the F.B.I., why did you say

25  it to Martin on December 17th, 2013, as always, I can help out

Yaffe - Cross - Brafman                          4472

1   so that value is recognized by giving me a shot on the

2   consulting side.

3           What did you say to him, where you were making

4   Leerink Swann available as a potential consultant to this new

5   healthcare company?

6   A    Yes, I would have done that anyway.  I think I was trying

7   to rationalize my signing the consulting agreement.

8   Q    By suggesting to yourself that there may in fact be some

9   legitimacy because I'm a healthcare knowledgeable guy, Swanny

10  is a healthcare knowledgeable guy and if we pull him into the

11  mix maybe we can do some good for Retrophin, correct?

12          MS. SMITH:  Objection.

13          THE COURT:  Sustained, rephrase.

14  Q    When you say you rationalized it, you were in your own

15  mind trying to understand that maybe you can provide through

16  Leerink Swann and Swanny, legitimate consulting services not

17  necessarily on cluster headaches, correct?

18  A    No, I wasn't-- I didn't have the background to do that.

19  I certainly would help out to the extent that I could.  But I

20  really didn't have the background to do that.

21  Q    Well, let's understand the background you need.  This is

22  a new IPO, new public company, correct?

23  A    Correct.

24  Q    In the healthcare services industry?

25  A    Correct.

Yaffe - Cross - Brafman                    4473

1   Q    And, over the years, you made-- one of your

2   subspecialities is to give companies investment guidance who

3   are involved in health care, correct?

4   A    I was a sales guy, so I would disseminate more

5   information and I would open up contacts within Leerink Swann

6   company.  If it was something pertaining to banking it would

7   go to the banking folks.  If it was something related to

8   research, maybe I would call an analyst in or have a

9   conversation with an analyst or hook a portfolio manager up

10  directly.  I was more on a liaison and conduit to disseminate

11  some of the services that Leerink Swann had.

12  Q    This is something Leerink Swann could provide to a new

13  healthcare company, correct?  The type of services you just

14  described?

15  A    Leerink Swann probably could, yes.

16  Q    You were part of Leerink Swann at the time, correct?

17  A    I believe I wasn't at that time.

18  Q    Is Leerink Swann the large, one of the largest healthcare

19  investment banks in the world?

20  A    I don't know, one of the largest.  They are in healthcare

21  investment banking.  Again remember, I have not worked for

22  Leerink Swann since 2008, 2009.

23  Q    I understand.  But you still had many many contacts that

24  you did develop while at Leerink, correct?

25  A    Correct.

Yaffe - Cross - Brafman                    4474

1    Q    And in fact, we will get to it later.  You were offering

2    to allow Martin to use your network of contacts on behalf of

3    Retrophin, correct?

4    A    Correct, and I would have done that anyway.

5    Q    All right.  That is some of the things that you had

6    available, correct?

7    A    Correct.

8    Q    And Leerink Swann while maybe not the largest, is

9    certainly recognized as an investment house that specializes

10   in health care investments, correct?

11   A    That's correct.

12   Q    Now, Government Exhibit 116-22 is in evidence.  I want to

13   refer you sir, to this document.

14            You testified yesterday that you recognized this as

15   an E-mail chain that you and Martin exchanged, correct?

16   A    Yes.

17   Q    And there is discussion by you.  Here you go, guess we

18   need to change terms to 4 months as will be paying me directly

19   but will cover any tax liability as discussed.  Also need to

20   change to Retrophin common stock.  But pull out info on freely

21   tradable as it will be restricted.  Just curious how long, but

22   my intent is to hold the stock long-term as don't have that

23   much to begin with.  Checks can be made payable to Lee Yaffe

24   and sent to the following address.

25            This is what you sent to Mr. Shkreli on

Yaffe - Cross - Brafman                    4475

1    December 30th, 2013, correct?

2    A    Correct.

3    Q    And would it be a fair statement that in terms of the

4    promissory note that you ultimately had some changes to the

5    note that you requested?

6    A    Not to the promissory note, but pertaining to the payment

7    of the promissory note.

8    Q    And, Mr. Shkreli says, I don't know how the restricted

9    rules work.  Evan do you want to chime in if we give a

10   consultant stock.  How long does it take to get register.

11            Do you see that?

12   A    Yes, that is surprising.

13   Q    But, do you see it?

14   A    Yes, I see it.

15   Q    In response, Evan Greebel who you knew to be a lawyer for

16   either Mr. Shkreli or Retrophin, at Katten, writes back the

17   stock is restricted for six months, after which it can be sold

18   under Rule 144.

19            Do you see that?

20   A    Yes.

21   Q    You understand Rule 144 to govern restrictions on stock?

22   A    Yes.

23   Q    And in order to sell it, you got to go through 114 to

24   remove the legend that says "restricted", correct?

25   A    Correct.

Yaffe - Cross - Brafman                    4476

1   Q    You went through that and got the shares to be freely
2   tradable?
3   A    Yes.
4   Q    Then in response to Mr. Greebel, you write to Mr.
5   Shkreli:  Can you make the changes and execute and send over
6   to me today.  Happy and healthy New Year.
7         Correct?
8   A    Correct.
9   Q    It is December 31st, so it is New Year's Eve basically,
10  right?
11  A    Yes.
12  Q    Did you use a separate lawyer negotiating this
13  arrangement?
14  A    Which arrangement?
15  Q    The promissory note, or the consulting agreement?
16  A    No.
17         (Transcript continues on next page.)
18
19
20
21
22
23
24
25

Yaffe - cross - Brafman                                4477

1   EXAMINATION CONTINUES

2   BY MR. BRAFMAN:

3   Q    Now, I want to go back to, again, your meeting with the

4   agents on April 1st.  I just have a couple of additional

5   questions and then we'll move on.  And, again, you have the

6   3500 exhibit on your desk, that's 3500-LY-1.

7           Do you have it, sir?

8   A    I have.

9   Q    All right.  If you need to reuse it to refresh your

10  recollection, I will tell you where to look.  Okay?

11  A    Would it make sense for me to read it first, so I --

12  Q    Maybe you don't need it.

13  A    Okay.

14  Q    I want to test your memory first, okay?

15  A    Okay.

16  Q    Did the tell the agents on April 1st that you had been

17  5 and 30 calls with Marek Biestek concerning cluster headache?

18  A    Yes.

19  Q    And was that a lie?

20  A    Don't recall exactly how many calls I had with him.  It

21  wasn't substantial, but it was certainly embellished.

22  Q    Okay.  Well, could it have been more than five calls

23  about cluster headaches?

24  A    No.

25  Q    So why did you tell them between 5 and 30 calls?

SAM      OCR      RMR      CRR      RPR

Yaffe - cross - Brafman                          4478

1   A     Because I wasn't truthful and I wanted to rationalize the

2   consulting agreement, even though I didn't provide consulting

3   services.  I panicked.

4   Q     So why did you pick Marek Biestek to be the recipient of

5   so many calls?

6   A     Because I wanted to protect Martin.

7   Q     How does that protect Martin if MSMB is Martin Shkreli

8   and Marek Biestek, and if they're the people who are giving

9   you, in a sense, the consulting agreement?

10  A     I guess it didn't, ultimately, protect him, but --

11  Q     Right.

12  A     -- remember I've known him for a decade.  I've had a lot

13  of history with Martin.

14  Q     Got it.

15  A     Okay.

16  Q     Now, did you tell the agents that in the end, despite

17  their efforts, Retrophin did not get the license for the

18  cluster headache drug?

19  A     Say that again, I'm sorry.

20  Q     Did you tell the agents on May 1st when they visited you

21  at your home that in the end Retrophin did not get the license

22  for the cluster headache drug?

23  A     No.

24  Q     All right, do you want to look at page 2 of that

25  document?  And look at the last big paragraph on the bottom

Yaffe - cross - Brafman                4479

1    beginning with "Yaffe," and then read it to yourself and then

2    look up when you're done.

3            (Pause.)

4    BY MR. BRAFMAN:

5    Q    Or if you want to start at the bottom to save time, the

6    last big sentence, "in the end," start there and read it to

7    yourself.

8    A    On page 2 of 3?

9    Q    Page 2 of 3500-LY-1.  It's page 2 of 3, yes, sir.  The

10   number is in the upper right-hand corner.

11   A    Yeah, I see that.  And you want me to read the last

12   sentence?

13   Q    The last big sentence concerning cluster headache

14   license.

15   A    Okay, so what's the question?

16   Q    Do you remember on April 1st telling the agents of the

17   FBI that Retrophin did not ultimately license the cluster

18   headache drug?

19   A    No.

20   Q    You don't remember telling them?

21   A    No.

22   Q    And does reading that refresh your recollection?

23   A    No.

24   Q    All right.  If you did tell them, how would you know --

25   withdrawn.  I'll withdraw the question.

SAM      OCR      RMR      CRR      RPR

Yaffe - cross - Brafman                    4480

1   A    Okay.

2   Q    I'm sorry.  Do you know what this report is?

3   A    No.  But, I'm, again, assuming from reading it, it was

4   the notes that the FBI agents took when they met with me on

5   April 1st.

6   Q    Now, did you discuss the cluster headache drug --

7   A    Not --

8   Q    -- with the agents?

9   A    Just mentioned cluster headaches drug, which was supposed

10  to be the essence of the consulting agreement, but I don't

11  recall going to any specifics because I didn't have any

12  specifics.

13  Q    Well, did you know whether Retrophin had licensed the

14  drug?

15  A    No.

16  Q    So this doesn't refresh your recollection at all,

17  correct?

18  A    Correct.

19  Q    Now, did you tell the agents that you used your

20  healthcare network, which included other consultants, to

21  network on behalf of Retrophin?

22  A    Yes.

23  Q    And was that true?

24  A    No.

25  Q    So do you have a healthcare network?

Yaffe - cross - Brafman                    4481

1    A    (No response.)

2    Q    Did you have a healthcare network while you were at

3    Leerink Swann?

4    A    Yes.

5    Q    What does that mean to you, a healthcare network,

6    contacts in the industry?

7    A    Yes, contacts on -- of portfolio managers running money,

8    of analysts, of people providing research.  Of all sorts of

9    people that invest or are part of providing research and

10   cultivating investment ideas in the healthcare arena; so yes.

11   Q    So a network like you had would be valuable to a new

12   company if they could use it, would it be a fair statement?

13   A    Yes.

14   Q    And would it be a fair statement that your network

15   consists of more than a thousand people in the healthcare

16   industry?

17            MS. SMITH:  Objection, timeframe.

18   BY MR. BRAFMAN:

19   Q    During your career, either with Leerink Swann before,

20   during or after, you developed a list of network people, if

21   you will, in healthcare that exceeds a thousand people, isn't

22   that correct?

23   A    Don't know on specific numbers, but I definitely had a

24   lot of contacts --

25   Q    All right.

Yaffe - cross - Brafman                    4482

1   A    -- in the healthcare arena.

2   Q    And those contacts, again, let me just ask, would be of

3   value to a pharmaceutical company or a biotech company if they

4   could use them, correct?

5   A    Some may, some -- I guess some could be, yes, possible.

6   Q    Now, did you tell the agents that Martin Shkreli and

7   Marek Biestek were intense guys not 9-to-5 guys?

8   A    I don't recall that, but they were both hardworking,

9   driven individuals.  And, again, from what I knew of them,

10  yeah, they would work around the clock.  They weren't 9-to-5

11  guys.

12  Q    All right, so if you told that to the agents it would be

13  true, you just don't remember telling it to the agents,

14  correct?

15  A    Correct.

16  Q    All right.

17  A    Again, in my opinion, from what I knew in my interaction.

18  But, you know, I wasn't there.  You know, I wasn't there

19  watching them, but yes.

20  Q    Okay.  You can put that sheet down, those sheets down, we

21  are done with this report.

22          Now, did there come a time when you, again, met with

23  the FBI and the prosecutors from the Eastern District of

24  New York and the SEC?

25  A    Yes.

SAM      OCR      RMR      CRR      RPR

Yaffe - cross - Brafman                    4483

1   Q    And this was much later on the April 30th -- I'm sorry --
2   April 20th of 2013, correct?
3   A    Correct.
4            MS. SMITH:  Objection.
5            MR. BRAFMAN:  All right.
6   BY MR. BRAFMAN:
7   Q    April 20th of 2015?
8   A    Okay, yeah.  I don't recall the exact date, but yes.
9            MR. BRAFMAN:  It's 2015.  I think we can stipulate
10  that that's the date.  I just misspoke for a second.
11  Q    Now, the first one was on April 1st, 2015, correct?
12  A    Yes.
13  Q    And that's when the FBI agents, without warning, just
14  came up and surprised you at your house?
15  A    Yes, that's -- it was very surprised.
16  Q    All right, and that's when you testified to this jury
17  that you panicked, is that correct?
18  A    Yes.
19  Q    And now there comes a time, approximately three weeks
20  later on April 20th, 2015 when you have a second interview,
21  correct?
22  A    Yes.
23  Q    And this time you knew that you were going to be
24  interviewed about Retrophin and Martin Shkreli, correct, you
25  knew in advance?

Yaffe - cross - Brafman                    4484

1    A    Yes.

2    Q    And after your first meeting when you panicked and before

3    your second meeting in the same month, you even hired a

4    lawyer, correct?

5    A    Yes, I did.

6    Q    Named Fred Schwartz?

7    A    Yes.

8    Q    And you brought your lawyer to the meeting in the Eastern

9    District of New York, correct?

10   A    Yes.

11   Q    And at that meeting, even though it was still -- I'm

12   sorry, even if it was three weeks later and even though you

13   knew that it was going to happen, you lied to the FBI again at

14   that meeting, correct?

15   A    Yes.

16   Q    Do you know, did you know or were you told that lying to

17   the FBI even when you're not under oath is a federal offense

18   punishable by up to five years in prison?

19   A    I didn't know that.

20   Q    No one told you that when you ultimately got your

21   agreement?

22   A    No.

23   Q    Did you think it was okay to lie to the FBI and the

24   United States Attorney's office?

25   A    No.

Yaffe - cross - Brafman                    4485

1    Q    Your lawyer didn't tell you before the meeting that if

2    you lied, even in an informal meeting, that you could go to

3    jail for five years?

4              MS. SMITH:  Objection, attorney-client privilege.

5              THE COURT:  I'm sorry, attorney-client; yes.

6              MR. BRAFMAN:  Well, I don't think it's

7    attorney-client.

8              THE COURT:  Well, if you're asking what his lawyer

9    told him it is, sir.

10             MR. BRAFMAN:  Okay.

11   BY MR. BRAFMAN:

12   Q    Did you have any knowledge going into the meeting that

13   intentionally lying to a federal agent who was conducting an

14   official investigation was a serious federal crime?

15   A    Can you repeat that once more?

16   Q    Going into the meeting on April 20th with your lawyer,

17   did you know that lying to a federal agent, even if you're not

18   under oath, if you lie in the course of an official

19   investigation it was a federal offense that could be punished

20   by up to five years in prison?

21   A    No.

22   Q    You didn't know that?

23   A    No.

24   Q    Did you know that it was wrong to lie to a federal agent

25   in the course of an official interview?

Yaffe - cross - Brafman                    4486

1   A    Yes, it's wrong to lie to anyone.

2   Q    Well, it may be wrong to lie to everyone, but if you lie

3   to me about the color of your shirt you wouldn't be subject to

4   imprisonment, would you?

5              MS. SMITH:  Objection.

6              THE COURT:  Sustained.

7   BY MR. BRAFMAN:

8   Q    Well, let's separate lying to non-official people from

9   lying to the FBI.  I'm not talking about lying to a friend or

10  a spouse or a business associate.  My question focuses on

11  lying to the FBI.

12  A    Okay.

13  Q    Did you know it was a crime?

14  A    No, I didn't; but you shouldn't lie to the FBI,

15  obviously.

16  Q    So you knew that was wrong?

17  A    Yes.

18  Q    All right.  Just didn't know how wrong, correct?

19  A    Correct.

20  Q    Now, there comes a time at this interview, and it was a

21  couple of blocks from here in the federal office of the United

22  States attorney, correct?

23  A    Yes.

24  Q    And some of the same people who were sitting at the

25  prosecution table were there that day as well, correct?

Yaffe - cross - Brafman                        4487

1   A     Correct.

2   Q     And your lawyer was there?

3   A     Yes.

4   Q     And you were there?

5   A     Yes.

6   Q     All right.  Did you tell the agents that Leerink Swann

7   from 1995 to 2010 was a boutique research firm focusing on

8   healthcare consulting?

9   A     Yes.

10  Q     Was that true?

11  A     Yes.

12  Q     All right, so during the period '95 to 2010, you were

13  part of an investment advisor firm that was a boutique firm

14  that did research focusing on healthcare consulting, correct?

15  A     From '95 to roughly 2008, that's correct.

16  Q     All right, but the import was research firm focusing on

17  healthcare consulting, correct?

18  A     Well, they provided a lot of different services.

19  Consulting was one of the services that they provided.

20  Q     And you said that to the FBI, correct?

21  A     Yes.  Yes.

22  Q     All right, now, did you tell the FBI on that date when

23  your lawyer was present that from 2010 to the present you had

24  not performed consulting services for anyone other than Martin

25  Shkreli?

Yaffe - cross - Brafman                    4488

1    A    2010 through --

2    Q    The present.

3    A    I don't recall that.

4    Q    All right, let's make it easier again.  I am going to

5    give you a copy of 3500-LY-2 --

6    A    Okay.

7    Q    -- for identification, a series of notes.  And I will

8    refer you to specific references and you can read it to

9    yourself.  It's not in evidence, and we will see if --

10             MR. BRAFMAN:  Do you have it, Your Honor?

11             THE COURT:  It is fine, I have it.

12             MR. BRAFMAN:  You have it.

13   BY MR. BRAFMAN:

14   Q    So you're referencing, do you have 3500-LY-2?

15   A    Yes, that's what you just gave me.

16   Q    Look at the upper left, so we get the date, on April

17   20th, 2015, correct?

18   A    Yes.

19   Q    All right.  And I am going to ask you a series of

20   questions.  Don't try and read it now, sir.

21   A    Okay.

22   Q    These are the rules.  If I ask you a question, you know

23   the answer, just tell me.  If you don't know the answer, we'll

24   let you use the document to see if it refreshes your

25   recollection.  Correct?

Yaffe - cross - Brafman                    4489

1   A    Okay.

2   Q    All right, now, I am asking you from your memory whether

3   on that date when you were in the U.S. Attorney's office with

4   your lawyer, not at your home, did you tell the agents that

5   from 2010 to the present Yaffe, you, had not performed

6   consulting services for anyone other than Martin Shkreli; did

7   you tell them that?

8   A    I don't recall telling them that.

9   Q    All right, I'd like you to look at page 2 of 6.  The

10  upper right-hand corner has the pages.

11          Do you see it?

12  A    Yes.

13  Q    All right.  Now, I want you to look second starting

14  paragraph, begins with "From 2010."  Do you see it?

15  A    Yes.

16  Q    All right; and read it to yourself.

17          (Pause.)

18  BY MR. BRAFMAN:

19  Q    Did you read that paragraph, sir?

20  A    Yes.

21  Q    Does it refresh your recollection that on April 20th you

22  told the agents that from 2010 to the present Yaffe had not

23  performed consulting services for anyone other than Martin

24  Shkreli?

25  A    Yes.

SAM      OCR      RMR      CRR      RPR

Yaffe - cross - Brafman                          4490

1    Q     You told them that?

2    A     Yes.

3    Q     So you told them that from 2010 you did perform

4    consulting services for Martin Shkreli, correct?

5    A     (No response.)

6    Q     That's what you're saying in this statement, isn't that

7    correct, that the only person you performed consulting

8    services for was Martin Shkreli?

9          Just focus on that paragraph.  We'll get to the

10   others in a minute, sir.

11         Does it refresh your recollection that you told them

12   that?

13   A     Yes.

14   Q     And right after saying that you told the agents that it

15   was not your intention to lie on that date during the

16   interview, correct?

17   A     Correct.

18   Q     And you told them that because you wanted them to believe

19   you?

20   A     I don't recall why -- why I told them that.

21   Q     But right after telling them that you had performed

22   consulting services for Mr. Shkreli after 2010, you told the

23   agents that you did not intend to lie during this interview,

24   isn't that correct?

25   A     Correct.

Yaffe - cross - Brafman                    4491

1   Q     Did you lie during that interview?

2   A     I think I embellished and I was less than truthful.  If

3   you're gonna say it was a lie, then yes.  I mean the bottom

4   line is I didn't provide any consulting services.

5   Q     So you lied?

6   A     So if I said I provided consulting services, I lied.

7   Q     And then when you told them that you didn't intend to

8   lie, that was a lie because you had just lied, correct?

9   A     No, I didn't intend to lie.

10  Q     You didn't?

11  A     (No response.)

12  Q     It just came out?

13  A     Look --

14  Q     No, no, no, not look, answer the question.

15        Did you lie during that interview or do you think

16  you just embellished?

17  A     Again, I don't re -- I don't recall every line of dialect

18  (sic) I had with them.  If I said that I provided consulting

19  service for Martin, that wasn't truthful.

20  Q     All right, stop there.

21        You did say that, correct, that the only person you

22  provided consulting services for after 2010 was Mr. Shkreli,

23  correct?

24  A     Again, I don't recall saying that, but --

25  Q     I thought you said you recall saying that after you read

Yaffe - cross - Brafman                    4492

1   it?

2   A    I see it on the form, but I don't recall saying it.

3   Q    Do you recall telling them that you didn't intend to lie?

4   A    I told -- yeah, well, I told them that I would be truthful.

5   Q    And you were not truthful is now your testimony, correct?

6   A    Again, I don't -- I don't recall saying that.  Just

7   because it's on this sheet, I'm reading what's on the sheet,

8   but I don't recall saying that.

9   Q    All right, but --

10  A    Is it possible that I said that?  Yes, it is, but I don't

11  know for sure.

12  Q    Now, let's move on.  Did you tell the agents that Martin

13  Shkreli was more motivated than anyone you had ever met in

14  your life?

15  A    I don't recall that.  I think he was driven and he was

16  certainly focused and he was certainly extremely bright, but I

17  mean more motivated than anyone I met in my life is a bit --

18  that's -- I don't recall that.

19  Q    Well, let me see if you can look at page 4 of 6.  In the

20  upper right-hand corner has the page numbers.  Read this.  The

21  first full paragraph beginning with, "Yaffe," and tell me

22  whether or not you told the FBI and the U.S. Attorney that

23  Mr. Shkreli was more motivated than anyone you knew.

24  A    Would you like me to read the paragraph?  I'm happy to.

25  Q    Yes, read the first full paragraph beginning with your

SAM      OCR      RMR      CRR      RPR

1    name.  After you've read it --

2              THE COURT:  He is reading it to himself.

3              MR. BRAFMAN:  Yes.

4              THE WITNESS:  Okay.

5    BY MR. BRAFMAN:

6    Q    To yourself, I'm sorry.

7              (Pause.)

8    Q    Does it refresh your recollection that you told the

9    agents that Mr. Shkreli was more motivated than anyone you knew?

10   A    No.

11   Q    Was he more motivated than anyone you know?

12   A    I'm not -- I don't think he was more motivated than

13   anyone, no, that I know.  I know some pretty motivated people.

14   With that said, he was certainly a highly-motivated person.

15   Q    And if you said to the FBI that he was more motivated

16   than anyone you knew, would it be a lie or an exaggeration or

17   the truth?

18   A    Probably -- probably an exaggeration.  He was highly

19   motivated, but, again, more motivated than anyone I know is --

20   you know --

21   Q    A tough statement, right?

22   A    Yeah.

23   Q    Did you tell the FBI during this meeting on April 20th

24   when you had your lawyer present that the consulting work you

25   provided Shkreli was research and introduction to Yaffe

Yaffe - cross - Brafman                                4494

1    healthcare contacts?

2    A    I don't remember, but certainly I would have done that.

3    Q    All right, certainly you would have said that the

4    consulting work you provided Mr. Shkreli was research and

5    introduction to Yaffe healthcare contacts?

6    A    I would have, yes, and would have done that whether I had

7    a consulting agreement or not.  That's what I had been doing

8    for the last ten years.

9    Q    And it would have been true, right?

10   A    Yes.

11   Q    Did you tell the agents that you wanted to work --

12   withdrawn.

13          Did you tell the agents on that date that you wanted

14   to work for Martin Shkreli because of future business in the

15   event that MSMB or Retrophin took off?

16   A    Not that I recall.

17   Q    Would you agree that you wanted to have some type of

18   business relationship with him if those businesses took off?

19   A    I hadn't really thought about it.  I have, you know --

20   Q    Sure you did, you wanted to introduce him to Swanny,

21   right, your partner?

22   A    That was to try to help Martin where I wasn't involved in

23   the business anymore.  Where I transitioned out of the

24   business, it would make more sense to connect Martin with

25   someone that was actively involved in the business because it

Yaffe - cross - Brafman                    4495

1   would probably be more beneficial for Martin and also more

2   beneficial for -- for -- you know, for Swanny if there was

3   some business opportunities there.

4   Q    If there was some business opportunities that you

5   arranged through Swanny, would you personally benefit from it?

6   A    No.

7   Q    Now, look at the paragraph beginning on page 4 with the

8   word "before."  It's the third full paragraph down.  And tell

9   me whether -- read it to yourself and tell me whether or not

10  you told the agents if MSMB took off, Leerink Swann would

11  benefit because MSMB would place trades; did you tell the

12  agents that?

13          (Pause.)

14  A    This is -- this is paragraph 3 on page 4?

15  Q    Yes.  It's the third full paragraph, which begins with

16  the words "before promissory note," read down.

17  A    Okay, that's the fourth paragraph.

18  Q    It's the third full paragraph.

19  A    Oh, okay, the third paragraph.  Okay, I see it.

20          (Pause.)

21  A    I see it.  So the question?

22  Q    Do you remember telling the FBI that if MSMB took off, it

23  would be good for business with Leerink Swann?

24  A    I don't recall that, but if MSMB was a successful hedge

25  fund that was investing in healthcare ideas, certainly there

Yaffe - cross - Brafman                     4496

1   would be a good -- could potentially be a good client for

2   Leerink.

3   Q     Same thing with Retrophin, potentially?

4   A     Potentially.

5   Q     Okay.  Now, did you tell the agents and members of the

6   government agencies that your relationship with Martin Shkreli

7   was atypical of your relationship with other clients?

8   A     I don't -- again, I don't re -- again, I don't recall

9   that, but it was I had a pretty close relationship with him

10  and I spoke with him probably a lot more frequent.  So that

11  wouldn't -- you know, again, I don't recall it, but it's

12  possible that I did.

13  Q     All right, atypical means unusual, correct?

14  A     Correct.

15  Q     So would it be a true statement that with respect to

16  Mr. Shkreli you spent more time talking to him about

17  healthcare stocks and issues than most any other client you

18  had during the period you were with Leerink Swann?

19  A     Not sure that that's correct, but I did speak with him

20  quite often because I felt that he had a pretty good grasp on

21  the healthcare industry and also had a lot of knowledge, you

22  know, about healthcare investors and companies and stuff,

23  which I got a lot, I learned a lot from Martin pertaining to

24  healthcare, healthcare companies.

25  Q     And from time to time in these conversations you would

Yaffe - cross - Brafman                4497

1   bounce ideas off of each other?

2   A    Yes.

3   Q    Now, did you tell the agents that you helped Retrophin

4   with two drugs that ultimately made it into their portfolio

5   from Ligand and Pharmacopeia?

6   A    That may have been a little bit of an embellishment, but

7   we talked a lot about different stocks and those were a couple

8   of stocks that we had researched, Martin was looking at and

9   had done a lot of research, and we were following.  And,

10  ultimately, I believe that Martin did try to in-license a few

11  of those products into Leerink Swann -- not -- I apologize,

12  that's wrong.  Martin did try to in-license some of those

13  products, I believe, independently or into Retrophin, I'm not

14  a hundred percent sure.

15  Q    So if you told the agents you had those discussions that

16  wouldn't be a lie, correct?

17  A    Correct.

18  Q    Now, you told us yesterday when we discussed cluster

19  headaches, and you correct me if I'm wrong, that you didn't

20  know really anything about cluster headaches?

21  A    Yeah, flying blind when it comes to cluster headaches.

22  Q    Blind in blind (sic)?

23  A    Pretty blind, yes.

24  Q    Do you remember telling the agents in your interview when

25  your lawyer was present on April 20th, 2015 that cluster

Yaffe - cross - Brafman                    4498

1    headaches are migraines to the ninth degree and that they are

2    debilitating; did you tell that to the agents?

3    A    Don't recall, it's possible.  I certainly know that.  I

4    mean don't have a lot of experience, but I know a cluster

5    headache is a --

6    Q    I thought you said blind and blind a minute ago?

7    A    Pertaining to research and drug development, yes.  But in

8    terms of what a cluster headache is, certainly I know what a

9    cluster headache is.

10   Q    Did you tell the agents that Retrophin had an interest in

11   the cluster headache drugs, but ultimately it fizzled out?

12   A    Again, I don't recall that.

13   Q    Well, look at the bottom of page 4 of 6, the last couple

14   of lines, and read it over to the top of page 5.  Read it to

15   yourself and tell me if it refreshes your recollection that

16   you told the FBI that Retrophin had interest in cluster

17   headache drugs --

18   A    Which paragraph or page?

19   Q    The bottom of the page.  It's the last paragraph, but

20   it's really the last part of the paragraph.

21   A    Okay.

22            (Pause.)

23   A    I see that, yes.

24   Q    Did you say it?

25   A    Don't -- I don't re -- I honestly don't remember saying

SAM      OCR      RMR      CRR      RPR

Yaffe - cross - Brafman                        4499

1   it or recall.

2   Q    You don't deny saying it?

3   A    I won't deny it.  It's possible, but I don't remember or

4   recall saying it.

5   Q    How would you know whether Retrophin had an interest in

6   cluster headache drugs?

7   A    Because I knew that was one of the areas that Martin was

8   looking at.

9   Q    And that was one of the areas that you discussed with

10  Marek Biestek too, is that correct?

11  A    No.

12  Q    Never?

13  A    We had a quick call, but we never really discussed any

14  substance.

15  Q    But the call was about cluster headaches?

16  A    The call was -- yeah --

17  Q    Marek Biestek calls you out of the blue and he says

18  cluster headaches, like the magic words, and you don't know

19  what he's talking about?

20  A    I don't -- I don't think I ever had a conversation with

21  just Marek.  Every time I spoke with Marek -- I met Martin

22  twice and Marek was there, and I had a few calls, of which I

23  believe Martin was on each call.  I mean it wasn't -- it was

24  less than a five-minute call.

25  Q    But the calls were about cluster headaches?

Yaffe - cross - Brafman                    4500

1    A    Yes.

2    Q    And why would Marek Biestek and Martin Shkreli, out of

3    all of the subjects under the pharmaceutical world, talk to

4    you about cluster headaches?

5              MS. SMITH:  Objection, Your Honor.

6              THE COURT:  Sustained.  Rephrase.

7    BY MR. BRAFMAN:

8    Q    Did you ask, Why are you talking about cluster headaches

9    with me who is retired from this industry?

10   A    Again, I don't know.  My thought was to try to legitimize

11   the consulting agreement as a legitimate consulting agreement.

12   Q    By working on cluster headaches for Marek's perspective,

13   if you know?

14             MS. SMITH:  Objection.

15             THE COURT:  Sustained.  Rephrase.

16   BY MR. BRAFMAN:

17   Q    Well, how do you legitimize your consulting agreement by

18   talking about cluster headaches?

19   A    For starts, maybe a specific scope of work.

20   Q    Okay.

21   A    And having a consultant that's credible, that has the

22   ability to provide those consulting services.

23   Q    Okay, thank you.

24             Now, did you tell the agents that Mr. Shkreli

25   discussed with you rolling out a separate company for cluster

SAM      OCR      RMR      CRR      RPR

Yaffe - cross - Brafman                    4501

1  headache research, but that there were issues with the

2  mechanism of introduction?

3  A    Don't recall the specifics of that.

4  Q    Well, look at the top of page 5.  Read the top paragraph

5  to yourself beginning with "Shkreli," and tell me if it

6  refreshes your recollection that you told the agents that

7  Shkreli thought about rolling out a separate company for

8  cluster headaches on the top of page 5.

9            (Pause.)

10  A    Yes, I see it.

11  Q    Did you say that?

12  A    I guess I might have.  I apologize.  I really don't recall.

13  Q    But how would you know that Mr. Shkreli had thought about

14  rolling out a separate company for cluster headaches unless he

15  talked to you about it?

16  A    He talked to me about a lot of different ideas and a lot

17  of different things that he was working on.

18  Q    Right.  Now one of them was a cluster headache company?

19  A    (No response.)

20  Q    Yes or no?

21  A    Again, I don't recall talking about specific companies.

22  I don't recall talking about a lot of specifics on cluster

23  headaches, and it was a very small amount of conversations I

24  had pertaining to research and stocks with Martin.

25  Q    And now with cluster headaches, did you tell the agents

SAM      OCR      RMR      CRR      RPR

Yaffe - cross - Brafman                    4502

1   on that date in the Eastern District that the cluster headache

2   had issues with the mechanism of introduction?

3   A    I don't recall that because I'm trying to figure out what

4   a mechanism of introduction even is.

5   Q    Are those words you used?

6   A    I don't think so.

7   Q    Do you see them, does it refresh your recollection when

8   you read this that you had used those exact words?

9   A    I don't -- no, I don't recall saying that.

10  Q    Okay.  Now, what about mechanism of action, do you know

11  what that means?

12  A    Mechanism of action --

13  Q    Related to a pharmaceutical drug.

14  A    Sounds -- I'm trying to think what a mecha --

15  Q    You've used those words to describe how a drug works,

16  isn't that correct?

17  A    Yeah, I should know what a mechanism of action is.  I'm

18  trying to think of how, yeah, I guess of how the drug would

19  actually work.

20  Q    Did you use that, did you mean to tell the agent method

21  of action as opposed to method of introduction?

22  A    Possibly.

23  Q    And would you tell the agents about mechanism of action

24  concerning cluster headache drugs?

25            MS. SMITH:  Objection to form.

SAM      OCR      RMR      CRR      RPR

Yaffe - cross - Brafman                    4503

1   A    Don't --

2           THE COURT:  Okay.

3   A    -- know.

4   Q    Do you remember if you said to the agents that the

5   cluster headache drug had issues because of mechanism of action?

6   A    Don't recall that; but if I did, that wouldn't have been

7   something I would have known unless Martin or Marek told me

8   that.

9   Q    All right.  And when would they tell you about the

10  trouble of a cluster headache drug if you only had these short

11  telephone calls, as you have testified?

12  A    Not sure when they would have told me that.  It could

13  have been a two-minute, it could have been a -- you know, I

14  don't know.  It could have been a two-minute call, but I don't

15  recall this.

16  Q    So it's, Hello, Lee, cluster headaches mechanism of

17  action, see you later; is it that type of call?

18          MS. SMITH:  Objection.

19          THE COURT:  Sustained.

20  BY MR. BRAFMAN:

21  Q    How do you have a telephone call with someone who is

22  explaining to you about the cluster headache issues and the

23  mechanism of action --

24  A    See --

25          MS. SMITH:  Objection, Your Honor, it

SAM       OCR       RMR       CRR       RPR

Yaffe - cross - Brafman                    4504

1    mischaracterizes the testimony.

2    A    See, therein lies the issue.

3         THE COURT:  I will allow it.

4    Q    Therein lies the issue?

5    A    The issue.

6    Q    The issue is you don't --

7    A    They were the consultants and they were educating me.

8    Q    Why would they bother?

9    A    To legitimize the consulting agreement maybe.

10   Q    Why would they bother to educate you about cluster

11   headaches?

12        MS. SMITH:  Objection, Your Honor.

13        THE COURT:  Overruled.

14   A    Don't know.

15   Q    Don't know, okay.  So did they or did they not try to

16   educate you about this issue that they wanted you and Marek to

17   work on; yes or no?

18        MS. SMITH:  Objection.  This is -- what they wanted

19   to educate.

20        THE COURT:  Why don't you rephrase?

21   BY MR. BRAFMAN:

22   Q    I'll withdraw it as to form.

23        Were there conversations in which Mr. Shkreli and

24   Mr. Biestek were giving you information about cluster

25   headaches; yes or no?

1    A    I'm trying to -- you know what, I'm trying to remember.

2    Possibly, I don't remember.

3    Q    Do you remember a discussion by Mr. Biestek and you

4    telling you that the difficulty with the drug for cluster

5    headaches is that it had sometimes the effect on a patient

6    similar to LSD?

7    A    Yes.

8    Q    When did you have that conversation?

9    A    I don't recall.

10   Q    But you recall a conversation with Marek and Martin where

11   they --

12   A    That could have been -- that could have happened.  We had

13   two five-minute calls.  In two five-minutes calls there could

14   have been a tremendous amount of information spewed out.

15   Similar to sending me 30 articles from medical reviews, I mean

16   does that rationalize that I'm a consultant on cluster

17   headaches?

18   Q    Well, it might mean that Mr. Shkreli is trying to get you

19   to be a consultant, isn't that true?

20            MS. SMITH:  Objection to what Mr. Shkreli was trying

21   to do.

22            THE COURT:  Overruled.  I will allow the question.

23   Go ahead and answer.

24   A    Repeat the question.

25   Q    You're having all of this information conveyed to you by

Yaffe - cross - Brafman                              4506

1  Mr. Shkreli or Mr. Biestek or both of them in two five-minute

2  calls?

3  A    Possibly; but what was I supposed to do with the

4  information?

5  Q    Well, the question is:  Was there an effort, to your

6  knowledge, by Mr. Biestek to educate you about cluster

7  headaches?

8  A    Yes.

9  Q    All right.  And when and how was that effort by

10 Mr. Biestek, which you now acknowledge, undertaken, just these

11 phone calls?

12 A    A couple of phone calls and probably I saw that they had

13 sent a bunch of articles.

14 Q    Okay.  Which you tell us you didn't see until I showed

15 them to you or didn't recognize until I showed them to you

16 yesterday?

17 A    Correct.  I'd be curious if I responded or what the

18 response was to that.

19 Q    All right, well, let's move on and then we'll go back to

20 the articles.

21        Now, did you tell the agents that you saw the

22 consulting agreement as a means by which to get $250,000 to

23 get your father paid back and for you to be compensated for

24 all the time you spent helping Shkreli without receiving

25 anything in return?  Did you tell the agents that?

Yaffe - cross - Brafman                    4507

1    A    Yes.

2    Q    Yes or no?

3    A    Yes.

4    Q    And was that true?

5    A    No.

6    Q    Part of it was true?

7    A    Yes.

8    Q    So you lie and you tell the truth in the same statement?

9    A    Well, I think sometimes you try to rationalize what you

10   do and you may leave out information or embellish, but you're

11   not absolutely truthful.  So in other words, sometimes if you

12   don't say something in an omission, you're not essentially

13   lying, but you're not essentially being truthful.

14   Q    So you call that rationalization or do you recall call

15   that just flat out lying?

16   A    Look, I admit that I made some mistakes.

17   Q    I am not asking you that.

18   A    Well, yeah, you are.

19   Q    No, I'm asking you, you used the word rationalization.

20   You say I rationalized, correct?

21   A    Have you ever done something that you've regretted and

22   then tried to rationalize why you did it?

23   Q    Yes, but that's different than --

24   A    Why is it different?

25   Q    -- something I did and then lying about it?

Yaffe - cross - Brafman                    4508

1           MS. SMITH:  Objection, Your Honor.

2           THE COURT:  This is an argument --

3   Q    Is it different to you?

4           THE COURT:  This is an argument that you need to

5   stop, both of you.

6           MR. BRAFMAN:  Okay.

7           THE COURT:  Ask a question, answer a question.

8           MR. BRAFMAN:  Yes, Your Honor.

9           THE WITNESS:  I apologize.

10          THE COURT:  Don't start this back and forth.

11          THE WITNESS:  I apologize.

12          MR. BRAFMAN:  Yes, Your Honor.

13  BY MR. BRAFMAN:

14  Q    Did you tell the government that the consulting agreement

15  was to compensate you for all the time you spent helping

16  Shkreli without receiving anything in return; did you tell

17  them that?

18  A    I might have, I don't recall.

19  Q    Well, let's look at 35 LY-2 and look at page 5 of 6.

20  A    Okay.

21  Q    And look at the third paragraph on the bottom.  I'm

22  sorry, the fourth paragraph on the bottom.

23  A    Fourth paragraph on the bottom.

24  Q    Yes, beginning with "Yaffe was shown."

25  A    Okay, I see.

Yaffe - cross - Brafman                    4509

1   Q    Now, look at the bottom, read that, and tell me whether

2   or not you told them that the consulting agreement was to pay

3   back your father and so you should be compensated for all the

4   time you spent helping Shkreli without receiving anything in

5   return.

6              (Pause.)

7   A    Yes, I see that.

8   Q    Does it refresh your recollection that's what you told

9   them?

10  A    Yes.

11  Q    Now, this meeting on April 20th of 2015 with the

12  government was no longer Lee Yaffe in panic mode with agents

13  coming up your driveway, correct?

14  A    Correct.

15  Q    This was Lee Yaffe retaining a lawyer and agreeing to go

16  in to the government and, essentially, making a decision in

17  some respects to lie, correct?

18  A    Yes.  I'd still say I was a little bit in panic mode, but

19  not to the extent of the two FBI agents showing up at my house.

20  Q    But your panic mode now is three weeks later and you have

21  your own lawyer sitting next to you, correct?

22  A    Correct.

23  Q    All right.  You chose that lawyer, correct?

24  A    Yes.

25  Q    All right.  Now, I want to talk to you about the

Yaffe - cross - Brafman                    4510

1   agreement you got with the government that says you are not

2   going to be prosecuted, correct?

3   A    Correct.

4   Q    I want to show you what's marked for identification as

5   3500-LY-5.  Can you see it, sir?

6   A    Yes.

7   Q    And you recognize that as a letter to your lawyer, which

8   lays out the terms of your non-prosecution agreement?

9   A    Yes.

10  Q    All right.

11       MR. BRAFMAN:  I offer it into evidence.

12       MS. SMITH:  No objection.

13       THE COURT:  All right, we will receive -- what do we

14  want to mark this, defense exhibit what?

15       MR. BRAFMAN:  Sorry, Your Honor.  I am putting an

16  exhibit sticker on it as we speak.  Defense Exhibit 105,

17  previously marked 3500-LY-5.

18       THE COURT:  All right, we will receive defense

19  Exhibit 5 --

20  Q    Now this is an important letter to you, correct?

21       THE COURT:  Did you say 105?

22       MR. BRAFMAN:  105, yes, ma'am.

23       THE COURT:  All right, 105; sorry.

24       (Defendant's Exhibit 105 was received in evidence.)

25       (Continued on the following page.)

Yaffe - cross - Brafman                              4511

1    BY MR. BRAFMAN:

2    Q    This is an important letter, is it not?

3    A    Yes, it is.

4    Q    And this letter says you're not going to be prosecuted

5    for the crimes you committed, correct?

6    A    Correct.

7    Q    Including the lies to the FBI, correct?

8    A    Correct.

9    Q    And this agreement was read by you and your lawyer and

10   you discussed it with him before signing it?

11   A    Yes.

12   Q    And it's the same lawyer who is present in the FBI office

13   on the 20th when you lied to the agents, correct?

14   A    Yes.

15   Q    And that's Fred Schwartz?

16   A    Yes.

17   Q    And that's the name of his firm and he's down in Florida.

18   You live in Florida, correct?

19   A    Correct.

20   Q    So, you had ample opportunity to talk to him about this,

21   correct?

22   A    Yes.

23   Q    Now, the meeting with the FBI that we just finished

24   talking about was in April of 2015.  This agreement is dated

25   November 5, 2015, correct?

Yaffe - cross - Brafman                     4512

1   A    Yes.

2   Q    And what you wanted to do is get an agreement that you

3   would not be prosecuted before you continued to provide

4   information; would that be a fair statement?

5              MS. SMITH:  Objection, your Honor.

6              THE COURT:  Sustained.

7   Q    You wanted an agreement that you would not be prosecuted,

8   correct?

9   A    Yes.

10  Q    Now I want to turn you, sir, to Page 3 of that agreement.

11  And the agreement provides, in pertinent part, at Paragraph 2,

12  the Office, capital "O," you understand that to be the

13  Government, correct?

14  A    Yes.

15  Q    They agree that except as provided in Paragraphs 5 and 6,

16  no criminal charges will be brought against the witness for

17  his heretofore disclosed involvement in signing a fraudulent

18  consulting agreement with the chief officer of Retrophin, a

19  publicly-traded company, and for accepting payment in the form

20  of cash and shares of a publicly-traded company despite

21  performing no work pursuant to the consulting agreement and

22  making false statements to the FBI on April 1, 2015; do you

23  see that?

24  A    Yes.

25  Q    That says you're not going to be prosecuted for making

Yaffe - cross - Brafman                    4513

1   false statements to the FBI on April 15, 2015?

2   A    Yes.

3   Q    What about the false statements you made to the FBI on

4   April 20, 2015, do you get immunity for that?

5        MS. SMITH:  Objection, your Honor, to the word

6   "immunity."

7        THE COURT:  Why don't you rephrase, Mr. Brafman?

8   Q    Do you understand this agreement covers the false

9   statements you made to the FBI on April 20, 2015?

10  A    Yes.

11  Q    Doesn't say that.  It says April 1, 2015.  See it?

12  A    I see it.

13  Q    It doesn't refer to anything you said on April 20, 2015,

14  correct?

15  A    Correct.

16  Q    You know what a wink and a nod is?

17       MS. SMITH:  Objection, your Honor.

18       THE COURT:  Sustained.

19  Q    Do you have any formal understanding besides this

20  agreement that so long as you show up here and testify, that

21  you're not going to be prosecuted for false statements that

22  you made on April 20, 2015?

23  A    If I am, then I'll be prosecuted.  Right now my main

24  focus is on telling the truth.

25  Q    But you don't have an understanding that you're going to

Yaffe - cross - Brafman                    4514

1   be prosecuted or not going to be prosecuted?

2   A    I don't have any understanding.  This is the agreement I

3   signed, and you can see the agreement.

4   Q    Now, this agreement only protects you if you tell the

5   truth, correct?

6   A    Yes.

7   Q    And who determines whether you are telling the truth or

8   not, in your mind?

9              MS. SMITH:  Objection, your Honor.

10             THE COURT:  Sustained.

11  Q    Look at what the agreement says.  The agreement says:

12  The witness must at all times give complete, truthful, and

13  accurate information and testimony and must not commit or

14  attempt to commit any further crimes.  Should it be judged by

15  the Office that the witness has failed to cooperate fully and

16  intentionally given false, misleading, or incomplete

17  information -- I'll read on -- the Office will be released

18  from its obligation under the agreement.

19             Do you see that?

20  A    Yes.

21  Q    And by the "Office," you mean the Government, correct?

22  A    Yes.

23  Q    So, in order for you to be deemed truthful, you have to

24  be truthful in the judgment of the Office, according to this

25  letter, correct?

Yaffe - cross - Brafman                    4515

1    A    Yes.

2    Q    The people at this table, correct?

3    A    Yes.

4    Q    The people you lied to on April 20, correct?

5             MS. SMITH:  Objection, your Honor.

6             THE COURT:  Overruled.

7    Q    Correct?

8    A    Yes.

9    Q    Now, let me ask you this question, and think carefully

10   before you answer:  If you testify here and the Government

11   believes you -- so in their judgment you're being truthful --

12   do you get the benefit of the agreement, yes or no?

13   A    I don't know.  I believe if I'm being truthful and I'm

14   going -- I'm telling you the truth.  I've admitted that I've

15   lied.  So, we can talk about the timing of the lies --

16   Q    Let's stop for a minute.

17             Under the terms of your agreement, you have conceded

18   that the judgment of the Office is the Government, correct?

19   A    The Office is, yes, the Attorney General's Office.

20   Q    The U.S. Attorney?

21   A    Yes.

22   Q    And the agreement clearly provides should it be judged by

23   the Office that the witness has intentionally lied or given

24   incomplete or misleading information, you would lose the

25   benefit of this agreement, correct?

Yaffe - cross - Brafman                          4516

1   A    Yes.

2   Q    So, the judgment on whether you tell the truth or not in

3   order to get this agreement's benefit is in the Government,

4   correct?

5   A    I guess it is, yes.

6   Q    So here's my question, and listen carefully:  If you lie

7   but the Government believes you, do you get the benefit of

8   this agreement, yes or no?

9              MS. SMITH:  Objection, your Honor.

10             THE COURT:  Sustained.

11  Q    What's your understanding, that you have to tell the

12  truth so that their judgment determines that you've told the

13  truth?

14             MS. SMITH:  Objection, your Honor.

15             MR. BRAFMAN:  That's what the letter says.

16             MS. SMITH:  Asked and answered.

17             THE COURT:  You need to phrase the question in an

18  appropriate manner.  We have covered this ground.

19  Q    Your understanding, according to the agreement, is that

20  the judgment that is made as to whether you told the truth or

21  lied is in the hands of the Government, correct?

22  A    I'm told to tell the truth to everyone.

23  Q    I understand.

24  A    The Government, you --

25  Q    Relax.  I'm talking about the agreement.

Yaffe - cross - Brafman                    4517

1           MS. SMITH:  Objection, your Honor.

2     A     It's a nonprosecution agreement.  My understanding was

3     that I agree to tell the truth and that the FBI was going to

4     forgive me for the lies that I made as well as for signing

5     the -- accepting the compensation and not providing consulting

6     service.  That was my understanding of the agreement.

7     Q     Now, you've told us when -- incidentally, does the

8     agreement require you to turn over materials to the Government

9     also?

10    A     I believe -- again, I believe if they're pertinent to the

11    case, yes.

12    Q     And the agreement specifically provides that you are

13    going to be required --

14          MR. BRAFMAN:  If we could put it up again.

15          (Exhibit published to the jury.)

16    Q     -- even specifically provides that you are the witness,

17    agree to furnish to the Office all documents and other

18    materials that may be relevant to the investigation and that

19    are in the witness' possession or control, correct?

20    A     Correct.

21    Q     And, indeed, you received subpoenas to produce those

22    materials, correct?

23    A     I received a subpoena to show up.  I don't think I

24    received a subpoena for specific information.

25    Q     But the records were turned over by you in response to

Yaffe - cross - Brafman                    4518

1   this agreement?  Your records?

2   A    I'm just trying to think what I turned over.  Any records

3   or information that they requested that I had, yes.

4   Q    So, you didn't discriminate on what you were going to

5   turn over.  You turned over everything you had, correct?

6   A    I didn't really believe -- I don't remember turning over

7   a lot.  A couple of specific pieces that I was asked for.

8   Q    Did you turn over e-mails?

9   A    Don't believe I turned over e-mails.  They had the

10  e-mails.

11  Q    So if they had them, you wouldn't turn over anything else

12  that you had which they didn't have, correct?

13  A    Didn't even think about it, to be honest.

14  Q    But it says so in your agreement that you're supposed to

15  do this.

16  A    Okay.  So, what's pertinent?  It goes back ten years.

17  I'm not sure what's pertinent and what isn't pertinent.

18  Q    Did you decide on your own to determine what was

19  pertinent and what's not pertinent?

20  A    No.

21  Q    What?

22  A    Did I decide on my own?  Not sure, I'm not sure I

23  understand the question.

24           So, what was it that I didn't do that I should have

25  done in your opinion?

Yaffe - cross - Brafman                    4519

1    Q    I can't give you my opinion of the rules because I'd get

2    thrown out of the courtroom.

3              THE COURT:  I think the witness is confused by the

4    question.

5              MR. BRAFMAN:  I'll straighten that out, your Honor.

6    Q    You signed this agreement.  You read it before you signed

7    it, you talked to your lawyer, right?

8    A    Yes.

9    Q    And it specifically says the witness agrees to furnish

10   the Office all documents and other material that may be

11   relevant to the investigation and that are in the witness'

12   possession or control, correct?

13   A    Yes.

14   Q    And you knew that you were going to be questioned and

15   that you had been questioned repeatedly about your

16   relationship and interaction with Martin and Mr. Biestek,

17   correct?

18   A    Correct.

19   Q    And you knew that the investigation was focusing on a

20   cluster headache consulting agreement, among other things?

21   A    Yes.

22   Q    Now yesterday, I showed you this e-mail.  I'm sorry, I

23   showed you this covering e-mail, Exhibit 100, which is in

24   evidence.

25              (Exhibit published to the jury.)

Yaffe - cross - Brafman                    4520

1    Q    And it is dated October 9, 2013, from Martin Shkreli to

2    you, and it says:  Thanks.

3              Do you remember?

4    A    Yes.

5    Q    And when I showed it to you, you said:  Wow, I hadn't

6    this before; correct, or words to that effect?

7    A    Yes.

8    Q    And you identified it as your e-mail?

9    A    Yes, I do recall.

10   Q    And you said you didn't recall it because it goes to your

11   e-mail at gmail.com which you rarely use, correct?

12   A    Correct.

13   Q    Now, you then looked at the next page and it was, indeed,

14   an e-mail several minutes after Mr. Shkreli's e-mail, in which

15   the caption is "thanks" and they send you all of this

16   information about cluster headaches, correct?

17   A    Yes.

18   Q    And you didn't turn this over to the Government.  The

19   first time I showed it to you was yesterday, when you saw it,

20   correct?

21   A    Correct, I didn't even recall seeing it.

22   Q    So, you didn't search to see what was relevant.  This

23   isn't ten years ago, this is 2013, pertaining specifically to

24   the facts of this case.

25              MS. SMITH:  Objection, your Honor.

Yaffe - cross - Brafman                    4521

1          THE COURT:  I'll sustain the objection, the form of

2    the question.

3    Q    This doesn't go back ten years, does it, sir?

4    A    No, it doesn't.

5    Q    It goes back to the time period we're talking about in

6    pertinent part, correct?

7    A    Correct, 2013.

8    Q    Right.  And it was addressed to an e-mail account that

9    you had but you said you didn't use quite often, correct?

10   A    I do use it.  But a lot of stuff gets caught up in

11   filters and I don't know at that point if it was getting

12   forwarded to another e-mail address.

13   Q    How do you think we got it?

14          MS. SMITH:  Objection, your Honor.

15          THE COURT:  Sustained.

16   Q    Well, it's here and you don't deny that it's from your

17   e-mail account, correct?

18          THE COURT:  Excuse me.  Sustained.

19   Q    Sir, you don't deny that these documents were addressed

20   to your e-mail account?

21   A    No, I don't deny it.

22   Q    And you don't deny getting them?

23   A    I don't deny getting them but I don't remember seeing it.

24   If I did, I would have given that information over.

25   Q    To the Government, you mean?

Yaffe - cross - Brafman                    4522

1   A    Yes.

2   Q    Now, I think yesterday you asked me what 408 BOL 148 was;

3   do you recall?

4   A    Yes.

5   Q    And if you look at the document itself --

6   A    Maybe you can fill me in on what the purpose of the

7   e-mail was.

8   Q    You want me to do that?

9   A    Yes.

10  Q    I don't think the judge will let me.

11            MS. SMITH:  Your Honor?

12            THE COURT:  He's going to ask you questions.

13            THE WITNESS:  I apologize.

14            THE COURT:  If you don't understand --

15            MR. BRAFMAN:  You don't have to apologize.  You're

16  doing fine.

17            THE COURT:  I'm speaking.  Please don't interrupt.

18            If you don't understand the question, tell the

19  attorney that you don't understand, and he will rephrase it.

20            THE WITNESS:  Okay.  Fair enough.

21            THE COURT:  Just answer to the best of your ability,

22  all right?

23            THE WITNESS:  Okay.

24            THE COURT:  Thank you.

25  Q    Yesterday on direct examination, you testified under oath

Yaffe - cross - Brafman                    4523

1   that prior to getting the consulting agreement, you had never

2   discussed cluster headache drug development with the

3   Defendant; do you remember giving that testimony?

4   A     Yes.

5   Q     Do you now stand corrected?

6              MS. SMITH:  Objection, your Honor.

7              THE COURT:  Overruled.

8   Q     Isn't it true that whether it's for five minutes or ten

9   minutes, you discussed cluster headache with Marek Biestek and

10  Mr. Shkreli in a conference call?

11             MS. SMITH:  Objection, your Honor.  The prior

12  question, the timing.

13             THE COURT:  Please rephrase, Mr. Brafman.

14  Q     You testified under oath on direct examination that prior

15  to getting this agreement, meaning the consulting agreement,

16  you never discussed cluster headache drug development with the

17  Defendant.  Do you remember being asked and giving those

18  answers under oath yesterday?

19  A     Yes.

20  Q     And as you sit here today, would you agree that that is

21  not completely accurate?

22  A     No, because we had a five-minute conversation.  We didn't

23  talk about any of the -- I mean, I got an e-mail with, I don't

24  know, hundreds of pages of documentation that I don't even

25  know that I saw that I responded to.  But what does that have

LAM      OCR      RPR

Yaffe - cross - Brafman                              4524

1   to do with a five-minute conversation or three-minute

2   conversation with Martin and Marek?

3   Q    Would it be true prior to yesterday you did discuss

4   cluster headaches with either Marek or Martin at least on a

5   couple of calls?

6   A    Briefly on a couple of calls, which is what I said.

7   Q    No.  Yesterday you said that you never discussed cluster

8   headache drug development with the Defendant.

9              MS. SMITH:  Objection, your Honor.

10  A    We didn't discuss --

11             THE COURT:  Excuse me.

12             MS. SMITH:  Mischaracterizing the testimony.

13             Can we do a sidebar.

14             MR. BRAFMAN:  Your Honor, I'll move on.

15             THE WITNESS:  I'll answer the question.

16             THE COURT:  No, he's withdrawn the question.  He's

17  moving on.

18             THE WITNESS:  Okay.

19  Q    Now, this GMail account that you only used sparingly was

20  an account that you searched and gave certain documents from

21  that account to the Government; isn't that true?

22  A    Don't recall.  It's possible.

23  Q    It's possible?

24  A    Yeah.

25  Q    It's possible you gave them records from the GMail

LAM      OCR      RPR

Yaffe - cross - Brafman                    4525

1   account but didn't give them the cluster headache materials?

2   A    Possible, yes.

3   Q    On purpose or by accident?

4   A    I mean, I didn't think about it.  I didn't go and --

5   basically, pulled the consulting agreement.  I wasn't focused

6   on cluster headache drugs because I didn't really provide any

7   consulting services.

8   Q    The whole discussion with the FBI pretty much discussed

9   cluster headaches, correct?

10  A    Yes.

11  Q    And that was your consulting agreement, correct?

12  A    Yes, but when I became truthful that I didn't provide

13  consulting services, I didn't think about the cluster headache

14  stuff because I didn't think it was pertinent.

15  Q    Didn't think it was pertinent even though that was the

16  substance of both FBI interviews on April 1 and April 20,

17  correct?

18  A    Correct.

19  Q    Now, look at 103 for identification.  Do you recognize

20  this as an e-mail from Martin Shkreli to your GMail account?

21  A    Yes.

22  Q    In the same time period, 2013?

23  A    Yes.

24  Q    Did you turn this over to the Government?

25  A    No.

LAM      OCR      RPR

Yaffe - cross - Brafman                    4526

1    Q    Well, it says -- there's a Bates stamp number there,

2    LY000058.  That's you, right, L-Y, Lee Yaffe?

3    A    That's me.

4    Q    Who did you turn this over to?

5    A    I don't recall turning it over to anyone.

6    Q    Do you recognize it, though, as an e-mail from your

7    account?

8    A    That came from, actually, Martin's account to me, yes.

9    Q    And it came from Martin's account to you, but it came to

10   your GMail account.

11   A    Yes.

12   Q    And my question is:  Did you turn it over to anybody?

13   A    No.

14   Q    You're sure?

15   A    Not that I recall.

16   Q    Nevertheless, you recognize it, right?

17   A    Yes.

18            MR. BRAFMAN:  I offer it into evidence, your Honor.

19            MS. SMITH:  Objection, hearsay.

20            MR. BRAFMAN:  It's not hearsay, your Honor.

21            THE COURT:  Let's have a sidebar rather than

22   fighting in front of the jury.

23            Why don't you take a mid-morning break, ladies and

24   gentlemen.  Please don't discuss the case.

25            (Jury exits.)(Continued on next page.)

```
                          Sidebar                      4527
```

 1                (The following occurred at sidebar.)

 2            MR. BRAFMAN:  Your Honor, first of all, these two

 3    documents are admissible for a number of reasons.

 4            THE COURT:  Let's identify them for the record?

 5            MR. BRAFMAN:  102 for identification and 103 for

 6    identification.

 7            THE COURT:  These are defense exhibits.

 8            MR. BRAFMAN:  Defense exhibits.  I'm going to show

 9    them to the witness to identify them as e-mails that he

10    received from Martin Shkreli.  And he has already identified

11    103 as an e-mail he received to his GMail account.

12            They're admissible for a number of reasons.  First

13    of all, the Government should stipulate that they got these

14    from the witness, who has denied turning them over.  And I

15    think they need to stipulate to that as officers of the court,

16    that they got them from him because he denies it.

17            MS. SMITH:  He said he doesn't recall.

18            MR. BRAFMAN:  Then they need to understand that I

19    didn't create these documents and that he did turn them over.

20            MS. SMITH:  Excuse me.  Mr. Brafman has created a

21    misimpression that we somehow -- you know, the document that

22    he showed that attached the article was produced by Retrophin.

23    We received it prior to receiving the documents from

24    Mr. Yaffe.  We asked Mr. Yaffe for documents we didn't

25    otherwise have.

```
                          Sidebar                        4528
```

1            If we're going to do a stipulation, we can stipulate

2    that we originally got the e-mail that he doesn't remember --

3            THE COURT:  The Marek Biestek e-mail regarding

4    cluster headache research?

5            MS. SMITH:  Yes.  We got it from Retrophin years

6    before -- at least the year before we received -- we asked for

7    any remaining documents from Mr. Yaffe.  And we had already

8    had that document.  Because the impression he's created --

9            MR. BRAFMAN:  But how would he know that you already

10   had the document?

11           MS. SMITH:  Because we asked him for specific

12   things.  We made a document request.

13           MR. BRAFMAN:  Right.  But you didn't tell him by the

14   way, we have the cluster headache --

15           MS. SMITH:  We have gone through the documents with

16   him.  Just because he doesn't remember them --

17           THE COURT:  He testified that what he produced was

18   what was requested.  Now, I know the agreement seems to

19   suggest that he should just produce whatever without a

20   request.  But his testimony thus far, as I recall, is that if

21   you requested something, he would turn it over.

22           I think what you should do is stipulate as to what

23   the Government got from Mr. Yaffe and what the Government got

24   from other sources, to the extent the source is important.

25           MS. SMITH:  We're happy to do that.  We'll do it for

Sidebar                                                        4529

1    both.

2            THE COURT:  You can stipulate that you received

3    Defense Exhibits 102 and 103 from Mr. Yaffe.

4            MS. SMITH:  And the other defense exhibit we

5    received from Retrophin prior to receiving documents from

6    Mr. Yaffe.

7            MR. BRAFMAN:  I can't stipulate that he got it prior

8    because I don't know when you got them.

9            MS. SMITH:  I can tell you what the dates are.  But

10   if you want me to stipulate, for example, to that --

11           MR. BRAFMAN:  Your Honor, I don't need their

12   stipulation because he's identified them and they're being

13   admitted for a number of reasons.  On his direct

14   examination -- and we can find the page -- he suggested that

15   the GMail account, when I questioned him, was something he

16   rarely used, rarely looked it.  This contradicts that because

17   it shows that during the same period on two separate occasions

18   there are two separate e-mails that bear his private e-mail

19   server, which obviously he provided to the Government.

20   Whether he provided to the Government is irrelevant.  The

21   purpose of --

22           MS. SMITH:  That's what you said the whole point

23   was, wasn't it?

24           MR. BRAFMAN:  I shouldn't say irrelevant, your

25   Honor.  I have a right to show the witness e-mails that are

                    LAM        OCR        RPR

```
                         Sidebar                          4530
```

1    from the GMail account during the same period to be able to

2    argue that when he said this is an account that he rarely

3    looked at, that they don't have any reason to believe him.

4         This is not hearsay because it's by the dialogue

5    that he wanted the consulting agreement changed into a Word

6    document.  So, there's no issue of prejudice.

7         MS. SMITH:  They're both from the Defendant, the

8    Defendant's statements.

9         MR. BRAFMAN:  But he got them.

10        THE COURT:  He wants to use this to contradict the

11   testimony that he didn't use this account during the relevant

12   period --

13        MS. SMITH:  That, I understand.

14        THE COURT:  -- and that's why he doesn't recall

15   having received Mr. Biestek's e-mail.

16        MS. SMITH:  That, I agree is a proper purpose.  That

17   is hearsay, so that's separate, it's two --

18        MR. BRAFMAN:  It's not being offered for the truth,

19   it's being offered that he got it, that he retrieved it.

20        MS. SMITH:  Then don't say it's not hearsay.

21        MR. BRAFMAN:  Well, I don't believe it's hearsay.

22   Secondly, if it's not admitted for the truth, it doesn't

23   matter what it is.

24        THE COURT:  It's not being offered for the truth,

25   it's being offered to show that he did access this e-mail

Sidebar                                          4531

1   account and use it and communicate with Mr. Shkreli during the

2   relevant period.

3          MS. SMITH:  He can just --

4          THE COURT:  His responds to it, does he not?

5          MR. BRAFMAN:  He doesn't respond to it, but he gets

6   it and he recognizes it.

7          MS. SMITH:  He said he rarely does.  And he doesn't

8   respond from this e-mail account.  I guess that that's

9   argument, but that's separate and apart from this issue of the

10  suggestion that Mr. Yaffe was not turning over documents he

11  should have been turning over.  So, those are two separate

12  things.

13         MR. BRAFMAN:  You can do that on redirect.

14         MS. SMITH:  I understand.

15         MR. BRAFMAN:  I don't know how.

16         MS. SMITH:  Because you're creating a misimpression

17  by asking us to stipulate to something.

18         MR. BRAFMAN:  I just want to give you a preview, and

19  I mean this respectfully.

20         If a witness has for the first time, for the first

21  time, on cross seen what I consider to be a critical document

22  in this case concerning cluster headaches, because there's no

23  way that we could make this up from three years ago that Marek

24  Biestek is going to talk to him about cluster headaches and

25  suddenly he gets a wealth of information, now there is an

LAM       OCR       RPR

Sidebar                                          4532

1   appropriate argument to be made that if I hire you as a

2   consultant believing you're going to do certain work and you

3   don't do the work and, therefore, you feel I don't deserve

4   payment for the cluster headache research I was supposed to

5   do, that's not on me if I in good faith believed you were

6   going to do it, agreed?

7             MS. SMITH:  I understand your closing argument.

8             MR. BRAFMAN:  No, no, no.

9             MS. SMITH:  Educating someone doesn't make them a

10  consultant.

11            MR. BRAFMAN:  No.  But my effort is I delegate it to

12  Marek, Marek delegates it to him --

13            MS. SMITH:  It's your cover story, I get it.

14            MR. BRAFMAN:  It's not a cover story.  You can call

15  it a cover story --

16            MS. SMITH:  I am.

17            MR. BRAFMAN:  Okay.  So, I hear your closing

18  arguments.

19            MS. SMITH:  What's the evidentiary issue?

20            MR. BRAFMAN:  The evidentiary issue is that he

21  denied that he used this account --

22            MS. SMITH:  He didn't deny, he said he used it

23  rarely.

24            MR. BRAFMAN:  Okay.

25            MS. SMITH:  I understand the argument.  I'm not

                    LAM      OCR      RPR

```
                        Sidebar                      4533
```

1   objecting to the document.

2           MR. BRAFMAN:  That's the only reason I'm doing it.

3   And I'll say I'm not offering them for the truth of the

4   material on it, just to show that the e-mail account was used.

5           THE COURT:  What it shows, counsel, is that

6   Mr. Shkreli sent an e-mail to Mr. Yaffe at this e-mail address

7   on these dates.  What it doesn't show is whether Mr. Yaffe

8   opened it, read it, or responded to it.

9           Do you have an responsive e-mail?

10          MR. BRAFMAN:  No.  But what I have and what I will

11  argue and be able to show -- and I don't want to do it now

12  because it takes forever -- if you line up all of the

13  correspondence between Mr. Shkreli and Mr. Yaffe during this

14  period, you will find that there is discussion about changing

15  the document into a Word document so that it's easier to

16  change.  That's on 102.

17          MS. SMITH:  I understand the argument.  I understand

18  putting these documents in for that purpose.  That's fine.

19  We'll obviously make those points on redirect.

20          The bigger issue is the point about us stipulating

21  that we received the documents --

22          MR. BRAFMAN:  I don't need you to stipulate.  I

23  don't care.

24          MS. SMITH:  Because that, I think, is very

25  misleading.

```
                           Sidebar                        4534
```

1      THE COURT:  So I understand, Mr. Brafman, you will

2   ask Mr. Yaffe whether this e-mail account was active during

3   the time of this e-mail and he'll say, as he previously has,

4   that he doesn't recall receiving these, as he doesn't recall

5   receiving the Marek Biestek materials.

6          MR. BRAFMAN:  I just want to establish that the

7   account was operable and used from time to time by him and

8   getting mail.  If he doesn't remember getting this, that's

9   great.

10         THE COURT:  Okay.

11         MR. BRAFMAN:  All right?  I don't need a

12  stipulation.  Thank you.

13         MS. SMITH:  And nothing beyond that in terms of

14  producing or not producing documents.

15         MR. BRAFMAN:  That's fine.

16         Your Honor, I just want the Court to understand,

17  because I never expected this to happen.  The agents -- I'll

18  leave the assistants out of it but the agents who this witness

19  made these statements to, which he either denies or doesn't

20  recall, are present in the courtroom --

21         MS. SMITH:  They are not, actually.

22         MS. KASULIS:  And neither were any of us.

23         MR. BRAFMAN:  You weren't at the April 20 meeting?

24         MS. SMITH:  No.  I was on trial, actually.  I know

25  exactly where I was.

```
                        Sidebar                        4535
```

1           MR. BRAFMAN:  The fact is that if the agents were to

2   appear and be called as defense witnesses, I think they would

3   admit that they took these notes accurately and that these

4   were statements that the witness made.  Whether I reach out to

5   use them as a defense witness, we'll decide later.

6           But I just want to know how to go about finding

7   them.  I can, I assume, contact them through you.

8           MS. SMITH:  Yes, you can.

9           THE COURT:  All right.

10

11           (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Yaffe - cross - Brafman                    4536

1              (Sidebar ends; in open court.)

2              MR. BRAFMAN:  Your Honor, I just need to step out

3      for a few minutes.

4              THE COURT:  Yes, we'll take a few minutes.

5              (Recess taken.)

6              (Jury enters.)

7              THE COURT:  All jurors are present.  Please have a

8      seat.

9              You may resume, Mr. Brafman.

10             MR. BRAFMAN:  Thank you.

11     BY MR. BRAFMAN:

12     Q    Mr. Yaffe, I want to show you what's marked for

13     identification as Government Exhibit 102.  Look at that

14     document.

15             And do you recognize that document as a document

16     addressed to your GMail account?

17     A    Yes.

18     Q    From Mr. Shkreli?

19     A    Yes.

20             MR. BRAFMAN:  I offer it into evidence.

21             MS. KASULIS:  No objection.

22             THE COURT:  We will receive Defense Exhibit 102.

23             (Defendant's Exhibit 102 so marked.)

24             (Exhibit published to the jury.)

25             THE COURT:  Clarification, does the Government

Yaffe - cross - Brafman                          4537

1   withdraw its objection to Exhibit 103 as well.

2           MS. SMITH:  Yes, your Honor.

3           THE COURT:  We will admit 103 as well.

4           (Defendant's Exhibit 103 so marked.)

5           (Exhibit published to the jury.)

6   Q    Here is 103.  And you recognize this as another e-mail

7   from Mr. Shkreli to the GMail account, right?

8   A    Yes.

9           MR. BRAFMAN:  102 and 103 are now in evidence, your

10  Honor?

11          THE COURT:  Yes.

12          MR. BRAFMAN:  Thank you.

13  Q    I want to show you for identification only 106.  Do you

14  see that as a series of e-mails from yourself and

15  Mr. Shkreli --

16  A    Yes.

17  Q    -- to all concerning consulting agreement or consulting

18  agreement and payment and updated document?

19  A    Yes.

20          MR. BRAFMAN:  I offer them into evidence, your

21  Honor.

22          MS. SMITH:  Objection, your Honor.

23          THE COURT:  Objection based on?

24          MS. SMITH:  Hearsay.

25          MR. BRAFMAN:  Your Honor, I'm just offering the top

LAM     OCR     RPR

Yaffe - cross - Brafman                    4538

1    part.  That's not hearsay.

2            THE COURT:  Would you like to then redact?

3            MR. BRAFMAN:  I'll redact it when the jury gets it,

4    but I'm offering just e-mail --

5            THE COURT:  Can you just scroll down so I can see it

6    too?

7            You want the e-mail dated December 28, sent at

8    1:57 a.m., from Mr. Shkreli to Mr. Yaffe?

9            MS. SMITH:  It's from the Defendant.  It's hearsay.

10           MR. BRAFMAN:  I want the e-mail from Mr. Yaffe to

11   Mr. Shkreli and the response from Mr. Shkreli to Mr. Yaffe.

12           MS. SMITH:  The response is hearsay and the e-mail

13   from Mr. Yaffe is already in evidence, or some portion of it.

14           THE COURT:  Do you have a nonhearsay proffer,

15   Mr. Brafman, for this last e-mail, sent December 28 at

16   1:57 a.m.?

17           MR. BRAFMAN:  From Mr. Shkreli to Mr. Yaffe?

18           THE COURT:  Yes.

19           MR. BRAFMAN:  It's part of the continuing dialogue

20   concerning the finalization of the consulting agreement.

21           THE COURT:  So, it's 106 proffer for the witness?

22           MR. BRAFMAN:  Yes.

23           MS. SMITH:  Your Honor, it's hearsay.  There's

24   plenty of other dialogue back and forth.  This particular one

25   is being offered for the truth.

Yaffe - cross - Brafman                    4539

1          MR. BRAFMAN:  It also goes to the understanding of

2    the witness, which I'm going to ask him about.

3          MS. SMITH:  It's not a hearsay exception.

4          THE COURT:  I'll admit it for its effect on the

5    witness.

6          MR. BRAFMAN:  Thank you.

7          THE COURT:  And to complete the chain.

8          MS. SMITH:  Can you give an instruction it's not

9    being admitted for the truth?

10         THE COURT:  This e-mail, dated December 28 at

11   1:57 a.m., from Mr. Shkreli to Mr. Yaffe, is not being offered

12   for the truth, it's being offered to show a response by

13   Mr. Shkreli to Mr. Yaffe's e-mail and to show the effect, if

14   any, this e-mail had on Mr. Yaffe.

15         MR. BRAFMAN:  Thank you, your Honor.

16         THE COURT:  So, not for the truth but those other

17   two purposes.

18         MR. BRAFMAN:  And I will only show the parts

19   admitted.  And after court, we'll redact it, make it Exhibit

20   106 with just those two back-and-forth; okay, your Honor?

21         MS. SMITH:  Objection, your Honor.  106, the entire

22   e-mail chain, should come in.

23         MR. BRAFMAN:  Your Honor has ruled.  Can I proceed?

24         THE COURT:  You want the entire thing in?

25         MR. BRAFMAN:  I offered the entire thing and you

Yaffe - cross - Brafman                    4540

1    objected.

2            MS. SMITH:  No, he didn't offer -- if it's going to

3    go in, the entire chain should go in.

4            THE COURT:  All right.  So, you can show the jury

5    the entire document.

6            MR. BRAFMAN:  Great.  Thank you.

7            (Defendant's Exhibit 106 so marked.)

8            (Exhibit published to the jury.)

9    Q    This is 106 now in evidence and this is communication

10   between you and Mr. Shkreli in December 2013, correct?

11   A    Yes.

12           MR. BRAFMAN:  And your Honor, it's no longer offered

13   for the limited purposes.  They have not objected to that.

14           THE COURT:  Well --

15           MR. BRAFMAN:  I don't want to do this.  I'm happy

16   it's in.  I'll take it for whatever reason you want.

17           THE COURT:  It's for the limited purpose I

18   instructed the jury on.

19           MR. BRAFMAN:  That's fine.

20   Q    Here's Mr. Shkreli writing to you about an updated

21   document:  Here's my add and I'm okay to sign this.  My

22   accounting guy will issue a check and FedEx it.  It may take a

23   few days.

24           Do you see that?

25   A    Yes.

Yaffe - cross - Brafman                    4541

1   Q    And the document they're talking about is a promissory

2   note?

3   A    I don't believe so.  I believe it was the consulting

4   agreement.

5   Q    Well, let's look the at next one:  Here you go.  If you

6   can, execute and send back.  I also have to check on payment,

7   whether you should cut check to me and I will then cut a check

8   to EFAY.  Otherwise, not sure I will be able to get into EFAY

9   account, which is held in Pershing Bank of New York.  I will

10  double-check.  Thanks for helping me get done.

11        And then Mr. Shkreli says:  Can you forward me back

12  the executed contract with the changes we agreed upon?  Also,

13  has accountant cut a check?  My address is -- that's you

14  saying 6875 Delray Beach.  Let me know.

15        THE COURT:  I just want to correct the record.  That

16  was an e-mail from Mr. Yaffe to Mr. Shkreli.

17        MR. BRAFMAN:  Correct.

18  Q    That's an e-mail from you, correct?

19  A    Yes.

20  Q    And it says "with the changes we agreed upon," correct?

21  A    Yes.

22  Q    So, you had some input into the final document as to what

23  the actual words would be, correct?

24  A    I had some suggestions, but yes.

25  Q    But they were made and the final document was something

Yaffe - cross - Brafman                    4542

1    you signed after all of the edits, correct?

2    A    Yes.

3    Q    And you assume in this conversation, you told us, it's

4    about the consulting agreement, correct?

5    A    Yes.

6    Q    Now, here is Mr. Shkreli's e-mail to you:  Updated and

7    status of consulting agreement.  Will have this done tomorrow.

8    Need to make changes we discussed.

9             Did you discuss changes to the consulting agreement

10   with Mr. Shkreli?

11   A    Yes.

12   Q    And then it says:  Looking forward to your services and

13   advice; is that correct?

14   A    Yes.

15   Q    Now, have you used consultants while you were in the

16   healthcare industry, either with Leerink Swann or in your

17   business substance abuse clinics?

18   A    Yes.

19   Q    And when you hire a consultant, that's an outside person.

20   They're not an employee generally, correct?

21   A    That's correct.

22

23             (Continued on next page.)

24

25

LAM        OCR        RPR

Yaffe - Cross - Brafman                          4543

1   BY MR. BRAFMAN:

2   Q    You hired them for a specific purpose, correct?

3   A    Correct.

4   Q    And you give them a direction about what you want them to

5   do?

6   A    That's correct.

7   Q    And then you as the head of the company or as the

8   investment advisor anticipate they are going to do the work

9   you ask them to do, correct?

10  A    That's correct.

11  Q    And, then sometimes you pay them and sometimes it is an

12  informal agreement where they are just helping you out?

13           MS. SMITH:  Objection, Your Honor.

14           THE COURT:  Sustained.

15  Q    Well, sometimes you pay consultants and sometimes are

16  consultants available to you from the industry without

17  requesting payment?

18           MS. SMITH:  Objection, compound.

19           THE COURT:  Well, I will allow it if the witness--

20           Do you understand the question, sir, can you answer

21  it as asked?

22           THE WITNESS:  Can you clarify.

23           MR. BRAFMAN:  Yes.

24  Q    You testified that from time to time you hire consultants

25  in your own business and that you have done that, correct?

Yaffe - Cross - Brafman                      4544

1    A    Yes.

2    Q    I think you agree that they are generally not employees,

3    they are outside independent --

4    A    Contractors, correct.

5    Q    Independent contractors, correct?

6    A    Yes.

7    Q    And you either-- and you assign them a project and then

8    you expect them to comply with the project, perform, correct?

9    A    Yes, I usually get pretty specific on what we are trying

10   to accomplish with specific goals and milestones.

11   Q    And sometimes, the consultants are better than others?

12   A    Yes.

13   Q    Sometimes you use them more than once if they perform well?

14   A    Yes.

15   Q    And sometimes, it is a one shot-- sometimes you use them

16   only once and don't ever use them again, correct?

17   A    That's correct.

18   Q    And, when you use the consultants and you pay them, are

19   there certain tax ramifications, if you know?

20   A    Yes.

21   Q    Both to the consultants and to the company?

22   A    Yes.

23   Q    You have to fill out some kind of form for the

24   consultants, if they are real consultants, correct?

25   A    That's correct.

Yaffe - Cross - Brafman                    4545

1   Q    Sometimes it is a 1099?

2   A    That's correct.

3   Q    Sometimes-- that means it is an independent contractor,

4   correct?

5   A    Yes.

6   Q    And sometimes it is a W-9 form?

7   A    Yes.

8   Q    Sometimes if they are employees, it would be a W-2 form?

9   A    Correct.

10          MR. BRAFMAN:  May I have a moment, Your Honor.

11          THE COURT:  Yes.

12          (Pause.)

13   Q    Did you get or ask for a 109 form from Retrophin for your

14   work as a consultant?

15   A    What is a 109?

16   Q    Sorry, a W-9 form?

17   A    No, I believe they sent me one.

18   Q    And what is a W-9 form?

19   A    1099 is something that you sign to declare income.

20   Q    Did you sign it?

21   A    Yes.

22   Q    Did you send it back to Retrophin?

23   A    Yes.

24   Q    You didn't send it to Martin, you sent it back to the

25   company, correct?

1   A    Probably sent it back to whoever sent me the W -- or the

2   1099 form.  I don't recall.

3   Q    Then did you turn it over to your accountant?

4   A    Yes.

5   Q    Now, I want to move back if we can.  Did you meet with

6   Government agents at F.B.I., again after you finalized your

7   non prosecution agreement?

8   A    Yes.

9   Q    And in that discussion, did they ask you about your

10  relationship to a man named Josiah Austin?

11  A    Yes.

12  Q    And did you know who Josiah Austin was?

13  A    Yes.

14  Q    Was Josiah Austin a guy you used to call either the old

15  man or Joe?

16  A    Yes.

17  Q    And was he someone who you came to know in your

18  investment days at Leerink Swann?

19  A    You say, came to know.

20  Q    I mean, came to know of?

21  A    Yes.

22  Q    And you knew him to have a relationship with Martin

23  Shkreli, correct?

24  A    Correct.

25  Q    You knew him to be perhaps one of the biggest investors

Yaffe - Cross - Brafman                    4547

1  in Chelsea Pharmaceutical, correct?

2  A    Yes.

3  Q    Did you tell the Government agents when they interviewed

4  you that he was a big investor in Chelsea Pharmaceuticals or

5  Chelsea Therapeutics?

6  A    No.

7  Q    Did you tell the Government that Martin Shkreli ran money

8  for Josiah Austin?

9  A    No.

10 Q    You sure?

11 A    I might have, I guess I don't recall.

12 Q    Let's see.

13 A    Yes.

14 Q    Let's see if we can refresh your recollection.

15 A    Okay.

16        MR. BRAFMAN:  I will with permission of the Court

17 hand the witness a copy of 3500 LY3 for identification.

18        THE COURT:  Thank you.

19 Q    This is your interview with the Government, the third

20 interview that you had I believe is on June 30th, 2015, does

21 that refresh your recollection?

22 A    If you say so.

23 Q    Well, look at the report and see if it refresh your

24 recollection that again, you met with Government officials

25 including Ms. Alix Smith on or about June 30th, 2015, in the

Yaffe - Cross - Brafman                    4548

1    Eastern District of New York.

2    A     Yes, if this report is correct, which I will assume it is.

3    Q     So it refreshes your recollection?

4    A     Yes.

5    Q     And at that meeting, you also had your own lawyer

6    present; is that correct?

7    A     That's correct.

8    Q     And, I will ask you again and then if you need to, I will

9    refer you to where you can refresh your recollection.  Did you

10   tell the Government in words or substance that Mr. Austin was

11   high net-- sorry, was involved with Chelsea Therapeutics and a

12   big investor with Shkreli?

13   A     Both of those were as far as I know accurate from what I

14   have been told.

15   Q     Okay.  Do you know whether Mr. Shkreli ran money for Mr.

16   Austin?

17   A     Not-- again, Martin said he did so, if that was accurate,

18   yes.

19   Q     So you knew about him independent of Martin, didn't you?

20   A     No, Martin had made the introduction.

21   Q     Yeah, but you spoke to Mr. Austin because he did business

22   with Leerink Swann, didn't he?

23   A     He did-- Martin made an introduction and he did sell some

24   shares of Chelsea Therapeutic through Leerink Swann trading

25   desk, that's correct.

1    Q    Martin brought him to you, correct?

2    A    Yes.

3    Q    And at the time, did you tell the Government that you

4    understood that Mr. Austin was Martin's client?

5    A    Again, don't recall, but it is possible, yes.  I don't

6    recall though.

7    Q    Well, what did you think the relationship was.  Martin

8    brings this older gentleman from Texas to you, and he

9    invests -- I'm sorry, he uses Leerink Swann to do business.

10   What did you think the relationship was between Mr. Shkreli

11   and Mr. Austin?

12   A    I don't know what the relationship was, other than it

13   makes sense that Martin probably managed some of his money or

14   gave him investment advice.

15   Q    But he did open an account and did some business with

16   Leerink Swann?

17   A    Yeah, but that is not uncommon.

18   Q    For someone like a Martin to bring a new client to you,

19   right?

20            THE COURT:  Sorry, Mr. Brafman, did you say he

21   opened the account.  Do you mean Mr. Shkreli or Mr. Austin?

22            MR. BRAFMAN:  Mr. Austin opened an account.

23   Q    Correct?

24   A    Yes.

25   Q    He did business and the business was Chelsea

Yaffe - Cross - Brafman                    4550

1    Therapeutics, correct?

2    A    Correct.

3    Q    Did you have an understanding whether he was the largest

4    shareholder of Chelsea at some point?

5    A    I believe he was.

6    Q    Now, I want to go back to the W-9, show you what-- it is

7    not in evidence.  It bears a sticker of 116-1 for the

8    Government.  If we offer it as a defense exhibit, we will

9    change the sticker.

10        Look at this.  Do you recognize this as an E-mail

11   between you and Mr. Shkreli in July of 2011?

12   A    Yes.

13        MR. BRAFMAN:  I offer this in evidence as

14   Defendant's Exhibit 107.

15        MS. SMITH:  Objection, Your Honor, what is the basis?

16        MR. BRAFMAN:  This is about matters he has already

17   testified to, Your Honor.  This is just--

18        MS. SMITH:  A self serving statement of the defendant.

19        THE WITNESS:  Testifying to the E-mail.

20        MS. SMITH:  It is hearsay.

21        THE COURT:  I'm going to sustain the objection.

22        MR. BRAFMAN:  What?

23        THE COURT:  Sustain the objection.

24        MR. BRAFMAN:  Can we discuss this, Judge?

25        THE COURT:  Sure.

- Sidebar -                                4551

1        (Sidebar.)

2        THE COURT:  Look, I don't know that he testified

3   that the $5,000 came from Mr. Shkreli's personal account, did

4   he?  I think--

5        MS. SMITH:  I don't think he knew where it came

6   from.

7        THE COURT:  I think he acknowledged receipt from Mr.

8   Shkreli from at one point in this process.  I don't-- I mean

9   it is hearsay.  To the extent you are offering Mr. Shkreli's

10  statement about --

11       MR. BRAFMAN:  Where it came from.

12       THE COURT:  Five thousand in his personal account.

13       MR. BRAFMAN:  All right.

14       (Pause.)

15       THE COURT:  Now that we are all here, anything else

16  we need to discuss?

17       We are hoping we can do a charge conference next

18  week.  Will you be ready to do that?

19       MS. SMITH:  Yes.

20       MR. AGNIFILO:  Yes.

21       MR. BRAFMAN:  As I understand it, they have told us

22  at least that they-- they have told us at least they don't

23  intend to call Al Geller who is a-- would have been a long

24  witness on direct and on cross.  So that I think substantially

25  shortens the balance of the case.

- Sidebar -                                        4552

1          My guess is, that unless there isn't a surprise,

2     they might be able to rest before the end of the week.

3          MS. KASULIS:  I think that is right Your Honor.  We

4     have been evaluating what we put in so far in trying to

5     streamline the case.  I think that that is accurate, that we

6     would be in a position potentially to rest by the end of the

7     week.

8          MR. BRAFMAN:  Will you stipulate to the bunny

9     slippers?

10          THE COURT:  By the end of the week?  Of next week.

11          MR. BRAFMAN:  This week.

12          THE COURT:  This week, really.

13          MR. BRAFMAN:  Today is Wednesday.

14          THE COURT:  I had in my mind you were going to rest

15     by the 28th.

16          MS. SMITH:  I think we have tried to--

17          THE COURT:  All right.  That is a surprise because

18     we have been working on the Charges.  My procedure is to post

19     them as a Court Exhibit and invite comments before the

20     charging conference so we don't waste time.

21          I would ask for any comments or objections to be

22     supported by legal authority.  Our draft that will be posted

23     will have legal authority for the Charge.  So, I would want to

24     understand what legal basis there maybe for any objections.

25          That does make it-- it changes the timing for us

- Sidebar -                                    4553

1   substantially.

2          MR. AGNIFILO:  I think one of the things that will

3   probably be a central part of the charge, is that no ultimate

4   harm charge.  We are putting together a memo for Your Honor.

5   It effects the timing on our end too.

6          So, would Your Honor--

7          THE COURT:  Well, if the Government rests by this

8   Friday, what is the defense case going to look like?

9          MR. BRAFMAN:  We will know tomorrow.

10         THE COURT:  Because, it does matter to me.  I am

11  going to either sacrifice a weekend for this case or not.

12         MR. BRAFMAN:  Trust me, so are we.  I think the

13  defense case in large measure will depend on Mr. Shkreli who

14  has at this point insisted on testifying, and we have to have

15  a long conversation scheduled with him for tomorrow to discuss

16  that.  We will let you know, the Government and all of us what

17  the final decision is.  I don't believe there is going to be a

18  significant number of additional witnesses beyond that.

19         MS. SMITH:  We have the last list I think is from

20  June.

21         MR. BRAFMAN:  What?

22         MS. SMITH:  The last list of witnesses is from June,

23  34 people.

24         MR. AGNIFILO:  We have been speaking every day.  You

25  know it is not 34.

                              - Sidebar -                    4554

1            MS. SMITH:  I know.

2            MR. BRAFMAN:  If Mr. Shkreli testifies--

3            MS. SMITH:  If there is somebody not on the list.

4            MR. BRAFMAN:  If Mr. Shkreli testifies there maybe

5     two additional witnesses.  If he doesn't, there maybe no

6     defense case.

7            And now that we have been told Mr. Geller is not

8     going to be a Government witness, we are going to decide

9     whether we call him as a defense witness.

10           MS. SMITH:  We are leading to--

11           MS. KASULIS:  We have to have notice that is what we

12    want to make sure.

13           THE COURT:  When will I be informed?

14           MR. BRAFMAN:  Tomorrow.

15           MR. AGNIFILO:  One last issue, in terms of the

16    Government's summary witness.  I think there maybe legal

17    issues surrounding that.  We are trying to work most of it

18    out.

19           But, since this will be in a couple of days.  At

20    some point, would Your Honor rather know sooner than later, if

21    we think we are going to have issues that we are still trying

22    to work out.  What I don't want to have happen, we don't work

23    it out and we bring it to Your Honor for the first time.  Then

24    Your Honor would say, we should have told me two days ago.  We

25    didn't.  It is almost a matter of what you want to know when.

1          THE COURT:  Well, I will tell you a couple of

2     things.

3          One is, I would have hoped you could have worked

4     this out before now.

5          Two, that if you are not working it out, you are

6     still trying to work it out.  I appreciate that.

7          Three, once you do do the briefing and I start

8     working on it with my clerk late into the night and over the

9     weekend and you get it resolved, we would like to know about

10    that too.  We are going to keep working on it until we get

11    word it is resolved.

12         So just bearing all that in mind, obviously, working

13    things out is the best.  If you can't work things out, I think

14    we should have a hard deadline, not to say you can't continue

15    to try to work things out, but I want a hard deadline by which

16    we will be given plenty of notice about what we need to

17    resolve.

18         MR. AGNIFILO:  The problem we have now is the case

19    agent is going to put in the Greebel Shkreli E-mails.  We

20    still don't know which ones they intend to put in.  There is

21    nothing I can possibly opine on from a 106 standpoint or

22    admissibility standpoint, we still don't have the E-mails.

23         MS. SMITH:  So, we have produced all the E-mails.

24    The universe of E-mails we thought we were going to put in on

25    June 12th.  So that universe has added a couple, but not very

- Sidebar -                                              4556

1   many.  That has not changed.

2          We have put together a list today, which I said I

3   would give at lunch that is I think a narrowed version but

4   they are all from the exhibit list.

5          So they are not --

6          MS. KASULIS:  We also did direct them to a specific

7   range in the exhibit list as well.

8          MS. SMITH:  This is now a further subset of that

9   list.

10         MR. AGNIFILO:  The problem isn't the universe, the

11  probably is cherry picking, not the universe.

12         MS. KASULIS:  You have had the universe to look at

13  to see if there is a cherry picking issue.

14         MR. AGNIFILO:  I don't know what that is yet.

15         MR. BRAFMAN:  We have a jury sitting looking at us

16  thinking we are arguing about this.

17         THE COURT:  Right.

18         MR. BRAFMAN:  I only have 10 minutes left.

19         THE COURT:  All right.  We will go back to the

20  trial.  Thank you.

21             (Open Court.)

22

23

24

25

Yaffe - Cross - Brafman                    4557

1   BY MR. BRAFMAN:

2   Q    I will show you Defendant's Exhibit 107, which is only

3   for you for identification.

4           I think you testified that you got a W-9 from

5   Retrophin; is that correct?  Did you?

6   A    Yes.

7   Q    To the best of your knowledge, you filled it out and you

8   sent it over; is that correct?

9   A    Yes.

10  Q    You notified Mr. Shkreli of that, correct?

11  A    Don't recall.

12  Q    Well, look at the E-mail and see if it refreshes your

13  recollection that on Thursday, July 14th, 2011, you told Mr.

14  Shkreli that you were sending over the W-9?

15  A    I'm not sure if this is the same-- this is out of context

16  because this was in July of 2011.

17  Q    Is this a different W-9?

18  A    It must have been, I have no idea what it is.

19  Q    Did you ultimately get a W-9 from Retrophin as well?

20  A    Yes, that I did.

21  Q    That was after you signed your consulting agreement,

22  correct?

23  A    Yes.

24  Q    And, you gave that one to your accountant; is that

25  correct?

Yaffe - Cross - Brafman                    4558

1    A    Yes.

2    Q    And whatever the tax consequences were, for the receipt

3    of the money, your accountant told you and you followed his

4    advice, correct?

5    A    Yes.

6    Q    Now, do you remember telling the jury that Mr. Shkreli at

7    one point gave you $5,000?

8    A    Not me.  It was I believe wired to my father's account.

9    Q    It was partial pay back for the money, this is part of

10   what you said was him manning up, correct?

11   A    Yes.

12   Q    Do you know whether that check came from Mr. Shkreli,

13   from Retrophin or from his personal account?

14   A    It would have come from Mr. Shkreli.

15   Q    Personally?

16   A    I believe so, yes.

17   Q    Now, I want to go back if we can to the materials that

18   you received from Mr.  Biestek, relating to, cluster

19   headaches, which is Exhibit 101 in evidence-- 100 in evidence,

20   an E-mail and Exhibit 101, which is the materials themselves.

21   Correct?

22   A    Yes.

23   Q    Now, you remember we discussed and you said to me what is

24   BOL-148?

25   A    Yes.

RB          OCR

Yaffe - Cross - Brafman                    4559

1   Q    I just want to briefly show you that within these

2   documents -- I will ask you some questions.  We turn to 101-D.

3   I will put it up on the screen in a minute.  It is in

4   evidence.

5            101-D in evidence, which bears Bates number RO15531,

6   is a list of questions and answers about BOL-148, correct?

7            Do you see that?

8   A    Yes.

9   Q    From Professor Passie.

10  A    Doctor Passie, correct.

11  Q    Did you ever read that when you got it?

12  A    I don't believe so.

13  Q    Now, you told the agents that cluster headaches were like

14  migraines to the 9th degree, do you remember that?

15  A    Yes.

16  Q    And did you know that from the materials Mr. Shkreli--

17  Mr. Biestek sent you or did you just know that because you

18  know that?

19  A    I know that from Martin.

20  Q    When Martin told you that, did you understand that that

21  was relating to cluster headaches?

22  A    He told me what a cluster headache was.

23  Q    When did he tell you that?

24  A    I don't recall the exact date.

25  Q    But it was person to person, it wasn't on the phone call

Yaffe - Cross - Brafman                    4560

1    with Biestek, was it?

2    A    No.

3    Q    It was person to person?

4    A    I believe-- not person to person, probably over the

5    phone.

6    Q    But just Martin and you?

7    A    I believe-- again, I believe so, but I don't completely

8    recall.

9    Q    You told the agents that you recalled-- sorry, you told

10   the agents you understood the cluster headaches to be sort of

11   a mammoth migraine headache?

12   A    Yes.

13   Q    Included in these materials that Marek Biestek sent you,

14   101-E in evidence and it bears Bates number RO15534.  If you

15   look on the next page, 5535, it tells you that BOL-148 has

16   been tested in migraine patients.  The question, is it

17   effective.

18        Do you see that?

19   A    Yes.

20   Q    So Mr. Shkreli talks to you about cluster headaches and

21   you tell the agents, you know cluster headaches are a form of

22   migraine headache, and these materials from Marek Biestek just

23   by coincidence have information concerning the exact same

24   subject?

25        MS. SMITH:  Objection, Your Honor.

Yaffe - Cross - Brafman                    4561

1           THE COURT:  Sustained.

2    Q    Do you understand why these materials about migraine

3    headaches and cluster headaches was part of the information

4    sent to you by Mr. Biestek?

5           MS. SMITH:  Objection.

6           THE COURT:  Overruled.

7    Q    You may answer.

8    A    No.

9    Q    Did you read it when you got it?

10   A    I don't recall reading it because it was hundreds of

11   pages of medical journals.

12   Q    But you do recall telling the agents that a cluster

13   headache was like a migraine headache, right?

14   A    Yes.

15   Q    You don't know whether you got it from this document, do

16   you?

17   A    I didn't get it from that document.

18   Q    You know that specifically?

19   A    Yes.

20   Q    I thought you said you don't recall whether you read

21   this?

22   A    I don't recall reading it, but pertaining to cluster

23   headaches, I did speak with Martin and he told me specifically

24   what a cluster headaches was.

25   Q    Did he tell you he was working on trying to find a drug

Yaffe - Cross - Brafman                          4562

1    to treat it?

2    A    Yes.

3    Q    And when did he tell you that?

4    A    Again, don't recall.  It could have went back-- I don't

5    recall.

6    Q    Was it before you signed your consulting agreement?

7    A    Yes.

8    Q    All right.

9         Thank you very much.  Nothing further, Your Honor.

10        THE COURT:  Is there any redirect?

11        MS. SMITH:  No, Your Honor, thank you.

12        THE COURT:  All right.  Sir, you are excused.  Thank

13   you, have a nice trip back to Florida.

14        THE WITNESS:  Thank you.

15        (Witness excused.)

16        MS. KASULIS:  With respect to the next witness, I do

17   think that there are a couple of evidentiary issues that we

18   need to work out with the defense that was raised last night.

19   If we can have a short break to allow us to do that.

20        THE COURT:  All right.  Why don't I have the jurors

21   retire once again to the jury room unless you want to take a

22   very early lunch.  Otherwise, I would have you take a break.

23   We will come retrieve you.

24        Please don't talk about the case, thank you.

25        (Jurors left the courtroom.)

RB          OCR

Proceedings                                    4563

1    (Continuing)

2          THE COURT:  How much time will you need?

3          MS. ZELLAN:  Your Honor, we haven't yet begun to

4    discuss the issues yesterday.  They came up, in part, because

5    certain decisions made by the government last night regarding

6    which witnesses they were going to call created some

7    evidentiary issues with respect to exhibits we anticipate the

8    government will introduce through the next witness.  I'm not

9    sure how long it will take because we haven't had an

10   opportunity to talk it through.  Hopefully, 10 to 15 minutes,

11   Your Honor.

12         THE COURT:  All right, I will be back at noon.

13   Please have it resolved.

14         MS. ZELLAN:  Thank you.

15         (Recess taken.)

16         (In open court - jury not present.)

17         THE COURT:  All right, should we do this here in

18   court or do we need to do this at sidebar?

19         MS. KASULIS:  We can do it in court.

20         MR. AGNIFILO:  We can do it in court.

21         THE COURT:  All right, there is an issue that you

22   have not resolved, right?

23         MR. AGNIFILO:  Yes.

24         THE COURT:  All right.  What is the problem?

25         MR. AGNIFILO:  So about five minutes ago we were

Proceedings                            4564

1    handed a 12-page list of things that relate largely to people

2    who were not called as witnesses in this case.  People like

3    Brent Saunders and Michael Lavelle and Molly Tschang and Steve

4    Rosenfeld and Diandra Douglas, and the government wants to put

5    into evidence different agreements concerning these people who

6    were not called as witnesses.

7                And it's our position that none of that is

8    admissible at this trial.  It's irrelevant.  This is not a

9    trial where -- this is a trial where each individual witness

10   investor who testifies, testifies to specific things from that

11   person's point of view individually.  Some care about some

12   things, some care about other things.  We've seen as the

13   testimony has gone on there's no uniformity among these

14   investors, it's far from it.  And I think that the government

15   trying to get in, essentially, more criminal conduct before

16   this jury through these agreements without calling these

17   witnesses is not allowed.  A --

18               THE COURT:  What kind of agreements are they?

19               MR. AGNIFILO:  They're the subscription agreements,

20   the consulting agreements.

21               MS. KASULIS:  Your, these are all MSMB Capital and

22   Healthcare investors, to be clear.

23               MS. SMITH:  Yes, and I just want to kind of separate

24   out what this is.

25               So there are two issues.  One is that we have a

                SAM      OCR      RMR      CRR      RPR

Proceedings                                    4565

1  witness from Standard Registrar who is going to be testifying

2  next, and that witness has business records from Standard

3  Registrar which are share transfer records.  And they relate

4  to investors -- they relate to shares that were issued by

5  Retrophin in connection either with the fear now shares or

6  shares that were issued in connection with the settlement and

7  consulting agreements.  And so the defendants are objecting, I

8  believe, on relevance grounds to any share transfer for any

9  individual who received shares from Retrophin who was also an

10 MSMB investor who didn't testify.  So that's part one.

11          And then part two is through the case agent.  We are

12 intending to introduce defendant's statements in the form of

13 performance reports that were sent to MSMB investors, both for

14 Capital and Healthcare; MSMB subscription agreements;

15 settlement and consulting agreements; and e-mails between the

16 defendant, Mr. Greebel and other co-conspirators, as well as

17 the defendant's statements that relate to MSMB Capital, MSMB

18 Healthcare and the two Retrophin schemes.

19          So these are all exhibits that have been on our list

20 since June 12th.  The Indictment charges the schemes.  It

21 charges the number of investors.  We had bank records in

22 evidence showing that these people put money in.  I understand

23 Mr. Agnifilo's arguments that he may have about victims who

24 didn't testify.  So, for example, I do not anticipate that we

25 will argue at closing that a victim who didn't testify had a

Proceedings                                    4566

1    particular -- when they were investing relied on a particular

2    aspect of the PPM because we didn't get that testimony.

3              THE COURT:  So why do you want this evidence?  Why

4    is it relevant to your case?

5              MS. SMITH:  So the evidence is relevant because

6    these are all statements of the defendant in the course of

7    these four separate schemes and they show the breadth of the

8    scheme.  They show all the money that came into the funds from

9    these individuals.  They show all the performance statements

10   that the defendant sent to not only the victims who testified,

11   but to all the other --

12             THE COURT:  But how do you prove that those

13   statements of the defendant are fraudulent if you do not have

14   a witness to testify that I got these statements, I believed

15   them to be true, they were important to me or to my investment

16   decisions?

17             MS. SMITH:  Well, we don't need to show that they

18   were important to them to show that they were fraudulent.  The

19   bank records show that they were fraudulent.  To be perfectly --

20             THE COURT:  In terms of the investor's valuation of

21   the investment?

22             MS. SMITH:  In terms of the actual value -- right,

23   exactly, the performance of the funds, for example.

24             So the individuals who testified, in fact, don't

25   know whether those performance reports are true or not.  We

Proceedings                                    4567

1   are showing that through other means, through the bank

2   records, for example.

3            So, you know, to be quite frank, we've never had

4   this come up before.  I've tried other fraud cases with

5   hundreds of victims and there is no requirement that you call

6   each and every victim in a case, whether it be a fraud case or

7   any other case.  And these are all defendant's statements.

8   It's within the charged conduct in the Indictment.  It's

9   within the charged time period.  They are statements from the

10  defendant about the, you know, the funds and the performance

11  of the funds.

12           And, like I said, there may be limitations on what

13  we can argue in terms of whether a particular investor who

14  didn't testify relied on those performance statements, but

15  it's very important to show the scope of the various schemes.

16  So it's how many people put money in and how many people

17  received these performance reports, as well as the settlement

18  and consulting agreements, which are statements of the

19  defendant, which are signed by the defendant.  And then there

20  are e-mails between the defendant and Mr. Greebel and others

21  about these particular investors, and it all goes to kind of

22  this continuing conspiracy, as well as his knowledge of the

23  fact that he had defrauded these people and wanted to pay them

24  back, you know, using Retrophin.

25           And so it's the entire scheme, and we've charged the

Proceedings                                        4568

1    total number of investors in the Indictment.  Like I said, the

2    bank records show the investors.  The share transfer records

3    show them getting shares.  And so there should be no -- I mean

4    my understanding is that it's a 401 relevance argument, which

5    is an incredibly low bar.  These are all MSMB and Healthcare

6    investors.  I don't think there's any dispute about that.  We

7    have subscription agreements that show that they were.  Their

8    money comes into the bank accounts.  They received performance

9    updates.

10          THE COURT:  So all of these investors for whom you

11   want to submit records received performance updates that

12   contained false statements about the overall, not the

13   individual, but the overall performance of the fund?

14          MS. SMITH:  Yes, Your Honor.

15          THE COURT:  And the amount in the fund?

16          MS. SMITH:  Yes, that's correct.  The bank records

17   show the money coming in and then we also have the performance

18   updates that were sent by the defendant to these individuals.

19          I mean those are basically -- that's the bulk of the

20   additional documents that are going in.  The settlement and

21   consulting agreements, and then most of the e-mails between

22   the defendant and Mr. Greebel that we have, again, had on our

23   exhibit list since June 12th, do relate to the individuals

24   that we've called.  In part, because we obviously want the

25   jury to be able to follow, but there are a couple in there

SAM        OCR        RMR        CRR        RPR

Proceedings                                                4569

1    that also discuss -- you know, in discussing, for example, one

2    person's settlement agreement, there may be a discussion of

3    another settlement agreement for an individual we didn't call.

4    But it's all within the scope of the charged conduct and

5    they're all the defendant's statements.

6              So I'm a little flummoxed as to how to argue this as

7    a relevance ground.  I recognize, again, that we can't argue

8    in closing that a particular MSMB Capital investor or

9    Healthcare investor who didn't testify relied on the

10   statements of the defendant to invest, for example, but it

11   certainly shows how much money in total was put in those

12   funds, how many people received the performance reports at the

13   various times.  And then on the back end, how many people got

14   settlement and consulting agreements.  I mean this is part of

15   a larger scheme and it goes to his intent.

16             MR. AGNIFILO:  They should call those witnesses.

17   They have the power to call witnesses.  They should call

18   witnesses.  They can't do it this way.

19             THE COURT:  Why?  What rule prohibits them from --

20             MR. AGNIFILO:  Because a consulting agreement is

21   only relevant at this trial if it's a fraudulent consulting

22   agreement.  A settlement agreement is only relevant at this

23   trial if it's a fraudulent settlement agreement.  And without

24   the witness they can't prove that.

25             THE COURT:  Well, isn't the idea that one of the

Proceedings                                    4570

1    underpinnings of the allegedly fraudulent settlement and

2    consulting agreements is that these are MSMB investors who are

3    receiving Retrophin money and shares?

4             MR. AGNIFILO:  But what if --

5             THE COURT:  Am I understanding the theory correctly?

6             MR. AGNIFILO:  But a perfect example is Rosenfeld.

7    We know Rosenfeld won his arbitration.  Look at what they're

8    trying to do and let's all try and figure out if that's fair.

9    They're trying to put in evidence that Rosenfeld didn't do any

10   work for the consulting agreement, and we all know as we sit

11   here that an arbitrator found to the contrary.

12            I'm sorry, I'm not done.

13            That is the best case in point, Judge.  They are

14   trying to do something --

15            THE COURT:  Who else is in that category?

16            MR. AGNIFILO:  We don't know because these witnesses

17   won't speak to us.  What if they say, I did do consulting

18   work.  We can't do this.  It's not fair.  It's not right.

19            I mean Mr. Yaffe is a case in point.  If Mr. Yaffe

20   wasn't cross-examined, we wouldn't know that he actually got

21   stuff on cluster headaches and had conversations about cluster

22   headaches.  And Rosenfeld is another example.

23            THE COURT:  But is that what you're defining as

24   consulting, Mr. Yaffe's receipt of e-mails about cluster

25   headaches that he doesn't remember ever seeing?

Proceedings                    4571

1          MR. BRAFMAN:  That's a jury question.

2          MR. AGNIFILO:  That's a jury question, Judge, that's

3    not a fact question.  That's why we have a jury.

4          THE COURT:  Okay, I'm still talking.

5          MR. AGNIFILO:  I'm sorry, Judge.

6          THE COURT:  Okay.  And also his testimony that he

7    had a couple of conversations with Mr. Biestek and Mr. Shkreli

8    where the subject of cluster headaches came up, you are saying

9    that that was consulting?

10          MR. AGNIFILO:  Yes.  We are saying that's consulting

11    and we are saying we think we are going to convince the jury

12    that that's consulting and it's their decision.

13          MR. BRAFMAN:  Can I just add to that, Judge?

14          THE COURT:  Well, we've heard from Mr. Yaffe, but

15    the conversation was a short conversation.  The mention of

16    cluster headaches was made and that Mr. Yaffe said he was

17    incapable of giving any sort of expert or consulting advice

18    regarding cluster headaches.

19          MR. BRAFMAN:  But, Judge --

20          THE COURT:  So how did he consult?  I'm just curious.

21          MR. BRAFMAN:  But, Judge, I am going to handle that

22    part of the argument, most respectfully.

23          THE COURT:  Okay.

24          MR. BRAFMAN:  This is a jury question as to, first

25    of all, whether they believed his denial because he's lied and

SAM      OCR      RMR      CRR      RPR

Proceedings                    4572

1    he's testified to two different things and he's given

2    statements in which he said, I was a consultant; I was a

3    consultant; I was a consultant; I'm not a consultant.  They

4    have a right to accept where his credibility lies and that's,

5    respectfully, not an issue for the Court to rule on, that is a

6    question of fact.  That's first.

7         Second, if I as a CEO assign Mr. Biestek to handle

8    this, I don't have to be involved after that and I have a

9    right to assume that the consultant has agreed to do work for

10   the company.  And to the extent that he defrauds the company

11   because he doesn't do the consulting work, that doesn't mean

12   Mr. Shkreli is a participant in the fraud.

13        What the government doesn't want us to be able to do

14   is cross-examine Al Geller, for example, because in the 3500

15   material Al Geller tells the FBI very openly, My job as a

16   consultant was to help Martin deal with issues, to help Martin

17   work as a better CEO, to help Martin straighten out his life.

18   I saw myself as a life coach, and that's why I think I was a

19   consultant to the company.  Every single person who either

20   entered into a consulting agreement or a settlement agreement

21   is ripe for cross-examination, and whether the jury credits it

22   or not, they have a right to hear it.  And if you just put in

23   a consulting agreement without the human who negotiated it and

24   acted upon it or didn't act upon it, they assume it's a

25   fraudulent consulting agreement.  And our position is none of

Proceedings                    4573

1   these agreements were fraudulent because Al Geller and Ken

2   Banta, who are not testifying, it was their consulting

3   agreements which the board passed on, at least insofar as the

4   SEC documents suggest.  And when Richardson and Aselage deny

5   it, that's a jury question as to whether they're denying it

6   because they don't want to be sitting next to Martin or

7   whether they're denying it because they never actually saw it.

8           But what you cannot do, most respectfully, is take

9   the case away from the defendant and deny him the right of

10  confrontation of witnesses that we have seriously confronted

11  the government's witnesses with.  And I bet you if you were to

12  poll jurors now they would think that this information is

13  valuable to them to make a determination as to whether Martin

14  Shkreli acted with intent to defraud.  You just can't give up

15  and say, You know what, we don't want to march out any more

16  consultants because they're vulnerable to cross-examination

17  and instead we'll get these consulting agreements in wholesale

18  and then suggest to the jury they're all fraudulent.  You need

19  a human to attach to a consulting agreement or a settlement

20  agreement to suggest otherwise.

21          Now, we might be able to come to a compromise on

22  certain bank records with respect to people who don't show up,

23  but to suggest that you can put in their e-mails and their

24  consulting agreements and their settlement agreements, that's

25  a serious Sixth Amendment violation because it suggests that

Proceedings                                        4574

1    Martin defrauded these people or defrauded Retrophin through

2    these people, and that's not been clear evidence in this case

3    in my opinion.  There is a wealth of argument to the jury

4    that's not specious, which, if they accept, could lead to an

5    acquittal on the Retrophin count.

6              And that's why they're just trying to shovel all

7    this stuff in without producing these people.  They were all

8    on their witness list.  Yes, we got these exhibits and the

9    reason we didn't object to these exhibits on June 12th is

10   because Brent Saunders and Al Geller and all of these people

11   were listed as potential witnesses, even on the refined

12   exhibit list.  We didn't find out about Al Geller until last

13   night and his brother --

14             THE COURT:  You mean that he wasn't going to be

15   called?

16             MR. BRAFMAN:  That he wasn't going to be called as a

17   witness.  And we cross-examined David Geller extensively, and

18   whether or not the jury credits David Geller's testimony as he

19   gave on his direct examination, I think we are alive in the

20   hunt to tell this jury that they can dismiss the testimony of

21   some of these people because they were not truthful.  And Your

22   Honor will charge that if a witness lied as to an important

23   matter you may disregard that witness' testimony or you may

24   accept that which you believe and reject that which you don't

25   believe.  That's the right we have with respect to every

SAM      OCR      RMR      CRR      RPR

Proceedings                                          4575

1   consultant or every settlement agreement, and to suggest that

2   they're all fraudulent ignores the last four weeks of trial.

3               MR. AGNIFILO:  Can I just add something to that,

4   Judge?

5               This is the arbitrator's decision concerning

6   Mr. Rosenfeld.

7               THE COURT:  I know, I am familiar with it.  Thank you.

8               MR. AGNIFILO:  Okay.

9               THE COURT:  Yes.

10              All right, look, I think there are a couple things

11  going on.  One is whether or not the subscription agreements

12  come in with the performance reports and are reviewed in

13  conjunction with the bank records.  I understand the defense

14  argument that in terms of the consulting agreements being

15  offered for evidence of fraud when they do not have the right

16  to confront the party on the other end of that agreement does

17  present problems.  There may be a different issue of

18  Mr. Shkreli's statements regarding the performance of a

19  particular fund.

20              So I do not know how many consulting agreements or

21  settlement agreements the government is proposing to put in

22  and for whom, but I do not think it is appropriate if a

23  witness has not testified to allow those agreements to come in

24  because they are deprived of their right to confront the

25  witness and cross-examine.

Proceedings                          4576

1          MS. KASULIS:  Your Honor, can we have the

2     opportunity to brief this issue because we do believe that

3     these are highly relevant?  The witnesses did testify.  The

4     Retrophin board members did testify that none of these

5     agreements were approved by the board, and that goes squarely

6     to --

7          THE COURT:  Well, there were only particular

8     agreements they did not approve.

9          MS. KASULIS:  The settlement, there were six

10    settlement agreements --

11         THE COURT:  Okay.

12         MS. KASULIS:  -- that were not approved by the

13    board, and that's squarely evidence that goes directly to

14    Count 7.

15         And so, again, it's statements of the defendant in

16    furtherance of the scheme.  There are those.  The settlement

17    agreements were signed by Mr. Shkreli, in addition to the

18    investors.  And then we had testimony that none of these

19    agreements were approved by the board.  So we believe the

20    settlement agreements are squarely within multiple counts in

21    terms of relevance and that we have an evidentiary basis to

22    admit those documents.

23         With respect to the consulting agreements, they have

24    the ability to call these witnesses.  Your Honor can order

25    trial subpoenas if they're saying that people are not

Proceedings                              4577

1   cooperating with them.  My understanding is the defense hasn't

2   even contacted Al Geller.

3           MR. BRAFMAN:  I've spoken to his lawyer on a number

4   of occasions.

5           MS. KASULIS:  Have you spoken to him personally?

6           MR. BRAFMAN:  I can't talk to him personally, he is

7   represented by counsel.

8           MS. KASULIS:  Well, call his attorney.  We can give

9   you his information.

10          MR. BRAFMAN:  Your Honor, we have no burden of doing

11  this.  They're talking about putting in documents for a

12  witness who is clearly in their control because they've

13  debriefed him, they've questioned him, they've discussed his

14  testimony with him, and both Geller and Rosenfeld were

15  actually investors in Retrophin.  To suggest that simply

16  because Richardson and Aselage said they didn't approve

17  settlement agreements is not the end of the discussion, Your

18  Honor.

19          I also, just because Your Honor said it,

20  subscription agreements, I don't think they come in just

21  because somebody signed them.  Several of the witnesses said

22  they never read the subscription agreements or they never

23  relied on the subscription agreements.  They relied on what

24  they were told about Mr. Shkreli.  How do we get around that?

25  Are you going to put in a subscription agreement to suggest

Proceedings                                    4578

1   that's evidence that my client defrauded you because he gave

2   you a subscription agreement which you never read and what

3   you're doing is you're investing in Mr. Shkreli because

4   Blanton or someone else raved about how smart he was and what

5   a good investor he was?

6              This trial is not open and shut, Your Honor.  You've

7   sat here, Judge, I think and very carefully paid attention.

8   We're not fishing for a defense.  The defense lies in the

9   cross-examination of the witnesses.  And if the government

10  doesn't feel that it's a good defense, God bless them, but

11  they are not making the decision in this case on what the jury

12  can and cannot consider to be relevant.  And we have a right

13  to show that Al Geller, in particular, and I refer Your Honor

14  respectfully to his 3500 material, the reason they don't want

15  to call him is he would be a terrible witness for the

16  government.  A terrible witness for the government.  He

17  invested millions of dollars into Retrophin as well and he

18  made millions of dollars.  He made about $10 million on his

19  investments, that's why they're not calling him.  So to

20  suggest they can throw in his consulting agreed and suggest to

21  the jury that that's a fraudulent consulting agreement, Al

22  Geller will not tell you that it's a fraudulent consulting

23  agreement.  That's not what he says in his 3500 material.

24             THE COURT:  All right.

25             MS. KASULIS:  Your Honor, I --

Proceedings                                              4579

1          THE COURT:  Look, we have set aside six weeks for

2     this trial.  Those witnesses are available.  If you want to

3     call them, call them so that they can be properly

4     cross-examined.  I am very uncomfortable putting in documents,

5     statements by witnesses, to the extent it is an agreement or

6     to the extent their reliance on a particular set of

7     representations by Mr. Shkreli are critical to the case, and

8     just accepting that as evidence of the government's charged

9     conduct.

10          MS. KASULIS:  Your Honor, can we please have the

11     opportunity to brief this because we do believe that it shows

12     the defendant's intent in furtherance of those schemes that he

13     was making these misrepresentations?

14          THE COURT:  But what do we do about the lack of

15     confrontation?

16          MS. KASULIS:  Your Honor, they're statements of

17     defendant.  They're statements of the defendant.

18          MR. BRAFMAN:  The consulting agreement is not a

19     statement of the defendant.

20          MS. KASULIS:  I think we keep talking about

21     different pieces of evidence here --

22          THE COURT:  Right.

23          MS. KASULIS:  -- which is I think part of the problem.

24          THE COURT:  Right.  This is a lot, but I think what

25     the parties have to do is segregate what category of documents

Proceedings                                                4580

1    and for what particular investors there is a fight.  Geller is

2    sort of an --

3                MS. KASULIS:  Right.

4                THE COURT:  -- individual situation, Al Geller,

5    right?  I do not know whether he is typical or atypical of the

6    others.

7                I agree that we have had testimony from some

8    investors who said they were not that concerned about the

9    boilerplate language in the subscription agreements.  They

10   were savvy, experienced investors.  Others have said certain

11   things were important to them and they relied.

12               So I think what we have to do is talk about what

13   category of documents are at issue for which investors, and I

14   do think the fundamental right to confront the witness and

15   cross-examine the witness is important.  Mr. Shkreli has a

16   right to have each witness against him confronted and

17   cross-examined.  And I am concerned that there would be an

18   infringement of that right if we just took documents without

19   hearing from the witness.

20               MS. KASULIS:  So, Your Honor, can we actually go

21   through the process of breaking these documents into buckets

22   and then briefing the issue for Your Honor because we do

23   believe that we're squarely on solid ground here under the

24   Rules of Evidence and the law with respect to proving

25   fraudulent schemes?  And so we would like the opportunity,

1    Your Honor, to brief this and to isolate these.

2             THE COURT:  I understand that every victim in every

3    fraudulent scheme does not have to necessarily testify, but to

4    the extent -- this is a fairly limited universe.  We are not

5    talking about thousands of defrauded victims, we are talking

6    about a limited universe, probably less than 30, less than 20

7    even.

8             MR. BRAFMAN:  Less than 10.

9             THE COURT:  Less than 10, all right.  Whatever the

10   number, I have set aside the time to have these witnesses come

11   before the jury and to testify on direct and then submit to

12   cross-examination.  So I think that to the extent the

13   government is or the defense is able to bring these witnesses

14   to court, we should hear from them.  And especially if their

15   agreements and their understanding of agreements or documents

16   or representations of Mr. Shkreli are so critical to the

17   issues to be decided.

18            MS. KASULIS:  Your Honor, why don't we break these

19   documents into the various buckets and then brief the issues

20   for Your Honor?

21            THE COURT:  I mean is there any common ground --

22            MR. BRAFMAN:  Well, let me just make a suggestion.

23            THE COURT:  -- or not?

24            MR. BRAFMAN:  I think they can brief the issues to

25   their heart's content and I'm happy to read what they write,

Proceedings                                      4582

1    but it's inconceivable to me that they convince Your Honor

2    that with respect to the settlement agreements and the

3    consulting agreements, in particular, that they don't have to

4    produce those witnesses if they intend to offer those

5    documents.

6              So in terms of scheduling, if we're being told we're

7    close to the end of the case, and we are, and we're not now if

8    these witnesses have to testify, it's hard for me to imagine

9    that they are going to be able to give you any compelling

10   authority for this case that would permit Your Honor to allow

11   Al Geller's consulting agreement to come in without Al Geller

12   testifying or someone else's settlement agreement to come in

13   without that person testifying or even their subscription

14   agreements to be introduced without them testifying to whether

15   or not they even read it.

16             So I think they can knock themselves out on those

17   arguments, but I don't think that's going to change, Your

18   Honor, because there is a Sixth Amendment issue there.  If

19   they want to talk to us about bank records, I think the bank

20   records are pretty much already in evidence by stipulation.

21   So the bank records aren't really what's holding us back from

22   stipulating.  Ms. Zellan e-mailed me last night at midnight

23   about this other stuff and I was kind of stunned, quite

24   frankly.  So --

25             THE COURT:  Ms. Who, I'm sorry?

Proceedings                           4583

1          MR. BRAFMAN:  Ms. Zellan, Andrea Zellan --

2          THE COURT:  I'm sorry.

3          MS. ZELLAN:  That's okay, Your Honor.

4          MR. BRAFMAN:  -- yes.  That the stipulation was

5    going to include consulting agreements, settlement agreements

6    and to that, you know, quite frankly, Judge, we would never

7    consent, however long this trial has to take.

8          MS. KASULIS:  So, Your Honor, again, all these

9    exhibits have been on the government's exhibit list since

10   prior to this trial.

11         MR. BRAFMAN:  What does that have to do with anything?

12         THE COURT:  Well, you still have to -- okay.

13         MS. KASULIS:  Okay, so if we could, Your Honor, if

14   we could break down documents at issue into buckets and then

15   present to Your Honor why we do not believe that they present

16   a Sixth Amendment issue or a confrontation issue to the Court,

17   we are happy to do that, and we would like the opportunity to

18   be able to do that.

19         THE COURT:  All right.  So when do you want to make

20   your submissions?  Can this trial continue, please, while in

21   the meantime?

22         MS. KASULIS:  Your Honor, because really the

23   remaining witnesses are squarely within the cross-hairs of

24   this issue.  So --

25         THE COURT:  All right, so what you are suggesting is

SAM      OCR      RMR      CRR      RPR

Proceedings                           4584

1    we dismiss the jury for today?

2              MS. KASULIS:  Yes.

3              THE COURT:  We give them a very short briefing

4    schedule.  You can get me something by, say, 4 o'clock this

5    afternoon, 4:30?

6              MS. KASULIS:  Can we do 5 o'clock, Your Honor?

7              THE COURT:  5 o'clock, and then I need to hear from

8    the defense.  And I would need to hear from them by 8 o'clock

9    tonight, 9 o'clock tonight?  Can you do that?

10             MR. BRAFMAN:  We'll try, Judge, but a lot depends on

11   what the government writes.  You know, it's hard to respond,

12   start your response before they give you their argument.

13   Because it may be that in a lot of this we don't have

14   disagreement or some of this, I should say.

15             THE COURT:  I mean the other solution is to tell the

16   jurors to come back tomorrow at noon, but it seems to me the

17   more time we give them away from the trial, the momentum has

18   been broken.  And look, I think really the best way is to just

19   go forward with your witnesses and keep this on track.

20             MS. KASULIS:  Your Honor, I think realistically if

21   we brief by 5 and the defense files a response tonight, I mean

22   I think we've obviously sort of started to raise what the

23   legal issues are.  They clearly can start performing their own

24   research.  We all know what the universe of documents are,

25   they should be able to respond by 9 or 10 o'clock tonight.  I

Proceedings                                          4585

1   don't think that this is -- it's going to be anything new or

2   novel.

3            THE COURT:  But that keeps us here until 10 and we

4   do not even start seeing what the parties have to say until

5   10.

6            MR. BRAFMAN:  Can I make a suggestion, Judge?

7            THE COURT:  Yes.

8            MR. BRAFMAN:  This could substantially shorten the

9   trial or substantially increase the length of the trial.  So I

10  think it's an important issue, and I think both counsel and

11  the Court need time.

12           If we give the jury a start time tomorrow after

13  they've had lunch, we are basically losing the afternoon and

14  the morning.  This is the first time I've been on trial where

15  we haven't lost days because of jurors not showing up.  So it

16  happens from time to time, and I'm not certain right now in

17  the coming days there is going to be much momentum, quite

18  frankly, because they are going to be reading bank records and

19  documents.  So if we get our ducks in a row and not all have

20  to work through the night, including Your Honor, if we come

21  back here at 12:30 or noon tomorrow, it will give the Court

22  the morning, and then we get you these materials either late

23  or in the morning, at least you'll have several hours when

24  both issues have been briefed.

25           (Continued on the following page.)

Proceedings                                    4586

1    (Continuing.)

2            THE COURT:  I was going to propose maybe they get

3    tomorrow off, the jurors.

4            MS. KASULIS:  That's fine.

5            THE COURT:  I would like to get everything by --

6    well, if you could get us something by ten tonight, we'll have

7    the day to look into this.  Because right now, I'm not sure

8    what the landscape is with regard to your dispute.  I don't

9    know which witnesses are at issue.  Necessarily, I'd have to

10   look at the 3500 material to even understand what their

11   position is vis-à-vis their subscription agreements, their

12   consulting or settlement agreements.

13           So, I think that, really, it would be better to just

14   give the jurors the afternoon and tomorrow off and we can

15   reconvene by the morning and we will do our best to get a

16   response.  It may push the trial back, but we've set aside six

17   weeks.

18           MS. KASULIS:  We have, we have.

19           THE COURT:  All right.

20           MS. KASULIS:  Okay.

21           THE COURT:  I'm going to ask -- I'll bring the

22   jurors back in and dismiss them and tell them they don't need

23   to come back; emphasize again open mind, no talking about the

24   case, and no media.

25           (Jury enters.)

Proceedings                                            4587

1          THE COURT:  All jurors are present.  Please have a

2     seat, everybody.

3          Members of the jury, I wish to thank you on behalf

4     of the Court and all of the parties here for your ongoing

5     attention.  We have some legal issues that we need to resolve,

6     and, accordingly, we're going to adjourn for the day and also

7     give you tomorrow off.

8          In the meantime, I urge you, again, please don't

9     talk about the case, remain committed to a fair and open mind

10    about the case, do not discuss the case or watch or listen to

11    any reports about the case.  In fact, I urge you to

12    consciously avoid any coverage about this case or about

13    Mr. Shkreli.

14         So, I will see you again Friday morning.  I want to

15    thank you again.  And enjoy your day off.  We will work with

16    the jury clerks to make sure --

17         THE COURTROOM DEPUTY:  I'll tell them in the back.

18         (Jury exits.)

19         THE COURT:  Just to clarify the timing, the

20    Government will submit by 6 p.m. tonight and the defense will

21    submit by 11 a.m. tomorrow morning.

22         MR. BRAFMAN:  Yes, your Honor.  Thank you.

23         THE COURT:  And please do your best to give me a

24    complete submission with the best law in support of your

25    respective positions.

Proceedings                                              4588

1          MS. KASULIS:  Thank you.

2          Your Honor, when do you want us to actually come

3    back to court?

4          THE COURT:  Are you going to need oral arguments or

5    will you rest on your submissions?

6          I'm certainly able to hear you tomorrow or even

7    perhaps if there are questions or issues that we need to

8    discuss, we may want to do that tomorrow.  Maybe the court

9    reporters won't like this, but maybe at 4 o'clock or so, maybe

10   5.

11         Can we just issue an order?  I don't know what

12   you're submitting and I don't know how much we'll have to dig

13   into the legal weeds.  But if we need you, we'll issue an

14   order, so please be ready to come to court.

15         Does any party now know that they want oral

16   argument?

17         MR. BRAFMAN:  I think we made some of the argument

18   already.

19         If your Honor needs us, can we have an understanding

20   that it would not be before two?

21         THE COURT:  It will not be before two.

22         MR. BRAFMAN:  Thank you.

23         MS. KASULIS:  Thank you, your Honor.

24         (Matter adjourned for the day and will reconvene at

25   a date and time to be determined by the Court.)

W. Name - direct/cross - Atty                    4589



SAM        OCR        RMR        CRR        RPR

<u>**INDEX**</u>

<u>**WITNESS:**</u>                                                    <u>**PAGE:**</u>

**BARRY KANE**
DIRECT EXAMINATION BY MS. SMITH          4449
CROSS EXAMINATION BY MR. AGNIFILO        4452

**LEE YAFEE**
CROSS EXAMINATION BY MR. BRAFMAN         4456

＊＊＊＊＊

Defendant's Exhibit 105                            4510
Defendant's Exhibit 102                            4536
Defendant's Exhibit 103                            4537
Defendant's Exhibit 106                            4540

＊＊＊＊＊

1

**$**

**$10** [1] - 4578:18
**$170,000** [1] - 4464:24
**$250,000** [6] - 4465:18, 4465:21, 4466:15, 4466:24, 4467:4, 4506:22
**$5,000** [2] - 4551:3, 4558:7

**'**

**'95** [2] - 4487:12, 4487:15

**1**

**1** [3] - 4512:22, 4513:11, 4525:16
**10** [7] - 4556:18, 4563:10, 4581:8, 4581:9, 4584:25, 4585:3, 4585:5
**100** [2] - 4519:23, 4558:19
**10017** [1] - 4447:20
**101** [2] - 4558:19, 4558:20
**101-D** [2] - 4559:2, 4559:5
**101-E** [1] - 4560:14
**102** [8] - 4527:5, 4529:3, 4533:16, 4536:13, 4536:22, 4536:23, 4537:9, 4590:9
**103** [10] - 4525:19, 4527:5, 4527:11, 4529:3, 4537:1, 4537:3, 4537:4, 4537:6, 4537:9, 4590:9
**105** [6] - 4510:16, 4510:21, 4510:22, 4510:23, 4510:24, 4590:8
**106** [8] - 4537:13, 4538:21, 4539:20, 4539:21, 4540:7, 4540:9, 4555:21, 4590:10
**106-4** [1] - 4460:12
**107** [2] - 4550:14, 4557:2
**109** [2] - 4545:13, 4545:15
**1099** [3] - 4545:1, 4545:19, 4546:2
**10:42** [1] - 4458:18
**11** [1] - 4587:21
**11201** [1] - 4447:16
**114** [1] - 4475:23
**116-1** [1] - 4550:7
**116-10** [2] - 4467:6, 4467:13
**116-14** [1] - 4464:7
**116-18** [1] - 4461:19
**116-20** [7] - 4456:16, 4456:19, 4469:5, 4469:6, 4469:16, 4469:20, 4471:21
**116-22** [1] - 4474:12
**116-4** [3] - 4460:11, 4460:14, 4460:15
**116-5** [1] - 4465:23
**11th** [1] - 4465:24
**12** [1] - 4467:21
**12-page** [1] - 4564:1
**12:30** [1] - 4585:21
**12th** [5] - 4464:11, 4555:25, 4565:20, 4568:23, 4574:9
**144** [2] - 4475:18, 4475:21
**148** [1] - 4522:2
**14th** [1] - 4557:13
**15** [2] - 4513:1, 4563:10
**15,000** [4] - 4464:16, 4464:24, 4465:12, 4465:14

**15-CR-00637(KAM** [1] - 4447:3
**16** [1] - 4458:18
**170,000** [4] - 4464:16, 4465:10, 4465:11, 4465:14
**17th** [5] - 4458:4, 4458:12, 4458:17, 4469:6, 4471:25
**18th** [1] - 4469:3
**19** [1] - 4447:7
**1995** [1] - 4487:7
**1:57** [3] - 4538:8, 4538:16, 4539:11
**1st** [6] - 4477:4, 4477:16, 4478:20, 4479:16, 4480:5, 4483:11

**2**

**2** [6] - 4478:24, 4479:8, 4479:9, 4489:9, 4512:11
**20** [8] - 4513:4, 4513:9, 4513:13, 4513:22, 4515:4, 4525:16, 4534:23, 4581:6
**2000** [7] - 4453:6, 4454:5, 4454:10, 4454:14, 4454:18, 4454:25, 4455:7
**2001** [7] - 4453:7, 4454:6, 4454:10, 4454:14, 4454:18, 4454:25, 4455:7
**2004** [1] - 4453:25
**2008** [2] - 4473:22, 4487:15
**2009** [1] - 4473:22
**2010** [10] - 4487:7, 4487:12, 4487:23, 4488:1, 4489:5, 4489:14, 4489:22, 4490:3, 4490:22, 4491:22
**2011** [4] - 4460:24, 4550:11, 4557:13, 4557:16
**2012** [1] - 4466:3
**2013** [12] - 4458:12, 4458:17, 4464:11, 4469:6, 4471:25, 4475:1, 4483:2, 4520:1, 4520:23, 4521:7, 4525:22, 4540:10
**2015** [18] - 4483:7, 4483:9, 4483:11, 4483:20, 4488:17, 4497:25, 4509:11, 4511:24, 4511:25, 4512:22, 4513:1, 4513:4, 4513:9, 4513:11, 4513:13, 4513:22, 4547:20, 4547:25
**2017** [2] - 4447:7, 4452:25
**20th** [10] - 4483:2, 4483:7, 4483:20, 4485:16, 4488:17, 4489:21, 4493:23, 4497:25, 4509:11, 4511:13
**21** [1] - 4460:23
**23rd** [1] - 4466:3
**24th** [1] - 4460:23
**250,000** [1] - 4466:4
**271** [1] - 4447:15
**28** [3] - 4538:7, 4538:15, 4539:10
**28th** [1] - 4552:15

**3**

**3** [4] - 4479:8, 4479:9, 4495:14, 4512:10
**30** [4] - 4477:17, 4477:25, 4505:15, 4581:6
**30th** [4] - 4475:1, 4483:1, 4547:20, 4547:25
**31st** [1] - 4476:9

**34** [2] - 4553:23, 4553:25
**35** [1] - 4508:19
**3500** [6] - 4477:6, 4547:17, 4572:14, 4578:14, 4578:23, 4586:10
**3500-LY-1** [2] - 4477:6, 4479:9
**3500-LY-2** [2] - 4488:5, 4488:14
**3500-LY-5** [2] - 4510:5, 4510:17

**4**

**4** [7] - 4474:18, 4492:19, 4495:7, 4495:14, 4498:13, 4584:4, 4588:9
**401** [1] - 4568:4
**408** [1] - 4522:2
**4449** [1] - 4590:4
**4452** [1] - 4590:4
**4456** [1] - 4590:6
**4510** [1] - 4590:8
**4536** [1] - 4590:9
**4537** [1] - 4590:9
**4540** [1] - 4590:10
**4:30** [1] - 4584:5

**5**

**5** [14] - 4461:14, 4477:17, 4477:25, 4498:14, 4501:4, 4501:8, 4508:19, 4510:19, 4511:25, 4512:15, 4584:6, 4584:7, 4584:21, 4588:10
**5535** [1] - 4560:15

**6**

**6** [6] - 4489:9, 4492:19, 4498:13, 4508:19, 4512:15, 4587:20
**60** [1] - 4470:22
**6875** [1] - 4541:14

**7**

**7** [1] - 4576:14
**767** [1] - 4447:19

**8**

**8** [1] - 4584:8

**9**

**9** [4] - 4461:14, 4520:1, 4584:9, 4584:25
**9-to-5** [2] - 4482:7, 4482:10
**9:00** [1] - 4447:8
**9th** [1] - 4559:14

**A**

**a.m** [6] - 4447:8, 4458:18, 4538:8, 4538:16, 4539:11, 4587:21
**ability** [3] - 4500:22, 4522:21, 4576:24
**able** [14] - 4458:4, 4458:12, 4530:1, 4533:11, 4541:8, 4552:2, 4568:25, 4572:13, 4581:13, 4582:9, 4583:18, 4584:25, 4588:6
**absolutely** [3] - 4450:22, 4465:8,

2

4507:11

**abuse** [1] - 4542:17
**academic** [1] - 4450:8
**accept** [3] - 4572:4, 4574:4, 4574:24
**accepted** [1] - 4465:10
**accepting** [3] - 4512:19, 4517:5, 4579:8
**access** [1] - 4530:25
**accident** [1] - 4525:3
**accommodate** [1] - 4448:19
**accomplish** [1] - 4544:10
**according** [2] - 4514:24, 4516:19
**accordingly** [1] - 4587:6
**account** [33] - 4521:8, 4521:17, 4521:20, 4524:19, 4524:20, 4524:21, 4525:1, 4525:20, 4526:7, 4526:8, 4526:9, 4526:10, 4527:11, 4529:15, 4530:1, 4530:2, 4530:11, 4531:1, 4531:8, 4532:21, 4533:4, 4534:2, 4534:7, 4536:16, 4537:7, 4541:9, 4549:15, 4549:21, 4549:22, 4551:3, 4551:12, 4558:8, 4558:13
**accountant** [4] - 4541:13, 4546:3, 4557:24, 4558:3
**accounting** [1] - 4540:22
**accounts** [3] - 4467:10, 4467:14, 4568:8
**accurate** [5] - 4514:13, 4523:21, 4548:13, 4548:17, 4552:5
**accurately** [1] - 4535:3
**acknowledge** [1] - 4506:10
**acknowledged** [1] - 4551:7
**acquittal** [1] - 4574:5
**act** [1] - 4572:24
**acted** [2] - 4572:24, 4573:14
**Acting** [1] - 4447:14
**action** [8] - 4502:10, 4502:12, 4502:17, 4502:21, 4502:23, 4503:5, 4503:17, 4503:23
**active** [1] - 4534:2
**actively** [1] - 4494:25
**actual** [2] - 4541:23, 4566:22
**add** [3] - 4540:21, 4571:13, 4575:3
**added** [1] - 4555:25
**addiction** [1] - 4457:25
**addition** [1] - 4576:17
**additional** [4] - 4477:4, 4553:18, 4554:5, 4568:20
**address** [4] - 4474:24, 4521:12, 4533:6, 4541:13
**addressed** [3] - 4521:8, 4521:19, 4536:16
**adjourn** [1] - 4587:6
**adjourned** [1] - 4588:24
**administrative** [1] - 4450:13
**admissibility** [1] - 4555:22
**admissible** [3] - 4527:3, 4527:12, 4564:8
**admit** [5] - 4507:16, 4535:3, 4537:3, 4539:4, 4576:22
**admitted** [5] - 4515:14, 4529:13, 4530:22, 4539:9, 4539:19
**advance** [1] - 4483:25

**advice** [4] - 4542:13, 4549:14, 4558:4, 4571:17
**advisor** [4] - 4468:13, 4471:10, 4487:13, 4543:8
**affiliated** [3] - 4450:11, 4451:22, 4452:5
**afternoon** [3] - 4584:5, 4585:13, 4586:14
**agencies** [1] - 4496:6
**agent** [6] - 4485:13, 4485:17, 4485:24, 4502:20, 4555:19, 4565:11
**agents** [50] - 4456:2, 4477:4, 4477:16, 4478:16, 4478:20, 4479:16, 4480:4, 4480:8, 4480:19, 4482:6, 4482:12, 4482:13, 4483:13, 4487:6, 4489:4, 4489:22, 4490:14, 4490:23, 4492:12, 4493:9, 4494:11, 4494:13, 4495:10, 4495:12, 4496:5, 4497:3, 4497:15, 4497:24, 4498:2, 4498:10, 4500:24, 4501:6, 4501:25, 4502:23, 4503:4, 4506:21, 4506:25, 4509:12, 4509:19, 4511:13, 4534:17, 4534:18, 4535:1, 4546:6, 4547:3, 4559:13, 4560:9, 4560:10, 4560:21, 4561:12
**Agnifilo** [1] - 4452:23
**AGNIFILO** [26] - 4447:21, 4452:16, 4452:17, 4455:10, 4551:20, 4553:2, 4553:24, 4554:15, 4555:18, 4556:10, 4556:14, 4563:20, 4563:23, 4563:25, 4564:19, 4569:16, 4569:20, 4570:4, 4570:6, 4570:16, 4571:2, 4571:5, 4571:10, 4575:3, 4575:8, 4590:4
**Agnifilo's** [2] - 4449:1, 4565:23
**ago** [6] - 4453:23, 4498:6, 4520:23, 4531:23, 4554:24, 4563:25
**agree** [10] - 4466:23, 4471:14, 4494:17, 4512:15, 4517:3, 4517:17, 4523:20, 4530:16, 4544:2, 4580:7
**agreed** [6] - 4449:6, 4532:6, 4541:12, 4541:20, 4572:9, 4578:20
**agreeing** [1] - 4509:15
**agreement** [102] - 4458:4, 4462:24, 4463:2, 4463:4, 4463:5, 4463:9, 4463:12, 4464:5, 4465:9, 4469:21, 4470:22, 4470:23, 4471:2, 4471:17, 4472:7, 4476:15, 4478:2, 4478:9, 4480:10, 4484:21, 4494:7, 4500:11, 4500:17, 4504:9, 4506:22, 4508:14, 4509:2, 4510:1, 4510:8, 4511:9, 4511:24, 4512:2, 4512:7, 4512:10, 4512:11, 4512:18, 4512:21, 4513:8, 4513:20, 4514:2, 4514:3, 4514:4, 4514:11, 4514:18, 4515:12, 4515:17, 4515:22, 4515:25, 4516:8, 4516:19, 4516:25, 4517:2, 4517:6, 4517:8, 4517:12, 4518:1, 4518:14, 4519:6, 4519:20, 4523:1, 4523:15, 4525:5, 4525:11, 4528:18, 4530:5, 4537:17, 4537:18, 4538:20, 4541:4, 4542:4, 4542:7, 4542:9, 4543:12, 4546:7, 4557:21, 4562:6, 4562:9, 4569:3, 4569:20, 4569:22, 4569:23, 4570:10, 4572:20, 4572:23, 4572:25, 4573:19,

4573:20, 4575:1, 4575:16, 4577:25, 4578:2, 4578:21, 4578:23, 4579:5, 4579:18, 4582:11, 4582:12
**agreement"** [1] - 4456:25
**agreement's** [1] - 4516:3
**agreements** [44] - 4564:5, 4564:16, 4564:18, 4564:19, 4564:20, 4565:7, 4565:14, 4565:15, 4567:18, 4568:7, 4568:21, 4569:14, 4570:2, 4573:1, 4573:3, 4573:17, 4573:24, 4575:11, 4575:14, 4575:20, 4575:21, 4575:23, 4576:5, 4576:8, 4576:10, 4576:17, 4576:19, 4576:20, 4576:23, 4577:17, 4577:20, 4577:22, 4577:23, 4580:9, 4581:15, 4582:2, 4582:3, 4582:14, 4583:5, 4586:11, 4586:12
**agrees** [1] - 4519:9
**ahead** [1] - 4505:23
**aided** [1] - 4447:25
**AI** [12] - 4551:23, 4572:14, 4572:15, 4573:1, 4574:10, 4574:12, 4577:2, 4578:13, 4578:21, 4580:4, 4582:11
**alive** [1] - 4574:19
**Alix** [1] - 4547:25
**ALIXANDRA** [1] - 4447:17
**allegedly** [1] - 4570:1
**allow** [8] - 4449:7, 4474:2, 4504:3, 4505:22, 4543:19, 4562:19, 4575:23, 4582:10
**allowed** [1] - 4564:17
**allows** [1] - 4468:15
**almost** [2] - 4453:10, 4554:25
**alone** [1] - 4461:5
**altogether** [1] - 4450:18
**Amendment** [3] - 4573:25, 4582:18, 4583:16
**AMERICA** [1] - 4447:3
**amount** [3] - 4501:23, 4505:14, 4568:15
**ample** [1] - 4511:20
**analyst** [2] - 4473:8, 4473:9
**analysts** [1] - 4481:8
**ANDREA** [1] - 4447:21
**Andrea** [1] - 4583:1
**announced** [1] - 4459:12
**announcement** [1] - 4457:4
**announcements** [4] - 4459:9, 4459:16, 4469:9, 4469:13
**announces** [1] - 4468:4
**answer** [10] - 4488:23, 4491:14, 4505:23, 4508:7, 4515:10, 4522:21, 4524:15, 4543:20, 4561:7
**answered** [1] - 4516:16
**answers** [2] - 4523:18, 4559:6
**anticipate** [3] - 4543:8, 4563:7, 4565:24
**anyway** [2] - 4472:6, 4474:4
**apart** [1] - 4531:9
**apologize** [4] - 4497:11, 4501:12, 4508:9, 4508:11, 4522:13, 4522:15
**appear** [1] - 4535:2
**appreciate** [1] - 4555:6
**appreciated** [1] - 4458:20

**appreciative** [1] - 4464:15
**appropriate** [3] - 4516:18, 4532:1, 4575:22
**approve** [3] - 4471:2, 4576:8, 4577:16
**approved** [3] - 4576:5, 4576:12, 4576:19
**April** [27] - 4477:4, 4477:16, 4479:16, 4480:5, 4483:1, 4483:2, 4483:7, 4483:11, 4483:20, 4485:16, 4488:16, 4489:21, 4493:23, 4497:25, 4509:11, 4511:24, 4512:22, 4513:1, 4513:4, 4513:9, 4513:11, 4513:13, 4513:22, 4515:4, 4525:16, 4534:23
**arbitration** [1] - 4570:7
**arbitrator** [1] - 4570:11
**arbitrator's** [1] - 4575:5
**areas** [2] - 4499:7, 4499:9
**arena** [2] - 4481:10, 4482:1
**argue** [6] - 4530:2, 4533:11, 4565:25, 4567:13, 4569:6, 4569:7
**arguing** [1] - 4556:16
**argument** [14] - 4508:2, 4508:4, 4531:9, 4532:1, 4532:7, 4532:25, 4533:17, 4568:4, 4571:22, 4574:3, 4575:14, 4584:12, 4588:16, 4588:17
**arguments** [4] - 4532:18, 4565:23, 4582:17, 4588:4
**arranged** [1] - 4495:5
**arrangement** [2] - 4476:13, 4476:14
**arrived** [1] - 4465:18
**article** [1] - 4527:22
**articles** [4] - 4467:8, 4505:15, 4506:13, 4506:20
**ASAP** [2] - 4464:14, 4465:25
**Aselage** [2] - 4573:4, 4577:16
**aside** [3] - 4579:1, 4581:10, 4586:16
**aspect** [1] - 4566:2
**assign** [2] - 4544:7, 4572:7
**Assistant** [1] - 4447:18
**assistants** [1] - 4534:18
**associate** [2] - 4450:2, 4486:10
**ASSOCIATES** [1] - 4447:19
**assume** [6] - 4463:20, 4535:7, 4542:3, 4548:2, 4572:9, 4572:24
**assuming** [1] - 4480:3
**attach** [1] - 4573:19
**attached** [2] - 4467:17, 4527:22
**attempt** [1] - 4514:14
**attention** [2] - 4578:7, 4587:5
**attorney** [6] - 4485:4, 4485:5, 4485:7, 4486:22, 4522:19, 4577:8
**Attorney** [4] - 4447:14, 4492:22, 4515:19, 4515:20
**Attorney's** [2] - 4484:24, 4489:3
**attorney-client** [3] - 4485:4, 4485:5, 4485:7
**Attorneys** [1] - 4447:18
**atypical** [3] - 4496:7, 4496:13, 4580:5
**audit** [8] - 4452:6, 4452:8, 4452:25, 4453:4, 4453:6, 4453:9, 4453:12, 4454:24

**audited** [1] - 4455:6
**August** [2] - 4460:23, 4465:24
**Austin** [11] - 4546:10, 4546:12, 4546:14, 4547:8, 4548:10, 4548:16, 4548:21, 4549:4, 4549:11, 4549:21, 4549:22
**authority** [3] - 4552:22, 4552:23, 4582:10
**authorize** [1] - 4454:5
**available** [6] - 4455:24, 4471:18, 4472:4, 4474:6, 4543:16, 4579:2
**Avenue** [1] - 4447:19
**avoid** [1] - 4587:12

# B

**back-and-forth** [1] - 4539:20
**background** [3] - 4472:18, 4472:20, 4472:21
**backwards** [1] - 4469:17
**balance** [1] - 4551:25
**Bank** [1] - 4541:9
**bank** [12] - 4565:21, 4566:19, 4567:1, 4568:2, 4568:8, 4568:16, 4573:22, 4575:13, 4582:19, 4582:21, 4585:18
**banking** [3] - 4473:6, 4473:7, 4473:21
**banks** [1] - 4473:19
**Banta** [1] - 4573:2
**bar** [1] - 4568:5
**Barry** [2] - 4447:23, 4449:12
**BARRY** [2] - 4449:14, 4590:3
**based** [3] - 4461:17, 4471:2, 4537:23
**basis** [4] - 4455:6, 4550:15, 4552:24, 4576:21
**Bates** [1] - 4526:1, 4559:5, 4560:14
**Beach** [1] - 4541:14
**bear** [1] - 4529:18
**bearing** [1] - 4555:12
**bears** [3] - 4550:7, 4559:5, 4560:14
**became** [1] - 4525:12
**bed** [1] - 4464:14
**BEFORE** [1] - 4447:11
**begin** [1] - 4474:23
**beginning** [6] - 4479:1, 4492:21, 4492:25, 4495:7, 4501:5, 4508:24
**begins** [2] - 4489:14, 4495:15
**begun** [1] - 4563:3
**behalf** [3] - 4474:2, 4480:21, 4587:3
**believes** [2] - 4515:11, 4516:7
**beneficial** [2] - 4495:1, 4495:2
**benefit** [6] - 4495:5, 4495:11, 4515:12, 4515:25, 4516:3, 4516:7
**BENJAMIN** [1] - 4447:20
**best** [8] - 4522:21, 4555:13, 4557:7, 4570:13, 4584:18, 4586:15, 4587:23, 4587:24
**bet** [1] - 4573:11
**better** [3] - 4544:11, 4572:17, 4586:13
**between** [13] - 4460:17, 4461:20, 4464:10, 4465:17, 4477:25, 4533:13, 4540:10, 4549:10, 4550:11, 4565:15, 4567:20, 4568:21

**beyond** [2] - 4534:13, 4553:18
**Biestek** [25] - 4477:17, 4478:4, 4478:8, 4482:7, 4499:10, 4499:17, 4500:2, 4504:24, 4505:3, 4506:1, 4506:6, 4506:10, 4519:16, 4523:9, 4528:3, 4531:24, 4534:5, 4558:18, 4559:17, 4560:1, 4560:13, 4560:22, 4561:4, 4571:7, 4572:7
**Biestek's** [1] - 4530:15
**big** [5] - 4478:25, 4479:6, 4479:13, 4547:4, 4548:12
**bigger** [1] - 4533:20
**biggest** [1] - 4546:25
**biotech** [5] - 4462:7, 4462:9, 4462:13, 4462:20, 4482:3
**biotechnology** [2] - 4467:18, 4468:7
**birth** [1] - 4451:6
**bit** [4] - 4465:1, 4492:17, 4497:6, 4509:18
**Blanton** [1] - 4578:4
**bless** [1] - 4578:10
**blind** [3] - 4497:21, 4497:22, 4497:23, 4498:6
**Blind** [1] - 4497:22
**blocks** [1] - 4486:21
**blue** [1] - 4499:17
**board** [5] - 4573:3, 4576:4, 4576:5, 4576:13, 4576:19
**boilerplate** [1] - 4580:9
**BOL** [1] - 4522:2
**BOL-148** [3] - 4558:24, 4559:6, 4560:15
**bother** [3] - 4460:13, 4504:8, 4504:10
**bottom** [12] - 4456:24, 4461:21, 4469:17, 4478:25, 4479:5, 4491:3, 4498:13, 4498:19, 4508:21, 4508:22, 4508:23, 4509:1
**bounce** [1] - 4497:1
**boutique** [2] - 4487:7, 4487:13
**Brafman** [9] - 4449:6, 4456:9, 4513:7, 4523:13, 4527:20, 4534:1, 4536:9, 4538:15, 4549:20
**BRAFMAN** [147] - 4447:19, 4447:20, 4448:17, 4448:22, 4455:20, 4455:24, 4456:7, 4456:11, 4456:12, 4458:11, 4466:22, 4477:2, 4479:4, 4481:18, 4483:5, 4483:6, 4483:9, 4485:6, 4485:10, 4485:11, 4486:7, 4488:10, 4488:12, 4488:13, 4489:18, 4493:3, 4493:5, 4500:7, 4500:16, 4503:20, 4504:21, 4508:6, 4508:8, 4508:12, 4508:13, 4510:11, 4510:15, 4510:22, 4511:1, 4516:15, 4517:14, 4519:5, 4522:15, 4524:14, 4526:18, 4526:20, 4527:2, 4527:5, 4527:8, 4527:18, 4528:9, 4528:13, 4529:7, 4529:11, 4529:24, 4530:9, 4530:18, 4530:21, 4531:5, 4531:13, 4531:15, 4531:18, 4532:8, 4532:11, 4532:14, 4532:17, 4532:20, 4532:24, 4533:2, 4533:10, 4533:22, 4534:6, 4534:11, 4534:15, 4534:23, 4535:1, 4536:2, 4536:10,

4536:11, 4536:20, 4537:9, 4537:12, 4537:20, 4537:25, 4538:3, 4538:10, 4538:17, 4538:19, 4538:22, 4539:1, 4539:6, 4539:15, 4539:18, 4539:23, 4539:25, 4540:6, 4540:12, 4540:15, 4540:19, 4541:17, 4543:1, 4543:23, 4545:10, 4547:16, 4549:22, 4550:13, 4550:16, 4550:22, 4550:24, 4551:11, 4551:13, 4551:21, 4552:8, 4552:11, 4552:13, 4553:9, 4553:12, 4553:21, 4554:2, 4554:4, 4554:14, 4556:15, 4556:18, 4557:1, 4571:1, 4571:13, 4571:19, 4571:21, 4571:24, 4574:16, 4577:3, 4577:6, 4577:10, 4579:18, 4581:8, 4581:22, 4581:24, 4583:1, 4583:4, 4583:11, 4584:10, 4585:6, 4585:8, 4587:22, 4588:17, 4588:22, 4590:6

**breadth** [1] - 4566:7

**break** [5] - 4526:23, 4562:19, 4562:22, 4581:18, 4583:14

**breaking** [1] - 4580:21

**Brent** [2] - 4564:3, 4574:10

**BRIDGET** [1] - 4447:3

**brief** [6] - 4576:2, 4579:11, 4581:1, 4581:19, 4581:24, 4584:21

**briefed** [1] - 4585:24

**briefing** [3] - 4555:7, 4580:22, 4584:3

**briefly** [2] - 4452:16, 4559:1

**Briefly** [1] - 4524:6

**bright** [1] - 4492:16

**bring** [6] - 4448:15, 4456:1, 4549:18, 4554:23, 4581:13, 4586:21

**brings** [1] - 4549:8

**broken** [1] - 4584:18

**broker** [1] - 4457:17

**Brooklyn** [2] - 4447:6, 4447:16

**brother** [1] - 4574:13

**brought** [3] - 4484:8, 4512:16, 4549:1

**buckets** [3] - 4580:21, 4581:19, 4583:14

**bulk** [1] - 4568:19

**bunch** [1] - 4506:13

**bunny** [1] - 4552:8

**burden** [1] - 4577:10

**business** [18] - 4450:20, 4486:10, 4494:14, 4494:18, 4494:23, 4494:24, 4494:25, 4495:3, 4495:4, 4495:23, 4542:17, 4543:25, 4548:21, 4549:9, 4549:15, 4549:25, 4565:2

**businesses** [1] - 4494:18

**busy** [5] - 4463:14, 4463:16, 4463:18, 4463:21, 4469:23

**buttoned** [1] - 4469:22

**BY** [26] - 4447:16, 4447:20, 4449:17, 4452:17, 4456:12, 4477:2, 4479:4, 4481:18, 4483:6, 4485:11, 4486:7, 4488:13, 4489:18, 4493:5, 4500:7, 4500:16, 4503:20, 4504:21, 4508:13, 4511:1, 4536:11, 4543:1, 4557:1, 4590:4, 4590:4, 4590:6

## C

**Cadman** [1] - 4447:15

**calculus** [2] - 4454:24, 4455:7

**cannot** [2] - 4573:8, 4578:12

**capital** [1] - 4512:12

**Capital** [4] - 4564:21, 4565:14, 4565:17, 4569:8

**caption** [4] - 4456:25, 4457:3, 4469:21, 4520:15

**care** [11] - 4457:8, 4457:16, 4457:19, 4457:22, 4462:13, 4462:18, 4473:3, 4474:10, 4533:23, 4564:11, 4564:12

**career** [1] - 4481:19

**carefully** [3] - 4515:9, 4516:6, 4578:7

**case** [35] - 4451:2, 4451:9, 4453:1, 4517:11, 4520:24, 4526:24, 4531:22, 4551:25, 4552:5, 4553:8, 4553:11, 4553:13, 4554:6, 4555:18, 4562:24, 4564:2, 4565:11, 4566:4, 4567:6, 4567:7, 4570:13, 4570:19, 4573:9, 4574:2, 4578:11, 4579:7, 4582:7, 4582:10, 4586:24, 4587:9, 4587:10, 4587:11, 4587:12

**cases** [1] - 4567:4

**cash** [2] - 4464:24, 4512:20

**catch** [1] - 4458:22

**category** [4] - 4450:8, 4570:15, 4579:25, 4580:13

**caught** [1] - 4521:10

**CAUSE** [1] - 4447:11

**center** [1] - 4457:25

**central** [2] - 4450:13, 4553:3

**CEO** [2] - 4572:7, 4572:17

**certain** [7] - 4524:20, 4532:2, 4544:19, 4563:5, 4573:22, 4580:10, 4585:16

**certainly** [13] - 4472:19, 4474:9, 4477:21, 4492:16, 4493:14, 4494:2, 4494:3, 4495:25, 4498:3, 4498:8, 4569:11, 4588:6

**certainty** [2] - 4452:10, 4453:8

**chain** [5] - 4464:10, 4474:15, 4539:7, 4539:22, 4540:3

**chance** [1] - 4462:23

**change** [5] - 4474:18, 4474:20, 4533:16, 4550:9, 4582:17

**changed** [2] - 4530:5, 4556:1

**changes** [7] - 4475:4, 4476:5, 4541:12, 4541:20, 4542:8, 4542:9, 4552:25

**changing** [2] - 4457:4, 4533:14

**characterized** [1] - 4460:21

**charge** [4] - 4551:17, 4553:3, 4553:4, 4574:22

**Charge** [1] - 4552:23

**charged** [5] - 4567:8, 4567:9, 4567:25, 4569:4, 4579:8

**charges** [3] - 4512:16, 4565:20, 4565:21

**Charges** [1] - 4552:18

**charging** [1] - 4552:20

**chasing** [1] - 4460:21

**check** [8] - 4448:3, 4540:22, 4541:6,

4541:7, 4541:10, 4541:13, 4558:12

**checks** [1] - 4474:23

**Chelsea** [7] - 4547:1, 4547:4, 4547:5, 4548:11, 4548:24, 4549:25, 4550:4

**cherry** [2] - 4556:11, 4556:13

**chief** [1] - 4512:18

**chime** [1] - 4475:9

**chose** [1] - 4509:23

**City** [5] - 4449:21, 4454:13, 4454:15, 4454:17, 4454:21

**city** [1] - 4454:12

**claim** [1] - 4463:20

**Clarification** [1] - 4536:25

**clarify** [2] - 4543:22, 4587:19

**class** [4] - 4452:1, 4452:2, 4454:24, 4455:7

**clean** [1] - 4460:13

**clear** [3] - 4457:15, 4564:22, 4574:2

**clearly** [3] - 4515:22, 4577:12, 4584:23

**clerk** [1] - 4555:8

**clerks** [1] - 4587:16

**client** [8] - 4485:4, 4485:5, 4485:7, 4496:1, 4496:17, 4549:4, 4549:18, 4578:1

**clients** [1] - 4496:7

**clinic** [1] - 4458:1

**clinics** [1] - 4542:17

**clock** [1] - 4482:10

**close** [3] - 4457:5, 4496:9, 4582:7

**closing** [4] - 4532:7, 4532:17, 4565:25, 4569:8

**cluster** [79] - 4471:6, 4471:11, 4471:18, 4472:17, 4477:17, 4477:23, 4478:18, 4478:22, 4479:13, 4479:17, 4480:6, 4480:9, 4497:18, 4497:20, 4497:21, 4497:25, 4498:4, 4498:8, 4498:9, 4498:11, 4498:16, 4499:6, 4499:15, 4499:18, 4499:25, 4500:4, 4500:8, 4500:12, 4500:18, 4500:25, 4501:8, 4501:14, 4501:18, 4501:22, 4501:25, 4502:1, 4502:24, 4503:5, 4503:10, 4503:16, 4503:22, 4504:10, 4504:24, 4505:4, 4505:16, 4506:6, 4519:20, 4520:16, 4523:2, 4523:9, 4523:16, 4524:4, 4524:7, 4525:1, 4525:6, 4525:9, 4525:13, 4528:4, 4528:14, 4531:22, 4531:24, 4532:4, 4558:18, 4559:13, 4559:21, 4559:22, 4560:10, 4560:20, 4560:21, 4561:3, 4561:12, 4561:22, 4561:24, 4570:21, 4570:24, 4571:8, 4571:16, 4571:18

**co** [1] - 4565:16

**co-conspirators** [1] - 4565:16

**coach** [1] - 4572:18

**coincidence** [1] - 4560:23

**college** [1] - 4449:24

**color** [1] - 4486:3

**Columbia** [20] - 4448:12, 4448:24, 4449:21, 4449:22, 4450:1, 4450:3, 4450:10, 4450:11, 4450:17, 4450:21, 4450:25, 4451:13, 4451:14, 4451:22,

4452:1, 4452:6, 4453:20, 4453:22, 4453:25, 4455:5
**coming** [5] - 4459:9, 4461:7, 4509:13, 4568:17, 4585:17
**comments** [2] - 4552:19, 4552:21
**commit** [2] - 4514:13, 4514:14
**committed** [2] - 4511:5, 4587:9
**common** [2] - 4474:20, 4581:21
**communicate** [1] - 4531:1
**communication** [1] - 4540:9
**companies** [5] - 4457:19, 4473:2, 4496:22, 4496:24, 4501:21
**company** [32] - 4457:13, 4459:5, 4459:13, 4459:16, 4467:19, 4468:7, 4468:15, 4470:16, 4471:10, 4471:12, 4471:14, 4471:19, 4472:5, 4472:22, 4473:6, 4473:13, 4481:12, 4482:3, 4500:25, 4501:7, 4501:14, 4501:18, 4512:19, 4512:20, 4543:7, 4544:21, 4545:25, 4572:10, 4572:19
**compelling** [1] - 4582:9
**compensate** [1] - 4508:15
**compensated** [2] - 4506:23, 4509:3
**compensation** [1] - 4517:5
**complete** [4] - 4468:4, 4514:12, 4539:7, 4587:24
**completely** [2] - 4523:21, 4560:7
**completing** [1] - 4468:4
**comply** [1] - 4544:8
**compound** [1] - 4543:18
**comprise** [1] - 4450:14
**comprised** [1] - 4453:10
**compromise** [1] - 4573:21
**Computer** [1] - 4447:25
**Computer-aided** [1] - 4447:25
**computerized** [1] - 4447:25
**conceded** [1] - 4515:17
**concerned** [2] - 4580:8, 4580:17
**concerning** [13] - 4457:12, 4459:16, 4469:9, 4469:13, 4477:17, 4479:13, 4502:24, 4531:22, 4537:17, 4538:20, 4560:23, 4564:5, 4575:5
**conclusively** [1] - 4454:23
**conduct** [5] - 4451:2, 4564:15, 4567:8, 4569:4, 4579:9
**conducting** [1] - 4485:13
**conduit** [1] - 4473:10
**confer** [1] - 4469:9
**conference** [3] - 4523:10, 4551:17, 4552:20
**conferral** [1] - 4450:23
**confront** [3] - 4575:16, 4575:24, 4580:14
**confrontation** [3] - 4573:10, 4579:15, 4583:16
**confronted** [2] - 4573:10, 4580:16
**confused** [1] - 4519:3
**conjunction** [1] - 4575:13
**connect** [1] - 4494:24
**connection** [5] - 4451:2, 4451:5, 4451:9, 4565:5, 4565:6

**consciously** [1] - 4587:12
**consent** [1] - 4583:7
**consequences** [1] - 4558:2
**consider** [2] - 4531:21, 4578:12
**considered** [1] - 4449:24
**consists** [1] - 4481:15
**conspiracy** [1] - 4567:22
**conspirators** [1] - 4565:16
**consult** [1] - 4571:20
**consultant** [23] - 4459:25, 4460:1, 4471:10, 4471:12, 4471:14, 4471:19, 4472:4, 4475:10, 4500:21, 4505:16, 4505:19, 4532:2, 4532:10, 4542:19, 4545:14, 4572:2, 4572:3, 4572:9, 4572:16, 4572:19, 4575:1
**consultants** [12] - 4480:20, 4504:7, 4542:15, 4543:15, 4543:16, 4543:24, 4544:11, 4544:18, 4544:21, 4544:24, 4573:16
**consulting** [99] - 4456:25, 4458:4, 4458:25, 4459:21, 4460:3, 4463:5, 4469:21, 4470:22, 4470:23, 4471:11, 4471:22, 4472:2, 4472:7, 4472:16, 4476:15, 4478:2, 4478:9, 4480:10, 4487:8, 4487:14, 4487:17, 4487:19, 4487:24, 4489:6, 4489:23, 4490:4, 4490:7, 4490:22, 4491:4, 4491:6, 4491:18, 4491:22, 4493:24, 4494:4, 4494:7, 4500:11, 4500:17, 4500:22, 4504:9, 4506:22, 4508:14, 4509:2, 4512:18, 4512:21, 4517:5, 4519:20, 4523:1, 4523:15, 4525:5, 4525:7, 4525:11, 4525:13, 4530:5, 4537:17, 4538:20, 4541:3, 4542:4, 4542:7, 4542:9, 4557:21, 4562:6, 4564:20, 4565:7, 4565:15, 4567:18, 4568:21, 4569:14, 4569:20, 4569:21, 4570:2, 4570:10, 4570:17, 4570:24, 4571:9, 4571:10, 4571:12, 4571:17, 4572:11, 4572:20, 4572:23, 4572:25, 4573:2, 4573:17, 4573:19, 4573:24, 4575:14, 4575:20, 4576:23, 4578:21, 4578:22, 4579:18, 4582:3, 4582:11, 4583:5, 4586:12
**cont'g** [1] - 4456:12
**contact** [1] - 4535:7
**contacted** [1] - 4577:2
**contacts** [9] - 4473:5, 4473:23, 4474:2, 4481:6, 4481:7, 4481:24, 4482:2, 4494:1, 4494:5
**contained** [1] - 4568:12
**contains** [1] - 4457:9
**content** [1] - 4581:25
**context** [3] - 4464:23, 4465:2, 4557:15
**continue** [3] - 4449:1, 4555:14, 4583:20
**Continued** [2] - 4535:11, 4542:23
**continued** [2] - 4510:25, 4512:3, 4585:25
**continues** [1] - 4476:17
**CONTINUES** [1] - 4477:1
**Continuing** [2] - 4563:1, 4586:1

**continuing** [2] - 4538:19, 4567:22
**contract** [1] - 4541:12
**contractor** [1] - 4545:3
**contractors** [2] - 4544:4, 4544:5
**contradict** [1] - 4530:10
**contradicts** [1] - 4529:16
**contrary** [1] - 4570:11
**control** [3] - 4517:19, 4519:12, 4577:12
**conversation** [14] - 4473:9, 4499:20, 4505:8, 4505:10, 4523:22, 4524:1, 4524:2, 4542:3, 4553:15, 4571:15
**conversations** [6] - 4454:20, 4496:25, 4501:23, 4504:23, 4570:21, 4571:7
**conveyed** [1] - 4505:25
**convince** [2] - 4571:11, 4582:1
**cool** [2] - 4458:20, 4469:21
**cooperate** [1] - 4514:15
**cooperating** [1] - 4577:1
**copy** [4] - 4460:12, 4460:13, 4488:5, 4547:17
**corner** [3] - 4479:10, 4489:10, 4492:20
**correct** [249] - 4453:1, 4453:2, 4454:3, 4454:6, 4454:7, 4454:9, 4455:9, 4457:10, 4457:11, 4457:13, 4457:14, 4457:17, 4457:18, 4457:20, 4457:21, 4457:23, 4458:1, 4458:19, 4459:3, 4459:6, 4459:7, 4459:10, 4459:11, 4459:13, 4459:17, 4459:18, 4459:24, 4460:4, 4460:8, 4460:18, 4460:19, 4460:21, 4460:22, 4461:14, 4461:15, 4461:17, 4462:1, 4462:2, 4463:2, 4463:3, 4463:12, 4463:13, 4464:6, 4464:25, 4465:1, 4465:12, 4465:15, 4465:16, 4465:19, 4465:20, 4466:1, 4466:2, 4466:9, 4466:24, 4467:3, 4467:8, 4467:11, 4467:15, 4467:16, 4468:2, 4468:3, 4468:5, 4468:8, 4468:9, 4468:10, 4468:13, 4468:16, 4468:17, 4468:19, 4468:20, 4468:21, 4468:22, 4469:3, 4469:12, 4469:14, 4469:15, 4470:3, 4470:4, 4470:5, 4470:6, 4470:14, 4470:25, 4471:3, 4471:4, 4471:15, 4471:16, 4471:19, 4471:20, 4472:11, 4472:17, 4472:22, 4472:23, 4472:25, 4473:3, 4473:13, 4473:16, 4473:24, 4473:25, 4474:3, 4474:4, 4474:6, 4474:7, 4474:10, 4474:11, 4474:15, 4475:1, 4475:2, 4475:24, 4475:25, 4476:7, 4476:8, 4480:17, 4480:18, 4481:22, 4482:4, 4482:14, 4482:15, 4483:2, 4483:3, 4483:11, 4483:17, 4483:21, 4483:24, 4484:4, 4484:9, 4484:14, 4486:18, 4486:19, 4486:22, 4486:25, 4487:1, 4487:14, 4487:15, 4487:17, 4487:20, 4488:17, 4488:25, 4490:4, 4490:7, 4490:16, 4490:17, 4490:24, 4490:25, 4491:8, 4491:21, 4491:23, 4492:5, 4496:13, 4496:14, 4496:19, 4497:16, 4497:17, 4497:19, 4499:10, 4502:16, 4506:17, 4507:20, 4509:13, 4509:14,

6

4509:17, 4509:21, 4509:22, 4509:23, 4510:2, 4510:3, 4510:20, 4511:5, 4511:7, 4511:13, 4511:18, 4511:21, 4511:25, 4512:8, 4512:13, 4513:14, 4514:5, 4514:21, 4514:25, 4515:2, 4515:4, 4515:18, 4515:25, 4516:4, 4516:21, 4517:19, 4517:22, 4518:5, 4518:12, 4519:12, 4519:17, 4520:6, 4520:11, 4520:16, 4520:20, 4521:6, 4521:9, 4521:17, 4525:9, 4525:11, 4525:17, 4540:10, 4541:15, 4541:18, 4541:20, 4541:23, 4542:1, 4542:4, 4542:13, 4542:20, 4542:21, 4543:2, 4543:3, 4543:6, 4543:9, 4543:10, 4543:25, 4544:4, 4544:5, 4544:8, 4544:16, 4544:17, 4544:24, 4544:25, 4545:2, 4545:4, 4545:9, 4545:25, 4546:23, 4546:24, 4547:1, 4548:2, 4548:6, 4548:7, 4548:25, 4549:1, 4549:23, 4550:1, 4550:2, 4557:5, 4557:8, 4557:10, 4557:22, 4557:25, 4558:4, 4558:10, 4558:21, 4559:6, 4559:10, 4568:16
**Correct** [2] - 4511:6, 4511:8, 4511:19, 4513:15, 4515:7, 4517:20, 4519:18, 4520:12, 4520:21, 4521:7, 4525:18, 4541:17
**corrected** [1] - 4523:5
**correctly** [2] - 4464:20, 4570:5
**correspondence** [1] - 4533:13
**counsel** [4] - 4448:1, 4533:5, 4577:7, 4585:10
**count** [1] - 4574:5
**Count** [1] - 4576:14
**countries** [1] - 4462:14
**counts** [1] - 4576:20
**couple** [20] - 4452:20, 4458:17, 4466:16, 4466:19, 4466:23, 4477:4, 4486:21, 4497:7, 4498:13, 4506:12, 4518:7, 4524:5, 4524:6, 4554:19, 4555:1, 4555:25, 4562:17, 4568:25, 4571:7, 4575:10
**course** [5] - 4450:24, 4455:2, 4485:18, 4485:25, 4566:6
**court** [11] - 4527:15, 4536:1, 4539:19, 4563:16, 4563:18, 4563:19, 4563:20, 4581:14, 4588:3, 4588:8, 4588:14
**Court** [12] - 4447:23, 4447:23, 4534:16, 4547:16, 4552:19, 4556:21, 4572:5, 4583:16, 4585:11, 4585:21, 4587:4, 4588:25
**COURT** [181] - 4447:1, 4448:1, 4448:7, 4448:11, 4448:14, 4448:20, 4449:2, 4449:4, 4449:16, 4452:8, 4452:12, 4452:14, 4455:14, 4455:18, 4455:23, 4455:25, 4456:4, 4456:8, 4456:21, 4458:7, 4458:9, 4467:1, 4472:13, 4485:5, 4485:8, 4486:6, 4488:11, 4493:2, 4500:6, 4500:15, 4503:2, 4503:19, 4504:3, 4504:13, 4504:20, 4505:22, 4508:2, 4508:4, 4508:7, 4508:10, 4510:13, 4510:18, 4510:21,

4510:23, 4512:6, 4513:7, 4513:18, 4514:10, 4515:6, 4516:10, 4516:17, 4519:3, 4521:1, 4521:15, 4521:18, 4522:12, 4522:14, 4522:17, 4522:21, 4522:24, 4523:7, 4523:13, 4524:11, 4524:16, 4526:21, 4527:4, 4527:7, 4528:3, 4528:17, 4529:2, 4530:10, 4530:14, 4530:24, 4531:4, 4533:5, 4534:1, 4534:10, 4535:9, 4536:4, 4536:7, 4536:22, 4536:25, 4537:3, 4537:11, 4537:23, 4538:2, 4538:5, 4538:14, 4538:18, 4538:21, 4539:4, 4539:7, 4539:10, 4539:16, 4539:24, 4540:4, 4540:14, 4540:17, 4541:15, 4543:14, 4543:19, 4545:11, 4547:18, 4549:20, 4550:21, 4550:23, 4550:25, 4551:2, 4551:7, 4551:12, 4551:15, 4552:10, 4552:12, 4552:14, 4552:17, 4553:7, 4553:10, 4554:13, 4555:1, 4556:17, 4556:19, 4561:1, 4561:6, 4562:10, 4562:12, 4562:20, 4563:2, 4563:12, 4563:17, 4563:21, 4563:24, 4564:18, 4566:3, 4566:12, 4566:20, 4568:10, 4568:15, 4569:1, 4569:25, 4570:5, 4570:15, 4570:23, 4571:4, 4571:6, 4571:14, 4571:20, 4571:23, 4574:14, 4575:7, 4575:9, 4576:7, 4576:11, 4578:24, 4579:1, 4579:14, 4579:22, 4579:24, 4580:4, 4581:2, 4581:9, 4581:21, 4581:23, 4582:25, 4583:2, 4583:12, 4583:19, 4583:25, 4584:3, 4584:7, 4584:15, 4585:3, 4585:7, 4586:2, 4586:5, 4586:19, 4586:21, 4587:1, 4587:19, 4587:23, 4588:4, 4588:21
**Courthouse** [1] - 4447:5
**courtroom** [3] - 4519:2, 4534:20, 4562:25
**COURTROOM** [2] - 4587:17
**cover** [5] - 4450:11, 4474:19, 4532:13, 4532:14, 4532:15
**coverage** [2] - 4470:12, 4587:12
**covered** [1] - 4516:18
**covering** [1] - 4519:23
**covers** [1] - 4513:8
**create** [2] - 4467:22, 4527:19
**created** [3] - 4527:20, 4528:8, 4563:6
**creates** [1] - 4468:7
**creating** [1] - 4531:16
**credibility** [1] - 4572:4
**credible** [1] - 4500:21
**credits** [2] - 4572:21, 4574:18
**crime** [2] - 4485:14, 4486:13
**crimes** [2] - 4511:5, 4514:14
**CRIMINAL** [1] - 4447:11
**criminal** [2] - 4512:16, 4564:15
**criteria** [1] - 4470:12
**critical** [3] - 4531:21, 4579:7, 4581:16
**CROSS** [4] - 4452:17, 4456:12, 4590:4, 4590:6
**cross** [21] - 4448:18, 4448:23, 4449:1,

4449:8, 4452:15, 4455:18, 4456:10, 4531:21, 4551:24, 4570:20, 4572:14, 4572:21, 4573:16, 4574:17, 4575:25, 4578:9, 4579:4, 4580:15, 4580:17, 4581:12, 4583:23
**cross-examination** [4] - 4572:21, 4573:16, 4578:9, 4581:12
**cross-examine** [3] - 4572:14, 4575:25, 4580:15
**cross-examined** [4] - 4570:20, 4574:17, 4579:4, 4580:17
**cross-hairs** [1] - 4583:23
**cultivating** [1] - 4481:10
**curious** [4] - 4460:24, 4474:21, 4506:17, 4571:20
**current** [1] - 4452:24
**custodial** [1] - 4448:13
**custodian** [1] - 4448:24
**cut** [3] - 4541:7, 4541:13

## D

**dad** [6] - 4458:20, 4460:24, 4461:5, 4464:14, 4465:17, 4466:8
**database** [3] - 4451:10, 4451:12
**date** [12] - 4451:6, 4465:9, 4483:8, 4483:10, 4487:22, 4488:16, 4489:3, 4490:15, 4494:13, 4502:1, 4559:24, 4588:25
**dated** [6] - 4469:3, 4469:6, 4511:24, 4520:1, 4538:7, 4539:10
**dates** [2] - 4529:9, 4533:7
**David** [2] - 4574:17, 4574:18
**days** [6] - 4540:23, 4546:18, 4554:19, 4554:24, 4585:15, 4585:17
**deadline** [2] - 4555:14, 4555:15
**deal** [2] - 4572:16
**dealt** [2] - 4457:19, 4462:13
**dean** [2] - 4453:13, 4453:20, 4453:24
**Dean** [3] - 4453:13, 4454:11, 4454:14
**debilitating** [1] - 4498:2
**debriefed** [1] - 4577:13
**decade** [1] - 4478:12
**December** [12] - 4458:10, 4458:12, 4458:17, 4469:3, 4469:6, 4471:25, 4475:1, 4476:9, 4538:7, 4538:15, 4539:10, 4540:10
**decide** [4] - 4518:18, 4518:22, 4535:5, 4554:8
**decided** [1] - 4581:17
**decision** [5] - 4509:16, 4553:17, 4571:12, 4575:5, 4578:11
**decisions** [2] - 4563:5, 4566:16
**deck** [4] - 4457:5, 4457:6, 4457:10, 4457:12
**declare** [1] - 4545:19
**deemed** [1] - 4514:23
**defendant** [18] - 4447:9, 4550:18, 4565:16, 4566:6, 4566:10, 4566:13, 4567:10, 4567:19, 4567:20, 4568:18, 4568:22, 4569:10, 4573:9, 4576:15, 4579:17, 4579:19

**Defendant** [6] - 4447:19, 4523:3, 4523:17, 4524:8, 4530:7, 4538:9

**Defendant's** [11] - 4510:24, 4530:8, 4536:23, 4537:4, 4540:7, 4550:14, 4557:2, 4590:8, 4590:9, 4590:9, 4590:10

**defendant's** [6] - 4451:6, 4565:12, 4565:17, 4567:7, 4569:5, 4579:12

**defendants** [1] - 4565:7

**Defense** [3] - 4527:8, 4529:3, 4536:22

**defense** [22] - 4510:14, 4510:16, 4510:18, 4527:7, 4529:4, 4535:2, 4535:5, 4550:8, 4553:8, 4553:13, 4554:6, 4554:9, 4562:18, 4575:13, 4577:1, 4578:8, 4578:10, 4581:13, 4584:8, 4584:21, 4587:20

**defining** [1] - 4570:23

**definitely** [1] - 4481:23

**defraud** [1] - 4573:14

**defrauded** [5] - 4567:23, 4574:1, 4578:1, 4581:5

**defrauds** [1] - 4572:10

**degree** [3] - 4453:11, 4498:1, 4559:14

**degrees** [1] - 4450:23

**delegate** [1] - 4532:11

**delegates** [1] - 4532:12

**deliverables** [1] - 4471:15

**Delray** [1] - 4541:14

**denial** [1] - 4571:25

**denied** [2] - 4527:14, 4532:21

**denies** [2] - 4527:16, 4534:19

**deny** [10] - 4499:2, 4499:3, 4521:16, 4521:19, 4521:21, 4521:22, 4521:23, 4532:22, 4573:4, 4573:9

**denying** [2] - 4573:5, 4573:7

**deprived** [1] - 4575:24

**DEPUTY** [1] - 4587:17

**describe** [1] - 4502:15

**described** [2] - 4464:22, 4473:14

**description** [2] - 4471:5, 4471:9

**Desert** [3] - 4468:5, 4468:21, 4468:23

**deserve** [1] - 4532:3

**desk** [2] - 4477:6, 4548:25

**despite** [2] - 4478:16, 4512:20

**determination** [1] - 4573:13

**determine** [1] - 4518:18

**determined** [1] - 4588:25

**determines** [2] - 4514:7, 4516:12

**develop** [1] - 4473:24

**developed** [1] - 4481:20

**development** [5] - 4471:12, 4498:7, 4523:2, 4523:16, 4524:8

**dialect** [1] - 4491:17

**dialogue** [3] - 4530:4, 4538:19, 4538:24

**Diandra** [1] - 4564:4

**different** [16] - 4454:12, 4462:14, 4463:23, 4463:24, 4487:18, 4497:7, 4501:16, 4501:17, 4507:23, 4507:24, 4508:3, 4557:17, 4564:5, 4572:1, 4575:17, 4579:21

**difficulty** [1] - 4505:4

**dig** [1] - 4588:12

**direct** [8] - 4467:25, 4522:25, 4523:14, 4529:13, 4551:24, 4556:6, 4574:19, 4581:11

**DIRECT** [2] - 4449:17, 4590:4

**direction** [1] - 4543:4

**directly** [3] - 4473:10, 4474:18, 4576:13

**disagreement** [1] - 4584:14

**disclosed** [1] - 4512:17

**discriminate** [1] - 4518:4

**discuss** [12] - 4480:6, 4524:3, 4524:10, 4526:24, 4542:9, 4550:24, 4551:16, 4553:15, 4563:4, 4569:1, 4587:10, 4588:8

**discussed** [14] - 4474:19, 4497:18, 4499:9, 4499:13, 4500:25, 4511:10, 4523:2, 4523:9, 4523:16, 4524:7, 4525:8, 4542:8, 4558:23, 4577:13

**discussing** [1] - 4569:1

**discussion** [7] - 4474:17, 4505:3, 4525:8, 4533:14, 4546:9, 4569:2, 4577:17

**discussions** [1] - 4497:15

**dismiss** [3] - 4574:20, 4584:1, 4586:22

**dispute** [2] - 4568:6, 4586:8

**disregard** [1] - 4574:23

**disseminate** [2] - 4473:4, 4473:10

**DISTRICT** [3] - 4447:1, 4447:1, 4447:12

**District** [5] - 4447:15, 4482:23, 4484:9, 4502:1, 4548:1

**doctor** [1] - 4559:10

**document** [27] - 4456:22, 4460:15, 4461:21, 4474:13, 4478:25, 4488:24, 4522:5, 4527:21, 4528:8, 4528:10, 4528:12, 4530:6, 4531:21, 4533:1, 4533:15, 4536:14, 4536:15, 4537:18, 4540:5, 4540:21, 4541:1, 4541:22, 4541:25, 4561:15, 4561:17

**documentation** [1] - 4523:24

**documents** [31] - 4517:17, 4519:10, 4521:19, 4524:20, 4527:3, 4527:19, 4527:23, 4527:24, 4528:7, 4528:15, 4529:5, 4531:10, 4533:18, 4533:21, 4534:14, 4559:2, 4568:20, 4573:4, 4576:22, 4577:11, 4579:4, 4579:25, 4580:13, 4580:18, 4580:21, 4581:15, 4581:19, 4582:5, 4583:14, 4584:24, 4585:19

**dollars** [2] - 4578:17, 4578:18

**done** [15] - 4452:2, 4469:23, 4472:6, 4474:4, 4479:2, 4482:21, 4494:2, 4494:6, 4497:9, 4507:21, 4518:25, 4541:10, 4542:7, 4543:25, 4570:12

**double** [1] - 4541:10

**double-check** [1] - 4541:10

**Douglas** [1] - 4564:4

**down** [8] - 4460:24, 4482:20, 4495:8, 4495:16, 4511:17, 4538:5, 4583:14

**draft** [1] - 4552:22

**driven** [2] - 4482:9, 4492:15

**driveway** [1] - 4509:13

**drug** [19] - 4457:13, 4471:11, 4478:18, 4478:22, 4479:18, 4480:6, 4480:9, 4480:14, 4498:7, 4502:13, 4502:15, 4502:18, 4503:5, 4503:10, 4505:4, 4523:2, 4523:16, 4524:8, 4561:25

**drugs** [7] - 4459:12, 4497:4, 4498:11, 4498:17, 4499:6, 4502:24, 4525:6

**ducks** [1] - 4585:19

**duly** [2] - 4449:14, 4456:5

**during** [16] - 4460:20, 4481:19, 4481:20, 4487:12, 4490:15, 4490:23, 4491:1, 4491:15, 4493:23, 4496:18, 4529:17, 4530:1, 4530:11, 4531:1, 4533:13, 4534:2

**E**

**E-mail** [12] - 4447:24, 4456:24, 4464:10, 4467:14, 4469:10, 4469:16, 4469:18, 4474:15, 4550:10, 4550:19, 4557:12, 4558:20

**e-mail** [40] - 4519:22, 4519:23, 4520:8, 4520:11, 4520:14, 4521:8, 4521:12, 4521:17, 4521:20, 4522:7, 4523:23, 4525:20, 4526:6, 4527:11, 4528:2, 4528:3, 4529:18, 4530:15, 4530:25, 4531:8, 4533:4, 4533:6, 4533:9, 4534:2, 4534:3, 4537:6, 4538:4, 4538:7, 4538:10, 4538:12, 4538:15, 4539:10, 4539:13, 4539:14, 4539:22, 4541:16, 4541:18, 4542:6

**e-mailed** [1] - 4582:22

**E-mails** [7] - 4460:17, 4461:20, 4469:16, 4555:19, 4555:22, 4555:23, 4555:24

**e-mails** [12] - 4518:8, 4518:9, 4518:10, 4527:9, 4529:18, 4529:25, 4537:14, 4565:15, 4567:20, 4568:21, 4570:24, 4573:23

**earful** [1] - 4461:1

**early** [2] - 4461:6, 4562:22

**easier** [3] - 4456:18, 4488:4, 4533:15

**East** [1] - 4447:15

**EASTERN** [1] - 4447:1

**Eastern** [5] - 4447:15, 4482:23, 4484:8, 4502:1, 4548:1

**edits** [1] - 4542:1

**educate** [4] - 4504:10, 4504:16, 4504:19, 4506:6

**Educating** [1] - 4532:9

**educating** [1] - 4504:7

**education** [1] - 4449:23

**EFAY** [2] - 4541:8

**effect** [4] - 4505:5, 4520:6, 4539:4, 4539:13

**effective** [1] - 4560:17

**effects** [1] - 4553:5

**effort** [3] - 4506:5, 4506:9, 4532:11

**efforts** [1] - 4478:17

**either** [15] - 4451:13, 4451:21, 4457:9, 4459:12, 4475:16, 4481:19, 4524:4, 4534:19, 4542:16, 4544:7, 4546:14, 4553:11, 4565:5, 4572:19, 4585:22

**electronic** [2] - 4451:10, 4451:20
**ELEIS** [1] - 4447:17
**embellish** [1] - 4507:10
**embellished** [3] - 4477:21, 4491:2, 4491:16
**embellishment** [1] - 4497:6
**emphasize** [1] - 4586:23
**employee** [1] - 4542:20
**employees** [2] - 4544:2, 4545:8
**end** [12] - 4470:14, 4478:16, 4478:21, 4479:6, 4552:2, 4552:6, 4552:10, 4553:5, 4569:13, 4575:16, 4577:17, 4582:7
**ends** [1] - 4536:1
**enjoy** [1] - 4587:15
**enrolled** [5] - 4451:13, 4451:17, 4451:21, 4455:4
**enrollment** [4] - 4450:20, 4450:22, 4451:16, 4455:2
**entered** [1] - 4572:20
**entering** [1] - 4449:3
**enters** [2] - 4536:6, 4586:25
**entire** [7] - 4451:10, 4539:21, 4539:24, 4539:25, 4540:3, 4540:5, 4567:25
**equivalent** [1] - 4470:16
**especially** [1] - 4581:14
**ESQ** [8] - 4447:14, 4447:16, 4447:17, 4447:17, 4447:20, 4447:21, 4447:21, 4447:22
**essence** [1] - 4480:10
**essentially** [6] - 4464:4, 4468:15, 4507:12, 4507:13, 4509:16, 4564:15
**establish** [1] - 4534:6
**evaluating** [1] - 4552:4
**Evan** [2] - 4475:9, 4475:15
**Eve** [1] - 4476:9
**event** [1] - 4494:15
**evidence** [41] - 4456:16, 4456:19, 4460:12, 4460:14, 4461:20, 4464:8, 4465:23, 4467:6, 4467:13, 4469:5, 4470:21, 4474:12, 4488:9, 4510:11, 4510:24, 4519:24, 4526:18, 4536:20, 4537:9, 4537:20, 4538:13, 4540:9, 4550:7, 4550:13, 4558:19, 4559:4, 4559:5, 4560:14, 4564:5, 4565:22, 4566:3, 4566:5, 4570:9, 4574:2, 4575:15, 4576:13, 4578:1, 4579:8, 4579:21, 4582:20
**Evidence** [1] - 4580:24
**evidentiary** [5] - 4532:19, 4532:20, 4562:17, 4563:7, 4576:21
**exact** [4] - 4483:8, 4502:8, 4559:24, 4560:23
**exactly** [3] - 4477:20, 4534:25, 4566:23
**exaggeration** [2] - 4493:16, 4493:18
**examination** [13] - 4448:18, 4449:1, 4449:8, 4456:10, 4468:1, 4522:25, 4523:14, 4529:14, 4572:21, 4573:16, 4574:19, 4578:9, 4581:12
**EXAMINATION** [7] - 4449:17, 4452:17, 4456:12, 4477:1, 4590:4, 4590:4,

4590:6
**examine** [4] - 4452:15, 4572:14, 4575:25, 4580:15
**examined** [4] - 4570:20, 4574:17, 4579:4, 4580:17
**example** [9] - 4529:10, 4565:24, 4566:23, 4567:2, 4569:1, 4569:10, 4570:6, 4570:22, 4572:14
**exceeds** [1] - 4481:21
**except** [1] - 4512:15
**exception** [1] - 4539:3
**exchanged** [1] - 4474:15
**exclusively** [2] - 4453:10, 4471:17
**Excuse** [3] - 4521:18, 4524:11, 4527:20
**excused** [4] - 4455:14, 4455:17, 4562:12, 4562:15
**execute** [2] - 4476:5, 4541:6
**executed** [1] - 4541:12
**Exhibit** [30] - 4460:11, 4464:7, 4470:22, 4471:21, 4474:12, 4510:16, 4510:19, 4510:24, 4517:15, 4519:23, 4519:25, 4536:13, 4536:22, 4536:23, 4536:24, 4537:1, 4537:4, 4537:5, 4539:19, 4540:7, 4540:8, 4550:14, 4552:19, 4557:2, 4558:19, 4558:20, 4590:8, 4590:9, 4590:9, 4590:10
**exhibit** [14] - 4455:22, 4477:6, 4510:14, 4510:16, 4529:4, 4550:8, 4556:4, 4556:7, 4568:23, 4574:12, 4583:9
**Exhibits** [1] - 4529:3
**exhibits** [7] - 4527:7, 4527:8, 4563:7, 4565:19, 4574:8, 4574:9, 4583:9
**exits** [1] - 4587:18
**exits.)(Continued** [1] - 4526:25
**expect** [1] - 4544:8
**expected** [1] - 4534:17
**expecting** [1] - 4466:1
**experience** [1] - 4498:4
**experienced** [1] - 4580:10
**expert** [1] - 4571:17
**explain** [2] - 4448:17, 4465:2
**explaining** [1] - 4503:22
**exposure** [1] - 4470:12
**extensively** [1] - 4574:17
**extent** [9] - 4472:19, 4509:19, 4528:24, 4551:9, 4572:10, 4579:5, 4579:6, 4581:4, 4581:12
**extremely** [2] - 4464:14, 4492:16

---

**F**

**F.B.I** [2] - 4471:24, 4546:6
**facilities** [1] - 4462:20
**fact** [8] - 4472:8, 4474:1, 4535:1, 4566:24, 4567:23, 4571:3, 4572:6, 4587:11
**facts** [1] - 4520:24
**failed** [1] - 4514:15
**fair** [8] - 4454:25, 4475:3, 4481:12, 4481:14, 4512:4, 4570:8, 4570:18, 4587:9

**Fair** [1] - 4522:20
**fairly** [1] - 4581:4
**faith** [1] - 4532:5
**fall** [5] - 4450:7, 4453:6, 4454:5, 4454:25, 4455:7
**false** [7] - 4512:22, 4513:1, 4513:3, 4513:8, 4513:21, 4514:16, 4568:12
**familiar** [3] - 4453:21, 4454:16, 4575:7
**far** [4] - 4528:20, 4548:13, 4552:4, 4564:14
**father** [8] - 4463:8, 4464:5, 4464:24, 4465:7, 4465:10, 4467:4, 4506:23, 4509:3
**father's** [1] - 4558:8
**FBI** [29] - 4479:17, 4480:4, 4482:23, 4483:13, 4484:13, 4484:17, 4484:23, 4486:9, 4486:11, 4486:14, 4487:20, 4487:22, 4492:22, 4493:15, 4493:23, 4495:22, 4498:16, 4509:19, 4511:7, 4511:12, 4511:23, 4512:22, 4513:1, 4513:3, 4513:9, 4517:3, 4525:8, 4525:16, 4572:15
**fear** [1] - 4565:5
**federal** [7] - 4484:17, 4485:13, 4485:14, 4485:17, 4485:19, 4485:24, 4486:21
**FedEx** [1] - 4540:22
**felt** [1] - 4496:20
**few** [6] - 4466:5, 4497:10, 4499:22, 4536:3, 4536:4, 4540:23
**field** [2] - 4457:8, 4462:18
**fight** [1] - 4580:1
**fighting** [1] - 4526:22
**figure** [2] - 4502:3, 4570:8
**files** [1] - 4584:21
**fill** [3] - 4469:24, 4522:6, 4544:23
**filled** [1] - 4557:7
**filters** [1] - 4521:11
**final** [3] - 4541:22, 4541:25, 4553:17
**finalization** [1] - 4538:20
**finalized** [1] - 4546:6
**fine** [6] - 4488:11, 4522:16, 4533:18, 4534:15, 4540:19, 4586:4
**finished** [2] - 4448:23, 4511:23
**firm** [6] - 4470:5, 4487:7, 4487:13, 4487:16, 4511:17
**First** [1] - 4527:12
**first** [17] - 4449:14, 4469:17, 4471:5, 4477:11, 4477:14, 4483:11, 4484:2, 4492:21, 4492:25, 4520:19, 4527:2, 4531:20, 4554:23, 4571:24, 4572:6, 4585:14
**fishing** [1] - 4578:8
**five** [14] - 4448:25, 4477:22, 4484:18, 4485:3, 4485:20, 4499:24, 4505:13, 4506:1, 4523:8, 4523:22, 4524:1, 4551:12, 4563:25
**five-minute** [4] - 4499:24, 4505:13, 4506:1, 4523:22, 4524:1
**five-minutes** [1] - 4505:13
**fizzled** [1] - 4498:11
**flat** [1] - 4507:15

**Florida** [4] - 4460:25, 4511:17, 4511:18, 4562:13
**flummoxed** [1] - 4569:6
**flying** [1] - 4497:21
**focus** [4] - 4457:5, 4467:19, 4490:9, 4513:24
**focused** [2] - 4492:16, 4525:5
**focuses** [1] - 4486:10
**focusing** [4] - 4487:7, 4487:14, 4487:16, 4519:19
**folks** [1] - 4473:7
**follow** [2] - 4464:13, 4568:25
**followed** [1] - 4558:3
**following** [8] - 4459:9, 4467:7, 4468:16, 4474:24, 4497:9, 4510:25, 4527:1, 4585:25
**follows** [2] - 4449:15, 4456:6
**FOR** [1] - 4447:11
**forever** [1] - 4533:12
**forgive** [1] - 4517:4
**form** [15] - 4466:22, 4492:2, 4502:25, 4504:22, 4512:19, 4521:1, 4544:23, 4545:6, 4545:8, 4545:13, 4545:16, 4545:18, 4546:2, 4560:21, 4565:12
**formal** [1] - 4513:19
**forming** [1] - 4459:6
**forth** [3] - 4508:10, 4538:24, 4539:20
**forward** [5] - 4462:23, 4467:19, 4541:11, 4542:12, 4584:19
**forwarded** [1] - 4521:12
**founding** [1] - 4470:19
**four** [3] - 4450:18, 4566:7, 4575:2
**fourth** [3] - 4495:17, 4508:22, 4508:23
**frank** [1] - 4567:3
**frankly** [3] - 4582:24, 4583:6, 4585:18
**fraud** [4] - 4567:4, 4567:6, 4572:12, 4575:15
**fraudulent** [15] - 4512:17, 4566:13, 4566:18, 4566:19, 4569:21, 4569:23, 4570:1, 4572:25, 4573:1, 4573:18, 4575:2, 4578:21, 4578:22, 4580:25, 4581:3
**Fred** [2] - 4484:6, 4511:15
**freely** [2] - 4474:20, 4476:1
**frequent** [1] - 4496:10
**Friday** [5] - 4458:5, 4458:13, 4553:8, 4587:14
**friend** [2] - 4470:2, 4486:9
**friends** [1] - 4467:17
**front** [1] - 4526:22
**fulfill** [2] - 4464:17, 4466:11
**full** [5] - 4492:21, 4492:25, 4495:8, 4495:15, 4495:18
**fully** [1] - 4514:15
**fun** [1] - 4462:3
**fund** [4] - 4495:25, 4568:13, 4568:15, 4575:19
**fundamental** [1] - 4580:14
**funds** [5] - 4566:8, 4566:23, 4567:10, 4567:11, 4569:12
**furnish** [2] - 4517:17, 4519:9

**furtherance** [2] - 4576:16, 4579:12
**future** [1] - 4494:14

## G

**game** [1] - 4457:4
**Gateway** [3] - 4468:5, 4468:21, 4468:23
**Geller** [15] - 4551:23, 4554:7, 4572:14, 4572:15, 4573:1, 4574:10, 4574:12, 4574:17, 4577:2, 4577:14, 4578:13, 4578:22, 4580:1, 4580:4, 4582:11
**Geller's** [2] - 4574:18, 4582:11
**General's** [1] - 4515:19
**generally** [3] - 4457:9, 4542:20, 4544:2
**generic** [2] - 4463:22, 4463:25
**gentleman** [1] - 4549:8
**gentlemen** [1] - 4526:24
**gift** [1] - 4464:16
**given** [5] - 4514:16, 4515:23, 4521:24, 4555:16, 4572:1
**GMail** [9] - 4524:19, 4524:25, 4525:20, 4526:10, 4527:11, 4529:15, 4530:1, 4536:16, 4537:7
**gmail.com** [1] - 4520:11
**goals** [1] - 4544:10
**God** [1] - 4578:10
**gonna** [1] - 4491:3
**govern** [1] - 4475:21
**Government** [40] - 4447:14, 4449:7, 4449:12, 4456:15, 4460:11, 4461:13, 4470:21, 4474:12, 4512:13, 4514:21, 4515:10, 4515:18, 4516:3, 4516:7, 4516:21, 4516:24, 4517:8, 4520:18, 4521:25, 4524:21, 4525:24, 4527:13, 4528:23, 4529:19, 4529:20, 4536:13, 4536:25, 4546:6, 4547:3, 4547:7, 4547:19, 4547:24, 4548:10, 4549:3, 4550:8, 4553:7, 4553:16, 4554:8, 4587:20
**government** [16] - 4496:6, 4508:14, 4509:12, 4509:16, 4510:1, 4563:5, 4563:8, 4564:4, 4564:14, 4572:13, 4575:21, 4578:9, 4578:16, 4581:13, 4584:11
**government's** [3] - 4573:11, 4579:8, 4583:9
**Government's** [2] - 4449:11, 4554:16
**graduated** [2] - 4451:14, 4451:22
**graduation** [1] - 4450:21
**grasp** [1] - 4496:20
**Great** [1] - 4540:6
**great** [2] - 4458:20, 4534:9
**Greebel** [2] - 4475:15, 4476:4, 4555:19, 4565:16, 4567:20, 4568:22
**ground** [4] - 4516:18, 4569:7, 4580:23, 4581:21
**grounds** [1] - 4565:8
**guess** [9] - 4474:17, 4478:10, 4482:5, 4501:12, 4502:18, 4516:5, 4531:8, 4547:11, 4552:1
**guidance** [1] - 4473:2
**guide** [1] - 4467:22

**guy** [6] - 4461:14, 4472:9, 4472:10, 4473:4, 4540:22, 4546:14
**guys** [5] - 4458:22, 4469:24, 4470:8, 4482:7, 4482:11

## H

**hairs** [1] - 4583:23
**half** [1] - 4453:23
**hand** [4] - 4479:10, 4489:10, 4492:20, 4547:17
**handed** [1] - 4564:1
**handle** [2] - 4571:21, 4572:7
**hands** [1] - 4516:21
**happy** [9] - 4464:14, 4465:2, 4465:3, 4476:6, 4492:24, 4528:25, 4540:15, 4581:25, 4583:17
**hard** [5] - 4461:14, 4555:14, 4555:15, 4582:8, 4584:11
**hardworking** [1] - 4482:8
**harm** [1] - 4553:4
**head** [1] - 4543:7
**headache** [36] - 4471:11, 4477:17, 4478:18, 4478:22, 4479:13, 4479:18, 4480:6, 4498:5, 4498:8, 4498:9, 4498:11, 4498:17, 4499:6, 4501:1, 4501:18, 4502:1, 4502:24, 4503:5, 4503:10, 4503:22, 4519:20, 4523:2, 4523:9, 4523:16, 4524:8, 4525:1, 4525:6, 4525:13, 4528:4, 4528:14, 4532:4, 4559:22, 4560:11, 4560:22, 4561:13
**headaches** [47] - 4471:7, 4471:18, 4472:17, 4477:23, 4480:9, 4497:19, 4497:20, 4497:21, 4498:1, 4499:15, 4499:18, 4499:25, 4500:4, 4500:8, 4500:12, 4500:18, 4501:8, 4501:14, 4501:23, 4501:25, 4503:16, 4504:11, 4504:25, 4505:5, 4505:17, 4506:7, 4520:16, 4524:4, 4525:9, 4531:22, 4531:24, 4558:19, 4559:13, 4559:21, 4560:10, 4560:20, 4560:21, 4561:3, 4561:23, 4561:24, 4570:21, 4570:22, 4570:25, 4571:8, 4571:16, 4571:18
**health** [8] - 4457:8, 4457:16, 4457:19, 4457:22, 4462:13, 4462:18, 4473:3, 4474:10
**healthcare** [28] - 4467:21, 4472:5, 4472:9, 4472:10, 4472:24, 4473:13, 4473:18, 4473:20, 4480:20, 4480:25, 4481:2, 4481:5, 4481:10, 4481:15, 4481:21, 4482:1, 4487:8, 4487:14, 4487:17, 4494:1, 4494:5, 4495:25, 4496:17, 4496:21, 4496:22, 4496:24, 4542:16
**Healthcare** [3] - 4564:22, 4565:14, 4565:18, 4568:5, 4569:9
**healthy** [1] - 4476:6
**hear** [7] - 4449:8, 4532:17, 4572:22, 4581:14, 4584:7, 4584:8, 4588:6
**heard** [1] - 4571:14
**hearing** [1] - 4580:19

**Hearsay** [1] - 4537:24
**hearsay** [13] - 4526:19, 4526:20, 4530:4, 4530:17, 4530:20, 4530:21, 4538:1, 4538:9, 4538:12, 4538:23, 4539:3, 4550:20, 4551:9
**heart's** [1] - 4581:25
**hedge** [1] - 4495:24
**held** [1] - 4541:9
**Hello** [1] - 4503:16
**help** [13] - 4458:22, 4458:24, 4459:19, 4459:20, 4469:24, 4470:7, 4470:8, 4471:25, 4472:19, 4494:22, 4572:16, 4572:17
**helped** [1] - 4497:3
**helping** [5] - 4506:24, 4508:15, 4509:4, 4541:10, 4543:12
**heretofore** [1] - 4512:17
**hi** [2] - 4460:24, 4461:24
**high** [2] - 4454:14, 4548:11
**higher** [1] - 4449:23
**highlighting** [1] - 4456:17
**highly** [3] - 4493:14, 4493:18, 4576:3
**highly-motivated** [1] - 4493:14
**himself** [1] - 4493:2
**hire** [3] - 4532:1, 4542:19, 4543:24
**hired** [2] - 4484:3, 4543:2
**history** [1] - 4478:13
**hold** [1] - 4474:22
**holding** [1] - 4582:21
**home** [2] - 4478:21, 4489:4
**honest** [1] - 4518:13
**honestly** [1] - 4498:25
**Honor** [97] - 4449:12, 4452:13, 4455:13, 4455:20, 4455:22, 4456:3, 4456:11, 4456:17, 4488:10, 4500:5, 4503:25, 4504:12, 4508:1, 4508:8, 4508:12, 4510:15, 4512:5, 4513:5, 4513:17, 4514:9, 4515:5, 4516:9, 4516:14, 4517:1, 4519:5, 4520:25, 4521:14, 4522:11, 4523:6, 4523:11, 4524:9, 4524:14, 4526:18, 4526:20, 4527:2, 4529:11, 4529:25, 4534:16, 4536:2, 4537:2, 4537:10, 4537:21, 4537:22, 4537:25, 4538:23, 4539:15, 4539:20, 4539:21, 4539:23, 4540:12, 4543:13, 4545:10, 4550:15, 4550:17, 4552:3, 4553:4, 4553:6, 4554:20, 4554:23, 4554:24, 4560:25, 4562:9, 4562:11, 4563:3, 4563:11, 4568:14, 4574:22, 4576:1, 4576:24, 4577:10, 4577:18, 4577:19, 4578:6, 4578:13, 4578:25, 4579:10, 4579:16, 4580:20, 4580:22, 4581:1, 4581:18, 4581:20, 4582:1, 4582:10, 4582:18, 4583:3, 4583:8, 4583:13, 4583:15, 4583:22, 4584:6, 4584:20, 4585:20, 4587:22, 4588:2, 4588:19, 4588:23
**honor** [1] - 4464:5
**HONORABLE** [1] - 4447:11
**hook** [1] - 4473:9
**hope** [2] - 4462:3, 4467:20

**hoped** [1] - 4555:3
**hopefully** [2] - 4461:6, 4563:10
**hoping** [1] - 4551:17
**hours** [1] - 4585:23
**house** [3] - 4474:9, 4483:14, 4509:19
**huge** [1] - 4458:21
**human** [2] - 4572:23, 4573:19
**hundred** [1] - 4497:14
**hundreds** [3] - 4523:24, 4561:10, 4567:5
**hunt** [1] - 4574:20

**I**

**idea** [5] - 4461:12, 4462:8, 4465:21, 4557:18, 4569:25
**ideas** [4] - 4481:10, 4495:25, 4497:1, 4501:16
**identification** [9] - 4488:7, 4510:4, 4525:19, 4527:5, 4527:6, 4536:13, 4537:13, 4547:17, 4557:3
**identified** [3] - 4520:8, 4527:10, 4529:12
**identify** [2] - 4527:4, 4527:9
**ignores** [1] - 4575:2
**illegal** [1] - 4468:18
**imagine** [1] - 4582:8
**immunity** [2] - 4513:4, 4513:6
**impatient** [1] - 4466:8
**import** [1] - 4487:16
**important** [10] - 4510:20, 4511:2, 4528:24, 4566:15, 4566:18, 4567:15, 4574:22, 4580:11, 4580:15, 4585:10
**importantly** [1] - 4464:18
**impression** [1] - 4528:8
**imprisonment** [1] - 4486:4
**in-license** [2] - 4497:10, 4497:12
**incapable** [1] - 4571:17
**incidentally** [1] - 4517:7
**include** [1] - 4583:5
**included** [2] - 4480:20, 4560:13
**including** [3] - 4454:15, 4547:25, 4585:20
**Including** [1] - 4511:7
**income** [1] - 4545:19
**incomplete** [2] - 4514:16, 4515:24
**inconceivable** [1] - 4582:1
**increase** [1] - 4585:9
**incredibly** [2] - 4461:14, 4568:5
**indeed** [2] - 4517:21, 4520:13
**independent** [4] - 4544:3, 4544:5, 4545:3, 4548:19
**independently** [1] - 4497:13
**INDEX** [1] - 4590:1
**indicates** [1] - 4468:21
**Indictment** [3] - 4565:20, 4567:8, 4568:1
**individual** [8] - 4451:3, 4451:13, 4451:17, 4564:9, 4565:9, 4568:13, 4569:3, 4580:4
**individually** [1] - 4564:11

**individuals** [5] - 4482:9, 4566:9, 4566:24, 4568:18, 4568:23
**industry** [10] - 4457:16, 4457:23, 4462:13, 4472:24, 4481:6, 4481:16, 4496:21, 4500:9, 4542:16, 4543:16
**info** [1] - 4474:20
**informal** [2] - 4485:2, 4543:12
**informally** [1] - 4452:2
**information** [21] - 4457:12, 4459:8, 4473:5, 4504:24, 4505:14, 4505:25, 4506:4, 4507:10, 4512:4, 4514:13, 4514:17, 4515:24, 4517:24, 4518:3, 4520:16, 4521:24, 4531:25, 4560:23, 4561:3, 4573:12, 4577:9
**informed** [1] - 4554:13
**infringement** [1] - 4580:18
**input** [1] - 4541:22
**insisted** [1] - 4553:14
**insofar** [1] - 4573:3
**instead** [1] - 4573:17
**institution** [1] - 4449:23
**instructed** [1] - 4540:18
**instruction** [1] - 4539:8
**intend** [7] - 4490:23, 4491:7, 4491:9, 4492:3, 4551:23, 4555:20, 4582:4
**intending** [1] - 4565:12
**intense** [1] - 4482:7
**intent** [5] - 4460:5, 4474:22, 4569:15, 4573:14, 4579:12
**intention** [1] - 4490:15
**intentionally** [3] - 4485:13, 4514:16, 4515:23
**interaction** [2] - 4482:17, 4519:16
**interest** [3] - 4498:10, 4498:16, 4499:5
**interrupt** [2] - 4449:8, 4522:17
**interview** [10] - 4483:20, 4485:25, 4486:20, 4490:16, 4490:23, 4491:1, 4491:15, 4497:24, 4547:19, 4547:20
**interviewed** [2] - 4483:24, 4547:3
**interviews** [1] - 4525:16
**introduce** [3] - 4494:20, 4563:8, 4565:12
**introduced** [1] - 4582:14
**introduction** [8] - 4493:25, 4494:5, 4501:2, 4502:2, 4502:4, 4502:21, 4548:20, 4548:23
**invest** [2] - 4481:9, 4569:10
**invested** [1] - 4578:17
**investigation** [5] - 4485:14, 4485:19, 4517:18, 4519:11, 4519:19
**investing** [4] - 4467:21, 4495:25, 4566:1, 4578:3
**investment** [13] - 4457:20, 4468:13, 4473:2, 4473:19, 4473:21, 4474:9, 4481:10, 4487:13, 4543:8, 4546:18, 4549:14, 4566:15, 4566:21
**investments** [2] - 4474:10, 4578:19
**investor** [9] - 4457:17, 4547:4, 4548:12, 4564:10, 4565:10, 4567:13, 4569:8, 4569:9, 4578:5
**investor's** [1] - 4566:20

**investors** [19] - 4496:22, 4546:25, 4564:14, 4564:22, 4565:4, 4565:13, 4565:21, 4567:21, 4568:1, 4568:2, 4568:6, 4568:10, 4570:2, 4576:18, 4577:15, 4580:1, 4580:8, 4580:10, 4580:13
**invests** [1] - 4549:9
**invite** [1] - 4552:19
**involved** [7] - 4457:16, 4463:23, 4473:3, 4494:22, 4494:25, 4548:11, 4572:8
**involvement** [1] - 4512:17
**IPO** [1] - 4472:22
**irrelevant** [3] - 4529:20, 4529:24, 4564:8
**isolate** [1] - 4581:1
**issue** [28] - 4504:2, 4504:4, 4504:5, 4504:6, 4504:16, 4530:6, 4531:9, 4532:19, 4532:20, 4533:20, 4540:22, 4554:15, 4556:13, 4563:21, 4572:5, 4575:17, 4576:2, 4580:13, 4580:22, 4582:18, 4583:14, 4583:16, 4583:24, 4585:10, 4586:9, 4588:11, 4588:13
**issued** [2] - 4565:4, 4565:6
**issues** [20] - 4449:9, 4496:17, 4501:1, 4502:2, 4503:5, 4503:22, 4554:17, 4554:21, 4562:17, 4563:4, 4563:7, 4564:25, 4572:16, 4581:17, 4581:19, 4581:24, 4584:23, 4585:24, 4587:5, 4588:7
**itself** [1] - 4522:5
**ivy** [2] - 4449:24, 4449:25

## J

**JACOB** [1] - 4447:22
**JACQUELYN** [1] - 4447:16
**jail** [1] - 4485:3
**January** [1] - 4466:3
**job** [4] - 4450:1, 4450:6, 4450:19, 4572:15
**Joe** [1] - 4546:15
**Josiah** [4] - 4546:10, 4546:12, 4546:14, 4547:8
**journals** [1] - 4561:11
**judge** [1] - 4522:10
**Judge** [14] - 4453:3, 4455:12, 4550:24, 4570:13, 4571:2, 4571:5, 4571:13, 4571:19, 4571:21, 4575:4, 4578:7, 4583:6, 4584:10, 4585:6
**JUDGE** [1] - 4447:12
**judged** [2] - 4514:14, 4515:22
**judgment** [6] - 4514:24, 4515:11, 4515:18, 4516:2, 4516:12, 4516:20
**July** [4] - 4447:7, 4550:11, 4557:13, 4557:16
**June** [8] - 4547:20, 4547:25, 4553:20, 4553:22, 4555:25, 4565:20, 4568:23, 4574:9
**jurors** [13] - 4448:2, 4448:15, 4449:3, 4536:7, 4562:20, 4562:25, 4573:12, 4584:16, 4585:15, 4586:3, 4586:14, 4586:22, 4587:1

**jury** [35] - 4449:4, 4483:16, 4517:15, 4519:25, 4526:22, 4536:24, 4537:5, 4538:3, 4540:4, 4540:8, 4540:18, 4556:15, 4558:6, 4562:21, 4563:16, 4564:16, 4568:25, 4571:1, 4571:2, 4571:3, 4571:11, 4571:24, 4572:21, 4573:5, 4573:18, 4574:3, 4574:18, 4574:20, 4578:11, 4578:21, 4581:11, 4584:1, 4585:12, 4587:3, 4587:16
**JURY** [1] - 4447:12
**Jury** [4] - 4526:25, 4536:6, 4586:25, 4587:18

## K

**Kane** [3] - 4449:13, 4449:18, 4452:15
**KANE** [2] - 4449:14, 4590:3
**KAPLAN** [1] - 4447:22
**KARTHIK** [1] - 4447:17
**KASULIS** [38] - 4447:16, 4448:3, 4448:9, 4448:12, 4456:2, 4534:22, 4536:21, 4552:3, 4554:11, 4556:6, 4556:12, 4562:16, 4563:19, 4564:21, 4576:1, 4576:9, 4576:12, 4577:5, 4577:8, 4578:25, 4579:10, 4579:16, 4579:20, 4579:23, 4580:3, 4580:20, 4581:18, 4583:8, 4583:13, 4583:22, 4584:2, 4584:6, 4584:20, 4586:4, 4586:18, 4586:20, 4588:1, 4588:23
**Katten** [1] - 4475:16
**keep** [3] - 4555:10, 4579:20, 4584:19
**keeps** [1] - 4585:3
**Ken** [1] - 4573:1
**kept** [1] - 4450:24
**kind** [5] - 4544:23, 4564:18, 4564:23, 4567:21, 4582:23
**KIYO** [1] - 4447:11
**knock** [1] - 4582:16
**KNOW** [1] - 4463:15
**knowing** [3] - 4454:4, 4455:6, 4463:16
**knowledge** [6] - 4463:15, 4468:19, 4471:3, 4485:12, 4496:21, 4506:6, 4557:7, 4567:22
**knowledgeable** [2] - 4472:9, 4472:10
**known** [3] - 4453:16, 4478:12, 4503:7

## L

**lab** [3] - 4462:7, 4462:9, 4462:12
**labs** [1] - 4462:13
**lack** [1] - 4579:14
**ladies** [1] - 4526:23
**landscape** [1] - 4586:8
**language** [1] - 4580:9
**Lanza** [1] - 4462:9
**large** [2] - 4473:18, 4553:13
**largely** [1] - 4564:1
**larger** [1] - 4569:15
**largest** [4] - 4473:18, 4473:20, 4474:8, 4550:3
**last** [17] - 4478:25, 4479:6, 4479:11, 4479:13, 4494:8, 4498:13, 4498:19,

4498:20, 4538:15, 4553:19, 4553:22, 4554:15, 4562:18, 4563:5, 4574:12, 4575:2, 4582:22
**late** [2] - 4555:8, 4585:22
**Lavelle** [1] - 4564:3
**law** [2] - 4580:24, 4587:24
**lawyer** [21] - 4475:15, 4476:12, 4484:4, 4484:8, 4485:1, 4485:8, 4485:16, 4487:2, 4487:23, 4489:4, 4493:24, 4497:25, 4509:15, 4509:21, 4509:23, 4510:7, 4511:9, 4511:12, 4519:7, 4548:5, 4577:3
**lays** [1] - 4510:8
**lead** [1] - 4574:4
**leading** [1] - 4554:10
**league** [2] - 4449:24, 4449:25
**learned** [1] - 4496:23
**least** [7] - 4470:10, 4524:4, 4528:6, 4551:22, 4573:3, 4585:23
**leave** [2] - 4507:10, 4534:18
**LEE** [2] - 4456:5, 4590:5
**Lee** [6] - 4467:14, 4474:23, 4503:16, 4509:12, 4509:15, 4526:2
**lee@visualofficesolutions.com** [1] - 4467:15
**Leerink** [29] - 4470:2, 4470:10, 4470:13, 4470:19, 4472:4, 4472:16, 4473:5, 4473:11, 4473:12, 4473:15, 4473:16, 4473:18, 4473:22, 4473:24, 4474:8, 4481:3, 4481:19, 4487:6, 4495:10, 4495:23, 4496:2, 4496:18, 4497:11, 4542:16, 4546:18, 4548:22, 4548:24, 4549:9, 4549:16
**left** [3] - 4488:16, 4556:18, 4562:25
**legal** [7] - 4552:22, 4552:23, 4552:24, 4554:16, 4584:23, 4587:5, 4588:13
**legend** [1] - 4475:24
**legitimacy** [1] - 4472:9
**legitimate** [2] - 4472:16, 4500:11
**legitimize** [3] - 4500:10, 4500:17, 4504:9
**Lehecka** [7] - 4453:14, 4453:16, 4453:24, 4454:5, 4454:11, 4454:14, 4454:21
**length** [1] - 4585:9
**less** [6] - 4491:2, 4499:24, 4581:6, 4581:8, 4581:9
**letter** [6] - 4510:7, 4510:20, 4511:2, 4511:4, 4514:25, 4516:15
**liability** [1] - 4474:19
**liaison** [1] - 4473:10
**license** [6] - 4478:17, 4478:21, 4479:14, 4479:17, 4497:10, 4497:12
**licensed** [1] - 4480:13
**lie** [22] - 4477:19, 4484:23, 4485:18, 4485:24, 4486:1, 4486:2, 4486:14, 4490:15, 4490:23, 4491:1, 4491:3, 4491:8, 4491:9, 4491:15, 4492:3, 4493:16, 4497:16, 4507:8, 4509:17, 4516:6
**lied** [12] - 4484:13, 4485:2, 4491:5,

4491:6, 4491:8, 4511:13, 4515:4, 4515:15, 4515:23, 4516:21, 4571:25, 4574:22

**lies** [7] - 4504:2, 4504:4, 4511:7, 4515:15, 4517:4, 4572:4, 4578:8

**life** [4] - 4492:14, 4492:17, 4572:17, 4572:18

**Ligand** [1] - 4497:5

**limitations** [1] - 4567:12

**limited** [5] - 4471:6, 4540:13, 4540:17, 4581:4, 4581:6

**line** [4] - 4448:7, 4491:4, 4491:17, 4533:12

**lines** [1] - 4498:14

**liquid** [1] - 4466:5

**list** [15] - 4481:20, 4553:19, 4553:22, 4554:3, 4556:2, 4556:4, 4556:7, 4556:9, 4559:6, 4564:1, 4565:19, 4568:23, 4574:8, 4574:12, 4583:9

**listed** [1] - 4574:11

**listen** [3] - 4465:3, 4516:6, 4587:10

**live** [3] - 4461:5, 4461:9, 4511:18

**living** [1] - 4461:11

**long-term** [1] - 4474:22

**Lonza** [1] - 4462:7

**look** [35] - 4458:3, 4477:10, 4478:24, 4478:25, 4479:2, 4488:16, 4489:9, 4489:13, 4491:13, 4491:14, 4492:19, 4495:7, 4498:13, 4501:4, 4507:16, 4508:19, 4508:21, 4509:1, 4522:5, 4525:19, 4541:5, 4547:23, 4550:10, 4551:2, 4553:8, 4556:12, 4557:12, 4560:15, 4570:7, 4575:10, 4579:1, 4584:18, 4586:7, 4586:10

**Look** [2] - 4514:11, 4536:13

**looked** [3] - 4520:13, 4529:16, 4530:3

**looking** [3] - 4497:8, 4499:8, 4556:15

**Looking** [1] - 4542:12

**lose** [1] - 4515:24

**losing** [1] - 4585:13

**lost** [1] - 4585:15

**love** [1] - 4464:15

**low** [1] - 4568:5

**LSD** [1] - 4505:6

**lunch** [3] - 4556:3, 4562:22, 4585:13

**LY** [1] - 4526:2

**LY-2** [1] - 4508:19

**LY000058** [1] - 4526:2

**LY3** [1] - 4547:17

**lying** [10] - 4484:16, 4485:13, 4485:17, 4486:8, 4486:9, 4486:11, 4507:13, 4507:15, 4507:25

## M

**ma'am** [1] - 4510:22

**magic** [1] - 4499:18

**mail** [53] - 4447:24, 4456:24, 4464:10, 4467:14, 4469:10, 4469:16, 4469:18, 4474:15, 4519:22, 4519:23, 4520:8, 4520:11, 4520:14, 4521:8, 4521:12,

4521:17, 4521:20, 4522:7, 4523:23, 4525:20, 4526:6, 4527:11, 4528:2, 4528:3, 4529:18, 4530:15, 4530:25, 4531:8, 4533:4, 4533:6, 4533:9, 4534:2, 4534:3, 4534:8, 4537:6, 4538:4, 4538:7, 4538:10, 4538:12, 4538:15, 4539:10, 4539:13, 4539:14, 4539:22, 4541:16, 4541:18, 4542:6, 4550:10, 4550:19, 4557:12, 4558:20

**mailed** [1] - 4582:22

**mails** [19] - 4460:17, 4461:20, 4469:16, 4518:8, 4518:9, 4518:10, 4527:9, 4529:18, 4529:25, 4537:14, 4555:19, 4555:22, 4555:23, 4555:24, 4565:15, 4567:20, 4568:21, 4570:24, 4573:23

**main** [1] - 4513:23

**maintain** [1] - 4450:19, 4450:22

**maintained** [1] - 4462:20

**mammoth** [1] - 4560:11

**man** [3] - 4464:1, 4546:10, 4546:15

**managed** [1] - 4549:13

**manager** [1] - 4473:9

**managers** [1] - 4481:7

**manner** [1] - 4516:18

**manning** [2] - 4464:2, 4464:18, 4558:10

**Marc** [1] - 4452:23

**MARC** [1] - 4447:21

**march** [1] - 4573:15

**March** [2] - 4458:4, 4458:9

**Marek** [23] - 4477:17, 4478:4, 4478:8, 4482:7, 4499:10, 4499:17, 4499:21, 4499:22, 4500:2, 4503:7, 4504:16, 4505:10, 4523:9, 4524:2, 4524:4, 4528:3, 4531:23, 4532:12, 4534:5, 4560:13, 4560:22

**Marek's** [1] - 4500:12

**mark** [1] - 4510:14

**marked** [7] - 4460:12, 4510:4, 4510:17, 4536:12, 4536:23, 4537:4, 4540:7

**market** [2] - 4461:5, 4465:25

**marketing** [1] - 4457:20

**marking** [1] - 4455:22

**MARTIN** [1] - 4447:8

**Martin** [69] - 4451:3, 4451:21, 4452:23, 4454:17, 4454:24, 4459:6, 4459:22, 4460:24, 4461:13, 4461:24, 4471:25, 4474:2, 4474:15, 4476:6, 4478:7, 4478:13, 4482:6, 4483:24, 4487:24, 4489:6, 4489:23, 4490:4, 4490:8, 4491:19, 4492:12, 4494:14, 4494:22, 4494:24, 4495:1, 4496:6, 4496:23, 4497:8, 4497:10, 4497:12, 4499:7, 4499:21, 4499:23, 4500:2, 4501:24, 4503:7, 4505:10, 4519:16, 4520:1, 4524:2, 4524:4, 4525:20, 4527:10, 4545:24, 4546:22, 4547:7, 4548:17, 4548:19, 4548:20, 4548:23, 4549:1, 4549:7, 4549:13, 4549:18, 4559:19, 4559:20, 4560:6, 4561:23, 4572:16, 4572:17, 4573:6, 4573:13, 4574:1

**Martin's** [5] - 4461:8, 4465:22, 4526:8,

4526:9, 4549:4

**material** [6] - 4519:10, 4533:4, 4572:15, 4578:14, 4578:23, 4586:10

**materials** [13] - 4463:20, 4517:8, 4517:18, 4517:22, 4525:1, 4534:5, 4558:17, 4558:20, 4559:16, 4560:13, 4560:22, 4561:2, 4585:22

**math** [1] - 4458:19

**MATSUMOTO** [1] - 4447:11

**Matter** [1] - 4497:5

**matter** [5] - 4466:15, 4530:23, 4553:10, 4554:25, 4574:23

**matters** [2] - 4471:12, 4550:16

**mean** [28] - 4459:22, 4463:15, 4464:4, 4481:5, 4491:3, 4492:17, 4498:4, 4499:23, 4502:20, 4505:15, 4505:18, 4514:21, 4521:25, 4523:23, 4525:4, 4531:19, 4546:20, 4549:21, 4551:8, 4568:3, 4568:19, 4569:14, 4570:19, 4572:11, 4574:14, 4581:21, 4584:15, 4584:21

**meaning** [2] - 4463:15, 4464:22, 4523:15

**means** [6] - 4461:3, 4496:13, 4502:11, 4506:22, 4545:3, 4567:1

**meant** [3] - 4458:9, 4460:2, 4463:22

**meantime** [2] - 4523:21, 4587:8

**measure** [1] - 4553:13

**mecha** [1] - 4502:14

**mechanism** [10] - 4501:2, 4502:2, 4502:4, 4502:10, 4502:12, 4502:17, 4502:23, 4503:5, 4503:16, 4503:23

**media** [1] - 4586:24

**medical** [2] - 4505:15, 4561:11

**meet** [1] - 4546:5

**meeting** [15] - 4477:3, 4484:2, 4484:3, 4484:8, 4484:11, 4484:14, 4485:1, 4485:2, 4485:12, 4485:16, 4493:23, 4509:11, 4511:23, 4534:23, 4548:5

**member** [2] - 4449:24, 4449:25

**Members** [1] - 4587:3

**members** [4] - 4449:4, 4470:19, 4496:5, 4576:4

**memo** [1] - 4553:4

**memory** [2] - 4477:14, 4489:2

**mention** [1] - 4571:15

**mentioned** [1] - 4480:9

**merger** [3] - 4468:4, 4468:10, 4468:18

**met** [7] - 4470:12, 4480:4, 4482:22, 4492:13, 4492:17, 4499:21, 4547:24

**method** [2] - 4502:20, 4502:21

**Michael** [1] - 4564:3

**mid** [1] - 4526:23

**mid-morning** [1] - 4526:23

**middle** [1] - 4460:23

**midnight** [1] - 4582:22

**might** [5] - 4481:25, 4501:12, 4505:18, 4508:18, 4547:11, 4552:2, 4573:21

**migraine** [5] - 4560:11, 4560:16, 4560:22, 4561:2, 4561:13

**migraines** [2] - 4498:1, 4559:14

milestones [1] - 4544:10
million [1] - 4578:18
millions [2] - 4578:17, 4578:18
mind [6] - 4472:15, 4514:8, 4552:14, 4555:12, 4586:23, 4587:9
mine [1] - 4470:2
minute [13] - 4448:6, 4490:10, 4498:6, 4499:24, 4503:13, 4503:14, 4505:3, 4506:1, 4515:16, 4523:22, 4524:1, 4559:3
minutes [12] - 4448:25, 4458:17, 4458:18, 4505:13, 4520:14, 4523:8, 4523:9, 4536:3, 4536:4, 4556:18, 4563:10, 4563:25
mischaracterizes [1] - 4504:1
Mischaracterizing [1] - 4524:12
misimpression [2] - 4527:21, 4531:16
misleading [3] - 4514:16, 4515:24, 4533:25
misrepresentations [1] - 4579:13
misspoke [1] - 4483:10
mistakes [1] - 4507:16
mix [2] - 4469:24, 4472:11
mode [3] - 4509:12, 4509:18, 4509:20
Molly [1] - 4564:3
moment [1] - 4545:10
momentum [2] - 4584:17, 4585:17
money [21] - 4458:5, 4458:13, 4460:21, 4461:5, 4461:7, 4461:9, 4470:13, 4481:7, 4547:7, 4548:15, 4549:13, 4558:3, 4558:9, 4565:22, 4566:8, 4567:16, 4568:8, 4568:17, 4569:11, 4570:3
month [1] - 4484:3
months [6] - 4466:5, 4466:16, 4466:19, 4466:23, 4474:18, 4475:17
morning [20] - 4448:10, 4449:4, 4449:6, 4449:9, 4449:18, 4449:19, 4452:18, 4452:19, 4456:4, 4456:13, 4456:14, 4467:7, 4467:9, 4526:23, 4585:14, 4585:22, 4585:23, 4586:15, 4587:14, 4587:21
most [7] - 4448:25, 4458:20, 4496:17, 4554:17, 4568:21, 4571:22, 4573:8
mostly [1] - 4450:7
motivated [11] - 4492:13, 4492:17, 4492:23, 4493:9, 4493:11, 4493:12, 4493:13, 4493:14, 4493:15, 4493:19
move [5] - 4477:5, 4492:12, 4506:19, 4524:14, 4546:5
moving [2] - 4461:24, 4524:17
MR [171] - 4448:6, 4448:17, 4448:22, 4452:16, 4452:17, 4455:10, 4455:20, 4455:24, 4456:7, 4456:11, 4456:12, 4458:11, 4466:22, 4477:2, 4479:4, 4481:18, 4483:5, 4483:6, 4483:9, 4485:6, 4485:10, 4485:11, 4486:7, 4488:10, 4488:12, 4488:13, 4489:18, 4493:3, 4493:5, 4500:7, 4500:16, 4503:20, 4504:21, 4508:6, 4508:8, 4508:12, 4508:13, 4510:11, 4510:15,

4510:22, 4511:1, 4516:15, 4517:14, 4519:5, 4522:15, 4524:14, 4526:18, 4526:20, 4527:2, 4527:5, 4527:8, 4527:18, 4528:9, 4528:13, 4529:7, 4529:11, 4529:24, 4530:9, 4530:18, 4530:21, 4531:5, 4531:13, 4531:15, 4531:18, 4532:8, 4532:11, 4532:14, 4532:17, 4532:20, 4532:24, 4533:2, 4533:10, 4533:22, 4534:6, 4534:11, 4534:15, 4534:23, 4535:1, 4536:2, 4536:10, 4536:11, 4536:20, 4537:9, 4537:12, 4537:20, 4537:25, 4538:3, 4538:10, 4538:17, 4538:19, 4538:22, 4539:1, 4539:6, 4539:15, 4539:18, 4539:23, 4539:25, 4540:6, 4540:12, 4540:15, 4540:19, 4541:17, 4543:1, 4543:23, 4545:10, 4547:16, 4549:22, 4550:13, 4550:16, 4550:22, 4550:24, 4551:11, 4551:13, 4551:20, 4551:21, 4552:8, 4552:11, 4552:13, 4553:2, 4553:9, 4553:12, 4553:21, 4553:24, 4554:2, 4554:4, 4554:14, 4554:15, 4555:18, 4556:10, 4556:14, 4556:15, 4556:18, 4557:1, 4563:20, 4563:23, 4563:25, 4564:19, 4569:16, 4569:20, 4570:4, 4570:6, 4570:16, 4571:1, 4571:2, 4571:5, 4571:10, 4571:13, 4571:19, 4571:21, 4571:24, 4574:16, 4575:3, 4575:8, 4577:3, 4577:6, 4577:10, 4579:18, 4581:8, 4581:22, 4581:24, 4583:1, 4583:4, 4583:11, 4584:10, 4585:6, 4585:8, 4587:22, 4588:17, 4588:22, 4590:4, 4590:6
MS [145] - 4448:3, 4448:9, 4448:12, 4448:16, 4448:24, 4449:12, 4449:17, 4452:13, 4455:13, 4456:2, 4466:21, 4466:25, 4472:12, 4481:17, 4483:4, 4485:4, 4486:5, 4500:5, 4500:14, 4502:25, 4503:18, 4503:25, 4504:12, 4504:18, 4505:20, 4508:1, 4510:12, 4512:5, 4513:5, 4513:17, 4514:9, 4515:5, 4516:9, 4516:14, 4516:16, 4517:1, 4520:25, 4521:14, 4522:11, 4523:6, 4523:11, 4524:9, 4524:12, 4526:19, 4527:17, 4527:20, 4528:5, 4528:11, 4528:15, 4528:25, 4529:4, 4529:9, 4529:22, 4530:7, 4530:13, 4530:16, 4530:20, 4531:3, 4531:7, 4531:14, 4531:16, 4532:7, 4532:9, 4532:13, 4532:16, 4532:19, 4532:22, 4532:25, 4533:17, 4533:24, 4534:13, 4534:21, 4534:22, 4534:24, 4535:8, 4536:21, 4537:2, 4537:22, 4537:24, 4538:9, 4538:12, 4538:23, 4539:3, 4539:8, 4539:21, 4540:2, 4543:13, 4543:18, 4550:15, 4550:18, 4550:20, 4551:5, 4551:19, 4552:3, 4552:16, 4553:19, 4553:22, 4554:3, 4554:10, 4554:11, 4555:23, 4556:6, 4556:8, 4556:12, 4560:25, 4561:5, 4562:11, 4562:16, 4563:3, 4563:14, 4563:19, 4564:21, 4564:23, 4566:5,

4566:17, 4566:22, 4568:14, 4568:16, 4576:1, 4576:9, 4576:12, 4577:5, 4577:8, 4578:25, 4579:10, 4579:16, 4579:20, 4579:23, 4580:3, 4580:20, 4581:18, 4583:3, 4583:8, 4583:13, 4583:22, 4584:2, 4584:6, 4584:20, 4586:4, 4586:18, 4586:20, 4588:1, 4588:23, 4590:4
MSMB [15] - 4478:7, 4494:15, 4495:10, 4495:11, 4495:22, 4495:24, 4564:21, 4565:10, 4565:13, 4565:14, 4565:17, 4568:5, 4569:8, 4570:2
multiple [1] - 4576:20
must [3] - 4514:12, 4514:13, 4557:18

N

nada [1] - 4461:2
name [8] - 4451:6, 4452:23, 4453:15, 4453:16, 4453:21, 4493:1, 4511:17
named [3] - 4451:3, 4453:24, 4462:7, 4484:6, 4546:10
narrowed [1] - 4556:3
necessarily [2] - 4472:17, 4581:3
Necessarily [1] - 4586:9
need [32] - 4457:5, 4460:10, 4469:23, 4472:21, 4474:18, 4474:19, 4477:9, 4477:12, 4508:4, 4516:17, 4527:15, 4527:18, 4529:11, 4533:22, 4534:11, 4536:2, 4548:8, 4551:16, 4555:16, 4562:18, 4563:2, 4563:18, 4566:17, 4573:18, 4584:7, 4584:8, 4585:11, 4586:22, 4587:5, 4588:4, 4588:7, 4588:13
Need [1] - 4542:8
needs [4] - 4448:6, 4466:11, 4466:15, 4588:19
negotiated [1] - 4572:23
negotiating [1] - 4476:12
negotiations [2] - 4464:23, 4465:5
net [1] - 4548:11
network [9] - 4474:2, 4480:20, 4480:21, 4480:25, 4481:2, 4481:5, 4481:11, 4481:14, 4481:20
never [12] - 4499:12, 4499:13, 4523:1, 4523:16, 4524:7, 4534:17, 4567:3, 4573:7, 4577:22, 4578:2, 4583:6
Nevertheless [1] - 4526:16
NEW [1] - 4447:1
new [13] - 4459:5, 4459:12, 4461:7, 4467:20, 4472:4, 4472:22, 4473:12, 4481:11, 4549:18, 4585:1
New [12] - 4447:6, 4447:15, 4447:16, 4447:20, 4449:21, 4476:6, 4476:9, 4482:24, 4484:9, 4541:9, 4548:1
news [1] - 4467:8
next [15] - 4449:11, 4476:17, 4509:21, 4520:13, 4526:25, 4535:11, 4541:5, 4542:23, 4551:17, 4552:10, 4560:15, 4562:16, 4563:8, 4565:2, 4573:6
nice [1] - 4562:13
night [6] - 4555:8, 4562:18, 4563:5,

**ninth** [1] - 4574:13, 4582:22, 4585:20
**ninth** [1] - 4498:1
**non** [3] - 4486:8, 4510:8, 4546:7
**non-official** [1] - 4486:8
**non-prosecution** [1] - 4510:8
**none** [5] - 4462:16, 4564:7, 4572:25, 4576:4, 4576:18
**nonhearsay** [1] - 4538:14
**nonprosecution** [1] - 4517:2
**noon** [3] - 4563:12, 4584:16, 4585:21
**note** [13] - 4463:7, 4463:10, 4464:17, 4465:17, 4466:4, 4467:3, 4475:4, 4475:5, 4475:6, 4475:7, 4476:15, 4495:16, 4541:2
**notes** [3] - 4480:4, 4488:7, 4535:3
**nothing** [5] - 4461:3, 4468:18, 4534:13, 4555:21, 4562:9
**notice** [2] - 4554:11, 4555:16
**notified** [1] - 4557:10
**novel** [1] - 4585:2
**November** [1] - 4511:25
**number** [14] - 4451:7, 4465:18, 4479:10, 4526:1, 4527:3, 4527:12, 4529:13, 4553:18, 4559:5, 4560:14, 4565:21, 4568:1, 4577:3, 4581:10
**numbers** [2] - 4481:23, 4492:20
**numerous** [1] - 4468:12

## O

**o'clock** [7] - 4584:4, 4584:6, 4584:7, 4584:8, 4584:9, 4584:25, 4588:9
**oath** [6] - 4456:9, 4484:17, 4485:18, 4522:25, 4523:14, 4523:18
**object** [1] - 4574:9
**objected** [2] - 4540:1, 4540:13
**objecting** [2] - 4533:1, 4565:7
**objection** [26] - 4466:21, 4466:25, 4472:12, 4481:17, 4483:4, 4485:4, 4486:5, 4500:5, 4500:14, 4502:25, 4503:18, 4503:25, 4504:12, 4504:18, 4505:20, 4510:12, 4521:1, 4536:21, 4537:1, 4543:13, 4543:18, 4550:15, 4550:21, 4550:23, 4560:25, 4561:5
**Objection** [18] - 4508:1, 4512:5, 4513:5, 4513:17, 4514:9, 4515:5, 4516:9, 4516:14, 4517:1, 4520:25, 4521:14, 4523:6, 4523:11, 4524:9, 4526:19, 4537:22, 4537:23, 4539:21
**objections** [2] - 4552:21, 4552:24
**obligation** [3] - 4464:17, 4466:12, 4514:18
**observed** [1] - 4461:17
**obviously** [7] - 4454:21, 4486:15, 4529:19, 4533:19, 4555:12, 4568:24, 4584:22
**occasions** [3] - 4468:12, 4529:17, 4577:4
**occurred** [1] - 4527:1
**October** [1] - 4520:1
**OF** [3] - 4447:1, 4447:3, 4447:11
**offense** [2] - 4484:17, 4485:19

**offer** [8] - 4510:11, 4526:18, 4536:20, 4537:20, 4540:2, 4550:8, 4550:13, 4582:4
**offered** [10] - 4530:18, 4530:19, 4530:24, 4530:25, 4538:25, 4539:11, 4539:12, 4539:25, 4540:12, 4575:15
**offering** [5] - 4474:1, 4533:3, 4537:25, 4538:4, 4551:9
**Office** [11] - 4512:12, 4514:15, 4514:17, 4514:21, 4514:24, 4515:18, 4515:19, 4515:23, 4517:17, 4519:10
**office** [8] - 4450:3, 4450:10, 4450:13, 4461:11, 4484:24, 4486:21, 4489:3, 4511:12
**officer** [1] - 4512:18
**officers** [1] - 4527:15
**Official** [1] - 4447:23
**official** [14] - 4452:3, 4452:6, 4452:8, 4452:25, 4453:4, 4453:6, 4453:9, 4453:12, 4454:11, 4455:1, 4485:14, 4485:18, 4485:25, 4486:8
**officials** [1] - 4547:24
**often** [2] - 4496:20, 4521:9
**old** [1] - 4546:14
**older** [1] - 4549:8
**omission** [1] - 4507:12
**once** [5] - 4485:15, 4544:13, 4544:16, 4555:7, 4562:21
**one** [34] - 4448:6, 4449:25, 4451:18, 4453:5, 4454:24, 4455:7, 4455:10, 4467:14, 4469:12, 4473:1, 4473:18, 4473:20, 4483:11, 4484:20, 4487:19, 4499:7, 4499:9, 4501:18, 4538:24, 4541:5, 4544:15, 4545:17, 4546:25, 4551:8, 4553:2, 4554:15, 4555:3, 4557:24, 4558:7, 4564:25, 4565:10, 4569:1, 4569:25, 4575:11
**ones** [1] - 4555:20
**ongoing** [1] - 4587:4
**open** [7] - 4473:5, 4536:1, 4549:15, 4563:16, 4578:6, 4586:23, 4587:9
**Open** [1] - 4556:21
**opened** [3] - 4533:8, 4549:21, 4549:22
**openly** [1] - 4572:15
**operable** [1] - 4534:7
**operation** [1] - 4450:25
**opine** [1] - 4555:21
**opinion** [4] - 4482:17, 4518:25, 4519:1, 4574:3
**opportunities** [2] - 4495:3, 4495:4
**opportunity** [6] - 4511:20, 4563:10, 4576:2, 4579:11, 4580:25, 4583:17
**opposed** [1] - 4502:21
**oral** [2] - 4588:4, 4588:15
**order** [7] - 4455:21, 4475:23, 4514:23, 4516:3, 4576:24, 4588:11, 4588:14
**ordinary** [1] - 4450:24
**originally** [1] - 4528:2
**Otherwise** [1] - 4541:8
**otherwise** [3] - 4527:25, 4562:22, 4573:20

**outside** [2] - 4542:19, 4544:3
**overall** [2] - 4568:12, 4568:13
**overlap** [1] - 4454:8
**Overruled** [4] - 4504:13, 4505:22, 4515:6, 4523:7
**overruled** [1] - 4561:6
**overseas** [2] - 4462:20, 4462:21
**oversight** [1] - 4450:14
**own** [8] - 4471:3, 4472:14, 4509:21, 4518:18, 4518:22, 4543:25, 4548:5, 4584:23

## P

**P.C** [1] - 4447:19
**p.m** [1] - 4587:20
**PAGE** [1] - 4590:2
**page** [27] - 4469:20, 4471:5, 4476:17, 4478:24, 4479:8, 4479:9, 4489:9, 4492:19, 4492:20, 4495:7, 4495:14, 4498:13, 4498:14, 4498:18, 4498:19, 4501:4, 4501:8, 4508:19, 4510:25, 4520:13, 4526:25, 4529:14, 4535:11, 4542:23, 4560:15, 4585:25
**Page** [1] - 4512:10
**pages** [3] - 4489:10, 4523:24, 4561:11
**paid** [3] - 4465:7, 4506:23, 4578:7
**panic** [3] - 4509:12, 4509:18, 4509:20
**panicked** [3] - 4478:3, 4483:17, 4484:2
**paperwork** [1] - 4455:21
**paragraph** [23] - 4471:9, 4471:10, 4478:25, 4489:14, 4489:19, 4490:9, 4492:21, 4492:24, 4492:25, 4495:7, 4495:8, 4495:14, 4495:15, 4495:17, 4495:18, 4495:19, 4498:18, 4498:19, 4498:20, 4501:4, 4508:21, 4508:22, 4508:23
**Paragraph** [1] - 4512:11
**Paragraphs** [1] - 4512:15
**part** [20] - 4450:19, 4473:16, 4481:9, 4487:13, 4498:20, 4507:6, 4512:11, 4521:6, 4538:1, 4538:19, 4553:3, 4558:9, 4561:3, 4563:4, 4565:10, 4565:11, 4568:24, 4569:14, 4571:22, 4579:23
**partial** [1] - 4558:9
**participant** [1] - 4572:12
**particular** [12] - 4538:24, 4566:1, 4567:13, 4567:21, 4569:8, 4575:19, 4576:7, 4578:13, 4579:6, 4580:1, 4582:3
**parties** [3] - 4579:25, 4585:4, 4587:4
**partner** [2] - 4470:5, 4494:21
**partners** [1] - 4470:17
**parts** [1] - 4539:18
**party** [2] - 4575:16, 4588:15
**passed** [1] - 4573:3
**Passie** [2] - 4559:9, 4559:10
**patient** [2] - 4466:10, 4505:5
**patients** [1] - 4560:16
**Pause** [3] - 4448:5, 4545:12, 4551:14

**pause** [8] - 4479:3, 4489:17, 4493:7, 4495:13, 4495:20, 4498:22, 4501:9, 4509:6
**pay** [7] - 4464:5, 4509:2, 4543:11, 4543:15, 4544:18, 4558:9, 4567:23
**payable** [1] - 4474:23
**paying** [1] - 4474:18
**payment** [8] - 4461:25, 4463:9, 4475:6, 4512:19, 4532:4, 4537:18, 4541:6, 4543:17
**people** [28] - 4478:8, 4481:8, 4481:9, 4481:15, 4481:20, 4481:21, 4486:8, 4486:24, 4493:13, 4515:2, 4515:4, 4553:23, 4564:1, 4564:2, 4564:5, 4565:22, 4567:16, 4567:23, 4569:12, 4569:13, 4573:22, 4574:1, 4574:2, 4574:7, 4574:10, 4574:21, 4576:25
**percent** [1] - 4497:14
**perfect** [3] - 4464:15, 4464:22, 4570:6
**perfectly** [1] - 4566:19
**perform** [4] - 4471:13, 4490:3, 4544:8, 4544:13
**performance** [14] - 4565:13, 4566:9, 4566:23, 4566:25, 4567:10, 4567:14, 4567:17, 4568:8, 4568:11, 4568:13, 4568:17, 4569:12, 4575:12, 4575:18
**performed** [5] - 4487:24, 4489:5, 4489:23, 4490:7, 4490:21
**performing** [2] - 4512:21, 4584:23
**perhaps** [2] - 4546:25, 4588:7
**period** [11] - 4451:17, 4487:12, 4496:18, 4521:5, 4525:22, 4529:17, 4530:1, 4530:12, 4531:2, 4533:14, 4567:9
**permission** [1] - 4547:16
**permit** [1] - 4582:10
**Pershing** [1] - 4541:9
**person** [12] - 4490:7, 4491:21, 4493:14, 4542:19, 4559:25, 4560:3, 4560:4, 4572:19, 4582:13
**person's** [2] - 4564:11, 4569:2
**personal** [4] - 4471:3, 4551:3, 4551:12, 4558:13
**personally** [4] - 4495:5, 4558:15, 4577:5, 4577:6
**perspective** [1] - 4500:12
**pertaining** [8] - 4450:23, 4473:6, 4475:6, 4496:23, 4498:7, 4501:24, 4520:23, 4561:22
**pertinent** [10] - 4512:11, 4517:10, 4518:16, 4518:17, 4518:19, 4521:6, 4525:14, 4525:15
**pharmaceutical** [3] - 4482:3, 4500:3, 4502:13
**Pharmaceutical** [1] - 4547:1
**Pharmaceuticals** [1] - 4547:4
**Pharmacopeia** [1] - 4497:5
**phone** [4] - 4506:11, 4506:12, 4559:25, 4560:5
**phrase** [1] - 4516:17
**pick** [1] - 4478:4
**picking** [2] - 4556:11, 4556:13

**pieces** [2] - 4518:7, 4579:21
**pipeline** [1] - 4459:12
**place** [2] - 4451:5, 4495:11
**planning** [1] - 4448:9
**Plaza** [1] - 4447:15
**plenty** [2] - 4538:24, 4555:16
**point** [12] - 4457:9, 4521:11, 4529:22, 4533:20, 4550:4, 4551:8, 4553:14, 4554:20, 4558:7, 4564:11, 4570:13, 4570:19
**points** [1] - 4533:19
**policy** [1] - 4450:9
**poll** [1] - 4573:12
**portfolio** [3] - 4473:9, 4481:7, 4497:4
**portion** [1] - 4538:13
**position** [4] - 4552:6, 4564:7, 4572:25, 4586:11
**positions** [1] - 4587:25
**positive** [1] - 4461:6
**possession** [2] - 4517:19, 4519:12
**Possible** [1] - 4525:2
**possible** [10] - 4470:13, 4482:5, 4492:10, 4496:12, 4498:3, 4499:3, 4524:22, 4524:23, 4524:25, 4549:5
**possibly** [5] - 4470:15, 4502:22, 4505:2, 4506:3, 4555:21
**post** [1] - 4552:18
**posted** [1] - 4552:22
**potential** [2] - 4472:4, 4574:11
**potentially** [4] - 4496:1, 4496:3, 4496:4, 4552:6
**power** [2] - 4457:9, 4569:17
**PPM** [1] - 4566:2
**practical** [1] - 4466:15
**prejudice** [1] - 4530:6
**present** [20] - 4448:2, 4449:5, 4449:7, 4449:10, 4487:23, 4488:2, 4489:5, 4489:22, 4493:24, 4497:25, 4511:12, 4534:20, 4536:7, 4548:6, 4563:16, 4575:17, 4583:15, 4587:1
**presentation** [1] - 4457:9
**president** [1] - 4450:2
**press** [8] - 4458:23, 4459:8, 4459:15, 4463:20, 4467:10, 4467:18, 4467:25
**pretty** [9] - 4460:10, 4470:16, 4493:13, 4496:9, 4496:20, 4497:23, 4525:8, 4544:9, 4582:20
**preview** [1] - 4531:18
**previously** [4] - 4449:6, 4456:5, 4510:17, 4534:3
**price** [2] - 4465:21, 4466:15
**primary** [1] - 4467:19
**principal** [1] - 4454:21
**prison** [2] - 4484:18, 4485:20
**private** [2] - 4464:15, 4529:18
**privilege** [1] - 4485:4
**problem** [4] - 4555:18, 4556:10, 4563:24, 4579:23
**problems** [1] - 4575:17
**procedure** [1] - 4552:18
**proceed** [4] - 4449:16, 4456:7, 4456:20,

4539:23
**Proceedings** [1] - 4447:25
**process** [3] - 4461:24, 4551:8, 4580:21
**produce** [3] - 4517:21, 4528:19, 4582:4
**produced** [4] - 4447:25, 4527:22, 4528:17, 4555:23
**producing** [3] - 4534:14, 4574:7
**products** [2] - 4497:11, 4497:13
**professional** [1] - 4467:21
**Professor** [1] - 4559:9
**proffer** [2] - 4538:14, 4538:21
**program** [8] - 4452:25, 4453:4, 4453:6, 4453:9, 4453:12, 4454:11, 4454:14, 4454:16
**programs** [2] - 4452:6, 4452:9
**progress** [2] - 4459:17, 4467:7
**prohibits** [1] - 4569:19
**project** [3] - 4471:14, 4544:7, 4544:8
**promissory** [11] - 4463:7, 4463:10, 4465:17, 4466:4, 4467:3, 4475:4, 4475:6, 4475:7, 4476:15, 4495:16, 4541:1
**proper** [1] - 4530:16
**properly** [1] - 4579:3
**propose** [1] - 4586:2
**proposing** [1] - 4575:21
**prosecuted** [9] - 4510:2, 4511:4, 4512:3, 4512:7, 4512:25, 4513:21, 4513:23, 4514:1
**prosecution** [3] - 4486:25, 4510:8, 4546:7
**prosecutors** [1] - 4482:23
**protect** [3] - 4478:6, 4478:7, 4478:10
**protects** [1] - 4514:4
**prove** [2] - 4560:12, 4569:24
**provide** [10] - 4460:4, 4471:11, 4472:15, 4473:12, 4478:2, 4491:4, 4500:22, 4512:3, 4525:6, 4525:12
**provided** [10] - 4487:18, 4487:19, 4491:6, 4491:18, 4491:22, 4493:25, 4494:4, 4512:15, 4529:19, 4529:20
**provides** [4] - 4512:11, 4515:22, 4517:12, 4517:16
**providing** [3] - 4481:8, 4481:9, 4517:5
**proving** [1] - 4580:24
**public** [2] - 4468:15, 4472:22
**publicly** [3] - 4468:7, 4512:19, 4512:20
**publicly-traded** [2] - 4512:19, 4512:20
**published** [4] - 4517:15, 4519:25, 4536:24, 4537:5, 4540:8
**pull** [4] - 4469:23, 4470:7, 4472:10, 4474:20
**pulled** [2] - 4465:1, 4525:5
**punishable** [1] - 4484:18
**punished** [1] - 4485:19
**purpose** [7] - 4522:6, 4525:3, 4529:21, 4530:16, 4533:18, 4540:17, 4543:2
**purposes** [2] - 4539:17, 4540:13
**pursuant** [1] - 4512:21
**push** [1] - 4586:16
**put** [21] - 4456:16, 4460:10, 4460:11,

4464:13, 4482:20, 4517:14, 4552:4, 4555:19, 4555:20, 4555:24, 4556:2, 4559:3, 4564:4, 4565:22, 4567:16, 4569:11, 4570:9, 4572:22, 4573:23, 4575:21, 4577:25
**putting** [5] - 4510:15, 4533:18, 4553:4, 4577:11, 4579:4

## Q

**questioned** [4] - 4519:14, 4519:15, 4529:15, 4577:13
**questions** [10] - 4452:13, 4452:20, 4455:12, 4455:13, 4477:5, 4488:20, 4522:12, 4559:2, 4559:6, 4588:7
**quick** [1] - 4499:13
**quickly** [1] - 4468:16
**quite** [6] - 4496:20, 4521:9, 4567:3, 4582:23, 4583:6, 4585:17

## R

**raise** [2] - 4465:21, 4584:22
**raised** [1] - 4562:18
**ramifications** [1] - 4544:19
**ran** [2] - 4547:7, 4548:15
**range** [1] - 4556:7
**rarely** [6] - 4520:11, 4529:16, 4530:2, 4531:7, 4532:23
**rather** [2] - 4526:21, 4554:20
**rationalization** [2] - 4507:14, 4507:19
**rationalize** [5] - 4472:7, 4478:1, 4505:16, 4507:9, 4507:20
**rationalized** [2] - 4472:14, 4507:20
**raved** [1] - 4578:4
**re** [3] - 4491:17, 4496:8, 4498:25
**reach** [2] - 4454:13, 4535:4
**reaching** [1] - 4454:12
**read** [37] - 4458:16, 4458:22, 4463:21, 4464:11, 4464:20, 4471:9, 4477:11, 4479:1, 4479:6, 4479:11, 4488:8, 4488:20, 4489:16, 4489:19, 4491:25, 4492:20, 4492:24, 4492:25, 4493:1, 4495:9, 4495:16, 4498:14, 4501:4, 4502:8, 4509:1, 4511:9, 4514:17, 4519:6, 4533:8, 4559:11, 4561:9, 4561:20, 4577:22, 4578:2, 4581:25, 4582:15
**reading** [8] - 4467:10, 4479:22, 4480:3, 4492:7, 4493:2, 4561:10, 4561:22, 4585:18
**ready** [4] - 4448:1, 4455:18, 4551:18, 4588:14
**real** [1] - 4544:24
**realistically** [1] - 4584:20
**realizing** [1] - 4460:3
**really** [13] - 4472:20, 4494:19, 4497:20, 4498:20, 4499:13, 4501:12, 4518:6, 4525:6, 4552:12, 4582:21, 4583:22, 4584:18, 4586:13
**reason** [5] - 4530:3, 4533:2, 4540:16, 4574:9, 4578:14

**reasons** [3] - 4527:3, 4527:12, 4529:13
**recalled** [1] - 4560:9
**receipt** [3] - 4551:7, 4558:2, 4570:24
**receive** [3] - 4510:13, 4510:18, 4536:22
**received** [14] - 4510:24, 4517:21, 4517:23, 4517:24, 4527:10, 4527:11, 4527:23, 4528:6, 4529:2, 4529:5, 4530:15, 4533:21, 4558:18, 4565:9, 4567:17, 4568:8, 4568:11, 4569:12
**receiving** [8] - 4506:24, 4508:16, 4509:4, 4527:23, 4529:5, 4534:4, 4534:5, 4570:3
**recent** [1] - 4458:23
**Recess** [1] - 4536:5
**recess** [1] - 4563:15
**recipient** [1] - 4478:4
**recognize** [12] - 4460:17, 4506:15, 4510:7, 4525:19, 4526:6, 4526:16, 4536:15, 4537:6, 4550:10, 4569:7
**recognized** [7] - 4458:24, 4459:15, 4459:20, 4459:22, 4472:1, 4474:9, 4474:14
**recognizes** [1] - 4531:6
**recollection** [17] - 4477:10, 4479:22, 4480:16, 4488:25, 4489:21, 4490:11, 4493:8, 4498:15, 4501:6, 4502:7, 4509:8, 4547:14, 4547:21, 4547:24, 4548:3, 4548:9, 4557:13
**reconvene** [2] - 4586:15, 4588:24
**record** [3] - 4455:3, 4527:4, 4541:15
**recorded** [1] - 4447:25
**records** [31] - 4450:8, 4450:20, 4450:23, 4450:24, 4451:3, 4451:9, 4451:16, 4451:20, 4451:21, 4451:25, 4452:4, 4517:25, 4518:1, 4518:2, 4524:25, 4565:2, 4565:3, 4565:21, 4566:19, 4567:2, 4568:2, 4568:11, 4568:16, 4573:22, 4575:13, 4582:19, 4582:20, 4582:21, 4585:18
**redact** [3] - 4538:2, 4538:3, 4539:19
**redirect** [2] - 4531:13, 4533:19, 4562:10
**refer** [11] - 4456:15, 4456:18, 4461:8, 4461:19, 4463:2, 4463:11, 4474:13, 4488:8, 4513:13, 4548:9, 4578:13
**references** [1] - 4488:8
**referencing** [1] - 4488:14
**referring** [1] - 4459:5
**refers** [1] - 4466:1
**refined** [1] - 4574:11
**reflect** [2] - 4451:25, 4452:4
**refresh** [12] - 4477:9, 4479:22, 4480:16, 4489:21, 4490:11, 4493:8, 4502:7, 4509:8, 4547:14, 4547:21, 4547:23, 4548:9
**refreshes** [5] - 4488:24, 4498:15, 4501:6, 4548:3, 4557:12
**regard** [1] - 4586:8
**regarding** [4] - 4528:3, 4563:5, 4571:18, 4575:18
**register** [1] - 4475:10
**registrar** [1] - 4450:2

**Registrar** [2] - 4565:1, 4565:3
**registrar's** [2] - 4450:3, 4450:10
**registration** [4] - 4450:8, 4450:20, 4452:3, 4455:2
**regretted** [1] - 4507:21
**reject** [1] - 4574:24
**relate** [5] - 4564:1, 4565:3, 4565:4, 4565:17, 4568:23
**related** [5] - 4450:11, 4450:20, 4457:22, 4473:7, 4502:13
**relating** [2] - 4558:18, 4559:21
**relationship** [10] - 4494:18, 4496:6, 4496:7, 4496:9, 4496:15, 4546:10, 4546:22, 4549:7, 4549:10, 4549:12
**Relax** [1] - 4516:25
**release** [2] - 4467:18, 4467:25
**released** [1] - 4514:17
**releases** [4] - 4458:23, 4459:8, 4459:15
**relevance** [4] - 4565:8, 4568:4, 4569:7, 4576:21
**relevant** [11] - 4517:18, 4519:11, 4520:22, 4530:11, 4531:2, 4566:4, 4566:5, 4569:21, 4569:22, 4576:3, 4578:12
**reliance** [1] - 4579:6
**relied** [6] - 4566:1, 4567:14, 4569:9, 4577:23, 4580:11
**remain** [1] - 4587:9
**remaining** [2] - 4528:7, 4583:23
**remember** [26] - 4473:21, 4478:12, 4479:16, 4479:20, 4482:13, 4494:2, 4495:22, 4497:24, 4498:25, 4499:3, 4503:4, 4505:1, 4505:2, 4505:3, 4518:6, 4520:3, 4521:23, 4523:3, 4523:17, 4528:2, 4528:16, 4534:8, 4558:6, 4558:23, 4559:14, 4570:25
**remove** [1] - 4475:24
**repeat** [3] - 4462:17, 4485:15, 4505:24
**repeatedly** [1] - 4519:15
**rephrase** [4] - 4467:2, 4472:13, 4500:6, 4500:15, 4504:20, 4513:7, 4522:19, 4523:13
**report** [4] - 4480:2, 4482:21, 4547:23, 4548:2
**Reporter** [2] - 4447:23, 4447:23
**reporters** [1] - 4588:9
**reports** [6] - 4565:13, 4566:25, 4567:17, 4569:12, 4575:12, 4587:11
**represent** [1] - 4452:23
**representations** [2] - 4579:7, 4581:16
**representative** [1] - 4448:12
**represented** [1] - 4577:7
**represents** [1] - 4469:12
**request** [2] - 4528:12, 4528:20
**requested** [5] - 4471:13, 4475:5, 4518:3, 4528:18, 4528:21
**requesting** [1] - 4543:17
**require** [2] - 4449:10, 4517:8
**required** [1] - 4517:13
**requirement** [1] - 4567:5
**requiring** [1] - 4455:2

**research** [16] - 4470:12, 4473:8, 4481:8, 4481:9, 4487:7, 4487:14, 4487:16, 4493:25, 4494:4, 4497:9, 4498:7, 4501:1, 4501:24, 4528:4, 4532:4, 4584:24
**researched** [1] - 4497:8
**resolve** [3] - 4466:19, 4555:17, 4587:5
**resolved** [4] - 4555:9, 4555:11, 4563:13, 4563:22
**respect** [8] - 4496:15, 4562:16, 4563:7, 4573:22, 4574:25, 4576:23, 4580:24, 4582:2
**respectfully** [5] - 4531:19, 4571:22, 4572:5, 4573:8, 4578:14
**respective** [1] - 4587:25
**respects** [1] - 4509:17
**respond** [5] - 4458:18, 4531:5, 4531:8, 4584:11, 4584:25
**responded** [3] - 4506:17, 4523:25, 4533:8
**responds** [3] - 4457:3, 4461:2, 4531:4
**response** [16] - 4458:16, 4465:24, 4475:15, 4476:4, 4481:1, 4490:5, 4491:11, 4501:19, 4506:18, 4517:25, 4538:11, 4538:12, 4539:12, 4584:12, 4584:21, 4586:16
**responsibilities** [1] - 4450:6
**responsibility** [1] - 4450:19
**responsive** [1] - 4533:9
**rest** [4] - 4552:2, 4552:6, 4552:14, 4588:5
**restricted** [5] - 4469:1, 4474:21, 4475:8, 4475:17, 4475:24
**restrictions** [1] - 4475:21
**rests** [1] - 4553:7
**result** [1] - 4451:20
**resume** [3] - 4455:18, 4456:10, 4536:9
**resumed** [1] - 4456:5
**retaining** [1] - 4509:15
**retire** [1] - 4562:21
**retired** [2] - 4453:25, 4500:9
**retrieve** [1] - 4562:23
**retrieved** [1] - 4530:19
**Retrophin** [56] - 4459:5, 4459:10, 4459:15, 4459:23, 4462:6, 4463:21, 4464:16, 4467:8, 4467:10, 4467:19, 4467:22, 4468:24, 4468:25, 4469:9, 4469:14, 4470:9, 4470:11, 4470:14, 4470:24, 4471:2, 4472:11, 4474:3, 4474:20, 4475:16, 4478:17, 4478:21, 4479:17, 4480:13, 4480:21, 4483:24, 4494:15, 4496:3, 4497:3, 4497:13, 4498:10, 4498:16, 4499:5, 4512:18, 4527:22, 4528:5, 4529:5, 4545:13, 4545:22, 4557:5, 4557:19, 4558:13, 4565:5, 4565:9, 4565:18, 4567:24, 4570:3, 4574:1, 4574:5, 4576:4, 4577:15, 4578:17
**return** [4] - 4459:25, 4506:25, 4508:16, 4509:5
**reuse** [1] - 4477:9

**reverse** [3] - 4468:4, 4468:10, 4468:18
**reviewed** [1] - 4575:12
**reviews** [1] - 4505:15
**Richard** [1] - 4447:23
**Richardson** [2] - 4573:4, 4577:16
**right-hand** [3] - 4479:10, 4489:10, 4492:20
**ripe** [1] - 4572:21
**RO15531** [1] - 4559:5
**RO15534** [1] - 4560:14
**Roger** [5] - 4453:13, 4453:16, 4453:24, 4454:4, 4454:21
**ROHDE** [1] - 4447:14
**role** [1] - 4467:20
**rolling** [4] - 4458:21, 4500:25, 4501:7, 4501:14
**room** [1] - 4562:21
**Rosenfeld** [7] - 4564:4, 4570:6, 4570:7, 4570:9, 4570:22, 4575:6, 4577:14
**roughly** [1] - 4487:15
**route** [1] - 4468:16
**row** [1] - 4585:19
**RPR** [1] - 4447:23
**Rule** [2] - 4475:18, 4475:21
**rule** [2] - 4569:19, 4572:5
**ruled** [1] - 4539:23
**Rules** [1] - 4580:24
**rules** [3] - 4475:9, 4488:22, 4519:1
**running** [1] - 4481:7
**rwbarrycourtreporter@gmail.com** [1] - 4447:24

# S

**sacrifice** [1] - 4553:11
**sales** [2] - 4457:20, 4473:4
**sat** [2] - 4452:1, 4578:7
**Saunders** [2] - 4564:3, 4574:10
**save** [1] - 4479:5
**savvy** [1] - 4580:10
**saw** [7] - 4468:1, 4506:12, 4506:21, 4520:19, 4523:25, 4572:18, 4573:7
**schedule** [2] - 4448:19, 4584:4
**scheduled** [1] - 4553:15
**scheduling** [2] - 4449:9, 4582:6
**scheme** [5] - 4566:8, 4567:25, 4569:15, 4576:16, 4581:3
**schemes** [6] - 4565:18, 4565:20, 4566:7, 4567:15, 4579:12, 4580:25
**School** [4] - 4454:13, 4454:15, 4454:17, 4454:21
**school** [5] - 4451:22, 4453:13, 4454:13, 4454:14, 4454:15
**schools** [8] - 4449:25, 4450:11, 4450:14, 4450:16, 4451:11, 4452:5, 4453:10, 4454:12
**Schwartz** [2] - 4484:6, 4511:15
**scientist** [1] - 4457:15
**scope** [4] - 4471:15, 4500:19, 4567:15, 4569:4
**screen** [4] - 4456:16, 4460:10, 4464:8,

4559:3
**scroll** [1] - 4538:5
**search** [5] - 4451:2, 4451:5, 4451:9, 4451:20, 4520:22
**searched** [2] - 4451:10, 4524:20
**seat** [3] - 4449:5, 4536:8, 4587:2
**SEC** [2] - 4482:24, 4573:4
**second** [7] - 4455:10, 4469:20, 4483:10, 4483:20, 4484:3, 4489:13, 4572:7
**Secondly** [1] - 4530:22
**Security** [1] - 4451:6
**See** [2] - 4503:24, 4513:11
**see** [56] - 4448:20, 4453:24, 4456:22, 4457:1, 4458:6, 4458:14, 4459:1, 4460:14, 4461:21, 4462:4, 4462:25, 4464:8, 4466:6, 4466:17, 4467:17, 4467:23, 4469:18, 4469:22, 4475:11, 4475:13, 4475:14, 4475:19, 4479:11, 4488:9, 4488:24, 4489:11, 4489:14, 4492:2, 4492:19, 4495:19, 4495:21, 4498:23, 4501:10, 4502:7, 4503:17, 4504:2, 4506:14, 4508:25, 4509:7, 4510:5, 4512:23, 4513:12, 4514:3, 4514:19, 4520:22, 4537:14, 4538:5, 4540:24, 4547:12, 4547:14, 4547:23, 4556:13, 4557:12, 4559:7, 4560:18, 4587:14
**seeing** [5] - 4460:25, 4520:21, 4521:23, 4570:25, 4585:4
**seeking** [1] - 4453:11
**segregate** [1] - 4579:25
**self** [1] - 4550:18
**sell** [2] - 4475:23, 4548:23
**send** [5] - 4476:5, 4520:15, 4541:6, 4545:22, 4545:24
**sending** [2] - 4505:15, 4557:14
**sense** [4] - 4477:11, 4478:9, 4494:24, 4549:13
**sent** [18] - 4467:13, 4474:24, 4474:25, 4506:13, 4533:6, 4538:7, 4538:15, 4545:17, 4545:24, 4546:1, 4557:8, 4559:17, 4560:13, 4561:4, 4565:13, 4566:10, 4568:18
**sentence** [3] - 4479:6, 4479:12, 4479:13
**separate** [12] - 4476:12, 4486:8, 4500:25, 4501:7, 4501:14, 4529:17, 4529:18, 4530:17, 4531:9, 4531:11, 4564:23, 4566:7
**September** [2] - 4461:6, 4464:11
**series** [5] - 4460:17, 4461:20, 4488:7, 4488:19, 4537:14
**serious** [2] - 4485:14, 4573:25
**seriously** [1] - 4573:10
**serve** [1] - 4471:10
**server** [1] - 4529:19
**service** [3] - 4471:15, 4491:19, 4517:6
**services** [26] - 4457:25, 4460:3, 4471:6, 4471:9, 4471:11, 4471:13, 4472:16, 4472:24, 4473:11, 4473:13, 4478:3, 4487:18, 4487:19, 4487:24, 4489:6, 4489:23, 4490:4, 4490:8, 4490:22,

4491:4, 4491:6, 4491:22, 4500:22, 4525:7, 4525:13, 4542:12

**serving** [1] - 4550:18

**set** [4] - 4579:1, 4579:6, 4581:10, 4586:16

**settlement** [29] - 4462:23, 4463:2, 4463:9, 4463:11, 4466:25, 4565:6, 4565:15, 4567:17, 4568:20, 4569:2, 4569:3, 4569:14, 4569:22, 4569:23, 4570:1, 4572:20, 4573:19, 4573:24, 4575:1, 4575:21, 4576:9, 4576:10, 4576:16, 4576:20, 4577:17, 4582:2, 4582:12, 4583:5, 4586:12

**several** [3] - 4520:14, 4577:21, 4585:23

**shall** [1] - 4471:13

**share** [3] - 4565:3, 4565:8, 4568:2

**shareholder** [2] - 4467:22, 4550:4

**shares** [13] - 4464:16, 4464:24, 4465:12, 4465:15, 4476:1, 4512:20, 4548:24, 4565:4, 4565:5, 4565:6, 4565:9, 4568:3, 4570:3

**sheet** [3] - 4482:20, 4492:7

**sheets** [1] - 4482:20

**shirt** [1] - 4486:3

**Shkreli** [106] - 4451:3, 4451:21, 4452:23, 4454:17, 4454:24, 4457:3, 4458:3, 4458:16, 4459:6, 4460:18, 4461:10, 4461:21, 4462:22, 4464:4, 4464:10, 4465:18, 4465:24, 4466:3, 4467:4, 4469:8, 4470:8, 4470:23, 4474:25, 4475:8, 4475:16, 4476:5, 4478:7, 4482:6, 4483:24, 4487:25, 4489:6, 4489:24, 4490:4, 4490:8, 4490:22, 4491:22, 4492:13, 4492:23, 4493:9, 4493:25, 4494:4, 4494:14, 4496:6, 4496:16, 4500:2, 4500:24, 4501:5, 4501:7, 4501:13, 4504:23, 4505:18, 4505:20, 4506:1, 4506:24, 4508:16, 4509:4, 4520:1, 4523:10, 4525:20, 4527:10, 4531:1, 4533:6, 4533:13, 4536:18, 4537:7, 4537:15, 4538:8, 4538:11, 4538:17, 4539:11, 4539:13, 4540:10, 4540:20, 4541:11, 4541:16, 4542:10, 4546:23, 4547:7, 4548:12, 4548:15, 4549:10, 4549:21, 4550:11, 4551:8, 4553:13, 4554:2, 4554:4, 4555:19, 4557:10, 4557:14, 4558:6, 4558:12, 4558:14, 4559:16, 4560:20, 4571:7, 4572:12, 4573:14, 4576:17, 4577:24, 4578:3, 4579:7, 4580:15, 4581:16, 4587:13

**SHKRELI** [1] - 4447:8

**Shkreli's** [5] - 4520:14, 4542:6, 4551:3, 4551:9, 4575:18

**short** [6] - 4451:17, 4469:22, 4503:10, 4562:19, 4571:15, 4584:3

**shorten** [1] - 4585:8

**shortens** [1] - 4551:25

**shortly** [2] - 4458:21, 4460:25

**shot** [5] - 4458:24, 4459:20, 4471:22, 4472:1, 4544:15

**shovel** [1] - 4574:6

**show** [36] - 4451:12, 4451:16, 4464:7, 4465:23, 4470:21, 4510:4, 4513:20, 4517:23, 4527:8, 4529:25, 4530:25, 4533:4, 4533:7, 4533:11, 4536:12, 4537:13, 4539:12, 4539:13, 4539:18, 4540:4, 4550:6, 4557:2, 4559:1, 4566:7, 4566:8, 4566:9, 4566:17, 4566:18, 4566:19, 4567:15, 4568:2, 4568:3, 4568:7, 4568:17, 4573:22, 4578:13

**showed** [7] - 4506:14, 4506:15, 4519:22, 4519:23, 4520:5, 4520:19, 4527:22

**showing** [4] - 4509:19, 4565:22, 4567:1, 4585:15

**shown** [1] - 4508:24

**shows** [4] - 4529:17, 4533:5, 4569:11, 4579:11

**shut** [1] - 4578:6

**sic** [2] - 4491:18, 4497:22

**side** [4] - 4458:25, 4459:21, 4471:22, 4472:2

**sidebar** [4] - 4524:13, 4526:21, 4527:1, 4563:18

**Sidebar** [2] - 4536:1, 4551:1

**sign** [4] - 4463:8, 4540:21, 4545:19, 4545:20

**signed** [11] - 4467:4, 4470:23, 4514:3, 4519:6, 4542:1, 4557:21, 4562:6, 4567:19, 4576:17, 4577:21

**significant** [1] - 4553:18

**signing** [5] - 4471:17, 4472:7, 4511:10, 4512:17, 4517:4

**similar** [2] - 4505:6, 4505:15

**simply** [1] - 4577:15

**single** [1] - 4572:19

**sit** [4] - 4454:23, 4471:1, 4523:20, 4570:10

**sitting** [5] - 4452:2, 4486:24, 4509:21, 4556:15, 4573:6

**situation** [1] - 4580:4

**six** [5] - 4453:23, 4475:17, 4576:9, 4579:1, 4586:16

**Sixth** [3] - 4573:25, 4582:18, 4583:16

**sleeping** [1] - 4461:11

**slide** [4] - 4457:5, 4457:6, 4457:10, 4457:12

**slippers** [1] - 4552:9

**small** [2] - 4471:9, 4501:23

**smart** [1] - 4578:4

**Smith** [2] - 4448:3, 4547:25

**SMITH** [106] - 4447:17, 4448:16, 4448:24, 4449:12, 4449:17, 4452:13, 4455:13, 4466:21, 4466:25, 4472:12, 4481:17, 4483:4, 4485:4, 4486:5, 4500:5, 4500:14, 4502:25, 4503:18, 4503:25, 4504:12, 4504:18, 4505:20, 4508:1, 4510:12, 4512:5, 4513:5, 4513:17, 4514:9, 4515:5, 4516:9, 4516:14, 4516:16, 4517:1, 4520:25,

4521:14, 4522:11, 4523:6, 4523:11, 4524:9, 4524:12, 4526:19, 4527:17, 4527:20, 4528:5, 4528:11, 4528:15, 4528:25, 4529:4, 4529:9, 4529:22, 4530:7, 4530:13, 4530:16, 4530:20, 4531:3, 4531:7, 4531:14, 4531:16, 4532:7, 4532:9, 4532:13, 4532:16, 4532:19, 4532:22, 4532:25, 4533:17, 4533:24, 4534:13, 4534:21, 4534:24, 4535:8, 4537:2, 4537:22, 4537:24, 4538:9, 4538:12, 4538:23, 4539:3, 4539:8, 4539:21, 4540:2, 4543:13, 4543:18, 4550:15, 4550:18, 4550:20, 4551:5, 4551:19, 4552:16, 4553:19, 4553:22, 4554:1, 4554:3, 4554:10, 4555:23, 4556:8, 4560:25, 4561:5, 4562:11, 4564:23, 4566:5, 4566:17, 4566:22, 4568:14, 4568:16, 4590:4

**Social** [1] - 4451:6

**sold** [1] - 4475:17

**solid** [1] - 4580:23

**solution** [1] - 4584:15

**someone** [8] - 4457:8, 4494:25, 4503:21, 4532:9, 4546:17, 4549:18, 4578:4, 4582:12

**sometimes** [15] - 4505:5, 4507:9, 4507:11, 4543:11, 4543:15, 4544:11, 4544:13, 4544:15, 4545:1, 4545:3, 4545:6, 4545:8

**sooner** [1] - 4554:20

**sorry** [22] - 4458:11, 4460:10, 4460:13, 4478:19, 4480:2, 4483:1, 4484:12, 4485:5, 4493:6, 4508:22, 4510:15, 4510:23, 4519:22, 4545:16, 4548:11, 4549:9, 4549:20, 4560:9, 4570:12, 4571:5, 4582:25, 4583:2

**sort** [5] - 4467:7, 4560:10, 4571:17, 4580:2, 4584:22

**sorts** [2] - 4463:24, 4481:8

**sounds** [1] - 4502:14

**source** [1] - 4528:24

**sources** [1] - 4528:24

**sparingly** [1] - 4524:19

**speaking** [2] - 4522:17, 4553:24

**specializes** [1] - 4474:9

**specific** [13] - 4463:25, 4481:23, 4488:8, 4500:19, 4501:21, 4517:24, 4518:7, 4528:11, 4543:2, 4544:9, 4544:10, 4556:6, 4564:10

**specifically** [4] - 4517:12, 4517:16, 4519:9, 4520:23, 4561:18, 4561:23

**specifics** [4] - 4480:11, 4480:12, 4501:3, 4501:22

**specious** [1] - 4574:4

**spent** [4] - 4496:16, 4506:24, 4508:15, 4509:4

**spewed** [1] - 4505:14

**spoken** [2] - 4577:3, 4577:5

**spouse** [1] - 4486:10

**spring** [4] - 4453:6, 4454:6, 4454:25, 4455:7

**squarely** [5] - 4576:5, 4576:13, 4576:20, 4580:23, 4583:23
**SRINIVASAN** [2] - 4447:17, 4448:6
**stamp** [1] - 4526:1
**stand** [4] - 4449:14, 4456:1, 4456:6, 4523:5
**Standard** [2] - 4565:1, 4565:2
**standing** [1] - 4448:8
**standpoint** [2] - 4555:21, 4555:22
**start** [11] - 4448:1, 4453:22, 4457:25, 4479:5, 4479:6, 4508:10, 4555:7, 4584:12, 4584:23, 4585:4, 4585:12
**started** [3] - 4454:2, 4467:18, 4584:22
**starting** [2] - 4448:20, 4489:13
**starts** [3] - 4456:24, 4469:16, 4500:19
**statement** [12] - 4461:8, 4475:3, 4481:12, 4481:14, 4490:6, 4493:21, 4496:15, 4507:8, 4512:4, 4550:18, 4551:10, 4579:19
**statements** [27] - 4512:22, 4513:1, 4513:3, 4513:9, 4513:21, 4530:8, 4534:19, 4535:4, 4565:12, 4565:17, 4566:6, 4566:9, 4566:13, 4566:14, 4567:7, 4567:9, 4567:14, 4567:18, 4568:12, 4569:5, 4569:10, 4572:2, 4575:18, 4576:15, 4579:5, 4579:16, 4579:17
**STATES** [3] - 4447:1, 4447:3, 4447:12
**States** [5] - 4447:5, 4447:14, 4447:18, 4484:24, 4486:22
**status** [1] - 4542:7
**stenography** [1] - 4447:25
**step** [1] - 4536:2
**Steve** [1] - 4564:3
**sticker** [3] - 4510:16, 4550:7, 4550:9
**still** [13] - 4448:17, 4456:9, 4457:5, 4466:11, 4473:23, 4484:11, 4509:18, 4554:21, 4555:6, 4555:20, 4555:22, 4571:4, 4583:12
**stinks** [1] - 4461:5
**stipulate** [11] - 4483:9, 4527:13, 4527:15, 4528:1, 4528:22, 4529:2, 4529:7, 4529:10, 4531:17, 4533:22, 4552:8
**stipulating** [2] - 4533:20, 4582:22
**stipulation** [5] - 4528:1, 4529:12, 4534:12, 4582:20, 4583:4
**stock** [8] - 4457:16, 4464:16, 4468:23, 4474:20, 4474:22, 4475:10, 4475:17, 4475:21
**stocks** [6] - 4462:19, 4467:21, 4496:17, 4497:7, 4497:8, 4501:24
**stop** [5] - 4461:25, 4465:5, 4491:20, 4508:5, 4515:16
**story** [3] - 4532:13, 4532:14, 4532:15
**straighten** [2] - 4519:5, 4572:17
**strategy** [1] - 4457:20
**streamline** [1] - 4552:5
**student** [1] - 4451:25
**students** [2] - 4450:21, 4453:11
**stuff** [8] - 4463:23, 4463:24, 4496:22,

4521:10, 4525:14, 4570:21, 4574:7, 4582:23
**stunned** [1] - 4582:23
**subject** [3] - 4486:3, 4560:24, 4571:8
**subjects** [1] - 4500:3
**submission** [1] - 4587:24
**submissions** [2] - 4583:20, 4588:5
**submit** [4] - 4568:11, 4581:11, 4587:20, 4587:21
**submitting** [1] - 4588:12
**subpoena** [2] - 4517:23, 4517:24
**subpoenas** [2] - 4517:21, 4576:25
**subscription** [12] - 4564:19, 4565:14, 4568:7, 4575:11, 4577:20, 4577:22, 4577:23, 4577:25, 4578:2, 4580:9, 4582:13, 4586:11
**subset** [1] - 4556:8
**subspecialities** [1] - 4473:2
**substance** [4] - 4499:14, 4525:16, 4542:17, 4548:10
**substantial** [1] - 4477:21
**substantially** [4] - 4551:24, 4553:1, 4585:8, 4585:9
**successful** [1] - 4495:24
**suddenly** [1] - 4531:25
**suggest** [10] - 4528:19, 4573:4, 4573:18, 4573:20, 4573:23, 4575:1, 4577:15, 4577:25, 4578:20
**suggested** [1] - 4529:14
**suggesting** [2] - 4472:8, 4583:25
**suggestion** [3] - 4531:10, 4581:22, 4585:6
**suggestions** [1] - 4541:24
**suggests** [1] - 4573:25
**summary** [1] - 4554:16
**support** [2] - 4467:20, 4587:24
**supported** [1] - 4552:22
**supposed** [4] - 4480:9, 4506:3, 4518:14, 4532:4
**surprise** [2] - 4552:1, 4552:17
**surprised** [2] - 4483:14, 4483:15
**surprising** [1] - 4475:12
**surrounding** [1] - 4554:17
**sustain** [3] - 4521:1, 4550:21, 4550:23
**Sustained** [13] - 4467:1, 4486:6, 4500:6, 4500:15, 4503:19, 4512:6, 4513:18, 4514:10, 4516:10, 4521:15, 4521:18, 4543:14, 4561:1
**sustained** [1] - 4472:13
**Swann** [27] - 4470:2, 4470:3, 4470:13, 4470:19, 4472:4, 4472:16, 4473:5, 4473:11, 4473:12, 4473:15, 4473:16, 4473:18, 4473:22, 4474:8, 4481:3, 4481:19, 4487:6, 4495:10, 4495:23, 4496:18, 4497:11, 4542:16, 4546:18, 4548:22, 4548:24, 4549:9, 4549:16
**Swanny** [13] - 4469:24, 4470:1, 4470:3, 4470:7, 4470:8, 4470:16, 4472:9, 4472:16, 4494:20, 4495:2, 4495:5
**Switzerland** [3] - 4462:3, 4462:7, 4462:10

**sworn** [2] - 4449:14, 4456:5

**T**

**tab** [1] - 4470:23
**table** [2] - 4486:25, 4515:2
**talks** [1] - 4560:20
**tax** [3] - 4474:19, 4544:19, 4558:2
**telephone** [2] - 4503:11, 4503:21
**ten** [6] - 4494:8, 4518:16, 4520:23, 4521:3, 4523:8, 4586:6
**term** [3] - 4464:1, 4469:22, 4474:22
**terms** [15] - 4451:16, 4457:20, 4474:18, 4475:3, 4498:8, 4510:8, 4515:17, 4534:13, 4554:15, 4566:20, 4566:22, 4567:13, 4575:14, 4576:21, 4582:6
**terrible** [2] - 4578:15, 4578:16
**test** [1] - 4477:14
**tested** [1] - 4560:16
**testified** [16] - 4449:15, 4456:6, 4474:14, 4483:16, 4503:11, 4522:25, 4523:14, 4528:17, 4543:24, 4550:17, 4551:2, 4557:4, 4566:10, 4566:24, 4572:1, 4575:23
**testifies** [4] - 4554:2, 4554:4, 4564:10
**testify** [13] - 4513:20, 4515:10, 4565:10, 4565:24, 4565:25, 4566:14, 4567:14, 4569:9, 4576:3, 4576:4, 4581:3, 4581:11, 4582:8
**testifying** [7] - 4550:19, 4553:14, 4565:1, 4573:2, 4582:12, 4582:13, 4582:14
**testimony** [17] - 4449:10, 4492:5, 4504:1, 4514:13, 4523:3, 4524:12, 4528:20, 4530:11, 4564:13, 4566:2, 4571:6, 4574:18, 4574:20, 4574:23, 4576:18, 4577:14, 4580:7
**Texas** [1] - 4549:8
**thanking** [1] - 4460:8
**THE** [195] - 4447:11, 4448:1, 4448:7, 4448:11, 4448:14, 4448:20, 4449:2, 4449:4, 4449:16, 4452:8, 4452:10, 4452:12, 4452:14, 4455:14, 4455:16, 4455:18, 4455:23, 4455:25, 4456:4, 4456:8, 4456:21, 4458:7, 4458:9, 4467:1, 4472:13, 4485:5, 4485:8, 4486:6, 4488:11, 4493:2, 4493:4, 4500:6, 4500:15, 4503:2, 4503:19, 4504:3, 4504:13, 4504:20, 4505:22, 4508:2, 4508:4, 4508:7, 4508:9, 4508:10, 4508:11, 4510:13, 4510:18, 4510:21, 4510:23, 4512:6, 4513:7, 4513:18, 4514:10, 4515:6, 4516:10, 4516:17, 4519:3, 4521:1, 4521:15, 4521:18, 4522:12, 4522:13, 4522:14, 4522:17, 4522:20, 4522:21, 4522:23, 4522:24, 4523:7, 4523:13, 4524:11, 4524:15, 4524:16, 4524:18, 4526:21, 4527:4, 4527:7, 4528:3, 4528:17, 4529:2, 4530:10, 4530:14, 4530:24, 4531:4, 4533:5, 4534:1, 4534:10, 4535:9, 4536:4, 4536:7, 4536:22,

4536:25, 4537:3, 4537:11, 4537:23, 4538:2, 4538:5, 4538:14, 4538:18, 4538:21, 4539:4, 4539:7, 4539:10, 4539:16, 4539:24, 4540:4, 4540:14, 4540:17, 4541:15, 4543:14, 4543:19, 4543:22, 4545:11, 4547:18, 4549:20, 4550:19, 4550:21, 4550:23, 4550:25, 4551:2, 4551:7, 4551:12, 4551:15, 4552:10, 4552:12, 4552:14, 4552:17, 4553:7, 4553:10, 4554:13, 4555:1, 4556:17, 4556:19, 4561:1, 4561:6, 4562:10, 4562:12, 4562:14, 4562:20, 4563:2, 4563:12, 4563:17, 4563:21, 4563:24, 4564:18, 4566:3, 4566:12, 4566:20, 4568:10, 4568:15, 4569:19, 4569:25, 4570:5, 4570:15, 4570:23, 4571:4, 4571:6, 4571:14, 4571:20, 4571:23, 4574:14, 4575:7, 4575:9, 4576:7, 4576:11, 4578:24, 4579:1, 4579:14, 4579:22, 4579:24, 4580:4, 4581:2, 4581:9, 4581:21, 4581:23, 4582:25, 4583:2, 4583:12, 4583:19, 4583:25, 4584:3, 4584:7, 4584:15, 4585:3, 4585:7, 4586:2, 4586:5, 4586:19, 4586:21, 4587:1, 4587:17, 4587:19, 4587:23, 4588:4, 4588:21

**themselves** [2] - 4558:20, 4582:16

**theory** [1] - 4570:5

**Therapeutic** [1] - 4548:24

**Therapeutics** [3] - 4547:5, 4548:11, 4550:1

**therefore** [1] - 4532:3

**therein** [2] - 4504:2, 4504:4

**they've** [4] - 4577:12, 4577:13, 4585:13

**thinking** [1] - 4556:16

**third** [6] - 4495:8, 4495:15, 4495:18, 4495:19, 4508:21, 4547:19

**Third** [1] - 4447:19

**thoughts** [1] - 4458:23

**thousand** [3] - 4481:15, 4481:21, 4551:12

**thousands** [1] - 4581:5

**three** [6] - 4483:19, 4484:12, 4509:20, 4524:1, 4531:23, 4555:7

**three-minute** [1] - 4524:1

**throw** [1] - 4578:20

**thrown** [1] - 4519:2

**Thursday** [1] - 4557:13

**timeframe** [1] - 4481:17

**timetable** [1] - 4471:15

**timing** [5] - 4515:15, 4523:12, 4552:25, 4553:5, 4587:19

**title** [1] - 4450:1

**today** [8] - 4448:21, 4449:10, 4471:1, 4476:6, 4523:20, 4552:13, 4556:2, 4584:1

**together** [2] - 4553:4, 4556:2

**tomorrow** [14] - 4458:22, 4542:7, 4553:9, 4553:15, 4554:14, 4584:16, 4585:12, 4585:21, 4586:3, 4586:14, 4587:7, 4587:21, 4588:6, 4588:8

**tonight** [6] - 4584:9, 4584:21, 4584:25, 4586:6, 4587:20

**took** [8] - 4449:14, 4480:4, 4494:15, 4494:18, 4495:10, 4495:22, 4535:3, 4580:18

**top** [6] - 4463:14, 4498:14, 4501:4, 4501:8, 4537:25

**total** [2] - 4568:1, 4569:11

**tough** [1] - 4493:21

**town** [1] - 4458:21

**track** [1] - 4584:19

**tradable** [2] - 4474:21, 4476:2

**traded** [3] - 4468:7, 4512:19, 4512:20

**trades** [1] - 4495:11

**trading** [1] - 4548:24

**traditional** [1] - 4468:16

**Transcript** [2] - 4447:25, 4476:17

**TRANSCRIPT** [1] - 4447:11

**Transcription** [1] - 4447:25

**transfer** [3] - 4565:3, 4565:8, 4568:2

**transitioned** [1] - 4494:23

**treat** [1] - 4562:1

**tremendous** [1] - 4505:14

**trial** [19] - 4534:24, 4556:20, 4564:8, 4564:9, 4569:21, 4569:23, 4575:2, 4576:25, 4578:6, 4579:2, 4583:7, 4583:10, 4583:20, 4584:17, 4585:9, 4585:14, 4586:16

**TRIAL** [1] - 4447:11

**tried** [3] - 4507:22, 4552:16, 4567:4

**trip** [1] - 4562:13

**trouble** [1] - 4503:10

**true** [14] - 4453:14, 4480:23, 4482:13, 4487:10, 4494:9, 4496:15, 4505:19, 4507:4, 4507:6, 4523:8, 4524:3, 4524:21, 4566:15, 4566:25

**trust** [1] - 4553:12

**truth** [21] - 4461:16, 4493:17, 4507:8, 4513:24, 4514:5, 4514:7, 4515:14, 4516:2, 4516:12, 4516:13, 4516:20, 4516:22, 4517:3, 4530:18, 4530:22, 4530:24, 4533:3, 4538:25, 4539:9, 4539:12, 4539:16

**truthful** [15] - 4471:22, 4478:1, 4491:2, 4491:19, 4492:4, 4492:7, 4507:11, 4507:13, 4514:12, 4514:23, 4514:24, 4515:11, 4515:13, 4525:12, 4574:21

**try** [12] - 4461:24, 4465:25, 4488:20, 4494:22, 4497:10, 4497:12, 4500:10, 4504:15, 4507:9, 4555:15, 4570:8, 4584:10

**trying** [22] - 4455:20, 4472:6, 4472:15, 4502:3, 4502:14, 4502:18, 4505:1, 4505:18, 4505:20, 4518:2, 4544:9, 4552:4, 4554:17, 4554:21, 4555:6, 4561:25, 4564:15, 4570:8, 4570:9, 4570:14, 4574:6

**Tschang** [1] - 4564:3

**turmoil** [1] - 4465:25

**turn** [17] - 4448:10, 4448:19, 4449:7, 4469:20, 4512:10, 4517:8, 4518:5,

4518:8, 4518:11, 4520:18, 4525:24, 4526:4, 4526:12, 4527:19, 4528:21, 4546:3, 4559:2

**turned** [4] - 4517:25, 4518:2, 4518:5, 4518:9

**turning** [4] - 4518:6, 4526:5, 4527:14, 4531:10, 4531:11

**twice** [1] - 4499:22

**two** [23] - 4497:4, 4503:13, 4503:14, 4505:13, 4506:1, 4509:19, 4527:2, 4529:17, 4529:18, 4530:17, 4531:11, 4539:17, 4539:20, 4554:5, 4554:24, 4555:5, 4564:25, 4565:11, 4565:18, 4572:1, 4588:20, 4588:21

**two-minute** [2] - 4503:13, 4503:14

**type** [4] - 4453:12, 4473:13, 4494:17, 4503:17

**typical** [1] - 4580:5

## U

**U.S** [3] - 4489:3, 4492:22, 4515:20

**ultimate** [1] - 4553:3

**ultimately** [14] - 4463:5, 4465:14, 4465:18, 4466:19, 4466:23, 4467:3, 4475:4, 4478:10, 4479:17, 4484:20, 4497:4, 4497:10, 4498:11, 4557:19

**umbrella** [1] - 4450:16

**uncomfortable** [1] - 4579:4

**uncommon** [1] - 4549:17

**under** [14] - 4450:8, 4450:16, 4456:9, 4469:21, 4471:5, 4475:18, 4484:17, 4485:18, 4500:3, 4514:18, 4522:25, 4523:14, 4523:18, 4580:23

**Under** [1] - 4515:17

**undergraduate** [3] - 4450:16, 4452:5, 4453:10

**underpinnings** [1] - 4570:1

**understood** [4] - 4457:4, 4469:14, 4549:4, 4560:10

**undertaken** [1] - 4506:10

**uniformity** [1] - 4564:13

**UNITED** [3] - 4447:1, 4447:3, 4447:12

**United** [5] - 4447:5, 4447:14, 4447:18, 4484:24, 4486:21

**universe** [8] - 4555:24, 4555:25, 4556:10, 4556:11, 4556:12, 4581:4, 4581:6, 4584:24

**university** [3] - 4450:2, 4450:15, 4451:11

**University** [19] - 4448:13, 4448:25, 4449:21, 4449:22, 4450:1, 4450:4, 4450:10, 4450:12, 4450:17, 4450:21, 4450:25, 4451:13, 4451:14, 4451:23, 4452:1, 4452:6, 4453:22, 4453:25, 4455:5

**unless** [4] - 4501:14, 4503:7, 4552:1, 4562:21

**unofficial** [1] - 4455:6

**unusual** [2] - 4453:11, 4496:13

**up** [35] - 4448:7, 4456:16, 4458:22, 4460:10, 4460:11, 4464:1, 4464:2,

4464:13, 4464:18, 4464:20, 4466:14, 4470:14, 4471:17, 4473:5, 4473:9, 4479:2, 4483:14, 4484:18, 4485:20, 4509:13, 4509:19, 4513:20, 4517:14, 4517:23, 4521:10, 4531:23, 4533:12, 4558:10, 4559:3, 4563:4, 4567:4, 4571:8, 4573:14, 4573:22, 4585:15

**update** [2] - 4461:6, 4466:4
**Updated** [1] - 4542:6
**updated** [5] - 4456:25, 4458:4, 4469:21, 4537:18, 4540:20
**updates** [3] - 4568:9, 4568:11, 4568:18
**upper** [4] - 4479:10, 4488:16, 4489:10, 4492:20
**urge** [2] - 4587:8, 4587:11
**uses** [1] - 4549:9

## V

**valuable** [2] - 4481:11, 4573:13
**valuation** [1] - 4566:20
**value** [8] - 4458:24, 4459:20, 4459:22, 4460:3, 4467:22, 4472:1, 4482:3, 4566:22
**varied** [1] - 4450:7
**various** [3] - 4567:15, 4569:13, 4581:19
**version** [1] - 4556:3
**vice** [1] - 4450:2
**victim** [3] - 4565:25, 4567:6, 4581:2
**victims** [4] - 4565:23, 4566:10, 4567:5, 4581:5
**view** [1] - 4564:11
**violation** [1] - 4573:25
**vis-à-vis** [1] - 4586:11
**visited** [1] - 4478:20
**vulnerable** [1] - 4573:16

## W

**W-2** [1] - 4545:8
**W-9** [8] - 4545:6, 4545:16, 4545:18, 4550:6, 4557:4, 4557:14, 4557:17, 4557:19
**wait** [1] - 4466:16
**waiting** [1] - 4466:9
**wants** [2] - 4530:10, 4564:4
**warning** [1] - 4483:13
**waste** [1] - 4552:20
**watch** [1] - 4587:10
**watching** [1] - 4482:19
**ways** [2] - 4458:23, 4459:19
**wealth** [2] - 4531:25, 4574:3
**Wednesday** [2] - 4447:7, 4552:13
**weeds** [1] - 4588:13
**week** [7] - 4551:18, 4552:2, 4552:7, 4552:10, 4552:11, 4552:12
**weekend** [2] - 4553:11, 4555:9
**weeks** [6] - 4483:19, 4484:12, 4509:20, 4575:2, 4579:1, 4586:17
**wherewithal** [1] - 4466:13
**whole** [2] - 4525:8, 4529:22
**wholesale** [1] - 4573:17

**wink** [1] - 4513:16
**wire** [4] - 4458:5, 4458:12, 4464:15, 4466:1
**wired** [1] - 4558:8
**wish** [1] - 4587:3
**withdraw** [4] - 4466:22, 4479:25, 4504:22, 4537:1
**withdrawn** [3] - 4479:25, 4494:12, 4524:16
**Witness** [2] - 4455:17, 4562:15
**WITNESS** [14] - 4452:10, 4455:16, 4493:4, 4508:9, 4508:11, 4522:13, 4522:20, 4522:23, 4524:15, 4524:18, 4543:22, 4550:19, 4562:14, 4590:2
**witness** [51] - 4448:4, 4448:9, 4448:13, 4448:18, 4449:7, 4449:9, 4449:11, 4455:24, 4456:18, 4512:16, 4514:12, 4514:15, 4515:23, 4517:16, 4519:3, 4519:9, 4527:9, 4527:14, 4529:25, 4531:20, 4534:18, 4535:4, 4535:5, 4538:21, 4539:2, 4539:5, 4543:19, 4547:17, 4551:24, 4554:8, 4554:9, 4554:16, 4562:16, 4563:8, 4564:9, 4565:1, 4565:2, 4566:14, 4569:24, 4574:8, 4574:17, 4574:22, 4575:23, 4575:25, 4577:12, 4578:15, 4578:16, 4580:14, 4580:15, 4580:16, 4580:19
**witness'** [3] - 4517:19, 4519:11, 4574:23
**witnesses** [28] - 4535:2, 4553:18, 4553:22, 4554:5, 4563:6, 4564:2, 4564:6, 4564:17, 4569:16, 4569:17, 4569:18, 4570:16, 4573:10, 4573:11, 4574:11, 4576:3, 4576:24, 4577:21, 4578:9, 4579:2, 4579:5, 4581:10, 4581:13, 4582:4, 4582:8, 4583:23, 4584:19, 4586:9
**won** [1] - 4570:7
**word** [4] - 4495:8, 4507:19, 4513:5, 4555:11
**Word** [2] - 4530:5, 4533:15
**words** [11] - 4459:3, 4463:11, 4495:16, 4499:18, 4502:5, 4502:8, 4502:15, 4507:11, 4520:6, 4541:23, 4548:10
**works** [2] - 4470:2, 4502:15
**world** [4] - 4464:15, 4464:22, 4473:19, 4500:3
**worries** [1] - 4463:14
**Wow** [1] - 4520:5
**write** [3] - 4463:15, 4476:4, 4581:25
**writes** [3] - 4458:18, 4475:16, 4584:11
**writing** [2] - 4457:5, 4540:20
**wrote** [1] - 4460:2

## Y

**YAFEE** [2] - 4456:5, 4590:5
**Yaffe** [41] - 4449:8, 4455:19, 4456:9, 4456:13, 4456:15, 4467:14, 4474:23, 4479:1, 4489:5, 4489:22, 4492:21, 4493:25, 4494:5, 4508:24, 4509:12, 4509:15, 4526:2, 4527:24, 4528:7,

4528:23, 4529:3, 4529:6, 4531:10, 4533:6, 4533:7, 4533:13, 4534:2, 4536:12, 4538:8, 4538:10, 4538:11, 4538:13, 4538:17, 4539:11, 4539:14, 4541:16, 4570:19, 4571:14, 4571:16
**Yaffe's** [2] - 4539:13, 4570:24
**Year** [1] - 4476:6
**year** [1] - 4528:6
**Year's** [1] - 4476:9
**years** [16] - 4453:23, 4457:17, 4462:12, 4462:18, 4467:21, 4468:12, 4473:1, 4484:18, 4485:3, 4485:20, 4494:8, 4518:16, 4520:23, 4521:3, 4528:5, 4531:23
**yesterday** [11] - 4464:1, 4467:9, 4474:14, 4497:18, 4506:16, 4519:22, 4520:19, 4522:2, 4523:18, 4524:3, 4563:4
**Yesterday** [2] - 4522:25, 4524:7
**YORK** [1] - 4447:1
**York** [10] - 4447:6, 4447:15, 4447:16, 4447:20, 4449:21, 4482:24, 4484:9, 4541:9, 4548:1
**yourself** [10] - 4472:8, 4479:1, 4479:7, 4488:9, 4489:16, 4493:6, 4495:9, 4498:15, 4501:5, 4537:14

## Z

**Zellan** [3] - 4582:22, 4583:1
**ZELLAN** [4] - 4447:21, 4563:3, 4563:14, 4583:3