4447

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 15-CR-00637(KAM)
                                   :
                                   :
                                   :
        -against-                  : United States Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
                                   : Thursday, July 20, 2017
MARTIN SHKRELI,                    : 4:00 p.m.
                                   :
         Defendant.                :
                                   :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE KIYO A. MATSUMOTO
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Government:   BRIDGET M. ROHDE, ESQ.
                      Acting United States Attorney
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                 BY:  JACQUELYN M. KASULIS, ESQ.
                      ALIXANDRA ELEIS SMITH, ESQ.
                      G. KARTHIK SRINIVASAN, ESQ.
                      Assistant United States Attorneys

For the Defendant:    BRAFMAN & ASSOCIATES, P.C.
                      767 Third Avenue
                      New York, New York 10017
                 BY: BENJAMIN BRAFMAN, ESQ.
                      MARC AGNIFILO, ESQ.
                      ANDREA ZELLAN, ESQ.
                      JACOB KAPLAN, ESQ.

Court Reporter:   Richard W. Barry, RPR
                  Official Court Reporter
                  E-mail:  rwbarrycourtreporter@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

- Proceedings -                              4448

1      THE COURT:  All right.  This is just a conference

2  that we scheduled in light of the Government's motion which

3  was filed last evening.  It was a motion to admit certain

4  evidence of the charged crimes through the testimony of an

5  F.B.I. agent and the registration agent.

6          The defendant opposes and we received a reply from

7  the Government just maybe half an hour ago.  So, I guess my

8  question is this, I think-- I understand the Government has

9  laid out an evidentiary basis for the admissibility of the

10 evidence.

11         The defense raises, I would say constitutional

12 arguments for the most part.  Raising concerns that the

13 evidence of fraud cannot be established by merely throwing an

14 agreement, a subscription agreement before the jury because as

15 we know, and as I have gotten some glimpse of some of the

16 302's by the F.B.I., there were a variety of different

17 circumstances under which investors came into the MSMB hedge

18 funds.

19         The Government has cited law which is accurate

20 that-- we look at an objective standard as to what a

21 reasonable investor would find important in making an

22 investment decision.

23         But, the question I have for the parties is whether

24 they have-- thought about stipulating to the fact that

25 investors A,B,C,D,E, made investments of "X" amount over-- on

RB         OCR

- Proceedings -                                    4449

1    these particular days.  So that the subscription agreements

2    don't have to be admitted.  Is that something the parties

3    would consider?

4              MR. BRAFMAN:  I think there is-- the Government

5    agent will testify to certain bank deposits and I assume they

6    will identify who the people are.  That is really not the issue.

7              The fact that the money came in is really not the

8    issue.  It is why it came in, who it came in from, and why

9    that person decided to invest.  If it is just a deposit

10   without more, there is no evidence of any fraud whatsoever.

11             THE COURT:  Well, I know the Government says it is

12   important to establish A the investment was made; B, it was

13   not a loan or some other arrangement.  That it was actually an

14   investment by the investor.

15             So, my question is, would the parties be able to

16   stipulate to the fact of the investment by investor A through

17   Z in whatever amount it was on a given date?

18             MR. BRAFMAN:  For what purpose, Judge?

19             THE COURT:  Well, with an instruction that the

20   defendant is not conceding that these investors were victims

21   of fraud or, you know, without conceding that these investors

22   necessarily relied on statements by Mr. Shkreli.

23             Unless the Government is offering these statements

24   to show that these investors were defrauded.  You don't say

25   that in your papers.

- Proceedings -                                    4450

1          MR. BRAFMAN:  That is the only reason they would

2    offer it.

3          MS. KASULIS:  Your Honor, we can't stand up and

4    argue that these individuals relied on those specific

5    misrepresentations that Mr. Shkreli made.  I mean we can't,

6    because we have not obviously, we have not heard testimony

7    from them.

8          But we do believe the fact that Mr. Shkreli made

9    misrepresentations to them.

10          MR. BRAFMAN:  I can't hear you.

11          MS. KASULIS:  The fact Mr. Shkreli made

12    representations to them which we believe are

13    misrepresentations and omissions, and that those individuals

14    invested in the funds.  Then they received these performance

15    updates which we believe are patently false, is relevant

16    evidence to the charged frauds in the case, and we therefore

17    believe that they are admissible.

18          With respect to stipulating that these individuals

19    invested in the funds on these particular dates, we are happy

20    to stipulate to that to avoid the admission of the

21    subscription agreements.  But we don't think then a limiting

22    instruction is appropriate.

23          THE COURT:  Well, just to say--

24          MS. KASULIS:  But the fact that they invested, again

25    like we said, we can't say that person specifically relied--

- Proceedings -                                        4451

1   we can't make that-- we would not make that argument.  We

2   can't make that argument.

3           We do think it goes to the overall fraudulent scheme

4   to show the scope of the scheme, which we believe is very

5   relevant to our case.

6           THE COURT:  See, in that statement Ms. Kasulis, what

7   you are saying is, to the extent those investors are evidence,

8   their investments per se are evidence of the scope of the

9   scheme, is to say that they were in fact defrauded.

10          MS. KASULIS:  Your Honor, what we are saying is, is

11  that, Mr. Shkreli made these misrepresentations to them and

12  just the fact of him making these misrepresentations, that

13  alone, could be the basis of the fraud.

14          These investors could say, you know what, this is

15  fraud, what I am saying, I thought you are saying to me, I do

16  not believe is truthful.

17          But the fact he is making material

18  misrepresentations and omissions, is fraud.  That is the basis

19  to convict on that crime.

20          THE COURT:  But, you are not putting in the PPM.

21  What you are putting in, are the subscription agreements.  You

22  make the point that those agreements do not contain any

23  statements by Mr. Shkreli.

24          So, I don't know how you link the purported

25  fraudulent misrepresentations in the private placement

RB        OCR

- Proceedings -                                      4452

1   memoranda, to the fact that an investor then made an

2   investment.  You are not putting that evidence in.

3           MS. KASULIS:  So, Your Honor, A, we want to admit

4   that these investors actually made investments into the funds.

5   Because we heard from the defense just your argument, that you

6   said that, oh, this was just personal loans.  So we think it

7   is important to establish that if money is coming into the

8   bank accounts for those investors it was because they were

9   investing in the fund.

10          Then these investors do receive these performance

11  updates.

12          THE COURT:  So we are --

13          MS. KASULIS:  That is why we believe they are relevant.

14          THE COURT:  So, we are talking about post invest.

15  Then the subscription agreements demonstrate the fact of the

16  investment.

17          MS. KASULIS:  Correct.

18          THE COURT:  Without regard to what was said to

19  induce them to make the investment; is that right?

20          MS. KASULIS:  That's correct.

21          THE COURT:  They are not asking for the private

22  placement memoranda or any of the representations that Mr.

23  Shkreli made, but rather, these investors made an investment

24  and then what comes next.  What comes next are, the monthly

25  performance reports.

- Proceedings -                                    4453

1          MR. BRAFMAN:  Yes, but the Government only wants to

2    do this, because they will then argue in summation that the

3    jury may infer that all of these people who they never heard

4    of, or never saw or never was able to-- able to listen to and

5    provided no testimony, are nevertheless victims of this fraud

6    because over the scope of the fraud is "X" instead of the

7    limited "Y" they proved.

8          I will tell you Judge and say this with great

9    sincerity, that for the last 36 hours, reading the

10   Government's papers and being up all night trying to respond

11   to it, I feel like I have landed on the moon where they have

12   not watched this trial.

13         What they put forward is a hodgepodge of investors,

14   each of whom is different.  Many of them have relied on

15   independent advisors or people like Kevin Mulleady and Ron

16   Tilles, and people who have not come into this courtroom and

17   the jury has not heard.  They have not established those

18   people are coconspirators, and yet whatever anybody said to

19   these people, suddenly it is Martin's fault because they

20   invested in the fund they believe to have been a fraud.  I

21   don't get it, Judge.

22         You have watched the testimony of these investors.

23   I want to say this because I need to say it.

24         They have in my judgment, been sitting on this hand

25   grenade for weeks.  This is not a decision they made after

- Proceedings -                                    4454

1   listening to Mr. Yaffe implode yesterday.  This is a decision

2   they were planning for weeks.  And to do that to you, most

3   respectfully, and also to us, is just not right.

4           Let me tell you why.  Let me tell you why.  Last

5   week they told us Al Geller was testifying and they told us it

6   will be at the end of the week and he is on an E-mail chain.

7   He is an important witness.  There is a wealth of material

8   that you need to prepare in order to cross examine him.

9           I don't believe they ever intended to call Al

10  Geller.  I believe they intended to try to slip this in, Ms.

11  Zellan found it.  We were stunned.  And they are trying to put

12  in a consultant agreement or a-- for them to say well, in

13  their reply we had a list of their exhibits, since June 12th.

14  Yes, we did.  And we expected that like with the Blanton

15  exhibits, Mr. Blanton would testify; and like Mr. Geller,

16  David Geller would testify.  It was never a sound from them

17  they were going to offer the consulting agreements and

18  settlement agreements from the dozens of people who are

19  reflected in our papers.

20          This is a motion that should have been argued before

21  the trial started because it would-- it would have effected

22  the opening statements on both sides.  But, having said that,

23  we are now here.

24          The one thing that has become clear is there is no

25  method to the madness in the Government's case.  Each witness

- Proceedings -                                    4455

1   who testified in our view, gave enough evidence on cross

2   examination from which we could argue that they should not be

3   considered a victim of a fraud.

4           Now, Your Honor may feel differently.  But, I'm not

5   asking you to agree with that.  I am asking you to allow Mr.

6   Shkreli the fundamental fairness of being able to finish this

7   trial and deal with these people if they testify and not with

8   pieces of paper that they might very well disavow on the

9   witness stand or a theory of fraud that Al Geller would

10  disavow on the witness stand or Ron Tilles would disavow.

11          These are people who invested because they either

12  loved Martin or were related to Kevin Mulleady and nothing to

13  do with us.

14          THE COURT:  You know, I did just in order to prepare

15  myself and understand, go through the binders of the 3500

16  material looking for information to understand who these other

17  investors were and what the circumstances were.

18          I think Mr. Brafman makes a point some for example

19  Mr. Lavelle said that he came through his cousin Kevin

20  Mulleady.  He didn't really pay much attention to the private

21  placement memorandum.  He trusted his cousin.  He wanted to

22  support his cousin and that is why he invested.

23          I can't recall for sure, but I think he also didn't

24  really pay close attention to the monthly reports, performance

25  reports, because he relied on his cousin to tell him that the

- Proceedings -                                    4456

1   fund was doing great.

2          I could not find anything about Molly Chang, but

3   Steve Rosenfeld said he relied on his relationship with Mr.

4   Tilles to be brought into the fund.  And I think he didn't

5   even get performance reports.

6          MR. BRAFMAN:  That's correct.

7          THE COURT:  And then Diandra Douglas had an

8   investment manager.  Pretty much said, I don't remember

9   anything.  She has unfortunately this issue with her memory.

10  She said, you know, I had an investment advisor, I would get

11  documents to sign.  I signed them.  I didn't really look at

12  any of the performance reports.

13         So, I think by putting these subscription agreements

14  in, it does create an unfair 403 type of problem of unfair

15  prejudice to the defendant, because there is an implication

16  that all of these people were brought in because of Mr.

17  Shkreli's statements.

18         Unless you can show that Mr. Mulleady and Mr. Tilles

19  were providing information directly from Mr. Shkreli.  We

20  don't have that so far.

21         MS. KASULIS:  We did, Your Honor, through Jackson

22  Su.  He testified that he sat next to Mr. Mulleady when

23  calling investors and that Mr. Shkreli and Mr. Mulleady, on

24  speakerphone would talk to potential investors and make

25  misrepresentations regarding the funds.

- Proceedings -                                           4457

1          THE COURT:  Generally he heard some of these, but in

2    terms of specifically Mr. Lavelle, Mr. Rosenfeld and Ms.

3    Douglas, there is no evidence that those conversations were

4    overheard by Mr. Su.  There is really nothing that establishes

5    that they paid any attention to any of those statements or the

6    private placement memoranda.

7          I do think that admitting those subscription

8    agreements would create an unfair impression that they did

9    come to the table because of Mr. Shkreli.  When in fact, it

10   doesn't appear that that is accurate.

11         MR. BRAFMAN:  Can I add one other thing, Judge?

12         THE COURT:  Yes.

13         MR. BRAFMAN:  You know, I was stunned when I saw Mr.

14   Rosenfeld's name included among the people who they claimed to

15   be participating in the false consulting agreement.  I mean

16   they fought very hard for us not to be able to mention the

17   fact that Mr. Rosenfeld went through a heated, significant

18   arbitration proceeding in which among other people Mr.

19   Deslogi(ph) testified at length.  The arbitrator made a

20   finding, the consulting agreement was real, that Mr. Rosenfeld

21   provided real consulting work and that they were ordered to

22   then provide the final payment under the consulting agreement.

23         We can't get that in, I understand because it is a

24   different proceeding and I recognize however much I would like

25   to use it, I can't use it affirmatively.

- Proceedings -                                    4458

1          For them to suggest that Mr. Rosenfeld's consulting

2   agreement is evidence of fraud, when the only time he has ever

3   been challenged on that, the independent arbitrator ruled in

4   his favor and made Retrophin pay him the balance of the fee,

5   is to me, just stunning.  They would try to offer his

6   consulting agreement on paper and suggest that it represents

7   fraud.

8          I mean I just don't understand this.

9          MS. KASULIS:  With respect to Mr. Rosenfeld's

10  agreement we are not going to be arguing it is a sham.  We are

11  going to admit it to show that Mr. Shkreli did in fact settle

12  with Mr. Rosenfeld.  That is the releases in the agreement

13  that shows that.

14         So, we do believe that it is relevant and we are not

15  arguing it is a sham.  So Your Honor, we believe that we have

16  provided evidence that Kevin Mulleady, Ron Tilles they are

17  coconspirators.  Mr. Rosenfeld did receive investor statement.

18         THE COURT:  What evidence is there, that Mulleady is

19  a coconspirator?

20         MS. KASULIS:  We had testimony from Jackson Su and

21  E-mails from Kevin Mulleady admitted and showing, we have

22  another E-mail here.  Showing Kevin Mulleady is going back and

23  forth.  I told this investor what is the-- is it 40 million,

24  saying 80 million.  I mean, I think that we have established

25  by a preponderance that-- that separate and apart, Your Honor,

- Proceedings -                          4459

1   from the fact the individuals are receiving these performance

2   updates, which I think we have proven are patently false.

3          THE COURT:  That is another category.

4          MS. KASULIS:  We have to prove they are in the fund

5   to be able to say they are getting these misrepresentations.

6          THE COURT:  Why don't the performance updates prove

7   they are in the fund.  A, it says it is a statement directly

8   from Mr. Shkreli or Mr. Mulleady or Mr.-- or NAV.  I think you

9   have to show-- I think you have to show that the information

10  that was contained in those monthly performance reports, were

11  sourced from Mr. Shkreli.

12         MR. BRAFMAN:  They don't have that evidence.

13         MS. KASULIS:  They were --

14         THE COURT:  I don't see any information.  I don't

15  see the link that the information provided by NAV came from

16  Mr. Shkreli.  We don't have an NAV witness saying, Mr. Shkreli

17  gave me the information that I put in the reports that I sent

18  each month.

19         Mr. Mulleady doesn't say, and there is no evidence

20  that says, Mr. Shkreli told Mr. Mulleady, this is the

21  information you should put in the performance reports.  Maybe

22  you have it, but I have not seen it yet in evidence.

23         Mr. Mulleady's-- the fact Mr. Mulleady is being told

24  by Mr. Shkreli what the AUM is, doesn't mean Mr. Mulleady

25  agreed to misrepresent the amount of the AUM.  He could have

- Proceedings -                                           4460

1   just been relying on Mr. Shkreli's representation about what

2   the AUM was and just convey that.  We don't have evidence that

3   there was an agreement between them to agree to an illegal

4   scheme.

5           MS. KASULIS:  Your Honor, so if Your Honor is not

6   finding that we have proven that Mr. Mulleady is a

7   coconspirator there is also an 801(d)(2) exception for agents

8   and employees of Mr. Shkreli.  So, if he is acting as Mr.

9   Shkreli's agent as Mr. Shkreli is the fund manager, then again

10  we are entitled to put in those statements as evidence of the

11  fraud.

12          THE COURT:  But if he is conspiring with an agent

13  of-- of himself.  He has got to conspire with another person.

14          MS. KASULIS:  Right.

15          THE COURT:  Can that other person be an agent of

16  himself?

17          MS. KASULIS:  We are not saying-- we believe he is a

18  coconspirator Your Honor.

19          THE COURT:  I'm trying to understand what evidence

20  there is about-- I guess we are jumping ahead to the E-mails.

21          MS. KASULIS:  We can, we believe we have established

22  that NAV, the source of NAV's information came from Mr.

23  Shkreli.  But we are happy to call a witness from NAV.  We can

24  do that, to say our sole source of information was Jackson Su

25  and Mr. Shkreli.  So it actually is Mr. Shkreli because

- Proceedings -                    4461

1   Jackson Su didn't have access to the MSMB healthcare accounts.

2   Mr. Shkreli excluded him from doing that.

3            So we are happy to call an NAV witness, Your Honor,

4   to establish or we can stipulate to that.

5            MR. BRAFMAN:  We are not.

6            MS. KASULIS:  We are happy to call the witness, Your

7   Honor to show that Mr. Shkreli was the one providing these

8   updates or performance updates to NAV.  We certainly can do that.

9            MR. BRAFMAN:  Your Honor --

10           MS. KASULIS:  Either a coconspirator exception that

11  applies or an agent exception that applies.  Under either of

12  those theories, we believe these updates are in fact

13  admissions of the defendant and should be admissible to prove

14  the charged crimes.

15           MR. BRAFMAN:  Can they indicate-- am I missing

16  something or didn't NAV get their value third party valuations

17  of Retrophin from a company called VRC?  Mr. Shkreli didn't

18  give them this information.

19           MS. KASULIS:  Mr. --

20           MR. BRAFMAN:  Besides, Judge, what they have failed

21  to do throughout this trial, and I was hoping not to have to

22  front this issue before the case agent.  What they failed to

23  do, is recognize that the performance bills that the people

24  got, says your account is valued at.  Not the balance of your

25  account is $256,000.  They have completely ignored the

- Proceedings -                          4462

1   Retrophin value that Mr. Shkreli valued and shown to be

2   completely correct throughout the period.

3          So the agent saying there was only $800 in the

4   account when you said my balance was 256.  He doesn't use the

5   word "balance".  He says the valuation of your account.  The

6   value of your account.  This is sort of like, I want you to

7   value the house, sir, but I don't want you to consider the

8   value of the house.  This is ridiculous.

9          The company of MSMB and Retrophin at one point

10  became fungible.  They may not want to agree to that or they

11  may argue to the contrary.  But at the end of the day, this

12  was Mr. Shkreli and MSMB, Mr. Shkreli and Retrophin, and at

13  times they overlapped.  They have completely ignored the

14  valuation of Retrophin throughout the period of this trial.

15         So if they want to put on a witness to discuss this,

16  we will be happy to do it.  Kevin Mulleady is no more a

17  coconspirator on this record today, than just any random

18  person you might select.

19         The fact he has an E-mail exchange with Mr. Shkreli

20  discussing what the valuation should or should not be, the

21  evidence is clear, Your Honor, that the valuation of Retrophin

22  changed over time.  And as the company got more settled and

23  got more sound, the valuation increased.  And right now it is

24  close to a billion dollars and many of the investors have

25  profited handsomely as a result.

- Proceedings -                                    4463

1          THE COURT:  I understand that theory, I don't know

2     legally it is correct.

3          MS. KASULIS:  We are conflating MSMB Capital and

4     Healthcare.  Capital had no money in its bank accounts when

5     these performance updates were going out.  That is separate

6     and apart, that is one thing.

7               With respect to NAV and the MSMB Healthcare account.

8     We are happy to call a witness from NAV and happy to call a

9     witness from VRC.  Frankly they were very concerned, that they

10    would even call a report that was used by the defendant to

11    value Retrophin at $20 million.  We are happy to call those

12    two witnesses to put the lie to this valuation argument with

13    respect to MSMB Healthcare and we are certainly in a position

14    to do that.

15              I think what we are doing here is starting to do

16    closing arguments.

17         THE COURT:  Well, I'm just trying to understand what

18    evidence there is that would allow admission based on-- a view

19    that this is a coconspirator statement.

20              So, I'm thinking, all right, let's look at the

21    evidence.  The E-mails to and from Mr. Shkreli, to or from Mr.

22    Tilles, Mr. Greebel and the investors.

23              Again, evidence that Mr. Tilles, Mulleady or Greebel

24    are coconspirator, what do we have?

25              I understand that you rely on for example with

- Proceedings -                              4464

1   Mulleady, Government Exhibit 211 where Mulleady asks in

2   December 2011, where is the AUM for healthcare these days.  I

3   told Doug 40, he asked if we lost a big client.  I told him 80

4   earlier in the year.  Mr. Shkreli says 45.  It is 80 only if

5   you count full value of Retrophin, which I sometimes do.  We

6   don't know whether, you know that.

7              MS. SMITH:  Your Honor, one other thing to be clear.

8              So NAV, like I said we can-- we have a stipulation

9   on NAV because the defense didn't want us to spend time on

10  NAV.  The stipulation includes engagement letters and the

11  E-mail or letter directly to the defendant at the end of the

12  engagement saying, you know, Martin, that is the way the

13  letter is described.  We are ending our engagement with NAV.

14             So the three documents, we put them on the list for

15  the case agent from NAV.  I think pretty clearly show and you

16  know that Mr. Shkreli was the fund manager for MSMB

17  Healthcare, the only one that people who have testified that

18  had access to the bank accounts.  He was really in charge and

19  NAV was the agent.  If we need to call someone from NAV to

20  provide additional testimony to that point, we absolutely can.

21             I do want to say that the NAV quits, NAV stops

22  working for the fund, I believe in May or-- April or May 2012.

23  And so, after that point it is Mr. Shkreli who is sending out

24  the last round of investor statements to everybody, which

25  includes an investor statement to Mr. Rosenfeld, which have by

- Proceedings -                    4465

1   the way, completely insane estimates for MSMB Healthcare, very

2   different from when NAV was sending them out.

3           So you know, there are investor statements for MSMB

4   Healthcare that come directly from the defendant and not from

5   NAV.  All of the statements for MSMB Capital come directly

6   from the defendant.

7           On the VRC point, we are again more than happy to

8   call someone from VRC.  They tried to get the report in

9   through Mr. Massella, it didn't come in.  We didn't

10  necessarily think as a result they were going to try to argue

11  about a document that is not in evidence.

12          However, if that is going to be the case, we are

13  more than happy to get VRC on a plane from Chicago, they are

14  prepared to come and provide that testimony, that it was the

15  defendant who provided the information for that $20 million

16  investment summary, one page.  That he paid a total of $3,000

17  for that report and that there was basically no information

18  given to provide the report.

19          MS. KASULIS:  They spent one to two days on this

20  engagement.

21          MS. SMITH:  They were concerned that it was going to

22  be used in court, as a representation of the type of work they

23  normally do.  We are more than happy to put a witness on.

24          In addition, that report is not created until 2012.

25  So this idea that Mr. Shkreli had some sort of independent

- Proceedings -                                    4466

1    company, you know, backing up his valuation for Retrophin is,

2    A, absurd; and B, doesn't happen until I believe March of 2012.

3            So his valuation of Retrophin for MSMB Healthcare,

4    again MSMB Capital never invests in Retrophin, is not gifted

5    shares and doesn't show up on the table until December 3rd,

6    2012.  So, you know, the idea that Retrophin is part of MSMB

7    Capital's valuation, I am sure Mr. Brafman is going to argue

8    at closing, we are going to provide that information as a

9    reason why that is not true.

10           But for healthcare, if the idea is that oh, he was

11   valuing Retrophin and an independent third party company

12   backed him up, it didn't happen until March.  It is not a real

13   backup.  I mean you saw Mr. Massella's testimony.  He said

14   this is one page.  Normally a valuation report has schedules

15   and all the bank information.  I believe what they got from

16   Mr. Shkreli in order to create that report was a Cap table,

17   and a statement from him that somebody else unknown third

18   party had valued Retrophin at two hundred million.

19           MS. KASULIS:  Like three documents in the file they

20   got from Mr. Shkreli and did no independent verification of

21   any of the information Mr. Shkreli gave them.

22           THE COURT:  The thing is, each month, many of these

23   investors received these monthly performance reports.  They

24   came either from Mr. Shkreli or NAV.  And we saw a few that

25   were from Mr. Mulleady.

RB          OCR

- Proceedings -                                    4467

1          So --

2          MS. SMITH:  Those are forwarded from NAV.  The

3   original source was either Mr. Shkreli or NAV.  I don't think

4   they ever originally came from Mr. Mulleady.

5          THE COURT:  It seems to me those performance reports

6   which you make those links, and they are either admissions by

7   the party opponent or his agent or employee, or NAV

8   establishes the information they put in these performance

9   reports which were then forwarded to the investors, were

10  sourced directly from Mr. Shkreli.  Then it seems to me those

11  monthly performance reports could be admitted.

12          And, those reports establish who the investors are,

13  it establishes the amount of their investments and the date of

14  their investments, and gives the amount that Mr. Shkreli is

15  telling them-- it gives them a value for their account.

16          So, it seems to me that with that, with those

17  reports, you would not necessarily need the subscription

18  agreement.

19          MS. SMITH:  I think that is right.  With the

20  performance reports plus the bank accounts.  I think there is

21  a very good argument that is not one of defense counsel

22  suggested yesterday, a loan somehow to MSMB.  I mean that was

23  the reason to put in the subscription agreements.  Just to

24  establish the fact that the investor actually invested.  I

25  agree with you we can do it through performance reports.

- Proceedings -                                    4468

1        MR. BRAFMAN:  Are you talking about performance

2   reports for people who have not invested or not testified?

3        MS. SMITH:  Yes.

4        MR. BRAFMAN:  Will not be called.  Just everybody

5   whoever got a performance report.

6        THE COURT:  Well --

7        MR. BRAFMAN:  They are not relevant unless they are

8   part of the fraud.

9        MS. KASULIS:  They are part of the fraud.

10       MR. BRAFMAN:  There is no proof.

11       MS. KASULIS:  There is, because the performances

12  estimates.

13       MS. SMITH:  I think we are talking about two

14  different things.  Mr. Brafman is only focusing on what made

15  this investors invest.  And, that is one part, right.  But,

16  then there is the ongoing fraud, once their money is in there,

17  they are lied to, every single month about how much money is

18  in there.  They are told their investment is up.  If they were

19  told that their investment was way down and that there is $600

20  in the bank account in September of 2012, those people would

21  not have left their money in those funds.

22       So, I don't disagree with Mr. Brafman.  We are not

23  going to stand up in closing and argue somebody who didn't

24  testify relied on misrepresentations from the defendant to

25  invest.  We are not going to do that.  There is not going to

- Proceedings -                    4469

1   be evidence in the record for that.

2            What we are going to do is, say these people,

3   received false statements about the performance of the fund.

4   And that is part of the fraud.

5            It is not just oh, if you didn't lie to them to get

6   them in or they weren't paying attention that they weren't

7   defrauded.  It doesn't stop at the moment of investment.

8            THE COURT:  It is irrelevant whether or not they

9   actually looked or relied on them.

10           MS. SMITH:  That's correct.

11           MR. BRAFMAN:  Why is it irrelevant?  Why are they

12  victims of anything if they submitted money for let's say good

13  reasons.  They saw the-- they never looked at the documents.

14  They could not care less.  They are suggesting that if they

15  saw a negative balance they would get out.  Or they have no

16  evidence to that.  They may very well have been investing on

17  Mr. Shkreli's reputation, and on his ability, which is what

18  some of the witnesses said.

19           They are opining that if they got a performance

20  document that said that they were losing money, they would

21  have pulled out and they would have gone to the police and

22  they would have been known they are a victim.  That is not

23  true.  They don't have any evidence to support that.  They

24  don't have any evidence to support that.

25           MS. SMITH:  It is a lie by the defendant.  It is a

- Proceedings -                    4470

1    fraud for him to do that.  Even if nobody ever looks at it.

2             THE COURT:  I think the idea is, would a reasonable

3    investor rely on this information.

4             MS. SMITH:  Right.

5             THE COURT:  A reasonable investor, not the

6    subjective investor.  Would it be important for a reasonable

7    investor to know that the valuation of their investment was

8    wiped out.

9             MR. AGNIFILO:  Can I throw something in.

10            We are missing the entire premise.  At one point,

11   there was a nascent company called Retrophin.  And Retrophin

12   had a value.  It wasn't without a value.  It had a value.

13            How do we know these investors didn't know that.

14   How do we know unless the person comes here and testifies

15   under oath that what they knew, and what they did not know

16   about the content of their investments, especially when the

17   PPM specifically says, that their investment could involve

18   illiquid securities.

19            So my point though is --

20            THE COURT:  The Government takes the position though

21   that the MSMB Capital Fund never invested in Retrophin and

22   had-- there is no right for-- no basis for a representation to

23   be made to the MSMB Capital investors that somehow the value

24   of Retrophin was a factor in the value of their investment.

25            (Transcript continues on next page.)

Proceedings                                          4471

1    (Continuing)

2            MR. AGNIFILO:  If the fraud then is that rather than

3    being in MSMB Capital the value is in Healthcare, we have to

4    ask the investor if that would have mattered to them because

5    at some point, what -- we are making a factual conclusion and

6    it's dangerous, and it's inappropriate, and it's absolutely,

7    in my opinion, unconstitutional without a live witness.

8            And the factual conclusion that is being made in

9    this courtroom right now is that this investor, who will never

10   come into that courtroom and swear under oath to tell the

11   truth and talk about what they knew and what they didn't know,

12   somehow knew that Retrophin was not playing a factor in the

13   value of their investment.  And that is not a factual matter

14   that has been established in this record.  It's a factual

15   matter that everyone seems to be engaging in and going down

16   the path of fact-finding, except us.

17           What we want is, we want a witness in the chair,

18   Judge.  We want to ask the witness questions and I want,

19   Your Honor, respectfully to be suspicious of why they don't

20   want that to happen.  Why don't they want these witnesses to

21   testify?  We want the witness to testify.  We want to ask the

22   witness, did you know that Retrophin was what was providing

23   the value of your investment.  And I want it hear the answer

24   to that question.  And we get the right to ask that.

25           THE COURT:  The law, I think the Government's

Proceedings                                        4472

1    argument is that the law is not what the individual investor

2    subjectively thought.  It is what a reasonable investor would

3    have considered to be an important fact.  The fact that the

4    misstatement was made in and of itself --

5              MR. AGNIFILO:  Judge, we're saying it's not a

6    misstatement.

7              MS. KASULIS:  You can argue that to the jury.

8              MR. AGNIFILO:  You can't argue without a witness.

9              MS. KASULIS:  You're making the argument right now.

10             MS. SMITH:  Your Honor, in terms of the witnesses

11   first of all, you know, I can tell you that the jury was

12   glazing over during the last investment witness.  We are not

13   going to call another ten people.

14             MR. BRAFMAN:  Glazing over?  I thought they were

15   riveted.

16             THE COURT:  Only when you are cross-examining.

17             MR. BRAFMAN:  I understand that, but that's part of

18   the game, Judge, that's what we have in our system.

19             MS. KASULIS:  Your Honor, can we please respond?

20             MS. SMITH:  Seriously.  They have subpoena power, I

21   know they keep talking about a Grand Jury investigation.  We

22   are happy to tell them --

23             MR. BRAFMAN:  Are you going to give them

24   non-prosecution agreements?

25             MS. SMITH:  The remaining witnesses are not subjects

Proceedings                                            4473

1    or targets of an investigation.

2              MS. KASULIS:  They're victims.

3              MS. SMITH:  They're victims.  If the Defense wants

4    to call them in their case, they're more than welcome to.  Al

5    Geller has a non-prosecution agreement.  They can pick up the

6    phone, call his attorney and get him on the stand.  We prepped

7    Al Geller on Monday night, we made a decision this week based

8    on the way that the case was going not to call Mr. Geller.  We

9    know where he lives, we have the number of his attorney, his

10   attorney has not been reached out to by the Defense.

11             MR. BRAFMAN:  That's not true, I've spoken to him

12   five times.

13             MS. SMITH:  Mr. Cox?

14             MR. BRAFMAN:  Jeff Cox.  I'll show you E-mails from

15   him to me.

16             MS. KASULIS:  When did this happen?

17             MR. BRAFMAN:  Yesterday.

18             MR. AGNIFILO:  Oops.

19             MS. KASULIS:  Seriously, this is so unprofessional

20   the way that you are acting.

21             MR. BRAFMAN:  I'm not allowed to call Jeff Cox?

22             THE COURT:  No, you two are sitting there and making

23   wisecracks and swearing under your breath.  Just stop.  We are

24   not going do it that way in here.  I know this is an important

25   issue, but stop with the nonsense.

```
                        Proceedings                    4474
```

1          MS. SMITH:  I'm not sure what you want me to do, we

2   asked him if Defense had reached out to him.

3          MS. KASULIS:  I have an e-mail from him.

4          MS. SMITH:  When we have an e-mail from him, too.

5          My point is only that these witnesses are equally

6   available, which is why we have the instruction in the jury

7   instructions.  They are not cooperators, not in jail

8   somewhere.  If the Defense wants to call them, they're more

9   than welcome to.  And we're happy to clarify if they're

10  concerned about an ongoing Grand Jury investigation in which

11  people are subjects or targets.  But as far as we know, the

12  investors with maybe one exception, Mr. Sullivan who received

13  Fearnow shares, do not receive exposure.

14         They don't the get to force us to call people

15  because they want to cross-examine them.

16         MS. KASULIS:  They can call them themselves and

17  prove that they didn't rely on these performance updates and

18  then make some argument that they weren't material.  They can

19  do that.  They can put on a Defense case.  We don't have to do

20  that for them.

21         THE COURT:  All right.

22         So, I think, as I said before, in order to submit

23  some of these e-mails -- I am moving on to the third category

24  of disputed documents, which were e-mails to and from

25  Mr. Shkreli with Greebel and Mulleady.

Proceedings                                    4475

1          MS. SMITH:  So, Your Honor, the list we submitted,

2   so originally when we provided the Exhibits in June, we

3   provided about 150 what we called like, Shkreli-Greebel

4   e-mails back and forth.  And we've narrowed the list to 99

5   based on the way the case has gone in and I went through them

6   this morning.  There are nine of them that somehow touch on an

7   investor in Capital or Healthcare that was not called, so nine

8   of the 99.  Of those, the majority of them also discuss

9   investors who did testify.  So, you know, this is a very, very

10  small subset and the e-mails are the defendant's statements.

11         So, this continual invocation of the confrontation

12  clause, which the Defense has agreed does not apply to the

13  defendant's own statements, which are non-testimonial is, you

14  know, it's a total red-herring.  And so, these are, I think we

15  have been very streamlined.  It's not as if we're putting in

16  300 e-mails with an investor who didn't put into the fund.

17         They're all very, very squarely admissible as the

18  defendant's statements.  And they've had notice of them since

19  June 12th.  And there's no way that they would have thought

20  that an e-mail between Mr. Shkreli and Mr. Greebel that was

21  discussing a particular investor would go in through anyone

22  other than the case agent.  It just can't.

23         We are not required to not only identify the

24  Exhibits, but also say which witness is going to put them in.

25  And to be perfectly frank, this is very frustrating for us.

Proceedings                                        4476

1    We provided the Exhibits in good faith on June 12th.  There

2    haven't been a lot of additions.  We provided on June 19th, a

3    full week before trial started and a week-and-a-half before

4    any witness went on the stand, a list of the witnesses we were

5    going to put on in our first week.  We field phone calls every

6    night about what witness is coming next, what's the order,

7    what are the documents.  We have answered every question.  We

8    have provided so much far and above what is required of the

9    Government, we have really done that in a good faith effort to

10   make this case move.

11          We have had Exhibits dumped on us the morning of a

12   witness testifying, 90 Exhibits in, which as we said, to the

13   extent they're trying to actually move them into evidence,

14   they really should have provided notice of those Exhibits

15   before our case started.  We have not made a big deal out of

16   it.  We have answered all of the questions and to now have it

17   thrown in our face that we think the case is going incredibly

18   well, we're trying to streamline, we want to get this done, we

19   want to the jury to be paying attention.

20          The reason we weren't going to call any NAV is we

21   have a stip to bring in the NAV documents.  We're trying to

22   move this thing along and to have the suggestion that somehow

23   we have done something unprofessional or that they're

24   surprised that we've decided not to call certain witnesses,

25   it's just very, very frustrating.

Proceedings                                          4477

1          Like I said, these witnesses are equally available.

2    So, they are more than welcome to go ahead and call those

3    witnesses.

4          MS. KASULIS:  And the way that we've proceeded,

5    Your Honor, is very standard in these fraud cases, that you

6    have the case agent to put these Exhibits in.  This is

7    standard across all fraud cases in this District, the Southern

8    District and in the country.  So, again, this idea that we've

9    somehow sandbagged through the case agent is -- honestly, if

10   we want to use words shocking and stunning, I think it really

11   applies here.  This outrage is really misplaced and we don't

12   think it has really any business in this argument.

13         MR. BRAFMAN:  Judge, let's sort of tone this down.

14         THE COURT:  Okay.

15         MR. BRAFMAN:  Let's understand the following.  Yes,

16   we've had many discussions with the Government and as late as

17   last week they told me that -- I'll show you the e-mail --

18   that Al Geller was slated to testify this week.  They didn't

19   tell me that they weren't going to call Al Geller and that

20   they were going to try to put in his consulting agreement

21   through the case agent.

22         And Judge, I will show this to you, but not to the

23   Government.  I have an e-mail from Mr. Cox yesterday, who is

24   Mr. Geller's lawyer, telling me that he won't talk to me and

25   that the Government will not even tell him for certain whether

Proceedings                                    4478

1   he is or is not a witness.  So, for Mr. Geller's lawyer to

2   tell you that I haven't been in touch.  That's his problem.  I

3   will show it to the Court, if, Your Honor, wants to see it.  I

4   won't give it to the Government because they have no right to

5   see it.  But I don't lie about things like this.

6           And, Your Honor, up until yesterday, nobody was

7   told, nobody on this side was told that Mr. Geller's testimony

8   was going to be offered through a consulting agreement.  To

9   suggest that they don't have to -- a consulting agreement that

10  an agent was going to put in.  And, Your Honor, to me, it's

11  sort of stunning how they could do that given the 3500

12  material of Mr. Geller who takes the position that he did

13  believe he was a consultant to Martin.  And you might

14  pooh-pooh his consulting work and say that doesn't deserve a

15  million shares, butt Al Geller is considered one of the

16  founders of Retrophin.  Al Geller put $200,000 in and without

17  that, Retrophin would have failed.  And Al Geller wanted to be

18  a founder of Retrophin and that's why he ends up making

19  $10 million on his investment.  They can't just put in his

20  consulting agreement and suggest that Al Geller is not someone

21  who should be cross-examined.

22          And I also suggest most respectfully that yes, we

23  have a series of e-mails between Evan Greebel and Martin

24  Shkreli.  And most of those e-mails, I believe at the end of

25  day, will be admissible and quite frankly, helpful to us

Proceedings                                                    4479

1   because it shows constant communication with Mr. Shkreli with

2   a lawyer who everybody describes as a well-respected member of

3   a big firm who they had a right to take comfort in, all except

4   Mr. Shkreli.  He doesn't have a right to take comfort from the

5   fact that Greebel is guiding him.  So, we're not going to

6   fight them on every one of those e-mails.

7            But yesterday we were going to go through those

8   e-mails to determine whether there are any of them that we

9   object to.  Instead, we had to spend 15 hours collectively,

10  each of us, responding to a Government motion that should not

11  have been necessary.  So, at this point, Judge, we need a

12  time-out.  But one thing you cannot do, and I say this

13  respectfully, if you want to put in bank records, fine.  We'll

14  cross-examine the case agent.  You want to put in NAV

15  consulting reports, we don't need somebody from NAV, we'll

16  argue that to the jury if they want to and we will sign that

17  stipulation.

18            THE COURT:  You'll argue what to the jury?  That

19  Mr. Shkreli was not the source of the information?

20            MR. BRAFMAN:  They don't have any evidence that he

21  was the source.

22            MS. KASULIS:  Then we will call someone, Your Honor.

23            MR. BRAFMAN:  Let them call somebody.  Let them call

24  somebody from NAV.  Let them call witnesses.

25            THE COURT:  All right.

Proceedings                                   4480

1          MR. BRAFMAN:  But you cannot allow them, Your Honor,

2    to put in the heartland of the case, which is either a

3    settlement agreement or a consulting agreement, and suggest

4    that that must be evidence of fraud when the witnesses they've

5    produced have, in some respects, undermined the flawed theory

6    of this case.

7          MS. SMITH:  Your Honor, just on the consulting

8    agreements.

9          THE COURT:  Yes.

10         MS. SMITH:  As we said, for the Rosenfeld and Al

11   Geller consulting agreements, we're not arguing that they're

12   shams.  We are arguing that they weren't approved by the Board

13   and that they also had the same release in them.  We are not

14   going to argue that Mr. Geller or Mr. Rosenfeld did not

15   perform services for Retrophin because there won't be evidence

16   in the record of that.

17            For the settlement agreements, first of all, there's

18   already been some mention of, for example, the Spielberg

19   settlement agreement in some of the documents and the Board

20   members' testimony that they did not approve the settlement

21   agreements.  We don't need to have all of the individuals who

22   signed settlement agreements show up.  They are signed by

23   Mr. Shkreli, they are legal documents, so they are both his

24   statements and legal documents.  And there's been testimony

25   from the Board members, both of them, that they were not

Proceedings                          4481

1   approved at the time.  And that this was part of the -- and

2   this was money and shares that went to former MSMB investors

3   out of Retrophin and that they did not approve them.

4           So, that is the purpose for putting in the

5   settlement and consulting agreements.

6           THE COURT:  Well, Spielberg and Lavelle were both

7   MSMB Healthcare investors.

8           MS. SMITH:  Yes.

9           THE COURT:  So, didn't money from Healthcare go into

10  Retrophin?

11          MS. SMITH:  Yes.

12          THE COURT:  So, what is fraudulent about those

13  settlement agreements, under your theory?

14          MS. SMITH:  So, they actually did receive shares of

15  Retrophin.  There was an initial distribution by Mr. Shkreli

16  and then they were unhappy with what they got as that

17  distribution and they demanded more money on top of that.

18          MR. BRAFMAN:  So?

19          MS. SMITH:  So that additional money on top of that

20  came from Retrophin and without the approval of the Board.

21  And it wasn't explained to the Board that they were actually

22  getting additional shares and money from Retrophin, not from

23  Mr. Shkreli personally, because they were unhappy with their

24  MSMB Healthcare investment.

25          MR. BRAFMAN:  Your Honor, where has there been

Proceedings                                              4482

1   testimony in this trial that Mr. Shkreli, as the founder of

2   Retrophin, couldn't authorize a settlement agreement on his

3   own that didn't need Board approval?  Where did we have that

4   evidence?  Maybe I was absent that day.  All Richardson and

5   Aselage said was, they don't remember getting the Board

6   minutes that showed that the Al Geller and...

7              MS. SMITH:  Ken Banta.

8              MR. BRAFMAN:  -- Ken Banta consulting agreements

9   were approved.  But where does it say anywhere that the

10  founder of a company cannot authorize his company to pay

11  someone who invested in the company and is potentially

12  threatening litigation and the cost of litigation is not good

13  for a company that's looking to become an IPO and I made the

14  decision to settle the case.  Me, the founder of the company.

15  Where does it say that I have to get Board approval?  I

16  haven't seen that evidence.

17             MS. SMITH:  It was a public company and he was

18  settling personal debts related to MSMB Healthcare.

19             MR. BRAFMAN:  No, it's not personal debt.  It's not

20  personal debt if it's MSMB Healthcare when that money was gone

21  into Retrophin.  It's part of how Retrophin became a company.

22  They have a personal interest in Retrophin doing well.  And

23  Mr. Shkreli has a personal interest in repaying that trust.

24  That's not a personal debt.  That keeps dancing from one MSMB

25  venue to the next.  This is wrong.

Proceedings                                    4483

1          THE COURT:  I am talking right now about Spielberg

2   and Lavelle who were Healthcare investors.

3          MR. BRAFMAN:  Yes.

4          THE COURT:  They did invest in MSMB Healthcare.

5   That money was then put into Retrophin, in exchange for which

6   in the settlement agreements they got shares and money.

7          MS. SMITH:  No, so that's, I think, maybe the little

8   bit of the confusion and maybe where Mr. Brafman's confused.

9   And we haven't yet had the standard registrar witness testify,

10  which I think will actually make this much clearer.

11         But MSMB Healthcare sits on the cap table for

12  Retrophin when it goes public because MSMB Healthcare, unlike

13  MSMB Capital had to actually put some money, about $2 million

14  net, into Retrophin.  And so, that investment gets converted

15  through the actual when the company goes public into, I think,

16  it was a seven-to-one share conversion, and they wind up with

17  X number of shares and I don't remember -- that were MSMB

18  Healthcare shares in Retrophin.

19         Those shares get distributed out to the MSMB

20  Healthcare investors.  That's by Mr. Shkreli's own directive.

21         THE COURT:  But is there a law against the

22  apportionment of the shares of Retrophin or is there some

23  corporate violation or compliance violation?

24         MS. SMITH:  No, that distribution, that represented

25  the investment into MSMB Healthcare.  That was the

VB        OCR        CRR

Proceedings                                     4484

1    distribution.

2              THE COURT:  So Mr. Brafman asks a good question.  If

3    then those original investors aren't happy with the number of

4    shares that they get and they say, look, this is not right, we

5    had put in X, we thought at the time MSMB Healthcare was

6    valued at whatever it was, right?  And your giving me these

7    shares is not sufficient.

8              MS. SMITH:  Right.

9              THE COURT:  A) they might be restricted, B) they're

10   not valuable enough to make me whole in my investment or not

11   adequate to bring me to the last valuation I had.

12             MS. SMITH:  Right.

13             THE COURT:  What law was violated by Mr. Shkreli as

14   CEO and founder giving those investors additional money?

15   These are the MSMB Healthcare investors.

16             MS. SMITH:  Yes, so Mr. Shkreli, at the time when he

17   did it, it's a public company, so he doesn't have the ability

18   to just distribute shares and money from the public company.

19   If he wanted to distribute his own shares and money because

20   the investors were unhappy, that was fine.  But he doesn't

21   have the right to distribute shares and money of the public

22   company.

23             THE COURT:  So what evidence is there that he used

24   the company's shares instead of his own?  He has 425,000

25   shares under one cap table, so how do we know these aren't his

Proceedings                                    4485

1   shares?

2           MS. SMITH:  Because the standard register agent will

3   show that the shares came from the company and not

4   Mr. Shkreli.

5           Mr. Shkreli had his own set which throughout this

6   entire process he keeps telling people, I'll give you my own

7   shares, I'll true you up, I'll give you my own money.  He

8   doesn't do that once.  He uses the public company for every

9   single payment of shares and money to the MSMB investors who

10  were unhappy about their distribution.  So, every single

11  settlement agreement, every single consulting agreement, all

12  comes from Retrophin and not from Mr. Shkreli.  Even though he

13  has, I don't know, what is it 2.7 million shares?

14          MR. SRINIVASAN:  2.5.

15          THE COURT:  If MSMB Healthcare, though, has a

16  $2 million stake in Retrophin, how is it improper?  Why is it

17  improper for Retrophin as a corporation to give more of its

18  shares if there was a disagreement about the valuation of the

19  MSMB Healthcare investment, the value of that investment and

20  how it was converted into a certain level of shares?  Why

21  would it not be a prudent decision by a CEO to say, look -- or

22  even the corporation -- these people are threatening to sue

23  and rather than get tied up in all of this, let's give them

24  some additional money and shares of the corporation so that

25  we, Retrophin, can get a release.

Proceedings                                    4486

1        MS. SMITH:  Well, Your Honor, I think that if

2   Mr. Shkreli had presented that to the Board and that had been

3   the rationale and then they were approved, I think there's an

4   argument for that.  But that's not what happened.

5        THE COURT:  Is there a law?  I mean, is that a

6   violation of Federal securities law or a conspiracy to commit

7   securities fraud if the Board -- you know, I think the jury is

8   going to decide whether the Board knew it or didn't know it.

9   There is evidence that they knew it because they signed the

10  SEC statements revealing these lawsuits and so --

11       MS. SMITH:  Well, Mr. Shkreli had to enter into

12  indemnification agreements with Retrophin.  There's already

13  evidence about that, it's in the SEC filings because when they

14  discovered it they said, hey, this has nothing to do with

15  Retrophin.  The public company should never have paid the

16  money, should never have paid the shares.  That's the entire

17  restatement.  And he had to sign indemnification agreements

18  saying, I have the money, I will repay, which of course, he

19  doesn't ever do.

20       MR. BRAFMAN:  Your Honor, we're not talking about

21  civil liability here.  And Mr. Aselage who testified that

22  there are certain things that it doesn't require Board

23  approval and he talked about there being caps on things that a

24  CEO can do on his own without Board approval.  There is no

25  crime admitted by the founder of a company who decides to give

Proceedings                                          4487

1    a person who has who actually invested into the company in its

2    early stages a bonus of shares because they're not happy and

3    maybe you do it to maintain the goodwill, maybe you do it to

4    avoid litigation.  Mr. Aselage was questioned about that on

5    cross-examination as to whether or not sometimes a company

6    decides to do things or a CEO decides to do things because the

7    cost of litigation equals the cost of the extra shares that

8    they're being given.

9              There's no complainant in this case saying, I did

10   not authorize that.  And they're wrong about something,

11   Your Honor.  They're wrong about something.  There is no law

12   that governs what Mr. Shkreli, as the founder of the company,

13   can do.  And if he does something without Board approval, the

14   Board has the right to sue him, the board has the right to

15   remove him, but that doesn't necessarily bring you to criminal

16   liability if, as the founder, you're giving back an investor

17   more money than he is happy with.  Because you are making up

18   the numbers anyway.  No one really understands how to value an

19   infant company, so he's making a good faith evaluation which

20   turns out to be conservative, quite frankly, and these people

21   end up walking away with a few extra shares.  And who is

22   harmed by that?

23             MS. SMITH:  Your Honor, again, this is a public

24   company.  It would be another thing if it was a private

25   company.  And the Board members were asked very specifically

VB        OCR        CRR

Proceedings                                              4488

1   if this was presented as a litigation issue.  You know, hey

2   guys, there are a bunch of people who are going to sue the

3   company, let's settle with them so we don't have to get

4   embroiled in litigation.  It was never presented that way.  It

5   was never presented at all.

6              THE COURT:  The Count in your case is conspiracy to

7   commit securities fraud, right?

8              MS. SMITH:  One of them.

9              THE COURT:  For Count 7, it's wire fraud.

10             MS. SMITH:  Wire fraud I believe.

11             THE COURT:  Conspiracy to commit wire fraud.

12             So, who are the co-conspirators with Mr. Shkreli on

13  that?

14             MS. SMITH:  Mr. Greebel.  I mean, there are others,

15  but it's primarily Mr. Greebel.

16             MR. BRAFMAN:  What proof have they presented that

17  Mr. Greebel was on the Board of Retrophin.

18             THE COURT:  That was my next question.

19             MS. SMITH:  Your Honor, obviously, look, we don't

20  have Mr. Greebel.

21             THE COURT:  Based on what we have right now.

22             MS. SMITH:  But most of the evidence has to go in

23  through the case agent.  Those are the e-mails between

24  Mr. Shkreli and Mr. Greebel.

25             MS. KASULIS:  Mr. Greebel says in the e-mails, we

Proceedings                                    4489

1    did not get board approval for the settlement agreements.

2            MR. BRAFMAN:  But he doesn't say you need Board

3    approval.

4            MS. KASULIS:  That's the argument that you can make.

5            MR. BRAFMAN:  That's the question.  You have to ask

6    the question.  If under the law you don't need Board approval,

7    the fact that you didn't get Board approval doesn't make you

8    guilty of wire fraud.  It's only wire fraud if there's a law

9    that says you must get Board approval and you violate that

10   law.  There's no law here that says he needs to get Board

11   approval.

12           They're making this up.  Aselage didn't say that.

13   Richardson didn't say that.  They were the Board.  It's those

14   two people and Mr. Shkreli.  And it's his company.  These

15   guys -- and I hate to use this word -- but you're talking

16   about Aselage is the one who has been fooled?  By his own

17   admission he wasn't paying any attention.  I will refrain from

18   using the word he used.  But he's asleep at the switch.

19           And Mr. Richardson, God bless him, he didn't say

20   Shkreli fooled the Board.  He didn't say Shkreli violated the

21   law.  He said, I don't remember ever approving these

22   consulting agreements.  That's all he said.  And he did not

23   talk about the consulting agreements that we're talking about

24   now with MSMB Healthcare with people who were investments in

25   the company.  The only thing he ever talked about was Geller

Proceedings                                              4490

1   and Banta, which are provided in the S-1 and filed with the

2   SEC.

3           And yes, if the Board then, after-the-fact, says you

4   know, what you shouldn't have done this and to make it fair,

5   we want an indemnification agreement, that happens in

6   corporations all at time after the fact.  That doesn't make

7   you guilty retroactively of intentionally violating the law by

8   attempting to defraud that company.

9           And we forget something.  Retrophin was him.  It's

10  not like he's a stranger.  Without him, there is no company.

11  He's founded it, he started it, he made it a success and

12  Richardson and Aselage did nothing.  Did nothing at the time

13  to help make that Board continue to function, that company

14  continue to function.  To suggest that he ripped off Retrophin

15  that way is just, I just have never understood that.

16          MS. SMITH:  Your Honor, I mean, first of all,

17  there's more than just the settlement and consulting

18  agreements.  There's also the creation of the false interest

19  in MSMB Capital.  But it is a wire fraud and if Mr. Brafman

20  wants to make the argument that a CEO of a public company is

21  allowed to take money and shares from the public company to

22  repay his personal debts --

23          THE COURT:  What personal debts, though?

24          MS. SMITH:  I mean, some of the settlement

25  agreements were for MSMB Capital which, obviously, never

Proceedings                                    4491

1    invested in Retrophin.  So, I think that's very clear.  I'll

2    be more than happy to walk Your Honor again through the fact

3    that MSMB Healthcare's investment was distributed out.  There

4    was nothing left.  To the extent that the individuals from

5    MSMB Healthcare were unhappy with the distribution they got

6    from that $2 million investment into Retrophin, it's because

7    Mr. Shkreli lied to them about how much they're investment was

8    actually worth.  And then they wanted the difference.

9            And the difference, Mr. Shkreli's responsible for

10   the fact that they thought there was a difference when there

11   wasn't.  And he can't just go taking money out of a public

12   company and shares out of a public company without getting

13   approval for it, without providing some sort of justification.

14   Both Board members testified they did no approve consulting

15   agreements for former MSMB Healthcare Capital investors or

16   Elea Capital investor in order to repay them and that they did

17   not approve settlement agreements.

18           Now, I understand the arguments Mr. Brafman's making

19   again, I think we're getting into closing argument territory.

20           THE COURT:  I understand, but I am trying to

21   understand what we have in our record now and what evidence

22   there is that supports your various claims.

23           MS. SMITH:  Well, I also think that part of the

24   problem is that we haven't gotten to the transfer agent, which

25   shows all of this.  And then, we haven't also gotten to the

Proceedings                                        4492

1    case agent, which really puts in sort of the heart of the

2    conspiracy between Mr. Greebel and Mr. Shkreli, which are, in

3    part, those e-mails, so.  And the defendant's own statements.

4              MR. BRAFMAN:  Can we not move off the point,

5    Your Honor, has focused on?

6              Who is it that says that Mr. Shkreli can't give

7    additional shares, even in a in a public company, to someone

8    who is investing in the company, and then maybe at the time it

9    goes public the stock is a little bit low, so they're not

10   particularly happy and they want more shares because they

11   think that they are entitled to more shares.  And rather than

12   fight a war over this he agrees to do it.

13             And he doesn't need Board approval.  I don't know

14   where you have in this case the evidence that suggests that he

15   needs Board approval.  I'm looking for the cross-examination

16   of Mr. Aselage because I think I specifically asked him -- let

17   me just see if we've been able to find it.

18             (Pause in the proceedings.)

19

20             (Continued on following page.)

21

22

23

24

25

- Proceedings -                4493

1          MS. SMITH:  Your Honor, they didn't invest in
2     Retrophin.  They invested in MSMB Healthcare.
3          THE COURT:  But they were told.
4          MS. SMITH:  They were told after the fact that the
5     money had gone into Retrophin.  Not all of it.
6          THE COURT:  Some of them actually got on board and
7     said yes, put my investment in Retrophin.
8          MS. SMITH:  Not for MSMB Healthcare.
9          THE COURT:  Healthcare, really?
10         MS. SMITH:  Not for MSMB Healthcare.  In fact, most
11    of them wanted their cash back.
12         THE COURT:  I thought Rosenfeld and Geller did know.
13         MS. SMITH:  Rosenfeld and Geller invested in
14    Retrophin separately, separate investments.
15         THE COURT:  But he also, in looking at his 302,
16    said, I originally wanted to be cashed out, but then I decided
17    that my investment in MSMB Healthcare could be rolled into
18    Retrophin.
19         MS. SMITH:  Well, it had already happened.
20         THE COURT:  All right.  But --
21         MS. SMITH:  I mean, obviously --
22         THE COURT:  They weren't, you know, opposed to it.
23         MS. SMITH:  Well, they were when they got the shares
24    on the other side because basically what they thought had been
25    rolled into Retrophin hadn't been because it didn't exist.

- Proceedings -                                    4494

1        MS. KASULIS:  Michael Lavelle put in over

2   $1 million, and if there was only a $2 million investment in

3   MSMB Healthcare and he's told his money has grown, that in and

4   of itself right there, the shares are not sufficient.

5        THE COURT:  But in that instance, I think his 302

6   indicates he only got information from Mulleady.

7        MS. SMITH:  Yes.  I mean, this is part of the

8   reason -- look, if Mr. Lavelle was testifying -- again, the

9   arguments we're not going to make if he's not a witness.

10       THE COURT:  Right.

11       MS. SMITH:  But there are additional arguments.

12       THE COURT:  Right.

13       MS. SMITH:  Mr. Mulleady, we won't get into it.

14       THE COURT:  I mean, I did go into the 3500 just

15  because I wanted to understand --

16       MS. SMITH:  Yes.

17       THE COURT:  -- what the landscape looked like with

18  regard to some of these investors.

19       So, I think this is my view.  The subscription

20  agreements don't come in.

21       MS. SMITH:  Okay.

22       THE COURT:  And I believe the monthly performance

23  reports will come in, but it's subject to getting information

24  into the record or evidence into the record that Mr. Shkreli

25  was the source for the NAV reports and I understand Mulleady

- Proceedings -                      4495

1    is an agent or an employee of Mr. Shkreli.  And it's not

2    dependent on his status as a co-conspirator, but just rather

3    an agent of the employee.

4              MS. SMITH:  Right.

5              THE COURT:  The e-mails between and among

6    Mr. Shkreli, Tilles, Greebel and other investors, I think

7    Mr. Brafman is conceding that those are admissible.

8              MR. BRAFMAN:  Well, there are a couple we will have

9    rule 106 arguments.

10             THE COURT:  I just don't know what those are.

11             MR. BRAFMAN:  We don't either, Judge.

12             THE COURT:  Can we stop the lengthy side bars.

13             MS. SMITH:  Honestly, that's what we thought we were

14   doing.

15             MR. BRAFMAN:  They suddenly got very busy, Judge.

16             MS. KASULIS:  We were able to brief the issue and we

17   were able to manage with three attorneys versus five.  So I

18   think we're able to get this done in a timely manner under the

19   same time constraints.

20             MS. SMITH:  I thought last night what we were doing

21   was making a motion on all the documents and then waiting to

22   hear which ones they were objecting to.

23             MR. BRAFMAN:  We got the list yesterday, the actual

24   list.  They were winding down the actual list, we got it

25   yesterday.

- Proceedings -                                    4496

1          MS. SMITH:  Well, all of those documents, again, are

2     a subset.

3          THE COURT:  Would somebody please inform me so I can

4     make a ruling so we don't have a long side bar and another

5     break in our trial.

6          MS. SMITH:  We would like to know which documents

7     you're objecting to.

8          THE COURT:  I have no idea.

9          MR. AGNIFILO:  We only just got these documents.

10         THE COURT:  When can you tell me, sir?

11         MR. AGNIFILO:  I'll take the list back to the office

12    and I'll tell you, Your Honor.

13         THE COURT:  Can you tell me by noon tomorrow,

14    please?

15         MR. AGNIFILO:  Yes.

16         THE COURT:  So I know which ones are at issue.  I'm

17    going through every single one right now.  I'd rather not do

18    that.

19         MR. AGNIFILO:  So am I, and the problem is five

20    lawyers or three lawyers, starting yesterday when we left

21    court, I did nothing, including 3 o'clock in the morning,

22    other than write a brief and so I got --

23         THE COURT:  I want to compliment all the lawyers on

24    the quality of the briefing.  It was very impressive.

25         MS. KASULIS:  Thank you, Your Honor.

- Proceedings -                              4497

1          THE COURT:  Given the short time.  Thank you.

2          MS. SMITH:  So, it sounds like we've done the

3    subscription agreement.  I guess the e-mails to the extent

4    there are 106 arguments.

5          THE COURT:  We've done the performance reports.

6          MS. SMITH:  We've done the performance reports.

7          THE COURT:  The settlement agreements, we have

8    Spielberg and Lavelle.

9          MS. SMITH:  Right.  And in addition, again, they're

10   statements of the defendant and the legal documents.  So they

11   can make whatever arguments the want but there's not an actual

12   legal argument for them not to come in, and they've already

13   been discussed by the board members.  So if they want to make

14   an argument that Mr. Shkreli, and you're not going to get

15   testimony from a witness that there's a legal requirement for

16   the board to sign off because they can't decide the ultimate

17   issue, that is our job to argue why is that wire fraud.

18         MR. BRAFMAN:  But, Judge, how can you admit a

19   document that's only relevant if, in fact, it is a document

20   that was used to perpetrate a fraud?  And the only person who

21   can tell you that is the person who's on the other end of the

22   settlement or consulting agreement.

23         MS. SMITH:  Your Honor, the individuals who

24   testified who received settlement agreements actually do not

25   know that Mr. Shkreli took all of their money.  They just

- Proceedings -                    4498

1  thought they were unhappy.  So they're not going to get up and

2  tell you that the settlement agreement is part of a fraud

3  because they did not know that that was the case.

4          THE COURT:  I'm looking at this list.  Mr. Spielberg

5  is Exhibit 53.

6          MS. SMITH:  Yes.

7          THE COURT:  He is an MSMB Healthcare investor.  He

8  knows his money went from MSMB Healthcare into Retrophin.  He

9  knew that because he said he opted to move his MSMB money to

10  Retrophin.  That's what his 302 says.  He opted to do this.

11  So.

12          MS. SMITH:  And then he was unhappy with the amount

13  of money and shares, the amount of shares that he actually

14  got, and then he went back and Mr. Shkreli took additional

15  shares and money from Retrophin.

16          MR. BRAFMAN:  He's not happy with the share price,

17  Your Honor.  He's just not happy with the share price.

18          MS. SMITH:  But that's because he was told by

19  Mr. Shkreli that the investment was worth way more than it

20  actually was.  That is the basis for it.

21          The board members were presented with Spielberg.

22  It's in one of the lines.  They're mentioned in the SEC

23  filings and, again, signed by the defendant and it's a legal

24  document.  They can argue whatever they want about this.

25  There's a release in there.

- Proceedings -                    4499

1          THE COURT:  The other MSMB Healthcare investor issue

2    is Michael Lavelle and Lavelle similarly says, Look, it was

3    all Mulleady, he's my cousin, I trusted him, whatever I did is

4    based on what he told me, and he says that he -- I think it

5    was his settlement that caused the restatement, is that right?

6          MS. SMITH:  His is the one that was big enough.

7          THE COURT:  $1 million.

8          MS. SMITH:  The company, they realized that

9    Mr. Shkreli was doing this and went back and tried to figure

10   out what had gone on because it hadn't been brought to their

11   attention, so that is right.

12         I mean, again, it is a signed statement of the

13   defendant in furtherance of the fraud and Mr. Lavelle, even if

14   Mr. Lavelle wanted extra shares, which he did, Mr. Shkreli did

15   not have a right to distribute them out of a public company

16   the way that he did.  I mean, that is the argument.  So it's

17   not actually dependent on what Mr. Lavelle thought at all.

18   And we're not going to be arguing that Mr. Lavelle thought.

19         THE COURT:  But is there an instruction -- I mean,

20   there isn't going to be an instruction that you cannot

21   distribute shares out of a public company without --

22         MS. SMITH:  Well, that's obviously what we need to

23   prove with the board members and that they didn't approve

24   these, they wouldn't have approved these, and then Mr. Shkreli

25   can't use the public company as his personal piggybank.

- Proceedings -                                    4500

1          THE COURT:  But you say is it is his personal debt.

2    What I see is evidence that he's paying off Mulleady capital,

3    an MSMB Capital investor and these health care investors are a

4    little bit rare, more complicated.

5          MS. SMITH:  It's more complicated.

6          THE COURT:  But what personal -- did he take

7    Retrophin money and buy a condo or buy a fancy car?

8          MS. SMITH:  You know, he founded MSMB Healthcare,

9    right?  And he's the one who ran it and as you can see with

10   Allea, if you blow up a fund, people come after the fund.

11         THE COURT:  But legally, is he personally liable?

12   Don't they sign agreements that they're not going to come

13   after --

14         MS. SMITH:  There's an argument.  I mean, first of

15   all --

16         THE COURT:  How does it become a personal debt?

17         MS. SMITH:  Even in the MSMB Healthcare.

18         THE COURT:  Pardon me?

19         MS. SMITH:  Say even if it's not a personal debt,

20   we've seen language in all the PPMs, willful misconduct and

21   fraud can cause you to be personally liable.

22         I think there was no question that there was fraud

23   in connection with both funds, so I think he would be

24   personally liable, however, even if he's not personally

25   liable, it's still the liability of MSMB Healthcare.  It would

- Proceedings -                                    4501

1   not be the liability of Retrophin.

2              THE COURT:  No, I understand that.

3              MS. SMITH:  And he is -- he's the person controlling

4   Healthcare.  So, you know, ultimately, if he hadn't used

5   Retrophin shares and money, the people, and were told that

6   they couldn't come after Retrophin because the bank accounts

7   come out and they realize that they got their initial share

8   distribution, they're not entitled to more, they go after

9   Healthcare and then, eventually, they go after Mr. Shkreli, so

10  to avoid them getting to Mr. Shkreli, he just takes money and

11  shares out of Retrophin.  It's basically like the Merrill

12  Lynch settlement.  It's the same kind of idea.

13             THE COURT:  All right.  Then we go to the consulting

14  agreements, again, that you claim are fraudulent with

15  regard -- I think it's Rosenfeld and Geller.  I think we

16  talked about them.

17             Obviously, I do think the defendant could subpoena

18  them if they wanted to.  I know you have no obligation to do

19  so.  You're not required to put on a case, but --

20             MS. SMITH:  And, again, with the consulting

21  agreements, those two are basically, like, the settlement

22  agreements.  We're not going to be arguing that they didn't do

23  any work.

24             THE COURT:  So why are they relevant?

25             MS. SMITH:  It's the same as the settlement

- Proceedings -                          4502

1   agreements.

2          So, you know, the consulting agreements were used to

3   pay money and shares to MSMB Healthcare investors in order to

4   settle up and there are e-mails that show that they were, you

5   know, unhappy with their original investments.

6          THE COURT:  But they also are adamant, both

7   Rosenfeld and Geller, that they did, they received, they gave

8   value for those shares.

9          MS. SMITH:  So, Mr. Geller is not.  I mean, he

10  signed an NPA for lying to the FBI for this.

11         MR. BRAFMAN:  Then call him.

12         MS. KASULIS:  You call him.

13         MR. BRAFMAN:  No, but, Judge, if they did consulting

14  work, then they're not shams, they're not settlement

15  agreements, and Retrophin has a right to hire consultants, pay

16  them, and it's not a fraud on Retrophin if they did, in fact,

17  provide consulting service so it's not just like we switch it

18  to a settlement agreement and, therefore, it's a fraud.  They

19  charge it as a consultant agreement.

20         Rosenfeld won his arbitration because he was a

21  consultant.  They can't just argue it was a settlement

22  agreement and Retrophin isn't defrauded if it's a real

23  consultant agreement and Al Geller, throughout his 302, until

24  they could say you either get prosecuted or tell us it's a

25  real consultant agreement, Geller talks about all of the time

- Proceedings -                     4503

1   he spent counseling and mentoring and giving Mr. Shkreli

2   advice.

3          Now, if they want to laugh that off, fine, but

4   they're not calling him because they I think believe that, on

5   balance, he would come across as someone who believes that he

6   was a consultant for Retrophin and I will show Your Honor the

7   e-mail to indicate that Mr. Geller will not talk to me, will

8   not respond to me, and I am not going to subpoena a witness

9   who will not talk to me.  Part of the reason that his lawyer

10  will not let him talk to me is because he has a

11  non-prosecution agreement with the government.  He doesn't

12  want to be in the mix.

13         So, I'm not going to subpoena him and they can't

14  shift the burden.  They can't say, you know what, we don't

15  want to call him but we want to put in a fraudulent consulting

16  agreement they know he would disavow as a fraud and then say

17  you can call him.  They don't shift the burden that way.  They

18  have to prove that consulting agreement is not what it

19  purports to be and if it is what it purports to be, then

20  Retrophin isn't a victim of a fraud.

21         MS. SMITH:  Your Honor, look, at this point, I

22  disagree with the characterization of Mr. Geller.  If he was

23  subpoenaed, he would be required to testify.  He has no

24  further exposure.  So the fact that he won't prep with

25  Mr. Brafman, that doesn't mean that Mr. Brafman can't call him

- Proceedings -                    4504

1    and, you know --

2            MS. KASULIS:  Put him on the stand.

3            MS. SMITH:  That said, in the interest of moving

4    things along, we will not put in the two remaining consulting

5    agreements.

6            THE COURT:  For Mr. Rosenfeld and Mr. Geller?

7            MS. SMITH:  For Mr. Al Geller and Mr. Rosenfeld if

8    we do not call them because some of the stuff that's come up

9    in the conversations today and some of the arguments that we

10   don't think have a basis in the current evidence, but we're

11   concerned that Mr. Brafman in any way in closing may cause us

12   to have to call additional witnesses.  So I think even though

13   we have an NAV stip, we'll probably be calling NAV and REC as

14   well.

15           THE COURT:  Well, I don't know if the NAV stip

16   provides for the source of the information that they used.

17           MS. SMITH:  It doesn't.  We thought that we were,

18   between Mr. Su and the fact that all of the NAV documents are

19   with Mr. Shkreli, I'm surprised to hear that that's an

20   argument especially because Mr. Jackson Su didn't have any

21   access to the MSMB Healthcare bank accounts so I'm really not

22   sure how he could have provided information to NAV for MSMB

23   healthcare so to clear that up, we'll call those two

24   witnesses.

25           So, for the consulting agreement, if we don't call

- Proceedings -                                    4505

1   Mr. Geller or Mr. Rosenfeld which we will now reconsider, we

2   won't put in those agreements.

3              THE COURT:  So there is no grounds for any other

4   disputes?

5              MS. SMITH:  The Standard Registrar documents is, I

6   think, the last one.

7              Does that mean, Your Honor, Your Honor is admitting

8   the settlement agreements?

9              THE COURT:  I beg your pardon?

10             MS. SMITH:  The settlement agreements will be

11   admitted?

12             THE COURT:  I think that what I am hearing on these

13   settlement agreements is argument about what they mean and

14   what was legal and what was not legal with regard to the

15   nature of the agreements.

16             Mr. Spielberg and Mr. Lavelle were Healthcare

17   investors.  They clearly stated, I think in their 302s that

18   they went into, they knew they were going into Retrophin and

19   it seems like this was a beef about the amount of shares or

20   money for the valuation.

21             Whether that, as matter of law, the transactions

22   that occurred, in order to put this dispute to bed amounts to

23   conspiracy to commit securities fraud --

24             MS. SMITH:  It's wire fraud, Your Honor.

25             THE COURT:  Wire fraud, I'm sorry.

- Proceedings -                                    4506

1          -- wire fraud is, I guess, something that I will

2    have to wait and see.  I'm not --

3          MS. SMITH:  But, Your Honor, there's statements by

4    the defendant in legal documents so I just don't understand

5    how they're not admissible under those bases.

6          If the defense wants to argue what the purpose is or

7    what the meaning is of those two agreements, I understand

8    that, but as an evidentiary matter, there's no bar to them

9    coming in.

10          THE COURT:  No, I understand that.  I am not saying

11    on an evidentiary basis.  The issue is whether there is some

12    legal import to the documents and I understand that they are

13    passing the hurdles for the admissibility in terms of

14    relevance.

15          MR. BRAFMAN:  Even if they pass the hurdle of

16    admissibility, given the fact that the government has argued

17    the fact that settlement agreements with other people in this

18    case constitutes evidence of fraud, to offer those settlement

19    agreements which may not at all be fraud with respect to those

20    two people, just to throw them in, that there's no relevance

21    and there's a 403 issue.

22          The jury is going to assume that these people

23    entered into fraudulent settlement agreements when it's

24    obvious that they didn't from the 302s.  So, even if they

25    satisfy an admissibility bar, they have to satisfy not just

- Proceedings -                                    4507

1   the relevance bar, but the 403 bar as well.

2           MS. SMITH:  Your Honor, none of these witnesses,

3   even the ones who testified, thought they were entering into

4   fraudulent settlement agreements.  Mr. Brafman is off in the

5   wrong direction.

6           MR. BRAFMAN:  No, I'm not.

7           MS. SMITH:  It's on the company, and the witnesses

8   didn't know that.

9           THE COURT:  The board did not approve it.

10          MS. SMITH:  That's right.  So, it has nothing to do

11  with what the witness thought about the settlement agreements

12  which is why there's no reason why they shouldn't come in.

13  Mr. Brafman can make his arguments however he would like, but

14  on 403, it's not more prejudicial or probative.

15          MS. KASULIS:  Or more unduly probative.

16          MR. BRAFMAN:  What they're missing is the witness'

17  statement, if called, that they authorized the investment into

18  Retrophin and, therefore, I have a valid claim against

19  Retrophin and, therefore, I wanted a settlement agreement or I

20  was going to sue Retrophin is relevant on the issue of whether

21  or not Martin Shkreli committed a fraud against Retrophin when

22  he got this settlement agreement, when he signed the

23  settlement agreement or whether he was acting in the best

24  interest of the company.

25          They don't get to suggest impropriety in the

- Proceedings -                    4508

1   settlement agreement simply because Mr. Shkreli got it signed.

2   Shkreli signed it.  There's no proof that he couldn't sign it.

3   The only proof that it's a fraud, if you will, is if Retrophin

4   had no valid basis upon which to release these people from a

5   claim because it really wasn't a claim against Retrophin.  If

6   these people were to testify and they were to say, I invested

7   in MSMB Healthcare, I knew that that money was invested in

8   Retrophin, I wanted a settlement with Retrophin because I was

9   entitled to it, if I didn't get it, I was going to sue, that

10  implies that Mr. Shkreli was acting not to defraud Retrophin

11  but to save them the costs of litigation.  That's what they're

12  missing.

13          MS. SMITH:  That's not what happened.

14          THE COURT:  Didn't Mulleady actually engage counsel?

15          MR. BRAFMAN:  Yes.

16          THE COURT:  And threaten to sue?

17          MS. SMITH:  They actually threatened to sue

18  Retrophin but they didn't have a valid claim.

19          THE COURT:  But corporations get sued all the time.

20          MS. SMITH:  I get it, but that was also not the way

21  it was presented to the board.  It wasn't presented as, oh,

22  they're going to sue Retrophin and so we need to look at this.

23          THE COURT:  But there is no evidence that it was

24  presented to the board at all.

25          MS. SMITH:  No, and it certainly wasn't presented to

- Proceedings -                                    4509

1    the board as a litigation update, you know, as something that

2    they were concerned that was going to get, the company was

3    going to get sued.  I mean, both board members testified to

4    that.  Mr. Greebel provided litigation updates, Jackson Su was

5    going to sue the board and George Wong was going to sue and

6    they decided what to do and the company should settle with

7    them.

8              That's not the way these settlement the agreements

9    were presented.  They were not presented at all, firstly, and

10   secondly, they were not presented that the company should now

11   protect themselves because these people who Mr. Shkreli

12   defrauded are now going to sue the company.

13             It completely disconnects because it's a post-hoc

14   explanation and this is, of course, what Mr. Shkreli has been

15   saying, but that is not the way they were presented.  They

16   weren't presented at all.  He just went ahead and took money

17   and shares out of the company.

18             MR. BRAFMAN:  But they're making a legal

19   obligation -- they are making up a legal obligation that there

20   is no basis in law to find.  The fact that this board never

21   approved these settlement agreements does not mean that they

22   were required to be presented to the board.  Who has testified

23   to that?  Nobody.

24             THE COURT:  You know, I think it would be one

25   thing -- and this was not the scenario -- that Mr. Shkreli,

- Proceedings -                                    4510

1  you know, misrepresented to Mr. Spielberg and Mr. Lavelle that

2  their money was not going to Retrophin, he never made that

3  affirmative statement, right, and then they just decided to

4  sue and then Mr. Shkreli wanted to just buy them off and give

5  them money to save them from suing Retrophin, that would be

6  one thing, but to hear these two guys, Spielberg and Lavelle,

7  had, you know, a colorable beef against Retrophin as a

8  corporation because the value of their shares was, in their

9  view, too low.

10             MS. SMITH:  Your Honor --

11             THE COURT:  I know that that perception --

12             MS. SMITH:  I know --

13             THE COURT:  -- would have been based on

14  misstatements.

15             MS. SMITH:  Well, it was.

16             So, for example, some of Mr. Lavelle's money has

17  been used to repay Darren Blanton.  You know, that's the way

18  the money flows because it comes in and it goes out in parts

19  in co-ventures.  So the reason why the investment in MSMB

20  Healthcare wasn't what they thought it was was because

21  Mr. Shkreli stole the money out under him.

22             Maybe it would make sense to just brief this one

23  issue so we're not here all night.

24             THE COURT:  All right.

25             MS. SMITH:  Just those two settlement agreements, we

- Proceedings -                          4511

1   can just brief them.

2            THE COURT:  Okay.

3            MS. SMITH:  And then I think the last bucket that we

4   haven't kind of discussed yet is the Standard Registrar

5   documents.

6            THE COURT:  And, again, I think --

7            MS. SMITH:  So, for the Al Geller piece, if we don't

8   put in the consulting agreements, I think we can agree that

9   those share transfers, they kind of rise and fall together, so

10  I think I understand those.

11           THE COURT:  Geller and Rosenfeld?

12           MS. SMITH:  Yes.  I don't know that there were --

13  Geller and Rosenfeld.  Then there's the remainder of Spielberg

14  and Lavelle.  So what we can do is, you know, I don't, maybe

15  we can --

16           THE COURT:  Who's coming tomorrow morning?

17           MS. KASULIS:  Amy Merrill, the Standard Registrar

18  person.

19           MS. SMITH:  So maybe what we can do is if Your Honor

20  agrees to put in the settlement agreements and if that

21  decision is made after Ms. Merrill is off the stand, then

22  maybe we can stip those two transfers without having to call

23  her again.

24           THE COURT:  Would you do that, Mr. Brafman and

25  Mr. Agnifilo, Ms. Zellan and Ms. Geragos?

- Proceedings -                                      4512

1          MR. BRAFMAN:  If Your Honor rules and we have no

2     choice, yes.

3          THE COURT:  She is asking if you would stip.

4          MS. SMITH:  We can put them in subject to connection

5     without discussing them and then just not having them come all

6     the way in.

7          MR. BRAFMAN:  Without the jury being told whose

8     shares they were?

9          MS. SMITH:  Yes, just admit them in a chunk.  We

10    were going to do this anyway, admit all of Amy Merrill's, you

11    know, all the business records at once and then, you know, and

12    we just won't -- we'll say the two are subject to connection.

13    We won't discuss this with the jury and if Your Honor rules

14    the settlement agreements come in, then they'll come in.

15         THE COURT:  And you were not going to include

16    Geller's and Rosenfeld's, correct?

17         MS. SMITH:  That's right.

18         MR. BRAFMAN:  Judge, can I ask a question?  Since

19    we've had sort of a breakdown in communication and perhaps

20    both sides are to blame, if they are indeed -- Geller is an

21    important witness and he's a long witness and his direct will

22    be long and his cross will be very long.  So, to the extent

23    that they are going to call him, we can't have, you know, show

24    up in the morning and here's Al Geller.  I would like to know

25    if he's coming in on Monday because, one, it requires us to

- Proceedings -                                    4513

1    bring down a lot of materials that we would otherwise not drag

2    into the courtroom and, B, we would like to know for our own

3    scheduling purposes who's on deck so we're not asking the

4    Court to wait after the direct examination.

5              MS. SMITH:  Your Honor, we'll make a decision

6    tomorrow.

7              For NAV and VRC, neither of them are in town so

8    we're going to have to call them and get them here hopefully

9    on Monday and so I think what's going to happen -- and we have

10   an issue with the Marcum witnesses because they were not

11   available tomorrow.  So, we have Amy Merrill for tomorrow

12   morning and then I think we would suggest that we then adjourn

13   to Monday morning and we'll try an get Marcum, VRC and NAV on

14   Monday and then we'll put the case agent on.  So, that will

15   give a little bit more time to make the decision about the

16   settlement agreements and then we can make a decision about

17   Mr. Geller.

18             MS. KASULIS:  I mean, that will give Mr. Agnifilo an

19   opportunity to look at the e-mails to see if there are any 106

20   issues with respect --

21             MR. BRAFMAN:  Can we know about Mr. Geller before

22   the weekend?

23             THE COURT:  She said yes.

24             MS. KASULIS:  Yes.  We'll let you know tomorrow.

25             THE COURT:  So, from the government, we will get a

- Proceedings -                          4514

1    commitment one way or the other regarding Mr. Geller.

2             You wanted an opportunity to brief further.

3             MS. SMITH:  Just on the two settlement agreements.

4             THE COURT:  Of these two individuals?

5             MS. SMITH:  Yes.

6             THE COURT:  And we will give time to the defense to

7    respond.

8             And Mr. Agnifilo, tomorrow by noon, you will let me

9    know which exhibits you have objections to regarding this

10   bucket that we call the e-mail bucket?

11            MR. AGNIFILO:  My guess is going to be rather than

12   objecting to these specific exhibits, although that could

13   happen, I suppose it's probably going to be a 106 issue, if

14   you are going to use this, you have to use this one too.

15            THE COURT:  Well, we have resolved some of these in

16   the motions in limine, right?

17            MS. SMITH:  Those are the defendant statements.

18            MR. AGNIFILO:  We never really objected.  I mean, we

19   had noticed that at a proper time and we never really objected

20   to the defendant's statements to the extent that they're

21   e-mails.  There's more of a 106 issue and I guess if there are

22   e-mails going back and forth, there could be issues with

23   co-conspirator statements on the other side, but what I'll do

24   is I'll look at the new list that we got yesterday with the

25   government's motion and I'll have an answer for the Court and

- Proceedings -                                4515

1   the government by noon tomorrow.

2            THE COURT:  All right.  And to the extent the

3   government is relying on these e-mails' admissibility based on

4   co-conspirator's statements, I would like you to point me to

5   evidence that shows that they are co-conspirators.  I mean,

6   honestly, it was not really clear to me going into this trial,

7   other than those that you specifically mentioned, who your

8   co-conspirators were and even though you identified some of

9   them, I am not sure what evidence there is to show that they

10  are co-conspirators.

11           MS. SMITH:  I would say the majority of the e-mails

12  are with Mr. Greebel, but to the extent that there are others,

13  we'll let you know.

14           THE COURT:  So you will tell us how -- the fact that

15  they are communicating, how they have agreed to some common

16  objective and I know that he is raised the advice of counsel

17  and Mr. Greebel is going to raise he lied to me all the way.

18           MS. SMITH:  Yes.

19           THE COURT:  So it seems a little bit contrary to a

20  conspiracy theory when you've got two people at odds.

21           MS. SMITH:  That's the positions now.  I think the

22  e-mails make it pretty clear.

23           THE COURT:  Well, I've started to read them but,

24  yes, all right.  Thank you.

25           MS. SMITH:  Thank you.

- Proceedings -                                    4516

1          THE COURT:  Thanks for coming in on short notice.

2          MR. BRAFMAN:  Thank you, Judge.

3          MS. KASULIS:  So are we starting at 9:00 a.m.?

4          THE COURT:  9 o'clock.  I guess we'll go tomorrow

5   and maybe go half the day is what you are thinking and then

6   dismiss the jury and then Friday, we will go for the full

7   day --

8          MS. KASULIS:  Tomorrow is Friday.

9          THE COURT:  Tomorrow is Friday?  Right.

10         MR. AGNIFILO:  So half day tomorrow.

11         THE COURT:  All right.  Thank you.

12         (Matter adjourned to July 21, 2017 at 9:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CMH       OCR       RMR       CRR       FCRR

## $

**$10** [1] - 4478:19
**$20** [2] - 4463:11, 4465:15
**$200,000** [1] - 4478:16
**$256,000** [1] - 4461:25
**$3,000** [1] - 4465:16
**$600** [1] - 4468:19
**$800** [1] - 4462:3

## 1

**1** [2] - 4494:2, 4499:7
**10017** [1] - 4447:20
**106** [5] - 4495:9, 4497:4, 4513:19, 4514:13, 4514:21
**11201** [1] - 4447:16
**12th** [3] - 4454:13, 4475:19, 4476:1
**15** [1] - 4479:9
**15-CR-00637(KAM** [1] - 4447:3
**150** [1] - 4475:3
**19th** [1] - 4476:2

## 2

**2** [4] - 4483:13, 4485:16, 4491:6, 4494:2
**2.5** [1] - 4485:14
**2.7** [1] - 4485:13
**20** [1] - 4447:7
**2011** [1] - 4464:2
**2012** [5] - 4464:22, 4465:24, 4466:2, 4466:6, 4468:20
**2017** [2] - 4447:7, 4516:12
**21** [1] - 4516:12
**211** [1] - 4464:1
**256** [1] - 4462:4
**271** [1] - 4447:15

## 3

**3** [1] - 4496:21
**300** [1] - 4475:16
**302** [4] - 4493:15, 4494:5, 4498:10, 4502:23
**302's** [1] - 4448:16
**302s** [2] - 4505:17, 4506:24
**3500** [3] - 4455:15, 4478:11, 4494:14
**36** [1] - 4453:9
**3rd** [1] - 4466:5

## 4

**40** [2] - 4458:23, 4464:3
**403** [4] - 4456:14, 4506:21, 4507:1, 4507:14
**425,000** [1] - 4484:24
**45** [1] - 4464:4
**4:00** [1] - 4447:8

## 5

**53** [1] - 4498:5

## 7

**7** [1] - 4488:9
**767** [1] - 4447:19

## 8

**80** [3] - 4458:24, 4464:3, 4464:4
**801(d)(2** [1] - 4460:7

## 9

**9** [1] - 4516:4
**90** [1] - 4476:12
**99** [2] - 4475:4, 4475:8
**9:00** [2] - 4516:3, 4516:12

## A

**A,B,C,D,E** [1] - 4448:25
**a.m** [2] - 4516:3, 4516:12
**ability** [2] - 4469:17, 4484:17
**able** [10] - 4449:15, 4453:4, 4455:6, 4457:16, 4459:5, 4492:17, 4495:16, 4495:17, 4495:18
**absent** [1] - 4482:4
**absolutely** [2] - 4464:20, 4471:6
**absurd** [1] - 4466:2
**access** [3] - 4461:1, 4464:18, 4504:21
**account** [8] - 4461:24, 4461:25, 4462:4, 4462:5, 4462:6, 4463:7, 4467:15, 4468:20
**accounts** [7] - 4452:8, 4461:1, 4463:4, 4464:18, 4467:20, 4501:6, 4504:21
**accurate** [2] - 4448:19, 4457:10
**Acting** [1] - 4447:14
**acting** [4] - 4460:8, 4473:20, 4507:23, 4508:10
**actual** [4] - 4483:15, 4495:23, 4495:24, 4497:11
**adamant** [1] - 4502:6
**add** [1] - 4457:11
**addition** [2] - 4465:24, 4497:9
**additional** [9] - 4464:20, 4481:19, 4481:22, 4484:14, 4485:24, 4492:7, 4494:11, 4498:14, 4504:12
**additions** [1] - 4476:2
**adequate** [1] - 4484:11
**adjourn** [1] - 4513:12
**adjourned** [1] - 4516:12
**admissibility** [5] - 4448:9, 4506:13, 4506:16, 4506:25, 4515:3
**admissible** [6] - 4450:17, 4461:13, 4475:17, 4478:25, 4495:7, 4506:5
**admission** [3] - 4450:20, 4463:18, 4489:17
**admissions** [2] - 4461:13, 4467:6
**admit** [6] - 4448:3, 4452:3, 4458:11, 4497:18, 4512:9, 4512:10
**admitted** [5] - 4449:2, 4458:21, 4467:11, 4486:25, 4505:11
**admitting** [2] - 4457:7, 4505:7
**advice** [2] - 4503:2, 4515:16

**advisor** [1] - 4456:10
**advisors** [1] - 4453:15
**affirmatively** [1] - 4457:25
**after-the-fact** [1] - 4490:3
**agent** [25] - 4448:5, 4449:5, 4460:9, 4460:12, 4460:15, 4461:11, 4461:22, 4462:3, 4464:15, 4464:19, 4467:7, 4475:22, 4477:6, 4477:9, 4477:21, 4478:10, 4479:14, 4485:2, 4488:23, 4491:24, 4492:1, 4495:1, 4495:3, 4513:14
**agents** [1] - 4460:7
**agnifilo** [1] - 4513:18
**AGNIFILO** [13] - 4447:21, 4470:9, 4471:2, 4472:5, 4472:8, 4473:18, 4496:9, 4496:11, 4496:15, 4496:19, 4514:11, 4514:18, 4516:10
**Agnifilo** [2] - 4511:25, 4514:8
**ago** [1] - 4448:7
**agree** [5] - 4455:5, 4460:3, 4462:10, 4467:25, 4511:8
**agreed** [3] - 4459:25, 4475:12, 4515:15
**agreement** [40] - 4448:14, 4454:12, 4457:15, 4457:20, 4457:22, 4458:2, 4458:6, 4458:10, 4458:12, 4460:3, 4467:18, 4473:5, 4477:20, 4478:8, 4478:9, 4478:20, 4480:3, 4480:19, 4482:2, 4485:11, 4490:5, 4497:3, 4497:22, 4498:2, 4502:18, 4502:19, 4502:22, 4502:23, 4502:25, 4503:11, 4503:16, 4503:18, 4504:25, 4507:19, 4507:22, 4507:23, 4508:1
**agreements** [59] - 4449:1, 4450:21, 4451:21, 4451:22, 4452:15, 4454:17, 4454:18, 4456:13, 4457:8, 4467:23, 4472:24, 4480:8, 4480:11, 4480:17, 4480:21, 4480:22, 4481:5, 4481:13, 4482:8, 4483:6, 4486:12, 4486:17, 4489:1, 4489:22, 4489:23, 4490:18, 4490:25, 4491:15, 4491:17, 4494:20, 4497:7, 4497:24, 4500:12, 4501:14, 4501:21, 4501:22, 4502:1, 4502:2, 4502:15, 4504:5, 4505:2, 4505:8, 4505:10, 4505:13, 4505:15, 4506:7, 4506:17, 4506:19, 4506:23, 4507:4, 4507:11, 4509:8, 4509:21, 4510:25, 4511:8, 4511:20, 4512:14, 4513:16, 4514:3
**agrees** [2] - 4492:12, 4511:20
**ahead** [3] - 4460:20, 4477:2, 4509:16
**aided** [1] - 4447:25
**AI** [17] - 4454:5, 4454:9, 4455:9, 4473:4, 4473:7, 4477:18, 4477:19, 4478:15, 4478:16, 4478:17, 4478:20, 4480:10, 4482:6, 4502:23, 4504:7, 4511:7, 4512:24
**ALIXANDRA** [1] - 4447:17
**Allea** [1] - 4500:10
**allow** [3] - 4455:5, 4463:18, 4480:1
**allowed** [2] - 4473:21, 4490:21
**alone** [1] - 4451:13

**AMERICA** [1] - 4447:3
**amount** [8] - 4448:25, 4449:17, 4459:25, 4467:13, 4467:14, 4498:12, 4498:13, 4505:19
**amounts** [1] - 4505:22
**Amy** [3] - 4511:17, 4512:10, 4513:11
**and..** [1] - 4482:6
**ANDREA** [1] - 4447:21
**answer** [2] - 4471:23, 4514:25
**answered** [2] - 4476:7, 4476:16
**anyway** [2] - 4487:18, 4512:10
**apart** [2] - 4458:25, 4463:6
**appear** [1] - 4457:10
**applies** [3] - 4461:11, 4477:11
**apply** [1] - 4475:12
**apportionment** [1] - 4483:22
**appropriate** [1] - 4450:22
**approval** [15] - 4481:20, 4482:3, 4482:15, 4486:23, 4486:24, 4487:13, 4489:1, 4489:3, 4489:6, 4489:7, 4489:9, 4489:11, 4491:13, 4492:13, 4492:15
**approve** [6] - 4480:20, 4481:3, 4491:14, 4491:17, 4499:23, 4507:9
**approved** [6] - 4480:12, 4481:1, 4482:9, 4486:3, 4499:24, 4509:21
**approving** [1] - 4489:21
**April** [1] - 4464:22
**arbitration** [2] - 4457:18, 4502:20
**arbitrator** [2] - 4457:19, 4458:3
**argue** [16] - 4450:4, 4453:2, 4455:2, 4462:11, 4465:10, 4466:7, 4468:23, 4472:7, 4472:8, 4479:16, 4479:18, 4480:14, 4497:17, 4498:24, 4502:21, 4506:6
**argued** [3] - 4454:20, 4506:16
**arguing** [6] - 4458:15, 4458:15, 4480:11, 4480:12, 4499:18, 4501:22
**argument** [19] - 4451:1, 4451:2, 4452:5, 4463:12, 4467:21, 4472:1, 4472:9, 4474:18, 4477:12, 4486:4, 4489:4, 4490:20, 4491:19, 4497:12, 4497:14, 4499:16, 4500:14, 4504:20, 4505:13
**arguments** [10] - 4448:12, 4463:16, 4491:18, 4494:9, 4494:11, 4495:9, 4497:4, 4497:11, 4504:9, 4507:13
**arrangement** [1] - 4449:13
**Aselage** [7] - 4482:5, 4486:21, 4487:4, 4489:12, 4489:16, 4490:12, 4492:16
**asleep** [1] - 4489:18
**Assistant** [1] - 4447:18
**ASSOCIATES** [1] - 4447:19
**assume** [2] - 4449:5, 4506:22
**attempting** [1] - 4490:8
**attention** [7] - 4455:20, 4455:24, 4457:5, 4469:6, 4476:19, 4489:17, 4499:11
**attorney** [3] - 4473:6, 4473:9, 4473:10
**Attorney** [1] - 4447:14
**attorneys** [1] - 4495:17
**Attorneys** [1] - 4447:18

**AUM** [4] - 4459:24, 4459:25, 4460:2, 4464:2
**authorize** [3] - 4482:2, 4482:10, 4487:10
**authorized** [1] - 4507:17
**available** [3] - 4474:6, 4477:1, 4513:11
**Avenue** [1] - 4447:19
**avoid** [3] - 4450:20, 4487:4, 4501:10

### B

**backed** [1] - 4466:12
**backing** [1] - 4466:1
**backup** [1] - 4466:13
**balance** [5] - 4458:4, 4461:24, 4462:4, 4469:15, 4503:5
**balance"** [1] - 4462:5
**bank** [10] - 4449:5, 4452:8, 4463:4, 4464:18, 4466:15, 4467:20, 4468:20, 4479:13, 4501:6, 4504:21
**Banta** [3] - 4482:7, 4482:8, 4490:1
**bar** [5] - 4496:4, 4506:8, 4506:25, 4507:1
**Barry** [1] - 4447:23
**bars** [1] - 4495:12
**based** [7] - 4463:18, 4473:7, 4475:5, 4488:21, 4499:4, 4510:13, 4515:3
**bases** [1] - 4506:5
**basis** [9] - 4469:8, 4451:13, 4451:18, 4470:22, 4498:20, 4504:10, 4506:11, 4508:4, 4509:20
**became** [2] - 4462:10, 4482:21
**become** [3] - 4454:24, 4482:13, 4500:16
**bed** [1] - 4505:22
**beef** [2] - 4505:19, 4510:7
**BEFORE** [1] - 4447:11
**beg** [1] - 4505:9
**believes** [1] - 4503:5
**BENJAMIN** [1] - 4447:20
**best** [1] - 4507:23
**between** [7] - 4460:3, 4475:20, 4478:23, 4488:23, 4492:2, 4495:3, 4497:16
**big** [4] - 4464:3, 4476:15, 4479:3, 4499:6
**billion** [1] - 4462:24
**bills** [1] - 4461:23
**binders** [1] - 4455:15
**bit** [5] - 4483:8, 4492:9, 4500:4, 4513:15, 4515:19
**blame** [1] - 4512:20
**Blanton** [3] - 4454:14, 4454:15, 4510:17
**bless** [1] - 4489:19
**blow** [1] - 4500:10
**Board** [29] - 4480:12, 4480:19, 4480:25, 4481:20, 4481:21, 4482:3, 4482:5, 4482:15, 4486:2, 4486:7, 4486:8, 4486:22, 4486:24, 4487:13, 4487:14, 4487:25, 4488:17, 4489:2, 4489:6, 4489:7, 4489:9, 4489:10, 4489:13, 4489:20, 4490:3, 4490:13, 4491:14, 4492:13, 4492:15

**board** [15] - 4487:14, 4489:1, 4493:6, 4497:13, 4497:16, 4498:21, 4499:23, 4507:9, 4508:21, 4508:24, 4509:1, 4509:3, 4509:5, 4509:20, 4509:22
**bonus** [1] - 4487:2
**Brafman** [13] - 4455:18, 4466:7, 4468:14, 4468:22, 4484:2, 4490:19, 4495:7, 4503:25, 4504:11, 4507:4, 4507:13, 4511:24
**BRAFMAN** [60] - 4447:19, 4447:20, 4449:4, 4449:18, 4450:1, 4450:10, 4453:1, 4456:6, 4457:11, 4457:13, 4459:12, 4461:5, 4461:9, 4461:15, 4461:20, 4468:1, 4468:4, 4468:7, 4468:10, 4469:11, 4472:14, 4472:17, 4472:23, 4473:11, 4473:14, 4473:17, 4473:21, 4477:13, 4477:15, 4479:20, 4479:23, 4480:1, 4481:18, 4481:25, 4482:8, 4482:19, 4483:3, 4486:20, 4488:16, 4489:2, 4489:5, 4492:4, 4495:8, 4495:11, 4495:15, 4495:23, 4497:18, 4498:16, 4502:11, 4502:13, 4506:15, 4507:6, 4507:16, 4508:15, 4509:18, 4512:1, 4512:7, 4512:18, 4513:21, 4516:2
**Brafman's** [2] - 4483:8, 4491:18
**break** [1] - 4496:5
**breakdown** [1] - 4512:19
**breath** [1] - 4473:23
**BRIDGET** [1] - 4447:14
**brief** [5] - 4495:16, 4496:22, 4510:22, 4511:1, 4514:2
**briefing** [1] - 4496:24
**bring** [4] - 4476:21, 4484:11, 4487:15, 4513:1
**Brooklyn** [1] - 4447:6, 4447:16
**brought** [3] - 4456:4, 4456:16, 4499:10
**bucket** [3] - 4511:3, 4514:10
**bunch** [1] - 4488:2
**burden** [2] - 4503:14, 4503:17
**business** [2] - 4477:12, 4512:11
**busy** [1] - 4495:15
**butt** [1] - 4478:15
**buy** [3] - 4500:7, 4510:4
**BY** [2] - 4447:16, 4447:20

### C

**Cadman** [1] - 4447:15
**cannot** [5] - 4448:13, 4479:12, 4480:1, 4482:10, 4499:20
**cap** [2] - 4483:11, 4484:25
**Cap** [1] - 4466:16
**Capital** [13] - 4463:3, 4465:5, 4466:4, 4470:21, 4470:23, 4471:3, 4475:7, 4483:13, 4490:19, 4490:25, 4491:15, 4491:16, 4500:3
**capital** [2] - 4463:4, 4500:2
**Capital's** [1] - 4466:7
**caps** [1] - 4486:23
**car** [1] - 4500:7
**care** [2] - 4469:14, 4500:3

case [30] - 4450:16, 4451:5, 4454:25, 4461:22, 4464:15, 4465:12, 4473:4, 4473:8, 4474:19, 4475:5, 4475:22, 4476:10, 4476:15, 4476:17, 4477:6, 4477:9, 4477:21, 4479:14, 4480:2, 4480:6, 4482:14, 4487:9, 4488:6, 4488:23, 4492:1, 4492:14, 4498:3, 4501:19, 4506:18, 4513:14
cases [2] - 4477:5, 4477:7
cash [1] - 4493:11
cashed [1] - 4493:16
category [2] - 4459:3, 4474:23
CAUSE [1] - 4447:11
caused [1] - 4499:5
CEO [5] - 4484:14, 4485:21, 4486:24, 4487:6, 4490:20
certain [6] - 4448:3, 4449:5, 4476:24, 4477:25, 4485:20, 4486:22
certainly [3] - 4461:8, 4463:13, 4508:25
chain [1] - 4454:6
chair [1] - 4471:17
challenged [1] - 4458:3
Chang [1] - 4456:2
changed [1] - 4462:22
characterization [1] - 4503:22
charge [2] - 4464:18, 4502:19
charged [3] - 4448:4, 4450:16, 4461:14
Chicago [1] - 4465:13
choice [1] - 4512:2
chunk [1] - 4512:9
circumstances [2] - 4448:17, 4455:17
cited [1] - 4448:19
civil [1] - 4486:21
claim [5] - 4501:14, 4507:18, 4508:5, 4508:18
claimed [1] - 4457:14
claims [1] - 4491:22
clarify [1] - 4474:9
clause [1] - 4475:12
clear [7] - 4454:24, 4462:21, 4464:7, 4491:1, 4504:23, 4515:6, 4515:22
clearer [1] - 4483:10
clearly [2] - 4464:15, 4505:17
client [1] - 4464:3
close [2] - 4455:24, 4462:24
closing [5] - 4463:16, 4466:8, 4468:23, 4491:19, 4504:11
co [8] - 4488:12, 4495:2, 4510:19, 4514:23, 4515:4, 4515:5, 4515:8, 4515:10
co-conspirator [2] - 4495:2, 4514:23
co-conspirator's [1] - 4515:4
co-conspirators [4] - 4488:12, 4515:5, 4515:8, 4515:10
co-ventures [1] - 4510:19
coconspirator [7] - 4458:19, 4460:7, 4460:18, 4461:10, 4462:17, 4463:19, 4463:24
coconspirators [2] - 4453:18, 4458:17
collectively [1] - 4479:9
colorable [1] - 4510:7

comfort [2] - 4479:3, 4479:4
coming [6] - 4452:7, 4476:6, 4506:9, 4511:16, 4512:25, 4516:1
commit [4] - 4486:6, 4488:7, 4488:11, 4505:23
commitment [1] - 4514:1
committed [1] - 4507:21
common [1] - 4515:15
communicating [1] - 4515:15
communication [2] - 4479:1, 4512:19
company [50] - 4461:17, 4462:9, 4462:22, 4466:1, 4466:11, 4470:11, 4482:10, 4482:11, 4482:13, 4482:14, 4482:17, 4482:21, 4483:15, 4484:17, 4484:18, 4484:22, 4485:3, 4485:8, 4486:15, 4486:25, 4487:1, 4487:5, 4487:12, 4487:19, 4487:24, 4487:25, 4488:3, 4489:14, 4489:25, 4490:8, 4490:10, 4490:13, 4490:20, 4490:21, 4491:12, 4492:7, 4492:8, 4499:8, 4499:15, 4499:21, 4499:25, 4507:7, 4507:24, 4509:2, 4509:6, 4509:10, 4509:12, 4509:17
company's [1] - 4484:24
complainant [1] - 4487:9
completely [5] - 4461:25, 4462:2, 4462:13, 4465:1, 4509:13
compliance [1] - 4483:23
complicated [2] - 4500:4, 4500:5
compliment [1] - 4496:23
Computer [1] - 4447:25
Computer-aided [1] - 4447:25
computerized [1] - 4447:25
conceding [3] - 4449:20, 4449:21, 4495:7
concerned [5] - 4463:9, 4465:21, 4474:10, 4504:11, 4509:2
concerns [1] - 4448:12
conclusion [2] - 4471:5, 4471:8
condo [1] - 4500:7
conference [1] - 4448:1
conflating [1] - 4463:3
confrontation [1] - 4475:11
confused [1] - 4483:8
confusion [1] - 4483:8
connection [3] - 4500:23, 4512:4, 4512:12
conservative [1] - 4487:20
consider [2] - 4449:3, 4462:7
considered [3] - 4455:3, 4472:3, 4478:15
conspiracy [6] - 4486:6, 4488:6, 4488:11, 4492:2, 4505:23, 4515:20
conspirator [2] - 4495:2, 4514:23
conspirator's [1] - 4515:4
conspirators [4] - 4488:12, 4515:5, 4515:8, 4515:10
conspire [1] - 4460:13
conspiring [1] - 4460:12
constant [1] - 4479:1
constitutes [1] - 4506:18

constitutional [1] - 4448:11
constraints [1] - 4495:19
consultant [7] - 4454:12, 4478:13, 4502:19, 4502:21, 4502:23, 4502:25, 4503:6
consultants [1] - 4502:15
consulting [34] - 4454:17, 4457:15, 4457:20, 4457:21, 4457:22, 4458:1, 4458:6, 4477:20, 4478:8, 4478:9, 4478:14, 4478:20, 4479:15, 4480:3, 4480:7, 4480:11, 4481:5, 4482:8, 4485:11, 4489:22, 4489:23, 4490:17, 4491:14, 4497:22, 4501:13, 4501:20, 4502:2, 4502:13, 4502:17, 4503:15, 4503:18, 4504:4, 4504:25, 4511:8
contain [1] - 4451:22
contained [1] - 4459:10
content [1] - 4470:16
continual [1] - 4475:11
continue [2] - 4490:13, 4490:14
Continued [1] - 4492:20
continues [1] - 4470:25
Continuing [1] - 4471:1
contrary [2] - 4462:11, 4515:19
controlling [1] - 4501:3
conversations [2] - 4457:3, 4504:9
conversion [1] - 4483:16
converted [2] - 4483:14, 4485:20
convey [1] - 4460:2
convict [1] - 4451:19
cooperators [1] - 4474:7
corporate [1] - 4483:23
corporation [4] - 4485:17, 4485:22, 4485:24, 4510:8
corporations [2] - 4490:6, 4508:19
correct [7] - 4452:17, 4452:20, 4456:6, 4462:2, 4463:2, 4469:10, 4512:16
cost [3] - 4482:12, 4487:7
costs [1] - 4508:11
counsel [3] - 4467:21, 4508:14, 4515:16
counseling [1] - 4503:1
Count [2] - 4488:6, 4488:9
count [1] - 4464:5
country [1] - 4477:8
couple [1] - 4495:8
course [2] - 4486:18, 4509:14
COURT [133] - 4447:1, 4448:1, 4449:11, 4449:19, 4450:23, 4451:6, 4451:20, 4452:12, 4452:14, 4452:18, 4452:21, 4455:14, 4456:7, 4457:1, 4457:12, 4458:18, 4459:3, 4459:6, 4459:14, 4460:12, 4460:15, 4460:19, 4463:1, 4463:17, 4466:22, 4467:5, 4468:6, 4469:8, 4470:2, 4470:5, 4470:20, 4471:25, 4472:16, 4473:22, 4474:21, 4477:14, 4479:18, 4479:25, 4480:9, 4481:6, 4481:9, 4481:12, 4483:1, 4483:4, 4483:21, 4484:2, 4484:9, 4484:13, 4484:23, 4485:15, 4486:5, 4488:6, 4488:9, 4488:11, 4488:18, 4488:21, 4490:23, 4491:20, 4493:3,

4493:6, 4493:9, 4493:12, 4493:15, 4493:20, 4493:22, 4494:5, 4494:10, 4494:12, 4494:14, 4494:17, 4494:22, 4495:5, 4495:10, 4495:12, 4496:3, 4496:8, 4496:10, 4496:13, 4496:16, 4496:23, 4497:1, 4497:5, 4497:7, 4498:4, 4498:7, 4499:1, 4499:7, 4499:19, 4500:1, 4500:6, 4500:11, 4500:16, 4500:18, 4501:2, 4501:13, 4501:24, 4502:6, 4504:6, 4504:15, 4505:3, 4505:9, 4505:12, 4505:25, 4506:10, 4507:9, 4508:14, 4508:16, 4508:19, 4508:23, 4509:24, 4510:11, 4510:13, 4510:24, 4511:2, 4511:6, 4511:11, 4511:16, 4511:24, 4512:3, 4512:15, 4513:23, 4513:25, 4514:4, 4514:6, 4514:15, 4515:2, 4515:14, 4515:19, 4515:23, 4516:1, 4516:4, 4516:9, 4516:11

**Court** [5] - 4447:23, 4447:23, 4478:3, 4513:4, 4514:25

**court** [2] - 4465:22, 4496:21

**Courthouse** [1] - 4447:5

**courtroom** [4] - 4453:16, 4471:9, 4471:10, 4513:2

**cousin** [5] - 4455:19, 4455:21, 4455:22, 4455:25, 4499:3

**Cox** [4] - 4473:13, 4473:14, 4473:21, 4477:23

**create** [3] - 4456:14, 4457:8, 4466:16

**created** [1] - 4465:24

**creation** [1] - 4490:18

**crime** [2] - 4451:19, 4486:25

**crimes** [2] - 4448:4, 4461:14

**CRIMINAL** [1] - 4447:11

**criminal** [1] - 4487:15

**cross** [9] - 4454:8, 4455:1, 4472:16, 4474:15, 4478:21, 4479:14, 4487:5, 4492:15, 4512:22

**cross-examination** [2] - 4487:5, 4492:15

**cross-examine** [2] - 4474:15, 4479:14

**cross-examined** [1] - 4478:21

**cross-examining** [1] - 4472:16

**current** [1] - 4504:10

## D

**dancing** [1] - 4482:24

**dangerous** [1] - 4471:6

**Darren** [1] - 4510:17

**date** [2] - 4449:17, 4467:13

**dates** [1] - 4450:19

**David** [1] - 4454:16

**days** [3] - 4449:1, 4464:2, 4465:19

**deal** [2] - 4455:7, 4476:15

**debt** [6] - 4482:19, 4482:20, 4482:24, 4500:1, 4500:16, 4500:19

**debts** [3] - 4482:18, 4490:22, 4490:23

**December** [2] - 4464:2, 4466:5

**decide** [2] - 4486:8, 4497:16

**decided** [5] - 4449:9, 4476:24, 4493:16,

4509:6, 4510:3

**decides** [3] - 4486:25, 4487:6

**decision** [10] - 4448:22, 4453:25, 4454:1, 4473:7, 4482:14, 4485:21, 4511:21, 4513:5, 4513:15, 4513:16

**deck** [1] - 4513:3

**defendant** [18] - 4447:9, 4448:6, 4449:20, 4456:15, 4461:13, 4463:10, 4464:11, 4465:4, 4465:6, 4465:15, 4468:24, 4469:25, 4497:10, 4498:23, 4499:13, 4501:17, 4506:4, 4514:17

**Defendant** [1] - 4447:19

**defendant's** [4] - 4475:10, 4475:13, 4475:18, 4492:3, 4514:20

**defense** [6] - 4448:11, 4452:5, 4464:9, 4467:21, 4506:6, 4514:6

**Defense** [6] - 4473:3, 4473:10, 4474:2, 4474:8, 4474:19, 4475:12

**defraud** [2] - 4490:8, 4508:10

**defrauded** [5] - 4449:24, 4451:9, 4469:7, 4502:22, 4509:12

**demanded** [1] - 4481:17

**demonstrate** [1] - 4452:15

**dependent** [2] - 4495:2, 4499:17

**deposit** [1] - 4449:9

**deposits** [1] - 4449:5

**described** [1] - 4464:13

**describes** [1] - 4479:2

**deserve** [1] - 4478:14

**Deslogi(ph** [1] - 4457:19

**determine** [1] - 4479:8

**Diandra** [1] - 4456:7

**difference** [3] - 4491:8, 4491:9, 4491:10

**different** [5] - 4448:16, 4453:14, 4457:24, 4465:2, 4468:14

**differently** [1] - 4455:4

**direct** [2] - 4512:21, 4513:4

**direction** [1] - 4507:5

**directive** [1] - 4483:20

**directly** [6] - 4456:19, 4459:7, 4464:11, 4465:4, 4465:5, 4467:10

**disagree** [2] - 4468:22, 4503:22

**disagreement** [1] - 4485:18

**disavow** [4] - 4455:8, 4455:10, 4503:16

**disconnects** [1] - 4509:13

**discovered** [1] - 4486:14

**discuss** [3] - 4462:15, 4475:8, 4512:13

**discussed** [2] - 4497:13, 4511:4

**discussing** [3] - 4462:20, 4475:21, 4512:5

**discussions** [1] - 4477:16

**dismiss** [1] - 4516:6

**dispute** [1] - 4505:22

**disputed** [1] - 4474:24

**disputes** [1] - 4505:4

**distribute** [5] - 4484:18, 4484:19, 4484:21, 4499:15, 4499:21

**distributed** [2] - 4483:19, 4491:3

**distribution** [7] - 4481:15, 4481:17, 4483:24, 4484:1, 4485:10, 4491:5, 4501:8

**DISTRICT** [3] - 4447:1, 4447:1, 4447:12

**District** [3] - 4447:15, 4477:7, 4477:8

**document** [5] - 4465:11, 4469:20, 4497:19, 4498:24

**documents** [20] - 4456:11, 4464:14, 4466:19, 4469:13, 4474:24, 4476:7, 4476:21, 4480:19, 4480:22, 4480:24, 4495:21, 4496:1, 4496:6, 4496:9, 4497:10, 4504:18, 4505:5, 4506:4, 4506:12, 4511:5

**dollars** [1] - 4462:24

**done** [8] - 4476:9, 4476:18, 4476:23, 4490:4, 4495:18, 4497:2, 4497:5, 4497:6

**Doug** [1] - 4464:3

**Douglas** [2] - 4456:7, 4457:3

**down** [5] - 4468:19, 4471:15, 4477:13, 4495:24, 4513:1

**dozens** [1] - 4454:18

**drag** [1] - 4513:1

**dumped** [1] - 4476:11

**during** [1] - 4472:12

## E

**E-mail** [5] - 4447:24, 4454:6, 4458:22, 4462:19, 4464:11

**e-mail** [7] - 4474:3, 4474:4, 4475:20, 4477:17, 4477:23, 4503:7, 4514:10

**E-mails** [3] - 4458:21, 4460:20, 4463:21, 4473:14

**e-mails** [20] - 4474:23, 4474:24, 4475:4, 4475:10, 4475:16, 4478:23, 4478:24, 4479:6, 4479:8, 4488:23, 4488:25, 4492:3, 4495:5, 4497:3, 4502:4, 4513:19, 4514:21, 4514:22, 4515:11, 4515:22

**e-mails'** [1] - 4515:3

**early** [1] - 4487:2

**East** [1] - 4447:15

**EASTERN** [1] - 4447:1

**Eastern** [1] - 4447:15

**effected** [1] - 4454:21

**effort** [1] - 4476:9

**either** [9] - 4455:11, 4461:10, 4461:11, 4466:24, 4467:3, 4467:6, 4480:2, 4495:11, 4502:24

**Elea** [1] - 4491:16

**ELEIS** [1] - 4447:17

**embroiled** [1] - 4488:4

**employee** [3] - 4467:7, 4495:1, 4495:3

**employees** [1] - 4460:8

**end** [6] - 4454:6, 4462:11, 4464:11, 4478:24, 4487:21, 4497:21

**ending** [1] - 4464:13

**ends** [1] - 4478:18

**engage** [1] - 4508:14

**engagement** [4] - 4464:10, 4464:12, 4464:13, 4465:20

**engaging** [1] - 4471:15

**enter** [1] - 4486:11

**entered** [1] - 4506:23
**entering** [1] - 4507:3
**entire** [3] - 4470:10, 4485:6, 4486:16
**entitled** [4] - 4460:10, 4492:11, 4501:8, 4508:9
**equally** [2] - 4474:5, 4477:1
**equals** [1] - 4487:7
**especially** [2] - 4470:16, 4504:20
**ESQ** [8] - 4447:14, 4447:16, 4447:17, 4447:17, 4447:20, 4447:21, 4447:21, 4447:22
**establish** [5] - 4449:12, 4452:7, 4461:4, 4467:12, 4467:24
**established** [5] - 4448:13, 4453:17, 4458:24, 4460:21, 4471:14
**establishes** [3] - 4457:4, 4467:8, 4467:13
**estimates** [2] - 4465:1, 4468:12
**evaluation** [1] - 4487:19
**Evan** [1] - 4478:23
**evening** [1] - 4448:3
**eventually** [1] - 4501:9
**evidence** [47] - 4448:4, 4448:10, 4448:13, 4449:10, 4450:16, 4451:7, 4451:8, 4452:2, 4455:1, 4457:3, 4458:2, 4458:16, 4458:18, 4459:12, 4459:19, 4459:22, 4460:2, 4460:10, 4460:19, 4462:21, 4463:18, 4463:21, 4463:23, 4465:11, 4469:1, 4469:16, 4469:23, 4469:24, 4476:13, 4479:20, 4480:4, 4480:15, 4482:4, 4482:16, 4484:23, 4486:9, 4486:13, 4488:22, 4491:21, 4492:14, 4494:24, 4500:2, 4504:10, 4506:18, 4508:23, 4515:5, 4515:9
**evidentiary** [3] - 4448:9, 4506:8, 4506:11
**examination** [4] - 4455:2, 4487:5, 4492:15, 4513:4
**examine** [3] - 4454:8, 4474:15, 4479:14
**examined** [1] - 4478:21
**examining** [1] - 4472:16
**example** [4] - 4455:18, 4463:25, 4480:18, 4510:16
**except** [2] - 4471:16, 4479:3
**exception** [4] - 4460:7, 4461:10, 4461:11, 4474:12
**exchange** [2] - 4462:19, 4483:5
**excluded** [1] - 4461:2
**Exhibit** [2] - 4464:1, 4498:5
**exhibits** [4] - 4454:13, 4454:15, 4514:9, 4514:12
**Exhibits** [7] - 4475:2, 4475:24, 4476:1, 4476:11, 4476:12, 4476:14, 4477:6
**exist** [1] - 4493:25
**expected** [1] - 4454:14
**explained** [1] - 4481:21
**explanation** [1] - 4509:14
**exposure** [2] - 4474:13, 4503:24
**extent** [8] - 4451:7, 4476:13, 4491:4, 4497:3, 4512:22, 4514:20, 4515:2,

4515:12
**extra** [3] - 4487:7, 4487:21, 4499:14

# F

**F.B.I** [2] - 4448:5, 4448:16
**face** [1] - 4476:17
**fact** [38] - 4448:24, 4449:7, 4449:16, 4450:8, 4450:11, 4450:24, 4451:9, 4451:12, 4451:17, 4452:1, 4452:15, 4457:9, 4457:17, 4458:11, 4459:1, 4459:23, 4461:12, 4462:19, 4467:24, 4471:16, 4472:3, 4479:5, 4489:7, 4490:3, 4490:6, 4491:2, 4491:10, 4493:4, 4493:10, 4497:19, 4502:16, 4503:24, 4504:18, 4506:16, 4506:17, 4509:20, 4515:14
**fact-finding** [1] - 4471:16
**factor** [2] - 4470:24, 4471:12
**factual** [4] - 4471:5, 4471:8, 4471:13, 4471:14
**failed** [3] - 4461:20, 4461:22, 4478:17
**fair** [1] - 4490:4
**fairness** [1] - 4455:6
**faith** [3] - 4476:1, 4476:9, 4487:19
**fall** [1] - 4511:9
**false** [5] - 4450:15, 4457:15, 4459:2, 4469:3, 4490:18
**fancy** [1] - 4500:7
**far** [3] - 4456:20, 4474:11, 4476:8
**fault** [1] - 4453:19
**favor** [1] - 4458:4
**FBI** [1] - 4502:10
**Fearnow** [1] - 4474:13
**Federal** [1] - 4486:6
**fee** [1] - 4458:4
**few** [2] - 4466:24, 4487:21
**field** [1] - 4476:5
**fight** [2] - 4479:6, 4492:12
**figure** [1] - 4499:9
**file** [1] - 4466:19
**filed** [2] - 4448:3, 4490:1
**filings** [2] - 4486:13, 4498:23
**final** [1] - 4457:22
**fine** [3] - 4479:13, 4484:20, 4503:3
**finish** [1] - 4455:6
**firm** [1] - 4479:3
**first** [5] - 4472:11, 4476:5, 4480:17, 4490:16, 4500:14
**firstly** [1] - 4509:9
**five** [3] - 4473:12, 4495:17, 4496:19
**flawed** [1] - 4480:5
**flows** [1] - 4510:18
**focused** [1] - 4492:5
**focusing** [1] - 4468:14
**following** [2] - 4477:15, 4492:20
**fooled** [2] - 4489:16, 4489:20
**FOR** [1] - 4447:11
**force** [1] - 4474:14
**forget** [1] - 4490:9
**former** [2] - 4481:2, 4491:15

**forth** [3] - 4458:23, 4475:4, 4514:22
**forward** [1] - 4453:13
**forwarded** [2] - 4467:2, 4467:9
**fought** [1] - 4457:16
**founded** [2] - 4490:11, 4500:8
**founder** [8] - 4478:18, 4482:1, 4482:10, 4482:14, 4484:14, 4486:25, 4487:12, 4487:16
**founders** [1] - 4478:16
**frank** [1] - 4475:25
**frankly** [2] - 4478:25, 4487:20
**Frankly** [1] - 4463:9
**fraud** [49] - 4448:13, 4449:10, 4449:21, 4451:13, 4451:15, 4451:18, 4453:5, 4453:6, 4453:20, 4455:3, 4455:9, 4458:2, 4458:7, 4460:11, 4468:8, 4468:9, 4468:16, 4469:4, 4470:1, 4471:2, 4477:5, 4477:7, 4480:4, 4486:7, 4488:7, 4488:9, 4488:10, 4488:11, 4489:8, 4490:19, 4497:17, 4497:20, 4498:2, 4499:13, 4500:21, 4500:22, 4502:16, 4502:18, 4503:16, 4503:20, 4505:23, 4505:24, 4505:25, 4506:1, 4506:18, 4506:19, 4507:21, 4508:3
**frauds** [1] - 4450:16
**fraudulent** [7] - 4451:3, 4451:25, 4481:12, 4501:14, 4503:15, 4506:23, 4507:4
**Friday** [3] - 4516:6, 4516:8, 4516:9
**front** [1] - 4461:22
**frustrating** [2] - 4475:25, 4476:25
**full** [3] - 4464:5, 4476:3, 4516:6
**function** [2] - 4490:13, 4490:14
**Fund** [1] - 4470:21
**fund** [13] - 4452:9, 4453:20, 4456:1, 4456:4, 4459:4, 4459:7, 4460:9, 4464:16, 4464:22, 4469:3, 4475:16, 4500:10
**fundamental** [1] - 4455:6
**funds** [7] - 4448:18, 4450:14, 4450:19, 4452:4, 4456:25, 4468:21, 4500:23
**fungible** [1] - 4462:10
**furtherance** [1] - 4499:13

# G

**game** [1] - 4472:18
**Geller** [39] - 4454:5, 4454:10, 4454:15, 4454:16, 4455:9, 4473:5, 4473:7, 4473:8, 4477:18, 4477:19, 4478:12, 4478:15, 4478:16, 4478:17, 4478:20, 4480:11, 4480:14, 4482:6, 4489:25, 4493:12, 4493:13, 4501:15, 4502:7, 4502:9, 4502:23, 4502:25, 4503:7, 4503:22, 4504:6, 4504:7, 4505:1, 4511:7, 4511:11, 4511:13, 4512:20, 4512:24, 4513:17, 4513:21, 4514:1
**Geller's** [4] - 4477:24, 4478:1, 4478:7, 4512:16
**generally** [1] - 4457:1
**George** [1] - 4509:5

**Geragos** [1] - 4511:25
**gifted** [1] - 4466:4
**given** [6] - 4449:17, 4465:18, 4478:11, 4487:8, 4497:1, 4506:16
**glazing** [2] - 4472:12, 4472:14
**glimpse** [1] - 4448:15
**God** [1] - 4489:19
**goodwill** [1] - 4487:3
**Government** [16] - 4447:14, 4448:7, 4448:8, 4448:19, 4449:4, 4449:11, 4449:23, 4453:1, 4464:1, 4470:20, 4476:9, 4477:16, 4477:23, 4477:25, 4478:4, 4479:10
**government** [5] - 4503:11, 4506:16, 4513:25, 4515:1, 4515:3
**Government's** [4] - 4448:2, 4453:10, 4454:25, 4471:25
**government's** [1] - 4514:25
**governs** [1] - 4487:12
**Grand** [2] - 4472:21, 4474:10
**great** [2] - 4453:8, 4456:1
**Greebel** [18] - 4463:22, 4463:23, 4474:25, 4475:3, 4475:20, 4478:23, 4479:5, 4488:14, 4488:15, 4488:17, 4488:20, 4488:24, 4488:25, 4492:2, 4495:6, 4509:4, 4515:12, 4515:17
**grenade** [1] - 4453:25
**grounds** [1] - 4505:3
**grown** [1] - 4494:3
**guess** [7] - 4448:7, 4460:20, 4497:3, 4506:1, 4514:11, 4514:21, 4516:4
**guiding** [1] - 4479:5
**guilty** [2] - 4489:8, 4490:7
**guys** [3] - 4488:2, 4489:15, 4510:6

# H

**half** [4] - 4448:7, 4476:3, 4516:5, 4516:10
**hand** [1] - 4453:24
**handsomely** [1] - 4462:25
**happy** [20] - 4450:19, 4460:23, 4461:3, 4461:6, 4462:16, 4463:8, 4463:11, 4465:7, 4465:13, 4465:23, 4472:22, 4474:9, 4484:3, 4487:2, 4487:17, 4491:2, 4492:10, 4498:16, 4498:17
**hard** [1] - 4457:16
**harmed** [1] - 4487:22
**hate** [1] - 4489:15
**health** [1] - 4500:3
**healthcare** [5] - 4461:1, 4464:2, 4466:10, 4493:9, 4504:23
**Healthcare** [46] - 4463:4, 4463:7, 4463:13, 4464:17, 4465:1, 4465:4, 4466:3, 4471:3, 4475:7, 4481:7, 4481:9, 4481:24, 4482:18, 4482:20, 4483:2, 4483:4, 4483:11, 4483:12, 4483:18, 4483:20, 4483:25, 4484:5, 4484:15, 4485:15, 4485:19, 4489:24, 4491:5, 4491:15, 4493:2, 4493:8, 4493:10, 4493:17, 4494:3, 4498:7, 4498:8, 4499:1, 4500:8, 4500:17,

4500:25, 4501:4, 4501:9, 4502:3, 4504:21, 4505:16, 4508:7, 4510:20
**Healthcare's** [1] - 4491:3
**hear** [5] - 4450:10, 4471:23, 4495:22, 4504:19, 4510:6
**heard** [5] - 4450:6, 4452:5, 4453:3, 4453:17, 4457:1
**hearing** [1] - 4505:12
**heart** [1] - 4492:1
**heartland** [1] - 4480:2
**heated** [1] - 4457:17
**hedge** [1] - 4448:17
**help** [1] - 4490:13
**helpful** [1] - 4478:25
**herring** [1] - 4475:14
**himself** [2] - 4460:13, 4460:16
**hire** [1] - 4502:15
**hoc** [1] - 4509:13
**hodgepodge** [1] - 4453:13
**honestly** [3] - 4477:9, 4495:13, 4515:6
**Honor** [52] - 4450:3, 4451:10, 4452:3, 4455:4, 4456:21, 4458:15, 4458:25, 4460:5, 4460:18, 4461:3, 4461:7, 4461:9, 4462:21, 4464:7, 4471:19, 4472:10, 4472:19, 4475:1, 4477:5, 4478:3, 4478:6, 4478:10, 4479:22, 4480:1, 4480:7, 4481:25, 4486:1, 4486:20, 4487:11, 4487:23, 4488:19, 4490:16, 4491:2, 4492:5, 4493:1, 4496:12, 4496:25, 4497:23, 4498:17, 4503:6, 4503:21, 4505:7, 4505:24, 4506:3, 4507:2, 4510:10, 4511:19, 4512:1, 4512:13, 4513:5
**HONORABLE** [1] - 4447:11
**hopefully** [1] - 4513:8
**hoping** [1] - 4461:21
**hour** [1] - 4448:7
**hours** [2] - 4453:9, 4479:9
**house** [2] - 4462:7, 4462:8
**hundred** [1] - 4466:18
**hurdle** [1] - 4506:12
**hurdles** [1] - 4506:13

# I

**idea** [7] - 4465:25, 4466:6, 4466:10, 4470:2, 4477:8, 4496:8, 4501:12
**identified** [1] - 4515:8
**identify** [2] - 4449:6, 4475:23
**ignored** [2] - 4461:25, 4462:13
**illegal** [1] - 4460:3
**illiquid** [1] - 4470:18
**implication** [1] - 4456:15
**implies** [1] - 4508:10
**implode** [1] - 4454:1
**import** [1] - 4506:12
**important** [8] - 4448:21, 4449:12, 4452:7, 4454:7, 4470:6, 4472:3, 4473:24, 4512:21
**impression** [1] - 4457:8
**impressive** [1] - 4496:24

**improper** [2] - 4485:16, 4485:17
**impropriety** [1] - 4507:25
**inappropriate** [1] - 4471:6
**include** [1] - 4512:15
**included** [1] - 4457:14
**includes** [2] - 4464:10, 4464:25
**including** [1] - 4496:21
**increased** [1] - 4462:23
**incredibly** [1] - 4476:17
**indeed** [1] - 4512:20
**indemnification** [3] - 4486:12, 4486:17, 4490:5
**independent** [5] - 4453:15, 4458:3, 4465:25, 4466:11, 4466:20
**indicate** [2] - 4461:15, 4503:7
**indicates** [1] - 4494:6
**individual** [1] - 4472:1
**individuals** [8] - 4450:4, 4450:13, 4450:18, 4459:1, 4480:21, 4491:4, 4497:23, 4514:4
**induce** [1] - 4452:19
**infant** [1] - 4487:19
**infer** [1] - 4453:3
**inform** [1] - 4496:3
**information** [22] - 4455:16, 4456:19, 4459:9, 4459:14, 4459:15, 4459:17, 4459:21, 4460:22, 4460:24, 4461:18, 4465:15, 4465:17, 4466:8, 4466:15, 4466:21, 4467:8, 4470:3, 4479:19, 4494:6, 4494:23, 4504:16, 4504:22
**initial** [2] - 4481:15, 4501:7
**insane** [1] - 4465:1
**instance** [1] - 4494:5
**instead** [3] - 4453:6, 4479:9, 4484:24
**instruction** [3] - 4449:19, 4450:22, 4474:6, 4499:19, 4499:20
**instructions** [1] - 4474:7
**intended** [2] - 4454:9, 4454:10
**intentionally** [1] - 4490:7
**interest** [5] - 4482:22, 4482:23, 4490:18, 4504:3, 4507:24
**invest** [6] - 4449:9, 4452:14, 4468:15, 4482:25, 4483:4, 4493:1
**invested** [16] - 4450:14, 4450:19, 4450:24, 4453:20, 4455:11, 4455:22, 4467:24, 4468:2, 4470:21, 4482:11, 4487:1, 4491:1, 4493:2, 4493:13, 4508:6, 4508:7
**investigation** [3] - 4472:21, 4473:1, 4474:10
**investing** [3] - 4452:9, 4469:16, 4492:8
**investment** [36] - 4448:22, 4449:12, 4449:14, 4449:16, 4452:2, 4452:16, 4452:19, 4452:23, 4456:8, 4456:10, 4465:16, 4468:18, 4468:19, 4469:7, 4470:7, 4470:17, 4470:24, 4471:13, 4471:23, 4472:12, 4478:19, 4481:24, 4483:14, 4483:25, 4484:10, 4485:19, 4491:3, 4491:6, 4491:7, 4493:7, 4493:17, 4494:2, 4498:19, 4507:17, 4510:19

**investments** [9] - 4448:25, 4451:8, 4452:4, 4467:13, 4467:14, 4470:16, 4489:24, 4493:14, 4502:5
**investor** [26] - 4448:21, 4449:14, 4449:16, 4452:1, 4458:17, 4458:23, 4464:24, 4464:25, 4465:3, 4467:24, 4470:3, 4470:5, 4470:6, 4470:7, 4471:4, 4471:9, 4472:1, 4472:2, 4475:7, 4475:16, 4475:21, 4487:16, 4491:16, 4498:7, 4499:1, 4500:3
**investors** [41] - 4448:17, 4448:25, 4449:20, 4449:21, 4449:24, 4451:7, 4451:14, 4452:4, 4452:8, 4452:10, 4452:23, 4453:13, 4453:22, 4455:17, 4456:23, 4456:24, 4462:24, 4463:22, 4466:23, 4467:9, 4467:12, 4468:15, 4470:13, 4470:23, 4474:12, 4475:9, 4481:2, 4481:7, 4483:2, 4483:20, 4484:3, 4484:14, 4484:15, 4484:20, 4485:9, 4491:15, 4494:18, 4495:6, 4500:3, 4502:3, 4505:17
**invests** [1] - 4466:4
**invocation** [1] - 4475:11
**involve** [1] - 4470:17
**IPO** [1] - 4482:13
**irrelevant** [2] - 4469:8, 4469:11
**issue** [17] - 4449:6, 4449:8, 4456:9, 4461:22, 4473:25, 4488:1, 4495:16, 4496:16, 4497:17, 4499:1, 4506:11, 4506:21, 4507:20, 4510:23, 4513:10, 4514:13, 4514:21
**issues** [2] - 4513:20, 4514:22
**itself** [2] - 4472:4, 4494:4

**J**

**Jackson** [6] - 4456:21, 4458:20, 4460:24, 4461:1, 4504:20, 4509:4
**JACOB** [1] - 4447:22
**JACQUELYN** [1] - 4447:16
**jail** [1] - 4474:7
**Jeff** [2] - 4473:14, 4473:21
**job** [1] - 4497:17
**JUDGE** [1] - 4447:12
**judge** [1] - 4512:18
**Judge** [16] - 4449:18, 4453:8, 4453:21, 4457:11, 4461:20, 4471:18, 4472:5, 4472:18, 4477:13, 4477:22, 4479:11, 4495:11, 4495:15, 4497:18, 4502:13, 4516:2
**judgment** [1] - 4453:24
**July** [2] - 4447:7, 4516:12
**jumping** [1] - 4460:20
**June** [5] - 4454:13, 4475:2, 4475:19, 4476:1, 4476:2
**Jury** [2] - 4472:21, 4474:10
**jury** [14] - 4448:14, 4453:3, 4453:17, 4472:7, 4472:11, 4474:6, 4476:19, 4479:16, 4479:18, 4486:7, 4506:22, 4512:7, 4512:13, 4516:6
**justification** [1] - 4491:13

**K**

**KAPLAN** [1] - 4447:22
**KARTHIK** [1] - 4447:17
**Kasulis** [1] - 4451:6
**KASULIS** [49] - 4447:16, 4450:3, 4450:11, 4450:24, 4451:10, 4452:3, 4452:13, 4452:17, 4452:20, 4456:21, 4458:9, 4458:20, 4459:4, 4459:13, 4460:5, 4460:14, 4460:17, 4460:21, 4461:6, 4461:10, 4461:19, 4463:3, 4465:19, 4466:19, 4468:9, 4468:11, 4472:7, 4472:9, 4472:19, 4473:2, 4473:16, 4473:19, 4474:3, 4474:16, 4477:4, 4479:22, 4488:25, 4489:4, 4494:1, 4495:16, 4496:25, 4502:12, 4504:2, 4507:15, 4511:17, 4513:18, 4513:24, 4516:3, 4516:8
**keep** [1] - 4472:21
**keeps** [2] - 4482:24, 4485:6
**Ken** [2] - 4482:7, 4482:8
**Kevin** [7] - 4453:15, 4455:12, 4455:19, 4458:16, 4458:21, 4458:22, 4462:16
**kind** [5] - 4501:12, 4511:4, 4511:9
**KIYO** [1] - 4447:11
**known** [1] - 4469:22
**knows** [1] - 4498:8

**L**

**laid** [1] - 4448:9
**landed** [1] - 4453:11
**landscape** [1] - 4494:17
**language** [1] - 4500:20
**last** [10] - 4448:3, 4453:9, 4454:4, 4464:24, 4472:12, 4477:17, 4484:11, 4495:20, 4505:6, 4511:3
**late** [1] - 4477:16
**laugh** [1] - 4503:3
**Lavelle** [17] - 4455:19, 4457:2, 4481:6, 4483:2, 4494:1, 4494:8, 4497:8, 4499:2, 4499:13, 4499:14, 4499:17, 4499:18, 4505:16, 4510:1, 4510:6, 4511:14
**Lavelle's** [1] - 4510:16
**law** [16] - 4448:19, 4471:25, 4472:1, 4483:21, 4484:13, 4486:5, 4486:6, 4487:11, 4489:6, 4489:8, 4489:10, 4489:21, 4490:7, 4505:21, 4509:20
**lawsuits** [1] - 4486:10
**lawyer** [4] - 4477:24, 4478:1, 4479:2, 4503:9
**lawyers** [3] - 4496:20, 4496:23
**left** [3] - 4468:21, 4491:4, 4496:20
**legal** [12] - 4480:23, 4480:24, 4497:10, 4497:12, 4497:15, 4498:23, 4505:14, 4506:4, 4506:12, 4509:18, 4509:19
**legally** [2] - 4463:2, 4500:11
**length** [1] - 4457:19
**lengthy** [1] - 4495:12
**less** [1] - 4469:14
**letter** [2] - 4464:11, 4464:13

**letters** [1] - 4464:10
**level** [1] - 4485:20
**liability** [4] - 4486:21, 4487:16, 4500:25, 4501:1
**liable** [4] - 4500:11, 4500:21, 4500:24, 4500:25
**lie** [4] - 4463:12, 4469:5, 4469:25, 4478:5
**lied** [3] - 4468:17, 4491:7, 4515:17
**light** [1] - 4448:2
**limine** [1] - 4514:16
**limited** [1] - 4453:7
**limiting** [1] - 4450:21
**lines** [1] - 4498:22
**link** [2] - 4451:24, 4459:15
**links** [1] - 4467:6
**list** [11] - 4454:13, 4464:14, 4475:1, 4475:4, 4476:4, 4495:23, 4495:24, 4496:11, 4498:4, 4514:24
**listen** [1] - 4453:4
**listening** [1] - 4454:1
**litigation** [9] - 4482:12, 4487:4, 4487:7, 4488:1, 4488:4, 4508:11, 4509:1, 4509:4
**live** [1] - 4471:7
**lives** [1] - 4473:9
**loan** [2] - 4449:13, 4467:22
**loans** [1] - 4452:6
**Look** [1] - 4499:2
**look** [11] - 4448:20, 4456:11, 4463:20, 4484:4, 4485:21, 4488:19, 4494:8, 4503:21, 4508:22, 4513:19, 4514:24
**looked** [3] - 4469:9, 4469:13, 4494:17
**looking** [5] - 4455:16, 4482:13, 4492:15, 4493:15, 4498:4
**looks** [1] - 4470:1
**losing** [1] - 4469:20
**lost** [1] - 4464:3
**loved** [1] - 4455:12
**low** [2] - 4492:9, 4510:9
**lying** [1] - 4502:10
**Lynch** [1] - 4501:12

**M**

**madness** [1] - 4454:25
**mail** [12] - 4447:24, 4454:6, 4458:22, 4462:19, 4464:11, 4474:3, 4474:4, 4475:20, 4477:17, 4477:23, 4503:7, 4514:10
**mails** [24] - 4458:21, 4460:20, 4463:21, 4473:14, 4474:23, 4474:24, 4475:4, 4475:10, 4475:16, 4478:23, 4478:24, 4479:6, 4479:8, 4488:23, 4488:25, 4492:3, 4495:5, 4497:3, 4502:4, 4513:19, 4514:21, 4514:22, 4515:11, 4515:22
**mails'** [1] - 4515:3
**maintain** [1] - 4487:3
**majority** [2] - 4475:8, 4515:11
**manage** [1] - 4495:17

**manager** [3] - 4456:8, 4460:9, 4464:16
**manner** [1] - 4495:18
**MARC** [1] - 4447:21
**March** [2] - 4466:2, 4466:12
**Marcum** [2] - 4513:10, 4513:13
**Martin** [5] - 4455:12, 4464:12, 4478:13, 4478:23, 4507:21
**MARTIN** [1] - 4447:8
**Martin's** [1] - 4453:19
**Massella** [1] - 4465:9
**Massella's** [1] - 4466:13
**material** [5] - 4451:17, 4454:7, 4455:16, 4474:18, 4478:12
**materials** [1] - 4513:1
**MATSUMOTO** [1] - 4447:11
**matter** [5] - 4471:13, 4471:15, 4505:21, 4506:8, 4516:12
**mattered** [1] - 4471:4
**mean** [27] - 4450:5, 4457:15, 4458:8, 4458:24, 4459:24, 4466:13, 4467:22, 4486:5, 4488:14, 4490:16, 4490:24, 4493:21, 4494:7, 4494:14, 4499:12, 4499:16, 4499:19, 4500:14, 4502:9, 4503:25, 4505:7, 4505:13, 4509:3, 4509:21, 4513:18, 4514:18, 4515:5
**meaning** [1] - 4506:7
**member** [1] - 4479:2
**members** [7] - 4480:25, 4487:25, 4491:14, 4497:13, 4498:21, 4499:23, 4509:3
**members'** [1] - 4480:20
**memoranda** [3] - 4452:1, 4452:22, 4457:6
**memorandum** [1] - 4455:21
**memory** [1] - 4456:9
**mention** [2] - 4457:16, 4480:18
**mentioned** [2] - 4498:22, 4515:7
**mentoring** [1] - 4503:1
**merely** [1] - 4448:13
**Merrill** [4] - 4501:11, 4511:17, 4511:21, 4513:11
**Merrill's** [1] - 4512:10
**method** [1] - 4454:25
**Michael** [2] - 4494:1, 4499:2
**might** [4] - 4455:8, 4462:18, 4478:13, 4484:9
**million** [14] - 4458:23, 4458:24, 4463:11, 4465:15, 4466:18, 4478:15, 4478:19, 4483:13, 4485:13, 4485:16, 4491:6, 4494:2, 4499:7
**minutes** [1] - 4482:6
**misconduct** [1] - 4500:20
**misplaced** [1] - 4477:11
**misrepresent** [1] - 4459:25
**misrepresentations** [10] - 4450:5, 4450:9, 4450:13, 4451:11, 4451:12, 4451:18, 4451:25, 4456:25, 4459:5, 4468:24
**misrepresented** [1] - 4510:1
**missing** [4] - 4461:15, 4470:10, 4507:16, 4508:12

**misstatement** [2] - 4472:4, 4472:6
**misstatements** [1] - 4510:14
**mix** [1] - 4503:12
**Molly** [1] - 4456:2
**moment** [1] - 4469:7
**Monday** [5] - 4473:7, 4512:25, 4513:9, 4513:13, 4513:14
**money** [48] - 4449:7, 4452:7, 4463:4, 4468:16, 4468:17, 4468:21, 4469:12, 4469:20, 4481:2, 4481:4, 4481:17, 4481:19, 4481:22, 4482:20, 4483:5, 4483:6, 4483:13, 4484:14, 4484:18, 4484:19, 4484:21, 4485:7, 4485:9, 4485:24, 4486:16, 4486:18, 4487:17, 4490:21, 4491:11, 4493:5, 4494:3, 4497:25, 4498:8, 4498:9, 4498:13, 4498:15, 4500:7, 4501:5, 4501:10, 4502:3, 4505:20, 4508:7, 4509:16, 4510:2, 4510:5, 4510:16, 4510:18, 4510:21
**month** [3] - 4459:18, 4466:22, 4468:17
**monthly** [6] - 4452:24, 4455:24, 4459:10, 4466:23, 4467:11, 4494:22
**moon** [1] - 4453:11
**morning** [7] - 4475:6, 4476:11, 4496:21, 4511:16, 4512:24, 4513:12, 4513:13
**most** [6] - 4448:12, 4464:2, 4478:22, 4478:24, 4488:22, 4493:10
**motion** [6] - 4448:2, 4448:3, 4454:20, 4479:10, 4495:21, 4514:25
**motions** [1] - 4514:16
**move** [4] - 4476:10, 4476:13, 4476:22, 4492:4, 4498:9
**moving** [2] - 4474:23, 4504:3
**MR** [71] - 4449:4, 4449:18, 4450:1, 4450:10, 4453:1, 4456:6, 4457:11, 4457:13, 4459:12, 4461:5, 4461:9, 4461:15, 4461:20, 4468:1, 4468:4, 4468:7, 4468:10, 4469:11, 4470:9, 4471:2, 4472:5, 4472:8, 4472:14, 4472:17, 4472:23, 4473:11, 4473:14, 4473:17, 4473:18, 4473:21, 4477:13, 4477:15, 4479:20, 4479:23, 4480:1, 4481:18, 4481:25, 4482:8, 4482:19, 4483:3, 4485:14, 4486:20, 4488:16, 4489:2, 4489:5, 4492:4, 4495:8, 4495:11, 4495:15, 4495:23, 4496:9, 4496:11, 4496:15, 4496:19, 4497:18, 4498:16, 4502:11, 4502:13, 4506:15, 4507:6, 4507:16, 4508:15, 4509:18, 4512:1, 4512:7, 4512:18, 4513:21, 4514:11, 4514:18, 4516:2, 4516:10
**MS** [161] - 4450:3, 4450:11, 4450:24, 4451:10, 4452:3, 4452:13, 4452:17, 4452:20, 4456:21, 4458:9, 4458:20, 4459:4, 4459:13, 4460:5, 4460:14, 4460:17, 4460:21, 4461:6, 4461:10, 4461:19, 4463:3, 4464:7, 4465:19, 4465:21, 4466:19, 4467:1, 4467:19, 4468:3, 4468:9, 4468:11, 4468:13, 4469:10, 4469:25, 4470:4, 4472:7,

4472:9, 4472:10, 4472:19, 4472:20, 4472:25, 4473:2, 4473:3, 4473:13, 4473:16, 4473:19, 4474:1, 4474:3, 4474:4, 4474:16, 4475:1, 4477:4, 4479:22, 4480:7, 4480:10, 4481:8, 4481:11, 4481:14, 4481:19, 4482:7, 4482:17, 4483:7, 4483:24, 4484:8, 4484:12, 4484:16, 4485:2, 4486:1, 4486:11, 4487:23, 4488:8, 4488:10, 4488:14, 4488:19, 4488:22, 4488:25, 4489:4, 4490:16, 4490:24, 4491:23, 4493:1, 4493:4, 4493:8, 4493:10, 4493:13, 4493:19, 4493:21, 4493:23, 4494:1, 4494:7, 4494:11, 4494:13, 4494:16, 4494:21, 4494:23, 4495:13, 4495:16, 4495:20, 4496:1, 4496:6, 4496:25, 4497:2, 4497:6, 4497:9, 4497:23, 4498:6, 4498:12, 4498:18, 4499:6, 4499:8, 4499:22, 4500:5, 4500:8, 4500:14, 4500:17, 4500:19, 4501:3, 4501:20, 4501:25, 4502:9, 4502:12, 4503:21, 4504:2, 4504:3, 4504:7, 4504:17, 4505:5, 4505:10, 4505:24, 4506:3, 4507:2, 4507:7, 4507:10, 4507:15, 4508:13, 4508:17, 4508:20, 4508:25, 4510:10, 4510:12, 4510:15, 4510:25, 4511:3, 4511:7, 4511:12, 4511:17, 4511:19, 4512:4, 4512:9, 4512:17, 4513:5, 4513:18, 4513:24, 4514:3, 4514:5, 4514:17, 4515:11, 4515:18, 4515:21, 4515:25, 4516:3, 4516:8
**MSMB** [60] - 4448:17, 4461:1, 4462:9, 4462:12, 4463:3, 4463:7, 4463:13, 4464:16, 4465:1, 4465:3, 4465:5, 4466:3, 4466:4, 4466:6, 4467:22, 4470:21, 4470:23, 4471:3, 4481:2, 4481:7, 4481:24, 4482:18, 4482:20, 4482:24, 4483:4, 4483:11, 4483:12, 4483:13, 4483:17, 4483:19, 4483:25, 4484:5, 4484:15, 4485:9, 4485:15, 4485:19, 4489:24, 4490:19, 4490:25, 4491:3, 4491:5, 4491:15, 4493:2, 4493:8, 4493:10, 4493:17, 4494:3, 4498:7, 4498:8, 4498:9, 4499:1, 4500:3, 4500:8, 4500:17, 4500:25, 4502:3, 4504:21, 4504:22, 4508:7, 4510:19
**Mulleady** [29] - 4453:15, 4455:12, 4455:20, 4456:18, 4456:22, 4456:23, 4458:16, 4458:18, 4458:21, 4458:22, 4459:8, 4459:19, 4459:20, 4459:23, 4459:24, 4460:6, 4462:16, 4463:23, 4464:1, 4466:25, 4467:4, 4474:25, 4494:6, 4494:13, 4494:25, 4499:3, 4500:2, 4508:14
**Mulleady's** [1] - 4459:23
**must** [2] - 4480:4, 4489:9

**N**

**name** [1] - 4457:14

**narrowed** [1] - 4475:4
**nascent** [1] - 4470:11
**nature** [1] - 4505:15
**NAV** [38] - 4459:8, 4459:15, 4459:16, 4460:22, 4460:23, 4461:3, 4461:8, 4461:16, 4463:7, 4463:8, 4464:8, 4464:9, 4464:10, 4464:13, 4464:15, 4464:19, 4464:21, 4465:2, 4465:5, 4466:24, 4467:2, 4467:3, 4467:7, 4476:20, 4476:21, 4479:14, 4479:15, 4479:24, 4494:25, 4504:13, 4504:15, 4504:18, 4504:22, 4513:7, 4513:13
**NAV's** [1] - 4460:22
**necessarily** [4] - 4449:22, 4465:10, 4467:17, 4487:15
**necessary** [1] - 4479:11
**need** [13] - 4453:23, 4454:8, 4464:19, 4467:17, 4479:11, 4479:15, 4480:21, 4482:3, 4489:2, 4489:6, 4492:13, 4499:22, 4508:22
**needs** [2] - 4489:10, 4492:15
**negative** [1] - 4469:15
**net** [1] - 4483:14
**never** [18] - 4453:3, 4453:4, 4454:16, 4466:4, 4469:13, 4470:21, 4471:9, 4486:15, 4486:16, 4488:4, 4488:5, 4490:15, 4490:25, 4509:20, 4510:2, 4514:18, 4514:19
**nevertheless** [1] - 4453:5
**new** [1] - 4514:24
**NEW** [1] - 4447:1
**New** [5] - 4447:6, 4447:15, 4447:16, 4447:20
**next** [7] - 4452:24, 4456:22, 4470:25, 4476:6, 4482:25, 4488:18
**night** [5] - 4453:10, 4473:7, 4476:6, 4495:20, 4510:23
**nine** [2] - 4475:6, 4475:7
**nobody** [4] - 4470:1, 4478:6, 4478:7, 4509:23
**non** [4] - 4472:24, 4473:5, 4475:13, 4503:11
**non-prosecution** [3] - 4472:24, 4473:5, 4503:11
**non-testimonial** [1] - 4475:13
**none** [1] - 4507:2
**nonsense** [1] - 4473:25
**noon** [3] - 4496:13, 4514:8, 4515:1
**normally** [2] - 4465:23, 4466:14
**nothing** [8] - 4455:12, 4457:4, 4486:14, 4490:12, 4491:4, 4496:21, 4507:10
**notice** [3] - 4475:18, 4476:14, 4516:1
**noticed** [1] - 4514:19
**NPA** [1] - 4502:10
**number** [3] - 4473:9, 4483:17, 4484:3
**numbers** [1] - 4487:18

# O

**o'clock** [2] - 4496:21, 4516:4
**oath** [2] - 4470:15, 4471:10

**object** [1] - 4479:9
**objected** [2] - 4514:18, 4514:19
**objecting** [3] - 4495:22, 4496:7, 4514:12
**objections** [1] - 4514:9
**objective** [2] - 4448:20, 4515:16
**obligation** [3] - 4501:18, 4509:19
**obvious** [1] - 4506:24
**obviously** [6] - 4450:6, 4488:19, 4490:25, 4493:21, 4499:22, 4501:17
**occurred** [1] - 4505:22
**odds** [1] - 4515:20
**OF** [3] - 4447:1, 4447:3, 4447:11
**offer** [4] - 4450:2, 4454:17, 4458:5, 4506:18
**offered** [1] - 4478:8
**offering** [1] - 4449:23
**office** [1] - 4496:11
**Official** [1] - 4447:23
**omissions** [2] - 4450:13, 4451:18
**once** [3] - 4468:16, 4485:8, 4512:11
**one** [34] - 4454:24, 4457:11, 4461:7, 4462:9, 4463:6, 4464:7, 4464:17, 4465:16, 4465:19, 4466:14, 4467:21, 4468:15, 4470:10, 4474:12, 4478:15, 4479:6, 4479:12, 4482:24, 4483:16, 4484:25, 4487:18, 4488:8, 4496:17, 4496:17, 4498:22, 4499:6, 4500:9, 4505:6, 4509:24, 4510:6, 4510:22, 4512:25, 4514:1, 4514:14
**ones** [2] - 4495:22, 4496:16, 4507:3
**ongoing** [2] - 4468:16, 4474:10
**oops** [1] - 4473:18
**opening** [1] - 4454:22
**opining** [1] - 4469:19
**opinion** [1] - 4471:7
**opponent** [1] - 4467:7
**opportunity** [2] - 4513:19, 4514:2
**opposed** [1] - 4493:22
**opposes** [1] - 4448:6
**opted** [2] - 4498:9, 4498:10
**order** [8] - 4454:8, 4455:14, 4466:16, 4474:22, 4476:6, 4491:16, 4502:3, 4505:22
**ordered** [1] - 4457:21
**original** [3] - 4467:3, 4484:3, 4502:5
**originally** [3] - 4467:4, 4475:2, 4493:16
**otherwise** [1] - 4513:1
**outrage** [1] - 4477:11
**overall** [1] - 4451:3
**overheard** [1] - 4457:4
**overlapped** [1] - 4462:13
**own** [12] - 4475:13, 4482:3, 4483:20, 4484:19, 4484:24, 4485:5, 4485:6, 4485:7, 4486:24, 4489:16, 4492:3, 4513:2

# P

**P.C** [1] - 4447:19
**p.m** [1] - 4447:8

**page** [4] - 4465:16, 4466:14, 4470:25, 4492:20
**paid** [2] - 4457:5, 4465:16, 4486:15, 4486:16
**paper** [2] - 4455:8, 4458:6
**papers** [3] - 4449:25, 4453:10, 4454:19
**pardon** [2] - 4500:18, 4505:9
**part** [14] - 4448:12, 4466:6, 4468:8, 4468:9, 4468:15, 4469:4, 4472:17, 4481:1, 4482:21, 4491:23, 4492:3, 4494:7, 4498:2, 4503:9
**participating** [1] - 4457:15
**particular** [3] - 4449:1, 4450:19, 4475:21
**particularly** [1] - 4492:10
**parties** [3] - 4448:23, 4449:2, 4449:15
**parts** [1] - 4510:18
**party** [4] - 4461:16, 4466:11, 4466:18, 4467:7
**pass** [1] - 4506:15
**passing** [1] - 4506:13
**patently** [2] - 4450:15, 4459:2
**path** [1] - 4471:16
**Pause** [1] - 4492:18
**pay** [6] - 4455:20, 4455:24, 4458:4, 4482:10, 4502:3, 4502:15
**paying** [4] - 4469:6, 4476:19, 4489:17, 4500:2
**payment** [2] - 4457:22, 4485:9
**people** [35] - 4449:9, 4453:3, 4453:15, 4453:16, 4453:18, 4453:19, 4454:18, 4455:7, 4455:11, 4456:16, 4457:14, 4457:18, 4461:23, 4464:17, 4468:2, 4468:20, 4469:2, 4472:13, 4474:11, 4474:14, 4485:6, 4485:22, 4487:20, 4488:2, 4489:14, 4489:24, 4500:10, 4501:5, 4506:17, 4506:20, 4506:22, 4508:4, 4508:6, 4509:11, 4515:20
**per** [1] - 4451:8
**perception** [1] - 4510:11
**perfectly** [1] - 4475:25
**perform** [1] - 4480:15
**performance** [27] - 4450:14, 4452:10, 4452:25, 4455:24, 4456:5, 4456:12, 4459:1, 4459:6, 4459:10, 4459:21, 4461:8, 4461:23, 4463:5, 4466:23, 4467:5, 4467:8, 4467:11, 4467:20, 4467:25, 4468:1, 4468:5, 4469:3, 4469:19, 4474:17, 4494:22, 4497:5, 4497:6
**performances** [1] - 4468:11
**perhaps** [1] - 4512:19
**period** [2] - 4462:2, 4462:14
**perpetrate** [1] - 4497:20
**person** [11] - 4449:9, 4450:25, 4460:13, 4460:15, 4462:18, 4470:14, 4487:1, 4497:20, 4497:21, 4501:3, 4511:18
**personal** [14] - 4452:6, 4482:18, 4482:19, 4482:20, 4482:22, 4482:23, 4482:24, 4490:22, 4490:23, 4499:25, 4500:1, 4500:6, 4500:16, 4500:19

**personally** [5] - 4481:23, 4500:11, 4500:21, 4500:24
**phone** [2] - 4473:6, 4476:5
**pick** [1] - 4473:5
**piece** [1] - 4511:7
**pieces** [1] - 4455:8
**piggybank** [1] - 4499:25
**placement** [4] - 4451:25, 4452:22, 4455:21, 4457:6
**plane** [1] - 4465:13
**planning** [1] - 4454:2
**playing** [1] - 4471:12
**Plaza** [1] - 4447:15
**plus** [1] - 4467:20
**point** [14] - 4451:22, 4455:18, 4462:9, 4464:20, 4464:23, 4465:7, 4470:10, 4470:19, 4471:5, 4474:5, 4479:11, 4492:4, 4503:21, 4515:4
**police** [1] - 4469:21
**pooh** [2] - 4478:14
**pooh-pooh** [1] - 4478:14
**position** [3] - 4463:13, 4470:20, 4478:12
**positions** [1] - 4515:21
**post** [2] - 4452:14, 4509:13
**post-hoc** [1] - 4509:13
**potential** [1] - 4456:24
**potentially** [1] - 4482:11
**power** [1] - 4472:20
**PPM** [2] - 4451:20, 4470:17
**PPMs** [1] - 4500:20
**prejudice** [1] - 4456:15
**prejudicial** [1] - 4507:14
**premise** [1] - 4470:10
**prep** [1] - 4503:24
**prepare** [2] - 4454:8, 4455:14
**prepared** [1] - 4465:14
**preponderance** [1] - 4458:25
**prepped** [1] - 4473:6
**presented** [16] - 4486:2, 4488:1, 4488:4, 4488:5, 4488:16, 4498:21, 4508:21, 4508:24, 4508:25, 4509:9, 4509:10, 4509:15, 4509:16, 4509:22
**pretty** [3] - 4456:8, 4464:15, 4515:22
**price** [2] - 4498:16, 4498:17
**primarily** [1] - 4488:15
**private** [5] - 4451:22, 4452:21, 4455:20, 4457:6, 4487:24
**probative** [2] - 4507:14, 4507:15
**problem** [4] - 4456:14, 4478:2, 4491:24, 4496:19
**proceeded** [1] - 4477:4
**proceeding** [2] - 4457:18, 4457:24
**Proceedings** [1] - 4447:25
**proceedings** [1] - 4492:18
**process** [1] - 4485:6
**produced** [2] - 4447:25, 4480:5
**profited** [1] - 4462:25
**proof** [4] - 4468:10, 4488:16, 4508:2, 4508:3
**proper** [1] - 4514:19

**prosecuted** [1] - 4502:24
**prosecution** [3] - 4472:24, 4473:5, 4503:11
**protect** [1] - 4509:11
**prove** [6] - 4459:4, 4459:6, 4461:13, 4474:17, 4499:23, 4503:18
**proved** [1] - 4453:7
**proven** [2] - 4459:2, 4460:8
**provide** [6] - 4457:22, 4464:20, 4465:14, 4465:18, 4466:8, 4502:17
**provided** [14] - 4453:5, 4457:21, 4458:16, 4459:15, 4465:15, 4475:2, 4475:3, 4476:1, 4476:2, 4476:8, 4476:14, 4490:1, 4504:22, 4509:4
**provides** [1] - 4504:16
**providing** [4] - 4456:19, 4461:7, 4471:22, 4491:13
**prudent** [1] - 4485:21
**public** [18] - 4482:17, 4483:12, 4483:15, 4484:17, 4484:18, 4484:21, 4485:8, 4486:15, 4487:23, 4490:20, 4490:21, 4491:11, 4491:12, 4492:7, 4492:9, 4499:15, 4499:21, 4499:25
**pulled** [1] - 4469:21
**purported** [1] - 4451:24
**purports** [2] - 4503:19
**purpose** [3] - 4449:18, 4481:4, 4506:6
**purposes** [1] - 4513:3
**put** [38] - 4453:13, 4454:11, 4459:17, 4459:21, 4460:10, 4462:15, 4463:12, 4464:14, 4465:23, 4467:8, 4467:23, 4474:19, 4475:16, 4475:24, 4476:5, 4477:6, 4477:20, 4478:10, 4478:16, 4478:19, 4479:13, 4479:14, 4480:2, 4483:5, 4483:13, 4484:5, 4493:7, 4494:1, 4501:19, 4503:15, 4504:2, 4504:4, 4505:2, 4505:22, 4511:8, 4511:20, 4512:4, 4513:14
**puts** [1] - 4492:1
**putting** [6] - 4451:20, 4451:21, 4452:2, 4456:13, 4475:15, 4481:4

## Q

**quality** [1] - 4496:24
**questioned** [1] - 4487:4
**questions** [2] - 4471:18, 4476:16
**quite** [2] - 4478:25, 4487:20
**quits** [1] - 4464:21

## R

**raise** [1] - 4515:17
**raised** [1] - 4515:16
**raises** [1] - 4448:11
**raising** [1] - 4448:12
**ran** [1] - 4500:9
**random** [1] - 4462:17
**rare** [1] - 4500:4
**rather** [7] - 4452:23, 4471:2, 4485:23, 4492:11, 4495:2, 4496:17, 4514:11
**rationale** [1] - 4486:3

**reached** [2] - 4473:10, 4474:2
**read** [1] - 4515:23
**reading** [1] - 4453:9
**real** [5] - 4457:20, 4457:21, 4466:12, 4502:22, 4502:25
**realize** [1] - 4501:7
**realized** [1] - 4499:8
**really** [20] - 4449:6, 4449:7, 4455:20, 4455:24, 4456:11, 4457:4, 4464:18, 4476:9, 4476:14, 4477:10, 4477:11, 4477:12, 4487:18, 4492:1, 4493:9, 4504:21, 4508:5, 4514:18, 4514:19, 4515:6
**reason** [8] - 4450:1, 4466:9, 4467:23, 4476:20, 4494:8, 4503:9, 4507:12, 4510:19
**reasonable** [5] - 4448:21, 4470:2, 4470:5, 4470:6, 4472:2
**reasons** [1] - 4469:13
**REC** [1] - 4504:13
**receive** [3] - 4452:10, 4458:17, 4474:13, 4481:14
**received** [7] - 4448:6, 4450:14, 4466:23, 4469:3, 4474:12, 4497:24, 4502:7
**receiving** [1] - 4459:1
**recognize** [2] - 4457:24, 4461:23
**reconsider** [1] - 4505:1
**record** [7] - 4462:17, 4469:1, 4471:14, 4480:16, 4491:21, 4494:24
**recorded** [1] - 4447:25
**records** [2] - 4479:13, 4512:11
**red** [1] - 4475:14
**red-herring** [1] - 4475:14
**reflected** [1] - 4454:19
**refrain** [1] - 4489:17
**regard** [4] - 4452:18, 4494:18, 4501:15, 4505:14
**regarding** [3] - 4456:25, 4514:1, 4514:9
**register** [1] - 4485:2
**Registrar** [3] - 4505:5, 4511:4, 4511:17
**registrar** [1] - 4483:9
**registration** [1] - 4448:5
**related** [2] - 4455:12, 4482:18
**relationship** [1] - 4456:3
**release** [4] - 4480:13, 4485:25, 4498:25, 4508:4
**releases** [1] - 4458:12
**relevance** [3] - 4506:14, 4506:20, 4507:1
**relevant** [8] - 4450:15, 4451:5, 4452:13, 4458:14, 4468:7, 4497:19, 4501:24, 4507:20
**relied** [8] - 4449:22, 4450:4, 4450:25, 4453:14, 4455:25, 4456:3, 4468:24, 4469:9
**rely** [3] - 4463:25, 4470:3, 4474:17
**relying** [2] - 4460:1, 4515:3
**remainder** [1] - 4511:13
**remaining** [2] - 4472:25, 4504:4
**remember** [4] - 4456:8, 4482:5, 4483:17, 4489:21

**remove** [1] - 4487:15
**repay** [4] - 4486:18, 4490:22, 4491:16, 4510:17
**repaying** [1] - 4482:23
**reply** [2] - 4448:6, 4454:13
**report** [8] - 4463:10, 4465:8, 4465:17, 4465:18, 4465:24, 4466:14, 4466:16, 4468:5
**Reporter** [2] - 4447:23, 4447:23
**reports** [22] - 4452:25, 4455:24, 4455:25, 4456:5, 4456:12, 4459:10, 4459:17, 4459:21, 4466:23, 4467:5, 4467:9, 4467:11, 4467:12, 4467:17, 4467:20, 4467:25, 4468:2, 4479:15, 4494:23, 4494:25, 4497:5, 4497:6
**representation** [3] - 4460:1, 4465:22, 4470:22
**representations** [2] - 4450:12, 4452:22
**represented** [1] - 4483:24
**represents** [1] - 4458:6
**reputation** [1] - 4469:17
**require** [1] - 4486:22
**required** [5] - 4475:23, 4476:8, 4501:19, 4503:23, 4509:22
**requirement** [1] - 4497:15
**requires** [1] - 4512:25
**resolved** [1] - 4514:15
**respect** [6] - 4450:18, 4458:9, 4463:7, 4463:13, 4506:19, 4513:20
**respected** [1] - 4479:2
**respectfully** [4] - 4454:3, 4471:19, 4478:22, 4479:13
**respects** [1] - 4480:5
**respond** [4] - 4453:10, 4472:19, 4503:8, 4514:7
**responding** [1] - 4479:10
**responsible** [1] - 4491:9
**restatement** [2] - 4486:17, 4499:5
**restricted** [1] - 4484:9
**result** [2] - 4462:25, 4465:10
**retroactively** [1] - 4490:7
**Retrophin** [84] - 4458:4, 4461:17, 4462:1, 4462:9, 4462:12, 4462:14, 4462:21, 4463:11, 4464:5, 4466:1, 4466:3, 4466:4, 4466:6, 4466:11, 4466:18, 4470:11, 4470:21, 4470:24, 4471:12, 4471:22, 4478:16, 4478:17, 4478:18, 4480:15, 4481:3, 4481:10, 4481:15, 4481:20, 4481:22, 4482:2, 4482:21, 4482:22, 4483:5, 4483:12, 4483:14, 4483:18, 4483:22, 4485:12, 4485:16, 4485:17, 4485:25, 4486:12, 4486:15, 4488:17, 4490:9, 4490:14, 4491:1, 4491:6, 4493:2, 4493:5, 4493:7, 4493:14, 4493:18, 4493:25, 4498:8, 4498:10, 4498:15, 4500:7, 4501:1, 4501:5, 4501:6, 4501:11, 4502:15, 4502:16, 4502:22, 4503:6, 4503:20, 4505:18, 4507:18, 4507:19, 4507:20, 4507:21, 4508:3, 4508:5, 4508:8, 4508:10, 4508:18, 4508:22,

4510:2, 4510:5, 4510:7
**revealing** [1] - 4486:10
**Richard** [1] - 4447:23
**Richardson** [4] - 4482:4, 4489:13, 4489:19, 4490:12
**ridiculous** [1] - 4462:8
**ripped** [1] - 4490:14
**rise** [1] - 4511:9
**riveted** [1] - 4472:15
**ROHDE** [1] - 4447:14
**rolled** [2] - 4493:17, 4493:25
**Ron** [3] - 4453:15, 4455:10, 4458:16
**Rosenfeld** [19] - 4456:3, 4457:2, 4457:17, 4457:20, 4458:12, 4458:17, 4464:25, 4480:10, 4480:14, 4493:12, 4493:13, 4501:15, 4502:7, 4502:20, 4504:6, 4504:7, 4505:1, 4511:11, 4511:13
**Rosenfeld's** [4] - 4457:14, 4458:1, 4458:9, 4512:16
**round** [1] - 4464:24
**RPR** [1] - 4447:23
**rule** [1] - 4495:9
**ruled** [1] - 4458:3
**rules** [2] - 4512:1, 4512:13
**ruling** [1] - 4496:4
**rwbarrycourtreporter@gmail.com** [1] - 4447:24

## S

**S-1** [1] - 4490:1
**sandbagged** [1] - 4477:9
**sat** [1] - 4456:22
**satisfy** [1] - 4506:25
**save** [2] - 4508:11, 4510:5
**saw** [6] - 4453:4, 4457:13, 4466:13, 4466:24, 4469:13, 4469:15
**scenario** [1] - 4509:25
**scheduled** [1] - 4448:2
**schedules** [1] - 4466:14
**scheduling** [1] - 4513:3
**scheme** [4] - 4451:3, 4451:4, 4451:9, 4460:4
**scope** [3] - 4451:4, 4451:8, 4453:6
**se** [1] - 4451:8
**SEC** [4] - 4486:10, 4486:13, 4490:2, 4498:22
**secondly** [1] - 4509:10
**securities** [5] - 4470:18, 4486:6, 4486:7, 4488:7, 4505:23
**see** [10] - 4451:6, 4459:14, 4459:15, 4478:3, 4478:5, 4492:17, 4500:2, 4500:9, 4506:2, 4513:19
**select** [1] - 4462:18
**sending** [2] - 4464:23, 4465:2
**sense** [1] - 4510:22
**sent** [1] - 4459:17
**separate** [3] - 4458:25, 4463:5, 4493:14
**separately** [1] - 4493:14
**September** [1] - 4468:20

**series** [1] - 4478:23
**seriously** [2] - 4472:20, 4473:19
**service** [1] - 4502:17
**services** [1] - 4480:15
**set** [1] - 4485:5
**settle** [5] - 4458:11, 4482:14, 4488:3, 4502:4, 4509:6
**settled** [1] - 4462:22
**settlement** [46] - 4454:18, 4480:3, 4480:17, 4480:19, 4480:20, 4480:22, 4481:5, 4481:13, 4482:2, 4483:6, 4485:11, 4489:1, 4490:17, 4490:24, 4491:17, 4497:7, 4497:22, 4497:24, 4498:2, 4499:5, 4501:12, 4501:21, 4501:25, 4502:14, 4502:18, 4502:21, 4505:8, 4505:10, 4505:13, 4506:17, 4506:18, 4506:23, 4507:4, 4507:11, 4507:19, 4507:22, 4507:23, 4508:1, 4508:8, 4509:8, 4509:21, 4510:25, 4511:20, 4512:14, 4513:16, 4514:3
**settling** [1] - 4482:18
**seven** [1] - 4483:16
**seven-to-one** [1] - 4483:16
**sham** [2] - 4458:10, 4458:15
**shams** [2] - 4480:12, 4502:14
**share** [5] - 4483:16, 4498:16, 4498:17, 4501:7, 4511:9
**shares** [50] - 4466:5, 4474:13, 4478:15, 4481:2, 4481:14, 4481:22, 4483:6, 4483:17, 4483:18, 4483:19, 4483:22, 4484:4, 4484:7, 4484:18, 4484:19, 4484:21, 4484:24, 4484:25, 4485:1, 4485:3, 4485:7, 4485:9, 4485:13, 4485:18, 4485:20, 4485:24, 4486:16, 4487:2, 4487:7, 4487:21, 4490:21, 4491:12, 4492:7, 4492:10, 4492:11, 4493:23, 4494:4, 4499:13, 4498:15, 4499:14, 4499:21, 4501:5, 4501:11, 4502:3, 4502:8, 4505:19, 4509:17, 4510:8, 4512:8
**shift** [2] - 4503:14, 4503:17
**SHKRELI** [1] - 4447:8
**Shkreli** [93] - 4449:22, 4450:5, 4450:8, 4450:11, 4451:11, 4451:23, 4452:23, 4455:6, 4456:19, 4456:23, 4457:9, 4458:11, 4459:8, 4459:11, 4459:16, 4459:20, 4459:24, 4460:8, 4460:9, 4460:23, 4460:25, 4461:2, 4461:7, 4461:17, 4462:1, 4462:12, 4462:19, 4463:21, 4464:4, 4464:16, 4464:23, 4465:25, 4466:16, 4466:20, 4466:21, 4466:24, 4467:3, 4467:10, 4467:14, 4474:25, 4475:3, 4475:20, 4478:24, 4479:1, 4479:4, 4479:19, 4480:23, 4481:15, 4481:23, 4482:1, 4482:23, 4484:13, 4484:16, 4485:4, 4485:5, 4485:12, 4486:2, 4486:11, 4487:12, 4488:12, 4488:24, 4489:14, 4489:20, 4491:7, 4492:2, 4492:6, 4494:24, 4495:1, 4495:6, 4497:14, 4497:25, 4498:14, 4498:19, 4499:9, 4499:14,

4499:24, 4501:9, 4501:10, 4503:1, 4504:19, 4507:21, 4508:1, 4508:2, 4508:10, 4509:11, 4509:14, 4509:25, 4510:4, 4510:21

**Shkreli's** [6] - 4456:17, 4460:1, 4460:9, 4469:17, 4483:20, 4491:9

**Shkreli-Greebel** [1] - 4475:3

**shocking** [1] - 4477:10

**short** [2] - 4497:1, 4516:1

**show** [19] - 4449:24, 4451:4, 4456:18, 4458:11, 4459:9, 4461:7, 4464:15, 4466:5, 4473:14, 4477:17, 4477:22, 4478:3, 4480:22, 4485:3, 4502:4, 4503:6, 4512:23, 4515:9

**showed** [1] - 4482:6

**showing** [2] - 4458:21, 4458:22

**shown** [1] - 4462:1

**shows** [4] - 4458:13, 4479:1, 4491:25, 4515:5

**side** [5] - 4478:7, 4493:24, 4495:12, 4496:4, 4514:23

**sides** [2] - 4454:22, 4512:20

**sign** [6] - 4456:11, 4479:16, 4486:17, 4497:16, 4500:12, 4508:2

**signed** [10] - 4456:11, 4480:22, 4486:9, 4498:23, 4499:12, 4502:10, 4507:22, 4508:1, 4508:2

**significant** [1] - 4457:17

**similarly** [1] - 4499:2

**simply** [1] - 4508:1

**sincerity** [1] - 4453:9

**single** [5] - 4468:17, 4485:9, 4485:10, 4485:11, 4496:17

**sits** [1] - 4483:11

**sitting** [2] - 4453:24, 4473:22

**slated** [1] - 4477:18

**slip** [1] - 4454:10

**small** [1] - 4475:10

**SMITH** [114] - 4447:17, 4464:7, 4465:21, 4467:2, 4467:19, 4468:3, 4468:13, 4469:10, 4469:25, 4470:4, 4472:10, 4472:20, 4472:25, 4473:3, 4473:13, 4474:1, 4474:4, 4475:1, 4480:7, 4480:10, 4481:8, 4481:11, 4481:14, 4481:19, 4482:7, 4482:17, 4483:7, 4483:24, 4484:8, 4484:12, 4484:16, 4485:2, 4486:1, 4486:11, 4487:23, 4488:8, 4488:10, 4488:14, 4488:19, 4488:22, 4490:16, 4490:24, 4491:23, 4493:1, 4493:4, 4493:10, 4493:10, 4493:13, 4493:19, 4493:21, 4493:23, 4494:7, 4494:11, 4494:13, 4494:16, 4494:21, 4495:4, 4495:13, 4495:20, 4496:1, 4496:6, 4497:2, 4497:6, 4497:9, 4497:23, 4498:6, 4498:12, 4498:18, 4499:6, 4499:8, 4499:22, 4500:5, 4500:8, 4500:14, 4500:17, 4500:19, 4501:3, 4501:20, 4501:25, 4502:9, 4503:21, 4504:3, 4504:7, 4504:17, 4505:5, 4505:10, 4505:24, 4506:3, 4507:2, 4507:7, 4507:10,

4508:13, 4508:17, 4508:20, 4508:25, 4510:10, 4510:12, 4510:15, 4510:25, 4511:3, 4511:7, 4511:12, 4511:19, 4512:4, 4512:9, 4512:17, 4513:5, 4514:3, 4514:5, 4514:17, 4515:11, 4515:18, 4515:21, 4515:25

**sole** [1] - 4460:24

**someone** [7] - 4464:19, 4465:8, 4478:20, 4479:22, 4482:11, 4492:7, 4503:5

**sometimes** [2] - 4464:5, 4487:5

**somewhere** [1] - 4474:8

**sorry** [1] - 4505:25

**sort** [7] - 4462:6, 4465:25, 4477:13, 4478:11, 4491:13, 4492:1, 4512:19

**sound** [2] - 4454:16, 4462:23

**sounds** [1] - 4497:2

**source** [7] - 4460:22, 4460:24, 4467:3, 4479:19, 4479:21, 4494:25, 4504:16

**sourced** [1] - 4459:11, 4467:10

**Southern** [1] - 4477:7

**speakerphone** [1] - 4456:24

**specific** [2] - 4450:4, 4514:12

**specifically** [6] - 4450:25, 4457:2, 4470:17, 4487:25, 4492:16, 4515:7

**spend** [2] - 4464:9, 4479:9

**spent** [2] - 4465:19, 4503:1

**Spielberg** [10] - 4480:18, 4481:6, 4483:1, 4497:8, 4498:4, 4498:21, 4505:16, 4510:1, 4510:6, 4511:13

**spoken** [1] - 4473:11

**squarely** [1] - 4475:17

**SRINIVASAN** [2] - 4447:17, 4485:14

**stages** [1] - 4487:2

**stake** [1] - 4485:16

**stand** [8] - 4450:3, 4455:9, 4455:10, 4468:23, 4473:6, 4476:4, 4504:2, 4511:21

**standard** [5] - 4448:20, 4477:5, 4477:7, 4483:9, 4485:2

**Standard** [3] - 4505:5, 4511:4, 4511:17

**started** [5] - 4454:21, 4476:3, 4476:15, 4490:11, 4515:23

**starting** [3] - 4463:15, 4496:20, 4516:3

**statement** [9] - 4451:6, 4458:17, 4459:7, 4463:19, 4464:25, 4466:17, 4499:12, 4507:17, 4510:3

**statements** [23] - 4449:22, 4449:23, 4451:23, 4454:22, 4456:17, 4457:5, 4460:10, 4464:24, 4465:3, 4465:5, 4469:3, 4475:10, 4475:13, 4475:18, 4480:24, 4486:10, 4492:3, 4497:10, 4506:3, 4514:17, 4514:20, 4514:23, 4515:4

**STATES** [3] - 4447:1, 4447:3, 4447:12

**States** [3] - 4447:5, 4447:14, 4447:18

**status** [1] - 4495:2

**stenography** [1] - 4447:25

**Steve** [1] - 4456:3

**still** [1] - 4500:25

**stip** [5] - 4476:21, 4504:13, 4504:15,

4511:22, 4512:3

**stipulate** [3] - 4449:16, 4450:20, 4461:4

**stipulating** [2] - 4448:24, 4450:18

**stipulation** [3] - 4464:8, 4464:10, 4479:17

**stock** [1] - 4492:9

**stole** [1] - 4510:21

**stop** [4] - 4469:7, 4473:23, 4473:25, 4495:12

**stops** [1] - 4464:21

**stranger** [1] - 4490:10

**streamline** [1] - 4476:18

**streamlined** [1] - 4475:15

**stuff** [1] - 4504:8

**stunned** [2] - 4454:11, 4457:13

**stunning** [3] - 4458:5, 4477:10, 4478:11

**Su** [8] - 4456:22, 4457:4, 4458:20, 4460:24, 4461:1, 4504:18, 4504:20, 4509:4

**subject** [3] - 4494:23, 4512:4, 4512:12

**subjective** [1] - 4470:6

**subjectively** [1] - 4472:2

**subjects** [2] - 4472:25, 4474:11

**submit** [1] - 4474:22

**submitted** [2] - 4469:12, 4475:1

**subpoena** [4] - 4472:20, 4501:17, 4503:8, 4503:13

**subpoenaed** [1] - 4503:23

**subscription** [11] - 4448:14, 4449:1, 4450:21, 4451:21, 4452:15, 4456:13, 4457:7, 4467:17, 4467:23, 4494:19, 4497:3

**subset** [2] - 4475:10, 4496:2

**success** [1] - 4490:11

**suddenly** [2] - 4453:19, 4495:15

**sue** [12] - 4485:22, 4487:14, 4488:2, 4507:20, 4508:9, 4508:16, 4508:17, 4509:2, 4509:5, 4509:12, 4510:4

**sued** [2] - 4508:19, 4509:3

**sufficient** [2] - 4484:7, 4494:4

**suggest** [9] - 4458:1, 4458:6, 4478:9, 4478:20, 4478:22, 4480:3, 4490:14, 4507:25, 4513:12

**suggested** [1] - 4467:22

**suggesting** [1] - 4469:14

**suggestion** [1] - 4476:22

**suggests** [1] - 4492:14

**suing** [1] - 4510:5

**Sullivan** [1] - 4474:12

**summary** [1] - 4465:16

**summation** [1] - 4453:2

**support** [3] - 4455:22, 4469:23, 4469:24

**supports** [1] - 4491:22

**suppose** [1] - 4514:13

**surprised** [2] - 4476:24, 4504:19

**suspicious** [1] - 4471:19

**swear** [1] - 4471:10

**swearing** [1] - 4473:23

**switch** [2] - 4489:18, 4502:17

**system** [1] - 4472:18

## T

**table** [5] - 4457:9, 4466:5, 4466:16, 4483:11, 4484:25
**talks** [1] - 4502:25
**targets** [2] - 4473:1, 4474:11
**ten** [1] - 4472:13
**terms** [3] - 4457:2, 4472:10, 4506:13
**territory** [1] - 4491:19
**testified** [11] - 4455:1, 4456:22, 4457:19, 4464:17, 4468:2, 4486:21, 4491:14, 4497:24, 4507:3, 4509:3, 4509:22
**testifies** [1] - 4470:14
**testify** [12] - 4449:5, 4454:15, 4454:16, 4455:7, 4468:24, 4471:21, 4475:9, 4477:18, 4483:9, 4503:23, 4508:6
**testifying** [3] - 4454:5, 4476:12, 4494:8
**testimonial** [1] - 4475:13
**testimony** [13] - 4448:4, 4450:6, 4453:5, 4453:22, 4458:20, 4464:20, 4465:14, 4466:13, 4478:7, 4480:20, 4480:24, 4482:1, 4497:15
**THE** [133] - 4447:11, 4448:1, 4449:11, 4449:19, 4450:23, 4451:6, 4451:20, 4452:12, 4452:14, 4452:18, 4452:21, 4455:14, 4456:7, 4457:1, 4457:12, 4458:18, 4459:3, 4459:6, 4459:14, 4460:12, 4460:15, 4460:19, 4463:1, 4463:17, 4466:22, 4467:5, 4468:6, 4469:8, 4470:2, 4470:5, 4470:20, 4471:25, 4472:16, 4473:22, 4474:21, 4477:14, 4479:18, 4479:25, 4480:9, 4481:6, 4481:9, 4481:12, 4483:1, 4483:4, 4483:21, 4484:2, 4484:9, 4484:13, 4484:23, 4485:15, 4486:5, 4488:6, 4488:9, 4488:11, 4488:18, 4488:21, 4490:23, 4491:20, 4493:3, 4493:6, 4493:9, 4493:12, 4493:15, 4493:20, 4493:22, 4494:5, 4494:10, 4494:12, 4494:14, 4494:17, 4494:22, 4495:5, 4495:10, 4495:12, 4496:3, 4496:8, 4496:10, 4496:13, 4496:16, 4496:23, 4497:1, 4497:5, 4497:7, 4498:4, 4498:7, 4499:1, 4499:7, 4499:19, 4500:1, 4500:6, 4500:11, 4500:16, 4500:18, 4501:2, 4501:13, 4501:24, 4502:6, 4504:6, 4504:15, 4505:3, 4505:9, 4505:12, 4505:25, 4506:10, 4507:9, 4508:14, 4508:16, 4508:19, 4508:23, 4509:24, 4510:11, 4510:13, 4510:24, 4511:2, 4511:6, 4511:11, 4511:16, 4511:24, 4512:3, 4512:15, 4513:23, 4513:25, 4514:4, 4514:6, 4514:15, 4515:2, 4515:14, 4515:19, 4515:23, 4516:1, 4516:4, 4516:9, 4516:11
**themselves** [2] - 4474:16, 4509:11
**theories** [1] - 4461:12
**theory** [5] - 4455:9, 4463:1, 4480:5, 4481:13, 4515:20
**therefore** [4] - 4450:16, 4502:18,

4507:18, 4507:19
**they've** [3] - 4475:18, 4480:4, 4497:12
**thinking** [2] - 4463:20, 4516:5
**Third** [1] - 4447:19
**third** [4] - 4461:16, 4466:11, 4466:17, 4474:23
**threaten** [1] - 4508:16
**threatened** [1] - 4508:17
**threatening** [2] - 4482:12, 4485:22
**three** [4] - 4464:14, 4466:19, 4495:17, 4496:20
**throughout** [5] - 4461:21, 4462:2, 4462:14, 4485:5, 4502:23
**throw** [2] - 4470:9, 4506:20
**throwing** [1] - 4448:13
**thrown** [1] - 4476:17
**Thursday** [1] - 4447:7
**tied** [1] - 4485:23
**Tilles** [8] - 4453:16, 4455:10, 4456:4, 4456:18, 4458:16, 4463:22, 4463:23, 4495:6
**time-out** [1] - 4479:12
**timely** [1] - 4495:18
**today** [2] - 4462:17, 4504:9
**together** [1] - 4511:9
**tomorrow** [12] - 4496:13, 4511:16, 4513:6, 4513:11, 4513:24, 4514:8, 4515:1, 4516:4, 4516:8, 4516:9, 4516:10
**tone** [1] - 4477:13
**took** [3] - 4497:25, 4498:14, 4509:16
**top** [2] - 4481:17, 4481:19
**total** [2] - 4465:16, 4475:14
**touch** [2] - 4475:6, 4478:2
**town** [1] - 4513:7
**transactions** [1] - 4505:21
**TRANSCRIPT** [1] - 4447:11
**transcript** [1] - 4470:25
**Transcript** [1] - 4447:25
**Transcription** [1] - 4447:25
**transfer** [1] - 4491:24
**transfers** [2] - 4511:9, 4511:22
**TRIAL** [1] - 4447:11
**trial** [9] - 4453:12, 4454:21, 4455:7, 4461:21, 4462:14, 4476:3, 4482:1, 4496:5, 4515:6
**tried** [2] - 4465:8, 4499:9
**true** [4] - 4466:9, 4469:23, 4473:11, 4485:7
**trust** [1] - 4482:23
**trusted** [2] - 4455:21, 4499:3
**truth** [1] - 4471:11
**truthful** [1] - 4451:16
**try** [5] - 4454:10, 4458:5, 4465:10, 4477:20, 4513:13
**trying** [8] - 4453:10, 4454:11, 4460:19, 4463:17, 4476:13, 4476:18, 4476:21, 4491:20
**turns** [1] - 4487:20
**two** [18] - 4463:12, 4465:19, 4466:18, 4468:13, 4473:22, 4489:14, 4501:21,

4504:4, 4504:23, 4506:7, 4506:20, 4510:6, 4510:25, 4511:22, 4512:12, 4514:3, 4514:4, 4515:20
**type** [2] - 4456:14, 4465:22

## U

**ultimate** [1] - 4497:16
**ultimately** [1] - 4501:4
**unconstitutional** [1] - 4471:7
**under** [12] - 4448:17, 4457:22, 4461:11, 4470:15, 4471:10, 4473:23, 4481:13, 4484:25, 4489:6, 4495:18, 4506:5, 4510:21
**undermined** [1] - 4480:5
**understood** [1] - 4490:15
**unduly** [1] - 4507:15
**unfair** [3] - 4456:14, 4457:8
**unfortunately** [1] - 4456:9
**unhappy** [8] - 4481:16, 4481:23, 4484:20, 4485:10, 4491:5, 4498:1, 4498:12, 4502:5
**UNITED** [3] - 4447:1, 4447:3, 4447:12
**United** [3] - 4447:5, 4447:14, 4447:18
**unknown** [1] - 4466:17
**unless** [4] - 4449:23, 4456:18, 4468:7, 4470:14
**unlike** [1] - 4483:12
**unprofessional** [2] - 4473:19, 4476:23
**up** [24] - 4450:3, 4453:10, 4466:1, 4466:5, 4466:12, 4468:18, 4468:23, 4473:5, 4478:6, 4478:18, 4480:22, 4483:16, 4485:7, 4485:23, 4487:17, 4487:21, 4489:12, 4498:1, 4500:10, 4502:4, 4504:8, 4504:23, 4509:19, 4512:24
**update** [1] - 4509:1
**updates** [10] - 4450:15, 4452:11, 4459:2, 4459:6, 4461:8, 4461:12, 4463:5, 4474:17, 4509:4
**uses** [1] - 4485:8

## V

**valid** [3] - 4507:18, 4508:4, 4508:18
**valuable** [1] - 4484:10
**valuation** [14] - 4462:5, 4462:14, 4462:20, 4462:21, 4462:23, 4463:12, 4466:1, 4466:3, 4466:7, 4466:14, 4470:7, 4484:11, 4485:18, 4505:20
**valuations** [1] - 4461:16
**value** [20] - 4461:16, 4462:1, 4462:6, 4462:7, 4462:8, 4463:11, 4464:5, 4467:15, 4470:12, 4470:23, 4470:24, 4471:3, 4471:13, 4471:23, 4485:19, 4487:18, 4502:8, 4510:8
**valued** [4] - 4461:24, 4462:1, 4466:18, 4484:6
**valuing** [1] - 4466:11
**variety** [1] - 4448:16
**various** [1] - 4491:22
**ventures** [1] - 4510:19

**venue** [1] - 4482:25
**verification** [1] - 4466:20
**versus** [1] - 4495:17
**victim** [3] - 4455:3, 4469:22, 4503:20
**victims** [5] - 4449:20, 4453:5, 4469:12, 4473:2, 4473:3
**view** [4] - 4455:1, 4463:18, 4494:19, 4510:9
**violate** [1] - 4489:9
**violated** [2] - 4484:13, 4489:20
**violating** [1] - 4490:7
**violation** [3] - 4483:23, 4486:6
**VRC** [7] - 4461:17, 4463:9, 4465:7, 4465:8, 4465:13, 4513:7, 4513:13

# W

**wait** [2] - 4506:2, 4513:4
**waiting** [1] - 4495:21
**walk** [1] - 4491:2
**walking** [1] - 4487:21
**wants** [6] - 4453:1, 4473:3, 4474:8, 4478:3, 4490:20, 4506:6
**war** [1] - 4492:12
**watched** [2] - 4453:12, 4453:22
**wealth** [1] - 4454:7
**week** [8] - 4454:5, 4454:6, 4473:7, 4476:3, 4476:5, 4477:17, 4477:18
**week-and-a-half** [1] - 4476:3
**weekend** [1] - 4513:22
**weeks** [2] - 4453:25, 4454:2
**welcome** [3] - 4473:4, 4474:9, 4477:2
**well-respected** [1] - 4479:2
**whatsoever** [1] - 4449:10
**whole** [1] - 4484:10
**willful** [1] - 4500:20
**wind** [1] - 4483:16
**winding** [1] - 4495:24
**wiped** [1] - 4470:8
**wire** [10] - 4488:9, 4488:10, 4488:11, 4489:8, 4490:19, 4497:17, 4505:24, 4505:25, 4506:1
**wisecracks** [1] - 4473:23
**witness** [31] - 4454:7, 4454:25, 4455:9, 4455:10, 4459:16, 4460:23, 4461:3, 4461:6, 4462:15, 4463:8, 4463:9, 4465:23, 4471:7, 4471:17, 4471:18, 4471:21, 4471:22, 4472:8, 4472:12, 4475:24, 4476:4, 4476:6, 4476:12, 4478:1, 4483:9, 4494:9, 4497:15, 4503:8, 4507:11, 4512:21
**witness'** [1] - 4507:16
**witnesses** [17] - 4463:12, 4469:18, 4471:20, 4472:10, 4472:25, 4474:5, 4476:4, 4476:24, 4477:1, 4477:3, 4479:24, 4480:4, 4504:12, 4504:24, 4507:2, 4507:7, 4513:10
**won** [1] - 4502:20
**Wong** [1] - 4509:5
**word** [3] - 4462:5, 4489:15, 4489:18
**words** [1] - 4477:10

**worth** [2] - 4491:8, 4498:19
**write** [1] - 4496:22

# Y

**Yaffe** [1] - 4454:1
**year** [1] - 4464:4
**yesterday** [10] - 4454:1, 4467:22, 4473:17, 4477:23, 4478:6, 4479:7, 4495:23, 4495:25, 4496:20, 4514:24
**YORK** [1] - 4447:1
**York** [5] - 4447:6, 4447:15, 4447:16, 4447:20

# Z

**Zellan** [2] - 4454:11, 4511:25
**ZELLAN** [1] - 4447:21