1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  ------------------------------x
                                        15-CR-00637(KAM)
3  UNITED STATES OF AMERICA,
                                        United States Courthouse
4          Plaintiff,                   Brooklyn, New York

5          -against-                    July 10, 2017
                                        9:00 a.m.
6  MARTIN SHKRELI,

7          Defendant.

8  ------------------------------x

9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE KIYO A. MATSUMOTO
10               UNITED STATES DISTRICT JUDGE
                      BEFORE A JURY
11
   APPEARANCES
12
   For the Government:        BRIDGET M. ROHDE, ESQ.
13                            Acting United States Attorney
                              Eastern District of New York
14                            271 Cadman Plaza East
                              Brooklyn, New York 11201
15                            BY:  JACQUELYN M. KASULIS, ESQ.
                              BY:  ALIXANDRA ELEIS SMITH, ESQ.
16                            BY:  G. KARTHIK SRINIVASAN, ESQ.
                              Assistant United States Attorneys
17

18 For the Defendant:         BRAFMAN & ASSOCIATES, P.C.
                              767 Third Avenue
19                            New York, New York 10017
                              BY:  BENJAMIN BRAFMAN, ESQ.
20                            BY:  MARC AGNIFILO, ESQ.
                              BY:  ANDREA ZELLAN, ESQ.
21                            BY:  JACOB KAPLAN, ESQ.

22
   Court Reporter:            Rivka Teich, CSR, RPR, RMR
23                            Phone:  718-613-2268
                              Email:  RivkaTeich@gmail.com
24
   Proceedings recorded by mechanical stenography.  Transcript
25 produced by computer-aided transcription.

KOCHER – DIRECT – MR. SRINIVASAN

1    COURTROOM DEPUTY:  All Rise.

2          (Jury enters the courtroom.)

3          THE COURT:  Good morning, ladies and gentlemen of

4    the jury.  Hope you had a good weekend.  Please be seated

5    everybody.

6          If you'd like to continue your direct you may do so,

7    sir.

8          MR. SRINIVASAN:  Yes, your Honor.

9          THE COURT:  Good morning.  You're still under oath,

10   sir, so the Government will continue with their questioning.

11   A    Okay.

12          THE COURT:  Have a seat.

13          (Witness takes the witness stand.)

14   RICHARD KOCHER, called as a witness, having been previously

15   first duly sworn/affirmed, was examined and testified as

16   follows:

17   DIRECT EXAMINATION

18   BY MR. SRINIVASAN:

19   Q    Good morning, Mr. Kocher.

20   A    Good morning.

21   Q    We concluded last week on Government's Exhibit 83-4, if

22   we could pull that exhibit up, please.  It's in the small

23   binder tab four if you'd like a paper copy.

24          Mr. Kocher, when was this statement sent to you?

25   A    September 9, 2012.

KOCHER - DIRECT - MR. SRINIVASAN

1    Q    Now at this point in September 2012 did you have an

2    understanding of how much MSMB Healthcare had invested in

3    Retrophin?

4    A    No.

5    Q    Did you have an understanding of how much of MSMB

6    Healthcare's portfolio was in the liquid securities?

7    A    No.

8    Q    To what extent were you informed that all of MSMB

9    Healthcare's money had been invested in Retrophin?

10   A    I remember that Kevin Mulleady told me that they had put

11   something like $10 million into it, but I never saw any

12   statements or -- that was what he had said.  And I didn't know

13   if it was a loan or, I didn't know what it was.

14   Q    During the course of your MSMB Healthcare investment, did

15   you approve any personal loans by MSMB Healthcare to the

16   defendant?

17   A    No.

18   Q    If you had learned of any personal loans to the

19   defendant, what, if any, effect would that have had on your

20   continued investment?

21             MR. AGNIFILO:  I object to the relevance to this.

22   There is no obligation.

23             THE COURT:  Do you want to have a sidebar?

24             MR. SRINIVASAN:  Sure, your Honor.

25             (Continued on the next page.)

SIDEBAR CONFERENCE

1              (Sidebar conference.)

2              THE COURT:  May I ask a question, I'm assuming that

3    you're asking the question because personal loans were made?

4              MR. SRINIVASAN:  In Mr. Shkreli's SEC testimony

5    there were questions about $775,000 that was classified as a

6    loan.  Mr. Shkreli described it as a personal loan that he

7    intended to pay and reimburse to the MSMB Healthcare

8    investors.

9              THE COURT:  $775,000 from MSMB?

10             MR. SRINIVASAN:  Exactly, Healthcare.  I think that

11   the evidence will show that that money was not disbursed back

12   to the MSMB Healthcare investors.  So we think it's relevant

13   to these charges.  I don't have very many questions about

14   this, just establishing his knowledge and awareness of this

15   issue.

16             MR. AGNIFILO:  The basis of the objection, Judge, is

17   there nothing in the PPM, which they have not even discussed

18   with this witness, that precludes this thing.  The question

19   presupposes a duty to not do that; but there is no duty do

20   that.

21             THE COURT:  That is something you can ask him on

22   cross.

23             MR. BRAFMAN:  Judge, there is no obligation to

24   inform any investor in MSMB as to how the funds are being

25   disbursed; and this presupposes that there is such an

SIDEBAR CONFERENCE

1    obligation.  So asking him, did you know that Mr. Shkreli was

2    borrowing money or lending money, suggests that that is

3    something Mr. Shkreli had to disclose.

4           THE COURT:  Does the PPM define what the fund is

5    going to do with the invested funds?

6           MR. BRAFMAN:  In several places in the PPM it has

7    discretion entirely on the general partner with no obligation,

8    so long as he's acting in good faith.  This is like asking the

9    witness who has no knowledge about the terrible thing that

10   somebody did so you get the question out.  Because he has

11   nothing to do with Mr. Shkreli, his personal contact is

12   Mulleady.  There is nothing in the 3500 material that suggests

13   that somebody said to him the money is never going to be used

14   for a loan.

15          MR. SRINIVASAN:  Your Honor, I think the lack of

16   awareness is a relevant issue.  When the fund is shut down,

17   the representation that is made to the investors is the money

18   will be disbursed to them.  Mr. Shkreli indicates there is

19   additional $775,000 out there that is disbursed to investors,

20   they don't get it.

21          THE COURT:  Does he describe the $750,000 as it's

22   winding down?

23          MR. SRINIVASAN:  Nothing, he never tells them.

24          MR. BRAFMAN:  That's the point.  They want to argue

25   on summation, they have evidence of the loan and the records,

SIDEBAR CONFERENCE

1    they will argue on summation a misuse of MSMB funds, that

2    might be a fair argument.  But to float a question to a

3    witness who they know doesn't have a clue about this issue and

4    never has, just to ask the question is suggest to the jury

5    that Mr. Shkreli has an obligation to each limited partner

6    every time he spends $10 from this fund, and that is not true.

7             MS. SMITH:  I will say that Mr. Shkreli testified

8    that he got permission from the limited partner.  That's a

9    statement he made to the SEC.  As well there is an affirmative

10   misrep later on related to what information he provided to the

11   limited partners about the loan that is relevant.

12            MR. AGNIFILO:  But without pulling in the PPM, which

13   they had not yet done, to establish what the duties are, they

14   are going at this backwards.  They have to establish a duty

15   before they ask the question, before putting in the PPM and

16   saying what the duties are, what they said the duties and

17   responsibilities are based on the PPM.  I don't think they can

18   avoid that step and suggest that there is a duty on

19   Mr. Shkreli to do this when there is no duty established.

20            MR. SRINIVASAN:  We can do it subject to connection.

21   There is going be another witness later on where the PPM will

22   go in.  I think all we established here, is just a lack of

23   awareness.

24            THE COURT:  He had a PPM that you can put in for

25   him?

SIDEBAR CONFERENCE

1        MR. SRINIVASAN:  He didn't recall it.

2        MR. AGNIFILO:  That's our problem.  That's the whole

3  problem with the whole line of questioning.

4        MR. SRINIVASAN:  It does get the representation that

5  the funds in MSMB were fairly disbursed to a limited partners.

6  I think that representation about distribution is relevant.

7        THE COURT:  Is there ever any mention of the

8  $775,000 by Mr. Shkreli to any of the limited partners?

9        MR. SRINIVASAN:  No.

10        THE COURT:  But did he make a statement to the SEC

11  that he informed them of it?

12        MS. SMITH:  Yes.

13        THE COURT:  I think it's fair for them to do this

14  subject to connection, then that evidence is coming in his

15  testimony to the SEC regarding disclosure of the 775.

16        MS. SMITH:  Those are some of the statements that we

17  previewed and did the whole Rule of Completeness motion in

18  limine nature on.

19        MR. AGNIFILO:  What are you going to say the

20  statement is exactly?

21        MS. SMITH:  The statements is already marked as an

22  exhibit.

23        MR. AGNIFILO:  What is the statement that makes this

24  testimony relevant?

25        MS. SMITH:  I can double check.  I believe he said

SIDEBAR CONFERENCE

1   he informed the limited partners of the personal loan.

2           MR. BRAFMAN:  I don't think he said any of the

3   statements.  I don't remember seeing any of the statements.

4           MS. SMITH:  We can take a quick break and check

5   that.

6           THE COURT:  Save that question, check it in the

7   meantime, if you can verify that he said that to the SEC then

8   I think this statement that you're offering can come in.

9           MS. SMITH:  He did say it.  I believe it's in the

10  statements we've marked.  I'll double check.

11          THE COURT:  But you're positive he did make the

12  statement to the SEC.

13          MS. SMITH:  Yes.

14          MR. BRAFMAN:  Whether he said it to the SEC is not

15  the issue.  The issue is whether the statements were admitted

16  against Mr. Shkreli in this trial include that statement.

17          MS. SMITH:  That's the piece I'm going to check.

18          THE COURT:  Keep going around this one and we'll

19  come back to it.

20              (End of sidebar conference.)

21              (Continued on the next page.)

22

23

24

25

KOCHER – DIRECT – MR. SRINIVASAN

1      (In open court.)

2           MR. SRINIVASAN:  Your Honor, may I proceed?

3           THE COURT:  Yes.

4   DIRECT EXAMINATION

5   BY MR. SRINIVASAN:

6   Q    Mr. Kocher, did there come a time you learned that MSMB

7   Healthcare would be shutting down?

8   A    Yes.  I got a memo approximately, I think it was the same

9   date, September 9.

10  Q    In the bigger binder that you have in front of you, if

11  you can turn to tab 12, that's Government's Exhibit 107-12

12  marked for identification.  Do you recognize this document?

13  A    Yes.

14  Q    What is it?

15  A    It's an e-mail from Martin to me.

16  Q    What is the date on the document?

17  A    It's September 9, 2012.

18          MR. SRINIVASAN:  Your Honor, we move 107-12 into

19  evidence.

20          MR. AGNIFILO:  Bear with me, no objection.

21          THE COURT:  We'll receive 107-12.

22          (Government Exhibit 107-12, was received in

23  evidence.)

24  BY MR. SRINIVASAN:

25  Q    Mr. Kocher, turning your attention to the first

KOCHER – DIRECT – MR. SRINIVASAN

1    paragraph.

2    A    Yes.

3    Q    It says, the first sentence says, "I have decided to wind

4    down our hedge fund partnerships with a goal of completing the

5    liquidation of the funds by November or December 1st, 2012."

6              What did you understand this to mean?

7    A    Well, I wasn't really sure, but I found it curious that

8    they were going to wind it down.  But at any rate, they are

9    saying that they would take, they would basically, I assume

10   that I was going to get paid back my account balance by the

11   end of the year.

12   Q    Let's go to the second page, Bates RK000291.  Turning

13   your attention the last paragraph, the first two sentences

14   say, "A few operational notes.  Investors will have their

15   limited partnership interests redeemed by the fund for cash.

16   Alternatively investors may ask for a redemption of Retrophin

17   shares or a combination of Retrophin shares and cash."

18             What did you understand that language to mean?

19   A    Well, we could get our money back in cash, if we wanted

20   to, or alternately in Retrophin stock, or a combination of

21   either.

22   Q    Did you believe that was your choice as to cash or stock?

23   A    Well, my choice would be cash.

24   Q    After you received this e-mail, did you try to redeem

25   your investment?

KOCHER - DIRECT - MR. SRINIVASAN

1    A    I didn't try to redeem it right away.

2    Q    Why not?

3    A    Because they were saying they were going to take care of

4    it by the end of the year.  So I thought you know, that that

5    was going to happen.

6    Q    Did it happen by the end of the year?

7    A    No, it didn't.

8             THE COURT:  You say "they," who do you think they

9    is?

10            THE WITNESS:  MSMB or Martin.

11   BY MR. SRINIVASAN:

12   Q    Now, at some point did you try to redeem your investment?

13   A    Yes.

14   Q    Did you contact anybody about that?

15   A    I believe I probably contacted Kevin first.  And then at

16   a certain point Kevin was out of the company, and you know, I

17   had to pursue it directly with Martin.

18   Q    Showing you what is marked for identification as

19   Government's Exhibit 107-15, which is tab 15 in that binder,

20   do you recognize this document?

21   A    Yes.

22   Q    What is it?

23   A    This is an e-mail from me to Martin.

24   Q    What is the date on the top there?

25   A    March 11, 2013.

KOCHER – DIRECT – MR. SRINIVASAN

1      MR. SRINIVASAN:  Your Honor, we move Government

2  Exhibit 107-15 into evidence.

3      MR. AGNIFILO:  No objection.

4      THE COURT:  We will receive 107-15.

5      (Government Exhibit 107-15, was received in

6  evidence.)

7  Q    Let's start on the bottom e-mail on this page, when did

8  you write this e-mail?

9  A    This was March 11, 2013.

10 Q    You're writing it to Martin Shkreli, Evan Greebel,

11 Jim@attorneyburke.com, Kevin@stonecornergroup.com, and

12 FuldaKocher@gmail.com.  What was your understanding who Evan

13 Greebel was?

14 A    My understanding was that Evan Greebel was Martin

15 Shkreli's lawyer.

16 Q    How about Jim@attorneyBurke.com?

17 A    He's my actual zoning lawyer for Hoboken, New Jersey

18 City.

19 Q    Is there any reason you're CC'ing him on this e-mail?

20 A    Well, I had been trying to get Martin's attention to try

21 to get my money back.  I wasn't getting anywhere, so I

22 included my lawyer in it.

23 Q    And FuldaKocher@gmail.com?

24 A    That's my wife.

25 Q    Looking at the body of the e-mail, could you please read

Rivka Teich CSR, RPR, RMR
Official Court Reporter

KOCHER – DIRECT – MR. SRINIVASAN

1    that?

2    A     Sure.  "Hello Martin.  I have repeatedly attempted to

3    contact you via phone over the past two days.  I know that you

4    are busy but I have given over two months' notice that I was

5    going to need to liquidate my account by the 15th of this

6    month, which is the end of this week.  I have been in contact

7    with Kevin Mulleady, who has been my account manager, but now

8    he tells me I have to go contact you directly.  As I hope you

9    are aware, I am an LP in the MSMB Healthcare fund.  I actually

10   was the client that wired in money on a day's notice when your

11   organization was in a tight spot.  Per my conversation with

12   Kevin Mulleady, my account value was approximately $280,000,

13   which was towards the end of last year.  Retrophin has gone up

14   in value substantially since then, and I'm aware that our

15   hedge fund which funded Retrophin directly should benefit

16   directly because of this.  I am also aware that you manage

17   both companies, which seems to be a conflict of interest.  If

18   our hedge fund doesn't benefit directly from Retrophin which

19   it helped fund it.  My position in MSMB was supposed to be

20   transitioned into shares of Retrophin, but I can never get a

21   straight answer as to how or when this is supposed to happen.

22   I have liquidity needs and would like to be aware of my

23   account value immediately.  Based on this information I

24   potentially will exercise my rights to weekly redemption, a

25   side letter signed by you.  As this is a formal request I have

KOCHER - DIRECT - MR. SRINIVASAN

1    CC'ed your attorney, Evan Greebel, and my attorney, Jim Burke.

2    I expect an expedited response.  Thank you.  Richard Kocher."

3    Q    What did you mean when you wrote, "I'm also aware that

4    you manage both companies, which seems to be to be a conflict

5    of interest if our hedge fund doesn't benefit directly from

6    Retrophin which has helped fund it"?

7    A    Well, it seemed obvious that if all of a sudden he's

8    winding down the hedge fund and now it's basically become

9    Retrophin that and he's -- I would think in terms of fiduciary

10   responsibility that there is a conflict of interest there

11   because he is managing both companies.

12   Q    Going up one e-mail, the defendant wrote back on

13   March 11, 2013 to you CC'ing Evan Greebel.  He writes, "Hi

14   Richard.  We are just acknowledging receipt.  We'll get back

15   to you within 24 hours.  I need your mailing address if you

16   have that handy."

17        Then going up one more e-mail, what did you write

18   back?

19   A    I wrote back, I gave him my address.

20   Q    Did your communications with the defendant continue after

21   this point?

22   A    Yes.

23   Q    I'm showing you what is marked for identification as

24   Government's Exhibit 107-16, tab 16 in your binder.  Do you

25   recognize this?

KOCHER - DIRECT - MR. SRINIVASAN

1    A     Yes, this is another e-mail from me to Martin.

2    Q     Looking at the top, what is the date?

3    A     The date is March 12, 2013.

4          MR. SRINIVASAN:  Your Honor, we move Government's

5    Exhibit 107-16 into evidence.

6          MR. AGNIFILO:  No objection.

7          THE COURT:  We will receive 107-16

8          (Government Exhibit 107-16, was received in

9    evidence.)

10   Q     Mr. Kocher, I'd like to call your attention to the e-mail

11   that is in the middle, March 12, 2013, at 4:19 p.m.  Do you

12   see that?

13   A     Yes.

14   Q     What did you write?

15   A     "Hi Martin.  Well, it's been over the 24 hours since you

16   said you would get back to me, and I called you again without

17   a response.  I've already sent you my address, but asking for

18   wiring instructions would be more appropriate."

19   Q     Going up one e-mail, the defendant wrote back on

20   March 12, 2013, "We are distributing the funds holdings to

21   you.  You should receive a stock certificate this week."

22         Were you informed about a potential stock

23   certificate before this point?

24   A     No.

25   Q     Going up one e-mail, what did you write on March 12,

KOCHER – DIRECT – MR. SRINIVASAN

1   2013?

2   A     "My last account value was 280,000 and it was in a

3   diversified MSMB Healthcare portfolio, MSMB, which was net

4   neutral.  If my redemption is in Retrophin shares, which is

5   thinly traded, then I would assume my account value would be

6   higher to compensate for the illiquidity.  So how many shares

7   are you giving me?"

8   Q     What did you mean by, quote, "diversified health care

9   portfolio"?

10  A     Well, it was supposed to be diversified health care

11  portfolio.  Originally when they sent out, I think the

12  original literature that I had gotten from them, I think it

13  said they weren't going to hold more than 10 percent share in

14  any particular company.  I think nothing greater than that, I

15  think that's what it said.  In other words, it was going to be

16  diversified.  It was going to have various companies and that

17  they would hold or hold stock in companies.

18  Q     When you say "it," are you referring to the fund?

19  A     Yes.

20  Q     What did you mean when you wrote, "I would assume my

21  account value would be higher to compensate for illiquidity"?

22  A     Well, if they were going to give me shares of Retrophin,

23  I knew that the Retrophin stock was very-thinly traded; in

24  other words, there is very low volume.  So maybe you get 1,000

25  shares or 2,000 shares that were traded each day, so if you

KOCHER - DIRECT - MR. SRINIVASAN

1   tried to sell, you know, 5,000 shares the stock would go from,

2   if it was at $4.00 it would go down to three or two, if you

3   tried to get rid of stock right away.  So you couldn't sell

4   the stock.

5   Q    What was your reaction to that?

6   A    Well, I made it clear that I needed cash, that I needed

7   liquidity.  I needed money right away.  So I was upset about

8   it.

9   Q    After this point did the defendant send you a stock

10  certificate for Retrophin?

11  A    They did.

12  Q    I'm showing you what's been marked for identification as

13  Government's Exhibit 107-18, do you recognize this?

14  A    This is another e-mail from Martin to me.

15  Q    What is the date on the top?

16  A    This is March 14, 2013.

17            MR. SRINIVASAN:  Your Honor, we move Government's

18  Exhibit 107-18 into evidence.

19            MR. AGNIFILO:  No objection.

20            THE COURT:  We'll admit 107-18.

21            (Government Exhibit 107-18, was received in

22  evidence.)

23  Q    I'd like to focus on the top e-mail, where it starts

24  here.  The defendant writes, "Here is the FedEx confirmation

25  number.  They the attempted delivery and he will redeliver

Rivka Teich CSR, RPR, RMR
Official Court Reporter

KOCHER - DIRECT - MR. SRINIVASAN

1   again tomorrow.  It is a certificate for 23,654 shares.  It is

2   not the full redemption.  Let us discuss when is a good time

3   for you."

4            Based on this e-mail, did you believe that these

5   shares were a full or partial redemption of your investment?

6   A    A partial redemption.

7   Q    Did you, in fact, receive the 23,654 shares?

8   A    Yes.

9   Q    Were they restricted or unrestricted?

10  A    They were restricted, essentially they were worthless to

11  me.

12  Q    Why were they worthless to you?

13  A    Restricted stock you can't sell at all.

14  Q    Did you make a further attempts to obtain your full

15  redemption request?

16  A    Yes.

17  Q    I'm showing you what is marked for identification as

18  Government's Exhibit 107-22, this is tab 22 in your binder.

19  Do you recognize this?

20  A    Yes.

21  Q    What is it?

22  A    An e-mail from me on March 18, 2013 to Martin.

23           MR. SRINIVASAN:  Your Honor, we move 107-22 into

24  evidence.

25           MR. AGNIFILO:  No objection.

KOCHER - DIRECT - MR. SRINIVASAN

1          THE COURT:  We received 107-22.

2              (Government Exhibit 107-22, was received in

3    evidence.)

4    Q    I'd like to start by the e-mail on the bottom there,

5    which is dated March 15, 2013.  What did you write?

6    A    "Martin, just so you understand my situation.  I have

7    counted on what your memo back in September said, that we

8    would be taken care of before the end of the year.  And that

9    we would be able to taken out in cash or in stock of our

10   choice.  For some reason you are giving me Retrophin stock

11   that is not tradeable and it is worth around a quarter of what

12   I'm owed.  And now you are going to somehow compensate later

13   for it.  I'd like to remind you, again, that when you were in

14   trouble and needed $100,000, I wired it over the next day.  I

15   have given you over two months' notice.  I expect to get in

16   addition to this insulting, untradeable stock, at least

17   $200,000, which you owe me in cash, wired to my account by

18   early next week.  I have already been in touch with counsel

19   that is versed in this kind of litigation.  You should be

20   hearing from them soon.  I have damages that have occurred

21   because I have been relying on what you have represented as

22   the manager of MSMB.  I also believe that as manager of MSMB

23   and CEO of Retrophin, that you have not lived up to your

24   fiduciary responsibilities to me as an LP.  And that I will

25   require a full accounting of both MSMB and Retrophin and your

KOCHER - DIRECT - MR. SRINIVASAN

1   financial involvement.  Also I will make sure that this does

2   go public and will also go to the appropriate agencies.  I'm

3   going to attach your e-mail from September, again, for the

4   limited partners."

5   Q    Mr. Kocher, you write, "I had damages that have occurred

6   because I've been relying on what you have represented as the

7   manager of MSMB," what did you mean by that?

8   A    Well, towards the end of 2012 when I was expecting to get

9   the money back, I went into contract on two properties one in

10  Jersey City and one in Hoboken.  And so I had to close on

11  those properties around this time, it was actually March/April

12  time frame for one property, and then a little bit later for

13  the next property.  In order to close on them I needed this

14  cash.

15  Q    In the middle of the page, this is the e-mail, next

16  e-mail up, he wrote the defendant wrote on March 15, 2013, "I

17  called your office.  You can call me with or without counsel

18  at your convenience (212)983-1310, CC'ing my attorneys if you

19  want to start a dialogue with them."

20           And then going up one more e-mail, you wrote back on

21  March 18, "I called you back Friday, and left my cellphone but

22  go no response.  I also called your office this morning and

23  couldn't get you.  Let me know what you are thinking in terms

24  of taking care of me.  You can e-mail me.  Up to now the

25  communication has been very poor."

KOCHER - DIRECT - MR. SRINIVASAN

1          What was your reaction to the defendant's responses

2    so far?

3    A    Well, him sending me restrictive stock was, like I said,

4    an insult, as far as I was concerned.  Because I felt like I

5    went out of my way to give him money when they needed and when

6    MSMB needed it.  And it was obvious that I had given him a lot

7    of notice here and I was given the run-around.  For me to get

8    restrictive stock, and I never got an account balance for

9    anything after July, so there was August, September, October.

10   So I really didn't know what my account balance was exactly.

11          THE COURT:  Of what year, 2012 or 2013.

12          THE WITNESS:  2012.

13   Q    A minute ago you mentioned sending MSMB Healthcare money

14   when they needed it.  Who is they?

15   A    Well, it was, you know, Kevin at that time, it was Kevin

16   Mulleady and Martin.

17   Q    When you say "at a time when they needed it," what is

18   that a reference to?

19   A    Well, they called me on short notice and said they needed

20   money that week.

21          MR. AGNIFILO:  Who called?  Did they both call?  He

22   said they.

23          THE WITNESS:  I believe it was Kevin that called me.

24          THE COURT:  What did he say he needed the money for,

25   MSMB Healthcare?  Or was it in relation to the fund or

KOCHER – DIRECT – MR. SRINIVASAN

1   something else?

2            THE WITNESS:  I don't remember exactly, but I

3   assumed it was for MSMB Healthcare.

4   BY MR. SRINIVASAN:

5   Q    What time frame was that request made?

6   A    Well it was made -- I'm sorry, you want to know the date?

7   Q    The rough time frame.

8   A    Initially, I think it was May.

9   Q    Of?

10  A    Of 2012.

11  Q    Mr. Kocher, I'm showing you what is marked for

12  identification as Government's Exhibit 107-23, do you

13  recognize this?

14  A    Yes.

15  Q    What is this?

16  A    This is another e-mail from Martin to me sent Friday

17  March 22, 2013.

18            MR. SRINIVASAN:  Your Honor, we move Government's

19  Exhibit 107-23 into evidence.

20            MR. AGNIFILO:  No objection.

21            THE COURT:  We will receive 107-23.

22            (Government Exhibit 107-23, was received in

23  evidence.)

24  Q    Let's start with the bottom e-mail, Mr. Kocher.

25  A    Okay.

KOCHER – DIRECT – MR. SRINIVASAN

1    Q    This is the defendant writing to you March 21, 2013, the

2    subject like line is solution.

3            And he writes, "Hi Rich.  We've decided to double

4    the shares you've received mathematically and legally we have

5    divested the full contents of the fund to you.  All

6    investments have some element of risk and this one was no

7    exception.  Having said that and taking your comments into

8    account, we think doubling the shares you received will be a

9    good start to a solution.  We are also willing to buy back

10   your shares or help to arrange a buy back.  You mentioned

11   liquidity is important to you and we wanted to help.  We can

12   speak any time Monday to get the process started.  Thank you

13   for your continued patience and trust, Martin."

14           Mr. Kocher, did you have any understanding of the

15   basis or the reason for doubling the shares that are reflected

16   here?

17   A    No.

18   Q    Did you have any understanding of what a "good start to a

19   solution," was a reference to?

20   A    He's negotiating at this point, that's the way I saw it.

21   He's still trying to low-ball me.  And you know, as far as

22   what my actual account balance or if there was an account

23   balance, didn't seem to make any difference, that was my

24   interpretation of it.

25   Q    Going up one e-mail, this is dated March 22, 2013, what

KOCHER – DIRECT – MR. SRINIVASAN

1   did you write back?

2   A    "Hi Martin.  I will call you on Monday.  Doubling the

3   shares doesn't cut it.  It will not bring me back to the 280K

4   that was my last account balance.  And it's not liquid, but as

5   you said, it will be a start to a solution."

6   Q    Going up one e-mail, this is the defendant writing to you

7   on March 22, 2013.  He writes, "I'll make sure you get back to

8   the last account value and it's liquefied immediately."

9        What was your reaction to this?

10  A    Well, I was optimistic that he might do that.

11  Q    Did your efforts to redeem your investment continue after

12  March 22?

13  A    Yes.

14  Q    I'm showing you Government's Exhibit 107-25, marked for

15  identification, tab 25 in your binder.  Do you recognize this

16  document?

17  A    Yes, this is a e-mail from me to Martin on March 27,

18  2013.

19        MR. SRINIVASAN:  Your Honor, we move Government's

20  Exhibit 107-25 into evidence.

21        MR. AGNIFILO:  No objection.

22        THE COURT:  We will receive Government's Exhibit

23  107-25.

24        (Government Exhibit 107-25, was received in

25  evidence.)

KOCHER - DIRECT - MR. SRINIVASAN

1  Q    Let's go to the second page of this exhibit, Bates

2  R017964.  There appears be to a long e-mail in the middle of

3  the page, do you see that?

4  A    Yes.

5  Q    This is from you dated March 26, 2013, to Martin Shkreli

6  and David G. Trachtenberg.  Who was David G. Trachtenberg?

7  A    David Trachtenberg is of the firm Trachtenberg Rodes.

8  And he was a lawyer, a New York lawyer, that I hired.

9  Q    For?

10  A    He was my lawyer.

11  Q    What did you write to the defendant?

12  A    "Hi Martin.  Nice to speak with you yesterday.  I

13  appreciate you apologized for not being professional about how

14  I have been treated.  You indicated you would be available

15  today so we could finish up and I could finally get redeemed

16  from my investment with you.  As per our conversation you have

17  agreed to buy my restricted Retrophin shares at market price

18  or approximately 23,564 times $5.10, as of now, which is

19  120,176.  And in addition to the 120,176, you will send me

20  50,000 shares of unrestricted Retrophin stock.  You also

21  indicated that you would try and get me some more stock, but

22  were not specific about the quantity or the time.  Because I

23  have not been able to get my redemption from you, I've had to

24  get out of other liquidity investments and I now risk not

25  being able to live up to my contractual obligations because

KOCHER – DIRECT – MR. SRINIVASAN

1    I've been unable to get my account redeemed.  You indicated

2    you would start the process today, but I've called of twice

3    again, and again it's at the end of the day, so I'd like to

4    remind you that there was a point when it looked like we would

5    be paid back 3.5 account balance before our fund helped

6    finance Retrophin and bought Retrophin -- brought Retrophin

7    public.  Again, we were supposed to have been redeemed before

8    the end of last year and any cash in Retrophin stock.  I'm

9    getting past the point of being patient.  Time is of the

10   essence for me now and really expect to be fully taken care of

11   before the end of this week.  Don't forget Friday is Good

12   Friday and lot of people are out.  I would prefer to keep this

13   amicable.  From a practical stand point we need to get this

14   worked out quickly so it does not escalate.  It would be

15   helpful if you had someone from your office that could work

16   out the details other than yourself if you're too busy.

17   Rich."

18   (Continued following page.)

19

20

21

22

23

24

25

KOCHER - DIRECT - MR. SRINIVASAN

1  Q    And in that first paragraph you say as per our

2  conversation.

3        Did you have a conversation with the defendant?

4  A    Yes.

5  Q    Was this in person or by phone?

6  A    It was by phone.

7  Q    You also refer to having to get out of other lucrative

8  investments.  And you say I'm now risking not being able to

9  live up to my contractual obligations.

10        What is that a reference to?

11  A    Well, this is March 26, 2013 already and so we were

12  supposed to close on one of the properties that I had gotten

13  into contract with, the Jersey City, property.  And I wasn't

14  going to end up having enough cash to complete the deal.  So

15  as it turned out, I ended up having to get a partner involved.

16  Q    Could you elaborate on that.

17  A    Well, I wasn't going to let the property -- first off, I

18  was contractually obligated to buy the property and, you know,

19  I would be in trouble not to, but also I wanted to buy it.  So

20  but I didn't have the cash to do it so I brought   in -- I

21  ended up bringing in a partner who came up with, you know,

22  some of the money that was needed to close.

23  Q    Did that action have any financial consequences for you?

24  A    Well, besides giving -- ending up giving him a lucrative

25  limited partnership deal, I ended up having to pay him a

KOCHER - DIRECT - MR. SRINIVASAN

1  hundred thousand dollars just to get him out of the, you know,

2  a general partnership.  Because I was under financial stress

3  at that point because I didn't have this money back so I had a

4  very tight timeframe.  So I had to get someone that was

5  willing to come in, and in order to do that I gave up quite a

6  bit.

7  Q    After this point did your communications with the

8  defendant continue about the redemption?

9  A    Yes.

10 Q    I'm showing you what's marked for identification as

11 Government's Exhibit 107-26.  It's tab 26 in your binder.

12       Do you recognize this?

13 A    Yes, this is an email from me to Martin, March 28, 2013.

14       MR. SRINIVASAN:  Your Honor, we move Government's

15 Exhibit 107-26 into evidence.

16       MR. AGNIFILO:  No objection, Judge.

17       THE COURT:  We will receive 107-26.

18       (Government Exhibit 107-26, was received in

19 evidence.)

20 Q    Mr. Kocher, turning your attention to the email near the

21 bottom which is dated March 27, 2013 at 8:22 p.m.

22       Do you see that?

23 A    Yes.

24 Q    And this is you writing to the defendant.  What did you

25 write?

KOCHER - DIRECT - MR. SRINIVASAN

1    A    "Hi, Martin.  Please finalize this deal tomorrow.  I

2    don't want to get my attorney involved, but I won't have a

3    choice if you don't get back to me.  All we have to do is

4    agree on terms and how we're going to finalize them.  It

5    really shouldn't be this hard.  Rich."

6    Q    Going up one email, this is the defendant writing on

7    March 27, 2013 at 8:33 p.m.  He writes, "I'm doing my best.

8    You can't believe how backed up we are right now."

9         What was your reaction to this?

10   A    Sorry.  Where is this?

11   Q    I'm sorry.  It's one email up from the one that you just

12   read out.

13   A    Okay.

14   Q    It's also on your screen.

15   A    I see it.  Okay.

16        Well, my response is that he had, you know, we are

17   at the end of March now so, you know.  I've been trying to get

18   this thing done since the beginning of the year so that's

19   three months into it.

20   Q    Going up one email.  This is you writing to the

21   defendant, March 27, 2013 at 8:41 p.m.

22        What did you write?

23   A    Well, I'm willing to be patient, but the bank wants to

24   see liquid assets in order for me to close a large real estate

25   deal, and I really can't afford to lose this deal so what's

KOCHER - DIRECT - MR. SRINIVASAN

1    the best way we can proceed?

2    Q    And the reference to a large real estate deal, is that

3    the same deal that you were talking about a minute ago?

4    A    Yes.  And it's actually not a large real estate deal.

5    It's large for me, but actually it's not a big deal.

6    Q    I'm showing you what's marked for identification as

7    Government's Exhibit 107-28.  It's tab 28 in your binder.

8         Do you recognize this?

9    A    Yes.

10   Q    What is it?

11   A    An email sent from me to Martin, April 2, 2013.

12        MR. SRINIVASAN:  Your Honor, we move Government's

13   Exhibit 107-28 into evidence.

14        MR. AGNIFILO:  No objection.

15        THE COURT:  We receive 107-28.

16        (Government Exhibit 107-28, was received in

17   evidence.)

18   Q    Mr. Kocher, starting at the bottom email there, the

19   defendant writes to you on March 31, 2013, I will have an

20   agreement for you to sign tomorrow.

21        And then what did you write on April 1, 2013?

22   A    I said to save time can you tell me what the terms are.

23   Tell me the terms.

24   Q    And then he writes back April 1, 2013, same terms we

25   discussed and agreed upon.

KOCHER - DIRECT - MR. SRINIVASAN

1      What did you write back on April 2nd?

2    A    Hi, Martin.  You said you would have an agreement for me

3    yesterday.  Any progress?

4    Q    And what was going on in your mind now five days later?

5    A    Same thing that's been going on for the last three

6    months.  He's just, you know, there's really nothing solid I

7    could really get out of him.

8    Q    I'm showing you Government's Exhibit 107-29 marked for

9    identification.  Do you recognize this?

10   A    Yes.

11   Q    What is it?

12   A    It's a letter -- email from Martin to me regarding the

13   agreement, April 3rd, which is Wednesday, 2013.

14            MR. SRINIVASAN:  Your Honor, we move Government's

15   Exhibit 107-29 into evidence.

16            MR. AGNIFILO:  No objection.

17            THE COURT:  We will receive 107-29.

18            (Government Exhibit 107-29, was received in

19   evidence.)

20   Q    Mr. Kocher, let's start with the bottom there.  This is

21   the defendant writing to you on March 31st, I will have an

22   agreement for you to sign tomorrow.

23            Do you see that?

24   A    Yes.

25   Q    And then if we actually go up two emails.

Angela Grant, RPR CRR
Official Court Reporter

KOCHER – DIRECT – MR. SRINIVASAN

1    A    Yep.

2    Q    It's him writing the same terms we discussed and agreed

3    upon.

4           Is this a continuation of the chain we just saw in

5    the previous exhibit?

6    A    Yes.

7    Q    Now, if we go up one more email.  This is you writing to

8    the defendant on April 3, 2013.  Could you please read that.

9    A    Martin, now we're going on another two weeks and again

10   you are putting me in a bad situation.  If I don't see an

11   agreement from you by tomorrow, then the deal we have agreed

12   on -- agreed to will be off and I will be forced to have you

13   deal with my lawyer.  That will change the equation.  It will

14   cost me in finding alternate funding for my project, and I

15   will look at what you owe me differently.

16          I will remind you again, when you had someone drop

17   out and needed a hundred K on short notice I got the money to

18   you by the next day.  I will go on what I was told by your

19   representative Kevin that my account value of 280,000 will be

20   redeemed for three to three-and-a-half times its value in

21   either cash or Retrophin stock.

22   Q    Mr. Kocher, did you have any conversations with the

23   defendant about the value of your investment in these months?

24   A    I never got a straight answer.  And, obviously, like I

25   said, the last account balance I had was from the year

KOCHER – DIRECT – MR. SRINIVASAN

1    previous and it was I think in August of 2012.

2    Q    And who sent that account balance to you?

3    A    Martin did.

4    Q    Now, going up an email, the defendant wrote to you on

5    April 3, 2013 at 2:49 p.m., busy running the company.  I will

6    send today.  I don't know about what Kevin told you, but it's

7    not accurate.

8            What was your reaction to receiving this?

9    A    Well, again, the way I saw it, he was just negotiating

10   anyway.  I don't know what the account balance was or where it

11   was.  I don't know if he did, but I don't think it mattered to

12   him.  I think it was more what he could get away with in terms

13   of paying me back.

14           MR. AGNIFILO:  Objection.  Objection to that

15   statement.  Move to strike.

16           THE COURT:  Well, he's asking him what his reaction

17   was.

18           MR. AGNIFILO:  I'm not sure that's relevant either.

19           MR. SRINIVASAN:  It's the witness' understanding of

20   the reaction.

21           MR. AGNIFILO:  Well, a reaction –– can we go to the

22   side?

23           THE COURT:  All right.

24           (Sidebar conference.)

25           (Continued on the following page.)

SIDEBAR CONFERENCE

Official Court Reporter

SIDEBAR CONFERENCE

1

2          MR. AGNIFILO:  Can I have the question and the

3     answer read back?

4          THE COURT:  I've got it on my computer.

5          MR. AGNIFILO:  So what I think it was --

6          THE COURT:  He said what was your reaction.

7          MR. AGNIFILO:  And then he said a bunch of things

8     about what he thinks Martin's reaction about it; I was

9     disappointed, I was happy.  It's not what Martin did and that

10    Martin commented on and all these other things he went on to

11    say.  It's utterly inappropriate.

12         MS. KASULIS:  He's allowed to interpret what he

13    believed Martin was telling him, what his reaction was as to

14    why Martin made that statement.

15         MR. AGNIFILO:  I don't think that's an

16    appropriate -- that's absolutely inappropriate for him to

17    interpret --

18         MS. KASULIS:  It's his understanding of what Martin

19    is writing to him.

20         MR. AGNIFILO:  I object.  I think it's inflammatory.

21    I think there's no basis for it.  I think it's irrelevant.

22    For him to say that's not -- he has no ability to speculate

23    what Martin Shkreli was thinking.

24         MS. KASULIS:  Yes, he does.  He's in these exchanges

25    with him.

ANGELA GRANT, RPR, CRR

SIDEBAR CONFERENCE

1        Your Honor, we're making this argument that none of

2   these witnesses were ever harmed and they got their money

3   back, they were made rich.

4        The fact that this individual had a lot of

5   interactions with the defendant that caused him to stress his

6   reaction to Martin's repeated statements, which they interpret

7   as delay and stalling, are entirely relevant to this case, and

8   we should be able to elicit that kind of reaction as his

9   interpretation of what Martin was saying to him.

10       MR. AGNIFILO:  The question of what's your reaction

11  has nothing to do with that answer.

12       MS. KASULIS:  Yes, it does.

13       MR. AGNIFILO:  No, it doesn't.

14       MR. SRINIVASAN:  Your Honor, we previously asked the

15  witness about immediate harm including the deprivation and

16  inability to make decisions about economic decisions, and this

17  goes directly to that.

18       MR. BRAFMAN:  Well, you've asked him that, and he

19  said he missed opportunities to invest in this last answer.

20       What he said was I believe that Martin was basically

21  trying to scam me.  And two days later he gets his money back.

22       MS. KASULIS:  But that's then your argument.  That's

23  your argument as to why it is the jury should not credit his

24  statement, but that was his reaction at the time.  How did he

25  know at that point in time he was going to get his money back

ANGELA GRANT, RPR, CRR

SIDEBAR CONFERENCE

1    in two days?

2         MR. AGNIFILO:  He's giving a thought and to question

3    what his reaction is, it's a very discrete answer, I was mad,

4    I was angry, I was disappointed.  Not I thought Martin was

5    scamming me.

6         THE COURT:  Well, he was expressing his frustration,

7    and based on these months of interactions since he got the

8    notice in September or October of the previous year about the

9    winding down and his initial immediate request for cash

10   redemption.  So here it is in April and the question was what

11   was your reaction.

12        I don't think it's appropriate for him to say what's

13   in Martin's mind.  But it would be all right for him to react

14   -- for him to answer the question what was your reaction or

15   what did you feel, you know, what was your understanding of

16   what was going on.  I think he should avoid testifying to

17   what's in Mr. Shkreli or anyone else's mind at the time.

18        MR. AGNIFILO:  So we move to strike that portion of

19   his answer.

20        THE COURT:  So what I'll do is I will strike the

21   portion of the testimony that may relate to what's in

22   Mr. Shkreli's mind, but you will be able to elicit what his

23   understanding was of the situation and how he viewed his

24   situation at that time.

25        MR. SRINIVASAN:  Okay.

ANGELA GRANT, RPR, CRR

Kocher – Direct – Srinivasan

1          THE COURT:  I'll just say on the record that the

2     witness should not testify about what he believes is in

3     someone else's mind, but he may testify about his own reaction

4     to the situation.

5          Would that be acceptable?

6          MR. AGNIFILO:  Yes.  Thank you, Judge.

7          MS. SMITH:   Your Honor, just for the record, we

8     went back and looked at the defendant's statements.

9          THE COURT:  Yes.

10          MS. SMITH:  We have sliced them thinner than I

11     thought and so there isn't the statement that he disclosed the

12     loan to the limited partners actually is not within the

13     statements so we're not going to circle back to that question.

14          MR. KAPLAN:  The fact is that he did not give

15     written --

16          MS. SMITH:  He said he gave oral, but we didn't

17     actually put that one in, so we won't circle back to that

18     earlier question.

19          THE COURT:   You will not?

20          MS. SMITH:  Right.

21          (Sidebar conference concluded.)

22          (Continued on the following page.)

23
     Official Court Reporter
24

25

ANGELA GRANT, RPR, CRR

2377

Kocher – Direct – Srinivasan

1

2          MR. SRINIVASAN:   Your Honor, may I proceed?

3          THE COURT:  Just one moment.  I'm just trying to

4    find the testimony that I've agreed to strike.

5          MR. SRINIVASAN:  Sure.

6          THE COURT:  The jury is instructed to disregard

7    testimony regarding what may be in someone else's mind.  A

8    witness may testify about what his view or understanding is

9    and what is in his own mind, but we can't have testimony about

10   what may be in someone else's mind.

11         So, Mr. Srinivasan, you may elicit testimony

12   regarding this witness' reaction to the email exchanges that

13   he had with Mr. Shkreli over the course of these months.

14         MR. SRINIVASAN:   Yes, Your Honor.  Thank you.

15   Q    Mr. Kocher, if we go back down actually to the email that

16   we had just read previously.

17   A    Yes.

18   Q    You said if I don't see an agreement from you by

19   tomorrow, then the deal we have agreed to will be off and I

20   will be forced to have you deal with my lawyer.

21         Do you see that?

22   A    Yes.

23   Q    Did you, in fact, use a lawyer --

24   A    Yes.

25   Q    -- after this point?

ANGELA GRANT, RPR, CRR

Kocher - Direct - Srinivasan

1    A    Yes.  I used David Trachtenberg.

2    Q    After Mr. Trachtenberg got involved, did you and the

3    defendant reach an agreement about your redemption?

4    A    We did.

5    Q    Was it a signed agreement?

6    A    Yes.

7    Q    I'm showing you Government's Exhibit 107-32 which is tab

8    32 in your binder marked for identification.

9         Do you recognize this document?

10   A    Yes.

11   Q    What is it?

12   A    It's the settlement -- well, it's an email sent from Mr.

13   Evan Greebel to David Trachtenberg.

14   Q    Did you receive this document?

15   A    Yes.

16        MR. SRINIVASAN:  Your Honor, we move to admit

17   Government's Exhibit 107-32.

18        MR. AGNIFILO:  107-32 is the email and the document?

19        MR. SRINIVASAN:  Yes.

20        MR. AGNIFILO:  No objection.

21        THE COURT:  All right.  We will receive 107-32.

22        (Government Exhibit 107-32, was received in

23   evidence.)

24   Q    Mr. Kocher, in this email Evan Greebel writes on May 14,

25   2014 attached is the dually executed settlement agreement.  Do

ANGELA GRANT, RPR, CRR

Kocher - Direct - Srinivasan

1    you see that?

2    A    Yes.

3    Q    Is there an attachment to this email?

4    A    Yes.

5    Q    Going to the second page, which is Bates numbered

6    GR0001255.  What is this document here?

7    A    It's the settlement agreement.

8    Q    Now, if we can go to the last page which is Bates number

9    GR0001262 and go one more page.

10         Is your signature on this page?

11   A    Yes.

12   Q    Where is it?

13   A    My signature is at the top left.

14   Q    The top left of Government's Exhibit 107-32?

15   A    I guess so.

16   Q    And do you know whose signatures are on the right-hand

17   side?

18   A    Martin's signatures.

19   Q    And which entities was the defendant signing for?

20   A    He was signing individually.  He was signing for

21   Retrophin as the CEO, he was signing for MSMB Capital

22   Management LLC as a managing member; he was signing for MSMB

23   Capital Management LP as the managing member; and he was

24   signing for MSMB Healthcare LP as the managing member.

25   Q    Now, let's go back to the second page of this exhibit

Kocher – Direct – Srinivasan

1   which is the Bates numbered GR0001255.

2   A     Yes.

3   Q     Mr. Kocher, the top says settlement and release

4   agreement.  And who are the parties to this agreement in that

5   first paragraph?

6   A     The parties are myself and Martin and MSMB Capital

7   Management LP, MSMB Capital LLC, MSMB Healthcare, MSMB

8   Investors, MSMB Management and MSMB entities along with

9   Retrophin.

10  Q     Did you have any understanding of why Retrophin was a

11  party to this agreement?

12  A     Well, I assumed that.

13  Q     At the time did you have any understanding?

14  A     Not exactly, no.

15  Q     And if we go down the page, the paragraph that says

16  payment terms.

17  A     Yes.

18  Q     What were the terms?

19  A     The payment terms were that they would pay me $123,711 as

20  a cash payment which was basically in return for that

21  Retrophin stock that was restricted.  And then they gave me

22  47,128 shares of common stock.

23  Q     Mr. Kocher, if we could be specific.  Who agreed to give

24  you the $123,711 based on this paragraph?

25  A     Martin.

ANGELA GRANT, RPR, CRR

Kocher - Direct - Srinivasan

1    Q     If you look at the first sentence.

2    A     Yeah.  Oh, it says MSMB entities or Retrophin

3    individually or collectively to payor agree to deliver or

4    cause to be delivered to releasor the total amount of $123,711

5    in cash payment.  And Shkreli agrees to deliver or cause to be

6    delivered to the releasor the total amount of 47,128 shares of

7    common stock.

8    Q     Did you, in fact, receive the $123,711?

9    A     Yes.

10   Q     Did you receive the 47,128 shares?

11   A     Yes.

12   Q     Showing you what's been marked for identification as

13   Government's Exhibit 107-33.  It's tab 33 in your binder.

14          Do you recognize this document?

15   A     Yes.

16   Q     What is this?

17   A     This is the common stock that I was given, the 47,128

18   shares of Retrophin.

19          MR. SRINIVASAN:  Your Honor, we move to admit

20   Government's Exhibit 107-33.

21          MR. AGNIFILO:  No objection.

22          THE COURT:  We receive 107-33.

23          (Government Exhibit 107-33, was received in

24   evidence.)

25   Q     Mr. Kocher, was it your understanding that these shares

ANGELA GRANT, RPR, CRR

Kocher - Direct - Srinivasan

1   were restricted or unrestricted?

2   A    Unrestricted.

3   Q    For what company were these shares?

4   A    This is from Retrophin.

5   Q    Mr. Kocher, did you sell your shares of Retrophin?

6   A    Yes.

7   Q    And could you describe that process, please.

8   A    Well, I briefly described it before, but this was very

9   thinly traded stock.  So I have 47,000 shares here and I want

10  to get rid of it the next day, but if I did that the stock

11  would probably go down to $0.50 a share so I couldn't.  The

12  most I could sell was about a thousand to 2,000 shares every

13  week or two.  And I had to kind of, you know, check the price

14  and, you know.  I had to find out, you know, when it made

15  sense to sell it and it was over a matter of I think six or

16  seven months.  I don't remember exactly.

17  Q    Did you do this yourself or did you have a broker?

18  A    I had a broker.  There was only one or two brokers that

19  would even deal with Retrophin.  I had a hard time finding

20  them.  And -- anyway, it was a painful process because, you

21  know, you can only sell a little bit at a time.

22  Q    Approximately how much did you make at the end of the

23  process?

24  A    Well, in terms of the actual sales price, it varied.  So

25  it went from anywhere from, you know, $3 up to over $10 a

ANGELA GRANT, RPR, CRR

Kocher - Direct - Srinivasan

1  share.  But, you know, I suppose -- I don't know the exact

2  number.  I have to look it up and, you know, review it, but my

3  recollection in terms of the ballpark was that the 200,000

4  that I originally invested became close to 350.  But that's

5  without taking into account my time dealing with Martin, you

6  know, this whole process, paying my lawyer, paying for fees

7  and other expenses that I incurred because I didn't have the

8  cash.

9  Q    Mr. Kocher, you received the wind down email in September

10 of 2012 which I believe you testified to earlier?

11 A    Yes.

12 Q    And when did you get these shares?

13 A    This was in April sometime, I believe.

14 Q    Mr. Kocher, if I could direct your attention to 107-33.

15 Is there a date on these shares?  It's tab 33 in your binder.

16 A    Oh, yes, there is, May 23, 2013.  So it's -- oh, so it's

17 all the way at the end of May.

18           THE COURT:  May I ask a question?

19           MR. SRINIVASAN:  Yes, Your Honor.

20           THE COURT:  You said, sir, that you had invested

21 $200,000 and it had become $350,000.

22           Are you talking about the value of your initial

23 investment based on those monthly reports that we saw earlier

24 or are you talking about what you ultimately realized in the

25 cash that you received in settlement plus the shares that you

ANGELA GRANT, RPR, CRR

Kocher – Direct – Srinivasan

1  sold?

2          THE WITNESS:  Okay.

3          THE COURT:  I want to know what that 350,000 is that

4  you referred to earlier.

5          THE WITNESS:  Yeah, the original –– my original

6  money that I put in was 200,000.

7          THE COURT:  Right.

8          THE WITNESS:  But, yes, I ended up with the cash

9  which was 123,000 approximately, plus the sale of the 47,000

10  shares.  So if you added those up you would end up with

11  somewhere in the neighborhood of 350,000.

12          THE COURT:  Thank you.

13          MR. SRINIVASAN:  One moment, Your Honor.

14          (Brief pause.)

15          MR. SRINIVASAN:  No further questions at this time.

16  Thank you.

17          THE COURT:  Would the jurors like a break before we

18  take time for the cross examination?  All right.  Please don't

19  talk about the case, and we will come and bring you back in

20  about ten-to-fifteen minutes.  Thank you.

21          (Jury exits the courtroom.)

22          THE COURT:  Sir, you can step down and take a break.

23          All right.  Let's take a few minutes.  Thank you.

24          (Recess taken.)

25          (Continued on the following page.)

KOCHER – CROSS – MR. AGNIFILO

1          COURTROOM DEPUTY:  Jury entering.

2          (Jury enters the courtroom.)

3          (Witness takes the witness stand.)

4          THE COURT:  All the jurors are present.  Please have

5     a seat, everybody.

6          Mr. Agnifilo, if you would like to cross-examine

7     this witness, you may.

8          MR. AGNIFILO:  Thank you, Judge.

9          THE COURT:  And I remind him that he is still under

10    oath.

11    CROSS-EXAMINATION

12    BY MR. AGNIFILO:

13    Q    Good morning, Mr. Kocher.

14    A    Good morning.

15    Q    My name is Mark Agnifilo.  I am one of Martin Shkreli's

16    lawyers.

17          I am going to ask you some questions, won't be

18    terribly law.  If I ask you a question and you don't

19    understand my question, please ask me to rephrase it.  I'm

20    happy to do that, okay?

21    A    All right.

22    Q    We will start by referring to some of the documents that

23    are already in evidence.

24          Do you still have your government book up there?

25    A    Yes.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

KOCHER - CROSS - MR. AGNIFILO

1    Q    All right.

2         I'm going to ask you to look at 107-15 which I think

3    is your Tab 15?

4    A    Okay.

5    Q    Let me get this up here a second.  You can see that okay,

6    Mr. Kocher?

7    A    Yes.

8    Q    All right.

9         So I want to -- I know we talked about this on

10   direct examination.  I want to refer you to the bottom of the

11   last paragraph of this document and tell me if I read this

12   correctly.

13        It says, "Based upon this information, I potentially

14   will exercise my rights to weekly redemption (side letter to

15   you) as this is a formal question.  I have CC'd your attorney

16   Evan Greebel, my attorney Jim Burke.  I expect an expedited

17   response."

18        Do you see that there?

19   A    Yes.

20   Q    And you see the date of this e-mail is Monday, March 11,

21   2013; correct?

22   A    Yes.

23   Q    All right.

24        So this here you're making a formal -- you're saying

25   -- you're calling it -- potentially I will exercise my rights

KOCHER - CROSS - MR. AGNIFILO

1    to weekly redemption.

2              Why did you say "potentially"?

3    A    Good question.  I'm not sure why I would say potentially.

4    Q    Well, let's go to the next e-mail, and let's see if this

5    refreshes your recollection as to why you said "potentially."

6              We're going to go to what's been marked as 107-16,

7    and we're going to look at the top of the e-mail here.

8              Do you see that here?

9    A    Yes.

10   Q    All right.

11             So this is March 12th.  This is the day after the

12   e-mail we just looked at where you said you potentially

13   exercised your redemption.  And what you're saying here, and

14   I'm looking at the top e-mail from March 12th at 4:52 p.m.,

15   it's from you to Martin; correct?

16   A    Yes.

17   Q    And it's copied to Evan Greebel, a lawyer.  Correct?

18   A    Yes.

19   Q    And you said on direct that was Martin's personal lawyer?

20   A    I didn't say "personal," I don't believe.  I might have

21   said it was Martin's lawyer, but it was my understanding that

22   it was either Martin's lawyer or the lawyer for MSMB.

23   Q    Okay.

24             Do you have an understanding it was MSMB'S lawyer

25   and then later Retrophin's lawyer.

KOCHER – CROSS – MR. AGNIFILO

1           Do you have that understanding?

2    A    No.

3    Q    You said you have a lawyer there representing you named

4    Jim Burke?

5    A    Yes.

6    Q    Okay.

7           And I want to read the last two partial sentences

8    here starting with, "I would assume."  Do you see that there?

9    It's the second line on the top e-mail to the right.

10   A    Yes.

11   Q    Okay.  It says, "I would assume my account value would be

12   higher to compensate for illiquidity, so how many shares are

13   you giving me?"

14          You see where you say that?

15   A    Yes.

16   Q    Your negotiating there, isn't that fair?

17   A    I felt like there was a negotiation going on the whole

18   time.

19   Q    Right.  Okay.

20          And you think Martin's negotiating with you, and

21   you're negotiating with Martin; correct?

22   A    Well, the thing was I was trying to find out what my

23   account value was.

24   Q    But that's not what you're doing here; right?

25   A    No, but I did on numerous occasions try to get --

KOCHER - CROSS - MR. AGNIFILO

1    Q    But you were --

2    A    My main account --

3    Q    I'm talking about a specific e-mail --

4         THE COURT:  Sir, you both can't talk over each

5    other.  So he was speaking, let him finish.

6    Q    Go ahead.  You said you had something you wanted to say.

7    A    Yes.  I tried for months to try to find out what my

8    account value was and I never got a straight answer on it.

9    Q    So let's talk for a second again about Government's

10   Exhibit 107-16, okay?

11        Talking about Government Exhibit 107-16.  What

12   you're saying is, "I would assume my account value would be

13   higher to compensate for illiquidity.  How many shares are you

14   giving me?"

15        You're not asking for cash in that statement;

16   correct?

17   A    In that statement, but that's because, at that point,

18   they weren't offering me cash.  Even though they said they

19   were going to give me cash, from what I knew, they were

20   offering Retrophin stock.

21   Q    So what you're doing here is you're not asking for cash

22   in this statement, yes or no?

23   A    In this I'm not asking for cash, not in this statement.

24   Q    Okay.

25        What you're asking for in this statement -- what

KOCHER - CROSS - MR. AGNIFILO

1    you're saying is, "So how many shares are you giving me?"

2    That is what you want the answer to be; correct?

3              In this statement, that's what it says; right?

4    A    In this statement, yes.

5    Q    And what you're also saying in the partial sentence

6    before is you want more shares because of the illiquidity of

7    the Retrophin shares --

8              MR. SRINIVASAN:  Objection.

9    Q    -- true?

10             THE COURT:  Sustained.

11   Q    Is that what you're asking?

12             THE COURT:  I sustained the objection.

13   Q    When say, "I would assume my account value would be

14   higher for compensate for illiquidity, what are you saying?

15             MR. SRINIVASAN:  Objection.  He's not reading the

16   whole sentence.

17             THE COURT:  Sustained.

18   Q    I will read the whole thing.  Let's read the entire

19   e-mail.

20             My's last account value was $280,000 and it was in a

21   diversified healthcare portfolio, MSMB, which was net neutral.

22   If my redemption is in Retrophin shares which are thinly

23   traded, then I would assume my account value would be higher

24   to compensate for illiquidity."

25             Right?  That's what you wrote?

KOCHER - CROSS - MR. AGNIFILO

1    A    That's correct.

2    Q    Okay.

3        And is what you're saying there that because of the

4    illiquidity of the Retrophin shares you want more?

5    A    That's correct, but I would prefer cash.  But, at that

6    point, I didn't know that, you know, it seemed to me I wasn't

7    going to be able to get the cash.  That was my problem.  What

8    I needed was, you know, I needed liquidity at that point, not

9    Retrophin shares even though I'm talking about it here.  But

10   that's because my feeling was that was the only way I was

11   going to get my money back.

12   Q    But what you want is you want more Retrophin shares.  You

13   want a number of Retrophin shares to make up for the fact that

14   the Retrophin shares are thinly traded or illiquid; correct.

15            MR. SRINIVASAN:  Asked and answered.

16            THE COURT:  Sustained.

17   Q    I mean, you agree with me that here you are negotiating

18   with Martin; correct?

19            MR. SRINIVASAN:  Objection.

20            THE COURT:  Sustained.

21   Q    Did you get an answer about how many shares he would give

22   you?

23   A    No.

24   Q    Now, did you have an idea as you wrote this what you

25   thought would be fair?

KOCHER – CROSS – MR. AGNIFILO

1   A     My problem was I needed cash and, you know, I was just

2   trying to get my money back any way I could do it.  But the

3   problem was, I didn't know what my account balance was.  So I

4   had been told that it was at the end which I didn't get

5   statements for –– this was in 2012 –– that it was worth,

6   approximately, 280,000.  That was for account balances that I

7   never got statements for.

8   Q     You'll agree with me that the purpose of this e-mail is

9   to see how many shares of Retrophin you could get; correct?

10              MR. SRINIVASAN:  Objection.

11              THE COURT:  Sustained.

12              MR. AGNIFILO:  Your Honor, can we go to the side?

13              THE COURT:  Yes.

14              (Continued on the next page.)

15              (Sidebar conference.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  The problem is you're repeating.  You're

5    going over it.  He already explained that at this point he was

6    asking for shares because he wasn't --

7          MR. AGNIFILO:  I don't have to accept that answer.

8          THE COURT:  I know.  But you're repeating the same

9    question.  You asked and answered -- the objection is asked

10   and answered.  You've gone over this already.

11         MR. AGNIFILO:  But he volunteers things that

12   undermine the answer.  I have a right to refocus the jury

13   on -- I don't think it's asked and answered.

14         THE COURT:  I can go back and look at it and show

15   you.

16         MR. AGNIFILO:  The point is, Judge, I have -- I

17   don't of it accept his answer.

18         THE COURT:  Of course you don't.  You keep asking

19   the same question over and over again.  That's what you're

20   doing, you're asking him the same question.

21         At this point, you wanted shares, didn't you?  You

22   already asked that and you already got an answer, so why do

23   you want to ask him again.

24         MR. AGNIFILO:  Because he backs off the answer by

25   continuing to narrate things that aren't part of the question

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1    but I'll move on.

2                THE COURT:  Please avoid repeating your same

3    questions over and over again.

4                Thank you.

5                (Sidebar discussion concludes.)

6                (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KOCHER – CROSS – MR. AGNIFILO

1        (In open court.)

2    CROSS-EXAMINATION

3    EXAMINATION BY

4    MR. AGNIFILO:

5    (Continuing.)

6    Q    Sir, how many shares did you expect?

7    A    I was expecting cash.  So I'm saying here, "If my

8    redemption is in Retrophin shares" because they're telling me

9    they want to give me Retrophin shares.

10   Q    And since you're asking for Retrophin shares, how many

11   are you expecting?

12   A    I'm trying to get my $280,000 back that I believe my

13   account balance was in cash.  So, if it's Retrophin, I would

14   expect more shares because it's thinly traded; however, that

15   wasn't my preference.  It was to get Retrophin shares.

16   Q    Now, you know how to negotiate as part of your business;

17   correct?

18   A    I would hope so.

19   Q    Okay.

20        Tell us a little bit about your business again.  I

21   know you talked about it on direct examination.

22   A    I'm a contractor, so I build for individuals and do

23   brownstones in Hoboken and Jersey City.  And I also build

24   buildings and, you know, buy property and build from scratch,

25   new construction.

KOCHER – CROSS – MR. AGNIFILO

1    Q      And do you hire subcontractors?

2    A      Yes.

3    Q      And how many subcontractors are in a typical brownstone

4    project?

5    A      Brownstone project, if it's just a renovation, may only

6    be four or five.  On a bigger project, if it's new

7    construction, it may be up to 15 or 20.

8    Q      And you have to negotiate at times with these

9    subcontractors; correct?

10   A      Yes.

11   Q      And the purpose of your negotiation is within the bounds

12   of fairness, obviously, for you to make as much as money in

13   the overall deal as possible; correct?

14   A      It's more on performance, you know.  You get two or three

15   bids in, so you don't necessarily take the low bid, you try to

16   get someone who is going to actually perform on time and do

17   the job right.

18   Q      And when the bids come in, do you sometimes negotiate

19   with the subcontractors on the bid?

20   A      Sometimes, yeah.

21   Q      And you try to get the bid lower?

22   A      Sometimes, but not always.  No.

23   Q      Have you ever negotiated with a subcontractor so the bid

24   would go higher?

25   A      Sometimes.

KOCHER – CROSS – MR. AGNIFILO

1    Q    You want them to charge you more?

2    A    If I want a better product, yes.

3    Q    Okay.

4         And sometimes you want to have the bid be lower;

5    correct?

6    A    Yes.

7    Q    Because that's how you make more money?

8    A    Right.

9    Q    So this is part of what you do professionally is you

10   negotiate with people; fair to say?

11   A    Yes, but my --

12   Q    I have no other question.

13   A    Okay.

14   Q    I'm going to turn your attention to what's been marked in

15   evidence as Government 107-22.

16        Now, you say in this e-mail, this portion here from

17   March 15, 2013, from 2:38 p.m. do you see that e-mail here?

18   A    Yes, uh-huh.

19   Q    And you send that e-mail to Martin; correct?

20   A    Yes.

21   Q    And it's to your lawyer at the time, Jim Burke; correct?

22   A    That's correct.

23   Q    Is Tier White; correct?

24   A    Yes.

25   Q    And kevin@stonecornergroup.  Who is that?

KOCHER – CROSS – MR. AGNIFILO

1   A      That's Kevin Mulleady.

2   Q      Kevin is on this e-mail chain; correct?

3   A      Yes.

4   Q      You continue to have some relationship of some sort with

5   Kevin Mulleady?

6   A      Yes.

7   Q      Do you continue to have a friendship or social

8   relationship with Kevin Mulleady?

9   A      Yes.

10  Q      So going seven lines down of that one-block e-mail, it

11  says, "I have already been in touch with counsel that is

12  versed in this kind of litigation."

13          Do you see that?

14  A      Yes.

15  Q      You want Martin to know that you have a lawyer ready, if

16  need be, who you say is well versed in this kind of

17  litigation; fair to say?

18  A      Yes.

19  Q      And you then, two lines below that, you go on to say, "I

20  also believe that as a manager of MSMB and CEO of Retrophin

21  that you have not lived up your fiduciary responsibilities to

22  me as LP, limited partner."  Right?

23  A      Right.

24  Q      "And I will require a full accounting of both MSMB,

25  Retrophin, and your financial involvement."

KOCHER - CROSS - MR. AGNIFILO

1          Then you say, "Also, I will make sure that this does

2    go public and will also go to the appropriate agencies."

3          Do you see that?

4    A    Yes.

5    Q    Now, you knew that Martin was the manager of MSMB;

6    correct?

7    A    Yes.

8    Q    And he was the CEO of Retrophin?

9    A    Yes.

10   Q    You understand that he founded Retrophin?

11   A    No.

12   Q    You didn't know that?

13   A    No.

14   Q    That he started Retrophin?

15   A    No.

16   Q    Do you know how Retrophin started?

17   A    No.

18   Q    Mulleady never told you how Retrophin started?

19   A    No, I thought Retrophin was already a company that he

20   acquired.

21   Q    Okay.

22          You thought he acquired Retrophin?

23   A    Yes.

24   Q    So you have no knowledge that he actually had the idea

25   and started it and founded it himself; correct?

KOCHER - CROSS - MR. AGNIFILO

1    A    That's correct.

2    Q    Now, at this point, you are trying to get as much out of

3    your investment as possible; correct?

4    A    I'm just trying to get my investment back.

5    Q    You would have been happy with $200,000 cash?

6    A    $200,000 cash would have done me very well at that point

7    because that was right about the time when I was trying to

8    close on this property.  And I wouldn't have had to bring in

9    an extra partner, which basically took 49 percent of this

10   whole project from me.

11   Q    So you talked about this pretty extensively on direct

12   examination.  What was you and your business going through

13   precisely at March 15, 2013?

14   A    We had a contract on two properties.  One of them was one

15   that was going to close that actually did close in April, and

16   it was a property in Jersey City that comprised of three lots.

17   Q    And you needed quick liquidity for that project?

18   A    In order to buy it, I put money down.  But I needed the

19   balance of the deposit to purchase it.

20   Q    On direct examination, you didn't testify at all about

21   anything regarding an MSMB Healthcare Private Offering

22   Memorandum; correct?

23        MR. SRINIVASAN:  Objection, your Honor.

24        THE COURT:  Overruled.

25   A    I don't know.  No, I guess not.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

KOCHER – CROSS – MR. AGNIFILO

1   Q    Do you know what that is?

2   A    The Private Offering Memorandum?

3   Q    Right.

4   A    It was probably a MSMB part of the paperwork.

5   Q    Did you read it?

6   A    Probably, yes.  I don't remember, specifically.  I read a

7   lot of stuff.  This is about MSMB.  I did read stuff

8   originally but that was, you know, now 2012, so that's five

9   years ago.

10  Q    Now, did you read the MSMB Healthcare, LP, Private

11  Offering Memorandum before you invested?

12  A    I assume I did.

13  Q    Can you recall, as you're sitting here today, whether you

14  read it or not?

15  A    I read paperwork on MSMB.  I don't remember specifically

16  what I read.

17  Q    Do you remember being advised that the general partner

18  will have the right to suspend the redemptions.

19          Do you remember reading that in the paperwork?

20  A    No.

21  Q    Did you read the entire document that you got?

22  A    I probably did.  I just don't remember specifics right

23  now.

24  Q    Wouldn't that have been a significant thing to have read?

25  A    Yeah.

KOCHER – CROSS – MR. AGNIFILO

1  Q     If, in the Private Offering Memorandum, it specifically

2  said that the general partner, at the general partner's own

3  discretion, can suspend redemptions, that would be significant

4  to you?

5  A     Yes.

6  Q     Because what you're saying what you wanted most of all

7  was ready liquidity; correct?

8  A     That's correct.

9  Q     So because you want ready liquidity, you invest in a

10 hedge fund that invests in healthcare stocks.  That was your

11 decision?

12 A     Part of the –– one of the statements that was in MSMB

13 before I actually did invest with them did say that they were

14 liquid, and that they were a diversified fund that was liquid,

15 and that we would be able to get our money back out in one

16 month.  That's what I remember.  That's what I went on.

17 Q     That's one of the things that's also in the Private

18 Offering Memorandum; correct?

19 A     Okay.

20 Q     But also in the Private Offering Memorandum, it says that

21 the general partner can suspend that.

22       Is this news to you?

23 A     Yes.

24 Q     It's news to you?

25 A     Yes.

KOCHER – CROSS – MR. AGNIFILO

1   Q    You've never heard of this before today?

2   A    No.

3   Q    And this is -- you have the Private Offering Memorandum

4   in your possession; correct?

5   A    I probably did, yes.

6   Q    When this was also going on, you were having a hard time

7   getting your money out.

8        Did you go back and look at it?

9   A    No one is going to say they were going to suspend

10  redemption.

11  Q    Did you see what the rules were?

12  A    Like I said, from my -- from what I knew, there was no

13  suspension of redemption.

14  Q    Right.  But my point is, did you ever, at any point while

15  this was going on, go back and take a look at any part of the

16  Private Offering Memorandum?

17  A    No, I didn't.

18  Q    Now, looking at Government's Exhibit 107-23 that's

19  already in evidence, already.  And I'm looking at Martin's

20  e-mail to you from Thursday March 21, 2013, at 10:27 p.m.

21       Do you see that part?

22  A    Yes.

23  Q    And, at this point, he said, "Hi, Rich, we've decided to

24  double the shares you've received."

25       You see that there?

KOCHER – CROSS – MR. AGNIFILO

1  A    Yes.

2  Q    And then, in response to Martin just above, you say, I

3  think it looks like the next day March 22nd at 10:38 a.m.,

4  "Doubling the shares doesn't cut it."

5       Correct?

6  A    Yes.

7  Q    At this point, you guys are in a full-blown negotiation

8  over the number of shares; fair to say?

9  A    Well, again, I'm at the time I'm looking for cash.  He's

10 not offering me cash, that's the problem.

11 Q    But, at this point, you'll agree with me that what you're

12 saying is that doubling the shares won't cut it; right?

13 A    That's correct.  In other words, doubling the shares

14 isn't going to give me back my account value.

15 Q    All right.  Because what you say is, "It will not bring

16 me back it my account 280K which was my last account balance

17 and it's not liquid."

18      Correct?

19 A    That's right.

20 Q    But you go on to say, but as you said it will be a start

21 to a solution; right?

22 A    Yes.

23 Q    Okay.  You're inviting him to do better; correct?

24 A    Well, I'm hoping he's going do give me some cash

25 somewhere along the line.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

KOCHER – CROSS – MR. AGNIFILO

1  Q    But you agree with me that in this statement you don't

2  ask for cash; right?

3  A    That's correct.

4  Q    He says that he'll double the shares and you're off to a

5  good start; correct?

6  A    I'm not saying it's a good start.

7  Q    What you are saying is --

8  A    That --

9  Q    It's a start to a solution, I'm sorry.  Right?

10  A    Yes.

11  Q    It's a start to a solution, that's what you said.

12       Now, at this point, did you have an idea of what

13  number of shares you would accept?

14  A    Again, I was still trying to get cash.

15  Q    Do you recall in any of these e-mails or conversations

16  with Martin if you specifically asked for cash at this time?

17  A    Yes.  I did ask for cash, but what he started out by

18  doing was giving me restricted shares of Retrophin.  But it

19  was always my understanding that we had a choice of cash or

20  Retrophin or a combination.

21  Q    But you would agree with me at this point how many shares

22  of Retrophin you're going to get because you're not willing to

23  accept merely doubling of his first offer; correct?

24       MR. SRINIVASAN:  Objection, your Honor.

25       THE COURT:  Overruled.

KOCHER – CROSS – MR. AGNIFILO

1  A    Again, my feeling was I needed cash, he's not offering me

2  cash.  If he's going to offer me Retrophin, it's not worth as

3  much to me.

4  Q    So you want more?

5  A    Yeah.  I preferred cash, though.  But, yes.

6  Q    Listen, I understand you prefer cash.  You have made that

7  so clear.

8  A    Okay.

9  Q    All right.  And I won't forget it.

10        But what you're actually talking about is you want

11  more shares; correct?

12  A    Than what he's offering here, yes.

13  Q    Good.  Okay.  Let's go on.

14        Government Exhibit 107-26 it's in evidence.  You see

15  the e-mail that you send to Martin from Wednesday, March 27th,

16  at 8:41 p.m.?

17  A    Yes.

18  Q    Okay.

19        And you say, "Well, I'm willing to be patient, but

20  the bank wants to see liquid assets in order for me to close a

21  large real estate deal."

22        That's the deal you just told us about five minutes

23  ago; correct.

24  A    That's correct.

25  Q    The one in Hoboken; correct?

KOCHER – CROSS – MR. AGNIFILO

1   A     No, that --

2   Q     Jersey City?

3   A     I had two deals at the time.  One was Jersey City, one

4   was Hoboken.

5   Q     Got it.  "I really can't afford to lose the deal."

6   A     Why.

7   Q     You got yourself overleveraged in these real estate

8   transactions; correct?

9   A     No, not really.  What I had relied on was what Martin had

10  said which was that by the end of 2012 that I would get my

11  money back in cash or in Retrophin stock, whichever I wanted.

12  So I had assumed that I got into these deals in 2012, okay?

13  So in 2012, I had both deals and I expected to get my account

14  balance back by the end of the year in 2012.

15            We're all the way into 2013 here at the end of March

16  and, you know, that's -- the problem was that, you know, I had

17  expected to be taken care of long before this.

18  Q     Now, did you ever send the Private Offering Memorandum to

19  the attorney that you had been working with at the time?

20  A     I don't remember.  I don't recall.

21  Q     You don't have any recollection as to whether you sent

22  the Private Offering Memorandum to the lawyer one way or the

23  other?

24  A     No.

25  Q     Wouldn't that have been an important thing for the lawyer

KOCHER – CROSS – MR. AGNIFILO

1    to know?

2    A    He may have asked for it; I might have sent it.  I don't

3    remember.

4    Q    Okay.  We're going to go ahead a few.

5         What we're looking at now is

6    Government Exhibit 107-29.  I think it's Tab 29 in your book.

7    A    Yes.

8    Q    I will put it up on the screen.  It's in evidence.

9         You see your e-mail to Martin.  It's April 3, 2013,

10   at 2:21 p.m.

11        Do you see it?

12   A    Yes.

13   Q    You say, "Martin, now, we're going on another two weeks,

14   and again, you're putting me in a bad situation."

15        Correct?

16   A    That's correct.

17   Q    All right.

18        And you say, "two weeks," because the first time

19   that you say that you're going to exercise your right to

20   weekly redemptions was March 11, 2013; correct?

21   A    I believe that's right.

22   Q    All right.

23        "So it's going on two weeks, and again, you're

24   putting me in a bad situation.  If I don't see an agreement

25   which tomorrow then the deal we have agreed will be off and I

KOCHER - CROSS - MR. AGNIFILO

1    will forced to have you deal with my lawyer."

2           Do you remember what deal you and he had agreed to

3    at that point in time?

4    A    It wasn't entirely clear because he had offered me cash

5    and stock and also more stock at a later date.  So there was

6    no -- that was the problem.  I never knew what my account

7    value was, I never knew what the actual deal was.  At this

8    point, honestly, I don't remember right now what it was.

9    Q    Okay.  But you're referring to a specific deal.  I mean,

10   you're saying --

11   A    We spoke on the phone about -- yes.  When we spoke on the

12   phone, he told me that he was going to give me a certain

13   amount of stock in cash, I believe.

14   Q    Okay.  Because you were saying, "Then the deal we have

15   agreed to will be off."

16   A    Right.

17   Q    So you and he agreed to a deal with specific terms as of

18   April 3, 2013.

19   A    They weren't specific enough.

20   Q    But you don't say that in the e-mail, do you?

21   A    I don't say that here, no.

22   Q    No, you refer to a specific deal.  "Then the deal will be

23   off."  That's what you say; right?

24   A    Yeah, but I think if you look at an earlier e-mail, it

25   does say -- I think he was offering me cash and stock, but he

KOCHER – CROSS – MR. AGNIFILO

1  was also promising me more stock which was nebulous as to how

2  much.

3  Q    Okay.

4        So what you're saying here when you're referring to

5  the deal that will be off, you don't know what the terms are

6  and you think the terms were vague.  Is that what you're

7  telling you us?

8  A    Yes.

9  Q    All right.

10       Now, he then says at the top, and this is the e-mail

11  from Martin to you, April 3, 2013, 2:49 p.m.

12       At the end, it says, "I don't know what Kevin told

13  you but it's not accurate."

14       Do you see that he wrote that to you?

15  A    Yes.

16  Q    Now, fair to say you were brought in to MSMB by Kevin

17  Mulleady; correct?

18  A    That's correct.

19       (Continued on the next page.)

20

21

22

23

24

25

KOCHER - CROSS - MR. AGNIFILO

1   (Continued)

2   CROSS EXAMINATION

3   BY MR. AGNIFILO:

4   Q    Now I know you testified about this on Friday on direct,

5   how do you know Kevin Mulleady?

6   A    He was an account manager for me and a financial advisor

7   at Smith Barney.

8   Q    Starting in 2010?

9   A    Approximately.

10  Q    You have grown to know him and trust him?

11  A    Yes.

12  Q    It was really Kevin Mulleady that told you that he

13  thought MSMB Healthcare would be a good investment for you.

14  A    Correct.

15  Q    You followed his advice?

16  A    Yes.

17  Q    Have you ever spoken with Martin before deciding to

18  invest?

19  A    No.

20  Q    Have you ever met Martin Shkreli?

21  A    No, not in person.  I talked to him on the phone.

22  Q    So right here in this very courtroom is the first time,

23  to your knowledge, that you and Martin Shkreli are in the same

24  room at the same time?

25  A    Yes, well, yes.

KOCHER – CROSS – MR. AGNIFILO

1    Q    Yes, right?

2    A    Yes.

3    Q    Are you hesitant?  Was there another time?

4    A    Well, Friday.

5    Q    That's a good witness.  That was terrific.  You're right,

6    very good.  One for the witness.

7              Other than Friday, so Friday was a first time that

8    you Martin Shkreli were at the same room at the same time?

9    A    That's correct.

10   Q    Now at one point you engage David Trachtenberg as your

11   attorney?

12   A    That's correct.

13   Q    And Mr. Trachtenberg is going to try to reach a

14   settlement with Martin and Evan Greebel, correct?

15   A    That's correct.

16   Q    And eventually a settlement is reached, correct?

17   A    Yes.

18   Q    There is a settlement agreement dated May 13 that is

19   Government's Exhibit 107-32?

20   A    Yes.

21   Q    I know you read part of this on direct examination --

22   incidentally, do you recall -- and I'm just changing the

23   subject for a second, do you remember when you identified

24   Mr. Shkreli in court on Friday?

25   A    No.

KOCHER – CROSS – MR. AGNIFILO

1        MR. SRINIVASAN:  Objection.

2   Q    You didn't?

3   A    I don't believe I did.

4   Q    Do you see him in court?

5   A    Yes.

6   Q    How do you know it's him?

7        MR. SRINIVASAN:  Objection.

8        THE COURT:  Sustained.

9   Q    That's fine, that's fine.  You know what he looked like.

10  A    Yes.

11  Q    Not because you've ever met him.

12       MR. SRINIVASAN:  Objection.

13       THE COURT:  Sustained.

14  Q    Okay.  Let's get back to the settlement here.  You have

15  it in front of you?

16  A    Yes.

17  Q    So it says that, "This settlement and release agreement

18  is made and entered as of May 13, 2013, by and among you

19  Richard Kocher, Martin Shkreli."  The first thing it's

20  personal to Martin Shkreli, you're settling first personally

21  with Martin Shkreli, correct?

22  A    Yes.

23  Q    Then MSMB Capital management LP, do you see that?

24  A    Yes.

25  Q    Settling with them as well?

KOCHER – CROSS – MR. AGNIFILO

1   A    Yes.

2   Q    Also settling with MSMB Capital Management LLC, correct?

3   A    Yes.

4   Q    You're settling MSMB Healthcare LP, do you see that?

5   A    Yes.

6   Q    You're settling with MSMB Healthcare Investors LLC, do

7   you see that?

8   A    Uh-huh.

9   Q    You have to answer yes or no.

10  A    Yes.

11  Q    You're settling with MSMB Healthcare Management LLC,

12  correct?

13  A    Yes.

14  Q    You're settling with MSMB Capital LP, right?

15  A    Yes.

16  Q    Then a whole collection of MSMB entities, correct?

17  A    Yes.

18  Q    Then you're also settling with Retrophin, correct?

19  A    Yes.

20  Q    Now was it your understanding at the time that you

21  entered into the settlement agreement that Retrophin was a

22  fairly young company?

23  A    I wasn't aware of the age of Retrophin.

24  Q    Okay.  And were you aware -- and you said that you

25  believe that Martin had acquired Retrophin, right?

KOCHER – CROSS – MR. AGNIFILO

1    A    Yes.

2    Q    Fair to say that -- what you're agreeing here is that

3    you're not going to bring any lawsuits against all of those

4    entities, correct?

5    A    Yes.

6    Q    You're also -- so you're not going to sue any of these

7    entities, correct?

8    A    That's correct.

9    Q    It's obviously a benefit to have an agreement with the

10   party that could be involved in litigation with you that they

11   agree that they are not going to sue you, correct?

12   A    That's correct.

13   Q    So fair to say Retrophin was getting something out of

14   this agreement from your perspective?

15           MR. SRINIVASAN:  Objection.

16           THE COURT:  Overruled.

17   Q    Retrophin was getting an assurance that you weren't going

18   to sue them, correct?

19   A    Yes.

20   Q    And you had a lawyer lined up, correct?

21   A    Yes.

22   Q    At the end of the day as part of this settlement

23   agreement you got some cash and you got some shares, correct?

24   A    That's correct.

25   Q    The cash portion was $122,700 correct?

KOCHER - CROSS - MR. AGNIFILO

1   A    Yes.

2   Q    Cash wired to your account?

3   A    Yes.

4   Q    Then you got 47,128 shares of Retrophin, correct?

5   A    That's correct.

6   Q    You said that was those were freely tradeable shares,

7   correct?

8   A    Yes, they were common stock.

9   Q    Right, right.  And you said that the stock is thinly

10  traded so you can't sell them in one big block like you can

11  with IBM or Google?

12  A    Yes.

13  Q    You have to sell them in tranches?

14  A    Yes.

15  Q    Do you remember if you sold them between July and October

16  of 2013?

17  A    I had to start selling them right away.  The stock was

18  very low, so I started selling them in May.

19  Q    All right.  And do you recall --

20  A    May, June, July.

21  Q    Right.  And do you recall about the average price was

22  about $6 a share?

23  A    It was less than that to start with.

24  Q    How much less?

25  A    It ranged between, I know I sold some for $4 a share, and

KOCHER - CROSS - MR. AGNIFILO

1    some, a lot of it was four and $5 a share.  I think it went

2    down as low as three at one point.  But basically it was

3    between four and seven is where I sold most of them.

4    Q    Do you have a clear recollection what you sold it for?

5    A    No.

6    Q    Do you recall that you sold it, for the most part,

7    between six and $8 a share?

8    A    No, I'd say as I recall, it would be closer to four to

9    seven.

10   Q    And do you recall that you sold the vast majority of the

11   shares for more than $6 a share?

12   A    No, I don't remember that.

13   Q    I'm going to refresh your recollection.  I'm going to ask

14   you a number of questions, my only questions for the time

15   being, sir, is if this refreshes your recollection.

16   A    Okay.

17   Q    Do you recall on June 11, 2013, selling a number of

18   shares for $6 and 48?

19   A    No, I don't remember specifically any of them.  But if

20   you have documentation that says I did, then I believe you.

21   Q    Well, that's your first mistake.

22        Do you remember on June 13 the high was 6.20 and the

23   low was 5.85, only if you remember?

24   A    No, I don't remember.  I'm sorry.

25   Q    That's all right.  Incidentally, who is Victor Abadia?

KOCHER - CROSS - MR. AGNIFILO

1    A    Victor was the person that I used to do the trading, to

2    sell the stock.

3    Q    He's the one who actually sold the stock?

4    A    That's correct.

5    Q    Fair to say that almost every day Victor would send you

6    an e-mail, every day that the markets that were open, Victor

7    send you an e-mail with what number of shares he was able to

8    trade that day, right?  Do you recall that?

9    A    No, I don't.  But I think it was more like weekly not

10   daily.

11   Q    Do you remember sometimes multiple e-mails in one day

12   from Victor?

13   A    I'm sure that happened.

14   Q    He always indicated what the price was, do you remember

15   that?

16   A    Yes.

17   Q    So he would tell you what the price was and he would tell

18   you what number of shares he was able to sell?

19   A    Right.

20   Q    Do you recall the vast majority of the sales were over $6

21   a share?

22   A    I don't remember.

23   Q    What was your recollection of how much you made on this

24   investment?

25   A    Well, if you don't subtract out lawyer fees and my time

KOCHER – CROSS – MR. AGNIFILO

1   and everything else then, my thinking was that it was in the

2   realm of 350,000.

3   Q   So then your $200,000 investments netted you $350,000,

4   correct?

5   A   Well, the profit on the 200 was maybe 150 or more.

6   Q   Okay.  So the $200,000 that you invested in 2012,

7   resulted in about $350,000 after the Retrophin shares were

8   sold in what you're saying is in the fall of 2013, correct?

9   A   Yes, something like that, probably slightly over 350, but

10  in that realm.

11  Q   Did you pay Martin any fee for your profit?

12  A   Why would I?

13  Q   Is that yes or no?

14  A   No.

15  Q   And I'll answer your question.

16          THE COURT:  Excuse me, you're not testifying, sir.

17  Q   Isn't it true that one of the reasons you might pay him a

18  fee is because you made $150,000 in the course of about a

19  year-and-a-half?

20  A   No.  I wouldn't know why I would pay him a fee for that.

21  The thing is for me, I spent five months just trying to get a

22  settlement.  Then I spent another five months trying to sell

23  the stock.  So you know, I'm sure my time is not worth what

24  you're time is worth, but at any rate my time is worth

25  something and I spent a lot of time.  And I'm here today

KOCHER - CROSS - MR. AGNIFILO

1    spending time where I'm getting nothing, I'm away from my

2    business.  So that on top of the fact that I had counted on

3    having the capital by April, so I could close this real estate

4    deal, that cost me a lot of money.

5    Q    Just so we're clear, you said five months, but you agree

6    with me that you sent that e-mail making a request for

7    redemption on March 11, 2013, correct?  If you need to see it

8    again I it can show it to you.

9    A    I remember it.

10   Q    Do you agree with the timing?

11   A    That's correct but I was trying to get --

12   Q    That's the only question.  Did you send that e-mail

13   asking for your redemption on that date?

14   A    Yes.

15   Q    March 11.

16   A    Yes.

17   Q    You got the stock certificate on May 23, 2013, correct?

18   A    Correct.

19   Q    Basically two months and 12 days later, correct?

20   A    What was the date you said, May what?

21   Q    March 11 was that e-mail redemption e-mail, then the

22   stock certificate is dated May 23, 2013.

23   A    That's correct.

24   Q    Kevin Mulleady recently lent you money, correct?

25   A    That's true.

KOCHER - CROSS - MR. AGNIFILO

1    Q    When was that?

2    A    I don't remember exactly.

3    Q    How much was it?

4    A    100,000.

5    Q    You told him you'd pay him back right away, correct?

6    A    No.

7    Q    You didn't tell him that?  You didn't tell him it was a

8    short-term loan?

9    A    No.

10   Q    Did you pay him back right away?

11   A    No.

12   Q    When did you pay him back?

13   A    I don't know exactly, but it was probably two-and-a-half

14   years later.

15   Q    So from time to time the nature of your business causes

16   you to be in a cash crunch; fair to say?

17   A    Yes.

18   Q    Fair to say that there are times when your business is

19   cash poor, correct?

20   A    Yes.

21   Q    And your business is cash poor but you have projects that

22   you're working on that you think will be profitable, correct?

23   A    That's correct.

24        MR. AGNIFILO:  One second, Judge.  No other

25   questions.

KOCHER - REDIRECT - MR. SRINIVASAN

1      THE COURT:  Any redirect, Mr. Srinivasan?

2      MR. SRINIVASAN:  Yes, your Honor, just briefly.

3  REDIRECT EXAMINATION

4  BY MR. SRINIVASAN:

5  Q     If we can pull up Government's Exhibit 107-12 in

6  evidence.  If we can zoom in on the top there.

7      Mr. Kocher, this is the e-mail that you got

8  notifying you that the MSMB Healthcare was shutting down; is

9  that right?

10 A     That's correct.

11 Q     The date on this is?

12 A     This is September 9, 2012.

13 Q     You got your shares about on September 23 -- May 23 of

14 2013; is that right?

15 A     That's correct.

16 Q     That's a nine month --

17     MR. AGNIFILO:  I'm going to object, leading his

18 witness.

19     THE COURT:  Try to rephrase.

20     How much time between September 9, 2012 and May 27,

21 2013.

22     THE WITNESS:  It's approximately nine months.

23 BY MR. SRINIVASAN:

24 Q     During that nine-month period, did the defendant ever

25 tell you that redemptions were suspended from MSMB Healthcare?

MARSHALL – DIRECT – MR. SRINIVASAN

1  A    No, he did not.

2           MR. SRINIVASAN:  Thank you, no further questions.

3           MR. AGNIFILO:  Nothing, Judge.

4           THE COURT:  You're excused.  Thank you for your

5  time.

6           (Whereupon, the witness was excused.)

7           MR. SRINIVASAN:  We're ready to call the next

8  witness, Schuyler Marshall.

9           (Witness takes the witness stand.)

10  SCHUYLER B. MARSHALL, called as a witness, having been first

11  duly sworn/affirmed, was examined and testified as follows:

12           THE WITNESS:  I do.

13           THE COURT:  State and spell your full name.

14           THE WITNESS:  S-C-H-U-Y-L-E-R, B., M-A-R-S-H-A-L-L.

15           THE COURT:  Thank you, please proceed.

16           MR. SRINIVASAN:  Thank you, your Honor.

17  DIRECT EXAMINATION

18  BY MR. SRINIVASAN:

19  Q    Good morning, sir.

20  A    Good morning.

21  Q    How old are you?

22  A    Seventy-one.

23  Q    Are you married?

24  A    Yes.

25  Q    Any kids?

MARSHALL – DIRECT – MR. SRINIVASAN

1    A    Three children.

2    Q    Any grandkids?

3    A    Two.

4    Q    Where do you live?

5    A    Dallas, Texas.

6    Q    How long have you lived in Dallas?

7    A    Since 1970.

8    Q    Could you please briefly describe your educational

9    background to the jury?

10   A    Yes, I attended University of Texas undergraduate, and

11   then went to University of Texas Law School graduating in

12   1970.

13   Q    What did you do after law school?

14   A    I went to Dallas, started working for a law firm called

15   Thompson & Knight.

16   Q    Did you specialize in any area of law?

17   A    Yes, litigation.

18   Q    How long did you work for Thompson & Knight?

19   A    Twenty-five-and-a-half years, until right at the end of

20   '95.

21   Q    What did you do after that?

22   A    I had represented a client called Rosewood Corporation in

23   a significant matter, and they essentially hired me away to go

24   in-house with them as initially general counsel and Senior VP

25   of finance.  And they subsequently with this was kind of a

MARSHALL – DIRECT – MR. SRINIVASAN

1   hand shake, they said, if you work out, don't get fired,

2   you're at will basis, if it works out the guy that was running

3   it wanted to have me as his successor, so within three years I

4   became CEO.

5   Q   What is the Rosewood Corporation?

6   A   A private corporation owned by a trust that engages in a

7   variety of different activities, such as ranching, oil and gas

8   drilling, both in domestically and in that sector of the North

9   Sea.  Real estate development.  Investment we called Rosewood

10  Private Investment, investments in small companies that we can

11  provide guidance or capital to help them grow.

12          Probably best known for the hotel business, Rosewood

13  Hotel and Resorts.  In fact, one of our hotels is in New York,

14  The Carlyle; however, we sold the hotel business about four

15  years ago.

16  Q   What is your position at the Rosewood Corporation?

17  A   Now I'm Chairman of the Board.

18  Q   Do you know an individual named Martin Shkreli?

19  A   Yes, I do.

20  Q   Have you met him in person?

21  A   Yes.

22  Q   Approximately when was the first time you met him?

23  A   It was sometime in the summer of 2010.

24  Q   Do you see him in the room today?

25  A   Yes.

MARSHALL – DIRECT – MR. SRINIVASAN

1  Q    Can you point him out and identify him by a piece of

2  clothing?

3  A    Well, he's got on a white shirt, no tie, and gray sport

4  coat or suit.

5         THE COURT:  We will note that Mr. Marshall has

6  identified Mr. Shkreli.

7         MR. SRINIVASAN:  Thank you, your Honor.

8  Q    Mr. Marshall, what were the circumstances that led to the

9  first meeting?

10 A    We have a tenant, had then and still do, a tenant in our

11 building, Colt Ventures.  The principal of that is a guy

12 Darren Blanton.  He touted Martin's expertise a lot, said we

13 should consider investing with him.  We do vet a number of

14 investing opportunities like this.  At first I thought, well,

15 you know probably this is not something we'd be interested in,

16 but after repeated praises of Martin and suggestion that this

17 could be a good investment for Rosewood, I decided to take a

18 meeting.  So we did have a meeting.

19 Q    Mr. Marshall, where was the first meeting?

20 A    It was in one of our conference rooms.

21 Q    When you say our?

22 A    Rosewood Corporation conference rooms.

23 Q    Who else was at the meeting?

24 A    Well Martin of course attended, and Darren Blanton sat

25 in, although he didn't say much.  From our side there was John

MARSHALL - DIRECT - MR. SRINIVASAN

1    Dziminski, who was then a VP and Kim Mandel, also VP private

2    investments.

3    Q      What did you talk about with the defendant at that

4    meeting?

5    A      Well, he described his hedge fund and his area of

6    expertise being pharmaceutical companies.

7    Q      What was the name of the hedge fund, do you recall?

8    A      MSMB.

9    Q      What did you tell you about the hedge fund?

10   A      Basically it was focused on small pharmaceutical stocks.

11   And what was different about it and interesting was that, a

12   lot of hedge funds call themselves hedge funds but they are

13   truly not, mostly by long.  By long, they invest in stocks

14   they hope will go up.

15          What he described was a fund that where he invested

16   long, meaning stocks he believed in; and also short, meaning

17   stocks that he thought were over-valued for one reason or

18   another and it was approximately even.  Sometimes he would

19   make more money on the short positions than his long

20   positions, so that was a true hedge fund.  That was

21   interesting.

22          And the second thing that was unique was he said

23   that he did not, he had been with previous hedge funds and did

24   not like the idea of investors' capital being tied up for a

25   long period of time.  Often times it's a year before you have

2428

MARSHALL - DIRECT - MR. SRINIVASAN

1   a chance to get your money out, they call it redeeming.  He

2   said he wanted to provide liquidity to investors on a monthly

3   basis.  Basically I thought this was a really good feature,

4   also showed confidence that he had in his hedge fund that he

5   would offer that.

6   Q    Was there any discussion about the size of the fund?

7   A    There was.  I can't remember details.  I got the

8   impression that it was fairly sizeable, but I can't really

9   quantify it.

10  Q    Was there any discussion about the performance of the

11  fund?

12  A    Yes, there was.  What he described was quite impressive.

13  Q    Was there any discussion about the rate of return or

14  anything else like that?

15  A    I believe there were figures based on inception-to-date

16  numbers, and I don't remember the specifics.  But I do

17  remember that they were better than you would normally expect

18  in a hedge fund like this.  Also very consistent because they

19  calculated them on a monthly basis.

20  Q    Did he mention anything about anyone else who was

21  involved in this fund?

22  A    The only one I remember because I asked, I assumed MS was

23  Martin Shkreli, and MB that was Martin (sic) Biestek, I think

24  was the CFO, I may be mispronouncing Biestek, but that was the

25  MB.

MARSHALL – DIRECT – MR. SRINIVASAN

1    Q    After this meeting in December 2010, did the Rosewood

2    Corporation invest in MSMB Capital?

3    A    This meeting was in the summer of 2010.  We did not,

4    Rosewood, did not invest.

5    Q    Is there any reason?

6    A    Let me just go back to the summer.  We considered whether

7    this was appropriate at the end of the meeting and felt it

8    didn't have a long enough track record, but interesting and

9    probably ought to watch and it and see how it develops

10   overtime.  Martin was young.

11   Q    Through the end of 2010 or so, did you have further

12   communications with the defendant?

13   A    Yes.  At the end of the meeting, frankly, I thought

14   Rosewood would invest.  I thought I would look at it and

15   consider investing myself, just as a precursor to Rosewood's

16   investment.  There were conversations after the meetings.

17         One thing that was unique in the meeting and after

18   the meeting was that Martin shared his ideas about specific

19   companies and the reasons why he thought they were

20   under-valued; and therefore he was long, or over-valued and he

21   was short.  He continued to do that after the meeting.  And so

22   I followed that.  I was frankly quite impressed because he was

23   right on all of his ideas.

24   Q    Did you follow through on any of those ideas in late

25   2010?

MARSHALL – DIRECT – MR. SRINIVASAN

1   A    Yes.  Sometime in the fall I invested small amounts in

2   ideas that he suggested, mainly just to keep my focus.  So I'd

3   watch him and see if they performed the way he thought they

4   should, or events unfolded the way he thought events would.

5   So, yes, I did follow him in that way.

6   Q    Did there come a point in time in which you decided to

7   invest in MSMB Capital?

8   A    Yes.  Towards the end of 2010 I said I would consider an

9   investment and decided that if I did invest it would be

10  through my IRA.

11  Q    Did you get any documents about the fund.

12  A    Yes, I did.

13  Q    What did you get?

14  A    I got an offering memorandum that was pretty lengthy, and

15  then attached to it was a subscription agreement.  And you

16  asked about the decision, I didn't decide to invest until I

17  read through those documents.

18  Q    I'm showing you what is marked for identification as

19  Government's Exhibit 6.  You have two binders there, in the

20  slightly bigger binder, it's tab 15.

21  A    I have it.

22  Q    Do you recognize this document?

23  A    Yes.

24  Q    What is it?

25  A    It's the private offering memorandum that he sent me.

MARSHALL - DIRECT - MR. SRINIVASAN

1          MR. SRINIVASAN:  We offer Government's Exhibit 6

2    into evidence.

3          MR. AGNIFILO:  No objection, your Honor.

4          THE COURT:  We'll receive Government's Exhibit 6.

5          (Government Exhibit 6, was received in evidence.)

6    Q    Sticking with the cover page, what was the name of the

7    fund?

8    A    MSMB Capital Management LP.

9    Q    What is the date on this document?

10   A    June 9, 2010.

11   Q    If we can go to the 11th page, Bates number MS000137, do

12   you see the paragraph that starts, "Capital withdrawals"?

13   A    Yes.

14   Q    The first sentence reads, "Limited partners may withdraw

15   any or all of their capital accounts, subject to certain

16   reserves which may be established by the general partner to

17   cover contingent liabilities of the partnership, monthly at

18   the last calendar day of each month, commencing one full month

19   after the date of their initial investment in the partnership,

20   upon not less than 30 days prior written notice to the general

21   partner."  Do you see that?

22   A    Yes, I do.

23   Q    What did this language mean to you?

24   A    Well, this confirmed what Martin had said in the meeting,

25   that he allowed monthly withdrawals of your investment.  And

MARSHALL – DIRECT – MR. SRINIVASAN

1    it was one of the things that I looked for to make sure it was

2    in here.  It was a very positive factor in deciding to invest

3    in the fund.

4    Q    Why was it a positive factor?

5    A    Well, if you invest in a fund, typically you're tied up

6    for a year so you're sort of stuck for that period of time

7    regardless of performance.  This was, if you didn't like the

8    way things were going you could withdraw your capital with 30

9    days' notice.  And I thought, not only was it a positive

10   feature, but also showed that Martin had a great deal of

11   confidence in that he was going to offer that.

12   Q    Let's go to the next page, Bates SM0000138.

13   A    Yes.

14   Q    Do you see the paragraph "auditors"?

15   A    Yes.

16   Q    "The general partner has selected Rothstein Kass &

17   Company as the partnership's independent certified public

18   accountants, which firm will issue an audit report on the

19   annual financial statements of the partnership."  Do you see

20   that?

21   A    Yes.

22   Q    What did this language mean to you?

23   A    Well, this was important, let me back up.  They reported

24   monthly results.  I was told that in the initial meeting, I

25   understood those were unaudited.  I knew they had an auditor.

MARSHALL – DIRECT – MR. SRINIVASAN

1    I don't think I knew at the meeting who it was, I may have,

2    but.  In any event, when I read this I saw they would have

3    annual audits.  Rothstein Kass is a well-regarded, independent

4    CPA firm.  And so that was obviously comfortable to know that

5    you would have an independent third-party reviewing the

6    records and certifying the financials on an annual basis.

7    Q    Is the name Rothstein Kass familiar to you?

8    A    Yes.

9    Q    What was your impression of Rothstein Kass?

10   A    That they were independent and competent.

11   Q    If MSMB Capital did not have an auditor would that have

12   changed your decision to invest?

13   A    I would say almost certainly yes.

14   Q    How?

15   A    Well, an enterprise like this should be audited on an

16   annual basis.  If they were not, that would be a big red flag.

17   I certainly would wonder why.  I would say almost certainly I

18   would not have invested if they had not had an independent

19   auditor.

20   Q    Let's go to the 17th page of the exhibit, Bates

21   SM0000143, the heading labeled "risk factors"?

22   A    Okay.

23   Q    The italicized paragraph under that heading says, "All

24   securities investments risk the loss of capital.  There can be

25   no assurance that the partnership will be profitable or that

MARSHALL – DIRECT – MR. SRINIVASAN

1    it will not incur losses.  Prospective investors should, among

2    other things, consider the risks summarized below before

3    investing in the partnership.  An investment in the

4    partnership is speculative, involves a high degree of risk

5    suitable only for person who are willing and able to assume

6    the risk of losing their entire investment."  Do you see that?

7    A     I do.

8    Q     You mentioned you invested in MSMB Capital with your IRA

9    account?

10   A     Yes.

11   Q     What was your thought process with respect to evaluating

12   the risks of this investment?

13   A     Well, first these risk factors are pretty standard.  In

14   fact when I read this I was sort of comforted by the fact that

15   I thought it was a well-crafted legal document.  The risk

16   factors in one form or another you see in almost every

17   investment like this.

18          The reason I thought it would be a good investment

19   for my IRA, was that it was a hedge fund.  And typically what

20   that means, or at least it meant to me, is that it's market

21   neutral.  Meaning, that if the market should go up then your

22   long position should be well and you might lose money on your

23   short position.  If it goes down the opposite occurs, you lose

24   money on your longs and you make money on your short

25   positions.  And therefore, in either market the fund had the

MARSHALL - DIRECT - MR. SRINIVASAN

1   potential to out-perform based on the expertise of the

2   manager.

3   Q      In terms of your IRA, how did you at the time view the

4   risks of this investment?

5   A      I viewed it certainly not risk-free, but I thought it was

6   a moderate risk investment that I could safely make.

7   Especially since if it started to where it wasn't working out,

8   I could withdraw the money on a 30-days notice.

9   Q      In the months that followed that 2010 meeting at the

10  Rosewood Corporation, what, if anything, did the defendant

11  tell you about MSMB Capital's returns?

12  A      If you're asking before I decided to invest, honestly I

13  can't recall specifics.  But the tenor it was positive, doing

14  well on a monthly basis.  And also I was watching the specific

15  ideas that he had talked about in the meeting as well as ideas

16  after the meeting, and they all performed like he thought they

17  would perform, either positively or negatively.

18  Q      Was your impression of MSMB Capital's performance

19  important for your investing decision?

20  A      Yes, sure.

21  Q      Why is that?

22  A      Well, you want to see a positive track record.  And also

23  I didn't want to see real wild swings one way or the other.

24  And what I saw was pretty consistent and pretty positive, a

25  few months you'd see slightly down, but the consistency was

MARSHALL – DIRECT – MR. SRINIVASAN

1    important and it was positive.

2    Q    If MSMB Capital was not profitable, would that have

3    affected your decision to invest?

4    A    Yes.

5    Q    How so?

6    A    Well, you want to see a track record that's positive and

7    if the track record had been one of losses, it would have

8    caused me not to invest quite frankly.

9    Q    A minute ago I think you talked about MSMB Capital's

10   investment strategy, was that important to your investment

11   decision too?

12   A    Yes, it was.  One thing that, let me just throw in that I

13   probably should have answered in response to one of your

14   earlier questions, was that I was a little concerned to make

15   sure that these investment returns were being generated

16   without the use of inside information.  And both in the

17   meeting and after the meeting, I was listening to the

18   rationale and the factors that were being used to make the

19   securities selection, and satisfied myself that this was not

20   something that was being done with a inside information but

21   rather just intensive study of public documents and analysis.

22   Q    Mr. Marshall, what sorts of companies did you believe

23   MSMB Capital invested in?

24   A    Well, they were primarily small pharma companies, often

25   times with a product that either might or might not get

MARSHALL - DIRECT - MR. SRINIVASAN

1   approved by the FDA.  So a lot of instances depended on FDA

2   decision, which could be positive or negative.

3   Q   At this point, in about December 2014, had the name Elea

4   Capital came up with your discussion with the defendant?

5   A   No.

6   Q   If the defendant had run a prior hedge fund that had

7   performed poorly, would that have been important for you to

8   know when you make your investment?

9        MR. BRAFMAN:  Objection, your Honor.

10       THE COURT:  I'll overrule the objection.

11  A   Yes, it would have.

12  Q   How so?

13  A   Well, you want to look at the entire track record of the

14  person who is making the security selection.  So if he had a

15  bad run, negative result, in it a prior hedge fund, that would

16  have certainly been something I would have taken into account.

17  Q   You also mentioned that you received a subscription

18  agreement; is that right?

19  A   Yes.

20  Q   I'm showing you what is marked for identification as

21  Government's Exhibit 25, which is tab 16 in your binder.

22  A   Yes, I have it.

23  Q   What is this document?

24  A   It's first a questionnaire, which you have to fill out to

25  show that you're qualified investor for this sort of

MARSHALL – DIRECT – MR. SRINIVASAN

1    investment.  Then it's a signature page, where you certify

2    that you answered truthfully and indicate an interest in

3    investing.

4    Q    If you go to Bates number SM000077, which is the 14th

5    page of this document?

6    A    Yes.

7    Q    What is that?

8    A    That's the signature page.  It has various information

9    about myself and at the bottom my signature.

10   Q    I think I meant the seventh page of the document.

11            THE COURT:  Are you moving this in or just showing

12   it to him for recollection?

13            MR. SRINIVASAN:  I am, your Honor.

14   Q    What does it say on the top?

15   A    Which page?

16   Q    SM000077.

17   A    It says, "Individual form of signature page to

18   subscription agreement."

19            THE COURT:  We move Government's Exhibit 25 into

20   evidence.

21            MR. BRAFMAN:  No objection.

22            THE COURT:  We receive Government's Exhibit 245.

23            (Government Exhibit 25, was received in evidence.)

24   Q    Mr. Marshall, when did you sign this subscription

25   agreement?

MARSHALL – DIRECT – MR. SRINIVASAN

1  A    I believe I signed it in December, I think December 14.

2  There is no date signed, blank in here.  I'm not sure why it's

3  different, but that's not my handwriting.

4  Q    What is the date of remittance the bottom of this page?

5  A    January 3rd, 2011.

6  Q    What did that mean?

7  A    That was the date that I was to remit the funds to

8  invest.

9  Q    At the top there it says, first line, "IRA plus Southwest

10 LLC FDO Schuyler Marshall IRA"?

11 A    Yes.

12 Q    What did that mean?

13 A    I had self-managed my IRA and I had recently approved

14 funds from another manager who wasn't performing well and put

15 some in the IRA fund in the brokerage firm.  You have to have

16 a custodian to invest in a fund such as this.  I decided to

17 put $200,000 in an account with IRA plus Southwest, which is

18 such a custodian.

19 Q    Is that the name of the IRA custodian?

20 A    That's right.

21 Q    How much did you invest in MSMB Capital?

22 A    200,000.

23 Q    You can put that away.

24       After you invested in MSMB Capital, did you receive

25 periodic performance updates about your investment?

MARSHALL – DIRECT – MR. SRINIVASAN

1    A    Yes.

2    Q    Who sent them to you?

3    A    Martin did, via e-mail.

4    Q    Did you rely on these performance updates?

5    A    Yes.

6    Q    Did you believe them to be accurate?

7    A    Well, they stated that they were unaudited; but yes, I

8    did believe they were accurate, subject to maybe slight

9    corrections if there was an audit.

10   Q    What was your overall impression of the fund's

11   performance?

12   A    Well, after investing I was very impressed.  It

13   essentially continued as to what had been described prior,

14   that it was consistent, some months were a few percents, some

15   months were better than that.  Only one month I think was in a

16   loss position.  It was just steadily increasing in value.

17   Q    Do you have a thinner binder there labeled 81 series?

18   A    Yes.

19   Q    There are eight tabs which are marked for identification

20   as Government's Exhibit 81-1 through 81-8.  Do you see those?

21   A    Yes.

22   Q    Do you recognize them?

23   A    Yes.

24   Q    What are they?

25   A    The e-mails that Martin sent me during 2011 describing

MARSHALL - DIRECT - MR. SRINIVASAN

1   the funds results.

2   Q     Did you read them during your investment with MSMB

3   Capital?

4   A     Yes.

5           MR. SRINIVASAN:  Your Honor, we admit Government's

6   Exhibit 81-1 through 81-8.

7           MR. BRAFMAN:  No objection.

8           THE COURT:  We will admit 81-1 through 81-8.

9           (Government Exhibit 81-1 through 81-8, was received

10  in evidence.)

11  Q     Let's start with 81-1, on what date was this e-mail sent

12  to you?

13  A     It states March 2, I believe that's the date it was sent.

14  Q     What month does the statement cover?

15  A     It covers returns through February, and also has an

16  inception-to-date return figure.

17  Q     According to this statement, what was the value of your

18  investment as of February 2011?

19  A     207,641.

20  Q     Mr. Marshall, under account values it says you invested

21  $199,195 there.  I believe a minute ago you said you invested

22  200,000, is there anything that explains the difference?

23  A     Well, what happened was this was a new custodian.  I

24  asked them to remit the funds to MSMB early in the year.

25  They, for some unexplained reason, filled out $199,195.  I

MARSHALL – DIRECT – MR. SRINIVASAN

1    contacted them, asked people why they didn't send the whole

2    200,000.  They didn't have a good reason for it.  I asked them

3    to send the other $805 ASAP, which they did.

4    Q    Was that deposited into the MSMB Capital account?

5    A    Yes, it was.

6    Q    Mr. Marshall, did the defendant ever talk to you about a

7    company called Orex, or Orexigen?

8    A    I don't believe so.

9    Q    Did he ever say anything about losses that were sustained

10   by MSMB Capital in February 2011?

11   A    No.

12   Q    Let's go to Government's Exhibit 81-8.  When was this

13   e-mail sent to you?

14   A    It states September 10, 2012, I believe that's the date

15   it was sent.

16   Q    What month does this statement cover?

17   A    It covers the period through June, and also adds

18   year-to-date and inception-to-date figures.

19   Q    What was the value of your investment according to this

20   statement?

21   A    282,237.

22   Q    In addition to getting these account statements, did you

23   ever speak to the defendant about the performance of the fund?

24   A    Yes.  We did speak periodically about the fund and also

25   specific investments.

MARSHALL - DIRECT - MR. SRINIVASAN

1    Q    Based on those conversations, what was your overall

2    impression of MSMB Capital's performance?

3    A    Well, that it was doing extremely well.  And it was doing

4    well primarily because Martin had very detailed knowledge of

5    the companies that he was investing in, either long or short.

6    Q    Mr. Marshall, looking at period between January of 2011

7    and September of 2012, did you ever attempt to redeem your

8    investment in MSMB Capital?

9    A    No.

10   Q    Was there any reason why not?

11   A    It was performing as I hoped it would.

12   Q    During the course of your investment, did the defendant

13   ever tell you in writing or verbally that redemptions were no

14   longer allowed to MSMB Capital?

15   A    No.

16   Q    During your time as an MSMB Capital investor, did you

17   become aware of a company called Retrophin?

18   A    Yes.  I received some documents about, that they were

19   trying to invest, have a second business I would say, that was

20   investment in a private company called Retrophin.

21   Q    Who is they?

22   A    Well, Martin and I assume his staff at MSMB.

23   Q    When you say a second business, could you elaborate on

24   that?

25   A    Well, the hedge fund as it was described to me was going

MARSHALL - DIRECT - MR. SRINIVASAN

1   to be investing in publicly-traded stocks, and either long or

2   short.  And they themselves had a lot of information about

3   them that Martin could analyze and decide whether to invest

4   either way.  This was a start-up of a private company.  And if

5   I remember correctly, I think he was, he had a candidate for

6   the initial drug that he was trying to get a license from a

7   university, I think Minnesota.

8   Q    When you say second business, did you believe there was a

9   relationship between MSMB Capital and Retrophin or?

10  A    I thought, I believe I was told that it was going to be a

11  separate business that was not connected to the hedge fund,

12  but an attempt to start a business from scratch.

13  Q    So to what extent were you told that MSMB Capital had

14  paid money to invest in Retrophin?

15  A    I don't believe I was told that.

16  Q    At some point did you learn that MSMB Capital was

17  shutting down?

18  A    Yes.  Later that year there was an e-mail I think to all

19  investors to that effect.

20  Q    I'm showing you what is marked for identification

21  Government's Exhibit 109-9.

22  A    I have that.

23  Q    If you look at the top of that e-mail, do you see your

24  e-mail address on this document?

25  A    Yes.

MARSHALL - DIRECT - MR. SRINIVASAN

1   Q    What is the date of the document?

2   A    It says it was sent Monday September 10, 2012.

3           MR. SRINIVASAN:  Your Honor, we move Government's

4   Exhibit 109-9 into evidence.

5           MR. BRAFMAN:  No objection.

6           THE COURT:  We will receive 109-9.

7           (Government Exhibit 109-9, was received in

8   evidence.)

9   Q    Mr. Marshall, do you recall getting this e-mail in

10  September 2012?

11  A    I recall the e-mail.  I'm not sure if I got it on the

12  date.  I'm not sure why, but it seems to me it might have been

13  a little later than this that I got it, but I do remember

14  getting it.

15  Q    If we could focus on the first paragraph, "I decided to

16  wind down our hedge fund partnerships with the goal of

17  liquidating of the funds by November or December 1st, 2012."

18  Do you see that?

19  A    Yes.

20  Q    What was your understanding what of that meant?

21  A    Well, that he had decided to close the fund down,

22  essentially.  And there was -- the document speaks to more

23  detail on the second page.

24  Q    Let me go to the second page?

25  A    It was my understanding he was going to shut the hedge

MARSHALL – DIRECT – MR. SRINIVASAN

1   fund down.

2   Q    Let's go to the second page.  The last paragraph?

3   A    Yes.

4   Q    "A few operational notes.  Investors will have limited

5   partnership interests redeemed by the fund by cash.

6   Alternatively investors may ask for a redemption of Retrophin

7   shares or a combination of Retrophin shares and cash."  Do you

8   see that?

9   A    I do.

10  Q    What did that language mean to you?

11  A    Well, that as the fund shut down they would be

12  liquidating all the investments and I could receive back the

13  cash that I had invested, plus the gains that had occurred in

14  the fund.  And I had the option, if I choose it, to take some

15  Retrophin shares in addition to cash.

16  Q    Mr. Marshall, at some point did you become familiar with

17  a reverse merger as it related to Retrophin?

18  A    I believe, I believe there was a later e-mail that

19  indicated that they had done such a reverse merger by

20  acquiring a shell company that was probably called Gateway.

21  Q    Let me go to Government's Exhibit 104-3, tab three in

22  your binder.

23  A    I see that.

24  Q    Marked for identification.  Do you recognize this?

25  A    Yes.

MARSHALL – DIRECT – MR. SRINIVASAN

1   Q    What is it?

2   A    It's a press release at the bottom with a cover letter

3   from Martin Shkreli dated December 18, 2012, with my response

4   at the top the next day, December 19.

5            THE COURT:  Speak into the microphone I'm having a

6   little trouble hearing you.

7            THE WITNESS:  Sorry.

8            MR. SRINIVASAN:  We move Defendant's Exhibit 104-3

9   into evidence.

10           MR. BRAFMAN:  No objection.

11           THE COURT:  We receive 104-3 in evidence.

12           (Government Exhibit 104-3, was received in

13   evidence.)

14   Q    Mr. Marshall, focusing on the e-mail that's in the

15   middle, from the defendant dated December 18, 2012, do you see

16   that?

17   A    Yes.

18   Q    He wrote, "Please see the attached press release.  As

19   many of you know I've started a biotechnology company

20   Retrophin, RTRX.  This is my primary focus going forward.  I

21   hope you will support me in my new role.  I'll use my 12 years

22   professional investing to get Retrophin to great shareholder

23   value."  Do you see that?

24   A    I do.

25   Q    If you go up to the e-mail on the top, what did you write

MARSHALL – DIRECT – MR. SRINIVASAN

1    back on December 19?

2    A    You want me to read what I wrote?

3    Q    Yes.

4    A    "Congratulations, Martin.  Sounds promising.  Does RTRX

5    have enough cash to get through phase two and/or start phase

6    three?  If not, what are the plans to secure the needed funds?

7    Approximately what percentage of the fund of value is

8    represented by RTRX?  And when do you plan to close it down

9    and distribute?  And am I correct in assuming that the

10   distribution will consist of cash and RTRX shares.  Schuyler."

11   Q    Mr. Marshall, at this point, did you have any

12   understanding of how much of the fund value was represented by

13   Retrophin?

14   A    I did not.  But based on the tenor the previous memo and

15   this one, I assumed it was a small portion, maybe several

16   percent something like that, because they were looking to get

17   more funds to grow Retrophin.

18   Q    What was your reaction to receiving this information

19   about Retrophin?

20   A    Well, I was a little surprised that MSMB had invested in

21   Retrophin, because I thought it was going to be all public

22   companies.  My reaction was that I'd like to get the cash back

23   into my IRA, and then I would follow this and possibly

24   consider a separate investment in Retrophin in the future if

25   it worked out.

MARSHALL – DIRECT – MR. SRINIVASAN

1    Q    By this point, what did you believe was the value of your

2    MSMB Capital investment?

3    A    I think the last thing that I had seen, it showed a value

4    about 282,000.

5    Q    After you received this e-mail did you try to redeem your

6    investment in MSMB Capital?

7    A    Yes, I did.

8    Q    In about what time frame was that?

9    A    Well, it was pretty much the whole spring of 2013.

10   Q    Who at MSMB Capital did you communicate with?

11   A    Martin.

12   Q    What did you communicate with him about what you wanted

13   in the redemption?

14   A    I wanted to get the cash back in my IRA.  And I was just

15   trying to basically exercise the liquidity right.  And also

16   plus they had represented back in the fall that, or he had

17   represented, that they would be distributing cash if you

18   wanted it soon.  And already it was past the date that that

19   cash was supposed to be out.  So I was interested in getting

20   that done and then possibly making a separate investment in

21   Retrophin.

22   Q    Now focusing on the late winter, early spring in 2013,

23   was the defendant responsive to your communications?

24   A    Well, I'd say intermittingly.  He was very busy, he said,

25   getting Retrophin started, and having various meetings with

MARSHALL – DIRECT – MR. SRINIVASAN

1    different people and so forth.  And I was trying to get him

2    focused on just getting this done, getting the cash back.

3    Q    Sticking with the Spring of 2013, did you receive

4    anything from the defendant in connection with your

5    redemption?

6    A    Well, somewhere in mid-spring I received a share

7    certificate of Retrophin.  I don't believe it had a cover

8    letter.  I don't remember it having one.  I hasn't asked for

9    it.  I was surprised that it showed up in the mail.

10   Q    How did it arrive to you?

11   A    By mail.

12   Q    How many shares did you get?

13   A    37,000 and some number, 37-plus, 37000-plus shares.

14   Q    I'm going to show you what is marked Government's Exhibit

15   104-6 for identification.  Look at this document and see if it

16   refreshes your recollection on the number of shares you got?

17   A    37,809.

18   Q    You can put that document away for now.  What was your

19   reaction to receiving this stock certificate?

20   A    Well, I was surprised because we hadn't discussed either

21   receiving any stock or certainly not an amount of stock.  It

22   just showed up.  And I looked at it, it was restricted stock,

23   meaning it couldn't be traded.  And so I was -- we had

24   discussion about that.  I said I really wanted cash, not

25   stock.  And I didn't want stock that was also restricted

MARSHALL - DIRECT - MR. SRINIVASAN

1   because I couldn't convert it to cash.

2   Q    So did you continue to have communications with the

3   defendant about your redemption after this point?

4   A    Yes.

5   Q    I'm showing you what is marked for identification as

6   Government's Exhibit 104-4, which is tab four in your binder

7   marked for identification, do you recognize this?

8   A    Yes.

9   Q    What is it?

10  A    It's a series of e-mails back and forth between Martin

11  and me spanning March and April of 2012, actually starting

12  February 2012.

13  Q    Take a look at the document, is it 2012?

14  A    I'm sorry 2013, yes, 2013.

15          MR. SRINIVASAN:  We move Government's Exhibit 104-4

16  into evidence.

17          MR. AGNIFILO:  No objection.

18          THE COURT:  We will receive 104-4.

19          (Government Exhibit 104-4, was received in

20  evidence.)

21  Q    If we go to the second page of this document, look at the

22  e-mail on the bottom.

23  A    Yes.

24  Q    This is from you to the defendant dated February 27,

25  2013?

MARSHALL – DIRECT – MR. SRINIVASAN

1    A    Yes.

2    Q    What did you write to the defendant?

3    A    "Martin, I received the RTRX share certificate with the

4    restricted legend on the back.  When does the company plan to

5    register these shares or otherwise make them tradeable?  Also,

6    you indicated that the fund would be liquidating and

7    distributing cash for the remaining balance, when will that

8    occur?  And what is my approximate remaining balance.  Thank

9    you, Schuyler Marshall."

10   Q    Why did you write this email?

11   A    Well, again, I was, what I really wanted was cash.  But I

12   was trying to find out what was going on and exert pressure

13   but in a more or less friendly way.

14   Q    Why friendly?

15   A    Well, I just thought that it would be the most effective

16   way to get the cash back in my IRA, by working together,

17   cooperatively Martin to get that done.

18   Q    Going to the next e-mail up, this is written by the

19   defendant to you on March 4, 2013.  He writes, "Hi, Schuyler.

20   I hope you're well.  There is no specific registration plan

21   other than we intend to register the shares as soon as

22   possible.  You may be familiar with Rule 144, which allows for

23   the sale of any unregistered security if held for over one

24   year.  I hope we can get them registered a lot sooner than

25   that, but hopefully that gives you some error bounds.  The

MARSHALL – DIRECT – MR. SRINIVASAN

1    fund focused primarily on growing Retrophin and as such this

2    is the only remaining asset.  I would be willing to buy back

3    your shares for the most recent quoted value of your fund, if

4    that is of use to you, or give you more shares from my

5    personal shares to true-up your account value.  It is

6    unfortunate the stock market doesn't like Retrophin as much as

7    I do.  However, over time I'm confident the shares will be

8    worth over a ton.  I wouldn't be quick to sell them if I were

9    you.  I'm happy to come to Dallas and give you an update on

10   what I'm doing."  Do you see that?

11   A     Yes.

12   Q     When the defendant wrote that Retrophin is the only

13   remaining fund, did you know this before you received this

14   e-mail?

15   A     No.

16   Q     What was your reaction to that news?

17   A     Well, that was pretty shocking.  Because up until that

18   point I had seen that it had positions in a number of

19   publicly-traded stocks that it had liquidated pending

20   distributing cash to the investors.  And when he said it's the

21   only remaining asset, I was quite surprised because I thought

22   it might be a very small investment of the fund and the rest

23   would be cash that resulted from the liquidation of the public

24   securities.

25
     (Continued following page.)

MARSHALL - DIRECT - SRINIVASAN

1   DIRECT EXAMINATION (CONTINUED)

2   BY MR. SRINIVASAN:

3   Q    Let's go to the next email up.

4        What did you write in response on March 4th, 2015?

5   A    Martin, thanks for responding.  What was my most recent

6   quoted accounted value.  I believe the last I saw in the early

7   fall was about 265,000.  I do need to consider the option as

8   these are IRA funds, as you know, and thus were intended for

9   conservative investment.  If I do take this option, I may buy

10  some RTRX in a smaller quantity, and in an account that fit an

11  expected investment in the future and look forward to

12  following it closely.  Regards, Schuyler.

13  Q    Now, going to the next email up.

14       He writes -- the defendant wrote to you on March 7,

15  2013:  Sorry for the delay, Schuyler, things are a little nuts

16  here.  The other thing I'll mention is the value of Retrophin

17  did fall from when MSMB invested in it.  We will make sure you

18  get $265,000 of value that you deserve, despite that.  I will

19  be back to you with an update soon.

20       Did you have any reaction to this?

21  A    Well I was -- I was pleased that he agreed to cash me

22  out.  And so I was hoping to making progress and I was

23  expecting to go in and wrap it up on that basis.

24       I think at some point I realized I had make a

25  mistake.  The last figure I had seen was actually 282, not

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

MARSHALL - DIRECT - SRINIVASAN

1    265.

2    Q    And going to the previous page, SM00054, at the bottom

3    there.

4             What did you write back on March 7th?

5    A    Yeah, it was the same day I responded to him.

6             Thanks for the response, Martin, as my investment

7    was with IRA funds, I appreciate your offer to buy back the

8    shares in exchange for the 265K.  Please let me know the best

9    way logistically to do this.  A simple one would be just to

10   exchange the share certificate for a check the next time you

11   are here, or that I am in NYC.  Would this work from your

12   standpoint.  I will be cheering RTRX on and may buy a small

13   number of shares in an account with a respective to investment

14   will be suitable and actively follow the company.  Regards,

15   Schuyler.

16   Q    Mr. Marshall, what were your feelings about the defendant

17   and your investment at this point?

18             MR. BRAFMAN:  Objection.

19             THE COURT:  Can you rephrase the question, please.

20   Q    Mr. Marshall, what were your -- what were your feelings

21   about your investment in MSMB Capital?

22             MR. BRAFMAN:  Objection.

23             THE COURT:  Overruled.

24   A    Well, I was concerned about my investment having learned

25   that instead of liquidating public securities and holding the

MARSHALL - DIRECT - SRINIVASAN

1    cash, that he said that the only investment in MSMB Capital

2    was Retrophin.

3    Q    And, Mr. Marshall, going up to -- sticking on SM00054,

4    the next email up.  This is March 20th, 2013.

5              What did you write?

6    A    Martin, it's been two weeks since the last of our

7    March 4-7 email exchange.  I would like to exchange the share

8    certificate for the check you offered in the emails of March 4

9    and 7, in order to put the funds into investment suitable for

10   an IRA.  Please let me know when and how we can complete this

11   exchange.  Best regards, Schuyler.

12   Q    And if we go another email up.

13             The defendant wrote on March 20th:  I will

14   definitely help you -- I will definitely help with this, just

15   on a California roadshow, back Monday.  Everything going great

16   and I'm sure I give this attention and priority it deserves.

17             And what did you write on April 1st?

18   A    Martin, glad things are great with RTRX.  Do you just

19   want to second a check for the exchange of the shares?  We

20   could have Darren as the middle, if you want, or I will be in

21   NYC later this month if we are to meet there to complete the

22   transaction.  The check should be to me as custodian or my

23   IRA.  Thanks, Schuyler.

24   Q    If we go up one more email.

25             The defendant wrote on April the 8th:  Hey,

MARSHALL – DIRECT – SRINIVASAN

1    Schuyler, sorry this is taking so long.  I'm going to send you

2    an agreement that will finalize the transaction.

3           Do you see it?

4    A    Yes.

5    Q    Did he give you any explanation for why, quote, this was

6    taking so long at this point?

7    A    There were some telephone conversations and, in general,

8    Martin was very busy doing going to meetings and, you know,

9    various things and didn't seem to be as focused as I wanted to

10   be on just completing this transaction, which I thought would

11   be pretty simple where we would simply meet and exchange the

12   share certificates for a check.

13   Q    Were the communications with the defendant about

14   redeeming continue after this point?

15   A    Yes, they did.

16   Q    At some point was there a discussion about the outline of

17   the deal?

18   A    I think at some point I was frankly encouraged and

19   thought it was positive that Martin told me that my account

20   had actually gone up 300,000 after that last email that said

21   it was 283, and that he wanted to do what was right in terms

22   of redeeming me out of the fund.

23   Q    And about when was that?

24   A    That, I think, occurred in May, and then there really

25   wasn't a negotiation.  There was an email that he sent which

MARSHALL – DIRECT – SRINIVASAN

1  proposed what our final transaction would be.

2  Q    I'm showing you what's marked for identification as

3  Government's Exhibit 104-6.

4           Do you recognize this document?

5  A    Yes, that's the email I just referred to.

6           MR. SRINIVASAN:  Your Honor, we move Government's

7  Exhibit 104-6 into evidence.

8           MR. BRAFMAN:  No objection.

9           THE COURT:  Received, 104-6.

10          (Government Exhibit 104-6, was received in

11  evidence.)

12  Q    And, Mr. Marshall, according to this email, what were

13  the -- what was the proposal, as you put it?

14  A    Well, it simply says 300,000 cash, 300 stock.  It's

15  actually an email sent to his attorney, Evan Greebel, with a

16  copy to me.  And then it says:  He has some amount of stock

17  now, dash, 37,809 or so, so we would issue 6300 shares of

18  stock and wire 300,000 in cash.  And then it has my

19  handwriting on it.

20  Q    What happened after this email?

21  A    Well, I immediately said fine.  I accept.  Let's get it

22  done.

23  Q    Did you receive any proposed documents to the deal?

24  A    I think the next thing that happened was there was some

25  back and forth in June where I was trying to just get it done,

MARSHALL - DIRECT - SRINIVASAN

1    and at some point received from Evan Greebel a draft

2    settlement agreement.

3              MR. SRINIVASAN:  Your Honor, I'm happy to keep on

4    going, or we can take the lunch break.

5              THE COURT:  How are the jurors?  Would you like to

6    take a lunch break now, ladies and gentlemen, or would you

7    like to keep going?

8              THE JURORS:  Keep going.

9              THE COURT:  Keep going?  All right.

10   BY MR. SRINIVASAN:

11   Q    I'm showing you what's been marked for identification,

12   sir, as Government's Exhibit 104-8, which is Tab 8 in the

13   binder.

14   A    Yes.

15   Q    What is this document?

16   A    It's an email from Evan Greebel to me dated June 18, 2013

17   attaching a draft settlement and release agreement.

18             MR. SRINIVASAN:  Your Honor, we move Government's

19   Exhibit 104-8 into evidence.

20             MR. BRAFMAN:  No objection.

21             THE COURT:  Received 104-8.

22             (Government Exhibit 104-8, was received in

23   evidence.)

24   Q    And, Mr. Marshall, who is cc'd on the email?

25   A    Martin Shkreli.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

MARSHALL - DIRECT - SRINIVASAN

1  Q    And it's at what email address?

2  A    Martin@retrophin.com.

3  Q    And it says:  Schuyler, as we discussed, attached is a

4  draft settlement agreement.  I'm simultaneously sending it to

5  my client.  It is subject to their review and comments.  If

6  you have any questions or comments, please call me.  Evan

7  Greebel.

8         In the line that says there's an attachment, is

9  there an attachment to this email?

10 A    There is.

11 Q    Go to the next page.  It's Bates number R019906.

12        What is this document?

13 A    It's the draft settlement and release agreement.

14 Q    And if we can focus on the first paragraph.

15        Who are the parties in this draft?

16 A    You want me to read into the record?

17        It was basically MSMB Capital and related entities,

18 management entities, and Martin Shkreli.  Also named

19 Retrophin.

20 Q    Were you one of the parties?

21 A    Yes, of course.

22 Q    Martin Shkreli?  Was Martin Shkreli one the parties?

23 A    Yes, he was.

24 Q    And MSMB Capital and MSMB Capital, LLC?

25 A    Yes.

MARSHALL - DIRECT - SRINIVASAN

1  Q    What are the other entities that are listed here?  If you

2  can you just read those out.

3  A    Well, it lists in addition to Martin Shkreli, MSMB

4  Capital Management, LP; MSMB Capital Management, LLC; MSMB

5  Healthcare, LP; MSMB Healthcare Investors, LLC; MSMB

6  Healthcare Management, LLC; MSMB Capital.  I think I repeated

7  that.  These were collectively called the MSMB entities and

8  Retrophin.

9  Q    Did you have any understanding of why MSMB Healthcare or

10 Retrophin were listed as parties to this agreement?

11 A    No, I did not.

12 Q    Going to the bottom of the page.  The paragraph that

13 starts "payment terms."

14        Do you see that?

15 A    Yes.

16 Q    And it says:  The MSMB entities, or Retrophin,

17 individually or collectively the payor, agree to deliver or

18 cause to be delivered to the releasor, the total amount of,

19 $300,000, the attached payment, and Shkreli agrees to deliver,

20 or cause to be delivered to the releasor the total amount of

21 6,300 shares of common stock.

22        Do you see that?

23 A    Yes.

24 Q    Again, as between you and the defendant, which side

25 proposed this language?

MARSHALL - DIRECT - SRINIVASAN

1   A    They did.

2   Q    Mr. Marshall, was this agreement that we see here signed?

3   A    This one was not signed.  I indicated it was acceptable.

4   There was a typo in it, but at this point I just wanted to get

5   this transaction concluded and so I said fine, let's proceed.

6   Q    What happened after that?

7   A    Further delay.

8   Q    I'm showing you what's marked for identification as

9   Government's Exhibit 104-7.

10          Do you recognize this?  That's Tab 7 in the binder,

11  sir.

12  A    Yes.

13  Q    What is this?

14  A    It's a series of emails, one was that I wrote on

15  June 24th to Evan Greebel.  And he responded the same day and

16  I responded back to him the same day.

17          MR. SRINIVASAN:  Your Honor, we move Government's

18  Exhibit 104-7 into evidence.

19          MR. BRAFMAN:  No objection.

20          THE COURT:  Received 104-7.

21          (Government Exhibit 104-7, was received in

22  evidence.)

23          (Pause.)

24  BY MR. SRINIVASAN:

25  Q    Mr. Marshall, so we're on 104-7.  And if we can focus on

MARSHALL - DIRECT - SRINIVASAN

1   the bottom of that page.

2   A    Yes.

3   Q    There's an email that appears to go on to the next page.

4        You wrote this on June 24th, 2013 to Evan Greebel?

5   A    Yes.  Yes, I did.

6   Q    And what did you write?

7   A    Evan, I am disappointed no one is responding to calls or

8   emails concerning getting the release executed and our

9   agreement performed.  I am still willing to proceed as we

10  agreed.  However, in order to ensure preservation of documents

11  in case they are needed, this confirms my request to be

12  provided the following, colon:  All documents concerning or

13  relating to my account value at all times; all documents

14  concerning or relating to the funds and Martin's investment in

15  Desert Gateway/RTRX; all document relating -- concerning or

16  relating to Martin's acquisition of the shares of RTRX,

17  including the consideration for such shares, and relate --

18  relation -- that should have been relating -- or referring to

19  the shares issued to other fund shareholders; all documents

20  relating to Martin's decision to convert a long/short fund

21  into a single investment in one company; including the

22  efforts, if any, to obtain approval for such conversion from

23  any limited partners in the fund; all documents relating to or

24  concerning the disposition of any fund investment.  Evan, my

25  position is that no privilege would apply to communications

MARSHALL – DIRECT – SRINIVASAN

1    with attorneys representing MSMB and RTRX, as those attorneys

2    owe duty to the entities and their own IRS, including limited

3    partners, and minority shareholders.  This is not a complete

4    request and hopefully it will become moot through the

5    performance of the agreement outlined in the release you sent.

6    Regards, Schuyler Marshall.

7    Q    Mr. Marshall, why are you writing to Evan Greebel?

8    A    Well, he's the one I was dealing with.  He was the

9    attorney, outside attorney for Martin, and Retrophin, and I

10   guess all the entities, and --

11   Q    Why did you write this email in the way that you did?

12   A    Well, we finally reached an agreement at the end of May.

13   I accepted this the same day.  They sent out a draft

14   settlement agreement which I -- he sent, which I said that's

15   fine, let's proceed, I'll sign it.

16        And then a period of time elapsed where nobody was

17   responding, and so I really at this point I was concerned and

18   just wanted to increase the pressure, and the language I wrote

19   was essentially to make the point that if litigation should be

20   necessary, I wanted him to preserve any and all documents that

21   could be related to the litigation.  So, in effect, I was

22   trying to ramp up the pressure a little bit.

23   Q    Did you have any conversations with Evan Greebel during

24   this time period?

25   A    There were some communications.  There wasn't anything

MARSHALL - DIRECT - SRINIVASAN

1    too substantive, it was along the lines that he had sometimes

2    there was a delay communicating with Martin because he was so

3    busy.

4    Q    Did you elaborate -- in your conversations with Evan

5    Greebel, did you elaborate and on this email?

6    A    I don't think so.

7    Q    What happened in June or July, after you sent this email?

8    Did you have further communications with the defendant?

9    A    I'm not honestly sure whether the communications were

10   with Martin or with Evan Greebel.  But, yes, there were

11   further communications.  I was definitely trying to, you know,

12   get the agreement performed and get this over with.

13   Q    Were you following Retrophin at the time?

14   A    Yes, I was.

15   Q    What, if anything, do you recall about that?

16   A    Well, I do recall reading that they had, I think it was

17   in August, included a, what's called a "pipe transaction,"

18   which is a public debt financing for a private company in the

19   amount of $25 million.  And so I remember reading that and

20   writing and, in effect, what I was thinking is if they're

21   short the cash, they now have $25 million in fresh cash, let's

22   get this done.

23   Q    I'm showing you what's been marked for identification as

24   Government's Exhibit 104-12.  Tab 12 in your binder.

25   A    Yes.

                     MARSHALL - DIRECT - SRINIVASAN

1    Q    What is this?

2    A    Martin sent me an email.

3    Q    When did he send it?

4    A    August 28th, 2013.

5             MR. SRINIVASAN:  Your Honor, we move Government's

6    Exhibit 104-12 into evidence.

7             MR. BRAFMAN:  No objection.

8             THE COURT:  Received 104-12.

9             (Government Exhibit 104-12, was received in

10   evidence.)

11   Q    Mr. Marshall, let's start with the bottom email.  This is

12   the defendant writing to you on August 28th, 2013, cc'g Evan

13   Greebel, the subject is revision.

14            He wrote:  After exhaustive talks with our

15   attorneys, there will be a revision to the agreement.  You

16   will get this at about 7 p.m. Eastern Standard Time.  The

17   revision is simple, it merely removes MSMB as an obligor and

18   references Retrophin alone.  This is crucial for a number of

19   reasons that are beyond my ability to explain.  Evan is cc'd

20   if you have any questions.  They are sending the wire this

21   week, the money should be on its way.  I am glad to get this

22   behind us.

23            Did you have any understanding of what he meant by

24   "exhaustive talks"?

25   A    No, just -- it was my understanding that for some reason

                     LINDA D. DANELCZYK, RPR, CSR
                        Official Court Reporter

MARSHALL - DIRECT - SRINIVASAN

1   they wanted to revise the agreement in a manner that didn't

2   change the deal that we had, but did you sort of split it in

3   the two agreements.

4   Q    So let's go to the next email up.

5        This is written by Evan Greebel to you and the

6   defendant on August 29th.  He writes:  Hi, Schuyler, I

7   apologize for the delay, but I had some connectivity issues.

8   As discussed, attached are two settlement/release agreements;

9   one between you and Retrophin contemplating the payment of the

10  money, and the second between you and Martin and MSMB relating

11  to the delivery of the shares.  In the interest of time, I am

12  simultaneously sending it to Martin.  The difference between

13  these two agreements, and the prior version is that we divided

14  the prior version to separate Retrophin's payment obligation

15  and release from the delivery obligation and release of Martin

16  and MSMB.  Otherwise, the agreements are the same.  Please

17  advise if you have any questions.  Best regards, Evan.

18       Mr. Marshall, did you have any understanding of the

19  reason for the change?

20  A    I did not.

21  Q    Does this document here indicate that there's attachments

22  to Evan's Greebel email?

23  A    Yes.

24       I guess my understanding was that maybe they were

25  concerned on their side that it would be clear that there was

MARSHALL - DIRECT - SRINIVASAN

1  consideration flowing from all the entities that I was going

2  to release so that the releases would be valid.  It think

3  that's what I surmised, but I didn't really know.

4  Q    Okay.  And if you go to the third page of this exhibit,

5  which is R02197.

6  A    Yes.

7  Q    Is this the attachment?

8  A    Yes, it is.

9  Q    Did you eventually sign these agreements?

10 A    Yes.

11 Q    I'm showing you what's been marked for identification as

12 Government's Exhibits 57A and 57B, which are Tabs 17A and B in

13 your binder.

14        Do you recognize these documents?

15 A    Yes.

16 Q    What are they?

17 A    These are the documents that I signed that effectuated

18 the settlement.

19        MR. SRINIVASAN:  Your Honor, we move to admit

20 Government's Exhibit 57A and B.

21        MR. BRAFMAN:  No objection.

22        THE COURT:  Received 57A and 57B.

23        (Government Exhibit 57A, was received in evidence.)

24        Government Exhibit 57B, was received in evidence.)

25        MR. SRINIVASAN:  Ms. Zellan, can we put 57A and B

MARSHALL - DIRECT - SRINIVASAN

1    side by side, please?  And can you zoom in on the first

2    paragraph of each document?

3    Q    Mr. Marshall, 57A is on the left of the screen, 57B is on

4    the right-hand side.

5         Are you able to see them on your screen, sir?

6    A    Yes.

7    Q    Who are the parties to the agreement on Government's

8    Exhibit 57A on the left-hand side?

9    A    Well, the agreement is between me, as releasor, and

10   Martin Shkreli; MSMB Capital, LP; MSMB Capital, LLC, MSMB

11   Healthcare; Investors, LP; MSMB Healthcare Investors, LLC;

12   MSMB Healthcare Management, LLC; MSMB Capital, LLC -- well, no

13   sorry.  Those are collectively called MSMB entities.

14   Q    Okay.  And looking on the right-hand side of your screen,

15   that's Government's Exhibit 57B.  Who are the parties to

16   Government's Exhibit 57B?

17   A    I am the releasor and Retrophin is the other party.

18   Q    Did you have any understanding of why Retrophin was the

19   only party in Government's Exhibit 57B?

20   A    No.  Other than what I've already said, that I assumed

21   that they wanted to sort of clarify that consideration from

22   all the parties that were going to get a release.

23        MR. SRINIVASAN:  Now, let's zoom in on the bottom of

24   the first page of both documents.

25   Q    Now, again, 57 -- Government's Exhibit 57A is on the

MARSHALL - DIRECT - SRINIVASAN

1    left.  The first sentence says:  Shkreli agrees to deliver or

2    cause to be delivered to the releasor the total amount of

3    6,300 shares of common stock.

4              Do you see that?

5    A    Yes.

6    Q    And on the right-hand side it says:  Retrophin agrees to

7    deliver or cause to be delivered to the releasor the total

8    amount of $300,000 for the attached payment.

9              Do you see that?

10   A    Yes, I do.

11   Q    If we can go to the last pages of both documents.

12             So on the left, Mr. Marshall, is Government's

13   Exhibit 57A.

14             That's the agreement where Martin Shkreli was to

15   give you 6300 shares; is that right?

16             MR. BRAFMAN:  Objection.  It says Retrophin.

17             THE COURT:  Overruled.

18             MR. SRINIVASAN:  It's Government's Exhibit 57A.

19             MR. BRAFMAN:  Withdrawn.

20             MR. SRINIVASAN:  Okay.

21   A    Yes, that's correct.

22   Q    Okay.  Whose signature is on this page?

23   A    Mine.

24   Q    Do you see the defendant's signature for himself here?

25   A    I do not.

MARSHALL - DIRECT - SRINIVASAN

1    Q    If we go to Government's Exhibit 57B, which is on the

2    right-hand side of your screen?

3    A    Yes.

4    Q    This is the agreement where Retrophin agreed to pay

5    $300,000?

6    A    Yes.

7    Q    Whose signature is on the left-hand side?

8    A    That's my signature.

9    Q    Do you know whose signatures is on the right-hand side?

10   A    I believe it's Martin Shkreli's.

11   Q    Mr. Marshall, did you speak to anyone at Retrophin, other

12   than the defendant, about these settlement agreements?

13   A    No.  Other than their outside counsel, Evan Greebel.

14   Q    Did you have any understanding of whether the Retrophin

15   board of directors approved the settlement agreements?

16   A    I suppose that issue never crossed my mind.  I would have

17   assumed, yes, but...

18   Q    Do you know one way or the other?

19   A    No, I don't.

20   Q    Mr. Marshall, what happened after you signed these

21   agreements?

22   A    I believe the same day the 300,000 shares was -- was

23   wired.

24            MR. BRAFMAN:  Stock.

25            THE COURT:  You mean cash?

MARSHALL – DIRECT – SRINIVASAN

1    A    I'm sorry, correct, $300,000 was wired to my account

2    and...

3    Q    What, if anything, happened to the 6300 shares?

4    A    It was never -- that share certificate was never sent.

5    Q    Mr. Marshall, you mentioned before that you got about

6    37,809 shares; is that right?

7    A    That's right.

8    Q    What did you do with the shares that you received?

9    A    Well, I had asked that the legend be removed, the

10   restrictions, and the restrictions were not removed, so I

11   simply held on to those shares.  And it is proved that after a

12   year you can go through the process of getting the

13   restrictions removed.  There are applications that you have to

14   make and so forth that I had my broker who had the shares, was

15   holding the shares, went through that process and got the

16   restrictions removed, and I sold those shares as soon as I was

17   way able to.

18   Q    Did you make a profit?  As compared to your initial

19   investment?

20   A    Well, I had received 300,000 in cash, and I did sell the

21   shares for positive, a positive return, yes.

22   Q    And approximately how much, overall, did you sell the

23   shares for?

24   A    You know, I don't really have that figure.  Initially I

25   remembered the shares bouncing around between 1 and 3.  And I

MARSHALL - DIRECT - SRINIVASAN

1   really just wanted to liquidate the shares whenever I could,

2   so I -- it was something in the range, let's just say, of

3   maybe a low of 40,000 and a high of 100,000 would be my best

4   estimate.

5              THE COURT:  When you say "between 1 and 3," what are

6   you talking about?

7              THE WITNESS:  The Retrophin shares I recall, Your

8   Honor, were trading between 1 dollar a share and $3 a share in

9   small amounts.  I remember watching it and possibly -- it was

10  very volitive, it could have gotten higher than that, but

11  that's the range I remember.  But as soon as I could liquidate

12  the shares, I did.

13  Q   Mr. Marshall, from the point that you -- that we're

14  talking about the winding down of MSMB Capital to the time you

15  signed this agreement, about how much time elapsed?

16  A    Well, this occurred at the end of August of '13, and I

17  would say, what, nine or ten months.

18             MR. SRINIVASAN:  One moment, Your Honor.

19             THE COURT:  Would now be a good time for a lunch

20  break?

21             MR. SRINIVASAN:  Yes, Your Honor.

22             THE COURT:  The jurors are ready.

23             MR. SRINIVASAN:  No further questions.

24             THE COURT:  Okay.  Let's give the jurors a lunch

25  break.

MARSHALL – DIRECT – SRINIVASAN

1           If you would kindly return to the jury room by 2.

2   Please don't talk about the case, and avoid any media on this

3   case, or Mr. Shkreli.  Thank you.

4                   (Jury exits the courtroom.)

5                   (Whereupon, a recess was taken at 1:01 p.m.)

6                   (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          MR. AGNIFILO:  Your Honor, I have a three-minute

2   objection to make.  I can do it now or at the end of the day.

3          THE COURT:  Let's do it now.  If it's something you

4   would like me to think about I'd rather correct it now rather

5   than wait until the end of the day when the witness is

6   finished testifying.

7          MR. AGNIFILO:  Yes.  We've objected, I think with a

8   number of the witnesses, to questions along the lines of,

9   'would a certain fact or a certain condition have been

10  important to you,' or, 'would this have been an important

11  factor whether or not to invest.'.

12          We've objected to those questions.  There is also

13  sort of a subtle refraining of the question, which is, if you

14  would have known a certain fact would you have invested.

15  We've objected to those with many of the witnesses as well.

16  The reason we're objecting is the question is framed such that

17  the omission is apparently a material term that the witness

18  would have wanted to know.

19          While that's all well and good, under the Supreme

20  Court decision in Matrixx Initiatives Versus Siracusano, 563

21  United States, page 27, 2011, the standard is an objective

22  standard.  It's a reasonable investor.  It's not any one

23  particular investor.  It's not a subjective standard.

24          So it's really irrelevant at the end of the day in

25  terms of the misrepresentation by omission that any particular

PROCEEDINGS

1    investor thinking a particular condition or fact is

2    dispositive of whether he or she would invest.

3              I also note the Supreme Court Basic Versus Levinson,

4    485 United States 224 from 1988, says very clearly that

5    silence absent a duty to disclose is not misleading under

6    10B5, the Securities Laws.  The problem with the questions as

7    being framed is there is no establishment of a duty on the

8    part of Mr. Shkreli or MSMB to say whether or not he was

9    involved in Elea Capital or other things that the prosecution

10   has repeatedly used to frame a question.

11             So that's the basis that we've objected.  But I just

12   want the Court to know why we we've been objecting.

13             THE COURT:  May I, just to make sure I understand.

14   The 10B5 issue comes up with public corporations, these are

15   questions regarding his knowledge or lack of knowledge when he

16   made the investment decision, right, in the hedge fund, who's

17   not a registered security.

18             MR. AGNIFILO:  I don't think that the Supreme Court

19   in Basic or in Matrixx makes the distinction.  They are

20   talking --

21             THE COURT:  You said it was not a violation under

22   10B5, that's why I thought it had to be a publicly-traded

23   corporation.

24             MR. AGNIFILO:  The facts in Basic happened to

25   involve a publicly-traded corporation.  But the Supreme Court

PROCEEDINGS

1   in these two cases, and there are other cases, the point that

2   needs to be made is that an omission is a different type of

3   animal than an affirmative misrepresentation.  There are other

4   requirements that come with an omission that don't exist when

5   someone says something that is arguably false and misleading.

6   And that distinction is being blurred in the way the questions

7   are framed.  And we've been objecting because at the end of

8   the day it suggests that somehow, that someone did something

9   wrong by not, for instance, saying that Martin was with Elea

10  Capital, when in fact, there is no establishment of a duty

11  that he disclose that information.

12         And so to the extent that it's an objective

13  reasonable investor standard, rather than a subjective

14  investor standard, it's really an irrelevant question at the

15  end of the day.

16         Your Honor, so I wanted to introduce that topic.  I

17  think.  That's been the reason we've been objecting to these

18  questions.

19         THE COURT:  All right.  I'll hear from the

20  Government.

21         MS. KASULIS:  Your Honor, we need to look into these

22  two cases that counsel just raised.  We do believe these

23  questions are appropriate.  We have in fact also charged wire

24  fraud, where there is material omissions and

25  misrepresentations, so the omissions piece is important for us

PROCEEDINGS

1    to prove.

2           Additionally, we've been very careful in the way

3    that we're framing the questions.  It's not, 'if you learned

4    X.'  It's, 'if that fact exists but if there was a prior hedge

5    fund that not performed well that the defendant was associated

6    with.'  So we've been careful in the way we've asked the

7    questions purposely.

8           Also, if there is a reasonable investor standard we

9    have to establish the facts to make the argument that a

10   reasonable investor would find these omissions and

11   misrepresentations material.  So some of the questions go to

12   the omissions piece and some of them go to the misrep piece.

13          For example, when the defendant has said he has an

14   auditor, and if we ask, 'if there was no auditor would that

15   have been important to you,' the answer is yes.  The so then

16   it establishes the misrepresentations.  We can go back and

17   look at the law that counsel cites.  We didn't have the notice

18   about the law prior to this point, but we can certainly raise

19   any additional issues with the Court or additional responses.

20   But this is our response now.  We think it's entirely

21   appropriate.  We believe we should be able to continue to ask

22   these questions.

23          THE COURT:  I mean, my understanding is that the

24   Government has the burden to proof beyond a reasonable doubt

25   that whether there were material misstatements or omissions.

PROCEEDINGS

1    Materiality, you say is objective, I agree.  But I think that

2    to ask the investors whether they were aware of, so for

3    example a discrepancy between what they were told and what the

4    facts may be, or whether certain facts had they known whether

5    that would have influenced their investment decision, I think

6    is something that -- again, I will look at the cases -- but it

7    seems to me, in my mind, it was directly relevant to the

8    Government's proof.  I'll look at the cases as you have

9    characterized them.

10           Are we going to expect ongoing objections until this

11   is resolved?  I'll look at the cases.  I can't do it now

12   obviously.

13           It does seem maybe this was an issue you -- it would

14   have been nice to have had some prior notice of it.  We'll

15   look at it as soon as we can.

16           MR. AGNIFILO:  I started doing research when

17   Mr. Brafman objected to it with the witness who is still on

18   the stand.  The objection was overruled.

19           It occurred to me at that point that we, I would

20   look into, dig a little deeper, as to why we've been

21   objecting.

22           THE COURT:  I figure you're objecting for a reason.

23           MR. AGNIFILO:  We tend to try to have a reason.

24           THE COURT:  I would hope so.

25           MR. AGNIFILO:  But I want to give your Honor a

PROCEEDINGS

1    clearer idea of the basis, that's why I'm bringing it up now.

2            MS. KASULIS:  Your Honor, we have been eliciting

3    these questions in the same format with respect to each

4    witness since our first witness, which was about a

5    week-and-a-half ago now.  So we will continue to solicit those

6    sorts of answers unless we hear otherwise from the Court as to

7    those questions.

8            THE COURT:  We'll look into it.  I can't say we'll

9    have an answer for you by the time the next witness is asked a

10   question, but we'll get to it as soon as we can.

11           It would have nice if you raised it even before the

12   lunch hour, I could have looked at the cases then.  But, we

13   have what we have and I'll deal with what you've given me now.

14   All right.

15           MR. AGNIFILO:  I did most the research over the

16   lunch hour.  Judge, as I do further research, I share it with

17   the Court.

18           THE COURT:  I appreciate that.  I'm just saying this

19   has been going on for a week-and-a-half, there are sort of set

20   questions that you can expect.  We've heard again and again,

21   I'm not saying it's rote, but each witness is asked to look at

22   certain documents, and asked what was important to their

23   decision et cetera, et cetera, so I'm just noting that it

24   would have been nice, as I've said before, to hear from you

25   earlier.  But we'll now look into what we have been given and

MARSHALL - CROSS - MR. BRAFMAN

1    I'll try to make a decision before the next witness is asked

2    the series of questions.

3            MR. AGNIFILO:  Thank you, Judge.

4            THE COURT:  Did you want to bring the witness back

5    on the stand, please?

6            MR. BRAFMAN:  Your Honor, when the witness testifies

7    could you just remind him, sometimes he leans back, his voice

8    doesn't get picked up on the microphone, it's hard to hear.

9            THE COURT:  I will.  If I'm having trouble, I'm

10   concerned about everyone else of.

11           MR. BRAFMAN:  Thank you.

12           (Jury enters the courtroom.)

13           THE COURT:  All our jurors are back, sir, you're

14   still under oath.  Please have a seat.

15           You may proceed, Mr. Brafman.

16   CROSS-EXAMINATION

17   BY MR. BRAFMAN:

18   Q    Good afternoon, Mr. Marshall.

19   A    Good afternoon.

20   Q    Mr. Marshall, if you can, I know it's a long day, but if

21   can you speak into the microphone, sometimes your voice

22   doesn't pick up in the back.

23           Sir, my name is Ben Brafman.  We've never met; is

24   that correct?

25   A    That's true.

MARSHALL - CROSS - MR. BRAFMAN

1    Q    You've had a chance to speak with the Government lawyers

2    even by phone or in person before your testimony today?

3    A    Yes, I have.

4    Q    You knew the general scope of the questions that they

5    would be asking you, would that be a fair statement?

6    A    That's true.

7    Q    I want to, if we can start backwards from where I think

8    the Government left off.  And if you still have 57A and B, if

9    you want to me to save time I can put my copy on the screen or

10   if you can find the documents, sir?

11              MR. SRINIVASAN:  Tab 17A and B.

12   A    Yes, I have it.

13   Q    You have 57A, sir?

14   A    Yes, I do.

15   Q    57A is the agreement that was signed in or about the end

16   of August of 2013.  And it's the one that refers to 300 -- I'm

17   sorry, referring to 6300 shares of Retrophin that you were

18   supposed to receive; is that correct?

19   A    That's right.

20              MR. SRINIVASAN:  If the jury can see it also.

21              MR. BRAFMAN:  I'm going to do that.

22              MR. SRINIVASAN:  Thank you.

23   BY MR. BRAFMAN:

24   Q    This is 57A, it refers to 6300 shares that you were to

25   receive, correct?

MARSHALL - CROSS - MR. BRAFMAN

1    A    That's right.

2    Q    If you turn to the signature page, if you can.  That

3    agreement is signed by you but it was never signed by Martin

4    Shkreli, correct?

5    A    I don't know whether it was or wasn't.

6    Q    But this is the document that we have, and it doesn't

7    appear to have a signature for Martin Shkreli, correct?

8    A    There does not appear to be one on this one.

9    Q    And would you accept my representation that there is no

10   document like this that has Mr. Shkreli's of signature on it?

11              MR. SRINIVASAN:  Objection, your Honor.

12              THE COURT:  Sustained.

13   Q    The Government has never shown you one that has

14   Mr. Shkreli's signature on it, did they?

15   A    They have not, and I don't know whether he ever signed it

16   or not.

17   Q    Do you know why those 6300 shares were sent to you?

18   A    I do not.

19   Q    Do you have any understanding of whether or not Retrophin

20   by that time was undergoing an audit?  You don't know anything

21   about that, do you?

22   A    I do not.

23   Q    Now, you did, however, sign an agreement which we have in

24   evidence as 57B; is that correct?

25   A    Yes.

MARSHALL - CROSS - MR. BRAFMAN

1   Q    That agreement called for you to get $300,000 in cash,

2   correct?

3   A    Yes.

4   Q    And $37,809 -- 37,809 shares of Retrophin stock, correct?

5        MR. SRINIVASAN:  Objection, your Honor.

6        THE COURT:  Sustained.

7   Q    Did that agreement call for you to get $300,000 in cash?

8   A    It did.  I don't think it refers to the stock.

9   Q    Okay.  If you look at the second paragraph, it says

10  37,809 shares that you already had, correct?  Do you see where

11  it says?

12  A    Whereas clause, I see that.

13  Q    That's the agreement, if you look at the last page, that

14  is signed both by Mr. Shkreli and by you; is that correct?

15  A    Yes.

16  Q    You identified those signatures on direct examination

17  correct, sir?

18  A    Yes.

19  Q    The agreement that Mr. Shkreli, signed that was signed in

20  or about August at the end of August 2013?

21  A    I believe that's right.

22  Q    You got the $300,000 wire, which represents the $300,000

23  cash, correct?

24  A    Yes, I did.

25  Q    It was sent to the wire instructions that your office

MARSHALL – CROSS – MR. BRAFMAN

1    sent to Mr. Shkreli or Mr. Greebel correct?

2    A    That's correct.

3    Q    So the $200,000 that you invested in cash was repaid with

4    $300,000, correct?

5    A    Yes.

6    Q    And the last valuation you had from MSMB as to your

7    investment was approximately $282,000, correct?

8    A    That was the last written one, but Martin subsequently

9    told me that it had gonna above 300,000.

10   Q    But you back the 300,000, plus you also got 37,809

11   Retrophin shares, correct?

12   A    That's right.

13   Q    When you got the shares you testified, sir, that they

14   were restrictive, correct?

15   A    That's right.

16   Q    I think you testified that you got them in January of

17   2013?

18   A    I think it was February of 2013.

19   Q    Okay.  You got them in February 2013.  I think you told

20   us that the restriction was not lifted until how many months

21   later, a year, ten months?

22   A    It was my understanding that legally after you have this

23   share certificate you had to wait a year and then you could

24   apply to have the restriction lifted.  That was a complicated

25   process that a brokerage house handled for me.  So it would

MARSHALL - CROSS - MR. BRAFMAN

1    have been sometime around February or March of the following

2    year.

3    Q    Okay.  Do you know, as you sit here today, how much you

4    sold those shares for?

5    A    I really do not.

6    Q    But you testified under oath, and I'm not suggesting you

7    lied, you may have been mistaken, you testified on direct --

8                MR. SRINIVASAN:  Objection.

9                THE COURT:  Sustained.

10   Q    You don't know what you sold them for?

11   A    I do not.

12   Q    But on direct examination did you not say that you sold

13   them for somewhere between two and $3 a share, the range you

14   got was between 40,000 and 100,000.

15   A    I believe that's what I said.  But I hope I prefaced it

16   but saying I really didn't remember.  I was doing the best I

17   could to express a range.

18   Q    You were coming up here.  You knew you were going to

19   testify about your involvement with Retrophin and Mr. Shkreli,

20   correct?

21   A    Yes.

22   Q    You're a person who works in the stock market or with

23   investments on a regular basis professionally?

24   A    I invest regularly.

25   Q    But you also know, you follow stocks on a regular basis.

MARSHALL - CROSS - MR. BRAFMAN

1    Mr. Shkreli gave you some stocks you were able to follow to

2    see how they did?

3    A    Yes.

4    Q    The easy way to do it, if you agree, you press Yahoo

5    Finance, you put in the letters for the stock, the symbol, and

6    you get a current price, right?

7    A    That's one way to do it.

8    Q    And you can also go back in time and get the price at a

9    specific period in time, correct?

10   A    I don't believe I've ever done that, but I accept your --

11   I assume that's possible.

12   Q    Would it surprise you to know that during the period of

13   January 2014 through February of 2014 the lowest price for

14   Retrophin was $7.19 and the highest was $17.03?

15   A    That does surprise me, but if you --

16   Q    Let me show you what I've marked for identification as

17   Defendants Exhibit 4462 and ask you to look at this document

18   for Retrophin stock.  And a copy to the Court.

19            THE COURT:  Thank you.

20   Q    Are you able to look at that document and understand it?

21   A    I'm looking at it.  It appears to be be historical RTRX

22   prices based on Yahoo Finance.

23   Q    Okay.  And am I correct, sir, that during the period in

24   question, if it refreshes your recollection --

25            MR. SRINIVASAN:  Objection.

MARSHALL - CROSS - MR. BRAFMAN

1          THE COURT:  What I would appreciate the parties

2     doing is allowing the question to be asked.  If there is an

3     objection we'll hear it, and the witness will not answer until

4     I've made a ruling.

5     Q    Does it make reference to the price range of Retrophin

6     during the period when you claimed to have sold your shares?

7     A    Let me answer it this way, it doesn't refresh my

8     recollection.  What stuck in any mind was one to three, but I

9     don't dispute it either because I haven't looked it up.  I

10    think it's been five or six years.

11    Q    I'll accept that.

12         But if hypothetically -- and we'll get to that in a

13    minute -- you sold it for seven or $17 a share or something in

14    between, you could have gotten upwards of a half million

15    dollars for 37,000 shares; isn't that correct?

16    A    Well, if I averaging $10 a share, that would be 370,000.

17    Q    You have no recollection whether you made 40,000, 100,000

18    or 370,000 on the sale of Retrophin stock?

19    A    I thought it was less than 100,000.  But if this is

20    correct, then obviously I was mistaken.

21    Q    Okay.  Could we do this, sir, so we don't delay your time

22    on the witness stand, when you get back could you check with

23    your broker and then notify the Government as to the price you

24    actually sold the stock for.  And then we'll decide whether

25    the Court will allow us to introduce that into evidence?

MARSHALL – CROSS – MR. BRAFMAN

1          MR. SRINIVASAN:  Objection, your Honor.

2          THE COURT:  You know, it's a rather unusual request

3    I'm not --

4          MR. BRAFMAN:  Judge, I'm dealing with somebody who

5    doesn't remember.  I'm taking him at his word.

6          THE COURT:  We'll do a sidebar.

7          (Continued on the next page.)

8          (Sidebar conference.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          MR. BRAFMAN:  Your Honor, I think this is something

2    almost that the Court can take judicial notice of, just what

3    the price of a public security is on a given date.  Because

4    these are records maintained, I can have Yahoo come in here

5    and say this is an accurate statement on what is on a given

6    date, but I'm not trying to do that.  We have don't have to be

7    stuck with the answer he gave on direct examination.  Without

8    any wavering he said he believes he sold the stock for two or

9    $3 a share.  He realized a gain 40 to $100,000.

10          He's just flat out wrong.  Because we know that he

11   sold it in the January/February 2014 time period.  During that

12   period the stock ranged from $7 a share to $17 a share on

13   February 20 of 2014.  And then it went up because a lot of

14   good things were happening at Retrophin.

15          So I'm accepting that he sold it then.  But if he

16   kept it longer, as Mr. Blanton testified, the stock went at

17   high as $30 a share.  He said just now that Mr. Shkreli told

18   him that the value of his account was more than $300,000.

19          I think I have a right to let this jury know that

20   although he had a lot of aggravation in getting his stock

21   cleared and sold, at the end of the day he, like everyone

22   else, made upwards of half million dollars on Retrophin stock

23   that they got for free.  There is no basis.

24          If they want to respond, and what I'm suggesting is

25   if he goes to his broker and they say you sold it in tranches

SIDEBAR CONFERENCE

1    and you got $18 or $15, I'll accept what they say.  Because I

2    know it's going to be more than two or $3 a share.  Then you

3    can put it in the record rather than have him come back on the

4    defense case.

5              MS. SMITH:  Let me short circuit this.  We've

6    already stipulated to an exhibit, which I believe 606 or

7    Government's Exhibit 607, but I believe 606, which shows the

8    stock price from Retrophin from the day it went public until

9    the day the defendant was removed from his position.  I'm

10   saying we have the stipulation already to that document.  We

11   can read that into evidence.

12             MR. BRAFMAN:  I'll read it into evidence.  I'm happy

13   to read the stipulation.  I'm trying to demonstrate --

14             MS. SMITH:  If we want to establish the stock price

15   on a given day, we've stipulated to that.  I wanted to short

16   circuit.

17             MR. BRAFMAN:  We'll accept the stipulation.

18             MS. SMITH:  The suggestion to the jury that we ask

19   the witness to provide additional information that is not in

20   this courtroom and then bring it in, is wholly inappropriate.

21   You can establish he doesn't know.

22             MR. BRAFMAN:  The witness is either unattentive or

23   has forgotten or lying, one of the three.  I'm accepting the

24   fact that he's making a mistake.  He's a prominent lawyer in

25   Texas.  I'm not suggesting perjury.  The fact that these

SIDEBAR CONFERENCE

1   people have been attentive to every word Martin Shkreli says,

2   then when you ask them how much money they sold it for, they

3   make up a preposterous number.  I think it's fair for cross.

4           MS. SMITH:  To suggest to the jury that while he's

5   off the stand and to bring it back, that that's normal is

6   inappropriate.

7           MR. BRAFMAN:  I'll accept the stipulation.

8           THE COURT:  All right.  Just in terms of addressing

9   the --

10           MR. BRAFMAN:  I'll read the stipulation.

11           THE COURT:  We'll just tell the jury then that you

12   are withdrawing your request that he go back.

13           It was just a very unusual request that's why it

14   drew an objection and a concern that, again, we're pulling

15   things from outside the courtroom and throwing at the jury I

16   have concerns with.

17           MR. BRAFMAN:  I understand.  But I wasn't suggesting

18   that we pull a statement that can't be independently verified.

19   This is a fact, you can't change the price.

20           THE COURT:  Why don't you withdraw the request and

21   read the stipulation.

22           MR. BRAFMAN:  Yes.

23           (End of sidebar conference.)

24           (Continued on the next page.)

25

MARSHALL - CROSS - BRAFMAN

1        (In open court.)

2   BY MR. BRAFMAN:

3   Q    Mr. Marshall, I'm going to withdraw the request that you

4   go check with your broker because I've been advised by the

5   Court, the Government, and my associate that we have a

6   stipulation in the case that will state as a matter of agreed

7   fact what the price of Retrophin was from the period

8   January 2014 through March of 2014.  I'm referring to tab 606

9   of the Government's stipulation.

10        MR. SRINIVASAN:  January 2012, your Honor.

11        MR. BRAFMAN:  I understand, but I'm only focusing on

12   a little portion of it.  The stipulation covers more ground,

13   I'm focusing on the period January 2014 through March of 2014.

14        MR. SRINIVASAN:  Your Honor, it might be more

15   efficient if we read the stipulation in.

16        THE COURT:  Are you going to read the stip, sir?

17        MR. BRAFMAN:  Your Honor, there is a stipulation

18   between the United States of America and Martin Shkreli in

19   this case.  I'll read it as follows:

20        "It is hereby stipulated and agreed by and between

21   the undersigned parties that Government 606 is a true and

22   accurate copy of data from Bloomberg LP detailing the daily

23   closing price and share volume of shares of Retrophin Inc. for

24   the period December 17, 2012 to September 30, 2014 and is

25   admissible as evidence at trial.

MARSHALL – CROSS – BRAFMAN

1          "Government 607 is a true and accurate copy of data

2     from Bloomberg LP detailing the daily opening intraday high,

3     intraday low, and daily closing prices of shares of Retrophin

4     Inc. for the period of December 17, 2012 to March 28, 2013 and

5     is admissible as evidence at trial.

6          This stipulation marked Government's Exhibit 85, is

7     admissible in trial.  Signed by the Assistant United States

8     Attorney Jacquelyn Kasulis and counsel for Martin Shkreli."

9          Sir, the fact is that there is no dispute in this

10    record that during the period of December 17, 2012, through

11    September 2014 we can determine what the actual price and

12    closing price of Retrophin stock was, do you understand that,

13    sir.

14    A    I don't dispute the stipulation.

15    Q    Okay.  And in accordance with this stipulation I'm going

16    to put just one page for now from exhibit, from the

17    stipulation, which is Exhibit 606 on the Elmo.

18         THE COURT:  To be clear, you're offering by

19    stipulation both 606 and 607, correct?

20         MR. BRAFMAN:  Correct.  The stipulation is 805.  606

21    which I have in part on the Elmo, is exhibit 606, which covers

22    the period of time December 17, 2012 through September 30,

23    2014.  Both are in evidence as a result of the stipulation,

24    your Honor.

25         THE COURT:  All right.  Thank you.

MARSHALL - CROSS - BRAFMAN

1   BY MR. BRAFMAN:

2   Q     So now I'm going to show you, sir, the record of

3   Retrophin stock just for the period of January 2014.  On the

4   right of it is the price of the stock that day, which is $8 a

5   share.  If we go down to February 7, 2014 it's $10.39 a share.

6   If we go to the next page we go from February 10, 2014, it's

7   begins $10.80 a share.  If we go to March 31, 2014, it's

8   $21.20 a share.  Do you see that, sir?

9   A     No, I don't see the 21; but again, I don't dispute.

10  Q     Here is the 21.

11  A     I see it, yes.

12  Q     There is never a period of time after your restriction is

13  lifted where the stock traded between two and $3 a share, do

14  you accept that?

15  A     If this stipulation is correct, certainly I accept that.

16  Q     Does it help you in anyway to understand how much money

17  you got from selling 37,000 shares if you sold them between

18  January and March of 2014?

19  A     If this stipulation is correct, then I got a lot more

20  dollars than I thought I did when I testified this morning.

21  Q     A lot more, as much as half million dollars more?

22  A     Theoretically, but I don't think it was that much.  But

23  it was clearly substantial if these figures are correct.

24  Q     If the figures are correct, and they are stipulated to by

25  both parties.  If you sold it in March you were getting

MARSHALL - CROSS - BRAFMAN

1  upwards of $20 a share, at 37,000 shares that's $600,000 maybe

2  more, correct?

3  A    That imagine would be correct, yes.

4  Q    Now you were an attorney for 25 years before you went to

5  work for Rosewood; is that correct?

6  A    That's correct.

7  Q    You were with a rather well-known, well-respected law

8  firm, correct?

9  A    I hope so.

10  Q    In it that law firm you were a litigation partner; is

11  that correct?

12  A    That's right.

13  Q    At some point you did both civil litigation and also some

14  criminal defense work; isn't that correct?

15  A    The criminal defense work was only appointed when

16  somebody in the form got appointed then they asked me to

17  handle it them for them.

18  Q    You had at least some exposure to criminal defense work?

19  A    Yes.

20  Q    Would it be a fair statement that you decided to invest

21  in these matters -- withdrawn.

22          You decided to invest in Martin Shkreli; isn't that

23  correct?

24  A    Well, I'm not sure I'd characterize it that way.  I

25  invested in MSMB, but the primary motivation was Martin

MARSHALL - CROSS - BRAFMAN

1    Shkreli and his, what I perceived to be, his talent analyzing

2    and investing in small pharmaceutical stocks.

3    Q    Before you ever saw a prospectus or put a dollar in MSMB,

4    you met with Martin Shkreli in person, correct?

5    A    Yes.

6    Q    At your offices in Dallas, Texas?

7    A    That's correct.

8    Q    You met him at the recommendation of Darren Blanton?

9    A    That's right.

10   Q    And Darren Blanton, who testified in this case, is also

11   from Texas; is that right?

12   A    Yes.

13   Q    Indeed your firm, Rosewood, owns the building that Darren

14   Blanton rents his offices from, correct?

15   A    That's correct.

16   Q    In the building that you are in, he has Colt Ventures, an

17   investment company that he runs in the same building as you?

18   A    Yes.

19   Q    So you've known Darren Blanton for a long time?

20   A    I would say they were a tenant in the building for at

21   least several years before I met him.  But I would say in

22   point of time maybe I knew who he was about a year or two

23   prior to the time I made the investment.

24   Q    When you say you knew he was, you knew he was the head of

25   Colt Invest -- Invest -- Ventures?

MARSHALL - CROSS - BRAFMAN

1   A    Colt Ventures.

2   Q    You knew him to be a prominent person in the investment

3   community in Dallas, Texas, did you not?

4   A    I'm not sure I would characterize it that way.  He was

5   young, entrepreneurial, and he got some favorable press.

6   Q    And he got --

7   A    He wasn't considered a giant in the landscape.

8   Q    We'll accept that.  Will you at least agree that he was

9   somewhat of a public figure in Dallas at the time you knew

10  him?

11  A    I'm not really sure I would say that.  Because I didn't

12  know who he was until a year or two after, hadn't even heard

13  of him until he had been a tenant for a year or two.

14  Q    Then you came to know that he was a prominent rancher;

15  would that be fair?

16  A    I don't believe I ever knew that.

17  Q    You didn't know he had a horse farm with 70 colts?

18  A    No, I didn't.

19  Q    Did you know that he was running his own capital venture,

20  capital fund?

21  A    I did not.

22  Q    What did you think Blanton did in the building every day?

23  A    Well, he wasn't there every day, but I thought he was in

24  looking for entrepreneurial investments.

25  Q    There came a time that he spoke to you about Martin

MARSHALL - CROSS - BRAFMAN

1   Shkreli?

2   A     Yes.

3   Q     By the time he spoke to you about Martin Shkreli you knew

4   him already, correct?

5   A     Yes.

6   Q     He didn't show up one day and say, hey, I want to talk to

7   you about this the guy I met.  You knew who he was, he knew

8   who you were.

9   A     Yes.

10  Q     He knew the kind of work you did?

11  A     Yes.

12  Q     What he did was he said words or substance that he met

13  Martin Shkreli and he thought he was a genius?

14  A     Well, let me try to answer it this way, he told me that

15  he had followed Martin Shkreli for sometime that they made a

16  lot of money with Martin Shkreli.  And that Martin was very

17  focused on small pharmaceutical stocks and very good at

18  analyzing them.  That's what the way I can describe it.

19  Q     Did he ever describe Martin Shkreli to you as a genius?

20  A     I don't think he used that term.

21  Q     Did you use that term when you spoke to the Government

22  the first time you were interviewed?

23  A     I don't believe I did.

24  Q     I'm going to show you 3500SM-1, and I'm going to ask you

25  to hold it.  Don't read it yet.  Trying to use it to refresh

MARSHALL - CROSS - BRAFMAN

1    your recollection, okay.

2            Do you remember being interviewed by the Government

3    by telephone on a conference call with the SEC in or about

4    November of 2015?

5    A    Yes.

6    Q    And the substance of the interview was about Martin

7    Shkreli; would that be a fair statement?

8    A    Yes.

9    Q    One of the things you told the SEC and the FBI and all of

10   the law enforcement people on the phone was that you had met,

11   you were told about Martin Shkreli by Darren Blanton, who had

12   a family investment office in Texas?

13   A    Yes, that's right.

14   Q    Did you tell them that Blanton told you he invested with

15   Shkreli, and Blanton said Shkreli was a genius.  Did you use

16   that word?

17   A    This document uses that word.

18   Q    I'm not asking you to read from the document.  Does the

19   document refresh your recollection that during your interview

20   on the telephone with the SEC the FBI you told them that

21   Blanton told you that Martin Shkreli was a genius?

22   A    It doesn't refresh my recollection; but I don't really

23   dispute it either.

24   Q    Fair enough.  Did you also tell them that you met with

25   Martin Shkreli -- can you put that down for a minute, sir --

MARSHALL - CROSS - BRAFMAN

1   did you tell the Government that you had met with Martin

2   Shkreli in your office in Texas for over -- for an hour and

3   that you were impressed by him?

4   A    Yes.  I think I said over an hour.

5   Q    Okay.  During that period did Martin Shkreli talk to you

6   virtually non-stop about drugs and pharmaceutical companies

7   and different investment thoughts that he had in the

8   pharmaceutical arena?

9   A    That was part of it, yes.

10   Q    Were you impressed by Martin Shkreli's knowledge on that

11   during that meeting?

12   A    Extremely impressed.

13   Q    Was this long before you ever invested in MSMB?

14   A    Yes.

15   Q    And everything Blanton had said to you in words or

16   substance when describing Martin Shkreli was confirmed by your

17   own assessment of Martin Shkreli, correct?

18   A    I don't think I would agree with that characterization

19   because I can't remember everything Darren Blanton said.  In

20   essence Darren Blanton was trying to get us to have a meeting

21   with Martin.

22   Q    For the purpose of assessing his potential as an

23   investment, what?

24   A    Yes, yes.

25   Q    He did impress you, did he not?

MARSHALL - CROSS - BRAFMAN

1    A    He did.

2    Q    Did you have the opportunity to ask Martin Shkreli any

3    question that came to mind?

4    A    I would say I did have that opportunity.

5    Q    Martin wasn't there with a lawyer or anyone else, he just

6    came by himself, correct?

7    A    I think Darren Blanton was in the meeting.

8    Q    But Darren was not there as Martin's lawyer?

9    A    No.

10   Q    Darren Blanton is not a lawyer?

11   A    I don't believe he is.

12   Q    But you are.

13   A    Yes.

14   Q    And Martin -- you told us your age is 71; is that

15   correct?

16   A    Yes.

17   Q    In this period you're about 65, 66?

18   A    Yes, 64.

19   Q    Okay and Martin was someone who was relatively young

20   compared to everybody else in the room; is that correct?

21   A    That's true.

22   Q    When you saw him at the time, did you think he was

23   somewhere in his mid 20s, or young 20s?  Did you have any

24   idea?

25   A    I thought late 20s.

MARSHALL - CROSS - BRAFMAN

1    Q    The people in the room, at least you, were old enough to

2    be his father?

3    A    I guess that would be fair to say.

4    Q    You've had 25 years of litigation experience and more

5    than 15 years of working in private equity before that

6    meeting?

7    A    Yes.  25 years of trial experience and then 15, actually

8    18 years, of working in a private company, private equity was

9    a part of what we did, yes.

10   (Continued following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARSHALL - CROSS - BRAFMAN

1    CROSS-EXAMINATION (CONTINUED)

2    BY MR. BRAFMAN:

3    Q    And did you have an opportunity after he left to talk to

4    Darren Blanton?  After Martin left the meeting, did you talk

5    to Darren Blanton?

6    A    You asked about did I have an opportunity.  Of course, I

7    had an opportunity.  I think, we may have had one or two

8    conversations.  After he left most of the conversations were

9    with Martin.

10   Q    And the conversations with Martin were about stock tips

11   that he was giving you, correct?

12   A    I'm not sure I'd describe it as "stock tips," because

13   that just --

14   Q    I'm not trying to --

15   A    -- implies something.  He would say we're investing in

16   such and such company, here's the reason why.  Frequently it

17   had to do with either they had a drug that they were hoping

18   that the FDA would approve and his opinion about that.

19           So "tip" implies to do this.  These were

20   conversations which were substantive.

21   Q    And these were substantive conversations that gave you

22   additional ability to sort of assess Martin's knowledge,

23   correct?

24   A    That's right, yes.

25   Q    And then when he would talk to you about a specific

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

MARSHALL - CROSS - BRAFMAN

1    company and what his plan was, you personally would follow

2    that company to see if Martin was right, correct?

3    A    That's exactly right.

4    Q    And you did that from the confines of your own office,

5    not in Martin's office, while you were back in Texas, right?

6    A    That's right.

7    Q    And would it be a fair statement that virtually

8    everything Martin told you about these companies and the

9    reasons that he thought this was going to happen was verified

10   in the future performance of those stocks?

11   A    That would be -- absolutely a fair statement from the

12   time of the meeting until the time I invested in the company.

13   Q    Okay, so from the time of the meeting until the time you

14   invested in the company, everything Martin said to you in

15   those telephone conversations as to pharmaceutical companies

16   you might consider and the reasons, they were all borne out by

17   your own watching of the marketing, correct?

18   A    Again, you're maybe overstating when you say everything

19   he said.

20   Q    I'm saying the substance of what he said.

21   A    Yes, in general.

22   Q    The thoughts of what he said.  Do well because the FDA is

23   going to approve something, and sure enough, that happened,

24   correct?  Or words to that effect?

25   A    That would be an example, correct.

MARSHALL - CROSS - BRAFMAN

1  Q    And you were so impressed that you actually conducted an

2  investigation to make certain that he wasn't giving you in

3  information, correct?

4  A    You asked several questions, but the let me try to answer

5  it this way.

6        I was impressed with the results, and I actually

7  called a lawyer friend of mine back at Thompson & Knight and

8  said this is the kind of information he has, and can you tell

9  me if that's inside information or not?  And I didn't think it

10  was, but I thought it would be prudent to get that kind of a

11  check from an outside source.

12        And this is a lawyer who is very familiar with that

13  area, and the essence of what he said was that this is not

14  information that's coming from within a company.  He's using

15  information that is publicized.  And his judgment and his

16  knowledge of -- of both science of the drug and also FDA

17  approval procedures to form a judgment as to whether it's a

18  good investment.  That --

19  Q    And he said to you, in words or substance, that what

20  Martin's telling you is public information, he's just

21  analyzing it for you, correct?

22  A    I -- I guess you could -- that would be correct, yeah.

23  Q    And nothing that that lawyer said to you caused you to

24  hold back from investing with Martin Shkreli, correct?

25  A    That's right.

MARSHALL - CROSS - BRAFMAN

1   Q    And Martin Shkreli -- and some of the stocks that he

2   spoke to you about, you actually dabbled or invested a little

3   bit; isn't that correct?

4   A    Yes.

5   Q    And do you remember the names of the stock?

6   A    At this point I don't.

7   Q    Did he tell you the short Mankind?

8   A    Yes.

9   Q    And did you?

10  A    Yes.

11  Q    And did you make money?

12  A    Yes.

13  Q    And can you tell this jury how much money you made?

14  A    I think I invested -- I think I bought or shorted a

15  thousand shares at about 8, and I believe it went down to

16  about 4.

17          But, again, this is so long ago that this is memory

18  but, yes, I can tell that I made money on that investment.

19  Q    And this is before you ever invested in MSMB, correct?

20  A    Yes, that's right.

21  Q    And you have other stocks that Martin discussed and that

22  you also invested in and you also made money on those stocks;

23  isn't that correct?

24  A    I think there was one or two others.  But I did follow

25  all of them that he -- that he suggested, either long or

MARSHALL - CROSS - BRAFMAN

1    short, and the rational for it to see if it played out whether

2    I invested or not.

3    Q    And everything -- not everything, but the substance of

4    what he suggested was going to happen actually happened?

5    A    That's my recollection.

6    Q    And the same thing that Blanton told you, he did the same

7    thing; isn't that correct?

8    A    I'm not sure I understood what you asked.

9    Q    Didn't Blanton tell that you he had made millions of

10   dollars of investing with Martin Shkreli?

11   A    Yes, he did.

12              MR. SRINIVASAN:  Objection.

13              MR. BRAFMAN:  It's not for the truth.

14              THE COURT:  What did he offer?

15   Q    Didn't Mr. Blanton tell you that he had made millions of

16   dollars investing with Martin Shkreli?

17              MR. SRINIVASAN:  Objection, Your Honor, hearsay.

18              THE COURT:  Sustained.

19              MR. BRAFMAN:  May we approach, Your Honor?

20              THE COURT:  Yes.

21              (Continued on the next page.)

22              (Sidebar conference.)

23

24

25

SIDEBAR CONFERENCE

1        MR. BRAFMAN:  First of all, we know that's true

2   because Mr. Martin testified to it.  But it's not being

3   offered for the truth of it through this witness, it's offered

4   because this is part of what this, in his state of mind when

5   he makes the decision to invest in MSMB.  On direct, it seemed

6   that all he did was read the memorandum and nothing else

7   influenced his decision.  What Blanton says about Shkreli is

8   relevant to his state of mind as the basis for his decision to

9   go ahead with MSMB.  It goes to weight not admissibility.

10        THE COURT:  Okay, so it's being offered for the

11   effect.

12        MR. BRAFMAN:  Correct.

13        MR. SRINIVASAN:  Mr. Blanton didn't say that he made

14   millions of dollars.

15        MR. BRAFMAN:  But if he tells him that, whether

16   Blanton made money or not is not the point.

17        THE COURT:  Did Blanton actually tell him that?

18        MR. BRAFMAN:  Yes.  He said yes before the objection

19   was -- he answered it, I'll ask it again.  But there's no

20   hearsay issue here, it's the fact --

21        MR. SRINIVASAN:  Your Honor, Evan Greebel testified

22   on direct that when Mr. Blanton helped set up the meeting, he

23   testified to that and cross also, and that would not have an

24   establishing effect on this at all witness.  Because what he

25   was he had lengthy conversations with Mr. Shkreli and

SIDEBAR CONFERENCE

1  afterwards, when he was actually considering the investment,

2  that Mr. Blanton was helped him to set up the meeting.  It's

3  foundation necessarily --

4          THE COURT:  Maybe you should establish whether or

5  not Mr. Shkreli indicated his investment decision as a

6  foundation.

7          MR. BRAFMAN:  Okay.

8          THE COURT:  And see where that goes and then you can

9  see whether or not Mr. Blanton told to him ascertain the

10  effect on Mr. Marshall's investment decision.

11          MR. BRAFMAN:  Okay.

12          (End of sidebar conference.)

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

MARSHALL – CROSS – BRAFMAN

```
 1              (In open court; Jury present.)

 2   BY MR. BRAFMAN:

 3   Q    Mr. Marshall, would be a fair statement that before you

 4   invested or made the decision to invest in MSMB, you

 5   considered a number of factors; is that correct?

 6   A    Yes.

 7   Q    You considered Martin Shkreli, the personality, correct?

 8   A    Yes.

 9   Q    Martin Shkreli, who was providing you with information

10   that he verified to be accurate, correct?

11   A    It turned out to be -- it played out the way he said he

12   thought it would, yes.

13   Q    And the whole meeting with Shkreli was at the

14   recommendation of Blanton; is that correct?

15   A    That's right.

16   Q    And you understood Blanton to be telling you the truth

17   about the things he said about Mr. Shkreli, correct?

18   A    I didn't see any reason to think otherwise.

19   Q    All right.  And I ask you, sir, did Mr. Blanton tell you

20   in his dealings with Martin Shkreli he had made millions of

21   dollars in connection with trades that Martin Shkreli

22   recommended?

23              MR. SRINIVASAN:  Objection, Your Honor.

24              THE COURT:  Sustained.

25              MR. BRAFMAN:  Excuse me?
```

MARSHALL - CROSS - BRAFMAN

1        THE COURT:  Sustained.

2   BY MR. BRAFMAN:

3   Q    Did Mr. Blanton tell you he made millions of dollars with

4   Martin Shkreli before you invested in MSMB?

5        MR. SRINIVASAN:  Objection, Your Honor.

6        THE COURT:  I'll overrule that.

7        MR. BRAFMAN:  You may answer the question, sir.

8   A    I believe he did, yes.

9   Q    And was that part of what you factored into the equation

10  when deciding whether to invest in MSMB at the end of the day?

11  A    I think that statement came before we had a meeting

12  because we don't take many meetings like this, and so it's

13  kind of hard to get them into order, get people together to

14  consider an investment, so I think that came before.

15  Q    And that was one of the reasons you agreed to meet with

16  Mr. Shkreli?

17  A    That's right.

18  Q    And also, sir, am I correct that Mr. Blanton told you

19  that he was able to withdraw money from Mr. Shkreli's fund

20  when he wanted to; isn't that correct?

21  A    Yes.

22  Q    And that he withdrew over a million dollars?

23  A    Yes.

24  Q    And that gave you some level of comfort, correct?

25  A    That's right.

MARSHALL - CROSS - BRAFMAN

1  Q    Now, am I correct that Mr. Shkreli also mentioned the

2  name of Even Greebel as a lawyer at Katten at some point,

3  correct?

4  A    Yes.

5  Q    And you knew of that firm, correct?

6  A    Yes.

7  Q    And that also gave you some comfort because you knew the

8  firm Katten to be a very well respected law firm?

9  A    That's right.

10 Q    Now, did there come a time in December of 2015 when you

11 had another telephone call with someone from the U.S.

12 Attorney's Office or the FBI, if you recall?

13 A    I can't recall a date.  I think you meant 2017.

14 Q    No, I'm talking about 2015, and I'm just going to hand

15 you 3500SM-2.  If you could like at this, sir, and refresh

16 your recollection as to whether or not you had a telephone

17 interview with the FBI on December 22nd, 2015?

18          (Whereupon, the witness is reviewing the document.)

19 A    I don't remember dates, but this -- I do recall having a

20 conversation with Michael Braconi.

21 Q    That's Special Agent Michael Braconi of the FBI?

22 A    Yes.

23 Q    And that was by telephone, correct?

24 A    Yes.

25 Q    And do you remember telling the FBI that you were more

MARSHALL - CROSS - BRAFMAN

1    impressed with Martin Shkreli than the prospectus?

2                MR. SRINIVASAN:  Your Honor, if it refreshes his

3    recollection, the witness has the document.

4                THE COURT:  All right.

5                Read the document, and then he'll ask you a

6    question.

7    BY MR. BRAFMAN:

8    Q    If you don't remember, you can use it to refresh your

9    recollection, but am I correct, sir, that on that telephone

10   conversation with the FBI, you told him that you were more

11   impressed with Martin Shkreli than the actual prospectus?

12   A    Let me answer it this way.  I think I did tell him that,

13   but this states that I had the prospectus when we first met,

14   and I don't recall that being the case.

15   Q    Okay.

16   A    It's possible.

17   Q    All right.

18   A    But I don't recall it that way.

19   Q    All right.  But you did say that you were more impressed

20   with Martin Shkreli than the prospectus, right?

21   A    I think that's right, yes.

22   Q    You had -- you've seen in your career 25, a hundred

23   prospectuses?  Would that be a fair statement, maybe on the

24   low side?

25   A    I'd say I've seen that many.

MARSHALL - CROSS - BRAFMAN

1   Q    Okay.  And have you ever seen a Martin Shkreli?

2   A    I'm sorry, have I ever seen Martin Shkreli?

3   Q    A Martin Shkreli.

4   A    You mean another person like Martin Shkreli?

5   Q    Yes.

6   A    I would say not.

7   Q    Now, did you tell the government on that date that before

8   you ever invested Blanton told you that he had withdrawn over

9   a million dollars from his investments with Shkreli?

10          MR. SRINIVASAN:  Answered and answered, Your Honor.

11          THE COURT:  Sustained.

12  Q    Let's move on, sir.

13          There comes a time when you have a sit down,

14  in-person meeting with the government in Texas; is that

15  correct?

16  A    Yes.

17  Q    And rather than bring to you the U.S. Attorney's in Texas

18  they brought to you the U.S. Attorney's Office -- I'm sorry,

19  let me stop.

20          Rather than bring you to the U.S. Attorney's Office

21  in New York, they met with you in the U.S. Attorney's Office

22  in Texas, is that correct?

23  A    That's right.

24  Q    And among the people meeting you in Texas were one of the

25  assistant United States attorneys prosecuting this case?

MARSHALL - CROSS - BRAFMAN

1    A    I believe the woman's name was Alix Smith.

2    Q    Okay.  And you also had several members of law

3    enforcement or FBI at that meeting, correct?

4    A    I remember one being there.

5    Q    Okay.  And you sat with them for several hours; would

6    that be fair?

7    A    I'd say one to two hours.

8    Q    And did you give them your background, your personal

9    background during that meeting?

10   A    Yes.

11   Q    And did you tell them you worked with Thompson & Knight

12   from 1970 to 1995?

13   A    I assume I did.  That is correct, any way.

14   Q    All right.  And did you tell them on that date that you

15   were working as general counsel and vice president for TRC

16   until you were promoted to chief executive officer in 1998?

17   A    I think I was promoted in 1999.

18   Q    Okay.  And what is TRC?

19   A    That's The Rosewood Corporation.

20   Q    And is it a private equity portion of The Rosewood

21   Corporation?

22   A    No, that's the whole corporation.

23   Q    And what did you do?

24   A    Now?

25   Q    Yes?

MARSHALL - CROSS - BRAFMAN

1   A    I'm the chairman of the board.

2   Q    But then what can you do?  For Rosewood?

3   A    You mean at the time I invested with Martin or the time I

4   became president?

5   Q    At the time you were investing with Martin.

6   A    I was president and CEO.  And the way it's structured, we

7   have -- The Rosewood Corporation is the parent company, and it

8   has operating subsidiaries.  So among those subsidiaries

9   there's branching, real estate, oil and gas domestic, oil and

10  gas foreign, and Rosewood Private Investments.  And then we

11  also have something called Rosewood Management Corporation,

12  which manages certain trusts.  And within that corporation, we

13  select more private investments, like stock funds, a few hedge

14  funds, bond funds and so forth.

15  Q    And did you tell the government that part of your

16  responsibilities was to identify investments in private

17  equity?

18  A    I don't remember if I told them that, but if I did, it

19  would be true.

20  Q    Okay.  And by identifying the investments in private

21  equity it requires you to sort of look at the potential of the

22  company before it becomes even a real company sometimes,

23  right?

24  A    Yes, that's right.

25  Q    And sometimes a company comes to you as a startup that

MARSHALL - CROSS - BRAFMAN

1  may have potential, and you do an analysis to see if it's

2  appropriate for TRC to invest; is that correct?  This is what

3  you do at the time?

4  A    Well, I -- I would say that -- that we really don't look

5  at startup companies for investment.

6  Q    Okay.  Do you look at small companies that need capital?

7  A    Yes.

8  Q    All right.

9  A    By startup, that's what it implies.  It's -- it's either

10  just getting going or maybe it's a startup of a company.

11  Q    Okay.

12  A    And more -- our interest was to find a company that had

13  some kind of a problem and that we felt we could fix by good

14  management, or maybe it had a -- it was starved for capital,

15  so we put in capital and make the investments that it needed

16  for a long time and grow it that way.

17        So I'm not trying to argue with you, I'm just trying

18  to explain.

19  Q    Okay.

20  A    By using words that make sense to me.

21  Q    But in doing that, you do meet with lawyers and owners of

22  companies, correct?

23  A    Yes.

24  Q    And you do meet about representatives of companies?

25  A    Yes.

MARSHALL - CROSS - BRAFMAN

1  Q   And they pitch you for capital and try to explain the

2  company and who they are and what they would like to become;

3  fair statement?

4  A   Yes, I would say so.

5  Q   And sometimes you turn them down, and sometimes you would

6  decide to invest on behalf of TRC, correct?

7  A   Yes.  But almost always we turn them down.

8  Q   Okay.  Because you have the ability to be selective,

9  correct?

10  A   We hope so.

11  Q   Okay.  Now, at the meeting on at the U.S. Attorney's

12  Office in Texas, did you tell the government that Mr. Shkreli

13  reminded you of a character from "Rain Man"?

14  A   I don't remember if I said that at that meeting, but if I

15  did it -- it probably would be true.  Because that was the

16  impression that I had.

17  Q   All right.  Well, let's just take a look at 3500SM-3,

18  dated 3/7/2'16.  And look at the bottom paragraph and read it

19  to yourself, and tell me whether or not it refreshes your

20  recollection that during that meeting in Texas, you told the

21  government that Martin Shkreli reminded you of a character

22  from "Rain Man".

23       (Whereupon, the witness is reviewing the document.)

24  Q   It's on the bottom of the first page to read.

25  A   Yes, I'm reading that.

MARSHALL - CROSS - BRAFMAN

1        When I did these interviews, I didn't have the

2   benefit of notes or any files, so I was operating from memory.

3   Q    Okay.

4   A    But if your main question is did Martin Shkreli remind me

5   of Dustin's Hoffman's character in "Rain Man", my answer would

6   be, yes.

7   Q    All right.  So let's do that for the benefit of the jury,

8   if you could explain that a minute, in case some people

9   haven't seen "Rain Man".

10       Dustin Hoffman in "Rain Man" plays an autistic

11  genius; is that correct?

12  A    I believe he did does, yes.

13  Q    And his older brother Tom Cruise is saddled with the

14  responsibility for him, and that's pretty much the premise of

15  movie.  Would be that a fair statement?

16       MR. SRINIVASAN:  Objection.

17       THE COURT:  Overruled.

18       You can answer the question, but I hope you would

19  move on after you get an answer to this question.

20       MR. BRAFMAN:  I'm going to move on from the movie,

21  but I'm going to ask him about --

22  Q    What about Martin Shkreli at the meeting you had with him

23  made you believe that he was a "Rain Man" character?

24  A    Well, let me just answer it this way.  I did not at the

25  meeting conclude that Martin Shkreli was autistic or on the

MARSHALL - CROSS - BRAFMAN

1   autistic spectrum or try to make a diagnosis like that.

2           What I thought was that this was a person who was

3   intensely focused on one small segment of the stock marketing

4   and just lived it day and night and was so focused that that

5   was his investment advantage.

6   Q    And that reminded you of "Rain Man"?

7   A    I would say that my recollection of the movie was that

8   the character was very -- very, very focused in one area and

9   one area, or maybe had to do with math, and that he could come

10  up with answers that other people wouldn't come up with.  And

11  the reference here was just that this was an intensely

12  focused, bright guy who knew his stuff.

13  Q    Had you ever characterized any other investment picture

14  in your office to remind you of Dustin Hoffman's character in

15  "Rain Man"?

16  A    No.

17  Q    Okay.  So Martin impressed you as being Rain Man,

18  correct?

19  A    No, I would just say he impressed me as being intensely

20  focused and extremely knowledgeable about this wear.

21  Q    But the "Rain Man" person who you're comparing him to,

22  would you agree is severely autistic in the film?

23           MR. SRINIVASAN:  Objection, Your Honor.

24           THE COURT:  Sustained.

25  Q    Is he brilliant in the film?

MARSHALL – CROSS – BRAFMAN

1   A    Well --

2         MR. SRINIVASAN:  Objection.

3   A    Well, Blanton said he was sort of, you know, socially --

4         MR. SRINIVASAN:  Objection.

5   Q    Awkward?

6         THE COURT:  Sustained.

7   Q    Did Martin Shkreli at this meeting, after which you

8   characterized him as Rain Man, did he rattle off statistics be

9   drug names with nonstop virtually for half the time he was in

10  your office?

11  A    No.

12  Q    Did he impresses as being brilliant?

13  A    I'd say he impressed me with being smart and highly

14  focused.

15  Q    Did he impresses as a scatterbrain?

16  A    No, I wouldn't say so, because it sort of went in a

17  series of discussions.  There was a stock -- you know, I was

18  trying to find out how much he knew and the depth of his

19  knowledge.  And we had somebody in the office that we met with

20  only because they were a friend of a family member.  And they

21  came in and they had an idea that was absolutely laughable.

22  It was a small Australian company that had a video of a swim

23  mouse.

24  Q    What does that have do with what we're talking about?

25  A    Well, it's an answer to your question, because we asked

MARSHALL - CROSS - BRAFMAN

1    if he heard of this company.

2    Q    You asked Martin?

3    A    Yes.  Prana Pharmaceuticals.

4    Q    And he knew everything about it; isn't that correct?

5    A    I don't know if he knew everything, but the point is that

6    he -- he gave about a ten-minute discussion about the company,

7    its prospects.  He had seen the film, probably the video, and

8    he had the same conclusion that we did, that just because a

9    mouse learned to swim over and stand on a bridge so it

10   wouldn't drown, that didn't mean the drug was going to be

11   successful for Alzheimer's.

12   Q    Were you pretty surprised that Martin knew that

13   information?

14   A    Yes, I was.

15   Q    And were the people in the room besides you -- withdrawn.

16        Did you discuss the fact that he knew this remote

17   piece of information after the meeting with any of the people

18   in your firm?

19   A    Yes.

20   Q    And was that kind of performance by Martin, in part,

21   which led you to believe that he was so intensely focused that

22   you could characterize him as the character in "Rain Man"?

23        MR. SRINIVASAN:  Objection, Your Honor.

24        THE COURT:  Sustained.

25        MR. BRAFMAN:  Your Honor, may we approach?

MARSHALL – CROSS – BRAFMAN

1        THE WITNESS:  Can I answer, maybe it will save time?

2        THE COURT:  It may save time, but there's an

3   objection to the question.

4        (Continued on the next page.)

5        (Sidebar conference.)

SIDEBAR CONFERENCE

1        THE COURT:  How much more are we going to do on

2   this?

3        MR. BRAFMAN:  Judge, they are not being fair.  This

4   is their witness, who of all of the people in all of the

5   movies in America, characterizes him as Dustin Hoffman in

6   "Rain Man".

7        And just so I would be up to speed, I watched that

8   movie again recently so I would not make a mistake.

9        In "Rain Man" the man is diagnosed as --

10        MR. SRINIVASAN:  We don't have to go into all the --

11        MR. BRAFMAN:  It is the issue.

12        MR. SRINIVASAN:  If he doesn't believe him, let's

13   argue with he Court and the witness has explained -- he

14   doesn't believe it explains what you meant when he made that

15   reference.  Mr. Brafman might disagree with that and argue it

16   in closing, but I don't know how much -- how many more

17   questions we can ask about "Rain Man".

18        MR. BRAFMAN:  On cross-examination, I'm generally

19   not bound by the witness' answer, especially if I don't

20   believe him.

21        THE COURT:  What do you not believe?

22        MR. BRAFMAN:  I don't believe why he said Martin

23   reminded him of Dustin Hoffman.  Because Dustin Hoffman in

24   that movie is severely autistic, he has no people skills, and

25   he gets himself in all these kinds of awkward positions by

SIDEBAR CONFERENCE

1    coming up with incredible amounts of information that no

2    normal person --

3            THE COURT:  Are you trying to allege, are you going

4    to be arguing that he's severely autistic?

5            MR. BRAFMAN:  No, I'm attempting to argue --

6            THE COURT:  Okay.

7            MR. BRAFMAN:  -- that if you compared him to "Rain

8    Man," he came to one of two conclusions, either -- one, of

9    three conclusions; either Martin was autistic, and many

10   autistic people are brilliant beyond words, and/or that if he

11   was brilliant beyond words, that part of the reason he

12   invested is because he saw Martin as an idiot savant; being

13   socially awkward by having almost supernatural knowledge.

14           THE COURT:  But the question I have is why is it so

15   critical to you that you put some sort of label on Mr. Shkreli

16   as being a rain man?

17           MR. BRAFMAN:  I didn't.

18           THE COURT:  But the reference was what he meant was

19   that he very smart, he was able to understand very a small

20   segment of the pharmaceutical investment, you know, world.

21           I'm just not sure how much more we have to go on

22   about Mr. Hoffman's character.  I don't even know if the

23   portrayal of him as an autistic, a severely autistic person

24   who's a genius in that movie is accurate.

25           You've probed his understanding of the reference,

SIDEBAR CONFERENCE

1    but I don't think you're going to be able to get that

2    Mr. Shkreli is autistic, that that somehow is relevant to the

3    jury's understanding.

4              MR. BRAFMAN:  The defendant's state of mind, when he

5    was making these representations to people, is a question --

6    let me finish -- is a question of fact that the jury will have

7    to decide; if he viewed intentionally, if he supposed that

8    something's off about Mr. Shkreli, and there is something off

9    about Mr. Shkreli that is obvious to someone who never met him

10   before.

11             THE COURT:  Well, are you arguing that he lacks

12   mental capacity --

13             MR. BRAFMAN:  No.

14             THE COURT:  -- to form intent?

15             MR. BRAFMAN:  No.  No.

16             THE COURT:  How does it -- that's what it sounds

17   like you're arguing, that the autism can impair his ability to

18   form the intent.

19             MR. BRAFMAN:  No, but it weighs on whether or not at

20   the time he is making a statement, he understands that if

21   someone else is going to be relying on the statement, and it

22   better be a hundred percent accurate, or you could end up

23   going to jail later.  And the character in the Dustin Hoffman

24   movie, makes all sorts of statements that people look at him

25   like he's crazy, and that's what he's referring to.

SIDEBAR CONFERENCE

1    MR. SRINIVASAN:  Your Honor, what he was referring

2    to, you can't just do a diminished capacity defense with

3    questions like this, Your Honor, there is a proper way to do

4    it is and it's not being established in this case.  And he's

5    trying to badger this witness into changing his testimony when

6    what he said was, we think, that he agreed that Martin Shkreli

7    was a smart, brilliant --

8            MR. BRAFMAN:  I'll move on.

9            MR. SRINIVASAN:  -- diminished capacity of an idiot

10   savant, for example.

11           MR. BRAFMAN:  I'll move on and rely on the jurors'

12   understanding of what the reference to "Rain Man" is.

13           THE COURT:  Assuming they even they saw the movie.

14           MS. KASULIS:  He already testified about what his

15   interpretation was that --

16           MR. BRAFMAN:  I'll move on.  I have much to do.

17           THE COURT:  Okay.

18           MR. BRAFMAN:  And we're beyond "Rain Man".

19           THE COURT:  Okay.

20           (End of sidebar conference.)

21           (Continued on the next page.)

22

23

24

25

MARSHALL - CROSS - BRAFMAN

1          (In open court; Jury present.)

2   BY MR. BRAFMAN:

3   Q    One of the things you told us is that impressed you at

4   that meeting with Mr. Shkreli in Texas was that he knew

5   everything about Prana Pharmaceuticals; is that correct?

6   A    Yes.

7   Q    And was that a subject that you believed was widely known

8   about Prana?

9   A    I didn't think Prana was wildly known.

10  Q    And yet the minute you mentioned it, Martin Shkreli

11  focused on it immediately, correct?

12  A    Yes.

13  Q    And everything he told you in that room, you knew to be

14  verified by the independent information you had?

15  A    Well, let me put it this way.  He had seen the same film

16  of the swimming mouse that we had seen and reached exactly the

17  same judgment that we had, that that was no basis to invest in

18  a company that's going to solve the problem for Alzheimer's.

19  Q    So among other things, you made your decision after

20  meeting with Mr. Shkreli that it was not an appropriate

21  investment in your mind at the time for TRC, correct?

22  A    That's right.

23  Q    And TRC, and you said earlier, you know, picks and

24  chooses its investment opportunities and generally does not

25  invest in companies that had not yet been formed, correct?

MARSHALL – CROSS – BRAFMAN

1    A    That's right.

2    Q    But you personally made the decision some months later to

3    invest in Martin Shkreli, MSMB, correct?

4    A    Yes.

5    Q    Now, you testified that you are chairman of the board now

6    of TRC?

7    A    That's right.

8    Q    And you understand that as a member of board you have

9    fiduciary obligation to the company that you are a board

10   member of?

11   A    Of course.

12   Q    And since the Sarbanes-Oxley Act by Congress, you have to

13   even be more careful as a member of board to take your

14   responsibilities seriously, correct?

15   A    I'd say I always took them seriously.

16   Q    Okay.  And the board of a company like yours makes

17   important decisions that bind the company, correct?

18   A    Yes.  From time to time they do.

19   Q    And they could have serious consequences if that's the

20   wrong decision, so you think carefully about them; fair

21   statement?

22   A    For any board action, I would say, yes.  We think them

23   through and try to be careful.

24   Q    Now, did Martin Shkreli also give you an understanding

25   that you should watch the stock BioMarin?

MARSHALL - CROSS - BRAFMAN

1    A    No.  I can answer what he did say.

2    Q    Okay.

3    A    I asked him if there were any stocks that he thought had

4    really good fundamental research that, you know, would be a

5    good sound long-term investment, and he mentioned BioMarin.

6    Q    And did you buy it?

7    A    Yes, I did.

8    Q    And did you make money?

9    A    Yes.

10   Q    And was Martin correct?  The stock went up?

11   A    Yes.  Yeah.

12   Q    Now, were you impressed with Martin's knowledge of the

13   Food and Drug Administration approval process?

14   A    Yes.

15   Q    And it was fairly impressive.  Would that be a fair

16   statement?

17   A    Yes.

18   Q    You know, as someone who has been in sort of the

19   investment community for a long time, that the Food and Drug

20   Administration has the capacity to either kill a drug stock or

21   make it a wonderful success, correct?

22   A    Well, they can kill it if they only have one drug and

23   they don't approve it.  And if they approve a drug, that is a

24   positive affect for the company.

25   Q    So having an understanding of the Food and Drug

MARSHALL - CROSS - BRAFMAN

1   Administration, when you're in the biotech sector is

2   important.  Would that be a fair statement?

3   A    Yes, it would.

4   Q    And Martin Shkreli impressed you with his knowledge of

5   the Food and Drug Administration approval process?

6   A    Yes, and I would add his judgment.  It was -- he knew the

7   way they operated, and he sort of combined his knowledge of

8   the science with his judgment as to whether -- for example, if

9   there's a trial that they -- when it was properly structured

10  and whether it would be impressive enough to the FDA to result

11  in approval.  So it's kind of a combination process plus the

12  science.

13  Q    Now, I think you mentioned this before, but at that

14  meeting you said to the U.S. Attorney's Office that the fact

15  that Evan Greebel was Martin's lawyer was a positive sign for

16  you.

17  A    Yes.

18  Q    And when you were at Holland & Knight, were you aware of

19  Katten Muchin as a competitive law firm out there or as

20  another law firm of prominence?

21  A    My firm was Thompson & Knight but, yes, I was aware of

22  them as being a reputable New York City based firm while I was

23  practicing law and subsequently as well.

24  Q    Now, in of January 2011, you made the decision to invest

25  $200,000 from your IRA, correct?

MARSHALL - CROSS - BRAFMAN

1   A    I think the decision was made after I went through the --

2   the investment circular, which could have been December.

3   Q    All right.  And then you actually sent in the money

4   sometime in January; is that correct?

5   A    Yes.

6   Q    And did you know that Darren Blanton came to New York and

7   visited the offices of MSMB Capital?

8   A    Yes.

9   Q    And when he came back, he told you that he was there; is

10  that correct?

11          MR. SRINIVASAN:  Objection, Your Honor.

12          THE COURT:  Overruled.

13          MR. BRAFMAN:  You may answer, sir.

14  A    He told me that he had come to the offices and met the

15  people and was impressed with their operation.

16  Q    And I think what you said was to the U.S. Attorney's

17  Office was that -- the words you used were that Blanton vetted

18  MBC Capital for you; is that correct?

19  A    Let me just say I don't remember if I said then, but that

20  is what -- the impression that I got.

21  Q    Okay.  And when you vet a company, you look at it and see

22  if it impresses you, in words or substance, correct?

23  A    That would be right.

24  Q    And that Mr. Blanton, when he came back, told you that he

25  was favorably impressed with their operation, and that made

MARSHALL - CROSS - BRAFMAN

1    you more comfortable, correct?

2    A    Yes.

3    Q    Now, did you ever ask Mr. Blanton how many shares of

4    Retrophin he was given when he signed his agreement at the end

5    of the day?

6    A    I don't recall ever asking him that, no.

7    Q    Okay.  And did Mr. Blanton ever tell you, in words or

8    substance, that he made several million dollars on his

9    investment into MSMB?

10              MR. SRINIVASAN:  Objection, Your Honor.

11              THE COURT:  Sustained.

12   Q    Do you know whether or not he currently has 150,000

13   shares of Retrophin?  Yes or no; do you know?

14   A    I do not.

15   Q    Okay.  Now, I want you to turn, sir, to what's in

16   evidence as Government Exhibit 6, which is the confidential

17   offering memorandum for MSMB Capital Management; is that

18   correct?  Do you have it, sir?

19              THE COURT:  It's at Tab 15.

20   A    Yes, I have it.

21   Q    Okay.  I'm just going to go through some of the areas in

22   this book.

23              Now, you have seen documents like this before?

24   A    Yes.

25   Q    Offering memorandums?

MARSHALL - CROSS - BRAFMAN

1    A    Yes.

2    Q    Offering memorandums for companies that were not public

3    companies but they were private companies?

4    A    Private companies or funds, yes.

5    Q    Okay.  And you understand that before an investor can

6    even invest, they have to be given a copy of the private

7    offering memorandum, they have to verify that they've read it

8    and they have to sign a subscription agreement, correct?

9    A    That's right.

10   Q    And they also have to meet certain criteria as an

11   investor, correct?

12   A    Yes.

13   Q    They have to establish a certain degree of net worth,

14   correct?

15   A    Yes.

16   Q    And they have to, in effect, assure the people at the

17   company that you're not playing with rent money, correct, more

18   or less?

19   A    The point of all this is that they need to know that the

20   investor is not only a sophisticated investor and can form a

21   judgment about the investment, but also has enough net worth

22   and/or current income that they have afford to make an

23   investment like this.

24   Q    And afford to lose the investment, if that's what

25   happens, correct?

MARSHALL – CROSS – BRAFMAN

1    A    Yes.

2    Q    Now, if you look at the first page under the cover page,

3    I'll put it up here, this is 00128.  I'm going to point to a

4    paragraph lower down, which is in the bold letters.

5         Do you see it?

6    A    Yes.

7    Q    An investment to the partnership will involve significant

8    risk.  There is no assurance that the partnership will achieve

9    its investment objectives, will be profitable.  See risk

10   factors.

11        That's standard language in a private placement

12   memorandum; is that correct?

13   A    It is, yes.

14   Q    And you're supposed to read it, and despite the risks,

15   verify that you're willing to invest, correct, sir?

16   A    Yes.

17   Q    And when you say sophisticated investors, it's generally

18   meant for people who understand the nature of the risks being

19   described in a private placement memorandum?  Correct?

20   A    That would be right, yeah.

21   Q    And I'd like you to look at page 1.  And I think if you

22   look down the -- sorry.  If you look down towards the bottom

23   of the page where it says "general partner"?

24   A    Yes.

25   Q    I'm going to read that, start with the general partner,

MARSHALL - CROSS - BRAFMAN

1    which is on the fourth line down.  Can you follow along

2    please.

3              The general partner will have full responsibility

4    for the management and control of the partnership.  Mr. Martin

5    Shkreli is the managing member of a general partner, as such

6    Mr. Shkreli will be the individual primarily responsible for

7    the management and control of the partnership.

8              Did you understand that before you invested?

9    A     Yes.

10   Q     So you were essentially relying on Martin Shkreli as the

11   general partner?

12   A     That's right.

13   Q     Now, let me just ask a general question.  When you invest

14   in a private placement, in a fund that has just no background,

15   no track record, you understand that as a limited partner

16   you're really relying on the general partner?

17   A     Yes.

18   Q     Now, you have investments, either on behalf of your

19   company or yourself, in other equity funds, correct?

20   A     Yes.

21   Q     And do you think they have to call you every time they do

22   a trade?

23   A     No.

24   Q     Now, do they have to call you to tell you the outcome of

25   a trade?

MARSHALL - CROSS - BRAFMAN

1   A    No.

2   Q    You're relying on them -- as a limited partner, you rely

3   on the general partner to make those decisions, correct?

4   A    Yes.

5   Q    And you've been around a while and you know that when

6   you're in the stock market, you can have good days and bad

7   days, correct?

8   A    Sure.

9   Q    And if we looked at what happened, you know, in the

10  history of the market, there are times when even the most

11  sophisticated investors have essentially lost their shirt;

12  fair statement?

13  A    I'd say some sophisticated investors.  I don't recall

14  Warren Buffett ever having that.

15  Q    Well, maybe Warren Buffett is the exception.

16  A    In general, I would agree that even smart, sophisticated

17  investors can lose money, sure.

18  Q    Sometimes they make a bet and it turns out bad.

19  A    Right.

20  Q    And whatever you want to say about the stock market, and

21  however much research you use, at the end of the day, it's

22  just a form of gambling; isn't it?

23  A    No, I don't agree with that.

24  Q    All right.  It's form of risk taking?

25  A    Yes.

MARSHALL - CROSS - BRAFMAN

1   Q    All right.  And when you take a risk, sometimes you win

2   and sometimes you lose?

3   A    Yes.

4   Q    Now, if you turn to page 4, Mr. -- I'm sorry.  On direct

5   examination, the government asked you a question about the

6   beginning of this paragraph on capital withdrawals.

7             Do you remember?

8   A    Yes.

9   Q    And he read a few lines to you, and you said that's

10  correct.

11            I want to go to the end of the paragraph where it

12  says "the general partner."

13            Do you see that?

14  A    Yes.

15  Q    Four lines from the bottom, five lines from the bottom?

16  A    Yes.

17  Q    All right.  And it starts with:  The general partner will

18  have the right to suspend redemptions under certain

19  circumstances.  The general partner may withdraw any portion

20  of its capital without prior notice, if the limited partners

21  see the partnership agreement withdrawals by partners.

22            Did I read that correctly, sir?

23  A    You did.

24  Q    And did you read that before you invested?

25  A    Yes.

MARSHALL - CROSS - BRAFMAN

1  Q    And that's standard language in a private placement

2  memorandum when it's a limited partnership with a general

3  partner, correct?

4  A    I'm not sure that this is standard language.

5  Q    But that's the language in this memorandum?

6  A    It is, yes.

7  Q    And it refers you to the partnership agreement?

8  A    Yes.

9  Q    And the partnership agreement was an exhibit to the

10 private placement memorandum, correct?

11 A    Yes.

12 Q    And it's something which you also read before, and that's

13 what the partnership agreement provides, that the general

14 partner has the right, under certain conditions, to suspend

15 redemptions, correct?

16 A    Yes.

17 Q    Now I think Mr. --

18         MR. BRAFMAN:  How do you pronounce your last name?

19         MR. SRINIVASAN:  SRIN-A-VAS-SIN.

20 Q    The government asked you on direct examination whether or

21 not you understood that there was going to be an investment in

22 any restricted securities; is that correct?

23 A    I don't recall being asked that.

24 Q    Okay.  But I'm sorry, the government asked what you

25 thought you were investing in, and I think you said you

MARSHALL - CROSS - BRAFMAN

1   thought you were going to invest in a fund that was long and

2   short, correct?

3   A    Yes.  I was told that the fund invested in public

4   securities, and in some cases they took long positions,

5   meaning that they would hope that they felt stock value would

6   go up, and other cases they shorted the stock, which

7   essentially was an investment predicated on the idea that the

8   stock was overpriced and would go down.

9   Q    Now, before you invested, I think you were taking into

10  consideration what Mr. Blanton said, what Mr. Shkreli said,

11  and also what was written in the private placement memorandum,

12  correct, among other things?

13  A    I would -- I would say that all these are true except

14  that what Blanton said only verified what Martin had already

15  said.

16            (Continued on next page.)

17

18

19

20

21

22

23

24

25

MARSHALL – CROSS – BRAFMAN

1    EXAMINATION

2    BY MR. BRAFMAN:

3    (Continuing.)

4    Q     Okay.

5    A     That they had a invested substantial amount of money,

6    withdrawn substantial amount of money; that he was responsive

7    to withdrawal requests, which was what Martin had told us when

8    we met and what was also put in the partnership agreement and

9    the offering memorandum.

10   Q     Did you have any understanding that part of the

11   investments might be in illiquid securities?

12   A     I don't think that was ever discussed, although I

13   wouldn't be surprised if there's language to that effect in

14   here because you often see that.

15   Q     So look at Page 7, and you're a hundred percent right.

16          On the bottom of Page 7, there is a bold caption

17   that reads, "Restricted Securities."

18          Do you see that?

19   A     Yes.

20   Q     And it basically tells you in clear English language, I

21   have Page 7 up, "The partnership may invest in so-called

22   restricted securities i.e., securities to which the public

23   resale is currently restricted under the Securities Act of

24   1933 as amended."

25          The Securities Act; correct?

MARSHALL - CROSS - BRAFMAN

1    A    That is what it says, yes.

2    Q    And just so we understand, restricted securities

3    includes, for example, what you ultimately got as a share

4    certificate of Retrophin which was restricted; is that

5    correct?

6    A    Well, it's true that that was a stock certificate that

7    was restricted.

8    Q    That's all I'm trying to establish.  Whether a stock

9    certificate that says "restricted" under the Securities and

10   Exchange Act of 1933, that means until you remove the legend,

11   you cannot transfer or sell the stock; correct?

12   A    That's right.

13   Q    And the stock certificate you received from Retrophin at

14   the end of the day was, in fact, restricted and you had to

15   have it removed; correct?

16   A    That's right.

17   Q    And it was removed; correct?

18   A    Well, it wasn't removed by -- Martin agreed to remove it

19   but never did.  So after a year expired, the brokerage firm

20   went through a process of getting the restrictions removed.

21   Q    But the question was, at the end the day, the stock

22   became freely tradeable and the restriction was lifted?

23   A    It's got to be the other way around.  After a year,

24   you're entitled to make application to have the restricted

25   legend removed, and when that's removed then you can sell the

MARSHALL – CROSS – BRAFMAN

1    stock.

2    Q    Okay.

3         Just so we're clear, when it came it was Rule 144

4    stock as you would call it.  Restricted securities, correct?

5    A    I'm not sure about whether it was Rule 144, some other

6    rule, but I wouldn't dispute that either.

7    Q    And then, what you had to do was make application to

8    remove the restriction so that you could trade it and sell it?

9    A    That's right.

10   Q    You took care of that, you brokered it, and you were able

11   to sell it?

12   A    Yes.

13   Q    And however much you realized from the gain, I think we

14   established you're not sure, but you were ultimately able to

15   sell it in the market; correct?

16   A    Yes, that's right.

17   Q    So while when you got it, it was not marketable, it was

18   ultimately marketable?

19   A    Yes.

20   Q    Now, I think they showed you Page 10.  If you could turn

21   to Page 10, sir.

22        Page 10 is labeled "Risk Factors."  Is that correct?

23   A    Yes.

24   Q    All right.

25        The Government read the paragraph under "Risk

MARSHALL - CROSS - BRAFMAN

1    Factors" and I think it says, "All security investments risk

2    the loss of capital.  There can be no assurance that the

3    partnership will be profitable, but that it will not incur

4    losses.  Protective investors should, among other matters,

5    consider the risks summarized below before investing in the

6    partnership.  And investment in the partnership is

7    speculative, involves a high degree of risk, and is suitable

8    only for persons who are willing and able to assume the risk

9    of losing their entire investment."

10        You understood that before you invested; correct?

11   A    Yes, I read that language.

12   Q    Okay.  But you also read the language below which the

13   Government did not point you to, so let me ask you if it has

14   the following language.

15        "Lack of operating history, experience of portfolio

16   manager.  The partnership is a newly formed enterprise and

17   will have no operating history upon which basis potential

18   investors may evaluate its performance."

19        Am I correct?

20        MR. SRINIVASAN:  Objection.

21   Q    Am I reading that correctly?

22        THE COURT:  Overruled.

23   A    You read that correctly.

24   Q    Did you read that paragraph before you invested?

25   A    Yes, I did.

MARSHALL - CROSS - BRAFMAN

1    Q    And the next paragraph begins with, "Dependence Upon

2    portfolio manager."

3          Let me stop for a minute.  You understood the

4    portfolio in MSMB to be Martin Shkreli; correct?

5    A    Yes.

6    Q    And it reads, "As noted above, the success of the

7    partnership will substantially depend upon the efforts of the

8    portfolio manager, Mr. Shkreli.  In the event that Mr. Shkreli

9    ceases to be responsible for the partnership investments for

10   any reason and although another person now may be available to

11   the general partner and the advisor, the operations of the

12   partnership will likely be adversely affected."

13         Now, Mr. Shkreli was the person who you were relying

14   on to administer this portfolio.

15         Correct, sir?

16   A    That's correct, yes.

17   Q    All right.

18         Now, if you could just read with me in the middle of

19   the next paragraph where my finger is pointed, the paragraph

20   begins with, "Dependence upon individual judgment and skill,"

21   you're talking about Mr. Shkreli; correct?

22         That refers to Mr. Shkreli; correct?

23   A    It refers to the portfolio manager which I took to be

24   Mr. Shkreli; correct.

25   Q    Now, if you read down further, I'm going to begin with

MARSHALL - CROSS - BRAFMAN

1    "Accordingly."

2           "Accordingly success of the partnership will be

3    dependent to a large extent on the investment skills and

4    judgment of the portfolio manager.  There can be no assurance

5    that the portfolio manager will successfully identify

6    investments that fulfill the investment objective of the

7    partnership, or that such investments will not cause the

8    partnership to experience losses."

9           And you understood that the portfolio manager is

10   going to be making judgment calls, but his judgment may not

11   always be right; correct, that you're basically being told?

12   A    Yes, but he's making judgment calls within certain

13   parameters.

14   Q    I understand, we'll get to those in a minute.

15          "Alternative investing."  Generally, the first

16   sentence reads, "The partnership is designed for investors

17   seeking potentially long-term growth from alternative

18   investments who do not require regular current income who can

19   accept a high degree of risk in their investment."

20          Let me stop there.  This money was from your IRA;

21   correct?

22   A    Yes.

23   Q    IRA is an Individual Retirement Account?

24   A    That's correct.

25   Q    The money you want to use when you retire?

MARSHALL - CROSS - BRAFMAN

1    A    That's right.

2    Q    You have not retired yet; correct?

3    A    That's right.

4    Q    And the IRA now has substantially more money in it as a

5    result of the investment in this MSMB that it had before you

6    invested; correct?

7    A    Yes.

8    Q    Now, it says here that you're seeking long-term

9    investment; correct?

10   A    Yes.

11   Q    Now, that's the objective of a retirement account as a

12   practical matter because you want to have money when you get

13   old and retired and no longer have income; correct?

14   A    Yes, and I hoped that this investment would be that.

15   Would fit that bill.

16   Q    Okay.  And to some degree it did.

17        You should have held on to your Retrophin stock,

18   it's at $20?

19   A    You don't say.

20        MR. SRINIVASAN:  Objection.

21        THE COURT:    Sustained.

22        MR. BRAFMAN:  I withdraw that.

23        THE COURT:  The jury is to disregard those comments.

24   Q    The last part of the paragraph reads, "The partnership is

25   intended for investment solely by sophisticated investors who

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

MARSHALL - CROSS - BRAFMAN

1    are accustomed to and fully understands the risk of such

2    investments."

3             And you fit that bill; correct?

4    A    Well, I thought I did, yes.

5    Q    Okay.

6             Now, I think on direct examination you were asked

7    whether Mr. Shkreli ever told you about an investment fund or

8    a hedge fund that he had run named Elea.

9             Do you recall that?

10   A    I recall being asked that, yes.

11   Q    You told us that he never told you about Elea; correct?

12   A    I don't believe he did.

13   Q    I would like to you turn to Page 22.

14   A    I have it.

15   Q    All right.

16            If you look -- I don't know what I did to turn off

17   this light off.

18   A    Well, regardless, I see it.

19   Q    I want the jury to see it.  I have it here, but I don't

20   have it on the screen.

21            MR. BRAFMAN:  Do the jurors have it?

22            THE JURY:  (Collectively) Now it is.

23   Q    Okay.  Under "Portfolio Manager," you see that heading?

24   A    Yes, I do.

25   Q    "The following is a summary the business and educational

MARSHALL - CROSS - BRAFMAN

1  background of the portfolio manager who will be responsible

2  for all investment decisions of the partnership.

3          Martin Shkreli.  In addition to performing operating

4  MSMB, Mr.  Shkreli is the founder and portfolio manager of

5  Elea Capital Management."

6          Do you see that there?

7  A    Yes, I do see that.

8  Q    Did you read this before you invested?

9  A    I think it's a 40-something-page document and the answer

10 is yes.

11 Q    I'm not being critical, I'm just saying can you see Elea

12 Capital as a prior fund that Mr. Shkreli was involved with in

13 this offering prospectus before you invested?

14 A    I believe I read this document.

15 Q    Okay.

16          Do you remember whether you asked Mr. Shkreli about

17 Elea Capital good or bad or anything about it?

18 A    I don't believe I did.

19 Q    "Now, prior to forming MSMB, Mr. Shkreli was a healthcare

20 and technology analyst with Intrepid Capital Management.

21 Prior to that, Mr. Shkreli was employed by Cramer Berkowitz

22 and Company?

23          Do you know who Cramer is in the Cramer Berkowitz

24 and Company?

25 A    No.

MARSHALL - CROSS - BRAFMAN

1    Q    Do you know Jim Cramer, the guy who is on CNBC and has

2    that crazy investment show?

3    A    Yes.

4    Q    Did you ask Mr. Shkreli about his experience working with

5    Jim Cramer?

6    A    No.

7    Q    Did you know prior to investing that he started that

8    there when he was 17?

9    A    I did not.

10   Q    Okay.

11        So would it be fair to say that you really didn't

12   ask Mr. Shkreli any questions about his background before you

13   invested, you were investing Mr. Shkreli that you met in the

14   office and that you rant and raved about?

15        MR. SRINIVASAN:  Objection.

16        THE COURT:  Sustained.

17   Q    Now, when I say to you the words, "securities with a

18   limited market," what do you understand that to mean?

19   A    I would understand that it would be securities that there

20   are not enough securities out for there to be a big volume on

21   a daily basis.  So that if you invest in a company that

22   doesn't have big volume, you might have difficulty selling the

23   shares or a big enough volume.

24   Q    You would say that might also be thinly traded

25   securities; correct?

MARSHALL – CROSS – BRAFMAN

1    A    Yes.

2    Q    A security is no good if you can't sell it, or if there

3    is no volume if somebody wants to buy it; correct?

4    A    I wouldn't say it's no good.

5    Q    It's not as valuable or Google or Amazon, or one of those

6    stocks?

7    A    Well, if it's hard to sell it -- that decreases its

8    value.

9    Q    All right.

10        And one of the things you wanted in this investment

11   was to have an investment in, you said, I think, on direct,

12   "freely tradeable securities"?

13   A    Yes.

14   Q    All right.

15        Now, look at what the memorandum provides under

16   Paragraph C on Page 29.

17        You have that, sir?

18   A    Yes.

19   Q    I'm going to read it, and then I'm going to ask you a

20   couple of questions and I will stop every once in a while.

21        "Securities with a limited market.  Securities or

22   other investments, without an active trading market as

23   hereafter defined, shall be assigned clear value by the

24   general partner based upon, One, recent sale price."

25        Let me stop there.

MARSHALL - CROSS - BRAFMAN

1          If I wanted to evaluate a company that was freely

2    tradeable, do you understand what the words, "Last sale mean"?

3    A    Yes.

4    Q    So you look to see what the stock got on the last sale,

5    and if it got $20 a share, the stock will be worth $20 a share

6    in your mind; correct?

7          It's not a trick question.  I just want to -- last

8    sale is easy because you just look at what the stock sold for.

9    If you want to value that stock per share, you have a board

10   that tells you it's selling at $20 a share; correct?

11   A    Well, the reason I hesitate is that's one factor.  And

12   that's probably the key factor, but you might also see that

13   the bid/ask spread is now 18 to 18 and a half, and in that

14   case you think it's worth less than the last trade.

15   Q    But it gives you have a ballpark value?

16   A    Yes, correct.

17   Q    Now, if you go to the second way to value it.  "Opinions

18   of brokers trade actively in the security."

19          If you see a security that's actively traded, you

20   could check with some of the expert money managers and get

21   their opinion as to how much that security is worth; correct?

22   A    I assume that's what that language means.

23   Q    But they do that all the time.  Don't they say, Target

24   price is X and it can affect the way the market reacts.

25          Jim Cramer does it every day.  He says this company

MARSHALL - CROSS - BRAFMAN

1    is undervalued --

2              MR. SRINIVASAN:  Objection, Judge.

3    Q    -- target price of 20 and if it's time--

4              MR. SRINIVASAN:  Objection.

5    Q    -- it can impact on the market; correct?

6              THE COURT:  Sustained.

7    Q    But do you understand -- let me move on to the next

8    question.

9              You can also look at other companies, or other

10   markets for similar companies; correct?

11   A    It says, "Comparison with market values for similar

12   companies."

13   Q    And four, "The investment risk and/or potential."

14              That's always a factor; right?

15   A    Yes.

16   Q    All right.

17              And marketability, if any, and/or such other factors

18   as the general partner in its sole discretion deems

19   appropriate.  What this tells you is that Martin Shkreli, in a

20   company like MSMB, that has no share value and no track

21   history is going to be the person who is going to make the

22   evaluation?

23              MR. SRINIVASAN:  Objection, your Honor.

24              THE COURT:  Sustained.

25   Q    What do you understand that to mean?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

MARSHALL - CROSS - BRAFMAN

1   A     This was somewhat boilerplate that told you if a security

2   is difficult to determine the value, then these were the

3   factors that would be taken into account.

4           As I said there were parameters, for example, the

5   agreement also says that they would never invest in more than

6   ten percent of the fund in securities that did not have --

7   that were not marketable.

8   Q     Is that what it says, ten percent?

9   A     I believe it does.

10  Q     Do you see what else it says after the ten percent.  Let

11  me find it for you.

12  A     I think it's on Page 8 at the top.

13  Q     And what it's says is "The partnership overall investment

14  in restricted securities will be limited, however, to a

15  maximum of ten percent in terms of their costs at time of

16  purchase of current market value of partnership assets."

17          Correct?

18  A     Right.

19  Q     So it's ten percent at cost; right?

20  A     That's what it says, yes.

21  Q     And the shares that you got before you were able to sell

22  them for a lot of money has a value of 000.1 percent, isn't

23  that correct?

24          MR. SRINIVASAN:  Objection, your Honor.

25          THE COURT:  Overruled.

MARSHALL - CROSS - BRAFMAN

1    Q    Isn't that correct, sir?

2    A    Well, I think the stated value -- that didn't mean it's

3    the market value, but it was .0001.

4    Q    And ten percent of .0001 is what?  Nothing?

5    A    That's par value.

6              MR. SRINIVASAN:  Objection.

7              THE COURT:  Sustained.

8    A    A lot of stocks state a par value of --

9              THE COURT:  Excuse me.  I'm going to overrule the

10   objection.

11             You can answer.

12   A    A lot of stocks state a par value which is different from

13   its market value.

14   Q    But the -- let's move on.

15             Now, you had to fill out a subscription agreement;

16   is that correct?

17   A    It is, yes.

18   Q    And I think that was one the exhibits, and it's

19   Government Exhibit 25 in evidence.  It was introduced on your

20   direct examination.

21             You have it, sir?

22   A    What tab?

23             MR. SRINIVASAN:  Tab 16.

24             MR. BRAFMAN:  Thank you.

25             THE WITNESS:   Yes, I have it.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

MARSHALL - CROSS - BRAFMAN

1    Q     All right.

2          Now, this basically tells you to tell the company a

3    little bit about yourself; is that correct?

4    A     It does, yes.

5    Q     Because you have to meet certain criteria to be

6    considered a person who can invest in this; correct?

7    A     Yes.

8    Q     Now, if you look at Page 3 of the subscription agreement

9    under number 3.1, you list yourself as president and CEO of

10   The Rosewood Corporation?

11   A     Yes.

12   Q     It says 3.2, "Please summarize briefly your business and

13   financial background."  And you say you practiced law for 25

14   plus years, have been in business for 15 years, 12 as

15   president of Rosewood; is that correct?

16   A     That's right.

17   Q     And that's all accurate, sir?

18   A     Yes.

19   Q     Now, if you look at 3.3, do you have sufficient knowledge

20   and experience in financial and business matters so that you

21   are capable of evaluating the merits and risks of investing in

22   restricted securities of a private enterprise as the

23   partnership.  Answer:  Yes.

24   A     It says, "Such as the partnership."

25   Q     Yes.  And you check yes?

MARSHALL - CROSS - BRAFMAN

1   A    I did, yes.

2   Q    Okay.

3        And you knew when you were investing based on this

4   question that you were investing in restricted securities of a

5   private enterprise such as the partnership; correct?

6        MR. SRINIVASAN:  Objection.

7        THE COURT:  Sustained.

8   Q    Isn't it what it says?

9        MR. SRINIVASAN:   Objection, your Honor.

10       THE COURT:  Sustained.

11  Q    Did you then write in connection with 3.4, "Please be

12  supply brief information as to any prior investments you have

13  made during the past five years similar to the partnership

14  such as funds of funds, hedge funds, or other private

15  investment partnerships."

16       And you list, and I'm going to try to read it

17  correctly, you invest with Blackrock.

18       What is Blackrock?

19  A    That's a New York based fund of funds.

20  Q    I understand.  It's like a big hedge fund?

21  A    Yes, it is.

22  Q    And Blackstone.  That's a big hedge fund?

23  A    Yes.  Portfolio Advisors.

24  Q    And Portfolio Advisors Fund of Funds, is that another

25  hedge fund?

MARSHALL - CROSS - BRAFMAN

1   A    No, that one is not a hedge fund.

2   Q    Okay.

3        Then you say, "Also, my IRA investor it invests with

4   Southwest Partners Hedge Fund."  Correct?

5   A    Southwell Partners Hedge Fund.

6   Q    So you have a significant degree of experience in

7   partnerships similar to the partnership, MSMB; correct?

8        MR. SRINIVASAN:  Objection, your Honor.

9        THE COURT:  Sustained.

10  Q    Does the question ask you, "Please supply brief

11  information as to any prior investments you have made during

12  the past five years similar to the partnership such as funds

13  of funds, hedge funds, or other private investment

14  partnerships.

15       Did I read that correctly, sir?

16  A    That's the question, yes.

17  Q    Okay.  That's the question.

18       Investing in the past five years similar to the

19  partnership; correct?

20  A    That's the question.

21  Q    And the partnership being MSMB; is that correct?

22  A    Yes.

23       THE COURT:  Mr. Brafman, is now a good point to give

24  the jury a break?

25       MR. BRAFMAN:  Thank you, Judge.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

MARSHALL - CROSS - BRAFMAN

1        THE COURT:  Please put your notebooks on your chairs

2    and don't discuss the case during the break.

3        Thank you.

4        (Jury exits courtroom at 3:  53 p.m.)

5        (Witness leaves the witness stand.)

6        THE COURT:  All right.  Let's take a few minutes.

7        The witness would like to know if it's possible that

8    he'll finish today?

9        MR. BRAFMAN:  I'm sorry, your Honor.

10        THE COURT:  The witness would like to know if it is

11    possible that he can be -- his testimony can be concluded

12    today.

13        MR. BRAFMAN:  I will be finished with cross today.

14    I think it's maybe another 40 minutes at most.

15        THE COURT:  All right.  Well, let's hope for the

16    best.

17        MR. BRAFMAN:  I will do my best.  What time is your

18    flight?

19        THE WITNESS:   I'm flying out tomorrow.

20        MR. BRAFMAN:  I will try and get done today.

21        THE WITNESS:   Tomorrow morning, yeah.

22        THE COURT:  Let's take some time.

23        (Recess taken.)

24        THE COURT:  Can you check to see if the jury is

25    back?

MARSHALL - CROSS - BRAFMAN

1        Thank you.

2        COURTROOM DEPUTY:  Jury entering.

3        (Jury enters courtroom at 4:  11 p.m.)

4        THE COURT:  All the jurors are present.  Please have

5   a seat.

6        You may resume, Mr. Brafman.

7        MR. BRAFMAN:  Yes, your Honor, thank you.

8   EXAMINATION BY
    MR. BRAFMAN:
9   (Continuing.)

10  Q    Mr. Schuyler, I'm going to ask you to look at Page 4 of

11  the subscription agreement which is on the screen.

12       Do you have it, sir?

13  A    Yes.

14  Q    And question 3.5 asks, "Please provide in the space below

15  any additional information which would indicate that you have

16  sufficient knowledge and experience in financial and business

17  matters so that you're capable of evaluating the merits and

18  risks of investing in restricted securities of a private

19  enterprise such as the partnership."

20       And what you write there, correct me if I'm wrong,

21  "I evaluate investments for Rosewood," correct?

22  A    Such investments for Rosewood.

23  Q    And that's true; correct?

24  A    Yes, it is.

25  Q    And now 3.6, "Do you have adequate means of providing for

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

MARSHALL - CROSS - BRAFMAN

1   your current needs and personal contingencies and have no need

2   for liquidity in this investment."  And you checked the box

3   marked, yes?

4   A    That's right.

5   Q    Now, 3.7, are you aware that the proposed offering of

6   perfect interests will involve nonmarketable nontransferable

7   securities requiring your capital investment to maintain for

8   an indefinite period of time and you checked yes; correct?

9   A    I did, yes.

10  Q    And it says, 3.8, "In evaluating the merits and risks of

11  this investment, do you intend to rely on the advice of any

12  other persons who will be acting as your purchaser or

13  representative."

14       And you said no; correct?

15  A    That's right.

16  Q    Can I just have a minute, your Honor.

17       Now, I think we've established, sir, that this

18  investment was on your behalf, but it was for money that it

19  was in an IRA; correct?

20  A    Yes.

21  Q    And your IRA is administered by a custodian; is that

22  correct?

23  A    The assets are held by.  A portion of the assets were

24  held by the custodian IRA Plus Southwest.

25  Q    And do you have to give them notice when you ask for an

MARSHALL - CROSS - BRAFMAN

1   investment out of your IRA and tell them what it is that

2   you're going to be investing in?

3   A     You asked several questions.

4   Q     Let me just break it down?

5   A     What I did was I told them that I was going to invest in

6   MSMB And to wire the funds in accordance with the wiring

7   instructions.

8   Q     And if you look at the, SM, Schuyler Marshall, 0000081

9   it's in back of the materials you're looking at.

10          Do you see that?

11  A     I do.

12  Q     That's the investment authorization form that you filled

13  out for IRA, The IRA Experts; correct?

14  A     They're not experts, they just are custodians.

15  Q     But what they call themselves is IRA experts; correct?

16  It's up there where my finger is?

17          MR. SRINIVASAN:  Your Honor, I think the jury can't

18  see it.

19          MR. BRAFMAN:  I'm sorry.

20  Q     Do you see it?  The IRA Experts?

21  A     That's in their logo, yes.

22  Q     They're the ones who administer part of your IRA;

23  correct?

24  A     Well, administer is not the correct term.

25  Q     They hold it?

MARSHALL - CROSS - BRAFMAN

1   A    Yes.

2   Q    Okay.  And you trust them in holding it?

3   A    Yes.

4   Q    And when you want to invest in something, you're supposed

5   to give them notice as to what you're investing in so they can

6   take the money out of the IRA and send it to the investment

7   vehicle, fair?

8   A    That's right.

9   Q    All right.

10        Now, you have to give them certain assurances, do

11  you not?

12  A    I think I signed a form that had various, sort of, outs

13  for them on the second page.

14  Q    Outs for them, meaning, in case this goes bad, they're

15  not responsible?

16  A    Yes.

17  Q    Now, let's look at one of the outs you gave them which is

18  D.

19        Do you have that, sir?

20  A    I do.

21  Q    And it's SM00082 in evidence.  And under D, it says as

22  follows:  I agree and represent that I have performed or will

23  perform the necessary and required due diligence of a prudent

24  investor with regards to the investment and investment sponsor

25  including, but not limited to, obtaining and reading any

MARSHALL – CROSS – BRAFMAN

1  applicable prospectus, Private Placement Memorandum, offering

2  circular, or similar document prior to authorizing IRA Plus

3  Southwest LLC and/or custodian to make the investment on

4  behalf of my IRA.

5          Did I read that correctly?

6  A     You did.

7  Q     So you're representing to them before they send this

8  money, Relax guys, I've done my own due diligence; is that

9  correct?

10  A     That's correct, yes.

11  Q     So if the investment goes bad, you can't go to them and

12  say, hey, why did you invest in this enterprise?

13  A     Correct.

14  Q     Now, Government Exhibit 104-3 that the Government put

15  into evidence on your direct examination is a series of

16  e-mails and a press release and this is 104-3.

17          And I think you testified to receiving this on or

18  about December 18th and 19th; correct?

19          You see the document?  You can look on the screen,

20  sir, it's easier.

21  A     Okay.

22  Q     You see it?  There's an e-mail from Martin Shkreli to

23  you?

24  A     Yes.

25  Q     An e-mail from Martin Shkreli addressed to friends?

MARSHALL - CROSS - BRAFMAN

1    A    The answer is yes.

2    Q    Okay.

3         And it says, "Please see the attached press release.

4    As many of you know, I have started a biotechnology company,

5    Retrophin, RTRX.  This is my primary focus going forward and I

6    hope you will support me in this new role as I will use my

7    12 years of professional investing in healthcare stocks to

8    guide Retrophin to create shareholder value."

9         And you got that e-mail on or about December 18th?

10   A    Yes.

11   Q    I have took things, Judge, and it's not working?

12        THE COURT:  What would you like to do?

13        MR. BRAFMAN:  I would like to have somebody help me.

14   My VCR is still flashing midnight, Judge.

15   Q    All right.

16        So this is your response when you get this press

17   release for Retrophin on December 19th, you don't say, What

18   the hell is Retrophin?"  You say, "Congratulations."  Correct?

19   A    Yes.

20   Q    Did you know that Martin was investing MSMB Money in

21   Retrophin?

22   A    I did not.

23   Q    Did you know that Martin was starting Retrophin?

24   A    Yes, I had heard, and it seems like a year before they

25   mentioned that they were trying to start Retrophin.  I think I

MARSHALL - CROSS - BRAFMAN

1    referred to that as they were trying to get a license from the

2    University of Minnesota or Michigan, one of those.

3    Q    So you were aware of name, you just didn't know that

4    Martin had put MSMB Money into it?

5    A    That's right.

6    Q    Now, you say, "Congratulations, Martin.  Sounds

7    promising.  Does Retrophin have enough cash to get through

8    phase two and/or start phase three.  If not, what are the

9    plans to secure the needed funds?  Approximately what

10   percentage of the fund value is represented by Retrophin, and

11   when do you plan to close it down and distribute, and am I

12   correct in assuming that distribution will consist of cash and

13   Retrophin shares."

14           You signed is it Schuyler; correct?

15   A    That's right.

16   Q    Now, even though you assume that part of what you would

17   get back would be money and Retrophin shares; correct?

18   A    There was an earlier thing that he sent out which said

19   that they were going to redeem the investors out for cash, or

20   the investors would have the option to take cash and Retrophin

21   shares.

22   Q    And while it took a long time and involved a lot of back

23   and forth between you and Martin, and you and Mr. Greebel and

24   Martin, ultimately, you got back cash and Retrophin shares;

25   correct?

MARSHALL - CROSS - BRAFMAN

1   A    Yes.

2   Q    All right.

3        Now, do you know what MSMB Paid for the Retrophin

4   shares it got to give you back?

5        MR. SRINIVASAN:   Objection, your Honor.

6        THE COURT:  Sustained.

7   Q    Do you know if there was any cost to MSMB For Retrophin

8   shares it used to pay you back?

9        MR. SRINIVASAN:  Objection, your Honor.

10       THE COURT:  Overruled.

11  A    I don't know.

12  Q    Okay.  And when you got the Retrophin shares, there was

13  no cost basis to you; right?

14       Do you know what I mean by cost basis?

15  A    I know what you mean, but I don't really know whether

16  there was or there wasn't.

17  Q    When you got the stock, you just got it.  You didn't pay

18  for it; right?

19  A    That's right.

20  Q    When I say, "Cost basis," if you buy a stock for $10, you

21  sell it for 20, your cost basis is ten; correct?

22  A    That's right.

23  Q    You didn't pay out of pocket for Retrophin shares?

24  A    That's correct.

25  Q    So anything you made when you sold them, whether it was

MARSHALL - CROSS - BRAFMAN

1    40,000 or 600,000, that was profit.  Pure profit; correct?

2    A    Yes.

3    Q    Now, in your experience with hedge funds, if a hedge fund

4    general partner makes a bad trade and it loses money, in your

5    experience is the general partner liable to reimburse the

6    investors out of his own pocket?

7            MR. SRINIVASAN:  Objection, your Honor.

8            THE COURT:  Overruled.

9    A    Absent fraud or gross negligence, I would say not.

10   Q    Because what you're doing in the hedge fund is you are

11   relying on the general partner; correct?

12   A    Yes.

13   Q    And most of the hedge fund prospectuses including this

14   one has a paragraph which basically says, Absent fraud or

15   gross negligence, he's not responsible if he makes a bad

16   trade; correct, sir?

17   A    Yes.

18   Q    Now, did you pay Martin Shkreli or MSMB Or Retrophin any

19   fees for the shares that you got?

20   A    You mean the MSMB Shares or Retrophin shares.

21   Q    Either one.

22   A    MSMB, as I recall, had a one percent management fee and

23   then a 20 percent what's called a back end or a fee or profit

24   sharing that would be 20 percent any gains that the

25   partnership made.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

MARSHALL - CROSS - BRAFMAN

1    Q    And did you ever see any fees being paid to Mr. Shkreli

2    on behalf of your involvement with MSMB?

3    A    I never got an audit, so I never -- some of the monthly

4    statements said this is your account value net of fees.  And

5    some said, gross of fees which meant before fees were taken

6    out.

7    Q    Now, the Government showed you a series of forms you

8    received from Mr. Shkreli in the course of your history with

9    MSMB Starting with 81-1.

10            Do you see that document it's on the screen now?

11   A    Yes, I have to.

12   Q    And you got that on or about March 2, 2011?

13   A    I'm assuming that that I got all of these on the dates

14   that are shown on the documents.

15   Q    And do you know what, if anything, on this document is

16   inaccurate or false?

17   A    I do not.

18   Q    Okay.  Now, go to 81-2.

19            Do you see that document, sir?

20   A    Yes.

21   Q    That's another valuation from Martin Shkreli performance

22   statement Sunday, April 10, 2011?

23   A    Yes.

24   Q    And is it fair to say that you got that on or about that

25   date?

MARSHALL - CROSS - BRAFMAN

1    A    Yes.

2    Q    Do you know what, if anything, on that document is false

3    or inaccurate?

4    A    I assume every one of these documents was accurate.

5    Q    And as you sit here today, do you have any evidence to

6    the contrary?

7    A    I do not.

8    Q    Okay.  Now, 81-3 in evidence is dated Sunday May 8, 2011.

9    Correct, sir?

10   A    Yes.

11   Q    And to save some time, we'll go through the same

12   questions.

13        Do you have any idea whether anything on this

14   document is false?

15   A    Do not.

16   Q    And 81-4 in evidence is dated May 8, 2011.

17        Once again, you have no idea whether anything on

18   this document is false or inaccurate?

19   A    I hope it's all true.

20   Q    Okay.  81-5?

21   A    Same answer.

22   Q    Same answer.  And 81-6?  Same answer?

23   A    Yes, uh-huh.

24   Q    And 81-7?

25   A    Same.

MARSHALL - CROSS - BRAFMAN

1   Q    And the last one is 81-8.  And I think you testified on

2   direct examination that this was the last performance

3   evaluation you received from Mr. Shkreli, and it comes in on

4   September of 2012; correct?

5   A    I testified that was the last written one I got.  He

6   subsequently gave me a verbal one.

7   Q    But the last written one?

8   A    Yes.

9   Q    And the last written one says that the value of your

10  investment is now, approximately $282,237 net of fees?

11  A    That's right.

12  Q    You got $300,000 in cash which is a little bit more than

13  what's stated here; correct?

14  A    That's right.

15  Q    Now, during the calendar year 2010, I'm sorry, 2012, did

16  you continue to have e-mail correspondence with Mr. Shkreli

17  about other companies that he was recommending to you, if you

18  recall?

19  A    I don't recall right now.

20  Q    I'm going to put this up just for the witness and the

21  Government if I can and ask it's designated as Defendant's

22  Exhibit 4459.

23          Does the witness see it?

24          THE COURT:  You need to move.

25  Q    Do you see it?

MARSHALL - CROSS - BRAFMAN

1    A    Yes, I see it.

2    Q    I asked you whether or not you recognize this as an

3    e-mail from you from Mr. Shkreli to you, and from you to

4    Mr. Shkreli in June of 2012?

5    A    I think so, yes.

6              MR. BRAFMAN:  I offer it into evidence as

7    Defendant's Exhibit 4459.

8              MR. SRINIVASAN:  Objection, your Honor.

9              THE COURT:  I understand the basis for the

10   objection.  Do you want to give me the basis for your proffer,

11   sir?

12             MR. BRAFMAN:  I'm sorry.

13             THE COURT:  The basis for your proffer?

14             MR. BRAFMAN:  Do you want me to do it here or there?

15             THE COURT:  If you can do it in one word, but if not

16   we'll go to sidebar.

17             MR. BRAFMAN:  Goes to the continuing relationship

18   between the defendant and this witness during the period in

19   question.

20             MR. SRINIVASAN:  Not on basis.

21             THE COURT:  I will see you at sidebar.

22             MR. BRAFMAN:  I'm sorry.

23             THE COURT:  I'll see you at sidebar.

24             MR. BRAFMAN:  Yes, Judge.

25             (Continued on the next page.)

SIDEBAR CONFERENCE
Sidebar

1    (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4    MR. BRAFMAN:  Your Honor, there is no hard cut that

5    stops the relationship between Mr. Shkreli and this investor

6    because it goes on for years.  And during the period in

7    question, the relationship have part Mr. Shkreli in good faith

8    trying to help this guy and he has testified to other tips he

9    got.

10   This is not one that he has testified too, but I

11   think it's probative of Mr. Shkreli's state of mind believing

12   he's dealing with someone who is a sophisticated investor, and

13   also his state of mind in why he continues to deal with

14   Mr. Shkreli, why he doesn't go to the SEC, why he signs the

15   settlement agreement because he's dealing with someone who

16   keeps helping him.  I don't understand the basis of the

17   objection.

18   MR. SRINIVASAN:  Your Honor, the basis is hearsay.

19   MR. BRAFMAN:  It's not hearsay between two of them.

20   MR. SRINIVASAN:  That's defendant's statements.

21   MR. BRAFMAN:  It's not being offered for the truth

22   of it.  It's being offered for the effect it has on him.

23   I'm not going to ask whether he bought this company

24   or sold this company or made money on it.

25   MR. SRINIVASAN:  One we did.

SIDEBAR CONFERENCE
Sidebar

1        THE COURT:  Okay.  If you're not going to ask him

2   about the effect that it had on him i.e., did you use this

3   information to buy shares why are you offering it.

4        MR. BRAFMAN:  Because it shows the continuing

5   ongoing nature of the relationship.

6        THE COURT:  He testified that he and Mr. Shkreli

7   continued to communicate about stocks that he recommended

8   through, I think, you said June 18th.

9        MR. BRAFMAN:  That's why there's no prejudice to the

10  Government because it's more of the same.

11       MR. SRINIVASAN:  It's not prejudice, your Honor.

12  Prejudice is an element of the hearsay, your Honor.

13       MR. BRAFMAN:  It's not being offered for the truth

14  of it.  It's being offered for the relationship and for the

15  impact it has on him as trusting Martin Shkreli.

16       MR. SRINIVASAN:  You can ask him if the -- we've

17  done this repeatedly refreshing his recollection.  Did Martin

18  Shkreli offer stock tips, did he offer you stock tips, does

19  this refresh your recollection.

20       THE COURT:  First of all, this witness didn't say he

21  can't recall.  He admitted that for June of 2012 he continued

22  to exchange e-mails with Mr. Shkreli about different stock

23  tips.  So.

24       MR. BRAFMAN:  Then we could have been finished with

25  this long ago.  I don't understand the prejudice to the

SIDEBAR CONFERENCE
Sidebar

1    Government.

2              MR. SRINIVASAN:  Yes, your Honor to before the wind

3    down period not being.

4              MR. BRAFMAN:  I'm going to withdraw the offer and I

5    will ask him about it, okay.

6              (End of sidebar conference.)

7              (Continued on the next page.)

CROSS – SCHUYLER – BRAFMAN

1        (In open court.)

2        MR. BRAFMAN:  May I proceed, your Honor?

3        THE COURT:  Yes.

4    EXAMINATION BY

5    MR. BRAFMAN:

6    (Continuing.)

7    Q    In June of 2012, did you continue to have exchange of

8    information between you and Mr. Shkreli?

9    A    Yes.

10   Q    And from time to time, he would send you some idea about

11   a particular stock and you would converse with him about it?

12   A    Yes.

13   Q    Do you recall whether or not he gave you some information

14   concerning a particular drug dealing with Alzheimer's Disease?

15   A    I recall asking if he had a judgment about the company

16   that had such a drug, yes.

17   Q    And in June 18th of 2012, did Martin report to you that

18   the Retrophin was going incredibly well?

19        MR. SRINIVASAN:  Objection, your Honor.

20        THE COURT:  Overruled.

21   Q    In June of 2012, did Mr. Shkreli inform you that

22   Retrophin was going incredibly well?

23   A    I don't have an independent memory of that.

24   Q    Let me ask you to look at 4559 for identification only.

25        Can you see it, sir?

CROSS - SCHUYLER - BRAFMAN

1   A    Yes.  Yes, I do.

2   Q    June 18, 2012.  Does it refresh your recollection?

3   A    Yes, it does.

4   Q    That with respect to Retrophin he was telling you it was

5   going incredibly well?

6   A    Yes.

7   Q    And that is several months before the wind down letter;

8   correct?

9   A    Yes.

10            (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CROSS - SCHUYLER - BRAFMAN

1    Q     Thank you, sir.  And would it be a fair statement that

2    once you came to an agreement in principal that you were going

3    to get cash and stock, that then took a period much longer

4    that you would have liked for it to be resolved?

5    A     Yes.

6    Q     That's some of the back and forth that you and Martin,

7    and then you and Greebel, correct?

8    A     Yes.

9    Q     During this period of time were you keeping tabs on

10   Retrophin independently?

11              MR. SRINIVASAN:  Can I get a time frame, your Honor?

12              THE COURT:  Can you specify a time frame, Sir.

13   BY MR. BRAFMAN:

14   Q     In December 2012, during that time period, after the wind

15   down letter, were you keeping up with developments on

16   Retrophin or Mr. Shkreli?

17   A     I don't believe so.

18   Q     When you got a subpoena from the Government to turnover

19   your documents, do you remember all of the documents you

20   turned over?

21   A     I do not remember.

22   Q     Do you remember turning over an article about Mr. Shkreli

23   that appeared in Forbes?

24   A     I don't remember doing that; but I don't deny that I did

25   if I had it.

CROSS – SCHUYLER – BRAFMAN

1  Q    I'd like you to look at what I've marked for

2  identification as 4454 and ask you if you could look at this

3  and tell me, sir, whether it refreshes your recollection that

4  you were independently trying to keep track of Mr. Shkreli and

5  Retrophin?

6              MR. SRINIVASAN:  Objection, your Honor.

7              THE COURT:  Sustained.  Refrain the question, sir.

8  BY MR. BRAFMAN:

9  Q    Does it refresh your recollection that among the

10 documents you gave the Government when they subpoenaed your

11 records, was an article that referenced Martin Shkreli and

12 Retrophin?

13 A    The direct answer is it doesn't refresh my recollection.

14 But if you tell me this was a document that I turned over to

15 the Government, then I certainly don't deny it.  I may have

16 had it.

17 Q    Look at Bates stamp numbers -- SM is Schuyler Marshall,

18 do you see that?

19             MR. SRINIVASAN:  Objection.

20             THE COURT:  Sustained.

21 Q    Is 1044 in evidence?  It is, thank you.

22             Now, I want to return your attention, sir, to 1044

23 in evidence.  I'm putting it on the screen, a series of

24 e-mails between and Mr. Shkreli, it ends April 8.  Do you see

25 that, sir?

CROSS – SCHUYLER – BRAFMAN

1   A    I do.

2   Q    I want to turn to the prior page, SM000055, which has the

3   beginning of this chain.  Do you see that, sir?

4   A    Yes.

5   Q    Let me start on the bottom, "Martin, I received a

6   Retrophin share certificate with the restrictive legend on the

7   back.  When does the company plan to register these shares or

8   otherwise make them tradeable?  Also, you have indicated that

9   the fund would be liquidating and distributing cash for the

10  remaining balance, when will that occur and what is my

11  approximate remaining balance.  Thank you, Schuyler Marshall."

12  Is that an e-mail you sent to Mr. Mr. Shkreli on February 27,

13  2013?

14  A    Yes.

15  Q    And the response from Mr. Shkreli in March 4 to that

16  e-mail is -- 2013, "Hi, Schuyler.  I hope you're well.  There

17  is no specific registration plan other than we intend to

18  register the shares as soon as possible.  You may be familiar

19  with Rule 144, which allows for the sale of any unregistered

20  security if held for over a year.  I hope we can get them

21  registered a lot sooner than that, but hopefully that gives

22  some error bounds."  I'm going to stop there.

23       That is March 4, 2013, Mr. Shkreli indicates that

24  Rule 144 requires them to be held over one year, a year later

25  you were selling these shares; is that correct?

CROSS - SCHUYLER - BRAFMAN

1    A    It was a little after a year later.

2    Q    Okay, but you were able to sell the shares, correct?

3    A    Yes.

4    Q    Now, the balance of his comments to you is, "The fund

5    focused primary on growing Retrophin and as such this is the

6    only remaining asset."  The let me stop.

7             The fund, you understood that to be MSMB, correct?

8             MR. SRINIVASAN:  Objection, your Honor.

9    BY MR. BRAFMAN:

10   Q    MSMB Capital, is that what you understand that to be, you

11   said the fund?

12   A    I understood that that's what he was referring to in this

13   sentence when he said fund, yes.

14   Q    Now, "The fund focused primarily on growing Retrophin,

15   and as such this is the only remaining asset.  I would be

16   willing to buy back your shares for the most recent quoted

17   value of your fund, if that is of use to you, or give you more

18   shares from my personal shares to "true up" -- in quotation --

19   "your account value."  Let me stop.

20            What do you understand the term "true up," to mean

21   to you?

22   A    I assume that what he was referring is the last value

23   that he had quoted to me, which was over 300,000, and if these

24   shares were not, didn't match up to that value he'd give me

25   more shares to --

CROSS - SCHUYLER - BRAFMAN

1    Q    True up?

2    A    -- to make it equal to that value.

3    Q    To get you whole, correct?

4    A    Yes.

5    Q    Then he continues.  "It is unfortunate the stock market

6    doesn't like Retrophin as much as I do.  However, over time

7    I'm confident the shares will be worth a ton.  I wouldn't be

8    quick to sell them if I were you.  I'm happy to come to Dallas

9    and give you an update on what I'm doing."  You see that?

10   A    Yes, I do.

11   Q    Did you meet him in Dallas?

12   A    No.

13   Q    And did you go to New York to meet him?

14   A    No.

15   Q    His predictions about the shares being worth a ton turned

16   out to be accurate, correct?

17           MR. SRINIVASAN:  Objection.

18           THE COURT:  Sustained.

19   A    Well, in response you say, "Martin, thanks for

20   responding.  What was my most recent quoted account value?  I

21   believe the last I saw in early fall was about 265K.  I do

22   need to consider the option as these are IRA funds, as you

23   know, and thus were intended for conversative investments.  If

24   I do take this option I may buy some RTRX in smaller quantity

25   and in an account that could hold a speculative investment in

CROSS - SCHUYLER - BRAFMAN

1   the future, and look forward to following it closely.

2   Regards, Schuyler."

3           So during this period even though you were asking

4   for your money back, you were still on reasonably pleasant

5   terms with Mr. Shkreli, correct?

6   A    I would say this, that I was really shocked when I found

7   out that the only asset the fund held was Retrophin.

8   Q    I understand.

9   A    But I was trying to remain cordial.  I thought that was

10  the best way to get cash back and into my IRA.  Also, what I

11  was telling him, and it was true, that I would follow

12  Retrophin and consider a small investment, not in my IRA,

13  possibly in the future.

14  Q    Okay.  Now, you then begin to receiving certain

15  correspondence at some point from Mr. Greebel; is that

16  correct?

17  A    Yes.

18  Q    You received correspondence from Mr. Greebel after a

19  period of time when the negotiations are continuing, it's no

20  longer you dealing directly with Mr. Shkreli, you're now

21  dealing at times with Mr. Greebel, correct, sir?

22  A    Let me just say, I believe I started having

23  correspondence with Mr. Greebel in June of 2012 -- 2013,

24  sorry.

25  Q    Now, in June of 2012 is when you started dealing with

CROSS – SCHUYLER – BRAFMAN

1    Mr. Greebel, correct?

2              MR. SRINIVASAN:  Objection, your Honor.

3    Q    Is that what you said?

4    A    I think I meant '13.

5    Q    I'm sorry, June of 2013, I stand corrected.

6              In June 2013 do you know what a litigation hold

7    letter is?

8    A    No.

9    Q    You don't?

10   A    No.

11   Q    You're contemplating litigation, you want the other party

12   to keep documents, not destroy them.  Have you ever sent them

13   a letter or e-mail saying, please hold the documents because

14   they may be needed?

15   A    Yes.

16   Q    All right.  So in the East we refer to that as a

17   litigation hold letter.

18             You sent an e-mail which would be classified as a

19   litigation hold e-mail; isn't that correct?

20             MR. SRINIVASAN:  Objection, your Honor.

21             THE COURT:  Sustained.  You can rephrase it.

22   Q    I'll just show it to him and ask him what he meant.

23   A    I know what you're talking about; yes, I did send that

24   letter, tried to refer to that this morning, to try to ratchet

25   up the pressure that I would be prepared to go to litigation

CROSS – SCHUYLER – BRAFMAN

1   if they didn't carry through with the agreement.

2   Q    I'm going to show you what is in evidence as 104-7.  You

3   read that on your direct examination.  Do you see that, sir,

4   it's on the screen?

5   A    That's it, yes.

6   Q    This is your letter now to Evan Greebel -- your e-mail,

7   sorry -- on June 24, 2013, correct.

8   A    Yes.

9   Q    This is your method of, as you say ratching up the

10  pressure, correct?

11  A    Yes.

12  Q    And letting them know that you were serious about

13  starting litigation if this couldn't be resolved, correct,

14  sir?

15  A    That's a characterization, but in general I was trying to

16  let them know that stalling around had gone on too long.  I

17  wanted them to put an ethical obligation on him to retain all

18  these documents, which I thought would make him nervous to

19  focus on this and finish the agreement.

20  Q    Okay.  And what you say to Mr. Greebel, who was a partner

21  at Capuchin, "Evan, I'm disappointed.  No one is responding to

22  calls or e-mails concerning getting the release executed and

23  our agreement performed.  I am still waiting to proceed" --

24  A    "Willing."

25  Q    "Willing to proceed as we agreed."  Let me stop there.

CROSS - SCHUYLER - BRAFMAN

1    Did you have a verbal understanding with Mr. Greebel

2  as to how this would be resolved or was it with Mr. Shkreli?

3  A    Mr. Shkreli.

4  Q    And you're assuming that Mr. Shkreli had told

5  Mr. Greebel, correct?

6            MR. SRINIVASAN:  Objection, your Honor.

7            THE COURT:  Overruled.

8  A    The way it happened was that Mr. Shkreli sent me an

9  e-mail, it's in evidence, saying -- actually, he sent it to

10  Evan Greebel saying what the deal, was copying me.

11  Q    Right?

12  A    It was $300,000 and the shares of Retrophin and I think

13  6300 more shares.

14  Q    And this is your response now, writing to Mr. Greebel, to

15  your knowledge is this the first time you're writing directly

16  to Mr. Greebel?

17  A    I can't say one way or another.

18  Q    All right.  You say that you are still willing to proceed

19  as we agreed.  Did Mr. Greebel agree with you or was it

20  Shkreli, I want to straighten that out?

21  A    I was referring to Shkreli.

22  Q    "And however, in order to ensure preservation of

23  documents in case they are needed, this confirms my request to

24  be provided the following documents concerning the relating to

25  my account value at the time all times all documents

CROSS - SCHUYLER - BRAFMAN

1  concerning or relating to the funds and Martin's investment in

2  Desert Gateway, Retrophin, all documents concerning relating

3  to Martin's acquisition of his shares in Retrophin, including

4  the consideration for such shares, and relation or referring

5  to those shares issued to other fund shareholders, all

6  documents relating to Martin's decision to convert a long

7  short fund into a single investment in one company, including

8  efforts, if any, to obtain approval for such conversion from

9  any limited partner in the fund, all documents relating to or

10  concerning the disposition of any fund investment.  Evan, my

11  position that no privilege would apply to communications with

12  the attorneys, representing MSMB and Retrophin as those

13  attorneys owe a duty to the entities and their owners

14  including limited partners and minority shareholders.  This is

15  not a complete request and hopefully it becomes moot, through

16  performance of the agreement outlined in the release.  Regard,

17  Schuyler Marshall."

18         Did I read that correctly?

19  A    There were a couple of glitches, but the substance was.

20  Q    You got them -- this letter goes to Evan Greebel, and

21  when you say "hope it becomes moot," you are suggesting you

22  hope litigation becomes moot, that's what you're implying?

23  A    Yes.

24  Q    If you come to a settlement, it will not have to proceed

25  to litigation.

                    CROSS - SCHUYLER - BRAFMAN

1   A    We had already come to a settlement.

2   Q    You just want to finish it?

3   A    Yes.

4   Q    Then later in the summer -- withdrawn.

5        In that earlier one with Mr. Greebel, he writes

6   back, "Schuyler, I've been out of country and just returned.

7   We will revert regarding our conversation from last week."

8        You say, "I will be out of country starting tomorrow

9   for about ten days.  If you wish to, I could sign the release

10  and deliver it to a trusted party, such as Darren Blanton or a

11  local attorney to release to you upon payment of the

12  consideration."

13       Given this is during the summer, both you and

14  Mr. Greebel essentially are informing of your travel or

15  vacation plans?

16  A    Yes.

17  Q    That had something to do with the delay, because they

18  didn't entrust it to Darren Blanton or a third-party, you and

19  Shkreli correct -- you and Greebel?

20  A    That's correct.

21  Q    Now, there was also communication that Mr. Shkreli was

22  copied on by Greebel and you were copied on by Shkreli.  An

23  example of that is 104-12 in evidence, which was gone over on

24  direct examination.  This is the beginning on the bottom where

25  it's Martin Shkreli to you, and then Evan Greebel is copied.

CROSS – SCHUYLER – BRAFMAN

1          And Martin tells you, "After exhaustive talks with

2     our attorneys there will be a revision to the agreement.  You

3     will get this at or about 7:00 p.m. Eastern Standard Time, the

4     revision simple.  It merely removes MSMB as an obligor and

5     references Retrophin alone.  This is crucial for a number of

6     reasons that are beyond my ability to explain.  Evan is

7     copied.  If you have any questions we are sending the wire as

8     we speak.  The money should hit tomorrow morning.  I'm glad to

9     get this behind us."

10          And the money did come the next day, didn't it?

11     A    I think so, I didn't verify that, but it came in a day or

12     two, yes.

13     Q    What Mr. Greebel says is, "I apologize for the delay.  I

14     had some corrective issues."  Do you know what that means?

15     A    I'm not sure what that meant.

16     Q    "As discussed, attached are two settlement release

17     agreements, one between and Retrophin contemplating the

18     payment of the money and second between you and Martin and

19     MSMB relating to the delivery the shares.  In the interest of

20     time I'm simultaneously sending to Martin.  The difference

21     between these two agreements and prior version is that we

22     divided the prior version into separate focus payment

23     obligation, and release of delivery obligation in regards

24     Martin and MSMB, otherwise the agreements are the same.

25     Please be advised if you have any questions, alternatively if

Rivka Teich CSR, RPR, RMR
Official Court Reporter

CROSS - SCHUYLER - BRAFMAN

1    it acceptable, please fax me or PDF one to me."  Do you see

2    that?

3    A    I do.

4    Q    Did you call Mr. Greebel and try to get a further

5    explanation?

6    A    I don't recall doing so.

7    Q    You have practiced law responsibility for 35, 40 years?

8         MR. SRINIVASAN:  Objection.

9         THE COURT:  Sustained.

10   Q    You've been a lawyer for quite sometime by that time?

11   A    Yes.

12   Q    You're not shy about asking questions if you wanted to

13   ask them?

14        MR. SRINIVASAN:  Objection.

15        THE COURT:  You can answer, sir.

16   A    I think if I need to know something I'm certainly willing

17   to ask.  But I don't recall that I asked for clarification of

18   this.

19   Q    You're dealing with, on the other hand a lawyer from a

20   firm that you recognize as a prominent firm, that's part of

21   equation, correct?

22   A    Yes.

23   Q    And at the end of the day you get your release

24   ultimately; is that correct?

25   A    Well, I got documents that I signed.

CROSS - SCHUYLER - BRAFMAN

1    Q     Okay.  Did you read them before you signed them?

2    A     I did, yes.

3    Q     And if you read them before you signed them, you would

4    understand that they refer to Retrophin as a company as part

5    of the entities being released, correct?

6    A     Yes.

7    Q     And you knew by then that Retrophin was a public company?

8    A     Yes, I believe so.

9    Q     You're Chairman of a Board of a public company or a

10   private company?

11   A     Private.

12   Q     And do you know as you sign -- would you have signed the

13   document if you believed you were involved in anything that

14   was fraudulent?

15          MR. SRINIVASAN:  Objection, your Honor.

16          THE COURT:  Sustained.

17   Q     Did you know whether or not Retrophin had approved the

18   document before you signed it?

19   A     I assume they did.

20   Q     But you didn't make inquiry?

21   A     Well, it's a major New York law firm representing the

22   company.  They are the lawyers, not me.  And I was, I just

23   assumed that they had authority to do what they agreed to do.

24   Q     You were getting the money, sir, correct?

25   A     Yes.

CROSS - SCHUYLER - BRAFMAN

1  Q    All right.  Now I think we have verified that on

2  August 29 a wire for $300,000 was actually sent and went to

3  FDO Morgan Stanley Smith Barney for credit to your account?

4  A    That's where it went.  I'm not certain of the date, but

5  it was close to that date.

6         MR. BRAFMAN:  Let me have a minute, your Honor.

7  Q    Did there come a time when you were contacted by the SEC?

8  A    Yes.

9  Q    What happened was you received a letter from Eric Schmidt

10  of the SEC asking you to come for a voluntary interview; is

11  that correct?

12  A    Yes.

13  Q    And you then contacted Martin Shkreli?

14  A    I did.

15  Q    I'm going to show you a copy of Exhibit 4460 for

16  identification.

17         MR. SRINIVASAN:   There is no question pending.

18  Q    Do you remember what you said to Mr. Shkreli?  Do you

19  remember what he said to you after you were contacted by the

20  SEC?

21  A    Yes.

22  Q    Maybe we don't need to use this.

23         Do you remember telling Mr. Shkreli in words or

24  substance that you received a letter from Eric Schmidt of the

25  SEC asking you to come in for a voluntary interview?

CROSS - SCHUYLER - BRAFMAN

1    A    Yes.

2    Q    In words or substance you told Martin Shkreli that you're

3    not inclined to submit to a voluntary interview?

4    A    Yes.  I had agreed in a settlement to notify him if

5    anybody contacted me about the settlement.

6    Q    This is a confidentiality clause?

7    A    Yes.

8    Q    You notified Mr. Shkreli about the contact from the SEC

9    and Mr. Shkreli encouraged you to go in there and tell the

10   truth, didn't he?

11   A    In substance, yes.

12   Q    Well, it's not in substance, it's in detailed words.  Do

13   you remember the conversation?

14   A    I don't remember the exact words, but the gist of it is

15   as you said, yes.

16   Q    That you should go and cooperate of fully with the SEC

17   and provide them any information to resolve the interview?

18   A    I believe that's correct.

19   Q    And then you asked Martin Shkreli whether or not you

20   should tell them that you should ask whether the SEC

21   understands the, "no harm, no foul" concept?

22             MR. SRINIVASAN:  Objection.

23             THE COURT:  Overruled.

24   Q    Did you say that to Mr. Shkreli?

25   A    Yes, I did.

MARSHALL – REDIRECT – MR. SRINIVASAN

1    Q    What did you understand the "no foul, no harm" concept to

2    mean?

3              MR. SRINIVASAN:  Objection, your Honor.

4              THE COURT:  Overruled.

5    A    What I meant by that, I was trying to give them some

6    encouragement.  At this point I felt that even though it had

7    taken a long time, he had ultimately paid back my investment

8    and then some.  I appreciated it.  And I had heard that, I

9    think he in fact told me, he was trying to deal similarly with

10   all the other investors.  My point here was that I had not

11   been harmed in terms of losing money.  In fact, I made money.

12   That's what I meant by no harm, no foul.

13             MR. BRAFMAN:  Thank you, sir.  Have a pleasant sent

14   trip back.

15             THE COURT:  Redirect?

16             MR. SRINIVASAN:  One moment, your Honor.

17   REDIRECT EXAMINATION

18   BY MR. SRINIVASAN:

19   Q    Mr. Marshall, Mr. Brafman just asked you about some

20   communications you had with the defendant regarding the SEC

21   subpoena you received?

22   A    Yes.

23   Q    And in the communications that he was, Mr. Brafman, was

24   citing, you also told the defendant that you think the picture

25   is essentially a number of Acting Rule violations, correct?

MARSHALL - REDIRECT - MR. SRINIVASAN

1          MR. BRAFMAN:  Objection, your Honor.

2          THE COURT:  I'm sorry, I didn't hear the question.

3    Would you repeat it?

4    Q    In the communications that you had with Mr. Shkreli, you

5    also said that you think the picture is essentially a number

6    of Acting Rule violations?

7          MR. BRAFMAN:  Objection, your Honor.

8          THE COURT:  Overruled.

9    A    Yes.

10   Q    What did you mean by that?

11   A    In effect what I was saying, is that the no harm, no foul

12   applied to me and I assumed other investors who had been paid

13   back.  And that that's one issue.

14          A separate issue is whether or not they had

15   adequately had complied with Securities Act and Securities

16   Rules in the handling of this, in particular converting a

17   hedge fund investment into a single investment in a non-traded

18   company.  That was what as I was referring to.

19   Q    Mr. Marshall, Mr. Brafman went through a series of the

20   performance reports that you received?

21   A    Yes.

22   Q    And he asked you for each of those whether you thought

23   anything on those performance reports were false, do you

24   recall that?

25   A    Yes.

PROCEEDINGS

1    Q    Have you ever seen bank records for MSMB Capital?

2    A    No.

3    Q    Have you ever seen brokerage records for MSMB Capital?

4    A    No.

5             MR. SRINIVASAN:  No further questions.  Thank you.

6             MR. BRAFMAN:  Nothing, your Honor.

7             THE COURT:  All right, sir.  Have a pleasant trip

8    back to Texas.

9             THE WITNESS:  Thank you.

10            (Whereupon, the witness was excused.)

11            THE COURT:  Does the Government have another

12   Government witness they would like to call between now and

13   5:30?

14            MS. SMITH:  It's up to the Court to proceed with

15   another witness.  Or we have a stipulation for the witness on

16   bank records that I could read now.

17            THE COURT:  If the jury would just indulge us a

18   little longer, the Government will read a stipulation, which I

19   explained is an agreement between the parties as to fact.

20   Please listen carefully.

21            MS. SMITH:  Your Honor, procedurally if it would

22   help for the jury to see the stipulation as we put it into

23   evidence.

24            THE COURT:  On the document camera or the laptop?

25            MS. SMITH:  Laptop.  Stipulation 801.  It reads, "It

PROCEEDINGS

1    is hereby of stipulated and agreed by between the undersigned

2    parties that, one, Government Exhibit 501 consists of true and

3    accurate copies of JP Chase records for MSMB Capital

4    Management LP, account number ending 9453, and is admissible

5    in evidence at trial.

6            "Two, Government's Exhibit 502, 502-1, and 502-2

7    consists of true and accurate copies of interactive brokerage

8    records for MSMB Capital Management LP account number ending

9    1231, and are admissible in evidence at trial.

10           "Three, Government's Exhibit 503 consists of true

11   and accurate copies of JP Morgan Chase records for MSMB

12   Healthcare Management LLC for account number ending 1768, and

13   is admissible in evidence at trial.

14           "Four, Government's Exhibit 504 consists of true and

15   accurate copies of JP Morgan Chase records for MSMB Healthcare

16   Investors LLC, account number ending 3319, and is admissible

17   in evidence at trial.

18           "Five, Government's Exhibit 505 consists of true and

19   accurate copies of JP Morgan Chase records for MSMB Healthcare

20   LP, account number ending 7700, and is admissible in evidence

21   at trial.

22           "Six, Government's Exhibits 506 and 506-1 consists

23   of true and accurate copies of Bank of America records for

24   MSMB Healthcare LP, account number ending 9143, and are

25   admissible in evidence at trial.

PROCEEDINGS

1          "Seven, Government's Exhibit 507 consists of true

2    and accurate copies of Merlin Securities records for MSMB

3    Healthcare LP, account number ending 2983, is admissible in

4    evidence at trial.

5          "Eight, Government's Exhibit 508 consists of true

6    and accurate copies of JP Morgan Chase records for Retrophin

7    LLC, account number ending 2444, and is admissible in evidence

8    at trial.

9          "Nine, Government's Exhibit 509 consists of true and

10   accurate copies of JP Morgan Chase records for Retrophin

11   Incorporated, account number ending 2527, and is admissible in

12   evidence at trial.

13         "Ten, Government's Exhibit 510, consists of true and

14   accurate copies of JP Morgan Chase records for Retrophin

15   Incorporated, account number ending 3600, and is admissible in

16   evidence at trial.

17         "Eleven, Government's Exhibit 511, consists of true

18   and accurate copies of JP Morgan Chase records for Retrophin

19   Incorporated, account number ending 3830, and is admissible in

20   evidence at trial.

21         "Twelve, Government's Exhibit 5126, consist of true

22   and accurate copies of JP Morgan Chase records for Retrophin

23   LLC, account number ending 8845, and is admissible in evidence

24   at trial.

25         "Thirteen, Government's Exhibit 513 consists of true

PROCEEDINGS

1    and accurate copies of JP Morgan Chase records for Retrophin

2    Incorporated, account number ending 9678, and is admissible in

3    evidence at trial.

4              "Fourteen, Government's Exhibit 514, consists of

5    true and accurate copies of JP Morgan Chase records for the

6    defendant Martin Shkreli, account number ending 6097, and is

7    admissible in evidence at trial.

8              "Fifteen, Government's Exhibit 515, consists of true

9    and accurate copies of JP Morgan Chase records for Desert

10   Gateway, account number ending 8730, and is admissible in

11   evidence at trial.

12             "Sixteen, this stipulation marked Government's

13   Exhibit 801 is admissible in evidence at trial."

14             It's dated June 28, 2017, signed by the parties.

15             THE COURT:  All right, thank you.

16             How are the jurors feeling?  Would you like be

17   excused for the evening and come back at 9:00 o'clock?  Yes,

18   why don't we do that.

19             Ladies and gentlemen, please leave your notebooks on

20   your chairs, conscious of any exposure about this case or

21   Mr. Shkreli.  And please don't talk about this case.

22             I'll see you tomorrow, and we hope to put you in

23   this the jury box by nine.  Thank you.

24             (Jury exits the courtroom.)

25             THE COURT:  Thank you.  Is there anything I need to

PROCEEDINGS

1    address at this time before we adjourn?

2              MS. KASULIS:  No, your Honor.

3              MR. BRAFMAN:  No, your Honor.

4              THE COURT:  Thank you.

5

6              (Whereupon, the matter was adjourned July 11, 2017

7    at 9:00 a.m..)

8

9                        *    *    *    *    *

10

11   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

12

13   Rivka Teich, CSR RPR RMR
     Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2     WITNESS                                    PAGE

3     RICHARD KOCHER
      DIRECT EXAMINATION      BY MR. SRINIVASAN  2340
4     CROSS-EXAMINATION       BY MR. AGNIFILO    2385
      REDIRECT EXAMINATION    BY MR. SRINIVASAN  2422
5
      SCHUYLER MARSHALL
6     DIRECT EXAMINATION      BY MR. SRINIVASAN  2423
      CROSS-EXAMINATION       BY MR. BRAFMAN     2481
7     REDIRECT EXAMINATION    BY MR. SRINIVASAN  2595

8     *             *                *           *              *
                           I N D E X

9

10                         EXHIBITS

11    GOVERNMENT               PAGE
      107-12                   2347
12    107-15                   2350
      107-16                   2353
13    107-18                   2355
      107-22                   2357
14    107-23                   2360
      107-25                   2362
15    107-26                   2366
      107-28                   2368
16    107-29                   2369
      107-32                   2378
17    107-33                   2381
      6                        2431
18    25                       2438
      81-1 through 81-8        2441
19    109-9                    2445
      104-3                    2447
20    104-4                    2451
      104-6                    2458
21    104-8                    2459
      104-7                    2462
22    104-12                   2466
      57A                      2468
23    57B                      2468

24

25

                  Rivka Teich CSR, RPR, RMR
                   Official Court Reporter