1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        15-CR-00637(KAM)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4              Plaintiff,              Brooklyn, New York

5              -against-               July 12, 2017
                                       9:00 a.m.
6    MARTIN SHKRELI,

7              Defendant.

8    ------------------------------x

9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
              BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                 UNITED STATES DISTRICT JUDGE
                       BEFORE A JURY
11
     APPEARANCES
12
     For the Government:        BRIDGET M. ROHDE, ESQ.
13                              Acting United States Attorney
                                Eastern District of New York
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                              BY:  JACQUELYN M. KASULIS, ESQ.
                                BY:  ALIXANDRA ELEIS SMITH, ESQ.
16                              BY:  G. KARTHIK SRINIVASAN, ESQ.
                                Assistant United States Attorneys
17

18   For the Defendant:        BRAFMAN & ASSOCIATES, P.C.
                                767 Third Avenue
19                              New York, New York 10017
                                BY:  BENJAMIN BRAFMAN, ESQ.
20                              BY:  MARC AGNIFILO, ESQ.
                                BY:  ANDREA ZELLAN, ESQ.
21                              BY:  JACOB KAPLAN, ESQ.

22   Court Reporter:           Rivka Teich, CSR, RPR, RMR
                                Phone:  718-613-2268
23                              Email:  RivkaTeich@gmail.com

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25

```
1              COURTROOM DEPUTY:  All Rise.

2              THE COURT:  Counsel, good morning.  Do you have any

3    issues you'd like to bring o up to the Court?

4              MR. BRAFMAN:  No.

5

6              THE COURT:  All right.  Thank you.

7              (Jury enters the courtroom.)

8              THE COURT:  Good morning, members of the jury.  All

9    are present.  Have a seat everybody.

10             The Government would like to continue the

11   examination.

12             MS. KASULIS:  Yes, your Honor.

13             (Witness enters.)

14             THE COURT:  Good morning.

15             THE WITNESS:  Good morning.

16             (Witness takes the witness stand.)

17   STEVEN RICHARDSON, called as a witness, having been previously

18   first duly sworn/affirmed, was examined and testified further

19   as follows:

20             THE COURT:  Nice to see you you're still under oath,

21   sir, the Government will continue its examination.

22             THE WITNESS:  Thank you.

23             MS. KASULIS:  May I proceed, your Honor?

24             THE COURT:  Yes, you may.

25   (Continued)
```

STEVEN RICHARDSON – DIRECT – MS. KASULIS

1   DIRECT EXAMINATION

2   BY MS. KASULIS:

3   Q    Good morning, Mr. Richardson.

4   A    Good morning.

5   Q    So yesterday we spoke about Retrophin and the 2012 time

6   period, now we'll talk about Retrophin in the 2013 time

7   period.  During that time period, 2012 to 2013, who was

8   controlling Retrophin?

9   A    Martin Shkreli was certainly leading the company.

10  Q    Who had access to Retrophin's bank accounts during that

11  time period?

12  A    Martin.

13  Q    Following the reverse merger that we spoke about

14  yesterday, did you have any discussions with the defendant

15  regarding the status of your investment in Retrophin?

16  A    Yes, I did.

17  Q    So I'm showing you what is marked for identification as

18  Government's Exhibit 122-38, tab 49 of your binder.  It's --

19  122-39, I'm sorry.

20  A    Bear with me.  It's tab?  I'm sorry.

21  Q    Tab 49 of your binder.

22  A    Thank you.

23  Q    Do you recognize this document?

24  A    Yes.

25  Q    What is it?

STEVEN RICHARDSON – DIRECT – MS. KASULIS

1    A    It is an e-mail from Martin telling us that our stock

2    certificates are available.

3    Q    What is the date on this e-mail?

4    A    Dated January 24, 2013.

5         MS. KASULIS:  The Government moves this exhibit into

6    evidence.

7         MR. AGNIFILO:  No objection.

8         THE COURT:  We'll receive 122-39.

9         (Government Exhibit 122-39, was received in

10   evidence.)

11   Q    This appears to be an e-mail from Mr. Shkreli to a number

12   of receipts including yourself, Mr. Richardson?

13   A    Yes.

14   Q    The date is January 24, 2013?

15   A    Yes.

16   Q    It's regarding Retrophin stock certificates?

17   A    Yes.

18   Q    The first sentence reads, "You may now call our transfer

19   agent Standard Registrar and Transfer Company" -- with the

20   phone number -- "and request the FedEx of your stock

21   certificates.  Once you receive your certificates you may

22   deposit them at a brokerage of your choice at your

23   convenience.  The shares will be restricted from trading until

24   a registration statement is filed."

25         What does that mean to you, that the shares will be

STEVEN RICHARDSON – DIRECT – MS. KASULIS

1  restricted from trading?

2  A    That there was a period of time that we, as investors,

3  have to hold them, not able to trade them.

4  Q    If you look at the next paragraph, he states, "Of course

5  I trust there will not be any sellers whatsoever."  Then goes

6  on to say, "In all seriousness, thank you for your support."

7       Did you feel any pressure from the defendant to not

8  sell your Retrophin stock?

9       MR. AGNIFILO:  Objection to the form of the

10  question.

11       THE COURT:  Try to rephrase it Ms. Kasulis.

12  BY MS. KASULIS:

13  Q    During this time period did you have any discussions with

14  the defendant regarding selling your Retrophin stock?

15  A    No, I did not.

16  Q    Now I'm showing you what's been marked for identification

17  as Government's Exhibit 122-97, it's tab 50 of your binder.

18  A    Yes.

19  Q    Do you recognize this document?

20  A    Yes.

21  Q    What is it?

22  A    An e-mail exchange between myself and Martin.

23  Q    What is the date on the exchange?

24  A    Starts on the 7th of March, 2013.

25       MS. KASULIS:  The Government moves this exhibit into

STEVEN RICHARDSON – DIRECT – MS. KASULIS

1    evidence.

2             MR. AGNIFILO:  It's one of new exhibits, I just have

3    to -- no objection.

4             THE COURT:  We will receive Government's Exhibit

5    122-97.

6             (Government Exhibit 122-97, was received in

7    evidence.)

8    BY MS. KASULIS:

9    Q    Mr. Richardson, if we could start with the first email

10   chronologically in the chain, March 7, 2013, from you to

11   Mr. Shkreli with a title, "clarify headline numbers."  Can you

12   read this, what you wrote in this e-mail to the jury?

13   A    "Hi again M.  I know you are sending me the

14   reconciliation of my monies with you from MSMB Capital through

15   to the present day.  But I need to submit my Form 4 for the

16   recent stock purchases is adding more urgency.  Evan's team

17   sent me back the Form 4 saying I hold 99,055 shares after the

18   1,000 I had purchased.  Is that the common stock?  I am

19   holding preferred stock as well, but I don't have to record on

20   the Form 4.  I'm trying to see where my total value sits,

21   knowing how well it grew from the MSMB fund and through the

22   private Retrophin holding, where I know you kindly gave me an

23   extra stock along the way.  I clearly have a lot more of the

24   99,000.  I don't want to sign the Form 4 until I know the

25   accurate picture.  Please give me the overall picture so I

STEVEN RICHARDSON – DIRECT – MS. KASULIS

1    know how to submit the Form 4 correctly."

2    Q      What is a Form 4?

3    A      A Securities Exchange requirement to log how many, what

4    my shareholding is.

5    Q      Had you just made another purchase of Retrophin stock, is

6    that what you're discussing, in part, in this e-mail?

7    A      Yes.  I additionally just purchased 1,000 shares myself.

8    Q      If we go to the Mr. Shkreli's response.

9    A      He says, "Yes, it is a lot more, let me do some work."

10   Q      Do you respond to this e-mail?

11   A      Yes.  I say, "Good.  I know I have north of 5 percent

12   when it was 8 million shares.  I know that was diluted when

13   the financing took us to 12 million.  Look forward to

14   confirmation."

15   Q      When you say, "I know I had north of 5 percent," what are

16   you referring to there?

17   A      Both verbal commitments that Martin had given me and the

18   Capitalization Table, which said I would be getting 5 percent

19   of the company stock.

20   Q      When you refer to, "when the financing took us to

21   12 million," what are you referring to there?

22   A      We initially were operating with 8 million shares.  And

23   as you go out and sell more shares we went from 8 million to

24   12 million.  So whatever percent I had will be slightly

25   diluted, slightly smaller, a piece of 12 million instead of a

STEVEN RICHARDSON - DIRECT - MS. KASULIS

1    piece of 8 million.

2    Q    During this time period, did you continue to have

3    discussions with the defendant about your holdings in

4    Retrophin?

5    A    Yes.

6    Q    I'm showing you what's been marked for identification as

7    Government's Exhibit 122-41, it's tab 51 of your binder.

8    A    Yes.

9    Q    Do you recognize this document?

10   A    Yes.

11   Q    What is it?

12   A    An e-mail exchange between myself and Martin.

13   Q    The date on the e-mail exchange?

14   A    It starts on March 13, 2013.

15        MS. KASULIS:  The Government moves this exhibit into

16   evidence.

17        MR. AGNIFILO:  Can we approach for a second?

18        THE COURT:  Yes.

19        (Continued on the next page.)

20        (Sidebar conference.)

21

22

23

24

25

SIDEBAR CONFERENCE

1        THE COURT:  Can you work it out?

2        MR. AGNIFILO:  We might be able to.  So the

3    objection is, this is one of -- the format is different, one

4    of the Jackson Su emails that's been our position he stole.

5    But, so what we're going to do is this, I don't want to

6    interrupt the direct.  It's harmless.  But I don't want to

7    waive the objection by letting this in.  What we'll do is put

8    it in then substitute, you probably have another one.

9        MS. SMITH:  Just so it's clear, when Mr. Su was

10   copying and printing out these e-mails, obviously the MSMB

11   Capital e-mail address is one that, as we discussed early on,

12   was on the Retrophin servers.  However, Mr. Shkreli, after he

13   was terminated went back into the servers and deleted

14   documents.  And not all of the documents with that e-mail

15   address remain on the server.  I don't know whether or not we

16   are going to be able to get this off of the Retrophin server.

17       It's our position that this is an authentic

18   document.  And Mr. Richardson can testify that he actually

19   received this document.  It has his e-mail address on it.  We

20   understood the objection with Mr. Su, in part, because Mr. Su

21   himself didn't send or receive this e-mail.  He was watching

22   them pop up and printed them out.  But whether or not we are

23   going to get this off of Retrophin servers is another question

24   because of the actions that the defendant himself took.

25       THE COURT:  What about Mr. Richardson, does he have

Rivka Teich CSR, RPR, RMR
Official Court Reporter

SIDEBAR CONFERENCE

1    this e-mail change?

2           MS. KASULIS:  I have to go back and look.

3           MR. AGNIFILO:  Here is what I'm happy to do.  The

4    only reason I'm objecting, I've made a legal objection and I

5    don't want to waive it by letting it in but I also don't want

6    to interrupt the flow of the direct.

7           What I'm happy to do is, if you have another version

8    of this, and you can swap it out later, you'll do that.  If

9    you don't have another version of it, without waiving my

10   objection overall to the proprietary of the Su e-mails, I

11   don't want to interrupt the trial obviously.  We'll just let

12   it come in with that understanding.

13          THE COURT:  Well, all right.  I don't know how you

14   would propose to authentic this Su e-mail.  The Government

15   does have a difficult position if this fact what they say is

16   correct, that Mr. Shkreli deleted e-mails from the servers

17   where you would have otherwise not have an objection.

18          MR. AGNIFILO:  I don't know that that's true.  I'll

19   work with them.  I'm not going to object.  I'm putting my

20   objection here.

21          MS. SMITH:  It may be that we can find another

22   version.

23          MR. AGNIFILO:  If you can, great; if you can't,

24   without waiving the overall objection.

25          MS. KASULIS:  This is the version that was clearest

Rivka Teich CSR, RPR, RMR
Official Court Reporter

SIDEBAR CONFERENCE

1    that we got.

2              MR. KAPLAN:  Presumably you would have his AOL

3    account also.

4              MS. KASULIS:  Right.  We have to check.  It could

5    have been this was a clearest version, for example, that

6    didn't have writing on it.

7              MR. AGNIFILO:  If you swap it out, great; if not,

8    don't.

9              THE COURT:  So it will be admitted.

10             MR. AGNIFILO:  Yes.

11             (End of sidebar conference.)

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

RICHARDSON - DIRECT - KASULIS

1      (In open court.)

2      MR. AGNIFILO:  With the understanding that we

3  discussed at sidebar, I waive the objection to this one

4  document.

5      THE COURT:  All right.  We will admit Government's

6  Exhibit 122-41.

7

8  BY MS. KASULIS:

9  Q    Mr. Richardson if we could start with the earliest e-mail

10  in this chain.  This e-mail chain is between yourself and

11  Mr. Shkreli; is that right?

12  A    Yes.

13  Q    So it appears that this you sent an e-mail on March 13,

14  2013, to Mr. Shkreli and it's regarding candidate, you say,

15  "Hi M.  Hope the trip and presentation go well.  I'm now back

16  in NYC and had a good call with Marc Panoff.  Let me know when

17  you're back in NYC so I can debrief you on my thoughts.  Save

18  travels S."

19      Who is Marc Panoff?

20  A    One of the candidates I was interviewing for our Chief

21  Financial Officer position.

22  Q    If we go to Mr. Shkreli's response starting on the prior

23  page, the first page of the document.

24  A    Yes.

25  Q    Dated March 13, 2013, he states, "Just a reminder, we

RICHARDSON – DIRECT – KASULIS

1   have never given options or stock to anyone, something we are

2   sorely overdue for."  On the bottom he lists out you're first

3   MSMB Capital Management investment?

4   A    Yes.

5   Q    If you go to the top of the next page, zoom in on this

6   whole e-mail.

7   A    Yes.

8   Q    Mr. Shkreli appears to list out his accounting of your

9   various investments in MSMB Capital, and then Retrophin LLC do

10  you see that at the top portion here of the page?

11  A    Yes.

12  Q    Is he states, "Total cash invested 460,000," and then

13  referring to the units of Retrophin owned, then in bold

14  states, "122,916 total shares post conversion times $4.90

15  stock price equals $602,288.40."  Do you see that there?

16  A    Yes.

17  Q    So underneath that he writes, "So according to my math,

18  you're missing about 25,000 shares."  When he was referring to

19  shares is he referring to Retrophin shares?

20  A    Yes, he is.

21  Q    He then write, "The company has never given stock out to

22  you, which I think is something overdue, perhaps even owed to

23  you, and that we should discuss ASAP."  What is your reaction

24  to seeing that the company had never given stock out to you?

25  A    A little surprised, a little surprised.  I'd been a Board

RICHARDSON - DIRECT - KASULIS

1   member for a period of time.  I was expecting some recognition

2   as a Board member, but we hadn't discussed it as a specific

3   number at that point.

4   Q    And then you respond to this e-mail; is that correct,

5   Mr. Richardson?

6   A    Yes.

7   Q    What is the subject line here of this e-mail?

8   A    "Major concern".

9   Q    Was that actually different than the subject line for the

10  e-mail that Mr. Shkreli sent you that you're responding to?

11  A    Yes, I had changed it.

12  Q    Why did thank you change it to major concern?

13  A    Because I felt the response here just given me, the one

14  we reviewed, was significantly different than what he said to

15  me even a few days earlier in talking about the 5 percent of

16  the company and talking about the aspects of the

17  Capitalization Table.

18  Q    Can you please read your e-mail that you sent to

19  Mr. Shkreli in response to his e-mail.

20  A    "M, this is exactly why I had been asking for an accurate

21  accounting for months.  Your summary below is well off the

22  mark, even at a factual level, and that's pushing the verbal

23  and written commitments to the side for the moment.  If your

24  numbers below are to believe, then you're asking me to accept

25  an actual loss on my investment since MSMB, and then have the

RICHARDSON - DIRECT - KASULIS

1    news compounded with zero upside from getting Retrophin from

2    day one, where I signed papers telling me we have potential

3    stock pricing before we went public" -- excuse me,

4    "preferential stock pricing before we went public.  Also any

5    calculation of my investments into Retrophin as a public stock

6    would be need to be assessed at agreed initial strike price

7    which I recall was $2 or 2.50 not 4.90.  As a founding

8    investor how can there be no accurate record of my accumulated

9    investments?  I'm at a dinner with friends but will send a

10   list of facts back to you in the morning, which will then need

11   to be tracked back to the market pricing decisions taken been

12   Retrophin each step of the way.  This is a huge disappointment

13   to me and a lesson to me letting friendship drive blind faith.

14   And no, I haven't spoken with the transfer agent.  I wanted an

15   accurate reconciliation of my stockholding before I did,

16   fearing you didn't have an accurate record."

17   Q    When you write here, "This is a huge disappointment to me

18   and a lesson to me letting friendship drive blind faith," what

19   do you mean there?

20   A    I had raised this issue back at the point of our

21   Capitalization Table coming out when I first raised the

22   subject of Martin saying I really want to have a clear picture

23   of what my stockholdings are and the value of them.  And so I

24   was blindly waiting from, I think November through to March,

25   expecting he'd give me an accurate response at this point.

RICHARDSON - DIRECT - KASULIS

1  Q    When you say not, "letting friendship drive blind faith,"

2  what do you mean by that?

3  A    Again, trusting that he would be coming back to me at

4  this point with an accurate reflection of the stock I was

5  holding per the Capitalization Table from late 2012.

6  Q    Let's look at -- did Mr. Shkreli in fact respond to this

7  e-mail?

8  A    Yes.

9  Q    Let's look at that response.

10 A    Yes, do you want me to read it?

11 Q    I can read the first couple of sentences.  "Yes,

12 Retrophin has not been a good investment in the last six

13 months.  There wasn't much we could do other than what we did.

14 There is some good news, we should be able to transfer some

15 stock from Marek and myself to make sure everyone ends up a

16 winner."  When you saw the "Retrophin has not been a good

17 investment in the last six months," what was your response to

18 that?

19 A    I certainly knew given the strategic direction, that we

20 had to move in a different direction, but I was surprised to

21 see it written like that.

22 Q    Did you in fact send in your own accounting of your

23 holdings in Retrophin to the defendant?

24 A    Yes, I did.

25 Q    I'm showing you what's been marked for identification as

RICHARDSON - DIRECT - KASULIS

1   Government's Exhibit 122-42, and it's tab 52 of your binder.

2   Do you recognize this exhibit, Mr. Richardson?

3   A    Yes.

4   Q    What is it?

5   A    It is my own reconciliation starting to layout my

6   assessment of the facts on my stockholding in an e-mail

7   exchange with Martin.

8            MS. KASULIS:  Government moves this exhibit into

9   evidence.

10           MR. AGNIFILO:  No objection.

11           THE COURT:  We will receive Government's Exhibit

12  122-42.

13           (Government Exhibit 122-42, was received in

14  evidence.)

15  BY MS. KASULIS:

16  Q    If we can start on the last page of this exhibit, ending

17  505, the earliest e-mail in this chain, the bottom, this is if

18  we scroll up, does this appear to be the prior e-mails that we

19  saw in Government's Exhibit 122-41?

20  A    Yes, it's the same e-mail exchange.

21  Q    Okay.  If we could go to the prior page, you submit a

22  fairly lengthy e-mail to Mr. Shkreli.  Why don't we focus on

23  the first half of that e-mail.

24  A    Yes.

25  Q    Does it appear to be your response to Mr. Shkreli

RICHARDSON - DIRECT - KASULIS

1   outlining what you believe your holdings are in Retrophin?

2   A    Yes, I had gone back to my files and my emails to pull

3   out of facts as I saw them.

4   Q    So you write Martin, "Here are the facts that I have on

5   file."  Your first point is entitled "my investments into

6   MSMB;" is that correct?

7   A    Yes.

8   Q    Then you then list your $400,000 and the dates of those

9   investments into MSMB Capital?

10  A    Yes.

11  Q    That last line, the last section here, what do you write

12  "This 400,000"?

13  A    "This 400,000, thanks to you and your team's performance,

14  stood $583,482 as of February 2012, the last MSMB performance

15  summary I've access to.  All of which was moved into

16  Retrophin.  So a total of 583,482 invested into Retrophin at

17  the deeply discounted preferred stock rate."

18  Q    Your second point, "My additional investments into

19  Retrophin," and you then list out your additional investments

20  and the dates of those investments; is that right?

21  A    Yes.

22  Q    Then you write, "So an additional 75,000 invested into

23  Retrophin, again at the preferred stock rate;" is that

24  correct?

25  A    Yes.

RICHARDSON – DIRECT – KASULIS

1    Q    The third point is regarding what we had spoken about

2    yesterday entitled "My investments in MSMB consumer and

3    Surepoint."

4    A    Yes.

5    Q    What do you write?

6    A    "Of the $100,000 I invested, I was refunded $86,967, a

7    loss of $13,033.  You committed to cover these losses and

8    rather than receiving a check I asked you to invest the 13,033

9    into Retrophin on my behalf."

10   Q    Then write below that it appears that you then tally

11   points one, two, three; is that correct?

12   A    That's correct.

13   Q    What do you state there?

14   A    "Running total, so I have invested 671,515 into Retrophin

15   all at the preferred discounted rate, which while private was

16   $20 and $25, while the valuation set at $80 per e-mails from

17   you and Jackson."

18   Q    Then section four below that is entitled, "the multiplier

19   factors and conversations."  You then write, "You have said to

20   me a number of times that you had added to my portfolio in

21   recognition of my sustaining role and being a board member."

22   Then right below that you state, "You shared the

23   Capitalization Table, which showed my shares moving from

24   14,361, (2%)to 264,361 (5%).  As Aselage, Tim and others

25   received stock, I was left with the clear impression this new

2896

RICHARDSON – DIRECT – KASULIS

1   allocution was made effective."

2          Who is Tim?

3   A    This is Tim Pierotti.

4   Q    Below that you wrote, "In sharing news of the final

5   financing deal you verbally reaffirmed to me that I had

6   5 percent before the move to 12 million shares and that my

7   stake was worth between 1.5 and 3 million;" is that correct

8   there, sir?

9   A    Yes.

10  Q    If we go to the next page, just look at the rest of your

11  response.  The fifth point is entitled, "critical calculation

12  points," then why don't we go to the last sentence in this

13  section starting, "Which ever way," read that?

14  A    "Which ever way I look at it, I was expecting my stake to

15  be worth north of 1.5 million entering this phase of our

16  evolution and before the market price took hold."

17  Q    You have a section entitled, "key actions," can you read

18  those key actions that you list there?

19  A    "Somebody needs to do a forensic accounting review of any

20  investments and the transactions pricing decisions taken at

21  each decision action point.  You need to clarify where/when

22  the new capitalization takes or took effect, and whether I was

23  included."

24  Q    Why are you asking for a forensic accounting review of

25  your investments?

RICHARDSON - DIRECT - KASULIS

1    A    Because I was disappointed by, as per the earlier e-mail

2    we reviewed, disappointed by Martin's first response to this

3    discussion around reconciling my investments.

4    Q    Did Mr. Shkreli then respond to your e-mail?

5    A    Yes.

6    Q    Let's look further up in this chain.  It appears his

7    response starts at the bottom of the first page of this

8    exhibit ending in 503, from Mr. Shkreli to you Mr. Richardson

9    on March 14, 2013, do you see that?

10   A    Yes.

11   Q    If we go to the next page, can you please read that first

12   paragraph there to the jury?

13   A    "I agree that you should have about 400,000 shares, which

14   would have been 5 percent of the company post DGTE" -- Desert

15   Gateway -- "the company had $88 million post DGTE."

16   Q    Keep going.

17   A    "So we owe you 300,000 shares.  I think we can

18   accommodate this painlessly.  I think my accounting was

19   accurate.  I think there was some miscommunication on my part,

20   but also some great fault on my part for not being clear.  I

21   probably assumed an options grant would be done when it

22   wasn't.  I will try to be more clear and direct in the

23   future."

24   Q    So in terms of this paragraph, did you at this point in

25   time believe you were owed 300,000 shares of Retrophin?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

RICHARDSON – DIRECT – KASULIS

1    A    Yes.

2    Q    If we read the next paragraph.

3    A    "I have a call with Evan to see what the best path

4    forward is.  The biggest two deltas here are the perception of

5    a deeply discounted rate, that was not the case.  We always

6    had looked Retrophin valuations of 20 and $40 million, both of

7    which proved to be heavily optimistic as we raised the 10

8    million at a 24 million valuation."

9    Q    Just to stop you there, when he said, "we raised the

10   10 million," what is that a reference to?

11   A    One of our financing.

12   Q    When you say financing, what do you mean?

13   A    One of the investment pipes calling for more investments.

14   Q    Just what is a pipe?

15   A    A pipe is a private investment in public equity.

16   Q    What does that mean when you say, this is one of the

17   pipes?

18   A    When we go out to the market looking to attract new funds

19   and bringing investors in.  When you do a pipe, normally it's

20   at a discounted rate on the stock price so that it becomes an

21   attractive way to attract new dollars for the company.

22   Q    So looking back on this e-mail, when Mr. Shkreli writes,

23   "we raised 910 million," is that a separate pipe that had

24   recently occurred with respect to Retrophin?

25   A    Yes.

RICHARDSON - DIRECT - KASULIS

1    Q    Then can you continue, please?

2    A    "The second misunderstanding is the added stock for your

3    recognition.  This was repeatedly said but frankly never done

4    for any of us on the Board.  I have been pushing Evan for a

5    grant but it simply hasn't happened given all we've tried to

6    accomplish."

7    Q    The Evan references who you are referring to, who Evan

8    is?

9    A    Evan Greebel, who again, is the outside counsel and

10   acting internal counsel.

11   Q    If you could proceed with the last paragraph.

12   A    "The good news is, it is all fixable.  I certainly feel

13   that without any top up, the number you have now is still shy

14   but not terribly shy of accurate.  The top up is obviously the

15   big part and a lot of people got topped up with the DGTE

16   transaction, which should have been handled very differently.

17   I'm apologetic for the way this was handled.  We can go over

18   that in person.  In the meantime I will discuss the solution

19   with Evan tonight.  I hope we can secure your signature

20   tomorrow, as penalties kick in if we don't all sign it."

21   Q    "I hope we can secure your signature tomorrow, as

22   penalties kick in if we don't all sign it," do you know what

23   he's referring to there?

24   A    He's referring to the S1 form that was the subject to my

25   earlier e-mail that had to be submitted by a concern deadline,

RICHARDSON - DIRECT - KASULIS

1   otherwise the company would be held liable for not meeting

2   registry deadlines.

3   Q     Your understanding is you had to sign that form as part

4   of your role in the company?

5   A     Yes.

6   Q     Did you respond to this e-mail, Mr. Richardson?

7   A     Yes.

8   Q     Why don't we take a look at that.  Can you please read

9   your response to the jury?

10  A     "I appreciate the spirit of your response and I hate

11  finding myself in this situation.  I never fueled this vision

12  with you having money at the center.  I always knew I would

13  lose it all, or do amazingly well.  But I always proceeded

14  with your endorsing words believing that my core investment

15  was accumulating well through these early stages and my

16  jumping in early each time to invest would be recognized.  You

17  are right, we need to get this fixed and behind us and commit

18  that we never get far apart in understanding again.  Knowing

19  we have to go over the details in my investment journey, I

20  don't yet agree that the accounting you laid out is accurate.

21  My summary to you highlighted a number of discrepancies that

22  you are not -- that are not to do with any top up or options.

23  I can't sign the filing with the current data in it.  As I

24  speak with Evan perhaps there is a way to footnote this as an

25  open issue being worked on.  We will need to move forward in

RICHARDSON - DIRECT - KASULIS

1  good faith that the right resolution is locked.  Let me know

2  what your recommendation is after you discussed with Evan."

3  Q    Why did you feel you couldn't be followed with signed the

4  S1 form?

5  A    Because to me there was some factual errors on the

6  initial list that Martin shared with me about my

7  stockholdings.  He missed one or two of my of contributions.

8  Q    If we look at the response from Mr. Shkreli.

9  A    "Just so we're transparent, the issue with the S1 is it

10  needs to be filed with the SEC by tomorrow, by tomorrow night,

11  or there are punitive damages that they begin in favor of the

12  investors who just invested.  I personally swear to you that

13  my assessment is that it is largely irrelevant what number is

14  written there.  You are right to be wanting to be accurate.

15  So as long as you get to where you want through our

16  discussions, which I have no reason to think that you

17  shouldn't, have the faith we can arrive at it in the very near

18  future."

19  Q    You respond to Mr. Shkreli; is that correct,

20  Mr. Richardson?

21  A    Yes.

22  Q    Let's look at your response.  If we can scroll up, can

23  you please read your response?

24  A    "The way you forward your outline is fine.  And yes, I

25  have trust of that it being fulfilled, although it pains me

RICHARDSON – DIRECT – KASULIS

1    that I would be sourcing shares from you and Marek.  I agree

2    that option grant should be issued to a select few.  Are you

3    therefore to sign the filing as is, or is Evan making any

4    changes?"

5    Q    So your understanding, when you say the "sourcing," that

6    it would be sourcing shares from you and Marek, what do you

7    mean by that?

8    A    Again, in the earlier communication to me he said that

9    part of making sure I got to the accurate number, i.e. the

10   300,000 shares, that Marek and he would be contributing to

11   those shares that were owed to me.

12   Q    So those were Marek and Martin's shares in Retrophin that

13   he would be giving you?

14   A    Yes.

15   Q    If we of go to Mr. Shkreli's response, the last e-mail in

16   this chain.

17   A    Yes.

18   Q    What does he write there?

19   A    "He will make the changes that will indicate a large

20   share count.  I would not feel pained at all.  We had intend

21   to do this for sometime.  We apologize for not having our act

22   together.  With everything in the air I hope you understand

23   why we overlooked it.  It is because we do in fact do trust

24   and love you, not because we thought we could avoid this.  I

25   thank you for holding me accountable.  I dread giving anyone a

RICHARDSON – DIRECT – KASULIS

1  feeling that I'm abusing a friendship."

2  Q    Did you have any further discussions with the defendant

3  about him giving you some of his Retrophin shares?

4  A    Yes.  There was a follow up, I think a few days after

5  this, where I met with him in the office and talked through

6  the subject in person with him.

7  Q    What do you recall discussing in that conversation?

8  A    I was, again you can tell from these e-mail exchanges, I

9  was pretty upset.  I asked him to get me more background on

10  why exactly this happened.  He shared with me, he said that he

11  did have a problem with the MSMB funds in the period from when

12  it was, in the period from when it was winding down before the

13  monies were moved into Retrophin for any of the investors that

14  chose to do that.

15  Q    What else did he discuss with you in that meeting?

16  A    He said that he diluted to that in these e-mails, there

17  were a number of investors that chose to move their founds

18  over to Retrophin, that indeed he had to top up.  I was not

19  the only one that indeed he was going to have to top up.

20  Q    Your understanding was that those investors were

21  similarly situated to you, meaning they had chosen to role

22  their investment in MSMB Capital, or any other fund, into

23  Retrophin?

24            MR. AGNIFILO:  I object to leading, Judge.

25            THE COURT:  Overruled.

RICHARDSON - DIRECT - KASULIS

1  A    Yes, yes, that's certainly the way he expressed it to me.

2  Q    What did he say with respect to giving you shares from

3  his own Retrophin holdings?

4  A    He had shared with me, because it was going to represent

5  a sizeable number of shares, that he would be passing to me

6  and to some other investors that as he was the regarded CEO it

7  wouldn't look good if these shares all came down dramatically,

8  quickly.  It could be viewed by the investment market as a

9  negative signal and would I mind waiting to get my shares as

10 he worked through some of other ones he was going to do.  So

11 it didn't have a dramatic impact on reducing his personal

12 shares, which the market could view negatively.  I said I

13 would be willing to wait.

14 Q    Did you have a sense of how long you were being -- what

15 was your understanding of how long you were being asked to

16 wait?

17 A    There was no precise timeline that we agreed.  I got the

18 impression it was a matter of months.

19 Q    Did you ever see a finalized Capitalization Table for

20 Retrophin?

21 A    No.

22 Q    Did you ultimately sign this S1 registration form that's

23 the being discussed in the e-mail chain at 122-42?

24 A    Yes, I did, on the basis that I clarified that when my

25 stock was changed we would send a revision of that form in.

RICHARDSON - DIRECT - KASULIS

1    So I did sign the S1 at that point.

2    Q    Did the defendant ever give you shares from his Retrophin

3    holdings, the ones that he had stated he would give you?

4    A    No.

5    Q    Did you ever file a revised S1 statement?

6    A    No.

7    Q    I wanted to next discuss with you Retrophin in the 2013

8    into 2014 time period after the reverse merger.  Immediately

9    following Retrophin becoming a public company, at the end of

10   December 2012, what was your position or role at Retrophin?

11   A    I continued on the Board of Directors.

12   Q    In that role, did you have an understanding of

13   Retrophin's financial state at this point in time?

14   A    Generally, yes.  I know we were very, very tight on cash

15   available to us at that point.

16   Q    Did you have access to the bank accounts of Retrophin?

17   A    No.

18   Q    After Retrophin became public, what was your

19   understanding as to what the plan was for Retrophin in the

20   first half of 2013?

21   A    Well, the decision we made at the end of 2012 not to go

22   to the merger route or the venture capital route, meant now we

23   were determined, having done the reverse merger with Desert

24   Gateway, established us on the over-the-counter markets.  That

25   now we would be a stand-alone company.  Now we needed to

RICHARDSON – DIRECT – KASULIS

1   seriously build out our capability and really look at bringing

2   drugs on board, building up a management team and bringing in

3   expertise we needed.  And as the year progressed, building up

4   the Board of Directors as well.  Now we were no longer

5   thinking of merging with someone else, we had to build those

6   capabilities ourselves.

7   Q    When you were talking about building out the management,

8   were you part of the process of helping to build out the

9   management at Retrophin?

10  A    Yes, because again, with my HR background Martin asked me

11  to interview some of key senior positions as candidates that

12  were identified.

13  Q    Did you in fact participate in those interviews?

14  A    I did, for the Chief Medical Officer position and for the

15  Chief Financial Officer position.

16  Q    Were those two positions filled?

17  A    They were, around mid-year.

18  Q    Mid-year, which year?

19  A    2013.

20  Q    With respect to the Chief Financial Officer position, who

21  obtained that position?

22  A    The final candidate that was selected was Mark Panoff.

23  Q    With respect to the Chief Medical Officer position, who

24  filled that role?

25  A    A gentleman called Horacio Plotkin.

RICHARDSON – DIRECT – KASULIS

1  Q    What, if any role, did Steve Aselage play in the first

2  half of 2013?

3  A    At this point, given the fact that we had changed

4  strategy, he had vacated the CEO role that he had assumed in

5  late 2012 for the company, and Martin had retaken, resumed the

6  CEO rolled, and Aselage continued on the Board of Directors.

7  Q    You had said that in the first half of 2013 Mr. Shkreli

8  was the CEO of Retrophin?

9  A    Yes.

10  Q    What about Evan Greebel?  What was his role, if any, with

11  respect to Retrophin in the first half of 2013?

12  A    Continuing as both external legal counsel and acting as

13  internal counsel.

14  Q    Do you know who Ron Tilles is?

15  A    Ron is someone that Martin had accessed who was very good

16  at building future investors and attracting that, and looking

17  at the financing options.

18  Q    Who did Ron Tilles work for?

19  A    He worked directly with Martin.

20  Q    Did you know for which entities?

21  A    Not at that point, no, I assumed it was Retrophin.

22  Q    Now, you were on the Board of Directors in the first half

23  of 2013 you had testified; is that right?

24  A    Yes.

25  Q    What was the status of the Board of Directors at that

RICHARDSON - DIRECT - KASULIS

1  point in time?

2  A    It was just myself, Martin, and Steve Aselage, the three

3  of us at the start of the year.

4  Q    Were you having face-to-face regular board meetings at

5  that point in time?

6  A    No.

7  Q    What, generally speaking, were the meetings like?

8  A    They were either telephonic or individual discussions

9  with Martin.

10  Q    As part of these meetings, was it your understanding that

11  there were supposed to be minutes taken of the meetings?

12  A    Yes, if there was no unanimous written consent recorded.

13  Q    And what was your understanding as to who was responsible

14  for taking those minutes?

15  A    Evan Greebel as our acting counsel, internal counsel.

16  Q    When Mr. Greebel was acting as internal counsel and

17  responsible for those minutes, did you receive those minutes

18  after each board meeting to review?

19  A    No.

20  Q    Did you ever receive Board of Directors meeting minutes

21  to review?

22  A    In 2014.

23  Q    Who circulated those minutes?

24  A    The first minutes we received came in approximately July,

25  I believe of 2014, from a new colleague Margaret

RICHARDSON - DIRECT - KASULIS

1    Valeur-Jensen, who was appointed as our internal general

2    counsel for the company in the middle of 2014.

3    Q    So you received -- the first board minutes you ever

4    received to review was in July 2014 from Ms. Valeur-Jensen?

5    A    Yes.

6    Q    Did you ever receive board minutes that had been drafted

7    by Mr. Greebel?

8    A    Yes.  He sent a whole batch to us I believe around in

9    September of 2014.

10   Q    So September 2014?

11   A    '14.

12   Q    Now directing your attention to the July 2013 time

13   period, did you have a telephonic Board of Directors meeting

14   that month?

15   A    Yes, I believe we did.

16   Q    I'm showing you what is marked for identification as

17   Government's Exhibit 122-43, it's tab 53 of your binder.

18   A    Yes.

19   Q    Do you recognize this document?

20   A    Yes.

21   Q    What is it?

22   A    It is an e-mail from Marc Panoff, who is our recently

23   appointed Chief Financial Officer, talking about the subjects

24   to be covered on the Board call.

25          MS. KASULIS:  Government moves this exhibit into

RICHARDSON – DIRECT – KASULIS

1    evidence.

2              MR. AGNIFILO:  No objection.

3              THE COURT:  We will receive Government's Exhibit

4    122-43.

5              (Government Exhibit 122-43, was received in

6    evidence.)

7    BY MS. KASULIS:

8    Q    If we look at Mr. Panoff's first e-mail, appears to be a

9    addressed to you, is that Mr. Aselage's e-mail address right

10   after -- it's from Mr. Panoff to Mr. Shkreli, and is that

11   Mr. Aselage's e-mail address?

12   A    Yes.

13   Q    Then your e-mail address?

14   A    Yes.

15   Q    Then Evan Greebel; is that right?

16   A    Yes.

17   Q    And he writes, "Members of the Board, Martin and I would

18   like to schedule a Board call for this week to update you on

19   the financing process as well as the company's current

20   financial position and operating plan."  Do you see that?

21   A    Yes.

22   Q    Then if we zoom in it appears that he actually then

23   followed up and sends some attachments to you prior to this

24   meeting?

25   A    Yes.

RICHARDSON – DIRECT – KASULIS

1    Q    So let's look at the next page of this exhibit, do you

2    recognize this document?

3    A    Yes.

4    Q    What is it?

5    A    It's a summary cash flow for the Retrophin company

6    through to the middle of June 2013.

7    Q    If we look at the very first line, did you review this

8    document?

9    A    Yes, it was discussed on the Board call.

10   Q    The very first line of this document, does it state,

11   "Cash balance as of December 31, 2012 is that $11,388?

12   A    Yes.

13   Q    That's for the company?

14   A    Yes.

15   Q    If we look, if we scroll down, there is financing

16   proceeds and then it says, "Amounts raised, gross Q1, and

17   that's $9,954,451," what does this line reference?

18   A    That's talking about the external financing that we

19   referenced earlier that we had just secured.

20   Q    That was what you referred to as a pipe?

21   A    Referred to as a pipe.  I call it, $10 million, it was

22   close to that.

23   Q    With some deduction of legal fees then the net financing

24   is around 9.275 million; is that right?

25   A    Yes.

RICHARDSON – DIRECT – KASULIS

1    Q    Below that is a section entitled, "use of proceeds"?

2    A    Yes.

3    Q    The first section there is note and license fee.  The

4    first line underneath that is, "Note payable to MSMB including

5    interest quarter one and it's $1,053,000."  Do you have any

6    understanding as to what that note payable to MSMB references?

7    A    No, I don't recall that item.

8    Q    Below that there is the Ligand license participation?

9    What is the Ligand again?

10   A    Ligand is the company we acquired that the license

11   reference.  This is paying the license fee for the drug we

12   acquired.

13   (Continued following page.)

14

15

16

17

18

19

20

21

22

23

24

25

RICHARDSON - DIRECT - KASULIS

1   Q    And then if we could zoom out and look at the operating

2   expenses section for quarter 1 and quarter 2.

3   A    Yes.

4   Q    If we can just go -- thank you.  Perfect.

5        So does it appear here that under operating expenses

6   it's broken out by each quarter, quarter 1 and quarter 2?

7   A    Yes.

8   Q    And under quarter 2 the cash balance as of June 30, 2013,

9   what is the number listed there?

10  A    Excuse me.  Which?

11  Q    It says -- I'm sorry.  The very bottom, the very last

12  line, cash balance as of June 30, 2013.

13  A    Oh, yes.  $303,247.

14  Q    And one of the line items in this quarter 2 section, do

15  you see there MSMB settlement, (Spencer Spielberg, Sarah

16  Hassan, Trachtenberg & Rodes), do you see that?

17  A    Yes.

18  Q    And it's quarter 2 and it's listing as a deduction

19  $548,711?

20  A    Yes.

21  Q    Do you recall this line item at all, Mr. Richardson, in

22  this financial flow?

23  A    I believe I -- I believe, because I read the page, I had

24  recognized it but there was no discussion.

25  Q    Do you know who Spencer Spielberg, Sarah Hassan and

Angela Grant, RPR CRR
Official Court Reporter

RICHARDSON - DIRECT - KASULIS

1   Trachtenberg & Rodes, who those people are?

2   A    No.

3   Q    So this $303,247 cash balance as of June 30, 2013, what

4   was your understanding of the financial state of the company

5   at this point in time?

6   A    Again, as I mentioned at the start of the year because we

7   were going to a new strategy, we knew that we were very tight

8   and we had to raise funds.  The discussion we had on this call

9   was recognizing that we were spending money very rapidly, and

10  that we had to come up with a sustained funding strategy.  And

11  we also had to get on top of expenses because we were burning

12  expenses very rapidly.  That was what the discussion was on

13  this board call.  Particularly with Marc Panoff, as our new

14  CFO, as one of first priorities he had when he came onboard.

15  Q    And so that's what your recollection was the focus of

16  this call?

17  A    That's my recollection of the focus of the call.

18  Q    And so now directing your attention to the September 2013

19  time period.  We can put this aside.

20       Do you recall having any board of directors meeting

21  in that month?

22  A    Which month?

23  Q    September 2013 time period.

24  A    Yes, I do.

25  Q    Was that a telephonic meeting?

Angela Grant, RPR CRR
Official Court Reporter

RICHARDSON - DIRECT - KASULIS

1    A    Yes.

2    Q    I'm showing you what's been marked for identification as

3    Government's Exhibits 48 -- 122-48, 122-49 and 122-50.

4    They're tabs 54 through 56 of your binder.  If you can just

5    take a minute to look at those three exhibits and let me know

6    if you recognize them.

7    A    Yes.

8    Q    What are these documents?

9    A    These are documents attached for the subjects that we're

10   going to be reviewing as a board on this call.

11        MS. KASULIS:  The government moves these exhibits

12   into evidence.

13        MR. AGNIFILO:  No objection.

14        THE COURT:  We will receive 122-48, 122-49 and

15   122-50.

16        (Government Exhibit 122-48, 122-49, 122-50, was

17   received in evidence.)

18   Q    We can start with 122-48.  I'm sorry, 122-49.

19        And what is this document, Mr. Richardson?

20   A    This is the agenda for the call and the subjects that

21   they intended for us to cover.

22   Q    Did you, in fact, participate in this board of directors

23   call?

24   A    Yes, I did.

25   Q    And there are a number of items listed here as agenda

Angela Grant, RPR CRR
Official Court Reporter

RICHARDSON - DIRECT - KASULIS

1    items.  Which of these items do you remember discussing on

2    this call?

3    A     I believe, because part of the issue is a lot of the

4    documents have come out rather late and we only got to a

5    number of the items on this list.  I believe we covered 2

6    through 7.  Yeah, 2 through 7 I believe we covered on the

7    available time.

8    Q     And what about the rest of the items?

9    A     The rest of the items, which were the more administrative

10   ones, Martin said he'd bring back to us as a board.

11   Q     Now, item number 2 there states "Review and approve

12   amendments to the 2012 10K and the 10Q for the quarter ended

13   March 31, 2013."

14            What was your understanding as to why these two SEC

15   filings needed to be amended?

16   A     Our external auditors are now working with Marc Panoff,

17   as I say, he's only been on board with us for a while, had

18   determined that there was a handling of some items called

19   settlement agreements that required us to restate our prior

20   results effectively and we needed -- that needed to be

21   captured in an amended reporting document.

22   Q     And who were the external auditors?

23   A     At this point it was Marcum.

24   Q     And who from Marcum?

25   A     The lead colleague was Ed Hackert and there was one other

RICHARDSON - DIRECT - KASULIS

1   colleague, Sunil -- my apologies, I forget his name -- but Ed

2   Hackert was the lead.

3   Q    And what do you recall being discussed during this call?

4   A    The external auditors were taking the board through the

5   language that related to what the revisions were in the 10K.

6   Q    And do you recall anything else being discussed?

7   A    Well, during that discussion Martin had interjected quite

8   forcefully when Marcum was talking about the settlement

9   agreements.  And he had said, you know, I don't understand why

10  we're covering this again.  I am MSMB and I'm standing by

11  this.  We should just move on.

12  Q    When you say "standing by this," what are you referring

13  to?

14  A    In the detail of what Marcum was taking us through there

15  were promissory notes which referred to MSMB and to Martin.

16  So they were taking us through that language which is what he

17  was responding through to say, yes, I'm standing by this.

18  Q    What was your understanding as to the need for the

19  promissory notes?

20  A    Promissory notes were required because the way that the

21  settlement agreements were being handled for accounting

22  purposes is they had to move through the Retrophin books

23  because it was changing the holdings of Retrophin

24  shareholders.

25  Q    And so what were the promissory notes for?

RICHARDSON - DIRECT - KASULIS

1    A      And the promissory notes were from both MSMB Capital and

2    from Martin himself that they, in fact, would be making

3    Retrophin whole on the amount that the settlement agreements

4    represented.

5    Q      Now, did the board of directors ever approve the

6    settlement agreements that caused the restatement of

7    Retrophin's SEC filings?

8    A      No.  We've never seen the settlement agreements.

9    Q      And were you aware of the settlement agreements that

10   caused the restatement of the filings prior to the fall of

11   2013?

12   A      No, not aware of the settlement agreements.

13   Q      After this meeting did you have any communications with

14   Mr. Panoff?

15   A      Yes.  A couple of days later I was in the office and I

16   spoke with him because, again, he was still very new to the

17   company.  And I congratulated him to say because it was a

18   pretty contentious call at times and I felt it was very

19   healthy to have that kind of debate and discussion.

20          And I said to him, I know you're fairly new but I

21   want to make sure you're on top of this is a restatement and I

22   want to make sure you're on top of this.  And he said to me,

23   well, as long as Martin stands by the promissory note, the

24   company is okay.

25   Q      Now, in the latter half of 2013 and early 2014, what was

Angela Grant, RPR CRR
Official Court Reporter

RICHARDSON - DIRECT - KASULIS

1   your understanding as to whether Retrophin used consultants?

2   A    Martin from time to time would bring contract type people

3   onboard so that in some specific roles, like we mentioned Ron

4   Tilles earlier, I believe he was on like a contract basis

5   rather than a full employee basis.  So Martin would use him

6   from time to time.

7   Q    So let's go back to Government Exhibit 122-49.  If we

8   look at the line item number 9.

9   A    Yes.

10  Q    It's listed there approve retaining Al Geller, Ken Banta

11  as consultants.  Do you see that?

12  A    Yes.

13  Q    You had stated earlier, was this one of the line items

14  that you did not get to on the September 9, 2013 call?

15  A    That's correct.  We didn't get to them.

16  Q    And did you recall ever reviewing or discussing the Al

17  Geller consulting agreement?

18  A    No.  It had been sent in the attachments, but we never

19  got to the discussion.

20  Q    And what is your understanding as to whether the board of

21  directors ever approved Al Geller's consulting agreement?

22  A    It was -- to the best of my knowledge, it was never

23  brought back to the board.  I certainly never saw it or

24  approved it.

25  Q    What about with respect to Ken Banta?

RICHARDSON – DIRECT – KASULIS

1   A    It was never brought back to the board.

2   Q    Have you ever heard of an individual named Lee Yaffe?

3   A    No.

4   Q    Or Efay?

5   A    No.

6   Q    Have you ever heard of an individual named Darren

7   Blanton?

8   A    I didn't know him, but I know I had seen his name as one

9   of the investors earlier.  So I had seen his name, but I

10   didn't know him.

11   Q    Did the Retrophin board of directors ever approve a

12   consulting agreement for Mr. Blanton?

13   A    No.

14   Q    Or a consulting agreement for Mr. Yaffe?

15   A    No.

16   Q    Have you ever heard of an individual named Steve

17   Rosenfeld?

18   A    No.

19   Q    Did the board of directors ever approve a consulting

20   agreement for Mr. Rosenfeld?

21   A    No.

22   Q    Now, I'm showing you what's been marked for

23   identification as Government Exhibit 122-53.  It's tab 57 of

24   your binder.

25        Do you recognize this document?

Angela Grant, RPR CRR
Official Court Reporter

RICHARDSON - DIRECT - KASULIS

1    A    Yes.

2    Q    What is it?

3    A    It is an email from Marc Panoff to the board with the

4    board agenda and attachments related to the board agenda.

5         MS. KASULIS:  And the government moves this exhibit

6    into evidence.  I'm sorry.

7         MR. AGNIFILO:  No objection.

8         THE COURT:  We receive Government's 122-53.

9         (Government Exhibit 122-53, was received in

10   evidence.)

11   Q    Is this in relation to a board of directors meeting on

12   November 6, 2013?

13   A    I believe the meeting was actually the 8th.

14   Q    Thank you.

15   A    I'm just looking at the agenda.

16   Q    Thank you.

17        And so this is an email that was sent prior to the

18   meeting; is that correct?

19   A    That's correct.

20   Q    In the recipient line it's sent from Marc Panoff and

21   received by a number of individuals.  Listed there is a Neal,

22   N-e-a-l.  Do you know who Neal is?

23   A    This is Neal Golding who has just joined us on the board

24   as one of our first new board members.

25   Q    Who is Neal Golding?

RICHARDSON – DIRECT –  KASULIS

1   A    As I say, we had interviewed and spoken with him and

2   appointed him to the board.  He had a very strong background

3   in finance and had previously sat on audit committees.  So he

4   was a great addition to bring to our board and he immediately

5   headed up our audit committee as we formed it.

6   Q    And it appears that yourself, Mr. Aselage and Mr. Shkreli

7   are listed there with a cc to Evan Greebel and then two

8   individuals, Ed Hackert and Sunil Jain.

9        Who are those two individuals?

10  A    Those are the two individuals I mentioned earlier from

11  our external auditor firm Marcum.

12  Q    If we turn the page to the actual agenda.

13  A    Yes.

14  Q    If you look at line, just line item number 4 there.

15  A    Yes.

16  Q    And it says discuss appointment of Dr. Jeff Paley's

17  appointment to the board.

18  A    Yes.

19  Q    Who is Jeff Paley?

20  A    He was the next candidate that we'd been speaking to to

21  join the board.  He was medical director in his own right and

22  had very good experience in investing in the -- in the

23  healthcare space.

24  Q    And we can put this document aside.

25       You had mentioned in the course of your testimony

Angela Grant, RPR CRR
Official Court Reporter

RICHARDSON - DIRECT - KASULIS

1   today about getting documents related to a board meeting very

2   close in time to the meetings themselves; is that right?

3   A    Yes.

4   Q    Did you express any concern about that?

5   A    Yes, I mentioned that a number of times.  And

6   particularly I was reassuring when Marc Panoff came onboard,

7   because he was starting to add some of the rigor we were

8   lacking before, and I had asked, especially with these large

9   documents, that we need at least a day in advance if we're

10  going to credibly review them before we have a discussion.

11  Q    I'm showing you what's been marked for identification as

12  Government Exhibit 122-58.  And it's tab 58 of your binder.

13  A    Good.

14  Q    Do you recognize this exhibit, Mr. Richardson?

15  A    Yes.

16  Q    What is it?

17  A    It is an email from one of Evan Greebel's associates at

18  Katten starting to send -- starting to talk about the board

19  call and my response.

20         MS. KASULIS:  The government moves this exhibit into

21  evidence.

22         MR. AGNIFILO:  No objection.

23         THE COURT:  We receive Government's Exhibit 122-58.

24         (Government Exhibit 122-58, was received in

25  evidence.)

RICHARDSON - DIRECT - KASULIS

1    Q    And if we look at this, the bottom email of the two

2    emails in this exhibit, you had mentioned -- who is David

3    Kravitz?

4    A    He's an associate at the Katten, the external law firm

5    that Evan Greebel worked at.

6    Q    And the date on this email is January 6, 2014?

7    A    Yes.

8    Q    And he writes, All, attached please find the agenda

9    today's board of directors meeting along with copies of the

10   documents that we will discuss.  Regards, David.

11         And in response, what do you write there in response

12   to Mr. Kravitz?

13   A    I'm writing to him and then the rest of the group saying,

14   Guys, I just landed back in New York City 50 minutes ago after

15   an agonizing series of delays.  We need to set a standard for

16   issuing these materials ahead of board calls so we can conduct

17   an adequate review of all materials.  Getting them straight

18   ahead of a call does not allow us to -- does not allow us to

19   fill our oversight role adequately.  I suggest 48 hours

20   minimum on most items.  As of today's call, can we be clear on

21   the items that are time sensitive for your required submission

22   deadlines?

23   Q    And did the situation improve after this point in time?

24   A    Slowly it did.  Not all the time, but slowly it did.

25   Q    Now, I want to direct your attention to the 2014 time

RICHARDSON – DIRECT – KASULIS

1    period at Retrophin.

2    A    Yes.

3    Q    Were you still on the board of directors at that point in

4    time?

5    A    Yes, I was and Jeff Paley had now joined as well.  So

6    there were five of us on the board.

7    Q    So just to be clear, who were the five board members of

8    Retrophin at the beginning of 2014?

9    A    Myself, Martin, Steve Aselage, Neal Golding and now Jeff

10   Paley as well.

11   Q    And so at the beginning of 2014 what was your

12   understanding as to the status of Retrophin at this point in

13   time?

14   A    It was now a very exciting time for us.  We'd gone

15   through 2013, as we said before, building out our

16   capabilities.  And at this point it was a very exciting time

17   because Martin had started to secure some very interesting

18   drug candidates to bring into our Retrophin company, and he'd

19   also started to move forward to move us for NASDAQ listing,

20   which really would be a very important big step for our

21   company.  But to become NASDAQ listed we also had to have a

22   secure, you know, $40 million in new funding which is one of

23   the requirements to secure NASDAQ listing.  So it was a very

24   exciting time.

25   Q    Now, directing your attention to the February 2014 time

RICHARDSON - DIRECT - KASULIS

1    period.  Do you recall a board of directors meeting that

2    month?

3    A     Yes, this, in fact, was an offsite meeting and really the

4    very first time the board was going to meet with the

5    management team in a fully -- in a very intense meeting

6    format.

7    Q     And was this an actual face-to-face meeting of the board?

8    A     This was a face-to-face meeting.

9    Q     And where did that meeting occur?

10   A     That happened here in Manhattan, a venue at -- a venue

11   that has meeting rooms on 14th Street here in Manhattan.

12   Q     And what is that location called?

13   A     It's called the Norwood Club.

14   Q     I'm showing you what's been marked for identification as

15   Government's Exhibit 122-64 and 122-70.  It's tabs 59 and 60

16   of your binder.

17         Do you recognize these documents?

18   A     Yes, I do.

19   Q     What are they?

20   A     These are the agendas with the supporting documents for

21   this offsite meeting.  It was going to be a full-day meeting

22   and a number of us had worked very hard to put together the

23   agenda and the subjects we needed to discuss.  And then the

24   next attachment is a summary of who would be the attendees for

25   the various parts of the day.

RICHARDSON – DIRECT – KASULIS

1          MS. KASULIS:  Government moves these two exhibits

2   into evidence.

3          MR. AGNIFILO:  No objection.

4          THE COURT:  We receive 122-64 and 122-70.

5          (Government Exhibit 122-6 and 122-70, was received

6   in evidence.)

7   Q    Let's go to 122-70 first.

8   A    Yes.

9   Q    And what is this document?

10  A    This is Martin's assistant -- it's coming from Martin's

11  assistant at the company who's laying out who's attending the

12  respective -- we had some board committee meetings first, and

13  then we had the main meeting at 10:30 so confirming who would

14  be attending each of those respective meetings.

15  Q    So if we look at the 8:30 a.m. time slot, the attendees

16  listed there, it's Mr. Aselage, Mr. Golding, Mr. Greebel,

17  Mr. Panoff, Mr. Richardson and Mr. Shkreli?

18  A    Yes.

19  Q    Do you see that?

20  A    Yes.

21  Q    What do you recall about this 8:30 a.m. meeting?

22  A    This was one of the board committee meetings, but,

23  unfortunately, we had to delay it because Martin had been

24  delayed.

25  Q    Do you have an understanding as to why Martin had been

RICHARDSON - DIRECT - KASULIS

1   delayed?

2   A     Well, part of the exciting news is that he had secured

3   the previous day, he'd secured the acquisition of two new

4   drugs and he was proceeding to get the announcement ready for

5   that to go.  So in making that happen, he was delayed in

6   coming to this meeting.

7   Q     And did you have an understanding when you -- did

8   everyone arrive at 8:30 a.m., did Martin give you notice that

9   he would be late?

10  A     No, unfortunately not.

11  Q     What was your reaction to that?

12              MR. AGNIFILO:  I'm going to object to his reaction

13  to Martin being laid.

14              THE COURT:   Overruled.

15              You can answer it, sir.

16  A     It was, you know, it was rather frustrating because,

17  again, a number of us had put extensive time together in

18  putting this meeting together.  And while Martin was clearly

19  working on exciting news, I was disappointed that he hadn't

20  taken the time to give us a quick call so that we could redo

21  the agenda meaningfully and didn't waste too much time.

22  Q     And let's look back -- oh, just before we move on from

23  this.

24              With respect to the 10:30 a.m. meeting that you had

25  stated here that there would be more individuals who would be

RICHARDSON - DIRECT - KASULIS

1   added at this point.  If we look at this list here, the list

2   includes Horacio Plotkin.

3           Who is Horacio Plotkin again?

4   A    He's the chief medical officer for the company.

5   Q    And Srinivas Rao, who's he?

6   A    Srinivas was the leader of a neuroscience group that we

7   had acquired in I believe December of the year.  It was a new

8   arm to our company that Martin was very enthusiastic about,

9   and Srini was the head of that entity.

10  Q    And is Ken Banta listed here as well?

11  A    Yes.  Ken had helped craft the meeting agenda as well.

12  Q    Now, if we look at Government Exhibit 122-64 and if we

13  look at the second page of this document.  What is this

14  document here?

15  A    This is now the actual agenda with the subjects that we

16  will be covering for the main meeting of the day which is

17  starting at 10:30 through the afternoon.

18  Q    And were you involved in preparing this document?

19  A    Yes, I was.

20  Q    And if we go to the page of this, the third page of the

21  agenda ending in Bates number 935, can we just look at that

22  page.

23  A    Yes.

24  Q    This appears to be the agenda for an afternoon session of

25  the board of directors meeting; is that right?

RICHARDSON - DIRECT - KASULIS

1    A    Yes, the meeting carried on through the day.  So we just

2    took a lunch break and carried the meeting on through the

3    afternoon.

4    Q    And then if you see here there's a Corporate Governance

5    and Risk Management section?

6    A    Yes.

7    Q    Underneath it it states distribute D&O questionnaires and

8    then cash management investment policy.  And the first bullet

9    point being discuss investment policy parameters.

10   A    Yes.

11   Q    Exhibit C and D.

12        What is your understanding of what that bullet point

13   was referring to?

14   A    Again, part of -- now that we're NASDAQ listed, we needed

15   to put in place rigorous policies and guidelines across many

16   of the ways the company was operating.  And this is one of the

17   subjects that we needed to discuss as a board to make sure

18   that we were all aligned.

19   Q    When you're talking about investment policy parameters,

20   was there anything in particular that was referring to?

21   A    Once we got into the discussion I think there are a

22   number of subjects that came to bear.

23   Q    Such as?

24   A    Any trading, any trading that we were doing, any trading

25   that the company was doing with shareholder money.

RICHARDSON - DIRECT - KASULIS

1    Q    So what are you referring to, trading that the company

2    was doing with shareholder money?

3    A    Well, as part of the discussion when we got into this,

4    we, as a board, were hearing for the first time that the

5    business development team was actually trading company money,

6    shareholder money.  Effectively, attempting to make deals if

7    you'd like -- well, no.  I'm trying to think how to express

8    it.

9         Well, no.  The fact the business development team

10   was trading, you know, doing trades as if they were, you know,

11   a hedge fund in their own right if you like.

12   Q    And who was leading the business development group?

13   A    That was -- it was accountable to Martin at the time.

14   Q    And this was the first time you had been hearing about

15   this?

16   A    Yes.

17   Q    Was there anything discussed with respect to that

18   trading?

19   A    It was a very healthy discussion in the board that we

20   engaged with Martin on and that we had laid out that we need

21   to put a policy in place around this because this is

22   shareholder money.  You know, we're no longer a fund.  You

23   know, we're a company operating, a publicly-traded company and

24   we had to make sure that anything happening in that area was

25   very, very small and very low risk.  So it was a very healthy

RICHARDSON - DIRECT - KASULIS

1    discussion with Martin at the meeting.

2    Q    If I can direct your attention to another attachment.

3    It's ending in Bates number 11939 of this document.

4             Do you recognize this attachment?

5    A    Yes.

6    Q    What is it?

7    A    I believe this is, again, this is, again, for -- yeah,

8    this is the requirement for NASDAQ listing.  Now that we're

9    NASDAQ listed, both board of directors and executive officers

10   had to complete this questionnaire for submission to NASDAQ.

11   Q    And did you, in fact, complete this questionnaire?

12   A    Yes, I did.

13   Q    And your understanding is that all the board of directors

14   and executive officers had to complete this questionnaire?

15   A    Yes.  It was a NASDAQ requirement.

16   Q    And directing your attention to Bates number ending in

17   947, that page.  The 7.6.1 question, it states "Have you been

18   or are you presently the subject of an investigation by the

19   SEC, the Commodities Futures Trading Commission, FINRA or any

20   other regulatory or self-regulatory organization that could

21   result in the finding of a violation of any federal or state

22   securities or commodities laws"?

23             Do you see that?

24   A    Yes.

25   Q    And then you have to indicate either yes or no?

RICHARDSON - DIRECT - KASULIS

1   A    Yes.

2   Q    And did you complete this part of the questionnaire as

3   well?

4   A    Yes, I did.

5   Q    And your understanding is that everyone -- the board of

6   directors and all the executive officers completed this as

7   well?

8   A    Yes.

9   Q    So putting these documents aside.  We had spoken earlier

10  about Horacio Plotkin.

11          Do you recall whether he participated in the board

12  of directors meeting on that day at the Norwood Club?

13  A    Yes, he did.

14  Q    And what do you recall about his participation?

15  A    He gave an update on one of our important drugs in the

16  pipeline.  And during that discussion, because he had to -- he

17  was asked to give us an update on the clinical trials, and

18  during that discussion Martin got rather upset because

19  Horacio's response was admittedly rather vague and a bit, you

20  know, lacks emergency.  But Martin was very forceful with him

21  in the meeting and he used some pretty forceful language

22  expressing his disappointment and it did create quite an

23  atmosphere in the room.  I was facilitating the meeting and

24  stepped in and said we need to followup on this item, but

25  let's keep this, let's keep this, you know, at an appropriate

RICHARDSON - DIRECT - KASULIS

1    level.

2    Q     And did Ken Banta participate in that meeting?

3    A     Yes, he did.  Not in the committee meetings, but he

4    participated in the main meeting.

5    Q     Did you recall any discussions you had with Mr. Banta?

6    A     Yes.  Ken had come up to me during one of I think the

7    lunch break and had asked me, because he knew I was on the

8    board, and he had asked me do I know the status of his

9    consulting agreement.

10   Q     And what did you state?

11   A     I said, no, it had been brought to the board, but we

12   hadn't got to it and he needed to go back to Martin for Martin

13   to decide when he was going to bring it back to us.

14   Q     Do you ever recall approving a consulting agreement for

15   Mr. Banta?

16   A     No.  In fact, Ken had even called me I think two weeks

17   after this meeting with the same question.

18   Q     Now, do you recall Evan Greebel being present at this

19   board of directors meeting at the Norwood Club?

20   A     Yes, he was.

21   Q     Do you recall him participating at all?

22   A     Yes.

23   Q     What do you recall?

24   A     Well, I met, you know, I met him the night before because

25   we had a dinner the night before where we all joined together.

RICHARDSON - DIRECT - KASULIS

1    I met him there.  And then I remember him at the meeting.  And

2    now, of course, because he is acting internal counsel and I do

3    see him taking the minutes as he should be.

4    Q    With respect to the dinner, what do you recall about that

5    dinner?

6    A    At the dinner because it was the first time now the  full

7    board with its new members was meeting with many of the

8    management team who were also new.  So it was a very exciting

9    time and very social time.  And we sat at a long table, and I

10   happened to sit next to Evan Greebel.  And in that discussion

11   I had said to him, because I hadn't had much personal time

12   with him before, you know, reminding him that, you know,

13   again, not only was he external counsel, he was acting

14   internal counsel but he was also acting company secretary.

15   And I wanted to make sure he understood that he had to have an

16   independent line to the board.  If there's anything that he

17   felt the board ought to be made aware of, I restated to him

18   there that he needed to make sure that he accessed the board

19   if it was necessary.  And I also reminded him that he, as

20   acting company secretary, he had to take minutes and make sure

21   that they were circulated.

22        MS. KASULIS:  Your Honor, this may be a good time to

23   take a midmorning break.

24        THE COURT:  All right.  Let's let the jurors take a

25   break.

RICHARDSON – DIRECT – KASULIS

1          Please leave your notes on the chair and don't

2   discuss the case.

3              Thank you for your attention.

4              (Jury exits the courtroom.)

5              THE COURT:  All right.  Let's take a few minutes.

6   Please return by a quarter of.  Thank you.

7              (Recess taken.)

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RICHARDSON – DIRECT – KASULIS

1          (Jury enters the courtroom.)

2          THE COURT:  All the jurors are present, and as soon

3    as our witness returns, we will continue.

4          MS. KASULIS:  Thank you, Your Honor.

5    DIRECT EXAMINATION (CONTINUED)

6    BY MS. KASULIS:

7    Q    Okay, Mr. Richardson.  Now, after this February 14th,

8    2013 board of directors meeting that we've been speaking

9    about, did you have any further communications with the

10   defendant regarding that business development group that

11   you -- that we had discussed earlier?

12   A    Yes.  I had met Martin to debrief on the meeting as a

13   whole, and that was one of the subjects covered.

14   Q    I'm showing you what's been marked for identification as

15   Government Exhibit 122-71.  And it's Tab 61 of your binder.

16          Do you recognize this document?

17   A    Yes, I do.

18   Q    And what is it?

19   A    It's an email from Martin to an external gentleman,

20   copying myself, Marek Biestek and Marc Panoff.

21   Q    And what is the date on this email?

22   A    It's dated February the 14th, 2014.

23          MS. KASULIS:  Government moves this exhibit into

24   evidence.

25          MR. AGNIFILIO:  No objection.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

RICHARDSON - DIRECT - KASULIS

1          THE COURT:  We receive Government Exhibit 122-71 in

2    evidence.

3          (Government Exhibit 122-71, was received in

4    evidence.)

5    Q    It appears to be an email from Mr. Shkreli to you,

6    marc@sixthmanresearch.com.

7          Do you see that?

8    A    Yes.

9    Q    And who is that?

10   A    I didn't know him ahead of this email and Martin was

11   introducing me to him through this email.

12   Q    Okay.  And in the body of the email, Mr. Shkreli writes:

13   Our board discussed the Retrophin investment program and the

14   feedback missed.  In general, the BOD -- is that in reference

15   to the board of directors?

16   A    Yes.

17   Q    Was intrigued by engaging in a unique and different

18   approach, parens, the program is up over 3 million, a material

19   amount to Retrophin, but was also concerned about risk.  After

20   some sole searching and chatting with you, I think we've

21   arrived at good place.  Three way sign-off on all investments

22   and a strong focus by everyone but me on the portfolio.

23   You're right that I don't have the time to do this.  I don't

24   need training, but it is stellar tool for my team to

25   investigate investments.  So we have systematically exited

RICHARDSON - DIRECT - KASULIS

1    many of the investments in taking down the risk.  I think

2    there should be more investment but at less size.  This would

3    lower the risk even further, and I am committed to the

4    portfolio being exactly what I described, a tool to teach, not

5    a tool to scratch my inch of needing to make trades.

6              What was your understanding as to what Mr. Shkreli

7    was referring to here?

8    A    And that really catches the spirit of what we discussed a

9    at the Norwood Club meeting.  This is what the board said, we

10   shouldn't be actively trading with shareholder money, but if

11   you want to use it in a very narrowed and defined way as a

12   trading tool, that's a very useful potential vehicle to use.

13   And now he's reaffirming that's the spirit of how he wants to

14   proceed in agreement with what the board had discussed with

15   him.

16   Q    And following this, is that, in fact, the way that

17   Mr. Shkreli proceeded?

18   A    That certainly is our understanding.

19   Q    And you had mentioned that you actually met with

20   Mr. Shkreli following the Norwood Club meeting; is that right?

21   A    Yes, I think it was about a week later from memory.

22   Q    And why did you meet with Mr. Shkreli after the Norwood

23   Club meeting?

24   A    It was such an involved meeting and I wanted to make sure

25   that I was giving him feedback and how it went and feedback I

RICHARDSON - DIRECT - KASULIS

1    wanted to share with him.  And we also had an executive

2    session that he wasn't party to at the Norwood Club meeting,

3    and I wanted to give him the headlines that I agreed with the

4    board, I would share with him that as well.

5    Q    And what's an executive session?

6    A    It's an executive session is where the independent

7    directors can chose to meet by themselves without having any

8    executives of the company there, including Martin, of course,

9    who was an executive CEO.  So it's effectively a closed

10   session of the independent directors and whoever they chose to

11   invite.

12   Q    And did you share what had been discussed in the

13   executive session with Mr. Shkreli?

14   A    Yes.  Yes, I did.

15   Q    And what do you recall discussing with the defendant at

16   that meeting?

17   A    Well, I know we went over -- the meeting as a whole at

18   Norwood Club went very well.  The overall meeting as whole

19   went well.  But I did share feedback with him about the one or

20   two things that became sticky; you know, how he handled the

21   Horacio Plotkin situation and trying to couch him about how to

22   handle that differently.  Reaffirming that the investment

23   proposal would be handled.  Of course, it would be handled the

24   way that we discussed at board meeting.  And there are a

25   couple of other subjects.  I don't recall a list at this

RICHARDSON - DIRECT - KASULIS

1    point.  But those are the two principal ones that I wanted to

2    share with him.

3    Q    And let me direction your attention to Government

4    Exhibit 122-72, if you want to refer to this document to see

5    if it refreshes your recollection.

6    A    Oh, yes.  Yeah, this -- yes.

7    Q    And do you recall anything else that you discussed with

8    the defendant at that meeting after reviewing this document?

9    A    Yes, this is a list that I compiled all ready for the

10   discussion.  I don't believe we got to all of it, but we

11   certainly did discuss some of the items under one; you know,

12   one and two.

13   Q    And what did you discuss with the defendant at this point

14   in time regarding any use of social media?

15   A    This was a time when, you know, some of the board in

16   particular were concerned about Martin's use of Twitter.  And

17   my discussion with him was, you know, again, as you can see

18   here, you know, you are a little bit younger profile and he

19   wants to be a modern CEO, but he has to respect that he's a

20   public CEO.  And we agreed that he would go away and come back

21   with an approach that we as a board could agree with him

22   what's the appropriate use for him, if he's going to be on

23   Twitter attached to Retrophin.

24   Q    Did you talk at all about Mr. Shkreli making sure to

25   inform the board of any development?

RICHARDSON - DIRECT - KASULIS

1   A    Yes, one of the items you see here under point C1, look

2   for earlier board engagement.

3   Q    Excuse me.  I'm sorry, this is not in evidence,

4   Mr. Richardson, it's just to refresh your recollection.

5        So does it refresh your recollection at all about

6   discussing anything with Mr. Shkreli during this meeting

7   regarding engaging with the board of directors?

8   A    Yes.  We wanted to make sure all press releases and

9   any -- any future rejections where he might talk about the

10  company performance in the future, we wanted to make sure that

11  we as a board he consulted with us first before anything was

12  released to the media.

13  Q    And what -- what are you referring to there about

14  releasing information to the media before informing the board?

15  A    There were one or two press releases and one or two, I

16  think he made a Twitter reference some volumes, things that we

17  as the board hadn't seen ahead of time, and we wanted to make

18  sure he wasn't, you know, putting the company at risk by

19  disclosing anything that wasn't public information yet.

20  Q    And how -- what was your observation of how Mr. Shkreli

21  reacted to this meeting?

22  A    As I say, it's the first time that I think we had the

23  whole management, senior management team and the board

24  together and, you know, Martin likes to operate as an

25  entrepreneur.  And I think it's fair to say that while the

RICHARDSON - DIRECT - KASULIS

1    meeting doing go well, it wasn't his favorite environment.  He

2    did find it that while he engaged well on the discussions, you

3    know, there was clearly a bit of angst that here was a board

4    that's going to be quite actively, you know, working with you

5    and overseeing you.

6    Q    And that was in relation to the board of directors

7    meeting at the Norwood Club, or at your meeting with him on,

8    you know, shortly thereafter?

9    A    No, I'm referring to, you know, the discussion I'm having

10   with him about the Norwood Club meeting.

11   Q    Okay.  Did you inform the board that you had had a

12   discussion with Mr. Shkreli after the Norwood Club meeting?

13   A    Yes.

14   Q    I'm showing you what's been marked for identification as

15   Government Exhibit 122-33 -- I'm sorry, 122-73.  It's Tab 63

16   of your binder.

17   A    Yes.

18   Q    Do you recognize this exhibit?

19   A    Yes.

20   Q    And what is this?

21   A    It's an email from me to my fellow board members, and

22   copying Marc Panoff and Evan Greebel.

23   Q    And that's dated February 20th, 2014?

24   A    That's right.

25               MS. KASULIS:  The government moves this exhibit into

RICHARDSON - DIRECT - KASULIS

1   evidence.

2          MR. AGNIFILIO:  No objection.

3          THE COURT:  We received 122-73.

4          (Government Exhibit 122-73, was received in

5   evidence.)

6   Q    And I'll just direct your attention to the top of the

7   last email.

8   A    Yes.

9   Q    No, I'm sorry, the last in the chain on the first page.

10         Thank you, Ms. Zellan.

11         This is an email to the various board members and

12   Mr. Greebel and Mr. Panoff and yourself; is that right?

13  A    Yes.

14  Q    And it's dated February 20th, 2014?

15  A    Yes.

16  Q    You write:  Hi all, I hope your week is going well.

17  Thanks again for a productive board session last week.  Quite

18  an agenda.  Particular thanks to Neal and Steve for making the

19  treck through crazy winter weather.

20         Was it your understanding that Neal Golding and

21  Steve Aselage had traveled to attend the Norwood Club board

22  meeting in February of 2014?

23  A    Yes, they did, and it was a major, major snow storm is

24  what it's referring to.  They courageously fought through it

25  and made the meeting.

RICHARDSON - DIRECT - KASULIS

1   Q    Now right under that you said:  Confirming on Monday our

2   first call will be an executive session and de facto comp

3   committee followup where, and then you state:  I will update

4   you on my excellent meeting with Martin following our board

5   discussions last week.  And then we will discuss CEO

6   compensation.  I am meeting with the compensation consultant

7   this Friday and we have written stuff to share with you.

8         And so with respect to an excellent meeting this

9   week with Martin, what meeting are you referring to?

10  A    I'm referring to the meeting where I met him on the 19th.

11  Q    Now, with respect to this first CEO compensation, did

12  you, in fact, review Mr. Shkreli's compensation during this

13  time period?

14  A    Yes, I did, because with the board now fully functioning,

15  I was actually the head of the compensation committee.  And

16  one of my accountabilities was CEO compensation and putting

17  that together.

18  Q    I'm showing you what's been marked for identification as

19  Government Exhibit 122-74.  It's Tab 64 of your binder.

20  A    Yes.

21  Q    And do you recognize this document?

22  A    Yes, I do.

23  Q    And what is it?

24  A    It's confirmation of the compensation for the performance

25  year 2013 for Martin.

RICHARDSON - DIRECT - KASULIS

1    Q    And is that your signature at the bottom there?

2    A    Yes, it is.

3         MS. KASULIS:  The government moves this exhibit into

4    evidence.

5         MR. AGNIFILIO:  No objection.

6         THE COURT:  We received government 122-74.

7         (Government Exhibit 122-74, was received in

8    evidence.)

9    Q    And this was CEO compensation for performance year 2013;

10   is that right?

11   A    Yes.

12   Q    And that's for Mr. Shkreli?

13   A    Yes.

14   Q    And can you just generally explain what this document

15   reflects?

16   A    It reflects what the board has decided to compensate

17   Martin for -- for that year, which includes the incentive plan

18   going forward as well.

19   Q    And total cash compensation was, as set forth in the

20   middle here, was $550,000 --

21   A    Yes.

22   Q    -- is that right?

23        And the very -- the top it states, Martin Shkreli,

24   comma, CEO and founder, and then states:  In recognition of

25   the exceptional performance Martin delivered in setting

RICHARDSON - DIRECT - KASULIS

1   Retrophin on to a dynamic and broad-based track for market

2   impact, and for starting to build a world class team that

3   shares our vision.  And then the board approved this

4   compensation; is that right?

5   A    Yes, it did.

6   Q    Okay.  You can put that aside.

7         Now, did there come a point in time when you spoke

8   with the defendant regarding an SEC investigation?

9   A    Yes, that was in March of 2014.

10  Q    And that was after this compensation had been approved;

11  is that right?

12  A    Yes.

13  Q    For Mr. Shkreli?

14        What happened?  Can you please describe that

15  discussion to the jury.

16  A    I believe the initial discussion Martin had with me is

17  that he had framed that a disgruntled employee had filed a

18  complaint with the SEC, Securities and Exchange Commission,

19  and this related to MSMB Capital.  And that would I

20  consider -- as an investor in MSMB Capital, would I consider

21  going to be voluntarily interviewed by the SEC to answer any

22  questions or -- or that they might have.  Because he felt that

23  someone, one or two of the investors, myself included went,

24  that would nip this issue in the bud and it would be closed

25  down quickly.

RICHARDSON - DIRECT - KASULIS

1  Q    And so the first that you learned of this SEC

2  investigation was this conversation with Mr. Shkreli?

3  A    Yes.

4  Q    And what was your reaction to your conversation with the

5  defendant?

6  A    Well, again, I was seeking at the time reassurance that

7  this indeed was a small issue and, again, one that could be --

8  you know, that didn't have bigger ramifications and was

9  certainly only MSMB.  And he assured me it was and -- and I

10 said I would be willing to be interviewed, you know, on that

11 basis.

12 Q    And what happened next?

13 A    The next thing that followed is I got a letter from the

14 SEC inviting me to come or call in for an interview.

15 Q    And did you schedule an interview with the SEC?

16 A    Yes, I did.

17 Q    And when was that?

18 A    The end of March, 2014.

19 Q    Prior to that meeting, did you have any discussions

20 regarding the SEC investigation with anyone?

21 A    Yes, I did.  I had a discussion with both Evan Greebel,

22 the counsel, and with Martin the day before I believe I was

23 going.

24 Q    And what do you recall regarding your discussion with

25 Mr. Shkreli?

RICHARDSON - DIRECT - KASULIS

1  A    Again, I checked in with him to make sure I had all the

2  facts I needed.  And I said is there anything else I need to

3  be aware of?  And he said, No, there were a couple of periods

4  in the fund, this is the MSMB fund, where we weren't doing so

5  well, but I covered it.  So just be aware of that.  And that's

6  when he said to me going into the interview.

7  Q    And what do you recall about your discussion with

8  Mr. Greebel?

9  A    Again, I was checking with him, my concern at that point

10  was to make sure this was indeed only MSMB and had nothing to

11  do with Retrophin.  Because I was right that it might have

12  disclosure requirements if indeed it touched on Retrophin, and

13  he assured me it was only to do with MSMB.

14  Q    And were you, in fact, interviewed by the SEC?

15  A    Yes, I did go in person to be interviewed by them.

16  Q    And what was your reaction to that interview?

17  A    The interview as a whole went pretty well and -- and, you

18  know, there were couple of surprises in there that took me

19  back, as they asked me specifically if I knew about a Merrill

20  Lynch lawsuit, which I didn't know.  I told them I didn't know

21  about that.

22       And they also talked about, do you know about any

23  monies being shared with MSMB investors to do with Retrophin.

24  And I also said I wasn't aware of that, you know, other than

25  my own case.  You know, I knew there were going to be

RICHARDSON - DIRECT - KASULIS

1    adjustments made for me.

2    Q    And what did you do following the interview?

3    A    When I came back from the interview, I immediately called

4    Evan Greebel.  As I said, my first concern was in the

5    discussion, while there was nothing specific in the

6    discussion, other than these two points I referenced, the one

7    that surprised me was, first of all I said the SEC referenced

8    Retrophin.  They did say the scope of their review wasn't

9    Retrophin, but they referenced it.  And I double checked with

10   Evan again, because I called him immediately when I got back,

11   that this is definitely not to do with Retrophin, he said, No.

12   And I said, secondly, why am I hearing about a Merrill Lynch

13   lawsuit for the first time?

14              MR. AGNIFILIO:  I'm going to object to this entire

15   line of question and answer.  I just don't know what it

16   elicits at all.

17              THE COURT:  If we can have a sidebar proffer,

18   please.

19              (Continued on the next page.)

20              (Sidebar conference.)

21

22

23

24

25

SIDEBAR CONFERENCE

1          MR. AGNIFILIO:  My objection is it's based on

2    relevance and it's also prejudicial.  I don't know what the

3    relevance of what he said to the SEC and what he went back and

4    said to Evan about what he said to the SEC, and what his

5    expectations were in talking to the SEC and then going back to

6    Evan and saying that my expectations in talking to the SEC

7    weren't met.  It's just unduly prejudicial and I find it's

8    irrelevant.

9          MS. KASULIS:  Your Honor, part of this, the rest of

10   this, I expect his testimony to be about the processes of

11   Mr. Shkreli as the CEO of Retrophin; that they opened on this

12   issue, that these individuals stole the company from Martin,

13   and we have to lay the ground work as to the decision that

14   they made to remove Mr. Shkreli.  It's also effect on the

15   listener, what he does next with respect to learning that

16   information from the SEC interview.  And so we believe that,

17   you know, that exceptions to the hearsay rule apply and that

18   it is, in fact, relevant to this period of time with respect

19   to the matter regarding the defendant.

20         THE COURT:  All right, and at this point is the

21   government alleging that Mr. Greebel is discussing with --

22         MS. KASULIS:  Yes.

23         THE COURT:  -- Mr. Shkreli --

24         MS. KASULIS:  Yes.

25         THE COURT:  -- with regard to the Retrophin account?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1          MS. KASULIS:  Yes.

2          MR. BRAFMAN:  Your Honor, the issue of what he said

3    to Mr. Greebel and what Mr. Greebel says to him is a separate

4    issue than what the SEC says to him.  We have someone from the

5    SEC essentially testifying through his discussion with

6    Greebel.

7          THE COURT:  No, it's a discussion between this

8    witness and Mr. Greebel, an alleged coconspirator charged in

9    Count Seven and Eight about information he learned from the

10   SEC and asking the attorney for information about, point one

11   was the Merrill Lynch, and also use of Retrophin money

12   purportedly for MSMB investors.

13         So I think it's fair ground and it's directly

14   relevant to the charges, and I don't believe it's unduly

15   prejudicial to Mr. Shkreli.  So I will overrule the objection.

16         MR. AGNIFILIO:  We know the SEC investigation was

17   only on MSMB, and there's no allegation that Greebel as a

18   coconspirator knew of that investigation.

19         MS. SMITH:  The SEC sent documents to Retrophin as

20   well, and they have -- they are familiar with the charges in

21   this case, so while it may have begun as a focus on MSMB, it

22   certainly developed and produced communications between the

23   SEC and Mr. Greebel -- I'm sorry, Mr. Greebel's associate or

24   fellow partner, Mr. Rosensaft, that shows that the

25   investigation proceeded from MSMB into what was Retrophin's

SIDEBAR CONFERENCE

1    connection to what had happened with the MSMB investors.  So

2    by this point in 2014, the SEC investigation has proceeded,

3    and like I said, they did send document requests to Retrophin

4    directly.

5                MR. AGNIFILIO:  You know, I don't think there's been

6    a showing by preponderance that Evan Greebel is a

7    coconspirator.  Basically the evidence in this record that

8    Evan Greebel is a coconspirator for purposes of having these

9    discussions with this witness being the exception to the

10   hearsay rule.  I think there's layers of hearsay.

11               THE COURT:  Okay, but what I'm seeing is that

12   Mr. Richardson, as a member of board and has a very close

13   relationship with Mr. Shkreli, consults with him in his

14   capacity as a board member and as a friend; he's meeting with

15   him, he's mentoring him, he's giving him tips on how to

16   conduct himself in a board meeting.  He's somebody who is

17   taking the part himself, both as a board member and because of

18   his relationship with Mr. Shkreli, to find out what is going

19   on as a result of Mr. Shkreli's request that he show up and

20   basically meet with the SEC on his behalf.  If he learned from

21   him initially -- that he otherwise wouldn't have learned if

22   Mr. Shkreli hadn't asked him to meet, and he's consenting now

23   with Mr. Greebel, who he testified was counsel to Retrophin

24   and he said, look, the SEC is raising issues or concerns about

25   Retrophin money and its use with MSMB investors.  So I think

SIDEBAR CONFERENCE

1    it certainly appropriate for him to tell the jury what

2    happened as a result of these interrelated concerns.

3           So on the undo prejudice issue, I don't think that

4    would -- I would say in terms of its probative value to the

5    counts, outweighs the prejudice.  I don't believe it would

6    about prejudicial, much less unduly prejudicial, but anyway.

7           MR. AGNIFILIO:  Okay.

8           MS. KASULIS:  Okay, thank you, Your Honor.

9           THE COURT:  Thank you.

10          (End of sidebar conference.)

11          (Continued on the next page.)

RICHARDSON - DIRECT - KASULIS

1        (In open court; Jury present.)

2    BY MS. KASULIS:

3    Q    So you had stated, Mr. Richardson, that you had called

4    Mr. Greebel after you met -- after you met with the SEC; is

5    that correct?

6    A    Yes.

7    Q    Did you also have any discussions with the defendant?

8    A    Yes.  Yes, I did.  A few days later.

9    Q    And where did you have those discussions?

10   A    I believe they were in the office again.

11   Q    What do you recall about that discussion?

12   A    I raised it and said generally the interview went, you

13   know, as I anticipated as he laid out, but with one big

14   exception, that he raised a Merrill Lynch lawsuit and what was

15   that.  And why didn't I know about it.  And he had said to me,

16   yes, that was -- that was one of the areas where we had some

17   problems I referenced, but I didn't tell you the specifics

18   because I didn't want to come across as a failure to you on

19   that.

20   Q    And what was your reaction to that explanation?

21   A    You know, we talked it through a little bit and I

22   understood, you know, at the end of the day I asked him, I

23   said, Are you telling me there's nothing inappropriate in here

24   and that everything was covered, and that's how we left it,

25   yes.  Yes, while it was a problem at the time, I covered it

RICHARDSON - DIRECT - KASULIS

1   and we moved on, and you saw that in your own investment.

2   Q    And so what did you do after this -- after this SEC

3   interview and your discussion with the defendant?

4   A    You know, I said, you know, you got to keep me up to date

5   and the one thing you got to make sure is totally transparent

6   so I'm not blindsided by anything in the future.  I am on the

7   board and it's critical you keep my fully informed.

8   Q    Did you actually notify the other board members about the

9   interview?

10  A    I did a little bit later.  I had spoken to Evan to double

11  check that this still didn't impact Retrophin, so I wanted to

12  be careful not to get ahead of ourselves, it was still MSMB

13  specific.  And as information, I had just let the board

14  members know I think sometime a few week later when I saw

15  them.  I just said be aware of this, that it doesn't touch

16  Retrophin.

17  Q    And then directing your attention to May of 2014, was

18  there a board of directors meeting that month?

19  A    Yes, there was.

20  Q    And where was it located?

21  A    It was located at the Manhattan offices.  The outside law

22  firm, because it was -- the board meeting was next to -- was

23  happening next to the annual general meeting, which would

24  involve potentially more people.

25  Q    And what's this general annual meeting?

RICHARDSON - DIRECT - KASULIS

1    A     Again, it's a legal reporting and processing requirement

2    of any publicly-traded company, where any shareholder is free

3    to come along to meet the management of the company.  The

4    auditors, the external auditors are there, and it's a chance,

5    very transparently, for the shareholders to engage with the

6    management of the company, and that needs to happen publicly

7    and in a public forum once a year.

8    Q     And that's why it was conducted at Katten's offices?

9    A     Yes, because we weren't sure how many people might come.

10   It could be 20, 30, 40 people, and they have the space to

11   handle that type of meeting.

12   Q     And was there also a board of directors meeting that

13   occurred at that time?

14   A     Yes.  That followed the AGN.

15   Q     What do you recall about that meeting, the board of

16   directors meeting?

17   A     We started it with an executive session and we -- because

18   we were moving from the one room to the other meeting, because

19   at this point in time we were just about to appoint Steve

20   Aselage as president of the company, and the independent

21   directors wanted to talk directly with Steve about what that

22   would look like and what some of these areas of focus would

23   look like.

24         So when we held the meeting, Evan Greebel had come

25   up and come in with us, he wanted to join the meeting and I

RICHARDSON - DIRECT - KASULIS

1  said to him, No, this is probably going to be the independent

2  directors with Steve Aselage and we want to exclude you and

3  Martin at this point.

4  Q    And what did you observe was there reaction to that?

5  A    Well, the point was only Evan by himself because Martin

6  was still walking over from the other meeting.  He said, look,

7  it's normal for the company executives to sit in, even in

8  executive sessions.  I said it's normal, it doesn't have to

9  happen, and at this meeting we don't want you to be here.

10  Q    Why didn't you want Mr. Greebel to be there?

11  A    Again, certainly after the SEC discussion, I was -- I was

12  losing some confidence in Evan's independence.

13  Q    Independence, what do you mean by that?

14  A    Independence of was he really -- was he taking his role

15  as acting company secretary seriously and really talking with

16  the board and letting us know anything we should be aware of,

17  or raising any issues that he feels should be raised.

18        So part of what I had already done with Martin is to

19  say we must accelerate getting our own general counsel on

20  board so that we, you know, the board has access to them, so

21  our own general counsel.

22        So that was part of the reason, again, I wanted to

23  have a more private -- we wanted to have a more private

24  discussion with Steve Aselage as he was taking -- as he was

25  assuming his new role.

RICHARDSON - DIRECT - KASULIS

1    Q    And what did you observe with respect to Martin Shkreli's

2    reaction to not being part of the executive session?

3    A    Because he was walking behind us, because he was talking

4    to other people from the annual general meeting, he started to

5    walk in, and I think I was the one who said to him, hey,

6    Martin, we don't want you yet, we're going to have this

7    independent to start with, we'll let you know when we're

8    ready.

9    Q    And what was his response?

10   A    At that point he did stay out there.  But about, you

11   know, ten minutes into our discussions, he did sort of bang on

12   the door and said, you know, is it about time I can come in

13   now?  And we said, No, not quite yet.

14   Q    And why did you exclude Mr. Shkreli from that meeting?

15   A    Again, we wanted to really have a chat, a discussion with

16   Steve Aselage.

17   Q    And why didn't do that with Mr. Shkreli present?

18   A    Again, because we were getting role clarity.  We wanted

19   to get the role clarity that we felt we needed between Steve

20   coming on board as president and chief operations officer and

21   Martin.

22   Q    And you were saying that you were bringing Mr. Aselage on

23   as president of the company at that point?

24   A    Yes.

25   Q    And was he solely in the president role?

RICHARDSON - DIRECT - KASULIS

1    A     Yes.

2    Q     Okay.  And what was his responsibilities as the

3    president?

4    A     He was going to take the commercial side, you know,

5    really bring together and building out the sales force that we

6    would be building the infrastructure for selling the drugs

7    that we would to bring is to market, and also some of the

8    interfaces with the research and development department.

9    That's where he focused.

10   Q     Okay.  And then during the -- after that meeting, during

11   the summer of 2014, what was happening at Retrophin?

12   A     It was an incredibly busy time, we were just acquiring

13   another drug, and Martin had been bringing forward, you know,

14   almost like an endless stream of new business development

15   opportunities, potential acquisitions.

16         And as a board, we were getting concerned about the

17   volume of new deals he was potentially bringing forward,

18   because we already had the success of the ones from January,

19   we had another one in May, and we felt the organization needed

20   to consolidate so it can cope with these new drugs and build

21   them into our offering model.

22         And also coming into that summer window, you know,

23   there was a strained relationship between Martin and the CEO

24   Marc Panoff, which was becoming quite public to the board.

25   You know, Martin's raising issues with us, and Martin is

RICHARDSON - DIRECT - KASULIS

1    raising issues and concerns about with Marc with us.

2              So it was an incredibly busy time but there were

3    starting to be some cracks, if you like, starting to emerge.

4    Q    And I'm going to direct your attention to an exhibit

5    marked for identification as Government Exhibit 122-84.  It's

6    Tab 66 of this binder.

7              Do you recognize this document?

8    A    Yes.

9    Q    And what is it?

10   A    It is an email from myself to Martin copying Steve

11   Aselage.

12   Q    And what is the date on this email?

13   A    It's dated June 25th, 2014.

14             MS. KASULIS:  The government moves this exhibit into

15   evidence.

16             MR. AGNIFILIO:  No objection.

17             THE COURT:  We receive Government Exhibit 122-84.

18             (Government Exhibit 122-84, was received in

19   evidence.)

20   Q    So this is an email from you dated June 25th, 2014 to

21   Mr. Shkreli with a carbon copy to Steve Aselage; is that

22   right?

23   A    That's right.

24   Q    And it's entitled "Board Input Company Confidential" with

25   an attachment?

RICHARDSON - DIRECT - KASULIS

1    A    Yes.

2    Q    Can you please read that first paragraph of your email?

3    A    Excuse me.  Martin, as we discussed, I was able to speak

4    with each of our board colleagues before I got on the plane.

5    They all share the same frustration you have, that much of the

6    hard work and breakthroughs of recent months are getting

7    buried under a series of items that are both surprises and

8    distractions.  As a board we want to make sure we support and

9    guide you in a manner where you can focus on the things you do

10   so well, growing Retrophin and driving for breakthrough

11   patient solutions.  If we work together with the right rigor

12   and planning, we know we can keep Retrophin on the growth

13   trajectory we all want to see.

14   Q    And then the next paragraph?

15   A    The collective input of the board is to set out on the

16   attached page, you and I have already discussed most of these

17   items, in keeping with our oversight -- excuse me, the

18   collective input of the board is set out on the attached page,

19   you and I have already discussed most of these items, in

20   keeping with our oversight and government's responsibilities,

21   we want to see each of the attached items put in place as soon

22   as possible.

23   Q    Okay, so let's go ahead and look at the attachment that

24   you refer to there.

25        Who put together this attachment?

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

RICHARDSON – DIRECT – KASULIS

1    A    I put this together -- this attachment together after

2    discussion with the other board members.

3    Q    And what is the title of this attachment?

4    A    "Retrophin Growth and Control Initiatives Company

5    Confidential June 2014."

6    Q    What prompted you putting this together this -- this memo

7    and sending it to Mr. Shkreli?

8    A    Two or three things, as I mentioned, were happening

9    particularly in June that concerned us as a board.

10        First of all, you know, the fact that, you know, as

11   I said, the fact that his relationship with Marc Panoff was

12   obviously strained and the concern that we weren't moving

13   ahead at that point to find our own internal general counsel,

14   and that we weren't building out some of the other roles that

15   we needed to recruit.  And also we were starting to get

16   feedback that there was some control exposures and that he

17   wasn't following through on some of his commitments on the

18   business development trading side as well.

19   Q    And does this document reflect the different parameters

20   that you had set out to Mr. Shkreli regarding your concerns?

21   A    Yes.  These are the things we wanted addressed as a

22   board, and we wanted him to realize how serious we thought

23   about this, because it was critical in the way the company was

24   run.

25   Q    Under this stakeholder insight section, we talked about

RICHARDSON - DIRECT - KASULIS

1    an investor perception survey and employee survey.

2              What was your purpose in asking for those two

3    surveys?

4    A     The other -- the other directors and myself had had a

5    discussion at this point through the month of June, but we

6    really needed to now accelerate the timeline of -- of Martin

7    moving out of the CEO role in a progressive manner.

8    Q     When you say accelerate the timeline for him moving out

9    of the role, what do you mean by that?

10   A     Well, we had been discussing it for quite a while, all

11   the way back to when we were coming to be NASDAQ listed, he

12   was interviewing a potential president who would potentially

13   become CEO, and the context of this, again, is, you know, we

14   saw Martin, again, as we discussed before, he's excellent at

15   the setup stages, but he didn't have the experience and the

16   leadership to really run, you know, a complex multi-product

17   business.  And, again, we were -- this wasn't about taking him

18   out of the company in any form, it was -- this was to prepare

19   ourselves to say, we want to have the facts at our fingertips

20   to have a discussion with him later in the year so say let's

21   have an orderly move towards you assuming a different role,

22   you, Martin, assuming a different role, and then having a new

23   CEO appointed, who had experience running a multi-product line

24   complex business.

25   Q     And what was your position at Retrophin at this point in

RICHARDSON – DIRECT – KASULIS

1  time?

2  A    As part of the discussions with the other directors, they

3  had asked me to become chairman of the board.  We didn't have

4  a chairman up to this point, because they wanted me to help

5  steer these discussions Martin and to lay it out.  So they had

6  nominated and voted me in as chairman of the board during the

7  month of June of 2014.

8  Q    And in this email, you reference, before you get on the

9  plane.

10          What are you referring to there?

11  A    I'm getting off for my family vacation in Europe to meet

12  my family and friends.

13  Q    And was that something that you do regularly annually?

14  A    Yes, it's annual.  I meet my family usually in Greece.

15  Q    So after this point in time, what is the next thing that

16  happened with respect to Mr. Shkreli's employment as CEO of

17  Retrophin?

18  A    Well, specific to, you know, this document we just looked

19  at, you know, I copied Steve Aselage on it because Martin was

20  going to be with Steve Aselage in San Diego following this

21  communication and I knew I'd be in Greece, so prompting the

22  two of them to discuss this, because I discussed most of it

23  with Martin before he left.  So to make sure that there was a

24  follow through suggestion.  So that was the specific next step

25  that happened in June.

RICHARDSON - DIRECT - KASULIS

1   Q    Who was on the board of directors at this point in time?

2   A    At this point in time, it was still myself, Martin, Steve

3   Aselage, Neal Golding, and Jeff Paley.

4   Q    And with respect to Jeff Paley, what happened, if

5   anything, regarding his position on the board of directors?

6   A    He ended up resigning in early September.  In early

7   September of 2014, he had shared with me that he was concerned

8   about Martin not following the direction of the board, and

9   ignoring some of our instructions, and also the fact that

10  Martin was being forward very significant potential

11  acquisitions, one of them over $500 million.  And he didn't

12  feel as a company we were ready yet to -- to handle an

13  acquisition of that size, so he decided to resign in early

14  September.

15  Q    And so with his resignation, how many board members did

16  have at that point?

17  A    That left us with four.

18  Q    And with respect to NASDAQ listing requirements, did that

19  impact the listing requirements?

20  A    Yes, it did.  Because of the four, two were executive

21  roles, both Martin and Steve Aselage, the CEO and president

22  were executives, which only left myself and Neal Golding as

23  independent.  NASDAQ listing requirements are that you have a

24  majority of independent directors.

25  Q    So now directing your attention to September of 2014.

RICHARDSON - DIRECT - KASULIS

1  A    Yes.

2  Q    In early September what, if any, discussions did you have

3  with Mr. Shkreli regarding his position at Retrophin?

4  A    I arranged to have a meeting with him and a dinner with

5  him to talk about how these discussions had moved towards

6  through the summer and also raised with him very specifically

7  that I was telling him sort of this one-on-one meeting that he

8  was losing support of the board.

9  Q    And why is that?

10  A    Again, he -- he was not heeding the direction of the

11  advice that we set out all the way back in June and -- and

12  also, we had just learned, about a two weeks or maybe a week

13  before I was meeting with him, but not only had he ignored our

14  instructions on the trading of the business development group,

15  he had actually put in place a commission structure to pay

16  them money as compensation, you know, these are Retrophin

17  employees to actually do trading.

18  Q    And did you raise that with the defendant at that dinner?

19  A    I raised it as part of the discussion and asked him

20  directly had he put a commission structure in place with the

21  business development group and he said no.

22  Q    And what was your reaction to that?

23  A    I was stunned.  Absolutely stunned.

24  Q    And why is that?

25  A    You know, as a board member and chairman at the time,

RICHARDSON - DIRECT - KASULIS

1    he's lying to my face.

2             MR. AGNIFILIO:  Objection.

3             THE COURT:  I will overrule the objection, it's a

4    perception of the witness.

5    Q    And after -- was there anything else that Mr. Shkreli

6    said to you during that dinner?

7    A    No, the other thing is he basically said, you know, it's

8    a weak board, I can get rid of you whenever I need to.

9    Q    So what did you do after this dinner with the defendant?

10   A    Well, clearly that -- you know, again, up until that

11   point while I still knew he would go ahead in the following

12   weeks with the board meeting and talk about him coming out of

13   the CEO role, we were going to do it more as a discussion with

14   him.  Because we certainly wanted him to stay in the company

15   and felt that was important.

16            A very important criteria to me here as a board

17   member is how the street -- how the market reacts.  You know,

18   if they hear bad news or something traumatic about the CEO,

19   that can hurt the company dramatically.  So I knew we had to

20   handle this in a very appropriate manner, very appropriate

21   manner to protect the board -- to protect the company -- the

22   company.  So I had a followup conversation with -- at that

23   time the only other directors, other than Martin, was Steve

24   Aselage and Neal Golding after I had this meeting with Martin.

25   I think two or three days later I had a call with him where I

RICHARDSON - DIRECT - KASULIS

1   shared with him.  And I said -- I previously set out the

2   criteria that I only would be willing to proceed to remove

3   Martin from the CEO role under three -- you know, if we had an

4   interim CEO ready to announce; if we had -- we were able to

5   talk -- make sure that he, Martin, remained on the board of

6   directors in an advisory role, and that we had a very, very

7   good communication plan to handle the news and handle the

8   transition.

9           And it was on this call that following week, I think

10  it was around the 23rd of September, with Steve Aselage and

11  Neal Golding that it was the first time that Steve Aselage

12  agreed that he would be willing to be interim CEO.  And on

13  that call with him, we agreed now that we would proceed the

14  following week after we got our communication plan ready and

15  we would prove to remove Martin as CEO, ask him to stay on the

16  board of directors and play a strategic advisory role.

17  Q    And what happened after that call?

18  A    After that call, you know, Steve Aselage and I focused on

19  the communication plan, or punch list as we called it.  We had

20  to make sure that we had a very good communication plan

21  together to make sure, again, we protected the company, and,

22  again, you know, we were preparing on how we would communicate

23  this with Martin.  Because, again, while we knew he couldn't

24  stay in an executive role, because of the fact he lied to me,

25  he could no longer stay in an executive role, even at that

2970

RICHARDSON - DIRECT - KASULIS

1   point wanted him to stay as a board of director because of his

2   ideas and everything else were very valuable to the company.

3           So we prepared to meet with him, and Steve Aselage

4   and I set up the meeting with him for, I think, 5:00 on the

5   Monday the 29th of September.

6   Q    And did you, in fact, have that meeting?

7   A    We had that meeting with Martin, yes.

8   Q    And who -- who was part of that meeting?

9   A    It was just myself, and Martin, and Steve Aselage and at

10  Martin's office.

11  Q    And what happened during that meeting?

12  A    As chairman, I took the lead in the discussion and,

13  again, because I wanted to make sure that we kept Martin

14  playing a role with the company I -- I framed it in two ways.

15          One, is to talk about the fact that we had many

16  times talked about once the company got to certain size and

17  complexity, we needed a different type of CEO.  And we talked

18  about that previously and said that was one of the framing of

19  that, however, we now as a board had decided that he had to --

20  we wanted him -- to remove him from the CEO role because of --

21  of three specific incidents and government breaches, which

22  meant he could longer stay in an executive role.

23  (Continued following page.)

24

25

RICHARDSON – DIRECT – KASULIS

1    Q    Do you recall those Government issues?

2    A    Yes.  One was, as I've explained before, which is that he

3    had blatantly ignored the direction of the Board around the

4    trading of the Business Development Group.  And in fact, had

5    lied to me when I had spoken to him about it.

6              Secondly, because we had found out a little earlier

7    that he had done trading in company stock when it wasn't

8    allowable; at certain times officers aren't allowed to trade,

9    and he did trading in one of these windows.

10             MR. AGNIFILO:  Object, object, Judge.  Can we

11   approach?

12             THE COURT:  Sidebar?

13             MR. AGNIFILO:  Yes.

14             (Continued on the next page.)

15             (Sidebar conference.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          MR. AGNIFILO:  I'm hearing this for the first time,

2     and he's not charged with this, that he traded when stock was

3     restricted.

4          THE COURT:  He's not charged with it, but he's

5     explaining the reasons for removing him.

6          MR. AGNIFILO:  That's a new crime that they didn't

7     put in for 404(b).

8          MS. SMITH:  He traded during the lock-up period and

9     there is a short swing lawsuit.  These were all the reasons he

10    was given in that meeting for why he was being removed as CEO.

11         MR. AGNIFILO:  Before you told that to the jury, you

12    should have made a 404(b).

13         MS. SMITH:  We're not alleging the separate crime.

14         MR. AGNIFILO:  404(b) is not a separate crime.

15         MS. SMITH:  Tweeting inside information, this led up

16    to why he was removed.

17         THE COURT:  Let's give the instruction to the jury

18    that he's not charged with trading company stock.  What else

19    do you want to list so we'll make it clear.

20         MR. AGNIFILO:  But --

21         THE COURT:  This explains the reasons for --

22         MR. AGNIFILO:  -- it could be he was convicted of

23    manslaughter, they can't say it's the reason he was fired.

24    It's duly prejudicial.  It's hardly on 404(b).  They want to

25    bring in another crime as background to the offense as

SIDEBAR CONFERENCE

1   background to the witness's testimony or trial evidence,

2   that's why we have 404(b) evidence.

3          I had no idea this was coming.

4          MS. SMITH:  Your Honor, I think it's clearly not

5   404(b), it's direct evidence.  I'm surprised Mr. Agnifilo was

6   not aware of the lock-up issue.  They were aware of the short

7   swing, there was a lawsuit.  This was discussed.

8          MR. AGNIFILO:  I'm aware of what you give me notice

9   of.  You didn't give us notice of this, you just didn't.

10         MS. SMITH:  There was tweeting of the inside

11  information.  There was the short swing lawsuit.  There was

12  the berating of employees.  There was the use of private

13  investigators.  There was a whole series of things that led up

14  to the firing, all of which were perfectly fair.  I don't

15  think that we saw the trading during the lock-up as any

16  different than anything else.  He hasn't been charged with

17  that civilly.

18         MR. AGNIFILO:  He said it was illegal.

19         THE COURT:  He said -- I don't believe he used the

20  word illegal.  He had traded in company stock.

21         MR. AGNIFILO:  He had an adjective.

22         THE COURT:  We can go back and look.

23         MS. KASULIS:  I can -- we can move on from this

24  discussion.  But again, if the cross-examination is going to

25  be that this Board removed him unfairly, I think that is a

SIDEBAR CONFERENCE

1    fair rebuttal evidence.

2            MR. AGNIFILO:  But this isn't rebuttal.

3            MS. KASULIS:  But if that's where you go, then I

4    think, again, that opens the door to eliciting that kind of

5    information.  Because again, if that's going to be your

6    cross-examination that he was being unfairly removed by the

7    Board, we should be able to put in their reasons, principled

8    reasons, for removing him as CEO of the company.  We believe

9    this is squarely within purview of evidence that we should be

10   allowed to admit.

11           I can move on from this conversation.

12           MR. AGNIFILO:  Are you saying that he tweeted inside

13   information?

14           MS. KASULIS:  They basically said he was tweeting

15   information about the finances of the company that could be

16   construed that -- they warned him about that, do not do that.

17           MR. AGNIFILO:  They warned him about tweeting.

18           THE COURT:  They mentioned, he did mention that it

19   was about information that wasn't public, that's why they

20   asked the Board to approve any outside media.

21           MS. KASULIS:  Or Twitter.

22           MR. AGNIFILO:  I was worried, inside information is

23   a very specific definition.

24           MS. SMITH:  I was using that here.  I don't think

25   that's how either of the witnesses will describe it.  We won't

SIDEBAR CONFERENCE

1  use that term.

2           THE COURT:  Non-public information.

3           MR. AGNIFILO:  We need a limited instruction.

4           THE COURT:  Let's talk about that.  Mr. Shkreli has

5  not been charged with --

6           MS. KASULIS:  Yes.

7           THE COURT:  -- what would you like me to address?

8           MR. AGNIFILO:  Anything related to the trading that

9  was just described by the witness.

10           THE COURT:  Okay.  What else?

11           MR. AGNIFILO:  Are you guys, you haven't really --

12  the tweeting issue.

13           MS. KASULIS:  That's all I was planning on eliciting

14  on tweeting.

15           MR. AGNIFILO:  I don't know that that's clear, that

16  he was tweeting anything that could be construed as inside --

17  I'm not sure about the tweeting.

18           THE COURT:  The way he described it, it was just a

19  general board concerned about unauthorized disclosures about

20  company business either through tweeting or they wanted to

21  suppress releases or disclosures.

22           MR. AGNIFILO:  Let's leave the tweeting alone.

23           THE COURT:  Has not been charged with any offenses

24  relating to trading Retrophin stock; is that fair?

25           MR. AGNIFILO:  That's fine.

SIDEBAR CONFERENCE

1          MS. SMITH:  And the other witness will talk about

2    it.  We can do it at that level as well with the tweeting.

3          MS. KASULIS:  That's Mr. Aselage.

4          THE COURT:  This was reason number two.  What is the

5    third so we don't have anymore sidebar?

6          MS. SMITH:  Short swinging stock trading that led

7    to, there was a lawsuit.

8          MS. KASULIS:  Shareholder lawsuit.

9          THE COURT:  He said three reasons why he was

10   relieved.  One was that he ignored the Board's directive

11   regarding business development.  He traded in company stock,

12   lied to --

13         MS. KASULIS:  He had issued more stock options than

14   should have to the Board.  That's just an internal company

15   issue.

16         THE COURT:  We'll give the instruction and then you

17   can elicit whatever the second or third items are.

18         All right.  So before she elicits the third I'll

19   give the instruction.

20         MR. AGNIFILO:  Yes.

21         (End of sidebar conference.)

22         (Continued on the next page.)

23

24

25

RICHARDSON - DIRECT - KASULIS

1          (In open court.)

2          THE COURT:  Members of the jury, you are instructed

3   that Mr. Shkreli is not being charged with any offenses

4   relating to trading Retrophin stock.

5   BY MS. KASULIS:

6   Q    So Mr. Richardson, you mentioned three separate things

7   that you had discussed.  We discussed the first two, what is

8   the third one?

9   A    He had been issuing quite a number of stock grants,

10  incentive grants, to new employees but hadn't been keeping

11  track of what the available approved pool was, and

12  unfortunately he had exceeded the available pool.

13  Q    So what was the defendant's reaction during this meeting?

14  A    He did listen throughout the discussion, at the end of

15  the discussion because I had said to him, now it's best that

16  you go home and we can talk to you tonight or tomorrow about

17  the appropriate communication around this.  And that at that

18  point he said, "I'll beat be guys to build a new company.

19  I'll get to a billion dollars before you can."

20  Q    What happened after this meeting?

21  A    After this meeting immediately Mr. Aselage and I met with

22  our internal CFO and head of investor relations to start to

23  action our communication plan and start to draft the press

24  release, which we were planning to share with Martin to agree

25  to issue the next day.

RICHARDSON - DIRECT - KASULIS

1      That evening, unfortunately, it appears that Martin

2 had chosen to speak to some of the investors in the company.

3 And Mr. Aselage started to, and I started to, receive e-mails

4 from investors expressing their concern and alarm and wanting

5 to understand more about these circumstances.

6 Q    So who are the individuals that you met with after the

7 meeting with Mr. Shkreli?

8 A    We met with Tom Fernandez, Marc Panoff the CFO, and for

9 part of that meeting I believe Chris Klein, who was our new

10 investor relations employee manager, he joined as well because

11 we needed him to set up calls with each of our investors.

12 Q    Did that in fact happen?  Were there in fact calls that

13 were set up with investors?

14 A    Yes, yes.  Over the next two days Steve Aselage and I

15 handled a series of calls, some of which I joined, some of

16 which Steve Aselage handled separately.

17 Q    With the investors of Retrophin?

18 A    With the individual investors.

19 Q    And was there a Board meeting that happened around this

20 time period?

21 A    Yes.  We had already planned the Board meeting.  We had

22 to delay the original agenda so we could handle these

23 discussions before we got back to the agenda itself, normal

24 agenda.

25 Q    What happened during that Board meeting?

RICHARDSON - DIRECT - KASULIS

1    A    During the Board meeting, of course we had to formally

2    talk about removing Martin from the CEO role, formally

3    appointing Steve Aselage as the interim CEO.

4    Q    The Government is showing you what is marked for

5    identification as exhibit 122-44, tab 67 of your binder.

6    A    Yes.

7    Q    Do you recognize this exhibit?

8    A    Yes, it's the minutes of the Board of Directors meeting.

9    Q    What is the date on these minutes?

10   A    September 30, 2014.

11          MS. KASULIS:  The Government moves this exhibit into

12   evidence.

13          MR. AGNIFILO:  No objection.

14          THE COURT:  We receive Government 122-44.

15          (Government Exhibit 122-44, was received in

16   evidence.)

17   Q    So is this document the minutes of the Board of Directors

18   meeting that occurred on September 30, 2014, that you were

19   just referencing?

20   A    Yes.

21   Q    What is your understanding as to who actually prepared

22   these minutes?

23   A    These were prepared by our new in-house general counsel,

24   Margaret Valeur-Jensen.

25   Q    Do you have an opportunity to review these minutes before

RICHARDSON - DIRECT - KASULIS

1    they were approved?

2    A     She brought them to the Board for approval.

3    Q     Your understanding is these were in fact approved by the

4    Board?

5    A     They were approved by the Board, yes.

6    Q     So directing your attention to, after the first paragraph

7    there is a sentence that reads, "Mr. Richardson acted as

8    Chairman of the meeting.  Ms. Valeur-Jensen acted as

9    Secretary."  Again, who is Ms. Valeur-Jensen?

10   A     Our new in-house general counsel, which also carries the

11   company's Secretary title as well.

12   Q     The next paragraph, if you can look at that paragraph,

13   can you read that paragraph, please?

14   A     "Mr. Richardson reported that he and Mr. Aselage had met

15   with Mr. Shkreli to discuss the issues with respect to

16   Mr. Shkreli's performance as Chief Executive Officer of the

17   company.  Mr. Richardson reported that Mr. Shkreli had been

18   asked to transition from Chief Executive Officer to a senior

19   strategic advisory position with the company, and that

20   Mr. Shkreli had declined.  Mr. Richardson summarized issues

21   with Mr. Shkreli trading in common stock of the company and

22   the results of litigation.  He also outlined the need for

23   stricter governance and controls.  The Directors discussed

24   Mr. Shkreli's performance and the terms of his employment

25   agreement with the company.  And following discussion,

RICHARDSON − DIRECT − KASULIS

1    determined that it was in the best interest of the company

2    that Mr. Shkreli no longer serve as Chief Executive Officer of

3    the company."

4    Q    If you look right below that, if we scroll down, it says

5    "Upon motion made and duly seconded, it was unanimously

6    resolved that the removal of Mr. Shkreli from all of his

7    duties and authority as Chief Executive Officer of the company

8    is hereby approved."  Do you see that?

9    A    Yes.

10   Q    And that Mr. Shkreli was then put on paid administrative

11   leave for the remainder of the term of his employment

12   agreement?

13   A    That's right.

14   Q    Below that, "It was resolved further that Mr. Aselage was

15   to be the Interim Chief Executive Officer of Retrophin;" is

16   that right?

17   A    Yes.

18   Q    You had mentioned that investors had started calling and

19   that he had a series of communications with them, what were

20   the investors' response to the news of Mr. Shkreli's removal

21   as CEO?

22   A    We took them through what we could appropriately share,

23   knowing that they were trading in company stock.  As we're

24   speaking to them we had to have their reassurance they weren't

25   trading until this was publicly disclosed information.  And in

RICHARDSON - DIRECT - KASULIS

1    the discussion with them, we took them through why we had made

2    this decision and why we had taken this action and that we

3    indeed had hoped and still wanted Martin to remain on the

4    Board.

5                And they were quite surprised, because they said

6    what we were sharing with them was quite different than the

7    story that Martin had shared with them the night before.

8    Q    What ultimately was the investors' response by the

9    decision by the Board?

10   A    They wanted reassurance about the direction the company

11   was taking.  And ultimately, I'm proud to say, we didn't lose

12   one investor that I'm aware of, each of them continued to

13   invest in the company.

14   Q    What was Martin's reaction to the Board's removal of him

15   as CEO of Retrophin?

16   A    By the 30th he had reacted, the way explained earlier, by

17   the next day he had started to take the more aggressive stance

18   saying, "you can't terminate me,"  and he became a lot more

19   volatile and said, "I'm not resigning."

20   Q    I'm showing you what's been marked for identification as

21   Government's Exhibit 122-92, it's tab 68 of the binder.  Do

22   you recognize this exhibit?

23   A    Yes.

24   Q    What is it?

25   A    An e-mail from Martin.

RICHARDSON - DIRECT - KASULIS

1    Q    What is the date on it?

2    A    This is October 1st.

3    Q    Of what year?

4    A    2014.

5         MS. KASULIS:  Government moves this exhibit into

6    evidence.

7         MR. AGNIFILO:  No objection.

8         THE COURT:  We will receive 122-92 in evidence.

9         (Government Exhibit 122-92, was received in

10   evidence.)

11   Q    This appears to be from Mr. Shkreli to yourself and

12   Steven@Retrophin.com is that Steve Aselage?

13   A    Yes, that's his new business e-mail address.

14   Q    Dated October 1st, 2014, with the subject "BOD thoughts."

15        Mr. Shkreli writes, "Let me know what you want to do

16   regarding BOD," is that Board of Directors?

17   A    Yes.

18   Q    "Happy to stay on until you find a fifth to regain NASDAQ

19   compliance.  Long term there are technical reasons I would not

20   like to be on the Board, Form 4 requirement, inability to

21   borrow against stock.  Also interested in resigning now if

22   that is something you're interested in.  MS."

23        What was your understanding of Mr. Shkreli's posture

24   at this point in time regarding his removal as CEO of

25   Retrophin?

RICHARDSON - DIRECT - KASULIS

1   A    Again, he was sending us mixed messages during this week.

2   And part of it was, I think, he was waiting to see the

3   investor reaction because he had spoken to many of them.  I

4   think he had shared with us that he expected many of the

5   investors not to stick with the company.  And so he was moving

6   his stance with us during this week.

7   Q    After this e-mail -- and you're saying he was moving his

8   stance, what, if anything, did the defendant do next?

9   A    Later this week, unfortunately, despite agreements with

10  us, or we thought agreements with us, he went into the

11  Retrophin offices and started to actually go through servers

12  and files and started to take files out of the offices.

13  Q    And what happened after that?

14  A    At this point, again what we agreed in our action plan

15  between Mr. Aselage and myself and Neal Golding, is that Steve

16  Aselage would take the lead in now discussing with Martin and

17  managing this transition with Martin.

18       So Steve Aselage and Martin were in discussions

19  through the back end of this week.  But we made it clear that

20  he was not allowed to come into the offices, was not allowed

21  to take files out.  And that at this point we actually worked

22  with our technology people to remove his access to the

23  servers.

24  Q    Was there a subsequent Board of Directors meeting from

25  the September 30, 2014, meeting we've discussed?  A meeting

RICHARDSON - DIRECT - KASULIS

1  which Mr. Shkreli participated after the Board of Directors

2  meeting in September 30, 2014?

3  A     Excuse me, yes, yes.  Through the various discussions and

4  through the rocky period here, Steve Aselage and Martin

5  Shkreli were able to put together an agreement, I think by

6  October 13, at which point Martin was being forward part of

7  the agreement, his resignation from the company and the Board.

8  As part of that, we agreed as a company, that we would sell

9  him for his new company that he was setting up for at this

10 point, he was telling, two drugs that weren't of core

11 importance to our company.  We were going to sell two drugs to

12 him, which is one of the drugs he wanted to kickstart his new

13 company.

14 Q    What happened with respect to Mr. Greebel's involvement

15 with Retrophin in the September 2014 time period?

16 A     At this point we were of pulling back from him totally.

17 We had already been pulling back from involvement with Katten

18 and him ever since we had Valeur-Jensen on Board and she was

19 bringing in external advisers.

20 Q    Are you still on Retrophin's Board of Directors?

21 A     No, I'm not.

22 Q    Why not?

23 A     I made the decision.  The decision was made I think March

24 of 2015.  I decided not to remain on the Board when I came up

25 for reelection at that year's annual general meeting.

RICHARDSON – DIRECT – KASULIS

1    Q    Did you ultimately leave the Board of Directors?

2    A    I left the Board of Directors effective March 2015.

3    Q    Prior to your departure from the Board of Directors do

4    you have an understanding as to whether an internal

5    investigation was initiated by Retrophin?

6              MR. AGNIFILO:  I object.  He is no longer on the

7    Board.

8              MS. KASULIS:  This is prior to when he left.

9              MR. AGNIFILO:  I object anything about this.

10             THE COURT:  What is the ground, one word.

11             MR. AGNIFILO:  I think it's hearsay and irrelevant.

12             THE COURT:  Does the Government want to make a

13   proffer on relevancy?

14             MS. KASULIS:  Your Honor, just the purpose was to

15   say he was separate and apart from that.

16             THE COURT:  All right.  I'll overrule the objection

17   then.

18   BY MS. KASULIS:

19   Q    Did you have any involve in any sort of internal

20   investigation undertaken by Retrophin?

21   A    No.  Through the October/November window, we had

22   appointed, as I mentioned, a new external general counsel.  We

23   had asked them to start to do an investigation so we could

24   find out if indeed there were any other problems that we

25   weren't aware of.  As part of that investigation we had

RICHARDSON - DIRECT - KASULIS

1   appointed an oversight committee from the Board, which were

2   the two new directors we appointed.  And to make sure that

3   indeed any director, like myself, who was involved through the

4   time while Martin was CEO, wasn't any part of the

5   investigation's oversight.

6   Q    Were you compensated for serving on Retrophin's Board of

7   Directors?

8   A    Yes, I was, from the end of 2013 through to when I left

9   the Board in March 2015.

10  Q    What was your compensation as a Board member of

11  Retrophin?

12  A    In total for those two periods, again, much of this is in

13  stock that I still hold.  So again, it's stock I hold, but the

14  total value of the stock I hold and the cash retainer that I

15  received was just over $400,000.

16  Q    Separate from your compensation as a Board of Directors

17  member, what about your MSMB Capital investment that you had

18  rolled over into Retrophin.  Do you understand what the value

19  is of that investment?

20  A    It's all, again, in Retrophin stock that I still hold.

21  So it's based on whatever the market right is, but I'd

22  estimate if the price stayed the same the last couple days

23  $1.9 million.

24  Q    Then separate and apart from that, you have your own

25  Retrophin shares that you purchased independently of anything

RICHARDSON - DIRECT - KASULIS

1    with respect to your MSMB Capital investment?

2    A     Yes.

3    Q     Or your compensation on the Board of Directors; is that

4    right?

5    A     Yes, yes.

6    Q     You still hold those shares?

7    A     I still hold those shares.

8    Q     When was the last time you had contact with the

9    defendant?

10   A     The last time, he sent me an e-mail I believe when it was

11   publicly announced that I wasn't going to be standing on the

12   Board again, that would have been March 2015.

13   Q     What do you recall from that e-mail?

14   A     It was an e-mail sort of saying that he was pleased that

15   I wasn't going to be staying on the Board and now can we

16   rekindle our friendship.

17   Q     What was your response to that?

18   A     My response was, I'm still on the Board for the

19   foreseeable future.  And I would be willing to meet with him.

20   I really wanted to understand at this point why he comprised

21   our friendship and why he held so many things back from me as

22   a Board member.

23   Q     Did you have any further discussions with the defendant

24   after that e-mail exchange?

25   A     No.

RICHARDSON - DIRECT - KASULIS

1           MS. KASULIS:  One moment, your Honor.

2           No further questions at this time.

3           THE COURT:  Are you ready to cross-examine.

4           MR. AGNIFILO:  Yes.

5           MS. KASULIS:  Your Honor, we just got handed this

6    binder from the defense.  I haven't seen these documents

7    before.  Can we take a brief moment to review them?

8           THE COURT:  Why don't we give the jurors lunch right

9    now then.

10          Please return in an hour.  We will start the trial

11   again at 1:05.  Thank you for your ongoing attention.  Please

12   don't talk about the case.

13          (Jury exits the courtroom.)

14          (Whereupon, a lunch recess was taken at 12:10 p.m.)

15          (Continued following page.)

16

17

18

19

20

21

22

23

24

25

S. RICHARDSON – CROSS – AGNIFILO

1            (In open court: 1:08 p.m.)

2            (Jury enters the courtroom.)

3            THE COURT:  All right.  We have all our jurors back.

4            Mr. Agnifilo, if you'd like to cross examine

5    Mr. Richardson we'll bring him back to the witness stand.

6            (Witness takes the stand.)

7            THE COURT:  Sir, you're still under oath.

8            THE WITNESS:  Yes, Judge.

9    CROSS-EXAMINATION

10   BY MR. AGNIFILO:

11   Q    Good afternoon, Mr. Richardson.

12   A    Good afternoon.

13   Q    My name is Marc Agnifilo.  I'm one of Martin Shkreli's

14   lawyers.  I'm going to ask you some questions.  If I ask you a

15   question that's not clear to you, please ask me to rephrase

16   it.  I'm happy to do that.

17   A    Okay.

18   Q    Before we broke you gave three reasons, three primary

19   reasons why the board of Retrophin removed Martin as the CEO.

20   Do you remember that testimony?

21   A    Yes.

22   Q    And you said that he was giving essentially incentives to

23   the business commission, the business group that was doing the

24   trading, correct?

25   A    The business development group, yes.

Angela Grant, RPR CRR
Official Court Reporter

2991

S. RICHARDSON – CROSS – AGNIFILO

1    Q    And they were the ones doing trading?

2    A    Yes.

3    Q    You said he was trading in the company, correct?

4    Trading company stock?

5    A    When the window was closed.

6    Q    And you said that he was giving stock grants to new

7    employees, correct?

8    A    In excess of the approval.

9    Q    Got it.  None of the reasons related to unauthorized

10   settlement agreements, correct?  Yes or no?

11   A    No.

12   Q    None of the reasons related to unauthorized consulting

13   agreements, yes or no?

14   A    No.

15   Q    None of the reasons related to him steeling from the

16   company through such agreements, yes or no?

17   A    No.

18   Q    None of them related to him lying to Retrophin through

19   reaching such agreements, correct?

20   A    Correct.

21   Q    Now, before we broke you said that you were paid for your

22   duties as a board of directors member, correct?

23   A    From late 2013, yes.

24   Q    And you worked very hard in that capacity, fair to say?

25   A    Yes.

S. RICHARDSON - CROSS - AGNIFILO

1  Q    And you were paid $400,000 by today's value of Retrophin

2  stock?

3  A    That's correct.  Across that period.

4  Q    And you also said that the exchange of your MSMB value to

5  your Retrophin stock is what as of today's value?

6  A    1.9 million.

7  Q    So between your pay on the board and your profit, we're

8  talking about $2.3 million, fair to say?

9  A    Yes.

10 Q    Now, you were with American Express how long?

11 A    Thirty-six years.

12 Q    American Express, one of the leading companies in the

13 world by many metrics, correct?

14 A    Yes.

15 Q    Founded in 1850, correct?

16 A    Yes.

17 Q    I did my research.

18 A    You did.  The Wells Fargo.

19 Q    Yes.  And you were Senior Vice President of HR, correct?

20 A    Yes.  I wasn't the number one person in HR, but I was

21 Senior Vice President of HR.

22 Q    And how many people did you supervise, if I can ask?

23 A    At that time about 400.

24 Q    And so you had 400 people working under you in your

25 capacity in the HR department of AMEX, right?

S. RICHARDSON – CROSS – AGNIFILO

1   A    Yes.  My responsibilities.

2   Q    And how long a period of time did you have those

3   responsibilities where you were supervising 400 people?

4   A    Really through that 12-year period that I was in the

5   human resources area.

6   Q    And at one point you were something called the Chief

7   Talent Officer?

8   A    That was part.  It was an adjunct title.  They went

9   together.

10  Q    I see.  And tell us about that.  What are your duties and

11  responsibilities in that capacity?

12  A    It was -- I was responsible for all the international

13  regions, so outside of the United States from the human

14  resources point of view.  I was responsible for the

15  recruitment of our talent of our employees going forward.  I

16  was responsible for the development, planning of our existing

17  employees.  I was responsible for employee relations, you

18  know, if there were any issues with employees.  A whole mix of

19  portfolio of account abilities.

20  Q    So fair to say you had a very significant job at a very

21  significant company?

22  A    Yes.

23  Q    And you left American Express after 36 years in 2008?

24  A    That's correct.

25  Q    And then you were with the Boston Consulting Group?

2994

S. RICHARDSON – CROSS – AGNIFILO

1    A    That was as a senior advisor, not as an employee.  Yes.

2    Q    Right.  Right.  And despite its name, the Boston

3    Consulting Group has offices in 80 different locations around

4    the world, correct?

5    A    Yes.

6    Q    And it's a large very successful management consulting

7    firm, correct?

8    A    Yes.

9    Q    And in your capacity as senior advisor there, what were

10   your duties and responsibilities?

11   A    It was to join their consultant teams as an outside

12   advisor and external voice, if you'd like, as they work with

13   their clients largely around the gain of people and

14   organizational issues that I described in my role.

15   Q    And if there's such a thing, what was a typical client

16   that you would handle with the Boston Consulting Group?

17   A    They were large multinational organizations mostly.

18   Q    What type of services would you provide?

19   A    I joined them for meetings and meet with some of their

20   leadership team.  You know, again, perhaps their businesses

21   were having problems with growth.  Talk with their leaders

22   about how they can improve their growth plans and what they

23   could do to improve the performance of their employees.

24   Q    And you also had your own consulting business, Diverse

25   Outcomes is the name?

S. RICHARDSON - CROSS - AGNIFILO

1    A     Yes.

2    Q     Tell me about that business.

3    A     And, again, those two pieces, Diverse Outcomes, I had

4    just two or three direct clients that I had, again, in the

5    same kind of areas.  Working with clients about their

6    organizational models, their people strategies, how they got

7    the best performance they could out of their employees.

8    Q     And you were also involved with the United Way Worldwide,

9    correct?

10   A     Yes, up until 2010.

11   Q     Tell us what that is exactly.

12   A     United Way, as you know, is one of the largest, globally

13   one of the largest nonprofit organizations in terms of money

14   that they are stimulating for local development, and I was

15   involved with the international board which is, again, all the

16   United Way affiliates around the world outside of the United

17   States and helping steer them and how they collaborate

18   together.

19   Q     And what were your duties and responsibilities on the

20   international board of the United Way?

21   A     I started as a board -- on the board of directors, again,

22   part of our role is a part from any personal contributions one

23   is making as well, is to really work with their management and

24   help them think through how can they accelerate their vision,

25   their charter.  How can they accelerate the impact of their

S. RICHARDSON – CROSS – AGNIFILO

1    programs.

2    Q    Did you have traditional board responsibilities with the

3    United Way?

4    A    Yes, I ended up being chairman of the international board

5    for a while.

6    Q    And just -- I don't need too much detail.  Generally

7    speaking, what's the structure of the board that you were the

8    chairman of?

9    A    It's fairly normal.  It would have the secretary and it

10   would have, you know, the management team would be there.  And

11   it was probably eight to ten -- no, probably about 12

12   external board members and we meet regularly.

13   Q    And how regularly?

14   A    Probably quarterly.  I think we had face-to-face meetings

15   quarterly.

16   Q    Did you ever have meetings on the phone?

17   A    As a full board I don't believe we did.  As subsets of

18   the board on specific subjects, I think we had meetings, we

19   had calls.

20   Q    So that the board would have certain sort of like

21   subgroups within the overall board?

22   A    Yes.  That might be working on a particular project or a

23   particular geography of support.

24   Q    Fair to say that you're a sophisticated investor?

25   A    Certainly capable, a capable investor, yeah.

S. RICHARDSON - CROSS - AGNIFILO

1   Q    Do you remember telling the Securities and Exchange

2   Commission you were a sophisticated investor?

3   A    I think in response to the question I probably said yes,

4   but -- or I may have said what I just said now which is

5   capable may be the better word.

6   Q    This will only take a second.  Let me ask you, do you

7   recall what you said to the SEC about the type of investor you

8   are?  Do you have any specific recollection?

9   A    I don't about the particular adjectives used or

10  descriptors used, I don't.

11          MR. AGNIFILO:  Just give me one second.

12  Q    Bear with me one second, Mr. Richardson.  I apologize.

13  A    Okay.

14  Q    What I'm going to do, with your permission, it's 3500-SR

15  1-1.  Mr. Richardson, I'm just going to show you something and

16  I'm just going to ask if it refreshes your recollection.

17  That's the only question I'm going to ask you, and I'd ask you

18  to look right under where it says investment experience and

19  just read that to yourself, if you could.

20  A    Yeah.

21  Q    Do you recall if you told the SEC you were a

22  sophisticated but conservative investor?

23  A    Yes.  And I think it's the word "conservative."  I knew

24  that I had put a qualifier in there to my earlier response to

25  you.

Angela Grant, RPR CRR
Official Court Reporter

S. RICHARDSON - CROSS - AGNIFILO

1  Q    Very good.  Very good.

2           Now, your investments are broken into real estate

3  holdings and other holdings, correct?

4  A    Yes.

5  Q    And tell us about your real estate holdings, if you

6  could.

7  A    Yes, again, I've always tried to split my investments

8  roughly half and half if I can or at least make sure I

9  diversify them well.  So I have a property here in New York,

10 I have two properties in Mexico and I have a property in

11 Greece.

12 Q    Do you have a property in Australia?

13 A    No.

14 Q    And in Canada?

15 A    No.  My partner has a property there.

16 Q    And your partner is Canadian?

17 A    Yes.

18 Q    And how long have you had the property in -- its in

19 Mykonos in Greece, correct?

20 A    Yes.

21 Q    How long have you had that?

22 A    About, about over 20 years.  Must be about 25 years.  I

23 actually had it built.

24 Q    During the time period that we've been talking about,

25 this 2009 to 2014 time period, you would frequently go to

S. RICHARDSON - CROSS - AGNIFILO

1   Mykonos, correct?

2   A    Yeah, I always spend summer there, always have summer

3   there with my family for vacation.

4   Q    And you would frequently go to Mexico as well?

5   A    Yeah.  Mexico is more recent.  Mexico is the last few

6   years.

7   Q    Now, your non-real estate holdings are generally of what

8   type?

9   A    They're a classic retirement fund with conservative

10  profile and a mix of the mutual funds and, you know, basically

11  that's it.  It's a fairly conservative portfolio.

12  Q    And I think you said yesterday that you had never

13  invested in a hedge fund before meeting Martin, is that fair

14  to say?

15  A    That's correct.

16  Q    And you said that you were considering your investment

17  options and you decided that there was a certain amount of

18  money that you were willing to put in a riskier investment,

19  correct?

20  A    Yes, which I had spoken to my financial planner about

21  that year, yes.

22  Q    And so you decided you would take a portion of your

23  overall investment and invest it in some hedge fund, correct?

24  A    Yes.

25  Q    And I think you told us yesterday what that -- you were

3000

S. RICHARDSON - CROSS - AGNIFILO

1    willing to go up to 8 percent of your non-real estate

2    holdings?

3    A    Up to like 8-to-10 percent.  8-to-10 percent.

4    Q    Okay.  And so you met Martin at a cocktail party in the

5    East Village, correct?

6    A    Yes.

7    Q    It was like on a roof?

8    A    Yeah.  The apartment had a roof level and the apartment

9    level.  So an indoor level and an outdoor level.

10   Q    And the apartment was owned by Ken Banta and Tony Powe?

11   A    Yes.

12   Q    Now, did you speak with Ken Banta at all that evening?

13   A    I think in passing, yes.  It was Tony who I was more the

14   friend with and Ken was his partner, so I had only met Ken

15   very briefly before, but Tony I knew.

16   Q    Did you know if Mr. Banta had invested with Martin

17   previously?

18   A    Not that night, no.

19   Q    You came to learn that though?

20   A    I came to learn that later.

21   Q    And so give us an idea of how large is this cocktail

22   party.  This is like the fall of 2009, fair to say?

23   A    Yes.  Fall of 2009, late summer.  Yes, fall.

24   Q    Okay.

25   A    Probably I would have thought 40-to-50 people probably

Angela Grant, RPR CRR
Official Court Reporter

S. RICHARDSON - CROSS - AGNIFILO

1  churned through.  Again, it was the nature of cocktail

2  parties, people come and go and it was on two floors.

3  Q    And you met Martin Shkreli for the first time at this

4  time; is that correct?

5  A    Yes.

6  Q    And you said that you told him you thought he was cocky?

7  A    Yes, because of the way he'd been interacting and the

8  first time, literally the first time I saw him.

9  Q    Tell me what you remember seeing.

10 A    It was a group of colleagues standing together and

11 chatting and talking with each other that I had just joined as

12 I walked in there with my other friends, and, again, he was

13 talking a little bit about his plans and what he was doing.

14 And it was just a natural social interaction of people.

15 Q    And how old was he at the time, do you know?

16 A    I assumed, you know, probably late 20s.  Mid-to-late 20s,

17 I assume.

18 Q    And was he there with other people his age, could you

19 tell?

20 A    It was a mix, mixed, a mixed group of people.  Mixed

21 ages.  Mixed group of people.

22 Q    So you and he got to talking, correct?

23 A    Yes.  A little bit there, but later on.  We talked later

24 on.

25 Q    Later on on a different day?

S. RICHARDSON – CROSS – AGNIFILO

1    A    No.  No, later on that day, yes.  Because, again, we were

2    floating around talking with different people from the

3    cocktail party.

4    Q    And so when you and he got to talking, what did you talk

5    about?

6    A    We talked about, you know, as I say, we started and he

7    was interested in my human resources background, and we talked

8    about quite a few things.  Started to talk about family and

9    other dimensions.  And, again, because I used that cocky line,

10   I think he was, you know, he was intrigued about my

11   directness.  So it was a very lively, lively conversation,

12   meeting someone for the first time.

13   Q    And you recall it all these years later?

14   A    Yeah.  I don't recall the specifics of what we have

15   covered, but I remember that we, you know, we created, you

16   know, an understanding of who each of us was to some extent.

17   Q    But you remember all these years later you met him in the

18   East Village in an apartment that had a roof access, right?

19   A    Yes.

20   Q    And that you spoke to him and you told him he was cocky,

21   right?

22   A    Yes.

23   Q    And the way you put it yesterday, I think he kind of

24   followed you a little after you said that and engaged you in

25   conversation again?

Angela Grant, RPR CRR
Official Court Reporter

S. RICHARDSON - CROSS - AGNIFILO

1   A    He just found me later.  I don't want to give the

2   impression he was following me.  He just found me later

3   because I had moved down inside -- into the apartment itself.

4   Q    The second time that you guys spoke, how long do you

5   think you spoke about?

6   A    Probably 45 minutes maybe.  Maybe up to an hour.

7   Q    All right.  And then the next thing that happened is you

8   and he had dinner, correct?

9   A    Yes.

10  Q    And you said that Marek Biestek was there for some period

11  of time, but he had car trouble, correct?

12  A    Yes.

13  Q    So he wasn't there the whole time?

14  A    No.

15  Q    You and Martin were there the whole time?

16  A    Yes.

17  Q    And do you remember where you went?

18  A    Yes, I believe the first dinner was a restaurant in the

19  Village.

20  Q    What was the name?

21  A    Cafe Loup.

22  Q    Cafe Loup.  Okay.

23       Do you recall that you and he went to Cafe Loup on

24  September 28, 2009?

25  A    I don't recall the dates, exact date, but that's

S. RICHARDSON - CROSS - AGNIFILO

1    certainly the right time period.

2    Q     That's about right?

3    A     That's about right.

4    Q     And you and he had dinner a lot, right?

5    A     From that point, yes.  Once I was interested in the fund

6    and we were starting to forge a friendship, yes.

7    Q     You went to a place called Olives pretty frequently?

8    A     I don't think we went there frequently.

9    Q     How many times would you say?

10   A     Olives I would think only a couple I would think.

11   Q     You went to a place called Blue Water?

12   A     Blue Water Grill, yes.

13   Q     How many times would you say you were there?

14   A     Probably -- we did brunch and dinner over the two or

15   three years because it was one of my favorite restaurants.

16   Probably four times, five times.

17   Q     And he came to your apartment?

18   A     Yes.  Two or three times.

19   Q     Now, at the time he was living with his parents?

20   A     I don't remember exactly when he overlapped to his own

21   apartment.

22   Q     Do you think he had his own apartment when you met him in

23   2009?

24   A     I don't recall.

25   Q     Because you said that often he would sleep in a sleeping

S. RICHARDSON – CROSS – AGNIFILO

1    bag in his office, correct?

2    A     No.  He told me.  He told me that, you know, he'd do that

3    sometimes.

4    Q     And he would tell you that he did that quite frequently,

5    correct?

6    A     I don't recall.  I don't recall quite frequently, but I

7    certainly recall him telling me he had done it a few times.

8    Q     And you'd bought him gifts, correct?

9    A     Yes.  Through the years, yes, through the years.

10   Q     What sort of gifts have you gotten him?

11   A     A shirt, a jacket.  I think they were mainly clothes.

12   Again, as I said yesterday in terms of helping him with his

13   own sharpening his image.

14   Q     Right.  He's not a particularly fashionable person?  No

15   offense to my client?

16   A     That's a good way of putting it.

17   Q     Okay.  Thank you.

18          There are less diplomatic ways of putting it,

19   correct?

20   A     Yes.

21   Q     And from your perspective, it seemed clear that he looked

22   up to you, correct?

23   A     Yes.  As I say, from very early meeting him particularly

24   when he knew I was human resources, I had been in human

25   resources, I think I did quickly assume a mentor  role as I

S. RICHARDSON - CROSS - AGNIFILO

1   said previously.

2   Q    Didn't he tell you many times that you made him happy?

3   A    I don't particularly know the phrase happy, making him

4   happy, but certainly he said he enjoyed my company and he

5   liked my positive vibes.

6   Q    Didn't he refer to you in messages he sent you as a

7   blessing in his life?  Do you remember him saying that?

8   A    There were some very, very praiseworthy comments and

9   both, I think both of us reciprocated in our messages.

10  Q    But it wasn't just comments along the lines of I highly

11  regard you as a professional.  He would say things to you like

12  you're a blessing in my life.

13  A    I don't recall that particular phrase, but, no, there

14  were some very complementary phrases used.

15  Q    And you could tell he felt very close to you, correct?

16  A    I think there was, yeah, we developed trust very early

17  on.  I think, yes, we got to -- we were very caring for each

18  other particularly given, as I mentioned, some of the family

19  dynamics.  There was a lot of caring about the support that we

20  were giving each other.

21  Q    And he told you that his brother has autism, correct?

22  A    No.  I don't recall him ever saying autism.

23  Q    What did he say about his brother?

24  A    That he had severe anxiety issues and had problems

25  socializing outside of the house.

3007

S. RICHARDSON – CROSS – AGNIFILO

1   Q    And did Martin also tell you that Martin had severe

2   anxiety issues?

3   A    No.  Martin, Martin only ever labeled depression.

4   Depression that he was given medication for.

5   Q    So he told you that he suffered from depression?

6   A    Yes.  He told me that later on probably 2013 or '14 is

7   when he said the doctor is giving him some medication for it.

8   Q    Did he tell you that there were times he couldn't bring

9   himself to leave his house?

10  A    No.

11  Q    He never told you that?

12  A    No.  Not for himself, only for his brother.

13  Q    Just for the moment I'm just talking about Martin.

14       Did you have to give him advice from time to time

15  about hygiene?

16  A    A little bit, yes.

17  Q    He wasn't brushing his teeth?

18  A    He phrased that to me a couple of times.  When he slept

19  in the sleeping bag in the office he wouldn't clean his teeth.

20  Q    And fair to say you noticed that he wasn't always taking

21  good care of himself, correct?

22  A    Yes.  Both from the health point of view and occasionally

23  looking disheveled.

24  Q    And these were among the ways that you were trying to

25  help him, correct?

S. RICHARDSON – CROSS – AGNIFILO

1    A    Yes.

2    Q    Because you, you have the good fortune to have moved

3    through the business world at a fairly high level.

4              Let me rephrase the question.

5              You had a very responsible job at American Express,

6    correct?  You have to answer yes or no.

7    A    Excuse me.  Yes.

8    Q    That's fine.  You know how executives behave.  You've

9    seen them?

10   A    Yes.

11   Q    And from your perspective, fair to say, Martin was doing

12   things that were not in keeping with being a traditional

13   executive, fair to say?

14   A    Yes, with a qualifier in that, again, part of my job in

15   human resources is studying the difference between

16   generations.  And I'm an older gentleman.  I'm a baby boomer.

17   Martin was at the time a 20 something or young 30 something,

18   so I respected that there were differences in the way a young

19   leader might want to act.  So I just want to distinguish, you

20   know, I don't expect an executive at one large corporation to

21   necessarily act or look the same as an entrepreneur.

22   Q    Did he complain to you a lot that he was sick?

23   A    Quite often in his emails he said I have a headache.  I

24   have a headache.  I have a cold.

25   Q    And did he complain in his emails that you would invite

S. RICHARDSON - CROSS - AGNIFILO

1   him out and he said I just can't do it tonight?

2   A    Yeah, sometimes he'd say that.

3   Q    And often you would invite him places and he would say

4   he's not well enough to go?

5   A    It certainly happened.  You know, again, I can't put a

6   number on that, but it certainly happened.

7   Q    And I think we talked when you were talking to my

8   colleague with the government, you said that there were in

9   your emails with each other you would express love for each

10  other, correct?

11  A    We certainly used the label, yeah, the word.

12  Q    Did you not mean it?

13  A    Well, again, I just want to clarify, implication in terms

14  of loving each other or caring for each other as friends.

15  Yes, again, part of, you know, what clearly he was enjoying

16  about my company is the fact that, you know, once we could

17  remove any question of anything that wasn't outside of being

18  platonic, you know.  He was very comfortable, you know,

19  because he didn't share any of these emotions with many

20  people.

21  Q    And did he say to you on more than one occasion that you

22  are the first person that he feels he can be himself with?

23  A    I don't remember if it was the first person, but it was

24  certainly, you know, again, I'm one of the few people.

25  Q    And you knew that you had that role in his eyes, correct?

S. RICHARDSON - CROSS - AGNIFILO

1    A    Well, as a mentor and someone that he cared about and
2    trusted.
3    Q    But as someone who he viewed as a blessing in his life,
4    correct?
5    A    Again, I don't remember that phrase but.
6    Q    Someone one of the few people that he expressed that he
7    felt happiness with, correct?
8    A    Again, using the word "happy" again.  You know, I know
9    that he enjoyed my company and enjoyed my present in his life,
10   yes, that's the way I'll express it.
11   Q    I won't stick to words.  I want to talk about concepts.
12   A    Okay.
13   Q    You were a very special person to him and you knew it?
14   A    I think it certainly thought over time, yes.
15   Q    And he would say things in emails to you that led you to
16   believe that he had feelings for you, fair to say?
17              MS. KASULIS:  Objection.
18              THE COURT:  Sustained.
19   Q    He would tell you that he loved you, correct?
20   A    He'd used the word in some emails and to my face
21   sometimes, yes.
22   Q    He told you to your face that he loved you?
23   A    Yeah.
24   Q    And he wrote in an email messages that he loved you,
25   right?

S. RICHARDSON - CROSS - AGNIFILO

1    A    Yes.

2    Q    And you wrote in email messages that you loved him?

3    A    Sometimes.

4    Q    Did you not mean it?

5    A    But, again, loving, loving and caring as a friend.

6    Q    Do you have other business, male or female business

7    associates that you're not involved in a relationship with and

8    you tell them that you love them repeatedly?

9    A    Certainly with friends I use it, yes.

10   Q    And is that how you were using it with Martin?

11   A    As a friend.

12   Q    Only as a friend?

13   A    Yes.

14   Q    Now, you talked yesterday about you would get these

15   performance reports.  Do you remember talking about that?

16   A    Yes.

17   Q    And in addition to performance reports from time to time

18   Martin would send you other reports about companies, correct?

19   A    No.  He'd send his quarterly letter in which he included

20   reference to other companies.

21   Q    Do you remember a company called GenVec?

22   A    I remember seeing the name, but I don't remember detail.

23   Q    And do you remember him sending you information about

24   GenVec and a drug that it had failed, a phase three clinical

25   trial.

3012

S. RICHARDSON - CROSS - AGNIFILO

1   A    I don't recall that.

2   Q    And he wanted you to have this information.  He sent it

3   to you, do you remember?

4   A    I don't recall that.

5   Q    And do you recall after he sent it to you there was a

6   conversation in an email with you and him trying to figure out

7   if you could see each other soon?

8   A    I don't know.  I just don't recall the GenVec drug piece.

9   Q    And you said to him only if I can touch your soft skin?

10              MS. KASULIS:  Objection, Your Honor.

11              THE COURT:  Sustained.

12  Q    Did you ever say that to him?

13              MS. KASULIS:  Objection, Your Honor.

14              THE COURT:  Sustained.

15              MR. AGNIFILO:  Your Honor?

16              THE COURT:  Do you want to have a sidebar?

17              MR. AGNIFILO:  Yes.

18              THE COURT:  Okay.

19              (Continued on the next page.)

20              (Sidebar conference.)

21

22

23

24

25

ANGELA GRANT, RPR, CRR

SIDEBAR CONFERENCE

1          MR. AGNIFILO:  This man lied to this jury about

2     their relationship and I'm going to prove it.  I'm going to

3     prove it.

4          THE COURT:  By?

5          MR. AGNIFILO:  By his own words.

6          MS. KASULIS:  You're asking him questions and he's

7     saying he doesn't recall.

8          Do you have something to refresh his recollection?

9          MR. AGNIFILO:  Yes.  If that's the objection, I'll

10     refresh his recollection, sure.

11          MS. KASULIS:  I mean, I'm not certain why you're

12     doing that.

13          MR. AGNIFILO:  No.  No.  No.  That's fine.  I'm

14     happy to do that.  I'll refresh his recollection.  We're good.

15          MS. KASULIS:  If you have something to show him, you

16     can show it to him to refresh his memory and you can ask him

17     that.

18          THE COURT:  I thought we were talking about GenVec.

19          MR. AGNIFILO:  Well, no.  There is a context.  "Only

20     if I can touch your soft skin."  And I'm quoting.

21          MR. BRAFMAN:  He's not speaking to the Judge.  He's

22     quoting from an email.

23          THE COURT:  Understood.

24          MR. AGNIFILO:  Thank you.

25          MS. KASULIS:  So the issue is that he's asking him a

SIDEBAR CONFERENCE

1    series of questions clearly about an email exchange.  If he

2    wants to say he doesn't recall -- if he wants to refresh his

3    recollection, he can.

4                MR. AGNIFILO:  I will.  Absolutely.

5                MS. KASULIS:  And then he can ask a question.  And

6    if it's objectionable, we will object.

7                MR. BRAFMAN:  So we maybe don't have to come back

8    here, they opened this door with a crow bar.  They suggested

9    the relationship.  Martin was infatuated with him.  He didn't

10   believe Martin was really gay, sat him down on his bed and

11   confronted him, they started that.  The fact is we're not --

12               THE COURT:  I get it.

13               MS. SMITH:  Your Honor, we need to put something on

14   the record.

15               MS. KASULIS:  Your Honor, we actually contacted

16   defense this weekend prior to this witness testifying and

17   asked specifically if they were going to get into this

18   relationship issue and if they were going to imply or

19   insinuate that there was a romantic relationship.

20               MR. BRAFMAN:  And we said yes.

21               MS. KASULIS:  And they said yes.  And we asked, we

22   vetted, we talked about --

23               MR. BRAFMAN:  He --

24               THE COURT:  Let her finish.

25               MS. KASULIS:  We asked, we vetted and we talked

ANGELA GRANT, RPR, CRR

SIDEBAR CONFERENCE

1  about it with him because we don't do these things lightly.

2  And so we called them, we asked them.  They said they intended

3  to go into this with the witness, and so when we responded

4  accordingly with respect to our direct examination and that

5  was something that we had vetted.  So I just want to correct

6  the record that we opened the door and this is a crow bar.

7          MR. BRAFMAN:  No.  No.  No.  That's not what I

8  meant.  She's right about all of that.  But what we said was

9  that we intend to go down that path, but we're not barred by

10 what the witness says on direct to suggest that that's the

11 true nature of the relationship.

12         THE COURT:  All right.  But my question is this.  I

13 know you opened with this whole thing that people thought he

14 was gay.  I just think sexual preference is not relevant in

15 this case.

16         MR. BRAFMAN:  It is.

17         MR. AGNIFILO:  He doesn't care about the performance

18 reports.  They were together.

19         THE COURT:  In the opening they are talking --

20 Mr. Brafman went at length about all those perceptions that

21 people had about Mr. Shkreli, that he's odd, that he's

22 autistic.  We have no evidence that he's autistic.  We have no

23 evidence that he's odd.  Numerous witnesses have denied using

24 these terms to describe him.  And now I've heard I guess at

25 recent sidebars a few days ago that the autism may have

ANGELA GRANT, RPR, CRR

SIDEBAR CONFERENCE

1    interfered with his ability to form an intent to defraud or to

2    understand.

3            MR. BRAFMAN:   No.

4            THE COURT:   Well, I can pull that part of the

5    transcript, but I think that sexual preference just isn't

6    relevant.

7            MR. AGNIFILO:   It doesn't matter.   They're having a

8    romantic --

9            THE COURT:   He's admitted that he's gay.

10           MR. AGNIFILO:   It's not about sexual preference.   It

11   could be a man or a woman, two women, two men, it doesn't

12   matter.   He invested with him.   They were having a

13   relationship.   That's critical.   It's central, Judge.

14           And no one is objecting.   We have had this

15   discussion between us for days now.

16           MS. KASULIS:   Your Honor, he wants to ask him about

17   the nature of his relationship and if that influenced his

18   decision, he can do that, but to go and try to humiliate this

19   witness.

20           MR. AGNIFILO:   I'm not going to humiliate --

21           MS. KASULIS:   You can just ask --

22           MR. AGNIFILO:   The relationship took place when they

23   were together.   He's going to lie.   I don't get to be stuck

24   with his answer.

25           THE COURT:   One moment.   The fact that someone has

ANGELA GRANT, RPR, CRR

SIDEBAR CONFERENCE

1  made comments of someone's touching soft skin, I mean, I'm not

2  sure what you mean by a relationship.  They're obviously very

3  close.

4          MR. AGNIFILO:  I think they have a romantic

5  relationship.

6          THE COURT:  A sexual relationship?

7          MS. SMITH:  Then they can ask him.

8          THE COURT:  I think, as Mr. Brafman said, it's 2017.

9  Are we going to try to humiliate this witness because he's

10  gay?

11          MR. AGNIFILO:  No.  You're missing the whole point.

12  No, Judge, I would never do that.  I would never do that in a

13  million years.  I'm surprised we have to have this discussion.

14          The reason I'm doing this is because they're not

15  arm's length business people.  I think they're having a

16  romantic relationship.  I think that's critical to the actual

17  charge here.  He's not invested.  They said yesterday, the

18  performance reports meant a lot to you.  They're not.  I'm

19  going to go through --

20          THE COURT:  But he's testified both on direct and so

21  far in court that they're very close.  They expressed

22  thoughts.  They do love each other.

23          MR. AGNIFILO:  A romantic relationship is different,

24  Judge.  It's different.  It is.  A romantic relationship is

25  different.  It just -- it's always been different.  People who

SIDEBAR CONFERENCE

1    love each other and are in a romantic relationship are just

2    different with each other.  That's the last thing I'm going to

3    do because I would never do that.  I am not going to embarrass

4    this man, not in a million years.  I would never do that.  I'm

5    trying to establish I think what is a healthy and loving

6    relationship between two people.

7              THE COURT:  All right.  That's fine.  I do think

8    though to the extent there's a comment about soft skin, it

9    could be arguably evidence that there's more than a platonic

10   relationship.

11             MS. KASULIS:  Right.

12             THE COURT:  So I think it's fair ground.

13             MR. AGNIFILO:  I will.  I will.

14             MS. KASULIS:  So ask him that.

15             MR. AGNIFILO:  I will.

16             THE COURT:  I think he can impeach, but I don't want

17   this to evolve into --

18             MS. KASULIS:  That's our concern as well, Your

19   Honor.  That's our concern as well.

20             MS. SMITH:  We understand the argument of bias.

21   That's fair.

22             MS. KASULIS:  Right.  We get that.

23             MR. AGNIFILO:  Okay.

24             THE COURT:  So just tread carefully.  Don't, you

25   know, I mean, because as Mr. Brafman said, and I totally

SIDEBAR CONFERENCE

1    agree, this is 2017.  We're not going to --

2              MR. BRAFMAN:  That's why we can go into this and not

3    keep it under a rock.

4              THE COURT:  Well, all right.  It's how it's done and

5    what is said.  So just, you know, guide yourself accordingly.

6              MR. AGNIFILO:  All right.  Okay.  Will do.

7              (End of sidebar conference.)

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S. RICHARDSON - CROSS - AGNIFILO

1          (In open court.)

2    Q    Mr. Richardson, do you remember saying to Martin "only if

3    I can touch your soft skin"?

4    A    I'd have to look.  This is on an email or?

5    Q    Yes.  I'll show it to you.

6    A    See, and the context is.

7    Q    Understood.  It's Defense Exhibit 4218.  It's a series of

8    emails.  This is from March 29, 2010 at 9:21 p.m.  Just read

9    it to yourself.

10          Did you write to Martin in an email "only if I can

11   touch your soft skin"?

12   A    Yes, my recollection is this is after he had an infection

13   on his neck and ear, and I -- and he left it -- he hadn't

14   medically treated it and then medically treated it.  So I

15   believe here what I'm referring to is the fact that he's now

16   fixed his skin because he had a very, very nasty looking rash

17   and infection from his ear and neck.  So I'm referring to, I

18   believe, I believe, because the context, I believe that's what

19   I'm referring to, that he's now fixed the skin on his neck.

20          (Continued on the following page.)

21

22

23

24

25

ANGELA GRANT, RPR, CRR

S. RICHARDSON - CROSS - AGNIFILO

1    BY MR. AGNIFILO:

2    Q    So what you believe when you said, "only if I can touch

3    your soft skin," you were referring to a rash on his neck?

4    A    The fact that he had fixed it, after leaving it alone for

5    too long.

6

7    Q    Do you recall any other conversation in this e-mail or

8    any other e-mail about a rash?

9    A    No, just verbally with him and seeing him of course with

10   this infection.

11   Q    And you have a clear recollection as you sit here today

12   that that's what you're talking about?

13   A    I'm trying -- again, context is important.  That's, I

14   certainly have that recollection.  Again, if I'm talking about

15   skin, his skin infection was probably that's what I'm

16   referring to.

17   Q    Now, to the extent you received periodic performance

18   reports, correct?

19   A    On the MSMB Capital fund.

20   Q    Right?

21   A    Yes.

22   Q    And when you got the periodic performance report on

23   February 12 at 10:07 a.m., did you ask him how he was feeling

24   and whether the bubble bath worked?

25        MS. KASULIS:  Objection, your Honor.

S. RICHARDSON - CROSS - AGNIFILO

1          THE COURT:  I will overrule that objection.  Go

2    ahead and answer it.

3    Q    Only if you recall, if you don't recall I can show you

4    something.

5    A    Again, Counsel, it's context again.  Because quite often

6    when he was sick he'd tell me he was sick.  I would say things

7    that again in isolation may sound a bit weird, but when it's

8    me carrying for him as friend, if it's responding to the fact

9    that he just told me he's was sick, I might have said, have a

10   bubble bath, make yourself feel better.

11   Q    DX9029, e-mail from you from February 12, 2010, at

12   10:07 a.m.

13   A    I actually did say, "Did the bubble bath work?"  which is

14   consistent again with helping him to try fix a health issue or

15   feel better about himself.

16   Q    That e-mail is in response to him sending a daily

17   performance report, right?

18   A    But, again, we possibly had spoken separately during the

19   day.  Again, Counsel, I don't have the context of the rest of

20   the discussions that might have triggered that.  I did say,

21   "Did the bubble bath work," again.

22   Q    I'll give you the whole e-mail, I want to make sure you

23   have the right context.  Here is the whole e-mail.  Fair to

24   say he's sending you a performance report, right?

25   A    Then I'm probably speaking to him on the phone

Rivka Teich CSR, RPR, RMR
Official Court Reporter

S. RICHARDSON – CROSS – AGNIFILO

1    separately.

2    Q    In response to you getting the performance report you ask

3    him about a bubble bath?

4    A    Again, it's coming from my personal e-mail just checking

5    in with him.  I called it "checking in."  I changed the title

6    to checking in, I changed the subject but I used the same

7    e-mail.

8    Q    He sends you your daily performance report.  He tells you

9    how your fund is doing.  You change the subject, literally and

10   figuratively --

11           MS. KASULIS:  Objection, your Honor.

12           THE COURT:  Sustained.

13   Q    You got an e-mail from Martin with the performance report

14   for the fund, correct?

15   A    Yes.

16   Q    You changed the subject line of the e-mail, correct?

17   A    Yes.

18   Q    To "checking in," correct?

19   A    Yes.

20   Q    And you asked him how the bubble bath worked or if the

21   bubble bath worked, correct.

22   A    Yes.

23   Q    All right.  You didn't ask him anything about what was in

24   the performance report in that e-mail, correct?

25   A    No.

S. RICHARDSON – CROSS – AGNIFILO

1   Q    Thank you.  I'm done with this, thank you.

2            This was the performance report sent you to on

3   February 12, 2010, correct?

4   A    The one you just showed me?  Yes.

5   Q    Did you frequently, when you got these performance

6   reports, change the subject line then send him a personal

7   e-mail in exchange?

8   A    Occasionally, I think.  All of it was coming to my

9   personal e-mail address.  I just used whatever the last e-mail

10  was that I received quite often.

11  Q    Do you remember if in response to the performance report

12  from March 7, 2010, you told him you hoped he was enjoying the

13  lovely day and that he was headache free?

14  A    I quite often checked in with him, particularly if he

15  told me he was ill.

16  Q    But you're getting these performance reports, correct --

17  A    Yes.

18  Q    -- on a regular basis?

19  A    Daily.

20  Q    Daily.  You're using these e-mails that he's sending you

21  to send personal emails back to him, correct?

22  A    It's all in my personal e-mail account, so.

23  Q    My point is you're not asking questions about the fund?

24  A    Separately, I might be verbally when I update with him.

25  Q    But you agree with me -- do you recall specifically what

S. RICHARDSON – CROSS – AGNIFILO

1  you might have said on March 7, 2010?

2  A    No.

3  Q    I'm going to show you Defense Exhibit 9030.  I'm going to

4  ask if it refreshes your recollection, an e-mail March 7,

5  2010, from you to Martin.

6  A    Yes.

7  Q    He sent you a daily performance report?

8  A    Yes.

9  Q    You asked him how he was feeling?

10  A    Yes.

11  Q    Which is a nice thing.

12  A    Yes.

13  Q    Because you cared about him?

14  A    Yes.

15  Q    You cared about him, you asked him how he was feeling,

16  right?

17  A    Yes.

18  Q    Then you're not asking about the performance report or

19  about the fund in that e-mail, right?

20  A    Not in this e-mail.  But again, these are daily e-mails.

21  On the monthly one I might have questions on the fund, not

22  daily.

23  Q    At some point you went to the MSMB Capital offices,

24  correct?

25  A    Yes.

S. RICHARDSON - CROSS - AGNIFILO

1   Q   And those were in lower Broadway?

2   A   Yes, Broadway close to Wall Street.

3   Q   You said I think you testified yesterday that you went

4   there and that Martin was there, correct?

5   A   Yes.

6   Q   And Marek was there?

7   A   Yes.

8   Q   I think you described the setting as sort of a, I think

9   you put it, not a huge office, correct.

10  A   That's correct.

11  Q   It was actually quite a small office; fair to say?

12  A   Five or six work stations, I think two offices.

13  Q   Sort of a humble, paired down office?

14  A   Yes.

15  Q   Obviously a start-up company.

16  A   Yes.

17  Q   There is no pretensions about it, right?

18  A   That's right.

19  Q   It was two young guys with a start-up hedge fund, right?

20  A   Yes, back to the office question again?  Sorry.

21  Q   Marek was there, right.

22  A   Yes.

23  Q   Martin was there?

24  A   And one other.

25  Q   The third guy was even younger than them.  You said he

S. RICHARDSON – CROSS – AGNIFILO

1    was junior?

2    A    His position was junior, I wasn't casting any question on

3    his age.

4    Q    And you knew what you were getting into.  You were going

5    to invest with these two young guys out of this small office

6    in lower Broadway?

7    A    Yes.

8    Q    And soon after you decide to invest with them, Martin

9    tells you he's dissolving the fund.

10   A    A few weeks later, yes.

11   Q    A few weeks later, right, he sends you an e-mail.  He

12   says, "Marek and I have irreconcilable differences.  I'm

13   dissolving the fund."

14   A    Yes.

15   Q    You go down to lower Broadway, two young guys in this

16   office, and couple weeks later Martin says we're dissolving

17   the fund, and you decide to stick with it, right?

18   A    After I met with them and help reconcile them.

19   Q    Right.  So you met with -- you met with Martin right soon

20   thereafter, you had dinner.  Do you recall having dinner with

21   him after you were in the office?

22   A    It was probably a dinner; I met with him about the

23   subject.

24   Q    You and he discussed the business, right.

25   A    Yes.

S. RICHARDSON - CROSS - AGNIFILO

1  Q    Just the two of you at dinner.

2  A    Yes.

3  Q    Do you remember where you went?

4  A    No.

5  Q    And then you met with Marek?

6  A    Yes, who had been on vacation for a few days, when he

7  came back I met with him.

8  Q    You told Martin to try to stick it out, right?

9  A    After I had my discussion with Marek, because Martin

10 believed it couldn't be redeemed, the relationship couldn't be

11 redeemed.  And after my meeting with Marek I could see a

12 glimmer of hope that it could be.

13 Q    Then you basically, you tried to put them back together

14 so the business would work?

15 A    I suggested, I had discussions with both of them, but I

16 left it for the two of them to see if they could figure it

17 out.

18 Q    And they figured out.

19 A    They figured out, yes.

20 Q    With your guidance?

21 A    I think I acted as a catalyst with my discussion, yes.

22 Q    I think you testified yesterday from time to time Martin

23 would send you these -- you testified even a little while

24 ago -- these periodic letters describing different stocks?

25 A    Yes, investor commentaries, I think the plan was

S. RICHARDSON – CROSS – AGNIFILO

1  quarterly.

2  Q    Fair to say Martin, you knew because you got to know

3  Martin fairly well, he worked very hard; fair to say?

4  A    Oh, yes, he worked very hard.

5  Q    He worked days and nights?

6  A    He worked extensively long hours.

7  Q    Every day?

8  A    I can't speak to the weekends, but certainly often a

9  weekend too.

10 Q    Did you know him to take a pleasure vacation?

11 A    Certainly not this early in our friendship.

12 Q    At any point?

13 A    He went to Italy.  He went to Italy with his girlfriend

14 in 2013.

15 Q    And other than going to Italy with his girlfriend in

16 2013, anything else?

17 A    No.  He did -- when he did trips for business he quite

18 often took three or four days.  If he went to the West Coast

19 he would take a weekend for himself afterwards on the back of

20 another trip.

21 Q    Part of what you were counseling him to do was take more

22 time for himself?

23 A    Yes.

24 Q    You thought he worked too hard?

25 A    Generally, yes, certainly in the early years.

S. RICHARDSON - CROSS - AGNIFILO

1    Q    You thought he worked so hard to the point he was

2    actually effecting his health?

3    A    Yes, I did.

4    Q    You thought he was, working so hard it actually impacted

5    on his ability to take care of himself?

6    A    Certainly some of the physical aspects of looking after

7    himself.

8    Q    Like what?

9    A    The infection I talked about before, which may or may not

10   have come from eating, sleeping bad, that sort of thing.  And

11   the headaches the frequent headaches I noticed in the e-mails.

12   Q    Did you notice that he was often complaining to you that

13   he was getting teeth extracted?

14   A    I don't remember a discussion around teeth extractions.

15   I know he had dental issues, I don't remember him sharing the

16   specifics of it.

17   Q    Now, at one point you said in 2010, you and he started

18   having discussions around building a company, correct?

19   A    That was later in 2010 I believe, yes.

20   Q    Could it have been the summer of 2010?

21   A    It could have been summer, the discussion was around this

22   issue of the short sales various the long that I had talked

23   about before.  And the desire to want to be behind drugs that

24   were succeeding not failing, that was the genesis of my first

25   discussion with him.

S. RICHARDSON - CROSS - AGNIFILO

1    Q    It could have been as early as summer 2010?

2    A    Certainly the issue of long versus short sales.

3    Q    So the jury understands, short sales are when you think

4    that stock is going to go down, right?  And long sales are you

5    think the stock is going to go up, you buy the stocks and

6    hold?

7    A    Yes.

8    Q    One of the difference is in long sales the idea is you

9    think this is a fundamentally good company that is doing

10   something worthwhile enough that the stock will increase in

11   price?

12   A    Yes.

13   Q    With the short sales, at least in the pharmaceutical

14   industry, correct me if I'm wrong, it's very often that a

15   company will have a drug that is not going to pass FDA

16   approval and you can predict that?

17   A    Through the clinical trial process it may not come out

18   positively.

19   Q    One of the things you said yesterday was that Martin was

20   especially good at predicting which drugs would not pass the

21   FDA clinical process, correct?

22   A    That's part of what he'd written in one of his letters.

23   He'd had more success with short sales versus the long.

24   Q    You preferred to be in long sales with companies that had

25   inherent value, correct?

                  S. RICHARDSON - CROSS - AGNIFILO

1    A    Yes.

2    Q    You and Martin were talking about that in the summer/fall

3    2010; fair to say?

4    A    Certainly by the fall, yes.

5    Q    You said I think yesterday that at one point he -- I

6    think the way you phrased it -- "he went off and he did

7    research," correct?

8    A    Research?  Sorry?  About starting a company?

9    Q    Correct.

10   A    Yes, yes.  Late in 2010 he had said to me, "Give me time

11   to go away, do my research.  I want to bring some ideas back."

12   Q    By research, do you know what he was doing?

13   A    No, he specifically said, "give me time to go away and do

14   my research."

15   Q    Did you understand him to be going away, physically going

16   away?  Or, I'm going to go in my Martin Shkreli hubble and

17   think and read?

18             MS. KASULIS:  Objection.

19             THE COURT:  Sustained.

20   Q    Did you think he was physically going away?

21   A    I didn't think he was physically going away.

22   Q    What did you think he was doing?

23   A    He would do his own desk research and figure out what is

24   the market opportunity.

25   Q    At one point he came to you and he says, "I think I

S. RICHARDSON - CROSS - AGNIFILO

1    figured it out," right?

2    A    Yes, about March of 2011.

3    Q    Do you recall having discussions with him about Retrophin

4    before March of 2011?

5    A    I recall him updating me a little bit about his progress.

6    I don't recall the name appearing much before that.

7    Q    You know of a company called Lonza?

8    A    I don't recall that.

9    Q    A Swiss biochemical company?

10   A    Lonza, I don't have any recollection at the moment.

11   Q    Do you recall Martin telling you that he had actually

12   hired a Swiss company to basically try to build molecules?

13              MS. KASULIS:  Objection.

14              THE COURT:  Sustained.

15   Q    Do you remember him telling you anything about the

16   building of molecules?

17   A    He certainly talked about molecules in the sense of can

18   we take one molecule and use it differently for different

19   diseases.  He talked about it in a broad application with me.

20   Q    Okay.  Do you recall him having conversations with you

21   about this process as early as February of 2011?

22              MS. KASULIS:  Objection.

23   Q    Only if you remember?

24              THE COURT:  All right, clarify "this process."

25   Q    The process of using molecules for other purposes in the

S. RICHARDSON - CROSS - AGNIFILO

1    creation of a potential drug for disease?

2    A    I remember him discussing, raising that with me.  I don't

3    remember the time table.

4    Q    Do you remember him telling you in February that

5    Retrophin was growing like a weed?

6            THE COURT:  February of what year, sir?

7    BY MR. AGNIFILO:

8    Q    February 2011.

9            I can show you something, Defense 4221, an e-mail

10   from Martin to you, February 26, 2011, at 12:22 a.m.

11   A    Yes, I do recall this, just the time I couldn't remember

12   the time.

13   Q    Very good.  Tell us what you recall.

14   A    That he was starting to put the company into motion,

15   starting to put the company in motion, establish the investors

16   behind it.  That's all I remember in this time period.

17   Q    That's February 2011, correct?

18   A    This is dated February, the end of February.

19   Q    Very good, thank you, sir.

20           Do you recall you and he having what seemed to be

21   excited communications about Retrophin in February 2011?

22   A    Again, I don't recall the exact times; but yes, the

23   excitement he was now bringing to life for me, the idea that

24   we talked some months earlier, yes, I do remember the

25   excitement.

S. RICHARDSON - CROSS - AGNIFILO

1    Q    Because this is something you really wanted him to do,

2    correct?

3    A    Yes, something I felt personally very, very passionate

4    about in terms of a legacy I could help contribute towards.

5    Q    You said yesterday you had realized success in the

6    business context of your life, correct?

7    A    Yes.

8    Q    And where you were in your life at that time, is you

9    wanted a legacy of having done something actually good and

10   meaningful in your time here?

11   A    Specific to the impact of people's lives through

12   hopefully bringing drugs to cure or help cure diseases.

13   Q    The one doing the work at this period of time to try to

14   bring that about was Martin, correct?

15   A    Yes.

16   Q    At one point in March he sort of unveiled Retrophin,

17   correct?

18   A    That's right.

19   Q    We're going to look at what is admitted into evidence as

20   Government's Exhibit 122-6, the first page.  You talked about

21   this yesterday with the Government.  This is the Retrophin

22   presentation from March of 2011, correct?

23   A    Yes.

24   Q    It says, "Martin Shkreli, Interim CEO," right?

25   A    Yes.

S. RICHARDSON - CROSS - AGNIFILO

1    Q    You answered questions that the Government was asking you

2    yesterday about why he would be the interim CEO, fair to say

3    he has some of the qualities but not all the qualities as

4    someone you would typically hand-pick as a CEO; fair to say?

5    A    That's fair to say, in terms of a operating company, yes.

6    Q    So he was going to get the company off the ground, right?

7    A    Yes.

8    Q    Because essentially he was providing the scientific

9    content to the company, correct?

10   A    Well, again, until we go through the presentation I'm

11   still learning more.  This is exactly what I'm -- he's

12   starting to unveil what it's going to look like.  I don't know

13   about roles in context yet, Counsel.  I wanted to clarify my

14   direct answer your question.

15   Q    The next page is the executive summary.  The executive

16   says, "Retrophin is a bio technology company dedicated to the

17   developing drugs for rare and life-threatening diseases."  You

18   see that, right?

19   A    Yes.

20   Q    "Specifically, our mission is to become the first company

21   to receive FDA approval for the Duchenne Muscular Dystrophy

22   drug."  You understand that was the point of Retrophin,

23   correct?

24   A    Yes.

25   Q    That was the whole reason for Retrophin's existence

Rivka Teich CSR, RPR, RMR
Official Court Reporter

S. RICHARDSON - CROSS - AGNIFILO

1   right?

2              MS. KASULIS:  Objection.

3              THE COURT:  Sustained.

4   Q    At this point in time, this is the executive summary

5   about what the company is going to do, correct?

6   A    Certainly in terms of, he called it a mission, but of

7   course at the end of the day if there are investors and

8   shareholders, it has to be a return to them not just the drug

9   approval as well.

10  Q    You thought that trying to be the first company to bring

11  about a cure for Duchenne Muscular Dystrophy was certainly a

12  worthwhile endeavor from your perspective?

13  A    Yes.

14  Q    It's a horrible disease; fair to say?

15  A    Yes.

16  Q    There is no cure.

17  A    I down know whether there cure is the right word, but in

18  terms of treatment, extensive treatment.  Cure is a lovely

19  aspiration.

20  Q    It's a disease where there is no meaningful way of

21  defeating the disease?

22             MS. KASULIS:  Objection.

23             THE COURT:  Sustained.

24  Q    From your perspective, I'm really talking about, because

25  you said you wanted a legacy, correct?  You wanted Martin

S. RICHARDSON - CROSS - AGNIFILO

1    Shkreli to stop shorting stocks, correct?  Not stop, but you

2    want him to add something to his --

3              THE COURT:  Counsel, I'm going to tell you now you

4    need to ask one question at a time; there are two right there.

5              MR. AGNIFILO:  Very good, Judge.

6    Q    You were looking for Retrophin to be your legacy; fair to

7    say?

8    A    Again, you position it such a broad way.  An important

9    part of my legacy.  I'm a brother.  I'm an uncle.  All of

10   those things.  Part of my legacy was I want to do this.  I

11   don't want to give the impression this is the only part of my

12   legacy.

13   Q    This is part of your legacy; fair to say?

14   A    I was looking for this kind of direction as part of my

15   legacy.

16   Q    Something as important as curing this particular disease

17   or bringing about a potential cure was certainly something you

18   thought was worthwhile?

19   A    It was certainly worthwhile.

20   Q    When Martin gave you this presentation, you thought he

21   was on to something; fair to say?

22   A    Yes, it seemed like a very good starting position.

23   Q    Let's go to the next page.  So we're clear, this

24   highlighting is mine.

25              It says, "Pipeline, RE-001.  Is our main asset in

S. RICHARDSON - CROSS - AGNIFILO

1    preclinical development for Duchenne Muscular Dystrophy."  You

2    see that, right?

3    A    Yes.

4    Q    "RE-001 replaces the missing protein that causes Duchenne

5    Muscular Dystrophy, dystrophin, by providing a recombinant

6    supply of a very similar protein," right?

7    A    Yes.

8    Q    Now the idea here is that this dystrophin is the type of

9    protein that the cell needs to be healthy, correct?

10             MS. KASULIS:  Objection.

11             THE COURT:  Sustained.

12   Q    This is a company that you ended up being on the Board

13   of -- let me ask you, do you know how Martin plans for this to

14   work?

15   A    Even for this presentation he's laying out the next

16   steps.  I'm clearly not a medical expert.  Once we get into

17   the medical analysis, I'm not an expert.

18   Q    But you knew that he had an idea even in March of 2011

19   that could be a significant idea for the future of the

20   company; fair to say?

21   A    Again, just to go back to saying this is the first time

22   I'm seeing him layout the business plan.  I'm assimilating it

23   as I'm reading it at that point in time.  I was certainly

24   excited about it.  But I -- this is the first time I'm going

25   through it at this time.

S. RICHARDSON - CROSS - AGNIFILO

1    Q    Right.  And the idea is that he was going to get

2    dystrophin into the cell.  Isn't that like kind of the magic

3    bullet of conflict all of this is about?

4              MS. KASULIS:  Objection.

5              THE COURT:  Sustained.

6              MR. AGNIFILO:  Can we approach?

7              THE COURT:  Yes.

8              (Continued on the next page.)

9              (Sidebar conference.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1        MR. AGNIFILO:  He can't explain the presentation.

2   If he doesn't know the answer, he doesn't know the answer.

3        THE COURT:  You're assuming medical facts not in

4   evidence.

5        MR. AGNIFILO:  I'm assuming he read the

6   presentation.

7        THE COURT:  I think you should ask is this

8   Mr. Shkreli's idea, but you're almost implying that this

9   witness should be able to say, 'this is great idea, I think

10  it's going to work.'

11       MR. AGNIFILO:  But he might think it's a great.  He

12  thinks it's a great idea.  He's putting his time and money

13  into it.

14       THE COURT:  Asking specific medical questions about

15  the chemistry of this product and how it works in the cell and

16  the disease process is something he --

17       MR. AGNIFILO:  I'll stick what is in evidence.

18  That's fine.

19       MS. KASULIS:  Thank you, your Honor.

20            (End of sidebar conference.)

21            (Continued on the next page.)

22

23

24

25

Case 1:15-cr-00637-KAM   Document 315   Filed 08/15/17   Page 166 of 297 PageID #: 6557

1        (In open court.)

2   BY MR. AGNIFILO:

3   Q    We'll do it this way.  Next page, "R0001 mechanism of

4   action," do you see that on the screen?

5   A    Yes.

6   Q    There is a diagram there?

7   A    Yes.

8   Q    Do you know if Martin drew that?  Do you know?

9   A    No.

10  Q    "Dystrophin anchors the cell membrane, known as the

11  sarcolemma in muscle cells to actin filaments.  This provides

12  vital cell stability."  That's what it says?

13  A    That's what it says.

14  Q    "Dystrophin is missing or unusable in Duchenne Muscular

15  Dystrophy patients."  That's what it says?

16  A    Yes.

17  Q    "RE-001 would replace the missing dystrophin actin

18  connection and restore muscle cell stability.  The only known

19  problem in Duchenne Muscular Dystrophy," correct, that's what

20  it says?

21  A    That's what it says.

22  Q    Fair to say you don't know exactly how the science works,

23  correct?

24  A    No, definitely not qualified on the science side.

25  Q    But you trusted that Martin did; fair to say?

RICHARDSON - CROSS - AGNIFILO

1    A    Yes.  And that he started a network with some scientific
2    groups and individuals as he did his research.
3    Q    Do you know that he went up to Harvard to talk to a
4    doctor at Harvard?
5    A    I don't remember Harvard specifically.
6    Q    Do you remember Darren Blanton being around at this time?
7    A    No, I only heard the name.  I thought he was an investor
8    in the MSMB fund.  I could be wrong.  I know the name, but I
9    didn't know who he was.
10   Q    After this presentation, you understood that Martin was
11   working on building Retrophin, correct?
12   A    Yes.
13   Q    And you were working on building Retrophin; fair to say?
14   A    In a small way at that point.
15   Q    So the one who was building Retrophin in February/March
16   April 2011 really was Martin, correct?
17   A    Yes.
18   Q    From your perspective, were there any other people that
19   played significant roles in helping him?
20   A    No.  He had reaching out, I don't remember when colleague
21   Andrew Vaino came on board.  At this point, no, Martin was the
22   visible end of this work to me.
23   Q    And so Martin is working on Retrophin and also working on
24   MSMB Capital, correct?
25   A    Correct.

RICHARDSON – CROSS – AGNIFILO

1    Q    So he's doing both at the same time?

2    A    Yes, with Marek the portfolio manager on the MSMB Capital

3    fund.

4    Q    In the beginning do you remember they were doing both

5    that out of their office in lower Broadway?

6    A    I don't remember it starting at lower Broadway.  I don't

7    remember when they moved to the new office.  This is a timing

8    issue.  I know they were sharing an office from a

9    cost-effective point of view in terms of two entities.

10   Q    You remember in April 2011 they went to Madison Avenue?

11   A    Sounds about right in terms of the office move time.

12   Q    Then after April 2011 Retrophin and MSMB were both out of

13   the office in Madison Avenue, correct?

14   A    Yes.

15   Q    I think you testified yesterday that they had common

16   employees, correct?

17   A    Yes.

18   Q    And they had I think you said common facilities?

19   A    Yes, the same real estate.

20   Q    The same physical office?

21   A    Same physical space.

22   Q    Do you know if they had the same computers?

23   A    I'm assuming so, but I can't answer if they were distinct

24   terminals for an activity.

25   Q    And Martin was essentially running MSMB, correct, with

RICHARDSON - CROSS - AGNIFILO

1  Marek?

2  A    With Marek.

3  Q    And Martin was essentially running Retrophin, correct?

4  A    Yes.

5  Q    Now, I think yesterday you said that MSMB and Retrophin

6  were on parallel tracks.  Do you remember when you said that?

7  A    Again, can you give me the context?

8  Q    I was going to ask you what you meant.  Is that true?  Do

9  you view them as running on parallel tracks?

10  A    In terms of resources, the resources that we talked about

11  being shared.  I think that might be a reference to parallel

12  tracks.  They were distinct entities but sharing resources,

13  running them, I think that's what I was saying.

14  Q    That's fine.  One of the problems that you were aware

15  that Retrophin was having in these early days is how was it

16  going to raise money, correct?

17  A    In any start-up that's always a critical question.

18  Q    That's what every start-up faces at one point or another?

19  A    That's fair.

20  Q    At one point you said that there was a conversation that

21  you and Martin had about Vivo Ventures.  Do you remember that?

22  A    That was well into 2012.

23  Q    Okay, all right.  Do you remember having conversations

24  with Martin in 2011 about the best way to try to raise capital

25  for Retrophin?

RICHARDSON - CROSS - AGNIFILO

1    A    I don't remember a distinct dialogue around that.  We

2    talked about it generally.  I don't remember a distinct

3    discussion.

4    Q    You were always very much against the venture capital

5    group, correct?

6    A    The Vivo one, which is late 2012.

7    Q    Right.  But weren't you against venture capital for

8    Retrophin as a general concept?

9    A    What I was against, was giving up control.

10   Q    Fair to say that's what would happen if you brought a

11   venture capital firm on board?

12   A    Most likely, most likely.

13   Q    Tell the jury, if you would, why that would be?  Why does

14   bringing a venture capital firm into a business cause the

15   preexisting people who control the business to have less

16   control?

17   A    Because basically the venture capital's intent is to try

18   to get as much profit or value out of that entity.  So they

19   want to bring their own people in, their own people in to run

20   it, and potentially run it quite differently so they can

21   leverage the assets that they are putting their money into.

22   Q    You didn't want that to happen?

23   A    At the end of 2012, which is the first time I was aware

24   of a venture capital proposal.

25   Q    We'll talk now about 2012, end of 2012.  You were against

RICHARDSON - CROSS - AGNIFILO

1   the venture capital company coming into Retrophin?

2   A    Yes.

3   Q    And you Martin had that discussion; fair to say?

4   A    Yes.

5   Q    And Martin said to you that he had been speaking to this

6   venture capital company, Vivo Ventures, right?

7   A    Yes.

8   Q    And he said they could bring a lot of much-needed money

9   to the company, right?

10  A    Yes.

11  Q    He says, "But we would be giving up the baby," right?

12  A    That was his phrase, yes.

13  Q    From your perspective, did he say that he viewed

14  Retrophin as his baby?

15  A    I don't remember if it was an invert the way he wrote it.

16  He looked -- he expressed, he knew I was part of the genesis

17  of Retrophin as well, so I read it in that light, we would be

18  giving up the baby.

19  Q    That's what he said," we would be giving up the baby,"

20  you and he would be giving up the baby?

21  A    Collective baby.

22  Q    The baby is Retrophin?

23  A    Yes.

24  Q    And you advised him to not go with the Vivo Venture

25  Group, correct?

RICHARDSON - CROSS - AGNIFILO

1   A    I said I was against it.  Again, it wasn't in the spirit

2   of what I thought what we talked in 2010.  At this point we

3   had no drugs.  We had nothing to take to market.  The idea of

4   starting a legacy was evaporating, that was my concern.

5   Q    Fair to say that you thought that the company was founded

6   on a potentially very good idea?

7   A    Yes.

8   Q    And the concern is, an idea without any money just

9   remains an idea, correct?

10  A    In many cases, yes.

11  Q    And so what you were struggling with is how to get the

12  money to build this into a profitable company?

13  A    I think not just me, the collective all of us who were

14  involved with Retrophin, yes, come up with a right financing

15  strategy where we could maintain control, was the genesis of

16  my question of push back to him.

17  Q    You ultimately decided that the best way to raise the

18  company would be a reverse merger, correct?

19  A    Yes, by the end, now it's end of 2012, yes.

20  Q    There is nothing wrong with a reverse merger, correct?

21  A    No, no.

22  Q    Just tell the jury very quick what a reverse merger is?

23  A    Again, it's when one business, in particular a start-up

24  business, buys the shell company that we talked about before.

25  A shell company is, again, something that is listed but

Rivka Teich CSR, RPR, RMR
Official Court Reporter

3049

RICHARDSON – CROSS – AGNIFILO

1    basically has no operations.  The owner is comfortable to sell

2    that shell company to an existing company, so when they merge

3    the company, in this case Retrophin, can use the operating

4    over-the-counter approval that that shell company already

5    holds.

6    Q    Do you recall in about April 2012 a patent for something,

7    for a drug PKAN, the disease PKAN?

8    A    Yes.  I don't remember the exact timing, but PKAN, yes, I

9    remember PKAN.

10   Q    What do you remember about?

11   A    That PKAN was, is, a particularly nasty disease that

12   impacts young children.  And it's a neurological one, where

13   slowly their body stops operating.  It's a very, very dramatic

14   and aggressive disease.  It didn't have a cure or any really

15   meaningful treatment.

16   Q    And Duchenne Muscular Dystrophy is a disease that

17   afflicts children as well, right?

18   A    Yes.

19   Q    Do you recall there was a drug that Retrophin patented,

20   RE-024?

21   A    Yes.

22   Q    What do you remember about that?

23   A    That is actually the one focused on this PKAN disease.

24   Q    Fair say that was an important step forward, correct?

25   A    Yes, it was.  Again, it hadn't reached drug standards yet

RICHARDSON - CROSS - AGNIFILO

1    in terms of markets.  It is still in clinical trial.  This was

2    the first, a very exciting first look that this might have a

3    possibility to impact those poor children positively.

4    Q    So Retrophin was going in the direction that you had

5    hoped; fair to say?

6    A    Yes.

7    Q    So now it had a patent, correct?

8    A    Again, I want to separate, the ability to patent is very

9    different to having a drug to take to market and commercially

10   sell and get to the patients.

11   Q    It's not a drug that you can buy, but it is a patented

12   product.

13   A    Yes, that we can move forward as a company exclusively to

14   build a towards clinical trial to a drug.

15   Q    And fair to say that Martin was instrumental in securing

16   the patent?

17   A    Yes, he was.  I believe, going from discussions, were

18   that it was also Marek Biestek and Andrew Vaino, two of the

19   key players, working with Martin in shaping how do we come up

20   with that particular PKAN piece.

21   Q    You talked a lot on direct examination about this

22   Capitalization Table from November 19, 2012, 122-32.  Do you

23   see it on your screen okay?

24   A    Yes.

25   Q    An e-mail from Martin to you and to Steve Aselage?

RICHARDSON - CROSS - AGNIFILO

1   A     Yes.

2   Q     "We have a lot going on, but this is I think what the

3   founders Cap Table should look like versus what it does."

4   A     Yes.

5   Q     So he's talking about sort of something that right now

6   doesn't exist, he says what it should look like; fair to say?

7   A     The left hand side is what it is today, just to clarify,

8   and the right-hand side is what it could look like and should

9   look like.

10  Q     He says, "I will talk to Evan Greebel in a few minutes if

11  doing something like this is even possible and/or to what

12  degree it can be done."  Do you see that?

13  A     Yes.

14  Q     So as he's writing this to you, he's not even sure that

15  those columns on the right is something he can do, correct?

16  A     Yes.

17  Q     It's fair to say it's something that you knew he wanted

18  to do, right?

19  A     Yes, he told me verbally it would happen, for me at least

20  it would happen.

21  Q     What he's actually writing in the e-mail is he has to

22  talk to the lawyer, Evan Greebel, right, that's what he's

23  saying?

24  A     Yes.

25  Q     Because he doesn't even know if this is possible to

RICHARDSON – CROSS – AGNIFILO

1   accomplish, correct?

2   A    Yes.

3   Q    Nothing in this is a promise, correct?

4   A    No, this is not a promise this page.

5   Q    And he says, "This is for informational purposes only,"

6   you see that there, right?

7   A    Yes.

8   Q    "It basically reflects my vision of what folks deserve in

9   relation to the founding of the company," you see that?

10  A    Yes.

11  Q    "As opposed to where they are at the moment," correct?

12  A    Yes.

13  Q    So he obviously greatly valued your role as one of the

14  founders of the company, correct?

15  A    Yes, founder may be -- well, in this context, yes,

16  founder is okay.

17  Q    It's his words.

18  A    Yes.

19  Q    "Please keep in mind, I'm happy to move forward with not

20  changing the Cap Table as well.  Having said that, I would

21  like to highlight the discrepancy (self-afflicted)."  Do you

22  see that there?

23           THE COURT:  I'm wondering if the jurors might need a

24  break right now.  Do you need your afternoon break?  Why don't

25  we ask you to retire to the jury room, refresh yourself and

RICHARDSON - CROSS - AGNIFILO

1    we'll bring you back.

2              Sir, you may step down.  Ten minutes roughly, thank

3    you.

4              (Jury exits the courtroom.)

5              (Whereupon, the witness steps down.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RICHARDSON - CROSS - AGNIFILIO

1        THE COURT:  Have a seat.

2        Would you mind getting the witness back?

3        (Jury enters the courtroom.)

4        THE COURT:  All jurors are present.  Please have a

5   seat everybody.

6        MR. AGNIFILIO:  May I proceed, Judge?

7        THE COURT:  Yes.

8   CROSS-EXAMINATION (CONTINUED)

9   BY MR. AGNIFILIO:

10  Q    We spoke on direct examination about a email that you got

11  from Marc Panoff on September 9th, 2013.

12       Do you remember that testimony?

13       It's in evidence, I'll put it on the screen.

14  A    The agenda, our meeting agenda?

15  Q    Yes.

16  A    Yes, I do recall.

17  Q    The email is from Marc Panoff -- it's from Marc Panoff to

18  you, to Steve Aselage, and Martin Shkreli, correct?

19  A    Yes.

20  Q    And it's also copied to Evan Greebel at the Katten law

21  firm, correct?

22  A    Yes.

23  Q    And it says the subject is board agenda, right?

24  A    Yes.

25  Q    And then there are a number of attachments.  Do you see

3055

RICHARDSON – CROSS – AGNIFILIO

1    that there are a number of attachments listed there?

2    A    Yes.

3    Q    And two of the attachments, one says "Geller consulting

4    agreement."

5         Do you see that?

6    A    Yes.

7    Q    And then one says "consulting agreement Banta."

8         Do you see that?

9    A    Yes.

10   Q    Okay.  So these were sent to you.  This document, this

11   email was sent to you, correct?

12   A    Yes.

13   Q    And you got the attachments as well, right?

14   A    Yes, we did.

15   Q    Okay.  So you got the Geller and the Banta consulting

16   agreement sent to you from Marc Panoff, correct?

17   A    Yes.

18   Q    This is all part of the same exhibit in evidence.

19        This is the Geller consulting agreement.

20        Do you see it?

21   A    Yes.

22   Q    Okay.  And so you don't dispute that you got this sent to

23   you from Marc Panoff on September 9th, 2013, correct?

24   A    That's correct.

25   Q    Did you read this?

RICHARDSON - CROSS - AGNIFILIO

1   A     Certainly I -- I skimmed it.  These are ones that came

2   very late to the meeting, or just before the meeting was

3   called.  So I skimmed them, yes.

4   Q     Okay.  So you knew that this was a consulting agreement

5   and release, because that's the title of the document, right?

6   A     I certainly skimmed it, so I would have read -- I would

7   have read the heading, I didn't register it, but I read the

8   heading.

9   Q     Okay.  And did you have the phone call, the board phone

10  call without knowing what this was?

11  A     Again, we received it almost immediately before the call,

12  so there wasn't the chance to read it in great deal, and we

13  didn't discuss it on the call, because they were only brought

14  back to us.  So I didn't dwell and them, because I knew it was

15  going to go brought back to the board, at which point I could

16  look at it in the detail.

17  Q     Would it possible to put the call off until you had the

18  chance the read the attachments?

19  A     I'm sorry, what's the point, Counselor?

20  Q     Is it possible to put off the call until you have a

21  chance to read the attachments?

22  A     Well, that was basically, as you heard on direct, part of

23  what I was asking Marc and others to do, is that we had to, as

24  a board, we should be receiving these documents much earlier

25  so we could do justice to the them before the discussion.

RICHARDSON - CROSS - AGNIFILIO

1  Q    I understand that you're saying you didn't get it in

2  time, but isn't it something that you have the ability to do

3  to say I don't want to have the call now, I'm not ready; fair

4  to say?

5  A    No, I believe there were time sensitive items on the

6  agenda that we had to proceed with and we couldn't delay the

7  call because of other agenda items.

8  Q    So this is the first page of the Alan Geller consulting

9  agreement and release, correct?

10  A    Yes.

11  Q    Okay.  It's a seven page -- I can show it to you just so

12  we can have it.  It's part of that same exhibit.

13          THE COURT:  Can we just, for the record, identify

14  the exhibit number?

15          MR. AGNIFILIO:  Sure.  It's the same exhibit, Judge,

16  it's all attached to 122-48.

17          THE COURT:  Thank you.

18          MS. KASULIS:  It's Tab 54.

19          THE WITNESS:  Okay.

20  BY MR. AGNIFILIO:

21  Q    Okay.

22  A    Thank you.  Or maybe 55.

23  Q    Well, there's two of them.  There's Banta and there's

24  Geller.  This one is Geller.

25  A    Yes.

3058

RICHARDSON - CROSS - AGNIFILIO

1    Q    Tell me when you have it.

2              MS. KASULIS:  Can we have a reference?

3              MR. AGNIFILIO:  For the time being, I just want to

4    establish how many pages the document is.

5    A    Yes, I have it.

6    Q    Okay.  It's a seven-page document, right?  You can take

7    your time and thumb through it.

8              THE COURT:  "It" being the Geller consulting

9    agreement?

10             MR. AGNIFILIO:  Yes, yes.  This is the Geller

11   consulting agreement.

12   A    Yes.

13   Q    Okay.  And on the first page, it indicates the

14   compensation for Alan Geller in exchange for his being a

15   consultant, correct?

16   A    Yes.

17   Q    All right.  And just so the jury can see it as well,

18   there's a break down of different numbers of shares of common

19   stock that he's going to get in exchange for him being a

20   consultant, correct?

21   A    Yes.

22   Q    And then we'll turn to the other agreement.  The

23   agreement -- other agreement -- same exhibit, I think it's

24   probably right after that one in your book there, is in regard

25   to Ken Banta, correct?

RICHARDSON - CROSS - AGNIFILIO

1    A    Yes.

2    Q    And Ken Banta also is promised on page 1, certain shares

3    of stock in exchange for his role as a consultant, correct?

4    A    Yes.

5    Q    All right.  Now, through these consulting agreements, the

6    company is looking to give these shares of stock to these two

7    people for their role in being consultants, correct?

8    A    That's certainly what the agreement is outlining.

9    Q    Okay.  And when Marc Panoff sent you these agreements at

10   4:32 p.m. on September 9th, 2013, he sent them to you so you

11   could read them, correct?

12   A    Yes.  For a 5:30 call.

13   Q    Okay.  And now you knew that these were things that the

14   board was being asked to consider, correct?

15   A    Yes.

16   Q    Okay.  And you knew that as of September 9th, 2013; fair

17   to say?

18   A    Once I received them, yes.

19   Q    Okay.  And fair to say that these agreements were -- you

20   had further discussions with at least Ken Banta about the

21   agreement, correct?

22   A    Certainly not at this time.

23   Q    Later on?

24   A    Later.  Later, yes, right.

25   Q    Right.  And because Ken Banta and you were at the same

RICHARDSON - CROSS - AGNIFILIO

1  meeting, correct?

2  A    In February '14.

3  Q    Okay.  And when you -- and he discussed the consulting

4  agreement with you, correct?

5  A    Yes.  Asking if it's been brought to the board for

6  approval and been approved.

7  Q    And when you met him in February of 2014, what was he

8  doing?

9  A    He was supporting the -- supporting Martin.

10 Q    Did you think he was doing that for free?

11 A    I knew he had a previous agreement that predated, because

12 Ken had been involved with Martin for many years, so I didn't

13 know if there was a, you know, an interim agreement that that

14 was party to, and this one was the revised one.

15 Q    But you knew he was working, he was working on behalf of

16 Martin, right?

17 A    Yes.

18 Q    And Martin was new at the company at the time?

19 A    A CEO.

20 Q    Okay.  So he was working directly for the benefit of the

21 CEO, correct?

22 A    Yes.

23 Q    And you knew also that some months earlier you had gotten

24 that consulting agreement for that same person, correct?

25 A    Yes.

RICHARDSON - CROSS - AGNIFILIO

1    Q    Now, at this point, you're saying that you received these

2    two agreements, you just didn't take official board action on

3    them, correct?

4    A    No.  And I do recall that I actually, as I said, I took a

5    cursory look at them the best I could in the available time,

6    and I made a couple of notes on my own agenda, questions

7    really to raise about them.

8    Q    Okay.  And looking at the agenda, that is Government

9    Exhibit 122-49.  It's already in evidence.  And you see there

10   it's agenda item number 9, correct?

11   A    Yes.

12   Q    All right.  And it references Exhibits I and J.

13         You see that, right?

14   A    Yes.

15   Q    Okay.  And now switching back to 122-48, which is the

16   original email at 4:32 p.m. from Marc Panoff, to you and

17   others, you see that Exhibit I is the Geller consulting

18   agreement, right?

19   A    Yes.

20   Q    And that Exhibit J is the consulting agreement for Banta,

21   correct?

22   A    Yes.

23   Q    All right.  So they correspond.  What's in the agenda is

24   exactly the same exhibit numbers what Panoff had sent you,

25   correct?

RICHARDSON – CROSS – AGNIFILIO

1    A    Yes.

2    Q    All right.  So Martin wasn't trying to sneak this by you;

3    fair to say?

4              MS. KASULIS:  Objection.

5              THE COURT:  Sustained.

6    Q    Did you feel like someone was trying to sneak this past

7    you?

8    A    No.  Not at this point because they were going to come

9    back to us for discussion.

10   Q    You were being told flat out that these consulting

11   agreements has to be considered by the board, right?

12   A    Yes.  Asked to be considered, yes.

13   Q    Right.  So it was sent to you, right?

14             You have to answer, "yes".

15   A    Oh, yes.  Excuse me.

16   Q    It was specifically on the agenda item, correct?

17   A    Yes.

18   Q    Okay.  And you knew later, when you saw Ken Banta, at

19   least, that he was actually working, correct?

20   A    Yes.

21   Q    Now, there was a later email the same day from Marc

22   Panoff, correct?

23             I'll show it to you.  It's in evidence as 122-50.

24             122-50 is an email from Marc Panoff to you, to Steve

25   Aselage, to Martin Shkreli with copies to Evan Greebel Ed

RICHARDSON - CROSS - AGNIFILIO

1   Hackert and Sunil Jain.

2           Do you see that?

3   A    Yes.

4   Q    Okay.  And here there's a number of attachments that is

5   being indicated from the email, correct?

6   A    Yes.

7   Q    All right.  There's the latest draft of the amended 10-K.

8           Do you see that?

9   A    Yes.

10  Q    Okay, what's a 10-K?

11  A    It's a legal requirement which basically supports the

12  financial reports of the company laying out more details

13  behind their results.

14  Q    Okay.  And are they publicly filed?

15  A    Publicly filed, yes.

16  Q    With the SEC?

17  A    Yes.

18  Q    On the SEC's website?

19  A    Yes.

20  Q    Okay.  Sort of a critical document, public filing

21  document of the company?

22  A    Yes.

23  Q    All right.  And it says the latest draft of the amended

24  10Q from March 31st, 2013.

25          Do you see that there?

RICHARDSON – CROSS – AGNIFILIO

1    A    Yes.

2    Q    Okay.  And what's a 10Q?

3    A    It's just -- it's the quarterly version.  It's the need

4    to do this quarterly, and then "K," meaning annually.

5    Q    Okay.  And then it mays Marcum, LLP's audit communication

6    letter for the quarter ended June 30th, 2013, correct?

7    A    Yes.

8    Q    All right.  And then there's also a draft 10Q for the

9    quarter ending June 30th, 2013.

10           Do you see that there, too?

11   A    Yes.

12   Q    Okay.  Now, as part of that same exhibit -- so I'm not

13   sure where it would be in your book, but it's in that same

14   exhibit.

15           MS. KASULIS:  It's tab 56.

16   Q    Tab 56.  There's a 10Q.  There's a 10Q and an amended

17   10QA.

18   A    Yes.

19   Q    Do you see that there?

20   A    Yes.

21   Q    I'm going to ask if you could go to page 9 of that

22   document.  It's already in evidence.

23           MS. KASULIS:  Is there a Bates number on this?

24           MR. AGNIFILIO:  The Bates number is 19377.

25           MS. KASULIS:  Thank you.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

RICHARDSON – CROSS – AGNIFILIO

1   A    377.

2   Q    Yes.  19377.  Tell me when you're there.

3        Now, I'm going to ask you to go to page 9, I'll put

4   it up, the highlighting is mine, but the document's the

5   original.

6        Looking at the highlighted part, and I'll read it to

7   you, you tell me if I read it correctly.  And I'm about one

8   third of the way down and it says:  In the second quarter of

9   2013, the company, its chief executive officer, and related

10  party, became party to a series of agreements to settle up to

11  2,286,511 of liabilities, which company management believes

12  are the primary obligation of the related party.

13       Do you see that there?

14  A    Yes.

15  Q    The company and related party have entered into an

16  indemnification agreement, whereby related party has agreed to

17  defend and hold the company harmless against all such

18  obligations and amounts, whether paid or unpaid, arising from

19  these agreements.

20       Do you see that?

21  A    Yes.

22  Q    Do you know what agreement they're talking about?

23  A    Not these agreements, no.

24  Q    Do you have an understanding of what is in this document?

25  A    I have an understanding of what sits behind -- what this

RICHARDSON - CROSS - AGNIFILIO

1    is referring to, but I haven't seen specific agreements, is

2    the only point I want to clarify.

3    Q    Okay.  And what's your understanding of what it refers

4    to?

5    A    It refers to the monies being paid to MSMB investors who

6    move their money over to Retrophin that Martin is talking up,

7    if you like, making them whole of what they should have got.

8    Q    And you understand that there were settlement agreements?

9    A    No.

10   Q    You never saw the settlement agreements?

11   A    We never saw the settlement agreements.

12   Q    Do you know if the settlement agreements were included in

13   the form S1, registration statements for Retrophin?

14   A    I can't -- I can't recall.

15   Q    And do you know what a form S1 registration statement is?

16   A    It is about clarifying someone's stock holding.

17   Q    I'm not sure it's in your book, what I'm going to do, if

18   it's okay -- actually, I'm going to move this into evidence,

19   Judge, it Defendant's Exhibit 4237.

20          MS. KASULIS:  No objection.

21          THE COURT:  We received Defendant's Exhibit 4237.

22          (Defendant's Exhibit 4237, was received in

23   evidence.)

24   Q    And I'm just going to ask, if I could, Judge, I'm just

25   going to approach the witness, I think it will be quicker.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

RICHARDSON - CROSS - AGNIFILIO

1          THE COURT:  Well, step away when you speak to the

2    witness.

3          MR. AGNIFILIO:  I will, yes, Judge.

4          THE COURT:  All right.

5    Q    Sir, I'm just going to put something in front of you and

6    I'm just going to have you read it for a second and then I'll

7    step back.

8          And before -- well, take a chance and read it.

9          (Whereupon, the witness is reviewing the document.)

10         THE COURT:  Are you directing him to a specific

11   page, sir?

12         MR. AGNIFILIO:  Yes, it's a page that says 1 of 6 in

13   the back, but there's not like a hard page number and there's

14   no Bates number.

15   Q    And just so we're clear, can you tell us what that

16   document is?

17   A    The document is the Retrophin, Inc. form S1 date -- I

18   don't see a date.

19   Q    It's for the year 2013, though, correct?

20   A    It says, as filed, November 15th, 2013.  Not the whole

21   year.

22   Q    Right.

23   A    Right.

24   Q    So now within that document, and I apologize, the page

25   doesn't have a page number on it, but what does -- what does

RICHARDSON - CROSS - AGNIFILIO

1   that page read?

2            You know what I'll do, I'll put it up.  I'll make it

3   easier, let me take it back and I'll put it up.  You can see

4   it on the screen.

5            Thank you, sir.

6            THE COURT:  Let's just describe what it is for the

7   record, please.

8            MR. AGNIFILIO:  Yes.

9            THE COURT:  If they don't -- do you not have a copy?

10           MS. KASULIS:  We have one but the witness doesn't

11   have a full copy, so we just asked if there was an extra one.

12           THE COURT:  Does the defense have a full copy?

13   Q   Do you see the page, okay?

14   A   Yes.

15   Q   So on the bottom, just so we're clear, on the bottom it

16   says?

17           MS. SMITH:  Your Honor, just for the record this is

18   Exhibit 10.12 is the filing.

19           MR. AGNIFILIO:  There's a legend on the bottom.  I'm

20   trying to pull it up to see.  That will be Exhibit 10-12 of

21   the S1 filing.

22   Q   And then the rest of the page it says:  Settlement and

23   release agreement.  And then it goes on to say, tell me if I

24   read this right, the settlement and release agreement, the

25   agreement, is made and entered into as of -- the date is kept

RICHARDSON - CROSS - AGNIFILIO

1   blank, by and among the releasor, Martin Shkreli, Shkreli,

2   MSMB Capital, LP; MSMB Capital, a Delaware limited

3   partnership; MSMB Healthcare -- I'm sorry, MSMB Capital

4   Management, LLC; MSMB Capital, LLC, a Delaware limited

5   liability company; a number of MSMB entities and Retrophin,

6   Inc., a Delaware corporation, releasor, Shkreli --

7           THE COURT:  Sir, use the microphone, sir.  I just

8   can't hear you.

9           MR. AGNIFILIO:  Yes.

10  Q    All of the releasors, Retrophin and the MSMB entities,

11  referred to as the parties, it says, whereas Shkreli is the

12  managing member of MSMB Capital, LLC, MSMB Investors

13  MSMB Management; whereas MSMB Investment is the general

14  partner of MSMB Healthcare; whereas MSMB Capital, LLC is the

15  general partner of MSMB Capital LP; whereas Shkreli is the

16  president and chief executive officer of Retrophin; and

17  whereas the parties are entering into this agreement in order

18  to settle and compromise fully and finally, any and all

19  presently existing or future disputes and claims, the release

20  they may have against Shkreli, Retrophin, and any of the MSMB

21  entities or their respective affiliates.

22          Do you see that there?

23  A    Yes.

24  Q    Okay.  And fair to say -- and that's part of the first --

25  I'm not going to read the whole document, that's part of the

RICHARDSON - CROSS - AGNIFILIO

1   first page, correct?

2   A    Yes.

3   Q    All right.  And then there's a second page, which I'm not

4   going to read, but the document continues, correct?

5   A    Yes.

6   Q    All right.  And there's a third page, which I'm not going

7   to read, but the document continues, correct?

8   A    Yes.

9   Q    There's a fourth page, which I'm not going to read.  The

10  document continued, right?

11  A    Yes.

12  Q    And then there's a fifth page, that I'm not going to read

13  but, the document it continues, correct?

14  A    Yes.

15  Q    All right.  And then there's a signature page, right?

16  A    Yes.

17  Q    Okay.  And this is all included in a public filing on

18  behalf of Retrophin, correct?

19  A    I don't recall this section at all, but...

20  Q    Do you have any doubt that this was included as part of

21  the S1 public filing with the SEC?

22  A    No, it's not a public filing, it must be in there.  It's

23  not something that I have recall on.

24  Q    No, I understand you don't recall it, but -- but this is

25  all part of the S1 Retrophin filing with the SEC?

RICHARDSON - CROSS - AGNIFILIO

1    A    Right.

2    Q    So the exact settlement agreements, the form of the

3    settlement agreements, was publicly file?

4              MS. KASULIS:  Objection.

5              THE COURT:  Sustained.

6    Q    What I just read to you, what we just read, says the

7    settlement and release agreement is part of a public filing on

8    behalf of Retrophin, correct?

9    A    But it doesn't change that we, the board, never received

10   settlement agreements to review and approve.

11   Q    No, I'm not -- that's not the question.

12             The question is that -- is that this is a public

13   filing, right, for Retrophin, correct?

14   A    Yes.

15   Q    And you're on the board of directors, correct?

16   A    Yes.

17   Q    And you're telling me you didn't read this?

18   A    I'm sure I read through whatever I can of the S1.

19   Q    The S1 is an important public filing, correct?

20   A    Yes.  But, again, I don't recall this specific section.

21   Q    So you might have read it and forgot; it is what you're

22   saying?

23   A    I just don't recall it.

24   Q    But you think you read it?

25   A    If the draft was sent to us for approval, I would have

RICHARDSON - CROSS - AGNIFILIO

1    read it.

2    Q    It's also on the SEC website to read publicly-filed

3    documents by the company that you're on the board of, correct?

4    A    I could do, but obviously being on the board, I'd expect

5    to see them before their publicly disclosed.

6    Q    And you're -- and you don't have a recollection as to

7    whether you read this or not?

8    A    I'm sure I looked at draft S1, but I have no recollection

9    of this particular section.

10   Q    Now, we're going to go to a November 6th, 2013 email from

11   Panoff to you and others.  It's Government Exhibit 122-53.

12          You can see it on the screen, we can do it that way.

13   A    Okay.

14   Q    All right.  It's from Marc Panoff, it's to Neal Golding;

15   is that right?

16   A    Yes, who is now on the board; yes.

17   Q    To you?

18   A    Yes.

19   Q    To Mr. Aselage, to Martin Shkreli, with copies to

20   Mr. Greebel, Mr. Hackert and Sunil Jain, correct?

21   A    Yes.

22   Q    All right.  And there is -- there are number of things

23   attached here, correct?

24   A    Yes.

25   Q    All right.  There's a telephone board meeting agenda,

RICHARDSON – CROSS – AGNIFILIO

1    correct?

2    A    Yes.

3    Q    There is a Marcum, LLP audit communication letter for

4    September 30th, 2013, correct?

5    A    Yes.

6    Q    All right.  And there are other things attached here,

7    correct?

8    A    Yes.

9    Q    Including the Martin Shkreli employment agreement,

10   correct?

11   A    Yes.

12   Q    Did you have a hand in drafting the Shkreli employment

13   agreement?

14   A    No.

15   Q    You had no role in drafting it?

16   A    No.

17   Q    Do you know that if it called that said he can only be

18   discharged if he was convicted of a felony?  Do you remember

19   that provision?

20   A    I missed that when it was circulated here, but I picked

21   it up in February of '14 when I got a second copy of the

22   agreement.

23   Q    Okay.  So did you know it at some point?

24   A    In February of '14.

25   Q    Okay.  Now, in regard to this particular email, it

RICHARDSON - CROSS - AGNIFILIO

1   attached the letter from Martin, correct?

2   A    Yes, the external auditors.

3   Q    And what do external auditors do?

4   A    They're really reviewing all the books, reviewing all of

5   the financial results to make sure that -- that -- and they

6   can flesh out any concerns I have, any inconsistencies so they

7   can report that back to the management.

8   Q    All right.  And this is the first page of the Marcum

9   letter, it's a November 8, 2013 letter to Retrophin, correct?

10  A    Yes.

11  Q    And we're going to look at the third page.

12       MS. KASULIS:  This is Tab 57 for the record.

13       MR. AGNIFILIO:  Tab 57.

14  Q    And the third page is 8717 on the number.

15  A    Okay.

16  Q    Do you see that now okay?

17  A    Yes.

18  Q    Okay.  So here, on November 8th, the day of the Marcum

19  letter, the external auditors have a section there saying,

20  accounting for full exposure of settlement agreement.

21       Do you see that there?

22  A    Yes.

23  Q    Okay.  And I'm just going to read it, and you just tell

24  me if I read it correctly.

25       During the quarter ending June 30th, 2013, the

RICHARDSON - CROSS - AGNIFILIO

1    company, its chief executive officer, and MSMB Capital, MSMB,

2    became parties to a series of agreements to settle up to

3    $2,286,511 of liabilities, which company management believes

4    are the primary obligation of MSMB.

5           Do you see that there?

6    A    Yes.

7    Q    Okay.  And then under it there's another small paragraph

8    that says:  In August 2013, the company entered an additional

9    settlement agreement for $300,000 and made payment on

10   August 29th, 2013, to settle such agreement.

11          Do you see that?

12   A    I see that.

13   Q    Okay.  Did you take any action after reading this on or

14   about November 8th, 2013?

15   A    No, the action I had taken was earlier with Marc Panoff

16   to be comfortable with the promissory note that Martin and

17   MSMB had signed behind these agreements was being actioned.

18   Q    But by this point you're being told by the auditor that

19   there's over $2 million in liability, correct?

20   A    Yes, but with promissory notes behind them.  Holding the

21   company whole.

22   (Continues on following page.)

23

24

25

RICHARDSON – CROSS – AGNIFILIO

1  Q    And do you know if Steve Aselage told Martin not to worry

2  about the promissory note?

3           MS. KASULIS:  Objection.

4           THE COURT:  Sustained.  Sustained.

5  Q    Did you ever have a conversation with Steve Aselage about

6  the promissory notes?

7  A    No.

8  Q    Never?

9  A    No.

10  Q    Did you ever have conversation with Martin about the

11  promissory notes?

12  A    No.  Only Marc Panoff.

13  Q    And did you and Steve Aselage ever discuss the settlement

14  agreements at all?

15  A    Only in the context of the board, any board discussion

16  that we wanted to make sure, obviously, they're fulfilled.

17  Q    And you understand that the company is picking these up

18  as liabilities, correct?

19  A    Initially.

20  Q    These are appearing as liabilities in Retrophin's public

21  filings, correct?

22  A    Yes.  But with a promissory note from MSMB and Martin to

23  make the company whole.

24  Q    But you understand that in terms of the auditor here,

25  correct, they are considering this a liability of Retrophin,

RICHARDSON - CROSS - AGNIFILIO

1   fair to say?

2   A    At that point in time.

3   Q    And so you -- fair to say, you as a board member --

4            THE COURT:  I'm sorry.  Did you say it was a

5   liability of Retrophin or MSMB?

6            MR. AGNIFILO:  No, a liability of Retrophin.  A

7   liability of Retrophin.

8   Q    You understood that it was on the books of Retrophin as a

9   liability of Retrophin, fair to say, at this point in time?

10  A    Yes, but with recognition of the promissory note again.

11  Q    And you were aware at this point in time of the

12  settlement agreement, correct?

13  A    We were aware of the settlement.  The subject had been

14  moved.  We weren't aware of the specific settlement

15  agreements.  None had been brought to us.

16  Q    Well, two consulting agreements were sent to you,

17  correct?

18  A    That's a very different, settlement agreements.

19  Q    No.  No.  I understand.  But you understood that there

20  were settlement agreements that were being reached, correct?

21  A    Between Martin, MSMB and certain investors.

22  Q    And Retrophin.  These are on Retrophin books as

23  liabilities, yes or no?

24  A    At this point in time, yes.

25  Q    Now, I think you also talked in direct examination about

Angela Grant, RPR CRR
Official Court Reporter

RICHARDSON - CROSS - AGNIFILIO

1    an email that is in evidence as Government's 122-43  that

2    Panoff sent to you July 2, 2013.  It's Martin Shkreli, Steve

3    Aselage, Richardson, Greebel concerning a board call.

4                Do you see that?

5    A    Yes.

6    Q    And in connection with this email you also had in

7    evidence and I think you looked at a Retrophin incorporated

8    summary cash flow for the six months ended June 30, 2013.

9                Do you see that there?

10               MS. KASULIS:  It's tab 53 of your binder.

11   A    Yes.  Thank you.

12   Q    And I think you said on direct examination, correct me if

13   I'm wrong, that toward the bottom there there's an entry that

14   says MSMB's settlements, Spencer Spielberg.

15               MS. KASULIS:   Your Honor, can I just object to all

16   the -- the version with counsel's writing on it.

17               THE COURT:  I don't know whose writing that is.

18               MR. AGNIFILO:   It's mine.

19               THE COURT:  The government has a clean copy.  Do you

20   want to put that one up?

21               MR. AGNIFILO:  I think I got rid of it.

22               I'm all about efficiency.  Okay.

23   Q    Toward the bottom there it says MSMB settlement, Spencer

24   Spielberg, Sarah Hassan, Trachtenberg & Rodes.  Do you see

25   that there?

RICHARDSON - CROSS - AGNIFILIO

1        THE COURT:    You might need to move the document.

2   A    Yeah, move the -- I have it on my hard copy.  Yeah.

3   Q    Can you see it okay?

4   A    Yes.

5   Q    There we go.  All right.  And the sum is 548,711,

6   correct?

7   A    Yes.

8   Q    And I think your testimony on direct is you don't recall

9   seeing this?

10  A    No.  I think I said I recalled seeing it.  I said that

11  there wasn't any discussion about it.

12  Q    Well, you saw it.  What did you think it was?

13  A    Well, again, I go back to counsel to what I said before

14  is, you know, I was aware that settlements were being

15  processed, but they were being backed up by the promissory

16  note so that the company was being made whole at some point in

17  time.

18  Q    But this is being captured as an expense, correct?

19  A    Yes.

20  Q    An expense of Retrophin, right?

21  A    Yes.

22  Q    And it's an expense that's in excess of a half a million

23  dollars, correct?

24  A    Yes.

25  Q    And it's right there in a financial report that's given

RICHARDSON - CROSS - AGNIFILIO

1    to you in your capacity as a board member, correct?

2    A    Yes.

3    Q    And you're saying you saw it, but you didn't think much

4    about it?

5    A    No.  I spoke to the new CFO at this point, Marc Panoff.

6    I spoke to him both here and in September, and he said as long

7    as Martin and MSMB stand by the promissory note, the company

8    will be made whole.  So I was a board of directors.  I'm

9    comfortable with that coming from my CFO.

10   Q    Did you speak to Martin about it?

11   A    I didn't speak to Martin about it, no.  Not specifically

12   I didn't.

13   Q    You never raised this with Martin?

14   A    Not as a specific discussion point.

15   Q    Is there a reason why you didn't raise it with Martin?

16   A    No.  I had raised it with Marc and I felt that was

17   adequate.

18   Q    I mean, here's a $548,000 plus liability to Retrophin.

19   You're given an explanation from someone other than Martin

20   that Martin is going to pay it, and you don't confront Martin

21   about it?

22   A    Well, no, but remember, counsel, what I said in my direct

23   is I'd spoken to Martin in March of that year and he'd already

24   told me specifically he was going to take from his personal

25   stock to top me up and the other investors.  So the angle I

RICHARDSON - CROSS - AGNIFILIO

1    had from Martin was he said to me all the way back in March,

2    I, Martin, am making each of you good again from my personal

3    stockholding so I didn't need to go back to him because that

4    was my frame of reference.

5    Q    But if Martin was going to use his personal stock, why is

6    it on a Retrophin financial document?

7    A    That was part of what he must have, you know, arranged.

8    Because we never saw the agreements, I didn't see the

9    agreements, maybe someone wanted cash.  I don't know what the

10   outcome was.  My frame of reference was Martin was making them

11   whole and the promissory note confirmed that to me as a board

12   member and that I took as adequate.  And then I'd spoke to the

13   CFO about it who also confirmed the same thing.  So I had all

14   the reassurances I felt I needed as a board member.

15   Q    But you will agree with me that this financial report

16   doesn't say anything along those lines, correct?

17   A    The --

18   Q    Go ahead.  Yes?

19   A    But the audit letter says, it refers to the promissory

20   notes.  If you pull up some other audit letters, you'll see it

21   refers specifically to the promissory notes that make the

22   company good.

23   Q    Then at a minimum there are inconsistencies within the

24   recordkeeping of Retrophin, is that fair to say?

25              MS. KASULIS:  Objection.

3082

RICHARDSON - CROSS - AGNIFILIO

1    THE COURT:  Sustained.

2    Q    Do you see this document as consistent with -- let me ask

3    you a different question.

4         This document doesn't indicate that anybody other

5    than Retrophin is paying this bill, correct?

6    A    On this one page, yes.

7    Q    Yes.  This one page is a Retrophin liability to the tune

8    of $548,000 plus, correct?

9    A    Yes.

10   Q    And you never at any time after receiving this

11   information had a conversation with Mr. Shkreli about this?

12   A    Not that I remember specifically, no.

13   Q    But wouldn't that have been important to do to understand

14   what the overall situation was?  Wouldn't you want to speak to

15   Martin directly about it?

16        MS. KASULIS:  Objection.

17        THE COURT:  Mr. Agnifilo, this is the third or

18   fourth time you have asked the question so I'm going to

19   sustain the objection.

20        MR. AGNIFILO:  No, I know he didn't, but I want to

21   ask him why he didn't.

22   A    Again, because I had the reassurances from Martin and

23   then the promissory note was reconfirming that.  And then

24   going forward the audit letter again, you know, said there

25   were no lingering issues.

Angela Grant, RPR CRR
Official Court Reporter

3083

RICHARDSON - CROSS - AGNIFILIO

1   Q    Now, at one point you're saying that Martin never paid

2   this debt back, correct?

3          MS. KASULIS:  Objection as to this debt.  I don't

4   know.

5   Q    Did Martin ever pay the $548,000?

6   A    I understood he was paying some of it.  I don't know at

7   what point and how much was paid.

8   Q    How was he paying it back?

9          MS. KASULIS:  Objection.

10          THE COURT:  All right.

11  A    I wasn't party to that.

12          THE COURT:  If you know.

13          Do you know?

14          THE WITNESS:  No, I wasn't party to it.

15  Q    You don't know?

16  A    No.

17  Q    But you'll agree with me that none of this was cited in

18  the reasons that Martin was let go as CEO, correct?

19  A    That's correct.

20  Q    Part of the concern that the board had with Martin toward

21  the end of his time as the CEO is that he was tweeting,

22  correct?

23  A    Yes, his use of Twitter.

24  Q    And the board had talked to him about using Twitter, and

25  he kept using Twitter, right?

Angela Grant, RPR CRR
Official Court Reporter

RICHARDSON - CROSS - AGNIFILIO

1    A     Yeah.  We talked to him.  It was me specifically and Jeff

2    Paley numerous times.

3    Q     And despite that it was bad for him, he kept using

4    Twitter?

5    A     No.  I agreed with him, as you heard in direct that, you

6    know, again, he was a younger profile CEO.  There is an

7    appropriate way, but he needed to tell us how he wanted to use

8    it.

9    Q     And what do you think the excuse is for Donald Trump?

10   He's not a younger CEO.

11             MS. KASULIS:  Objection.

12             THE COURT:  Sustained.  Sustained.

13             MR. AGNIFILO:   Withdrawn.

14             THE COURT:   Just disregard these gratuitous

15   remarks.  They are completely irrelevant and inappropriate.

16   All right.

17             MR. AGNIFILO:  I apologize.

18   Q     But this was of great concern to the board, the tweeting?

19   A     Not tweeting as a total, but certain types of tweets that

20   he was making that could be, you know, could be suggesting he

21   was somehow sharing company information.

22   Q     Understood.  Now, you talked a lot on your direct and

23   cross examination about Evan Greebel, correct?

24   A     Yes.

25   Q     Evan Greebel is a partner at Katten Muchin Rosenman,

RICHARDSON - CROSS - AGNIFILIO

1    correct?

2    A    Yes, which was -- we had -- he was our external counsel.

3    Q    And I think you said he's external counsel, but he was

4    present for the board meetings, correct?

5    A    Yes.

6    Q    And I think you said that you assumed he was taking notes

7    during the meetings, correct?

8    A    Yes, because I was only physically with him once or

9    twice.  So, yes, I assumed he was taking the minutes.

10   Q    Right.  Because he was the secretary of the board?

11   A    Yes.

12   Q    And he was also someone that was on a great amount of the

13   email traffic that would go on within Retrophin?

14   A    Yes, he was copied on virtually everything.

15   Q    On virtually everything, right?

16   A    Yes.

17   Q    And his job is to provide sound legal advice, fair to

18   say?

19   A    Yes.

20   Q    And he was involved in the capitalization tables,

21   correct?

22   A    Yes.

23   Q    He was involved in the information that was given to

24   board members in preparation for the meetings, correct?

25   A    Yes.

RICHARDSON – CROSS – AGNIFILIO

1    Q    And he was copied on all of those emails?

2    A    Yes.

3    Q    Martin, very often, would, if a legal question came his

4    way, would say he had to speak to Evan, fair to say?

5              MS. KASULIS:  Objection.

6              THE COURT:  Sustained.

7    Q    Did Martin ever refer legal questions to Evan in your

8    experience?

9    A    I certainly saw a few referrals, yes, that either through

10   email or.

11   Q    And in conversations with Martin, would Martin say to you

12   that I need to run this past Evan?

13   A    I think one or two specific instances he probably did,

14   yes.

15   Q    Do you remember what those were?

16   A    Well, certainly, again, in terms of my own, my own

17   topping up of my own stock, that was one area that he said I

18   have to get back to Evan on.

19   Q    Because he wanted to be appropriate, correct?

20   A    Yes.

21   Q    And, to your knowledge, did he speak with Evan about it?

22   A    Only -- through the email exchange Evan was copied.  I

23   don't know if he spoke to him.

24   Q    And you've met Evan a number of times, correct?

25   A    Yes.

RICHARDSON - CROSS - AGNIFILIO

1  Q    I think at one point Martin introduced you at some point

2  in 2012 or so.  Does that sound about right?

3  A    I only recall meeting him for the first time in 2013, but

4  I may have met him in the office.  2013 is the first

5  recollection I had of meeting him.

6  Q    Do you have any recollection of Martin, you and Evan ever

7  having dinner beyond a social situation?

8  A    The board dinners.

9  Q    That's it?

10  A    Yeah, the board dinners.

11            (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RICHARDSON - CROSS - AGNIFILIO

1  Q    When Martin introduced you to Evan he said this is going

2  to be essentially the company's counsel, correct?

3

4  A    Well, he, he didn't say that.  I already met him

5  electronically, if you would.  Like, I already know the role

6  before.  I don't believe Martin ever said that, he knew I knew

7  what Evan's context was.

8  Q    At one point Martin asked you to go down to the

9  Securities Exchange Commission, right?

10 A    Yes.

11 Q    Tell us what he told you in preparation for your

12 interview there?

13 A    He had said this complaint has been triggered by a

14 disgruntled employee.  There is no substance to it.  It would

15 really help if there was one of the investors in MSMB Capital

16 could answer go and speak to them because I think that would

17 immediately close down this complaint.

18 Q    Do you know who Jackson Su is?

19 A    Yes, he was on the Retrophin team I believe in 2011,

20 2012.

21 Q    Do you know if he made a complaint with the SEC?  Only if

22 you know.

23 A    No.

24 Q    You did go down to the SEC, correct?

25 A    Yes.

RICHARDSON - CROSS - AGNIFILIO

1    Q     And you told the SEC that you were happy with your
2    investment in MSMB; fair to say?
3    A     Yes.
4    Q     And you told the SEC that you would invest with Martin
5    Shkreli again, if given the opportunity?
6    A     Yes.
7    Q     And you meant that at the time, right?
8    A     At the time, yes.
9    Q     The $1.9 million that you hold in Retrophin shares from
10   the stock conversion, how much money did you put into MSMB?
11   A     Into MSMB I put $400,000 in.
12   Q     And your total now is 1.9 million?
13   A     Yes.
14   Q     That's a good investment; fair to say?
15   A     Yes.
16   Q     Now yesterday you described a situation between you and
17   Martin in your apartment, do you remember telling the jury
18   about that?
19   A     Yes.
20   Q     Were you being fully accurate?
21   A     Yes.
22   Q     Yes?
23   A     Yes.
24   Q     You and Martin did not have a physical relationship?
25   A     No.

S. RICHARDSON - REDIRECT - KASULIS

1   Q    Do you remember telling him at one point, "I'm drunk,

2   where are you"?

3   A    I don't recall that.

4   Q    I'm going to show you an e-mail, Defendant's Exhibit

5   4223, an e-mail from you to Martin, March 29, 2010, 9:55 p.m.

6   A    I don't recall it, but I'm reading it now.

7   Q    Did you write to him, "Martin, I'm drunk.  Where are

8   you?"

9            MS. KASULIS:  Objection.

10           THE COURT:  Overruled.  You can answer the question.

11  A    It's from my e-mail.  It's on here.

12  Q    Did you send it?

13  A    I must have, but I don't have any recall of it.

14  Q    Thank you, Mr. Richardson?

15           MR. AGNIFILO:  Thank you.  No further questions at

16  this point.

17           THE COURT:  Any redirect of this witness?

18           MS. KASULIS:  Briefly, your Honor.

19  REDIRECT EXAMINATION

20  BY MS. KASULIS:

21  Q    Mr. Richardson, earlier in cross-examination there had

22  been some discussion about touching soft skin, do you recall

23  that?

24  A    Yes.

25  Q    You made some reference to some sort of a neck

S. RICHARDSON - REDIRECT - KASULIS

1   infection --

2   A    Yes.

3   Q    -- that the defendant had?

4   A    Yes.

5   Q    I'm showing you what's been marked for identification as

6   Government's Exhibit 122-99.  I have copies here.

7          Do you recall when you were speaking earlier, when

8   you were speaking with Mr. Agnifilo that the touching the soft

9   skin reference was in the March 29, 2010, end of March 2010

10  time period.  Do you recall that Mr. Richardson?

11  A    Yes.

12  Q    So Government's Exhibit 122-99, do you recognize this

13  e-mail?

14  A    Yes.

15  Q    What is it?

16  A    An e-mail from Martin to me.

17  Q    What is the date on it?

18  A    April 13, 2010.

19          MS. KASULIS:  Government moves this exhibit into

20  evidence.

21          MR. AGNIFILO:  No objection.

22          THE COURT:  We will receive Government's Exhibit

23  122-99.

24          (Government Exhibit 122-99, was received in

25  evidence.)

S. RICHARDSON - RECROSS - AGNIFILO

1    Q    So the date on this e-mail is April 13, 2010; is that

2    right?

3    A    Yes.

4    Q    And it's from Mr. Shkreli to yourself; is that right?

5    A    Yes.

6    Q    The subject is, "the skin around my neck is all better."

7    Do you see that?

8    A    Yes.

9    Q    Is that a reference, is that another reference to the

10   neck infection that you were testifying about earlier?

11   A    Yes.

12        MS. KASULIS:  No further questions.

13   RECROSS-EXAMINATION

14   BY MR. AGNIFILO:

15   Q    You remember clearly there is reference to a neck

16   infection, that this e-mail, you're saying you remember this

17   e-mail?  Is that what you're saying?

18   A    It says, "the skin around my neck is all better."

19   Q    Do you know what he's talking about?

20   A    Yes, the infection that I referred to earlier.

21   Q    And had you ever touched his soft skin?

22        MS. KASULIS:  Objection.

23        THE COURT:  Overruled.  You can answer it.

24   A    Well, in terms of a hug or something like that, yes, I

25   touched him in a hug or whatever.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

D. GELLER - DIRECT - SRINIVASAN

1   Q     That's all?

2   A     Yes.

3              MR. AGNIFILO:  Nothing else.  Thank you, Judge.

4              THE COURT:  All right.  Any redirect?

5              MS. KASULIS:  No.

6              THE COURT:  Mr. Richardson, you're excused.  Have a

7   nice day.

8              (Whereupon, the witness was excused.)

9              MR. SRINIVASAN:  Your Honor we call David Geller to

10  the stand.

11             (Witness takes the witness stand.)

12  DAVID GELLER, called as a witness, having been first duly

13  sworn/affirmed, was examined and testified as follows:

14             MS. SMITH:  Your Honor, I'm going to replace the

15  binders.

16             THE COURT:  Sure.

17             COURTROOM DEPUTY:  State and spell your name

18             THE WITNESS:  David Geller, D-A-V-I-D, G-E-L-L-E-R.

19             MR. SRINIVASAN:  Your Honor, may I proceed?

20             THE COURT:  Yes, please.

21  DIRECT EXAMINATION

22  BY MR. SRINIVASAN:

23  Q     Good afternoon, sir.  How old are you, Mr. Geller?

24  A     Fifty-four.

25  Q     Where do you live?

D. GELLER – DIRECT – SRINIVASAN

1   A    New York City.

2   Q    Which borough?

3   A    Manhattan.

4   Q    How long have you lived there?

5   A    Probably about 20 years.

6   Q    Are you married?

7   A    I am.

8   Q    Do you have any children?

9   A    I do, I have a 12-and-a-half year old boy.

10  Q    Could you please describe your educational background?

11  A    I had a BS in finance from Syracuse University.

12  Q    About when did you graduate?

13  A    1984.

14  Q    Could you please describe your professional background

15  after college?

16  A    After college I was, I had a couple of odd jobs, amongst

17  a salesman for six months.  Then I became an assistant trader

18  at Shearson Lehman Brothers.

19  Q    What is Shearson Lehman Brothers?

20  A    A large brokerage firm that doesn't exist any longer.

21  Q    How long were you at Shearson Lehman?

22  A    Five years.

23  Q    What did you do after that?

24  A    After that I continued in the industry.  I had a few

25  different jobs, same industry.  I assisted some law traders

D. GELLER - DIRECT - SRINIVASAN

1    and then I traded on my own.

2    Q    When you say trading, what do you mean?

3    A    Just pretty much speculating buying and selling, buying

4    low, selling high.

5    Q    Any particular kinds of things that you were trading?

6    A    Just basic equities, nothing in particular.

7    Q    Since about 2011 or so, what have you done?

8    A    In 2011 I was still trading.  I think I maybe took a

9    break in 2012 for a couple of years.  Market has been getting

10   a lot harder with the computer derivatives and black boxes,

11   all that kind of stuff.  And in the last year-and-a-half I

12   took on trading part-time again.

13   Q    Do you know an individual named Martin Shkreli?

14   A    I do.

15   Q    Have you met him in person?

16   A    I have.

17   Q    How do you know him?

18   A    I was introduced to him a while ago and I became an

19   investor in his fund.

20   Q    Who were you introduced by?

21   A    My brother, Alan.

22   Q    About when was your first contact with Martin Shkreli?

23   A    In the beginning of 2011.

24   Q    Do you see Martin Shkreli in the courtroom today?

25   A    I do.

D. GELLER - DIRECT - SRINIVASAN

1  Q    Can you point him out and pick out --

2  A    Sitting over there, to the right.

3        MR. BRAFMAN:  We'll stipulate to the identification.

4  A    He's wearing a collared shirt, pink or white.

5        THE COURT:  We will note that Mr. Geller has

6  identified Mr. Shkreli.

7        MR. SRINIVASAN:  Thank you, your Honor.

8  Q    How did you first contact him, by phone in person?

9  A    By phone.

10 Q    Why did you speak to him?

11 A    I spoke to him because I just wanted to feel him out a

12 little.

13 Q    Feel him out in terms of what?

14 A    See a little about his background.  I wanted to hear him

15 talk about his investing style.  And I just wanted to see what

16 type of strategy he used.  And I guess lastly, to try to get a

17 feel of what type of guy he was.

18 Q    Was he running any kind of company at that time or fund?

19 A    Repeat it?

20 Q    Was he running any company or fund at the time?

21 A    Yes, he was.

22 Q    What was that?

23 A    MSMB Healthcare.

24 Q    Did you discuss MSMB Healthcare with him?

25 A    We did.

D. GELLER - DIRECT - SRINIVASAN

1    Q    What did he tell you about MSMB Healthcare?

2    A    He said it was a long/short balanced fund that invested

3    primarily in health care securities.

4    Q    When you say long/short, what did that mean?

5    A    That meant at any one time he, in his position, balances

6    he had to have a certain amount of shorts or longs or setting

7    the shorts or longs.

8            THE COURT:  Can I ask you to push the mic a little I

9    away.  You're a little too close.  Push the base away.  Thank

10   you.

11   Q    Did he say anything about the liquidity in the fund?

12   A    He did.  He said it was a very liquid fund.

13   Q    What did that mean to you?

14   A    That meant that if an investor wanted to cash out or take

15   part of his cash out, it would be simple.

16   Q    Did this information make any impression on you with

17   respect to MSMB Healthcare?

18   A    It did.

19   Q    What was that?

20   A    It fit my objectives at the time.  Because I was looking

21   for a fund such as that.  I just wanted a liquid fund.  Low

22   volatility, balance.

23   Q    Had you invested in any hedge funds before this?

24   A    I did.

25   Q    What was your prior experience with investing in hedge

D. GELLER - DIRECT - SRINIVASAN

1  funds?

2  A    My prior experience unfortunately was not too good.

3  Because I invested a big portion of my money in 2006, 2007 and

4  that, as you know, was right before the stock market crashed.

5  So a lot of the investments I had were illiquid and they were

6  they were hedge funds that required 120 days written notice.

7           And one of them was, I invested with a friend, and

8  they invested in pipes which are similar to like a secondary

9  investments, and that fund lost 90 percent.  The big hedge

10 funds, I had didn't do too well.

11 Q    Mr. Geller, just so the record is clear, you say that

12 your investments were liquid or illiquid?

13 A    Illiquid, a lot of them.  Some were liquid but a decent

14 portion that was illiquid.

15 Q    Did that experience have any effect on how you evaluated

16 hedge fund investments going forward?

17 A    Absolutely.

18 Q    How so?

19 A    The next, if I invested again, the next investment I

20 wanted to make was going to be a fund that I could recoup any

21 cash, if I wanted to cash out, on my terms not anyone else's

22 terms.

23 Q    You mentioned a second ago you were trying to get a sense

24 of the defendant, did he describe his background to you?

25 A    He told me that, what impressed me was he worked for Jim

D. GELLER - DIRECT - SRINIVASAN

1   Cramer.  And at the time, Jim Cramer was a rising.  He's on

2   CNBC now.  He was a rising star in the brokerage industry.

3   That impressed me pretty much.

4   Q    Did the name Elea Capital come up in your conversations

5   with the defendant?

6            MR. BRAFMAN:  Objection, your Honor?

7   A    No.

8            MR. BRAFMAN:  Move to strike, your Honor.

9            THE COURT:  We will -- I'm going to overrule the

10  objection.

11           MR. BRAFMAN:  Your Honor, could we have a quick

12  sidebar?

13           THE COURT:  Yes.

14           (Continued on the next page.)

15           (Sidebar conference.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1      MR. BRAFMAN:  Your Honor, we have a witness that

2  testified to what the defendant told him.  He said, "I was

3  working at Jim Cramer."  The fact that he had previously

4  worked for Elea Capital is not spoken about either in a good

5  way or a bad way.  If he said, "I worked at Elea Capital and I

6  did great there," that would be an affirmative

7  misrepresentation.  I don't think every time you pitch

8  yourself to a prospective investor you need to tell them

9  everything in your career that may be good or bad.  It's what

10  did you say, what did you rely on.

11      He was referred to this man by his brother, who is

12  in the fund and made millions.  He's referred to by Kevin

13  Mulleady.

14      If the next question is, if he had told you that he

15  was in Elea and Elea didn't work out, would you have wanted to

16  know that.  Those are inappropriate questions.

17      THE COURT:  Were you going to move on?

18      MR. SRINIVASAN:  The next question is, "If the

19  defendant had performed well or poorly at a previous hedge

20  fund, would that have been important to your investing," which

21  the form of the question I think Ms. Kasulis asked yesterday.

22  So it's not eliciting anything more than a hypothetical.

23      THE COURT:  Why don't we do this.  We can strike the

24  whole Elea reference.

25      MS. SMITH:  It's a fact question, not a

SIDEBAR CONFERENCE

1  hypothetical.

2          THE COURT:  When he told him --

3          MS. SMITH:  You can of argue later that it's not

4  material, but we have a right to ask.

5          MR. BRAFMAN:  The next question is, if you know of

6  that Elea didn't work out.

7          MR. SRINIVASAN:  That's not what I said, "would

8  information about whether the defendant performed well or

9  poorly as a hedge fund manager been important to your

10 investment," it could be anything.

11         THE COURT:  It's a neutral question.

12         MR. BRAFMAN:  It's not a neutral question, because

13 this jury has heard throughout the trial, over our objection,

14 about Elea Capital and that Elea was something that didn't

15 perform well, because they have asked everybody about it over

16 our objection.  And now with someone who could careless, who

17 had no clue about Elea, good or bad, made his investment on

18 what of his brother Alan Geller told him.

19         MS. SMITH:  The defense withdrew the objection to

20 Elea Capital.

21         MR. BRAFMAN:  We withdrew our objection as a -- when

22 we were talking about motions in limine there was a question

23 as to whether or not you could reference Elea or RBC.  That

24 doesn't mean you can do it in the way that you are using it.

25         MS. SMITH:  In what way would we use it?

SIDEBAR CONFERENCE

1    MR. BRAFMAN:  This man has had no conversation with

2  him about anything.  He says he was impressed with Jim Cramer.

3    THE COURT:  We established that Elea never came up.

4  The next question is not going to Elea.  If we can move

5  forward with the question, whether or not prior performance as

6  a hedge fund manager positive or negative would have been

7  important to him, I think that's neutral enough.

8    If the objection was withdrawn, then the motions I

9  think --

10    MR. BRAFMAN:  Judge, we're talking about apples and

11  oranges.

12    What we said first, if Mr. Shkreli -- if the

13  witnesses are coming here from Elea they can testify to it.

14  If Elea was properly mentioned because it's in many of the

15  PPMs Elea is noted.  So we withdrew our objection because Elea

16  comes up in several of the PPMs.

17    That doesn't mean we withdraw our objection to what

18  you ask about Elea.  We've been pressing this objection since

19  the trial started.  In particular with this person we don't

20  believe you have -- I want to make the record clear.  I do not

21  believe that someone who is pitching you to invest has an

22  affirmative obligation to go through their entire track record

23  every time they suggest that you should invest with them.

24    MR. SRINIVASAN:  This is argument.  He's entitled to

25  argue it.  In our motion initially we clearly had the grounds

SIDEBAR CONFERENCE

1   why Elea matters in terms of its knowledge, in terms of direct

2   evidence in this case.  They withdrew their objection.  The

3   next question is neutral, not about if you learned about Elea,

4   or if Elea bust would that have mattered to you.  That's not

5   the question.

6           MR. BRAFMAN:  The next question following reference

7   to Elea is only being asked to imply that Elea was a bad hedge

8   fund.

9           MS. SMITH:  In fact, there is other examples which

10  may or may not come in, where the defendant performed poorly

11  in trading.  So it is a completely fair question, "if you had

12  known if he performed poorly as a hedge fund or trader, would

13  that have effected your decision to invest."  The defendant

14  chose not to disclose that the information.  We can argue that

15  material.  We have a right to ask the questions.  We have a

16  right to ask the hypothetical questions.  We have neutralized

17  them, but we have have a right to ask those as well.

18          THE COURT:  You can ask the question in the form

19  that you're proposing the next question.

20          MR. BRAFMAN:  We're not waiving our objection.

21          THE COURT:  We're not striking anything.

22          (End of sidebar conference.)

23          (Continued on the next page.)

24

25

D. GELLER - DIRECT - SRINIVASAN

1    (In open court.)

2    THE COURT:  Please proceed.

3    BY MR. SRINIVASAN:

4    Q    Mr. Geller, would information about whether the defendant

5    had performed well or poorly as a hedge fund manager had been

6    important to your investing decision?

7    A    Yes.

8    Q    Why is that?

9    A    Because I think everyone basically needs some type of a

10   track record just to base your decision on.

11   Q    While you were considering an investment, did you receive

12   documents about MSMB Healthcare?

13   A    Yes.

14   Q    What were they?

15   A    They were the basic documents you get before an

16   investment.  There is a Private Placement Memorandum, there is

17   a subscription agreement, and there is an investor

18   questionnaire.

19   Q    Did you review those documents?

20   A    I went over them, I briefed them.

21   Q    What do you mean by brief them?

22   A    I looked them.  I didn't sit and read every word for word

23   for five hours.  I did look them over.  I'd seen documents

24   like that before, a lot of it is just the same language.

25   Q    When you do that, do you have a sense of what you're

D. GELLER - DIRECT - SRINIVASAN

1   looking for in the document?

2   A    There is a couple of key words, yes, absolutely.

3   Q    Did you rely on the information contained in the

4   documents we were just talking about?

5   A    Yes.

6   Q    I'm showing you what is marked for identification as

7   Government's Exhibit 109-3.

8           Mr. Geller, you have a big binder and a little

9   binder.  In the big binder, it's tab three.  On the front page

10  what kind of document is this?

11  A    Investment letter with all the attachments of the

12  documents.

13          MR. SRINIVASAN:  Your Honor, we move Government's

14  Exhibit 109-3 into evidence.

15          MR. BRAFMAN:  No objection.

16          THE COURT:  We will receive 109-3.

17          (Government Exhibit 109-3, was received in

18  evidence.)

19  Q    Focusing on the top for a minute, who sent these

20  documents to you?

21  A    Kevin Mulleady.

22  Q    Who is Kevin Mulleady?

23  A    Kevin was the, he was the salesman of the hedge fund and

24  he performed other tasks as well.

25  Q    When you say the hedge fund, we're talking about MSMB

D. GELLER - DIRECT - SRINIVASAN

1   Healthcare?

2   A     MSMB Healthcare.

3   Q     When did he send this e-mail to you?

4   A     June 22, 2011.

5   Q     You mentioned attachments a second ago, what are the

6   attachments that are listed here?

7   A     Private Placement Memorandum, a subscription agreement,

8   and a individual questionnaire.

9   Q     Let's go to the third page of this exhibit, which is

10  Bates number R036371, what is this document?

11  A     This is the cover letter to the Private Placement

12  Memorandum.

13  Q     For which fund?

14  A     MSMB Healthcare.

15  Q     Who is listed as the managing partner?

16  A     Martin Shkreli.

17  Q     What is the date on this document?

18  A     January 1st, 2011.

19  Q     Mr. Geller, I'm showing you what is marked for

20  identification as Government's Exhibit 11A, if you keep a

21  finger on the page that you have now, tab three, then go to

22  tab 30.

23  A     Okay.

24  Q     What is the document that's behind tab 30?

25  A     Private Placement Memorandum.

D. GELLER – DIRECT – SRINIVASAN

1    Q    For what fund?

2    A    MSMB Healthcare.

3    Q    What is the date on this document?

4    A    January 1st, 2011.

5    Q    Mr. Geller, is this the same document that we just saw as

6    an attachment?

7    A    Yes, it is.

8              MR. SRINIVASAN:  We move to admit Government's

9    Exhibit 11A.

10             MR. BRAFMAN:  No objection.

11             THE COURT:  We will receive 11A.

12             (Government Exhibit 11A, was received in evidence.)

13   Q    Let's stick with this document on tab 30, 11A in

14   evidence.  Please turn to the page that has Bates number

15   R036372, which is the second page of this document.  If we

16   could zoom in on the second full paragraph.

17             Do you see the language that says, "The

18   partnership's investment objective will be to seek superior

19   absolute returns, while attempting to minimize portfolio

20   volatility, primarily through long and short equity

21   investments in healthcare companies located in the United

22   States and throughout the world."

23   A    Yes.

24   Q    What, if anything, did you understand that language to

25   mean?

D. GELLER - DIRECT - SRINIVASAN

1   A    It meant that it was pretty much in line with what I was

2   looking for to invest in.  But it meant to me that superior

3   absolute returns means, that if the general market has a big

4   move on the upside or the down side, the investment will be

5   shielded because it has long and shorts.  It also meant that

6   there will be low volatility, which means not wild swings.

7   And long and short investment in health care companies will be

8   long investment and short investments in health care companies

9   in the U.S. and the world.

10  Q    Mr. Geller, was this information important to your

11  investing decision?

12  A    Very important.

13  Q    Why was that?

14  A    Because it fit my objective.  I was looking for only an

15  investment that was liquid.

16  Q    Let's go to Bates R036381, the 11th page of this exhibit,

17  the paragraph capital withdrawals?

18  A    Yes.

19  Q    The first sentences say, "Limited partners may withdraw

20  any or all of their capital accounts subject to certain

21  reserves which may be established by the general partner to

22  cover contingent liabilities of the partnership monthly at the

23  last calendar day, of each month commencing one full month

24  after the date of their initial investment in the partnership

25  of upon not less than 30 days prior written notice to the

D. GELLER - DIRECT - SRINIVASAN

1    general partner."  Do you see that?

2    A    Yes.

3    Q    What did you understand this to mean?

4    A    This means that an investor in the fund can cash out on a

5    monthly basis, giving 30 days' written notice.

6    Q    Was this information important to your investing

7    decision?

8    A    Yes.

9    Q    Why is that?

10   A    It was part of the whole liquidity.  If you needed your

11   money back you can get it without any road blocks or other

12   obstacles.

13   Q    Let's go to the next page, which is Bates R036382, do you

14   see the paragraph that starts, "Partnership reports"?

15   A    Yes.

16   Q    The first sentence says, "Following the end of each

17   fiscal year, the partnership's certified public accountants

18   will audit for delivery by the general partner to each limited

19   partner financial statements of the partnership for such year,

20   as well as a statement of such limited partner's capital

21   account and certain tax information for the preparation of

22   such limited partner's income tax returns."  Do you see that?

23   A    Yes.

24   Q    There is a reference there to certified public

25   accountants will audit, what, if anything, did that mean to

3110

D. GELLER - DIRECT - SRINIVASAN

1    you?

2    A    That's pretty much what, from what I understand, all

3    hedge funds have.  They have a certified public accountant who

4    does the audits at the end of the year.

5    Q    When you invested in hedge funds in the past, have those

6    hedge funds had auditors?

7    A    Yes.

8    Q    And administrators?

9    A    Yes.

10   Q    Was the presence of an auditor important to your

11   investing decision?

12   A    Yes.

13   Q    Why is that?

14   A    Because this way everything was checks and balances,

15   everything was done right.

16   Q    When you say everything was done right, what do you mean?

17   A    Well, the brokerage firm or hedge fund has certain

18   responsibilities to the investors as a due diligence type of

19   thing to make sure the booking of the positions are, the

20   positions are looked at, positions are right, there will be

21   monthly statements sent out, accurate monthly statements and

22   so on.

23   Q    Now how would having or not having an auditor affect your

24   investing decision?

25   A    I would not invest in any investment if there wasn't an

D. GELLER - DIRECT - SRINIVASAN

1    auditor or a certified public accountant.

2    Q    I'm showing you what is marked for identification as

3    Government's Exhibit 109-4, which is tab four of your binder,

4    do you recognize this document?

5    A    Yes.

6    Q    What kind of document is it?

7    A    It's an investor letter.

8    Q    Did you receive it?

9    A    I did.

10         MR. SRINIVASAN:  Your Honor we move to admit 109-4.

11         MR. BRAFMAN:  No objection.

12         THE COURT:  We receive 109-4.

13         (Government Exhibit 109-4, was received in

14   evidence.)

15   Q    Looking at the top, Mr. Geller, who sent this to you?

16   A    Kevin Mulleady.

17   Q    When did he send it to you?

18   A    June 23, 2011.

19   Q    Let's look at the first two paragraphs, if we could zoom

20   in on those, please.  The first paragraph says, "MSMB Capital

21   management, a fund specializing in long-term strategic

22   investments in healthcare and biotechnology businesses, today

23   announced that it had made a proposal to the Board of

24   Directors of SeraCare" --

25         MR. BRAFMAN:  Objection, your Honor.

D. GELLER - DIRECT - SRINIVASAN

1          THE COURT:  What is the objection, sir?

2          MR. BRAFMAN:  It's not relevant.

3          MR. SRINIVASAN:  I can make a proffer, your Honor.

4          THE COURT:  I'll hear from the parties.

5          (Continued on the next page.)

6          (Sidebar conference.)

SIDEBAR CONFERENCE

1          MR. SRINIVASAN:  Your Honor, this is a notification

2     that was sent out to investors of a press release.  We've done

3     this before with other investors and shown this document and

4     talked to them about it, Dr. Rosenfeld for example.

5          Two, the relevance for this witness is that it

6     impressed him about the financial wherewith all of MSMB

7     entities.  For example, you'll see $82 million cash offer to

8     SeraCare, that offer is not subject to any financing

9     condition.  This is just days before he invests, which is what

10    we're going to get to in just a few minutes.  So what it

11    impresses him about is about the assets and the finances that

12    the defendant has.  It gives him confidence in the investment.

13    If the concern is that we are somehow getting into details --

14         MR. BRAFMAN:  Are you putting this into evidence?

15         THE COURT:  You did.  You didn't object.

16         MR. SRINIVASAN:  We're not getting into the details

17    of the deal, that there is false information, just the

18    impression to the witness.

19         THE COURT:  The effect on him.

20         MS. SMITH:  We did the same document in for

21    Rosenfeld, the same discussion.

22         THE COURT:  Okay.

23         (End of sidebar conference.)

24         (Continued on the next page.)

25

D. GELLER – DIRECT – SRINIVASAN

1          (In open court.)

2   BY MR. SRINIVASAN:

3   Q    Mr. Geller, why don't I start by starting the reading

4   this paragraph again.

5          So the first paragraph there says, "MSMB Capital

6   Management, a fund specializing in long-term strategic

7   investments in healthcare and biotechnology businesses today

8   announced that it has made a proposal to the Board of

9   Directors of SeraCare Sciences Inc. to acquire all the

10  outstanding common stock of SeraCare for $4.25 per share or an

11  aggregate of $82 million.  This proposal represents an

12  approximate 22 percent premium of the closing price of

13  SeraCare stock 3.49 on June 22, 2011.  MSMB's offer is

14  conditioned upon completion of cursory due diligence and other

15  customary provisions.  MSMB's offer is not subject to any

16  financing condition."

17         In the second paragraph it says, "MSMB's offer is

18  not subject to any financing conditions," do you see that?

19  A    Yes.

20  Q    What did that language mean to you?

21  A    That they don't, they can do it themselves, they don't

22  really, they don't need help with loans or bridge financing or

23  any of those other financial things.

24  Q    What, if any, impression did this e-mail make on you

25  about MSMB Healthcare and the defendant?

D. GELLER - DIRECT - SRINIVASAN

1    A    Actually it made a very good impression.

2    Q    Why is that?

3    A    Well, after reading it, it led me to believe that MSMB

4    Healthcare was very-well capitalized, if they were going to

5    purchase a public company for this amount of money.

6    Q    Did you in fact invest in MSMB Healthcare?

7    A    I did.

8    Q    How much did you invest?

9    A    200,000.

10   Q    I'm showing you what is marked for identification as

11   Government's Exhibit 28, tab 32 in your binder.  What is this

12   document?

13   A    It's a subscription agreement.

14   Q    Is this a document that you signed?

15   A    It is.

16   Q    For what fund?

17   A    MSMB Healthcare.

18        MR. SRINIVASAN:  Your Honor we move to admit

19   Government's Exhibit 28.

20        MR. BRAFMAN:  No objection.

21        THE COURT:  We will receive Government's Exhibit 28.

22        (Government Exhibit 28, was received in evidence.)

23   Q    Mr. Geller, let's go to the 12th page, Bates R011939.

24   Did you sign this document?

25   A    I did.

D. GELLER - DIRECT - SRINIVASAN

1   Q    When did you sign it?

2   A    June 29, 2011.

3   Q    At the time you invested, did the defendant ever mention

4   a company called Orexigen or Orex?

5           MR. BRAFMAN:  Objection, no testimony that he spoke

6   to Mr. Shkreli before he invested.

7           MR. SRINIVASAN:  He had a phone call, your Honor.

8           THE COURT:  Let's not argue in front of the jury.

9   Lay a foundation about conversations.

10  BY MR. SRINIVASAN:

11  Q    Mr. Geller --

12          THE COURT:  Before the investment.

13  Q    Mr. Geller, before you invested in MSMB Healthcare, did

14  you ever speak to the defendant?

15  A    I did.

16  Q    And in that conversation and before the time you

17  invested, did the defendant ever mention a company called

18  Orexigen sometimes abbreviated as Orex?

19  A    He did not.

20  Q    Over the course of your investment, did you receive

21  information about the performance of your investment?

22  A    Yes.

23  Q    How did you receive that information?

24  A    I got investor statements.

25  Q    You have a binder that's labeled 91 series, it has ten

D. GELLER - DIRECT - SRINIVASAN

1    tabs in it.  These exhibits are marked for identification as

2    Government's Exhibits 91-1 through 91-10, do you recognize

3    these documents?

4    A    Yes.

5    Q    What are they?

6    A    These are the investor statements.

7            MR. SRINIVASAN:  Your Honor we move to admit

8    Government's Exhibit 91-1 through 9-10.

9            MR. BRAFMAN:  No objection.

10           THE COURT:  We will receive 91-1 through 91-10.

11           (Government Exhibit 91-1 through 91-10, was received

12   in evidence.)

13   Q    Tab one, 91-1, if you look at the middle e-mail, it

14   should be on your screen, who sent the e-mail to you?

15   A    NAVConsulting.net.

16   Q    What, if anything, did you understand NAV Consulting to

17   be?

18   A    I believed it was their consulting and administrative

19   type firm.

20   Q    What is the date on the e-mail?

21   A    August 9, 2011.

22   Q    For what month is this statement?

23   A    July 2011.

24   Q    Let's go to page two of this exhibit, Bates R013294, what

25   was your ending balance according to this statement?

D. GELLER – DIRECT – SRINIVASAN

1   A    205,000.

2   Q    Did you believe that these investor statements were

3   accurate?

4   A    I did.

5   Q    Did you rely on these statements to keep track of your

6   investment.

7   A    Yes.

8   Q    Did these statements have any influence in terms of

9   keeping your money in MSMB Healthcare?

10  A    They had some.

11  (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GELLER - DIRECT - SRINIVASAN

1    A    They had some.  Just pretty much, you know, you see to

2    how the game is going, to see what the score is.

3    DIRECT EXAMINATION (CONTINUED)

4    BY MR. SRINIVASAN:

5    Q    Okay.  Let's go to the next tab, which is Government

6    Exhibit 91-2.

7            And focusing on the middle email, Mr. Geller, what's

8    the date on this email?

9    A    October 27th, 2017.

10   Q    For what month is this statement?

11   A    September 2011.

12   Q    Let's go to page 2.  What was your ending balance for

13   this month?

14   A    $210,354.

15   Q    Mr. Geller, do you see some fine print at the bottom of

16   that page?

17   A    Yes.

18   Q    And is there a reference to Retrophin in this fine print?

19   A    Yes.

20   Q    Did this fine print make any impression on you at this

21   time?

22   A    To tell you truth, I didn't -- I didn't notice -- I mean,

23   there was something there but I never -- I never -- I never

24   bothered to really read it.

25   Q    Let's go to Government Exhibit 91-3, which is the next

GELLER - DIRECT - SRINIVASAN

1    tab in your binder.

2            Mr. Geller, what's the date on the email?

3    A    November 30th, 2011.

4    Q    And for what month is the statement?

5    A    October 2011.

6    Q    Let's go to the second page.  What was your ending

7    balance for this month?

8    A    $199,938.

9    Q    And if we could zoom in on that paragraph at the bottom.

10            Mr. Geller, do you see a reference to Retrophin in

11    this time frame?

12    A    Yes.

13    Q    Did this fine print make any impression on you at this

14    time?

15    A    Yes, it did.  It absolutely did.  I mean, I did notice

16    the footnote at this time.

17    Q    At this point what, if anything, was your understanding

18    of Retrophin?

19    A    I really had no idea what it was.

20    Q    And in the first sentence of the fine print, it says:

21    MSMB Healthcare, LP has accepted the transfer of 30,000

22    investment units consisting of Class A common units of

23    Retrophin, LLC, a Delaware limited liability company focused

24    on developing biopharmaceutical products for Martin Shkreli at

25    no consideration as a gift.

GELLER - DIRECT - SRINIVASAN

1          What, if anything, was your understanding of the

2   language "at no consideration as a gift"?

3   A    My understanding was that it was -- it was a gift that

4   was gifted to all -- whoever he gifted it to.

5   Q    To MSMB Healthcare?

6   A    Well, in looking at this footnote, yes, MSMB Healthcare.

7   Q    At this point, did you believe that MSMB Healthcare had

8   paid money to invest in Retrophin?

9   A    I'm sorry, say it again?

10  Q    Of course.  At this point, did you believe that MSMB

11  Healthcare had paid money to invest in Retrophin?

12  A    No.

13  Q    Did you have any understanding of the size of MSMB

14  Healthcare's position in Retrophin?

15  A    I did not.

16  Q    So let's go back to the big binder.  And I'm showing you

17  what's been marked for identification as Government

18  Exhibit 109-6.  It's Tab 6 in your -- in the big binder.

19  A    Okay.

20  Q    Now, what kind of document is this?

21  A    An investor letter.

22  Q    Did you receive it?

23  A    I did.

24          MR. SRINIVASAN:  Your Honor, we move to admit

25  Government's Exhibit 109-6.

GELLER – DIRECT – SRINIVASAN

1          MR. AGNIFILIO:  No objection.

2          THE COURT:  We will receive 109-6.

3          (Government Exhibit 109-6, was received in

4    evidence.)

5    Q    And, Mr. Geller, who sent this email to you?

6    A    NAV Consulting.

7    Q    And the email says:  Dear investor, please find attached

8    an important notice from the fund, along with a materially

9    revised PPM dated October 28th, 2011.  These are critical

10   notices for your information and may require a response action

11   on your part, if you have any objection to the changes to the

12   PPM.  For this reason we urge you to carefully review both

13   documents and exercise due care in your investment decision.

14          Do you see that?

15   A    Yes.

16   Q    And I'm looking at the attachment line.  Are there

17   attachments?  On the email, sir.

18   A    Okay.

19   Q    On that first page, are there attachments to this

20   document?

21   A    Private placement memorandum.

22   Q    And letter to investors?

23   A    And letter to investors, yes.

24   Q    You know, I'm not sure if I asked you before.

25          Traderexp@aol.com, who is that?

GELLER - DIRECT - SRINIVASAN

1    A    That's my email.

2    Q    Okay.  So let's go to the fourth page of this exhibit,

3    which is Bates number DG00010.

4              What is this document?

5    A    A private placement memorandum.

6    Q    For what month?

7    A    MSMB Healthcare.

8    Q    What's the date of this document?

9    A    October 28th, 2011.

10   Q    Now, if you could just keep this page open for a second.

11   I'm showing you what's been marked for identification as

12   Government Exhibit 11B, which is Tab 31 in your binder.

13             What is this document?

14   A    Private placement memorandum.

15   Q    What's the date on this document?

16   A    October 28th, 2011.

17   Q    Mr. Geller, is this the same document that we saw just a

18   minute ago?

19   A    Yes.

20             MR. SRINIVASAN:  Your Honor, we move Government's

21   Exhibit 11B into evidence.

22             MR. AGNIFILIO:  No objection.

23             THE COURT:  We received Government's Exhibit 11B.

24             (Government Exhibit 11B, was received in evidence.)

25   Q    Mr. Geller, let's go back to the Tab 6 in the binder and

GELLER - DIRECT - SRINIVASAN

1    stick to the documents there.  And that's Government

2    Exhibit 109-6 in evidence.

3            If you can go back two pages from where you were,

4    it's Bates-numbered DG0008.

5            So this is a letter to investors from the defendant.

6    And if we can zoom in on the first three paragraphs of this

7    letter?

8            MR. BRAFMAN:  Is that a separate exhibit number?

9            MR. SRINIVASAN:  No, this is all part of 109-6, the

10   attachments to the email.

11   Q   Mr. Geller, this part of the letter reads:  MSMB

12   Healthcare, LP has updated it's private placement memorandum

13   to reflect new disclosures regarding the fund.  Specifically,

14   MSMB Healthcare, LP has expanded its disclosure regarding its

15   ability and intent to invest in illiquid securities including

16   venture capital, private equity limited partnerships and other

17   hedge funds.  If you disagree with these changes, we will

18   facilitate your redemption within our standard parameters.

19   MSMB Healthcare, LP has and will continue to invest in

20   MSMB-affiliated entities, which are controlled by the

21   MSMB Capital umbrella.  These entities may or may not be

22   administered and audited, and the fund will rely heavily on

23   our impressions of value of these assets.  These investments

24   are expected to be a material portion of the funding assets.

25   MSMB Healthcare, LP may invest in private equity, directly or

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

GELLER – DIRECT – SRINIVASAN

1    indirectly.  MSMB-affiliated partnerships are most likely to

2    carry out these private equity investments.  There's no

3    assurance that these investments will be profitable, and any

4    equity invested may not be able to be returned for a

5    redemption.

6              What, if anything, was your reaction to receiving

7    this information?

8    A    Very negative reaction.

9    Q    Why is that?

10   A    Because they were changing the objective of the fund,

11   which is not what I originally planned for.  Originally

12   wanted.

13   Q    Was it consistent or inconsistent with your objectives?

14   A    Inconsistent.

15   Q    In what way?

16   A    It looked like they were trying to turn the fund into an

17   illiquid fund that invested in -- in private type -- private

18   type of investments, as it says, in the first paragraph.

19   Q    At some point after you received this information, did

20   you try to redeem your investment?

21   A    Yes.

22   Q    I'm showing you what's marked for identification as

23   Government's Exhibit 109-7, which is Tab 7 in your binder.

24             Now, what kind of document is this?

25   A    It's a email.

GELLER - DIRECT - SRINIVASAN

1    Q    Are you on the email?

2    A    Yes.

3    Q    And who else is on the email?

4    A    Kevin Mulleady and Martin Shkreli.

5         MR. SRINIVASAN:  Your Honor, we move to admit

6    Government Exhibit 107-9?

7         MR. BRAFMAN:  No objection.

8         THE COURT:  We will receive 109-7.

9         (Government Exhibit 109-7, was received in

10   evidence.)

11   Q    Mr. Geller, when did you write this email?

12   A    January 24th, 2012.

13   Q    What did you write?

14   A    I wrote:  Kevin and Martin, after careful thought, I have

15   decided to put in for redemption.  This is my own personal

16   decision as the investment objective of the fund no longer

17   matches my personal objective.  I believe we have talked about

18   this in the past.  Basically, my portfolio already has too

19   much private equity and illiquid components in it.  Let's try

20   and chat later.  David Geller.

21   Q    What did you mean when you wrote that the investment

22   objective of the fund no longer matches my personal objective?

23   A    I meant that it -- I wanted -- I my original goal was

24   to -- I was only really going to invest in this fund if it

25   was -- sorry, a liquid balanced fund.  And now it looks like,

GELLER - DIRECT - SRINIVASAN

1    you know, after they sent this letter, they wanted to change

2    the make up of the fund.

3    Q    What happened after you sent this email?  Did you redeem?

4    A    I never fully, no, I never redeemed.

5    Q    Why not?

6    A    Because I had some conversations with Kevin and Martin

7    and they convinced me to stay in the fund.

8    Q    And what did Kevin Mulleady and the defendant say?

9    A    I think the main thing they said was this private

10   investment letter that they sent to me, they -- it was just

11   going to be -- when they did invest in the liquid private --

12   private other hedge fund things, that it was going to be a

13   very small portion of the fund.

14   Q    And was this a conversation by phone or in person?

15   A    Conversation by phone.

16   Q    And did it take place after you sent the email or before?

17   A    It took place after I sent the email.

18   Q    And at this point, was your understanding of the size of

19   the MSMB Healthcare's investment in illiquid securities

20   important for your investing decision?

21   A    Yes.

22   Q    Let's go back to the binder that's labeled 91 series.

23   The smaller binder that you have.  And if you can go to

24   Government's Exhibit 91-8, which is Tab 8 in that binder.

25            What is the date on this email?

GELLER - DIRECT - SRINIVASAN

1    A    September 9th, 2012.

2    Q    What month does this statement cover?

3    A    May of 2012.

4    Q    Going to the second page.  What was your ending balance

5    here?

6    A    $251,228.

7              THE COURT:  I'm sorry, did you say it was in

8    evidence.

9              MR. SRINIVASAN:  It is part of Government's

10   Exhibit 91-1 through 10.  They're admitted.

11             THE COURT:  Right.

12   Q    Mr. Geller, some of the statements we saw earlier were

13   sent to you by NAV Consulting.

14             Do you recall that?

15   A    Yes.

16   Q    And if we go back to the first page of this exhibit, who

17   sent this one to you?

18   A    Martin Shkreli.

19   Q    Did there come a point when your statements no longer

20   came from NAV Consulting?

21   A    This statement did not -- did not come from NAV

22   Consulting.

23   Q    And did you have any understanding of how that change

24   came about or why?

25   A    No.

GELLER – DIRECT – SRINIVASAN

1    Q    At this point, in September 2012, did you believe that

2    MSMB Healthcare had an administrator?

3    A    Yes.

4    Q    And at this point, was having or not having an

5    administrator important to your decision to keep investing in

6    MSMB Healthcare?

7    A    Yes.

8    Q    Why is that?

9    A    Because if they didn't have an administrator, then

10   something would be wrong.

11   Q    What do you mean by "wrong"?

12   A    Well, what we talked about before, like the administrator

13   has -- I mean, the fund has to run with an administrator.

14   Q    Go to the next tab, Government's Exhibit 91-9.

15            What's the date of this email?

16   A    June 2012.

17   Q    If you look closer to the top, what's the date on the

18   email?

19   A    Oh, I'm sorry.  September 9th, 2012.

20   Q    And for what month is it, the statement?

21   A    June 2012.

22   Q    And if we go to page 2 of the document.  What's your

23   ending balance here?

24   A    $272,760.

25   Q    And let's go to the next tab, which is Government's

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

GELLER - DIRECT - SRINIVASAN

1    Exhibit 91-10 in evidence.

2              What's the date on this email?

3    A    September 10, 2012.

4    Q    For what month is this statement?

5    A    July 2012.

6    Q    And going to the second page, what was the value of your

7    investment here?

8    A    $299,343.

9              MR. SRINIVASAN:  Ms. Zellan, if we can put the first

10   pages of 91-9 and 91-10 side by side.  And if we can zoom in,

11   please, on the email at the top of this page.

12   Q    Mr. Geller, it's on your screen.

13             Taking these exhibits together, in your experience,

14   was there anything unusual about the timing of these investor

15   statements?

16   A    Yes.

17   Q    What was that?

18   A    There was a four- or five-month lag from when the

19   statements were sent out from the actual -- from the actual

20   date.

21   Q    Did you have any reaction to the timing of the

22   statements?

23   A    It wasn't -- it wasn't kosher with me because I mean a

24   five-month lag, I didn't understand why there was a five-month

25   lag.

GELLER - DIRECT - SRINIVASAN

1      I was -- I was a little bit worried.

2  Q    Mr. Geller, now taking all of these performance

3  statements together, did you rely on them?

4  A    Yes.

5  Q    Do you believe them to be accurate?

6  A    I did.

7  Q    To what extent were inaccurate or accurate performance

8  statements important to your investment decision?

9  A    Repeat that again, I'm sorry.

10 Q    I'm sorry, I said that quickly.

11      To what extent were accurate or inaccurate

12 performance statements important to your continued investment

13 decisions?

14 A    It's -- I think I said it before, it's just like a -- an

15 ongoing line score just to see how the fund is doing, how --

16 how the month -- how the performance changes month to month.

17 Q    Now, during the course of your MSMB Healthcare

18 investment, did you approve any personal loans by MSMB

19 Healthcare to the defendant?

20 A    No.

21      MR. BRAFMAN:  Objection, Your Honor, it assumes a

22 requirement.

23      THE COURT:  I think this was the subject of a prior

24 discussion.

25      A sidebar, I'm going to sustain the objection.

GELLER - DIRECT - SRINIVASAN

1        MR. SRINIVASAN:  Your Honor, could we just explain

2    very briefly on this one question.

3        THE COURT:  All right.

4        (Continued on the next page.)

5        (Sidebar conference.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1           MR. SRINIVASAN:  This exact question I think Your

2   Honor overruled the objection to.  There was a follow-on

3   question that related to the notification of personal loans

4   and so on.  This is in connection when you checked the

5   statements.

6           THE COURT:  Oh, okay.  Okay.

7           MR. SRINIVASAN:  This factual question was okay, but

8   I'm not going to follow-up questions.

9           MR. BRAFMAN:  Objection, Judge.  It's hard for me to

10  remember, you know, everything.  But this presumes a duty by

11  the general partner to disclose this to a limited partner,

12  because otherwise why ask the question.  And there is no such

13  duty anywhere in the private placement memorandum.  And just

14  asking him, would you have liked to know, or did you know is

15  just not fair.  It suggests to the jury that there's an

16  obligation by the general partner to inform every limited

17  partner every time they do something.  And the private

18  placement memorandum gives the general partner substantial

19  discretion in what to do and how to do it.  There's no

20  obligation for them to notify him that they're going to borrow

21  money or loan money.  None.

22          THE COURT:  Well, I think there's a distinction

23  between borrowing and lending money for fund purposes versus

24  borrowing money for personal general partner purposes.

25          Are you saying that he has the authority under the

SIDEBAR CONFERENCE

1    private placement memo or any other arrangement to take

2    personal loans from the fund?

3           MR. BRAFMAN:  It's not addressed anywhere, which

4    means there's no legal obligation.

5           THE COURT:  All right.

6           MR. SRINIVASAN:  We're almost done.

7           THE COURT:  Ladies and gentlemen of the jury, I

8    think rather than give you a break, I will dismiss you for the

9    day and ask you to come back at 9:00 in the morning.

10          Please don't talk about the case.  Please leave your

11   notebooks on the chair and, you know, conscientiously avoid

12   any media, please.

13          (Jury exits the courtroom.)

14          MR. BRAFMAN:  Your Honor, I can conceive a hundred

15   different things that a limited partner would like to know,

16   which might peak their interest every time the general partner

17   makes a decision.  But the fact remains that there is nothing

18   in the partnership agreement, or in the private placement

19   memorandum that addresses these matters.

20          THE COURT:  One moment, I just want to excuse the

21   witness, too.  Sorry.  Bear with me.

22          Sir, Mr. Geller, you're excused for the remainder of

23   the day.

24          (Whereupon, the witness was excused.)

25          THE COURT:  All right, so let's hear from the

SIDEBAR CONFERENCE

1    government on this issue, please.

2              MR. SRINIVASAN:  Your Honor, there's nothing in the

3    PPM that authorizes the defendant to take personal loans from

4    the partnership.  And these are the partners' assets, that

5    he's managing.

6              There are provisions, for example, for a 1 percent

7    management fee for operating expenses; there's a 20 percent

8    performance fee that he gets.  Those are the kinds of things

9    that he's allowed to take from the fund.

10             One of the reasons this issue comes up is, I think

11   as we addressed this last time, the 775,000-dollar payment

12   comes back to MSMB Healthcare, the defendant has claimed that

13   this was a payment that will be distributed back to the

14   limited partners.  It was money that belongs to the limited

15   partners, it never happened.

16             THE COURT:  This is a loan?

17             MR. SRINIVASAN:  He classifies it as loan, but this

18   is part of, I think, the process of moving money between

19   entities to pay off Merrill Lynch and various other

20   obligations.

21             So I think it's part of our proof and part of the

22   misappropriation scheme.  This is relevant.  This is money

23   that he's using and he's described it in a certain way and

24   nobody knew about it.

25             MR. BRAFMAN:  I'm not quarreling with you that it's

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    relevant for you to be able to show it through your

2    accountants, which you've already to show the movement of

3    money.  It's not relevant to confront the witness because he

4    has no opinion to offer.  We have a lot of discretion under

5    the terms of the agreement.

6               MR. SRINIVASAN:  We also have to establish that the

7    witness does not know and then argue the other elements, that

8    that's irrelevant for the jury's consideration.  I think we

9    have a duty to find out what the witness knows and or does not

10   know, which is something that Mr. Brafman and his colleagues

11   have been doing repeatedly in his cross-examination of

12   witnesses.

13              MR. BRAFMAN:  Would it be relevant if you knew that

14   the general partner was sleeping on the floor of his office

15   like a vagrant?  Would that be relevant?  It would affect your

16   ability -- your willingness to participate if you knew that

17   the person in charge had these issues?  Why is that different?

18              MR. SRINIVASAN:  That's what the witness knows.  He

19   think that's relevant.

20              MR. BRAFMAN:  That's relevant to who Martin Shkreli

21   is, not what he knows.  You want to put in the loan, you have

22   it in your records.

23              MR. SRINIVASAN:  I'm establishing he doesn't know.

24              MR. BRAFMAN:  But why does he have to know?

25              MS. SMITH:  There's an argument in the testimony,

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1    and we're not putting it into evidence, but Mr. Shkreli's

2    claim has been that he got permission from the limited

3    partners to take out this personal loan.

4              MR. BRAFMAN:  From the limited partners?

5              MS. SMITH:  At least some of the limited partners.

6              MR. BRAFMAN:  I don't think there's any discussion

7    with him about this.

8              MS. SMITH:  There may be with other witnesses, and

9    we would like to establish that this is not, in fact, certain

10   of the investors whether he took it as a personal loan.

11             THE COURT:  Is there going to be evidence about the

12   SEC testimony regarding whether or not certain of the limited

13   partners were aware of the loan?

14             MS. SMITH:  Not from the SEC testimony.  But I think

15   we will establish through our witnesses that they did not

16   know, and then the SEC testimony from the defendant will

17   establish that he classified it as a personal loan and that he

18   did not make a written disclosure.

19             MR. BRAFMAN:  I'm not arguing that there is going to

20   be evidence that Mr. Shkreli took it as a loan.  What I'm

21   suggesting, obviously not compellingly enough, is that just

22   because he does something, doesn't impose an obligation to

23   notify a limited partner who is bound by the partnership

24   agreement.

25             If you and I run a store together, we have a

SIDEBAR CONFERENCE

1   partnership agreement.  It doesn't mean I have to tell you if

2   I borrow money from somebody to put my money into your

3   business.  It doesn't say that.  That's the legal operative

4   document.

5           MS. SMITH:  It's a misuse of corporation funds.

6   You're allowed to take out 1 percent of the management fees.

7   The operating fees are very clear.  There's nothing else in

8   there that let's him take it out.

9           We can argue it, but we have a right to establish

10  that there was no extra agreement outside of that PPM between

11  the partner and Mr. Shkreli that would have permitted him to

12  do that.

13          MR. BRAFMAN:  Your Honor, I made the record.  I

14  don't want to delay.  Everyone's going home.

15          I've questioned this argument.  I've objected.  You

16  have a ruling, and I stand by my objection.

17          THE COURT:  All right.  So just to be clear, I was

18  confused about the prior sidebar where Ms. Smith was going to

19  go back for emails about the personal loan.  And I thought it

20  was going to be put to rest.

21          But to the extent it is directly relevant to the

22  charge that's misappropriated the funds, I think that this

23  should be permitted, and I understand and I overrule your

24  objection.

25          MR. BRAFMAN:  Thank you.

SIDEBAR CONFERENCE

1          MS. SMITH:  And just to make the record clear, we

2    did circle back on the hypothetical that originally followed

3    and agreed that the hypothetical was not appropriate, but that

4    the underlying question was.

5          THE COURT:  All right.  Okay.

6          MR. BRAFMAN:  Good night, Judge.

7          MR. SRINIVASAN:  Thank you, Judge.

8

9          (Proceedings adjourned at 4:50 p.m. to resume on

10   July 13, 2017 at 9:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2   WITNESS                                  PAGE

 3   STEVEN RICHARDSON
     DIRECT EXAMINATION      BY KASULIS         2879
 4   CROSS-EXAMINATION       BY AGNIFILO        2990
     REDIRECT EXAMINATION    BY KASULIS         3090
 5   RECROSS-EXAMINATION     BY AGNIFILO        3092

 6   DAVID GELLER
     DIRECT EXAMINATION      BY SRINIVASAN      3093
 7                         *   *   *   *   *   *
                           I N D E X
 8                          EXHIBITS

 9   GOVERNMENT                    PAGE
     122-39                        2880
10   122-97                        2882
     122-42                        2893
11   122-43                        2910
     122-48, 122-49, 122-50        2915
12   122-53                        2921
     122-58                        2923
13   122-6 and 122-70              2927
     122-71                        2938
14   122-73                        2944
     122-74                        2946
15   122-84                        2961
     122-44                        2979
16   122-92                        2983
     122-99                        3091
17   109-3                         3105
     11A                           3107
18   109-4                         3111
     28                            3115
19   91-1 through 91-10            3117
     109-6                         3122
20   11B                           3123
     109-7                         3126
21
     DEFENDANT                     PAGE
22   4237                          3066

23

24

25
```

COURTROOM DEPUTY: [2] 2877/24
3093/16
MR. AGNIFILIO: [23] 2937/24 2944/1
2946/4 2950/13 2950/20 2952/15
2953/4 2954/6 2961/15 2968/1 3054/5
3057/14 3058/2 3058/9 3064/23 3067/2
3067/11 3068/7 3068/18 3069/8
3074/12 3121/25 3123/21
MR. AGNIFILIO: [82] 2880/6 2881/8
2882/1 2884/16 2885/1 2886/2 2886/17
2886/22 2887/6 2887/9 2888/1 2893/9
2903/23 2910/1 2915/12 2921/6
2923/21 2927/2 2928/11 2971/9
2971/12 2971/15 2972/5 2972/10
2972/13 2972/19 2972/21 2973/7
2973/17 2973/20 2974/1 2974/11
2974/16 2974/21 2975/2 2975/7
2975/10 2975/14 2975/21 2975/24
2976/19 2979/12 2983/6 2986/5 2986/8
2986/10 2989/3 2997/10 3012/14
3012/16 3012/20 3013/4 3013/8
3013/12 3013/18 3013/23 3014/3
3015/16 3016/6 3016/9 3016/19
3016/21 3017/3 3017/10 3017/22
3018/12 3018/14 3018/22 3019/5
3038/4 3040/5 3040/9 3041/4 3041/10
3041/16 3078/17 3078/20 3084/12
3084/16 3090/14 3091/20 3093/2
MR. BRAFMAN: [47] 2878/3 2952/1
3013/20 3014/6 3014/19 3014/22
3015/6 3015/15 3016/2 3019/1 3096/2
3099/5 3099/7 3099/10 3099/15 3101/4
3101/11 3101/20 3101/25 3102/9
3103/5 3103/19 3105/14 3107/9
3111/10 3111/24 3112/1 3113/13
3115/19 3116/4 3117/8 3124/7 3126/6
3131/20 3133/8 3134/2 3134/13
3135/24 3136/12 3136/19 3136/23
3137/3 3137/5 3137/18 3138/12
3138/24 3139/5
MR. KAPLAN: [1] 2887/1
MR. SRINIVASAN: [31] 3093/8
3093/18 3096/6 3100/17 3101/6
3102/23 3105/12 3107/7 3111/9 3112/2
3112/6 3113/15 3115/17 3116/6 3117/6
3121/23 3123/19 3124/8 3126/4 3128/8
3130/8 3131/25 3132/5 3133/6 3134/5
3135/1 3135/16 3136/5 3136/17
3136/22 3139/6
MS. KASULIS: [89] 2878/11 2878/22
2880/4 2881/24 2884/14 2886/1
2886/24 2887/3 2893/7 2909/24
2915/10 2921/4 2923/19 2926/25
2935/21 2937/3 2937/22 2943/24
2946/2 2951/8 2951/21 2951/23
2951/25 2954/7 2961/13 2973/22
2974/2 2974/13 2974/20 2975/5
2975/12 2976/2 2976/7 2976/12
2979/10 2983/4 2986/7 2986/13
2988/25 2989/4 3010/16 3012/9
3012/12 3013/10 3013/14 3014/4
3014/14 3014/20 3014/24 3016/15
3016/20 3018/10 3018/13 3018/17
3021/24 3023/10 3032/17 3033/12
3033/21 3037/1 3037/21 3039/9 3040/3
3041/18 3057/17 3058/1 3062/3

3064/14 3064/23 3064/24 3066/19
3068/9 3071/3 3074/1 3078/2 3078/9
3078/14 3081/24 3082/15 3083/2
3083/8 3084/10 3086/4 3090/8 3090/17
3091/18 3092/11 3092/21 3093/4
MS. SMITH: [28] 2885/8 2886/20
2952/18 2972/7 2972/12 2972/14
2973/3 2973/9 2974/23 2975/25 2976/5
3014/12 3017/6 3018/19 3068/16
3093/13 3100/24 3101/2 3101/18
3101/24 3103/8 3113/19 3136/24
3137/4 3137/7 3137/13 3138/4 3138/25
THE COURT: [178] 2878/1 2878/4
2878/7 2878/13 2878/19 2878/23
2880/7 2881/10 2882/3 2884/17
2884/20 2885/24 2886/12 2887/8
2888/4 2893/10 2903/24 2910/2
2915/13 2921/7 2923/22 2927/3
2928/13 2935/23 2937/1 2937/25
2944/2 2946/5 2950/16 2951/19
2951/22 2951/24 2952/6 2953/10
2954/8 2961/16 2968/2 2971/11 2972/3
2972/16 2972/20 2973/18 2973/21
2974/17 2975/1 2975/3 2975/6 2975/9
2975/17 2975/22 2976/3 2976/8
2976/15 2977/1 2979/13 2983/7 2986/9
2986/11 2986/15 2989/2 2989/7 2990/2
2990/6 3010/17 3012/10 3012/13
3012/15 3012/17 3013/3 3013/17
3013/22 3014/11 3014/23 3015/11
3015/18 3016/3 3016/8 3016/24 3017/5
3017/7 3017/19 3018/6 3018/11
3018/15 3018/23 3019/3 3021/25
3023/11 3032/18 3033/13 3033/23
3034/5 3037/3 3037/22 3038/2 3039/10
3040/4 3040/6 3041/2 3041/6 3041/13
3052/22 3053/5 3054/3 3054/6 3057/12
3057/16 3058/7 3062/4 3066/20
3066/25 3067/3 3067/9 3068/5 3068/8
3068/11 3069/6 3071/4 3076/3 3077/3
3078/16 3078/25 3081/25 3082/16
3083/9 3083/11 3084/11 3084/13
3086/5 3090/9 3090/16 3091/21
3092/22 3093/3 3093/5 3093/15
3093/19 3096/4 3097/7 3099/8 3099/12
3100/16 3100/22 3101/1 3101/10
3102/2 3103/17 3103/20 3104/1
3105/15 3107/10 3111/11 3111/25
3112/3 3113/14 3113/18 3113/21
3115/20 3116/7 3116/11 3117/9 3122/1
3123/22 3126/7 3128/6 3128/10
3131/22 3132/2 3133/5 3133/21 3134/4
3134/6 3134/19 3134/24 3135/15
3137/10 3138/16 3139/4
THE WITNESS: [6] 2878/14 2878/21
2990/7 3057/18 3083/13 3093/17

$

$1,053,000 [1] 2912/5
$1.9 [2] 2987/23 3089/9
$1.9 million [2] 2987/23 3089/9
$10 [1] 2911/21
$10 million [1] 2911/21
$100,000 [1] 2895/6
$11,388 [1] 2911/11
$13,033 [1] 2895/7
$199,938 [1] 3120/8

$2 [2] 2891/7 3075/19
$2 million [1] 3075/19
$2,286,511 [1] 3075/3
$2.3 [1] 2992/8
$2.3 million [1] 2992/8
$20 [1] 2895/16
$210,354 [1] 3119/14
$25 [1] 2895/16
$251,228 [1] 3128/6
$272,760 [1] 3129/24
$299,343 [1] 3130/8
$300,000 [1] 3075/9
$303,247 [2] 2913/13 2914/3
$4.25 [1] 3114/10
$4.90 [1] 2889/14
$40 [2] 2898/6 2925/22
$40 million [1] 2898/6
$400,000 [4] 2894/8 2987/15 2992/1
3089/11
$500 [1] 2966/11
$500 million [1] 2966/11
$548,000 [3] 3080/18 3082/8 3083/5
$548,711 [1] 2913/19
$550,000 [1] 2946/20
$583,482 [1] 2894/14
$602,288.40 [1] 2889/15
$80 [1] 2895/16
$82 [2] 3113/7 3114/11
$82 million [2] 3113/7 3114/11
$86,967 [1] 2895/6
$88 [1] 2897/15
$88 million [1] 2897/15
$9,954,451 [1] 2911/17

'

'14 [5] 2909/11 3007/6 3060/2 3073/21
3073/24
'this [1] 3041/9

-

-------------------------x [2] 2877/2
2877/8
-against [1] 2877/5

0

001 [3] 3038/25 3039/4 3042/17
00637 [1] 2877/2
024 [1] 3049/20

1

1 percent [2] 3135/6 3138/6
1,000 [2] 2882/18 2883/7
1-1 [1] 2997/15
1.5 [1] 2896/7
1.5 million [1] 2896/15
1.9 million [2] 2992/6 3089/12
10 [11] 2898/7 3000/3 3000/3 3117/2
3117/8 3117/10 3117/11 3128/10
3130/1 3130/3 3130/10
10 million [1] 2898/10
10-K [2] 3063/7 3063/10
10.12 [1] 3068/18
10017 [1] 2877/19
109-3 [4] 3105/7 3105/14 3105/16
3105/17
109-4 [4] 3111/3 3111/10 3111/12
3111/13

**109-6 [3]** 3122/2 3122/3 3124/9
**109-7 [2]** 3126/8 3126/9
**10:07 a.m [2]** 3021/23 3022/12
**10:30 [2]** 2927/13 2929/17
**10:30 a.m [1]** 2928/24
**10K [2]** 2916/12 2917/5
**10Q [6]** 2916/12 3063/24 3064/2 3064/8 3064/16 3064/16
**10QA [1]** 3064/17
**11201 [1]** 2877/14
**11939 [1]** 2932/3
**11A [5]** 3106/20 3107/9 3107/11 3107/12 3107/13
**11B [4]** 3123/12 3123/21 3123/23 3123/24
**11th [1]** 3108/16
**12 [6]** 2877/5 2996/11 3021/23 3022/11 3024/3 3068/20
**12 million [5]** 2883/13 2883/21 2883/24 2883/25 2896/6
**12-and-a-half [1]** 3094/9
**12-year [1]** 2993/4
**120 [1]** 3098/6
**122,916 [1]** 2889/14
**122-32 [1]** 3050/22
**122-38 [1]** 2879/18
**122-39 [3]** 2879/19 2880/8 2880/9
**122-41 [3]** 2884/7 2888/6 2893/19
**122-42 [4]** 2893/1 2893/12 2893/13 2904/23
**122-43 [4]** 2909/17 2910/4 2910/5 3078/1
**122-44 [3]** 2979/5 2979/14 2979/15
**122-48 [6]** 2915/3 2915/14 2915/16 2915/18 3057/16 3061/15
**122-49 [4]** 2915/3 2915/14 2915/16 2915/18
**122-50 [5]** 2915/3 2915/15 2915/16 3062/23 3062/24
**122-53 [2]** 2921/8 2921/9
**122-58 [1]** 2923/24
**122-6 [2]** 2927/5 3035/20
**122-64 [1]** 2927/4
**122-70 [4]** 2926/15 2927/4 2927/5 2927/7
**122-71 [2]** 2937/15 2938/3
**122-73 [3]** 2943/15 2944/3 2944/4
**122-74 [2]** 2946/6 2946/7
**122-84 [1]** 2961/18
**122-92 [3]** 2982/21 2983/8 2983/9
**122-97 [3]** 2881/17 2882/5 2882/6
**122-99 [4]** 3091/6 3091/12 3091/23 3091/24
**12:10 [1]** 2989/14
**12:22 a.m [1]** 3034/10
**12th [1]** 3115/23
**13 [7]** 2884/14 2888/13 2888/25 2985/6 3091/18 3092/1 3139/10
**13,033 [1]** 2895/8
**14 [1]** 2897/9
**14,361 [1]** 2895/24
**14th [3]** 2926/11 2937/7 2937/22
**15-CR-00637 [1]** 2877/2
**15th [1]** 3067/20
**1850 [1]** 2992/15
**19 [1]** 3050/22

**19377 [2]** 3064/24 3065/2
**1984 [1]** 3094/13
**19th [1]** 2945/10
**1:05 [1]** 2989/11
**1:08 [1]** 2990/13
**1st [4]** 2983/2 2983/14 3106/18 3107/4

**2**

**2,286,511 [1]** 3065/11
**2.50 [1]** 2891/7
**20 [4]** 2898/6 2957/10 3008/17 3094/5
**20 percent [1]** 3135/7
**20 years [1]** 2998/22
**200,000 [1]** 3115/9
**2006 [1]** 3098/3
**2007 [1]** 3098/3
**2008 [1]** 2993/23
**2009 [5]** 2998/25 3000/22 3000/23 3003/24 3004/23
**2010 [19]** 2995/10 3020/8 3022/11 3024/3 3024/12 3025/1 3025/5 3030/17 3030/19 3030/20 3031/1 3032/3 3032/10 3048/2 3090/5 3091/9 3091/9 3091/18 3092/1
**2011 [31]** 3033/2 3033/4 3033/21 3034/8 3034/10 3034/17 3034/21 3035/22 3039/18 3043/16 3044/10 3044/12 3045/24 3088/19 3095/7 3095/8 3095/23 3106/24 3106/18 3107/4 3111/18 3114/13 3116/2 3117/21 3117/23 3119/11 3120/3 3120/5 3122/9 3123/9 3123/16
**2012 [29]** 2879/5 2879/7 2892/5 2894/14 2905/10 2905/21 2907/5 2911/11 2916/12 3045/22 3046/6 3046/23 3046/25 3046/25 3048/19 3049/6 3050/22 3087/2 3088/20 3095/9 3126/12 3128/1 3128/3 3129/1 3129/16 3129/19 3129/21 3130/3 3130/5
**2013 [59]** 2879/6 2879/7 2880/4 2880/14 2881/24 2882/10 2884/14 2888/14 2888/25 2897/9 2905/7 2905/20 2906/19 2907/2 2907/7 2907/11 2907/23 2909/12 2911/6 2913/8 2913/12 2914/3 2914/18 2914/23 2916/13 2918/11 2918/25 2919/14 2921/12 2925/15 2937/8 2945/25 2946/9 2987/8 2991/23 3007/6 3029/14 3029/16 3054/11 3055/23 3059/10 3059/16 3063/24 3064/6 3064/9 3065/9 3067/19 3067/20 3072/10 3073/4 3074/9 3074/25 3075/8 3075/10 3075/14 3078/2 3078/8 3087/3 3087/4
**2014 [37]** 2905/8 2908/22 2908/25 2909/2 2909/4 2909/9 2909/10 2918/25 2924/6 2924/25 2925/8 2925/11 2925/25 2937/22 2943/23 2944/14 2944/22 2947/9 2948/18 2953/2 2956/17 2960/11 2961/13 2961/20 2963/5 2965/7 2966/7 2966/25 2979/10 2979/18 2983/4 2983/14 2984/25 2985/2 2985/15 2998/25 3060/7
**2015 [4]** 2985/24 2986/2 2987/9 2988/12
**2017 [5]** 2877/5 3017/8 3019/1 3119/9 3139/10

**205,000 [1]** 3118/1
**20s [2]** 3001/16 3001/16
**20th [2]** 2943/23 2944/14
**22 [2]** 3106/4 3114/13
**22 percent [1]** 3114/12
**2268 [1]** 2877/22
**23 [1]** 3111/18
**23rd [1]** 2969/10
**24 [2]** 2880/4 2880/14
**24 million [1]** 2898/8
**24th [1]** 3126/12
**25 years [1]** 2998/22
**25,000 [1]** 2889/18
**25th [2]** 2961/13 2961/20
**26 [1]** 3034/10
**264,361 [1]** 2895/24
**271 [1]** 2877/14
**27th [1]** 3119/9
**28 [5]** 3003/24 3115/11 3115/19 3115/21 3115/22
**28th [3]** 3122/9 3123/9 3123/16
**29 [4]** 3020/8 3090/5 3091/9 3116/2
**29th [2]** 2970/5 3075/10

**3**

**3 million [2]** 2896/7 2938/18
**3.49 [1]** 3114/13
**30 [15]** 2913/8 2913/12 2914/3 2957/10 2979/10 2979/18 2984/25 2985/2 3008/17 3078/8 3106/22 3106/24 3107/13 3108/25 3109/5
**30,000 [1]** 3120/21
**300,000 [3]** 2897/17 2897/25 2902/10
**30th [6]** 2982/16 3064/6 3064/9 3073/4 3074/25 3120/3
**31 [3]** 2911/11 2916/13 3123/12
**31st [1]** 3063/24
**32 [2]** 3050/22 3115/11
**33 [1]** 2943/15
**3500-SR [1]** 2997/14
**36 years [1]** 2993/23
**377 [1]** 3065/1
**38 [1]** 2879/18
**39 [3]** 2879/19 2880/8 2880/9

**4**

**4.90 [1]** 2891/7
**40 [1]** 2957/10
**40-to-50 [1]** 3000/25
**400 [3]** 2992/23 2992/24 2993/3
**400,000 [3]** 2894/12 2894/13 2897/13
**404 [6]** 2972/7 2972/12 2972/14 2972/24 2973/2 2973/5
**41 [3]** 2884/7 2888/6 2893/19
**42 [4]** 2893/1 2893/12 2893/13 2904/23
**4218 [1]** 3020/7
**4221 [1]** 3034/9
**4223 [1]** 3090/5
**4237 [3]** 3066/19 3066/21 3066/22
**43 [4]** 2909/17 2910/4 2910/5 3078/1
**44 [3]** 2979/5 2979/14 2979/15
**45 minutes [1]** 3003/6
**460,000 [1]** 2889/12
**48 [7]** 2915/3 2915/3 2915/14 2915/16 2915/18 3057/16 3061/15
**48 hours [1]** 2924/19
**49 [8]** 2879/18 2879/21 2915/3 2915/14

**4**
49... [4] 2915/16 2915/18 2919/7 3061/9
4:32 p.m [2] 3059/10 3061/16
4:50 [1] 3139/9

**5**
5 percent [6] 2883/11 2883/15 2883/18
 2890/15 2896/6 2897/14
50 [7] 2881/17 2915/3 2915/15 2915/16
 3000/25 3062/3 3062/24
50 minutes [1] 2924/14
503 [1] 2897/8
505 [1] 2893/17
51 [1] 2884/7
52 [1] 2893/1
53 [6] 2909/17 2920/23 2921/8 2921/9
 3072/11 3078/10
54 [2] 2915/4 3057/18
548,711 [1] 3079/5
55 [1] 3057/22
56 [3] 2915/4 3064/15 3064/16
57 [3] 2920/23 3074/12 3074/13
58 [4] 2923/12 2923/12 2923/23
 2923/24
583,482 [1] 2894/16
59 [1] 2926/15
5:00 [1] 2970/4
5:30 call [1] 3059/12

**6**
60 [1] 2926/15
61 [1] 2937/15
63 [1] 2943/15
64 [4] 2926/15 2927/4 2929/12 2945/19
66 [1] 2961/6
67 [1] 2979/5
671,515 [1] 2895/14
68 [1] 2982/21
6th [1] 3072/10

**7**
7.6.1 [1] 2932/17
70 [4] 2926/15 2927/4 2927/5 2927/7
71 [3] 2937/15 2938/1 2938/3
718-613-2268 [1] 2877/22
72 [1] 2941/4
73 [3] 2943/15 2944/3 2944/4
74 [3] 2945/19 2946/6 2946/7
75,000 [1] 2894/22
767 [1] 2877/18
775,000-dollar [1] 3135/11
7th [1] 2881/24

**8**
8 million [4] 2883/12 2883/22 2883/23
 2884/1
8-to-10 [2] 3000/3 3000/3
80 [1] 2994/3
84 [3] 2961/5 2961/17 2961/18
8717 [1] 3074/14
8:30 a.m [3] 2927/15 2927/21 2928/8
8th [3] 2921/13 3074/18 3075/14

**9**
9-10 [1] 3117/8
9.275 million [1] 2911/24
90 percent [1] 3098/9

**9030 [1]** 3025/3
**90-1 [2]** 3116/25 3127/22
**91-1 [5]** 3117/2 3117/8 3117/10 3117/11
 3117/13
**91-10 [4]** 3117/2 3117/10 3117/11
 3130/10
**91-9 [1]** 3130/10
**910 million [1]** 2898/23
**92 [3]** 2982/21 2983/8 2983/9
**935 [1]** 2929/21
**947 [1]** 2932/17
**97 [3]** 2881/17 2882/5 2882/6
**99 [4]** 3091/6 3091/12 3091/23 3091/24
**99,000 [1]** 2882/24
**99,055 [1]** 2882/17
**9:00 [3]** 2877/5 3134/9 3139/10
**9:21 p.m [1]** 3020/8
**9:55 p.m [1]** 3090/5
**9th [6]** 3054/11 3055/23 3059/10
 3059/16 3128/1 3129/19

**A**
a.m [9] 2877/5 2927/15 2927/21 2928/8
 2928/24 3021/23 3022/12 3034/10
 3139/10
abbreviated [1] 3116/18
abilities [1] 2993/19
ability [6] 3016/1 3030/5 3050/8 3057/2
 3124/15 3136/16
able [11] 2881/3 2885/2 2885/16
 2892/14 2962/3 2969/4 2974/7 2985/5
 3041/9 3125/4 3136/1
absolute [2] 3107/19 3108/3
absolutely [5] 2967/23 3014/4 3098/17
 3105/2 3120/15
abusing [1] 2903/1
accelerate [5] 2958/19 2964/6 2964/8
 2995/24 2995/25
accept [2] 2890/24
accepted [1] 3120/21
access [6] 2879/10 2894/15 2905/16
 2958/20 2984/22 3002/18
accessed [2] 2907/15 2935/18
accommodate [1] 2897/18
accomplish [2] 2899/6 3052/1
according [2] 2889/17 3117/25
accordingly [2] 3015/4 3019/5
account [5] 2887/3 2951/25 2993/19
 3024/22 3109/21
accountabilities [1] 2945/16
accountable [2] 2902/25 2931/13
accountant [2] 3110/3 3111/1
accountants [3] 3109/17 3109/25
 3136/2
accounting [9] 2889/8 2890/21 2892/22
 2896/19 2896/24 2897/18 2900/20
 2917/21 3074/20
accounts [3] 2879/10 2905/16 3108/20
accumulated [1] 2891/8
accumulating [1] 2900/15
accurate [18] 2882/25 2890/20 2891/8
 2891/15 2891/16 2891/25 2892/4
 2897/19 2899/14 2900/20 2901/14
 2902/9 3089/20 3110/21 3118/3 3131/5
 3131/7 3131/11
acquire [1] 3114/9
acquired [3] 2912/10 2912/12 2929/7

acquiring [1] 2960/12
acquisition [2] 2968/3 2966/13
acquisitions [2] 2960/15 2966/11
act [3] 2902/21 3008/19 3008/21
acted [3] 2980/7 2980/8 3028/21
actin [2] 3042/11 3042/17
acting [10] 2877/13 2899/10 2907/12
 2908/15 2908/16 2935/2 2935/13
 2935/14 2935/20 2958/15
action [9] 2896/21 2977/23 2982/2
 2984/14 3042/4 3061/2 3075/13
 3075/15 3122/10
actioned [1] 3075/17
actions [3] 2885/24 2896/17 2896/18
actively [2] 2939/10 2943/4
activity [1] 3044/24
actual [7] 2890/25 2922/12 2926/7
 2929/15 3017/16 3130/19 3130/19
add [2] 2923/7 3038/2
added [3] 2895/20 2899/2 2929/1
adding [1] 2882/16
addition [2] 2922/4 3011/17
additional [4] 2894/18 2894/19 2894/22
 3075/8
additionally [1] 2883/7
address [9] 2885/11 2885/15 2885/19
 2910/9 2910/11 2910/13 2975/7
 2983/13 3024/9
addressed [4] 2910/9 2963/21 3134/3
 3135/11
addresses [1] 3134/19
adequate [3] 2924/17 3080/17 3081/12
adequately [1] 2924/19
adjective [1] 2973/21
adjectives [1] 2997/9
adjourned [1] 3139/9
adjunct [1] 2993/8
adjustments [1] 2950/1
administered [1] 3124/22
administrative [3] 2916/9 2981/10
 3117/18
administrator [5] 3129/2 3129/5 3129/9
 3129/12 3129/13
administrators [1] 3110/8
admit [8] 2888/5 2974/10 3107/8
 3111/10 3115/18 3117/7 3121/24
 3126/5
admitted [4] 2887/9 3016/9 3035/19
 3128/10
admittedly [1] 2933/19
advance [1] 2923/9
advice [3] 2967/11 3007/14 3085/17
advised [1] 3047/24
advisers [1] 2985/19
advisor [3] 2994/1 2994/9 2994/12
advisory [3] 2969/6 2969/16 2980/19
affect [2] 3110/23 3136/15
affiliated [3] 3124/20 3125/1
affiliates [3] 2995/16 3069/21
affirmed [2] 2878/18 3093/13
afflicted [1] 3052/21
afflicts [1] 3049/17
afternoon [7] 2929/17 2929/24 2930/3
 2990/11 2990/12 3052/24 3093/23
afterwards [1] 3029/19
age [3] 3001/18 3027/3
agenda [28] 2915/20 2915/25 2921/4

**agenda...** [25] 2921/4 2921/15 2922/12 2924/8 2926/23 2928/21 2929/11 2929/15 2929/21 2929/24 2944/18 2978/22 2978/23 2978/24 3054/14 3054/14 3054/23 3057/6 3057/7 3061/6 3061/8 3061/10 3061/23 3062/16 3072/25

**agendas** [1] 2926/20

**agent** [2] 2880/19 2891/14

**ages** [1] 3001/21

**aggregate** [1] 3114/11

**aggressive** [2] 2982/17 3049/14

**AGN** [1] 2957/14

**AGNIFILO** [11] 2877/20 2973/5 2990/4 2990/10 2990/13 3077/6 3082/17 3082/20 3091/8 3140/4 3140/5

**ago** [7] 2924/14 3015/25 3028/24 3095/18 3098/23 3106/5 3123/18

**agonizing** [1] 2924/15

**agree** [9] 2897/13 2900/20 2902/1 2941/21 2977/24 3019/1 3024/25 3081/15 3083/17

**agreed** [11] 2891/6 2904/17 2940/3 2941/20 2969/12 2969/13 2984/14 2985/8 3065/16 3084/5 3139/3

**agreement** [53] 2919/17 2919/21 2920/12 2920/14 2920/20 2934/9 2934/14 2939/14 2980/25 2981/12 2985/5 2985/7 3055/4 3055/7 3055/16 3055/19 3056/4 3057/9 3058/9 3058/11 3058/22 3058/23 3058/23 3059/8 3059/21 3060/4 3060/11 3060/13 3060/24 3061/18 3061/20 3065/16 3065/22 3068/23 3068/24 3068/25 3069/17 3071/7 3073/9 3073/13 3073/22 3074/20 3075/9 3075/10 3077/12 3104/17 3106/7 3115/13 3134/18 3136/5 3137/24 3138/1 3138/10

**agreements** [39] 2916/19 2917/9 2917/21 2918/3 2918/6 2918/8 2918/9 2918/12 2984/9 2984/10 2991/10 2991/13 2991/16 2991/19 3059/5 3059/9 3059/19 3061/2 3062/11 3065/10 3065/19 3065/23 3066/1 3066/8 3066/10 3066/11 3066/12 3071/2 3071/3 3071/10 3075/2 3075/17 3076/14 3077/15 3077/16 3077/18 3077/20 3081/8 3081/9

**ahead** [10] 2924/16 2924/18 2938/10 2942/17 2956/12 2962/23 2963/13 2968/11 3022/2 3081/18

**aided** [1] 2877/24

**air** [1] 2902/22

**Al** [3] 2919/10 2919/16 2919/21

**Alan** [3] 3057/8 3058/14 3095/21 3101/18

**alarm** [1] 2978/4

**aligned** [1] 2930/18

**ALIXANDRA** [1] 2877/15

**allegation** [1] 2952/17

**alleged** [1] 2952/8

**alleging** [2] 2951/21 2972/13

**allocution** [1] 2896/1

**allow** [2] 2924/18 2924/18

**allowable** [1] 2971/8

**allowed** [6] 2971/8 2974/10 2984/20 2984/20 3135/6 3138/6

**almost** [4] 2960/14 3041/8 3056/11 3134/6

**alone** [3] 2905/25 2975/22 3021/4

**amazingly** [1] 2900/13

**amended** [5] 2916/15 2916/21 3063/7 3063/23 3064/16

**amendments** [1] 2916/12

**AMERICA** [1] 2877/3

**American** [4] 2992/10 2992/12 2993/23 3008/5

**AMEX** [1] 2992/25

**amount** [6] 2918/3 2938/19 2999/17 3085/12 3097/6 3115/5

**amounts** [2] 2911/16 3065/18

**analysis** [1] 3039/17

**anchors** [1] 3042/10

**ANDREA** [1] 2877/20

**Andrew** [2] 3043/21 3050/18

**angle** [1] 3080/25

**angst** [1] 2943/3

**announce** [1] 2969/4

**announced** [3] 2988/11 3111/23 3114/8

**announcement** [1] 2928/4

**annual** [5] 2956/23 2956/25 2959/4 2965/14 2985/25

**annually** [2] 2965/13 3064/4

**answer** [14] 2928/15 2947/21 2950/15 3008/6 3016/24 3022/2 3036/14 3041/2 3041/2 3044/23 3062/14 3088/16 3090/10 3092/23

**answered** [1] 3036/1

**anticipated** [1] 2955/13

**anxiety** [2] 3006/24 3007/2

**anyway** [1] 2954/6

**AOL** [1] 2887/2

**aol.com** [1] 3122/25

**apart** [3] 2900/18 2986/15 2987/24

**apartment** [9] 3000/8 3000/8 3000/10 3002/18 3003/3 3004/17 3004/21 3004/22 3089/17

**apologetic** [1] 2899/17

**apologies** [1] 2917/1

**apologize** [4] 2902/21 2997/12 3067/24 3084/17

**appear** [3] 2893/18 2893/25 2913/5

**APPEARANCES** [1] 2877/11

**appearing** [2] 3033/6 3076/20

**apples** [1] 3102/10

**application** [1] 3033/19

**apply** [1] 2951/17

**appoint** [1] 2957/19

**appointed** [7] 2909/1 2909/23 2922/2 2964/23 2986/22 2987/1 2987/2

**appointing** [1] 2979/3

**appointment** [2] 2922/16 2922/17

**appreciate** [1] 2900/10

**approach** [6] 2884/17 2938/18 2941/21 2971/11 3040/6 3066/25

**appropriate** [5] 2933/25 2941/22 2954/1 2968/20 2968/20 2977/17 3084/7 3086/19 3139/3

**appropriately** [1] 2981/22

**approval** [8] 2980/2 2991/8 3031/16 3036/21 3037/9 3049/4 3060/6 3071/25

**approve** [2] 2916/11 2918/5 2919/10

**approved** [10] 2919/21 2919/24 2947/3 2947/10 2977/11 2980/1 2980/3 2980/5 2981/8 3060/6

**approving** [1] 2934/14

**approximate** [1] 3114/12

**April** [6] 3043/16 3044/10 3044/12 3049/6 3091/18 3092/1

**April 13** [2] 3091/18 3092/1

**April 2011** [3] 3043/16 3044/10 3044/12

**April 2012** [1] 3049/6

**area** [3] 2931/24 2993/5 3086/17

**areas** [3] 2955/16 2957/22 2995/5

**arguably** [1] 3018/9

**argue** [6] 3101/3 3102/25 3103/14 3116/8 3136/7 3138/9

**arguing** [1] 3137/19

**argument** [4] 3018/20 3102/24 3136/25 3138/15

**arising** [1] 3065/18

**arm** [1] 2929/8

**arm's** [1] 3017/15

**arranged** [2] 2967/4 3081/7

**arrangement** [1] 3134/1

**arrive** [2] 2901/17 2928/8

**arrived** [1] 2938/21

**ASAP** [1] 2889/23

**Aselage** [46] 2895/24 2907/1 2907/6 2908/2 2922/6 2925/9 2927/16 2944/21 2957/20 2958/2 2958/24 2959/16 2959/22 2961/11 2961/21 2965/19 2965/20 2966/3 2966/21 2968/24 2969/10 2969/11 2969/18 2970/3 2970/9 2976/3 2977/21 2978/3 2978/14 2978/16 2979/3 2980/14 2981/14 2983/12 2984/15 2984/16 2984/18 2985/4 3050/25 3054/18 3062/25 3072/19 3076/1 3076/5 3076/13 3078/3

**Aselage's** [2] 2910/9 2910/11

**aside** [4] 2914/19 2922/24 2933/9 2947/6

**aspects** [2] 2890/16 3030/6

**aspiration** [1] 3037/19

**assessed** [1] 2891/6

**assessment** [2] 2893/6 2901/13

**asset** [1] 3038/25

**assets** [5] 3046/21 3113/11 3124/23 3124/24 3135/4

**assimilating** [1] 3039/22

**assistant** [4] 2877/16 2927/10 2927/11 3094/17

**assisted** [1] 3094/25

**associate** [2] 2924/4 2952/23

**associates** [3] 2877/18 2923/17 3011/7

**assume** [2] 3001/17 3005/25

**assumed** [6] 2897/21 2907/4 2907/21 3001/16 3085/6 3085/9

**assumes** [1] 3131/21

**assuming** [6] 2958/25 2964/21 2964/22 3041/3 3041/5 3044/23

**assurance** [1] 3125/3

**assured** [2] 2948/9 2949/13

**atmosphere** [1] 2933/23

**attached** [11] 2915/9 2924/8 2941/23 2962/16 2962/18 2962/21 3057/16 3072/23 3073/6 3074/1 3122/7

# A

**attachment [10]** 2926/24 2932/2 2932/4 2961/25 2962/23 2962/25 2963/1 2963/3 3107/6 3122/16

**attachments [16]** 2910/23 2919/18 2921/4 3054/25 3055/1 3055/3 3055/13 3056/18 3056/21 3063/4 3105/11 3106/5 3106/6 3122/17 3122/19 3124/10

**attempting [2]** 2931/6 3107/19

**attend [1]** 2944/21

**attendees [2]** 2926/24 2927/15

**attending [2]** 2927/11 2927/14

**attention [14]** 2909/12 2914/18 2924/25 2925/25 2932/2 2932/16 2936/3 2941/3 2944/6 2956/17 2961/4 2966/25 2980/6 2989/11

**attorney [2]** 2877/13 2952/10

**Attorneys [1]** 2877/16

**attract [2]** 2898/18 2898/21

**attracting [1]** 2907/16

**attractive [1]** 2898/21

**audit [9]** 2922/3 2922/5 3064/5 3073/3 3081/19 3081/20 3082/24 3109/18 3109/25

**audited [1]** 3124/22

**auditor [6]** 2922/11 3075/18 3076/24 3110/10 3110/23 3111/1

**auditors [9]** 2916/16 2916/22 2917/4 2957/4 2957/4 3074/2 3074/3 3074/19 3110/6

**audits [1]** 3110/4

**August [3]** 3075/8 3075/10 3117/21

**August 2013 [1]** 3075/8

**August 29th [1]** 3075/10

**August 9 [1]** 3117/21

**Australia [1]** 2998/12

**authentic [2]** 2885/17 2886/14

**authority [2]** 2981/7 3133/25

**authorizes [1]** 3135/3

**autism [3]** 3006/21 3006/22 3015/25

**autistic [2]** 3015/22 3015/22

**available [6]** 2880/2 2905/15 2916/7 2977/11 2977/12 3061/5

**Avenue [3]** 2877/18 3044/10 3044/13

**avoid [2]** 2902/24 3134/11

**aware [20]** 2918/9 2918/12 2935/17 2949/3 2949/5 2949/24 2956/15 2958/16 2973/6 2973/6 2973/8 2982/12 2986/25 3045/14 3046/23 3077/11 3077/13 3077/14 3079/14 3137/13

# B

**baby [8]** 3008/16 3047/11 3047/14 3047/18 3047/19 3047/20 3047/21 3047/22

**backed [1]** 3079/15

**background [10]** 2903/9 2906/10 2922/2 2972/25 2973/1 3002/7 3094/10 3094/14 3096/14 3098/24

**bad [2]** 2968/18 3030/10 3084/3 3100/5 3100/9 3101/17 3103/7

**bag [2]** 3005/1 3007/19

**balance [10]** 2911/11 2913/8 2913/12 2914/3 3097/22 3117/25 3119/12 3120/7 3128/4 3129/23

**balanced [2]** 3097/2 3126/25

**balances [2]** 3097/5 3110/14

**bang [1]** 2959/11

**bank [2]** 2879/10 2905/16

**Banta [18]** 2919/10 2919/25 2929/10 2934/2 2934/5 2934/15 3000/10 3000/12 3000/16 3055/7 3055/15 3057/23 3058/25 3059/2 3059/20 3059/25 3061/20 3062/18

**bar [2]** 3014/8 3015/6

**barred [1]** 3015/9

**base [2]** 3097/9 3104/10

**based [3]** 2947/1 2951/1 2987/21

**basic [2]** 3095/6 3104/15

**basis [6]** 2904/24 2919/4 2919/5 2948/11 3024/18 3109/5

**batch [2]** 2909/8

**Bates [14]** 2929/21 2932/3 2932/16 3064/23 3064/24 3067/14 3106/10 3107/14 3108/16 3109/13 3115/23 3117/24 3123/3 3124/4

**Bates-numbered [1]** 3124/4

**bath [7]** 3021/24 3022/10 3022/13 3022/21 3023/3 3023/20 3023/21

**bear [4]** 2879/20 2930/22 2997/12 3134/21

**beat [1]** 2977/18

**became [7]** 2905/14 2940/20 2982/18 3065/10 3075/2 3094/17 3095/18

**become [2]** 2925/21 2964/13 2965/3 3036/20

**becomes [1]** 2898/20

**becoming [2]** 2905/9 2960/24

**bed [1]** 3014/10

**begin [1]** 2901/11

**beginning [4]** 2925/8 2925/11 3044/4 3095/23

**begun [1]** 2952/21

**behalf [5]** 2895/9 2953/20 3060/15 3070/18 3071/8

**behave [1]** 3008/8

**behind [9]** 2900/17 2959/3 3030/23 3034/16 3063/13 3065/25 3075/17 3075/20 3106/24

**believes [3]** 3065/11 3075/3

**belongs [1]** 3135/14

**below [10]** 2890/21 2890/24 2895/10 2895/18 2895/22 2896/4 2912/1 2912/8 2981/4 2981/14

**benefit [1]** 3060/20

**BENJAMIN [1]** 2877/19

**berating [1]** 2973/12

**best [8]** 2898/3 2919/22 2977/15 2981/1 2995/7 3045/24 3048/17 3061/5

**better [5]** 2997/5 3022/10 3022/15 3092/6 3092/18

**between [18]** 2881/22 2884/12 2888/10 2896/7 2952/7 2952/22 2959/19 2960/23 2984/15 2992/7 3008/15 3016/15 3018/6 3077/21 3089/16 3133/23 3135/18 3138/10

**beyond [1]** 3087/7

**bias [1]** 3018/20

**Biestek [3]** 2937/20 3003/10 3050/18

**big [10]** 2899/15 2925/20 2955/13 3098/3 3098/9 3105/8 3105/9 3108/3 3121/16 3121/18

**bigger [1]** 2948/8

**biggest [1]** 2898/4

**bill [1]** 3062/5

**billion [1]** 2977/19

**binder [33]** 2879/18 2879/21 2881/17 2884/7 2893/1 2909/17 2915/4 2920/24 2923/12 2926/16 2937/15 2943/16 2945/19 2961/6 2979/5 2982/21 2989/6 3078/10 3105/8 3105/9 3105/9 3111/3 3115/11 3116/25 3120/1 3121/16 3121/18 3123/12 3123/25 3125/23 3127/22 3127/23 3127/24

**binders [1]** 3093/15

**bio [1]** 3036/16

**biochemical [1]** 3033/9

**biopharmaceutical [1]** 3120/24

**biotechnology [2]** 3111/22 3114/7

**bit [11]** 2933/19 2941/18 2943/3 2955/21 2956/10 3001/13 3001/23 3007/16 3022/7 3033/5 3131/1

**black [1]** 3095/10

**blank [1]** 3069/1

**Blanton [3]** 2920/7 2920/12 3043/6

**blatantly [1]** 2971/3

**blessing [3]** 3006/7 3006/12 3010/3

**blind [3]** 2891/13 2891/18 2892/1

**blindly [1]** 2891/24

**blindsided [1]** 2956/6

**blocks [1]** 3109/11

**Blue [2]** 3004/11 3004/12

**board [227]** 2889/25 2890/2 2895/21 2899/4 2905/11 2906/2 2906/4 2907/6 2907/22 2907/25 2908/4 2908/18 2908/20 2909/3 2909/6 2909/13 2909/24 2910/17 2910/18 2911/9 2914/13 2914/20 2915/10 2915/22 2916/10 2916/17 2917/4 2918/5 2919/20 2919/23 2920/1 2920/11 2920/19 2921/3 2921/4 2921/4 2921/11 2921/23 2921/24 2922/2 2922/4 2922/17 2922/21 2923/1 2923/18 2924/9 2924/16 2925/3 2925/6 2925/7 2926/1 2926/4 2926/7 2927/12 2927/22 2929/25 2930/17 2931/4 2931/19 2932/9 2932/13 2933/5 2933/11 2934/8 2934/11 2934/19 2935/7 2935/16 2935/17 2935/18 2937/8 2938/13 2938/15 2939/9 2939/14 2940/4 2940/24 2941/15 2941/21 2941/25 2942/2 2942/7 2942/11 2942/14 2942/17 2942/23 2943/3 2943/6 2943/11 2943/21 2944/11 2944/17 2944/21 2945/4 2945/14 2946/16 2947/3 2953/12 2953/14 2953/16 2953/17 2956/7 2956/8 2956/13 2956/18 2956/22 2957/12 2957/15 2958/16 2958/20 2958/20 2959/2 2960/16 2960/24 2961/24 2962/4 2962/8 2962/15 2962/18 2963/2 2963/9 2963/22 2965/6 2966/1 2966/5 2966/8 2966/15 2967/8 2967/25 2968/8 2968/12 2968/16 2968/21 2969/5 2969/16 2970/1 2970/19 2971/3 2973/25 2974/7 2974/20 2975/19 2976/14 2978/19 2978/21 2978/25 2979/1 2979/8 2979/17 2980/2 2980/4 2980/5 2982/4 2982/9 2983/16 2983/20 2984/24 2985/1 2985/7 2985/18

**board... [66]** 2985/20 2985/24 2986/1 2986/2 2986/3 2986/7 2987/1 2987/6 2987/9 2987/10 2987/16 2988/3 2988/12 2988/15 2988/18 2988/22 2990/19 2991/22 2992/7 2995/15 2995/20 2995/21 2995/21 2996/2 2996/4 2996/7 2996/12 2996/17 2996/18 2996/20 2996/21 3039/12 3043/21 3046/11 3054/23 3056/9 3056/15 3056/24 3059/14 3060/5 3061/2 3062/11 3071/9 3071/15 3072/3 3072/4 3072/16 3072/25 3076/15 3076/15 3077/3 3078/3 3080/1 3080/8 3081/11 3081/14 3083/20 3083/24 3084/18 3085/4 3085/10 3085/24 3087/8 3087/10 3111/23 3114/8
**Board's [2]** 2976/10 2982/14
**BOD [3]** 2938/14 2983/14 2983/16
**body [2]** 2938/12 3049/13
**bold [1]** 2889/13
**book [3]** 3058/24 3064/13 3066/17
**booking [1]** 3110/19
**books [4]** 2917/22 3074/4 3077/8 3077/22
**boomer [1]** 3008/16
**borough [1]** 3094/2
**borrow [3]** 2983/21 3133/20 3138/2
**borrowing [2]** 3133/23 3133/24
**Boston [3]** 2993/25 2994/2 2994/16
**bothered [1]** 3119/24
**bottom [13]** 2889/2 2893/17 2897/7 2913/11 2924/1 2946/1 3068/15 3068/15 3068/19 3078/13 3078/23 3119/15 3120/9
**bought [1]** 3005/8
**bound [1]** 3137/23
**boxes [1]** 3095/10
**boy [1]** 3094/9
**BRAFMAN [6]** 2877/18 2877/19 3015/20 3017/8 3018/25 3136/10
**breaches [1]** 2970/21
**break [9]** 2920/2 2934/7 2935/23 2935/25 3052/24 3052/24 3058/14 3095/9 3134/8
**breakthrough [1]** 2962/10
**breakthroughs [1]** 2962/6
**bridge [1]** 3114/22
**BRIDGET [1]** 2877/12
**brief [2]** 2989/7 3104/21
**briefed [1]** 3104/20
**briefly [3]** 3000/15 3090/18 3132/2
**bring [17]** 2878/3 2916/10 2919/2 2922/4 2925/18 2934/13 2960/5 2960/7 2972/25 2990/5 3007/8 3032/11 3035/14 3037/10 3046/19 3047/8 3053/1
**bringing [11]** 2898/19 2906/1 2906/2 2959/22 2960/13 2960/17 2985/19 3034/23 3035/12 3038/17 3046/14
**broad [3]** 2947/1 3033/19 3038/8
**broad-based [1]** 2947/1
**Broadway [6]** 3026/1 3026/2 3027/6 3027/15 3044/5 3044/6
**broke [2]** 2990/18 2991/21
**broken [2]** 2913/6 2998/2
**brokerage [4]** 2880/22 3094/20 3099/2

3110/12
**Brooklyn [2]** 2877/4 2877/14
**brother [7]** 3006/21 3006/23 3007/12 3038/9 3095/21 3100/11 3101/18
**Brothers [2]** 3094/18 3094/19
**brought [9]** 2919/23 2920/1 2934/11 2980/2 3046/10 3056/13 3056/15 3060/5 3077/15
**brunch [1]** 3004/14
**brushing [1]** 3007/17
**BS [1]** 3094/11
**bubble [7]** 3021/24 3022/10 3022/13 3022/21 3023/3 3023/20 3023/21
**bud [1]** 2947/24
**build [9]** 2906/1 2906/5 2906/8 2947/2 2960/20 2977/18 3033/12 3048/12 3050/14
**building [13]** 2906/2 2906/3 2906/7 2907/16 2925/15 2960/5 2960/6 2963/14 3030/18 3033/16 3043/11 3043/13 3043/15
**built [1]** 2998/23
**bullet [3]** 2930/8 2930/12 3040/3
**buried [1]** 2962/7
**burning [1]** 2914/11
**business [33]** 2931/5 2931/9 2931/12 2937/10 2960/14 2963/18 2964/17 2964/24 2967/14 2967/21 2971/4 2975/20 2976/11 2983/13 2990/23 2990/23 2990/25 2994/24 2995/2 3008/3 3011/6 3011/6 3017/15 3027/24 3028/14 3029/17 3035/6 3039/22 3046/14 3046/15 3048/23 3048/24 3138/3
**businesses [3]** 2994/20 3111/22 3114/7
**bust [1]** 3103/4
**busy [2]** 2960/12 2961/2
**buy [2]** 3031/5 3050/11
**buying [3]** 3095/3 3095/3
**buys [1]** 3048/24

# C

**C1 [1]** 2942/1
**Cadman [1]** 2877/14
**Cafe [3]** 3003/21 3003/22 3003/23
**calculation [2]** 2891/5 2896/11
**calendar [1]** 3108/23
**Canada [1]** 2998/14
**Canadian [1]** 2998/16
**candidate [3]** 2888/14 2906/22 2922/20
**candidates [3]** 2888/20 2906/11 2925/18
**Cap [2]** 3051/3 3052/20
**capabilities [2]** 2906/6 2925/16
**capability [1]** 2906/1
**capable [3]** 2996/25 2996/25 2997/5
**capacity [6]** 2953/14 2991/24 2992/25 2993/11 2994/9 3080/1
**capital [45]** 2882/14 2885/11 2889/3 2889/9 2894/9 2903/22 2905/22 2918/1 2947/19 2947/20 2987/17 2988/1 3021/19 3025/23 3043/24 3044/2 3045/24 3046/4 3046/7 3046/11 3046/14 3046/24 3047/1 3047/6 3069/2 3069/3 3069/4 3069/12 3069/14 3069/15 3075/1 3075/18 3099/4 3100/4

3100/5 3101/14 3101/20 3108/14 3108/20 3109/20 3111/20 3111/5 3124/16 3124/21
**capital's [1]** 3046/17
**capitalization [9]** 2883/18 2890/17 2891/21 2892/5 2895/23 2896/22 2904/19 3050/22 3085/20
**capitalized [1]** 3115/4
**captured [2]** 2916/21 3079/18
**car [1]** 3003/11
**carbon [1]** 2961/21
**care [7]** 3007/21 3015/17 3030/5 3097/3 3108/7 3108/8 3122/13
**cared [3]** 3010/1 3025/13 3025/15
**career [2]** 3100/9
**careful [2]** 2956/12 3126/14
**carefully [2]** 3018/24 3122/12
**careless [1]** 3101/16
**caring [4]** 3006/17 3006/19 3009/14 3011/5
**carried [2]** 2930/1 2930/2
**carries [1]** 2980/10
**carry [1]** 3125/2
**carrying [1]** 3022/8
**case [9]** 2898/5 2936/2 2949/25 2952/21 2989/12 3015/15 3049/3 3103/2 3134/10
**cases [1]** 3048/10
**cash [18]** 2889/12 2905/14 2911/5 2911/11 2913/8 2913/12 2914/3 2930/8 2946/19 2987/14 3078/8 3081/9 3097/14 3097/15 3098/21 3098/21 3109/4 3113/7
**casting [1]** 3027/2
**catalyst [1]** 3028/21
**catches [1]** 2939/8
**caused [2]** 2918/6 2918/10
**causes [1]** 3039/4
**cc [1]** 2922/7
**cell [6]** 3039/9 3040/2 3041/15 3042/10 3042/12 3042/18
**cells [1]** 3042/11
**center [1]** 2900/12
**central [1]** 3016/13
**CEO [45]** 2904/6 2907/4 2907/8 2940/9 2941/19 2941/20 2945/5 2945/11 2945/16 2946/9 2946/24 2951/11 2960/23 2964/7 2964/13 2964/23 2965/16 2966/21 2968/13 2968/18 2969/3 2969/4 2969/12 2969/15 2970/17 2970/20 2972/10 2974/9 2979/2 2979/3 2981/21 2982/15 2983/24 2987/4 2990/19 3035/24 3036/2 3036/4 3060/19 3060/21 3083/18 3083/21 3084/6 3084/10
**certain [15]** 2970/16 2971/8 2996/20 2999/17 3013/11 3059/2 3077/21 3084/19 3097/6 3108/20 3109/21 3110/17 3135/23 3137/9 3137/12
**certainly [41]** 2879/9 2892/19 2899/12 2904/1 2919/23 2939/18 2941/11 2948/9 2952/22 2954/1 2958/11 2968/14 2996/25 3004/1 3005/7 3006/4 3009/5 3009/6 3009/11 3009/24 3010/14 3011/9 3021/14 3029/8 3029/11 3029/25 3030/6 3031/2 3032/4 3033/17 3037/6 3037/17 3038/17

**C**

**certainly...** [8]  3038/19 3039/23 3056/1 3056/6 3059/8 3059/22 3086/9 3086/16
**certificates** [4]  2880/2 2880/16 2880/21 2880/21
**certified** [4]  3109/17 3109/24 3110/3 3111/1
**CFO** [5]  2914/14 2977/22 2978/8 3080/5 3080/9 3081/13
**chain** [8]  2882/10 2888/10 2888/10 2893/17 2897/6 2902/16 2904/23 2944/9
**chair** [2]  2936/1 3134/11
**chairman** [8]  2965/3 2965/4 2965/6 2967/25 2970/12 2980/8 2996/4 2996/8
**chance** [5]  2957/4 3056/12 3056/18 3056/21 3067/8
**change** [7]  2886/1 2890/12 3023/9 3024/6 3071/9 3127/1 3128/23
**changed** [6]  2890/11 2904/25 2907/3 3023/5 3023/6 3023/16
**changes** [5]  2902/4 2902/19 3122/11 3124/17 3131/16
**changing** [3]  2917/23 3052/20 3125/10
**charge** [3]  3017/17 3136/17 3138/22
**charged** [8]  2952/8 2972/2 2972/4 2972/18 2973/16 2975/5 2975/23 2977/3
**charges** [2]  2952/14 2952/20
**charter** [1]  2995/25
**chat** [2]  2959/15 3126/20
**chatting** [2]  2938/20 3001/11
**check** [3]  2887/4 2895/8 2956/11
**checked** [2]  2949/1 2950/9 3024/14 3133/4
**checking** [5]  2949/9 3023/4 3023/5 3023/6 3023/18
**checks** [1]  3110/14
**chemistry** [1]  3041/15
**chief** [17]  2888/20 2906/14 2906/15 2906/20 2906/23 2929/3 2929/4 2959/20 2980/16 2980/18 2981/2 2981/7 2981/15 2993/6 3065/9 3069/16 3075/1
**children** [4]  3049/12 3049/17 3050/3 3094/8
**choice** [1]  2880/22
**chose** [5]  2903/14 2903/17 2940/7 2940/10 3103/14
**chosen** [2]  2903/21 2978/2
**Chris** [1]  2978/9
**chronologically** [1]  2882/10
**churned** [1]  3001/1
**circle** [1]  3139/2
**circulated** [3]  2908/23 2935/21 3073/20
**circumstances** [1]  2978/5
**cited** [1]  3083/17
**City** [2]  2924/14 3094/1
**civilly** [1]  2973/17
**claim** [1]  3137/2
**claimed** [1]  3135/12
**claims** [1]  3069/19
**clarified** [1]  2904/24
**clarify** [7]  2882/11 2896/21 3009/13 3033/24 3036/13 3051/7 3066/2
**clarifying** [1]  3066/16
**clarity** [2]  2959/18 2959/19

**class** [2]  2947/3 3120/22
**classic** [1]  2999/6
**classified** [1]  3137/17
**classifies** [1]  3135/17
**clean** [2]  3007/19 3078/19
**clear** [21]  2885/9 2891/22 2895/25 2897/20 2897/22 2924/20 2925/7 2972/19 2975/15 2984/19 2990/15 3005/21 3021/11 3038/23 3067/15 3068/15 3098/11 3102/20 3138/7 3138/17 3139/1
**clearest** [2]  2886/25 2887/5
**clearly** [10]  2882/23 2928/18 2943/3 2968/10 2973/4 3009/15 3014/1 3039/16 3092/15 3102/25
**client** [2]  2994/15 3005/15
**clients** [3]  2994/13 2995/4 2995/5
**clinical** [6]  2933/17 3011/24 3031/17 3031/21 3050/1 3050/14
**close** [9]  2911/22 2923/2 2953/12 3006/15 3017/3 3017/21 3026/2 3088/17 3097/9
**closed** [2]  2940/9 2947/24 2991/5
**closer** [1]  3129/17
**closing** [1]  3114/12
**clothes** [1]  3005/11
**Club** [12]  2926/13 2933/12 2934/19 2939/9 2939/20 2939/23 2940/2 2940/18 2943/7 2943/10 2943/12 2944/21
**clue** [1]  3101/17
**CNBC** [1]  3099/2
**Coast** [1]  3029/18
**cocktail** [4]  3000/4 3000/21 3001/1 3002/3
**cocky** [3]  3001/6 3002/9 3002/20
**coconspirator** [4]  2952/8 2952/18 2953/7 2953/8
**cold** [1]  3008/24
**collaborate** [1]  2995/17
**collared** [1]  3096/4
**colleague** [5]  2908/25 2916/25 2917/1 3009/8 3043/20
**colleagues** [3]  2962/4 3001/10 3136/10
**collective** [4]  2962/15 2962/18 3047/21 3048/13
**college** [2]  3094/15 3094/16
**columns** [1]  3051/15
**comfortable** [4]  3009/18 3049/1 3075/16 3080/9
**coming** [14]  2891/21 2892/3 2927/10 2928/6 2959/20 2960/22 2964/11 2968/12 2973/3 3023/4 3024/8 3047/1 3080/9 3102/13
**comma** [1]  2946/24
**commencing** [1]  3108/23
**comment** [1]  3018/8
**commentaries** [1]  3028/25
**comments** [3]  3006/8 3006/10 3017/1
**commercial** [1]  2960/4
**commercially** [1]  3050/9
**commission** [7]  2932/19 2947/18 2967/15 2967/20 2990/23 2997/2 3088/9
**commit** [1]  2900/17
**commitments** [3]  2883/17 2890/23 2963/17

**committed** [2]  2895/7 2939/3
**committee** [7]  2922/5 2927/12 2927/22 2934/3 2945/3 2945/15 2987/1
**committees** [1]  2922/3
**commodities** [2]  2932/19 2932/22
**common** [7]  2882/18 2980/21 3044/15 3044/18 3058/18 3114/10 3120/22
**communicate** [1]  2969/22
**communication** [10]  2902/8 2965/21 2969/7 2969/14 2969/19 2969/20 2977/17 2977/23 3064/5 3073/3
**communications** [5]  2918/13 2937/9 2952/22 2981/19 3034/21
**comp** [1]  2945/2
**companies** [7]  2992/12 3011/18 3011/20 3031/24 3107/21 3108/7 3108/8
**company** [152]  2879/9 2880/19 2883/19 2889/21 2889/24 2890/16 2897/14 2897/15 2898/21 2900/1 2900/4 2905/9 2905/25 2907/5 2909/2 2911/5 2911/13 2912/10 2914/4 2918/17 2918/24 2925/18 2925/21 2927/11 2929/4 2929/8 2930/16 2930/25 2931/1 2931/5 2931/23 2931/23 2935/14 2935/20 2940/8 2942/10 2942/18 2951/12 2957/2 2957/3 2957/6 2957/20 2958/7 2958/15 2959/23 2961/24 2963/4 2963/23 2964/18 2966/12 2968/14 2968/19 2968/21 2968/22 2969/21 2970/2 2970/14 2970/16 2971/7 2972/18 2973/20 2974/8 2974/15 2975/20 2976/11 2976/14 2977/18 2978/2 2980/17 2980/19 2980/21 2980/25 2981/1 2981/3 2981/7 2981/23 2982/10 2982/13 2984/5 2985/7 2985/8 2985/9 2985/11 2985/13 2991/3 2991/4 2991/16 2993/21 3006/4 3009/16 3010/9 3011/21 3026/15 3030/18 3031/9 3031/15 3032/8 3033/7 3033/9 3033/12 3034/14 3034/15 3036/5 3036/6 3036/9 3036/16 3036/20 3037/5 3037/10 3039/12 3039/20 3047/1 3047/6 3047/9 3048/5 3048/12 3048/18 3048/24 3048/25 3049/2 3049/2 3049/3 3049/4 3050/13 3052/9 3052/14 3059/6 3060/18 3063/12 3063/21 3065/9 3065/11 3065/15 3065/17 3069/5 3072/3 3075/1 3075/3 3075/8 3075/21 3076/17 3076/23 3079/16 3080/7 3081/22 3084/21 3096/18 3096/20 3115/5 3116/4 3116/17 3120/23
**company's** [3]  2910/19 2980/11 3088/2
**compellingly** [1]  3137/21
**compensate** [1]  2946/16
**compensated** [1]  2987/6
**compensation** [16]  2945/6 2945/6 2945/11 2945/12 2945/15 2945/16 2945/24 2946/9 2946/19 2947/4 2947/10 2967/16 2987/10 2987/15 2988/3 3058/14
**compiled** [1]  2941/9
**complain** [2]  3008/22 3008/25
**complaining** [1]  3030/12
**complaint** [4]  2947/18 3088/13 3088/17 3088/21

**C**

**complementary [1]** 3006/14
**complete [4]** 2932/10 2932/11 2932/14 2933/2
**completed [1]** 2933/6
**completely [2]** 3084/15 3103/11
**completion [1]** 3114/14
**complex [2]** 2964/16 2964/24
**complexity [1]** 2970/17
**compliance [1]** 2983/19
**components [1]** 3126/19
**compounded [1]** 2891/1
**comprised [1]** 2988/20
**compromise [1]** 3069/18
**computer [2]** 2877/24 3095/10
**computer-aided [1]** 2877/24
**computers [1]** 3044/22
**conceive [1]** 3134/14
**concept [1]** 3046/8
**concepts [1]** 3010/11
**concern [15]** 2890/8 2890/12 2899/25 2923/4 2949/9 2950/4 2963/12 2978/4 3018/18 3018/19 3048/4 3048/8 3083/20 3084/18 3113/13
**concerned [6]** 2938/19 2941/16 2960/16 2963/9 2966/7 2975/19
**concerning [1]** 3078/3
**concerns [5]** 2953/24 2954/2 2961/1 2963/20 3074/6
**condition [2]** 3113/9 3114/16
**conditioned [1]** 3114/14
**conditions [1]** 3114/18
**conduct [2]** 2924/16 2953/16
**conducted [1]** 2957/8
**conference [15]** 2884/20 2887/11 2950/20 2954/10 2971/15 2976/21 3012/20 3019/7 3040/9 3041/20 3099/15 3103/22 3112/6 3113/23 3132/5
**confidence [2]** 2958/12 3113/12
**Confidential [2]** 2961/24 2963/5
**confirmation [2]** 2883/14 2945/24
**confirmed [2]** 3081/11 3081/13
**confirming [2]** 2927/13 2945/1
**conflict [1]** 3040/3
**confront [2]** 3080/20 3136/3
**confronted [1]** 3014/11
**confused [1]** 3138/18
**congratulated [1]** 2918/17
**connection [4]** 2953/1 3042/18 3078/6 3133/4
**conscientiously [1]** 3134/11
**consent [1]** 2908/12
**consenting [1]** 2953/22
**conservative [4]** 2997/22 2997/23 2999/9 2999/11
**consider [3]** 2947/20 2947/20 3059/14
**consideration [3]** 3120/25 3121/2 3136/8
**considered [2]** 3062/11 3062/12
**considering [3]** 2999/16 3076/25 3104/11
**consistent [3]** 3022/14 3082/2 3125/13
**consisting [1]** 3120/22
**consolidate [1]** 2960/20
**construed [2]** 2974/16 2975/16
**consultant [5]** 2945/6 2994/11 3058/15

3058/20 3059/3
**consulted [1]** 2942/11
**consulting [34]** 2919/17 2919/21 2920/12 2920/14 2920/19 2934/9 2934/14 2991/12 2993/25 2994/3 2994/6 2994/16 2994/24 3055/3 3055/7 3055/15 3055/19 3056/4 3057/8 3058/8 3058/11 3059/5 3060/3 3060/24 3061/17 3061/20 3062/10 3077/16 3117/16 3117/18 3122/6 3128/13 3128/20 3128/22
**consults [1]** 2953/13
**consumer [1]** 2895/2
**contact [3]** 2988/8 3095/22 3096/8
**contacted [1]** 3014/15
**contained [1]** 3105/3
**content [1]** 3036/9
**contentious [1]** 2918/18
**context [14]** 2964/13 3013/19 3020/6 3020/18 3021/13 3022/5 3022/19 3022/23 3035/6 3036/13 3045/7 3052/15 3076/15 3088/7
**contingent [1]** 3108/22
**continue [6]** 2878/10 2878/21 2884/2 2899/1 2937/3 3124/19
**continued [32]** 2878/25 2884/19 2887/12 2905/11 2907/6 2912/13 2936/8 2937/5 2950/19 2954/11 2970/23 2971/14 2976/22 2982/12 2989/15 3012/19 3019/8 3020/20 3040/8 3041/21 3054/8 3070/10 3087/11 3094/24 3099/14 3103/23 3112/5 3113/24 3118/11 3119/3 3131/12 3132/4
**continues [4]** 3070/4 3070/7 3070/13 3075/22
**Continuing [1]** 2907/12
**contract [2]** 2919/2 2919/4
**contribute [1]** 3035/4
**contributing [1]** 2902/10
**contributions [2]** 2901/7 2995/22
**control [6]** 2963/4 2963/16 3046/9 3046/15 3046/16 3048/15
**controlled [1]** 3124/20
**controlling [1]** 2879/8
**controls [1]** 2980/23
**convenience [1]** 2880/23
**conversation [17]** 2903/7 2948/2 2948/4 2968/22 2974/11 3002/11 3002/25 3012/6 3021/7 3045/20 3076/5 3076/10 3082/11 3102/1 3116/16 3127/14 3127/15
**conversations [7]** 2895/19 3033/20 3045/23 3086/11 3094/4 3116/9 3127/6
**conversion [2]** 2889/14 3089/10
**convicted [2]** 2972/22 3073/18
**convinced [1]** 3127/7
**cope [1]** 2960/20
**copied [5]** 2965/19 3054/20 3085/14 3086/1 3086/22
**copies [4]** 2924/9 3062/25 3072/19 3091/6
**copy [7]** 2961/21 3068/9 3068/11 3068/12 3073/21 3078/19 3079/2
**copying [4]** 2885/10 2937/20 2943/22 2961/10

**core [2]** 2900/14 2985/10
**corporate [1]** 2938/4
**corporation [3]** 3008/20 3069/6 3138/5
**correct [185]** 2886/16 2890/4 2894/6 2894/24 2895/11 2895/12 2896/7 2901/19 2919/15 2921/18 2921/19 2955/5 2990/24 2991/3 2991/7 2991/10 2991/19 2991/20 2991/22 2992/3 2992/13 2992/15 2992/19 2993/24 2994/4 2994/7 2995/9 2998/3 2998/19 2999/1 2999/15 2999/19 2999/23 3000/5 3001/4 3001/22 3003/8 3003/11 3005/1 3005/5 3005/8 3005/19 3005/22 3006/15 3006/21 3007/21 3007/25 3008/6 3009/10 3009/25 3010/4 3010/7 3010/19 3011/18 3015/5 3021/18 3023/14 3023/16 3023/18 3023/21 3023/24 3024/3 3024/16 3024/21 3025/24 3026/4 3026/9 3026/10 3030/18 3031/14 3031/21 3031/25 3032/7 3032/9 3034/17 3035/2 3035/6 3035/14 3035/17 3035/22 3036/9 3036/23 3037/5 3037/25 3038/1 3039/9 3042/19 3042/23 3043/11 3043/16 3043/24 3043/25 3044/13 3044/16 3044/25 3045/3 3045/16 3046/5 3047/25 3048/9 3048/18 3048/20 3049/24 3050/7 3051/15 3052/1 3052/3 3052/11 3052/14 3054/18 3054/21 3055/11 3055/16 3055/23 3055/24 3057/9 3058/15 3058/20 3058/25 3059/3 3059/7 3059/11 3059/14 3059/21 3060/1 3060/4 3060/21 3060/24 3061/3 3061/10 3061/21 3061/25 3062/16 3062/19 3062/22 3063/5 3064/6 3067/19 3070/1 3070/4 3070/7 3070/13 3070/18 3071/8 3071/13 3071/15 3071/19 3072/3 3072/20 3072/23 3073/1 3073/4 3073/7 3073/10 3074/1 3074/9 3075/19 3076/18 3076/21 3076/25 3077/12 3077/17 3077/20 3078/12 3079/6 3079/18 3079/23 3080/1 3081/16 3082/5 3082/8 3083/2 3083/18 3083/19 3083/22 3084/23 3085/1 3085/4 3085/7 3085/21 3085/24 3086/19 3086/24 3088/2 3088/24
**correctly [3]** 2883/1 3065/7 3074/24
**correspond [1]** 3061/23
**cost [1]** 3044/9
**cost-effective [1]** 3044/9
**couch [1]** 2940/21
**counsel [29]** 2878/2 2899/9 2899/10 2907/12 2907/13 2908/15 2908/15 2908/16 2909/2 2935/2 2935/13 2935/14 2948/22 2953/23 2958/19 2958/21 2963/13 2979/23 2980/10 2986/22 3022/5 3022/19 3036/13 3038/3 3079/13 3080/22 3085/2 3085/3 3088/2
**counsel's [1]** 3078/16
**counseling [1]** 3029/21
**Counselor [1]** 3056/19
**count [2]** 2902/20 2952/9
**counter [2]** 2905/24 3049/4
**counts [1]** 2954/5
**couple [13]** 2892/11 2918/15 2940/25

**C**

couple... [10] 2949/3 2949/18 2987/22 3004/10 3007/18 3027/16 3061/6 3094/16 3095/9 3105/2
courageously [1] 2944/24
course [11] 2881/4 2922/25 2935/2 2940/8 2940/23 2979/1 3021/9 3037/7 3116/20 3121/10 3131/17
Courthouse [1] 2877/3
courtroom [9] 2878/7 2936/4 2937/1 2989/13 2990/2 3053/4 3054/3 3095/24 3134/13
cover [5] 2895/7 2915/21 3106/11 3108/22 3128/2
covered [8] 2909/24 2916/5 2916/6 2937/13 2949/5 2955/24 2955/25 3002/15
covering [2] 2917/10 2929/16
CR [1] 2877/2
cracks [1] 2961/3
craft [1] 2929/11
Cramer [4] 3099/1 3099/1 3100/3 3102/2
crashed [1] 3098/4
crazy [1] 2944/19
create [1] 2933/22
created [1] 3002/15
creation [1] 3034/1
credibly [1] 2923/10
crime [4] 2972/6 2972/13 2972/14 2972/25
CRIMINAL [1] 2877/9
criteria [2] 2968/16 2969/2
critical [8] 2896/11 2956/7 2963/23 3016/13 3017/16 3045/17 3063/20 3122/9
cross [9] 2973/24 2974/6 2989/3 2990/4 2990/9 3054/8 3084/23 3090/21 3136/11
cross-examination [6] 2973/24 2974/6 2990/9 3054/8 3090/21 3136/11
cross-examine [1] 2989/3
crow [2] 3014/8 3015/6
CSR [1] 2877/22
cure [8] 3035/12 3035/12 3037/11 3037/16 3037/17 3037/18 3038/17 3049/14
curing [1] 3038/16
current [2] 2900/23 2910/19
cursory [2] 3061/5 3114/14
customary [1] 3114/15

**D**

D-A-V-I-D [1] 3093/18
daily [7] 3022/16 3023/8 3024/19 3024/20 3025/7 3025/20 3025/22
damages [1] 2901/11
Darren [2] 2920/6 3043/6
data [1] 2900/23
date [29] 2880/3 2880/14 2881/23 2884/13 2924/6 2937/21 2956/4 2961/12 2979/9 2983/1 3003/25 3067/17 3067/18 3068/25 3091/17 3092/1 3106/17 3107/3 3108/24 3117/20 3119/8 3120/2 3123/8 3123/15 3127/25 3129/15 3129/17 3130/2 3130/20

dated [10] 2880/4 2888/25 2937/22 2943/23 2944/14 2961/13 2961/20 2983/14 3034/18 3122/9
dates [3] 2894/8 2894/20 3003/25
David [6] 2924/2 2924/10 3093/9 3093/12 3093/18 3126/20
days [16] 2890/15 2903/4 2918/15 2955/8 2968/25 2978/14 2987/22 3015/25 3016/15 3028/6 3029/5 3029/18 3045/15 3098/6 3108/25 3113/9
days' [1] 3109/5
de [1] 2945/2
deadline [1] 2899/25
deadlines [2] 2900/2 2924/22
deal [3] 2896/5 3056/12 3113/17
deals [2] 2931/6 2960/17
Dear [1] 3122/7
debate [1] 2918/19
debrief [2] 2888/17 2937/12
debt [2] 3083/2 3083/3
December [3] 2905/10 2911/11 2929/7
December 2012 [1] 2905/10
December 31 [1] 2911/11
decent [1] 3098/13
decide [3] 2934/13 3027/8 3027/17
decided [8] 2946/16 2966/13 2970/19 2985/24 2999/17 2999/22 3048/17 3126/15
decision [21] 2896/21 2905/21 2951/13 2982/2 2982/9 2985/23 2985/23 3016/18 3103/13 3104/6 3104/10 3108/11 3109/7 3110/11 3110/24 3122/13 3126/16 3127/20 3129/5 3131/8 3134/17
decisions [3] 2891/11 2896/20 3131/13
declined [1] 2980/20
dedicated [1] 3036/16
deduction [2] 2911/23 2913/18
deeply [1] 2894/17 2898/5
defeating [1] 3037/21
defend [1] 3065/17
defendant [45] 2877/7 2877/18 2879/14 2881/7 2881/14 2884/3 2885/24 2892/23 2903/2 2905/2 2937/10 2940/15 2941/8 2941/13 2947/8 2948/5 2951/19 2955/7 2956/3 2967/18 2968/9 2984/8 2988/9 2988/23 3091/3 3098/24 3099/5 3100/2 3100/19 3101/8 3103/10 3103/13 3104/4 3113/12 3114/25 3116/3 3116/14 3116/17 3124/5 3127/8 3131/19 3135/3 3135/12 3137/16 3140/21
defendant's [5] 2977/13 3066/19 3066/21 3066/22 3090/4
defense [7] 2989/6 3014/16 3020/7 3025/3 3034/9 3068/12 3101/19
defined [1] 2939/11
definitely [2] 2950/11 3042/24
definition [1] 2974/23
defraud [1] 3016/1
degree [1] 3051/12
Delaware [4] 3069/2 3069/4 3069/6 3120/23
delay [4] 2927/23 2978/22 3057/6 3138/14
delayed [3] 2927/24 2928/1 2928/5

delays [1] 2924/15
deleted [2] 2885/18 2886/16
delivered [1] 2946/25
delivery [1] 3109/18
deltas [1] 2898/4
denied [1] 3015/23
dental [1] 3030/15
department [2] 2960/8 2992/25
departure [1] 2986/3
deposit [1] 2880/22
depression [3] 3007/3 3007/4 3007/5
derivatives [1] 3095/10
describe [7] 2947/14 2974/25 3015/24 3068/6 3094/10 3094/14 3098/24
described [7] 2939/4 2975/9 2975/18 2994/14 3026/8 3089/16 3135/23
describing [1] 3028/24
descriptors [1] 2997/10
Desert [2] 2897/14 2905/23
deserve [1] 3052/8
desire [1] 3030/23
desk [1] 3032/23
despite [3] 2984/9 2994/2 3084/3
detail [4] 2917/14 2996/6 3011/22 3056/16
details [4] 2900/19 3063/12 3113/13 3113/16
determined [3] 2905/23 2916/18 2981/1
developed [2] 2952/22 3006/16
developing [2] 3036/17 3120/24
development [16] 2931/5 2931/9 2931/12 2937/10 2941/25 2960/8 2960/14 2963/18 2967/14 2967/21 2971/4 2976/11 2990/25 2993/16 2995/14 3039/1
DG00010 [1] 3123/3
DG0008 [1] 3124/4
DGTE [3] 2897/14 2897/15 2899/15
diagram [1] 3042/6
dialogue [1] 3046/1
Diego [1] 2965/20
difference [3] 3008/15 3031/8
differences [2] 3008/18 3027/12
different [28] 2885/3 2890/9 2890/14 2892/20 2938/17 2963/19 2964/21 2964/22 2970/17 2973/16 2982/6 2994/3 3001/25 3002/2 3017/23 3017/24 3017/25 3017/25 3018/2 3028/24 3033/18 3050/9 3058/18 3077/18 3082/3 3094/25 3134/15 3136/17
differently [4] 2899/16 2940/22 3033/18 3046/20
difficult [1] 2886/15
diligence [2] 3110/18 3114/14
diluted [3] 2883/12 2883/25 2903/16
dimensions [1] 3002/9
dinner [18] 2891/9 2934/25 2935/4 2935/5 2935/6 2967/4 2967/18 2968/6 2968/9 3003/8 3003/18 3004/4 3004/14 3027/20 3027/20 3027/22 3028/1 3087/7
dinners [3] 3087/8 3087/10
diplomatic [1] 3005/18
direct [27] 2879/1 2885/6 2886/6 2897/22 2924/25 2932/2 2937/5 2944/6

D

**direct...** [19]  2961/4 2973/5 2995/4 3015/4 3015/10 3017/20 3036/14 3050/21 3054/10 3056/22 3077/25 3078/12 3079/17 3082/20 3084/1 3084/22 3093/21 3103/1 3119/3

**directing** [8]  2909/12 2914/18 2925/25 2932/16 2956/17 2966/25 2980/6 3067/10

**direction** [9]  2892/19 2892/20 2941/3 2966/8 2967/10 2971/3 2982/10 3038/14 3050/4

**directive** [1]  2976/10

**directly** [9]  2907/19 2952/13 2953/4 2957/21 2967/20 3060/20 3082/15 3124/25 3138/21

**directness** [1]  3002/11

**director** [3]  2922/21 2970/1 2987/3

**directors** [62]  2905/11 2906/4 2907/6 2907/22 2907/25 2908/20 2909/13 2914/20 2915/22 2918/5 2919/21 2920/11 2920/19 2921/11 2924/9 2925/3 2926/1 2929/25 2932/9 2932/13 2933/6 2933/12 2934/19 2937/8 2938/15 2940/7 2940/10 2942/7 2943/6 2956/18 2957/12 2957/16 2957/21 2958/2 2964/4 2965/2 2966/1 2966/5 2966/24 2968/23 2969/6 2969/16 2979/8 2979/17 2980/23 2983/16 2984/24 2985/1 2985/20 2986/1 2986/2 2986/3 2987/2 2987/7 2987/16 2988/3 2991/22 2995/21 3071/15 3080/8 3111/24 3114/9

**disagree** [1]  3124/17

**disappointed** [3]  2897/1 2897/2 2928/19

**disappointment** [3]  2891/12 2891/17 2933/22

**discharged** [1]  3073/18

**disclose** [2]  3103/14 3133/11

**disclosed** [2]  2981/25 3072/5

**disclosing** [1]  2942/19

**disclosure** [3]  2949/12 3124/14 3137/18

**disclosures** [3]  2975/19 2975/21 3124/13

**discounted** [4]  2894/17 2895/15 2898/5 2898/20

**discrepancies** [1]  2900/21

**discrepancy** [1]  3052/21

**discretion** [2]  3133/19 3136/4

**discuss** [18]  2889/23 2899/18 2903/15 2905/7 2922/16 2924/10 2926/23 2930/9 2930/17 2936/2 2941/11 2941/13 2945/5 2965/22 2980/15 3056/13 3076/13 3096/24

**discussed** [28]  2885/11 2888/3 2890/2 2901/2 2904/23 2911/9 2917/3 2917/6 2931/17 2937/11 2938/13 2939/8 2939/14 2940/12 2940/24 2941/7 2962/3 2962/16 2962/19 2964/14 2965/22 2973/7 2977/7 2977/7 2980/23 2984/25 3027/24 3060/3

**discussing** [10]  2883/6 2903/7 2916/1 2919/16 2940/15 2942/6 2951/21 2964/10 2984/16 3034/2

**discussion** [62]  2897/3 2913/24 2914/8

2914/12 2917/7 2918/19 2919/19 2925/10 2930/21 2931/3 2931/19 2932/1 2933/16 2933/18 2935/10 2941/10 2941/17 2943/9 2943/12 2947/15 2947/16 2948/21 2948/24 2949/7 2950/5 2950/6 2952/5 2952/7 2955/11 2956/3 2958/11 2958/24 2959/15 2963/2 2964/5 2964/20 2967/19 2968/13 2970/12 2973/24 2977/14 2977/15 2980/25 2982/1 3016/15 3017/13 3028/9 3028/21 3030/14 3030/21 3030/25 3046/3 3047/3 3056/25 3062/9 3076/15 3079/11 3080/14 3090/22 3113/21 3131/24 3137/6

**discussions** [28]  2879/14 2881/13 2884/3 2901/16 2903/2 2908/8 2934/5 2943/2 2945/5 2948/19 2953/9 2955/7 2955/9 2959/11 2965/2 2965/5 2967/2 2967/5 2978/23 2984/18 2985/3 2988/23 3022/20 3028/15 3030/18 3033/3 3050/17 3059/10

**disease** [11]  3034/1 3037/14 3037/20 3037/21 3038/16 3041/16 3049/7 3049/11 3049/14 3049/16 3049/16

**diseases** [3]  3033/19 3035/12 3036/17

**disgruntled** [2]  2947/17 3088/14

**disheveled** [1]  3007/23

**dismiss** [1]  3134/8

**dispute** [1]  3055/22

**disputes** [1]  3069/19

**disregard** [1]  3084/14

**dissolving** [3]  3027/9 3027/13 3027/16

**distinct** [4]  3044/23 3045/12 3046/1 3046/2

**distinction** [1]  3133/22

**distinguish** [1]  3008/19

**distractions** [1]  2962/8

**distribute** [1]  2930/7

**distributed** [1]  3135/13

**DISTRICT** [4]  2877/1 2877/1 2877/10 2877/13

**Diverse** [2]  2994/24 2995/3

**diversify** [1]  2998/9

**doctor** [2]  3007/7 3043/4

**document** [77]  2879/23 2881/19 2884/9 2885/18 2885/19 2888/4 2888/23 2909/19 2911/2 2911/8 2911/10 2915/19 2916/21 2920/25 2922/24 2927/9 2929/13 2929/14 2929/18 2932/3 2937/16 2941/4 2941/8 2945/21 2946/14 2953/3 2961/7 2963/19 2965/18 2979/17 3055/10 3056/5 3058/4 3058/6 3063/20 3063/21 3064/22 3065/24 3067/9 3067/16 3067/17 3067/24 3069/25 3070/4 3070/7 3070/10 3070/13 3079/1 3081/6 3082/2 3082/4 3105/1 3105/10 3106/10 3106/17 3106/24 3107/3 3107/5 3107/13 3107/15 3111/4 3111/6 3113/3 3113/20 3115/12 3115/14 3115/24 3121/20 3122/20 3123/4 3123/8 3123/13 3123/15 3123/17 3125/24 3129/22 3138/4

**document's** [1]  3065/4

**documents** [25]  2885/14 2885/14 2915/8 2915/9 2916/4 2923/1 2923/9

2924/10 2926/17 2926/20 2933/9 2952/9 2989/6 3086/24 3072/3 3104/12 3104/15 3104/19 3104/23 3105/4 3105/12 3105/20 3117/3 3122/13 3124/1

**dollar** [1]  3135/11

**dollars** [3]  2898/21 2977/19 3079/23

**Donald** [1]  3084/9

**done** [15]  2897/21 2899/3 2905/23 2958/18 2971/7 3005/7 3019/4 3024/1 3035/9 3051/12 3095/7 3110/15 3110/16 3113/2 3134/6

**door** [4]  2959/12 2974/4 3014/8 3015/6

**double** [2]  2950/9 2956/10

**doubt** [1]  3070/20

**down** [21]  2903/12 2904/7 2911/15 2939/1 2947/25 2981/4 3003/3 3014/10 3015/9 3026/13 3027/15 3031/4 3037/17 3053/2 3053/5 3058/18 3065/8 3088/8 3088/17 3088/24 3108/4

**Dr** [1]  3113/4

**Dr.** [1]  2922/16

**Dr. Jeff** [1]  2922/16

**draft** [6]  2977/23 3063/7 3063/23 3064/8 3071/25 3072/8

**drafted** [1]  2909/6

**drafting** [2]  3073/12 3073/15

**dramatic** [2]  2904/11 3049/13

**dramatically** [2]  2904/7 2968/19

**dread** [1]  2902/25

**drew** [1]  3042/8

**drive** [3]  2891/13 2891/18 2892/1

**driving** [1]  2962/10

**drug** [15]  2912/11 2925/18 2960/13 3011/24 3012/8 3031/15 3034/1 3036/22 3037/8 3049/7 3049/19 3049/25 3050/9 3050/11 3050/14

**drugs** [13]  2906/2 2928/4 2933/15 2960/6 2960/20 2985/10 2985/11 2985/12 3030/23 3031/20 3035/12 3036/17 3048/3

**drunk** [2]  3090/1 3090/7

**Duchenne** [7]  3036/21 3037/11 3039/1 3039/4 3042/14 3042/19 3049/16

**due** [3]  3110/18 3114/14 3122/13

**duly** [4]  2878/18 2972/24 2981/5 3093/12

**during** [28]  2879/7 2879/10 2881/13 2884/24 2917/3 2917/7 2933/16 2933/18 2934/6 2942/6 2945/12 2960/10 2960/10 2965/6 2968/6 2970/11 2972/8 2973/15 2977/13 2978/25 2979/1 2984/1 2984/6 2998/24 3022/18 3074/25 3085/7 3131/17

**duties** [5]  2981/7 2991/22 2993/10 2994/10 2995/19

**duty** [3]  3133/10 3133/13 3136/9

**dwell** [1]  3056/14

**DX9029** [1]  3022/11

**dynamic** [1]  2947/1

**dynamics** [1]  3006/19

**dystrophin** [6]  3039/5 3039/8 3040/2 3042/10 3042/14 3042/17

**Dystrophy** [7]  3036/21 3037/11 3039/1 3039/5 3042/15 3042/19 3049/16

**e-mails [10]** 2885/10 2886/10 2886/16 2893/18 2895/16 2903/16 2978/3 3024/20 3025/20 3030/11
**ear [2]** 3020/13 3020/17
**earliest [2]** 2888/9 2893/17
**early [15]** 2885/11 2900/15 2900/16 2918/25 2966/6 2966/6 2966/13 2967/2 3005/23 3006/16 3029/11 3029/25 3031/1 3033/21 3045/15
**easier [1]** 3068/3
**East [3]** 2877/14 3000/5 3002/18
**EASTERN [2]** 2877/1 2877/13
**eating [1]** 3030/10
**Ed [4]** 2916/25 2917/1 2922/8 3062/25
**educational [1]** 3094/10
**Efay [1]** 2920/4
**effect [4]** 2896/22 2951/14 3098/15 3113/19
**effected [1]** 3103/13
**effecting [1]** 3030/2
**effective [3]** 2896/1 2986/2 3044/9
**effectively [3]** 2916/20 2931/6 2940/9
**efficiency [1]** 3078/22
**eight [2]** 2952/9 2996/11
**either [6]** 2908/8 2932/25 2974/25 2975/20 3086/9 3100/4
**Elea [24]** 3099/4 3100/4 3100/5 3100/15 3100/15 3100/24 3101/6 3101/14 3101/14 3101/17 3101/20 3101/23 3102/3 3102/4 3102/13 3102/14 3102/15 3102/15 3102/18 3103/1 3103/3 3103/4 3103/7 3103/7
**electronically [1]** 3088/5
**ELEIS [1]** 2877/15
**elements [1]** 3136/7
**elicit [1]** 2976/17
**eliciting [3]** 2974/4 2975/13 3100/22
**elicits [2]** 2950/16 2976/18
**email [62]** 2877/23 2882/9 2921/3 2921/17 2923/17 2924/1 2924/6 2937/19 2937/21 2938/5 2938/10 2938/11 2938/12 2943/21 2944/7 2944/11 2961/10 2961/12 2961/20 2962/2 2965/8 3010/24 3011/2 3012/6 3013/22 3014/1 3020/4 3020/10 3054/10 3054/17 3055/11 3061/16 3062/21 3062/24 3063/5 3072/10 3073/25 3078/1 3078/6 3085/13 3086/10 3086/22 3119/7 3119/8 3120/2 3122/5 3122/7 3122/17 3123/1 3124/10 3125/25 3126/1 3126/3 3126/11 3127/3 3127/16 3127/17 3127/25 3129/15 3129/18 3130/2 3130/11
**emails [12]** 2885/4 2894/2 2924/2 3008/23 3008/25 3009/9 3010/15 3010/20 3020/8 3024/21 3086/1 3138/19
**embarrass [1]** 3018/3
**emerge [1]** 2961/3
**emergency [1]** 2933/20
**emotions [1]** 3009/19
**employee [7]** 2919/5 2947/17 2964/1 2978/10 2993/17 2994/1 3088/14
**employees [10]** 2967/19 2973/12 2977/10 2991/7 2993/15 2993/17 2993/18 2994/23 2995/7 3044/16

**employment [5]** 2965/16 2980/24 2981/11 3073/9 3073/12
**end [25]** 2887/11 2905/9 2905/21 2948/18 2954/10 2955/22 2976/21 2977/14 2984/19 2987/8 3019/7 3034/18 3037/7 3041/20 3043/22 3046/23 3046/25 3048/19 3048/19 3083/21 3091/9 3103/22 3109/16 3110/4 3113/23
**endeavor [1]** 3037/12
**ended [6]** 2916/12 2966/6 2996/4 3039/12 3064/6 3078/8
**ending [12]** 2893/16 2897/8 2929/21 2932/3 2932/16 3064/9 3074/25 3117/25 3119/12 3120/6 3128/4 3129/23
**endless [1]** 2960/14
**endorsing [1]** 2900/14
**ends [1]** 2892/15
**engage [1]** 2957/5
**engaged [3]** 2931/20 2943/2 3002/24
**engagement [1]** 2942/2
**engaging [2]** 2938/17 2942/7
**enjoyed [3]** 3006/4 3010/9 3010/9
**enjoying [2]** 3009/15 3024/12
**entered [3]** 3065/15 3068/25 3075/8
**entering [2]** 2896/15 3069/17
**enters [5]** 2878/7 2878/13 2937/1 2990/2 3054/3
**enthusiastic [1]** 2929/8
**entire [2]** 2950/14 3102/22
**entities [10]** 2907/20 3044/9 3045/12 3069/5 3069/10 3069/21 3113/7 3124/20 3124/21 3135/19
**entitled [8]** 2894/5 2895/2 2895/18 2896/11 2896/17 2912/1 2961/24 3102/24
**entity [2]** 2929/9 3046/18
**entrepreneur [2]** 2942/25 3008/21
**entry [1]** 3078/13
**environment [1]** 2943/1
**equals [1]** 2889/15
**equities [1]** 3095/6
**equity [7]** 2898/15 3107/20 3124/16 3124/25 3125/2 3125/4 3126/19
**errors [1]** 2901/5
**especially [2]** 2923/8 3031/20
**ESQ [8]** 2877/12 2877/15 2877/15 2877/16 2877/19 2877/20 2877/20 2877/21
**essentially [6]** 2952/5 2990/22 3036/8 3044/25 3045/3 3088/2
**establish [8]** 3018/5 3034/15 3058/4 3136/6 3137/9 3137/15 3137/17 3138/9
**established [3]** 2905/24 3102/3 3108/21
**establishing [1]** 3136/23
**estate [5]** 2998/2 2998/5 2999/7 3000/1 3044/19
**estimate [1]** 2987/22
**Europe [1]** 2965/11
**evaluated [1]** 3098/15
**Evan [43]** 2898/3 2899/4 2899/7 2899/7 2899/9 2899/19 2900/24 2901/2 2902/3 2907/10 2908/15 2910/15 2922/7 2923/17 2924/5 2934/18 2935/10 2943/22 2948/21 2950/24 2950/10

2951/4 2951/6 2953/6 2953/8 2956/10 2957/24 2958/5 3087/10 3057/22
3054/20 3062/25 3084/23 3084/25 3086/4 3086/7 3086/12 3086/18 3086/21 3086/22 3086/24 3087/6 3088/1
**Evan's [3]** 2882/16 2958/12 3088/7
**evaporating [1]** 3048/4
**evening [2]** 2978/1 3000/12
**evidence [74]** 2880/6 2880/10 2882/1 2882/7 2884/16 2893/9 2893/14 2910/1 2910/6 2915/12 2915/17 2921/6 2921/10 2923/21 2923/25 2927/2 2927/6 2937/24 2938/2 2938/4 2942/3 2944/1 2944/5 2946/4 2946/8 2953/7 2961/15 2961/19 2973/1 2973/2 2973/5 2974/1 2974/9 2979/12 2979/16 2983/6 2983/8 2983/10 3015/22 3015/23 3018/9 3035/19 3041/4 3041/17 3054/13 3055/18 3061/9 3062/23 3064/22 3066/18 3066/23 3078/1 3078/7 3091/20 3091/25 3103/2 3105/14 3105/18 3107/12 3107/14 3111/14 3113/14 3115/22 3117/12 3122/4 3123/21 3123/24 3124/2 3126/10 3128/8 3130/1 3137/1 3137/11 3137/20
**evolution [1]** 2896/16
**evolve [1]** 3018/17
**exact [5]** 3003/25 3034/22 3049/8 3071/2 3133/1
**exactly [8]** 2890/20 2903/10 2939/4 2995/11 3004/20 3036/11 3042/22 3061/24
**examination [20]** 2878/11 2878/21 2879/1 2937/5 2973/24 2974/6 2990/9 3015/4 3050/21 3054/8 3054/10 3077/25 3078/12 3084/23 3090/19 3090/21 3092/13 3093/21 3119/3 3136/11
**examine [2]** 2989/3 2990/4
**examined [2]** 2878/18 3093/13
**example [4]** 2887/5 3113/4 3113/7 3135/6
**examples [1]** 3103/9
**exceeded [1]** 2977/12
**excellent [3]** 2945/4 2945/8 2964/14
**exception [2]** 2953/9 2955/14
**exceptional [1]** 2946/25
**exceptions [1]** 2951/17
**excess [2]** 2991/8 3079/22
**exchange [18]** 2881/22 2881/23 2883/3 2884/12 2884/13 2893/7 2893/20 2947/18 2988/24 2992/4 2997/1 3014/1 3024/7 3058/14 3058/19 3059/3 3086/22 3088/9
**exchanges [1]** 2903/8
**excited [2]** 3034/21 3039/24
**excitement [2]** 3034/23 3034/25
**exciting [7]** 2925/14 2925/16 2925/24 2928/2 2928/19 2935/8 3050/2
**exclude [2]** 2958/2 2959/14
**exclusively [1]** 3050/13
**excuse [10]** 2891/3 2913/10 2942/3 2962/3 2962/17 2985/3 3008/7 3062/15 3084/9 3134/20
**excused [4]** 3093/6 3093/8 3134/22

**E**

**excused...** [1] 3134/24

**executive** [29] 2932/9 2932/14 2933/6
2940/1 2940/5 2940/6 2940/9 2940/13
2945/2 2957/17 2958/8 2959/2 2966/20
2969/24 2969/25 2970/22 2980/16
2980/18 2981/2 2981/7 2981/15
3008/13 3008/20 3036/15 3036/15
3037/4 3065/9 3069/16 3075/1

**executives** [4] 2940/8 2958/7 2966/22
3008/8

**exercise** [1] 3122/13

**exhibit** [126] 2879/18 2880/5 2880/9
2881/17 2881/25 2882/4 2882/6 2884/7
2884/15 2888/6 2893/1 2893/2 2893/8
2893/11 2893/13 2893/16 2893/19
2897/8 2909/17 2909/25 2910/3 2910/5
2911/1 2915/16 2919/7 2920/23 2921/5
2921/9 2923/12 2923/14 2923/20
2923/23 2923/24 2924/2 2926/15
2927/5 2929/12 2930/11 2937/15
2937/23 2938/1 2938/3 2941/4 2943/15
2943/18 2943/25 2944/4 2945/19
2946/3 2946/7 2961/4 2961/5 2961/14
2961/17 2961/18 2979/5 2979/7
2979/11 2979/15 2982/21 2982/22
2983/5 2983/9 3020/7 3025/3 3035/20
3055/18 3057/12 3057/14 3057/15
3058/23 3061/9 3061/17 3061/20
3061/24 3064/12 3064/14 3066/19
3066/21 3066/22 3068/18 3068/20
3072/1 3090/4 3091/6 3091/12
3091/19 3091/22 3091/24 3105/7
3105/14 3105/17 3106/9 3106/20
3107/9 3107/12 3108/16 3111/3
3111/13 3115/11 3115/19 3115/21
3115/22 3117/8 3117/11 3117/24
3119/6 3119/25 3121/14 3121/25
3122/3 3123/2 3123/12 3123/21
3123/23 3123/24 3124/2 3124/8
3125/23 3126/6 3126/9 3127/24
3128/10 3128/16 3129/14 3130/1

**Exhibit 10-12** [1] 3068/20

**Exhibit 107-9** [1] 3126/6

**Exhibit 109-6** [3] 3121/18 3121/25
3124/2

**Exhibit 109-7** [1] 3125/23

**Exhibit 11B** [2] 3123/21 3123/23

**Exhibit 122-33** [1] 2943/15

**Exhibit 122-49** [2] 2919/2 3061/9

**Exhibit 122-53** [2] 2920/23 3072/11

**Exhibit 122-58** [2] 2923/12 2923/23

**Exhibit 122-64** [2] 2926/15 2929/12

**Exhibit 122-71** [1] 2938/1

**Exhibit 122-72** [1] 2941/4

**Exhibit 122-74** [1] 2945/19

**Exhibit 122-84** [2] 2961/5 2961/17

**Exhibit 4218** [1] 3020/7

**Exhibit 4237** [2] 2979/19 3066/21

**Exhibit 91-1** [1] 3128/10

**Exhibit 91-10** [1] 3130/1

**Exhibit 91-2** [1] 3119/6

**Exhibit 91-3** [1] 3119/25

**Exhibit 91-8** [1] 3127/24

**Exhibit 91-9** [1] 3129/14

**Exhibit I** [1] 3061/17

**Exhibit J** [1] 3061/20

**exhibits** [10] 2882/2 2915/3 2915/5
2915/11 2927/1 3061/12 3117/1 3117/2
3130/13 3140/8

**exist** [2] 3051/6 3094/20

**existence** [1] 3036/25

**existing** [3] 2993/16 3049/2 3069/19

**exited** [1] 2938/25

**exits** [4] 2936/4 2989/13 3053/4
3134/13

**expanded** [1] 3124/14

**expect** [3] 2951/10 3008/20 3072/4

**expectations** [2] 2951/5 2951/6

**expected** [2] 2984/4 3124/24

**expecting** [3] 2890/1 2891/25 2896/14

**expense** [3] 3079/18 3079/20 3079/22

**expenses** [5] 2913/2 2913/5 2914/11
2914/12 3135/7

**experience** [9] 2922/22 2964/15
2964/23 2997/18 3086/8 3097/25
3098/2 3098/15 3130/13

**expert** [2] 3039/16 3039/17

**expertise** [1] 2906/3

**explain** [3] 2946/14 3041/1 3132/1

**explained** [2] 2971/2 2982/16

**explaining** [1] 2972/5

**explains** [1] 2972/21

**explanation** [2] 2955/20 3080/19

**exposure** [1] 3074/20

**exposures** [1] 2963/16

**express** [8] 2923/4 2931/7 2992/10
2992/12 2993/23 3008/5 3009/9
3010/10

**expressed** [4] 2904/1 3010/6 3017/21
3047/16

**expressing** [2] 2933/22 2978/4

**extensive** [2] 2928/17 3037/18

**extensively** [1] 3029/6

**extent** [6] 3002/16 3018/8 3021/17
3131/7 3131/11 3138/21

**external** [19] 2907/12 2911/18 2916/16
2916/22 2917/4 2922/11 2924/4
2935/13 2937/19 2957/4 2985/19
2986/22 2994/12 2996/12 3074/2
3074/3 3074/19 3085/2 3085/3

**extra** [3] 2882/23 3068/11 3138/10

**extracted** [1] 3030/13

**extractions** [1] 3030/14

**eyes** [1] 3009/25

**F**

**face** [11] 2908/4 2908/4 2926/7 2926/7
2926/8 2926/8 2968/1 2996/14 2996/14
3010/20 3010/22

**face-to-face** [4] 2908/4 2926/7 2926/8
2996/14

**faces** [1] 3045/18

**facilitate** [1] 3124/18

**facilitating** [1] 2933/23

**facilities** [1] 3044/18

**fact** [38] 2886/15 2892/6 2892/22
2902/23 2906/13 2907/3 2915/22
2918/22 2926/3 2931/9 2932/11 2934/16
2939/16 2945/12 2949/14 2951/18
2963/10 2963/11 2966/9 2969/24
2970/6 2970/15 2971/4 2978/12
2978/12 2980/3 3009/16 3014/11
3016/25 3020/15 3021/4 3022/8 3100/3

**exhibits** [10] 2882/2 2915/3 2915/5
2915/11 2927/1 3061/12 3117/1 3117/2
**factor** [1] 2945/2

**factors** [1] 2895/19

**facts** [7] 2891/10 2893/6 2894/3 2894/4
2949/2 2964/19 3041/3

**factual** [3] 2890/22 2901/5 3133/7

**failed** [1] 3011/24

**failing** [1] 3030/24

**failure** [1] 2955/18

**fair** [57] 2942/25 2952/13 2973/14
2974/1 2975/24 2991/24 2992/8
2993/20 2996/24 2999/13 3000/22
3007/20 3008/11 3008/13 3010/16
3018/12 3018/21 3022/23 3026/11
3029/2 3029/3 3032/3 3036/2 3036/4
3036/5 3037/14 3038/6 3038/13
3038/21 3039/20 3042/22 3042/25
3043/13 3045/19 3046/10 3047/3
3048/7 3049/24 3050/5 3050/15 3051/6
3051/17 3057/3 3059/16 3059/19
3062/3 3069/24 3077/1 3077/3 3077/9
3081/24 3085/17 3086/4 3089/2
3089/14 3103/11 3133/15

**fairly** [6] 2893/22 2918/20 2996/9
2999/11 3008/3 3029/3

**faith** [5] 2891/13 2891/18 2892/1
2901/1 2901/17

**fall** [6] 2918/10 3000/22 3000/23
3000/23 3032/2 3032/4

**false** [1] 3113/17

**familiar** [1] 2952/20

**family** [6] 2965/11 2965/12 2965/14
2999/3 3002/8 3006/18

**far** [2] 2900/18 3017/21

**Fargo** [1] 2992/18

**fashionable** [1] 3005/14

**fault** [1] 2897/20

**favor** [1] 2901/11

**favorite** [2] 2943/1 3004/15

**FDA** [3] 3031/15 3031/21 3036/21

**fearing** [1] 2891/16

**February** [24] 2894/14 2925/25 2937/7
2937/22 2943/23 2944/14 2944/22
3021/23 3022/11 3024/3 3033/21
3034/4 3034/6 3034/8 3034/10 3034/17
3034/18 3034/18 3034/21 3043/15
3060/2 3060/7 3073/21 3073/24

**February 12** [3] 3021/23 3022/11
3024/3

**February 14th** [1] 2937/7

**February 2011** [3] 3034/8 3034/10
3034/21

**February 2012** [1] 2894/14

**February 2014** [1] 2925/25

**February 20th** [1] 2944/14

**February 26** [1] 3034/10

**February/March** [1] 3043/15

**federal** [1] 2932/21

**FedEx** [1] 2880/20

**fee** [4] 2912/3 2912/11 3135/7 3135/8

**feedback** [5] 2938/14 2939/25 2939/25
2940/19 2963/16

**feelings** [1] 3010/16

**fees** [3] 2911/23 3138/6 3138/7

**fellow** [2] 2943/21 2952/24

**felony** [1] 3073/18

**felt** [12] 2890/3 2918/18 2935/17

F

**felt...** [9] 2947/22 2959/19 2960/19
2968/15 3006/15 3010/7 3035/3
3080/16 3081/14
**female** [1] 3011/6
**Fernandez** [1] 2978/8
**few** [19] 2890/15 2902/2 2903/4 2936/5
2955/8 2956/14 2999/5 3002/8 3005/7
3009/24 3010/6 3015/25 3027/10
3027/11 3028/6 3051/10 3086/9
3094/24 3113/10
**fifth** [3] 2896/11 2983/18 3070/12
**Fifty** [1] 3093/24
**Fifty-four** [1] 3093/24
**figuratively** [1] 3023/10
**figure** [3] 3012/6 3028/16 3032/23
**figured** [3] 3028/18 3028/19 3033/1
**filaments** [1] 3042/11
**file** [3] 2894/5 2905/5 3071/3
**filed** [7] 2880/24 2901/10 2947/17
3063/14 3063/15 3067/20 3072/2
**files** [4] 2894/2 2984/12 2984/12
2984/21
**filing** [12] 2900/23 2902/3 3063/20
3068/18 3068/21 3070/17 3070/21
3070/22 3070/25 3071/7 3071/13
3071/19
**filings** [4] 2916/15 2918/7 2918/10
3076/21
**fill** [1] 2924/19
**filled** [2] 2906/16 2906/24
**final** [2] 2896/4 2906/22
**finalized** [1] 2904/19
**finally** [1] 3069/18
**finance** [2] 2922/3 3094/11
**finances** [2] 2974/15 3113/11
**financial** [17] 2888/21 2905/13 2906/15
2906/20 2909/23 2910/20 2913/22
2914/4 2999/20 3063/12 3074/5
3079/25 3081/6 3081/15 3109/19
3113/6 3114/23
**financing** [15] 2883/13 2883/20 2896/5
2898/11 2898/12 2907/17 2910/19
2911/15 2911/18 2911/23 3048/14
3113/8 3114/16 3114/18 3114/22
**fine** [12] 2901/24 2975/25 3008/8
3013/13 3018/7 3041/18 3045/14
3119/15 3119/18 3119/20 3120/13
3120/20
**finger** [1] 3106/21
**fingertips** [1] 2964/19
**finish** [1] 3014/24
**FINRA** [1] 2932/19
**fired** [1] 2972/23
**firing** [1] 2973/14
**firm** [10] 2922/11 2924/4 2956/22
2994/7 3046/11 3046/14 3054/21
3094/20 3110/17 3117/19
**first** [86] 2878/18 2880/18 2882/9
2888/23 2889/2 2891/21 2892/11
2893/23 2964/18 2897/2 2897/7 2897/11
2905/20 2907/1 2907/7 2907/11
2907/22 2908/24 2909/3 2910/8 2911/7
2911/10 2912/3 2912/4 2914/14
2921/4 2926/4 2927/7 2927/12 2930/8
2931/4 2931/14 2935/6 2942/11
2942/22 2944/9 2945/2 2945/11 2948/1

2950/4 2950/7 2950/13 2962/2 2963/10
2969/3 2969/11 2972/1 2977/7 2980/6 3001/9
3001/8 3001/8 3002/12 3003/18
3009/22 3009/23 3030/24 3035/20
3036/20 3037/10 3039/21 3039/24
3046/23 3050/2 3050/2 3057/8 3058/13
3059/24 3070/1 3074/8 3087/3 3087/4
3093/12 3095/22 3096/8 3102/12
3108/19 3109/16 3111/19 3111/20
3114/5 3120/20 3122/19 3124/6
3125/18 3128/16 3130/9
**fiscal** [1] 3109/17
**fit** [2] 3097/20 3108/14
**five** [9] 2925/6 2925/7 3004/16 3026/12
3094/22 3104/23 3130/18 3130/24
3130/24
**five-month** [3] 3130/18 3130/24
3130/24
**fix** [1] 3022/14
**fixable** [1] 2899/12
**fixed** [4] 2900/17 3020/16 3020/19
3021/4
**flat** [1] 3062/10
**flesh** [1] 3074/6
**floating** [1] 3002/2
**floor** [1] 3136/14
**floors** [1] 3001/2
**flow** [4] 2886/6 2911/5 2913/22 3078/8
**focus** [7] 2893/22 2914/15 2914/17
2938/22 2952/21 2957/22 2962/9
**focused** [4] 2960/9 2969/18 3049/23
3120/23
**focusing** [2] 3105/19 3119/7
**folks** [1] 3052/8
**follow** [4] 2903/4 2965/24 3133/2
3133/8
**follow-on** [1] 3133/2
**follow-up** [1] 3133/8
**followed** [6] 2901/3 2910/23 2948/13
2957/14 3002/24 3139/2
**following** [24] 2879/13 2905/9 2912/13
2936/8 2939/16 2939/20 2945/4 2950/2
2963/17 2965/20 2966/8 2968/11
2969/9 2969/14 2970/23 2980/25
2989/15 3003/2 3020/20 3075/22
3087/11 3103/6 3109/16 3118/11
**follows** [2] 2878/19 3093/13
**followup** [2] 2933/24 2945/3 2968/22
**footnote** [3] 2900/24 3120/16 3121/6
**force** [1] 2960/5
**forceful** [2] 2933/20 2933/21
**forcefully** [1] 2917/8
**forensic** [2] 2896/19 2896/24
**foreseeable** [1] 2988/19
**forge** [1] 3004/6
**forget** [1] 2917/1
**forgot** [1] 3071/21
**form** [21] 2881/9 2882/15 2882/17
2882/20 2882/24 2883/1 2883/2
2899/24 2900/3 2901/4 2904/22
2904/25 2964/14 2983/20 3016/1
3066/13 3066/15 3067/17 3071/2
3100/21 3103/18
**formally** [2] 2979/1 2979/2
**format** [2] 2885/3 2926/6
**formed** [1] 2922/5
**forth** [1] 2946/19

**fortune** [1] 3008/2
**forum** [1] 2957/7
**forward** [17] 2883/19 2898/4 2900/25
2901/24 2925/19 2946/18 2960/13
2960/17 2966/10 2985/6 2993/15
3049/24 3050/13 3052/19 3082/24
3098/16 3102/5
**fought** [1] 2944/24
**foundation** [1] 3116/9
**founded** [2] 2992/15 3048/5
**founder** [3] 2946/24 3052/15 3052/16
**founders** [2] 3051/3 3052/14
**founding** [2] 2891/7 3052/9
**founds** [1] 2903/17
**four** [8] 2895/18 2966/17 2966/20
3004/16 3029/18 3093/24 3111/3
3130/18
**fourth** [3] 3070/9 3082/18 3123/2
**frame** [3] 3081/4 3081/10 3120/11
**framed** [2] 2947/17 2970/14
**framing** [1] 2970/18
**frankly** [1] 2899/3
**free** [3] 2957/2 3024/13 3060/10
**frequent** [1] 3030/11
**frequently** [7] 2998/25 2999/4 3004/7
3004/8 3005/4 3005/6 3024/5
**Friday** [1] 2945/7
**friend** [7] 2953/14 3000/14 3011/5
3011/11 3011/12 3022/8 3098/7
**friends** [5] 2891/9 2965/12 3001/12
3009/14 3011/9
**friendship** [8] 2891/13 2891/18 2892/1
2903/1 2988/16 2988/21 3004/6
3029/11
**front** [3] 3067/5 3105/9 3116/8
**frustrating** [1] 2928/16
**frustration** [1] 2962/5
**fueled** [1] 2900/11
**fulfilled** [2] 2901/25 3076/16
**full** [9] 2919/5 2926/21 2935/6 2996/17
3068/11 3068/12 3074/20 3107/16
3108/23
**full-day** [1] 2926/21
**fully** [6] 2926/5 2945/14 2956/7
3069/18 3089/20 3127/4
**functioning** [1] 2945/14
**fund** [68] 2882/21 2903/22 2931/11
2931/22 2949/4 2949/4 2999/9 2999/13
2999/23 3004/5 3021/19 3023/9
3023/14 3024/23 3025/19 3025/21
3026/19 3027/9 3027/13 3027/17
3043/8 3044/3 3095/19 3096/18
3096/20 3097/2 3097/11 3097/12
3097/21 3097/21 3098/9 3098/16
3098/20 3100/12 3100/20 3101/9
3102/6 3103/8 3103/12 3104/5 3105/23
3105/25 3106/13 3107/1 3109/4
3110/17 3111/21 3114/6 3115/16
3122/8 3124/13 3124/22 3125/10
3125/16 3125/17 3126/16 3126/22
3126/24 3126/25 3127/2 3127/7
3127/12 3127/13 3129/13 3131/15
3133/23 3134/2 3135/9
**fundamentally** [1] 3031/9
**funding** [3] 2914/10 2925/22 3124/24
**funds** [14] 2898/18 2903/11 2914/8
2999/10 3097/23 3098/1 3098/6

**F**

**funds... [7]** 3098/10 3110/3 3110/5
3110/6 3124/17 3138/5 3138/22
**future [9]** 2897/23 2901/18 2907/16
2942/9 2942/10 2956/6 2988/19
3039/19 3069/19
**Futures [1]** 2932/19

**G**

**G-E-L-L-E-R [1]** 3093/18
**gain [1]** 2994/13
**game [1]** 3119/2
**Gateway [2]** 2897/15 2905/24
**gay [4]** 3014/10 3015/14 3016/9
3017/10
**Geller [43]** 2919/10 2919/17 3055/3
3055/15 3055/19 3057/8 3057/24
3057/24 3058/8 3058/10 3058/14
3061/17 3093/9 3093/12 3093/18
3093/23 3096/9 3098/11 3101/18
3104/4 3105/8 3106/19 3107/5 3108/10
3111/15 3114/3 3115/23 3116/11
3116/13 3119/7 3119/15 3120/2
3120/10 3122/5 3123/17 3123/25
3124/11 3126/11 3126/20 3128/12
3130/12 3131/2 3134/22
**Geller's [1]** 2919/21
**general [26]** 2909/1 2938/14 2956/23
2956/25 2958/19 2958/21 2959/4
2963/13 2975/19 2979/23 2980/10
2985/25 2986/22 3046/8 3069/13
3069/15 3108/3 3108/21 3109/1
3109/18 3133/11 3133/16 3133/18
3133/24 3134/16 3136/14
**generally [8]** 2905/14 2908/7 2946/14
2955/12 2996/6 2999/7 3029/25 3046/2
**generations [1]** 3008/16
**genesis [3]** 3030/24 3047/16 3048/15
**gentleman [3]** 2906/25 2937/19
3008/16
**gentlemen [1]** 3134/7
**GenVec [4]** 3011/21 3011/24 3012/8
3013/18
**geography [1]** 2996/23
**gift [3]** 3120/25 3121/2 3121/3
**gifted [2]** 3121/4 3121/4
**gifts [2]** 3005/8 3005/10
**girlfriend [2]** 3029/13 3029/15
**given [15]** 2883/17 2889/1 2889/21
2889/24 2890/13 2892/19 2899/5
2907/3 2972/10 3006/18 3007/4
3079/25 3080/19 3085/23 3089/5
**glimmer [1]** 3028/12
**globally [1]** 2995/12
**gmail.com [1]** 2877/23
**goal [1]** 3126/23
**Golding [11]** 2921/23 2921/25 2925/9
2927/16 2944/20 2966/3 2966/22
2968/24 2969/11 2984/15 3072/14
**governance [2]** 2930/4 2980/23
**government [75]** 2877/12 2878/10
2878/21 2880/5 2880/9 2881/25 2882/6
2884/15 2886/14 2893/8 2893/13
2909/25 2910/5 2915/11 2915/16
2919/7 2920/23 2921/5 2921/9 2923/12
2923/20 2923/24 2927/1 2927/5
2929/12 2937/15 2937/23 2938/1

2938/3 2941/3 2943/15 2943/25 2944/4
2945/19 2946/3 2946/6 2948/7 2951/21
2961/5 2961/14 2961/17 2961/18
2970/21 2971/1 2979/4 2979/11
2979/14 2979/15 2983/5 2983/9
2986/12 3009/8 3035/21 3036/1 3061/8
3072/11 3078/19 3091/19 3091/24
3105/17 3107/12 3111/13 3115/22
3117/11 3119/5 3119/25 3121/17
3122/3 3123/12 3123/24 3124/1 3126/6
3126/9 3135/1 3140/9
**government's [39]** 2879/18 2881/17
2882/4 2884/7 2888/5 2893/1 2893/11
2893/19 2909/17 2910/3 2915/3 2921/8
2923/23 2926/15 2962/20 2982/21
3035/20 3078/1 3091/6 3091/12
3091/22 3105/7 3105/13 3106/20
3107/8 3111/3 3115/11 3115/19
3115/21 3117/2 3117/8 3121/25
3123/20 3123/23 3125/23 3127/24
3128/9 3129/14 3129/25
**graduate [1]** 3094/12
**grant [2]** 2897/21 2899/5 2902/2
**grants [3]** 2977/9 2977/10 2991/6
**gratuitous [1]** 3084/14
**great [3]** 2886/23 2887/7 2897/20
2922/4 3041/9 3041/11 3041/12
3056/12 3084/18 3085/12 3100/6
**greatly [1]** 3052/13
**Greebel [37]** 2899/9 2907/10 2908/15
2908/16 2909/7 2910/15 2922/7 2924/5
2927/16 2934/18 2935/10 2943/22
2944/12 2948/21 2949/8 2950/4
2951/21 2952/3 2952/3 2952/6 2952/8
2952/17 2952/23 2953/6 2953/8
2953/23 2955/4 2957/24 2958/10
3051/10 3051/22 3054/20 3062/25
3072/20 3078/3 3084/23 3084/25
**Greebel's [2]** 2923/17 2952/23 2985/14
**Greece [4]** 2965/14 2965/21 2998/11
2998/19
**grew [1]** 2882/21
**Grill [1]** 3004/12
**gross [1]** 2911/16
**ground [5]** 2951/13 2952/13 2986/10
3018/12 3036/6
**grounds [1]** 3102/25
**group [17]** 2924/3 2929/6 2931/12
2937/10 2967/14 2967/21 2971/4
2990/23 2990/25 2993/25 2994/3
2994/16 3001/10 3001/20 3001/21
3046/5 3047/25
**groups [1]** 3043/2
**growing [2]** 2962/10 3034/5
**growth [4]** 2962/12 2963/4 2994/21
2994/22
**guess [3]** 3015/24 3096/16
**guidance [1]** 3028/20
**guide [2]** 2962/9 3019/5
**guidelines [1]** 2930/15
**guy [2]** 3026/25 3096/17
**guys [7]** 2924/14 2975/11 2977/18
3003/4 3026/19 3027/5 3027/15

**H**

**Hackert [5]** 2916/25 2917/2 2922/8
3063/1 3072/20

**half [12]** 2893/23 2905/20 2907/2
2907/7 2907/11 2907/22 2918/25
2998/8 2998/8 3079/22 3094/9 3095/11
**hand [4]** 3036/4 3051/7 3051/8 3073/12
**hand-pick [1]** 3036/4
**handed [1]** 2989/5
**handle [8]** 2940/22 2957/11 2966/12
2968/20 2969/7 2969/7 2978/22
2994/16
**handled [8]** 2899/16 2899/17 2917/21
2940/20 2940/23 2940/23 2978/15
2978/16
**handling [1]** 2916/18
**happiness [1]** 3010/7
**happy [11]** 2886/3 2886/7 2983/18
2990/16 3006/2 3006/3 3006/4 3010/8
3013/14 3052/19 3089/1
**hard [11]** 2926/22 2962/6 2991/24
3029/3 3029/4 3029/24 3030/1 3030/4
3067/13 3079/2 3133/9
**harder [1]** 3095/10
**hardly [1]** 2972/24
**harmless [2]** 2885/6 3065/17
**Harvard [3]** 3043/3 3043/4 3043/5
**Hassan [3]** 2913/16 2913/25 3078/24
**hate [1]** 2900/10
**head [3]** 2929/9 2945/15 2977/22
**headache [3]** 3008/23 3008/24 3024/13
**headaches [2]** 3030/11 3030/11
**headed [1]** 2922/5
**heading [2]** 3056/7 3056/8
**headline [1]** 2882/11
**headlines [1]** 2940/3
**health [6]** 3007/22 3022/14 3030/2
3097/3 3108/7 3108/8
**healthcare [36]** 2922/23 3069/3
3069/14 3096/23 3096/24 3097/1
3097/17 3104/12 3106/1 3106/2
3106/14 3107/2 3107/21 3111/22
3114/7 3114/25 3115/4 3115/6 3115/17
3116/13 3118/9 3120/21 3121/5 3121/6
3121/7 3121/11 3123/7 3124/12
3124/14 3124/19 3124/25 3129/2
3129/6 3131/7 3131/19 3135/12
**Healthcare's [2]** 3121/14 3127/19
**healthy [5]** 2918/19 2931/19 2931/25
3018/5 3039/9
**hear [5]** 2968/18 3069/8 3096/14
3112/4 3134/25
**heard [8]** 2920/2 2920/6 2920/16
3015/24 3043/7 3056/22 3084/5
3101/13
**hearing [4]** 2931/4 2931/14 2950/12
2972/1
**hearsay [4]** 2951/17 2953/10 2953/10
2986/11
**heavily [2]** 2898/7 3124/22
**hedge [23]** 2931/11 2999/13 2999/23
3026/19 3097/23 3097/25 3098/6
3098/9 3098/16 3100/19 3101/9 3102/6
3103/7 3103/12 3104/5 3105/23
3105/25 3110/3 3110/5 3110/6 3110/17
3124/17 3127/12
**heeding [1]** 2967/10
**held [3]** 2900/1 2957/24 2988/21
**help [8]** 2965/4 2995/24 3007/25
3027/13 3034/5 3035/12 3088/15

**H**

help... [1] 3114/22
helped [1] 2929/11
helping [5] 2906/8 2995/17 3005/12 3022/14 3043/19
hereby [1] 2981/8
Hi [3] 2882/13 2888/15 2944/16
high [2] 3008/3 3095/4
highlight [1] 3052/21
highlighted [2] 2900/21 3065/6
highlighting [2] 3038/24 3065/4
highly [1] 3006/10
himself [15] 2885/21 2885/24 2918/22 2953/16 2953/17 2958/5 3007/9 3007/12 3007/21 3009/22 3022/15 3029/19 3029/22 3030/5 3030/7
hired [1] 3033/12
hold [12] 2881/3 2882/17 2896/16 2987/13 2987/13 2987/14 2987/20 2988/6 2988/7 3031/6 3065/17 3089/9
holding [6] 2882/19 2882/22 2892/5 2902/25 3066/16 3075/20
holdings [11] 2884/3 2892/23 2894/1 2904/3 2905/3 2917/23 2998/3 2998/3 2998/5 2999/7 3000/2
holds [1] 3049/5
home [2] 2977/16 3138/14
Honor [49] 2878/12 2878/23 2935/22 2937/4 2951/9 2952/2 2954/8 2973/4 2986/14 2989/1 2989/5 3012/10 3012/13 3012/15 3014/13 3014/15 3016/16 3018/19 3021/25 3023/11 3041/19 3068/17 3078/15 3090/18 3093/9 3093/14 3093/19 3096/7 3099/6 3099/8 3099/11 3100/1 3105/13 3111/10 3111/25 3112/3 3113/1 3115/18 3116/7 3117/7 3121/24 3123/20 3126/5 3131/21 3132/1 3133/2 3134/14 3135/2 3138/13
HONORABLE [1] 2877/9
hope [6] 2888/15 2899/19 2899/21 2902/22 2944/16 3028/12
hoped [3] 2982/3 3024/12 3050/5
hopefully [1] 3035/12
Horacio [5] 2906/25 2929/2 2929/3 2933/10 2940/21
Horacio's [1] 2933/19
horrible [1] 3037/14
hour [2] 2989/10 3003/6
hours [3] 2924/19 3029/6 3104/23
house [2] 2979/23 2980/10 3006/25 3007/9
HR [5] 2906/10 2992/19 2992/20 2992/21 2992/25
hubble [1] 3032/16
hug [2] 3092/24 3092/25
huge [3] 2891/12 2891/17 3026/9
human [6] 2993/5 2993/13 3002/7 3005/24 3005/24 3008/15
humble [1] 3026/13
humiliate [3] 3016/18 3016/20 3017/9
hundred [1] 3134/14
hurt [1] 2968/19
hygiene [1] 3007/15
hypothetical [5] 3100/22 3101/1 3103/16 3139/2 3139/3

**I**

**I N D E X [1]** 3140/7
i.e [1] 2902/9
idea [16] 2973/3 3000/21 3031/8 3034/23 3039/8 3039/18 3039/19 3040/1 3041/8 3041/9 3041/12 3048/3 3048/6 3048/8 3048/9 3120/19
ideas [2] 2970/2 3032/11
identification [25] 2879/17 2881/16 2884/6 2892/25 2909/16 2915/2 2920/23 2923/11 2926/14 2937/14 2943/14 2945/18 2961/5 2979/5 2982/20 3091/5 3096/3 3105/6 3106/20 3111/2 3115/10 3117/1 3121/17 3123/11 3125/22
identified [2] 2906/12 3096/6
identify [1] 3057/13
ignored [3] 2967/13 2971/3 2976/10
ignoring [1] 2966/9
ill [1] 3024/15
illegal [2] 2973/18 2973/20
illiquid [8] 3098/5 3098/12 3098/13 3098/14 3124/15 3125/17 3126/19 3127/19
image [1] 3005/13
immediately [7] 2905/8 2922/4 2950/3 2950/10 2977/24 3056/11 3088/17
impact [7] 2904/11 2947/2 2956/11 2966/19 2995/25 3035/11 3050/3
impacted [1] 3030/4
impacts [1] 3049/12
impeach [1] 3018/16
implication [1] 3009/13
imply [3] 3014/18 3103/7
implying [1] 3041/8
importance [1] 2985/11
important [23] 2925/20 2933/15 2968/15 2968/19 3021/13 3038/8 3038/16 3049/24 3071/19 3082/13 3100/20 3101/9 3102/7 3104/6 3108/10 3108/12 3109/6 3110/10 3122/8 3127/20 3129/5 3131/8 3131/12
impose [1] 3137/22
impressed [4] 3098/25 3099/3 3102/2 3113/6
impresses [1] 3113/11
impression [10] 2895/25 2904/18 3003/2 3038/11 3097/16 3113/18 3114/24 3115/1 3119/20 3120/13
impressions [1] 3124/23
improve [3] 2924/23 2994/22 2994/23
in-house [2] 2979/23 2980/10
inability [1] 2983/20
inaccurate [2] 3131/7 3131/11
inappropriate [3] 2955/23 3084/15 3100/16
Inc [3] 3067/17 3069/6 3114/9
incentive [2] 2946/17 2977/10
incentives [1] 2990/22
inch [1] 2939/5
incidents [1] 2970/21
included [6] 2896/23 2947/23 3011/19 3066/12 3070/17 3070/20
includes [2] 2929/2 2946/17
including [5] 2880/12 2912/4 2940/8 3073/9 3124/15
income [1] 3109/22

inconsistencies [2] 3074/6 3081/23
inconsistent [2] 3125/13 3125/14
incorporated [1] 3078/7
increase [1] 3031/10
incredibly [2] 2960/12 2961/2
indeed [8] 2903/18 2903/19 2948/7 2949/10 2949/12 2982/3 2986/24 2987/3
indemnification [1] 3065/16
independence [3] 2958/12 2958/13 2958/14
independent [8] 2935/16 2940/6 2940/10 2957/20 2958/1 2959/7 2966/23 2966/24
independently [1] 2987/25
indicate [3] 2902/19 2932/25 3082/4
indicated [1] 3063/5
indicates [1] 3058/13
indirectly [1] 3125/1
individual [7] 2908/8 2920/2 2920/6 2920/16 2978/18 3095/13 3106/8
individuals [8] 2921/21 2922/8 2922/9 2922/10 2928/25 2951/12 2978/6 3043/2
indoor [1] 3000/9
industry [4] 3031/14 3094/24 3094/25 3099/2
infatuated [1] 3014/9
infection [9] 3020/12 3020/17 3021/10 3021/15 3030/9 3091/1 3092/10 3092/16 3092/20
influence [1] 3118/8
influenced [1] 3016/17
inform [3] 2941/25 2943/11 3133/16
information [34] 2942/14 2942/19 2951/16 2952/9 2952/10 2956/13 2972/15 2973/11 2974/5 2974/13 2974/15 2974/19 2974/22 2975/2 2981/25 3011/23 3012/2 3082/11 3084/21 3085/23 3097/16 3101/8 3103/14 3104/4 3105/3 3108/10 3109/6 3109/21 3113/17 3116/21 3116/23 3122/10 3125/7 3125/19
informational [1] 3052/5
informed [1] 2956/7
informing [1] 2942/14
infrastructure [1] 2960/6
inherent [1] 3031/25
initial [4] 2891/6 2901/6 2947/16 3108/24
initiated [1] 2986/5
Initiatives [1] 2963/4
input [3] 2961/24 2962/15 2962/18
inside [6] 2972/15 2973/10 2974/12 2974/22 2975/16 3003/3
insight [1] 2963/25
insinuate [1] 3014/19
instances [1] 3086/13
instead [1] 2883/25
instructed [1] 2977/2
instruction [4] 2972/17 2975/3 2976/16 2976/19
instructions [2] 2966/9 2967/14
instrumental [1] 3050/15
intend [2] 2902/20 3015/9
intended [2] 2915/21 3015/2
intense [1] 2926/5

**I**

intent [3] 3016/1 3046/17 3124/15
interacting [1] 3001/7
interaction [1] 3001/14
interest [3] 2912/5 2981/1 3134/16
interested [2] 2983/21 2983/22 3002/7
 3004/5
interesting [1] 2925/17
interfaces [1] 2960/8
interfered [1] 3016/1
interim [7] 2969/4 2969/12 2979/3
 2981/15 3035/24 3036/2 3060/13
interjected [1] 2917/7
internal [12] 2899/10 2907/13 2908/15
 2908/16 2909/1 2935/2 2935/14
 2963/13 2976/14 2977/22 2986/4
 2986/19
international [4] 2993/12 2995/15
 2995/20 2996/4
interrelated [1] 2954/2
interrupt [3] 2885/6 2886/6 2886/11
interview [13] 2906/11 2948/14
 2948/15 2949/6 2949/16 2949/17
 2950/2 2950/3 2951/16 2955/12 2956/3
 2956/9 3088/12
interviewed [5] 2922/1 2947/21
 2948/10 2949/14 2949/15
interviewing [2] 2888/20 2964/12
interviews [1] 2906/13
intrigued [2] 2938/17 3002/10
introduced [4] 3087/1 3088/1 3095/18
 3095/20
introducing [1] 2938/11
invert [1] 3047/15
invest [21] 2895/8 2900/16 2982/13
 2999/23 3027/5 3027/8 3089/4 3102/21
 3102/23 3103/13 3108/2 3110/25
 3115/6 3115/8 3121/8 3121/11 3124/15
 3124/19 3124/25 3126/24 3127/11
invested [23] 2889/12 2894/16 2894/22
 2895/6 2895/14 2901/12 2999/13
 3000/16 3016/12 3017/17 3097/2
 3097/23 3098/3 3098/7 3098/8 3098/19
 3110/5 3116/3 3116/6 3116/13 3116/17
 3125/4 3125/17
investigate [1] 2938/25
investigation [12] 2932/18 2947/8
 2948/2 2948/20 2952/16 2952/18
 2952/25 2953/2 2986/5 2986/20
 2986/23 2986/25
investigation's [1] 2987/5
investigators [1] 2973/13
investing [11] 2922/22 3096/15
 3097/25 3100/20 3104/6 3108/11
 3109/6 3110/11 3110/24 3127/20
 3129/5
investment [57] 2879/15 2889/15
 2890/25 2892/12 2892/17 2898/13
 2898/15 2900/14 2900/19 2903/22
 2904/8 2930/8 2930/9 2930/19 2938/13
 2939/2 2940/22 2956/1 2987/17
 2987/19 2988/1 2997/18 2999/16
 2999/18 2999/23 3069/13 3089/2
 3089/14 3098/19 3101/10 3101/17
 3104/1 3104/16 3105/11 3107/18
 3108/4 3108/7 3108/8 3108/15 3108/24
 3110/25 3113/12 3116/12 3116/20

 3116/21 3118/6 3120/22 3122/13
 3129/20 3126/18 3126/21 3127/10
 3127/19 3130/7 3131/8 3131/12
 3131/18
investments [30] 2889/9 2891/5 2891/9
 2894/5 2894/9 2894/18 2894/19
 2894/20 2895/2 2896/20 2896/25
 2897/3 2898/13 2938/21 2938/25
 2939/1 2998/2 2998/7 3098/5 3098/9
 3098/12 3098/16 3107/21 3108/8
 3111/22 3114/7 3124/23 3125/2 3125/3
 3125/18
investor [26] 2891/8 2947/20 2964/1
 2977/22 2978/10 2982/12 2984/3
 2996/24 2996/25 2997/2 2997/7
 2997/22 3028/25 3043/7 3095/19
 3097/14 3100/8 3104/17 3109/4 3111/7
 3116/24 3117/6 3118/2 3121/21 3122/7
 3130/14
investors [36] 2881/2 2898/19 2901/12
 2903/13 2903/17 2903/20 2904/6
 2907/16 2920/9 2947/23 2949/23
 2952/12 2953/1 2953/25 2978/2 2978/4
 2978/11 2978/13 2978/17 2978/18
 2981/18 2984/5 3034/15 3037/7 3066/5
 3069/12 3077/21 3080/25 3088/15
 3110/18 3113/2 3113/3 3122/22
 3122/23 3124/15 3131/5
investors' [2] 2981/20 2982/8
invests [1] 3113/9
invite [3] 2940/11 3008/25 3009/3
inviting [1] 2948/14
involve [2] 2956/24 2986/19
involved [10] 2929/18 2939/24 2987/3
 2995/8 2995/15 3011/7 3048/14
 3060/12 3085/20 3085/23
involvement [2] 2985/14 2985/17
irreconcilable [1] 3027/12
irrelevant [5] 2901/13 2951/8 2986/11
 3084/15 3136/8
isolation [1] 3022/7
issue [22] 2891/20 2900/25 2901/9
 2916/3 2947/24 2948/7 2951/12 2952/2
 2952/4 2954/3 2973/6 2975/12 2976/15
 2977/25 3013/25 3014/18 3022/14
 3030/22 3031/2 3044/8 3135/1 3135/10
issued [2] 2902/2 2976/13
issues [15] 2878/3 2953/24 2958/17
 2960/25 2961/1 2971/1 2980/15
 2980/20 2993/18 2994/14 3006/24
 3007/2 3030/15 3082/25 3136/17
issuing [2] 2924/16 2977/9
Italy [3] 3029/13 3029/13 3029/15
item [8] 2912/7 2913/21 2916/11
 2919/8 2922/14 2933/24 3061/10
 3062/16
items [20] 2913/14 2915/25 2916/1
 2916/1 2916/5 2916/8 2916/9 2916/14
 2919/13 2924/20 2924/21 2941/11
 2942/1 2962/7 2962/17 2962/19
 2962/21 2976/17 3057/5 3057/7
itself [2] 2978/23 3003/3

**J**

jacket [1] 3005/11
Jackson [3] 2885/4 2895/17 3088/18
JACOB [1] 2877/21

JACQUELYN [1] 2877/15.
Jan [3] 2922/8 3063/1 3072/20
January [7] 2880/4 2880/14 2924/6
 2960/18 3106/18 3107/4 3126/12
January 1st [2] 3106/18 3107/4
January 24 [2] 2880/4 2880/14
January 24th [1] 3126/12
January 6 [1] 2924/6
Jeff [7] 2922/16 2922/19 2925/5 2925/9
 2966/3 2966/4 3084/1
Jensen [6] 2909/1 2909/4 2979/24
 2980/8 2980/9 2985/18
Jim [4] 3098/25 3099/1 3100/3 3102/2
job [4] 2993/20 3008/5 3008/14 3085/17
jobs [2] 3094/16 3094/25
join [3] 2922/21 2957/25 2994/11
joined [7] 2921/23 2925/5 2934/25
 2978/10 2978/15 2994/19 3001/11
journey [1] 2900/19
JUDGE [19] 2877/10 2903/24 2971/10
 2990/8 3013/21 3016/13 3017/12
 3017/24 3038/5 3054/6 3057/15
 3066/19 3066/24 3067/3 3093/3
 3102/10 3133/9 3139/6 3139/7
July [8] 2877/5 2908/24 2909/4 2909/12
 3078/2 3117/23 3130/5 3139/10
July 13 [1] 3139/10
July 2 [1] 3078/2
July 2011 [1] 3117/23
July 2012 [1] 3130/5
July 2013 [1] 2909/12
jumping [1] 2900/16
June [22] 2911/6 2913/8 2913/12
 2914/3 2961/13 2961/20 2963/5 2963/9
 2964/5 2965/7 2965/25 2967/11 3064/6
 3064/9 3074/25 3078/8 3106/4 3111/18
 3114/13 3116/2 3129/16 3129/21
June 2012 [2] 3129/16 3129/21
June 2013 [1] 2911/6
June 2014 [1] 2963/5
June 22 [2] 3106/4 3114/13
June 23 [1] 3111/18
June 25th [2] 2961/13 2961/20
June 29 [1] 3116/2
June 30 [4] 2913/8 2913/12 2914/3
 3078/8
June 30th [2] 3064/6 3064/9
junior [2] 3027/1 3027/2
jurors [6] 2935/24 2937/2 2989/8
 2990/3 3052/23 3054/4
jury [30] 2877/10 2878/7 2878/8
 2882/12 2897/12 2900/9 2936/4 2937/1
 2947/15 2954/1 2955/1 2972/11
 2972/17 2977/2 2989/13 2990/2 3013/1
 3031/3 3046/13 3048/22 3052/25
 3053/4 3054/3 3058/17 3089/17
 3101/13 3116/8 3133/15 3134/7
 3134/13
jury's [1] 3136/8
justice [1] 3056/25

**K**

KAM [1] 2877/2
KAPLAN [1] 2877/21
KARTHIK [1] 2877/16
KASULIS [8] 2877/15 2881/11 3013/6
 3013/25 3018/22 3100/21 3140/3

## K

**KASULIS... [1]** 3140/4
**Katten [5]** 2923/18 2924/4 2985/17 3054/20 3084/25
**Katten's [1]** 2957/8
**keep [12]** 2897/16 2933/25 2933/25 2956/4 2956/7 2962/12 3019/3 3052/19 3106/20 3118/5 3123/10 3129/5
**keeping [5]** 2962/17 2962/20 2977/10 3008/12 3118/9
**Ken [17]** 2919/10 2919/25 2929/10 2929/11 2934/2 2934/6 2934/16 3000/10 3000/12 3000/14 3000/14 3058/25 3059/2 3059/20 3059/25 3060/12 3062/18
**kept [4]** 2970/13 3068/25 3083/25 3084/3
**Kevin [8]** 3100/12 3105/21 3105/22 3105/23 3111/16 3126/4 3126/14 3127/6 3127/8
**key [5]** 2896/17 2896/18 2906/11 3050/19 3105/2
**kick [2]** 2899/20 2899/22
**kickstart [1]** 2985/12
**kind [12]** 2918/19 2974/4 2995/5 3002/23 3038/14 3040/2 3095/11 3096/18 3105/10 3111/6 3121/20 3125/24
**kindly [1]** 2882/22
**kinds [3]** 3095/5 3135/8
**KIYO [1]** 2877/9
**Klein [1]** 2978/9
**knowing [4]** 2882/21 2900/18 2981/23 3056/10
**knowledge [3]** 2919/22 3086/21 3103/1
**known [3]** 3042/10 3042/18 3103/12
**knows [3]** 3136/9 3136/18 3136/21
**kosher [1]** 3130/23
**Kravitz [2]** 2924/3 2924/12

## L

**label [1]** 3009/11
**labeled [3]** 3007/3 3116/25 3127/22
**lacking [1]** 2923/8
**lacks [1]** 2933/20
**Ladies [1]** 3134/7
**lag [3]** 3130/18 3130/24 3130/25
**laid [4]** 2900/20 2928/13 2931/20 2955/13
**landed [1]** 2924/14
**language [8]** 2917/5 2917/16 2933/21 3104/24 3107/17 3107/24 3114/20 3121/2
**large [7]** 2902/19 2923/8 2994/6 2994/17 3000/21 3008/20 3094/20
**largely [2]** 2901/13 2994/13
**largest [2]** 2995/12 2995/13
**last [23]** 2892/12 2892/17 2893/16 2894/11 2894/11 2894/14 2896/12 2899/11 2902/15 2913/11 2944/7 2944/9 2944/17 2945/5 2987/22 2988/8 2988/10 2999/5 3018/2 3024/9 3095/11 3108/23 3135/11
**lastly [1]** 3096/16
**late [11]** 2892/5 2907/5 2916/4 2928/9 2991/23 3000/23 3001/16 3001/16 3032/10 3046/6 3056/2

**latest [2]** 3063/7 3063/23
**latter [1]** 2918/25
**law [4]** 2924/4 2956/21 3054/20 3094/25
**laws [1]** 2932/22
**lawsuit [8]** 2949/20 2950/13 2955/14 2972/9 2973/7 2973/11 2976/7 2976/8
**lawyer [1]** 3051/22
**lawyers [1]** 2990/14
**lay [3]** 2951/13 2965/5 3116/9
**layers [1]** 2953/10
**laying [3]** 2927/11 3039/15 3063/12
**layout [2]** 2893/5 3039/22
**lead [4]** 2916/25 2917/2 2970/12 2984/16
**leader [2]** 2929/6 3008/19
**leaders [1]** 2994/21
**leadership [2]** 2964/16 2994/20
**leading [4]** 2879/9 2903/24 2931/12 2992/12
**learn [2]** 3000/19 3000/20
**learned [6]** 2948/1 2952/9 2953/20 2953/21 2967/12 3103/3
**learning [2]** 2951/15 3036/11
**least [7]** 2923/9 2998/8 3031/13 3051/19 3059/20 3062/19 3137/5
**leave [6]** 2936/1 2975/22 2981/11 2986/1 3007/9 3134/10
**leaving [1]** 3021/4
**led [5]** 2972/15 2973/13 2976/6 3010/15 3115/3
**Lee [1]** 2920/2
**left [12]** 2895/25 2955/24 2965/23 2966/17 2966/22 2986/2 2986/8 2987/8 2993/23 3020/13 3028/16 3051/7
**legacy [10]** 3035/4 3035/9 3037/25 3038/6 3038/9 3038/10 3038/12 3038/13 3038/15 3048/4
**legal [10]** 2886/4 2907/12 2911/23 2957/1 3063/11 3085/17 3086/3 3086/7 3134/4 3138/3
**legend [1]** 3068/19
**Lehman [3]** 3094/18 3094/19 3094/21
**lending [1]** 3133/23
**length [2]** 3015/20 3017/15
**lengthy [1]** 2893/22
**less [5]** 2939/2 2954/6 3005/18 3046/15 3108/25
**lesson [2]** 2891/13 2891/18
**letter [21]** 2948/13 3011/19 3064/6 3073/3 3074/1 3074/9 3074/9 3074/19 3081/19 3082/24 3105/11 3106/11 3111/7 3121/21 3122/22 3122/23 3124/5 3124/7 3124/11 3127/1 3127/10
**letters [3]** 3028/24 3031/22 3081/20
**letting [6]** 2885/7 2886/5 2891/13 2891/18 2892/1 2958/16
**level [8]** 2890/22 2934/1 2976/2 3000/8 3000/9 3000/9 3000/9 3008/3
**leverage [1]** 3046/21
**liabilities [6]** 3065/11 3075/3 3076/18 3076/20 3077/23 3108/22
**liability [10]** 3069/5 3075/19 3076/25 3077/5 3077/6 3077/7 3077/9 3080/18 3082/7 3120/23
**liable [1]** 2900/1
**license [2]** 2912/3 2912/8 2912/10

**2912/11
lie [1]** 3016/23
**lied [4]** 2969/24 2971/5 2976/12 3013/1
**life [8]** 3006/7 3006/12 3010/3 3010/9 3034/23 3035/6 3035/8 3036/17
**life-threatening [1]** 3036/17
**Ligand [3]** 2912/8 2912/9 2912/10
**light [1]** 3047/17
**lightly [1]** 3015/1
**likely [3]** 3046/12 3046/12 3125/1
**limine [1]** 3101/22
**limited [19]** 2975/3 3069/2 3069/4 3108/19 3109/18 3109/20 3109/22 3120/23 3124/16 3133/11 3133/16 3134/15 3135/14 3135/14 3137/2 3137/4 3137/5 3137/12 3137/23
**line [24]** 2890/7 2890/9 2894/11 2911/7 2911/10 2911/17 2912/4 2913/12 2913/14 2913/21 2919/8 2919/13 2921/20 2922/14 2922/14 2935/16 2950/15 2964/23 3002/9 3023/16 3024/6 3018/1 3122/16 3131/15
**lines [2]** 3006/10 3081/16
**lingering [1]** 3082/25
**liquid [7]** 3097/12 3097/21 3098/12 3098/13 3108/15 3126/25 3127/11
**liquidity [2]** 3097/11 3109/10
**list [13]** 2889/8 2891/10 2894/8 2894/19 2896/18 2901/6 2916/5 2929/1 2929/1 2940/25 2941/9 2969/19 2972/19
**listed [15]** 2913/9 2915/25 2919/10 2921/21 2922/7 2925/21 2927/16 2929/10 2930/14 2932/9 2964/11 3048/25 3055/1 3106/6 3106/15
**listen [1]** 2977/14
**listener [1]** 2951/15
**listing [7]** 2913/18 2925/19 2925/23 2932/8 2966/18 2966/19 2966/23
**lists [1]** 2889/2
**literally [2]** 3001/8 3023/9
**litigation [1]** 2980/22
**live [1]** 3093/25
**lived [1]** 3094/4
**lively [2]** 3002/11 3002/11
**lives [1]** 3035/11
**living [1]** 3004/19
**LLC [6]** 2889/9 3069/4 3069/4 3069/12 3069/14 3120/23
**LLP [1]** 3073/3
**LLP's [1]** 3064/5
**loan [10]** 3133/21 3135/16 3135/17 3136/7 3137/3 3137/10 3137/13 3137/17 3137/20 3138/19
**loans [5]** 3114/22 3131/18 3133/3 3134/2 3135/3
**local [1]** 2995/14
**located [3]** 2956/20 2956/21 3107/21
**location [1]** 2926/12
**locations [1]** 2994/3
**lock [2]** 2972/8 2973/6 2973/15
**lock-up [3]** 2972/8 2973/6 2973/15
**locked [1]** 2901/1
**log [1]** 2883/3
**long-term [2]** 3111/21 3114/6
**long/short [2]** 3097/2 3097/4
**longs [2]** 3097/6 3097/7
**Lonza [3]** 3033/7 3033/10

**L**

look [54]  2881/4 2883/13 2886/2
2892/6 2892/9 2896/10 2896/14 2897/6
2900/8 2901/8 2901/22 2904/7 2906/1
2910/8 2911/1 2911/7 2911/15 2913/1
2915/5 2919/8 2922/14 2924/1 2927/15
2928/22 2929/1 2929/12 2929/13
2929/21 2942/1 2953/24 2957/22
2957/23 2958/6 2962/23 2973/22
2980/12 2981/4 2997/18 3008/21
3020/4 3035/19 3036/12 3050/2 3051/3
3051/6 3051/8 3051/9 3056/16 3061/5
3074/11 3104/23 3111/19 3117/13
3129/17
looked [9]  2898/6 2965/18 3005/21
3047/16 3072/8 3078/7 3104/22
3110/20 3125/16
looking [19]  2898/18 2898/22 2907/16
2921/15 3007/23 3020/16 3030/6
3038/6 3038/14 3059/6 3061/8 3065/6
3097/20 3105/1 3108/2 3108/14
3111/15 3121/6 3122/16
looks [1]  3126/25
lose [2]  2900/13 2982/11
losing [2]  2958/12 2967/8
loss [2]  2890/25 2895/7
losses [1]  2895/7
lost [1]  3098/9
Loup [3]  3003/21 3003/22 3003/23
3018/1
love [5]  2902/24 3009/9 3011/8 3017/22
3018/1
loved [4]  3010/19 3010/22 3010/24
3011/2
lovely [2]  3024/13 3037/18
loving [4]  3009/14 3011/5 3011/5
3018/5
low [4]  2931/25 3095/4 3097/21 3108/6
lower [6]  2939/3 3026/1 3027/6
3027/15 3044/5 3044/6
LP [7]  3069/2 3069/15 3120/21 3124/12
3124/14 3124/19 3124/21
lunch [4]  2930/2 2934/7 2989/8
2989/14
lying [2]  2968/1 2991/18
Lynch [5]  2949/20 2950/12 2952/11
2955/14 3135/19

**M**

Madison [2]  3044/10 3044/13
magic [1]  3040/2
mail [85]  2880/1 2880/3 2880/11
2881/22 2882/12 2883/6 2883/10
2884/12 2884/13 2885/11 2885/14
2885/19 2885/21 2886/1 2886/14
2888/9 2888/10 2888/13 2889/6 2890/4
2890/7 2890/10 2890/18 2890/19
2892/7 2893/6 2893/17 2893/20
2893/22 2893/23 2897/1 2897/4
2898/22 2899/25 2900/6 2902/15
2903/8 2904/23 2909/22 2910/8 2910/9
2910/11 2910/13 2982/25 2983/13
2984/7 2988/10 2988/13 2988/14
2988/24 3021/7 3021/8 3022/11
3022/16 3022/22 3022/23 3023/4
3023/7 3023/13 3023/16 3023/24
3024/7 3024/9 3024/9 3024/22 3025/4
3025/19 3025/20 3027/11 3034/9

**3050/23** 3051/21 3090/4 3090/5
3090/11 3091/13 3091/16 3092/1
3092/16 3092/17 3106/3 3114/24
3117/13 3117/14 3117/20
mails [10]  2885/10 2886/10 2886/16
2893/18 2895/16 2903/16 2978/3
3024/20 3025/20 3030/11
main [5]  2927/13 2929/16 2934/4
3038/25 3127/9
maintain [1]  3048/15
major [2]  2890/8 2890/12 2944/23
2944/23
majority [1]  2966/24
male [1]  3011/6
man [5]  3013/1 3016/11 3018/4
3100/11 3102/1
management [24]  2889/3 2906/2
2906/7 2906/9 2926/5 2930/5 2930/8
2935/8 2942/23 2942/23 2957/3 2957/6
2994/6 2995/23 2996/10 3065/11
3069/4 3069/13 3074/7 3075/3 3111/21
3114/6 3135/17 3138/6
manager [5]  2978/10 3044/2 3101/9
3102/6 3104/5
managing [4]  2984/17 3069/12 3106/15
3135/5
Manhattan [3]  2926/10 2926/11
2956/21 3094/3
manner [4]  2962/9 2964/7 2968/20
2968/21
manslaughter [1]  2972/23
marc [32]  2877/20 2888/16 2888/19
2909/22 2914/13 2916/16 2921/3
2921/20 2923/6 2937/20 2938/6
2943/22 2960/24 2961/1 2963/11
2978/8 2990/13 3054/11 3054/17
3054/17 3055/16 3055/23 3056/23
3059/9 3061/16 3062/21 3062/24
3072/14 3075/15 3076/12 3080/5
3080/16
March [30]  2881/24 2882/10 2884/14
2888/13 2888/25 2891/24 2897/9
2916/13 2947/9 2948/18 2985/23
2986/2 2987/9 2988/12 3020/8 3024/12
3025/1 3025/4 3033/2 3033/4 3035/16
3035/22 3039/18 3043/15 3063/24
3080/23 3081/1 3090/5 3091/9 3091/9
March 13 [2]  2884/14 2888/13
March 14 [1]  2897/9
March 2010 [1]  3091/9
March 2015 [3]  2986/2 2987/9 2988/12
March 29 [3]  3020/8 3090/5 3091/9
March 31 [1]  2916/13
March 7 [4]  2882/10 3024/12 3025/1
3025/4
Marcum [9]  2916/23 2916/24 2917/8
2917/14 2922/11 3064/5 3073/3 3074/8
3074/18
Marek [17]  2892/15 2902/1 2902/6
2902/10 2902/12 2937/20 3003/10
3026/6 3026/21 3027/12 3028/5 3028/9
3028/11 3044/2 3045/1 3045/2 3050/18
Margaret [2]  2908/25 2979/24
mark [2]  2890/22 2906/22
marked [24]  2879/17 2881/16 2884/6
2892/25 2909/16 2915/2 2920/22
2923/11 2926/14 2937/14 2943/3

**2945/18** 2961/5 2979/4 2982/20 2991/5
3106/3 3106/19 3117/2 3117/1
3121/17 3123/11 3125/22
market [15]  2891/11 2896/16 2898/18
2904/8 2904/12 2947/1 2960/7 2968/17
2987/21 3032/24 3048/3 3050/9 3095/9
3098/4 3108/3
markets [2]  2905/24 3050/1
married [1]  3094/6
MARTIN [215]  2877/6 2879/9 2879/12
2880/1 2881/22 2883/17 2884/12
2891/22 2893/7 2894/4 2901/6 2906/10
2907/5 2907/15 2907/19 2908/2 2908/9
2910/17 2916/10 2917/7 2917/15
2918/2 2918/23 2919/2 2919/5 2925/9
2925/17 2927/23 2927/25 2928/8
2928/13 2928/18 2929/8 2931/13
2931/20 2932/1 2933/18 2933/20
2934/12 2934/12 2937/12 2937/19
2938/10 2940/8 2942/24 2945/4 2945/9
2945/25 2946/17 2946/23 2946/25
2947/16 2948/22 2951/12 2958/3
2958/5 2958/18 2959/1 2959/6 2959/21
2960/13 2960/23 2960/25 2961/10
2962/3 2964/6 2964/14 2964/22 2965/5
2965/19 2965/23 2966/2 2966/8
2966/10 2966/21 2968/23 2968/24
2969/3 2969/5 2969/15 2969/23 2970/7
2970/9 2970/13 2977/24 2978/1 2979/2
2982/3 2982/7 2982/25 2984/16
2984/17 2984/18 2985/4 2985/6 2987/4
2990/13 2990/19 2999/13 3000/4
3000/16 3001/3 3003/15 3007/1 3007/1
3007/3 3007/3 3007/13 3008/11
3008/17 3011/10 3011/18 3014/9
3014/10 3020/2 3020/10 3023/13
3025/5 3026/4 3026/23 3027/8 3027/16
3027/19 3028/8 3028/9 3028/22 3029/2
3029/3 3031/19 3032/2 3032/16
3033/11 3034/10 3035/14 3035/24
3037/25 3038/20 3039/13 3042/8
3042/25 3043/10 3043/16 3043/21
3043/23 3044/25 3045/3 3045/21
3045/24 3047/3 3047/5 3050/15
3050/19 3050/25 3054/18 3060/9
3060/12 3060/16 3060/18 3062/2
3062/25 3066/6 3069/1 3072/19 3073/9
3074/1 3075/16 3076/1 3076/10
3076/22 3077/21 3078/2 3080/7
3080/10 3080/11 3080/13 3080/15
3080/19 3080/20 3080/20 3080/23
3081/1 3081/2 3081/5 3081/10 3082/15
3082/22 3083/1 3083/5 3083/18
3083/20 3086/3 3086/7 3086/11
3086/11 3087/1 3087/6 3088/1 3088/6
3088/8 3089/4 3089/17 3089/24 3090/5
3090/7 3091/16 3095/13 3095/22
3095/24 3106/16 3120/4 3124/20
3126/14 3127/6 3128/18 3136/20
Martin's [8]  2897/2 2902/12 2927/10
2927/10 2941/16 2960/25 2970/10
2982/14
matches [2]  3126/17 3126/22
material [4]  2938/18 3101/4 3103/15
3124/24
materially [1]  3122/8
materials [2]  2924/16 2924/17

**math [1]** 2889/17

**MATSUMOTO [1]** 2877/9

**matter [4]** 2904/18 2951/19 3016/7 3016/12

**mattered [1]** 3103/4

**matters [2]** 3103/1 3134/19

**mays [1]** 3064/5

**mean [33]** 2880/25 2891/19 2892/2 2898/12 2898/16 2902/7 2958/13 2964/9 3009/12 3011/4 3013/11 3017/1 3017/2 3018/25 3080/18 3095/2 3097/4 3097/13 3101/24 3102/17 3104/21 3107/25 3109/3 3109/25 3110/16 3114/20 3119/22 3120/15 3126/21 3129/11 3129/13 3130/23 3138/1

**meaning [2]** 2903/21 3064/4

**meaningful [3]** 3035/10 3037/20 3049/15

**meaningfully [1]** 2928/21

**means [4]** 3108/3 3108/6 3109/4 3134/4

**meant [12]** 2905/22 2970/22 3015/8 3017/18 3045/8 3089/7 3097/5 3097/14 3108/1 3108/2 3108/5 3126/23

**meantime [1]** 2899/18

**mechanical [1]** 2877/24

**mechanism [1]** 3042/3

**media [6]** 2941/14 2942/12 2942/14 2974/20 3134/12

**medical [8]** 2906/14 2906/23 2922/21 2929/4 3039/16 3039/17 3041/3 3041/14

**medically [1]** 3020/14 3020/14

**medication [2]** 3007/4 3007/7

**meet [12]** 2926/4 2939/22 2940/7 2953/20 2953/22 2957/3 2965/11 2965/14 2970/3 2988/19 2994/19 2996/12

**meeting [127]** 2900/1 2903/15 2908/18 2908/20 2909/13 2910/24 2914/20 2914/25 2918/13 2921/11 2921/13 2921/18 2923/1 2924/9 2926/1 2926/3 2926/5 2926/7 2926/8 2926/9 2926/11 2926/21 2926/21 2927/13 2927/21 2928/6 2928/18 2928/24 2929/11 2929/16 2929/25 2930/1 2930/2 2932/1 2933/12 2933/21 2933/23 2934/2 2934/4 2934/17 2934/19 2935/1 2935/7 2937/8 2937/12 2939/9 2939/20 2939/23 2939/24 2940/2 2940/16 2940/17 2940/18 2940/24 2941/8 2942/6 2942/21 2943/1 2943/7 2943/7 2943/10 2943/12 2944/22 2944/25 2945/4 2945/6 2945/8 2945/9 2945/10 2948/19 2953/14 2953/16 2956/18 2956/22 2956/23 2956/25 2957/11 2957/12 2957/15 2957/16 2957/18 2957/24 2957/25 2958/6 2958/9 2959/4 2959/14 2960/10 2967/4 2967/7 2967/13 2968/12 2968/24 2970/4 2970/6 2970/7 2970/8 2970/11 2972/10 2977/13 2977/20 2977/21 2978/7 2978/9 2978/19 2978/21 2978/25 2979/1 2979/8 2979/18 2980/8 2984/24 2984/25 2984/25 2985/2 2985/25 2999/13 3002/12 3005/23 3028/11 3054/14 3056/2 3056/2 3060/1 3072/25

**meetings [16]** 2908/4 2908/7 2908/10 2908/11 2923/2 2927/12 2927/14 2927/22 2934/3 2994/19 2996/14 2996/16 2996/18 3085/4 3085/7 3085/24

**member [17]** 2890/1 2892/2 2895/21 2953/12 2953/14 2953/17 2967/25 2968/17 2987/10 2987/17 2988/22 2991/22 3069/12 3077/3 3080/1 3081/12 3081/14

**members [14]** 2878/8 2910/17 2921/24 2925/7 2935/7 2943/21 2944/11 2956/8 2956/14 2963/2 2966/15 2977/2 2996/12 3085/24

**membrane [1]** 3042/10

**memo [2]** 2963/6 3134/1

**memorandum [11]** 3104/16 3106/7 3106/12 3106/25 3122/21 3123/5 3123/14 3124/12 3133/13 3133/18 3134/19

**memory [2]** 2939/21 3013/16

**men [1]** 3016/11

**mention [3]** 2974/18 3116/3 3116/17

**mentioned [16]** 2914/6 2919/3 2922/10 2922/25 2923/5 2924/2 2939/19 2963/8 2974/18 2977/6 2981/18 2986/22 3006/18 3098/23 3102/14 3106/5

**mentor [2]** 3005/25 3010/1

**mentoring [1]** 2953/15

**merge [1]** 3049/2

**merger [7]** 2879/13 2905/8 2905/22 2905/23 3048/18 3048/20 3048/22

**merging [1]** 2906/5

**Merrill [5]** 2949/19 2950/12 2952/11 2955/14 3135/19

**messages [5]** 2984/1 3006/6 3006/9 3010/24 3011/2

**met [30]** 2903/5 2934/24 2934/24 2935/1 2937/12 2939/19 2945/10 2951/7 2955/4 2955/4 2977/21 2978/6 2978/8 2980/14 3000/4 3000/14 3001/3 3002/17 3004/22 3027/18 3027/19 3027/19 3027/22 3028/5 3028/7 3060/7 3086/24 3087/4 3088/4 3095/15

**metrics [1]** 2992/13

**Mexico [4]** 2998/10 2999/4 2999/5 2999/5

**mic [1]** 3097/8

**microphone [1]** 3069/7

**mid [3]** 2906/17 2906/18 3001/16

**Mid-to-late [1]** 3001/16

**mid-year [2]** 2906/17 2906/18

**middle [5]** 2909/2 2911/6 2946/20 3117/13 3119/7

**midmorning [1]** 2935/23

**might [19]** 2885/2 2942/9 2947/22 2949/11 2957/9 2996/22 3008/19 3022/9 3022/20 3024/24 3025/1 3025/21 3041/11 3045/11 3050/2 3052/23 3071/21 3079/1 3134/16

**million [33]** 2883/12 2883/13 2883/21 2883/22 2883/23 2883/24 2883/25 2884/1 2896/6 2896/7 2896/15 2897/15 2898/6 2898/8 2898/8 2898/10 2898/23 2911/21 2911/24 2925/22 2938/18 2966/11 2987/23 2992/6 2992/8

**millions [1]** 3100/12

**mind [3]** 2904/9 3052/19 3054/2

**mine [3]** 3038/24 3065/4 3078/18

**minimize [1]** 3107/19

**minimum [2]** 2924/20 3081/23

**minute [3]** 2915/5 3105/19 3123/18

**minutes [24]** 2908/11 2908/14 2908/17 2908/17 2908/20 2908/23 2908/24 2909/3 2909/6 2924/14 2935/3 2935/20 2936/5 2959/11 2979/8 2979/9 2979/17 2979/22 2979/25 3003/6 3051/10 3053/22 3085/9 3113/10

**misappropriated [1]** 3138/22

**misappropriation [1]** 3135/22

**miscommunication [1]** 2897/19

**misrepresentation [1]** 3100/7

**missed [3]** 2901/7 2938/14 3073/20

**missing [5]** 2889/18 3017/11 3039/4 3042/14 3042/17

**mission [2]** 3036/20 3037/6

**misunderstanding [1]** 2899/2

**misuse [1]** 3138/5

**mix [3]** 2993/18 2999/10 3001/20

**mixed [5]** 2984/1 3001/20 3001/20 3001/20 3001/21

**model [1]** 2960/21

**models [1]** 2995/6

**modern [1]** 2941/19

**molecule [1]** 3033/18

**molecules [4]** 3033/12 3033/16 3033/17 3033/25

**moment [8]** 2890/23 2989/1 2989/7 3007/13 3016/25 3033/10 3052/11 3134/20

**Monday [2]** 2945/1 2970/5

**money [37]** 2900/12 2914/9 2930/25 2931/2 2931/5 2931/6 2931/22 2939/10 2952/11 2953/25 2967/16 2995/13 2999/18 3041/12 3045/16 3046/21 3047/8 3048/8 3048/12 3066/6 3089/10 3098/3 3109/11 3115/5 3118/9 3121/8 3121/11 3133/21 3133/21 3133/23 3133/24 3135/14 3135/18 3135/22 3136/3 3138/2 3138/2

**monies [4]** 2882/14 2903/13 2949/23 3066/5

**month [24]** 2909/14 2914/21 2914/22 2926/2 2956/18 2964/5 2965/7 3108/23 3108/23 3117/22 3119/10 3119/13 3120/4 3120/7 3123/6 3128/2 3129/20 3130/4 3130/18 3130/24 3130/24 3131/16 3131/16 3131/16

**monthly [5]** 3025/21 3108/22 3109/5 3110/21 3110/21

**months [9]** 2890/21 2892/13 2892/17 2904/18 2962/6 3034/24 3060/23 3078/8 3094/17

**morning [8]** 2878/2 2878/8 2878/14 2878/15 2879/3 2879/4 2891/10 3134/9

**most [7]** 2924/20 2962/16 2962/19 2965/22 3046/12 3046/12 3125/1

**mostly [1]** 2994/17

**motion [4]** 2981/5 3034/14 3034/15 3102/25

**motions [2]** 3101/22 3102/8

**M**

**move [31]** 2892/20 2896/6 2900/25 2903/17 2917/11 2917/22 2925/19 2925/19 2928/22 2964/21 2973/23 2974/11 3044/11 3050/13 3052/19 3066/6 3066/18 3079/1 3079/2 3099/8 3100/17 3102/4 3105/13 3107/8 3108/4 3111/10 3115/18 3117/7 3121/24 3123/20 3126/5

**moved [8]** 2894/15 2903/13 2956/1 2967/5 3003/3 3008/2 3044/7 3077/14

**movement [1]** 3136/2

**moves [16]** 2880/5 2881/25 2884/15 2893/8 2909/25 2915/11 2921/5 2923/20 2927/1 2937/23 2943/25 2946/3 2961/14 2971/19 2983/5 3091/19

**moving [8]** 2895/23 2957/18 2963/12 2964/7 2964/8 2984/5 2984/7 3135/18

**Mr. [189]** 2879/3 2880/11 2880/12 2882/9 2882/11 2883/8 2885/9 2885/12 2885/18 2885/20 2885/20 2885/25 2886/16 2888/9 2888/11 2888/14 2888/22 2889/8 2890/5 2890/10 2890/19 2892/6 2893/2 2893/22 2893/25 2897/4 2897/8 2897/8 2898/22 2900/6 2901/8 2901/19 2901/20 2902/15 2907/7 2908/16 2909/7 2910/8 2910/9 2910/10 2910/10 2910/11 2913/21 2915/19 2918/14 2920/12 2920/14 2920/20 2922/6 2922/6 2923/14 2924/12 2927/16 2927/16 2927/17 2927/17 2927/17 2934/5 2934/15 2937/7 2938/5 2938/12 2939/6 2939/17 2939/20 2939/22 2940/13 2941/24 2942/4 2942/6 2942/20 2943/12 2944/12 2944/12 2945/12 2946/12 2947/13 2948/2 2948/25 2949/8 2951/11 2951/14 2951/21 2951/23 2952/3 2952/3 2952/8 2952/15 2952/23 2952/23 2952/24 2953/12 2953/13 2953/18 2953/19 2953/22 2953/23 2955/3 2955/4 2958/10 2959/14 2959/17 2959/22 2961/21 2963/7 2963/20 2965/16 2967/3 2968/5 2976/3 2977/6 2977/21 2978/3 2978/7 2980/7 2980/14 2980/15 2980/16 2980/17 2980/17 2980/20 2980/20 2980/21 2980/24 2981/2 2981/6 2981/10 2981/21 2983/15 2983/23 2984/15 2985/1 2985/14 2990/4 2990/5 2990/11 2997/12 2997/15 3000/16 3015/20 3015/21 3017/8 3018/25 3020/2 3041/8 3072/19 3072/20 3072/20 3082/11 3082/17 3090/21 3091/8 3091/10 3092/4 3093/6 3093/3 3096/5 3096/6 3098/11 3102/12 3104/4 3105/8 3106/19 3107/5 3108/10 3111/15 3114/3 3115/23 3116/6 3116/11 3116/13 3119/7 3119/15 3120/22 3120/10 3122/5 3123/17 3123/25 3124/11 3126/11 3128/12 3130/12 3131/2 3134/22 3136/10 3137/1 3137/20 3138/11

**Mr. Agnifilo [3]** 2990/4 3082/17 3091/8

**Mr. Aselage [8]** 2922/6 2927/16 2959/22 2976/3 2977/21 2978/3

2984/15 3072/19
**Mr. Aselage's [2]** 2910/9 2910/11
**Mr. Banta [3]** 2934/5 2934/15 3000/16
**Mr. Blanton [1]** 2920/12
**Mr. Brafman [4]** 3015/20 3017/8 3018/25 3136/10
**Mr. Geller [26]** 3093/23 3096/5 3098/11 3104/4 3105/8 3106/19 3107/5 3108/10 3111/15 3114/3 3115/23 3116/11 3116/13 3119/7 3119/15 3120/2 3120/10 3122/5 3123/17 3123/25 3124/11 3126/11 3128/12 3130/12 3131/2 3134/22
**Mr. Golding [1]** 2927/16
**Mr. Greebel [13]** 2908/16 2909/7 2944/12 2949/8 2951/21 2952/3 2952/3 2952/8 2952/23 2953/23 2955/4 2958/10 3072/20
**Mr. Greebel's [2]** 2952/23 2985/14
**Mr. Hackert [1]** 3072/20
**Mr. Kravitz [1]** 2924/12
**Mr. Panoff [4]** 2910/10 2918/14 2927/17 2944/12
**Mr. Panoff's [1]** 2910/8
**Mr. Richardson [32]** 2879/3 2880/12 2882/9 2885/18 2885/25 2888/9 2890/5 2893/2 2897/8 2900/6 2901/20 2913/21 2915/19 2923/14 2927/17 2937/7 2942/4 2953/12 2955/3 2977/6 2980/7 2980/14 2980/17 2980/20 2990/5 2990/11 2997/12 2997/15 3020/2 3090/21 3091/10 3093/6
**Mr. Rosenfeld [1]** 2920/20
**Mr. Rosensaft [1]** 2952/24
**Mr. Shkreli [69]** 2880/11 2882/11 2885/12 2886/16 2888/11 2888/14 2889/8 2890/10 2890/19 2892/6 2893/22 2893/25 2897/4 2897/8 2898/22 2901/8 2901/19 2907/7 2910/10 2922/6 2927/17 2938/5 2938/12 2939/6 2939/17 2939/20 2939/22 2940/13 2941/24 2942/6 2942/20 2943/12 2946/12 2947/13 2948/2 2948/25 2951/11 2951/14 2951/23 2952/15 2953/13 2953/18 2953/22 2959/14 2959/17 2961/21 2963/7 2963/20 2967/3 2968/5 2978/7 2980/15 2980/17 2980/20 2980/21 2981/2 2981/6 2981/10 2983/11 2983/15 2985/1 3015/21 3082/11 3092/4 3096/6 3102/12 3116/6 3137/20 3138/11
**Mr. Shkreli's [12]** 2883/8 2888/22 2902/15 2945/12 2953/19 2965/16 2980/16 2980/24 2981/20 2983/23 3041/8 3137/1
**Mr. Su [3]** 2885/9 2885/20 2885/20
**Mr. Yaffe [1]** 2920/14
**Ms. [8]** 2881/11 2909/4 2944/10 2980/8 2980/9 3100/21 3130/9 3138/18
**Ms. Kasulis [2]** 2881/11 3100/21
**Ms. Smith [1]** 3138/18
**Ms. Valeur-Jensen [3]** 2909/4 2980/8 2980/9
**Ms. Zellan [2]** 2944/10 3130/9
**MSMB [110]** 2882/14 2882/21 2885/10 2885/23 2889/9 2890/25 2894/6 2894/9

2894/14 2895/2 2903/11 2903/22 2912/4 2913/6 2915/5 2917/10 2917/15 2918/1 2947/19 2947/20 2948/9 2949/4 2949/10 2949/13 2949/23 2952/12 2952/17 2952/21 2952/25 2953/1 2953/25 2956/12 2987/17 2988/1 2992/4 3021/19 3025/23 3043/8 3043/24 3044/2 3044/12 3044/25 3045/5 3066/5 3069/2 3069/2 3069/3 3069/3 3069/4 3069/5 3069/10 3069/12 3069/12 3069/13 3069/13 3069/14 3069/14 3069/15 3069/13 3069/14 3069/14 3069/15 3069/20 3075/1 3075/1 3075/4 3075/17 3076/22 3077/5 3077/21 3078/23 3080/7 3088/15 3089/2 3089/10 3089/11 3096/23 3096/24 3097/1 3097/17 3104/12 3105/25 3106/2 3106/14 3107/2 3111/20 3113/6 3114/5 3114/25 3115/3 3115/6 3115/17 3116/13 3118/9 3120/21 3121/5 3121/6 3121/7 3121/10 3121/13 3123/7 3124/11 3124/14 3124/19 3124/20 3124/21 3124/25 3125/1 3127/19 3129/2 3129/6 3131/17 3131/18 3135/12
**MSMB Capital [10]** 2947/19 2947/20 3069/2 3069/2 3069/3 3069/4 3069/12 3069/15 3075/1 3124/21
**MSMB Management [1]** 3069/13
**MSMB's [4]** 3078/14 3114/13 3114/15 3114/17
**MSMB-affiliated [2]** 3124/20 3125/1
**much-needed [1]** 3047/8
**Muchin [1]** 3084/25
**Mulleady [6]** 3100/13 3105/21 3105/22 3111/16 3126/4 3127/8
**multi [2]** 2964/16 2964/23
**multi-product [2]** 2964/16 2964/23
**multinational [1]** 2994/17
**multiplier [1]** 2895/18
**muscle [3]** 3042/11 3042/18
**Muscular [7]** 3036/21 3037/11 3039/1 3039/5 3042/14 3042/19 3049/16
**must [5]** 2958/19 2998/22 3070/22 3081/7 3090/13
**mutual [1]** 2999/10
**Mykonos [2]** 2998/19 2999/1

**N**

**N-e-a-l [1]** 2921/22
**name [13]** 2917/1 2920/8 2920/9 2990/13 2994/2 2994/25 3003/20 3011/22 3033/6 3043/7 3043/8 3093/17 3099/4
**named [4]** 2920/2 2920/6 2920/16 3095/13
**narrowed [1]** 2939/11
**NASDAQ [12]** 2925/19 2925/21 2925/23 2930/14 2932/8 2932/9 2932/10 2932/15 2964/11 2966/18 2966/23 2983/18
**nasty [2]** 3020/16 3049/11
**natural [1]** 3001/14
**nature [3]** 3001/1 3015/11 3016/17
**NAV [5]** 3117/16 3122/6 3128/13 3128/20 3128/21
**NAVConsulting.net [1]** 3117/15

**N**

**Neal [13]** 2921/21 2921/22 2921/23 2921/25 2925/9 2944/18 2944/20 2966/3 2966/22 2968/24 2969/11 2984/15 3072/14

**near [1]** 2901/17

**necessarily [1]** 3008/21

**necessary [1]** 2935/19

**neck [9]** 3020/13 3020/17 3020/19 3021/3 3090/25 3092/6 3092/10 3092/15 3092/18

**need [27]** 2882/15 2891/6 2891/10 2896/21 2900/17 2900/25 2917/18 2923/9 2924/15 2931/20 2933/24 2938/24 2949/2 2968/8 2975/3 2980/22 2996/6 3014/13 3038/4 3052/23 3052/24 3064/3 3079/1 3081/3 3086/12 3100/8 3114/22

**needed [21]** 2905/25 2906/3 2916/15 2916/20 2916/20 2926/23 2930/14 2930/17 2934/12 2935/18 2949/2 2959/19 2960/19 2963/15 2964/6 2970/17 2978/11 3047/8 3081/14 3084/7 3109/10

**needing [1]** 2939/5

**needs [5]** 2896/19 2901/10 2957/6 3039/9 3104/9

**negative [3]** 2904/9 3102/6 3125/8

**negatively [1]** 2904/12

**net [1]** 2911/23

**network [1]** 3043/1

**neurological [1]** 3049/12

**neuroscience [1]** 2929/6

**neutral [4]** 3101/11 3101/12 3102/7 3103/3

**neutralized [1]** 3103/16

**never [32]** 2889/1 2889/21 2889/24 2899/3 2900/11 2900/18 2918/8 2919/18 2919/22 2919/23 2920/1 2999/12 3007/11 3017/12 3017/12 3018/3 3018/4 3066/10 3066/11 3071/9 3076/8 3080/13 3081/8 3082/10 3083/1 3102/3 3119/23 3119/23 3119/23 3127/4 3127/4 3135/15

**new [46]** 2877/1 2877/4 2877/13 2877/14 2877/19 2877/19 2882/2 2895/25 2896/22 2898/18 2898/21 2908/25 2914/7 2914/13 2918/16 2918/20 2921/24 2924/14 2925/22 2928/3 2929/7 2935/7 2935/8 2958/25 2960/14 2960/17 2960/20 2964/22 2972/6 2977/10 2977/18 2978/9 2979/23 2980/10 2983/13 2985/9 2985/12 2986/22 2987/2 2991/6 2998/9 3044/7 3060/18 3080/5 3094/1 3124/13

**news [9]** 2891/1 2892/14 2896/4 2899/12 2928/2 2928/19 2968/18 2969/7 2981/20

**next [57]** 2881/4 2884/19 2887/12 2889/5 2896/10 2897/11 2898/2 2905/7 2911/1 2922/20 2926/24 2935/10 2948/12 2948/13 2950/19 2951/15 2954/11 2956/22 2956/23 2962/14 2965/15 2965/24 2971/14 2976/22 2977/25 2978/14 2980/12 2982/17 2984/8 3003/7 3012/19 3019/8 3036/15 3038/23 3039/15 3040/8 3041/21

3042/3 3098/19 3098/19 3099/14 3100/14 3100/18 3101/8 3102/4 3103/9 3103/6 3103/19 3103/23 3109/13 3112/5 3113/24 3119/5 3119/25 3129/14 3129/25 3132/4

**nice [3]** 2878/20 3025/11 3093/7

**night [6]** 2901/10 2934/24 2934/25 2982/7 3000/18 3139/6

**nights [1]** 3029/5

**nip [1]** 2947/24

**nobody [1]** 3135/24

**nominated [1]** 2965/6

**non [3]** 2975/2 2999/7 3000/1

**Non-public [1]** 2975/2

**non-real [2]** 2999/7 3000/1

**none [7]** 2991/9 2991/12 2991/15 2991/18 3077/15 3083/17 3133/21

**nonprofit [1]** 2995/13

**normal [4]** 2958/7 2958/8 2978/23 2996/9

**normally [1]** 2898/19

**north [3]** 2883/11 2883/15 2896/15

**Norwood [12]** 2926/13 2933/12 2934/19 2939/9 2939/20 2939/22 2940/2 2940/18 2943/7 2943/10 2943/12 2944/21

**note [13]** 2912/3 2912/4 2912/6 2918/23 3075/16 3076/2 3076/22 3077/10 3079/16 3080/7 3081/11 3082/23 3096/5

**notebooks [1]** 3134/11

**noted [1]** 3102/15

**notes [13]** 2917/15 2917/19 2917/20 2917/25 2918/1 2936/1 3061/6 3075/20 3076/6 3076/11 3081/20 3081/21 3085/6

**nothing [11]** 2949/10 2950/5 2955/23 3048/3 3048/20 3052/3 3093/3 3095/6 3134/17 3135/2 3138/7

**notice [10]** 2928/8 2973/8 2973/9 3030/12 3098/6 3108/25 3109/5 3119/22 3120/15 3122/8

**noticed [2]** 3007/20 3030/11

**notices [1]** 3122/10

**notification [2]** 3113/1 3133/3

**notify [2]** 2956/8 3133/20 3137/23

**November [10]** 2891/24 2921/12 2986/21 3050/22 3067/20 3072/10 3074/9 3074/18 3075/14 3120/3

**November 30th [1]** 3120/3

**November 6 [1]** 2921/12

**November 8 [1]** 3074/9

**November 8th [2]** 3074/18 3075/14

**number [46]** 2880/11 2880/20 2890/3 2895/20 2899/13 2900/21 2901/13 2902/9 2903/17 2904/5 2913/9 2915/25 2916/5 2916/11 2919/8 2921/21 2922/14 2923/5 2926/22 2928/17 2929/21 2930/22 2932/3 2932/16 2976/4 2977/9 2992/20 3009/6 3054/25 3055/1 3057/14 3061/10 3063/4 3064/23 3064/24 3067/13 3067/14 3067/25 3069/5 3072/22 3074/14 3086/24 3106/10 3107/14 3123/3 3124/8

**numbered [1]** 3124/4

**numbers [4]** 2882/11 2890/24 3058/18

3061/24

**numerous [2]** 3018/23 3084/2

**NYC [2]** 2888/16 2888/17

**O**

**oath [2]** 2878/20 2990/7

**object [11]** 2886/19 2903/24 2928/12 2950/14 2971/10 2971/10 2986/6 2986/9 3014/6 3078/15 3113/15

**objected [1]** 3138/15

**objecting [2]** 2886/4 3016/14

**objection [87]** 2880/7 2881/9 2882/3 2885/3 2885/7 2885/20 2886/4 2886/10 2886/17 2886/20 2886/24 2888/3 2893/10 2910/2 2915/13 2921/7 2923/22 2927/3 2937/25 2944/2 2946/5 2951/1 2952/15 2961/16 2968/2 2968/3 2979/13 2983/7 2986/16 3010/17 3012/10 3012/13 3013/9 3021/25 3022/1 3023/11 3032/18 3033/13 3033/22 3037/2 3037/22 3039/10 3040/4 3062/4 3066/20 3071/4 3076/3 3081/25 3082/16 3082/19 3083/3 3083/9 3084/11 3086/5 3090/9 3091/21 3092/22 3099/6 3099/10 3101/13 3101/16 3101/19 3101/21 3102/8 3102/15 3102/17 3102/18 3103/2 3103/20 3105/15 3107/10 3111/11 3111/25 3112/1 3115/20 3116/5 3117/9 3122/1 3122/11 3123/22 3126/7 3131/21 3131/25 3133/2 3133/9 3138/16 3138/24

**objectionable [1]** 3014/6

**objective [7]** 3107/18 3108/14 3125/10 3126/16 3126/17 3126/22 3126/22

**objectives [2]** 3097/20 3125/13

**obligation [7]** 3065/12 3075/4 3102/22 3133/16 3133/20 3134/4 3137/22

**obligations [2]** 3065/18 3135/20

**observation [1]** 2942/20

**observe [2]** 2958/4 2959/1

**obstacles [1]** 3109/12

**obtained [1]** 2906/21

**obviously [10]** 2885/10 2886/11 2899/14 2963/12 3017/2 3026/15 3052/13 3072/4 3076/16 3137/21

**occasion [1]** 3009/21

**occasionally [2]** 3007/22 3024/8

**occur [1]** 2926/9

**occurred [3]** 2898/24 2957/13 2979/18

**October [9]** 2983/2 2983/14 2985/6 2986/21 3119/9 3120/5 3122/9 3123/9 3123/16

**October 13 [1]** 2985/6

**October 1st [2]** 2983/2 2983/14

**October 2011 [1]** 3120/5

**October 27th [1]** 3119/9

**October 28th [3]** 3122/9 3123/9 3123/16

**October/November [1]** 2986/21

**odd [3]** 3015/21 3015/23 3094/16

**offense [2]** 2972/25 3005/15

**offenses [2]** 2975/23 2977/3

**offer [6]** 3113/7 3113/8 3114/13 3114/15 3114/17 3136/4

**offering [1]** 2960/21

**office [21]** 2903/5 2918/15 2955/10

**O**

**office...** [18] 2970/10 3005/1 3007/19 3026/9 3026/11 3026/13 3026/20 3027/5 3027/16 3027/21 3044/5 3044/7 3044/8 3044/11 3044/13 3044/20 3087/4 3136/14

**officer** [17] 2888/21 2906/14 2906/15 2906/20 2906/23 2909/23 2929/4 2959/20 2980/16 2980/18 2981/2 2981/7 2981/15 2993/7 3065/9 3069/16 3075/1

**officers** [4] 2932/9 2932/14 2933/6 2971/8

**offices** [8] 2956/21 2957/8 2984/11 2984/12 2984/20 2994/3 3025/23 3026/12

**official** [1] 3061/2

**offsite** [2] 2926/3 2926/21

**often** [11] 3004/25 3008/23 3009/3 3022/5 3024/10 3024/14 3029/8 3029/18 3030/12 3031/14 3086/3

**old** [3] 3001/15 3093/23 3094/9

**older** [1] 3008/16

**Olives** [2] 3004/7 3004/10

**onboard** [3] 2914/14 2919/3 2923/6

**once** [9] 2880/21 2930/21 2957/7 2970/16 3004/5 3009/16 3039/16 3059/18 3085/8

**one** [124] 2882/2 2885/3 2885/3 2885/8 2885/11 2888/3 2888/20 2890/13 2891/2 2895/11 2898/11 2898/13 2898/16 2901/7 2903/19 2912/5 2913/14 2914/14 2916/25 2919/13 2920/8 2921/24 2923/17 2925/22 2927/22 2930/16 2933/15 2934/6 2937/13 2940/19 2941/11 2941/12 2942/1 2942/15 2942/15 2945/16 2947/23 2948/7 2950/6 2952/10 2955/13 2955/16 2956/5 2957/18 2959/5 2960/19 2966/11 2967/7 2967/7 2970/15 2970/18 2971/2 2971/9 2976/10 2977/8 2982/12 2985/12 2986/10 2989/1 2990/13 2992/12 2992/20 2993/6 2995/12 2995/13 2995/22 2997/11 2997/12 3004/15 3008/20 3009/21 3009/24 3010/6 3016/14 3016/25 3024/4 3025/21 3026/24 3030/17 3031/8 3031/19 3031/22 3032/5 3032/25 3033/18 3035/13 3035/16 3038/4 3043/15 3045/14 3045/18 3045/20 3046/6 3048/23 3049/12 3049/23 3052/13 3055/3 3055/7 3057/24 3058/24 3060/14 3060/14 3065/7 3068/10 3068/11 3078/20 3082/6 3082/7 3083/1 3086/13 3086/17 3087/1 3088/8 3088/15 3090/1 3097/5 3098/7 3108/23 3117/13 3128/17 3132/2 3134/20 3135/10

**one-on-one** [1] 2967/7

**ones** [7] 2904/10 2905/3 2916/10 2941/1 2960/18 2991/1 3056/1

**ongoing** [2] 2989/11 3131/15

**open** [10] 2888/1 2900/25 2955/1 2977/1 2990/1 3020/1 3042/1 3104/1 3114/1 3123/10

**opened** [4] 2951/11 3014/8 3015/6
3015/13

**opening** [1] 3015/19

**opens** [1] 2974/4

**operate** [1] 2942/24

**operating** [11] 2883/22 2910/20 2913/1 2913/5 2930/16 2931/23 3036/5 3049/3 3049/13 3135/7 3138/7

**operations** [2] 2959/20 3049/1

**operative** [1] 3138/3

**opinion** [1] 3136/4

**opportunities** [1] 2960/15

**opportunity** [3] 2979/25 3032/24 3089/5

**opposed** [1] 3052/11

**optimistic** [1] 2898/7

**option** [1] 2902/2

**options** [6] 2889/1 2897/21 2900/22 2907/17 2976/13 2999/17

**oranges** [1] 3102/11

**order** [1] 3069/17

**orderly** [1] 2964/21

**Orex** [2] 3116/4 3116/18

**Orexigen** [2] 3116/4 3116/18

**organization** [2] 2932/20 2960/19

**organizational** [2] 2994/14 2995/6

**organizations** [2] 2994/17 2995/13

**original** [4] 2978/22 3061/16 3065/5 3126/23

**originally** [3] 3125/11 3125/11 3139/2

**otherwise** [4] 2886/17 2900/1 2953/21 3133/12

**ought** [1] 2935/17

**ourselves** [3] 2906/6 2956/12 2964/19

**outcome** [1] 3081/10

**Outcomes** [2] 2994/25 2995/3

**outdoor** [1] 3000/9

**outline** [1] 2901/24

**outlined** [1] 2980/22

**outlining** [2] 2894/1 3059/8

**outside** [9] 2899/9 2956/21 2974/20 2993/13 2994/11 2995/16 3006/25 3009/17 3138/10

**outstanding** [1] 3114/10

**outweighs** [1] 2954/5

**over-the-counter** [2] 2905/24 3049/4

**overall** [7] 2882/25 2886/10 2886/24 2940/18 2996/21 2999/23 3082/14

**overdue** [2] 2889/2 2889/22

**overlapped** [1] 3004/20

**overlooked** [1] 2902/23

**overrule** [6] 2952/15 2968/3 2986/16 3022/1 3099/9 3138/23

**overruled** [5] 2903/25 2928/14 3090/10 3092/23 3133/2

**overseeing** [1] 2943/5

**oversight** [5] 2924/19 2962/17 2962/20 2987/1 2987/5

**owe** [1] 2897/17

**owed** [3] 2889/22 2897/25 2902/11

**own** [25] 2892/22 2893/5 2904/3 2922/21 2931/11 2949/25 2956/1 2958/19 2958/21 2963/13 2987/24 2994/24 3004/20 3004/22 3005/13 3013/5 3032/23 3046/19 3046/19 3061/6 3086/16 3086/16 3086/17 3095/1 3126/15

**owned** [2] 2889/13 3000/10
owner [1] 3049/1

**P**

**P.C** [1] 2877/18

**p.m** [7] 2989/14 2990/1 3020/8 3059/10 3061/16 3090/5 3139/9

**page** [97] 2884/19 2887/12 2888/23 2888/23 2889/5 2889/10 2893/16 2893/21 2896/10 2897/7 2897/11 2911/1 2912/13 2913/23 2922/12 2929/13 2929/20 2929/20 2929/22 2932/17 2936/8 2944/9 2950/19 2954/11 2962/16 2962/18 2970/23 2971/14 2976/22 2989/15 3012/19 3019/8 3020/20 3035/20 3036/15 3038/23 3040/8 3041/21 3042/3 3052/4 3057/8 3057/11 3058/6 3058/13 3059/2 3064/21 3065/3 3067/11 3067/12 3067/13 3067/24 3067/25 3068/1 3068/13 3068/22 3070/1 3070/3 3070/6 3070/9 3070/12 3070/15 3074/8 3074/11 3074/14 3075/22 3082/6 3082/7 3087/11 3099/14 3103/23 3105/9 3106/9 3106/21 3107/14 3107/15 3108/16 3109/13 3112/5 3113/24 3115/23 3117/24 3118/11 3119/12 3119/16 3120/6 3122/19 3123/2 3123/10 3128/4 3128/16 3129/22 3130/6 3130/11 3132/4 3140/2 3140/9 3140/21

**page 1** [1] 3059/2

**page 2** [2] 3119/12 3129/22

**page 9** [2] 3064/21 3065/3

**pages** [3] 3058/4 3124/3 3130/10

**paid** [9] 2981/10 2991/21 2992/1 3065/18 3066/5 3083/1 3083/7 3121/8 3121/11

**pained** [1] 2902/20

**painlessly** [1] 2897/18

**pains** [1] 2901/25

**paired** [1] 3026/13

**Paley** [6] 2922/19 2925/5 2925/10 2966/3 2966/4 3084/2

**Paley's** [1] 2922/16

**Panoff** [34] 2888/16 2888/19 2906/22 2909/22 2910/10 2914/13 2916/16 2918/14 2921/3 2921/20 2923/6 2927/17 2937/20 2943/22 2944/12 2960/24 2963/11 2978/8 3054/11 3054/17 3054/17 3055/16 3055/23 3059/9 3061/16 3061/24 3062/22 3062/24 3072/11 3072/14 3075/15 3076/12 3078/2 3080/5

**Panoff's** [1] 2910/8

**papers** [1] 2891/2

**paragraph** [21] 2881/4 2897/12 2897/24 2898/2 2899/11 2962/2 2962/14 2980/6 2980/12 2980/12 2980/13 3075/7 3107/16 3108/17 3109/14 3111/20 3114/4 3114/5 3114/17 3120/9 3125/18

**paragraphs** [2] 3111/19 3124/6

**parallel** [3] 3045/6 3045/9 3045/11

**parameters** [4] 2930/9 2930/19 2962/19 3124/18

**parens** [1] 2938/18

**parents** [1] 3004/19

**part [64]** 2883/6 2885/20 2897/19 2897/20 2899/15 2900/3 2902/9 2906/8 2908/10 2916/3 2928/2 2930/14 2931/3 2933/2 2951/9 2953/17 2958/18 2958/22 2959/2 2965/2 2967/19 2970/8 2978/9 2984/2 2985/6 2985/8 2986/25 2987/4 2993/8 2995/22 2995/22 3008/14 3009/15 3016/4 3029/21 3031/22 3038/9 3038/10 3038/11 3038/13 3038/14 3047/16 3055/18 3056/22 3057/12 3064/12 3065/6 3069/24 3069/25 3070/20 3070/25 3071/7 3081/7 3083/20 3095/12 3097/15 3109/10 3122/11 3124/9 3124/11 3128/9 3135/18 3135/21 3135/21

**part-time [1]** 3095/12
**participate [4]** 2906/13 2915/22 2934/2 3136/16
**participated [3]** 2933/11 2934/4 2985/1
**participating [1]** 2934/21
**participation [2]** 2912/8 2933/14
**particular [15]** 2930/2 2941/16 2944/18 2996/22 2996/23 2997/9 3006/13 3038/16 3048/23 3050/20 3072/9 3073/25 3095/5 3095/6 3102/19
**particularly [9]** 2914/12 2923/6 2963/9 3005/14 3005/23 3006/3 3006/18 3024/14 3049/11
**parties [5]** 3001/2 3069/11 3069/17 3075/2 3112/4
**partner [23]** 2952/24 2998/15 2998/16 3000/14 3069/14 3069/15 3084/25 3106/15 3108/21 3109/1 3109/18 3109/19 3133/11 3133/11 3133/16 3133/17 3133/18 3133/24 3134/15 3134/16 3136/14 3137/23 3138/11
**partner's [2]** 3109/20 3109/22
**partners [7]** 3108/19 3135/14 3135/15 3137/3 3137/4 3137/5 3137/13
**partners' [1]** 3135/4
**partnership [9]** 3069/3 3108/22 3108/24 3109/14 3109/19 3134/18 3135/4 3137/23 3138/1
**partnership's [2]** 3107/18 3109/17
**partnerships [2]** 3124/16 3125/1
**parts [1]** 2926/25
**party [12]** 2940/2 3000/4 3000/22 3002/3 3060/14 3065/10 3065/10 3065/12 3065/15 3065/16 3083/11 3083/14
**pass [2]** 3031/15 3031/20
**passing [2]** 2904/5 3000/13
**passionate [1]** 3035/3
**past [4]** 3062/6 3086/12 3110/5 3126/18
**patent [4]** 3049/6 3050/7 3050/8 3050/16
**patented [2]** 3049/19 3050/11
**path [2]** 2898/3 3015/9
**patient [1]** 2962/11
**patients [2]** 3042/15 3050/10
**pay [5]** 2967/15 2992/7 3080/20 3083/5 3135/19
**payable [2]** 2912/4 2912/6
**paying [4]** 2912/11 3082/5 3083/6

**payment [3]** 3075/9 3135/11 3135/13
**peak [1]** 3134/16
**penalties [2]** 2899/20 2899/22
**people [33]** 2899/15 2914/1 2919/2 2956/24 2957/9 2957/10 2959/4 2984/22 2992/22 2992/24 2993/3 2994/13 2995/6 3000/25 3001/2 3001/14 3001/18 3001/20 3001/21 3002/2 3009/20 3009/24 3010/6 3015/13 3015/21 3017/15 3017/25 3018/6 3043/18 3046/15 3046/19 3046/19 3059/7
**people's [1]** 3035/11
**per [4]** 2892/5 2895/16 2897/1 3114/10
**percent [15]** 2883/11 2883/15 2883/18 2883/24 2890/15 2896/6 2897/14 3000/1 3000/3 3000/3 3098/9 3114/12 3135/6 3135/7 3138/6
**perception [3]** 2898/4 2964/1 2968/4
**perceptions [1]** 3015/20
**Perfect [1]** 2913/4
**perfectly [1]** 2973/14
**perform [1]** 3101/15
**performance [35]** 2894/13 2894/14 2942/10 2945/24 2946/9 2946/25 2980/16 2980/24 2994/23 2995/7 3011/15 3011/17 3015/17 3017/18 3021/17 3021/22 3022/17 3022/24 3023/2 3023/8 3023/13 3023/24 3024/2 3024/5 3024/11 3024/16 3025/7 3025/18 3102/5 3116/21 3131/2 3131/7 3131/12 3131/16 3135/8
**performed [6]** 3100/19 3101/8 3103/10 3103/12 3104/5 3105/24
**perhaps [3]** 2889/22 2900/24 2994/20
**period [32]** 2879/6 2879/7 2879/7 2879/11 2881/2 2881/13 2884/2 2890/1 2903/11 2903/12 2905/8 2909/13 2914/19 2914/23 2925/1 2926/1 2945/13 2951/18 2972/8 2978/20 2985/4 2985/15 2992/3 2993/2 2993/4 2998/24 2998/25 3003/10 3004/1 3034/16 3035/13 3091/10
**periodic [3]** 3021/17 3021/22 3028/24
**periods [2]** 2949/3 2987/12
**permission [2]** 2997/14 3137/2
**permitted [2]** 3138/11 3138/23
**person [14]** 2899/18 2903/6 2949/15 2992/20 3005/14 3009/22 3009/23 3010/13 3040/24 3045/15 3096/8 3102/19 3127/14 3136/17
**personal [23]** 2904/11 2935/11 2995/22 3023/4 3024/6 3024/9 3024/21 3024/22 3080/24 3081/2 3081/5 3126/15 3126/17 3126/22 3131/18 3133/3 3133/24 3134/2 3135/3 3137/3 3137/10 3137/17 3138/19
**personally [2]** 2901/12 3035/3
**perspective [6]** 3005/21 3008/11 3037/12 3037/24 3043/18 3047/13
**pharmaceutical [1]** 3031/13
**phase [2]** 2896/15 3011/24
**phone [11]** 2877/22 2880/20 2996/16 3022/25 3056/9 3056/9 3096/8 3096/9 3116/7 3127/14 3127/15
**phrase [3]** 3006/3 3006/13 3010/5

**phrased [2]** 3007/18 3032/6
**phrases [1]** 3006/14
**physical [4]** 3030/6 3044/20 3044/21 3089/24
**physically [4]** 3032/15 3032/20 3032/21 3085/8
**pick [2]** 3036/4 3096/1
**picked [1]** 3073/20
**picking [1]** 3076/17
**picture [3]** 2882/25 2882/25 2891/22
**piece [4]** 2883/25 2884/1 3012/8 3050/20
**pieces [1]** 2995/3
**Pierotti [1]** 2896/3
**pink [1]** 3096/4
**pipe [6]** 2898/14 2898/15 2898/19 2898/23 2911/20 2911/21
**pipeline [2]** 2933/16 3038/25
**pipes [3]** 2898/13 2898/17 3098/8
**pitch [1]** 3100/7
**pitching [1]** 3102/21
**PKAN [7]** 3049/7 3049/7 3049/8 3049/9 3049/11 3049/23 3050/20
**place [11]** 2930/15 2931/21 2938/21 2962/21 2967/15 2967/20 3004/7 3004/11 3016/22 3127/16 3127/17
**placement [12]** 3104/16 3106/7 3106/11 3106/25 3122/21 3123/5 3123/14 3124/12 3133/13 3133/18 3134/1 3134/18
**places [1]** 3009/3
**Plaintiff [1]** 2877/4
**plan [11]** 2905/19 2910/20 2946/17 2969/7 2969/14 2969/19 2969/20 2977/23 2984/14 3028/25 3039/22
**plane [2]** 2962/4 2965/9
**planned [2]** 2978/21 3125/11
**planner [1]** 2999/20
**planning [4]** 2962/12 2975/13 2977/24 2993/16
**plans [3]** 2994/22 3001/13 3039/13
**platonic [2]** 3009/18 3018/9
**play [2]** 2907/1 2969/16
**played [1]** 3043/19
**players [1]** 3050/19
**playing [1]** 2970/14
**Plaza [1]** 2877/14
**pleased [1]** 2988/14
**pleasure [1]** 3029/10
**Plotkin [5]** 2906/25 2929/2 2929/3 2933/10 2940/21
**plus [2]** 3080/18 3082/8
**point [109]** 2890/3 2891/20 2891/25 2892/4 2894/5 2894/18 2895/1 2896/11 2896/21 2897/24 2905/1 2905/13 2905/15 2907/3 2907/21 2908/1 2908/5 2914/5 2916/23 2924/23 2925/3 2925/12 2925/16 2929/1 2930/9 2930/12 2941/1 2941/13 2942/1 2947/7 2949/9 2951/20 2952/10 2953/2 2957/19 2958/3 2958/5 2959/10 2959/23 2963/13 2964/5 2964/25 2965/4 2965/15 2966/1 2966/2 2966/16 2968/11 2970/1 2977/18 2983/24 2984/14 2984/21 2985/6 2985/10 2985/16 2988/20 2993/6 2993/17

**P**

**point... [50]** 3004/5 3007/22 3017/11 3024/23 3025/23 3029/12 3030/1 3030/17 3032/5 3032/25 3035/16 3036/22 3037/4 3039/23 3043/14 3043/21 3044/9 3045/18 3045/20 3048/2 3056/15 3056/19 3061/1 3062/8 3066/2 3073/23 3075/18 3077/2 3077/9 3077/11 3077/24 3079/16 3080/5 3080/14 3083/1 3083/7 3087/1 3087/1 3088/8 3090/1 3090/16 3096/1 3120/17 3121/7 3121/10 3125/19 3127/18 3128/19 3129/1 3129/4
**points [3]** 2895/11 2896/12 2950/6
**policies [1]** 2930/15
**policy [4]** 2930/8 2930/9 2930/19 2931/21
**pool [2]** 2977/11 2977/12
**poor [1]** 3050/3
**poorly [5]** 3100/19 3101/9 3103/10 3103/12 3104/5
**pop [1]** 2885/22
**portfolio [8]** 2895/20 2938/22 2939/4 2993/19 2999/11 3044/2 3107/19 3126/18
**portion [6]** 2889/10 2999/22 3098/3 3098/14 3124/24 3127/13
**position [20]** 2885/4 2885/17 2886/15 2888/21 2905/10 2906/14 2906/15 2906/20 2906/21 2906/23 2910/20 2964/25 2966/5 2967/3 2980/19 3027/2 3038/8 3038/22 3097/5 3121/14
**positions [5]** 2906/11 2906/16 3110/19 3110/20 3110/20
**positive [2]** 3006/5 3102/6
**positively [2]** 3031/18 3050/3
**possibility [1]** 3050/3
**possible [5]** 2962/22 3051/11 3051/25 3056/17 3056/20
**possibly [1]** 3022/18
**post [3]** 2889/14 2897/14 2897/15
**posture [1]** 2983/23
**potential [5]** 2891/2 2939/12 2960/15 2964/12 2966/10 3034/1 3038/17
**potentially [5]** 2956/24 2960/17 2964/12 3046/20 3048/6
**Powe [1]** 3000/10
**PPM [4]** 3122/9 3122/12 3135/3 3138/10
**PPMs [2]** 3102/15 3102/16
**praiseworthy [1]** 3006/8
**precise [1]** 2904/17
**preclinical [1]** 3039/1
**predated [1]** 3060/11
**predict [1]** 3031/16
**predicting [1]** 3031/20
**preexisting [1]** 3046/15
**preference [3]** 3015/14 3016/5 3016/10
**preferential [1]** 2891/4
**preferred [5]** 2882/19 2894/17 2894/23 2895/15 3031/24
**prejudice [2]** 2954/3 2954/5
**prejudicial [6]** 2951/2 2951/7 2952/11 2954/6 2954/6 2972/24
**premium [1]** 3114/12
**preparation [3]** 3085/24 3088/11 3109/21

**prepare [1]** 2964/18
**prepared [3]** 2976/3 2979/21 2979/23
**preparing [2]** 2929/18 2969/22
**preponderance [1]** 2953/6
**presence [1]** 3110/10
**present [9]** 2878/9 2882/15 2934/18 2937/2 2955/1 2959/17 3010/9 3054/4 3085/4
**presentation [8]** 2888/15 3035/22 3036/10 3038/20 3039/15 3041/1 3041/6 3043/10
**presently [2]** 2932/18 3069/19
**president [10]** 2957/20 2959/20 2959/23 2959/25 2960/3 2964/12 2966/21 2992/19 2992/21 3069/16
**press [4]** 2942/8 2942/15 2977/23 3113/2
**pressing [1]** 3102/18
**pressure [1]** 2881/7
**Presumably [1]** 2887/2
**presumes [1]** 3133/10
**pretensions [1]** 3026/17
**pretty [10]** 2903/9 2918/18 2933/21 2949/17 3004/7 3095/3 3099/3 3108/1 3110/2 3119/1
**previous [3]** 2928/3 3060/11 3100/19
**previously [7]** 2878/17 2922/3 2969/1 2970/18 3000/17 3006/1 3100/3
**price [7]** 2889/15 2891/6 2896/16 2898/20 2987/22 3031/11 3114/12
**pricing [4]** 2891/3 2891/4 2891/11 2896/20
**primarily [2]** 3097/3 3107/20
**primary [3]** 2990/18 3065/12 3075/4
**principal [1]** 2941/1
**principled [1]** 2974/7
**print [5]** 3119/15 3119/18 3119/20 3120/13 3120/20
**printed [1]** 2885/22
**printing [1]** 2885/10
**priorities [1]** 2914/14
**private [27]** 2882/22 2895/15 2898/15 2958/23 2958/23 2973/12 3104/16 3106/7 3106/11 3106/25 3122/21 3123/5 3123/14 3124/12 3124/16 3124/25 3125/2 3125/17 3125/17 3126/19 3127/9 3127/11 3127/12 3133/13 3133/17 3134/1 3134/18
**probative [1]** 2954/4
**problem [2]** 2903/11 2955/25 3042/19
**problems [5]** 2955/17 2986/24 2994/21 3006/24 3045/14
**proceed [9]** 2878/23 2899/11 2939/14 2969/2 2969/13 3054/6 3057/6 3093/19 3104/2
**proceeded [4]** 2900/13 2939/17 2952/25 2953/2
**proceeding [1]** 2928/4
**Proceedings [2]** 2877/24 3139/9
**proceeds [2]** 2911/16 2912/1
**process [9]** 2906/8 2910/19 3031/17 3031/21 3033/21 3033/24 3033/25 3041/16 3135/18
**processed [1]** 3079/15
**processes [1]** 2951/10
**processing [1]** 2957/1
**produced [2]** 2877/24 2952/22

**product [4]** 2964/16 2964/23 3041/15 3050/12
**productive [1]** 2944/17
**products [1]** 3120/24
**professional [2]** 3006/11 3094/14
**proffer [3]** 2950/17 2986/13 3112/3
**profile [3]** 2941/18 2999/10 3084/6
**profit [2]** 2992/7 3046/18
**profitable [2]** 3048/12 3125/3
**program [2]** 2938/13 2938/18
**programs [1]** 2996/1
**progress [1]** 3033/5
**progressed [1]** 2906/3
**progressive [1]** 2964/7
**project [1]** 2996/22
**promise [2]** 3052/3 3052/4
**promised [1]** 3059/2
**promissory [19]** 2917/15 2917/19 2917/20 2917/25 2918/1 2918/23 3075/16 3075/20 3076/2 3076/6 3076/11 3076/22 3077/10 3079/15 3080/7 3081/11 3081/19 3081/21 3082/23
**prompted [1]** 2963/6
**prompting [1]** 2965/21
**proof [1]** 3135/21
**properly [1]** 3102/14
**properties [1]** 2998/10
**property [5]** 2998/9 2998/10 2998/12 2998/15 2998/18
**proposal [5]** 2940/23 3046/24 3111/23 3114/8 3114/11
**propose [1]** 2886/14
**proposing [1]** 3103/19
**proprietary [1]** 2886/10
**prospective [1]** 3100/8
**protect [2]** 2968/21 2968/21
**protected [1]** 2969/21
**protein [3]** 3039/4 3039/6 3039/9
**proud [1]** 2982/11
**prove [3]** 2969/15 3013/2 3013/3
**proved [1]** 2898/7
**provide [2]** 2994/18 3085/17
**provides [1]** 3042/11
**providing [2]** 3036/8 3039/5
**provision [1]** 3073/19
**provisions [2]** 3114/15 3135/6
**public [25]** 2891/3 2891/4 2891/5 2898/15 2905/9 2905/18 2941/20 2942/19 2957/7 2960/24 2974/19 2975/2 3063/20 3070/17 3070/21 3070/22 3071/7 3071/12 3071/19 3076/20 3109/17 3109/24 3110/3 3111/1 3115/5
**publicly [10]** 2931/23 2957/2 2957/6 2981/25 2988/11 3063/14 3063/15 3071/3 3072/2 3072/5
**publicly-filed [1]** 3072/2
**publicly-traded [2]** 2931/23 2957/2
**pull [4]** 2894/2 3016/4 3068/20 3081/20
**pulling [2]** 2985/16 2985/17
**punch [1]** 2969/19
**punitive [1]** 2901/11
**purchase [2]** 2883/5 3115/5
**purchased [3]** 2882/18 2883/7 2987/25
**purchases [1]** 2882/16
**purportedly [1]** 2952/12

**P**

**purpose [2]** 2964/2 2986/14
**purposes [6]** 2917/22 2953/8 3033/25 3052/5 3133/23 3133/24
**purview [1]** 2974/9
**push [3]** 3048/16 3097/8 3097/9
**pushing [2]** 2890/22 2899/4
**put [41]** 2885/7 2914/19 2922/24 2926/22 2928/17 2930/15 2931/21 2947/6 2962/21 2962/25 2963/1 2967/15 2967/20 2972/7 2974/7 2981/10 2985/5 2997/24 2999/18 3002/23 3009/5 3014/13 3026/9 3028/13 3034/14 3034/15 3054/13 3056/17 3056/20 3065/3 3067/5 3068/2 3068/3 3078/20 3089/10 3089/11 3126/15 3130/9 3136/21 3138/2 3138/20
**putting [12]** 2886/19 2928/18 2933/9 2942/18 2945/16 2963/6 3005/16 3005/18 3041/12 3046/21 3113/14 3137/1

**Q**

**Q1 [1]** 2911/16
**qualified [1]** 3042/24
**qualifier [2]** 2997/24 3008/14
**qualities [2]** 3036/3 3036/3
**quarreling [1]** 3135/25
**quarter [15]** 2912/5 2913/2 2913/2 2913/6 2913/6 2913/6 2913/8 2913/14 2913/18 2916/12 2936/6 3064/6 3064/9 3065/8 3074/25
**quarterly [6]** 2996/14 2996/15 3011/19 3029/1 3064/3 3064/4
**questioned [1]** 3138/15
**questionnaire [6]** 2932/10 2932/11 2932/14 2933/2 3104/18 3106/8
**questionnaires [1]** 2930/7
**questions [17]** 2947/22 2989/2 2990/14 3013/6 3014/1 3024/23 3025/21 3036/1 3041/14 3061/6 3086/7 3090/15 3092/12 3100/16 3103/15 3103/16 3133/8
**quick [3]** 2928/20 3048/22 3099/11
**quicker [1]** 3066/25
**quickly [4]** 2904/8 2947/25 3005/25 3131/10
**quite [20]** 2917/7 2933/22 2943/4 2944/17 2959/13 2960/24 2964/10 2977/9 2982/5 2982/6 3002/8 3005/4 3005/6 3008/23 3022/5 3024/10 3024/14 3026/11 3029/17 3046/20
**quoting [2]** 3013/20 3013/22

**R**

**R0001 [1]** 3042/3
**R011939 [1]** 3115/23
**R013294 [1]** 3117/24
**R036371 [1]** 3106/10
**R036372 [1]** 3107/15
**R036381 [1]** 3108/16
**R036382 [1]** 3109/13
**raise [7]** 2914/8 2967/18 3045/16 3045/24 3048/17 3061/7 3080/15
**raised [13]** 2891/20 2891/21 2898/7 2898/9 2898/23 2911/16 2955/12

2955/14 2958/17 2967/6 2967/19 3080/13 3080/16
**raising [5]** 2953/24 2958/17 2960/25 2961/1 3034/2
**ramifications [1]** 2948/8
**Rao [1]** 2929/5
**rapidly [2]** 2914/9 2914/12
**rare [1]** 3036/17
**rash [3]** 3020/16 3021/3 3021/8
**rate [5]** 2894/17 2894/23 2895/15 2898/5 2898/20
**rather [7]** 2895/8 2916/4 2919/5 2928/16 2933/18 2933/19 3134/8
**RBC [1]** 3101/23
**RE [4]** 3038/25 3039/4 3042/17 3049/20
**RE-001 [3]** 3038/25 3039/4 3042/17
**RE-024 [1]** 3049/20
**reached [2]** 3049/25 3077/20
**reaching [2]** 2991/19 3043/20
**reacted [2]** 2942/21 2982/16
**reaction [15]** 2889/23 2928/11 2928/12 2948/4 2949/16 2955/20 2958/4 2959/2 2967/22 2977/13 2982/14 2984/3 3125/6 3125/8 3130/21
**reacts [1]** 2968/17
**read [50]** 2882/12 2890/18 2892/10 2892/11 2896/13 2896/17 2897/11 2898/2 2900/8 2901/23 2913/23 2962/2 2980/13 2997/19 3020/8 3032/17 3041/5 3047/17 3055/25 3056/6 3056/7 3056/7 3056/12 3056/18 3056/21 3059/11 3065/6 3065/7 3067/6 3067/8 3068/1 3068/24 3069/25 3070/4 3070/7 3070/9 3070/12 3071/6 3071/6 3071/17 3071/18 3071/21 3071/24 3072/1 3072/2 3072/7 3074/23 3074/24 3104/22 3119/24
**reading [5]** 3039/23 3075/13 3090/6 3114/3 3115/3
**reads [3]** 2880/18 2980/7 3124/11
**ready [8]** 2928/4 2941/9 2959/8 2966/12 2969/4 2969/14 2989/3 3057/3
**reaffirmed [1]** 2896/5
**reaffirming [2]** 2939/13 2940/22
**real [5]** 2998/2 2998/5 2999/7 3000/1 3044/19
**realize [1]** 2963/22
**realized [1]** 3035/5
**really [27]** 2891/22 2906/1 2925/20 2926/3 2939/8 2958/14 2958/15 2959/15 2960/5 2964/6 2964/16 2975/11 2988/20 2993/4 2995/23 3014/10 3035/1 3037/24 3043/16 3049/14 3061/7 3074/4 3088/15 3114/22 3119/24 3120/19 3126/24
**reason [9]** 2886/4 2901/16 2958/22 2972/23 2976/4 3017/14 3036/25 3080/15 3122/12
**reasons [14]** 2972/5 2972/9 2972/21 2974/7 2974/8 2976/9 2983/19 2990/18 2990/19 2991/9 2991/12 2991/15 3083/18 3135/10
**reassurance [3]** 2948/6 2981/24 2982/10
**reassurances [2]** 3081/14 3082/22
**reassuring [1]** 2923/6
**rebuttal [2]** 2974/1 2974/2

**recalled [1]** 3029/10
**receipts [1]** 2880/12
**receive [32]** 2880/8 2880/21 2882/4 2885/21 2893/11 2908/17 2908/20 2909/6 2910/3 2915/14 2921/8 2923/23 2927/4 2938/1 2961/17 2978/3 2979/14 2983/8 3036/21 3091/22 3104/11 3105/16 3107/11 3111/8 3111/12 3115/21 3116/20 3116/23 3117/10 3121/22 3122/2 3126/8
**received [42]** 2880/9 2882/6 2885/19 2893/13 2895/25 2908/24 2909/3 2909/4 2910/5 2915/17 2921/9 2921/21 2923/24 2927/5 2938/3 2944/3 2944/4 2946/6 2946/7 2961/18 2979/15 2983/9 2987/15 3021/17 3024/10 3056/11 3059/18 3061/1 3066/21 3066/22 3071/9 3091/24 3105/17 3107/12 3111/13 3115/22 3117/11 3122/3 3123/23 3123/24 3125/19 3126/9
**receiving [4]** 2895/8 3056/24 3082/10 3125/6
**recent [4]** 2882/16 2962/6 2999/5 3015/25
**recently [2]** 2898/24 2909/22
**recess [2]** 2936/7 2989/14
**recipient [1]** 2921/20
**reciprocated [1]** 3006/9
**recognition [5]** 2890/1 2895/21 2899/3 2946/24 3077/12
**recognize [20]** 2879/23 2881/19 2884/9 2893/2 2909/19 2911/2 2915/6 2920/25 2923/14 2926/17 2932/4 2937/16 2943/18 2945/21 2961/7 2979/7 2982/22 3091/12 3111/4 3117/2
**recognized [2]** 2900/16 2913/24
**recognizing [1]** 2914/9
**recollection [20]** 2914/15 2914/17 2941/5 2942/4 2942/5 2997/8 2997/16 3013/8 3013/10 3013/14 3014/3 3020/12 3021/11 3021/14 3025/4 3033/10 3072/6 3072/8 3087/5 3087/6
**recombinant [1]** 3039/5
**recommendation [1]** 2901/2
**reconcile [1]** 3027/18
**reconciliation [3]** 2882/14 2891/15 2893/5
**reconciling [1]** 2897/3
**reconfirming [1]** 3082/23
**record [16]** 2882/19 2891/8 2891/16 2953/7 3014/14 3015/6 3057/13 3068/7 3068/17 3074/12 3098/11 3102/20 3102/22 3104/10 3138/13 3139/1
**recorded [2]** 2877/24 2908/12
**recordkeeping [1]** 3081/24
**records [1]** 3136/22
**recoup [1]** 3098/20
**RECROSS [1]** 3092/13
**RECROSS-EXAMINATION [1]** 3092/13
**recruit [1]** 2963/15
**recruitment [1]** 2993/15
**redeem [2]** 3125/20 3127/3
**redeemed [3]** 3028/10 3028/11 3127/4
**redemption [3]** 3124/18 3125/5 3126/15
**redirect [3]** 3090/17 3090/19 3093/4
**redo [1]** 2928/20

**reducing** [1] 2904/11
**reelection** [1] 2985/25
**refer** [5] 2883/20 2941/4 2962/24 3006/6 3086/7
**reference** [22] 2898/10 2911/17 2912/11 2938/14 2942/16 2965/8 3011/20 3045/11 3058/2 3081/4 3081/10 3090/25 3091/9 3092/9 3092/9 3092/15 3100/24 3101/23 3103/6 3109/24 3119/18 3120/10
**referenced** [5] 2911/19 2950/6 2950/7 2950/9 2955/17
**references** [3] 2899/7 2912/6 3061/12
**referencing** [1] 2979/19
**referrals** [1] 3086/9
**referred** [7] 2911/20 2911/21 2917/15 3069/11 3092/20 3100/11 3100/12
**referring** [25] 2883/16 2883/21 2889/13 2889/18 2889/19 2899/7 2899/23 2899/24 2917/12 2930/13 2930/20 2931/1 2939/7 2942/13 2943/9 2944/24 2945/9 2945/10 2965/10 3020/15 3020/17 3020/19 3021/3 3021/16 3066/1
**refers** [4] 3066/3 3066/5 3081/19 3081/21
**reflect** [2] 2963/19 3124/13
**reflection** [1] 2892/4
**reflects** [3] 2946/15 2946/16 3052/8
**refresh** [8] 2942/4 2942/5 3013/8 3013/10 3013/14 3013/16 3014/2 3052/25
**refreshes** [3] 2941/5 2997/16 3025/4
**refunded** [1] 2895/6
**regain** [1] 2983/18
**regard** [4] 2951/25 3006/11 3058/24 3073/25
**regarded** [1] 2904/6
**regarding** [21] 2879/15 2880/16 2881/14 2888/14 2895/1 2937/10 2941/14 2942/7 2947/8 2948/20 2948/24 2951/19 2963/20 2966/5 2967/3 2976/11 2983/16 2983/24 3124/13 3124/14 3137/12
**Regards** [1] 2924/10
**regions** [1] 2993/13
**register** [1] 3056/7
**Registrar** [1] 2880/19
**registration** [4] 2880/24 2904/22 3066/13 3066/15
**registry** [1] 2900/2
**regular** [2] 2908/4 3024/18
**regularly** [3] 2965/13 2996/12 2996/13
**regulatory** [2] 2932/20 2932/20
**rejections** [1] 2942/9
**rekindle** [1] 2988/16
**related** [14] 2917/5 2921/4 2923/1 2947/19 2975/8 2991/9 2991/12 2991/15 2991/18 3065/9 3065/12 3065/15 3065/16 3133/3
**relating** [2] 2975/24 2977/4
**relation** [3] 2921/11 2943/6 3052/9
**relations** [3] 2977/22 2978/10 2993/17
**relationship** [24] 2953/13 2953/18 2960/23 2963/11 3011/7 3013/2 3014/9 3014/18 3014/19 3015/11 3016/13

3016/13 3016/23 3017/2 3017/5 3017/6 3017/16 3017/23 3017/24 3018/1 3018/6 3018/10 3028/10 3089/24
**release** [8] 2977/24 3056/5 3057/9 3068/23 3068/24 3069/19 3071/7 3113/2
**released** [1] 2942/12
**releases** [3] 2942/8 2942/15 2975/21
**releasing** [1] 2942/14
**releasor** [2] 3069/1 3069/6
**releasors** [1] 3069/10
**relevance** [3] 2951/2 2951/3 3113/5
**relevancy** [1] 2986/13
**relevant** [13] 2951/18 2952/14 3015/14 3016/6 3112/2 3135/22 3136/1 3136/3 3136/13 3136/15 3136/19 3136/20 3138/21
**relieved** [1] 2976/10
**rely** [5] 3100/10 3105/3 3118/5 3124/22 3131/3
**remain** [3] 2885/15 2982/3 2985/24
**remainder** [2] 2981/11 3134/22
**remained** [1] 2969/5
**remains** [2] 3048/9 3134/17
**remarks** [1] 3084/15
**remember** [58] 2916/1 2935/1 2990/20 2997/1 3001/9 3002/15 3002/17 3003/17 3004/20 3006/7 3009/23 3010/5 3011/15 3011/21 3011/22 3011/22 3011/23 3012/3 3020/2 3024/11 3028/3 3030/14 3030/15 3033/15 3033/23 3034/2 3034/3 3034/4 3034/11 3034/16 3034/24 3043/5 3043/6 3043/20 3044/4 3044/6 3044/7 3044/10 3045/6 3045/21 3045/23 3046/1 3046/2 3047/15 3049/8 3049/9 3049/10 3049/22 3054/12 3073/18 3080/22 3082/12 3086/15 3089/17 3090/1 3092/15 3092/16 3133/10
**reminded** [1] 2935/19
**reminder** [1] 2888/25
**reminding** [1] 2935/12
**removal** [4] 2981/6 2981/20 2982/14 2983/24
**remove** [6] 2951/14 2969/2 2969/15 2970/20 2984/22 3009/17
**removed** [5] 2972/10 2972/16 2973/25 2974/6 2990/19
**removing** [3] 2972/5 2974/8 2979/2
**Repeat** [2] 3096/19 3131/9
**repeatedly** [2] 2899/3 3011/8 3136/11
**rephrase** [3] 2881/11 2990/15 3008/4
**replace** [2] 3042/17 3093/14
**replaces** [1] 3039/4
**report** [14] 3021/22 3022/17 3022/24 3023/2 3023/8 3023/13 3023/24 3024/2 3024/11 3025/7 3025/18 3074/7 3079/25 3081/15
**reported** [2] 2980/14 2980/17
**Reporter** [1] 2877/22
**reporting** [2] 2916/21 2957/1
**reports** [10] 3011/15 3011/17 3011/18 3015/18 3017/18 3021/18 3024/6 3024/16 3063/12 3109/14
**represent** [1] 2904/4
**represented** [1] 2918/4
**represents** [1] 3114/11

**request** [2] 2880/20 2953/19
**requests** [1] 2953/9
**require** [1] 3122/10
**required** [4] 2916/19 2917/20 2924/21 3098/6
**requirement** [7] 2883/3 2932/8 2932/15 2957/1 2983/20 3063/11 3131/22
**requirements** [3] 2925/23 2949/12 2966/18 2966/19 2966/23
**research** [9] 2960/8 2992/17 3032/7 3032/8 3032/11 3032/12 3032/14 3032/23 3043/2
**reserves** [1] 3108/21
**resign** [1] 2966/13
**resignation** [2] 2966/15 2985/7
**resigning** [3] 2966/6 2982/19 2983/21
**resolution** [1] 2901/1
**resolved** [2] 2981/6 2981/14
**resources** [9] 2993/5 2993/14 3002/7 3005/24 3005/25 3008/15 3045/10 3045/10 3045/12
**respect** [23] 2898/24 2904/2 2906/20 2906/23 2907/11 2919/25 2928/24 2931/17 2935/4 2941/19 2945/8 2945/11 2951/15 2951/18 2959/1 2965/16 2966/4 2966/18 2980/15 2985/14 2988/1 3015/4 3097/17
**respected** [1] 3008/18
**respective** [3] 2927/12 2927/14 3069/21
**respond** [6] 2883/10 2890/4 2892/6 2897/4 2900/6 2901/19
**responded** [1] 3015/3
**responding** [3] 2890/10 2917/17 3022/8
**response** [32] 2883/8 2888/22 2890/13 2890/19 2891/25 2892/9 2892/17 2893/25 2896/11 2897/2 2897/7 2900/9 2900/10 2901/8 2901/22 2901/23 2902/15 2923/19 2924/11 2924/11 2933/19 2959/9 2981/20 2982/8 2988/17 2988/18 2997/3 2997/24 3022/16 3023/2 3024/11 3122/10
**responsibilities** [9] 2960/2 2962/20 2993/1 2993/3 2993/11 2994/10 2995/19 2996/2 3110/18
**responsible** [7] 2908/13 2908/17 2993/12 2993/14 2993/16 2993/17 3008/5
**rest** [8] 2896/10 2916/8 2916/9 2924/13 2951/9 3022/19 3068/22 3138/20
**restate** [1] 2916/19
**restated** [1] 2935/17
**restatement** [3] 2918/6 2918/10 2918/21
**restaurant** [1] 3003/18
**restaurants** [1] 3004/15
**restore** [1] 3042/18
**restricted** [3] 2880/23 2881/1 2972/3
**result** [3] 2932/21 2953/19 2954/2
**results** [4] 2916/20 2980/22 3063/13 3074/5
**resume** [1] 3139/9
**resumed** [1] 2907/5
**retainer** [1] 2987/14
**retaining** [1] 2919/10
**retaken** [1] 2907/5

**R**

retire [1]  3052/25
retirement [1]  2999/9
Retrophin [168]  2879/5 2879/6 2879/8
2879/15 2880/16 2881/8 2881/14
2882/22 2883/5 2884/4 2885/12
2885/16 2885/23 2889/9 2889/13
2889/19 2891/1 2891/5 2891/12
2892/12 2892/16 2892/23 2894/1
2894/16 2894/16 2894/19 2894/23
2895/9 2895/14 2897/25 2898/6
2898/24 2902/12 2903/3 2903/13
2903/18 2903/23 2904/3 2904/20
2905/2 2905/7 2905/9 2905/10 2905/16
2905/18 2905/19 2906/9 2907/8
2907/11 2907/21 2911/5 2917/22
2917/23 2918/3 2919/1 2920/11 2925/1
2925/8 2925/12 2925/14 2938/13
2938/19 2941/23 2947/1 2949/11
2949/12 2949/23 2950/8 2950/9
2950/11 2951/11 2951/25 2952/11
2952/19 2953/3 2953/23 2953/25
2956/1 2956/16 2960/11 2962/10
2962/12 2963/4 2964/25 2965/17
2967/3 2967/16 2975/24 2977/4
2978/17 2981/15 2982/15 2983/25
2984/1 2985/15 2986/5 2986/20
2987/1 2987/18 2987/20 2987/25
2990/9 2991/18 2992/1 2992/5 3033/3
3034/5 3034/21 3035/16 3035/21
3036/16 3036/22 3038/6 3043/11
3043/13 3043/15 3043/23 3044/12
3045/3 3045/5 3045/15 3045/25 3046/8
3047/1 3047/14 3047/17 3047/22
3048/14 3049/3 3049/19 3050/4 3066/6
3066/13 3067/17 3069/5 3069/10
3069/16 3069/20 3070/18 3070/25
3071/8 3071/13 3074/9 3076/25 3077/5
3077/6 3077/7 3077/8 3077/9 3077/22
3077/22 3078/7 3079/20 3080/18
3081/6 3081/24 3082/5 3082/7 3085/13
3088/19 3089/9 3119/18 3120/10
3120/18 3120/23 3121/8 3121/11
3121/14
Retrophin's [8]  2879/10 2905/13
2918/7 2952/25 2985/20 2987/6
3036/25 3076/20
Retrophin.com [1]  2983/12
return [3]  2936/6 2989/10 3037/8
returned [1]  3125/4
returns [4]  2937/3 3107/19 3108/3
3109/22
reverse [6]  2879/13 2905/8 2905/23
3048/18 3048/20 3048/22
review [16]  2896/19 2896/24 2908/18
2908/21 2909/4 2911/7 2916/11
2923/10 2924/17 2945/12 2950/8
2979/25 2989/7 3071/10 3104/19
3122/12
reviewed [2]  2890/14 2897/2
reviewing [6]  2915/10 2919/16 2941/8
3067/9 3074/4 3074/4
revised [3]  2905/5 3060/14 3122/9
revision [1]  2904/25
revisions [1]  2917/5
RICHARDSON [35]  2878/17 2879/3
2880/12 2882/9 2885/18 2885/25

2888/9 2890/5 2893/2 2897/8 2900/6
2907/20 2913/2 2919/8 2923/14
2927/17 2937/7 2942/4 2953/12 2955/3
2977/6 2980/7 2980/14 2980/17
2980/20 2990/5 2990/11 2997/12
2997/15 3020/2 3078/3 3090/14
3090/21 3091/10 3093/6
rid [2]  2968/8 3078/21
right-hand [1]  3051/8
rigor [2]  2923/7 2962/11
rigorous [1]  2930/15
Rise [1]  2878/1
rising [2]  3099/1 3099/2
risk [6]  2930/5 2931/25 2938/19 2939/1
2939/3 2942/18
riskier [1]  2999/18
Rivka [1]  2877/22
RivkaTeich [1]  2877/23
RMR [1]  2877/22
road [1]  3109/11
rock [1]  3019/3
rocky [1]  2985/4
Rodes [3]  2913/16 2914/1 3078/24
ROHDE [1]  2877/12
role [38]  2895/21 2900/4 2903/21
2905/10 2905/12 2906/24 2907/1
2907/4 2907/10 2924/19 2958/14
2958/25 2959/18 2959/19 2959/25
2964/7 2964/9 2964/21 2964/22
2968/13 2969/3 2969/6 2969/16
2969/24 2969/25 2970/14 2970/20
2970/22 2979/2 2994/14 2995/22
3005/25 3009/25 3052/13 3059/3
3059/7 3073/15 3088/5
roles [5]  2919/3 2963/14 2966/21
3036/13 3043/19
rolled [2]  2907/6 2987/18
romantic [7]  3014/19 3016/8 3017/4
3017/16 3017/23 3017/24 3018/1
Ron [4]  2907/14 2907/15 2907/18
2919/3
roof [3]  3000/7 3000/8 3002/18
room [2]  2933/23 2957/18 3052/25
rooms [1]  2926/11
Rosenfeld [4]  2920/17 2920/20 3113/4
3113/21
Rosenman [1]  3084/25
Rosensaft [1]  2952/24
roughly [2]  2998/8 3053/2
route [2]  2905/22 2905/22
RPR [1]  2877/22
rule [2]  2951/17 2953/10
ruling [1]  3138/16
run [7]  2963/24 2964/16 3046/19
3046/20 3086/12 3129/13 3137/25
running [8]  2895/14 2964/23 3044/25
3045/3 3045/9 3045/13 3096/18
3096/20

**S**

S1 [15]  2899/24 2901/4 2901/9 2904/22
2905/1 2905/5 3066/13 3066/15
3067/17 3068/21 3070/21 3070/25
3071/18 3071/19 3072/8
sales [9]  2960/5 3030/22 3031/2 3031/3
3031/4 3031/8 3031/13 3031/23
3031/24

salesman [2]  3094/17 3105/23
San [1]  2965/20
Sarah [3]  2913/15 2913/25 3078/24
sarcolemma [1]  3042/11
sat [3]  2922/3 2935/9 3014/10
Save [1]  2888/17
saw [19]  2892/16 2893/19 2894/3
2919/23 2956/1 2956/14 2964/14
2973/15 3001/8 3062/18 3066/10
3066/11 3079/12 3080/3 3081/8 3086/9
3107/5 3123/17 3128/12
schedule [2]  2910/18 2948/15
scheme [1]  3135/22
science [2]  3042/22 3042/24
Sciences [1]  3114/9
scientific [2]  3036/8 3043/1
scope [1]  2950/8
score [2]  3119/2 3131/15
scratch [1]  2939/5
screen [7]  3042/4 3050/23 3054/13
3068/4 3072/12 3117/14 3130/12
scroll [4]  2893/18 2901/22 2911/15
2981/4
searching [1]  2938/20
seat [3]  2878/9 3054/1 3054/5
SEC [43]  2901/10 2916/14 2918/7
2932/19 2947/8 2947/18 2947/21
2948/1 2948/14 2948/15 2948/20
2949/14 2950/7 2951/3 2951/4 2951/5
2951/6 2951/16 2952/4 2952/5 2952/10
2952/16 2952/19 2952/23 2953/2
2953/20 2953/24 2955/4 2956/2
2958/11 2997/7 2997/21 3063/16
3070/21 3070/25 3072/2 3088/21
3088/24 3089/1 3089/4 3137/12
3137/14 3137/16
SEC's [1]  3063/18
second [22]  2884/17 2894/18 2899/2
2929/13 2976/17 2997/6 2997/11
2997/12 3003/4 3065/8 3067/6 3070/3
3073/21 3098/23 3106/5 3107/15
3107/16 3114/17 3120/6 3123/10
3128/4 3130/6
secondary [1]  3098/8
seconded [1]  2981/5
secondly [2]  2950/12 2971/6
secretary [7]  2935/14 2935/20 2958/15
2980/9 2980/11 2996/9 3085/10
section [14]  2894/11 2895/18 2896/13
2896/17 2912/1 2912/3 2913/2 2913/14
2930/5 2963/25 3070/19 3071/20
3072/9 3074/19
secure [5]  2899/19 2899/21 2925/17
2925/22 2925/23
secured [3]  2911/19 2928/2 2928/3
securing [1]  3050/15
securities [8]  2883/3 2932/22 2947/18
2997/1 3088/9 3097/3 3124/15 3127/19
see [87]  2878/20 2882/20 2889/10
2889/15 2892/21 2897/9 2898/3
2904/19 2910/20 2913/15 2913/16
2919/11 2927/19 2930/4 2932/23
2935/3 2938/7 2941/4 2941/17 2942/1
2962/13 2962/21 2981/8 2984/2
2993/10 3012/7 3020/6 3028/11
3028/16 3036/18 3039/2 3042/4
3050/23 3051/12 3052/6 3052/9

**S**

**see...** [51] 3052/22 3054/25 3055/5 3055/8 3055/20 3058/17 3061/9 3061/13 3061/17 3063/2 3063/8 3063/25 3064/10 3064/19 3065/13 3065/20 3067/18 3068/3 3068/13 3068/20 3069/22 3072/5 3072/12 3074/16 3074/21 3075/5 3075/11 3075/12 3078/4 3078/9 3078/24 3079/3 3081/8 3081/20 3082/2 3092/7 3095/24 3096/14 3096/15 3107/17 3109/1 3109/14 3109/22 3113/7 3114/18 3119/1 3119/2 3119/15 3120/10 3122/14 3131/15

**seeing** [8] 2889/24 2953/11 3001/9 3011/22 3021/9 3039/22 3079/9 3079/10

**seek** [1] 3107/18

**seeking** [1] 2948/6

**select** [1] 2902/2

**selected** [1] 2906/22

**self** [2] 2932/20 3052/21

**self-afflicted** [1] 3052/21

**self-regulatory** [1] 2932/20

**sell** [6] 2881/8 2883/23 2985/8 2985/11 3049/1 3050/10

**sellers** [1] 2881/5

**selling** [4] 2881/14 2960/6 3095/3 3095/4

**send** [14] 2885/21 2891/9 2892/22 2904/25 2923/18 2953/3 3011/18 3011/19 3024/6 3024/21 3028/23 3090/12 3106/3 3111/17

**sending** [7] 2882/13 2963/7 2984/1 3011/23 3022/16 3022/24 3024/20

**sends** [3] 2910/23 3023/8 3027/11

**senior** [7] 2906/11 2942/23 2980/18 2992/19 2992/21 2994/1 2994/9

**sense** [4] 2904/14 3033/17 3098/23 3104/25

**sensitive** [2] 2924/21 3057/5

**sent** [40] 2882/17 2888/13 2890/10 2890/18 2909/8 2919/18 2921/17 2921/20 2952/19 2988/10 3006/6 3012/2 3012/5 3024/2 3025/7 3055/10 3055/11 3055/16 3055/22 3059/9 3059/10 3061/24 3062/13 3071/25 3077/16 3078/2 3105/19 3110/21 3111/15 3113/2 3117/14 3122/5 3127/1 3127/3 3127/10 3127/16 3127/17 3128/13 3128/17 3130/19

**sentence** [5] 2880/18 2896/12 2980/7 3109/16 3120/20

**sentences** [2] 2892/11 3108/19

**separate** [10] 2898/23 2952/3 2972/13 2972/14 2977/6 2986/15 2987/16 2987/24 3050/8 3124/8

**separately** [4] 2978/16 3022/18 3023/1 3024/24

**September** [29] 2909/9 2909/10 2914/18 2914/23 2919/14 2966/6 2966/7 2966/14 2966/25 2967/2 2969/10 2970/5 2979/10 2979/18 2984/25 2985/2 2985/15 3003/24 3054/11 3055/23 3059/10 3059/16 3073/4 3080/6 3119/11 3128/1 3129/1 3129/19 3130/3

**September 10** [1] 3130/3

**September 2011** [1] 3119/11

**September 2012** [1] 3129/1

**September 2013** [2] 2914/18 2914/23

**September 2014** [2] 2909/10 2985/15

**September 28** [1] 3003/24

**September 30** [4] 2979/10 2979/18 2984/25 2985/2

**September 30th** [1] 3073/4

**September 9** [1] 2919/14

**September 9th** [5] 3054/11 3055/23 3059/10 3128/1 3129/19

**SeraCare** [5] 3111/24 3113/8 3114/9 3114/10 3114/13

**series** [11] 2924/15 2962/7 2973/13 2978/15 2981/19 3014/1 3020/7 3065/10 3075/2 3116/25 3127/22

**serious** [1] 2963/22

**seriously** [2] 2906/1 2958/15

**seriousness** [1] 2881/6

**serve** [1] 2981/2

**server** [2] 2885/15 2885/16

**servers** [6] 2885/12 2885/13 2885/23 2886/16 2984/11 2984/23

**services** [1] 2994/18

**serving** [1] 2987/6

**session** [10] 2929/24 2940/2 2940/5 2940/6 2940/10 2940/13 2944/17 2945/2 2957/17 2959/2

**sessions** [1] 2958/8

**set** [11] 2895/16 2924/15 2946/19 2962/15 2962/18 2963/20 2967/11 2969/1 2970/4 2978/11 2978/13

**setting** [4] 2946/25 2985/9 3026/8 3097/6

**settle** [4] 3065/10 3069/18 3075/2 3075/10

**settlement** [29] 2913/15 2916/19 2917/8 2917/21 2918/3 2918/6 2918/8 2918/9 2918/12 2918/17 2919/10 3066/8 3066/9 3066/11 3066/12 3068/22 3068/24 3071/2 3071/3 3071/7 3071/10 3074/20 3075/9 3076/13 3077/12 3077/13 3077/14 3077/18 3077/20 3078/23

**settlements** [2] 3078/14 3079/14

**setup** [1] 2964/15

**seven** [3] 2952/9 3057/11 3058/6

**seven-page** [1] 3058/6

**several** [1] 3102/16

**severe** [2] 3006/24 3007/1

**sexual** [4] 3015/14 3016/5 3016/10 3017/6

**shaping** [1] 3050/19

**share** [12] 2902/20 2940/1 2940/4 2940/12 2940/19 2941/2 2945/7 2962/5 2977/24 2981/22 3009/19 3114/10

**shared** [10] 2895/22 2901/6 2903/10 2904/4 2949/23 2966/7 2969/1 2982/7 2984/4 3045/11

**shareholder** [7] 2930/25 2931/2 2931/6 2931/22 2939/10 2957/2 2976/8

**shareholders** [3] 2917/24 2957/5 3037/8

**shareholding** [1] 2883/4

**shares** [36] 2880/23 2880/25 2882/17 2883/7 2883/12 2883/22 2883/23

**289/14 2889/18 2889/19 2889/19** 2891/2 2892/18 2895/8 2897/12 2895/23 2896/6 2897/13 2897/13 2897/25 2902/1 2902/6 2902/10 2902/11 2902/12 2903/3 2904/2 2904/5 2904/7 2904/9 2904/12 2905/2 2947/3 2987/25 2988/6 2988/7 3058/18 3059/2 3059/6 3089/9

**sharing** [6] 2896/4 2982/6 3030/15 3044/8 3045/12 3084/21

**sharpening** [1] 3005/13

**Shearson** [3] 3094/18 3094/19 3094/21

**shell** [4] 3048/24 3048/25 3049/2 3049/4

**shielded** [1] 3108/5

**shirt** [2] 3005/11 3096/4

**SHKRELI** [100] 2877/6 2879/9 2880/11 2882/11 2885/12 2886/16 2888/11 2888/14 2889/8 2890/10 2890/19 2892/6 2893/22 2893/25 2897/4 2897/8 2898/22 2901/8 2901/19 2907/7 2910/10 2922/6 2927/17 2938/5 2938/12 2939/6 2939/17 2939/20 2939/22 2940/13 2941/24 2942/6 2942/20 2943/12 2946/12 2946/23 2947/13 2948/2 2948/25 2951/11 2951/14 2951/23 2952/15 2953/13 2953/18 2953/22 2959/14 2959/17 2961/21 2963/7 2963/20 2967/3 2968/5 2975/4 2977/3 2978/7 2980/15 2980/17 2980/20 2980/21 2981/2 2981/6 2981/10 2983/11 2983/15 2985/1 2985/5 3001/3 3015/21 3032/16 3035/24 3038/1 3054/18 3062/25 3069/1 3069/1 3069/6 3069/11 3069/15 3069/20 3072/19 3073/9 3073/12 3078/2 3082/11 3089/5 3092/4 3095/13 3095/22 3095/24 3096/6 3102/12 3106/16 3116/6 3120/24 3126/4 3128/18 3136/20 3137/20 3138/11

**Shkreli's** [14] 2883/8 2888/22 2902/15 2945/12 2953/19 2959/1 2965/16 2980/16 2980/24 2981/20 2983/23 2990/13 3041/8 3137/1

**short** [14] 2972/9 2973/6 2973/11 2976/6 3030/22 3031/2 3031/3 3031/13 3031/23 3097/2 3097/4 3107/20 3108/7 3108/8

**shorting** [1] 3038/1

**shortly** [1] 2943/8

**shorts** [3] 3097/6 3097/7 3108/5

**show** [13] 2953/19 2997/15 3013/15 3013/16 3020/5 3022/3 3025/3 3034/9 3057/11 3062/23 3090/4 3136/1 3136/2

**showed** [2] 2895/23 3024/4

**showing** [23] 2879/17 2881/16 2884/6 2892/25 2909/16 2915/2 2920/22 2923/11 2926/14 2937/14 2943/14 2945/18 2953/6 2979/4 2982/20 3091/5 3105/6 3106/19 3111/2 3115/10 3121/16 3123/11 3125/22

**shown** [1] 3113/3

**shows** [1] 2952/24

**shy** [2] 2899/13 2899/14

**sick** [4] 3008/22 3022/6 3022/6 3022/9

**side** [9] 2890/23 2960/4 2963/18 3042/24 3051/7 3051/8 3108/4 3130/10 3130/10

**S**

**sidebar [23]** 2884/20 2887/11 2888/3 2950/17 2950/20 2954/10 2971/12 2971/15 2976/5 2976/21 3012/16 3012/20 3019/7 3040/9 3041/20 3099/12 3099/15 3103/22 3112/6 3113/23 3131/25 3132/5 3138/18
**sidebars [1]** 3015/25
**sign [11]** 2882/24 2899/20 2899/22 2900/3 2900/23 2902/3 2904/22 2905/1 2938/21 3115/24 3116/1
**sign-off [1]** 2938/21
**signal [1]** 2904/9
**signature [4]** 2899/19 2899/21 2946/1 3070/15
**signed [4]** 2891/2 2901/3 3075/17 3115/14
**significant [5]** 2966/10 2993/20 2993/21 3039/19 3043/19
**significantly [1]** 2890/14
**similar [2]** 3039/6 3098/8
**similarly [1]** 2903/21
**simple [1]** 3097/15
**simply [1]** 2899/5
**sit [4]** 2935/10 2958/7 3021/11 3104/22
**sits [2]** 2882/20 3065/25
**Sitting [1]** 3096/2
**situated [1]** 2903/21
**situation [6]** 2900/11 2924/23 2940/21 3082/14 3087/7 3089/16
**six [6]** 2892/12 2892/17 2992/11 3026/12 3078/8 3094/17
**sixthmanresearch.com [1]** 2938/6
**size [5]** 2939/2 2966/13 2970/16 3121/13 3127/18
**sizeable [1]** 2904/5
**skimmed [3]** 3056/1 3056/3 3056/6
**skin [16]** 3012/9 3013/20 3017/1 3018/8 3020/3 3020/11 3020/16 3020/19 3021/3 3021/15 3021/15 3090/22 3091/9 3092/6 3092/18 3092/21
**sleep [1]** 3004/25
**sleeping [4]** 3004/25 3007/19 3030/10 3136/14
**slept [1]** 3007/18
**slightly [2]** 2883/24 2883/25
**slot [1]** 2927/15
**slowly [3]** 2924/24 2924/24 3049/13
**small [7]** 2931/25 2948/7 3026/11 3027/5 3043/14 3075/7 3127/13
**smaller [2]** 2883/25 3127/23
**SMITH [2]** 2877/15 3138/18
**sneak [2]** 3062/2 3062/6
**snow [1]** 2944/23
**social [4]** 2935/9 2941/14 3001/14 3087/7
**socializing [1]** 3006/25
**soft [10]** 3012/9 3013/20 3017/1 3018/8 3020/3 3020/11 3021/3 3090/22 3091/8 3092/21
**sole [1]** 2938/20
**solely [1]** 2959/25
**solution [1]** 2899/18
**solutions [1]** 2962/11
**someone [16]** 2906/5 2907/15 2947/23 2952/4 3002/12 3010/1 3010/3 3010/6 3016/25 3036/4 3062/6 3080/19 3081/9

3085/13 3101/16 3102/21
**sometime [2]** 2952/21 2956/14
**sometimes [5]** 3005/3 3009/2 3010/21 3011/3 3116/18
**soon [5]** 2937/2 2962/21 3012/7 3027/8 3027/19
**sophisticated [3]** 2996/24 2997/2 2997/22
**sorely [1]** 2889/2
**sorry [21]** 2879/19 2879/20 2913/11 2915/18 2921/6 2942/3 2943/15 2944/9 2952/23 3026/20 3032/8 3056/19 3069/3 3077/4 3121/9 3126/25 3128/7 3129/19 3131/9 3131/10 3134/21
**sort [13]** 2959/11 2967/7 2986/19 2988/14 2996/20 3005/10 3026/8 3026/13 3030/10 3035/16 3051/5 3063/20 3090/25
**sound [3]** 3022/7 3085/17 3087/2
**Sounds [1]** 3044/11
**sourcing [3]** 2902/1 2902/5 2902/6
**space [3]** 2922/23 2957/10 3044/21
**speaking [10]** 2908/7 2922/20 2937/8 2981/24 2996/7 3013/21 3022/25 3047/5 3091/7 3091/8
**special [1]** 3010/13
**specializing [2]** 3111/21 3114/6
**specific [18]** 2890/2 2919/3 2950/5 2956/13 2965/18 2965/24 2970/21 2974/23 2996/18 2997/8 3035/11 3041/14 3066/1 3067/10 3071/20 3077/14 3080/14 3086/13
**specifically [14]** 2949/19 2967/6 3014/17 3024/25 3032/13 3036/20 3043/5 3062/16 3080/11 3080/24 3081/21 3082/12 3084/1 3124/13
**specifics [3]** 2955/17 3002/14 3030/16
**speculating [1]** 3095/3
**spell [1]** 3093/17
**Spencer [4]** 2913/15 2913/25 3078/14 3078/23
**spend [1]** 2999/2
**spending [1]** 2914/9
**Spielberg [4]** 2913/15 2913/25 3078/14 3078/24
**spirit [4]** 2900/10 2939/8 2939/13 3048/1
**split [1]** 2998/7
**spoken [11]** 2891/14 2895/1 2922/1 2933/9 2956/10 2971/5 2984/3 2999/20 3022/18 3080/23 3100/4
**squarely [1]** 2974/9
**SR [1]** 2997/14
**Srini [1]** 2929/9
**Srinivas [2]** 2929/5 2929/6
**SRINIVASAN [2]** 2877/16 3140/6
**stability [3]** 3042/12 3042/18
**stages [2]** 2900/15 2964/15
**stake [2]** 2896/7 2896/14
**stakeholder [1]** 2963/25
**stance [3]** 2982/17 2984/6 2984/8
**stand [8]** 2878/16 2905/25 2990/5 2990/6 3080/7 3093/10 3093/11 3138/16
**stand-alone [1]** 2905/25
**standard [3]** 2880/19 2924/18 3124/18
**standards [1]** 3049/25

**standing [5]** 2917/10 2917/12 2917/17 2988/11 3001/10
**stands [1]** 2918/23
**star [1]** 3099/2
**start [17]** 2882/9 2888/9 2893/16 2908/3 2914/6 2915/18 2959/7 2977/22 2977/23 2986/23 2989/10 3026/15 3026/19 3045/17 3045/18 3048/23 3114/3
**start-up [5]** 3026/15 3026/19 3045/17 3045/18 3048/23
**started [17]** 2925/17 2925/19 2957/17 2959/4 2978/3 2978/3 2981/18 2982/17 2984/11 2984/12 2995/21 3002/6 3002/8 3014/11 3030/17 3043/1 3102/19
**starting [20]** 2888/22 2893/5 2896/13 2923/7 2923/18 2923/18 2929/17 2947/2 2961/3 2961/3 2963/15 3004/6 3032/8 3034/14 3034/15 3036/12 3038/22 3044/6 3048/4 3114/3
**starts [4]** 2881/24 2884/14 2897/7 3109/14
**state [9]** 2895/13 2895/22 2905/13 2911/10 2914/4 2932/21 2934/10 2945/3 3093/17
**statement [12]** 2880/24 2905/5 3066/15 3109/20 3117/22 3117/25 3119/10 3120/4 3128/2 3128/21 3129/20 3130/4
**statements [18]** 3066/13 3109/19 3110/21 3110/21 3116/24 3117/6 3118/2 3118/5 3118/8 3128/12 3128/19 3130/15 3130/19 3130/22 3131/3 3131/8 3131/12 3133/5
**states [18]** 2877/1 2877/3 2877/3 2877/10 2877/13 2877/16 2881/4 2888/25 2889/12 2889/14 2916/11 2930/7 2932/17 2946/23 2946/24 2993/13 2995/17 3107/22
**stations [1]** 3026/12
**status [4]** 2879/15 2907/25 2925/12 2934/8
**stay [9]** 2959/10 2968/14 2969/15 2969/24 2969/25 2970/1 2970/22 2983/18 3127/7
**stayed [1]** 2987/22
**staying [1]** 2988/15
**steeling [1]** 2991/15
**steer [2]** 2965/5 2995/17
**stellar [1]** 2938/24
**stenography [1]** 2877/24
**step [7]** 2891/12 2925/20 2965/24 3049/24 3053/2 3067/1 3067/7
**stepped [1]** 2933/24
**steps [2]** 3039/16 3053/5
**Steve [38]** 2907/1 2908/2 2920/16 2925/9 2944/18 2944/21 2957/19 2957/21 2958/2 2958/24 2959/16 2959/19 2961/10 2961/21 2965/19 2965/20 2966/2 2966/21 2968/23 2969/10 2969/11 2969/18 2970/3 2970/9 2978/14 2978/16 2979/3 2983/12 2984/15 2984/18 3050/25 3054/18 3062/24 3076/1 3076/5 3076/13 3078/2
**STEVEN [2]** 2878/17 2983/12
**stick [7]** 2984/5 3010/11 3027/17

## S

**stick... [4]** 3028/8 3041/17 3107/13 3124/1
**sticky [1]** 2940/20
**still [20]** 2878/20 2899/13 2918/16 2925/3 2956/11 2956/12 2958/6 2966/2 2968/11 2982/3 2985/20 2987/13 2987/20 2988/6 2988/7 2988/18 2990/7 3036/11 3050/1 3095/8
**stimulating [1]** 2995/14
**stipulate [1]** 3096/3
**stock [61]** 2880/1 2880/16 2880/20 2881/8 2881/14 2882/16 2882/18 2882/19 2882/23 2883/5 2883/19 2889/1 2889/15 2889/21 2889/24 2891/3 2891/4 2891/5 2892/4 2892/15 2894/17 2894/23 2895/25 2898/20 2899/2 2904/25 2971/7 2972/2 2972/18 2973/20 2975/24 2976/6 2976/11 2976/13 2977/4 2977/9 2980/21 2981/23 2983/21 2987/13 2987/13 2987/14 2987/20 2991/4 2991/6 2992/2 2992/5 3031/4 3031/5 3031/10 3058/19 3059/3 3059/6 3066/16 3080/25 3081/5 3086/17 3089/10 3098/4 3114/10 3114/13
**stockholding [3]** 2891/15 2893/6 3081/3
**stockholdings [2]** 2891/23 2901/7
**stocks [3]** 3028/24 3031/5 3038/1
**stole [2]** 2885/4 2951/12
**stood [1]** 2894/14
**stop [3]** 2898/9 3038/1 3038/1
**stops [1]** 3049/13
**store [1]** 3137/25
**storm [1]** 2944/23
**story [1]** 2982/7
**straight [1]** 2924/17
**strained [2]** 2960/23 2963/12
**strategic [5]** 2892/19 2969/16 2980/19 3111/21 3114/6
**strategies [1]** 2995/6
**strategy [5]** 2907/4 2914/7 2914/10 3048/15 3096/16
**stream [1]** 2960/14
**street [3]** 2926/11 2968/17 3026/2
**stricter [1]** 2980/23
**strike [3]** 2891/6 3099/8 3100/23
**striking [1]** 3103/21
**strong [2]** 2922/2 2938/22
**structure [3]** 2967/15 2967/20 2996/7
**struggling [1]** 3048/11
**stuck [1]** 3016/23
**studying [1]** 3008/15
**stuff [2]** 2945/7 3095/11
**stunned [2]** 2967/23 2967/23
**style [1]** 3096/15
**Su [7]** 2885/4 2885/9 2885/20 2885/20 2886/10 2886/14 3088/18
**subgroups [1]** 2996/21
**subject [20]** 2890/7 2890/9 2891/22 2899/24 2903/6 2932/18 2983/14 3023/6 3023/9 3023/16 3024/6 3027/23 3054/23 3077/13 3092/6 3100/20 3113/8 3114/15 3114/18 3131/23
**subjects [10]** 2909/23 2915/9 2915/20 2926/23 2929/15 2930/17 2930/22

2937/13 2940/25 2996/18
**submission [2]** 2324/21 2932/10
**submit [3]** 2882/15 2883/1 2893/21
**submitted [1]** 2899/25
**subscription [3]** 3104/17 3106/7 3115/13
**subsequent [1]** 2984/24
**subsets [1]** 2996/17
**substance [1]** 3088/14
**substantial [1]** 3133/18
**substitute [1]** 2885/8
**succeeding [1]** 3030/24
**success [3]** 2960/18 3031/23 3035/5
**successful [1]** 2994/6
**suffered [1]** 3007/5
**suggest [3]** 2924/19 3015/10 3102/23
**suggested [2]** 3014/8 3028/15
**suggesting [2]** 3084/20 3137/21
**suggestion [1]** 2965/24
**suggests [1]** 3133/15
**sum [1]** 3079/5
**summarized [1]** 2980/20
**summary [8]** 2890/21 2894/15 2900/21 2911/5 2926/24 3036/15 3037/4 3078/8
**summer [10]** 2960/11 2960/22 2967/6 2999/2 2999/2 3000/23 3030/20 3030/21 3031/1 3032/2
**summer/fall [1]** 3032/2
**Sunil [4]** 2917/1 2922/8 3063/1 3072/20
**superior [2]** 3107/18 3108/2
**supervise [1]** 2992/22
**supervising [1]** 2993/3
**supply [1]** 3039/6
**support [5]** 2881/6 2962/8 2967/8 2996/23 3006/19
**supporting [3]** 2926/20 3060/9 3060/9
**supports [1]** 3063/11
**supposed [1]** 2908/11
**suppress [1]** 2975/21
**Surepoint [1]** 2895/3
**surprised [7]** 2889/25 2889/25 2892/20 2950/7 2973/5 2982/5 3017/13
**surprises [2]** 2949/18 2962/7
**survey [2]** 2964/1 2964/1
**surveys [1]** 2964/3
**sustain [2]** 3082/19 3131/25
**sustained [19]** 2914/10 3010/18 3012/11 3012/14 3023/12 3032/19 3033/14 3037/3 3037/23 3039/11 3040/5 3062/5 3071/5 3076/4 3076/4 3082/1 3084/12 3084/12 3086/6
**sustaining [1]** 2895/21
**swap [2]** 2886/8 2887/7
**swear [1]** 2901/12
**swing [3]** 2972/9 2973/7 2973/11
**swinging [1]** 2976/6
**swings [1]** 3108/6
**Swiss [2]** 3033/9 3033/12
**switching [1]** 3061/15
**sworn [2]** 2878/18 3093/13
**sworn/affirmed [2]** 2878/18 3093/13
**Syracuse [1]** 3094/11
**systematically [1]** 2938/25

## T

**tab [38]** 2879/18 2879/20 2879/21 2881/17 2884/7 2893/1 2909/17

2937/13 2937/13 2937/15 2943/15 2945/19 2961/6 2976/5 2982/21 3057/18 3064/15 3064/16 3074/12 3074/13 3078/10 3105/9 3106/21 3106/22 3106/24 3107/13 3111/3 3115/11 3117/13 3119/5 3120/1 3121/18 3123/12 3123/25 3125/23 3127/24 3129/14 3129/25
**Tab 31 [1]** 3123/12
**Tab 54 [1]** 3057/18
**tab 56 [2]** 3064/15 3064/16
**Tab 6 [2]** 3121/18 3123/25
**Tab 61 [1]** 2937/15
**Tab 63 [1]** 2943/15
**Tab 64 [1]** 2945/19
**Tab 66 [1]** 2961/6
**Tab 7 [1]** 3125/23
**Tab 8 [1]** 3127/24
**table [11]** 2883/18 2890/17 2891/21 2892/5 2895/23 2904/19 2935/9 3034/3 3050/22 3051/3 3052/20
**tables [1]** 3085/20
**tabs [3]** 2915/4 2926/15 3117/1
**talent [2]** 2993/7 2993/15
**tally [1]** 2895/10
**tasks [1]** 3105/24
**tax [2]** 3109/21 3109/22
**teach [1]** 2939/4
**team [12]** 2882/16 2906/2 2926/5 2931/5 2931/9 2935/8 2938/24 2942/23 2947/2 2994/20 2996/10 3088/19
**team's [1]** 2894/13
**teams [1]** 2994/11
**technical [1]** 2983/19
**technology [2]** 2984/22 3036/16
**teeth [4]** 3007/17 3007/19 3030/13 3030/14
**Teich [1]** 2877/22
**telephone [1]** 3072/25
**telephonic [3]** 2908/8 2909/13 2914/25
**ten [4]** 2959/11 2996/11 3053/2 3116/25
**term [5]** 2975/1 2981/11 2983/19 3111/21 3114/6
**terminals [1]** 3044/24
**terminate [1]** 2982/18
**terminated [1]** 2885/13
**terms [25]** 2897/24 2954/4 2980/24 2995/13 3005/12 3009/13 3015/24 3035/4 3036/5 3037/6 3037/18 3044/9 3044/11 3045/10 3050/1 3076/24 3086/16 3092/24 3096/13 3098/21 3098/22 3103/1 3103/1 3118/8 3136/5
**terribly [1]** 2899/14
**testified [10]** 2878/14 2907/23 2953/23 3017/20 3026/3 3028/22 3028/23 3044/15 3093/13 3100/2
**testify [2]** 2885/18 3102/13
**testifying [3]** 2952/5 3014/16 3092/10
**testimony [11]** 2922/25 2951/10 2973/1 2990/3 3054/12 3079/8 3116/5 3136/25 3137/12 3137/14 3137/16
**themselves [3]** 2923/2 2940/7 3114/21
**thereafter [2]** 2943/8 3027/20
**therefore [1]** 2902/3
**thinking [1]** 2906/5
**thinks [1]** 3041/12
**third [14]** 2877/18 2895/1 2929/20

T

3078/24

3125/16

third... [11] 2976/5 2976/17 2976/18
2977/8 3026/25 3065/8 3070/6 3074/11
3074/14 3082/17 3106/9
Thirty [1] 2992/11
Thirty-six years [1] 2992/11
this -- this [1] 2963/6
thoughts [3] 2888/17 2983/14 3017/22
threatening [1] 3036/17
three [20] 2895/11 2908/2 2915/5
2938/21 2963/8 2968/25 2969/3
2970/21 2976/9 2977/6 2990/18
2990/18 2995/4 3004/15 3004/18
3011/24 3029/18 3105/9 3106/21
3124/6
throughout [3] 2977/14 3101/13
3107/22
thumb [1] 3058/7
tight [2] 2905/14 2914/7
Tilles [3] 2907/14 2907/18 2919/4
Tim [3] 2895/24 2896/2 2896/3
timeline [3] 2904/17 2964/6 2964/8
timing [3] 3044/7 3049/8 3130/14
3130/21
tips [1] 2953/15
title [6] 2882/11 2963/3 2980/11 2993/8
3023/5 3056/5
today [6] 2923/1 3021/11 3051/7
3095/24 3111/22 3114/7
today's [4] 2924/9 2924/20 2992/1
2992/5
together [24] 2902/22 2926/22 2928/17
2928/18 2934/25 2942/24 2945/17
2960/5 2962/11 2962/25 2963/1 2963/1
2963/6 2969/21 2985/5 2993/9 2995/18
3001/10 3015/18 3016/23 3028/13
3130/3 3131/3 3137/25
Tom [1] 2978/8
tomorrow [5] 2899/20 2899/21 2901/10
2901/10 2977/16
tonight [3] 2899/19 2977/16 3009/1
Tony [3] 3000/10 3000/13 3000/15
took [19] 2883/13 2883/20 2885/24
2896/16 2896/22 2930/2 2949/18
2970/12 2981/22 2982/1 3016/22
3029/18 3061/4 3081/12 3095/5
3095/12 3127/17 3137/10 3137/20
tool [4] 2938/24 2939/4 2939/5 2939/12
top [17] 2889/5 2889/10 2899/13
2899/14 2900/22 2903/18 2903/19
2914/11 2918/21 2918/22 2944/6
2946/23 3080/25 3105/19 3111/15
3129/17 3130/11
topped [1] 2899/15
topping [1] 3086/17
total [10] 2882/20 2889/12 2889/14
2894/16 2895/14 2946/19 2987/12
2987/14 3084/19 3089/12
totally [3] 2956/5 2985/16 3018/25
touch [6] 2956/15 3012/9 3013/20
3020/3 3020/11 3021/2
touched [2] 2949/12 3092/21 3092/25
touching [3] 3017/1 3090/22 3091/8
toward [3] 3078/13 3078/23 3083/20
towards [4] 2964/21 2967/5 3035/4
3050/14
Trachtenberg [3] 2913/16 2914/1

track [5] 2947/1 2977/11 3102/22
3104/10 3118/5
tracked [1] 2891/11
tracks [3] 3045/6 3045/9 3045/12
trade [2] 2881/3 2971/8
traded [7] 2931/23 2957/2 2972/2
2972/8 2973/20 2976/11 3095/1
trader [2] 3094/17 3103/12
Traderexp [1] 3122/25
traders [1] 3094/25
trades [2] 2931/10 2939/5
trading [36] 2880/23 2881/1 2930/24
2930/24 2930/24 2931/1 2931/5
2931/10 2931/18 2932/19 2939/10
2939/12 2963/18 2967/14 2967/17
2971/4 2971/7 2971/9 2972/18 2973/15
2975/8 2975/24 2976/6 2977/4 2980/21
2981/23 2981/25 2990/24 2991/1
2991/3 2991/4 3095/2 3095/5 3095/8
3095/12 3103/11
traditional [2] 2996/2 3008/12
traffic [1] 3085/13
training [1] 2938/24
trajectory [1] 2962/13
transaction [1] 2899/16
transactions [1] 2896/20
transcript [3] 2877/9 2877/24 3016/5
transcription [1] 2877/24
transfer [5] 2880/18 2880/19 2891/14
2892/14 3120/21
transition [3] 2969/8 2980/18 2984/17
transparent [2] 2901/9 2956/5
transparently [1] 2957/5
traumatic [1] 2968/18
traveled [1] 2944/21
travels [1] 2888/18
tread [1] 3018/24
treated [2] 3020/14 3020/14
treatment [3] 3037/18 3037/18 3049/15
treck [1] 2944/19
trial [10] 2877/9 2886/11 2973/1
2989/10 3011/25 3031/17 3050/1
3050/14 3101/13 3102/19
trials [1] 2933/17
tried [3] 2899/5 2998/7 3028/13
triggered [2] 3022/20 3088/13
trip [2] 2888/15 3029/20
trips [1] 3029/17
trouble [1] 3003/11
true [3] 2886/18 3015/11 3045/8
Trump [1] 3084/9
trust [4] 2881/5 2901/25 2902/23
3006/16
trusted [3] 3010/2 3042/25
trusting [1] 2892/3
truth [1] 3119/22
try [13] 2881/11 2897/22 3016/18
3017/9 3022/14 3028/8 3033/12
3035/13 3045/24 3046/17 3096/16
3125/20 3126/19
trying [13] 2882/20 2931/7 2940/21
3007/24 3012/6 3018/5 3021/13
3037/10 3062/2 3062/6 3068/20
3098/23 3125/16
tune [1] 3082/7
turn [2] 2922/12 3058/22 3107/14

tweeted [1] 2974/12
tweeting [14] 2972/15 2973/10 2974/14
2974/17 2975/12 2975/14 2975/16
2975/17 2975/20 2975/22 2976/2
3083/21 3084/18 3084/19
tweets [1] 3084/19
twice [1] 3085/9
Twitter [8] 2941/16 2941/23 2942/16
2974/21 3083/23 3083/24 3083/25
3084/4
two [61] 2895/11 2898/4 2901/7
2906/16 2916/14 2922/7 2922/9
2922/10 2924/1 2927/1 2928/3 2934/16
2940/20 2941/1 2941/12 2942/15
2942/15 2947/23 2950/6 2963/8 2964/2
2965/22 2966/20 2967/12 2968/25
2970/14 2976/4 2977/7 2978/14
2985/10 2985/11 2987/2 2987/12
2995/3 2995/4 2998/10 3001/2 3004/14
3004/18 3016/11 3016/11 3018/6
3026/12 3026/19 3027/5 3027/15
3028/1 3028/16 3038/4 3044/9 3050/18
3055/3 3057/23 3059/6 3061/2 3077/16
3086/13 3111/19 3113/5 3117/24
3124/3
type [14] 2919/2 2957/11 2970/17
2994/18 2997/7 2999/8 3039/8 3096/16
3096/17 3104/9 3110/18 3117/19
3125/17 3125/18
types [1] 3084/19
typical [1] 2994/15
typically [1] 3036/4

U

U.S [1] 3108/9
ultimately [5] 2904/22 2982/8 2982/11
2986/1 3048/17
umbrella [1] 3124/21
unanimous [1] 2908/12
unanimously [1] 2981/5
unauthorized [3] 2975/19 2991/9
2991/12
uncle [1] 3038/9
under [16] 2878/20 2913/5 2913/8
2941/11 2942/1 2945/1 2962/7 2963/25
2969/3 2990/7 2992/24 2997/18 3019/3
3075/7 3133/25 3136/4
underlying [1] 3139/4
underneath [3] 2889/17 2912/4 2930/7
understood [10] 2885/20 2935/15
2955/22 3013/23 3020/7 3043/10
3077/8 3077/19 3083/6 3084/22
undertaken [1] 2986/20
undo [1] 2954/3
unduly [3] 2951/7 2952/14 2954/6
unfairly [2] 2973/25 2974/6
unfortunately [6] 2927/23 2928/10
2977/12 2978/1 2984/9 3098/2
unique [1] 2938/17
UNITED [14] 2877/1 2877/3 2877/3
2877/10 2877/13 2877/16 2993/13
2995/8 2995/12 2995/16 2995/16
2995/20 2996/3 3107/21
units [3] 2889/13 3120/22 3120/22
University [1] 3094/11
unpaid [1] 3065/18

**U**

**unusable [1]** 3042/14
**unusual [1]** 3130/14
**unveil [1]** 3036/12
**unveiled [1]** 3035/16
**up [77]** 2878/3 2885/22 2892/15
2893/18 2897/6 2899/13 2899/14
2899/15 2900/22 2901/22 2903/4
2903/18 2903/19 2906/2 2906/3
2910/23 2914/10 2922/5 2934/6
2938/18 2953/19 2956/4 2957/25
2965/4 2966/6 2968/10 2970/4 2972/8
2972/15 2973/6 2973/13 2973/15
2978/11 2978/13 2985/9 2985/24
2995/10 2996/4 3000/1 3000/3 3003/6
3005/22 3026/15 3026/19 3031/5
3039/12 3043/3 3045/17 3045/18
3046/9 3047/11 3047/18 3047/19
3047/20 3048/14 3048/23 3050/19
3065/4 3065/10 3066/6 3068/2 3068/3
3068/20 3073/21 3075/2 3076/17
3078/20 3079/15 3080/25 3081/20
3086/17 3099/4 3102/3 3102/16 3127/2
3133/8 3135/10
**update [5]** 2910/18 2933/15 2933/17
2945/3 3024/24
**updated [1]** 3124/12
**updating [1]** 3033/5
**upset [2]** 2903/9 2933/18
**upside [2]** 2891/1 3108/4
**urge [1]** 3122/12
**urgency [1]** 2882/16
**useful [1]** 2939/12

**V**

**vacated [1]** 2907/4
**vacation [4]** 2965/11 2999/3 3028/6
3029/10
**vagrant [1]** 3136/15
**vague [1]** 2933/19
**Vaino [3]** 3043/21 3050/18
**Valeur [6]** 2909/1 2909/4 2979/24
2980/8 2980/9 2985/18
**Valeur-Jensen [3]** 2909/1 2979/24
2985/18
**valuable [1]** 2970/2
**valuation [2]** 2895/16 2898/8
**valuations [1]** 2898/6
**value [12]** 2882/20 2891/23 2954/4
2987/14 2987/18 2992/1 2992/4 2992/5
3031/25 3046/18 3124/23 3130/6
**valued [1]** 3052/13
**various [6]** 2889/9 2926/25 2944/11
2985/3 3030/22 3135/19
**vehicle [1]** 2939/12
**venture [11]** 2905/22 3046/4 3046/7
3046/11 3046/14 3046/17 3046/24
3047/1 3047/6 3047/24 3124/16
**Ventures [2]** 3045/21 3047/6
**venue [2]** 2926/10 2926/10
**verbal [2]** 2883/17 2890/22
**verbally [4]** 2896/5 3021/9 3024/24
3051/19
**version [7]** 2886/7 2886/9 2886/22
2886/25 2887/5 3064/3 3078/16
**versus [4]** 3031/2 3031/23 3051/3
3133/23

**very-well [1]** 3115/4
**vetted [3]** 3014/22 3014/25 3015/5
**vibes [1]** 3006/5
**Vice [2]** 2992/19 2992/21
**view [5]** 2904/22 2993/14 3007/22
3044/9 3045/9
**viewed [3]** 2904/8 3010/3 3047/13
**Village [3]** 3000/5 3002/18 3003/19
**violation [1]** 2932/21
**virtually [2]** 3085/14 3085/15
**visible [1]** 3043/22
**vision [4]** 2900/11 2947/3 2995/24
3052/8
**vital [1]** 3042/12
**Vivo [4]** 3045/21 3046/6 3047/16
3047/24
**voice [1]** 2994/12
**volatile [1]** 2982/19
**volatility [3]** 3097/22 3107/20 3108/6
**volume [1]** 2960/17
**volumes [1]** 2942/16
**voluntarily [1]** 2947/21
**voted [1]** 2965/6

**W**

**wait [2]** 2904/13 2904/16
**waiting [3]** 2891/24 2904/9 2984/2
**waive [3]** 2885/7 2886/5 2888/3
**waiving [3]** 2886/9 2886/24 3103/20
**walk [1]** 2959/5
**walked [1]** 3001/12
**walking [2]** 2958/6 2959/3
**Wall [1]** 3026/2
**wants [5]** 2939/13 2941/19 3014/2
3014/2 3016/16
**warned [2]** 2974/16 2974/17
**was -- it [1]** 3121/3
**was -- that [1]** 2955/16
**waste [1]** 2928/21
**watching [1]** 2885/21
**Water [2]** 3004/11 3004/12
**ways [4]** 2930/16 2970/14 3005/18
3007/24
**weak [1]** 2968/8
**wearing [1]** 3096/4
**weather [1]** 2944/19
**website [2]** 3063/18 3072/2
**weed [1]** 3034/5
**week [14]** 2910/18 2939/21 2944/16
2944/17 2945/5 2945/9 2956/14
2967/12 2969/9 2969/14 2984/1 2984/6
2984/9 2984/19
**weekend [3]** 3014/16 3029/9 3029/19
**weekends [1]** 3029/8
**weeks [6]** 2934/16 2967/12 2968/12
3027/10 3027/11 3027/16
**weird [1]** 3022/7
**Wells [1]** 2992/18
**West [1]** 3029/18
**whatsoever [1]** 2881/5
**where/when [1]** 2896/21
**whereas [5]** 3069/11 3069/13 3069/14
3069/15 3069/17
**whereby [1]** 3065/16
**wherewith [1]** 3113/6
**white [1]** 3096/4
**whole [27]** 2889/6 2909/8 2918/3

**very [3]** 2937/13 2940/17 2940/18 2942/23
2949/17 2973/13 2993/18 3003/13
3003/15 3015/13 3017/11 3022/22
3022/23 3036/25 3066/7 3067/20
3069/25 3075/21 3076/23 3079/16
3080/8 3081/11 3100/24 3109/10
**wild [1]** 3108/6
**willing [7]** 2904/13 2948/10 2969/2
2969/12 2988/19 2999/18 3000/1
**willingness [1]** 3136/16
**winding [1]** 2903/12
**window [3]** 2960/22 2986/21 2991/5
**windows [1]** 2971/9
**winner [1]** 2892/16
**winter [1]** 2944/19
**withdraw [2]** 3102/17 3108/19
**withdrawals [1]** 3108/17
**withdrawn [2]** 3084/13 3102/8
**withdrew [4]** 3101/19 3101/21 3102/15
3103/2
**witness [39]** 2878/13 2878/16 2878/16
2878/17 2937/3 2952/8 2953/9 2968/4
2975/9 2976/1 2990/5 2990/6 3014/16
3015/3 3015/10 3016/19 3017/9 3041/9
3053/5 3054/2 3066/25 3067/2 3067/9
3068/10 3090/17 3093/8 3093/11
3093/11 3093/12 3100/1 3113/5
3113/18 3134/21 3134/24 3136/3
3136/7 3136/9 3136/18 3140/2
**witness's [1]** 2973/1
**witnesses [6]** 2974/25 3015/23 3102/13
3136/12 3137/8 3137/15
**woman [1]** 3016/11
**women [1]** 3016/11
**wondering [1]** 3052/23
**word [10]** 2973/20 2986/10 2997/5
2997/23 3009/11 3010/8 3010/20
3037/17 3104/22 3104/22
**words [5]** 2900/14 3010/11 3013/5
3052/17 3105/2
**work.' [1]** 3041/10
**works [2]** 3041/15 3042/22
**world [7]** 2947/2 2992/13 2994/4
2995/16 3008/3 3107/22 3108/9
**Worldwide [1]** 2995/8
**worried [2]** 2974/22 3131/1
**worry [1]** 3076/1
**worth [2]** 2896/7 2896/15
**worthwhile [4]** 3031/10 3037/12
3038/18 3038/19
**write [15]** 2889/21 2891/17 2894/4
2894/11 2894/22 2895/5 2895/10
2895/19 2902/18 2924/11 2944/16
3020/10 3090/7 3126/11 3126/13
**writes [6]** 2889/17 2898/22 2910/17
2924/8 2938/12 2983/15
**writing [6]** 2887/6 2924/13 3051/14
3051/21 3078/16 3078/17
**written [10]** 2890/23 2892/21 2901/14
2908/12 2945/7 3031/22 3098/6
3108/25 3109/5 3137/18
**wrote [7]** 2882/12 2896/4 3010/24
3011/2 3047/15 3126/14 3126/21

**Y**

**Yaffe [2]** 2920/2 2920/14
**year [24]** 2906/3 2906/17 2906/18

**Y**

**year... [21]**  2906/18 2908/3 2914/6
2929/7 2945/25 2946/9 2946/17 2957/7
2964/20 2983/3 2993/4 2999/21 3034/6
3067/19 3067/21 3080/23 3094/9
3095/11 3109/17 3109/19 3110/4
**year's [1]**  2985/25
**year-and-a-half [1]**  3095/11
**years [17]**  2992/11 2993/23 2998/22
2998/22 2999/6 3002/13 3002/17
3004/15 3005/9 3005/9 3017/13 3018/4
3029/25 3060/12 3094/5 3094/22
3095/9
**yesterday [20]**  2879/5 2879/14 2895/2
2999/12 2999/25 3002/23 3005/12
3011/14 3017/17 3026/3 3028/22
3031/19 3032/5 3035/5 3035/21 3036/2
3044/15 3045/5 3089/16 3100/21
**YORK [9]**  2877/1 2877/4 2877/13
2877/14 2877/19 2877/19 2924/14
2998/9 3094/1
**young [6]**  3008/17 3008/18 3026/19
3027/5 3027/15 3049/12
**younger [4]**  2941/18 3026/25 3084/6
3084/10
**yourself [12]**  2880/12 2888/10 2922/6
2944/12 2983/11 2997/19 3019/5
3020/9 3022/10 3052/25 3092/4 3100/8

**Z**

**ZELLAN [3]**  2877/20 2944/10 3130/9
**zero [1]**  2891/1
**zoom [8]**  2889/5 2910/22 2913/1
3107/16 3111/19 3120/9 3124/6
3130/10