1

2       UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF NEW YORK
3       ------------------------------x
                                            15-CR-00637(KAM)
        UNITED STATES OF AMERICA,
4                                           United States Courthouse
                                            Brooklyn, New York
5
                -against-                   July 13, 2017
6                                           9:00 a.m.

7       MARTIN SHKRELI,

8               Defendant.

9       ------------------------------x

10                  TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                    BEFORE THE HONORABLE KIYO A. MATSUMOTO
11                     UNITED STATES DISTRICT JUDGE
                           BEFORE A JURY

12
        APPEARANCES
13      For the Government:         BRIDGET M. ROHDE, ESQ.
                                    Acting United States Attorney
14                                  Eastern District of New York
                                    271 Cadman Plaza East
15                                  Brooklyn, New York 11201
                                    BY:  JACQUELYN M. KASULIS, ESQ.
16                                  BY:  ALIXANDRA ELEIS SMITH, ESQ.
                                    BY:  G. KARTHIK SRINIVASAN, ESQ.
17                                  Assistant United States Attorneys

18      For the Defendant:          BRAFMAN & ASSOCIATES, P.C.
                                    767 Third Avenue
19                                  New York, New York 10017
                                    BY:  BENJAMIN BRAFMAN, ESQ.
20                                  BY:  MARC AGNIFILO, ESQ.
                                    BY:  ANDREA ZELLAN, ESQ.
21                                  BY:  JACOB KAPLAN, ESQ.

22      Court Reporter:             Rivka Teich, CSR, RPR, RMR
                                    Phone:  718-613-2268
23                                  Email:  RivkaTeich@gmail.com

24      Proceedings recorded by mechanical stenography.  Transcript
        produced by computer-aided transcription.
25

D. GELLER - DIRECT - MR. SRINIVASAN

1          COURTROOM DEPUTY:  All Rise.

2          THE COURT:  All our jurors are present.  Have a seat

3    everybody.

4          (Witness takes the witness stand.)

5    D. GELLER, called as a witness, having been previously first

6    duly sworn/affirmed, was examined and testified further as

7    follows:

8          Good morning, Mr. Geller you're your reminded you're

9    still under oath.

10          MR. SRINIVASAN:  May I proceed, your Honor?

11          THE COURT:  Yes.

12          MR. SRINIVASAN:  Thank you.

13   DIRECT EXAMINATION

14   BY MR. SRINIVASAN:

15   Q    Good morning.  Let's pick up where we left off.  I'm

16   showing you what is in evidence as Government's Exhibit 109-9,

17   that's tab nine of the bigger binder.  Did you receive this

18   e-mail?

19          THE COURT:  Are we using the laptop?

20          MR. SRINIVASAN:  The laptop.

21   BY MR. SRINIVASAN:

22   Q    Mr. Geller, did you receive this e-mail?

23   A    I did.

24   Q    Let's zoom in on the first paragraph.  Mr. Geller, the

25   first sentence in that first paragraph it reads, "To our

D. GELLER - DIRECT - MR. SRINIVASAN

1   limited partners.  I have decided to wind down our hedge fund

2   partnerships with a goal of completing the liquidation of the

3   funds by November or December 1st, 2012."  What did you

4   understand this to mean?

5   A    I understood this to mean that he was closing down the

6   hedge fund and he would return all original investor cash in

7   the form of -- well, that's later on -- but I understood that

8   he was closing it down on a profitable basis.

9   Q    Why don't we go to the second page.  Bates R012275, focus

10  in on the last paragraph.

11          At the beginning it says, "A few operational notes.

12  Investors will have their limited partnership interests

13  redeemed by the fund for cash, alternatively investors may ask

14  for a redemption of Retrophin shares or a combination of

15  Retrophin shares and cash."  What did you understand this to

16  mean?

17  A    That you had your choice to either get all cash or you

18  could get any type of combination of cash and Retrophin

19  shares.

20  Q    If you go to the last two sentences, the one that starts

21  "MSMB will halt reporting," do you see that?

22  A    Yes.

23  Q    It says, "MSMB will halt reporting at the 9/30/12 period

24  and begin offering cash to purchase limited partnership

25  interests shortly thereafter.  If all goes according to plan,

D. GELLER – DIRECT – MR. SRINIVASAN

1    you'll either be a Retrophin LLC unit holder or cash out by

2    10/31/12."  What did you understand that to mean?

3    A    That by the end of October the fund will be closed down

4    and the shareholders will made whole in some form or another

5    with cash OR Retrophin shares or a combination.

6    Q    What did you do, if anything, in response to this e-mail?

7    A    I was waiting for the next instruction actually.

8    Q    Instruction from the fund?

9    A    Instruction from the fund.

10   Q    In what form did you want your investment redeemed?

11   A    At that point I wasn't sure.  The only thing I was sure

12   of was I wanted to at least take my original investment out.

13   And then I was going to make the decision whether to have, if

14   I was going to take any Retrophin shares how much.

15   Q    And when you say you wanted to get your investment out

16   in, what form did you want to get your investment out?

17   A    Cash.

18   Q    What communication, if any, did you get from the

19   defendant or anyone else at MSMB Healthcare in the months that

20   followed this e-mail?

21   A    I did not get any communication at all.

22   Q    I'm showing you what is marked for identification as

23   Government's Exhibit 109-10, tab ten in your binder.  Looking

24   at the first page, what is this document?

25   A    This is an overnight envelope from Federal Express.

D. GELLER - DIRECT - MR. SRINIVASAN

1   Q     On the second page, what is this document?

2   A     This is a stock certificate for Retrophin Inc.

3   Q     Did you receive it?

4   A     I did.

5   BY MR. SRINIVASAN:

6          MR. SRINIVASAN:  Your Honor, we move to admit

7   Government's Exhibit 109-10.

8          MR. BRAFMAN:  No objection.

9          THE COURT:  We will receive 109-10.

10         (Government Exhibit 109-10, was received in

11  evidence.)

12  Q     Let's go back to the first page, when did you receive

13  this FedEx package?

14  A     On March 14.

15  Q     Of?

16  A     Of 2013.

17  Q     If now we go to page Bates DG200075, if we focus on the

18  center there, how many Retrophin shares did you get?

19  A     30,514.

20  Q     Do you see the language restricted securities?

21  A     Yes.

22  Q     What did that mean to you?

23  A     That meant to me the shares cannot be sold in the open

24  market.

25  Q     What was your reaction to receiving this stock

D. GELLER – DIRECT – MR. SRINIVASAN

1    certificate?

2    A    Actually one of bewilderment.

3    Q    Why is that?

4    A    First of all, the stock certificate came in the envelope

5    alone, there were no letters of instruction.  And I thought

6    that in September that we would have the option to be cashed

7    out.  And then after not hearing anything for three, four,

8    five months for this to come to me, it really didn't sit well

9    with me.

10   Q    Did you expect to receive this stock certificate?

11   A    No.

12   Q    At any point between September 2012 and March 2013 did

13   you ask for shares of Retrophin?

14   A    I did not.

15   Q    After you received this package, what did you think had

16   happened with your MSMB Healthcare investment?

17            MR. BRAFMAN:  Objection.

18            THE COURT:  Why don't you rephrase the question.

19   BY MR. SRINIVASAN:

20   Q    Mr. Geller, in terms of your reaction to receiving the

21   stock certificate, did you react in anyway relating to your

22   MSMB Healthcare investment?

23   A    I wasn't really sure at that time, there was some

24   scenarios going through my head.  There were really bad

25   scenarios, there were some medium scenarios.  I guess my

D. GELLER – DIRECT – MR. SRINIVASAN

1  medium scenario was MSMB Healthcare was still around and not

2  cashed out yet and this may have been a gift.  The worse case

3  scenario was my MSMB fund was replaced by this Retrophin

4  restricted securities.

5  Q    What happened next after you received this package?

6  A    I sent a day or two later I sent an e-mail to Martin.

7  Q    Let's go to what is marked for identification as

8  Government's Exhibit 109-11, tab 11 in your binder.  What kind

9  of document is this?

10  A    An e-mail.

11  Q    Are you on the e-mail?

12  A    Yes.

13  Q    Who are you e-mailing with?

14  A    Martin Shkreli.

15          MR. SRINIVASAN:  Your Honor we move 109-11 into

16  evidence.

17          MR. BRAFMAN:  No objection.

18          THE COURT:  We will receive 109-11.

19          (Government Exhibit 109-11, was received in

20  evidence.)

21  Q    Let's start with the e-mail at the bottom, which will

22  also appear on your screen.  This is dated March 16, 2013 at

23  6:37 a.m.  You wrote to the defendant, could you please read

24  to the jury what you wrote?

25  A    I wrote, "Martin, I hope this e-mail finds you well.  It

D. GELLER - DIRECT - MR. SRINIVASAN

1   has been a while since I last spoke to you.  I have been

2   trying to keep up with current events on Retrophin by reading

3   articles, press releases, and talking to my brother.  I am

4   excited about our future prospects.  However, I am in the dark

5   on the status of my investment as whole.  The last statement I

6   received was in July of 2012.  I spoke to Kevin late December

7   but the status was unknown then too.  I received a letter in

8   September which said the fund would have a goal of completing

9   liquidity by December 2012.  I did receive a certificate in

10  the mail a couple of days ago for a total of 30,514 of

11  Retrophin.  I guess the most basic answer I'm looking for is

12  how much of my original investment is in the fund and how much

13  is Retrophin.  Also, what is the status of the fund?  Is it

14  liquidated?  Can you or one of your partners spend a little

15  time with me to explain some of these items?  Best, David

16  Geller."

17  Q    Why did you send this e-mail?

18  A    I was looking to get some clarification.

19  Q    Going up one e-mail, the defendant wrote to you on

20  March 17, "Hi David.  En route to California for a few days.

21  Will be able to give you a comprehensive satisfactory answer

22  soon.  Hope you're well.  May see Al while I'm out here."

23       If we go up one more e-mail.  You wrote to the

24  defendant on March 25, 2013.  What did you write?

25  A    "Martin, were you able to research the valuation issue?

D. GELLER – DIRECT – MR. SRINIVASAN

1   I'm starting to get a little anxiety, please help me on this

2   one."

3   Q    Why did you write this e-mail on March 25?

4   A    He did not get back to me yet with an answer.

5   Q    I'm showing you what is marked for identification as

6   Government's Exhibit 109-12, tab 12 of your binder.  What kind

7   of document is this?

8   A    An e-mail.

9   Q    Are you on the e-mails?

10  A    Yes.

11  Q    Who are you emailing with?

12  A    To Martin.

13          MR. SRINIVASAN:  Your Honor we move Government's

14  Exhibit 109-12 into evidence.

15          MR. BRAFMAN:  No objection.

16          THE COURT:  We will receive 109-12.

17          (Government Exhibit 109-12, was received in

18  evidence.)

19  Q    If we look at that e-mail that is in the middle of the

20  page April 4, 2013, 3:45 p.m., you're writing to the

21  defendant.  What did you write?

22  A    "Martin, hi.  Alan told me you had a nice long

23  conversation with him.  From what I gathered over the last few

24  months it seemed you put all my money into Retrophin stock at

25  the high valuation.  From our conversation last year I

D. GELLER – DIRECT – MR. SRINIVASAN

1    informed you guys I needed the diversification and you told me

2    Retrophin stock would only be a small part of my portfolio.

3    Please tell me where I stand so I can try to mentally move on

4    somehow.  You told me you would get back to me soon with a

5    comprehensive and satisfactory answer.  It's really not fair

6    to leave me on a cliff.  I'm a better person than that."

7    Q    You wrote, "from our conversations last year I informed

8    you guys I needed diversification.  You told me Retrophin

9    stock would only be a small part of my portfolio."  What did

10   you mean by diversification?

11   A    Going back to the original investment objective, a

12   balanced liquid fund.  And if there was any private equities

13   or any illiquid stuff, it would be a very, very small part.  I

14   was assuming like 10 percent or under.

15   Q    If we go up one e-mail, the defendant wrote to you on

16   April 4, 2013, "I will call absolutely, David.  Things are

17   nuts here.  Zero disrespect."

18              What was your reaction to this?

19              MR. BRAFMAN:  Objection, your Honor.

20              THE COURT:  Overruled.

21   A    My reaction, I was, I was disappointed, angry.  I wasn't

22   getting the answers I was looking for.  But at the same time I

23   was kind of getting the worse case, putting the worse case

24   scenario into my mind.

25   Q    I'm showing you what is marked for identification

D. GELLER — DIRECT — MR. SRINIVASAN

1   Government's Exhibit 109-18, tab 18 of your binder.  What kind

2   of document is this?

3   A    E-mail.

4   Q    Are you on the e-mail?

5   A    Yes.

6   Q    Who are you e-mailing with?

7   A    Martin.

8           MR. SRINIVASAN:  Your Honor we move Government's

9   Exhibit 109-18 into evidence.

10          MR. BRAFMAN:  No objection.

11          THE COURT:  We will receive 109-18.

12          (Government Exhibit 109-18, was received in

13   evidence.)

14   Q    Let's start with the e-mail at the bottom.  You wrote to

15   the defendant on April 25, 2013.  What did you write?

16   A    "Martin, I am upset but more sad with my investment

17   situation in MSMB.  I have acted with class and have been a

18   true gentleman in this light of the current situation.  As per

19   our conversation two weeks ago, you led me to believe you were

20   going to remedy the situation.  Then you made yourself

21   unavailable, as you have done many times in the past.  I

22   really don't understand your actions.  I would never act like

23   this.  Please don't force me to go to the next level.  I

24   expect something to be worked out in the next few days.

25   Please do the right thing."

D. GELLER - DIRECT - MR. SRINIVASAN

1   Q    Going to the middle e-mail, the defendant wrote back to

2   you CCing Evan Greebel on April 26, 2013.  He wrote, "I'm

3   sorry to hear that.  Have you been in contact with our

4   attorney, Evan Greebel?  He can expedite this process

5   significantly."

6           Mr. Geller, who is Evan Greebel?

7   A    He was the attorney for Retrophin.

8   Q    Did you deal with him as well as the defendant while you

9   were trying to redeem your investment?

10  A    I did.

11  Q    I'm showing you what has been marked for identification

12  as Government's Exhibit 109-17, if you go back one tab in the

13  binder.  What kind of document is this?

14  A    An e-mail.

15  Q    Are you on the e-mail?

16  A    Yes.

17  Q    Who are you e-mailing with?

18  A    Martin.

19          MR. SRINIVASAN:  Your Honor, we move to admit miss

20  Government's Exhibit 109-17.

21          MR. BRAFMAN:  No objection.

22          THE COURT:  We will receive 109-17.

23          (Government Exhibit 109-17, was received in

24  evidence.)

25  Q    Let's start with the bottom e-mail.  This is the

D. GELLER - DIRECT - MR. SRINIVASAN

1    defendant writing to you on April 26, 2013.  He wrote, "David,

2    one of the delays has been I forgot what we agreed to, do you

3    remember?"

4              If we go up one e-mail, you wrote back on April 26

5    to the defendant, what did you write?

6    A    "We agreed upon 300,000 in cash, which you would give me

7    by, which you would give me part by buying back my shares.  In

8    addition, you would leave me with 20,000 shares but don't

9    remember if free or restricted.  I tried to get in touch with

10   Evan, as you suggested, but he was not in today."

11   Q    If we go up one more e-mail, the defendant wrote to you

12   again on April 26.  He wrote, "Okay.  As you can imagine he

13   writes these up, that sounds like a deal to me."

14             I'm showing you what is marked for identification as

15   Government's Exhibit 109-21, tab 21 of your binder.  What kind

16   of document is this?

17   A    E-mail.

18   Q    Are you and the defendant on these e-mails?

19   A    Yes.

20             MR. SRINIVASAN:  Your Honor, we move Government's

21   Exhibit 109-21 into evidence.

22             MR. BRAFMAN:  No objection.

23             THE COURT:  We will receive 109-21.

24             (Government Exhibit 109-21, was received in

25   evidence.)

D. GELLER - DIRECT - MR. SRINIVASAN

1   Q    Mr. Geller, let's go to the second page of the document

2   DG00086, focus on the bottom e-mail to start.  You wrote to

3   the defendant and Evan Greebel on May 13, 2013, what did you

4   write?

5   A    "Martin and Evan, on Friday night I found the paper where

6   I wrote down the deal Martin and I originally agreed to.

7   Seems I misplaced it.  It was for 300,000 and 30,000 shares

8   not 20,000.  I do feel that under all the past circumstances

9   we should go with the 300,000 and the 30,000.  I feel this is

10  really right and it would make us whole.  Since I already have

11  30,514 shares, it would be best if that just stays with me and

12  then you just do the cash pay out.  Please let's wrap this up

13  today or tomorrow."

14  Q    Who are you primarily dealing with in terms of setting

15  the deal?

16  A    Martin.

17  Q    Let's go to the next e-mail up.  You wrote to the

18  defendant on May 15, 2013.  What did you write?

19  A    "Martin, I sent this out on Monday morning for your

20  information.  Evan has told me twice he would get the contract

21  to me by a certain deadline, these deadlines have came and

22  went, I have not seen anything yet.  I really thought we all

23  got past these delay situations with what went on in the past.

24  Once again, I am disappointed and sad."

25  Q    Let's go to the next e-mail up.  This is from you to the

D. GELLER - DIRECT - MR. SRINIVASAN

1    defendant, what did you write?

2    A    "Martin and Evan, this is my third e-mail this week as it

3    relates to the settlement we were supposed to have completed.

4    I feel entitled to get some type of response on this."

5    Q    If we go to the next e-mail up, written by Evan Greebel

6    to you on May 17, 2013.  He wrote, "David, I have not had a

7    chance to touch base with Martin on your request from earlier

8    this week.  I'm tied up today.  Will try to speak with him

9    over the weekend or next week.  I apologize that we have not

10   been able to speak and I hope to get back to you next week."

11          If we go to the first page, to the e-mail on the

12   bottom there, from you to Evan Greebel and the defendant on

13   May 17, 1:05 p.m.  What did you write?

14   A    "Evan and Martin, I appreciate your prompt response to

15   this e-mail.  Asking for a small change to my deal should not

16   delay it for a week or more.  These are poor business

17   dealings.  I expect the contract to be signed and monies to be

18   transferred by the end of next week, which was Memorial Day

19   weekend.  I don't think I'm asking for too much.  Martin, we

20   made a verbal deal on April 5.  Evan, we started talking on

21   April 26 and you told me twice the contract would be done.

22   Today is May 17.  Have a great weekend."

23   Q    Let's go up one more e-mail.

24   A    This is the defendant writing to you on May 22 at

25   10:24 a.m., he wrote, "Where do we stand?  I'm ready to

D. GELLER – DIRECT – MR. SRINIVASAN

1    execute and send the funds, what exactly is the deal that you

2    want, David?  I think part of the confusion is that you may

3    want some more in the settlement.  We will probably

4    accommodate.  But if you can clearly state your terms I can

5    give a yes or no or a counter proposal."  What was your

6    reaction to receiving this e-mail?

7            MR. BRAFMAN:  Your Honor, continuing objection to

8    the witness's reaction.  It's not relevant, Judge.  He can say

9    what happened next.

10           THE COURT:  I think that the effect of this e-mail

11   on the recipient and his actions are tandem, unless you want

12   to go to sidebar.

13           MR. BRAFMAN:  Yes, please.

14           (Continued on the next page.)

15           (Sidebar conference.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1      MR. BRAFMAN:  Your Honor, if we were at a point

2   where the person is deciding to invest, I would agree and in

3   certain instances that his reaction to what he's being told

4   might be relevant because it goes to his state of mind whether

5   he decided to invest and why he decided to invest.

6      He's already in the deal for a long time.  He's now

7   exasperated at the delay in getting his money back, and he

8   ultimately gets everything he wants.

9      The problem asking him to express his reaction to

10   every delay in an e-mail is it allows him to vent and express

11   his frustration, which is really not relevant to the

12   defendant.  The defendant is not charged with aggravating an

13   investor.  The defendant is charged with defrauding an

14   investor.

15      If in fact he was defrauded before he invested by

16   believing he was investing in something that he didn't then

17   get, that's relevant.  The fact that there are delays in

18   liquidating your account, he can talk about the delay and the

19   next step and the next step.  But you can't just ask him on

20   every e-mail, 'Were you frustrated?  Were you exasperated?

21   Were you angry?  Were you sad?'  If he says it in his e-mail,

22   'I'm sad.  I'm disappointed,' that's one thing.  But then to

23   ask him what was his reaction is, is just not relevant.

24      MR. SRINIVASAN:  Your Honor, I think it's relevant

25   in a few ways.

SIDEBAR CONFERENCE

1          One, the defense has made a big deal with these

2    investor witnesses that everyone was happy at the end of the

3    day.  I think it was showing there was aggravation, worrying

4    about not getting money along the way which is relevant to

5    show what those investors were thinking at the time.

6          Secondly, I think under the Securities Laws one type

7    of harm is the harm that is the deprivation of your money and

8    ability to make investment decisions.  I think that goes

9    directly to that issue.  I think what the evidence will show

10   is that the money was all gone.  That the defendant was

11   desperately trying to get money from Retrophin and from other

12   sources, whatever, to try to pay these investors.  So I think

13   this is all part of the story of delay, delay, delay while the

14   defendant is buying time.

15         So I think that it shows what the investors are

16   feeling at the time, what they are going through.  Not just

17   that they were happy at the end of the day, that they got a

18   settlement agreement.  There is a lot that happened along the

19   way that goes to the harm that these investors experienced.

20         Because they have a narrow definition of harm, which

21   is, did somebody get cash at the end.  That's not the whole

22   story.

23         MS. KASULIS:  We think the reaction that the

24   witnesses are having to these e-mails from the defendant are

25   very relevant to help us show harm to these witnesses as part

SIDEBAR CONFERENCE

1    of the scheme.

2              MR. BRAFMAN:  But there is no expression that, there

3    is no statement by the witness that he was unable to use money

4    during this period and that's really the harm.  The delay here

5    is anxiety and frustration, how is that relevant?

6              THE COURT:  He doesn't have his money.  He doesn't

7    have money.  The issue about using money is the point, he

8    doesn't have his money to use.

9              MR. BRAFMAN:  But that's the point that's made just

10   by the chronology of the e-mails and the amount of time it

11   takes for him to get his money back.  That is a matter of

12   dates and e-mails.  I haven't objected to any of the e-mails,

13   which tell their own story.

14             Then to ask him every time in the e-mail he says,

15   'I'm sad.  I'm disappointed,' to ask him after that, 'What is

16   your reaction when you got the e-mail?  I'm frustrated.  I'm

17   angry.'  He already said that in the e-mail.  Those questions

18   are really just allowing a witness to vent.

19             MR. SRINIVASAN:  Your Honor, I think two more

20   points.  One, we're asking about his reaction to the

21   defendant's e-mails, the reaction to the defendant's

22   statements and what effect it has on him.

23             I think during cross-examination of various

24   investors the defense has tried to emphasis this was just a

25   negotiation, you'll be happy to get shares, you were just in

SIDEBAR CONFERENCE

1   this process, it was all part of the game.  It is highly

2   relevant to show what these investors were actually thinking.

3   We have a person who is writing the e-mail and the person who

4   is receiving e-mails from the defendant.  So unless we're

5   going to stop hearing about how investors are completely happy

6   with their investment and were negotiating and it was all part

7   of the game with them, I think this is all highly relevant.

8           MS. KASULIS:  It goes to the argument that a lot of

9   these investors were wealthy individuals and they didn't care

10  that it took a year to get their money back or their shares in

11  order to make them whole.  And so I think their feelings and

12  their reactions to the defendant's communications to them

13  during this delay-time period is highly relevant to show that

14  there really was harm to these investors in a way that

15  counters the defense's arguments as to the effect of the

16  defendant's actions on these victims.

17          THE COURT:  It does appear to be relevant to one of

18  the elements that they have to prove, which is the harm or the

19  intent to cause harm to the investor on the repeated delay in

20  just redeeming their investment, having an effect on a

21  reasonable investor, is his reaction reasonable when he's been

22  told, 'I forgot what the deal was.  My lawyer is working on

23  it.  And talk to the lawyer.  And we're busy.'  I think that

24  it does bear on the issues that are relevant here.

25          MR. BRAFMAN:  I think I've made my record.  I don't

SIDEBAR CONFERENCE

1    want to belabor it.  I stand on my objection, you overruled

2    it.

3                    (End of sidebar conference.)

4                    (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D. GELLER – DIRECT – MR. SRINIVASAN

1          (In open court.)

2   BY MR. SRINIVASAN:

3   Q    Mr. Geller, we were on the e-mail that's on your screen

4   right now.  I was asking, what was your reaction to receiving

5   this e-mail?

6   A    My reaction was disappointment because it was, just to

7   me, it was just more stalling tactics.

8   Q    If we go up one e-mail, you wrote to the defendant on

9   May 22, 2013, what did you write?

10  A    "Hi Martin.  Here are the terms of the proposal 300,000

11  in cash and 30,000 shares.  Now since I already have a total

12  of 30,514 shares I thought it would make sense just to leave

13  me with those 30,514 shares to make things simple."

14  Q    If we go up one e-mail, the defendant wrote to you CC'ing

15  Evan Greebel on May 22, 2013.  What did he say?

16  A    "Agreed."

17  Q    I'm showing you what is marked for identification as

18  Government's Exhibit 109-22, tab 22 in your binder.  What kind

19  of document is this?

20  A    An investor letter.

21  Q    I'm sorry.  Are you in the big binder, tab 22?

22  A    Yes.  Sorry, this is a letter from Evan Greebel to me.

23  Q    To you?

24  A    To me.

25          MR. SRINIVASAN:  Your Honor, we move Government's

D. GELLER - DIRECT - MR. SRINIVASAN

1   Exhibit 109-22 into evidence.

2            MR. BRAFMAN:  No objection.

3            THE COURT:  We will receive 109-22.

4            (Government Exhibit 109-22, was received in

5   evidence.)

6   Q    Mr. Geller, if we focus on the first page for a second.

7   Evan Greebel wrote to you on May 22, CC'ing the defendant, he

8   wrote, "Hi David.  Attached is the settlement agreement.

9   Please advise if this is acceptable or if you have any

10  comments.  I'm simultaneously sending it to my client.  And it

11  is subject to his review and comment."

12           If we go to the second page, is this the attachment?

13  A    Yes.

14  Q    Mr. Geller, what is this document here?

15  A    Settlement and release agreement.

16  Q    Did you sign this document?

17  A    I did.

18  Q    What happened next?

19  A    After I signed it, I walked it back to Evan's office.

20  Q    I'm showing you what is marked for identification as

21  Government's Exhibit 55, tab 33 in your binder.

22  A    What tab?

23  Q    Tab 33.  What kind of document is this?

24  A    A letter from Evan to me.

25           MR. SRINIVASAN:  Your Honor, we move Government's

D. GELLER – DIRECT – MR. SRINIVASAN

1  Exhibit 55 into evidence.

2           MR. BRAFMAN:  No objection.

3           THE COURT:  We will receive Exhibit 55.

4           (Government Exhibit 55, was received in evidence.)

5  Q    On the front page Evan Greebel wrote to you, "Hi David.

6  Attached is the mutually executed settlement agreement."

7           If we go to the second page of this agreement

8  GR0001290.  Let's focus on the first paragraph, who are the

9  parties to this agreement?

10 A    Myself, Martin Shkreli, and a whole bunch of entities.

11 Q    What were those entities?

12 A    MSMB Capital Management, MSMB Capital management LLC,

13 MSMB Healthcare LP, MSMB Healthcare Investors LLC, MSMB

14 Healthcare Management LLC.

15 Q    Was Retrophin?

16 A    And Retrophin.

17 Q    Looking at the second line there, what was the date?

18 A    May 30, 2013.

19 Q    Mr. Geller, did you have any understanding of why

20 Retrophin was a party to this agreement?

21 A    No.

22 Q    Let's go to the bottom of the page, the section that says

23 payment terms.  It says, "The MSMB entities were Retrophin

24 individually or collectively.  The payor agreed to deliver or

25 cause to be delivered to releasor the $300,000, the quote

D. GELLER – DIRECT – MR. SRINIVASAN

1  payment, following the execution of this agreement and

2  releasor previously received 35,514 shares of common stock of

3  Retrophin from the MSMB entities of the shares and

4  collectively with the payment the liquidation amount as full

5  and final satisfaction of any and all claims, obligations,

6  liabilities, promises, agreements, controversies, damages,

7  actions, causes of actions, suits, judgments, rights, demands,

8  losses, debts, contracts commitments, or expenses of every

9  kind or nature."  Then it continues on.

10          Is that an accurate deal you reached?

11  A    Yes.

12  Q    The second last page, GR0001295, is your signature on

13  this page?

14  A    Yes.

15  Q    Who wrote signatures on the right-hand side?

16  A    Martin Shkreli.

17  Q    Did he sign for himself, Retrophin, MSMB Capital

18  management, MSMB Healthcare?

19  A    Yes.

20  Q    Did you have any understanding of whether Retrophin's

21  Board of Directors approved the agreement at the time you

22  signed it?

23  A    I did not.

24  Q    Mr. Geller, you received that e-mail about winding down

25  the fund in September 2013; is that right?

D. GELLER – DIRECT – MR. SRINIVASAN

1    A    Yes.

2    Q    This agreement was signed on May 30?

3    A    Yes.

4    Q    Is that about an eight-month gap?

5    A    Yes, seven or eight months.

6    Q    What happened after this agreement was signed on May 30,

7    2013?

8    A    Actually nothing, there were more delays in getting the

9    money.

10   Q    I'm showing you what is marked for identification as

11   Government's Exhibit 109-24, tab 24 of your binder.  What kind

12   of document is this?

13   A    An e-mail.

14   Q    Are you on the e-mail?

15   A    Yes.

16   Q    And the defendant?

17   A    Yes.

18              MR. SRINIVASAN:  Your Honor, we move to admit

19   109-24.

20              MR. BRAFMAN:  No objection.

21              THE COURT:  We receive 109-24.

22              (Government Exhibit 109-24, was received in

23   evidence.)

24   Q    Let's start with the second page.  I'll focus your

25   attention on the bottom e-mail there.  You wrote on June 3rd,

3167

D. GELLER – DIRECT – MR. SRINIVASAN

1   2013 to the defendant, what did you write?

2   A    "Martin, hope you had a good weekend.  Please wire the

3   funds within the next couple of days.  Let's complete this

4   thing.  I'm including my wiring instructions again."

5   Q    Why did you include wiring instructions?

6   A    I included it so the money will be wired; I had a place

7   to receive the money.

8   Q    Going up one e-mail, the defendant wrote to you on Monday

9   June 3rd and said, "Hi David.  We will send the funds on

10  Monday the tenth."

11        If we go up another e-mail.  You wrote to the

12  defendant on June 10, what did you write?

13  A    "Martin, did not receive funds.  Maybe you guys got busy.

14  I'm looking for the incoming wire tomorrow."

15  Q    If we go up another e-mail, the defendant wrote to you on

16  June 11.  He wrote, "We're going to be unable to send the

17  funds on the timeline requested.  I'm available to do a call

18  today to discuss."  What was your reaction to receiving this?

19  A    Disappointment, sadness, disappointment.

20  Q    If we go up, go to the first page actually Bates AG00469,

21  focus on the bottom e-mail.  You wrote to the defendant on

22  June 11, 2013, 4:31 p.m., what did you wrote to him?

23  A    "Martin, it was nice speaking to you today.  I'm sorry,

24  I'm sorry the deal didn't go our way but greater things lie

25  ahead.  As I was walking home a little reality set in.  You

D. GELLER – DIRECT – MR. SRINIVASAN

1    really need to show some good faith at this point.  I really

2    need you to wire me the 150,000 tomorrow.  Please make it

3    happen."

4    Q    You wrote, "It was nice speaking to you today," did you

5    have a conversation with the defendant on this date?

6    A    Yes.

7    Q    Was that in person or by phone?

8    A    In person.

9    Q    What happened during that conversation?

10   A    Martin told me that they were expecting to have a deal

11   completed and it didn't get done, and because of that they

12   didn't have the money to pay me.

13   Q    Who is they?

14   A    Retrophin the company.

15   Q    Where did the conversation take place?

16   A    In Martin's office.

17   (Continued following page.)

18

19

20

21

22

23

24

25

D. GELLER – DIRECT – MR. SRINIVASAN

1  DIRECT EXAMINATION (CONT'D)

2  BY MR. SRINIVASAN:

3  Q     And if we go up one more e-mail, you wrote to the

4  defendant on June 12th, 2013.

5

6          What did you write?

7  A     "Martin, Once again I am deeply disappointed and sad that

8  you did not honor your statement of sending me $150,000 today.

9  Also you said you would contact me if there were any glitches.

10  I never heard from you.  You have left me with no other choice

11  but to pursue all means to fulfill the settlement agreement we

12  signed.  Believe me I will make it my full-time job, there are

13  plenty of lawyers who will take this case on a contingency

14  basis.  I will also contact all enforcement agencies and media

15  outlets.  You have taken months off my life.  I have done

16  nothing but be a gentleman and cooperate as a team player.  I

17  have my own financial responsibilities.  You really crossed

18  the line.  I will give you until tomorrow to make this right."

19  Q     If we go up one more e-mail, the defendant wrote to you

20  on June 12th, 2013 and he wrote:  "Trying to handle it."

21          What was your reaction to this?

22  A     No reaction.

23  Q     When did you eventually get the $300,000 that you agreed

24  upon?

25  A     October 13th.

Holly Driscoll, CSR

D. GELLER - DIRECT - MR. SRINIVASAN

1   Q    Mr. Geller, did you sell the Retrophin shares you

2   received?

3   A    I did.

4   Q    Did you sell all of them?

5   A    Yes.

6   Q    How much did you sell them for?

7   A    I sold them for approximately $315,000.

8   Q    After you received the $300,000 in October 2013 did you

9   receive any further disbursements from MSMB Health Care?

10  A    No.

11  Q    Did you receive any additional disbursements in

12  connection with a personal loan repaid to the fund by the

13  defendant?

14  A    No.

15          MR. BRAFMAN:  Objection, Your Honor.

16          THE COURT:  Rephrase the question.

17          MR. SRINIVASAN:  That's fine, Your Honor, withdrawn.

18          THE COURT:  Okay.

19  Q    Mr. Geller, overall how much time elapsed between that

20  wind down e-mail in September and the time you got your money?

21  A    September -- 13 months.

22          MR. SRINIVASAN:  Thank you.

23          One moment, Your Honor.

24          (Pause.)

25          MR. SRINIVASAN:   Thank you, Your Honor.  No further

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1    questions at this time.

2              THE COURT:  All right.  Thank you.

3              MR. BRAFMAN:  May I proceed now, Your Honor?

4              THE COURT:  Yes, please.

5    CROSS-EXAMINATION

6    BY MR. BRAFMAN:

7    Q    Good morning, Mr. Geller.

8    A    Good morning.

9    Q    Mr. Geller, you and I have never met; is that correct?

10   A    Correct.

11   Q    My name is Ben Brafman, I am attorney for Martin Shkreli

12   and I'm going to ask you a series of questions and please,

13   these are going to be very similar in many ways to the

14   questions you've just been asked so try your best and if you

15   have any questions for me after I ask the question, don't

16   hesitate to pause and ask me to clarify, okay?

17   A    Okay.

18   Q    All right.  So, I just want to start with where the

19   government ended.  Ultimately, I know you had a series of

20   delays and we'll talk about that for a minute, but during the

21   period of delays do you remember Martin at one point before

22   you threatened litigation apologizing and telling you that he

23   was going to make it up to you?

24   A    Yes.

25   Q    And in addition to the money that the government just

Holly Driscoll, CSR

D. GELLER - CROSS - MR. BRAFMAN

1    talked to you about, did Martin Shkreli send you also 2,000

2    shares in Turing?

3    A    He did.

4    Q    And did you pay for those shares?

5    A    No.

6    Q    Do you still have them?

7    A    I'm not sure.

8    Q    Do you know what their current value is?

9    A    I have no clue.

10   Q    Okay.  Now, you invested $200,000 in MSMB Health Care; is

11   that correct?

12   A    Yes.

13   Q    And at the end of the saga, if you will, you got back

14   $300,000 in cash; is that correct?

15   A    Yes.

16   Q    So, that's $100,000 in cash more than you invested?

17   A    Correct.

18   Q    And then, while it took a while, you did ultimately sell

19   the 30,514 shares of Retrophin stock for $315,000?

20   A    Yes.

21   Q    And when you sold them you got cash for them, right, not

22   other stock?

23   A    I got cash, yes.

24   Q    Okay.  So, in total for the $200,000 that you invested,

25   you ultimately got back $615,000 plus 2,000 shares of Turing,

D. GELLER – CROSS – MR. BRAFMAN

1  correct?

2  A    That's correct but I didn't get Turing at that time.

3  Q    Okay, but at some point you got Turing from Martin,

4  correct?

5  A    Yes.

6  Q    You have a brother, Al Geller?

7  A    I do.

8  Q    Do you know if Al Geller has both a personal and

9  professional relationship with Mr. Shkreli?

10 A    Yes.

11 Q    He is also an investor, if you know?

12 A    Yes.

13 Q    And throughout the period of time that you were dealing

14 with Martin and Kevin Mulleady you were also talking to your

15 brother from time to time, correct?

16 A    Correct.

17 Q    And when you had delays with Martin or with Evan Greebel

18 you would keep your brother informed, would that be a fair

19 statement?

20 A    That would be a fair statement.

21 Q    All right.  Now, I just want to go back to the math

22 again; with an investment of $200,000 and a cash payout

23 ultimately of $615,000, you tripled your investment, would

24 that be a fair statement?

25        MR. SRINIVASAN:  Objection.

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1    A    Yes.

2              THE COURT:  It is overruled, in any event.

3              MR. BRAFMAN:  The answer can stand, Your Honor?

4              THE COURT:  Yes.

5              MR. BRAFMAN:  Okay.

6    Q    Now, I know it took over a year for you to get back your

7    money and you went through some anxiety over this but during

8    this same period did you have any other investments in which

9    you tripled your money during that same period?

10   A    I did not.

11   Q    Now, if I may ask you some questions, and we're going to

12   do this calmly and slowly, I'm not in a rush and I want to

13   make sure we get this right, you had testified on direct

14   examination that you had prior experience in a hedge fund,

15   correct?

16   A    I did.

17   Q    And it was an unpleasant experience?

18   A    Yes.

19   Q    Was that a significant hedge fund?

20   A    One was, one wasn't.

21             MR. SRINIVASAN:  Objection.

22   Q    This had --

23             MR. BRAFMAN:  Sorry?

24             THE COURT:  There was an objection.  I'm going to

25   just direct you to try to define your terms when you propound

D. GELLER – CROSS – MR. BRAFMAN

1   a question.

2            MR. BRAFMAN:  Okay.

3   Q    You testified on direct that in 2006 you invested in a

4   hedge fund that turned out, in your words, to be a disaster,

5   correct?

6   A    I did.

7   Q    And you lost 90 percent of your investment?

8   A    I did.

9   Q    And that fund had absolutely nothing to do with

10  Mr. Shkreli or Mr. Mulleady or any of the people at MSMB or

11  Retrophin, correct?

12  A    Correct.

13  Q    And do you know if that hedge fund had an auditor?

14  A    Yes.

15  Q    And did that hedge fund, was it represented by a law firm

16  or a certified public accounting firm?

17  A    Yes.

18  Q    And despite all of those bells and whistles, you lost

19  virtually all of your money, correct?

20  A    Correct.

21            MR. SRINIVASAN:  Objection.

22            THE COURT:  Overruled.

23            MR. BRAFMAN:  He's answered the question, Your

24  Honor.

25            THE COURT:  He did.

Holly Driscoll, CSR

D. GELLER - CROSS - MR. BRAFMAN

1        MR. BRAFMAN:  Okay.

2   Q    And you lost all your money, I think you testified,

3   because the market crashed, correct?

4   A    That was in connection with why I lost the money.

5   Q    So, in 2006 a lot of stocks were either overvalued or

6   they ultimately went down significantly, correct?

7        MR. SRINIVASAN:  Objection.

8        THE COURT:  Overruled.

9   Q    Correct, sir?

10  A    In 2006, 2007, 2008, yes.

11  Q    Okay.  And at the end of that crash your position in that

12  hedge fund was virtually wiped out?

13  A    Like I said before, I lost about 90 percent and also keep

14  in mind that these were not -- well, they were pipes and pipes

15  were like secondary placements.

16  Q    Right, we'll get to your investment experience, but at

17  the end of the day even with the best of effort though would

18  you agree after a lifetime of being in the market that from

19  time to time no one can -- not everybody can accurately

20  predict how the market is going to go?

21  A    I agree with that.

22  Q    Okay.  Now, just so we're clear, at some point when you

23  were getting frustrated, if I can use that word, with the

24  delay, you threatened Martin with going to a law firm or going

25  to law enforcement agencies; is that correct, sir?

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1    MR. SRINIVASAN:  Objection.

2    THE COURT:  Overruled.

3  Q    Is that correct, sir?  You may answer.

4  A    Yes.

5  Q    And you never did, did you?

6  A    I never did.

7  Q    You never hired a lawyer to sue Martin or Retrophin or

8  MSMB?

9  A    No.

10  Q    And you never complained to any law enforcement agencies

11  suggesting that someone was involved in a fraud; is that

12  correct?

13    MR. SRINIVASAN:   Objection?

14    THE COURT:  Overruled.

15  Q    Is that correct, sir?

16  A    Yes.

17  Q    All right.

18    MR. BRAFMAN:   Excuse me one moment, Your Honor.

19  I'm just getting some water, Your Honor, if I may?

20    (Pause.)

21    MR. BRAFMAN:  Excuse me, Your Honor.

22  Q    Now, so, did there come a time when the Securities and

23  Exchange Commission called you about this case?

24  A    Repeat that.

25  Q    Yes, I'm sorry.  Did there come a time on February of

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1    2015 when a representative of the Securities and Exchange

2    Commission called you?

3    A    No.

4    Q    Let me show you what's been marked for identification as

5    3500 DG-1, I'm just going to show it to you, it is not in

6    evidence so you're going to look at it to yourself.

7         MR. BRAFMAN:  I'll put it up here, Your Honor, for

8    the witness.

9    Q    And tell me if that refreshes your recollection that on

10   February 24th, 2015 Eric Schmidt of the SEC called you to

11   discuss MSMB Capital?

12        MR. SRINIVASAN:  Objection, Your Honor.

13        THE COURT:  Sustained.

14   Q    Does looking at that document refresh your recollection

15   that you were in fact called by the SEC?

16   A    I don't recall this document.

17   Q    Do you recall being asked about MSMB and deciding that

18   you did not want to answer any questions?

19   A    I recall originally that someone did contact me.  This

20   was a long time ago.

21   Q    Yes, sir.

22   A    And I did not, you know, I just didn't want to get

23   involved in anything.

24   Q    Okay.  And they asked you questions about MSMB and you

25   didn't really want to give them any information, correct?

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1      MR. SRINIVASAN:  Objection, Your Honor.

2      THE COURT:  Overruled.

3  Q    You may answer, sir.

4  A    What was your question?  Repeat it.

5  Q    You were asked questions from the SEC in February 2015

6  and I think you said you didn't want to get involved, correct?

7  A    I didn't want to get involved at that time because I --

8  sometimes it's better just to do nothing.

9  Q    And by then you had gotten all your money back plus

10  $415,000, correct?

11  A    Yes.

12  Q    And you knew that your brother Al had an ongoing

13  investment relationship with Mr. Shkreli, correct?

14  A    Yes.

15  Q    And you know that your brother has put in over a million

16  and a half dollars into Turing Pharmaceuticals, correct?

17      MR. SRINIVASAN:  Objection.

18      THE COURT:  Sustained, sustained.

19      MR. BRAFMAN:  Well, Your Honor, may we approach just

20  for a minute?

21      THE COURT:  Yes.

22      (Continued on the next page.)

23      (Sidebar conference.)

24

25

SIDEBAR CONFERENCE

1          MR. BRAFMAN:  I want to head off additional

2     side-bars.  You will see in a minute that part of the reason

3     and the principal reason that the defendant invested with

4     Mr. Shkreli was because of his brother Al.  Both of these men

5     have inherited a lot of money from their father.  They had a

6     lot of money.  They day traded.  They invested on a regular

7     basis.  And Al Geller was his mentor and Al Geller --

8          THE COURT:  Was whose mentor?

9          MR. BRAFMAN:  Was the witness' mentor.

10          THE COURT:  His older brother?

11          MR. BRAFMAN:  Yes.  I think Mr. Geller will testify

12     next week that -- there is within the 3500 material clear

13     discussion of Mr. Geller and, indeed, Mr. Geller is copied on

14     the e-mail chain that was cut by the government and it's

15     forwarded by this witness to Mr. Geller or by Mr. Shkreli to

16     Mr. Geller, Al Geller, when he threatens litigation.

17          So, the relationship is important because it impacts

18     on this witness' state of mind and during the entire period

19     when this delay was ongoing this witness will testify that he

20     knew that Mr. Al Geller was having dinner with Mr. Shkreli, he

21     references the discussion in e-mail traffic that I will

22     introduce.  So, this isn't me trying to get in hearsay

23     statements by a person who nobody knows anything about.  If

24     you like, I'd lay the foundation and then go back to this,

25     okay, I'll withdraw that last question.

SIDEBAR CONFERENCE

1          THE COURT:  Because I didn't know you wanted to

2     tread into Turing.

3          MR. BRAFMAN:  I'm sorry, I should have done it.

4     I'll delay that question, I will withdraw that question and do

5     it a different way.

6          MR. SRINIVASAN:   I think the whole line of

7     questioning about discussions with Al Geller is all going to

8     tread into hearsay because I think that's where we're going.

9     So, unless there's some basis for some independent knowledge

10    that he's seen the documents or he's seen something, it's all

11    going to be hearsay.

12         MR. BRAFMAN:  Your Honor, it is not hearsay if it is

13    introduced for the effect it has on the listener and in this

14    case the listener will tell you, this witness will tell you

15    that before he decided to invest in Retrophin Al Geller, his

16    brother, touted Martin's genius, touted Martin's investment

17    skills and told the witness that he had made millions with

18    Martin.  So, they can't in a vacuum say, oh, I decided to

19    invest with Martin Shkreli.  It impacts on his decision to

20    invest and to the extent that they want to say that this

21    witness' investment was solely because he relied on what was

22    said in the memo, you will see in a minute that he never read

23    the memo, he discussed it with Mulleady in a bar.  What he was

24    relying on was Al Geller's vouching for the defendant and it's

25    his brother, Judge, so it's not hearsay because it is being

SIDEBAR CONFERENCE

1   offered for the impact it has on the listener and it is highly

2   relevant because it goes to his underlying reason in part for

3   why he went into the fund and who and what he relied on.

4   They've sanitized this to suggest that this witness out of the

5   blue gets confronted by Mulleady.  This was all planned by Al

6   Geller because he had very much success and he knows about it.

7           MR. SRINIVASAN:  Well, Your Honor, I think to the

8   extent that they want to probe what was material to this

9   witness, I don't think he's ever denied that he had

10  discussions with his brother.  I think it was the second or

11  third question after:  "Do you know Martin Shkreli?"  I think

12  that's in the record already.  But I think that what

13  Mr. Brafman is doing is trying to get all the details about Al

14  Geller's investment and the history of Al Geller's investment

15  including the end of that in through this witness and I think

16  that's extraordinarily inappropriate because it doesn't

17  actually go to what this witness knows or what was material to

18  him because I think the end of that question was going to be:

19  Do you know what Al Geller made?  That's where this is going.

20  This is not about materiality, this is about Al Geller's

21  consulting agreement, Judge, and so that's what we're trying

22  to head off.

23          If the question is:  What were the factors that

24  influenced you?  Al Geller was one of those factors.

25          MS. KASULIS:  He said X, Y, Z about the fund --

Holly Driscoll, CSR

SIDEBAR CONFERENCE

1          MR. SRINIVASAN:   -- X, Y, Z about the fund, he

2     thought they were doing a good job, that's fine, but I think

3     what we're heading towards is something way far afield and

4     we're not going to be able to stop this train.

5          MR. BRAFMAN:  You don't think it is relevant to why

6     a person comes into the fund because he's told by his brother

7     who he respects and who he gets advice from that he had made

8     several million dollars by Martin Shkreli --

9          THE COURT:  One at a time.

10         I was going to say the government seems to concede

11    that it is appropriate to ask what motivated his investment

12    including his brother's --

13         MR. BRAFMAN:  Track record.

14         THE COURT:  What his brother might have shared with

15    him regarding his success with the fund but the concern is

16    that you may be probing information about his brother's

17    investments, specific knowledge about his brother's

18    investments which you don't really have a foundation for and

19    you could certainly probe through the brother.

20         MR. BRAFMAN:  But this witness has been -- look, the

21    sad reality is this witness who appears to be sympathetic, he

22    sounds sympathetic, he's a very sophisticated investor and I

23    will go through that in his experience.

24         THE COURT:  Part of your defense seems to be if

25    somebody is wealthy --

SIDEBAR CONFERENCE

1          MR. BRAFMAN:  No.

2          THE COURT:  You made a point at side-bar these were

3    wealthy young men by virtue of their inheritance.  There's a

4    theme that the fact that there's a lot of money, family money

5    or otherwise, that this is not really a harm.  I'm just saying

6    it is something I've noticed.

7          MR. BRAFMAN:  Judge, I understand what the law is

8    but they can't have it both ways.  They can't suggest that the

9    harm in the delay is such that the jurors should see it and

10   essentially punish Mr. Shkreli for the aggravation factor

11   without allowing me to probe whether there really was an

12   aggravation factor and one of the reasons that I think we have

13   a right to argue is, for example, in the case of Sarah Hassan

14   that there was no harm because she sat on that investment for

15   two years before she liquidated the shares, so if she really

16   was dying to get the money back she certainly didn't act that

17   way in connection with the disposition.

18         THE COURT:  She was locked up.

19         MR. BRAFMAN:  No, I know, after the period of lock

20   up, Judge.  They can argue what they want to argue about that.

21   I think the fact that someone --

22         MR. SRINIVASAN:  This is extraordinarily confusing

23   to the jury, Judge, extraordinarily confusing and this is like

24   veering back into the no ultimate harm issue.

25         THE COURT:  But I do think it is fair ground for

Holly Driscoll, CSR

SIDEBAR CONFERENCE

1    cross-examination for him to probe what motivated the

2    investment.

3            MR. SRINIVASAN:  Of course.

4            THE COURT:  And also to explore whether or not his

5    aggravation and disappointment and anger that he testified to

6    on direct was real or whether he was -- you're saying he was

7    just puffing and --

8            MR. BRAFMAN:  He was threatening.  It's a way of

9    negotiating, getting your money by threatening litigation.

10           THE COURT:  After nine months he was resorting to

11   threats.

12           MR. BRAFMAN:  I understand and they will argue that

13   Martin was scrambling to get the money and I can argue that he

14   was waiting for board approval which we think he ultimately,

15   you know, is a fact that we are going to have to deal with.

16   So, at the end of the day these are arguments, this is not

17   evidence.

18           MR. SRINIVASAN:  Okay.  Well, Your Honor, if we can

19   go back to the -- sort of the issue we started with which is

20   Al Geller, so I think probing what motivated this witness,

21   that is fine, but I think once we get into Al Geller's

22   investment, what Al Geller may or may not have made which is

23   not in the record, I think we're going way far afield and this

24   is an attempt to sort of preview the cross of Al Geller which

25   there's no foundation for that.

3186

SIDEBAR CONFERENCE

1          THE COURT:   Rather than state it as a fact as to

2     what Al Geller made, if you ask it in a way that probes his

3     understanding of how his brother was or was not successful --

4          MR. BRAFMAN:  Okay.

5          THE COURT:   -- with his investments with Martin

6     Shkreli, that's okay.  It's the form of the question.

7          MR. BRAFMAN:  Okay.

8          MS. KASULIS:  Right, it's the foundational issue and

9     the form of the question.

10         MR. SRINIVASAN:  And where we're going, we just want

11    to preview the issue.

12         THE COURT:  Please lay the appropriate foundation.

13         MR. BRAFMAN:  I will when I get there.

14         THE COURT:  And don't probe what he may not know but

15    remember what he might have understood based on perhaps

16    conversations with --

17         MR. BRAFMAN:  But some of what happened, Your

18    Honor -- I understand.

19         THE COURT:  All right.  Okay.

20              (End of sidebar conference.)

21              (Continued on the next page.)

22

23

24

25

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1          (In open court.)

2          MR. BRAFMAN:  May I proceed?

3          THE COURT:  Yes.

4    BY MR. BRAFMAN:

5    Q    You testified a little while ago about going to see

6    Mr. Shkreli at the Retrophin office; is that correct?

7    A    Yes.

8    Q    Did you see your nephew Matt there?

9    A    I did not.

10   Q    Do you know whether Matt worked for Mr. Shkreli?

11   A    He did a summer internship.

12   Q    And Matt is your brother Al's son?

13   A    Yes.

14   Q    Okay.  Now, I just want to probe your own background as a

15   day trader and involved in the securities industry.  Do you

16   hold any licenses by the SEC?

17   A    Currently I do not.

18   Q    Did you hold a Series 7 and a Series 63 license at any

19   point?

20   A    Yes.

21   Q    And that requires you to have some degree of expertise in

22   securities matters before you get those licenses?

23   A    I don't know about expertise but it requires you to know

24   the laws --

25   Q    Okay.

D. GELLER - CROSS - MR. BRAFMAN

1    A    -- regulations.

2    Q    And you worked as a licensed broker for many years; is

3    that correct?

4    A    A trader, not a broker, I never sold.

5    Q    You day traded your own money?

6    A    At one point.

7    Q    And did you also trade on behalf of a Generic Trading?

8    A    Yes.

9    Q    And was that a company you worked for?

10   A    Yes.

11   Q    And did you also trade for a Schonfeld Securities?

12   A    Yes.

13   Q    And those were companies where you traded the company's

14   money; is that correct?

15   A    That is correct.

16   Q    And in order for you to make money in those places you

17   needed to make money on the trades, correct?

18   A    Yes.

19   Q    And then you received a portion of the profits?

20   A    Yes.

21   Q    And you, without going into detail, you traded all types

22   of securities; is that correct?

23   A    Yes.

24   Q    And did you in the trading companies that you worked for,

25   either Generic Trading or Schonfeld, sit in a floor with

D. GELLER - CROSS - MR. BRAFMAN

1    dozens of other people who were also trading?

2    A    Yes.

3    Q    And you were provided with information about stocks on a

4    regular basis by the company's experts?

5    A    I never -- no.

6    Q    Did you have the ability to trade in anything you wanted

7    to?

8    A    Not anything.

9    Q    But you had some discretion?

10   A    We had some discretion but there are certain securities

11   that were restricted or certain types of securities that were

12   off limits.

13   Q    Okay.  But anything that you were allowed to trade in,

14   the amount of your trades and when you traded was up to you?

15   A    Yes.

16   Q    And when you bought and when you sold was up to you?

17   A    Yes.

18   Q    And sometimes you made money, sometimes you lost money,

19   correct?

20   A    Correct.

21   Q    But that's what you did essentially for a living for a

22   number of years?

23   A    Yes.

24   Q    And among the companies where you currently have

25   brokerage accounts is UBS; is that correct?

D. GELLER – CROSS – MR. BRAFMAN

1    A    Yes.

2    Q    And Ladenburg Thalmann?

3    A    Yes.

4    Q    And Charles Schwab?

5    A    Yes.

6    Q    And Bank of America Merrill Lynch?

7    A    No more Bank of -- I closed it last year.

8    Q    But you had accounts there?

9    A    I did.

10   Q    Now, I don't want to pry into personal matters but I have

11   to ask you this question, did you and your brother, Al Geller,

12   inherit money from your dad?

13   A    No.

14   Q    Did you trade with the money that you had earned when you

15   were day trading?

16   A    Yes.

17   Q    And when you gave your $200,000 investment into MSMB I

18   think you advised, the government will tell me if I'm wrong,

19   that it amounted to 5 percent of your portfolio?

20   A    I don't recall that.

21   Q    Let me ask if you could look at this document, I'm going

22   to ask you to keep it up there and only look at it please,

23   sir, when I refer to it and use it only to refresh your

24   recollection, but let me ask you first, do you remember

25   meeting with the government on January 25th, 2016?

D. GELLER - CROSS - MR. BRAFMAN

1    A    I don't remember any specific date.

2    Q    But you remember meeting with some of the prosecutors in

3    this room and the agents in which they debriefed you about

4    your relationship with Mr. Shkreli, Retrophin and MSMB?

5    A    Yeah, at some point there was a meeting.

6    Q    And it was for several hours correct?

7    A    I don't remember how long it was.

8    Q    All right.  Well, I just want to show you, leave it up

9    there for now, sir, it is dated 1/25/2016, 3500 DG-2.  From

10   time to time I may ask you to look at something to see if it

11   refreshes your recollection, okay, sir?

12   A    Okay.

13   Q    I asked you a minute ago whether or not the $200,000 that

14   you invested into MSMB represented approximately 5 percent of

15   your portfolio, did it?

16   A    I don't recall telling anyone that it represented that

17   amount.

18   Q    Well, whether you told anybody or not, do you remember if

19   $200,000 was in fact 5 percent of your portfolio?

20   A    It's about --

21   Q    You don't have to look at the document.

22   A    No, it's about that.

23   Q    Okay.  So, at the time you made the investment you had

24   then, if my math is correct, approximately $4,000,000 as a

25   portfolio, correct?

D. GELLER – CROSS – MR. BRAFMAN

1   A      In assets, total assets.

2   Q      Okay.

3   A      Not in a portfolio.

4   Q      So, the $200,000 was from among your assets which was

5   $4,000,000?

6   A      Okay, when I say assets too, I'm talking about my own --

7   the value of my apartment, just everything in general.

8   Q      Okay.  And that 5 percent, so then the total value would

9   be about $4,000,000, correct?

10  A      Yes.

11  Q      All right.  And you don't have to look at the document,

12  I'll mention it to you if you need to, okay.

13          Now, your brother, Alan Geller, is he younger or

14  older than you, sir?

15  A      Younger.

16  Q      Does he live in Florida?

17  A      Yes.

18  Q      How old is he?

19  A      51, 50.

20  Q      And you are how old?

21  A      54.

22  Q      So, are you and your brother Al close?

23  A      Yeah, we're close.

24  Q      And do you talk to each other on a regular basis?

25  A      Not on a regular basis but at least once a week.

D. GELLER – CROSS – MR. BRAFMAN

1   Q    And during the period when you and he were both –– do you

2   know whether or not he was also an investor with Mr. Shkreli?

3   A    He was.

4   Q    And do you know whether or not he is going to be

5   testifying soon in this case?

6            MR. SRINIVASAN:  Objection.

7            THE COURT:  Sustained.

8   Q    Do you know if he and Mr. Shkreli also had a close

9   friendship?

10           MR. SRINIVASAN:  Objection.

11           THE COURT:  Sustained.

12  Q    Do you know ––

13           MR. BRAFMAN:  Your Honor, the question is do you

14  know if Mr. Geller and Mr. Shkreli had a close friendship.

15           MR. SRINIVASAN:  Objection, Your Honor.

16           THE COURT:  Well, I'll overrule the objection.

17           MR. BRAFMAN:  Thank you.

18  Q    You may answer.

19  A    They had a professional relationship and there was some

20  type of personal relationship involved.

21  Q    Because your brother Al's son Matt actually interned for

22  Mr. Shkreli?

23  A    Yes.

24  Q    And you knew that?

25  A    I did know that.

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1    Q    Okay.  Now, you told the government that you were

2    introduced to Martin Shkreli by either Kevin Mulleady or your

3    brother Al, correct?

4    A    Yes.

5    Q    And was it your brother Al?

6    A    It was my brother Al.

7    Q    And what your brother Al, in words or substance, said to

8    you was that you should invest with this guy, correct?

9    A    Yes.

10            MR. SRINIVASAN:   Objection.

11            THE COURT:  Overruled.

12   Q    And was it in fact your brother's advice that at least

13   was one of the factors that you relied on?

14   A    Repeat that.

15   Q    Was your brother Al's advice about Martin Shkreli at

16   least one of the factors among many that you relied on in

17   making the decision to invest?

18   A    Yes.

19   Q    And you knew at the time you made the decision to invest

20   that your brother Al had been very successful in his business

21   relationship with Martin; is that correct?

22            MR. SRINIVASAN:   Objection.

23            THE COURT:  Sustained.

24   Q    Did your brother Al before you invested discuss with you

25   the nature of his bottom line, if you will, with Martin

D. GELLER - CROSS - MR. BRAFMAN

1  Shkreli?

2           MR. SRINIVASAN:   Objection?

3           THE COURT:  Overruled.

4  Q    You may answer.

5  A    I didn't know the -- are you asking me the amount that he

6  invested?

7  Q    No, I'm asking you did he tell you that he had a

8  successful business relationship with Martin Shkreli?

9  A    It was too early -- he just had invested with him so it

10 was too early.

11 Q    And he urged you to invest?

12 A    He did.

13 Q    And did he tell you that, in words or substance, did he

14 say anything about Martin's brilliance?

15 A    He did.

16 Q    Did he tell you that Martin was an amazing genius?

17           MR. SRINIVASAN:  Objection.

18           THE COURT:  Overruled.

19 Q    You may answer, sir.

20 A    I don't know if he used the word "genius," he said he's a

21 very, very sharp smart person.

22 Q    And was that one of the factors that you relied on in

23 making your investment, at least among the other factors?

24 A    Yes.

25 Q    And did you also believe your brother to be a good reader

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1   of people?

2            MR. SRINIVASAN:  Objection.

3   A    I did.

4            THE COURT:  Overruled.

5   Q    You may answer.

6   A    I did.

7   Q    And that's one of the reasons you trusted his advice

8   about Mr. Shkreli, correct?

9   A    Yes.

10  Q    Now, did your brother prior to you investing tell you

11  that he was making tons of money with Martin?

12           MR. SRINIVASAN:   Objection?

13           MS. KASULIS:  We need a side-bar.

14           THE COURT:  All right, we'll have a side-bar.

15           (Continued on the next page.)

16           (Sidebar conference.)

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1      MR. BRAFMAN:  Your Honor, the witness has told the

2  government that Al Geller is a good reader of people.

3      THE COURT:  That's already in.

4      MR. BRAFMAN:  Yes.  Geller invested with Shkreli in

5  part because of the information Al related to him about

6  Shkreli, said he was doing well in MSMB.

7      THE COURT:  Okay.  I think your question was tons of

8  money.

9      MR. BRAFMAN:  I'll withdraw that.

10      THE COURT:  All right.

11      There was a general objection?

12      MR. SRINIVASAN:  We're circling back to the same

13  issues again, Your Honor.

14      MR. BRAFMAN:  I think the witness has verified that

15  before making his investments one of the things he relied on

16  in part was the advice he got from Mr. Geller.

17      THE COURT:  Right, you have that, so let's not ask

18  it repeatedly.  Just keep moving, okay.

19      MR. BRAFMAN:  Yes.

20      (End of sidebar conference.)

21      (Continued on the next page.)

22

23

24

25

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1              (In open court.)

2    BY MR. BRAFMAN:

3    Q    Now, ultimately you also knew a person named Kevin

4    Mulleady?

5    A    I did.

6    Q    And how did you know Kevin Mulleady?

7    A    Kevin Mulleady was the supposed mouthpiece of MSMB.

8    Q    He was also your brother Al's stockbroker, wasn't he?

9    A    He was -- I think my brother inquired at the end, he

10   looked into an old account of his from years ago and it turned

11   out that Kevin Mulleady was the one that took it over.

12   Q    And was Kevin Mulleady, if you know, the one who referred

13   your brother to Mr. Shkreli to invest?

14   A    He did.

15   Q    And during the period of time when you were deciding

16   whether to invest or not you met with Kevin Mulleady at times

17   alone or together with Mr. Shkreli, correct?

18   A    I met Kevin alone but we never met together with Martin.

19   Q    Okay.  And the time you met Kevin Mulleady alone before

20   you decided to invest was a meeting you had at a bar with

21   Kevin Mulleady, correct?

22   A    Correct.

23   Q    And that was before you made the decision to invest,

24   correct?

25   A    Correct.

D. GELLER - CROSS - MR. BRAFMAN

1    Q    And I think you testified on direct examination that

2    Kevin was the person who sent you the Private Placement

3    Memorandum, correct?

4    A    Correct.

5    Q    Now, did you actually read the document or did Kevin

6    Mulleady tell you what was in it at the bar?

7    A    I actually, before I met him at the bar I actually went

8    over the document.

9    Q    Did you read the whole document?

10   A    I didn't read word for word but I briefed it.

11   Q    Okay.  When you say "briefed it," do you mean you flipped

12   through it?

13   A    When I flipped through it there were certain sections

14   that I looked over more than other sections.

15   Q    And you've seen in your career literally dozens if not

16   hundreds of documents like that?

17   A    Maybe dozens, not hundreds.

18   Q    Okay, dozens?

19   A    Maybe dozens.

20   Q    And many of them have significantly -- I'm sorry, many of

21   them have somewhat the same language concerning risks of the

22   investment, correct?

23   A    If you're asking me is it boilerplate stuff, my answer is

24   yes.

25   Q    Okay.  And in some of what you refer to as boilerplate

D. GELLER - CROSS - MR. BRAFMAN

1   relates to certain risks that may be involved in investing in

2   the fund, correct?

3   A    Correct.

4   Q    And you read through those parts?

5   A    I briefed through it.

6   Q    All right.  But did you have an understanding before you

7   invested as to the degree of risk that this investment

8   presented?

9   A    The degree of risk is pretty much -- you know, to me it

10  was the same category for all investments.

11  Q    So, it didn't really matter what the specific terms of

12  this agreement was, correct?

13          MR. SRINIVASAN:   Objection?

14          THE COURT:  Sustained.

15  Q    Well, when you say the degree of risk was the same in all

16  investments, you have experience in investments like this,

17  don't you?

18  A    I expect there to be some type of fiduciary

19  responsibility to the clients.

20  Q    Right.

21  A    I understand that, you know, that an investment, like you

22  said before, an investment can go bad because of timing or an

23  investment that is a real investment that just didn't work

24  out.

25  Q    Okay.  Now, do you remember that on direct examination

D. GELLER - CROSS - MR. BRAFMAN

1    the government took you through a couple of paragraphs or

2    sentences of the Private Placement Memorandum?

3    A    Yes.

4    Q    And the first one you got is Exhibit 11A; do you know

5    what tab that is, sir?

6              I think you still have it up there.

7              MR. SRINIVASAN:   Tab 30.

8    Q    Tab 30, sir.

9              (Pause.)

10   A    Okay.

11   Q    Do you have that, sir?

12   A    I do.

13   Q    Can you tell me, if you can turn to page two of

14   Government Exhibit 11A; do you have that page, sir?

15   A    Yes.

16   Q    And I think you testified that one of the things that was

17   attractive to you about this investment was the fact that you

18   believed that the investment could be liquid, correct?

19   A    Yes.

20   Q    I want to ask you to look at the -- I'll put it on the

21   screen and be able to point to it, it's easier I think, this

22   document is in evidence.

23            Do you have the page I have on the screen that's

24   page two; is that correct?

25            Do you have that in page two in front of you?

D. GELLER - CROSS - MR. BRAFMAN

1   A    I don't.

2   Q    It's got the small --

3            (Pause while counsel confer.)

4            MR. BRAFMAN:  It is Bates number AG 00019.

5            MR. SRINIVASAN:  That's an attachment to 109-3.

6            That's tab three of your binder, Mr. Geller.

7   Q    Tab three of your binder, sir, I'm sorry.

8            Mr. Geller, it's tab three.

9            MR. BRAFMAN:  May I approach the witness just to

10  look at the document he's looking at?

11           THE COURT:  Yes.

12           (Pause.)

13  Q    109-3 is an e-mail from Kevin Mulleady, correct?

14  A    Yes.

15  Q    Sending you the documents?

16  A    Yes.

17  Q    And among the documents --

18           THE COURT:  Mr. Brafman, now can you step down.

19           MR. BRAFMAN:  I just want to turn to the correct

20  page, Judge, so we don't go through this.  I'm sorry.

21           Can you turn to page two.

22           (Pause while counsel confer.)

23  Q    So, if you have page two before you, sir, do you have it?

24  A    It's the one on the screen?  Because that's different

25  from what I have.

Holly Driscoll, CSR

D. GELLER - CROSS - MR. BRAFMAN

1       MR. BRAFMAN:  Let me ask you this, could the

2  government give me a copy of the one he has?

3       I have it.  Thank you, Judge.  Some of these have

4  been paginated again and again, Your Honor.

5  Q    Now, if you could look at this page two and tell me

6  whether that's the same page, RO 36?

7  A    What am I looking at?

8  Q    Are you looking at page two?

9  A    I'm looking at it, on my own screen I see it.

10  Q    All right.  And I think on direct examination the

11  government asked you about this sentence and read with you:

12  "While a substantial portion of the partnership's portfolio is

13  expected to consist of equity securities in U.S. and global

14  markets, the partnership may also invest in and trade in a

15  diverse range of securities, instruments and investments

16  including without limitation preferred stock, debt

17  instruments, convertible debt, equity securities, warrants,

18  options, rights, bonds, debentures, American depository

19  receipts, etc.

20       Did you understand that those were among the many

21  investments that could be made by the fund?

22  A    I didn't understand that to be many investments among the

23  fund.

24  Q    Okay.  So, is this not one of the paragraphs you read

25  before you invested?

D. GELLER - CROSS - MR. BRAFMAN

1  A    When I looked at this partnership agreement I briefed it

2  over and all this stuff, like I told you before, is

3  boilerplate to me.

4  Q    Well, let me ask you if this is boilerplate to you, if

5  you look at the paragraph that I have my finger on:  The

6  partnership's instruments may also include securities that are

7  thinly traded and non-publicly traded or restricted

8  securities.

9        Did you read that before you invested?

10  A    I briefed it over, the document, and I don't recall

11  reading that part.

12  Q    Now, once you signed your subscription agreement, you did

13  say in that agreement that you had read the Private Placement

14  Memorandum and agreed to be essentially bound by the terms?

15  A    If that's what I signed, then that's what I signed.

16  Q    Okay.  Now, I want to just move ahead for a minute

17  because there comes a time when you received an update; is

18  that correct?

19  A    Yes.

20  Q    And shortly after you got into the fund and paid your

21  $200,000 you received Government Exhibit 109-6 which is a note

22  from NAV Consulting and a new updated memorandum, correct?

23  A    Can you show me the document?

24  Q    Yes, sir, this is 109-6.  And on direct examination you

25  agreed that you received this on or about October 31st, 2011,

Holly Driscoll, CSR

D. GELLER - CROSS - MR. BRAFMAN

1   do you recall?

2   A     Yes.

3   Q     All right.  And let me read the part that says:  Dear

4   investor, Please find attached an important notice from the

5   fund along with a materially revised Private Placement

6   Memorandum dated October 28, 2011.  These are critical notices

7   for your information and they require responsive action on

8   your part if you have any objection to the changes to the PPM.

9   For this reason we urge you to carefully review both documents

10  and exercise due care in your investment decision.

11            Do you remember getting that?

12  A     Yes.

13  Q     And it came with this letter which I think also has your

14  handwriting on it which is attached to 109-6, do you remember

15  this letter?

16  A     Yes.

17  Q     And it was a letter from Mr. Shkreli to you as a limited

18  partner?

19  A     Yes.

20  Q     And you received this letter, correct?

21  A     I did.

22  Q     And that -- those handwriting of October 31st, 2011,

23  that's your handwriting, isn't that correct, sir?

24  A     It is.

25  Q     And this letter tells you in the first paragraph:  Dear

Holly Driscoll, CSR

D. GELLER - CROSS - MR. BRAFMAN

1    Limited Partner, MSMB Health Care has updated its Private

2    Placement Memorandum to reflect new disclosures regarding the

3    fund, specifically MSMB Health Care LP has expanded its

4    disclosure regarding its ability and intent to invest in

5    illiquid securities including venture capital, private equity,

6    limited partnerships and other hedge funds.  If you disagree

7    with these changes, we will facilitate your redemption within

8    our standard parameters.

9              Did you get that?

10   A    Yes.

11   Q    And also in this letter it tells you specifically which

12   paragraphs of the updated memorandum have been changed; is

13   that correct?

14   A    Yes.

15   Q    And it shows you pages 2, 9, 10, 12, 14, 15, 16, 17, 18,

16   21, 27 and 36.  Please don't hesitate to call me with any

17   questions on these new disclosures.  Martin Shkreli.

18              Now, did you look at those paragraphs to see how the

19   investment had changed?

20   A    I did not because when I saw this letter I'm like this

21   fund is not for me anymore.

22   Q    But you didn't move to redeem your shares until three

23   months later, isn't that true?

24   A    Yeah -- if that's the date, that's the date.

25   Q    All right.  We'll get to the date in a minute.  You

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1   didn't call Martin Shkreli on October 31, 2011 or any day

2   thereafter and tell him, I want to redeem my shares, did you?

3           MR. SRINIVASAN:   Objection.

4           THE COURT:   Sustained.

5   Q    Did you call Mr. Shkreli when you got this letter and ask

6   him any questions?

7   A    No.

8   Q    And did you call anybody at MSMB Capital and ask them any

9   questions?

10  A    No.

11  Q    And did you speak to your brother about this?

12          MR. SRINIVASAN:   Objection, Your Honor.

13          THE COURT:   Sustained.

14  Q    Do you know if your brother got the same letter?

15  A    I assumed everyone got the same letter.

16  Q    Did you speak to Mr. Mulleady about the letter?

17  A    I don't remember.

18  Q    Okay.   Now, I think you testified on direct examination

19  that there came a time when you sent notice that you wanted to

20  redeem your shares, correct?

21  A    Correct.

22  Q    And then after talking to Mr. Geller and Mr. Mulleady --

23  I'm sorry, Mr. Mulleady, you also withdraw your request to

24  redeem on the same day, didn't you?

25          MR. SRINIVASAN:   Objection, Your Honor.

Holly Driscoll, CSR

D. GELLER – CROSS – MR. BRAFMAN

1    THE COURT:  Sustained.  Rephrase.

2    Q    I think you testified on direct examination that there

3    came a time when you decided to redeem your shares; is that

4    correct?

5    A    Yes.

6    Q    And you got this letter telling you the fund had changed

7    in October of 2011, correct, sir?

8    A    Yes, the letter we just went over.

9    Q    That was October, correct?

10   A    Yes.

11   Q    And I think you testified on direct examination that

12   there came a time when you sent an e-mail, which is 109-7 in

13   evidence, in which you said:  Kevin and Martin, After careful

14   thought I've decided to put in for redemption.  This is my own

15   personal decision as the investment objective of the fund no

16   longer matches my personal objectives.  I believe we have

17   talked about this in the past.  Basically my portfolio has too

18   much private equity and illiquid components in it.  Let's try

19   and chat later.

20        Do you see that?

21   A    Yes.

22   Q    And isn't it true, sir, that there is a follow-up to this

23   e-mail that is not in evidence which I mark for identification

24   as Defense Exhibit 5480 which is a series of chats that you

25   had with Mr. Mulleady.

D. GELLER - CROSS - MR. BRAFMAN

1            MR. SRINIVASAN:  Objection, Your Honor.

2            THE COURT:  Mr. Brafman, can you think about

3   rephrasing your question.

4            MR. BRAFMAN:  Yes.

5            MR. SRINIVASAN:  Your Honor, he's just handing the

6   document to the witness, Your Honor.

7            MR. BRAFMAN:  I'll wait.

8            THE COURT:  Is this for refreshing or what?

9            MR. BRAFMAN:  Just for refreshing if he needs.

10           THE COURT:   All right.

11  Q    Mr. Geller, did you follow through on the decision to

12  redeem at that point?

13  A    I did not follow through.

14  Q    In fact, you specifically confirmed to Mr. Mulleady and

15  Mr. Shkreli that you are withdrawing your redemption, correct?

16  A    At some point, yes.

17  Q    And just so the jury is clear, there is more conversation

18  following what e-mail was shown to you on 109-7, correct?

19  A    I don't remember the e-mails.  If you show me, maybe it

20  will strike a cord.

21  Q    Let me show you what's marked for identification as

22  Defendant Exhibit 5480.  Just read it to yourself and tell me

23  whether it refreshes your recollection that you and Kevin

24  Mulleady had a series of conversations about your decision to

25  redeem your shares.

Holly Driscoll, CSR

D. GELLER - CROSS - MR. BRAFMAN

1                (Pause.)

2                THE COURT:  Could you just put a date range on those

3      conversations.

4                MR. BRAFMAN:  Yes, Your Honor.

5                THE COURT:  Just month and year will be helpful.

6                MR. BRAFMAN:  Beginning with January going through

7      February of 2012.

8                THE COURT:  Thank you.

9                (Pause.)

10               (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GELLER - CROSS - BRAFMAN

1  CROSS-EXAMINATION (CONTINUED)

2  A    Okay, I remember this.

3  Q    And do you remember telling Mr. Mulleady that you decided

4  to redeem -- you decided to rescind your request for

5  redemption and stay in the fund?

6  A    Yes.

7  Q    And did you tell that to Mr. Geller?

8        MR. SRINIVASAN:  Objection.

9  Q    I'm sorry, did you tell to that Mr. Mulleady?

10  A    I told him on the email.

11  Q    Okay.  But that's -- this is an instant messaging back be

12  forth?

13  A    Instant message I mean.

14  Q    And in the instant messaging at 12 -- 2:14 p.m., if you

15  look down to the front page --

16        MR. SRINIVASAN:  Objection.

17        MR. BRAFMAN:  All right, I'll do a different way to

18  save time.

19  Q    The point is that before the redemption could be put

20  through, you notified them that you didn't want to redeem,

21  correct?

22  A    Yes.

23  Q    And you specifically told them I am rescinding my

24  redemption, correct?

25  A    Yes.

GELLER - CROSS - BRAFMAN

1    Q    And you also told Mr. Geller that you don't want to let

2    the past block a positive great opportunity, plus my brother

3    really likes you guys.

4              Did you tell that to Mr. Geller?

5              MR. SRINIVASAN:  Objection.

6    Q    To Mr. Mulleady?

7              THE COURT:  Sustained.  I think you misspoke.  You

8    said did you tell Mr. Geller.

9    Q    Mr. Geller, did you tell this to Mr. Mulleady during the

10   conversation about not redeeming -- that you like -- that my

11   brother likes you guys and I don't want to let the past block

12   a possible great opportunity?

13             MR. SRINIVASAN:  Objection.

14             THE COURT:  Sustained.

15             MR. BRAFMAN:  Your Honor, this is the witness'

16   statement.

17   Q    Was this explaining why you didn't want to redeem?

18             MR. SRINIVASAN:  Your Honor.

19   A    This was --

20             THE COURT:  Wait.  Wait.  Wait.  Wait.  I haven't

21   ruled.

22             MR. BRAFMAN:  Okay.

23             THE COURT:  I think the problem is the form of your

24   question, sir.

25   Q    In the conversation with Mr. Mulleady after you told him

GELLER - CROSS - BRAFMAN

1    that you decided not to redeem, did you also tell him that one

2    of the reasons was because your brother likes you guys --

3              MR. SRINIVASAN:  Objection.

4    Q    -- meaning Mulleady and Shkreli?

5              THE COURT:  Overruled.

6              MR. BRAFMAN:  You can answer.

7    A    That was one of the -- one of the reasons, yes.

8    Q    And during the conversation -- withdrawn.

9              Did you also refer to something as not wanting to

10   block a possible great opportunity?

11   A    I did.

12   Q    And by that were you referring to the Retrophin

13   investment that you were now going to be part of?

14             MR. SRINIVASAN:  Objection.

15             THE COURT:  Rephrase the question.

16   Q    What were you saying when you were talking about not

17   wanting to block a great opportunity?  What were you talking

18   about?

19   A    I was referring to past investments that I had anxiety

20   over that I -- the past investments that I described before.

21   So I was very on edge and praying major defense.

22   Q    Okay.  And what were you telling Mr. Mulleady is you

23   didn't want your past experience to interfere with the

24   possibility of a good opportunity, correct?

25   A    Yes.

GELLER - CROSS - BRAFMAN

1   Q    And what was the great opportunity that in your mind was

2   what you were thinking about when you said this to

3   Mr. Mulleady?

4   A    That -- that my money would be with Martin Shkreli.

5   Q    And Retrophin?

6   A    I didn't really know what Retrophin was at the time.

7   Q    But with Mr. Shkreli, correct?

8   A    Yes.

9   Q    And you still understood at that point that this was

10  potentially a great opportunity?

11          THE COURT:  "This" meaning what?

12          MR. BRAFMAN:  A great opportunity to make more money

13  on your $200,000.

14  A    To make money on my 200,000.

15  Q    And you did make money on your $200,000, we've

16  established that, right?

17          MR. SRINIVASAN:  Objection.

18          THE COURT:  Overruled.

19          MR. BRAFMAN:  You can answer.

20  Q    Yes?

21  A    Bottom line, I made -- yes, as of today, I did make

22  money.

23  Q    All right.  Now, I think on direct examination the

24  government showed you a series of statements that you got from

25  Navigant Consulting marked as Exhibits 91-1 through 91-10 in

GELLER - CROSS - BRAFMAN

1    evidence.

2              Now, I'm going to put them on the screen, sir, but

3    I'm going to put on the first one, which is Exhibit 91-1, and

4    you can look at it on the screen, and I think you testified

5    that you remember getting this exhibit in or about August 9th,

6    correct?

7              THE COURT:  2011.

8    Q    Dated up on the top there?

9    A    It's August 9th, okay.

10   Q    August 9th 2011, correct?

11   A    Yes.

12   Q    And this was something you had testified on direct

13   examination, it has a covering email from NAV Consulting; is

14   that correct?

15   A    Yes.

16   Q    And the name of the contact person was Varun Agarwal,

17   A-G-A-R-W-A-L, as the account manager, correct?

18   A    Okay.

19   Q    And it lists the name and address and telephone number of

20   Navigant Consulting, correct?

21   A    Yes.

22   Q    I'm sorry.  And you also -- attached to that was a

23   statement, correct, provided by NAV Consulting with their logo

24   on the bottom, and it's RO12394, and this was the first

25   statement on your account that you received after your

GELLER - CROSS - BRAFMAN

1   200,000-dollar investment, correct?

2   A    Correct.

3   Q    And that shows that you had a balance of $205,139.30,

4   correct?

5   A    Correct.

6   Q    Do you have any understanding as to how that was

7   computed?

8   A    No.

9   Q    Did you ever call NAV Consulting and ask what caused your

10  portfolio to be increased about by $5,139?

11  A    No.

12  Q    And did you ever ask Mulleady or Shkreli about that?

13  A    No.

14  Q    Now, 91-2, is another email from NAV and that came on

15  October 27th, 2011, correct?

16  A    Correct.

17  Q    And that is 91-2 in evidence and, again, it still has the

18  same account manager, correct?

19  A    Yes.

20  Q    And can I assume you never called him, correct?

21  A    I never called.

22  Q    All right.  Now, for the first time in this attachment,

23  you received not just another balance which shows you went up

24  another 5,000 in your account, and you don't have any

25  understanding as to what securities caused it to increase; do

GELLER – CROSS – BRAFMAN

1    you?

2    A    I -- no.

3    Q    And as you sit here today, do you have any knowledge

4    whatsoever one way or the other whether this a real statement

5    or a false statement?

6    A    I'm not sure.

7    Q    Now, did you call NAV Consulting when you got it?

8    A    No.

9    Q    And this one has a change, which was pointed out to you

10   on direct examination.  You see this footnote down here or

11   these small letters?

12   A    Yep.

13   Q    And try your best, if you can, to focus on that language

14   if you can.  Can you see it?

15   A    I can.

16   Q    Okay.  And it reads:  MSMB Healthcare, LP has accepted

17   the transfer of 30,000 investment units consisting of Class A

18   common units of Retrophin, LLC, a Delaware limited liability

19   company, focused on developing biopharmaceutical products for

20   Martin Shkreli at no consideration as a gift.  Let me stop

21   there.

22         Was this the first time you see a statement which

23   has any mention of Retrophin in it?

24   A    I -- I testified under examination before that the first

25   time I saw this footnote I didn't notice it.

GELLER – CROSS – BRAFMAN

1    Q    Okay.  But now that we have it here, you see what it says

2    in the first sentence that we just read, correct?

3    A    Yes.

4    Q    And it also goes on to say at the bottom of the email:

5    These units are liquid in nature and prices are not readily

6    available in the market.  Valuations of the investment have

7    been provided by the general partner.  NAV Consulting, Inc. is

8    not involved in the calculation, verification, or

9    dissemination of such value, and disclaims any responsibility

10   for the accuracy or completeness thereof.  As of the date of

11   this statement, we are valuing these units at $10 per unit,

12   worth $300,000.  Retrophin, LLC.  And I'll stop there.

13            Do you see that?

14   A    Yes.

15   Q    And while you didn't notice it at the time, you're not

16   suggesting it wasn't there when you got this statement,

17   correct?

18   A    It was there.

19   Q    Okay.  Now, you then get a statement, which is marked,

20   covering email from NAV Consulting, 91-3, and you get that on

21   November 30th; is that correct?

22   A    Yes.

23   Q    And sent to your email address, and now the balance of

24   your account went down.

25            Do you see that?

GELLER - CROSS - BRAFMAN

1    A    Uh-huh.

2    Q    Went down from 210,000 to $199,938.47, which is a few

3    dollars less than the $200,000 you put in, correct?

4    A    Correct.

5    Q    And did getting that statement concern you at all?

6    A    Yes.

7    Q    And did you call anyone to ask why it went from 210 to

8    199?

9    A    No.

10   Q    And you did you take any action at that time to get out

11   of the fund?

12   A    No.

13   Q    Now, this one also has that a footnote; is that correct?

14   A    Yes.

15   Q    And, again, I won't read the whole thing, but if you look

16   at the first sentence, we go down here to:  As of the date of

17   this statement, we are valuing these units, referring to

18   Retrophin units, at $12 per unit for $360,000.

19        Do you see that?

20   A    Yes.

21   Q    And that went up from the prior statement that had a

22   10,000-dollar valuation.  I'm putting that back on the board.

23        Do you see the 10-dollar per unit valuation?

24   A    Yes.

25   Q    And a 300,000-dollar total valuation?

GELLER - CROSS - BRAFMAN

1    A      Yes.

2    Q      And the next one, the one that we see there, just to --

3    shows a $12 and 360,000, correct?

4    A      Yes.

5    Q      Do you have any understanding as to why the valuation of

6    Retrophin went from $10 a share to $12?

7    A      No.

8                MR. SRINIVASAN:  Objection, Your Honor.

9    Q      And did you call the account manager at NAV and ask him

10   to explain?

11   A      No.

12   Q      And did you call Mr. Shkreli or Mr. Mulleady and ask them

13   to explain?

14   A      No.

15   Q      Did you have any discussion -- without telling us what

16   they were, did you have any discussions with your brother Al

17   at the time as to the nature of the statements you were

18   getting at NAV -- from NAV?

19                MR. SRINIVASAN:  Objection.

20                MR. BRAFMAN:  Without telling us the substance, did

21   you have any discussions.

22                THE COURT:  Overruled.

23   A      I had a discussion and actually, yes, he -- he -- this is

24   when we noticed that there were -- that the footnotes on the

25   bottom of the page about Retrophin.

GELLER - CROSS - BRAFMAN

1    Q    But after that discussion, you did not move to withdraw,

2    correct?

3              MR. SRINIVASAN:  Objection.

4              THE COURT:  Sustained.

5    Q    At that time.  I'll move on.

6              91-4 is the next valuation that you received from

7    NAV and it says, by email, dated Thursday, January 26th; is

8    that correct?

9    A    Yes.

10   Q    And it comes now with a different form of statement,

11   correct?

12   A    Yes.

13   Q    And it's different format; is that correct?

14   A    Yes.

15   Q    And the value of your balance now is even lower, it's

16   $191,755, correct?

17   A    Yes.

18   Q    And there's still a footnote; is that correct?

19   A    Yes.

20   Q    And this footnote is a little bit different; would you

21   agree?

22   A    Yes.

23   Q    And this footnote tells you as a limited partner that the

24   partnership invested, with its affiliate entities, some of the

25   investments with affiliated are illiquid in nature, and prices

GELLER - CROSS - BRAFMAN

1   are not readily available in the market.

2           Do you see that?

3   A    Yes.

4   Q    And it also tells you that NAV Consulting is not involved

5   in this calculation, verification, or dissemination of such

6   values, correct?

7   A    Correct.

8   Q    So that as of the date of this statement, you are being

9   told that NAV Consulting is no longer issuing the balance --

10  the monthly statement, correct?

11          MR. SRINIVASAN:  Objection.

12  Q    The statements?

13          THE COURT:  Sustained -- overruled.

14  Q    Correct?

15          THE COURT:  You can answer.

16  A    What I was led to believe that NAV was not valuing the

17  illiquid Retrophin, but I still believed that NAV was valuing

18  MSMB Healthcare.

19  Q    Okay.  But this is no longer a valid statement that was

20  sent to you by NAV Consulting because it doesn't have the same

21  format as the one before; is that correct?

22          MR. SRINIVASAN:  Objection.

23          THE COURT:  Sustained.

24  Q    Did you inquire as to why the value of your investment

25  went from 200 to 191,000 and change?

GELLER - CROSS - BRAFMAN

1   A    No.

2   Q    And now you get a statement with 91-5, which is an

3   exhibit in evidence dated March 2nd, 2012.

4        Do you see that?

5   A    Yes.

6   Q    By the way, do you know the status of Retrophin in March

7   of 2012, whether it's private company or a public company by

8   that point?

9   A    I -- I still really wasn't sure what Retrophin was.

10  Q    Okay.

11       Now, do you in the -- the statement which came on

12  that day, now you have your balance is 222,585, which is

13  22,585,000 more than you originally invested, correct?

14       MR. SRINIVASAN:  Objection.

15  A    Correct.

16  Q    And you are currently now in a positive position,

17  according to this statement?

18  A    Correct.

19  Q    And did you make inquiry at the fund with anyone, either

20  Mulleady or Shkreli, as to how that came about?

21  A    No.

22  Q    And then in 91-6, which is in evidence, came to you on

23  Monday, April 9th, 2012, the attachment is, again, a

24  statement, and this one shows your balance to be $263,311.86.

25       Do you see that?

GELLER - CROSS - BRAFMAN

1   A    Yes.

2   Q    So it increased again from the prior statement.

3   A    Okay.

4   Q    And would it be correct to save time that, again, you

5   never called anyone to ask any explanation whatsoever,

6   correct?

7   A    No.

8   Q    I'm correct, right?

9   A    You're correct.

10  Q    All right.  And you didn't know what kind of investments

11  were used to create that -- that profit, correct?

12  A    I do not, no.

13  Q    Now, then you got an email, 91-7, on September 9th, 2012,

14  and this one shows a balance of $255,012.05, correct?

15  A    Correct.

16  Q    And then in Exhibit 91-8, which came to you from

17  Mr. Shkreli on September 9th, 2012, at 11:16 p.m., it says:

18  We see the correct attached statement for the month of

19  May 12th for investment in MSMB Healthcare.  I apologize for

20  the confusion.  And this is a corrected statement; is that

21  correct?

22  A    If that's what it says, yes.

23  Q    Well, this one shows a balance of 251,000, correct?

24  A    Okay.

25  Q    Now then you received an email, 91-9, for identification,

GELLER - CROSS - BRAFMAN

1    and you get that from Mr. Shkreli on September 2012,

2    11:30 p.m.

3            Do you see that?

4    A    Yes.

5    Q    And that has a balance of $272,760.27, correct?

6    A    Yes.

7    Q    And the last, I think, statement you received, if you

8    recall, was on September 10th, 2012, from Mr. Shkreli, and

9    that statement shows that your investment had grown to

10   $299,343.85; is that correct?

11   A    Yes.

12   Q    And when you negotiated your settlement with Mr. Greebel

13   and Mr. Shkreli, you got back a 300,000-dollar cash --

14           MR. SRINIVASAN:  Objection.

15   Q    -- settlement; is that correct?

16           THE COURT:  Sustained.

17   Q    Well --

18           THE COURT:  Rephrase the question.

19   Q    Well, you testified that when you finished the

20   negotiation and you ultimately got a signed --

21           MR. SRINIVASAN:  Objection.

22           MR. BRAFMAN:  Withdrawn.

23   Q    You testified that at the end of the day you had signed a

24   settlement agreement that provided you to get $300,000 in cash

25   and some Retrophin stock, correct?

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

GELLER - CROSS - BRAFMAN

1        MR. SRINIVASAN:  Objection.

2        THE COURT:  I'll overrule the objection.

3   Q    Is that correct?

4   A    The agreement I signed was to get cash and for him to

5   leave me with the stock that -- that was already sent to me.

6   Q    Right.  We'll talk about that in a minute.

7        But the cash component of what you were requesting

8   was $300,000, correct?

9   A    I didn't request the cash, Martin offered it to me.

10  Q    And the amount -- the value of your account, based on the

11  last statement you ever received for that account, was a few

12  dollars less than $300,000, correct?

13  A    That was the value of the account, yes.

14  Q    And you were satisfied with the 300,000-dollar number

15  because you understood it to be the value of your account,

16  correct?

17  A    One thing had nothing to do with the other.

18  Q    The 300,000-dollar figure was just random in your mind?

19  A    It was totally random.

20  Q    Okay.  But the fact that it matches up with the last

21  evaluation of your account to you is just a coincidence?

22  A    Total coincidence.

23  Q    But nevertheless, whether it was a coincidence or not,

24  the 300,000-dollar cash portion of the agreement, which is

25  what you accepted?

GELLER - CROSS - BRAFMAN

1   A    I did accept it, yes.

2   Q    And the 30,514 shares of Retrophin was over and above the

3   300,000?

4   A    At the time I didn't know what -- if there was any value

5   on the restricted shares.

6   Q    Correct, but ultimately there became a lot of value?

7   A    As of today, yes.

8   Q    No, not as of today.  As of the date you sold it.

9   A    As of the date I sold it, yes.

10  Q    Which was at least two-and-half years ago.

11  A    Yes.

12  Q    And you sold it for 315,000, correct.

13  A    Yes.

14       MR. BRAFMAN:  Your Honor, this might be a good place

15  to stop, if you don't mind.

16       THE COURT:  Are you finished with your cross?

17       MR. BRAFMAN:  No, I just -- you know, it's normally

18  the time you give the jurors a break, so it's up to you.

19       THE COURT:  All right, I will give the jurors a

20  break if they're ready.  Are you ready?

21       THE COURTROOM DEPUTY:  All rise.

22       (Jury exits the courtroom.)

23       THE COURT:  All right, yes, please return by 11:15

24  at the latest.

25       (Whereupon, a recess was taken.)

GELLER – CROSS – BRAFMAN

1          (Jury enters the courtroom.)

2          THE COURT:  All the jurors are present.  Please have

3  a seat.

4          MR. BRAFMAN:  May I continue, Your Honor?

5          THE COURT:  Yes, you may.

6          MR. BRAFMAN:  Thank you.

7  BY MR. BRAFMAN:

8  Q    Mr. Geller, are you ready to continue?

9  A    Yes.

10  Q    All right.  Here is Government Exhibit 109-12 in

11  evidence, which is an email.  I just want to go to through it

12  with you.  I think it was gone through with you with the

13  government on direct examination.

14          It's an email from you, at the bottom here, on

15  March 26th, 2013 at 9:53 p.m.  Got your email and call, will

16  call you shortly.  And then there's an email on April 4th,

17  where you sent an email to Mr. Shkreli:  Martin, hi.  Alan

18  told me you had a nice long conversation with him.  I'm going

19  to stop there.

20          Do you remember the conversation with your brother?

21  A    I don't remember the conversation.

22  Q    But does this refresh your recollection that you

23  obviously spoke to your brother at or about this time about

24  having had dinner with Mr. Shkreli?

25  A    I don't remember the conversation.  But a lot of these

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

GELLER - CROSS - BRAFMAN

1    things I put in were just for pleasantries.

2    Q    Okay.  Now, from what I gather over the past -- the last

3    few months, it seems you put all my money into Retrophin stock

4    at the higher valuation.  From our conversations last year, I

5    informed you guys I needed diversification and you told me

6    Retrophin stock would be only a small part of my portfolio,

7    please tell me where I stand so I can try to mentally move on

8    somehow.  You told me you would get back to me soon with a

9    comprehensive and satisfactory answer.  It's really not fair

10   to leave me on a cliff.  I'm a better person than that.

11        Do you see that?

12   A    Yes.

13   Q    Now, you were using the expression "leave me on a cliff"

14   sort of try to get his attention, correct?

15   A    More or less.

16   Q    You weren't contemplating suicide at the time, correct?

17        MR. SRINIVASAN:  Objection, Your Honor.

18   Q    And you were not on a cliff, correct?

19   A    No.

20   Q    Okay.  Now, he then responds the same day, says:  I will

21   call, absolutely, David.  Things are nuts here, zero

22   disrespect.

23        Do you see that?

24   A    Yes.

25   Q    Now, when he says "things are nuts here," what did you

GELLER - CROSS - BRAFMAN

1   understand him to mean?

2            MR. SRINIVASAN:  Objection, Your Honor.

3            THE COURT:  Sustained.

4   Q    What did you understand Mr. -- what did you understand

5   what Mr. Shkreli was saying?

6   A    Well, when a person says things are nuts, usually that

7   means they're busy.

8   Q    Okay.  And did you know during this period that

9   Mr. Shkreli was involved in trying to make Retrophin --

10           MR. SRINIVASAN:  Objection, Your Honor.

11  Q    -- a public company?

12           THE COURT:  Sustained.

13  Q    Well didn't you have a dinner with Mr. Shkreli and

14  Mr. Mulleady in Bryant Park in 2012?

15  A    We did.

16  Q    And at that dinner, didn't they talk to you extensively

17  about Retrophin?

18  A    The subject came up.

19  Q    And the subject that came up was Mr. Shkreli trying to

20  make a new drug company go public; isn't that true?

21           MR. SRINIVASAN:  Objection, Your Honor.

22           THE COURT:  This is at the dinner in 2012?

23           MR. BRAFMAN:  Yes.  It was summer of 2012.

24           MR. SRINIVASAN:  2013.

25           MR. BRAFMAN:  The summer of 2012.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

GELLER - CROSS - BRAFMAN

1          THE COURT:  I think he said 2012.  It's overruled.

2          You can answer, sir.

3          MR. BRAFMAN:  You may answer.

4    A    It was -- it was 2012.

5    Q    In the summer and it was at Bryant Park, right?

6    A    Yes.

7    Q    In a restaurant?

8    A    Yes.

9    Q    And it was, you, Mr. Mulleady, and Mr. Shkreli?

10   A    Yes.

11   Q    And you had a friendly dinner?

12   A    We did.

13   Q    And you had an exchange of ideas, correct?

14   A    We did.

15   Q    In fact, Mr. Shkreli told you about Retrophin, and you

16   told him about something you were involved in called Diamond

17   Funding, correct?

18   A    Correct.

19   Q    And did you pitch Diamond Funding to him as a potential

20   investment?

21   A    At one point I did.

22   Q    And what was Diamond Funding?

23   A    Diamond Funding was a -- it was -- it was a cash advance

24   business.

25   Q    A payroll cash advance business?

GELLER - CROSS - BRAFMAN

1  A    I don't know if it was payroll cash advance business, but

2  it was cash advance business to businesses who needed money.

3  Q    Right.  And you were going to be a lender of money,

4  correct?

5  A    Yes.

6          MR. SRINIVASAN:  Objection.

7  Q    And you were soliciting Mr. Shkreli as an investor,

8  correct?

9          MR. SRINIVASAN:  Objection.

10          THE COURT:  Overruled.

11          MR. BRAFMAN:  You may answer.

12  A    At one point, yes.  Not during that meeting, though.

13  This was before the Byrant Park meeting.

14  Q    Okay.  But he didn't invest; did he?

15  A    No.

16  Q    And you didn't pursue it; did you?

17  A    No.

18  Q    And during the dinner, there was discussion by you,

19  Mulleady, and Shkreli about Retrophin.  I think we've covered

20  that.

21          THE COURT:  You have covered it.  Asked and

22  answered.

23  Q    What did you -- what were you told about Retrophin?

24  A    I was told -- well, my recollection that they were

25  starting a new company called Retrophin.

GELLER - CROSS - BRAFMAN

1   Q    And what type of company was it?

2   A    Drug company.

3   Q    And what was that -- was that of interest to you?

4   A    Well, anything they said was of interest to me.

5   Q    Because part of your money at that point was already

6   invested in Retrophin you understood, correct?

7              MR. SRINIVASAN:  Objection, Your Honor.

8              THE COURT:  Overruled.

9   Q    You understood that from the NAV agreements you were

10  getting, right?

11  A    I only thing I understood was that if any of my money was

12  in Retrophin, it was a gift, it wasn't part of the original

13  MSMB fund I was in.

14  Q    And ultimately it was a substantial gift, correct?

15  A    I -- I don't know if it was a substantial gift or not.

16  Q    Well you got $300,000 for it.

17             MR. SRINIVASAN:  Objection.

18             THE COURT:  Don't argue with the witness.

19  Sustained.

20             MR. BRAFMAN:  I'm not arguing, Judge.

21             THE COURT:  Well, you can argue with me, too, but --

22  Q    Did Mr. -- did you tell -- did Mr. Mulleady tell you at

23  the dinner that Martin Shkreli walks to his own beat?

24             MR. SRINIVASAN:  Objection, Your Honor.

25             THE COURT:  I'll sustain that objection.

GELLER - CROSS - BRAFMAN

1    Q    In the conversation at Bryant Park, did you tell the

2    government that one of the things that was discussed was that

3    Martin Shkreli walks to his own beat?

4    A    I don't recall.

5    Q    Well, you have that document, which I gave you before,

6    3500EG2.  Is it still up there?

7              Do you still have it, sir?

8    A    The one you gave me, DX48?

9    Q    I left it up there -- 3500EG2.

10             Do you have that, sir?

11   A    Yes.

12   Q    And it's dated on the left-hand side 1/25/16?

13   A    Yes.

14   Q    All right.  And I'd ask you to turn to page 3 on the top

15   of page -- on the top right-hand corner the pages are

16   numbered.

17             Do you see the number on the top right-hand corner?

18   On the top, sir.

19             Do you see the number "3" on the top, 3 of 6 on the

20   top?

21   A    Yes.

22   Q    Okay.  So I want you to go down that page to the one,

23   two -- third paragraph, little paragraph in the middle of the

24   page and ask if you remember --

25             MR. SRINIVASAN:  Your Honor.

GELLER - CROSS - BRAFMAN

1    Q    -- Mr. Mulleady --

2              MR. SRINIVASAN:  Sidebar.

3    Q    Mr. Mulleady --

4              THE COURT:  Wait.  Sidebar.

5              (Continued on the next page.)

6              (Sidebar conference.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1        MR. SRINIVASAN:  It's hearsay, Your Honor.

2        MR. BRAFMAN:  I have -- I'm close, but I haven't yet

3   lost all of my senses.  They have identified Mr. Mulleady as

4   an unindicted coconspirator, right?  Have you?  Yes.

5        And they have used statements by Mr. Mulleady

6   offered against my client when he wasn't there as a statement

7   made in furtherance of a conspiracy.

8        When a witness -- when an unindicted coconspirator

9   is talking to an investor, who's alleged to be a victim of

10  their joint conspiracy, and he is describing one of the

11  principals of the conspiracy, I have a right -- I have a right

12  to inquire on cross-examination about what he was told about

13  the coconspirator, because a --

14       THE COURT:  Sorry.  I was just going to grab my

15  rules.  Just one moment.  Give me one moment.

16       (Pause.)

17       THE COURT:  All right, I just want to get my

18  Rule 801.

19       Okay, I'm listening, Mr. Brafman.  Go ahead.

20       MR. BRAFMAN:  It's a statement of a coconspirator,

21  coconspirator.  They offer statements of a coconspirator in

22  furtherance of a conspiracy.  And to the extent that they

23  conclude that everything Mulleady says in furtherance of a

24  conspiracy is not hearsay, I can offer it to show what impact,

25  if any, it had on this listener's mind, and it doesn't have to

SIDEBAR CONFERENCE

1    be an admission against Mr. Shkreli, and it does further a

2    conspiracy, because it regards Mr. Shkreli, because it's

3    during a discussion where he was complaining about

4    Mr. Shkreli, and I can lay that foundation, and the response

5    to Mr. Mulleady is that he travels to the beat of his own

6    drum, and Mr. Mulleady laughs.  That's the context of the

7    conversation, as I understand it.

8            How is that not admissible, when they use the

9    statements by Mr. Mulleady against me.  I understand that the

10   government, and they get to offer it as an admission --

11           THE COURT:  No, the rule says that it's offered

12   against an opposing party.

13           MR. BRAFMAN:  Yes.  Yes.  That's correct.

14           THE COURT:  So that's what I wanted to double check.

15           MR. BRAFMAN:  In some respects.  Because they've

16   opened the door about Mulleady being able to characterize him.

17           I could get this in under 806 as essentially an

18   inconsistent statement to the extent that they say anything --

19           THE COURT:  By whom?  An inconsistent statement by

20   whom?

21           MR. BRAFMAN:  By Mulleady.

22           THE COURT:  No, no.

23           MR. SRINIVASAN:  It's attacking and supporting --

24           MR. BRAFMAN:  Your Honor, if he is listening to this

25   conversation, to the extent that they have to out of court

SIDEBAR CONFERENCE

1    statements by Mr. Mulleady against my client suggesting that

2    what he did was an intentional fraud, a statement by

3    Mr. Mulleady that qualifies that to suggest that Mr. Shkreli

4    travels to the beat of his own -- I'm sorry, travels to the

5    beat of his own drum is admissible for a variety of reasons,

6    because it will impact on the listener and goes to his state

7    of mind.  What do you understand Mr. Mulleady saying, and why

8    did you laugh when you -- when he said that, and what did you

9    understand him to be saying.  For that alone it's admissible.

10             It's not being offered for the truth of this, Judge.

11             MR. SRINIVASAN:  Yes, it is.

12             MS. KASULIS:  Yes, it is.  And it's an opposing

13   party statement, Your Honor.

14             THE COURT:  That's why I wanted to double check.

15   But it can only be offered by the opposing party.  So here the

16   government can offer a statement to further the conspiracy,

17   but it doesn't work the other way under 801(b), which is the

18   other rule, which is 806.

19             MR. BRAFMAN:  Let me explain.

20             THE COURT:  The document in here -- the document,

21   you know, has not testified inconsistently with the witness.

22   If you offered it in his statement.

23             MR. BRAFMAN:  Mr. Mulleady is the declarant.

24             THE COURT:  But 806 --

25             MR. BRAFMAN:  But let me explain why.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1          Mr. Mulleady is a declarant that they have used

2    against Mr. Shkreli, even though they haven't produced him for

3    cross-examination.  And when they offer it, they say it's in

4    furtherance of a conspiracy.

5          A statement by a coconspirator that is inconsistent

6    with the argument that he was furthering a conspiracy is

7    admissible through the person it is said to and -- and I'm

8    telling you --

9          THE COURT:  What rule did you read that?

10          MS. KASULIS:  What's the basis?

11          THE COURT:  I just want to know the rule.  I'm not

12    telling you if that is appropriate.  Tell me which rule.

13          MR. BRAFMAN:  May I borrow this for one moment?

14          I briefed this issue for Judge Graham, may she rest

15    in peace, that's why I remember it, and it involves a -- you

16    don't have 806 in here.

17          MS. KASULIS:  It is.  Keep going.

18          MR. BRAFMAN:  Oh, I'm sorry.

19          The declarant, Your Honor, is Mulleady not

20    Mr. Geller.  When a hearsay statement to a statement described

21    in Rule 801(d)(2)(C), (D), or (E) has been admitted in

22    evidence, the declarant's credibility may be attacked and then

23    supported by any evidence that would be admissible for those

24    purposes if the declarant had testified as a witness.

25          The declarant is not Mr. Geller.  He does not say

SIDEBAR CONFERENCE

1  this.  It's Mr. Mulleady.  And they have used statements by

2  Mr. Mulleady out of court against my client to suggest that he

3  had intentionally violated the law.  And this undermines the

4  statements by Mr. Mulleady, at least to the extent that it

5  shows that Mulleady has an opinion of Mr. Shkreli which he

6  imparts to this witness.  The declarant is Mulleady.

7        MR. SRINIVASAN:  That's inconsistent.  He's

8  supporting credibility of who?

9        MR. BRAFMAN:  Well, if Mulleady characterized

10  Mr. Shkreli as traveling to the beat of his own drummer, that

11  is a fact that the jury can consider as to whether or not what

12  Mr. Mulleady said about Mr. Shkreli should be taken in

13  context.

14        THE COURT:  But what statement of Mr. Mulleady's are

15  you attacking in terms of his credibility with the beat of his

16  own drum?

17        MR. BRAFMAN:  They have used Mr. Mulleady's

18  credibility to impugn my client, when Mr. Mulleady is never

19  being called as a witness.

20        THE COURT:  But how has his credibility been

21  attacked?

22        MR. BRAFMAN:  Because anything offered by Mulleady

23  was only offered against Mr. Shkreli.  So it was offered by

24  Mulleady, outside of court, against Mr. Shkreli.  They've used

25  it with several witnesses, things that Mr. Mulleady said about

SIDEBAR CONFERENCE

1    Mr. Shkreli, or about others in this conspiracy.  And this

2    suggests that when you listen to Mulleady, you have to

3    understand that according it Mr. Mulleady, Mr. Shkreli travels

4    to the beat of his own drummer, whatever that witness says he

5    understood that to mean.

6            THE COURT:  But how does that bear either -- I think

7    it has to bear either on the declarant's credibility or

8    inconsistent statement.

9            MR. BRAFMAN:  Your Honor, we argue that if Mulleady

10   was here --

11           THE COURT:  Yes.

12           MR. BRAFMAN:  -- and he were to testify, as he has

13   in context throughout this trial, that Mr. Shkreli was a

14   knowing participant in the conspiracy, I have a right to

15   cross-examine Mulleady on whether he characterized my client

16   as traveling to the beat of his own drummer.  I think I would

17   be fair game, and he could then be questioned by them as to

18   what that means.

19           This witness understood from Mr. Mulleady what that

20   means to him.  And I think what they have essentially done is

21   they have this guy out there, Mulleady, who everything

22   Mulleady says my client is bound by, is responsible for, and

23   is in trouble for, and yet Mulleady is a person who, when he

24   talks about my client, characterizes him in this way.  I this

25   that's relevant for them to hear.  Otherwise, they hear only

SIDEBAR CONFERENCE

1    bad from Mulleady in a vacuum.

2              MR. SRINIVASAN:  Your Honor, I think that Mulleady

3    is on their witness.

4              MR. BRAFMAN:  He's not being called.  You know that

5    and you I know that.  I can't immunize him, only you can.

6              MR. SRINIVASAN:  That's a separate discussion.

7              MR. BRAFMAN:  No, it's not.

8              THE COURT:  Wait.

9              MR. BRAFMAN:  -- interview Mulleady.

10             THE COURT:  Okay.  Everyone needs to calm down and

11   not interrupt.

12             MR. SRINIVASAN:  It doesn't attack his credibility,

13   it's just another statement that he makes where it talks about

14   what can be in evidence of a prior inconsistent statement.

15   Nothing is inconsistent.  He just wants to slip the statement

16   in with no basis in the rules to do so.  I understand it

17   attacks his credibility.  I don't know.

18             THE COURT:  The problem I'm having, Mr. Brafman, is,

19   you know, I agree with you that 806 would, under some

20   circumstances, allow a coconspirator's statement to be

21   admitted if it was to attack the credibility of that

22   coconspirator.  But we don't have -- or to point out an

23   inconsistency.  There's nothing here that allows that at this

24   point.  Whether there is going to be something later on, I

25   don't know, but --

SIDEBAR CONFERENCE

1          MR. BRAFMAN:  But, Your Honor, Mr. Mulleady has been

2     ejected into the case by the government.  They are, in effect,

3     telling this jury that if Mulleady does something wrong, that

4     means Martin Shkreli could be help responsible.

5          When Mr. Mulleady characterizes Mr. Shkreli, what he

6     is essentially implying is that the guy may be a crack pot,

7     but I can argue to the jury they didn't say Shkreli is a bad

8     guy.  He doesn't say Shkreli is a genius.  What he is

9     basically saying is putting it in context.  By that comment

10    you put it in context everything Mulleady has.

11          And just so the record is clear, if they have

12    Mulleady on their witness list, they have the power as the

13    government to immunize Mulleady.  I can't immunize Mulleady.

14    I can't give him a non-prosecution agreement.  We have

15    interviewed him.  He has no wealth of exculpatory statements,

16    just that he has materials.  But I can't immunize him, and he

17    will not honor a subpoena unless he is immunized.  So they are

18    not equally available to talk about.

19          MS. SMITH:  Your Honor, just to make the record

20    clear.  He is not on our witness list, the revised witness

21    list.  He has also sued Mr. Shkreli for fraud.

22          MR. BRAFMAN:  It's not a lawsuit that's still

23    pending.

24          MS. SMITH:  To be honest, this is trial rehab of

25    Mr. Mulleady's credibility because they want the truth of it.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

SIDEBAR CONFERENCE

1    It's not attacking his credibility, it's trying to make

2    Mulleady kind of a voice for the defendant.  I don't really

3    see how that fits in, Your Honor.

4           MR. BRAFMAN:  You can't use him as a voice against

5    the defendant and then keep out anything he says for the

6    defendant.

7           MR. SRINIVASAN:  I think the testimony rule is that

8    the declarant's credibility may be attacked and then

9    supported, right.  So this is similar to rehabilitating the

10   witness after the credibility has been attacked, and they're

11   not attacking his credibility at all.

12          THE COURT:  The one statement he wants is Mulleady's

13   statement that Mr. Shkreli is a crack pot.

14          MR. BRAFMAN:  No, travels to the beat of his own

15   drum.

16          THE COURT:  Okay, I'm sorry.  Excuse me.  Okay,

17   travels to the beat of his own drum.

18          Okay, I -- I don't think it's technically admissible

19   under the rules of evidence.

20          Is this the only question?

21          MR. BRAFMAN:  The only question.

22          THE COURT:  I mean it's just -- it is hearsay.

23          MR. BRAFMAN:  It's being offered for the truth of

24   it, Judge.

25          THE COURT:  Well, I think it is.

SIDEBAR CONFERENCE

1          MR. BRAFMAN:  Judge, it's not hearsay, it's how he

2    characterizes Mr. Shkreli to someone who he put into the fund.

3    So this is a Mulleady client.

4          THE COURT:  So you want to offer this to see what

5    the effect of Mr. Mulleady's comment is on Mr.?

6          MR. BRAFMAN:  On Mr. Geller.

7          MS. SMITH:  So is Mr. Brafman saying in closing he

8    is not going to get up and say Kevin Mulleady said that

9    Mr. Shkreli marches to the beat of his own drum?

10          MR. BRAFMAN:  I'm not precluded from commenting on

11    anything that's in the record.  And to be honest with you, I

12    have a right to ask that question just to see what the witness

13    understood that to mean and the impact it has on the witness,

14    because he stays in the fund because Al Geller tells him that

15    Martin Shkreli is crazy that he is betting on a genius.

16          MS. SMITH:  He means Kevin Mulleady.

17          MR. BRAFMAN:  No, Al Geller and Kevin Mulleady.

18          MR. SRINIVASAN:  It's all hearsay.

19          MR. BRAFMAN:  When Al Geller testifies, it's not

20    going to be hearsay.  You know it's coming.

21          THE COURT:  Well, I mean I think Al Geller can

22    testify to whatever he wants regarding his view of

23    Mr. Shkreli; whether it's good for you or bad for you, but I

24    think that the Mulleady piece of this is so far removed from a

25    ground for admission.

SIDEBAR CONFERENCE

1          MR. BRAFMAN:  It comes in a conversation about

2    Retrophin --

3          THE COURT:  Okay.

4          MR. BRAFMAN:  -- and how it's developing.

5          THE COURT:  If he is saying that Mulleady's comment

6    about marches to the beat of his own drummer and has appeased

7    this witness in to remaining in the fund, so you're offering

8    it to show the effect on him?

9          MR. BRAFMAN:  Yes.

10         THE COURT:  I would allow that.  But you haven't

11   proffered that as a ground.

12         MR. BRAFMAN:  I did.  No, I did.

13         MS. SMITH:  And it certainly doesn't work because he

14   had already rescinded his redemption in February of 2012.

15         MR. BRAFMAN:  But there's still testimony and emails

16   on that.

17         THE COURT:  He still has a right to withdraw the

18   offer to rescind his redemption, you know what I'm saying, if

19   he's in a state of unhappiness with the --

20         MS. SMITH:  It's not clear that he was trying to

21   rescind at this point.

22         THE COURT:  I will allow this with a little bit of

23   lat latitude, but don't --

24         MR. BRAFMAN:  I understand, okay.

25         (End of sidebar conference.)

SIDEBAR CONFERENCE

(Continued on the next page.)

GELLER - CROSS - BRAFMAN

1

2          (In open court; Jury present.)

3          THE COURT:  I have discussed the parameters.

4    BY MR. BRAFMAN:

5    Q    So during this -- the conversation with Mr. Mulleady,

6    sir --

7    A    Yes.

8    Q    -- did he tell you that Mr. Shkreli walks to his own

9    beat?

10   A    Could you explain what conversation this was?

11   Q    Could you explain what the conversation was?

12          THE COURT:  Sir, let me just be clear.

13          The witness answers questions propounded by a

14   lawyer.  The lawyer's questions, again I'll remind by the

15   jury, are not evidence.  What matters is the answer in the

16   context of the question.

17          The witness has indicated some confusion about the

18   question.

19          MR. BRAFMAN:  I will strike it out.

20          THE COURT:  Please rephrase it.  He will rephrase

21   the question so you understand the context.

22          THE WITNESS:  Okay.

23   Q    Did you have a conversation with Mr. Mulleady in or about

24   December of 2012?

25   A    I believe we had a telephone conversation.

LINDA D. DANELCZYK, RPR, CSR
Official Court Reporter

GELLER - CROSS - BRAFMAN

1    Q     And was the conversation related to Retrophin and MSMB?

2    A     Yes.

3    Q     And in that conversation, were you either complaining or

4    asking Mr. Mulleady to help straighten this out?

5    A     Yes.

6    Q     And did Mr. Mulleady at one point in the conversation

7    tell you that Martin Shkreli walks to his own beat?

8    A     It's possible, but I can't recall a hundred percent.

9    Q     You're not denying that he said it?

10   A     I'm not denying it.

11   Q     And for the purposes of this discussion, do you see --

12   does it refresh your recollection that he told the government

13   he said that?  You see the document in front -- does it

14   refresh your recollection that you told the government --

15   A     Yes.

16   Q     -- he said that?

17   A     Yes.

18   Q     And does that refresh your recollection that he said

19   that?

20   A     I could have said that.

21   Q     Okay.  And if you said that, what did you understand

22   Mulleady to mean --

23             MR. SRINIVASAN:  Objection, Your Honor.

24   Q     -- when he said that to you?

25             THE COURT:  Overruled.

GELLER - CROSS - BRAFMAN

1    A    I understood that he meant to say that he does things his

2    own way.  He does things on his own time.

3              (Continued on next page.)

GELLER - CROSS - BRAFMAN

1   BY MR. BRAFMAN:

2   Q    And did you ever have a discussion with Mr. Mulleady

3   concerning Martin Shkreli's stability as a person?

4              MR. SRINIVASAN:  Objection.

5              THE COURT:  Sustained.

6

7   Q    You testified that at some point you came to learn that

8   Mr. Greebel was involved on behalf of Retrophin in the

9   negotiations with you in the terms of finalizing your

10  agreement, correct?

11  A    Correct.

12  Q    You recognized him as a lawyer who was working for

13  Retrophin, correct?

14  A    Retrophin, MSMB, yes.

15  Q    And I think would it be fair to say that you told the

16  Government you that you comforted by the fact that Evan

17  Greebel, who was from a big firm, was involved?

18  A    Yes.

19  Q    And that helped calm you to believe that you would

20  ultimately be repaid, correct?

21  A    I didn't know if I would be ultimately be repaid, but it

22  helped calm me.

23  Q    Now, you get a new agreement -- I'm sorry, you get a new

24  Private Placement Memorandum in October of 2011, do you

25  remember that?

GELLER - CROSS - BRAFMAN

1    A    Not off the bat.

2    Q    All right.  Well, we put into evidence your letter with

3    your handwriting which showed October 31, 2011, do you recall?

4    A    I don't recall.  Can you just show me again?

5              MR. BRAFMAN:  Can we put up 109-6?  It's in

6    evidence.

7              THE COURT:  Mr. Srinivasan, do you want to tell him

8    what tab?

9              MR. SRINIVASAN:  Tab six.

10   BY MR. BRAFMAN:

11   Q    Turn to tab six, sir.

12   A    Okay, yes.

13   Q    All right.  It's on the screen.  Is that the letter you

14   received that you marked that in your handwriting October 31,

15   2011?

16   A    Yes.

17   Q    And it came with a new Memorandum, correct?

18   A    Yes.

19   Q    And the Memorandum is in your book and it's marked 11B,

20   do you see it?

21             MR. SRINIVASAN:  Tab 31.

22   Q    Tab 31.

23   A    Okay.

24   Q    And do you remember getting that?

25   A    Yes.

GELLER - CROSS - BRAFMAN

1    Q    And this was, your understanding, replaced the one you

2    got in October, correct?

3    A    This is October.

4    Q    This one -- I'm sorry.  This replaced the one you saw in

5    January, correct?

6    A    It replaced the original one that I got before I invested

7    in the fund, or I got one in January too?

8    Q    It replaced the original one you got, correct?

9    A    Yes.

10   Q    So now when you got this, did you review it?

11   A    I didn't review it, I briefed it.  Because the letter

12   that I got with this said that they were changing the fund.  I

13   knew that I was getting out of the fund.  So there would be no

14   reason for me to review it.

15   Q    It didn't say you were getting out the funds, it said the

16   fund's investments were being changed; isn't that true?

17   A    The letter that I received with this memorandum was the

18   description of how the fund was changing.

19   Q    Okay.  And you remained in the fund for a period of time

20   after getting that, correct?

21   A    Yes.

22   Q    And did you review it to see how your investment was

23   being changed?

24   A    No.

25   Q    Could you look now, if you turn over the cover page of --

GELLER - CROSS - BRAFMAN

1   look at 109-6 for a minute, can you go back to tab three,

2   109-6.  It's now on the board, you see it, sir?

3              Can you read it from the screen or do you need to

4   find it?

5   A    Can you tell me what tab it's in in my book.

6              MR. SRINIVASAN:  Tab six.

7   A    I have it up now.

8   Q    It says, "Dear investor."

9   A    Yes.

10  Q    It comes from Investor Relations NAV, correct?

11  A    Correct.

12  Q    It says it's dated October 31, 2011?

13  A    Yes.

14  Q    It says, "Dear investor, please find attached an

15  important notice from the fund along with a materially revised

16  PPM dated October 20, 2011.  These are critical notices for

17  your information and they require a response action on your

18  part if you have any questions to the changes to the PPM.  For

19  this reason we urge you to carefully review both documents and

20  exercise care in your investment decision."  Did I read it

21  correctly, sir?

22  A    Yes.

23  Q    And when you got this, am I correct, sir, I think you

24  just testified that you really didn't review carefully, you

25  just briefed it?

GELLER - CROSS - BRAFMAN

1    A    I briefed it, yes.

2    Q    Okay.  Let's look at the first page after the cover page,

3    for a minute.  And if we can put up 00011, do you have that

4    page there, sir?

5    A    Yes.

6    Q    If you look at the part where it says, "The partnership's

7    investment"?

8    A    Okay.

9    Q    If you look at the second sentence, read with me from the

10   word adviser, "The adviser intends to primarily focus on

11   public healthcare opportunities, but will also invest in

12   private equity and venture capital, including funding

13   start-up, biotechnology companies, as well as funding

14   leveraged buyout opportunities."  Do you see that?

15   A    Yes.

16   Q    Did you read that sentence at the time you got this?

17   A    No.

18   Q    We can move on now to page two.  If we can, I'm going to

19   put this on the screen so the jurors can see page two, which

20   is part of Exhibit 109-6.  This is a copy of the letter where

21   you wrote 10/31 without your handwriting on it, but it's the

22   same letter.  This is the letter that came to you with this

23   new Private Placement Memorandum, correct?

24   A    Yes.

25   Q    It tells specifically, "Please review the new disclosures

GELLER - CROSS - BRAFMAN

1   located on pages two, nine, ten, 12, 14, 15, 16, 17, 18, 21,

2   27, and 36."  Did you look at those pages and carefully review

3   what changes there were to your investment?

4   A    I think I said this before, but I did not.  And the

5   reason being was because on the description on the letter,

6   that "Dear limited partner," when I saw this type of language,

7   that's all I needed to see.

8   Q    And you did nothing immediately after seeing that for

9   several months; is that correct?

10              MR. SRINIVASAN:  Objection, asked and answered.

11              THE COURT:  Sustained.

12  Q    Now, you if you had looked at it, look at page two.

13              MR. SRINIVASAN:  What exhibit?

14              MR. BRAFMAN:  11B.

15  Q    If you look at page two of the document, do you have it,

16  sir.

17  A    Yes.

18  Q    The investment objective and strategy.  Reading down to

19  the second sentence, "The adviser intends to primarily focus

20  on public healthcare opportunities but will also invest in

21  private equity and venture capital including funding,

22  start-up, biotechnology companies, as well as funding ledgered

23  buyout opportunities."  Did you see that?

24  A    Yes.

25  Q    Again, if I asked you if you read that at the time, you

GELLER - CROSS - BRAFMAN

1   would say no.

2   A    I would say no.

3   Q    I'm putting it back for a minute to ask you this

4   question, when you had your dinner with Mr. Shkreli and

5   Mr. Mulleady, the subject of Retrophin came up, I think you

6   testified to that, correct?

7   A    The subject came up, yes.

8   Q    You knew that to be a start up company for wont of a

9   better word?

10          MR. SRINIVASAN:  Objection.

11  Q    What did you understand Retrophin to be?

12          THE COURT:  At the time of the dinner?

13          MR. BRAFMAN:  Yes.

14  A    I understood the name of the fund.

15  Q    Did you understand it to be a separate company?

16  A    No, I didn't.

17  Q    What did you understand Mr. Shkreli to be working on

18  during this period?

19  A    I knew he had some drugs that he was in the stage of

20  developing.

21  Q    Did you it understand that to be that he was developing

22  them under the umbrella of Retrophin?

23  A    I wasn't in the beginning.  And I remember I was having

24  problems understanding whether Retrophin was a drug or the

25  name of fund, the new fund, or a new fund that he was

GELLER - CROSS - BRAFMAN

1   starting.

2   Q    Okay.  And if you could look at page six to page seven,

3   the bottom of page six -- that's my check mark, it's not on

4   your copy -- it says, "Investments and portfolio composition,"

5   do you see that?

6   A    Yes.

7   Q    If you go over to page eight -- again ignore my check

8   marks and highlights -- looking at the first paragraph,

9   "Primary investments," second sentence, "Other investments may

10  include private equity, limited partnerships including other

11  hedge funds, preferred securities, convertible securities,

12  equity and index options, including market basket options,

13  American depository receipts, global depository receipts,

14  bonds, and currencies," do you see that?

15  A    Yes.

16  Q    It goes on to say, "The Partnership's investments may

17  also include securities that are thinly traded and not

18  publicly-traded or restricted securities," do you see that?

19  A    Yes.

20  Q    That's substantially inconsistent with what you wanted

21  correct?

22          MR. SRINIVASAN:  Objection, your Honor.

23          THE COURT:  Sustained.

24  Q    You told us on direct that you did not want to invest in

25  restricted securities, correct?

GELLER - CROSS - BRAFMAN

1   A    That's what I said, yes.

2   Q    In October of 2011 this memo advises you that your fund

3   is going to include restricted securities.  And from November

4   December until mid-January you did not redeem, correct?

5            MR. SRINIVASAN:  Objection, your Honor.

6            THE COURT:  Overruled.

7   Q    Correct, sir?

8   A    That's correct.

9   Q    And then after you sent in your redemption, you withdrew

10  you're redemption?

11  A    Correct.

12  Q    This is after you had been given notice that terms of the

13  fund and the make up of the fund had changed, correct?

14           MR. SRINIVASAN:  Objection, your Honor.

15           THE COURT:  Overruled.

16  Q    Correct?

17  A    Correct.

18  Q    Now let's go down to the next highlighted paragraph.  It

19  says, "Other securities and investment.  The partnership may

20  also invest in a broad variety of securities and other

21  instruments, whether traded on exchanges or over-the-counter

22  or negotiated or electronic markets.  The Partnership may also

23  invest in private equity, including other limited

24  partnerships."  Let me stop there, do you know what private

25  equity is?

GELLER - CROSS - BRAFMAN

1    A    Yes.

2    Q    Is it a non-public company?

3    A    Yes.

4    Q    When you invest in a non-public company do you understand

5    that to be a liquid or illiquid type of investment?

6    A    Illiquid.

7    Q    "As a result the Partnership's investment in the

8    discretion of the adviser may also include convertible and

9    hybrid stocks, index securities, including high-yield

10   securities, warrants and limited partnership interests."

11           I'm going to stop there.  Would it be a fair

12   statement that in that paragraph it describes a variety of

13   investments that you would, as a former trader, understand to

14   be not liquid securities?

15   A    Pretty much.

16   Q    Now, you understand what the term restricted securities

17   mean, sir?  It's not on the page, just look at me.

18   A    Pretty much.

19   Q    Restricted securities would be like the Retrophin stock

20   when you first got it, it had a legend that said restricted

21   securities, right?

22   A    Restricted securities cannot be sold in the open market.

23   Q    Until the restriction is lifted.

24   A    Basically, yes.

25   Q    When you got the Retrophin stock certificate it said

GELLER - CROSS - BRAFMAN

1   restricted securities, correct?

2   A     Yes.

3   Q     Then you got that lifted and you were able to sell in the

4   open market?

5   A     When it was lift from the restriction, yes.

6   Q     Now if you look at page eight of the document, same

7   Memorandum, you see on the top page, full paragraph,

8   "Restricted securities," do you have that, sir?

9   A     Yes.

10  Q     "The Partnership may invest in so-called restricted

11  securities i.e. securities as to which the public re-sale is

12  currently restricted under the under the Securities Act of

13  1933 as amended, the Securities Act, and which are not

14  immediately convertible into freely tradeable securities.  The

15  portfolio manager intends to purchase restricted securities

16  where pricing and growth characteristics justify the limited

17  liquidity and which provide the means to achieving eventual

18  marketability such as registration rights under the Securities

19  Act."  Do you see that?

20  A     Yes.

21  Q     This memo clearly tells that you the general partner --

22  withdrawn.

23          Did you understand Martin Shkreli to be the general

24  partner of MSMB?

25  A     Yes.

GELLER - CROSS - BRAFMAN

1  Q    And this tells that you the general partner intends to

2  purchase restricted securities, correct?

3  A    Yes.

4  Q    And that restricted securities can't be sold in the

5  market place, as you yourself just testified, until the

6  restriction is lifted, correct?

7  A    Correct.

8  Q    And restricted securities would certainly, not in your

9  mind, be a liquid security, correct?

10 A    In my mind, it would not be liquid, no.

11 Q    Now, if you look at page eight -- again, the highlighting

12 and red markings are mine -- see where it says private equity?

13 A    Yes.

14 Q    I want to ask you if you understand, "The Partnership may

15 engage in directly or indirectly the funding of leveraged

16 buyouts of healthcare companies."  Do you understand what

17 private equity means?

18 A    Yes.

19 Q    What is private equity?

20 A    Private equity is when you buy a company that is

21 publicly-traded, take it private, fix it up, then bring it out

22 public at a later date.

23 Q    Or it could be a private company that has not yet gone

24 public, correct?

25 A    Yes.

GELLER – CROSS – BRAFMAN

1    Q    But private equity one way or another does not represent

2    in your mind a liquid security, correct, sir?

3    A    It's not liquid.

4    Q    All right.  And this tells you, this sentence, "These

5    interests will have limited liquidity and may be difficult to

6    value," do you see that?

7    A    Yes.

8    Q    Do you understand how a private equity security is

9    valued?

10   A    No, I don't not totally.

11   Q    Okay.  Now, "These limit investments in private equity

12   may result in an inability to fully redeem a limited partners

13   interest in the partnership," do you see that?

14   A    Yes.

15   Q    Now, do you understand that if you invest in limited --

16   in private equity -- if you invest in private equity, it may

17   not be possible to just get your investment out when you

18   decide you want it, correct?

19   A    Correct.

20   Q    You need either the consent of the other partners,

21   correct?

22   A    Correct.

23   Q    Or you need to be able to sell the private equity and

24   then take the share, correct?

25   A    Sell it in the open market?

GELLER - CROSS - BRAFMAN

1    Q    Sell it to someone else who wants your share.

2    A    Yes.

3    Q    But that's difficult to do ordinarily.

4    A    Yes, secondary market is difficult.

5    Q    The portfolio manager in this case was Martin Shkreli,

6    correct?

7    A    Yes.

8    Q    MSMB Healthcare was the portfolio, correct?

9    A    Yes.

10   Q    And on page ten under, "Risk factors," it says, "Lack of

11   operating history, experience of a portfolio manager.  The

12   partnership is newly formed enterprise will have no operating

13   history upon which basis potential investors may valuate its

14   performance," do you see that?

15   A    Yes.

16   Q    Then it goes to say, "Any past success with Mr. Shkreli's

17   investments or investment strategy should not be construed as

18   indicative of the future results of the partnership," am, I,

19   correct?

20   A    Yes.

21   Q    So this memo tells you, if even in your brother vouched

22   for Martin Shkreli --

23            MR. SRINIVASAN:  Objection.

24            THE COURT:  Overruled.

25   Q    Even in your brother vouched for Martin Shkreli, Martin

Rivka Teich CSR, RPR, RMR
Official Court Reporter

GELLER – CROSS – BRAFMAN

1    Shkreli's past success was not a guarantee of future success,

2    did you understand that to say that?

3    A    As with anyone, yes.

4    Q    Now, then if you look at page 13, the same document in

5    terms of liquidity, this paragraph near my finger in

6    highlighted, "Investments with limited and no liquidity,

7    Partnership may take significant positions in particular

8    securities which are relatively large as compared to their

9    trading volume or overall market capitalization."  Do you see

10   of that, sir?

11   A    Yes.

12   Q    Then we go down to the bottom again, "Investments and

13   private equity venture capital, limited partnerships and other

14   hedge funds.  The Partnership may take significant positions

15   without limitation in certain securities related to private

16   equity and venture capital, which may be illiquid and

17   difficult to value.  These investments may also be entities

18   which may be affiliated with the portfolio manager and,

19   therefore, represent a conflict of interest.  These

20   investments may result in an inability for a limited partner

21   of a Partnership to redeem its investment in full."  Do you

22   see that?

23   A    Yes.

24   Q    Now, this characterization of the portfolio, you will

25   agree, is different than what you believed you were investing

GELLER - CROSS - BRAFMAN

1  in when you first got told about the investment, correct?

2  A    Correct.

3  Q    And when you get this notification to review it carefully

4  in October of 2011, you are now under notice, if you will,

5  that this is going to involve illiquid securities to some

6  extent, correct?

7            MR. SRINIVASAN:  Objection, your Honor.

8            THE COURT:  Overruled.

9  Q    Correct, sir?

10 A    Yes.

11 Q    Even if you only briefed it and didn't read it verbatim,

12 you're told in black and white that the nature of the

13 portfolio is being changed, correct?

14 A    Correct.

15 Q    And I don't want to belabor this, but the only time you

16 sought to redeem your share after getting this, you later

17 rescinded the redemption, correct?

18 A    Correct.

19 Q    You stayed in the fund until you ultimately got the fund

20 wind down letter, correct?

21 A    Correct.

22 Q    Then you started to negotiate, and we'll get to that in a

23 minute, started to negotiate an agreement?

24            MR. SRINIVASAN:  Objection, your Honor.

25            THE COURT:  Sustained.

GELLER - CROSS - BRAFMAN

1    Q    To discuss a settlement agreement, correct?

2    A    Correct.

3    Q    Now, when the document I just had on there tells you that

4    "The Partnership may take significant positions in related

5    private equity and venture capital and may be affiliated with

6    the portfolio manager," did you understand that in a sense you

7    were being advised that Martin Shkreli as the general partner

8    would have the right --

9            MR. SRINIVASAN:  Objection, your Honor.

10           MR. BRAFMAN:  I didn't ask the question.

11           THE COURT:  Let him finish the question.  I'll hear

12   the objection, then I'll make a ruling.

13   Q    I'm going to put this back on the screen.  Page 13, you

14   see that again, sir?

15   A    Okay.

16   Q    I apologize for the check marks.  "Investment for private

17   equity venture capital.  The partnership may take significant

18   positions without limitation in certain securities related to

19   private equity and venture capital, which make difficult and

20   illiquid and difficult to value.  These investments may also

21   be entities which may be affiliated with the portfolio

22   manager."  Let me stop there, who did you understand the

23   portfolio manager to be?

24   A    Martin Shkreli.

25   Q    And it goes on, "It may be affiliated with the portfolio

GELLER - CROSS - BRAFMAN

1    manager; and therefore, represent a conflict of interest."  Do

2    you see that?

3    A    Yes.

4    Q    What did you understand that to tell you?

5    A    I don't know because I don't remember reading it.  Are

6    you asking me now?

7    Q    Yes.

8    A    As I read it now?

9    Q    Does it suggest to you that some of the investments that

10   MSMB are going to make will be affiliated companies that the

11   portfolio manager may be affiliated with?

12           MR. SRINIVASAN:  Objection, your Honor.

13           THE COURT:  Sustained.

14   Q    What did you understand the potential for a conflict to

15   mean?

16           MR. SRINIVASAN:  Objection.

17           THE COURT:  Sustained.

18   Q    As you sit here now, do you understand what this

19   paragraph was advising you?

20           MR. SRINIVASAN:  Objection.

21           THE COURT:  Sustained.

22   Q    When you invest in a hedge fund do you understand -- when

23   you invested in MSMB, did you understand that as a limited

24   partner you were essentially agreeing that the general partner

25   or portfolio manager could make investment decisions on your

GELLER - CROSS - BRAFMAN

1   behalf?

2   A    Yes.

3   Q    Did you understand that he had to call you every day

4   before he sold a specific stock or bought a specific stock and

5   get your permission, or he could rely on his own choices?

6   A    He can rely on his own choices.

7   Q    To the extent that you were asked on direct examination

8   about whether or not you ever heard of Orex trade, you said

9   you had not?

10  A    I didn't.

11  Q    Even as you sit here today, you don't know what that

12  refers to, correct?

13  A    Now I know what it refers to.

14  Q    Now because you've learned after the case, correct?

15  A    Correct.

16  Q    Now, at the time you didn't know, correct?

17  A    At the time I didn't know.

18  Q    How did you understand your share of the partnership was

19  being valued on a regular basis when you got those statements

20  suggesting the value?

21  A    I didn't understand how they were being valued.  I just

22  know how they value things on a base mark.

23  Q    On a what?

24  A    You asked me about private equity, how I value it.  I

25  know how they value it from what I read, but I don't know how

GELLER - CROSS - BRAFMAN

1   they were valuing MSMB stuff.

2   Q    Okay.  If you look at page 17.

3            THE COURT:  Of the same exhibit, sir?

4            MR. BRAFMAN:  Yes, your Honor.

5   Q    "Valuation and other matters.  The general partner will

6   be responsible for a variety of important matters affecting

7   the partnership.  Among other matters, the general partner

8   will determine the value of the securities held by the

9   partnership."  Do you see that?

10           MR. SRINIVASAN:  Objection, your Honor.

11           THE COURT:  Overruled.

12  Q    Do you understand that?

13  A    I see it, yes.

14  Q    What you're saying, what you understand that to mean is

15  that in the case of MSMB the general partner had the right to,

16  MSMB Healthcare, the general partner had the right to value

17  the securities, correct?

18           MR. SRINIVASAN:  Objection, foundation.

19           THE COURT:  Sustained.

20  Q    Now if you look at Exhibit 28, which is the subscription

21  agreement that was sent to you in October of 2011, do you have

22  it in your binder?

23  A    2012?  That one.

24  Q    2011.  Do you remember signing a subscription agreement?

25  I'll put it on the board.

GELLER - CROSS - BRAFMAN

1          MR. SRINIVASAN:  Tab 32.

2    Q    Tab 32, Exhibit 28.  You see, it sir?

3    A    Yes.

4    Q    That's now on the screen, Exhibit 28, subscription

5    agreement for MSMB Healthcare?

6    A    Correct.

7    Q    The first page, we'll put it on the screen, this is your

8    handwriting where you put in $200,000, correct?

9    A    Correct.

10   Q    This is the one you ultimately sent to them to get your

11   investment, correct?

12   A    Correct.

13   Q    Look at page four of the agreement, on the top of the

14   page.  Do you have the page, sir?

15   A    Yes.

16   Q    It says on the top of the page sub paragraph G, "The

17   subscriber had an opportunity to ask questions of and receive

18   answers from the general partner concerning the terms of this

19   subscription," do you see that?

20   A    Yes.

21   Q    Is that true, sir?

22   A    Is what true?

23   Q    Did you have the opportunity to ask questions?

24   A    Yes.

25   Q    And no one ever stopped you from asking questions,

GELLER - CROSS - BRAFMAN

1    correct?

2    A    Correct.

3    Q    Did you ever ask any questions beyond which you testified

4    to today about the nature of what you were getting involved

5    in?

6              MR. SRINIVASAN:  Objection.

7              THE COURT:  Overruled.  This is the at the time he

8    was making the investment?

9              MR. BRAFMAN:  Yes.

10   Q    You called and asked the general partner, or NAV

11   Consulting, questions about what you were getting into besides

12   what you testified to?

13   A    I never asked the general partner or NAV Consulting.  I

14   might have asked Kevin a couple of questions.

15   Q    By Kevin, you're talking about Kevin Mulleady?

16   A    Kevin Mulleady.

17   Q    Was Kevin Mulleady generally responsive to your

18   questions?

19   A    Pretty much.

20   Q    Did he answer your questions?

21   A    Yes.

22   Q    Now, did you ever get a K-1 for tax purposes from MSMB,

23   if you know or recall?

24   A    Can you show me the document?  I believe I did.

25   Q    You know what I'm referring to when I say K-1?

GELLER - CROSS - BRAFMAN

1    A    I do.

2    Q    When you're a member of a partnership, a limited member,

3    you get a document for your tax returns, correct?

4    A    Correct.

5    Q    I'm going to show you -- is this in evidence?

6            MR. SRINIVASAN:   No.

7    Q    I'm going to show you what I marked as Defense Exhibit,

8    what has now been are marked for identification as Defendant

9    5484 for identification, also has an exhibit tab underneath it

10   of 109-6.

11           Do you remember getting a K-1 from MSMB?  I'm going

12   to put this on the screen.  Do you see that as an e-mail from

13   Mr. Mulleady?

14   A    Yes.

15   Q    In or about April of 2002?

16   A    Yes.

17   Q    It's attachment of 2011 k-1 document?

18   A    Yes.

19   Q    Behind it is a document that was sent to you at your

20   apartment, sir?

21   A    Yes.

22   Q    And attaches a K-1 for the limited partnership interest

23   that you had?

24   A    Yes.

25           MR. BRAFMAN:  I offer this into evidence as

GELLER - CROSS - BRAFMAN

1    Defendants Exhibit 5484.

2              MR. SRINIVASAN:  No objection.

3              THE COURT:  We receive Defense Exhibit 5484.

4              (Defense Exhibit 5484, was received in evidence.)

5    BY MR. BRAFMAN:

6    Q    Now that the jury can see it, again, this is an e-mail

7    from Kevin Mulleady at MSMBCapital.com, correct?

8    A    Correct.

9    Q    It goes to your e-mail address?

10   A    Yes.

11   Q    It goes to you and it says, "Enclosed is your 2011

12   Schedule K-1, Form 1065, partner's share of income credits

13   deductions, et cetera, which has been filed with the

14   partnership tax return of MSMB Healthcare," correct?

15   A    Correct.

16   Q    When he says, it has been filed, do you understand filed

17   with the Internal Revenue Service?

18   A    It's supposed to be, yes.

19   Q    Did you file yours with the Internal Revenue Service?

20   A    Yes.

21   Q    That's an obligation that you have when you file your

22   personal returns, to file attach any K-1 that you may have,

23   correct?

24   A    Correct.

25   Q    You've gotten a lot of K-1s in your career from other

GELLER - CROSS - BRAFMAN

1    limited partnerships, correct?

2    A    Yes.

3    Q    This was not a document that surprised you in any way,

4    did it?

5    A    No.

6    Q    In this case it shows that as of that date the value of

7    your capital account was $222,585.67, correct?

8    A    That's correct.

9    Q    You understand that these documents were being provided

10   to the Internal Revenue Service, correct?

11   A    They were supposed to be.

12   Q    Then you were supposed to do it, and you did.

13   A    Right.

14   Q    Did you on occasion tell either Martin Shkreli or Kevin

15   Mulleady that you had anxiety issues that they were causing by

16   delaying your withdrawing or redemption or settlement

17   agreement?

18   A    I mentioned I was having anxiety issues in the e-mails;

19   but verbally telling them, I don't recall.

20   Q    All right.  Let me show you 109-11 in evidence.  Do you

21   recognize this, sir, as an e-mail chain from you to Martin

22   starting on the bottom, correct?

23   A    Yes.

24   Q    It says, "I hope this e-mail finds you well.  It has been

25   a while since I last spoke to you.  I have been trying to keep

GELLER - CROSS - BRAFMAN

1   up with current events on Retrophin by reading articles, press

2   releases and talking to my brother.  I am excited about our

3   future prospects."  Do you see that?

4   A      Correct.

5   Q      What were you reading about Retrophin?

6   A      Whatever was out there, yes.

7   Q      Were you also talking with your brother, without telling

8   us what he said?

9   A      I might have, we might have had some conversations.

10  Q      Based on what you read and what you heard from your

11  brother, you then say that you were "excited about our future

12  prospects," do you see that?

13  A      Yes.

14  Q      When you use the word "our," was it your understanding at

15  the time that you had a stake in Retrophin?

16  A      No.

17  Q      Why did you use the words "our"?

18  A      I used our because it was, to be honest, it was my

19  strategy of putting pleasantries in the e-mail.

20  Q      To maintain the relationship?

21  A      Yup.  And "our" means I'm part of the team.

22  Q      All right.

23  A      We're all together, you know, general partners, limited

24  partners.

25  Q      And part of what the team was doing, based on what you've

GELLER - CROSS - BRAFMAN

1   said, is the Retrophin venture, correct?

2           MR. SRINIVASAN:  Objection, your Honor.

3           THE COURT:  Sustained.

4   Q    When you were reading these materials that you

5   referenced, did you understand that Retrophin was trying to

6   become a public company?

7           MR. SRINIVASAN:  Objection, your Honor.

8           THE COURT:  Sustained.

9   Q    What were you telling him about -- what were you saying

10  in this e-mail to Martin Shkreli, let's do it that way.

11  A    I was telling him, I was basically just trying to find

12  out what my investment was, when I was supposed to get paid

13  back.

14  Q    I understand there is also a part that is conversational

15  in which you bring up the subject of Retrophin and which you

16  referenced how you are excited about -- you including you, are

17  excited about our future prospects, what did you mean to say

18  when you said that?

19  A    General future prospects.

20  Q    With Retrophin?

21  A    No.

22  Q    Mr. Shkreli says, "Hi David.  En route to California for

23  a few days.  Will be able to give a comprehensive and

24  satisfactory answer.  Soon hope you're well.  May see Al while

25  I'm out."  There did you understand Al to be your brother?

GELLER - CROSS - BRAFMAN

1    A    Yes.

2    Q    Did you know if your brother was also in California?

3    A    Yes.

4    Q    Did you know if Mr. Shkreli and your brother did meet in

5    California?

6    A    I don't know.

7    Q    And then Martin says -- then you say to Martin, "Were you

8    able to research the valuation issue?  I'm starting to get a

9    little anxiety.  Please help me on this one."  Were you just

10   trying to be dramatic?

11   A    No.  I probably, no, I had a little anxiety.

12   Q    You had wanted to him to know that, correct?

13   A    Yes.  Why not?

14   Q    You wanted him to know that in the hope it would urge him

15   to get this done sooner, correct?

16   A    Yes.

17   Q    Now, if you look at 109-14 -- I'm going to put it up on

18   here for you to look at, Defense Exhibit 5485?

19            MR. SRINIVASAN:  Your Honor there is no question.

20            MR. BRAFMAN:  I'm asking him to recognize a

21   document.

22   Q    I'm showing you 5485.

23            THE COURT:  Are you planning to move this in and

24   trying to lay a foundation?

25            MR. BRAFMAN:  Yes.

GELLER - CROSS - BRAFMAN

1          THE COURT:  Defense Exhibit what?

2          MR. BRAFMAN:  5485.

3          THE COURT:  Formerly 109-14.

4          MR. BRAFMAN:  Correct.

5   Q    Do you see the document, sir?

6   A    Yes.

7   Q    You see it as a series of e-mail exchanges between you

8   and Mr. Shkreli in April 2012.

9   A    Yes.

10         THE COURT:  No, '13.

11         MR. BRAFMAN:  I'm sorry, 2013.

12         I offer this into evidence as Defense 5485.

13         MR. SRINIVASAN:  No objection.

14         THE COURT:  We receive Defense 5485.

15         (Defense Exhibit 5485, was received in evidence.)

16  Q    This is from you to Martin at MSMB Capital, correct?

17  A    Yes.

18  Q    On the bottom we start with the e-mail change backwards

19  at 10:49 a.m. on April 10 you write to Martin, you say, "I

20  know you're super busy.  In the conclusion of our conversation

21  on Friday you said can I expect to hear further details by

22  Wednesday, and you said, David, I'll have an answer for you by

23  Monday night."  Then you end, "Please don't forget me."  Do

24  you see that?

25  A    Yes.

GELLER - CROSS - BRAFMAN

1    Q    What did you know Mr. Shkreli to be super busy in?

2    A    I didn't know if he was super busy.  I was just using

3    pleasantries in the e-mail, just to lead into my question.

4    Q    All right.  And then he says, "Hey, will do," correct?

5    A    Yes.

6    Q    Then you end, "Please don't think I'm hawking you," is

7    that the word you mean to use or hounding you?

8    A    Hawking, hounding same thing.

9    Q    "I know you are involved with really important stuff.

10   Just reminding you that we should complete what we discussed."

11   Do you see that?

12   A    Uh-huh.

13   Q    What was the important stuff?

14   A    I didn't know anything; I was trying to make him feel

15   good.

16   Q    When you say, "we should complete what we discussed,"

17   that's the agreement to pay you $300,000 and shares of

18   Retrophin?

19   A    I don't -- I can't give you a definite answer on that.

20   Q    Now, did you learn during that very same period in April

21   of 2013 that Mr. Shkreli met with your brother?

22   A    I don't recall.

23   Q    I'm going to show you what I've marked for identification

24   as 5486, formerly 109-15 for the Government, and ask you to

25   look at this and tell me if this is an e-mail between you and

GELLER - CROSS - BRAFMAN

1  Mr. Shkreli in April of 2013?

2  A    I see it.

3  Q    Is it an e-mail exchange between you and Mr. Shkreli?

4  A    Yes.

5  Q    Does it relate to your deal talk, as you phrase it?

6  A    "I hope we resume our deal talk," yes.

7         MR. BRAFMAN:  I offer this into evidence as Defense

8  5486.

9         MR. SRINIVASAN:  No objection.

10        THE COURT:  We will receive Defense 5486.

11        (Defense Exhibit 5486, was received in evidence.)

12  BY MR. BRAFMAN:

13  Q    In April you say to Mr. Shkreli, "I hope we resume our

14  deal talk," what did you mean, the deal closing your position

15  at MSMB?

16  A    Most likely.

17  Q    And it says, "I heard you had a lovey conversation with

18  my brother.  Be well.  David Geller."  Did you hear about a

19  conversation between Mr. Shkreli and your brother?

20  A    I know there was a conversation.

21  Q    Was it in New York or in California?

22  A    I don't remember.

23  Q    Did your brother then tell you about the conversation?

24        MR. SRINIVASAN:  Objection, your Honor.

25        MR. BRAFMAN:  Just tell you about the conversation.

GELLER - CROSS - BRAFMAN

1    THE COURT:  Overruled, you can answer.

2   A    I don't remember.  And if he told me or if he didn't tell

3   me, I put it in the e-mail just to spice up the e-mail, to

4   make it more personable.

5   Q    By saying it was a lovely conversation, correct?

6   A    Yes.

7   Q    Then Mr. Shkreli says to you, "Around tomorrow?"  Meaning

8   are you around tomorrow, is that what you understood?

9   A    I believe.

10  Q    Then you write back to him, "Open the whole morning until

11  11:00 a.m."?

12  A    Okay.

13  Q    Do you remember if you spoke to Mr. Shkreli that next

14  day?

15  A    No.

16  Q    You may have, but you don't remember?

17  A    I may have, but I don't remember.

18  Q    Did there come a time when you told Mr. Shkreli in words

19  or substance that you really didn't remember the terms of the

20  agreement you and he had discussed.

21  A    Are you talking about the amount of shares and the --

22  Q    Yes.

23  A    Yes.

24  Q    I'm going to show you an e-mail for identification only,

25  series of e-mails.  Can you see that, sir, DX5450, can you see

GELLER - CROSS - BRAFMAN

1   it, sir?

2   A    Yes.

3   Q    This an e-mail exchange between you and Mr. Shkreli on or

4   about April 26, 2013?

5   A    Okay.

6   Q    Is it?

7   A    Yes.

8          MR. BRAFMAN:  Your Honor, I offer into evidence

9   Exhibit DX5450.

10          MR. SRINIVASAN:  Objection, your Honor, hearsay,

11   misstatement of the document.

12          THE COURT:  I think part of this was already in

13   evidence as a Government's Exhibit.

14          MR. BRAFMAN:  Your Honor, I'll use 109-17, which is

15   already in evidence, the same e-mail it just has more.  109-17

16   I think is in evidence.

17          MR. SRINIVASAN:  Yes, it is.

18   Q    I'm showing you 109-17 already in evidence, do you see

19   this document, sir?

20   A    Yes.

21   Q    And it starts with Mr. Shkreli writing to you, correct?

22   A    Yes.

23   Q    "One of these delays has been I forgot what we agreed to"

24   do you remember -- do you see that?

25   A    Yes.

GELLER - CROSS - BRAFMAN

1    Q    And you then say same day, "We agreed upon 300,000 cash,

2    which you would give me part of by buying back my shares.  In

3    addition you would leave me with 20,000 shares, but I don't

4    remember if free or restricted.  I tried to get in touch with

5    Evan as you suggested, but he was not in today."  Do you see

6    that?

7    A    Yes.

8    Q    When Mr. Shkreli asked you to remind him you say, "It's

9    20,000 shares," correct?

10   A    Yes.

11   Q    And you ended up getting 30,514, correct?

12   A    I already had 30,514.

13   Q    Okay.  But in this e-mail you told him that the agreement

14   in your mind was for 20,000 shares, correct, that's what you

15   remembered at the time?

16   A    Yes.  But if I got 20,000 shares, then I knew that I

17   would have to give back the other 30,514.

18   Q    Okay.  But you never had to give that back, and that's

19   what you kept, correct?

20   A    Correct.

21   Q    So you got back 10,514 more shares than you thought you

22   had agreed on?

23            MR. SRINIVASAN:  Objection, your Honor.

24            THE COURT:  Sustained.

25   Q    Now, you then say, "We agreed upon 300,000 cash, in which

GELLER - CROSS - BRAFMAN

1    you would give me part of by buying back my shares.  In

2    addition you would leave me with 20,000 shares.  But I don't

3    remember if free or restricted.  I tried to get in touch with

4    Evan but he was not in today."  The Evan is Evan Greebel is

5    your understanding, correct?

6    A    Yes.

7    Q    And then Mr. Shkreli says to you, "Okay.  As you can

8    imagine, he writes these up.  That's sounds like a deal to

9    me."  When he says "he writes these up," did you understand

10   that to be a formal settlement agreement?

11   A    Yes.

12   Q    And indeed it was, the formal settlement agreement came

13   from Mr. Greebel; is that correct?

14   A    Yes.

15   Q    You then asked, "How do we proceed without it getting

16   side tracked?  Should I speak with him?"  And Mr. Shkreli

17   gives you (212)940-6383, you understand that to be Evan

18   Greebel's telephone number, correct?

19   A    Correct.

20   Q    There is a series of discussions you have with

21   Mr. Greebel and Mr. Shkreli trying to make this close; is that

22   correct?

23   A    Correct.

24   Q    After these discussions in April were there still

25   discussions about the uncertainty of what the deal was

GELLER - CROSS - BRAFMAN

1    supposed to?

2    A    At one point there was a difference between 20 or 30,000.

3    Q    Showing you what is marked for identification at Defense

4    Exhibit 5487, formerly 109-19.  Do you see this, sir?

5    A    Yes.

6    Q    Are these a series of e-mails in May of 2013 between you

7    and Mr. Shkreli?

8    A    Okay.

9    Q    Is it?

10   A    Yes.

11             R ONE:  I offer these into evidence, your Honor.

12             MR. SRINIVASAN:  No objection.

13             THE COURT:  We will receive Defense Exhibit 5487.

14             (Defense Exhibit 5487, was received in evidence.)

15   Q    Read it from the bottom up, as we do these e-mails,

16   Martin writes to you, "Correction, Evan understands the

17   agreement to be $300,000, but neither of us seem to know how

18   much stock, if any, there was to be issued."

19             You write back saying, "Not sure if was 20,000 or

20   30,000, but I will be happy with 20,000, cash is what is

21   important."  Do you see that?

22   A    Yes.

23   Q    If it ended right there would you have been happy with

24   20,000 shares and $300,000 cash?

25   A    If it ended right there, yes.

GELLER - CROSS - BRAFMAN

1   Q    Shkreli says, "Okay let's close this on Monday then.

2   Should be easy."

3        You write back, "I heard you guys had a great dinner

4   on Monday.  Sorry I did not attend.  I look forward to hearing

5   from you today about closing this deal, as your last e-mail

6   indicated."  Was there another dinner with your brother?

7   A    It was a dinner with my brother.

8   Q    Were you invited but you didn't attend?

9   A    Yes.

10  Q    He writes back, Martin, "Yes, it was fun.  You were

11  missed.  We will close it all up today."  Do you see that?

12  A    Yes.

13  Q    "Martin, not to bother you, but Monday came and went

14  without me hearing anything."

15       He writes back, "Sorry to hear that.  Can you call

16  Evan?"  Did you call Mr. Greebel again that day?

17  A    Most likely.

18  Q    Then there came a time that you found a piece of paper

19  which indicated that the deal was 30,000 shares and you said

20  that since you already had the 30,514 you should get 300,000

21  and keep the stock certificate you already had, correct?

22  A    Yes.

23  Q    That's exactly what happened.

24  A    Yes.

25  Q    Now, there comes a time that you threaten, if you will,

GELLER - CROSS - BRAFMAN

1  I'll use that word, litigation or going to law enforcement in

2  an e-mail, correct?

3          MR. SRINIVASAN:  Objection, your Honor.

4          THE COURT:  All right, I think you need to rephrase

5  the question.

6          MR. BRAFMAN:  I'll rephrase it.

7  Q    Did there come a time when you're frustrated and you

8  write to Mr. Shkreli, you basically say there are a lot of

9  lawyers out there that would take this on a contingency basis,

10 I'd like to get my money in words or substance, correct?

11 A    Yes.

12 Q    You also say, if I don't get my money I'll go to law

13 enforcement agencies, correct?

14 A    Yes.

15 Q    You didn't go to a law enforcement agency, you didn't

16 hire a lawyer, correct?

17         MR. SRINIVASAN:  Objection, asked and answered.

18         THE COURT:  Sustained.

19 Q    Mr. Shkreli then says, "Now you have to talk to

20 Mr. Greebel," correct?

21 A    Yes.

22 Q    And after you brought up the subject of a lawsuit you

23 were then dealing with Mr. Greebel, although Mr. Shkreli was

24 being copied, correct, but you were dealing directly with

25 Greebel by e-mail?

GELLER - CROSS - BRAFMAN

1    A    I don't remember; if you show me the document.

2    Q    I'll show you the e-mail that comes with -- is 109-22 in

3    evidence?

4         There comes a time when you are communicating with

5    Mr. Greebel, in May 22, and I'm putting up 109-22 in evidence.

6    This is an e-mail from Mr. Greebel.  He says, "Hi David.

7    Attached is a settlement agreement.  Please advise if it's

8    acceptable.  If you have any comments I'm simultaneously

9    sending it to my client and it is subject to his review and

10   comment.  If you have any questions or comments call me."

11        I think you told us that you signed it and sent it

12   back.  And as far as you're concerned, the negotiation is over

13   and done with, correct?

14   A    Yes.

15   Q    The problem that results later is that you don't get the

16   funds right away as you expected, correct?

17   A    Yes.

18   Q    There is a delay between when you sign it and when you

19   ultimately get paid, correct?

20   A    Yes.

21   Q    Do you know whether or not this agreement, if it had to

22   be approved by the Retrophin Board of Directors?

23   A    I didn't know.

24   Q    Well, this is 2013, by then Retrophin is a public

25   company, you know that, sir, correct?

GELLER - CROSS - BRAFMAN

1    A    Yes.

2    Q    And now this agreement relates to releasing Retrophin, as

3    one of the people who are being released.  Do you see that?

4    A    Yes.

5    Q    In return for you getting $300,000, correct?

6    A    Yes.

7    Q    And shares of Retrophin stock which was 30,514 shares,

8    correct?

9              MR. SRINIVASAN:  Objection, your Honor.

10             THE COURT:  Sustained.

11   Q    Did you ultimately -- did you ever know what the reason

12   was for the delay in payment was?

13   A    I assumed that they didn't have the money to pay me.

14   Q    Did you assume that they had to get approval for the

15   payment?

16             MR. SRINIVASAN:  Objection.

17   Q    Do you know one way or the other whether they had the

18   money or to get approval for the money?

19             MR. SRINIVASAN:  Objection.

20             THE COURT:  Overruled.

21   Q    Do you know?

22   A    What I do know is that dealing with Martin I again, I

23   hate to use the word, I assume he would go through the proper

24   channels since it was a public company and since these

25   documents were being drawn up with a high-class attorney, that

D. GELLER - REDIRECT - MR. SRINIVASAN

1   they would have to do go through the proper channels and it

2   would be approved to get me the money.  I just assumed it.

3          MR. BRAFMAN:  Thank you, very much.  I have no

4   further questions.

5          THE COURT:  Any redirect?

6          MR. SRINIVASAN:  Yes, your Honor, one minute.

7   REDIRECT EXAMINATION

8   BY MR. SRINIVASAN:

9   Q    Mr. Geller, I'm showing you what is in evidence as

10  Government's Exhibit 109-7, do you recall being asked

11  questions about the time you put in for redemption in

12  January 2012?

13  A    Yes.

14  Q    And did you have a conversation with the defendant?

15  A    I did.

16  Q    What did the defendant tell you about MSMB Healthcare?

17  A    He told me that the securities in question, the private

18  securities that they were going to go into, would be a very

19  small part of the portfolio and it wouldn't effect any, it

20  wouldn't really effect anything.

21  Q    Did you understand one way or the other whether there

22  would be still be long and short positions?

23  A    Once he said that, I understood the fund would still

24  operate the way I, the way it was when I originally invested

25  in it.

D. GELLER - REDIRECT - MR. SRINIVASAN

1    Q    Mr. Geller, I'm showing you what is in evidence as

2    Government's Exhibit 11B, I'm drawing your attention to THE

3    page that has the Bates number DG00018, this is the

4    October 2011 Private Placement Memorandum.  Do you recall

5    being asked questions about the investment strategy objectives

6    section of this document by Mr. Brafman?

7    A    Yes, I do.

8    Q    If you look at the first sentence of this paragraph here,

9    it says, "The Partnership's investment objective will be to

10   seek superior absolute returns while attempting to minimize

11   portfolio volatility primarily through long and short equity

12   investments in healthcare companies located in the United

13   States and throughout the world."

14   A    Yes.

15   Q    Then later on it says, "The Partnership's positions are

16   anticipated to consist of a number of long positions, which

17   the advisor believes have the potential to experience

18   significant price appreciation, and short positions, which is

19   the adviser believes have the potential to experience

20   significant price declines."

21   A    Yes.

22   Q    Would that BE consistent with the conversation that you

23   had with the defendant that you just described?

24   A    Yes.

25             THE COURT:  May I, for clarification, was that the

D. GELLER - REDIRECT - MR. SRINIVASAN

1    PPM that was initially signed or the later one?

2              MR. SRINIVASAN:  Your Honor, I'll put up the front

3    page up so the jury can see it.  This is the October 28, 2011

4    PPM, the second one.

5              THE COURT:  Thank you.

6    BY MR. SRINIVASAN:

7    Q    Mr. Geller, I'm showing you the same document

8    Government's Exhibit 11B Bates number DG00023, it's page seven

9    of the Private Placement Memorandum.  Do you recall

10   Mr. Brafman pointing you to the language up here that starts,

11   "Other investments may include private equity, limited

12   partnerships," et cetera?

13   A    Yes.

14   Q    The first sentence says, "The Adviser expects that the

15   partnership's portfolio will consist of long and short

16   positions in the equity securities of approximately 150

17   companies located throughout the world."  Do you see that?

18   A    Yes.

19   Q    Was that consistent with the conversation that you had

20   with the defendant?

21   A    Yes.

22   Q    Same page, do you see a paragraph, "long and short

23   positions"?

24   A    Yes.

25   Q    It says, "The Portfolio manager anticipates that when

D. GELLER - REDIRECT - MR. SRINIVASAN

1    fully invested, the long and short positions in the

2    partnership's portfolio will consist of between 100 and 200

3    positions.  No single position is expected to exceed in terms

4    of cost at time of investment 10 percent of the Partnership's

5    assets.  The adviser intends to utilize short selling both to

6    enhance returns and to hedge long positions."  Was this

7    language in the October 2011 PPM consistent with what the

8    defendant told you a few months later?

9    A    Yes.

10   Q    Mr. Geller, I'll call your attention now to Bates number

11   DG00038, Government's Exhibit 11B, page 22 of this October

12   PPM.  I'll draw your attention to this paragraph, "Exculpation

13   of the general partner, the adviser of portfolio manager.

14   General partner and adviser fiduciaries will have a

15   responsibility to the limited partners exercise good faith and

16   fairness in all dealings effecting the partnership.  However,

17   the Partnership is agreed in the partnership agreement to

18   indemnify and exculpate the general partner, the advisor, and

19   the, respected members, managers, employees, agents including

20   without limitation the portfolio manager from any liability

21   for losses, damages, or expenses resulting from their

22   respective status as general partner and adviser, or their

23   acts and omissions, the Partnership's business or their

24   management of the Partnership's affairs, unless gross

25   negligence willful misconduct willful breach of the

D. GELLER - REDIRECT - MR. SRINIVASAN

1   Partnership agreement on the part of the general partner the

2   adviser or any other parties is involved."  Do you see of that

3   language?

4   A    I do.

5   Q    Did you rely on this language?

6          MR. BRAFMAN:  Objection.

7   A    I did rely on it.

8          THE COURT:  I was going to overrule the objection.

9   Q    I'll ask the question again.  Mr. Geller, did you rely on

10  this language?

11  A    I did.

12  Q    Mr. Geller, after the conversation that you just

13  described with the defendant, the one that took place after

14  the January redemption request, did you actually redeem your

15  investment?

16  A    I did not.

17  Q    What influence, if any, did that conversation have on

18  that decision?

19  A    It had a big influence on it.

20  Q    Did it lead you not to redeem your investment at that

21  time?

22  A    It led me not to redeem it, yes.

23          MR. SRINIVASAN:  One moment your Honor.  No further

24  questions, thank you.

25          THE COURT:  Any recross?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

D. GELLER – REDIRECT – MR. SRINIVASAN

1          MR. BRAFMAN:  No, your Honor.

2          THE COURT:  Sir, you're excused.  Thank you for your

3     time.

4          (Whereupon, the witness was excused.)

5          It might make sense at this point to allow the

6     jurors to have their lunch.  Would you like a lunch break now?

7     All right, good.  Return in one hour.

8          In the meantime, don't talk about the case or expose

9     yourself to any media.  Thank you for your ongoing attention.

10         (Jury exits the courtroom.)

11         THE COURT:  We'll see everyone in one hour.

12         (Whereupon, a lunch recess was taken at 12:50 p.m.)

13    (Continued following page.)

14

15

16

17

18

19

20

21

22

23

24

25

ASELAGE – DIRECT – SMITH

1              A F T E R N O O N   S E S S I O N

2                        (1:50 p.m.)

3          (In open court; jury present.)

4          THE COURT:  All jurors are present, please have a

5    seat everybody.

6              Is the government prepared to call its next witness?

7          MS. SMITH:  Yes, Your Honor, the government calls

8    Stephen Aselage.

9          THE COURT:  Hello, sir.

10         THE COURTROOM DEPUTY:  Good afternoon, sir.  Please

11   raise your right hand.

12   STEPHEN ASELAGE, called as a witness, having been first duly

13   sworn/affirmed, was examined and testified as follows:

14         THE COURT:  Good afternoon.

15         THE COURTROOM DEPUTY:  State and spell your name for

16   the record, please.

17         THE WITNESS:  My name is Steve Aselage.

18         THE COURT:  Will you spell it please, sir.

19         THE WITNESS:  Sure, formal first name is

20   S-T-E-P-H-E-N.  Last name, A-S-E-L-A-G-E.

21         THE COURT:  Thank you.  Please proceed.

22   DIRECT EXAMINATION

23   BY MS. SMITH:

24   Q    Good afternoon.

25              How old are you?

ASELAGE - DIRECT - SMITH

1    A    I am 66 years old.

2    Q    Are you married?

3    A    I am.

4    Q    Do you have any children?

5    A    I have three.

6    Q    Where do you live?

7    A    San Diego, California.

8    Q    What is your current occupation?

9    A    I'm the CEO of Retrophin.

10   Q    What's the CEO?

11   A    The chief executive officer.

12   Q    How long have you been the CEO of Retrophin?

13   A    I took the interim CEO role in September, at the end of

14   September 2014.  I was made permanent in November of 2014.

15   Q    And were you affiliated with Retrophin prior to September

16   of 2014?

17   A    Yes, in several capacities.  I initially started with

18   Retrophin as a CEO in October of 2012.  Mr. Shkreli was the

19   founder and recruited me to do that.  I gave him the CEO

20   position back at the end of -- or in December of 2012.  He

21   became CEO at that point but I remained on the board of

22   directors.

23        In the spring of 2014, at the request of the board,

24   I went back into an operating position and took a chief

25   operating officer role and remained in that role until

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE – DIRECT – SMITH

1    Mr. Shkreli left the CEO role at the end of September 2014.

2    Q    Taking a step back for a minute, what is your highest

3    level of education?

4    A    BS in biology.

5    Q    Where you go to school?

6    A    My undergrad was at the University of Notre Dame.  I

7    did --

8    Q    Go ahead.

9    A    I did go to graduate school at Ohio State.  Finished the

10   course work in bacterial genetics but did not finish the

11   thesis so I did not receive a master's.

12   Q    What did you do after you finished with school?

13   A    I got a job with Pepsi Cola.

14   Q    What did you do for Pepsi?

15   A    I sold Pepsi and delivered Pepsi and got enough sales

16   experience to be considered for a job in the pharmaceutical

17   business.

18   Q    Where did you work after you left Pepsi?

19   A    When I left Pepsi I went to work for company called

20   Bristol Laboratories, it's a division of Bristol-Myers now

21   Bristol-Myers Squibb.  I took a sales position, territory

22   sales representative position in Cedar Rapids, Iowa.

23   Q    How long did you work for Bristol Labs?

24   A    Just about 10 years.  I spent -- initially began as a

25   sales representative and did a very traditional pharmaceutical

ASELAGE – DIRECT – SMITH

1  career path, was promoted into hospital sales, specialty

2  oncology sales and then sales management.

3  Q    What did you after you left Bristol?

4  A    I was very fortunate Genentech was just forming their

5  first commercial organization to launch the first

6  biotechnology products in the United States, I became part of

7  that original Genentech sales force at the end of 1985.  I

8  think I actually went on board January of 1986.

9  Q    And what was your position at Genentech?

10  A    Sales representative.

11  Q    How long were you there?

12  A    Just over seven years.

13  Q    And where did you work after Genentech?

14  A    I did several start-up type of opportunities.  Boehringer

15  Mannheim, set up the oncology group for the launch of

16  taqsitear.  After Rhone-Poulenc Rorer, I moved to California

17  to San Diego.  The company's technology I was very impressed

18  with advanced tissue sciences, a great technology

19  unfortunately we weren't able to manufacture what we were

20  trying to make and that company did not survive.

21        I did five years then running the commercial side of

22  SangStat, a company in the Bay area that worked in the solid

23  organ transplant field, stayed there unless we were acquired

24  by Genzyme.  At that point SangStat ceased to exist.

25        I did two years working for a company called Cell

ASELAGE – DIRECT – SMITH

1   Therapeutics in Seattle.  We were poised to do a massive

2   commercial expansion when Phase III trials came in positive

3   for the lead product there, unfortunately those trials came in

4   negative and we had to sell off the one product we had and the

5   sales force was divested with that product.

6           At that point, I laid myself off and I moved back to

7   the Bay area -- actually I stayed in the Bay area but quit

8   commuting to Seattle and spent seven years with BioMarin.

9   Q    What was BioMarin?

10  A    BioMarin was a startup technology company.  The focus of

11  the company was primarily on enzyme replacement products,

12  although I did have some small molecules as well.

13  Q    How long were you at BioMarin?

14  A    Just over seven years.

15  Q    What was the most senior position that you held there?

16  A    I was the executive vice president and chief business

17  officer.

18  Q    What were your responsibilities in that position?

19  A    I had several groups that I had direct reporting

20  responsibilities for.  Those included sales, marketing,

21  patient services, operations, our international group, and

22  then participated in the executive council and our business

23  development overview committee.

24  Q    What was the last year that you were at BioMarin?

25  A    I left in 2012.

ASELAGE - DIRECT - SMITH

1    Q    And in 2012, what was the size of BioMarin?

2    A    The size for the market cap, if you're talking about

3    financials, was between 5 and 6 billion if I recall.  We had

4    probably a little over thousand people working in the company.

5    And we had structured our commercial organization so we were

6    doing business in about 45 countries around the world by then.

7    Q    What were your total earnings at BioMarin during your

8    last year there?

9    A    My last year only?

10   Q    Yes.

11   A    A little bit over $6 million.

12   Q    And how much of that was attributable to salary versus

13   selling stock?

14   A    Salary was less than 500,000 of that 6 million.  I should

15   mention that my last year I sold options that I had

16   accumulated over my previous six years.  So it's a little bit

17   of an aberration in terms of how high that number was.

18   Q    When did you first hear about Retrophin?

19   A    It was fall of 2012.

20   Q    Where were you living at the time?

21   A    San Diego -- excuse me.  Pleasanton, California.  We were

22   planning on moving to San Diego but had not moved get.

23   Q    Was this while you were still at BioMarin?

24   A    Yes, I was still at BioMarin at that time.

25   Q    Had you made any decision about whether you were going to

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - DIRECT - SMITH

1  stay or leave BioMarin at that point?

2  A    Yes, I had already made a decision I was going to leave,

3  I was planning on moving to San Diego at that point.

4  Q    And how did you hear about Retrophin?

5  A    I was contacted by Mr. Shkreli.

6  Q    How were you contacted?

7  A    You know, I don't recall if it was an email or a phone

8  call, but it was, you know, either an email or a cold call.

9  Q    So were you introduced to him by somebody or --

10  A    No.

11  Q    -- it was out of the blue?

12  A    It was out of the blue.

13  Q    What do you remember discussing on that initial call?

14  A    He indicated that he was forming a new pharmaceutical

15  company, he was looking for someone to be CEO of that company,

16  someone that had commercial experience.  He had products lined

17  up that he needed commercial experience to be able to support

18  and wanted to know if I would be willing to talk to him about

19  that position.

20  Q    What was your understanding of the defendant's role at

21  Retrophin when he called you?

22  A    He was the founder.

23  Q    What was your reaction to the call?

24  A    I was interested.  I didn't know anything about

25  Mr. Shkreli or about Retrophin, but I told him I would meet

ASELAGE - DIRECT - SMITH

1  with him and listen to what he had to say.

2  Q    What happened next?

3  A    He came to San Francisco, I met him downtown San

4  Francisco, talked to him for probably an hour or so.  You

5  know, he shared his vision for the company, what he wanted to

6  do.  He was, I think, very articulate and very bright in

7  describing how he wanted to build a great new pharmaceutical

8  company.

9  Q    Who attended that meeting?

10  A    He and I were the only two people that actually talked.

11  George Huang, who I later found out was a Retrophin employee,

12  apparently did the driving to the meeting and I met him

13  briefly in the hallway as we were parting.

14  Q    What did the defendant tell you about his background

15  during the meeting?

16  A    That he was a very successful investment manager.

17  Q    What information did he give you about the company during

18  the meeting?

19  A    He told me that he had lined up an opportunity to buy two

20  drugs that were currently commercially available but

21  undersupported; that he had funding lined up to be able to

22  make that acquisition and he wanted to bring in somebody that

23  could pull the company together and do that relaunch of those

24  two products.

25  Q    Where was he going to acquire the two products from?

ASELAGE – DIRECT – SMITH

1   A     A company call Valeant was going to sell those two

2   products to him.

3   Q     Mr. Aselage, would you please look around the courtroom

4   and tell us if you see the defendant Martin Shkreli?

5   A     Yes, I do.

6   Q     And can you identify him by a piece of clothing that he's

7   wearing?

8   A     Gray suit, can't see much else beyond the computer

9   screen.

10              THE COURT:  We will --

11              MR. BRAFMAN:  Stipulate to the identification.

12              THE COURT:  All right.  Thank you.

13  BY MS. SMITH:

14  Q     What happened at the end of the meeting?

15  A     At the end of the meeting, I indicated that I would give

16  some thought as to whether I would be interested in the

17  position.  He also indicated he wanted to give it some

18  thought.  He had asked me what my plans were at the time.  I

19  told him my plans were to retire at that point.  So we had a

20  discussion.  He was curious as to whether or not I still had

21  the energy to devote to running the company.  He wanted to

22  think about that.  I had only superficial knowledge of

23  Retrophin at that point, I wanted to think about that.  We

24  left it that we would follow up with each other.

25  Q     Did the defendant follow up with you after the meeting?

ASELAGE - DIRECT - SMITH

1   A    He did, and I don't recall if it was a week or two weeks,

2   but at some point after the meeting there was follow up, we

3   did talk.  I told him I would be interested in moving further

4   with the possibility if I could base that position out of

5   San Diego.  As I said, we'd already made a commitment to move

6   and the only way I could take a position with Retrophin is if

7   I could do that out of San Diego.

8   Q    After that discussion did the defendant offer you a job

9   with Retrophin?

10  A    Yeah, we had some back and forth, I don't recall the

11  extent of those back and forths, but he did end up offering me

12  the CEO position.

13  Q    What did he tell you about the position as he's offering

14  it to you?

15  A    The position was going to be responsible for building the

16  organization that could take these two products to market, and

17  then build on that initial success with additional products.

18  Q    What was your salary going to be?

19  A    He offered me an initial base salary of $500,000.

20  Q    Why did you take the job if you were thinking about

21  retiring?

22  A    I thought it was an interesting opportunity.  I've been

23  in a number of very early stage companies, I'd never been in a

24  company that was actually truly just starting up.

25           One of the commitments I had made to my family was

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - DIRECT - SMITH

1   we would move to San Diego at that point.  We'd been in the

2   Bay area for almost 20 years, we had two children and a

3   grandchild on the way in San Diego.  I had been on the road,

4   as I said we had business in 45 countries, I was spending 200

5   nights here on the road and while I wasn't on the road, I had

6   126-mile round trip to work.  It was time to retire as far as

7   I was concerned.

8           But an opportunity to continue working while moving

9   to San Diego, you know, getting rid some of the travel and

10  some of the commute time, you know, I thought was interesting

11  and I think to his credit, Mr. Shkreli painted a really very

12  attractive vision of what he thought he could do with the

13  company.  He was bright, articulate, energetic and I thought

14  visionary.  I thought there was an opportunity to do something

15  really exciting.

16  Q    I'm going to show you what's been marked for

17  identification as Government Exhibit 122-25, which is Tab 1 in

18  your binder.

19  A    I've got it.

20  Q    Do you recognize this document?

21  A    I do.

22  Q    What is this document?

23  A    It's a press release announced my being named as CEO.

24  Q    And is it an email?

25  A    It is an email to me, yes, with the press release.

ASELAGE – DIRECT – SMITH

1    Q    Is it an email from the defendant?

2    A    It is.

3         MS. SMITH:  Your Honor, the government moves to

4    admit Government Exhibit 122-25 into evidence.

5         MR. BRAFMAN:  No objection.

6         THE COURT:  We will receive 122-25.

7         (Defense Exhibit 122-25, was received in evidence.)

8         MS. SMITH:  Ms. Balbin, if we can focuses on the top

9    half.

10   Q    What's the date of this email?

11   A    September 10th, 2012.

12   Q    And again, it is from the defendant?

13   A    It is.

14   Q    And what's the subject line?

15   A    The subject is Retrophin names Stephen Aselage as chief

16   executive officer.

17   Q    Under the contact it says, Retrophin LLC, then there is a

18   name Tom Fernandez president.  Who is Tom Fernandez?

19   A    Tom Fernandez was the vice president of investor and

20   corporate communications.

21   Q    What was his role at Retrophin?

22   A    He was VP of corporate communications and investor

23   relations.

24   Q    How long did he work for Retrophin?

25   A    How long did he work for Retrophin?  I believe he was

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - DIRECT - SMITH

1  just making the transition from MSMB to Retrophin at that

2  time.

3  Q    And --

4  A    He stayed until 2000 -- I believe it was early '16 or

5  late '15.

6  Q    Next to Mr. Fernandez's name is phrase in parenthesis, it

7  says MSMB Capital.  Had you ever discussed MSMB Capital with

8  the defendant?

9  A    Yes, to some extent.  MSMB Capital was a hedge fund that

10  he indicated he had founded and managed.

11  Q    What else did the defendant tell you about the hedge

12  fund?

13  A    He said it had been a very successful fund, that people

14  had made a lot of money but that he felt like he could make

15  more money and do more good by starting his own pharmaceutical

16  company rather than by shorting other companies.

17  Q    Can you read the text starting with, Retrophin names you

18  chief executive order -- officer.  Excuse me.

19  A    Yes.  Retrophin names Steven Aselage as chief executive

20  officer.  Industry veteran brings more than 30 years of

21  pharmaceutical experience.  Strong record in rare disease and

22  global markets.  Company moves headquarters to San Diego.

23  Q    Was it your understanding that Retrophin was going to

24  move its headquarters to San Diego as is stated in this press

25  release?

ASELAGE - DIRECT - SMITH

1    A    It was.

2    Q    Why was the company going to move to San Diego?

3    A    Basically I let Martin know that it was part of my need

4    to be in San Diego if I was going to go to work for Retrophin.

5    The company should be headquartered where the CEO is.

6    Q    Was the company's headquarters -- were they in fact moved

7    to San Diego at that time?

8    A    No, they were never really moved to San Diego at that

9    time.

10   Q    Were there any other Retrophin employees located in

11   San Diego when you were hired?

12   A    Yes.  When I was hired Andrew Vaino was the chief

13   scientific officer and he was also in San Diego.

14   Q    How long did Andrew Vaino work for the company?

15   A    Andrew Vaino worked for the company until the summer of

16   2013.

17   Q    When you first started at Retrophin, how often did you

18   travel from San Diego to New York?

19   A    Quite a bit in the first few months.  You know, probably

20   once to twice a month.

21   Q    Where was the Retrophin offices located in New York?

22   A    Midtown Manhattan.

23   Q    What other employees worked in that office?

24   A    I'm not sure I can name everybody that was in the office

25   at that time, but there was Tom Fernandez, Marek Biestek, I

ASELAGE - DIRECT - SMITH

1    believe Jesse Shefferman was there at the time.  I believe

2    Courtney Bond was there at the time.  I believe Justin

3    DeMartino was there at the time.

4    Q    This is in 2012?

5    A    I believe.

6    Q    Who was Marek Biestek?

7    A    Marek was the MB, the second half of MSMB and was also

8    head of business development.

9    Q    Were you familiar with an individual named Jackson Su?

10   A    Yes, I'm sorry I forgot Jackson Su was also an employee

11   as was George Huang.

12   Q    What was Jackson Su's role at Retrophin?

13   A    Jackson and George seemed to manage the financial books.

14   The payroll and accounting functions.

15   Q    Who is Ron Tilles?

16   A    Ron Tilles was an individual who worked with the business

17   development group.  I thought he was an employee at the time,

18   as it turned out I found out later he was a consultant not an

19   employee.

20   Q    Was he working out of the Retrophin offices in 2012 as

21   well?

22   A    He was, yes.

23   Q    At the time that you were hired in the fall of 2012, what

24   was your understanding of what assets Retrophin had other than

25   the two products that the defendant was seeking to acquire as

ASELAGE – DIRECT – SMITH

1    part of the deal?

2    A    My understanding was we did not have really much of

3    anything at the time.  There was an agreement with Ligand,

4    another pharmaceutical company, to license in a product called

5    Sparsentan, but that had not been funded yet so it was an

6    asset that we wanted to acquire but had not completed the deal

7    yet due to lack of funding.

8    Q    Had Retrophin developed any products that treated

9    Duchenne muscular dystrophy at that time?

10   A    No.

11   Q    Did Retrophin ever develop any products that treated

12   Duchenne muscular dystrophy?

13   A    No.

14   Q    I'm going to show you a document marked Government

15   Exhibit 122-26, which is already in evidence.  It's behind

16   Tab 2 of your binder.

17        Can we zoom in a little more through the top three

18   whereas clauses.

19        What is this document?

20   A    It's a UWC, unanimous written consent.

21   Q    What is a unanimous written consent?

22   A    It's a document in which the board of directors

23   authorizes management to engage in a specific activity.

24   Q    Is this the unanimous written consent for Retrophin?

25   A    It is.

ASELAGE – DIRECT – SMITH

1    Q    If you look down the page to the third whereas clause it

2    says, Whereas, management of the company recommends that the

3    company acquire certain licenses and distribution rights for

4    Syprine and Cuprimine from Aton Pharma, Inc., a subsidiary of

5    Valeant Pharmaceuticals International Incorporated pursuant to

6    a license and development agreement in a form of which is

7    attached hereto as Exhibit A.

8              What is this clause referring to?

9              THE COURT:  Excuse me.  Are you going to enter this

10   into evidence?

11             MS. KASULIS:  It already is.

12             THE COURT:  Excuse me.

13             THE WITNESS:  It is referring to the two commercial

14   products that I mentioned that Mr. Shkreli was planning on

15   acquiring; Cuprimine and Syprine were products to treat

16   Wilson's disease.

17   Q    What's the date of unanimous written consent?

18   A    September 14th, 2012.

19   Q    Can we turn to the third page of the document that ends

20   in Bates 18723.

21   A    Yes.

22   Q    What are the signature lines on the document?

23   A    I'm sorry, I may not be at the time direct page yet.

24   Q    That's all right.

25   A    The signature lines are Martin Shkreli, Steven

ASELAGE - DIRECT - SMITH

1    Richardson, Edmund Sullivan and Stephen Aselage.

2    Q    Who is Steven Richardson?

3    A    He's a board of directors member.

4    Q    How long was Steven Richardson on the board of Retrophin?

5    A    You know I'm not sure when he joined.  He was there

6    before I was.

7    Q    How long did he serve on the board of Retrophin?

8    A    He served on the board of Retrophin until probably late

9    2015 maybe even spring of -- and it would have been 2015 I

10   believe.

11   Q    When was the first time that you met Steven Richardson?

12   A    One of the trips to New York in fourth quarter of 2012.

13   Q    What was your impression of him?

14   A    I liked him.  He seemed very personable, knowledgeable.

15   His background was interesting, he had been head of human

16   resources at American Express, which is a pretty big company,

17   so he struck me as a very seasoned business professional even

18   though he did not have pharmaceutical background.

19   Q    Who is Edmund Sullivan?

20   A    Edmund Sullivan I was less familiar with.  He was a board

21   member but not one that I had interaction with.

22   Q    Did you ever meet him in person?

23   A    I met him once in a brief hallway introduction.

24   Q    And was that in the fall of 2012?

25   A    I believe it was.

ASELAGE - DIRECT - SMITH

1  Q    And was the hallway at the Retrophin offices or somewhere

2  else?

3  A    No, it was at the Retrophin offices.

4  Q    I'm going to show you what's in evidence as Government

5  Exhibit 122-31, which is Tab 3.  If you look at the bottom

6  email, what's the date of the bottom email?

7  A    It is November 5th, 2012.

8  Q    And who is it from?

9  A    Edmund Sullivan.

10  Q    Who is it to?

11  A    Martin Shkreli.

12  Q    And the subject line is Retrophin board resignation.

13       Did you have an understanding why Edmund Sullivan

14  resigned from the board of directors for Retrophin?

15       MR. BRAFMAN:  Objection.

16  A    I did not.

17  Q    If you can scroll up, Ms. Balbin.  Who is the resignation

18  forwarded to?

19  A    Mr. Shkreli.

20  Q    Who is it forwarded from Mr. Shkreli to?

21  A    Mr. Greebel, Evan Greebel who was the company's outside

22  counsel at the time.

23  Q    Are you and Mr. Richardson also copied on the email?

24  A    We are.

25  Q    Who is Mr. Greebel again?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - DIRECT - SMITH

1   A    The lawyer who's the functioning as the outside counsel

2   for the company.

3   Q    When did you first meet him?

4   A    One of the trips to New York in the late 2012.

5   Q    Did you meet him in the Retrophin offices or somewhere

6   else?

7   A    I don't recall where I met him the first time.  I had

8   interaction with him both in the offices and outside the

9   offices.

10  Q    What law firm did he work for?

11  A    Katten Muchin.

12  Q    Taking a step back, when in the fall of 2012 did you

13  start working at Retrophin?

14  A    Officially in the middle of October.  Functionally, I

15  began doing some work before I even came on officially, but

16  officially in October.

17  Q    When you started what did you expect to be doing for

18  Retrophin?

19  A    I expected to be building a commercial organization to be

20  capable of transferring the Cuprimine and Syprine products

21  into the company and providing support for those products to

22  grow.

23  Q    When you say a commercial organization, what do you mean?

24  A    Well, a commercial organization would include sales

25  force, marketing function, patient services function,

ASELAGE - DIRECT - SMITH

1    distribution function, and an operations function.

2    Q    So is that the framework for actually delivering those

3    two products to the market?

4    A    It's a framework for education, it's a framework for

5    delivering, you need warehousing, you need the ability to do

6    education with prescribers, so it encompasses all the things

7    necessary to have a successful product launch.

8    Q    Is that the work that you wound up doing for Retrophin

9    when you started?

10   A    Well, I did some work to try to put that organization

11   together.  As it turned out, however, we did not actually have

12   the funding that I thought we had.  So a good bit of my time

13   in Q4 of 2012 ended up being focused on trying to raise the

14   money to actually complete this transaction.

15   Q    Why had you had an understanding that Retrophin already

16   had the financing for the deal?

17   A    That was the information I got from Mr. Shkreli.

18   Q    And so what did you do in terms of trying to secure

19   financing for the deal?

20   A    Mr. Shkreli had engaged an investment bank already to try

21   to lay the financing round.  I worked with he and the bankers

22   calling on funds primarily in New York City to try to convince

23   them to put money into Retrophin so we would have the money to

24   buy these products.

25   Q    And how much was it that Valeant wanted for the two

ASELAGE - DIRECT - SMITH

1  products?

2  A    It seems like it was 30 to 35 million.  I know the goal

3  of the fund raising was 40 to 45 million.

4  Q    What role did you play in the meetings where you were

5  seeking funding for the products?

6  A    I think for the most part my role in those meetings was

7  to talk about the commercial opportunity and to convey that we

8  were capable of putting together a group that could

9  successfully launch those products.

10 Q    Who else attended those meetings?

11 A    Mr. Shkreli.

12 Q    And what role did Mr. Shkreli have in those meetings?

13 A    I think he focused more on grand vision for the company,

14 you know, what he wanted to build, where he wanted to go with

15 the company.

16 Q    What was your impression of him in those meetings?

17 A    Variable.  There were times when I thought, you know, he

18 did such a good job that people would write a check for

19 everything they had.  I mean, he's very energetic, very

20 bright, very enthusiastic.  He just came across as a guy that

21 could knock down walls to make Retrophin successful.

22      At other times he was, you know, a little bit not as

23 credible as he could have been in addressing things that

24 didn't seem to be areas of knowledge but where he was trying

25 to answer questions anyway.

ASELAGE - DIRECT - SMITH

1    Q    What, if anything, did you do in your role as a board

2    member during the fall of 2012?

3    A    I just came on in October of 2012 so there wasn't a lot

4    of time for the board to be doing anything.  My focus in the

5    fall of 2012 was really two things:  Help us get the money

6    that we needed to do to buy the products and simultaneously

7    try to get people lined up so that if we were successful, we

8    could put an organization together that could be efficient,

9    effective in taking these products to market and supporting

10   them.

11   Q    I'm going to show you what is already in evidence as

12   Government Exhibit 122-32, which is Tab 4 of your binder.

13            Do you recognize this email?

14   A    I do.

15   Q    Who is the email from?

16   A    Mr. Shkreli.

17   Q    Who is it to?

18   A    Mr. Richardson and myself.

19   Q    What is the subject line?

20   A    Capitalization table.

21   Q    What is your understanding of a capitalization table?

22   A    The cap table is a summary of the shares of stock

23   outstanding and who owns those shares.

24   Q    And at the time that this email was sent in November of

25   2012, was Retrophin a public company or a private company?

ASELAGE – DIRECT – SMITH

1   A    It was still private in November of 2012.  It went public

2   for a reverse merge in December of 2012.

3   Q    Your name appears on the cap table in the second line

4   there.

5   A    Yes.

6   Q    It says that you currently have 50,000 shares.  How had

7   you received those shares?

8   A    Those shares were gifted to me by Mr. Shkreli.

9   Q    Why were they gifted to you?

10  A    Mr. Shkreli indicated that he wanted me to have those

11  shares to better align financial incentives for himself and

12  myself.

13  Q    In addition to the shares that you were gifted, did you

14  also at some point purchase shares of Retrophin?

15  A    I purchased shares of Retrophin several times.  Once

16  shortly after this cap table was published.

17  Q    I want to ask you about a few names on the cap table.

18  Under your name is Steven Richardson and then the next name is

19  Brent Saunders.  Who is Brent Saunders?

20  A    Brent Saunders is a fairly well known pharmaceutical

21  executive, he's run several companies.

22  Q    What did the defendant tell you about Brent Saunders?

23  A    That he was an investor, advisor, and a friend.

24  Q    If you look down the cap table little bit there is an

25  entry for someone named Ken Banta?

ASELAGE – DIRECT – SMITH

1   A    Yes.

2   Q    Who Ken Banta?

3   A    I did not know who Ken Banta was at the time.

4   Subsequently it turns out Ken Banta was an ex-Schering

5   employee who Martin had hired in a consulting capacity.

6   Q    What was Ken Banta's role at Retrophin?

7   A    It was never particularly clear to me what his role was.

8   Q    If you look down the table there is an entry for MSMB

9   Healthcare LP.  At the time of this email in November 2012,

10  did you know what MSMB Healthcare was?

11  A    I thought MSMB Healthcare and MSMB Capital were the same

12  thing.

13  Q    If you look a little bit farther down the cap table there

14  is an entry for Dynagrow Capital LLLP and in parenthesis it

15  says, Fred Hassan?

16  A    Yes.

17  Q    Who is Fred Hassan?

18  A    Again, a very well known pharmaceutical executive, former

19  CEO of Schering Laboratories.

20  Q    What did the defendant tell you about Fred Hassan?

21  A    That he was an investor, an advisor and a friend.

22  Q    Did you have any involvement in creating or maintaining

23  the capitalization table for Retrophin?

24  A    I did not.

25  Q    I'm going to show you what's been marked as Government

ASELAGE - DIRECT - SMITH

1    Exhibit 119-22 for identification, that's Tab 6 of your

2    binder.

3             Do you recognize this document?

4    A    I do.

5    Q    What is this document?

6    A    It is an email string that incorporates Jackson Su,

7    myself and Mr. Shkreli.

8    Q    What's the time -- what's the date I guess at the top of

9    the email in the chain?

10   A    The top email is December 3rd, 2012.

11            MS. SMITH:  Your Honor, the government moves to

12   admit Government Exhibit 119-22 in evidence.

13            MR. BRAFMAN:  No objection.

14            THE COURT:  We receive 119-22.

15            (Defense Exhibit 119-22, was received in evidence.)

16   BY MS. SMITH:

17   Q    If we can start on page 2 at the bottom.  So do you see

18   the email from Peter Kolchinsky?

19   A    I do.

20   Q    Who is Peter Kolchinsky?

21   A    Peter Kolchinsky is one the principals of RA Capital.

22   It's a fund, an investment fund.

23   Q    What's the date on the email?

24   A    December 2nd, 2012.

25   Q    In this email Peter Kolchinsky is asking for the company

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE – DIRECT – SMITH

1    to send me the last company slides, latest HR chart, latest

2    financials, and latest budget projections.

3              Do you know what company he's referring to here?

4    A    Yes, he's referring to Retrophin.

5    Q    Why is he asking for this information?

6              MR. BRAFMAN:  Objection.

7              THE COURT:  Sustained.

8    Q    What was Peter Kolchinsky's relationship to Retrophin at

9    this time?

10   A    Peter Kolchinsky had been recruited to be the lead

11   investor in raising the funding that was necessary to buy the

12   two commercial products.

13   Q    Was this request made in connection with the funding for

14   the Valeant deal?

15   A    Yes.

16             MS. SMITH:  If we can scroll up to the next email.

17   Q    This email is from Brian O'Connor and it forwards that

18   email to a number of individuals including you and the

19   defendant and Mr. Greebel on December 2nd, 2012.

20             Who is Brian O'Connor?

21   A    He's an employee of the investment bank who was working

22   to try to help us raise the funds.

23   Q    So at this point in December of 2012, December 2nd, was

24   the Valeant deal still a possibility?

25   A    It was still a possibility.

ASELAGE - DIRECT - SMITH

1    Q    We can scroll up to the next email.

2         And just -- we went back to page 1 just to see the

3    header on the email.  It is from you and the date is

4    December 3rd, 2012?

5    A    Yes.

6    Q    Then we'll go back to the second page and look at the

7    email.  Who is that email to?

8    A    That email is to Martin.

9    Q    And can you read the contents of the email.

10   A    I can.  This is from me to Martin.

11        The text is:  I spoke to George about the financial

12   info that Peter asked for.  I got two impressions:  One, those

13   financial documents either don't exist or he doesn't have

14   access to them.  If they do exist and you have them, could you

15   share them with both Jackson and myself.

16   Q    Just to stop you there, were those the financial

17   documents that we saw requested from RA Capital in the

18   original email?

19   A    That's what I'm referring to, yes.

20   Q    Then can you read the second half of your email.

21   A    Yes.  Two, there's been some significant commingle of

22   monies between the fund and the company.  You are likely to be

23   the only person that can untangle them.  With a private

24   company there is some degree of flexibility in doing that.  We

25   can't go public with tangled finances however.  Can you

ASELAGE - DIRECT - SMITH

1    provide an accurate picture of the financial transactions that

2    have involved both fund and company and clarify exactly what

3    money is owed to which entity and for what.

4              Then I end it with, Thanks.  It would be good to get

5    this done quickly so we can get the financials to Peter today.

6    Q    In that second section you're talking about commingling

7    of monies between the fund and company.  What's the fund that

8    you're referring to in that sentence?

9    A    MSMB.

10   Q    And what's the company?

11   A    Retrophin.

12   Q    And what were you talking about when you talked about

13   commingling of monies?

14   A    Well, there was shared office space, shared equipment

15   being used.  Some of the employees seemed to be working for

16   Retrophin but, you know, continuing with some closedown

17   activities of MSMB and it just simply wasn't clear.  I was

18   struggling figuring out what money was actually where and what

19   was being spent by who.

20   Q    At the time did you have access to the books and records

21   of MSMB Capital?

22   A    I did not, no.

23   Q    Did you have access to the books and records of

24   Retrophin?

25   A    Well, that's actually what I was asking for with this

ASELAGE - DIRECT - SMITH

1    email.

2    Q     And what was the concern about the commingling of funds?

3    A     Well, in order for an investor to come in with

4    substantial funding as we were asking Peter to do, they need

5    to be comfortable in the financial structure and the situation

6    of the company.  Without being able to provide that

7    information, I was afraid we would not be able to close the

8    funding round.

9    Q     You also say, we can't go public with tangled financing.

10   Was there a discussion or plan around this time for Retrophin

11   to go from a private company to a public company?

12   A     Yeah, there were discussions by -- I'm not sure exactly

13   when the first discussion started, but certainly by this time

14   in December there was significant discussion about going

15   public.

16   Q     What was the mechanism that was being discussed to take

17   Retrophin public?

18   A     The company was looking for a public shell.  A company

19   that's already public that has a little or no assets to do a

20   reverse merge into that company.

21   Q     And did you have any involvement in the process of

22   choosing the shell or putting together the reverse merger?

23   A     No, I did not.

24   Q     If we can turn to the next email in the chain, which is

25   on page 1 of the document.  And this is an email from the

ASELAGE – DIRECT – SMITH

1   defendant on December 3rd, 2012 to you and copying Jackson Su.

2   And he writes, the auditors are responsible for the financial

3   statements.  I don't know when they will be done.

4          Then if we can scroll up.  And this is your response

5   also on December 3rd, 2012 to the defendant.  And can you read

6   your response, please?

7   A    Sure.  The response is, as I've digested this response,

8   it strikes me as a problematic.  We're responsible for the

9   financials.  The auditors are responsible for certifying them

10  as accurate.  Are you telling me that we don't have accurate

11  financial statements for the company.  Then question marks.

12  Q    What's the concern that you're expressing in this email?

13  A    Two concerns.  One, you know, it seemed like a pretty

14  simple request to get our financial statements and the

15  response would tell me that those aren't readily available.

16  And secondly, the response that it's the auditors that are

17  responsible for our financials simply isn't accurate.

18  Auditors are responsible for reviewing and certifying

19  financials as accurate not for putting them to together.

20  Q    If we can scroll up to the defendant's response.  The

21  defendant responds again copying Jackson Su and he says, talk

22  to Jackson.  Retrophin has an outsourced CFO group called SEC

23  Solutions, they prepare Retrophin's financials.  Those

24  financials are still being prepared.

25         Did you know what SEC Solutions was?

ASELAGE - DIRECT - SMITH

1   A    At the time I did not.  I don't think I had ever heard of

2   SEC solutions at the time, but subsequently I found out they

3   are not auditors but they are an outsourced accounting firm.

4   Q    And if we can scroll up to the final email, and this is

5   an email from Jackson Su to you also on December 3rd.  And he

6   writes:  Martin's transfer of shares from people whom he gave

7   them to and now having them transfer it back to him is

8   delaying the financials to be sent to the auditors for review.

9   Every time this occurs, the accountants have to go back and

10  redo the work, most recently as this morning with the share

11  transfer.  I'm asking the accountants to move as quickly as

12  possible so we can satisfy Peter.

13          At the time, did you have an understanding of what

14  transfer of shares Jackson was referring to here?

15  A    I did not.

16  Q    Did you have other discussions in this time period with

17  Jackson about Retrophin's financials?

18  A    I did.

19  Q    What do you remember about those discussions?

20          MR. BRAFMAN:  Objection.

21          THE COURT:  Overruled.

22  A    I had discussions with both Mr. Su and Mr. Huang.  They

23  tended --

24          THE COURT:  Mr. who?

25          THE WITNESS:  Huang.

ASELAGE – DIRECT – SMITH

1        MR. BRAFMAN:  I'm going to object.

2        THE WITNESS:  George Huang.

3        THE COURT:  Sustained.

4        MS. SMITH:  Your Honor, can I get a sidebar on this?

5        THE COURT:  Yes, of course.

6        (Sidebar conference.)

7        (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          MS. SMITH:  So under 801D(2)(d), these are

2   statements made by the defendant's agents or employees on a

3   matter within the scope of the relationship while it existed.

4          So Jackson and George Huang were both employed by

5   the defendant to do, in part, the financials of the company

6   and to provide information to SEC Solutions and so they were

7   in fact kind of providing Mr. Aselage with information that

8   they had learned from the defendant and in the course of their

9   work at Retrophin about the state of the financials.

10         MR. BRAFMAN:  We don't have any evidence in the

11  record that everything they learned about the financials came

12  from Mr. Shkreli.  They interfaced with accountants, they

13  interfaced with SEC Solutions.  There is no evidence that they

14  are unindicted co-conspirators.  This is classic hearsay and

15  there is no established agency relation with Huang whatsoever.

16  Who testified to --

17         THE COURT:  But they are employees.

18         MR. BRAFMAN:  They are employees of MSMB.  They are

19  not employees of Mr. Shkreli.

20         MS. SMITH:  They are employees of both MSMB and

21  Retrophin.  From everything I heard, Mr. Shkreli is MSMB and

22  Retrophin before it goes public.

23         MR. BRAFMAN:  You can't use that to introduce

24  hearsay and just say that this is a company --

25         MS. SMITH:  They are employees of Mr. Shkreli.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

SIDEBAR CONFERENCE

1        MR. BRAFMAN:  No, they're not.  They're not.

2        MS. SMITH:  They are not employed --

3        MR. BRAFMAN:  They are employees of MSMB and

4   Retrophin, they're not personal employees.

5        MS. SMITH:  Mr. Shkreli is MSMB.  You don't get use

6   as a corporate -- as overhang to say that he's not an employee

7   of -- he was hired by Mr. Shkreli, the employment agreement is

8   with Mr. Shkreli and the entities.  They are employees of

9   Mr. Shkreli, and they are conveying information from him.

10        There are other witnesses that will testify that all

11   of the financial information that was coming to that time to

12   SEC Solutions and to Mr. Su came from Mr. Shkreli.

13        MR. BRAFMAN:  That's not what Mr. Su testified to.

14        MS. SMITH:  That's what Mr. Massella will testify

15   to.

16        MR. AGNIFILO:  Well, the only witness who testified

17   was Mr. Su and that's not what --

18        MS. SMITH:  We can do it subject to connection

19   that's.

20        MR. BRAFMAN:  That's not what he said though.

21        MR. AGNIFILO:  What he said --

22        MR. BRAFMAN:  That's not what he said.

23        MR. AGNIFILO:  The agency principal to work has to

24   be employed by the defendant not by a corporate entity that's

25   not a trial defendant.

SIDEBAR CONFERENCE

1    You didn't indict MSMB, you didn't indict Retrophin,

2    you don't get to use that provision.

3        MS. SMITH:  Then we'll put it in as effect on the

4    listener, what his understanding of what the financial

5    situation was at Retrophin at the time.

6        Which is Mr. Brafman's favorite hearsay.

7        MR. BRAFMAN:  That's not what they're talking about.

8    They're talking about financial information where the

9    declarant is not going to be cross examined and it's offered

10   for the truth of it.

11       THE COURT:  They are not necessarily right now

12   asking about the substance of the financial information,

13   they're just asking about the source and why the accountants

14   are having a difficult time.

15       And then what are you eliciting regarding what

16   Mr. Su and Mr. Huang will tell him about the financials, is it

17   the granular financial info itself or is it what's going on in

18   the process of preparing the financials.

19       MS. SMITH:  It's in the process of preparing the

20   financials for the company to go public.  There was a lot of

21   difficulty getting financial information which is one of the

22   concerns that ultimately leads this witness to step down as

23   CEO.

24       MR. BRAFMAN:  But you can say that.  You can say was

25   there difficulty in getting information and did that cause you

SIDEBAR CONFERENCE

1  to ultimately leave the company.  You don't have to get the

2  testimony as to what the information was from people who are

3  not here to be cross examined, and you could have asked what

4  you asked Su is in the record.  But Huang is not testifying,

5  as I understand it, and even Su said a lot of the information

6  came from a variety of people.

7            MS. SMITH:  I don't think that was his testimony

8  but --

9            MR. BRAFMAN:  We have an objection as to the

10  granular information.  If you want to elicit the fact that --

11            MS. SMITH:  I can do it more generally.

12            MR. BRAFMAN:  -- he left the company.

13            THE COURT:  Okay, good thanks.

14            (End of sidebar conference.)

15            (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

ASELAGE – DIRECT – SMITH

1    (In open court.)

2  BY MS. SMITH:

3  Q    Focusing on the time period of the email the early

4  December 2012, what information did you have about the

5  financial condition of the company?

6  A    As I mentioned, when I first started I thought the

7  company was reasonably well funded and the financing had

8  already been achieved, but I found out shortly after starting

9  that was not the case.  The company was actually very low on

10 cash at that point.  Even expenses were being only

11 intermittently reimbursed.  It was really running on fumes at

12 that time.

13 Q    Following up on this back and forth with the defendant,

14 did you get any further clarity from the defendant on the

15 financial condition of Retrophin?

16 A    I continued to get periodic updates verbally from either

17 Jackson or George, both of whom were involved.  And I

18 continued to hear that funding was in short supply, that we

19 had very little cash in the bank.

20 Q    And was the Valeant deal referenced in this email

21 ultimately completed?

22 A    It was not.

23 Q    What did the defendant tell you about why it didn't work

24 out?

25 A    He told me that at the last second Mr. Kolchinsky from RA

ASELAGE – DIRECT – SMITH

1   Capital had talked to other investors, changed the valuations

2   and that the whole thing fell apart because of RA Capital's

3   activities.

4            (Continued on the next page.)

3336

ASELAGE – DIRECT – SMITH

1   DIRECT EXAMINATION (CONTINUED)

2   BY MR. SRINIVASAN:

3   Q    Did the fact that the Valeant deal fell apart affect

4   Retrophin's decision to go public?

5   A    No, Retrophin was still able to go public.

6   Q    I'm going to show you what's in evidence as Government

7   Exhibit 122-34, which is Tab 13.

8   A    Okay.

9   Q    What is this document?

10  A    It is another email that's written, consent document.

11  Q    What's the date of the document?

12  A    December 12th, 2012.

13  Q    And as a general matter, what does this document do?

14  A    It gives the company the authority to engage in the

15  activities described in the document, which is the reverse

16  merge and to get this in place as shown.

17  Q    And if you can turn to page 4 of the document.

18       And who are the board members at the time of this

19  unanimous written consents?

20  A    Mr. Shkreli, Mr. Richardson, and myself.

21  Q    After the reverse merger was completed and Retrophin

22  became a public company, did you remain on as CEO?

23  A    No, it was about this time that I let Mr. Shkreli know

24  that I felt that I should resign as both the CEO and as a

25  board member.

ASELAGE – DIRECT – SMITH

1   Q    Why did you feel you should resign as both CEO and a

2   board member?

3   A    Well, I felt that the company was being run by

4   Mr. Shkreli.  And I had been hired not really to be the CEO

5   but rather to be an experienced pharmaceutical phase that gave

6   the company a front, you know, that was credible.  Hopefully

7   credible.

8        And he really never had any intention of giving away

9   any decision making or authority and continued to engage in

10  activities that I not only was a part of, I didn't hear about

11  until after they were finished.  It always put me in an

12  untenable position to be CEO of the company that things were

13  happening that I didn't know about.

14       I also found out, to some dismay, that we had no

15  directors and officers insurance for the senior management and

16  the board of the company.  And I asked -- that's a standard

17  piece for any company to have as insurance for the individuals

18  on the board and senior management.

19       I had asked to see our policy when I started, and

20  Mr. Shkreli sent me a D&O policy.  I found out later on that

21  while we had a policy, the premiums for that policy had never

22  been paid, and we were operating in 2012 with no insurance at

23  all.

24  Q    And when you say "policy," you're referring to

25  Retrophin's policy --

ASELAGE – DIRECT – SMITH

1    A    The Retrophin policy, yes.

2    Q    And why is Retrophin's officers' insurance important?

3    A    Well, if the company engages in an activity for which

4    they're sued, I mean even if it's a perfectly legitimate

5    activity, you can sue people, and it's America and everybody

6    can sue everybody.

7         If you're sued -- the company is sued, that

8    liability can be slumped on to the officers and directors if

9    there's no D&O insurance.  It can wipe an individual's entire

10   life savings out very easily if there's no insurance.

11        So to be sent a copy that this is our D&O insurance,

12   and then to find out later that no premium had ever been paid

13   and I was operating completely exposed without knowing that, I

14   found that very discouraging, and I felt like he was

15   dishonest, and I did not feel like I could stay on in CEO role

16   at that time.

17   Q    What about your role as a board member of Retrophin, did

18   you resign from that role as well?

19   A    My initial feedback to him was I wanted to leave both

20   positions.

21   Q    Sorry, when you say your "feedback to him," are you

22   talking about the defendant?

23   A    Mr. Shkreli, yes, sorry.

24        I was going to resign from both positions.  I heard

25   both from Mr. Shkreli and from Mr. Greebel asking if I would

ASELAGE - DIRECT - SMITH

1    stay on as a board member.  Mr. Greebel assured me that D&O

2    insurance was being put in place, that Mr. Shkreli hadn't

3    meant to engage in a deceitful communication, as he simply

4    didn't understand the importance, and Mr. Greebel explained it

5    to him, and now Mr. Shkreli was committed to doing the right

6    thing in that regard.

7            I wrestled with the decision and eventually made a

8    decision that I would stay on the board.

9    Q    And why did you decide to stay on in light of some of the

10   concerns that you expressed?

11   A    Yes, I asked myself that question a number of times and

12   I -- it's not an easy one to answer.

13           I think that the downside we've covered here, the

14   concern I had about, you know, of things happening without

15   visibility; you know, the knowledge, getting a straight answer

16   when I was asking a question.

17           The flip side of that, though, which is invisible in

18   this, is what I talked about previously when Mr. Shkreli

19   talked to investors.  He is a brilliant intellect and a

20   visionary.  I had one of my senior managers describe him as

21   the pied piper.  He tells a story, sings a song, and everybody

22   just wants to follow him.  He can do that.  And I felt like it

23   was a unique talent, and that given the right direction, it

24   could be a unique opportunity to build something really neat.

25   Q    Earlier I believe that you testified that when you were

ASELAGE - DIRECT - SMITH

1    hired by the defendant as CEO, your salary would be $500,000.

2              During your tenure as CEO, between October and

3    December of 2012, were you paid regularly?

4    A    Irregularly, but I was eventually paid.

5    Q    And during that time period, approximately how much did

6    you earn in your position as CEO?

7    A    Just over $80,000.

8    Q    So let's turn to early 2013, right after Retrophin goes

9    public.

10   A    Uh-huh.

11   Q    I'm going to show I what's been marked as Government

12   Exhibit 122-38, which is Tab 14 in your binder, and it's

13   already in evidence.

14              What is this document?

15   A    It's a unanimous written consent.

16   Q    And it says it's of the board of directors of Desert

17   Gateway; is that right?

18   A    Yes.

19   Q    And what is this?  Can you read the second whereas

20   clause?

21   A    Whereas the company, if it desires to change its name to

22   Retrophin, Inc., pursuant to Section 253B of the general

23   corporation law of the state of Delaware.

24   Q    And so what does this unanimous written consent do?

25   A    It takes Desert Gateway, the shell that Retrophin merged

ASELAGE - DIRECT - SMITH

1   into, and it renames it Retrophin.

2   Q    What's the date of this unanimous written consent?

3   A    It is January, then there's a blank area, 2013, and a

4   note that says the scan back shows 123 of 13.

5   Q    And if you turn to the third page of the document.

6        What are those signature lines on this page?

7   A    Mr. Shkreli, myself, and Mr. Richardson.

8   Q    And at this time, in 2013, or January 2013, are these the

9   three members of the Retrophin board?

10  A    They are.

11  Q    I'm going to show you what's been marked for

12  identification as Government Exhibit 122-40, which is Tab 16.

13       Do you recognize this document?

14  A    I do.

15  Q    What is this document?

16  A    It's an email string between myself and Mr. Shkreli.

17  Q    And is it from February of 2013?

18  A    It is.

19       MR. SRINIVASAN:  Your Honor, the government moves in

20  evidence Government Exhibit 122-40.

21       MR. BRAFMAN:  No objection.

22       THE COURT:  We receive 122-40.

23       (Government Exhibit 122-40, was received in

24  evidence.)

25  Q    So if we can start with the bottom email, which is an

ASELAGE - DIRECT - SMITH

1    email from you to the defendant on February 8th, 2013.

2              And what did you write in that email?

3    A    Were you able to close the deal.

4    Q    And what's the subject line?

5    A    Financing.

6    Q    So what deal are you referring to in this email chain?

7    A    At this period of time, Mr. Shkreli was attempting to

8    raise $10 million in a private placement, which is slang

9    termed the "pipe".  The 10 million-dollar pipe was the target

10   financing that the company was trying to do at that time.

11             THE COURT:  For what?  What deal?

12             THE WITNESS:  I'm not sure there was a specific deal

13   that was referenced in this.

14   Q    Was the pipe designed just to generally raise money for

15   the company?

16   A    Yes.

17   Q    And did you have an understanding at this point in

18   February of 2013 of what the company's financial situation

19   was?

20   A    I would assume -- I would assume based on --

21             THE COURT:  Sustained.

22             So don't assume, just based on what you recall or

23   knew based on the circumstance.

24   A    My belief at the time was that prior --

25             MR. SRINIVASAN:  Objection.

ASELAGE - DIRECT - SMITH

1          THE COURT:  If the witness can explain the basis of

2     his understanding of the finances, I will overrule, otherwise

3     I'll sustain.

4          THE WITNESS:  I'll try to respond differently.

5     A    When the company had lowered our money in January of

6     2013, there had been no additional financing up until this

7     pipe was attempted.  So it would be reasonable to assume that

8     they were still rolling our money at that time.

9     Q    So was the February pipe significant to the ability of

10    the company to move forward?

11    A    Yes, it was.

12    Q    And if you can scroll up to the top email in the chain.

13    A    I've got it.

14    Q    And who is that email from?

15    A    Martin Shkreli to myself.

16    Q    And he says:  Thanks.  The big question is we will be

17    okay with the deal being just 8 million or 8.5 million.  I

18    think so, but who knows.

19          Do you have an understanding of whether or not this

20    pipe was successful?

21    A    Yes, my understanding is that the 10 million was raised.

22    Q    In the winter and spring of 2013, did you have any

23    additional discussion with the defendant about the Valeant

24    deal that had fallen apart in December?

25    A    Yes, I believe -- I'm struggling with the exact time

ASELAGE - DIRECT - SMITH

1   period, but I think that's the time period where we had

2   discussions.

3   Q    And what were those discussions?

4   A    I was then no longer working full time at Retrophin, I

5   was still a board member.  I was also working with several

6   other people in our industry, and was asked if there was an

7   opportunity to acquire those products for another company,

8   since Valeant seemed to want to sell them and Retrophin was

9   not able to acquire them.

10        So I did some checking and it looked like it might

11   be possible for another startup company to acquire those

12   products.  After doing that checking, I went back to

13   Mr. Shkreli and double checked to make sure that he was not

14   still trying to acquire them.

15   Q    And what did Mr. Shkreli tell you when you checked with

16   him as to whether Retrophin was still going to still and

17   acquire those drugs?

18   A    Yeah, I was surprised that he said they were.  Because I

19   had -- because I heard previously that we didn't have the

20   funds to do that.  And I had also had discussions with folks

21   at Valeant, because they became increasingly frustrated with

22   our delays in late 2012 and early '13 trying to buy the drugs.

23        The Valeant folks had told me that they had given up

24   on Retrophin, they did not want to work with Retrophin in the

25   future, and yet Retrophin didn't have the funds, and I thought

ASELAGE - DIRECT - SMITH

1    if another company wanted to acquire the product and was in

2    the start, they should be fine.

3            When I checked with Mr. Shkreli, he said absolutely

4    no way, we're still going to go after those products.  And at

5    that point we backed off and did not try to move those

6    products to another company.

7    Q    And after Mr. Shkreli told you that Retrophin was still

8    interested in those products, did you pursue that deal for

9    anybody else?

10   A    No, I did not.

11   Q    Did the defendant ever cause Retrophin to pursue those

12   two products?

13   A    Not that I'm aware of.

14   Q    And do you know where those two products are today?

15   A    They're still at Valeant.

16   Q    What was your role at Retrophin in the early to mid-2013

17   time frame?

18   A    I was a board member but, you know, as I think I've been

19   candid about, was a board member with an expertise in the

20   commercial area and we had no commercial products.  So there

21   was not a lot of interaction between myself and Retrophin

22   management at that time.

23   Q    Had you ever been on the board of a company before?

24   A    Yes, I've been on several boards of private companies.

25   Q    Was this the first time that you were on the board of a

ASELAGE - DIRECT - SMITH

1   public company?

2   A    Yes, it was the first time I was on the board of a public

3   company.

4   Q    And what does it mean to be a board member at a public

5   company?

6   A    It's a pretty broad question, but I think it incorporates

7   a variety of different activities.

8            There's a broad oversight and management

9   responsibility.  There's also responsibility to provide

10  support information, assistance to management on request.

11  Most boards, you know, have a fairly broad background.  Within

12  the structure of the board, some people are strong on the

13  finance side, some on the clinical development side, some on

14  the science side.  My strength was commercial, and I felt like

15  my primary role was supporting on the commercial side.

16  Q    And when there's a board member of a public company, is

17  their duty to the management or to the shareholders?

18  A    We have duties to a number of individuals, but ultimately

19  you have a duty, which I think is to the management and

20  shareholders is to see that the company is run effectively,

21  efficiently and ethically.

22  Q    Did you receive any compensation for being a Retrophin

23  board member in 2013?

24  A    Yes.  I received $6,250.

25  Q    And was that for the entire year of 2013?

ASELAGE - DIRECT - SMITH

1    A    I believe it was.

2    Q    In addition to serving on the board of Retrophin in 2013,

3    were you doing any other work?

4    A    I was.  I did some consulting work for another

5    pharmaceutical company.

6    Q    How often did you meet as the board of Retrophin in the

7    early to mid-2013 time period?

8    A    We had regularly scheduled meetings for once a quarter,

9    and then periodically, if there was a specific issue that

10   needed discussion, there would be an ad hoc meeting called.

11   Q    And did those meetings take place in person or on the

12   telephone?

13   A    Most were telephonic.

14   Q    Who else attended the meetings?

15   A    Regular attendees were the three board members, Evan

16   Greebel.  And at some point in 2013, Marc Panoff, the CFO, was

17   hired, and he was routinely, I think, involved.

18   Q    And what was Evan Greebel's role at the board meetings?

19   A    Evan Greebel was the secretary.  He was outside counsel

20   and functioned as secretary to the board.

21   Q    And what does it mean to be secretary to the board?

22   A    You're taking notes and it's your responsibility to put

23   the board minutes together.

24   Q    And what are board minutes?

25   A    Board minutes are an accurate summary of the discussions

ASELAGE – DIRECT – SMITH

1    and the decisions made by the board during that meeting.

2    Q    And what is the general process by which board minutes

3    are reviewed and approved?

4    A    After the board meeting, the counsel and the secretary

5    puts the minutes together.  Normally those minutes are then

6    included in the briefing book for the following board meeting,

7    and then reviewed -- were sent out before that board meeting,

8    reviewed and approved by the board members before the start of

9    the next meeting.

10   Q    And to the extent that you attended board meetings in

11   person, did you ever observe Mr. Greebel taking notes during

12   board meetings?

13   A    I did, yes.

14   Q    At the board meetings in 2013, did Mr. Greebel provide

15   written minutes of the meetings for the board to review and

16   approve at the next meeting in a manner that you described?

17   A    He did not.

18   Q    And what about in 2014, did Mr. Greebel provide written

19   meeting -- written minutes of Retrophin board meetings for the

20   board to review and approve?

21   A    He did not.

22   Q    And at any point when Mr. Greebel was the secretary for

23   the Retrophin board, did you ever see, review, and approve

24   board minutes?

25   A    I did not.

ASELAGE – DIRECT – SMITH

1   Q    Who was leading the board meetings?

2   A    Well, Steve Richardson was the chairman of the board and

3   was in charge from a technical perspective, but Marcum

4   actually drove the agendas and on a very consistent basis.

5   Q    And who was doing the most speaking at the board

6   meetings?

7   A    Martin.

8   Q    How was the agenda set for the meetings?

9   A    It was set by Martin, Marc Panoff, and Evan Greebel.

10  Q    And did any other individuals make presentations at board

11  meetings?

12  A    Rarely.  I believe there was an occasion when an outside

13  compensation consultant made a presentation.  It's the only

14  one I recall, at least during this time period.

15       There were subsequent board meetings in 2014, after

16  the research and development organization had been further

17  expanded where there were updates that came out of the R&D

18  group.

19  Q    And in addition to serving as the secretary at board

20  meetings, did Mr. Greebel ever provide the board with

21  litigation updates?

22  A    Sometimes, yes.

23  Q    What kind of litigation would he update the board on?

24  A    We had a variety of lawsuits coming in through 2013.  The

25  two individuals that I previously mentioned as employees,

ASELAGE – DIRECT – SMITH

1   Jackson Su and George Huang both filed suit.  We had a suit

2   come in from Charles Schwab.  A suit come in from Guggenheim.

3   Later on we had a suit from Donahue over a short-term

4   situation.  And normally we would get litigation updates on

5   those type of lawsuits or threatened lawsuits.

6   Q    I'm going to show you what's been marked as Government

7   Exhibit 123-43, which is Tab 17 in your binder, and it's

8   already in evidence.

9            Your Honor, I think I misspoke.  It's actually

10  Government Exhibit 122-43.  I think I said 123-43.  I

11  apologize.

12           THE COURT:  No problem.

13           123-43 in evidence.

14           (Government Exhibit 123-43, was received in

15  evidence.)

16  Q    Do you recognize this email?

17  A    Yes.

18  Q    Who is the email from?

19  A    Marc Panoff.

20  Q    And remind us, who is Marc Panoff?

21  A    The chief financial officer.

22  Q    When did Marc Panoff join Retrophin?

23  A    I don't recall the exact date, it was sometime in the

24  2000 -- first half of 2013.

25  Q    What was your impression of Mr. Panoff?

ASELAGE - DIRECT - SMITH

1   A    He seemed like a nice young man.  A good financial

2   background.

3          I wasn't involved in interviewing him for the

4   position, so I didn't really know much about him when he came

5   in, other than he created a good first impression.

6   Q    And what's the date of this email?

7   A    July 2nd, 2013.

8   Q    And what's the subject line?

9   A    Re, board call.

10  Q    And is it to the defendant, yourself, Mr. Richardson, and

11  Mr. Greebel?

12  A    It is.

13  Q    And what is attached to this email?

14  A    There are a variety of attachments, including Exhibit A,

15  2013 cash flow --

16  Q    Sorry, without reading all the items, as a general

17  matter.

18  A    There are five or six different attachments for review at

19  the board meeting.

20  Q    And if you look at first sentence of the email, it says,

21  attached please find the agenda for tomorrow's board call as

22  well as related exhibits?

23  A    Yes.

24  Q    Are those the documents attached to the email?

25  A    Yes.

ASELAGE - DIRECT - SMITH

1  Q    Was this the particular way in which you received

2  documents or information for a telephonic board meeting?

3  A    Yes.

4  Q    What was your general process for reviewing materials

5  that were sent in connection with a board meeting?

6  A    The board materials usually came fairly shortly before

7  the board meeting.  There wasn't much time.  If there was

8  time, I would skim through the materials, because as I said,

9  we get a lot of materials and not much time.  If they came

10 right before the board meeting, I might not see them until

11 we're actually in the board meeting.

12 Q    And if you look at the bottom email, the first email in

13 the chain, Mr. Panoff writes:  Martin and I would like to

14 schedule a board call for this week to update you on the

15 financing process, as well as the company's current financial

16 position and operating plan.

17         When financial information was discussed at a board

18 meeting, who did you rely on to help you understand that kind

19 of information?

20 A    Mr. Panoff.

21 Q    And did you have any accounting or financial background?

22 A    I took one semester of basic accounting in 1970, so no.

23 Q    What about if any legal issues were discussed at a board

24 meeting, who did you rely on to help you understand the legal

25 issues?

ASELAGE - DIRECT - SMITH

1    A    Evan Greebel.

2    Q    And as a result of your background at other

3    pharmaceutical companies, were there areas of expertise that

4    you brought to bear at board meetings?

5    A    Sure.  I think I've said several times, my core area of

6    expertise is commercialization of pharmaceutical products.

7    And I have other areas that I've worked in; post-marketing

8    registries, medical education, those types of things,

9    industry-sponsored trials.  But commercialization is my core

10   area of expertise.

11   Q    So if we can look at the first attachment to this email,

12   which is on page 2 of the document, and the first tab.

13   A    Got it.

14   Q    So this document is titled "Summary Cash Flow for the Six

15   Months Ending June 30th, 2013."  Reviewing the first section,

16   it says financing proceeds, and shows almost $10 million for

17   the first quarter of 2013.

18        Are these the proceeds from the February 2013 pipe

19   that we discussed earlier?

20   A    Yes.

21   Q    And looking at the balance sheet as a whole, what does it

22   say about a how quickly Retrophin was using the proceeds of

23   that pipe?

24   A    Well, it certainly appears that almost the entire

25   proceeds were burned through in the first quarter of 2013.

*LINDA D. DANELCZYK, RPR, CSR*
*Official Court Reporter*

ASELAGE - DIRECT - SMITH

1  Q    Did the company have any marketable products at this

2  point?

3  A    No, I said the first quarter -- excuse me, the first half

4  of 2013.

5  Q    Did the company have any marketable products in the first

6  half of 2013?

7  A    We did not.

8  Q    So was there any money coming in to the company, other

9  than what could be raised through an investment like a pipe?

10 A    There was not.

11 Q    What's the impact on a pharmaceutical company like

12 Retrophin when the cash balance in the company is very low and

13 there are no revenues?

14 A    You simply have to cut back on your expenses.  That could

15 mean putting less resources into your development programs,

16 you know, having fewer clinical trial sites.  Anything you can

17 do to squeeze more time, you need to do.

18 Q    And specifically with respect to research and

19 development, what is the impact of the low cash flow at this

20 point on research and development?

21 A    Well, we were trying to get a study out to take a product

22 called parsynthian (phonetic) through what we hoped to be a

23 registration trial, and that trial went very, very slowly.

24 And there may be a lot of reasons for that, and at least one

25 of the reasons may have been a lack of resources for the

ASELAGE – DIRECT – SMITH

1    trial.

2            MS. SMITH:  And if you can zoom in on the bottom

3    half of the document, Ms. Zellan.

4    Q    And if look towards the bottom of this section, there's a

5    line titled "MSMB settlements," and there are three names next

6    to it.

7            In June 2013, did you know who Spencer Spielberg

8    was?

9    A    I did not.

10   Q    Do you know who Sarah Hassan was?

11   A    I did not.

12   Q    Did you know what Trachtenberg & Rodes was?

13   A    I did not.

14   Q    Do you remember any discussion of this line item at the

15   meeting?

16   A    I do not.

17   Q    And in June 2013, did you have any idea what the

18   reference to MSMB settlement was?

19   A    I did not.

20   Q    In general, do you remember any discussions with the

21   defendant about his salary at Retrophin?

22   A    I remember general discussions, not that I can tie

23   specifically to this particular meeting, but his consistent

24   message was that he wanted to keep his cash compensation very

25   low, he didn't need money, he was already very wealthy, and he

ASELAGE - DIRECT - SMITH

1   was going to make himself very rich by driving the value of

2   the stock, since he had a huge equity stake in the company and

3   that was the best way for him to make money.

4   Q   When you say a "huge equity stake," what do you mean?

5   A   He owned a lot of the stock.

6   Q   I want to turn now to a document from another board

7   meeting in 2013, and starting with Government Exhibit 122-48,

8   which is Tab 18.

9       What is this document?

10   A   It's another email from Marc Panoff relative to another

11   board meeting.

12   Q   And what's the date of the email?

13   A   September 9th, 2013.

14   Q   And who is copied on the email?

15   A   Steve Richardson, myself, and Martin Greebel.  Excuse me,

16   Martin Shkreli and Evan Greebel.

17   Q   And the email says:  Attached please find the board

18   agenda and all supporting documents, with the exception of the

19   amended 10K, amended March 10Q, and the June 10Q.  We are

20   still waiting on comments from Marcum.  We'll have these

21   documents to you as soon as we can prior to the call.

22       There's a reference there to Marcum.  What was

23   Marcum?

24   A   They were our auditors at the time.

25   Q   And it also references 10Ks, and 10Qs.  What are --

ASELAGE - DIRECT - SMITH

1   what's a 10K?

2   A    It's an SEC document.  Files the annual status of the

3   company's business operation.

4   Q    And what's a 10Q?

5   A    Same thing, but on a quarter basis.

6   Q    And does this email also say that there will be

7   additional documents prior to the call?

8   A    Yes.

9   Q    And what's the time of this email?

10  A    4:32 p.m.

11  Q    If we can look now at Government Exhibit 122-50, which is

12  behind Tab 19, and it's already in evidence.

13          What's the date of this email?

14  A    September the 9th.

15  Q    And who is it from?

16  A    Marc Panoff.

17  Q    What's the subject line?

18  A    Additional board documents.

19  Q    And attached to this email is a 10K, 10Q, audit

20  communications and another 10Q.

21          Are these the additional documents referenced in the

22  prior email, which was Government Exhibit 122-48?

23  A    Yes.

24  Q    And if we can now turn to Government Exhibit 122-49,

25  which is Tab 20.

ASELAGE – DIRECT – SMITH

1          MS. SMITH:  Can we just hold on one second, Your

2    Honor?

3          (Pause.)

4    BY MS. SMITH:

5    Q    Sorry about that.  So we were looking at Government

6    Exhibit 12 to-49.  And if we can zoom in on the top half.

7          What is this document?

8    A    It's a agenda for the board meeting for September the

9    9th.

10   Q    And is this the agenda for the board meeting related to

11   those two emails that we just saw attaching the various

12   documents for the board meeting?

13   A    Yes, it is.

14   Q    And it says this is a telephonic board meeting; is that

15   right?

16   A    It does.

17   Q    Did you attend this meeting?

18   A    I did.

19   Q    If you look at the second agenda item there, it says:

20   Review and approve amendments to the 2012 10K and the 10Q for

21   the quarter ended March 31st, 2013.

22          Are amendments to prior SEC filings also known as a

23   restatement?

24   A    Yes, ma'am.

25   Q    What do you remember about a discussion at this board

ASELAGE - DIRECT - SMITH

1    meeting about the restatement of Retrophin's financials in the

2    fall of 2013 due to settlement agreements?

3    A    I don't recall anything relative to settlement

4    agreements.  My recollection is that there were some

5    accounting issues that needed to be rectified.

6    Q    Was the restatement presented as an issue for the board

7    to receive, or an issue that had already been resolved?

8    A    It was an issue that had already been resolved.  It was

9    presented for the board to approve.

10   Q    In connection with the restatement, was there ever a

11   discussion with the board that the settlement agreements were

12   being used to repay MSMB investors with monies or shares from

13   Retrophin?

14   A    No.

15   Q    Did the board ever review the settlement agreements?

16          MR. BRAFMAN:  Objection as to the form of the

17   question.

18   Q    What discussions, if any, did the board have regarding

19   settlement agreements that were being used to repay MSMB

20   investors with money or shares from Retrophin?

21          MR. BRAFMAN:  Objection as to the form of the

22   question.

23          THE COURT:  Overruled.

24   A    No.

25   Q    The question was what discussions, so is the answer that

ASELAGE - DIRECT - SMITH

1   there were no discussions?

2   A   There were no discussions.

3   Q   Did the board ever approve settlement agreements that

4   were being used to repay MSMB investors with money or shares

5   from Retrophin?

6   A   No.

7   Q   Earlier you said that Mr. Greebel sometimes presented

8   litigation updates on various lawsuits.

9       Were the settlement agreements presented to the

10  board as part of litigation updates?

11  A   No.

12  Q   Was the board informed that the settlement agreement with

13  MSMB investors were necessary to avoid a lawsuit against the

14  defendant or against Retrophin?

15  A   No.

16  Q   If you look back at Government Exhibit 122-49, item

17  number six says:  Discuss appointment of Cornelius Golding

18  Jeff Paley to the board.

19       Who is Cornelius Golding?

20  A   Cornelius Golding was a prospective board member with an

21  extensive history of experience in the finance field.

22  (Continued following page.)

23

24

25

ASELAGE - DIRECT - SMITH

1   BY MS. SMITH:

2   Q     Did he go by Neal?

3   A     Yes, he did.

4

5   Q     Who was Jeff Paley?

6   A     Jeff Paley was a physician here in New York.

7   Q     Were those two individuals ultimately appointed to the

8   Board of Retrophin?

9   A     They were.

10  Q     When did that occur?

11  A     Shortly after this meeting.

12  Q     Why was Retrophin looking to add additional Board members

13  at this time?

14  A     By the fall of 2013 there was discussion about the

15  company being listed on the NASDAQ exchanges, there are two

16  major exchanges, the New York and the NASDAQ.  We were pink

17  sheet stock, which is a way of trading stock which is very

18  illiquid, it's hard to work with.  And NASDAQ was a big step

19  for us.  But NASDAQ has substantial requirements that we were

20  not meeting at the time; part of which was having at least

21  three independent directors.  These people were being added to

22  meet the NASDAQ requirements.

23  Q     What does it mean to be an independent director?

24  A     Not an employee of the company or past employee of the

25  company in a short period of time.

ASELAGE - DIRECT - SMITH

1   Q    If we look back at 122-49 one more time, we look at item

2   number nine on the agenda.  That says, "approve retaining Al

3   Geller, Ken Banta as consultants."  Taking a step back, based

4   on your experience in the pharmaceutical industry, what kind

5   of consultant would you expect a company like Retrophin to

6   hire?

7   A    We might have a variety of types, historically I see more

8   consultants hired in the research and development area than

9   anywhere, particularly if your company is like Retrophin that

10  doesn't have your own lab space, you count on external sources

11  to provide information.  Consultants in the CMC, chemistry and

12  manufacturing the space, are not unusual.  You can sometimes

13  have general management consultants.  It's normal for

14  companies to have a compensation consultant.  Radford is the

15  gold standard for compensation consultants.  We still use them

16  today.

17  Q    During your time as a Board member at Retrophin, did you

18  remember any discussion about authorization for the defendant

19  or other members of Retrophin management to hire consultants?

20  A    There were discussions at various times related to

21  Mr. Shkreli's ability to authorize expenses, whether they were

22  consultants or purchase orders for equipment.  And the

23  discussions centered around how much leeway he would have to

24  unilaterally authorize expenses.  There was a moving target on

25  that.

ASELAGE - DIRECT - SMITH

1        It started out very low, I thought too low actually.

2   I believe the initial Board recommendation was anything over

3   $50,000 required some type of Board approval.  That was

4   eventually moved up to 100, I think 150, maybe eventually to

5   $250,000.

6   Q    Do you remember reviewing or discussing either of these

7   two individuals at consultants at the September 9, 2013 Board

8   meeting?

9   A    These two specific individuals, no, I do not.

10  Q    At this point, September 2013, did you know who Alan

11  Geller was?

12  A    No.

13  Q    What about Lee Yaffe?

14  A    No.

15  Q    Did you know what EFAY was?

16  A    No.

17  Q    Did you know who Darren Blanton was?

18  A    No.

19  Q    Did you know who Steven Rosenfeld was?

20  A    No.

21  Q    Did the Retrophin Board ever discuss the use of

22  consulting agreements to repay MSMB investors with Retrophin

23  shares or stock?

24  A    No.

25  Q    Did the Retrophin Board ever approve the use of

ASELAGE - DIRECT - SMITH

1   consulting agreements to repay MSMB investors with Retrophin

2   shares or stock?

3   A    No.

4   Q    Did the Retrophin Board ever discuss the use of

5   consulting agreements to repay investors in other funds run by

6   the defendant with Retrophin shares or stock?

7   A    No.

8   Q    Did the Retrophin Board ever approve the use of

9   consulting agreements to repay investors in other funds with

10  the defendant with Retrophin shares or stock?

11  A    No.

12  Q    I'm going to show you what is marked Government's Exhibit

13  122-58, which is tab 26, already in evidence.  If we start

14  with the bottom e-mail, who is the bottom e-mail from?

15  A    David Kravitz.

16  Q    If we start on the first page, sorry, I apologize.  We'll

17  start with the e-mail from Mr. Kravitz.  Starting with the

18  e-mail from Mr. Kravitz on January 6, 2014, that's an e-mail

19  to Marc Panoff, yourself, Mr. Richardson, Mr. Golding,

20  Mr. Paley, the defendant, and CCed to Mr. Greebl and someone

21  named Christine Giordano.  At this point, early 2013, were

22  Mr. Golding and Mr. Paley on the Board of Retrophin?

23  A    2014 they were on the Board.

24  Q    Did you know who David Kravitz was?

25  A    Only from the e-mail, he's obviously a Capuchin employee.

ASELAGE - DIRECT - SMITH

1    Q    Other than Mr. Greebel, did you every deal with anyone

2    directly at Capuchin?

3    A    I did not.

4    Q    What is the subject line for the e-mail?

5    A    Board call.

6    Q    If we can scroll to the top e-mail, this is a response

7    from Mr. Richardson also sent on January 6, 2014.  He writes,

8    "We need to set a standard for issuing these materials ahead

9    of Board calls so we can conduct an adequate review of all

10   materials.  Getting them straight ahead of a call does not

11   allow us to fulfill our oversight role adequately.  I suggest

12   48 hours minimum on most item."  What was your reaction to

13   this e-mail?

14   A    He put on paper what had been requested verbally

15   previously.  There was a consistent pattern of getting things

16   at the last second where there wasn't time to do any thorough

17   review.

18   Q    After Mr. Richardson sent this e-mail, did that improve?

19   A    No.

20   Q    The e-mail is from January 2014, were there any big

21   developments for Retrophin in 2014?

22   A    January of 2014, can you give me a specific that you

23   might be asking for?

24   Q    With respect to whether Retrophin was listing on the pink

25   sheets or the NASDAQ?

3366

ASELAGE – DIRECT – SMITH

1   A    Retrophin did uplift to the NASDAQ in January 2014.

2   Q    Again, can you explain what that means to uplift to

3   NASDAQ?

4   A    NASDAQ is an exchange that virtually all investors are

5   familiar with.  It's easy to do electronic or online trading

6   of stocks.  NASDAQ brings a certain level of respect to the

7   company because they have guidelines, rules, you have

8   financial and structural requirements that have to be met in

9   order to be listed on the NASDAQ.  So being able to uplift to

10  NASDAQ was kind of a message to the world that we were a real

11  company, you should take a look at Retrophin.

12  Q    I'm going to show what you is marked for identification

13  as Government's Exhibit 122-61, which is tab 27, do you

14  recognize this document?

15  A    I do.

16  Q    What is this document?

17  A    It's an e-mail string between Martin Shkreli and myself.

18  Q    Is it from February of 2014?

19  A    It is.

20  Q    Is it related to business at Retrophin?

21  A    It is.

22       MS. SMITH:  Your Honor, the Government moves to

23  admit Government's Exhibit 122-61 into evidence.

24       MR. BRAFMAN:  No objection.

25       THE COURT:  We'll receive 122-61.

ASELAGE - DIRECT - SMITH

1        (Government Exhibit 122-61, was received in

2   evidence.)

3   Q    If we can start with the bottom e-mail on the first page.

4   This is an e-mail from you to the defendant on February 6,

5   2014.  If you can read the e-mail for us.

6   A    Sure.  "Hi Martin.  Hope all is well and the weather

7   let's me get in and out of NYC next week.  I'll arrive in

8   plenty of time for dinner, fly out Thursday night at 7:10

9   hopefully that will work.  Also have been talking to Chris and

10  he filled me in a bit.  It sounds like he's not going to be

11  available to help with autism planning.  A group that worked

12  with Chris on autism and knows the space pretty well is headed

13  by Tim Rice.  The company is Symbiotix..  Tim is the founder

14  and principal.  I've known him since 1987.  I think very

15  highly of him.  If you'd like an introduction I'm happy to do

16  that online or in person.  Let me know."

17  Q    If we can go back to the first page now, zoom in on the

18  e-mail again, the same e-mail at the bottom.  You reference in

19  this email you're going to be flying in and out of New York

20  City next week?

21  A    Yes.

22  Q    Was that related to a Retrophin Board meeting?

23  A    I don't recall why I was flying in and out of New York

24  City next week.

25  Q    You were talking about speaking to someone named Chris,

ASELAGE – DIRECT – SMITH

1    what were you kind of discussing with the defendant in this

2    part of the e-mail?

3    A    Yes.  Martin, had indicated that he had an interest in

4    autism, with one of the drugs he was acquiring or trying to

5    acquire, Chris Schelling is a former co-worker who had

6    spearheaded an effort to treat a autistic children with a

7    product that the, the bottom line had, a fair amount of

8    experience on.  He had worked with an outside medical

9    education firm, Symbiotix on that product.

10        I thought if Martin was going into the autism area,

11   having someone who had experience and expertise in the area

12   might be useful to him.  I was offering him resources if he

13   wanted.

14   Q    If we can move up to the defendant's response.  The

15   defendant writes, "These are the diagnostic guys, I think.

16   Retrophin is close to an acquisition of a very unique orphan

17   drug company with a marketed drug call Manchester.  This is a

18   very Aselage-style play.  Can we chat tomorrow?"

19        Did you have an understanding what the defendant

20   meant when he said, "this is a very Aselage-style play."

21   A    No.  I'm not sure what that meant, other than I have a

22   fair amount of experience in ultra-rare diseases.  Certainly

23   have spent a fair amount of time working on ways to get better

24   diagnostics done with patients with rare diseases.  This is a

25   disease, as it turned out, is very difficult to diagnose

ASELAGE - DIRECT - SMITH

1    early.  The significant morbidity for patients is a

2    consequence of late diagnosis.  So my guess is that's what

3    he's referring to, but I can't tell you that for sure.

4    Q     What is the reference to Manchester here?

5    A     Manchester is a company that Retrophin acquired.

6    Q     When did it acquire Manchester?

7    A     Around this time, February or March of 2014.

8    Q     Why did it acquire Manchester?

9    A     They have the Chenodal product, which I was referencing,

10   which gave Retrophin it's first commercial product.

11   Q     Prior to purchasing the drug or purchasing the Manchester

12   company, did Retrophin have any products?

13   A     Not on the market, no.

14   Q     Were there any products in development at this point?

15   A     I'd have to go back and reference timelines, but I think

16   Martin had acquired several other products by 2014.  I believe

17   he acquired Oxytocin by 2014.  I believe the inhale ketamine

18   product by 2014.

19   Q     Was Retrophin actually selling any of these products at

20   the time?

21   A     No, they were development assets, not commercial assets.

22   Q     If we scroll up to the next e-mail.  Your response on

23   February 7, can you read your response?

24   A     Sure.  "Can talk any time tomorrow.  I've got a full day

25   Saturday, and I'm hanging out taking easy tomorrow.  Symbiotix

ASELAGE - DIRECT - SMITH

1    is therapeutic focused, can fill you in tomorrow.  Call

2    anytime.  If you have a good time, let me know and I'll call

3    you."

4    Q    What was the defendant's response just above that?

5    A    "Can I call you at 11:00 a.m. Eastern time, 8:00 a.m.

6    Pacific time?"

7    Q    The top of the e-mail is your response saying, "Sorry,

8    just saw this.  Call any time.  I'm in my office now."

9         What was your relationship like with the defendant

10   at this point in February of 2014?

11   A    I think it was professional.  I saw myself as having a

12   role that if he had assets that I could be of help to him.  I

13   was certainly more than willing to do that.

14   Q    At this time in February 2014 had you had any major

15   disagreements with the defendant?

16   A    I think we didn't always see eye to eye on value of some

17   business development targets, but I would not say we had

18   significant disagreements, no.

19   Q    Was your relationship cordial or not cordial?  What was

20   the nature of it?

21   A    I would define it as cordial.

22   Q    I'm going to show you what is in evidence as 122-64, tab

23   29 in your binder.  What is the date of this e-mail?

24   A    February 11, 2014.

25   Q    Who is it from?

ASELAGE - DIRECT - SMITH

1    A    Marc Panoff.

2    Q    Who is it to?

3    A    Martin Shkreli, Neal Golding, Jeff Paley, myself, and

4    Steve Richardson, copies to Greebel and Blanton.

5    Q    What is the subject line?

6    A    "Board agenda 214, 13 offset."

7    Q    The e-mail says, "Attached please fine agenda and

8    supporting schedule for Thursday's meeting which will begin at

9    10:30 a.m. in Norwood Club.  We're working to finalize the

10   presentation deck and will have handouts at the meeting."Did

11   you attend this meeting in person?

12   A    I did.

13   Q    So does that refresh your recollection that the last

14   e-mail we looked at, from the week before, was referencing a

15   New York trip?

16   A    Yes, I'm sure this is what it's for then.

17   Q    There are two people copied on the e-mail, Mr. Greebel

18   and Ken Banta.  At this point in 2014 what was Ken Banta's

19   position or relationship to Retrophin?

20   A    Ken Banta by this time, I believe by this time I was

21   aware that he was a consultant for Martin.  He had an office

22   set up in our New York facilities.

23   Q    What was your observation of what Ken Banta did for

24   Retrophin?

25   A    It wasn't clear.  What I gathered was some kind of

ASELAGE − DIRECT − SMITH

1    general corporate management, pharmaceutical advisor, nothing

2    was very well defined.

3    Q    What is the Norwood Club?

4    A    Some type of a social club that Ken Banta was a member

5    of.

6    Q    Do you know who arranged this particular meeting at the

7    Norwood Club?

8    A    The fact that Ken Banta is on the e-mail, would make me

9    believe that Ken Banta did.

10   Q    If you turn to page two of the document, which is the

11   cover of the agenda for the Board of Directors meeting, then

12   we can turn to page three.  In the morning session there is a

13   line number for "pipeline update," what is a pipeline update?

14   A    That was a overview of progress with moving our

15   developmental programs closer to the market.

16   Q    What do you remember about this particular meeting at the

17   Norwood Club?

18   A    It was a very unusual meeting; in that, we had two of our

19   research and development people there, Dr. Srinivas Rao, who

20   was head of research and development, and Horacio Plotkin,

21   Chief Medical Officer at the time.  There was a very lively

22   hostile interaction between Dr. Plotkin and Mr. Shkreli at

23   this meeting.

24        THE COURT:  Excuse me, I think some of the jurors

25   would like to have a break right now.  Sorry to interrupt.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE – DIRECT – SMITH

1          Let's take twn minutes, ladies and gentlemen.  Don't

2     talk about the case.

3          THE COURT:  You can step down also.

4          (Jury exits the courtroom.)

5          (Whereupon, the witness steps down.)

6          THE COURT:  Let's take ten minutes, I'm sorry to

7     interrupt you.

8          (Jury enters the courtroom.)

9          THE COURT:  All of our jurors are present and I

10    wanted to just announce that we will adjourn a little bit

11    early today.  Just to remind you, please don't discuss the

12    case with anybody, avoid all media coverage about the case for

13    Mr. Shkreli.  And have a good evening.  Thank you for your

14    ongoing attention.

15         You can leave your notebooks on the chairs.  We'll

16    see you tomorrow morning at 9:00 o'clock.  Thank you very

17    much.

18         *          *          *          *

19         (Proceedings adjourned at 3:45 p.m. to resume on

20    July 14, 2017 at 9:00 a.m.)

21

22

23

24

25

1                           I N D E X

2     WITNESS                                PAGE

3
      D. GELLER
4
      DIRECT EXAMINATION    BY MR. SRINIVASAN  3142
5
      CROSS-EXAMINATION     BY MR. BRAFMAN     3171
6
      REDIRECT EXAMINATION  BY MR. SRINIVASAN  3291
7
                      *       *       *       *
8

9                       E X H I B I T S

10    DEFENSE                   PAGE
      5484                      3274
11    5485                      3279
      5486                      3281
12    5487                      3286
      122-25                    3308
13    119-22                    3322

14
      GOVERNMENT                PAGE
15    109-10                    3145
      109-11                    3147
16    109-12                    3149
      109-18                    3151
17    109-17                    3152
      109-21                    3153
18    109-22                    3163
      55                        3164
19    109-24                    3166
      122-40                    3341
20    123-43                    3350
      122-61                    3367
21

22

23

24

25

                  Rivka Teich CSR, RPR, RMR
                    Official Court Reporter

**COURTROOM DEPUTY: [1]** 3141/24

**MR. AGNIFILO: [3]** 3331/15 3331/20 3331/22

**MR. BRAFMAN: [159]** 3145/2 3146/16 3147/16 3149/14 3150/18 3151/9 3152/20 3153/21 3156/6 3156/12 3156/15 3159/1 3159/8 3160/24 3163/1 3164/1 3166/19 3170/14 3171/2 3174/2 3174/4 3174/22 3175/1 3175/22 3175/25 3177/17 3177/20 3178/6 3179/18 3179/23 3180/8 3180/10 3181/2 3181/11 3183/4 3183/12 3183/19 3183/25 3184/6 3184/18 3185/7 3185/11 3186/3 3186/6 3186/12 3186/16 3193/12 3193/16 3196/16 3197/3 3197/8 3197/13 3197/18 3202/3 3202/8 3202/18 3202/25 3209/3 3209/6 3209/8 3210/3 3210/5 3211/16 3212/14 3212/21 3213/5 3214/11 3214/18 3220/19 3225/21 3227/13 3227/16 3228/3 3228/5 3230/22 3230/24 3231/2 3232/10 3233/19 3236/1 3236/19 3237/12 3237/14 3237/20 3237/23 3238/18 3238/22 3238/24 3239/12 3239/17 3240/8 3240/16 3240/21 3241/8 3241/11 3242/3 3242/6 3242/8 3242/25 3243/21 3244/3 3244/13 3244/20 3244/22 3244/25 3245/5 3245/9 3245/16 3245/18 3245/25 3246/3 3246/8 3246/11 3246/14 3246/23 3248/18 3252/4 3256/13 3257/12 3267/9 3270/3 3272/8 3273/24 3278/19 3278/24 3279/1 3279/3 3279/10 3281/6 3281/24 3283/7 3283/13 3288/5 3291/2 3295/5 3295/25 3305/10 3308/4 3315/14 3322/12 3323/5 3328/19 3328/25 3330/9 3330/17 3330/22 3330/25 3331/2 3331/12 3331/19 3331/21 3332/6 3332/23 3333/8 3333/11 3341/20 3359/15 3359/20 3366/23

**MR. SRINIVASAN: [133]** 3142/9 3142/11 3142/19 3145/4 3147/14 3149/12 3151/7 3152/18 3153/19 3157/23 3159/18 3162/24 3163/24 3166/17 3170/16 3170/21 3170/24 3173/24 3174/20 3175/20 3176/6 3176/25 3177/12 3178/11 3178/25 3179/16 3181/5 3182/6 3182/25 3184/21 3185/2 3185/17 3186/9 3193/5 3193/9 3193/14 3194/9 3194/21 3195/1 3195/16 3196/1 3196/11 3197/11 3200/12 3201/6 3202/4 3207/2 3207/11 3207/24 3208/25 3209/4 3211/7 3211/15 3212/4 3212/12 3212/17 3213/2 3213/13 3214/16 3220/7 3220/18 3221/2 3222/10 3222/21 3223/13 3225/13 3225/20 3225/25 3229/16 3230/1 3230/9 3230/20 3230/23 3232/5 3232/8 3233/6 3233/10 3233/23 3234/24 3235/1 3235/6 3237/22 3238/10 3240/6 3242/1 3242/5 3242/11 3244/6 3245/17 3249/22 3251/3 3252/8 3252/20 3254/5 3256/9 3256/12 3257/9 3258/21 3259/4 3259/13 3264/22 3266/6 3266/23

3267/8 3268/11 3268/15 3268/19 3270/9 3270/17 3270/23 3272/5 3273/9 3274/1 3277/1 3277/6 3278/18 3279/12 3281/8 3281/23 3283/9 3283/16 3284/22 3286/11 3288/2 3288/16 3290/8 3290/15 3290/18 3291/5 3293/1 3295/22 3341/18 3342/24

**MS. KASULIS: [9]** 3158/22 3160/7 3182/24 3186/7 3196/12 3238/11 3239/9 3239/16 3313/10

**MS. SMITH: [26]** 3243/18 3243/23 3245/6 3245/15 3246/12 3246/19 3297/6 3308/2 3308/7 3322/10 3323/15 3329/3 3329/7 3330/19 3330/24 3331/1 3331/4 3331/13 3331/17 3332/2 3332/18 3333/6 3333/10 3355/1 3357/25 3366/21

**R ONE: [1]** 3286/10

**THE COURT: [213]** 3142/1 3142/10 3142/18 3145/8 3146/17 3147/17 3149/15 3150/19 3151/10 3152/21 3153/22 3156/9 3159/5 3160/16 3163/2 3164/2 3166/20 3170/15 3170/17 3171/1 3171/3 3174/1 3174/3 3174/23 3175/21 3175/24 3176/7 3177/1 3177/13 3178/12 3179/1 3179/17 3179/20 3180/7 3180/9 3180/25 3183/8 3183/13 3183/23 3184/1 3184/17 3184/24 3185/3 3185/9 3185/25 3186/4 3186/11 3186/13 3186/18 3187/2 3193/6 3193/10 3193/15 3194/10 3194/22 3195/2 3195/17 3196/3 3196/13 3197/2 3197/6 3197/9 3197/16 3200/13 3202/10 3202/17 3207/3 3207/12 3207/25 3209/1 3209/7 3209/9 3210/1 3210/4 3210/7 3212/6 3212/13 3212/19 3212/22 3213/4 3213/14 3214/10 3214/17 3215/6 3220/21 3221/3 3222/12 3222/14 3222/22 3225/15 3225/17 3226/1 3227/15 3227/18 3227/22 3228/1 3228/4 3230/2 3230/11 3230/21 3230/25 3232/9 3232/20 3233/7 3233/17 3233/20 3233/24 3235/3 3236/13 3236/16 3237/10 3237/13 3237/18 3237/21 3238/13 3238/19 3238/23 3239/8 3239/10 3240/13 3240/19 3241/5 3241/10 3242/7 3242/9 3242/17 3244/11 3244/15 3244/21 3244/24 3245/3 3245/20 3246/2 3246/4 3246/9 3246/16 3246/21 3248/22 3248/11 3248/19 3249/24 3251/4 3252/6 3256/10 3257/11 3258/22 3259/5 3259/14 3264/23 3266/7 3266/24 3267/10 3268/12 3268/16 3268/20 3270/2 3270/10 3270/18 3272/6 3274/2 3277/2 3277/7 3278/22 3278/25 3279/2 3279/9 3279/13 3281/9 3281/25 3283/11 3284/23 3286/12 3288/3 3288/17 3290/9 3290/19 3291/4 3292/24 3293/4 3295/7 3295/24 3296/1 3296/10 3297/3 3297/8 3297/13 3297/17 3297/20 3305/9 3305/11 3308/5 3313/8 3313/11 3322/13 3323/6 3328/20 3328/23 3329/2 3329/4 3330/16 3332/10 3333/12 3341/21 3342/10 3342/24 3342/25 3350/11

3359/22 3366/24 3372/23 3373/2 3373/5 3373/8

**THE COURTROOM DEPUTY: [3]** 3227/20 3297/9 3297/14

**THE WITNESS: [8]** 3248/21 3297/16 3297/18 3313/12 3328/24 3329/1 3342/11 3343/3

**$**

**$10 [4]** 3218/11 3220/6 3342/8 3353/16

**$10 million [2]** 3342/8 3353/16

**$100,000 [1]** 3172/16

**$12 [3]** 3219/18 3220/3 3220/6

**$150,000 [1]** 3169/8

**$191,755 [1]** 3221/16

**$199,938.47 [1]** 3219/2

**$200,000 [12]** 3172/10 3172/24 3173/22 3190/17 3191/13 3191/19 3192/4 3204/21 3214/13 3214/15 3219/3 3271/8

**$205,139.30 [1]** 3216/3

**$222,585.67 [1]** 3275/7

**$250,000 [1]** 3363/5

**$255,012.05 [1]** 3224/14

**$263,311.86 [1]** 3223/24

**$272,760.27 [1]** 3225/5

**$299,343.85 [1]** 3225/10

**$300,000 [13]** 3164/25 3169/23 3170/8 3172/14 3218/12 3225/24 3226/8 3226/12 3233/16 3280/17 3286/17 3286/24 3290/5

**$315,000 [2]** 3170/7 3172/19

**$360,000 [1]** 3219/18

**$4,000,000 [3]** 3191/24 3192/5 3192/9

**$415,000 [1]** 3179/10

**$5,139 [1]** 3216/10

**$50,000 [1]** 3363/3

**$500,000 [2]** 3306/19 3340/1

**$6 [1]** 3302/11

**$6 million [1]** 3302/11

**$6,250 [1]** 3346/24

**$615,000 [2]** 3172/25 3173/23

**$80,000 [1]** 3340/7

**'**

**'13 [2]** 3279/10 3344/22

**'15 [1]** 3309/5

**'16 [1]** 3309/4

**'I [1]** 3160/22

**'I'm [2]** 3157/22 3159/15

**'Were [1]** 3157/20

**'What [1]** 3159/15

**-**

**------------------------------x [2]** 3141/2 3141/9

**-against [1]** 3141/5

**0**

**00011 [1]** 3255/3

**00019 [1]** 3202/4

**00637 [1]** 3141/3

**1**

**1/25/16 [1]** 3234/12

**1/25/2016 [1]** 3191/9

**10 [9]** 3144/23 3145/7 3145/9 3145/10

**10... [5]** 3167/12 3206/15 3214/25 3279/19 3299/24
**10 million [1]** 3343/21
**10 million-dollar [1]** 3342/9
**10 percent [1]** 3150/14 3294/4
**10,000-dollar [1]** 3219/22
**10,514 [1]** 3284/21
**10-dollar [1]** 3219/23
**10/31 [1]** 3255/21
**10/31/12 [1]** 3144/2
**100 [2]** 3294/2 3363/4
**10017 [1]** 3141/19
**1065 [1]** 3274/12
**109-10 [4]** 3144/23 3145/7 3145/9 3145/10
**109-11 [3]** 3147/8 3147/15 3147/18 3147/19 3275/20
**109-12 [4]** 3149/6 3149/14 3149/16 3149/17
**109-14 [2]** 3278/17 3279/3
**109-15 [1]** 3280/24
**109-17 [7]** 3152/12 3152/20 3152/22 3152/23 3283/14 3283/15 3283/18
**109-18 [4]** 3151/1 3151/9 3151/11 3151/12
**109-19 [1]** 3286/4
**109-21 [4]** 3153/15 3153/21 3153/23 3153/24
**109-22 [6]** 3162/18 3163/1 3163/3 3163/4 3289/2 3289/5
**109-24 [4]** 3166/11 3166/19 3166/21 3166/22
**109-3 [2]** 3202/5 3202/13
**109-6 [7]** 3204/24 3205/14 3252/5 3254/1 3254/2 3255/20 3273/10
**109-7 [3]** 3208/12 3209/18 3291/10
**109-9 [1]** 3142/16
**10:24 a.m [1]** 3155/25
**10:30 a.m [1]** 3371/9
**10:49 a.m [1]** 3279/19
**10K [4]** 3356/19 3357/1 3357/19 3358/20
**10Ks [1]** 3356/25
**10Q [6]** 3356/19 3356/19 3357/4 3357/19 3357/20 3358/20
**10Qs [1]** 3356/25
**10th [2]** 3225/8 3308/11
**11 [9]** 3147/8 3147/8 3147/15 3147/18 3147/19 3167/16 3167/22 3275/20 3370/24
**11201 [1]** 3141/15
**119-22 [2]** 3322/14 3322/15
**11:00 [1]** 3370/5
**11:00 a.m [1]** 3282/11
**11:15 [1]** 3227/23
**11:16 p.m [1]** 3224/17
**11:30 p.m [1]** 3225/2
**11A [2]** 3201/4 3201/14
**11B [5]** 3252/19 3256/14 3292/2 3293/8 3294/11
**12 [12]** 3143/23 3144/2 3149/6 3149/6 3149/14 3149/16 3149/17 3206/15 3211/14 3228/10 3256/1 3358/6
**122-25 [2]** 3308/6 3308/7
**122-34 [1]** 3336/7
**122-40 [2]** 3341/22 3341/23

**122-49 [1]** 3362/1
**122-58 [1]** 3364/13
**122-61 [4]** 3366/13 3366/23 3366/25 3367/1
**122-64 [1]** 3370/22
**123 [1]** 3341/4
**123-43 [3]** 3350/10 3350/13 3350/14
**126-mile [1]** 3307/6
**12:50 [1]** 3296/12
**12th [4]** 3169/4 3169/20 3224/19 3336/12
**13 [7]** 3141/5 3154/3 3265/4 3267/13 3336/7 3341/4 3371/6
**13 months [1]** 3170/21
**13th [1]** 3169/25
**14 [7]** 3145/14 3206/15 3256/1 3278/17 3279/3 3340/12 3373/20
**14th [1]** 3313/18
**15 [4]** 3154/18 3206/15 3256/1 3280/24
**15-CR-00637 [1]** 3141/3
**150 [2]** 3293/16 3363/4
**150,000 [1]** 3168/2
**16 [5]** 3147/22 3206/15 3234/12 3256/1 3341/12
**17 [15]** 3148/20 3152/12 3152/20 3152/22 3152/23 3155/6 3155/13 3155/22 3206/15 3256/1 3270/2 3283/14 3283/15 3283/18 3350/7
**18 [8]** 3151/1 3151/1 3151/9 3151/11 3151/12 3206/15 3256/1 3356/8
**18723 [1]** 3313/20
**19 [2]** 3286/4 3357/12
**191,000 [1]** 3222/25
**1933 [1]** 3261/13
**1970 [1]** 3352/22
**1985 [1]** 3300/7
**1986 [1]** 3300/8
**1987 [1]** 3361/4
**199 [1]** 3219/8
**1:05 p.m [1]** 3155/13
**1:50 [1]** 3297/2
**1s [1]** 3274/25
**1st [1]** 3143/3

**2**

**2,000 [2]** 3172/1 3172/25
**20 [4]** 3254/16 3286/2 3307/2 3357/25
**20,000 [10]** 3153/8 3154/8 3284/3 3284/9 3284/14 3284/16 3285/2 3286/19 3286/20 3286/24
**200 [3]** 3222/25 3294/2 3307/4
**200,000 [1]** 3214/14
**200,000-dollar [1]** 3216/1
**2000 [2]** 3309/4 3350/24
**2002 [1]** 3273/15
**2006 [3]** 3175/3 3176/5 3176/10
**2007 [1]** 3176/10
**2008 [1]** 3176/10
**2011 [22]** 3204/25 3205/6 3205/22 3207/1 3208/7 3215/7 3215/10 3216/15 3251/24 3252/3 3252/15 3254/12 3254/16 3259/2 3266/4 3270/21 3270/24 3273/17 3274/11 3292/4 3293/3 3294/7
**2012 [59]** 3143/3 3146/12 3148/6 3148/9 3210/7 3223/3 3223/7 3223/23 3224/13 3224/17 3225/1 3225/8

**2013 [67]** 3145/16 3146/12 3147/22 3148/24 3149/20 3150/16 3151/15 3152/2 3153/1 3154/3 3154/18 3155/6 3162/9 3162/15 3164/18 3165/25 3166/7 3167/1 3167/22 3169/4 3169/20 3170/8 3228/15 3230/24 3279/11 3280/21 3281/1 3283/4 3286/6 3289/24 3310/16 3340/8 3341/3 3341/8 3341/8 3341/17 3342/1 3342/18 3343/6 3343/22 3345/16 3346/23 3346/25 3347/2 3347/7 3347/16 3348/14 3349/24 3350/24 3351/7 3351/15 3353/15 3353/17 3353/18 3353/25 3354/4 3354/6 3355/7 3355/17 3356/7 3356/13 3358/21 3359/2 3361/14 3363/7 3363/10 3364/21
**2014 [24]** 3298/14 3298/14 3298/20 3298/23 3299/1 3348/18 3349/15 3364/18 3364/23 3365/7 3365/20 3365/21 3365/22 3366/1 3366/18 3367/5 3369/7 3369/16 3369/17 3369/18 3370/10 3370/14 3370/24 3371/18
**2015 [5]** 3178/1 3178/10 3179/5 3314/9 3314/9
**2016 [2]** 3190/25 3191/9
**2017 [2]** 3141/5 3373/20
**21 [7]** 3153/15 3153/15 3153/21 3153/23 3153/24 3206/16 3256/1
**210 [1]** 3219/7
**210,000 [1]** 3219/2
**212 [1]** 3285/17
**214 [1]** 3371/6
**22 [18]** 3155/24 3162/9 3162/15 3162/18 3162/18 3162/21 3163/1 3163/3 3163/4 3163/7 3289/2 3289/5 3289/5 3294/11 3322/1 3322/12 3322/14 3322/15
**22,585,000 [1]** 3223/13
**222,585 [1]** 3223/12
**2268 [1]** 3141/22
**24 [5]** 3166/11 3166/11 3166/19 3166/21 3166/22
**24th [1]** 3178/10
**25 [7]** 3148/24 3149/3 3151/15 3307/17 3308/4 3308/6 3308/7
**251,000 [1]** 3224/23
**253B [1]** 3340/22
**25th [1]** 3190/25
**26 [8]** 3152/2 3153/1 3153/4 3153/12 3155/21 3283/4 3312/15 3364/13
**26th [2]** 3221/7 3228/15
**27 [3]** 3206/16 3256/2 3366/13
**271 [1]** 3141/14
**27th [1]** 3216/15
**28 [5]** 3205/6 3270/20 3271/2 3271/4

**230/14 3230/21 3230/23 3230/25** 3230/25 3237/1 3237/4 3248/14 3248/24
**3270/23 3279/8 3291/12 3298/18** 3298/20 3301/25 3302/1 3302/19 3308/11 3311/4 3311/20 3311/23 3313/18 3314/12 3314/24 3315/7 3316/4 3316/12 3317/13 3319/2 3319/3 3319/5 3319/25 3320/1 3320/2 3321/9 3322/10 3322/24 3323/19 3323/23 3324/4 3327/1 3327/5 3334/4 3336/12 3337/22 3340/3 3344/22 3358/20

**2**

**28...** [1] 3293/3
**29** [1] 3370/23
**2:14 p.m** [1] 3211/14
**2nd** [5] 3223/3 3322/24 3323/19
3323/23 3351/7

**3**

**30** [7] 3164/18 3166/2 3166/6 3201/7
3201/8 3309/20 3318/2
**30,000** [7] 3154/7 3154/9 3162/11
3217/17 3286/2 3286/20 3287/19
**30,514** [12] 3145/19 3148/10 3154/11
3162/12 3162/13 3172/19 3227/2
3284/11 3284/12 3284/17 3287/20
3290/7
**300,000** [8] 3153/6 3154/7 3154/9
3162/10 3227/3 3284/1 3284/25
3287/20
**300,000-dollar** [5] 3219/25 3225/13
3226/14 3226/18 3226/24
**30th** [2] 3218/21 3353/15
**31** [8] 3207/1 3252/3 3252/14 3252/21
3252/22 3254/12 3255/21 3315/5
**315,000** [1] 3227/12
**31st** [3] 3204/25 3205/22 3358/21
**32** [3] 3271/1 3271/2 3319/12
**33** [2] 3163/21 3163/23
**34** [1] 3336/7
**35 million** [1] 3318/2
**35,514** [1] 3165/2
**3500** [3] 3178/5 3180/12 3191/9
**3500EG2** [2] 3234/6 3234/9
**36** [3] 3203/6 3206/16 3256/2
**360,000** [1] 3220/3
**38** [1] 3340/12
**3:45** [1] 3373/19
**3:45 p.m** [1] 3149/20
**3rd** [7] 3166/25 3167/9 3322/10 3324/4
3327/1 3327/5 3328/5

**4**

**40** [5] 3318/3 3341/12 3341/20 3341/22
3341/23
**43** [5] 3350/7 3350/10 3350/10 3350/13
3350/14
**45** [2] 3302/6 3307/4
**45 million** [1] 3318/3
**48** [3] 3356/7 3357/22 3365/12
**49** [4] 3357/24 3358/6 3360/16 3362/1
**4:31 p.m** [1] 3167/22
**4:32 p.m** [1] 3357/10
**4th** [1] 3228/16

**5**

**5 percent** [3] 3190/19 3191/14 3191/19
**5,000** [1] 3216/24
**50** [2] 3192/19 3357/11
**50,000** [1] 3320/6
**500,000** [1] 3302/14
**51** [1] 3192/19
**54** [1] 3192/21
**5480** [2] 3208/24 3209/22
**5484** [4] 3273/9 3274/1 3274/3 3274/4
**5485** [6] 3278/18 3278/22 3279/2
3279/12 3279/14 3279/15
**5486** [4] 3280/24 3281/8 3281/10

**3281/13**
**5487** [3] 3286/4 3286/13 3286/14
**55** [4] 3163/21 3164/1 3164/3 3164/4
**58** [1] 3364/13
**5th** [1] 3315/7

**6**

**6 billion** [1] 3302/3
**6 million** [1] 3302/14
**61** [4] 3366/13 3366/23 3366/25 3367/1
**63** [1] 3187/18
**6383** [1] 3285/17
**64** [1] 3370/22
**66** [1] 3298/1
**6:37 a.m** [1] 3147/23

**7**

**718-613-2268** [1] 3141/22
**767** [1] 3141/18
**7:10** [1] 3367/8

**8**

**8 million** [1] 3343/17
**8.5 million** [1] 3343/17
**801** [3] 3236/18 3238/17 3239/21
**801D** [1] 3330/1
**806** [5] 3237/17 3238/18 3238/24
3239/16 3242/19
**8:00 a.m** [1] 3370/5
**8th** [1] 3342/1

**9**

**9/30/12** [1] 3143/23
**90 percent** [2] 3175/7 3176/13
**91-10** [1] 3214/25
**91-2** [2] 3216/14 3216/17
**91-3** [1] 3218/20
**91-4** [1] 3221/6
**91-5** [1] 3223/2
**91-6** [1] 3223/22
**91-7** [1] 3224/13
**91-9** [1] 3224/25
**940-6383** [1] 3285/17
**9:00** [2] 3141/6 3373/20
**9:00 o'clock** [1] 3373/16
**9:53 p.m** [1] 3228/15
**9th** [9] 3215/5 3215/9 3215/10 3223/23
3224/13 3224/17 3356/13 3357/14
3358/9

**A**

**A-G-A-R-W-A-L** [1] 3215/17
**A-S-E-L-A-G-E** [1] 3297/20
**a.m** [9] 3141/6 3147/23 3155/25
3279/19 3282/11 3370/5 3370/5 3371/9
3373/20
**aberration** [1] 3302/17
**ability** [6] 3158/8 3189/6 3206/4 3317/5
3343/9 3362/21
**able** [19] 3148/21 3148/25 3155/10
3183/4 3201/21 3237/16 3261/3
3263/23 3277/23 3278/8 3300/19
3303/17 3304/21 3326/6 3326/7 3336/5
3342/3 3344/9 3366/9
**absolute** [1] 3292/10
**absolutely** [4] 3150/16 3175/9 3229/21
3345/3

**accept** [1] 3227/1
**acceptable** [2] 3165/9 3289/8
**accepted** [2] 3217/16 3226/25
**access** [3] 3324/14 3325/20 3325/23
**accommodate** [1] 3156/4
**according** [3] 3143/25 3223/17 3241/3
**account** [14] 3157/18 3198/10 3215/17
3215/25 3216/18 3216/24 3218/24
3220/9 3226/10 3226/11 3226/13
3226/15 3226/21 3275/7
**accountants** [4] 3328/9 3328/11
3330/12 3332/13
**accounting** [6] 3175/16 3311/14 3328/3
3352/21 3352/22 3359/5
**accounts** [2] 3189/25 3190/8
**accumulated** [1] 3302/16
**accuracy** [1] 3218/10
**accurate** [7] 3165/10 3325/1 3327/10
3327/10 3327/17 3327/19 3347/25
**accurately** [1] 3176/19
**achieved** [1] 3334/8
**achieving** [1] 3261/17
**acquire** [13] 3304/25 3311/25 3312/6
3313/3 3344/7 3344/9 3344/11 3344/14
3344/17 3345/1 3368/5 3369/6 3369/8
**acquired** [4] 3300/23 3369/5 3369/6
3369/17
**acquiring** [2] 3313/15 3368/4
**acquisition** [2] 3304/22 3368/16
**act** [5] 3151/22 3184/16 3261/12
3261/13 3261/19
**acted** [1] 3151/17
**Acting** [1] 3141/13
**action** [3] 3205/7 3219/10 3254/17
**actions** [5] 3151/22 3156/11 3160/16
3165/7 3165/7
**activities** [5] 3325/17 3335/3 3336/15
3337/10 3346/7
**activity** [3] 3312/23 3338/3 3338/5
**acts** [1] 3294/23
**ad** [1] 3347/10
**add** [1] 3361/12
**added** [1] 3361/21
**addition** [7] 3153/8 3171/25 3284/3
3285/2 3320/13 3347/2 3349/19
**additional** [9] 3170/11 3180/1 3306/17
3343/6 3343/23 3357/7 3357/18
3357/21 3361/12
**address** [3] 3215/19 3218/23 3274/9
**addressing** [1] 3318/23
**adequate** [1] 3365/9
**adequately** [1] 3365/11
**adjourn** [1] 3373/10
**adjourned** [1] 3373/19
**admissible** [6] 3237/8 3238/5 3238/9
3239/7 3239/23 3244/18
**admission** [3] 3237/1 3237/10 3245/25
**admit** [6] 3145/6 3152/19 3166/18
3308/4 3322/12 3366/23
**admitted** [2] 3239/21 3242/21
**advance** [4] 3231/23 3231/25 3232/1
3232/2
**advanced** [1] 3300/18
**advice** [5] 3183/7 3194/12 3194/15
3196/7 3197/16
**advise** [2] 3163/9 3289/7
**advised** [3] 3190/18 3267/7

**adviser [11]** 3255/10 3255/10 3256/19 3260/8 3292/19 3293/14 3294/5 3294/13 3294/14 3294/22 3295/2
**advises [1]** 3259/2
**advising [1]** 3268/19
**advisor [5]** 3292/17 3294/18 3320/23 3321/21 3372/1
**affairs [1]** 3294/24
**affect [1]** 3336/3
**affecting [1]** 3270/6
**affiliate [1]** 3221/24
**affiliated [8]** 3221/25 3265/18 3267/5 3267/21 3267/25 3268/10 3268/11 3298/15
**affirmed [2]** 3142/6 3297/13
**afield [2]** 3183/3 3185/23
**afraid [1]** 3326/7
**afternoon [3]** 3297/10 3297/14 3297/24
**AG [1]** 3202/4
**AG00469 [1]** 3167/20
**Agarwal [1]** 3215/16
**agencies [4]** 3169/14 3176/25 3177/10 3288/13
**agency [3]** 3288/15 3330/15 3331/23
**agenda [10]** 3349/8 3351/21 3356/18 3358/8 3358/10 3358/19 3362/2 3371/6 3371/7 3372/11
**agendas [1]** 3349/4
**agents [3]** 3191/3 3294/19 3330/2
**aggravating [1]** 3157/12
**aggravation [4]** 3158/3 3184/10 3184/12 3185/5
**AGNIFILO [1]** 3141/20
**ago [7]** 3148/10 3151/19 3178/20 3187/5 3191/13 3198/10 3227/10
**agree [6]** 3157/2 3176/18 3176/21 3221/21 3242/19 3265/25
**agreed [13]** 3153/2 3153/6 3154/6 3162/16 3164/24 3169/23 3204/14 3204/25 3283/23 3284/1 3284/22 3284/25 3294/17
**agreeing [1]** 3268/24
**agreement [45]** 3158/18 3163/8 3163/15 3164/6 3164/7 3164/9 3164/20 3165/1 3165/21 3166/2 3166/6 3169/11 3182/21 3200/12 3204/1 3204/12 3204/13 3225/24 3226/4 3226/24 3243/14 3251/10 3251/23 3266/23 3267/1 3270/21 3270/24 3271/5 3271/13 3275/17 3280/17 3282/20 3284/13 3285/10 3285/12 3286/17 3289/7 3289/21 3290/2 3294/17 3295/1 3312/3 3313/6 3331/7 3360/12
**agreements [13]** 3165/6 3233/9 3359/2 3359/4 3359/11 3359/15 3359/19 3360/3 3360/9 3363/22 3364/1 3364/5 3364/9
**ahead [6]** 3167/25 3204/16 3236/19 3299/8 3365/8 3365/10
**aided [1]** 3141/24
**AI [41]** 3148/22 3173/6 3173/8 3179/12 3180/4 3180/7 3180/7 3180/16 3180/20 3181/7 3181/15 3181/24 3182/5 3182/13 3182/14 3182/19 3182/20 3182/24 3185/20 3185/21 3185/22 3185/24 3186/2 3190/11 3192/22

3194/3 3194/5 3194/6 3194/7 3194/20 3194/24 3197/2 3197/5 3220/16 3245/14 3245/17 3245/19 3245/21 3277/24 3277/25 3362/2
**AI's [4]** 3187/12 3193/21 3194/15 3198/8
**Alan [4]** 3149/22 3192/13 3228/17 3363/10
**align [1]** 3320/11
**ALIXANDRA [1]** 3141/16
**alleged [1]** 3236/9
**allow [5]** 3242/20 3246/10 3246/22 3296/5 3365/11
**allowed [1]** 3189/13
**allowing [2]** 3159/18 3184/11
**allows [2]** 3157/10 3242/23
**almost [3]** 3307/2 3353/16 3353/24
**alone [5]** 3146/5 3198/17 3198/18 3198/19 3238/9
**alternatively [1]** 3143/13
**amazing [1]** 3195/16
**amended [3]** 3261/13 3356/19 3356/19
**amendments [2]** 3358/20 3358/22
**AMERICA [3]** 3141/3 3190/6 3338/5
**American [3]** 3203/18 3258/13 3314/16
**amount [10]** 3159/10 3165/4 3189/14 3191/17 3195/5 3226/10 3282/21 3368/7 3368/22 3368/23
**amounted [1]** 3190/19
**ANDREA [1]** 3141/20
**Andrew [3]** 3310/12 3310/14 3310/15
**anger [1]** 3185/5
**angry [2]** 3150/21 3157/21
**angry.' [1]** 3159/17
**announce [1]** 3373/10
**announced [1]** 3307/23
**annual [1]** 3357/2
**answer [30]** 3148/11 3148/21 3149/4 3150/5 3174/3 3177/3 3178/18 3179/3 3193/18 3195/4 3195/19 3196/5 3199/23 3213/6 3214/19 3222/15 3229/9 3231/2 3231/3 3232/11 3248/15 3272/20 3277/24 3279/22 3280/19 3282/1 3318/25 3339/12 3339/15 3359/25
**answered [4]** 3175/23 3232/22 3256/10 3288/17
**answers [3]** 3150/22 3248/13 3271/18
**anticipated [1]** 3292/16
**anticipates [1]** 3293/25
**anxiety [8]** 3149/1 3159/5 3174/7 3213/19 3275/15 3275/18 3278/9 3278/11
**anytime [1]** 3370/2
**anyway [2]** 3146/21 3318/25
**apart [1]** 3335/2 3336/3 3343/24
**apartment [2]** 3192/7 3273/20
**apologize [5]** 3155/9 3224/19 3267/16 3350/11 3364/16
**apologizing [1]** 3171/22
**appear [2]** 3147/22 3160/17
**APPEARANCES [1]** 3141/12
**appeased [1]** 3246/6
**appointed [1]** 3361/7
**appointment [1]** 3360/17
**appreciate [1]** 3155/14
**appreciation [1]** 3292/18

**approach [2]** 3179/19 3202/9
**appropriate [3]** 3185/17 3186/12 3239/12
**approval [4]** 3185/14 3290/14 3290/18 3363/3
**approve [9]** 3348/16 3348/20 3348/23 3358/20 3359/9 3360/3 3362/2 3363/25 3364/8
**approved [5]** 3165/21 3289/22 3291/2 3348/3 3348/8
**April [19]** 3149/20 3150/16 3151/15 3152/2 3153/1 3153/4 3153/12 3155/20 3155/21 3223/23 3228/16 3273/15 3279/8 3279/19 3280/20 3281/1 3281/13 3283/4 3285/24
**April 10 [1]** 3279/19
**April 2012 [1]** 3279/8
**April 25 [1]** 3151/15
**April 26 [5]** 3152/2 3153/1 3153/12 3155/21 3283/4
**April 4 [2]** 3149/20 3150/16
**April 4th [1]** 3228/16
**April 5 [1]** 3155/20
**April 9th [1]** 3223/23
**area [11]** 3300/22 3301/7 3301/7 3307/2 3341/3 3345/20 3353/5 3353/10 3362/2 3368/10 3368/11
**areas [3]** 3318/24 3353/3 3353/7
**argue [9]** 3184/13 3184/20 3184/20 3185/12 3185/13 3233/18 3233/21 3241/9 3243/7
**arguing [1]** 3233/20
**argument [2]** 3160/8 3239/6
**arguments [2]** 3160/15 3185/16
**arranged [1]** 3372/6
**arrive [1]** 3367/7
**articles [2]** 3148/3 3276/1
**articulate [2]** 3304/6 3307/13
**Aselage [10]** 3297/8 3297/12 3297/17 3305/3 3308/15 3309/19 3314/1 3330/7 3368/18 3368/20
**Aselage-style [2]** 3368/18 3368/20
**asset [1]** 3312/6
**assets [10]** 3192/1 3192/1 3192/4 3192/6 3294/5 3311/24 3326/19 3369/21 3369/21 3370/12
**assistance [1]** 3346/10
**Assistant [1]** 3141/17
**ASSOCIATES [1]** 3141/18
**assume [7]** 3216/20 3290/14 3290/23 3342/20 3342/20 3342/22 3343/7
**assumed [3]** 3207/15 3290/13 3291/2
**assuming [1]** 3150/14
**assured [1]** 3339/1
**Aton [1]** 3313/4
**attach [1]** 3274/22
**attached [15]** 3163/8 3164/6 3205/4 3205/14 3215/22 3224/18 3254/14 3289/7 3313/7 3351/13 3351/21 3351/24 3356/17 3357/19 3371/7
**attaches [1]** 3273/22
**attaching [1]** 3358/11
**attachment [6]** 3163/12 3202/5 3216/22 3223/23 3273/17 3353/11
**attachments [2]** 3351/14 3351/18
**attack [2]** 3242/12 3242/21
**attacked [2]** 3239/22 3240/21 3244/8

**A**

attacked... [1] 3244/10
attacking [4] 3237/23 3240/15 3244/1 3244/11
attacks [1] 3242/17
attempt [1] 3185/24
attempted [1] 3343/7
attempting [2] 3292/10 3342/7
attend [4] 3287/4 3287/8 3358/17 3371/11
attended [4] 3304/9 3318/10 3347/14 3348/10
attendees [1] 3347/15
attention [7] 3166/25 3229/14 3292/2 3294/10 3294/12 3296/9 3373/14
attorney [5] 3141/13 3152/4 3152/7 3171/11 3290/25
Attorneys [1] 3141/17
attractive [2] 3201/17 3307/12
attributable [1] 3302/12
audit [1] 3357/12
auditor [1] 3175/13
auditors [7] 3327/2 3327/9 3327/16 3327/18 3328/3 3328/8 3356/24
August [3] 3215/5 3215/9 3215/10
August 9th [2] 3215/5 3215/9
authority [3] 3336/14 3337/9
authorization [1] 3362/18
authorize [2] 3362/21 3362/24
authorizes [1] 3312/23
autism [3] 3367/11 3367/12 3368/4 3368/10
autistic [1] 3368/6
available [7] 3167/17 3218/6 3222/1 3243/18 3304/20 3327/15 3367/11
Avenue [1] 3141/18
avoid [2] 3360/13 3373/12
aware [2] 3345/13 3371/21

**B**

backed [1] 3345/5
background [8] 3187/14 3304/14 3314/15 3314/18 3346/11 3351/2 3352/21 3353/2
backwards [1] 3279/18
bacterial [1] 3299/10
bad [5] 3146/24 3200/22 3242/1 3243/7 3245/23
balance [12] 3216/3 3216/23 3218/23 3221/15 3222/9 3223/12 3223/24 3224/14 3224/23 3225/5 3353/21 3354/12
balanced [1] 3150/12
Balbin [2] 3308/8 3315/17
bank [5] 3190/6 3190/7 3317/20 3323/21 3334/19
bankers [1] 3317/21
Banta [11] 3320/25 3321/2 3321/3 3321/4 3362/3 3371/18 3371/20 3371/23 3372/4 3372/8 3372/9
Banta's [2] 3321/6 3371/18
bar [7] 3181/23 3184/2 3196/13 3196/14 3198/20 3199/6 3199/7
bars [1] 3180/2
base [4] 3155/7 3269/22 3306/4 3306/19
based [8] 3186/15 3226/10 3276/10

3276/25 3342/20 3342/22 3342/23 3362/3
basic [2] 3148/11 3352/22
basis [15] 3143/8 3169/14 3180/7 3181/9 3189/4 3192/24 3192/25 3239/10 3242/16 3264/13 3269/19 3288/9 3343/1 3349/4 3357/5
basket [1] 3258/12
bat [1] 3252/1
Bates [8] 3143/9 3145/17 3167/20 3202/4 3292/3 3293/8 3294/10 3313/20
Bates 18723 [1] 3313/20
Bay [4] 3300/22 3301/7 3301/7 3307/2
bear [4] 3160/24 3241/6 3241/7 3353/4
beat [15] 3233/23 3234/3 3237/5 3238/4 3238/5 3240/10 3240/15 3241/4 3241/16 3244/14 3244/17 3245/9 3246/6 3248/9 3249/7
became [5] 3227/6 3298/21 3300/6 3336/22 3344/21
become [1] 3277/6
began [2] 3299/24 3316/15
begin [2] 3143/24 3371/8
beginning [3] 3143/11 3210/6 3257/23
behalf [3] 3188/7 3251/8 3269/1
behind [3] 3273/19 3312/15 3357/12
belabor [2] 3161/1 3266/15
belief [1] 3342/24
believes [3] 3292/17 3292/19
bells [1] 3175/18
Ben [1] 3171/11
BENJAMIN [1] 3141/19
best [6] 3148/15 3154/11 3171/14 3176/17 3217/13 3356/3
better [6] 3150/6 3179/8 3229/10 3257/9 3320/11 3368/23
betting [1] 3245/15
between [19] 3146/12 3170/19 3279/7 3280/25 3281/3 3281/19 3283/3 3286/2 3286/6 3289/18 3294/2 3322/3 3324/22 3325/7 3340/2 3341/16 3345/21 3366/17 3372/22
bewilderment [1] 3146/2
beyond [2] 3272/3 3305/8
Biestek [2] 3310/25 3311/6
big [8] 3158/1 3162/21 3251/17 3295/19 3314/16 3343/16 3361/18 3365/20
bigger [1] 3142/17
billion [1] 3302/3
binder [21] 3142/17 3144/23 3147/8 3149/6 3151/1 3152/13 3153/15 3162/18 3162/21 3163/21 3166/11 3202/6 3202/7 3270/22 3307/18 3312/16 3319/12 3322/2 3340/12 3350/7 3370/23
biology [1] 3299/4
BioMarin [10] 3301/8 3301/9 3301/10 3301/13 3301/24 3302/1 3302/7 3302/23 3302/24 3303/1
biopharmaceutical [1] 3217/19
biotechnology [3] 3255/13 3256/22 3300/6
bit [11] 3221/20 3246/22 3302/11 3302/16 3310/19 3317/12 3318/22 3320/24 3321/13 3367/10 3373/10
black [1] 3266/12

blank [1] 3341/3
Blanton [2] 3363/17 3371/4
block [4] 3212/2 3212/11 3213/10 3213/17
blue [3] 3182/5 3303/11 3303/12
board [119] 3165/21 3185/14 3219/22 3254/2 3270/25 3289/22 3298/21 3298/23 3300/8 3312/22 3314/3 3314/4 3314/7 3314/8 3314/20 3315/12 3315/14 3319/11 3319/4 3336/18 3336/25 3337/2 3337/16 3337/18 3338/17 3339/1 3339/8 3340/16 3341/9 3344/5 3345/18 3345/19 3345/23 3345/25 3346/2 3346/4 3346/12 3346/16 3346/23 3347/2 3347/6 3347/15 3347/18 3347/20 3347/21 3347/23 3347/24 3347/25 3348/1 3348/2 3348/4 3348/6 3348/7 3348/8 3348/10 3348/12 3348/14 3348/15 3348/19 3348/20 3348/23 3348/24 3349/1 3349/2 3349/5 3349/10 3349/15 3349/19 3349/20 3349/23 3351/9 3351/19 3351/21 3352/2 3352/5 3352/6 3352/7 3352/10 3352/11 3352/14 3352/17 3352/23 3353/4 3356/6 3356/11 3356/17 3357/18 3358/8 3358/10 3358/12 3358/14 3358/25 3359/6 3359/9 3359/11 3359/15 3359/18 3360/3 3360/10 3360/12 3360/18 3360/20 3361/8 3361/12 3362/17 3363/2 3363/3 3363/7 3363/21 3363/25 3364/4 3364/8 3364/22 3364/23 3365/5 3365/9 3367/22 3371/6 3372/11
boards [2] 3345/24 3346/11
Boehringer [1] 3300/14
boilerplate [4] 3199/23 3199/25 3204/3 3204/4
Bond [1] 3311/2
bonds [2] 3203/18 3258/14
book [3] 3252/19 3254/5 3348/6
books [3] 3311/13 3325/20 3325/23
borrow [1] 3239/13
bother [1] 3287/13
bottom [31] 3147/21 3151/14 3152/25 3154/2 3155/12 3164/22 3166/25 3167/21 3194/25 3214/21 3215/24 3218/4 3220/25 3228/14 3258/3 3265/12 3275/22 3279/18 3286/15 3315/5 3315/6 3322/17 3341/25 3352/12 3355/2 3355/4 3364/14 3364/14 3367/3 3367/18 3368/7
bought [2] 3189/16 3269/4
bound [2] 3204/14 3241/22
BRAFMAN [14] 3141/18 3141/19 3171/6 3171/11 3182/13 3187/2 3202/18 3209/2 3236/19 3242/18 3245/7 3292/6 3293/10 3374/5
Brafman's [1] 3332/6
breach [1] 3294/25
break [3] 3227/18 3227/20 3296/6 3372/25
Brent [3] 3320/19 3320/19 3320/22
Brian [2] 3323/17 3323/20
BRIDGET [1] 3141/13
brief [1] 3314/23

**B**

**briefed [10]** 3199/10 3199/11 3200/5 3204/1 3204/10 3239/14 3253/11 3254/25 3255/1 3266/11
**briefing [1]** 3348/6
**briefly [1]** 3304/13
**bright [3]** 3304/6 3307/13 3318/20
**brilliance [1]** 3195/14
**brilliant [1]** 3339/19
**bring [3]** 3262/21 3277/15 3304/22
**brings [2]** 3309/20 3366/6
**Bristol [5]** 3299/20 3299/20 3299/21 3299/23 3300/3
**Bristol-Myers [2]** 3299/20 3299/21
**broad [4]** 3259/20 3346/6 3346/8 3346/11
**broker [2]** 3188/2 3188/4
**brokerage [1]** 3189/25
**Brooklyn [2]** 3141/4 3141/15
**brother [54]** 3148/3 3173/6 3173/15 3173/18 3179/12 3179/15 3180/4 3180/10 3181/16 3181/25 3182/10 3183/6 3183/14 3183/19 3186/3 3187/12 3190/11 3192/13 3192/22 3193/21 3194/3 3194/5 3194/6 3194/7 3194/15 3194/20 3194/24 3195/25 3196/10 3198/8 3198/9 3198/13 3207/11 3207/14 3212/2 3212/11 3213/2 3220/16 3228/20 3228/23 3264/21 3264/25 3276/2 3276/7 3276/11 3277/25 3278/2 3278/4 3280/21 3281/18 3281/19 3281/23 3287/6 3287/7
**brother's [4]** 3183/12 3183/16 3183/17 3194/12
**brought [2]** 3288/22 3353/4
**Bryant [3]** 3230/14 3231/5 3234/1
**BS [1]** 3299/4
**budget [1]** 3323/2
**build [4]** 3304/7 3306/17 3318/14 3339/24
**building [2]** 3306/15 3316/19
**bunch [1]** 3164/10
**burned [1]** 3353/25
**business [19]** 3155/16 3194/20 3195/8 3231/24 3231/25 3232/1 3232/2 3294/23 3299/17 3301/16 3301/22 3302/6 3307/4 3311/8 3311/16 3314/17 3357/3 3366/20 3370/17
**businesses [1]** 3232/2
**busy [5]** 3167/13 3230/7 3279/20 3280/1 3280/2
**busy.' [1]** 3160/23
**buy [6]** 3262/20 3304/19 3317/24 3319/6 3323/11 3344/22
**buying [4]** 3153/7 3158/14 3284/2 3285/1
**buyout [2]** 3255/14 3256/23
**buyouts [1]** 3262/16
**Byrant [1]** 3232/13

**C**

**Cadman [1]** 3141/14
**calculation [2]** 3218/8 3222/5
**California [8]** 3148/20 3277/22 3278/2 3278/5 3281/21 3298/7 3300/16 3302/21

**calm [3]** 3242/10 3251/19 3251/22 3287/1
**calmly [1]** 3174/12
**candid [1]** 3345/19
**cannot [1]** 3145/23 3260/22
**cap [7]** 3302/2 3319/22 3320/3 3320/16 3320/17 3320/24 3321/13
**capable [2]** 3316/20 3318/8
**capacities [1]** 3298/17
**capacity [1]** 3321/5
**capital [24]** 3164/12 3164/12 3165/17 3178/11 3206/5 3207/8 3255/12 3256/21 3265/13 3265/16 3267/5 3267/17 3267/19 3275/7 3279/16 3309/7 3309/7 3309/9 3321/11 3321/14 3322/21 3324/17 3325/21 3335/1
**Capital's [1]** 3335/2
**capitalization [4]** 3265/9 3319/20 3319/21 3321/23
**Capuchin [2]** 3364/25 3365/2
**care [7]** 3160/9 3170/9 3172/10 3205/10 3206/1 3206/3 3254/20
**career [3]** 3199/15 3274/25 3300/1
**careful [1]** 3208/13
**carefully [5]** 3205/9 3254/19 3254/24 3256/2 3266/3
**case [18]** 3147/2 3150/23 3150/23 3169/13 3177/23 3181/14 3184/13 3193/5 3243/2 3264/5 3269/14 3270/15 3275/6 3296/8 3334/9 3373/2 3373/12 3373/12
**cash [39]** 3143/6 3143/13 3143/15 3143/17 3143/18 3143/24 3144/1 3144/5 3144/17 3153/6 3154/12 3158/21 3162/11 3172/14 3172/16 3172/21 3172/23 3173/22 3225/13 3225/24 3226/4 3226/7 3226/9 3226/24 3231/23 3231/25 3232/1 3232/2 3284/1 3284/25 3286/20 3286/24 3334/10 3334/19 3351/15 3353/14 3354/12 3354/19 3355/24
**cashed [2]** 3146/6 3147/2
**category [1]** 3200/10
**caused [2]** 3216/9 3216/25
**causes [1]** 3165/7
**causing [1]** 3275/15
**CC'ing [2]** 3162/14 3163/7
**CCed [1]** 3364/20
**CCing [1]** 3152/2
**ceased [1]** 3300/24
**Cedar [1]** 3299/22
**Cell [1]** 3300/25
**center [1]** 3145/18
**centered [1]** 3362/23
**CEO [23]** 3298/9 3298/10 3298/12 3298/13 3298/18 3298/19 3298/21 3299/1 3303/15 3306/12 3307/23 3310/5 3321/19 3332/23 3336/22 3336/24 3337/1 3337/4 3337/12 3338/15 3340/1 3340/2 3340/6
**certain [10]** 3154/21 3157/3 3189/10 3189/11 3199/13 3200/1 3265/15 3267/18 3313/3 3366/6
**certainly [8]** 3183/19 3184/16 3246/13 3262/8 3326/13 3353/24 3368/22 3370/13
**certificate [8]** 3145/2 3146/1 3146/4 3146/10 3146/21 3148/9 3260/25

**certified [1]** 3175/16
**certifying [2]** 3327/9 3327/18
**cetera [2]** 3274/13 3293/12
**CFO [7]** 3327/22 3347/16
**chain [7]** 3180/14 3275/21 3322/9 3326/24 3342/6 3343/12 3352/13
**chairman [1]** 3349/2
**chairs [1]** 3373/15
**chance [1]** 3155/7
**change [5]** 3155/15 3217/9 3222/25 3279/18 3340/21
**changed [8]** 3206/12 3206/19 3208/6 3253/16 3253/23 3259/13 3266/13 3335/1
**changes [4]** 3205/8 3206/7 3254/18 3256/3
**changing [2]** 3253/12 3253/18
**channels [2]** 3290/24 3291/1
**characteristics [1]** 3261/16
**characterization [1]** 3265/24
**characterize [1]** 3237/16
**characterized [2]** 3240/9 3241/15
**characterizes [3]** 3241/24 3243/5 3245/2
**charge [1]** 3349/3
**charged [2]** 3157/12 3157/13
**Charles [2]** 3190/4 3350/2
**chart [1]** 3323/1
**chat [2]** 3208/19 3368/18
**chats [1]** 3208/24
**check [6]** 3237/14 3238/14 3258/3 3258/7 3267/16 3318/18
**checked [3]** 3344/13 3344/15 3345/3
**checking [2]** 3344/10 3344/12
**chemistry [1]** 3362/11
**Chenodal [1]** 3369/9
**chief [9]** 3298/11 3298/24 3301/16 3308/15 3309/18 3309/19 3310/12 3350/21 3372/21
**children [3]** 3298/4 3307/2 3368/6
**choice [2]** 3143/17 3169/10
**choices [2]** 3269/5 3269/6
**choosing [1]** 3326/22
**Chris [4]** 3367/9 3367/12 3367/25 3368/5
**Christine [1]** 3364/21
**chronology [1]** 3159/10
**circling [1]** 3197/12
**circumstance [1]** 3342/23
**circumstances [2]** 3154/8 3242/20
**City [3]** 3317/22 3367/20 3367/24
**claims [1]** 3165/5
**clarification [2]** 3148/18 3292/25
**clarify [2]** 3171/16 3325/2
**clarity [1]** 3334/14
**class [3]** 3151/17 3217/17 3290/25
**Class A [1]** 3217/17
**classic [1]** 3330/14
**clause [3]** 3313/1 3313/8 3340/20
**clauses [1]** 3312/18
**clear [10]** 3176/22 3180/12 3209/17 3243/11 3243/20 3246/20 3248/12 3321/7 3325/17 3371/25
**clearly [2]** 3156/4 3261/21
**client [10]** 3163/10 3236/6 3238/1 3240/2 3240/18 3241/15 3241/22

client... [3]  3241/24 3245/3 3289/9
clients [1]  3200/19
cliff [4]  3150/6 3229/10 3229/13
3229/18
clinical [2]  3346/13 3354/16
close [11]  3192/22 3192/23 3193/8
3193/14 3236/2 3285/21 3287/1
3287/11 3326/7 3342/3 3368/16
closed [2]  3144/3 3190/7
closedown [1]  3325/16
closer [1]  3372/15
closing [5]  3143/5 3143/8 3245/7
3281/14 3287/5
clothing [1]  3305/6
club [5]  3371/9 3372/3 3372/4 3372/7
3372/17
clue [1]  3172/9
CMC [1]  3362/11
co [2]  3330/14 3368/5
co-conspirators [1]  3330/14
co-worker [1]  3368/5
coconspirator [8]  3236/4 3236/8
3236/13 3236/20 3236/21 3236/21
3239/5 3242/22
coconspirator's [1]  3242/20
coincidence [3]  3226/21 3226/22
3226/23
Cola [1]  3299/13
cold [1]  3303/8
collectively [2]  3164/24 3165/4
combination [3]  3143/14 3143/18
3144/5
comfortable [1]  3326/5
comforted [1]  3251/16
coming [4]  3245/20 3331/11 3349/24
3354/8
comment [5]  3163/11 3243/9 3245/5
3246/5 3289/10
commenting [1]  3245/10
comments [4]  3163/10 3289/8 3289/10
3356/20
commercial [18]  3300/5 3300/21
3301/2 3302/5 3303/16 3303/17
3313/13 3316/19 3316/23 3316/24
3318/7 3323/12 3345/20 3345/20
3346/14 3346/15 3369/10 3369/21
commercialization [2]  3353/6 3353/9
commercially [1]  3304/20
commingle [1]  3324/21
commingling [3]  3325/6 3325/13
3326/2
Commission [2]  3177/23 3178/2
commitment [1]  3306/5
commitments [2]  3165/8 3306/25
committed [1]  3339/5
committee [1]  3301/23
common [2]  3165/2 3217/18
communicating [1]  3289/4
communication [3]  3144/18 3144/21
3339/3
communications [4]  3160/12 3308/20
3308/22 3357/20
commute [1]  3307/10
commuting [1]  3301/8
companies [15]  3188/13 3188/24
3189/24 3255/13 3256/22 3262/16

3268/19 3292/13 3293/17 3306/23
3309/16 3320/21 3345/24 3353/3
3362/14
company [117]  3168/14 3188/9
3217/19 3223/7 3223/7 3230/11
3230/20 3232/25 3233/1 3233/2 3257/8
3257/15 3260/2 3260/4 3262/20
3262/23 3277/6 3289/25 3290/24
3299/19 3300/20 3300/22 3300/25
3301/10 3301/11 3302/4 3303/15
3303/15 3304/5 3304/8 3304/17
3304/23 3305/1 3305/21 3306/24
3307/13 3309/16 3309/22 3310/2
3310/5 3310/14 3310/15 3312/4 3313/2
3313/3 3314/16 3316/2 3316/21
3318/13 3318/15 3319/25 3319/25
3322/25 3323/1 3323/3 3324/22
3324/24 3325/2 3325/7 3325/10 3326/6
3326/11 3326/11 3326/18 3326/18
3326/20 3327/11 3330/5 3330/24
3332/20 3333/1 3333/12 3334/5 3334/7
3334/9 3336/14 3336/22 3337/3 3337/6
3337/12 3337/16 3337/17 3338/3
3338/7 3340/21 3342/10 3342/15
3343/5 3343/10 3344/7 3344/11 3345/1
3345/6 3345/23 3346/1 3346/3 3346/5
3346/16 3346/20 3347/5 3354/1 3354/5
3354/8 3354/11 3354/12 3356/2
3361/15 3361/24 3361/25 3362/5
3362/9 3366/7 3366/11 3367/13
3368/17 3369/5 3369/12
company's [8]  3188/13 3189/4 3300/17
3310/6 3315/21 3342/18 3352/15
3357/3
compared [1]  3265/8
compensation [5]  3346/22 3349/13
3355/24 3362/14 3362/15
complained [1]  3177/10
complaining [2]  3237/3 3249/3
complete [4]  3167/3 3280/10 3280/16
3317/14
completed [5]  3155/3 3168/11 3312/6
3334/21 3336/21
completely [2]  3160/5 3338/13
completeness [1]  3218/10
completing [2]  3143/2 3148/8
component [1]  3226/7
components [1]  3208/18
composition [1]  3258/4
comprehensive [4]  3148/21 3150/5
3229/9 3277/23
computed [1]  3216/7
computer [2]  3141/24 3305/8
computer-aided [1]  3141/24
concede [1]  3183/10
concern [5]  3183/15 3219/5 3326/2
3327/12 3339/14
concerned [2]  3289/12 3307/7
concerning [3]  3199/21 3251/3
3271/18
concerns [3]  3327/13 3332/22 3339/10
conclude [1]  3236/23
conclusion [1]  3279/20
condition [2]  3334/5 3334/15
conduct [1]  3365/9
confer [2]  3202/3 3202/22
conference [10]  3156/15 3161/3

3179/23 3186/20 3196/16 3197/20
3235/6 3246/25 3386/6 3333/14
confirmed [1]  3209/14
conflict [3]  3265/19 3268/1 3268/14
confronted [1]  3182/5
confusing [2]  3184/22 3184/23
confusion [3]  3156/2 3224/20 3248/17
connection [7]  3170/12 3176/4 3184/1
3323/13 3331/18 3352/5 3359/10
consent [9]  3263/20 3312/20 3312/21
3312/24 3313/17 3336/10 3340/15
3340/24 3341/2
consents [1]  3336/19
consequence [1]  3369/2
consider [1]  3240/11
consideration [1]  3217/20
considered [2]  3299/16
consist [4]  3203/13 3292/16 3293/15
3294/2
consistent [6]  3292/22 3293/19 3294/7
3349/4 3355/23 3365/15
consisting [1]  3217/17
conspiracy [7]  3236/7 3236/10
3236/11 3236/22 3236/24 3237/2
3238/16 3239/4 3239/6 3241/1 3241/14
conspirators [1]  3330/14
construed [1]  3264/17
consultant [5]  3311/18 3349/13 3362/5
3362/14 3371/21
consultants [8]  3362/3 3362/8 3362/11
3362/13 3362/15 3362/19 3362/22
3363/7
consulting [21]  3182/21 3204/22
3214/25 3215/13 3215/20 3215/23
3216/9 3217/7 3218/7 3218/20 3222/4
3222/9 3222/20 3272/11 3272/13
3321/5 3347/4 3363/22 3364/1 3364/5
3364/9
CONT'D [1]  3169/1
contact [6]  3152/3 3169/9 3169/14
3178/19 3215/16 3308/17
contacted [2]  3303/5 3303/6
contemplating [1]  3229/16
contents [1]  3324/9
context [7]  3237/6 3240/13 3241/13
3243/9 3243/10 3248/16 3248/21
contingency [2]  3169/13 3288/9
continue [3]  3228/4 3228/8 3307/8
continued [21]  3156/14 3161/4 3168/17
3179/22 3186/21 3196/15 3197/21
3210/10 3211/1 3235/5 3247/1 3250/3
3296/13 3329/7 3333/15 3334/16
3334/18 3335/3 3336/1 3337/9 3360/22
continues [1]  3165/9
continuing [2]  3156/7 3325/16
contract [3]  3154/20 3155/17 3155/21
contracts [1]  3165/8
controversies [1]  3165/6
conversation [38]  3149/23 3149/25
3151/19 3168/5 3168/9 3168/15
3209/17 3212/10 3212/25 3213/8
3228/18 3228/20 3228/21 3228/25
3234/1 3237/7 3237/25 3246/1 3248/5
3248/10 3248/11 3248/23 3248/25
3249/1 3249/3 3249/6 3279/20 3281/17
3281/19 3281/20 3281/23 3281/25
3282/5 3291/14 3292/22 3293/19

**C**

conversation... [2] 3295/12 3295/17
conversational [1] 3277/14
conversations [6] 3150/7 3186/16
3209/24 3210/3 3229/4 3276/9
convertible [4] 3203/17 3258/11 3260/8
3261/14
convey [1] 3318/7
conveying [1] 3331/9
convince [1] 3317/22
cooperate [1] 3169/16
copied [5] 3180/13 3288/24 3315/23
3356/14 3371/17
copies [1] 3371/4
copy [4] 3203/2 3255/20 3258/4
3338/11
copying [2] 3327/1 3327/21
cord [1] 3209/20
cordial [3] 3370/19 3370/19 3370/21
core [2] 3353/5 3353/9
Cornelius [3] 3360/17 3360/19 3360/20
corner [2] 3234/15 3234/17
corporate [5] 3308/20 3308/22 3331/6
3331/24 3372/1
corporation [1] 3340/23
correct [251]
corrected [1] 3224/20
Correction [1] 3286/16
correctly [1] 3254/21
cost [1] 3294/4
council [1] 3301/22
counsel [6] 3202/3 3202/22 3315/22
3316/1 3347/19 3348/4
count [1] 3362/10
counter [2] 3156/5 3259/21
counters [1] 3160/15
countries [2] 3302/6 3307/4
couple [4] 3148/10 3167/3 3201/1
3272/14
course [4] 3185/3 3299/10 3329/5
3330/8
Courthouse [1] 3141/4
Courtney [1] 3311/2
courtroom [6] 3227/22 3228/1 3296/10
3305/3 3373/4 3373/8
cover [3] 3253/25 3255/2 3372/11
coverage [1] 3373/12
covered [3] 3232/19 3232/21 3339/13
covering [2] 3215/13 3218/20
CR [1] 3141/3
crack [2] 3243/6 3244/13
crash [1] 3176/11
crashed [1] 3176/3
crazy [1] 3245/15
create [1] 3224/11
created [1] 3351/5
creating [1] 3321/22
credibility [14] 3239/22 3240/8 3240/15
3240/18 3240/20 3241/7 3242/12
3242/17 3242/21 3243/25 3244/1
3244/8 3244/10 3244/11
credible [3] 3318/23 3337/6 3337/7
credit [1] 3307/11
credits [1] 3274/12
CRIMINAL [1] 3141/10
critical [2] 3205/6 3254/16
cross [11] 3159/23 3171/5 3185/1

3185/24 3211/1 3227/16 3236/12
3239/3 3241/15 3332/9 3333/5
cross-examination [6] 3159/23 3171/5
3185/1 3211/1 3236/12 3239/3
cross-examine [1] 3241/15
crossed [1] 3169/17
CSR [1] 3141/22
Cuprimine [3] 3313/4 3313/15 3316/20
curious [1] 3305/20
currencies [1] 3258/14
current [6] 3148/2 3151/18 3172/8
3276/1 3298/8 3352/15
cut [2] 3180/14 3354/14

**D**

dad [1] 3190/12
damages [2] 3165/6 3294/21
Dame [1] 3299/6
dark [1] 3148/4
Darren [1] 3363/17
date [27] 3164/17 3168/5 3191/1
3206/24 3206/24 3206/25 3210/2
3218/10 3219/16 3222/8 3227/8 3227/9
3262/22 3275/6 3308/10 3313/17
3315/6 3322/8 3322/23 3324/3 3336/11
3341/2 3350/23 3351/6 3356/12
3357/13 3370/23
dated [9] 3147/22 3191/9 3205/6
3215/8 3221/7 3223/3 3234/12 3254/12
3254/16
dates [1] 3159/12
David [16] 3148/15 3148/20 3150/16
3153/1 3155/6 3156/2 3163/8 3164/5
3167/9 3229/21 3277/22 3279/22
3281/18 3289/6 3364/15 3364/24
days [5] 3148/10 3148/20 3151/24
3167/3 3277/23
deadline [1] 3154/21
deadlines [1] 3154/21
deal [38] 3152/8 3153/13 3154/6
3154/15 3155/15 3155/20 3156/1
3157/6 3158/1 3160/22 3165/10
3167/24 3168/10 3185/15 3281/5
3281/6 3281/14 3281/14 3285/8
3285/25 3287/5 3287/19 3312/1 3312/6
3317/16 3317/19 3323/14 3323/24
3334/20 3336/3 3342/3 3342/6 3342/11
3342/12 3343/17 3343/24 3345/8
3365/1
dealing [5] 3154/14 3173/13 3288/23
3288/24 3290/22
dealings [2] 3155/17 3294/16
Dear [5] 3205/3 3205/25 3254/8
3254/14 3256/6
debentures [1] 3203/18
debriefed [1] 3191/3
debt [2] 3203/16 3203/17
debts [1] 3165/8
deceitful [1] 3339/7
December [21] 3143/3 3148/6 3148/9
3248/24 3259/4 3298/20 3320/2
3322/10 3322/24 3323/19 3323/23
3323/23 3324/4 3326/14 3327/1 3327/5
3328/5 3334/4 3336/12 3340/3 3343/24
December 12th [1] 3336/12
December 2012 [2] 3148/9 3334/4
December 2nd [1] 3322/24 3323/19

3323/23

December 3rd [5] 3322/10 3324/4
3327/1 3327/5 3328/5
decide [2] 3263/18 3339/9
decided [11] 3143/1 3157/5 3157/5
3181/15 3181/18 3198/20 3208/3
3208/14 3211/3 3211/4 3213/1
deciding [3] 3157/2 3178/17 3198/15
decision [17] 3144/13 3181/19 3194/17
3194/19 3198/23 3205/10 3208/15
3209/11 3209/24 3254/20 3295/18
3302/25 3303/2 3336/4 3337/9 3339/7
3339/8
decisions [3] 3158/8 3268/25 3348/1
deck [1] 3371/10
declarant [7] 3238/23 3239/1 3239/19
3239/24 3239/25 3240/6 3332/9
declarant's [3] 3239/22 3241/7 3244/8
declines [1] 3292/20
deductions [1] 3274/13
deeply [1] 3169/7
defendant [93] 3141/8 3141/18 3144/19
3147/23 3149/19 3148/24 3149/21
3150/15 3151/15 3152/1 3152/8 3153/1
3153/5 3153/11 3153/18 3154/3
3154/18 3155/1 3155/12 3155/24
3157/12 3157/12 3157/13 3158/10
3158/14 3158/24 3160/4 3162/8
3162/14 3163/7 3166/16 3167/1 3167/8
3167/12 3167/15 3167/21 3168/5
3169/4 3169/19 3170/13 3180/3
3181/24 3209/22 3244/2 3244/5 3244/6
3273/8 3291/14 3291/16 3292/23
3293/20 3294/8 3295/13 3304/14
3305/4 3305/25 3306/8 3308/1 3308/12
3309/8 3309/11 3311/25 3320/22
3321/20 3323/19 3327/1 3327/5
3327/21 3330/5 3330/8 3331/24
3331/25 3334/13 3334/14 3334/23
3338/22 3340/1 3342/1 3343/23
3345/11 3351/10 3355/21 3360/14
3362/18 3364/6 3364/10 3364/20
3367/4 3368/1 3368/15 3368/19 3370/9
3370/15
defendant's [9] 3159/21 3159/21
3160/12 3160/16 3303/20 3327/20
3330/2 3368/14 3370/4
Defendants [1] 3274/1
defense [22] 3158/1 3159/24 3183/24
3208/24 3213/21 3273/7 3274/3 3274/4
3278/18 3279/1 3279/12 3279/14
3279/15 3281/7 3281/10 3281/11
3286/3 3286/13 3286/14 3308/7
3322/15 3374/10
defense's [1] 3160/15
define [2] 3174/25 3370/21
defined [1] 3372/2
definite [1] 3280/19
definition [1] 3158/20
defrauded [1] 3157/15
defrauding [1] 3157/13
degree [5] 3187/21 3200/7 3200/9
3200/15 3324/24
Delaware [2] 3217/18 3340/23
delay [17] 3154/23 3155/16 3157/7
3157/10 3157/18 3158/13 3158/13
3158/13 3159/4 3160/13 3160/19

**D**

delay... [6] 3176/24 3180/19 3181/4
3184/9 3289/18 3290/12
delay-time [1] 3160/13
delaying [1] 3275/16 3328/8
delays [8] 3153/2 3157/17 3166/8
3171/20 3171/21 3173/17 3283/23
3344/22
deliver [1] 3164/24
delivered [2] 3164/25 3299/15
delivering [2] 3317/2 3317/5
demands [1] 3165/7
DeMartino [1] 3311/3
denied [1] 3182/9
denying [2] 3249/9 3249/10
depository [3] 3203/18 3258/13
3258/13
deprivation [1] 3158/7
describe [1] 3339/20
described [6] 3213/20 3239/20 3292/23
3295/13 3336/15 3348/16
describes [1] 3260/12
describing [2] 3236/10 3304/7
description [2] 3253/18 3256/5
Desert [2] 3340/16 3340/25
designed [1] 3342/14
desires [1] 3340/21
desperately [1] 3158/11
despite [1] 3175/18
detail [1] 3188/21
details [2] 3182/13 3279/21
determine [1] 3270/8
develop [1] 3312/11
developed [1] 3312/8
developing [4] 3217/19 3246/4 3257/20
3257/21
development [15] 3301/23 3311/8
3311/17 3313/6 3346/13 3349/16
3354/15 3354/19 3354/20 3362/8
3369/14 3369/21 3370/17 3372/19
3372/20
developmental [1] 3372/15
developments [1] 3365/21
devote [1] 3305/21
DG [2] 3178/5 3191/9
DG-1 [1] 3178/5
DG-2 [1] 3191/9
DG00018 [1] 3292/3
DG00023 [1] 3293/8
DG00038 [1] 3294/11
DG00086 [1] 3154/2
DG200075 [1] 3145/17
diagnose [1] 3368/25
diagnosis [1] 3369/2
diagnostic [1] 3368/15
diagnostics [1] 3368/24
Diamond [4] 3231/16 3231/19 3231/22
3231/23
didn't understand [1] 3203/22
Diego [19] 3298/7 3300/17 3302/21
3302/22 3303/3 3306/5 3306/7 3307/1
3307/3 3307/9 3309/22 3309/24 3310/2
3310/4 3310/7 3310/8 3310/11 3310/13
3310/18
difference [1] 3286/2
different [9] 3181/5 3202/24 3211/17
3221/10 3221/13 3221/20 3265/25

3346/7 3351/18
differently [1] 3345/4
difficult [8] 3263/5 3264/3 3264/4
3265/17 3267/19 3267/20 3332/14
3368/25
difficulty [2] 3332/21 3332/25
digested [1] 3327/7
dinner [14] 3180/20 3228/24 3230/13
3230/16 3230/22 3231/11 3232/18
3233/23 3257/4 3257/12 3287/3 3287/6
3287/7 3367/8
direct [23] 3142/13 3169/1 3174/13
3174/25 3175/3 3185/6 3199/1 3200/25
3203/10 3204/24 3207/18 3208/2
3208/11 3214/23 3215/12 3217/10
3228/13 3258/24 3269/7 3297/22
3301/19 3313/23 3336/1
direction [1] 3339/22
directly [4] 3158/9 3262/15 3288/24
3365/2
director [1] 3361/23
directors [11] 3165/21 3289/22 3298/22
3312/22 3314/3 3315/14 3337/15
3338/8 3340/16 3361/21 3372/11
disagree [1] 3206/6
disagreements [2] 3370/15 3370/15
disappointed [3] 3150/21 3154/24
3169/7
disappointed,' [2] 3157/22 3159/15
disappointment [4] 3162/6 3167/19
3167/19 3185/5
disaster [1] 3175/4
disbursements [2] 3170/9 3170/11
disclaims [1] 3218/9
disclosure [1] 3206/4
disclosures [3] 3206/2 3206/17
3255/25
discouraging [1] 3338/14
discretion [3] 3189/9 3189/10 3260/8
discuss [8] 3167/18 3178/11 3194/24
3267/1 3360/17 3363/21 3364/4
3373/11
discussed [11] 3181/23 3234/2 3248/3
3280/10 3280/16 3282/20 3309/7
3326/16 3352/17 3352/23 3353/19
discussing [3] 3303/13 3363/6 3368/1
discussion [22] 3180/13 3180/21
3220/15 3220/23 3221/1 3232/18
3237/3 3242/6 3249/11 3251/2 3305/20
3306/8 3326/10 3326/13 3326/14
3343/23 3347/10 3355/14 3358/25
3359/11 3361/14 3362/18
discussions [23] 3181/7 3182/10
3220/16 3220/21 3285/20 3285/24
3285/25 3326/12 3328/16 3328/19
3328/22 3344/2 3344/3 3344/20
3347/25 3355/20 3355/22 3359/18
3359/25 3360/1 3360/2 3362/20
3362/23
disease [3] 3309/21 3313/16 3368/25
diseases [2] 3368/22 3368/24
dishonest [1] 3338/15
dismay [1] 3337/14
disposition [1] 3184/17
disrespect [2] 3150/17 3229/22
dissemination [2] 3218/9 3222/5
distribution [3] 3313/3 3317/1

diverse [1] 3203/15
diversification [4] 3150/1 3150/8
3150/10 3229/5
divested [1] 3301/5
division [1] 3299/20
document [76] 3144/24 3145/1 3147/9
3149/7 3151/2 3152/13 3153/16 3154/1
3162/19 3163/14 3163/16 3163/23
3166/12 3178/14 3178/16 3190/21
3191/21 3192/17 3199/5 3199/8 3199/9
3201/22 3202/10 3204/10 3204/23
3209/6 3234/5 3238/20 3238/20
3249/13 3256/15 3261/6 3265/4 3267/3
3272/24 3273/3 3273/17 3273/19
3275/3 3278/21 3279/5 3283/11
3283/19 3289/1 3292/6 3293/7 3307/20
3307/22 3312/14 3312/19 3312/22
3313/19 3313/22 3322/3 3322/5
3326/25 3336/9 3336/10 3336/11
3336/13 3336/15 3336/17 3340/14
3341/5 3341/13 3341/15 3353/12
3353/14 3355/3 3356/6 3356/9 3357/2
3358/7 3366/14 3366/16 3372/10
documents [18] 3181/10 3199/16
3202/15 3202/17 3205/9 3254/19
3275/9 3290/25 3324/13 3324/17
3351/24 3352/2 3356/18 3356/21
3357/7 3357/18 3357/21 3358/12
dollar [9] 3216/1 3219/22 3219/23
3219/25 3225/13 3226/14 3226/18
3226/24 3342/9
dollars [4] 3179/16 3183/8 3219/3
3226/12
Donahue [1] 3350/3
done [11] 3151/21 3155/21 3168/11
3169/15 3181/3 3241/20 3278/15
3289/13 3325/5 3327/3 3368/24
door [1] 3237/16
double [3] 3237/14 3238/14 3344/13
down [28] 3143/1 3143/5 3143/8
3144/3 3154/6 3165/24 3170/20 3176/6
3202/18 3211/15 3217/10 3218/24
3219/2 3219/16 3234/22 3242/10
3256/18 3259/18 3265/12 3266/20
3313/1 3318/21 3320/24 3321/8
3321/13 3332/22 3373/3 3373/5
downside [1] 3339/13
downtown [1] 3304/3
dozens [5] 3189/1 3199/15 3199/17
3199/18 3199/19
Dr. [2] 3372/19 3372/22
Dr. Plotkin [1] 3372/22
Dr. Srinivas [1] 3372/19
dramatic [1] 3278/10
draw [1] 3294/12
drawing [1] 3292/2
drawn [1] 3290/25
driving [2] 3304/12 3356/1
drove [1] 3349/4
drug [6] 3230/20 3233/2 3257/24
3368/17 3368/17 3369/11
drugs [5] 3257/19 3304/20 3344/17
3344/22 3368/4
drum [6] 3237/6 3238/5 3240/16
3244/15 3244/17 3245/9

**D**

**drummer [4]** 3240/10 3241/4 3241/16 3246/6
**Duchenne [2]** 3312/9 3312/12
**due [3]** 3205/10 3312/7 3359/2
**duly [2]** 3142/6 3297/12
**during [29]** 3159/4 3159/23 3160/13 3168/9 3171/20 3174/7 3174/9 3180/18 3193/1 3198/15 3212/9 3213/8 3230/8 3232/12 3232/18 3237/3 3248/5 3257/18 3280/20 3302/7 3304/15 3304/17 3319/2 3340/2 3340/5 3348/1 3348/11 3349/14 3362/17
**duties [1]** 3346/18
**duty [2]** 3346/17 3346/19
**DX48 [1]** 3234/8
**DX5450 [2]** 3282/25 3283/9
**dying [1]** 3184/16
**Dynagrow [1]** 3321/14
**dystrophy [2]** 3312/9 3312/12

**E**

**e-mail [112]** 3142/18 3142/22 3144/6 3144/20 3147/6 3147/10 3147/11 3147/21 3147/25 3148/17 3148/19 3148/23 3149/3 3149/8 3149/19 3150/15 3151/3 3151/4 3151/14 3152/1 3152/14 3152/15 3152/25 3153/4 3153/11 3153/17 3154/2 3154/17 3154/25 3155/2 3155/5 3155/11 3155/15 3155/23 3156/6 3156/10 3157/10 3157/20 3157/21 3159/14 3159/16 3159/17 3160/3 3162/3 3162/5 3162/8 3162/14 3165/24 3166/13 3166/14 3166/25 3167/8 3167/11 3167/15 3167/21 3169/3 3169/19 3170/20 3180/14 3180/21 3202/13 3208/12 3208/23 3209/18 3273/12 3274/6 3274/9 3275/21 3275/24 3276/19 3277/10 3279/7 3279/18 3280/3 3280/25 3281/3 3282/3 3282/3 3282/24 3283/3 3283/15 3284/13 3287/5 3288/2 3288/25 3289/2 3289/6 3364/14 3364/14 3364/17 3364/18 3364/18 3364/25 3365/4 3365/6 3365/13 3365/18 3365/20 3366/17 3367/3 3367/4 3367/5 3367/18 3367/18 3368/2 3369/22 3370/7 3370/23 3371/7 3371/14 3371/17 3372/8
**e-mailing [3]** 3147/13 3151/6 3152/17
**e-mails [13]** 3149/9 3153/18 3158/24 3159/10 3159/12 3159/12 3159/21 3160/4 3209/19 3275/18 3282/25 3286/6 3286/15
**early [12]** 3195/9 3195/10 3306/23 3309/4 3334/3 3340/8 3344/22 3345/16 3347/7 3364/21 3369/1 3373/11
**earn [1]** 3340/6
**earned [1]** 3190/14
**earnings [1]** 3302/7
**easier [1]** 3201/21
**easily [1]** 3338/10
**East [1]** 3141/14
**EASTERN [3]** 3141/2 3141/14 3370/5
**easy [4]** 3287/2 3339/12 3366/5 3369/25
**edge [1]** 3213/21

**Edmund [5]** 3314/1 3314/19 3314/20 3315/9 3315/13
**education [5]** 3299/3 3317/4 3317/6 3353/8 3368/9
**EFAY [1]** 3363/15
**effect [11]** 3156/10 3159/22 3160/15 3160/20 3181/13 3243/2 3245/5 3246/8 3291/19 3291/20 3332/3
**effecting [1]** 3294/16
**effective [1]** 3319/9
**effectively [1]** 3346/20
**efficient [1]** 3319/8
**efficiently [1]** 3346/21
**effort [2]** 3176/17 3368/6
**eight [5]** 3166/4 3166/5 3258/7 3261/6 3262/11
**eight-month [1]** 3166/4
**either [15]** 3143/17 3144/1 3176/5 3188/25 3194/2 3223/19 3241/6 3241/7 3249/3 3263/20 3275/14 3303/8 3324/13 3334/16 3363/6
**ejected [1]** 3243/2
**elapsed [1]** 3170/19
**electronic [2]** 3259/22 3366/5
**ELEIS [1]** 3141/16
**elements [1]** 3160/18
**elicit [1]** 3333/10
**eliciting [1]** 3332/15
**email [80]** 3141/23 3211/10 3215/13 3216/14 3218/4 3218/20 3218/23 3221/7 3224/13 3224/25 3228/11 3228/14 3228/15 3228/16 3228/17 3303/7 3303/8 3307/24 3307/25 3308/1 3308/10 3315/6 3315/6 3315/23 3319/13 3319/15 3319/24 3321/9 3322/6 3322/9 3322/10 3322/18 3322/23 3322/25 3323/16 3323/17 3323/18 3324/1 3324/3 3324/7 3324/7 3324/8 3324/9 3324/18 3324/20 3326/1 3326/24 3326/25 3327/12 3328/4 3328/5 3334/3 3334/20 3336/10 3341/16 3341/25 3342/1 3342/2 3342/6 3343/12 3343/14 3350/16 3350/18 3351/6 3351/13 3351/20 3351/24 3352/12 3352/13 3353/11 3356/10 3356/12 3356/14 3356/17 3357/6 3357/9 3357/13 3357/19 3357/22 3367/19
**emailing [1]** 3149/11
**emails [2]** 3246/15 3358/11
**emphasis [1]** 3159/24
**employed [3]** 3330/4 3331/2 3331/24
**employee [10]** 3304/11 3311/10 3311/17 3311/19 3321/5 3323/21 3331/6 3361/24 3361/24 3364/25
**employees [14]** 3294/19 3310/10 3310/23 3325/15 3330/2 3330/17 3330/18 3330/19 3330/20 3330/25 3331/3 3331/4 3331/8 3349/25
**employment [1]** 3331/7
**En [2]** 3148/20 3277/22
**Enclosed [1]** 3274/11
**encompasses [1]** 3317/6
**end [28]** 3144/3 3155/18 3158/2 3158/17 3158/21 3161/3 3172/13 3176/11 3176/17 3182/15 3182/18 3185/16 3186/20 3197/20 3198/9

3225/23 3246/25 3279/23 3280/6 3298/13 3298/20 3305/1 3307/7 3305/14 3305/15 3306/11 3325/4 3333/14
**ended [6]** 3171/19 3284/11 3286/23 3286/25 3317/13 3358/21
**Ending [1]** 3353/15
**ends [1]** 3313/19
**energetic [2]** 3307/13 3318/19
**energy [1]** 3305/21
**enforcement [6]** 3169/14 3176/25 3177/10 3288/1 3288/13 3288/15
**engage [5]** 3262/15 3312/23 3336/14 3337/9 3339/3
**engaged [1]** 3317/20
**engages [1]** 3338/3
**enhance [1]** 3294/6
**enter [1]** 3313/9
**enterprise [1]** 3264/12
**enters [2]** 3228/1 3373/8
**enthusiastic [1]** 3318/20
**entire [4]** 3180/18 3338/9 3346/25 3353/24
**entities [8]** 3164/10 3164/11 3164/23 3165/3 3221/24 3265/17 3267/21 3331/8
**entitled [1]** 3155/4
**entity [2]** 3325/3 3331/24
**entry [3]** 3320/25 3321/8 3321/14
**envelope [2]** 3144/25 3146/4
**enzyme [3]** 3301/11
**equally [1]** 3243/18
**equipment [2]** 3325/14 3362/22
**equities [1]** 3150/12
**equity [31]** 3203/13 3203/17 3206/5 3208/18 3255/12 3256/21 3258/10 3258/12 3259/23 3259/25 3262/12 3262/17 3262/19 3262/20 3263/1 3263/8 3263/11 3263/16 3263/16 3263/23 3265/13 3265/16 3267/5 3267/17 3267/19 3269/24 3292/11 3293/11 3293/16 3356/2 3356/4
**Eric [1]** 3178/10
**ESQ [8]** 3141/13 3141/15 3141/16 3141/16 3141/19 3141/20 3141/20 3141/21
**essentially [7]** 3184/10 3189/21 3204/14 3237/17 3241/20 3243/6 3268/24
**established [2]** 3214/16 3330/15
**et [2]** 3274/13 3293/12
**etc [1]** 3203/19
**ethically [1]** 3346/21
**evaluation [1]** 3226/21
**Evan [33]** 3152/2 3152/4 3152/6 3153/10 3154/3 3154/5 3154/20 3155/2 3155/5 3155/12 3155/14 3155/20 3162/15 3162/22 3163/7 3163/24 3164/5 3173/17 3251/16 3284/5 3284/5 3285/4 3285/4 3285/17 3286/16 3287/16 3315/21 3347/15 3347/18 3347/19 3349/9 3353/1 3356/16
**Evan's [1]** 3163/19
**evening [1]** 3373/13
**event [1]** 3174/2
**events [2]** 3148/2 3276/1
**eventual [1]** 3261/17

**E**

**eventually [5]** 3169/23 3339/7 3340/4 3363/4 3363/4

**evidence [75]** 3142/16 3145/11 3147/16 3147/20 3149/14 3149/18 3151/9 3151/13 3152/24 3153/21 3153/25 3158/9 3163/1 3163/5 3164/1 3164/4 3166/23 3178/6 3185/17 3201/22 3208/13 3208/23 3215/1 3216/17 3223/3 3223/22 3224/11 3239/22 3239/23 3242/14 3244/19 3248/15 3252/2 3252/6 3273/5 3273/25 3274/4 3275/20 3279/12 3279/15 3281/7 3281/11 3283/8 3283/13 3283/15 3283/16 3283/18 3286/11 3286/14 3289/3 3289/5 3291/9 3292/1 3308/4 3308/7 3312/15 3313/10 3315/4 3319/11 3322/12 3322/15 3330/10 3330/13 3336/6 3340/13 3341/20 3341/24 3350/8 3350/13 3350/15 3357/12 3364/13 3366/23 3367/2 3370/22

**ex [1]** 3321/4

**ex-Schering [1]** 3321/4

**exact [2]** 3343/25 3350/23

**exactly [4]** 3156/1 3287/23 3325/2 3326/12

**examination [25]** 3142/13 3159/23 3169/1 3171/5 3174/14 3185/1 3199/1 3200/25 3203/10 3204/24 3207/18 3208/2 3208/11 3211/1 3214/23 3215/13 3217/10 3217/24 3228/13 3236/12 3239/3 3269/7 3291/7 3297/22 3336/1

**examine [1]** 3241/15

**examined [4]** 3142/6 3297/13 3332/9 3333/3

**example [1]** 3184/13

**exasperated [2]** 3157/7 3157/20

**exceed [1]** 3294/3

**exception [1]** 3356/18

**exchange [6]** 3177/23 3178/1 3231/13 3281/3 3283/3 3366/4

**exchanges [4]** 3259/21 3279/7 3361/15 3361/16

**excited [5]** 3148/4 3276/2 3276/11 3277/6 3277/17

**exciting [1]** 3307/15

**exculpate [1]** 3294/18

**Exculpation [1]** 3294/12

**exculpatory [1]** 3243/15

**excuse [10]** 3177/18 3177/21 3244/16 3302/21 3309/18 3313/9 3313/12 3354/3 3356/15 3372/24

**excused [2]** 3296/2 3296/4

**execute [1]** 3156/1

**executed [1]** 3164/6

**execution [1]** 3165/1

**executive [8]** 3298/11 3301/16 3301/22 3308/16 3309/18 3309/19 3320/21 3321/18

**exercise [3]** 3205/10 3254/20 3294/15

**exhibit [90]** 3142/16 3144/23 3145/7 3145/10 3147/8 3147/19 3149/6 3149/14 3149/17 3151/1 3151/9 3151/12 3152/12 3152/20 3152/23 3153/15 3153/21 3153/24 3162/18

3163/1 3163/4 3163/21 3164/1 3164/3 3164/4 3186/11 3166/22 3201/4 3201/14 3204/21 3208/24 3209/22 3215/3 3215/5 3223/3 3224/16 3228/10 3255/20 3256/13 3270/3 3270/20 3271/2 3271/4 3273/7 3273/9 3274/1 3274/3 3274/4 3287/18 3279/1 3279/15 3281/11 3283/9 3283/13 3286/4 3286/13 3286/14 3291/10 3292/2 3293/8 3294/11 3307/17 3308/4 3308/7 3312/15 3313/7 3315/5 3319/12 3322/1 3322/12 3322/15 3336/7 3340/12 3341/12 3341/20 3341/23 3350/7 3350/10 3350/14 3351/14 3356/7 3357/11 3357/22 3357/24 3358/6 3360/16 3364/12 3366/13 3366/23 3367/1

**Exhibit 109-12 [1]** 3228/10

**Exhibit 109-6 [1]** 3204/21

**Exhibit 119-22 [2]** 3322/1 3322/12

**Exhibit 11A [2]** 3201/4 3201/14

**Exhibit 12 [1]** 3358/6

**Exhibit 122-25 [1]** 3307/17 3308/4

**Exhibit 122-26 [1]** 3312/15

**Exhibit 122-31 [1]** 3315/5

**Exhibit 122-32 [1]** 3319/12

**Exhibit 122-38 [1]** 3340/12

**Exhibit 122-40 [2]** 3341/12 3341/20

**Exhibit 122-43 [1]** 3350/10

**Exhibit 122-48 [2]** 3356/7 3357/22

**Exhibit 122-49 [2]** 3357/24 3360/16

**Exhibit 122-50 [1]** 3357/11

**Exhibit 123-43 [1]** 3350/7

**Exhibit 5480 [2]** 3208/24 3209/22

**Exhibit 91-1 [1]** 3215/3

**Exhibit 91-8 [1]** 3224/16

**Exhibit A [1]** 3351/14

**exhibits [2]** 3214/25 3351/22

**Exhibits 91-1 [1]** 3214/25

**exist [3]** 3300/24 3324/13 3324/14

**existed [1]** 3330/3

**exits [3]** 3227/22 3296/10 3373/4

**expanded [2]** 3206/3 3349/17

**expansion [1]** 3301/2

**expect [9]** 3146/10 3151/24 3155/17 3200/18 3279/21 3316/17 3362/5

**expected [4]** 3203/13 3289/16 3294/3 3316/19

**expecting [1]** 3168/10

**expects [1]** 3152/4

**expedite [1]** 3152/4

**expenses [6]** 3165/8 3294/21 3334/10 3354/14 3362/21 3362/22

**experience [18]** 3174/14 3174/17 3176/16 3183/23 3200/16 3213/23 3264/11 3292/17 3292/19 3299/16 3303/16 3303/17 3309/21 3360/21 3362/4 3368/8 3368/11 3368/12

**experienced [2]** 3158/19 3337/5

**expertise [7]** 3187/21 3187/23 3345/19 3353/3 3353/6 3353/10 3368/11

**experts [1]** 3189/4

**explain [9]** 3148/15 3220/10 3220/13 3238/19 3238/25 3248/10 3248/11 3343/1 3366/2

**explained [1]** 3339/4

**explaining [1]** 3212/17

**explanation [1]** 3224/5

**explore [1]** 3185/4

**expose [1]** 3296/8

**exposed [1]** 3338/13

**express [4]** 3144/25 3157/9 3157/10 3314/16

**expressed [1]** 3339/10

**expressing [1]** 3327/12

**expression [2]** 3159/2 3229/13

**extensive [1]** 3360/21

**extensively [1]** 3230/16

**extent [11]** 3181/20 3182/8 3236/22 3237/18 3237/25 3240/4 3266/6 3269/7 3306/11 3309/9 3348/10

**external [1]** 3362/10

**extraordinarily [3]** 3182/16 3184/22 3184/23

**eye [2]** 3370/16 3370/16

**F**

**facilitate [1]** 3206/7

**facilities [1]** 3371/22

**fact [20]** 3157/15 3157/17 3178/15 3184/4 3184/21 3185/15 3186/1 3191/19 3194/12 3201/17 3209/14 3226/20 3231/15 3240/11 3251/16 3310/6 3330/7 3333/10 3336/3 3372/8

**factor [2]** 3184/10 3184/12

**factors [7]** 3182/23 3182/24 3194/13 3194/16 3195/22 3195/23 3264/10

**fair [12]** 3150/5 3173/18 3173/20 3173/24 3184/25 3229/9 3241/17 3251/15 3260/11 3368/7 3368/22 3368/23

**fairly [3]** 3320/20 3346/11 3352/6

**fairness [1]** 3294/16

**faith [2]** 3168/1 3294/15

**fall [8]** 3302/19 3311/23 3314/24 3316/12 3319/2 3319/5 3359/2 3361/14

**fallen [1]** 3343/24

**false [1]** 3217/5

**familiar [3]** 3311/9 3314/20 3366/5

**family [2]** 3184/4 3306/25

**far [5]** 3183/3 3185/23 3245/24 3289/12 3307/6

**father [1]** 3180/5

**favorite [1]** 3332/6

**February [17]** 3177/25 3178/10 3179/5 3210/7 3246/14 3341/17 3342/1 3342/18 3343/9 3353/18 3366/18 3367/4 3369/7 3369/23 3370/10 3370/14 3370/24

**February 11 [1]** 3370/24

**February 2013 [1]** 3353/18

**February 2014 [1]** 3370/14

**February 2015 [1]** 3179/5

**February 24th [1]** 3178/10

**February 6 [1]** 3367/4

**February 7 [1]** 3369/23

**February 8th [1]** 3342/1

**Federal [1]** 3144/25

**FedEx [1]** 3145/13

**feedback [2]** 3338/19 3338/21

**feelings [1]** 3160/11

**fell [2]** 3335/2 3336/3

**felt [6]** 3309/14 3336/24 3337/3 3338/14 3339/22 3340/14

**F**

**Fernandez [4]** 3308/18 3308/18 3308/19 3310/25

**Fernandez's [1]** 3309/6

**few [12]** 3143/15 3148/20 3149/23 3151/24 3157/25 3219/2 3226/11 3229/3 3277/23 3294/8 3310/19 3320/17

**fewer [1]** 3354/16

**fiduciaries [1]** 3294/14

**fiduciary [1]** 3200/18

**field [2]** 3300/23 3360/21

**figure [1]** 3226/18

**figuring [1]** 3325/18

**file [3]** 3274/19 3274/21 3274/22

**filed [4]** 3274/13 3274/16 3274/16 3350/1

**Files [1]** 3357/2

**filings [1]** 3358/22

**fill [1]** 3370/1

**filled [1]** 3367/10

**final [2]** 3165/5 3328/4

**finalize [1]** 3371/9

**finalizing [1]** 3251/9

**finance [2]** 3346/13 3360/21

**finances [2]** 3324/25 3343/2

**financial [26]** 3169/17 3311/13 3320/11 3324/11 3324/13 3324/16 3325/1 3326/5 3327/2 3327/11 3327/14 3331/11 3332/4 3332/8 3332/12 3332/17 3332/21 3334/5 3334/15 3342/18 3350/21 3351/1 3352/15 3352/17 3352/21 3366/8

**financials [17]** 3302/3 3323/2 3325/5 3327/9 3327/17 3327/19 3327/23 3327/24 3328/8 3328/17 3330/5 3330/9 3330/11 3332/16 3332/18 3332/20 3359/1

**financing [10]** 3317/16 3317/19 3317/21 3326/9 3334/7 3342/5 3342/10 3343/6 3352/15 3353/16

**fine [5]** 3170/17 3183/2 3185/21 3345/2 3371/7

**finger [2]** 3204/5 3265/5

**finish [2]** 3267/11 3299/10

**finished [5]** 3225/19 3227/16 3299/9 3299/12 3337/11

**firm [7]** 3175/15 3175/16 3176/24 3251/17 3316/10 3328/3 3368/9

**first [58]** 3142/5 3142/24 3142/25 3142/25 3144/24 3145/12 3146/4 3155/11 3163/6 3164/8 3167/20 3190/24 3201/4 3205/25 3215/3 3215/24 3216/22 3217/22 3217/24 3218/2 3219/16 3255/2 3258/8 3260/20 3266/1 3271/7 3292/8 3293/14 3297/12 3297/19 3300/5 3300/5 3302/18 3310/17 3310/19 3314/11 3316/3 3316/7 3326/13 3346/6 3345/25 3346/2 3350/24 3351/5 3351/20 3352/12 3353/11 3353/12 3353/15 3353/17 3353/25 3354/3 3354/3 3354/5 3364/16 3367/3 3367/17 3369/10

**fits [1]** 3244/3

**five [3]** 3146/8 3300/21 3351/18

**fix [1]** 3262/21

**flexibility [1]** 3324/24

**flip [1]** 3339/17

**flipped [2]** 3199/11 3199/13

**floor [1]** 3188/25

**Florida [1]** 3192/16

**flow [3]** 3351/15 3353/14 3354/19

**fly [1]** 3367/8

**flying [2]** 3367/19 3367/23

**focus [12]** 3143/9 3145/17 3154/2 3163/6 3164/8 3166/24 3167/21 3217/13 3255/10 3256/19 3301/10 3319/4

**focused [4]** 3217/19 3317/13 3318/13 3370/1

**focuses [1]** 3308/8

**Focusing [1]** 3334/3

**folks [2]** 3344/20 3344/23

**follow [7]** 3208/22 3209/11 3209/13 3305/24 3305/25 3306/2 3339/22

**follow-up [1]** 3208/22

**followed [1]** 3144/20

**following [7]** 3165/1 3168/17 3209/18 3296/13 3334/13 3348/6 3360/22

**follows [2]** 3142/7 3297/13

**footnote [6]** 3217/10 3217/25 3219/13 3221/18 3221/20 3221/23

**footnotes [1]** 3220/24

**force [4]** 3151/23 3300/7 3301/5 3316/25

**forget [1]** 3279/23

**forgot [4]** 3153/2 3160/22 3283/23 3311/10

**form [12]** 3143/7 3144/4 3144/10 3144/16 3186/6 3186/9 3212/23 3221/10 3274/12 3313/6 3359/16 3359/21

**formal [3]** 3285/10 3285/12 3297/19

**format [2]** 3221/13 3222/21

**formed [1]** 3264/12

**former [3]** 3260/13 3321/18 3368/5

**formerly [3]** 3279/3 3280/24 3286/4

**forming [4]** 3300/4 3303/14

**forth [3]** 3211/12 3306/10 3334/13

**forths [1]** 3306/11

**fortunate [1]** 3300/4

**forward [2]** 3287/4 3343/10

**forwarded [5]** 3180/15 3315/18 3315/20

**forwards [1]** 3323/17

**foundation [7]** 3180/24 3183/18 3185/25 3186/12 3237/4 3270/18 3278/24

**foundational [1]** 3186/8

**founded [1]** 3309/10

**founder [3]** 3298/19 3303/22 3367/13

**four [2]** 3146/7 3271/13

**fourth [1]** 3314/12

**frame [1]** 3345/17

**framework [3]** 3317/2 3317/4 3317/4

**Francisco [2]** 3304/3 3304/4

**fraud [3]** 3177/11 3238/2 3243/21

**Fred [3]** 3321/15 3321/17 3321/20

**free [3]** 3153/9 3284/4 3285/3

**freely [1]** 3261/14

**Friday [2]** 3154/5 3279/21

**friend [2]** 3320/23 3321/21

**friendly [1]** 3231/11

**friendship [2]** 3193/9 3193/14

**front [6]** 3164/5 3201/25 3211/15 3249/13 3293/2 3387/6

**frustrated [5]** 3157/20 3159/16 3176/23 3288/7 3344/21

**frustration [2]** 3157/11 3159/5

**fulfill [2]** 3169/11 3365/11

**full [6]** 3165/4 3169/12 3261/7 3265/21 3344/4 3369/24

**full-time [1]** 3169/12

**fully [2]** 3263/12 3294/1

**fumes [1]** 3334/11

**fun [1]** 3287/10

**function [4]** 3316/25 3316/25 3317/1 3317/1

**Functionally [1]** 3316/14

**functioned [1]** 3347/20

**functioning [1]** 3316/1

**functions [1]** 3311/14

**fund [68]** 3143/1 3143/6 3143/13 3144/3 3144/8 3144/9 3147/3 3148/8 3148/12 3148/13 3150/12 3165/25 3170/12 3174/14 3174/19 3175/4 3175/9 3175/13 3175/15 3176/12 3182/3 3182/25 3183/1 3183/6 3183/15 3200/2 3203/21 3203/23 3204/20 3205/5 3206/3 3206/21 3208/6 3208/15 3211/5 3219/11 3223/19 3233/13 3245/2 3245/14 3246/7 3253/7 3253/12 3253/13 3253/18 3253/19 3254/15 3257/14 3257/25 3257/25 3257/25 3259/2 3259/13 3259/13 3266/19 3266/19 3268/22 3291/23 3309/9 3309/12 3309/13 3318/3 3322/22 3322/22 3324/22 3325/2 3325/7 3325/7 **fund's [1]** 3253/16

**funded [2]** 3312/5 3334/7

**funding [18]** 3231/17 3231/19 3231/22 3231/23 3255/12 3255/13 3256/21 3256/22 3262/15 3304/21 3312/7 3317/12 3318/5 3323/11 3323/13 3326/4 3326/8 3334/18

**funds [18]** 3143/3 3156/1 3167/3 3167/9 3167/13 3167/17 3206/6 3253/15 3258/11 3265/14 3289/16 3317/22 3323/22 3326/2 3344/20 3344/25 3364/5 3364/9

**furtherance [4]** 3236/7 3236/22 3236/23 3239/4

**furthering [1]** 3239/6

**future [8]** 3148/4 3264/18 3265/1 3276/3 3276/11 3277/17 3277/19 3344/25

**G**

**game [3]** 3160/1 3160/7 3241/17

**gap [1]** 3166/4

**Gateway [2]** 3340/17 3340/25

**gather [1]** 3229/2

**gathered [2]** 3149/23 3371/25

**GELLER [69]** 3142/5 3142/8 3142/22 3142/24 3146/20 3148/16 3152/6 3154/1 3162/3 3163/6 3163/14 3164/19 3165/24 3170/1 3170/19 3171/7 3171/9 3173/6 3173/8 3180/7 3180/7 3180/11 3180/13 3180/13 3180/15 3180/16 3180/16 3180/20 3181/7 3181/15 3182/6 3182/19 3182/24 3185/20

**G**

**GELLER... [35]** 3185/22 3185/24 3186/2 3190/11 3192/13 3193/14 3197/2 3197/4 3197/16 3202/6 3202/8 3207/22 3209/11 3211/7 3212/1 3212/4 3212/8 3212/9 3228/8 3239/20 3239/25 3245/6 3245/14 3245/17 3245/19 3245/21 3281/18 3291/9 3292/1 3293/7 3294/10 3295/9 3295/12 3362/3 3363/11

**Geller's [5]** 3181/24 3182/14 3182/14 3182/20 3185/21

**Genentech [4]** 3300/4 3300/7 3300/9 3300/13

**general [31]** 3192/7 3197/11 3218/7 3261/21 3261/23 3262/1 3267/7 3268/24 3270/5 3270/7 3270/15 3270/16 3271/18 3272/10 3272/13 3276/23 3277/19 3294/13 3294/14 3294/18 3294/22 3295/1 3336/13 3340/22 3348/2 3351/16 3352/4 3355/20 3355/22 3362/13 3372/1

**generally [3]** 3272/17 3333/11 3342/14

**Generic [2]** 3188/7 3188/25

**genetics [1]** 3299/10

**genius [5]** 3181/16 3195/16 3195/20 3243/8 3245/15

**gentleman [2]** 3151/18 3169/16

**gentlemen [1]** 3373/1

**Genzyme [1]** 3300/24

**George [8]** 3304/11 3311/11 3311/13 3324/11 3329/2 3330/4 3334/17 3350/1

**gift [5]** 3147/2 3217/20 3233/12 3233/14 3233/15

**gifted [3]** 3320/8 3320/9 3320/13

**Giordano [1]** 3364/21

**given [3]** 3259/12 3339/23 3344/23

**glitches [1]** 3169/9

**global [3]** 3203/13 3258/13 3309/22

**gmail.com [1]** 3141/23

**goal [3]** 3143/2 3148/8 3318/2

**gold [1]** 3362/15

**Golding [6]** 3167/17 3360/19 3360/20 3364/19 3364/22 3371/3

**government [64]** 3141/13 3145/10 3147/19 3149/17 3151/12 3152/23 3153/24 3163/4 3164/4 3166/22 3171/19 3171/25 3180/14 3183/10 3190/18 3190/25 3194/1 3197/2 3201/1 3201/14 3203/2 3203/11 3204/21 3214/24 3228/10 3228/13 3234/2 3237/10 3238/16 3243/2 3243/13 3249/12 3249/14 3251/16 3280/24 3297/6 3297/7 3307/17 3308/3 3308/4 3312/14 3315/4 3319/12 3321/25 3322/11 3322/12 3336/6 3340/11 3341/12 3341/19 3341/20 3341/23 3350/6 3350/10 3350/14 3356/7 3357/11 3357/22 3357/24 3358/5 3360/16 3366/22 3367/1 3374/14

**Government's [25]** 3142/16 3144/23 3145/7 3147/8 3149/6 3149/13 3151/1 3151/8 3152/12 3152/20 3153/15 3153/20 3162/18 3162/25 3163/21 3163/25 3166/11 3283/13 3291/10 3292/2 3293/8 3294/11 3364/12 3366/13 3366/23

**GR0001290 [1]** 3164/8

**GR0001295 [1]** 3165/12

**grab [1]** 3236/14

**graduate [1]** 3299/9

**Graham [1]** 3239/14

**grand [1]** 3318/13

**grandchild [1]** 3307/3

**granular [2]** 3332/17 3333/10

**Gray [1]** 3305/8

**great [11]** 3155/22 3212/2 3212/12 3213/10 3213/17 3214/1 3214/10 3214/12 3287/3 3300/18 3304/7

**greater [1]** 3167/24

**Greebel [46]** 3152/2 3152/4 3152/6 3154/3 3155/5 3155/12 3162/15 3162/22 3163/7 3164/5 3173/17 3225/12 3251/8 3251/17 3285/4 3285/13 3285/21 3287/16 3288/20 3288/23 3288/25 3289/5 3289/6 3315/21 3315/21 3315/25 3323/19 3338/25 3339/1 3339/4 3347/16 3347/19 3348/11 3348/14 3348/18 3348/22 3349/9 3349/20 3351/11 3353/1 3356/15 3356/16 3360/7 3365/1 3371/4 3371/17

**Greebel's [2]** 3285/18 3347/18

**Greebl [1]** 3364/20

**gross [1]** 3294/24

**ground [3]** 3184/24 3245/25 3246/11

**group [7]** 3300/15 3301/21 3311/17 3318/8 3327/22 3349/18 3367/11

**groups [1]** 3301/19

**grow [1]** 3316/22

**grown [1]** 3225/9

**growth [1]** 3261/16

**guarantee [1]** 3265/1

**guess [4]** 3146/25 3148/11 3322/8 3369/2

**Guggenheim [1]** 3350/2

**guidelines [1]** 3366/7

**guy [5]** 3194/8 3241/21 3243/6 3243/8 3318/20

**guys [9]** 3150/1 3150/8 3167/13 3212/3 3212/11 3213/2 3229/5 3287/3 3368/15

**H**

**half [10]** 3179/16 3227/10 3308/9 3311/7 3324/20 3350/24 3354/3 3354/6 3355/3 3358/6

**hallway [2]** 3304/13 3314/23 3315/1

**halt [2]** 3143/21 3143/23

**hand [5]** 3165/15 3234/12 3234/15 3234/17 3297/11

**handing [1]** 3209/5

**handle [1]** 3169/20

**handouts [1]** 3371/10

**handwriting [7]** 3205/14 3205/22 3205/23 3252/3 3252/14 3255/21 3271/8

**hanging [1]** 3369/25

**happy [7]** 3158/2 3158/17 3159/25 3160/5 3286/20 3286/23 3367/15

**hard [1]** 3361/18

**harm [13]** 3158/7 3158/7 3158/19 3158/20 3158/25 3159/4 3160/14 3160/18 3160/19 3184/5 3184/9 3184/14 3184/24

**Hassan [5]** 3184/13 3321/15 3321/17 3321/20 3335/10

**hate [1]** 3290/23

**hawking [2]** 3280/6 3280/8

**head [6]** 3146/24 3180/1 3182/22 3311/8 3314/15 3372/20

**headed [1]** 3367/12

**header [1]** 3324/3

**heading [1]** 3183/3

**headquartered [1]** 3310/5

**headquarters [3]** 3309/22 3309/24 3310/6

**Health [4]** 3170/9 3172/10 3206/1 3206/3

**healthcare [23]** 3144/19 3146/16 3146/22 3147/1 3164/13 3164/13 3164/14 3165/18 3217/16 3222/18 3224/19 3255/11 3256/20 3262/16 3264/8 3270/16 3271/5 3274/14 3291/16 3292/12 3321/9 3321/10 3321/11

**hear [11]** 3152/3 3241/25 3241/25 3267/11 3279/21 3281/18 3287/15 3302/18 3303/4 3334/18 3337/10

**heard [9]** 3169/10 3269/8 3276/10 3281/17 3287/3 3328/1 3330/21 3338/24 3344/19

**hearing [4]** 3146/7 3160/5 3287/4 3287/14

**hearsay [16]** 3180/22 3181/8 3181/11 3181/12 3181/25 3236/1 3236/24 3239/20 3244/22 3245/1 3245/18 3245/20 3283/10 3330/14 3330/24 3332/6

**hedge [15]** 3143/1 3143/6 3174/14 3174/19 3175/4 3175/13 3175/15 3176/12 3206/6 3258/11 3265/14 3268/22 3294/6 3309/9 3309/11

**held [2]** 3270/8 3301/15

**Hello [1]** 3297/9

**help [11]** 3149/1 3158/25 3243/4 3249/4 3278/9 3319/5 3323/22 3352/18 3352/24 3367/11 3370/12

**helped [2]** 3251/19 3251/22

**helpful [1]** 3210/5

**hereto [1]** 3313/7

**hesitate [2]** 3171/16 3206/16

**hi [10]** 3148/20 3149/22 3162/10 3163/8 3164/5 3167/9 3228/17 3277/22 3289/6 3367/6

**high [4]** 3149/25 3260/9 3290/25 3302/17

**high-class [1]** 3290/25

**high-yield [1]** 3260/9

**higher [1]** 3229/4

**highest [1]** 3299/2

**highlighted [2]** 3259/18 3265/6

**highlighting [1]** 3262/11

**highlights [1]** 3258/8

**highly [5]** 3160/1 3160/7 3160/13 3182/1 3367/15

**himself [3]** 3165/17 3320/11 3356/1

**hire [3]** 3288/16 3362/6 3362/19

**hired [10]** 3177/7 3310/11 3310/12 3311/23 3321/5 3331/7 3337/4 3340/1 3347/17 3362/8

**historically [1]** 3362/7

# H

**history [4]** 3182/14 3264/11 3264/13 3360/21
**hoc [1]** 3347/10
**hold [3]** 3187/16 3187/18 3358/1
**holder [1]** 3144/1
**home [1]** 3167/25
**honest [3]** 3243/24 3245/11 3276/18
**honor [100]** 3142/10 3145/6 3147/15 3149/13 3150/19 3151/8 3152/19 3153/20 3156/7 3157/1 3157/24 3159/19 3162/25 3163/25 3166/18 3169/8 3170/15 3170/17 3170/23 3170/25 3171/3 3174/3 3175/24 3177/18 3177/19 3177/21 3178/7 3178/12 3179/1 3179/19 3181/12 3182/7 3185/18 3186/18 3193/13 3193/15 3197/1 3197/13 3203/4 3207/12 3207/25 3209/1 3209/5 3209/6 3210/4 3212/15 3212/18 3220/8 3227/14 3228/4 3229/17 3230/2 3230/10 3230/21 3233/7 3233/24 3234/25 3236/1 3237/24 3238/13 3239/19 3241/9 3242/2 3243/1 3243/17 3243/19 3244/3 3249/23 3258/22 3259/5 3259/14 3266/7 3266/24 3267/9 3268/12 3270/4 3270/10 3277/2 3277/7 3278/19 3281/24 3283/8 3283/10 3283/14 3284/23 3286/11 3288/3 3290/9 3291/6 3293/2 3295/23 3296/1 3297/7 3308/3 3322/11 3329/4 3341/19 3350/9 3358/2 3366/22
**HONORABLE [1]** 3141/10
**hope [10]** 3147/25 3148/22 3155/10 3167/2 3275/24 3277/24 3278/14 3281/6 3281/13 3367/6
**hoped [1]** 3354/22
**hopefully [2]** 3337/6 3367/9
**Horacio [1]** 3372/20
**hospital [1]** 3300/1
**hostile [1]** 3372/22
**hounding [2]** 3280/7 3280/8
**hour [3]** 3296/7 3296/11 3304/4
**hours [2]** 3191/6 3365/12
**HR [1]** 3323/1
**Huang [10]** 3304/11 3311/11 3328/22 3328/25 3329/2 3330/4 3330/15 3332/16 3333/4 3350/1
**huge [2]** 3356/2 3356/4
**human [1]** 3314/15
**hundred [1]** 3249/8
**hundred percent [1]** 3249/8
**hundreds [2]** 3199/16 3199/17
**hybrid [1]** 3260/9

# I

**i.e [1]** 3261/11
**idea [1]** 3355/17
**ideas [1]** 3231/13
**identification [23]** 3144/22 3147/7 3149/5 3150/25 3152/11 3153/14 3162/17 3163/20 3166/10 3178/4 3208/23 3209/21 3224/25 3273/8 3273/9 3280/23 3282/24 3286/3 3305/11 3307/17 3322/1 3341/12 3366/12
**identified [1]** 3236/3

**identify [1]** 3305/6
**ignore [1]** 3258/7
**Ill [1]** 3301/2
**illiquid [11]** 3150/13 3206/5 3208/18 3221/25 3222/17 3260/5 3260/6 3265/16 3266/5 3267/20 3361/18
**imagine [2]** 3153/12 3285/8
**immediately [2]** 3256/8 3261/14
**immunize [4]** 3242/5 3243/13 3243/13 3243/16
**immunized [1]** 3243/17
**impact [6]** 3182/1 3236/24 3238/6 3245/13 3354/11 3354/19
**impacts [2]** 3180/17 3181/19
**imparts [1]** 3240/6
**implying [1]** 3243/6
**importance [1]** 3339/4
**important [8]** 3180/17 3205/4 3254/15 3270/6 3280/9 3280/13 3286/21 3338/2
**impressed [1]** 3300/17
**impression [4]** 3314/13 3318/16 3350/25 3351/5
**impressions [1]** 3324/12
**improve [1]** 3365/18
**impugn [1]** 3240/18
**inability [2]** 3263/12 3265/20
**inappropriate [1]** 3182/16
**Inc [4]** 3145/2 3218/7 3313/4 3340/22
**incentives [1]** 3320/11
**include [8]** 3167/5 3204/6 3258/10 3258/17 3259/3 3260/8 3293/11 3316/24
**included [3]** 3167/6 3301/20 3348/6
**including [15]** 3167/4 3182/15 3183/12 3203/16 3206/5 3255/12 3256/21 3258/10 3258/12 3259/23 3260/9 3277/16 3294/19 3323/18 3351/14
**income [1]** 3274/12
**incoming [1]** 3167/14
**inconsistency [1]** 3242/23
**inconsistent [8]** 3237/18 3237/19 3239/5 3240/7 3241/8 3242/14 3242/15 3258/20
**inconsistently [1]** 3238/21
**Incorporated [1]** 3313/5
**incorporates [2]** 3322/6 3346/6
**increase [1]** 3216/25
**increased [2]** 3216/10 3224/2
**increasingly [1]** 3344/21
**indeed [2]** 3180/13 3285/12
**indemnify [1]** 3294/18
**independent [3]** 3181/9 3361/21 3361/23
**index [2]** 3258/12 3260/9
**indicated [9]** 3248/17 3287/6 3287/19 3303/14 3305/15 3305/17 3309/10 3320/10 3368/3
**indicative [1]** 3264/18
**indict [2]** 3332/1 3332/1
**indirectly [1]** 3262/15
**individual [2]** 3311/9 3311/16
**individual's [1]** 3338/9
**individually [1]** 3164/24
**individuals [9]** 3160/9 3323/18 3337/17 3346/18 3349/10 3349/25 3361/7 3363/7 3363/9
**industry [5]** 3187/15 3309/20 3344/6

3353/9 3362/4
**industry-sponsored [1]** 3353/9
**influence [3]** 3295/17 3295/19
**influenced [1]** 3182/24
**info [2]** 3324/12 3332/17
**information [28]** 3154/20 3178/25 3183/16 3189/3 3197/5 3205/7 3254/17 3304/17 3317/17 3323/5 3326/7 3330/6 3330/7 3331/9 3331/11 3332/8 3332/12 3332/21 3332/25 3333/2 3333/5 3333/10 3334/4 3346/10 3352/2 3352/17 3352/19 3362/11
**informed [5]** 3150/1 3150/7 3173/18 3229/5 3360/12
**inhale [1]** 3369/17
**inherit [1]** 3190/12
**inheritance [1]** 3184/3
**inherited [1]** 3180/5
**initial [5]** 3303/13 3306/17 3306/19 3338/19 3363/2
**inquire [2]** 3222/24 3236/12
**inquired [1]** 3198/9
**inquiry [1]** 3223/19
**instances [1]** 3157/3
**instant [3]** 3211/11 3211/13 3211/14
**instruction [4]** 3144/7 3144/8 3144/9 3146/5
**instructions [2]** 3167/4 3167/5
**instruments [4]** 3203/15 3203/17 3204/6 3259/21
**insurance [8]** 3337/15 3337/17 3337/22 3338/2 3338/9 3338/10 3338/11 3339/2
**intellect [1]** 3339/19
**intends [5]** 3255/10 3256/19 3261/15 3262/1 3294/5
**intent [2]** 3160/19 3206/4
**intention [1]** 3337/8
**intentional [1]** 3238/2
**intentionally [1]** 3240/3
**interaction [4]** 3314/21 3316/8 3345/21 3372/22
**interest [7]** 3233/3 3233/4 3263/13 3265/19 3268/1 3273/22 3368/3
**interested [4]** 3303/24 3305/16 3306/3 3345/8
**interesting [3]** 3306/22 3307/10 3314/15
**interests [4]** 3143/12 3143/25 3260/10 3263/5
**interfaced [2]** 3330/12 3330/13
**interfere [1]** 3213/23
**interim [1]** 3298/13
**intermittently [1]** 3334/11
**Internal [3]** 3274/17 3274/19 3275/10
**international [2]** 3301/21 3313/5
**interned [1]** 3193/21
**internship [1]** 3187/11
**interrupt [3]** 3242/11 3372/25 3373/7
**interview [1]** 3242/9
**interviewed [1]** 3243/15
**interviewing [1]** 3351/3
**introduce [2]** 3180/22 3330/23
**introduced [3]** 3181/13 3194/2 3303/9
**introduction [2]** 3314/23 3367/15
**invest [27]** 3157/2 3157/5 3157/5 3181/15 3181/19 3181/20 3194/8 3194/17 3194/19 3195/11 3198/13

**I**

**invest... [16]** 3198/16 3198/20 3198/23 3203/14 3206/4 3232/14 3255/11 3256/20 3258/24 3259/20 3259/23 3260/4 3261/10 3263/15 3263/16 3268/22

**invested [22]** 3157/15 3172/10 3172/16 3172/24 3175/3 3180/3 3180/6 3191/14 3194/24 3195/6 3195/9 3197/4 3200/7 3203/25 3204/19 3223/13 3233/6 3253/6 3268/23 3291/24 3294/1

**investing [4]** 3157/16 3196/10 3200/1 3265/25

**investment [76]** 3144/10 3144/12 3144/15 3144/16 3146/16 3146/22 3148/5 3148/12 3150/11 3151/16 3152/9 3158/8 3160/6 3160/20 3173/22 3173/23 3175/7 3176/16 3179/13 3181/16 3181/21 3182/14 3182/14 3183/11 3184/14 3185/2 3185/22 3190/17 3191/23 3195/23 3199/22 3200/7 3200/21 3200/22 3200/23 3200/23 3201/17 3201/18 3205/10 3206/19 3208/15 3213/13 3216/1 3217/17 3218/6 3222/24 3224/19 3225/9 3231/20 3253/22 3254/20 3255/7 3256/3 3256/18 3259/19 3260/5 3260/7 3263/17 3264/17 3265/21 3266/1 3267/16 3268/25 3271/11 3272/8 3277/12 3292/5 3292/9 3294/4 3295/15 3295/20 3304/16 3317/20 3322/22 3323/21 3354/9

**investments [31]** 3174/8 3183/17 3183/18 3186/5 3197/15 3200/16 3200/16 3200/16 3203/15 3203/21 3203/22 3213/19 3213/20 3221/25 3224/10 3253/16 3258/4 3258/9 3258/9 3258/16 3260/13 3263/11 3264/17 3265/6 3265/12 3265/17 3265/20 3267/20 3268/9 3292/12 3293/11

**investor [22]** 3143/6 3157/13 3157/14 3158/2 3160/19 3160/21 3162/20 3173/11 3183/22 3193/2 3205/4 3232/7 3236/9 3254/8 3254/10 3254/14 3308/19 3308/22 3320/23 3321/11 3323/11 3326/3

**investors [24]** 3143/12 3143/13 3158/5 3158/12 3158/15 3158/19 3159/24 3160/2 3160/5 3160/9 3160/14 3164/13 3264/13 3335/1 3339/19 3359/12 3359/20 3360/4 3360/13 3363/22 3364/1 3364/5 3364/9 3366/4

**invisible [1]** 3339/17
**invited [1]** 3287/8
**involve [1]** 3266/5
**involved [20]** 3177/11 3178/23 3179/6 3179/7 3187/15 3193/20 3200/1 3218/8 3222/4 3230/9 3231/16 3251/8 3251/17 3272/4 3280/9 3295/2 3325/2 3334/17 3347/17 3351/3
**involvement [2]** 3321/22 3326/21
**involves [1]** 3239/15
**Iowa [1]** 3299/22
**Irregularly [1]** 3340/4
**issue [13]** 3148/25 3158/9 3159/7 3184/24 3185/19 3186/8 3186/11 3239/14 3278/8 3347/9 3359/6 3359/7

3359/8
**issued [1]** 3286/18
**issues [7]** 3160/24 3197/13 3275/15 3275/18 3352/23 3352/25 3359/5
**issuing [2]** 3222/9 3365/8
**item [5]** 3355/14 3358/19 3360/16 3362/1 3365/12
**items [2]** 3148/15 3351/16
**itself [1]** 3332/17

**J**

**Jackson [15]** 3311/9 3311/10 3311/12 3311/13 3322/6 3324/15 3327/1 3327/21 3327/22 3328/5 3328/14 3328/17 3330/4 3334/17 3350/1
**JACOB [1]** 3141/21
**JACQUELYN [1]** 3141/15
**January [17]** 3190/25 3210/6 3221/7 3253/5 3253/7 3259/4 3291/12 3295/14 3300/8 3341/3 3341/8 3343/5 3364/18 3365/7 3365/20 3365/22 3366/1
**January 2012 [1]** 3291/12
**January 2013 [1]** 3341/8
**January 2014 [2]** 3365/20 3366/1
**January 26th [1]** 3221/7
**January 6 [2]** 3364/18 3365/7
**Jeff [4]** 3360/18 3361/5 3361/6 3371/3
**Jesse [1]** 3311/1
**job [7]** 3169/2 3183/2 3299/13 3299/16 3306/8 3306/20 3318/18
**join [1]** 3350/22
**joined [1]** 3314/5
**joint [1]** 3236/10
**JUDGE [14]** 3141/11 3156/8 3181/25 3182/21 3184/7 3184/20 3184/23 3202/20 3203/3 3233/20 3238/10 3239/14 3244/24 3245/1
**judgments [1]** 3165/7
**July [4]** 3141/5 3148/6 3351/7 3373/20
**July 14 [1]** 3373/20
**July 2nd [1]** 3351/7
**June [11]** 3166/25 3167/9 3167/12 3167/16 3167/22 3169/4 3169/20 3353/15 3355/7 3355/17 3356/19
**June 10 [1]** 3167/12
**June 10Q [1]** 3356/19
**June 11 [2]** 3167/16 3167/22
**June 12th [1]** 3169/4
**June 2013 [2]** 3355/7 3355/17
**June 30th [1]** 3353/15
**June 3rd [2]** 3166/25 3167/9
**jurors [10]** 3142/2 3184/9 3227/18 3227/19 3228/2 3255/19 3296/6 3297/4 3372/24 3373/9
**jury [17]** 3141/11 3147/24 3184/23 3209/17 3227/22 3228/1 3240/11 3243/3 3243/7 3248/2 3248/15 3274/6 3293/3 3296/10 3297/3 3373/4 3373/8
**justify [1]** 3261/16
**Justin [1]** 3311/2

**K**

**k-1 [7]** 3272/22 3272/25 3273/11 3273/17 3273/22 3274/12 3274/22
**K-1s [1]** 3273/3
**KAM [1]** 3141/3
**KAPLAN [1]** 3141/21

**KARTHIK [1]** 3141/16
**KASULIS [1]** 3141/15
**Katten [1]** 3316/11
**keep [10]** 3148/2 3173/18 3176/13 3190/22 3192/17 3239/17 3244/5 3275/25 3287/21 3355/24
**Ken [13]** 3320/25 3321/2 3321/3 3321/4 3321/6 3362/3 3371/18 3371/18 3371/20 3371/23 3372/4 3372/8 3372/9
**kept [1]** 3284/19
**ketamine [1]** 3369/17
**Kevin [27]** 3148/6 3173/14 3194/2 3198/3 3198/6 3198/7 3198/11 3198/12 3198/16 3198/18 3198/19 3198/21 3199/2 3199/5 3202/13 3208/13 3209/23 3245/8 3245/16 3245/17 3272/14 3272/15 3272/15 3272/16 3272/17 3274/7 3275/14
**kind [19]** 3147/8 3149/6 3150/23 3151/1 3152/13 3153/15 3162/18 3163/23 3165/9 3166/11 3224/10 3244/2 3330/7 3349/23 3352/18 3362/4 3366/10 3368/1 3371/25
**KIYO [1]** 3141/10
**knock [1]** 3318/21
**knowing [2]** 3241/14 3338/13
**knowledge [6]** 3181/9 3183/17 3217/3 3305/22 3318/24 3339/15
**knowledgeable [1]** 3314/14
**known [4]** 3320/20 3321/18 3358/22 3367/14
**knows [5]** 3180/23 3182/6 3182/17 3343/18 3367/12
**Kolchinsky [6]** 3322/18 3322/20 3322/21 3322/25 3323/10 3334/25
**Kolchinsky's [1]** 3323/8
**Kravitz [4]** 3364/15 3364/17 3364/18 3364/24

**L**

**lab [1]** 3362/10
**Laboratories [2]** 3299/20 3321/19
**Labs [1]** 3299/23
**lack [3]** 3264/10 3312/7 3354/25
**Ladenburg [1]** 3190/2
**ladies [1]** 3373/1
**laid [1]** 3301/6
**language [9]** 3145/20 3199/21 3217/13 3256/6 3293/10 3294/7 3295/3 3295/5 3295/10
**laptop [2]** 3142/19 3142/20
**large [1]** 3265/8
**last [26]** 3143/10 3143/20 3148/1 3148/5 3149/23 3149/25 3150/7 3165/12 3180/25 3190/7 3225/7 3226/11 3226/20 3229/2 3229/4 3275/25 3287/5 3297/20 3301/24 3302/8 3302/9 3302/15 3323/1 3334/25 3365/16 3371/13
**lat [1]** 3246/23
**late [6]** 3148/6 3309/5 3314/8 3316/4 3344/22 3369/2
**latest [4]** 3227/24 3323/1 3323/1 3323/2
**latitude [1]** 3246/23
**laugh [1]** 3238/8
**laughs [1]** 3237/6

**L**

**launch [4]** 3300/5 3300/15 3317/7 3318/9
**law [11]** 3175/15 3176/24 3176/25 3177/10 3184/7 3240/3 3288/1 3288/12 3288/15 3316/10 3340/23
**laws [2]** 3158/6 3187/24
**lawsuit [3]** 3243/22 3288/22 3360/13
**lawsuits [4]** 3349/24 3350/5 3350/5 3360/8
**lawyer [7]** 3160/22 3160/23 3177/7 3248/14 3251/12 3288/16 3316/1
**lawyer's [1]** 3248/14
**lawyers [2]** 3169/13 3288/9
**lay [5]** 3180/24 3186/12 3237/4 3278/24 3317/21
**lead [4]** 3280/3 3295/20 3301/3 3323/10
**leading [1]** 3349/1
**leads [1]** 3332/22
**learn [2]** 3251/7 3280/20
**learned [3]** 3269/14 3330/8 3330/11
**least [10]** 3144/12 3192/25 3194/12 3194/16 3195/23 3227/10 3240/4 3349/14 3354/24 3361/20
**leave [14]** 3150/6 3153/8 3162/12 3191/8 3226/5 3229/10 3229/13 3284/3 3285/2 3303/1 3303/2 3333/1 3338/19 3373/15
**led [3]** 3151/19 3222/16 3295/22
**ledgered [1]** 3256/22
**Lee [1]** 3363/13
**leeway [1]** 3362/23
**left [11]** 3142/15 3169/10 3234/9 3234/12 3299/1 3299/18 3299/19 3300/3 3301/25 3305/24 3333/12
**left-hand [1]** 3234/12
**legal [3]** 3352/23 3352/24
**legend [1]** 3260/20
**legitimate [1]** 3338/4
**lender [1]** 3232/3
**less [6]** 3219/3 3226/12 3229/15 3302/14 3314/20 3354/15
**letter [26]** 3197/2 3162/20 3162/22 3163/24 3205/13 3205/15 3205/17 3205/20 3205/25 3206/11 3206/20 3207/5 3207/14 3207/15 3207/16 3208/6 3208/8 3252/2 3252/13 3253/11 3253/17 3255/20 3255/22 3255/22 3256/5 3266/20
**letters [2]** 3146/5 3217/11
**level [3]** 3151/23 3299/3 3366/6
**leveraged [2]** 3255/14 3262/15
**liabilities [1]** 3165/6
**liability [3]** 3217/18 3294/20 3338/8
**license [3]** 3187/18 3312/4 3313/6
**licensed [1]** 3188/2
**licenses [3]** 3187/16 3187/22 3313/3
**lie [1]** 3167/24
**life [2]** 3169/15 3338/10
**lifetime [1]** 3176/18
**lift [1]** 3261/5
**lifted [3]** 3260/23 3261/3 3262/6
**Ligand [1]** 3312/3
**light [2]** 3151/18 3339/9
**likely [3]** 3281/16 3287/17 3324/22
**limit [1]** 3263/11
**limitation [4]** 3203/16 3265/15 3267/18
3294/20
**limited [26]** 3143/1 3143/12 3143/24 3205/17 3206/1 3206/6 3217/18 3221/23 3256/6 3258/10 3259/23 3260/10 3261/16 3263/5 3263/12 3263/15 3265/6 3265/13 3265/20 3268/23 3273/2 3273/22 3275/1 3276/23 3293/11 3294/15
**limits [1]** 3189/12
**line [18]** 3164/17 3169/18 3181/6 3194/25 3214/21 3308/14 3315/12 3319/19 3320/3 3342/4 3351/8 3355/5 3355/14 3357/17 3365/4 3368/7 3371/5 3372/13
**lined [1]** 3303/16 3304/19 3304/21 3319/7
**lines [3]** 3313/22 3313/25 3341/6
**liquid [9]** 3150/12 3201/18 3218/5 3260/5 3260/14 3262/9 3262/10 3263/2 3263/3
**liquidated [2]** 3148/14 3184/15
**liquidating [1]** 3157/18
**liquidation [2]** 3143/2 3165/4
**liquidity [5]** 3148/9 3261/17 3263/5 3265/5 3265/6
**list [3]** 3243/12 3243/20 3243/21
**listed [2]** 3361/15 3366/9
**listen [2]** 3241/2 3304/1
**listener [5]** 3181/13 3181/14 3182/1 3238/6 3332/4
**listener's [1]** 3236/25
**listening [2]** 3236/19 3237/24
**listing [1]** 3365/24
**lists [1]** 3215/19
**literally [1]** 3199/15
**litigation [9]** 3171/22 3180/16 3185/9 3288/1 3349/21 3349/23 3350/4 3360/8 3360/10
**live [2]** 3192/16 3298/6
**lively [1]** 3372/21
**living [2]** 3189/21 3302/20
**LLC [7]** 3144/1 3164/12 3164/13 3164/14 3217/18 3218/12 3308/17
**LLLP [1]** 3321/14
**loan [1]** 3170/12
**located [5]** 3256/1 3292/12 3293/17 3310/10 3310/21
**lock [1]** 3184/19
**locked [1]** 3184/18
**logo [1]** 3215/23
**look [54]** 3149/19 3178/6 3183/20 3190/21 3190/22 3191/10 3191/21 3192/11 3201/20 3202/10 3203/5 3204/5 3206/18 3211/15 3215/4 3219/15 3253/25 3254/1 3255/2 3255/6 3255/9 3256/2 3256/12 3256/15 3258/2 3260/17 3261/6 3262/11 3265/4 3270/2 3270/20 3271/13 3278/17 3278/18 3280/25 3287/4 3292/8 3305/3 3313/1 3315/5 3320/24 3321/8 3321/13 3324/6 3351/20 3352/12 3353/11 3355/4 3357/11 3358/19 3360/16 3362/1 3362/1 3366/1
**looked [6]** 3198/10 3199/14 3204/1 3256/12 3344/10 3371/14
**looking [17]** 3144/23 3148/11 3148/18 3150/22 3164/17 3167/14 3178/14
**llllllll** 3202/10 3203/7 3203/8 3203/9 3258/8 3305/15 3326/18 3353/21 3358/5 3361/12
**losses [2]** 3165/8 3294/21
**lost [7]** 3175/7 3175/18 3176/2 3176/4 3176/13 3189/18 3236/3
**lovely [1]** 3282/5
**lovey [1]** 3281/17
**low [6]** 3334/9 3354/12 3354/19 3355/25 3363/1 3363/1
**lower [1]** 3221/15
**lowered [1]** 3343/5
**LP [4]** 3164/13 3206/3 3217/16 3321/9
**lunch [3]** 3296/6 3296/6 3296/12
**Lynch [1]** 3190/6

**M**

**ma'am [1]** 3358/24
**mail [113]** 3142/18 3142/22 3144/6 3144/20 3147/6 3147/10 3147/11 3147/21 3147/25 3148/10 3148/17 3148/19 3148/23 3149/3 3149/8 3149/19 3150/15 3151/3 3151/4 3152/25 3153/4 3153/11 3153/17 3154/2 3154/17 3154/25 3155/2 3155/5 3155/11 3155/15 3155/23 3156/6 3156/10 3157/10 3157/20 3157/21 3159/14 3159/16 3159/17 3160/3 3162/3 3162/5 3162/8 3162/14 3165/24 3166/13 3166/14 3166/25 3167/8 3167/11 3167/15 3167/17 3169/3 3169/19 3170/20 3180/14 3180/21 3202/13 3208/12 3208/23 3209/18 3273/12 3274/6 3274/9 3275/21 3275/24 3276/19 3277/10 3279/7 3279/18 3280/3 3280/25 3281/3 3282/3 3282/3 3282/24 3283/3 3283/15 3284/13 3287/5 3288/2 3288/25 3289/2 3289/6 3364/14 3364/14 3364/17 3364/18 3364/18 3364/23 3365/4 3365/6 3365/13 3365/18 3365/20 3366/17 3367/3 3367/4 3367/5 3367/18 3367/18 3368/2 3369/22 3370/7 3370/23 3371/7 3371/14 3371/17 3372/8
**mailing [3]** 3147/13 3151/6 3152/17
**mails [13]** 3149/9 3153/18 3158/24 3159/10 3159/12 3159/12 3159/21 3160/4 3209/19 3275/18 3282/25 3286/6 3286/15
**maintain [1]** 3276/20
**maintaining [1]** 3321/22
**major [3]** 3213/21 3361/16 3370/14
**man [1]** 3351/1
**manage [1]** 3311/13
**managed [1]** 3309/10
**management [18]** 3164/12 3164/12 3164/14 3165/18 3294/24 3300/2 3312/23 3313/2 3337/15 3337/18 3345/22 3346/8 3346/10 3346/17 3346/19 3362/13 3362/19 3372/1
**manager [17]** 3215/17 3216/18 3220/9 3261/15 3264/5 3264/11 3265/18 3267/6 3267/22 3267/23 3268/1 3268/11 3268/25 3293/25 3294/13 3294/20 3304/9

**managers [2]** 3294/19 3339/20
**Manchester [6]** 3368/17 3369/4 3369/5 3369/6 3369/8 3369/11
**Manhattan [1]** 3310/22
**manner [1]** 3348/16
**Mannheim [1]** 3300/15
**manufacture [1]** 3300/19
**manufacturing [1]** 3362/12
**MARC [10]** 3141/20 3347/16 3349/9 3350/19 3350/20 3350/22 3356/10 3357/16 3364/19 3371/1
**March [12]** 3145/14 3146/12 3147/22 3148/20 3148/24 3149/3 3223/3 3223/6 3228/15 3356/19 3358/21 3369/7
**March 10Q [1]** 3356/19
**March 14 [1]** 3145/14
**March 16 [1]** 3147/22
**March 17 [1]** 3148/20
**March 2013 [1]** 3146/12
**March 25 [2]** 3148/24 3149/3
**March 26th [1]** 3228/15
**March 2nd [1]** 3223/3
**March 31st [1]** 3358/21
**marches [2]** 3245/9 3246/6
**Marcum [4]** 3349/3 3356/20 3356/22 3356/23
**Marek [3]** 3310/25 3311/6 3311/7
**mark [3]** 3208/23 3258/3 3269/22
**marked [27]** 3144/22 3147/7 3149/5 3150/25 3152/11 3153/14 3162/17 3163/20 3166/10 3178/4 3209/21 3214/25 3218/19 3252/14 3252/19 3273/7 3273/8 3280/23 3286/3 3307/16 3312/14 3321/25 3340/11 3341/11 3350/6 3364/12 3366/12
**market [19]** 3145/24 3176/3 3176/18 3176/20 3218/6 3222/1 3258/12 3260/22 3261/4 3262/5 3263/25 3264/4 3265/9 3302/2 3306/16 3317/3 3319/9 3369/13 3372/15
**marketability [1]** 3261/18
**marketable [2]** 3354/1 3354/5
**marketed [1]** 3368/17
**marketing [3]** 3301/20 3316/25 3353/7
**markets [3]** 3203/14 3259/22 3309/22
**markings [1]** 3262/12
**marks [3]** 3258/8 3267/16 3327/11
**married [1]** 3298/2
**MARTIN [99]** 3141/7 3147/6 3147/14 3147/25 3148/25 3149/12 3149/22 3151/7 3151/16 3152/18 3154/5 3154/6 3154/16 3154/19 3155/2 3155/7 3155/14 3155/19 3162/10 3164/10 3165/16 3167/2 3167/13 3167/23 3168/10 3169/7 3171/11 3171/21 3172/1 3173/3 3173/14 3173/17 3176/24 3177/7 3181/18 3181/19 3182/11 3183/8 3185/13 3186/5 3194/2 3194/15 3194/21 3194/25 3195/8 3195/16 3196/11 3198/18 3206/17 3207/1 3208/13 3214/4 3217/20 3226/9 3228/17 3233/23 3234/3 3243/4 3245/15 3249/7 3251/3 3261/23 3264/5 3264/22 3264/25 3264/25 3267/7 3267/24 3275/14 3275/21 3277/10 3278/7 3278/7 3279/16 3279/19

**Martin's [5]** 3168/16 3181/16 3181/16 3195/14 3328/6
**Massella [1]** 3331/14
**massive [1]** 3301/1
**master's [1]** 3299/11
**matches [2]** 3208/16 3226/20
**material [3]** 3180/12 3182/8 3182/17
**materiality [1]** 3182/20
**materially [2]** 3205/5 3254/15
**materials [8]** 3243/16 3277/4 3352/4 3352/6 3352/8 3352/9 3365/8 3365/10
**math [2]** 3173/21 3191/24
**MATSUMOTO [1]** 3141/10
**Matt [4]** 3187/8 3187/10 3187/12 3193/21
**matter [5]** 3159/11 3200/11 3330/3 3336/13 3351/17
**matters [6]** 3187/22 3190/10 3248/15 3270/5 3270/6 3270/7
**May 12th [1]** 3224/19
**May 13 [1]** 3154/3
**May 15 [1]** 3154/18
**May 17 [3]** 3155/6 3155/13 3155/22
**May 22 [5]** 3155/24 3162/9 3162/15 3163/7 3289/5
**May 30 [3]** 3164/18 3166/2 3166/6
**MB [1]** 3311/7
**mean [28]** 3143/4 3143/5 3143/16 3144/2 3145/22 3150/10 3199/11 3211/13 3230/1 3241/5 3244/22 3245/13 3245/21 3249/22 3260/17 3268/15 3270/14 3277/17 3280/7 3281/14 3316/23 3318/19 3338/4 3346/4 3347/21 3354/15 3356/4 3361/23
**meaning [3]** 3213/4 3214/11 3282/7
**means [10]** 3169/11 3230/7 3241/18 3241/20 3243/4 3245/16 3261/17 3262/17 3276/21 3366/2
**meant [5]** 3145/23 3250/1 3339/3 3368/20 3368/21
**meantime [1]** 3296/8
**mechanical [1]** 3141/24
**mechanism [1]** 3326/16
**media [3]** 3169/14 3296/9 3373/12
**medical [3]** 3353/8 3368/8 3372/21
**medium [2]** 3146/25 3147/1
**meet [7]** 3278/4 3303/25 3314/22 3316/3 3316/5 3347/6 3361/22
**meeting [52]** 3190/25 3191/2 3191/5 3198/20 3232/12 3232/13 3304/9 3304/12 3304/15 3304/18 3305/14 3305/15 3305/25 3306/2 3347/10 3348/1 3348/4 3348/6 3348/7 3348/9 3348/16 3348/19 3351/19 3352/2 3352/5 3352/7 3352/10 3352/11 3352/18 3352/24 3355/15 3355/23 3356/7 3356/11 3358/8 3358/10 3358/12 3358/14 3358/17 3359/1 3361/11 3361/20 3363/8 3367/22 3371/8 3371/10 3371/11 3371/13 3372/6

**meetings [21]** 3316/4 3318/6 3318/10 3318/12 3318/16 3347/8 3347/11 3347/14 3347/18 3348/10 3348/12 3348/14 3348/15 3348/19 3349/1 3349/6 3349/8 3349/11 3349/15 3349/20 3353/4
**member [18]** 3273/2 3273/2 3314/3 3314/21 3319/2 3336/25 3337/2 3338/17 3339/1 3344/5 3345/18 3345/19 3346/4 3346/16 3346/23 3360/20 3362/17 3372/4
**members [7]** 3294/19 3336/18 3341/9 3347/15 3348/8 3361/12 3362/19
**memo [5]** 3181/22 3181/23 3259/2 3261/21 3264/21
**memorandum [15]** 3199/3 3201/2 3204/14 3204/22 3205/6 3206/2 3206/12 3251/24 3252/17 3252/19 3253/17 3255/23 3261/7 3292/4 3293/9
**Memorial [1]** 3155/18
**men [3]** 3180/4 3184/3
**mentally [2]** 3150/3 3229/7
**mention [3]** 3192/12 3217/23 3302/15
**mentioned [4]** 3275/18 3313/14 3334/6 3349/25
**mentor [3]** 3180/7 3180/8 3180/9
**merge [3]** 3320/2 3326/20 3336/16
**merged [1]** 3340/25
**merger [2]** 3326/22 3336/21
**Merrill [1]** 3190/6
**message [3]** 3211/13 3355/24 3366/10
**messaging [2]** 3211/11 3211/14
**met [13]** 3171/9 3198/16 3198/18 3198/18 3198/19 3199/7 3280/21 3304/3 3304/12 3314/11 3314/23 3316/7 3366/8
**mid [3]** 3259/4 3345/16 3347/7
**mid-2013 [2]** 3345/16 3347/7
**mid-January [1]** 3259/4
**middle [3]** 3149/19 3152/1 3234/23 3316/14
**Midtown [1]** 3310/22
**might [13]** 3157/4 3183/14 3186/15 3227/14 3272/14 3276/9 3276/9 3296/5 3344/10 3352/10 3362/7 3365/23 3368/12
**mile [1]** 3307/6
**million [12]** 3179/15 3183/8 3302/11 3302/14 3318/2 3318/3 3342/8 3342/9 3343/17 3343/17 3343/21 3353/16
**millions [1]** 3181/17
**mind [13]** 3150/24 3157/4 3176/14 3180/18 3214/1 3226/18 3227/15 3236/25 3238/7 3262/9 3262/10 3263/2 3284/14
**mine [1]** 3262/12
**minimize [1]** 3292/10
**minimum [1]** 3365/12
**minute [14]** 3171/20 3179/20 3180/2 3181/22 3191/13 3204/16 3206/25 3226/6 3254/1 3255/3 3257/3 3266/23 3291/6 3299/2
**minutes [11]** 3347/23 3347/24 3347/25 3348/2 3348/5 3348/5 3348/15 3348/19 3348/24 3373/1 3373/6
**misconduct [1]** 3294/25

**M**

misplaced [1] 3154/7
miss [1] 3152/19
missed [1] 3287/11
misspoke [2] 3212/7 3350/9
misstatement [1] 3283/11
molecules [1] 3301/12
moment [6] 3170/23 3177/18 3236/15
3236/15 3239/13 3295/23
Monday [8] 3154/19 3167/8 3167/10
3223/23 3279/23 3287/1 3287/4
3287/13
money [74] 3149/24 3157/7 3158/4
3158/7 3158/10 3158/11 3159/3 3159/6
3159/7 3159/7 3159/8 3159/11 3160/10
3166/9 3167/6 3167/7 3168/12 3170/20
3171/25 3174/7 3174/9 3175/19 3176/2
3176/4 3179/9 3180/5 3180/6 3184/4
3184/4 3184/16 3185/9 3185/13 3188/5
3188/14 3188/16 3188/17 3189/18
3189/18 3190/12 3190/14 3196/11
3197/8 3214/4 3214/12 3214/14
3214/15 3214/22 3229/3 3232/2 3232/3
3233/5 3233/11 3288/10 3288/12
3290/13 3290/18 3290/18 3291/2
3309/14 3309/15 3317/14 3317/23
3317/23 3319/5 3325/3 3325/18
3342/14 3343/5 3343/8 3354/8 3355/25
3356/3 3359/20 3360/4
monies [5] 3155/17 3324/22 3325/7
3325/13 3359/12
month [4] 3166/4 3210/5 3224/18
3310/20
monthly [1] 3222/10
months [13] 3144/19 3146/8 3149/24
3166/5 3169/15 3170/21 3185/10
3206/23 3229/3 3256/9 3294/8 3310/19
3353/15
morbidity [1] 3369/1
morning [9] 3142/8 3142/15 3154/19
3171/7 3171/8 3282/10 3328/10
3372/12 3373/16
most [10] 3148/11 3281/16 3287/17
3301/15 3318/6 3328/10 3346/11
3347/13 3349/5 3365/12
motivated [3] 3183/11 3185/1 3185/20
mouthpiece [1] 3198/7
move [25] 3145/6 3147/15 3149/13
3150/3 3151/8 3152/19 3153/20
3162/25 3163/25 3166/18 3204/16
3206/22 3221/1 3221/5 3229/7 3255/18
3278/23 3306/5 3307/1 3309/24 3310/2
3328/11 3343/10 3345/5 3368/14
moved [6] 3300/16 3301/6 3302/22
3310/6 3310/8 3363/4
moves [5] 3308/3 3309/22 3322/11
3341/19 3366/22
moving [7] 3197/18 3302/22 3303/3
3306/3 3307/8 3362/24 3372/14
Mr. [275]
Mr. Al [1] 3180/20
Mr. Aselage [2] 3305/3 3330/7
MR. BRAFMAN [9] 3171/6 3182/13
3202/18 3209/2 3236/19 3242/18
3245/7 3292/6 3293/10
Mr. Fernandez's [1] 3309/6
Mr. Geller [40] 3142/8 3142/22 3142/24

3146/20 3152/6 3154/1 3162/3 3163/6
3163/14 3164/19 3165/24 3170/1
3170/19 3171/7 3171/9 3180/11
3180/13 3180/15 3180/16 3193/14
3197/16 3202/6 3202/8 3207/22
3209/11 3211/7 3212/1 3212/4 3212/8
3212/9 3228/8 3239/20 3239/25 3245/6
3291/9 3292/1 3293/7 3294/10 3295/9
3295/12
Mr. Golding [2] 3364/19 3364/22
Mr. Greebel [24] 3225/12 3251/8
3285/13 3285/21 3287/16 3288/20
3288/23 3289/5 3289/6 3315/21
3315/25 3323/19 3338/25 3339/1
3339/4 3348/11 3348/14 3348/18
3348/22 3349/20 3351/11 3360/7
3365/1 3371/17
Mr. Greebl [1] 3364/20
Mr. Huang [1] 3328/22
Mr. Kolchinsky [1] 3334/25
Mr. Kravitz [2] 3364/17 3364/18
Mr. Massella [1] 3331/14
Mr. Mulleady [45] 3175/10 3207/16
3207/22 3207/23 3208/25 3209/14
3211/3 3211/9 3212/6 3212/9 3212/25
3213/22 3214/3 3220/12 3230/14
3231/9 3233/22 3235/1 3236/3 3236/5
3237/5 3237/6 3237/9 3238/1 3238/3
3238/7 3238/23 3239/1 3240/1 3240/2
3240/4 3240/12 3240/18 3240/25
3241/3 3241/19 3243/1 3243/5 3248/5
3248/23 3249/4 3249/6 3251/2 3257/5
3273/13
Mr. Mulleady's [4] 3240/14 3240/17
3243/25 3245/5
Mr. Paley [2] 3364/20 3364/22
Mr. Panoff [3] 3350/25 3352/13
3352/20
Mr. Richardson [8] 3315/23 3319/18
3336/20 3341/7 3351/10 3364/19
3365/7 3365/18
Mr. Shkreli [119] 3173/9 3175/10
3179/13 3180/4 3180/15 3180/20
3184/10 3187/6 3187/10 3191/4 3193/2
3193/8 3193/14 3196/8 3198/13
3198/17 3205/17 3207/5 3209/15
3214/7 3220/12 3224/17 3225/1 3225/8
3225/13 3228/8 3228/17 3228/24 3230/5
3230/9 3230/13 3230/19 3231/9
3231/15 3232/7 3237/1 3237/2 3237/4
3238/3 3239/2 3240/5 3240/10 3240/12
3240/23 3240/24 3241/1 3241/3
3241/13 3243/5 3244/13 3245/2 3245/9
3245/23 3248/8 3257/4 3257/17
3277/22 3278/4 3279/8 3280/1 3280/21
3281/1 3281/3 3281/13 3281/19 3282/7
3282/13 3282/18 3283/3 3283/21
3284/8 3285/7 3285/16 3285/21 3286/7
3288/8 3288/19 3288/23 3298/18
3299/1 3303/5 3303/25 3307/11
3313/14 3315/19 3315/20 3317/17
3317/20 3318/11 3318/12 3319/16
3320/8 3320/10 3320/21 3330/12
3330/19 3330/21 3330/25 3331/7
3331/8 3331/9 3331/12 3336/20
3336/23 3337/4 3337/20 3338/23
3338/25 3339/4 3339/5 3339/18 3341/7

3341/16 3342/7 3344/13 3344/15
3345/3 3347/5 3372/22 3373/13
Mr. Shkreli's [2] 3264/16 3362/21
MR. SRINIVASAN [2] 3169/2 3252/7
Mr. Su [4] 3328/22 3331/13 3331/17
3332/16
Mr. who [1] 3328/24
Ms. [3] 3308/8 3315/17 3355/3
Ms. Balbin [2] 3308/8 3315/17
Ms. Zellan [1] 3355/3
MSMB [78] 3143/21 3143/23 3144/19
3146/16 3146/22 3147/1 3147/3
3151/17 3164/12 3164/12 3164/13
3164/13 3164/13 3164/23 3165/3
3165/17 3165/18 3170/9 3172/10
3175/10 3177/8 3178/11 3178/17
3178/24 3190/17 3191/4 3191/14
3197/6 3198/7 3206/1 3206/3 3207/8
3217/16 3222/18 3224/19 3233/13
3249/1 3251/14 3261/24 3264/8
3268/10 3268/23 3270/1 3270/15
3270/16 3271/5 3272/22 3273/11
3274/14 3279/16 3281/15 3291/16
3309/1 3309/7 3309/7 3309/9 3311/7
3321/8 3321/10 3321/11 3321/11
3325/9 3325/17 3325/21 3330/18
3330/20 3330/21 3331/3 3331/5 3332/1
3355/5 3355/18 3359/12 3359/19
3360/4 3360/13 3363/22 3364/1
MSMBCapital.com [1] 3274/7
Muchin [1] 3316/11
Mulleady [100] 3173/14 3175/10
3181/23 3182/5 3194/2 3198/4 3198/6
3198/7 3198/11 3198/12 3198/16
3198/19 3198/21 3199/6 3202/13
3207/16 3207/22 3207/23 3208/25
3209/14 3209/24 3211/3 3211/9 3212/6
3212/9 3212/25 3213/4 3213/22 3214/3
3216/12 3220/12 3223/20 3230/14
3231/9 3232/19 3233/22 3235/1 3235/3
3236/3 3236/5 3236/23 3237/5 3237/6
3237/9 3237/16 3237/21 3238/1 3238/3
3238/7 3238/23 3239/1 3239/19 3240/1
3240/2 3240/4 3240/5 3240/6 3240/9
3240/12 3240/18 3240/22 3240/24
3240/25 3241/2 3241/3 3241/9 3241/15
3241/19 3241/21 3241/22 3241/23
3242/1 3242/2 3242/9 3243/1 3243/3
3243/5 3243/10 3243/12 3243/13
3243/13 3244/2 3245/3 3245/8 3245/16
3245/17 3245/24 3248/5 3248/23
3249/4 3249/6 3249/22 3251/2 3257/5
3272/15 3272/16 3272/17 3273/13
3274/7 3275/15
Mulleady's [6] 3240/14 3240/17
3243/25 3244/12 3245/5 3246/5
muscular [2] 3312/9 3312/12
mutually [1] 3164/6
Myers [2] 3299/20 3299/21

**N**

name [16] 3171/11 3215/16 3215/19
3257/14 3257/25 3297/15 3297/17
3297/19 3297/20 3308/18 3309/6
3310/24 3320/3 3320/18 3320/18
3340/21
named [6] 3198/3 3307/23 3311/9

**N**

named... **[3]** 3320/25 3364/21 3367/25
names **[5]** 3308/15 3309/17 3309/19 3320/17 3355/5
narrow **[1]** 3158/20
NASDAQ **[12]** 3361/15 3361/16 3361/18 3361/19 3361/22 3365/25 3366/1 3366/3 3366/4 3366/6 3366/9 3366/10
nature **[8]** 3165/9 3194/25 3218/5 3220/17 3221/25 3266/12 3272/4 3370/20
NAV **[21]** 3204/22 3215/13 3215/23 3216/9 3216/14 3217/7 3218/7 3218/20 3220/9 3220/18 3220/18 3221/7 3222/4 3222/9 3222/16 3222/17 3222/20 3233/9 3254/10 3272/10 3272/13
Navigant **[2]** 3214/25 3215/20
Neal **[2]** 3361/2 3371/3
near **[1]** 3265/5
neat **[1]** 3339/24
necessarily **[1]** 3332/11
necessary **[3]** 3317/7 3323/11 3360/13
need **[15]** 3168/1 3168/2 3192/12 3196/13 3254/3 3263/20 3263/23 3288/4 3310/3 3317/5 3317/5 3326/4 3354/17 3355/25 3365/8
needed **[10]** 3150/1 3150/8 3188/17 3229/5 3232/2 3256/7 3303/17 3319/6 3347/10 3359/5
needs **[2]** 3209/9 3242/10
negative **[1]** 3301/4
negligence **[1]** 3294/25
negotiate **[2]** 3266/22 3266/23
negotiated **[2]** 3225/12 3259/22
negotiating **[2]** 3160/6 3185/9
negotiation **[3]** 3159/25 3225/20 3289/12
negotiations **[1]** 3251/9
nephew **[1]** 3187/8
never **[22]** 3151/22 3169/10 3171/9 3177/5 3177/6 3177/7 3177/10 3181/22 3188/4 3189/5 3198/18 3216/20 3216/21 3224/5 3240/18 3272/13 3284/18 3306/23 3310/8 3321/7 3337/8 3337/21
nevertheless **[1]** 3226/23
new **[32]** 3141/2 3141/4 3141/14 3141/15 3141/19 3141/19 3204/22 3206/2 3206/17 3230/20 3232/25 3251/23 3251/23 3252/17 3255/23 3255/25 3257/25 3257/25 3281/21 3303/14 3304/7 3310/18 3310/21 3314/12 3316/4 3317/22 3361/6 3361/16 3367/19 3367/23 3371/15 3371/22
newly **[1]** 3264/12
next **[47]** 3144/7 3147/5 3151/23 3151/24 3154/17 3154/25 3155/5 3155/9 3155/10 3155/18 3156/9 3156/14 3157/19 3157/19 3161/4 3163/18 3167/3 3179/22 3180/12 3186/21 3196/15 3197/21 3210/10 3220/2 3221/6 3235/5 3247/1 3250/3 3259/18 3282/13 3297/6 3304/2 3309/6 3320/18 3323/16 3324/1 3326/24 3329/7 3333/15 3335/4 3348/9 3348/16 3355/5 3367/7 3367/20 3367/24

3369/23

nice **[5]** 3149/22 3167/23 3166/4 3228/18 3351/1
night **[3]** 3154/5 3279/23 3367/8
nights **[1]** 3307/5
nine **[4]** 3142/17 3185/10 3256/1 3362/2
nobody **[1]** 3180/23
non **[4]** 3204/7 3243/14 3260/2 3260/4
non-prosecution **[1]** 3243/14
non-public **[2]** 3260/2 3260/4
non-publicly **[1]** 3204/7
normal **[1]** 3362/13
normally **[3]** 3227/17 3348/5 3350/4
Norwood **[4]** 3371/9 3372/3 3372/7 3372/17
note **[2]** 3204/21 3341/4
notebooks **[1]** 3373/15
notes **[3]** 3143/11 3347/22 3348/11
nothing **[9]** 3166/8 3169/16 3175/9 3179/8 3226/17 3242/15 3242/23 3256/8 3372/1
notice **[7]** 3205/4 3207/19 3217/25 3218/15 3254/15 3259/12 3266/4
noticed **[2]** 3184/6 3220/24
notices **[2]** 3205/6 3254/16
notification **[1]** 3266/3
notified **[1]** 3211/20
Notre **[1]** 3299/6
November **[8]** 3143/3 3218/21 3259/3 3298/14 3315/7 3319/24 3320/1 3321/9
November 2012 **[1]** 3321/9
November 30th **[1]** 3218/21
November 5th **[1]** 3315/7
number **[19]** 3189/22 3202/4 3215/19 3226/14 3234/17 3234/19 3285/18 3292/3 3292/16 3293/8 3294/10 3302/17 3306/23 3323/18 3339/11 3346/18 3360/17 3362/2 3372/13
numbered **[1]** 3234/16
nuts **[4]** 3150/17 3229/21 3229/25 3230/6
NYC **[1]** 3367/7

**O**

o'clock **[1]** 3373/16
O'Connor **[2]** 3323/17 3323/20
oath **[1]** 3142/9
object **[1]** 3329/1
objected **[1]** 3159/12
objection **[113]** 3145/8 3146/17 3147/17 3149/15 3150/19 3151/10 3152/21 3153/22 3156/7 3161/1 3163/2 3164/2 3166/20 3170/15 3173/25 3174/21 3174/24 3175/21 3176/7 3177/1 3177/13 3178/12 3179/1 3179/17 3193/6 3193/10 3193/15 3193/16 3194/10 3194/22 3195/2 3195/17 3196/2 3196/12 3197/11 3200/13 3205/8 3207/3 3207/12 3207/25 3209/1 3211/8 3211/16 3212/5 3212/13 3213/3 3213/14 3214/17 3220/8 3220/19 3221/3 3222/22 3223/14 3225/14 3225/21 3226/1 3226/2 3229/17 3230/2 3230/10 3230/21 3232/6 3232/9 3233/7 3233/17 3233/24 3233/25 3249/23 3251/4

3256/10 3257/10 3258/22 3259/5 3259/11 3264/23 3266/7 3266/24 3267/9 3267/12 3268/12 3268/16 3268/20 3270/10 3270/18 3272/6 3274/2 3277/2 3277/7 3279/13 3281/9 3281/24 3283/10 3284/23 3286/12 3288/3 3288/17 3290/9 3290/16 3290/19 3295/6 3295/8 3308/5 3315/15 3322/13 3323/6 3328/20 3333/9 3341/21 3342/25 3359/16 3359/21 3366/24
objective **[4]** 3150/11 3208/15 3256/18 3292/9
objectives **[2]** 3208/16 3292/5
obligation **[1]** 3274/21
obligations **[1]** 3165/5
observation **[1]** 3371/23
observe **[1]** 3348/11
obviously **[2]** 3228/23 3364/25
occasion **[2]** 3275/14 3349/12
occupation **[1]** 3298/8
occur **[1]** 3361/10
occurs **[1]** 3328/9
October **[29]** 3144/3 3169/25 3170/8 3204/25 3205/6 3205/22 3207/1 3208/7 3208/9 3216/15 3251/24 3252/3 3252/14 3252/3 3253/2 3253/3 3254/12 3254/16 3259/2 3266/4 3270/21 3292/4 3293/3 3294/7 3294/11 3298/18 3316/14 3316/16 3319/3 3340/2
October 13th **[1]** 3169/25
October 20 **[1]** 3254/16
October 2011 **[2]** 3292/4 3294/7
October 2013 **[1]** 3170/8
October 27th **[1]** 3216/15
October 28 **[2]** 3205/6 3293/3
October 31 **[4]** 3207/1 3252/3 3252/14 3254/12
October 31st **[2]** 3204/25 3205/22
of 2012 **[1]** 3210/7
offer **[13]** 3236/21 3236/24 3237/10 3238/16 3239/3 3245/4 3246/18 3273/25 3279/12 3281/7 3283/8 3286/11 3306/8
offered **[13]** 3182/1 3226/9 3236/6 3237/11 3238/10 3238/15 3238/22 3240/22 3240/23 3240/23 3244/23 3306/19 3332/9
offering **[5]** 3143/24 3246/7 3306/11 3306/13 3368/12
office **[8]** 3163/19 3168/16 3187/6 3310/23 3310/24 3325/14 3370/8 3371/21
officer **[9]** 3298/11 3298/25 3301/17 3308/16 3309/18 3309/20 3310/13 3350/21 3372/21
officers **[2]** 3337/15 3338/8
officers' **[1]** 3338/2
offices **[7]** 3310/21 3311/20 3315/1 3315/3 3316/5 3316/8 3316/9
officially **[3]** 3316/14 3316/15 3316/16
offset **[1]** 3371/6
often **[2]** 3310/17 3347/6
Ohio **[1]** 3299/9
old **[5]** 3192/18 3192/20 3198/10 3297/25 3298/1
older **[5]** 3180/10 3192/14

**O**

**omissions** [1] 3294/23
**once** [10] 3154/24 3169/7 3185/21
3192/25 3204/12 3291/23 3310/20
3314/23 3320/15 3347/8
**oncology** [2] 3300/2 3300/15
**one** [109] 3143/20 3146/2 3148/14
3148/19 3148/23 3149/2 3150/15
3152/12 3153/2 3153/4 3153/11
3155/23 3157/22 3158/1 3158/6
3159/20 3160/17 3162/8 3162/14
3167/8 3169/3 3169/19 3170/23
3171/21 3174/20 3174/20 3176/19
3177/18 3182/24 3183/9 3184/12
3188/6 3194/13 3194/16 3195/22
3196/7 3197/15 3198/11 3198/12
3201/4 3201/16 3202/24 3203/2
3203/24 3213/1 3213/7 3213/7 3215/3
3217/4 3217/9 3219/13 3220/2 3220/2
3222/21 3223/24 3224/14 3224/23
3226/17 3231/21 3232/12 3234/2
3234/8 3234/22 3236/10 3236/15
3236/15 3239/13 3244/12 3249/6
3253/1 3253/4 3253/4 3253/6 3253/7
3253/8 3263/1 3270/23 3271/10
3271/25 3278/9 3283/23 3286/2 3290/3
3290/17 3291/6 3291/21 3293/1 3293/4
3295/13 3295/23 3296/7 3296/11
3301/4 3306/25 3314/12 3314/21
3316/4 3322/21 3324/12 3327/13
3332/21 3339/12 3339/20 3349/14
3352/22 3354/24 3358/1 3362/1 3368/4
**ongoing** [4] 3179/12 3180/19 3296/9
3373/14
**online** [2] 3366/5 3367/16
**open** [11] 3145/23 3162/1 3187/1
3198/1 3248/2 3260/22 3261/4 3263/25
3282/10 3297/3 3334/1
**opened** [1] 3237/16
**operate** [1] 3291/24
**operating** [7] 3264/11 3264/12 3298/24
3298/25 3337/22 3338/13 3352/16
**operation** [1] 3357/3
**operational** [1] 3143/11
**operations** [2] 3301/21 3317/1
**opinion** [1] 3240/5
**opportunities** [5] 3255/11 3255/14
3256/20 3256/23 3300/14
**opportunity** [17] 3212/2 3212/12
3213/10 3213/17 3213/24 3214/1
3214/10 3214/12 3271/17 3271/23
3304/19 3306/22 3307/8 3307/14
3318/7 3339/24 3344/7
**opposing** [3] 3237/12 3238/12 3238/15
**option** [1] 3146/6
**options** [4] 3203/18 3258/12 3258/12
3302/15
**order** [5] 3160/11 3188/16 3309/18
3326/3 3366/9
**orders** [1] 3362/22
**ordinarily** [1] 3264/3
**Orex** [1] 3269/8
**organ** [1] 3300/23
**organization** [9] 3300/5 3302/5
3306/16 3316/19 3316/23 3316/24
3317/10 3319/8 3349/16
**original** [9] 3143/6 3144/12 3148/12

**originally** [4] 3154/6 3178/19 3223/13
3291/24
**orphan** [1] 3368/16
**otherwise** [3] 3184/5 3241/25 3343/2
**outlets** [1] 3169/15
**outside** [7] 3240/24 3315/21 3316/1
3316/8 3347/19 3349/12 3368/8
**outsourced** [2] 3327/22 3328/3
**outstanding** [1] 3319/23
**over-the-counter** [1] 3259/21
**overall** [2] 3170/19 3265/9
**overhang** [1] 3331/6
**overnight** [1] 3144/25
**overrule** [4] 3193/16 3226/2 3295/8
3343/2
**overruled** [30] 3150/20 3161/1 3174/2
3175/22 3176/8 3177/2 3177/14 3179/2
3194/11 3195/3 3195/18 3196/4 3213/5
3214/18 3220/22 3222/13 3231/1
3232/10 3233/8 3249/25 3259/6
3259/15 3264/24 3266/8 3270/11
3272/7 3282/1 3290/20 3328/21
3359/23
**oversight** [2] 3346/8 3365/11
**overvalued** [1] 3176/5
**overview** [2] 3301/23 3372/14
**owed** [1] 3325/3
**own** [28] 3159/13 3169/17 3187/14
3188/5 3192/6 3203/9 3208/14 3233/23
3234/3 3237/5 3238/4 3238/5 3240/10
3240/16 3241/4 3241/16 3244/14
3244/17 3245/9 3246/6 3248/8 3249/7
3250/2 3250/2 3269/5 3269/6 3309/15
3362/10
**owned** [1] 3356/5
**owns** [1] 3319/23
**Oxytocin** [1] 3369/17

**P**

**P.C** [1] 3141/18
**p.m** [11] 3149/20 3155/13 3167/22
3211/14 3224/17 3225/2 3228/15
3296/12 3297/2 3357/10 3373/19
**Pacific** [1] 3370/6
**package** [3] 3145/13 3146/15 3147/5
**page** [99] 3143/9 3144/24 3145/1
3145/12 3145/17 3149/20 3154/1
3155/11 3156/14 3161/4 3163/6
3163/12 3164/5 3164/7 3164/2
3165/12 3165/13 3166/24 3167/20
3168/17 3179/22 3186/21 3196/15
3197/21 3201/13 3201/14 3201/23
3202/14 3201/25 3202/20 3202/21
3202/23 3203/5 3203/6 3203/8 3210/10
3211/15 3220/25 3234/14 3234/15
3234/22 3234/24 3235/5 3247/1 3250/3
3253/25 3255/2 3255/2 3255/4 3255/18
3255/19 3256/12 3256/15 3258/2
3258/2 3258/3 3258/7 3260/17 3261/6
3261/7 3262/11 3264/10 3265/4
3267/13 3270/2 3271/7 3271/13
3271/14 3271/14 3271/16 3292/3
3293/3 3293/8 3293/22 3294/11
3296/13 3313/1 3313/19 3313/23
3322/17 3324/2 3326/14 3326/25 3329/7

**page 1** [2] 3324/2 3326/25
**page 2** [2] 3322/17 3353/12
**page 3** [1] 3234/14
**page 4** [1] 3336/17
**pages** [4] 3206/15 3234/15 3256/1
3256/2
**paginated** [1] 3203/4
**paid** [7] 3204/20 3277/12 3289/19
3337/22 3338/12 3340/3 3340/4
**painted** [1] 3307/11
**Paley** [6] 3360/18 3361/5 3361/6
3364/20 3364/22 3371/3
**Panoff** [12] 3347/16 3349/9 3350/19
3350/20 3350/22 3350/25 3352/13
3352/20 3356/10 3357/16 3364/19
3371/1
**paper** [3] 3154/5 3287/18 3365/14
**paragraph** [18] 3142/24 3142/25
3143/10 3164/8 3204/5 3205/25
3234/23 3234/23 3258/8 3259/18
3260/12 3261/7 3265/5 3268/19
3271/16 3292/8 3293/22 3294/12
**paragraph that** [1] 3204/5
**paragraphs** [4] 3201/1 3203/24
3206/12 3206/18
**parameters** [2] 3206/8 3248/3
**parenthesis** [2] 3309/6 3321/14
**Park** [4] 3230/14 3231/5 3232/13
3234/1
**parsynthian** [1] 3354/22
**part** [41] 3150/2 3150/9 3150/13 3153/7
3156/2 3158/13 3158/25 3160/1 3160/6
3180/2 3182/2 3183/24 3197/5 3197/16
3204/11 3205/3 3205/8 3213/13 3229/6
3233/5 3233/12 3254/18 3255/6
3255/20 3276/21 3276/25 3277/14
3283/12 3284/2 3285/1 3291/19 3295/1
3300/6 3310/3 3312/1 3318/6 3330/5
3337/10 3360/10 3361/20 3368/2
**participant** [1] 3241/14
**participated** [1] 3301/22
**particular** [5] 3265/7 3352/1 3355/23
3372/6 3372/16
**particularly** [2] 3321/7 3362/9
**parties** [2] 3164/9 3295/2
**parting** [1] 3304/13
**partner** [24] 3205/18 3206/1 3218/7
3221/23 3256/6 3261/21 3261/24
3262/1 3265/20 3267/7 3268/24
3268/24 3270/5 3270/7 3270/15
3270/16 3271/18 3272/10 3272/13
3294/13 3294/14 3294/18 3294/22
3295/1
**partner's** [1] 3274/12
**partners** [7] 3143/1 3148/14 3263/12
3263/20 3276/23 3276/24 3294/15
**partnership** [28] 3143/12 3143/24
3203/14 3204/1 3221/24 3259/19
3259/22 3260/10 3261/10 3262/14
3263/13 3264/12 3264/18 3265/7
3265/14 3265/21 3267/4 3267/17
3269/18 3270/7 3270/9 3273/2 3273/22
3274/4 3294/16 3294/17 3294/2

**P**

partnership... [1] 3295/1
partnership's [12] 3203/12 3204/6
3255/6 3258/16 3260/7 3292/9 3292/15
3293/15 3294/2 3294/4 3294/23
3294/24
partnerships [7] 3143/2 3206/6
3258/10 3259/24 3265/13 3275/1
3293/12
parts [1] 3200/4
party [4] 3164/20 3237/12 3238/13
3238/15
past [14] 3151/21 3154/8 3154/23
3154/23 3208/17 3212/2 3212/11
3213/19 3213/20 3213/23 3229/2
3264/16 3265/1 3361/24
path [1] 3300/1
patient [2] 3301/21 3316/25
patients [2] 3368/24 3369/1
pattern [1] 3365/15
pause [11] 3170/24 3171/16 3177/20
3201/9 3202/3 3202/12 3202/22 3210/1
3210/9 3236/16 3358/3
pay [6] 3154/12 3158/12 3168/12
3172/4 3280/17 3290/13
payment [5] 3164/23 3165/1 3165/4
3290/12 3290/15
payor [2] 3164/24
payout [1] 3173/22
payroll [3] 3231/25 3232/1 3311/14
peace [1] 3239/15
pending [1] 3243/23
people [19] 3175/10 3189/1 3196/1
3197/2 3290/3 3302/4 3304/10 3309/13
3318/18 3319/7 3328/6 3333/2 3333/6
3338/5 3344/6 3346/12 3361/21
3371/17 3372/19
Pepsi [6] 3299/13 3299/14 3299/15
3299/15 3299/18 3299/19
per [4] 3151/18 3218/11 3219/18
3219/23
percent [9] 3150/14 3175/7 3176/13
3190/19 3191/14 3191/19 3192/8
3249/8 3294/4
perfectly [1] 3338/4
performance [1] 3264/14
perhaps [1] 3186/15
period [24] 3143/23 3159/4 3160/13
3171/21 3173/13 3174/8 3174/9
3180/18 3184/19 3193/1 3198/15
3230/8 3253/19 3257/18 3280/20
3328/16 3334/3 3340/5 3342/7 3344/1
3344/1 3347/7 3349/14 3361/25
periodic [1] 3334/16
periodically [1] 3347/9
permanent [1] 3298/14
permission [1] 3269/5
person [23] 3150/6 3157/2 3160/3
3160/3 3168/7 3168/8 3180/23 3183/6
3195/21 3198/3 3199/2 3215/16
3229/10 3230/6 3239/7 3241/23 3251/3
3314/22 3324/23 3347/11 3348/11
3367/16 3371/11
personable [2] 3282/4 3314/14
personal [8] 3170/12 3173/8 3190/10
3193/20 3208/15 3208/16 3274/22
3331/4

perspective [1] 3349/3
Peter [10] 3322/16 3322/20 3322/21
3322/25 3323/8 3323/10 3324/12
3325/5 3326/4 3328/12
Pharma [1] 3313/4
pharmaceutical [17] 3299/16 3299/25
3303/14 3304/7 3309/15 3309/21
3312/4 3314/18 3320/20 3321/18
3337/5 3347/5 3353/3 3353/6 3354/11
3362/4 3372/1
Pharmaceuticals [2] 3179/16 3313/5
phase [2] 3301/2 3337/5
phone [3] 3141/22 3168/7 3303/7
phonetic [1] 3354/22
phrase [2] 3281/5 3309/6
physician [1] 3361/6
pick [1] 3142/15
picture [1] 3325/1
piece [4] 3245/24 3287/18 3305/6
3337/17
pied [1] 3339/21
pink [2] 3361/16 3365/24
pipe [9] 3342/9 3342/9 3342/14 3343/7
3343/9 3343/20 3353/18 3353/23
3354/9
pipeline [2] 3372/13 3372/13
piper [1] 3339/21
pipes [2] 3176/14 3176/14
pitch [1] 3231/19
place [8] 3167/6 3168/15 3227/14
3262/5 3295/13 3336/16 3339/2
3347/11
placement [10] 3199/2 3201/2 3204/13
3205/5 3206/2 3251/24 3255/23 3292/4
3293/9 3342/8
placements [1] 3176/15
places [1] 3188/16
plan [3] 3143/25 3326/10 3352/16
planned [1] 3182/5
planning [5] 3278/23 3302/22 3303/3
3313/14 3367/11
plans [2] 3305/18 3305/19
play [3] 3318/4 3368/18 3368/20
player [1] 3169/16
Plaza [1] 3141/14
Pleasanton [1] 3302/21
pleasantries [3] 3229/1 3276/19 3280/3
plenty [2] 3169/13 3367/8
Plotkin [2] 3372/20 3372/22
plus [3] 3172/25 3179/9 3212/2
point [52] 3144/11 3146/12 3157/1
3159/7 3159/9 3168/1 3171/21 3173/3
3176/22 3184/2 3187/19 3188/6 3191/5
3201/21 3209/12 3209/16 3211/19
3214/9 3223/8 3231/21 3232/12 3233/5
3242/22 3242/24 3246/21 3249/6
3251/7 3286/2 3296/5 3298/21 3300/24
3301/6 3303/1 3303/3 3305/19 3305/23
3306/2 3307/1 3320/14 3323/23
3334/10 3342/17 3345/5 3347/16
3348/22 3354/2 3354/20 3363/10
3364/21 3369/14 3370/10 3371/18
pointed [1] 3217/9
pointing [1] 3293/10
points [1] 3159/20
poised [1] 3301/1
policy [7] 3337/19 3337/20 3337/21

3337/21 3337/24 3337/25 3338/1
poor [1] 3155/16
portfolio [32] 3150/2 3150/9 3190/19
3191/15 3191/19 3191/25 3192/3
3203/12 3208/17 3216/10 3229/6
3258/4 3261/15 3264/5 3264/8 3264/11
3265/15 3265/24 3266/13 3267/6
3267/21 3267/23 3267/25 3268/11
3268/25 3291/19 3292/11 3293/15
3293/25 3294/2 3294/13 3294/20
portion [3] 3188/19 3203/12 3226/24
position [23] 3176/11 3223/16 3281/14
3294/3 3298/20 3298/24 3299/21
3299/22 3300/9 3301/15 3301/18
3303/19 3305/17 3306/4 3306/6
3306/12 3306/13 3306/15 3337/12
3340/6 3351/4 3352/16 3371/1
positions [15] 3265/7 3265/14 3267/4
3267/18 3291/22 3292/15 3292/16
3292/18 3293/16 3293/23 3294/1
3294/3 3294/6 3338/20 3338/24
positive [3] 3212/2 3223/16 3301/2
possibility [4] 3213/24 3306/4 3323/24
3323/25
possible [6] 3212/12 3213/10 3249/8
3263/17 3328/12 3344/11
post [1] 3353/7
post-marketing [1] 3353/7
pot [2] 3243/6 3244/13
potential [5] 3231/19 3264/13 3268/14
3292/17 3292/19
potentially [1] 3214/10
Poulenc [1] 3300/16
power [1] 3243/12
PPM [7] 3205/8 3254/16 3254/18
3293/1 3293/4 3294/7 3294/12
praying [1] 3213/21
precluded [1] 3245/10
predict [1] 3176/20
preferred [2] 3203/16 3258/11
premium [1] 3338/12
premiums [1] 3337/15
prepare [1] 3327/23
prepared [5] 3297/6 3327/24
preparing [2] 3332/18 3332/19
prescribers [1] 3317/6
present [6] 3142/2 3228/2 3248/2
3297/3 3297/4 3373/9
presentation [2] 3349/13 3371/10
presentations [1] 3349/10
presented [5] 3200/8 3359/6 3359/9
3360/7 3360/9
president [3] 3301/16 3308/18 3308/19
press [5] 3148/3 3276/1 3307/23
3307/25 3309/24
pretty [8] 3200/9 3260/15 3260/18
3272/19 3314/16 3327/13 3346/6
3367/12
preview [2] 3185/24 3186/11
previous [1] 3302/16
previously [6] 3142/5 3165/2 3339/18
3344/19 3349/25 3365/15
price [2] 3292/18 3292/20
prices [2] 3218/5 3221/25
pricing [1] 3261/16
primarily [6] 3154/14 3255/10 3256/19
3292/11 3301/11 3317/22

**P**

**primary [2]** 3258/9 3346/15
**principal [3]** 3180/3 3331/23 3367/14
**principals [2]** 3236/11 3322/21
**private [44]** 3150/12 3199/2 3201/2
3204/13 3205/5 3206/1 3206/5 3208/18
3223/7 3251/24 3255/12 3255/23
3256/21 3258/10 3259/23 3259/24
3262/12 3262/17 3262/19 3262/20
3262/21 3262/23 3263/1 3263/8
3263/11 3263/16 3263/16 3263/23
3265/13 3265/15 3267/5 3267/16
3267/19 3269/24 3291/17 3292/4
3293/9 3293/11 3319/25 3320/1
3324/23 3326/11 3342/8 3345/24
**probe [6]** 3182/8 3183/19 3184/11
3185/1 3186/14 3187/14
**probes [1]** 3186/2
**probing [2]** 3183/16 3185/20
**problem [5]** 3157/9 3212/23 3242/18
3289/15 3350/12
**problematic [1]** 3327/8
**problems [1]** 3257/24
**proceed [5]** 3142/10 3171/3 3187/2
3285/15 3297/21
**Proceedings [2]** 3141/24 3373/19
**proceeds [4]** 3353/16 3353/18 3353/22
3353/25
**process [8]** 3152/4 3160/1 3326/21
3332/18 3332/19 3348/2 3352/4
3352/15
**produced [2]** 3141/24 3239/2
**product [12]** 3301/3 3301/4 3301/5
3312/4 3317/7 3345/1 3354/21 3368/7
3368/9 3369/9 3369/10 3369/18
**products [39]** 3217/19 3300/6 3301/11
3303/16 3304/24 3304/25 3305/2
3306/16 3306/17 3311/25 3312/8
3312/11 3313/14 3313/15 3316/20
3316/21 3317/3 3317/24 3318/1 3318/5
3318/9 3319/6 3319/9 3323/12 3344/7
3344/12 3345/4 3345/6 3345/8 3345/12
3345/14 3345/20 3353/6 3354/1 3354/5
3369/12 3369/14 3369/16 3369/19
**professional [4]** 3173/9 3193/19
3314/17 3370/11
**proffered [1]** 3246/11
**profit [1]** 3224/11
**profitable [1]** 3143/8
**profits [1]** 3188/19
**programs [2]** 3354/15 3372/15
**progress [1]** 3372/14
**projections [1]** 3323/2
**promises [1]** 3165/6
**promoted [1]** 3300/1
**prompt [1]** 3155/14
**proper [2]** 3290/23 3291/1
**proposal [2]** 3156/5 3162/10
**propound [1]** 3174/25
**propounded [1]** 3248/13
**prosecution [1]** 3243/14
**prosecutors [1]** 3191/2
**prospective [1]** 3360/20
**prospects [5]** 3148/4 3276/3 3276/12
3277/17 3277/19
**prove [1]** 3160/18
**provide [9]** 3261/17 3325/1 3326/6

3330/6 3346/9 3348/14 3348/18
3349/20 3362/11
**provided [5]** 3189/3 3215/23 3218/7
3225/24 3275/9
**providing [2]** 3316/21 3330/7
**provision [1]** 3332/2
**pry [1]** 3190/10
**public [33]** 3175/16 3223/7 3230/11
3230/20 3255/11 3256/20 3260/2
3260/4 3261/11 3262/22 3262/24
3277/6 3289/24 3290/24 3319/25
3320/1 3324/25 3326/9 3326/11
3326/15 3326/17 3326/18 3326/19
3330/22 3332/20 3336/4 3336/5
3336/22 3340/9 3346/1 3346/2 3346/4
3346/16
**publicly [3]** 3204/7 3258/18 3262/21
**publicly-traded [2]** 3258/18 3262/21
**published [1]** 3320/16
**puffing [1]** 3185/7
**pull [1]** 3304/23
**punish [1]** 3184/10
**purchase [5]** 3143/24 3261/15 3262/2
3320/14 3362/22
**purchased [1]** 3320/15
**purchasing [2]** 3369/11 3369/11
**purposes [3]** 3239/24 3249/11 3272/22
**pursuant [2]** 3313/5 3340/22
**pursue [4]** 3169/11 3232/16 3345/8
3345/11
**put [35]** 3149/24 3178/7 3179/15
3201/20 3208/14 3210/2 3211/19
3215/2 3215/3 3219/3 3229/1 3229/3
3243/10 3245/2 3252/2 3252/5 3255/3
3255/19 3267/13 3270/25 3271/7
3271/8 3273/12 3278/17 3282/3
3291/11 3293/2 3317/10 3317/23
3319/8 3332/3 3337/11 3339/2 3347/22
3365/14
**puts [1]** 3348/5
**putting [10]** 3150/23 3219/22 3243/9
3257/3 3276/19 3289/5 3318/8 3326/22
3327/19 3354/15

**Q**

**Q4 [1]** 3317/13
**qualifies [1]** 3238/3
**quarter [7]** 3314/12 3347/8 3353/17
3353/25 3354/3 3357/5 3358/21
**questioned [1]** 3241/17
**questioning [1]** 3181/7
**questions [29]** 3159/17 3171/1 3171/12
3171/14 3171/15 3174/11 3178/18
3178/24 3179/5 3206/17 3207/6 3207/9
3248/13 3248/14 3254/18 3271/17
3271/23 3271/25 3272/3 3272/11
3272/14 3272/18 3272/20 3289/10
3291/4 3291/11 3292/5 3295/24
3318/25
**quickly [3]** 3325/5 3328/11 3353/22
**quit [1]** 3301/7
**Quite [1]** 3310/19
**quote [1]** 3164/25

**R**

**R012275 [1]** 3143/9
**RA [4]** 3322/21 3324/17 3334/25 3335/2

**Radford [1]** 3362/14
**raise [5]** 3297/11 3317/13 3323/22
3342/8 3342/14
**raised [2]** 3343/21 3354/9
**raising [2]** 3318/3 3323/11
**random [2]** 3226/18 3226/19
**range [2]** 3203/15 3210/2
**Rao [1]** 3372/19
**Rapids [1]** 3299/22
**rare [3]** 3309/21 3368/22 3368/24
**Rarely [1]** 3349/12
**rather [3]** 3186/1 3309/16 3337/5
**re [2]** 3261/11 3351/9
**re-sale [1]** 3261/11
**reached [1]** 3165/10
**react [1]** 3146/21
**reaction [21]** 3145/25 3146/20 3150/18
3150/21 3156/6 3156/8 3157/3 3157/9
3157/23 3158/23 3159/16 3159/20
3159/21 3160/21 3162/4 3162/6
3167/18 3169/21 3169/22 3303/23
3365/12
**reactions [1]** 3160/12
**read [32]** 3147/23 3181/22 3199/5
3199/9 3199/10 3200/4 3203/11
3203/24 3204/9 3204/13 3205/3
3209/22 3218/2 3219/15 3239/9 3254/3
3254/20 3255/9 3255/16 3256/25
3266/11 3268/8 3269/25 3276/10
3286/15 3309/17 3324/9 3324/20
3327/5 3340/19 3367/5 3369/23
**reader [2]** 3195/25 3197/2
**readily [5]** 3218/5 3222/1 3327/15
**reading [8]** 3148/2 3204/11 3256/18
3268/5 3276/1 3276/5 3277/4 3351/16
**reads [3]** 3142/25 3217/16
**ready [4]** 3155/25 3227/20 3227/20
3228/8
**real [4]** 3185/6 3200/23 3217/4 3366/10
**reality [2]** 3167/25 3183/21
**really [39]** 3146/8 3146/23 3146/24
3150/5 3151/22 3154/10 3154/22
3157/11 3159/4 3159/18 3160/14
3168/1 3168/1 3169/17 3178/25
3183/18 3184/5 3184/11 3184/15
3200/11 3212/3 3214/6 3223/9 3229/9
3244/2 3254/24 3280/9 3282/19
3291/20 3307/11 3307/15 3310/8
3312/2 3319/5 3334/11 3337/4 3337/8
3339/24 3351/4
**reason [8]** 3180/2 3180/3 3182/2
3205/9 3253/14 3254/19 3256/5
3290/11
**reasonable [3]** 3160/21 3160/23 3343/7
**reasonably [1]** 3334/7
**reasons [7]** 3184/12 3196/7 3213/2
3213/7 3238/5 3354/24 3354/25
**receipts [3]** 3203/19 3258/13 3258/13
**receive [31]** 3142/17 3142/22 3145/3
3145/9 3145/12 3146/10 3147/18
3148/9 3149/16 3151/11 3152/22
3153/23 3163/3 3164/3 3166/21 3167/7
3167/13 3170/9 3170/11 3271/17
3274/3 3279/14 3281/10 3286/13
3299/11 3308/6 3322/14 3341/22
3346/22 3359/7 3366/25
**received [42]** 3145/10 3146/15 3147/5

**R**

received... **[39]** 3147/19 3148/6 3148/7
3149/17 3151/12 3152/23 3153/24
3163/4 3164/4 3165/2 3165/24 3166/22
3170/2 3170/8 3188/19 3204/17
3204/21 3204/25 3205/20 3215/25
3216/23 3221/6 3224/25 3225/7
3226/11 3252/14 3253/17 3274/4
3279/15 3281/11 3286/14 3308/7
3320/7 3322/15 3341/23 3346/24
3350/14 3352/1 3367/1
**receiving [6]** 3145/25 3146/20 3156/6
3160/4 3162/4 3167/18
**recently [1]** 3328/10
**recess [2]** 3227/25 3296/12
**recipient [1]** 3156/11
**recognize [8]** 3275/21 3278/20 3307/20
3319/13 3322/3 3341/13 3350/16
3366/14
**recognized [1]** 3251/12
**recollection [12]** 3178/9 3178/14
3190/24 3191/11 3209/23 3228/22
3232/24 3249/12 3249/14 3249/18
3359/4 3371/13
**recommendation [1]** 3363/2
**recommends [1]** 3313/2
**record [11]** 3160/25 3182/12 3183/13
3185/23 3243/11 3243/19 3245/11
3297/16 3309/21 3330/11 3333/4
**recorded [1]** 3141/24
**records [2]** 3325/20 3325/23
**recross [1]** 3295/25
**recruited [2]** 3298/19 3323/10
**rectified [1]** 3359/5
**red [1]** 3262/12
**redeem [19]** 3152/9 3206/22 3207/2
3207/20 3207/24 3208/3 3209/12
3209/25 3211/4 3211/20 3212/17
3213/1 3259/4 3263/12 3265/21
3266/16 3295/14 3295/20 3295/22
**redeemed [2]** 3143/13 3144/10
**redeeming [2]** 3160/20 3212/10
**redemption [15]** 3143/14 3206/7
3208/14 3209/15 3211/5 3211/19
3211/24 3246/14 3246/18 3259/9
3259/10 3266/17 3275/16 3291/11
3295/14
**redirect [2]** 3291/5 3291/7
**redo [1]** 3328/10
**refer [3]** 3190/23 3199/25 3213/9
**reference [3]** 3355/18 3356/22 3367/18
3369/4 3369/15
**referenced [5]** 3277/5 3277/16 3334/20
3342/13 3357/21
**references [2]** 3180/21 3356/25
**referencing [2]** 3369/9 3371/14
**referred [1]** 3198/12
**referring [14]** 3213/12 3213/19 3219/17
3272/25 3313/8 3313/13 3323/3 3323/4
3324/19 3325/8 3328/14 3337/24
3342/6 3369/3
**refers [2]** 3269/12 3269/13
**reflect [1]** 3206/2
**refresh [7]** 3178/14 3190/23 3228/22
3249/12 3249/14 3249/18 3371/13
**refreshes [3]** 3178/9 3191/11 3209/23
**refreshing [2]** 3209/8 3209/9

**regard [1]** 3339/6
**regarding [6]** 3163/15 3206/2 3206/4
3245/22 3332/15 3359/18
**regards [1]** 3237/2
**registration [2]** 3261/18 3354/23
**registries [1]** 3353/8
**regular [6]** 3180/6 3189/4 3192/24
3192/25 3269/19 3347/15
**regularly [2]** 3340/3 3347/8
**regulations [1]** 3188/1
**rehab [1]** 3243/24
**rehabilitating [1]** 3244/9
**reimbursed [1]** 3334/11
**relate [1]** 3281/5
**related [5]** 3197/5 3249/1 3265/15
3267/4 3267/18 3351/22 3358/10
3362/20 3366/20 3367/22
**relates [3]** 3155/3 3200/1 3290/2
**relating [1]** 3146/21
**relation [1]** 3330/15
**relations [2]** 3254/10 3308/23
**relationship [14]** 3173/9 3179/13
3180/17 3191/4 3193/19 3193/20
3194/21 3195/8 3276/20 3323/8 3330/3
3370/9 3370/19 3371/19
**relative [2]** 3356/10 3359/3
**relatively [1]** 3265/8
**relaunch [1]** 3304/23
**release [4]** 3163/15 3307/23 3307/25
3309/25
**released [1]** 3290/3
**releases [2]** 3148/3 3276/2
**releasing [1]** 3290/2
**releasor [2]** 3164/25 3165/2
**relevant [17]** 3156/8 3157/4 3157/11
3157/17 3157/23 3157/24 3158/4
3158/25 3159/5 3160/2 3160/7 3160/13
3160/17 3160/24 3182/2 3183/5
3241/25
**relied [6]** 3181/21 3182/3 3194/13
3194/16 3195/22 3197/15
**rely [7]** 3269/5 3269/6 3295/5 3295/7
3295/9 3352/18 3352/24
**relying [1]** 3181/24
**remain [1]** 3336/22
**remained [3]** 3253/19 3298/21 3298/25
**remaining [1]** 3246/7
**remedy [1]** 3151/20
**remember [47]** 3153/3 3153/9 3171/21
3186/15 3190/24 3191/1 3191/2 3191/7
3191/18 3200/25 3205/11 3205/14
3207/17 3209/19 3211/2 3211/3 3215/5
3228/20 3228/21 3228/25 3234/24
3239/15 3251/25 3252/24 3257/23
3268/5 3270/24 3273/11 3281/22
3282/2 3282/13 3282/16 3282/17
3282/19 3283/24 3284/4 3285/3 3289/1
3313/3 3328/19 3355/14 3355/20
3355/22 3358/25 3362/18 3363/6
3372/16
**remembered [1]** 3284/15
**remind [4]** 3248/14 3284/8 3350/20
3373/11
**reminded [1]** 3142/8
**reminding [1]** 3280/10
**removed [1]** 3245/24
**renames [1]** 3341/1

**repaid [3]** 3170/12 3251/20 3251/21
**repay [7]** 3359/12 3359/19 3360/4
3363/22 3364/1 3364/5 3364/9
**Repeat [3]** 3177/24 3179/4 3194/14
**repeated [1]** 3160/19
**repeatedly [1]** 3197/18
**rephrase [9]** 3146/18 3170/16 3208/1
3213/15 3225/18 3248/20 3248/20
3288/4 3288/6
**rephrasing [1]** 3209/3
**replaced [5]** 3147/3 3253/1 3253/4
3253/6 3253/8
**replacement [1]** 3301/11
**Reporter [2]** 3141/22
**reporting [3]** 3143/21 3143/23 3301/19
**represent [3]** 3263/1 3265/19 3268/1
**representative [4]** 3178/1 3299/22
3299/25 3300/10
**represented [3]** 3175/15 3191/14
3191/16
**request [9]** 3155/7 3207/23 3211/4
3226/9 3295/14 3298/23 3323/13
3327/14 3346/10
**requested [3]** 3167/17 3324/17 3365/14
**requesting [1]** 3226/7
**require [2]** 3205/7 3254/17
**required [1]** 3363/3
**requirements [3]** 3361/19 3361/22
3366/8
**requires [2]** 3187/21 3187/23
**rescind [3]** 3211/4 3246/18 3246/21
**rescinded [2]** 3246/14 3266/17
**rescinding [1]** 3211/23
**research [8]** 3148/25 3278/8 3349/16
3354/18 3354/20 3362/8 3372/19
3372/20
**resign [4]** 3336/24 3337/1 3338/18
3338/24
**resignation [2]** 3315/12 3315/17
**resigned [1]** 3315/14
**resolved [2]** 3359/7 3359/8
**resorting [1]** 3185/10
**resources [4]** 3314/16 3354/15 3354/25
3368/12
**respect [3]** 3354/18 3365/24 3366/6
**respected [1]** 3294/19
**respective [1]** 3294/22
**respects [2]** 3183/7 3237/15
**respond [1]** 3343/4
**responds [2]** 3229/20 3327/21
**response [18]** 3144/6 3155/4 3155/14
3237/4 3254/17 3327/4 3327/6 3327/7
3327/7 3327/15 3327/16 3327/20
3365/6 3368/14 3369/22 3369/23
3370/4 3370/7
**responsibilities [3]** 3169/17 3301/18
3301/20
**responsibility [6]** 3200/19 3218/9
3294/15 3346/9 3346/9 3347/22
**responsible [9]** 3241/22 3243/4 3270/6
3306/15 3327/2 3327/8 3327/9 3327/17
3327/18
**responsive [2]** 3205/7 3272/17
**rest [1]** 3239/14
**restatement [4]** 3358/23 3359/1 3359/6
3359/10
**restaurant [1]** 3231/7

**R**

**restricted [23]** 3145/20 3147/4 3153/9
3189/11 3204/7 3227/5 3258/18
3258/25 3259/3 3260/16 3260/19
3260/20 3260/22 3261/1 3261/8
3261/10 3261/12 3261/15 3262/2
3262/4 3262/8 3284/4 3285/3
**restriction [3]** 3260/23 3261/5 3262/6
**result [4]** 3260/7 3263/12 3265/20
3353/2
**resulting [1]** 3294/21
**results [2]** 3264/18 3289/15
**resume [3]** 3281/6 3281/13 3373/19
**retaining [1]** 3362/2
**retire [2]** 3305/19 3307/6
**retiring [1]** 3306/21
**Retrophin [204]** 3143/14 3143/15
3143/18 3144/1 3144/5 3144/14 3145/2
3145/18 3146/13 3147/3 3148/2
3148/11 3148/13 3149/24 3150/2
3150/8 3152/7 3158/11 3164/15
3164/16 3164/20 3164/23 3165/3
3165/17 3168/14 3170/1 3172/19
3175/11 3177/7 3181/15 3187/6 3191/4
3213/12 3214/5 3214/6 3217/18
3217/23 3218/12 3219/18 3220/6
3220/25 3222/17 3223/6 3223/9
3225/25 3227/2 3229/3 3229/6 3230/9
3230/17 3231/15 3232/19 3232/23
3232/25 3233/6 3233/12 3246/2 3249/1
3251/8 3251/13 3251/14 3257/5
3257/11 3257/22 3257/24 3260/19
3260/25 3276/1 3276/5 3276/15 3277/1
3277/5 3277/15 3277/20 3280/18
3289/22 3289/24 3290/2 3290/7 3298/9
3298/12 3298/15 3298/18 3302/18
3303/4 3303/21 3303/25 3304/11
3305/23 3306/6 3306/9 3308/15
3308/17 3308/21 3308/24 3308/25
3309/1 3309/17 3309/19 3309/23
3310/4 3310/10 3310/17 3310/21
3311/12 3311/20 3311/24 3312/8
3312/11 3312/24 3314/4 3314/7 3314/8
3315/1 3315/3 3315/12 3315/14 3316/5
3316/13 3316/18 3317/8 3317/15
3317/23 3318/21 3319/25 3320/14
3320/15 3321/6 3321/23 3323/4 3323/8
3325/11 3325/16 3325/24 3326/10
3326/17 3327/22 3330/9 3330/21
3330/22 3331/4 3332/1 3332/5 3334/15
3336/5 3336/21 3338/1 3338/17 3340/8
3340/22 3340/25 3341/1 3341/9 3344/4
3344/8 3344/16 3344/24 3344/24
3344/25 3345/7 3345/11 3345/16
3345/21 3346/22 3347/2 3347/6
3348/19 3348/23 3350/22 3353/22
3354/12 3355/21 3359/13 3359/20
3360/5 3360/14 3361/8 3361/12 3362/5
3362/9 3362/17 3362/19 3363/21
3363/22 3363/25 3364/1 3364/4 3364/6
3364/8 3364/10 3364/22 3365/21
3365/24 3366/1 3366/11 3366/20
3367/22 3368/16 3369/5 3369/10
3369/12 3369/19 3371/19 3371/24
**Retrophin's [7]** 3165/20 3327/23
3328/17 3336/4 3337/25 3338/2 3359/1
**return [5]** 3143/6 3227/23 3274/14

3290/5 3296/7
**returns [4]** 3273/3 3274/22 3292/10
3294/6
**Revenue [3]** 3274/17 3274/19 3275/10
**revenues [1]** 3354/13
**reverse [5]** 3320/2 3326/20 3326/22
3336/15 3336/21
**review [21]** 3163/11 3205/9 3253/10
3253/11 3253/14 3253/22 3254/19
3254/24 3255/25 3256/2 3266/3 3289/9
3328/8 3348/15 3348/20 3348/23
3351/18 3358/20 3359/15 3365/9
3365/17
**reviewed [3]** 3348/3 3348/7 3348/8
**reviewing [4]** 3327/18 3352/4 3353/15
3363/6
**revised [3]** 3205/5 3243/20 3254/15
**Rhone [1]** 3300/16
**Rhone-Poulenc [1]** 3300/16
**Rice [1]** 3367/13
**rich [1]** 3356/1
**Richardson [16]** 3314/1 3314/2 3314/4
3314/11 3315/23 3319/18 3320/18
3336/20 3341/7 3349/2 3351/10
3356/15 3364/19 3365/7 3365/18
3371/4
**rid [1]** 3307/9
**right-hand [3]** 3165/15 3234/15
3234/17
**rights [4]** 3165/7 3203/18 3261/18
3313/3
**rise [2]** 3142/1 3227/21
**risk [4]** 3200/7 3200/9 3200/15 3264/10
**risks [2]** 3199/21 3200/1
**Rivka [1]** 3141/22
**RivkaTeich [1]** 3141/23
**RMR [1]** 3141/22
**RO [1]** 3203/6
**RO12394 [1]** 3215/24
**road [3]** 3307/3 3307/5 3307/5
**Rodes [1]** 3355/12
**ROHDE [1]** 3141/13
**role [21]** 3298/13 3298/25 3298/25
3299/1 3303/20 3308/21 3311/12
3318/4 3318/6 3318/12 3319/1 3321/6
3321/7 3338/15 3338/17 3338/18
3345/16 3346/15 3347/18 3365/11
3370/12
**rolling [1]** 3343/8
**Ron [2]** 3311/15 3311/16
**room [1]** 3191/3
**Rorer [1]** 3300/16
**Rosenfeld [1]** 3363/19
**round [3]** 3307/6 3317/21 3326/8
**route [2]** 3148/20 3277/22
**routinely [1]** 3347/17
**RPR [1]** 3141/22
**rule [8]** 3236/18 3237/11 3238/18
3239/9 3239/11 3239/12 3239/21
3244/7
**Rule 801 [1]** 3236/18
**ruled [1]** 3212/21
**rules [4]** 3236/15 3242/16 3244/19
3366/7
**ruling [1]** 3267/12
**run [4]** 3320/21 3337/3 3346/20 3364/5
**running [1]** 3300/21 3305/21 3334/11

**rush [1]** 3174/12

**S**

**S-T-E-P-H-E-N [1]** 3297/20
**sad [7]** 3151/16 3154/24 3157/21
3157/22 3159/15 3169/7 3183/21
**sadness [1]** 3167/19
**saga [1]** 3172/13
**salary [6]** 3302/12 3302/14 3306/18
3306/19 3340/1 3355/21
**sale [1]** 3261/11
**sales [12]** 3299/15 3299/21 3299/22
3299/25 3300/1 3300/2 3300/2 3300/7
3300/10 3301/5 3301/20 3316/24
**San [21]** 3298/7 3300/17 3302/21
3302/22 3303/3 3304/3 3304/3 3306/5
3306/7 3307/1 3307/3 3307/9 3309/22
3309/24 3310/2 3310/4 3310/7 3310/8
3310/11 3310/13 3310/18
**San Diego [14]** 3306/5 3306/7 3307/1
3307/3 3307/9 3309/22 3309/24 3310/2
3310/4 3310/7 3310/8 3310/11 3310/13
3310/18
**SangStat [2]** 3300/22 3300/24
**sanitized [1]** 3182/4
**Sarah [2]** 3184/13 3355/10
**sat [1]** 3184/14
**satisfaction [1]** 3165/5
**satisfactory [4]** 3148/21 3150/5 3229/9
3277/24
**satisfied [1]** 3226/14
**satisfy [1]** 3328/12
**Saturday [1]** 3369/25
**Saunders [4]** 3320/19 3320/19 3320/20
3320/22
**save [2]** 3211/18 3224/4
**savings [1]** 3338/10
**saw [8]** 3206/20 3217/25 3253/4 3256/6
3324/17 3358/11 3370/8 3370/11
**scan [1]** 3341/4
**scenario [3]** 3147/1 3147/3 3150/24
**scenarios [3]** 3146/24 3146/25 3146/25
**schedule [3]** 3274/12 3352/14 3371/8
**scheduled [1]** 3347/8
**Schelling [1]** 3368/5
**scheme [1]** 3159/1
**Schering [2]** 3321/4 3321/19
**Schmidt [1]** 3178/10
**Schonfeld [2]** 3188/11 3188/25
**school [3]** 3299/5 3299/9 3299/12
**Schwab [2]** 3190/4 3350/2
**science [1]** 3346/14
**sciences [1]** 3300/18
**scientific [1]** 3310/13
**scope [1]** 3330/3
**scrambling [1]** 3185/13
**screen [16]** 3147/22 3162/3 3201/21
3201/23 3202/24 3203/9 3215/2 3215/4
3252/13 3254/3 3255/19 3267/13
3271/4 3271/7 3273/12 3305/9
**scroll [9]** 3315/17 3323/16 3324/1
3327/4 3327/20 3328/4 3343/12 3365/6
3369/22
**seasoned [1]** 3314/17
**seat [3]** 3142/2 3228/3 3297/5
**Seattle [2]** 3301/1 3301/8
**SEC [12]** 3178/10 3178/15 3179/5

**SEC... [9]** 3187/16 3327/22 3327/25
3328/2 3330/6 3330/13 3331/12 3357/2
3358/22
**second [24]** 3143/9 3145/1 3154/1
3163/6 3163/12 3164/7 3164/17
3165/12 3166/24 3182/10 3255/9
3256/19 3258/9 3293/4 3311/7 3320/3
3324/6 3324/20 3325/6 3334/25
3340/19 3358/1 3358/19 3365/16
**secondary [2]** 3176/15 3264/4
**secondly [2]** 3158/6 3327/16
**secretary [6]** 3347/19 3347/20 3347/21
3348/4 3348/22 3349/19
**section [6]** 3164/22 3292/6 3325/6
3340/22 3353/15 3355/4
**sections [2]** 3199/13 3199/14
**secure [1]** 3317/18
**securities [54]** 3145/20 3147/4 3158/6
3177/22 3178/1 3187/15 3187/22
3188/11 3188/22 3189/10 3189/11
3203/13 3203/15 3203/17 3204/6
3204/8 3206/5 3216/25 3258/11
3258/11 3258/17 3258/18 3258/25
3259/3 3259/19 3259/20 3260/9
3260/10 3260/14 3260/16 3260/19
3260/21 3260/22 3261/1 3261/8
3261/11 3261/11 3261/12 3261/13
3261/14 3261/15 3261/18 3262/2
3262/4 3262/8 3265/8 3265/15 3266/5
3267/18 3270/8 3270/17 3291/17
3291/18 3293/16
**security [3]** 3262/9 3263/2 3263/8
**see [94]** 3143/21 3145/20 3148/22
3180/2 3181/22 3184/9 3187/5 3187/8
3191/10 3203/9 3206/18 3208/20
3217/10 3217/14 3217/22 3218/1
3218/13 3218/25 3219/19 3219/23
3220/2 3222/2 3223/4 3223/25 3224/18
3225/3 3229/11 3229/23 3234/17
3234/19 3244/3 3245/4 3245/12
3249/11 3249/13 3252/20 3253/22
3254/2 3255/14 3255/19 3256/7
3256/23 3258/5 3258/14 3258/18
3261/7 3261/19 3262/12 3263/6
3263/13 3264/14 3265/9 3265/22
3267/14 3268/2 3270/9 3270/13 3271/2
3271/19 3273/12 3274/6 3276/3
3276/12 3277/24 3279/5 3279/7
3279/24 3280/11 3281/2 3282/25
3282/25 3283/18 3283/24 3284/5
3286/4 3286/21 3287/11 3290/3 3293/3
3293/17 3293/22 3295/2 3296/11
3305/4 3305/8 3322/17 3324/2 3337/19
3346/20 3348/23 3352/10 3362/7
3370/16 3373/16
**seeing [1]** 3256/8
**seek [1]** 3292/10
**seeking [2]** 3311/25 3318/5
**seem [2]** 3286/17 3318/24
**sell [11]** 3170/1 3170/4 3170/6 3172/18
3261/3 3263/23 3263/25 3264/1 3301/4
3305/1 3344/8
**selling [3]** 3294/5 3302/13 3369/19
**semester [1]** 3352/22
**send [6]** 3148/17 3156/1 3167/9
3167/16 3172/1 3323/1

**sending [4]** 3163/10 3169/8 3202/15
3289/9
**senior [4]** 3301/15 3337/15 3337/18
3339/20
**sense [3]** 3162/12 3267/6 3296/5
**senses [1]** 3236/3
**sent [23]** 3147/6 3147/6 3154/19
3199/2 3207/19 3208/12 3218/23
3222/20 3226/5 3228/17 3259/9
3270/21 3271/10 3273/19 3289/11
3319/24 3328/8 3337/20 3338/11
3348/7 3352/5 3365/7 3365/18
**sentence [13]** 3142/25 3203/11 3218/2
3219/16 3255/9 3255/16 3256/19
3258/9 3263/4 3292/8 3293/14 3325/8
3351/20
**sentences [2]** 3143/20 3201/2
**separate [2]** 3242/6 3257/15
**September [21]** 3146/6 3146/12 3148/8
3165/25 3170/20 3170/21 3224/13
3224/17 3225/1 3225/8 3298/13
3298/14 3298/15 3299/1 3308/11
3313/18 3356/13 3357/14 3358/8
3363/7 3363/10
**September 10th [2]** 3225/8 3308/11
**September 14th [1]** 3313/18
**September 2012 [2]** 3146/12 3225/1
**September 2013 [2]** 3165/25 3363/10
**September 2014 [2]** 3298/14 3299/1
**September 9 [1]** 3363/7
**September 9th [3]** 3224/13 3224/17
3356/13
**series [11]** 3171/12 3171/19 3187/18
3187/18 3208/24 3209/24 3214/24
3279/7 3282/25 3285/20 3286/6
**serve [1]** 3314/7
**served [1]** 3314/8
**Service [3]** 3274/17 3274/19 3275/10
**services [2]** 3301/21 3316/25
**serving [2]** 3347/2 3349/19
**session [1]** 3372/12
**set [6]** 3167/25 3300/15 3349/8 3349/9
3365/8 3371/22
**setting [1]** 3154/14
**settlement [24]** 3155/3 3156/3 3158/18
3163/8 3163/15 3164/6 3169/11
3225/12 3225/15 3225/24 3267/1
3275/16 3285/10 3285/12 3289/7
3355/18 3359/2 3359/3 3359/11
3359/15 3359/19 3360/3 3360/9
3360/12
**settlements [1]** 3355/5
**seven [6]** 3166/5 3258/2 3293/8
3300/12 3301/8 3301/14
**several [13]** 3183/8 3191/6 3240/25
3256/9 3298/17 3300/14 3301/19
3320/15 3320/21 3344/5 3345/24
3353/5 3369/16
**share [8]** 3220/6 3263/24 3264/1
3266/16 3269/18 3274/12 3324/15
3328/10
**shared [4]** 3183/14 3304/5 3325/14
3325/14
**shareholders [3]** 3144/4 3346/17
3346/20
**shares [64]** 3143/14 3143/15 3143/19
3144/5 3144/14 3145/18 3145/23

3146/13 3152/7 3153/8 3154/7 3154/11
3156/23 3160/10 3162/1 3162/12
3162/13 3165/2 3165/3 3170/1 3172/2
3172/4 3172/19 3172/25 3184/15
3206/22 3207/2 3207/20 3208/3
3209/25 3227/2 3227/5 3280/17
3282/21 3284/2 3284/3 3284/9 3284/14
3284/16 3284/21 3285/1 3285/2
3286/24 3287/19 3290/7 3290/7
3319/22 3319/23 3320/6 3320/7 3320/8
3320/11 3320/13 3320/14 3320/15
3328/6 3328/14 3359/12 3359/20
3360/4 3363/23 3364/2 3364/6 3364/10
**sharp [1]** 3195/21
**sheet [2]** 3353/21 3361/17
**sheets [1]** 3365/25
**Shefferman [1]** 3311/1
**shell [3]** 3326/18 3326/22 3340/25
**SHKRELI [169]** 3141/7 3147/14
3164/10 3165/16 3171/11 3172/1
3173/9 3175/10 3179/13 3180/4
3180/15 3180/20 3181/19 3182/11
3183/8 3184/10 3186/6 3187/6 3187/10
3191/4 3193/2 3193/8 3193/14 3193/22
3194/2 3194/15 3195/1 3195/8 3196/8
3197/4 3197/6 3198/13 3198/17
3205/17 3206/17 3207/1 3207/5
3209/15 3213/4 3214/4 3214/7 3216/12
3217/20 3220/12 3223/20 3224/17
3225/1 3225/8 3225/13 3228/17
3228/24 3230/5 3230/9 3230/13
3230/19 3231/9 3231/15 3232/7
3232/19 3233/23 3234/3 3237/1 3237/2
3237/4 3238/3 3239/2 3240/5 3240/10
3240/12 3240/23 3240/24 3241/1
3241/3 3241/13 3243/4 3243/5 3243/7
3243/8 3243/21 3244/13 3245/2 3245/9
3245/15 3245/23 3248/8 3249/7 3257/4
3257/17 3261/23 3264/5 3264/22
3264/25 3267/7 3267/24 3275/14
3277/10 3277/22 3278/4 3279/8 3280/1
3280/21 3281/1 3281/3 3281/13
3281/19 3282/7 3282/13 3282/18
3283/3 3283/21 3284/8 3285/7 3285/16
3285/21 3286/7 3287/1 3288/8 3288/19
3288/23 3298/18 3299/1 3303/5
3303/25 3305/4 3307/11 3313/14
3313/25 3315/11 3315/19 3315/20
3317/17 3317/20 3318/11 3318/12
3319/16 3320/8 3320/10 3322/7
3330/12 3330/19 3330/21 3330/25
3331/5 3331/7 3331/8 3331/9 3331/12
3336/20 3336/23 3337/4 3337/20
3338/23 3338/25 3339/2 3339/5
3339/18 3341/7 3341/16 3342/7
3343/15 3344/13 3344/15 3345/3
3345/7 3356/16 3366/17 3371/3
3372/22 3373/13
**Shkreli's [4]** 3251/3 3264/16 3265/1
3362/21
**short [10]** 3291/22 3292/11 3292/18
3293/15 3293/22 3294/1 3294/5
3334/18 3350/3 3361/25
**short-term [1]** 3350/3
**shorting [1]** 3309/16
**shortly [7]** 3143/25 3204/20 3228/16
3320/16 3334/8 3352/6 3361/11

**show [35]** 3158/5 3158/9 3158/25 3160/2 3160/13 3168/1 3178/4 3178/5 3191/8 3204/23 3209/19 3209/21 3236/24 3246/8 3252/4 3272/24 3273/5 3273/7 3275/20 3280/23 3282/24 3289/1 3289/2 3307/16 3312/14 3315/4 3319/11 3321/25 3336/6 3340/11 3341/11 3350/6 3364/12 3366/12 3370/22

**showed [2]** 3214/24 3252/3

**showing [16]** 3142/16 3144/22 3149/5 3150/25 3152/11 3153/14 3158/3 3162/17 3163/20 3166/10 3278/22 3283/18 3286/3 3291/9 3292/1 3293/7

**shown [2]** 3209/18 3336/16

**shows [13]** 3158/15 3206/15 3216/3 3216/23 3220/3 3223/24 3224/14 3224/23 3225/9 3240/5 3275/6 3341/4 3353/16

**side [13]** 3165/15 3180/2 3184/2 3196/13 3196/14 3234/12 3285/16 3300/21 3339/17 3346/13 3346/13 3346/14 3346/15

**side-bar [3]** 3184/2 3196/13 3196/14

**side-bars [1]** 3180/2

**sidebar [14]** 3156/12 3156/15 3161/3 3179/23 3186/20 3196/16 3197/20 3235/2 3235/4 3235/6 3246/25 3329/4 3329/6 3333/14

**sign [3]** 3163/16 3165/17 3289/18

**signature [4]** 3165/12 3313/22 3313/25 3341/6

**signatures [1]** 3165/15

**signed [14]** 3155/17 3163/19 3165/22 3166/2 3166/6 3169/12 3204/12 3204/15 3204/15 3225/20 3225/23 3226/4 3289/11 3293/1

**significant [12]** 3174/19 3265/7 3265/14 3267/4 3267/17 3292/18 3292/20 3324/21 3326/14 3343/9 3369/1 3370/18

**significantly [3]** 3152/5 3176/6 3199/20

**signing [1]** 3270/24

**similar [2]** 3171/13 3244/9

**simple [2]** 3162/13 3327/14

**simply [4]** 3325/17 3327/17 3339/3 3354/14

**simultaneously [3]** 3163/10 3289/8 3319/6

**single [1]** 3294/3

**sings [1]** 3339/21

**sit [5]** 3146/8 3188/25 3217/3 3268/18 3269/11

**sites [1]** 3354/16

**situation [7]** 3151/17 3151/18 3151/20 3326/5 3332/5 3342/18 3350/4

**situations [1]** 3154/23

**six [9]** 3252/9 3252/11 3254/6 3258/2 3258/3 3302/16 3351/18 3353/14 3360/17

**size [2]** 3302/1 3302/2

**skills [1]** 3181/17

**skim [1]** 3352/8

**slang [1]** 3342/8

**slides [1]** 3323/1

**slip [1]** 3242/15

**slowly [2]** 3174/12 3354/22

**slumped [1]** 3336/8

**small [7]** 3150/2 3150/9 3150/13 3155/15 3202/2 3217/11 3229/6 3291/19 3301/12

**smart [1]** 3195/21

**SMITH [1]** 3141/16

**so-called [1]** 3261/10

**social [1]** 3372/4

**sold [13]** 3145/23 3170/7 3172/21 3188/4 3189/16 3227/8 3227/9 3227/12 3260/22 3262/4 3269/4 3299/15 3302/15

**solely [1]** 3181/21

**soliciting [1]** 3232/7

**solid [1]** 3300/22

**solutions [6]** 3327/23 3327/25 3328/2 3330/6 3330/13 3331/12

**someone [11]** 3177/11 3178/19 3184/21 3245/2 3264/1 3303/15 3303/16 3320/25 3364/20 3367/25 3368/11

**sometime [1]** 3350/23

**sometimes [6]** 3179/8 3189/18 3189/18 3349/22 3360/7 3362/12

**somewhat [2]** 3199/21

**somewhere [2]** 3315/1 3316/5

**son [2]** 3187/12 3193/21

**song [1]** 3339/21

**soon [6]** 3148/22 3150/4 3193/5 3229/8 3277/24 3356/21

**sooner [1]** 3278/15

**sophisticated [1]** 3183/22

**sorry [33]** 3152/3 3162/21 3162/22 3167/23 3167/24 3174/23 3177/25 3181/3 3199/20 3202/7 3202/20 3207/23 3211/9 3215/22 3236/14 3238/4 3239/18 3244/16 3251/23 3253/4 3279/11 3287/4 3287/15 3311/10 3313/23 3338/21 3338/23 3351/16 3358/5 3364/16 3370/7 3372/25 3373/6

**sort [3]** 3185/19 3185/24 3229/14

**sought [1]** 3266/16

**sounds [4]** 3153/13 3183/22 3285/8 3367/10

**source [1]** 3332/13

**sources [2]** 3158/12 3362/10

**space [4]** 3325/14 3362/10 3362/12 3367/12

**Sparsentan [1]** 3312/5

**speaking [4]** 3167/23 3168/4 3349/5 3367/25

**spearheaded [1]** 3368/6

**specialty [1]** 3300/1

**specific [10]** 3183/17 3191/1 3200/11 3269/4 3269/4 3312/23 3342/12 3347/9 3363/9 3365/22

**specifically [7]** 3206/3 3206/11 3209/14 3211/23 3255/25 3354/18 3355/23

**spell [2]** 3297/15 3297/18

**Spencer [1]** 3355/7

**spend [1]** 3148/14

**spending [1]** 3307/4

**spent [4]** 3299/24 3301/8 3325/19 3368/23

**spice [1]** 3282/3

**Spielberg [1]** 3355/7

**sponsored [1]** 3358/9

**spring [3]** 3298/23 3314/9 3343/22

**squeeze [1]** 3354/17

**Squibb [1]** 3299/21

**Srinivas [1]** 3372/19

**SRINIVASAN [5]** 3141/16 3169/2 3252/7 3374/4 3374/6

**stability [1]** 3251/3

**stage [2]** 3257/19 3306/23

**stake [3]** 3276/15 3356/2 3356/4

**stalling [1]** 3162/7

**stand [6]** 3142/4 3150/3 3155/25 3161/1 3174/3 3229/7

**standard [4]** 3206/8 3337/16 3362/15 3365/8

**start [20]** 3147/21 3151/14 3152/25 3154/2 3166/24 3171/18 3255/13 3256/22 3257/8 3279/18 3300/14 3316/13 3322/17 3341/25 3345/2 3348/8 3364/13 3364/16 3364/17 3367/3

**start-up [3]** 3255/13 3256/22 3300/14

**started [12]** 3155/20 3185/19 3266/22 3266/23 3298/17 3310/17 3316/17 3317/9 3326/13 3334/6 3337/19 3363/1

**starting [11]** 3149/1 3232/25 3258/1 3275/22 3278/8 3306/24 3309/15 3309/17 3334/8 3356/7 3364/17

**starts [3]** 3143/20 3283/21 3293/10

**startup [2]** 3301/10 3344/11

**state [10]** 3156/4 3157/4 3180/18 3186/1 3238/6 3246/19 3297/15 3299/9 3330/9 3340/23

**statement [52]** 3148/5 3159/3 3169/8 3173/19 3173/20 3173/24 3212/16 3215/23 3215/25 3217/4 3217/5 3217/22 3218/11 3218/16 3218/19 3219/5 3219/17 3219/21 3221/10 3222/8 3222/10 3222/19 3223/2 3223/11 3223/17 3223/24 3224/2 3224/18 3224/20 3225/7 3225/9 3226/11 3236/6 3236/20 3237/18 3237/19 3238/2 3238/13 3238/16 3238/22 3239/5 3239/20 3239/20 3240/14 3241/8 3242/13 3242/14 3242/15 3242/20 3244/12 3244/13 3260/12

**statements [17]** 3159/22 3180/23 3214/24 3220/17 3222/12 3236/5 3236/21 3237/9 3238/1 3240/1 3240/4 3243/15 3269/19 3327/3 3327/11 3327/14 3330/2

**STATES [8]** 3141/1 3141/3 3141/4 3141/11 3141/13 3141/17 3292/13 3300/6

**status [6]** 3148/5 3148/7 3148/13 3223/6 3294/22 3357/2

**stay [6]** 3211/5 3303/1 3338/15 3339/1 3339/8 3339/9

**stayed [2]** 3266/19 3300/23 3301/7 3309/4

**stays [2]** 3154/11 3245/14

**stenography [1]** 3141/24

**step [9]** 3157/19 3157/19 3202/18 3299/2 3316/12 3332/22 3361/18 3362/3 3373/3

**S**

**Stephen [4]** 3297/8 3297/12 3308/15 3314/1
**steps [1]** 3373/5
**Steve [4]** 3297/17 3349/2 3356/15 3371/4
**Steven [7]** 3309/19 3313/25 3314/2 3314/4 3314/11 3320/18 3363/19
**still [35]** 3142/9 3147/1 3172/6 3201/6 3214/9 3216/17 3221/18 3222/17 3223/9 3234/6 3234/7 3243/22 3246/15 3246/17 3285/24 3291/22 3291/23 3302/23 3302/24 3305/20 3320/1 3323/24 3323/25 3327/24 3336/5 3343/8 3344/5 3344/14 3344/16 3344/16 3345/4 3345/7 3345/15 3356/20 3362/15
**Stipulate [1]** 3305/11
**stock [33]** 3145/2 3145/25 3146/4 3146/10 3146/21 3149/24 3150/2 3150/9 3165/2 3172/19 3172/22 3203/16 3225/25 3226/5 3229/3 3229/6 3260/19 3260/25 3269/4 3269/4 3286/18 3287/21 3290/7 3302/13 3319/22 3356/2 3356/5 3361/17 3361/17 3363/23 3364/2 3364/6 3364/10
**stockbroker [1]** 3198/8
**stocks [4]** 3176/5 3189/3 3260/9 3366/6
**stop [10]** 3160/5 3183/4 3217/20 3218/12 3227/15 3228/19 3259/24 3260/11 3267/22 3324/16
**stopped [1]** 3271/25
**story [4]** 3158/13 3158/22 3159/13 3339/21
**straight [2]** 3339/15 3365/10
**straighten [1]** 3249/4
**strategy [4]** 3256/18 3264/17 3276/19 3292/5
**strength [1]** 3346/14
**strike [2]** 3209/20 3248/19
**strikes [1]** 3327/8
**string [3]** 3322/6 3341/16 3366/17
**strong [2]** 3329/21 3346/12
**struck [1]** 3314/17
**structural [1]** 3366/8
**structure [2]** 3326/5 3346/12
**structured [1]** 3302/5
**struggling [2]** 3325/18 3343/25
**study [1]** 3354/21
**stuff [6]** 3150/13 3199/23 3204/2 3270/1 3280/9 3280/13
**style [2]** 3368/18 3368/20
**Su [14]** 3311/9 3311/10 3322/6 3327/1 3327/21 3328/5 3328/22 3331/12 3331/13 3331/17 3332/16 3333/4 3333/5 3350/1
**Su's [1]** 3311/12
**sub [1]** 3271/16
**subject [18]** 3163/11 3230/18 3230/19 3257/5 3257/7 3277/15 3288/22 3289/9 3308/14 3308/15 3315/12 3319/19 3331/18 3342/4 3351/8 3357/17 3365/4 3371/5
**subpoena [1]** 3243/17
**subscriber [1]** 3271/17
**subscription [5]** 3204/12 3270/20

3270/24 3271/4 3271/19
**subsequent [1]** 3349/15
**subsequently [2]** 3321/4 3328/2
**subsidiary [1]** 3313/4
**substance [6]** 3194/7 3195/13 3220/20 3282/19 3288/10 3332/12
**substantial [5]** 3203/12 3233/14 3233/15 3326/4 3361/19
**substantially [1]** 3258/20
**success [6]** 3182/6 3183/15 3264/16 3265/1 3265/1 3306/17
**successful [9]** 3186/3 3194/20 3195/8 3304/16 3309/13 3317/7 3318/21 3319/7 3343/20
**successfully [1]** 3318/9
**sue [3]** 3177/7 3338/5 3338/6
**sued [4]** 3243/21 3338/4 3338/7 3338/7
**suggest [6]** 3182/4 3184/8 3238/3 3240/2 3268/9 3365/11
**suggested [2]** 3153/10 3284/5
**suggesting [4]** 3177/11 3218/16 3238/1 3269/20
**suggests [1]** 3241/2
**suicide [1]** 3229/16
**suit [5]** 3305/8 3350/1 3350/1 3350/2 3350/3
**suits [1]** 3165/7
**Sullivan [5]** 3314/1 3314/19 3314/20 3315/9 3315/13
**summary [3]** 3319/22 3347/25 3353/14
**summer [5]** 3187/11 3230/23 3230/25 3231/5 3310/15
**super [2]** 3279/20 3280/1 3280/2
**superficial [1]** 3305/22
**superior [2]** 3292/10
**supply [1]** 3334/18
**support [3]** 3303/17 3316/21 3346/10
**supported [2]** 3239/23 3244/9
**supporting [6]** 3237/23 3240/8 3319/9 3346/15 3356/18 3371/9
**supposed [7]** 3155/3 3198/7 3274/18 3275/11 3275/12 3277/12 3286/1
**surprised [2]** 3275/3 3344/18
**survive [1]** 3300/20
**sustain [2]** 3233/25 3343/3
**sustained [35]** 3178/13 3179/18 3179/18 3193/7 3193/11 3194/23 3200/14 3207/4 3207/13 3208/1 3212/7 3212/14 3221/4 3222/13 3222/23 3225/16 3230/3 3230/12 3233/19 3251/5 3256/11 3258/23 3266/25 3268/13 3268/17 3268/21 3270/19 3277/3 3277/8 3284/24 3288/18 3290/10 3323/7 3329/3 3342/21
**sworn [2]** 3142/6 3297/13
**sworn/affirmed [3]** 3142/6 3297/13
**Symbiotix [3]** 3367/13 3368/9 3369/25
**sympathetic [2]** 3183/21 3183/22
**Syprine [3]** 3313/4 3313/15 3316/20

**T**

**tab [46]** 3142/17 3144/23 3147/8 3149/6 3151/1 3152/12 3153/15 3162/18 3162/21 3163/21 3163/22 3163/23 3166/11 3201/5 3201/7 3201/8 3202/6 3202/7 3202/8 3252/8 3252/9 3252/11 3252/21 3252/22 3254/1

3251/5 3254/6 3271/1 3271/2 3273/9 3307/17 3312/16 3315/5 3319/12 3322/1 3336/7 3340/12 3341/12 3350/7 3353/12 3356/8 3357/12 3357/25 3313/3 3366/13 3370/22
**Tab 1 [1]** 3307/17
**Tab 13 [1]** 3336/7
**Tab 16 [1]** 3341/12
**Tab 17 [1]** 3350/7
**Tab 18 [1]** 3356/8
**Tab 19 [1]** 3357/12
**Tab 2 [1]** 3312/16
**Tab 20 [1]** 3357/25
**Tab 3 [1]** 3315/5
**Tab 4 [1]** 3319/12
**Tab 6 [1]** 3322/1
**table [10]** 3319/20 3319/21 3319/22 3320/3 3320/16 3320/17 3320/24 3321/8 3321/13 3321/23
**tactics [1]** 3162/7
**talent [1]** 3339/23
**talks [2]** 3241/24 3242/13
**tandem [1]** 3156/11
**tangled [2]** 3324/25 3326/9
**taqsitear [1]** 3300/16
**target [3]** 3342/9 3362/24
**targets [1]** 3370/17
**tax [3]** 3272/22 3273/3 3274/14
**team [3]** 3169/16 3276/21 3276/25
**technical [1]** 3349/3
**technically [1]** 3244/18
**technology [3]** 3300/17 3300/18 3301/10
**Teich [1]** 3141/22
**telephone [4]** 3215/19 3248/25 3285/18 3347/12
**telephonic [3]** 3347/13 3352/2 3358/14
**ten [4]** 3144/23 3256/1 3264/10 3373/6
**tended [1]** 3328/23
**tenth [1]** 3167/10
**tenure [1]** 3340/2
**term [2]** 3260/16 3350/3
**termed [1]** 3342/9
**terms [17]** 3146/20 3154/14 3156/4 3162/10 3164/23 3174/25 3200/11 3204/14 3240/15 3251/9 3259/12 3265/5 3271/18 3282/19 3294/3 3302/17 3317/18
**territory [1]** 3299/21
**testified [29]** 3142/6 3174/13 3175/3 3176/2 3185/5 3187/5 3199/1 3201/16 3207/18 3208/2 3208/11 3215/4 3215/12 3217/24 3225/19 3225/23 3238/21 3239/24 3251/7 3254/24 3257/6 3262/5 3272/3 3272/12 3297/13 3330/16 3331/13 3331/16 3339/25
**testifies [1]** 3245/19
**testify [6]** 3180/11 3180/19 3241/12 3245/22 3331/10 3331/14
**testifying [2]** 3193/5 3333/4
**testimony [4]** 3244/7 3246/15 3333/2 3333/7
**text [2]** 3309/17 3324/11
**Thalmann [1]** 3190/2
**theme [1]** 3184/4
**therapeutic [1]** 3370/1
**Therapeutics [1]** 3301/1

thereafter [2] 3143/25 3207/2
therefore [2] 3265/19 3268/1
thereof [1] 3218/10
thesis [1] 3299/11
they've [3] 3182/4 3237/15 3240/24
3306/20
thinking [4] 3158/5 3160/2 3214/2
3306/20
thinly [2] 3204/7 3258/17
third [7] 3141/18 3155/2 3182/11
3234/23 3313/1 3313/19 3341/5
thorough [1] 3365/16
thousand [1] 3302/4
threaten [1] 3287/25
threatened [3] 3171/22 3176/24 3350/5
threatening [2] 3185/8 3185/9
threatens [1] 3180/16
threats [1] 3185/11
three [13] 3146/7 3202/6 3202/7 3202/8
3206/22 3254/1 3298/5 3312/17 3341/9
3347/15 3355/5 3361/21 3372/12
throughout [4] 3173/13 3241/13
3292/13 3293/17
Thursday [2] 3221/7 3367/8
Thursday's [1] 3371/8
tie [1] 3355/22
tied [1] 3155/8
Tilles [1] 3311/15 3311/16
Tim [2] 3367/13 3367/13
timeline [1] 3167/17
timelines [1] 3369/15
timing [1] 3200/22
tissue [1] 3300/18
titled [2] 3353/14 3355/5
to-49 [1] 3358/6
today [22] 3153/10 3154/13 3155/8
3155/22 3167/18 3167/23 3168/4
3169/8 3214/21 3217/3 3227/7 3227/8
3269/11 3272/4 3284/5 3285/4 3287/5
3287/11 3325/5 3345/14 3362/16
3373/11
together [11] 3198/17 3198/18 3276/23
3304/23 3317/11 3318/8 3319/8
3326/22 3327/19 3347/23 3348/5
Tom [4] 3308/18 3308/18 3308/19
3310/25
tomorrow [11] 3154/13 3167/14 3168/2
3169/18 3282/7 3282/8 3368/18
3369/24 3369/25 3370/1 3373/16
tomorrow's [1] 3351/21
tons [2] 3196/11 3197/7
took [10] 3160/10 3172/18 3174/6
3198/11 3201/1 3295/13 3298/13
3298/24 3299/21 3352/22
top [18] 3215/8 3234/14 3234/15
3234/17 3234/18 3234/19 3234/20
3261/7 3271/13 3271/16 3308/8
3312/17 3322/8 3322/10 3343/12
3358/6 3365/6 3370/7
total [8] 3148/10 3162/11 3172/24
3192/1 3192/8 3219/25 3226/22 3302/7
totally [3] 3226/19 3263/10
touch [4] 3153/9 3155/7 3284/4 3285/3
touted [2] 3181/16 3181/16
towards [2] 3183/3 3355/4
Trachtenberg [1] 3355/12
Track [1] 3183/13

tracked [1] 3285/16
trade [7] 3187/7 3188/11 3189/6
3189/13 3190/14 3203/14 3269/8
tradeable [1] 3261/14
traded [11] 3180/6 3188/5 3188/13
3188/21 3189/14 3204/7 3204/7
3258/17 3258/18 3259/21 3262/21
trader [3] 3187/15 3188/4 3260/13
trades [2] 3188/17 3189/14
trading [8] 3188/7 3188/24 3188/25
3189/1 3190/15 3265/9 3361/17 3366/5
traditional [1] 3299/25
traffic [1] 3180/21
train [1] 3183/4
transaction [1] 3317/14
transactions [1] 3325/1
TRANSCRIPT [2] 3141/10 3141/24
transcription [1] 3141/24
transfer [5] 3217/17 3328/6 3328/7
3328/11 3328/14
transferred [1] 3155/18
transferring [1] 3316/20
transition [1] 3309/1
transplant [1] 3300/23
travel [2] 3307/9 3310/18
traveling [2] 3240/10 3241/16
travels [6] 3237/5 3238/4 3238/4
3241/3 3244/14 3244/17
tread [2] 3181/2 3181/8
treat [2] 3313/15 3368/6
treated [2] 3312/8 3312/11
trial [8] 3141/10 3241/13 3243/24
3331/25 3354/16 3354/23 3354/23
3355/1
trials [3] 3301/2 3301/3 3353/9
tried [4] 3153/9 3159/24 3284/4 3285/3
trip [2] 3307/6 3371/15
tripled [2] 3173/23 3174/9
trips [2] 3314/12 3316/4
trouble [1] 3241/23
true [7] 3151/18 3206/23 3208/22
3230/20 3253/16 3271/21 3271/22
truly [1] 3306/24
trusted [1] 3196/7
truth [4] 3238/10 3243/25 3244/23
3332/10
try [16] 3150/3 3155/8 3158/12 3171/14
3174/25 3208/18 3217/13 3229/7
3229/14 3317/10 3317/20 3317/22
3319/7 3323/22 3343/4 3345/5
trying [27] 3148/2 3152/9 3158/11
3169/20 3180/22 3182/13 3182/21
3230/9 3230/19 3244/2 3256/20
3275/25 3277/5 3277/11 3278/10
3278/24 3280/14 3285/21 3300/20
3317/13 3317/18 3318/24 3342/10
3344/14 3344/22 3354/21 3368/4
Turing [6] 3172/2 3172/25 3173/2
3173/3 3179/16 3181/2
turn [15] 3201/13 3202/19 3202/21
3234/14 3252/11 3253/25 3313/19
3326/24 3336/17 3340/8 3341/5 3356/6
3357/24 3372/10 3372/12
turned [5] 3175/4 3198/10 3311/18
3317/11 3368/25
turns [1] 3321/4
twice [2] 3154/20 3155/21 3310/20

two [1] 3373/1
two [48] 3143/20 3147/6 3151/19
3159/19 3184/15 3201/13 3201/24
3201/25 3202/21 3202/23 3203/5
3203/8 3227/10 3234/23 3255/18
3255/19 3256/1 3256/12 3256/15
3300/25 3304/10 3304/19 3304/24
3304/25 3305/1 3306/1 3306/16 3307/2
3311/25 3313/13 3317/3 3317/25
3319/5 3323/12 3324/12 3324/21
3327/13 3345/12 3345/14 3349/25
3358/11 3361/7 3361/15 3363/7 3363/9
3371/17 3372/10 3372/18
two-and-half [1] 3227/10
type [12] 3143/18 3155/4 3158/6
3193/20 3200/18 3233/1 3256/6 3260/5
3300/14 3350/5 3363/3 3372/4
types [4] 3188/21 3189/11 3353/8
3362/7

## U

U.S [1] 3203/13
UBS [1] 3189/25
ultimate [1] 3184/24
ultimately [22] 3157/8 3171/19 3172/18
3172/25 3173/23 3176/6 3185/14
3198/3 3225/20 3227/6 3233/14
3251/20 3251/21 3266/19 3271/10
3289/19 3290/11 3332/22 3333/1
3334/21 3346/18 3361/7
ultra [1] 3368/22
ultra-rare [1] 3368/22
umbrella [1] 3257/22
unable [2] 3159/3 3167/16
unanimous [8] 3312/20 3312/21
3312/24 3313/17 3336/19 3340/15
3340/24 3341/2
unavailable [1] 3151/21
uncertainty [1] 3285/25
under [18] 3142/9 3150/14 3154/8
3158/6 3217/24 3237/17 3238/17
3242/19 3244/19 3257/22 3261/12
3261/12 3261/14 3266/10 3266/4
3308/17 3320/18 3330/1
undergrad [1] 3299/6
underlying [1] 3182/2
undermines [1] 3240/3
underneath [1] 3273/9
understood [15] 3143/5 3143/7
3186/15 3214/9 3226/15 3233/6 3233/9
3233/11 3241/5 3241/19 3245/13
3250/1 3257/14 3282/8 3291/23
undersupported [1] 3304/21
unfortunately [2] 3300/19 3301/3
unhappiness [1] 3246/19
unilaterally [1] 3362/24
unindicted [3] 3236/4 3236/8 3330/14
unique [3] 3339/23 3339/24 3368/16
unit [4] 3144/1 3218/11 3219/18
3219/23
UNITED [8] 3141/1 3141/3 3141/4
3141/11 3141/13 3141/17 3292/12
3300/6
units [6] 3217/17 3217/18 3218/5
3218/11 3219/17 3219/18
University [1] 3299/6
unknown [1] 3148/7

## U

**unless [6]** 3156/11 3160/4 3181/9 3243/17 3294/24 3300/23
**unpleasant [1]** 3174/17
**untangle [1]** 3324/23
**untenable [1]** 3337/12
**unusual [2]** 3362/12 3372/18
**up [94]** 3142/15 3148/2 3148/19 3148/23 3150/15 3153/4 3153/11 3153/13 3154/12 3154/17 3154/25 3155/5 3155/8 3155/23 3162/8 3162/14 3167/8 3167/11 3167/15 3167/20 3169/3 3169/19 3171/23 3178/7 3184/18 3184/20 3189/14 3189/16 3190/22 3191/8 3201/6 3208/22 3215/8 3216/23 3219/21 3226/20 3227/18 3230/18 3230/19 3234/6 3234/9 3245/8 3252/5 3254/7 3255/3 3255/13 3256/22 3257/5 3257/7 3257/8 3259/13 3262/21 3276/1 3277/15 3278/17 3282/3 3284/11 3285/8 3285/9 3286/15 3287/11 3288/22 3289/5 3290/25 3293/2 3293/3 3293/10 3300/14 3300/15 3303/17 3304/19 3304/21 3305/24 3305/25 3306/2 3306/11 3306/24 3315/17 3317/8 3317/13 3319/7 3323/16 3324/1 3327/4 3327/20 3328/4 3334/13 3343/6 3343/12 3344/23 3363/4 3368/14 3369/22 3371/22
**update [5]** 3204/17 3349/23 3352/14 3372/13 3372/13
**updated [3]** 3204/22 3206/1 3206/12
**updates [6]** 3334/16 3349/17 3349/21 3350/4 3360/8 3360/10
**uplift [3]** 3366/1 3366/2 3366/9
**upset [1]** 3151/16
**urge [3]** 3205/9 3254/19 3278/14
**urged [1]** 3195/11
**useful [1]** 3368/12
**utilize [1]** 3294/5
**UWC [1]** 3312/20

## V

**vacuum [2]** 3181/18 3242/1
**Vaino [3]** 3310/12 3310/14 3310/15
**Valeant [12]** 3305/1 3313/5 3317/25 3323/14 3323/24 3334/20 3336/3 3343/23 3344/8 3344/21 3344/23 3345/15
**valid [1]** 3222/19
**valuate [1]** 3264/13
**valuation [10]** 3148/25 3149/25 3219/22 3219/23 3219/25 3220/5 3221/6 3229/4 3270/5 3278/8
**valuations [2]** 3218/6 3335/1
**value [23]** 3172/8 3192/7 3192/8 3218/9 3221/15 3222/24 3226/10 3226/13 3226/15 3227/4 3227/6 3263/6 3265/17 3267/20 3269/20 3269/22 3269/24 3269/25 3270/8 3270/16 3275/6 3356/1 3370/16
**valued [3]** 3263/9 3269/19 3269/21
**values [1]** 3222/6
**valuing [5]** 3218/11 3219/17 3222/16 3222/17 3270/1
**Variable [1]** 3318/17

**variety [9]** 3238/5 3259/20 3260/12 3270/6 3353/6 3346/7 3349/24 3351/14 3362/7
**various [4]** 3159/23 3358/11 3360/8 3362/20
**Varun [1]** 3215/16
**veering [1]** 3184/24
**vent [2]** 3157/10 3159/18
**venture [9]** 3206/5 3255/12 3256/21 3265/13 3265/16 3267/5 3267/17 3267/19 3277/1
**verbal [1]** 3155/20
**verbally [3]** 3275/19 3334/16 3365/14
**verbatim [1]** 3266/11
**verification [2]** 3218/8 3222/5
**verified [1]** 3197/14
**versus [1]** 3302/12
**veteran [1]** 3309/20
**vice [2]** 3301/16 3308/19
**victim [1]** 3236/9
**victims [1]** 3160/16
**view [1]** 3245/22
**violated [1]** 3240/3
**virtually [3]** 3175/19 3176/12 3366/4
**virtue [1]** 3184/3
**visibility [1]** 3339/15
**vision [3]** 3304/5 3307/12 3318/13
**visionary [2]** 3307/14 3339/20
**voice [2]** 3244/2 3244/4
**volatility [1]** 3292/11
**volume [1]** 3265/9
**vouched [2]** 3264/21 3264/25
**vouching [1]** 3181/24
**VP [1]** 3308/22

## W

**wait [7]** 3209/7 3212/20 3212/20 3212/20 3212/20 3235/4 3242/8
**waiting [3]** 3144/7 3185/14 3356/20
**walked [1]** 3163/19
**walking [1]** 3167/25
**walks [4]** 3233/23 3234/3 3248/8 3249/7
**walls [1]** 3318/21
**wants [6]** 3157/8 3242/15 3244/12 3245/22 3264/1 3339/22
**warehousing [1]** 3317/5
**warrants [2]** 3203/17 3260/10
**water [1]** 3177/19
**ways [4]** 3157/25 3171/13 3184/8 3368/23
**wealth [1]** 3243/15
**wealthy [4]** 3160/9 3183/25 3184/3 3355/25
**wearing [1]** 3305/7
**weather [1]** 3367/6
**Wednesday [1]** 3279/22
**week [14]** 3155/2 3155/8 3155/9 3155/10 3155/16 3155/18 3180/12 3192/25 3306/1 3352/14 3367/7 3367/20 3367/24 3371/14
**weekend [4]** 3155/9 3155/19 3155/22 3167/2
**weeks [2]** 3151/19 3306/1
**whatsoever [3]** 3217/4 3224/5 3330/15
**whereas [5]** 3312/18 3313/1 3313/2 3340/19 3340/21

**whistles [1]** 3175/18
**white [1]** 3266/12
**whole [12]** 3144/4 3148/5 3154/10 3158/21 3160/11 3164/10 3181/6 3199/9 3219/15 3282/10 3335/2 3353/21
**will testify [1]** 3180/11
**willful [1]** 3294/25 3294/25
**willing [2]** 3303/18 3370/13
**Wilson's [1]** 3313/16
**wind [3]** 3143/1 3170/20 3266/20
**winding [1]** 3165/24
**winter [1]** 3343/22
**wipe [1]** 3338/9
**wiped [1]** 3176/12
**wire [3]** 3167/2 3167/14 3168/2
**wired [1]** 3167/6
**wiring [2]** 3167/4 3167/5
**withdraw [6]** 3180/25 3181/4 3197/9 3207/23 3221/1 3246/17
**withdrawing [2]** 3209/15 3275/16
**withdrawn [4]** 3170/17 3213/8 3225/22 3261/22
**withdrew [1]** 3259/9
**witness [47]** 3142/4 3142/4 3142/5 3159/3 3159/18 3178/8 3180/15 3180/19 3181/14 3181/17 3182/4 3182/9 3182/15 3182/17 3183/20 3183/21 3185/20 3197/1 3197/14 3202/9 3209/6 3233/18 3236/8 3238/21 3239/24 3240/6 3240/19 3241/4 3241/19 3242/3 3243/12 3243/20 3243/20 3244/10 3245/12 3245/13 3246/7 3248/13 3248/17 3296/4 3297/6 3297/12 3331/16 3332/22 3343/1 3373/5 3374/2
**witness' [4]** 3180/9 3180/18 3181/21 3212/15
**witness's [1]** 3156/8
**witnesses [5]** 3158/2 3158/24 3158/25 3240/25 3331/10
**word [10]** 3176/23 3195/20 3199/10 3199/10 3255/10 3257/9 3276/14 3280/7 3288/1 3290/23
**words [6]** 3175/4 3194/7 3195/13 3276/17 3282/18 3288/10
**worker [1]** 3368/5
**world [4]** 3292/13 3293/17 3302/6 3366/10
**worrying [1]** 3158/3
**worse [3]** 3147/2 3150/23 3150/23
**worth [1]** 3218/12
**wound [1]** 3317/8
**wrap [1]** 3154/12
**wrestled [1]** 3339/7
**write [20]** 3148/24 3149/3 3149/21 3151/15 3153/5 3153/4 3154/18 3155/1 3155/13 3162/9 3167/1 3167/12 3169/6 3279/19 3282/10 3286/19 3287/3 3288/8 3318/18 3342/2
**writes [11]** 3153/13 3285/8 3285/9 3286/16 3287/10 3287/15 3327/2 3328/6 3352/13 3365/7 3368/15
**writing [5]** 3149/20 3153/1 3155/24 3160/3 3283/21
**written [13]** 3155/5 3312/20 3312/21 3312/24 3313/20 3336/10 3336/19

**W**

**written... [6]** 3340/15 3340/24 3341/2
3348/15 3348/18 3348/19
**wrote [37]** 3147/23 3147/24 3147/25
3148/19 3148/23 3150/7 3150/15
3151/14 3152/1 3152/2 3153/1 3153/4
3153/11 3153/12 3154/2 3154/6
3154/17 3155/6 3155/25 3162/8
3162/14 3163/7 3163/8 3164/5 3165/15
3166/25 3167/8 3167/11 3167/15
3167/16 3167/21 3167/22 3168/4
3169/3 3169/19 3169/20 3255/21

**Y**

**Yaffe [1]** 3363/13
**year [12]** 3149/25 3150/7 3160/10
3174/6 3190/7 3210/5 3229/4 3301/24
3302/8 3302/9 3302/15 3346/25
**years [15]** 3184/15 3188/2 3189/22
3198/10 3227/10 3298/1 3299/24
3300/12 3300/21 3300/25 3301/8
3301/14 3302/16 3307/2 3309/20
**yield [1]** 3260/9
**YORK [18]** 3141/2 3141/4 3141/14
3141/15 3141/19 3141/19 3281/21
3310/18 3310/21 3314/12 3316/4
3317/22 3361/6 3361/16 3367/19
3367/23 3371/15 3371/22
**young [2]** 3184/3 3351/1
**younger [2]** 3192/13 3192/15
**yourself [7]** 3151/20 3178/6 3209/22
3262/5 3296/9 3351/10 3364/19
**Yup [1]** 3276/21

**Z**

**ZELLAN [2]** 3141/20 3355/3
**zero [2]** 3150/17 3229/21
**zoom [5]** 3142/24 3312/17 3355/2
3358/6 3367/17