```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                          15-CR-00637(KAM)
 3    UNITED STATES OF AMERICA,
                                          United States Courthouse
 4                                        Brooklyn, New York

 5            -against-                   July 14, 2017
                                          9:00 a.m.
 6    MARTIN SHKRELI,

 7            Defendant.

 8    ------------------------------x

 9                TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                  BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                     UNITED STATES DISTRICT JUDGE
                            BEFORE A JURY
11
      APPEARANCES
12
      For the Government:        BRIDGET M. ROHDE, ESQ.
13                               Acting United States Attorney
                                 Eastern District of New York
14                               271 Cadman Plaza East
                                 Brooklyn, New York 11201
15                               BY:  JACQUELYN M. KASULIS, ESQ.
                                 BY:  ALIXANDRA ELEIS SMITH, ESQ.
16                               BY:  G. KARTHIK SRINIVASAN, ESQ.
                                 Assistant United States Attorneys
17

18    For the Defendant:         BRAFMAN & ASSOCIATES, P.C.
                                 767 Third Avenue
19                               New York, New York 10017
                                 BY:  BENJAMIN BRAFMAN, ESQ.
20                               BY:  MARC AGNIFILO, ESQ.
                                 BY:  ANDREA ZELLAN, ESQ.
21                               BY:  JACOB KAPLAN, ESQ.

22
      Court Reporter:            Rivka Teich, CSR, RPR, RMR
23                               Phone:  718-613-2268
                                 Email:  RivkaTeich@gmail.com
24
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

PROCEEDINGS

1

2          COURTROOM DEPUTY:  All Rise.

3          MS. KASULIS:  There was one issue we wanted to

4   preview for the Court; it's not an argument.

5          THE COURT:  Okay.

6          MS. KASULIS:  We intended to call from FINRA Deb

7   Oremland.  She works in the Criminal Prosecution Assistance

8   Group, just to explain very basics about the securities

9   industry and to do summary charts.  We've been talking with

10  the defense, I've been talking with Ms. Zellan.  We intended

11  to call her today.  They made the request to adjourn her to

12  Monday because there were issues that we're trying to work

13  out.  There is some difference of opinion as to there whether

14  she should be a fact or expert witness.  We do intend to file

15  a letter with the Court explaining why we believe she is a

16  fact witness and has testified in this capacity a number of

17  times.

18          I do believe the other issues we can work out with

19  the defense.  We did agree to adjourn her until Monday to work

20  out issues, to make sure to crystalize any issues for the

21  Court's consideration on Monday.

22          THE COURT:  Do you think any of this effects our

23  scheduling?

24          MS. KASULIS:  It could, it depends.  We do have

25  Mr. Aselage for a little while longer on direct this morning.

PROCEEDINGS

1    I do anticipate that Mr. Brafman will have a robust

2    cross-examination of this witness.  So I think -- I don't

3    know, I don't want to speak for you.

4              MR. BRAFMAN:  I don't want there to be any illusion

5    that we'll fill the day with cross.  We may have to end early.

6              MS. KASULIS:  We just had the witness lined up that

7    we might call this short witness.  But because we agreed to

8    the of adjournment of this one witness, we haven't had time to

9    lineup anyone else.  We might finish at three, potentially.

10             THE COURT:  Do you have an idea, now that the trial

11   is underway as to how long before the Government rests, and

12   when and how long the defense case may be?

13             MS. KASULIS:  From the Government's perspective, we

14   anticipate in trying to do our best to map out the remainder

15   of the witnesses by the end of next week, early following

16   week.  I think we're on a pretty good pace from what we

17   anticipated.  I can't speak for defense.

18             MR. BRAFMAN:  If there is a defense case, it will

19   not be more than several days at the most.

20             THE COURT:  It is possible that in two weeks we will

21   have the case in the jury and we will be able to charge.

22             MR. BRAFMAN:  It might be less than that.  I think

23   some of the witnesses that are left are not as extensive

24   cross-examinations as any of the witness that came before us,

25   with exception of perhaps one.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1          MS. KASULIS:  I think that's right, your Honor.

2          MR. BRAFMAN:  We don't know exactly who is left in

3    the order.  I assume you'll tell us that.

4          MS. KASULIS:  We'll go ahead and make sure that we

5    notice the rest of our witnesses for next week.  We'll do that

6    with the defense.  We do ask that if we are getting close to

7    resting our case, that the defense provides us with an updated

8    witness list.  We did exchange witness lists prior to the

9    trial and we have been speaking to them about potential

10   defense witnesses, but if we can get something a little more

11   formalized, that would be helpful.

12         THE COURT:  All right, good.  So we just wanted to

13   know for our own purposes how to schedule.  We've been moving

14   a lot of our other matters around.  Optimistically we could

15   have the jury charged by two weeks.

16         MS. KASULIS:  Yes.  Just very quickly, just for

17   everyone's benefit.  In the courtroom, apparently if you're

18   speaking close to the podium with a colleague, they can hear

19   it in the overflow room.  Just be on honest.  If you're

20   conferring with counsel or by the podium, they can hear it.

21   So just to stand at least three to 4 feet away from the

22   podium.

23         THE COURT:  We can try to turn off the mics by the

24   podium.

25         MS. KASULIS:  More of a notice.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

S. ASELAGE – DIRECT – MS. SMITH

1          MR. BRAFMAN:  Your Honor, when the witness is done

2     on direct can we take the morning break then.  It will take me

3     a couple of minutes to get all the stuff over and set up.

4          THE COURT:  I'll give you a few minutes in any

5     event.  The jury might need an earlier break.

6          (Jury enters.)

7          THE COURT:  All our jurors are present.  Have a

8     seat, ladies and gentlemen.

9          If the Government would like to resume it's direct

10    examination, please proceed.

11         THE COURT:  Good morning, sir.

12         THE WITNESS:  Good morning.

13         THE COURT:  You're still under oath.  Please have a

14    seat.

15         (Witness takes the witness stand.)

16    STEPHEN ASELAGE, called as a witness, having been previously

17    first duly sworn/affirmed, was examined and testified further

18    as follows:

19    DIRECT EXAMINATION

20    DIRECT EXAMINATION (Continued)

21    BY MS. SMITH:

22    Q    Good morning.

23    A    Good morning.

24    Q    When we left off yesterday we were looking at

25    Government's Exhibit 122-64.  If we can, this is the cover

S. ASELAGE – DIRECT – MS. SMITH

1    e-mail we talked about.  It is from Marc Panoff to the

2    Retrophin Board of Directors, copying Mr. Greebel and

3    Mr. Banta, and it was attaching Board materials for a Board

4    meeting in February of 2014 at the Norwood club.

5              If we could turn to page two of the document.  When

6    we left off, we were looking at the agenda for the Board

7    meeting February 14, 2014.  If we could turn to page three.

8    At the end of the day yesterday I was asking you about the

9    meeting regarding the pipeline update or the status of drug

10   development at Retrophin, who attended that discussion?

11   A    There were two individuals from the research and

12   development group, as I recall, Dr. Srinivas Rao, head of

13   research and development, and Horacio Plotkin, Chief Medical

14   Officer.

15   Q    Who else attended that discussion?

16   A    There was the rest of Board, Mr. Richardson, myself,

17   Mr. Shkreli, Mr. Greebel, I think Mr. Golding and Mr. Paley

18   joined the Board by then.

19   Q    What do you remember about that discussion?

20   A    It was a fairly unusual discussion, in which Mr. Shkreli

21   was very upset and angry at Mr. Plotkin and berated Mr.

22   Plotkin extensively through the meeting.

23   Q    What did you do after the meeting?

24   A    I apologized to Mr. Plotkin for the way he was treated.

25   And I talked to Mr. Shkreli about handling disappointment in a

S. ASELAGE — DIRECT — MS. SMITH

1  different way.

2  Q    What was Mr. Shkreli's reaction?

3  A    He told me it was important for him to convey to the

4  Board how disappointed he was with Mr. Plotkin.

5  Q    In addition to the discussion you just described, was

6  there also a discussion at this Board meeting of an investment

7  fund that was being run by the defendant within Retrophin?

8  A    Yes, there was.  There was concern raised that

9  individuals in his Business and Development Group were

10  actually both buying and selling shares of biopharmaceutical

11  stocks and operating similar to a hedge fund.

12  Q    What is the Business and Development Group?

13  A    Business and Development is a group that normally is

14  assigned to acquire assets for the company or sell assets that

15  the company owns that it no longer wants to develop.

16  Q    When you said there was essentially a hedge fund of the

17  Business and Development Group, what do you mean?

18  A    It means the company's resources were being used not for

19  developing our own product, but rather to try to make money

20  buying and selling other stocks.

21  Q    What money was being used for that hedge fund within the

22  Business Development?

23          MR. BRAFMAN:  Objection.

24          THE COURT:  Overruled, if the witness knows.

25  A    Treasury, the company's money.

S. ASELAGE – DIRECT – MS. SMITH

1    Q     Who was overseeing the hedge fund?

2    A     That was Mr. Shkreli.

3    Q     What was the discussion at the Board meeting about the

4    hedge fund?

5    A     The Board requested that Mr. Shkreli --

6              MR. BRAFMAN:  Objection, we have no person

7    identified.

8              THE COURT:  The Board he said.

9              MR. BRAFMAN:  I understand.

10             THE COURT:  Do you want specific members of the

11   Board?

12             MR. BRAFMAN:  Not all members of Board can testify

13   unless they appear.

14             THE COURT:  Did the Board as a group vote or speak?

15   Or who spoke at the Board?

16             THE WITNESS:  I believe Mr. Richardson made the

17   specific request, with all the Board members in agreement.

18             THE COURT:  In agreement.

19             THE WITNESS:  Yes, ma'am.

20   BY MS. SMITH:

21   Q     What was that discussion?

22   A     That discussion did not go well.  Mr. Shkreli informed us

23   that if he was not allowed to operate that way, that he was

24   going resign immediately.

25   Q     What else was discussed with the defendant at that time?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

S. ASELAGE – DIRECT – MS. SMITH

1    A     There was eventually a compromise reached in which

2    Mr. Shkreli was able to use a small amount of money for what

3    he termed training purposes for the Business Development

4    people.  He indicated that they needed to be able to use live

5    money, at least in small amounts, to be trained as to what to

6    buy, what to sell.

7            The analogy he gave us was that he was like a mother

8    lion and he was teaching his cubs to kill.

9    Q     Did the Board place any restrictions on the amount of

10   money that could be used for this purpose?

11   A     Yes.  Mr. Shkreli agreed to maximize -- to a maximum of

12   $50,000 that his Business Development team could use for

13   training purposes.

14   Q     If you can turn now to page eight of Government's Exhibit

15   122-64, which has the Bates stamp MSMB939.

16   A     Okay.

17   Q     Zoom in on the top two paragraphs.  What is this

18   document?

19   A     It's a questionnaire for directors and officers.

20   Q     Can you read the first two paragraphs?

21   A     Sure.  "This questionnaire is being furnished to all

22   directors and executive officers of Retrophin, Inc.  The

23   purpose of the questionnaire is to obtain information required

24   to be disclosed by the company to the Securities & Exchange

25   Commission, the SEC, in connection with the filing of the

Rivka Teich CSR, RPR, RMR
Official Court Reporter

S. ASELAGE – DIRECT – MS. SMITH

1   company's proxy statement for its 2014 annual meeting of

2   stockholders and other disclosure documents.  The length and

3   complexity of this questionnaire is the unfortunate result of

4   the many rules and regulations of the SEC and the NASDAQ Stock

5   Market LLC relating to the preparation of a publicly-traded

6   company's disclosure documents.  Although every attempt was

7   made to simplify this questionnaire, the requirements of the

8   SEC and NASDAQ do not lend themselves to simplification.  Your

9   patience in completing this questionnaire is much

10  appreciated."

11  Q    Were all members of the Board of Retrophin required to

12  fill out this questionnaire?

13  A    Yes.

14  Q    Was it in connection with the company's up-listing to

15  NASDAQ?

16  A    Yes.

17  Q    If we can scroll down to the bottom of that page.  Who is

18  the questionnaire to be returned to?

19  A    It says, "Please complete, date and sign, and copy and

20  return it to David Kravitz Katten Muchin Rosenman."

21  Q    If you can turn to page 37 of your document, Bates stamp

22  MSMB968, that's page 37 of the PDF.

23  A    I got it.

24  Q    Can we zoom in on the top paragraph.  If you could just

25  read for us, starting with the sentence that says,

Rivka Teich CSR, RPR, RMR
Official Court Reporter

S. ASELAGE - DIRECT - MS. SMITH

1    "Mr. Shkreli is also the founder and managing partner"?

2    A    I'm looking for that sentence.

3         "Mr. Shkreli is also the founder and managing

4    partner of MSMB Capital Management, a New York hedge fund

5    firm, founded in 2016 that manages a variety of partnerships.

6    Prior to MSMB Mr. Shkreli" -- do you want me to go on?

7    Q    Read the rest of the paragraph.

8    A    "Prior to MSMB, Mr. Shkreli was employed at Intrepid

9    Capital Management from 2004 to 2006, and previously at Cramer

10   Berkowitz and Company, both of which are hedge fund firms

11   based in New York.  Mr. Shkreli is an experienced

12   biotechnology and pharmaceutical industry investor,

13   particularly in businesses with orphan drugs.  Mr. Shkreli

14   received his BBA from Baruch College.  Mr. Shkreli was

15   selected as a director because of his business and

16   professional experience, including but not limited to, his

17   leadership of Retrophin in the early stages, private and

18   public financings, and a successful track record of

19   identifying drug assets."

20   Q    I'm now going to show what you is marked Government's

21   Exhibit 122-76 for identification, that is tab 33 in your

22   binder.  Do you recognize this document?

23   A    It is an e-mail string between Mr. Shkreli and myself.

24   Q    Is it from February 2014?

25   A    It is.

S. ASELAGE – DIRECT – MS. SMITH

1    Q     Is it related to Retrophin?

2    A     It is.

3          MS. SMITH:  Your Honor, the Government moves to

4    admit Government's Exhibit 122-76 in evidence

5          MR. BRAFMAN:  No objection.

6          THE COURT:  We admit 122-76.

7          (Government Exhibit 122-76, was received in

8    evidence.)

9    Q     If we can start on the third page with the e-mail at the

10   bottom of the third page, please.  This is an e-mail dated

11   February 18, 2014 from you to Mr. Shkreli and someone named

12   Vince Wintermute, with the subject "introduction."  Who is

13   Vince Wintermute?

14   A     Vince Wintermute is an individual who was interested in a

15   position of running our sales force.

16   Q     How did you know Mr. Wintermute?

17   A     He had previously worked for me at BioMarin.

18   Q     If we scroll up to the next e-mail, this is February 19,

19   2014, from Mr. Wintermute to Mr. Shkreli in response to the

20   introduction.  He says, "I'm very interested in being part of

21   building your commercial team and would life (sic) to discuss

22   with you.  Please let me know how would you like to proceed."

23          If we can look farther up in the e-mail, on page two

24   he attaches his resume.  If we scroll up, if you look here on

25   February 19, the bottom e-mail from Mr. Shkreli in response at

Rivka Teich CSR, RPR, RMR
Official Court Reporter

S. ASELAGE – DIRECT – MS. SMITH

1   12:57 p.m.  He asked Mr. Wintermute to relocate and says, "I

2   don't want to waste your time.  I don't know if typically this

3   job can be in a non-office location."  If you look above that,

4   what does Mr. Wintermute say about relocation?

5   A     "Martin, I would prefer not to relocate and not relocate

6   immediately.  In the past I've done this position remotely and

7   know that commitment necessary to effectively manage a field

8   team and maintain the proper physical presence at the home

9   office.  I realize every situation is different.  I think it

10  would be valuable for us to discuss the position and

11  expectations to see if there is a workable solution.  Please

12  let me know the best time for you."

13  Q     If we can turn to page one of the e-mail chain, focus on

14  the bottom half from the "PS" down.  If can you look at the

15  e-mail from Mr. Shkreli to you on February 27 at 8:47 a.m.

16  Mr. Shkreli says, "Do you think working remotely is okay for

17  this type of position?"  What is your response on February 27

18  at 12:42 p.m.?

19  A     "PS, do you envision the commercial base in New York City

20  or San Diego?  Or in Boston?"

21          Those were the three physical locations where we had

22  people based at that time.

23  Q     When you're talking about the commercial base, what are

24  you referring to?

25  A     I'm talking about the sales, marketing, patient services,

S. ASELAGE – DIRECT – MS. SMITH

1    and operations, sales operations.

2    Q    At this time in February of 2014, where was the

3    commercial base for Retrophin located?

4    A    There wasn't much of a commercial base.  But I believe

5    Martin had already hired Brian Selby to run the commercial

6    group or set up the commercial group in San Diego.

7    Q    Why was there not a commercial base in 2014?

8    A    There weren't any commercial products to support in

9    February 2014.

10   Q    If can you scroll up to the next few e-mails.  If you

11   look at the response from Mr. Shkreli on February 27, 2014, to

12   your question about where the commercial base should be

13   located, what does he say?

14   A    He says, "I don't even know."

15   Q    What is your response at 12:46?

16   A    I said, "The suggestion then is to put in San Diego since

17   you already have Brian Selby there to run the neuro sales

18   group.  There will be some overlaps, particularly in the sales

19   ops area, where having both groups in the same place will

20   create some synergies and save duplication.  On the bench

21   side, being in the same zone is helpful if you decide to go

22   that direction."  I'm referring to time zone when I say zone.

23   Q    Who hired Mr. Selby?

24   A    Mr. Shkreli did.

25   Q    What is Mr. Shkreli's response to your suggestion to

S. ASELAGE – DIRECT – MS. SMITH

1    putting the commercial base of the company in San Diego?

2    A    "Excellent idea," exclamation point.

3    Q    Turning to the spring of 2014, did you remain on the

4    Board of Retrophin?

5    A    I did.

6    Q    In 2014 were you have compensated in anyway for serving

7    as a Board member?

8    A    Yes, I was compensated for serving as a Board member.

9    Q    How much did you earn in 2014 in your role as a Board

10   member?

11   A    My recollection is somewhere in the 12 to $13,000 range.

12   Q    Did there come a time in the spring of 2014 when you took

13   on an additional role at Retrophin in addition to being a

14   Board member?

15   A    Yes.  In spring of '14, after some extensive Board

16   discussions, I agreed to take an operating role as Chief

17   Operating Officer.

18   Q    What were the Board discussions that led to the decision

19   to have you as Chief Operating Officer of Retrophin?

20        MR. BRAFMAN:  Can I have a continuing objection, so

21   I don't have to get up every minute.

22        THE COURT:  If you can clarify.  I believe the

23   objection is that --

24        MS. SMITH:  Your Honor, I can rephrase.

25        THE COURT:  All right.

S. ASELAGE – DIRECT – MS. SMITH

1    BY MS. SMITH:

2    Q    What were the circumstances that led you to become Chief

3    Operating Officer at Retrophin?

4    A    The Board had several discussions about concerns related

5    to Mr. Shkreli's activities as the CEO and felt there was a

6    need for better control and process within the company.  There

7    was discussion as to whether there should be a change of CEO

8    at that time.  And the decision that was made was to give

9    Mr. Shkreli more time, and that I should step into an

10   operating role to try put in place some controls, processes

11   and support to keep the company somewhat more focused.

12   Q    What were the specific concerns that were discussed in

13   the spring of 2014 about the defendant in the role of CEO?

14             THE COURT:  Can you define again who these

15   discussions occur between?

16   Q    In terms of Board discussions, who were those discussions

17   with?

18   A    Steven Richardson, Jeff Paley, Neal Golding, myself.

19   Q    Did those discussions include either the defendant or

20   Mr. Greebel?

21   A    They did not.

22   Q    What were the concerns specifically about the defendant

23   in the role of CEO?

24             MR. BRAFMAN:  Object, your Honor.

25             THE COURT:  I'm going to overrule the objection.

S. ASELAGE – DIRECT – MS. SMITH

1   A    Different Board members had different concerns.  But all

2   Board members had some concerns.

3          The concerns related to lack of communication

4   cross-functionally.  Different departments didn't seem to be

5   talking to each other.  In particular, Business Development

6   seemed to be siloed from the rest of the company and treated

7   differently than the rest of the company.

8          One Board member in particular had significant

9   concerns about Mr. Shkreli's ongoing use of Twitter.  There

10  were concerns about some of the Business Development

11  activities.  There were concerns about some of the

12  interpersonal interactions that Mr. Shkreli had, such as the

13  one with Dr. Plotkin.  There were concerns about ongoing

14  series of suits filed against the company, or threatened to be

15  filed against the company.  And the overall assessment was

16  that while Martin brought a lot of good ideas to the table, he

17  wasn't actually managing the company under there needed to be

18  some management put in place if the company was to survive.

19  Q    In terms of the interpersonal interactions, you mentioned

20  the incident with Mr. Plotkin, were there other incidents that

21  come to mind?

22  A    Sure.  There were a number of people that were

23  terminated, the Chief Scientific Officer was terminated by

24  e-mail on the morning, which was a complete surprise to

25  everyone.  That individual was one of the three people who's

S. ASELAGE – DIRECT – MS. SMITH

1    name is on the RE-024 Patent.  The product was developed at

2    Retrophin.  The company spent four to $5 million, I don't

3    remember the exact number, to buy Kyalin, which largest asset

4    was actually it's founder, who was Dr. Rao.  And Dr. Rao was

5    brought in to Retrophin to run a research and development

6    program.  He was terminated in roughly three months by

7    Mr. Shkreli.  And then we had notification from his lawyers

8    that they plan to litigate because of breach of employment

9    contract and abusive treatment that he received from

10   Mr. Shkreli.

11   Q    When you said that the Chief Scientific Officer was

12   terminated by e-mail, are you referring to Andrew Vaino?

13   A    I am.

14   Q    Who terminated him by e-mail?

15   A    Mr. Shkreli.

16   Q    When you say the Business and Development Group was

17   siloed, what did you mean.

18   A    They operated somewhat apart from the rest of the

19   company.  That was, they were viewed as Martin's personal

20   posse, if you will.  They were his friends, drinking buddies,

21   people that he treated differently than the rest of the

22   company.

23   Q    What was the concern with that?

24   A    I think he made, certainly in Cambridge, the research and

25   development team feel like second class citizens.  One group

S. ASELAGE – DIRECT – MS. SMITH

1  was being the favorite son, if you will, versus all the other

2  employees.  It's not a healthy environment to have people

3  working together well.

4  Q    When you agreed to step into the role of Chief Operating

5  Officer, what was your understanding of what you would be

6  doing at Retrophin?

7  A    My mandate was to do several things.  One, try to put in

8  some process and control.  Try to find a, to develop

9  cross-functional communication so the different departments

10  would be working together rather than working separately.  And

11  Mr. Richardson in particular wanted me to spend time with

12  Mr. Shkreli to try to give him some advice and mentoring over

13  the course of that summer.

14  Q    What was your salary going to be as a Chief Operating

15  Officer?

16  A    I believe that was $300,000.

17  Q    In connection with being Chief Operating Officer, did you

18  receive any stock or options?

19  A    Yes.  I received stock options, I believe I received

20  options on 300,000 shares.

21  Q    In connection with your role as Chief Operating Officer,

22  were you responsible for hiring any new individuals for the

23  company?

24  A    I was.  The priorities I had for hiring included general

25  counsel.  I was increasingly concerned about work that was

                        S. ASELAGE - DIRECT - MS. SMITH

1   being done by Mr. Greebel and his firm.

2           MR. BRAFMAN:  Objection.

3           THE COURT:  I'll overrule the objection.  You as COO

4   became concerned.  He's stating why.

5           MS. SMITH:  I was going to follow up with why.

6   A    There were several reasons.  One, we were seeing

7   extensive bills coming from in that seemed extremely high,

8   relative to what you would expect legal costs would be for a

9   firm our size.

10          Secondly, we saw Mr. Greebel as functioning really

11  not as responsive to the entire Board but only to Mr. Shkreli.

12  Mr. Richardson, our Chairman, had given him repeated requests

13  for Board minutes, which we were never able to obtain.  It

14  gave me an easy feeling.  I felt we needed to get someone else

15  functioning as counsel for the company.  So I instituted a

16  search for a general counsel.

17  Q    Did you have the opportunity to observe the defendant and

18  Mr. Greebel interact in person?

19  A    I did.

20  Q    Where was that?

21  A    Board meetings and occasionally in the office.  But

22  mostly either at dinner before a Board meeting or the Board

23  meeting itself.

24  Q    Based on those interactions, what was the relationship

25  like from what you could observe between the defendant and

S. ASELAGE – DIRECT – MS. SMITH

1    Mr. Greebel?

2    A    They seemed very close.

3    Q    In terms of which of the two individuals was the

4    individual who kind of, who was the leader in the

5    relationship?

6    A    Mr. Shkreli was the dominant personality.

7    Q    What makes you say that?

8    A    Just the interaction, the tone.  When there was an issue

9    to be decided, Mr. Shkreli was directive to Mr. Greebel; and

10   Mr. Greebel was responsive.

11   Q    Did the defendant or Mr. Greebel ever tell you that the

12   SEC was conducting an investigation of MSMB or the defendant?

13   A    No.

14   Q    Did the defendant or Mr. Greebel ever tell you that

15   Retrophin had received a subpoena from the United States

16   Attorney's Office in connection with a criminal investigation?

17   A    No.

18   Q    I'm going to show you what is marked Government's Exhibit

19   122-84 in evidence, tab 36.  This is an e-mail from

20   Mr. Richardson to the defendant copying you on June 25, 2014,

21   with the subject matter "Board input company confidential."

22   Can you please read the first two sentences of

23   Mr. Richardson's e-mail?

24   A    "Martin, as we discussed I was able to speak with each of

25   our Board colleagues before I got on the plane.  They all

S. ASELAGE – DIRECT – MS. SMITH

1    share the same frustration you have that much of the hard work

2    and breakthroughs of recent months are getting buried under a

3    series of items that are both surprises and distractions."

4    Q    What is Mr. Richardson referring to when he says, "a

5    series of items that are both surprises and distractions"?

6    A    Well, we saw several things happen over the course of

7    2014.  I mentioned the Twitter, which was a big issue for at

8    least some the Board members, not all actually.

9    Q    Just to clarify, when you say the use of the Twitter

10   account, what specifically are you referring to?

11   A    Mr. Shkreli was very active on social media, and

12   particularly on Twitter, putting out a variety of tweets,

13   things ranging from related directly to Retrophin business to

14   unrelated.  The perception that I had -- I'll speak for myself

15   here -- is they tended to be immature and not particularly

16   relevant and not particularly appropriate for the CEO of a

17   public company.  I saw them as a distraction, but other Board

18   members saw them as even worse than a distraction.

19   Q    If we can turn to the second page of this exhibit, zoom

20   in on the top half.  This is titled, "Retrophin growth and

21   control initiatives, company confidential June 2014," what was

22   this document?

23   A    This was a document in which Mr. Richardson summarized

24   for Mr. Shkreli the expectations of the Board, the

25   improvements that the Board was hoping to see in Mr. Shkreli's

S. ASELAGE – DIRECT – MS. SMITH

1    activities.

2    Q     If can you read the section that says, "appropriate

3    controls and rigor in decision making"?

4    A     "In addition to the spending controls Martin has already

5    put in place, any expenditures or investments exceeding

6    $150,000 need dual approval and Board consultation.  These can

7    be shared with Steve A. as president and Board member to keep

8    the dialogue efficient.  And then you can both can agree what

9    warrants full Board review."

10   Q     Then if we can zoom out and look at the bottom of the

11   page.  There is a section that says, "restrict use of," the

12   first paragraph says, "Continue hiatus in using Twitter."  Is

13   that related to the Twitter use you were talking about

14   earlier?

15   A     It is, yes.

16   Q     Can we go to page three, zoom in on the top.  Is this a

17   continuation of the "restrict use of" section?

18   A     Yes.

19   Q     Can you read this line here?

20   A     "Stop the use of private investigators going forward, any

21   exceptional circumstance that may warrant their use should be

22   discussed and approved by the Board.

23   Q     What was this a reference to?

24   A     Mr. Shkreli hired outside investigators to investigate a

25   number of individuals without anyone on the Board being aware?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

S. ASELAGE – DIRECT – MS. SMITH

1    Q    How much was spent on private investigators?

2    A    That I don't know, not off the top of my head.

3    Q    What was the concern of the Board regarding the use of

4    private investigators?

5    A    I can't speak for everyone on the Board, my own

6    perception was that it was simply inappropriate for anyone in

7    the company to unilaterally hire private investigators to dig

8    up information on another individual without of significant

9    reason for that being done, and without review and approval on

10   a Board level for that being done.

11   Q    Did you have an understanding what the private

12   investigators were used to investigate?

13   A    Never found out for sure.

14   Q    If we can focus on the summer of 2014.  In that time

15   period were you still functioning as the Chief Operating

16   Officer of Retrophin?

17   A    I was.

18   Q    What work were you undertaking in the summer of 2014?

19   A    There were several things I was trying to do.  I

20   mentioned I was trying to put in general counsel.  I was also

21   try to put in a Chief Compliance Officer.  A Compliance

22   Officer is a position where a person has oversight of company

23   operations to ensure that what is being done inside the

24   company meets legal and regulatory guidelines for our

25   industry.  Then subsequently I was working to try to develop

S. ASELAGE – DIRECT – MS. SMITH

1    an organized plan in developing assets that we had inside the

2    company.

3              Over the course of 2013 and 2014 a number of

4    products had been acquired by Retrophin.  We had acquired

5    Intranasal Ketamine, Intranasal Oxytocin, besides the

6    Manchester product Chenodal in February.  Then in the summer

7    of 2014 another product called Thiola.  We had small group,

8    small company, limited resources.  A lot of products,

9    resources, were being spread thinly, in my opinion.  I thought

10   it was important to get the different departments on the same

11   page with regard to priorities to determine what were the

12   things that can create the most value for shareholders, to

13   place the resources behind those products, and probably most

14   importantly, to get the different groups understanding what

15   the other groups were doing.

16             We simply had no good communication between our

17   research group, our manufacturing group, our business

18   development group, our finance group.  All different

19   departments complained that they were working in a silo and

20   didn't know what was going on.

21   Q    Did you in fact find an individual to serve as general

22   counsel for Retrophin that summer?

23   A    I did.

24   Q    Who is that?

25   A    Megan Jensen.

S. ASELAGE – DIRECT – MS. SMITH

1   Q    Who hired Meg Jensen?

2   A    I did, although Mr. Shkreli did interview her as well as

3   myself.

4   Q    In the summer of 2014, how many offices did Retrophin

5   have?

6   A    Three, one in Cambridge, one in New York, one in San

7   Diego.

8   Q    Approximately how many people were working for the

9   company at that time?

10  A    Probably somewhere in the 80 range, plus or minus a few,

11  that's an estimate not a hard number.

12  Q    By the end of the summer of 2014, so August beginning of

13  September, had the defendant taken steps to address the

14  concerns outlined by the Board in the e-mail that we saw from

15  June 25, 2014?

16  A    No, not at all.

17  Q    Had any other issues arisen with respect to the defendant

18  over the summer of 2014?

19  A    Yes, there were several additional red flags that came up

20  over the course of that summer.  There was a continued effort

21  to have business development chase after products that, at

22  least in my opinion, were not appropriate assets for the

23  company to acquire.  There was continued, or renewed use, of

24  the Twitter account, including one instance that I was

25  significantly concerned about.  Mr. Shkreli went on Twitter to

S. ASELAGE – DIRECT – MS. SMITH

1  announce -- while the stock market was open and stocks were

2  being traded -- went on the Twitter to announce that this was

3  the best day of his life.  And then engage in some back and

4  forth on Twitter with some of his followers who were asking

5  him if they should buy stock.  The impact of that was the

6  perception, at least, that he was giving a tip with non-public

7  information to his followers on Twitter that this would be a

8  good day to buy Retrophin stock; that's a problem.

9  Q    Were there any concerns with the defendant's purchase or

10  sale of Retrophin stock in this time period?

11  A    Yes, there were.  There was a situation in which

12  Mr. Shkreli engaged in --

13           MR. BRAFMAN:  I'm going to object and ask for an

14  offer of proof at sidebar.

15           (Continued on the next page.)

16           (Sidebar conference.)

17

18

19

20

21

22

23

24

25

Rivka Teich CSR, RPR, RMR
Official Court Reporter

SIDEBAR CONFERENCE

1          MS. SMITH:  There were two instances.  One was the

2   breach of a lock-up period.  Mr. Shkreli sold stock during a

3   lock-up period.  And the second was, there is a short swing

4   pattern of sales and purchases that led to a major lawsuit.

5          MR. BRAFMAN:  This implies to the jury of

6   non-professionals that there was illegality involved in these.

7   These are not 404(b) crimes that we were given notice.  I

8   don't think a limited instruction can cure it.

9          THE COURT:  These aren't crimes, though.  You're not

10  alleging these's crimes.

11         MS. SMITH:  We're not.  In fact, the short swing

12  litigation is significant.  It's mentioned in the Board

13  minutes from September 30, 2014 that are already in evidence

14  and what Mr. Richardson has testified about.  Basically the

15  defendant caused a major lawsuit, shareholder lawsuit, to be

16  filed against the company in a time when they had very few

17  resources.  So that one in particular, like I said, is already

18  described in the documents.

19         MR. BRAFMAN:  If they are putting that in, it's over

20  our objection.  I want a limited instruction that there was no

21  allegation that was illegal by Mr. Shkreli.

22         MS. SMITH:  I can direct him to those two instances

23  and try to keep the answers tight.

24         MR. BRAFMAN:  I would like a limited instruction.

25         MS. SMITH:  Why don't I ask the two questions in a

SIDEBAR CONFERENCE

1    tighter leading way so we don't get any kind of long

2    discussion about it.  Then we can do a limited instruction.

3              MR. BRAFMAN:  If you do a leading question with

4    respect to leading I wouldn't object.  Hopefully he will

5    answer yes or no; and if your Honor can give a limited

6    instruction.

7              I'm not waiving the objection.  Since I think you'll

8    overrule the objection, that we have a leading question to

9    limit the damage.  Then also your Honor can give them a

10   instruction.

11             THE COURT:  The instruction will be that he's not

12   been charged with --

13             MR. BRAFMAN:  It's not -- what is being discussed is

14   not alleged to be illegal.

15             THE COURT:  Okay.

16             (End of sidebar conference.)

17             (Continued on the next page.)

18

19

20

21

22

23

24

25

3404

S. ASELAGE - MS. SMITH - DIRECT

1    (In open court.)

2    BY MS. SMITH:

3    Q    Mr. Aselage, I was asking you if there were concerns

4    about Mr. Shkreli's trading of Retrophin stock during the

5    summer of 2014.  Specifically, asking you whether there was an

6    incident in which Mr. Shkreli traded stock during a lock-up

7    period when trading stock was not permitted?

8    A    Yes, there was.

9    Q    Was there also a series of trades that led to a lawsuit

10   by shareholders related to concerns about short swings?

11   A    Yes, that was the Donahue Versus Retrophin lawsuit.

12           THE COURT:  Let me instruct the jury that two

13   incidents that Mr. Aselage just testified to are not alleged

14   to be illegal transactions or activities.

15   BY MS. SMITH:

16   Q    Turning to September of 2014, did there come a time when

17   Jeff Paley left the Retrophin Board?

18   A    Yes.

19   Q    What were the circumstances under which that occurred?

20           MR. BRAFMAN:  Objection, your Honor.

21           THE COURT:  Overruled.

22   A    Dr. Paley was of the Board members the most concerned

23   about Mr. Shkreli's use of Twitter.  And Mr. Shkreli had

24   agreed to cease use of Twitter.  He resumed very active use of

25   Twitter during the summer.  Mr. Paley confronted Mr. Shkreli

3405

S. ASELAGE - MS. SMITH - DIRECT

1    about that.  And Mr. Shkreli directed Mr. Paley to leave the

2    Board.  And Mr. Paley then submitted his resignation.

3    Q    Was Mr. Paley an independent Board member?

4    A    Excuse me, I said Mr., I should say Dr. Paley.

5    Q    Was Dr. Paley an independent Board member?

6    A    He was an independent Board member.

7    Q    What were the consequences to Retrophin of losing an

8    independent Board member?

9    A    We had a minimum number of independent Board members to

10   be qualified as a NASDAQ listing.  We were out of guidelines

11   as soon as he resigned.

12   Q    Were there any other issues in the September 2014 with

13   respect to SEC filings or the need to file an AK?

14   A    September 14, I don't recall.

15   Q    Let me ask you about Marc Panoff.  In the summer of 2014

16   what was the relationship between Marc Panoff and the

17   defendant?

18   A    Marc Panoff worked for Mr. Shkreli.  Marc Panoff was the

19   Chief Financial Officer.

20   Q    What was the relationship like in the summer of 2014 time

21   period?

22   A    Well, it was Mr. Shkreli was the dominant personality.

23   He was very directive toward Mr. Panoff, and somewhat

24   dismissive toward Mr. Panoff.

25   Q    Did you observe any interactions between Mr. Panoff and

S. ASELAGE - MS. SMITH - DIRECT

1    Mr. Shkreli that were disconcerting to you?

2    A    Indirectly.  They had Panoff and in the San Diego

3    offices.  In a meeting, he got a call from Mr. Shkreli, got

4    up, walked out, then paced around frantically for some period

5    of time, and left the meeting.  I was concerned about him.  He

6    looked really distraught.

7              MR. BRAFMAN:  I'm going to object to this.  They

8    don't know what they talked about.

9              MS. SMITH:  Objection, your Honor.  Can we do this

10   at sidebar?

11             (Continued on the next page.)

12             (Sidebar conference.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1      THE COURT:  Can I understand the context, Mr.

2  Aselage is in San Diego at a Board meeting?

3      MS. SMITH:  With Mr. Panoff and Mr. Shkreli.

4      THE COURT:  And Mr. Panoff gets a phone call and

5  leaves the meeting; is that right?

6      MS. SMITH:  There was an interaction.  I feel it

7  didn't come out very clearly.  There was an interaction with

8  Mr. Shkreli.  And then he observed Mr. Panoff being very

9  upset.  He later basically resigns from Retrophin.

10     THE COURT:  There is an interaction during the

11 boarding between Mr. Shkreli and Mr. Panoff?

12     MS. SMITH:  I believe during the Board meeting.

13     MR. BRAFMAN:  Your Honor, if the effort is made to

14 make Mr. Shkreli look like a bad guy, just as a general

15 proposition, because he has a conversation, you assume with

16 Mr. Panoff because you don't know who Panoff is talking to,

17 you then see Mr. Panoff upset, then shortly thereafter Panoff

18 leaves.  We don't know that Mr. Shkreli was even on the phone

19 with Mr. Panoff.  How do we know what they were talking about?

20 If it was Mr. Shkreli?  And maybe it was something personal in

21 his life.  Panoff is not charged with being a co-conspirator,

22 unindicted co-conspirator.  So other than the fact that he

23 observes Panoff acting -- I don't understand this.

24     THE COURT:  I thought what they said was

25 Mr. Shkreli, Mr. Panoff and Mr. Aselage were in a meeting

SIDEBAR CONFERENCE

1    together in San Diego?

2            MS. SMITH:  I believe that Mr. Panoff got a phone

3    call from Mr. Shkreli while Mr. Panoff and Mr. Aselage were in

4    a meeting together.  And he knew that's who called him.  It

5    didn't come out that clearly.

6            I think this is relevant because there was a line of

7    argument in the opening, and I expect on cross, that

8    Mr. Shkreli was bullied by people in Retrophin and that the

9    company was stolen from him.  That said, I can move on to the

10   next question.  This is not significant.

11           MR. BRAFMAN:  We move to strike that, though.  It's

12   going to read so absurd in the record.

13           MS. SMITH:  I'm going to move on.

14           MR. BRAFMAN:  I ask that to be stricken.

15           MS. SMITH:  That's fine.

16           THE COURT:  The last response of the witness will be

17   stricken.

18           MR. BRAFMAN:  And the question.

19           MS. SMITH:  Yes, obviously the question.

20           THE COURT:  Okay.

21           (End of sidebar conference.)

22           (Continued on the next page.)

23

24

25

S. ASELAGE – DIRECT – MS. SMITH

1          (In open court.)

2          THE COURT:  Ladies and gentlemen of the jury, the

3   Court is going to strike the last question and answer.  You

4   should disregard it.  Hit the erase button and don't think

5   about it.

6   BY MS. SMITH:

7   Q    Turning back to September 2014, what, if anything, did

8   the Board determine about the defendant's role at Retrophin at

9   that time?

10  A    By September of 2014 the Board decided that Mr. Shkreli

11  was not responding to any of the requests for a change in

12  behavior and that Mr. Shkreli should step out of his role as

13  CEO.

14  Q    How was that decision conveyed to the defendant?

15  A    There was a meeting with Mr. Richardson, Mr. Shkreli, and

16  myself in which Mr. Richardson conveyed that verbally to the

17  defendant.

18  Q    Where did that meeting take place.

19  A    In our New York offices.

20  Q    What was the defendant's reaction to Mr. Richardson's

21  statements?

22  A    I think he was surprised initially.  He stayed very calm.

23  There was not fireworks at the time.  He told us we were

24  making a mistake.

25          And I think maybe it's worthing stepping back to say

Rivka Teich CSR, RPR, RMR
Official Court Reporter

S. ASELAGE – DIRECT – MS. SMITH

1    that he was being offered another position within the company.

2    We wanted to put him into business strategy or business

3    development, something where he could still use his interest

4    and intellect in acquiring assets, but not be responsible for

5    actually running the company.  That was the initial

6    discussion.

7            He rejected that out of hand.  So that, if he was

8    not going to be CEO he would not stay with company.  And told

9    us he would be starting a new pharmaceutical company and it

10   would be a bigger and better company than we would ever make

11   Retrophin.

12   Q    I'm going to show what you is already in evidence

13   Government's Exhibit 122-44, which is tab 40.  If we focus in

14   on the top up until the motion piece.  What is this document?

15   A    The minutes of the Board meeting.

16   Q    What was the date of the Board meeting?

17   A    September 30, 2014.

18   Q    If you can read the first three paragraphs there?

19   A    "The following are minutes of a meeting of the Board of

20   Directors of Retrophin Incorporated, a Delaware corporation,

21   held at the above time pursuant to notice duly given to all

22   members of the Board of Directors.  Participating in the

23   meeting were many directors, Stephen Aselage, Cornelius

24   Golding and Steve Richardson.  Present by invitation was

25   Margaret Valeur-Jensen acting as general counsel and secretary

S. ASELAGE – DIRECT – MS. SMITH

1    to the company.  Mr. Richardson acted as Chairman of the

2    meeting.  And Ms. Valeur-Jensen acted as secretary.

3    Mr. Richardson reported that he and Mr. Aselage had met with

4    Mr. Shkreli to discuss issues with respect to Mr. Shkreli's

5    performance as Chief Executive Officer of the company.

6    Mr. Richardson reported that Mr. Shkreli had been asked to

7    transition from Chief Executive Officer to a senior strategic

8    advisory position with the company and that Mr. Shkreli had

9    declined.  Mr. Richardson summarized issues with Mr. Shkreli's

10   trading in common stock of the company and the resulting

11   litigation.  He also outlined the need for stricter governance

12   and controls.  The directors discussed Mr. Shkreli's

13   performance in terms of his employment agreement with the

14   company.  And following discussion determined that it was in

15   the best interest of the company that Mr. Shkreli no longer

16   serve as Chief Executive Officer of the company."

17   (Continued following page.)

18

19

20

21

22

23

24

25

S. ASELAGE – DIRECT – MS. SMITH

1   Q    And if we can scroll down.  And then there are three

2   resolutions here.  The first is the removal of Mr. Shkreli

3   from all of his duties and authority as Chief Executive

4   Officer.  The second is to place Mr. Shkreli on administrative

5   leave for the remainder of the term of his employment, and it

6   notes that that's paid leave.  And then the third resolution

7   is the appointment of Stephen Aselage as interim Chief

8   Executive Officer of the company.

9            Who drafted the minutes of this Board meeting?

10  A    Ms. Jensen.

11  Q    And were the minutes of this Board meeting approved at a

12  subsequent meeting of the Retrophin Board?

13  A    They were.

14  Q    And if we can turn to page 3 of this document.  And at

15  the top of this Board meeting minutes it says "Resolved, that

16  the minutes of the meetings of the Board of Directors held on

17  July 25, 2014, August 8, 2014 and September 17, 2014 are

18  hereby approved."

19  A    Yes.

20  Q    When Ms. Valeur-Jensen was serving as secretary, were the

21  Board meeting minutes approved at subsequent meetings in a

22  fashion described here?

23  A    They were.

24  Q    At this Board meeting you were appointed as interim CEO;

25  is that right?

Angela Grant, RPR CRR
Official Court Reporter

S. ASELAGE – DIRECT – MS. SMITH

1    A    That is correct.

2    Q    Following the Board meeting, did you and other Board

3    members reach out to Retrophin investors about the decision to

4    remove the defendant as CEO?

5    A    We did.

6    Q    What was that process like?

7    A    It was somewhat chaotic, if I can use that word.  Many of

8    the investors had heard Mr. Shkreli almost immediately after

9    the meeting.  Mr. Shkreli's response was to try to convince

10   investors to band together to remove the Board and put him

11   back in charge as CEO.

12   Q    What was the ultimate outcome of the meetings with the

13   investors?

14   A    The ultimate outcome was that he was not successful in

15   getting that done.

16   Q    After the defendant was removed from his position, did

17   Retrophin continue to use Mr. Greebel or the Katten law firm?

18   A    No.  We let Katten know that we would be -- no longer be

19   using them.

20   Q    I'm going to show you what's been marked as Government

21   Exhibit 122-92 which is already in evidence, and that's tab

22   38.

23        What is this document?

24   A    That's an email from Mr. Shkreli to myself.

25   Q    And is Mr. Richardson also copied?

S. ASELAGE - DIRECT - MS. SMITH

1    A    It is.  He is.

2    Q    And the email says, "Let me know what you want to do

3    regarding BOD."

4              Is it your understanding that that's a reference to

5    Board of directors?

6    A    It is.

7    Q    Happy to stay on until you find a fifth to regain NASDAQ

8    compliance.  Long term there are technical reasons I would not

9    like to be on the BOD.  Form 4 requirement, inability to

10   borrow against stock.  Also interested in resigning now if

11   that is something you are interested in.

12             What did you understand the defendant to mean when

13   he said he's happy to stay on until you find a fifth to regain

14   NASDAQ compliance?

15   A    I think his thinking at the time was we needed five Board

16   members to be in compliance with NASDAQ guidelines, but it

17   also required that there be three independent directors.  As a

18   former CEO, he would not have been considered an independent

19   director anyway so it wouldn't really have made any difference

20   relative to NASDAQ.

21   Q    But at the time of this email, what did you understand

22   the defendant was saying with respect to his intentions for

23   remaining on the Board?

24   A    I took this email to mean that he had accepted the fact

25   that he was going to be leaving the company and was willing to

                    S. ASELAGE - DIRECT - MS. SMITH

1    reach out and try to leave on a good-faith basis and move on

2    to other things.

3    Q    I'm going to show you what's been marked as Government

4    Exhibit 122-93 for identification.  And that's behind tab 39.

5              Do you recognize this document?

6    A    I do.

7    Q    What is this document?

8    A    It is, again, an email string between Mr. Shkreli and

9    myself.

10   Q    Is it from October of 2014?

11   A    It is.

12   Q    And is it related to Retrophin?

13   A    It is.

14             MS. SMITH:  Your Honor, we offer Government

15   Exhibit 122-93 into evidence.

16             MR. BRAFMAN:  No objection.

17             THE COURT:  We receive 122-93.

18             (Government Exhibit 122-93, was received in

19   evidence.)

20   Q    And if we can start with the bottom email.  This is an

21   email from Mr. Shkreli to you and Mr. Richardson on October 1,

22   2014.  And if you can just read the top part of the email for

23   us.

24   A    "Hi, guys.  Here is the idea I have.  I believe this deal

25   is quite fair and in everyone's best interest.  It is also as

                    Angela Grant, RPR CRR
                    Official Court Reporter

S. ASELAGE – DIRECT – MS. SMITH

1   you know time sensitive.  The bid for Biltricide is due on

2   Monday and as any good lawyer knows, the time for legal action

3   is usually immediate.  A good deal would bring clarity and

4   success to everyone involved.  Thanks, Martin."

5   Q    What is the defendant referencing when he said the bid

6   for Biltricide?

7   A    Biltricide was a product that Martin had looked at

8   acquiring for Retrophin.  Biltricide is an antiparasitic drug

9   that was owned by Bear Laboratories, a large German firm.

10  Bear, apparently, was willing to divide at best Biltricide.

11  Martin wanted to buy Biltricide.  That was an acquisition that

12  Martin thought would be very good for the company and which I

13  had significant disagreements with.

14  Q    And in terms of the settlement offer that's lower down,

15  was it your understanding that this was an offer to take some

16  of the drugs from the company in return for resigning?

17  A    Yes.  Some of the drugs from the company as well as

18  having the company act as a surrogate for Martin.  The company

19  would buy Biltricide and then transfer ownership of Biltricide

20  to Martin.

21  Q    If you can scroll up to the next email.  And this middle

22  email here is from you to the defendant, Mr. Richardson, (sic)

23  on October 1, 2014.  And you say here, "This is a bit of a

24  change from the conversation this morning, but I'll give it

25  some thought and get back to you.  I'm reviewing the

S. ASELAGE - DIRECT - MS. SMITH

1    Biltricide file on the plane tonight."

2            So at this point on October 1st, were you in ongoing

3    discussions with the defendant about having him step town and

4    resign from Retrophin?

5    A    Yes.  We were hopeful that we could find a resolution

6    which would allow him to transition out of the company

7    peacefully.

8    Q    And then if you can scroll up to the top email.  And can

9    you just read the defendant's response on October 1, 2014.

10   A    It says "Sure.  Let's talk then.  This should be very

11   easy to work out procedurally, especially if there is some

12   mutual trust and respect, which I know is there.  We are all

13   professionals with a vested interest in success.  If there are

14   financial terms you don't agree with or assets you think

15   Retrophin should hold on to, then I can understand that as

16   well."

17   Q    So after these emails, which are on Wednesday, October 1,

18   2014, did the process of negotiating with the defendant about

19   the terms of his resignation proceed smoothly?

20   A    No.  The company was not willing to act as a surrogate

21   for the acquisition of Biltricide, at which point things did

22   not proceed smoothly to say the least.

23   Q    And did you have any interactions with the defendant

24   shortly after these emails were exchanged?

25   A    Yes.  I had a phone conversation with the defendant, I

Angela Grant, RPR CRR
Official Court Reporter

S. ASELAGE – DIRECT – MS. SMITH

1    believe it was the Friday following these emails, and that

2    phone conversation was very hostile.

3    Q    What did the defendant say to you in that phone

4    conversation?

5    A    It was what I would consider a very threatening

6    conversation.  You know, he told me that I would regret our

7    actions.  That he had never -- I had never dealt with anyone

8    like him and I would be subject to unremitting waves of

9    litigation.  And that both I and my family would suffer as a

10   result of our actions.

11   Q    And did the defendant take any other actions in that time

12   period shortly after those emails?

13   A    The defendant took actions with our investors doing

14   everything he could to put negative information about the

15   company.  You know, he told investors he would come out with a

16   generic version of one of our current products by this time to

17   damage the value of the company.  He went on a, you know, I

18   think, you know, he went on a warpath is how I would describe

19   it to try to damage the company and to try to damage the

20   reputation of the people in the company.

21   Q    Did the defendant take any action with respect to

22   Retrophin's offices?

23   A    Yes.  The defendant and three of his friends broke into

24   the offices --

25            MR. BRAFMAN:  Objection.

3419

S. ASELAGE – DIRECT – MS. SMITH

1          THE COURT:  Let's avoid use of the term --

2          MR. BRAFMAN:  Move to strike that answer.

3          THE COURT:  We'll strike that and you can start over

4    with your response.

5    A    The defendant entered the offices, even though he had no

6    access to the offices, downloaded files from the server and

7    took Retrophin information out of the offices with him when he

8    left.

9    Q    Were Retrophin and the defendant ultimately able to reach

10   a resolution?

11   A    We did.

12   Q    And what was that resolution?

13   A    It was actually just later in the month of October we

14   resolved -- Mr. Shkreli offered, and we accepted, a proposal

15   that he would step down as CEO and as a Board member if we

16   would divest three products to him, and those three products

17   were Ketamine, Oxytocin and Vecamyl.

18          And in return for divestment to his new company he

19   would resign from Board and CEO positions and pay Retrophin

20   $3 million for those products.

21   Q    And the September 30, 2014 Board minutes said you took on

22   the interim CEO role.

23          Did your salary increase at that point?

24   A    No, it did not.

25   Q    Did you receive any stock or options as a result of that

S. ASELAGE – DIRECT – MS. SMITH

1   interim role?

2   A      No, I did not.

3   Q      And what happened with the options that you had received

4   as a COO at that point?

5   A      Well, what we discovered was that during the course of

6   2014 the company had actually issued more options than it was

7   allowed to issue.  And for, maybe just for clarity, companies

8   can't just give away options.  They need shareholder approval

9   with an authorized pool of options to give to employees, and

10  we had exceeded that authorized number by roughly actually a

11  little bit over a million shares.  There had simply been no

12  one keeping track.  The options that I had been given as a COO

13  I turned back in and it was part of an overall effort to get

14  us back into compliance.

15  Q      Were you ultimately made the permanent CEO of Retrophin?

16  A      I was in November of that year.

17  Q      And what was your salary as the CEO in November of 2014?

18  A      It was $480,000.

19  Q      Has that increased in the years since 2014?

20  A      Yes, I've been given a raise annually since then.

21  Q      Have you also received stock and options in Retrophin?

22  A      I have.

23  Q      Have you sold any of those stock or options?

24  A      I have sold -- I received 100,000 RSUs that invested.

25  When RSUs vest, that's a taxable event and I've sold enough of

S. ASELAGE – DIRECT – MS. SMITH

1    the vested RSUs to cover my tax liabilities.  I sold

2    68 percent of my vested RSUs when they vested.  I'm holding

3    the other shares that covered all of my taxes and left a

4    little bit of money out.

5    Q    What is the value of the Retrophin stock and options that

6    you currently hold?

7    A    If you accumulate all of the stock I hold and all of the

8    options that are invested, it is slightly over $7 million.

9    Q    Following the defendant's removal as CEO, what, if

10   anything, did you learn about the internal hedge fund that the

11   defendant had promised to keep at a $50,000 cap?

12           MR. BRAFMAN:  Objection, Your Honor.

13           What did you learn?

14           THE COURT:  Well —

15           MS. SMITH:  I can say what do you know.

16           THE COURT:  What do you know.

17   Q    So following the defendant's removal as CEO, what, if

18   anything, do you know about the internal hedge fund that the

19   defendant has promised to keep at $50,000?

20           MR. BRAFMAN:  Objection, Your Honor.

21           THE COURT:  Can we give this a timeframe.

22           MS. SMITH:  This is in September of 2014.

23           THE COURT:  So you became aware of this in September

24   of 2014, sir?

25           THE WITNESS:  Actually, October of 2014.

3422

Sidebar Conference

1        MS. SMITH:  October of 2014.

2        THE COURT:  All right.  Overruled.

3    A    We had a 2 and a half million dollar short position on

4    one other stock.  There were a variety of positions, but just

5    one position was a 2 and a half million dollar short debt.

6    Q    Was that during the time that the defendant was

7    overseeing that fund?

8    A    Yes, it was.

9    Q    Was there an internal investigation conducted after the

10   defendant's departure from Retrophin?

11       MR. BRAFMAN:  Objection, Your Honor.

12       THE COURT:  Let's go to sidebar for a moment, all

13   right.

14       Thank you.

15       (Sidebar conference.)

16       (Continued on the following page.)

17
     Official Court Reporter
18

19

20

21

22

23

24

25

ANGELA GRANT, RPR, CRR

Sidebar Conference

1

2          MS. SMITH:  This is the same question that we asked

3    with Mr. Richardson, just that there was an internal

4    investigation and that he was not a part of it because he had

5    been on the Board at the same time.

6          I might as well tell you what also I'm going to

7    elicit so we can decide if there's anything else.  I expect

8    you're going to cross him on the Retrophin civil lawsuit, and

9    so I was going to ask him if there was a lawsuit brought

10   against the defendant just so that that's out there without

11   getting into details about it.

12         And that there was a restatement of the financials

13   following the internal investigation.  That's pretty much it,

14   but if you weren't going to go into it on cross, I --

15         MR. BRAFMAN:  I'm not going to go into the internal

16   investigation.  I think the fact that there's a lawsuit

17   pending is relevant.

18         MS. SMITH:  I don't disagree, but that's why I am

19   going to ask about that.

20         MR. BRAFMAN:   So long as we're not getting into the

21   internal investigation.

22         THE COURT:  She's going to elicit there was one.

23         MS. SMITH:  There was one and that it was run by the

24   independent Board members that came on afterwards and that

25   there was a restatement as a result.

ANGELA GRANT, RPR, CRR

Aselage – Direct – Smith

1          THE COURT:  All right.  Good.  Thank you.

2          (Sidebar conference concluded.)

3          (Continued on the following page.)

4

Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3425

Aselage – Direct – Smith

1

2   Q    Was there an internal investigation conducted after the

3   defendant's departure from Retrophin?

4   A    Yes, there was.

5   Q    Who is responsible for oversight of that investigation?

6   A    After Mr. Shkreli's departure two additional Board

7   members were added to the Retrophin Board.  There was a

8   decision made that those two new Board members would oversee

9   an independent investigation.

10  Q    What was the result of that investigation in terms of the

11  financials of Retrophin?

12  A    The result was that the firm that our independent

13  committee hired reported that substantial amounts of both cash

14  and --

15       MR. BRAFMAN:  Objection, Your Honor.  I thought we

16  weren't doing that.

17       THE COURT:  The financials she asked.

18       MS. SMITH:  I can try and ask it in a different way.

19  Q    As a result of the internal investigation, did Retrophin

20  need to restate the financials of the company?

21  A    Yes, we did.

22  Q    And was that in connection with activity undertaken by

23  the defendant?

24  A    It was sure.

25  Q    Did the Board of Retrophin decide to take any other

ANGELA GRANT, RPR, CRR

Aselage - Direct - Smith

1    action as a result of the internal investigation?

2    A    Yes, as a result of the internal investigation, the

3    company did file suit against Mr. Shkreli, civil suit, to

4    recover moneys lost from Mr. Shkreli's misdealings.

5    Q    In terms of damages, what is the suit seeking?

6    A    $65 million.

7    Q    And is that suit currently pending?

8    A    It is.

9    Q    Turning back to the fall of 2014.  What was the financial

10   status of the company at the point that the defendant was

11   removed?

12   A    Well, the company was in substantial trouble the fall of

13   2014.  The company had $38 million in cash.  It had

14   $83 million in debt and it had burned through $16 million of

15   cash in the previous quarter, and we had roughly two quarters

16   of operating time left before we ran completely out of cash.

17   We spent roughly $13 million on an our research and

18   development efforts that quarter, and the market valuation of

19   the company, the market cap was $240 million.

20          THE COURT:  I'm sorry.  "That quarter" meaning which

21   quarter, sir?

22          THE WITNESS:  That was the end of Q3 of 2014.

23   Q    When you say Q3, do you mean the third quarter of the

24   year?

25   A    Yes.  I'm sorry, the third quarter of the year.

ANGELA GRANT, RPR, CRR

Aselage – Direct – Smith

1    Q     And following the fall of September -- following that

2    period in September of 2014, what steps did the company take

3    to improve the financial status of the company?

4    A     We did a number of things.  The spending was put under

5    control.  You know, obviously some of the money that was being

6    spent on non-Retrophin activities stopped.  We divested in

7    non-core assets so we could put more resources in things that

8    could provide value to our shareholders.  We acquired an

9    additional product in March.  We acquired rights to it in

10   January of 2015, and then actually acquired the product in

11   March of 2015.  It gave us a third product generating revenues

12   for the company and also allowed us to acquire what's called a

13   priority review voucher and which we were able to monetize for

14   a substantial amount of cash, retire some of our debt, reboot

15   our balance sheet to put ourselves on a strong financial

16   footing.

17   Q     Is the company currently on strong financial footing?

18   A     I think it is.  We have -- currently debt has been paid

19   down to $45 million.  We have $295 million in cash.  We

20   roughly doubled our spending on research and development.  Our

21   last reported quarter we spent $21 million and while we did

22   that we burned only $3 million of cash.  Our current market

23   cap evaluation of the company is now just over $700 million

24   from 240.

25   Q     And as compared to the research and development money

ANGELA GRANT, RPR, CRR

Aselage - Direct - Smith

1  that was being spent in September of 2014, how much money is

2  being spent on research and development at Retrophin now?

3  A    We spent $21 million in the first quarter of this year.

4           MS. SMITH:  Just one moment, Your Honor.

5           (Brief pause.)

6           MS. SMITH:   Your Honor, I have no further questions

7  for this witness.

8           THE COURT:  All right.  Why don't we ask the jurors

9  to take a midmorning break.  Please leave your notebooks on

10  the chair, don't discuss the case, and we will come retrieve

11  you in about 10-to-15 minutes.

12           Thank you for your ongoing attention.

13           COURTROOM DEPUTY:  All rise.

14           (Jury exits the courtroom.)

15           THE COURT:  Sir, you can step down also.

16           All right.  Let's hope that we can all get back here

17  by 35 past the hour.

18           (Recess taken.)

19           (Continued on the following page.)

20

21

22

23

24

25

ANGELA GRANT, RPR, CRR

ASELAGE - CROSS - BRAFMAN

1              (In open court; jury not present.)

2              THE COURT:  Are you ready, Mr. Brafman?

3              MR. BRAFMAN:  Yes, Your Honor.

4              MR. SRINIVASAN:  My colleagues will be back in just

5     a second, Your Honor.

6              THE COURT:  Have a seat everybody.

7              (Jury enters courtroom.)

8              THE COURT:  All jurors are present, please have a

9     seat.

10             Will somebody please bring the witness back in.

11    Thank you.

12             You may proceed, Mr. Brafman.

13             MR. BRAFMAN:  Thank you.

14    CROSS-EXAMINATION

15    BY MR. BRAFMAN:

16    Q    Good morning, Mr. Aselage.

17    A    Good morning.

18    Q    My name is Benjamin Brafman, I represent Mr. Shkreli.

19    You and I have never met; is that correct?

20    A    That is correct.

21    Q    I want to start backwards, if I can, from where you I

22    think came close to leaving off with your direct examination.

23    I think you testified that you became full-time CEO in

24    November of 2014?

25    A    That's correct.

ASELAGE – CROSS – BRAFMAN

1    Q    And your salary then was $480,000?

2    A    That's correct.

3    Q    What is your salary today, sir?

4    A    560.

5    Q    And you testified that you have about $7 million worth of

6    stock?

7    A    That's correct.

8    Q    Now --

9    A    Excuse me, that's not correct.  I have $7 million worth

10   of stock and vested stock options that if exercised would

11   accumulate to 7 million.

12   Q    You testified that there came a time when you told

13   Mr. Shkreli that he was being asked to step down or leave as

14   CEO, correct?

15   A    That's correct.

16   Q    And you indicated that it was you and Mr. Richardson?

17   A    That's correct.

18   Q    How old are you, sir?

19   A    I am 66.

20   Q    And how old is Mr. Richardson, if you know?

21   A    I believe he's slightly younger than I am, somewhere in

22   his early '60s.

23   Q    But you were both in your 60s at the time you had this

24   conversation with Mr. Shkreli?

25   A    That is correct.

ASELAGE - CROSS - BRAFMAN

1    Q    How old do you understand Mr. Shkreli to be at that time?

2    A    He would have been somewhere in his early thirties.

3    Q    Now you indicated that he was shocked, correct?

4    A    He seemed surprised.  I don't know if shock -- I don't

5    think I used the word shocked, but he did seem surprised.

6    Q    And he was angry?

7    A    I wouldn't say angry.  It was more of a kind of a pouty

8    just kind of sullen response.

9    Q    Sullen?

10   A    I would consider that's my best description.

11   Q    He told you you were making a mistake?

12   A    He did, yes.

13   Q    He told you he would initiate litigation, correct?

14   A    Not at that time, no.

15   Q    Did there come a time when after the negotiations broke

16   down that there was a threat made by Mr. Shkreli that he would

17   initiate litigation?

18   A    Oh, yes.

19   Q    Is there presently pending a case brought by Mr. Shkreli

20   against Retrophin?

21   A    There is.

22   Q    For wrongful termination?

23   A    That's part of it.

24   Q    Yes.  And that case and the case by Retrophin against

25   Mr. Shkreli are both still pending and they've been stayed

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1   pending the outcome of this case, correct?

2   A    That is correct.

3   Q    You are -- Retrophin is suing Mr. Shkreli for

4   $65 million?

5   A    That is correct.

6   Q    And that lawsuit is also stayed pending the outcome of

7   this case?

8   A    That is correct.

9   Q    You understand that one of the claims Mr. Shkreli made

10  against Retrophin was that he could only be terminated if he

11  was convicted of a felony; is that correct?

12  A    That is correct.

13  Q    And you saw his employment agreement which specifically

14  states that the only way Mr. Shkreli could be terminated is if

15  he were convicted a felony?

16  A    That is correct.

17  Q    So Retrophin has a lot riding on the outcome of this

18  case, would that be a fair statement?

19  A    No.

20  Q    It doesn't?

21  A    No.

22  Q    He if gets convicted, you get $65 million, don't you, and

23  his lawsuit gets dismissed?

24        MS. SMITH:  Objection, Your Honor, compound.

25        THE COURT:  Why don't you break it down.  It is

ASELAGE - CROSS - BRAFMAN

1    compound.

2    BY MR. BRAFMAN:

3    Q    If Mr. Shkreli gets convicted, Retrophin has a much

4    easier path to getting $65 million in their lawsuit, correct?

5    A    Sir, it's a separate case and I don't have any legal

6    expertise to be able to tell you how this case would change

7    that case.

8    Q    But you do understand that the only way Retrophin could

9    legally fire Mr. Shkreli is if he were convicted of a felony?

10            MS. SMITH:  Objection, Your Honor.

11            THE COURT:  Sustained.  You'll have to rephrase.

12    BY MR. BRAFMAN:

13    Q    The only way you could terminate him for cause --

14    Retrophin could terminate him for cause is if he were to be

15    convicted of a felony?

16    A    Sir, he's not an employee, he resigned.

17    Q    I understand that, but he has filed a wrongful

18    termination suit, you said that, right?

19    A    That is correct.

20    Q    And that's pending?

21    A    It is pending.

22    Q    And his employment agreement indicated that the only way

23    Retrophin could wrongfully terminate him -- could terminate

24    him is if he were convicted of a felony, you've acknowledged

25    that?

ASELAGE - CROSS - BRAFMAN

1   A      Yes.

2   Q      Do you know of any other felony indictment pending

3   against Mr. Shkreli besides this case?

4   A      I do not.

5             MS. SMITH:  Objection, Your Honor.

6             THE COURT:  Sustained.

7   Q      I think you testified that you brought in independent

8   counsel Meg Valeur-Jensen at some point in 2014?

9   A      That is correct.

10  Q      To replace Mr. Greebel?

11  A      That is correct.

12  Q      Because you felt Mr. Greebel and Mr. Shkreli were too

13  close?

14  A      I don't believe I said that.  I believe I said they were

15  close, but what we saw from Katten were bills that were

16  excessive and we had difficulty getting Board minutes or other

17  documents back from Mr. Greebel.

18  Q      You've had interaction, professional interaction with

19  Ms. Jensen for years before you brought her to Retrophin;

20  isn't that true?

21  A      I'd never met Ms. Jensen before I brought her to

22  Retrophin.

23  Q      But you had email exchanges with her going back to 2012;

24  isn't that correct?

25  A      2012, yes, that's when I came to Retrophin.

ASELAGE - CROSS - BRAFMAN

1   Q    Now, is she still counsel to Retrophin?

2   A    No, she retired at the end of 2016.

3   Q    You didn't fire her?

4   A    No, sir.

5   Q    Now Dr. Plotkin -- remember the Norwood Board meeting

6   that Mr. Shkreli, based on your testimony, acted

7   inappropriately?

8   A    I felt it was inappropriate.

9   Q    One of the things he did was he went on a tirade, I'll

10  use that word, if you agree, against Dr. Plotkin in

11  particular, correct?

12  A    He did.

13  Q    And in large measure he suggested that Dr. Plotkin was

14  not competent?

15  A    He didn't suggest it, he stated it very adamantly.

16  Q    And shortly thereafter you fired Dr. Plotkin, didn't you?

17  A    It was sometime after that.

18  Q    But you did fire him?

19  A    I did not.  But --

20  Q    Retrophin fired him?

21  A    Yes.  The head of research and development,

22  Dr. Alvin Shih, terminated Mr. Plotkin's employment --

23  Q    And came to the same conclusion --

24  A    -- Dr. Plotkin's employment.

25            THE COURT REPORTER:  I'm sorry.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1   Q    -- about him that Mr. Shkreli took in the Norwood

2   meeting?

3           MS. SMITH:  Objection, Your Honor.

4           THE COURT:  Excuse me, excuse me.

5           Just for the sake of our record, wait until the

6   question is asked and until --

7           MR. BRAFMAN:  Yes.

8           THE COURT:  -- I rule on any objections, if there

9   are.  Just so we don't have people talking at the same time.

10  BY MR. BRAFMAN:

11  Q    Just so the jury understands, I'll do this quickly,

12  Mr. Shkreli accused Dr. Plotkin at the Norwood Board meeting

13  of being incompetent?

14  A    He did.

15  Q    And you told Mr. Shkreli, in words or substance, you

16  didn't think he acted appropriately by doing that, correct?

17  A    I did not object or disagree with Mr. Shkreli's

18  assessment of Dr. Plotkin's performance, I was in no position

19  to do that.  The feedback I gave Mr. Shkreli was that the way

20  in which that feedback was delivered was abusive and

21  unprofessional and inappropriate for a Board meeting.

22  Q    So it was more style over substance, would that be a fair

23  statement?

24  A    You could say it that way if you want to.

25  Q    Well, I'm saying it that way because you've had

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1  substantial concerns about, let's call it Mr. Shkreli's style;

2  isn't that correct?

3  A    I wouldn't refer to it as style, I would refer to it as

4  substance.

5  Q    Well, you called him immature, right?

6  A    I did say that.

7  Q    Is being immature substance?

8  A    I think it is substantive in the conduct of a public

9  company's CEO, yes, sir.

10  Q    You were concerned about his activity on social media; is

11  that correct?

12  A    I thought it was distracting.

13  Q    And do you engage in any form of social media?

14  A    I'm on Facebook.

15  Q    Not on Twitter?

16  A    I have a Twitter account which I don't think I've used

17  for at least four or five years.

18  Q    But Mr. Shkreli was incessant in his use of social media,

19  would that be a fair characterization?

20  A    I think so.

21  Q    He was live streaming his life at certain points; isn't

22  that correct?

23            MS. SMITH:  Objection.

24            THE COURT:  Sustained.

25  Q    Do you know whether he was live streaming his life during

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1 a period when he was also on the Board and CEO and president

2 of Retrophin?

3 A    I have never personally watched Martin Shkreli live

4 stream, I have been told by multiple people that he does.

5 Q    You felt that that was inappropriate for a Board member

6 and suggested not the image that you thought should be

7 portrayed, correct?

8 A    I think as I said it was distracting and relatively

9 immature.

10 Q    And Government Exhibit 122-76 that was put into evidence

11 a little while ago is an email chain between -- you see it up

12 there on the screen?  Can you see it, sir?  Can you see it on

13 your computer?

14 A    Yes, I can.

15 Q    122-76, it is an email chain dated February 27th and the

16 subject line is introduction; is that correct?

17 A    That's correct.

18 Q    And this email chain, in words or substance, relates to

19 you recommending that Mr. Shkreli meet with an individual

20 named --

21 A    Wintermute.

22 Q    Excuse me?

23 A    Vince Wintermute.

24 Q    You thought he would be a good fit for Retrophin,

25 correct?

ASELAGE - CROSS - BRAFMAN

1    A    Yes.  Mr. Shkreli had indicated he wanted to find someone

2    who could head up Retrophin's sales force.

3    Q    This gentleman worked with you at BioMarin; is that

4    correct?

5    A    That's correct.

6    Q    He was fired from BioMarin for noncompliance with company

7    policy, wasn't he?

8    A    No, he wasn't fired for noncompliance with company

9    policies, he was let go and he was let go and one of his

10   subordinates filed a fraudulent expense report.  He was let go

11   despite the fact that he had done nothing wrong other than not

12   caught the fraudulent expense reports.  I thought it was an

13   excessive response and the gentleman deserved another chance.

14   Q    And did you know anything about a sexual harassment claim

15   that was made against him at BioMarin?

16   A    No, I did not.

17            MS. SMITH:  Objection to relevance.

18            THE COURT:  Excuse me?

19   Q    Now were involved in the decision to fire him?

20            THE COURT:  Excuse me.

21            MR. BRAFMAN:  I'm moving on.

22            THE COURT:  Are you -- okay, so we're moving on

23   beyond --

24            MR. BRAFMAN:  He's answered that question.  I'm

25   moving on.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1          THE COURT:  Okay.

2  BY MR. BRAFMAN:

3  Q    Were you involved in the decision to fire him?

4  A    No, I was told to fire him.

5  Q    Who were you told to fire him by?

6          MS. SMITH:  Objection, Your Honor, I'm not sure what

7  the relevance of this is.

8          THE COURT:  This is regarding the firing from

9  Retrophin.

10         MR. BRAFMAN:  No, BioMarin.

11         MS. SMITH:  No.

12         THE COURT:  All right.  I agree it's not relevant.

13         MR. BRAFMAN:  But they brought it up on direct.

14  They put this document into evidence.

15         THE COURT:  They didn't bring up the history.  We

16  can talk at sidebar.

17         MR. BRAFMAN:  Yes, that's the point, Judge.

18         THE COURT:  Let's talk at sidebar --

19         MR. BRAFMAN:  I'll move on.

20         THE COURT:  -- I won't have you yelling at me across

21  the courtroom.

22         MR. BRAFMAN:  I'm sorry, Judge, I'll move on.

23         THE COURT:  Mr. Brafman, come over to sidebar, I

24  don't like being yelled at.

25         (Sidebar conference.)

ASELAGE - CROSS - BRAFMAN

1          (Continued on the next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          THE COURT:  I really don't want to argue with you.

2          MR. BRAFMAN:  I apologize, I apologize, I will not

3    do that again.

4          But they brought up the fact that he was recommended

5    to Retrophin by Mr. Aselage, they did not mention the fact

6    that he fired him in BioMarin.  I think that's relevant.  That

7    if he's going to recommend someone because he knew -- he

8    vouched for him on direct examination as someone I knew at

9    BioMarin and someone I recommended.

10         They put this into evidence.  I think the jury needs

11   to understand that he was also the one who fired him even

12   though he claims he was told to do it.  I think that rounds

13   out the picture and I'll move on.

14         MS. SMITH:  That was my objection.  I understand the

15   question, it's just the multiple questions about who fired him

16   and what were the circumstances -- after doing the

17   circumstances.  He explained them.  I don't know why we needed

18   additional questions about the firing.

19         MR. BRAFMAN:  Because I don't believe he's being

20   honest.  We have a good faith basis to believe that this

21   gentleman was fired because he was involved in a sexual

22   harassment complaint.

23         MS. SMITH:  You asked that question and got an

24   answer.

25         MR. BRAFMAN:  But I didn't press that issue, I

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

3443

SIDEBAR CONFERENCE

1   didn't ask another question about it.

2            MS. SMITH:  Okay.  But then you asked about the

3   additional circumstances, who particularly fired him.

4            MR. BRAFMAN:  Yes, who fired him.  Because if

5   Mr. Aselage is the one who fired him when he's recommending

6   him to Mr. Shkreli, he didn't tell him he had fired him, he's

7   recommending him.  And when my client doesn't confess to

8   everything he's ever done, that's suggesting that he has an

9   omission.  This is something you would want to know if you are

10  considering hiring someone that you just fired the same

11  person.

12           MS. SMITH:  I just wasn't sure how many questions --

13           MR. BRAFMAN:  We're not doing any more questions.

14           MS. SMITH:  Okay.

15           THE COURT:  So Mr. Aselage actually did do the

16  firing?

17           MR. BRAFMAN:  Yes, he answered that.

18           MS. SMITH:  He's already answered that.

19           THE COURT:  I thought he said that it was an

20  excessive penalty to have --

21           MS. SMITH:  He said he was asked to fire him.

22           MR. BRAFMAN:  And he did fire him.

23           THE COURT:  All right.

24           MR. BRAFMAN:  Okay.

25           Thank you, Your Honor, I apologize.

SIDEBAR CONFERENCE

1          THE COURT:  All right.

2          (End of sidebar conference.)

3          (Continued on the next page.)

ASELAGE – CROSS – BRAFMAN

1          MR. BRAFMAN:  May I proceed, Your Honor?

2          THE COURT:  Yes, you may.

3    BY MR. BRAFMAN:

4    Q    I think you told us on direct examination that the

5    beginning, in the spring of 2014, you and other Board members

6    were concerned that what Martin was doing was hurting the

7    company; is that correct?

8    A    We were concerned that there activities that were, yes,

9    inappropriate and potentially harmful.

10   Q    And he had engaged in those activities for quite sometime

11   at that point; is that correct, sir?

12   A    I think you can say that, yes.

13   Q    Then you, in the spring of 2014, made the determination

14   that it could hurt the company; is that correct?

15   A    I think some of us felt before that that some of his

16   activities were harmful.

17   Q    And in the spring of 2014 was when the decision started

18   to percolate that maybe we should tone this guy down, in words

19   or substance, correct?

20   A    It's fine to phrase it that way.  I think the idea is

21   correct.

22   Q    We have a stipulation in evidence in Government

23   Exhibit 606 and Government Exhibit 607 concerning the stock

24   price for Retrophin during different times of the year.  So

25   these are accurate, both sides agree, okay, sir?  I'm just

ASELAGE - CROSS - BRAFMAN

1    going to refer you to one and I have checkmarks on it.

2            This is part of Government Exhibit 605 or 606 and on

3    the column on the left it relates to the date, the column in

4    the middle relates to the share price, and the column on the

5    end relates to the number of shares and forget the checkmarks

6    those are just my notes.  I'm going to ask you to look, sir,

7    at the spring of what we have called the spring of 2014

8    starting with March, which is when spring starts, let's start

9    in the middle of the month going through March and April.

10           You see the share price of Retrophin?

11   A    I do.

12   Q    It's at its highest since its inception, isn't that

13   correct, at least up to that point?

14   A    I'd have to go back and look, but it's certainly at one

15   of its higher points.

16   Q    And today it's at 20, right, approximately?

17   A    It's at 20 with a lot more shares outstanding.

18   Q    Without Martin Shkreli's involvement at all, right?

19   A    Say that again.

20   Q    Today Martin Shkreli has nothing to do with Retrophin?

21   A    He does not.

22   Q    The company stock is at 20 approximately?

23   A    The company stock is at 20 with many more shares

24   outstanding.

25   Q    Okay, but it is still at 20?

ASELAGE - CROSS - BRAFMAN

1   A    It was actually 19 and change the last time I looked.

2   Q    Well, let's look at some of the prices during the period

3   that you claim Martin Shkreli's activities were hurting the

4   company.  In March, the stock price goes from 19.81 a share,

5   on March 10th.  It goes as high as $20.40 on March 25th.

6   March 26, 20.56.  In April it goes back up to 20, and then it

7   starts to drop and then it goes back up.

8           During the period when Martin's activities, in your

9   opinion and the opinion of the people you talked about, the

10  stock was holding its own; isn't that correct?

11  A    It seems to be, yes.

12  Q    Well, when you said that it was hurting the company, that

13  was your assumption, correct?

14  A    Not an assumption, an opinion.

15  Q    An opinion.  And at the end of the day obviously there

16  were other people who didn't share that opinion, at least not

17  with respect to people buying the stock?

18  A    That's correct.  The stock price doesn't always reflect

19  the underlying situation of the company.  It reflects what

20  people see and that's what's visible to the outside.

21  Q    Well, one of the problems that you said Mr. Shkreli was

22  causing was what people were seeing on social media, correct?

23  A    As I said previously, there were different opinions on

24  the Board.  I thought it was distracting.  I did not think it

25  was a critical issue personally.  Other Board members did.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1   Q    I think you testified to the nature of certain

2   friendships or relationships that Mr. Shkreli had with people

3   who were part of the group.  You said Mr. Shkreli had certain

4   close relationships, correct?

5   A    He seemed to have closer relationships with the business

6   development team with any of the other departments.

7   Q    But the closest relationship he had was with your only

8   other Board member for a period of time, Steve Richardson;

9   isn't that correct?

10          MS. SMITH:  Objection to what he knows about --

11          THE COURT:  Sustained.

12  BY MR. BRAFMAN:

13  Q    Did he have a very close relationship in your opinion

14  with Mr. Richardson during this entire period?

15  A    My impression was that he had a very professional

16  relationship with Mr. Richardson during that period.

17  Q    Did you ever discuss with Mr. Richardson whether he and

18  Mr. Shkreli also had a personal relationships?

19          MS. SMITH:  Objection, Your Honor.

20          THE COURT:  Overruled.

21  A    No, I did not.

22  Q    Did you ever see any of the email traffic between

23  Mr. Richardson and Mr. Shkreli that's been the subject of part

24  of this trial?

25          MS. SMITH:  Objection, Your Honor.

ASELAGE – CROSS – BRAFMAN

1    Q    Did he ever see it?

2              THE COURT:  Sustained to form.  You'll have to

3    rephrase.

4    BY MR. BRAFMAN:

5    Q    Since you took over, has any information come to your

6    attention about the relationship between Mr. Richardson and

7    Mr. Shkreli that would suggest to you that they also shared a

8    personal relationship?

9    A    We got a report from the independent commission that

10   indicated that there may have been a personal relationship as

11   well, yes.

12   Q    And during the period when you and Mr. Richardson and

13   Mr. Shkreli were the only three people on the Board, it was

14   generally Mr. Richardson who was one of the people who

15   Mr. Shkreli needed to get approval from for certain actions,

16   correct?

17   A    That's correct.

18   Q    And did you ever talk to Mr. Shkreli offline on certain

19   business matters being meaning not at a formal Board member,

20   just you and him?

21   A    I did, yes.

22   Q    Do you know if he had similar conversations with

23   Mr. Richardson offline not in a formal Board member?

24   A    I can't say for sure but I would assume he did.

25   Q    You don't know whether in those offline conversations

3450

ASELAGE - CROSS - BRAFMAN

1   between just him and Mr. Richardson, Mr. Richardson authorized

2   him to do all of the things that he was doing, do you?

3            MS. SMITH:  Objection, Your Honor.

4            THE COURT:  Sustain.

5   Q    Do you know what, if any, authorization Mr. Richardson

6   may have personally given Mr. Shkreli during the period in

7   question?  Just if you know.  Yes or no?

8            MS. SMITH:  Objection, Your Honor, I don't

9   understand what personal authorization.

10           THE COURT:  Sustained.

11  BY MR. BRAFMAN:

12  Q    If Mr. Mr. Shkreli needed Board authorization he could

13  either come to the Board, correct?

14  A    Correct.

15  Q    Or if it wasn't something that required Board approval,

16  he could discuss it with a Board member if he wanted to,

17  correct?

18           MS. SMITH:  Objection, Your Honor.

19           THE COURT:  I would like, Mr. Brafman, if you can

20  please to try to focus your questions more specifically rather

21  than generally.

22  BY MR. BRAFMAN:

23  Q    Do you know whether Mr. Shkreli ever discussed with

24  Mr. Richardson the subject of consulting agreements?

25  A    I do not.

ASELAGE - CROSS - BRAFMAN

1   Q    Do you know whether he ever discussed with Mr. Richardson

2   the subject of settlement agreements?

3   A    I do not.

4   Q    And during the period, was Mr. Richardson chairman of the

5   Board?

6   A    He was.

7   Q    And you and Mr. Shkreli were Board members, correct?

8   A    Correct.

9   Q    Now as chairman of the Board, did he have authorization

10  that you didn't have?

11  A    No, not that aware of.

12  Q    So why was he chairman?

13  A    Most boards have a chairman.  You need a leader and --

14  Q    He was --

15  A    -- he was the leader.

16  Q    You left BioMarin in 2012, correct?

17  A    I did.

18  Q    And did you leave or were you asked to leave?

19  A    I gave BioMarin notification that I was resigning.

20  Q    And did you have any interaction with boss of -- the head

21  of BioMarin that caused you to put in your resignation?

22  A    No.  Mr. Bienaime and I had a reasonable, cordial

23  professional relationship.

24  Q    And you left after many years and at the time you left

25  you were making in excess of $5 million a year?

ASELAGE - CROSS - BRAFMAN

1    A    No, I was not making that a year.

2    Q    That was the financial package that you had at the end?

3    A    I testified previously that my 2012 taxable income from

4    BioMarin was just over $6 million.  That's the result of after

5    seven years of stock options and stock grants, most of those

6    were vested and, you know, I exercised those options, sold the

7    stock and created an abnormally high tax year, and abnormally

8    high income year because it was a departure year.

9    Q    Okay.  Now you then leave BioMarin, which is a

10   substantial company, correct?

11   A    Correct.

12   Q    And I think you told us that your work in BioMarin

13   involved running operations to some extent in 45 different

14   countries?

15   A    We had a commercial operations working in 45 countries,

16   yes.

17   Q    You traveled extensively, correct?

18   A    Extensively.

19   Q    Would it be a fair statement that during that period you

20   met a lot of talented people?

21   A    Yes, I've worked with a tremendous number of talented

22   people.

23   Q    And a tremendous number of bright, smart people?

24   A    Yes, indeed.

25   Q    And some with great scientific minds because you are in

ASELAGE - CROSS - BRAFMAN

1   the science industry, aren't you?

2   A    I am.

3   Q    And I'm correct you met some very bright scientists?

4   A    No argument, sir.

5   Q    Now, you told us that at some point I think you

6   referenced Mr. Shkreli as being a pied piper?

7   A    I did make that reference, yes.

8   Q    What does mean, if you can explain, that people followed

9   him?

10  A    Yes.  You know, I said it in the context that he could be

11  incredibly persuasive and really energizing.  People got on

12  Board.  He shared a vision and people bought in and wanted to

13  follow him wherever he was going to go.

14  Q    You didn't mean that in the negative connotation,

15  correct?

16  A    No, I did not.  And I've been told subsequently some

17  people took it that way.  It was not intended as a derogatory

18  comment.

19  Q    I wanted to clear that up.  Because one of the people who

20  followed Mr. Shkreli was you?

21  A    That's true, he hired me.  That's correct.

22  Q    But he hired you where you had no idea who he was when he

23  called you, correct?

24  A    Never heard of him.

25  Q    Cold called out of the blue?

ASELAGE - CROSS - BRAFMAN

1    A    Correct.

2    Q    You never heard of him and you never read anything about

3    him before that call, correct?

4    A    That is correct.

5    Q    He introduces himself, he says, I'm Martin Shkreli and he

6    told you about this company that was his idea and this vision

7    that he had I think you testified, correct?

8    A    That is correct.

9    Q    And you were intrigued?

10   A    I was.

11   Q    And you had 35 years of experience in the pharmaceutical

12   industry by then so you had something upon which to base your

13   assessment, correct?

14   A    I had some experience.

15   Q    Now two weeks later there's a follow-up call,

16   thereabouts, correct?

17   A    I'm not sure of the exact time frame, somewhat later.

18   Q    I'm not pinning you down to time frame.  Shortly

19   thereafter there's another call?

20   A    Yes.

21   Q    You tell him you're interested, he tells you he's

22   interested, and you agree to meet?

23   A    Correct.

24   Q    And you meet in San Diego?

25   A    We met in Sans Francisco.

ASELAGE – CROSS – BRAFMAN

1  Q    San Francisco.  Mr. Shkreli comes out to meet with you?

2  A    Correct.

3  Q    And the person who you met with is the person you

4  identified as Martin Shkreli, who's pulling on his hair now,

5  correct, do you see that.  That's Shkreli, right?

6            MS. SMITH:  Objection, Your Honor.

7  Q    The same man you met in San Francisco?

8  A    That's him, yes.

9  Q    At that meeting he comes into your office or where was

10 this meeting held?

11 A    We met at the Westin St. Francis Hotel.

12 Q    In some restaurant or lobby?

13 A    Yes, it was a bar/restaurant.

14 Q    You sat at a table with him for how long, an hour?

15 A    It was probably an hour maybe a little longer.

16 Q    He told you about this company, idea, correct?

17 A    Yes.

18 Q    And Retrophin was not yet a public company, correct?

19 A    Correct.

20 Q    But it was a private company?

21 A    Correct.

22 Q    Founded by Martin Shkreli?

23 A    Correct.

24 Q    He told you about the product ideas that he was

25 developing?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1    A    He did.

2    Q    Did he tell you about his vision for Retrophin?

3    A    He did.

4    Q    And on that day you decided to become the CEO of

5    Retrophin?

6    A    No.  On that day I committed to giving it some serious

7    thought, he committed to giving some serious thought as to

8    whether or not he thought I was the right person and then we

9    both did and then followed up probably a week later.  And I

10   let him know I was interested and he subsequently offered me

11   the position.

12   Q    Now, before you made that decision, there was really no

13   due diligence that you could do because Retrophin was a very

14   private company, correct?

15   A    There wasn't much information other than what I got from

16   him.

17   Q    And based on what you got from him, a man with your

18   background, agreed to become the CEO of this company that

19   Martin Shkreli had developed?

20   A    That's correct.

21   Q    And he agreed to pay you $500,000; is that correct?

22   A    That's correct.

23   Q    And he told you at your meeting in San Francisco that he

24   had an encounter with a sick child that he decided at that

25   point to use his --

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1          MR. BRAFMAN:  Can you sit down until I finish the

2    question, please.

3          THE COURT:  Well, she wants to make sure she's

4    noticed.

5          MS. SMITH:  I'm worried that it's compounds.  Where

6    it's going.

7          MR. BRAFMAN:  I'm going back to the conversation he

8    personally had with Mr. Shkreli.

9          THE COURT:  All right.

10   Q    In that conversation in San Francisco before you

11   committed to working for him, he told you about an emotional

12   encounter he had with a sick child; is that correct?

13   A    He told me about an emotional encounter he had with a

14   sick child, to be honest I don't recall if it was in the San

15   Francisco conversation or in a different one --

16   Q    Okay.

17   A    -- but he did have a conversation similar to that.

18   Q    And in words or substance he told you that as a result of

19   that encounter he wanted to no longer do hedge fund work or

20   stock work, he wanted to devote his life to developing drugs?

21   A    He said that, yes.

22   Q    And in fact, one of the things that you saw in

23   Mr. Shkreli was, what you I think have described as a

24   brilliant, scientific mind?

25   A    He has a brilliant, scientific mind in my opinion.

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1    Q    Now there comes a time when you went to the Retrophin

2    offices; is that correct?

3    A    That is correct.

4    Q    And when you went to the Retrophin offices they were

5    fairly modest; is that correct?

6    A    That's correct.

7    Q    And you also learned that they were sharing offices with

8    MSMB Capital, correct?

9    A    That's correct.

10   Q    They were also sharing some employees; is that correct?

11   A    It wasn't clear the exact sharing part but it was my

12   understanding that employees of MSMB, as MSMB was being closed

13   down or transferring, to become employees of Retrophin.

14   Q    And you knew, did you not, early on as soon as you came

15   on Board that there was some degree of commingling of monies

16   between MSMB and Retrophin?

17   A    I'm not sure I could say as soon as I came on Board, but

18   once I spent sometime in New York that was my understanding.

19   Q    It wasn't a secret?  You learned about it, right?

20   A    I learned about it.

21   Q    And you learned that they were splitting rent; is that

22   correct?

23   A    I was told that rent was to be shared and that MSMB would

24   pay their appropriate portion.

25   Q    Now Martin Shkreli told you that he was the head of MSMB,

ASELAGE - CROSS - BRAFMAN

1    didn't he?

2    A    He said he had closed that fund down.

3    Q    But before it had been closed down, he was the head of

4    it?

5    A    Yes, that's correct.

6    Q    He was also the head of Retrophin?

7    A    That is correct.

8    Q    And you knew that there was a certain period of time when

9    there was an overlap, correct?

10   A    I knew there was a transition period, yes, sir.

11   Q    And nothing about that caused you to back away from your

12   decision to join Retrophin, correct?

13   A    That is correct.

14   Q    Now, at some point you told us on direct examination when

15   you saw some of the names on the list of people who

16   Mr. Shkreli told you had invested in Retrophin, you recognized

17   some of those names, correct?

18   A    There were some very big recognizable names on that list.

19   Q    Brent Saunders, correct?

20   A    Correct.

21   Q    You knew him to be a very well known person in the

22   pharmaceutical industry, correct?

23   A    That is correct.

24   Q    Tied, if you will, to the waist of Fred Hassan?

25        MS. SMITH:  Objection, Your Honor.

3460

ASELAGE – CROSS – BRAFMAN

1    THE COURT:  Sustained.

2    Q    I'm sorry, a colleague of Mr. Hassan at a number of

3    different pharmaceutical companies?

4    A    Actually I wasn't familiar with the Brent Saunders/Fred

5    Hassan relationship.  I felt Brent Saunders was a big name on

6    his own.

7    Q    And Fred Hassan was a very big name on his own?

8    A    Very much so.

9    Q    A household name in the pharmaceutical industry to your

10   knowledge?

11   A    I think so.

12   Q    Now, did you question Mr. Shkreli about how he came to

13   know Fred Hassan?

14   A    No, I didn't.

15   Q    Did you ever question Fred Hassan whether or not he knew

16   Mr. Shkreli?

17   A    I've never met or talked to Fred Hassan.

18   Q    Now did you ever talk to Brent Saunders about how

19   Mr. Saunders came to know Mr. Shkreli?

20   A    I have never met or talked to Brent Saunders.

21   Q    Now there comes a time when you learn that there is no

22   directors and officers insurance; is that correct?

23   A    That's correct.

24   Q    And so the jury understands, when you are an officer or

25   director of a company, the company has an insurance policy

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1   that could protect an officer or director if someone claims

2   they did something wrong in connection with their official

3   work.  Would that be a fair statement?

4   A    No, sir, I don't think so.

5   Q    What do you understand a D&O policy to be?

6   A    A D&O policies protect individual employees or directors

7   of the company from liabilities that the company would incur

8   with or without any involvement of that particular individual.

9   Q    And it's an umbrella that you look to have when you

10  become an officer or director of a company, correct?

11  A    Yes, every company has that.

12  Q    And what you learned was that Retrophin had it but the

13  bill had just not yet been paid, correct?

14  A    No, sir, what I learned was that I was sent a policy and

15  that the policy had never been put into place.

16  Q    Because it had not been paid for?

17  A    Yes, sir, it most certainly had not been paid for.

18  Q    Then you spoke to Mr. Shkreli and ultimately Evan Greebel

19  assured you that you would have coverage and the policy was

20  paid for, correct?

21  A    Yes.

22  Q    The fact they didn't have at policy was the final straw,

23  if you will, that suggested you did not want to work at this

24  company, correct?

25  A    I felt like there was a lack of transparency and lack of

ASELAGE - CROSS - BRAFMAN

1   trust that had developed by that point beyond just the D&O

2   insurance, though it was very clear to me by December of 2012

3   that I was not hired as CEO to actually run the company, I was

4   hired as CEO to be an experienced pharmaceutical face to be,

5   you know, someone for outsiders to look in and see at the

6   company while Martin actually made the decisions.

7   Q    And that didn't sit well with you?

8   A    I don't think anyone -- I shouldn't say that.  I was not

9   comfortable certainly with being in a position where people

10  assumed I was making decisions and actually I had no part of.

11  Q    You stepped down, correct?

12  A    I did.

13  Q    And while you weren't paid immediately for the three

14  months that you had worked there, you did ultimately get the

15  $80,000 in salary that you were promised, correct?

16  A    That is correct.

17  Q    And although you stepped down, you spoke to Mr. Shkreli

18  and you agreed to stay on the Board?

19  A    That's correct.

20  Q    You understand the fiduciary obligation of someone who is

21  member of the Board of directors of a company?

22  A    I think so.

23  Q    And it's a serious obligation?

24  A    It is.

25  Q    And you have a fiduciary obligation to the company?

ASELAGE - CROSS - BRAFMAN

1    A    You do.

2    Q    And you have a fiduciary obligation to the company as a

3    member of the Board of directors whether it's a private

4    company or a public company, correct?

5    A    That is correct.  Although fiduciary responsibility in a

6    public company I think is certainly more rigorous than a

7    private company.

8    Q    Fair enough.  But it certainly is still an obligation

9    that you take seriously when you're a member of the Board of

10   directors of a private company as well, correct?

11   A    I would agree with that.

12   Q    And you agreed to step back on to the Board and remain on

13   the Board even though there were things that you saw in the

14   three-month period that you were not pleased with, correct?

15   A    That is correct.

16   Q    And Mr. Shkreli remained the CEO?

17   A    He became the CEO when I stepped down, yes.

18   Q    Then as the CEO he was essentially running the company on

19   a day-to-day basis, correct?

20   A    Correct.

21   Q    And the Board had the responsibility of supervising the

22   company, in words or substance, correct?

23   A    Correct.

24   Q    Now, you are now the CEO and president of the company?

25   A    No, sir, we have no president, I'm simply the CEO.

ASELAGE - CROSS - BRAFMAN

1    Q    I'm sorry.  CEO.  But there's nobody above you in the

2    company, correct?

3    A    Just the Board.

4    Q    But under the Board you're the boss of operations and the

5    CEO?

6    A    That's correct.

7    Q    And did you tell the government that staying on the Board

8    of Retrophin was the worst decision you made in 40 years?

9    A    I might have said that.  There certainly have been times

10   over the past few years that I've regretted any involvement

11   with the company.

12   Q    But now you're pretty happy there, right?

13   A    I'm really proud of the transition that the company has

14   made.

15   Q    When you became CEO of the company, the company issued a

16   press release; is that correct?

17   A    I believe so.

18   Q    I'm going to show you what's marked for Defense Exhibit

19   6017.  I'll just put it on the Board for identification only

20   at this time.  6017.

21        Are you able to see it, sir?

22   A    I can, yes.

23   Q    And you recognize this as the press release issued by

24   Retrophin appointing you as chief executive officer?

25   A    Frankly, I don't recall what that press release looked

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1   like.  If you tell me it's the press release I believe you.

2   Q    It's dated November 10th, 2014, the upper left-hand

3   corner?

4   A    Yes.

5   Q    Now when Retrophin announced your any appointment, they

6   said they were going to continue to work with the company's

7   proven products; is that correct?

8   A    That's true.

9   Q    And at the time one of the biggest products you had was

10  Thiola, correct?  T-H-I-O-L-A.

11  A    That's correct.

12  Q    That's a treatment if you will, for among other things,

13  kidney stones?

14  A    It's a treatment for cystinuria.

15  Q    Which to a layperson involves the treatment of kidney

16  stones?

17  A    Cystinuria, if untreated, can cause production of kidney

18  stones, that's correct.

19  Q    Today Thiola accounts for most of the revenue that

20  Retrophin makes in a year; isn't it true?

21  A    Thiola is our largest single product.

22  Q    That is a product that Martin Shkreli found, developed

23  and it was his, right?

24  A    I'm not sure he developed it.  He --

25  Q    He found it?

ASELAGE - CROSS - BRAFMAN

1    A    Courtney Bond is given credit from our business

2    development group.  Courtney certainly worked for Martin and

3    with Martin on that acquisition, that's correct.

4    Q    And Martin is the one who, at the time, was the CEO when

5    Thiola was brought into the company, correct?

6    A    That is correct.

7    Q    And since then, in all of the years -- in the year since

8    he's gone, there is no other moneymaker for Retrophin that's

9    better than Thiola as we speak, correct?

10   A    Well, not really.  I mean, the single biggest financial

11   change for this company was the acquisition of Cholbam in

12   March of 2015.  With the acquisition of Cholbam we got a third

13   revenue producing product.  We also got access to a priority

14   review voucher which we then sold to Sanofi for

15   $245 million --

16   Q    Right, but in terms of --

17   A    -- that 245 million-dollar infusion is what helped us

18   turn this company around.

19   Q    What about Chenodal, C-H-E-N-O-D-A-L.  Is that a product?

20   A    Chenodal is a product, yes, sir.

21   Q    Was that founded during Martin Shkreli's tenure?

22   A    It was.

23   Q    How about Vecamyl, V-E-C-A-M-Y-L?

24   A    That came with Chenodal.

25   Q    So those three products, Chenodal, Thiola, Vecamyl were

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1   there when Martin Shkreli was running the company?

2   A    That is correct.

3   Q    And the company's pipeline included at the time FSGS,

4   I'll just use the term for it, correct?

5   A    FSGS is a disease.  The product I think you're trying to

6   refer to is Sparsentan.  Sparsentan is a drug that is in

7   clinical trials now to treat FSGS.

8   Q    And PKAN?

9   A    PKAN again is a disease.  We have a product, RE-024,

10  which is used to treat PKAN.  PKAN is an acronym for

11  pantothenate kinase neurodegenerative disease.

12  Q    That is -- RE-024 was brought there when Mr. Shkreli was

13  in charge of Retrophin, correct?

14  A    RE-024 correctly was developed when Mr. Shkreli was CEO.

15  Q    Now, when Mr. Shkreli left, he threatened a lawsuit

16  against Retrophin, correct?

17  A    Yes.

18  Q    And he filed one?

19  A    He did.

20  Q    That's pending?

21  A    It is.

22  Q    And did he threaten to open up another company right away

23  that would compete with Retrophin?

24  A    He didn't threaten, he promised.

25  Q    And he did?

ASELAGE - CROSS - BRAFMAN

1    A    He did.

2    Q    He promised and he did, he built another company?

3    A    He did.

4    Q    And it's Turing Pharmaceuticals?

5    A    It is.

6    Q    And Turing Pharmaceuticals is currently developing a

7    generic equivalent, if you know, to Thiola; isn't that true?

8    A    I have no idea.

9    Q    You have no idea?

10   A    Correct.

11   Q    If a company has a money making medicine like Thiola and

12   a competitor produces a generic equivalent that could be made

13   for much less, can that impact on the revenue of Retrophin?

14   A    Sure.

15   Q    Okay, and it could cause substantial harm to Retrophin?

16   A    Sure.

17          MR. BRAFMAN:  Can I have just a minute, Your Honor.

18          THE COURT:  Yes.

19   BY MR. BRAFMAN:

20   Q    You indicated -- we'll go to them specifically -- that

21   there came a time when you decided to leave for a number of

22   reasons, correct?

23   A    Are you talking about leaving the CEO position at

24   Retrophin?

25   Q    Yes, sir.

ASELAGE - CROSS - BRAFMAN

1    A    Yes.

2    Q    And I think did you tell the government that one of the

3    red flags -- did you call these things red flags at any time?

4    A    I don't recall, I may have.

5    Q    Let's do this so I don't have to spend too much time.

6    I'm going to hand you something which I just ask you to keep

7    up by your side and if we need to use it to try and refresh

8    your recollection I'll ask you to look at it and read certain

9    portions to yourself.  Okay?

10   A    Okay.

11   Q    I'm handing the witness 35-SA-1.

12   A    Thank you.

13   Q    You're welcome.

14        Did you tell the government, when you met with them

15   on October 14th, 2015, that you noticed red flags while at

16   Retrophin, sir?  Do you remember saying that?

17   A    I don't remember using that term but I certainly told

18   them that I saw things that were of concern to me.  I may have

19   used the term red flags.

20   Q    Look at page 5 of the document I gave you, sir.  The page

21   numbers are on the top right-hand corner.  It will say five of

22   eight.

23   A    Got it, thank you.

24   Q    And look at the first large paragraph, read it to

25   yourself and tell me if you recall if that refreshes your

ASELAGE – CROSS – BRAFMAN

1    recollection that you told the government that you noticed red

2    flags at Retrophin?

3    A    It does not refresh my recollection.  It says I noticed

4    red flags --

5              THE COURT:  Sir --

6    BY MR. BRAFMAN:

7    Q    No, don't read from the document.

8              Does it refresh your recollection, you don't

9    remember using those words?

10   A    I don't remember those specific terms, no, but I would

11   not argue with them.  I certainly said, you know, I saw things

12   that concerned me.  I may have well used the term red flag.

13   Q    Did you give them an example of a red flag as being a

14   party that Martin threw for Retrophin in which a rapper

15   appeared?  A rapper meaning a music rapper.

16   A    Yes, sir, I know what a rapper is.  I'm old but I know

17   what a rapper is.

18              (Continued on the next page.)

19

20

21

22

23

24

25

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE – CROSS – BRAFMAN

1  BY MR. BRAFMAN:

2  Q    Did you tell them that a red flag was a party that Martin

3  ran where there was a rapper?

4

5  A    I don't recall that being a red flag for me, sir.

6  Q    If it was said, you don't recall it.

7  A    That's correct.

8  Q    If you look at that same paragraph and ask I'll you if it

9  refreshes your recollection that you said, "The red flags

10  while at Retrophin, the party were being thrown at which a

11  rapper was hired."

12  A    I don't recall that.

13  Q    Do you recall a party at which a rapper was hired?

14  A    I recall Retrophin getting tickets and having a number of

15  employees sent to Madison Square Garden where a rapper was

16  performing.

17  Q    You thought that was a red flag in how Retrophin was

18  conducting its business?

19  A    I don't recall ever saying that, no.

20  Q    But would that be a red flag for you?

21  A    It would seem inappropriate.  Pharmaceutical companies

22  historically send employees to concerts.  A rap concert is not

23  a destination that most people would consider appropriate.

24  Q    Why not?

25  A    There tends to be language content that generally you try

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1   to protect employees from.

2   Q     One of the people who went to that concert was your

3   daughter.

4   A     That's correct.

5   Q     She was employed at Retrophin, Martin hired her; isn't

6   that correct?

7   A     That's correct.

8   Q     Did you find out, did you say to her, 'Elizabeth, this is

9   inappropriate'?

10  A     My daughter was 24 at the time --

11  Q     How old was Martin?

12  A     Can I finish?  If my daughter would like to get into a

13  rap concert, that's within her purview.

14  Q     Wasn't it within Mr. Shkreli's purview to go to a rap

15  concert?

16  A     Sir, you seem to be wanting me to argue about a rap

17  concert.  A rap concert is not on my list of things that were

18  concerns.

19  Q     It was not on your list of things that were your

20  concerns?

21  A     Yes, sir, that's correct.

22  Q     But if you said that to the Government you have no

23  recollection, correct?

24  A     That's correct.

25  Q     Were one of these FBI agents sitting there and one of

ASELAGE - CROSS - BRAFMAN

1   these lawyers sitting there when you were interviewed?

2   A    I don't recall which interview this was, but I recognize

3   the agents.

4   Q    Were people there taking notes when you spoke?

5   A    They were.

6   Q    Did you tell the Government that you also confronted

7   Martin Shkreli about red flags and his response to you was he

8   would cut back on the dosage of his medicine?

9   A    Those are unrelated conversations.

10  Q    Did you have a conversation with Mr. Shkreli about things

11  he wasn't doing properly?

12  A    There were periodic times where I made suggestions to

13  Mr. Shkreli on how he could change his behavior.

14  Q    Change his behavior?

15  A    Yes.

16  Q    Okay.

17  A    Would you like an example?

18  Q    I'm going to talk to you about that.  In the conversation

19  where you wanted to change his behavior, did Mr. Shkreli offer

20  to cut back on his medication?

21  A    No.

22  Q    Never said that to you?

23  A    He never offered to cut back on his medication.

24  Q    Did you ever tell the Government that, when confronted

25  with red flags, Shkreli stated to me that he would cut back on

ASELAGE - CROSS - BRAFMAN

1  his medication and that would do it?

2  A    The only conversation I ever had with Martin Shkreli

3  about his medications was in the summer of 2014.

4  Q    In California?

5  A    He had come to San Diego, ostensibly to spend two or

6  three weeks in the office.  He spent most of the time holed up

7  in the Grand Del Mar Hotel.  I went over to see him, several

8  times.  Several times he said he could not come down to meet

9  with me.  The one time he does come down to meet with me, we

10  met for coffee.  I said, "Hi Martin, how are you doing?"  His

11  response was, "They've cut my medications in half.  I think

12  I'm going to be okay."

13        That is the only conversation I ever had with him

14  about medications.

15  Q    Was Mr. Shkreli during that several-week period in

16  California he essentially stayed in his hotel room virtually

17  all the time?

18  A    I don't know what he did all the time.  I know he came

19  into the office several days; but for most of the days he was

20  in California he was not in the office.

21  Q    He stayed in his room?

22  A    He said he spent most of his time there.

23  Q    When he talked to you about his medication, did you ask

24  him what his medication was for?

25  A    That is none of my business.  I did not ask.

ASELAGE - CROSS - BRAFMAN

1    Q    This person is running the company that you're a part of

2    and you have no interest in understanding why he stays in his

3    hotel room and takes medication?

4    A    I didn't say I had no interest, I said I did not press

5    him on what his medications were.

6    Q    It didn't concern you that there was something possibly

7    wrong with him?

8    A    Sure.

9    Q    You never followed up on it, correct?

10   A    I did not follow up on his medications.  The fact that he

11   told me that his dosages were being modified would convey to

12   me that he was under professional care.  I'm not a doctor.  He

13   must have had a physician carrying for him or his dosages

14   would not be modified.

15   Q    Let's agree that that's a fair analysis.  But let me ask

16   is you, there wasn't anything physically wrong with Martin, he

17   didn't have fever or ailment that you could see; isn't that

18   correct?

19            MS. SMITH:  Objection.

20            THE COURT:  Sustained.

21   Q    Did you notice whether there was anything physically

22   wrong with Martin.

23   A    I did not notice.

24   Q    So did you conclude from that that this issue that he was

25   taking medication for was some type of emotional issue?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE – CROSS – BRAFMAN

1    A    I didn't conclude what type of an issue it was.

2    Q    This was during what month?

3    A    It would have been June or July.

4    Q    Of 2014?

5    A    Yes.

6    Q    Shortly before you and the Board talked about maybe

7    terminating this man?

8    A    No.  We actually talked about whether or not he should be

9    terminated either April or May and made a final decision not

10   to terminate him but rather to try to move him into a

11   different position in September.

12   Q    Did you feel an obligation to inform other members of the

13   Board about what you had observed in your interaction with

14   Mr. Shkreli?

15   A    I don't recall if I discussed it with other members or

16   not.

17   Q    You didn't feel a fiducial obligation to the Board to let

18   them know that the key employee, if you will, was under some

19   type of medication because he was staying in his room?

20   A    The medication and the room may or may not have been

21   connected.  I guess the short answer is no, I didn't feel an

22   obligation to talk about his medications situation.

23   Q    So the attendance at a rap concert concerned you more

24   than the fact that he stayed in a room for which he needed to

25   take medication?

ASELAGE - CROSS - BRAFMAN

1   A    Again, his rap concert issue was not a major issue in my

2   mind.

3   Q    When you met him in the hotel during this visit to

4   California, isn't it true that you also met an individual

5   named Al Geller who was with Mr. Shkreli at one point?

6   A    That is not true.

7   Q    You have no recollection of meeting Mr. Geller?

8   A    I never met a Mr. Geller.

9   Q    Now, did you tell the Government that you felt that Evan

10  Greebel was behind Mr. Shkreli and backed him up on all major

11  issues?

12  A    I believe that it would not surprise me if I told the

13  Government that.

14  Q    Did you also tell the Government the fact that Greebel

15  who was a lawyer from a well-respected firm was supporting

16  Martin, that gave you some level of comfort at the beginning?

17  A    Can you ask me that question again?

18  Q    Yes.  I think -- tell me if I'm wrong -- I think we've

19  agreed that you wouldn't deny maybe telling the Government

20  that Greebel and Mr. Shkreli were close, and that Greebel

21  seemed to support Mr. Shkreli on major issues, correct?

22  A    That is correct.

23  Q    In fact, you testified to something like that today about

24  the two of them being very close?

25  A    I did.

ASELAGE - CROSS - BRAFMAN

1   Q    Did you tell the Government that when while you knew that

2   Greebel backed up Shkreli, it meant a lot to you because he

3   was an independent counsel from an outside firm that you knew

4   at the time, correct?

5   A    That is correct.

6   Q    The outside firm was Katten Muchin?

7   A    Correct.

8   Q    You knew at that time that was a fairly, well-respected

9   law firm in New York City?

10  A    I didn't know personally of them.  I was told they had a

11  good reputation.

12  Q    Okay.  And now did there come a time when you discussed

13  with Mr. Shkreli the fact that he was going to have to step

14  down, I think we've agreed on that, correct?

15  A    Yes.

16  Q    I think what you said in words or substance, is that you

17  were offering him to stay on as COO, correct?

18  A    No, sir.  We did not offer him a Chief Operating Officer

19  position.  We told him we could be flexible and work with him

20  to create a position that was in charge of strategy or

21  business development, something that would play to his

22  strengths.

23  Q    And strategy would play to his strengths, you thought?

24  A    We thought so.

25  Q    This was after your encounter with Mr. Shkreli and the

ASELAGE - CROSS - BRAFMAN

1  issue in California?

2  A     Yes, it was.

3  Q     You were going to have someone, in his condition that you

4  observed, be the person in charge of Retrophin's business

5  strategy?

6            MS. SMITH:  Objection, your Honor.

7            THE COURT:  Sustained.

8  Q     Were you telling people in your business world about the

9  efforts to disentangle yourself from Retrophin early on after

10  you took the job from as CEO?

11  A     I had conversations with people that were friends, not

12  necessarily people that were in my business world.

13  Q     All right.  Who is David Oram?

14  A     David Oram is my old college roommate.

15  Q     Did you continue a friendship up to today?

16  A     We are still good friends.

17  Q     In or about December 19, you had just stepped down as

18  CEO, correct?

19  A     That would be the right timing.

20  Q     Did you tell Mr. Oram in words or substance that you

21  resigned to keep from having a headache?

22  A     I don't recall those exact words, but it sounds right.

23  Q     Did you tell him that you feel fortunate to have gotten

24  out when you did?

25  A     Probably.

ASELAGE - CROSS - BRAFMAN

1    Q    All though you told Mr. Oram that you got out, you stayed

2    on the Board, correct?

3    A    That's correct.

4    Q    And staying on the Board, made you in some respects

5    responsible for things that at Retrophin.

6    A    In some respects.

7    Q    You were willing to do that, even though you were telling

8    your friends that you were fortunate to get out when you did,

9    correct.

10   A    I thought I was fortunate to get out the COO role.

11   Q    There comes a time when you are -- on direct examination,

12   referring to 122-64 in evidence as a Government's Exhibit.

13   This document marked 122-64 is an e-mail from Marc Panoff to

14   Mr. Shkreli, Paley and you, Steve Aselage, and Richardson.  Do

15   you see it?

16   A    I see it.

17   Q    The subject is Board agenda, do you see it?

18   A    I do.

19   Q    And Ms. Smith focused your attention on a specific

20   schedule that was MSMB 0011968, which I'm going to put up in a

21   moment.  Do you remember going through this paragraph with

22   Ms. Smith a little while ago on direct examination?

23   A    I do.

24   Q    She read it to the jury and you; is that correct?

25   A    That's correct.

ASELAGE - CROSS - BRAFMAN

1    Q    The one that references Martin Shkreli?

2    A    That's correct.

3    Q    This was designed for people who were in positions of

4    responsibility to put out their credentials?

5    A    Correct.

6    Q    I'm going to read it again then ask you questions.

7              "Martin Shkreli has served as Chief Executive

8    Officer and Director of the company since December 17, 2012."

9    That as far as you know is true, correct?

10   A    Correct.

11   Q    "Previously Mr. Shkreli was the founder of Retrophin LLC,

12   the predecessor of our predecessor Retrophin Inc. and served

13   as president of our predecessor since its formation."  That

14   was true as well, correct?

15   A    Yes.

16   Q    "Mr. Shkreli is also a founder and managing partner of

17   MSMB Capital Management in New York, a hedge fund firm founded

18   in 2016 that manages a variety of partnerships."  Do you see

19   that?

20   A    I do.

21   Q    So right here I'm going to stop there for a minute.

22   Everyone was being informed about Mr. Shkreli's relationship

23   to MSMB, correct?

24   A    That's what it says.

25   Q    It was not kept a secret from the Retrophin Board,

ASELAGE - CROSS - BRAFMAN

1   correct?

2   A    I would say -- I can't speak for the rest of the Board --

3   I would say it was there to see; I did not notice it.

4   Q    You did not notice this?

5   A    That's what I said.

6   Q    What is the purpose of preparing these documents for the

7   Board if someone with your background would not even look at

8   it?

9   A    I didn't say I didn't look at them; I didn't of notice

10  the MSMB mention.

11  Q    Did you read the part about Mr. Shkreli?

12  A    I don't recall if I read the part about Mr. Shkreli or

13  not.

14  Q    Let met see if MSMB comes up again.  "Prior to MSMB

15  Mr. Shkreli was employed at Intrepid Capital Management from

16  2004 to 2006.  And previously at Cramer Berkowitz and Company,

17  both of which are hedge fund firms based in New York.

18  Mr. Shkreli is an experienced biotechnology and pharmaceutical

19  industry investor, particularly in the business with orphan

20  drugs."  Now let's talk about orphan drugs for a minute, sir.

21  You understand that term?

22  A    I do.

23  Q    Would it be fair to say that orphan drugs is a drug that

24  is used to treat a relatively small number of people in the

25  population?

ASELAGE - CROSS - BRAFMAN

1    A    That's correct.

2    Q    And as opposed to a regular drug, like Lipitor for

3    example, that treats maybe hundreds of millions of people, an

4    orphan drug has a small population?

5    A    That's correct.

6    Q    It's only a couple of companies who are dedicated to

7    producing orphan drugs, correct?

8    A    More than a couple, but it's a relatively small number.

9    Q    And the reason it is small is because an orphan drug

10   doesn't necessarily generate the type of income that a

11   non-orphan drug could generate, correct?

12   A    In general terms, yes, sir, there are exceptions to that.

13   Q    Because it's a limited patient population?

14   A    That's correct.

15   Q    You take it one step lower, Retrophin is considered a

16   producer of ultra orphan drugs, correct, ultrathin orphan

17   drugs, correct?

18   A    Ultra orphan, that is a term that is used for fewer than

19   a thousand patients in population.

20   Q    A term used with respect to Retrophin at times, correct?

21   A    At times.

22   Q    One of the things that Mr. Shkreli told you what was part

23   of his vision was the ability to find drugs that could only --

24   that needed -- that will treat only a small number of patients

25   who were now not being treated, that was part of his vision?

ASELAGE - CROSS - BRAFMAN

1    A    I don't recall his vision being limited to ultra orphan

2    drug populations.

3    Q    I'm not saying limited, it was part of the vision?

4    A    Part of, yes.

5    Q    Is that correct?

6    A    That's correct.

7    Q    That was something that also intrigued you as one of the

8    things that made it interesting, correct?

9    A    That's correct.

10   Q    BioMarin was a multi-billion dollar company, correct?

11   A    Market cap, not in revenues.

12   Q    Multi-billion dollar market cap.

13   A    Yes.

14   Q    Retrophin was a smaller drug manufacturing company?

15   A    That's correct.

16   Q    Now continuing, "Mr. Shkreli received his BBA from Baruch

17   College.  Mr. Shkreli was selected as director because of his

18   business and professional experience, including but not

19   limited to his leadership of Retrophin in the early stages,

20   private and public financings, and a successful track record

21   of identifying drug assets."  Is everything in that paragraph

22   I read to you true about Mr. Shkreli, to the best of your

23   knowledge?

24   A    The last sentence I have no visibility to.

25   Q    You can't see it or?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE – CROSS – BRAFMAN

1   A      I mean, I don't know about him being selected as a

2   director.  You're talking about Baruch College.

3   Q      Baruch College is City college.

4   A      I'm sorry, I gave the California pronunciation.

5   Q      You don't know precisely where he got the degree from,

6   but the words or substance what they said about Mr. Shkreli,

7   to the best of your knowledge, was true at the time you would

8   have seen this?

9   A      I think so, yes.

10  Q      Now, did you read what it said about you?

11  A      I'm sure I did.

12  Q      It's on the same page.  It starts on the same page as the

13  information about Mr. Shkreli, see that on the bottom?

14  A      Yes, I do.

15  Q      You would certainly want to see what they said about you

16  to make sure it was accurate, correct?

17  A      Yes.

18  Q      Now I think you told us that for the two years that you

19  served on the Board, before you took on the job of CEO, you

20  never saw Board minutes, correct?

21  A      That is correct.

22  Q      Now you are a experienced business person, you served on

23  other boards.  Is it a regular part of serving on a Board that

24  after the Board meeting somebody sends you minutes?

25  A      Normally you get the minutes as part of the subsequent

ASELAGE – CROSS – BRAFMAN

1    meetings.

2    Q    Now you're on the Board for two years, you don't see any

3    of Board minutes, according to your testimony, and you don't

4    ask anyone where are the Board minutes?

5    A    Let me start with timing.  I was on the Board from end of

6    December 2012 until I stepped into an operating role in spring

7    of 2014.  And once we got Ms. Jensen into the GC role we

8    started seeing Board minutes.  So there was about a

9    year-and-a-half, just under a year-and-a-half, when we were

10   unable to see Board minutes.

11   Q    You say unable, you just don't recall ever seeing them,

12   correct?

13   A    No.  There was an effort to get of Board minutes to the

14   Board.  Mr. Richardson repeatedly requested Board minutes,

15   repeatedly was told they are coming.  They never did.

16   Q    So if I ask you for Board minutes today, they tell me

17   they are coming.  I ask two weeks later, they tell me they are

18   coming.  This goes on for a year-and-a-half, you don't say

19   wait a minute what is going on?

20   A    I think it was one of the reasons why the Board was

21   becoming so concerned about Mr. Greebel and Mr. Shkreli.

22   Q    When you speak to Mr. Greebel, what does Mr. Greebel tell

23   you as to the Board minutes, he's the secretary at the Board

24   meetings?

25   A    They are coming.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1  Q    And you then took that as an answer for 18 months?

2  A    I think it's fair criticism that we should have been more

3  aggressive.  I think eventually we did the right thing.

4  Q    Did you take your job as a Board member seriously?

5  A    I think so.

6  Q    You've testified already that being on the Board, even

7  though it's not a public company, it gives you some fair

8  degree of responsibility, correct?

9  A    I said that.

10 Q    Would it be a fair statement that you really made no

11 effort to be a responsible Board member during the 18-month

12 period we're talking about?

13           MS. SMITH:  Objection.

14           THE COURT:  Sustained.

15 Q    Is it your testimony that you took it seriously?

16 A    I think I did, yes.

17 Q    Did you ever characterize your involvement on the

18 Retrophin Board as "farting around with the Retrophin thing"?

19 A    I don't believe I did.

20 Q    You don't believe you did?

21 A    I know there is an e-mail where I used the term farting

22 around, I don't recall that it was in reference to my role as

23 a Board member.  If you want to refresh my memory I'm happy to

24 see it.

25 Q    Let me show you DX6013, just look at it yourself then

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1    I'll ask you some questions.  Did you have a chance to read
2    it?
3    A    Give me another second.
4    Q    Okay.  Is that an e-mail on July 21, 2013, from you to a
5    gentleman named Christopher Schelling?
6    A    It is.
7    Q    Who is Christopher Schelling?
8    A    A friend and former co-worker.
9    Q    In the pharmaceutical industry?
10   A    He is.
11   Q    In July of 2013 what was your title with Retrophin on
12   that date?
13   A    I was a Board member.
14   Q    And this was during a period when you told the jury that
15   you were taking your work seriously as a Board member?
16   A    Yes.
17   Q    Did you tell Mr. Schelling on that date that you're still
18   "farting around with Retrophin although not really spending
19   any serious time on them"?
20   A    That's what the e-mail says, yes.
21   Q    Does it refresh your recollection that you actually said
22   that?
23   A    Yes, it does.
24   Q    Did you mean it when you said it?
25   A    In a way, yes.  I think 2013 was a time period that for

ASELAGE - CROSS - BRAFMAN

1    me there wasn't much going on at Retrophin.

2    Q    Not spending much time, what do you mean?  I hate to use

3    it, but it's there, what do you mean "still farting around"?

4    A    It means I'm still involved but not particularly active.

5    I was recruited -- if I can finish -- I was recruited because

6    I had commercial expertise.

7              In 2013 we had no commercial products.  There wasn't

8    input being requested from Mr. Shkreli or anyone else at the

9    company.  And I felt like I was on a Board of a company that

10   was doing things that did not play to anything that I could

11   help much with.

12   Q    So why didn't you resign?

13   A    Well, I think they needed a Board member.  It would have

14   created more problems for the company for me to step off at

15   that time.  There was still a plan to find a commercial

16   product, which eventually we did.  And at the time when we got

17   commercial products, I think if you go back, I got

18   substantially more involved.

19   Q    Do you mean by the way you phrase this, that during this

20   period there was really nothing for you to do, so you were

21   just farting around as a Board member?

22   A    Nothing is an exaggeration, but I had minimal involvement

23   for most of 2013 as the company was not involved in areas

24   where I had expertise.

25   Q    But you're a business person, you could do a lot of

ASELAGE - CROSS - BRAFMAN

1    things besides your own area of sales and commercialization,

2    correct?  You're now CEO, right?

3    A    I am the CEO.

4    Q    During the period when you were on the Board of Directors

5    was the period when you were claiming Mr. Shkreli and others

6    were doing stuff that they shouldn't have been doing?

7    A    I think there was feedback that went to Mr. Shkreli from

8    both myself and the Board members where it was appropriate.

9    Q    But you didn't do anything to stop it?

10   A    Well, that's not accurate.  Are you suggesting that we

11   lock him up?  We gave him advice.  We gave him counsel.

12   Eventually it became clear to the Board that he was not taking

13   either and relieved him of his responsibilities.

14   Q    You resigned as CEO because there was no insurance policy

15   in place, right?

16   A    That was the final straw, yes.

17   Q    Then you went on the Board, no one twisted your arm,

18   correct?

19   A    No one twisted my arm, that's correct.

20   Q    You're an adult, twice the age of Mr. Shkreli.  You made

21   the decision to go on the Board, correct?

22   A    I think I'm not white twice his age, but all the rest of

23   it is true.

24   Q    You went back on the Board because you wanted to be part

25   of what you recognize to be a brilliant vision, correct?

ASELAGE - CROSS - BRAFMAN

1    A    I thought there was an opportunity for that.

2    Q    Now for the period of time when you are on the Board, you

3    testified that you have a fiducial obligation to see to it

4    that things are done well, not just sit around and fart around

5    as a Board member; isn't that true?

6    A    I think you may be overstating it a bit more

7    dramatically.  I did have a fiduciary responsibility.

8    Q    I didn't use these of worsts, they are in your e-mail,

9    correct?

10   A    The farting around, yes, that's in my e-mail.  The rest

11   of what you said were your words.

12   Q    Did you tell the Government that you learned that Martin

13   Shkreli made a lot of money for his MSMB investors?

14   A    Yes, that's what Mr. Shkreli told me.

15   Q    Then you told that to the Government?

16   A    I told them that that's what Mr. Shkreli told me.

17   Q    And did you also tell the Government that the MSMB

18   investors had the option to receive cash or roll-over their

19   investment into Retrophin?

20   A    That's what Mr. Shkreli told me.

21   Q    Did he tell you that while you were a member of the

22   Board?

23   A    He told me that in the fourth quarter of 2012, so I would

24   have either been in the COO role, or just newly on to the

25   Board.

ASELAGE - CROSS - BRAFMAN

1    Q    When he told you that, that wasn't a red flag?

2    A    I thought it was true.

3    Q    But it wasn't a red flag that the MSMB investors could

4    cash out with Retrophin funds?

5    A    No, they weren't able to cash out with Retrophin funds.

6    They were able to cash out with funds from MSMB or they could

7    take their MSMB holdings and use that cash to buy Retrophin

8    stock.

9    Q    By Retrophin stock or get Retrophin stock from

10   Mr. Shkreli?

11   A    Buy.

12   Q    Is that what you think happened, they bought Retrophin

13   stock?

14   A    As it turned out there was no money in MSMB, nobody

15   bought anything.  What I was told was that there were funds in

16   MSMB, that individuals there had made substantial funds, and

17   that they had the option of rolling their funds in MSMB into

18   Retrophin stock.  And by that I mean the money that they had

19   in MSMB would be used to come into Retrophin in exchange for

20   Retrophin shares.

21   Q    Is that your understanding as you sit here today?

22   A    That is what Mr. Shkreli told us, told me, was the option

23   in the fourth quarter of 2012.

24   Q    And --

25   A    Today I know that is not true.

ASELAGE - CROSS - BRAFMAN

1    Q    What you know today is that these people were given

2    Retrophin stock by Mr. Shkreli, correct?

3    A    That is correct.

4    Q    And do you know whether he was giving them his own stock?

5    A    He was not giving them his own stock.

6    Q    He is not, is that your testimony?

7    A    That's my testimony.

8    Q    Did you at the time understand who these people were?

9    A    At what time?

10   Q    When you were told this information.

11   A    You're talking about late 2012, I had no idea who the

12   MSMB investors were.

13   Q    Did you ask?

14   A    I didn't care who they were.  I did not ask.

15   Q    You didn't care who they were because?

16   A    Any investor that wanted to put his money into Retrophin

17   was welcome to.  And I had nothing to do with the hedge fund

18   that Martin had been running before; that it was none of my

19   business who his MSMB investors were.

20   Q    Do you know if MSMB was an investor in Retrophin?

21   A    I do not -- well, give me a time period.

22   Q    Now you have learned that MSMB was a substantial investor

23   in Retrophin?

24             MS. SMITH:  Objection.

25             THE COURT:  Sustained.

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1    Q    At the time during the period when you we're talking

2    about, did you know that MSMB was a substantial investor?

3              MS. SMITH:  Objection, your Honor.

4              THE COURT:  Fourth quarter 2012?

5              MR. BRAFMAN:  Yes.

6              MS. SMITH:  Capital or MSMB Healthcare?

7              THE COURT:  Distinguish the two.

8    Q    Did you know that MSMB, any company using MSMB, was a

9    holder of Retrophin stock and an investor in Retrophin?

10   A    I did not.

11   Q    Now, am I correct that Martin Shkreli was to your

12   knowledge the sole founder of Retrophin?

13   A    As far as I know, yes.

14   Q    It became a public company in December of 2012; is that

15   correct, sir?

16   A    That is correct.

17   Q    And in prior to being a public company it was a private

18   company, I think we established that, yes?

19   A    Yes.

20   Q    And when it was a public company, was Mr. Shkreli at the

21   outset in charge of Retrophin?

22   A    My resignation and the company going public, were almost

23   simultaneous so, yes.

24   Q    As the founder was he also the primary shareholder of the

25   company?

ASELAGE - CROSS - BRAFMAN

1    A    Yes, he had the dominant position.

2    Q    Prior to becoming a public company, all of the decisions

3    made for Retrophin were made by Mr. Shkreli or he certainly

4    could have made them, correct?

5    A    Correct.

6    Q    Prior to when Retrophin became a public company, did he,

7    after you left, become Chief Executive Officer?

8    A    He did.

9    Q    As CEO did he have certain power that he could use within

10   his discretion?

11   A    Sure.

12   Q    Just like you have now.

13   A    Certainly.

14   Q    Did he have that power to hire employees?

15   A    He did.

16   Q    Did he have the power to fire employees?

17   A    He did.

18   Q    And he did from time to time.

19   A    Regularly.

20   Q    Both hired and fired, correct?

21   A    Yes, sir.

22   Q    After you became CEO, you fired certain people, correct?

23   A    I have.

24   Q    When you became CEO, Retrophin had a New York office, a

25   Boston office, and a San Diego office, correct?

ASELAGE - CROSS - BRAFMAN

1    A    That's correct.

2    Q    Subsequently, you consolidated all the operations and

3    they are now in San Diego, correct?

4    A    No, not exactly.  Start with I decided, this was a Board

5    decision, consolidating offices is not something, closing down

6    offices, not something a CEO makes unilaterally.

7    Q    Fair enough.  But right now there is a San Diego office

8    of Retrophin and that's it?

9    A    No, our Cambridge office is open and functioning.  It

10   will cease operations on December 31 of this year.

11   Q    How many people were employed in the Cambridge office

12   when you became the CEO, if you know?

13   A    Actually I don't know, there were probably 20-some.

14   Q    Most of those --

15   A    That's an estimate.

16   Q    -- most of those people are gone and they will all be

17   gone by the end of this year, correct?

18   A    Actually I think most of them are probably still there,

19   but almost all of them will be terminated at the end of the

20   year.  We have offered everyone in Cambridge a full relocation

21   to the San Diego office.  Most of them have declined and

22   chosen a severance at the end of the year instead.

23   Q    The New York office, when you became CEO, had how many

24   people?

25   A    About 20.

ASELAGE - CROSS - BRAFMAN

1    Q    All those people are gone, correct?

2    A    No.

3    Q    Most of those people?

4    A    Most, yes.

5    Q    Did you ever tell anyone that Mr. Shkreli was in words or

6    substance, 'the single most brilliant most person I ever met'?

7    A    I said intellectually he might have the brightest

8    intellect.

9    Q    That's quite a statement, would you agree?

10   A    Yes.  As I said, I think he's stunningly smart, from an

11   intellectual perspective.

12   Q    Do you know whether or not Mr. Shkreli is someone who

13   self-educated himself in the science field?

14   A    To the best of my knowledge he has, yes.

15   Q    So all of the work he does developing drugs and the

16   research, he's taught himself how to do that, correct, as far

17   as you know?

18   A    As far as I know.

19   Q    That's kind of amazing; isn't it?

20   A    It is.

21   Q    You call it -- and correct me if I'm wrong -- 'truly

22   astounding'?

23   A    I may have well said that.  I think it is, yes.

24   Q    So it's fair to say that there was never a doubt in your

25   mind that Mr. Shkreli was smart enough to develop these drugs,

ASELAGE - CROSS - BRAFMAN

1    correct?

2    A    He certainly had the intellectual capabilities, yes.

3    Q    The vision he described that he wanted Retrophin to

4    eventually turn into, you certainly believed that he had the

5    mental capacity or the intellectual capacity to achieve those

6    visions, correct?

7    A    I did.

8    Q    And indeed you saw him do it, correct?

9    A    Well, I think history would show he did not do it.

10   Q    That he did not do it.  Well, you saw him develop certain

11   concepts that you're still using today or find them and apply

12   them?

13   A    Some, yes.

14   Q    Now, when Mr. Shkreli -- did Mr. Shkreli appear to you

15   besides being brilliant, also somewhat of a scatter brain?

16   A    I don't think I would use the term scatter brain, no.

17   Q    What would you use?

18               MS. SMITH:  Objection, for what.

19               THE COURT:  Overruled.

20   Q    What would you use to describe his personality?

21   A    I think there is an intellectual component that is

22   obvious.  There is also kind of a component of

23   self-aggrandizing that plays out.  There is a lot of ego that

24   comes out of Mr. Shkreli.  I think some insensitivity in how

25   he deals with other people.

ASELAGE - CROSS - BRAFMAN

1   Q    Lack of people skills?

2   A    I would say so, yes.

3   Q    Lack of --

4   A    Let me rephrase it.  If he likes somebody, he has great

5   people skills.  Or if he have wants to use someone for

6   something, he can demonstrate great people skills.  In day to

7   day interaction with people, though, he doesn't seem to see

8   other people as important, other than as they fit into the

9   scheme of what he's trying to do.  That's my just personal

10  opinion.

11  Q    That's all I'm asking for.  From your personal

12  perspective, is there something off about Mr. Shkreli despite

13  his intellectual capacity?

14          MS. SMITH:  Objection.

15          THE COURT:  Sustained.

16  Q    Well, do you understand that there were times when he

17  would be so intense about a subject that he would alienate

18  people close to him?

19  A    I saw him alienate a number of people, yes.

20  Q    Did he do so sometimes non-stop, in which he would get

21  focused and seemingly not be able to control himself?

22  A    He was very impulsive.

23  Q    Is that something that in the big, mature business world

24  sometimes doesn't sit well with people that you encounter in

25  your work, sir?

ASELAGE - CROSS - BRAFMAN

1   A     Impulsiveness can lead to rash decisions, and rash

2   decisions can lead to mistakes.

3             R ONE:  Your Honor, are we going to take another

4   break or go to lunch break?

5             THE COURT:  How are the jurors feeling?  Would you

6   like to take a lunch now?

7             (Jurors collectively respond no.)

8             THE COURT:  They are a hard working group.

9             MR. BRAFMAN:  We all are.

10            THE COURT:  I'm very admiring of this group.

11            MR. BRAFMAN:  Me to.

12  BY MR. BRAFMAN:

13  Q     Now, you participated at some times in meeting with

14  Mr. Shkreli and people who you might consider investors,

15  correct?

16  A     I did.

17  Q     When you watched Mr. Shkreli, did he impress you with the

18  depth of knowledge that he had about the subject matter under

19  discussion?

20            MS. SMITH:  Can we get a time frame on these

21  investors, in 2012 or later?

22  Q     Did you ever participate in meetings with Mr. Shkreli

23  where people were in the meeting who Mr. Shkreli was trying to

24  get money from to invest in the company?

25  A     Yes.

ASELAGE - CROSS - BRAFMAN

1    Q    Did you participate in those meetings?

2    A    I did.

3    Q    Prior to going into those meetings did you and

4    Mr. Shkreli discuss the subject matter that would be

5    discussed?

6    A    Normally we would have a corporate slide deck of what the

7    subject matter what was going to be covered.

8    Q    There would be a presentation, correct?

9    A    Yes.

10   Q    In any of those meetings, is it a fair statement, that

11   you never heard Mr. Shkreli in your opinion try to defraud any

12   of the investors?

13             MS. SMITH:   Objection, your Honor.

14             THE COURT:   Sustained.

15   Q    Let me ask you this question, when he was talking to

16   these investors were there times that he would say different

17   things to some investors about the same subject and different

18   things to other investors about the same subject?

19   A    Yes.

20   Q    Did you discuss that with Mr. Shkreli?

21   A    We did.

22   Q    Did you discuss with him that he was essentially trying

23   to discuss with each group of investors how he thought they

24   would of best react to the pitch?

25   A    That was -- I conveyed to him that I thought his pitch

ASELAGE - CROSS - BRAFMAN

1    wasn't consistent and that in the investment world in which we

2    were working, investors talk to each other.  And that even if

3    his different focus with different groups was well-intentioned

4    and accurate, that leaving different investment groups with a

5    different message or different impression was going to be

6    potentially problematic when they compared notes, which I

7    thought they would do.

8    Q    But you never thought Mr. Shkreli was saying something

9    that you knew to be a lie to an investor; is that correct?

10             MS. SMITH:  Objection, your Honor.

11             THE COURT:  I'm going to overrule the objection.

12   A    I wouldn't say I saw him lie.  I saw him fill-in blanks

13   where he did not have an answer with what he thought might be

14   an answer.  I think if you would like an example of that, it

15   sounds pretty vague.

16   Q    Let me focus you.  Did you have any concerns that he

17   wasn't being truthful to an investor?

18   A    I thought he was sometimes of exaggerating a bit.  I

19   don't think that's lack of truthfulness.  I think he honestly

20   believes some of things he was saying.  I felt some things he

21   was saying were probably through rose-colored glasses, maybe

22   more optimistic than was realistic to believe.

23   Q    Fair enough, thank you.

24             Now did you ever serve on the corporate governance

25   committee when you were a member of the Board of Directors at

ASELAGE - CROSS - BRAFMAN

1    Retrophin?

2    A    I believe we did form a corporate governance committee in

3    2014.  I was on that.

4    Q    You were on it?

5    A    Yes.

6    Q    Did you know anything about corporate governance before

7    you joined that committee?

8    A    Only whatever --

9    Q    What is the corporate governance committee supposed to be

10   responsible for, if can you tell us?

11   A    Sure.  Corporate governance in, it's not just corporate

12   governance, it's nominating governance.  You're responsible

13   for looking, for making sure that the Board is appropriately

14   staffed out.  You have some oversight, responsibilities for

15   personnel.  And governance also looks at operation of the

16   company.  Normally when a company that has a compliance

17   function, the compliance function would have a line directly

18   back to the head of nominating and governance.  If there was

19   something inappropriate within the company there would be a

20   way for compliance to get that message out.

21   Q    Before joining that committee, you had no prior

22   experience or legal training in corporate governance?

23   A    I had no legal training in anything.

24   Q    Did you have any regulatory training in corporate

25   governance?

3504

ASELAGE - CROSS - BRAFMAN

1    A    No.

2    Q    Despite having no legal training, you volunteered to join

3    on that committee, correct?

4    A    Yes, I was asked to join.  I wasn't qualified.  I was

5    closer to qualified for nominating governance.

6    Q    Now, before you became CEO and before Mr. Shkreli was

7    asked to leave, was there another press release issued by

8    Retrophin in May of 2014 naming you Chief Operations Officer?

9    A    I believe there was.

10   Q    I'm going to show you for identification only, Defense

11   6016, do you see that document, sir?

12   A    I do.

13   Q    It says the exhibit number on the bottom.  Do you

14   recognize this as the press release issued by Retrophin in

15   2014?

16   A    I believe so.

17   Q    Did you give the press people or the public relations

18   people a quote to attribute to you, if you remember?

19   A    To be honest I don't remember whether I gave them a quote

20   or not.

21   Q    Look at the press release, third paragraph, and see if

22   there is a quote that you recognize attributed to you about

23   Martin Shkreli.  Do you see that?

24   A    It looks familiar.

25   Q    Does it refresh your recollection as to what you may have

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE – CROSS – BRAFMAN

1    said at that time?

2    A    It does, yes.

3    Q    In May of 2014, May 28, 2014, was long after you had

4    already determined that there were red flags all over the

5    place that were causing you and the Board to reprimand

6    Mr. Shkreli, correct?

7    A    We had seen some red flags by that point.  I think if you

8    recall what I testified previously, the Board asked me to step

9    into this job to be able to hopefully be able to put in some

10   control, some processes and some communication mechanisms so

11   Mr. Shkreli's vision could be better implemented.

12   Q    This is a public announcement, correct?

13   A    It is.

14   Q    You're aware that when a public company makes a public

15   announcement you have to be careful that it's accurate,

16   correct?

17   A    You do.

18   Q    A public announcement by a public company can impact on

19   the share price if something negative were to come out?

20   A    That's correct.

21   Q    It could have an up-tick for the price if something

22   positive comes out, correct?

23   A    You never know, but that's the way it's supposed to work.

24   Q    It's common sense most the time?

25   A    Most the time.

ASELAGE - CROSS - BRAFMAN

1   Q     But the key is you have to be truthful in what you're

2   saying, correct?

3   A     You do.

4   Q     In May 2014, end the May 2014, you announced to the world

5   that you "have been impressed with Martin's progress in

6   building Retrophin over the past year-and-a-half.  And as

7   president of and Chief Operating Officer you look forward to

8   sustaining this growth in helping the company realize the full

9   potential of its promising treatment for rare and often

10  life-threatening diseases."  Did you say that?

11  A     That's my quote.

12  Q     Was that honest when you said that?

13  A     I think it was actually.  The fact that there are red

14  flags, you have concerns, doesn't mean that there isn't

15  progress in the company.  The company had acquired two

16  products.  We had commercial revenues.  We had a portfolio of

17  development-stage products, at least two of which I thought

18  were available.  So there had been progress.

19  Q     Now, you also say, though that you were impressed with

20  Mr. Shkreli in May 28, 2014 in words or substance you're

21  announcing to the general public that despite everything you

22  yourself know you're still impressed with Mr. Shkreli,

23  correct?

24  A     I'm not sure when you say despite everything else I know.

25  I know that I saw some things that concerned me.  When you

ASELAGE - CROSS - BRAFMAN

1    talk about everything else, it feels like you're encompassing

2    everything we found out subsequent to Mr. Shkreli's departure.

3    We knew none of that back then.

4    Q    Well, in 2014 you knew enough for you and Mr. Richardson

5    to say that things were getting out of hand, in words or

6    substance?

7    A    That's true.

8    Q    You have to step in as Chief Operating Officer, correct?

9    A    That's true.

10   Q    Primarily because of Mr. Shkreli's immature behavior,

11   which you said on direct examination?

12   A    I didn't say predominately, but his immature behavior was

13   a component.

14   Q    Some of what he was doing did not we fit the person who

15   was out there as the CEO of a public company, fair?

16   A    That's correct.

17   Q    But that's not what you say in this press release.  What

18   you say is that you're impressed with Mr. Shkreli.

19   A    Sir, I don't want to be argumentative, but you can be

20   impressed with some aspects of a person's efforts and

21   accomplishments without being universally happy about

22   everything they are doing.

23        Mr. Shkreli did a lot of good things.  While he was

24   doing those good things, as it turns out, he was doing some

25   very bad things.  Only the tip of iceberg is what we saw at

ASELAGE – CROSS – BRAFMAN

1    the time.  What we had concerns about, the fact that we had

2    concerns about whether you want to say Twitter or his rap

3    concert or his non-public information tweet, it doesn't take

4    away from what he did well.  But what he did well doesn't make

5    him less accountable for what he didn't do well.

6    Q     Fair enough.  Are you done?

7    A     I'm done.

8    Q     I'm not done.

9    A     I suspected that.

10   Q     There comes a time when you are now the CEO of Retrophin

11   and you and Mr. Richardson –– he's still chairman of the

12   Board, correct?

13   A     He is.

14   Q     And there comes a time when you and on behalf of

15   Retrophin authorize the filing of a lawsuit against

16   Mr. Shkreli, correct?

17   A     Yes.  There are a lot of things between those two events,

18   but yes.

19   Q     Did you authorize a lawsuit to be filed against Evan

20   Greebel?

21   A     The Board did, yes, I'm a member of the Board.

22   Q     But there is no lawsuit pending against Mr. Greebel?

23   A     I'm sorry, I thought you were referring to the criminal

24   charges.  No, there is no lawsuit against Mr. Greebel.

25   Q     Let's talk about the civil charges, okay.  There is a

ASELAGE - CROSS - BRAFMAN

1   lawsuit pending against Mr. Shkreli for $65 million by

2   Retrophin?

3   A    That's correct.

4   Q    During this period you believed that Mr. Greebel was

5   helping him in the things that he did wrong, correct?

6   A    That's correct.

7   Q    And Mr. Greebel was doing it while a partner of a

8   prominent law firm, correct?

9   A    That's correct.

10  Q    You know in dealing with law firms that they generally

11  carry malpractice insurance, correct?

12  A    I have no idea what malpractice insurance law firms

13  carry.

14  Q    But you never filed a lawsuit against Mr. Greebel or

15  Katten Muchin, did you?

16  A    We didn't file a lawsuit.

17  Q    I'm asking you about a lawsuit, a civil lawsuit, correct?

18  A    You want a yes or no answer?

19  Q    Yes.

20  A    Yes, we did not file a lawsuit.

21  Q    You came to learn there were certain people who had

22  consulting agreements with Retrophin, correct?

23  A    That's correct.

24  Q    And you came to determine that those consulting

25  agreements, based on your testimony, were never authorized by

ASELAGE - CROSS - BRAFMAN

1    the Board?

2    A    Correct.

3    Q    That's the position you maintain now?

4    A    That is correct.

5    Q    You maintain that the people who got those consulting

6    agreements basically didn't provide any work for Retrophin,

7    correct?

8    A    That's correct.

9    Q    And that is why the consulting agreements, from your

10   perspective, is fraud, correct?

11   A    That's our belief.

12   Q    Some of the consulting agreements involve staggering

13   amounts of money; isn't that true?

14   A    Big money.

15   Q    Many millions of dollars?

16   A    Correct.

17   Q    Did you ever authorize a lawsuit to be filed against

18   Mr. Alan Geller?

19   A    No, sir.

20   Q    Mr. Darren Blanton?

21   A    No, sir.

22   Q    Mr. Steve Rosenfeld?

23   A    No.

24   Q    Mr. Lee Yaffe?

25   A    No.

ASELAGE - CROSS - BRAFMAN

1    Q    Now those are people who you, as a head of a public

2    company, believe took money from the company unlawfully,

3    correct?

4              MS. SMITH:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q    You believe that they walked away with unlawful

7    consulting agreements?

8    A    They received agreements from Mr. Shkreli, which we did

9    not believe were legitimate.

10   Q    And the question I have is, you never went after any of

11   those people to return the money that they got from Retrophin

12   or the stock that they got from Retrophin, correct?

13   A    We filed suit against Mr. Shkreli.

14   Q    I'm asking you about Geller, Blanton, Rosenfeld, Yaffe.

15   We understand you filed suit for Mr. Shkreli.  The question

16   is, did Retrophin file a suit against any of the people who

17   got consulting agreements?

18   A    We have not.

19   Q    And there are a number of people who got settlement

20   agreements, correct?

21   A    I know that now.

22   Q    You know that and you knew that for almost two years now,

23   right.

24   A    I knew that as soon as the independent report came in,

25   which would have been '15.

ASELAGE - CROSS - BRAFMAN

1    Q    So almost two years.  Did you on behalf of Retrophin ever

2    attempt to recover the money that they received?

3    A    No.

4    Q    And included in that is Sarah Hassan, correct?

5    A    Yes.

6    Q    Do you know if she is Fred Hassan's daughter?

7    A    I am told she is.

8    Q    David Geller no lawsuit against him?

9    A    Yes.

10   Q    Do you know that he tripled his investment at MSMB at got

11   35,414 shares on top of the money?

12   A    That's what I read.

13   Q    Richard Kocher, do you know how much money he got before

14   the settlement?

15   A    Who?

16   Q    Richard Kocher?

17   A    Kessler, is who?

18   Q    No, Kocher -- doesn't ring a bell?  That's fine.

19            Lindsay Rosenwald?

20   A    No.

21   Q    Do you know who Lindsay Rosenwald is?

22   A    Yes.

23   Q    Probably the most prominent biotech investor in the

24   country, correct?

25   A    I can't say that, but I know who he is.

ASELAGE - CROSS - BRAFMAN

1    Q    He's been involved in some major biotech private equity

2    firms, correct?

3    A    I have no idea what Mr. Rosenwald's investment history

4    is.

5    Q    But you know who he is.

6    A    I know who he is.  He's a prominent individual.

7    Q    No lawsuit against him, correct?

8    A    Correct.

9    Q    And Spencer Spielberg, do you know who that is?

10   A    Only by name.

11   Q    Michael Lavalle?

12   A    No lawsuit.

13   Q    Now, Schuyler Marshall, do you know who that is?

14   A    Only from what I read.

15   Q    All of the consulting agreements and settlement

16   agreements that we've discussed, to your knowledge, were

17   prepared by Katten Muchin and either Evan Greebel or one of

18   the lawyers at that firm, correct?

19   A    Yes.

20   Q    The settlement groups include a release among other

21   entities Retrophin?

22   A    I guess.  My focus was on the release of the MSMB

23   entities.  I believe it does release Retrophin as well.

24   Q    When we say it releases Retrophin, the settlement

25   agreements release Retrophin from any claim that any of these

ASELAGE - CROSS - BRAFMAN

1    people would have, correct?

2    A    That's correct.

3    Q    It prevents from them from filing a lawsuit against

4    Retrophin or MSMB entity, correct?

5    A    Yes, or Shkreli himself.

6    Q    Once you sign a release, in legal terms means you're

7    giving up your claim?

8            MS. SMITH:  Objection, your Honor.

9            MR. BRAFMAN:  Withdrawn.

10           THE COURT:  Sustained.

11   Q    You understand that when Retrophin is released from

12   liability, it essentially ends it as far as Retrophin is

13   concerned?

14   A    It ends as far as the company's liability to the person

15   on the other end of the form, yes.

16   Q    Now, you have testified previously -- if you need to I'll

17   give you the reference -- that Retrophin is not in your view a

18   litigious company?

19   A    That's correct.

20   Q    Sometimes it makes business sense to resolve lawsuits

21   with the settlement agreement even though it might stick in

22   your craw, because the cost the litigation might be as much as

23   the settlement, right?

24           MS. SMITH:  Objection.

25           THE COURT:  Sustained.

3515

ASELAGE – CROSS – BRAFMAN

1    Q    As a business person, as someone who has said Retrophin

2    is not a litigious company, by that do you mean that sometimes

3    Retrophin does not pursue a lawsuit even though they think

4    they might be right in doing it?

5    A    That's correct.

6    Q    Do you make a business decision at times as to whether or

7    not it makes sense from a business perspective to litigate or

8    not litigate?

9    A    Yes.

10   Q    And the cost of some litigation, it might make business

11   sense to Retrophin to eat a settlement rather than a eat a

12   costly litigation?

13            MS. SMITH:  Objection to eating.

14            THE COURT:  Sustained.  You'll have to rephrase.

15            MR. BRAFMAN:  I'd like to go to sidebar.

16            (Continued on the next page.)

17            (Sidebar conference.)

18

19

20

21

22

23

24

25

Rivka Teich CSR, RPR, RMR
Official Court Reporter

SIDEBAR CONFERENCE

1      MR. BRAFMAN:  Your Honor, the Government is claiming

2 and will claim that Retrophin didn't get anything in return

3 for these settlement agreements.  We maintain that if you get

4 a release, that is of benefit to the company.  He's already

5 said that in words or substance.

6      And what I need to flush out is that it may well be

7 that there is a business reason as to why you would accept a

8 settlement agreement even though you don't believe it's valid,

9 rather than undergo the cost of litigation.  I think that's

10 perfectly appropriate cross, because the suggestion that

11 Retrophin doesn't receive any benefit suggests that Retrophin

12 just has to eat these settlement agreements because they have

13 no choice.  Their choice is to sue.  And when you make a

14 decision not to, sometimes that's a business benefit because

15 that's why you're doing it as a benefit to the company.

16      MS. SMITH:  I think that's been asked and answered.

17 I don't know what you mean "eat a settlement."

18      THE COURT:  She was objecting to your term "eating a

19 settlement" or "eating."

20      MS. SMITH:  "Swallowing," a couple of phrases like

21 that.  It's the form of the question.

22      MR. BRAFMAN:  If that were the case, if you were to

23 say objection as to form I would then rephrase it rather than

24 come here.

25      Judge, I need to go out for a minute and we're

SIDEBAR CONFERENCE

1    almost at 12:30.  I have at least another hour.  For me to

2    break now would be a personal request.

3                THE COURT:  Okay.

4                (End of sidebar conference.)

5                (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1              (In open court.)

2              THE COURT:  At this time, ladies and gentlemen of

3      the jury, we're going to give you your lunch break.  Leave

4      your notebooks on the chair.  Do not discuss the case at all

5      and have a nice lunch.

6              We hope to come retrieve you no later than 1:30.

7              (Jury exits the courtroom.)

8              THE COURT:  We'll take an hour break.

9      (Continued following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ASELAGE - CROSS - BRAFMAN

1          A F T E R N O O N   S E S S I O N

2                         (1:35 p.m.)

3              (Jury enters courtroom.)

4              THE COURT:  All jurors are present.  Please have a

5    seat.

6              (Witness resumes the stand.)

7              THE COURT:  You are still under oath, sir.

8              MR. BRAFMAN:  May I proceed, Your Honor?

9              THE COURT:  Yes, you may.

10   CROSS-EXAMINATION(Continued)

11   BY MR. BRAFMAN:

12   Q    Mr. Richardson, I think you testified on direct

13   examination, perhaps also on cross-examination, that you

14   didn't learn of MSMB settlement agreements until -- sorry,

15   until after you became CEO?

16   A    For clarity, I'm Mr. Aselage.

17   Q    I'm sorry.

18   A    That's okay, not a problem.  We're both Steves it can get

19   confusing sometimes.

20   Q    I was looking at his notes.  I'm sorry.

21   A    That's okay.

22   Q    Let me start again.

23              Mr. Aselage, on direct and before lunch I think even

24   on cross I think you testified that you did not become aware

25   of the MSMB settlement agreements until after Martin was

ASELAGE - CROSS - BRAFMAN

1    removed from Retrophin; is that correct?

2    A    That's correct.

3    Q    I want to show you what's in evidence as 122-45.

4         Do you recognize this document?  You went through it

5    with Ms. Smith I believe on direct examination.

6    A    I do.

7    Q    And there's handwriting, it's my understanding -- do you

8    recognize the handwriting?

9    A    I do not.

10   Q    Let's just ignore the handwriting because I believe

11   that's how the exhibit was provided to us.

12        Retrophin, Inc. summary cash flow --

13        MS. SMITH:  Your Honor, this isn't actually the

14   document that's in evidence.

15        MR. BRAFMAN:  I'm sorry?

16        MS. SMITH:  This isn't actually the document that's

17   in evidence.  I can give the number for that.

18        THE COURT:  All right, it's not the exhibit in

19   evidence.  Let's get the right one.

20        MR. BRAFMAN:  Sorry.

21        THE COURT:  Thank you.

22        MR. BRAFMAN:  Your Honor, I'm told the number is

23   what?

24        MS. SMITH:  It's Government Exhibit 122-43 and it's

25   the second page.

ASELAGE - CROSS - BRAFMAN

1          MR. BRAFMAN:  Thank you.

2          THE COURT:  Thank you.

3   BY MR. BRAFMAN:

4   Q    So I'm going to show you what's in evidence as Government

5   Exhibit 122-43, the same document I showed you without the

6   handwriting on it and the second page is the one I'm referring

7   to.  This is titled on top it says, Retrophin, Inc. summary

8   cash flow for the six months ended June 30th, 2013.

9          Do you see that?

10  A    I do.

11  Q    And that's for the six months ended June 30th, 2013, so

12  this starts on January 1st, 2013, correct?

13  A    It does.

14  Q    It shows the cash flow for Retrophin for the six months

15  from January to June 30th, correct?

16  A    Yes.

17  Q    And this document very clearly shows MSMB settlements

18  Spencer, Spielberg, Sarah Hassan, Trachtenberg and Rodes,

19  $548,711, correct?

20  A    It shows that, yes.

21  Q    This is the cover page which is 122-43 and it shows that

22  it was sent from Mr. Panoff and it's a telephone Board meeting

23  agenda for July 3rd, 2013.  Do you see that?

24  A    I see it.

25  Q    Among the people who get it are Mr. Shkreli, Stephen

ASELAGE – CROSS – BRAFMAN

1    Aselage, that's you, correct, sir?

2    A    That's me.

3    Q    Steve Richardson, who was the chairman of the Board?

4    A    Yes.

5    Q    And Evan Greebel, who was the lawyer for the Board at the

6    time, correct?

7    A    Correct.

8    Q    Now did you get this?

9    A    I believe I did.

10   Q    Did you look at it?

11   A    I believe I did.

12   Q    And this is sent out on July 2nd, correct?

13   A    Yes.

14   Q    For a meeting that's going to happen on July 3rd,

15   correct?

16   A    Yes.

17   Q    And that means you didn't get it an hour or two before,

18   you got it at least a day before or at least several hours

19   before, correct?

20   A    Yes, I got it the night before.

21   Q    It's not a long document, it's only a couple of pages and

22   right on the first substantive page it tells you MSMB

23   settlements are going to be discussed at the Board meeting,

24   correct?

25   A    No, it doesn't say MSMB settlements are going to be

ASELAGE - CROSS - BRAFMAN

1   discussed.

2   Q    But it lists MSMB settlements?

3   A    Yeah, I just want to be accurate in what it says and it

4   lists them as MSMB settlements.  Sorry.

5   Q    You didn't see that at the time?

6   A    I didn't notice it, no, I did not.  And they were not

7   discussed.

8   Q    But you remember getting this?

9   A    I remember getting the email with a number of attachments

10  to it.  This was one of them.

11  Q    Now, I'm showing you what's in evidence as 122-48, which

12  is an email again from Mr. Panoff.

13        Do you see that, sir?

14  A    I do.

15  Q    And it's again sent to you, Mr. Richardson, Stephen

16  Aselage you -- Mr. Richardson, Stephen Aselage, Martin Shkreli

17  Evan Greebel.  It's again a Board agenda, correct?

18  A    Yes.

19  Q    It's dated September 9th, 2013?

20  A    Yes.

21  Q    Correct?

22  A    Yes.

23  Q    And it says, Attached please find the Board agenda and

24  all supporting documents with the exception of the amended

25  10-K, amended March 10-Q and the June 10-Q exhibits.  We are

ASELAGE - CROSS - BRAFMAN

1    still waiting on comments from Marcum and will have these

2    documents to you as soon as we can prior to the call.

3              Who is Marcum?

4    A    Our auditors.

5    Q    At the time Marcum was doing the auditing for Retrophin;

6    is that correct?

7    A    It is.

8    Q    Do you remember getting this email and this agenda?

9    A    I do.

10   Q    Do you remember participating in that call?

11   A    I was on that call.

12   Q    I want to flip to a page within that document which is

13   Bates stamped RO19302.  Do you see that number there?

14   A    I see it.

15   Q    And that's a draft of a consulting agreement, is it not?

16   A    It is.

17   Q    Consulting agreement and release.

18   A    Uh-huh.

19   Q    It's for Alan Geller?

20   A    Yes.

21   Q    Who is Alan Geller?

22   A    He was one of the people that ended up with a consulting

23   agreement.

24   Q    You told us that you didn't know anything about this

25   until after Mr. Shkreli was removed?

ASELAGE - CROSS - BRAFMAN

1    A    That's correct.

2    Q    But you got an agenda on September 9th while you were a

3    member of the Board that's not extensive and one the things it

4    does is -- I'll withdraw the word "extensive."

5         It is an agenda which attaches an actual draft of

6    Mr. Geller's consulting agreement; is that correct?

7    A    It does.

8    Q    And you didn't bother to look at this?

9    A    There were a number of attachments, as you know.  It was

10   a very brief Board meeting and this was never discussed at

11   that Board meeting.

12   Q    You're telling me that this was never discussed?

13   A    I am.

14   Q    Okay.  Now, why is it being sent to you, if you know?

15   A    I have no idea.

16   Q    Wouldn't this be a red flag to the Board to know that

17   there are draft consulting agreements if you're not in the

18   loop already?

19   A    Would it be a red flag?

20   Q    Yes.

21   A    Could you repeat the question.  I'm not sure I quite

22   understood where you were going with that.

23   Q    You're telling me that you didn't see it, correct?

24   A    I don't know if I saw it or not.  If I saw it I don't

25   remember it.  I can tell you it was not discussed.

ASELAGE - CROSS - BRAFMAN

1   Q   But if you saw it would not that be something that you

2   would want to raise, what is an Alan Geller consulting and

3   release agreement?

4   A   Well, if it was never discussed and it was never approved

5   it probably was not high on a priority list.

6   Q   But did you at least review the document?

7   A   I don't recall if I reviewed it or not. As I sit here

8   today, I do not remember seeing that document.

9   Q   Okay. Now, as you sit here today, do you remember

10   getting this document?

11   A   I remember getting the --

12   Q   Cover sheet?

13   A   -- electronic email with a long series of attachments

14   that were --

15   Q   But one of the obligations as a member of the Board of

16   directors is to review financial agreements that the company

17   is entering into, isn't it?

18   A   Well, the company never entered into this to the best of

19   my knowledge.

20   Q   But it is signed by the person who is running the

21   company.

22         THE COURT: I'm sorry, this draft, sir, is signed?

23   BY MR. BRAFMAN:

24   Q   The ultimate agreement is signed by the person running

25   the company, isn't it?

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1    A    I never saw the ultimate agreement until after

2    Mr. Shkreli's departure.

3    Q    And you never saw the draft either?

4    A    I don't know if I saw the draft or not.  I can tell you

5    the draft was never discussed and it was never approved.

6    Q    What would be the purpose of sending you a draft in

7    preparation for a Board meeting if it wasn't something that

8    Mr. Panoff wanted you to at least approve or disapprove?

9              MS. SMITH:  Objection, Your Honor.

10             THE COURT:  Sustained.

11   Q    Who is Mr. Panoff?

12   A    The CFO at the time.

13   Q    Do you know whether this agreement was ultimately signed

14   by Mr. Panoff?

15   A    I don't recall if it was signed by Mr. Panoff or

16   Mr. Shkreli.  I believe it was ultimately signed.

17   Q    Further on in this document in this email, RO19309, there

18   is also a draft of a consulting agreement, correct?

19   A    You'll have to show it to me.

20   Q    I'm showing it to you.

21   A    Yes, that's a draft consulting agreement.

22   Q    This is a draft consulting agreement with Ken Banta,

23   correct?

24   A    Correct.

25   Q    And it lists him as a consultant?

ASELAGE - CROSS - BRAFMAN

1    A    Correct.

2    Q    Did you know Ken Banta at the time?

3    A    I had seen Ken Banta in the office.  I can't really say I

4    know him or knew him, but I knew he was someone who spent time

5    in the office with Mr. Shkreli.

6    Q    But I think you described him on direct examination as

7    someone you saw as, you know, someone who seemed to be doing a

8    good job?

9    A    I don't think I ever said that.

10   Q    What did you say about him on direct examination?

11   A    I said I wasn't sure what he did, that I thought he was

12   some type of the consultant for Mr. Shkreli.

13   Q    You see a draft of his consulting agreement there?

14   A    I do.

15   Q    This wasn't discussed either?

16   A    It was not.

17   Q    Now this email by Mr. Panoff tells you that these

18   documents are going to eventually be prepared for a 10-K, 10-Q

19   and 10-Q, correct?

20           MS. SMITH:  Objection, Your Honor.

21           THE COURT:  Sustained.

22   Q    The attached -- let me read it.  Please find the Board

23   agenda and all supporting documents with the exception of the

24   amended 10-K, amended March 10-Q and the June 10-Q.  We are

25   still waiting on comments from Marcum and will have those

ASELAGE - CROSS - BRAFMAN

1    documents to you as soon as we can prior to trial -- prior to

2    the call.

3              Do you know what a 10-K is?

4    A    I do.

5    Q    What is a 10-K?

6    A    A 10-K is an annual SEC filing that overviews the

7    company's status and operations.

8    Q    It gets filed as an official document, correct?

9    A    It does.

10   Q    And there's some degree of responsibility in connection

11   with the preparation of that document, correct?

12   A    There is.

13   Q    And potential liability?

14   A    Sure.

15   Q    And if there's something in it that's wrong it's

16   potential criminal liability, correct?

17             MS. SMITH:  Objection, Your Honor.

18             THE COURT:  Sustained.

19   Q    And a 10-Q, what is that?

20   A    Quarterly.

21   Q    And a June Q -- I'm sorry, June 10-Q that's a quarterly

22   as well, correct?

23   A    Correct.

24   Q    When you say quarterly, sir, you're referring to

25   quarterly SEC filings, correct?

ASELAGE - CROSS - BRAFMAN

1    A    I am.

2    Q    And these are filings that the SEC requires from all

3    public companies, correct?

4    A    Correct.

5    Q    And it requires them because the SEC can keep track of

6    what's going on inside a public company at least to some

7    degree by the filings, correct?

8    A    Correct.

9    Q    If they want to question the filings, the document gives

10   them a basis to do so?

11   A    It does.

12   Q    And it also goes out to the public who can, any time they

13   want to, log on and read these filings, correct?

14   A    That is true.

15   Q    Okay.  Now I want to show you what's in evidence as

16   122-49, which is an agenda for September 9th, Monday,

17   September 9th, 2'13 and it's approximately for the 5:30 p.m.

18   New York time.  Do you see that?

19   A    Yes, I do.

20   Q    Did you get this document?

21   A    I believe I did.

22   Q    Did you participate in that meeting?

23   A    I believe I did.

24   Q    And this agenda clearly states that it's going to approve

25   retaining Al Geller and Ken Banta as consultants; is that

ASELAGE - CROSS - BRAFMAN

1    correct?

2    A    It says that, yes.

3    Q    Now this agenda is one page long, correct?

4    A    Yes.

5    Q    And it is a document which is alerting the people on the

6    Board as to the subjects that are going to come up and be

7    discussed on the call, isn't that what the agenda is for?

8    A    Yes, it is.

9    Q    And as a practical matter, this is a heads up to the

10   Board members that there are some topics that are expected to

11   be discussed on the call?

12   A    Yes.

13   Q    And this doesn't mince words, it says review and approve

14   Al Geller, Ken Banta as consultants, correct?

15   A    Correct.

16   Q    Did you see this document when you got it?

17   A    I did.

18   Q    And did you look at that line?

19   A    I would assume I did.  I don't recall specifically

20   looking at that line in 2013.

21   Q    But you do recall getting it, right?

22   A    I do.

23   Q    There would be no reason for you to look at the whole

24   document but just skip the part that says Al Geller and Ken

25   Banta as consultants, correct, that would make no sense.

ASELAGE - CROSS - BRAFMAN

1    A    You are correct it would not.

2    Q    So when had you read this, do you say to yourself who's

3    Al Geller?

4    A    I assumed that I would find out who Al Geller was on the

5    call.

6    Q    Are you telling us that you remembered that it wasn't

7    discussed on the call?

8    A    Yes, I am.

9    Q    You remember everything that was discussed on the call,

10   or are you just saying to the best of your recollection it

11   wasn't discussed?

12   A    I don't recall a discussion of Geller or Banta and having

13   seen the consulting agreements later, the amount being paid to

14   Geller was so substantive that I think I would remember it if

15   it had been discussed.

16   Q    When you see the Geller draft consulting agreement, the

17   amount is in there, right?

18   A    I don't know that I reviewed it prior to the call.

19   Q    But you had the right to ask whatever questions you

20   wanted to on the call, correct?

21   A    Well, yes and no.

22   Q    Well, but you're not in the same room as the people,

23   correct, all the people?

24   A    You're right, I'm not in the same room.

25   Q    This is you and a telephone wherever you are whether it's

ASELAGE – CROSS – BRAFMAN

1    San Diego or while you're traveling, Mr. Richardson and

2    Mr. Shkreli, correct?

3    A    That's correct.

4    Q    And on sometimes Mr. Panoff, correct?

5    A    Yes.

6    Q    And at any time that you're looking at this agenda you

7    have the ability to raise the subject, correct?

8    A    I think normally an agenda in a Board member is driven by

9    the leader of that meeting, which was Mr. Shkreli --

10   Q    I understand.

11   A    -- and it was for this, like most meetings, Mr. Shkreli

12   talked about what he wanted to talk about, covered what he

13   wanted to cover and what he didn't want to cover we didn't

14   cover.

15   Q    We've met Mr. Richardson, Mr. Aselage, would you agree

16   that he is an experienced businessperson?

17   A    Yes, he is.

18   Q    And he had some very responsible positions in his career?

19   A    Yes, he has.

20   Q    Working in a very high level executive capacity at

21   American Express among other places?

22   A    Yes.

23   Q    And you have no reason to doubt his professionalism, do

24   you?

25   A    I do not.

ASELAGE - CROSS - BRAFMAN

1    Q    So now he's chairman of the Board at the time?

2    A    Yes.

3    Q    And as chairman of the Board you're telling me that you

4    or Mr. Richardson could not just say, excuse me, Martin, who

5    is Al Geller?  You couldn't say that if you wanted to?

6    A    You could, but I'm not sure you'd get an answer.  And as

7    I said, if you look at that agenda I believe that is item

8    Number 9 on a telephonic Board meeting starting at 5:30 in the

9    evening.

10   Q    And?

11   A    And we didn't get there.

12   Q    You know that as you sit here today?

13   A    I would remember a consulting agreement being discussed

14   if it had the amounts of shares and dollars.  Those are

15   massive quantities of shares and dollars being given away.  If

16   it was a normal consulting agreement, if it was an agreement

17   for $10,000 a month, $20,000 a month for specific services, I

18   might well forget that.  To give away millions of dollars

19   worth of cash and shares to a consultant, I would remember

20   that and it was not discussed.

21   Q    And it was -- you had no idea what was being given away

22   when you saw the agenda, right?

23   A    I did not.

24   Q    Okay, so it could have been $10, it could have been 10

25   million?

ASELAGE – CROSS – BRAFMAN

1   A     That's my point.

2   Q     No, the point is that you never bothered to inquire,

3   correct?

4   A     It was a draft, sir.

5   Q     Okay.  Now, did you ultimately learn, come to learn

6   whether these drafts were eventually found their way into the

7   formal filings that your company made with the Securities and

8   Exchange Commission?

9   A     Eventually I did.

10  Q     And I'm going to go through them in a moment, but did

11  Marcum make a presentation at that meeting, if you know?

12  A     I believe they did.

13  Q     You had a right to ask Marcum anything you wanted to,

14  correct?

15  A     Correct.

16  Q     I want to show you what's marked for identification as

17  122-53 and the attachments.  122-53 in evidence.  Is it in

18  evidence?

19              MS. SMITH:  Yes.

20              MR. BRAFMAN:  Yes?

21              MS. SMITH:  Yes.

22  Q     Can we have it up.  Thank you.

23              122-53 is, again, a November 6th email from

24  Mr. Panoff to Steve Richardson, Steve Aselage, Martin Shkreli

25  and Evan Greebel.  Again it's a Board agenda, correct?

ASELAGE - CROSS - BRAFMAN

1    A     Yes.

2    Q     And this is sent to you.  Attached please find the agenda

3    for Friday's meeting along with supporting documents.  The

4    call is scheduled for 1:30 New York time.  Please let me know

5    if you have any questions.

6               Do you see that?

7    A     I do.

8    Q     And what is the date of the Board meeting, November 8th,

9    2013?

10   A     Yes.

11   Q     You get it on November 6th, 2013, correct?

12   A     Correct.

13   Q     So this isn't given to you 20 minutes before the call

14   where you don't have the opportunity to download it and read

15   it and study it, right?

16   A     It's five days.

17   Q     It's several days?

18   A     Five.

19   Q     And you know, do you not, that you have --

20   A     I'm sorry, two days.  Excuse me.

21   Q     Two days from the 8th to the 6th, you have two days,

22   correct?

23   A     That's correct.

24   Q     And so you know now that there is an agenda that's coming

25   and a call that's coming and an agenda that's coming and that

ASELAGE – CROSS – BRAFMAN

1    you are going to be reviewing a number of things including the

2    approval of the 10-Q for the quarter September 30th, correct?

3    A    Correct.

4    Q    And reviewing Marcum LLP audit communications, correct?

5    A    Correct.

6    Q    You're going to review and approve Martin Shkreli's

7    employment agreement, correct?

8    A    That's all on the agenda.

9    Q    And do you know whether or not they also sent you a draft

10   of the 10-Q along with this?

11   A    I don't recall.

12   Q    Well, here's a draft of the 10-Q, that's an attachment to

13   this email.

14   A    Well, if it was attached to the email then I would have

15   received it, yes.

16   Q    Here the attachments are listed.  They say Exhibit B,

17   10-Q quarter 3, 2013.  Do you see that?

18   A    I do.  I'm not arguing with you.  I just agreed if it was

19   attached to the email I would have seen it.

20   Q    Would you review it?

21   A    Probably during the meeting.

22   Q    And not the two days you had it before the meeting?

23   A    Possibly yes, possibly no.

24   Q    I want to show you what's in the draft of the QT and ask

25   you to read along with me, sir, which is paragraph 2.

ASELAGE - CROSS - BRAFMAN

1          MS. SMITH:  Objection, Your Honor, it's not actually

2     the 10-Q.

3          MR. BRAFMAN:  I'm sorry?

4          MS. SMITH:  This is not the 10-Q.

5          THE COURT:  You misspoke.  She's objecting because

6     what you're reading is not the actual 10-Q.

7          MR. BRAFMAN:  It's a draft.

8          MS. SMITH:  It's a draft -- we can do it at sidebar.

9          MR. BRAFMAN:  I'm sorry.  I mischaracterized it.

10    I'll go back.

11         THE COURT:  All right.

12    BY MR. BRAFMAN:

13    Q    Including as an attachment was a Marcum letter, correct?

14    A    Correct.

15    Q    And I want to point to the draft of the Marcum letter,

16    which is at R1687115, correct?

17    A    Correct.

18    Q    And at paragraph number 2 on page R168719 I'm going to

19    read to you paragraph number 2 of the Marcum letter.  During

20    the quarter ended June 30th, 2013, the company, its chief

21    executive officer and MSMB became parties to a series of

22    agreements to settle up to $2,286,511 of liabilities which

23    company management believes are the primary obligation of

24    MSMB.

25         Do you see that?

ASELAGE - CROSS - BRAFMAN

1    A      Yes, I see that.

2    Q      And the company management means Retrophin?

3    A      It does.

4    Q      And did you read this sentence before the call?

5    A      I don't recall if I read it before the call or not.

6    Q      If you read it before the call, would it raise a red

7    flag?

8    A      Should have.

9    Q      The company and MSMB have entered into indemnification

10   agreements whereby MSMB has agreed to defend and hold the

11   company harmless against all such obligations and amounts,

12   whether paid or unpaid, arising from these agreements.

13   Notwithstanding the indemnification, the company recorded a

14   2,286,511-dollar charge to operations during the quarter ended

15   June 30th, 2013 that was offset by a corresponding liability

16   of 1,691,400 for the difference between A, the aggregate

17   amount of all such settlements and, B, $593,111 of cash and

18   non-cash consideration that the company paid to immediately

19   settle a portion of the agreement on behalf of MSMB.  The

20   $1,691,400 was fully settled in October 2013 by cash payments

21   of 1,655,000 and issuance of 5,000 shares of common stock

22   valued at $36,400.  There is uncertainty as to whether MSMB

23   will have sufficient liquidation to repay the company or the

24   fund the indemnification agreements should it become

25   necessary.

ASELAGE - CROSS - BRAFMAN

1          Did I read that correctly, sir?

2     A    You read it correctly.

3     Q    And this letter from Marcum tells you up close, if you

4     will, and personal, two days before the call that included in

5     these documents are millions of dollars of settlement

6     agreements that were essentially agreed upon by Retrophin to

7     pay some of MSMB debts; isn't that true?

8               MS. SMITH:  Objection, Your Honor.

9               THE COURT:  Sustained.

10    Q    What does that paragraph mean to you as you read it?

11    A    The paragraph, you know, as I recall, there was a

12    discussion of some liabilities related to the transition of

13    personnel and certainly Mr. Shkreli from MSMB to Retrophin.

14    At the time, you know, it seemed like this was largely

15    technical accounting as a change.  In retrospect, we should

16    have been much more diligent about this.  We counted on

17    Mr. Panoff who was our CFO, Mr. Greebel who was our general

18    counsel, and the auditors to tell us if this was inappropriate

19    and while it was a restatement, it was not characterized as an

20    inappropriate accounting mechanism.

21    Q    And it was approved by the Board?

22              MS. SMITH:  Objection.

23    A    You don't approve an auditor's letter, sir.

24    Q    But the auditor's letter was a preface to the 10-Q that

25    was coming, wasn't it?

ASELAGE - CROSS - BRAFMAN

1    A    You're connecting dots that are not connected.

2    Q    Well, let's see whether they're connected or not.  This

3    is --

4    A    When I say not connecting, I'm talking about the

5    authorization not the content.

6    Q    Well, what were you authorizing -- I'm sorry.  What was

7    Marcum telling you, that these were liabilities of MSMB that

8    Retrophin had picked up, correct?

9    A    I don't think it was quite that simple.

10   Q    But in words or substance that's what it says if you read

11   through all the legalese.  MSMB --

12   A    That's exactly right, if you read through all the

13   legalese I would agree with you.

14   Q    Okay.  And that didn't trigger any discussion by you or

15   Mr. Richardson to your knowledge?

16   A    I don't recall whether there was discussion about it or

17   not.

18   Q    You certainly didn't say anything about it, correct?

19   A    I don't recall if I did or if I didn't.  If I did, I do

20   not recall it at this point in time.

21   Q    I want to show you what's in evidence as Defendant's

22   Exhibit 4237.  This was previously identified and it is in

23   evidence.

24        Do you recognize this as a form S-1 filed by

25   Retrophin?

ASELAGE - CROSS - BRAFMAN

1    A    I do.

2    Q    And tell the jury, if you can very briefly, what is a

3    Form S-1?

4    A    It's a filing with the SEC which informs an intent to

5    sell shares.

6    Q    And it also informs the SEC and the general public as to

7    certain financial information about the company?

8    A    There's backup information that does that, yes.

9    Q    It's supposed to be accurate and it's supposed to be all

10   legal?

11   A    Yes, indeed.

12   Q    On part of this has signature pages or at least the

13   identification of who the directors are who have, in effect,

14   signed off on the S-1, correct?

15   A    Correct.

16   Q    Listed among them is yourself; is that correct?

17   A    That is correct.

18   Q    And at the time you were a director, correct?

19   A    I was.

20   Q    And it's Mr. Richardson as well, correct?

21   A    Correct.

22   Q    Now, in the S-1 on the page that bears a number in the

23   upper left-hand corner as dated 626 -- I'm sorry that's when

24   it was copied.  On the bottom it says the number is 155156 is

25   the Bates number, if you will.

ASELAGE - CROSS - BRAFMAN

1          It indicates that the S-1 is going to include at

2     number 10.12, form of settlement and release agreements

3     between the company -- meaning Retrophin, correct?

4     A     Yes.

5     Q     -- MSMB Capital LP, MSMB Capital Management, MSMB

6     Healthcare, MSMB Healthcare Investors, MSMB Healthcare

7     Management and other parties thereto.

8          Do you see that?

9     A     Yes, sir.

10    Q     So the filing with the SEC had a form of the actual

11    settlement and release agreements that the company was using

12    to settle these matters, correct?

13    A     Apparently.

14    Q     Well, this is an S-1 document that you signed off on as a

15    director of the company?

16    A     Correct.  I did sign off on the S-1.

17    Q     And even if you're not paying full attention to your job

18    as a director during this period --

19          MS. SMITH:  Objection, Your Honor.

20          THE COURT:  Sustained.

21          MR. BRAFMAN:  I'll withdraw it.

22    Q     Even if you are just going -- withdrawn.

23          As a director you have an obligation to see to it

24    that what you're signing on behalf of the company and being

25    filed with the SEC is accurate, correct?

ASELAGE - CROSS - BRAFMAN

1    A    Yes, sir.

2              (Continued on the next page.)

ASELAGE - CROSS - BRAFMAN

1   Q    And you signed this document?

2   A    I did.

3

4   Q    It was filed, correct?

5   A    I believe it was, yes.

6   Q    Did you read it?

7   A    I did not read the entire document.  Again, we had

8   financial experts; we had the CFO, who was a financial expert;

9   auditors who were financial experts; a lawyer who was a legal

10  expert.  And this was never discussed with us.  We count on

11  the people who are experts in the field to give us advice if

12  there were things happening that we should be made aware of

13  and paid attention to.

14  Q    This is, would you say, the third or fourth time that the

15  settlement agreements have been raised in agendas or

16  documents?

17  A    I haven't kept count.

18  Q    Well, this document is kind of important because not only

19  is the subject raised, it actually lays out a form that's

20  going to be used by the company to actually settle and release

21  these liabilities, correct?

22           MS. SMITH:  Objection to going to be used.

23           THE COURT:  Sustained.

24  Q    This contains an actual form of a settlement and a

25  release agreement, correct?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1   A    It does.

2   Q    We are no longer talking about a Board telephone call,

3   which you may or may not remember completely, this is a

4   written document going to the SEC in a formal company filing

5   signed by you as a member of the Board of Directors, correct?

6   A    That's correct.

7   Q    It carries -- it would carry, included in it is a form of

8   a settlement and release agreements that we've been talking

9   about, correct?

10  A    That's correct.

11  Q    Now, on November 19 --

12          THE COURT:  Is this in evidence, sir.

13          MR. BRAFMAN:  I'm sorry, I don't know.

14  Q    It's marked for identification DX6007.  Can you look at

15  it yourself, sir, it will be on your scene and my screen and

16  the Court's screen.  DX6007, this is an e-mail from yourself

17  to Jim Long, correct?

18  A    No.  It's an e-mail from Jim Long to me.

19  Q    If you look up on top there is an e-mail by you to him,

20  correct?

21  A    Yes.

22  Q    I'm not offering the document because we don't have Jim

23  Long here, but in terms of your e-mail, you concur you confide

24  that you are still on the Board of, you say in words or

25  substance, you're -- did you tell Mr. Long that you were still

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1   on the Board of Retrophin?

2   A     Yes, it says that in the first sentence.

3   Q     This is not in evidence.  I need to ask you questions in

4   a proper form.

5         On November 19, 2013, do you remember having a

6   communication with Mr. Long in which you told him, among other

7   things that you're still on the Board of Retrophin?

8   A     I did.

9   Q     Did you tell him that, 'while Martin keeps things

10  interesting, but he runs things pretty much on his own.  I

11  can't say I'm a very active Board member'?

12            MS. SMITH:  Objection hearsay.

13            THE COURT:  Sustained.

14  Q     Did you say you were not an active Board member?

15            MS. SMITH:  Objection hearsay.

16            MR. BRAFMAN:  Did you say that you were not an

17  active Board member, I don't think that's subjective.

18            THE COURT:  No, it is hearsay.  I'm going to allow a

19  little bit of latitude on this.

20            MR. BRAFMAN:  Thank you, Judge, just that one

21  question.

22  Q     Did you tell Mr. Long on or about November 19, 2013 that

23  you were not an active Board member?

24  A     Yes, I think it's accurate that I said that.  And I

25  actually felt that I was somewhat inactive at that time.

ASELAGE - CROSS - BRAFMAN

1   Q    But that doesn't excuse you from responsibility as a

2   Board member, does it?

3   A    No, it doesn't.

4   Q    In fact, if you wanted to be excused you should resign

5   from the Board at that time, right?

6   A    That's your opinion, I'm not going to argue with you.

7   Q    But if you stay on the Board, that suggests that you

8   still maintain a fiduciary obligation?

9   A    I did still have a fiduciary obligation, sir.  When I say

10  I'm not an active person on the Board -- I think this came up

11  earlier today -- I was put on the Board or asked to stay on

12  the Board for commercial expertise.

13  Q    Okay.

14  A    Where we had commercial needs, I was active.  If there

15  was interests on a commercial product, I was available, I was

16  engaged.  On the things that were going on in 2013, there was

17  little to nothing that was commercial.  So when I say I'm not

18  active, I'm not saying I'm not paying any attention, I'm

19  saying there is not much for me to do here.

20  Q    Fair.

21  A    That's what I was tying to do.

22  Q    I'll accept there is not much for you to do.  But we're

23  not asking if you had much to do, we're asking if you

24  participated as a member of the Board in meetings of the

25  Board, in official documents that were approved, and did you

ASELAGE - CROSS - BRAFMAN

1    or did you not take that part seriously?

2    A    I certainly tried to.

3    Q    But it's clear that you did not read much of the

4    documentation in the S1 or the 10Q that we just went through.

5             MS. SMITH:  Objection, your Honor.

6             THE COURT:  Sustained.

7    Q    I want to show you what is marked for identification as

8    6033, do you recognize this as an e-mail from Mr. Panoff to

9    you on the bottom -- I'm sorry, let's look at the top.

10   A    I'm not seeing it.

11   Q    Do you recognize on the top that you sent Mr. Panoff an

12   e-mail?

13   A    Yes.

14   Q    Does it relate to the S1?

15   A    I need to see the screen below that to know.

16   Q    All right.  Does Mr. Panoff tell you he's going to be

17   sending you an S1?

18   A    Can you pull it down a little bit further?  I can't see

19   where it's from.  Okay, yes, I see that.  I don't see the

20   header.  Okay.  It is from Panoff.

21   Q    He's going to send you an S1, he said within an hour,

22   because you had not signed you were traveling, correct?

23   A    It sounds like that from the e-mail.

24   Q    Now, did you get an e-mail, if you recall, from

25   Mr. Greebel on November 22, 2013?  Look at 6043 for

ASELAGE – CROSS – BRAFMAN

1    identification and I ask if this refreshes your recollection

2    that you got an e-mail from Mr. Greebel with a copy of

3    Mr. Shkreli's employment agreement?

4    A    Can you go back to page one and slide it down so I can

5    see the entire header?  Okay, thank you.  Okay.

6    Q    Do you recognize this document as something you received

7    while a member of the Board?

8    A    I don't recall it, but it certainly appears to be an

9    e-mail from Greebel to myself.

10   Q    And it also has attached to it a unanimous written

11   consent?

12   A    Yes.

13   Q    What's a unanimous written consent?

14   A    A way to get Board approval when you don't have an actual

15   Board meeting.

16   Q    From time to time this format was used?

17   A    It was.

18   Q    When Mr. Greebel forwarded documents to you, there are

19   times when you remember getting them and times when you don't?

20   A    That's correct.

21   Q    And do you remember getting this unanimous written

22   consent to approve Mr. Shkreli's employment agreement?

23   A    I do not.

24   Q    Do you remember ultimately getting a signature page from

25   Mr. Greebel for the S1 that's already in evidence?

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE – CROSS – BRAFMAN

1   A    I do not.

2   Q    Let me show you a copy of a document that is identified

3   as 6044, do you recognize this as an e-mail from Greebel to

4   you?

5   A    What I'm seeing is an e-mail from me to Mr. Greebel.

6   Q    I'm sorry, the title subject is the "signature sheet",

7   correct?

8   A    Yes.

9   Q    You sent Mr. Greebel a signature sheet, the document that

10  was going to be filed with the SEC, correct?

11  A    Apparently.

12  Q    This is the signature sheet on the next page, correct?

13          MS. SMITH:  Objection, your Honor.  The unanimous

14  written consent was going to be filed with the SEC?

15          THE COURT:  No, this is a different document.  This

16  is 6044.

17          MR. BRAFMAN:  This is a unanimous written consent

18  sheet.

19          MS. SMITH:  To be filed with the SEC?

20          MR. BRAFMAN:  I'll withdraw that.

21  Q    This is a signature sheet that you sent to Mr. Greebel,

22  is that your signature?

23  A    Yes, it is.

24  Q    So when you were not present and they needed your

25  signature there was a procedure by which you could send a

ASELAGE - CROSS - BRAFMAN

1    signature page for a document that Mr. Greebel needed your

2    signature or Mr. Panoff, correct?

3    A    That's correct.

4    Q    Now do you know whether or not the 10K or the 10Q had to

5    be amended and restated before they were filed?

6    A    Can you tell me which?

7    Q    In September 9, 2013.

8    A    I don't recall.  Did you say a 10K?

9    Q    10K, 10Q and a 10Q.  I'll show you the e-mail, you tell

10   me if you remember this.  It's in evidence.  Can we put it on

11   the screen, please, 122-50 in evidence.  This is from Marc

12   Panoff; is that correct?

13   A    Correct.

14   Q    September 9, 2013, to you Mr. Richardson, Mr. Shkreli,

15   correct?

16   A    Correct.

17   Q    Copying Mr. Greebel and Mr. Hackert and Jain Sunil, do

18   you who those people are?

19   A    Sure.  Evan was outside general.  Hackert was our contact

20   at Marcum Auditors.  The other two individuals Sunil, Jain I

21   do not know.

22   Q    Do you know if she was a colleague of Mr. Hackert?

23   A    I believe so.  It's not somebody I can personally say

24   anything about it.

25   Q    This is an e-mail in which it lists, it says, "The

ASELAGE - CROSS - BRAFMAN

1    attachments.  Please find the latest draft of the amended 10Q

2    for December 31, 2012," do you see that?

3    A    Yes, it's a 10K.

4    Q    10K.  What is a 10K?

5    A    As I said before, that's an SEC filing that is done

6    annually.

7    Q    If there's something in it that changes, do you have to

8    amend it and restate it?

9    A    You do if it's material.

10   Q    Okay.  And here, this indicates that the latest draft of

11   the amended 10Q is included.  And it says, "The latest draft

12   of the amended 10Q for March 31 is 2013 is enclosed," correct?

13   A    Yes.

14   Q    And "Marcum LLP audit communication letter for quarter

15   ended June 30, 2013, and a draft 10Q for the quarter ended

16   June 30, 2013," correct?

17   A    It says all that.

18   Q    Do you remember getting this document?

19   A    I remember the e-mail.  Again, specifics on what is in

20   the document I don't have a great recollection of.  The e-mail

21   says I got it; I assume I did.

22   Q    Now the e-mail takes about a minute to read.  It comes

23   with, in this case, maybe 100 pages of attachments.  Did you

24   read this or look at it?

25   A    Those are two different questions.  Did I read every line

ASELAGE - CROSS - BRAFMAN

1   of the 100 pages, probably not.

2   Q    Did you look at it?

3   A    I'm sure I did.

4   Q    Did anything in this document grab your attention?

5   A    Not that I recall.  Again, we're three years ago.

6   Q    Let's see if I can refresh your recollection.  Let's see

7   what was being sent to you and ultimately filed.  RO19399 --

8            MS. SMITH:  Objection, your Honor, again this is not

9   the SEC filing.

10           THE COURT:  Sir, do you want to restate your

11  questioned and correct what you --

12  Q    Do you know if these documents once amended were filed by

13  Retrophin?

14  A    You're showing me a document, not the SEC filing.

15  Q    Do you know whether the 10Q 10K 2013 were filed by

16  Retrophin?

17  A    I believe they were, yes.

18  Q    This document, which is brought to your attention by the

19  e-mail includes RO19399, the Bates stamp number, and I'm going

20  to read from paragraph two on that page.

21           "During the second quarter of 2013 the company,

22  meaning Retrophin, its Chief Executive Officer and MSMB

23  Capital became parties to a series of agreements to settle up

24  to $2,286,511 of the liabilities which Company management

25  believes are the primary obligation of MSMB.  The Company and

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1    MSMB have entered into indemnification agreements whereby MSMB

2    has agreed to defend and hold the Company harmless against all

3    such obligations and amounts whether the paid or unpaid

4    arising from these agreements.  Notwithstanding the

5    indemnification, the company recorded a $2,286,511 charge to

6    operations during the quarter ended June 30, 2013, that was

7    offset by a corresponding liability of $1,691,400 for the

8    difference between, A, the aggregate amount of all such

9    settlements and $593,00 of cash and non-cash consideration the

10   Company paid to immediately settle a portion of the agreements

11   on behalf of MSMB.  The $1,691,400 is past due as of the date

12   of this filing, and there is uncertainty as to whether MSMB

13   will have sufficient liquidity to repay the company or fund

14   the indemnification agreement should it become necessary."

15              Did I read that pretty much accurately?

16   A    You read it very accurately.

17   Q    Is this the first time -- did you not read this at the

18   time you got it?

19   A    I don't recall.

20   Q    If you had read it, would you recall it?

21   A    Should.

22   Q    I'm sorry?

23   A    I should.

24   Q    But you don't recall.

25   A    I don't.

ASELAGE - CROSS - BRAFMAN

1    Q    On page with the Bates stamp R019400, there is a

2    paragraph where it says, "caption financial statement

3    presentation."  And the second paragraph which is italicized

4    reads, "Except for amending the previously filed form 10K for

5    the year ended December 31, 2012, and form 10Q for the quarter

6    ending March 31, 2011 (sic), which have been amended to

7    include an omitted subsequent event footnote disclosure

8    relating to certain settlement agreements the company, its

9    Chief Executive Officer and MSMB entered into during the

10   second quarter of 2013 to settle up to $2,286,511 of

11   liabilities which Company management believes are the primary

12   obligation of MSMB.  There are no other matters regarding the

13   financial statement presentation that we believe should be

14   communicated to you."  Do you understand what that paragraph

15   says?

16   A    Yes.  It's essentially very similar to the paragraph we

17   covered previously.

18   Q    But it's in a separate place, so two separate times in

19   the same document where the people who get this draft are

20   being advised that the company is essentially picking up

21   liabilities for MSMB; is that correct?

22   A    That is correct.

23   Q    You don't remember seeing that?

24   A    I do not.

25   Q    I want to now, sir, go to R019421, that's the Bates stamp

ASELAGE - CROSS - BRAFMAN

1   number, I'm going to just refer to one paragraph in the second

2   quarter.

3   A    Yes.

4   Q    "In the second quarter of 2013, the Company, its Chief

5   Executive Officer and a related party became party to a series

6   of agreements to settle up $2,286,511 of liabilities, which

7   Company management believes are the primary obligations of a

8   related party.  The company paid $593,111 of these settlements

9   in the second quarter on behalf of the related party and had

10  outstanding liabilities of $1,691,400 as of June 30, which is

11  entirely past due as the date of this filing.  There is an

12  uncertainty as to the related party will have sufficient

13  liquidity to repay the Company or fund the indemnification

14  agreements should it become necessary, see note nine."

15          Now that basically says for the third time what we

16  are discussing, correct?

17  A    Yes, recap of what we discussed before.

18  Q    So this is the third time in the same document where in

19  words or substance it says that the company, Retrophin, is

20  essentially picking up MSMB's liabilities, correct?

21          MS. SMITH:  Objection, your Honor.  It's not the

22  same document.

23          THE COURT:  The objection is you're characterization

24  of this being in the same document three times.  Do you want

25  to rephrase, sir?

ASELAGE - CROSS - BRAFMAN

1   Q    Is this the third time we've covered the same subject?

2   A    It is.

3   Q    The same attachments, the same group of attachments that

4   are covered by the covering e-mail from Mr. Panoff, correct?

5   A    Yes.  They are in different documents, but in the same

6   tranches.

7   Q    In each case, in words or substance, what these three

8   paragraphs say, if you agree, is that Retrophin or the company

9   is picking up liabilities of MSMB; is that correct?

10  A    It says that.

11  Q    You didn't read that either?

12  A    I don't recall reading it.

13  Q    Now, if we go to the sort of end, I don't see the Bates

14  stamp on this.  I'm just going to identify it by its caption,

15  one of the attachments to the covering e-mail, same exhibit,

16  "part financial Retrophin subsidiary a development statement

17  company condensed consolidated balance sheets," do you see

18  that?

19  A    I do.

20  Q    Here it lists settlement payable.  You see that, where my

21  finger is pointing, sir?

22  A    Yes, I do.

23  Q    It lists $1,691,400; is that correct?

24  A    It is.

25  Q    And that's the same settlement number that we talked

Rivka Teich CSR, RPR, RMR
Official Court Reporter

ASELAGE - CROSS - BRAFMAN

1  about for the last 15 minutes; is that correct?

2  A    Yes.

3  Q    It's listed here to show it on the June 30, 2013 under

4  Retrophin's financial information, correct?

5  A    I'm not seeing the top.  I'll take your word for it.

6  Q    It's considered a consolidated balance sheet for

7  Retrophin and subsidiary, correct?

8  A    Yes.

9  Q    On the top it says, "part financial information,"

10  correct?

11  A    Yes.

12  Q    This is not a long document, do you remember looking at

13  this and seeing that number?

14  A    I do not.

15  Q    You read financial statements on a regular basis for

16  corporations, don't you?

17  A    Do I read financial statements?

18  Q    You've seen financial statements by corporations

19  throughout your career?

20  A    Yes.

21  Q    As a member of the Board of Directors, sometimes

22  financial statements are sent to you to review and approve?

23  A    That's correct.  I'm sorry, generally a Board of

24  Directors doesn't approve a financial statement.

25  Q    But they bring it to your attention, correct?

S. ASELAGE – REDIRECT – MS. SMITH

1  A     Hopefully, yes.

2  Q     Well, they did here?

3  A     Yes.

4  Q     But it didn't get your attention.

5  A     It did not.

6         MR. BRAFMAN:  I have nothing further.  Thank you,

7  sir.

8         THE COURT:  Do you have redirect?

9         MS. SMITH:  I do.  Can we take a two-minute break.

10        THE COURT:  Would the jurors like to take a stretch

11 or get some coffee?  You can step out.  Please don't discuss

12 the case.

13        (Jury exits the courtroom.)

14        (Whereupon, the witness steps down.)

15        THE COURT:  Let's have a ten-minute break, please.

16        (Whereupon, a recess was taken at 2:30 p.m.)

17        (Back in session at 2:40 p.m.)

18        THE COURT:  All jurors are present.  Please have a

19 seat everybody.

20        Ms. Smith, you may commence your redirect.

21 REDIRECT EXAMINATION

22 BY MS. SMITH:

23 Q     On cross Mr. Brafman asked you about what is marked as

24 Defendant's Exhibit 4237, which is a form S1, it's in

25 evidence.  I'm actually going to use the Elmo.  Then he also

S. ASELAGE - VOIR DIRE - MR. BRAFMAN

1   asked you about an attachment to the form S1, which was a form

2   of settlement agreement.

3   A    I recall.

4   Q    This is the form of settlement agreement that he asked

5   you questions about.  I'm going to show you what is marked

6   Government's Exhibit 617, which is marked for identification

7   in front of you, it's kind of a larger document.  Do you

8   recognize that document?

9   A    The cover is the e-mail that was previously discussed

10  from Panoff with the S1, relative to the S1.

11  Q    Just the document in front of you.  This is a new

12  exhibit, so if can you just take a look, is it an e-mail from

13  Mr. Panoff?

14  A    Yes, it is.

15  Q    And is it dated October of 2013?

16  A    Yes, Friday October 25, 2013.

17  Q    Did you receive this e-mail?

18  A    Yes.

19  Q    Is it related to the S1 for Retrophin?

20  A    Yes.

21          MS. SMITH:  The Government moves into evidence 617.

22          MR. BRAFMAN:  May I ask for a brief voir dire?

23          THE COURT:  Of course.

24  VOIR DIRE

25  BY MR. BRAFMAN:

S. ASELAGE - VOIR DIRE - MR. BRAFMAN

1    Q    The e-mail that is attached to it IS dated October 25,

2    2013.  You have seen that before, right?

3    A    Yes.

4    Q    Do you have any idea whether you've ever seen the

5    documents that are attached by spring clip to this document

6    before?

7    A    Sir, I haven't even looked at them yet.

8    Q    Can you identify each of them as documents you've seen at

9    the time this e-mail was sent to you?

10   A    Ask that again?

11   Q    Are you able to identify what is attached to this

12   document by a spring clip as attachments you actually looked

13   at, at time this e-mail was sent to you?

14   A    This is the S1.  And I just testified --

15   Q    It's a different document than the S1 I placed into

16   evidence.  This is a document that the Government is offering

17   as Exhibit 617.  My question to you is, with the exception of

18   a covering e-mail which you recognize as an e-mail sent to

19   you, do you have any idea whether that e-mail had these

20   documents attached to it at the time you got the e-mail?

21   A    These documents appear to be the same S1 that you showed

22   me.  If they are different, I don't know that.

23   Q    So you don't know what is attached to this document,

24   correct?

25   A    The S1 is attached to this document.

S. ASELAGE - VOIR DIRE - MR. BRAFMAN

1   Q    It's not.  It's --

2            THE COURT:  Sir --

3   A    You're talking about the --

4   Q    The attachments.

5            MS. SMITH:  Your Honor, can we do a sidebar.

6            (Continued on the next page.)

7            (Sidebar conference.)

SIDEBAR CONFERENCE

1    MS. SMITH:  Your Honor, I asked the foundational

2    questions.  They are relevant documents that this witness

3    received in the course of his business for Retrophin.  I don't

4    know if there is an authenticity question, or what the voir

5    dire is other than to breakup my redirect.

6    MR. BRAFMAN:  I have never broken up your redirect

7    before. Okay.

8    MS. SMITH:  Okay.

9    MR. BRAFMAN:  Your Honor, this document was handed

10   to us 20 minutes ago.  It's got a cover page with a Government

11   exhibit number.  And it is something they want to introduce

12   into evidence through this witness.  And I'm not objecting to

13   the e-mail, he can identify as having received.  But he has no

14   clue what was attached to this document.  It's not the same

15   materials that were attached to the S1 I showed him, which he

16   did identify.

17   MS. SMITH:  That's correct.  Because the S1 was

18   filed with attachments that were not sent to the Board

19   members.  This is what was sent to the Board members as the

20   S1.

21   MR. BRAFMAN:  But he doesn't know that.

22   MS. SMITH:  Yes, he has seen this document.

23   THE COURT:  He hasn't been able to testify as to

24   what, he hasn't been able to answer the question that you

25   asked.  I think he said he had just been handed this.  He

3565

SIDEBAR CONFERENCE

1    identified this as an S1.  Now the question is whether this

2    was sent to him as part of this e-mail or whether the other

3    version we saw.

4              MS. SMITH:  The other version was the version filed

5    with the SEC, which is why we didn't object to it.  It's a

6    public document.  This is a Retrophin document that he

7    received.

8              If you would like me to put it in subject to

9    connection I can call a witness from Retrophin to authenticate

10   that this is the e-mail with the attachments he received.  We

11   have not done that for any of the other documents in evidence.

12   And so we could do that if we need to do.  We can do that for

13   each and every Retrophin document that we have.  We've had no

14   other -- if this is an authenticity objection we're happy to

15   do it subject to connection and have someone testify that

16   these are the attachments that were attached to this e-mail

17   which he received.

18             MR. BRAFMAN:  It's not an authenticity objection.

19   We haven't had that problem at any point in this trial.

20             I'm suggesting you can't simply hand a witness like

21   this who doesn't remember anything about these documents, and

22   suggest that he saw this, other than the e-mail.

23             MS. SMITH:  He has seen this e-mail.

24             MR. BRAFMAN:  He had hasn't testified.  He has seen

25   the e-mail.

SIDEBAR CONFERENCE

1          MS. SMITH:  He has seen the attachments.

2          THE COURT:  He hasn't testified to this because

3     we're here instead of listening to him.  I don't know what he

4     will say.

5          MS. SMITH:  He has seen the e-mail and the

6     attachments before.

7          MR. BRAFMAN:  That's not what he said.  He said he

8     saw the e-mail.

9          MS. SMITH:  You are confusing him.  You said they

10    were the same document before, and he said it wasn't.  I can

11    clarify if you would like.  The S1 that is publicly filed,

12    this is the version of the S1 that was e-mailed to the Board

13    for approval.  They are two of different documents.

14         MR. BRAFMAN:  But the Board approved the S1 that was

15    filed as well.  He testified to it.

16         MS. SMITH:  The signature page is on there.  He was

17    asked to send a signature back in response to this e-mail in

18    response to this attachment that doesn't have it.

19         MR. BRAFMAN:  I'm going withdraw the objection.  You

20    can try to straighten it out with the witness.

21         THE COURT:  While we're here at sidebar, in light of

22    Ms. Kasulis' anticipating submission this evening I'm going to

23    order defense to respond to this by tomorrow at 2:00 p.m. so

24    we can be --

25         MR. BRAFMAN:  Can you --

SIDEBAR CONFERENCE

1         THE COURT:  I don't know what we're expecting.  I

2    want to make sure, I have a commitment all day Sunday, a

3    family commitment.  I need to work tomorrow on it.  I need to

4    get it no longer than two.  I want to address it.

5         MR. AGNIFILO:  Can I make a suggestion?  Is there a

6    way we can talk about this since we're going to break early,

7    and we have an hour, at least, of found time.  Can we hammer

8    this out in the next hour?

9         MS. KASULIS:  Our position is what it is.  I'm happy

10   to convince you if I would like to be convinced of our

11   position.  I've been doing that with Ms. Zellan.  I'm filing

12   it in anticipation of your objection.

13        We have a lovely relationship.

14        MR. AGNIFILO:  So do we.

15        THE COURT:  Judge Donnelly says you're a nice man

16   too.

17        MR. AGNIFILO:  So let's when we finish, we can stay

18   and resolve so we don't have to be writing briefs this

19   weekend.

20        THE COURT:  Okay.  Good, thank you.

21        (End of sidebar conference.)

22        (Continued on the next page.)

23

24

25

S. ASELAGE – REDIRECT – MS. SMITH

1          (In open court.)

2    REDIRECT EXAMINATION

3    BY MS. SMITH:

4    Q    If we can go back to Defense 42 in evidence again.  Mr.

5    Aselage, this is the publicly filed S1 from November 15, 2013

6    that Mr. Brafman asked you about, correct?

7    A    I believe so.

8    Q    Looking at 617 for identification, we talked about that.

9    That's an e-mail from Marc Panoff to the Board attaching a

10   copy of an S1 on October 25, 2013; is that right?

11   A    That is correct.

12   Q    You received the e-mail; is that right?

13   A    Yes.

14   Q    You also received the attachment, which is the S1

15   registration statement; is that correct?

16   A    Yes.

17   Q    This e-mail was sent and received by you prior to the

18   filing of the publicly filed S1; is that correct?

19   A    I believe so.

20          MS. SMITH:  Your Honor, the Government offers

21   Government's Exhibit 617 into evidence

22          MR. BRAFMAN:  No objection, your Honor.

23          THE COURT:  We will receive Government's Exhibit

24   617.

25          (Government Exhibit 617, was received in evidence.)

S. ASELAGE - REDIRECT - MS. SMITH

1    Q    If we can look at this e-mail again.  This is an e-mail

2    from Mr. Panoff to yourself, Mr. Richardson, Mr. Shkreli and

3    Mr. Golding; is that correct.

4    A    It is.

5    Q    The subject is "S1 registration statement"?

6    A    Yes.

7    Q    It's dated October 25, 2013?

8    A    Yes.

9    Q    Mr. Panoff writes, "We received the expected comment

10   letter from the SEC in response to our registration statement

11   submission on form S1 a week-and-a-half ago and submitted a

12   response along with an amended S1 yesterday.  I'm attaching

13   the comment letter with our responses as well as the amended

14   S1 for your reference."

15        Then later on in the e-mail he says, "I'm also

16   attaching the signature page from the amended registration

17   statement for you to sign.  Please PDF or fax it back to me as

18   soon as you can.  If you have any comments or questions please

19   let me know."

20        Mr. Aselage did you review the attachments to this

21   e-mail?

22   A    I don't recall.

23   Q    Can you review them now and let me know if attached to

24   this e-mail, the S1 that is attached to this e-mail, contains

25   the settlement and release agreement attachment that was filed

S. ASELAGE - REDIRECT - MS. SMITH

1    publicly with the S1 in Defendant's Exhibit 4237?

2    A    I actually reviewed them while you were in the sidebar,

3    there is no attachment with a settlement agreement.

4    Q    So just to be clear, this version of the S1 that was sent

5    to you by Marc Panoff does not include the attachment here,

6    which was contained in the publicly filed version of the S1;

7    is that correct?

8    A    That's correct.  I think i guess it's obvious, it was

9    filed the day before it was sent to me.  So comments would

10   have been pretty irrelevant at that point.

11   Q    On cross Mr. Brafman asked you some questions about

12   meetings that you and the defendant had with Retrophin

13   investors when you first joined the company, right?

14   A    Right.

15   Q    And those were in connection with the investment banks

16   for the Valeant deal; is that right?

17   A    That's correct.

18   Q    To be clear, you never attended any meetings with any

19   potential or actual investors in MSMB Capital, correct?

20   A    That's correct.

21   Q    You never attended any meeting with potential or actual

22   investors in MSMB Healthcare, correct?

23   A    Correct.

24   Q    And you didn't meet the defendant until August of 2012;

25   is that right?

S. ASELAGE - REDIRECT - MS. SMITH

1   A    I believe it was August, it was either August or

2   September.

3   Q    And you had no involvement in MSMB Capital or MSMB

4   Healthcare whatsoever?

5   A    Correct.

6   Q    Mr. Brafman asked you about when the defendant made

7   pitches at those meetings with the investment bankers for the

8   Valeant deal, and you had said that he on one occasion "filled

9   in the blanks".  You were going to explain that occasion but

10  Mr. Brafman came of cut you off, can you give the explanation

11  of the occasion on which Mr. Shkreli filled in a blank?

12  A    The one that stuck out to me, because of my prior

13  position I had done a lot of work internationally.  We were in

14  an investor meeting where one of the potential investors asked

15  a question about potential to give the products we were going

16  to buy used and reimburse in Europe, specifically shared a

17  concern about the reimbursement process in France.

18  Mr. Shkreli just told him, 'It's really easy.  Reimbursement

19  in France is no problem at all.'.

20       I have a fair amount of experience with

21  reimbursement in France, it's extremely difficult.  You go

22  through two different commissions and then negotiate a price.

23  It was clear he was just giving a flip answer without really

24  knowing anything about reimbursement in France, at least to

25  the best that I can tell.  That concerned me a little bit.

S. ASELAGE - REDIRECT - MS. SMITH

1    You can see from the investors' face they knew what he said of

2    wasn't accurate.

3    Q    Do you know why the defendant said that?

4              MR. BRAFMAN:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q    Do you know that the defendant believed about the

7    reimbursement?

8              MR. BRAFMAN:  Objection, your Honor.

9              THE COURT:  Sustained.

10   Q    On cross Mr. Brafman also asked you about the stock price

11   of Retrophin at various points during the company's history.

12   He was showing you Government's Exhibit 606, which is in

13   evidence.  I think that he focused primarily on the March 2014

14   time period.

15   A    Yes.

16   Q    He pointed out some of the high points in March of 2014

17   including share prices of $19, $20; is that right?

18   A    Yes.

19   Q    The time when you kind of first had the meeting for the

20   Retrophin Board of Directors and discussed the possibility of

21   removing Mr. Shkreli was in May of 2014; is that right?

22   A    Yes, April/May time period.

23   Q    Kind of in the May time period of 2014 what was the stock

24   price of Retrophin?  For example, if you look at May 20, 2014?

25   A    12.34.

S. ASELAGE - REDIRECT - MS. SMITH

1   Q    If we go down to the beginning of June on June 2, 2014

2   what is it?

3   A    14.45.

4   Q    If you go down to the bottom there on June 10, 2014, what

5   is the price?

6   A    11.33.

7            THE COURT:  May I ask a question?  Sir, you earlier

8   said that there was something having to do with a number of

9   shares in connection with the stock price.  I didn't really

10  understand that at all.  Could you explain?

11           THE WITNESS:  Sure.  In March of 2015 the company

12  did a secondary offering and raised $150 million by selling

13  shares of stock.  So there were roughly, I don't recall the

14  number, 78 million more shares at the time, well, as of today,

15  than there were at the time period when Mr. Brafman was going

16  through the stock prices.

17           So to create the value of the company or determine a

18  value of the company you have to take the share price, times

19  the number of shares.  So the fewer shares in 2014, even with

20  the same stock price, would have a lower overall company

21  value.

22           THE COURT:  So I don't recall that chart that we

23  looked at, 606, did not have a number of shares issued at the

24  time.

25           THE WITNESS:  It did not show the shares issued,

S. ASELAGE - REDIRECT - MS. SMITH

1    just a stock price.

2              THE COURT:  Thank you.

3              THE WITNESS:  The stock price, to determine a value

4    of a company you have to know the stock price and the number

5    of shares, apples to apples comparison on stock price has to

6    have the same number of shares.

7              THE COURT:  I see.  Thank you.

8              THE WITNESS:  Sure.

9    BY MS. SMITH:

10   Q    You just to recap, the section that Mr. Brafman showed

11   you, was in March of 2014 and the share price at 19 or $20.

12   If we can look at September of 2014, is that when the Board

13   made a determination to address some concerns that they had

14   with the defendant by asking him to step down as CEO, is that

15   the right time frame September 2014?

16   A    It is.

17   Q    So if we look for example September 10, 2014 what was the

18   stock price of Retrophin at that time?

19   A    13.41.

20   Q    On September 30, 2014 the date of the Board meeting where

21   the Board voted to remove Mr. Shkreli, what was the stock

22   price?

23   A    9.02.

24              MS. SMITH:  That's it, your Honor.  No further

25   questions.

S. ASELAGE - RECROSS - MR. BRAFMAN

1          MR. BRAFMAN:  I have a couple.

2          THE COURT:  Of course.

3    RECROSS-EXAMINATION

4    BY MR. BRAFMAN:

5    Q    Mr. Aselage, just a couple more minutes then we'll be

6    done.

7          Whether it's the Government's exhibit or my exhibit,

8    and latest exhibit is 617, which the Government offered into

9    evidence, whether it's mine or the Government's there is no

10   question, sir, that even in the new and produced shown to you

11   by the Government, if we look at page R168933 -- I'm sorry the

12   numbers are really, really small, but trust me I read it I

13   think correctly -- R168933 is the Bates stamp number.  There

14   is no question that the settlement issue is contained in their

15   copy as well, settlement payable and that same number

16   $1,691,400 is listed, even in the Government's new one,

17   correct?

18   A    It does, yes.

19   Q    Okay.  And not only listed once, it's listed on R168942

20   is the new number, and not only is it listed but there is a

21   discussion about the issue in the paragraph with my finger on

22   it.  It's very small.  I'll read it out loud, if you can read

23   it with me.

24   A    Can I ask you to tell me what page it is, it's easier for

25   me to look at the paper.  Tell me where it is in this thing.

S. ASELAGE - RECROSS - MR. BRAFMAN

1    Q    There are no page numbers.  There are these Bates stamp

2    numbers.  You have it in front of you?

3    A    Yes.

4    Q    Look at --

5         MR. BRAFMAN:  Can I find it for the witness, that

6    might be easier.

7         THE COURT:  Sure.

8    BY MR. BRAFMAN:

9    Q    Number in the lower corner, R168942.

10   A    All right.

11   Q    Do you have that document, sir?

12   A    I think I do.

13   Q    I'm pointing to the paragraph in the middle of the page,

14   starts with, "In the second quarter of 2013," do you have

15   that, sir?

16   A    I do.

17   Q    I'm going to read it.  You'll tell me if I read it

18   correctly.  "In the second quarter of 2013 the Company, the

19   Chief Executive Officer and related party, which is a former

20   investor in the company that was previously managed by the

21   Company's Chief Executive Officer became partner to a series

22   of agreements to settle up $2,286,511 of liabilities, which

23   Company management believes are the primary obligation of the

24   related party.  The Company and the related party have entered

25   into indemnification agreements whereby the related party has

S. ASELAGE - RECROSS - MR. BRAFMAN

1    agreed to defend and hold the company harmless against all

2    such obligations and amounts whether paid or unpaid arising

3    from these agreements.  Notwithstanding the indemnification,

4    the Company recorded a $2,286,500.11 charge to operations

5    during the quarter ending June 30, 2013, and a corresponding

6    liability of $1,691,400 for the difference between, A, the

7    aggregate amount of all such settlements; B, $593,111 of cash

8    and non-cash consideration of the Company paid to immediately

9    settle a portion of the agreement on behalf of the related

10   party.  The $1,691,400 is past due as of August 9, 2013.  The

11   counter parties to these agreements receive the right to

12   demand payment at any time.  The Chief Executive Officer also

13   agreed to deliver, caused to be deliver, 47,182 shares of

14   common stock to one of the counter parties as a separate

15   component of one of these agreements.  Accordingly, the

16   Company does not believe it is required to record a liability

17   for the shared base component of this specific agreement

18   during the second of quarter ending June 30, 2013.  There is

19   uncertainty as to whether the related party will have

20   sufficient liquidity to repay the Company upon the

21   indemnification agreements should it become necessary.  As of

22   the date of this filing, the Company owes 1,655,000 in cash in

23   the 5,000 shares of common stock valued at 36,400 due

24   immediately."

25           Did I read that correctly, sir?

S. ASELAGE - RECROSS - MR. BRAFMAN

1   A    You did.  And if it helps as we go through more of this,

2   there are larger page numbers in the upper, right-hand, this

3   is 82 of 112.

4   Q    Whether it's the one she put in evidence or the one I

5   did, the settlement agreements are discussed in both

6   agreements, correct, both documents?

7   A    Yes.

8   Q    It doesn't matter which one I show you because your

9   position is that didn't see either of these references and

10  either of the documents, correct?

11          MS. SMITH:  Objection, your Honor.

12          THE COURT:  Overruled.

13  Q    You may answer.

14  A    I did not say I did not see them.  I said I do not recall

15  seeing them.

16  Q    I'll accept that, thank you.

17          Finally, sir, if you look at R168945.

18  A    What is the page numberer in the upper right?

19  Q    Eighty-five of 112.

20  A    Yes.

21  Q    There is additional references to an "additional

22  settlement agreement," correct?

23  A    What paragraph are you on?

24  Q    Look at my finger, "Additional settlement agreement,"

25  about 60 percent of the way down.

S. ASELAGE - RECROSS - MR. BRAFMAN

1   A    Okay, I've got it.

2   Q    "On August 29, 2013 the company entered into an

3   additional settlement agreement for $300,000 due following

4   execution of the agreement.  The company charged this amount

5   for selling general administrative in its statement of

6   operations.  As of the date of the filing this settlement has

7   been paid."

8             Do you know what that refers to, which settlement?

9   A    I do not.

10  Q    Do you know who got the $300,000?

11  A    I do not.

12  Q    Would it be fair to say, just like the other references,

13  if you saw them you don't recall them?

14  A    That's correct.

15            R ONE:  Thank you, sir.  Have a good trip back.

16            THE WITNESS:  Thank you.

17            THE COURT:  Anymore redirect?

18            MS. SMITH:  No, your Honor.

19            THE COURT:  All right, sir.  You're excused.  Have a

20  safe trip back.  Have a good weekend.

21            (Whereupon, the witness was excused.)

22            THE COURT:  Are the parties ready to adjourn for the

23  day?

24            MS. KASULIS:  Yes, your Honor.

25            MR. BRAFMAN:  Yes, your Honor.

S. ASELAGE - RECROSS - MR. BRAFMAN

1          THE COURT:  As I promised the jurors, you get an

2     early weekend break.  Please do not discuss the case,

3     conscientiously avoid any media coverage.  Have a good

4     weekend.  See you 9:00 o'clock on Monday morning.  Take care.

5          (Jury exits the courtroom.)

6          THE COURT:  Did the parties want to talk amongst

7     themselves or do I need to be here?

8          MR. AGNIFILO:  I don't know that you need to be

9     here.

10         THE COURT:  The briefing schedule is set.  We'll

11     hear from the Government tonight and we'll hear from the

12     defense by noon.  If you work it out, you don't have to submit

13     anything.

14         MR. AGNIFILO:  Can I ask one question?  If it turns

15     out that after 15 minutes of discussing it there is a discreet

16     issue that we don't agree on, would your Honor rather us -- we

17     can do the briefing schedule, obviously but --

18         THE COURT:  I don't want to cause anybody to do

19     unnecessary briefing.  I'm around.  You can call my chambers

20     and we can come back.  I'll have to make sure our court

21     reporter is available.

22         You'll be able to know in the next half hour whether

23     or not you could work this out?

24         MR. AGNIFILO:  I would think so.

25         There is one other issue, Mr. Pierotti.

S. ASELAGE - RECROSS - MR. BRAFMAN

1   Mr. Pierotti, if you remember, there are issues between

2   Mr. Shkreli and Mr. Pierotti.  I think what your Honor said in

3   your decision was this is better left as a trial issue.  So I

4   don't know if Mr. Pierotti is testifying on Monday, I think he

5   might be.

6           MS. KASULIS:  We're not certain.  He's scheduled for

7   next week.  We can raise the issue with the defense and talk

8   about it and if there is anything outstanding we can raise it

9   with the Court.

10          THE COURT:  Are the parties taking same positions

11  they did in the briefing?

12          MS. KASULIS:  Yes.

13          MR. AGNIFILO:  We'll try to work it out.

14          THE COURT:  You can use the phone on the desk and

15  call chambers if you would like me to come back.

16          MS. KASULIS:  To be honest, if there is an

17  outstanding issue, I do believe we have to file briefing on

18  it.  It would rely on case law that I think your Honor would

19  review.

20          THE COURT:  I appreciate it.

21          MS. KASULIS:  If we can't work it out, I prefer the

22  filing.

23          THE COURT:  Okay.

24          MS. KASULIS:  Sorry, your Honor.

25          THE COURT:  I'll see you Monday morning and we'll

S. ASELAGE - RECROSS - MR. BRAFMAN

1  keep our eyes open for a submission.

2           MS. KASULIS:  Thank you.

3           MR. AGNIFILO:  Thank you.

4           MR. BRAFMAN:  Thank you.

5

6           (Proceedings adjourned at 3:20 p.m. to resume on

7  July 17, 2017 at 9:00 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         I N D E X

3    WITNESS                                    PAGE

4    STEPHEN ASELAGE
     DIRECT EXAMINATION     BY MS. SMITH        3379
5    CROSS-EXAMINATION      BY MR. BRAFMAN      3429
     REDIRECT EXAMINATION   BY MS. SMITH        3560
6    VOIR DIRE              BY MR. BRAFMAN      3561
     REDIRECT EXAMINATION   BY MS. SMITH        3568
7    RECROSS-EXAMINATION    BY MR. BRAFMAN      3575
                        *      *      *      *

8

9                         I N D E X

10                         EXHIBITS

11   GOVERNMENT              PAGE
     122-76                  3386
12   122-93                  3415
     617                     3568
13

14

15

16

17

18

19

20

21

22

23

24

25

                Rivka Teich CSR, RPR, RMR
                  Official Court Reporter

**COURTROOM DEPUTY: [2]** 3375/25
3428/12
**MR. AGNIFILO: [8]** 3567/4 3567/13
3567/16 3580/7 3580/13 3580/23
3581/12 3582/2
**MR. BRAFMAN: [95]** 3377/3 3377/17
3377/21 3378/1 3378/25 3381/22
3382/5 3382/8 3382/11 3386/4 3389/19
3390/23 3394/1 3401/12 3402/4
3402/18 3402/23 3403/2 3403/12
3404/19 3406/6 3407/12 3408/10
3408/13 3408/17 3415/15 3419/1
3421/11 3421/19 3422/10 3423/14
3423/19 3425/14 3429/2 3429/12
3436/6 3439/20 3439/23 3440/9
3440/12 3440/16 3440/18 3440/21
3442/1 3442/18 3442/24 3443/3
3443/12 3443/16 3443/21 3443/23
3444/3 3456/25 3457/6 3468/16 3494/4
3500/8 3500/10 3514/8 3515/14
3515/17 3516/21 3519/7 3520/14
3520/19 3520/21 3520/25 3535/19
3538/2 3538/6 3538/8 3543/20 3546/12
3547/15 3547/19 3551/16 3551/19
3560/5 3561/21 3564/5 3564/8 3564/20
3565/17 3565/23 3566/6 3566/13
3566/18 3566/24 3568/21 3572/3
3572/7 3574/25 3576/4 3579/24 3582/3
**MR. SRINIVASAN: [1]** 3429/3
**MS. KASULIS: [17]** 3376/2 3376/5
3376/23 3377/5 3377/12 3377/25
3378/3 3378/15 3378/24 3567/8
3579/23 3581/5 3581/11 3581/15
3581/20 3581/23 3582/1
**MS. SMITH: [105]** 3386/2 3389/23
3394/4 3401/16 3402/10 3402/21
3402/24 3406/8 3407/2 3407/5 3407/11
3408/1 3408/12 3408/14 3408/18
3415/13 3421/14 3421/21 3421/25
3422/17 3423/17 3423/22 3425/17
3428/3 3428/5 3432/23 3433/9 3434/4
3436/2 3437/22 3439/16 3440/5
3440/10 3442/13 3442/22 3443/1
3443/11 3443/13 3443/17 3443/20
3448/9 3448/18 3448/24 3450/2 3450/7
3450/17 3455/5 3457/4 3459/24
3475/18 3479/5 3487/12 3493/23
3494/2 3494/5 3498/17 3499/13
3500/19 3501/12 3502/9 3511/3 3514/7
3514/23 3515/12 3516/15 3516/19
3520/12 3520/15 3520/23 3527/8
3528/19 3529/16 3535/18 3535/20
3537/25 3538/3 3538/7 3540/7 3540/21
3543/18 3545/21 3547/11 3547/14
3549/4 3551/12 3551/18 3554/7
3557/20 3560/8 3561/20 3563/4 3563/7
3564/7 3564/16 3564/21 3565/3
3565/22 3565/25 3566/4 3566/8
3566/15 3568/19 3574/23 3578/10
3579/17
**R ONE: [2]** 3500/2 3579/14
**THE COURT REPORTER: [1]** 3435/24
**THE COURT: [161]** 3376/4 3376/11
3377/9 3377/19 3378/11 3378/22
3379/3 3379/6 3379/10 3379/12
3381/23 3382/7 3382/9 3382/13

3382/17 3386/5 3389/21 3389/24
3390/13 3390/24 3394/2 3402/8
3403/10 3403/14 3404/11 3404/20
3406/12 3407/3 3407/9 3407/23
3408/15 3408/19 3409/1 3415/16
3418/25 3419/2 3421/13 3421/15
3421/20 3421/22 3422/1 3422/11
3423/21 3423/25 3425/16 3426/19
3428/7 3428/14 3429/1 3429/5 3429/7
3432/24 3433/10 3434/5 3436/3 3436/7
3437/23 3439/17 3439/19 3439/21
3439/25 3440/7 3440/11 3440/14
3440/17 3440/19 3440/22 3441/1
3443/14 3443/18 3443/22 3443/25
3445/1 3448/10 3448/19 3449/1 3450/3
3450/9 3450/18 3457/2 3457/8 3459/25
3468/17 3470/4 3475/19 3479/6
3487/13 3493/24 3494/3 3494/6
3498/18 3499/14 3500/4 3500/7 3500/9
3501/13 3502/10 3511/4 3514/9
3514/24 3515/13 3516/17 3517/2
3518/1 3518/7 3519/3 3519/6 3519/8
3520/17 3520/20 3521/1 3526/21
3527/9 3528/20 3529/17 3538/4
3538/10 3540/8 3543/19 3545/22
3546/11 3547/12 3547/17 3549/5
3551/14 3554/9 3557/22 3560/7 3560/9
3560/14 3560/17 3561/22 3563/1
3564/22 3566/1 3566/20 3566/25
3567/14 3567/19 3568/22 3572/4
3572/8 3573/6 3573/21 3574/1 3574/6
3575/1 3576/6 3578/11 3579/16
3579/18 3579/21 3579/25 3580/5
3580/9 3580/17 3581/9 3581/13
3581/19 3581/22 3581/24
**THE WITNESS: [10]** 3379/11 3382/15
3382/18 3421/24 3426/21 3573/10
3573/24 3574/2 3574/7 3579/15

**$**

**$1,691,400 [8]** 3539/20 3555/7 3555/11
3557/10 3558/23 3575/16 3577/6
3577/10
**$10 [1]** 3534/24
**$10,000 [1]** 3534/17
**$13 [1]** 3426/17
**$13 million [1]** 3426/17
**$13,000 [1]** 3389/11
**$150 [1]** 3573/12
**$150 million [1]** 3573/12
**$150,000 [1]** 3397/6
**$16 [1]** 3426/14
**$16 million [1]** 3426/14
**$19 [1]** 3572/17
**$2,286,500.11 [1]** 3577/4
**$2,286,511 [6]** 3538/22 3554/24 3555/5
3556/10 3557/6 3576/22
**$20 [2]** 3572/17 3574/11
**$20,000 [1]** 3534/17
**$20.40 [1]** 3447/5
**$21 [1]** 3427/21 3428/3
**$21 million [2]** 3427/21 3428/3
**$240 [1]** 3426/19
**$240 million [1]** 3426/19
**$245 [1]** 3466/15
**$245 million [1]** 3466/15
**$295 [1]** 3427/19

**$295 million [1]** 3427/19
**$3 [2]** 3419/20 3427/22
**$3 million [2]** 3419/20 3427/22
**$300,000 [3]** 3393/16 3579/3 3579/10
**$36,400 [1]** 3539/22
**$38 [1]** 3426/13
**$38 million [1]** 3426/13
**$45 [1]** 3427/19
**$45 million [1]** 3427/19
**$480,000 [2]** 3420/18 3430/1
**$5 [2]** 3392/2 3451/25
**$5 million [2]** 3392/2 3451/25
**$50,000 [3]** 3383/12 3421/11 3421/19
**$500,000 [1]** 3456/21
**$548,711 [1]** 3521/19
**$593,00 [1]** 3555/9
**$593,111 [3]** 3539/17 3557/8 3577/7
**$6 [1]** 3452/4
**$6 million [1]** 3452/4
**$65 [5]** 3426/6 3432/4 3432/22 3433/4
3509/1
**$65 million [4]** 3426/6 3432/4 3432/2
3509/1
**$7 [3]** 3421/8 3430/5 3430/9
**$7 million [3]** 3421/8 3430/5 3430/9
**$700 [1]** 3427/23
**$700 million [1]** 3427/23
**$80,000 [1]** 3462/15
**$83 [1]** 3426/14
**$83 million [1]** 3426/14

**,**

**'14 [1]** 3389/15
**'15 [1]** 3511/25
**'60s [1]** 3430/22
**'Elizabeth [1]** 3472/8
**'It's [1]** 3571/18
**'the [1]** 3497/6
**'truly [1]** 3497/21
**'while [1]** 3547/9

**-**

**-----------------------------x [2]** 3375/2
3375/8
**-against [1]** 3375/5

**0**

**0011968 [1]** 3480/20
**00637 [1]** 3375/2
**024 [4]** 3392/1 3467/9 3467/12 3467/14

**1**

**1,655,000 [2]** 3539/21 3577/22
**1,691,400 [1]** 3539/16
**10 [3]** 3534/24 3573/4 3574/17
**10-K [6]** 3523/25 3528/18 3528/24
3529/3 3529/5 3529/6
**10-Q [16]** 3523/25 3523/25 3528/18
3528/19 3528/24 3528/24 3529/19
3529/21 3537/2 3537/10 3537/12
3537/17 3538/2 3538/4 3538/6 3540/24
**10-to-15 minutes [1]** 3428/11
**10.12 [1]** 3543/2
**100 [2]** 3553/23 3554/1
**100,000 [1]** 3420/24
**10017 [1]** 3375/19
**10K [8]** 3552/4 3552/8 3552/9 3553/3

**10K... [4]** 3553/4 3553/4 3554/15 3556/4
**10Q [10]** 3549/4 3552/4 3552/9 3552/9 3553/1 3553/11 3553/12 3553/15 3554/15 3556/5
**10th [2]** 3447/5 3465/2
**11.33 [1]** 3573/6
**112 [2]** 3578/3 3578/19
**11201 [1]** 3375/14
**12 [1]** 3389/11
**12.34 [1]** 3572/25
**122-43 [1]** 3521/21
**122-44 [1]** 3410/13
**122-45 [1]** 3520/3
**122-48 [1]** 3523/11
**122-49 [1]** 3530/16
**122-50 [1]** 3552/11
**122-53 [3]** 3535/17 3535/17 3535/23
**122-64 [4]** 3379/25 3383/15 3480/12 3480/13
**122-76 [5]** 3385/21 3386/4 3386/6 3386/7 3438/15
**122-84 [1]** 3395/19
**122-93 [2]** 3415/17 3415/18
**12:30 [1]** 3517/1
**12:42 p.m [1]** 3387/18
**12:46 [1]** 3388/15
**12:57 p.m [1]** 3387/1
**13.41 [1]** 3574/19
**14 [3]** 3375/5 3380/7 3405/14
**14.45 [1]** 3573/3
**14th [1]** 3469/15
**15 [3]** 3559/1 3568/5 3580/15
**15-CR-00637 [1]** 3375/2
**155156 [1]** 3542/24
**17 [3]** 3412/17 3481/8 3582/7
**18 [2]** 3386/11 3487/1
**18-month [1]** 3487/11
**19 [8]** 3386/18 3386/25 3447/1 3479/17 3546/11 3547/5 3547/22 3574/11
**19.81 [1]** 3447/4
**1:30 [2]** 3518/6 3536/4
**1:35 [1]** 3519/2
**1st [2]** 3417/2 3521/12

**2**

**2'13 [1]** 3530/17
**2,286,511-dollar [1]** 3539/14
**20 [10]** 3446/16 3446/17 3446/22 3446/23 3446/25 3447/6 3496/25 3536/13 3564/10 3572/24
**20-some [1]** 3496/13
**20.56 [1]** 3447/6
**2004 [2]** 3385/9 3482/16
**2006 [2]** 3385/9 3482/16
**2011 [1]** 3556/6
**2012 [16]** 3434/23 3434/25 3451/16 3452/3 3462/2 3481/8 3486/6 3491/23 3492/23 3493/11 3494/4 3494/14 3500/21 3553/2 3556/5 3570/24
**2013 [45]** 3399/3 3488/4 3488/11 3488/25 3489/7 3489/23 3521/8 3521/11 3521/12 3521/23 3523/19 3531/20 3536/9 3536/11 3537/17 3538/20 3539/15 3539/20 3547/5 3547/22 3548/16 3549/25 3552/7

**2014 [88]** 3380/4 3380/7 3384/1 3385/24 3386/11 3386/19 3388/2 3388/7 3388/9 3388/11 3389/3 3389/6 3389/9 3389/12 3390/13 3395/20 3396/7 3396/21 3398/14 3398/18 3399/3 3399/7 3400/4 3400/12 3400/15 3400/18 3402/13 3404/5 3404/16 3405/12 3405/15 3405/20 3409/7 3409/10 3410/17 3412/17 3412/17 3412/17 3415/10 3415/22 3416/23 3417/9 3417/18 3419/21 3420/6 3420/17 3420/19 3421/22 3421/24 3421/25 3422/1 3426/9 3426/13 3426/22 3427/2 3428/1 3429/24 3434/8 3445/5 3445/13 3445/17 3446/7 3465/2 3474/3 3476/4 3486/7 3503/3 3504/8 3504/15 3505/3 3505/3 3506/4 3506/4 3506/20 3507/4 3572/13 3572/16 3572/21 3572/23 3572/24 3573/1 3573/4 3573/19 3574/11 3574/12 3574/15 3574/17 3574/20
**2015 [5]** 3427/10 3427/11 3466/12 3469/15 3573/11
**2016 [3]** 3385/5 3435/2 3481/18
**2017 [2]** 3375/5 3582/7
**21 [1]** 3488/4
**22 [1]** 3549/25
**2268 [1]** 3375/23
**24 [1]** 3472/10
**240 [1]** 3427/24
**245 million-dollar [1]** 3466/17
**25 [7]** 3395/20 3400/15 3412/17 3561/16 3562/1 3568/10 3569/7
**25th [1]** 3447/5
**26 [1]** 3447/6
**27 [3]** 3387/15 3387/17 3388/11
**271 [1]** 3375/14
**27th [1]** 3438/15
**28 [2]** 3505/3 3506/20
**29 [1]** 3579/2
**2:00 p.m [1]** 3566/23
**2:30 [1]** 3560/16
**2:40 p.m [1]** 3560/17
**2nd [1]** 3522/12

**3**

**30 [11]** 3402/13 3410/17 3419/21 3553/15 3553/16 3555/6 3557/10 3559/3 3574/20 3577/5 3577/18
**300,000 [1]** 3393/20
**30th [6]** 3521/8 3521/11 3521/15 3537/2 3538/20 3539/15
**31 [5]** 3496/10 3553/2 3553/12 3556/5 3556/6
**33 [1]** 3385/21
**35 [2]** 3428/17 3454/11
**35,414 [1]** 3512/11
**35-SA-1 [1]** 3469/11
**36 [1]** 3395/19
**36,400 [1]** 3577/23
**37 [2]** 3384/21 3384/22

**38 [1]** 3413/22
**39 [1]** 3417/2
**3:20 [1]** 3582/6
**3rd [2]** 3521/23 3522/14

**4**

**4 feet [1]** 3378/21
**40 [2]** 3410/13 3464/8
**404 [1]** 3402/7
**42 [1]** 3568/4
**4237 [3]** 3541/22 3560/24 3570/1
**43 [3]** 3520/24 3521/5 3521/21
**44 [1]** 3410/13
**45 [3]** 3452/13 3452/15 3520/3
**47,182 [1]** 3577/13
**48 [1]** 3523/11
**49 [1]** 3530/16

**5**

**5,000 [2]** 3539/21 3577/23
**50 [1]** 3552/11
**53 [3]** 3535/17 3535/17 3535/23
**560 [1]** 3430/4
**5:30 [1]** 3534/8
**5:30 p.m [1]** 3530/17

**6**

**60 percent [1]** 3578/25
**6016 [1]** 3504/11
**6017 [2]** 3464/19 3464/20
**6033 [1]** 3549/8
**6043 [1]** 3549/25
**6044 [2]** 3551/3 3551/16
**605 [1]** 3446/2
**606 [4]** 3445/23 3446/2 3572/12 3573/23
**607 [1]** 3445/23
**60s [1]** 3430/23
**617 [8]** 3561/6 3561/21 3562/17 3568/8 3568/21 3568/24 3568/25 3575/8
**626 [1]** 3542/23
**64 [4]** 3379/25 3383/15 3480/12 3480/13
**66 [1]** 3430/19
**68 percent [1]** 3421/2
**6th [3]** 3535/23 3536/11 3536/21

**7**

**7 million [1]** 3430/11
**718-613-2268 [1]** 3375/23
**76 [6]** 3385/21 3386/4 3386/6 3386/7 3438/10 3438/15
**767 [1]** 3375/18
**78 million [1]** 3573/14

**8**

**80 [1]** 3400/10
**82 [1]** 3578/3
**84 [1]** 3395/19
**8:47 a.m [1]** 3387/15
**8th [2]** 3536/8 3536/21

**9**

**9.02 [1]** 3574/23
**92 [1]** 3413/21
**93 [4]** 3415/4 3415/15 3415/17 3415/18
**9:00 [1]** 3375/5 3582/7

**9:00 o'clock [1]** 3580/4
**9th [4]** 3523/19 3525/2 3530/16 3530/17

**A**

**a.m [3]** 3375/5 3387/15 3582/7
**ability [2]** 3483/23 3533/7
**able [18]** 3377/21 3383/2 3383/4
3394/13 3395/24 3419/9 3427/13
3433/6 3464/21 3492/5 3492/6 3499/21
3505/9 3505/9 3562/11 3564/23
3564/24 3580/22
**abnormally [2]** 3452/7 3452/7
**absurd [1]** 3408/12
**abusive [2]** 3392/9 3436/20
**accept [3]** 3516/7 3548/22 3578/16
**accepted [2]** 3414/24 3419/14
**access [2]** 3419/6 3466/13
**accomplishments [1]** 3507/21
**according [1]** 3486/3
**Accordingly [1]** 3577/15
**account [3]** 3396/10 3400/24 3437/16
**accountable [1]** 3508/5
**accounting [2]** 3540/15 3540/20
**accounts [1]** 3465/19
**accumulate [2]** 3421/7 3430/11
**accurate [10]** 3445/25 3485/16 3490/10
3502/4 3505/15 3523/3 3542/9 3543/25
3547/24 3572/2
**accurately [2]** 3555/15 3555/16
**accused [1]** 3436/12
**achieve [1]** 3498/5
**acknowledged [1]** 3433/24
**acquire [3]** 3381/14 3400/23 3427/12
**acquired [6]** 3399/4 3399/4 3427/8
3427/9 3427/10 3506/15
**acquiring [2]** 3410/4 3416/8
**acquisition [5]** 3416/11 3417/21 3466/3
3466/11 3466/12
**acronym [1]** 3467/10
**act [2]** 3416/18 3417/20
**acted [4]** 3411/1 3411/2 3435/6
3436/16
**acting [3]** 3375/13 3407/23 3410/25
**action [3]** 3416/2 3418/21 3426/1
**actions [5]** 3418/7 3418/10 3418/11
3418/13 3449/15
**active [10]** 3396/11 3404/24 3489/4
3547/11 3547/14 3547/17 3547/23
3548/10 3548/14 3548/18
**activities [10]** 3390/5 3391/11 3397/1
3404/14 3427/6 3445/8 3445/10
3445/16 3447/3 3447/8
**activity [2]** 3425/22 3437/10
**actual [7]** 3525/5 3538/6 3543/10
3545/24 3550/14 3570/19 3570/21
**adamantly [1]** 3435/15
**added [1]** 3425/7
**addition [3]** 3381/5 3389/13 3397/4
**additional [10]** 3389/13 3400/19 3425/6
3427/9 3442/18 3443/3 3578/21
3578/21 3578/24 3579/3
**address [3]** 3400/13 3567/4 3574/13
**adjourn [3]** 3376/11 3376/19 3579/22
**adjourned [1]** 3582/6
**adjournment [1]** 3377/8
**administrative [2]** 3412/4 3579/5

**admiring [1]** 3500/10
**admit [2]** 3386/4 3386/6
**adult [1]** 3490/20
**advice [3]** 3393/12 3490/11 3545/11
**advised [1]** 3556/20
**advisory [1]** 3411/8
**affirmed [1]** 3379/17
**afterwards [1]** 3423/24
**age [2]** 3490/20 3490/22
**agenda [6]** 3380/6 3480/17 3521/23
3523/17 3523/23 3524/8 3525/2 3525/5
3528/23 3530/16 3530/24 3531/3
3531/7 3533/6 3533/8 3534/7 3534/22
3535/25 3536/2 3536/24 3536/25
3537/8
**agendas [1]** 3545/15
**agents [2]** 3472/25 3473/3
**aggrandizing [1]** 3498/23
**aggregate [3]** 3539/16 3555/8 3577/7
**aggressive [1]** 3487/3
**AGNIFILO [1]** 3375/20
**ago [5]** 3438/11 3480/22 3554/5
3564/10 3569/11
**agree [14]** 3376/19 3397/8 3417/14
3435/10 3440/12 3445/25 3454/22
3463/11 3475/15 3497/9 3533/15
3541/13 3558/8 3580/16
**agreed [17]** 3377/7 3383/11 3389/16
3393/4 3404/24 3456/18 3456/21
3462/18 3463/12 3477/19 3478/14
3537/18 3539/10 3540/6 3555/2 3577/1
3577/13
**agreement [39]** 3382/17 3382/18
3411/13 3432/13 3433/22 3514/21
3516/8 3524/15 3524/17 3524/23
3525/6 3526/3 3526/24 3527/1 3527/13
3527/18 3527/21 3527/22 3528/13
3532/16 3534/13 3534/16 3534/16
3537/7 3539/19 3545/25 3550/3
3550/22 3555/14 3561/2 3561/4
3569/25 3570/3 3577/9 3577/17
3578/22 3578/24 3579/3 3579/4
**agreements [45]** 3450/24 3451/2
3509/22 3509/25 3510/6 3510/9
3510/12 3511/7 3511/8 3511/17
3511/20 3513/15 3513/16 3513/25
3525/17 3526/16 3532/13 3538/22
3539/10 3539/12 3539/24 3540/6
3543/2 3543/11 3545/15 3546/8
3554/23 3555/1 3555/4 3555/10 3556/8
3557/6 3557/14 3576/22 3576/25
3577/3 3577/11 3577/15 3577/21
3578/5 3578/6
**ahead [1]** 3378/4
**aided [1]** 3375/25
**ailment [1]** 3475/17
**AK [1]** 3405/13
**Al [7]** 3477/5 3530/25 3531/14 3531/24
3532/3 3532/4 3534/5
**Alan [4]** 3510/18 3524/19 3524/21
3526/2
**alerting [1]** 3531/5
**alienate [2]** 3499/17 3499/19
**ALIXANDRA [1]** 3375/15
**all.' [1]** 3571/19
**allegation [1]** 3402/21

**alleged [2]** 3403/14 3404/13
**alleging [1]** 3402/10
**allow [2]** 3417/6 3547/13
**allowed [3]** 3382/23 3420/7 3427/12
**almost [6]** 3413/8 3494/22 3496/19
3511/22 3512/1 3517/1
**Alvin [1]** 3435/22
**amazing [1]** 3497/19
**amend [1]** 3553/8
**amended [13]** 3523/24 3523/25
3528/24 3528/24 3552/5 3553/1
3553/11 3553/12 3554/12 3556/6
3569/12 3569/13 3569/16
**amending [1]** 3556/4
**AMERICA [1]** 3375/3
**American [1]** 3533/21
**amount [10]** 3383/2 3383/9 3427/14
3532/13 3532/17 3539/17 3555/8
3571/20 3577/7 3579/4
**amounts [7]** 3383/5 3425/13 3510/13
3534/14 3539/11 3555/3 3577/2
**analogy [1]** 3383/7
**analysis [1]** 3475/15
**ANDREA [1]** 3375/20
**Andrew [1]** 3392/12
**angry [3]** 3380/21 3431/6 3431/7
**announce [2]** 3401/1 3401/2
**announced [2]** 3465/5 3506/4
**announcement [3]** 3505/12 3505/15
3505/18
**announcing [1]** 3506/21
**annual [2]** 3384/1 3529/6
**annually [2]** 3420/20 3553/6
**answer [13]** 3403/5 3409/3 3419/2
3442/24 3476/21 3487/1 3502/13
3502/14 3509/18 3534/6 3564/24
3571/23 3578/13
**answered [4]** 3439/24 3443/17 3443/18
3516/16
**answers [1]** 3402/23
**anticipate [2]** 3377/1 3377/14
**anticipated [1]** 3377/17
**anticipating [1]** 3566/22
**anticipation [1]** 3567/12
**antiparasitic [1]** 3416/8
**anyway [2]** 3389/6 3414/19
**apart [1]** 3392/18
**apologize [3]** 3442/2 3442/2 3443/25
**apologized [1]** 3380/24
**appear [3]** 3382/13 3498/14 3562/21
**APPEARANCES [1]** 3375/11
**appeared [1]** 3470/15
**apples [2]** 3574/5 3574/5
**apply [1]** 3498/11
**appointed [1]** 3412/24
**appointing [1]** 3464/24
**appointment [2]** 3412/7 3465/5
**appreciate [1]** 3581/20
**appreciated [1]** 3384/10
**appropriate [7]** 3396/16 3397/2
3400/22 3458/24 3471/23 3490/8
3516/10
**appropriately [2]** 3436/16 3503/13
**approval [8]** 3397/6 3398/9 3420/8
3449/15 3450/15 3537/2 3550/14
3566/13
**approve [8]** 3527/8 3530/24 3531/13

**A**

approve... [5] 3537/6 3540/23 3550/22 3559/22 3559/24
approved [9] 3397/22 3412/11 3412/18 3412/21 3526/4 3527/5 3540/21 3548/25 3566/14
April [4] 3446/9 3447/6 3476/9 3572/22
April/May [1] 3572/22
area [2] 3388/19 3490/1
areas [1] 3489/23
argue [4] 3442/1 3470/11 3472/16 3548/6
arguing [1] 3537/18
argument [3] 3376/4 3408/7 3453/4
argumentative [1] 3507/19
arisen [1] 3400/17
arising [3] 3539/12 3555/4 3577/2
arm [2] 3490/17 3490/19
Aselage [26] 3376/25 3379/16 3404/3 3404/13 3407/2 3407/25 3408/3 3410/23 3411/3 3412/7 3429/16 3442/5 3443/5 3443/15 3480/14 3519/16 3519/23 3522/1 3523/16 3523/16 3533/15 3535/24 3568/5 3569/20 3575/5 3583/4
aspects [1] 3507/20
assessment [3] 3391/15 3436/18 3454/13
asset [1] 3392/3
assets [9] 3381/14 3381/14 3385/19 3399/1 3400/22 3410/4 3417/14 3427/7 3484/21
assigned [1] 3381/14
Assistance [1] 3376/7
Assistant [1] 3375/16
ASSOCIATES [1] 3375/18
assume [5] 3378/3 3407/15 3449/24 3531/19 3553/21
assumed [2] 3462/10 3532/4
assumption [2] 3447/13 3447/14
assured [1] 3461/19
astounding' [1] 3497/22
attached [17] 3523/23 3528/22 3536/2 3537/14 3537/19 3550/10 3562/1 3562/5 3562/11 3562/20 3562/23 3562/25 3564/14 3564/15 3565/16 3569/23 3569/24
attaches [2] 3386/24 3525/5
attaching [4] 3380/3 3568/9 3569/12 3569/16
attachment [8] 3537/12 3538/13 3561/1 3566/18 3568/14 3569/25 3570/3 3570/5
attachments [18] 3523/9 3525/9 3526/13 3535/17 3537/16 3553/1 3553/23 3558/3 3558/3 3558/15 3562/12 3563/4 3564/18 3565/10 3565/16 3566/1 3566/6 3569/20
attempt [2] 3384/6 3512/2
attendance [1] 3476/23
attended [3] 3380/10 3380/15 3570/18 3570/21
attention [10] 3428/12 3449/6 3480/19 3543/17 3545/13 3548/18 3554/4 3554/18 3559/25 3560/4
Attorney [1] 3375/13
Attorney's [1] 3395/16
Attorneys [1] 3375/16
attribute [1] 3504/18
attributed [1] 3504/22
audit [2] 3537/4 3553/14
auditing [1] 3524/5
auditor's [2] 3540/23 3540/24
auditors [4] 3524/4 3540/18 3545/9 3552/20
August [7] 3400/12 3412/17 3570/24 3571/1 3571/1 3577/10 3579/2
August 29 [1] 3579/2
August 8 [1] 3412/17
August 9 [1] 3577/10
authenticate [1] 3565/9
authenticity [3] 3564/4 3565/14 3565/18
authority [1] 3412/3
authorization [5] 3450/5 3450/9 3450/12 3451/9 3541/5
authorize [3] 3508/15 3508/19 3510/17
authorized [4] 3420/9 3420/10 3450/1 3509/25
authorizing [1] 3541/6
available [3] 3506/18 3548/15 3580/21
Avenue [1] 3375/18
avoid [2] 3419/1 3580/3
aware [6] 3397/25 3421/23 3451/11 3505/14 3519/24 3545/12

**B**

B0D [1] 3414/9
backed [2] 3477/10 3478/2
background [2] 3456/18 3482/7
backup [1] 3542/8
backwards [1] 3429/21
bad [2] 3407/14 3507/25
balance [3] 3427/15 3558/17 3559/6
band [1] 3413/10
bankers [1] 3571/7
banks [1] 3570/15
Banta [8] 3380/3 3527/22 3528/2 3528/3 3530/25 3531/14 3531/25 3532/12
bar [1] 3455/13
bar/restaurant [1] 3455/13
Baruch [4] 3385/14 3484/16 3485/2 3485/3
base [9] 3387/19 3387/23 3388/3 3388/4 3388/7 3388/12 3389/1 3454/12 3577/17
based [7] 3385/11 3387/22 3394/24 3435/6 3456/17 3482/17 3509/25
basics [1] 3376/8
basis [5] 3415/1 3442/20 3463/19 3530/10 3559/15
Bates [10] 3383/15 3384/21 3524/13 3542/25 3554/19 3556/1 3556/25 3558/13 3575/13 3576/1
BBA [2] 3385/14 3484/16
Bear [2] 3416/9 3416/10
bears [1] 3542/22
became [18] 3394/4 3421/23 3429/23 3463/17 3464/15 3490/12 3494/14 3495/6 3495/22 3495/24 3496/12 3496/23 3504/6 3519/15 3538/21 3554/23 3557/5 3576/21
become [11] 3390/2 3456/4 3456/18 3458/13 3461/19 3495/7 3519/24 3539/24 3555/14 3557/14 3577/21
becoming [2] 3486/21 3495/2
beginning [4] 3400/12 3445/5 3477/16 3573/1
behalf [7] 3508/14 3512/1 3539/19 3543/24 3555/11 3557/9 3577/9
behavior [6] 3409/12 3473/13 3473/14 3473/19 3507/10 3507/12
behind [3] 3399/13 3415/4 3477/10
belief [1] 3510/11
believes [5] 3502/20 3538/23 3554/25 3556/11 3557/7 3576/23
bell [1] 3512/18
below [1] 3549/15
bench [1] 3388/20
benefit [5] 3378/17 3516/4 3516/11 3516/14 3516/15
BENJAMIN [2] 3375/19 3429/18
berated [1] 3380/21
Berkowitz [2] 3385/10 3482/16
best [14] 3377/14 3387/12 3401/3 3411/15 3415/25 3416/10 3431/10 3484/22 3485/7 3497/14 3501/24 3526/18 3532/10 3571/25
better [5] 3390/6 3410/10 3466/9 3505/11 3581/3
between [19] 3385/23 3390/15 3394/25 3399/16 3405/16 3405/25 3407/11 3415/8 3438/11 3448/22 3449/6 3450/1 3458/16 3508/17 3539/16 3543/3 3555/8 3577/6 3581/1
beyond [2] 3439/23 3462/1
bid [2] 3416/1 3416/5
Bienaime [1] 3451/22
big [6] 3396/7 3459/18 3460/5 3460/7 3499/23 3510/14
bigger [1] 3410/10
biggest [2] 3465/9 3466/10
bill [1] 3461/13
billion [2] 3484/10 3484/12
bills [2] 3394/7 3434/15
Biltricide [10] 3416/1 3416/6 3416/7 3416/8 3416/10 3416/11 3416/19 3416/19 3417/1 3417/21
binder [1] 3385/22
BioMarin [14] 3386/17 3439/3 3439/6 3439/15 3440/10 3442/6 3442/9 3451/16 3451/19 3451/21 3452/4 3452/9 3452/12 3484/10
biopharmaceutical [1] 3381/10
biotech [2] 3512/23 3513/1
biotechnology [2] 3385/12 3482/18
bit [8] 3416/23 3420/11 3421/4 3491/6 3502/18 3547/19 3549/18 3571/25
blank [1] 3571/11
blanks [2] 3502/12 3571/9
Blanton [2] 3510/20 3511/14
blue [1] 3453/25
Board [231]
boarding [1] 3407/11
boards [2] 3451/13 3485/23
BOD [1] 3414/3
Bond [1] 3466/1
borrow [1] 3414/10
boss [2] 3451/20 3464/4
Boston [2] 3387/20 3495/25

**B**

**bother** [1] 3525/8
**bothered** [1] 3535/2
**bottom** [11] 3384/17 3386/10 3386/25 3387/14 3397/10 3415/20 3485/13 3504/13 3542/24 3549/9 3573/4
**bought** [3] 3453/12 3492/12 3492/15
**BRAFMAN** [20] 3375/18 3375/19 3377/1 3418/25 3429/2 3429/12 3429/18 3440/23 3450/19 3560/23 3568/6 3570/11 3571/6 3571/10 3572/10 3573/15 3574/10 3583/5 3583/6 3583/7
**brain** [2] 3498/15 3498/16
**breach** [2] 3392/8 3402/2
**break** [13] 3379/2 3379/5 3428/9 3432/25 3500/4 3500/4 3517/2 3518/3 3518/8 3560/9 3560/15 3567/6 3580/2
**breakthroughs** [1] 3396/2
**breakup** [1] 3564/5
**Brent** [5] 3459/19 3460/4 3460/5 3460/18 3460/20
**Brian** [2] 3388/5 3388/17
**BRIDGET** [1] 3375/12
**brief** [3] 3428/5 3525/10 3561/22
**briefing** [5] 3580/10 3580/17 3580/19 3581/11 3581/17
**briefly** [1] 3542/2
**briefs** [1] 3567/18
**bright** [2] 3452/23 3453/3
**brightest** [1] 3497/7
**brilliant** [5] 3457/24 3457/25 3490/25 3497/6 3498/15
**bring** [4] 3416/3 3429/10 3440/15 3559/25
**broke** [2] 3418/23 3431/15
**broken** [1] 3564/6
**Brooklyn** [2] 3375/4 3375/14
**brought** [12] 3391/16 3392/5 3423/9 3431/19 3434/7 3434/19 3434/21 3440/13 3442/4 3466/5 3467/12 3554/18
**buddies** [1] 3392/20
**building** [2] 3386/21 3506/6
**built** [1] 3468/2
**bullied** [1] 3408/8
**buried** [1] 3396/2
**burned** [2] 3426/14 3427/22
**business** [39] 3381/9 3381/12 3381/13 3381/17 3381/22 3383/3 3383/12 3385/15 3391/5 3391/10 3392/16 3396/13 3399/17 3400/21 3410/2 3410/2 3448/5 3449/19 3466/1 3471/18 3474/25 3478/21 3479/4 3479/8 3479/12 3482/19 3484/18 3485/22 3489/25 3493/19 3499/23 3514/20 3515/1 3515/6 3515/7 3515/10 3516/7 3516/14 3564/3
**businesses** [1] 3385/13
**businessperson** [1] 3533/16
**button** [1] 3409/4
**buy** [9] 3383/6 3392/3 3401/5 3401/8 3416/11 3416/19 3492/7 3492/11 3571/16
**buying** [3] 3381/10 3381/20 3447/17

**C**

**C-H-E-N-O-D-A-L** [1] 3466/19
**Cadman** [1] 3375/14
**California** [6] 3474/4 3474/16 3474/20 3477/4 3479/1 3485/4
**calm** [1] 3409/22
**Cambridge** [5] 3392/24 3400/6 3496/9 3496/11 3496/20
**cap** [5] 3421/11 3426/19 3427/23 3484/11 3484/12
**capabilities** [1] 3498/2
**capacity** [5] 3376/16 3498/5 3498/5 3499/13 3533/20
**Capital** [11] 3385/4 3385/9 3458/8 3481/17 3482/15 3494/6 3543/5 3543/5 3554/23 3570/19 3571/3
**caption** [2] 3556/2 3558/14
**care** [4] 3475/12 3493/14 3493/15 3580/4
**career** [2] 3533/18 3559/19
**careful** [1] 3505/15
**carries** [1] 3546/7
**carry** [3] 3509/11 3509/13 3546/7
**carrying** [1] 3475/13
**case** [22] 3377/12 3377/18 3377/21 3378/7 3428/10 3431/19 3431/24 3431/24 3432/1 3432/7 3432/18 3433/5 3433/6 3433/7 3434/3 3516/22 3518/4 3553/23 3558/7 3560/12 3580/2 3581/18
**cash** [24] 3425/13 3426/13 3426/15 3426/16 3427/14 3427/19 3427/22 3491/18 3492/4 3492/5 3492/6 3492/7 3520/12 3521/8 3521/14 3534/19 3539/17 3539/18 3539/20 3555/9 3555/9 3577/7 3577/8 3577/22
**caught** [1] 3439/12
**caused** [4] 3402/15 3451/21 3459/11 3577/13
**causing** [2] 3447/22 3505/5
**cease** [2] 3404/24 3496/10
**CEO** [54] 3390/5 3390/7 3390/13 3390/23 3396/16 3409/13 3410/8 3412/24 3413/4 3413/11 3414/10 3419/15 3419/19 3419/22 3420/15 3420/17 3421/9 3421/17 3429/23 3430/14 3437/9 3438/1 3456/4 3456/18 3462/3 3462/4 3463/16 3463/17 3463/18 3463/24 3463/25 3464/1 3464/5 3464/15 3466/4 3467/14 3468/23 3479/10 3479/18 3485/19 3490/2 3490/3 3490/14 3495/9 3495/22 3495/24 3496/6 3496/12 3496/23 3504/6 3507/15 3508/10 3519/15 3574/14
**certain** [14] 3437/21 3448/1 3448/3 3449/15 3449/18 3459/8 3469/8 3495/9 3495/22 3498/10 3509/21 3542/7 3556/8 3581/6
**certainly** [19] 3392/24 3446/14 3461/17 3462/9 3463/6 3463/8 3464/9 3466/2 3469/17 3470/11 3485/15 3495/3 3495/13 3498/2 3498/4 3540/13 3541/18 3549/2 3550/8
**CFO** [3] 3527/12 3540/17 3545/8
**chain** [4] 3387/13 3438/11 3438/15 3438/18

**chair** [2] 3428/10 3518/4
**chairman** [10] 3394/12 3411/1 3451/4 3451/9 3451/12 3451/13 3508/11 3522/3 3534/1 3534/3
**chambers** [2] 3580/19 3581/15
**chance** [2] 3439/13 3488/1
**change** [10] 3390/7 3409/11 3416/24 3433/6 3447/1 3466/11 3473/13 3473/14 3473/19 3540/15
**changes** [1] 3553/7
**chaotic** [1] 3413/7
**characterization** [2] 3437/19 3557/23
**characterize** [1] 3487/17
**characterized** [1] 3540/19
**charge** [9] 3377/21 3413/11 3467/13 3478/20 3479/4 3494/21 3539/14 3555/5 3577/4
**charged** [4] 3378/15 3403/12 3407/21 3579/4
**charges** [2] 3508/24 3508/25
**chart** [1] 3573/22
**charts** [1] 3376/9
**chase** [1] 3400/21
**checkmarks** [2] 3446/1 3446/5
**Chenodal** [5] 3399/6 3466/19 3466/20 3466/24 3466/25
**chief** [32] 3380/13 3389/16 3389/19 3390/2 3391/23 3392/11 3393/4 3393/14 3393/17 3393/21 3398/15 3398/21 3405/19 3411/5 3411/7 3411/16 3412/3 3412/7 3464/24 3478/18 3481/7 3495/7 3504/8 3506/7 3507/8 3538/20 3554/22 3556/9 3557/4 3576/9 3576/21 3577/12
**child** [3] 3456/24 3457/12 3457/14
**choice** [2] 3516/13 3516/13
**Cholbam** [2] 3466/11 3466/12
**chosen** [1] 3496/22
**Christopher** [2] 3488/5 3488/7
**circumstance** [1] 3397/21
**circumstances** [5] 3390/2 3404/19 3442/16 3442/17 3443/3
**citizens** [1] 3392/25
**City** [3] 3387/19 3478/9 3485/3
**civil** [4] 3423/8 3426/3 3508/25 3509/17
**claim** [5] 3439/14 3447/3 3513/25 3514/7 3516/2
**claiming** [2] 3490/5 3516/1
**claims** [3] 3432/9 3442/12 3461/1
**clarify** [3] 3389/22 3396/9 3566/11
**clarity** [3] 3416/3 3420/7 3519/16
**class** [1] 3392/25
**clear** [8] 3453/19 3458/11 3462/2 3490/12 3549/3 3570/4 3570/18 3571/23
**clearly** [4] 3407/7 3408/5 3521/17 3530/24
**client** [1] 3443/7
**clinical** [1] 3467/7
**clip** [2] 3562/5 3562/12
**close** [12] 3378/6 3378/18 3395/2 3429/22 3434/13 3434/15 3448/4 3448/13 3477/20 3477/24 3499/18 3540/3
**closed** [3] 3458/12 3459/2 3459/3
**closer** [2] 3448/5 3504/5
**closest** [1] 3448/7

**closing** [1] 3496/5
**club** [1] 3380/4
**clue** [1] 3564/14
**co** [3] 3407/21 3407/22 3488/8
**co-conspirator** [2] 3407/21 3407/22
**co-worker** [1] 3488/8
**coffee** [2] 3474/10 3560/11
**Cold** [1] 3453/25
**colleague** [3] 3378/18 3460/2 3552/22
**colleagues** [2] 3395/25 3429/4
**collectively** [1] 3500/7
**college** [6] 3385/14 3479/14 3484/17 3485/2 3485/3 3485/3
**colored** [1] 3502/21
**column** [3] 3446/3 3446/3 3446/4
**comfort** [1] 3477/16
**comfortable** [1] 3462/9
**coming** [9] 3394/7 3486/15 3486/17 3486/18 3486/25 3536/24 3536/25 3536/25 3540/25
**commence** [1] 3560/20
**comment** [3] 3453/18 3569/9 3569/13
**comments** [4] 3524/1 3528/25 3569/18 3570/9
**commercial** [21] 3386/21 3387/19 3387/23 3388/3 3388/4 3388/5 3388/6 3388/7 3388/8 3388/12 3389/1 3452/15 3489/6 3489/7 3489/15 3489/17 3506/16 3548/12 3548/14 3548/15 3548/17
**commercialization** [1] 3490/1
**commingling** [1] 3458/15
**commission** [3] 3383/25 3449/9 3535/8
**commissions** [1] 3571/22
**commitment** [3] 3387/7 3567/2 3567/3
**committed** [3] 3456/6 3456/7 3457/11
**committee** [7] 3425/13 3502/25 3503/2 3503/7 3503/9 3503/21 3504/3
**common** [5] 3411/10 3505/24 3539/21 3577/14 3577/23
**communicated** [1] 3556/14
**communication** [6] 3391/3 3393/9 3399/16 3505/10 3547/6 3553/14
**communications** [1] 3537/4
**companies** [5] 3420/7 3460/3 3471/21 3483/6 3530/3
**company** [207] 3381/14 3381/15 3383/24 3385/10 3389/1 3390/6 3390/11 3391/6 3391/7 3391/14 3391/15 3391/17 3391/18 3392/2 3392/19 3392/22 3393/23 3394/15 3395/21 3396/17 3396/21 3398/7 3398/22 3398/24 3399/2 3399/8 3400/9 3400/23 3402/16 3408/9 3410/1 3410/5 3410/8 3410/9 3410/10 3411/1 3411/5 3411/8 3411/10 3411/14 3411/15 3411/16 3412/8 3414/25 3416/12 3416/16 3416/17 3416/18 3416/18 3417/6 3417/20 3418/15 3418/17 3418/19 3418/20 3419/18 3420/6 3425/20 3426/3 3426/10 3426/12 3426/13 3426/19 3427/2 3427/3 3427/12 3427/17 3427/23 3439/6 3439/8 3445/7 3445/14 3446/22 3446/23 3447/4 3447/12 3447/19 3452/10 3454/6 3455/16 3455/18

3455/23 3456/14 3456/18 3460/25 3460/25 3461/7 3461/7 3461/10 3461/11 3461/24 3462/3 3462/6 3462/21 3462/25 3463/2 3463/4 3463/4 3463/6 3463/7 3463/10 3463/18 3463/22 3463/24 3464/2 3464/11 3464/13 3464/15 3464/15 3466/5 3466/11 3466/18 3467/1 3467/22 3468/2 3468/11 3475/1 3481/8 3482/16 3484/10 3484/14 3487/7 3489/9 3489/9 3489/14 3489/23 3494/8 3494/14 3494/17 3494/18 3494/20 3494/22 3494/25 3495/2 3495/6 3500/24 3503/16 3503/16 3503/19 3505/14 3505/18 3506/8 3506/15 3506/15 3507/15 3511/2 3511/2 3514/18 3515/2 3516/4 3516/15 3526/16 3526/18 3526/21 3526/25 3530/6 3535/7 3538/20 3538/23 3539/2 3539/9 3539/11 3539/13 3539/18 3539/23 3542/7 3543/3 3543/11 3543/15 3543/24 3545/20 3546/4 3554/2 3554/24 3554/25 3555/2 3555/5 3555/10 3555/13 3556/8 3556/11 3556/20 3557/4 3557/7 3557/8 3557/13 3557/19 3558/8 3558/17 3570/13 3573/11 3573/17 3573/18 3573/20 3574/4 3576/18 3576/20 3576/23 3576/24 3577/1 3577/4 3577/8 3577/16 3577/20 3577/22 3579/2 3579/25
**company's** [12] 3381/18 3381/25 3384/1 3384/6 3384/14 3437/9 3465/6 3467/3 3514/14 3529/7 3572/11 3576/21
**compared** [2] 3427/25 3502/6
**comparison** [1] 3574/5
**compensated** [2] 3389/6 3389/8
**compete** [1] 3467/23
**competent** [1] 3435/14
**competitor** [1] 3468/12
**complained** [1] 3399/19
**complaint** [1] 3442/22
**complete** [2] 3384/19 3391/24
**completely** [2] 3426/16 3546/3
**completing** [1] 3384/9
**complexity** [1] 3384/3
**compliance** [9] 3398/21 3398/21 3414/8 3414/14 3414/16 3420/14 3503/16 3503/17 3503/20
**component** [2] 3498/21 3498/22 3507/13 3577/15 3577/17
**compound** [2] 3432/24 3433/1
**compounds** [1] 3457/5
**compromise** [1] 3383/1
**computer** [2] 3375/25 3438/13
**computer-aided** [1] 3375/25
**concepts** [1] 3498/11
**concern** [6] 3381/8 3392/23 3398/3 3469/18 3475/6 3571/17
**concerned** [14] 3393/25 3394/4 3400/25 3404/22 3406/5 3437/10 3445/6 3445/8 3470/12 3476/23 3486/21 3506/25 3513/13 3571/25
**concerning** [1] 3445/23
**concerns** [22] 3390/4 3390/12 3390/22 3391/1 3391/2 3391/3 3391/9 3391/10 3391/11 3391/13 3400/14 3401/9

3404/3 3404/10 3437/1 3472/18 3472/20 3502/16 3506/14 3508/7 3508/2 3574/13
**concert** [9] 3471/22 3472/2 3472/13 3472/15 3472/17 3472/17 3476/23 3477/1 3508/3
**concerts** [1] 3471/22
**conclude** [2] 3475/24 3476/1
**concluded** [1] 3424/2
**conclusion** [1] 3435/23
**concur** [1] 3546/23
**condensed** [1] 3558/17
**condition** [1] 3479/3
**conduct** [1] 3437/8
**conducted** [2] 3422/9 3425/2
**conducting** [2] 3395/12 3471/18
**conference** [12] 3401/16 3403/16 3406/12 3408/21 3422/15 3424/2 3440/25 3444/2 3515/17 3517/4 3563/7 3567/21
**conferring** [1] 3378/20
**confess** [1] 3443/7
**confide** [1] 3546/23
**confidential** [2] 3395/21 3396/21
**confronted** [2] 3404/25 3473/6 3473/24
**confusing** [2] 3519/19 3566/9
**connected** [3] 3476/21 3541/1 3541/2
**connecting** [2] 3541/1 3541/4
**connection** [12] 3383/25 3384/14 3393/17 3393/21 3395/16 3425/22 3461/2 3529/10 3565/9 3565/15 3570/15 3573/9
**connotation** [1] 3453/14
**conscientiously** [1] 3580/3
**consent** [5] 3550/11 3550/13 3550/22 3551/14 3551/17
**consequences** [1] 3405/7
**consider** [4] 3418/5 3431/10 3471/23 3500/14
**consideration** [4] 3376/21 3539/18 3555/9 3577/8
**considered** [3] 3414/18 3483/15 3559/6
**considering** [1] 3443/10
**consistent** [1] 3502/1
**consolidated** [3] 3496/2 3558/17 3559/6
**consolidating** [1] 3496/5
**conspirator** [2] 3407/21 3407/22
**consultant** [3] 3527/25 3528/12 3534/19
**consultants** [3] 3530/25 3531/14 3531/25
**consultation** [1] 3397/6
**consulting** [23] 3450/24 3509/22 3509/24 3510/5 3510/9 3510/12 3511/7 3511/17 3513/15 3524/15 3524/17 3524/22 3525/6 3525/17 3526/2 3527/18 3527/21 3527/22 3528/19 3532/13 3532/16 3534/13 3534/16
**contact** [1] 3552/19
**contained** [3] 3570/6 3575/14
**contains** [2] 3545/24 3569/24
**content** [2] 3471/25 3541/5
**context** [2] 3407/1 3453/10
**continuation** [1] 3397/17
**continue** [4] 3397/12 3413/17 3465/6 3479/15

**C**

**continued [21]** 3379/20 3400/20 3400/23 3401/15 3403/17 3406/11 3408/22 3411/17 3422/16 3424/3 3428/19 3441/1 3444/3 3470/18 3515/16 3517/5 3518/9 3519/10 3544/2 3563/6 3567/22

**continuing [2]** 3389/20 3484/16

**contract [1]** 3392/9

**control [6]** 3390/6 3393/8 3396/21 3427/5 3499/21 3505/10

**controls [4]** 3390/10 3397/3 3397/4 3411/12

**conversation [15]** 3407/15 3416/24 3417/25 3418/2 3418/4 3418/6 3430/24 3457/7 3457/10 3457/15 3457/17 3473/10 3473/18 3474/2 3474/13

**conversations [4]** 3449/22 3449/25 3473/9 3479/11

**convey [2]** 3381/3 3475/11

**conveyed [3]** 3409/14 3409/16 3501/25

**convicted [7]** 3432/11 3432/15 3432/22 3433/3 3433/9 3433/15 3433/24

**convince [2]** 3413/9 3567/10

**convinced [1]** 3567/10

**COO [6]** 3394/3 3420/4 3420/12 3478/17 3480/10 3491/24

**copied [2]** 3413/25 3542/24

**copy [5]** 3384/19 3550/2 3551/2 3568/10 3575/15

**copying [3]** 3380/2 3395/20 3552/17

**cordial [1]** 3451/22

**core [1]** 3427/7

**Cornelius [1]** 3410/23

**corner [4]** 3465/3 3469/21 3542/23 3576/9

**corporate [9]** 3501/6 3502/24 3503/2 3503/6 3503/9 3503/11 3503/11 3503/22 3503/24

**corporation [1]** 3410/20

**corporations [2]** 3559/16 3559/18

**correct [386]**

**correctly [6]** 3467/14 3540/1 3540/2 3575/13 3576/18 3577/25

**corresponding [3]** 3539/15 3555/7 3577/5

**cost [3]** 3514/22 3515/10 3516/9

**costly [1]** 3515/12

**costs [1]** 3394/8

**counsel [12]** 3378/20 3393/25 3394/15 3394/16 3398/20 3399/22 3410/25 3434/8 3435/1 3478/3 3490/11 3540/18

**count [2]** 3545/10 3545/17

**counted [1]** 3540/16

**counter [2]** 3577/11 3577/14

**countries [2]** 3452/14 3452/15

**country [1]** 3512/24

**couple [7]** 3379/3 3483/6 3483/8 3516/20 3522/21 3575/1 3575/5

**course [8]** 3393/13 3396/6 3399/3 3400/20 3420/5 3561/23 3564/3 3575/2

**Court's [2]** 3376/21 3546/16

**Courthouse [1]** 3375/3

**Courtney [2]** 3466/1 3466/2

**courtroom [8]** 3378/17 3428/14 3429/7 3440/21 3518/7 3519/3 3560/13 3580/5

**cover [9]** 3379/25 3421/1 3521/21
3526/13 3533/13 3533/13 3533/14 3561/9 3564/10

**coverage [2]** 3461/19 3580/3

**covered [6]** 3421/3 3501/7 3533/12 3556/17 3558/1 3558/4

**covering [3]** 3558/4 3558/15 3562/18

**CR [1]** 3375/2

**Cramer [2]** 3385/9 3482/16

**craw [1]** 3514/22

**create [4]** 3388/20 3399/12 3478/20 3573/17

**created [2]** 3452/7 3489/14

**credentials [1]** 3481/4

**credit [1]** 3466/1

**crimes [2]** 3402/7 3402/9 3402/10

**criminal [5]** 3375/9 3376/7 3395/16 3508/23 3529/16

**critical [1]** 3447/25

**criticism [1]** 3487/2

**cross [16]** 3377/2 3377/5 3377/24 3391/4 4393/9 3408/7 3423/8 3423/14 3429/14 3516/10 3519/10 3519/13 3519/24 3560/23 3570/11 3572/10

**cross-examination [4]** 3377/2 3429/14 3519/10 3519/13

**cross-examinations [1]** 3377/24

**cross-functional [1]** 3393/9

**cross-functionally [1]** 3391/4

**crystalize [1]** 3376/20

**CSR [1]** 3375/22

**cubs [1]** 3383/8

**cure [1]** 3402/8

**current [2]** 3418/16 3427/22

**cut [6]** 3473/8 3473/20 3473/23 3473/25 3474/11 3571/10

**cystinuria [2]** 3465/14 3465/17

**D**

**damage [4]** 3403/9 3418/17 3418/19 3418/19

**damages [1]** 3426/5

**Darren [1]** 3510/20

**date [11]** 3384/19 3410/16 3446/3 3488/12 3488/17 3536/8 3555/11 3557/11 3574/20 3577/22 3579/6

**dated [8]** 3386/10 3438/15 3465/2 3523/19 3542/23 3561/15 3562/1 3569/7

**daughter [4]** 3472/3 3472/10 3472/12 3512/6

**David [4]** 3384/20 3479/13 3479/14 3512/8

**day-to-day [1]** 3463/19

**days [10]** 3377/19 3474/19 3474/19 3536/16 3536/17 3536/17 3536/20 3536/21 3536/21 3537/22 3540/4

**deal [4]** 3415/24 3416/3 3570/16 3571/8

**dealing [1]** 3509/10

**deals [1]** 3498/25

**dealt [1]** 3418/7

**Deb [1]** 3376/6

**debt [4]** 3422/5 3426/14 3427/14 3427/18

**debts [1]** 3540/7

**December [8]** 3462/2 3479/17 3481/8 3486/6 3494/14 3496/10 3553/2 3556/5

**December 17 [1]** 3481/8
**December 19 [1]** 3479/17

**December 2012 [1]** 3486/6

**December 31 [3]** 3496/10 3553/2 3556/5

**decide [3]** 3388/21 3423/7 3425/25

**decided [6]** 3395/9 3409/10 3456/4 3456/24 3468/21 3496/4

**decision [18]** 3389/18 3390/8 3397/3 3409/14 3413/3 3425/8 3439/19 3440/3 3445/17 3456/12 3462/12 3464/8 3476/9 3490/21 3496/5 3515/6 3516/14 3581/3

**decisions [5]** 3462/6 3462/10 3495/2 3500/1 3500/2

**deck [1]** 3501/6

**declined [2]** 3411/9 3496/21

**dedicated [1]** 3483/6

**defend [3]** 3539/10 3555/2 3577/1

**defendant [48]** 3375/7 3375/18 3381/7 3382/25 3390/13 3390/19 3390/22 3394/17 3394/25 3395/11 3395/12 3395/14 3395/20 3400/13 3400/17 3402/15 3405/17 3409/14 3409/17 3413/4 3413/16 3414/12 3414/22 3416/5 3416/22 3417/3 3417/18 3417/23 3417/25 3418/3 3418/11 3418/13 3418/21 3418/23 3419/5 3419/9 3421/11 3421/19 3422/6 3423/10 3425/23 3426/10 3570/12 3570/24 3573/3 3572/6 3574/14

**defendant's [11]** 3401/9 3409/8 3409/20 3417/9 3421/9 3421/17 3422/10 3425/3 3541/21 3560/24 3570/1

**defense [14]** 3376/10 3376/19 3377/12 3377/17 3377/18 3378/6 3378/7 3378/10 3464/18 3504/10 3566/23 3568/4 3580/12 3581/7

**define [1]** 3390/14

**defraud [1]** 3501/11

**degree [5]** 3458/15 3485/5 3487/8 3529/10 3530/7

**Del [1]** 3474/7

**Delaware [1]** 3410/20

**deliver [2]** 3577/13 3577/13

**delivered [1]** 3436/20

**demand [1]** 3577/12

**demonstrate [1]** 3499/6

**deny [1]** 3477/19

**departments [5]** 3391/4 3393/9 3399/10 3399/19 3448/6

**departure [6]** 3422/10 3425/3 3425/6 3452/8 3507/2 3527/2

**depth [1]** 3500/18

**derogatory [1]** 3453/17

**describe [2]** 3418/18 3498/20

**described [6]** 3381/5 3402/18 3412/22 3457/23 3498/3 3528/6

**description [1]** 3431/10

**deserved [1]** 3439/13

**designed [1]** 3481/3

**desk [1]** 3581/14

**despite [5]** 3439/11 3499/12 3504/2 3506/21 3506/24

**destination [1]** 3471/23

**details [1]** 3423/11

**determination [1]** 3445/13 3574/13

**D**

**determine [5]** 3399/11 3409/8 3509/24 3573/17 3574/3
**determined [2]** 3411/14 3505/4
**develop [5]** 3381/15 3393/8 3398/25 3497/25 3498/10
**developed [6]** 3392/1 3456/19 3462/1 3465/22 3465/24 3467/14
**developing [6]** 3381/19 3399/1 3455/25 3457/20 3468/6 3497/15
**development [28]** 3380/10 3380/12 3380/13 3381/9 3381/12 3381/13 3381/17 3381/22 3383/3 3383/12 3391/5 3391/10 3392/5 3392/16 3392/25 3399/18 3400/21 3410/3 3426/18 3427/20 3427/25 3428/2 3435/21 3448/6 3466/2 3478/21 3506/17 3558/16
**development-stage [1]** 3506/17
**devote [1]** 3457/20
**dialogue [1]** 3397/8
**Diego [15]** 3387/20 3388/6 3388/16 3389/1 3400/7 3406/2 3407/2 3408/1 3454/24 3474/5 3495/25 3496/3 3496/7 3496/21 3533/1
**difference [5]** 3376/13 3414/19 3539/16 3555/8 3577/6
**different [30]** 3381/1 3387/9 3391/1 3391/1 3391/4 3393/9 3399/10 3399/14 3399/18 3425/18 3445/24 3447/23 3452/13 3457/15 3460/3 3476/11 3501/16 3501/17 3502/3 3502/3 3502/4 3502/5 3502/5 3551/15 3553/25 3558/5 3562/15 3562/22 3566/13 3571/22
**differently [2]** 3391/7 3392/21
**difficult [1]** 3571/21
**difficulty [1]** 3434/16
**dig [1]** 3398/7
**diligence [1]** 3456/13
**diligent [1]** 3540/16
**dinner [1]** 3394/22
**dire [3]** 3561/22 3561/24 3564/5
**direct [19]** 3376/25 3379/2 3379/9 3379/19 3379/20 3402/22 3429/22 3440/13 3442/8 3445/4 3459/14 3480/11 3480/22 3507/11 3519/12 3519/23 3520/5 3528/6 3528/10
**directed [1]** 3405/1
**direction [1]** 3388/22
**directive [2]** 3395/9 3405/23
**directly [2]** 3396/13 3503/17
**director [12]** 3385/15 3414/19 3460/25 3461/1 3461/10 3481/8 3484/17 3485/2 3542/18 3543/15 3543/18 3543/23
**directors [23]** 3380/2 3383/19 3383/22 3410/20 3410/22 3410/23 3411/12 3412/16 3414/5 3414/17 3460/22 3461/6 3462/21 3463/3 3463/10 3490/4 3502/25 3526/16 3542/13 3546/5 3559/21 3559/24 3572/20
**disagree [2]** 3423/18 3436/17
**disagreements [1]** 3416/13
**disappointed [1]** 3381/4
**disappointment [1]** 3380/25
**disapprove [1]** 3527/8
**disclosed [1]** 3383/24
**disclosure [3]** 3384/2 3384/6 3556/7

**disconcerting [1]** 3406/1
**discovered [1]** 3420/9
**discreet [1]** 3580/15
**discretion [1]** 3495/10
**discuss [13]** 3386/21 3387/10 3411/4 3428/10 3448/17 3450/16 3501/4 3501/20 3501/22 3501/23 3518/4 3560/11 3580/2
**discussed [34]** 3382/25 3390/12 3395/24 3397/22 3403/13 3411/12 3450/23 3451/1 3476/15 3478/12 3501/5 3513/16 3522/23 3523/1 3523/7 3525/10 3525/12 3525/25 3526/4 3527/5 3528/15 3531/7 3531/11 3532/7 3532/9 3532/11 3532/15 3534/13 3534/20 3545/10 3557/17 3561/9 3572/20 3578/5
**discussing [2]** 3557/16 3580/15
**discussion [19]** 3380/10 3380/15 3380/19 3380/20 3381/5 3381/6 3382/3 3382/21 3382/22 3390/7 3403/2 3410/6 3411/14 3500/19 3532/12 3540/12 3541/14 3541/16 3575/21
**discussions [8]** 3389/16 3389/18 3390/4 3390/15 3390/16 3390/16 3390/19 3417/3
**disease [3]** 3467/5 3467/9 3467/11
**diseases [1]** 3506/10
**disentangle [1]** 3479/9
**dismissed [1]** 3432/23
**dismissive [1]** 3405/24
**disregard [1]** 3409/4
**Distinguish [1]** 3494/7
**distracting [3]** 3437/12 3438/8 3447/24
**distraction [2]** 3396/17 3396/16
**distractions [2]** 3396/3 3396/5
**distraught [1]** 3406/6
**DISTRICT [4]** 3375/1 3375/1 3375/10 3375/13
**divest [1]** 3419/16
**divested [1]** 3427/6
**divestment [1]** 3419/18
**divide [1]** 3416/10
**doctor [1]** 3475/12
**document [72]** 3380/5 3383/18 3384/21 3385/22 3396/22 3396/23 3410/14 3412/14 3413/23 3415/5 3415/7 3440/14 3469/20 3470/7 3480/13 3504/11 3520/4 3520/14 3520/16 3521/5 3521/17 3522/21 3524/12 3526/6 3526/8 3526/10 3527/17 3529/8 3529/11 3530/9 3530/20 3531/5 3531/16 3531/24 3543/14 3545/1 3545/7 3545/18 3546/4 3546/22 3550/6 3551/2 3551/9 3551/11 3553/18 3553/20 3554/4 3554/14 3554/18 3556/19 3557/18 3557/22 3557/24 3559/12 3561/7 3561/8 3561/11 3562/5 3562/12 3562/15 3562/16 3562/23 3562/25 3564/9 3564/14 3564/22 3565/6 3565/6 3565/13 3566/10 3576/11
**documentation [1]** 3549/4
**documents [27]** 3384/2 3384/6 3402/18 3434/17 3482/6 3523/24 3524/2 3528/18 3528/23 3529/1 3536/3 3540/5 3545/16 3548/25 3550/18 3554/12

**3558/5** 3562/5 3562/8 3562/20 3562/21 3564/2 3563/1 3565/21 3566/13 3578/6 3578/10
**dollar [6]** 3422/3 3422/5 3466/17 3484/10 3484/12 3539/14
**dollars [5]** 3510/15 3534/14 3534/15 3534/18 3540/5
**dominant [3]** 3395/6 3405/22 3495/1
**Donahue [1]** 3404/11
**done [17]** 3379/1 3387/6 3394/1 3398/9 3398/10 3398/23 3413/15 3439/11 3443/8 3491/4 3508/6 3508/7 3508/8 3553/5 3565/11 3571/13 3575/6
**Donnelly [1]** 3567/15
**dosage [1]** 3473/8
**dosages [2]** 3475/11 3475/13
**dots [1]** 3541/1
**doubled [1]** 3427/20
**doubt [2]** 3497/24 3533/23
**down [31]** 3384/17 3387/14 3412/1 3416/14 3419/15 3427/19 3428/15 3430/13 3431/16 3432/25 3445/18 3454/18 3457/1 3458/13 3459/2 3459/3 3462/11 3462/17 3463/17 3474/8 3474/9 3478/14 3479/17 3496/5 3549/18 3550/4 3560/14 3573/1 3573/4 3574/14 3578/25
**download [1]** 3536/14
**downloaded [1]** 3419/6
**Dr. [15]** 3380/12 3391/13 3392/4 3392/4 3404/22 3405/4 3405/5 3435/5 3435/10 3435/13 3435/16 3435/22 3435/24 3436/12 3436/18
**Dr. Alvin Shih [1]** 3435/22
**Dr. Paley [3]** 3404/22 3405/4 3405/5
**Dr. Plotkin [6]** 3391/13 3435/5 3435/10 3435/13 3435/16 3436/12
**Dr. Plotkin's [2]** 3435/24 3436/18
**Dr. Rao [2]** 3392/4 3392/4
**Dr. Srinivas [1]** 3380/12
**draft [25]** 3524/15 3525/5 3525/17 3526/22 3527/3 3527/4 3527/5 3527/6 3527/18 3527/21 3527/22 3528/13 3532/16 3535/4 3537/9 3537/12 3537/24 3538/7 3538/8 3538/15 3553/1 3553/10 3553/11 3553/15 3556/19
**drafted [1]** 3412/9
**drafts [1]** 3535/6
**dramatically [1]** 3491/7
**drinking [1]** 3392/20
**driven [1]** 3533/8
**drop [1]** 3447/7
**drug [12]** 3380/9 3385/19 3416/8 3467/6 3482/23 3483/2 3483/4 3483/9 3483/11 3484/2 3484/14 3484/21
**drugs [13]** 3385/13 3416/16 3416/17 3457/20 3482/20 3482/20 3482/23 3483/7 3483/16 3483/17 3483/23 3497/15 3497/25
**dual [1]** 3397/6
**due [7]** 3416/1 3456/13 3555/11 3557/11 3577/10 3577/23 3579/3
**duly [2]** 3379/17 3410/21
**duplication [1]** 3388/20
**during [38]** 3402/2 3404/4 3404/6 3404/25 3407/10 3407/12 3420/5 3422/6 3437/25 3444/24 3447/2 3447/8

**D**

**during... [26]** 3448/14 3448/16 3449/12 3450/6 3451/4 3452/19 3466/21 3474/15 3476/2 3477/3 3487/11 3488/14 3489/19 3490/4 3494/1 3509/4 3537/21 3538/19 3539/14 3543/18 3554/21 3555/6 3556/9 3572/11 3577/5 3577/18

**duties [1]** 3412/3

**DX6007 [2]** 3546/14 3546/16

**DX6013 [1]** 3487/25

**E**

**e-mail [70]** 3380/1 3385/23 3386/9 3386/10 3386/18 3386/22 3386/25 3387/13 3387/15 3391/24 3392/12 3392/14 3395/19 3395/23 3400/14 3480/13 3487/21 3488/4 3488/20 3491/8 3491/10 3546/16 3546/18 3546/19 3546/23 3549/8 3549/12 3549/23 3549/24 3550/2 3550/9 3551/3 3551/5 3552/9 3552/25 3553/19 3553/20 3553/22 3554/19 3558/4 3558/15 3561/9 3561/12 3561/17 3562/1 3562/9 3562/13 3562/18 3562/18 3562/19 3562/20 3564/13 3565/2 3565/10 3565/16 3565/22 3565/23 3565/25 3566/5 3566/8 3566/17 3568/9 3568/12 3568/17 3569/1 3569/1 3569/15 3569/21 3569/24 3569/24

**e-mailed [1]** 3566/12

**e-mails [1]** 3388/10

**early [10]** 3377/5 3377/15 3385/17 3430/22 3431/2 3458/14 3479/9 3484/19 3567/6 3580/2

**earn [1]** 3389/9

**easier [3]** 3433/4 3575/24 3576/6

**East [1]** 3375/14

**EASTERN [2]** 3375/1 3375/13

**easy [3]** 3394/14 3417/11 3571/18

**eat [4]** 3515/11 3515/11 3516/12 3516/17

**eating [3]** 3515/13 3516/18 3516/19

**educated [1]** 3497/13

**effect [1]** 3542/13

**effectively [1]** 3387/7

**effects [1]** 3376/22

**efficient [1]** 3397/8

**effort [5]** 3400/20 3407/13 3420/13 3486/13 3487/11

**efforts [3]** 3426/18 3479/9 3507/20

**ego [1]** 3498/23

**eight [2]** 3383/14 3469/22

**Eighty [1]** 3578/19

**Eighty-five [1]** 3578/19

**either [13]** 3390/19 3394/22 3450/13 3476/9 3490/13 3491/24 3513/17 3527/3 3528/15 3558/11 3571/1 3578/9 3578/10

**electronic [1]** 3526/13

**ELEIS [1]** 3375/15

**elicit [2]** 3423/7 3423/22

**Elmo [1]** 3560/25

**email [27]** 3375/23 3413/24 3414/2 3414/21 3414/24 3415/8 3415/20 3415/21 3415/22 3416/21 3416/22

3417/8 3434/23 3438/11 3438/15 3438/18 3448/22 3523/9 3523/12 3524/8 3526/13 3527/17 3528/17 3535/23 3537/13 3537/14 3537/19

**emails [4]** 3417/17 3417/24 3418/1 3418/12

**emotional [3]** 3457/11 3457/13 3475/25

**employed [4]** 3385/8 3472/5 3482/15 3496/11

**employee [2]** 3433/16 3476/18

**employees [11]** 3393/2 3420/9 3458/10 3458/12 3458/13 3461/6 3471/15 3471/22 3472/1 3495/14 3495/16

**employment [10]** 3392/8 3411/13 3412/5 3432/13 3433/22 3435/22 3435/24 3537/7 3550/3 3550/22

**enclosed [1]** 3553/12

**encompassing [1]** 3507/1

**encounter [6]** 3456/24 3457/12 3457/13 3457/19 3478/25 3499/24

**end [21]** 3377/5 3377/15 3380/8 3400/12 3403/16 3408/21 3426/22 3435/2 3444/2 3446/5 3447/15 3452/2 3486/5 3496/17 3496/19 3496/22 3506/4 3514/15 3517/4 3558/13 3567/21

**ended [9]** 3521/8 3521/11 3524/22 3538/20 3553/14 3553/15 3553/15 3555/6 3556/5

**ending [3]** 3556/6 3577/5 3577/18

**ends [2]** 3514/12 3514/14

**energizing [1]** 3453/11

**engage [2]** 3401/3 3437/13

**engaged [3]** 3401/12 3445/10 3548/16

**ensure [1]** 3398/23

**entered [7]** 3419/5 3526/18 3539/9 3555/1 3556/9 3576/24 3579/2

**entering [1]** 3526/17

**enters [3]** 3379/6 3429/7 3519/3

**entire [4]** 3394/11 3448/14 3545/7 3550/5

**entirely [1]** 3557/11

**entities [2]** 3513/21 3513/23

**entity [1]** 3514/4

**environment [1]** 3393/2

**envision [1]** 3387/19

**equity [1]** 3513/1

**equivalent [2]** 3468/7 3468/12

**erase [1]** 3409/4

**especially [1]** 3417/11

**ESQ [8]** 3375/12 3375/15 3375/15 3375/16 3375/19 3375/20 3375/20 3375/21

**essentially [9]** 3381/16 3463/18 3474/16 3501/22 3514/12 3540/6 3556/16 3556/20 3557/20

**established [1]** 3494/18

**estimate [2]** 3400/11 3496/15

**Europe [1]** 3571/16

**evaluation [1]** 3427/23

**Evan [8]** 3461/18 3477/9 3508/19 3513/17 3522/5 3523/17 3535/25 3552/19

**evening [2]** 3534/9 3566/22

**event [3]** 3379/5 3420/25 3556/7

**events [1]** 3508/17

**eventually [8]** 3383/1 3487/3 3489/16

3490/12 3498/4 3528/18 3535/6 3535/9 3535/14 3537/15 3539/19

**evidence [40]** 3386/4 3386/8 3395/19 3402/13 3410/12 3413/21 3415/15 3415/19 3438/10 3440/14 3442/10 3445/22 3480/12 3520/3 3520/14 3520/17 3520/19 3521/4 3523/11 3530/15 3535/17 3535/18 3541/21 3541/23 3546/12 3547/3 3550/25 3552/10 3552/11 3560/25 3561/21 3562/16 3564/12 3565/11 3568/4 3568/21 3568/25 3572/13 3575/9 3578/4

**exact [4]** 3392/3 3454/17 3458/11 3479/22

**exactly [3]** 3378/2 3496/4 3541/12

**exaggerating [1]** 3502/18

**exaggeration [1]** 3489/22

**examination [21]** 3377/2 3379/10 3379/19 3379/20 3429/14 3429/22 3442/8 3445/4 3459/14 3480/11 3480/22 3507/11 3519/10 3519/13 3519/13 3520/5 3528/6 3528/10 3560/21 3568/2 3575/3

**examinations [1]** 3377/24

**examined [1]** 3379/17

**example [6]** 3470/13 3473/17 3483/3 3502/14 3572/24 3574/17

**exceeded [1]** 3420/10

**exceeding [1]** 3397/5

**Excellent [1]** 3389/2

**Except [1]** 3556/4

**exception [4]** 3377/25 3523/24 3528/23 3562/17

**exceptional [1]** 3397/21

**exceptions [1]** 3483/12

**excess [1]** 3451/25

**excessive [3]** 3434/16 3439/13 3443/20

**exchange [4]** 3378/8 3383/24 3492/19 3535/8

**exchanged [1]** 3417/24

**exchanges [1]** 3434/23

**exclamation [1]** 3389/2

**excuse [10]** 3405/4 3430/9 3436/4 3436/4 3438/22 3439/18 3439/20 3534/4 3536/20 3548/1

**excused [3]** 3548/4 3579/19 3579/21

**execution [1]** 3579/4

**executive [17]** 3383/22 3411/5 3411/7 3411/16 3412/3 3412/8 3464/24 3481/7 3495/7 3533/20 3538/21 3554/22 3556/9 3557/5 3576/19 3576/21 3577/12

**exercised [2]** 3430/10 3452/6

**exhibit [39]** 3379/25 3383/14 3385/21 3386/4 3386/7 3395/18 3396/19 3410/13 3413/21 3415/4 3415/15 3415/18 3438/10 3445/23 3445/23 3446/2 3464/18 3480/12 3504/13 3520/11 3520/18 3520/24 3521/5 3537/16 3541/22 3558/15 3560/24 3561/6 3561/12 3562/17 3564/11 3568/21 3568/23 3568/25 3570/1 3572/12 3575/7 3575/7 3575/8

**Exhibit 122-43 [2]** 3520/24 3521/5

**Exhibit 122-76 [1]** 3438/10

**Exhibit 122-92 [1]** 3413/21

**Exhibit 122-93 [2]** 3415/4 3415/15

## E

**Exhibit 4237 [1]** 3541/22
**Exhibit 605 [1]** 3446/2
**Exhibit 606 [1]** 3445/23
**Exhibit 607 [1]** 3445/23
**exhibits [2]** 3523/25 3583/10
**exits [4]** 3428/14 3518/7 3560/13 3580/5
**expect [3]** 3394/8 3408/7 3423/7
**expectations [2]** 3387/11 3396/24
**expected [2]** 3531/10 3569/9
**expecting [1]** 3567/1
**expenditures [1]** 3397/5
**expense [2]** 3439/10 3439/12
**experience [6]** 3385/16 3454/11 3454/14 3484/18 3503/22 3571/20
**experienced [5]** 3385/11 3462/4 3482/18 3485/22 3533/16
**expert [3]** 3376/14 3545/8 3545/10
**expertise [4]** 3433/6 3489/6 3489/24 3548/12
**experts [3]** 3545/8 3545/9 3545/11
**explain [4]** 3376/8 3453/8 3571/9 3573/10
**explained [1]** 3442/17
**explaining [1]** 3376/15
**explanation [1]** 3571/10
**Express [1]** 3533/21
**extensive [5]** 3377/23 3389/15 3394/7 3525/3 3525/4
**extensively [3]** 3380/22 3452/17 3452/18
**extent [1]** 3452/13
**extremely [2]** 3394/7 3571/21
**eyes [1]** 3582/1

## F

**face [2]** 3462/4 3572/1
**Facebook [1]** 3437/14
**fact [20]** 3376/14 3376/16 3399/21 3402/11 3407/22 3414/24 3423/16 3439/11 3442/4 3442/5 3457/22 3461/22 3475/10 3476/14 3477/14 3477/23 3478/10 3506/13 3508/1 3548/4
**fair [21]** 3415/25 3432/18 3436/22 3437/19 3452/19 3461/3 3463/8 3475/15 3482/23 3487/2 3487/7 3487/10 3496/7 3497/24 3501/10 3502/23 3507/15 3508/6 3548/20 3571/20 3579/12
**fairly [3]** 3380/20 3458/5 3478/8
**faith [2]** 3415/1 3442/20
**fall [3]** 3426/9 3426/12 3427/1
**familiar [2]** 3460/4 3504/24
**family [2]** 3418/9 3567/3
**far [6]** 3481/9 3494/13 3497/16 3497/18 3514/12 3514/14
**fart [1]** 3491/4
**farting [6]** 3487/18 3487/21 3488/18 3489/3 3489/21 3491/10
**fashion [1]** 3412/22
**favorite [1]** 3393/1
**fax [1]** 3569/17
**FBI [1]** 3472/25
**February [13]** 3380/4 3380/7 3385/24 3386/11 3386/18 3386/25 3387/15

**February 14 [1]** 3380/7
**February 18 [1]** 3386/11
**February 19 [2]** 3386/18 3386/25
**February 2014 [2]** 3385/24 3388/9
**February 27 [3]** 3387/15 3387/17 3388/11
**February 27th [1]** 3438/15
**feedback [3]** 3436/19 3436/20 3490/7
**feet [1]** 3378/21
**felony [6]** 3432/11 3432/15 3433/9 3433/15 3433/24 3434/2
**felt [12]** 3390/5 3394/14 3434/12 3435/8 3438/5 3445/15 3446/5 3461/25 3477/9 3489/9 3502/20 3547/25
**fever [1]** 3475/17
**few [5]** 3379/4 3388/10 3400/10 3402/16 3464/10
**fewer [2]** 3483/18 3573/19
**fiducial [2]** 3476/17 3491/3
**fiduciary [7]** 3462/20 3462/25 3463/2 3463/5 3491/7 3548/8 3548/9
**field [3]** 3387/7 3497/13 3545/11
**fifth [2]** 3414/7 3414/13
**file [8]** 3376/14 3405/13 3417/1 3426/3 3509/16 3509/20 3511/16 3581/17
**filed [32]** 3391/14 3391/15 3402/16 3433/17 3439/10 3467/18 3508/19 3509/14 3510/17 3511/13 3511/15 3529/8 3541/24 3543/25 3545/4 3551/10 3551/14 3551/19 3552/5 3554/7 3554/12 3554/15 3556/4 3564/18 3565/4 3566/11 3566/15 3568/5 3568/18 3569/25 3570/6 3570/9
**files [1]** 3419/6
**filing [17]** 3383/25 3508/15 3514/3 3529/6 3542/4 3543/10 3546/4 3553/5 3554/9 3554/14 3555/12 3557/11 3567/11 3568/18 3577/22 3579/6 3581/22
**filings [7]** 3405/13 3529/25 3530/2 3530/7 3530/9 3530/10 3533/5 3533/7
**fill [3]** 3377/5 3384/12 3502/12
**fill-in [1]** 3502/12
**filled [2]** 3571/8 3571/11
**final [3]** 3461/22 3476/9 3490/16
**Finally [1]** 3578/17
**finance [1]** 3399/18
**financial [23]** 3405/19 3417/14 3426/9 3427/3 3427/15 3427/17 3452/2 3466/10 3526/16 3542/7 3545/8 3545/8 3545/9 3556/2 3556/13 3558/16 3559/4 3559/9 3559/15 3559/17 3559/18 3559/22 3559/24
**financials [4]** 3423/12 3425/11 3425/17 3425/20
**financings [2]** 3385/18 3484/20
**fine [3]** 3408/15 3445/20 3512/18
**finger [3]** 3558/21 3575/21 3578/24
**finish [5]** 3377/9 3457/1 3472/12 3489/5 3567/17
**FINRA [1]** 3376/6
**fire [10]** 3433/9 3435/3 3435/18 3439/19 3440/3 3440/4 3440/5 3443/21 3443/22 3495/16
**fired [15]** 3435/16 3435/20 3439/6

**3387/13 3388/2 3388/9 3388/11 3399/6 3438/15**
**3439/8 3442/6 3442/11 3442/15 3442/21 3443/3 3445/4 3443/5 3443/6 3443/10 3495/20 3495/22**
**fireworks [1]** 3409/23
**firing [3]** 3440/8 3442/18 3443/16
**firm [13]** 3385/3 3394/1 3394/9 3413/17 3416/9 3425/12 3477/15 3478/3 3478/6 3478/9 3481/17 3509/8 3513/18
**firms [5]** 3385/10 3482/17 3509/10 3512/9 3513/2
**first [13]** 3379/17 3383/20 3395/22 3397/12 3410/18 3412/2 3428/3 3469/24 3522/22 3547/2 3555/17 3570/13 3572/19
**fit [3]** 3438/24 3499/8 3507/14
**five [6]** 3414/15 3437/17 3469/21 3536/16 3536/18 3578/19
**flag [11]** 3470/12 3470/13 3471/2 3471/5 3471/17 3471/20 3492/1 3492/3 3525/16 3525/19 3539/7
**flags [13]** 3400/19 3469/3 3469/3 3469/15 3469/19 3470/2 3470/4 3471/9 3473/7 3473/25 3505/4 3505/7 3506/14
**flexible [1]** 3478/19
**flip [2]** 3524/12 3571/23
**flow [3]** 3520/12 3521/8 3521/14
**flush [1]** 3516/6
**focus [3]** 3387/13 3398/14 3410/13 3450/20 3502/3 3502/16 3513/22
**focused [4]** 3390/11 3480/19 3499/21 3572/13
**follow [4]** 3394/5 3453/13 3454/15 3475/10
**follow-up [1]** 3454/15
**followed [4]** 3453/8 3453/20 3456/9 3475/9
**followers [2]** 3401/4 3401/7
**following [16]** 3377/15 3410/19 3411/14 3411/17 3413/2 3418/1 3421/9 3421/17 3422/16 3423/13 3424/3 3427/1 3427/1 3428/19 3518/9 3579/3
**following that [1]** 3427/7
**follows [1]** 3379/18
**footing [2]** 3427/16 3427/17
**footnote [1]** 3556/7
**force [2]** 3386/15 3439/2
**forget [2]** 3446/5 3534/18
**form [22]** 3414/9 3437/13 3449/2 3503/2 3514/15 3516/21 3516/23 3541/24 3542/3 3543/2 3543/10 3545/19 3545/24 3546/7 3547/4 3556/4 3556/5 3560/24 3561/1 3561/1 3561/4 3569/11
**formal [4]** 3449/19 3449/23 3535/7 3546/4
**formalized [1]** 3378/11
**format [1]** 3550/16
**formation [1]** 3481/13
**former [3]** 3414/18 3488/8 3576/19
**forth [1]** 3401/4
**fortunate [5]** 3479/23 3480/8 3480/10
**forward [2]** 3397/20 3506/7
**forwarded [1]** 3550/18
**foundational [1]** 3564/1
**founded [4]** 3385/5 3455/22 3466/21 3481/17
**founder [7]** 3385/1 3385/3 3392/4

# F

**founder... [4]** 3481/11 3481/16 3494/12
3494/24
**four [2]** 3392/2 3437/17
**fourth [5]** 3491/23 3492/23 3494/4
3545/14
**frame [4]** 3454/17 3454/18 3500/20
3574/15
**France [4]** 3571/17 3571/19 3571/21
3571/24
**Francis [1]** 3455/11
**Francisco [6]** 3454/25 3455/1 3455/7
3456/23 3457/10 3457/15
**Frankly [1]** 3464/25
**frantically [1]** 3406/4
**fraud [1]** 3510/10
**fraudulent [2]** 3439/10 3439/12
**Fred [7]** 3459/24 3460/4 3460/7
3460/13 3460/15 3460/17 3512/6
**Friday [2]** 3418/1 3561/16
**Friday's [1]** 3536/3
**friend [1]** 3488/8
**friends [5]** 3392/20 3418/23 3479/11
3479/16 3480/8
**friendship [1]** 3479/15
**friendships [1]** 3448/2
**front [3]** 3561/7 3561/11 3576/2
**frustration [1]** 3396/1
**FSGS [3]** 3467/3 3467/5 3467/7
**full [5]** 3397/9 3429/23 3496/20 3506/8
3543/17
**full-time [1]** 3429/23
**fully [1]** 3539/20
**function [2]** 3503/17 3503/17
**functional [1]** 3393/9
**functionally [1]** 3391/4
**functioning [4]** 3394/10 3394/15
3398/15 3496/9
**fund [19]** 3381/7 3381/11 3381/16
3381/21 3382/1 3382/4 3385/4 3385/10
3421/10 3421/18 3422/7 3457/19
3459/2 3481/17 3482/17 3493/17
3539/24 3555/13 3557/13
**funds [6]** 3492/4 3492/5 3492/6
3492/15 3492/16 3492/17
**furnished [1]** 3383/21

# G

**Garden [1]** 3471/15
**GC [1]** 3486/7
**Geller [18]** 3477/5 3477/7 3477/8
3510/18 3511/14 3512/8 3524/19
3524/21 3526/2 3530/25 3531/14
3531/24 3532/3 3532/4 3532/12
3532/14 3532/16 3534/5
**Geller's [1]** 3525/6
**general [12]** 3393/24 3394/16 3398/20
3399/21 3407/14 3410/25 3483/12
3506/21 3540/17 3542/6 3552/19
3579/5
**generally [5]** 3449/14 3450/21 3471/25
3509/10 3559/23
**generate [2]** 3483/10 3483/11
**generating [1]** 3427/11
**generic [3]** 3418/16 3468/7 3468/12
**gentleman [4]** 3439/3 3439/13 3442/21
3488/5

**gentlemen [3]** 3379/8 3409/2 3518/2
**German [1]** 3416/9
**given [11]** 3394/12 3402/7 3410/21
3420/12 3420/20 3450/6 3466/1 3493/1
3534/15 3534/21 3536/13
**glasses [1]** 3502/21
**gmail.com [1]** 3375/23
**Golding [4]** 3380/17 3390/18 3410/24
3569/3
**good-faith [1]** 3415/1
**governance [13]** 3411/11 3502/24
3503/2 3503/6 3503/9 3503/11 3503/12
3503/12 3503/15 3503/18 3503/22
3503/25 3504/5
**government [40]** 3375/12 3377/11
3379/9 3386/3 3386/7 3413/20 3415/3
3415/14 3415/18 3438/10 3445/22
3445/23 3446/2 3464/7 3469/2 3469/14
3470/1 3472/22 3473/6 3473/24 3477/9
3477/13 3477/14 3477/19 3478/1
3491/12 3491/15 3491/17 3516/1
3520/24 3521/4 3561/21 3562/16
3564/10 3568/20 3568/25 3575/8
3575/11 3580/11 3583/11
**Government's [15]** 3377/13 3379/25
3383/14 3385/20 3386/4 3395/18
3410/13 3480/12 3561/6 3568/21
3568/23 3572/12 3575/7 3575/9
3575/16
**grab [1]** 3554/4
**Grand [1]** 3474/7
**grants [1]** 3452/5
**great [4]** 3452/25 3499/4 3499/6
3553/20
**Greebel [46]** 3380/2 3380/17 3390/20
3394/1 3394/10 3394/18 3395/1 3395/9
3395/10 3395/11 3395/14 3413/17
3434/10 3434/12 3434/17 3461/18
3477/10 3477/14 3477/20 3477/20
3478/2 3486/21 3486/22 3486/22
3508/20 3508/22 3508/24 3509/4
3509/7 3509/14 3513/17 3522/5
3523/17 3535/25 3540/17 3549/25
3550/2 3550/9 3550/18 3550/25 3551/3
3551/5 3551/9 3551/21 3552/1 3552/17
**group [23]** 3376/8 3380/12 3381/9
3381/12 3381/13 3381/17 3382/14
3388/6 3388/6 3388/18 3392/16
3392/25 3399/7 3399/17 3399/17
3399/18 3399/18 3448/3 3466/2 3500/8
3500/10 3501/23 3558/3
**groups [6]** 3388/19 3399/14 3399/15
3502/3 3502/4 3513/20
**growth [2]** 3396/20 3506/8
**guess [3]** 3476/21 3513/22 3570/8
**guidelines [3]** 3398/24 3405/10
3414/16
**guy [2]** 3407/14 3445/18
**guys [1]** 3415/24

# H

**Hackert [3]** 3552/17 3552/19 3552/22
**hair [1]** 3455/4
**half [11]** 3387/14 3396/20 3422/3
3422/5 3474/11 3486/9 3486/9 3486/18
3506/6 3569/11 3580/22
**hammer [1]** 3567/7

**hand [8]** 3410/2 3465/2 3469/6 3469/21
3507/5 3542/23 3565/20 3576/2
**handed [2]** 3564/9 3564/25
**handing [1]** 3469/11
**handling [1]** 3380/25
**handwriting [4]** 3520/7 3520/8 3520/10
3521/6
**happy [7]** 3414/7 3414/13 3464/12
3487/23 3507/21 3565/14 3567/9
**harassment [2]** 3439/14 3442/22
**hard [3]** 3396/1 3400/11 3500/8
**harm [1]** 3468/15
**harmful [2]** 3445/9 3445/16
**harmless [3]** 3539/11 3555/2 3577/1
**Hassan [9]** 3459/24 3460/2 3460/5
3460/7 3460/13 3460/15 3460/17
3512/4 3521/18
**Hassan's [1]** 3512/6
**hate [1]** 3489/2
**head [10]** 3380/12 3398/2 3435/21
3439/2 3451/20 3458/25 3459/3 3459/6
3503/18 3511/1
**headache [1]** 3479/21
**header [2]** 3549/20 3550/5
**heads [1]** 3531/9
**Healthcare [6]** 3494/6 3543/6 3543/6
3543/6 3570/22 3571/4
**healthy [1]** 3393/2
**hear [4]** 3378/18 3378/20 3580/11
3580/11
**heard [4]** 3413/8 3453/24 3454/2
3501/11
**hearsay [3]** 3547/12 3547/15 3547/18
**hedge [13]** 3381/11 3381/16 3381/21
3382/1 3382/4 3385/4 3385/10 3421/10
3421/18 3457/19 3481/17 3482/17
3493/17
**held [3]** 3410/21 3412/16 3455/10
**help [1]** 3489/11
**helped [1]** 3466/17
**helpful [2]** 3378/11 3388/21
**helping [2]** 3506/8 3509/5
**helps [1]** 3578/1
**hereby [1]** 3412/18
**Hi [2]** 3415/24 3474/10
**hiatus [1]** 3397/12
**high [7]** 3394/7 3447/5 3452/7 3452/8
3526/5 3533/20 3572/16
**higher [1]** 3446/15
**highest [1]** 3446/12
**himself [5]** 3454/5 3497/13 3497/16
3499/21 3514/5
**hire [2]** 3398/7 3495/14
**hired [13]** 3388/5 3388/23 3397/24
3400/1 3425/13 3453/21 3453/22
3462/3 3462/4 3471/11 3471/13 3472/5
3495/20
**hiring [3]** 3393/22 3393/24 3443/10
**historically [1]** 3471/22
**history [4]** 3440/15 3498/9 3513/3
3572/11
**Hit [1]** 3409/4
**hold [6]** 3417/15 3421/6 3421/7
3539/10 3555/2 3577/1
**holder [1]** 3494/9
**holding [2]** 3421/2 3447/10
**holdings [1]** 3492/7

**holed** [1] 3474/6
**home** [1] 3387/8
**honest** [6] 3378/19 3442/20 3457/14 3504/19 3506/12 3581/16
**honestly** [1] 3502/19
**Honor** [71] 3378/1 3379/1 3386/3 3389/24 3390/24 3403/5 3403/9 3404/20 3406/9 3407/13 3415/14 3421/12 3421/20 3422/11 3425/15 3428/4 3428/6 3429/3 3429/5 3432/24 3433/10 3434/5 3436/3 3440/6 3443/25 3445/1 3448/19 3448/25 3450/3 3450/8 3450/18 3455/6 3459/25 3468/17 3479/6 3494/3 3500/3 3501/13 3502/10 3511/4 3514/8 3516/1 3519/8 3520/13 3520/22 3527/9 3528/20 3529/17 3538/1 3540/8 3543/19 3549/5 3551/13 3554/8 3557/21 3563/5 3564/1 3564/9 3568/20 3568/22 3572/4 3572/8 3574/24 3578/11 3579/18 3579/24 3579/25 3580/16 3581/2 3581/18 3581/24
**HONORABLE** [1] 3375/9
**hope** [2] 3428/16 3518/6
**hopeful** [1] 3417/5
**hopefully** [3] 3403/4 3505/9 3560/1
**hoping** [1] 3396/25
**Horacio** [1] 3380/13
**hostile** [1] 3418/2
**hotel** [5] 3455/11 3474/7 3474/16 3475/3 3477/3
**hour** [10] 3428/17 3455/14 3455/15 3517/1 3518/8 3522/17 3549/21 3567/7 3567/8 3580/22
**hours** [1] 3522/18
**household** [1] 3460/9
**hundreds** [1] 3483/3
**hurt** [1] 3445/14
**hurting** [3] 3445/6 3447/3 3447/12

**I**

**I N D E X** [1] 3583/8
**iceberg** [1] 3507/25
**idea** [16] 3377/10 3389/2 3415/24 3445/20 3453/22 3454/6 3455/16 3468/8 3468/9 3493/11 3509/12 3513/3 3525/15 3534/21 3562/4 3562/19
**ideas** [2] 3391/16 3455/24
**identification** [11] 3385/21 3415/4 3464/19 3504/10 3535/16 3542/13 3546/14 3549/7 3550/1 3561/6 3568/8
**identified** [5] 3382/7 3455/4 3541/22 3551/2 3565/1
**identify** [5] 3558/14 3562/8 3562/11 3564/13 3564/16
**identifying** [2] 3385/19 3484/21
**ignore** [1] 3520/10
**illegal** [3] 3402/21 3403/14 3404/14
**illegality** [1] 3402/6
**illusion** [1] 3377/4
**image** [1] 3438/6
**immature** [6] 3396/15 3437/5 3437/7 3438/9 3507/10 3507/12
**immediate** [1] 3416/3
**immediately** [8] 3382/24 3387/6 3413/8 3462/13 3539/18 3555/10 3577/8

**3577/24**
**impact** [3] 3401/5 3466/13 3505/18
**implemented** [1] 3505/11
**implies** [1] 3402/5
**important** [4] 3381/3 3399/10 3499/8 3545/18
**importantly** [1] 3399/14
**impress** [1] 3500/17
**impressed** [5] 3506/5 3506/19 3506/22 3507/18 3507/20
**impression** [2] 3448/15 3502/5
**improve** [1] 3427/3
**improvements** [1] 3396/25
**impulsive** [1] 3499/22
**impulsiveness** [1] 3500/1
**inability** [1] 3414/9
**inactive** [1] 3547/25
**inappropriate** [9] 3398/6 3435/8 3436/21 3438/5 3445/9 3471/21 3503/19 3540/18 3540/20
**inappropriate'** [1] 3472/9
**inappropriately** [1] 3435/7
**Inc** [4] 3383/22 3481/12 3520/12 3521/7
**inception** [1] 3446/12
**incessant** [1] 3437/18
**incident** [2] 3391/20 3404/6
**incidents** [2] 3391/20 3404/13
**include** [5] 3390/19 3513/20 3543/1 3556/7 3570/5
**included** [6] 3393/24 3467/3 3512/4 3540/4 3546/7 3553/11
**includes** [1] 3554/19
**including** [5] 3385/16 3400/24 3484/18 3537/1 3538/13 3572/17
**income** [3] 3452/3 3452/8 3483/10
**incompetent** [1] 3436/13
**Incorporated** [1] 3410/20
**increase** [1] 3419/23
**increased** [1] 3420/19
**increasingly** [1] 3393/25
**incredibly** [1] 3453/11
**incur** [1] 3461/7
**indeed** [3] 3452/24 3498/8 3542/11
**indemnification** [10] 3539/9 3539/13 3539/24 3555/1 3555/5 3555/14 3557/13 3576/25 3577/3 3577/21
**independent** [14] 3405/3 3405/5 3405/6 3405/8 3405/9 3414/17 3414/18 3423/24 3425/9 3425/12 3434/7 3449/9 3478/3 3511/24
**indicated** [7] 3383/4 3430/16 3431/3 3433/22 3439/1 3449/10 3468/20
**indicates** [2] 3543/1 3553/10
**indictment** [1] 3434/2
**Indirectly** [1] 3406/2
**individual** [10] 3386/14 3391/25 3395/4 3398/8 3399/21 3438/19 3461/6 3461/8 3477/4 3513/6
**individuals** [7] 3380/11 3381/9 3393/22 3395/3 3397/25 3492/16 3552/20
**industry** [9] 3376/9 3385/12 3398/25 3453/1 3454/12 3459/22 3460/9 3482/19 3488/9
**inform** [1] 3476/12
**information** [14] 3383/23 3398/8 3401/7 3418/14 3419/7 3449/5 3456/15 3513/25 3493/10 3508/3 3542/7 3542/8

**3559/4 3559/9**
**informed** [2] 3382/22 3481/22
**informs** [1] 3542/4 3542/6
**infusion** [1] 3466/17
**initial** [1] 3410/5
**initiate** [2] 3431/13 3431/17
**initiatives** [1] 3396/21
**input** [2] 3395/21 3489/8
**inquire** [1] 3535/2
**insensitivity** [1] 3498/24
**inside** [3] 3398/23 3399/1 3530/6
**instance** [1] 3400/24
**instances** [2] 3402/1 3402/22
**instead** [2] 3496/22 3566/3
**instituted** [1] 3394/15
**instruct** [1] 3404/12
**instruction** [7] 3402/8 3402/20 3402/24 3403/2 3403/6 3403/10 3403/11
**insurance** [6] 3460/22 3460/25 3462/2 3490/14 3509/11 3509/12
**intellect** [2] 3410/4 3497/8
**intellectual** [5] 3497/11 3498/2 3498/5 3498/21 3499/13
**intellectually** [1] 3497/7
**intend** [1] 3376/14
**intended** [3] 3376/6 3376/10 3453/17
**intense** [1] 3499/17
**intent** [1] 3542/4
**intentioned** [1] 3502/3
**intentions** [1] 3414/22
**interact** [1] 3394/18
**interaction** [9] 3395/8 3407/6 3407/7 3407/10 3434/18 3434/18 3451/20 3476/13 3499/7
**interactions** [5] 3391/12 3391/19 3394/24 3405/25 3417/23
**interest** [6] 3410/3 3411/15 3415/25 3417/13 3475/2 3475/4
**interested** [7] 3386/14 3386/20 3414/10 3414/11 3454/21 3454/22 3456/10
**interesting** [2] 3484/8 3547/10
**interests** [1] 3548/15
**interim** [4] 3412/7 3412/24 3419/22 3420/1
**internal** [11] 3421/10 3421/18 3422/9 3423/3 3423/13 3423/15 3423/21 3425/2 3425/19 3426/1 3426/2
**internationally** [1] 3571/13
**interpersonal** [2] 3391/12 3391/19
**interview** [2] 3400/2 3473/2
**interviewed** [1] 3473/1
**Intranasal** [2] 3399/5 3399/5
**Intrepid** [2] 3385/8 3482/15
**intrigued** [2] 3454/9 3484/7
**introduce** [1] 3564/11
**introduces** [1] 3454/5
**introduction** [3] 3386/12 3386/20 3438/16
**invest** [1] 3500/24
**invested** [3] 3420/24 3421/8 3459/16
**investigate** [2] 3397/24 3398/12
**investigation** [14] 3395/12 3395/16 3422/9 3423/4 3423/13 3423/16 3423/21 3425/2 3425/5 3425/9 3425/10 3425/19 3426/1 3426/2
**investigators** [6] 3397/20 3397/24 3398/1 3398/4 3398/7 3398/12

**investment [8]** 3381/6 3491/19 3502/1 3502/4 3512/10 3513/3 3570/15 3571/7
**investments [1]** 3397/5
**investor [12]** 3385/12 3482/19 3493/16 3493/20 3493/22 3494/2 3494/9 3502/9 3502/17 3512/23 3571/14 3576/20
**investors [24]** 3413/3 3413/8 3413/10 3413/13 3418/13 3418/15 3491/13 3491/18 3492/3 3493/12 3493/19 3500/14 3500/21 3501/12 3501/16 3501/17 3501/18 3501/23 3502/2 3543/6 3570/13 3570/19 3570/22 3571/14
**investors' [1]** 3572/1
**invitation [1]** 3410/24
**involve [1]** 3510/12
**involved [10]** 3402/6 3416/4 3439/19 3440/3 3442/21 3452/13 3489/4 3489/18 3489/23 3513/1
**involvement [6]** 3446/18 3461/8 3464/10 3487/17 3489/22 3571/3
**involves [1]** 3465/15
**irrelevant [1]** 3570/10
**issuance [1]** 3539/21
**issue [19]** 3376/3 3395/8 3396/7 3420/7 3442/25 3447/25 3475/24 3475/25 3476/1 3477/1 3477/1 3479/1 3575/14 3575/21 3580/16 3580/25 3581/3 3581/7 3581/17
**issued [7]** 3420/6 3464/15 3464/23 3504/7 3504/14 3573/23 3573/25
**issues [11]** 3376/12 3376/18 3376/20 3376/20 3400/17 3405/12 3411/4 3411/9 3477/11 3477/21 3581/1
**italicized [1]** 3556/3
**item [1]** 3534/7
**items [2]** 3396/3 3396/5
**itself [1]** 3394/23

**J**

**JACOB [1]** 3375/21
**JACQUELYN [1]** 3375/15
**Jain [2]** 3552/17 3552/20
**January [3]** 3427/10 3521/12 3521/15
**January 1st [1]** 3521/12
**Jeff [2]** 3390/18 3404/17
**Jensen [10]** 3399/25 3400/1 3410/25 3411/2 3412/10 3412/20 3434/8 3434/19 3434/21 3486/7
**Jim [3]** 3546/17 3546/18 3546/22
**job [7]** 3387/3 3479/10 3485/19 3487/4 3505/9 3528/8 3543/17
**join [3]** 3459/12 3504/2 3504/4
**joined [3]** 3380/18 3503/7 3570/13
**joining [1]** 3503/21
**JUDGE [6]** 3375/10 3440/17 3440/22 3516/25 3547/20 3567/15
**July [9]** 3375/5 3412/17 3476/3 3488/4 3488/11 3521/23 3522/12 3522/14 3582/7
**July 17 [1]** 3582/7
**July 21 [1]** 3488/4
**July 25 [1]** 3412/17
**July 2nd [1]** 3522/12
**July 3rd [2]** 3521/23 3522/14
**June [23]** 3395/20 3396/21 3400/15

**June 10 [1]** 3573/4
**June 2 [1]** 3573/1
**June 2014 [1]** 3396/21
**June 25 [2]** 3395/20 3400/15
**June 30 [7]** 3553/15 3553/16 3555/6 3557/10 3559/3 3577/5 3577/18
**June 30th [5]** 3521/8 3521/11 3521/15 3538/20 3539/15
**jurors [9]** 3379/7 3428/8 3429/8 3500/5 3500/7 3519/4 3560/10 3560/18 3580/1
**jury [22]** 3375/10 3377/21 3378/15 3379/5 3379/6 3402/5 3404/12 3409/2 3428/14 3429/1 3429/7 3436/11 3442/10 3460/24 3480/24 3488/14 3518/3 3518/7 3519/3 3542/2 3560/13 3580/5

**K**

**KAM [1]** 3375/2
**KAPLAN [1]** 3375/21
**KARTHIK [1]** 3375/16
**KASULIS [1]** 3375/15
**Kasulis' [1]** 3566/22
**Katten [7]** 3384/20 3413/17 3413/18 3434/15 3478/6 3509/15 3513/17
**keep [9]** 3390/11 3397/7 3402/23 3421/11 3421/19 3469/6 3479/21 3530/5 3582/1
**keeping [1]** 3420/12
**keeps [1]** 3547/9
**Ken [6]** 3527/22 3528/2 3528/3 3530/25 3531/14 3531/24
**kept [2]** 3481/25 3545/17
**Kessler [1]** 3512/17
**Ketamine [2]** 3399/5 3419/17
**key [2]** 3476/18 3506/1
**kidney [3]** 3465/13 3465/15 3465/17
**kill [1]** 3383/8
**kinase [1]** 3467/11
**kind [10]** 3395/4 3403/1 3431/7 3431/8 3497/19 3498/22 3545/18 3561/7 3572/19 3572/23
**KIYO [1]** 3375/9
**knowing [1]** 3571/24
**knowledge [9]** 3460/10 3484/23 3485/7 3494/12 3497/14 3500/18 3513/16 3526/19 3541/15
**known [1]** 3459/21
**knows [3]** 3381/24 3416/2 3448/10
**Kocher [3]** 3512/13 3512/16 3512/18
**Kravitz [1]** 3384/20
**Kyalin [1]** 3392/3

**L**

**Laboratories [1]** 3416/9
**lack [6]** 3391/3 3461/25 3461/25 3499/1 3499/3 3502/19
**ladies [3]** 3379/8 3409/2 3518/2
**language [1]** 3471/25
**large [3]** 3416/9 3435/13 3469/24
**largely [1]** 3540/14
**larger [2]** 3561/7 3578/2

**largest [2]** 3392/3 3465/21
**last [6]** 3408/16 3409/3 3427/21 3447/1 3484/24 3559/1
**late [3]** 3493/11
**latest [4]** 3553/1 3553/10 3553/11 3575/8
**latitude [1]** 3547/19
**Lavalle [1]** 3513/11
**law [6]** 3413/17 3478/9 3509/8 3509/10 3509/12 3581/18
**lawsuit [28]** 3402/4 3402/15 3402/15 3404/9 3404/11 3423/8 3423/9 3423/16 3432/6 3432/23 3433/4 3467/15 3508/15 3508/19 3508/22 3508/24 3509/1 3509/14 3509/16 3509/17 3509/17 3509/20 3510/17 3512/8 3513/7 3513/12 3514/3 3515/3
**lawsuits [1]** 3514/20
**lawyer [4]** 3416/2 3477/15 3522/5 3545/9
**lawyers [3]** 3392/7 3473/1 3513/18
**layperson [1]** 3465/15
**lays [1]** 3545/19
**lead [2]** 3500/1 3500/2
**leader [3]** 3395/4 3451/13 3451/15 3533/9
**leadership [2]** 3385/17 3484/19
**leading [4]** 3403/1 3403/3 3403/4 3403/8
**learn [7]** 3421/10 3421/13 3460/21 3509/21 3519/14 3535/5 3535/5
**learned [8]** 3458/7 3458/19 3458/20 3458/21 3461/12 3461/14 3491/12 3493/22
**least [19]** 3378/21 3383/5 3396/8 3400/22 3401/6 3417/22 3437/17 3446/13 3447/16 3506/17 3517/1 3522/18 3522/25 3528/8 3530/25 3530/6 3542/12 3567/7 3571/24
**leave [12]** 3405/1 3412/5 3412/6 3415/1 3428/9 3430/13 3451/18 3451/18 3452/9 3468/21 3504/7 3518/3
**leaves [2]** 3407/5 3407/18
**leaving [4]** 3414/25 3429/22 3468/23 3502/4
**led [4]** 3389/18 3390/2 3402/4 3404/9
**Lee [1]** 3510/24
**left [18]** 3377/23 3378/2 3379/24 3380/6 3404/17 3406/5 3419/8 3421/3 3426/16 3446/3 3451/16 3451/24 3451/24 3465/2 3467/15 3495/7 3542/23 3581/3
**left-hand [2]** 3465/2 3542/23
**legal [10]** 3394/8 3398/24 3416/2 3433/5 3503/22 3503/23 3504/2 3514/6 3542/10 3545/9
**legalese [2]** 3541/11 3541/13
**legally [1]** 3433/9
**legitimate [1]** 3511/9
**lend [1]** 3384/8
**length [1]** 3384/2
**less [3]** 3377/22 3468/13 3508/5
**letter [10]** 3376/15 3538/13 3538/15 3538/19 3540/3 3540/23 3540/24 3553/14 3569/10 3569/13
**level [3]** 3398/10 3477/16 3533/20
**liabilities [14]** 3421/1 3461/7 3538/22

**L**

**liabilities... [11]** 3540/12 3541/7 3545/21 3554/24 3556/11 3556/21 3557/6 3557/10 3557/20 3558/9 3576/22

**liability [8]** 3514/12 3514/14 3529/13 3529/16 3539/15 3555/7 3577/6 3577/16

**lie [2]** 3502/9 3502/12

**life [7]** 3386/21 3401/3 3407/21 3437/21 3437/25 3457/20 3506/10

**life-threatening [1]** 3506/10

**light [1]** 3566/21

**limit [1]** 3403/9

**limited [11]** 3385/16 3399/8 3402/8 3402/20 3402/24 3403/2 3403/5 3483/13 3484/1 3484/3 3484/19

**Lindsay [2]** 3512/19 3512/21

**line [7]** 3397/19 3408/6 3438/10 3503/17 3531/18 3531/20 3553/25

**lined [1]** 3377/6

**lineup [1]** 3377/9

**lion [1]** 3383/8

**Lipitor [1]** 3483/2

**liquidation [1]** 3539/23

**liquidity [3]** 3555/13 3557/13 3577/20

**list [6]** 3378/8 3459/15 3459/18 3472/17 3472/19 3526/5

**listed [7]** 3537/16 3542/16 3559/3 3575/16 3575/19 3575/19 3575/20

**listening [1]** 3566/3

**listing [2]** 3384/14 3405/10

**lists [7]** 3378/8 3523/2 3523/4 3527/25 3552/25 3558/20 3558/23

**litigate [3]** 3392/8 3515/7 3515/8

**litigation [9]** 3402/12 3411/11 3418/9 3431/13 3431/17 3514/22 3515/10 3515/12 3516/9

**litigious [2]** 3514/18 3515/2

**live [4]** 3383/4 3437/21 3437/25 3438/3

**LLC [2]** 3384/5 3481/11

**LLP [2]** 3537/4 3553/14

**lobby [1]** 3455/12

**located [2]** 3388/3 3388/13

**location [1]** 3387/3

**locations [1]** 3387/21

**lock [4]** 3402/2 3402/3 3404/6 3490/11

**lock-up [3]** 3402/2 3402/3 3404/6

**log [1]** 3530/13

**look [42]** 3386/23 3386/24 3387/3 3387/14 3388/11 3397/10 3407/14 3446/6 3446/14 3447/2 3461/9 3462/5 3469/8 3469/20 3469/24 3471/8 3482/7 3482/9 3487/25 3504/21 3506/7 3522/10 3525/8 3531/18 3531/23 3534/7 3546/14 3546/19 3549/9 3549/25 3553/24 3554/2 3561/12 3569/1 3572/24 3574/12 3574/17 3575/11 3575/25 3576/4 3578/17 3578/24

**looked [7]** 3406/6 3416/7 3447/1 3464/25 3562/7 3562/12 3573/23

**looking [9]** 3379/24 3380/6 3385/2 3503/13 3519/20 3531/20 3533/6 3559/12 3568/8

**looks [2]** 3503/15 3504/24

**loop [1]** 3525/18

**losing [1]** 3405/7

**lost [1]** 3426/4

**loud [1]** 3575/22

**lovely [1]** 3567/13

**lower [4]** 3416/14 3483/15 3573/20 3576/9

**LP [1]** 3543/5

**lunch [5]** 3500/4 3500/6 3518/3 3518/5 3519/23

**M**

**ma'am [1]** 3382/19

**Madison [1]** 3471/15

**mail [70]** 3380/1 3385/23 3386/9 3386/10 3386/18 3386/23 3386/25 3387/13 3387/15 3391/24 3392/12 3392/14 3395/19 3395/23 3400/14 3480/13 3487/21 3488/4 3488/20 3491/8 3491/10 3546/16 3546/18 3546/19 3546/23 3549/8 3549/12 3549/23 3549/24 3550/2 3550/9 3551/3 3551/5 3552/9 3552/25 3553/19 3553/20 3553/22 3554/19 3558/4 3558/15 3561/9 3561/12 3561/17 3562/1 3562/9 3562/13 3562/18 3562/18 3562/19 3562/20 3564/13 3565/2 3565/10 3565/16 3565/22 3565/23 3565/25 3566/5 3566/8 3566/17 3568/9 3568/12 3568/17 3569/1 3569/1 3569/15 3569/21 3569/24 3569/24

**mailed [1]** 3566/12

**mails [1]** 3388/10

**maintain [5]** 3387/8 3510/3 3510/5 3516/3 3548/8

**major [6]** 3402/4 3402/15 3477/1 3477/10 3477/21 3513/1

**malpractice [2]** 3509/11 3509/12

**man [4]** 3455/7 3456/17 3476/7 3567/15

**manage [1]** 3387/7

**managed [1]** 3576/20

**management [13]** 3385/4 3385/9 3391/18 3481/17 3482/15 3538/23 3539/2 3543/5 3543/7 3554/24 3556/11 3557/7 3576/23

**manages [2]** 3385/5 3481/18

**managing [4]** 3385/1 3385/3 3391/17 3481/16

**Manchester [1]** 3399/6

**mandate [1]** 3393/7

**manufacturing [2]** 3399/17 3484/14

**map [1]** 3377/14

**Mar [1]** 3474/7

**MARC [10]** 3375/20 3380/1 3405/15 3405/16 3405/18 3405/18 3480/13 3552/11 3568/9 3570/5

**March [17]** 3427/9 3427/11 3446/8 3446/9 3447/4 3447/5 3447/5 3447/6 3466/12 3523/25 3528/24 3553/12 3556/6 3572/13 3572/16 3573/11 3574/11

**March 10th [1]** 3447/5

**March 2014 [1]** 3572/13

**March 25th [1]** 3447/5

**March 26 [1]** 3447/6

**March 31 [2]** 3553/12 3556/6

**Marcum [14]** 3524/1 3524/3 3524/5 3528/23 3535/11 3535/13 3537/4 3538/13 3538/15 3538/19 3540/3 3541/7 3552/20 3553/14

**Margaret [1]** 3410/25

**marked [12]** 3385/20 3395/18 3413/20 3415/3 3464/18 3480/13 3535/16 3546/14 3549/7 3560/23 3561/5 3561/6

**market [7]** 3384/5 3401/1 3426/18 3426/19 3427/22 3484/11 3484/12

**marketing [1]** 3387/25

**Marshall [1]** 3513/13

**MARTIN [51]** 3375/6 3387/5 3388/5 3391/16 3395/24 3397/4 3416/4 3416/7 3416/11 3416/12 3416/18 3416/20 3438/3 3445/6 3446/18 3446/20 3447/3 3454/5 3455/4 3455/22 3456/19 3458/25 3462/6 3465/22 3466/2 3466/3 3466/4 3466/21 3467/1 3470/14 3471/2 3472/5 3472/11 3473/7 3474/2 3474/10 3475/16 3475/22 3477/16 3481/1 3481/7 3491/12 3493/18 3494/11 3504/23 3519/25 3523/16 3534/4 3535/24 3537/6 3547/9

**Martin's [3]** 3392/19 3447/8 3506/5

**massive [1]** 3534/15

**material [1]** 3553/9

**materials [2]** 3380/3 3564/15

**MATSUMOTO [1]** 3375/9

**matter [6]** 3395/21 3500/18 3501/4 3501/7 3531/9 3578/8

**matters [4]** 3378/14 3449/19 3543/12 3556/12

**mature [1]** 3499/23

**maximize [1]** 3383/11

**maximum [1]** 3383/11

**May 20 [1]** 3572/24

**May 2014 [2]** 3506/4 3506/4

**May 28 [2]** 3505/3 3506/20

**mean [18]** 3381/17 3392/17 3414/12 3414/24 3426/23 3453/8 3453/14 3466/10 3485/1 3488/24 3489/2 3489/3 3489/19 3492/18 3506/14 3515/2 3516/17 3540/10

**meaning [7]** 3426/20 3449/19 3470/15 3543/3 3554/22

**means [5]** 3381/18 3489/4 3514/6 3522/17 3539/2

**meant [1]** 3478/2

**measure [1]** 3435/13

**mechanical [1]** 3375/24

**mechanism [1]** 3540/20

**mechanisms [1]** 3505/10

**media [6]** 3396/11 3437/10 3437/13 3437/18 3447/22 3580/3

**Medical [1]** 3380/13

**medication [10]** 3473/20 3473/23 3474/1 3474/23 3474/24 3475/3 3475/25 3476/19 3476/20 3476/25

**medications [6]** 3474/3 3474/11 3474/14 3475/5 3475/10 3476/22

**medicine [2]** 3468/11 3473/8

**meet [7]** 3438/19 3454/22 3454/24 3455/1 3474/8 3474/9 3570/24

**meeting [62]** 3380/4 3380/7 3380/9 3380/22 3380/23 3381/6 3382/3 3384/1 3394/22 3394/23 3406/3 3406/5 3407/2

**meeting... [49]** 3407/5 3407/12 3407/25 3408/4 3409/15 3409/18 3410/15 3410/16 3410/19 3410/23 3411/2 3412/9 3412/11 3412/12 3412/15 3412/21 3412/24 3413/2 3413/9 3435/5 3436/2 3436/12 3436/21 3455/9 3455/10 3456/23 3477/7 3485/24 3500/13 3500/23 3521/22 3522/14 3522/23 3525/10 3525/11 3527/7 3530/22 3533/9 3534/8 3535/11 3536/3 3536/8 3537/21 3537/22 3550/15 3570/21 3571/14 3572/19 3574/20
**meetings [15]** 3394/21 3412/16 3412/21 3413/12 3486/1 3486/24 3500/22 3501/1 3501/3 3501/10 3533/11 3548/24 3570/12 3570/18 3571/7
**meets [1]** 3398/24
**Meg [2]** 3400/1 3434/8
**Megan [1]** 3399/25
**member [41]** 3389/7 3389/8 3389/10 3389/14 3391/8 3397/7 3405/3 3405/5 3405/6 3405/8 3419/15 3438/5 3448/8 3449/19 3449/23 3450/16 3462/21 3463/3 3463/9 3487/4 3487/11 3487/23 3488/13 3488/15 3489/13 3489/21 3491/5 3491/21 3502/25 3508/21 3525/3 3526/15 3533/8 3546/5 3547/14 3547/17 3547/23 3548/2 3548/24 3550/7 3559/21
**member' [1]** 3547/11
**members [25]** 3382/10 3382/12 3382/17 3384/11 3391/1 3391/2 3396/8 3396/18 3404/22 3405/9 3410/22 3413/3 3414/16 3423/24 3425/7 3425/8 3445/5 3447/25 3451/7 3476/12 3476/15 3490/8 3531/10 3564/19 3564/19
**memory [1]** 3487/23
**mental [1]** 3498/5
**mention [2]** 3442/5 3482/10
**mentioned [4]** 3391/19 3396/7 3398/20 3402/12
**mentoring [1]** 3393/12
**message [2]** 3502/5 3503/20
**met [18]** 3411/3 3429/19 3434/21 3452/20 3453/3 3454/25 3455/3 3455/7 3455/11 3460/17 3460/20 3469/14 3474/10 3477/3 3477/4 3477/8 3482/14 3533/15
**met' [1]** 3497/6
**Michael [1]** 3513/11
**mics [1]** 3378/23
**middle [4]** 3416/21 3446/4 3446/9 3576/13
**midmorning [1]** 3428/9
**might [16]** 3377/7 3377/9 3377/22 3379/5 3423/6 3464/9 3497/7 3500/14 3502/13 3514/21 3514/22 3515/4 3515/10 3534/18 3576/6 3581/5
**million [32]** 3392/2 3419/20 3420/11 3421/8 3422/3 3422/5 3426/6 3426/13 3426/14 3426/14 3426/17 3426/19 3427/19 3427/19 3427/21 3427/22 3427/23 3428/3 3430/5 3430/9 3430/11 3432/4 3432/22 3433/4 3451/25 3452/4

**millions [4]** 3483/3 3510/15 3534/18 3540/5
**mince [1]** 3531/13
**mind [5]** 3391/21 3457/24 3457/25 3477/2 3497/25
**minds [1]** 3452/25
**mine [1]** 3575/9
**minimal [1]** 3489/22
**minimum [1]** 3405/9
**minus [1]** 3400/10
**minute [9]** 3389/21 3468/17 3481/21 3482/20 3486/19 3516/25 3553/22 3560/9 3560/15
**minutes [30]** 3379/3 3379/4 3394/13 3402/13 3410/15 3410/19 3412/9 3412/11 3412/15 3412/16 3412/21 3419/21 3428/11 3434/16 3485/20 3485/24 3485/25 3486/3 3486/4 3486/8 3486/10 3486/13 3486/14 3486/16 3486/23 3536/13 3559/1 3564/10 3575/5 3580/15
**mischaracterized [1]** 3538/9
**misdealings [1]** 3426/4
**misspoke [1]** 3538/5
**mistake [2]** 3409/24 3431/11
**mistakes [1]** 3500/2
**modest [1]** 3458/5
**modified [2]** 3475/11 3475/14
**moment [4]** 3422/12 3428/4 3480/21 3535/10
**Monday [8]** 3376/12 3376/19 3376/21 3416/2 3530/16 3580/4 3581/4 3581/25
**monetize [1]** 3427/13
**money [23]** 3381/19 3381/21 3381/25 3383/2 3383/5 3383/10 3421/4 3427/5 3427/25 3428/1 3468/11 3491/13 3492/14 3492/18 3493/16 3500/24 3510/13 3510/14 3511/2 3511/11 3512/2 3512/11 3512/13
**moneymaker [1]** 3466/8
**moneys [1]** 3426/4
**monies [1]** 3458/15
**month [7]** 3419/13 3446/9 3463/14 3476/2 3487/11 3534/17 3534/17
**months [7]** 3392/6 3396/2 3462/14 3487/1 3521/8 3521/11 3521/14
**morning [12]** 3376/25 3379/2 3379/11 3379/12 3379/22 3379/23 3391/24 3416/24 3429/16 3429/17 3580/4 3581/25
**most [25]** 3377/19 3399/12 3399/13 3404/22 3451/13 3452/5 3461/17 3465/19 3471/23 3474/6 3474/19 3474/22 3489/23 3496/14 3496/16 3496/18 3496/21 3497/3 3497/4 3497/6 3497/6 3505/24 3505/25 3512/23 3533/11
**mostly [1]** 3394/22
**mother [1]** 3383/7
**motion [1]** 3410/14
**move [9]** 3408/9 3408/11 3408/13 3415/1 3419/2 3440/19 3440/22 3442/13 3476/10
**moves [2]** 3386/3 3561/21
**moving [4]** 3378/13 3439/21 3439/22

3466/15 3466/17 3509/1 3534/25 3573/14

**Mr. [40]**
**Mr. Alan [1]** 3510/18
**Mr. Aselage [13]** 3376/25 3404/3 3404/13 3407/25 3408/3 3429/16 3442/5 3443/5 3443/15 3519/16 3519/23 3533/15 3569/20
**Mr. Banta [1]** 3380/3
**Mr. Bienaime [1]** 3451/22
**Mr. Brafman [13]** 3377/1 3429/2 3429/12 3440/23 3450/19 3560/23 3568/6 3570/11 3571/6 3571/10 3572/10 3573/15 3574/10
**Mr. Darren [1]** 3510/20
**Mr. Geller [2]** 3477/7 3477/8
**Mr. Geller's [1]** 3525/6
**Mr. Golding [2]** 3380/17 3569/3
**Mr. Greebel [33]** 3380/2 3380/17 3390/20 3394/1 3394/10 3394/18 3395/1 3395/9 3395/10 3395/11 3395/14 3413/17 3434/10 3434/12 3434/17 3486/21 3486/22 3486/22 3508/22 3508/24 3509/4 3509/7 3509/14 3540/17 3549/25 3550/2 3550/18 3550/25 3551/5 3551/9 3551/21 3552/1 3552/17
**Mr. Hackert [2]** 3552/17 3552/22
**Mr. Hassan [1]** 3460/2
**Mr. Long [3]** 3546/25 3547/6 3547/22
**Mr. Mr. Shkreli [1]** 3450/12
**Mr. Oram [2]** 3479/20 3480/1
**Mr. Paley [5]** 3380/17 3404/25 3405/1 3405/2 3405/3
**Mr. Panoff [31]** 3405/23 3405/24 3405/25 3407/3 3407/4 3407/8 3407/11 3407/16 3407/17 3407/19 3407/25 3408/2 3408/3 3521/22 3523/12 3527/8 3527/11 3527/14 3527/15 3528/17 3533/4 3535/24 3540/17 3549/8 3549/11 3549/16 3552/2 3558/4 3561/13 3569/2 3569/9
**Mr. Pierotti [3]** 3580/25 3581/1 3581/2
**Mr. Plotkin [4]** 3380/21 3380/24 3381/4 3391/20
**Mr. Richardson [47]** 3380/16 3382/16 3393/11 3394/12 3395/20 3396/4 3396/23 3402/14 3409/15 3409/16 3411/1 3411/3 3411/6 3411/9 3413/25 3415/21 3416/22 3423/3 3430/16 3430/20 3448/14 3448/16 3448/17 3448/23 3449/6 3449/12 3449/14 3449/23 3450/1 3450/1 3450/5 3450/24 3451/1 3451/4 3486/14 3507/4 3508/11 3519/12 3523/15 3523/16 3533/1 3533/15 3534/4 3541/15 3542/20 3552/14 3569/2
**Mr. Richardson's [2]** 3395/23 3409/20
**Mr. Rosenwald's [1]** 3513/3
**Mr. Saunders [1]** 3460/19
**Mr. Schelling [1]** 3488/17
**Mr. Selby [1]** 3388/23
**Mr. Shkreli [199]** 3380/17 3380/20 3380/25 3382/2 3382/5 3382/22 3383/2 3383/11 3385/1 3385/3 3385/6 3385/8 3385/11 3385/13 3385/14 3385/23 3386/11 3386/19 3386/25 3387/15 3387/16 3388/14 3388/24 3390/9

**M**

**Mr. Shkreli... [175]** 3391/12 3392/7 3392/10 3392/15 3393/12 3394/11 3395/6 3395/9 3396/11 3396/24 3397/24 3400/2 3400/25 3401/12 3402/2 3402/21 3404/6 3404/23 3404/25 3405/1 3405/18 3405/22 3406/1 3406/3 3407/3 3407/8 3407/11 3407/14 3407/18 3407/20 3407/25 3408/3 3408/8 3409/10 3409/12 3409/15 3411/4 3411/6 3411/8 3411/15 3412/2 3412/4 3413/8 3413/24 3415/8 3415/21 3419/14 3426/3 3429/18 3430/13 3430/24 3431/1 3431/16 3431/19 3431/25 3432/3 3432/9 3432/14 3433/3 3433/9 3434/3 3434/12 3435/6 3436/12 3436/15 3436/19 3437/18 3438/19 3439/1 3443/6 3447/21 3448/2 3448/3 3448/18 3448/23 3449/7 3449/13 3449/15 3449/18 3450/6 3450/23 3451/7 3453/6 3453/20 3455/1 3457/8 3457/23 3459/16 3460/12 3460/16 3460/19 3461/18 3462/17 3463/16 3467/12 3467/14 3467/15 3473/10 3473/13 3473/19 3474/15 3476/14 3477/5 3477/10 3477/20 3477/21 3478/13 3478/25 3480/14 3481/11 3481/16 3482/11 3482/12 3482/15 3482/18 3483/22 3484/16 3484/17 3484/22 3485/6 3485/13 3486/21 3489/8 3490/5 3490/7 3490/20 3491/14 3491/16 3491/20 3492/10 3492/22 3493/2 3494/20 3495/3 3497/5 3497/12 3497/25 3498/14 3498/14 3498/24 3499/12 3500/14 3500/17 3500/22 3500/23 3501/4 3501/11 3501/20 3502/8 3504/6 3505/6 3506/20 3506/22 3507/18 3507/23 3508/16 3509/1 3511/8 3511/13 3511/15 3521/25 3524/25 3527/16 3528/5 3528/12 3533/2 3533/9 3533/11 3540/13 3552/14 3569/2 3571/18 3572/21 3574/21 3581/2

**Mr. Shkreli's [23]** 3381/2 3388/25 3390/5 3391/9 3396/25 3404/4 3404/23 3411/4 3411/9 3411/12 3413/9 3425/6 3426/4 3436/17 3437/1 3472/14 3481/22 3505/11 3507/2 3507/10 3527/2 3550/3 3550/22

**Mr. Steve [1]** 3510/22

**Mr. Wintermute [4]** 3386/16 3386/19 3387/1 3387/4

**Ms. [13]** 3376/10 3411/2 3412/10 3412/20 3434/19 3434/21 3480/19 3480/22 3486/7 3520/5 3560/20 3566/22 3567/11

**Ms. Jensen [4]** 3412/10 3434/19 3434/21 3486/7

**Ms. Kasulis' [1]** 3566/22

**Ms. Smith [4]** 3480/19 3480/22 3520/5 3560/20

**Ms. Valeur-Jensen [2]** 3411/2 3412/20

**Ms. Zellan [2]** 3376/10 3567/11

**MSMB [72]** 3385/4 3385/6 3385/8 3395/12 3458/8 3458/12 3458/12 3458/16 3458/23 3458/25 3480/20

3481/13 3481/23 3482/10 3482/14 3482/14 3491/13 3491/20 3491/22 3492/6 3492/7 3492/14 3492/16 3492/17 3492/19 3493/12 3493/19 3493/20 3493/22 3494/2 3494/6 3494/8 3494/8 3512/10 3513/22 3514/4 3519/14 3519/25 3521/17 3522/22 3522/25 3523/2 3523/4 3538/21 3538/24 3539/9 3539/10 3539/19 3539/22 3540/7 3540/13 3541/7 3541/11 3543/5 3543/5 3543/5 3543/6 3543/6 3554/22 3554/25 3555/1 3555/1 3555/11 3555/12 3556/9 3556/12 3556/21 3558/9 3570/19 3570/22 3573/3 3571/3

**MSMB's [1]** 3557/20

**MSMB939 [1]** 3383/15

**MSMB968 [1]** 3384/22

**Muchin [4]** 3384/20 3478/6 3509/15 3513/17

**multi [2]** 3484/10 3484/12

**multi-billion [2]** 3484/10 3484/12

**multiple [2]** 3438/4 3442/15

**music [1]** 3470/15

**must [1]** 3475/13

**mutual [1]** 3417/12

**N**

**name [6]** 3392/1 3429/18 3460/5 3460/7 3460/9 3513/10

**named [4]** 3386/11 3438/20 3477/5 3488/5

**names [3]** 3459/15 3459/17 3459/18

**naming [1]** 3504/8

**NASDAQ [8]** 3384/4 3384/8 3384/15 3405/10 3414/7 3414/14 3414/16 3414/20

**nature [1]** 3448/1

**Neal [1]** 3390/18

**necessarily [2]** 3479/12 3483/10

**necessary [5]** 3387/7 3539/25 3555/14 3557/14 3577/21

**need [19]** 3379/5 3390/6 3397/6 3405/13 3411/11 3420/8 3425/20 3451/13 3469/7 3514/16 3516/6 3516/25 3547/3 3549/15 3565/12 3567/3 3567/3 3580/7 3580/8

**needed [12]** 3383/4 3391/17 3394/14 3414/15 3442/17 3449/15 3450/12 3476/24 3483/24 3489/13 3551/24 3552/1

**needs [2]** 3442/10 3548/14

**negative [3]** 3418/14 3453/14 3505/19

**negotiate [1]** 3571/22

**negotiating [1]** 3417/18

**negotiations [1]** 3431/15

**neuro [1]** 3388/17

**neurodegenerative [1]** 3467/11

**never [40]** 3394/13 3398/13 3418/7 3418/7 3420/14 3434/21 3438/3 3453/24 3454/2 3454/2 3460/17 3460/20 3461/15 3473/22 3473/23 3475/9 3477/8 3485/20 3486/15 3497/24 3501/11 3502/8 3505/23 3509/14 3509/25 3511/10 3525/10 3525/12 3526/4 3526/4 3526/18 3527/1 3527/3 3527/5 3527/5 3535/2 3535/10

3564/6 3570/18 3570/21

**new [27]** 3375/1 3375/4 3375/13 3375/14 3375/19 3375/19 3385/4 3385/11 3387/19 3393/22 3400/6 3409/19 3410/9 3419/18 3425/8 3458/18 3478/9 3481/17 3482/17 3495/24 3496/23 3530/18 3536/4 3561/11 3575/10 3575/16 3575/20

**newly [1]** 3491/24

**next [22]** 3377/15 3378/5 3386/18 3388/10 3401/15 3403/17 3406/11 3408/10 3408/22 3416/21 3441/11 3444/3 3470/18 3515/16 3517/5 3544/2 3551/12 3563/6 3567/8 3567/22 3580/22 3581/7

**nice [2]** 3518/5 3567/15

**night [1]** 3522/20

**nine [1]** 3557/14

**nobody [2]** 3464/1 3492/14

**nominating [3]** 3503/12 3503/18 3504/5

**non [11]** 3387/3 3401/6 3402/6 3427/6 3427/7 3483/11 3499/20 3508/3 3539/18 3555/9 3577/8

**non-cash [3]** 3539/18 3555/9 3577/8

**non-core [1]** 3427/7

**non-office [1]** 3387/3

**non-orphan [1]** 3483/11

**non-professionals [1]** 3402/6

**non-public [2]** 3401/6 3508/3

**non-Retrophin [1]** 3427/6

**non-stop [1]** 3499/20

**noncompliance [2]** 3439/6 3439/8

**none [3]** 3474/25 3493/18 3507/3

**noon [1]** 3580/12

**normal [1]** 3534/16

**normally [5]** 3381/13 3485/25 3501/6 3503/16 3533/8

**Norwood [4]** 3380/4 3435/5 3436/1 3436/12

**note [1]** 3557/14

**notebooks [2]** 3428/9 3518/4

**notes [5]** 3412/6 3446/6 3473/4 3502/6 3519/20

**nothing [8]** 3439/11 3446/20 3459/11 3489/20 3489/22 3493/17 3548/17 3560/6

**notice [10]** 3378/5 3378/25 3402/7 3410/21 3475/21 3475/23 3482/3 3482/4 3482/9 3523/6

**noticed [3]** 3457/4 3469/15 3470/1 3470/3

**notification [2]** 3392/7 3451/19

**Notwithstanding [3]** 3539/13 3555/4 3577/3

**November [12]** 3420/16 3420/17 3429/24 3465/2 3535/23 3536/8 3536/11 3546/11 3547/5 3547/22 3549/15 3568/5

**November 10th [1]** 3465/2

**November 15 [1]** 3568/5

**November 19 [3]** 3546/11 3547/5 3547/22

**November 22 [1]** 3549/25

**November 6th [2]** 3535/23 3536/11

**November 8th [1]** 3536/8

**number [49]** 3376/16 3391/22 3392/3

**N**

**number... [46]** 3397/25 3399/3 3400/11
3405/9 3420/10 3427/4 3446/5 3452/21
3452/23 3460/2 3468/21 3471/14
3482/24 3483/8 3483/24 3499/19
3504/13 3511/19 3520/17 3520/22
3523/9 3524/13 3525/9 3534/8 3537/1
3538/18 3538/19 3542/22 3542/24
3542/25 3543/2 3554/19 3557/1
3558/25 3559/13 3564/11 3573/8
3573/14 3573/19 3573/23 3574/4
3574/6 3575/13 3575/15 3575/20
3576/9
**Number 9 [1]** 3534/8
**numberer [1]** 3578/18
**numbers [5]** 3469/21 3575/12 3576/1
3576/2 3578/2

**O**

**o'clock [1]** 3580/4
**oath [2]** 3379/13 3519/7
**object [6]** 3390/24 3401/13 3403/4
3406/7 3436/17 3565/5
**objecting [3]** 3516/18 3538/5 3564/12
**objection [73]** 3381/23 3382/6 3386/5
3389/20 3389/23 3390/25 3394/2
3394/3 3402/20 3403/7 3403/8 3404/20
3406/9 3415/16 3418/25 3421/12
3421/20 3422/11 3425/15 3432/24
3433/10 3434/5 3436/3 3437/23
3439/17 3440/6 3442/14 3448/10
3448/19 3448/25 3450/3 3450/8
3450/18 3455/6 3459/25 3475/19
3479/6 3487/13 3493/24 3494/3
3498/18 3499/14 3501/13 3502/10
3502/11 3511/4 3514/8 3514/24
3515/13 3516/23 3527/9 3528/20
3529/17 3538/1 3540/8 3540/22
3543/19 3545/22 3547/12 3547/15
3549/5 3551/13 3554/8 3557/21
3557/23 3565/14 3565/18 3566/19
3567/12 3568/22 3572/4 3572/8
3578/11
**objections [1]** 3436/8
**obligation [16]** 3462/20 3462/23
3462/25 3463/2 3463/8 3476/12
3476/17 3476/22 3491/3 3538/23
3543/23 3548/8 3548/9 3554/25
3556/12 3576/23
**obligations [5]** 3526/15 3539/11 3555/3
3557/7 3577/2
**observe [3]** 3394/17 3394/25 3405/25
**observed [3]** 3407/8 3476/13 3479/4
**observes [1]** 3407/23
**obtain [2]** 3383/23 3394/13
**obvious [2]** 3498/22 3570/8
**obviously [4]** 3408/19 3427/5 3447/15
3580/17
**occasion [3]** 3571/8 3571/9 3571/11
**occasionally [1]** 3394/21
**occur [1]** 3390/15
**occurred [1]** 3404/19
**October [16]** 3415/10 3415/21 3416/23
3417/2 3417/9 3417/17 3419/13
3421/25 3422/1 3469/15 3539/20
3561/15 3561/16 3562/1 3568/10
3569/7

**October 1 [4]** 3415/21 3416/23 3417/9
3417/17
**October 14th [1]** 3469/15
**October 1st [1]** 3417/2
**October 2013 [1]** 3539/20
**October 25 [4]** 3561/16 3562/1 3568/10
3569/7
**offer [6]** 3401/14 3415/14 3416/14
3416/15 3473/19 3478/18
**offered [6]** 3410/1 3419/14 3456/10
3473/23 3496/20 3575/8
**offering [4]** 3478/17 3546/22 3562/16
3573/12
**offers [1]** 3568/20
**office [18]** 3387/3 3387/9 3394/21
3395/16 3455/9 3474/6 3474/19
3474/20 3495/24 3495/25 3495/25
3496/7 3496/9 3496/11 3496/21
3496/23 3528/3 3528/5
**officer [36]** 3380/14 3389/17 3389/19
3390/3 3391/23 3392/11 3393/5
3393/15 3393/17 3393/21 3398/16
3398/21 3398/22 3405/19 3411/5
3411/7 3411/16 3412/4 3412/8 3460/24
3461/1 3461/10 3464/24 3478/18
3481/8 3495/7 3504/8 3506/7 3507/8
3538/21 3554/22 3556/9 3557/5
3576/19 3576/21 3577/12
**officers [3]** 3383/19 3383/22 3460/22
**offices [13]** 3400/4 3406/3 3409/19
3418/22 3418/24 3419/5 3419/6 3419/7
3458/2 3458/4 3458/7 3496/5 3496/6
**official [5]** 3422/17 3424/4 3461/2
3529/8 3548/25
**offline [3]** 3449/18 3449/23 3449/25
**offset [2]** 3539/15 3555/7
**often [1]** 3506/9
**old [6]** 3430/18 3430/20 3431/1
3470/16 3472/11 3479/14
**omission [1]** 3443/9
**omitted [1]** 3556/7
**once [5]** 3458/18 3486/7 3514/6
3554/12 3575/19
**one [74]** 3376/3 3377/8 3377/25
3387/13 3391/8 3391/13 3391/25
3392/25 3393/7 3394/6 3400/6 3400/6
3400/6 3400/24 3402/1 3402/17
3418/16 3420/12 3422/4 3422/5
3423/22 3423/23 3428/4 3432/9 3435/9
3439/9 3442/11 3443/5 3446/1 3446/14
3447/21 3449/14 3453/19 3457/15
3457/22 3465/9 3466/4 3467/18 3469/2
3472/2 3472/25 3474/22 3474/9 3477/5
3481/1 3483/15 3483/22 3484/7
3486/20 3490/17 3490/19 3513/17
3520/19 3521/6 3523/10 3524/22
3525/3 3526/15 3531/3 3547/20 3550/4
3557/1 3558/15 3571/8 3571/12
3571/14 3575/16 3577/14 3577/15
3578/4 3578/4 3578/8 3580/14 3580/25
**ongoing [4]** 3391/9 3391/13 3417/2
3428/12
**open [9]** 3401/1 3404/1 3409/1 3429/1
3467/22 3496/9 3518/1 3568/1 3582/1
**opening [1]** 3408/7
**operate [1]** 3382/23
**operated [1]** 3392/18

**operating [16]** 3381/11 3389/16
3389/17 3389/19 3390/3 3390/10
3393/4 3393/14 3393/17 3393/21
3398/15 3426/16 3478/18 3486/6
3506/7 3507/8
**operation [1]** 3503/15
**operations [14]** 3388/1 3388/1 3398/23
3452/13 3452/15 3464/4 3496/2
3496/10 3504/8 3529/7 3539/14 3555/6
3577/4 3579/6
**opinion [13]** 3376/13 3399/9 3400/22
3447/9 3447/9 3447/14 3447/15
3447/16 3448/13 3457/25 3499/10
3501/11 3548/6
**opinions [1]** 3447/23
**opportunity [3]** 3394/17 3491/1
3536/14
**opposed [1]** 3483/2
**ops [1]** 3388/19
**optimistic [1]** 3502/22
**Optimistically [1]** 3378/14
**option [3]** 3491/18 3492/17 3492/22
**options [16]** 3393/18 3393/19 3393/20
3419/25 3420/3 3420/6 3420/8 3420/9
3420/12 3420/21 3420/23 3421/5
3421/8 3430/10 3452/5 3452/6
**Oram [4]** 3479/13 3479/14 3479/20
3480/1
**order [1]** 3378/3 3566/23
**Oremland [1]** 3376/7
**organized [1]** 3399/1
**orphan [12]** 3385/13 3482/19 3482/20
3482/23 3483/4 3483/7 3483/9 3483/11
3483/16 3483/16 3483/18 3484/1
**ostensibly [1]** 3474/5
**ourselves [1]** 3427/15
**outcome [5]** 3413/12 3413/14 3432/1
3432/6 3432/17
**outlined [2]** 3400/14 3411/11
**outset [1]** 3494/21
**outside [5]** 3397/24 3447/20 3478/3
3478/6 3552/19
**outsiders [1]** 3462/5
**outstanding [5]** 3446/17 3446/24
3557/10 3581/8 3581/17
**overall [3]** 3391/15 3420/13 3573/20
**overflow [1]** 3378/19
**overlap [1]** 3459/9
**overlaps [1]** 3388/18
**overrule [4]** 3390/25 3394/3 3403/8
3502/11
**Overruled [6]** 3381/24 3404/21 3422/2
3448/20 3498/19 3578/12
**oversee [1]** 3425/8
**overseeing [2]** 3382/1 3422/7
**oversight [3]** 3398/22 3425/5 3503/14
**overstating [1]** 3491/6
**overviews [1]** 3529/6
**owes [1]** 3577/22
**own [10]** 3378/13 3381/19 3398/5
3447/10 3460/6 3460/7 3490/1 3493/4
3493/5 3547/10
**owned [1]** 3416/9
**ownership [1]** 3416/19
**owns [1]** 3381/15
**Oxytocin [2]** 3399/5 3419/17

P

**p.m [8]** 3387/1 3387/18 3519/2 3530/17 3560/16 3560/17 3566/23 3582/6
**pace [1]** 3377/16
**paced [1]** 3406/4
**package [1]** 3452/2
**page [61]** 3380/5 3380/7 3383/14 3384/17 3384/21 3384/22 3386/9 3386/10 3386/23 3387/13 3396/19 3397/11 3397/16 3399/11 3401/15 3403/17 3406/11 3408/22 3411/17 3412/14 3422/16 3424/3 3428/19 3441/1 3444/3 3469/20 3469/20 3470/18 3485/12 3485/12 3515/16 3517/5 3518/9 3520/25 3521/6 3521/21 3522/22 3524/12 3531/3 3538/18 3542/22 3544/2 3550/4 3550/24 3551/12 3552/1 3554/20 3556/1 3563/6 3564/10 3566/16 3567/22 3569/16 3575/11 3575/24 3576/1 3576/13 3578/2 3578/18 3583/3 3583/11
**page 5 [1]** 3469/20
**pages [4]** 3522/21 3542/12 3553/23 3554/1
**paid [17]** 3412/6 3427/18 3461/13 3461/16 3461/17 3461/20 3462/13 3532/13 3539/12 3539/18 3545/13 3555/3 3555/10 3557/8 3577/2 3577/8 3579/7
**Paley [11]** 3380/17 3390/18 3404/17 3404/22 3404/25 3405/1 3405/2 3405/3 3405/4 3405/5 3480/14
**Panoff [47]** 3380/1 3405/15 3405/16 3405/18 3405/18 3405/23 3405/24 3405/25 3406/2 3407/3 3407/4 3407/8 3407/11 3407/16 3407/16 3407/17 3407/17 3407/19 3407/21 3407/23 3407/25 3408/2 3408/3 3480/13 3521/22 3523/12 3527/8 3527/11 3527/14 3527/15 3528/17 3533/4 3535/24 3540/17 3549/8 3549/11 3549/16 3549/20 3552/2 3552/12 3558/4 3561/10 3561/13 3568/9 3569/2 3569/9 3570/5
**pantothenate [1]** 3467/11
**paper [1]** 3575/25
**paragraph [22]** 3384/24 3385/7 3397/12 3469/24 3471/8 3480/21 3484/21 3504/21 3537/25 3538/18 3538/19 3540/10 3540/11 3554/20 3556/2 3556/3 3556/14 3556/16 3557/1 3575/21 3576/13 3578/23
**paragraph 2 [1]** 3537/25
**paragraphs [4]** 3383/17 3383/20 3410/18 3558/8
**part [26]** 3386/20 3415/22 3420/13 3423/4 3431/23 3446/2 3448/3 3448/23 3458/11 3462/10 3475/1 3482/11 3482/12 3483/22 3483/25 3484/3 3484/4 3485/23 3485/25 3490/24 3531/24 3542/12 3549/1 3558/16 3559/9 3565/2
**participate [3]** 3500/22 3501/1 3530/22
**participated [2]** 3500/13 3548/24
**participating [2]** 3410/22 3524/10
**particular [6]** 3391/5 3391/8 3393/11 3402/17 3435/11 3461/8

**particularly [8]** 3385/13 3388/18 3390/12 3396/15 3396/16 3443/3 3482/19 3489/4
**parties [8]** 3538/21 3543/7 3554/23 3577/11 3577/14 3579/22 3580/6 3581/10
**partner [5]** 3385/1 3385/4 3481/16 3509/7 3576/21
**partnerships [2]** 3385/5 3481/18
**party [15]** 3470/14 3471/2 3471/10 3471/13 3557/5 3557/5 3557/8 3557/9 3557/12 3576/19 3576/24 3576/24 3576/25 3577/10 3577/19
**past [7]** 3387/6 3428/17 3464/10 3506/6 3555/11 3557/11 3577/10
**Patent [1]** 3392/1
**path [1]** 3433/4
**patience [1]** 3384/9
**patient [2]** 3387/25 3483/13
**patients [2]** 3483/19 3483/24
**pattern [1]** 3402/4
**pause [1]** 3428/5
**pay [4]** 3419/19 3456/21 3458/24 3540/7
**payable [2]** 3558/20 3575/15
**paying [2]** 3543/17 3548/18
**payment [1]** 3577/12
**payments [1]** 3539/20
**PDF [2]** 3384/22 3569/17
**peacefully [1]** 3417/7
**penalty [1]** 3443/20
**pending [12]** 3423/17 3426/7 3431/19 3431/25 3432/1 3432/6 3433/20 3433/21 3434/2 3467/20 3508/22 3509/1
**people [74]** 3383/4 3387/22 3391/22 3391/25 3392/21 3393/2 3400/8 3408/8 3418/20 3436/9 3438/4 3447/9 3447/16 3447/17 3447/20 3447/22 3448/2 3449/13 3449/14 3452/20 3452/22 3452/23 3453/8 3453/11 3453/12 3453/17 3453/19 3459/15 3462/9 3471/23 3472/2 3473/4 3479/8 3479/11 3479/12 3481/3 3482/24 3483/3 3493/1 3493/8 3495/22 3496/11 3496/16 3496/24 3497/1 3497/3 3498/25 3499/1 3499/5 3499/6 3499/7 3499/8 3499/18 3499/19 3499/24 3500/14 3500/23 3504/17 3504/18 3509/21 3510/5 3511/1 3511/11 3511/16 3511/19 3514/1 3521/25 3524/22 3531/5 3532/22 3532/23 3545/11 3552/18 3556/19
**percent [2]** 3421/2 3578/25
**perception [3]** 3396/14 3398/6 3401/6
**percolate [1]** 3445/18
**perfectly [1]** 3516/10
**performance [3]** 3411/5 3411/13 3436/18
**performing [1]** 3471/16
**perhaps [2]** 3377/25 3519/13
**period [38]** 3398/15 3401/10 3402/2 3402/3 3404/7 3405/21 3406/4 3418/12 3427/2 3438/1 3447/2 3447/8 3448/8 3448/14 3448/16 3449/12 3450/6 3451/4 3452/19 3459/8 3459/10 3463/14 3471/15 3487/12 3488/14

**3488/25 3489/20 3490/4 3490/5 3491/2 3493/21 3494/1 3509/4 3543/18 3572/14 3572/22 3572/23 3573/15**
**periodic [1]** 3473/12
**permanent [1]** 3420/15
**permitted [1]** 3404/7
**person [19]** 3382/6 3394/18 3398/22 3443/11 3455/3 3455/3 3456/8 3459/21 3475/1 3479/4 3485/22 3489/25 3497/6 3507/14 3511/4 3515/1 3526/20 3526/24 3548/10
**person's [1]** 3507/20
**personal [10]** 3392/19 3407/20 3448/18 3449/8 3449/10 3450/9 3499/9 3499/11 3517/2 3540/4
**personality [3]** 3395/6 3405/22 3498/20
**personally [6]** 3438/3 3447/25 3450/6 3457/8 3478/10 3552/23
**personnel [2]** 3503/15 3540/13
**perspective [5]** 3377/13 3497/11 3499/12 3510/10 3515/7
**persuasive [1]** 3453/11
**pharmaceutical [10]** 3385/12 3410/9 3454/11 3459/22 3460/3 3460/9 3462/4 3471/21 3482/18 3488/9
**Pharmaceuticals [3]** 3468/4 3468/6
**phone [8]** 3375/23 3407/4 3407/18 3408/2 3417/25 3418/2 3418/3 3581/14
**phrase [2]** 3445/20 3489/19
**phrases [1]** 3516/20
**physical [2]** 3387/8 3387/21
**physically [2]** 3475/16 3475/21
**physician [1]** 3475/13
**picked [1]** 3541/8
**picking [3]** 3556/20 3557/20 3558/9
**picture [1]** 3442/13
**piece [1]** 3410/14
**pied [1]** 3453/6
**Pierotti [3]** 3580/25 3581/1 3581/2 3581/4
**pinning [1]** 3454/18
**pipeline [2]** 3380/9 3467/3
**piper [1]** 3453/6
**pitch [2]** 3501/24 3501/25
**pitches [1]** 3571/7
**PKAN [4]** 3467/8 3467/9 3467/10 3467/10
**place [12]** 3383/9 3388/19 3390/10 3391/18 3397/5 3399/13 3409/18 3412/4 3461/15 3490/15 3505/5 3556/18
**placed [1]** 3562/15
**places [1]** 3533/21
**plan [3]** 3392/8 3399/1 3489/15
**plane [2]** 3395/25 3417/1
**play [3]** 3478/21 3478/23 3489/10
**plays [1]** 3498/23
**Plaza [1]** 3375/14
**pleased [1]** 3463/14
**Plotkin [12]** 3380/13 3380/21 3380/22 3380/24 3381/4 3391/13 3391/20 3435/5 3435/10 3435/13 3435/16 3436/12
**Plotkin's [3]** 3435/22 3435/24 3436/18
**plus [1]** 3400/10
**podium [4]** 3378/18 3378/20 3378/22 3378/24

Case 1:15-cr-00637-KAM   Document 317   Filed 08/15/17   Page 228 of 235 PageID #: 7180

**P**

**point [22]** 3389/2 3417/2 3417/21 3419/23 3420/4 3426/10 3434/8 3440/17 3445/11 3446/13 3453/5 3456/25 3459/14 3462/1 3477/5 3505/7 3535/1 3535/2 3538/15 3541/20 3565/19 3570/10
**pointed [1]** 3572/16
**pointing [2]** 3558/21 3576/13
**points [4]** 3437/21 3446/15 3572/11 3572/16
**policies [2]** 3439/9 3461/6
**policy [8]** 3439/7 3460/25 3461/5 3461/14 3461/15 3461/19 3461/22 3490/14
**pool [1]** 3420/9
**population [4]** 3482/25 3483/4 3483/13 3483/19
**populations [1]** 3484/2
**portfolio [1]** 3506/16
**portion [4]** 3458/24 3539/19 3555/10 3577/9
**portions [1]** 3469/9
**portrayed [1]** 3438/7
**position [23]** 3386/15 3387/6 3387/10 3387/17 3398/22 3410/1 3411/8 3413/16 3422/3 3422/5 3436/18 3456/11 3462/9 3468/23 3476/11 3478/19 3478/20 3495/1 3510/3 3567/9 3567/11 3571/13 3578/9
**positions [5]** 3419/19 3422/4 3481/3 3533/18 3581/10
**positive [1]** 3505/22
**posse [1]** 3392/20
**possibility [1]** 3572/20
**possible [1]** 3377/20
**possibly [3]** 3475/6 3537/23 3537/23
**potential [8]** 3379/2 3506/9 3529/13 3529/16 3570/19 3570/21 3571/14 3571/15
**potentially [3]** 3377/9 3445/9 3502/6
**pouty [1]** 3431/7
**power [3]** 3495/9 3495/14 3495/16
**practical [1]** 3531/9
**precisely [1]** 3485/5
**predecessor [3]** 3481/12 3481/12 3481/13
**predominately [1]** 3507/12
**preface [1]** 3540/24
**prefer [2]** 3387/5 3581/21
**preparation [3]** 3384/5 3527/7 3529/11
**prepared [2]** 3513/17 3528/18
**preparing [1]** 3482/6
**presence [1]** 3387/8
**present [7]** 3379/7 3410/24 3429/1 3429/8 3519/4 3551/24 3560/18
**presentation [4]** 3501/8 3535/11 3556/3 3556/13
**presently [1]** 3431/19
**president [6]** 3397/7 3438/1 3463/24 3463/25 3481/11 3506/7
**press [11]** 3442/25 3464/16 3464/23 3464/25 3465/1 3475/4 3504/7 3504/14 3504/17 3504/21 3507/17
**pretty [7]** 3377/16 3423/13 3464/12 3502/15 3547/10 3555/15 3570/10
**prevents [1]** 3514/3

**preview [1]** 3376/4
**previous [1]** 3426/5
**previously [14]** 3379/16 3385/9 3386/17 3447/23 3452/3 3481/11 3482/16 3505/8 3514/16 3541/22 3556/4 3556/17 3561/9 3576/20
**price [21]** 3445/24 3446/4 3446/10 3447/4 3447/18 3505/19 3505/21 3571/22 3572/10 3572/24 3573/5 3573/9 3573/18 3573/20 3574/1 3574/3 3574/4 3574/5 3574/11 3574/18 3574/22
**prices [3]** 3447/2 3572/17 3573/16
**primarily [2]** 3507/10 3572/13
**primary [6]** 3494/24 3538/23 3554/25 3556/11 3557/7 3576/23
**priorities [2]** 3393/24 3399/11
**priority [3]** 3427/13 3466/13 3526/5
**private [14]** 3385/17 3397/20 3398/1 3398/4 3398/7 3398/11 3455/20 3456/14 3463/3 3463/7 3463/10 3484/20 3494/17 3513/1
**problem [4]** 3401/8 3519/18 3565/19 3571/19
**problematic [1]** 3502/6
**problems [2]** 3447/21 3489/14
**procedurally [1]** 3417/11
**procedure [1]** 3551/25
**proceed [7]** 3379/10 3386/22 3417/19 3417/22 3429/12 3445/1 3519/8
**Proceedings [2]** 3375/24 3582/6
**process [5]** 3390/6 3393/8 3413/6 3417/18 3571/17
**processes [3]** 3390/10 3505/10
**produced [2]** 3375/25 3575/10
**producer [1]** 3483/16
**produces [1]** 3468/12
**producing [2]** 3466/13 3483/7
**product [18]** 3381/19 3392/1 3399/6 3399/7 3416/7 3427/9 3427/10 3427/11 3455/24 3465/21 3465/22 3466/13 3466/19 3466/20 3467/5 3467/9 3489/16 3548/15
**production [1]** 3465/17
**products [17]** 3388/8 3399/4 3399/8 3399/13 3400/21 3418/16 3419/16 3419/16 3419/20 3465/7 3465/9 3466/25 3489/7 3489/17 3506/16 3506/17 3571/15
**professional [6]** 3385/16 3434/18 3448/15 3451/23 3457/12 3484/18
**professionalism [1]** 3533/23
**professionals [2]** 3402/6 3417/13
**program [1]** 3392/6
**progress [3]** 3506/5 3506/15 3506/18
**prominent [3]** 3509/8 3512/23 3513/6
**promised [6]** 3421/11 3421/19 3462/15 3467/24 3468/2 3580/1
**promising [1]** 3506/9
**pronunciation [1]** 3485/4
**proof [1]** 3401/14
**proper [2]** 3387/8 3547/4
**properly [1]** 3473/11
**proposal [1]** 3419/14
**proposition [1]** 3407/15
**Prosecution [1]** 3376/7
**protect [1]** 3461/1 3461/6 3472/1

**proud [1]** 3464/13
**proven [1]** 3465/7
**provide [2]** 3427/8 3510/6
**provided [1]** 3520/11
**provides [1]** 3378/7
**proxy [1]** 3384/1
**PS [2]** 3387/14 3387/19
**public [30]** 3385/18 3396/17 3401/6 3437/8 3455/18 3463/4 3463/6 3484/20 3487/7 3494/14 3494/17 3494/20 3494/22 3495/2 3495/6 3504/17 3505/12 3505/14 3505/16 3505/18 3505/18 3506/21 3507/15 3508/3 3511/1 3530/3 3530/6 3530/12 3542/6 3565/6
**publicly [6]** 3384/5 3566/11 3568/5 3568/18 3570/1 3570/6
**publicly-traded [1]** 3384/5
**pull [1]** 3549/18
**pulling [1]** 3455/4
**purchase [1]** 3401/9
**purchases [1]** 3402/4
**purpose [10]** 3383/10 3383/23 3482/6 3527/6
**purposes [3]** 3378/13 3383/3 3383/13
**pursuant [1]** 3410/21
**pursue [1]** 3515/3
**purview [2]** 3472/13 3472/14
**put [27]** 3388/16 3390/10 3391/18 3393/7 3397/5 3398/20 3398/21 3410/2 3413/10 3418/14 3427/4 3427/7 3427/15 3438/10 3440/14 3442/10 3451/21 3461/1 3461/15 3464/19 3480/20 3481/4 3493/16 3505/9 3548/11 3552/10 3565/8 3578/4
**putting [3]** 3389/1 3396/12 3402/19

**Q**

**Q3 [2]** 3426/22 3426/23
**QT [1]** 3537/24
**qualified [3]** 3405/10 3504/4 3504/5
**quantities [1]** 3534/15
**quarter [28]** 3426/15 3426/18 3426/20 3426/21 3426/23 3426/25 3427/21 3428/3 3491/23 3492/23 3494/4 3537/2 3537/17 3538/20 3539/14 3553/14 3553/15 3554/21 3555/6 3556/5 3556/10 3557/2 3557/4 3557/9 3576/14 3576/18 3577/5 3577/18
**quarterly [4]** 3529/20 3529/21 3529/24 3529/25
**quarters [1]** 3426/15
**questioned [1]** 3554/11
**questionnaire [8]** 3383/19 3383/21 3383/23 3384/3 3384/7 3384/9 3384/12 3384/18
**questions [18]** 3402/25 3428/6 3442/15 3442/18 3443/12 3443/13 3450/20 3481/6 3488/1 3532/19 3536/5 3547/3 3553/25 3561/5 3564/2 3569/18 3570/11 3574/25
**quickly [2]** 3378/16 3436/11
**quite [5]** 3415/25 3445/10 3497/9 3525/21 3541/9
**quote [4]** 3504/18 3504/19 3504/22 3506/11

**R**

R019421 [1]  3556/25
R1687115 [1]  3538/16
R168719 [1]  3538/18
R168933 [2]  3575/11 3575/13
R168942 [2]  3575/19 3576/9
R168945 [1]  3578/17
raise [6]  3420/20 3526/2 3533/7 3539/6 3581/7 3581/8
raised [4]  3381/8 3545/15 3545/19 3573/12
ran [2]  3426/16 3471/3
range [2]  3389/11 3400/10
ranging [1]  3396/13
Rao [3]  3380/12 3392/4 3392/4
rap [8]  3471/22 3472/13 3472/14 3472/16 3472/17 3476/23 3477/1 3508/2
rapper [9]  3470/14 3470/15 3470/15 3470/16 3470/17 3471/3 3471/11 3471/13 3471/15
rare [1]  3506/9
rash [2]  3500/1 3500/1
rather [8]  3381/19 3393/10 3450/20 3476/10 3515/11 3516/9 3516/23 3580/16
RE [4]  3392/1 3467/9 3467/12 3467/14
RE-024 [4]  3392/1 3467/9 3467/12 3467/14
reach [3]  3413/3 3415/1 3419/9
reached [1]  3383/1
react [1]  3501/24
reaction [2]  3381/2 3409/20
read [57]  3383/20 3384/25 3385/7 3395/22 3397/2 3397/19 3408/12 3410/18 3415/22 3417/9 3454/2 3469/8 3469/24 3470/7 3480/24 3481/6 3482/11 3482/12 3484/22 3485/10 3488/1 3512/12 3513/14 3528/22 3530/13 3532/2 3536/14 3537/25 3538/19 3539/4 3539/5 3539/6 3540/1 3540/2 3540/10 3541/10 3541/12 3545/6 3545/7 3549/3 3553/22 3553/24 3553/20 3554/20 3555/15 3555/16 3555/17 3555/20 3558/11 3559/15 3559/17 3575/12 3575/22 3575/22 3576/17 3576/17 3577/25
reading [2]  3538/6 3558/12
reads [1]  3556/4
ready [3]  3429/2 3579/22
realistic [1]  3502/22
realize [2]  3387/9 3506/8
really [17]  3394/10 3406/6 3414/19 3442/1 3453/11 3456/12 3464/13 3466/10 3487/10 3488/18 3489/20 3528/3 3571/18 3571/23 3573/9 3575/12 3575/12
reason [5]  3398/9 3483/9 3516/7 3531/23 3533/23
reasonable [1]  3451/22
reasons [4]  3394/6 3414/8 3468/22 3486/20
reboot [1]  3427/14
recap [2]  3557/17 3574/10
receive [8]  3393/18 3415/17 3419/25 3491/18 3516/11 3561/17 3568/23 3577/11

received [25]  3385/14 3386/7 3392/9 3393/19 3393/19 3399/15 3415/18 3420/3 3420/21 3420/24 3484/16 3511/8 3512/2 3537/15 3550/6 3564/3 3564/13 3565/7 3565/10 3565/17 3568/12 3568/14 3568/17 3568/25 3569/9
recent [1]  3396/2
recess [2]  3428/18 3560/16
recognizable [1]  3459/18
recognize [16]  3385/22 3415/5 3464/23 3473/2 3490/25 3504/14 3504/22 3520/4 3520/8 3541/24 3549/8 3549/11 3550/6 3551/3 3561/8 3562/18
recognized [1]  3459/16
recollection [14]  3389/11 3469/8 3470/1 3470/3 3470/8 3471/9 3472/23 3477/7 3488/21 3504/25 3532/10 3550/1 3553/20 3554/6
recommend [1]  3442/7
recommended [2]  3442/4 3442/9
recommending [3]  3438/19 3443/5 3443/7
record [5]  3385/18 3408/12 3436/5 3484/20 3577/16
recorded [4]  3375/24 3539/13 3555/5 3577/4
recover [2]  3426/4 3512/2
RECROSS [1]  3575/3
RECROSS-EXAMINATION [1]  3575/3
recruited [2]  3489/5 3489/5
red [24]  3400/19 3469/3 3469/3 3469/15 3469/19 3470/1 3470/4 3470/12 3470/13 3471/2 3471/5 3471/9 3471/17 3471/20 3473/7 3473/25 3492/1 3492/3 3505/4 3505/7 3506/13 3525/16 3525/19 3539/6
redirect [7]  3560/8 3560/20 3560/21 3564/5 3564/6 3568/2 3579/17
refer [5]  3437/3 3437/3 3446/1 3467/6 3557/1
reference [6]  3397/23 3414/4 3453/7 3487/22 3514/17 3569/14
referenced [1]  3453/6
references [4]  3481/1 3578/9 3578/21 3579/12
referencing [1]  3416/5
referring [9]  3387/24 3388/22 3392/12 3396/4 3396/10 3480/12 3508/23 3521/6 3529/24
refers [1]  3579/8
reflect [1]  3447/18
reflects [1]  3447/19
refresh [7]  3469/7 3470/3 3470/8 3487/23 3488/21 3504/25 3554/6
refreshes [3]  3469/25 3471/9 3550/1
regain [2]  3414/7 3414/13
regard [1]  3399/11
regarding [5]  3380/9 3398/3 3414/3 3440/8 3556/12
registration [4]  3568/15 3569/5 3569/10 3569/16
regret [1]  3418/6
regretted [1]  3464/10
regular [3]  3483/2 3485/23 3559/15
Regularly [1]  3495/19
regulations [1]  3384/4

regulatory [2]  3398/24 3503/24
reimburse [1]  3579/16
reimbursement [5]  3571/17 3571/18 3571/21 3571/24 3572/7
rejected [1]  3410/7
relate [1]  3549/14
related [19]  3386/1 3390/4 3391/3 3396/13 3397/13 3404/10 3415/12 3540/12 3557/5 3557/8 3557/9 3557/12 3561/9 3576/19 3576/24 3576/24 3576/25 3577/9 3577/19
relates [4]  3438/18 3446/3 3446/4 3446/5
relating [2]  3384/5 3556/8
relations [1]  3504/17
relationship [14]  3394/24 3395/5 3405/16 3405/20 3448/7 3448/13 3448/16 3449/6 3449/8 3449/10 3451/23 3460/5 3481/22 3567/13
relationships [4]  3448/2 3448/4 3448/5 3448/18
relative [3]  3394/8 3414/20 3561/10
relatively [3]  3438/8 3482/24 3483/8
release [22]  3464/16 3464/23 3464/25 3465/1 3504/7 3504/14 3504/21 3507/17 3513/20 3513/22 3513/23 3513/25 3514/6 3516/4 3524/17 3526/3 3543/2 3543/11 3545/20 3545/25 3546/8 3569/25
released [1]  3514/11
releases [1]  3513/24
relevance [2]  3439/17 3440/7
relevant [6]  3396/16 3408/6 3423/17 3440/12 3442/6 3564/2
relieved [1]  3490/13
relocate [3]  3387/1 3387/5 3387/5
relocation [2]  3387/4 3496/20
rely [1]  3581/18
remain [2]  3389/3 3463/12
remainder [2]  3377/14 3412/5
remained [1]  3463/16
remaining [1]  3414/23
remember [34]  3380/19 3392/3 3435/5 3469/16 3469/17 3470/9 3470/10 3480/21 3504/18 3504/19 3523/8 3523/9 3524/8 3524/10 3525/25 3526/8 3526/9 3526/11 3532/9 3532/14 3534/13 3534/19 3546/3 3547/5 3550/19 3550/21 3550/24 3552/10 3553/18 3553/19 3556/23 3559/12 3565/21 3581/1
remembered [1]  3532/6
remotely [2]  3387/6 3387/16
removal [3]  3412/2 3421/9 3421/17
remove [3]  3413/4 3413/10 3574/21
removed [4]  3413/16 3426/11 3520/1 3524/25
removing [1]  3572/21
renewed [1]  3400/23
rent [2]  3458/21 3458/23
repay [3]  3539/23 3555/13 3557/13 3577/20
repeat [1]  3525/21
repeated [1]  3394/12
repeatedly [2]  3486/14 3486/15
rephrase [7]  3389/24 3433/11 3449/3 3499/4 3515/14 3536/13 3557/25

**R**

replace [1] 3434/10
report [3] 3439/10 3449/9 3511/24
reported [4] 3411/3 3411/6 3425/13 3427/21
reporter [4] 3375/22 3422/17 3424/4 3580/21
reports [1] 3439/12
represent [1] 3429/18
reprimand [1] 3505/5
reputation [2] 3418/20 3478/11
request [3] 3376/11 3382/17 3517/2
requested [3] 3382/5 3486/14 3489/8
requests [2] 3394/12 3409/11
required [5] 3383/23 3384/11 3414/17 3450/15 3577/16
requirement [1] 3414/9
requirements [1] 3384/7
requires [2] 3530/2 3530/5
research [11] 3380/11 3380/13 3392/5 3392/24 3399/17 3426/17 3427/20 3427/25 3428/2 3435/21 3497/16
resign [5] 3382/24 3417/4 3419/19 3489/12 3548/4
resignation [4] 3405/2 3417/19 3451/21 3494/22
resigned [4] 3405/11 3433/16 3479/21 3490/14
resigning [3] 3414/10 3416/16 3451/19
resigns [1] 3407/9
resolution [4] 3412/6 3417/5 3419/10 3419/12
resolutions [1] 3412/2
resolve [2] 3514/20 3567/18
resolved [2] 3412/15 3419/14
resources [6] 3381/18 3399/8 3399/9 3399/13 3402/17 3427/7
respect [9] 3400/17 3403/4 3405/13 3411/4 3414/22 3417/12 3418/21 3447/17 3483/20
respected [2] 3477/15 3478/8
respects [2] 3480/4 3480/6
respond [2] 3500/7 3566/23
responding [1] 3409/11
response [18] 3386/19 3386/25 3387/17 3388/11 3388/15 3388/25 3408/16 3413/9 3417/9 3419/4 3431/8 3439/13 3473/7 3474/11 3566/17 3566/18 3569/10 3569/12
responses [1] 3569/13
responsibilities [2] 3490/13 3503/14
responsibility [7] 3463/5 3463/21 3481/4 3487/8 3491/7 3529/10 3548/1
responsible [8] 3393/22 3410/4 3425/5 3480/5 3487/11 3503/10 3503/12 3533/18
responsive [2] 3394/11 3395/10
rest [10] 3378/5 3380/16 3385/7 3391/6 3391/7 3392/18 3392/21 3482/2 3490/22 3491/10
restate [3] 3425/20 3553/8 3554/10
restated [1] 3552/5
restatement [3] 3423/12 3423/25 3540/19
restaurant [2] 3455/12 3455/13
resting [1] 3378/7
restrict [2] 3397/11 3397/17

restrictions [1] 3383/9
rests [1] 3377/11
result [11] 3384/3 3418/10 3419/25 3423/25 3425/10 3425/12 3425/19 3426/1 3426/2 3452/4 3457/18
resulting [1] 3411/10
resume [3] 3379/9 3386/24 3582/6
resumed [1] 3404/24
resumes [1] 3519/6
retaining [1] 3530/25
retire [1] 3427/14
retired [1] 3435/2
retrieve [2] 3428/10 3518/6
Retrophin [200] 3380/2 3380/10 3381/7 3383/22 3384/11 3385/17 3386/1 3388/3 3389/4 3389/13 3389/19 3390/3 3392/2 3392/5 3393/6 3395/15 3396/13 3396/20 3398/16 3399/4 3399/22 3400/4 3401/8 3401/10 3404/4 3404/11 3404/17 3405/7 3407/9 3408/8 3409/8 3410/11 3410/20 3412/12 3413/3 3413/17 3415/12 3416/8 3417/4 3417/15 3419/7 3419/9 3419/19 3420/15 3420/21 3421/5 3422/10 3423/8 3425/3 3425/7 3425/11 3425/19 3425/25 3427/6 3428/2 3431/20 3431/24 3432/3 3432/10 3432/17 3433/3 3433/8 3433/14 3433/23 3434/19 3434/22 3434/25 3435/1 3435/20 3438/2 3438/24 3440/9 3442/5 3445/24 3446/10 3446/20 3455/18 3456/2 3456/5 3456/13 3458/1 3458/4 3458/13 3458/16 3459/6 3459/12 3459/16 3461/12 3464/8 3464/24 3465/5 3465/20 3466/8 3467/13 3467/16 3467/23 3468/13 3468/15 3468/24 3469/16 3470/2 3470/14 3471/10 3471/14 3471/17 3472/5 3479/9 3480/5 3481/11 3481/12 3481/25 3483/15 3483/20 3484/14 3484/19 3487/18 3487/18 3488/11 3488/18 3489/1 3491/19 3492/4 3492/5 3492/7 3492/9 3492/9 3492/12 3492/18 3492/19 3492/20 3493/2 3493/16 3493/20 3493/23 3494/9 3494/9 3494/12 3494/21 3495/3 3495/6 3495/24 3496/8 3498/3 3503/1 3504/8 3504/14 3506/6 3508/10 3508/15 3509/2 3509/22 3510/6 3511/11 3511/12 3511/16 3512/1 3513/21 3513/23 3513/24 3513/25 3514/4 3514/11 3514/12 3514/17 3515/1 3515/3 3515/11 3516/2 3516/11 3516/11 3520/1 3520/12 3521/7 3521/14 3524/5 3539/2 3540/6 3540/13 3541/8 3541/25 3543/3 3547/1 3547/7 3554/13 3554/16 3554/22 3557/19 3558/8 3558/16 3559/7 3561/19 3564/3 3565/6 3565/9 3565/13 3570/12 3572/11 3572/20 3572/24 3574/18
Retrophin's [4] 3418/22 3439/2 3479/4 3559/4
retrospect [1] 3540/15
return [5] 3384/20 3416/16 3419/18 3511/11 3516/2
returned [1] 3384/18
revenue [3] 3465/19 3466/13 3468/13

revenues [3] 3427/11 3484/11 3506/16
review [13] 3397/9 3398/9 3427/13 3466/14 3526/6 3526/16 3531/13 3537/6 3537/20 3559/22 3569/20 3569/23 3581/19
reviewed [3] 3526/7 3532/18 3570/2
reviewing [3] 3416/25 3537/1 3537/4
Richard [2] 3512/13 3512/16
Richardson [53] 3380/16 3382/16 3390/18 3393/11 3394/12 3395/20 3396/4 3396/23 3402/14 3409/15 3409/16 3410/24 3411/1 3411/3 3411/6 3411/9 3413/25 3415/21 3416/22 3423/3 3430/16 3430/20 3448/8 3448/14 3448/16 3448/17 3448/23 3449/6 3449/12 3449/14 3449/23 3450/1 3450/1 3450/5 3450/24 3451/1 3451/4 3480/14 3486/14 3507/4 3508/11 3519/12 3522/3 3523/15 3523/16 3533/1 3533/15 3534/4 3535/24 3541/15 3542/20 3552/14 3569/2
Richardson's [2] 3395/23 3409/20
riding [1] 3432/17
right-hand [2] 3469/21 3578/2
rights [1] 3427/9
rigor [1] 3397/3
rigorous [1] 3463/6
ring [1] 3512/18
rise [2] 3376/2 3428/13
Rivka [1] 3375/22
RivkaTeich [1] 3375/23
RMR [1] 3375/22
RO19302 [1] 3524/13
RO19309 [1] 3527/17
RO19399 [2] 3554/7 3554/19
robust [1] 3377/1
Rodes [1] 3521/18
ROHDE [1] 3375/12
role [17] 3389/9 3389/13 3389/16 3390/10 3390/13 3390/23 3393/4 3393/21 3409/8 3409/12 3419/22 3420/1 3480/10 3486/6 3486/7 3487/22 3491/24
roll [1] 3491/18
roll-over [1] 3491/18
rolling [1] 3492/17
room [9] 3378/19 3474/16 3474/21 3475/3 3476/19 3476/20 3476/24 3532/22 3532/24
roommate [1] 3479/14
rose [1] 3502/21
rose-colored [1] 3502/21
Rosenfeld [2] 3510/22 3511/14
Rosenman [1] 3384/20
Rosenwald [2] 3512/19 3512/21
Rosenwald's [1] 3513/3
roughly [6] 3392/6 3420/10 3426/15 3426/17 3427/20 3573/13
rounds [1] 3442/12
RPR [1] 3375/22
RSUs [4] 3420/24 3420/25 3421/1 3421/2
rule [1] 3436/8
rules [1] 3384/4
run [6] 3381/7 3388/5 3388/17 3392/5 3423/23 3462/3

**R**

running [9] 3386/15 3410/5 3452/13 3463/18 3467/1 3475/1 3493/18 3526/20 3526/24
runs [1] 3547/10

**S**

S-1 [7] 3541/24 3542/3 3542/14 3542/22 3543/1 3543/14 3543/16
S1 [33] 3549/4 3549/14 3549/17 3549/21 3550/25 3560/24 3561/1 3561/10 3561/10 3561/19 3562/14 3562/15 3562/21 3562/25 3564/15 3564/17 3564/20 3565/1 3566/11 3566/12 3566/14 3568/5 3568/10 3568/14 3568/18 3569/5 3569/11 3569/12 3569/14 3569/24 3570/1 3570/4 3570/6
SA [1] 3469/11
safe [1] 3579/20
sake [1] 3436/5
salary [6] 3393/14 3419/23 3420/17 3430/1 3430/3 3462/15
sale [1] 3401/10
sales [8] 3386/15 3387/25 3388/1 3388/17 3388/18 3402/4 3439/2 3490/1
San [20] 3387/20 3388/6 3388/16 3389/1 3400/6 3406/2 3407/2 3408/1 3454/24 3455/1 3455/7 3456/23 3457/10 3457/14 3474/5 3495/25 3496/3 3496/7 3496/21 3533/1
San Diego [2] 3454/24 3533/1
Sanofi [1] 3466/14
Sans [1] 3454/25
Sarah [2] 3512/4 3521/18
sat [1] 3455/14
Saunders [6] 3459/19 3460/4 3460/5 3460/18 3460/19 3460/20
Saunders/Fred [1] 3460/4
save [1] 3388/20
saw [32] 3394/10 3396/6 3396/17 3396/18 3400/14 3432/13 3434/15 3457/22 3459/15 3463/13 3469/18 3470/11 3485/20 3498/8 3498/10 3499/19 3502/12 3502/12 3506/25 3507/25 3525/24 3525/24 3526/1 3527/1 3527/3 3527/4 3528/7 3534/22 3565/3 3565/22 3566/8 3579/13
scatter [2] 3498/15 3498/16
scene [1] 3546/15
schedule [4] 3378/13 3480/20 3580/10 3580/17
scheduled [2] 3536/4 3581/6
scheduling [1] 3376/23
Schelling [3] 3488/5 3488/7 3488/17
scheme [1] 3499/9
Schuyler [1] 3513/13
science [2] 3453/1 3497/13
scientific [5] 3391/23 3392/11 3452/25 3457/24 3457/25
scientists [1] 3453/3
screen [5] 3438/12 3546/15 3546/16 3549/15 3552/11
scroll [7] 3384/17 3386/18 3386/24 3388/10 3412/1 3416/21 3417/8
search [1] 3394/16
seat [6] 3379/8 3379/14 3429/6 3429/9

3519/5 3560/19
SEC [22] 3383/25 3384/4 3384/8 3395/12 3405/13 3529/6 3529/25 3530/2 3530/5 3542/4 3542/6 3543/10 3543/25 3546/4 3551/10 3551/14 3551/19 3553/5 3554/9 3554/14 3565/5 3569/10
second [17] 3392/25 3396/19 3402/3 3412/4 3429/5 3488/3 3520/25 3521/6 3554/21 3556/3 3556/10 3557/1 3557/4 3557/9 3576/14 3576/18 3577/18
secondary [1] 3573/12
Secondly [1] 3394/10
secret [2] 3458/19 3481/25
secretary [4] 3410/25 3411/2 3412/20 3486/23
section [4] 3397/2 3397/11 3397/17 3574/10
securities [3] 3376/8 3383/24 3535/7
see [69] 3387/11 3396/25 3407/17 3438/11 3438/12 3438/12 3446/10 3447/20 3448/22 3449/1 3455/5 3462/5 3464/21 3474/7 3475/17 3480/15 3480/16 3480/17 3481/18 3482/3 3482/14 3484/25 3485/13 3485/15 3486/2 3486/10 3487/24 3491/3 3499/7 3504/11 3504/21 3504/23 3521/9 3521/23 3521/24 3523/5 3523/13 3524/13 3524/14 3525/23 3528/13 3530/18 3531/16 3532/16 3536/6 3537/17 3538/25 3539/1 3541/2 3543/8 3543/23 3549/15 3549/18 3549/19 3549/19 3550/5 3553/2 3554/6 3554/6 3557/14 3558/13 3558/17 3558/20 3572/1 3574/7 3578/9 3578/14 3580/4 3581/25
seeing [11] 3394/6 3447/22 3486/8 3486/11 3526/8 3549/10 3551/5 3556/23 3559/5 3559/13 3578/15
seeking [1] 3426/5
seem [5] 3391/4 3431/5 3471/21 3472/16 3499/7
seemingly [1] 3499/21
Selby [3] 3388/5 3388/17 3388/23
selected [3] 3385/15 3484/17 3485/1
self [2] 3497/13 3498/23
self-aggrandizing [1] 3498/23
self-educated [1] 3497/13
sell [3] 3381/14 3383/6 3542/5
selling [4] 3381/10 3381/20 3573/12 3579/5
send [4] 3471/22 3549/21 3551/25 3566/17
sending [2] 3527/6 3549/17
sends [1] 3485/24
senior [1] 3411/7
sense [5] 3505/24 3514/20 3515/7 3515/11 3531/25
sensitive [1] 3416/1
sent [22] 3461/14 3471/15 3521/22 3522/12 3523/15 3525/14 3536/2 3537/9 3549/11 3551/9 3551/21 3554/7 3559/22 3562/9 3562/13 3562/18 3564/18 3564/19 3565/2 3568/17 3570/4 3570/9
sentence [5] 3384/25 3385/2 3484/24 3539/4 3547/10

sentences [1] 3395/22
separate [4] 3433/9 3556/18 3556/18 3577/14
separately [1] 3393/10
September [28] 3400/13 3402/13 3404/16 3405/12 3405/14 3409/7 3409/10 3410/17 3412/17 3419/21 3421/22 3421/23 3427/1 3427/2 3428/1 3476/11 3523/19 3525/2 3530/16 3530/17 3532/7 3552/7 3552/14 3571/2 3574/12 3574/15 3574/17 3574/20
September 10 [1] 3574/17
September 14 [1] 3405/14
September 17 [1] 3412/17
September 2014 [3] 3405/12 3409/7 3574/15
September 30 [4] 3402/13 3410/17 3419/21 3574/20
September 30th [1] 3537/2
September 9 [2] 3552/7 3552/14
September 9th [2] 3523/19 3530/16
series [9] 3391/14 3396/3 3396/5 3404/9 3526/13 3538/21 3554/23 3557/5 3576/21
serious [3] 3456/6 3456/7 3462/23 3488/19
seriously [5] 3463/9 3487/4 3487/15 3488/15 3549/1
serve [3] 3399/21 3411/16 3502/24
served [5] 3481/7 3481/12 3485/19 3485/22
server [1] 3419/6
services [2] 3387/25 3534/17
serving [4] 3389/6 3389/8 3412/20 3485/23
session [1] 3560/17
set [3] 3379/3 3388/6 3580/10
settle [10] 3538/22 3539/19 3543/12 3545/20 3554/23 3555/10 3556/10 3557/6 3576/22 3577/9
settled [1] 3539/20
settlement [38] 3416/14 3451/2 3511/19 3512/14 3513/15 3513/20 3513/24 3514/21 3514/23 3515/11 3516/3 3516/8 3516/12 3516/17 3516/19 3519/14 3519/25 3540/5 3543/2 3543/11 3545/15 3545/24 3546/8 3556/8 3558/20 3558/25 3561/2 3561/4 3569/25 3570/3 3575/14 3575/15 3578/22 3578/24 3579/3 3579/6 3579/8
settlements [9] 3521/17 3522/23 3522/25 3523/2 3523/4 3539/17 3555/9 3557/8 3577/7
seven [1] 3452/5
several [13] 3377/19 3390/4 3393/7 3394/6 3396/6 3398/19 3400/19 3474/7 3474/8 3474/15 3474/19 3522/18 3536/17
several-week [1] 3474/15
severance [1] 3496/22
sexual [2] 3439/14 3442/21
share [9] 3396/1 3446/4 3446/10 3447/4 3447/16 3505/19 3572/17 3573/18 3574/11
shared [6] 3397/7 3449/7 3453/12 3458/23 3571/18 3577/17

S

**shareholder [3]** 3402/15 3420/8 3494/24
**shareholders [3]** 3399/12 3404/10 3427/8
**shares [25]** 3381/10 3393/20 3420/11 3421/3 3446/5 3446/17 3446/23 3492/20 3512/11 3534/14 3534/15 3534/19 3539/21 3542/5 3573/9 3573/13 3573/14 3573/19 3573/19 3573/23 3573/25 3574/5 3574/6 3577/13 3577/23
**sharing [3]** 3458/7 3458/10 3458/11
**sheet [8]** 3427/15 3526/12 3551/6 3551/9 3551/12 3551/18 3551/21 3559/6
**sheets [1]** 3558/17
**Shih [1]** 3435/22
**SHKRELI [225]**
**Shkreli's [27]** 3381/2 3388/25 3390/5 3391/9 3396/25 3404/4 3404/23 3411/4 3411/9 3411/12 3413/9 3425/6 3426/4 3436/17 3437/1 3446/18 3447/3 3466/21 3472/14 3481/22 3505/11 3507/2 3507/10 3527/2 3537/6 3550/3 3550/22
**shock [1]** 3431/4
**shocked [2]** 3431/3 3431/5
**short [7]** 3377/7 3402/3 3402/11 3404/10 3422/3 3422/5 3476/21
**shortly [6]** 3407/17 3417/24 3418/12 3435/16 3454/18 3476/6
**show [23]** 3385/20 3395/18 3410/12 3413/20 3415/3 3464/18 3487/25 3498/9 3504/10 3520/3 3521/4 3527/19 3530/15 3535/16 3537/24 3541/21 3549/7 3551/2 3552/9 3559/3 3561/5 3573/25 3578/8
**showed [4]** 3521/5 3562/21 3564/15 3574/10
**showing [4]** 3523/11 3527/20 3554/14 3572/12
**shown [1]** 3575/10
**shows [4]** 3521/14 3521/17 3521/20 3521/21
**sic [3]** 3386/21 3416/22 3556/6
**sick [3]** 3456/24 3457/12 3457/14
**side [2]** 3388/21 3469/7
**sidebar [23]** 3401/14 3401/16 3403/16 3406/10 3406/12 3408/21 3422/12 3422/15 3424/2 3440/16 3440/18 3440/23 3440/25 3444/2 3515/15 3515/17 3517/4 3538/8 3563/5 3563/7 3566/21 3567/21 3570/2
**sides [1]** 3445/25
**sign [4]** 3384/19 3514/6 3543/16 3569/17
**signature [13]** 3542/12 3550/24 3551/6 3551/9 3551/12 3551/21 3551/22 3551/25 3552/1 3552/2 3566/16 3566/17 3569/16
**signed [11]** 3526/20 3526/22 3526/24 3527/13 3527/15 3527/16 3542/14 3543/14 3545/1 3546/5 3569/2
**significant [5]** 3391/5 3398/8 3402/12 3408/10 3416/13
**significantly [1]** 3400/25

**signing [1]** 3543/24
**silo [1]** 3399/19
**siloed [2]** 3391/6 3392/17
**similar [4]** 3381/11 3449/22 3457/17 3556/16
**simple [1]** 3541/9
**simplification [1]** 3384/8
**simplify [1]** 3384/7
**simply [5]** 3398/6 3399/16 3420/11 3463/25 3565/20
**simultaneous [1]** 3494/23
**single [3]** 3465/21 3466/10 3497/6
**sit [8]** 3457/1 3462/7 3491/4 3492/21 3499/24 3526/7 3526/9 3534/12
**sitting [3]** 3472/25 3473/1
**situation [4]** 3387/9 3401/11 3447/19 3476/22
**six [3]** 3521/8 3521/11 3521/14
**size [1]** 3394/9
**skills [3]** 3499/1 3499/5 3499/6
**skip [1]** 3531/24
**slide [2]** 3501/6 3550/4
**slightly [2]** 3421/8 3430/21
**small [11]** 3383/2 3383/5 3399/7 3399/8 3482/24 3483/4 3483/8 3483/9 3483/24 3575/12 3575/22
**smaller [1]** 3484/14
**smart [3]** 3452/23 3497/10 3497/25
**SMITH [8]** 3375/15 3480/19 3480/22 3520/5 3560/20 3583/4 3583/5 3583/6
**smoothly [2]** 3417/19 3417/22
**social [5]** 3396/11 3437/10 3437/13 3437/18 3447/22
**sold [7]** 3402/2 3420/23 3420/24 3420/25 3421/1 3452/6 3466/14
**sole [1]** 3494/12
**solution [1]** 3387/11
**someone [19]** 3386/11 3394/14 3439/1 3442/7 3442/8 3442/9 3443/10 3461/1 3462/5 3462/20 3479/3 3482/7 3497/12 3499/5 3515/1 3528/4 3528/7 3528/7 3565/15
**sometime [3]** 3435/17 3445/10 3458/18
**sometimes [9]** 3499/20 3499/24 3502/18 3514/20 3515/2 3516/14 3519/19 3533/4 3559/21
**somewhat [7]** 3390/11 3392/18 3405/23 3413/7 3454/17 3498/15 3547/25
**somewhere [4]** 3389/11 3400/10 3430/21 3431/2
**son [1]** 3393/1
**soon [7]** 3405/11 3458/14 3458/17 3511/24 3524/2 3529/1 3569/18
**sorry [28]** 3426/20 3426/25 3435/25 3440/22 3460/2 3464/1 3485/4 3508/23 3519/14 3519/17 3519/20 3520/15 3520/20 3523/4 3526/22 3529/21 3536/20 3538/3 3538/9 3541/6 3542/23 3546/13 3549/9 3551/6 3555/22 3559/23 3575/11 3581/24
**sort [1]** 3558/13
**sounds [3]** 3479/22 3502/15 3549/23
**Sparsentan [2]** 3467/6 3467/6
**speaking [2]** 3378/9 3378/18
**specific [7]** 3382/10 3382/17 3390/12 3470/10 3484/19 3534/17 3577/17

**specifically [8]** 3390/22 3396/10 3404/5 3432/13 3450/20 3468/20 3531/19 3571/16
**specifics [1]** 3553/19
**Spencer [2]** 3513/9 3521/18
**spend [3]** 3393/11 3469/5 3474/5
**spending [5]** 3397/4 3427/4 3427/20 3488/18 3489/2
**spent [12]** 3392/2 3398/1 3426/17 3427/6 3427/21 3428/1 3428/2 3428/3 3458/18 3474/6 3474/22 3528/4
**Spielberg [2]** 3513/9 3521/18
**splitting [1]** 3458/21
**spread [1]** 3399/9
**spring [13]** 3389/3 3389/12 3389/15 3390/13 3445/5 3445/13 3445/17 3446/7 3446/7 3446/8 3486/6 3562/5 3562/12
**Square [1]** 3471/15
**Srinivas [1]** 3380/12
**SRINIVASAN [1]** 3375/16
**St [1]** 3455/11
**staffed [1]** 3503/14
**stage [1]** 3506/17
**stages [2]** 3385/17 3484/19
**staggering [1]** 3510/12
**stamp [8]** 3383/15 3384/21 3554/19 3556/1 3556/25 3558/14 3575/13 3576/1
**stamped [1]** 3524/13
**stand [3]** 3378/21 3379/15 3519/6
**start [8]** 3386/9 3415/20 3419/3 3429/21 3446/8 3486/5 3496/4 3519/22
**started [2]** 3445/17 3486/8
**starting [4]** 3384/25 3410/9 3446/8 3534/8
**starts [5]** 3446/8 3447/7 3485/12 3521/12 3576/14
**statement [17]** 3384/1 3432/18 3436/23 3452/19 3461/3 3487/10 3497/9 3501/10 3556/2 3556/13 3558/16 3559/24 3568/15 3569/5 3569/10 3569/17 3579/5
**statements [5]** 3409/21 3559/15 3559/17 3559/19 3559/22
**states [9]** 3375/1 3375/3 3375/3 3375/10 3375/13 3375/16 3395/15 3432/14 3530/24
**stating [1]** 3394/4
**status [4]** 3380/9 3426/10 3427/3 3529/7
**stay [8]** 3410/8 3414/7 3414/13 3462/18 3478/17 3548/7 3548/11 3567/17
**stayed [7]** 3409/22 3431/25 3432/6 3474/16 3474/21 3476/24 3480/1
**staying [3]** 3464/7 3476/19 3480/4
**stays [1]** 3475/2
**stenography [1]** 3375/24
**step [15]** 3390/9 3393/4 3409/12 3417/3 3419/15 3428/15 3430/13 3463/12 3478/13 3483/15 3489/14 3505/8 3507/8 3560/11 3574/14
**STEPHEN [7]** 3379/16 3410/23 3412/7 3521/25 3523/15 3523/16 3583/4
**stepped [5]** 3462/11 3462/17 3463/17 3479/17 3486/6
**stepping [1]** 3409/25

**S**

**steps [3]** 3400/13 3427/2 3560/14
**Steve [8]** 3397/7 3410/24 3448/8
3480/14 3510/22 3522/3 3535/24
3535/24
**Steven [1]** 3390/18
**Steves [1]** 3519/18
**stick [1]** 3514/21
**still [24]** 3379/13 3398/15 3410/3
3431/25 3435/1 3446/25 3463/8
3479/16 3488/17 3489/3 3489/4
3489/15 3496/18 3498/11 3506/22
3508/11 3519/7 3524/1 3528/25
3546/24 3546/25 3547/7 3548/8 3548/9
**stipulation [1]** 3445/22
**stock [58]** 3384/4 3393/18 3393/19
3401/1 3401/5 3401/8 3401/10 3402/2
3404/4 3404/6 3404/7 3411/10 3414/10
3419/25 3420/21 3420/23 3421/5
3421/7 3422/4 3430/6 3430/10 3430/10
3445/23 3446/22 3446/23 3447/4
3447/10 3447/17 3447/18 3452/5
3452/5 3452/7 3457/20 3492/8 3492/9
3492/9 3492/13 3492/18 3493/2 3493/4
3493/5 3494/9 3511/12 3539/21
3572/10 3572/23 3573/9 3573/13
3573/16 3573/20 3574/1 3574/3 3574/4
3574/5 3574/18 3574/21 3577/14
3577/23
**stockholders [1]** 3384/2
**stocks [3]** 3381/11 3381/20 3401/1
**stolen [1]** 3408/9
**stones [3]** 3465/13 3465/16 3465/18
**stop [4]** 3397/20 3481/21 3490/9
3499/20
**stopped [1]** 3427/6
**straighten [1]** 3566/20
**strategic [1]** 3411/7
**strategy [3]** 3410/2 3478/20 3478/23
3479/5
**straw [2]** 3461/22 3490/16
**stream [1]** 3438/4
**streaming [2]** 3437/21 3437/25
**strengths [2]** 3478/22 3478/23
**stretch [1]** 3560/10
**stricken [2]** 3408/14 3408/17
**stricter [1]** 3411/11
**strike [4]** 3408/11 3409/3 3419/2
3419/3
**string [2]** 3385/23 3415/8
**strong [2]** 3427/15 3427/17
**stuck [1]** 3571/12
**study [1]** 3536/15
**stuff [2]** 3379/3 3490/6
**stunningly [1]** 3497/10
**style [3]** 3436/22 3437/1 3437/3
**subject [21]** 3386/12 3395/21 3418/8
3438/16 3448/23 3450/24 3451/2
3480/17 3499/17 3500/18 3501/4
3501/7 3501/17 3501/18 3533/7
3545/19 3551/6 3558/1 3565/8 3565/15
3569/5
**subjective [1]** 3547/17
**subjects [1]** 3531/6
**submission [3]** 3566/22 3569/11
3582/1
**submit [1]** 3580/12

**submitted [2]** 3405/2 3569/11
**subordinates [1]** 3439/10
**subpoena [1]** 3395/15
**subsequent [5]** 3412/12 3412/21
3485/25 3507/2 3508/7
**subsequently [4]** 3398/25 3453/16
3456/10 3496/2
**subsidiary [2]** 3558/16 3559/7
**substance [19]** 3436/15 3436/22
3437/4 3437/7 3438/18 3445/19
3457/18 3463/22 3478/16 3479/20
3485/6 3497/6 3506/20 3507/6 3516/5
3541/10 3546/25 3557/19 3558/7
**substantial [9]** 3425/13 3426/12
3427/14 3437/1 3462/10 3468/15
3492/16 3493/22 3494/2
**substantially [1]** 3489/18
**substantive [3]** 3437/8 3522/22
3532/14
**success [2]** 3416/4 3417/13
**successful [3]** 3385/18 3413/14
3484/20
**sue [1]** 3516/13
**suffer [1]** 3418/9
**sufficient [4]** 3539/23 3555/13 3557/12
3577/20
**suggest [3]** 3435/14 3449/7 3565/22
**suggested [3]** 3435/13 3438/6 3461/23
**suggesting [3]** 3443/8 3490/10 3565/20
**suggestion [2]** 3388/16 3388/25
3516/10 3567/5
**suggestions [1]** 3473/12
**suggests [2]** 3516/11 3548/7
**suing [1]** 3432/3
**suit [8]** 3426/3 3426/3 3426/5 3426/7
3433/18 3511/13 3511/15 3511/16
**suits [1]** 3391/14
**sullen [2]** 3431/8 3431/9
**summarized [2]** 3396/23 3411/9
**summary [3]** 3376/9 3520/12 3521/7
**summer [14]** 3393/13 3398/14 3398/18
3399/6 3399/22 3400/4 3400/12
3400/18 3400/20 3404/5 3404/25
3405/15 3405/20 3474/3
**Sunday [1]** 3567/2
**Sunil [2]** 3552/17 3552/20
**supervising [1]** 3463/21
**support [3]** 3388/8 3390/11 3477/21
**supporting [4]** 3477/15 3523/24
3528/23 3536/3
**supposed [4]** 3503/9 3505/23 3542/9
3542/9
**surprise [2]** 3391/24 3477/12
**surprised [3]** 3409/22 3431/4 3431/5
**surprises [2]** 3396/3 3396/5
**surrogate [2]** 3416/18 3417/20
**survive [1]** 3391/18
**suspected [1]** 3508/9
**Sustain [1]** 3450/4
**Sustained [27]** 3433/11 3434/6 3437/24
3448/11 3449/2 3450/10 3460/1
3475/20 3479/7 3487/14 3493/25
3499/15 3501/14 3511/5 3514/10
3514/25 3515/14 3527/10 3528/21
3529/18 3540/9 3543/20 3545/23
3547/13 3549/6 3572/5 3572/9
**sustaining [1]** 3516/11

**Swallowing [1]** 3516/20
**swing [2]** 3402/3 3402/17
**swings [1]** 3404/10
**sworn [1]** 3379/17
**sworn/affirmed [1]** 3379/17
**synergies [1]** 3388/20

**T**

**T-H-I-O-L-A [1]** 3465/10
**tab [5]** 3385/21 3395/19 3410/13
3413/21 3415/4
**table [2]** 3391/16 3455/14
**talented [2]** 3452/20 3452/21
**taught [1]** 3497/16
**tax [2]** 3421/1 3452/7
**taxable [2]** 3420/25 3452/3
**taxes [1]** 3421/3
**teaching [1]** 3383/8
**team [5]** 3383/12 3386/21 3387/8
3392/25 3448/6
**technical [2]** 3414/8 3540/15
**Teich [1]** 3375/22
**telephone [3]** 3521/22 3532/25 3546/2
**telephonic [1]** 3534/8
**ten [1]** 3560/15
**ten-minute [1]** 3560/15
**tended [1]** 3396/15
**tends [1]** 3471/25
**tenure [1]** 3466/21
**term [13]** 3412/5 3414/8 3419/1 3467/4
3469/17 3469/19 3470/12 3482/21
3483/18 3483/20 3487/21 3498/16
3516/18
**termed [1]** 3383/3
**terminate [5]** 3433/13 3433/14 3433/23
3433/23 3476/10
**terminated [10]** 3391/23 3391/23
3392/6 3392/12 3392/14 3432/10
3432/14 3435/22 3476/9 3496/19
**terminating [1]** 3476/7
**termination [2]** 3431/22 3433/18
**terms [14]** 3390/16 3391/19 3395/3
3411/13 3416/14 3417/14 3417/19
3425/10 3426/5 3466/16 3470/10
3483/12 3514/6 3546/23
**testified [22]** 3376/16 3379/17 3402/14
3404/13 3429/23 3430/5 3430/12
3434/7 3448/1 3452/3 3454/7 3477/23
3487/6 3491/3 3505/8 3514/16 3519/12
3519/24 3562/14 3565/24 3566/2
3566/15
**testify [3]** 3382/12 3564/23 3565/15
**testifying [1]** 3581/4
**testimony [6]** 3435/6 3486/3 3487/15
3493/6 3493/7 3509/25
**themselves [2]** 3384/8 3580/7
**thereabouts [1]** 3454/16
**thereafter [3]** 3407/17 3435/16 3454/19
**thereto [1]** 3543/7
**these's [1]** 3402/10
**they've [2]** 3431/25 3474/11
**thinking [1]** 3414/15
**thinly [1]** 3399/9
**Thiola [9]** 3399/7 3465/10 3465/19
3465/21 3466/5 3466/9 3466/25 3468/7
3468/11
**third [13]** 3375/18 3386/9 3386/10

**T**

**third... [10]** 3412/6 3426/23 3426/25
3427/11 3466/12 3504/21 3545/14
3557/15 3557/18 3558/1
**thirties [1]** 3431/2
**thousand [1]** 3483/19
**threat [1]** 3431/16
**threaten [2]** 3467/22 3467/24
**threatened [2]** 3391/14 3467/15
**threatening [2]** 3418/5 3506/10
**three [22]** 3377/9 3378/21 3380/7
3387/21 3391/25 3392/6 3397/16
3400/6 3410/18 3412/1 3414/17
3418/23 3419/16 3419/16 3449/13
3462/13 3463/14 3466/25 3474/6
3554/5 3557/24 3558/7
**three-month [1]** 3463/14
**threw [1]** 3470/14
**throughout [1]** 3559/19
**thrown [1]** 3471/10
**tick [1]** 3505/21
**tickets [1]** 3471/14
**Tied [1]** 3459/24
**tight [1]** 3402/23
**tighter [1]** 3403/1
**timeframe [1]** 3421/21
**timing [2]** 3479/19 3486/5
**tip [2]** 3401/6 3507/25
**tirade [1]** 3435/9
**title [2]** 3488/11 3551/6
**titled [2]** 3396/20 3521/7
**today [17]** 3376/11 3430/3 3446/16
3446/20 3465/19 3477/23 3479/15
3486/16 3492/21 3492/25 3493/1
3498/11 3526/8 3526/9 3534/12
3548/11 3573/14
**together [5]** 3393/3 3393/10 3408/1
3408/4 3413/10
**tomorrow [2]** 3566/23 3567/3
**tone [2]** 3395/8 3445/18
**tonight [2]** 3417/1 3580/11
**took [13]** 3389/12 3414/24 3418/13
3419/7 3419/21 3436/1 3449/5 3453/17
3479/10 3485/19 3487/1 3487/15
3511/2
**top [17]** 3383/17 3384/24 3396/20
3397/16 3398/2 3410/14 3412/15
3415/22 3417/8 3469/21 3512/11
3521/7 3546/19 3549/9 3549/11 3559/5
3559/9
**topics [1]** 3531/10
**toward [2]** 3405/23 3405/24
**town [1]** 3417/3
**Trachtenberg [1]** 3521/18
**track [4]** 3385/18 3420/12 3484/20
3530/5
**traded [3]** 3384/5 3401/2 3404/6
**trades [1]** 3404/9
**trading [3]** 3404/4 3404/7 3411/10
**traffic [1]** 3448/22
**trained [1]** 3383/5
**training [6]** 3383/3 3383/13 3503/22
3503/23 3503/24 3504/2
**tranches [1]** 3558/6
**transactions [1]** 3404/14
**TRANSCRIPT [2]** 3375/9 3375/24
**transcription [1]** 3375/25

**transfer [1]** 3416/19
**transferring [1]** 3458/13
**transition [5]** 3411/7 3417/6 3459/10
3464/13 3540/12
**transparency [1]** 3461/25
**traveled [1]** 3452/17
**traveling [2]** 3533/1 3549/22
**Treasury [1]** 3381/25
**treat [4]** 3467/7 3467/10 3482/24
3483/24
**treated [4]** 3380/24 3391/6 3392/21
3483/25
**treatment [5]** 3392/9 3465/12 3465/14
3465/15 3506/9
**treats [1]** 3483/3
**tremendous [2]** 3452/21 3452/23
**trial [7]** 3375/9 3377/10 3378/9 3448/24
3529/1 3565/19 3581/3
**trials [1]** 3467/7
**tried [1]** 3549/2
**trigger [1]** 3541/14
**trip [2]** 3579/15 3579/20
**tripled [1]** 3512/10
**trouble [1]** 3426/12
**true [20]** 3434/20 3453/21 3465/8
3465/20 3468/7 3477/4 3477/6 3481/9
3481/14 3484/22 3485/7 3490/23
3491/5 3492/2 3492/25 3507/7 3507/9
3510/13 3530/14 3540/7
**trust [3]** 3417/12 3442/1 3575/12
**truthful [2]** 3502/17 3506/1
**truthfulness [1]** 3502/19
**try [21]** 3378/23 3381/19 3390/10
3393/7 3393/8 3393/12 3398/21
3398/25 3402/23 3413/9 3415/1
3418/19 3418/19 3425/18 3450/20
3469/7 3471/25 3476/10 3501/11
3566/20 3581/13
**trying [8]** 3376/12 3377/14 3398/19
3398/20 3467/5 3499/9 3500/23
3501/22
**Turing [2]** 3468/4 3468/6
**turn [10]** 3378/23 3380/5 3380/7
3383/14 3384/21 3387/13 3396/19
3412/14 3466/18 3498/4
**turned [3]** 3420/13 3492/14
**Turning [4]** 3389/3 3404/16 3409/7
3426/9
**turns [2]** 3507/24 3580/14
**tweet [1]** 3508/3
**tweets [1]** 3396/12
**twice [2]** 3490/20 3490/22
**twisted [2]** 3490/17 3490/19
**Twitter [17]** 3391/9 3396/7 3396/9
3396/12 3397/12 3397/13 3400/24
3400/25 3401/2 3401/4 3401/7 3404/23
3404/24 3404/25 3437/15 3437/16
3508/2
**two [42]** 3377/20 3378/15 3380/5
3380/11 3383/17 3383/20 3386/23
3395/3 3395/22 3402/1 3402/22
3402/25 3404/12 3425/6 3425/8
3426/15 3454/15 3474/5 3477/24
3485/18 3486/2 3486/17 3494/7
3506/15 3506/17 3508/17 3511/22
3512/1 3522/17 3536/20 3536/21
3536/21 3537/22 3540/4 3552/20

**3553/25 3554/20 3556/18 3560/9
3566/13 3567/4 3571/22**
**two-minute [1]** 3560/9
**tying [1]** 3548/21
**type [6]** 3387/17 3475/25 3476/1
3476/19 3483/10 3528/12
**typically [1]** 3387/2

**U**

**ultimate [4]** 3413/12 3413/14 3526/24
3527/1
**ultimately [9]** 3419/9 3420/15 3461/18
3462/14 3527/13 3527/16 3535/5
3550/24 3554/7
**ultra [3]** 3483/16 3483/18 3484/1
**ultrathin [1]** 3483/16
**umbrella [1]** 3461/9
**unable [2]** 3486/10 3486/11
**unanimous [5]** 3550/10 3550/13
3550/21 3551/13 3551/17
**uncertainty [4]** 3539/22 3555/12
3557/12 3577/19
**under [12]** 3379/13 3391/17 3396/2
3404/19 3427/4 3464/4 3475/12
3476/18 3486/9 3500/18 3519/7 3559/3
**undergo [1]** 3516/9
**underlying [1]** 3447/19
**understood [1]** 3525/22
**undertaken [1]** 3425/22
**undertaking [1]** 3398/18
**underway [1]** 3377/11
**unfortunate [1]** 3384/3
**unilaterally [2]** 3398/7 3496/6
**unindicted [1]** 3407/22
**UNITED [7]** 3375/1 3375/3 3375/3
3375/10 3375/13 3375/16 3395/15
**universally [1]** 3507/21
**unlawful [1]** 3511/6
**unlawfully [1]** 3511/2
**unless [1]** 3382/13
**unnecessary [1]** 3580/19
**unpaid [3]** 3539/12 3555/3 3577/2
**unprofessional [1]** 3436/21
**unrelated [2]** 3396/14 3473/9
**unremitting [1]** 3418/8
**untreated [1]** 3465/17
**unusual [1]** 3380/20
**up [60]** 3377/6 3379/3 3384/14 3386/18
3386/23 3386/24 3388/6 3388/10
3389/21 3394/5 3398/8 3400/19 3402/2
3402/3 3404/6 3406/4 3410/14 3416/21
3417/8 3438/11 3439/2 3440/13
3440/15 3442/4 3446/13 3447/6 3447/7
3453/19 3454/15 3456/9 3467/22
3469/7 3474/6 3475/9 3475/10 3477/10
3478/2 3479/15 3480/20 3482/14
3490/11 3505/21 3514/7 3524/22
3531/6 3531/9 3535/22 3538/22 3540/3
3541/8 3546/19 3548/10 3554/23
3556/10 3556/20 3557/6 3557/20
3558/9 3564/6 3576/22
**up-listing [1]** 3384/14
**up-tick [1]** 3505/21
**update [1]** 3380/9
**updated [1]** 3378/7
**upper [4]** 3465/2 3542/23 3578/2
3578/18

## U

**upset [3]** 3380/21 3407/9 3407/17

## V

**V-E-C-A-M-Y-L [1]** 3466/23
**vague [1]** 3502/15
**Vaino [1]** 3392/12
**Valeant [2]** 3570/16 3571/8
**Valeur [4]** 3410/25 3411/2 3412/20 3434/8
**Valeur-Jensen [2]** 3410/25 3434/8
**valid [1]** 3516/8
**valuable [1]** 3387/10
**valuation [1]** 3426/18
**value [8]** 3399/12 3418/17 3421/5 3427/8 3573/17 3573/18 3573/21 3574/3
**valued [2]** 3539/2 3577/23
**variety [4]** 3385/5 3396/12 3422/4 3481/18
**various [1]** 3572/11
**Vecamyl [3]** 3419/17 3466/23 3466/25
**verbally [1]** 3409/16
**version [7]** 3418/16 3565/3 3565/4 3565/4 3566/12 3570/4 3570/6
**versus [2]** 3393/1 3404/11
**vest [1]** 3420/25
**vested [6]** 3417/13 3421/1 3421/2 3421/2 3430/10 3452/6
**view [1]** 3514/17
**viewed [1]** 3392/19
**Vince [4]** 3386/12 3386/13 3386/14 3438/23
**virtually [1]** 3474/16
**visibility [1]** 3484/24
**visible [1]** 3447/20
**vision [10]** 3453/12 3454/6 3456/2 3483/23 3483/25 3484/1 3484/3 3490/25 3498/3 3505/11
**visions [1]** 3498/6
**visit [1]** 3477/3
**voir [3]** 3561/22 3561/24 3564/4
**volunteered [1]** 3504/2
**vote [1]** 3382/14
**voted [1]** 3574/21
**vouched [1]** 3442/8
**voucher [2]** 3427/13 3466/14

## W

**waist [1]** 3459/24
**wait [2]** 3436/5 3486/19
**waiting [2]** 3524/1 3528/25
**waiving [1]** 3403/7
**walked [2]** 3406/4 3511/6
**wants [3]** 3381/15 3457/3 3499/5
**warpath [1]** 3418/18
**warrant [1]** 3397/21
**warrants [1]** 3397/9
**waste [1]** 3387/2
**watched [2]** 3438/3 3500/17
**waves [1]** 3418/8
**Wednesday [1]** 3417/17
**week [7]** 3377/15 3377/16 3378/5 3456/9 3474/15 3569/11 3581/7
**week-and-a-half [1]** 3569/11
**weekend [4]** 3567/19 3579/20 3580/2 3580/4
**weeks [5]** 3377/20 3378/15 3454/15 3474/6 3486/17
**welcome [2]** 3469/13 3493/17
**well-intentioned [1]** 3502/3
**well-respected [2]** 3477/15 3478/8
**Westin [1]** 3455/11
**whatsoever [1]** 3571/4
**whereby [3]** 3539/10 3555/1 3576/25
**white [1]** 3490/22
**whole [1]** 3531/23
**willing [4]** 3414/25 3416/10 3417/20 3480/7
**Wintermute [9]** 3386/12 3386/13 3386/14 3386/16 3386/19 3387/1 3387/4 3438/21 3438/23
**withdraw [4]** 3525/4 3543/21 3551/20 3566/19
**withdrawn [2]** 3514/9 3543/22
**witness [28]** 3376/14 3376/16 3377/2 3377/6 3377/7 3377/8 3377/24 3378/8 3378/8 3379/1 3379/15 3379/15 3379/16 3381/24 3408/16 3428/7 3429/10 3469/11 3519/6 3560/14 3564/2 3564/12 3565/9 3565/20 3566/20 3576/5 3579/21 3583/3
**witnesses [4]** 3377/15 3377/23 3378/5 3378/10
**word [5]** 3413/7 3431/5 3435/10 3525/4 3559/5
**words [20]** 3436/15 3438/18 3445/18 3457/18 3463/22 3470/9 3478/16 3479/20 3479/22 3485/6 3491/11 3497/5 3506/20 3507/5 3516/5 3531/13 3541/10 3546/24 3557/19 3558/7
**workable [1]** 3387/11
**worker [1]** 3488/8
**works [1]** 3376/7
**world [5]** 3479/8 3479/12 3499/23 3502/1 3506/4
**worried [1]** 3457/5
**worse [1]** 3396/18
**worst [1]** 3464/8
**worsts [1]** 3491/8
**worth [3]** 3430/5 3430/9 3534/19
**worthing [1]** 3409/25
**writes [1]** 3569/9
**writing [1]** 3567/18
**written [6]** 3546/4 3550/10 3550/13 3550/21 3551/14 3551/17
**wrongful [2]** 3431/22 3433/17
**wrongfully [1]** 3433/23

## Y

**Yaffe [2]** 3510/24 3511/14
**year [21]** 3420/16 3426/24 3426/25 3428/3 3445/24 3451/25 3452/1 3452/7 3452/8 3452/8 3465/20 3466/7 3486/9 3486/9 3486/18 3496/10 3496/17 3496/20 3496/22 3506/6 3556/5
**year-and-a-half [4]** 3486/9 3486/9 3486/18 3506/6
**years [14]** 3420/19 3434/19 3437/17 3451/24 3452/5 3454/11 3464/8 3464/10 3466/7 3485/18 3486/2 3511/22 3512/1 3554/5
**yelled [1]** 3440/24
**yelling [1]** 3440/20
**yesterday [3]** 3379/24 3380/8 3569/12
**YORK [9]** 3375/3 3375/4 3375/13 3375/14 3375/19 3375/19 3385/4 3385/11 3387/19 3400/6 3409/19 3458/18 3478/9 3481/17 3482/17 3495/24 3496/23 3530/18 3536/4
**younger [1]** 3430/21
**yourself [10]** 3469/9 3469/25 3479/9 3487/25 3506/22 3532/2 3542/16 3546/15 3546/16 3569/2

## Z

**ZELLAN [3]** 3375/20 3376/10 3567/11
**zone [3]** 3388/21 3388/22 3388/22
**zoom [5]** 3383/17 3384/24 3396/19 3397/10 3397/16