```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
                                        15-CR-637 (KAM)
 3   UNITED STATES OF AMERICA,
                                        United States Courthouse
 4           Plaintiff,                 Brooklyn, New York

 5           -against-                  June 19, 2017
                                        10:30 a.m.
 6   MARTIN SHKRELI,

 7           Defendant.

 8   --------------------------------x

 9       TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
              BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES
     For the Government:        BRIDGET M. ROHDE, ESQ.
12                              Acting United States Attorney
                                Eastern District of New York
13                              271 Cadman Plaza East
                                Brooklyn, New York 11201
14                              BY:  JACQUELYN KASULIS, AUSA
                                     ALIXANDRA E. SMITH, AUSA
15                                   KARTHIK SRINIVASAN, AUSA

16
     For the Defendant:        BRAFMAN & ASSOCIATES, P.C.
17                              BY:  BENJAMIN BRAFMAN, ESQ.
                                     MARC AGNIFILO, ESQ.
18                                   ANDREA ZELLAN, ESQ.
                                     JACOB KAPLAN, ESQ.

19

20   Court Reporter:           Georgette K. Betts, RPR, CSR, OCR
                                Phone:  (718)804-2777
21                              Fax:    (718)804-2795
                                Email:  Georgetteb25@gmail.com

22
     Proceedings recorded by mechanical stenography.  Transcript
23   produced by computer-aided transcription.

24

25
```

1          THE COURT:  Have a seat, everybody.

2          This is oral argument and the final pretrial

3  conference, United States versus Martin Shkreli, 15-CR-637.

4          May I have the appearances of the parties, please.

5          MS. KASULIS:  Good morning, Your Honor, Jacqueline

6  Kasulis, Alixandra Smith, Karthik Srinivasan, paralegal

7  Gabriela Balbin, an intern for the summer Ari Hoffman and FBI

8  special agents, Michael Braconi and Sean Sweeney for the

9  government.  We have a full house.

10          THE COURT:  Thank you.  Good morning.

11          MR. BRAFMAN:  Good morning, Your Honor, Benjamin

12  Brafman, Marc Agnifilo, Andrea Zellan and Jacob Kaplan as

13  attorneys of record, Teny Geragos pending admission on the day

14  we start the trial, for the defendant Martin Shkreli, who is

15  who present in the courtroom.

16          THE COURT:  Good morning.

17          Who would like to be heard first?  I think we had

18  some arguments scheduled and before we go into arguments, if

19  you'd like, we can address some housekeeping issues.

20          Mr. Brafman, you look like you want to be heard, do

21  you want to --

22          MR. BRAFMAN:  No, I wanted to address certain

23  housekeeping issues but I am happy to defer to Your Honor's

24  list.

25          THE COURT:  Well, maybe I can address some of them

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

1    now.

2          I was a little surprised to hear that the trial is

3    now predicted to be up to six weeks long when previously I

4    thought the parties had indicated and I had scheduled a

5    three-week trial.  I do have a lengthy civil trial, complex

6    trial starting the last week of July, so I wanted to know

7    whether this new estimate is really a hard estimate and

8    whether the parties really do expect this trial to last up to

9    six weeks.

10          MR. BRAFMAN:  Your Honor, if I may, I think in

11   discussions with the government we, I think, agreed that when

12   Your Honor selects the jury that telling them three weeks

13   would be very conservative.  It's always hard to estimate the

14   length of a trial in hard weeks, but I think it would be fair

15   to say given the witness list that we have just been given as

16   modified still involves 57 witnesses I believe and not

17   including the defense case.  My guess is four to six weeks is

18   real and that jurors should be told that so they are not

19   surprised.

20          I apologize, Judge, but the dimensions of this case,

21   once the discovery started to be completed and the

22   government's list of direct witnesses began to grow, I think

23   changed both of our idea of how long we thought the trial was

24   going to take.

25          THE COURT:  Well, that's fine.  I just wish somebody

1   had the courtesy to tell me that before now because I do have

2   similar concerns with a civil trial that involves multiple

3   witnesses and moving parts starting the last week of July.

4           MR. BRAFMAN:  I appreciate that and to the extent we

5   share the responsibility, I would just say, respectfully, that

6   the government's initial witness list began in the 90s,

7   reduced to 75, and it's been further reduced.  If it's further

8   reduced, then it may well be we get closer to Your Honor's

9   projection.  I just don't want the jurors to be under the

10  impression that come late July they'll be done when we may be

11  beginning the defense case.  Some of the witnesses who are on

12  the government's witness list are not on the revised witness

13  list, understandably, and now they are people who the defense

14  will call.  So I don't know that we've accomplished much by

15  narrowing it.

16          THE COURT:  So the outside date --

17          MS. KASULIS:  Your Honor, we are --

18          THE COURT:  -- will be --

19          MS. KASULIS:  -- estimating a four week trial in

20  total.  Part of the variables are the length of the jury

21  selection, which I think we will also discuss at today's

22  appearance.  Separately because the second week of trial is

23  shortened because of the 4th of July holiday.

24          THE COURT:  I regret shortening it, honestly, we

25  should have been working July 3rd.

1          MS. KASULIS:  So we have only three days we're

2     sitting for that week.

3          We do have a 57 witness list but 14 of those

4     approximately are custodial witnesses.  We are hoping to be

5     able to eliminate the vast majority of those through

6     stipulations with the defense and the defense has also

7     provided the government with a 34-person exhibit list with

8     respect --

9          MR. BRAFMAN:  Witness list.

10          MS. KASULIS:  I'm sorry.  Thirty-four person witness

11     list to the government.  And so between the number of

12     witnesses, the number of fraud schemes and then the variables

13     regarding jury selection and the 4th of July holiday week, we

14     estimate that it will be in total approximately four weeks.

15     We're saying five weeks just to make sure that we don't run

16     out of time.  We hope to move our case quickly and have

17     witnesses available so that we're able to, of course, sit full

18     days before Your Honor, but we don't want to be in a situation

19     where we end up really significantly running out of time.

20          MR. BRAFMAN:  I think that's fair and I will add to

21     the equation that we will try our best wherever possible to

22     stipulate so that custodial witnesses are not required as

23     actual witnesses.  We would need the outline of the

24     stipulation and the records in question, but we don't intend

25     to challenge the vast majority of the records' authenticity,

1   so that could speed things up.

2            THE COURT:  So five to six weeks, is that where we

3   are now, or outside five weeks?

4            MS. KASULIS:  I think that's fair, Your Honor.

5            THE COURT:  Well, we're going to make a set of civil

6   lawyers very unhappy about this, but I will have to adjourn

7   this other trial.  Five weeks for trial.

8            The next issue I think that I wanted to address is

9   the questionnaire issue.  I don't think that the questions

10  that are being proposed are particularly onerous or out of the

11  ordinary and I don't think we need a separate questionnaire

12  for the jurors.  I do think that many of the questions that

13  are being proposed and agreed to by the parties are questions

14  that I would ask the jury anyway during the normal course of

15  voir dire.  And I do use a juror questionnaire at the end of

16  all of the general questioning and specific questioning where

17  each juror gets up and states where they live, how long

18  they've been living there, whether they rent or own, their

19  schooling or education achieved, where they work, whether they

20  supervise people and whether any adult members of their

21  household work.  I also ask them to tell us about military

22  service and whether any grown children are currently working.

23           I think a lot of that can incorporate the additional

24  questions that the parties hope to include.  I just think that

25  using a separate jury questionnaire where jurors are called in

1   to fill out questionnaires is going to add time to the process

2   and I'm not really sure why we would need to go through an

3   extra separate written questionnaire.

4           MR. BRAFMAN:  Let me address that.  I think this is

5   a joint questionnaire to the extent the Court agrees we can

6   use, I think both parties agree to the questions.

7           THE COURT:  What would be wrong with me just asking

8   the jurors during the voir dire?

9           MR. BRAFMAN:  Let me specifically -- does Your Honor

10   have a copy of the questionnaire?

11           THE COURT:  Yes, I do.

12           MR. BRAFMAN:  I'd ask you, respectfully, to look at

13   questions four and questions five and I believe that an

14   inappropriate answer or prejudicial answer from one juror as

15   to those questions could poison a panel.

16           THE COURT:  I agree with you, but this is what I do,

17   sir, in every case.  If I get an affirmative hand raised, we

18   come to sidebar out of the hearing of the rest of the jurors

19   and we explore, through my questioning and counsel's

20   questioning, any follow-up questions.

21           Would that satisfy you?

22           MR. BRAFMAN:  It would.  But I'm not -- it would,

23   but the procedure we had discussed, at least I had suggested,

24   was that if the jurors were called in on the morning of the

25   26th and given the brief instruction by the Court, perhaps in

1    the ceremonial courtroom, given the questionnaires, asked them

2    to fill them out and immediately return them, I think the

3    parties between both sides could, by those two questions, in

4    my opinion, figure out who is challengeable for cause on

5    consent.  We could then exclude those subject to Your Honor's

6    approval, we could then reconvene several hours later and very

7    quickly resolve the issue.  I don't think it delays the

8    process because I think a fair number of people are going to

9    be called sidebar in my expectation and as such that will also

10   take time.

11            THE COURT:  Well, you know --

12            MR. BRAFMAN:  I don't want to fight you on this,

13   Judge, whatever you want to do.

14            THE COURT:  The reason why I just want to say that I

15   disagree somewhat with your approach is, if they did answer

16   questions four and five yes or no, whatever, assume they

17   answer yes, you are going to want follow up and the best way

18   to get that follow up is to have it at sidebar asking them the

19   follow up and if there is a for cause challenge right then and

20   there we will rule on it.  I just think it is much more

21   efficient.

22            Ms. Smith --

23            MR. BRAFMAN:  Okay, but I think the questionnaire

24   provides for the written follow up that if you answer yes,

25   please explain, so a one-line sentence could be put there.  I

1    don't want to belabor the issue, we have enough to do.  I will

2    do it any way Your Honor suggests.

3              THE COURT:  I was just going to say that Ms. Smith

4    has been through a jury selection with me before and she's

5    familiar with the procedure of doing it right at sidebar,

6    making rulings right then and there on for cause challenges

7    and then we move on to the next jurors.

8              MR. BRAFMAN:  I'm prepared to accept that, Your

9    Honor.

10             THE COURT:  Because I do think, honestly, if you ask

11   these questions you're not going to get enough information to

12   satisfy yourself.

13             MR. BRAFMAN:  Okay, we'll do it your way.  Thank

14   you.

15             THE COURT:  All right.  Now, did you all want to

16   talk about anything else regarding jury selection?  I was

17   planning to seat four alternates and that would mean that you

18   would be selecting initially from a group of 40 if I add in

19   the strikes and figure out how many we need to end up with.

20   So we have presently 150 jurors ready to come in Monday but I

21   really think that's an overestimate and we are somewhat

22   careful about jury utilization and the cost to the court of

23   calling in far more jurors than we need and so I was going to

24   reduce that number, absent some reason to think that we're

25   going to not have enough jurors, to 130 jurors.  I think that

1    would account for those who are going to be struck for cause

2    and those who may have vacation conflicts or other conflicts.

3              Does that seem like a sufficient number?

4              MR. AGNIFILO:  I think it's fine, Judge, my concern

5    is -- 130 is a lot of jurors.  My concern is once we tell them

6    that we're looking at a five- or six-week trial over the

7    summer, we're going to lose a fair amount.  If we run out of

8    the 130, what are our options at that point?

9              THE COURT:  We will just use whatever is left over

10   from other panels.

11             MR. AGNIFILO:  So we won't be stuck, we can recycle

12   through other jurors.

13             THE COURT:  No, we can still go forward.  We will

14   ask our jury clerks to hold everybody who has been excluded

15   for cause, but not cause related to conflicts.

16             MR. AGNIFILO:  Right.

17             THE COURT:  Okay.

18             MR. AGNIFILO:  That's fine with us, Judge.

19             THE COURT:  All right.

20             MS. KASULIS:  Your Honor?

21             THE COURT:  Yes, ma'am.

22             MS. KASULIS:  May we raise the possibility of having

23   six alternates instead of four.  I'm just concerned

24   considering the length of the trial and it being in the middle

25   of the summer and there will be a lot of attention on this

1    trial and I do think there may be some risk of losing some

2    jurors throughout the process and so we, respectfully, request

3    six alternates instead of four.

4                MR. BRAFMAN:  We'll leave that to your discretion,

5    Judge.

6                THE COURT:  We will have six then, six alternates in

7    addition to the 12.

8                MR. AGNIFILO:  Can I ask a logistical question?

9    Where we would put the alternates, do we have enough space?

10               THE COURT:  We sometimes put chairs in front of the

11   jury box and have jurors one through it will probably be six

12   in the first row of chairs, and then have the rest sit back.

13   Now it does present a little bit of a problem for the screens,

14   but we will have the large screen down, hopefully we can get

15   enough -- we will have enough seats for everybody.

16               MR. AGNIFILO:  Very good.  Thank you, Judge.

17               THE COURT:  I want to confirm that the parties -- is

18   there anything else?

19               MS. KASULIS:  No, just I'm sorry, Your Honor, in

20   terms of logistics, where we'll be meeting and what time you

21   would like the parties to appear for jury selection.

22               THE COURT:  Okay, good point.  9:00 a.m. Monday

23   morning and on every day thereafter you should appear also at

24   nine and we will put the jurors in the box by 9:30.  We take

25   one mid morning break at around 11.  We take our lunch break

1    between 12:45 and 1:45 or less if we're pressed and then we

2    have a mid afternoon break somewhere around 3:30.  I would

3    like to sit at least until 5:30.  We will sit on Fridays.  And

4    I think that's it for scheduling.

5            MR. BRAFMAN:  Could I ask you, Judge, where on

6    Monday should we be coming here --

7            THE COURT:  Yes.

8            MR. BRAFMAN:  -- or the ceremonial courtroom?

9            THE COURT:  We are going to think about that.  I

10   will issue an order or let you know whether it's here or the

11   ceremonial courtroom.  The problem with the ceremonial

12   courtroom is we don't have computer access there.

13           MR. BRAFMAN:  I meant just for the selection.

14           THE COURT:  Right, I know.  I just want to look at

15   this courtroom more carefully and see if I can fit 130 jurors

16   here without difficulty.  The spectator part where most jurors

17   sit is a lot smaller on this side than it was on the other

18   side so we may not fit 130 folks in here.

19           MR. BRAFMAN:  As a personal courtesy, can I ask we

20   end at 5:00 o'clock on Friday instead of 5:30?

21           THE COURT:  Can we play it by ear?

22           MR. BRAFMAN:  Yes.

23           THE COURT:  I would like to go to 5:30 if we could.

24           MR. BRAFMAN:  All right.

25           THE COURT:  I want to confirm we have everything

1    resolved regarding the Retrophin privilege log, correct?

2                  MR. BRAFMAN:  I think we do.

3                  THE COURT:  No issues?  Okay, great.

4                  MR. AGNIFILO:  We don't see anything to bring to the

5    Court's attention, we're having a productive dialogue with the

6    Retrophin.

7                  THE COURT:  I appreciate that, good, thank you.

8                  There's a bail modification request --

9                  MR. BRAFMAN:  Yes.

10                 THE COURT:  -- I understand.  I understand the

11   government opposes.  I'd like to hear more about this and I

12   also feel I would want more verification as to where this

13   money is going and who has billed Mr. Shkreli and how it's

14   going to be spent.  My concern is that we have reduced already

15   I think once the bail and I'd like to hear from the parties.

16                 MR. BRAFMAN:  Your Honor, the bail was never

17   reduced.  The bail was changed from stock to cash so it's all

18   liquid in an E*Trade account, but it was never reduced from

19   the original 5 million.

20                 THE COURT:  All right.  I understand that you want

21   to pay $3 million collectively to accountants, tax -- federal

22   and state tax authorities and attorneys, correct?

23                 MR. BRAFMAN:  Yes.  And, Your Honor, I will

24   represent to you and then I can have Mr. Vernick, who is a

25   partner at Fox Rothschild, who will be the custodian of the

1   money if it's reduced.  And what we are seeking is, because of

2   the IRS liens, if you will, we are in a position where even if

3   Mr. Shkreli had funds, and he doesn't, he would be prohibited

4   from using them.  And the understanding would be that the

5   $3 million would be paid as follows by Fox Rothschild and all

6   of the money would go to them, maintained in their escrow

7   account with the understanding that none of it goes to

8   Mr. Shkreli.

9          It would be used in the following manner:  A million

10  250,000 dollars would be paid by that firm to New York State

11  Tax Department and we've been advised that if that payment is

12  made, that they will then lift the lien permitting the lawyers

13  and accountants to be paid from some of this money.

14         A million dollars would go to the Internal Revenue

15  Service, again directly from Fox Rothschild.

16         $50,000 will go to Marks Paneth, who at this point,

17  Your Honor, is providing both forensic accounting services and

18  also have cleaned up Mr. Shkreli's tax issues by filing

19  amended returns and trying to get the tax that the government

20  claims is owed to be reduced and he has been successful.  They

21  are owed close to a half million dollars.  They are willing to

22  take $50,000 on account now.  That money would go to straight

23  to Marks Paneth.

24         Fox Rothschild, the number I have for them now, is

25  $326,085 but that keeps growing every day because they are

1    essentially handling all of the litigation that Mr. Shkreli

2    has at least keeping it in place.  They were the ones who

3    negotiated the payment of part of the legal fees through the

4    Retrophin indemnification agreement, which took many months

5    for them to do.

6           Mr. Shkreli is still worth a lot of money in terms

7    of his share of Turing, but based on what Mr. Vernick has

8    advised me, Mr. Shkreli is not able to sell his share of

9    Turing, which may be worth as much as 30 to $50 million.

10          THE COURT:  Why is that?

11          MR. BRAFMAN:  Because it is not a public company and

12   it is a partnership that has a restrictive partnership

13   agreement that requires the consent of all of the partners.

14   They would require years of litigation to get this done.  He's

15   not allowed to pledge that share either as collateral for any

16   type of loan nor could he post it as bail.  And Mr. Vernick is

17   the person who has been handling all of those legal issues and

18   there are motions pending with respect to the Turing board to

19   have the board replaced, that involves litigation in

20   Switzerland, Your Honor.

21          So what's happened is, as a courtesy to me in a

22   sense, Marks Paneth and Fox Rothschild have continued to work

23   and I'm getting to the point where I can't in good faith

24   continue to ask them.  The balance -- and there may be a

25   couple of hundred thousand dollars, we are already out of

1    pocket, our firm, a fortune of out-of-pocket expenses because

2    it's a boutique firm and in order to produce and reproduce and

3    copy and input -- get involved with the downloading from the

4    database these expenses are being borne by us.  So none of the

5    money goes to Shkreli.  His bail is twice -- it would be still

6    twice the bail of Mr. Greebel.

7             Mr. Shkreli has no criminal record.  All of his

8    family lives in New York City and he has so far not violated

9    the terms of his bail, and he is also not a citizen of any

10   other country and the Court has -- or Pretrial Services has

11   his passport, so in the normal circumstances $2 million cash

12   bail is extraordinary in my experience.  Mr. Greebel's bail is

13   not cash, it's secured by a house and yet he is, you know, in

14   counts that carry severe penalties as well.

15            So we're doing this, we tried to work this out with

16   the government and they had said, well, you know, your client

17   tweets about willing to pay someone a hundred thousand

18   dollars.  I said, look, you know, tweeting has become,

19   unfortunately, still fashionable and when people tweet they

20   don't always mean what they say and he hasn't made any

21   payments.  We have an affidavit we've prepared to provide that

22   Mr. Shkreli does not have any foreign bank accounts, which is

23   the request they initially made.  Now they want him to fill

24   out the usual Eastern District 40-page financial affidavit.  I

25   can't let him do that.

1          One of the things I've learned from this discovery

2     is that he really doesn't have a handle on what companies he

3     once had an interest in and where that interest lies.  He

4     doesn't have any cash.  We could give you an affidavit saying

5     he doesn't have any bank accounts, he doesn't have any present

6     balance anywhere and that the only asset of value that he has

7     is the Turing stock, which he cannot use.

8          In addition, the government, when we raised this

9     issue, said, well, your client paid $2 million for a record

10    album which is now, quite frankly, almost worthless; he did.

11    And maybe it was absurd to do that but he did it at a time

12    when his KaloBios stock was worth $50 million and now it's

13    not.

14          Bail was never negotiated in this case.  The Arnold

15    & Porter firm agreed to $5 million in KaloBios stock when that

16    stock was worth $50 million.  The stock is virtually worthless

17    now, he doesn't own it any more, and we have $5 million cash

18    sitting in an E*Trade account that if Your Honor releases it

19    it will go directly to Mr. Vernick.  So if you want me to give

20    you an affidavit from Mr. Vernick affirming everything that

21    I've said to you, I'm happy to do that.  But it just seems to

22    me that it's sort of cruel and unusual punishment to make all

23    of the lawyers who are working 24/6 and sometimes 24/7 on this

24    case, and turning out hundreds of thousands of copies of

25    discovery over and over again, for those of us who need hard

1    copy, to continue to lay out money.

2         I just spoke to the reporter about a daily copy.

3    They want an advance deposit for the trial and that's standard

4    and if I have to I will pay it.  I just don't want to keep

5    doing that because it's, quite frankly, not fair especially if

6    this money is just sitting there.

7         I doubt that anybody can make a good argument to the

8    extent that he poses a risk of flight, most respectfully, and

9    never could make that argument and he's recognized everywhere

10   he goes.  So he's come here, we've worked our collective heart

11   off to get this trial ready and we're going to be here.  He's

12   always on time.  So I don't know what else I can say.

13        THE COURT:  All right.  I'll hear from the

14   government.

15        MS. SMITH:  Your Honor, there are three separate

16   reasons why the government has not consented to the proposed

17   bail reduction.  We've actually been having discussions with

18   defense counsel for at least eight months around the idea of a

19   bail reduction and, you know, I think these three reasons

20   haven't changed during that time period.

21        I also just want to make clear that the E*Trade

22   account has $5,994,000 in the account, the $994,000 above the

23   5 million-dollar bail.  Your Honor filed a letter permitting

24   the release of that money or an order on October 25th, 2016.

25   So the government does not oppose that $994,000 leaving the

1   E*Trade account, in fact, there is an order already in place

2   to allow that.  The objection is to any reduction below the

3   five million dollars.

4           So the three reasons why we haven't consented is

5   first, as Mr. Brafman said, the defendant refuses to fill out

6   the standard Eastern District financial affidavit that every

7   defendant seeking a bail modification or reduction in

8   forfeiture needs to fill out and that affidavit would disclose

9   and attest to his assets outside of the bail package.

10          Second, in direct contrast to what Mr. Brafman is

11  saying here, the defendant has made recent public statements

12  suggesting that he not only has plenty of liquid assets but

13  that he's spending those things on things other than legal

14  expenses and rent.  In addition, public filings --

15          THE COURT:  Like what kind of expenses, are they

16  large expenses or --

17          MS. SMITH:  So we have a series of articles, some of

18  them just last week Mr. Shkreli said that he was going to pay

19  $40,000 to a Princeton student for solving a theorem, a

20  geometric theorem towards a scholarship.

21          A couple of weeks ago he offered a hundred thousand

22  dollars to find the killer of an individual named Seth Rich,

23  who was murdered last year in D.C.

24          In December, he purchased another album, an

25  exclusive album from Lil Wayne similar to the Wu-Tang album.

1     We don't know how much he spent on that.

2            There are articles where he's apparently purchasing

3     domain names of reporters who write articles about him and

4     that he not only would have to purchase the domain name but

5     then maintain it.  So there are a number of, you know, public

6     expenditures that he said he has made.  Mr. Brafman has said

7     to us that those may be false, but particularly given those

8     public statements it's very important for us to have a sworn

9     affidavit to understand what is true and what is not true.

10            Retrophin has also said in its public filing, there

11    was a 10-Q that was filed on May 5th, 2017.  In the 10-Q

12    Retrophin disclosed that Mr. Brafman has been advanced

13    $4.8 million in legal fees; 2.8 million in pretrial expenses;

14    $2 million in trial expenses.  And so we do understand that

15    there has been a significant amount of money in connection

16    with the D&O insurance with Retrophin because Mr. Shkreli was

17    the CEO.

18            THE COURT:  So this is money not Retrophin, but the

19    D&O insurance covered.

20            MS. SMITH:  Actually, Retrophin advances it and the

21    D&O insurance will reimburse part of it.  I have a copy of the

22    10-Q with that highlighted for you, if you'd like, as well as

23    the articles detailing Mr. Shkreli's various statements about

24    monies that he's expended.

25            I also want to talk about the government's

1    understanding of the defendant's assets.  At the time of the

2    Pretrial Services report, Mr. Shkreli disclosed he had more

3    than $70 million in assets, that was the reason why we asked

4    for a 5 million-dollar bail.  I know Mr. Brafman has talked

5    about Mr. Greebel's bail.  Mr. Greebel's bail was $1 million,

6    which is a much larger percentage of his assets than

7    $5 million was of Mr. Shkreli's assets at the time.

8              THE COURT:  This is to Pretrial he said he had 70

9    million?

10             MS. SMITH:  This is to Pretrial with $70 million.

11             In discussions with defense counsel and also again

12   in connection with public statements that he's made, it's our

13   understanding that the defendant has additional assets that he

14   has not yet liquidated.  So that includes an Enigma machine,

15   which is an original Nazi-era German machine.  The last public

16   I guess auction of those machines there was one that was sold

17   for $269,000.

18             He paid $2 million for the Wu-Tang Clan album.  He

19   has a Picasso and his stake in Turing, we do not understand

20   why that stake is illiquid.  It was at one point offered as a

21   bail asset, so it does seem like at some point it was able to

22   be assigned.  There was an article recently that Turing had an

23   offer to sell Daraprim, which is a drug that it had, for a

24   hundred million dollars.  It seems to us there may well be a

25   market somewhere for those Turing shares.  And we haven't

1    gotten any information from the defendant.  We've asked about

2    any attempts the defendant has made to liquidate these other

3    assets before dipping into the bail money.

4         And then the last thing I just want to raise is the

5    concern that we have and we've raised this with the defense,

6    Mr. Shkreli has a number of outstanding liens.  So there are

7    tax liens from the federal government, from New York State.

8    There was a settlement, I believe it was for $2.6 million with

9    Dr. Kessler.  There are additional liens, outstanding debts.

10   The concern that we have is that by releasing money from the

11   bail, from the bank account per the Court order directly to

12   Fox Rothschild, we are circumventing the normal procedure by

13   which -- if the money was just in a regular account and wasn't

14   held for bail, would have to go through whatever the waterfall

15   is of different liens, and there's obviously a legal order for

16   doing that.

17        THE COURT:  The priority of the different liens.

18        MS. SMITH:  Exactly.  And so our concern is that the

19   defendant is using this as a mechanism to pick and choose

20   which creditors he wants to pay in which order as opposed to

21   going through the legal process that would need to be gone

22   through.  And the government is agnostic as to what that order

23   is, but given the existence of those liens the concern is that

24   we are somehow circumventing the natural legal order of that.

25        The defendant has had that $994,000 sitting in the

1    bank account since October 25th, 2016 when Your Honor signed

2    that order.  That money could have been used at any point to

3    pay off tax liens or any of these other expenses and it has

4    not been moved out of the account.  And our concern is the

5    reason it's not been moved out of the account is because if it

6    becomes available it's subject to whatever that order of liens

7    is.  We don't want to be a party to circumventing that.

8            I, finally, just want to address really quickly

9    Mr. Brafman's point about the original bail package.  It was

10   on consent.  The arguments that we would have made at the

11   time, however, I think would have been significant.  There

12   obviously is always a risk of flight.  I actually believe the

13   risk of flight is now heightened.  We are now one week from

14   trial, I'm not sure why this application is coming up now, but

15   there is certainly a concern the closer you get to the outcome

16   of a case.  Obviously the presumption switches as soon as

17   there is a conviction, so there is a risk of flight concern.

18           There also is a risk of danger.  Our case is going

19   to be about a series of frauds committed by the defendant over

20   many, many years and so --

21           THE COURT:  But how is releasing the money going to

22   enhance the danger to the community?

23           MS. SMITH:  It's more about the money that is left

24   holding Mr. Shkreli here.  I know Mr. Brafman has said the

25   Turing shares is somehow going to prevent his flight, but I

1    really don't understand how that's possible.  And again, the

2    concern is that this is another mechanism for kind of getting

3    out of paying people that he owes.

4           MR. BRAFMAN:  Your Honor, can I just respond

5    briefly.

6           THE COURT:  If she's finished.  If she's finished.

7    You can respond.

8           MS. SMITH:  I think that's it, Your Honor.

9           THE COURT:  Go ahead.

10          MR. BRAFMAN:  Your Honor, I don't know where some of

11   the government's figures come from quite frankly because while

12   the Retrophin has been kind in terms of willing to pay

13   two-thirds of the legal fees, it's not the number she used.

14   We did not get that number nor is there any provision for

15   Retrophin reimbursing us for out-of-pocket expenses.

16          The reason the application is brought to force now

17   is because we are paying out of pocket a substantial amount of

18   money that would normally be paid by the client who cannot or

19   by the person who is paying the client's fees and there was no

20   provision in the agreement with Retrophin for out-of-pocket

21   expenses.

22          I will also tell you that as late as June 16th,

23   which is last week, we were verified that the balance in the

24   account is $5,000,345.  I don't know where they get $5,994,000

25   from.  The last statement we have from Mr. Vernick tells me it

1    is 5 million and 17,000.  And the reason Mr. Shkreli cannot

2    use any of his assets, if you will, to even try and sell them

3    is because he owes $6 million in taxes.  What the IRS has been

4    willing to do because Marks Paneth, on their own dime, has

5    managed to convince the government that at the end of the day

6    there are a great many carryforward losses that Mr. Shkreli

7    did not take advantage of so his ultimate tax bill may be

8    substantially less.  They are willing to take a million

9    dollars now and then permit him to use whatever he can

10   including E*Trade money, to pay legal fees and the accountant

11   fees.  Same thing with the New York State tax people.  They

12   are owed more than 1.25 million, but they are willing to take

13   that as a good faith payment then work out a payout with

14   Mr. Shkreli.

15          I also indicate to Your Honor that some of the

16   preposterous promises that Mr. Shkreli has made in recent

17   weeks have never been paid forward and they are still part of

18   his effort, if you will, for him to remain a viable person in

19   his own right traveling to the beat of his very unique

20   drummer, if I may, which will become more apparent when this

21   trial actually starts.

22          So I'm representing to you, Your Honor, that the

23   only way the Rothschild firm gets paid so they continue to do

24   this, the Paneth firm gets paid and we have made a commitment

25   to the IRS and New York State that if Your Honor releases it

1    they get paid first.  If they get paid first, we will be able

2    to use some of that money to pay Marks Paneth or to pay Fox

3    Rothschild.

4            I will also tell you, Your Honor, that when he told

5    Pretrial Services that he was worth approximately $80 million,

6    the KaloBios stock was worth 50 million, it's now worth the

7    5 million that's in the E*Trade account.  And Turing was

8    valued conservatively at the time between 20 and $30 million.

9    Mr. Vernick can opine as a legal matter why we can't use

10   Turing either as collateral or why he can't sell it.  That's

11   something he told me is absolutely 100 percent right in the

12   partnership agreement.

13           THE COURT:  Why don't you provide that information

14   to the government since they apparently have been in

15   discussions with you for quite sometime and they are still

16   waiting for some answers.  If you want to provide

17   documentation from the New York and federal tax authorities

18   regarding the liens and the amounts they're willing to take at

19   this time, Marks Paneth invoices and Fox Rothschild, I think

20   that would be fine.  It also I suppose if the $994,000 that

21   was authorized to be released from the E*Trade account is now

22   reduced down by almost $600,000, maybe you can let them know

23   where that went.  And I certainly want to make sure that,

24   Mr. Brafman, you're paid.

25           This 10-Q form does indicate that --

1        MR. BRAFMAN:  It's wrong, Judge.  I'm happy to --

2    it's wrong.  Maybe it's, you know, just Retrophin made a

3    mistake and maybe they lumped some Vernick fees or some other

4    fees that they paid, not to my firm.  I know exactly what they

5    paid to my firm and I don't usually miss $800,000.

6        THE COURT:  Well, it says the company would

7    undertake an obligation to advance $2 million in future legal

8    fees in the event the matter proceeds to trial.  The company

9    has now advanced 2.8 million, 1.8 million of which occurred in

10   2016 in pretrial fees to Mr. Shkreli's counsel as well as the

11   $2 million in trial fees, so --

12       MR. BRAFMAN:  They are --

13       THE COURT:  -- you're saying that's just flat out

14   wrong?

15       MR. BRAFMAN:  Based on what I know about my firm,

16   yes.  I'll try to figure out how this happened and talk to Ian

17   Shapiro.  Your Honor --

18       THE COURT:  Let's --

19       MR. BRAFMAN:  -- I'm not going belabor the issue

20   now.  I'll discuss it with Mr. Shkreli whether we pursue this

21   matter with the government or we just --

22       THE COURT:  Obviously it would be a good idea to pay

23   tax liens because they generally do have a priority, but I

24   understand the government's position of not wanting to become

25   embroiled in some fight over the priority and who gets the

1    money first.

2          MR. BRAFMAN:  It's my understanding again -- and

3    this is out of my realm of expertise, but Mr. Kessler is not a

4    preferred creditor.  Mr. Kessler is a creditor who would stand

5    in line behind the IRS, behind the New York State and maybe

6    one day eventually have the right to apply for reimbursement.

7    I'm also under the impression that there's been communication

8    with Mr. Kessler's counsel and that he would take a position

9    that he is not a secured creditor.

10         I'm not aware of any other judgments that would take

11   precedence and I think the IRS and New York State would make

12   that verification before they agree to accept this money.

13   They have priority anyway.

14         The point is, Judge, he doesn't get any of this

15   money so it's not like we're giving Mr. Shkreli $3 million to

16   play with.  We have a breakdown of where it goes and any extra

17   money that's left would go to defray any legal fees or

18   expenses.

19         THE COURT:  Ms. Smith.

20         MS. SMITH:  Your Honor, just to make clear, in the

21   10-Q it's very clear there were additional legal fees in

22   connection with the short swing civil case that Retrophin was

23   to advance.  Mr. Shkreli owed several million dollars to the

24   company in connection with that case and so on the civil side

25   there was a decision that the company wouldn't advance legal

1    fees and Mr. Shkreli wouldn't pay that debt.  That's all in

2    connection with the short swing case and the civil case in the

3    Southern District of New York.  It's completely separate from

4    the $4.8 million here.  And what I'm hearing from Mr. Brafman

5    is that he was paid $4 million and he's contesting that point

6    eight.  But the matter stands that he has been advanced

7    $4 million in connection with this case.

8              MR. BRAFMAN:  Your Honor, just because we're in a

9    public courtroom and the legal fees is not something I

10   generally prefer to discuss, I have most of my firm working

11   around the clock on this case.  I have people who are going to

12   be living in hotels close to the courthouse because they can't

13   travel here from New Jersey to be here on time given the state

14   of mass transit or New Jersey PATH.  We are spending

15   literally, out of pocket, hundreds of thousands of dollars

16   before this trial is over given the experts that we've had to

17   confer with.  So it sounds like a lot of money until you start

18   looking at the number of hours that are consuming everyone's

19   life.

20             Thank you, Judge.

21             THE COURT:  All right.  Well, this is what I'm going

22   to suggest, Counsel.  Mr. Brafman, since you've promised

23   several declarations and documentation that you provide it to

24   the government and hopefully we can come to some sort of

25   agreement.

1          I am a little concerned that there are a number of

2    folks who are owed money and if there are funds or individuals

3    who are not on this list of suggested recipients, it would be

4    unfair to for me to order that they get paid ahead of others.

5    Certainly the legal fees should be paid.  I don't know what

6    the numbers are, I'm not asking you necessarily to tell me

7    here and now, but I do think that the only recognizable

8    priorities I've seen here are the state and federal tax liens

9    and if there's a judgment lien then maybe that has some level

10   of priority, but these others I'm not sure what the true

11   numbers are and whether there are other assets that could be

12   used to satisfy some of these outstanding debts.

13          It appears that there's not a very clear

14   understanding of the basis for the statement that the Turing

15   assets are illiquid.  I don't -- perhaps a statement from

16   Turing or some explanation would be helpful in that regard,

17   but I think I would be reluctant to release $3 million just

18   based on some of these unknowns.

19          I would say I respect, Mr. Brafman, your expertise

20   and your position as counsel for Mr. Shkreli in advising him

21   not to complete the financial statement, but many defendants

22   do when they want to release assets or to come to some

23   understanding with the government and so at some point, I mean

24   this financial statement may become necessary, but it's really

25   up to you and your client as to how you want to proceed.

1          MR. BRAFMAN:  Yes, Your Honor.

2          THE COURT:  Let me just make sure we don't have

3     anything else besides the bail modification.

4          I think that I will want to hear more argument on

5     this reliance of counsel defense and the other issues in the

6     motions in limine.  I do have time set aside tomorrow at

7     10:00 o'clock a.m. for a hearing if we go down that road.  I

8     know that, Mr. Brafman, in the past you've said that having

9     such a hearing so far in advance of trial would be

10    disadvantageous, I have rescheduled everything tomorrow to

11    make time starting at 10:00 o'clock a.m. for a hearing if we

12    need to proceed in that direction.

13         MR. BRAFMAN:  I don't think we will need to.  I

14    think we have notified the government, and if not we'll notify

15    them now and Your Honor, with respect to Counts One through

16    Six, the only counts in which this issue is questionable, we

17    have conceded that Mr. Shkreli will not argue or seek reliance

18    on counsel charge with respect to Counts One through Six.  I

19    do believe we told the government this in the last day or two

20    but it's something that we have discussed and Mr. Shkreli

21    agrees and we will not be seeking reliance on counsel defense

22    with respect to Counts One to Six.  I think the government has

23    conceded, I won't put words in their mouth, that we have a

24    right to argue reliance on counsel with respect to Count

25    Seven, which is the Retrophin count and Count Eight which is

1    the Fearnow count and whether or not you ultimately give that

2    charge is something I think Your Honor needs to decide until

3    after you hear that testimony.

4          I will say that with respect to Counts One through

5    Six, we will not be arguing that Mr. Shkreli relied on the

6    advice of any lawyer with respect to those counts.  There is

7    interaction with Mr. Greebel that will come into the case

8    because there are conversations he has with MSMB investors and

9    consultants and prepared settlement agreements, but we're not

10   going to be taking the position that the reliance on counsel

11   with respect to those counts.  I don't think a hearing is

12   necessary.

13         THE COURT:  All right, well, I am happy to hear

14   you're trying hard to resolve issues between yourselves.  I

15   guess in that regard, and this may be part of the argument,

16   maybe I should just go more methodically through the various

17   motions.

18         There was some issue you might be calling

19   Mr. Greebel.

20         MR. BRAFMAN:  We're not going to be calling

21   Mr. Greebel.

22         THE COURT:  All right, thank you.  So should we

23   address first then your motions in limine, Mr. Brafman.  I

24   understand that you had and have continued to try to narrow

25   some of the statements --

1          MR. BRAFMAN:  Yes.

2          THE COURT:  -- that you were in disagreement over.

3  If you could start with those that were still issues I'd

4  appreciate it.

5          I think you had objected -- I'm looking at your

6  May 31st letter to certain statements set forth in the second

7  paragraph under the heading "Overview."

8          MR. AGNIFILO:  I'm going to handle this motion.

9          THE COURT:  I'm sorry, that's fine.

10          MR. AGNIFILO:  Thank you, Judge.  What we've done,

11  we've spoke with the government on Friday and reached some

12  agreement as to some of the statements, then quite frankly I

13  went back over the weekend and I can even --

14          THE COURT:  Will you then just tell me which ones

15  are still in issue?  Again, I'm referring to paragraph 2 of

16  your May 31st letter under the heading "Overview."

17          MR. AGNIFILO:  Yes.

18          THE COURT:  Which --

19          MR. AGNIFILO:  So one through eight we agree.

20          THE COURT:  One through eight.

21          MS. SMITH:  Your Honor, we filed a chart on

22  June 15th that laid out all of the statements and kind of

23  where we were on each one.  It's color coded.

24          THE COURT:  Okay.  Thank you.

25          MR. AGNIFILO:  That's the easiest way to go through

1    it.

2              THE COURT:  That's the most recent iteration of

3    where you are currently?

4              MR. AGNIFILO:  I've even endeavored to be better

5    than that over the weekend, Judge.

6              THE COURT:  All right.  I'm ready.

7              MR. AGNIFILO:  So one through eight we have

8    agreement.  There is nothing for the Court to decide.

9              Nine and 10 they are 106 issues.  We agree that the

10   statement is generally admissible but in regard to each of

11   them -- and what we've done, Judge, I don't know if this is in

12   front of you, we have -- we attached, I'm sorry to say, a

13   39-page chart to I believe our initial.

14             THE COURT:  The May 31st letter?

15             MR. AGNIFILO:  I think so.  Look at the exhibit, I

16   think it will be --

17             THE COURT:  You want Exhibit 2 where you set forth

18   the additional information.

19             MR. AGNIFILO:  That's it.

20             THE COURT:  So number nine, statement number nine.

21             MR. AGNIFILO:  Right.

22             THE COURT:  This is his statement in the Merrill

23   Lynch.

24             MR. AGNIFILO:  That's correct.  So if Your Honor

25   prefers we can go statement by statement, the ones we object

1    to.

2              THE COURT:  To the extent there is still an issue,

3    so all the red items are still in dispute.

4              MS. SMITH:  That's right.

5              MR. AGNIFILO:  Yes.  Let me make it easier right off

6    the bat just so we see what's still in dispute.  I am

7    withdrawing the 106 objection to statements 26 through 30.

8              THE COURT:  Twenty-six through 30.

9              MR. AGNIFILO:  Yes.  They all relate to a personal

10   loan so they all related to the same subject and rather than

11   seek to add the 106 material that I wanted to add, we're going

12   to accept the government's statements as they initially

13   proposed them.

14             THE COURT:  Great.

15             MR. AGNIFILO:  Then with regard to 34, the same

16   thing.  I initially lodged a 106 objection to add material and

17   I'm withdrawing the 106 objection.  So 34 is fine the way the

18   government wanted it.

19             THE COURT:  So shall we start with number nine.

20             MR. AGNIFILO:  That's fine, Judge.  So number nine

21   we agree the statement is admissible but our contention is

22   that the portion of the statement that the government wants to

23   put in evidence is really only part of the answer.  The full

24   answer really continues, and now I'm looking at our chart that

25   we attached to our letter that goes from page 2 onto page 3.

1    Because he's basically being asked did Rothstein Kass do work

2    for MSMB and he says, well, how do you define work?  Then he

3    goes on to explain -- and this is what we get to on page 3 --

4    is that Rothstein provided tax services to MSMB Consumer LP.

5          And so our contention, from a 106 perspective, is

6    that the portion that the government wanted to elicit is

7    really only part of his answer and so by keeping out what we

8    have on page 2 and on the top of page 3 really takes his whole

9    answer, which is we contend this is his whole answer --

10         THE COURT:  This is my question though.  It appears

11   this MSMB Consumer LP is a completely separate entity and the

12   work that Rothstein Kass provided was more recent, it was only

13   really in April of 2012 after the period at issue here.  So I

14   think what we're focusing on is the period where -- set forth

15   in the indictment involving MSMB Capital and MSMB Healthcare.

16   This other entity is a separate entity, it's a hedge fund and

17   a limited partnership and it's a more recent consultation.  So

18   that was why I was wondering why it would be relevant to the

19   charges.

20         MR. AGNIFILO:  Well, I guess part of what I'm

21   concerned about is to the extent if you just look at what the

22   government wants in this and not the rest of his answer, the

23   conclusion can be reached that there was no connection between

24   MSMB.  And I think part of the problem we have, Judge, this

25   bleeds into other issues is the interrelationship between the

1    MSMB entities.  So my concern is that if we only put in the

2    government's portion of it they might say, well, there was no

3    connection between MSMB and Rothstein Kass where that's not

4    really an accurate answer.

5         THE COURT:  But this question in the Merrill Lynch

6    exchange is focused on the private offering memorandum for

7    MSMB Capital Management LP and it's really a different time, a

8    different entity and a different subject than what is being

9    discussed in this additional information that you wish to add.

10   That's why I'm just not sure whether adding that would A, one

11   be relevant, B, would confuse the jury because it's about a

12   different entity and a different time and it goes to a

13   different issue, which is not the private offering memorandum.

14        MR. AGNIFILO:  Right.  I think what you're going to

15   see is -- I think this is borne out in some of the statements

16   that are going to come out in the evidence, is that Rothstein

17   Kass and NAV, the consulting services, he has a relationship

18   with them, but at the end of the day they end up being hired,

19   you're right, a little bit later on.  My concern is by taking

20   it out of context it makes it, in effect, clearer but

21   misleading because there is a relationship between the MSMB

22   entities and Shkreli and Biestek with these other entities

23   that I don't think is reflected as accurately if we take only

24   the government's portion.  Everything Your Honor said is

25   absolutely right, but I don't think that's the whole answer.

1   Because there are different MSMB entities and MSMB Capital is

2   having discussions with Rothstein Kass and NAV, N-A-V, and I

3   think that's what the rest of the answer gets at.

4              So that's our application.

5              THE COURT:  Okay.  Number 10.

6              MR. AGNIFILO:  Yes.  Number 10 we viewed numbers 10,

7   20, and 21 as essentially being related and they all have to

8   do with the NAV consulting and the same issue of Rothstein

9   Kass.  And what we proposed in our chart, it's a little

10  confusing because we brought the three of them together, but I

11  can make it a little easier.

12             THE COURT:  It's 10, 20 and 21.

13             MR. AGNIFILO:  Yes, 10, 20 and 21 really relate to

14  the same subject matter and on our chart on page 9 -- I'll

15  wait for Your Honor to get there.

16             THE COURT:  Yes, I'm okay.

17             MR. AGNIFILO:  Initially we started what we wanted

18  our fuller answer to be on page 7 in the middle.  I don't

19  think -- I don't want make it longer than it has to be, so I'm

20  willing to take everything on page 7 out and I'm willing to

21  take everything on page 8 out.

22             THE COURT:  This is item 21 --

23             MR. AGNIFILO:  Yes.

24             THE COURT:  -- so you'll take out seven.

25             MR. AGNIFILO:  And eight.

1          THE COURT:  I'm sorry, statement 21 on page 7 and

2  page 8.

3          MR. AGNIFILO:  Yes, that comes out.

4          THE COURT:  Okay.

5          MR. AGNIFILO:  So we start on the top of page 9,

6  it's actually the fifth line down, Rothstein sent us an

7  engagement letter.

8          THE COURT:  Starting with?

9          MR. AGNIFILO:  So it's the third line of his answer.

10          THE COURT:  Yes.

11          MR. AGNIFILO:  Rothstein sent us an engagement

12  letter.  So we would go down the rest of page 9, because we

13  think that's responsive to the questions that the government

14  wanted.

15          Now I don't think, quite frankly -- I think page 10

16  can come out in total.  I think our proposed answer would end

17  at the end of page 9.  I think the pages 10, 11 and 12 can

18  come out just because I think it's unnecessary.

19          Now I'm looking on page 13 --

20          THE COURT:  Okay.

21          MR. AGNIFILO:  -- I would say two-thirds of the way

22  down Your Honor might see it says, "We did end up using NAV."

23          THE COURT:  Yes, so everything above that comes out?

24          MR. AGNIFILO:  Yes, except for what we just went

25  through on page 9.  It goes right from page 9 to page 13 where

1   it says, we did end up using NAV, then it goes to the end of

2   that page.

3          Then our contention is that 14 and 15, those

4   sections, are relevant as well.

5          THE COURT:  I'm sorry --

6          MR. AGNIFILO:  I know it's hard to follow.

7          THE COURT:  -- what did you say?

8          MR. AGNIFILO:  So we're on page 13, we did end up

9   using NAV.

10         THE COURT:  Yes.

11         MR. AGNIFILO:  We finished all the way to the bottom

12  of page 13 --

13         THE COURT:  Right.

14         MR. AGNIFILO:  -- all of page 14.

15         THE COURT:  Do you want to take that out?

16         MR. AGNIFILO:  No, it's all in.

17         THE COURT:  Fourteen and 15 stay in.

18         MR. AGNIFILO:  Yes, that's right.

19         THE COURT:  Got it.

20         MR. AGNIFILO:  Our contention basically is that the

21  whole situation with NAV and Rothstein really isn't captured

22  by the three segments that the government wants.  That this is

23  his full answer, it's all on the same topic area.

24         THE COURT:  Well, are you saying, then, that the

25  statements on these additional pages that you do want to leave

1    in relate to the use of NAV for MSMB Capital Management?

2                MR. AGNIFILO:  Yes.  Yes.

3                THE COURT:  For the time frame that is at issue

4    here?

5                MR. AGNIFILO:  It is.  Yes, I mean it is -- the

6    problem with the whole state of play here is they're talking

7    with NAV and they're talking with Rothstein and they're

8    seriously thinking about hiring them and both of those

9    entities send engagement letters to MSMB Capital.

10               THE COURT:  But the bottom line is Mr. Shkreli

11   testified he never used them for an entity for MSMB Capital

12   Management.  They have not performed any services for MSMB

13   Capital Management, that's at statement number 10.  So the

14   fact that they might have been talking or thinking about it or

15   discussing engagement letters is less relevant than the fact

16   that he didn't use them.

17               MR. AGNIFILO:  Right, but I don't think that's the

18   only relevant fact.  I think you're right in terms of the line

19   in the sand that Your Honor has drawn it's --

20               THE COURT:  Well, I'm not drawing lines, I'm looking

21   at what the question and the answer is and whether the answer

22   responds to the question, which it appears to do.  These other

23   statements are talking about things that might have been

24   discussed but never really occurred in terms of the provision

25   of services by NAV to MSMB.

1       MR. AGNIFILO:  The relevance, looking at it from a

2  different angle, could be this:  If I'm asked a question about

3  something that I've done and I give an answer, it might be one

4  state of reality if I never did it and I never had any

5  intention to do it.  If I'm making plans to do it, the quality

6  of that statement is different and so I think what the full

7  reality is from what these additional statements show is that

8  there are meaningful steps being made to retain both of these

9  companies.  That they were not retained ultimately by MSMB

10  Capital is certainly a relevant fact and a fact that the

11  government is going to make a point of I expect.  However, I

12  think we have the right to make a point of the fact that he

13  didn't just pull NAV and Rothstein out of thin air.  He was

14  having discussions with them and with an eye toward a business

15  relationship and so that's relevant.  There's something in

16  here for everyone.  The government is going to say, well, it

17  wasn't final, we're going to say but, yeah, he was talking to

18  them.  And that latter part of that is reflected in this part

19  of his answer.

20       THE COURT:  I think what the question was targeting,

21  if I read it correctly, was did you ever use their services.

22  Despite all of the dancing around and the engagements and the

23  attempts to actually have an agreement where they would

24  provide services, it doesn't matter if they never provided

25  services, which is what your client stated under oath, which

1   is no, NAV did not provide services to MSMB Capital, right?

2   So everything that surrounded that fact I'm not really sure

3   why it's relevant, but I will certainly --

4             MR. AGNIFILO:  That's fine.

5             THE COURT:  -- consider what you've told me.

6             MR. AGNIFILO:  Very good, Judge.

7             THE COURT:  Thank you.  What else?

8             MS. SMITH:  Your Honor, I don't know if you want us

9   to respond to each statement or --

10             THE COURT:  Maybe that would be more efficient.  Do

11   you want to be heard?

12             MS. SMITH:  I think for both 9, 10, 20 and 21, again

13   the standard isn't relevance.  We put in the law about the

14   government gets to put in the defendant's statements because

15   they are a party opponent.  The defendant doesn't get to put

16   in his own statements --

17             THE COURT:  Because it's hearsay.

18             MS. SMITH:  You don't get a chance to put in

19   self-serving, exculpatory explanations, after-the-fact

20   explanations.  We absolutely understand that Mr. Shkreli is

21   going to say oh, well, I never -- I represented to all my

22   investors I had NAV and I had Rothstein and, yeah, I never

23   hired them, they never did any work for MSMB Capital, but I

24   was thinking about hiring them.  That's going to be his

25   defense.  That defense he can put in if he takes the stand or

1   if they have another witness to do it, but they don't get to

2   highjack the government's statements to do that.  And the

3   questions and answers we have put in are completely on their

4   face, you know, under Rule 106.  And as you said, did this

5   company provide services, no, it did not.

6        We kept it kind of very tight and trying to add all

7   of this additional explanations from the defendant is not what

8   Rule 106 is for.  I think that's the same kind of issue with

9   all four of those statements.

10       THE COURT:  All right.  Do you want to go on to, is

11  it number 18, sir?

12       MR. AGNIFILO:  Yes, Judge.  So number 18 the

13  government wants -- the question is we're referring to

14  Mr. Austin's investments, Mr. Shkreli, did you ever have

15  trading discretion over any of his money?  And his answer was,

16  no, not specifically, no.

17       Now when someone says, no, not specifically, it's

18  not no.  It's no with a condition or it's no with a but.  And

19  I think we get to put in the additional information, which is

20  the information we set forth.  Because what he does is he goes

21  on for an explanation as to what the relationship is between

22  him and Josiah Austin in regard to Josiah Austin's

23  investments.  I think the statement that the government is

24  looking to put in his answer no, not specifically, no, leaves

25  out more than it puts in.  Because if the answer is no, he

1    would have said no.  But he didn't say no.  He said, no, not

2    specifically, no.

3         THE COURT:  Why is the nature of his relationship

4    from the age 17 or 18 and the fact that this individual's

5    purported to be one of the richest men in the world, why is

6    that completing anything with regard to the response

7    Mr. Shkreli gave just a few lines up?

8         MR. AGNIFILO:  He says -- I'm looking at our chart

9    maybe three-quarters of the way down.

10        THE COURT:  The question is, though, trading

11   discretion over this gentleman's money --

12        MR. AGNIFILO:  Right.

13        THE COURT:  -- not whether they had a good

14   relationship --

15        MR. AGNIFILO:  No, no, no, here he said he executed

16   those trades, fully his discretion, but he never heard of

17   Chelsea Therapeutics until I had mentioned it to him.  And

18   after buying eight or 9 million shares of Chelsea Therapeutics

19   he became far and away the largest holder.  So that's

20   absolutely explanatory.  And that's a fact that I don't think

21   is terribly in dispute, but it's an explanatory fact.

22        So when Martin Shkreli said, no, not specifically

23   no, the not specifically no part is precisely that statement.

24   And he's giving an example of the nature of the relationship

25   that he had with Mr. Austin.  That I think under one -- 106 I

1    agree with the government it's not a standard of relevance,

2    it's a standard of taking things out of context and it's a

3    standard of putting other aspects of the same statement into

4    evidence at the same time.

5            THE COURT:  Right, but the reason I used the word

6    relevance is because the idea of 106 is that it completes or

7    relates to or makes clear the statement that's being offered.

8    And so if it's a completely different time, place or entity,

9    or something that's not responsive to the question and

10   response that's being given, I think we have an issue that's

11   not really related or necessary to complete the full picture.

12           MR. AGNIFILO:  I agree with Your Honor's assessment

13   entirely, however --

14           THE COURT:  So if the question is, did you have

15   trading discretion over Mr. Austin's money and it's no, not

16   specifically, no, why is the nature and length of the

17   relationship and the fact that he's making suggestions,

18   although not having trading authority over his money,

19   necessary to complete the picture?

20           MR. AGNIFILO:  Because no, not specifically, no, is

21   not a complete answer.  And he goes on to say, I'd like to

22   characterize it further if you let me.  Because no, not

23   specifically, no, is he obviously has something else in the

24   answer that he wants to say that is the answer to that very

25   question.  And he goes --

1        THE COURT:  What he's saying, sir -- I am sorry, I

2   am interrupting you, I apologize.  Basically what he's saying

3   is he trusted me, I gave him good advice, he followed my

4   advice and he became a large shareholder of Chelsea

5   Therapeutics.  But that is not really part of the question

6   which was whether Mr. Shkreli had trading authority or

7   discretion over his money.  He just gave him suggestions.

8   There is a big difference.

9        MR. AGNIFILO:  It might not be part of the question

10  but it's part of the answer, it's absolutely part of the

11  answer.  Because he's not comfortable with his own answer.

12  No, not specifically, no.  Then he says, I want to

13  characterize it further.  That's his answer.  They asked the

14  question.  The question doesn't admit to an easy answer and

15  Mr. Shkreli is providing the answer and this part that we have

16  here is his answer and he's giving an example to answer the

17  question.  And that's what he's trying to do.  I think the

18  government -- and 106 is so that statements don't come in

19  unfairly, take things out of context.  That's exactly what

20  they're trying to do here.  They don't want his full answer.

21  It's not a self-serving answer, it's an answer to the

22  question.  He's asked the question, he gives an answer.  They

23  want him to say no, not specifically, no, and pretend that's

24  it, that it ends there, but we all know it doesn't end there

25  because we know what he goes on to say.  And he goes on to

1  give a very detailed assessment, giving an example of what he

2  does for Josiah Austin and putting him in Chelsea

3  Therapeutics, which is a full answer to that question.

4          THE COURT:  I just have other problems with the

5  statement that you want to offer.  I don't think that anyone

6  can testify that what is in the minds or the understanding of

7  Wall Street generally or Chelsea specifically.  He says it's

8  widely understood both on Wall Street as well as at Chelsea

9  for a long time that that investment was my idea, was Joe's

10  money to be certain.  He's making a declarative statement

11  about what is in someone's else mind and not even someone

12  else, just Wall Street in general.

13          So maybe I would consider this if you were willing

14  to redact a lot of what is just really not admissible.

15          MR. AGNIFILO:  I could do that.

16          THE COURT:  Let me hear from the government.

17          MS. SMITH:  Your Honor, again as you pointed out,

18  the question is whether he had trading discretion over Josiah

19  Austin's money.  The answer is no.  The answer has always been

20  no.  We will have Mr. Austin as a witness.  The defense is

21  more than welcome to cross the witness on what the other

22  relationship may or may not have been within the balance of

23  relevance.  But the question is whether there is trading

24  discretion and the reason that's important is because

25  Mr. Shkreli tried to count Mr. Austin's money as part of the

1   AUM for MSMB Capital, which he was not permitted to do.  He

2   did not have discretion over that money.

3           That is the question and the answer.  The rest of

4   the answer, which I know Mr. Shkreli desperately wants to get

5   into evidence is again, a self-serving, rambling explanation

6   of this relationship which is somehow supposed to create out

7   of thin air the ability for him to count Mr. Austin's money as

8   part of the AUM.  And that is why that question and answer is

9   complete on its face and the rest of it is self-serving,

10  exculpatory and not responsive to the question.

11          MR. AGNIFILO:  Your Honor, that response makes my

12  point.  His answer isn't no.  If his answer was no, we'd be

13  done.  He says, no, not specifically, which means there is

14  some other thing that he wants to say to answer the question

15  he was asked.  So I understand Your Honor's concern.  What I

16  think is the most important part of this is he says -- and I'm

17  looking at my block paragraph here, I'm going about two-thirds

18  of the way down.  He executed those trades, fully in his

19  discretion, but he had never heard of Chelsea Therapeutics.

20  That's true.  We can contend it's true.  Until I mentioned it

21  to him.

22          So this part, this part here toward the end, I think

23  doesn't get into some of the concerns that Your Honor has.  I

24  think it's Mr. Shkreli's way of answering the question.  They

25  don't think -- if they want to withdraw this as a statement

1    and they don't want to get into any of it, they can do that,

2    then I don't have a 106 objection.  But they can't do it

3    halfway.  I shot the sheriff but I didn't shoot the deputy,

4    one statement, you know, they don't get to break it up.

5              THE COURT:  What's wrong with the suggestion by the

6    government that you ask Mr. Austin when he testifies whether

7    he followed Mr. Shkreli's advice, whether he ever heard of

8    Chelsea before Mr. Shkreli told him about it, and whether he

9    then, based on Mr. Shkreli's advice, bought the shares?

10             MR. AGNIFILO:  Then they should withdraw the

11   statement.  If they want the statement, they can't do it this

12   way.

13             THE COURT:  Well, because the statement is addressed

14   to whether Mr. Shkreli had authority to trade Mr. Austin's

15   money.

16             MS. SMITH:  And it is his statement that he didn't.

17   I will note that there is an intervening question.  So the

18   question we're referring to investments, did you ever have

19   trading authority?  No, specifically, no.  There is then

20   another question, separate question by the questioner and then

21   a separate answer which they are try trying to append.  And as

22   I put it in my brief, the original 106 also included part of

23   the question before but not the back and forth in the question

24   before.  It's really just a way of trying to shoehorn this

25   information into this answer.

1           THE COURT:  All right.  Anything else, Mr. Agnifilo?

2           MR. AGNIFILO:  I've said everything I have to say on

3    this particular statement.

4           THE COURT:  Do you want to move on to number 19

5    then?

6           MR. AGNIFILO:  Yes.

7           Number 19, I initially had a proposal for a 106

8    addition, I'm going to withdraw it.

9           THE COURT:  Withdrawn?

10          MR. AGNIFILO:  Yes.

11          THE COURT:  What about 20, sir?

12          MR. AGNIFILO:  Yes.

13          MS. SMITH:  I think 20 and 21 were --

14          MR. AGNIFILO:  We dealt with 20 and 21 with the

15   other one.

16          MS. SMITH:  With 10.

17          THE COURT:  Okay.

18          MR. AGNIFILO:  We're on 22.

19          THE COURT:  Yes.

20          MR. AGNIFILO:  For 22, Judge, they want to put in --

21   they were my attempt to keep the investors apprised of their

22   account values and my contention with 22 is similar to my

23   contention with the last one, is that he then goes on to say

24   what he attempted to do.  He says it was my attempt to keep

25   investors apprised of their account values and then the part

1  we want to add is he goes on to say how, essentially, he did

2  the accounting.  Which, again, I think is his part and parcel

3  of that initial answer and whether it's self-serving or not is

4  not the standard.  It is whether a statement is being taken

5  out of its context and 106 is really, I submit, a fairly

6  liberal rule.  It talks about fairness, it talks about

7  statements that in fairness come in when other statements come

8  in.  So in fairness -- and I know the government cited the

9  Judge Rakoff decision from a couple of months ago, Lumiere --

10  you're looking for things that are explanatory, things to

11  avoid the statement being taken out of context, partial

12  statements where it's not the defendant's entire answer, the

13  declarant's entire answer, I think that's what we have here,

14  Judge.

15          THE COURT:  Ms. Smith.

16          MS. SMITH:  Yes, Your Honor, the questions and

17  answers that we're including are just, did you create the

18  performance statements that were sent out to investors and did

19  you do it all by yourself, period.  There is then another

20  question of how were the statements, you know, how did you

21  arrive at the numbers in those statements, then there is a

22  whole explanation, that is a separate question and a separate

23  issue and we are not putting that explanation in.  So I think

24  they are very easily separated.

25          THE COURT:  All right, thank you.

1          Do you want to talk about number 24?

2          MR. AGNIFILO:  I think we skipped number 23.

3          THE COURT:  I'm sorry, you're right.

4          MR. AGNIFILO:  So 23, they are asking him if he

5   spoke to other investors in addition to Darren Blanton in

6   regard to a trading loss that Mr. Shkreli suffered on

7   February 2nd.  And his answer is yes.  He says, yes.  They say

8   who else?  And he then says, I would say all of them.  Then

9   what happens is the questioner takes Mr. Shkreli through phone

10  records that have individual phone numbers that he identifies

11  as the people he spoke to.  So it's clear that he's trying to

12  remember this, he gives his best guess and he says, I would

13  say all of them.  But then to complete the answer, which is

14  really what it is, it's completing the answer is, he's then

15  taken through phone records and he identifies, for instance,

16  the phone number of Ed Sullivan.  He identifies the phone

17  number of Josiah Austin.  He identifies the phone number of

18  Mr. Blanton, and that's all part of the answer.  And to leave

19  it hanging as though that was the end of that issue is

20  misleading and unfair because his answer ends up being backed

21  up by phone records.  I understand they don't want the phone

22  records in, they want to try and cut it where they want to cut

23  it, but that's what 106 is meant to prevent.

24          THE COURT:  Well, is it the phone records you really

25  want because Mr. Shkreli's response is to the extent he

1    recognizes a few of the phone numbers and identifies the

2    individuals with whom those numbers are associated, he doesn't

3    really remember the conversations.  He testifies that he just

4    doesn't recall the conversations.  So is it the phone numbers

5    you want in?

6            MR. AGNIFILO:  Well, it's more --

7            THE COURT:  Because I don't think that necessarily

8    his lack of recollection about what was discussed would be

9    appropriately admissible.

10           MR. AGNIFILO:  Well, I guess my concern is --

11           THE COURT:  It seems to me you are concerned about

12   the phone numbers, you want those in.

13           MR. AGNIFILO:  My concern is that they're leaving

14   the record very unclear and if I'm right it's actually from

15   another -- there's other testimony we make that clear in our

16   chart where he actually goes through the actual phone records

17   so it's not unclear.  I mean -- and he has a recollection

18   about the numbers.

19           Rule 106 is very clear as a rule that you can talk

20   about different parts of the statement in the same statement

21   or in different statements.  It's written into the verbiage of

22   the rule.  So my concern is that the way that they're phrasing

23   the question and answer is going to leave a misimpression.

24   And that there is other related statements that the defendant

25   made that provide a better answer to that question.

1          THE COURT:  It seems to me that all that you are

2     offering, though, is sort of this painstaking parsing through

3     each phone number and Mr. Shkreli either saying he does

4     recognize the number and naming the person or entity with whom

5     that number is associated, or saying he doesn't have a clue,

6     and then when asked about conversations he doesn't recall.  So

7     I think that to the extent that would not necessarily complete

8     anything beyond the initial Q and A, which is who did you

9     speak to to discuss February 2nd losses, and his statement all

10    of them --

11          MR. AGNIFILO:  Okay, that's fine.

12          THE COURT:  -- that's pretty complete.

13          MR. AGNIFILO:  Okay, Judge.

14          THE COURT:  Shall we move on to number 31?

15          MR. AGNIFILO:  Yes, I withdrew 26 through 30.  So

16    for number 31 that's on page 34 of our chart.

17          THE COURT:  Yes, thank you.

18          MR. AGNIFILO:  I believe we start earlier.  That the

19    government's proposed statement is sort of two-thirds of the

20    way down of where we start and my contention is that they take

21    it out of context in essence by not putting in the whole

22    answer.  Because as -- they want to put in, did you read

23    through this private offering memorandum to make sure that it

24    was accurate with respect to MSMB Healthcare?  But this

25    memorandum obviously came from somewhere which is part and

1    parcel of the answer and he's providing that information in

2    the portion of the statement, the additional portion of the

3    statement that we'd like admitted under 106.

4          THE COURT:  All right, Ms. Smith.  If I'm recalling

5    correctly, is this the one that Mr. Shkreli re-purposed?  It

6    had been previously drafted by a lawyer in connection with

7    another.

8          MS. SMITH:  Yes, that's correct.  The additional

9    testimony we said was actually very misleading because the law

10   firm drafted a private placement memorandum for Elea Capital

11   and then Mr. Shkreli took that private placement memorandum

12   and modified it himself with no additional attorney input,

13   first for MSMB Capital and then he took it and modified it

14   again for MSMB Healthcare.  So the statement that we have is

15   basically, you know, did you review the PPM for Healthcare,

16   yes.  Did he draft it by himself, yes.

17         The whole explanation before for the genesis of the

18   document, first of all, we have another statement in that's a

19   detailed statement nine actually talks about how it was

20   drafted for Elea and then he kind of transformed it himself

21   for MSMB Capital.  So that idea is already in there and this

22   particular appendage is actually incredibly misleading because

23   it makes it sound like this law firm drafted it for MSMB

24   Capital, which wasn't in fact the case.

25         MR. AGNIFILO:  But I think the rule doesn't talk

1    about whether it's misleading or not misleading.  It talks

2    about things that are incomplete and I think that this is

3    exactly what this rule is.

4         THE COURT:  But Rule 403 does counsel against

5    admitting information that is going to mislead or confuse the

6    jury.  So even if 106 may arguably allow it, 403 would prevent

7    it from being admitted.

8         MR. AGNIFILO:  It might be a distinction without a

9    difference because -- I just don't want these statements

10   coming in without the overall appropriate context.  And as

11   long as it's clear that Mr. Shkreli got these documents from

12   whether it's Elea or another source and then I think that any

13   conclusions about these is remedied, so it's fine if we don't

14   do it here.  I think it also leads us to the next statement

15   number 32.

16        THE COURT:  All right.  If you look at number nine,

17   sir, it seems to me the Q and A question, how did you go about

18   preparing it?  This is the private offering memorandum for

19   MSMB Capital.  He says, I used the private placement

20   memorandum that was furnished to me by my law firm when I

21   created Elea Capital and then he goes on to describe how he

22   used the Cobb and Eisenberg form and then basically revised it

23   for MSMB.  So it's in there and the government's offering it

24   under --

25        MR. AGNIFILO:  That's fine, Judge.

1          THE COURT:  -- statement nine.  So I think it's

2   addressed.

3          MR. AGNIFILO:  Very good.  Very good.

4          THE COURT:  So I'm sorry, sir, you wanted to move on

5   to number --

6          MR. AGNIFILO:  Yes, 32.

7          THE COURT:  Okay.

8          MR. AGNIFILO:  I think it's the same issue and what

9   the government started on, did you revise this document in

10  order to use it as an offering memorandum.  And I'm looking at

11  the language who drafted this document, and it says it

12  certainly wasn't me, I would think it was Joe Cobb, but I

13  can't really be sure of that.  And my concern with this

14  particular statement is, is for them to say did you revise it,

15  they're essentially eliminating the part where he indicates

16  that where it came from.  I mean to revise something means to

17  have something from another source.  And in the immediate

18  lines of the statement he's saying what that other source was.

19         Now I understand Your Honor's point we dealt with

20  that in number nine, but then there is no harm in addressing

21  it again here, I mean where it's in its proper context.

22         THE COURT:  Well, because the question is who

23  drafted this document suggests this document refers to the

24  MSMB entity rather than the Elea Capital, that's why I think

25  it's misleading and it's just confusing.  It's out of context.

1    I think the statement that Mr. Shkreli made was that he

2    prepared the revisions to the original Elea document that was

3    then used for MSMB Healthcare, and the original Elea document

4    that he revised had been prepared originally by Mr. Cobb.  But

5    the question who drafted this document, first of all, that is

6    out of context, but the suggestion that one would get from

7    reading that would be it's the MSMB document not the Elea

8    Capital document and as we talked about statement number nine

9    addresses the full genesis of that.

10             MR. AGNIFILO:  That's fine, Judge.  As long as it's

11   clear in totality, I'm fine with the statement.

12             THE COURT:  Great.

13             MR. AGNIFILO:  Now 34 we withdrew.

14             THE COURT:  Okay, thank you.

15             We're now at 37, sir.

16             MR. AGNIFILO:  Correct.

17             THE COURT:  I think we might --

18             MR. AGNIFILO:  Thirty-seven I believe there was an

19   objection to relevance.  One second, Judge.  Yes, Judge, 37

20   wasn't a 106 objection, it's an objection to relevance.  My

21   concern with this statement -- the best way to go about it,

22   Judge, is the government submitted a 14-page chart that we

23   then put numbers on --

24             THE COURT:  Yes.

25             MR. AGNIFILO:  -- because we only have 106

1   objections on our chart, but they have all the statements in

2   their chart.

3            THE COURT:  Yes.

4            MR. AGNIFILO:  So on page 13 of their chart is the

5   Rule 37.

6            THE COURT:  Okay, got it.

7            MR. AGNIFILO:  My concern here is, if this were

8   questions and answers here in open court before Your Honor, no

9   one would allow someone to say, I think it probably came from,

10  it might have been written by, it's just not admissible.  I

11  think Your Honor's point that 403 still has a place in a 106

12  analysis, as do the general rules of relevance, he's really

13  not saying anything here.  He doesn't know the answer to the

14  question.  He's asked for the factual content about this

15  Desert Gateway Form 8K, come from you.  And he says I think it

16  probably came from some of my colleagues.  I might have

17  written some of it, but at that point Retrophin was already

18  starting to grow as a company, I certainly could have written

19  it and probably did write it.  Again, if we were in court and

20  such an answer were given there would be an objection and it

21  would probably be sustained.  So I don't think it's any more

22  reliable that it's a statement rather than a question and

23  answer here in open court.

24           MS. SMITH:  Your Honor, I mean we admit statements

25  of the defendant we don't go through the exercise of what

1   would be admissible in court.  There is often language that

2   would be used that's admissible in Court.  This is probably or

3   could have goes to weight and the defense is certainly able to

4   argue that that statement means he's not a hundred percent

5   sure about his answer.  But that's all that it goes to and

6   there's no case law that suggests that you can't put in a

7   defendant's statement unless it passes all the evidentiary

8   rules that it might be applicable if it was in the courtroom.

9   I've certainly heard witnesses say probably to an answer and

10  that be admitted.  Again, it goes to the weight of the answer

11  and the certainty the witness has about the statement, but it

12  doesn't go to admissibility.

13            THE COURT:  All right.  Thank you.

14            (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

```
1              THE COURT:  All right.  Thank you.

2              All right.  So should we move on to statement

3    Number 38?

4              MR. AGNIFILO:  Yes, Your Honor.  I'm going to

5    withdraw 38.

6              THE COURT:  Okay.

7              MR. AGNIFILO:  39, we agreed on.

8              THE COURT:  So we're at 40?

9              MR. AGNIFILO:  Yes.

10             THE COURT:  Relevance?

11             MR. AGNIFILO:  It was -- it was relevance.

12             And it's really -- it's really just the -- just the

13   same objection.  And I don't agree with the Government's

14   contention that 403 has no place in a 106 analysis.  I think

15   it does.  I think Your Honor as the gatekeeper is what

16   Your Honor concludes is -- is reliable evidence.  And my

17   concern is that the statement attributed here that Mr. Shkreli

18   in Number 40 has elements in it that are -- are -- are not

19   allowed in testimony because they're not really reliable

20   because he's talking about what other people might have --

21   might have thought.  And I -- I just -- it just doesn't seem

22   to -- doesn't strike me to as a reliable statement.  And I

23   think that the general rules of reliability and -- and

24   personal knowledge could make a statement more or less

25   reliable, and so we have a relevance objection to Number 40.
```

1            THE COURT:  I mean, it is somewhat vague and it is

2   attributing positions and understandings to others.

3   Mr. Shkreli, obviously, doesn't have personal knowledge about

4   what is in the minds of others; what many people believe,

5   whether they were supportive of him or not.  I think it is a

6   little bit on the margins of whether it should be admitted to

7   the extent he is trying to talk about what might be in the

8   minds of others.

9            MS. SMITH:  The sentence, "Many people believe...",

10  I understand the objection to that sentence.

11           THE COURT:  So would you agree to take that out?

12           MS. SMITH:  Yes.  We can take that sentence out,

13  that's fine.

14           THE COURT:  Would that satisfy you?

15           MR. AGNIFILO:  I'm sorry, Judge?

16           THE COURT:  Would that satisfy you?

17           MR. AGNIFILO:  Yes, Judge, that's fine.

18           THE COURT:  So is it all right as is?

19           MR. AGNIFILO:  It's better.  Yeah, I'm satisfied

20  with that.

21           THE COURT:   Okay.  Thank you.

22           Let's move on.  Number 41?

23           MR. AGNIFILO:  41 I'm going to withdraw.

24           THE COURT:  Okay.  Number 42, sir?

25           MR. AGNIFILO:  42 is a -- well -- oh, I guess 42

David R. Roy, RPR  -  Official Court Reporter

1    depends on -- on Your Honor's ruling of the hearing in regards

2    to admissibility of some of the information concerning

3    Mr. Pierotti.

4              THE COURT:  May I ask the Government, is an agent

5    going to testify about this conversation with Mr. Shkreli?

6              MS. SMITH:  Yes.  To the extent that we put in

7    statements in the proffer, we have an agent who will testify.

8              THE COURT:  Okay.  So this word "threatened," is

9    that a word that the agent used or a word that Mr. Shkreli

10   used?

11             MS. SMITH:  It is -- it is -- I mean, we're going to

12   have to look, but the way it's written down is the way that it

13   was expressed to the agent in the meeting.

14             THE COURT:  All right.  Because my concern is we

15   wouldn't want the agent to characterize Mr. Shkreli's actions

16   or words, but rather if it was Mr. Shkreli saying, I

17   threatened --

18             MS. SMITH:  Yes, and it --

19             THE COURT:  -- that would be one thing.

20             MS. SMITH:  In the -- I believe, and I would have to

21   go back and look in the 302, there's some additional context

22   that makes it clear that that word came from Mr. Shkreli, but

23   we can go back and look at that.

24             THE COURT:  If this was an account by the agent of

25   what Mr. Shkreli said about his conversation with

1    Mr. Pierotti, you would withdraw, correct?

2              MR. AGNIFILO:  If -- yes, if he -- well, no, no.  It

3    depends -- and it solely depends on Your Honor's ruling,

4    because one of the unresolved limine issues is dealing with

5    Mr. Pierotti.  And if Your Honor concludes that such is not

6    coming into evidence, then this would be within that -- a

7    number of Your Honor's rulings.

8              THE COURT:  Right.  But if Mr. Shkreli told the

9    agent, I did -- assuming if I did admit the evidence regarding

10   Mr. Pierotti, if Mr. Shkreli told the agent, I threatened him,

11   you would not have an objection, correct?

12             MR. AGNIFILO:  If you -- if Your Honor lets the

13   Pierotti stuff in and if Mr. Shkreli used the word

14   "threatened," then I don't know that I would have a basis to

15   object.

16             THE COURT:  All right.

17             Do you want to move on, sir?

18             MR. AGNIFILO:  Actually, Judge, I'm going to -- I'm

19   going to withdraw the last three.  I -- I see how Your Honor's

20   analyzing these, and I -- and I -- and I don't think I have a

21   basis to keep these three out.

22             THE COURT:  45 through 47?

23             MR. AGNIFILO:  45, 46, and 47, yes.

24             THE COURT:  Okay.

25             All right.  Well, I do not want you to think that I

David R. Roy, RPR  -  Official Court Reporter

1   have made a general ruling --

2              MR. AGNIFILO:  No, no --

3              THE COURT:   -- because I have not.

4              MR. AGNIFILO:   -- no, I -- I don't.  But I -- but

5   just listening to Your Honor's questioning, and then I don't

6   think I have a basis to keep it out.

7              THE COURT:  Okay.  All right.  Thank you.

8              Now, is there anything I have missed in terms of

9   Mr. Shkreli's motions in limine?

10             MR. BRAFMAN:  Your Honor, there are -- there are a

11  number of issues that we would like some guidance on.

12             THE COURT:  Okay.

13             MR. BRAFMAN:  That I think -- I mean, I'm happy to

14  report that we may be able to shorten this discussion.

15             THE COURT:  All right.

16             MR. BRAFMAN:  It's my understanding from looking at

17  the revised witness list that Mr. Rosenfeld is not on the

18  Government's witness list.  He is the person from whom the

19  arbitration issue arises.  Mr. Rosenfeld was a consultant, got

20  an agreement, sued on it, went to arbitration.  The arbitrator

21  ruled in his favor, and the Government's position is that the

22  ruling by the arbitrator should not come in.  If they don't

23  call Rosenfeld, obviously, we won't refer to it unless we call

24  him as a witness.  And if we call him as a witness before we

25  reach that issue, we'll give the Court a heads-up so that

1    Your Honor can determine how far we can go with Rosenfeld.

2    Because he's a consultant who claimed he did consulting work

3    and justified the payments he received and, indeed, was able

4    to sustain his burden with the arbitrator.

5         And if the reason it still comes in for it is

6    because Steven Aselage is a witness who the Government is

7    calling, and he is the CEO for Retrophin.  He was on the board

8    during the period in question, and then he -- Steven Aselage

9    testified under oath at the arbitration.  So when Steven

10   Aselage is cross-examined, it may be that some of the

11   statements he made under oath at the arbitration are referred

12   to, and I can stay away from, you know, Did the arbitrator

13   believe you or rule in favor of Rosenfeld?  We will not push

14   the envelope.  But I think it's fair game to cross-examine

15   them if he gives inconsistent testimony in connection with

16   this arbitration testimony.

17        So I don't think Your Honor needs to rule on the

18   question of whether the arbitration decision will result --

19   comes in at this time.  We will not open on it.

20        THE COURT:  Okay.  I have not even seen the

21   decision.  So before I were to rule on it, I think I would

22   like to see the decision --

23        MR. BRAFMAN:  Okay.  But all I'm suggesting --

24        THE COURT:  -- because I want to see whether it fits

25   within --

David R. Roy, RPR  -  Official Court Reporter

1          MR. BRAFMAN:  -- it may -- you have enough to do

2     without creating work.  And if we call him as a defense

3     witness, we will alert the Court in advance, give you a copy

4     of the decision, alert the Court that we intend to try to

5     offer the decision of the arbitrator.  Because if we don't,

6     then Your Honor doesn't need to make that ruling.  We will not

7     open on the fact that there was a Rosenfeld arbitration where,

8     what the Government characterizes as a sham consultant

9     agreement, was found by the arbitrator to be a real consulting

10    agreement.

11         THE COURT:  Anything from the Government?

12         MS. KASULIS:  Your Honor, the defense is correct,

13    that we are not calling -- the Government is not calling

14    Mr. Rosenfeld at trial.  We're fine with Mr. Brafman's

15    characterization as to how to proceed.  If Mr. Aselage

16    testified and -- during the cross-examination, if Mr. Brafman

17    goes ahead and limits the way in which he characterizes the

18    arbitration, et cetera, the Government is fine with that.  I

19    think that's entirely appropriate.  So we're in agreement with

20    Defense with respect to that motion in limine.

21         THE COURT:  All right.

22         MS. KASULIS:  And if anything changes throughout the

23    course of the trial, we can obviously revisit the issue.

24         MR. BRAFMAN:  Your Honor --

25         THE COURT:  All right.  Just so I am clear then, you

1  are not going to proffer the arbitration decision?  You will

2  not be talking about them in your opening statement?

3          MR. BRAFMAN:  Correct.

4          MS. KASULIS:  Correct.

5          THE COURT:  And it will only, perhaps, become

6  relevant if during the course of the testimony the arbitration

7  decision is brought up?

8          MR. BRAFMAN:  Well, I'm going a step further in

9  that.  During the cross-examination of Mr. Aselage, I may

10 refer to his testimony at the arbitration so the jury may

11 understand that there was an arbitration.  But I will not

12 reveal what the decision of the arbitrator was, which I think

13 is the only objection the Government has.  The fact that the

14 arbitration comes out is because Mr. Aselage testified at the

15 arbitration.  If we call Rosenfeld as a defense witness, we

16 will alert the Court and the Government and then we can

17 discuss then if it will be appropriate for the jury to know

18 what the arbitrator ruled.

19         MS. KASULIS:  Your Honor, the one request

20 the Government does have is if Mr. Brafman is to refer to the

21 debt alternate proceeding, that to leave the jury with the

22 idea that there was some sort of arbitration and then they

23 don't have any sense of what that was about or what happened

24 or any of those things, I think that it sort of leaves them

25 with the question that we don't need to have them be left

1    with.  That perhaps Mr. Brafman could refer that there was an

2    alternate proceeding or another proceeding that Mr. Aselage

3    testified in and then he can, of course, cross-examine him

4    about that testimony?

5              MR. BRAFMAN:  Your Honor --

6              MS. KASULIS:  That would be the Government's

7    suggestion with respect to that cross-examination.

8              MR. BRAFMAN:  Your Honor, throughout the

9    Government's memo we get to a couple of other points.  What

10   they're trying to do is essentially -- and I hate to use this

11   term -- but suggest alternate facts as opposed to what

12   actually happened.  What actually happened is that Mr. Aselage

13   was cross-examined and testified at an arbitration proceeding.

14   And I think calling it what it is without revealing the

15   outcome is not inappropriate.  That's where he testified.  It

16   wasn't a preliminary hearing.  It wasn't the Government's

17   office.  If he gave us 302, if we have a 302 we identified,

18   you know, where it was that he testified.  I don't want them

19   to think there's another trial somewhere.  I think the fact

20   that it's a civil proceeding, well, I can say that.  I can say

21   it was a civil proceeding so that they don't speculate that

22   there was another criminal trial that nobody knows about.

23             MS. KASULIS:  Your Honor, I think characterizing it

24   as a civil proceeding is acceptable to the Government.

25             THE COURT:  All right.

1          MR. BRAFMAN:  Okay.

2          THE COURT:  Thank you.

3          MR. BRAFMAN:  Your Honor, the Government has asked

4    us -- we -- the Government has asked to be allowed to refer to

5    Mr. Shkreli's experience at Elea Capital.  We originally

6    opposed that idea.  We withdraw our opposition.  We think Elea

7    is relevant, certainly since they list Josiah Austin as one of

8    the first Government witnesses they intend to call.  So we

9    don't have an objection to the Government making reference to

10   Mr. Shkreli's performance at Elea Capital.

11         THE COURT:  All right.

12         MR. BRAFMAN:  We do object, however, on some

13   combative issue.  We do object to any reference to

14   Mr. Shkreli's involvement for RBC Capital.  Unlike Elea, which

15   was used at times in conversations with potential investors,

16   I'm not aware of any reference to RBC by Mr. Shkreli of any

17   investor suggesting that they relied on his work at RBC to

18   invest.

19         In addition, he's only there for several months.

20   There would be a dispute as to the reasons he left.

21   Mr. Shkreli's position is he left because he had made a

22   commitment that if he was down 10 percent, he would leave.  At

23   the time he left, he was down 9 percent.  And I think

24   Mr. Abramson, if he would testify, would testify to matters

25   which are not relevant because his performance at RBC was

1    never cited as a credential.  And Mr. Abramson would testify

2    that Shkreli left because he had violated RBC policy.  And

3    then we would then need to go into an entire discussion as to

4    what the policies are, how they're enforced, how they are

5    applied.  And I think it's -- under 403 it has zero probative

6    value other than the prejudice, because unlike Elea, he never

7    touted his employment at RBC as a -- as a credit, if you will,

8    or a credential that would cause someone to invest who might

9    otherwise not have invested.

10          THE COURT:  Does the Government want to be heard on

11   that or could we agree -- could I have you agree?

12          MS. KASULIS:  Your Honor, the Government would like

13   to be heard just briefly because the Government's response as

14   set forth in its papers is very clear in our discussions with

15   the investors that Mr. Shkreli relied significantly on his

16   prior alleged success in the financial industry in recruiting

17   these investors into the funds.  He starts with his, you know,

18   background at Cramer Berkowitz and then touts his amazing

19   performance record, all the way up until the point that he is

20   recruiting these investors.

21          His failure at RBC Capital in a relativity short

22   period of time, a two-to-three month period of time,

23   Mr. Brafman's correct, he did have a 10 percent limit.  He

24   wasn't at -- they thought he was at 9 percent, and then when

25   they confronted him about the 9 percent limit, he had actually

1    doubled, had gone way over his limit by almost double what he

2    was allowed to trade.  And he hid this fact that he had

3    incurred those losses from RBC.

4    So we believe that this direct evidence, because it is -- is

5    evidence that, obviously, shows that he was making a material

6    misrep to the investors about how successful he, in fact,

7    really was in the finance industry.  And it shows alternately

8    that there was not a mistake made by Mr. Shkreli when he hid

9    his significant losses from the investors throughout the

10   performance of both funds.  So we believe that this is direct

11   evidence, and it goes directly to what the Government must

12   prove as part of this trial, that Mr. Shkreli made material

13   misrepresentations to the investors.  And alternately, we

14   believe that there is a pursuant to Rule 404(b) that this

15   evidence would be admissible.

16            MR. BRAFMAN:  Your Honor, on balance, if you look at

17   a Wall Street trader's performance over a very brief period of

18   time, you know Wall Street provides wild swings for even the

19   best of traders.  So to the extent that you're there for a

20   couple of months and you're down more than you're supposed to

21   be down and you remove yourself from there, I'm not certain

22   that that's something that anyone would either rely on or not

23   rely on because it's for a three-month period of time.  He

24   doesn't use it.  He doesn't use it as he does use Elea and as

25   he does use MSMB.

1          So to the extent that their position is Elea Capital

2   is relevant, we withdrew our -- our argument, and it's going

3   to come in through the testimony of a witness.  There's no

4   witness to my knowledge, unless I've missed something, who

5   says Mr. Shkreli said something about RBC, the good or the

6   bad.  And the problem we have is this is a policy that he

7   violated at RBC, and to the extent that you now got into what

8   is the -- what are the rules of an individual trading firm,

9   it's not as if what he did there was illegal.  He wasn't

10  charged with a crime.  What he did was in violation of company

11  policy, and I think it's probative of nothing and the

12  prejudice is substantially outweighed -- outweighs the limited

13  probative value.

14          THE COURT:  All right.  Thank you.

15          MR. BRAFMAN:  Your Honor, if I may move on to

16  another issue?

17          THE COURT:  Yes.

18          MR. BRAFMAN:  There is an issue with respect to --

19  should I move on, Judge?

20          THE COURT:  Pardon me?

21          MR. BRAFMAN:  May I move on?

22          THE COURT:  Of course.

23          MR. BRAFMAN:  Okay.  There is an issue with respect

24  to the investor who was identified as Mr. Tim Pierotti.

25          THE COURT:  Yes.

1    MR. BRAFMAN:  And here is the issue in a nutshell:

2    The Government will call Mr. Pierotti and in substance what

3    they said in their papers as Mr. Pierotti is one of a group of

4    people who received shares of Retrophin stock in a way that

5    suggests that Mr. Shkreli was trying to control these people

6    in terms of what they could or could not do with the shares.

7    And to the extent that that's relevant to Count 10, the

8    Fearnow count, they can obviously have Mr. Pierotti testify to

9    this.  Mr. Pierotti violated his understanding with

10   Mr. Shkreli.  He ends up quitting the job; never coming back

11   to work, at least at the initial part; and he ends up selling

12   the shares; and Mr. Shkreli is obviously upset.

13       I think the story that they need to tell is that --

14   that this witness who is going to be classified, I guess, as a

15   nominee for the purposes of this discussion had an

16   understanding with Mr. Shkreli that he was going to be given

17   these shares with the understanding that he would not do

18   anything with them, and that Mr. Shkreli was in control of

19   those shares.  That's what they need to establish with respect

20   to the Fearnow shares.

21       Mr. Shkreli is so enraged, if you will, as a result

22   of this Pierotti violating the terms of their understanding,

23   that he loses it at some point.  And if you look at the -- if

24   you look at the Government's memo, he writes a terrible letter

25   to the family.  It's after the fact.  It has nothing to do

1    with the violation of the agreement.  It just shows that

2    Mr. Shkreli is, you know, a little bit unhinged when it comes

3    to that issue, and he does something which is, obviously,

4    inappropriate.  But it has nothing -- no bearing on whether or

5    not there was an understanding.

6            THE COURT:  But isn't he still at the time engaging

7    this behavior attempting to gain control or regain control of

8    the Mr. Pierotti's Fearnow shares?

9            MR. BRAFMAN:  Yes, but he sues them also.  So

10   there's no --

11           THE COURT:  Right.  But --

12           MR. BRAFMAN:  No, but Judge -- Judge -- Judge,

13   attempting to get control back by harassing the family is not

14   relevant to whether or not the original issue was whether

15   Mr. Pierotti was going to -- was going to agree to the terms

16   that Mr. Shkreli has agreed to.  He can testify to this.  If

17   on the cross-examination of Mr. Pierotti we open a door that

18   suggests that there is a reason why the threat should come

19   in -- and I will -- I will tell you that the threats and the

20   misbehaviors are more than a year after the shares are -- are

21   given to him.  And the quote they have from this blog is in

22   2015, which is several years after it where he talks to a

23   reporter and he makes some reference to -- to the -- to

24   Pierotti, and I'm going to have a little bit of the Bobby

25   Shmurda in me.

1          I think that's under 403, simply not appropriate for

2     a -- in a case where the issue is whether or not Mr. Shkreli

3     gave those shares to the Fearnow recipients with the

4     understanding that he was still in control of those shares.

5     Mr. Shkreli makes that absolutely clear initially with the

6     discussion with Mr. Pierotti.  Mr. Pierotti can testify to the

7     original understanding.  And to the extent that on

8     cross-examination we suggest that Mr. Pierotti was a liar, and

9     if they -- this opens the door to these threats, well, maybe

10    then you revisit it.  But to put it on the direct case is just

11    inflammatory, and it, quite frankly, just adds nothing to the

12    proof as Mr. Shkreli's belief that Mr. Pierotti violated the

13    terms of the agreement.  That's clear in the lawsuit that he

14    files against him, and it's going to be clear from the

15    conversation that Mr. Pierotti will testify to about

16    Mr. Shkreli.

17          The rest of this stuff is -- is inappropriate,

18    perhaps, and maybe is -- is regrettable, but I don't think

19    it's relevant on the narrow issue that the Government is

20    trying to prove with respect to the Fearnow shares

21    understanding.

22          THE COURT:  All right.

23          Does the Government want to be heard?

24          MS. KASULIS:  Just briefly, Your Honor.

25    This is in Count 8 that this evidence goes directly to, and it

1    is absolutely direct evidence of Mr. Shkreli's intent to

2    control these shares.  When Mr. Pierotti disobeyed

3    Mr. Shkreli's instruction with respect to the Fearnow shares,

4    it wasn't that he was just upset.  He did things to

5    Mr. Pierotti to try to get control of those shares back, and

6    one of those is a letter that he wrote to Mr. Pierotti's wife,

7    that was not a year later.  That was in January of 2013, right

8    on the heels of Mr. Pierotti selling those shares.  And so it

9    is absolutely part of the story.  It completes the story.  You

10   know, we intend to have Mr. Pierotti elicit testimony about

11   it.  They will certainly have the ability to cross-examine him

12   about it.  But it is absolutely relevant and direct evidence

13   to what the Government needs to prove with respect to the

14   defendant's intent in Count 8; and therefore, we believe it's

15   admissible.

16        MR. BRAFMAN:  Your Honor, if the defendant by my

17   argument is -- as a practical -- as a practical matter telling

18   you, Judge, that the issue with Mr. Pierotti and whether or

19   not Mr. Shkreli was upset with him about violating the terms

20   of the agreement, we may choose not to challenge that part of

21   his testimony, and then you don't get to the threats.  The

22   threats are only important if with respect to -- of Count 8

23   when Mr. Pierotti testifies.  We suggest that this wasn't the

24   understanding by Mr. Shkreli.

25        At the end of the day, given the rest of this case,

1    I think what you're doing is you're throwing a hand grenade

2    into what is otherwise a white-collar criminal case where

3    there are very, I think, appropriate legal defenses to certain

4    counts and various esoteric defenses as to other counts.  But

5    at --

6              THE COURT:  But it's gutting on material -- I mean,

7    it seems to me that you're asking me to preclude

8    the Government from offering evidence that is directly

9    relevant to their proof that Mr. Shkreli was motivated by the

10   desire to control those shares?

11             MR. BRAFMAN:  Correct.

12             THE COURT:  And that he wanted to control those

13   shares, and in order to maintain control or regain control,

14   and this is evidence of the act.

15             MR. BRAFMAN:  Sending a letter to the defendant's

16   wife saying your husband stole from me and we're going to

17   render you homeless, I don't think you need to go there in a

18   case where the witness is going to testify to the

19   understanding.  The understanding is whether or not these are

20   shares that Mr. Shkreli intended to control.  To the extent

21   that we may not challenge that testimony, I'm not certain you

22   need to inflame the passions of the jury with respect to that

23   count.  So I ask you to let them not open on it.  Let them not

24   put it in the direct of Mr. Pierotti and -- and see where we

25   go on cross.  And if we look -- get that door slammed in our

1     face, obviously, you can make a ruling at that time.

2           MS. KASULIS:  Your Honor, with respect to this

3     issue, the Government does cite to Old Chief that the

4     Government --

5           MR. BRAFMAN:  I'm sorry?

6           THE COURT:  Old Chief.

7           MS. KASULIS:  Old Chief, the case that, of course,

8     allows the Government to put in evidence of what, in fact,

9     transpired.

10           And just because, you know, maybe Mr. Shkreli would

11    like to take these statements back, he said them and he said

12    things that are directly relevant to his intent to

13    Mr. Pierotti's wife.  He stated, Your husband has stolen

14    $1.6 million from me and I will get it back.  I will go to any

15    lengths necessary to get it back.  And that is directly in

16    reference to the shares that we have charged under the subject

17    of Count 8.  And while perhaps Mr. Shkreli, you know, believes

18    that this is prejudicial, it is not unduly prejudicial, it is

19    not unfairly prejudicial, it is what he, in fact, said to

20    Mr. Pierotti in response to Mr. Pierotti's action.  And that's

21    why the Government believes that it should be admissible and

22    that Mr. Pierotti should be allowed to testify about it.

23           THE COURT:  All right.

24           MR. BRAFMAN:  Should we move on, Your Honor?

25           THE COURT:  Yes.

1          MR. BRAFMAN:   Okay.   Your Honor, I hope -- I hope

2    the Government has listened carefully to the things that they

3    just said because they have tried in their brief, on the other

4    hand to preclude us from putting in good things about

5    Mr. Pierotti.  And I think whether he testifies or not is a

6    decision we will make later on.  And if he testifies,

7    obviously, it's different.  But I alert the Court to the fact

8    that I want to make certain that we're not violating your

9    ruling.

10   That, for example, with respect to Mr. Blanton's testimony,

11   there is a lot of conversation with Mr. Blanton at the time he

12   becomes an investor about Mr. Shkreli's moving efforts on

13   behalf of a young child who was a friend of Mr. Blanton, Josh

14   Fraise, who is suffering from a debilitating childhood illness

15   that Mr. Shkreli ultimately uses as the impetus to form

16   Retrophin to try and find cures for these diseases.  So to the

17   extent that that's all part of the narrative, I believe that

18   we're going to be able to question Mr. Blanton about the phone

19   conversations he had with Mr. Shkreli that caused, not only

20   Mr. Blanton to invest in Retrophin, but when he was alerted

21   the day of the failed Orex trade, counseled Mr. Shkreli that

22   Jesus was going to save him and he should work under

23   Retrophin.  So I think at the end of the day, they take the

24   good with the bad.  If they want to put in the bad with

25   respect to the Retrophin conversation with Pierotti, I just

1    looked at their brief and they said we should not be able to

2    put in, you know, the evidence of good things that Mr. Shkreli

3    has done.

4           I understand we're not -- we're not putting in his

5    prior history unless he takes the stand.  I understand that.

6    But -- but to the extent that these are all part of the

7    conversations with respect to the investors, I'm assuming that

8    the Government was not seeking to preclude us from using that

9    information.

10          THE COURT:  Do you mean you are claiming that this

11   particular drug and its affect on this child was a key or

12   material fact in inducing at least one investor?

13          MR. BRAFMAN:  A key investor, Mr. Darren Blanton,

14   has confirmed that in his statements to the FBI that the

15   Fraise family was introduced to Mr. Shkreli.  Mr. Shkreli

16   developed a strong relationship with their son who was dying,

17   who did die, and the attachment caused Mr. Shkreli to devote

18   an incredible amount of effort and time to creating Retrophin

19   for the purpose of developing orphan drugs among the orphan

20   drug -- drugs that could possibly be secured for this type of

21   disease.  And that, I think, is not in dispute.  I think

22   Mr. Blanton will acknowledge it.

23          THE COURT:  All right.  Well, you know, I guess my

24   question is:  You want this to be admitted because you want to

25   show why people would be inclined to invest with your client,

1   Mr. Shkreli?

2           MR. BRAFMAN:  It -- it's not enough for the

3   Government to say that I represented -- misrepresented my

4   background as an investor; and therefore, someone like Darren

5   Blanton, who runs $175 million -- $100 million fund, and is a

6   very wealthy man, gave him a lot of money.  Gave him a lot of

7   money, and I think people will find -- he will acknowledge

8   that he had faith in Martin Shkreli, the boy genius, not

9   necessarily just because of what he said.

10  Now, when Mr. Blanton changes his tune later on in some of his

11  later 302's, we can visit that on cross-examination.  But I

12  believe that if you are investing with someone because you

13  believe that this person has a great potential, and, in fact,

14  you're then made not only whole -- and we'll cover that in a

15  moment -- but you get four times your investment when

16  Retrophin becomes public.  This is a man who believes in

17  Martin Shkreli as a scientist, not just as an investment

18  advisor.

19          THE COURT:  All right.

20          All right.  Does the Government want to be heard?

21          MR. SRINIVASAN:  Yes, just briefly, Your Honor.

22          It looks like we have resolved most of the issues in

23  connection with this motion.  I think our concern was that,

24  you know, in addition to what the discussions were between

25  Mr. Shkreli and the investors, there may be evidence of

 1   depictions of some very devastated diseases, you know, sort of

 2   a side trial as to, you know, the science of myotubular

 3   myopathy or muscular -- muscular dystrophy.  I'm not -- I'm

 4   not saying that from Mr. Brafman's side -- I don't think that

 5   we have much of a dispute at this point that --

 6          THE COURT:  Well, are you planning to present such

 7   evidence, Mr. Brafman?

 8          MR. BRAFMAN:   Not through the witness, Blanton.  If

 9   Mr. Shkreli testifies, his entire effort on behalf of

10   Retrophin is relevant because many of the investors who

11   allowed their money to go from MSMB into Retrophin once they

12   were advised that the money was lost in MSMB, many of them

13   used words like, We were betting on the genius, not on the --

14   his investment savvy.  And all of those who did invest with

15   him made out like a bandit, quite frankly, because he was

16   ultimately very, very successful.  But the point is, I don't

17   intend to do a slide slow on -- on the science.  If

18   Mr. Shkreli testifies I think what he was working on, how hard

19   he worked on it, why he felt he would be successful, I think

20   is relevant to his state of mind, and whether or not he

21   intended to defraud these people and whether or not he blew

22   their money on a trade, which is often what happens in a --

23   when you're shorting stock, and then worked tirelessly for

24   years and years to make his promises good.  So I don't intend

25   to do a slide show on the actual science.

1      MR. SRINIVASAN:  Your Honor, just one final point.

2   I think as we set forth in our brief in one of the footnotes,

3   to the extent that Mr. Shkreli takes the stand and portrays

4   himself as altruistic and is concerned primarily about patient

5   care, that may potentially open the door to a host of other

6   evidence regarding other motivations he may have had and other

7   conduct he may have engaged in that may not necessarily come

8   in in the Government's case in chief.  And so I think that

9   attacks the --

10      THE COURT:  Have you already talked to Mr. Brafman

11   about what that evidence will be if --

12      MR. BRAFMAN:  We understand that.

13      THE COURT:  Okay.

14      MR. BRAFMAN:  We understand that.

15      THE COURT:  All right.  I just want to make sure

16   there are no surprises that could cause a delay?

17      MR. BRAFMAN:  No, we understand that.

18      THE COURT:  Okay.

19      MR. SRINIVASAN:  Yes, Your Honor.

20      THE COURT:  All right.

21      Let me see...  Was there anything else that was at

22   issue?  The lack of criminal history, is that going to be an

23   issue still?

24      MR. BRAFMAN:  It's not an issue on direct unless he

25   testifies.

1              THE COURT:  All right.

2              MR. BRAFMAN:   And then if he testifies, then I

3     think it is relevant.

4              THE COURT:  All right.

5              Okay.  What about in the event Mr. Shkreli, if he is

6     convicted or acquitted, his post-trial plans?

7              MR. BRAFMAN:  I'm sorry?

8              THE COURT:  His post-trial plan?

9              MR. BRAFMAN:  Well, I'm not --

10              THE COURT:  I am just concerned about that category

11     of evidence.

12              MR. BRAFMAN:  I understand that.  And it is not my

13     intension to convey to the jury that they should acquit him

14     because this is the line that they want -- may cure very

15     devastating diseases.  If he testifies and he discusses his

16     work at Retrophin and his continuing work at Turing, I think

17     that's appropriate because that's his employment.  And that is

18     all during the period charged because when Mr. Aselage decides

19     to take his company, he goes out and starts Turing during the

20     very same time period.  So it's not as if after Retrophin is

21     taken from him that he is just sitting in the street doing

22     nothing.  I think it completes who he is and what he is doing.

23              I understand what Your Honor doesn't want me to do,

24     which is open to say words to the effect that I said during

25     one of our oral arguments, I understand that.  That's --

1    that's not what we intend.  But if he does testify, I don't

2    think the future is appropriate for speculation, but I think

3    what he did during the period covered by the indictment is

4    very relevant to who Martin Shkreli is and how hard he's been

5    working as opposed to, well, many Defendants who have done

6    nothing worthwhile in their life.

7              THE COURT:  All right.  Thanks.

8              Does the Government need to heard on that topic?

9              MR. SRINIVASAN:  Nothing further, Your Honor.

10             THE COURT:   All right.  Is there anything that I

11   have -- anything else that the parties want to address at this

12   time?

13             MS. KASULIS:  Your Honor, I think what they're --

14   I'm counting two additional motions --

15             THE COURT:  Yes.

16             MS. KASULIS:  -- that we haven't addressed.

17             I think with respect to the Government's motion for

18   prosecution on this idea of Shkreli --

19             MR. BRAFMAN:   I'll make that easy.  Our position is

20   that Retrophin has a motive to file a $65 million lawsuit, and

21   I think that's fair game.  We do not intend to say that

22   you're -- the Government is doing anything wrong by

23   prosecuting this case.

24             THE COURT:  Well, does that modify you, or did you

25   want to also preclude -- are you seeking to preclude evidence

1   that there is a lawsuit out there?

2           MR. BRAFMAN:  Well, it goes to motive and bias by

3   Retrophin.  You can't preclude that.

4           MS. KASULIS:  Well, I think that, Your Honor --

5           THE COURT:  Well, is Retrophin --

6           MS. KASULIS:  Your Honor, I think that some of the

7   board members --

8           MR. BRAFMAN:  I'm sorry?

9           MS. KASULIS:  Some of the board members who we

10  intend to call as witnesses for Retrophin may have some

11  knowledge regarding that, and there may been an opportunity

12  for cross-examination for -- with respect to bias, and so we

13  believe that would be an appropriate avenue of

14  cross-examination but not to sort of get into, of course, a

15  trial within a trial about this alternate civil proceeding and

16  Retrophin bringing charges and things along those lines.

17          MR. BRAFMAN:  No.  But I do think -- I -- I agree.

18  I -- I'm -- I'm representing that we're not making the

19  Government the bad people in this case.  But I do think there

20  is a motive that will become crystal clear when people like

21  Aselage testify, that he took over this company, got rid of

22  Martin Shkreli, and is now running a company that is worth

23  $100 million based on Martin's genius.  And I think Retrophin

24  suing Martin for $65 million is relevant because some of the

25  same board members are the people who the Government is going

1   to call to testify as to the period of time when Martin was in

2   Retrophin.  So I hear the distinction between lumping

3   the Government in with Retrophin, and I am not going to do

4   that.  But Retrophin is fair game, I believe.

5           THE COURT:  What about the Government's motion to

6   preclude evidence of ultimate harm or ultimate benefit, are

7   you going to be standing down on that?

8           MR. AGNIFILO:  No, Judge.  I -- I think -- my

9   reasoning of the case is in this area, and -- and -- and we

10  can get to the -- we can get to this -- we can get to this at

11  a later time.

12          THE COURT:  Well, no, we should get to it now.

13          MR. AGNIFILO:  No, that's fine.

14          So the Judge's-- first of all, the Judges's --

15  the Government proposed charge is -- is not an accurate

16  statement of the law and it's not the charge that was given in

17  Finazzo, and it's not the charge that was given in Barkovich.

18  It -- they -- they leave out a critical phrase, which makes

19  all the difference which is for the purpose of causing loss

20  which is not in the charge.  I don't know how it fell out, but

21  it fell out.

22          My reading of the law starting with U.S. versus

23  Rossomando is -- is that -- in Rossomando, as Your Honor I'm

24  sure knows, the conviction was -- was overturned by the

25  Second Circuit, and the Second Circuit in Rossomando expressed

1  great concern that the charge, the so-called no ultimate harm

2  charge is -- is contradictory to other established charges,

3  including the good faith charge and other charges.

4          And what the cases all said -- and by "all," I mean

5  Rossomando and Barkovich and Lange and Finazzo is that you

6  need a factual predicate.  You need a sufficient, factual

7  predicate in the evidence to justify the charge.  In

8  Rossomando there was no sufficient factual predicate, and

9  that's why the charge is errant.  And so until we know what

10  the evidence is and we don't know what the evidence is, I

11  don't think we have -- we should -- we should have this

12  discussion about the no ultimate harm charge.  And I think if

13  we have the discussion now in the absence of the evidence,

14  we're essentially violating the Court's hold in Rossomando,

15  which -- which talks about a sufficient factual predicate for

16  the charge.

17          Here there's been no evidence.  And one of the

18  distinctions is that I think the Government is -- is going to

19  contend, I suppose, that Martin Shkreli committed -- made

20  misrepresentations or omissions with an eye toward losing

21  people's money in the short term but not in the long term.

22  That hasn't been proven yet.  It might never be proven.  If

23  it's not proven, then my contention, my argument is that

24  Rossomando is not allowed to charge.  And so until all of the

25  evidence is in, when we have a -- a meeting about the jury

1    charge after the evidence is in, then we can see if the

2    evidence in the case justifies the no ultimate harm charge,

3    because it may very well not.

4         And if we're going to be true to the decision in

5    Rossomando -- and there's no indication that Rossomando is not

6    good Second Circuit law.  It's never been overturned.

7    Finazzo, in my opinion, which is at least last I checked, was

8    an unpublished decision, was not as clear about the

9    requirement of a career factual predicate.  But if you look at

10   cases like Dinome and Rossomando and Barkovich and Lange, they

11   all talk about a sufficient factual predicate.  And Rossomando

12   says if you don't have a sufficient factual predicate, you

13   don't get the charge because the charge is misleading and the

14   charge is contradictory.  So at this point without any

15   evidence in the case, I don't think we can have the

16   discussion.

17        Because essentially what the Government's trying to

18   do, I contend, is essential go and putting -- putting the --

19   the horse before the cart.  And what they're basically saying

20   is, We don't want this evidence to come in -- or the cart

21   before the horse -- the horse is supposed to go before the

22   cart.  I was born in the Bronx.  We don't have carts or a

23   horse, so...

24        So what they're trying to say is, Well, because we

25   think there's going to be a no ultimate harm charge, we want

1  to sort of limit the type of evidence that comes in.  But it

2  doesn't goes that way.  It goes that we have a trial based on

3  relevant evidence.

4  The evidence comes in, and then when we look at that evidence,

5  we see if there's a sufficient factual predicate for the no

6  ultimate harm change, and we have that discussion at that

7  point.  We're all alerted to the issue.  We are alerted to the

8  issue, they're alerted to the issue.  And I don't -- I

9  don't -- I don't -- I'm not critical of them by their jury

10 instruction.  It's early in the case.  This is why we have

11 draft instructions and we go through them, and we'll have a

12 chance to go through them at the right time and get the

13 language that's appropriate.

14        One of the things that I'll also note having read

15 all of these cases, very often I have found there's not an

16 objection to the jury charge.  I think the no ultimate harm

17 charge kind of came of age in a series of trials when there

18 were no sufficient objections to the charge, and so a lot of

19 times it's being reviewed by the Second Circuit on a sort of

20 clearly erroneous standard.  I mean, here, obviously, we are

21 all very hip to the issues, so we're not going to have that

22 problem here.  We've already not had that problem here.  So my

23 suggestions for the time being is we know it's there.  There's

24 going to be very enlightened, educated discussion one day

25 about whether the facts of the case justify the no ultimate

1    harm charge.  But since the cases do talk about a factual

2    predicate and the trial hasn't started, I think it's fine to

3    talk about it in theory, but I don't think we can answer the

4    questions at this point.

5              THE COURT:  Does the Government have a different

6    view?

7              MS. KASULIS:  Your Honor, I think, you know, we made

8    this motion because we've been hearing the drum being beaten

9    throughout all of our proceedings up until this point about

10   sort of the no ultimate harm no harm, no foul idea.  And so we

11   raised this motion in part to put everyone on notice that the

12   law is very clear, that no ultimate harm is no defense.

13             And you know, I think what the defense did not

14   address is this issue of, you know, investors' right to

15   control their assets.  You know, that -- that you -- the fraud

16   is committed at the time that you make those misreps and

17   omissions because you were depriving them of the right to

18   control their assets both to make investments elsewhere, for

19   example, or while these funds are performing, that they have a

20   right to decide whether or not to pull their money out of the

21   fund, depending on how the fund is, in fact, performing.

22             So this idea of, Oh, well, you know, we're just

23   going to make them whole a couple of years from now.  So what

24   are we doing here?  I think that's the defense that we are

25   very concerned about.  You know, that our concern is that a

1    limine instruction is pages and pages and pages or a jury

2    instruction is pages of jury instructions that comes, you

3    know, five weeks after the start of trial is not sufficient to

4    address this issue and to address the prejudice that the

5    Government will experience if this defense, which there's no

6    basis in law for, is allowed to be raised over and over and

7    over again.  And so, you know, the Government is fine with

8    waiting to see how the evidence develops.  You know, I assume

9    that there will be no argument that the facts are on opening.

10   That's what I'm hearing the defense, at least.  And so we're

11   happy to revisit the issue as if and as it arises.  But this

12   is something that, obviously, we're very concerned about.  And

13   we will continue to raise it as an issue and as a concern

14   as -- as the trial develops.

15          THE COURT:  Well, is the defendant -- defense

16   planning to address that in their opening or in their

17   cross-examination, for example, of an investor to say to that

18   investor, Look, you actually made money or you made more than

19   you thought, or you didn't really lose money; is that going to

20   be coming up?

21          MR. BRAFMAN:  I don't have to use the words no

22   ultimate harm in my opening statements.  But the fact is this

23   is a very unusual case.  I've never seen a fraud case like

24   this.  And what the Government has done is they've taken --

25   they've sanitized a meiotic view of the relationship between

David R. Roy, RPR  -  Official Court Reporter

1    Martin Shkreli and the investors and essentially used their

2    view to essentially determine whether Mr. Shkreli intended to

3    defraud these people.  And if he says something on Monday that

4    they say is not completely accurate, then boom, the fraud is

5    committed and you're guilty and you go straight to jail.  I

6    don't think that that's the relationship that many of the

7    investors feel.

8            There was a period of time when they were relating

9    to each other and back and forth, and several of the investors

10   were happy continuing into Retrophin.  Some were not.  And I

11   think at the end of the day, I think it is relevant whether or

12   not they did, in fact, receive money back because if, in fact,

13   they agreed to go into Retrophin because that was the way they

14   would get their money back, I'm not certain those people are

15   victims of a fraud.  So I think on a case-by-case basis some

16   of these investors will say that they understood that MSMB did

17   not work out.

18   They're sophisticated people.  This was a hedge fund.  I think

19   the Government's view of what a hedge fund is and is not

20   allowed to do with money on deposit is some -- to some degrees

21   is based on a degree of naivete, and some of the investors in

22   this case have a degree of sophistication that far exceeds

23   that of Mr. Shkreli.  So if you're asking me, do I ever -- or

24   can I promise you that I am not going to ask an investor like

25   Al Geller or -- or Steve -- Darren Blanton or -- or Richardson

1   whether or not they had an ongoing communication relationship

2   with Mr. Shkreli in which implicitly they understood that the

3   money is being moved to Retrophin, and did you ultimately get

4   it back from Retrophin?  Everybody got paid back in this case,

5   to my knowledge.  And everybody got back -- got paid back with

6   either cash or shares of Retrophin.

7   The issue is did they get back -- paid back immediately?  No.

8   Does that mean you're guilty of fraud?  I don't think so in

9   every case.  And I think until Your Honor actually hears the

10  facts, a ruling that the no ultimate -- that the ultimate

11  fraud is -- is ironclad bar to a defense of fraud, I just

12  think is an incorrect statement on the law.

13          THE COURT:  Do you disagree, though, with the

14  Government's contention that the Second Circuit looked at the

15  immediate harm that comes from denying an investor the right

16  to control or decimate their assets?

17          MR. BRAFMAN:  I agreement to the extent that the

18  facts of this case become -- become such that that is the

19  charge that Your Honor agrees to give.  But I'm not certain

20  that we get to that point.  I read the cases that Mr. Agnifilo

21  has read, and to be honest with you, I think bad law was made

22  by lawyers who, quite frankly, chose not to object on

23  something they should have objected to, with all due respect

24  to that group of people.

25          However, this case is fact specific, and I think the

1    cases in which the Second Circuit made that decision were each

2    factually, in my opinion and our opinion, distinguishable from

3    what you're going to hear in this case.  So I think they asked

4    Your Honor to preclude the argument in advance of trial, and

5    if Your Honor gives the charge and if we have argued all

6    through the trial in a manner that undermines our defense when

7    Your Honor gives the charge, I think we have to live with that

8    at that point.  But I think for the Government to say, Well,

9    you cross-examined these people, you can't bring out the fact

10   that they were made whole because it doesn't matter, is just

11   cleaning up the case and making it what it's not.

12        I think the relationship between an investor and

13   his -- and his hedge fund person, if you will, or investment

14   vehicle has to be fleshed out, and then the jury can decide

15   when Your Honor appropriately guides them as to whether or not

16   they were defrauded the moment they give him money, if they

17   did it based on factors that were a misrepresentation.

18        I'm not asking for a jury nullification because all

19   of the investors made money.  That's what the Government seems

20   to be petrified about, because the facts of this case are that

21   this defendant, whatever else he did wrong, ultimately made

22   them whole.  And I understand that that would be something

23   the Government would love to keep out of the case, but it's

24   the case.  It's part of the case.  And each investor was made

25   whole at a different time and a manner through negotiations,

1    sometimes represented by their own lawyers.  And if -- if the

2    Government's position is, you know, on Day One when Martin

3    Shkreli told you he had a great record, and therefore you

4    invested, he's guilty of fraud, I don't think that that's the

5    case in this case, and I don't think that that's the law

6    either.

7              I understand what the Second Circuit has said, that

8    if you deprive someone of the use of their money by fraud, but

9    he still has to intend to defraud.  And I think the issue of

10   loss is alive in a case where the Government is going to argue

11   a fraud based on his actions, and I think this is just too

12   complicated for you to sort out without hearing the evidence,

13   because they're giving you, I think, a sanitized version of

14   the relationship between these parties.

15             And now having seen the 3500 material, we're

16   speaking with much more factual understanding of what these

17   people are saying, and it's kind of interesting that just as

18   an aside, that the -- the story develops.  The first 302 is

19   almost grading material, which we never got.  The second 302

20   is devastating.  And the third 302 is, You're getting a

21   nonprosecution agreement.  So I think there is a lot going on

22   that the jury needs to hear.

23             THE COURT:  Okay.  Anything else the Government

24   wants to add?

25             MS. KASULIS:  Your Honor, I think it's clear that

1    the Court understands the Government's concern.  We're not

2    making the argument that the witnesses cannot be -- cannot

3    testify about whether they regained any of their investment.

4    In fact, it's our position that they were paid from stolen

5    money.  I mean, that's, in fact, part of the charges in this

6    case.  So obviously, that testimony was irrelevant.

7           But what is clear is good faith is about believing,

8    you know, the representations that you make, and if you are

9    lying, if you know you are lying and you are using those lies

10   to take people's money and you are depriving them of their

11   right to choose how to use their own money based on your lies,

12   that is the law.  That is a fraud under the law.  And that is

13   what, you know, we intend to prove at trial.  That is the

14   issue.

15          And, you know, it's not about this -- the

16   Government's issue or what the Government wants everyone to

17   hear.  What the Government wants to do is enforce the law.  So

18   there is law here.  There are rules that apply to Mr. Shkreli.

19   They apply to everyone in this courtroom, and that's what we

20   are trying to enforce.  And any argument that are made that

21   were contrary, knowingly contrary to laws, they're

22   inappropriate and they should not be before the jury.  And

23   that's what the Government is trying to prove here,

24   Your Honor.

25          MR. BRAFMAN:  Can I just say one thing?

1          THE COURT:  Yes.

2          MR. BRAFMAN:  And I'm glad -- I'm glad I was just

3     reminded.  The Count 7, which charges the Retrophin fraud

4     makes it impossible to have this trial completed without the

5     testimony, even on the direct evidence, that these people were

6     already paid, because as she correctly points out, the people

7     who were at times repaid with Retrophin stock and the theory

8     supporting Count 7 is that this was the Retrophin fraud, that

9     he paid MSMB debts with Retrophin money.  So the fact that the

10    witnesses got their money back is going to be in the case

11    whether I put it in or not, but they can't try Count 7.  And

12    the issue of whether or not the Retrophin fraud was, in fact,

13    a fraud is obviously in many ways different from Counts 1

14    through 6.

15         So the stuff all comes in, to be honest with you.

16    And what we ultimately argue, they can argue to the Court and

17    if they convince you to give that charge, they can then argue

18    to the jury and the jury, if they follow your instructions and

19    believe the Government's argument, will -- will convict

20    Mr. Shkreli.  I think what we have a right to do, to be -- to

21    be candid, is still deal with his state of mind and his

22    intent.  And if the Court's Charge cuts the leg out from under

23    that argument, then we will obviously have to address that at

24    the end of trial.

25         THE COURT:  All right.  Thank you.

David R. Roy, RPR  -  Official Court Reporter

1          Is there anything else that I have overlooked?

2          MR. BRAFMAN:  I don't think so.

3          THE COURT:  Or anything else --

4          MR. BRAFMAN:  Not from the defense.

5          THE COURT:  -- that any party wants to argue?

6          MS. KASULIS:  No, Your Honor.  I think that's

7    everything.

8          We did speak with the Court's deputy about we did

9    provide our exhibits and our 3500 material, two copy sets.

10   We're going to bring them just directly to chambers --

11         THE COURT:  Okay.  Thank you.

12         MS. SMITH:  -- because they are voluminous.  So we

13   will just go ahead and do that, but I just wanted to make sure

14   that was clear for the record, that we did provide that to the

15   Court today.

16         MR. BRAFMAN:  And -- and with respect to ours, we

17   did give your deputy a -- a -- this and the exhibit list.  The

18   binders for the Court, were -- there are two sets.  There are

19   14 binders in each set.  So they are being finally collated as

20   we speak, and we hope to get you them at the latest tomorrow

21   morning.

22         THE COURT:  That's fine.

23         MR. BRAFMAN:  I apologize for missing today, but --

24         THE COURT:  No, that's fine.

25         MR. BRAFMAN:  -- they worked all weekend on it.

1          THE COURT:   So we will have it --

2          MR. BRAFMAN:  Before the end --

3          THE COURT:  -- before the end --

4          MR. BRAFMAN:  -- of the day tomorrow.

5          THE COURT:  Thank you.

6          We will be issuing a decision this week.  I

7     appreciate the arguments.  They have been helpful.

8          MR. BRAFMAN:  And -- and the next time we appear is

9     Monday at 9:00 a.m.?

10          THE COURT:  Monday at 9:00 a.m.

11          I am currently planning to do it here.  I will want

12     to think about whether -- and we will give you notification

13     whether we shift to the ceremonial courtroom.  I just want to

14     make sure I can sit everyone here.

15          MR. BRAFMAN:  Yes, ma'am.

16          MS. KASULIS:  So we'll await confirmation from the

17     Court, or if we don't --

18          THE COURT:  Yes.  It's going to be here, unless

19     advised otherwise.

20          MR. BRAFMAN:   Well, the trial will be here

21     regardless of whether the jury selection is --

22          THE COURT:   Yes.

23          MR. BRAFMAN:  -- yes?

24          THE COURT:  Correct.

25          MR. BRAFMAN:  Thank you.

David R. Roy, RPR  -  Official Court Reporter

1              THE COURT:  And I am hoping we can start openings on

2       Monday.  I am hoping we can select a jury in the morning.

3              MS. KASULIS:  And we will be ready for that,

4       Your Honor.

5              THE COURT:  Okay.

6              MS. KASULIS:  Thank you, Judge.

7              THE COURT:  Thank you.

8              And will you please kindly just let each other know

9       about your lineup of witnesses so that we can plan adequately

10      and have our smooth presentations?

11             MS. KASULIS:  Yes, Your Honor.  We did already

12      provide the defense with our anticipated witness list for the

13      first week.  They are subject to change depending on travel

14      issues and things along those lines, but this is what we

15      anticipate at this time.

16             THE COURT:  Okay.  Thank you.

17             MR. BRAFMAN:   Let me just add, we don't necessarily

18      care about the order, but if people are added to that list

19      because someone on the list can't make it, we would like to

20      know.

21             MS. KASULIS:  Absolutely.  We will let you know as

22      soon as we know.

23             THE COURT:  All right.  Thank you.

24             (Whereupon, the matter was concluded.)

25