4606

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
   - - - - - - - - - - - - - - - -X
 3  UNITED STATES OF AMERICA,      : 15-CR-637 (KAM)
                                   :
 4            Plaintiff,           :
                                   : United States Courthouse
 5        -against-                : Brooklyn, New York
                                   :
 6  MARTIN SHKRELI,                :
                                   : Monday, July 24, 2017
 7            Defendant.           : 9:00 a.m.
   - - - - - - - - - - - - - - - -X
 8

 9
                    TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10            BEFORE THE HONORABLE KIYO A. MATSUMOTO
              UNITED STATES DISTRICT JUDGE, AND A JURY
11

12
                     A P P E A R A N C E S:
13
    For the Government:       BRIDGET ROHDE, ESQ.
14                            Acting United States Attorney
                              Eastern District of New York
15                            271 Cadman Plaza East
                              Brooklyn, New York 11201
16                            BY:  JACQUELYN M. KASULIS, ESQ.
                                   ALIXANDRA ELEIS SMITH, ESQ.
17                                 KARTHIK SRINIVASAN, ESQ.
                                   Assistant United States Attorney
18
    For the Defendant:        BRAFMAN & ASSOCIATES, P.C.
19                            767 Third Avenue, 26th Floor
                              New York, New York 10017
20                            BY:  BENJAMIN BRAFMAN, ESQ.
                                   MARC AGNIFILO, ESQ.
21                                 JACOB KAPLAN, ESQ.

22
    COURT REPORTER:     DAVID R. ROY, RPR
23                      225 CADMAN PLAZA EAST / BROOKLYN, NY 11201
                        DRROYOFCR@GMAIL.COM
24
    PROCEEDINGS RECORDED BY STENOGRAPHIC MACHINE SHORTHAND,
25  TRANSCRIPT PRODUCED BY COMPUTER-ASSISTED TRANSCRIPTION.
```

Proceedings                                           4607

1          (In open court; outside the presence of the jury.)

2          THE COURT:  Since we adjourned Friday, the parties

3   have submitted ten different submissions, which I want to

4   say frankly I don't appreciate.  I think it's avoidable,

5   could have been avoidable, and I know that I had asked for

6   some of the submissions because as the week evolved the

7   parties were raising issues that hadn't previously been

8   discussed.  Specifically the defense raised a theory that

9   there's no duty to disclose in regard to Count 7, and that

10  prompted a lot of briefing, which I think is helpful, but I

11  think that it does require for all parties and the Court a

12  lot of extra time and effort to sort out.

13         We also had submissions on the settlement

14  agreements and submissions on exhibits that the defense had

15  objected to, specifically the e-mails.  Again, to do this in

16  ten submissions over the weekend, I think when we've got a

17  jury here on a Monday is somewhat unfair to the Court.

18  There are multiple lawyers on each side and there's me and

19  my clerk, and we've been working around the clock throughout

20  the weekend trying to address all the issues today.

21         I don't know whether it's a lack of communication

22  among the parties or whether there's been some reason that

23  these couldn't have been brought to my attention earlier,

24  but it makes it very difficult.  So I am prepared to make

25  ruling to the best of my ability at this time on certain

Proceedings                                         4608

1    things.

2          The one issue that I'm not going to address right

3    now is the charge regarding the duty to disclosure, which I

4    said, was a new theory that the parties have been scrambling

5    the address.  Partly by reference to Delaware law, partly by

6    reference to the law in the circuit regarding conspiracy to

7    commit wire fraud.  But I feel that we need more time to

8    process those arguments.

9          First with regard to e-mails that Mr. Agnifilo

10   submitted specific objections to on Friday afternoon after

11   we adjourned, I do find, and I've read the Government's

12   submissions as well, that these statements are admissible as

13   party admissions.  They are being offered here to an adverse

14   party, they're statements of party opponent or its agents

15   and employees.  As we know lawyers are also agents and

16   employees and can be included in the parameters of 801.  And

17   in addition, they are submitted and admissible as

18   co-conspirator statements.

19         With regard to the Rule 106 initial statements,

20   they're either unrelated to the substance of the e-mail or

21   they are self-serving hearsay on part of the defendant.  So

22   the additional e-mails, I think in two instances are not

23   admissible.

24         With regard to the settlement agreements, we have

25   multiple additional submissions on that as well.  I think as

Proceedings                                4609

1   a general matter, they're relevant to Count 7.  Admission of

2   those agreements would not be unduly prejudicial and don't

3   pose any Fifth Amendment issues, because the defense has had

4   ample notice.  And despite its arguments to the contrary,

5   there's -- there is an ability on the defense's part to

6   *subpoena* these witnesses and have them testify.

7          These particular agreements involved

8   MSMB Healthcare investor Michael Lavelle and Spencer

9   Spielberg and Retrophin.

10          The Government, as we know, argued these are

11  instrumentality for the wire fraud conspiracy charged in

12  Count 7 to the superseding indictment and the defense

13  objects that these agreements without testimony of

14  Mr. Lavelle and Mr. Spielberg would be unfair, that the

15  agreements are irrelevant and violate Mr. Shkreli's Fifth

16  Amendment right to due process and also in terms of the 403

17  balancing test would be unduly prejudicial.

18          With regard to relevance, these are relevant to

19  the charges in Count 7.  The defense argues that they're

20  only relevant if they are instruments of fraud and that the

21  Government cannot show that they are fraud without the

22  testimony of Mr. Lavelle and Mr. Spielberg.  It appears that

23  the hearsay objection that the defense raised with regard to

24  the prescription agreement, which are different, have not

25  been raised with regard to the settlement agreement.

Proceedings                                    4610

1        The documents are directly relevant to the conduct

2   charged in Count 7.  As we know, to be relevant, evidence

3   need not be sufficient by itself to prove a fact at issue

4   much less to prove it beyond a reasonable doubt, instead

5   what is required is that the proper evidence could affect

6   the mix of material information before the jury as found by

7   the Second Circuit in *United States versus Quattrone*, **441**

8   **F3d, 153 and 158**.

9        The Government's theory, as we know, is that

10  Mr. Shkreli misappropriated Retrophin assets by using stock

11  and cash of Retrophin to pay off investors in his MSMB hedge

12  fund.  The two settlement agreements at issue are evidence

13  of Retrophin providing shares and stock of Retrophin to

14  investors in the hedge funds in return for litigation

15  releases, and therefore they need the low bar for relevance.

16       Now, the Fifth Amendment issue is what I will

17  address next.  But first let me mention that the defense has

18  conceded that the confrontation clause right under the Fifth

19  Amendment does not apply to the settlement agreement because

20  they are nontestimonial.

21       Instead the defendant argues that introduction of

22  settlement agreements without accompanying witness testimony

23  violate the Fifth Amendment right to due process.

24  Mr. Shkreli emphasized that his due process right to

25  confrontation through cross-examination of individuals whom

Proceedings                                    4611

1  the Government alleges are victims of fraud.  These

2  agreements do not -- admission of the agreements will not

3  infringe on Mr. Shkreli's due process rights.

4           First he has had ample notice of these agreements.

5  They are provided to the defense, they were given notice

6  that these agreements were on the Government's exhibit list,

7  and the fact that the Government has chosen not to call

8  witness who were involved in the agreement does not violate

9  Mr. Shkreli's due process rights, because as we know the

10 Government is not obligated to call witnesses to testify

11 regarding otherwise admissible evidence, and these

12 agreements are otherwise admissible.  I recognize that the

13 defense expects that he could elicit from these investors

14 statements relating to their decision to invest in

15 MSMB Healthcare.

16          But I think on the one hand the defense claims

17 that is Mr. Lavelle will testify that he invested in

18 MSMB Healthcare because of his cousin Kevin Mulleady and not

19 because of Mr. Shkreli.

20          The Government has repeatedly stated, however,

21 that it will not argue about Lavelle and Spielberg relied on

22 the statements or admissions by Mr. Shkreli at the time of

23 the investment in MSMB Healthcare.  The key issue, as

24 defense acknowledges, is whether these MSMB Healthcare

25 investors who complained about their investment returns and

Proceedings                                           4612

1    then sought to obtain more than they were being offered in

2    settlement in Retrophin assets is directly on point with

3    Count 7.  The reason for they complaint is the distinct

4    issue from the propriety of the settlement with Retrophin,

5    which is what is at issue in Count 7.

6          With regard to the defense objections under

7    Rule 403, that the admission of the agreements will create

8    unfair prejudice because the jury will conclude that the

9    settlement agreements demonstrated that Mr. Shkreli lied and

10   that the jurors will be confused as to where the fraud

11   allegedly lies and may decide that the alleged fraud is

12   complete when the funds are transferred to MSMB Healthcare

13   for investment.  That's in their letter, Document No. 279,

14   at Page 5.  The Government has stated it will not argue that

15   the settlement agreements are evidence of fraud at the time

16   of Mr. Lavelle's and Mr. Spielberg's initial investment.

17         So it's not -- the focus is not on defrauding the

18   investor in Count 7 but rather the fraud against Retrophin,

19   vis-à-vis the settlement agreement.

20         If there's argument or to the extent there's

21   argument regarding whether or not Mr. Lavelle and

22   Mr. Spielberg were misled about the value of their

23   MSMB Healthcare holdings after they invested, such argument

24   will be necessarily based on the performance statements and

25   other documents which are either already in evidence or will

Proceedings                              4613

1    be in evidence as statements of a party opponent or

2    statements of an agent of the party opponent.

3              The jury, as we know, will be instructed

4    extensively on the various counts, which include Count 7

5    relating to the alleged misappropriation of Retrophin

6    assets.  And the Government is expected, and I believe has

7    argued, that these agreements are evidence of that count.

8    Again, not in relation to initial representations made to

9    the investors at the time of the -- of the investment.

10             I believe the jury will be able to distinguish

11   between the counts relating to misstatements -- alleged

12   misstatements to MSMB investors and the charges in Count 7

13   regarding the alleged misappropriation of Retrophin funds

14   and assets.

15             The defense also objects to the admission of the

16   disputed documents citing law of the case, in its letter

17   last Wednesday.  Although I did, in fact, make rulings

18   during testimony of the individual investors regarding the

19   subjective factors for their investment.  And the reason I

20   did that was because I believe that as stated that the

21   testimony was relevant to aid the jury's understanding of

22   what a reasonably investor may consider making an investment

23   decision.  Given that ruling, if the defense chose to call

24   Mr. Lavelle and Mr. Spielberg they could elicit testimony

25   regarding the reasons for their investments with

Proceedings                                    4614

1   MSMB Healthcare and could solicit any views that those

2   investors had regarding what was important to their

3   investment decision.

4           My ruling in allowing evidence and testimony

5   regarding the specific investor's investment decisions does

6   not change the objective standard, the objective nature of

7   materiality test under the securities and wire fraud laws.

8           And I refer to *United States versus Frankel* 2017

9   *Westlaw* 946727 at asterisk 2 decided March 8, 2017, it is a

10  summary order which discusses the standard of materiality

11  particularly in the *United States versus Nader*, N-A-D-E-R,

12  527 U.S. 1 at Page 24 to 25 decided by the Supreme Court in

13  1999 and notes that incorporate it is common law objective

14  standard.

15          So for those reasons the settlement agreements of

16  Mr. Lavelle and Spencer Spielberg are admissible.

17          Now, the next issue arises because, as I said, the

18  defense raised an argument last week that there was no duty

19  to disclose, and I think that the Government in response

20  cited Delaware law, which I agree with the defense's view

21  that it doesn't really apply to the facts that we have here.

22  Its's not -- it's not an agreement of this type discussed in

23  Delaware law, and as the defense pointed out, that the

24  legislation was discussing what agreements may or may not be

25  voidable and under what circumstances.  So I don't think

Proceedings                                    4615

1    that those -- that specific provision of Delaware law

2    necessarily can create the duty to disclose to the Board

3    certain of the transactions at issue in this case.

4            We are still in the process of trying to

5    straighten out the law.  I'm not sure that we even have to

6    refer to Delaware law.  I think there's evidence in the

7    record that there was a communication to Mr. Shkreli that he

8    had a duty, a loyalty of Retrophin by virtue of his stature

9    of -- as CEO and a board member of Retrophin.  And the issue

10   in Count 7, as I had understood it originally, was that

11   there were statements and material misstatements made in

12   order to use Retrophin funds to pay off MSMB Healthcare and

13   MSMB Capital and Elea Capital investors.

14           The duty to disclose arises and raises a new issue

15   of whether or not there were omissions that can constitute

16   the charged offense, and as I said, we're sorting out the

17   law because as we know, Count 7 is a conspiracy charge not

18   accepted in this count.

19           And we would be prepared when we submit the

20   instructions for the parties' review to set forth what we

21   think is the best iteration of the law to the extent there's

22   going to be an argument that there was no duty to disclose,

23   which I think is the defense's theory at this point.  Am I

24   correct?

25           MR. AGNIFILO:  The argument that this all spawned

Proceedings                                4616

1    from that we made that caused this slurry of briefing was

2    that Mr. Shkreli broke no law or no rule in Delaware or

3    anywhere else that obligated him as the CEO to do or not do

4    anything in particular.  So we weren't really talking about

5    fiduciary duty because the way that came up and I think it

6    came up on Thursday is we were saying that that -- there's

7    been no evidence in the case up to that point of a rule or a

8    law that was broke in doing this.

9            In other words, why can't the CEO do this and

10   that's what prompted the Government to cite to 144 and then

11   we had vast litigation.  So that's -- that's really what

12   kind of jump started all of this.

13           So before I answer Your Honor's question directly

14   I haven't even had a chance to even speak to my colleagues

15   about that, but that wasn't the crux of the argument.  The

16   crux of the argument was that he didn't break a law or rule.

17   So it's slightly different than where we are now.

18           THE COURT:  All right.  Well, I think that in, you

19   know, when reading the brief and understanding what the

20   parties intended to do, I think we got some word by phone on

21   Friday evening that there might be, you know, dueling

22   witnesses on Delaware law.  I thought that would just add a

23   lot of confusion to the jury and, you know, if you have two

24   different statements of law, you know, it kind of undermines

25   whatever instruction I'm going to give them.

Proceedings                                    4617

1       And I want to really be sure that what role, if

2  any, Delaware law plays in this whole thing.

3       So that's why I didn't think it would be

4  appropriate and it could be more confusing for the jury to

5  bring in dueling witnesses regarding what Delaware law

6  requires.

7       I was hoping that the parties could agree based on

8  their research on Delaware case law about some of those

9  issues that it may be that the appropriate instruction could

10 focus on the actual count in the superseding indictment

11 without reference to independent state law.  And so long as

12 the instruction tethers to the evidence, hopefully the Court

13 should not be -- it should not be infirmed, so I am hoping

14 that we can come up with an appropriate instruction.

15      We had hoped to post instructions either later

16 today or first thing in the morning but because of all these

17 submissions I think the latest one came in last night around

18 10:00 or something.  What time was it?  It was late.

19           MR. AGNIFILO:  I know it wasn't that late.

20           THE COURT:  Well, it was late.  We were working on

21 the instructions, we're up to 97 pages, but this does create

22 the need to work --

23           MR. AGNIFILO:  I understand.

24           THE COURT:  -- a new instruction into the mix if

25 the theory is there's no duty.

```
                       Proceedings                    4618
```

1         MR. AGNIFILO:  Right.

2         THE COURT:  All right.

3         MR. AGNIFILO:  Just at this point our -- is the

4    Court prepared -- I'm trying to figure out because I know

5    the Court is too, you know, what the next three days are

6    going to look like.  I mean, I know that we have three

7    witnesses lined up today.  Two I think are relatively short,

8    not too long.  The Kay statement I think is a very

9    substantial witness.  And so I don't want to be caught with

10   the Court wanting us to do something and then, you know, we

11   don't know in time.

12        And I don't know what that would be, but I know

13   part of, I think, the process that Your Honor's going to

14   follow is Your Honor's going to post propose charges and

15   then have us opine and 95 percent of the charge, I think,

16   will be very much noncontroversial.  I think we're obviously

17   going focus on no ultimate harm and probably in that area,

18   and so I just want to make sure that we're in a position, if

19   we get opinions on that, that would give them sufficiently

20   in advance that the Court and the Government would have a

21   change to consider them.  So I'm looking forward, you know,

22   trying to figure out what's going to happen when.

23        THE COURT:  Well, first of all, as you know, I

24   asked for proposed charges months ago and the deadline has

25   come and gone.  So we're working with what we have.  I'm not

Proceedings                                    4619

1    open to getting new charges.

2          Although I would make an exception if the evidence

3    at trial warranted a particular charge that's been proposed.

4          But what I would do is I would post the proposed

5    instructions and give the parties probably half a day to

6    review it and to give me feedback with citations of law as

7    to what instructions they object to or objections as to how

8    instructions could be clarified or tweaked to make it more

9    precise and more understandable for the jurors.  Because

10   part of what we have, as you know, the conspiracy charges is

11   an obligation to explain what conspiracy is and then to

12   explain what the underlying elements are in sort of a

13   general way.  But as we know, the Government doesn't have to

14   prove beyond a reasonable doubt the elements of the

15   underlying offense.  So I want to make sure that we don't

16   confuse the jury and tell them a legal standard that is --

17   that is improper.

18         So then we would have the charging conference and

19   we would go through whatever particular charges have drawn

20   an objection, and we try to get it resolved.  And what we

21   true to do is incorporate, I think for the most part the

22   defendant's side of the sand and we've incorporated that

23   with the charges proposed by the Government, we've made sure

24   as best we can that it's still consistent with the Supreme

25   Court Second Circuit law and we've tried to put out what we

Proceedings                          4620

1    hope is the clear iteration.  And sometimes, frankly, we've

2    used the submission almost verbatim from the Government

3    because it is correct and it has been used in the past and

4    the Second Circuit has endorsed the language, but it's not

5    to say that we haven't hold to incorporate it and looked at

6    the citation exam that the defense has proposed.

7              And as I said, we're open to suggestions regarding

8    clarification for the language, but not to hold new -- new

9    instructions.

10             Was the Government -- I mean, did the defense want

11   to press the advice of counsel instructions?

12             MR. BRAFMAN:  Can we have until the lunch break to

13   advise Your Honor on that and also to advise Your Honor with

14   respect to a charge on if the defendant does not testify and

15   presenting witnesses?

16             THE COURT:  Okay, sure.  We have it in there.

17   Right now we have a charge saying you can't discuss it or

18   think about it in your deliberations.

19             MR. BRAFMAN:  Okay.

20             THE COURT:  But we can always change that.

21             MR. BRAFMAN:  Okay.  Well, there is a -- something

22   that we want to discuss among ourselves, I don't want to

23   delay the process with respect to whether you give a

24   separate charge on reliance on counsel as opposed to

25   incorporating some language in the good faith instruction.

Proceedings                    4621

1    And so we want to see exactly how we propose that and you

2    can -- we'll inform the Government -- the Court by the lunch

3    hour or soon after the lunch hour.

4              THE COURT:  So it's going to be kind of like a

5    hybrid.

6              MR. BRAFMAN:  I believe so.

7              THE COURT:  Sort of not really an advice of

8    counsel, but not necessarily.

9              MR. BRAFMAN:  Well --

10             THE COURT:  I mean, I would lay out the elements

11   of what an advice of counsel's opinion is because I think

12   that's appropriate.

13             MR. BRAFMAN:  Let us have an opportunity just to

14   talk about it.

15             THE COURT:  Sure.

16             All right.  Is there anything else we need to

17   address?

18             MS. KASULIS:  Your Honor, one more issue in light

19   of Your Honor's ruling today regarding the e-mails in

20   particular with respect to Special Agent Ricciardi we did

21   disclose an additional e-mail on Friday night to Your Honor

22   and to defense.  I think in light of the Court's ruling my

23   hope is that over the lunch break we can speak with the

24   defense and hopefully just have no further issues with

25   respect to any evidentiary objections for Special Agent

Proceedings                          4622

1   Ricciardi because as I discussed the morning with the

2   defense I think ideally we would just not have -- we have

3   vetted all of our evidentiary issues with respect to Special

4   Agent Ricciardi's testimony and I can just move sort of

5   large chunks of evidence in at one time and then step

6   through them without having to go through the process of

7   moving to admit each single document and then having to do

8   sidebar and things along those lines.  So I'm hopeful in

9   light of the Court's ruling this morning that we can work

10  this out over lunch with the defense so that special agent

11  testimony goes in smoothly and as expeditiously as possible

12  for all parties and the jury.

13             MR. BRAFMAN:  We'll do our best.

14             THE COURT:  All right.  Thank you.

15             MR. BRAFMAN:  Your Honor, just so the record is

16  clear and obviously we still have time to object during the

17  charging conference, but just so the record is clear,

18  Your Honor have essentially ruled that the settlement

19  agreements for Lavelle and Spielberg would be admitted

20  without them having to call them.  I think we have preserved

21  our objection to the issue of whether any settlement or

22  consulting agreements could come in absent the witness who

23  is consulting with the settlement agreement it relates to.

24             So I think I don't want to repeat myself, but just

25  so the record is clear, by sitting silently Your Honor made

Proceedings                           4623

1    that ruling, we're not waiving that objection.

2           THE COURT:  No, I understand.

3           MR. BRAFMAN:  Okay.

4           THE COURT:  I think you have multiple

5    submissions --

6           MR. BRAFMAN:  Yes, Your Honor.

7           THE COURT:  -- stating you position and I

8    understand --

9           MR. BRAFMAN:  Thank you.

10          THE COURT:  -- it's not a ruling that you're

11   necessarily without objection.

12          MR. BRAFMAN:  Thank you.

13          THE COURT:  All right.  Are we ready to proceed

14   with our next witness?

15          Let me see if all the jurors are here.

16          THE COURTROOM DEPUTY:  Yes, ma'am.

17          THE COURT:  They are.

18          I really don't like having them wait.

19   Unfortunately it became necessary because of all the

20   submissions.

21          (Pause in proceedings.)

22          (Jury enters.)

23          (Jury present.)

24          THE COURT:  Good morning, members of the jury.

25   All are present, please have a seat.

Barnett - Kasulis - Direct                    4624

1           Sorry to keep you waiting this morning.

2           Is the Government prepared the call its next

3    witness?

4           MS. KASULIS:  Yes, Your Honor.  The Government

5    called Rob Barnett to the stand.

6           THE COURT:  All right, thank you.

7           (Enter witness.)

8           THE WITNESS:  Good morning.

9           THE COURT:  Good morning, how are you?

10          THE WITNESS:  Good.

11   R O B E R T   B A R N E T T,

12          called as a witness having been

13          first duly sworn/affirmed, was examined and

14          testified as follows:

15          THE COURTROOM DEPUTY:  Please have a seat.  Please

16   state and spell your name for the record.

17          THE WITNESS:  Yes.  Robert Barnett, R-O-B-E-R-T,

18   B-A-R-N-E-T-T.

19          THE COURT:  Thank you.  Please proceed.

20          MS. KASULIS:  Thank you, Your Honor.

21   DIRECT EXAMINATION

22   BY MS. KASULIS:

23   Q    Good morning, Mr. Barnett.

24   A    Good morning.

25   Q    Where do you live?

1    A    San Francisco, California.

2    Q    And where are you employed?

3    A    Valuation Research Corporation.

4    Q    Is that also known as VRC?

5    A    Yes.

6    Q    What is VRC?

7    A    VRC is a financial advisory services firm that works

8    with an independent client base.  It largely consists of

9    corporations and asset managers, namely, private equity

10   firms, venture capital firms, institutional investors.  VRC

11   performs business enterprise valuations so it values the

12   entire enterprise itself.  We also value the securities that

13   they issue such as equity, debt, hybrid securities, their

14   derivatives, hence the right-hand side of the balance sheet.

15   And then on the left-hand side we value the assets as well,

16   so intangible assets and tangible assets such as property

17   planned equipment and fixed assets and intangible assets,

18   you know, like goodwill, trade names, patents, those kind of

19   things.

20   Q    What is your position at VRC?

21   A    I'm a senior vice president.

22   Q    For how long have you worked at VRC?

23   A    Since December, 2010.

24   Q    Can you please briefly describe your education for the

25   jury?

Barnett - Kasulis - Direct                    4626

1   A    Sure.  I've completed high school.  I have an

2   undergraduate degree, a Bachelor of Science in

3   bioengineering from the University of California San Diego,

4   and I have a Master's in business administration from

5   Georgetown University.

6   Q    Can you also step the jury through your employment

7   history?

8   A    Yes.  Prior to VRC most recently I worked in valuation

9   service practices at Ernst & Young.  I was a large

10  accounting firm as well as Marsh & McLennan, which is a

11  public company and KPMG as well in a tax practice or

12  transfer pricing, economic consulting services valuation

13  group.

14  Q    You mentioned that you are a senior vice president at

15  VRC.  What are your job responsibilities?

16  A    There's a few.  Largely it's the management of

17  engagements, so valuation engagements as well as the

18  execution of those engagements and business development, so

19  marketing and such, the client base, primarily for me is the

20  corporation's private equity firms and some venture capital.

21  Q    And were you a senior vice president in the -- in the

22  2012 time period?

23  A    Yes, I was.

24  Q    Now you had mentioned valuations.  What are valuations?

25  A    Yeah, so a valuation simply is the analysis of a

Barnett - Kasulis - Direct                    4627

1  specifically defined subject interest for the expressed

2  purpose of providing either a point estimate or a range of

3  value of that subject interest as of a specific valuation

4  date.  So the interest must be clearly defined.  We may

5  provide a point estimate or a range and the valuation date

6  is also very important.  So it's an analysis.

7  Q    And what kinds of things can you perform a valuation

8  regarding?

9  A    Yeah.  Primarily for us it -- we have people that

10 literally do machinery and equipment, real estate and actual

11 personal property.  For me, it's more of a business.  So an

12 operating entity or what we call a business enterprise and

13 then more specifically -- so that would be very global.

14 More specifically it would be the securities that they issue

15 to finance themselves.  So that would be the equity

16 securities, it can be debt securities, something we call

17 hybrid securities, which is a kind of a mixture we do and

18 then derivatives, which are security that ties to another

19 line.

20 Q    Now, did there come a point in time when you provided

21 services to an entity named MSMB?

22 A    Yes.

23 Q    And what time period was that?

24 A    First half of 2012.

25 Q    And how did that come about?

Barnett - Kasulis - Direct                    4628

1  A    We were engaged through our New York office and I was

2  brought in to help manage and/or execute that engagement.

3  Q    And when you say you were engaged through the New York

4  office, was there anyone in particular who you dealt with in

5  VRC's New York office?

6  A    Yes, Raymond Weisner.

7  Q    And what was your understanding of what MSMB was?

8  A    Basically an asset manager of funds of sorts.

9  Q    And with respect to the MSMB engagement, what were you

10 engaged to do?

11 A    We were engaged to value securities held by MSMB in

12 Retrophin, LLC.

13 Q    Who did you deal with at MSMB as part of this

14 engagement?

15 A    Jackson Su.

16 Q    And what was your understanding of who Jackson Su was

17 at MSMB?

18 A    Just that he was a member of the fund.  I didn't have

19 any operational sense.

20 Q    Did you have any contact with the defendant Martin

21 Shkreli at all during this engagement?

22 A    No.

23 Q    Now, I'm showing you what has been marked for

24 identification behind Tab Number 4 of your binder as the

25 Government Exhibit 127-4.

1    A    Yes.

2    Q    Do you recognize this document?

3    A    Yes, I do.  This is an e-mail from Ray.  I am copied

4    and it's outlining the service order for MSMB Healthcare.

5    So a signed letter means there's an engagement underway.

6    Q    And the date of the e-mail is March 19, 2012?

7    A    Correct.

8    Q    And when you say Ray is that the Ray Weisner that you

9    mentioned earlier?

10   A    That's right.

11        MS. KASULIS:  The Government moves Exhibit 127-4

12   into evidence.

13        MR. BRAFMAN:  No objection.

14        THE COURT:  We receive 127-4.

15        (Government's Exhibit 127-4 so marked and received

16   in evidence.)

17   BY MS. KASULIS:

18   Q    So let's start with the cover e-mail.  Do you see at

19   the bottom of this e-mail from Jackson Su to an Allison

20   Russo dated March 19, 2012, with the title Proposal For

21   Valuation Services VRC.  Do you see that?

22   A    I do.

23   Q    And then Mr. Su writes, "Did Martin sign this and we

24   returned," with a question mark.

25        Ms. Russo then sends an e-mail to Mr. Weisner

Barnett - Kasulis - Direct                4630

1    saying, "Hi, Ray, please see the attached, thanks," and then

2    it appears that that e-mail is forwarded by Mr. Weisner on

3    March 19th, 2012, to Jane Becky.  Do you know who that is?

4    A    Yes.  She's, I believe, is administrative support.

5    Q    Are you are carbon copied on this e-mail; is that

6    right?

7    A    Yes.

8    Q    And it's entitled, "Signed letter MSMB Healthcare

9    SO8845."  Do you know what SO8845 is?

10   A    I do.  SO is service order and then the 8845 is the job

11   number.

12   Q    Thank you.

13        So if we can turn to the next page of this

14   document?

15   A    (Witness complies.)

16   Q    What is this document, generally speaking?

17   A    This is the engagement letter.

18   Q    And date on the letter?

19   A    March 16, 2012.

20   Q    And the letterhead is VRC letterhead; is that right?

21   A    That's right.

22   Q    And who is this letter addressed to?

23   A    Mr. Shkreli.

24   Q    And he's listed as the chief investment officer of

25   MSMB Healthcare LP; is that right?

Barnett - Kasulis - Direct                4631

1   A    True, yes.

2   Q    The first paragraph reads, "This letter will confirm

3   upon execution your authorization for Valuation Research

4   Corporation, VRC, to provide MSMB Healthcare LC, or the

5   company, with valuation services as outlined below."  And

6   then beneath that there is what is called an engagement

7   scope.  Is that typical for these types of letters to have a

8   defined engagement scope that's contained in the letter?

9   A    Yes.

10  Q    And this engagement scope section then goes on to

11  state, "The Company is the owner of certain interests in

12  Retrophin, LLC, a biotechnology company defined as

13  Retrophin.  The interests are comprised a Class A common

14  stock, Class B common stock and Series A preferred stock."

15        It goes on the state, "This project will involve

16  the determination by VRC of the fair value of the Class A

17  common stock of Retrophin as of both 12/31/2011 and

18  February 29th, 2011, and, two, Class B common stock of

19  Retrophin as of 12/31/2011 and February 29th, 2012."  Can

20  you explain the difference between Class A common stock and

21  Class B common stock?

22  A    Yes.  So for the LLC agreement, which is what outlines

23  the authorized capital stock of an LLC, limited liability

24  company, it just outlines if there's a series they prefer,

25  there's a Class A common and a Class B common.  So the Class

Barnett - Kasulis - Direct                    4632

1    B common is actually referred to as incentive units, so

2    these are things that vest.  They are awarded to individuals

3    and vest over time.  The Class A is just typical common

4    stock as well as defined in the agreement as the Series A

5    preferred.  So the Series A preferred is what is actually

6    purchased, so Retrophin capital contribution, and the common

7    stock is typically not purchased, it's just part of the

8    residual claim of equity.

9              THE COURT:  And that's under the Class A umbrella

10   for stock?

11   A    Well, the preferred, Series A preferred is an

12   individual class and then the common Class A and B, they

13   just have different voting rights and the B is really, you

14   have to vest.  It's an incentive unit, but otherwise it's

15   economically the same as Class A, so there's really very

16   economic distinction, it's just that vesting is required on

17   the Class B.

18   BY MS. KASULIS:

19   Q    Thank you.  And then what I just read, "The purposes of

20   our services is to support for financial reporting

21   requirement."  What does that mean?

22   A    Yeah, that's -- really outlines what we're hired, you

23   know, the scope of our work here is to -- for financial

24   reporting for audit, financial statements, so with respect

25   to financial statements, there's often fair value

Barnett - Kasulis - Direct                    4633

1    assessments and requirements.  So to the degree that's

2    needed in completing an audited financial, that's something

3    that we are -- that is the service we're providing.

4                (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Barnett - direct - Kasulis*                              4634

1   DIRECT EXAMINATION (CONT'D.)

2   BY MS. KASULIS:

3   Q    Then right below that it says:  "The standard of value

4   will be fair value."

5   A    Correct.

6   Q    Is that what you're referring to?

7   A    Yes.

8   Q    And below that it states:  "We will utilize the then most

9   recent transaction price of $20 per share of Series A

10  preferred for the 12/31/2011 valuation date and the then most

11  recent transaction price of $40 per share of Series A

12  preferred for the February 29th, 2012 valuation date."

13           With respect to those two prices per share, $20 per

14  share and $40 per share, where did that pricing come from?

15  A    That was provided by MSMB in what's called the

16  capitalization table of the company.  So, the capitalization

17  table lists all the individual holders of the securities, the

18  security that they hold and if there was a price paid for

19  them, the price that was paid for the security.

20  Q    And then right below that it states:  "Our work shall

21  include consideration of the liquidation, distribution and/or

22  voting right differences of the various shares.  We will not

23  be independently determining the enterprise value of

24  Retrophin."

25           So, what does that mean, "We will not be

*Barnett - direct - Kasulis*                                    4635

1  independently determining the enterprise value of Retrophin"?

2  A    It essentially limits the scope of our work directly to

3  the evidence of the price paid for the subject securities, so

4  we're not going and actually saying what is Retrophin worth

5  and then therefore inferring the value of the securities, we

6  are literally looking at the transactions provided to us in

7  the security and working with that as the indicator of value.

8  Q    If we go to the next page of this document and then under

9  the Engagement Management section, you're listed there; is

10  that right, Mr. Barnett?

11  A    Yes.

12  Q    And it lists your qualifications there as senior vice

13  president?

14  A    Yes.

15  Q    And it also references Mr. Weisner, that last line, of

16  the Engagement Management team?

17  A    Correct.

18  Q    And if we go below that, the next two sections under

19  Valuation Deliverables, it states:  "VRC shall deliver a

20  valuation report with our determination of the fair value of

21  the above securities."

22         And then the delivery time:  "We will deliver our

23  value conclusions within one week of our being engaged in

24  writing."

25         Is that sort of a typical amount of time for this

*Barnett - direct - Kasulis*                                    4636

1    sort of engagement, one week?

2    A    It's on the short side but given that we weren't going to

3    perform an enterprise and in this case /equity value, it was

4    appropriate for the scope that we were being engaged for.

5    Q    And if we turn to the next page of this letter.

6    A    Yes.

7    Q    And just look at the top section first, the fees and

8    charges.

9    A    Yes.

10   Q    It states there:  "Our fee for the services outlined

11   above exclusive of expenses will be $3,000."

12            Is this amount typical for this sort of work that's

13   being performed in the letter?

14   A    It reflects the limited scope nature of the work and

15   would be considered on the low fee -- low end range of a fee

16   of valuation services we would provide.

17   Q    And if we could now focus on the next section of this

18   page, the Liabilities and Indemnification section.

19            Will you look at the last paragraph here, the one

20   starting:  "VRC will furnish future additional services,"

21   starting about halfway down, the sentence starting:  "Our

22   report is intended solely," if we could read that full

23   sentence into the record?

24   A    "Our report is intended solely for the benefit of the

25   company and may not be disclosed publicly or made available to

Barnett - direct - Kasulis                              4637

1    third parties other than the board of the company and the

2    company's external auditor without the prior written consent

3    of VRC."

4    Q    And just to be clear, the company was defined on the

5    first page of this letter as MSMB Healthcare LP; is that

6    right?

7    A    Yes.

8    Q    And if we turn to the last page of this exhibit, it

9    appears to be signed by Raymond Weisner; is that correct?

10   A    Yes.

11   Q    Then the bottom part of this signature block, it appears

12   that Martin Shkreli has signed on behalf of MSMB Healthcare LP

13   dated March 19th, 2012; did I read that properly?

14   A    Yes.

15   Q    Thank you.  We can put this document aside.

16        Now, did you receive -- I think you've made some

17   reference to some materials that you used to perform this

18   engagement; can you please describe the materials from MSMB

19   that you received to begin your work on this engagement?

20   A    Yes, they were primarily what's called a Private

21   Placement Memorandum and also a couple of different LLC

22   agreements, basically they're the same, they just differed by

23   their date, and the capitalization table I referred to before

24   was provided.

25   Q    So, I'm sorry.

*Barnett - direct - Kasulis*                                    4638

1   A    Yeah, I think that's the primary things.

2   Q    So, I'm showing you what's marked for identification as

3   Government Exhibit 127-3, it's behind Tab 3 of your binder.

4   A    Okay.

5   Q    Do you recognize this document?

6   A    I do.

7   Q    What is it?

8   A    It's an e-mail to me from Ray providing the attachments I

9   was just referring to.

10          MS. KASULIS:  The government moves 127-3 into

11  evidence.

12          MR. AGNIFILO:  No objection.

13          THE COURT:  We receive 127-3.

14          (Government's Exhibit 127-3 so marked in evidence.)

15  Q    So, this is the e-mail that you just referenced, the last

16  e-mail in the chain dated March 15th, 2012.  It appears that

17  within this e-mail chain, it starts from Jackson Su dated

18  March 13th, 2012 to Mr. Weisner with the title MSMB Healthcare

19  LP Package for Retrophin Investment, and Mr. Su writes:

20          "Ray, Here is the package for Retrophin."

21          And Mr. Su is listed as the Chief Operating Officer

22  of MSMB Capital, do you see that?

23  A    I do.

24  Q    Okay.  So, if we can go up in this e-mail chain, it

25  appears that -- if we can scroll up a little bit, it appears

1   that Mr. Weisner then forwards this chain to you, Mr. Barnett;

2   is that correct?

3   A    Yes.

4   Q    And the title is Need For Assistance with Review of Stock

5   Valuation and then there are a series of attachments here

6   listed here in the attachment sections; is that right?

7   A    Yes.

8   Q    And that includes, for example, the Retrophin LLC

9   agreement on two separate dates in March 2011 and July 2011,

10  the Retrophin PPM in July of 2011, a Retrophin Excel

11  spreadsheet, it looks like there are two capitalization tables

12  for Retrophin dated March 13th, 2012 and December 31st, 2011,

13  and then a Retrophin LLC balance sheet dated February 29th,

14  2012; is that correct?

15  A    Yes.

16  Q    And did you review all of these attachments at the time

17  that you performed this engagement?

18  A    I did.

19  Q    And if I can direct your attention to the page after VRC

20  151, there's actually a little tab in your binder there.

21  A    Go ahead.

22           MS. KASULIS:  The page itself doesn't have a Bates

23  number, Your Honor, because it was produced as an Excel file.

24           THE COURT:  Okay.

25           MS. KASULIS:  So it is the page immediately after

*Barnett - direct - Kasulis*                                    4640

1    VRC 151 which does have a Bates stamp.  Okay.  So, if we can

2    zoom in --

3              THE COURT:  For the record, can we put the title in

4    the record of this document please.

5              MS. KASULIS:  The title of this document is

6    Retrophin LLC Capitalization as of March 13th, 2012.

7              THE COURT:  Thank you.

8    Q    Is that correct?

9    A    Yes, it is.

10   Q    Can you just explain how this capitalization table is set

11   up for the jury?

12   A    I can.  So, it outlines the three classes of stock in

13   Retrophin LLC.  We see the Class A common investment unit at

14   the top.  It shows you specifically who owns these units and

15   how many are currently owned or held.  These are the ones that

16   are outstanding, there may be more authorized but these are

17   the ones that are currently outstanding.

18              Next are the Class B common, you see a few more

19   names.  These are typically insiders to Retrophin LLC who have

20   received these as incentive units so they require vesting,

21   much like in any kind of an equity award.

22              And then the third column or the third category is

23   the Series A preferred units and these are the actual shares

24   that are sold and so you receive a capital contribution for

25   the ownership of these shares, it shows you the individual

Barnett - direct - Kasulis                         4641

1   that was the investor or the entity as well as the dollar

2   amount and the units.

3   Q    When you say "capital contribution," does that mean

4   money?

5   A    It means money.

6   Q    And if you turn to the next page.

7   A    Okay.

8   Q    And the title of this document is Retrophin LLC

9   Capitalization as of December 31, 2011.  Is this

10  capitalization table set up in the same way as the prior

11  capitalization table that we just reviewed?

12  A    Yes.

13  Q    And if we can go to the next page of this document, and

14  this is the Retrophin LLC Balance Sheet as of February 29th,

15  2012.  Did you use this document as part of your analysis?

16  A    We did not.  It would be more appropriate perhaps if we

17  were doing an actual enterprise value but we referenced it to

18  see what audited, you know, GAAP assets and liabilities and

19  equity existed and one thing we checked for was whether there

20  was any material long-term debt outstanding and there is not.

21  Q    And when you say an "enterprise value," what do you mean

22  by that?

23  A    The value of all invested capital in an entity, so that

24  can be debt and equity and in this case there is no meaningful

25  long-term debt outstanding so the enterprise value and the

1   equity value would merge to be sort of synonymous here.

2   Q    So, you were not performing an enterprise valuation for

3   Retrophin; is that correct?

4   A    That's correct.

5   Q    So, after you received these materials what did you do

6   with them?

7   A    Just reviewed them and focused on the materials that were

8   relevant to the work we were performing.

9   Q    And were you able to generate any work product?

10  A    Yes.

11  Q    I'm showing you what's been marked for identification as

12  Government Exhibit 127-5, it's behind Tab 5 of your binder.

13       Do you recognize this document?

14  A    I do, this is an e-mail to me -- from me to Jackson Su

15  containing the valuation of Retrophin as of 3/15/2012.

16  Q    And when you say a valuation of Retrophin, what do you

17  mean by that?

18  A    Well -- it's actually the valuation of the MSMB Capital

19  stock held in Retrophin.

20       MS. KASULIS:  The government moves Exhibit 127-5

21  into evidence.

22       MR. AGNIFILO:  No objection.

23       THE COURT:  All right.  We will receive 127-5.

24       (Government's Exhibit 127-5 so marked in evidence.)

25       THE COURT:  You said this was the valuation of MSMB

*Barnett - direct - Kasulis*                                    4643

1   Capital stock or MSMB Healthcare stock?

2            THE WITNESS:  MSMB Healthcare and the stock that

3   they held in Retrophin, so there's no valuation of Retrophin,

4   just the capital stock issued by Retrophin held by MSMB

5   Healthcare.

6            THE COURT:  Okay.  Thank you.

7            THE WITNESS:  Yes.

8   Q    So, this appears to be an e-mail from yourself to Jackson

9   Su dated March 30th, 2012; is that right?

10  A    Yes.

11  Q    And this appears to be about a couple weeks after you had

12  received the materials from Mr. Su that we just reviewed?

13  A    Correct.

14  Q    And the title is March Val Date and there is an

15  attachment listed here, is that right, with the date

16  3/15/2012?

17  A    Yes.

18  Q    So, if we can go to the next page of this document; so, I

19  know this is going to be a little hard to read so we're going

20  to try to focus but just generally speaking, how long is this

21  document that you prepared?

22  A    Well, it's one page.

23  Q    And if we could look at the top portion of the document,

24  on the left-hand side it's titled Investment Summary; is that

25  correct?

*Barnett - direct - Kasulis*                                                          4644

1   A    Yes.

2   Q    And then underneath it's MSMB Capital Valuation Date of

3   3/15/2012; is that correct?

4   A    Yes.

5   Q    And then it's Retrophin LLC, private company, and then

6   it's on VRC letterhead.  If we could then just step through

7   this first section entitled Business and Transaction Overview.

8   I know there's going to be multiple versions of this so we

9   won't do this for every one of these but if you could for the

10  jury just step through each one of these sections, that would

11  be helpful.

12  A    Yes, so this is the more comprehensive view of all the

13  valuation dates that we provided but the first is to identify

14  the subject company, so Retrophin LLC, just a brief blurb

15  about what they do.

16  Q    And that's just, if you look at your screen, Mr. Barnett,

17  this is the first section we're talking about, Business and

18  Transaction Overview?

19  A    Correct, and specifically then the business and there we

20  talk about when it was formed and that it's completed a

21  financing offering of the Series A preferred units and

22  otherwise authorized and issued both Class A common and Class

23  B common.

24       MS. KASULIS:  So, I think what might help, Your

25  Honor, is maybe we can switch to the Elmo and we can maybe

Barnett - direct - Kasulis                    4645

1   focus a little better.  Ms. Smith is going to try to assist

2   me.

3            (Pause.)

4   Q    So, it looks like under this Business and Transaction

5   Overview section there are four sections, Business,

6   Transaction, Follow-on Transaction and Recent Events; is that

7   correct?

8   A    Yes.

9   Q    And the Business and Transaction Overview section, what

10  is that, generally speaking?

11  A    It's basically outlining the facts and circumstances of

12  the engagement, so in this case we've defined and introduced

13  what the subject enterprise is, it is Retrophin LLC, and then

14  the two transactions are the Transaction and Follow-on

15  Transaction.  We've identified the actual transactions in the

16  securities issued by Retrophin LLC evidenced by the

17  capitalization table on various dates.

18  Q    And so, that's the Transaction section right below the

19  Business --

20  A    Yes.

21  Q    -- Transaction?

22  A    Yes, it's basically providing you with specific units

23  that were offered, the actual amount that transacted in terms

24  of number of units and the dollar value at which they

25  transacted, so there's also some aggregate dollar amounts

Barnett - direct - Kasulis                                    4646

1  presented.

2  Q    In this Transaction section what is the price per unit?

3  A    Yeah, so there were a couple, the Series A was purchased

4  at two different points in time, one time for $20 a unit and

5  then a second time at $40 a unit, still the same security just

6  purchased at a higher price.

7  Q    Can you just direct us in this Transaction section as to

8  where $40 a unit is?

9  A    Let's see, I think that would be in the Follow-on

10 Transaction.

11 Q    Okay.

12 A    Yes, it's in the Follow-on.  So, the initial transaction

13 saw only the units placed for $20 per unit.

14 Q    Okay.  And the Follow-on Transaction lists the $40 per

15 unit --

16 A    Yes.

17 Q    -- pricing?

18 A    Yes.

19 Q    So, if we read the Follow-on Transaction section, it

20 states:  In the first quarter of 2012 an additional 31,025

21 Series A preferred units were sold for $40 per unit raising

22 1.24 million dollars.  This increased the total contributed

23 capital in Retrophin to $2.1 million which is current as of

24 this valuation date.  MSMB Healthcare was the primary investor

25 in the second round, $40, purchasing 28,500 units for

*Barnett - direct - Kasulis*                                    4647

1   $1.4 million; is that correct?

2   A    $1.14 million.

3   Q    Sorry, thank you, $1.14 million.

4   A    Yes, that is correct.

5   Q    And then under the Recent Events section, what does that

6   section typically include?

7   A    Largely it --  well, it says Events, I was going to say

8   events, milestone or valuation inflection points, did anything

9   dramatic happen at this subject company, so this case

10  Retrophin LLC, so just things going on operationally or any

11  kind of changes or transformation in the entity.

12  Q    So, it states here in terms of recent events:   In

13  February 2012 Retrophin licensed ADARA program from Ligand.

14  And then it states:   In exchange for $1 million up front, $75

15  million in potential milestone payments and 9 percent

16  royalties.

17          And then it talks about Retrophin would then get

18  various rights and the last two sentences of this section

19  state:   "The company can have multiple early and later stage

20  products in the pipelines concurrently, as such the outlook

21  and valuation of its securities is highly event driven."

22          What does that mean?

23  A    It just reflects the early stage nature of the company

24  and that its valuation is going to be directly impacted by

25  particular milestone achievements or failures but significant

 1  developments in its course toward product development.

 2  Q    In terms of this upper section of this one-page summary

 3  entitled Business and Transaction Overview, the Business

 4  section, the Transaction section, the Follow-on Transaction

 5  and the Recent Events, where do you get this information from

 6  that's listed in this upper portion of the summary?

 7  A    Sure, it largely came from the Private Placement

 8  Memorandum, so that's a fairly detailed document really

 9  outlining the scope of the business enterprise, its goals and

10  its risks and those kind of things.  A lot of the specific

11  detail you see here is directly from the capitalization tables

12  and then the recent events was either probably also -- may not

13  have been in the PPM but it would have been provided by say

14  Jackson or some kind of a document.

15  Q    So, all of these sources that you reference, those all

16  come from the client; is that right?

17  A    Correct.

18  Q    And if we look now on the lower portion of the report on

19  the right side, can you explain this portion titled Retrophin

20  LLC Capitalization Table March 13th, 2012?

21  A    Yes, so this is a high level direct summary of the

22  detailed capitalization table just presented by the three

23  different classes of equity, the primary holders so

24  identifying with the focus being on MSMB Healthcare, and you

25  can see really then the focus being the Series A preferred

1  units because those are the ones that had a transacted value

2  that we list various and just seeking to identify which units

3  MSMB held but also within an aggregate total presentation of

4  the units outstanding.  Then you can see the contributing

5  capital, so if there was any money put forward on these

6  securities that's identified, again that is largely present

7  for the Series A preferred units, and then some minor notes

8  there.

9  Q    And the minor notes have to do with the price per unit of

10  the purchases?

11  A    Well, true, which is not as minor but that's also

12  detailed above but, yes, it just reiterates again actually

13  MSMB's holdings in Series A were 95 percent acquired at the

14  $40 per unit, 5 percent at the $20 per unit.

15  Q    From where is this information in this section derived?

16  A    Again the capitalization table.

17  Q    And if we then can look at the next section below that

18  entitled Valuation Considerations and Conclusion Highlights,

19  if we start with the first bullet point there, can you please

20  read that bullet point to the jury.

21  A    "This valuation summary does not undertake estimating a

22  current enterprise or total equity value.  The facts and

23  circumstances are that the Series A preferred units just

24  transacted in the last six months at $20 and $40 per unit

25  represent $830,000 and $1.2 million in contributing capital

1    respectively.  Investors included MSMB Healthcare -- or MSMB

2    Capital which that obviously should be Healthcare LP and

3    several sophisticated individuals with significant industry

4    experience."

5    Q    So, your understanding, and we'll get to this, but in

6    subsequent versions of this summary MSMB Capital is changed to

7    MSMB Healthcare?

8    A    Correct.

9    Q    And then with respect to "several sophisticated

10   individuals with significant industry experience," who is

11   being referred to there?

12   A    Just the other line items within the capitalization

13   table.

14   Q    So, do you know any of those investors?

15   A    I do not.

16   Q    If we look at the third bullet point, can you read that

17   first sentence there in the bullet point?

18   A    "The operational state," that bullet?

19   Q    Yes.

20   A    "The operational state of Retrophin and the very recent

21   (less than six months) Series A preferred capitalizations

22   suggest that the company's equity valuation is likely to be

23   equal to the total contributed capital.  However, the

24   significant events of the license agreement in February 2012

25   suggest that additional value may be present.  $1 million was

1  used to acquire this license, half the Series A contributed

2  capital.  In addition, 732,000 common B units have been issued

3  at no consideration of which 157,000 invested but may reflect

4  value contribution and additional equity value."

5  Q    And then if we could look at the very last bullet point

6  there.

7  A    Yes.

8  Q    And can you please read that bullet point for the jury?

9  A    "MSMB management has indicated that a $200 million

10 valuation has been seriously discussed by sophisticated third-

11 party institutions as a possible near-term IPO valuation.

12 Such a valuation would create significant economic value to

13 these securities well beyond the current purchase price

14 reflecting our upper bound."

15 Q    So, what does that bullet point mean?

16 A    Yeah, it's just that in our working with MSMB Healthcare,

17 you know, it was posited to us that there was serious

18 discussions about a near-term IPO, initial public offering,

19 and that the valuation of that was in the $200 million range

20 and so it would mean that we would -- that is reflective then

21 of our high end of the value range that we provided.

22 Q    From whom did you get this $200 million IPO potential

23 from?

24 A    Sure, MSMB Healthcare, the client.

25 Q    And did you do any third-party verification of that

*Barnett - direct - Kasulis*                          4652

1   potential $200 million IPO?

2   A    We did not.

3   Q    And if we just then look at the left side of this report,

4   if we could just go to the very top just to start with.

5            THE COURT:  May I ask a question.

6            MS. KASULIS:  Yes.

7            THE COURT:  Sir, you said you got the $200 million

8   IPO information from MSMB Healthcare, do you know who?

9            THE WITNESS:  It would be Jackson Su.

10           THE COURT:  Thank you.

11  Q    And then just at the very top here, so this section is

12  entitled Investment Overview and then MSMB Capital Analyst,

13  who is listed there?

14  A    Jackson Su.

15  Q    Okay.  And then if we go to this section here entitled

16  Security Valuation Contribution and then the per unit value

17  current, per unit value is current?

18  A    Yes.

19  Q    Can you please explain these two sections?

20  A    Yes.  So, the top section, the non-yellow section is the

21  aggregate dollar amount in a low, mid and high value range of,

22  and by column, the left column is Series A preferred, the

23  right column is common A, Class A stock, and this is

24  specifically the dollar amount of the securities held by MSMB

25  Healthcare.  So, those are the aggregate dollars amounts.  We

1   were provided with a mark or a value estimate by MSMB and

2   that's represented there as the 1.2 million and then --

3   correct -- and then everything in the yellow box is a

4   translation of the aggregate dollar amount that you see

5   divided by the number of units, just straight math, just a

6   straight divide.

7   Q    So, can you explain the low, mid and high value ranges?

8   A    Yes, so the low, mid and high, the low is reflective of

9   the transaction price of the Series A.

10   Q    So, that's how much?

11   A    This would either be at the $20 or $40 unit value, let's

12   see, the $40 unit value.  You can see that -- no, back under

13   the other capitalization table where I have contributed

14   capital, so the 1.17 million, it's the total investment held

15   by MSMB of which a couple -- 5 percent of the units were

16   purchased at $20 but 95 percent were purchased at $40.

17   Q    Okay.  So, that's the low and middle you have $20 and

18   $40?

19   A    Yes.

20   Q    Is that correct?

21   A    That's right.

22   Q    Then let's talk about the VRC value high at $210 per

23   share.

24   A    Yes.

25   Q    How did you come up with that number?

*Barnett - direct - Kasulis*                                           4654

1   A    So, that's essentially taking 200 million divided by the

2   fully diluted outstanding units at the time assuming all

3   vesting of the class B common; so, back to the table where

4   we've identified each class in the summary and there's 321,000

5   Class A common outstanding, 731,840 common B units or

6   incentive units outstanding, and then 75,525 Series A.  So, if

7   you sum those three numbers and then divide into, you get a

8   little over a million shares; you divide that into 200

9   million, you get $210 but there's some disaggregation there

10  between the Series A and the Class A common but that's why you

11  see two different values, but that's basically the value.

12  Q    So, basically it is total number of shares divided into

13  this 200 million?

14  A    Into the 200 million, that's correct.

15  Q    Just to be clear, the $200 million number, where does

16  that come from?

17  A    Jackson Su.

18  Q    That's the $200 million potential IPO?

19  A    Yeah, the potential IPO.

20  Q    And that's from the client?

21  A    Correct.

22  Q    If we just go a little further up just to explain this

23  $6,300,000, the VRC high value; can you just explain where

24  that comes from?

25  A    Yes, so that would then just be the units at 200 -- it's

*Barnett - direct - Kasulis*                                    4655

1   what MSMB holds of all of their units, so that would be the

2   common and the Series A preferred.  So, all of those units at

3   $210 approximately.

4   Q    So, again, the 6.3 million is derived from that

5   $200 million IPO potential, is that correct?

6   A    Yes.

7   Q    Okay, so I think we can put this document aside.

8        Now I'm showing you what's marked for identification

9   as Government Exhibit 127-5, it's behind Tab 5 of your binder.

10       THE CLERK:  Is that on the Prosecution?

11   Q    127-6, it's behind tab six of your binder.

12       THE CLERK:  Are you using the Elmo?

13       MS. KASULIS:  We can use the sanction for this one.

14   Q    Do you recognize this document?

15   A    Yes.

16   Q    What is it?

17   A    This is an e-mail from Jackson Su to myself with some

18   requests.

19       MS. KASULIS:  The government moves this exhibit into

20   evidence.

21       MR. AGNIFILO:  No objection.

22       THE COURT:  We receive 127-6.

23       (Government's Exhibit 127-6 so marked in evidence.)

24   Q    Now, can you please -- if we go to the very bottom of

25   this e-mail.

1   A     That's in the next page?

2   Q     Yes, that's right, if we can go to the next page,

3   the very first e-mail in this chain.  Could you please read

4   your e-mail to the jury, it's dated March 27th, 2012, to

5   Mr. Su.

6   A     Yes.

7           "Jack, I've put together a summary valuation for

8   your holdings in Retrophin LLC.  This summary is based on the

9   information you have provided to us including cap tables

10  December 2011 and March 2011, the LLC agreements, the private

11  placement memorandum June 2011, a balance sheet February 2012

12  and the model as well as our telephone conversations.  The

13  upper end of the value range is reflective of a $200 million

14  near-term IPO, the preferreds and common would effectively be

15  valued the same on a per unit basis at that level of equity

16  value.  At 72,525 preferred units, 321,660 common A units and

17  731,840 common B units there would be approximately $175 per

18  unit not considering any additional units or capital that an

19  IPO may involve.  I'm not giving any particular weight to the

20  ranges, just illustrating the potential value range.  I feel

21  marking the preferreds at the recent transaction price makes

22  sense though there may be upside already present and I've

23  marked the common at the midpoint of 0 and 20 or $10 a unit

24  which is reflective of your recent marks.  Have a look and we

25  can discuss."

Barnett - direct - Kasulis                    4657

1    Q    And if we go to Mr. Su's response just above that, it is

2    dated March 30th, 2012, Mr. Su writes:  "Hi, Rob.  I hate to

3    rush you but any chance of receiving a final draft this

4    morning.  We want to have something to our administrators

5    later this afternoon."

6            Do you know who he's referring to in terms of

7    administrators?

8    A    No.

9    Q    And if we go to the next page, the very bottom, you

10   reply:  "Okay.  I'm just getting on my feet at the office, a

11   bit hectic being gone all week.  I'll try to have to you by

12   3:00 p.m. EST, Eastern Standard time."

13           And then it looks like you do, if you go farther up

14   in the chain it looks like you -- and Jackson says, "Thank

15   You" and then farther up it looks like you then attach:

16   "Here's an updated valuation summary for March 15th, 2012,

17   I'll send the other 31 December 2011.  Rob."

18           Let's go ahead and look at Mr. Su's response.  And

19   Mr. Su responds on March 30th, 2012, to you and he states:

20   "Rob, Please revise MSMB Capital to MSMB Healthcare LP."

21           And so was that the change that you were referencing

22   in the prior investment summary that we reviewed?

23   A    That's correct.

24   Q    And then:  "Analyst to Martin Shkreli."

25           Was that then a change from the Jackson Su listed on

*Barnett - direct - Kasulis*                           4658

1    the investment summary to Martin Shkreli?

2    A    Yes.

3    Q    And then:  "Valuation date should be 12/30/2011 and

4    1/31/2012 instead of March 15.  I went the wrong direction

5    with dates.  Everything else looks good.  If possible send

6    final today.  Thank you."

7              So, what was your reaction to this changing of the

8    dates?

9    A    I don't remember.  Nothing major other than now all of a

10   sudden we're kind of going to dates prior to where we were but

11   nothing significant, no significant reaction.

12   Q    Okay.  Just to take a step back, in total how much time

13   did you spend on this engagement?

14   A    The fee which you saw earlier allows for ten billable

15   hours tour, ten what we call financial billable hours for the

16   work and my time was probably no more than say 20, it was in

17   line with what was available for the fee that was provided but

18   I think by the time I went through all the documents and

19   provided the detail in the schedules and, you know, back and

20   forth with e-mails, it was probably a little more than that.

21   Q    So, I'm showing you what's been marked for identification

22   as Government Exhibit 127-7, it's behind Tab 6 of your binder.

23   A    Tab 6?

24   Q    I'm sorry, seven.

25   A    Seven, yes.

*Barnett - direct - Kasulis*                                    4659

1    Q    Do you recognize this document?

2    A    Yes.

3    Q    And what is it?

4    A    It is a series of e-mails and with the top e-mail being

5    from myself to Jackson copying Ray Weisner with the valuation

6    summaries for December 30, 2011, and January 31, 2012 as

7    requested.

8    Q    So, this is your response to Mr. Su's request in our

9    prior exhibit?

10   A    It is.

11         MS. KASULIS:  The government moves this exhibit into

12   evidence.

13         MR. AGNIFILO:  No objection.

14         THE COURT:  We receive 127-7.

15         (Government's Exhibit 127-7 so marked in evidence.)

16   Q    So, if we look at the very top of this e-mail, this

17   appears to be a response to Mr. Su at 11:30 p.m. which says:

18   "Jackson, Here's the two valuation summaries with the changes

19   noted.  Let me know if I missed something.  Thanks, Rob" and

20   there are two attachments there, Retrophin LLC Preferred and

21   Common Valuation Summary, December 30th, 2011, and Retrophin

22   LLC Preferred and Common Valuation summary 31 January 2012.

23         If we could then go to the two attachments and then

24   if we can switch to the Elmo for these two attachments please.

25   So, the first attachment, if we can look at the upper

*Barnett - direct - Kasulis*                                    4660

1    left-hand corner, and so this investment summary is listed for

2    MSMB Healthcare LP with a valuation date of December 30th,

3    2011; is that right?

4    A     Yes.

5

6

7                (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Barnett - Direct - Kasulis                    4661

1    DIRECT EXAMINATION (CONTINUED)

2    BY MS. KASULIS:

3    Q     And then if you look at the MSMB Healthcare analyst

4    section, has that now been changed to Martin Shkreli?

5    A     Yes.

6    Q     And if we look at the right side of the valuation

7    summary, does this reflect the Capitalization Tables of

8    December of 2011?

9    A     Correct, as of year-end.

10   Q     Okay.  And then if we look further down in the valuation

11   and considerations section, the first bullet point here, it

12   appears to say that, it appears to have actually changed to be

13   investors included -- still lists investors included MSMB

14   Capital; is that right?

15   A     Yes.  So that's a typo or oversight in terms of making

16   that change, but you're right.

17   Q     Then if we look at the very bottom here, there is no

18   listing about a potential IPO scenario; is that right?

19   A     That is right.

20   Q     If we look to the left side of the report, can you then

21   please explain here what is going on in terms of the valuation

22   of the stock for MSMB Healthcare?

23   A     Yes.  Everything here is marked for or valued at the $20

24   per unit that was paid for the actual Series A preferred.  The

25   dollar amount you see under the Series A preferred column is

Barnett - Direct - Kasulis                    4662

1    specific to the shares held by MSMB Healthcare.  There is a

2    representation of the value of the Class A common, based again

3    also on the shares outstanding, and then you can see that

4    reflected in the per units amounts below.

5             The common is basically taken at a discount to the

6    preferred.  It does have distribution rights and there is a

7    preference afforded to the common, but it's junior to the

8    preferred.  And the preferred actually received a 2X

9    liquidation reference.  So every dollar invested in the Series

10   A, $2 will be have to returned to the Series A or any money

11   available to the Class A common.  The common is shown at a

12   discount level, and in fact, at this early stage where we've

13   not done an enterprise or equity value, and we're marking the

14   A purely at the transaction price, we show the common could

15   also be worthless.

16   Q    If you look at the per unit values, it looks like all of

17   the values you listed there are $20 per unit; is that right?

18   A    That's right.

19   Q    And in this scenario there is no $200 million IPO that is

20   contemplated; is that right?

21   A    That's right.

22   Q    If we look to the next page, so then here it looks like

23   this valuation date is 1/31/2012; is that right?

24   A    Yes.

25   Q    If we look under the valuation consideration and

Barnett - Direct - Kasulis                    4663

1   conclusion highlights section, if you go to the right, now the

2   investors included MSMB Healthcare that's been changed now; is

3   that right?

4   A    Yes.

5   Q    If we look all the way at the bottom of this section, as

6   of this date here is where the $200 million IPO consideration

7   comes back into play?

8   A    Yes.

9   Q    And again, you didn't confirm with any third-parties

10  about this potential for a $200 million IPO?

11  A    No.

12  Q    If we look to the left side of this report, again we're

13  seeing these per unit values, particularly in the box in

14  yellow, and these high numbers like the $210 or the 175, those

15  again are being derived from the potential $200 million IPO at

16  this point in time?

17  A    That's correct, the high numbers.

18  Q    What is your source of information regarding the

19  $200 million potential IPO?

20  A    It would just be MSMB.

21  Q    Thank you.  I'm showing you what is marked for

22  identification as Government's Exhibit 127-8, behind tab eight

23  of your binder.  Do you recognize this document?

24  A    Yes.

25  Q    What is it?

Barnett - Direct - Kasulis                    4664

1    A    An e-mail from myself to Jackson and copied Ray Weisner,

2    and it is attaching the valuation summary as of March 31,

3    2012, update.

4              MS. KASULIS:  Government moves this exhibit into

5    evidence.

6              MR. AGNIFILO:  No objection.

7              THE COURT:  We receive 127-8.

8              (Government's Exhibit Number 127-8 so marked and

9    received in evidence.)

10   Q    We can start on the second page of this exhibit, please.

11   If you look in the middle e-mail here from yourself to Mr. Su.

12   It appears to be that the e-mail, the top e-mail, is the chain

13   that we just reviewed; is that right?

14   A    Yes.

15   Q    So the rest of the e-mails are in response, or follow

16   from the chain that we just reviewed; is that correct?

17   A    Yes.

18   Q    Okay.  So if we scroll up, if we start on the prior page

19   on the bottom, appears to be an e-mail from Mr. Su dated

20   April 17, 2012, to yourself with the carbon copy to Ray

21   Weisner.  Then if we go to the actual e-mail, Mr. Su writes,

22   "Hi Rob.  Hope all is well.  Hate to bother you with this but

23   I need to trouble you with a date for Retrophin.  They keep

24   jumping back and forth on dates but can you put a 3/31/2012

25   date on the report?  Also, we'll need your services for this

Barnett - Direct - Kasulis                4665

1   particular investment every quarter end.  Just a heads up.

2   I'll send you a formal notice in the first week of each

3   quarter."  Do you see that?

4   A     Yes.

5   Q     Then if we go to your e-mail response on the first page.

6   A     Okay.

7   Q     You state, "Yes, we can do that.  So we have your

8   year-end and 3/31/2012."

9          When you state year-end, is that in reference to the

10  year-ending 2011?

11  A     Yes.

12  Q     "I actually think that makes a little more sense.  Got a

13  number of balls in the air today and tomorrow, but will send

14  you back something back probably today or later today."

15         Why do you say, I actually thinks that makes a

16  little more sense?

17  A    I think largely because it's just a 3/31 quarter end, so

18  it's something a little cleaner in that regard, than the 3/15

19  for example.  And it's also showing a little bit more

20  investment activity in the Series A preferred, just a little

21  bit more in depth highlighting recent transactions in the

22  stock.

23  Q     And so if we scroll up, Mr. Su responds, "Thank you."

24         And then you respond saying, "I think this will do

25  it."  You've attached Retrophin LLC valuations summary 31

Barnett - Direct - Kasulis                    4666

1    March 2012 updated.  And you state, "I think this will do it.

2    I just updated the valuation date from January 31 to March 31.

3    Optically this is preferable because you had a lot of activity

4    in the first quarter 2012 and putting a 1/31/12 date on it

5    limits our visibility into the important developments.  So the

6    3/31/2012 is a more suitable date for our purposes.  This

7    summary reflects our understanding of all the activity in the

8    first quarter and better supports the valuation than the

9    January 31 date.  Thanks, Rob."  Did I read that correctly?

10   A    Yes.

11   Q    So if we go to the attachment.  So it appears on the top,

12   left-hand corner of this of attachment the valuation date has

13   been changed to 3/31/2012; is that right?

14   A    Yes.

15   Q    And can you explain, what, if any, difference there is

16   between this report and the 1/31/2012 valuation that we saw in

17   a prior exhibit, the 127-7?

18   A    Yes.  The only difference really would be in the summary

19   units outstanding and held, and then the total contributed

20   dollar amount.

21   Q    Would it be in this right-hand side here?

22   A    Yes, that's correct.

23   Q    So those numbers have been updated to reflect changes to

24   the Capitalization Table?

25   A    Yes, to the degree that there were.  I think we had

Barnett - Direct - Kasulis                    4667

1   basically two Capitalization Tables, but that's correct.

2   Q    Okay.  Then if we look at the left-hand side again.

3   A    Same values.

4   Q    Those values are, in terms of the high range, those

5   values are based on the $200 million potential IPO that had

6   been shared with you by MSMB?

7   A    Yes.

8   Q    Is it common for the dates on the reports to be changing

9   frequently with clients?

10  A    No.

11  Q    So what was your reaction to that?

12  A    It was one of just supporting the client service that we

13  were providing.  But I didn't delve into it too significantly.

14  Largely the valuation approach that we were taking was

15  consistent across all the dates.  So I didn't have a

16  significant reaction, but I wouldn't call it usual.

17  Q    Okay.  So now I'm showing you what is marked for

18  identification as Government's Exhibit 127-9, do you recognize

19  this exhibit?

20  A    Yes.

21  Q    What is it?

22  A    It is an e-mail from me to Varun Agarwal at NAV

23  Consulting copying Jackson Su, attaching our 3/31 valuation

24  summary.

25             MS. KASULIS:  The Government moves this exhibit into

Barnett - Direct - Kasulis                    4668

1   evidence.

2            MR. AGNIFILO:  No objection.

3            THE COURT:  We receive 127-9.

4            (Government's Exhibit Number 127-9 so marked and

5   received in evidence.)

6   BY MS. KASULIS:

7   Q    So the date on this e-mail is May 15, 2012; is that

8   correct?

9   A    Yes.

10  Q    It's from yourself to a Varun Agarwal at

11  NAVConsulting.net with a carbon copy to Jackson Su and with an

12  attachment with the title Retrophin LLC stock valuation as of

13  March 31, 2012 with the attachment of the -- is your

14  understanding that the attachment is the investment summary

15  that was attached to the prior exhibit, Government's Exhibit

16  127-8?

17  A    Yes.

18  Q    In the body of the e-mail you write, "Varun, Jackson

19  requested that I forward our 3/31 valuation summary.  Please

20  find it attached.  Thanks, Rob."  Do you know who Varun

21  Agarwal is?

22  A    No.

23  Q    Do you know what NAV Consulting is?

24  A    No.

25            THE COURT:  Why did you send this?

Barnett - Direct - Kasulis                    4669

1            THE WITNESS:  It was at the request of Jackson.  And

2    it was identified to our administrators.

3            THE COURT:  Thank you.

4            THE WITNESS:  So when I say I don't know NAV

5    Consulting, I don't know that firm, that entity.

6    Q    Did you have any discussions, phone conversations, with

7    NAV Consulting?

8    A    No.

9    Q    Do you recall, separate from this e-mail, any other

10   communications with NAV Consulting?

11   A    I do not.

12   Q    I'm showing you what is marked for identification as

13   Government's Exhibit 127-10.  Do you recognize this exhibit?

14   A    I do.

15   Q    What is it?

16   A    This is an e-mail from Jackson Su to myself copying Ray

17   Weisner and Martin.

18   Q    And Martin meaning Martin Shkreli?

19   A    Yes.

20           MS. KASULIS:  The Government is moving this exhibit

21   into evidence.

22           MR. AGNIFILO:  No objection.

23           THE COURT:  We receive 127-10.

24           (Government's Exhibit Number 27-10 so marked and

25   received in evidence.)

Barnett - Direct - Kasulis                4670

1    BY MS. KASULIS:

2    Q    So if we look at the middle of this page, this appears to

3    be the e-mail that we saw in a prior exhibit from yourself in

4    Exhibit 127-8 from yourself to Jackson Su dated April 17,

5    2012; is that right?

6    A    Yes.

7    Q    If we look further up in the chain it appears that

8    Jackson is replying to that prior email on June 25, 2012.  He

9    is sending it to you with a carbon copy to Ray Weisner and

10   Martin Shkreli.  He states, "Hi Rob.  Hope you're well.  We'd

11   like a valuation for the 5/31/2012 date."

12            Then the next section he entitles update.  "We're

13   still in the process of doing a transaction for the whole

14   company.  But in the meantime we completed the $40 round of

15   financing, and started the $80 recently.  It has been mostly

16   MSMB Healthcare LP Capital, so nothing substantial at arm's

17   length thus far.  Retrophin is also doing a transaction

18   currently to buy a profitable specialty health care company

19   that will add sales to the company balance sheet.  Please let

20   me know if you have questions or would like to discuss any of

21   the items above."  What was your understanding of what Mr. Su

22   meant by at arm's length thus far?

23   A    Yes, he's referencing in discussion, in speaking with

24   Jackson over the course of all the valuation dates and getting

25   things sent over to him, it was just my comment that at some

Barnett - Direct - Kasulis                4671

1    point just having MSMB Healthcare continue to buy the shares

2    at an elevated share price is not going to be supportive of

3    the limited scope of work that we're doing.  So it was just to

4    say, to move away from relying on the Series A transactions,

5    it's going to be needed to see a material outside, new

6    investors into Retrophin as a holder of securities to really

7    continue down this valuation path.  So we're just looking for

8    something.  We began to raise the arm's length nature of the

9    transactions, and so I think there is a reference here from

10   that kind of a discussion.

11   Q    Okay.  Then if we look at the next tab, tab 11,

12   Government's Exhibit 127-11.

13   A    Okay.

14   Q    Do you recognize this document?

15   A    I do.

16   Q    What is it?

17   A    It is an e-mail from Ray to Jane that contains a copy of

18   an e-mail from Jackson to Ray that had copied me already in

19   the engagement letter.

20         MS. KASULIS:  The Government moves this exhibit into

21   evidence.

22         MR. AGNIFILO:  No objection.

23         THE COURT:  We receive 127-11.

24         (Government's Exhibit Number 127-11 so marked and

25   received in evidence.)

Barnett - Direct - Kasulis                    4672

1    BY MS. KASULIS:

2    Q    So this page, this exhibit, it appears that Jackson Su

3    has sent to Ray Weisner with a carbon copy to you on June 28,

4    2012, entitled engagement letter.  Then Mr. Weisner appears to

5    forward that engagement letter to Jane * Becky; is that

6    correct?

7    A    Yes.

8    Q    With the engagement letter attached?

9    A    Yes.

10   Q    If we go to the next page of this exhibit.  What is the

11   date on this letter?

12   A    June 28, 2012.

13   Q    Who is it addressed to?

14   A    Mr. Martin Shkreli.

15   Q    He's listed begin as the Chief Investment Officer of MSMB

16   Healthcare LP?

17   A    Yes.

18   Q    After the, "Dear Mr. Shkreli," it appears to state, "This

19   letter will confirm upon execution your authorization for

20   Valuation Research Corporation, or VRC, to provide MSMB

21   Healthcare LP defined as the Company with valuation services

22   at outlined below."

23            And then in the engagement scope section it states,

24   "This project will involve the determination by VRC of the

25   range of fair value of the Class A common stock in Series A

Barnett - Direct - Kasulis                4673

1  preferred stock as of both May 31, 2012 and June 30, 2012;" is

2  that correct?

3  A    Yes.

4  Q    Again, the purpose of this engagement is the same as the

5  prior engagement letter; is that correct?  Meaning, the

6  purpose of our services is support for financial reporting

7  requirements?

8  A    That's correct.

9  Q    Then, a couple lines below that, "We'll utilize the

10  recent transaction price of $40 per share of Series A

11  preferred in support of the valuation and recently received

12  June 27, 2012 Capitalization Table."  With respect to the $40

13  per share, where is that information coming from?

14  A    Again, the Capitalization Table the most recent one that

15  was available.

16  Q    Where did you obtain that Capitalization Table from?

17  A    MSMB Healthcare.

18  Q    Then the next paragraph, the last sentence states, "We

19  will not be independently determining the enterprise value of

20  Retrophin."  So what does that mean again?

21  A    It just means we are not valuing Retrophin itself.

22  Q    If we turn to the third page of this document, upper

23  portion of the fees and charges.  What is the fee for these

24  services listed here in this engagement letter?

25  A    $1,600.

Barnett - Direct - Kasulis                    4674

1    Q    Again, is that a reasonable estimate for the amount of

2    work that would need to be done for this engagement?

3    A    Yes, given the very limited scope.  Because now you're

4    down to about five or six billable hours for this work.

5    Q    Then if we go to the liabilities and indemnification

6    section below that, similar to the same section that we saw on

7    the prior engagement letter.  Starting again in the middle of

8    the last paragraph it states, "Our report is intended solely

9    for the benefit of the Company," and again the Company is?

10   A    Defined at MSMB Healthcare.

11   Q    That's right.  "And may not be disclosed publicly or made

12   available to third-parties other than the Board of the company

13   and the companies external auditor without the prior written

14   consent of VRC."  Do you see that?

15   A    Yes.

16   Q    Directing your attention to the next page, this agreement

17   appears to be signed by Mr. Weisner, and Mr. Shkreli on

18   June 28, 2012; is that correct?

19   A    Yes.

20   Q    I'm showing you what is marked for identification as

21   Government's Exhibit 127-13, it's tab 13 of your binder.

22   A    Okay.

23   Q    Do you recognize this document?

24   A    Yes, I do.

25   Q    What is it?

Barnett - Direct - Kasulis                4675

1    A    It is an e-mail from myself to Jackson Su copying Ray

2    Weisner, "We've updated the valuation summaries for both

3    May 31 and June 30, 2012."

4              MS. KASULIS:  Government moves this exhibit into

5    evidence.

6              MR. AGNIFILO:  No objection.

7              THE COURT:  We receive 127-13.

8              (Government's Exhibit Number 127-13 so marked and

9    received in evidence.)

10   BY MS. KASULIS:

11   Q    So again, this e-mail is dated July 16, 2012.  It's from

12   yourself to Mr. Su with a carbon copy to Ray Weisner; is that

13   correct?

14   A    Yes.

15   Q    The title is Retrophin updated valuation summaries, with

16   two attachments dated May 31, 2012 and June 30, 2012; is that

17   right?

18   A    Yes.

19   Q    Then you state, "Jackson I drafted the valuation

20   summaries for both May 31 and June 30, 2012.  They are

21   attached.  I've incorporated the June 30, 2012 cap table and

22   other relevant information provided that update from the

23   March 31, 2012 valuation date.  Please have a look and we can

24   discuss tomorrow.  Thanks, Rob."

25              If we just go briefly to the two attachments.  So

Barnett - Direct - Kasulis                4676

1    the top, left-hand portion of this document, what is the date

2    on the top, left-hand portion of the document?

3    A    May 31, 2012.

4    Q    And if we just then go to the Retrophin LLC

5    Capitalization Table section dated May 31, 2012, what is the

6    difference, generally speaking, listed there?

7    A    It would just be any activity in the Capitalization

8    Table, so an update on the units outstanding or contributing

9    capital.

10   Q    If we go to the first bullet point under the valuation

11   considerations and conclusions highlights, that very first

12   sentence reads, "This valuation summary does not undertake

13   estimating a current enterprise or total equity value."  With

14   respect to the current enterprise or total equity value, is

15   that with respect to Retrophin?

16   A    Correct.

17   Q    And if we go to the bottom portion of this section, the

18   section to last bullet point, the very last sentence reads,

19   "Future valuations will consider the diversity of

20   participation in capitalization contributions for more arm's

21   length."  What do you mean by that?

22   A    It just means that to continue working with these kind of

23   Capitalization Tables you have a shelf life in terms of how

24   long you can hold a valuation just at cost.  So the more

25   recent that the transaction occurred, at that price point,

Barnett - Direct - Kasulis                    4677

1    you're comfortable that's a representation of fair value.  As

2    time drags along, there may be some movement away from that

3    original transaction up or down, just something different.  So

4    it's really just a comment that we're seeing the same

5    investors buy the securities at different price points, which

6    is perfectly fine, but we're just looking to see if we want to

7    continue down this particular path of not valuing the entity

8    but just the transactions, more arm's length character would

9    be supportive of the point.

10   Q    The bullet point below that states, "MSMB Management had

11   indicated that a $200 million valuation has been seriously

12   discussed with sophisticated third-party institutions as a

13   possible near-term IPO value.  Such a valuation would create a

14   significant economic value to the securities well beyond the

15   current purchase price reflecting up or down."  Is this the

16   same $200 million possible IPO that we saw contemplated in the

17   prior versions of this investment summary?

18   A    It is.  So these updates are just reflecting no change in

19   that, with the waterfall calculations of the unit value.

20   Q    If we look at the left-hand side of the valuation report,

21   we're seeing now the VRC value high at $215 per share in the

22   per unit values current section.  Where does that $215 per

23   share value come from?

24   A    That's a straight waterfall calculation taking the

25   $200 million headline value, and dividing by the sum total

Barnett - Direct - Kasulis                4678

1    units presented in the summary table there.

2    Q    So that's a hypothetical value depending on this

3    potential $200 million IPO?

4    A    That's right.  It's not a valuation; it's just a

5    hypothetical calculation per the IPO.

6    Q    The same with respect to this section above that, VRC

7    high value.  It looks like over $10 million, the same applies

8    to that number as well?  It's a hypothetical valuation based

9    on the $200 million potential IPO?

10   A    Yes.

11   Q    If we just go to the next document the investment

12   summary, that date is June 30, 2012; is that right?

13   A    Correct.

14   Q    What is the difference between, generally speaking, this

15   valuation summary -- excuse me -- investment summary, from the

16   prior investment summary dated about one month before that?

17   A    Very little.  The concluded values all look the same.

18   The only thing that occurred was there is a note now here that

19   3,125 units were purchased or acquired by MSMB Healthcare at

20   $80 per unit.  Same Series A, now in the portfolio at 20, 40,

21   80 per units.

22   Q    If we look to the left-hand side of this exhibit, it

23   looks like the VRC value high for per unit looks like it just

24   dropped by a dollar at $214 per share.  Whey is there a dollar

25   difference?

Barnett - Direct - Kasulis                    4679

1    A    There might be slight additional share count in June

2    versus May, that's a waterfall calculation.

3    Q    When you say waterfall calculation, what do you mean?

4    A    $200 million divided by the fully diluted outstanding

5    units.

6    Q    The $200 million, again, that's the hypothetical

7    $200 million potential IPO?

8    A    Correct.

9    Q    Did you verify with any third-parties at this point in

10   time the potential for a $200 million IPO for Retrophin?

11   A    I did not.

12   Q    Do you recall working on this engagement any more after

13   these investment summaries?

14   A    I do not.  I think this was the end.

15   Q    Just to be clear, what do these investment summaries

16   represent, Mr. Barnett?

17   A    Just a summary of the transactions that occurred, the

18   subject company that's issuing the securities and performing

19   the transactions, a high-level summary of the classes of stock

20   from a capitalization perspective, some commentary on our

21   valuations, considerations and conclusions, then a range of

22   values from low to mid to high.

23   Q    The range of values with respect to the MSMB Healthcare's

24   shares?

25   A    Their own shares in the preferred and common.

Barnett - Direct - Kasulis                    4680

1    Q    In Retrophin?

2    A    Correct.

3    Q    Again, when you created these investment summaries where

4    did you get that information from?

5    A    Everything was provided by MSMB.

6    Q    Did you provide any additional services to -- strike

7    that.

8         Did you provide any services to Retrophin?

9    A    No.

10   Q    If you value a private company, what would that entail?

11   A    It's an entirely different operation.  You would work

12   obviously with the company management to some degree.  You

13   would gain audited financials that are both historical, all

14   historical, at least in the recent time frame.  Then you would

15   ask for prospective financial information, meaning forecasts.

16   Then work with various approaches.  But they would all be

17   largely what we call income approaches or market approaches.

18   A real analysis where you're looking into the performance,

19   financial performance, of the company.

20   Q    Would that be a more time-consuming process?

21   A    Yes; and therefore, more fee as well.

22   Q    Did you have any contact with any MSMB Healthcare

23   investors?

24   A    No.

25              MS. KASULIS:  One moment, Your Honor.  No further

Barnett - Cross - Agnifilo                    4681

1    questions.

2            THE COURT:  Why don't we give the jurors a

3    mid-morning break at this time.  We will come back in ten

4    minutes.

5            Thank you for your ongoing attention.  Please don't

6    talk about the case.

7            Sir, can you step down as well.

8            (Jury exits the courtroom.)

9            (Whereupon, the witness steps down.)

10           (Whereupon, a recess was taken at 11:10 a.m.)

11           (Jury enters the courtroom.)

12           (Whereupon, the witness resumes the stand.)

13           THE COURT:  All the jurors are present.  Have a seat

14   everybody.

15           Mr. Agnifilo, if would you like to cross-examine

16   Mr. Barnett.

17           MR. AGNIFILO:  Yes, Judge.

18           THE COURT:  All right.  Thank you.

19   CROSS EXAMINATION

20   BY MR. AGNIFILO:

21   Q    Good morning, Mr. Barnett.

22   A    Good morning.

23   Q    My name is Marc Agnifilo.  I represent Martin Shkreli.

24   I'm going to ask you questions for about five or ten minutes

25   and we'll get you on your way.

Barnett - Cross - Agnifilo                4682

1          I'm going to start with something that's already in

2    evidence as 127-13, it's one of these investment summaries.

3    I'm going to use the Elmo to show it to Mr. Barnett.

4               MS. KASULIS:   Tab 13.

5    A    Yes.

6    Q    On the left side here, where it says security valuations,

7    it says VRC low value, do you see that entry there?

8    A    Yes.

9    Q    And in within the range of the low value you have a low

10   of zero dollars, right?

11   A    Yes.

12   Q    And then a high, within the low range, of $1.17 million?

13   A    Yes.

14   Q    Then the next one is VRC mid value, do you see that?

15   A    Yes.

16   Q    So in a sense you're giving three different ranges,

17   right?

18   A    That's correct.

19   Q    All right.  Why the wide discrepancy in ranges, if I

20   could ask?

21   A    Yes.  So in this case the low and the mid are the same

22   because it's literally reflecting the price paid for the

23   security, so strong evidence of that.

24          Then the high scenario relates to a successful IPO.

25   Q    Right, okay.  Let's talk about that for a second.  I did

Barnett - Cross - Agnifilo                    4683

1   the yellow, it's not on the original.  It's kind a small I

2   hope everyone can see it.

3           So the IPO language is on the bottom, right?

4   A    Yes.

5   Q    And no one is saying that this IPO is going to happen.

6   A    Correct.

7   Q    It's speculative, true?

8   A    That's right.

9   Q    And it's being written here as something that's

10  speculative; fair to say?

11  A    Fair to say.

12  Q    Okay.  So what it says is, "MSMB Management has indicated

13  that a $200 million valuation has been seriously discussed by

14  sophisticated third-party institutions as a possible near term

15  IPO valuation," correct?

16  A    Correct.

17  Q    This is not reflecting that this is a done deal in any

18  way, shape or form, right?

19  A    Correct.

20  Q    This is not indicating that sophisticated investors have

21  made a commitment of some sort to do this, correct?

22  A    Correct.

23  Q    This is just being written down as something that could

24  possibly happen, correct?

25  A    Correct.

Barnett - Cross - Agnifilo                    4684

1    Q    And you're writing it down as such?

2    A    Correct.

3    Q    When you go on to say, "Such a valuation would create

4    significant economic value to the securities, well beyond the

5    current purchase price reflecting our upper bound," right?

6    A    That's right.

7    Q    The upper bound that we're talking about, I'll go back to

8    the Elmo, of between $10,245,250, and $4,950,000, you're

9    saying is based on the language we just read about this

10   speculative IPO, correct?

11   A    That's correct.

12   Q    Because in a sense it can't be ruled out, right?

13   A    Agreed.

14   Q    And so since it is a possibility it's being reflected in

15   your chart as that upper value, right?

16   A    That's correct.

17   Q    Okay.  But of the three values, the VRC low value the VRC

18   mid value and the VRC high value, you're not even expressing a

19   prediction on which of the three is the most likely?

20   A    That is also correct.

21   Q    Okay.  So you're just giving three values, a low one, a

22   middle one, a high one without saying any of the three is more

23   likely than the other two.

24   A    Correct.

25   Q    I think part of what you talked about on your direct

Barnett - Cross - Agnifilo                    4685

1    examination is the last sale principal, right?

2    A    Yes.

3    Q    Just tell the jury what that is.

4    A    It's just, the strongest evidence of a private illiquid

5    security is the most recently transacted price.

6    Q    So now we've been talked about illiquid securities.

7    Illiquid securities where there is not a wide-active market,

8    correct?

9    A    Correct.

10   Q    Okay.  So when we're talking about illiquid securities,

11   securities that are not traded very often, it's very

12   important, and maybe the most important thing, correct me if

13   I'm wrong, to see what the last price paid for the security?

14   A    That is correct.  Within a window of time, that is the

15   strongest indicator of that.

16   Q    I think you said on direct examination, at a certain

17   point so much time passes the last price paid is not as

18   relevant as might be otherwise?

19   A    Correct.

20   Q    Time element aside, the last price paid for the security

21   is a very, very significant factor in valuing an illiquid

22   security; fair to say?

23   A    Fair to say.

24   Q    Now I think you also said on direct examination that many

25   of the securities transactions we're talking about regarding

Barnett - Cross - Agnifilo                          4686

1   Retrophin stock were with MSMB Healthcare, correct?

2   A     Yes.

3   Q     You said those are valued differently because they are

4   not really arm's length transactions; fair to say?

5   A     No, I took them at their face value.  And I'm comfortable

6   being arm's length.  It was when we got into the series

7   valuation date extensions, and the new evidence and

8   capitalization was by ongoing purchases, that you become a

9   little less reliant or ideally you're looking for new arm's

10  length character.

11  Q     Fair to say if there were third-party transactions,

12  meaning other external investors, how would that be relevant,

13  if at all, to your valuation?

14  A     It would become very relevant.  Because at that point we

15  move away from just a Series A initial C capitalization, to

16  where now we're getting to what we presumed a Series B or

17  Series A-1, new class of stock.  You can really work with that

18  round to imply what the value, total equity of the company is.

19  They usually negotiate that on a pre- or post-money basis.  It

20  would be quite significant.

21  Q     If Retrophin stock was purchased by an entity other than

22  MSMB Healthcare, that would be a significant factor in your

23  valuation?

24  A     It would, depending upon the amount of dollars, the

25  timing of it, and the terms of the security that they are

Barnett - Cross - Agnifilo                    4687

1   buying.

2   Q     Okay.  And I think you said in your direct examination

3   you never actually spoke with Mr. Shkreli in terms of getting

4   information from the client in this particular case?

5   A     Correct.

6   Q     Your point of contact was Jackson Su, correct?

7   A     Correct.

8   Q     And did Jackson Su tell you, for instance, that someone

9   named Steve Richardson spent $10,000 on Retrophin stock at $40

10  a share?  Did you get that; only if you did or didn't.

11  A     Don't recall.

12  Q     Okay.  And were you told that someone named Ed Sullivan

13  bought Retrophin at $40 a share?

14  A     No.  In other words, the source of the information that

15  was all in the Capitalization Table.

16  Q     Okay.

17  A     Nothing verbal.

18  Q     Understood.  Do you recall if in addition at one point

19  you outlined certain documents that you had gotten from MSMB,

20  correct?

21  A     Yes.

22  Q     And I think you said it was, it was -- let me make sure I

23  get the exhibit numbers so we know what we're talking about --

24  it was the series of documents that were part of Government's

25  Exhibit 127-3.

Barnett - Cross - Agnifilo                    4688

1  A    Correct, yes, there it is.

2  Q    And I think you said that there was at least two

3  Capitalization Tables and some other documents, right?

4  A    Correct.

5  Q    Do you remember getting certain models sent to you

6  discounted cash flow models, does that ring a bell at all?

7  A    Yes.  So the Retrophin.xlsx file, that's the model file.

8  Q    What were those models?

9  A    I didn't look at them in depth.  The scope of valuation

10 was not to do an enterprise or equity value, so there is some

11 contents there, but I don't fully recall it.  It was not used.

12 Q    All right.  These models can take several forms, correct?

13 A    Sure.

14 Q    And do you remember -- I think, I'm not sure if you

15 talked about it on direct, what does the term "income-based

16 approach valuation" mean to you?

17 A    Looking at the future cash flows that would flow to a

18 security.  So it's looking at the income that would be

19 available to a certain security.

20 Q    Is that similar to the discounted cash flow?  Is that the

21 same concept?

22 A    Same concept.

23 Q    Tell the jury basically what that is.

24 A    So you're taking future cash flows over a period of time,

25 and you're discounting them to a present value equivalent.

Barnett - Cross - Agnifilo                    4689

1    You're estimating value as of today.  So some value today,

2    contingent upon the occurrence of future revenues and earnings

3    discounted to a point in time today.  Then you know a value,

4    in this case, of whatever it is that is receiving all these

5    cash flows, so a company in this case.  Then would you know

6    the value of the company times zero.

7    Q    Do you recall among the materials you received were these

8    discounted cash flows in regard to certain specific drug

9    products that Retrophin had at the time?

10   A    I do not recall.

11   Q    You don't recall models that basically predicted into the

12   future, here is the amount of money we think we might get from

13   these drugs in the future, from some years in the future?

14   A    There was, that was present.  But my level of involvement

15   with that was none.

16   Q    Correct me if I'm wrong, that information was unnecessary

17   for the type of valuation you were making; fair to say?

18   A    That's exactly right.

19   Q    Okay.  Because that's actually quite in depth

20   information?

21   A    That's correct.

22   Q    Okay.  And so this in depth information about the value

23   of these drugs on a going forward basis, was something you

24   didn't need to do the valuations we've been talking about here

25   today?

Barnett - Cross - Agnifilo                4690

1   A     That's correct.

2   Q     Do you have any reason to know what Retrophin's value is

3   today?

4   A     I'm aware that it's a publicly-traded stock.  I don't

5   know it's value today.

6              MR. AGNIFILO:  One second, sir.

7              I want to thank you for your time.  I have nothing

8   else.

9              MS. KASULIS:  Nothing further.

10             THE COURT:  Thank you, sir.  You're excused.  Have a

11  safe trip back.

12             (Whereupon, the witness was excused.)

13             MS. SMITH:  Before the Government calls the next

14  witness we want to read a stipulation.

15             THE COURT:  All right.  Thank you.

16             The Government is going to read a stipulation, so

17  please pay attention thank you.

18             MS. SMITH:  So this is a stipulation that's been

19  marked Government's Exhibit 806.

20             It reads, "It is hereby stipulated and agreed by an

21  between the undersigned parties that.

22             "1.  NAV Consulting Inc. Served as the fund

23  administrator for MSMB Healthcare Management LP between

24  March 11, 2011 and June 14, 2012.  NAV did not serve as the

25  fund administrator for MSMB Capital Management LP, nor did it

Barnett - Cross - Agnifilo                    4691

1    perform any services for MSMB Capital Management LP.

2              "2.   Government Exhibits 126-2, 126-3, 126-17 are

3    true and accurate copies of the NAV records and are admissible

4    in evidence at trial.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mohan - Smith - Direct                    4692

1              MS. SMITH:  Three:  This stipulation marked
2     Government's 806 is admissible in evidence at trial and it's
3     dated July 10th and it's signed by the parties.
4              THE COURT:  Thank you.
5              MS. SMITH:  And then -- Your Honor, we're going to
6     call the next witness who is Chandra Mohan from NAV
7     Templeton.
8              THE COURT:  Thank you.
9              Good morning.  Step up, please.
10    C H A N D R A   M O H A N   S I N G H   M E H E T A,
11              called as a witness having been
12              first duly sworn/affirmed, was examined and
13              testified as follows:
14              THE COURTROOM DEPUTY:  Please state and spell your
15    full name for the record.
16              THE WITNESS:  My full name is Chandra Mohan Singh
17    Meheta.
18              THE COURT:  Will you spell that, please.
19              THE WITNESS:  C-H-A-N-D-R-A, M-O-H-A-N, S-I-N-G-H,
20    M-E-H-E-T-A.
21              THE COURT:  Thank you, please proceed.
22    DIRECT EXAMINATION
23    BY MS. SMITH:
24    Q    Where do you live, Mr. Mohan?
25    A    I'm from Chicago.

Mohan - Smith - Direct                    4693

1   Q     Where are you employed?

2   A     I work for NAV Consulting.

3   Q     What is NAV Consulting?

4   A     NAV Consulting is hedge fund administration company and

5   we provide fund administration assistance to clients.

6   Q     How long have you been worked at NAV Consulting?

7   A     It's been ten years now.

8   Q     What is your position at NAV Consulting?

9   A     Actually I'm the account manager there.

10  Q     And when you served -- when NAV Consulting serves as

11  the administrator for hedge funds is this a responsibility

12  of NAV to create performance reports for the hedge fund?

13  A     Yes, that's true.  We provide them the performance

14  services.

15  Q     And where did the information for the performance

16  reports come from?

17  A     Initially the creation of performance parts come from

18  the client and from broker and then we do the reconciliation

19  and produce the performance numbers.

20  Q     How is an administrator different from an auditor of a

21  fund?

22  A     Actually hedge fund administrator they do all the

23  comps, they process everything, all the data number and then

24  generate the performance number by auditors, they actually

25  do their audit on the numbers, they verify that everything

Mohan - Smith - Direct                    4694

1   is done according to the accounting principles.

2   Q    And does NAV communicate with its clients by e-mail?

3   A    Yes, we do.

4   Q    Did NAV Consulting receive the *subpoena* in connection

5   with this case for records related to a client called

6   MSMB Healthcare?

7   A    Yes, we received that.

8   Q    And did NAV Consulting provide records in response to

9   that *subpoena*?

10  A    Yes, they did.

11  Q    I'm going to ask you to look at the binder in front of

12  you and specifically the documents with the red flag.  And

13  those are documents that are marked for identification as

14  Government Exhibit 126-1, 126-5, 126-14, 126-20, 126-21,

15  126-22, 126-23, 126-24, 126-25, 126-26, 126-27, 126-28,

16  126-29, 126-31, 126-32, and 126-33.

17           MR. AGNIFILO:  Can I speak --

18           THE COURT:  Yes.

19           (Pause in proceedings.)

20           MR. AGNIFILO:  Your Honor, the only objection I

21  have is to -32 on hearsay grounds.  May we be heard very

22  briefly?

23           THE COURT:  All right.  So brief sidebar on

24  126-32.

25           MR. AGNIFILO:  Yes.

Sidebar Conference                                4695

1              (The following occurred at sidebar.)

2         THE COURT:  Okay.

3              MR. AGNIFILO:  All right.  Judge, my only

4    objection to that list is to 32, and I object because I

5    really think when Allison used that statement here really is

6    only relevant to offer for the truth.  And I don't know

7    that -- I think she was hearsay.  It's a prior

8    out-of-statement being offered for the truth.  There's no

9    indication that Allison was Martin's agent or that she's

10   authorized to speak for him on this purpose.

11             THE COURT:  Well, she is his assistant and I

12   think they --

13             MR. AGNIFILO:  Well, I don't think that by itself

14   is -- at least allows another person to make hearsay

15   statements.  The rule is, the way I understand it, the

16   person has to be specifically authorized to speak on this

17   matter.  And I don't know that we have that.

18             MR. MR. BRAFMAN:  She telling him that she

19   doesn't.  She says that she doesn't deal with it at all.

20             MS. SMITH:  So there are other e-mails, for

21   example Government Exhibit 126-31 where Mr. Shkreli is

22   directing her to provide certain information.  And it's

23   within the scope of her employment as executive assistant.

24   And so because she's been directed on certain occasions to

25   provide certain information, in this case, they sent it both

1  to her and to Mr. Shkreli and that was for her response.

2          So I think that this is a response within the

3  scope of her employment at MSMB Capital, I suppose at that

4  point.  And also, you know, within kind of completing this

5  information within the other exhibits we've marked.

6          THE COURT:  So if I understand, she in her

7  capacity as an assistant at Martin's direction, is

8  transmitting different documents back and forth to NAV, and

9  then NAV said to her, Look, we want to know whether we can

10 get certain documents including proof of invoices.  And she

11 responds, I don't deal with this fund at all.  Martin would

12 be your best contact.  So basically she is saying that, If

13 you want these backup, talk to Martin.

14         Is that it?

15         MR. AGNIFILO:  Well, I guess my concern --

16         THE COURT:  And then as an assistant where she has

17 previously been directed to transmit, she is saying here

18 that Martin should be the person to provide.

19         Am I understanding that correctly?

20         MR. AGNIFILO:  Right, right.

21         THE COURT:  So you think it is hearsay because?

22         MR. AGNIFILO:  I don't think that -- listen, I

23 don't think that she's automatically -- I'm assuming that

24 with the exception is that she is an agent of Shkreli, not

25 that she's a co-conspirator.

Sidebar Conference                    4697

1          MS. SMITH:  No, it's within the scope of her

2    employment for Mr. Shkreli as his assistant.

3          MR. AGNIFILO:  But she's saying it isn't.  And

4    she's saying it's not.  I don't deal with this stock.  So I

5    don't know how you can have both.  And so she's an agent

6    dealing with this and that.  And there's no such thing as

7    being an agent generally.  It's being an agent in terms of

8    dealing with a specific issue as she's saying she doesn't

9    deal with the issue.

10         MS. SMITH:  Well, okay.  So it's a statement made

11   by the party's agent or employee on the matter within the

12   scope of that relationship.  So she's responding as his

13   executive assistant.

14         MS. KASULIS:  As the executive assistant.

15         MR. AGNIFILO:  Can I see the document for a

16   second?

17         THE COURT:  Watch the reporter.

18         MR. AGNIFILO:  Sorry.

19         Here you go, Judge.

20         THE COURT:  Right here.

21         MS. SMITH:  So she's not responding as a friend or

22   something else.  It's within the scope of --

23         THE COURT:  MSMB Capital.

24         MR. AGNIFILO:  And I'm focusing on C.  It was made

25   by a person whom the parties authorized to make a statement

Sidebar Conference                    4698

1   on the subject.

2         MS. SMITH:  And we're focusing on D, which was

3   made by the party's agent or employee on a matter within the

4   scope of the relationship involved within the -- so that's

5   801D(2)(d).

6         MR. AGNIFILO:  All right.  But she's saying -- my

7   concern is she's say on the one hand, I don't deal with this

8   fund.  So I think she's taking herself out of C and D.

9         MS. SMITH:  But she's responding as his assistant.

10  She's not responding as a friend or on a personal

11  relationship.  She wouldn't be on this e-mail at all if she

12  was not an assistant, and she's providing that response.

13        MR. AGNIFILO:  I don't think -- I -- I understand

14  the point.  I don't -- I think because she's saying that she

15  doesn't deal with this fund at all, she's not within the

16  scope of C and D.

17        THE COURT:  Well, okay.  I respectfully

18  disagree --

19        MR. AGNIFILO:  Okay.

20        THE COURT:  -- because I think that what has

21  happened here is as his assistant, she transmitted the

22  information to NAV, and when NAV requests backup for certain

23  information, she says, I don't deal with this fund.  It

24  doesn't mean that she's not transmitting information in the

25  scope of her employment.  Basically she's directing him to

Sidebar Conference                           4699

1   Mr. Shkreli.

2           So I mean, she is authorized as Mr. Shkreli's

3   assistant to transmit and to make statements about

4   information that may be needed, but she does not necessarily

5   have the ability to provide, but she does have the ability

6   to refer NAV to Mr. Shkreli.  That is the way --

7           MR. AGNIFILO:  Okay.

8           THE COURT:  -- I see it.

9           MR. AGNIFILO:  That's fine, Judge.

10          THE COURT:  All right.  I think under 801D(2)(d).

11          MR. AGNIFILO:  Thank you.  Thank you, Judge.

12          THE COURT:  All right.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Mohan - Smith - Direct                    4700

1          (In open court.  Sidebar ends.)

2          THE COURT:  The Court will receive in evidence

3   Government Exhibits 126-1-5, -14 and then -20 through -29,

4   and then 126-31 -- 32 and -33.

5          (Government's Exhibit Numbers 126-1 through 126-5,

6   126-14, 126-20 though 126-29, 126-31 through 126-32 and

7   126-33 so marked and received in evidence.)

8   BY MS. SMITH:

9   Q    And, Mr. Mohan, if we can start with the Government

10  Exhibit 126-2 which is behind Tab 2 of your binder.  And

11  is -- is this an engagement letter from NAV Consulting?

12  A    Yes, it's an engagement letter.

13  Q    What is the date of the letter?

14  A    It is March 11th, 2011.

15  Q    And then it's addressed to MSMB Capital Management LP

16  and MSMB Healthcare LP; is that right?

17  A    Yes, that is right.

18  Q    And if we can turn to Page 4 of the document.  And just

19  focus on the section of ex Paragraph 9 and this paragraph

20  reads, "We are not being engaged to perform and will not

21  perform any audit, review or other attestation services

22  concerning any financial statements or other information of

23  the fund or manager.  Accordingly, we will not express any

24  opinion on any fund financial statement, nor will we perform

25  any services related to the fund's system of internal

Mohan - Smith - Direct                    4701

1    controls.  We have no duties to report any information to

2    the fund regarding its system of internal controls,

3    including but not limited to any significant deficiencies or

4    material weaknesses.

5              You agree not to use our name, NAV Consulting

6    without our prior written consent.  Notwithstanding the

7    foregoing, we understand that certain of our work may be

8    provided to your members provided that any such work is

9    clearly marked unaudited."

10             Did I read that correctly?

11   A    Yes.

12   BY MS. SMITH:

13   Q    And then if we can just look at the last page of the

14   letter and focus on the bottom section.  And was this signed

15   by NAV Consulting?

16   A    Yes, it is signed.

17   Q    And then on behalf of MSMB Capital and MSMB Healthcare

18   is it signed by Martin Shkreli?

19   A    Yes; that is correct.

20   Q    If we can turn to Government Exhibit 126-3 in evidence

21   which is Tab 5 of your binder.  And is this a letter from

22   NAV Consulting?

23   A    Yes.

24   Q    And what is the date?

25   A    March 24, 2011.

1    Q    And it is addressed to MSMB Capital Management LP and

2    then the first two paragraphs read, "Martin, as we mentioned

3    on our call earlier this week, NAV Consulting has not to

4    date received any information according for our records for

5    the if initiation of services to MSMB Capital Management LP

6    we have previously been retained for.  NAV Consulting, Inc.,

7    hereby terminates this relationship with MSMB Capital

8    Management LP effective Thursday March 24th, 2011.  Please

9    note that at no time were we in possession of any

10   information required to perform the administrator function

11   and as a result, our firm was is at no point administrator

12   to this fund.  We should therefore not be named as a service

13   provider to the if fund or the investment manager or any

14   related entity in any offering memorandum, marketing

15   material, or any other information about the fund or any

16   related entity."

17           Did I read that correctly?

18   A    Yes.

19   Q    And then lastly I would like to direct your attention

20   to Government Exhibit 126-17, which is Tab 30 of your

21   binder.  And is this also a letter from NAV Consulting,

22   Incorporated?

23   A    Yes.

24   Q    And what is the date?

25   A    June 14th, 2012.

Mohan - Smith - Direct                    4703

1    Q    And it is addressed to MSMB Consumer, MSMB Healthcare

2    and MSMB Isotope; is that right?

3    A    That's right.

4    Q    And then the letter reads, "Dear Martin, As we told you

5    yesterday we will be terminating our relationship with the

6    above three funds effective immediately.  We will be sending

7    out a notice to your investors that NAV Consulting,

8    Incorporated, will no longer be the fund administrator for

9    these three funds.  We have completed the financial

10   statements and related records through March 31st, 2012.  If

11   you would like us to complete funding accounting for April

12   and May, please pay the attached invoices."

13            Did I read that correctly?

14   A    Yes.

15   Q    Mr. Mohan, did you have any personal knowledge of or

16   serve as the account manager for NAV Consulting with

17   MSMB Healthcare?

18   A    I did not.  I don't have any function with them.

19   Q    And have you ever had any contact with the defendant

20   Martin Shkreli?

21   A    No.

22            MS. SMITH:  Your Honor, we have no further

23   questions.

24            THE COURT:  Would you like to cross?

25            MR. AGNIFILO:  One, second, Your Honor.

1          THE COURT:  All right.

2          (Pause in proceedings.)

3          MR. AGNIFILO:  Very brief.

4          THE COURT:  Sure.

5    CROSS-EXAMINATION

6    BY MR. AGNIFILO:

7    Q    Good morning, sir.

8    A    Good morning.

9    Q    I'm going to ask you some questions, not too many, and

10   then I will get you on your way.  My name is Marc Agnifilo,

11   I represent Martin Shkreli.

12          Now, you did not work on this particular account,

13   correct?

14   A    Yes, that's correct.

15   Q    Okay.  Do you know that NAV sent out performance

16   reports on behalf of MSMB Healthcare, do you know that?

17   A    Actually I don't know, I have no information about the

18   account fund activity.

19   Q    Okay.  Now, do you know who Varun Agarwal is?

20   A    Yes, I know him.

21   Q    Okay.  Does this person still work at NAV?

22   A    Yes.  He works in -- now he works in our back office

23   that is in India.

24   Q    So he still works in your same company?

25   A    Yes.

Mohan - Agnifilo - Cross                    4705

1   Q    Okay.  And do you know if Mr. Agarwal was the person
2   who was the contact person for MSMB?
3   A    Actually I'm not sure, but it seems to be so, but I'm
4   not sure if he was the account manager on the fund or not.
5   Q    Okay.  And I think on direct examination you read parts
6   of a couple of letters from Nav Gupta, right?
7   A    Sure.
8   Q    Who is Nav Gupta?
9   A    He is the president and CEO of NAV Consulting.
10  Q    And he's still with the company?
11  A    Yes, he is.
12  Q    So he and Mr. Agarwal are still with NAV?
13  A    Yes.
14  Q    And you said you -- based on some of the e-mails you
15  believe that Mr. Agarwal was the contact person for MSMB?
16  A    Yes.
17              MS. SMITH:  Objection.
18              THE COURT:  Overruled.
19              MS. SMITH:  He's leading.
20              THE COURT:  Overruled.
21  BY MR. AGNIFILO:
22  Q    Was your answer yes, I couldn't quite hear you.
23  A    Yes.
24  Q    Okay.
25              All right.  Now how large is NAV, the company?

Mohan - Agnifilo - Cross                4706

1    A    Actually in our Chicago firm we have around 30 people

2    here and in our back office there are 500 people working

3    there.

4    Q    Okay.  And Mr. Agarwal works out of the Chicago office?

5    A    He used to work here around, I think, three or four

6    years ago.

7    Q    And do you know where he's working now?

8    A    He's working in our back office, NAV back office.

9              MR. AGNIFILO:  Your Honor, can you give me one

10   second, I have to call up...

11             (Pause in proceedings.)

12             MR. BRAFMAN:  Your Honor, we may need a short

13   break to find certain exhibits.  Could we ask that we take

14   an early lunch break or just give us a couple minutes.

15             THE COURT:  All right.  Well, I suppose we could

16   take a short break.

17             MR. BRAFMAN:  Okay.

18             THE COURT:  Unless the jurors would like to have

19   their lunch now.

20             JURORS:  No.

21             THE COURT:  Good.  This is a hardworking group.

22             All right.  We will take a short break.  Thank

23   you.  Please do not talk about the case.

24             (Recess taken.)

25             (Jury exits.)

```
               Mohan - Agnifilo - Cross              4707
```

 1              (The following matters occurred outside the

 2     presence of the jury.)

 3              THE COURT:  Sir, if you want to step down to take

 4     a break and stretch your legs.

 5              (Recess taken.)

 6              MR. BRAFMAN:  Your Honor, on an unrelated issue.

 7              (Pause in proceedings.)

 8              THE COURT:  I'm sorry, Mr. Brafman, what?

 9              MR. BRAFMAN:  I'm sorry.  On the issue you raised

10     earlier, I misunderstood.  The answer is yes, we will be

11     requesting a reliance on counsel charge.  So I withdrew what

12     I said earlier this morning.  When the Court asked me, my

13     mind was elsewhere, I apologize.

14              THE COURT:  Okay.  Thank you.

15              MR. BRAFMAN:  Thank you.

16              (Pause in proceedings.)

17              (Jury enters.)

18              (Jury present.)

19              THE COURT:  All jurors are present.

20              Please have a seat, everybody.

21              Are you ready to proceed, sir?

22              MR. AGNIFILO:  Yes, Your Honor.

23              THE COURT:  All right.  Thank you.

24     BY AGNIFILO:

25     Q    Sir, I'm going to ask you to look at something that's

Mohan - Agnifilo - Cross                4708

1   already been admitted into evidence, it's Government's

2   Exhibit 83-1.

3           This is Government's Exhibit 83-1 and the part

4   that I'm focusing on is the e-mail from Investor Relations

5   at NAV Consulting with someone named Rich Coker.  Do you see

6   that e-mail?

7   A    Yes.

8   Q    Okay.  And are you familiar with the fact that

9   NAV Consulting sometimes will send e-mails to individual

10  investors?

11  A    Yes, they do sometimes.

12  Q    And does this appear to be what's happening here?

13  A    Yes.

14  Q    This is an e-mail from your company NAV Consulting,

15  right?

16  A    Yes.

17  Q    And it talks an attachment, "Please see attached

18  statement for the month of February 2012," and this is part

19  of the same exhibit and I'll put that exhibit in front of

20  you now.

21          MSMB Healthcare LP care of MSMB Healthcare

22  investors.  The same name Richard and Barbara Coker.  Do you

23  see that there?

24  A    Yes.

25  Q    And at the bottom it talks about that this is an NAV

1   Consulting statement, correct?

2   A    It seems so.

3   Q    Does it look -- does it look familiar as an NAV

4   Consulting statement?

5   A    Yes, this seems familiar.

6   Q    Okay.

7        All right.  And you've seen these before, correct?

8   A    Yeah, I'm familiar with that statement.

9   Q    I'm sorry, I missed the last part.

10  A    I'm familiar with that NAV Consulting statements.

11  Q    All right.

12  A    The form of the statement.

13  Q    Now, there are different entries here, correct?  It

14  says, "trade income realized and unrealized."

15       Do you see that there?

16  A    Yes.

17  Q    What does that refer to?

18  A    That's in proportion categorize whatever the -- whether

19  it's in position, the portfolio is in the position to the

20  gain and loss to selling the stocks.

21  Q    All right.

22  A    The realized and unrealized.

23  Q    And where does NAV get that information from?

24  A    Actually we get it both from client and from the broker

25  bank and the media.

1  Q    So you get information from the broker, correct?

2  A    Yes.

3  Q    All right.  And then the next entry is trading income

4  private positions.  Do you see that entry?

5  A    Yes.

6  Q    And is that information provided by the brokers as

7  well?

8  A    I'm not sure in this case.  In this MSMB case, but in

9  general, on these positions, those are not held by brokers.

10  We receive those independently either from the client or

11  from the underlying investors.

12  Q    Okay.  You get it from the client for underlying

13  investors?

14  A    Yes.

15  Q    Okay.  So fair to say some of the information on the

16  statement is from the client and some of the information on

17  the statement is from a source other than the client,

18  correct?

19         MS. SMITH:  Objection, Your Honor.

20         THE COURT:  Sustained.  Rephrase.

21         MR. AGNIFILO:  Yeah.  I'll ask a more specific

22  question.

23         THE COURT:  Sir, can you put the microphone

24  closer.  Yeah, thank you.

25  BY MR. AGNIFILO:

Mohan - Agnifilo - Cross                 4711

1  Q    When NAV has an engagement, they have access to the

2  underlying documents related to the account, correct?

3  A    I'm sorry, can you say that over your question.

4  Underlying document?

5  Q    You get a password and you, through the password, can

6  access underlying documents of the particular investor's

7  account, correct?

8           MS. SMITH:  Objection, Your Honor, underlying

9  documents.

10           MR. AGNIFILO:  And I couldn't hear.

11           THE COURT:  She's objecting to the use of

12  underlying document.

13           MR. AGNIFILO:  Okay.

14  BY MR. AGNIFILO:

15  Q    All right.  Let me ask a more specific question.  On

16  the bottom it says, "Breakdown of ending balance," and it

17  says, "Cash at banks."

18           Do you see that?

19  A    Yes.

20  Q    All right.  You get the bank account records, correct?

21  A    Yes.

22  Q    You get the bank account records from the bank, right?

23  A    Yes.

24  Q    All right.  So that's not from the client, correct?

25  A    Yes, that's correct.

Mohan - Agnifilo - Cross                    4712

1   Q    Now, some of the other entries here.  It says,

2   "Interest expense."  Do you see I'm moving up now.  Interest

3   expense is maybe the fifth entry down in that first list of

4   items.  Do you see that there?

5   A    Yes.

6   Q    And where does that information come from?

7   A    That might be interest in particular stock, particular

8   bond or a -- or stocks.

9   Q    And where would that information come from?

10        MS. SMITH:  Objection to this particular

11   statement.

12        THE COURT:  Do you mean generally.

13   BY MR. AGNIFILO:

14   Q    Do you know generally where these things come from?

15   A    Generally, yes.  We receive all information either from

16   the client file or from the broker file.  And we receive

17   this information either from the client file or from the

18   broker file.

19   Q    Okay.  So now when you say the broker file, tell the

20   jury what you mean by the broker file.

21   A    The broker file is generally we are the client of

22   brokers to which clients are client should have a brokerage

23   account in order to trade and we receive all the offers by

24   that particular client of the broker.  If there is a monthly

25   client at the end of the month we receive that statement.

Mohan - Agnifilo - Cross                    4713

1   Q    And the broker is not MSMB Healthcare, correct?

2   A    No, that's correct.

3   Q    The broker is a third party, correct?

4   A    Yes.

5   Q    Okay.  So part of the information that you get is from

6   this third-party broker, correct?

7   A    Yes.

8   Q    And you also in addition to getting third-party broker

9   information, you get information from the banks in regard to

10  this bank account information, correct?

11  A    That's correct.

12          THE COURT:  May I just ask a question?

13          MR. AGNIFILO:  Of course, Judge.

14          THE COURT:  About the broker file and the bank.

15          Information, is that the broker information

16  regarding the fund, MSMB Healthcare, or is it the broker

17  file regarding the individual investor?

18          THE WITNESS:  No, the broker file they got in the

19  fund only, not the investor.

20          THE COURT:  And is that true also for the bank

21  statement?

22          THE WITNESS:  Yes.

23          THE COURT:  For the fund not --

24          THE WITNESS:  For the fund, yes.

25          THE COURT:  Thank you.

Mohan - Agnifilo - Cross                    4714

1    BY MR. AGNIFILO:

2    Q    So you get the bank statements from the fund's bank,

3    correct?

4    A    Yes.

5    Q    Okay.  So, in other words, if the fund is banking at

6    Chase you get records from Chase?

7    A    Yes.

8    Q    Okay.

9         And if the -- the fund has a broker, interactive

10   brokers, you get information from interactive brokers?

11   A    Yes.

12   Q    Okay.

13        And fair to say that MSMB -- that NAV sent out --

14   this is -- you don't dispute this is a NAV statement,

15   correct?

16   A    It seems so, but I'm not confident because that might

17   be a very old statement.  I'm familiar with the newer one

18   where our name the there.

19   Q    But you see your -- let me -- let me zoom in.

20        Do you see it says NAV Consulting on the bottom?

21   A    Yes.

22   Q    All right.  I want to show you another thing and you

23   tell me if you are familiar with it.

24        This is -- this is Government's 91.2.  I want to

25   look at the format of this statement.  Do you see on the

Mohan - Agnifilo - Cross                    4715

1   bottom right, do you see NAV Consulting, correct?

2   A    Yes.

3   Q    All right.  Are you familiar with this statement's

4   format?

5   A    Yes.  This seems like an investor statement.

6   Q    Okay.  And this is particular instance it goes to

7   someone named David Geller.  Do you see that?

8   A    Yes.

9   Q    And this is an investor statement for the month ending

10  September 30th, 2011, correct?

11  A    That's correct.

12  Q    All right.  You have no reason to doubt that NAV sent

13  these statements out to David Geller, correct?

14  A    Yes.

15  Q    Okay.  What you're saying is you didn't work on any of

16  these particular accounts, correct?

17  A    Yes, that's right.

18  Q    So you don't have personal knowledge one way or the

19  other as to what NAV was doing in regard to Mr. Coker and

20  Mr. Geller, correct?

21  A    Yes.

22  Q    But you --

23  A    I --

24  Q    Go ahead.

25  A    Yeah, I don't know much about that, yeah.

Mohan - Agnifilo - Cross                    4716

1    Q    Right, okay.  But you do recognize this, you said, as a

2    NAV statement, correct?

3    A    Yes, that is correct.  These are NAV statements.

4    Q    And NAV -- the job of NAV Consulting is to put together

5    accurate information, correct?

6    A    Yes.

7    Q    From different sources, right?

8    A    Yes.

9    Q    And -- and put this information from these different

10   sources into a statement, correct?

11   A    Yes.

12   Q    And as you said before, to send that statement to the

13   investor directly, correct?

14   A    Yes.  That other kind of stuff, yes.

15   Q    Are you involved in evaluating hedge funds?

16   A    No.

17   Q    No?  Do you know anything about how hedge funds are

18   valued?

19   A    No.  I know about that, but I'm not actually involved

20   in the valuation of them, but I know about the fund, the

21   valuation of hedge funds, how do you run the portfolio.

22   Q    Right.  And you understood that MSMB Healthcare is a

23   hedge fund, correct?

24   A    Yes.

25   Q    And a hedge fund like MSMB Healthcare is not valued by

```
                    Mohan - Agnifilo - Cross              4717
```

1    just the amount of money in the bank account, correct?

2            MS. SMITH:  Objection, Your Honor, beyond the

3    scope of direct.

4            THE COURT:  Sustained.

5            MR. AGNIFILO:  Can we approach, Judge.

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar Conference                    4718

1              (The following occurred at side bar.)

2          MR. AGNIFILO:  I think the problem is, Judge,

3    they're putting in a lot of documents through this witness,

4    but they're -- yes.  It is beyond.  They didn't ask about

5    his valuation, no two ways about it.

6          MR. MR. BRAFMAN:  We'll make our witness so he

7    doesn't have to come back from wherever he came from.

8          MS. SMITH:  He has no person knowledge of this

9    account.  We can ask his generally, but he doesn't know in

10   terms of the input into his account how it was valued or

11   anything like that.

12              And you guys wanted us to stipulate to the

13   documents for authentication so we had to bring somebody.

14   Mr. Agarwal's in India.  He cannot be brought here on a

15   moment's notice, and so we have a custodian.  That we -- you

16   know, we did not ask him to interpret or anything about the

17   actual statements that are in front of him.  So, I mean, to

18   any -- any cross on this point would have to be qualified

19   that he has no personal knowledge of how this particular

20   fund was valued.

21          MR. MR. BRAFMAN:  Yeah, I think --

22          MS. SMITH:  And so any information input other

23   than he doesn't know what the inputs were.

24          MR. MR. BRAFMAN:  But his ability to authenticate

25   the documents is not questioned.  That's why he was brought

1   here.  So he has the ability to authenticate this is a real

2   document on behalf of MSMB, I think he's fair game for that.

3            MS. SMITH:  He did that.  And, in fact, he doesn't

4   actually know because it doesn't have the NAV Bates Stamp on

5   the document.

6            MR. MR. BRAFMAN:  No, the one bail does.

7            MS. SMITH:  It just has the footer, but he doesn't

8   actually --

9            MR. MR. BRAFMAN:  You introduced it.

10           MS. SMITH:  Yes, but not through NAV.

11           MR. MR. BRAFMAN:  No, I understand that.  But

12   there's no to it authentication.  There's challenges to its

13   accuracy, but there's not challenge --

14           MS. SMITH:  That's right.

15           MR. MR. BRAFMAN:  -- to its authentication.

16           MS. SMITH:  But anything about the entry of that

17   document is beyond the scope of his knowledge.

18           MR. MR. BRAFMAN:  It's not beyond the scope of his

19   knowledge.  It's beyond the scope of his knowledge as to

20   this particular statement.  But we can certainly ask him as

21   a general matter when he does these calculations how do they

22   do that.

23           MS. SMITH:  Well, I thought you've already asked

24   about the --

25           MR. MR. BRAFMAN:  Well, I think you can ask is

1   there items defined?  I mean, what does that mean?  How do

2   you do that?

3           MS. KASULIS:  But he doesn't now how they did it.

4           MR. MR. BRAFMAN:  No, I think he does.  If he

5   doesn't know, he'll say he doesn't know.

6           MS. SMITH:  But this particular account, he

7   doesn't know --

8           THE COURT:  The question was asked very generally:

9   How does NAV gather information?  Where do they gather

10  information from for preparing investor statements?  But

11  there was not -- my understanding is you asked him to give

12  particular or any particular investor statement involving

13  MSMB Healthcare investors.

14          MR. MR. BRAFMAN:  But there are general terms on

15  the statement that he's familiar with that appear on all of

16  those investor statements, not just the ones for this

17  account, and I think he can opine on what that's supposed to

18  mean.  That's all.

19          MS. SMITH:  It's not an opinion, but if he knows

20  what that --

21          MR. MR. BRAFMAN:  Correct, but he'll know.

22          MS. SMITH:  Okay.  Well, I would just object that

23  we can --

24          MR. MR. BRAFMAN:  As a general matter.

25          MR. AGNIFILO:  Okay.  All right.  All right.

```
                        Sidebar Conference                4721
```

1           THE COURT:  If I understand, he is just here to

2    authenticate that these are NAV documents?

3           MS. SMITH:  Yes.

4           THE COURT:  All right.  So with regard to this

5    other series of documents, he is either going to say that it

6    looks familiar or it doesn't --

7           MR. MR. BRAFMAN:  Judge --

8           THE COURT:  -- right?  He has already testified.

9           MR. MR. BRAFMAN:  On direct examination, they

10   didn't show him the real NAV documents that are at the heart

11   of some of the witnesses in this case.  They showed him a

12   termination letter, and it suggested they didn't do anything

13   for this case.  And the NAV investor statements that we're

14   now showing him are something that he can identify as a real

15   investor statement, and he's familiar with the general type

16   of statement and the fact that all they did was bring him in

17   here to authenticate the termination letter, doesn't

18   eliminate our cross because that's the reason we brought him

19   here because we didn't want to stipulate.  We wanted a live

20   NAV person.

21          THE COURT:  But there are multiple documents in

22   that exhibit, correct?

23          MS. SMITH:  Yes.

24          THE COURT:  Which I unfortunately got delivered

25   Saturday --

Sidebar Conference                    4722

1        MR. MR. BRAFMAN:  They came in through Geller and

2   they come in through Kocher and it's in evidence.

3        THE COURT:  Those were sent to the investor.

4        MR. MR. BRAFMAN:  Correct.

5        THE COURT:  But as to, you know, no one's saying

6   they are not real, but they are saying that the investors

7   did not know when they got thee e-mails necessarily how they

8   were prepared with regard to their own investor's statement.

9        MR. MR. BRAFMAN:  Judge, the impression left with

10  the jury from the direction examination was that NAV was

11  retained and then they were terminated.  They didn't go

12  through any of the NAV investment statements, which are I in

13  evidence, which they put in through Geller, through Kocher

14  and others implying that they were fake -- or implying --

15  no --

16       MS. SMITH:  No.

17       MR. MR. BRAFMAN:  -- implying that they were real,

18  but not that they didn't accurately reflect the money in the

19  account.  And now he's here and I want to show him these

20  exhibits and ask him to at least identify them as what they

21  appear to be NAV statements.

22       MS. KASULIS:  She as done.

23       MR. MR. BRAFMAN:  Where has been done as to one,

24  and I think there are general questions that are within his

25  range of knowledge that he can testify to, not as to this

Sidebar Conference                    4723

1   specific Mr. Geller.

2         THE COURT:  I think, then, can you just

3   distinguish when you are talking generally and that you are

4   not asking him specifically what the source is, because he

5   said for example the bank account billing could come either

6   from the client, i.e., MSMB, or from the bank account of the

7   fund itself indirectly from the bank.  So -- so I think it

8   is just important to be clear when you are asking him --

9         MS. SMITH:  Right.  And he doesn't now because he

10  was -- you know, we were very clear that he specifically

11  says that --

12        MR. AGNIFILO:  Right, right.

13        MS. SMITH:  So, you know, we just need to be clear

14  that whatever you're asking him about, he doesn't know what

15  the inputs were, and he doesn't know the exact process.

16        MR. AGNIFILO:  I will ask him general questions.

17        MR. MR. BRAFMAN:  Okay.  But he's more than a

18  custodian.  He's done this for ten years.  He's not someone

19  who's in the office and mails them whose identifying it as a

20  business record.

21        MS. SMITH:  Well, that's who they sent as a

22  custodian.  I mean, I didn't pick out who they had available

23  on one day's notice.

24        MR. MR. BRAFMAN:  Okay.  All right.

25        MR. AGNIFILO:  All right.  Fine.

Mohan - Agnifilo - Cross                    4724

1              (In open court, sidebar ends.)

2              (Pause in proceedings.)

3    BY MR. AGNIFILO:

4    Q    Sir, still talking about the NAV report moving where we

5    left off, at the bottom it says rate of return 11.02 percent

6    MTV, right; do you see that there?

7    A    Yes.

8    Q    What does that mean?

9    A    It means that this fund has a quality background of one

10   percent during this month, what is mentioned --

11              MS. SMITH:  Objection, Your Honor, again as to

12   this fund.  What does the rate of return mean generally?

13   BY MR. AGNIFILO:

14   Q    How great a return?

15   A    Just put it on this on the gain and loses which fund

16   performance during the month and on the basis of whatever

17   the activity fund has.

18   Q    And this is a calculation that NAV engaged in, correct?

19   A    Correct.

20   Q    All right.  And NAV engages in this calculation in

21   order to be accurate, correct?

22   A    Correct.

23   Q    All right.  And NAV is in the business of being

24   accurate in the regard to the numbers that it reports,

25   correct?

Mohan - Agnifilo - Cross                    4725

1    A    Yes, that's correct.

2    Q    Okay.  Including the rate of return and the other items

3    here on this investor statement, correct?

4    A    Yes.

5              MS. SMITH:  Again, Your Honor, this is --

6              THE COURT:  I think I did discuss this whether we

7    are asking the witness generally NAV's practice or with

8    regard to --

9              MR. AGNIFILO:  I'll rephrase.

10             MS. SMITH:  And move to strike the last answer.

11             MR. AGNIFILO:  All right.  I'll rephrase.

12             THE COURT:  All right.  The jury should disregard

13   the last answer regarding testimony about this particular

14   statement which is Government Exhibit 91-2.

15   BY MR. AGNIFILO:

16   Q    As a general matter, NAV is in the business of

17   providing accurate financial data?

18   A    Correct, yes.

19   Q    Okay.  And as a general matter, NAV is in the business

20   of calculating a rate of return on investments, correct?

21   A    Yes.

22   Q    And as a general matter, NAV does that in an accurate

23   fashion, correct?

24   A    Yes.

25   Q    Now, we just looked at a statement for David Geller for

Mohan - Agnifilo - Cross                    4726

1  September 30, 2011, correct?

2  A    Yes.

3  Q    All right.  Government's Exhibit 91-3 in evidence, this

4  is the statement for David Geller for October 31st, 2011,

5  correct?

6  A    Yes.

7  Q    All right.  And you agree with me that this is a

8  statement from NAV based on the footer, here, correct?

9  A    Yes.

10 Q    Okay.  And you also -- this is Government Exhibit 91-5.

11 You have a statement from concerning David Geller.  Now, you

12 said that this was in a form that you -- you don't

13 recognize, but you don't dispute that this is an NAV report,

14 correct?

15 A    This is a form of NAV.

16 Q    This isn't a form out of NAV?

17 A    Yes.

18 Q    Okay.  And you see NAV referenced on the bottom,

19 correct?

20 A    Yes.

21 Q    All right.  And this is also a report concerning David

22 Geller, correct?

23 A    Yes.

24 Q    And Government's 91-6, similar report for David Geller,

25 correct?

Mohan - Agnifilo - Cross                    4727

1    A    Yes.

2              (Continued on next page.)

1    CROSS-EXAMINATION (CONT'D.)

2    BY MR. AGNIFILO:

3    Q    Right.

4              And there's reference to NAV at the bottom here,

5    correct, it says:

6              Fund invests significant portion of capital in

7    affiliated entities and valuation of some of these entities is

8    not verified by NAV Consulting, Inc."

9              Correct?

10   A    Yes.

11   Q    And you said you do recognize this as a report of NAV

12   Consulting, correct?

13   A    It seems so.

14   Q    And you don't know because you didn't work on the MSMB

15   account whether or not NAV sent out multiple reports for

16   different people that were clients of MSMB Healthcare,

17   correct?

18   A    Yes, I don't know about that.

19              (Pause in the proceedings.)

20              MR. AGNIFILO:  So, thank you for your

21   time.

22              THE WITNESS:  Thank you.

23              THE COURT:  Redirect?

24              MS. SMITH:  Just very briefly, Your Honor.

25

1  REDIRECT EXAMINATION

2  BY MS. SMITH:

3  Q    Mr. Mohan, on cross Mr. Agnifilo asked you about Varun

4  Agarwal and you said he worked in the back office?

5  A    Yes, now he work in the back office.

6  Q    So, he's currently working in the back office for NAV

7  Consulting?

8  A    Yes.

9  Q    Is that back office located in India?

10  A    Yes.

11        MS. SMITH:  Thank you, Your Honor, no further

12  questions.

13        THE COURT:  All right, sir, you are excused.  Thank

14  you.  Have a safe trip back to Chicago.

15        (Witness steps down.)

16        THE COURT:  Is the government prepared to call

17  another witness?

18        MS. KASULIS:  Your Honor, the next witness would be

19  our case agent but we do have those couple evidentiary issues

20  to work out so perhaps we could take our lunch break.

21        THE COURT:  We will give the jurors our lunch break

22  now.

23        Thank you for your ongoing attention.  Please don't

24  discuss the case.  We will come back and retrieve you in about

25  one hour, maybe a little bit more than that.  It will be about

*Proceedings*                                                    4730

1    an hour and 15 minutes.

2              (Jury leaves courtroom.)

3              THE COURT:  Did you want to speak amongst yourselves

4    or did you want to have me resolve something?

5              MS. KASULIS:  Speak amongst ourselves first.

6              THE COURT:  Thank you.  Please call me if you need

7    my input but I'd be happy not to hear from you.

8              MS. KASULIS:  We'd be happy not to bother you.

9              THE COURT:  Okay, thank you.

10             (Time noted:  12:40 p.m.)

11             (Luncheon recess taken.)

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                      4731

1          A F T E R N O O N   S E S S I O N

2          (The following takes place out of the presence of

3    the jury.)

4          THE COURT:  All right.  I've given a very quick

5    review to these multiple exhibits.  I'm assuming what I've

6    been handed are exhibits in dispute.  There are also some

7    exhibits with just yellow tabs on them, I'm not sure what

8    that --

9          MS. SMITH:  So, the yellow tabs are the ones in

10   dispute.

11         THE COURT:  Oh, okay.

12         MS. SMITH:  They're eight.

13         THE COURT:  So, why don't we just start at the

14   beginning but would somebody first please invite me, are these

15   exhibits that were exchanged starting yesterday?

16         MS. SMITH:  They were exchanged on Friday.

17         THE COURT:  Friday, okay.  All right.  And the

18   defense is objecting.  So, let's start with Government's

19   proposed Exhibit 353.

20         MR. AGNIFILO:  Yes, Judge, my concern with 353, it

21   is essentially a fairly heated argument -- well, it's Kevin

22   Mulleady essentially railing on Mr. Shkreli, making

23   accusations that I think are prejudicial and especially in a

24   fraud case saying that, how dare you lie to me about

25   everything.  There's reference to I guess a certain person's

*Proceedings*                                                    4732

1    picture here that I think is very prejudicial and obviously

2    has no place at the trial.  And I just don't see any exception

3    to this particular statement.  It's obviously not a

4    co-conspirator statement because they couldn't be more at

5    odds.  It's obviously not the statement of an agent because

6    it's pretty much the polar opposite of that and it is really

7    just Kevin Mulleady expressing tremendous frustration with

8    Mr. Shkreli and making accusatory factual statements that I

9    think should not be admitted as part of this trial without the

10   ability to cross-examine Mr. Mulleady.  So, that's 353.

11               THE COURT:  All right.  I'll hear from the

12   government.

13               MS. SMITH:  Your Honor, so for Kevin Mulleady, again

14   we think this is clear evidence of him as a co-conspirator and

15   I think you actually have to look at this in connection with

16   Government Exhibit 356.  So, some of what he says here, for

17   example:  100 positions is a lie.  30 percent?  How many funds

18   you blowing up.  And then also at the bottom you have:  100

19   positions, your positions are never big.

20               So, it goes to his knowledge that this argument that

21   the fund has all of these positions and is an active fund at

22   this point and that the returns are 30 percent are not true.

23               And then if you look at Government Exhibit 356 --

24               THE COURT:  Which actually postdates this by two

25   months.

*Proceedings*                                                        4733

1            MS. SMITH:  Yes.

2            THE COURT:  So, how is it that he's referring in

3    June to a document that doesn't exist until August 29?

4            MS. SMITH:  That's the point.  The way they're

5    pitching the fund to people is it has 100 positions and you

6    can see he does it again in September but in June he knows

7    it's not true and he's including it in a presentation for MSMB

8    Healthcare afterwards and so this knowledge by the

9    co-conspirator of the fact that the fund is not the way it's

10   being pitched to investors and we think that that's what this

11   e-mail clearly shows.

12           We are happy to redact the reference to the picture

13   that's in here to the extent that that's inflammatory.  There

14   is also some language which we're happy to redact but that is

15   the reason why we included this document.

16           THE COURT:  What's difficult about this e-mail is it

17   also looks like he's sending it to himself.  It's not clear

18   who he actually sent it to.

19           MS. SMITH:  That's true but it comes from him and it

20   shows his knowledge that these statements that are coming from

21   Mr. Shkreli and then that are included in pitches to investors

22   are not true.

23           MR. AGNIFILO:  Your Honor, I'd also point out it is

24   an e-mail he sent to himself at 2:08 a.m., I don't know what

25   condition Kevin Mulleady was in at 2:08 a.m. and we don't have

*Proceedings*                                                    4734

1   the ability to cross-examine him and this is just a rant and I

2   just don't think it has any probative value and it is horribly

3   prejudicial.

4          MS. SMITH:  Like I said, to the extent there's more

5   prejudicial language in this, we're happy to redact that.  It

6   is really the language about equity funds, lies, 100 positions

7   is a lie, 30 percent, how many funds you blowing up, and at

8   the bottom, you have 100 positions, your positions are never

9   big.  So, those are the pieces that we think are directly

10  relevant and evidence of his knowledge and we'll be happy to

11  redact basically the rest of it, frankly.

12         MR. AGNIFILO:  But even the characterization, how

13  many funds are you blowing up, this is not the kind of

14  evidence of a fact like that that should play any role in this

15  trial, a 2:08 a.m. e-mail from Kevin Mulleady that we don't

16  even know Martin got, certainly he didn't respond to, it's

17  just him railing for whatever state of mind he was in at the

18  time, we just done know.  I just don't think there's any

19  value -- it's a derogatory, mean spirited e-mail and we don't

20  know exactly why he's sending it.

21         THE COURT:  It's being offered for the truth I

22  think.

23         MS. SMITH:  Yes, it is, it is being offered as a

24  co-conspirator and they have challenged him as a

25  co-conspirator a number of times and it shows his knowledge.

*Proceedings*                                                              4735

1   "Blowing up" is the same language that Caroline Stewart used

2   in the e-mail that's already in evidence and there's another

3   e-mail that they're challenging that also uses the language

4   "blowing up."  So, it goes to what, you know, what he

5   understands that to mean as well.

6                THE COURT:  Do you have any reason to believe that

7   this just isn't like a memo to file where he's just writing

8   notes to himself and just ranting to feel better at 2:00 in

9   the morning?  I mean it's hard to know without sort of the

10  back and forth to the recipient.  I'm afraid that it is

11  somewhat speculative to assume that this is something that

12  he's referring to in the context of anything having to do with

13  Mr. Shkreli or MSMB.

14               MS. SMITH:  The subject line says:  For Martin.  And

15  the 100 positions language is then in the pitch book on

16  average, you know, that he puts together and sends out to

17  investors, as is the 30 percent return number.

18               MR. AGNIFILO:  We're forced to speculate about a lot

19  of things and all we know is he's just railing on him at

20  2:08 in the morning and we don't even know that he actually

21  sent it, we don't know if these are musings to himself, we

22  don't know anything about it because he hasn't testified and

23  we just have -- we're stuck with very prejudicial language

24  that really doesn't advance the ball at this trial I submit at

25  all.

*Proceedings*                                                    4736

 1           MS. SMITH:  Your Honor, the argument we've heard

 2    from defense is that Kevin Mulleady was not part of the

 3    conspiracy, had no idea that the information he was providing

 4    was false.  This is direct evidence in connection, again, with

 5    the Caroline Stewart e-mails that he did in fact know and then

 6    continued to work there and sent out the very information that

 7    he's calling lies in this document.

 8           THE COURT:  So, it is not really being offered for

 9    the truth of the statements but rather to show knowledge of

10    someone who the government contends is a co-conspirator?

11           MS. SMITH:  Yes.

12           MR. AGNIFILO:  But, Judge, we can't separate -- the

13    language itself is horribly prejudicial and there's no

14    relevance to it in any way, shape or form, it's purely

15    prejudicial.  I mean it's nothing other than him just ranting,

16    you know, we don't know to who, we don't know why, we don't

17    know if he's sending it, we don't know if Martin received it

18    at 2:08 in the morning.  It is just, in my opinion, the worst

19    kind of evidence, it's pure prejudice and no probative value

20    whatsoever and we're forced to speculate about these things

21    which we shouldn't have to do with something that's this

22    prejudicial on its face.

23           MS. SMITH:  Your Honor, I think those arguments go

24    to weight and I don't think it is any more prejudicial than

25    the Caroline Stewart document that is already in evidence and

*Proceedings*                                                              4737

1    then the one we've also marked as Government Exhibit 354.

2          MR. AGNIFILO:  I don't believe it is in evidence, I

3    believe it is subject to connection to Mr. Kevin Mulleady

4    being found as a co-conspirator.

5          MS. SMITH:  This is what we're doing here.

6          THE COURT:  I think it is probative to the extent it

7    does show certain knowledge on Mr. Mulleady's part or at least

8    a belief; whether or not it is a true belief or whether or not

9    he is actually correctly believing these things is not really

10   the issue, it's his state of mind and to the extent he's been

11   challenged as a co-conspirator, I think to the extent it shows

12   certain knowledge on his part, it should be admissible but I

13   would, for example, on this e-mail starting with that

14   sentence:  Is there a purpose, that should come out; dinner

15   after Sharlee (ph), that should come out; costing us bus

16   should come out.

17          If you're offended by the obscenities, we can take

18   out some of that.

19          MR. AGNIFILO:  It's not so much the obscenities.

20          THE COURT:  Okay.  This is the other thing, I know

21   that it's been in the trial that Mr. Mulleady rather than

22   Mr. Shkreli approached certain friends and family like

23   Mr. Rosen -- I'm sorry, it was Michael Lavelle who is a cousin

24   and there was --

25          MS. SMITH:  Mr. Kocher.

*Proceedings* 4738

1      THE COURT:  Kocher came through Mulleady.  And so

2  the question is whether he knew as an alleged co-conspirator

3  that certain statements that were being proffered in the PPMs

4  were not true and it goes to his state of mind, it's not

5  really for the truth, but I do agree there's some inflammatory

6  language in here and so the last three lines of this e-mail

7  should come out I think starting:  We it feels like you, etc.,

8  and then absolutely lie, that should come out, the line just

9  before that.

10      MS. SMITH:  Right.

11      THE COURT:  So, I would take out much of this.

12      MS. SMITH:  If Your Honor wants to mark that up --

13      THE COURT:  I could mark it, yes.

14      MS. SMITH:  -- then we'll take it.

15      MR. AGNIFILO:  I think the line, Judge, where he

16  says:  How dare you lie to me about everything, I don't know

17  how that shows his knowledge.  It shows, if anything, that

18  he's claiming in whatever form this is that he didn't know.

19      THE COURT:  Expense and city stock options, I'm not

20  sure that's related to anything here.  I think it could have

21  to do with maybe his compensation but I just don't know, I

22  think it should come out.

23      MS. SMITH:  Okay.

24      THE COURT:  I think the equity in funds statement

25  should stay just because, again, it has to do with I think the

*Proceedings*                                                     4739

1   funds at issue here and his stake in them.

2           The next line, more jobs, I think that should -- I'm

3   not quite sure what is being discussed up to the point of --

4           MS. SMITH:   100 positions.

5           THE COURT:   Neo p [ph] wtf?  That should come out I

6   think.  I don't know what that is.

7           MS. SMITH:   Then I think --

8           THE COURT:   To the extent the government wants to

9   tie this next statement about 100 positions and 30 percent,

10  it's linked directly to the PPM, you're going to --

11          MS. KASULIS:   The PowerPoint.

12          THE COURT:   The PowerPoint, sorry, the statement:

13  This is my friends and family; again, I think it is directly

14  relevant to his role in soliciting investors.

15          I think the next definition of insanity line should

16  come out.  I think it's just really a rhetorical argumentive

17  question.  The next line I think also because it's just not

18  clear what he's referring to and then everything below that

19  should come out.

20          MS. SMITH:   Other than the last line that says:  You

21  have 100 positions, after the picture?

22          THE COURT:   Yes.

23          All right.  The next document that was in dispute

24  is?  Government 354, is that right?

25          MR. AGNIFILO:   354.

*Proceedings*                                                        4740

1          THE COURT:  Okay.  Yes, Mr. Agnifilo.

2          MR. AGNIFILO:  My concern is we have Caroline

3     Stewart again using the term "after he blew up the fund."  I

4     don't think it's a co-conspirator statement.  I'm assuming

5     they're offering it for the truth and it's a prior out of

6     court statement offered for the truth without a hearsay

7     exception.

8          THE COURT:  Is this already in evidence or something

9     like it?

10          MS. SMITH:  The chat between Mr. Mulleady and

11     Ms. Stewart is in subject to connection.  The way we're going

12     to connect it, it then gets forwarded to the defendant who

13     responds, so it is defendant's statement, but this one is a

14     different time period.  I think it is significant, that

15     Caroline Stewart chat I believe is in June and this is now in

16     August, he's hearing it again.  So, I think that the timing is

17     actually significant because it is right around the time that,

18     again, he's recruiting people to the fund.

19          THE COURT:  So, what is the basis for offering this

20     if not for the truth?

21          MS. SMITH:  Again, I think it is same basis of

22     notice, that he's on notice about the funds blowing up and for

23     his state of mind.

24          MR. AGNIFILO:  He's only on notice if it's true and

25     you can't get away from the truth of a fairly prejudicial

*Proceedings*                                                     4741

1   statement and Caroline Stewart here is not a co-conspirator

2   and here is not an agent.

3            THE COURT:  She testified at length about her

4   frustration in not being paid what she had been promised and

5   the fact that there was no money in the fund and that's why

6   she wasn't paid.  This seems to be about that, that there's an

7   offer to settle up with her in some way and pay her some money

8   perhaps.

9            MR. AGNIFILO:  My concern, Judge, we got these over

10  the weekend, she already testified, so she testifies, she's

11  gone and then they put in an e-mail from her that we can't

12  cross-examine her on.  That doesn't seem -- I think that alone

13  should make it not come in.  I mean had we gotten to see them

14  before she testified, I could see some rationale but to have

15  her on the stand and off the stand and give us one of her

16  e-mails that I can't cross-examine her on just doesn't seem

17  right.  I'm not faulting anybody, I'm just talking purely from

18  a cross-examination standpoint.

19           THE COURT:  I don't think this shows that

20  Mr. Mulleady is necessarily a co-conspirator and I think it's

21  being offered in some respects for the truth that she's not

22  being paid and the funds are tight so I think we should

23  exclude 354.

24           MS. SMITH:  Okay.

25           THE COURT:  What's next?

*Proceedings*                                                         4742

1        MR. AGNIFILO:  356.  My concern with 356, it seems

2   to be a draft MSMB Capital Management presentation with

3   corrections, so it doesn't seem to be the final one.  If it

4   was the final one, I would have no objection to it but it

5   seems by its own terms -- Mulleady is saying:  Please review

6   the attached Excel corrections in red.  And then he asks

7   Martin:  The PowerPoint is ready to go out to prospective

8   clients with your approval.

9        This sort of leaves in doubt if this is the final

10  one and if it's not the final one, I don't know what relevance

11  it has.

12       THE COURT:  I'll tell you why it is relevant in my

13  mind, because it shows that he's answering to somebody or he's

14  seeking approval from Mr. Shkreli and to the extent he may

15  have been making his own statements without authority or

16  direction, it shows that he's seeking approval of Mr. Shkreli

17  on this presentation and it does, to the extent the government

18  has argued that this relates to that, parts of that rant

19  anyway, the rant e-mail, it ties the two together, but I do

20  think it's not being offered for the truth but rather to show

21  that he's seeking approval and direction from the defendant.

22  So, I would overrule the objection --

23       MR. AGNIFILO:  Yes, Judge.

24       THE COURT:  -- if that's the only basis.  356 would

25  be admissible.

*Proceedings*                                                      4743

1          (Government's Exhibit 356 so marked in evidence.)

2          Is there anything else?

3          MR. AGNIFILO:  Yes, there is, Judge.  The next one I

4    have is 364.  This comes back to whether Greebel and Biestek

5    are co-conspirators.  I don't know that there's sufficient

6    evidence that either of them are.  So, that's the basis for

7    objection to 364.

8          THE COURT:  I think we admitted similar e-mails in

9    the documents that were challenged by the defense over the

10   weekend.

11         MS. SMITH:  We have.  So, Government Exhibit 236 is

12   the e-mail that Greebel sends at the bottom here which is

13   already in evidence and this is Mr. Biestek's response.  The

14   next exhibit which is 365 is also Mr. Vaino's response and

15   there's obviously evidence in the record that both of them

16   were working at Retrophin at the time.

17         So, in terms of conspiracy on Count Eight, both of

18   these, 364 and 365, go directly to that conspiracy.

19         MR. AGNIFILO:  As to 365, Judge, I don't know that

20   there's any evidence that Vaino is a co-conspirator.  It is

21   still not clear to me, and this is an issue for another day,

22   although a day soon in terms of Rule 29, what evidence there

23   is of the Count Eight conspiracy and if there is evidence of

24   the Count Eight conspiracy, which we contest there's none,

25   what role Andrew Vaino had as a knowing, willing

*Proceedings*                                                    4744

1  co-conspirator such that this e-mail would be admissible as a

2  co-conspirator statement.

3          THE COURT:  Well, isn't he in the group of the

4  select few who are able to purchase --

5          MR. AGNIFILO:  He is, true.

6          THE COURT:  -- the shares at a discount, .001 per

7  share?

8          MR. AGNIFILO:  Right.

9          THE COURT:  And part of the theory of the government

10  is that those folks were hand selected by Mr. Shkreli and that

11  Mr. Greebel cooperated with him or joined with him in

12  directing these select investors to make statements, he wanted

13  them to send an e-mail confirming what's here.

14          So, I'll hear from the government whether Mr. Vaino

15  is a co-conspirator in their view or whether it is sufficient

16  to show the Count Eight attempt to control the free trading --

17  limit free trading shares of Desert Gateway at the time of the

18  reverse merger.

19          MS. SMITH:  So, for both of these e-mails, these, as

20  Your Honor said, they're both individuals who were given the

21  opportunity to purchase the Fearnow shares which were free

22  trading, however, if they were affiliates they would no longer

23  be free trading, they would be restricted and so by kind of

24  saying that they're not affiliates even when they're working

25  for Retrophin, they allow the shares to remain free trading

*Proceedings*                                                4745

1    and at the same time they also give the defendant control over

2    the shares, so if he asked them not to sell or he asked them

3    to sell, that can affect the trading price and volume because

4    at the time the Fearnow shares represented I believe

5    80 percent of the float or of the shares that could in fact be

6    traded.

7            So, this is direct evidence that they were saying

8    that, you know, they agreed to say that they were not

9    affiliates when in fact they were working for Retrophin.  I

10   think Marek Biestek's involvement is pretty clear, he was

11   basically given the opportunity to buy Fearnow shares because

12   he agreed to backdate a share transfer with the defendant to

13   create the MSMB Capital interest; and for Andrew Vaino, he

14   allows his free trading shares to be assigned by the defendant

15   to Richard Kocher in satisfaction of the settlement agreement

16   which is what we saw in the Standard Registrar documents.  So,

17   I think these are very clear evidence of that conspiracy.

18           MR. AGNIFILO:  Judge, I don't know that we have

19   nearly enough evidence of a conspiracy for there to be a

20   crime.  The attempt to control shares is not a violation of

21   the securities laws, I mean you need what Mr. Pierotti said

22   specifically did not happen which is you need buying and

23   selling and buying and selling to artificially create volume

24   and then you need an inside group and an outside group.  I

25   mean the case law on pump and dumps is pretty clear and we're

*Proceedings*                                                    4746

1   not -- I don't think we're even close to what would be a

2   securities violation and so the government's I think position

3   that there's a proven securities fraud conspiracy in this

4   record just doesn't exist, I don't think we're even close and

5   so all these different statements of Vaino and Biestek and

6   things like that presuppose the existence of a crime and I

7   just don't think there's evidence of an actual securities

8   fraud conspiracy.  I mean the case law on this is pretty

9   specific, I mean it's not enough to try to attempt to control

10  a stock, you need to do something in regard to the volume of

11  the stock so that there's an inside group and an outside group

12  and a group of investors gets hurt because they're not in with

13  the pump and dump flow.

14          And what the government really has is sort of, you

15  know, in the best case scenario a foundation of a house with

16  no house.  You know, they're saying, well, look, these guys

17  were going to control the shares and possibly do something

18  illegal but nothing illegal ever happened and what Pierotti

19  said, he sort of blurted it out, he said, well, if you buy and

20  sell and you buy and sell, you create volume, but then he

21  says, I heard from Biestek that that never happened, and that

22  was his testimony.

23          So, I think we're just very far from a completed

24  crime and without a completed crime I don't think we get any

25  of these things in as co-conspirator statements.

*Proceedings*                                                    4747

1        THE COURT:  So, your view is that it's not enough to

2   use a fraudulent scheme in connection with a purchase or sale

3   of securities, that there has to actually be an effect on the

4   market?  Because if you're saying that you have to actually

5   have had the artificial trading among the insiders, the

6   Fearnow shareholders, and that would have had to artificially

7   affect the share price and the volume, unless you have that

8   you don't have a securities fraud claim, is that your view?

9        MR. AGNIFILO:  Yes, and to answer Your Honor's --

10  the first part of Your Honor's question, I don't believe it's

11  a fraudulent scheme without that.  So, my position is not that

12  you have a fraudulent scheme without an effect on the market,

13  my position is it's not a fraudulent scheme.

14       THE COURT:  I know that but that's a jury issue,

15  right, they have to decide whether or not the notice to

16  certain employees of Retrophin that you're no longer employees

17  and you now go out and buy these shares at this special price

18  that are free trading, you put them in a Scottrade account and

19  you -- there's a request by Mr. Shkreli's assistant that they

20  get reports about the trading activity among this group and

21  then Mr. Shkreli does assert control over some of these shares

22  to resolve issues with MSMB Capital, Elea Capital and MSMB

23  Healthcare investors.  So, this is an issue for the jury to

24  decide whether there's evidence there that is evidence of a

25  fraudulent scheme, right?

*Proceedings*                                                4748

1        MR. AGNIFILO:  Right, right.  I mean it's a jury

2   question but I guess this tees it up as a question for Your

3   Honor in the first instance.

4        MS. SMITH:  Your Honor, I don't think that it's an

5   admissibility issue, I mean to the extent that this is an

6   argument that doesn't get to the jury, it is a Rule 29

7   argument, I'm sure we'll get there, but it is not a question

8   of admissibility.

9        MR. AGNIFILO:  I'm not sure that it is not because

10  to be a co-conspirator you have to be a co-conspirator in

11  connection with an actual crime and if there's no actual

12  crime, you're not a co-conspirator.  So, that's why we find

13  ourself in this position with statements like this.

14       MS. SMITH:  Your Honor, there's been a lot of

15  evidence that's come in on the Fearnow shares, this is the

16  first time I'm hearing that Count Eight is not a cognizable

17  crime, the defense certainly didn't move on this.  So, at this

18  point, again, these are individuals who received shares,

19  they're saying that they're not affiliated with Retrophin,

20  there's been lots of testimony that they in fact were working

21  for Retrophin at the time.

22            As for Mr. Pierotti's statement, it was a statement

23  made to him by Mr. Biestek that, oh, it didn't really happen

24  and there is in fact evidence that there was trading among the

25  Fearnow share group during the critical time period which came

*Proceedings*                                                          4749

1   in through Ms. Oremland.  So, just because a co-conspirator

2   says to someone, oh, don't worry, we didn't actually do

3   it doesn't mean that -- that's not evidence that it didn't

4   happen and, again, we're talking about admissibility, these

5   are clearly relevant statements, they're all statements made

6   by employees of Retrophin at the time and they complete

7   e-mails that are already in from Mr. Greebel and I just don't

8   think this is a admissibility issue.

9              MR. AGNIFILO:  Just one last, the evidence that it

10  didn't happen is Government Exhibit 630 which is the trading

11  records, I mean it didn't happen.  Vaino sold, Pierotti sold,

12  there is no buying and trading in order to create volume.

13  That's in the records, that's Government Exhibit 630.  Also, I

14  don't believe Vaino was a Retrophin employee at this time and

15  there certainly hasn't been any evidence that he was at this

16  time so I don't think that the government is in quite the

17  position they think they're in.

18             MS. SMITH:  Mr. Aselage testified that Andrew Vaino

19  was an employee when he started and he wasn't fired until

20  2014.  So, there's more than enough evidence in the record.

21  There are other people who also testified that he was working

22  there, you know, and Pierotti -- I mean look, I think

23  Mr. Agnifilo is also confused -- conflating, excuse me, in

24  conspiracy success is not an element, an agreement to do

25  something is alone a crime.  So, whether or not the trading

1  actually occurred, I think we have a different view of the

2  evidence and there are instances where Mr. Shkreli himself is

3  buying during the period but I don't think the evidence of

4  whether it actually occurred goes to whether a crime occurred

5  because it's a conspiracy because once there's an agreement to

6  do it, which Mr. Pierotti testified about, that is in and of

7  itself enough for the crime.

8         THE COURT:  All right.  I think that Exhibits 364

9  and 365 and 366 that all relate to this e-mail that

10 Mr. Greebel sends asking that these Fearnow shareholders write

11 an e-mail to confirm the following with return e-mail are

12 admissible for the reasons stated and I think that certainly

13 it doesn't foreclose arguments by the parties as to what the

14 significance and weight is of these particular series of

15 e-mails.  So, with regard to 364 through 366, I'm respectfully

16 overruling the defense objection.

17        MR. AGNIFILO:  I think 367 is probably in that

18 category.

19        THE COURT:  Oh, you're right.  Yes, 367 also and

20 maybe even -- yes, 367.  So, let's admit 364 through 367.

21        (Government's Exhibits 364 through 367 so marked in

22 evidence.)

23        THE COURT:  And then what about 368, Mr. Agnifilo?

24        MR. AGNIFILO:  Yes, Judge, we object to 368.  It

25 seems to be just another argument between Mulleady and

*Proceedings*                                                    4751

1   Mr. Shkreli.  I don't know how it advances the ball.  I'm not

2   seeing it.  It's Mulleady's objecting to certain tone or

3   language that's being used.  Shkreli is saying, OMG, not this

4   again.  I just don't -- maybe there's a relevance here, I just

5   don't see it.

6            MS. SMITH:  So, if you start with the first e-mail

7   on the second page, it is December 16th so it is right after

8   the reverse merger and Mr. Shkreli is saying that -- he's

9   talking about what he needs to do to and he's talking with

10  Mr. Mulleady about what he wants to do in connection with

11  Retrophin and discussing getting a replacement server e-mail

12  and moving Aselage to board of managers, that he's going to

13  give Mr. Shkreli a new bio and then if you turn the page to

14  the next e-mail you can see Kevin @ stonecornergroup.com which

15  is a new e-mail that's not a Retrophin e-mail and he's

16  waiting at the bottom:  I set up this e-mail, which he sets up

17  a non-Retrophin e-mail, and says:  Do you think I should stay

18  home till Fed Ex comes.

19           And that's waiting for his Fearnow shares which we

20  can show from the Standard Registrar documents were sent out

21  on December 14th.

22           And then, you know, you can go towards the top,

23  Mr. Shkreli is saying, you know, come into work basically at

24  Retrophin.  So, he's changed his e-mail address to a different

25  e-mail address that's not a Retrophin e-mail address, he's

*Proceedings*                                                          4752

1   waiting for his Fearnow shares but there's evidence throughout

2   the e-mail chain that he's actually coming to work for

3   Retrophin and so that's the significance, it is basically he's

4   created a new address so that there's no connection to

5   Retrophin but it is clear he's still doing work for Retrophin

6   and he's waiting to receive the Fearnow shares.

7            So, that's the reason why this e-mail is highly

8   relevant and we think it is admissible.  At the very least it

9   is the defendant's statements since he's at the top of the

10  e-mail chain but also a co-conspirator and, you know, and all

11  the other reasons we've kind of articulated.

12           THE COURT:  Well, what about the e-mail that comes

13  after where he says:  I don't appreciate your tone.  And then

14  Mr. Shkreli says:  OMG, not this again.

15           MS. SMITH:  We can redact the top two e-mails.

16           THE COURT:  Redact it, all right.  So, let's redact

17  the December 17th e-mails at 1:22 p.m. from Mr. Shkreli and at

18  8:14 a.m. from Mr. Mulleady.

19           (Continued on next page.)

20

21

22

23

24

25

```
                        Proceedings                    4753
```

1             MS. SMITH:  And then if Your Honor has Government's

2    Exhibit 353 marked up we can make those redactions.

3             THE COURT:  Sure.

4             MS. SMITH:  Then Your Honor, just one other issue

5    that we wanted to raise that we just learned about at lunch.

6    Defense counsel signed a stipulation -- we're good.

7             THE COURT:  Stip still going?

8             MR. BRAFMAN:  Stip still going.

9             THE COURT:  Are we ready to bring the jurors back?

10            MS. KASULIS:  Yes, Your Honor.

11            (Jury enters the courtroom.)

12            THE COURT:  All jurors are present.  Please have a

13   seat.

14            Is the Government prepared to call its next witness?

15            MS. KASULIS:  Yes, Your Honor.  The Government calls

16   FBI Special Agent Michael Braconi to the stand.

17            (Witness takes the witness stand.)

18   M I C H A E L   B R A C O N I, called as a witness, having

19   been first duly sworn/affirmed, was examined and testified as

20   follows:

21            COURTROOM DEPUTY:  Please have a seat state and

22   spell your full name.

23            THE WITNESS:  Michael Braconi.

24            MS. KASULIS:  Before we proceed with Special Agent

25   Braconi's testimony, I'd like to read three stipulations into

Proceedings                                      4754

1    the record.

2         THE COURT:  All right.  May we get the spelling of

3    the witness's name?

4         MS. KASULIS:  Of course.

5         THE WITNESS:  Michael Braconi, M-I-C-H-A-E-L,

6    B-R-A-C-O-N-I.

7         THE COURT:  Thank you.  We'll hear the stipulations

8    now.

9         MS. KASULIS:  Stipulations 807 through 809.  Moving

10   those stipulations into evidence we'll go ahead and read those

11   stipulations starting with 807.

12        THE COURT:  Is there any objection?

13        MR. BRAFMAN:  No.

14        THE COURT:  We'll admit.

15        (Government's Exhibit Number 907, 808, and 809 so

16   marked and received in evidence.)

17        MS. KASULIS:  Stipulation 807 reads, "It is hereby

18   stipulated and agreed by and between the undersigned parties

19   that from 2007 through 2014 both dates being approximate and

20   inclusive the law firm Cobb & Associates LLC, its predecessor

21   law firm Cobb & Eisenberg LLC and/or employees of those two

22   firms, including Jeffrey Cobb, Esquire, and collectively Cobb,

23   were not retained by and did not act as legal counsel to the

24   defendant, Martin Shkreli, MSMB Capital Management LP, MSMB

25   Capital Management LLC, MSMB Healthcare LP, MSMB Healthcare

Proceedings                                          4755

1  LLC, and/or any other MSMB entity.  In 2006 Cobb drafted the

2  marketing materials for Via Capital Management, including the

3  subscription agreement, private placement memorandum, limited

4  partnership agreement, and purchaser questionnaire."

5          Going to the next page, "This stipulation marked

6  Government's Exhibit 807 is admissible in evidence at trial."

7  Stipulation is dated July 15, 2017 signed by both parties.

8          If we can now turn to stipulation Government's

9  Exhibit 808.  This stipulation reads, "It is hereby stipulated

10 an agreed by and between the undersigned parties that from

11 2007 through 2014, both dates being approximate and inclusive,

12 the law firm Kleinberg Kaplan Wolf & Cohen PC and/or its

13 employees, were not retained by and did not act as legal

14 counsel to MSMB Capital Management LP, MSMB Capital Management

15 LLC, MSMB Healthcare LP, and/or MSMB Healthcare LLC."

16         If we can go to the next page, "This stipulation

17 marked Government's Exhibit 808 is admissible in evidence at

18 trial."  Dated July 18, 2017 and signed by both parties.

19         The last stipulation I'll read into evidence

20 Government's Exhibit 809.  That stipulation reads, "It is

21 hereby stipulated and agreed by and between the undersigned

22 parties that from 2007 through 2014, both dates being

23 approximate and inclusive, the auditing firm Rothstein Kass &

24 Company and/or its employees were not retained by and did not

25 act as auditors for the defendant Martin Shkreli, MSMB Capital

Braconi - Direct - Kasulis                    4756

1  Management LP, MSMB Capital Management LLC, MSMB Healthcare

2  LP, and/or MSMB Healthcare LLC."

3          If we go to the next page, please.  "This

4  stipulation marked Government's Exhibit 809 is admissible in

5  evidence at trial."  Dated July 18, 2017, again signed by both

6  parties.

7          May I proceed with the examination, Your Honor?

8          THE COURT:  Yes.

9          MS. KASULIS:  Thank you.

10  DIRECT EXAMINATION

11  BY MS. KASULIS:

12  Q    Special Agent Braconi, by whom are you employed?

13  A    By the FBI.

14  Q    Is that also call the Federal Bureau of Investigation?

15  A    Yes.

16  Q    I think I made reference to it already, what is your

17  title with the FBI?

18  A    Special Agent with the FBI.

19  Q    How long have you been a Special Agent with the FBI?

20  A    It will be eight years in October.

21  Q    Are you currently assigned to a specific unit or squad?

22  A    Yes, Squad C1.

23  Q    What does C1 investigate?

24  A    We investigate corporate and securities fraud.

25  Q    How long have you been assigned to that squad for?

Braconi - Direct - Kasulis                 4757

1    A    I think it's been six years.

2    Q    What did you do before becoming a Special Agent with the

3    FBI?

4    A    Before I became a Special Agent with the FBI I worked at

5    a public accounting firm as an auditor.

6    Q    For how long did you work at a firm as an auditor?

7    A    I worked as an auditor for three years.

8    Q    Were you involved in the investigation of Martin Shkreli?

9    A    Yes.

10   Q    What role did you play in that investigation?

11   A    I was one of two agents that were assigned to this

12   investigation.

13   Q    Were Grand Jury subpoenas issued in connection with your

14   investigation?

15   A    Yes.

16   Q    As part of the Grand Jury subpoenas issued, were

17   subpoenas issued to various banks, companies like Retrophin,

18   and various individuals?

19   A    Yes.

20   Q    Did you receive responses to those subpoenas?

21   A    Yes, I did.

22   Q    I'm showing you what is marked for identification and

23   it's behind tabs one through 13 in your binder marked Braconi

24   Exhibits, you have three binders in front of you.  I'm showing

25   you what is marked for identification as Government's Exhibit

Braconi - Direct - Kasulis                    4758

1    902 through 908, Government's Exhibit 916 through 918,

2    Government's Exhibit 924, Government's Exhibit 926,

3    Government's Exhibit 932, and Government's Exhibit 935.  Again

4    it's tabs one to 13 in your binder.  Do you recognize these

5    exhibits?

6    A     Yes.

7    Q     What are they?

8    A     These are statements by Martin Shkreli to the SEC and to

9    FINRA.

10   Q     For the statements to FINRA, are those dated May 15,

11   2012?

12   A     Yes.

13   Q     For the statements made by the defendant Martin Shkreli

14   to the SEC, was that on August 7, 2013 or February 24, 2014?

15   A     Yes.

16              MS. KASULIS:  The Government moves these exhibits

17   into evidence.

18              MR. AGNIFILO:  No objection.

19              THE COURT:  We will receive Exhibit 902 to 908, 916

20   to 918, 924, 926, 932 and 935.

21              (Government's Exhibit Number 902 through 908, 916

22   through 918, 926, 926, 932, and 935 so marked and received in

23   evidence.)

24              MS. KASULIS:  Thank you, Your Honor.

25              MR. AGNIFILO:  Is that 945 or 35?

Braconi - Direct - Kasulis                    4759

1          THE COURT:  935, did I misspeak?

2     BY MS. KASULIS:

3     Q    Let's go to tab one, this is Government's Exhibit 902.

4     You'll see with respect to the first page of this exhibit this

5     appears to be a cover sheet related to statements made by the

6     defendant to FINRA; is that correct?

7     A    Yes.

8     Q    If we turn to the second page, I will go ahead and read

9     the questions and if you could reads the answers of

10    Mr. Shkreli, that will be the case for the remainder of the

11    statements.

12          "Question:  Mr. Shkreli, would you state your name

13    and your home and business addresses for the record please?"

14    A    "Martin Shkreli, home address, Brooklyn, New York, 11230.

15    Business address, 330 Madison Avenue, Sixth Floor, New York,

16    New York 10017."

17    Q    If we go to tab two, exhibit 903.  Again, the same cover

18    page regarding Mr. Shkreli's statements to FINRA on May 15,

19    2012; is that correct?

20    A    Yes.

21    Q    If we go to the next page of this exhibit, I'll go ahead

22    and start with the question.

23          "Question:  Did you have any formal education

24    following your graduation from City-As-School?"

25    A    "Yes."

Braconi - Direct - Kasulis                    4760

1   Q    "Where?"

2   A    "CUNY Baruch College."

3   Q    "When did you first attend CUNY Baruch?"

4   A    "September 2001."

5   Q    "For how long did you attend CUNY Baruch?"

6   A    "Three years."

7   Q    "Did you graduate?"

8   A    "Yes."

9   Q    "What degree did you get?"

10  A    "Bachelor's in business administration and finance."

11  Q    "Was that in 2004?"

12  A    "Correct."

13  Q    "Did you have any formal education beyond your three

14  years at CUNY Baruch?"

15  A    "No."

16  Q    Turn to tab three, Government's Exhibit 904.  Again,

17  exhibit 904 has the same first page regarding Mr. Shkreli's

18  testimony to FINRA on May 15, 2012; is that correct?

19  A    Yes.

20  Q    I'll start with the question, "Why did you leave Intrepid

21  after a year?"

22  A    "I left Intrepid to launch my own hedge fund, Elea

23  Capital."

24  Q    "That's E-L-E-A?"

25  A    "Yes."

Braconi - Direct - Kasulis                    4761

1    Q    "When did you start operating Elea Capital?"

2    A    "March 1st, 2006 was the first day."

3    Q    "For what period of time did you continue to operate Elea

4    Capital?"

5    A    "Approximately a year-and-a-half."

6    Q    Let's turn to the next tab four, Government's Exhibit

7    905.  Again the same cover page regarding Mr. Shkreli's

8    testimony to FINRA on May 15, 2012.  If we go to the second

9    page, starting on the bottom, left-hand side.  I'll start with

10   the question.

11        "Question:  Were the investment results of Elea

12   Capital favorable or unfavorable?"

13        We can skip the objection.

14   A    "Unfavorable."

15   Q    "Unfavorable in what respect?  How did it perform?"

16   A    "The investors lost their entire principal."

17   Q    "Was that due to one particular trade?"

18   A    "Yes."

19   Q    "And did the firm shut down as a result of that loss?"

20   A    "Yes."

21   Q    "And what was the nature of the trade that caused the

22   loss of the investor's principal?"

23   A    "It was a loss that resulted in greater losses than the

24   firm had in assets."

25   Q    Let's turn to tab five, Government's Exhibit 906.  Same

Braconi - Direct - Kasulis                    4762

1  first page of the exhibit as the others we've seen so far,

2  Mr. Shkreli's testimony to FINRA dated May 15, 2012.

3           If we turn to the next page, the question in this

4  exhibit is, "When did you start MSMB Capital?"

5  A    "The middle of 2009."

6  Q    Let's go to tab six, Government's Exhibit 908.  Again,

7  the first page of this exhibit is again testimony by

8  Mr. Shkreli to FINRA on May 15, 2012.

9           I refer you to the next page, I'll begin with the

10 question, "Are you familiar with an entity called NAV

11 Consulting?"

12 A    "Yes."

13 Q    "What is NAV Consulting?"

14 A    "They are a third-party administrator."

15 Q    "Has NAV Consulting ever performed any services for MSMB

16 Capital Management LP?"

17 A    "Not to my recollection, no."

18 Q    Tab seven, Government's Exhibit 916, the first page of

19 this exhibit shows the witness is Martin Shkreli to the United

20 States SEC.  The date is August 7, 2013.

21           If we go to the next page I'll start with the

22 question, "We are referring to Mr. Austin's investments,

23 Mr. Shkreli.  Did you ever have trading discretion over any of

24 his money?"

25 A    "No, not specifically, no."

Braconi - Direct - Kasulis                    4763

1   Q    If we go to the next tab, tab eight, Government's Exhibit

2   917.  Again, the first page of this exhibit shows Martin

3   Shkreli is a witness before the SEC on August 7, 2013.

4           If we go to the next page, the question is, "So what

5   was the maximum asset value for MSMB Capital management or do

6   you know what it was in December of 2010?"

7   A    "I don't, but the fund was never more than 3 million or

8   so."

9   Q    If we go to the next tab, tab nine, this is Government's

10  Exhibit 918.  Again, it shows Mr. Shkreli is the witness

11  before the SEC on August 7, 2013.

12          If we go to the next page, "Question:  Did Rothstein

13  Kass ever do any work for MSMB Capital Management LP?"

14  A    "No."

15  Q    "And did NAV Consulting ever do any work for MSMB Capital

16  Management LP?"

17  A    "No."

18  Q    Before we proceed, can we please pull up what is already

19  in evidence as Government's Exhibit 5, this was the PPM that

20  was sent to Sarah Hassan regarding MSMB Capital Management.

21  If we can go to the page ending in 260, if we can zoom in on

22  the auditor section.

23          Who is the auditor listed there for MSMB Capital

24  Management?

25  A    Rothstein Kass & Company.

Braconi - Direct - Kasulis                    4764

1  Q    Thank you.  If we turn back to tab ten, Government's
2  Exhibit 924, which is in evidence, first page of this exhibit
3  shows Martin Shkreli is a witness before the SEC on
4  February 24, 2014.
5            If we turn to the next page I'll start with the
6  question, "You mentioned a personal loan, why don't you
7  describe that for me?"
8  A    "Sure.  It was a loan of $775,000.  It was made to me
9  personally but it was really not -- it didn't have to be a
10 personal loan, at the end of the day this was a loan to
11 satisfy a settlement on a related entity and it beared a
12 10 percent interest.  I recall discussing the loan with one of
13 my partners Marek Biestek who I believe this Commission is
14 aware of.  The loan is soon to be paid back sort of a function
15 of my own personal liquidity, which is just freed up and the
16 type of loan as it was described was to be complete a
17 settlement payment which after the repayment of this loan I
18 almost completely paid myself, which is something I didn't
19 have to do, this was a loss suffered by a fund, MSMB Capital
20 Management LP.  As I mentioned, after the next few weeks are
21 done, Mr. Biestek and myself will pay 100 percent of the
22 fund's losses personally."
23 Q    "When was -- was this loan documented?"
24 A    "It's a great question.  We certainly spent time thinking
25 about how to transact this loan and we did the best we could

Braconi - Direct - Kasulis                    4765

1  to document it.  As you know, we had not produced

2  documentation of the loan.  I remember attempting to document

3  this loan, we did our best to try to do that.  We have been

4  unable to produce any such documentation."

5  Q    And Special Agent Braconi, in your review of the

6  materials does the term personal loan in the question, "You

7  mentioned a personal loan why don't you describe that for me,"

8  refer to a $775,000 payment made from MSMB Healthcare

9  Management LP to the defendant?

10  A    That's correct.

11  Q    If we turn to the next tab, Government's Exhibit 926.

12  Again, this shows Martin Shkreli is a witness before the SEC

13  dated Monday February 24, 2014.

14         If we turn to the next page, the question is, "Did

15  you make any written disclosure to the limited partners?"

16  A    "No."

17  Q    Special Agent Braconi, in your review of the materials

18  does the question, "Did you make any written disclosure to the

19  limited partners refer," to whether the defendant made a

20  written disclosure to the limited partners of MSMB Healthcare

21  Management of the $775,000 payment made from MSMB Healthcare

22  Management LP to the defendant?

23  A    That's correct.

24  Q    If we turn to tab 12, it's Government's Exhibit 932, the

25  first page of this exhibit shows Martin Shkreli as a witness

Braconi - Direct - Kasulis                4766

1  before the Securities & Exchange Commission with the date of

2  February 24, 2014.

3          If we turn to the next page or the page after that,

4  the question is, "Who authorized the payment of $775,000 by

5  MSMB Healthcare to Merrill Lynch?"

6  A    "I did."

7  Q    If we go to tab 13, Government's Exhibit 935, the first

8  page again confirms this is Martin Shkreli's testimony before

9  the SEC on February 24, 2014.

10          If we turn to the next page of this document, I'll

11  start with the question, "Would there have been enough cash if

12  everybody had elected for cash?"

13  A    "No."

14  Q    Now Special Agent Braconi, in your review of the

15  materials with respect to the question, "Would there have been

16  enough cash if everybody had elected for cash," is that

17  referencing to whether there would have been enough cash on or

18  about September 9, 2012, to allow all of the MSMB Capital

19  Management LP and MSMB Healthcare Management LP investors to

20  redeem their investments for cash?

21  A    That's correct.

22  Q    Now directing your attention to tabs 14 through 85 of the

23  binder in front of you, behind those tabs are documents that

24  the Government has marked for identification as Government's

25  Exhibits 71-1 through 78-6; Government's Exhibit 84-1 through

Braconi - Direct - Kasulis                     4767

1   84-13; Government's Exhibit 85-1 through 85-4; Government's

2   Exhibit 86-1 to 86-2; Government's Exhibit 87-1; Government's

3   Exhibit 88-1 to 88-4; Government's Exhibit 89-1 to 89-16;

4   Government's Exhibit 90-1 to 90-9; Government's Exhibit 92-1

5   to 92-11; Government's Exhibit 93-1 to 93-5; and Government's

6   Exhibit 94-1.

7            Do you recognize these exhibits, Special Agent

8   Braconi?

9   A    Yes.

10  Q    What are they?

11  A    These are investor statements for MSMB Capital and MSMB

12  Healthcare.

13  Q    Investors?

14  A    Investor statements.

15           MS. KASULIS:  Thank you.  The Government moves to

16  admit these exhibits into evidence.

17           MR. AGNIFILO:  One second, Your Honor.

18           THE COURT:  May I get a clarification for the

19  record, you identified 71-1 through 78-6.  How high does 71-1

20  go through the series?

21           MS. KASULIS:  It's 78, Your Honor.

22           THE COURT:  It's 78-1 through 78-6.

23           MS. KASULIS:  Yes.

24           MR. AGNIFILO:  That's why I can't find them.

25           MS. KASULIS:  I may have misspoke.

Braconi - Direct - Kasulis                    4768

1           MR. AGNIFILO:  No objection.

2           MS. KASULIS:  78-1 through 78-6 was the first range.

3    Thank you, Your Honor.

4           THE COURT:  So no objection.  We will admit 78-1

5    through 78-6; 84-1 through 84-13; 85-1 through 85-4; 86-1 and

6    two; 87-1; 88-1 through 88-4; 89-1 through 89-16; 90-1 through

7    90-9; 92-1 through 92-11; 93-1 through 93-5; and 94-1.

8           (Government's Exhibit Number 78-1 through 78-6; 94-1

9    through 94-13; 85-1 through 85-4; 86-1, 86-2; 87-1, 88-1

10   through 88-4; 89-1 through 89-16; 90-1 through 90-9; 92-1

11   through 92-11; 93-1 through 93-5; and 94-1 so marked and

12   received in evidence.)

13          MS. KASULIS:  Thank you, Your Honor.

14   BY MS. KASULIS:

15   Q    Special Agent Braconi, if we could turn to tab 14 of your

16   binder, Government's Exhibit 78-1.  Can you please explain

17   this exhibit for the jury?

18   A    This is an e-mail from Martin Shkreli to Brent Saunders

19   with his MSMB performance estimate for February 2011.

20   Q    If you could read below the title starting with MSMB

21   returned, the first sentence?

22   A    "MSMB returned positive 4.24 percent in February 2011."

23   Q    Below that?

24   A    "MSMB has returned positive 8.2 percent year to date."

25   Q    That's what "YTD" stands for?

Braconi - Direct - Kasulis                    4769

1    A    Yes.

2    Q    Right below that, the first sentence?

3    A    "MSMB has returned positive 41.71 percent since inception

4    on November 1st, 2009."

5    Q    And again, this is a statement for February of 2011?

6    A    That's correct.

7    Q    Then the sentence a couple of sentences below starting

8    "in total"?

9    A    "In total you have invested $250,000.  The value of this

10   investment is now approximately $258,590 after fees, a

11   3.44 percent return after fees."

12   Q    Then this is signed by Martin Shkreli MSMB Capital

13   Management LP; is that correct?

14   A    That's correct.

15   Q    I'd like to pull up what is in evidence already as

16   Government's Exhibit 520 one of Wendy Spaulding's who

17   testified previously, one of her summary charts for MSMB

18   Capital.  If we can look at the January and February 2011 time

19   period for the accounts for MSMB Capital for January 2011.

20   What is the ending balance for the bank and brokerage accounts

21   on this chart for MSMB Capital?

22   A    $1,126,464.

23   Q    So that's for January of 2011?

24   A    That's correct.

25   Q    So for February of 2011, which is what this statement

Braconi - Direct - Kasulis                    4770

1   Government's Exhibit 78-1 that month is earning, what is the

2   ending balance for the MSMB Capital bank and brokerage

3   accounts?

4   A    $58,502.

5   Q    Thank you.  If we can turn to tab 16, Government's

6   Exhibit 78-3, can you explain what this document is to the

7   jury?

8   A    Sure.  This is an e-mail from Martin Shkreli to Brent

9   Saunders, his MSMB performance estimates a correction for

10  November 2011.

11  Q    What is the date on this e-mail?

12  A    January 25, 2012.

13  Q    So when you're saying this is a correction, the

14  performance numbers listed in the original e-mail is that

15  supposed to be for November 2011 and not October 2011, which

16  is listed in the original e-mail?

17  A    Yes.  It looks like the percentage also changes.

18  Q    So with respect to how much MSMB returned in that month,

19  what is listed here?

20  A    "MSMB lost 4.08 percent net in November 2011."

21  Q    If you look at the line under net returns for year to

22  date starting "MSMB has returned," do you see that?

23  A    Yes.

24  Q    Can you read that sentence?

25  A    "MSMB has returned positive 6.89 percent net of fees year

Braconi - Direct - Kasulis                4771

1    to date through the end of November 2011."

2    Q    Then the first sentence right below that?

3    A    "MSMB has returned positive 30.53 percent net of fees

4    since inception on November 1st, 2009."

5    Q    Under account values, can you please read those two

6    sentences?

7    A    "You invested $150,000 on August 3rd, 2010, the value of

8    this investment is now approximately $147,761 net of fees or

9    positive 6.89 percent year to date or negative 1.49 percent

10   since inception."

11   Q    If you look at right before the signature area for

12   Mr. Shkreli, can you read that line December 2011?

13   A    "December 2011 results will be reported shortly.  Our

14   preliminary estimate is a positive 10 percent net return for

15   December 2011."

16   Q    Okay.  So let's go ahead and go back to Government's

17   Exhibit 520, one of Ms. Spaulding's summary charts for the

18   bank and brokerage accounts for MSMB Capital.  If we look to

19   the right side of this chart it appears to end July 2011; is

20   that correct, Special Agent Braconi?

21   A    That's correct.

22   Q    Do you have an understanding as to why there is nothing

23   after July 2011?

24   A    The balances were zero in these accounts.

25   Q    So for example, if we go back to Government's Exhibit

Braconi - Direct - Kasulis                4772

1   78.3, the bank and brokerage records for this time period

2   November 2011 for MSMB Capital, the balance was zero between

3   those brokerage accounts; is that correct; and bank accounts?

4   A    That's correct.

5   Q    Directing your attention to tab 18, Government's Exhibit

6   78-5.  Can you please describe this e-mail for the jury?

7   A    This is an e-mail from Martin Shkreli to Brent Saunders

8   on March 4, 2012 regarding his MSMB performance estimate for

9   2011.

10  Q    So this e-mail is two months after the month ending in

11  December 2011?

12  A    Yes.

13  Q    Can you read the first sentences of the first three lines

14  there under net returns?

15  A    Sure.  "MSMB returned positive 12.14 percent net in

16  December 2011.

17          "MSMB has returned positive 19.87 percent net of

18  fees in 2011.

19          MSMB has returned positive 48.29 percent net of fees

20  since inception on November 1, 2009.

21  Q    If could you read under the account values the first two

22  sentences there?

23  A    "You invested $150,000 on August 3rd, 2010, the value of

24  the investment is now approximately $165,704 net of fees, or

25  19.87 percent year to date or positive 10.47 percent since

Braconi - Direct - Kasulis                    4773

1    inception."

2    Q    So for this time period December of 2011, if you recall

3    Wendy Spaulding's summary chart at Government's Exhibit 520,

4    how much money was in the bank and brokerage accounts for MSMB

5    Capital in December of 2011?

6    A    Zero.

7    Q    I'm showing you what is marked for identification as

8    Government's Exhibit 704, it's behind tab C of your binder,

9    behind the chart section.

10            Special Agent, can you please describe what this

11   exhibit is?

12   A    This exhibit shows MSMB Capital's, what was listed in the

13   investor statements, sent to the investors versus what was

14   actually in MSMB Capital's bank accounts.  So the left hand --

15   Q    The jury hasn't seen it yet.

16   A    Sorry.

17   Q    Did you prepare this chart?

18   A    Yes.

19   Q    What did you review to prepare this chart?

20   A    I reviewed all the MSMB Capital investor statements, as

21   well as the summary bank statements and brokerage accounts.

22   Q    Were all these materials voluminous?

23   A    Yes.

24            MS. KASULIS:  Your Honor the Government moves 704

25   into evidence.

Braconi - Direct - Kasulis                    4774

1           MR. AGNIFILO:  Can I have a one-minute voir dire?

2           THE COURT:  Okay.

3    VOIR DIRE EXAMINATION

4    BY MR. AGNIFILO:

5    Q    Special Agent Braconi, very quick, in preparing this

6    chart, did you account for the value of Retrophin at any point

7    in making the chart?

8    A    No.

9           MR. AGNIFILO:  Nothing else.  Thank you.

10          THE COURT:  Do you have any objection to admitting?

11          MR. AGNIFILO:  Not with that understanding I don't.

12          THE COURT:  All right.  We will receive Government's

13   Exhibit 704 in evidence.  You may publish.

14          (Government's Exhibit Number 704 so marked and

15   received in evidence.)

16          MS. KASULIS:  Thank you, Your Honor.

17   DIRECT EXAMINATION (CONTINUED)

18   BY MS. KASULIS:

19   Q    Special Agent Braconi, for Government's Exhibit 704 can

20   you please explain this chart for the jury?

21   A    Sure.  Like I said before, I compared what was sent to

22   the investors, all the investor statements, I added it up,

23   that's the blue.  Then I also totaled the MSMB Capital

24   brokerage and bank accounts, that's in the red.

25   Q    Can you please explain the three months that you looked

Braconi - Direct - Kasulis                    4775

1   at?

2   A     Sure.  So February 2011, March 2011, and November 2011

3   were the months that I picked.  Investors sometimes got

4   statements sporadically, these were months that I had for all

5   the investors.

6   Q     For February of 2011, the blue there is MSMB Capital

7   investor statements; is that right?

8   A     That's right.

9   Q     So what is that $3,270,913 number, what does that mean?

10  A     That means I totaled all the investors for MSMB Capital,

11  all their statements, together it added up to $3,270,913.

12  Q     And the red bar $58,502, what is that number?

13  A     That is MSMB Capital's bank and brokerage accounts

14  combined.

15  Q     And for March of 2011, for the total amount for MSMB

16  Capital as listed in the investor statements, what was the

17  total amount?

18  A     $3,182,232.

19  Q     With respect to the amount that was in MSMB Capital's

20  bank account and brokerage accounts for that month?

21  A     $58,051.

22  Q     With respect to the next month, November, 2011 what was

23  the total amount listed from the investor statements for MSMB

24  Capital investors for that month?

25  A     $3,074,185.

Braconi - Direct - Kasulis                    4776

1    Q    How much for the month of November 2011 was in MSMB

2    Capital as bank and brokerage accounts?

3    A    Zero.

4    Q    Now I want to refer you back to Government's Exhibit 917,

5    which is tab eight of your binder, which is already in

6    evidence.  Again, this is Mr. Shkreli's statement to the SEC

7    on August 7 of 2013.  If we go to the next page, when

8    Mr. Shkreli was asked, "So what was the maximum asset value

9    for MSMB Capital Management, or do you know what it was in

10   December of 2010," what did he answer?

11   A    "I don't, but the fund was never more than 3 million or

12   so."

13   Q    Now Special Agent Braconi, did you review all of

14   Ms. Spaulding's summary charts?

15   A    Yes.

16   Q    Did you review Government's Exhibit 501C, 501E, 502B,

17   502C?

18   A    Yes.

19   Q    Based on your review of those exhibits, what was the

20   total money invested in MSMB Capital?

21   A    $3,040,000.

22   Q    What is approximately 1 percent of that amount?

23   A    $30,000.

24            (Continued on next page.)

25

Braconi - Kasulis - Direct                4777

1   BY MS. KASULIS:

2   Q    Now, what was the total amount of money transferred

3   from MSMB Capital to Retrophin?

4   A    Zero.

5   Q    All right.  So let's go back to the investor statements

6   and let's look at MSMB Healthcare investor.  Directing your

7   attention to Tabs 20 through 32 and what we'll start with

8   the next Government's of Exhibit 84-1 through 84-13 and

9   we'll start with Tab 20.

10             Can you please explain this first stage of the

11   exhibit for the jury?

12   A    Sure.  Yes, this is an e-mail from Martin Kevin, the

13   investor statement -- or Geller, and then Kevin Mulleady

14   forwarded the statement on the Al Geller.

15   Q    And your understanding is AGTrading@fbn.com is AL

16   Geller's -- Alan Geller's e-mail address?

17   A    That's correct.

18   Q    And what is listed here that Mr. Mulleady wrote to

19   Mr. Geller?

20   A    "This is hot off the press version.  The more

21   comprehensive is on its way.  I'll send over as soon as I

22   get it.  Sorry for the delay.  Up about 3 percent this month

23   so far."

24   Q    And if we go to the next page of this document.  And if

25   we actually could just look at the bottom really quickly of

1   this document -- actually the very bottom of the page.  I'm

2   sorry.  I wasn't very clear.

3            Who is listed here on the bottom of the investor

4   statement?

5   A    NAV Consulting, Inc.

6   Q    And then right next to it there is a statement,

7   "Prepared by NAV Consulting, Inc. and then in parentheses

8   administrators"?

9   A    Yes.

10  Q    And then if we then go up.  And so this statement on

11  the top left-hand corner appears to be for MSMB Healthcare

12  LP; is that right?

13  A    That's correct.

14  Q    And the -- the recipient appeared to Alan Geller from

15  Delray Beach, Florida?

16  A    Correct.

17  Q    And the investor statement is for the month ending

18  April 30th, 2011?

19  A    Yes.

20  Q    And with respect to the beginning balance area, it

21  looks right underneath that there's a line for additions.

22  How much was added during this month by Mr. Geller?

23  A    $1 million.

24  Q    And what was the ending balance this month?

25  A    $993,878.83.

Braconi - Kasulis - Direct                4779

1    Q    And the rate of return?

2    A    Was negative .61 percentage.

3    Q    So let's go to another one of Ms. Spaulding's summary

4    chart for MSMB Healthcare.  Government Exhibit 521.

5            And with respect to this exhibit it appears to

6    have the combined totals for MSMB Healthcare LP, the

7    account -- the ending account balances for two bank accounts

8    and a brokerage account; is that correct, for

9    MSMB Healthcare?

10   A    That's correct.

11   Q    And so for the combined totals for the month leading up

12   to Mr. Geller's 1 million-dollar addition, February and

13   March of 2011, what are the two dollar amounts listed there?

14   A    $100 for February, 2011 and even $9 for March, 2011.

15   Q    And then for April of 2011 for the accounts listed in

16   this chart, what are the combined totals listed there at the

17   end of April 2011?

18   A    $1,000,732.

19   Q    So let's now turn to Tab 24 of your binder.  That's

20   Government Exhibit 84-5.  Can you please explain this e-mail

21   for the jury?

22   A    So it -- it's an e-mail from investor relations at

23   NAVConsulting.net to e-mail address AGTrading5@hotmail.com.

24   I believe is Alan Geller and cc'ing Marge Kelly.  It's

25   regarding the September, 2011 investor statement for

Braconi - Kasulis - Direct          4780

1   MSMB Healthcare LP.

2   Q    And at the top of the chain it appears that Mr. Shkreli

3   forwards this e-mail to Kevin Mulleady; is that correct?

4   A    That's correct.

5   Q    And if we turn to the next page and again, before we

6   zoom in just at the bottom, again do we see this similar NAV

7   Consulting footer on this investor statement?

8   A    Yes.

9   Q    If we zoom back out, the top of this investor statement

10  lists the statement for MSMB Healthcare LP, the recipient

11  again is Alan Geller for the month ending September 30th,

12  2015.  Do you see that?

13  A    Yes.

14  Q    If we can zoom back out and then go to this language

15  here below the actual dollar amount.  Can you please read

16  this for the jury?

17  A    "MSMB Healthcare LP has accepted the transfer of 30,000

18  investment units consisting of Class A common units of

19  Retrophin, LLC, a Delaware limited liability company focused

20  on the development -- developing biopharmaceutical products

21  from Marge Kelly and no consideration as a gift.  These

22  units are liquid in nature and prices are not readily

23  available in the market.  Valuations of this investment have

24  been provided by the general partner.  NAV Consulting, Inc.,

25  is not involved in the calculation, verification or

Braconi - Kasulis - Direct          4781

1   dissemination of such values and disclaims any

2   responsibility for the accuracy or completeness thereof.  As

3   of the date in this statement, we are valuing these units at

4   $10 per unit or $300,000.  Retrophin, LLC, has sold these

5   units at $20 per unit in connection with a Series A

6   financing.  The value of these units is material to the

7   value of your account and may have an adverse impact on your

8   ability to liquidate your investment in MSMB Healthcare LP.

9   MSMB Healthcare LP will not charge any incentive fees on

10  these units until liquidation of these units.  Please

11  contact the general partner at (212) 983-1310 if you have

12  any questions or if you would like additional information

13  regarding these units, including detail disclosures on

14  valuation and size of investment."

15  Q    And if we zoom that back out and look at the

16  performance for the month for Mr. Geller's investment, so

17  the beginning balance month to date, what is that listed

18  there?

19  A    $974,663.36.

20  Q    And the net income?

21  A    Is $107,413.53.

22  Q    And are there any additions or redemptions listed this

23  month for Mr. Geller?

24  A    No.

25  Q    And what is the ending balance listed here?

Braconi - Kasulis - Direct                4782

1    A    $1,082,076.89.

2    Q    And what is the rate of return listed on this

3    statement?

4    A    11.02 percent.

5    Q    So let's go back now to Government Exhibit 521,

6    Ms. Spaulding's chart for MSMB Healthcare LP for these two

7    bank accounts and the brokerage account listed in the chart.

8    Let's go ahead and look at September, 2015.  What are the

9    specific combined totals listed there for the account

10   balances for MSMB Healthcare at the end of the month?

11   A    It's $1,339,879.

12   Q    So now let's look at Tab 27, Government 84-8.  Can you

13   please describe this e-mail for the jury?

14   A    Sure.  This is an e-mail from -- begins with an e-mail

15   from investor relations at NAVconsulting.net to an e-mail

16   AGTrading5@hotmail, Alan Geller, CC Martin Kelly for

17   December, 2011 investor statements for MSMB Healthcare LP

18   and then Martin forwards this is e-mail to Kevin Mulleady.

19   Q    And so this is for December of 2011?

20   A    That's right.

21   Q    And if we turn to the actual account statement.  And,

22   again, just based on the e-mail before this, this appears to

23   be sent by NAV Consulting; is that right?

24   A    That's correct.

25   Q    And at the top of the page it's for MSMB Healthcare LP

Braconi - Kasulis - Direct                4783

1    and the recipient is Alan Geller again?

2    A    Correct.

3    Q    And if we look at the bottom -- well, before we go

4    there, it's entitled Individual Account Statement and then

5    underneath that "prepared from books without audit."

6              Do you see that?

7    A    Yes.

8    Q    If we could zoom back out and look at the language

9    under the ending balance area.  So can you please read this

10   language to the jury.

11   A    "Fund invests significant portion of capital and

12   affiliated entities valuation of some of these entities is

13   not verified by NAV Consulting, Inc.  The partnership

14   invested with its affiliated entities, some of the

15   investments with affiliated -- with affiliated -- some of

16   the investments with affiliates are illiquid in nature and

17   prices are not readily available in the market.  Valuation

18   of this investment has been provided by the general partner.

19   NAV Consulting, Inc., is not involved in the calculation

20   verification or dissemination of such values and disclaims

21   any responsibility for the accuracy or completeness thereof.

22   The value of these investments is material to the value of

23   your account.  May have an adverse impact on your ability to

24   liquidate your investment in MSMB Healthcare LP.

25              Please contact the general partner at

Braconi - Kasulis - Direct                    4784

1    (212) 983-1310 should you have any questions or if you would

2    like additional information regarding these investments

3    including detailed disclosure on valuation and size of

4    investment."

5    Q    And if we scroll up, what is the ending balance listed

6    there for Mr. Geller?

7    A    $1,144,997.22.

8    Q    And the rate of return?

9    A    Is 13.61 percent.

10   Q    Okay.  And if we go to Government Exhibit 521, it's

11   Ms. Spaulding's chart for MSMB Healthcare and then, again,

12   if we look at December 2011, for these bank accounts and the

13   brokerage account, what is listed there as the combined

14   total for the month of December of 2011 th?

15   A    $304,988.

16   Q    Now, Special Agent Braconi, at some point did NAV

17   Consulting stop preparing investor statements for

18   MSMB Healthcare based on your review of the documents?

19   A    Yes.

20   Q    And who then sent out the investor statements for

21   MSMB Healthcare after that?

22   A    Martin Shkreli.

23   Q    So let's turn to Tab 31, Government Exhibit 84-12.  Can

24   you please explain this exhibit to the jury?

25   A    Sure.  This is an e-mail dated September 9, 2012 from

Braconi - Kasulis - Direct                4785

1    Martin Shkreli to Al Geller or AGTrading5@hotmail.com,

2    cc'ing Kevin Mulleady, and it's regarding the June, 2012

3    investor statement for MSMB Healthcare LP.

4    Q    And is this signed by Martin Shkreli; is that right?

5    A    That's right.

6    Q    And it say, "Please see attached statement for the

7    month of June, 2012 for your investment in MSMB Healthcare

8    LP"; is that correct?

9    A    That's correct.

10              MR. BRAFMAN:  Your Honor.

11              THE COURT:  Yes.

12              MR. BRAFMAN:  May we have a brief sidebar or is it

13   an appropriate time for a break, we have an issue to

14   discuss.

15              THE COURT:  All right.  Are the jurors ready for a

16   midafternoon break?

17              JURORS:  Yes.

18              THE COURT:  Ten minutes, okay.  Thank you.  We'll

19   excuse your for a while, we'll take a break.  Don't discuss

20   the case, please.

21              (Jury exits.)

22              (The following matters occurred outside the

23   presence of the jury.)

24              THE COURT:  You may step down.

25              THE WITNESS:  Thank you.

Braconi - Kasulis - Direct                4786

1              THE COURT:  Do you want to have a sidebar at the

2      side or --

3              MR. BRAFMAN:  We can do it -- I just didn't want

4      to do it in the presence of the jury.

5              THE COURT:  I'll ask the litigation agent.

6              MR. BRAFMAN:  Judge, there's something

7      fundamentally unfair that I think would require some

8      instruction by the Court.  We all know that Al Geller is not

9      being called as a witness by the Government and we all know

10     that over objection the Court has allowed in his agreement

11     but there was some discussion -- it's not -- the agreement

12     is not in evidence, okay.

13             So we don't have an agreement, we don't know why

14     Al Geller got involved, we don't know what he relied on, the

15     3500 material indicates that he really relied on Kevin

16     Mulleady and also the fact that he viewed Martin Shkreli as

17     a genius and actually says to the Government, "I never read

18     any word of substance."  But beside the fact, I understand

19     why they didn't call him as a witness.  The jury is allowed

20     to see statements being sent to Al Geller which the

21     Government will argue ae fraudulent because in their view

22     without evaluating Retrophin there's no money in the bank,

23     therefore there's no money here.

24             It's really somewhat unfair because it shows that

25     his account statement, you know, is the $1,300,000.  If he

1   were a witness, he would testify that he made $10 million on

2   his investment with Martin Shkreli in MSMB Healthcare and

3   Retrophin, and he's an investor in Turing as well now.  So

4   there's somewhat of a -- of a sort -- of a sort of a snatch

5   of the testimony -- a snatch of the involvement of Al Geller

6   that allows the jury to speculate that he's the victim of

7   the fraud.  There's not going to be any evidence that he

8   was, in fact, defrauded, and I think if he were here he

9   would testify that he believed that he was fairly treated

10  and that he saw these statements but understood that they

11  involved Retrophin being valued as well because he was

12  actively involved in conversations with Mr. Shkreli.  So I

13  just don't know how you fix this.

14          But to the extent that the Court is not allowed in

15  the consulting agreement by Al Geller, I think there is some

16  instruction that the Court is required to give them, because

17  they're looking at Al Geller through the agent's testimony

18  as if he is a victim of the fraud and they don't see the

19  whole picture.

20          MS. KASULIS:  Your Honor, we're not arguing that

21  when Mr. Geller made his initial investment that there were

22  any misrepresentations made to him.  I feel like every day's

23  Groundhog Day on the issue.  So we are just showing simply

24  that Mr. Geller received monthly investor statements and

25  we're showing the disparity between the statements and what

1  was in the bank and brokerage records.  They can

2  cross-examine Special Agent Braconi about that comparison as

3  much as they want on cross-examination.  We also are not

4  admitting Mr. Geller's consulting agreement and so we're not

5  talking about, you know, how much he made down the road.

6  That how much he made as we all know that it means a fraud

7  was committed during the time that he was receiving these

8  the investor statements, and so that is simply what we're

9  doing, Mr. Geller he was a major investor in MSMB Healthcare

10 and he did receive, Your Honor, a nonprosecution agreement

11 because he admitted that the consulting agreement that he

12 entered into was fraudulent and that he lied to the

13 Government when he said initially that it was not

14 fraudulent.

15          And so, you know, I don't know what we're doing

16 here.  This is simply what we're doing with respect to

17 Mr. Geller.  We are not going into the consulting agreement,

18 we're not going into anything having to do with how much

19 money he made, we are just using him and his investor

20 statement for this purpose, which is that he was receiving

21 fraudulent performance numbers in these statements.  I

22 have -- literally this is the last one and we're going to a

23 summary charted, we're moving on.

24          MR. BRAFMAN:  Your Honor, it isn't Groundhog Day

25 and if it is, I'm sorry.  But the fact is that with all of

Braconi - Kasulis - Direct                    4789

1   the good things she just said about Al Geller, they made a

2   conscious decision not to call him because I don't think his

3   testimony on balance would support the theories of this case

4   I don't believe he would testify that he was the victim of a

5   fraud and the fact that he got performance estimates or

6   statements is not relevant if he's not someone who is a

7   victim of a fraud.  It's complete -- they sent these

8   statements to someone who had not invested in MSMB and who

9   did not have any misunderstanding about the nature of the

10   investment, they could never get them in.

11          So they're talking about a real person who we

12   don't believe is a victim here and the fact that the

13   statement according to agent has an inaccurate balance is

14   really not fair to the defendant because no one will be able

15   to tell the jury the whole Al Geller story.  And he has a

16   nonprosecution agreement which meant they intended to call

17   him before they went down this road and he was on the

18   narrowed window of the witness list up until Friday -- two

19   Fridays ago where the 6 or 7 remaining witnesses were

20   identified.

21          But this jury thinks he has been defrauded and

22   he's not defrauded just because he has the statement that

23   the Government doesn't think is accurate.

24          What is Al Geller's position in this case?  They

25   don't know that.

1           MS. KASULIS:  Your Honor, it doesn't -- it's been

2   misrepresentation made by the defendant that if we -- the

3   focus of this case, that's what the fraud is about.

4           MR. BRAFMAN:  It get it.

5           MS. KASULIS:  It's not about Mr. Geller and

6   whether he relied on those misrepresentations.

7           And with respect to Mr. Geller, he has a

8   nonpresumption agreement.  The defense obviously does not

9   need to put on the case, that is their choice.  They

10  obviously do not have to do that, but they can call

11  Mr. Geller as a witness if they would like to.  He had a

12  nonprosecution agreement there's no issue there with having

13  to immunize him or anything along those lines, it's their

14  choice not to call him.  And so we are using Mr. Geller's

15  statement for the very limited purpose that

16  misrepresentations about his investment were made to him,

17  period; no more, no less, and that is what we're doing.

18          THE COURT:  All right.  Well, I think consistent

19  with my prior ruling regarding excluding the consultant

20  agreement, they also agreed not to submit his subscription

21  agreement, but really the focus on the multi-performance

22  reports that were provided to him that, you know,

23  the Government hearing that these statements were fraudulent

24  as were untrue as conveyed in the monthly performance

25  report, so it seems to me that to the extent this witness

1  will be cross-examined about his failure to consider the

2  value of Retrophin and the valuation, that is something that

3  they're entitled to explore with the Agent, but I don't

4  think it changes the admissibility of this testimony

5  regarding the monthly performance of Mr. Geller's

6  investment.

7           I'm not quite sure what you're asking me to co.

8           MR. BRAFMAN:  I'm asking you to let the jury know

9  that Mr. Geller will not be a witness and that they are

10  not -- you know, they opened on it and so we did.

11           MS. KASULIS:  We actually did not open on Al

12  Geller.

13           MR. BRAFMAN:  All right.  Let me withdraw that.

14           THE COURT:  All right.  We're going to give them

15  an instruction about, you know, not every witness has to be

16  called in a case.

17           MS. KASULIS:  Yes.

18           THE COURT:  And not every piece of evidence has to

19  be presented to the jury during the trial.  The jury's going

20  to give it whatever weight it thinks it's deserves and

21  you're certainly at liberty to cross-examine this witness

22  and may call him regarding this -- regarding this testimony

23  and the documents as included.

24           MS. KASULIS:  Thank you, Your Honor.

25           MR. BRAFMAN:  May we have five minutes, Judge.

Braconi - Kasulis - Direct                    4792

1                (Recess taken.)

2                THE COURT:  We have a development with a juror, if

3     you would like to be heard about it.

4                Juror Number 14 has asked to be excused.  She says

5     she work on commission and she's beginning to suffer some

6     financial consequences.

7                MR. BRAFMAN:  Back row.

8                MS. KASULIS:  Back row.

9                THE COURT:  Yeah, Number 14, so she would be in

10    the back row.

11               MR. BRAFMAN:  Second seat.

12               THE COURT:  Second seat.

13               MR. BRAFMAN:  We have no objection.

14               MS. KASULIS:  We have no objection.

15               THE COURT:  All right.  What I'm going to propose

16    to do is just call her in and tell her she may be excused on

17    consent and that she should not discuss that with her fellow

18    jurors and she can just go to the jury room.

19               MR. BRAFMAN:  And if approached by anyone not to

20    discuss the case.

21               THE COURT:  She should not discuss the case at

22    this time, yes.

23               MR. BRAFMAN:  All right.

24               THE COURT:  All right.

25               MR. BRAFMAN:  May we have five minutes?

Braconi - Kasulis - Direct                    4793

1          THE COURT:  Of course.

2          (Recess taken.)

3          THE COURT:  Are we ready to bring Juror Number 14

4   in, just so she knows she's excused?

5          All right.

6          (Juror Number 14 enters.)

7          THE COURT:  Hello.

8          JUROR:  Hi.

9          THE COURT:  You're Juror Number 14.

10         JUROR:  I am.

11         THE COURT:  I understand that you've requested to

12  be excused because of work concerns.  The parties and the

13  Court are glad render your request.  I would just ask that

14  you please not discuss the case with anybody despite the

15  fact that you're no longer in service because it is

16  important that you wait until you read that there's a

17  verdict.  You may go to the second floor and let the jury

18  folks know that you've been excused and just get your

19  paperwork.  I would ask you also not to be in touch with the

20  jurors who are still actively serving in this case.

21         JUROR:  Uh-huh.

22         THE COURT:  After the verdict gets published, you

23  are certainly free to discuss.

24         JUROR:  All right.  Thank you.

25         THE COURT:  Be well.

1          JUROR:  Thank you.  Thank you.

2          THE COURT:  All right.

3          MS. KASULIS:  Thank you.

4          THE COURT:  I'm going to move each of the jurors

5    over one seat to the right on the left row and then they'll

6    be able the find their numbers.

7          All right.

8          I may just let the other jurors know that a juror

9    has been excused but not explain why, all right?

10         MR. BRAFMAN:  Judge, we have no objection if you

11   would just say it was work related so they don't speculate

12   that it was something to do with the case.

13         THE COURT:  All right.  We'll do.

14         MR. BRAFMAN:  Thank you.

15         (Jury enters.)

16         (Jury present.)

17         THE COURT:  All right.  We have 17 jurors present.

18   Everyone can have a seat, please.

19         And let me just advise the jurors that due to

20   work-related concerns and issues, we had excused Juror

21   Number 14.  She has agreed to follow the same admonishments

22   I had have given all of you, which is not to discuss the

23   case.  And please do not reach out to her until after you

24   are sent to deliberate.  You should not concern yourselves

25   beyond what I have told you and we will resume the

1   examination of Special Agent Braconi at this time.

2          And what we will do going forward you will all

3   have moved over one seat.  I guess you have already figured

4   that out, so thank you.

5          MS. KASULIS:  May I proceed, Your Honor?

6          THE COURT:  Yes, please.

7   BY MS. KASULIS:

8   Q    Okay.  Special Agent Braconi, I'm going to direct your

9   attention back to Government Exhibit 84-12, it's Tab 31 of

10  your binder.

11         Again, can you just briefly explain what this

12  cover e-mail is for the jury.

13  A    Sure.  It's an e-mail from Martin Shkreli to

14  AGTrading5@hotmail.com cc'ing Kevin Mulleady, and it's

15  regarding a June, 2012 investor statements for MSMB

16  Healthcare LP for Alan Geller.

17  Q    And if we turn to the next statement, and just

18  before -- actually just back up.

19         Before we proceed, was this just sent from Martin

20  Shkreli; is that correct?

21  A    Correct.

22  Q    And signed by Martin Shkreli MSMB Healthcare LP; is

23  that right?

24  A    Correct.

25  Q    Okay.  And if you look at the next page of this

Braconi - Kasulis - Direct                    4796

1   document, does this format for the investor statement appear

2   different than the statements that were issued by

3   NAV Consulting?

4   A    Yes.

5   Q    The title of this statement is MSMB Healthcare LP and

6   then underneath there's that individual account statement

7   and then currently prepared from books without audit.  Do

8   you see that?

9   A    Yes.

10  Q    And then the investor is Alan Geller?

11  A    Correct.

12  Q    And for the month ending June 31st, 2012?

13  A    Yes.

14  Q    If you look under the month to date column, the MTB

15  column, what is the ending balance listed there?

16  A    It's $1,403,099.10.

17  Q    And what is the rate of return?

18  A    8.57 percent.

19  Q    And if we look at Government Exhibit 521.  It's

20  Ms. Spaulding's summary chart related to MSMB Healthcare LP,

21  the ending account balances for Chase and Bank of America

22  bank account ending Marlow's [Ph] securities brokerage

23  account.  If we look at June, 2012, so if we go to the next

24  page for this time period June, 2012, what is the ending

25  balance for MSMB Healthcare for these three accounts?

Braconi - Kasulis - Direct                    4797

1    A    $16,694.

2    Q    Now, I'm showing you what has been marked for

3    identification as Government Exhibit 705.  It's behind Tab D

4    of the charts tab in your binder.  Do you have it there in

5    front of you?

6    A    Yes.

7    Q    Okay.  And what is this?

8    A    This is for -- this is a chart for MSMB Healthcare.

9    It's the total of the investor statements versus the total

10   of MSMB Healthcare's bank and brokerage accounts.

11   Q    Did you prepare this chart?

12   A    Yes.

13   Q    And what did you review to prepare this chart?

14   A    I reviewed MSMB Healthcare's investor statements, and I

15   also reviewed MSMB Healthcare bank and brokerage summary

16   records.

17   Q    And was the material that you reviewed voluminous?

18   A    Yes.

19            MS. KASULIS:  The Government moves Exhibit 705

20   into evidence.

21            (Government's Exhibit 705 so marked and received

22   in evidence.)

23            MR. AGNIFILO:  Could I voir dire?

24            THE COURT:  Sure.

25            MR. AGNIFILO:  Thank you.

Braconi - Voir Dire - Agnifilo                    4798

1   VOIR DIRE EXAMINATION

2   BY MR. AGNIFILO:

3   Q    Special Agent Braconi, did you reflect any value of

4   Retrophin in this chart that you made?

5   A    I included whatever was on the investor statement.  I

6   believe if there was Retrophin listed on the investor

7   statement with a value, it's included.

8   Q    And how were you valuing Retrophin; I mean how were you

9   actually valuing the entity?

10  A    Whatever was on the investor statement.

11  Q    Okay.  So this is different than MSMB Capital?

12  A    Yes.

13  Q    All right.

14       MR. AGNIFILO:  With that understanding, Judge, I

15  have no objection.

16       THE COURT:  All right.  Thank you.  We will accept

17  into evidence Government Exhibit 705.

18       (Government's Exhibit 705 received in evidence.)

19  DIRECT EXAMINATION (CONTINUED)

20  BY MS. KASULIS:

21  Q    And with respect to that difference with MSMB Capital

22  in your chart, is that because MSMB Capital never invested

23  in Retrophin?

24  A    That's correct.

25  Q    So, Special Agent Braconi, can you please explain this

Braconi - Kasulis - Direct                    4799

1   chart for the jury now that they can see it in front of
2   them?
3   A    Sure.  So the -- the blue columns are the
4   MSMB Healthcare investor statements.  So for all investors,
5   I totaled up all their statements for a particular month and
6   that's the -- the blue.  And then for the red, I took the
7   total of all the MSMB Healthcare bank and brokerage accounts
8   and that's the total of the red.
9   Q    And why did you pick these months in particular?
10  A    I picked these months, one reason was that not all of
11  the investors received statements every month.  So for these
12  months I had all the investor statements.
13  Q    And if we look, for example, in the July, 2011 time
14  period, can you please explain what this chart shows?
15  A    Sure.  This chart shows that the MSMB Healthcare
16  investor statements totaled $1,462,670.71.  While
17  MSMB Healthcare bank and brokerage accounts totaled
18  $1,545,830.
19  Q    And then if you look in January, 2012 can you please
20  explain that portion of this chart?
21  A    Sure.  So the blue, like I said, the total of the MSMB
22  Healthcare investor statements totaled $2,276,480.44, while
23  the bank and brokerage account for MSMB Healthcare totaled
24  $216,616.
25  Q    And if we look all the way to the right side of this

Braconi - Kasulis - Direct                4800

1  chart for July of 2012, and for that time period, July

2  of 2012, do you recall who was preparing the MSMB Healthcare

3  investor statements?

4  A    That was Martin Shkreli.

5  Q    And can you please explain what -- what is here on the

6  chart for July of 2012?

7  A    The MSMB Healthcare investor statements totaled

8  $4,376,933.03 while at the same time the MSMB bank and

9  brokerage account balances for July, 2012 were $111,939.

10 Q    Special Agent Braconi, did you review Ms. Spaulding's

11 summary charts related to MSMB Healthcare?

12 A    Yes.

13 Q    Did you review Government Exhibit 503B as in boy, 503D

14 as in dog, 503E, 504D as in dog, 504E, 505D as in dog, 505E,

15 506D as in dog, 506E, 507B as in boy and 507D as in dog?

16 A    Yes.

17 Q    And what was the total money invested in

18 MSMB Healthcare from February, 2011 to December of 2012?

19 A    It was $3,502,450.

20 Q    And what is approximately 1 percent of that amount?

21 A    $35,000.

22 Q    And what was the net amount of money transferred from

23 MSMB Healthcare to Retrophin from February 2011 to December

24 of 2012 based on your review of those exhibits?

25 A    $2,120,800.

1   Q     Okay.  So now let's look at a different set of

2   exhibits.  If you turn to Tab 89 through 94 of your binder,

3   I'm showing you what's been marked for identification as

4   Government's Exhibits 609 through 612; 618 and 619.  Do you

5   recognize these exhibits, Special Agent Braconi?

6   A     Yes.

7   Q     And what are they?

8   A     These are SEC Form 10K's, 10Q's and then amended 10K's

9   and 10Q's.

10  Q     For which company?

11  A     I'm sorry, there's also an 8K in here as well.

12              For Retrophin, Inc.

13              MS. KASULIS:  The Government moves these exhibits

14  into evidence.

15              MR. AGNIFILO:  No objection.

16              THE COURT:  We will receive Government's 609

17  through 612, 618 and 619.

18              (Government's Exhibit 609 through 612, 618 and 619

19  received in evidence.)

20  BY MS. KASULIS:

21  Q     If we can look at Government Exhibit 609 first, that's

22  behind Tab 89 of your binder.

23              If we could zoom in on the top portion of this

24  exhibit, Government Exhibit 609.  Special Agent Braconi,

25  what is this document?

1   A     It's an SEC Form 10K for Retrophin, Inc., the short

2   period March 1st, 2012, to December 31st, 2012.

3   Q     And you said it was for Retrophin, Inc.; is that

4   correct?

5   A     Correct.

6   Q     It lists for Delaware state or other jurisdiction of

7   corporation or organization; is that correct?

8   A     Correct.

9   Q     And it lists the 777 Third Avenue location New York,

10  New York, for Retrophin?

11  A     Yes.

12  Q     Now, do you know what -- on what date this 10K was

13  filed?  And I can direct your attention to Page 69 of 92 in

14  the bottom right-hand corner.

15  A     It was filed on June 13th, 2013.

16  Q     Okay.  And so if we go to Page 49 of the actual filing,

17  but in the bottom right-hand corner of the actual document,

18  it's marked as 65 of 92 -- sorry, I'll give you a second to

19  get there.

20          Okay.  So if we look at the bottom of this page

21  under the section called Director Independence.

22          MS. KASULIS:  Can you please highlight that

23  section for the jury at that time very bottom?

24          Thank you.

25  BY MS. KASULIS:

Braconi - Kasulis - Direct                4803

1    Q    Special Agent Braconi, can you please read the section

2    for the jury?

3    A    "Our securities are not listed on the national security

4    exchange or any interdealer quotation system which has a

5    requirement that a majority of directors be independent.  We

6    evaluate independence by the standards for director

7    independence set forth in the NASDAQ marketplace rules.

8    Under these rule, a director is not considered the

9    independent if he or she is also an executive, officer or

10   employee of the corporation.  As a result Mr. Shkreli would

11   not be considered independent because he serves as an

12   executive officer of the company.

13          Our other directors Messrs. Osilotti [ph] and

14   Richardson would be considered independent under these

15   rules.

16   Q    Thank you.

17          MS. KASULIS:  If we can now turn the Page 79 of 92

18   section --

19          (Pause in proceedings.)

20          (Recess taken.)

21          THE COURT:  Excuse us.

22          (Jury out.)

23          THE COURT:  Thank you.

24          JURORS:  Thank you.

25          THE COURT:  Sure.

Braconi - Kasulis - Direct                    4804

1              MS. KASULIS:  May I proceed, Your Honor?

2              THE COURT:  Yes, ma'am.

3    BY MS. KASULIS:

4    Q    So again, Page 79 of 92.

5              MS. KASULIS:  Your Honor, just a moment maybe I

6    can try to move this along.

7              THE COURT:  All right.

8              (Pause in proceedings.)

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Braconi - Direct - Kasulis*                                      4805

1   DIRECT EXAMINATION (CONT'D.)

2   BY MS. KASULIS:

3   Q     All right.  So, this is page 79 of 92 of Government

4   Exhibit 609, if we could look under Note 2 entitled Liquidity

5   and Financial Condition and Management's Plans and, again,

6   this is the 10-K for 2012 for Retrophin; is that correct?

7   A     That's correct.

8   Q     Can you please read that first paragraph to the jury.

9   A     "The company incurred a net loss of approximately

10  $33.6 million including a stock based compensation charge of

11  $24,389,521 for the period from March 11, 2011 (inception) to

12  December 31st, 2012.  At December 31st, 2012 the company had a

13  cash balance of approximately $11,000 and a working capital

14  deficiency of approximately $5,766,000.  The company's

15  accumulated deficit amounted to approximately $33,600,000 at

16  December 31st, 2012."

17  Q     And if we can go to page 84 of 92 and up at the top, the

18  Notes Payable section, so it says:  Note Payable Related

19  Party.  Can you please read that first paragraph to the jury?

20  A     On February 1st, 2012 the company entered into a secured

21  promissory note with a related party in the amount of $900,000

22  with an interest rate of 12 percent per annum compounded

23  monthly.  The note plus accrued unpaid interest shall become

24  due on or prior to December 31st, 2012 or upon consummation of

25  the sale of the company to acquire a majority of the

*Braconi - Direct - Kasulis*                                    4806

1   outstanding equity securities or all of the substantially --

2   all of the company's assets on a consolidated basis."

3   Q    And if you skip the next paragraph and read that last

4   line there.

5   A    "On December 28th, 2012 the secured promissory note was

6   extended to June 30th, 2013."

7   Q    And if we scroll down on this page to Note 7 which is the

8   related party transactions section, can you just read this

9   first line into the jury.

10  A    Sure.  "In October and November 2011 the company was

11  advanced $7,500 from a company related through common

12  ownership.  The advance is due on demand."

13  Q    And so, this dollar amount, the $7,500, that was listed

14  here in the related parties transactions?

15  A    Yes.

16  Q    Even that amount?

17  A    Yes.

18  Q    Okay.  And if we look at page 92 of 92, and we'll look at

19  Note 12 here entitled Subsequent Events, do you know what

20  subsequent events are?

21  A    Yes, things that happen after the balance sheet date.

22  Q    And what would be the balance sheet date here for this

23  10-K?

24  A    It would be December 31st, 2012.

25  Q    So, these would be events that occurred after that

1   December 31st, 2012 date?

2   A    Correct.

3   Q    And in your review of this subsequent events section, and

4   just to be clear, this document was, as you had testified,

5   filed in June of 2013?

6   A    That's correct.

7   Q    So, is it supposed to list any subsequent events from

8   December 2012 to the filing of the document?

9   A    Yes.

10  Q    In your review of this section do you see any reference

11  or mention of any settlement agreements with MSMB investors?

12  A    No.

13  Q    If you look at the last sentence of this section,

14  starting with:  In accordance with ASC-855-10, can you please

15  read that for the jury?

16  A    "In accordance with ASC-855-10, company management

17  reviewed all material events through the date of this report

18  and there are no material subsequent events to report other

19  than those listed in the note."

20  Q    And if we could go to 69 of 92, I think we had referenced

21  it earlier for the date of the filing.  Okay.

22         So, this is page 69 of 92, and if we could just zoom

23  in on the -- there we go, perfect.  Thank you.  What is the

24  date listed here?

25  A    June 13, 2013.

*Braconi - Direct - Kasulis*                                    4808

1   Q     And on the top right-hand portion, who signs on behalf as
2   the Chief Executive Officer of Retrophin?
3   A     Martin Shkreli.
4   Q     And then in the signature section right underneath that,
5   who signs here?
6   A     Martin Shkreli signs as the CEO and director, Marc Panoff
7   signs as the CFO and Steve Aselage as director and Steve
8   Richardson as a director.
9   Q     And Mr. Shkreli is listed here as a principal executive
10  officer, is that right?
11  A     Yes.
12  Q     Now, let's look at the next exhibit, Government
13  Exhibit 610.  It's tab 90 of your binder.  Can you please
14  explain what this document is, Special Agent Braconi?
15  A     This is a SEC form 10-Q for Retrophin, Inc. for the
16  quarter ended March 31st, 2013.
17  Q     And if we go to the last page of this document.
18  A     Yes.
19  Q     Hold on a second.  (Pause.)
20        What is the date listed here?
21  A     July 24th, 2013.
22  Q     And who is it signed by?
23  A     Martin Shkreli signs as the Chief Executive Officer and
24  Marc Panoff signs as the Chief Financial Officer.
25  Q     And, again, this is the 10-Q for the quarter ending

1    March 31, 2013; so, that's the first quarter of 2013, is that

2    right?

3    A    Correct.

4    Q    But it is filed on July 24th or signed on July 24th,

5    2013, is that correct?

6    A    Yes.

7    Q    So, let's go to page 16 of 33 of this document, and if we

8    look at Note Number 9 under the section entitled Notes

9    Payable, Note Payable Related Party; can you please read the

10   first paragraph there for the jury.

11   A    "On February 1st, 2012 the company entered into a secured

12   promissory note with a related party in the amount of $900,000

13   with an interest rate of 12 percent per annum compounded

14   monthly.  The remaining $884,764 principal balance of this

15   note and accrued interest of $90,650 was repaid during the

16   three months ended March 31, 2013."

17   Q    Can you read the next sentence as well.

18   A    "Total interest expense recognized for three months ended

19   March 31, 2013 and 2012 and for the period from March 11, 2011

20   (inception) through March 31, 2013 were aggregated to $19,733,

21   $17,327 and $147,480 respectively."

22   Q    Thank you.

23            And if we can go to page 18 of 33, it's two pages

24   later, and if we look down there at Note 13 and in the

25   Subsequent Events section; again, what is subsequent events

*Braconi - Direct - Kasulis*                                4810

1  for the purpose of this 10-Q?

2  A    It's events that happen after the end of the balance

3  sheet for this quarter which would be March 31st, 2013.

4  Q    And is that up until the time that the 10-Q is filed for

5  that period of time?

6  A    Yes.

7  Q    And if you look at this page and then the rest of the

8  note, Note 13 that goes on through 20 of 33, so if you go to

9  the next page and then the next page and the remainder is at

10 the top of this page for Subsequent Events; is that right?

11 A    That's correct.

12 Q    Again, do you see any reference to any settlement

13 agreements related to MSMB investors?

14 A    No.

15 Q    Let's now turn to Government Exhibit 611, it's tab 91 of

16 your binder.  And can you please explain to the jury what this

17 is?

18 A    This is an amended 10-K form, it is a SEC form for

19 Retrophin, Inc., it's for the year ended December 31st, 2012.

20 Q    And when you say "amended," what do you mean by that?

21 A    The company decided that they had to restate their

22 financial statements so they had to resend this report to the

23 SEC.

24 Q    And they had to restate their financial statements for

25 the year of 2012?

1    A    That's correct.

2    Q    And if we turn to page 14 of 39 -- it's actually page

3    nine of this document, who signs on behalf of Retrophin, Inc.

4    as the Chief Executive Officer?

5    A    Martin Shkreli.

6    Q    And the date of this filing?

7    A    September 13th, 2013.

8    Q    And below that top section who is listed under the

9    signature section for this amended 10-K?

10   A    It is Martin Shkreli, Marc Panoff, Steven Aselage and

11   Steve Richardson.

12   Q    And if we can go to Note 12, that was page -- we swapped

13   out this document so the page number is a little off.

14        Perfect.

15        For Note 13 -- sorry, Note 12, it is listed as

16   Subsequent Events section, do you see that, Special Agent

17   Braconi?

18   A    Yes.

19        Yes, sorry.

20   Q    If I can direct your attention to the last paragraph on

21   the page starting in the second quarter of 2013, can you

22   please read this to the jury?

23   A    "In the second quarter of 2013 the company, its Chief

24   Executive Officer and a related party became party to a series

25   of agreements to settle up to $2,286,511 of liabilities which

1    company management believes are the primary obligation of the

2    related party.  The company and related party have entered

3    into indemnification agreements whereby the related party has

4    agreed to defend and hold the company harmless against all

5    such obligations and amounts whether paid or unpaid arising

6    from these agreements.  Notwithstanding the indemnification,

7    the company recorded a $2,286,511 charge to operations during

8    the quarter ended June 30th, 2013.  That was offset by a

9    corresponding liability of $1,691,600, or the difference

10   between (A) the aggregate amount of all such settlements and

11   (B) $593,111 of cash and noncash consideration that the

12   company paid to immediately settle a portion of the agreement

13   on behalf of the related party.  Of the total outstanding

14   $1,691,400 settlement liability, $300,000 is past due.

15   $713,900 was due in July 2013 and $677,500 was due in

16   August 2013.  The counterparties to these agreements reserve

17   the right to demand payment at any time.  The Chief Executive

18   Officer also agreed to deliver or cause to be delivered 47,128

19   shares of common stock in the company to one of the

20   counterparties as a separate component of one of these

21   agreements.  Accordingly, the company does not believe it is

22   required to record a liability for the share-based component

23   of this specific agreement during the second quarter ended

24   June 30th, 2013.  There is uncertainty as to whether the

25   related party will have the sufficient liquidity to repay the

1   company or fund the indemnification agreements should it

2   become necessary."

3   Q     Thank you, Special Agent Braconi.

4           So, the difference between or one of the differences

5   in this Notes Payable section between the prior 10-K for 2012

6   that we've reviewed and this amended 10-K for 2012 for

7   Retrophin that we're now reviewing is the addition of this

8   language, one of the amendments to the 2012 10-K?

9   A     Yes.

10  Q     And then directing your attention to Government

11  Exhibit 612, that's tab 92 of your binder, can you please

12  explain this document for the jury?

13  A     This is a SEC form 10-Q which was amended and it was for

14  the quarter ended March 31st, 2013, for Retrophin, Inc.

15  Q     And if we go to the last page of this document, what is

16  the date of the signing of this document?

17  A     September 13th, 2013.

18  Q     And who signs as the Chief Executive Officer?

19  A     Martin Shkreli.

20  Q     And who signs as the Chief Financial Officer?

21  A     Marc Panoff.

22  Q     And if we go to page 22 of 36, the Subsequent Events

23  section, if you then go to the next page because this note

24  continues, and then the next page, it appears that this entire

25  section is related to the Subsequent Events section of this

1    filing, is that right?

2    A    Yes.

3    Q    And if we could look in the settlement agreements

4    section, again can you please read this top paragraph to the

5    jury?

6    A    "In the second quarter of 2013 the company, its Chief

7    Executive Officer and a related party became party to a series

8    of agreements to settle up to $2,286,511 of liabilities which

9    company management believes are the primary obligation of the

10   related party.  The company and the related party have entered

11   into indemnification agreements whereby the related party has

12   agreed to defend and hold the company harmless against all

13   such obligations and amounts whether paid or unpaid arising

14   from these agreements."

15   Q    Go ahead.

16   A    "Notwithstanding the indemnification, the company

17   recorded a $2,286,511 charge to Operations during the quarter

18   ended June 30th, 2013.  That was offset by a corresponding

19   liability of $1,691,400 or the difference between the

20   aggregate amount of all such settlements, and $593,111 of cash

21   and noncash consideration that the company paid immediately --

22   paid to immediately settle a portion of the agreement on

23   behalf of the related party, the $1,691,400 settlement

24   liability, $1,013,900 of which is past due, and $677,500 which

25   is due in August 2013.  The counterparties to these agreements

1   reserve the right to demand payment at any time.  The Chief

2   Executive Officer also agreed to deliver or cause to be

3   delivered 47,128 shares of common stock in the company to one

4   of the counterparties as a separate component of the

5   agreements.  Accordingly, the company does not believe that it

6   is required to record a liability for the share-based

7   component of this specific agreement during the second quarter

8   ended June 30th, 2013."

9   Q    And then if you could read the next two paragraphs?

10  A    "There is uncertainty as to whether the related party

11  will have sufficient liquidity to repay the company or fund

12  the indemnification agreements should it become necessary.

13  Concurrent with the execution of the settlement agreements the

14  company received promissory notes from the related party

15  whereby the related party agreed to pay the company the

16  principal amount of $593,111 plus interest at an annualized

17  rate of 5 percent as reimbursement of the payments that the

18  company made to settle a portion of the agreements."

19  Q    And so, what, if any, difference is there between this

20  language in this amended 10-Q and the language in the amended

21  10-K that we reviewed in Government Exhibit 611?

22  A    I'd have to check real fast, I think it's -- let me just

23  take a look.

24            (Pause.)

25  Q    Special Agent Braconi, if I could direct your attention

1    to the:  Of the total outstanding $1,691,400 Settlement

2    Liability sections of each of these notes payable section.

3    A    Yes.  So, in the prior 10-K there was $300,000 past due

4    and in this one there is $1,013,900 which is past due.

5    Q    And there had been in both of the amended SEC filings a

6    note that Chief Executive Officer also agreed to deliver or

7    cause to be delivered 47,128 shares of common stock in the

8    company to one of the counterparties as a separate component

9    of one of the agreements; and just to be clear, who is the

10   Chief Executive Officer who is being referred to here?

11   A    Martin Shkreli.

12   Q    Okay, so you can put that document aside.

13         If we can look at Government Exhibit 124-10, it's

14   behind the tab after the summary charts.

15   A    Sorry, what tab was it again?

16   Q    It's the tab after the summary charts.  Okay.

17         It is right before Shkreli's statements, do you see

18   that?

19   A    Yes.

20   Q    So, and I've been showing you what's been marked for

21   identification as Government Exhibit 124-10, do you recognize

22   this document?

23   A    Yes.

24   Q    And what is it?

25   A    It's a Retrophin, LLC transfer letter.

1          MS. KASULIS:  The government moves this exhibit into

2    evidence.

3          MR. AGNIFILO:  No objection.

4          THE COURT:  We will receive 124-10.

5          (Government's Exhibit 124-10 so marked in evidence.)

6    Q    Special Agent Braconi, if we could first focus on the top

7    portion of this document; what is this document here?

8    A    It's the Retrophin, LLC Transfer and Donee representation

9    letter.

10   Q    Can you please read the first sentence of this first

11   paragraph?

12   A    "For value received Martin Shkreli does hereby grant,

13   sell, assign, transfer and convey unto MSMB Capital

14   Management, LP, its successors and assigns, all of his rights,

15   title and interest to 75,000 Class B common units of

16   Retrophin, LLC, a Delaware limited liability company, to have

17   and to hold forever and the transferor does hereby warrant and

18   agree to defend title to the same against the claims of any

19   person or entity."

20   Q    If we go to the last page of this document, who signs on

21   behalf of Martin Shkreli?

22   A    Martin Shkreli.

23   Q    And what is the date below his signature for the Martin

24   Shkreli entry?

25   A    July 1st, 2012.

1   Q    And that's a handwritten date; is that correct?

2   A    Yes.

3   Q    If you look below that for the MSMB Capital Management LP

4   signature, who appears to sign there?

5   A    Martin Shkreli.

6   Q    And, again, the record -- I'm sorry, the date below that

7   signature?

8   A    Is July 1st, 2012.

9   Q    And if you look at the bottom left-hand corner, it's cut

10  off but it appears to be the remainder of Retrophin, LLC and a

11  signature there, do you see that?

12  A    Yes.

13  Q    Does it appear to be the top portion of Martin Shkreli's

14  signature?

15  A    Yes.

16              MS. KASULIS:  Your Honor, may I have one moment

17  please to confer?

18              THE COURT:  Yes.

19              (Pause in the proceedings.)

20  Q    Okay.  So, Special Agent Braconi, if we could switch to

21  the next binder, so there are actually two other binders if

22  you could keep handy.

23              So, contained within these two binders I'm showing

24  you what's been marked for identification as -- this is going

25  to be a long list, Government Exhibit 201, 203 through 4, 211

through 215, 217 through 218, 220 through 230, 232 through

240, 242, 245 through 249, 251 through 255, 258 through 259,

261 through 263, 265, 267 through 268, 271 through 272, 274

through 277, 283 through 285, 288, 291 through 293, 295

through 296, 298 through 301, 304 through 305, 307 through

309, 311 through 316, 318, 320, 322 to 323, 325 to 326, 330

through 338, 343, 347, 349 through 353, and 355 through 373 in

accordance, of course, Your Honor, with the redactions

discussed during the lunch break.

Special Agent Braconi, have you had an opportunity

to review these exhibits?

A     Yes.

(Continued on next page.)

1   DIRECT EXAMINATION (CONTINUED)

2   BY MS. KASULIS:

3   Q     And what are they?

4   A     Emails.

5   Q     Involving, can you just list some of the recipients or

6   senders?

7   A     Martin Shkreli, Evan Greebel, Kevin Mulleady, Ron Tilles

8   I believe, Vaino.

9           MS. KASULIS:   The Government moves these Exhibits

10  into evidence.

11          MR. AGNIFILO:   Can we have a quick sidebar for 30

12  seconds?

13          THE COURT:   Yes.

14          (Continued on the next page.)

15          (Sidebar conference.)

16

17

18

19

20

21

22

23

24

25

```
                    Sidebar Conference                    4821
```

1            MR. AGNIFILO:  I was hoping to see the redactions

2    before it went into evidence.

3            MS. KASULIS:  We can admit it then subject to the

4    redactions.

5            MR. AGNIFILO:  That's fine.  Which exhibit is that?

6            MS. SMITH:  I think 353.  Then also there is the

7    second one we redacted, a second Kevin Mulleady.

8            MR. AGNIFILO:  I'm less concerned with that.

9            The 353 before you put it up, let's make sure it's

10   all good.

11           MS. KASULIS:  Your Honor, I was going to say perhaps

12   after, it sounds like Your Honor will admit these documents,

13   after that I think this might be a good breaking point.  We're

14   about to start to go into all the e-mails.

15           THE COURT:  Okay.

16           MS. KASULIS:  I'd like to start fresh with all of

17   the e-mails.

18           THE COURT:  I have to be honest with you, I lost you

19   somewhere on this list.

20           MS. KASULIS:  I can send a list to everybody.

21           THE COURT:  You'll just move to admit all of those.

22           MR. AGNIFILO:  That's fine.

23           (End of sidebar conference.)

24           (Continued on the next page.)

25

Proceedings                                    4822

1              (In open court.)

2              MS. KASULIS:  Your Honor, subject to the redactions

3     that we discussed, the Government moves these Exhibits into

4     evidence.

5              MR. AGNIFILO:  We have no objection.

6              THE COURT:  All right.  We will admit the foregoing

7     exhibits into evidence subject to those redactions.

8              (Government's Exhibit Numbers 201, 203-204, 211-215,

9     217-218, 220-230, 232-240, 242, 245-249, 251-255, 258-259,

10    261-263, 265, 267-268, 271-272, 274-277, 283-285, 288,

11    291-293, 295-296, 298-301, 304-205, 307-309, 311-316, 318,

12    320, 322-323, 325-326, 330-338, 343, 347, and 349-373 so

13    marked and received in evidence.)

14             MS. KASULIS:  Thank you, Your Honor.

15             Perhaps now might be a good breaking point because

16    we're about to embark on a whole new segment on the direct

17    examination.

18             THE COURT:  I'll now excuse the members of the jury.

19    And ask them please not to discuss the case.  Avoid all media

20    exposure to anything touching upon the case or Mr. Shkreli.

21             Thank you again for your service.  See you tomorrow

22    at 9:00 o'clock.

23             (Jury exits the courtroom.)

24             THE COURT:  Sir, you can step down.  Thank you.

25             (Whereupon, the witness steps down.)

Proceedings                                  4823

1           THE COURT:  Have a seat, please.  I just wanted to

2    discuss a couple of things.  One in particular, regarding the

3    conspiracy to commit wire fraud charge and ask the Government

4    whether its proposed charge was intended to actually

5    incorporate as proposed the entire wire fraud instruction or

6    whether or not there could be or should be some abbreviated

7    form of the proposed instruction that would instead describe

8    the elements of wire fraud but really focus on the elements

9    for conspiracy.  We're in the process of trying to draft those

10   charges and hope that we can post them so we can have a

11   charging conference maybe on possibly Wednesday.

12           MS. KASULIS:  Yes, Your Honor.  Your Honor, could we

13   just right after this just quickly take a look at what you're

14   proposing or what you're asking us about, then we can get back

15   to you pretty immediately.

16           THE COURT:  There are were two other issues to bring

17   to the parties' attentions.  Specifically, I received an

18   inquiry from a member of the press whether, first, when the

19   Court would be willing to publish the names of the jurors.

20   And two, whether or not I would allow electronic devices in

21   this courtroom during the time that the jury returns its

22   verdict.

23           I don't know whether any of the parties wanted to

24   weigh in on these requests.  I did have a view and I'm happy

25   to hear from the parties before I announce it.

Proceedings                                    4824

1          MR. BRAFMAN:  Your Honor, we would object to the

2     publishing of the jurors' names until after the verdict has

3     been returned.  And we would strongly object to electronic

4     devices in the courtroom when the jury renders its verdict.

5     They are tweeting in the overflow room in realtime.  I'm not

6     certain there is any harm that goes to the press if they are

7     not in this room with electronic devices.  I think it's a bad

8     precedent to set in this building.  I'm not certain it's ever

9     been done before.

10          THE COURT:  I'm told by this member of the press

11     that it has been done in other cases; although, I'm not sure

12     which cases.  But did the Government have a view?

13          MS. KASULIS:  Your Honor, we agree with the defense,

14     with respect to -- we agree with the defense with respect to

15     the publishing of the jurors' names until after the verdict.

16          With respect to the electronic devices in the

17     courtroom, we again are in agreement with the defense.  I

18     think one of the issues with the opening statement was that

19     the sound was not working in the overflow room and so

20     hopefully we just confirm that the AV system is working in the

21     overflow.  Then of course in that room they are able to have

22     their electronic devices for when the verdict comes back.

23          THE COURT:  Well, I will say that I was inclined and

24     am inclined to agree with both parties.  I think that

25     publishing the names of jurors before the verdict would

Proceedings                                                    4825

1    present possible concerns if the jurors were to find out their

2    names were published.  It could influence their deliberations

3    and I wouldn't want that to be a factor in their

4    deliberations.  I think as we've instructed them over and

5    over, and will instruct yet again, that their verdict must be

6    based on evidence at this trial.

7              Second, with regard to the electronic devices in the

8    courtroom, I think the proposal was to allow member of the

9    Eastern District press pool, which I've consulted with our

10   Chief Judge and the District Executive, and they agreed it

11   would not be right to discriminate one group of journalists

12   over another.  If the journalists want access to electronic

13   devices, there is a room where they are allowed to convey the

14   verdict in realtime.  I also want to say that publishing the

15   jury must be an incredibly stressful situation for Mr. Shkreli

16   or any other defendant who is awaiting a verdict determining

17   his or her fate.  I think it would be most respectful to

18   maintain the current /STAT us quo.  And certainly if

19   journalists wish to communicate with their organizations in

20   realtime they can do that from the overflow room.

21             Is there anything else I should address before we

22   adjourn for the day?

23             MS. KASULIS:  Not for the Government.

24             THE COURT:  We will try very hard to post up the

25   instructions by tomorrow morning, at the latest assuming we

Proceedings                                                     4826

1   will hear from the Government.  Right now they are roughly 97

2   pages.  We'd love to find a way to stream line without

3   neglecting any important instructions.

4              We will include the advice of counsel instruction.

5   And I hope if anyone has anything else to add or say about the

6   instructions we would be informed of it by 7:00 o'clock

7   tonight, if that's possible.

8              MR. BRAFMAN:  You have, I think, included in the

9   instruction defendant's not required to testify?

10             THE COURT:  Yes.

11             MR. BRAFMAN:  Okay.  Thank you.

12             THE COURT:  In fact, my instruction provides that

13   the jurors can't even discuss it during deliberations.

14             MR. BRAFMAN:  And they cannot draw any inference

15   from it.

16             THE COURT:  Yes, of course.  Anything else?

17             MS. KASULIS:  No Your Honor.

18             THE COURT:  I just want to confirm, Mr. Shkreli is

19   not going to testify or is he still reserving that decision?

20             MR. BRAFMAN:  I think we have pretty much concluded

21   he's not going to testify.

22             THE COURT:  I did want to make sure that Mr. Shkreli

23   does understand that he has a right not to testify and he also

24   has a right to testify.

25             And do you understand that you have rights both

Proceedings                                          4827

1   ways, sir?

2             THE DEFENDANT:  Yes.

3             THE COURT:  Do you also understand that this is an

4   important decision, and it is your decision alone and nobody

5   else's.  Do you understand that, sir?

6             THE DEFENDANT:  Yes.

7             THE COURT:  And have you had sufficient time to

8   confer with your very able counsel, all four of them, about

9   this very important decision?

10            THE DEFENDANT:  Yes.

11            THE COURT:  Is it your decision, sir, not to

12  testify?

13            THE DEFENDANT:  Correct.

14            THE COURT:  Thank you, sir.

15            Have a good night everybody.

16            (Proceedings adjourned at 3:55 p.m. to resume on

17  July 25, 2017 at 9:00 a.m.)

18

19

20

21

22

23

24

25

INDEX                                         4828

1        W I T N E S S E S  /  E X A M I N A T I O N S

2    R O B E R T   B A R N E T T

3
     DIRECT EXAMINATION                                 4624
4    BY MS. KASULIS:

5    CROSS EXAMINATION                                  4681
     BY MR. AGNIFILO
6

7
     C H A N D R A   M O H A N   S I N G H
8    M E H E T A

9    DIRECT EXAMINATION                                 4692
     BY MS. SMITH
10
     CROSS-EXAMINATION                                  4704
11   BY MR. AGNIFILO
     REDIRECT EXAMINATION                               4729
12   BY MS. SMITH

13

14   M I C H A E L   B R A C O N I

15   DIRECT EXAMINATION                                 4756
     BY MS. KASULIS:
16
     VOIR DIRE EXAMINATION                              4774
17   BY MR. AGNIFILO

18   DIRECT EXAMINAION (CONTINUED)                      4774
     BY MS. KASULIS
19
     VOIR DIRE EXAMINATION                              4798
20   BY MR. AGNIFILO

21                                                      4798
     DIRECT EXAMINAION (CONTINUED)
22   BY MS. KASULIS

23

24

25

```
                         INDEX                    4829

 1                    E X H I B I T S

 2
     Government's Exhibit 127-4                   4629
 3
     Government's Exhibit 127-3                   4638
 4
     Government's Exhibit 127-5                   4642
 5
     Government's Exhibit 127-6                   4655
 6
     Government's Exhibit 127-7                   4659
 7
     Government's Exhibit Number 127-8            4664
 8
     Government's Exhibit Number 127-9            4668
 9
     Government's Exhibit Number 27-10            4669
10
     Government's Exhibit Number 127-11           4671
11
     Government's Exhibit Number 127-13           4675
12
     Government's Exhibit Numbers 126-1 through 126-5,   4700
13   126-14, 126-20 though 126-29, 126-31 through
     126-32 and 126-33
14
     Government's Exhibit 356                     4743
15
     Government's Exhibits 364 through 367        4750
16
     Government's Exhibit Number 907, 808, and 809   4754
17
     Government's Exhibit Number 902 through 908, 916   4758
18   through 918, 926, 926, 932, and 935
19   Government's Exhibit Number 78-1 through 78-6;   4768
     94-1 through 94-13; 85-1 through 85-4; 86-1,
20   86-2; 87-1, 88-1 through 88-4; 89-1 through
     89-16; 90-1 through 90-9; 92-1 through 92-11;
21   93-1 through 93-5; and 94-1
22   Government's Exhibit Number 704              4774
23   Government's Exhibit 705                     4797
24   Government's Exhibit 705                     4798
25   Government's Exhibit 609 through 612, 618 and 619   4801
```

*David R. Rou, RPR, CSR*
*Official Court Reporter*

INDEX                                      4830

1

         E X H I B I T S   C O N T I N E D
2

3
       Government's Exhibit 124-10                        4817
4
       Government's Exhibit Numbers 201, 203-204,         4822
5      211-215, 217-218, 220-230, 232-240, 242, 245-249,
       251-255, 258-259, 261-263, 265, 267-268, 271-272,
6      274-277, 283-285, 288, 291-293, 295-296, 298-301,
       304-205, 307-309, 311-316, 318, 320, 322-323,
7      325-326, 330-338, 343, 347, and 349-373

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25