5028

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - -X
3  UNITED STATES OF AMERICA,      : 15-CR-637 (KAM)

4           Plaintiff,            :
                                  : United States Courthouse
5        -against-                : Brooklyn, New York
                                  :
6  MARTIN SHKRELI,                :
                                  : Wednesday, July 26, 2017
7           Defendant.            : 9:00 a.m.
   - - - - - - - - - - - - - - - -X
8

9          TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
          BEFORE THE HONORABLE KIYO A. MATSUMOTO
10             UNITED STATES DISTRICT JUDGE

11

12              A P P E A R A N C E S:

13 For the Government:      BRIDGET ROHDE, ESQ.
                            Acting United States Attorney
14                          Eastern District of New York
                            271 Cadman Plaza East
15                          Brooklyn, New York 11201
                            BY:  JACQUELYN M. KASULIS, ESQ.
16                               ALIXANDRA ELEIS SMITH, ESQ.
                                 KARTHIK SRINIVASAN, ESQ.
17                               GABRIELA BALBIN, ESQ.
                                 CLAIRE KEDESHIAN, ESQ.
18                               Assistant United States Attorney

19 For the Defendant:       BRAFMAN & ASSOCIATES, P.C.
                            767 Third Avenue, 26th Floor
20                          New York, New York 10017
                            BY:  BENJAMIN BRAFMAN, ESQ.
21                               MARC AGNIFILO, ESQ.
                                 JACOB KAPLAN, ESQ.
22

   Court Reporter:      DAVID R. ROY, RPR
23                       225 Cadman Plaza East / Brooklyn, NY 11201
                         DRROYOFCR@GMAIL.COM
24

   Proceedings recorded by Stenographic machine shorthand,
25 transcript produced by Computer-Assisted Transcription.

5029

1            (In open court; outside the presence of the jury.)

2            THE COURT:  All right.  All counsel and parties

3     are present.

4            I have just been handed a stipulation and waiver

5     of jury trial in the event that Mr. Shkreli is convicted and

6     the forfeiture phase of the trial then must be continued.

7            My understanding originally was that the defendant

8     wished to invoke his right to have a jury determine the

9     forfeiture issues if he is convicted and the stipulation

10    appears to state that Mr. Shkreli waived his right to a jury

11    trial as to the forfeiture count.

12            So I just want to make sure, sir, that you do

13    understand your right to a jury trial in the event you are

14    convicted and the case proceeds to forfeiture; do you

15    understand that, sir?

16            THE DEFENDANT:  Yes, Your Honor.

17            THE COURT:  And were you able to discuss that

18    fully with your lawyer and understand that you would have a

19    right to have the jury determine the forfeiture issues?

20            THE DEFENDANT:  Yes, Your Honor.

21            THE COURT:  And do you wish to waive your right to

22    have a jury trial decide those issues?

23            THE DEFENDANT:  Yes, I do, Your Honor.

24            THE COURT:  Has anyone threatened you or coerced

25    you to waive this right?

5030

1          THE DEFENDANT:  No, Your Honor.

2          THE COURT:  All right, sir.  I will then execute

3   the stipulation and we will determine, if necessary, the

4   forfeiture issues.

5          MR. BRAFMAN:  Your Honor, I explained to

6   Mr. Shkreli, obviously, this only becomes an issue if, in

7   fact, he's convicted.

8          THE COURT:  Exactly, yes.

9          And I was just trying to recall whether

10  the Government sought forfeiture on all counts or just

11  certain counts?

12         MS. KEDESHIAN:  All counts, Your Honor.

13         THE COURT:  All counts?

14         MS. KEDESHIAN:  All counts.

15         THE COURT:  All right.

16         Okay.  Now, we posted the draft jury charges last

17  evening, I think maybe just before 8:00.  I am sorry it took

18  longer than we thought.  We just had -- you can see by the

19  volume of the instructions that we had to make sure that

20  everything was in order.

21         I think what I am going to propose to do is to go

22  through each instruction that a party identified as an

23  instruction which they wish to be heard.

24         MR. BRAFMAN:  Judge, it's not on, Your Honor.

25         THE COURT:  You cannot hear me?

5031

```
 1            MR. BRAFMAN:  We're having trouble hearing you,
 2  Your Honor.
 3            MS. KASULIS:  Your Honor, can you do the Rule 29
 4  motion and then the housekeeping with the exhibits?
 5            THE COURT:  Yes, we will.  We will start with
 6  that, but I just wanted to make sure that we understood the
 7  procedures for going through these instructions.
 8            There were a couple of matters that we were going
 9  to resolve.  One was the exhibits.  I understand the
10  Government has withdrawn the admission of five of the
11  exhibits, and I do not know whether the parties have --
12            MR. SRINIVASAN:  That's right.
13            THE COURT:  -- a dispute about whether the
14  Government had sufficiently connected these exhibits to the
15  trial evidence.
16            I am happy to hear exhibit by exhibit whether the
17  defense has objections or wants to be heard further.
18            MR. AGNIFILO:  Yes.
19            THE COURT:  Let's start with the Government
20  Exhibit 105-7.  This is an e-mail between Mr. Blanton's
21  assistant and Mr. Shkreli regarding a telephone call.
22            MR. AGNIFILO:  Right.  This is the e-mail
23  regarding tooth extractions?
24            THE COURT:  Yes.
25            MR. AGNIFILO:  Okay.  Right, right.
```

5032

1          I don't know at the end of the day that there's

2   any indication that this didn't happen.

3          (Pause in proceedings.)

4          MR. AGNIFILO:  Our position is that the e-mail is

5   essentially irrelevant.  I mean, there's been no pattern

6   shown that using any tooth extractions to put off

7   Mr. Blanton or anyone else.  So I don't really know what

8   relevance the e-mail has.  So we object to it.

9          THE COURT:  Mr. Srinivasan?

10         MR. SRINIVASAN:  Yes, just briefly, Your Honor.

11         I think this evidence was offered just as part of

12  the series of e-mails received with different investors

13  about what we would argue is a pattern of delay, especially

14  once the redemption process starts with these investors.

15         As to this particular e-mail, there was extensive

16  cross-examination about it where the defense asked

17  Mr. Blanton about the tooth extraction, whether it was

18  possible -- it was brought up multiple times.  So I think

19  there's an adequate basis for it to be admitted given all

20  the totality of the evidence in the case.

21         MR. AGNIFILO:  Your Honor, if I recall, I think it

22  was Mr. Richardson who said that he was personally aware of

23  the fact that Mr. Shkreli had a number -- I think I asked

24  Mr. Richardson on cross, you remember, that he got a number

25  of tooth extractions and my recollection of his answer, I

5033

1   don't recall that there was a tooth extraction, but I

2   remember there was a number of different dental procedures

3   that Mr. Shkreli was undergoing.

4        I just -- we're really just -- it's just sheer

5   speculation at this point, and I think that there's enough

6   in the record certainly from the Government's own witness on

7   cross that he was undergoing different dental procedures.

8        So I think to put this in front of the jury, you

9   know, really is a matter of speculation.  And they want to

10  be able to say that he was intentionally putting Mr. Blanton

11  off, which is -- which goes to the heart of some of their

12  charges in terms to redemptions and things like that.

13  There's no sufficient basis for this to be really relevant

14  and of value to the jury.

15       THE COURT:  I think there is sufficient testimony

16  and e-mails that demonstrate an ongoing sense of frustration

17  by some of the investors, that they're not getting responses

18  from Mr. Shkreli, and this is one among many that gives a

19  reason and there's no proof that the reason given is not

20  true.  And I think that the point that the Government wishes

21  to make regarding alleged evasion or ignoring of redemption

22  requests from investors have been made through evidence.

23       I am inclined to exclude 105-7 at this time.

24       I understand that there have been surrounding or

25  belated testimony of the evidence, but I think this part

5034

1    will be withdrawn or excluded from the jury's consideration.

2              Can we talk about the next one at issue which is

3    125-30?  This is the Spencer Spielberg share registration,

4    the changes for defense to Mr. Greebel for the settlement

5    which included 6,000 restricted shares of Retrophin.

6              MR. SRINIVASAN:  Yes, Your Honor.  I think

7    Your Honor's already ruled on a settlement agreement that

8    ties out the transaction.

9              THE COURT:  All right.  I would tend to agree.

10             I will hear from the defense.

11             MR. AGNIFILO:  Yeah.  Judge, it's just we objected

12   to this as Your Honor knows.  Your Honor made a final

13   ruling, and I don't need to belabor the record.  We continue

14   to objection for all the reasons we said before.

15             THE COURT:  All right.  I do believe the

16   Government has sufficiently established the admissibility of

17   this document and tied it to the rest of the case.

18             The same would be true for 125-39, Mr. Yaffe and

19   his Standard Registrar shares in the amount of $15,000 for

20   his consulting agreement.  There was testimony that he gave

21   regarding asking the registrar to reissue the shares for

22   EFAY rather than to himself, so I believe the Government's

23   Exhibit 135-29 should be admitted and I don't think the

24   defense raised a similar objection.

25             MR. AGNIFILO:  We did not because Mr. Yaffe

5035

1   testified.

2           THE COURT:  All right.

3           You next have Government's Exhibit 125-46, which

4   is the document in the Standard Registrar regarding

5   distribution of shares to investors and also the shares that

6   were provided to the designated group of Retrophin employees

7   who were reportedly no longer employed by Retrophin.  I

8   think this is directly relevant.  If Mr. Agnifilo wants to

9   be heard on Government Exhibit 125-36.  I will be glad to

10  hear him.

11          MR. AGNIFILO:  I think the basis -- I think the

12  basis for our objection was the fact that the settlement and

13  release agreement of Mr. Lavelle was attached to this

14  document and so for the reasons we put on the record I think

15  at length by this point, we objected to that because

16  Mr. Lavelle did not testify.  So I don't need to belabor the

17  issue anymore other than to remind the Court that we had

18  objected and stated the base grounds.

19          THE COURT:  All right.  Thank you.  So 125-46 will

20  remain part of the trial record given my prior rulings.

21          And I guess the last one here is

22  Government Exhibit 349A, which is the series of -- I don't

23  know whether it was instant messages or texts.

24          MR. SRINIVASAN:  That's right, Your Honor.  This

25  is an exhibit that we used with Caroline Stewart and the --

5036

1    the instant messages that she has are with Kevin Mulleady.

2         And then later on when we were admitting exhibits

3    to the case agent we also had Government's Exhibit 349 which

4    showed that this chat had been forwarded on by Kevin

5    Mulleady to Marek Biestek and eventually to the defendant.

6    So there's going to subject to connection to the defendant

7    knowing about the chat and then Marek Biestek and then Kevin

8    Mulleady having notice of the facts, so I think we've

9    established that language.

10        THE COURT:  I would agree.  I think just for the

11   record what's redacted from 349A is Mr. Biestek's forwarding

12   of the e-mail to Mr. Shkreli.  Mr. Shkreli commenting about

13   her being emotional, oh, well, something like that.

14        MR. SRINIVASAN:  Yes.

15        THE COURT:  So I think --

16        MR. BRAFMAN:  Your Honor, if I could.  I think

17   there are a number of different layers of hearsay on this

18   document.  I'm looking at -- I'm looking at Bates 21052 and

19   I know we did not object to it at the time.  So I'm aware of

20   that.

21        MS. KASULIS:  The document has already been

22   admitted.  This has already been admitted.

23        THE COURT:  It has been admitted, it has been

24   published and you did not object at that time.

25        MS. KASULIS:  Yeah.

5037

1          THE COURT:  Then --

2          MR. AGNIFILO:  All right.  Outnumbered three to

3     one, I'll sit back down.

4          THE COURT:  Well, you know, I think obviously --

5          MR. AGNIFILO:  We didn't object at the time.  What

6     I -- I noticed after we didn't object at the time is that

7     there -- there's a number of sort of multiple layers of

8     hearsay.  For instance, Caroline Stewart says, I was just

9     told that he blew up.  Stalin, who I think is another

10    employee, didn't get paid for a month.

11         THE COURT:  Okay.  We've identified the culprit.

12    Okay.

13         MR. AGNIFILO:  I'm sure Stalin doesn't really get

14    paid anyway.  You know, this is obviously something that

15    Caroline Stewart learned.  This is not her personal

16    knowledge.

17         We didn't object at the time, I know that, but

18    it's still double hearsay without the exception at these

19    levels.

20         THE COURT:  All right.  It's in evidence, the

21    objection, I believe, is waived and now retroactively you're

22    trying to assert it but we did have testimony both from

23    Ms. Stewart and Special Agent Braconi regarding the exhibit,

24    it was admitted, and 349 through the Agent and 349A through

25    Ms. Stewart and accordingly I will not eliminate 349A from

5038

1   the trial record.

2          So with that does is the Government prepared to

3   rest?

4          MS. KASULIS:  Yes, Your Honor, the Government

5   rests.

6          THE COURT:  All right.  Well, what we will do is

7   obviously have you make that formal statement in front of

8   the jury as well as allowing the defense to make that

9   statement in front of the jury when they return tomorrow.

10  But I think at this point, Mr. Agnifilo wanted to heard on

11  this Rule 29 motion, unless there was something else I

12  needed to deal with.

13         MS. KASULIS:  And, Your Honor, could we just note

14  for the record the defense is resting as well just to be

15  clear.

16         MR. BRAFMAN:  Yes, the defense rests, Your Honor.

17         THE COURT:  All right.  Thank you.

18         MR. AGNIFILO:  And, Your Honor, this is going to

19  be a very brief Rule 29 motion at the end of the

20  Government's case.  There are obviously eight counts in the

21  indictment of conspiracy to commit securities fraud as far

22  as Count 1 --

23         THE COURT:  Why don't you come forward and speak

24  into the microphone, and slowly, please.

25         MR. AGNIFILO:  There's eight counts in the

5039

1   superseding indictment.  Count 1 is conspiracy to commit
2   securities fraud.
3            Count 2 is conspiracy to commit wire fraud.
4            Count 3 is substantive securities fraud, all
5   having to do with MSMB Capital.
6            Count 4 is conspiracy to commit securities fraud.
7            Count 5 is conspiracy to commit wire fraud.
8            Count 6 is substantive securities fraud in regard
9   to MSMB Healthcare.
10           Count 7 is conspiracy to commit wire fraud with
11  regard to Retrophin.
12           And Count 8 is conspiracy to commit securities
13  fraud in regard to the unrestricted shares.  That's the way
14  it is dubbed in the indictment.
15           Our argument, Judge, is that there's legally
16  insufficient evidence to substantiate each of the eight
17  charges.
18           I note that in regard to five of the charges, five
19  of the charges relate to a violation of Rule 10B5 and
20  specifically Count 1 is the MSMB Capital conspiracy is,
21  relies on Rule 10B5.
22           Count 3 of the MSMB substantive count relies on
23  10BA.
24           Count 4 of the MSMB Healthcare conspiracy count is
25  a 10B5 count.

5040

1          Count 6, the MSMB Healthcare substantive count is

2    10B5 count.

3          And Count 8, the unrestricted securities scheme

4    also relied on 10B5.

5          10B5 has, as Your Honor well knows, I'm not trying

6    to tell the Court it doesn't know at this point, has three

7    different subsection.  Subsection A relates to employing any

8    device, scheme or artifice for the fraud.

9          B relates to making an untrue statement of

10   material facts or an omission of material facts necessary in

11   order to make the statements that are made not misleading.

12         And C relates to engaging in any act, practice or

13   course of business which acts as a fraud or deceit upon any

14   person.

15         In regard to the five counts that relate to a

16   violation of 10B5, it's our allegation that the Government

17   has not proved fraud under any of the three subsections.

18   There's been insufficient evidence to establish fraud under

19   any of the three subsection of 10B5.

20         In regard to the charges in the indictment, and

21   I'll go very briefly count by count.  In regard to the -- my

22   read of the MSMB Capital and then Healthcare count, so 1

23   through 6, is that in a sense, and the Government can

24   correct me if they see it somewhat differently, those

25   clusters of counts are broken into two overarching sections.

5041

1    There's the inducement part and then there's the -- the

2    prevention of redemption part, and then the Government

3    allegations both in regard to 1 through 3 in regard to

4    Capital and then alleges both in regard to 4 through 6 in

5    connection with Healthcare.

6              Specifically in regard to the MSMB Capital hedge

7    fund scheme, and I'm reading from the indictment.  It's

8    Page 4, Paragraph 8 it says, Martin Shkreli together with

9    Co-Conspirator 1 in an effort to induce investments in

10   MSMB Capital represented to potential investors *inter alia*

11   among other things that, I, MSMB Capital was a transparent

12   investment vehicle for sophisticated investors of monthly

13   liquidity.

14             Roman Numeral II, the investment advisor is

15   entitled to receive a 1 percent management fee per year

16   based on net assets of the partnership.

17             Roman Numeral III, the general partner was

18   entitled to receive 20 percent of the limited partners net

19   profits for the year.

20             And Roman Numeral IV, MSMB Capital had retained

21   independent Certified Public Accountants as auditors who

22   wold issue an audit report on the annual financial

23   statements.

24             In regard to those four manners and means, if you

25   will.

1        THE COURT:  And I will just tell you, though, they

2   also said in addition to the representations and additional

3   representations about Mr. Shkreli's upset with the portfolio

4   manager, et cetera.

5        MR. AGNIFILO:  Yes.

6        THE COURT:  So it's beyond just those four.

7        MR. AGNIFILO:  Yes, admittedly, and they say it's

8   among other things.

9        THE COURT:  Right.

10       MR. AGNIFILO:  Even in the language.

11       But I do argue at this point that in regard to the

12  MSMB Capital hedge fund scheme, there's been insufficient

13  evidence shown that the -- that a reasonable investor would

14  rely on the statements and the omissions.  And in regard to

15  the omissions as -- as -- we've had a fair amount of

16  discussion about this.  The omission can only be an act in

17  furtherance of a fraud scheme if one of two things happen:

18  Under the wording of 10B5 subdivision B, the omission of a

19  material fact is -- is -- makes something that is said

20  misleading and then alternatively, there's Supreme Court

21  decisions *Basic versus Levenson* was cited some of the cases

22  before that say that there's no -- there's nothing wrongful

23  about an omission unless the person omitting has an

24  affirmative duty to disclosure that which is omitted.

25       So given that legal rubric, I don't believe that

5043

1    the evidence shows that a reasonable investor would have

2    made investment decisions on the material statements on the

3    alleged statements that are alleged to be material or on

4    omissions that are the subject of Counts 1 through 3.

5            Now, I am mindful that there has been evidence of

6    different investors giving their subjective beliefs as to

7    certain things that they wanted to see from the investment.

8    For instance, Mr. Coker said that he was very interested in

9    liquidity.  And Your Honor remembers, I don't need to go

10   through that.  Your Honor's very well versed in evidence.

11           But our argument at the end of the day is that at

12   this point there's insufficient evidence to show that a

13   reasonable investor would have made invest decisions on the

14   specific statements or omissions that comprise Counts 1

15   through 3.

16           Now, in regard to --

17           THE COURT:  Is that not a jury determination,

18   though, based on the evidence before the jury to decide

19   whether or not a reasonable investor would find the

20   representations or omissions material to their investment to

21   an investment decision?

22           MR. AGNIFILO:  Certainly the standard of a motion

23   to dismiss at the end of the Government's case is a high one

24   on us, I admit that, I knowledge that.  And if Your Honor's

25   of the view that this is a question that should go to the

5044

1    jury that is not so clearly insufficient, that's a question

2    that should go to the jury, yes, that is certainly the right

3    thing to do.

4         But for the purposes of the motion, my argument is

5    even though we acknowledge the high bar that we have at the

6    Rule 29 phase, we think based on the credible evidence in

7    our argument that based on the credible evidence elicited as

8    to Counts 1 through 3 that there has not been sufficient

9    evidence to show materiality or to show that a reasonable

10   investor would have used the statements or the omissions as

11   part of the overall rubric of his or her investment

12   decision.  And that's our argument on 1 through 3.

13        Similarly for 4 through 6 and I'll just review 4

14   through 6 because the allegations are somewhat different.

15   Some of what the Government claims is evidence and the

16   allegations in regard to these inducement portion of

17   Counts 4 through 6 is found on Page 8 in Paragraph 16.  And

18   among the things that the Government alleges in the

19   indictment is that Mr. Shkreli did not fully inform the

20   investors of his past performance as a portfolio manager.

21   The indictment goes on to talk about the Merrill Lynch

22   liability stemming from the Orex trade.

23        In Paragraph 17 the Government alleges material

24   misrepresentations to potential investors that

25   MSMB Healthcare's assets under management.

5045

1          And then in terms of the second prong, I would

2    say, of the theory, the -- the inability of the investors to

3    redeem their investments in a timely fashion, the Government

4    refers, just the things in Paragraph 18 here, such as

5    contrary to Shkreli's representations, Roman number I, the

6    original MSMB Capital investors who invested in 2009 lost

7    their investments not double they money net of fees, and the

8    other things alleged here in Paragraphs 18 and also in

9    Paragraph 19 and 20.

10          Again, Your Honor's very well versed in the

11   evidence, I don't know need to go through it all.

12          I think part of the overarching problem with some

13   of Counts 1 through 6 is many of the investors indicated

14   pretty clearly that they decided to invest with Martin

15   Shkreli, not because of the PPM, indeed many of the

16   investors said they didn't read the PPM.  I remember Lindsay

17   Rosenwald said gave it to his lawyer.  Other investors said

18   they didn't read the PMM, that they invested with Shkreli

19   either because of something another investor said;

20   Mr. Blanton was speaking to Mr. Shkreli about him in very

21   positive terms.  That seemed to have some influence over

22   some of these other investors in the Dallas area who then

23   decided to invest.  So I think the credible evidence as we

24   sit here today is in regard to a lot of these investors.

25          They really did not focus or care about what was

5046

1    in the PPM, what Shkreli's track record was and that's in

2    part because so many of the investors had actual track

3    records with Shkreli, personal track records like

4    Mr. Blanton had a personal track record where he was very

5    successful with Shkreli, so he told some of his investment

6    friends and colleagues, they also invested with Shkreli.

7            So our argument in a general matter on Counts 1

8    through 6 is that the specific statements and the specific

9    omissions that the Government is alleging is comprising

10   those six counts are, A, not material.

11           And, B, not things that a reasonable investor

12   would rely on and, in fact, not things that the individual

13   investors who ended up investing, in fact, relied on.

14           THE COURT:  Well, I guess what you are doing is

15   you saying you used the term many investors, I don't think

16   it is many, I think it is two out of the group that did

17   testify.  A few of them did, you're right, not pay much

18   attention to the PPM.

19           But I think what's uniform about all of the

20   investors who testified is that they did care about and pay

21   attention to the monthly performance reports and, in fact,

22   they relied upon those reports to feel that their investment

23   was making money and use it as a benchmark during the

24   redemption process from which they were demanding the

25   redemption.

5047

1          So I think that it is a somewhat captive view of

2    the evidence to argue that two investors didn't -- or I

3    think you characterized it many investors didn't look at the

4    PMM.  There are other issues that I think reasonable

5    investor at least exemplifies through this testimony that

6    these investors paid attention to.  And as you know, so that

7    it iis perfect, I have to construe the evidence in the light

8    most favorable to the Government, as I would, you know,

9    after the verdict, if you choose to renew your motion which

10   I am expecting you will.

11          MR. AGNIFILO:  Yes.

12          THE COURT:  If it --

13          MR. AGNIFILO:  No, I acknowledge -- as I said,

14   this a high bar for us and, yes, Your Honor is obligated

15   under the law to view all this evidence in the light most

16   favorable to the Government.  So understanding that those

17   are my arguments on Counts 1 through 6.

18          THE COURT:  Okay.

19          MR. AGNIFILO:  Now, Count 7 I don't believe

20   there's -- I believe the credible evidence on Count 7 is

21   that the Board members were apprised of the settlement

22   agreements and the consulting agreements.  They were

23   apprised several different ways.  I think the -- the

24   credible evidence is that in connection with different Board

25   calls, specifically I'm thinking about in -- in June

5048

1    of 2013, there was an e-mail from Mr. Panoff that indicated

2    that attached certain documents indicating certain

3    settlement agreements.

4          Then in September there was another Board call in

5    September, I believe it was September 9th where Mr. Panoff

6    as the at the time attached, I think, the connection with an

7    e-mail from September 9th four different documents, if I

8    recall, a Marcum letter, a financial statement, and then two

9    draft SEC filings that each indicated the existence of the

10   settlement agreements.  And specifically in the Marcum

11   letter, the amount of the settlement agreements were broken

12   out.

13         And then in the draft SEC filings the total amount

14   of the settlement agreements was actually set forth in the

15   filing.

16         Those filings, if I remember correctly, were

17   actually filed with the SEC four days later on

18   September 13th.  So the Board members would have had four

19   full days, not talking about the time in advance of the

20   call, but would have had four full days to read the

21   materials that were sent to them by the CFO and to

22   understand them before signing them.  And at the end of the

23   day every member of the Board signed those SEC filings.  And

24   I understand the testimony was -- at least from our

25   perspective -- these Board members saying that they signed

5049

1    it but they read it in a hurried fashion, they didn't really

2    focus on it.  I don't know that that is the type of evidence

3    that could result in a -- even in this count going to the

4    jury, quite frankly.  There's just -- there's not much else

5    one can do in a corporate setting other than send important

6    Board documents to members of the Board, especially when

7    those documents are SEC filings.

8              SEC filings that under different rules and

9    regulations Sarbanes-Oxley I think there's some testimony at

10   trial about the obligations under Sarbanes-Oxley and on

11   Board members to read those documents, to understand those

12   documents and to sign those documents as a manifestation of

13   that Board member's statement that that Board member read

14   and understands that document.

15             And these are now SEC filings in the record.

16   These are SEC filings that these Board members could have

17   easily gone on the Edgar website to see and for the Board

18   members to come into court and say, Well, we don't know

19   about it even though yes, we signed SEC filings, I don't

20   think we're really even here or there.  I think from a

21   notice and intent standpoint it's clearly Mr. Shkreli, who

22   is also copied on the Panoff September and June e-mails,

23   would have been aware at that point that members of the

24   Board had these documents.

25             It was on the Board agenda, as I think entry

5050

1   Number 9 in the September letter from Mr. Panoff.  And I

2   understand that Mr. Richardson said, We don't think we got

3   to Number 9, but it was clearly there.

4           In regard to the consulting -- in regard to the --

5   the Banta --

6           MR. BRAFMAN:  Al Geller.

7           MR. AGNIFILO:  -- and the Al Geller, yes.  The

8   Banta and Al Geller agreement, the agreements were actually

9   attached in the o September Panoff e-mail.  The Board

10  members would have had them.  At a later date an S1 is

11  filed.  The S1 had in a document that was signed by each and

12  every Board member essentially a draft settlement agreement,

13  a form of settlement agreement, obviously without an

14  individual name as being the settler.  But the actual

15  agreement is attached to the S1?  Every member of the Board

16  signed that document with the draft -- with -- with -- with

17  an actual version of the settlement agreements, so I think

18  at a certain point and I think we passed that point, a

19  defendant just can't be in a position of doing something

20  essentially to defraud the Board or behind the Board's back

21  or to deceive the Board under these circumstances.

22          And so, quite frankly, with Counts 1 through 6, I

23  full expect that -- that given the burden that we have and

24  the light most favorable to the Government, Your Honor's

25  going to let those counts go to the jury.

5051

1          I think Count 7 is on a totally different footing.

2    I think Count 7 is really the type of -- what we have in the

3    record is really undisputed.  There's no dispute that these

4    Board members signed the SEC filings.  None.  They signed

5    them.  And I think as soon as that his is in record, I think

6    this count is on thin ice and I think it's on thin ice.  I

7    don't think that even in the light most favorable to the

8    Government, even with the burden that we have in

9    establishing insufficient evidence at this stage that this

10   count should go to the jury, most respectfully.  That's

11   Count 7.

12          THE COURT:  All right.  Do you want to just go

13   through the last count and then hear from the Government or

14   would you like the Government to respond.

15          MR. AGNIFILO:  Sure.  Whatever Your Honor wants to

16   do.

17          THE COURT:  Well, I am happy to hear you on Count

18   8 as well.

19          MR. AGNIFILO:  All right.

20          THE COURT:  Then I will hear from the Government.

21          MR. AGNIFILO:  Very good.

22          Count 8, I think like Count 7, in Count 8 it's --

23   there's a lot -- there's a lot of smoke but no substance.  I

24   mean, with count -- I'm reminded of the Wendy's commercial,

25   Where's the beef.  And you have --

5052

1          THE COURT:  Nothing burger.  It's a nothing
2     burger.
3          MR. AGNIFILO:  I'm sorry, judge.
4          THE COURT:  It is a nothing burger.  But I am not
5     saying it is.  It is not Where is the beef.
6          MR. AGNIFILO:  I'm dating myself.  I started on
7     Where's the beef.
8               Right, so we have Mr. Pierotti and I went back and
9     I looked at the Mr. Pierotti's testimony yesterday and he
10    doesn't say that Mr. Shkreli said everyone should buy and
11    sell, buy and sell, buy and sell to create volume.  He
12    answers a question and then he kind of goes off and he sort
13    of goes off in left field and he talks about things that
14    could happen.  And he says, Well, you could have buy and
15    selling, buy and selling and then he says that would be
16    insider trading and that prompted a sidebar and we all went
17    from there.
18              So he does not testify that Mr. Shkreli
19    specifically said, I want people to buy and sell and buy and
20    sell and create volume.  He doesn't say that, so there's
21    just no evidence of that in the record.
22         THE COURT:  Doesn't he encourage them to buy and
23    sell, he does not say because I want to create volume, but
24    he does say please or applicably, you know, trade these
25    shares and buy and sell.

5053

1          MR. AGNIFILO:  What he does --

2          THE COURT:  He doesn't say the because.

3          MR. AGNIFILO:  The e-mail that I think Your Honor

4    is referring to is there's an e-mail he sends and a number

5    of people, Blanton is copied on it.  There are a number of

6    people copied on it.  There are some of the people in the

7    group that we're, you know, talking about who ae copied on

8    it.  I think -- I think Tilles, I think Mulleady, I think

9    those people are copied on it.

10          But it's also send to Blanton and a number of

11   other people.  And if Your Honor recalls the very next day

12   Shkreli sends an e-mail to Pierotti and to Blanton basically

13   putting them together so that they could, you know, transact

14   some business.

15          Actually my Teny Geragos has been the heart and

16   soul of the defense from the very --

17          THE COURT:  She's amazing.

18          MR. AGNIFILO:  -- beginning.  We're putting that

19   on the record.  It's e-mail, Judge, from December 18th,

20   2012, it's Government Exhibit 120-14.  It's an e-mail that

21   Shkreli sends to Brent Saunders, Darren Blanton, Marek

22   Biestek, Tom Fernandez, Tim Pierotti, Kevin Mulleady, Ed

23   Sullivan, George Haywood.  I think that's it.

24

25          THE COURT:  Haywood's also an employee of

5054

1    Retrophin, right, or what does he do?  Mr. Shkreli's shaking

2    his head.

3              MR. AGNIFILO:  Ms. Geragos is returning.

4              (Pause in proceedings.)

5              MR. AGNIFILO:  Okay.  I'm -- I'm informed by a

6    reliable source that at one point he was a consultant but he

7    was never an employee.  Definitely -- I can't say that.  I

8    could go back and research that and get an answer for you.

9              THE COURT:  I thought a saw an e-mail where he was

10   using Retrophin either in e-mails or signature.  I could be

11   mistaken.

12             MR. AGNIFILO:  That could be right.  I don't want

13   to go off the cuff on a question that Your Honor asked me.

14   I'll go back and I'll take a look.

15             So -- so I don't think that this e-mail suggests

16   anything untoward in terms of securities fraud.

17             THE COURT:  Well, could you just read what it

18   says.

19             MR. AGNIFILO:  Sure, yes.  So it starts with a

20   Google alert and Google sends Mr. Shkreli a Google alert

21   that says 30 under 30 hedge fund gaslight turns biotech

22   entrepreneur.  And it's obviously an article about Shkreli.

23   Shkreli then writes to these people, Friends and

24   shareholders see the new art go out on the deal from Forbes.

25   One of my priorities for the future is increasing the

5055

1    trading volume in our stock.  Anything anyone can do to help

2    in this regard is welcome.

3            Now, I don't think that it is wrong for an

4    executive to want trading volume in the stock or even to

5    encourage trading volume in the stock.  What's wrong is to

6    do it by fraudulent means and fraudulent means meaning some

7    element of deception.  What -- and I'm not -- I'm sorry.

8            THE COURT:  This is, I think what I understand the

9    importance of this e-mail is that this is what is left to

10   you who have free-trading shares and he is indicating to

11   them that they should help out by increasing the is trading

12   volume, which to the outside public could create a false

13   impression about what is going on.  And I think that one of

14   the allegations, as I understand it, is to artificially

15   increase or pump up the volume and perhaps the share price

16   of the unrestricted shares.

17           So I think that e-mail was, you know, important to

18   the evidence that the jury would consider regarding the

19   conspiracy to commit securities fraud allegation.

20           Just my law clerk reminded me that the Haywood

21   e-mail that we saw, he signed off as, I think, controller of

22   Retrophin.  There was an e-mail.

23           MR. AGNIFILO:  I'll go back and check.  That might

24   be right.  I don't know.  Like I had said, I want to answer

25   the question, the Court's question in a more thorough

5056

1   fashion.

2          THE COURT:  All right.  I just wanted to go back

3   the that.

4          MR. AGNIFILO:  I don't believe that Blanton and

5   Haywood had free-trading shares.  I don't believe they did.

6          THE COURT:  Well, the group did, the group of

7   eight.  G8 did.

8          MR. AGNIFILO:  Some of them did.

9          But not -- but not all of them and -- but here's,

10   I think, the larger point that I want to try to make:  To

11   the extent that the allegation is that this -- the alleged

12   securities fraud here is, you know, sort of cabin, you know,

13   pigeonhole as almost like pump and dump or something like

14   that.  Now it doesn't have to exactly be a pump and dump in

15   order to be a securities fraud.  But the essence of the

16   typical pump and dump that we don't have here and we don't

17   have anything remotely similar is in pump and dumps there's

18   deception.  In other words, there is invariably some type of

19   public information that is deceptive in some way.  There are

20   false statements being made by the company to pump up the

21   volume or the stock or price of the stock.

22          We don't have anything of that here.  I don't

23   think there's anything remotely inappropriate about

24   Mr. Shkreli asking people to trade because through trading

25   and through -- that the volume -- that the price of the

5057

1    stock would go up.  I think it's illegal when it becomes

2    deceptive.

3            THE COURT:  I tell you what one has to look at is

4    the evidence about what happened before this December 18th

5    e-mail.  And again, construing the evidence in the light

6    most favorable to the Government, what happened before this

7    is that the e-mail was sent to this group of eight saying

8    You're no longer Retrophin employees.  But you are to go out

9    and buy these unrestricted shares at a heavily discounted

10   price.  They are then asked to sign a document by

11   Mr. Greebel in December, this is December 13th, where they

12   say that they do not alone or together with any other person

13   exercise control over Desert Gateway and they say, you know,

14   I am not an officer, director of holder of more than

15   10 percent.

16           The idea is that together those shares absolutely

17   amount to more than 10 percent, I believe, and also allowed

18   some exercise of control over those free-trading shares.

19           And then the covert act, Number C, on Page 31 of

20   Paragraph 59, you know, is that e-mail where he, quote,

21   fires everybody yet he is summoning people to come in to the

22   office.  Mr. Mulleady is told, Come in, we need you.  He's

23   sick, but he's to come in.  Pierotti is told, Come in, we

24   need you to work.

25           And so I think that there is a level of

5058

1    obfuscation or deception that is being conveyed to the

2    outside world, but within Retrophin there's this group of

3    eight who are taking direction which, for the most part with

4    a few exceptions, specifically Mr. Pierotti and maybe

5    Mr. Fernandez to some extent, but they're taking directions

6    from Mr. Shkreli regarding those shares.

7            And moreover those shares from those group of

8    eight are being used to final up claims with certain

9    MSMB Capital, Alea Capital and MSMB Healthcare Investors.

10   So there's control over their shares.

11           MR. AGNIFILO:  One thing I point out, and listen I

12   think in the light most favorable to the Government and the

13   burden that we have here, I think this is -- is not as

14   strong a motion for us, quite frankly, as Count 7, but just

15   give me one second.

16           (Pause in proceedings.)

17           THE COURT:  I mean, Mr. Pierotti was very clear I

18   never worked for MSMB.

19           MR. AGNIFILO:  Right.

20           THE COURT:  He was with MSMB Consumer, which was

21   the strip club hedge fund.

22           MR. AGNIFILO:  Right.

23           THE COURT:  And that is it.  And, you know, he was

24   told to come into the office.  So I think that there is

25   enough evidence to go to the jury on --

1           MR. AGNIFILO:  That's fine.

2           THE COURT:  -- this.

3           MR. AGNIFILO:  Okay, very well.  Thank you.

4    That's it, I have nothing else unless Your Honor has any

5    questions.

6           THE COURT:  Does the Government want to be heard?

7    I mean, maybe you should address Count 7.

8           MS. KASULIS:  Yeah.  Your Honor --

9           THE COURT:  I mean, of all the counts I think

10   Mr. Agnifilo does raise some issues that you should address.

11          MS. KASULIS:  Yes, Your Honor.  With respect to

12   Counts 1 through 6 and Count 8, I think it's clear that we

13   have met the Rule 29 hurdle.  Your Honor clearly understands

14   the standard to construe all the evidence in the light most

15   favorable to the Government and our position is that we have

16   clearly met that burden with respect to Counts 1 through 6

17   and Count 8.

18          With respect to Count 7, I just want to clarify

19   with respect to the timing of the Board members' knowledge

20   of the agreement.  I think what Mr. Agnifilo was referring

21   to with respect to the June of 2013, it was an e-mail from

22   Mr. Panoff in July of 2013 attaching a cash flow summary

23   that ends at June 30th, 2013 that has that line item about

24   settlements in which the Board members both testify that

25   that issue was not raised, not discussed.  And then again at

5060

1    this point in time the vast majority of the money is gone.

2    It's already paid out.  From the agreement, I think there's

3    a subsequent agreement in August which is again not raised

4    to the Board, and then the money and the shares are paid

5    out.  So I think the timing here is very important,

6    Your Honor.  The Board members do become aware of the

7    agreement in the fall of 2013, but again, they're not

8    provided with the full and complete information as to what

9    the agreements are truly about and why these individuals are

10   being paid by Mr. Shkreli through Retrophin in the way that

11   Mr. Shkreli is doing that.

12              (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                    5061

1           MS. KASULIS:  And so I think that, again, if the

2    board members, you know, are reviewing documents or saying,

3    okay, go ahead and file these SEC filings, they're relying

4    on their auditors, they're relying on Mr. Greebel who we

5    believe is a co-conspirator and is general counsel at that

6    point and acting as counsel for the firm or the company.

7    They're relying on them to say, okay, this seems all right.

8           And then Mr. Shkreli, of course, has to enter into

9    indemnification agreements and promissory notes to pay the

10   company back.  So I think the timing here is very important,

11   and that it's clear the board members did not have a full

12   and complete understanding as to what the settlement

13   agreements were about and the settlement agreements that

14   caused these restatements.

15          And then I think that there were two other means

16   in Count Seven by which Retrophin was defrauded, neither of

17   which the defense has argued about, which is the backdated

18   creation of the MSMB Capital interest in order to try to

19   compensate or to pay off MSMB Capital investors who had been

20   defrauded.  And then the other prong was the consulting

21   agreement prong with respect to Mr. Yaffe who was a

22   defrauded -- or, excuse me -- an Elea investor who had lost

23   all his money and that Mr. Shkreli had promised to pay back.

24          And then just to make the record clear, we're not

25   arguing the Geller consulting agreement, and so that I think

Proceedings                                5062

1   was a point of the defense's argument with respect to the

2   Rule 29, and we are not arguing with respect to the Geller

3   consulting agreement, that that is an additional basis of

4   the fraud.  So, again, I think construing the evidence in a

5   light most favorable to the government we satisfy the

6   hurdles with respect to all counts in the indictment.

7            THE COURT:  All right.  Thank you.

8            I do believe there's enough evidence to go to the

9   jury.  Obviously, the parties will have by way of attorney

10  motions, if necessary, after the verdict.  So, respectfully,

11  I'm going to deny the motion at this time.

12           Is there anything else?  I think I did want to

13  discuss a few other matters with the parties before we turn

14  to the specific instructions.

15           MS. KASULIS:  Your Honor?

16           THE COURT:  Yes.

17           MS. KASULIS:  Just two housekeeping matters with

18  respect to the summations.  I think one of the issues, and

19  we raised this I think in the last couple days about the use

20  of the electronic devices in the courtroom.  I think some of

21  the issues with respect to the opening and the overflow room

22  was the microphone issue of really having to almost like

23  hold the microphone up to your mouth for the overflow room

24  to hear.

25           Is there any way -- I don't know if it's possible

Proceedings                                    5063

1    to do some sort of a lapel mic on the attorneys who are

2    doing the summations and the rebuttal just to make sure that

3    the overflow room can hear all of the parties' closing

4    arguments.

5             THE COURT:  We will look into that.  Ms. Jackson

6    can check with our IT people and see.

7             MS. SMITH:  And then, Your Honor, one other thing.

8    I'm going to be using the PowerPoint, and the screen is

9    obviously behind me when I'm facing the jury.  In the past

10   the kind of the monitors on the side have been facing the

11   jury as well and so I've been able to see them.  Here

12   they're all facing out.  I don't know if it's possible to

13   either get a third monitor for tomorrow that can actually

14   face this way or to, you know, in a worse-case scenario, I

15   would ask that this at least be flat just so I can, without

16   having to turn around for every slide, see what's up on the

17   screen for the jury.  That's the only other kind of request.

18            THE COURT:  All right.  Ms. Jackson will inquire

19   today.  We might have to flip that monitor around and shift

20   the press over to the other side.

21            MS. SMITH:  Okay.  I just wanted to raise that

22   before.  Thanks.

23            And also we're happy to come a little bit early

24   tomorrow and do a test for the overflow.  We tested the

25   PowerPoint yesterday at lunch, but we can come early if that

Proceedings                                     5064

1    would be helpful for the AV setup.

2              THE COURT:  We can be here early.  We are here

3    early so you can test it or later today even.

4              MS. SMITH:  Great.

5              THE COURT:  Should we turn to the instructions?

6              I think, as I recall, you expect that the

7    government will close, for the most part, in the morning;

8    the defense will close, for the most part, in the afternoon;

9    and rebuttal will be offered Friday morning.

10             The charges, as you can see, are quite lengthy.

11   It will probably take me a couple of hours to read them and

12   then the jury will start deliberating.  So I would ask that

13   we have a complete set of exhibits to send back to the jury

14   and hopefully you have both verified with Ms. Jackson what's

15   in evidence and what isn't and we won't have any delays on

16   providing exhibits.

17             What I'd like to do when the jury asks for a read

18   back is we try to identify a portion of the transcript that

19   will be provided to the jurors rather than having them come

20   back in and have the Q and A read for them.  I think that

21   the court reporters have tried to segregate sidebars, but

22   oftentimes we also have to redact objections so that they

23   just see the testimony.

24             MR. BRAFMAN:  Your Honor, can I ask in terms of

25   scheduling, if the government has any further update on how

Proceedings                                    5065

1   long you think the opening summation will be?

2           MS. SMITH:  Your Honor, I don't.  I mean, I think

3   I had said three to three and a half hours and I think

4   that's about right.  I can't see it going significantly

5   longer and I don't think it's going to be shorter than that.

6           MR. BRAFMAN:  Could we try our best, if at all

7   possible, to complete the government's opening before we

8   give the jury a break for lunch if it's close so that I

9   don't have to go into the next day on Friday with part of my

10  summation?  I need, you know, if we start the defense

11  summation at 2 o'clock, for example, I think I can finish it

12  all before we excuse the jurors so we don't have to go into

13  Friday.  But I don't want to have to start at 3 o'clock and

14  then go over if it's not necessary.  So we'll all try and be

15  here at 9:00.  But if they're doing three, three-and-a-half

16  hours I think it should be done before 1:00, 1:15 at the

17  latest.

18          MS. SMITH:  I think that's right.  And, obviously,

19  with a break in the middle, you know.  And I can figure out

20  a good stopping point for a midmorning break as well.  I

21  mean, I'm certainly going to try and keep it to that length.

22          MR. BRAFMAN:  And, Judge, what is Your Honor -- I

23  think the superseding indictment is not in its present form

24  something that can go back into the jury room.  It talks

25  about the employees and people that would not normally be in

1    an indictment that a jury would see.

2           My request would be that there is a cleaned-up

3    redacted copy that the government gives us to look at.  I

4    think Ms. Kasulis has one in her hand.

5           MS. KASULIS:  I do.

6           MR. BRAFMAN:  Can we get one and then we'll notify

7    the Court if we have any objections to the redacted copy?

8           I assume the Court will give them a copy to take

9    back or is that --

10          THE COURT:  Well, I probably would just because of

11   the number of counts and the dense recitals of facts in the

12   indictment.

13          MR. BRAFMAN:  And is it Your Honor's --

14          MS. KASULIS:  Excuse me.  I'm sorry, Mr. Brafman.

15          Just to be clear with respect to what I've handed

16   to Mr. Brafman, we didn't redact because we didn't want it

17   to look as if there are other people who have been charged

18   and so what we did is we just made a Martin Shkreli focused

19   only version.

20          MR. BRAFMAN:  Did you take out references to

21   employees?

22          MS. KASULIS:  So what we did was when there were

23   references to like Corrupt Employee 1 or Investor 1 or

24   Investor 2, we actually put those individuals' name in for

25   who is Investor 1, who is Investor 2 because I think the

1  jury needs to know that for the overt acts piece in

2  particular.

3         THE COURT:  And then you made the change based on

4  our -- let me just speak to my law clerk.

5         MS. KASULIS:  Oh, I'm sorry.  And then for

6  Mr. Greebel we made him appear like any other individual.

7         (Brief pause.)

8         MR. BRAFMAN:  Your Honor, is it the Court's

9  practice to give the jury a copy of your charge or only if

10 they request?

11        THE COURT:  No, I usually do give them a charge.

12        MR. BRAFMAN:  Okay.  Thank you.

13        THE COURT:  Because if I can speak that long and

14 they can listen that long, I think it's almost impossible on

15 both ends, and I'd like to give them the instructions so

16 they can refer to it.

17        MR. BRAFMAN:  And can I ask, am I correct that the

18 Court will not ask the jury to deliberate on the weekend?

19 So if they don't reach a verdict by Friday at 5:00 then --

20        THE COURT:  I will not ask them to deliberate on

21 the weekend.

22        MR. BRAFMAN:  I'm sorry?

23        THE COURT:  No, I won't.

24        MR. BRAFMAN:  Okay.  Thank you.

25        THE COURT:  So would you like to get started?

```
                        Proceedings                    5068
```

1           MS. KASULIS:  Sure.

2           THE COURT:  And I guess what I would say is each

3    party should feel free as we go through.  I think what I'll

4    do you is I'll just use the table of contents and I'll just

5    state the number of each charge, and then if there is an

6    objection or a proposed amendment, I will be glad to hear

7    from the parties.

8           All right.  So we have Charge One, and if you have

9    an objection, please speak up.  Charge Two.  Charge Three.

10   Four.

11          MS. KASULIS:  Your Honor, just hold on.  I'm

12   sorry.  I did it by page number and so.

13          THE COURT:  Okay.

14          MS. KASULIS:  With respect to Charge Four I just

15   think there's one typographical error.

16          THE COURT:  All right.  Sure.

17          MS. KASULIS:  It's page 9.  I just think in the

18   paragraph starting "Every defendant starts with a clean

19   slate."

20          MR. BRAFMAN:  I really can't hear you, Jackie.

21          MS. KASULIS:  I'm sorry.

22          THE COURT:  Let me turn on the microphone.

23          MR. AGNIFILO:  Can we do this in a way just so

24   we're more sort of like facing each other.

25          THE COURT:  I can come sit down there.  I just

```
                         Proceedings                    5069
```

1    want to be near my clerk who might have to do some research

2    for us.

3              MR. BRAFMAN:  If we just do it at the podiums.

4              Your Honor, if you stay and we do it at the

5    podiums I think that will work.

6              THE COURT:  Sure.  We can do that.

7              MR. AGNIFILO:  Page 9?

8              MS. KASULIS:  Yes, page 9.

9              THE COURT:  The paragraph starting with "Every

10   defendant."

11             MS. KASULIS:  Right.  I think it says "Every

12   defendant starts with a clean state and is presumed innocent

13   of each chart."  I think it's each of the charges.

14             THE COURT:  Yes.  Thank you.

15             MS. KASULIS:  That was my only proposal for that

16   charge.

17             MR. AGNIFILO:  And we agree.  That's fine.  Yes.

18             THE COURT:  Charge Five.

19             MR. AGNIFILO:  Reasonable doubt.  Yeah, that's

20   fine.

21             THE COURT:  Charge Six.

22             MR. AGNIFILO:  One second.  Okay.  All right.

23             For Charge Six, and this is not a big one, this is

24   just a really miniscule one.  On page 14, any exhibits

25   identified but not admitted into evidence by the Court,

Proceedings                                          5070

1   obviously, that's right.  My concern is -- what I was

2   proposing is any exhibits identified but not admitted into

3   evidence by the Court are not evidence, however, the

4   testimony concerning such an exhibit is testimony like any

5   other testimony or something along those lines so that they

6   don't somehow think that if a piece of evidence wasn't

7   actually admitted, that there's nothing in the record about

8   such a thing.  And I know you talk about testimony I think

9   three or four pages earlier, but it just seems to round out

10  the concept.

11          THE COURT:  So how about we add comma, however,

12  testimony regarding such exhibits may be considered.

13          MR. AGNIFILO:  Sure.  That's fine.

14          MS. KASULIS:  Your Honor, I'm sorry.  What was

15  that?

16          THE COURT:  Is that all right with you?

17          MR. AGNIFILO:  So it's, however, testimony about

18  concerning such exhibits can be considered.

19          MS. KASULIS:  Okay.

20          MR. AGNIFILO:  One of the things as a general

21  matter because it's in different parts, and I don't want to

22  jump the gun, is I think what the government has done in the

23  indictment that they just gave us, which is the one that

24  Your Honor is going to give back to the jury, is that rather

25  than references to corrupt employee co-conspirator, maybe

Proceedings                                                5071

1    the person's names.  So at some point we'll have to conform

2    the charge to the indictment.  And I think also eliminating

3    certain overt acts, not in this indictment but in one that I

4    think they're probably going to give us shortly.

5               MS. KASULIS:  And we can hand up to the Court,

6    Your Honor.  We did make sure we double checked all the

7    overt acts that are listed, and I think there were just two

8    or three that we chose not to prove up.  And so I can hand

9    this to the Court so that Mr. Tata maybe.  But also we could

10   email Mr. Tata with a replacement for those sections.

11              THE COURT:  Well, we would like to see your

12   revised indictment, if you don't mind, and any other --

13              MS. KASULIS:  And then what we'll do is --

14              THE COURT:  -- proposed corrections.

15              MS. KASULIS:  And we can email the revised

16   indictment to Mr. Tata right after this.  We did make all of

17   the changes, but then realized we had not eliminated a

18   couple of the overt acts in the version that we just gave to

19   Mr. Brafman so we'll go ahead and eliminate those overt

20   acts, renumber them and then circulate to the parties after

21   this.

22              THE COURT:  Was there anything else with regard to

23   Charge Number Six?

24              MR. AGNIFILO:  Not from us.

25              THE COURT:  All right.  What about Charge Seven?

                          Proceedings                    5072

1              MR. AGNIFILO:  That's direct and circumstantial

2    evidence.

3              MS. KASULIS:  Yes, Your Honor.

4              The government proposes to add with respect to the

5    circumstantial evidence charge, I mean, we're always partial

6    to giving an example like the umbrella example.  I think

7    that's very helpful for jurors to understand.

8              THE COURT:  We had it in there.  We took it out.

9              MS. KASULIS:  I'm very partial to the umbrella

10   example.

11             THE COURT:  You know which one that is?

12             MR. AGNIFILO:  Yeah.  No, I do.  The raining --

13             THE COURT:  You may infer that it's raining if you

14   see somebody come into the courtroom with a wet coat and a

15   dripping umbrella.

16             MR. AGNIFILO:  That's fine, Judge.

17             THE COURT:  I think it is helpful, but, on the

18   other hand, I did have a case where there was an objection

19   to that example so we will have the rain example.

20             MS. KASULIS:  Thank you.

21             THE COURT:  What else?

22             MR. AGNIFILO:  Nothing from us on Charge Seven.

23             THE COURT:  Charge Eight.

24             MR. AGNIFILO:  Inferences.  Nothing from us on

25   inferences.

```
                        Proceedings                    5073
```

1            THE COURT:  Charge Nine.

2            MS. KASULIS:  So Charge Nine, Your Honor, because

3    we did not actually -- Charge Nine seems to be geared

4    towards statements made by a defendant to law enforcement

5    like post arrest or, you know, in a proffer.  And I

6    recognize that when we submitted our proposed charges we

7    were considering admitting statements by Mr. Shkreli from a

8    meeting that he had with the FBI, but we decided not to

9    proceed with admitting those statements.  And so the concern

10   with the way that Number Nine is written is it appears that

11   he made statements to government officials, whether they

12   were voluntary and understanding, it just has more of that

13   post-arrest feel to it as opposed to just he was deposed.

14   So our proposal is to eliminate it or modify it in a way to

15   make it more directed towards the types of admissions.

16           THE COURT:  The testimony?

17           MS. KASULIS:  Exactly.  That --

18           THE COURT:  It was the testimony before the SEC

19   really.

20           MS. KASULIS:  Exactly.

21           THE COURT:  And FINRA, as we established, is not a

22   law enforcement agency.

23           MS. KASULIS:  That's right.

24           THE COURT:  So what would be best for doing this?

25           MR. AGNIFILO:  I'm fine with modifying.  I think

Proceedings                                      5074

1   that's exactly right.  This is more geared to traditional

2   law enforcement settings, which we don't have here.

3   However, to the extent that the jury did hear about his

4   statements to the SEC, I think we need to put something in.

5   So I don't know if the government has a proposed

6   modification.  I'm happy to hear it.  Or, if not, we can

7   come up with one.

8               THE COURT:  All right.  So what if we say there

9   has been evidence that the defendant made certain statements

10  to the SEC.

11              MR. AGNIFILO:  That's fine.

12              MS. KASULIS:  Uh-huh.

13              MR. AGNIFILO:  I don't think we have issues with

14  voluntariness like we do in an interrogation setting.

15              MS. KASULIS:  I was just going to say we should

16  take that whose sentence out and just go I instruct you --

17              THE COURT:  So we will take out the sentence that

18  starts "In deciding what weight"?

19              MS. KASULIS:  Yes.

20              THE COURT:  Is that all right with you,

21  Mr. Agnifilo?

22              MR. AGNIFILO:  Yeah.  Let me just see what it

23  looks like once we do that.

24              So Your Honor is going to say there has been

25  evidence that the defendant made certain statements to the

Proceedings                               5075

1    Securities and Exchange Commission?

2            THE COURT:  In which the government claims he

3    admitted certain facts charged in the superseding

4    indictment.  Delete the next sentence and just leave the

5    last sentence.

6            MR. AGNIFILO:  That's fine.  That's fine.

7            THE COURT:  Charge Ten.

8            MR. AGNIFILO:  Charge Ten.  We're okay with Charge

9    Ten.

10           MS. KASULIS:  Same for the government.

11           THE COURT:  Charge Eleven.

12           MR. AGNIFILO:  Charge Eleven.

13           THE COURT:  Credibility.

14           MR. AGNIFILO:  Has Your Honor ever given what we

15   used to call the falsus in uno charge.  It says basically --

16           THE COURT:  Yes, I know what that is, but I think

17   that that is not necessarily the preferred charge.

18           MR. AGNIFILO:  I know there's some cases in the

19   Second Circuit that, at least the way I read them, say that

20   there has to be some predicate in the record.  And really

21   what I'm thinking about, Judge, and the reason I started

22   thinking of it last night is I thought that a fair reading

23   of some of Mr. Pierotti's testimony is that he was, in the

24   worse case scenario, lying or badly mistaken about certain

25   things.  For instance, he said, as a matter of fact, that

Proceedings                                    5076

1    Greebel got shares, that freely traded shares, which we know

2    isn't true.  It's not the government's theory that it is.

3    He said that the consumer funded $4.5 million.  Maybe that

4    was a mistake; maybe it wasn't a mistake.  But I think when

5    you start having, and there's other examples through the

6    witness testimony.

7            And I'm aware of certain Second Circuit decisions

8    that are not so much in favor of the charge, but I think if

9    there's a predicate or a reason in the record to give it, we

10   certainly do request it.  We think it's a fairly common

11   charge.

12           MR. BRAFMAN:  Your Honor, can I just add that this

13   is the rare case where there is no tape recording, there is

14   no video recording, there are no emails that are head shots

15   in my view.  It's really a question of credibility of a lot

16   of the witnesses who've been extensively cross examined.

17   Some of them have admitted on the witness stand that at one

18   point or another they did lie, for example, Mr. Yaffe.

19           Now, the government can say, well, he panicked and

20   he had a motive to protect Mr. Shkreli.  But to the extent

21   that a witness has admitted to lying or has been shown to

22   have lied in cross examination, for the jury not to

23   understand that if they find that a witness lied about an

24   issue, that they have the right, if they so choose, to

25   disregard the witness' testimony or they could believe as

Proceedings                                    5077

1    much of the testimony as they thought was credible and

2    disregard the part which they found not to be credible.

3            I think most of the cases that I've seen who

4    considered the issue said that they don't require it

5    necessarily in every case, are cases that I think could be

6    very distinguished from this case which relies, in large

7    measure, on witness credibility.  The government asked each

8    witness on direct examination a series of questions, had you

9    known, had you known, had you known.  And then on cross it

10   was clear that they could care less because they never read

11   the memo or they relied on their lawyer or they relied on

12   somebody who told them something about the defendant.  So

13   when witness credibility is really at the heart of the case,

14   I think the charge is necessary, Your Honor.

15           MS. KASULIS:  Your Honor, we believe that the

16   Court's charge satisfies all of the concerns that the

17   defense has.  There is, in fact, the top of 21, statements

18   about a willful falsehood always is a matter of importance

19   and should be considered seriously.  So we think that any

20   concerns that the defense has is sufficiently addressed in

21   the credibility of the witness charge as set forth in

22   Section 11.

23           THE COURT:  Well, I know that there is language

24   that is sometimes used about you may decide whether to

25   reject in total the witness' testimony or decide what

Proceedings                                    5078

1   portions of the testimony to accept as true and reject as

2   false.  I don't think we did put that specifically.

3          MR. BRAFMAN:  You didn't put that in, but we would

4   ask that it be added.  I know it's referenced in some way,

5   but I don't think the jury is clearly told what they can do

6   with testimony that they find to be false.  I think this

7   helps the government as much as it helps us.

8          MS. KASULIS:  And, Your Honor, I do think that the

9   prior inconsistent statements section, Section 14, does

10  address this issue about whether to discount a portion or

11  all of testimony with respect to witnesses' credibility and

12  so I think there is actually just a section that addresses

13  this potential inconsistency of witness testimony issue.

14         THE COURT:  I think also at page 20 we touch on

15  this in the second full paragraph, second sentence,

16  "Evidence of discrepancies may be a basis to disbelieve a

17  witness' testimony.  On the other hand, discrepancies in

18  witnesses' testimony are between his or her testimony and

19  that of others.  Do not necessarily mean that the witness'

20  entire testimony should be discredited.  I mean, it does

21  give the juror the clear message that it can be all or part.

22         MR. AGNIFILO:  I think, respectfully, I think

23  that's a little bit of a different issue, witness

24  discrepancy.  I mean, I think that the falsus in uno charge

25  is really geared towards something different which is how

Proceedings                          5079

1   does a -- what are the different ways that a jury could

2   handle a situation where it comes to a conclusion that a

3   witness misrepresented on a material subject.

4          And I think it's a subject -- I think it's a

5   charge that arose because the jury could use the Court's

6   guidance in that.  They could -- and that's all the Court

7   does.  The Court certainly in the charge doesn't tell the

8   jury what to do.  It gives the jury the range of options.

9          THE COURT:  We will add it.

10         MR. BRAFMAN:  Okay.

11         THE COURT:  We're going to look at it and we will

12  put something in and hope we can put up a black line and

13  suggestion and you can hopefully be satisfied.

14         MR. AGNIFILO:  In that same section.

15         THE COURT:  Charge 11?

16         MR. AGNIFILO:  Yes.  On page 19 there's that small

17  paragraph, the small full paragraph before the end.  It says

18  "Evidence that a witness is bias, prejudice or hostile

19  toward the defendant."  I don't know that -- I think Your

20  Honor basically touches on the same subject in the previous

21  paragraph in maybe a more balanced fashion.  I guess, I mean

22  I'm not concerned about the charge because it talks about

23  bias for or against the defendant so I guess it does add

24  something new.  But the balance of the charge seems -- the

25  rest of the charge has some balance to it.

1          THE COURT:  So do you want it out?  Is that the

2   bottom line?

3          MR. AGNIFILO:  No.  Give me -- let me just -- give

4   me one second.

5          THE COURT:  Okay.  I think if anything it helps.

6          MR. AGNIFILO:  Yeah, I agree.

7          MR. BRAFMAN:  We'll leave it in.

8          MR. AGNIFILO:  I've been overruled, which is why I

9   walked over.

10          THE COURT:  All right.  What else?

11          MR. AGNIFILO:  Nothing else in that section.

12          THE COURT:  Charge Twelve.

13          MR. AGNIFILO:  We're good on Charge Twelve.

14          MS. KASULIS:  Same for the government.

15          THE COURT:  Charge Thirteen.

16          MR. AGNIFILO:  My only concern with Charge

17   Thirteen, I know it's a typical charge, but the only witness

18   who testified who's a government witness was the FBI agent,

19   and I certainly didn't do anything to attack his credibility

20   as being biased for the government.  And so I'm concerned

21   that at the sentence in the middle of the page there on 13,

22   it is common for defense counsel to try to attack the

23   credibility of the witness employed by the government.  I

24   think had I done than, that would be relevant, but I think

25   that everyone would agree that I didn't even come close to

Proceedings                                  5081

1    that.

2          THE COURT:  I think that that was a placeholder

3    that we put in, but I'll hear from Mr. Kasulis if she feels

4    that you didn't attack his credibility.

5          MS. KASULIS:  With respect to the summary charts,

6    Your Honor, I do think that there was some cross examination

7    about the way in which Agent Braconi prepared the charts and

8    I anticipate there may be some argument in the summations

9    regarding that issue, and so we believe that this

10   instruction should be given to the jury.

11          (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                      5082

1          MR. AGNIFILO:  If I could, I don't disagree with

2    the characterization.  I did challenge him on the chart.  But

3    I didn't challenge him because his testimony was colored by a

4    personal or professional interest in the outcome of the case.

5    I think that's what -- I would have asked him the same

6    questions if he was an accountant.

7          THE COURT:  I think you went there because you said,

8    "How long have you been working on this case?"  He said, Four

9    years."  Basically creating a sense that he does have a

10   professional stake in the outcome.

11         MR. AGNIFILO:  I certainly, I certainly -- I thought

12   I was actually going in the other direction and I was trying

13   to convey to the jury -- listen, I think that -- not just

14   because he's standing behind me -- he is a responsible

15   credible FBI agent and suggesting anything else to the jury is

16   not in my interest.  So I thought I could cross-examine him on

17   the mere fact of how he made the chart, without suggesting,

18   which I didn't even come close to, you made the chart this way

19   because you're a Government employee, I didn't come close to

20   doing that.

21         I guess the word "attack," that's really what got my

22   attention, that I'm attacking the credibility.  Sometimes I do

23   attack the credibility of a few of the Government witnesses; I

24   certainly didn't --

25         THE COURT:  Should we say "question" the

```
                        Proceedings                     5083
```

1   credibility.

2          MR. BRAFMAN:  We questioned the fact that the chart

3   didn't consider certain facts.  It wasn't a witness who's had

4   personal credibility in the eyes of the jury.  It's a question

5   of how he went about doing this.  He admitted that he didn't

6   consider Retrophin when he valued, when he prepared the

7   charts.  This wasn't a hostile cross.

8          MS. KASULIS:  I think your Honor correctly noted

9   that Mr. Agnifilo, whether it was his attention or not, did

10  highlight the fact that Special Agent Braconi has been working

11  on this case for over four years as one of the case agents.

12  It's clear that they were attacking the way in which he

13  prepared the charts.  I'm sure we'll hear more on summation on

14  Thursday and we think this is an appropriate instruction.

15         MR. AGNIFILO:  Just to round out, I'm asking your

16  Honor to remove the sentence.  If your Honor doesn't want to

17  remove the sentence, I ask that we take out "attack," because

18  I think that has connotations that were very much inconsistent

19  with my cross-examination.  But if your Honor wants to put in

20  "question" that would be okay.

21         THE COURT:  We will opt for leaving it in and

22  substituting the word "question" for "attack."

23         MR. AGNIFILO:  Okay.

24         THE COURT:  Charge 14?

25         MR. AGNIFILO:  We're fine with 14.

```
                        Proceedings                      5084
```

1           MS. KASULIS:  Same for the Government.

2           THE COURT:  Fifteen?

3           MR. AGNIFILO:  Fine.

4           MS. KASULIS:  Same.

5           THE COURT:  Sixteen?

6           MR. AGNIFILO:  Fine with 16.

7           MS. KASULIS:  Same.

8           THE COURT:  Seventeen?

9           MR. AGNIFILO:  One second.

10          THE COURT:  Did you remove Mr. Greebel's name from

11  seven?

12          MR. SRINIVASAN:  I think we did.

13          MS. KASULIS:  We should look at that.  That was with

14  respect to Mr. Greebel's motion.  We'll go back and confirm.

15          THE COURT:  In terms of --

16          MS. KASULIS:  Removing Mr. Greebel entirely from the

17  Indictment.

18          THE COURT:  Just paragraph seven which says,

19  Mr. Shkreli together with Mr. Greebel and others were involved

20  in this -- I have the language here, it was objectionable.  I

21  think the Government had conceded that it would be willing to

22  remove it from the Indictment that would go to the jury.

23          MS. KASULIS:  Yes, your Honor.

24          THE COURT:  It reads that, "The defendant, Martin

25  Shkreli, together with the defendant, Evan Greebel, and others

Proceedings                              5085

1    orchestrated four interrelated fraud schemes."  I think you

2    were going to remove the words "with the defendant Evan

3    Greebel and," those words.

4              MS. KASULIS:  Yes, your Honor, we can go ahead and

5    do that.

6              MR. AGNIFILO:  On charge 17 considering only this

7    defendant, I'm looking on page 26, it's the last paragraph.

8    My concern is in a conspiracy, the charge is absolutely

9    correct, that the jury is not being asked whether any other

10   person has been proven guilty, but it seems to be somewhat

11   inconsistent with the notion of a conspiracy.  So maybe

12   just --

13             THE COURT:  Delete that first sentence?

14             MR. AGNIFILO:  Yes, I think that will do it.

15             THE COURT:  Okay.  I think that's acceptable.  We

16   will delete the first sentence of the last paragraph of the

17   charge in number 17.

18             Charge 18?

19             MR. AGNIFILO:  Approximate dates is fine.

20             MS. KASULIS:  Same.

21             THE COURT:  Did my clerk be give you some proposed

22   other charges regarding non-prosecution agreements?  I think

23   we were going to just, there is a charge for that and we

24   weren't sure whether to put it in given that this did come up.

25   I'll have my clerk give you the charge so we can have it and

Proceedings                                        5086

1   weigh in on it; A, whether it should be given at all; and B,

2   whether you want proposed changes to it.

3           MR. AGNIFILO:  One other thing on page 26, it might

4   be rendered moot by the way we're changing the Indictment, it

5   talks, maybe five lines down, on page 26, certain persons were

6   named as co-conspirators but not indicted.  I'm not sure if at

7   the end of the day we're going to have people named as

8   co-conspirators in the new Indictment.

9           MS. KASULIS:  We will be calling them

10  co-conspirators.

11          MR. AGNIFILO:  Right.  But it's what is in the

12  Superseding Indictment.

13          THE COURT:  What are you objecting to, sir?

14          MR. AGNIFILO:  I'm objecting to this part here where

15  it says, "or that certain persons were named as

16  co-conspirators but not indicted."  They can call people

17  co-conspirators in summation, but naming them co-conspirators

18  seems to refer to something in the Superseding Indictment.  So

19  my question was, the reason I'm jumping the gun a little bit,

20  I don't know what the changed Superseding Indictment is going

21  to look like at the end.  If they still have people named as

22  co-conspirators in the Indictment that's given to the jury,

23  we're going to object to that.  So if we're going to object to

24  that, we object to this portion of the charge.

25          MS. KASULIS:  So your Honor, I do believe in the

```
                         Proceedings                    5087
```

1    Indictment we do when we substitute co-conspirator one, for

2    example, we then do include the name of the individuals.

3              THE COURT:  And you will identify those people as

4    co-conspirators?

5              MS. KASULIS:  I believe it's, conspired with certain

6    individuals, so we believe this is appropriate.

7              THE COURT:  It will be appropriate once you revise

8    the Indictment.

9              MR. AGNIFILO:  I'm not clear.  You're going to say

10   so Shkreli conspired with a person's name, Mulleady for

11   instance?

12             MS. KASULIS:  Correct.  Do you want to take a look

13   at the Indictment then we can revisit the issue?

14             MR. AGNIFILO:  Let's do that.  I might come back to

15   this or I might not.

16             THE COURT:  So I think the proposed instruction

17   regarding non-prosecution agreement witnesses would fit here

18   before we get into the charges.

19             MR. BRAFMAN:  Yes.  And we request that your Honor

20   give -- we were handed a copy by your clerk, your Honor.

21             THE COURT:  Okay.

22             MS. KASULIS:  It's fine, your Honor.

23             THE COURT:  We'll add that maybe at the end of this.

24             MR. BRAFMAN:  What page would that be?

25             THE COURT:  We'll probably call it Instruction 19 on

Proceedings                                5088

1   page 27, at the end before we move on to the charges.  Is that

2   all right?

3           MR. AGNIFILO:  That's fine, Judge.

4           THE COURT:  Are we ready to move on to the charges?

5           MS. KASULIS:  Yes.

6           MR. AGNIFILO:  Yes.

7           THE COURT:  Page 27, the introduction of the

8   Superseding Indictment.

9           MR. AGNIFILO:  I'm fine on 27.

10          MS. KASULIS:  Same.

11          THE COURT:  Page 28?  Page 29?

12          MR. AGNIFILO:  I was on 28, the first line of 28.

13  It says, "Shkreli was not charged with crimes," can it be

14  "with acts"?  I feel like crimes, there is a conclusion that

15  these other things are in fact crimes.

16          THE COURT:  Substitute the word "acts" for "crimes"?

17          MR. AGNIFILO:  Yes, that's our request.

18          MS. KASULIS:  Your Honor, could you give me one

19  moment?

20          Your Honor, the only concern with doing that, it

21  sounds like unless it is specifically listed in the Indictment

22  that then they are not to consider any acts outside of the

23  Indictment.  There are, for example, overt acts or certain

24  e-mails and statements made.  So I'm a little concerned

25  about -- your Honor's instruction is always about, he's not

Proceedings                                          5089

1    charged with a crime in connection with this or that.  I'm

2    concerned changing that to acts will give the impression to

3    stay within the four corners of the Superseding Indictment in

4    their consideration of the evidence.

5           MR. AGNIFILO:  My concern only is that we don't

6    really know that all these things are in fact crimes.  Like

7    for instance, there was, your Honor instructed the jury,

8    Mr. Shkreli is not charged with, I think making

9    misrepresentations or anything in regard to Merrill Lynch;

10   that may be a crime, or may not be crime.  I don't want the

11   instruction to suggest that these different things that the

12   Court asked them to consider are in fact crimes in the

13   judgment of the Court which is why -- I understand the

14   Government's concern.  I'm trying to figure out a way of

15   getting us both what we want.

16          MS. KASULIS:  I think the sentence before it states,

17   "You have heard evidence of other acts allegedly committed by

18   the defendant when such evidence was introduced.  And I

19   instructed you that Mr. Shkreli was not charged with crimes

20   not listed in the Superseding Indictment.  So I mean that --

21          THE COURT:  How about if I say, "When such evidence

22   was introduced, I instructed that Mr. Shkreli was not charged

23   or that those acts were not charged in the Indictment," or

24   something like that.

25          MS. KASULIS:  Not charged as separate crimes in the

```
                        Proceedings                    5090
```

1   Indictment.

2          MR. AGNIFILO:  How about this, how about, well, I

3   guess we have to say what your Honor is doing here is you're

4   reminding them of what you previously instructed them.  So I'm

5   trying to remember exactly what you said; that's really what

6   you're doing here.  I'm trying to remember how your Honor

7   instructed them on those points.

8          THE COURT:  I think the main point was to tell the

9   jury that he's not charged with this in the Indictment, it's

10  not charged conduct.

11         MR. AGNIFILO:  Right, right.

12         THE COURT:  With those acts, with such acts in the

13  Superseding Indictment.

14         It says, "You have heard evidence of other acts

15  allegedly committed by the defendant.  When such evidence was

16  introduced I instructed you that Mr. Shkreli was not charged

17  in the Indictment."

18         MR. AGNIFILO:  "With such acts."

19         THE COURT:  "With such acts."

20         MR. AGNIFILO:  That would seem to link the acts to

21  the prior concept, which I think helps the Government with

22  their concern.

23         MS. KASULIS:  I think your Honor's instruction was

24  with respect to crimes that they are not charged as separate

25  crimes.

Proceedings                                    5091

1          THE COURT:  Yes.

2          MS. KASULIS:  I don't want to confuse the jury again

3    to just exclude entirely a consideration of an admissible

4    statement or evidence because --

5          THE COURT:  I think what this tells the jury is,

6    look, the crimes at issue here are the ones charged in the

7    Indictment.  And that's it.  I did tell the jury that those

8    particular acts were not charged in the Indictment, right?

9          MR. AGNIFILO:  Right.  But they could be not charged

10   in the Indictment because they are not crimes.  My concern is

11   something from the Court that calls them crimes, because they

12   may not be crimes.  I think "such acts," I think "such acts"

13   gets us where we need to be, because in context it makes

14   sense.

15         You previously said, "You have heard evidence of

16   other acts allegedly committed by the defendant.  When such

17   evidence was introduced I instructed you that Mr. Shkreli was

18   not charged with such acts as crimes."

19         THE COURT:  No, with such acts in the Superseding

20   Indictment.  I think that's enough.

21         MR. AGNIFILO:  I think that's right.  I think "such

22   acts" makes it clear.

23         THE COURT:  Is that all right?  It will read, in

24   relevant part, that "Mr. Shkreli was not charged with such

25   acts in the Superseding Indictment."

Proceedings                                      5092

1            MR. AGNIFILO:  That's fine.

2            MS. KASULIS:  "With such acts in the Superseding

3     Indictment."

4            THE COURT:  It refers back to the prior sentence.

5            MS. KASULIS:  Okay.

6            THE COURT:  What else?

7            MR. AGNIFILO:  Nothing else on 28.

8            THE COURT:  Page 29?

9            MS. KASULIS:  Just so we're clear, our next

10    modification is on page 36.

11           THE COURT:  What about you, Mr. Agnifilo?

12           MR. AGNIFILO:  I don't have anything on 29.  I don't

13    have anything on 30.  31, no.

14           I have a lot of scribbling on 35, let me see if I

15    can make sense of it.  My first concern on page 35 under

16    devise, scheme, or artifice to defraud.  "A devise, scheme, or

17    to defraud is merely a plan for the accomplishment of any

18    objective."  My concern with that is, we're not just talking

19    about a devise, scheme, or artifice; we're talking about a

20    devise, scheme, or artifice to defraud.  What I'm proposing is

21    a devise, scheme, or artifice to defraud is a plan to

22    accomplish a fraud.  Then you go on to define fraud.

23           THE COURT:  Any objection, Ms. Kasulis?

24           MS. KASULIS:  I think that's fine.

25           MR. AGNIFILO:  Okay.  Then the end of the last full

Proceedings                                    5093

1    paragraph, the last sentence of the last full paragraph.  I

2    tried put in an active voice, I'm hoping that I do it in a way

3    that makes sense.

4           It starts with, "The concealment of material facts

5    in a manner."  So the way it reads now, "The concealment of

6    material facts in a manner that makes what is said or

7    represented deliberately misleading may also constitute false

8    or fraudulent statements under the statute."  My proposed

9    change is, "You may also find an omission" -- wait one second.

10   "You may also find an omission to be fraudulent if the

11   omission is of a material fact, and if it causes what is said

12   or represented to be deliberately misleading," I'm trying to

13   put in an active sense.  Because I'm concerned, I read it a

14   few times.  I think your Honor is being more faithful to the

15   10(b)(5) statute with the way it's written.  I think it's

16   written in a passive voice.  But I think it's awfully hard to

17   follow.

18          MS. KASULIS:  Your Honor, this is the standard

19   instruction.

20          THE COURT:  I'm a little concerned about veering too

21   far from the statutory language.  I suppose we could put the

22   sentence structure, false or fraudulent statements under the

23   statute include or may include the concealment of," blah,

24   blah, blah.  Does that work?  That's a little more -- but I

25   don't want to stray from the --

Proceedings                                          5094

1          MR. AGNIFILO:  Because what the idea is obviously,

2     it's a material concealment if it makes what is actually said

3     or represented deliberately misleading.  So as long as that is

4     clear, I don't really care how we get there.  I put in an

5     active voice to bring that about.  I do acknowledge that the

6     way your Honor has it is more faithful to the way 10(b)(5) is

7     actually written.

8          MS. KASULIS:  Your Honor, we would like to maintain

9     this language.  I think it is most faithful to the statute.

10          THE COURT:  God forbid I create more confusion among

11     the jury.  And it's already difficult to comprehend the

12     statute, I think the least I stray the better.

13          MR. AGNIFILO:  Yes.

14          THE COURT:  We'll leave that as is.

15          What else, Counsel?  I believe the Government had

16     something on page 36?

17          MS. KASULIS:  For page 36 just at the very bottom,

18     your Honor, I think sale of "stock" should be sale of

19     "securities."

20          THE COURT:  You're right.

21          MR. AGNIFILO:  That's fine.

22          THE COURT:  Anything else?  Page 37?

23          MR. AGNIFILO:  On 37 all I have is second line from

24     the bottom, rather than "once you find," "if you find."

25          THE COURT:  Okay.  What else?

```
                      Proceedings                    5095
```

1           MR. AGNIFILO:  Nothing else there.  Thirty-eight,

2   I'm okay.

3           MS. KASULIS:  Me too.

4           THE COURT:  Page 39?

5           MR. AGNIFILO:  I'm okay on 39.

6           THE COURT:  Forty?

7           MR. AGNIFILO:  I'm okay on 40.

8           MS. KASULIS:  Same.

9           THE COURT:  Forty-one?

10          MR. AGNIFILO:  Forty-one, my understanding of the no

11  ultimate harm charge, let me back up.

12          So the *Rossomando* decision has the charge I think

13  the way it's written here.  Then after *Rossomando* there is

14  *Berkovich*, it's not in front of me, but the case that follows.

15          THE COURT:  *Berkovich*.

16          MR. BRAFMAN:  And *Berkovich* says that, the Second

17  Circuit in *Berkovich* said that the no ultimate harm charge was

18  appropriate in *Berkovich* because the *Berkovich* iteration added

19  certain things to the *Rossomando* iteration.  What it added was

20  two things.  The first thing -- I'll let your Honor get there.

21          THE COURT:  I have it.  I'm looking at the case.  Go

22  ahead.

23          MR. AGNIFILO:  Okay.  So at the end of the second

24  full paragraph your Honor has the sentence, "No amount of

25  honest belief on the part of the defendant that the scheme

Proceedings                                          5096

1    ultimately will make a profit for the investors will excuse

2    fraudulent actions or false representations by him."  I think

3    the language that *Berkovich* says that we should include after

4    that is "to obtain money or property."  The sentence would be,

5    "will excuse fraudulent actions or false representations by

6    him to obtain money or property."

7              MS. KASULIS:  We're just looking at the case.

8              MR. SRINIVASAN:  Your Honor, I'm looking at the

9    *Finazzo* decision.

10             THE COURT:  We have it in the *Finazzo* decision.

11             MR. SRINIVASAN:  What the Court clarified, the no

12   ultimate harm instruction was appropriate especially where the

13   District Court clarified immediately after that the Government

14   was still required to establish that the defendant engaged in

15   an alleged fraudulent scheme for the purpose of causing some

16   loss to another.  And the Court, I think the Second Circuit,

17   specifically approved that type of instruction.  So I think

18   that language --

19             THE COURT:  Let's just focus on, you're looking at

20   the decision at page 108?

21             MR. AGNIFILO:  You're talking about *Finazzo*, Judge?

22             THE COURT:  Yes.  And the instruction, is that the

23   one you're focusing on?

24             MR. SRINIVASAN:  Yes, your Honor.

25             MR. AGNIFILO:  I think what happened, I spent a lot

Proceedings                                          5097

1    of time trying to figure this out.  I think what happened in

2    *Finazzo*, the defense counsel objected to the charge in toto.

3    But what they didn't do in *Finazzo*, is bring the Court back to

4    *Berkovich*.  I think *Berkovich* is pretty clear, to say that

5    this is the totality of the charge and what it should be and

6    why it was upheld in *Berkovich*.  So I think if the *Berkovich*

7    charge is not in *Finazzo*, it's because I don't think the

8    defense lawyer thought to tell the Judge, the Second Circuit

9    in *Berkovich* has basically said that with the absence of this

10   other additional language the charge is improper.  Because

11   that's my reading of the *Berkovich* decision.

12          The *Berkovich* decision, I think, takes some pains to

13   say that the charge that was given by the trial Court in

14   *Berkovich* is inappropriate charge because it added certain

15   things that was not in the charge in *Rossomando*.  I think in

16   addition to whatever factual distinction there is between

17   *Rossomando* and *Berkovich*, there is a distinction between the

18   contents of the charge.  I think the Second Circuit in

19   *Berkovich* is pretty clear.

20          I think what Mr. Srinivasan's point is, some of the

21   threads didn't necessarily continue to the present into

22   *Finazzo*.  But I think that is more because of the way the

23   charge was litigated at the respective charge conference.

24   There is no indication in the record that the defense lawyer

25   in *Finazzo* wanted this additional language, the *Berkovich* type

Proceedings                                                5098

1   language which we're specifically requesting.  And I don't

2   know of any Second Circuit decision since *Berkovich* that backs

3   away from the proprietary of the additional language.  If I

4   remember right, I think the Circuit italicizes the language in

5   *Berkovich*.  And says that is the difference between the charge

6   in *Berkovich* and the charge in *Rossomando*.

7             THE COURT:  The concept is about deprivation of

8   money or property in the *Finazzo* case.  The instruction, which

9   is at page 108 says, "In order to prove a scheme to

10  defraud" -- and this is regarding the wire fraud, "In order to

11  prove a scheme to defraud, the Government must prove that the

12  alleged scheme contemplated depriving another of money or

13  property.  Property includes intangible interest such as the

14  right to control the use of one's assets.  This interest is

15  injured when a victim is deprived of potentially valuable

16  economic information it would consider valuable in deciding

17  how to use its assets.  To act with intent to defraud, means

18  to act knowingly and with a specific intent to deceive for the

19  purpose of causing some financial or property loss to

20  another."

21            Then the Circuit says, "These instructions are

22  consistent with our prior decisions and therefore not

23  erroneous."  They do propose, I guess in one of these

24  footnotes, an alternative instruction that might not -- well,

25  I won't comment on whether I think it's a good one.

Proceedings                                    5099

1          MR. SRINIVASAN:  Your Honor, if we could make a

2    proposal I think on page 69 of your charge, this is another

3    iteration of the no ultimate harm instruction.  Sorry, page

4    70.  "I reiterate, however, that an intent to defraud for

5    purposes of the wire fraud statute means to act knowingly and

6    with specific intent to deceive with the purpose of financial

7    loss or property loss to another."  I think putting that back

8    on page 41.

9          THE COURT:  Okay.  So I'll copy that and just put it

10   on page 41.  It will just say an intent to defraud, okay?

11         MR. AGNIFILO:  I'm sorry?

12         THE COURT:  So on page 70, at the bottom of the

13   first partial paragraph, the last sentence, it starts with, "I

14   reiterate however."  What we'll do is copy this and will

15   state, "An intent to defraud for the purpose of the wire fraud

16   statute means," et cetera, that will copied and pasted into

17   the instruction on page 41.  Right?

18         MR. AGNIFILO:  I understand what your Honor is

19   doing, I'm trying to compare that language.

20         My concern is I'm reading from the *Berkovich* case,

21   where the Court specifically cites this portion of the

22   instruction.  The instruction in the *Berkovich* case

23   specifically includes the language "to obtain money or

24   property" after the sentence "no amount of honest belief on

25   the part of the defendant that the scheme ultimately will make

Proceedings                               5100

1    a profit for the investors will excuse fraudulent actions or

2    false representations by him," that's not where the charge in

3    *Berkovich* ends, because it goes on to say, "to obtain money or

4    property."

5           So our request in regard to page 41, is that your

6    Honor use the charge in *Berkovich* exactly as it was in

7    *Berkovich*.  And there is two different places, so this is the

8    first place where the Court's charges proposed doesn't fully

9    reflect the charge given in *Berkovich*.

10          MS. KASULIS:  Your Honor, I think *Finazzo* again

11   post-dates this case and makes clear if your Honor inserts the

12   language that we discussed after this section that it

13   satisfies the most recent Second Circuit precedent regarding

14   this no ultimate harm charge.

15          MR. AGNIFILO:  *Finazzo* is not a published decision.

16   There is nothing that is cut back.  I think *Berkovich* is clear

17   as a bell.  It's specifically says, the decision of *Berkovich*

18   specifically says --

19          THE COURT:  My clerk points out that *Berkovich* was a

20   mail fraud case.  The money or property language may be

21   necessary for mail and wire fraud, but what this charge is

22   addressed to is securities fraud, which does not require

23   intent to cause loss under *U.S. Versus Litvak*.  Which is, I

24   think, why we did talk about this distinction and why we

25   didn't put it in.  Unless you think it's a different --

Proceedings                                    5101

1        MR. AGNIFILO:  I, I quite frankly hadn't thought of

2   the distinction between securities fraud and mail fraud until

3   you brought it up.

4        THE COURT:  You want to think about it for five

5   minutes?

6        MR. AGNIFILO:  Not a bad idea.

7        THE COURT:  Do you want us to print the *Litvak* case

8   for you?  Let's take five minutes and you'll think about it.

9   All right, that's fine, five minutes.

10       MR. BRAFMAN:  Your Honor, Mr. Agnifilo is handling

11  the part of the charge.  I feel comfortable asking your Honor

12  if I could be excused, and Mr. Shkreli has asked to come with

13  me, we have issues to discuss.  He will waive his appearance

14  with matters related to the charge, and tomorrow you can

15  indicate on the record that we've reviewed it with him and

16  that he feels comfortable, if you wish.  But there would be no

17  issue.  He has been excused with me.  It has a lot to do with

18  respect to the summation.

19       THE COURT:  All right.  Well, I'm happy to grant

20  your joint request to be excused.

21       As you know, Mr. Shkreli, you have a right to be

22  here.  It is often times the case the defendants don't come to

23  the charging conference.  And so absolutely you have the right

24  to be here.  You also have the right to be excused with your

25  lawyer and prepare for tomorrow if you wish.

```
                        Proceedings                   5102
```

1          Have a nice day.  I'll see you at nine.

2          MR. BRAFMAN:  Thank you very much, your Honor.

3               (Whereupon, Mr. Brafman and Mr. Shkreli were

4          Excused.)
           MR. AGNIFILO:  What we're trying to do, I think your
5     Honor, and the clerk made a good point, how the no ultimate

6     harm charge would apply to a crime that has no loss as an

7     element.  We're trying to go through the Second Circuit

8     decisions that liken to securities fraud, how it is handled.

9     United States V. Lange 834 F3d 58 from 2016, we have the added

10    benefit that AUSA Smith tried it.  So the decision doesn't

11    give us enough information of how the charge was worded.

12    We're trying to pull up.

13         MS. KASULIS:  We're trying to pull up the actual

14    jury instruction.

15         MR. AGNIFILO:  I think part of the issue there was

16    securities fraud and wire fraud, but we also have that here.

17         THE COURT:  But the instructions I'm sure were given

18    for each separate count, right?

19         MS. KASULIS:  That's what we're pulling up.

20         (Continued on next page.)

21

22

23

24

25

Proceedings                    5103

1           THE COURT:  This issue was whether Mr. Haywood was

2    an employee of Retrophin, and we had seen something that was

3    signed by an individual as comptroller of Retrophin, but it

4    was not Mr. Haywood.  It was Mr. Harrison.

5           MR. AGNIFILO:  Okay.

6           THE COURT:  So I wanted to be corrected.  But

7    nonetheless, my ruling would remain the same.

8           MR. AGNIFILO:  That's fine.  Thank you, Judge.

9           And just for the record, since we're on the

10   record, we -- I think both parties are fine with this

11   additional instructions, proposed instruction regarding

12   Defendant's duty, if any, to disclose settlements and

13   consult the opinions to the board.

14          THE COURT:  All right.  And that will be inserted

15   in instruction for Count 7 for the conspiracy to commit wire

16   fraud.

17          MS. KASULIS:  Yes.

18          MR. AGNIFILO:  Okay.

19          THE COURT:  All right.  Were there any

20   modifications to the language or were you all --

21          MR. AGNIFILO:  It seems fine with us.

22          MS. KASULIS:  No, Your Honor, I think we're both

23   in agreement.

24          THE COURT:  So have you straightened out your

25   issues with regarding the conspiracy the commit securities

Proceedings                               5104

1   fraud?

2           MR. AGNIFILO:  Well, here's -- all right.  There

3   are a few issues that I think are all combining around the

4   no ultimate harm charge.  Your Honor gives the charge twice,

5   and Your Honor gives the charge twice, I think, because you

6   give it once in the securities fraud context and you give it

7   once in the wire fraud context.

8           THE COURT:  Yes.

9           MR. AGNIFILO:  I think Your Honor and your staff

10  make a very good point in the securities fraud context, and

11  quite frankly, I haven't considered that.  And I'm still

12  trying to think through as to whether the no ultimate harm

13  charge has to necessarily be reflective of the elements of

14  the crime, but putting that aside, in -- and I know I'm

15  jumping the gun by going to Page 70, but it all comes

16  together in the charge.

17          The no ultimate harm charge, I think, in the wire

18  fraud context, it's my position is within a purview of the

19  *Berkovich* decision, and that added language in the *Berkovich*

20  decision.  So while I think the Court makes a good point,

21  that wire fraud -- because wire fraud involves the

22  contemplated depravation of property, whereas securities

23  fraud does not, I think the no ultimate harm charge in the

24  wire fraud context should contain the additional language,

25  by him to obtain money or property.  And then at the end of

Proceedings                                    5105

1    the case paragraph -- and I know I'm jumping -- I'm jumping

2    around -- for the purpose of causing some loss...

3           So then -- and I don't know what Your Honor's

4    going to do with that.  My concern is that we might have two

5    somewhat different no ultimate harm charges, one -- and

6    maybe that's okay.

7           MS. KASULIS:  I think --

8           THE COURT:  I think we have to --

9           MS. KASULIS:  Yeah.

10          THE COURT:  -- because it's a terminal statute --

11          MR. AGNIFILO:  Yeah, yeah.

12          THE COURT:  -- in the wire.

13          We can tweak the no ultimate harm charge with

14   regard to the wire fraud conspiracy, Count 7, but I think

15   that's where it is.

16          MS. KASULIS:  And, Your Honor, with respect to the

17   way in which Your Honor charged the no ultimate harm, he --

18   with respect to the wire fraud charge in *Finazzo*, it does

19   cite *Berkovich*.  And Your Honor's current reiteration of the

20   no ultimate harm instruction is consistent with the way in

21   which the Court charged this instruction in *Finazzo*.  And so

22   we think this is the correct reiteration of this

23   instruction.  And again, it addresses Mr. Agnifilo's concern

24   about making sure that it's looping back to the purpose as

25   to cause financial loss or property loss to another.

Proceedings                            5106

1          And so we think that the way in which Your Honor
2     has instructed with respect to the wire fraud charge
3     regarding the good faith instruction is the most consistent
4     with recent Second Circuit precedent that does, in fact,
5     cite back to the case that Mr. Agnifilo is relying on from
6     1999.
7               MR. AGNIFILO:  My concern is twofold.  One I
8     don't -- I don't know what the defense attorney's
9     specifically asked for in *Finazzo*.  I don't know that they
10    specifically asked for what I'm sort of referring to as the
11    *Berkovich* language.
12              I do know, and I don't know what significance this
13    has *Finazzo* is not a published decision, it's a thoughtful
14    decision by the Second Circuit, certainly, not a published
15    decision.
16              And my concern also with *Berkovich* is -- and I'm
17    just going to read off Page 67.
18              THE COURT:  May I just ask you a for direct
19    question?
20              MR. AGNIFILO:  Okay.
21              THE COURT:  What is it about the instruction on
22    Page 70 that doesn't capture what you want, which is the
23    intent to cause financial loss or property to another.
24              Why is that not in your view sufficient?
25              MR. AGNIFILO:  Let me -- it's a very good and very

Proceedings                    5107

1    direct question.  Let me see if I can give a good and direct

2    answer.  Okay.  The reason I think it doesn't capture it, is

3    because -- it comes close.  But here's, I think, what the

4    distinction is:  The distinction seems to be -- and I'm

5    really not doing anything that Court I think in *Berkovich*

6    didn't do already is to say that baked into the concept,

7    part of the very concept of sort of the no ultimate harm

8    instruction, at least in the wire fraud context, is the very

9    notion that the false representation must be part -- related

10   to obtaining money or property, which is why they actually

11   added to the instruction.  Not a different instruction but

12   an actual continuation of the sentence.

13            And I think that's significant.

14            And then what Your Honor doesn't have on Page 70

15   which Your Honor does have on Page 41 is that second

16   paragraph where it talks as a practical matter; Your Honor

17   does have it on Page 41 -- let me just double-check.  I'm

18   pretty sure you do.

19            THE COURT:  I do.

20            MR. AGNIFILO:  Yeah, so the way it reads in

21   *Berkovich* and I'll read the whole thing:  As a practical

22   matter, then, in order to sustain the charges against the

23   defendant, the Government must establish beyond a reasonable

24   doubt that he knew that his conduct as a participant in the

25   scheme was calculated to deceive and nonetheless he

Proceedings                                5108

1   associated himself with the alleged fraudulent scheme for

2   the purpose of causing some loss to another.

3          So that's the whole charge in *Berkovich*.  And what

4   *Berkovich* says and I'm quoting *Berkovich* now on Page 67,

5   Unlike *Rossomando*, the instruction here clearly informed the

6   jury that they could not convict appellant unless he

7   intended to cause loss to someone.  That this instruction

8   immediately followed the no ultimate harm language also

9   reduces the impact of that language.  And then they go on to

10  say, The possibility of confusion that troubled us in --

11  that troubled us in *Rossomando* was therefore greatly reduced

12  by this proper restatement of the law.

13         Now I don't know that in the series of no ultimate

14  harm cases that's changed since *Berkovich* that the issue

15  would necessarily press.  I mean so, for instance, in the

16  *Finazzo* decision I don't see any reference in the decision

17  that the defense attorney asked for this *Berkovich* language

18  and was denied.  It sounds like -- what people tend to do is

19  to object to the no ultimate harm charge as an improper

20  charge.  And by this point it seems pretty clear that the

21  Second Circuit has deemed it to be a proper charge given it

22  and okayed it in a number of cases.

23         I do note -- I don't think any other circuit's

24  ever given or endorsed the no ultimate harm charge, at least

25  I checked, I couldn't find the no ultimate harm charge in

Proceedings                                    5109

1    any other circuit.

2           That being the case, we're in the Second Circuit

3    and the Second Circuit seems pretty firm that it is an

4    appropriate charge.

5           So I think what happened in the *Finazzo* case is

6    the defense attorney is probably so concerned with trying to

7    keep the whole charge out, which I don't really have a good

8    faith argument to do in the Second Circuit, quite frankly,

9    that they weren't necessarily as concerned with the actual

10   iteration of the charge.

11          So I don't know that *Finazzo* somehow repudiates or

12   supersedes or disposes with *Berkovich*.  I think *Berkovich* is

13   still the law of the circuit.  So that's my -- that's my...

14          THE COURT:  You say it's unrecorded decision,

15   *Finazzo*.

16          MR. AGNIFILO:  I didn't have it as a recorded

17   decision.  It may be recorded since then.

18          MS. KASULIS:  Yeah, it was.

19          THE COURT:  One is more like a summary order but

20   the decision we've been relying on was reported 850 F.3d 94.

21          MR. AGNIFILO:  Then I stand corrected.  When I

22   checked in out on *Westlaw* I couldn't find a reported -- it

23   reported.

24          THE COURT CLERK:  That is not reported.  The

25   decision you referring to for *Berkovich* I believe is

Proceedings                              5110

1   unreported.  There are two different sections.

2            MS. KASULIS:  Got it.

3            MR. AGNIFILO:  Okay.

4            MS. KASULIS:  Got it.

5            MR. AGNIFILO:  All right.  So just by way of

6   clarification, just so I understand what I'm saying, so

7   there's a reported decision and unreported decision but the

8   unreported decision is the one that refers to *Berkovich*.

9   Okay.  That's the way I understand it.  Thank you.

10           THE COURT:  The other distinction, I think, in

11  Count 7 we have a conspiracy to commit wire fraud whereas

12  *Berkovich* was a substantive wire fraud count.  So it is a

13  different charge for a substantive charge and --

14           MR. AGNIFILO:  Well, but --

15           THE COURT:  Well, because the Government does not

16  have to prove beyond a reasonable doubt every element of the

17  underlying substantive charge.  What they have to prove is

18  conspiracy to commit wire fraud is the agreement to, you

19  know, the elements for the conspiracy.

20           MR. AGNIFILO:  But in a -- in a wire fraud

21  conspiracy there still has to be conspiracy that property

22  be -- if -- if -- if there's no agreement that property be

23  taken, I don't believe that would be conspiracy either.  I

24  think that for conspiracy to commit wire fraud there has to

25  be an agreement going in that property is wrongfully, you

Proceedings                    5111

1   know, taken from someone.  So I don't know that that ends up

2   changing the no ultimate harm analysis.

3            I mean, we strongly ask the Court for the language

4   in *Berkovich*, especially in regard to the wire fraud

5   iteration of the charge.  I think it's -- I think it's the

6   appropriate language.  I think in *Berkovich* the

7   Second Circuit is really being pretty explicit.

8            THE COURT:  If I understand you correctly what you

9   would like is for the last paragraph of 41 to be copied and

10  pasted into the charge that is at Page 70 with the words

11  added at the end of the sentence For the purpose of causing

12  loss to another, right?

13           MR. AGNIFILO:  So it's in two places.  So on

14  Page 41 at the end of the paragraph here, where it says The

15  investors will -- I'm sorry, Investors will excuse

16  fraudulent actions or false representations made by him to

17  obtain money or property.

18           MS. KASULIS:  That's for security fraud.

19           MR. AGNIFILO:  No, no, no that's right.

20           THE COURT:  What --

21           MR. AGNIFILO:  The question is the whole -- the

22  whole -- what I'm asking for *Berkovich* I understand that

23  the -- the Government wants it different for securities

24  fraud and I understand why they do.

25           But what I think I'm understanding from Your Honor

Proceedings                                          5112

1   is that it might be easier than -- let me give the whole

2   concept and then we can figure out where it goes.

3            So have that *Berkovich* language at the end of that

4   paragraph which is to obtain money or property, and then the

5   second paragraph be as a practical matter paragraph ends

6   with For the purpose of causing some loss to another.  I

7   mean that's language in *Berkovich*.  Yes, it literally is a

8   wire fraud case.  But that is our position as what's the

9   proper no ultimate harm charge is.

10           Certainly in a wire fraud case and --

11           THE COURT:  But you're importing into a securities

12   fraud case an element that is not required under

13   Second Circuit law.

14           MR. AGNIFILO:  Well, then I think what the answer

15   could be is that Your Honor has two no ultimate harm

16   charges.  You have one in the security context.

17           THE COURT:  It says --

18           MR. AGNIFILO:  That would not have the added

19   *Berkovich* language.

20           THE COURT:  Right.  That's what I was proposing.

21           MR. AGNIFILO:  Okay.

22           THE COURT:  The way I was proposing that you

23   read --

24           MR. AGNIFILO:  Uh-huh.

25           THE COURT:  -- *Berkovich* at Page 41 --

Proceedings                                    5113

1              MR. AGNIFILO:  Yep.

2              THE COURT:  -- the last paragraph that starts As a

3    practical matter, that is what you read from *Berkovich* with

4    the additional language at the sentence For the purpose of

5    causes loss to another, that will be transposed into the

6    charge for the conspiracy to commit wire fraud on Page 70 --

7              MR. AGNIFILO:  Okay.

8              THE COURT:  -- with the added, you know, For the

9    purpose of causing loss to another or for the purpose of

10   obtaining money or property, whatever you prefer.

11             But that last paragraph will be copied and pasted.

12   All right?

13             MR. AGNIFILO:  Right.

14             Okay.

15             THE COURT:  So does that make sense?

16             MR. AGNIFILO:  It does.

17             MS. KASULIS:  Yeah.

18             MR. AGNIFILO:  So now we're on Page 70.

19             MS. KASULIS:  Page 70.

20             MR. AGNIFILO:  So what Your Honor is going to have

21   on Page 70, a third of the way down, it's going to say, Make

22   a profit for investors will excuse fraudulent actions or

23   false representations caused by him to obtain money or

24   property.

25             THE COURT:  Well, if you want it there, that's

Proceedings                          5114

1   fine.

2          MR. AGNIFILO:  I think that's where it would go.

3          MS. KASULIS:  Is that the only issue?

4          THE COURT:  Is that all you want?

5          MR. AGNIFILO:  No, no, no that's one more thing.

6          THE COURT:  Okay.

7          MR. AGNIFILO:  I promise I'll get it.

8          THE COURT:  That's all right.  I will hold your

9   promise, but okay.

10          MR. AGNIFILO:  Okay.  I think what *Berkovich* is

11   saying is that it has to then be followed by that same As a

12   practical matter paragraph that Your Honor has on Page 41,

13   which we don't have on Page 70.

14          MS. KASULIS:  And can you read what paragraph

15   you're talking about?

16          MR. AGNIFILO:  Sure.  So now I'm reading from 41

17   As a practical matter then to prove the charge against the

18   defendant the Government must establish beyond a reasonable

19   doubt that the defendant knew that his conduct as a

20   participant in the scheme was calculated to deceive and

21   nonetheless he associated himself with the alleged

22   fraudulent scheme.

23          Now that's the way it reads on Page 41.

24          And I'll accept that in the securities fraud

25   context for the reasons we've discussed.

Proceedings                         5115

1          In the wire fraud context, you're going to want

2    the additional language in *Berkovich* that ends that

3    paragraph and I'll read what my proposal was With the

4    alleged fraudulent scheme for the purpose of causing some

5    loss to another.

6          And I'm getting that verbatim out of the *Berkovich*

7    decision.  And that would only be on Page 70 and not on 41.

8          MS. KASULIS:  Well, Your Honor, one of issues is

9    that it's also saying that we have to establish that beyond

10   a reasonable doubt and Your Honor correctly noted that in

11   the wire fraud context, this is a conspiracy charge.  So we

12   do not have to prove that beyond a reasonable doubt.  I

13   mean, Your Honor, again with respect to the language that

14   Your Honor has included, the language that was both upheld

15   in *Lange* recently and in *Finazzo* and I think it ain't broke.

16   I don't know why we're sort of trying to fix it to make it

17   inconsistent with what the recent Second Circuit law says is

18   a completely appropriate charge.

19          I'm just getting a little worried that we're

20   starting the sort of cobble something together that is not

21   really consistent at this point with recent Second Circuit

22   law.

23          MR. AGNIFILO:  I -- I've not seen a case that cuts

24   back on *Berkovich* and --

25          MS. KASULIS:  Well, it's cited to *Berkovich*.

Proceedings                          5116

1          MR. AGNIFILO:  And certainly not where a defense

2     attorney is specifically requesting this language.

3          MS. KASULIS:  And *Lange* also cites to *Berkovich*.

4     And with respect -- I mean, Mr. Agnifilo is speculating as

5     to what the attorneys in *Finazzo* did and did not argue.  In

6     that case, I can represent was a highly litigated case, both

7     with respect to depravation of money and property.

8          So I don't know, you know, again, I think it is

9     wholly speculative to say this issue was not focused on or

10    discussed as part of the litigation.

11         MR. AGNIFILO:  I'm only talking about what I'm

12    reading in the decision, obviously.

13         THE COURT:  Well, rather than include the language

14    about the Government having to prove beyond a reasonable

15    doubt the wire fraud, you know, if we are going to insert

16    some form of this into the conspiracy to commit wire fraud

17    count in Count 7, I think we can probably use language from

18    Page 41, which is from *Berkovich*, The defendant knew that

19    his conduct as a participant in the scheme was calculated to

20    deceive and nonetheless he associated himself with the

21    alleged fraudulent scheme for the purpose of causing loss to

22    another.  That part of the paragraph can be put into the

23    instruction for Count 7 without the language that the

24    Government must prove beyond a reasonable doubt that is so,

25    right?

Proceedings                                    5117

1          So...

2          MR. AGNIFILO:  But you're going to keep it in the

3     count on Page 41?

4          THE COURT:  Yes.

5          MR. AGNIFILO:  All right.  That's fine.

6          THE COURT:  We'll figure something out to just put

7     that language in and run it by you.

8          MR. AGNIFILO:  Okay.

9          THE COURT:  All right.  Could we just go back to

10    where we left off?  You said you also worked out other

11    issues, I think you said.  We were on Page 41.

12         MS. KASULIS:  Uh-huh.

13         THE COURT:  And I would like to hear whether

14    there's anything beyond Page 41 in addition to what we

15    discussed.

16         MS. KASULIS:  On Page 43 I think it's just a

17    typographical error.

18         THE COURT:  Uh-huh, sure.

19         MS. KASULIS:  It's an easy one.  In the first full

20    paragraph starting, It is not necessary.

21         THE COURT:  Yes.

22         MS. KASULIS:  It says that a defendant be directly

23    or personally involved in any e-mailing wire or use.  I

24    think this is supposed to be mailing wire or use because

25    it's the securities fraud.  I think it's just a typo because

```
                        Proceedings                    5118
```

1    the sentence before does make references to e-mail but it

2    also makes reference to mails or --

3            THE COURT:  Oh.

4            MR. AGNIFILO:  Okay.  That's fine just change

5    e-mails to mails.

6            MS. KASULIS:  Yes.

7            THE COURT:  Okay.  Anything else on Page 43?

8            MR. AGNIFILO:  No.

9            THE COURT:  Page 44.

10           MR. AGNIFILO:  No.

11           THE COURT:  Page 45.

12           MR. AGNIFILO:  No.

13           THE COURT:  46.

14           MR. AGNIFILO:  No.

15           THE COURT:  47.

16           MR. AGNIFILO:  No.

17           MS. KASULIS:  And, again, Your Honor, we will

18   provide a dated list of overt affects with the

19   co-conspirators and investor names inserted.

20           THE COURT:  Do you think that could come today?

21           MS. KASULIS:  Yes.

22           MR. AGNIFILO:  That would apply to 48, 49, 50.

23           MS. KASULIS:  Yes.

24           MR. AGNIFILO:  And 51.  And other than that I have

25   nothing else on any of those pages.

Proceedings                    5119

1           MS. KASULIS:  Same.

2           THE COURT:  Okay.  Good.

3           Starting with Page 52, conspiracy.

4           MR. AGNIFILO:  I do have something, let me see if

5    I'm -- if I can make sense of it.  What I have here on the

6    top of Page 52.

7           THE COURT:  Yes.

8           MR. AGNIFILO:  -- at the end of the second line.

9           THE COURT:  Yes.

10          MR. AGNIFILO:  My proposed added language is

11   However, you must find beyond a reasonable doubt that the

12   defendant conspired with one or more others to do so.  I

13   will now charge you on the law of conspiracy.

14          And the reason I'm requesting that is because the

15   whole sentence starts on 51 it says, For Count 1 and the

16   Government need not prove that the defendant actually

17   committed securities fraud.  The unlawful acts charged as

18   the objects of the conspiracy in Counts 1 and 4.

19          And then I feel like there should be some intro as

20   to why Your Honor's about to read conspiracy.  And so that's

21   my proposed language, that you basic -- Your Honor basically

22   have, you know, this statement showing, A, that conspiracy

23   is a charged crime, so it has elements that have to be

24   proven beyond a reasonable doubt and that Your Honor

25   introduce the concept of conspiracy with this as sort of the

```
                       Proceedings                5120
```

1    jumping off point from the entire section.

2              THE COURT:  Any objection, Ms. Kasulis?

3              MS. KASULIS:  Can you just read it again.

4              MR. AGNIFILO:  Sure, sure.

5              MS. KASULIS:  Can I just read it?

6              MR. AGNIFILO:  Sure, you can.

7              MS. KASULIS:  I'm more of a visual.

8              MR. AGNIFILO:  Yeah, go ahead.

9              I changed you to defendant.

10             MS. KASULIS:  Yeah, that's fine, Your Honor.

11             MR. AGNIFILO:  Do you want it again, Your Honor.

12             THE COURT:  However you must mind beyond a

13   reasonable doubt.

14             MR. AGNIFILO:  That the defendant conspired with

15   one or more others to do so.  I will now charge you on the

16   law of the conspiracy.

17             MS. KASULIS:  I just wanting to make sure the to

18   do still makes sense.

19             THE COURT:  Yeah, to do so.

20             MS. KASULIS:  Yeah, yeah.

21             THE COURT:  I think you said something else

22   earlier.

23             MS. KASULIS:  For counts --

24             THE COURT:  Oh, no, maybe you didn't.

25             MS. KASULIS:  ...to commit a securities fraud.

```
                        Proceedings                    5121
 1              MR. AGNIFILO:  We can put something -- let me
 2    think.
 3              (Pause in proceedings.)
 4              THE COURT:  All right.  I got it.
 5              MS. KASULIS:  Okay.
 6              THE COURT:  However, you must find beyond a
 7    reasonable doubt that defendant conspired with one or more
 8    individuals --
 9              MS. KASULIS:  Uh-huh.
10              MR. AGNIFILO:  That's fine.
11              THE COURT:  -- to commit securities fraud.
12              MR. AGNIFILO:  That's good.
13              MS. KASULIS:  Yeah, that's fine.
14              THE COURT:  And then you wanted to put the
15    introductory language, I will now instruct you on
16    conspiracy.
17              MR. AGNIFILO:  If Your Honor wants.  I'm not
18    married to it.  If Your Honor wants to do it, that's fine.
19              MS. KASULIS:  That's fine.
20              THE COURT:  I tell you what is awkward we have
21    these headings but I don't really necessarily read them
22    but --
23              MR. AGNIFILO:  Right.
24              THE COURT:  -- I try to, okay now I'm going to
25    tell you about whatever.
```

Proceedings                              5122

1              MR. AGNIFILO:  Right.

2              THE COURT:  That's fine.

3              We'll add that little introductory sentence.

4              All right.  What else do we have after Page 52,

5      please.

6              MR. AGNIFILO:  53, small thing where it says

7      First --

8              THE COURT:  Yes.

9              MR. AGNIFILO:  -- that two or more persons enter

10     into an agreement to commit securities fraud, as I have

11     defined the term to you, just because you haven't defined

12     the crime in a while, just to remind them that that's a

13     crime that has been defined for them by the Court.

14             MS. KASULIS:  That's fine.

15             THE COURT:  We want to give a reference to the

16     page?

17             MS. KASULIS:  Uh-huh.

18             MR. AGNIFILO:  Sure.

19             MS. KASULIS:  Yeah, the jury's going to get the

20     instruction.

21             MR. AGNIFILO:  Yeah; is that right.

22             THE COURT:  All right.

23             What else?

24             MR. AGNIFILO:  I don't have anything on 54.

25             THE COURT:  Just maybe flip simultaneously on your

```
                        Proceedings                    5123
```

1    next.

2            MS. KASULIS:  55's fine.

3            MR. AGNIFILO:  55's fine.

4            MS. KASULIS:  My next issue to raise is Page 59.

5            MR. AGNIFILO:  Okay.  I'm good until then, too.

6            THE COURT:  Okay.  Ms. Kasulis.

7            MS. KASULIS:  With respect, Your Honor, to the

8    paragraph starting In some --

9            THE COURT:  Yes.

10           MS. KASULIS:  -- I just think that for the

11   Government must prove beyond a reasonable doubt, I think

12   Number 1 should just circle back to the two or more people

13   entered into an agreement because it presupposes the

14   agreement.  I think we're just missing that there was an

15   agreement, entered into an agreement to commit securities

16   fraud.

17           THE COURT:  Well, also the defendant has to enter

18   into the agreement not two or more.

19           MS. KASULIS:  Oh, I'm sorry.

20           THE COURT:  Yes.

21           MS. KASULIS:  Yes.

22           THE COURT:  That the defendant entered an

23   agreement with another person.

24           MS. KASULIS:  Right or one or more individuals to

25   commit securities fraud.  And I think that circles back to

Proceedings                                    5124

1   Your Honor's listing of the prior elements.

2           THE COURT:  So then would we strike out The

3   purpose of the conspiracy is to commit securities fraud?

4           MS. KASULIS:  Right.

5           THE COURT:  I think that kind of captures it.

6           MS. KASULIS:  Right.

7           THE COURT:  Okay.

8           MR. AGNIFILO:  That's fine.

9           THE COURT:  All right.  What else?

10          MS. KASULIS:  My next proposal is for Page 60,

11  Your Honor.  I think that the -- in our proposed instruction

12  on venue for securities fraud conspiracy, I think the

13  sentence about The overt act does not have to be an overt

14  act that is charged in the superseding indictment in

15  furtherance of the conspiracy was eliminated from this

16  section from our proposed charges.  I think that was

17  recently -- I mean that was affirmed in *Lange* that -- that

18  language.

19          THE COURT:  Okay.  Where would you like to insert

20  it?

21          MS. KASULIS:  I think it was right after the

22  suffix.

23          THE COURT:  All right.

24          MR. AGNIFILO:  What --

25          MS. KASULIS:  The overt act does not have to be in

Proceedings                    5125

1    furtherance of the conspiracy.

2             MR. AGNIFILO:  Okay.

3             THE COURT:  So may I have you read it back again,

4    Ms. Kasulis.

5             MS. KASULIS:  Your Honor, I think that this

6    section that should be included is "The overt act does not

7    have to be an overt act that is charged in the superseding

8    indictment in furtherance of the conspiracy."

9             (Pause in proceedings.)

10            MS. KASULIS:  Just to be clear I think the

11   language is on Page 26.  I actually rewrote this because I

12   think it's not as clear as it could be.  The way it's

13   currently written, "The overt act does not have to be an

14   overt act in furtherance of the conspiracy that is specified

15   in the indictment."  That is specified in the indictment

16   perhaps maybe read to modify the conspiracy instead of the

17   overt act.

18            And so we went ahead and checked in *Lange* and we

19   can hand this up to Your Honor.  The Government is not

20   restricted to the overt act charged in the indictment in

21   justifying its choice of venue.

22            So the language that we proposed The overt act

23   does not have to be an overt act that is charged -- I'm

24   sorry.

25            THE COURT:  In the indictment in furtherance of

```
                        Proceedings                   5126
```

1    the conspiracy?

2           MS. KASULIS:  Right.  That's exactly right.  I

3    think that more captures and minimizes confusion about that

4    insert.

5           MR. AGNIFILO:  Which one?

6           MS. KASULIS:  *Lange*.

7           (Pause in proceedings.)

8           MR. AGNIFILO:  That sounds like a correct

9    statement, Your Honor.

10          THE COURT:  Okay, good.

11          We've got:  The overt act does not have to be an

12   overt act that is charged in the indictment in furtherance

13   of the conspiracy.

14          MS. KASULIS:  Right.  And I think we've been

15   defining it as the superseding.

16          THE COURT:  Superseding.

17          MS. KASULIS:  Uh-huh.

18          THE COURT:  Right we have.

19          And that will follow to word "suffix," correct?

20          MS. KASULIS:  Correct.

21          THE COURT:  All right.  What's next?

22          MS. KASULIS:  My next was on Page 64.

23          THE COURT:  Yes.

24          MS. KASULIS:  Your Honor, just for language at the

25   top the third and fourth overt act element, it makes it

1  sound like there are first and second overt act elements, so

2  perhaps we can just strike third and fourth.

3          THE COURT:  Okay.

4          MS. KASULIS:  And just leave the overt act element

5  on which I instructed you with respect to Counts 1 and 4..

6          THE COURT:  Okay.

7          MR. AGNIFILO:  That's fine.

8          MS. KASULIS:  Do not apply.

9          THE COURT:  Okay.  Thank you.

10         What else?

11         MR. AGNIFILO:  Nothing.

12         MS. KASULIS:  My next is Page 66.

13         THE COURT:  Okay.

14         MS. KASULIS:  Are you done?

15         MR. AGNIFILO:  Yeah, sure.

16         MS. KASULIS:  Okay.  On Page 66 in the first

17  paragraph listed there at the end of the sentence starting

18  The scheme to defraud giving rise to the wire fraud

19  conspiracy charges in Counts 2 and 5 are alleged to have

20  been carried out by making false representations and

21  omissions.

22         THE COURT:  Okay.

23         MS. KASULIS:  We would like to add that language.

24         THE COURT:  All right.  I think you look troubled.

25  Do you want to see the superseding indictment and see if

Proceedings                          5128

1    that's accurate?

2         MR. AGNIFILO:  That, and also I know Your Honor

3    already defined for the jury when omissions can be

4    actionable.  When -- when the utility of asking for -- would

5    Your Honor consider them as saying false representations or

6    omissions -- I'm trying to think of an artful way of putting

7    it.

8         The concept that I'm trying to get at, Your Honor

9    already told -- because omissions by themselves are not

10   equivalent of statements.  So I'm trying to, without too

11   many words, have the Court remind the jury of that since it

12   probably would have been an hour since they've heard what --

13   when an omission can be an actionable event.  I'm trying to

14   think of a way of putting it.  Do you want omissions right

15   after representations.

16        MS. KASULIS:  Uh-huh, uh-huh, that's fine.

17        THE COURT:  This is for the wire fraud?

18        MS. KASULIS:  Uh-huh.

19        THE COURT:  Go back and see what we said.

20        MS. KASULIS:  Your Honor, we do charge it as

21   misrepresentation, material misrepresentation and omissions

22   in the indictment.

23        THE COURT:  So do you want to just say by making

24   material misrepresentations?

25        MS. KASULIS:  Misrepresentations, we can do that.

Proceedings                                5129

1          THE COURT:  Or omissions?

2          MS. KASULIS:  Uh-huh.

3          THE COURT:  I want to capture the concept of the

4    omissions being fraudulent or material if.

5          MR. AGNIFILO:  In the other Court's false

6    statement and omissions section on Page 35.  The false

7    statements and omission section is on Page 35.

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Proceedings                   5130
```

1           THE COURT:  How about we say, "or omissions and

2     material facts in a manner that makes" -- it becomes very

3     long -- "what is said deliberately misleading."

4           MR. AGNIFILO:  I think that's our request.  Since it

5     would have been such a long time since they heard your Honor's

6     definition of omission, that's our request.  If you're going

7     to put omissions in.

8           MS. KASULIS:  It's language mirroring page 35?

9           THE COURT:  Yes.

10          MR. AGNIFILO:  That's fine.

11          MS. KASULIS:  So we would say "false

12    representations."

13          THE COURT:  "Or omissions of material fact."

14          MS. KASULIS:  "In a manner that makes what is said

15    or represented deliberately misleading."

16          MR. AGNIFILO:  Yes, that's good.

17          THE COURT:  Yes.  What else do we have?

18          MR. AGNIFILO:  Nothing else on page 66.

19          MS. KASULIS:  I'm sorry, your Honor, I'm just

20    thinking through this omissions issue for a second.

21          I think we can, Mr. Srinivasan is going to check one

22    thing for me, but we can keep going.

23          So we've been proceeding under a money theory, this

24    is page 67, People's side are proposing to strike in the

25    second paragraph starting with the sentence "property," all

Proceedings                                           5131

1    the way to the end because we've been arguing a deprivation of

2    money per the investor statements.  We went ahead and made

3    sure we pulled sidebars and looked at it.  This language has

4    to do with intangible property rights, inside information and

5    things along that line.  To make sure we're appeal-proof, we'd

6    like to strike the sentence beginning "property" all the way

7    to the bottom.  I think Mr. Agnifilo is in agreement.

8              MR. AGNIFILO:  Yes.

9              THE COURT:  So the preceding sentence will end with

10   the "depriving with another money."

11             MS. KASULIS:  "Or property," is fine.  We can take

12   out the next section, that has to do with intangible property

13   rights, which we've not proceeded under that theory.

14             THE COURT:  We'll strike the rest of the paragraph

15   down to footnote three.

16             MS. KASULIS:  Correct.

17             MR. AGNIFILO:  Correct.

18             MS. KASULIS:  My next one is page 79.

19             THE COURT:  Did you have something else before page

20   79, Mr. Agnifilo?

21             MR. AGNIFILO:  Let me check.  I have nothing before

22   79.

23             MS. KASULIS:  It has to do with Count Eight, your

24   Honor, starting on page 75.  Count Eight charges that

25   securities fraud conspiracy in relation to the Fearnow shares.

Proceedings                                    5132

1   We realize that in reviewing the jury instructions last night

2   that we should include some language regarding to capture the

3   concept of market manipulation or use of shares to effect the

4   trading or price of stock.  So we have a proposed an insert

5   which tracks the language in Royer, that I can hand up to your

6   Honor, and obviously can let counsel for the defense have an

7   opportunity to consider.  It's a short insert.  Royer, 549 F3d

8   886, Second Circuit case from 2008.  I can also hand this up

9   to your Honor.  It would be after the third prong of the first

10  element of securities fraud, that's on page 79.

11          THE COURT:  At the end of the sentence.

12          MS. KASULIS:  Right, after prong three.

13          I can hand up this case, your Honor, as well.

14          MR. AGNIFILO:  It seems like it's an accurate

15  statement of the law.

16          MS. KASULIS:  He tried not to --

17          MR. AGNIFILO:  It's it seems sort of dense.

18          MS. KASULIS:  Your Honor, this was the language that

19  we were proposing, I can hand this up to the Court.

20          You can ignore my circumstantial evidence umbrella

21  at the top.

22          THE COURT:  I appreciate having it.  You did hand

23  this up.

24          MS. KASULIS:  I'm sorry.

25          THE COURT:  Do you think we need the language

Proceedings                                    5133

1    regarding this third alternative prong of the first element of

2    securities fraud?  Could we just start the sentence with, "Any

3    conduct," after the end of the sentence the third element,

4    would that work?

5              MS. KASULIS:  That's fine with the Government, your

6    Honor.  Right after prong three, your Honor, would it be just

7    a paragraph insert or would it just follow on?

8              THE COURT:  Well, what I was going to suggest, since

9    we're saying first, second, third, at the end of that sentence

10   it says, "mails in furtherance of the fraudulent conduct,"

11   period.  And then we would start the sentence, "Any conduct

12   that is designed to deceive or defraud investors by

13   controlling," et cetera.

14             MS. KASULIS:  We could do that.

15             THE COURT:  Just because I think when we start

16   saying to the jury third alternative prong, it may be

17   confusing to them.  Does that work for you, Mr. Agnifilo?

18             MR. AGNIFILO:  I can't think of a better way to do

19   it.  The Government is right, this is a true statement of the

20   law.  I have no objection.

21             THE COURT:  What else do we have?

22             MS. KASULIS:  Your Honor, so my our last issue with

23   the proposed jury instructions is in the defense section on

24   page 80.  I think we're doing this sort of reiteration of good

25   faith that's been captured in two other places in the jury

```
                        Proceedings                    5134
```

1   instructions, and we would like an inclusion of the no

2   ultimate harm reference here as well, if we had it in two

3   other places to include it here in addition.

4             MR. AGNIFILO:  I don't think we need it a third

5   time.

6             THE COURT:  Can you just point it out then?

7             MR. AGNIFILO:  The good faith?

8             THE COURT:  Since it's mentioned in the other two

9   instances.

10            MS. KASULIS:  We can eliminate it entirely.  If we

11   mention it with the good faith instruction in the other two

12   places, we mention it in the third.  So either eliminate it

13   entirely, it's already in the instructions; or include the no

14   ultimate harm reference here as well.

15            MR. AGNIFILO:  I want the good faith in the defense

16   section.  I don't want your Honor have a section on defenses

17   and not have it there.  We have reliance on counsel, they go

18   together.  And they both are sort of hallmarks of the defense.

19            My request is that we have the good faith section as

20   a defense on its own, without the no ultimate harm, which has

21   been given two separate times.  I don't think that would work

22   in unfairness on the Government.  The Court has already linked

23   good faith to no ultimate harm specific to the actual charge,

24   and different based on counts.  By this point the jury would

25   have heard two no ultimate harm charges, them being slightly

Proceedings                                    5135

1    different from each one; one is in a securities fraud context,

2    one is a wire fraud context.  Giving it a third time is

3    unnecessary.

4          MS. KASULIS:  Your Honor, we feel very strongly

5    about this.  I think this is going to be one of the most sort

6    of heated issues of this case.  So if we are going to mention

7    good faith, again, we feel strongly.

8          THE COURT:  Which iteration will we get?

9          MS. KASULIS:  That's the issue or concern.

10         THE COURT:  Do you want to work together or you can

11   come up with it because we do have two different iterations of

12   it, depending on whether it relates to the wire fraud or

13   securities fraud.

14         MR. AGNIFILO:  I can tell we're going to want the

15   Berkovich wire fraud iteration, if it's going to be here in --

16         MS. KASULIS:  Can you say, with respect to wire

17   fraud conspiracy I instruct you with respect to no ultimate

18   harm, and with respect to securities fraud and securities

19   fraud conspiracy or reverse them because one is sort of a

20   little bit more than the other.  But again, we feel very

21   strongly it should be included here if we're going to include

22   the good faith section in the defense.

23         MR. AGNIFILO:  I think to have two different

24   iterations -- the good faith charge is meant to be, and it's

25   here as an across the board charge.  To cut back on good

Proceedings                                5136

1    faith, the defense of good faith, based on the specific charge

2    that the jury is considering the good faith in regard to, I

3    think waters down the good faith defense.  I mean, by this

4    point the jury has heard the no ultimate harm charge twice.

5            I feel like we're entitled to have a section of our

6    defenses that is our defenses.  We're not talking about a lot

7    of verbiage.  We're talking about a total of two-and-a-half

8    pages of defenses and I think that we get to have our defenses

9    as our defenses.

10           It doesn't do prejudice to the Government.  The jury

11   would have heard the no ultimate harm charge twice already.  I

12   think we get to have -- certainly there is page upon page of

13   the Indictment -- sorry, of your Honor's charges where you're

14   referencing the Indictment, the Indictment alleges this.  I

15   haven't counted them all between I don't know six and 11 pages

16   of the Court reminding the jury what is in the Indictment.

17   And I think we're entitled to have a defense section that is

18   our defenses.  I think that's fair.  I think it's balanced in

19   regard to everything.  And we feel strongly that we want a

20   good faith section as our defense.  By this point the no

21   ultimate harm charge has been given twice.  We are very happy

22   with this charge as it is.

23           MS. KASULIS:  I understand why Mr. Agnifilo is

24   taking the position that he's taking.  But we've also had a

25   good faith instruction twice.  I think if you're going to have

Proceedings                                        5137

1   another iteration of good faith, it should be complete, it

2   should be balanced and incapsulate all of the law on the

3   issue.  We feel very strongly, your Honor, if you're going to

4   have this section that there should be a no ultimate harm

5   addition that most accurately reflects the law with respect to

6   good faith.

7           MR. AGNIFILO:  But the law has been reflected.  The

8   law has been reflected based on the charges.  There is no,

9   there is nothing about the good faith charge that requires the

10  no ultimate harm charge, especially when the no ultimate harm

11  charge has been given twice.

12          I think that the Government gets to have the Court

13  tell the jury about the Indictment at great length.  I think

14  that we get to also have the Court tell the jury the defense

15  has defenses in the exact way that we hope to put them in

16  front of the jury.  I don't think we should have our good

17  faith defense --

18          THE COURT:  Diluted.

19          MR. AGNIFILO:  Yes, diluted, by an ultimate harm

20  charge in the defense section.

21          MS. KASULIS:  Your Honor, I think this is

22  prejudicial to the Government.  I do think again this is the

23  central issue of this case in many ways.  To have the third

24  iteration of good faith as a defense with no caveating or

25  reference to any ultimate harm, it's not an accurate

Proceedings                                     5138

1   expression of the law.  I don't want the jury, if they are

2   going to get the law to flip to defenses and see it doesn't

3   talk about no ultimate harm, and therefore, that doesn't

4   apply.  I think it's very misleading to have it listed in this

5   way.

6          MR. AGNIFILO:  One other thing I'll point out.

7   While your Honor mentions good faith previously, it's not set

8   forth in the way that it's set forth here as the actual

9   defense.

10         THE COURT:  Right.  I agree.  I do think they are

11  entitled to have their defenses set forth.  We could just

12  refer them back to the page or something or the concept.

13         "The jury however is reminded," or, "The Court

14  reiterates that, as provided in on page blank with regard to

15  the instruction regarding conspiracy to commit wire fraud or

16  conspiracy to commit securities fraud," and add it.  I think

17  this is something that you two ought to come to some agreement

18  on.

19         MR. AGNIFILO:  I would love to.  I think that as dug

20  in as they are, we are as dug in.

21         THE COURT:  I know.  But let's just talk about it.

22  I think the only issue is whether you get it all by itself or

23  whether we give the balanced charge that we have previously.

24         MR. AGNIFILO:  Let me see.  Because your Honor had a

25  thought that I was curious in seeing to conclusion.

Proceedings                                      5139

1          THE COURT:  I was just thinking that we could maybe

2     refer the jurors back, "Please be reminded that as set forth,"

3     or, "as you were instructed with the conspiracy to commit wire

4     fraud or conspiracy to commit securities fraud," and then

5     state what it was, maybe give page references since it's both

6     the good faith and the -- I just --

7          MS. KASULIS:  It does say here it's a complete

8     defense.  We want to make sure it's balanced.  We're fine with

9     your Honor's proposal to refer the jury back to the no

10    ultimate harm language.

11         THE COURT:  It can be as minimal as possible.  Maybe

12    what Ms. Kasulis should do is propose some minimal reminder

13    language back and drawing the description between the wire

14    fraud and securities fraud, because otherwise you'll have it

15    said twice in response to their good faith defense which would

16    not be fair to them.

17         MS. KASULIS:  So we'll propose language to insert in

18    that section, your Honor.

19         THE COURT:  What are we going to do about the next

20    defense, reliance on counsel?

21         MS. KASULIS:  I think we were fine.

22         MR. AGNIFILO:  We're fine with it.

23         THE COURT:  Okay.

24         MS. KASULIS:  I think that's it for us.

25         MR. AGNIFILO:  That's it for us too.

```
                      Proceedings                    5140
```

1          THE COURT:  What about the verdict sheet, folks?

2          MS. KASULIS:  The verdict sheet was fine with the

3    Government.

4          THE COURT:  Why was the Finazzo verdict sheet done

5    the way it was?

6          MS. KASULIS:  It's a very good question, your Honor.

7    I think because some of these issue were up on appeal before

8    the Circuit at the time.

9          THE COURT:  I see.

10          MS. KASULIS:  I think the law has been settled on

11    one issue since that time.

12          MR. AGNIFILO:  We're fine with the verdict sheet.

13          THE COURT:  Okay.

14          MS. KASULIS:  So we will go back and circulate the

15    revised proposed Indictment, the overt act inserts for the

16    Indictment, and then the proposed language to add to the good

17    faith defense.

18          MR. AGNIFILO:  My understanding, the good faith

19    defense is just going to be a reference back, we're not going

20    to have new language.

21          MS. KASULIS:  New language in drafting a reference

22    back.  We're going to try to keep it streamlined.

23          MR. AGNIFILO:  That's fine.

24          THE COURT:  So are you all going to be wanting to

25    fight about this more before me before I make my decision?  I

Proceedings                                  5141

1   would like to just decide it.  It makes it logistically

2   difficult to try to --

3           MR. AGNIFILO:  Let's try do it now.

4           MS. KASULIS:  Take ten minutes?

5           THE COURT:  Do you want to call me when we're ready?

6           MR. AGNIFILO:  Yes.

7           MS. KASULIS:  Yes.

8           (Lunch recess taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    5142

1          A F T E R N O O N   S E S S I O N

2              (In open court; outside the presence of the jury.)

3          THE COURT:  Counsel has conferred, and they have

4    reached what I think is a good compromise to add additional

5    language to the defense of good faith that is set forth in

6    the instructions under the section entitled Defenses.  And

7    let's figure out where this will be inserted.  At the end of

8    the second paragraph on Page 80, under the good faith

9    defense we will add the following language:  "As a reminder,

10   I instruct you that when considering the defense of good

11   faith, that you consider it in conjunction with the

12   instructions regarding the defendant's belief that

13   ultimately everything would work out so that no one would

14   lose money.

15              And we will refer the jurors back to Pages 41 and

16   70 of the instructions.

17              MS. KASULIS:  Your Honor, there was actually just

18   one more issue.

19              THE COURT:  Okay.

20              MS. KASULIS:  With respect to Page 66, when we

21   wanted to add "making false representations," we wanted to

22   add "and omissions."  I think because now where -- the

23   omissions referring back -- I think we want to just actually

24   return to the original language.

25              THE COURT:  Okay.

Proceedings                                    5143

1          MS. KASULIS:  Because that's defined later, the

2     omission speech.  So we are fine by leaving it as "carried

3     out by making false representations," on Page 66.

4          MR. AGNIFILO:  And that's fine with us,

5     Your Honor.

6          THE COURT:  Not "material representations"?

7          MS. KASULIS:  I think "false representations" is

8     fine Your Honor.  Just as Your Honor had it is fine with the

9     Government.

10          THE COURT:  I think my clerk wanted to just flag

11     something.  He was going to do some additional research to

12     make sure that certain of your -- the proposals were

13     consistent --

14          MS. KASULIS:  Okay.

15          THE COURT:  -- with the law.

16          MS. KASULIS:  Okay.

17          COURTROOM CLERK:  That was actually one of them.

18          THE COURT:  Is one.  Okay.

19          MS. KASULIS:  Yeah.

20          THE COURT:  Yes, the omission addition --

21          MS. KASULIS:  Yeah, but I think if we return to

22     the original language then I think we're fine on that piece.

23          THE COURT:  All right.  Great.

24          So I just wanted to make sure that everybody is

25     aware of the need not to stray beyond the evidence.

Proceedings                              5144

1            MS. KASULIS:  Uh-huh.

2            THE COURT:  I am a little concerned that there may

3    be arguments regarding matters that are not really in

4    evidence.  For example, I do not know whether Mr. Brafman is

5    going to be arguing that Mr. Shkreli suffers from some sort

6    of spectrum disorder or some sort of --

7            MR. AGNIFILO:  I think --

8            THE COURT:  -- autism, which I think would be

9    inappropriate.

10            MR. AGNIFILO:  I think he's going to stick to what

11    is in -- what I think is in the record.  I think

12    Mr. Richardson said that Mr. Shkreli suffers from

13    depression.

14            THE COURT:  Yes, and anxiety.

15            MR. AGNIFILO:  So I think he's going to be pretty

16    faithful --

17            MS. KASULIS:  Okay.

18            MR. AGNIFILO:  -- to the record.

19            THE COURT:  Okay.

20            MR. AGNIFILO:  But I will advise him that

21    Your Honor raised the issue.

22            THE COURT:  Right.  Because as we know the

23    doctor -- was it Rosenfeld?

24            MS. KASULIS:  Uh-huh.

25            THE COURT:  -- he would not --

```
                         Proceedings                5145
```

1          MR. AGNIFILO:  He wouldn't --

2          THE COURT:  -- go there.

3          MR. AGNIFILO:  He wouldn't go there, no.

4          MS. KASULIS:  No.

5          THE COURT:  And I thought that you might be

6    presenting evidence from a mental health provider that he

7    did have some sort of spectrum disorder, because it was

8    really talked about so much in the opening.  But I just want

9    to make sure that that does not repeat itself --

10         MR. AGNIFILO:  No, no --

11         THE COURT:  -- because it really is not

12   appropriate.

13         MR. AGNIFILO:  No.  I think he is going to stick

14   to the evidence.

15         THE COURT:  Okay.  All right.

16         MR. AGNIFILO:  One thing just to round out one

17   issue.  On the no ultimate harm charge --

18         THE COURT:  Right.

19         MR. AGNIFILO:  -- I know it's a recognized charge

20   in the Second Circuit, and Your Honor's absolutely following

21   Second Circuit law in giving it, and I don't have any good

22   faith argument to the contrary.  I don't know how this issue

23   would ever be raised in future matters, but it is our

24   position that -- for what it's worth -- that the

25   Second Circuit is wrong on the no ultimate harm charge; that

                              Proceedings                     5146

1    there were concerns that were raised in the earlier cases

2    like *Rossomando* and whatnot, that the no ultimate harm

3    charge arose to establish good faith charge is our position.

4              And that I think we're also mindful of the fact

5    that in my research, no other circuit gives the charge.  So

6    there's no doubt Your Honor is following establish -- well

7    established, repeatedly establish Second Circuit law.  It's

8    our position, though, that with all respect to the

9    Second Circuit that they're not right on this issue.

10             I don't know what value there is in putting that

11   on the record, but now it's on the record.

12             THE COURT:  Well, maybe somebody can seek the

13   juror instruction before the Supreme Court and get some

14   clarification.

15             MR. AGNIFILO:  Thank you, Judge.

16             THE COURT:  But I think we are going to follow --

17             MR. AGNIFILO:  Yes.

18             THE COURT:  -- the Second Circuit at this point.

19             MR. AGNIFILO:  Yes.

20             THE COURT:  And the Supreme Court.

21             MR. AGNIFILO:  Thank you, Judge.

22             THE COURT:  All right.  So is that it?

23             MS. KASULIS:  Yes, Your Honor.

24             THE COURT:  What we will do is we will try to post

25   our edit before close of business today.

```
                        Proceedings                    5147

 1           MS. KASULIS:  And we'll go right back right now,

 2    and the overt act piece --

 3           THE COURT:  All right.

 4           MS. KASULIS:  -- we will go ahead and circulate

 5    the word "movement" both with the proposed superseding

 6    indictment with the modifications that we have all discussed

 7    in the overt act to put into the jury instructions.

 8           MR. AGNIFILO:  Thank you.

 9           THE COURT:  All right.  Great.

10           MS. KASULIS:  Thank you.

11           MR. AGNIFILO:  Take care everybody.

12           THE COURT:  Thank you.  See you tomorrow.

13           (Matter adjourned until Thursday, July 27, 2017 at

14    9:00 a.m.)

15                           --oo0oo--

16

17

18

19

20

21

22

23

24

25
```