5148

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,      : 15-CR-637 (KAM)
                               :
            Plaintiff,         :
                               : United States Courthouse
        -against-             : Brooklyn, New York
                               :
MARTIN SHKRELI,                :
                               : Thursday, July 27, 2017
            Defendant.         : 9:00 a.m.
- - - - - - - - - - - - - - - -X


          TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
        BEFORE THE HONORABLE KIYO A. MATSUMOTO
        UNITED STATES DISTRICT JUDGE, AND A JURY



                A P P E A R A N C E S:

For the Government:      BRIDGET ROHDE, ESQ.
                         Acting United States Attorney
                         Eastern District of New York
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                         BY:  JACQUELYN M. KASULIS, ESQ.
                              ALIXANDRA ELEIS SMITH, ESQ.
                              KARTHIK SRINIVASAN, ESQ.
                              GABRIELA BALBIN, ESQ.
                              Assistant United States Attorney

For the Defendant:       BRAFMAN & ASSOCIATES, P.C.
                         767 Third Avenue, 26th Floor
                         New York, New York 10017
                         BY:  BENJAMIN BRAFMAN, ESQ.
                              MARC AGNIFILO, ESQ.
                              JACOB KAPLAN, ESQ.

Court Reporter:       DAVID R. ROY, RPR
                      225 Cadman Plaza East / Brooklyn, NY 11201
                      DRROYOFCR@GMAIL.COM

Proceedings recorded by Stenographic machine shorthand,
transcript produced by Computer-Assisted Transcription.

Proceedings                                5149

1              (In open court; outside the presence of the jury.)

2              THE COURT:  All right.  Just for the record, what

3    I am going to do is clarify yesterday's ruling, and note

4    that the defendant, if necessary, may renew its Rule 29

5    motion.  And we will bring the jurors in once we are all

6    here and advise them that the case will proceed to oral

7    argument and summations after the Government rests and the

8    defendant rests, all right?

9              MR. BRAFMAN:  Yes, Your Honor.

10             THE COURT:  I think we are about ready, we may

11   have one missing juror.

12             (Pause in proceedings.)

13             (Jurors enter.)

14             (Jury present.)

15             THE COURT:  Good morning, members of the jury.

16             All are present.  Please have a seat.

17             Does the Government have any further witnesses or

18   evidence to present?

19             MS. KASULIS:  No, Your Honor, the Government

20   rests.

21             THE COURT:  Thank you.  And does the defendant

22   wish to present a case?

23             MR. BRAFMAN:  No, Your Honor, the defendant rests.

24   Thank you, Your Honor.

25             THE COURT:  Given that the parties have rested and

Summations - Smith                          5150

1    have competed the presentation of evidence, you will now

2    hear summations, or closing arguments.  Let me remind you

3    that those summations, or closing arguments, are not

4    evidence but rather they are each party's opportunity to

5    summarize the evidence and to argue about what conclusions

6    and findings you should make based on the evidence that was

7    admitted at the trial.

8              So with that, we will hear first from the

9    Government.  Then we will hear from the defense, and the

10   Government will have an opportunity for rebuttal.

11             Are you ready to proceed?

12             MS. SMITH:  Yes, Your Honor.

13             THE COURT:  All right.  Thank you.

14   BY MS. SMITH:

15             Just about one month ago, my colleague,

16   Mr. Srinivasan, stood before you and told you how the

17   defendant told lies, upon lies, upon lies in connection with

18   four related fraud schemes that he and his co-conspirators

19   carried out over a period of years.  He told you that the

20   evidence would show that the defendant lied to investors in

21   MSMB Capital and MSMB Healthcare in order to get them to

22   invest in the funds and that he told more lies to prevent

23   them taking their money out of the funds

24             He told you that the evidence would show that when

25   some of the investors in the funds weren't happy with how the

Summations - Smith                      5151

1   funds performed because they believed the defendant's lies

2   the defendant doubled down using another fraudulent scheme to

3   force Retrophin to pay for those lies.

4         And he told you that the evidence would prove

5   beyond a reasonable doubt that the defendant also engaged in

6   a fraud to try and control the price and trading volume of

7   Retrophin stock and that he lied about who actually owned the

8   free-trading shares of the company.  That is exactly what we

9   have done.  Other the past month you've heard testimony from

10  defrauded investors, Board members of Retrophin, former

11  employees of the MSMB entities and others who had information

12  to share about the defendant's frauds.  You have seen bank

13  records and shared transfer records, read countless e-mails

14  and performance updates and reviewed settlement and

15  consulting agreements.  It is now my job to help step you

16  through the evidence and fully expose the defendant's

17  schemes.

18        To pull back the curtain on these four fraud

19  schemes and finally see the truth behind all of those lies.

20  And to show you that we've proved the charges against the

21  defendant beyond a reasonable doubt.  Keep in mind as we go

22  through this evidence that you are in a very unique position.

23  Other than the defendant and his co-conspirators, you are the

24  only people who know the whole story of what happened.  The

25  people who testified before you, they each had a piece of

1    that story, but none of them knew the whole truth because of

2    how often and how effectively the defendant told his lies

3            For example, the investors in MSMB Capital and

4    MSMB Healthcare, to this day, they have no idea what really

5    happened to the money they invested in those funds.  They

6    have never seen the bank records or the share transfer

7    records.  All of the information they got about how the funds

8    performed came from the defendant, and it was false.  Only

9    you have access to that information and so only you can see

10   the whole picture.  And that's what we're going to do

11   together this morning, we're going to walk through each piece

12   of the evidence

13           Now I'm not going to address every witness or every

14   document because then we would be here for another month, but

15   I'm going to highlight for you the key evidence and tell you

16   how it tells the story of the defendant's frauds and how it

17   proves beyond a reasonable doubt that the defendant is guilty

18   of each and every crime with which he has been charged.

19           I'm going to start for each crime with a legal

20   element.  Judge Matsumoto is going to instruct you on the law

21   after all the summations are completed, and what she tells

22   you is what controls, then I'm going to preview with respect

23   to what she's going to say about what we need to show for

24   each crime that's been charged.

25           This chart here gives you an overview of the eight

1    counts in the indictment.  The first column just lists the

2    count number, which is where each of those crimes will appear

3    on the verdict sheet that you look at as you deliberate.

4           The second column will list the schemes to which

5    the crime relates.  Of course.

6           THE COURT:  Sorry.

7           MS. SMITH:  That's okay.

8    BY MS. SMITH:

9           Hopefully we'll have limited technical difficulties

10   today, and this is not sanctioned so hopefully it's easier to

11   actually see the document

12          So the first column, as I said, lists the counts

13   which, again, is how you will track these crimes on the

14   verdict sheet.

15          The second column lists the scheme, the four

16   schemes; MSMB Capital, MSMB Healthcare, the Retrophin

17   appropriation scheme and then the Retrophin unrestricted

18   shares scheme.  And you can see that we've grouped them by

19   color so that the first three counts all relate to the first

20   scheme; the fourth, fifth and sixth counts relate to the

21   second scheme; and then the 7th and 8th counts are their own

22   scheme.

23          And then the final column lists the specific type

24   of crime that's charged, either securities fraud conspiracy,

25   wire fraud conspiracy or securities fraud.  And you can see

Summations - Smith                          5154

1   that some of the same crimes are charged for a different

2   scheme.

3           I'll be putting the chart up at the end of the

4   discussion of each scheme so that we can kind of keep track

5   of where we are.  Before I go any further, let me also

6   mention that you won't get to take the PowerPoint slides that

7   I'm going go through with you back into the jury room.

8   That's because these are just summaries of the evidence.  You

9   are entitled to ask for any of the evidence that you've seen

10  throughout the trial, either exhibits or testimony, and

11  you'll get an exist list that will actually describe for you

12  all the evidence that's been admitted.  And as I go through

13  these slides I have tried to actually highlight the Exhibit

14  Number or the place in the transcript where the testimony had

15  come from so that you can take notes on that as we go

16  through.

17          So let's start with the first scheme, the

18  MSMB Capital scheme.  And what exactly is this scheme?  It

19  consists basically of two major portions.  First the

20  defendant's made -- the defendant made misrepresentations and

21  omissions to MSMB Capital investors to get them to invest in

22  the funds and we've listed some of those omissions and

23  misrepresentations here and you've heard them from the

24  investor themselves.  He was not truthful about the assets

25  under management of the fund; whether or not the fund had an

Summations - Smith                    5155

1   auditor, an attorney or an administrator; the ability of

2   investors to get redemptions from the funds; the composition

3   of the funds, whether it was a long, short, hedge fund; or

4   whether it was invested what we've all been talking about as

5   a liquid security.  And also the defendant was not truthful

6   about his track record or his background, and those are all

7   the misrepresentations that he made in order to get people to

8   invest in the funds before the investors actually put their

9   money in.

10          The second set of misrepresentations that's charged

11  in this scheme are the misrepresentations that the defendant

12  made to the investors after they put their money in, in order

13  to get them to keep their money in the funds and not seek to

14  redeem them, and those are the false performance updates and

15  the false statement about the ability to redeem funds.

16          The time period for the scheme is September 2009 to

17  September of 2014.  September 2009, of course, is when the

18  defendant launched the fund.  The first investments were in

19  October.  And the misrepresentations continued with the

20  performance updates well into 2012.  And then as you'll see

21  once we move into 2013, there were additional

22  misrepresentations about what the fund had actually invested

23  in, how the fund has performed.

24          This scheme is charged in three different ways with

25  three different crimes.  The first one is a securities fraud

Summations - Smith                      5156

1    conspiracy, the second one is wire fraud conspiracy, and the

2    third count is securities fraud.  The evidence is the same

3    for all three counts, but I am going to walk you through, as

4    I said, what we expect Judge Matsumoto will tell you about

5    the elements of each count so you can keep that in mind as we

6    walk through the evidence

7              So we'll start first with the element of securities

8    fraud, which is charged as Count 3 and then securities fraud

9    conspiracy is charged with Count 1, but these are the

10   underlying elements of the count.

11             So first in connection with the purchase or sale of

12   the security in MSMB Capital, the defendant employed a

13   device, scheme, or artifice to defraud or made an untrue

14   statement of a material fact or omitted to state a material

15   fact necessary in order to make the statements made in light

16   of the circumstances under which they were made in the

17   pleading or engaged in an act, practice, or course of

18   business, that operated or would operate as a fraud or deceit

19   upon a purchaser or fellow, and that is, of course, listed in

20   there.

21             The second element is that the defendant acted

22   willfully, knowingly and with the intent to defraud.

23             And then the third element is that the defendant

24   knowingly used or caused to be used any means of

25   transportation or communication in interstate commerce or the

Summations - Smith                              5157

1    use of the mail in furtherance of the fraudulent conduct.

2              And we'll talk about that really briefly at the

3    end, but that's, you know, a phone call or an e-mail, some

4    sort of communication that crossed the state line.

5              And as set forth in the private placement memos

6    that we have seen a lot of over the last month, interest in

7    MSMB Capital, so when you invest in MSMB Capital you were

8    purchased a security.  So that's why this is the charged with

9    both as a wire fraud and as a securities fraud.  And two of

10   the three counts are charged as conspiracy.  Count 1 is

11   charged with securities fraud conspiracy and Count 2 is

12   charged with a wire fraud conspiracy, and so I just want to

13   also walk you through the law on conspiracy so you know what

14   to keep an eye out for.

15             A conspiracy is simply an agreement between two or

16   more people who violate the law.  And the elements are that

17   the conspiracy existed to commit the charged crime and that

18   the defendant knowingly and intentionally joined the

19   conspiracy.

20             And for securities fraud conspiracy we also need to

21   prove that the defendant of one of his co-conspirators

22   committed one or more overt acts to further the object of the

23   conspiracy, and we'll walk through that again at the end.  An

24   overt act can be something as simple as sending an e-mail.

25             And then for Count 2 which charges a wire fraud

Summations - Smith                        5158

1   conspiracy, and so the elements of the conspiracy are just

2   that there was an agreement to commit wire fraud and that the

3   defendant knowingly joined in that agreement.  But I'm going

4   to go through the elements underlying wire fraud so you can

5   understand what that crime is as well.

6           So for wire fraud, the idea is that there was a

7   scheme or artifice to defraud to obtain money or property by

8   false or fraudulent pretenses, representations or promises.

9           So basically obtaining money through lies.

10          Is second element is that the defendant knowingly

11  and willfully participated in a scheme or artifice to

12  defraud, and the third element is that in the execution of

13  the scheme the defendant used or caused to use an interstate

14  wire.

15          So let's start with the evidence for this scheme.

16  And let's start with the very first witness that you heard

17  from about a month ago, Sarah Hassan who was an investor in

18  MSMB Capital.  And just to remind you because it has been

19  awhile, you heard that Ms. Hassan graduated from college

20  early and that she worked to invest her own personal money

21  and that she also ran a family hedge fund which is called

22  Dynagrow Capital, that she met the defendant in December

23  of 2010 and that he pitched her on investing in MSMB Capital

24  over dinner, and that she invested $300,000 of her personal

25  money in MSMB Capital in January of 2011.  And that cite

Summations - Smith                    5159

1   there is the Government Exhibit cite, it's

2   Government Exhibit 502B.  Everything in the 500's are just

3   the bank records that we walked through with Wendy Spaulding,

4   so you'll be able to see which document shows you where the

5   money was actually going.

6           And so let's talk about the misrepresentation, the

7   lies, that the defendant told Sarah Hassan in order to get

8   her to invest in the fund.  So first of all the defendant

9   said that MSMB Capital had $40 million of AUM, or as we've

10  heard, assets under management when we were at dinner in

11  September of 2010.  So he basically said that fund had

12  $40 million at the time that she was looking to invest.

13          And this is Ms. Hassan's testimony at transcript

14  cite, Page 921.  And you can see that she was asked, What did

15  you discuss in particular about MSMB Capital and she

16  responded, He just went over some of -- I guess the basics

17  with me about it.  He told me it was a 40 to

18  50 million-dollar fund.

19          And she clarified later that she understood that to

20  be 40 or $50 million in the fund at the time she was looking

21  to invest.

22          And she also then repeated that statement in an

23  e-mail that she sent to the defendant after the dinner and

24  that e-mail is Government Exhibit 103-38, and there was a

25  discussion in that e-mail about how the defendant ran the

Summations - Smith                                    5160

1    fund, if you remember, they were talking about that because
2    Ms. Hassan was running her own family fund and she was kind
3    of curious to see how the defendant made certain decisions.
4    And in that e-mail with respect after the dinner on
5    December 27th, 2010, she said, Remember you mentioned your
6    fund is about $40 million.  And there's a response from the
7    defendant to this e-mail where they have a back and forth
8    about different decisions he makes with the fund and he did
9    not correct this 40 million-dollar figure in that e-mail.

10          And as we know the AUM of $40 million was a lie.
11   This is Government Exhibit 520 which is a summary chart for
12   MSMB Capital which shows the total amount in the bank and
13   brokerage accounts for MSMB Capital at the end of every
14   month, and this particular section on the screen shows
15   between September of 2009 and December of 2010.  And if you
16   look in November 2010, so the end of the month in
17   November 2010, Ms. Hassan and the defendant had dinner in
18   December of 2010, so on November 30th, 2010, there's $330 in
19   bank and brokerage account for MSMB Capital.  So it is clear
20   that when the defendant said that it was a 40 to
21   50 million-dollar fund, that was a lie.

22          And the other reason we know that is because as you
23   heard Agent Braconi testify, the defendant provided some
24   testimony to the SEC, and in August of 2013 he said that
25   MSMB Capital never had more than $3 million.  So not only did

Summations - Smith                          5161

1    the bank and brokerage records show that the

2    40 million-dollar figure was a lie, but the defendant's own

3    statements confirmed that the fund never had $40 million.

4              Let's talk about another misrepresentation.  The

5    defendant said in the PPM --

6              (Pause in proceedings.)

7              MS. SMITH:  So I'm going to back up to the

8    defendant's next misrepresentation which we were talking

9    about.  The defendant represented in the PPM, as you guys

10   now know is the private placement memorandum or the document

11   that investors get to review before they invest in the fund.

12             THE COURT:  Excuse me.  I'm very sorry about the

13   difficult issues we're having.  This is unacceptable.  Let's

14   just get the regular microphone.

15             MS. SMITH:  Okay.

16             THE COURT:  I'm sorry.

17             (Pause in proceedings.)

18             THE COURT:  All right, I'm sorry.

19             MS. SMITH:  I'll give it another try.  Is that

20   helpful?

21             THE COURT:  I think we can hear.

22             MS. SMITH:  All right.  So back to where we were,

23   which was the defendant's next misrepresentation.  Again, it

24   was from the private placement memorandum, or PPM, which was

25   the document that investors looked at before they invested

Summations - Smith                                      5162

1   in the fund.  And it represented that MSMB Capital had

2   Rothstein Kass as an auditor, and that was

3   Government Exhibit 5 was Ms. Hassan's PMM.  And you heard a

4   lot of testimony that an auditor is a third party that would

5   use the financials and check to make sure that they are

6   accurate.  And the defendant represented that this

7   particular firm Rothstein Kass was going to be serving as

8   the auditor for MSMB Capital.  And you can see that there on

9   Page 5 and 27 of the PPM.  And the representation that

10  Rothstein Kass was serving ing as the auditor was also a

11  lie.  The defendant admitted that Rothstein Kass did not

12  audit MSMB Capital.  And again this is one of the statements

13  that Agent Braconi read during his testimony.  He was asked

14  directly in Government Exhibit 918, Did Rothstein Kass ever

15  do any work for MSMB Capital Management LP, and he answered

16  no.

17          And there's also actually a stipulation in

18  evidence which is just an agreement between the parties on a

19  particular fact, which is Government Exhibit 809, and it

20  states that hereby stipulated and agreed between the

21  undersigned parties that between 2007 and 2014 Rothstein

22  Kass did not do any work for MSMB Capital and that it also

23  did not do any work for MSMB Healthcare.

24          So the representation that the fund had an auditor

25  and that that auditor was Rothstein Kass was also a lie.

Summations - Smith                    5163

1          The defendant represented to Ms. Hassan that he

2    had a strong track record in MSMB Capital.  That is, that

3    the fund itself in the time it had been in existence since

4    2009, that it had been successful.  And you can see the

5    testimony here from transcript Page 922.  Did Mr. Shkreli

6    speak to you at all about his own background in the finance

7    industry?  And Ms. Hassan said that he told her that he

8    referenced his own track record with MSMB Capital as being

9    quite strong.

10         And you can see here that the idea that

11   MSMB Capital had a strong track record was a lie.  We know

12   that the initial investments by Mr. Richardson and

13   Mr. Rosenwald were made in October of 2009 and we can see

14   that in the summary of the bank and brokerage records, by

15   October of 2009 there's about $300,000 in a bank account and

16   there were some additional investments but the pattern for

17   MSMB Capital is that the defendant would get investments and

18   then the fund would not perform and then he would go out and

19   get more investments.  And you can kind of see that the fund

20   never really above $600,000 and that there are multiple dips

21   in terms of the performance and that the fund only gets more

22   money when the defendant recruits new investors.

23         And so I think that you can see that most strongly

24   in November of 2010 when there's only $330 in the bank

25   account and that again is when the defendant is making this

Summations - Smith                    5164

1   misrepresentation to Ms. Hassan.  Clearly the fund which had

2   a lot of money invested already had not performed well at

3   the time that he told her that it had.

4          And again, this is Government Exhibit 520 which is

5   the summary chart for the bank and brokerage records for

6   MSMB Capital.

7          And then the other misrepresentation I want to

8   talk about is that the defendant represented after

9   Ms. Hassan invested that her investment was actually

10  performing well.  And her performance updates, which you've

11  seen for all of the investors, are Government Exhibit 80-1

12  through 80-9.  And they all show positive returns as a

13  whole.  And so this is a Government Exhibit 80-1 which is

14  the statement from February 2011.  And this is a significant

15  statement because, as we discussed, in February of 2011

16  there was the Orex trade and the defendant lost all of the

17  money that was left in the fund.  And so this is the

18  statement that was sent to her for the month of

19  February 2011 showing how the fund had performed in February

20  of 2011.  And if you look -- sorry -- if you look, the

21  performance statement says that the fund performed

22  4.2 percent better in February 2011 than it had performed

23  the month before.  And it also said that Ms. Hassan's

24  investment, which was originally $300,000 was now $324,000.

25         And we know obviously that this was a lie as well.

Summations - Smith                    5165

1   And I think that the performance reports are, in fact, some

2   of the most significant lies in the case, especially for

3   MSMB Capital, because we know that in February of 2011 in

4   that Orex trade that Mr. Stich testified about on

5   February 1st, the defendant lost all of the money that was

6   left in the fund and he also put himself in a situation

7   where he was in debt by the amount of $7 million to Merrill

8   Lynch.  So as of February 1st, 2011, there's no money left

9   in MSMB Capital.  There's no further trading after that

10  date, and the defendant and MSMB Capital are in debt by

11  $7 million.  So the performance updates that said that the

12  funds are performing are all lies.

13          And this again is Government Exhibit 520 at the

14  top and the testimony from Steven Stich which is at

15  Page 1522 of the transcript.

16          The defendant also misrepresented to Ms. Hassan

17  that MSMB Capital would be a hedge fund that would have a

18  mix of long and short positions, and we saw this in the PPM

19  as well.  And you can see that the -- this was a lie.  And

20  we know that because the defendant stopped trading

21  altogether.  So he stopped treating MSMB Capital as a hedge

22  fund and buying and selling stocks for MSMB Capital as of

23  February 2011 because there was nothing left in the fund.

24          And this is Government Exhibit 502, and you can

25  see that -- from the brokerage account records not only was

Summations - Smith                          5166

1    there no trading after February 1st, 2011, but the brokerage

2    account was actually shut down in July of 2011.  So after

3    that point there's not even a brokerage account to buy and

4    sell stock in for MSMB Capital.

5           And again the performance report, if we see as of

6    June 2012, Ms. Hassan was told that her original

7    300,000-dollar investment was worth $435,000 approximately.

8           And that's Government Exhibit 80-19 which is the

9    June 2012 performance report.  And that's -- was sent on

10   September 9th, 2012.  So the defendant sent out the

11   performance report for June 2012 on September 9th, 2012, and

12   you can see the 435,000-dollar figure.

13          And September 9th, 2012, September 10th, 2012, are

14   really significant because those are also the dates of the

15   wind-down e-mail that we talked about where the defendant

16   said I'm going to wind-down the fund.  And so on that same

17   date he is sending out performance reports for prior months

18   and the performance reports here, the information in it is

19   all a lie.

20          And we know that again from the bank and brokerage

21   records.

22          But we also know that the defendant, you know,

23   when he September sent out those performance statements and

24   then he sent out the wind-down e-mail that he was doubling

25   down on those lies because not only did the performance

Summations - Smith                      5167

1   update say that the investors, like Ms. Hassan, had made

2   money but he said that they would be able to redeem that

3   money or take their money out to the fund either in cash or

4   in stock or some combination thereof.  And this is

5   Government Exhibit 103-13 which is the wind-down e-mail.

6          As you've seen most of the investors received this

7   e-mail and so it has a bunch of different Government Exhibit

8   numbers, but the content of the e-mail was the same and this

9   is kind of a key section in terms of redemption is that a

10  few operational notes, investors will have their limited

11  partnership interest redeemed by the fund for cash.

12  Alternatively, investors may ask for a redemption of

13  Retrophin shares or a combination of Retrophin shares and

14  cash.  Keep in mind Retrophin shares are a liquid and no

15  liquid market may develop.

16         And then again misrepresentation sent the same day

17  as the performance report was also a lie because there was

18  no money in the fund at the time and there was no cash to

19  provide Ms. Hassan, and as you will see when we get a little

20  bit farther into this section, there was actually no

21  investment by MSMB Capital into Retrophin.  So not only is

22  there no cash, but there's no stock as of September 2012

23  that could be provided to Ms. Hassan.  So she's told that

24  her investment has gone, which is a lie, and she's also told

25  that she can take it out in cash or stock, which is a lie.

Summations - Smith                          5168

1           The next investor in MSMB Capital that I want to

2   talk about is Darren Blanton.  And again, just to give you a

3   kind of overview of who he was, he's from Texas and he runs

4   an investment company for Colt Ventures.  He met the

5   defendant in June of 2010 in New York for a fund pitch, they

6   had a lunch with Tillman Ward, which is one of the people

7   who worked with Mr. Stich.  He invested $1 million in

8   December of 2010 and then he invested an additional $250,000

9   in January of 2011.  And if you remember, he sought a

10  redemption of his funds in November of 2011.  And then he

11  reported the defendant to the SEC when he was unable to

12  actually redeem the investment.  So that's just an overview

13  of Mr. Blanton.

14          So let's walk through the lies that the defendant

15  told Mr. Blanton starting again with the lies that he told

16  him in order to get him to invest in o the fund in the first

17  place.

18          He said that MSMB Capital had an AUM, or access

19  under management, of $35 million and that Rothstein Kass was

20  the auditor and NAV Consulting was the administrator.  And

21  then all of this information was information that Darren

22  Blanton asked for on December 2, 2010, a couple of days

23  before he made his investment and he sent an e-mail with

24  kind of the most important things that he wanted to know

25  from the defendant to confirm before he put that million

Summations - Smith                    5169

1   dollars into the fund.  And you can see that e-mail here is

2   Government Exhibit 105-3 and he says, Darren Blanton said,

3   Martin, who is your auditor and administrator, what are the

4   current AUM's?  Sorry, you sent it, I'm operating on a

5   Blackberry tonight.  And the defendant writes back, Auditor

6   Rothstein Kass; administrator NAV Consulting; lawyer

7   McCormick and O'Brien and he says AUM 35M.  And Darren

8   Blanton testified that his understanding was that that meant

9   $35 million.  And we know that an AUM of $35 million was a

10  lie.  And again, if you look at Government Exhibit 520, the

11  summary chart for MSMB Capital and the defendant's statement

12  to the SEC, we know that in November 2010, on November 30th

13  just three days before the defendant sent that e-mail,

14  there's only $330 in the bank and brokerage accounts for

15  MSMB Capital.  And again, we know the defendant said that at

16  no point did the fund have more than $3 million.  So

17  $35 million was way, way off and was clearly a lie designed

18  to induce Mr. Blanton to actually put that million dollars

19  into the fund.

20          Rothstein Kass, as MSMB Capital's auditor, was

21  also a lie and we kind of walked through that evidence, both

22  the defendant admitting it and the parties have stipulated

23  that Rothstein Kass never did any work for MSMB Capital.

24          NAV Consulting as the administrator for

25  MSMB Capital was a lie.  Again, the defendant in

Summations - Smith                            5170

1   Government Exhibit 918 told the SEC that NAV Capital --

2   NAV Consulting, excuse me, never did any work for

3   MSMB Capital.  And there's also a stipulation to that

4   effect.

5        We did hear from a NAV Consulting witness during

6   the trial NAV Consulting did work for MSMB Healthcare.  But

7   they weren't engaged until after the Orex trade and they

8   never did any work for MSMB Capital.  So the representation

9   that MSMB Capital had an administrator was a lie and the

10  representation that the administrator was NAV Consulting is

11  also a lie.

12       Mr. Blanton was also told by the defendant after

13  he made his investment that the fund continues to perform

14  and the investor statements from Mr. Blanton are

15  Government Exhibits 79-1 to 79-3.  And again, I'm just going

16  to highlight 79-2 which is the statement from March of 2011.

17  And you can see at the bottom there the defendant had listed

18  out what he claims are the account values for Mr. Blanton

19  starting in December of 2010 and going through to March

20  of 2011.  And again, remember that on February 1st, 2011,

21  any money that was in the fund was lost, so this statement

22  that the defendant's -- excuse me -- that Mr. Blanton's

23  investment has increased and that it is more than the

24  $1.25 million that he put in is a lie because actually there

25  was no money at this point in the bank and brokerage

Summations - Smith                          5171

1    accounts.

2              (Continued on next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summations - Smith                                    5172

1          MS. SMITH:  And, again, this is the backup evidence

2     for the bank and brokerage accounts and Mr. Stitch's

3     testimony that not only did the defendant have no money left

4     in those accounts, but he owed $7 million to Merrill Lynch.

5          The next misrepresentation I want to talk about is

6     the representation in the private placement memorandum that

7     there were no lockups and that redemptions were available on

8     certain dates, so that basically an investor when you put your

9     money in, if you gave the defendant notice, he would give you

10    your money back in 30 days.

11         And that was in Government Exhibit 105-1 on the

12    first page, which was an email that the defendant sent to

13    Mr. Blanton when he was actually providing the information for

14    the fund.  He said, Here's all of our fund documentation, the

15    fund is a 120 fee structure with no lockups.  My philosophy is

16    if somebody doesn't to be a partner any more, no problem, 30

17    days' notice.

18         He is basically saying, you know, once you're in the

19    fund, if you change your mind, you want to your money out, if

20    you want to get out your investment plus whatever you earned,

21    just give notice and I'll get it back to you in 30 days.

22         And, again, that was also in a PowerPoint that

23    attached to that email, which, again, is Government

24    Exhibit 105-1.

25         And that representation, as we well know from

Summations - Smith                          5173

1   Mr. Blanton was a lie.  Because Mr. Blanton requested a return

2   of his investment on November 17th, 2011.  And as you heard

3   him testify, he had become concerned about the fund over the

4   summer of 2011.  He was concerned because he had some

5   information that maybe the fund didn't have an auditor and he

6   wasn't getting performance updates on time, and so he decided

7   he wanted to pull his money out.  So he put in a redemption

8   request and he asked for the return of the $1.25 million that

9   he put in, plus the money that the defendant said he had

10  earned while that investment was active.

11          And we know that the representation that the

12  defendant could get his money out in 30 days was a lie,

13  because once Mr. Blanton put in that request on November 17th,

14  2011, 30 days passed and he didn't get his money back, and

15  another 30 days passed and he didn't get his money back, and

16  he didn't get any money back until February of 2012.

17          At this point he got $200,000, and if you remember

18  that was in two payments of $100,000.  And the site is in the

19  government exhibit there, it's Government Exhibit 503-C.

20          I want to just pause here for a minute, because if

21  you remember when Ms. Spaulding testified, she was talking

22  about the different bank accounts.  And the bank accounts for

23  Capital are Government Exhibits 501 and 502.  And as we've

24  seen now multiple times, there was no money in those accounts

25  after July of 2011, and after February of 2011, there was just

Summations - Smith                           5174

1    a very, very tiny amount left.

2           And so how does Mr. Blanton get $200,000 back in

3    February of 2012 from MSMB Capital.  And the answer is that

4    the money doesn't come from MSMB Capital.  The $200,000 he got

5    back came from an account for MSMB Healthcare, and that is

6    Government Exhibit 503-C.  It was an MSMB Healthcare account.

7           And if you remember at the end of Ms. Spaulding's

8    testimony, we actually traced where that $200,000 came from in

9    the MSMB Healthcare account.  And there had been an investment

10   in MSMB Healthcare, a different account by an investor, an

11   850,000-dollar investment, which got transferred to a

12   Retrophin bank account, and then that $200,000 of that money

13   got transferred from the Retrophin bank account to a different

14   MSMB Healthcare account, and then out to Mr. Blanton at Colt

15   Ventures.

16          So the $200,000 that Mr. Blanton got back as a

17   partial redemption in February of 2012 did not come from MSMB

18   Capital.  It wasn't actually a redemption of his funds, it was

19   money that came from an MSMB Healthcare investor that was

20   taken from a Retrophin bank account and back to a different

21   MSMB Healthcare account, and then to Mr. Blanton.

22          So that's really important to keep in mind as well.

23   The defendant is lying not only about the ability to get a

24   redemption, but when there is a redemption about where that

25   money is coming from.  And Mr. Blanton thought there was money

Summations - Smith                    5175

1   left in MSMB Capital, because he did get $200,000, but, in

2   fact, that money had come from an MSMB Healthcare investor.

3   And so that's how in February of 2012 he's actually getting

4   money out of MSMB Capital, because it's not actually coming

5   from MSMB Capital.

6          And after this point, after Mr. Blanton gets that

7   $200,000, the defendant told him two more lies about his MSMB

8   Capital investment.

9          So first, the defendant told Blanton that MSMB

10  Capital had invested in Retrophin and that most of the value

11  of MSMB Capital was in Retrophin.  And that's Government

12  Exhibit 105-12, and that's an email that the defendant sent at

13  the end of April of 2012.

14         And you can see in the last line in the second

15  voided paragraph, the defendant says, A good part of the value

16  of the MSMB funds is in Retrophin.

17         And we know that the statement that MSMB Capital

18  invested in Retrophin was a lie.  Because from the bank and

19  brokerage records, we know that no money was transferred from

20  MSMB Capital to Retrophin, and we also heard that from the

21  testimony of Wendy Spaulding as she was going through the bank

22  accounts.

23         And this makes sense because all of the money in

24  MSMB Capital was lost on February 1st, 2011.  There was

25  nothing left to move over.  And Retrophin was founded, as we

Summations - Smith                          5176

1   see later, later in February 2011.  So the two entities didn't

2   even exist at the same time, and there was no money by the

3   time Retrophin was in existence for MSMB Capital to invest in

4   Retrophin.  So the statement that that's where the fund's

5   money went into Retrophin was also a lie.

6           And then finally, the defendant told Mr. Blanton in

7   that letter, that's Government Exhibit 105-13, in June of

8   2012, that he had suspended withdrawals from MSMB Capital for

9   all investors.

10          So if you remember, Mr. Blanton testified that he

11  put in that redemption request, he got the $200,000 back, and

12  then he kept kind of going back to the defendant saying, When

13  can I get the rest of my money?  When can I get the rest of my

14  money?  He was calling, and the people who worked for him were

15  calling, and so he gets this letter in June of 2012 where the

16  defendant says, Oh, you know, for MSMB Capital, I'm suspending

17  all withdrawals from the fund for all purposes.  And he gets

18  this, you know, very official looking letter that says this.

19          But in fact, the idea that the defendant had

20  suspended redemptions from the fund was also a lie.  First of

21  all, of course, there was no money in the fund so there were

22  month redemptions to suspend.

23          But significantly, Mr. Blanton is the only MSMB

24  Capital investor that gets a letter.  Other MSMB Capital

25  investors were not told that the redemptions were suspended.

LINDA D. DANELCZYK, RPR, CSR

Summations - Smith                              5177

1    And we have testimony to that effect from Sara Hassan,

2    Schuyler Marshall, Steven Richardson, John Neill and Lindsay

3    Rosenwald.  And this makes sense, because Mr. Blanton was the

4    only one asking for his money back.  And so the explanation

5    that was given to Mr. Blanton was that redemptions had been

6    suspended for the entire fund.  But, in fact, he was the only

7    one that was told that because he was the only one that was

8    asking.  And so that statement that redemptions had been

9    suspended was also a lie.

10         I also want to talk a little bit about Steven

11   Richardson, who was both an investor in MSMB Capital and a

12   member of Retrophin's board.  If you remember, he is

13   originally from the UK, and he worked for American Express in

14   the Boston Consulting Group.  He met the defendant in New York

15   in 2009.  And he invested $200,000 in MSMB Capital in October

16   of 2009.  And then another $200,000 in MSMB Capital in

17   February of 2010.

18         And you can kind of see that in the bank and

19   brokerage records.  Again, as you look at the different

20   investments, you will notice that the fund never really

21   performs particularly well, but there's always an uptake in

22   money and funds being invested.

23         And so the first misrepresentation I want to talk

24   about in Retrophin is the representation in his private

25   placement memorandum, and they do differ for the MSMB Capital

Summations - Smith                          5178

1   investors.  Everyone didn't get the same version of the PPM.

2   You can see they have different dates on the front and there's

3   slightly different information inside.

4           And so Steven Richardson is one of the first

5   investors in the fund, and his private placement memorandum

6   says that MSMB Capital had a company called Fulvio &

7   Associates as an auditor, and a law firm called Cobb &

8   Associates as the attorney.  And his private placement

9   memorandum has that information on page 5 and 27.

10          And, again, these statements that Fulvio and Cobb

11  were the auditor and the attorney were also lies.  Government

12  Exhibits 803 and 807, which are stipulations, show that

13  neither Fulvio nor Cobb ever did any work for MSMB Capital.

14          The next misrepresentation I want to talk about was

15  a misrepresentation that the defendant made at the dinner with

16  Mr. Richardson and Mr. Biestek where the defendant was talking

17  about his funds and kind of pitching Mr. Richardson on the

18  investment.  And Mr. Richardson said that they didn't talk

19  about the performance of the fund at that dinner too much,

20  other than the kind of performance he was used to delivering

21  for investors, which was 30 to 40 percent sustained range.  So

22  basically that if you put your money into our fund that the

23  defendant managed, he generally got you 30 or 40 percent

24  return.

25          And you can see from the other testimony that we had

Summations - Smith                              5179

1   from both Josiah Austin and also Lee Yaffe, that this

2   representation about this track record that the most the

3   defendant had done, prior to MSMB Capital and had gotten 30 to

4   40 percent returns was also a lie.

5          The hedge fund that the defendant ran directly

6   before he ran MSMB Capital, which was Elea Capital, resulted

7   in a loss of all the investors' money and a judgment against

8   him by Lehman Brothers.  And we heard that testimony from

9   Josiah Austin and Lee Yaffe.  You remember Josiah Austin said,

10  I put $4.8 million into Elea Capital.  And the defendant also

11  lost all the money in Elea Capital in a single trade, and as a

12  result of that trade, was also in debt to Lehman Brothers of

13  approximately $2 million.  So the statement that he was -- had

14  a good track record and often got investors 30 to 40 percent

15  returns was clearly a lie.

16         The defendant, when he was speaking to investors,

17  did not disclose what had happened with the Elea Capital.  Did

18  not talk about the fact that he ignored the fund, lost

19  people's money, or that he had a judgment that he owed to

20  Lehman Brothers.

21         There were certain versions of the private placement

22  memo that mentioned Elea Capital, not all of them, some of

23  them said that one of the things the defendant had done in the

24  past was work at Elea.  But to the extent that anyone actually

25  asked him about the Elea Capital funds, he lied about that as

Summations - Smith                    5180

1   well.

2         And if you remember you heard from Mr. Blanton, he

3   did mention a background check on the defendant and the Lehman

4   Brothers judgment showed up in that background check, and the

5   defendant said, Oh, that was a big misunderstanding and that's

6   money that Josiah Austin owes, it's not money that I owe.

7         And so to the extent that he even mentions Elea,

8   which for the most part he did not, he wasn't truthful to

9   investors about what had happened or that he had been

10  responsible for causing the fund to loss all of its money.

11        And then again Mr. Richardson, as with all of the

12  MSMB Capital investors, once the investment was in place, once

13  the money was in the fund, the defendant lied about the

14  performance of the fund.

15        And for Mr. Richardson, the performance updates are

16  Government Exhibits 77-1 through 77-26, and this is an

17  example, Government Exhibit 77-13, which is the statement from

18  the March of 2011.  And, again, similar to Sara Hassan, he was

19  told in March of 2011 that his original 400,000-dollar

20  investment had grown to approximately $500,000.  And this is a

21  month after the OREX trade, and we know that there's nothing

22  left in the fund.  So this performance update is clearly a

23  lie.

24        And you can just see, again, the total that he was

25  told his investment was now worth, a little bit more than

1   $500,000 and that the return was 42 percent, which is in line

2   with what he lied about when he tried to get Mr. Richardson to

3   put his money in the fund.

4           So, again, we're seeing a lie to get the money in.

5   I always made 30 to 40 percent returns.  And then once the

6   money is in and the money is gone, which Mr. Richardson

7   doesn't know, you get the same sort of lie, Oh, the fund is

8   doing great, you got 42 percent returns.

9           And, again this is just the same information from

10  the brokerage records with Mr. Switch about after the

11  February 1st, 2011 nothing left in the fund.

12          And then you also heard from additional MSMB Capital

13  investors, Lindsay Rosenwald who invested $100,000 in the fund

14  in October of 2009; Schuyler Marshall, who invested $200,000

15  in the fund in January of 2011; and John Neill.  John Neill

16  invested $500,000 in MSMB Capital on January 31st, 2011, the

17  day before the OREX trade.

18          And so, you know, I always keep John Neill in mind,

19  because John Neill wired his money in on January 31st, and the

20  next day the money was all gone.  And so anything that the

21  defendant said about the performance of MSMB Capital the day

22  after John Neill invested, was clearly a lie.

23          So let's just look at some additional

24  misrepresentations that were told to these three investors in

25  order to get them to put the money in the fund.  The defendant

Summations - Smith                            5182

1   falsely represented to Mr. Rosenwald that Fulvio was MSMB

2   Capital's auditors.  And he falsely represented to Marshall

3   that Rothstein Kass was MSMB Capital's auditors.

4           So, again, you've heard this a couple of times, but

5   the fund didn't have an auditor, and Rothstein Kass wasn't the

6   auditor.

7           The defendant falsely represented to Rosenwald,

8   Marshall, and Neill that he had a positive track record.  And

9   he falsely represented to Marshall and Neill that MSMB Capital

10  had a good track record in 2009 and 2010.  And, again for

11  Marshall and Neill, he's talking to them in December of 2010,

12  when the bank account had -- bank and brokerage account had

13  $330 in it.

14          The other misrepresentation I want to talk about is

15  the management fee would be 1 percent, and the incentive fee

16  would be 20 percent for the fund.  A bunch of the investors

17  talked about it and they saw it in the materials kind of this

18  120 fee structure.  And it basically meant that the manager of

19  the fund was going to take 1 percent of all the money that was

20  put into the fund, and that 1 percent would cover the costs

21  and the expenses related to the fund and salaries.  And then

22  the manager would also get 20 percent of any profits.

23          So if the fund made money, you know, let's say you

24  put $100 and you wind up with $200, you know, the manager gets

25  to take 20 percent, or $20 of that additional $100 that they

Summations - Smith                      5183

1   made.  And that's the way that hedge fund managers get paid

2   basically.

3           And for MSMB Capital, between all of the investors,

4   there was approximately $3 million invested in the fund, which

5   would have meant that the management fee earned 1 percent or

6   $30,000.  And there were no profits, as we know, so there was

7   no 20 percent incentive fee.

8           And you can see from the bank records that the

9   defendant withdraw from the fund far in excess of 1 percent

10  fee just in salaries for its employees alone, and these were

11  some of the payments that went out of the fund to Marek

12  Biestek, to Caroline Stewart, to Andre Logan, and the

13  defendant himself took $26,000 out of the fund personally.

14  You can see the management fee -- the total management fee of

15  $30,000, that the money he withdrew himself was close to in

16  excess of that 1 percent.

17          And then again the defendant falsely represented to

18  these three additional investors that the fund had performed

19  well in the performance reports.

20          And this is just a little overview for Rosenwald.

21  He was told in June of 2012 that the fund was up -- or his

22  investment in the fund was up 79 percent.  Neill was told that

23  his investment was up 29 percent.  And Marshall was told that

24  his investment was up 41 percent.  And, again, John Neill, his

25  investment was one day prior to the OREX trade.

Summations - Smith                        5184

1            So all of the information he got in all the

2    performance reports he received was false, because the day

3    after he put his money in, all of the money was gone.  And

4    that's Government Exhibit 502-B and you can see the wire in,

5    and the date, which is January 31st, 2011.

6            And then this is the chart that Special

7    Agent Braconi walked through in his testimony this week.  The

8    blue columns are what he calculated the investment performance

9    report said about the performance of the funds.  And the red

10   is what was actually in the bank and brokerage accounts.  So

11   that you can see in each month, February 2011, March 2011, and

12   then so on, that the blue is what the defendant is basically

13   telling people is in the fund.  This is what the fund is

14   worth.  And then the red there is what is actually in the bank

15   and brokerage accounts.  And that's Government Exhibit 704.

16           The next thing I want to talk about is materiality.

17   And one of the things that we could show is that the lies that

18   the defendant told were material.  And that basically just

19   means a material fact is one that would have been significant

20   to a reasonable investor's investment decision.  So if you

21   were a reasonable person in an investment hedge fund, what are

22   the facts that would be important to your decision to invest.

23   And we expect that Judge Matsumoto will also tell you that

24   once you find that there was a material misrepresentation or

25   omission, it does not matter whether the intended victims were

Summations - Smith                              5185

1    gullible buyers or sophisticated investors.

2           And so, you know, one of the reasons we look at

3    materiality is just to see whether or not these lies are

4    things that actually would have caused people to invest in the

5    fund.  And I think -- both invest in the fund, and then as

6    well, you know, whether or not they would have pulled their

7    money out of the fund but for the misrepresentation.

8           The evidence that we've just seen about all of the

9    lies about the performance, about the defendant's track

10   record, about the AUM are clearly material to a reasonable

11   investor.  You think about who that reasonable investor is,

12   they want to know is a third party looking at the financials.

13   They want to know how the fund has performed ahead of time.

14   They want to know whether or not the fund is performing now

15   after getting accurate performance updates.

16          And so that is the standard, the reasonable investor

17   standard that you should use to evaluate all of those lies you

18   just heard.  I'm also going to walk through what the investors

19   themselves said here about why these things were important so

20   you can see that these lies were, in fact, material

21   misrepresentations.

22          So you heard from Rosenwald, for example, about the

23   auditor, administrator, attorney and why those are important.

24   And he said they were important because you're giving people

25   money and you're expecting audited returns.  That's standard

1    in the industry.  And so the idea is when they're getting

2    performance updates, it's not someone making up numbers,

3    there's a third party and they're checking everything and that

4    you know the information you're getting is accurate.  And

5    that's why an auditor is important to a fund.  And he also

6    said that if MSMB Capital did not have an auditor, he likely

7    would not have made the investment.

8           And as you can see, a number of the other investors

9    who testified also said that auditors, administrators, and

10   legal counsel were important to them.  And these were some of

11   the issues that the defendant told lies about in order to get

12   people to invest in the fund.

13          And, again, keep in mind that the defendant had

14   experience in the industry.  He had run a prior hedge fund.

15   He had been on Wall Street at this point, even though he was

16   young, for about ten years.  And so he knew that these are the

17   kind of things that a reasonable investor expects to see when

18   they're going to put their money in.  Is there an auditor?  Is

19   there somebody keeping an eye out on the financials?  And that

20   these were important things to the people that were investing,

21   and that was the reason why he told these lies.

22          In terms of materiality for the assets under

23   management, Sara Hassan explained why you would want to know

24   what the assets under management were for a certain fund.  And

25   she said that that was a very healthy fund size, and it had

Summations - Smith                        5187

1    phenomenal returns.  And she talked about how if the hedge

2    fund was too small, you have a hard time getting any momentum

3    and to make any significant investments and to get solid

4    returns.  And so that's why she was looking for an AUM of a

5    certain size.  She wanted to know if the hedge fund could

6    survive and perform.

7            And you also heard testimony from Darren Blanton

8    about the AUM being important.  And he talked about how it was

9    important because if you had enough assets under management,

10   that meant that other people had invested in the fund, and

11   that it can operate and move forward and not worry about not

12   having enough money to continue.

13           In terms of the track record, you also heard from

14   Sara Hassan why is it important, and she said it's very

15   important that someone's track record be good, it's common in

16   the hedge fund world, you make investments in someone's

17   current fund based on their track record in old funds.  So if

18   there was an old fund that she could have used to make a

19   determination, that would have been very helpful.  And then

20   she said it's very important in understanding about a

21   manager's track record.

22           So, you know, what the defendant said about his

23   prior history, his ability to get returns, whether he had been

24   successful was really important to these investors to get them

25   to put their money into the fund.  And you also heard that

Summations - Smith                    5188

1    from Richardson, you heard that Mr. Marshall, and you heard

2    that from John Neill.

3              In terms of liquidity and redemptions, this is the

4    ability to get your money out if you want to within the 30-day

5    period.

6              Darren Blanton testified that that was important, if

7    there was something wrong in the market, or if you need your

8    money, that when the fund says you can get it out in 30 days,

9    you can actually get it out in 30 days.

10             And then again a bunch of the other investors who

11   testified, Sara Hassan, Ms. Rosenwald, Mr. Richardson, all

12   said that the ability to redeem or the ability to get their

13   money out when they wanted was important to their decision to

14   invest.

15             Marshall in particular said that it was a positive

16   factor for MSMB Capital, and that it was something he always

17   looked for when he was looking for the PPM of the fund.

18             And then again the performance reports.  So these

19   are the reports that tell you how your investment is doing

20   when your money is actually in there.

21             And Sara Hassan testified that she thought that the

22   fund was getting phenomenal returns based on the investor

23   statement that the defendant was sending out.  And she said,

24   as did all the investors, that the source of her information

25   about how MSMB Capital was doing was the defendant and what

Summations - Smith                              5189

1    were those performance reports.

2          And she was asked, Throughout 2011, did you consider

3    redeeming or withdrawing your money from MSMB Capital?  And

4    she said, No, I did not.  And when she was asked Why?  And she

5    said, Because they were pretty phenomenal returns.  And the

6    idea being you put your money in this fund, and it's

7    performing really well, why would you take your money out, why

8    wouldn't you just leave it in there and let it continue to

9    grow.

10         And then the additional investors as well, every

11   investor that you heard from, said that the performance

12   reports were very important to their decision to leave their

13   money in the fund, because that was how they knew kind of how

14   their money was doing and whether the fund was doing well.

15         Both Marshall, and Neill, and Richardson said that

16   they didn't make redemption requests like Ms. Hassan, because

17   they felt that the fund was doing well and there was no reason

18   to take their money out.

19         Mr. Blanton, obviously, was in a different category,

20   because he did request a redemption.  But he also said before

21   he requested his redemption, if you remember he had a

22   conversation with the defendant about the OREX trade and that

23   the defendant was kind of concerned that the fund may not have

24   done well.  And then he gets a performance report the next

25   month that says the fund is up 4 percent.  So he relied on

Summations - Smith                    5190

1    that performance report for the understanding that, you know,

2    the fund had done fine after the OREX trade, even though he

3    eventually did put in a redemption request, and up until that

4    point, he was still relying on the performance reports.

5         And the last thing I want to focus on in a big way

6    is evidence of the defendant's intent.  So, you know, one of

7    the things we need to show is that the defendant acted -- that

8    these weren't just kind of mistakes, that these were

9    intentional lies, that these were lies that were told with the

10   intent to have something happen and it is the government's

11   position that the intent was on the front end to get these

12   investors to actually put their money into the fund, and then

13   once the money was in the fund, the lies were done

14   intentionally to make sure that people didn't take their money

15   out of the fund.

16        And I think that one of the best examples of this is

17   the trip that the defendant took to Texas in December of 2010.

18   So if you remember, I talked about this a number a lot, but in

19   November of 2010 at the end of the month, the bank and

20   brokerage accounts for MSMB Capital had $330.  So all of the

21   money that people like Richardson and Rosenwald had put into

22   the fund was already gone in November of 2010.  There was

23   nothing theft.  There was $330.

24        And so the defendant, instead of telling Richardson

25   and Rosenwald that their money was gone, and instead kind of

LINDA D. DANELCZYK, RPR, CSR

Summations - Smith                    5191

1    coming clean, he continued to send performance reports saying

2    that the fund was doing well.  And then he needed to figure

3    out where to get more money from, and so he took a trip down

4    to Texas to recruit new investors.

5            And you've heard about his trip from Mr. Blanton,

6    and you can actually see in the bank records that on

7    December 6th, 2010, there are a bunch of credit card charges

8    in Texas.  And we also saw that email with the defendant's

9    schedule of various investors that he was going to meet with

10   on that trip.  And you can see the amount of money in the bank

11   account at the end of -- at the time he was down on that trip,

12   you know, less than a thousand dollar in the bank account at

13   that point.  So he's down in Texas at the end of November.

14   There's $330 in the bank and brokerage accounts.  While he's

15   in Texas, there's less than a thousand dollars in the bank

16   account, and he is down there telling the same lies to get

17   more people to put money into the fund.

18           And, again, right before he makes the trip.  So

19   after there's only $330 in the bank and brokerage accounts, on

20   December 2nd, 2010, when he sends that email to Darren Blanton

21   with the lies about the auditors and the administrator and the

22   amount of money under management.

23           And you heard from both Blanton and Neill, they

24   talked about what the defendant said at those meetings in

25   Texas and what their understanding was of the fund after

Summations - Smith                      5192

1   dinner.  And that they were both told that the fund had good

2   track record, and that it had been performing well.  And

3   Mr. Blanton said that the information he was told at dinner

4   was the information he had gotten all along in terms of the

5   size of the fund, and the auditor and the administrator.

6           So the defendant knowing the amount of money that

7   was left, knowing he had already lost Rosenwald's and

8   Richardson's money, goes downs to Texas, tells the exact same

9   lies, with the purpose of getting more money to put into the

10  fund.

11          The other email I want to walk through is one that

12  Agent Braconi talked about during his testimony.  It is from

13  March of 2011 which, again, is about a month after the OREX

14  trade, and the defendant sent an email to Edmond Sullivan and

15  he asked him to do a big favor and call this guy who's going

16  to give us 4 million but sounds like he's changing his mind.

17  And the guy's name on the email is Steve Harrison.  And if you

18  go back and look at the defendant's itinerary for the Dallas

19  trip, Steve Harrison is one of the people he meets with in

20  Dallas.

21          So now we're in March, the defendant has lost all

22  the money in MSMB Capital, and he's asking Mr. Sullivan to

23  serve as reference for him, and he is basically saying, I want

24  him to mention the investment in MSMB Capital, don't say how

25  much you put in, and then say you got back 1.3 times that

Summations - Smith                                5193

1   amount in a manner of months and there was no hassle in
2   redeeming.  Talk about how long you've known me and the trust.
3   Please sing my praise.  This is for us, and if you can help us
4   close the deal, I really appreciate it, if you can do it ASAP,
5   that would be with great.

6           He's basically asking Mr. Sullivan to call this guy
7   who might invest more money with him and tell him that the
8   defendant, you know, is great and he's trustworthy and gives
9   your money back if you want him to.  And Mr. Sullivan responds
10  that he wants the defendant to send some background
11  information he has on the investment.

12          And then this is the top portion of that same email
13  chain.  If you look at bottom, Mr. Sullivan is asking:  Does
14  he know OREX drama, which is obviously the OREX trade.  Is it
15  resolved officially with BAML?  You heard from Mr. Stitch that
16  Bank of America and Merrill Lynch merged so BAML is a
17  reference to those two entities.  Do you have last year's
18  audit available?  Who is your legal?  Lots of questions, we
19  just want to be prepared.

20          So Mr. Sullivan is asking the defendant, had you
21  told him about the fact that he lost all the money in the OREX
22  trade?  Have you resolved the situation with Merrill Lynch?
23  And what can I tell him about the auditors?

24          And this is Mr. Shkreli's response, and I think it's
25  really significant.  He says, This is from MSMB Capital.  It's

Summations - Smith                                5194

1   not aware of any drama, nor does it concern him as a manager

2   of the account.  Our legal is McCormich & O'Brien.  I would

3   stay away from legal and audit and accounting and talk about

4   her experience in LP or a limited partner investor, and how

5   you were treated with trust, transparency, and quick

6   turnaround of funding.  Any questions on the other stuff, I

7   would say I trust him, and the mechanisms are in place and

8   this other stuff looks fine as I traded with the guy and

9   watched him trade, and was very happy with what was provided.

10          So that is in March of 2011.  The defendant is

11  basically asking this person to serve as a reference and to

12  stay away from things like legal and audit and accounting, and

13  to talk only about trust.  Because he wants this investor from

14  Texas to provide an additional $4 million.

15          I also want to talk about Mr. Blanton a little bit

16  more.  He was told that there were no redemptions for any MSMB

17  Capital investors in June of 2012.  And he talked about he was

18  the only one that was provided that information, all the other

19  investors were told that they can redeem their investment for

20  stock and cash in the September 2012 wind down email.

21          Mr. Blanton did not receive the email.  If you

22  remember his testimony, he had the wind down email because he

23  got it from somebody else in hard copy, he didn't get it as an

24  email.  So the defendant knew that he had sent Mr. Blanton

25  this letter that said there were no more redemptions.  And he

Summations - Smith                              5195

1    knew that he didn't send anybody else that letter.  So
2    Mr. Blanton is in one category, and all the other MSMB Capital
3    investors are in another.  And when it comes time to send that
4    wind down email, he makes sure it goes to everybody else and
5    not Mr. Blanton, and Mr. Blanton is the only one that requests
6    the redemption.
7            Look at your deliberate, specific approach as to put
8    Mr. Blanton in one category and put everybody else in other
9    category and tell them that they can redeem in September of
10   2012.  To remind you, Mr. Blanton's response, and he testified
11   about it when he got the wind down email, he was very confused
12   because he had been told that, you know, redemptions had been
13   suspended for everybody.  And so that's the reason that the
14   defendant left him off that wind down email.  And this is just
15   Government Exhibit 109-9, which is a version of the wind down
16   email where you can see all of the bcc's, all the email
17   addresses to which it was sent and Mr. Blanton is not on that
18   email.
19           And, again, another of these examples of the
20   defendant's intent was the use of funds in excess of the
21   management fees to cover salaries and payments to employees.
22   And this is Government Exhibit 212.  This is actually an email
23   from April of 2012, long after MSMB Capital is defunct, but
24   he's discussing with Kevin Mulleady, who we'll talk about
25   later, in the context of an investment into MSMB Healthcare,

Summations - Smith                    5196

1   and to potential investors into the fund asking, How are you

2   able to pay your team such a modest asset base?  And that's

3   just saying, again, if you have a small amount of assets under

4   management, that management fee, the 1 percent you're allowed

5   to take out and spend on salaries and other expenses, is

6   really small.  If you have a big fund, that 1 percent is much

7   bigger.  And the defendant responds, Lots of ways.  Many of us

8   had no salaries or low salaries.  We have some expenses that

9   the fund pays for, and other deferences, we'll tell you more

10  when we meet.

11          So that's pretty good evidence that the defendant

12  knows that there are -- you know, if you have a larger asset

13  base, that you can pay more in salaries.  And he knows that

14  people are going to wonder if you have a really small fund how

15  you are actually paying your staff.  And if people knew that

16  the fund was only $3 million, then they know you only have

17  $30,000 to spend on expenses.

18          The defendant also concealed that he used MSMB

19  Capital fund for personal expenses.  We heard testimony from

20  Mr. Yaffe.  And he talked about his father's investment, the

21  George Yaffe investment in Elea Capital, and that George

22  Yaffe, prior to the consulting agreement, which we will get to

23  later, had received some small payments from the defendant.

24  He felt they totaled about $5,000, kind of as a repayment over

25  the years that they were waiting to get their investment money

Summations - Smith                    5197

1    back.

2          And there are direct payments to George Yaffe out of

3    the defendant -- out of the defendant's -- excuse me, out of

4    various accounts, and I believe actually that slide is wrong,

5    there are direct payments out of the MSMB Capital bank

6    account, which is Government Exhibit 501 to George Yaffe.  And

7    when these direct expenses go out of that bank account,

8    they're classified as research expenses, when they are coming

9    out of the MSMB Capital bank account.

10         But the defendant also passes money from MSMB

11   Capital through his personal account and used that money to

12   send George Yaffe payments.  And so that's actually Government

13   Exhibit 514E, which is the defendant's personal account.

14         And so I know that there was testimony on direct and

15   also on cross about this 5,000-dollar payment that George

16   Yaffe received during this period when he is waiting to get

17   his money back.  And Lee Yaffe was asked on cross, Well,

18   didn't that money that your father got, that $5,000, come from

19   the defendant's personal bank account?  And the truth is, that

20   the money did come from the defendant's personal bank account

21   but it was transferred in from MSMB Capital.  So the money

22   comes into the personal bank account from MSMB Capital, and

23   then it goes to George Yaffe.

24         And so the defendant knew that he shouldn't be

25   sending George Yaffe Elea Capital investor money from MSMB

Summations - Smith                          5198

1    Capital directly.  So when he sends it from MSMB Capital

2    directly.  He said it's a research expense.  And when he

3    doesn't classify it that way, he uses money from MSMB Capital,

4    passes it through his personal account, and then sends it out

5    to George Yaffe.  And you can see those transactions right

6    there.  So the money comes in from MSMB Capital to the

7    defendant's personal account, and then it goes out from his

8    personal account to George Yaffe.

9             And this section is about what the defendant said

10   about his education.  And this is really important for the

11   defendant's intent because it shows how the defendant

12   presented himself as a different person to different investors

13   who wanted to hear different things.

14            So the defendant was for each investor what the

15   defendant -- what the investor maybe wanted to hear or what

16   the defendant thought the investor wanted to hear in order to

17   get that investor to trust the defendant and to put their

18   money and keep their money with the defendant and in MSMB

19   Capital.

20            So in terms of the defendant's education, he told

21   Steven Richardson that he hadn't had the money to actually be

22   able to finish college, and you heard testimony from Steven

23   Richardson that he hadn't been able to finish college because

24   he didn't have enough money.  And so that was the story about

25   the education that the defendant told Steven Richardson.

Summations - Smith                    5199

1        When it came it Darren Blanton, who he was trying to

2    impress and get a million dollars out of, he told Darren

3    Blanton that he had graduated from Columbia, which is a

4    completely different story than I didn't have enough money to

5    graduate from college.

6        And then when he was talking to John Neill, when the

7    defendant emailed John Neill, if you'll remember there was an

8    anecdote about how John Neill had sent him a book on Steven

9    Jobs, the Apple founder, and he said, Oh, Steve Jobs dropped

10   out of college.  And so what did the defendant tell John Neill

11   about his education?  He says, Oh, I went to Columbia and I

12   dropped out, too.  I'm just like Steve Jobs.

13       So you get three different stories here.  One, I

14   didn't have money to finish college; two, I graduated from

15   Columbia; three, I dropped out of Columbia, just like Steve

16   Jobs.  Depending on which investor the defendant is talking

17   to, he changes the story to fit what he thinks the investor

18   wants to hear in order to get the investor to trust him and to

19   keep their money with him.

20       And what's the truth about the defendant's

21   education?  Well, there's a statement from the defendant,

22   Government Exhibit 903, that he graduated from Baruch College.

23   So that's not, I didn't have enough money, that's not I

24   dropped out of Columbia, that's not I graduated from Columbia.

25   He went to Baruch.  And we also have testimony from that he

1    did not, in fact, enroll at Columbia at any point, nor did he

2    graduate from Columbia.

3           And then the other, you know, evidence of the

4    defendant's intent was that there these books and records of

5    MSMB Capital that were provided to Mr. Blanton in the summer

6    of 2012.  And this is the point at which, if you remember,

7    Mr. Blanton decided to go to the SEC, because the information

8    that's provided to Mr. Blanton is very clear who invested at

9    what point.

10          Mr. Blanton is shocked.  He has no idea that he was

11   the largest investor in MSMB Capital.  That the actual total

12   amount of money that was put into MSMB Capital was only about

13   $3 million.  And so, you know, the defendant knew that this

14   was the information that was actually correct about MSMB

15   Capital.  He provided it to Darren Blanton in the summer of

16   2012 at the same time that, again, he's seeing these

17   performance updates to the other investors.

18          And just to recap, as of September of 2012, MSMB

19   Capital has no funds, it hasn't invested any money in

20   Retrophin, because Retrophin didn't exist when MSMB Capital

21   existed, and it didn't appear on the capitalization table of

22   Retrophin, and it hadn't received any shares of Retrophin, so

23   that's September of 2012.

24          On September 5th, 2012, there's a settlement of the

25   OREX trade between Merrill Lynch and MSMB Capital, the

Summations - Smith                          5201

1   defendant and Mr. Biestek.  And that's Government

2   Exhibit 113-7.  And that's signed by the defendant, also MSMB

3   Capital and also by Marek Biestek.

4           And in that settlement agreement, there is a

5   statement of the assets of Mr. Shkreli, Mr. Biestek, and MSMB

6   Capital.  And the reason there's a statement is because the

7   settlement is -- in connection with the settlement, they're

8   representing that they don't have more assets, and so they

9   pick the number to settle on, and this is the amount of money

10  that they actually have that could be used to pay it back.

11  And MSMB Capital is listed at the bottom there.  And says it

12  has zero dollars in assets as of September 5th, 2012.  And you

13  can see also that under Mr. Shkreli's name, there's the Lehman

14  judgment listed there as well.

15          So as of September 5th, 2012, the defendant says I

16  have 2 million in judgment against me, and MSMB Capital, it

17  has nothing.  And keep in mind this the same time, four to

18  five days before the performance updates are sent out.

19          And at the same time as the performance updates, the

20  wind down email was sent out where people in MSMB Capital are

21  told that they can get their money out in cash or stock, four

22  days after he tells Merrill Lynch that there's no money in the

23  fund.

24          And there's a statement from the defendant, which is

25  Government Exhibit 935 to the SEC, where he was asked if

LINDA D. DANELCZYK, RPR, CSR

Summations - Smith                          5202

1    everybody from MSMB Capital and Healthcare who wanted their

2    money out of the fund at the time he sent the wind down email,

3    would there have been enough cash available for all those

4    investors?  And the defendant's answer was No.

5              And these are those performance reports that I was

6    talking about.  So September 9th, 2012, the same time that he

7    sends that wind down email where he lies and says he'll send

8    out money out in cash, and that everybody's going to get a

9    redemption, these are the performance updates that he is

10   sending to MSMB Capital investors:  79 percent returns,

11   45 percent returns, 29 percent returns, 41 percent returns.

12             If you remember with Richardson, he had been

13   convinced by the defendant in June of 2012 that he was going

14   to move his MSMB Capital investment into Retrophin, which was

15   a fiction because there was no MSMB Capital investment at that

16   time.  But that's why he didn't receive the performance update

17   in September of 2012.

18             And Blanton had been told there were no more

19   redemptions, so he wasn't getting a performance update in

20   2012.  But the rest of the MSMB Capital investors at that time

21   where there's no money and the defendant is saying there's no

22   money and there's not enough cash, he's telling Merrill Lynch

23   there's zero dollars they're all getting those performance

24   updates with returns up to 79 percent.

25             (Continued on next page.)

Summation - Smith                              5203

1          MS. SMITH:  The other thing I want to talk about is

2     the SEC subpoena that the defendant received on October 1st,

3     2012.  If you remember, the subpoena asked for information

4     about MSMB Capital and investments that had been made in it

5     and this is, you know, after the point at which Mr. Blanton

6     had reported the defendant to the SEC.  This is October 1st,

7     2012 after the wind-down email, all those performance reports

8     after the Merrill Lynch settlement where MSMB Capital had said

9     it had zero dollars.

10          And the defendant responds to the SEC subpoena on

11    November 4th, 2012, and this response is significant.  He puts

12    a schedule of funds managed by MSMB attached to that subpoena

13    reply.  And on November 4th, 2012, two months after that

14    Merrill Lynch statement, he says that MSMB Capital has

15    $2.6 million assets under management to the SEC.  And part of

16    the explanation he gives is that the funds have been

17    successful because they've invested in Retrophin.  We

18    obviously know that is a lie because MSMB Capital did not

19    invest in Retrophin.

20          And then he gives another explanation for the assets

21    under management and says he has a long-term advisory

22    relationship with Josiah Austin, a private investor.  For many

23    years this advisory relationship represented the bulk of

24    MSMB's activities, conclusion of these efforts would also

25    affect the AUM calculation.

Summation - Smith                                    5204

1          So he's basically saying, well, I was a personal

2     advisor, I managed money for Josiah Austin so I'm counting in

3     my AUM his assets.  And we know from Josiah Austin's testimony

4     that that was a lie.  He was not an investor in MSMB Capital,

5     other than investing in Elea Capital.  He never invested any

6     other money with the defendant.  After the defendant lost

7     $4.8 million with him, he had very little contact with him

8     after 2008.  And the defendant himself admitted that he had no

9     trading authority or no discretionary authority over any of

10    Mr. Austin's money.  So again, this kind of explanation for

11    why in November 2012 all of a sudden the assets under

12    management are 2.6 million, when in September 2012 they were

13    zero, is a lie.

14         The last -- one of the last things I want to talk

15    about for MSMB Capital are the evidence of the conspiracy

16    between the defendant and Marek Biestek.  Because two of the

17    three counts for MSMB Capital are charged as a conspiracy.

18    You see a lot of Marek Biestek in the defendant's actions with

19    respect to MSMB Capital.  So MSMB, as you heard from a number

20    of people, is for short for Martin Shkreli Marek Biestek.

21         Mr. Biestek was involved in the setup of the MSMB

22    Capital bank and brokerage accounts and he had signatory

23    authority for the accounts, so he's the one who actually set

24    it up.  In fact, the main bank account he was the only person

25    on it for a period time and he was also responsible for the

Summation - Smith                    5205

1   brokerage account.  You heard from Mr. Stich that he was there

2   at the meeting where they set up the account for Merrill Lynch

3   and that he was the one responsible for that setup.  You can

4   see his name in both places.  He was involved in pitches to

5   MSMB Capital investors, he's listed in the private placement

6   memo and in marketing materials as the portfolio manager for

7   the fund, and multiple witnesses testified to his presence in

8   the office and his work at the fund, including people like

9   Mr. Austin, Mr. Yaffe, and Mr. Stich, who were there at

10  various points, and from Mr. Richardson, Mr. Biestek was there

11  for the pitch and they had a lot of communication about the

12  fund over the years that they knew each other.

13           Mr. Biestek was present for and aware of the fallout

14  from the Orex trade.  There is an email from the defendant to

15  Mr. Biestek that's as a result of the Orex trade and he's also

16  in the office at the same time, as you heard from Caroline

17  Stewart.  And after the Orex trade he continues to work with

18  the defendant on MSMB Healthcare and on Retrophin.  He has

19  interactions with MSMB investors such as Steve Richardson and

20  he doesn't say to anybody, oh, by the way, the defendant blew

21  up the fund, we owe, you know, $7 million to Merrill Lynch and

22  all of their money is gone.  He just continued to work with

23  the defendant on all of these different schemes.

24           In the wind-down email he's described as a

25  co-founder and partner of both funds.  And, again, he was, as

Summation - Smith                                5206

1   you saw, he signed the Merrill Lynch settlement agreement.  So

2   he knew what they were representing were the assets of MSMB

3   Capital as zero dollars on September 5th, 2012.

4           The last requirement I just wanted to talk about --

5   or I think there are a couple more, but getting to the end of

6   MSMB Capital.  Overt acts in the indictment.  So I told you

7   for securities fraud conspiracy there is an additional legal

8   requirement that you show an overt act and that could be just

9   something like an email.

10          So here are two of the overt acts that are in the

11  indictment.  One is on or about October 24th, 2009, Marek

12  Biestek sent an email to Steven Richardson copying Shkreli and

13  enclosing the MSMB Capital investor kit, which included a

14  presentation and a private placement memorandum, and that was

15  admitted as Government Exhibit 122-1.  Again, these overt acts

16  are just acts that are taken in furtherance of the conspiracy.

17          And I have a second one here, which is the email

18  from December 2nd, 2010 that was sent by the defendant to

19  Darren Blanton that 35 AUM Rothstein Kass and NAV Consulting,

20  all lies.  That's Government Exhibit 105-3.

21          The last two requirements are the wires and venue.

22  Venue just is a different standard.  Most of the -- everything

23  else we need to prove beyond a reasonable doubt.  Venue, the

24  standard is preponderance, which just means more likely than

25  not.  And here there's a lot of evidence that acts in

Summation - Smith                              5207

1    connection with MSMB Capital took place in the Eastern

2    District of New York.

3              So Mr. Blanton testified that he traveled through

4    LaGuardia Airport in Queens; Mr. Rosenwald, who was an MSMB

5    Capital investor lived in Lawrence, New York, which is in

6    Nassau County; the defendant lived in Brooklyn, and

7    Mr. Biestek lived in Queens during the operation of MSMB

8    Capital.

9              And then in terms of the interstate wires, we have

10   emails, we have phone calls, we have bank transfers.

11             So that is the end of the MSMB Capital scheme.  The

12   first three charges, securities fraud conspiracy, wire fraud

13   conspiracy and securities fraud.  And for all of the reasons

14   that I talked about and all of the evidence we just walked

15   through, we have proven beyond a reasonable doubt that the

16   defendant is guilty of those three crimes.

17             Your Honor, I don't know if you want to take a quick

18   break before I move on.

19             THE COURT:  Yes, I think maybe it would be a good

20   time to stretch and give the jurors a little break.  Please

21   don't talk about the case at this time and we will come and

22   retrieve you in about 10 minutes.  Thank you.

23             (Jury exits courtroom.)

24             THE COURT:  Let's take some time.  Ten minutes is

25   that enough?

Summation - Smith                              5208

1          MS. SMITH:  Yes.

2          (Recess.)

3          (Jury enters courtroom.)

4          THE COURT:  All jurors are present.  Please have a

5     seat.

6          Please proceed.

7          MS. SMITH:  So before the break we talked about the

8     MSMB Capital scheme and what you saw was devastating evidence

9     that the defendant is guilty of all three of the crimes for

10    which he is charged in connection with those schemes.

11         We're going to turn now to MSMB Healthcare, which

12    was the second hedge fund that the defendant ran.  He started

13    MSMB Healthcare just days after MSMB Capital, and what you're

14    going to see are a similar pattern of misrepresentations to

15    investors in MSMB Healthcare.  The same sort of

16    misrepresentations in order to get the investors to put their

17    money into the fund and the same sort of misrepresentations in

18    order to keep those investors invested in MSMB Healthcare.

19    And keep in mind, during MSMB Healthcare when we talk about

20    things like the defendant's track record and the track record

21    of the funds, you have MSMB Capital at this point which has

22    blown up and lost all of its money and MSMB Healthcare is the

23    next thing that the defendant moves to.  So that context, the

24    MSMB Capital context should be in the back of your minds as

25    you're listening to the MSMB Healthcare evidence and when the

Summation - Smith                              5209

1    defendant talks about his track record and his experience as

2    an investor for MSMB Healthcare now, not only do you have Elea

3    Capital which was a fund that did not perform and lost all of

4    its investors' assets in the 2007, 2008 period, now you also

5    have MSMB Capital, which has as of February 1st, 2011, ceased

6    to function.  So that's kind of the background going into

7    Counts Four, Five and Six, which are part of the MSMB

8    Healthcare frauds.

9            The same three types of conspiracy -- the same three

10   types of charges, securities fraud conspiracy, wire fraud

11   conspiracy and securities fraud are charged in the MSMB

12   Healthcare scheme.

13           Again, just as an overview of the schemes.  The same

14   sorts of misrepresentations to investors to get them to put

15   their money in and then to get them to keep their money in the

16   fund.  Things like the liquidity of the fund, the existence of

17   the auditor, the         defendant's track record and the

18   assets under management.  And then for the misrepresentations

19   to get them to keep their money in the fund, the false

20   performance updates and then the false statements about the

21   composition of the fund.

22           And MSMB Healthcare is a little bit different

23   because unlike MSMB Capital, MSMB Healthcare did in fact

24   invest in Retrophin.  And at some point in MSMB Healthcare, as

25   you will see, Retrophin was the only thing that MSMB

Summation - Smith                              5210

1    Healthcare was invested in.  And we'll get into this in more

2    detail, but the MSMB Healthcare investors also thought they

3    were investing in a hedge fund.  And, again, remember a hedge

4    fund is supposed to be a collection of stocks and add

5    different kinds of equities and there is a mix, there's longs,

6    there's shorts.  And so when we talk about the composition of

7    the fund for MSMB Healthcare, it's important because at the

8    end of the day MSMB Healthcare is basically only invested in

9    Retrophin.  And so it's only composed of Retrophin not this

10   kind of mix that the investors were told about and which they

11   expected.

12         So for the second scheme, MSMB Healthcare, again,

13   the time period is February 2011, which is when MSMB

14   Healthcare starts after the Orex trade to September 2014 and,

15   again, we have the same three charges for this scheme as we

16   did for MSMB Capital.

17         And each of the crimes has the same elements that we

18   talked about earlier.  The only difference is the overt acts

19   that are required for the securities fraud conspiracy -- and

20   we'll look at a couple of those at the end -- but those are

21   different for this scheme than they were for the MSMB Capital

22   scheme.

23         And, again, as with MSMB Capital, MSMB Healthcare,

24   when you buy an interest, when you invest in MSMB Healthcare,

25   you are investing in a security, which is why we have charged

Summation - Smith                    5211

1   securities fraud and securities fraud conspiracy.

2          So let's talk about the creation of MSMB Healthcare.

3   It followed in the immediate aftermath of the failed Orex

4   trade and the loss of all the funds in the MSMB Capital.  And

5   it was founded, as you can see the foundation documents, on

6   February 7th, 2011, so six days after the Orex trade.  It was

7   founded at the same time as Retrophin.  So there is this

8   Retrophin foundation document which is also at the beginning

9   of February 2011 and it's founded -- kind of Retrophin is

10  founded at the exact same time as MSMB Healthcare.

11         What I want to do for MSMB Healthcare is the same as

12  I did for MSMB Capital and talk about the investors in the

13  fund, the misrepresentations that were made to them in order

14  to get them to invest, and then the misrepresentations that

15  were made to them after they had invested.  And you heard from

16  two MSMB Healthcare investors.  David Geller and Richard

17  Kocher.

18         So starting with David Geller, he worked as a trader

19  at a brokerage fund and he was self-employed.  And he met with

20  the defendant and his brother -- and when I say his brother I

21  mean David Geller's brother -- in 2011 before he invested.  He

22  invested $200,000 in MSMB Healthcare in June of 2011.

23         And if you remember, there is a story where he

24  sought a redemption in January 2012 after he got additional

25  information about how much the fund had invested in Retrophin.

Summation - Smith                      5212

1   And he sought to get his money out of the fund and he was

2   convinced not to redeem by the defendant and that's a really

3   important story that we're going to focus on.

4            So starting with the misrepresentations.  Again, he

5   was told that MSMB Healthcare would be a long/short, balanced

6   hedge fund, and you can see that from the testimony.  He was

7   asked, When you say long/short, what do you mean?  And he said

8   that meant that at any time he, in his position balances, he

9   had to have a certain amount of shorts or longs or setting the

10  shorts or longs.  So basically that the hedge fund was going

11  to be a mix of stocks and equities and some of them would be

12  bets that the stocks would go up and some of them would be

13  bets that the stocks would go down, but it would be kind of a

14  mix.  And that's what it means to hedge, as we're told by a

15  number of witnesses.  They're going to make sure you can take

16  one position that it's balanced out by another position.  And

17  that was one of the things he was told in order to get him to

18  invest in the fund in the first place.

19           And this kind of representation was also in the

20  private placement memorandum.  And if you remember, David

21  Geller actually got two.  He got one when he initially

22  invested, sometime before he invested in June of 2011.  And

23  then he got an updated private placement memorandum in

24  August -- excuse me, in October of 2011.  And we'll talk about

25  the differences between the two PPMs, but a lot of them are

Summation - Smith                                    5213

1   actually the same, the same information was in both PPMs, and

2   this information about the long and short positions is in both

3   PPMs, it doesn't change from the original to the amended PPM.

4   And in both times it talks about having this mix of positions

5   and that no one position is going to be more than 10 percent

6   of the fund.

7            And the representation that MSMB Healthcare was a

8   long/short hedge fund was false.  We know this because we know

9   the MSMB Healthcare stopped trading in March of 2012.  So it

10  had bank accounts, it had a brokerage account.  The brokerage

11  account is where you buy and sell the actual stocks.  That

12  brokerage account was actually shut down in March of 2012, so

13  after that point there was no more trading in MSMB Healthcare.

14  At that point MSMB Healthcare basically existed to funnel

15  money to Retrophin.  And we know this not only from the

16  brokerage account records but also from Tim Pierotti who

17  testified that he was in the office with the defendant,

18  starting in August of 2011, and that he didn't really observe

19  him doing any trading.  Tim Pierotti had been at a lot of

20  hedge funds and he knows what trading looks like and he

21  discussed stocks and he didn't see any of that happening in

22  the office.

23           And as I said, over time MSMB Healthcare's true

24  purpose, which was not disclosed to the investors, was

25  basically to funnel money to Retrophin.

Summation - Smith                         5214

1          And we should actually take an example from Kocher,

2     his investment on May 3rd into MSMB Healthcare of $100,000.

3     The next transaction in MSMB Healthcare's bank account is

4     $90,000 of that hundred thousand dollars being shipped over

5     into Retrophin.  And you can see this pattern particularly

6     after March of 2012 when there's no more trading.  Money

7     that's invested in MSMB Healthcare gets funneled directly into

8     Retrophin.  And you can see that money coming in and then the

9     money being moved over to Retrophin.  A hundred thousand

10    dollars in, $90,000 out to Retrophin.

11         The defendant also made misrepresentations about

12    that revised private placement memorandum.  So after David

13    Geller invested, he then got this letter, which was dated

14    October 31st, 2011.  And the letter, which is Government

15    Exhibit 109-6, talked about how there were going to be changes

16    to the PPM and that MSMB Healthcare would be investing in more

17    illiquid securities and there was information on the

18    performance updates that they had invested in Retrophin.  And

19    so this was a letter kind of informing David Geller about some

20    of those changes.

21         As I said, if you actually put the two PPMs next

22    each other, they mostly contain the same information and they

23    still have all of those disclaimers about how you can get your

24    money out in 30 days, how it is a long/short fund, but this

25    letter did kind of make it clear that the fund was going to be

Summation - Smith                          5215

1  doing more investments into Retrophin and into illiquid

2  securities.

3          And so David Geller, as he testified, was very

4  concerned about this.  And he contacted both the defendant and

5  his co-conspirator, Kevin Mulleady, to try and get more

6  information about what did this really mean and did he

7  actually want to leave his money in MSMB Healthcare because,

8  as he testified, he was very concerned about liquidity

9  generally.  He had bad experiences in the past with investing

10  in private companies or investing in illiquid securities and

11  so he wanted to make sure this was still kind of this

12  long/short balanced hedge fund.

13          So what were those misrepresentations?  Well,

14  there's an email in January of 2012 where he actually

15  officially seeks a redemption following the PPM change and

16  there was testimony about why he had sought the redemption and

17  it was because he was really concerned about this change.  And

18  as he testified, he had conversations with the defendant and

19  Mr. Mulleady and those conversations led him to be convinced

20  that he should actually withdraw his redemption request and

21  not actually redeem and get his money out of the fund.  And he

22  specifically testified that both Kevin Mulleady and the

23  defendant said, I think the main thing they said was that this

24  private investment letter that they sent to me it was just

25  going to be -- when they did invest in the private other hedge

Summation - Smith                          5216

1   funds things, that it was going to be a very small portion of

2   the fund.  And this was a conversation that took place by

3   phone and it was a conversation that convinced him that even

4   though he had gotten that letter and the revised private

5   placement memorandum, the illiquid securities or the

6   investment in Retrophin was going to be small.  It wasn't

7   going to be the whole fund.  It was going to be a small

8   portion, he shouldn't worry about the language in the PPM and

9   he shouldn't try and take his money out of MSMB Healthcare.

10          You can actually see this not only in the email that

11  David Geller testified about, but actually in the email

12  between the defendant and Kevin Mulleady, his co-conspirator,

13  which is Government's Exhibit 350, that David Geller didn't

14  see.  So David Geller didn't actually see this back and forth,

15  but at the bottom of the email on November 2nd, which by the

16  way is three days after David Geller got that original letter

17  related to the revised PPM, three days after that he actually

18  emailed Kevin Mulleady and said that he had looked over the

19  PPM and that he had a couple of questions and he wanted to get

20  more information.  And Kevin Mulleady talks to the defendant

21  and they have a conversation back and forth and at the end of

22  the day the defendant says, tell him that the purpose of the

23  changes to the PPM -- and it's line at the top -- is to make a

24  small investment in Retrophin.  Not so that MSMB Healthcare

25  can kind of become a vehicle to funnel money to Retrophin but

Summation - Smith                                    5217

1   that MSMB Healthcare is going to make a small investment.  And
2   that's what that revised PPM meant.  And this is entirely
3   consistent, this is from November of 2011, with what the
4   defendant and Kevin Mulleady told David Geller in January of
5   2011 at the time that he was, like, I actually want to pull my
6   money out and they had to convince him, again, don't do it,
7   it's still a hedge fund, there's still lots of long/short and
8   the Retrophin investment is really small.  So the defendant
9   sends out the revised PPM and that letter and then he
10  basically says, don't worry about it, it's just a really small
11  investment in Retrophin.
12          And, again, the defendant represented to Geller that
13  there was monthly liquidity, which is a little intention with
14  this idea that there were going to be investments into
15  illiquid securities.  But this is another lie that the
16  defendant told David Geller in order to get him to invest in
17  the fund.  He said -- David Geller said that this liquidity,
18  the ability to redeem in 30 days, which is the same as with
19  the MSMB Capital requirement, was very important to his
20  decision to invest.  Again, the statement about being able to
21  pull your money out in 30 days and the fund being liquid is
22  both in the initial PPM and then in that revised PPM that was
23  dated in October of 2011.
24          We know that the representations about liquidity
25  were false.  And we know that, again, because MSMB Healthcare

Summation - Smith                              5218

1   invested heavily in Retrophin, which was not liquid, it was a

2   private company at the time and MSMB Healthcare specifically

3   did not have enough funds to make redemptions within that

4   30-day period.

5            So if you look at the chart, which is Government

6   Exhibit 521A, and we went through this with Wendy Spaulding,

7   this is the graph of the ending balances for the bank and

8   brokerage accounts for MSMB Healthcare.  And you can see that

9   by 2012, there is very little money actually left in those

10  bank and brokerage accounts.  There's very little money to

11  actually provide the liquidity that the defendant promised.

12           Once again, with MSMB Healthcare, the defendant

13  represented that the fund would be audited in addition to

14  having an administrator.  MSMB Capital, the lies were very,

15  very clear.  The defendant put in auditors Rothstein Kass,

16  Fulvio & Associates, who never did any work for MSMB Capital.

17  It was a lie, there was no auditor.

18           For MSMB Healthcare, the defendant was a little less

19  clear.  He, instead of saying that there was a particular

20  auditor and naming it, he included a section in the PPM that

21  said auditors, and then when you went to that section it

22  talked about the administrator NAV Consulting.  It also said

23  there would be an auditing firm that the fund would hire.  We

24  know from David Geller that he believed -- and I don't have

25  the testimony, but he testified that he thought that there was

Summation - Smith                          5219

1   an auditor and that that was something that was important to

2   him.  And it was based in part on this PPM, which suggests

3   there is an auditor and an auditing firm taking a second look

4   at the defendant's performance reports for the fund.

5           Again, the defendant represented to David Geller

6   that he had an impressive track record in the industry.  He

7   discussed with David Geller his experience with Jim Cramer

8   and, again he did not mention Elea Capital.  And we know that

9   these track record representations were false for the reasons

10  I said at the very beginning, you know, he had already blown

11  up Elea Capital, he just blown up MSMB Capital, so this idea

12  that he had this impressive performance record and was some

13  sort of genius in the investing industry was completely

14  untrue.

15          And, again, as with MSMB Capital, after David Geller

16  put his money in he continued to receive these performance

17  updates that said that the fund was performing well.  And his

18  performance updates are Government Exhibits 91 series.  I'm

19  just giving you an example of Government Exhibit 91-10, which

20  is the statement for July of 2012, and it shows significant

21  positive returns for David Geller's investment.  And we know

22  that the representation that the fund was performing well at

23  this point was a lie because you can see that the fund only

24  has about $79,000 in July of 2012, at the same time that David

25  Geller is getting a statement saying that his investment has

Summation - Smith                          5220

1    performed and returned more than 30 percent returns.  His

2    investment alone is $200,000.  There is $79,000 in the bank

3    and brokerage accounts at this point.

4           And, again, this is Government Exhibit 705 this is

5    the chart that Agent Braconi testified about earlier this

6    week.  The blue bars, as with the chart we saw for MSMB

7    Capital, are the representations that the defendant is making

8    in the investor statements themselves.  So the blue bars

9    represent what the defendant says the fund has in it.  And the

10   red bars are what is actually in the bank and brokerage

11   accounts for the fund.  And you can see that over time the

12   difference between what the defendant says about the fund's

13   performance and what is actually in the bank and brokerage

14   accounts.  There is an enormous difference.  It is clear that

15   the statements that the MSMB Healthcare investors are getting

16   are false.

17          Now, one question that Agent Braconi got on

18   cross-examination about this chart was the question about,

19   well, MSMB Healthcare invested money in Retrophin and that is

20   true.  They invested -- MSMB Healthcare, again, was used

21   primarily to funnel money to Retrophin unbeknownst to the

22   investors and over time it funneled approximately $2.1 million

23   to Retrophin.  And it did that in a time period between

24   approximately the summer of 2011 and December of 2012.  But

25   you can see that even if you were to add taking the last month

Summation - Smith                    5221

1   there, July of 2012 -- and by July 2012, the 2.1 million had

2   not yet gone into Retrophin, but even if you take that

3   $2.1 million that went into Retrophin and you add it to the

4   bank and brokerage account, it doesn't even come up to halfway

5   where the defendant said the value of MSMB Healthcare was.  So

6   just to keep that in mind, the bank and brokerage accounts

7   don't take into account the amount of money that was moved

8   over to Retrophin but even if you did, those performance

9   reports are not accurate.

10          So the next investor I want to talk about is Richard

11   Kocher, who is the second MSMB Healthcare investor you heard

12   from.  If you remember Mr. Kocher owns and runs a construction

13   business in New Jersey and he was recruited to MSMB Healthcare

14   by co-conspirator Kevin Mulleady.  He invested $100,000 in

15   MSMB Healthcare on February 1st, 2012, and then he invested an

16   additional hundred thousand dollars in MSMB Healthcare on

17   May 3rd, 2012, in response to what he was told was an urgent

18   request by Kevin Mulleady.  And if you remember, we just

19   looked at that transfer a couple of minutes ago when I was

20   saying that by the spring of 2012 MSMB Healthcare was

21   basically just being used to funnel money to Retrophin.  If

22   you remember that May 3rd, 2012 investment into MSMB

23   Healthcare, that hundred thousand dollars that Kevin Mulleady

24   told him they needed urgently for an MSMB Healthcare

25   investment, was immediately moved over, $90,000 of the hundred

Summation - Smith                          5222

1    thousand dollars was immediately moved over to Retrophin.

2              And so let's just walk through some of the

3    misrepresentations to Richard Kocher.  Prior to the initial

4    investment, Mulleady represented that the investment would

5    have monthly liquidity.  You can see the testimony from

6    Richard Kocher here from transcript at page 2318.  He says --

7    he's asked, Would you still have invested in MSMB Healthcare

8    if you couldn't get your money out in a month's time?  And he

9    responded, no, because, general speaking, I have very little

10   cash.  So when a project comes up I need to be able to have

11   money on hand.  And it was very clear from Mr. Kocher's

12   testimony that liquidity was the most important thing he was

13   looking for when he was thinking about investments, because he

14   runs a construction business and he needs to have a certain

15   access to cash to kind of, as things come up and as project

16   are completed he needs to be able to move that cash around, so

17   he was very focused on whether or not he would be able pull

18   his money out in 30 days if he needed to and he was assured

19   multiple times that he would be able to pull his money out in

20   that time frame as required.

21              (Continued on the next page.)

22

23

24

25

*Georgette Betts, RPR, CSR  -  Official Court Reporter*

*Summation - Smith*                                           5223

1          MS. SMITH:  (Cont'g.)  Sandy just gave me a chance

2     to take a water break, thanks.

3          And we can see that liquidity was actually so

4     important to Mr. Kocher that before he made his second

5     investment in the fund he made sure that both the defendant

6     and Kevin Mulleady promised that not only could he get his

7     funds out in a month if he needed that but he actually signed

8     a side letter to make sure that if he needed money on a quick

9     basis in a week he could get it out, and that's Government

10    Exhibit 107-11.

11         And you can see that the letter is dated in May of

12    2012 and it represents that -- it is a little faded -- but it

13    represents that if Mr. Kocher wants to take his money out in a

14    week he has the ability to do that separate and apart from

15    anything that might be in the Private Placement Memorandum and

16    the defendant signed that letter and agreed to those terms for

17    Mr. Kocher and you can see there the actual terms of that

18    liquidity, getting your money out in a week and the

19    defendant's signature.

20         And, again, as we've seen, the representations about

21    liquidity were false because the fund was invested heavily in

22    Retrophin and that itself didn't have any additional funds

23    that could be used to provide liquidity and those are just

24    kind of two calculations in May of 2012, there's $9,000 in the

25    bank and brokerage accounts in September 2012 which, again,

*Summation - Smith*                                               5224

1   becomes important because of the wind-down email.  At the end

2   of the month in September of 2012 there's $614 in MSMB

3   Healthcare's bank and brokerage accounts.

4          As with all of the investors in MSMB Capital and

5   MSMB Healthcare, the defendant falsely represented to Kocher

6   that his investment had continued to perform well and so his

7   investment statements are Government Exhibits 83-1 through

8   83-4 and they show overall positive returns, and this is an

9   example of the statement from July of 2012 and, again, keep in

10  mind this is a statement sent by the defendant on

11  September 9th, 2012, so this is right at the same time as he

12  is making the representations to MSMB Capital investors about

13  the performance of their funds, he's also sending out these

14  performance updates to MSMB Healthcare and while MSMB

15  Healthcare, unlike MSMB Capital, actually had some money left

16  in it, it did not have the performance returns that the

17  defendant was promising as you can see in Agent Braconi's

18  chart.

19          And these are just some additional

20  misrepresentations by the defendant in connection with MSMB

21  Healthcare.  Again, in September of 2012 he represented that

22  Kocher and Geller and the other investors could redeem their

23  investments for cash and then again that's the wind-down email

24  and that representation was a lie as well.  Again, as we

25  talked about with MSMB Capital, we wanted to focus on

*Summation - Smith*                                              5225

1    materiality.  So, why are these lies important, what about

2    these lies actually caused investors to put money with the

3    defendant or to keep money with the defendant, and I think

4    that you will see when you think about the evidence that these

5    misrepresentations were targeted towards getting people to

6    invest in the fund, they were about the fund, they were things

7    that people were asking about liquidity or the mix of the

8    fund, what is in the fund, and the defendant was making these

9    misrepresentations because he knew that by saying these

10   things, he would convince people to give them his money.

11          And we know this from the testimony as well as, you

12   know, when you think about it, again, it's that reasonable

13   investor standard, what would a reasonable investor want to

14   know about a hedge fund they were putting money in, what kind

15   of things is the fund invested in, when can I get my money

16   out, these are things that a reasonable investor would want to

17   know.  And we heard testimony from both Kocher and Geller to

18   that effect on different aspects of the defendant's lies.

19          So, for liquidity, again, Kocher testified at length

20   that liquidity was important and I actually put up this cite

21   earlier but basically he was saying that cash is very

22   important to the business, when a project comes up he wants to

23   be able to have money on hand, and so those representations

24   about liquidity both before his original investment and then

25   the side letter before his second investment were incredibly

*Summation - Smith*                                                    5226

1   important to his decision and he would not have invested if he

2   didn't think he could get his money out.  And David Geller

3   testified similarly that the liquidity representations were

4   important to him.

5            Again, the representations about the percentage of

6   MSMB Healthcare that would be invested in Retrophin were

7   important to investors.  Geller basically testified that, you

8   know, he was concerned when he got that letter and that second

9   PPM and it was only after talking to the defendant and

10  co-conspirator Kevin Mulleady, being told don't worry about

11  it, we're just making a small investment in Retrophin, was the

12  reason that he actually didn't try and take his money out, so

13  that was a lie to get him to keep the money in the fund.

14           And, again, this is additional testimony that said,

15  you know, that basically it was important for him to know what

16  the mix was and when he found out in 2013 that the fund had

17  invested solely in Retrophin and that Retrophin was the only

18  thing left in the fund, his reaction was, he said I was

19  disappointed and angry, I wasn't getting the answers I was

20  looking for but at the same time kind of getting the worst

21  case -- putting the worst case scenario in my mind and he said

22  this because, again, he had bad experiences investing in

23  illiquid securities in the past, he doesn't want a private

24  equity investment or an illiquid investment, he wanted a hedge

25  fund that was a mix and the reason he didn't pull his money

*Summation - Smith*                                           5227

1   out was that the defendant promised him it was only going to

2   be a small piece in Retrophin and that was a lie and when he

3   found out about it in 2013 he was very upset because the whole

4   reason he had asked those questions in the first place is

5   because he wanted to know whether he should make this

6   investment.

7          And, again, track record, we talked about this

8   before, Kocher testified that if the defendant had had a prior

9   hedge fund that had performed poorly, it would have been

10  important for him to know at the time of his investment and we

11  know, of course, that there were two prior hedge funds at this

12  point that had performed poorly that the defendant was

13  running.

14         And Geller also provided some more testimony.  And,

15  again, the accuracy of the performance reports was important

16  to the investors, it allowed them to keep track of their

17  investment and to make decisions about whether they should

18  leave their money in or they should take their money out and

19  this is some testimony from Geller about why those performance

20  statements are actually important.

21         And, again, the representations about the auditors,

22  why those are important, the idea that there is a third party

23  who is passing on the performance reports and making sure that

24  they're actually correct and that they line up with the

25  representations that are made in testimony.

*Summation - Smith*                                                5228

1              And in terms of intent, again, the defendant needs

2      to be acting knowingly and purposefully and the

3      representations that you have seen from MSMB Healthcare

4      already show that because there's no reason to say that

5      there's an auditor when there's not unless you're trying to

6      convince somebody to put your money in and to feel comfortable

7      doing that and that's the same with the liquidity and all of

8      the other misrepresentations that you heard so far.

9              But there's also some additional testimony that I

10     think shows the defendant's intent here.  You know, the

11     discussion about what was actually in MSMB Healthcare, which

12     is this testimony, which is David Geller being told directly

13     by the defendant the securities in question, the private

14     securities they were going to go into would be a very small

15     part of the portfolio and this is at a time that the defendant

16     is already using MSMB Healthcare to funnel money to Retrophin

17     in January of 2012, it is only two months before they stopped

18     trading altogether, a lot of money has already been moved over

19     and ultimately, as I said earlier, MSMB Healthcare is just

20     used to kind of prop Retrophin up and the defendant knows that

21     because he's running MSMB Healthcare, he's running Retrophin

22     at the same time and yet, he's telling David Geller, you know,

23     don't worry about it, it is just going to be a small portion

24     of MSMB Healthcare.

25             And, again, that's the email that we have from Kevin

*Summation - Smith*                                              5229

1   Mulleady discussing what to tell David Geller, how to keep him

2   from pulling his money out because they want to use that money

3   for Retrophin.  The defendant, as with MSMB Capital, had

4   access and signatory authority over all of the bank accounts,

5   the brokerage account.  You can see the main bank account for

6   MSMB Healthcare has both signatures of Mr. Shkreli and

7   Mr. Biestek who also worked on MSMB Healthcare, he also runs

8   MSMB Capital, stopped functioning, just moved right on over to

9   Healthcare and continued to be involved in that fund and you

10  can see all the signatures there fore Mr. Shkreli getting all

11  the information from the bank accounts as well as Mr. Biestek

12  on this first bank account.

13          And this is Government Exhibits 126-21 and 126-32.

14  I'm just having a little trouble with the screen so I'm going

15  to pull it up for you.

16          I wanted to put these exhibits up to talk about

17  NAV Consulting for a minute because unlike MSMB Capital which

18  didn't have an administrator, NAV Consulting, as you heard

19  testimony, helped put together the performance reports for

20  MSMB Healthcare up until a certain point.  So, we have a

21  stipulation that they were the administrator between March

22  of 2011 and May of 2012.  After that point the defendant is

23  sending out the performance reports himself.  So, those

24  performance reports that go out in September, those are

25  directly from the defendant, NAV Consulting isn't involved

*Summation - Smith*                                                5230

1    anymore, but NAV Consulting testified that the information

2    that goes into the performance reports is entirely from the

3    client, they are not an auditor, they do not do checks and you

4    can see from the documents we put in from NAV Consulting that

5    it is the defendant that is providing the information that's

6    going into those performance reports.

7         So, the top email, the defendant talks about how he

8    and Marek Biestek are going to be the two people who are

9    approving transactions and releasing funds from MSMB

10   Healthcare.  And the bottom email is from the defendant's

11   administrative assistant who says:  I don't deal with this

12   fund.  If you want information on the fund, NAV Consulting,

13   you need to go talk to the defendant.

14        So, it's just to keep in mind that those earlier

15   performance reports which if you look at Agent Braconi's

16   chart, there are some earlier which are closer to being

17   accurate, but there's a point after which NAV Consulting isn't

18   involved and I think at that point you can see that the

19   performance reports and the reality diverge even more greatly

20   but even while NAV Consulting is involved, the only

21   information they're getting is from the defendant and the bank

22   and brokerage records.

23        Again, in terms of intent, you know there's a

24   discussion here about the pitch book for MSMB Healthcare and

25   we're going so see that in a minute but Kevin Mulleady, who is

*Summation - Smith*                                                     5231

1    a co-conspirator, is talking about touching up the pitch book

2    in January of 2012 and that's one of the slides that show that

3    is used to kind of pitch MSMB Healthcare and he says:  I'm

4    going to touch up the pitch book, take out the side pocket

5    comments LOL.

6           The side pockets, we'll see it in a minute, there's

7    a line in the pitch book that says "no side pockets" meaning

8    have no places where we're going to stick money or illiquid

9    securities and it's only in January 2012 where he's jokingly

10   saying, oh, I guess at this point I should take that out, that

11   comment, which is months after they started funneling money

12   into Retrophin.

13          This exhibit is also notable because they're asking

14   for a reference for the defendant and he gives the name Ed

15   Sullivan which is that same person who the defendant was

16   asking to give him a reference earlier and saying stay away

17   from legal and audit and accounting, he's using that same

18   person to try and get investors to trust him now for MSMB

19   Healthcare.

20          And, again, you can see that the defendant, despite

21   knowing how much money is in the bank and brokerage accounts

22   and how much money that's been transferred over to Retrophin,

23   is still saying that the AUM for MSMB Healthcare is

24   $55 million in April of 2012.

25          And, again, this last piece that I want to talk

*Summation - Smith*                                              5232

1   about for intent has to do with the management fee and, as you

2   know, approximately $3.5 million was invested in Healthcare,

3   Agent Braconi testified about that, you can also see it in the

4   bank and brokerage records, which would mean that the

5   management fee would be 3,000 -- excuse me, $35,000 and,

6   again, there were no profits for MSMB Healthcare so there

7   wouldn't have been a right to a 20 percent incentive payment

8   and given that the $35,000 figure, it is significant that the

9   defendant misappropriated $900,000 from the fund without

10   getting the permission of the investors to repay a personal

11   debt that he and Marek Biestek and MSMB Capital owed to

12   Merrill Lynch and this is kind of some of what we walked

13   through with Wendy Spaulding when we were looking at the bank

14   accounts but I kind of want to explain this $900,000 note and

15   how it was used to take money out of MSMB Healthcare and loot

16   the fund for the defendant's personal expenses.

17           So, on February 1st 2012 MSMB Healthcare invested

18   $900,000 into Retrophin, and that's Government Exhibit 126-5,

19   and every time they invested money into Retrophin, just like

20   an investor, MSMB Healthcare would get a subscription

21   agreement which is basically like the initial agreement that

22   some of our investors got that says this is how much you have

23   invested in Retrophin.  And the defendant takes that agreement

24   and he sends it to NAV Consulting and so it lines up with the

25   bank account where you can actually see the $900,000 going

*Summation - Smith*                                           5233

1   from MSMB Healthcare into Retrophin and this is part of the

2   investments that MSMB Healthcare made into Retrophin over the

3   course of its existence, part of that $2.1 million.  And you

4   can see three that it's dated February 1st and that the amount

5   is $900,000.  So, this is an investment, I'm putting $900,000

6   from Healthcare into Retrophin and I'm getting shares in

7   return.  And that's the actual bank transfer that shows that

8   the money went from Healthcare to Retrophin.

9           If we look at the cap table for Retrophin, which

10  we've heard that a lot, the capitalization table, which is

11  basically the list of individuals who own shares in a company

12  either because they were an employee and they were gifted

13  shares or because they actually invested; if we look at the

14  February 2012 cap table which is made right after this

15  investment, you can see that February 1st investment from

16  Healthcare into Retrophin on the cap table, so that they've

17  actually received shares in return for their investment and

18  you can see that that investment remains on the cap table from

19  February 2012 all the way to November 2012 and there were a

20  lot of cap tables we put in evidence and if you look at any

21  one of those cap tables in between those two time periods,

22  this investment is on those cap tables.

23          And in November, however, there's this email that we

24  talked about with Corey Massella, who is the witness from

25  Citrin, and he talked about how there was some confusion

*Summation - Smith*                                                      5234

1   because they were seeing that $900,000 investment into

2   Retrophin from Healthcare but they were also seeing this note

3   that they hadn't seen before and it was a promissory note that

4   basically said that Retrophin owed MSMB Healthcare $900,000.

5   So, they were both seeing an investment into Retrophin and

6   what they were thinking was a loan and if you had seen both an

7   investment and a loan of $900,000, you would actually see a

8   total of $1.8 million going from Healthcare to Retrophin

9   because $900,000 would be for the shares and the additional

10  $900,000 would be the loan and they were very confused because

11  their records showed the investment and then they were handed

12  this note and they only saw $900,000, so that $900,000 was

13  either an investment or a loan but it couldn't be both

14  basically.

15          And this is the $900,000 note which is dated

16  February 1st, 2012 and signed by the defendant and basically

17  this says that Retrophin owes MSMB Healthcare $900,000.  So,

18  it's basically saying that that $900,000 wasn't to buy shares,

19  it was just a loan from MSMB Healthcare to Retrophin.  And you

20  can see that the defendant on December 3rd actually goes back

21  into the cap table and says that that investment which, by the

22  way, he's been relying on in the performance reports and in

23  representations to MSMB Healthcare between February and

24  December has now been disqualified and he's saying, you know,

25  there shouldn't -- it shouldn't have been an investment, it

*Summation - Smith*                                                  5235

1   was actually a loan, I have a promissory note, there was no

2   investment, the money is owed from Retrophin back to MSMB

3   Healthcare and that's on December 3rd, 2012.

4           And it's significant, the timing, because as a

5   result of the settlement agreement to resolve the dispute with

6   Merrill Lynch, the defendant, Marek Biestek and MSMB Capital

7   owed at least a million dollars to Merrill Lynch by

8   December 15th and if you remember when we talked about the

9   Merrill Lynch settlement, there were actually three settlement

10  agreements, there was the original one and then there were two

11  amendments because the defendant wasn't able to pay the amount

12  that was due initially and so they kept extending the time

13  that he had to make this element payment out but originally

14  this element payment was due on December 15th and so at the

15  time that the defendant reclassifies that investment as a loan

16  which would let him move the money from Retrophin back to MSMB

17  Healthcare he's looking down a debt of $1 million that's due

18  on December 15th, 2012.

19          The problem was that at this time in early

20  December 2012 Retrophin didn't have any money so even if the

21  $900,000 was owed from Retrophin to Healthcare, there was only

22  $11,000 in Retrophin, there was no way to get any money out of

23  Retrophin because there was no money in the bank account and

24  so the defendant entered into an amended settlement agreement

25  to buy himself more time to make that Merrill Lynch payment

*Summation - Smith*                                    5236

1    and you can see that the extension is signed on December 13th

2    and that it gives him until January to make a payment.

3            And then there's a second amendment, as I just said,

4    that extends the time until after the Retrophin pipe and

5    that's signed on January 8th, 2013 and so we talked a little

6    bit about the pipe, you know, in December of 2012 Retrophin

7    has no money and then they do kind of a -- they get investors

8    to put money in in a private placement in February and so what

9    happens is Retrophin's bank account has no money and so the

10   defendant extends out when he has to repay Merrill Lynch until

11   after people are going to put more money into Retrophin.

12           And then what happens is the defendant causes that

13   $900,000 note to be repaid in January and then in March, so he

14   takes the money from Retrophin and puts it back to MSMB

15   Healthcare saying that it had been a loan and now Retrophin is

16   repaying MSMB Healthcare.  What's really important is that the

17   money doesn't actually go to MSMB Healthcare.  So, the money

18   originally belonged to MSMB Healthcare, he said it was an

19   investment, now he's saying it is a loan so it should go back

20   to MSMB Healthcare and it belongs to the investors who put

21   their money in MSMB Healthcare in the first place but instead

22   of sitting in MSMB Healthcare and it being distributed back to

23   the investors, it goes to pay the defendant's personal debt to

24   Merrill Lynch.

25           And you can see this with the bank accounts, there's

*Summation - Smith*                                          5237

1   the original payment of the note on January 18, 2012, it is

2   $125,000.  So, the defendant pulls part of the money for the

3   note out of Retrophin, puts it back in Healthcare.  Again,

4   that's the money that the investors put into Healthcare.  You

5   know, if it wasn't an investment in Retrophin, it belonged to

6   MSMB Healthcare and he's using it to pay his personal debt to

7   Merrill Lynch and the debt of MSMB Capital.  So, that first

8   payment is made in January of 2013 and then the final

9   repayment of the note is made in March of 2013 and in total

10  there's the first $125,000 payment and then there's a $773,000

11  payment and that money is used to meet the $1.3 million that

12  he owes to Merrill Lynch.

13          So, it is really important to try and keep track of

14  that, how that worked with the original investment into

15  Retrophin.  Then the defendant says it was a loan, it should

16  go back into Healthcare and instead of actually going back

17  into Healthcare, it is used to pay his personal debts.  So,

18  that $900,000 is taken from the investors of MSMB Healthcare

19  and used for the defendant's personal debts.

20          And so, you can see there is additional money

21  transferred directly from Retrophin to Merrill Lynch in

22  connection with some of the payments and, in addition, on

23  March 4th the defendant takes money out of Retrophin,

24  $575,000, cycles it through his personal account and sends it

25  to Merrill Lynch.  So, the Merrill Lynch payment that was owed

*Summation - Smith*                                         5238

1    by the defendant and Marek Biestek and MSMB Capital winds up

2    getting paid by MSMB Healthcare investors, that $900,000 that

3    got cycled through Retrophin and by Retrophin itself.

4            And this is you can see that the defendant says that

5    the money that was moved from Retrophin to Healthcare was a

6    repayment of the note, this is one of the documents we looked

7    at from Corey Massella where the defendant was kind of going

8    through the cash transactions and saying what everything was

9    for, and you can see that he's classifying the $575,000 he

10   took directly out of Retrophin for his personal account as a

11   salary repayment and the other two payments that were

12   originally from MSMB Healthcare were debt repayments.

13           And you can see that there was testimony to the SEC

14   in February of 2012 about using money from Healthcare to repay

15   Merrill Lynch and the defendant has this kind of long

16   explanation and he talks about how he discussed it with Marek

17   Biestek and that he tried to document it and he wasn't able to

18   do so.  Let me just pull up my copy.  And he says that the

19   loan is going to be paid back and, you know, that this was all

20   just kind of, you know, he didn't have to pay it out of

21   Healthcare, it was a loss suffered by Capital.  It was kind of

22   this long winding explanation for what happened.  He talked

23   about it with Marek, he didn't want anyone to know what he had

24   done.

25           And then they were asked whether they had actually

*Summation - Smith*                                          5239

1   documented the loan and he said that they tried to but they

2   had been unable to and the loan that he's talking about here

3   is -- you know, so not only is he saying there was a loan from

4   Healthcare to Retrophin that got repaid but then he's saying

5   when he paid Merrill Lynch, he was just taking a loan from

6   MSMB Healthcare, he was going to pay them back trying to give

7   an explanation for why he hadn't just taken the funds from

8   MSMB Healthcare.

9            And then, again, the elements of conspiracy for MSMB

10  Healthcare, the co-conspirators involved again are Marek

11  Biestek and then also Kevin Mulleady.  As we saw, Biestek was

12  involved in the use of funds to repay Merrill Lynch from

13  Healthcare that $900,000 that was just taken from the MSMB

14  Healthcare investors.  Both co-conspirators were involved in

15  marketing and running the fund.  There's a pitch stack that

16  was sent to a potential investor in September 2011 that lists

17  each of their roles in MSMB Healthcare.

18           And then, if you remember, there was that

19  conversation between Kevin Mulleady and Caroline Stewart which

20  is in I believe May of 2012 and it is this IM chat that they

21  have and during that conversation Caroline Stewart talks about

22  how the defendant blew up twice, she's referencing Capital and

23  Elea at that point, one before my time, that nobody is getting

24  paid.  She says to Kevin Mulleady:  Ask yourself how is he

25  going to pay everybody, the fund has a negative return right

*Summation - Smith*                                        5240

1    now and he's probably got tiny assets under management anyway.

2    And again she talks about blowing up.  And this is a whole

3    back and forth between Kevin Mulleady where he's clearly on

4    notice at this point, if he didn't know already, that the

5    defendant has had these problems in the past and I think what

6    you can see from what happens with this IM chat, you can kind

7    of see how the conspiracy is working.

8            So, they have this back and forth between Caroline

9    Stewart and Kevin Mulleady and then what does Kevin Mulleady

10   do with that IM conversation, and we saw this through Agent

11   Braconi, Government Exhibit 349, he forwards it to Marek and

12   he says:  We should talk about this, don't need an issue

13   blowing up, obviously please don't forward to Martin at this

14   point.  And then he forwards it to Marek again and then he

15   forwards it directly to the defendant and the defendant's

16   response is:  Yeah, humorous how confused she is, seems very

17   emotional, oh, well.

18           So, this is the three of them discussing Stewart's

19   complaints and concerns about the defendant blowing up prior

20   funds.

21           And then we can see Government Exhibit 353 which,

22   again, we looked at with Agent Braconi which is an email from

23   Kevin Mulleady and it's sent to himself and he has a number of

24   comments which show his knowledge about what's going on at

25   MSMB Healthcare at this point which is June 2011.  So, some of

*Summation - Smith*                                           5241

1    the comments he makes are:  Equity in funds???  100 positions

2    is a lie.  30 percent?  How dare you take that risk, he says,

3    how many funds you blowing up, seriously you think I'm stupid.

4    And then at the bottom there he says:  You have 100 positions,

5    your positions are never big.

6              So, these are a bunch of complaints and concerns he

7    has about the funds and about the defendant.

8              And what does Kevin Mulleady do next?  So, this is

9    June of 2011, this is a pitch stack that he puts together for

10   MSMB Healthcare in August 2011, so after he's made clear that

11   he knows kind of what the defendant's history is and also that

12   the defendant is lying about the fund itself.  So, this is a

13   pitch stack that he sends to the defendant in August of 2012

14   and what does it say in the pitch stack, it says:  Possession

15   sizing attribution loss 1 percent limit, 10 percent position

16   limit.  Then it said:  Diversified portfolio, 100 positions on

17   average.

18             So, he knows that that's not true and he's putting

19   it into a pitch stack.  And then what happens with that pitch

20   stack -- oh, sorry, the August 2011 pitch stack also contains

21   information that at this point we know is false which is that

22   Rothstein Kass and that Kleinberg Kaplan are doing work for

23   Healthcare and there are stipulations that neither of them did

24   that work.

25             And then at the bottom you can see it says:  No

*Summation - Smith*                                                5242

1   gates, no side pockets, illiquid securities or other tricks.

2   And that's the language I was talking about earlier that they

3   were joking about they should finally take that out months

4   after they've done the investments into Retrophin and that's

5   that language.

6           And then it is not on here but this pitch stack is

7   at that point sent to the defendant and then within a month a

8   very similar pitch stack with the same language about no gates

9   and side pockets and with that 100 positions that Kevin

10  Mulleady knows is not true is sent out to a potential

11  investor.

12          And then again we have the overt acts that we need

13  for the securities fraud conspiracy which is Count Four and we

14  put two in here.  So, one is that on or about April 18th,

15  2012, Shkreli sent an email to Kevin Mulleady, and it's the 55

16  AUM, and then again this is the overt act that talks about the

17  wind-down email that was sent to MSMB Healthcare and there are

18  a number of them listed in the indictment and they all line up

19  with acts that we have shown in the course of the evidence.

20          And venue, so when I talked about venue the first

21  time I didn't explain it as clearly as I could have; venue

22  means something in connection with the case touches on the

23  Eastern District of New York which is where we are which is

24  Brooklyn, Queens, Nassau, Suffolk and Staten Island.  And we

25  showed that for MSMB Healthcare and we can show that -- we

*Summation - Smith*                                                    5243

1   showed it for MSMB Capital, we can show it again for MSMB

2   Healthcare.  So, Spencer Spielberg who is an investor whose

3   investment statements are in evidence, that's the 90 series,

4   lived in Brooklyn and Seymour Block who was another investor

5   whose investor statements are in evidence lived in Nassau

6   County and, again, the defendant lived in Brooklyn, Biestek

7   lived in Queens kind of during this time period of the

8   conspiracy and, again, there are phone calls and emails and

9   wire transfers.

10          So, that ends the evidence for MSMB Healthcare.  As

11  with MSMB Capital, there's just really overwhelming evidence

12  that the defendant lied to the investors to get their money to

13  put into the fund and then lied to the investors to make sure

14  they didn't take it out.  David Geller is a very, very clear

15  example of that, of somebody who actually said he wanted to

16  take his money out and then he was given more lies about the

17  size of the investment into Retrophin to convince him not to

18  take his money out of that fund.

19          And so, that's securities fraud conspiracy, wire

20  fraud conspiracy and securities fraud for MSMB Healthcare.

21          And then the next count we're going to talk about is

22  Count Seven which is the Retrophin misappropriation account.

23          Just give me one minute.

24          (Pause.)

25          So, Count Seven is that the defendant and his

*Summation - Smith*                                          5244

1   co-conspirators defrauded Retrophin in three separate ways,

2   the first was the creation of a fraudulent interest in

3   Retrophin for MSMB Capital through backdated documents, the

4   second was causing Retrophin to enter into settlement

5   agreements to repay the obligations of the defendant and MSMB

6   entities and they entered into those agreements with MSMB

7   Capital investors and MSMB Healthcare investors and you saw a

8   lot of testimony about that during the trial, and then the

9   third way is that it forced Retrophin to enter into consulting

10  agreements to repay the obligations of the defendant or MSMB

11  Capital and they entered into consulting agreements with

12  Darren Blanton who is an MSMB Capital investor and also the

13  Elea Capital investor, Lee Yaffe.

14           So, those are the different ways in which the fraud

15  in Count Seven is charged.  You can find the defendant guilty

16  on this count if you find any one of those three or any one of

17  the settlement or consulting agreements as long as you are all

18  unanimous about which of those acts you agree on.

19           I am going to walk you through the evidence that

20  shows that the defendant is guilty of all of these various

21  means that are charged in Count Seven but, again, you only

22  need to find one unanimously.

23           So, the time period again is from 2009 to 2014 and

24  it charges a wire fraud conspiracy only.  And again wire fraud

25  conspiracy, you need to show a conspiracy to commit wire fraud

*Summation - Smith*                                             5245

1   and that the defendant knowingly and intentionally became a

2   member of the conspiracy and, again, the judge's instructions

3   on the law will govern but I expect that she says that for

4   conspiracy the agreement to enter into the conspiracy to agree

5   to do the act is sufficient to show the conspiracy, you don't

6   actually have to show that a fraud occurred, there just had to

7   shall an agreement to commit the fraud.

8          And just so you have a sense, again, the elements of

9   wire fraud themselves, so the crime that you would be agreeing

10  to commit is a scheme or artifice to defraud, that the

11  defendant knowingly and willingly participated in that scheme

12  and then, again, that there were interstate wires, like phone

13  calls or emails that crossed state lines in furtherance of

14  that scheme.

15         So, the first one of those three is the MSMB Capital

16  interest in Retrophin.  And as we said before, MSMB Capital

17  did not invest in Retrophin, there was no money transferred,

18  it was blown up and dead before Retrophin was even founded.

19  And, again, that's the testimony of Wendy Spaulding and the

20  bank accounts show that.

21         That February 2012 cap table, the one we were

22  looking at with the $900,000 investment for Healthcare, MSMB

23  Capital is not on that cap table as an investor which, again,

24  is not a surprise because it didn't invest but starting in

25  February 2012, which I believe is the earliest cap table in

*Summation - Smith*                                           5246

1    evidence, you can see that MSMB Capital is not on the cap

2    table.  And then, again, September 5th, 2012 cap table MSMB

3    Capital is not on that cap table either.  And that

4    September 5th, 2012 date is significant because that's the

5    date of the settlement agreement with Merrill Lynch where the

6    defendant says MSMB Capital has zero assets.

7            So, it lines up, MSMB Capital has no money and has

8    no assets, he's telling Merrill Lynch that and it is not on

9    the cap table, so there was no interest for MSMB Capital in

10   Retrophin at this point.

11           Then we get to November of 2012 and the defendant

12   tells the SEC in November of 2012 that MSMB Capital has a

13   $2.6 million assets under management, so that MSMB Capital has

14   some assets and that they're worth $2.6 million and we know

15   this was false, again, from bank and brokerage records and

16   from everything else that we've seen but this is what the

17   defendant has represented and he says in his cover letter for

18   this that the most -- the largest and most successful effort

19   between -- for MSMB including MSMB Capital has been the

20   investment in Retrophin.

21           So, not only is he saying that MSMB Capital has

22   $2.6 million but he's saying that's because we've invested in

23   Retrophin which as we we've seen from the cap tables and the

24   bank records isn't true but that's what he's telling the SEC

25   on November 4th, 2012.

*Summation - Smith*                                          5247

1          So, what does the defendant do next.  Well, on

2    November 5th, which is the day after MSMB Capital still isn't

3    on the cap table, and then the defendant and Evan Greebel, who

4    is a co-conspirator for Count Seven and Count Eight and who

5    you're going to hear a lot about, they begin to discuss

6    something called share transfers in late November 2012 and

7    this is the email back and forth and the defendant says that

8    he wants to transfer shares and he wants to cancel the

9    transfer and they discuss how you might move shares back and

10   forth and this is Government Exhibit 221 and the date is

11   November I believe 26.

12          And then what we get on November 29th is the first

13   version of the share transfer from Marek Biestek to the

14   defendant and if you remember, we walked through this with

15   both Jackson Su and Corey Massella.  These were the agreements

16   where Marek Biestek is agreeing to give the defendant shares

17   and if you remember Mr. Massella's testimony, he said this was

18   strange because normally an employee, and at this point Marek

19   Biestek was an employee of Retrophin, is not giving shares

20   back to the CEO or the head of the company, and in the

21   transfer agreement there's nothing that Marek Biestek is

22   getting in return so it seemed to him to be a very, very

23   strange agreement.

24          And they're circling in this agreement because

25   they're trying to figure out who has what on the cap table

*Summation - Smith*                                           5248

1    before Retrophin becomes a public company and they distribute

2    the shares, so this is the first version of that transfer

3    agreement.  And if you remember, this was the signature page

4    for the transfer agreement which was scanned in kind of

5    sideways.  And if we blow up the signature there, it's signed

6    by both Marek Biestek and Martin Shkreli and the date that was

7    put on the document was the date that it was handed to Mr. Su

8    which was November 29th, 2012, and so basically this first

9    version has the signatures and it has the date on which

10   Jackson Su testified this document was dropped on his desk and

11   he put the date on it, and that's Government Exhibit 119-15.

12          So, then we get to Government Exhibit 123-2 which

13   was Mr. Massella's response to receiving the share transfer

14   agreement and he gave the very accountant-like response of

15   saying this was his way of saying "what the heck" and so he's

16   seeing this and he said the reason he was confused is why

17   would an employee give shares back to the head of the company

18   and also, if you will remember, this is very close in time to

19   when the reverse merger actually happens and every time there

20   is a share transfer like this they have to redo all the

21   financials, so Citrin is running around like crazy trying to

22   get ready and they're getting inundated with all of these

23   transfers and that's why he had that reaction.

24          The defendant's reaction was a little bit different

25   and the defendant said -- well, first Evan Greebel said that

*Summation - Smith*                                          5249

1   the share transfer needed to be changed from Retrophin LLC to

2   Retrophin, Inc. because, if you remember, Retrophin was

3   originally a limited liability company and then before it went

4   public it became a corporation, and then the defendant said,

5   no, that agreement was signed in June.

6            And so, we then get Government Exhibit 119-17 and

7   that's the defendant's response, that agreement was signed in

8   June.  We get the second version of the transfer agreement

9   from Biestek to the defendant, and this agreement is now

10  scanned in properly, but if we zoom in you can see that Marek

11  Biestek and Martin Shkreli have signed it and then there's

12  redacting tape over the date for both and it is now dated

13  July 1st, 2012.  And you can see Marek Biestek's address there

14  in East Rockaway, New York as well.

15           So, that's the second version.  That's actually the

16  defendant said, no, that agreement was signed in June.  Then

17  the defendant -- then the dates are changed to July 1st with

18  redacting tape.

19           And then there's another email from Mr. Greebel to

20  Mr. Su and it says:  Please call me after he gets the version

21  with the redacting tape on it.  That's Government

22  Exhibit 119-18.  That's the circle is where Mr. Greebel says:

23  Please call me.

24           And then we have the third and final transfer

25  version which is Government Exhibit 119-19, same transfer and

*Summation - Smith*                                          5250

1    donee representation letter, same transfer from Marek Biestek

2    to the defendant, and this third version has the date

3    June 1st, 2012, and instead of being written or taped over

4    with redacting tape, now it is actually typewritten out.

5            So, we have three various versions of this signed

6    agreement and you can see the dates across all three.  So,

7    first it is November 29th which is the date on which the

8    agreement was actually circulated and keep in mind, as we

9    heard from Mr. Massella, they had been working on this reverse

10   merger for months, they were trying to pull together all of

11   the information they needed to kind of figure out who owned

12   what and what was going on so they can get the financials

13   ready to take Retrophin public and, you know, they had been

14   looking for documents and asking for documents and documents

15   like this were showing up a week before the company went

16   public just like that $900,000 note.

17           So, it is important to keep in mind during this time

18   period that documents like this are kind of just appearing at

19   the very end and it is causing Mr. Massella to reorganize

20   everything but in terms of the timing of when those documents

21   appear, it's right before the merger and here we have kind of

22   three different dates for one of these documents that is just

23   popping up at the last minute.

24           So, this is a transfer of shares from Biestek to the

25   defendant.  There are also two other transfers that we see at

Case 1:15-cr-00637-KAM  Document 372  Filed 09/14/17  Page 104 of 269 PageID #: 9148

1   the same time.  One is from Kevin Mulleady to the defendant

2   and he agrees to the share transfer on November 30th, 2012,

3   and that's Government Exhibit 223.

4          And this is an email, the defendant talks about

5   reversing a share transfer that he had done earlier.  And then

6   he says that Michael Fearnow will sell you stock for a nominal

7   amount that is equal to the common stock in Retrophin and that

8   will be in exchange for this agreement but it is not in the

9   agreement but I'm sending you this email to let you know.

10

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           So the Fearnow shares, the free-trading shares are

2      Count 8 and we'll kind of discuss that as in the last

3      portion, but this is the first time that we kind of see how

4      Kevin Mulleady comes to be part of the Fearnow share group.

5      He agrees to give shares in Retrophin back to the defendant

6      and say that they were reversing an earlier transfer and

7      that he will get the opportunity to buy retrading shares.

8      And so that, he agrees to that transfer on November 30th,

9      2012, keep that date in mind.

10          THE COURT:  I'm sorry, I think there's been a

11     request by the jurors to take a break.  Do the jurors want

12     to take a lunch break now or just a short break.

13          THE JURY:  Short break.

14          THE COURT:  All right.  Let's take ten minutes.

15     Please don't discuss the case.  Thank you.

16          (Jury exits.)

17          (The following matters occurred outside the

18     presence of the jury.)

19          THE COURT:  All right.  Let's take ten minutes.

20          (Recess taken.)

21          (Jury enters.)

22          (Jury present.)

23          THE COURT:  All jurors are present.

24          Please have a seat.

25          Please continue.

Summation - Smith                               5253

1   BY MS. SMITH:

2              So before the break we were talking about the

3   backdated share transfers and we walked through the share

4   transfer from Marek Biestek to the defendant, which was

5   originally dated in November when the agreement first

6   appeared and then it was backdated to July 1st of 2012, and

7   then it was backdated again to June 1st of 2012.  And when we

8   took the break we were talking about a second share transfer

9   at the exam same time.  So that share transfer was first

10  discussed over e-mail on November 29th and then this is the

11  share transfer from Mulleady to the defendant on

12  November 30th.  And then the e-mail we were discussing the

13  defendant held Kevin Mulleady that in return for transferring

14  his shares back to the defendant, he'll let him buy some of

15  the Fearnow shares which we'll talk about.  But again, the

16  timing is important.  The Biestek agreement shows up on

17  November 29th but it was ultimately dated June 1st, 2012, and

18  the Mulleady agreement shows up on November 30th, 2012.

19             And then there's a third backdated agreement

20  between the defendant and Tom Fernandez.  And you heard some

21  testimony from Steven Aselage that Tom Fernandez was someone

22  who was given an MSMB and then transitioned to Retrophin and

23  stayed at Retrophin until, I believe it was 2015.  So

24  Fernandez is another person that's working at Retrophin and

25  on November 30th as well, he also agreed to a share transfer.

Summation - Smith                    5254

1        And he asked the defendant over a text message to

2   memorialize their understanding of the transfer and the

3   defendant says, You will surrender all your stock to me and

4   have 0 and the stock in Retrophin.  You will buy from Troy

5   Fearnow for a nominal amount approximately 5 percent of the

6   close merger in the common shares of Retrophin.  So he is

7   basically saying the shares you have in Retrophin, transfer

8   them back to me and then I'll let you participate in the

9   Fearnow share purchase.

10        And again that's on November 30th, 2012,

11        And then what we see is that there's an e-mail from

12   Jackson Su sending documents to Corey Massella and, again,

13   during this period Citrin is working on trying to figure out

14   who owns what piece of Retrophin so that when it goes public

15   the shares get transferred to the right people.  And this is

16   an e-mail sent on December 3rd, 2012, and all three share

17   transfers are attached and all three share transfers are

18   backdated.

19        So the one between Biestek and the defendant is

20   dated June 1st.  The one between Fernandez and the defendant

21   is dated July 1st.  And then the one between Mulleady and the

22   defendant is dated July 1st.  So all three were actually

23   completed in November 29th, November 30th and they're all

24   backdated.  And they all involve those people giving the

25   defendant their shares in Retrophin.  And that's

Summation - Smith                          5255

1    Government's Exhibit 119-25.

2            And then attached to that e-mail that's sent to

3    Citrin, there's actually a fourth share transfer agreement.

4    So those three were people employed by Retrophin giving the

5    defendant back their Retrophin shares and backdating those

6    agreements, and then the fourth agreement that's attached is

7    an agreement from the defendant with MSMB Capital.  And that

8    agreement gives shares from the defendant to MSMB Capital and

9    that agreement is also dated July 1st, 2012.  And so what

10   happens with these share transfer agreements is that it makes

11   it look like in June and July of 2012 all of these people

12   transferred their shares to the defendant and then he

13   transferred those shares to MSMB Capital.  So this is

14   happening late November, early December, but it's making it

15   look like it happened in June and July.

16           And just think about what else is going on in the

17   case in that middle period.  So that there's that

18   representation to the SEC in November by the defendant that

19   MSMB Capital has invested in Retrophin.  We know that's not

20   true.  These agreements make it look like that had happened,

21   that MSMB Capital got shares in Retrophin back in June and

22   July and we know that's not true from the cap tables that

23   we've seen.  We know that's not true from the banking

24   account, that there was no investment and they didn't have

25   shares because they weren't showing up on the cap tables.  We

1   know that on September 5th, 2012, the defendant said to

2   Merrill Lynch MSMB Capital has no assets and then all of a

3   sudden November 29th, November 30th there's this share

4   transfer that makes it look like MSMB Capital got Retrophin

5   shares back in July of 2012, which were then justified or

6   potentially tried to justify to the SEC that statement that's

7   made in November that oh, by the way, MSMB Capital has

8   investments.  So that timing is really, really significant

9   and these backdates go back before that representation to the

10   SEC was made.  And they actually go back before the Merrill

11   Lynch settlement as well.

12          And so this is a cap table that was revised on

13   December 3rd, 2012.  So this the updated list of individuals

14   and entities that had shares in Retrophin after all of these

15   backdated transferred have taken place.  And is sent from the

16   defendant to Jackson Su.  The defendant is sending an updated

17   cap table.  And if you look at the bottom section here you

18   can see that now on July 1st, 2012, it shows that

19   MSMB Capital has shares of Retrophin.  And it also shows

20   these transfers back and forth between the defendant, Tom

21   Fernandez and Kevin Mulleady as if they happened in May and

22   June and July of 2012.

23          And then the final Retrophin cap table with is

24   Government's Exhibit 119-27 now has MSMB Capital owning

25   shares of Retrophin.  And that is also on December 3rd of

Summation - Smith                          5257

1   2012.  So this cap table that the defendant sent in the prior

2   exhibit is the first time you see it and then it gets

3   incorporated into that final cap table.  And then on the

4   final cap table and then the company goes public what happens

5   is you actually get -- the shares of Retrophin get issued to

6   MSMB Capital.

7            So based on that backdated interest, basically --

8   MSMB Capital showing up on a cap table for Retrophin Standard

9   Registrars would be a transfer agent actually transferred and

10  issues shares to MSMB Capital as a result of them being on

11  the cap table at that point.  And that kind of accomplishes

12  two goals for the defendant.  One, again we had this SEC

13  representation in November and now it looks like MSMB Capital

14  got shares or invested in July of 2012.  And it also

15  accomplishes something with respect to the MSMB Capital fraud

16  scheme, which is that there was no money in bank and

17  brokerage accounts, there was no investment in Retrophin, but

18  all of a sudden it looks like MSMB Capital has Retrophin

19  shares and they are issued to MSMB Capital.  And the

20  defendant now has something, rather than nothing, that he can

21  give the MSMB Capital investors and say Oh, this is what you

22  your investment was used for.  It was used to buy shares in

23  Retrophin.  And now I'm giving you those shares and here's

24  your investment back.  And so the investors don't have any

25  idea that all of their money was lost in February of 2011.

Summation - Smith                          5258

1   There's absolutely no money in MSMB Capital all the way
2   through to December of 2012 and then there's this fraudulent
3   backdated interest in MSMB Capital which let the defendant
4   distribute shares of Retrophin for MSMB Capital as if the
5   MSMB Capital investors had actually invested in Retrophin,
6   which did not happen.  So it accomplishes both of those
7   goals.  It justifies or tries to justify that statement to
8   the SEC in November and then also gives the defendant
9   something to actually give the MSMB Capital investors after
10  he sends that wind down in September saying you're going to
11  get shares or cash or combination.  And this is in some ways
12  similar to the 900,000-dollar note situation.  Now this is
13  the defendant faced with a situation where he needs some sort
14  of asset or money to give to somebody so with the
15  900,000-dollar note he made it look like Healthcare had
16  loaned money to Retrophin and then they got the money back
17  from Retrophin to Healthcare and would be able to use that
18  money himself to pay the Merrill Lynch settlement.  Here he's
19  making it look as if MSMB Capital actually got shares in July
20  and that let him both kind of back out of his SEC statement
21  in November and give something to the MSMB Capital investors.
22  So that is the reason why this backdated share transfer
23  occurred.  And it is the way in which shares actually get
24  distributed to the MSMB Capital investors.  Not because they
25  invested, not because any money from MSMB Capital ever went

1   into Retrophin, because it didn't.  MSMB Capital was defunct,

2   it was done, as of February 2011.  But this is the reason

3   that MSMB Capital investors actually get shares showing up on

4   their doorstep in January 2013.  And so that kind of

5   accomplishes both purposes with these backdated transfers

6          And so this is a good transition point from kind of

7   the first scheme of Count 7 which is the backdated fraudulent

8   transfers which allowed the defendant to make it look like

9   MSMB Capital had invested in Retrophin and also caused these

10  shares to be issued from Retrophin to MSMB Capital improperly

11  to the second and third pieces of Count 7 which are the

12  settlement and consulting agreements.

13         And so as we go into that I just want the kind of

14  lay the background for where we are with Capital and

15  Healthcare at this point.  Both Capital and Healthcare

16  investors believed based on the performance updates that

17  their investments had grown.  So if you put in $100,000 now

18  it's worth $200,000.  So if you get Rosenwald, he said that

19  the returns are 79 percent and Geller was told his returns

20  were 34 percent.  So the investors think not only is their

21  money safe, all the money I put in is still there, but it's

22  actually grown and I've gotten this benefit -- I've got more

23  in there than I put in originally and they don't know any

24  different because they're getting these performance updates

25  that are telling them, even though we know from the bank and

1  brokerage records that that's not true.  So that's kind of
2  the state of affairs in September.  And again this is a lie.
3  You know, Capital had no assets, MSMB Healthcare only had the
4  shares of persons in Retrophin which were liquid and they
5  couldn't be sold on the market, and MSMB Healthcare only had
6  about $2,000 in its bank account.  So the difference between
7  what the investors thought had happened, their money is safe
8  and their money has grown and what had actually happened,
9  which is for Capital there is no money and for Healthcare
10 it's all tied up in Retrophin, which at this point is not
11 doing very well.  There's a huge difference between what the
12 defendant is saying, which are lies, and what the truth is.
13 But as a result of the lies, the Capital and Healthcare
14 investors think that their investments have done really well.

15       And so again September 2012 wind down, the
16 defendant says we're going to close out these funds, they've
17 done so well, you can get your money back.  And so what, you
18 know, they think they're getting back again is their money
19 plus the money they've made.  And for MSMB Capital at this
20 point is when that fraudulent interest we just looked at gets
21 created.

22       And for Healthcare, Healthcare actually did invest
23 in Retrophin and so we saw from the share transfer agent,
24 that's Government's Exhibit 125-20, that the defendant takes
25 the MSMB Healthcare money that was invested in Retrophin and

Summation - Smith                    5261

1    they divide it up among the investors in Healthcare and those

2    shares get sent out to the investors.  So the capital people

3    get Retrophin shares because of the backdated fraudulent

4    interest in Retrophin and Healthcare people get shares based

5    on the $2.1 million that was moved from Healthcare into

6    Retrophin.  So those are the shares that actually get

7    distributed in early 2013.

8            And just to kind of take a moment and think about

9    where Retrophin is, in December of 2012, keep in mind there's

10   no in money left in Capital, there's no money left in

11   Healthcare, Healthcare has invested in Retrophin, but there's

12   in money left in the fund, and Retrophin only had $11,000 in

13   its bank account.  And, in fact, the situation is so bad at

14   Retrophin that the defendant drafted a press release for the

15   end of Retrophin and he told Evan Greebel in an e-mail the

16   situation was dire.  And the e-mail that's basically attached

17   is a press release that says.  You know what?  Retrophin is

18   going under, and it was December 29, 2012.  And this actually

19   becomes important in Count 8 as well when we talk about the

20   Fearnow shares so just keep in mind, you know, in December

21   of 2012 Retrophin does not look like it's going to survive.

22   It's going to go under and that is a huge problem for the

23   defendant because he has given Capital and Healthcare

24   investors, there's nothing left and he's giving them

25   Retrophin shares.  So if the company blows up, they're going

Summation - Smith                          5262

1   to know that there was nothing in either of the funds and

2   Retrophin is not going to be able to save them.  So this is

3   kind of the situation at the end of December.  And as I said,

4   it's actually very important from Count 8, but it's something

5   to keep in mind here as well.

6          And so what winds up happening is that, like I

7   said, there was a private placement or pipe in February

8   of 2013 and they're actually able to raise money for

9   Retrophin.  People invest in Retrophin in the pharmaceutical

10  company and the share price you can see is very low.  It's in

11  the 3, $4 range in this time period.  So the company

12  survives, it doesn't go under.  And so the stock isn't

13  worthless but it's also not worth that much because it's a

14  brand-new company and the only money they have is the money

15  that they raised in private placement.  And it's money for

16  Retrophin.  So the idea is people invested in a

17  pharmaceutical company, you know, to make that company do

18  well.  They didn't invest in the defendant personally, it was

19  a public company at that point.  You heard a lot of testimony

20  about a public company.  The shareholders, the people that

21  buy shares and the people that own the public company, not

22  the people who run it, like the defendant.  And so at this

23  point in time the people who are investing in Retrophin and

24  the money Retrophin is raising is for the company, and that's

25  kind of important to keep in mind as well.  So stock is being

Summation - Smith                    5263

1    sold but the share prices are low and the only money that

2    Retrophin has is money that people are putting into it trying

3    to get the company off the ground.

4             And then again, what winds up happening is that the

5    share distribution, the Capital and Healthcare, happen in

6    January 2013 for Capital and I believe February of 2013 for

7    Healthcare.  And you heard some testimony about people saying

8    oh, I just -- I was trying to figure out what the defendant

9    for a long time what had happened with my money.  I had these

10   performance updates, he said I could take my money out in

11   September and then he disappeared and I couldn't follow up

12   with him and there was a lot of back and forth and I was

13   upset and then one day low and behold in the mail I get a

14   FedEx of shares of Retrophin.  And this is the reason why

15   those FedExes were showing up because basically the company

16   went public and it issued all the share on the cap table and

17   MSMB was on there, MSMB Capital was on there because of the

18   backdating and Healthcare was on there because of the

19   investment it had made.

20            So the defendant just sends out those shares to the

21   MSMB Capital and MSMB Healthcare investors and said this

22   is -- this is what's left of the funds, these are your

23   shares.

24            And the investors are very surprised because

25   they've been told in September of 2012 which again is a lie

1   that they could get their investments back in cash or stock

2   or combination.  And then what shows up in those FedEx

3   envelopes is not what they had been told by the defendant was

4   the value of their investments.  So I have two examples here.

5   The first is Sarah Hassan, she invested $300,000 in

6   MSMB Capital and then she was told that as of July of 2012

7   she had made $435,000 total, so that was the total amount of

8   money that she had made as a result of the investment.

9          On January 28th the share transfer, you know,

10  MSMB Capital had happened, the shares get distributed, she

11  gets about 58,000 shares and then share price is $3.90 at

12  that point and so the value of the shares at the time that

13  she got them was about $227,000, which is very different than

14  435,000.

15         The other problem is those shares were restricted

16  and we heard from Deb Oremland and a lot of the investors

17  themselves that the restriction lasted about a year and so

18  they had the shares but they couldn't actually sell them.

19  And so what winds up happening like Sarah Hassan thinks

20  because of the defendant's lies that she has $435,000 in this

21  investment and, in fact, what she gets are shares that cannot

22  be sold, that are liquid, that are only worth based on the

23  market about $227,000.

24         And the other problem that we've heard about is

25  even if you could sell those shares the volume was so low

1   there were so few shares outstanding and there wasn't a lot

2   of ability to sell or buy shares at that time that if you

3   tried to sell all of your shares at once you would bring the

4   stock price down even lower.

5          So what she winds up getting is not what she

6   expected and it's not in the form that she expected, she had

7   asked for cash.  And it's not remotely what the defendant

8   said her investment was worth.  And that's Sarah Hassan, and

9   the same thing happened with the Healthcare investors.  So

10  this is Richard Kocher, he invested $200,000.  He was told

11  that he had made $231,000 based on the defendant's lies, he

12  received 23,500 approximately shares on March 14th when the

13  share price was $4.75, and so the value of those shares was

14  about $111,000.  So again told that his money had gone up,

15  told that he can get his redemption back in cash which

16  remember Richard Kocher was particularly important, wanted

17  his investment in cash and said the stock in a company that's

18  brand-new and that can't be sold and that's not worth what

19  the defendant said, he was going to get.

20         And so as a result and you heard this from a number

21  of investors the -- the investors reacted not well, as you

22  can imagine, to this development.

23         So Sarah Hassan responds on January 21st, which is

24  actually right before she gets the shares but it's after she

25  tells the defendant she wants her redemption in cash.

Summation - Smith                           5266

1          And she says I would like to know why you're

2    refusing to return my cash.  If you need money you can ask

3    for it and I will consider it.  You already told all

4    investors in MSMB Capital that their funds would be returned

5    in cash unless instructed otherwise in an e-mail dated

6    September 9th, 2012, and she attaches that e-mail again.  I

7    had asked for my funds to be returned fully in cash and then

8    she was going to make an investment in Retrophin from there

9    so to get the appropriate paperwork.

10         And then she's also trying to get calculations for

11   what the current value of her investment actually is, and

12   that's Government's Exhibit 103-21.  And you see this was a

13   lot of the investors that we heard from.  So Schuyler

14   Marshall wants to know when they're going to register the

15   shares.  You can tell that he also doesn't understand that

16   this is supposed to be his entire investment coming back.  He

17   says You had indicated that the fund would be liquidating and

18   distributing cash for the remaining balance when will that

19   occur and what is the approximate remaining balance.  And we

20   get similar statements from David Geller on April 3rd where

21   he says From what I gather over the last few months, it seems

22   like you've put all my fund money into Retrophin at the high

23   valuation.  From our conversation last year I informed you

24   that I needed diversification and you told me Retrophin stock

25   would only be a small part of my portfolio.  And then finally

1   Richard Kocher, who, again, was focused on liquidity and so

2   getting these restricted shares of Retrophin that weren't

3   worth, you know, what his investment was suppose to be was

4   particularly upsetting to him given the side letter that he

5   had and that he thought he could get his money back at any

6   point within a week.

7            He says I expect to get in addition to this

8   insulting untradeable stock at least $200,000 which only in

9   cash.  You should be hearing from them soon.  I had damages

10  that have occurred because I've been relying on what you

11  represented as the manager of MSMB.  And he says I don't

12  think you've lived up to your fiduciary responsibility.  And

13  so these were some of the reactions that the MSMB Capital and

14  Healthcare investors had when they got this stock.

15           And at this point, obviously, the defendant had a

16  choice.  He could have stopping lying, come clean, said that,

17  you know, the funds hadn't worked out, that Healthcare was

18  really just used to invest in Retrophin and MSMB Capital had

19  lost everything.  But once again he chose a different way

20  out.  So instead of owning up to the frauds that were

21  MSMB Capital and MSMB Healthcare, he just engaged in another

22  one to cover himself.

23           He knew that the frustration that the investors

24  were feeling was his fault.  He is the one that lied in the

25  performance report.  He's the reason they think their

Summation - Smith                          5268

1   investments are worth more than they are or in Capital the

2   reason they think they have an investment left at all.  And

3   he knew that if he didn't do something they could come after

4   him and after MSMB.  As you saw with Lee Yaffe, that's what

5   happened with Alea Capital, the funds blew up and then, you

6   know, George Yaffe is hounding him for years personally for

7   the money back.  So he kind of knows what the stakes are at

8   this point and he's got two funds where people are coming

9   after him.  And he also knows that Retrophin, which is the

10  public company, is not actually responsible for the investors

11  for anything.  I mean, the defendant is the one who lied to

12  the investors about how much their performance is worth and

13  Retrophin didn't have any control over MSMB Healthcare

14  investing in it.  And there are two separate legal entities,

15  Retrophin and MSMB Healthcare.  And even though they were

16  both run by the defendant, Retrophin wasn't responsible for

17  the lies that were told in connection with MSMB Healthcare.

18  And it certainly wasn't responsibile for the lies that were

19  told in connection with MSMB Capital which never invested in

20  it in the first place.

21          And if you think about what a hedge fund is, you

22  know, you invest in a hedge fund and the manager's going to

23  buy a lot of different stock.  And the hedge fund will do

24  well and not well depending on what stock or options they buy

25  and how they control the mix.  And so, you know, if your

Summation - Smith                                 5269

1    hedge fund manager buys a lot of Apple and Microsoft and
2    Apple and Microsoft stock doesn't do very well and the hedge
3    fund manager decides to shut the hedge fund down, they might
4    give you back the Apple and Microsoft stock, what's left in
5    hedge fund.  But what doesn't happen is that the people
6    invest the hedge fund can't then go to Apple and say, Hey,
7    your company didn't do very well this year so I'm going to
8    sue you because my hedge fund didn't work out and the way
9    that the manager used Apple stock in the hedge fund wasn't to
10   my benefit.  They're completely different.  If something
11   happens with your hedge fund you get to go after the hedge
12   fund manager.  I mean, that's what happened with Alea
13   Capital, you can even see that with the MSMB Capital trading
14   Orex when something goes wrong with MSMB Capital, they go
15   after MSMB Capital, not the underlying stocks that are in the
16   hedge fund.  And so the defendant knew that Retrophin didn't
17   owe these investors anything.  He knew that he was the one
18   who put the investors in this position and so he -- but he
19   didn't want to take responsibility for what he did, and he
20   didn't want the pay them back in stock.  And he had just
21   gotten $10 million in the February pipes that people had
22   invested in Retrophin.  And so what he did was he made a
23   choice to steal that money which had been put into public
24   company to grow the public company and to use it to pay back
25   the investors that he defrauded.  And he did it in connection

1    with the his co-conspirator Evan Greebel, the attorney, and

2    you saw a lot of the e-mails that went through Agent Braconi

3    between the two of them where it's clear that Evan Greebel is

4    aware of the concerns that everyone knows about the MSMB

5    funds, about the Merrill Lynch settlement and he is working

6    with the defendant, and we'll talk a little bit about that

7    relationship, in order to get the settlement and consulting

8    agreement signed so that the defendant can use money from

9    Retrophin to pay off the defrauded investors.  So let's just

10   step through the evidence for the settlement and consulting

11   agreements and why the defendant was able to do that and what

12   was and wasn't told to the Board of Retrophin.

13          So the first step is for the defendant to make the

14   investors think that Retrophin was responsibile for the

15   losses.  Because then they wouldn't be surprised that

16   Retrophin was paying them back.

17          So he told a bunch of lies about that MSMB Capital

18   had invested in Retrophin and that there was an issue with

19   the merger and that MSMB Healthcare stake had somehow not

20   worked out the way he thought and you can see a bunch of

21   these additional misrepresentations in the e-mails that went

22   back and forth with the investors in 2013.

23          And we saw it, that Agent Braconi that a lot of

24   these e-mails didn't get forwarded to Evan Greebel and they

25   kind of discussed them and figure out who we're going to deal

1   with first and who we can put off.

2           So the defendant says that there Sarah Hassan is a

3   fund -- he's talking about MSMB Capital has continued to

4   invest in Retrophin and that is the only investment in the

5   fund at this moment.  There is no longer any cash at the fund

6   level.  And he also said I wish the fund could not support

7   Retrophin as much as it did.  Both realities over the last

8   few months have been very trying.  Thankfully we have

9   survived.  So he's lying to Sarah Hassan and saying that MSMB

10  Capital invested in Retrophin and that's the only investment

11  left and that's why you got the shares that you got.

12          And he made similar representation to Schuyler

13  Marshall, the fund focused primarily on growing Retrophin and

14  as such this is the only remaining asset.  So, again, these

15  are two -- Sarah Hassan and Schuyler Marshall are two MSMB

16  Capital investors to fund in each of these is MSMB Capital

17  and the defendant is continuing to lie and saying the fund

18  focused on growing Retrophin.  We all know that's not true.

19          Spencer Spielberg who was an MSMB Healthcare

20  investor and whose investor statements are in evidence, the

21  defendant tells Spencer Spielberg, As you know, the fund, and

22  for Spencer Spielberg that's MSMB Healthcare, is mostly

23  Retrophin shares and those shares have declined in value.  I

24  have to take a look at the math but I would expect some cash

25  and some Retrophin stock as far as the redemption goes.  And

Summation - Smith                              5272

1   that's a lie because there's no money left in MSMB Healthcare

2   and the only thing that MSMB Healthcare ultimately wound up

3   having an investment in is Retrophin.  So he's kind of

4   shading the truth here with Mr. Spielberg in saying, oh,

5   there might be some cash there for you and stringing him

6   along when, in fact, there's no cash left in the fund.

7            And then we have David Geller on March 4th he asks

8   Mr. Shkreli, I've been trying to keep up with current events

9   on Retrophin and he says, I guess the most basic answer I'm

10  looking for is how much of my original investment is in the

11  fund and how much is in Retrophin and what is the status of

12  the fund.  And the defendant's response is that he's en route

13  to California for a few days and he would be able to give a

14  comprehensive and satisfactory answer soon.  And at this

15  point in March of 2013, the defendant knows what the answer

16  is.  The answer is there's nothing left in the fund and the

17  shares that you got are the only thing that's left.  And so

18  he's putting him off, he's buying himself time to figure out

19  what he's going do next.

20           And what he does next is work with Evan Greebel to

21  figure out the settlement agreement and they space them out

22  over time and the settlement agreements are basically give

23  either money or shares from Retrophin, not from the

24  defendant, not from MSMB Capital, not from MSMB Healthcare,

25  but from Retrophin, the public company, back to these

Summation - Smith                    5273

1   defaulted investors.  And so there's a series of e-mails that

2   we walked through with Agent Braconi and I'm just going to

3   touch on a couple of them between the defendant and Evan

4   Greebel which show how they're kind of planning these and

5   structuring them and figuring them out.  And just keep in

6   mind, there was testimony from both Board members, you know,

7   it's a small Board at this point at Retrophin.  It's Aselage,

8   it's Richardson, it's the defendant and then Evan Greebel is

9   the fourth person who's at every single Board meeting.

10  Sometimes there are other people there as well.  So the Board

11  is meeting by phone during this point but all four of them

12  are on the phone.  During this time period when the

13  settlement agreements are being worked out and the defendant

14  doesn't raise them and Evan Greebel doesn't raise them and

15  we'll see later that there's acknowledgment that they never

16  told the Board about the settlement agreements and you'll

17  also see the timing of the various SEC filings.

18          But as this is going back and forth keep in mind

19  again that the defendant is forwarding all of these

20  complaints to Evan Greebel and they're trying to figure out

21  how they can get the money out of Retrophin to pay back these

22  defrauded investors.

23          So we start with Government's Exhibit 263 which is

24  a discussion between Evan Greebel and the defendant about

25  Lindsay Rosenwald who is an MSMB Capital investor and Evan is

Summation - Smith                    5274

1    conveying that, you know, Lindsay Rosenwald, who, as she

2    testified, was very upset to receive these restricted shares

3    that he couldn't do anything with when he thought his

4    investment had grown, has offered to take 80,000, what they

5    call free-trading shares.  And again this touches on Count 8

6    a little bit, but the defendant said if you'll accept that

7    offer and then Evan says -- Evan Greebel says that Lindsay

8    wants to get freely-traded stock, are we going to deal with

9    that next?

10          And the defendant responds he can get free-trading

11   stock from a friend, let's discuss today.  And what winds up

12   with Lindsay Rosenwald's settlement, as you can see in

13   Count 8, is he winds up getting the Fearnow shares, the share

14   that the defendant controlled are kind of organized from the

15   other Fearnow recipients and given to Lindsay Rosenwald.  And

16   this is a discussion in February of 2013 about how to pay off

17   Lindsay Rosenwald because he's upset using those Fearnow

18   shares.

19          So this is Government's Exhibit 252.  The bottom

20   e-mail is from the defendant to Evan Greebel and the subject

21   is Sarah Hassan.  And Martin says, Sarah equals the same

22   situation as Lindsay.  Sarah is also very upset, as we saw,

23   about shares she received.  And he says also Fred Hassan's

24   daughter.  And Evan Greebel responds I figured, how much do

25   they want?  So they're figuring out these different investors

Summation - Smith                          5275

1   how unhappy are they, how much Retrophin money and shares do

2   they need to go away.

3          Government's Exhibit 284 in the bottom e-mail Evan

4   Greebel is talking about what do with about Lavelle.  Lavelle

5   is an MSMB Healthcare investor that we've heard a little bit

6   about and his investor statements are in evidence.  And the

7   defendant's response was Lavelle isn't going anywhere.  You

8   know, put this one on the back of the queue, I can deal with

9   this investor later.

10          And then the defendant said Will you do me a favor

11  and e-mail Sarah, talking about Sarah Hassan, I apologize for

12  being on vacation.

13          And then Evan Greebel says, I will e-mail her in

14  the morning with the numbers and structure that she proposed

15  if works for you.  And this is a discussion about the

16  settlement agreement.  So Evan Greebel is asking the

17  defendant about what Sarah Hassan proposed would work for

18  him.  He's not offering his advise about how to go about

19  making sure the defendant is okay with the deal that they're

20  going to use to pay Sarah off.

21          If we look at Government's Exhibit 285 it talks

22  about some additional edits to Sarah Hassan's settlement

23  agreement and if you see that the defendant, who is at the

24  top of the chain, is the one who is actually editing the

25  agreement.  He says a couple of minutes it should contemplate

Summation - Smith                          5276

1   releasing liability from Retrophin and Retrophin will make a

2   payment.  So he's making clear that the company is going to

3   pay Sarah Hassan and he is the one that's actually line

4   editing the agreement.

5          Government's Exhibit 292, it's from April 2013, if

6   you can read the bottom Evan Greebel says What do you want to

7   give David Geller?

8          The defendant said, I don't even remember.  And

9   then Evan Greebel responds okay, I'll call and feel him out.

10         And this is a pattern you see in a lot of e-mails.

11  Evan Greebel does a lot of the work to call people and see

12  what they want and talk to them and he always goes back to

13  the defendant.  He always asks What do you want to do?  What

14  are we going to do?  And the defendant gave an instruction,

15  this is how we should handle this person.  We should deal

16  with this person first, we should deal with that person

17  later.  I want to give this number of shares.  It's always

18  the defendant who's making the decision about who gets what.

19         Government's Exhibit 295, it's a discussion about

20  Richard Kocher and again Michael Lavelle, two MSMB Healthcare

21  investors.  And Evan Greebel says Do you want me to send him

22  the settlement agreement and the defendant says looks good,

23  send to him.  So he's giving the okay to send out an

24  agreement.  And then Evan Greebel ask How much stock will he

25  get?  So it's the defendant who is deciding what Richard

1    Kocher should get -- or what Lavelle should get.  And then he

2    says, Also Kocher's lawyer keeps calling me and wants the

3    lawyer -- wants to offer.  He said Kocher is instructing him

4    to file papers.

5         And then the defendant says Okay, don't let them

6    sue us, just capitulate Kocher.  And the reason the defendant

7    doesn't want to be sued is that if he gets sued it will be

8    clear that there was no money in the fund.  If this all comes

9    out, if it can be shown from the bank records and all the

10   other documents you might get in a lawsuit that actually

11   there was no money in Capital and that Healthcare only

12   invested in Retrophin, this whole scheme will unwind.  And so

13   there's a real concern as soon as someone says I might sue

14   you, there is then a rush to actually take care of that

15   person first.

16        Because they're worried about the scheme being

17   uncovered.

18        If you look at Government's Exhibit 307, again this

19   is for Schuyler Marshall.  And if you look at the bottom the

20   defendant says This is the deal I want, and Evan Greebel

21   confirms that that is a similar settlement issue and the

22   defendant says yes.

23        (Continued on next page.)

24

25

1        MS. SMITH:  And we saw that Government Exhibit 309

2   is very significant.  At the bottom, that email is from David

3   Geller.  We saw that the trader at AOL is David Geller's email

4   address.  And he says to Evan Greebel, I've been contacting

5   with all correspondence going forward.  I have retained

6   counsel to start legal action.  As I stated before, I will be

7   contacting the SEC and starting the effort.  And in response,

8   Evan Greebel says, FYI, clearly the SEC threat concerns me

9   given these other issues.  What do you want me to tell him?

10  And if you remember, in the fall of 2012, the defendant got a

11  subpoena from the SEC telling them that there was an

12  investigation.

13        So he is representing in that investigation by

14  lawyers at Katten, including Evan Greebel, and you can see

15  that in the evidence that we put in, and there's an email

16  later on.  And so they're saying, What shall we do, we don't

17  want somebody else going to the SEC?  And in response the

18  defendant says, Just tell him we had a delay in the financing

19  and we can't pay him until then.  So they're trying to put off

20  David Geller to prevent him to reporting to the SEC as well.

21        And then this is another -- the top part of that

22  chain, so this is a continuation of that email chain.  And

23  then they're talking about David Geller as well as Michael

24  Lavelle, and then on July 11th, the defendant says, Make sure

25  you talk David Geller down from the ledge, somewhat important.

Summation - Smith                                5279

1   And this is after he made the threat to go to the SEC.

2             THE COURT:  Are the jurors open to having to lunch

3   now?

4             How much more do you have, Ms. Smith?

5             MS. SMITH:  Probably another 45 minutes.

6             THE COURT:  Are the jurors -- what do you like to do

7   lunch or hang in for 45 minutes?

8             THE JURY:  Another 45 minutes.

9             MS. SMITH:  That's fine.

10            THE COURT:  Thank you, jurors.

11            MS. SMITH:  So the next thing that we see then,

12   after all of this email correspondence back and forth, and

13   obviously the investors don't see this back and between the

14   defendant and Evan Greebel, you're the only ones who are

15   seeing this, so they're contacting, and all this is going back

16   and forth and they're getting the order that the defendant and

17   Evan Greebel decide, and the outcome of all this back and

18   forth is the settlement agreements, which you've heard a lot

19   of testimony about.

20            So this is -- I'm just going walk through very

21   quick.  Sara Hassan gets a settlement agreement on April 25th,

22   and the settlement agreement basically gives her $400,000 in

23   cash, and that comes from the company.  If you remember, she

24   put in 300, she got an investment that was worth 435, and she

25   got those liquid shares.  So the payment is for $400,000 in

Summation - Smith                    5280

1    cash.

2              And there's the release in the settlement agreement,

3    which releases Retrophin, which is a fraud, because Retrophin

4    doesn't owe Sara Hassan anything.  And it also releases the

5    defendant and MSMB entities.

6              And so this is the way in which the defendant gets

7    money out of Retrophin by getting this release in return, as

8    well as for Retrophin and for themself and the MSMB entities.

9    And the true parties that actually have liability here that

10   could be sued are the defendant and MSMB.  Retrophin doesn't

11   owe Sara Hassan anything.

12             And so this is the fraud on the company.  It's

13   basically saying, we're signing the settlement agreement

14   because Retrophin is in trouble, when the truth of the matter

15   is that Retrophin was not on the hook for any of this, and

16   this is just a way for the defendant to use the company to pay

17   back the investors.  That $10 million that was raised in

18   February, that money was raised again to make the company, the

19   pharmaceutical company, successful not to pay back people that

20   the defendant owed money to.

21             And you can see again at the end of these

22   agreements, everything for all the entities is all signed by

23   the defendant and the payment actually comes -- the payment to

24   Sara Hassan actually comes from Retrophin.

25             And the same thing with Richard Kocher.  He's an

Summation - Smith                    5281

1    MSMB Healthcare investor, and that is May 13th for Richard

2    Kocher.  And he gets paid a cash payment of $123,700, and then

3    also shares of common stock, which as we'll see come from the

4    Fearnow shares.  And he gets a similar release, again from

5    MSMB Healthcare investment in Retrophin, but that investment

6    was done at the minute that those shares got distributed in

7    the March of 2013.  So Retrophin doesn't owe Richard Kocher

8    anything.  Richard Kocher is owed money because the defendant

9    lied to him for years about what his investment was worth.  So

10   the defendant, or MSMB Healthcare owes Richard Kocher money,

11   not Retrophin.  And, again, it's signed all by the defendant

12   and the payment comes from Retrophin.  And the stock transfer

13   you can see in the records comes from the Fearnow shares.  And

14   you can see it coming from Fearnow and going to Richard Kocher

15   and the remainder goes to the defendant.

16           So there's been a lot of testimony about whether or

17   not the settlement agreement and then the consulting agreement

18   were known to the board of Retrophin.  And the evidence shows

19   that the settlement agreements and the consulting agreements

20   were concealed from the board.  The settlement and consulting

21   agreements -- the settlement agreements primarily were done by

22   June of 2013.

23           There's one final one with Schuyler Marshall that we

24   looked at, but they were done at this point.  The defendant

25   and Evan Greebel negotiated them, signed them, authorized

LINDA D. DANELCZYK, RPR, CSR

Summation - Smith                          5282

1    payments out of the Retrophin shares.  They were fully

2    completed.  Some of the payments went out later, but the

3    agreements were all signed.

4            And this is the filing, the public filing for the

5    company on June 13th, 2013, the 2012 10-K.  And that's the

6    public filing that discloses, you know, what's been going on

7    at Retrophin.  And there's a section called subsequent events.

8    And that section highlights any major transactions that would

9    have happened up to the point of filing, which is June 13th.

10   And as you can see that the settlement agreements, which at

11   this point are all mostly signed, except for Marshall, are not

12   included here.

13           So the defendant didn't disclose them.  So whatever

14   board meetings happened up until June 13th, they were not

15   raised, either by the defendant or by Evan Greebel.  They're

16   not in the financials, and they are already done by this

17   point.  So they weren't actually revealed to the board in any

18   fashion before actually being signed, and in many cases before

19   the money got transferred.  And this is a filing that is

20   signed by the defendant on June 13th, 2013.

21           So, again, Lindsay Rosenwald is signed, Kocher's

22   signed, David Lavelle.  All the settlement agreements are done

23   at this point.

24           And this is a document that got a lot of attention

25   during the trial, which is the cash flow summary from July of

Summation - Smith                                  5283

1    2013, and it's for the first two months, Government

2    Exhibit 122-43.

3              And if you remember, there was this tiny line item

4    that said MSMB settlement and it talks about Spielberg,

5    Hassan, and something called Trachtenberg & Rodes.

6    Trachtenberg & Rodes is the law firm for Richard Kocher,

7    that's actually for the Kocher settlement.  And there was a

8    lot of discussion about this document.  The most important

9    thing is the date.

10             So, again, this is after the settlement agreements

11   have already been entered into.  And there was testimony from

12   both board members that this was not brought to their

13   attention as a specific line item to look at at that call by

14   the defendant, by Evan Greebel, or by Marc Panoff, who is the

15   CFO.  It was not discussed.  It was not raised as a issue.  It

16   was not -- the board was not asked to sign off on it.  It was

17   just a line item on a cash flow for the entire company.

18             And Aselage says, talking about this cash flow, that

19   they had raised $10 million and most was gone and so he was

20   concerned about the company.  They weren't able to invest in

21   R&D because there wasn't a lot of money.  And that's what he

22   was looking at, not the specific line items which were not

23   explained to him.  And certainly weren't explained as, oh,

24   this is the money the defendant owes and the company is going

25   to pay.

Summation - Smith                                    5284

1          And this was Mr. Aselage's testimony about that

2    document and that it wasn't disclosed to him or to the board

3    what those settlement agreements were and that he didn't know

4    at the time who these people were.

5          What happens next is that over the summer the

6    auditors for Retrophin discover the settlement agreements.

7    And so they find out that there are a bunch of agreements in

8    the books which have, you know, $2 million or more going out

9    the door to various individuals to repay debts that are owed

10   by the defendant and the MSMB entities in connection with the

11   investments.

12         And so they kind of read these emails and say,

13   actually Retrophin should never have paid this money, this is

14   not Retrophin responsibilities, these are debts of the

15   defendant and that the MSMB entities are owed.

16         And so this is an email where the CFO is saying, you

17   know, we can't do any more settlement agreements because we

18   have to figure out why the company is even paying this in the

19   first place.  And the defendant's response is, Fix the fucking

20   issue.  It is not, you know, oh, we should have done things

21   differently.  It is not, oh, I'm concerned about it.  It is,

22   fix it because I want to be able to do more of this and I have

23   more people to pay off.

24         Government Exhibit 320, which is an email back and

25   forth between the defendant and Evan Greebel.  He says in the

Summation - Smith                          5285

1    middle there, the defendant says, Let's work out a resolution

2    ASAP.  I have been doing financial statement analysis for 15

3    years and I don't really think the Marcum view makes any

4    sense.  And Marcum were the auditors.  Please get this settled

5    ASAP.  I am promising these guys we'll have a definitive

6    solution Monday, be creative.  And Evan says, We may have a

7    decision we are exploring.

8         And you know, as you'll see in the SEC filing, what

9    winds up happening is that the company, it makes the defendant

10   sign notes saying, I actually owe this money and I'm going to

11   pay Retrophin back because Retrophin should never have paid

12   the money for the settlement agreements.

13        And you can see that, again, in Government

14   Exhibit 322, Evan Greebel says, at the bottom the defendant

15   says, There were serious faults with the agreements, the

16   settlement agreements, including lack of board approval.  So

17   acknowledging that the board never reviewed the settlement

18   agreements -- approved the settlement agreement.  And then he

19   says, Perhaps the second, though, isn't the worst idea.  And

20   Evan Greebel responds, The current thinking is let Retrophin

21   pay, get a note from the fund, and if the fund can't fulfill

22   the note, Retrophin will write it off as bad debt.

23        So basically saying we're going to get a note, we're

24   going to say that the fund is going to repay the money that

25   the fund should pay in the first place, and if they don't get

Summation - Smith                          5286

1    to, then Retrophin will just write it off, and that's how

2    we're going to deal with the settlement agreements.

3            And then when we get to Schuyler Marshall, who is

4    still in the mix at this point, he's the one person in the mix

5    who has not gotten a settlement agreement, and there's a

6    discussion between the defendant and Martin Shkreli about how

7    to handle him because he hasn't yet been dealt with.

8            And what they wind up doing in the settlement

9    agreement, if you remember, he actually gets two settlement

10   agreements; one for shares and one for money.  And the shares

11   agreement is between Schuyler Marshall and the defendant, and

12   the money, the $300,000, is between the defendant and the

13   company.  And so they split the settlement agreement.  So they

14   only have to get one part for the auditors and not the other.

15   And so they basically sign two agreements instead of one.

16           And not surprising what winds up happening, those

17   are the two agreements and the note, is that the shares

18   agreement is paid by defendant, the settlement agreement

19   that's the money, is paid by Retrophin.  And the share

20   agreement doesn't get signed and the defendant never actually

21   produces the shares.  But the agreement for cash does get

22   signed and Retrophin pays the money for the shares.  This is

23   the last element, they sneak it through at the last minute.

24   The company winds up paying the money.  And the shares which

25   defendant is supposed to pay, don't get paid.

1          And you can see the shares he gives the defendant

2     are his own responsibility to pay something decided not to do

3     it.  He was only going to do it if the company was going to

4     pay, and that's the payment from Retrophin.

5          And then again, the way the settlement agreements

6     are dealt with is that they disguised as restatement issue.

7     So it's basically said to the board that there were these

8     payments and the defendant should have made them but instead

9     Retrophin made them and there was some confusion and so we're

10    going to restate.  We're going to say that the company

11    shouldn't have paid that money.  The defendant should have

12    paid that money.  And we're just going to kind of fix it as an

13    accounting issue.

14         And what the board members testified to is that they

15    had no understanding what those payments were actually for.

16    They didn't know that the MSMB investors had been defrauded.

17    Richardson himself had no idea that his investment in MSMB

18    Capital had disappeared in February of 2011.  And so this was

19    kind of presented by the board -- to the board, excuse me, by

20    the defendant, and Evan Greebel, and the CFO as an accounting

21    issue.  And there was never any discussion of the underlying

22    settlement agreements, why they were agreements, why the

23    investors weren't happy, and they never actually saw the

24    settlement agreements.  They just kind of dealt with it in the

25    financial statement afterwards.

Summation - Smith                           5288

1           And you can see the testimony from the board members

2     Aselage was asked, What discussions, if any, did the board

3     have regarding settlement agreements used to repay MSMB

4     investors the money from Retrophin.  And he said, None, there

5     were no discussions and that the board never approved such

6     agreements.

7           He also said that Mr. Greebel kind of gave updates

8     and we talked situations where Retrophin might be sued, and he

9     was asked whether this was kind of raised, was this a

10    situation where the payments were made because Retrophin might

11    have been sued.  And Evan Greebel never said that.  He didn't

12    say to the board, we have to enter into these agreements

13    because Retrophin might be on the hook.  They were just

14    presenting that they were done, and this is an accounting

15    issue and moving on.  There was no information given to the

16    board about what was done actually underneath these

17    agreements.

18          And you see the same testimony from Steve

19    Richardson, that the settlement agreements were not approved.

20    No specific reason given why the settlement agreements were

21    entered into in the first place.  And that they weren't

22    actually approved by the board or seen by the board at any

23    point.  And so that's Richardson's testimony, it's on

24    page 2917.

25          And so what the defendant and Evan Greebel do next

1   is, you know, the settlement agreements were kind of done.

2   The auditors are on to them.  They restated the financials.

3   And they meet but they still have a couple of investors that

4   weren't happy.  And so what do we do next?  We can't do

5   settlement agreements any more.  And so they switch.  They

6   move from settlement agreements to consulting agreements.

7           And this is Government Exhibit 332.  And Evan

8   Greebel says in the middle there, Darren Blanton wants 100,000

9   shares.  Because remember Darren Blanton tried to get his

10  money out November of 2011, this is now October 2013.  And

11  he's hounding the defendant like, Where's my money?  Where's

12  my money?

13          And Evan Greebel says, Where will the hundred

14  thousand come from?  If it's from the company, we need to do

15  it in a consulting agreement.  And so they're moving from

16  settlement agreements to consulting agreements.  And we'll see

17  that that's because they can pretend like these people are

18  actually doing work for the company and pay them off that way

19  instead of having to do it in a settlement agreement for

20  litigation.  And the defendant says, Why do we need to do a

21  consulting agreement?  And you heard the term settlement.

22          And this is another email about the transition.

23  Evan says, We can call it a settlement agreement, but given

24  Marcum's recent behavior, it may require to be disclosed in

25  the financials.  I was trying to prevent that issue.

Summation - Smith                                  5290

1           So I'm trying to prevent a situation where the

2    auditors says, We have to let people know that we're paying

3    off investors.  I want to do it a different way, I want to do

4    it through a consulting agreement.  And the defendant says,

5    Maybe we don't need to have Marcum.  It doesn't matter if it

6    is disclosed, it is preferable that it is not.

7           And then we have the two sham consulting agreements.

8    And that's Darren Blanton and Lee Yaffe.  And we already heard

9    a lot of mention about Darren Blanton, and he put in 1.25

10   million to gets back $200,000 from Healthcare, not from the

11   Capital, and by October 2013 he's out his money for more than

12   two years and he's trying desperately to get the defendant to

13   pay him back.

14          And so this is his testimony about what he had

15   received in terms of redemption at that point.  And he hadn't

16   received any shares, and he hadn't received any money, other

17   than the capital which he just randomly got distributed to him

18   in the FedEx.

19          And he testified that in 2014, at the time that he

20   signed the consulting agreement, he wanted to get his

21   investment back from the defendant.  That was what the

22   consulting agreement was for.  And that the defendant and Evan

23   Greebel were the ones that proposed the consulting agreement.

24   They didn't discuss it with him, it just showed up.  He had

25   gotten settlement agreements originally.  And the purpose of

Summation - Smith                     5291

1   it was to get his money back for MSMB Capital.

2          And this is the consulting agreement itself, signed

3   by the defendant and Darren Blanton.  And in the description

4   of services, it says, For service and advisers to the company

5   to provide consulting service on strategic and corporate

6   governance matters, and that he was paid 200,000 shares in

7   response.

8          And he testified that the reason he signed the

9   consulting agreement was to get his investment in MSMB Capital

10  and the founder's share because he was involved in founding of

11  Retrophin as well.  Why was the consulting agreement involved?

12  And he said that was Martin and Evan Greebel's idea.  If it

13  looked like I worked for the company, that way I can get paid.

14         And he testified that he had never discussed with

15  his defendant providing consulting services, and that his

16  understanding of why he was entering into it was to get his

17  funds back.  And that's at 1678.

18         And that was the reason he signed the consulting

19  agreement.  Not because he wanted to do any work for

20  Retrophin, not because he wanted to be an employee of

21  Retrophin, not that he was going to provide government

22  services, it's because the defendant owed him money for years

23  and he was trying to get it back.

24         And we have the same situation with Lee Yaffe.  Lee

25  Yaffe is he different because he's the only one who's not an

Summation - Smith                          5292

1    MSMB investor, he's an Elea investor.  And Elea had absolutely

2    no connection to Retrophin.  And so there is no reason why

3    Retrophin should be paying back a debt that the defendant owed

4    from Elea Capital.

5           And we heard from Lee Yaffe again that his father

6    invested, that after years of hounding the defendant that he

7    needed to personally pay back $250,000.  And then by September

8    of 2013, the defendant says that he can pay him cash and

9    shares from Retrophin.  And he entered into an consulting

10   agreement with Retrophin where Retrophin's going to pay them

11   $50,000 a month for four months, and then 15,000 shares.

12          And the reason remember the term went from three

13   months to four months, because he wanted a certain amount of

14   money not because he was doing any kind of work or that he

15   need to extended the term of work.

16          And he testified about the promissory note that he

17   had where the defendant owed his father personally $250,000.

18   That's Government Exhibit 116-8.  And that the purpose of the

19   consulting the agreement was to get my money to repay Elea

20   Capital investment.  This is the consulting agreement,

21   Government Exhibit 16, which he signed, the defendant signed.

22   And then again the description of services include that he's

23   going to be a consultant on cluster headache drug development.

24          And you heard his testimony, he has no experience in

25   cluster headaches.  He has no background in that industry.  He

LINDA D. DANELCZYK, RPR, CSR

Summation - Smith                            5293

1   has no expertise in cluster headaches.  He never said that he

2   wanted to be consultant.  He never performed any services.  He

3   had two phone calls with the defendant and Marek Biestek for

4   less than five minutes where they discussed cluster headaches

5   in the general sense and that was it.  You know, he was not

6   providing services.  The purpose of this agreement was for him

7   to get repaid.

8            And the compensation, again, is in the agreement.

9   And that he knew at the time that the shares and the money

10  were coming from Retrophin instead of the defendant, and he

11  testified that that was wrong.  That he knew it was a debt

12  that the defendant owed him and that the company did not owe

13  him and that he signed the agreement anyway.

14           And, again, he wasn't qualified by any education or

15  experience to be a consultant, and he never provided any

16  consulting service to Retrophin.  This was just a sham.  It

17  was a pay to pull money out of Retrophin, a public company, to

18  pay back debts that were owed by the defendant.  And, again,

19  the consulting agreements were concealed by the board.

20           So both Aselage and Richardson testified that they

21  were never presented with the consulting agreements, they did

22  not sign off on the consulting agreements, and they weren't

23  told the consulting agreements were being used to repay

24  investors who had been defrauded by the defendant.  And that's

25  Richardson's testimony at 2920.

Summation - Smith                                5294

1           And, again, there's a lot of evidence of intent,

2    which I'll going through quickly.  Government Exhibit 363.

3           This is an email from November of 2012.  The

4    defendant's discussing actually consulting agreement or

5    agreements for somebody else, and it involves stock.  And the

6    defendant says, 55K plus a bunch of stock plus a reset on our

7    stock is a lot, considering I would need board approval, it

8    may not work.  So he knows back in November of 2012 that he

9    needs board approval if he's going to take money or shares out

10   of company for something like that.  And so he's on notice

11   very early on that this is his responsibility.

12          Same thing in Government's Exhibit 370, which is

13   February 2013 that the board needs to approve any grant of

14   shares.  That's Evan Greebel telling the defendant that in

15   February 2013.  Obviously that's not what Evan Greebel and the

16   defendant do, which is settle, they were both consultants

17   because they both know that's what they are supposed to do.

18          Government Exhibit 255, the defendant -- Evan

19   Greebel is talking to the defendant who wants to buy shares of

20   the company at below market price.  And Evan's explaining to

21   the defendant that he was a director and a CEO of a public

22   company, you have a duty and a loyalty in related issues.  You

23   are working for the public company, you can't just take the

24   money or shares out of the public company any way you want, it

25   has to be for something that benefits the company.  And you

Summation - Smith                           5295

1   can't just act as if you have no responsibility to the

2   company.  And the defendant's response in February of 2013 is,

3   "F" that.

4            Government Exhibit 343.  This is actually a

5   discussion between the defendant and Evan Greebel in

6   March 2014 about Blanton's consulting agreement.  And Evan

7   says at the bottom, Do you want to raise the consulting

8   agreement during the business update with the board?  And the

9   defendant responds, No, another time.  And they never raise

10  the consulting agreement.

11           So they know they're supposed to, they discuss it.

12  Mr. Greebel and the defendant are discussing it in March of

13  2014.  After it's been signed.  So it's after the fact.  They

14  still know they're supposed to raise it and they don't.

15           We went through this email with David Geller before.

16  About the SEC threat.  Again, as we see in Government

17  Exhibit 371, there's a discussion with another lawyer at

18  Katten.  This is November 2013.  This is a discussion about

19  additional information that the SEC wants about Retrophin's

20  investment -- MSMB's investment in Retrophin.  And so as of

21  2013, he knows that this investigation may ultimately pull in

22  what MSMB invested in Retrophin as well.

23           And even knowing that, he signs a document in

24  January of 2014, so after that last email, saying that he is

25  not the subject of any investigation by the SEC.

Summation - Smith                              5296

1          And so, again, there was testimony from Richardson

2     that neither the defendant nor Evan Greebel raised the SEC

3     investigation, which would have let the board know that the

4     MSMB investors weren't happy.  Because remember Darren Blanton

5     is the one that went to the SEC.

6          And then just very briefly to end here for this

7     count for venue.  Marek Biastek transferred shares to the

8     defendant he had backdated while he was a resident in Queens.

9     MSMB Capital investor, Rosenwald, is a resident of Lawrence,

10    New York.  He had a settlement agreement, as did MSMB

11    Healthcare investor Spielberg, who was living in Brooklyn at

12    the time.  And again interstate wires, or emails, and phone

13    calls, and wire transfers.

14         So those are the -- that's the evidence that's

15    supports Count Seven, which is the Retrophin misappropriation

16    scheme.  Again with those three components, the backdated

17    interest, the settlement agreements, the consulting

18    agreements, and I submit that the evidence we walked you

19    through proves beyond a reasonable doubt that the defendant is

20    guilty of the crimes charged in Count Seven.

21         And then the last crime is the Retrophin

22    unrestricted shares scheme, which is related to the Fearnow

23    shares, which we've talked about at length.

24         And just to give you a brief overview of the scheme

25    again, the defendant and the coconspirators, including Evan

1    Greebel and Marek Biestek and others, engaged in the

2    conspiracy to default investors and potential investors in

3    Retrophin by seeking to control the price and trading volume

4    of Retrophin stock.

5            And they sought to do this by concealing his

6    ownership of the Fearnow shares and his control of them.  And

7    at the time that they were issued, there was a majority of the

8    free trading shares of the company.  So the majority of the

9    shares can actually be transferred and shared and sold and

10   bought, as opposed to the restricted shares, which is what was

11   showing up in the Capital and Healthcare investors.  Again,

12   time period is November 2012 to September 2014, and the charge

13   is of securities fraud conspiracy.

14           And, again, these were the -- these are the elements

15   of securities fraud conspiracy.  This was in the agreement to

16   commit securities fraud.  And the defendant knowingly and

17   intentionally joined that agreement.  And, again, because it's

18   securities fraud and conspiracy, we have the overt act, which

19   takes it through the end.

20           And these were just the underlying crimes in

21   securities fraud.  And then just in addition, it's important

22   to note that it includes any conduct that is designed to

23   deceive or defraud investors by controlling or artificially

24   affecting the price of securities.

25           And one of the elements of this deception is that

Summation - Smith                                    5298

1    the investor into believing that the prices at which they

2    purchased and sold securities are determined by the natural

3    interplay of supply and demand.

4            So the idea is if you go out and buy Apple stock,

5    you're on the same terms as everybody else buying Apple stock,

6    and there's nobody artificially controlling the price or

7    getting a better deal than what you could get if you went out

8    on the market bought it.  That's one of the general ideas of

9    why you want to prevent people from controlling the price or

10   trading the volume of stock, so artificially putting it

11   somewhere that the market wouldn't put it.

12           So if you remember, there were 2.5 million free

13   trading shares that were attached to the Desert Gateway shell,

14   and was first discussed between the defendant and Evan Greebel

15   in November of 2012.  It's Government's Exhibit 220.

16           And if you remember from our discussion earlier,

17   Mulleady, Fernandez, and Biestek agreed to accept those shares

18   in return for backing the share transfer agreements to the

19   defendant, and we have those exhibits again.  And that's the

20   Fernandez transfer.

21           The defendant was the one who selected who received

22   the free trading shares.  And Pierotti testified to that.  The

23   defendant was the one who decided who got to purchase these

24   shares in connection with the Desert Gateway reverse merger.

25           And Pierotti was one of the people who was given the

Summation - Smith                            5299

1   opportunity to purchase the shares.  And we saw his purchase

2   agreement.  It was between Pierotti and Troy Fearnow, who is

3   someone connected to Desert Gateway.  And he bought 400,000 of

4   Desert Gateway, which became Retrophin shares for $400.  And

5   that was an agreement between him and the between Troy

6   Fearnow, and the defendant wasn't actually part of this

7   agreement.

8         And if you remember, you see that Evan Greebel was

9   the one that's kind of coordinating all of the purchases.  He

10  informs the defendant that he's got the signed purchase

11  agreements from everybody.  That's Government Exhibit 232.

12        And then the two of them figure out how many shares

13  everybody is going to get.  And if you remember, there was

14  that initial distribution of shares.  Pierotti is supposed to

15  get 400,000, and then 50,000 got held back because they didn't

16  have enough money to pay Troy Fearnow for all the shares, so

17  they held some back in order to kind of make sure that they

18  could get the Desert Gateway shell.

19        So this is the original distribution of shares, and

20  then that's the way that it worked after they held some back.

21  And Pierotti testified about the meeting that he was at with

22  Michael Fearnow in his home and they kind of discussed some of

23  the shares being held back.

24        In this portion, Greebel informs the defendant of

25  the need to make sure that everybody finds that there are not

Summation - Smith                           5300

1   affiliated with company because as you heard Deb Oremland

2   testify, if you're an affiliate of the company, if you work

3   there, if you own more than a certain amount of stock, you

4   actually can't get free trading shares, they're going to be

5   subject to a restriction.  So in order to let them be free

6   trading and actually be able to buy and sell them, you can't

7   be an affiliate.

8           And so they have to all affirm that they're not

9   affiliated with Desert Gateway, which becomes Retrophin.  So

10  they're not to be employees of Retrophin or working there.

11  And there's a series of emails between Evan Greebel and all

12  the Fearnow shares where they all say, you don't have any

13  connection to Retrophin.  And that's get forwarded by Evan to

14  the defendant so that he knows this is what everybody's saying

15  as well.

16          And Tim Pierotti's email is here.  As you remember,

17  at this point Tim Pierotti had stopped working for the

18  defendant.  He had never worked at Retrophin.  He worked at

19  MSMB Consumer.  And then he had this termination agreement

20  where he basically said, I'm no longer working for MSMB

21  Healthcare, and he was going to go off and do that Garreco,

22  that kind of dental gypsum business.  He was going to go do

23  something else.  And the defendant had said, you know, don't

24  come into the office, we're turning into Retrophin, and he

25  wasn't connected to Retrophin, and he had stopped working in

Summation - Smith                    5301

1   any way with the defendant at this point.  And, again, he

2   wasn't considered working for Retrophin because he didn't have

3   the background and he wasn't interested.

4           Here are the other people who agree that they're not

5   affiliates.  Marek Biestek.  Andrew Vaino.  And we know that

6   Andrew Vaino and Steve Aselage is actually someone who was in

7   the San Diego office of Retrophin at the time.  So we're going

8   to look at some of that.  But Andrew Vaino, Thomas Fernandez

9   is also affirmed that he's not an affiliate of Desert Gateway,

10  which, again, becomes Retrophin.  And Kevin Mulleady

11  represents that he's not.

12          And then Greebel provided that information to the

13  law firm that's preparing the opinion so when the shares get

14  distributed by email, by testified they need some sort of

15  order.  And the order that they get says that none of the

16  people who are receiving the shares are affiliated with Desert

17  Gateway, or Retrophin and, therefore, the shares can be free

18  trading instead of the restricted shares that other people

19  get.

20          And that's the legal opinion that gets sent, and

21  that's the section where they say that none of these people

22  are affiliated with Retrophin.  And at the bottom it has the

23  distribution of the Fearnow shares as well.

24          And then again, some of the people who were

25  affirming that they had nothing to with Desert Gateway or

Summation - Smith                    5302

1    Retrophin were, in fact, working there at the time.

2           So Mulleady was working for Retrophin, when he

3    received Fearnow shares.  The termination date was -- he

4    didn't Retrophin until January of 2013.  So he get the Fearnow

5    shares, he's an affiliate.

6           Vaino was a Retrophin employee through 2015.  So

7    when he gets the Fearnow shares, he's an affiliate.

8           Fernandez was a Retrophin employee through 2015.

9    When he gets the Fearnow shares, he's also an affiliate.

10          And Ron Tilles was a consultant for Retrophin, so

11   when he got shares of Retrophin, he was also considered an

12   affiliate.

13          You can see there's a discussion between Evan

14   Greebel and the defendant about where the Fearnow shares will

15   be sent, and Evan suggested they be sent all to MSMB and the

16   defendant says, No.  Because MSMB is sharing the same office

17   space as Retrophin, and they should be sent to the individuals

18   because nobody should know that these people are actually

19   working for Retrophin at the time.

20          And as you see, the standard register distributed

21   that they're not shared to the individuals, some of them were

22   actually sent to Evan Greebel.  But including Edmond Sullivan,

23   who was living in Brooklyn at the time, and then also Marek

24   Biestek, who's living in East Rockaway.

25          So they get the opinion that none of these people

1    are employees, they distribute the shares, all the shares that

2    can be bought and sold.

3           And then the defendant sends this email, which is

4    Government Exhibit 242, and he sends it to the Fearnow share

5    recipients and he says, Effectively immediately, I'm the CEO

6    of Retrophin, and MSMB Capital, as you know, is liquidating,

7    and basically says none of these people are employees of

8    Retrophin.  I decree, none of these people are employees of

9    Retrophin.  They shouldn't be in the office, they're not

10   employees.  And the reason he's doing this is because he knows

11   they just all affirmed that they're not affiliates, and so

12   they can't be working for Retrophin.  So this email he sends

13   out, kind of wink, wink, nod, nod, nobody here works for

14   Retrophin.  And that's Government Exhibit 242.

15          And you can see that there's discussion between Evan

16   Greebel and the defendant about this.  Evan Greebel says in

17   December of 2012, per your prior instructions, Kevin is not an

18   employee or consultant of Retrophin.  And we just saw earlier,

19   in fact, he was an employee of Retrophin until January of

20   2013.  So this is just cover.

21          You can see in Government Exhibit 368, this is a

22   discussion between Kevin Mulleady and the defendant.  Kevin

23   Mulleady on the left, the defendant is talking to him about

24   work that he wants him do for the Retrophin website.  And in

25   response Kevin Mulleady says, You know, I'm going to do it, I

1    just got up this new email address, which is a non-Retrophin

2    email address.  And he's sitting at home because he's waiting

3    for FedEx.  The FedEx are the Fearnow shares we just saw.

4    Those shares, if you look at the actual labels were sent out

5    on December 14th.  This is December 16th.  And he's saying,

6    I'm staying home with my Fearnow shares.  The defendant is

7    talking about working on something for Retrophin.  And then

8    the defendant says, Come into the office.  Like come in and

9    come to work.

10              And so there's this whole fiction.  He's giving this

11   new email address.  He's sitting at home waiting for the

12   Fearnow shares, and the defendant wants him to come in and

13   work for Retrophin.

14              And he also wanted Pierotti to come into the office.

15   Remember his testimony, Pierotti was -- had originally said to

16   Pierotti, You're not going working for me any more, you do

17   your own thing, you know, this office is for Retrophin.  Once

18   he gets the Fearnow shares, he wants Pierotti to come into the

19   office as well.  Even though Pierotti says he also not

20   affiliated with the company.

21              And then he gives all the Fearnow share recipients

22   updates about the office hours.  You know, so it's this -- you

23   know, on the one hand you have nothing to do the company, on

24   the other hand I want you to come into office, I'm telling you

25   what office hours are, I want to you do work for Retrophin.

1           And, you know, there's this whole disclosure issue,

2   because the reason the defendant wants these people to come

3   into the office is because he wants to control the shares.

4   And there's -- we'll get to that at the last piece which is

5   coming up, and actually why he wants to control the shares and

6   how he tries to do it.

7           But you will see that the Fearnow shares then get

8   used to pay off various settlement agreements, and the

9   defendant tries to control who can sell them and what they can

10  do with them, and he exercises control over many of those

11  Fearnow shares.  And in the filing that he makes right after

12  the merger, he does not disclose that he is, in fact,

13  controlling the shares.

14          So he puts them in other people's names.  He wants

15  to control them.  He wants them to keep trading because he

16  wants people to buy and sell them when he wants them to.  But

17  he doesn't actually take responsibility for controlling them.

18          And so he discusses the 13D filing with Greebel,

19  which is the filing that Deb Oremland says, We have to

20  disclose all the shares that you control.  And then he doesn't

21  actually disclose the shares.  He discloses his own shares,

22  and he discloses MSMB Capital, and MSMB Healthcare, but not

23  the Fearnow shares.

24          And so he has 3.3 million shares of his own, or MSMB

25  Capital and Healthcare, which represents 40 percent of the

1   company.  And those $2.5 million shares, remember they're

2   about 8.8 outstanding, would put him way in the majority of,

3   you know, the Retrophin, controlling Retrophin.  And they're

4   not disclosed.

5           And then you can see over the next few months how he

6   actually exercises control over those shares, and he moves

7   them around, and you can see all these initial decisions; LR,

8   Lindsay Rosenwald, gets 80,000 shares from MB and ES, and just

9   he kind of moves them.

10          And I'll going through this quickly, but there's a

11  series of emails where he's the one saying, You take your

12  Fearnow shares and give them to do this person, you take your

13  Fearnow shares and give them to that person.  That is control

14  of those shares, and he has not disclosed that, as he's

15  required to.

16          So, again, he's directing them to fulfill different

17  obligations, settlement agreements.  These are additional

18  personal obligations.  You know, shares going to LR, going to

19  DS, moving them around from different people that are supposed

20  to own them, and instead he's directing where those shares go.

21          Same thing, this is a listing in December of 2013,

22  approved the shares from which portion.

23          So Kocher got shares that had been with Andy Vaino.

24  Lindsay Rosenwald got shares from Ed Sullivan and Marek.  So

25  those shares are in other people's names, and he's directing

Summation - Smith                           5307

1   who gets them, and that's exercising control over them and

2   that needs to be disclosed and it wasn't.

3          And this is the distribution that we saw with Deb

4   Oremland and, again, you can see that the free trading shares

5   represent 80 percent of the shares that can actually be bought

6   and sold at this time.  And so if you're controlling

7   80 percent of the shares that can be bought and sold, you can

8   kind of decide when you're going to buy and sell and how much,

9   and in that way you control how many shares are being bought

10  and sold, the volume, and then also the price.  Because you

11  are the one that's out there telling people to buy and sell at

12  certain prices.

13         And that's the way that the control is used to

14  defraud Retrophin, because the stock is not being bought and

15  sold on the free market for what people think it's actually

16  worth.  There's control being exercised and people are trading

17  them, or buying and selling them for a certain price or a

18  certain volume in order to control the ultimate share price of

19  Retrophin.

20         And, again, if you remember at this point, the

21  defendant needs Retrophin to have a decent share price because

22  he's giving out the shares to Capital and Healthcare investors

23  and he needs them to be worth something.

24         As you remember, there's this attempt to control the

25  Scottrade accounts that are set up.  He says everyone who got

Summation - Smith                                        5308

1   Fearnow shares, everyone should get an account in Scottrade,

2   set it up, and then tell me what you're buying and selling

3   every single day so I can see how the shares of Retrophin are

4   being sold and for what price and how much.

5           And this is an email to all the Fearnow shares with

6   most of them saying set up these accounts.  And Pierotti

7   talked about that it was the defendant's idea to set these

8   accounts up and to keep track of the trading.  And it was

9   discussed between Marek and Evan Greebel as well.

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation - Smith                    5309

1          MS. SMITH:  And the defendant is, in this period,

2     encouraging people to buy and sell stock, to increase the

3     volume or to set a particular price.  So he asked Darren

4     Blanton to buy stock and he suggests that the Fearnow share

5     recipients should buy and sell stock between them to increase

6     the volume.  And he encourages people again to increase

7     trading volume, this is Government Exhibit 120-14.  One of my

8     priorities in the future is increasing the trading volume of

9     our stock.

10          And you can see on this chart from Deb Oremland, the

11    green are the Fearnow share recipients who are not Tim

12    Pierotti.  And they are in the fact out in the market buying

13    and selling stock in this time period, as the defendant has

14    directed.  You can also see there are a particular days she

15    talked about where the defendant is out there.  So on

16    December 17th he's the only one buying stock and so he's able

17    to set the price for the stock for the day and you can see

18    that it's particularly high at that point.  Then, again, this

19    is just as important because at this point, which is the far

20    left of the graph, the share price in is red and the volume is

21    the blue and there is not a lot of volume, so there are not a

22    lot people who are buying and selling or who can buy and sell

23    and so as a result what the defendant is doing is going to

24    have a big impact on the volume and the price of the shares.

25          Then the last piece of this is the attempt to

1    control Pierotti stock.  So Pierotti doesn't follow the rules,

2    he's not working for Retrophin, he doesn't want to come into

3    the office.  He doesn't want to tell the defendant when he's

4    buying and selling.  He's worried about being an insider and

5    getting insider information and he's uncomfortable with the

6    entire situation.  And so he goes off on his own and he starts

7    selling the Fearnow stock and this enrages the defendant

8    because he thought he had given it to people who were going to

9    do with the stock what he wanted, and Pierotti isn't playing

10   by the rules.  So he goes after Pierotti.  First he tries to

11   figure out who is actually selling the stock.  He has

12   conversations with Evan Greebel, you know, who's out there

13   selling?  Like, I know who has all the shares, who is out

14   there selling?  And there is a bunch of conversations about

15   who is it and trying to figure it out.

16          He concludes on December 29th that it might be Tim

17   selling, because he's talked to everyone else, he's kind of

18   figured out who is left, Tim must be selling his stock.

19          And he says to Evan Greebel, I want to send him an

20   email, you know, I want to do something to tell him to stop

21   selling or give me back the shares.  And Evan Greebel says to

22   him, leave it alone, you are an affiliate and it will only

23   create problems.  So he's the telling defendant not to try and

24   go after Pierotti's shares.  And what does the defendant do?

25   He doesn't listen to Evan Greebel, he goes and does what he

Summation - Smith                                    5311

1    wants, which is he sends a rant back to Pierotti about how he

2    promised to work for Retrophin and he's absconded with the

3    shares and he wants the shares back.  And it's in the same

4    time period at the end of December 2012.

5            So there is this email and then Pierotti testified

6    that there was a phone conversation where the defendant

7    screamed at him and told him to give back the shares.  And

8    then there was the whole over the wall set of emails.  And the

9    defendant consults with Greebel about whether or not he should

10   try and bring Tim Pierotti over the wall.  Basically what that

11   means is, if you give someone inside information about a

12   company, like Apple is going to buy another company, once you

13   have that information, you can't sell because you don't

14   want -- you can't sell on information that's not public.  So

15   what he wants to try to do is give Tim Pierotti, force him to

16   get information about Retrophin that is not public so he will

17   stop selling the stock.  That is what the over the wall email

18   is about.

19           He discusses it with Evan Greebel who says that he

20   never heard of putting someone over the wall with inside

21   information over email.  And they are discussing whether or

22   not they should put that in the title of the email and if it's

23   in the title whether Pierotti will actually delete the email

24   or he'll read it and once he reads it he can't sell the stock.

25           And you can see that Greebel is also warning him not

Summation - Smith                                5312

1   to make it clear kind of who the email is going to.  The email

2   is going to the Fearnow share recipients.  So he's trying to

3   keep them, the people who have the free trading shares from

4   selling and, particularly, Tim Pierotti because he's unhappy

5   about the share price at this point.

6           Greebel says, I don't know what happens if he just

7   deletes it.  Even if it's in the header there's some -- in the

8   subject line if there's some inside information if he just

9   deletes the email I don't know if he's actually over the wall.

10  And if you remember when Tim Pierotti testified, there was a

11  lot of cross-examination on why did he delete the email, it's

12  exactly what Evan Greebel says he's going to do.  He doesn't

13  want inside information, he wants to be able to share and so

14  he doesn't want to be brought over the wall.  And so the

15  defendant sends the over the wall email anyway, after the

16  discussion with Greebel to keep Pierotti from selling, and

17  then Mulleady sends another email to the group discouraging

18  them from selling.  So he's also kind of jumping on what the

19  defendant is doing and trying to prevent Tim Pierotti from

20  selling his shares.

21          And as we know, he doesn't stop.  And he says that

22  he deletes the email because he doesn't want to have inside

23  information and not be able to sell his shares.

24          And what happens next is they discuss suing Pierotti

25  for selling the shares.  Greebel says it's very risky given

Summation - Smith                           5313

1    what your agreement was, you could be opening a much bigger

2    can of worms.  Because he knows that Pierotti, you know, wink,

3    wink, nod, nod is probably going to do with those shares what

4    the defendant says.  And, technically, Pierotti is not, you

5    know, beholden to the defendant, he can do what he wants.  The

6    defendant's control has not been disclosed and so he's

7    concerned that if they sue Pierotti, this whole kind of

8    arrangement where he controls those shares is going to come to

9    light.  So he says, I don't think threatening to sue Tim

10   Pierotti is a good idea.

11           Of course, the defendant doesn't listen to him.  He

12   threatens it anyway, and we talked about this email with

13   Mr. Pierotti.  And after this email is when the defendant gets

14   really frustrated and upset and angry with Tim Pierotti.

15   Because despite sending the over the wall email, despite

16   threatening to sue him, Tim Pierotti is still selling his

17   shares.  And this is when the defendant threatens Pierotti's

18   wife to get him to return the free trade shares.  This is his

19   attempt to control those shares.  It's not enough to threaten

20   to sue, it's not enough to give him inside information, he has

21   to go and threaten Tim Pierotti's wife because he wants that

22   badly to control those shares.

23           And, as you remember, it includes threats about

24   making Tim Pierotti's wife homeless and his children homeless

25   and it includes, you know, this discussion of how he's frozen

Summation - Smith                        5314

1   Tim Pierotti's bank account and the effort, the lengths at

2   which he is going to try and get those shares back and control

3   them, because at this point, again, there aren't that many

4   free trading shares out there.  And the more shares he

5   controls, the more that he can control the price and the

6   volume of those shares and make sure that Retrophin's stock

7   price is at a decent level.

8          And if you remember, there are emails after this, he

9   actually goes ahead and has Evan Greebel, the Katten law firm

10  file a lawsuit against Pierotti.  That's how badly he wants to

11  the shares back.  He says, I expect you and Howard to bury

12  Tim.  That's in March 2015.

13         Then the last exercise of control over these shares

14  was, remember those 50,000 shares that were held back, those

15  were supposed to go to Pierotti because the agreement was

16  between Troy Fearnow and Tim Pierotti, not the defendant.  And

17  what happened is when Pierotti tries to get those shares, the

18  defendant prevents it.  Even though that agreement has nothing

19  to do with the defendant, he is exercising control over those

20  50,000 shares.  And there's an email from Michael Fearnow to

21  Martin Shkreli in December 2013 saying that Tim, Tim Pierotti

22  is asking for his stock.  And the defendant forwards that to

23  Evan Greebel.  And as Tim Pierotti testified, he never

24  actually got those 50,000 shares.  In the settlement agreement

25  with Retrophin over the lawsuit, he agrees not to go after

1   them because the defendant has effectively blocked him from

2   getting those shares.  And they settle on those shares.

3          And again, overt acts, which is the last piece.

4   There are a number of emails that are charged including one of

5   the affiliate emails that was sent by Evan Greebel to Marek

6   Biestek.  And then again another overt act that's been charged

7   in an email between the defendant and Evan Greebel, they're

8   talking about using the Fearnow shares for Kocher's settlement

9   agreement, which they do, and Greebel is asking him, well,

10   whose shares do I take?  Whose shares should I take to use to

11   settle this agreement, because we control all of them so who

12   do you want me to take them from?  The defendant's response is

13   take from anyone, I don't care, do the math.  And that is the

14   evidence on the final securities fraud conspiracy count for

15   Count Eight.

16          And I really appreciate everybody's patience, I know

17   this was a long presentation, it's been a long trial.  The

18   evidence comes in piece by piece it is not all at once and it

19   doesn't come in order, so this is our opportunity to kind of

20   put everything together for you and show you how all the

21   evidence fits in with the law that you're going to hear from

22   Judge Matsumoto and how we have shown that the defendant is

23   guilty beyond a reasonable doubt on all eight of the crimes

24   with which he's been charged.  Thank you.

25          THE COURT:  All right, thank you.

Proceedings                                    5316

1          I think at this time we will give the jurors their

2     lunch break.  Please return to the jury room, if you can.  Is

3     one hour sufficient?  So let's say 2:50.  If you can get there

4     a little earlier even better.

5          Please don't discuss the case.

6          (Jury exits courtroom.)

7          THE COURT:  All right, so let's take one hour and

8     resume.

9          MR. AGNIFILO:  Your Honor, we have a concern, during

10    the government's summation they seemed to define the term

11    affiliate.  I think they defined it inaccurately and I think

12    they defined it as someone who can be an employee of a company

13    or associated with a company.  It's a term with a very

14    specific definition and I think that we're going to need Your

15    Honor to give that definition to the jury because it's simply

16    not just an employee of the company.  An affiliate is a person

17    such as executive officer, a director, or a large shareholder

18    in a relationship of control with the issuer.

19          So maybe what we can do, since we're going to have

20    some time before the jury comes back, I can get Your Honor a

21    more precise, well, better researched definition of the term

22    affiliate, but I know it's very much inconsistent with what

23    the government just told the jury it was.

24          THE COURT:  Why don't you consult, trade your

25    authorities and I will straighten it out.  Why don't we come

Proceedings                                    5317

1   back then at 2:45, 2:40 so I can come up to speed on where you

2   stand.

3              MR. AGNIFILO:  Very good, Judge.  Thank you.

4              THE COURT:  Thank you.

5              (Luncheon recess:  1:50 p.m.)

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    5318

1           A F T E R N O O N    S E S S I O N

2           (In open court; jury not present.)

3           THE COURT:  Have a seat.

4           MR. AGNIFILO:  Judge --

5           THE COURT:  Yes.

6           MR. AGNIFILO:  -- we've been talking and rather than

7    taking something kind of out of context, we're going to agree

8    or come as close as possible to agreeing on a jury instruction

9    that Your Honor can incorporate in the general instructions --

10          THE COURT:  Okay.

11          MR. AGNIFILO:  -- on affiliates and that it's an

12   issue of fact for the jury to decide based on certain language

13   that we can probably come close to agreeing on by the end of

14   the day.

15          THE COURT:  All right.  I just think that perhaps

16   you seem to be reading maybe a definition that I wasn't

17   certain was applicable, I think that's one of the issues

18   whether it is the 1934 Act or --

19          MR. AGNIFILO:  We have -- what we can do, Judge, is

20   there are a couple of -- there seems to be a lot of confusion

21   about the precise definition and there's some changes in the

22   SEC, but what we can do after, I think when we finished with

23   the summations for today, we can probably come close to

24   agreeing on some language --

25          MS. KASULIS:  Yes.

Proceedings                                    5319

1        MR. AGNIFILO:  -- that Your Honor can maybe

2   incorporate into the general charge.  So we don't have to do a

3   specific charge at this point.

4        THE COURT:  Okay.

5        MR. BRAFMAN:  Judge, just on scheduling, the

6   government's summation was a little bit longer than everyone

7   expected, I'm not being critical I'm just stating a fact, and

8   it's now 10 to three.  I'm going to try and finish today but

9   I'll know by the break where I'm up to and then maybe by the

10  break the Court can ask the jurors whether they would be

11  willing to sit today a little bit past 5:30 or whether they

12  need to leave at 5:30, it's up to you.  I'll let you know by

13  the break how far I've come.

14       THE COURT:  All right.

15       MR. BRAFMAN:  I'd like to really finish today if

16  possible.

17       THE COURT:  I understand.  I would like to just keep

18  the case moving as well.  It may be difficult for me

19  personally to stay past 5:30, but I will certainly think about

20  it --

21       MR. BRAFMAN:  If they don't want to, I don't want to

22  keep them then.

23       THE COURT:  -- and stretch to do that.  Okay.

24       MR. BRAFMAN:  Thank you.

25       THE COURT:  Are all the jurors back?

Proceedings                                      5320

1          Do you know how soon you'll be able to discuss and
2   come to some sort of proposal regarding the definition of an
3   affiliate?  Because we will have to incorporate it, we'll have
4   to clear it with you.
5          MR. AGNIFILO:  I need maybe five or 10 minutes
6   after, we're not doing anything else, maybe we can even do it
7   over the afternoon break.
8          THE COURT:  Maybe we should adjourn at five so we
9   can straighten that out, we'll see.
10         MS. KASULIS:  We can talk about it over the break,
11  Your Honor.  I don't anticipate it being a big issue.  I think
12  we can probably work it out.
13         THE COURT:  All right.
14         Are you using the Elmo or the PowerPoint?
15         MR. BRAFMAN:  I'm going to use the Elmo.
16         (Jury enters courtroom.)
17         THE COURT:  All jurors are present.  Please have a
18  seat everybody.
19         Members of the jury you will now hear from the
20  defense.  Mr. Brafman, you may proceed.
21  BY MR. BRAFMAN:
22         Thank you, Judge.  May it please the Court.  It's
23  been a privilege to appear in this courtroom and I appreciate
24  the courtesies you've extended to counsel.  My whole team says
25  that, thank you, Your Honor.

```
                        Proceedings                      5321
```

1          And for you, ladies and gentlemen, I don't know how

2    to say this, I work here, without you I'd have no job and with

3    you at least I have decent citizens to speak to and hopefully

4    convince.  But thank you for your service.  This has not been

5    an easy case, it's been longer than usual jury service and you

6    have given of your time and you are entitled to the thanks of

7    all of the parties, because without you we don't do anything

8    here, we just look at each other and wait.  So thank you for

9    showing up and thank you.

10          As a trial lawyer, jurors always ask me how to get

11   out of jury duty and I always say the same thing, don't get

12   out of jury duty.  Agree to serve.  It's an obligation that

13   you should take very seriously because every once in a while,

14   like in this case, a man, I suggest, who is presumed to be

15   innocent and who from the evidence I think you should conclude

16   is innocent, needs people like you to help his lawyer save

17   him.  So thank you for showing up and I appreciate the fact

18   that you came every day and you paid attention and I need your

19   help to try and save Martin.

20          A couple of weeks ago -- and I know this passed very

21   quickly so I want to just sort of bring it back -- a woman was

22   asked to identify Martin Shkreli and she volunteered that he

23   was sitting next to the lawyer with the gray hair.  Remember

24   that?  And I said, thank you very much, you could have said

25   green tie or -- she said gray hair.  When this trial started

Proceedings                                   5322

1    my hair was not gray.

2            This trial has been a difficult voyage for all of

3    us.  And it's a difficult voyage because it's a complicated

4    case and that doesn't mean that you have to vote to convict

5    Mr. Shkreli because the government worked so very hard.  You

6    just heard an almost four-hour summation by a very bright,

7    eloquent, well trained, hard working Assistant United States

8    Attorney who gave you a very, very thorough summation.  And

9    it's very good.  Except for one thing, I have one criticism.

10   It could have been written before the trial.  Because it

11   ignored a lot of what you saw.  It ignored a lot of what

12   happened in this courtroom.  It completely ignored the

13   cross-examination of every single government witness, which I

14   submit, added important facts to the trial.  And you can't do

15   that.  I'm not offended, but you should be.  You shouldn't

16   take it personally, but you can't ignore the

17   cross-examination.

18           Her honor will charge you at some point tomorrow

19   about the instructions and one of the instructions in terms of

20   how do you decide credibility, is by looking at what a witness

21   said on direct examination and comparing it to what that

22   witness said on cross-examination.  And if there are

23   substantial distinctions, that is a factor that you may

24   consider in determining whether a witness is telling you the

25   truth, whether that person should or should not be believed.

Proceedings                                    5323

1   So you cannot ignore what is the messy stuff of a trial.  You

2   cannot ignore what happens when a witness comes into the

3   courtroom and says something and then on cross-examination is

4   forced to essentially admit that what they said on direct

5   examination was either inaccurate, or a lie, or a mistake, or

6   they fill out the narrative so that the impression you got on

7   direct examination is so different once the witness finishes.

8           It's part of the process.  That's why we have

9   trials.  What we do counts.  And it can't be ignored in the

10  government's summation as if all you need to do is look at a

11  couple of emails and look at a couple of charts and conclude

12  beyond a reasonable doubt that Martin Shkreli is guilty.  You

13  cannot ignore the witness testimony.

14          The government hand-picked the witnesses they chose

15  to call and we'll discuss how many people they ignored and did

16  not call for obvious reasons, and we'll get to that in a

17  minute.  But you cannot ignore three and a half or four weeks

18  of testimony that, I submit most respectfully, each of you

19  listened to, took notes about and carefully considered when

20  you decided whether or not that witness was or was not telling

21  the whole truth and nothing but the truth.

22          So I had a burning question since I began in this

23  case and it's a question I'm going to pose to you.  If Martin

24  Shkreli really wanted to defraud the people at MSMB, why

25  didn't he do it?  Why didn't he just defraud them?  Take their

Proceedings                              5324

1   money in MSMB Capital, he bets wrong on the Orex trade, the

2   private placement memorandum basically insulates him because

3   he is the general partner, he can pick the stock he wants to

4   invest in and if it's not good they have no legal -- they have

5   no legal claim.  It says it in the private placement

6   memorandum, that the general partner has the discretion to do

7   it.  He can suspend withdrawals, he can suspend redemptions.

8   It's in the private placement memorandum that they each swore

9   that they read and many of them did not.  You can't ignore the

10  fact that most of the people who testified, testified that

11  they never read the private placement memorandum.  What's that

12  all about?  You can't just toss it aside as if it didn't

13  happen in this case.  So if Martin Shkreli wanted to defraud

14  these people, why didn't he defraud them?  Why did he sleep in

15  his office for two years in a sleeping bag to make Retrophin a

16  dazzling success?  And we'll talk about Retrophin in a minute.

17          But it's all Martin Shkreli.  Martin Shkreli is MSMB

18  Capital, Martin Shkreli is MSMB Healthcare, Martin Shkreli is

19  Retrophin.  There would be no Retrophin without his genius and

20  without his effort and without his intensity to see to it that

21  that company becomes an extraordinary success.  Steve

22  Richardson and Steve Aselage did nothing to make Retrophin a

23  success.  But when it became a success they got rid of him.

24  And we'll walk you through it and we'll walk you through their

25  testimony, the direct and the cross.  Because the cross

Proceedings                                    5325

1    counts.  Cross-examination has been considered to be the

2    engine of truth because it helps flesh out the narrative.

3          So if Martin Shkreli wanted to defraud these people,

4    why didn't he just take a hike and why didn't he take their

5    money?  They all deposit their money, they have no idea what

6    he's doing with it.  All of the big hedge fund witnesses told

7    you the general partner doesn't have to call you and say I'm

8    buying Apple, I'm buying Orex.  So he screwed up.  He's not

9    charged with making an illegal Orex trade.

10         All of the people in this case told you when you

11   play on that level in the market it's basically sophisticated

12   gambling.  You might hit a home run, you might strike out.  So

13   the Orex trade was a bad trade, but that wasn't a crime.  Why

14   didn't he just walk away?  I'm sorry, you were all rich, you

15   invested in a hedge fund.  Hedge funds don't have liquidity.

16   Read the documents you signed.  Why didn't he just walk away?

17         So when you consider his intent, the Court will also

18   instruct you on the issue of good faith.  Because good faith

19   can, in this case, be a complete defense to every single one

20   of the charges if Martin Shkreli believed that what he was

21   doing was truthful and accurate and he was a visionary, as

22   Steve Aselage described him.

23         Now some investors got ignored by Mr. Shkreli

24   sometimes for days and you can see the emails.  And sometimes

25   he would say I'm crazy, busy, nuts, I'll get back to you and

Proceedings                                5326

1  some people took it better than others.  He's not charged with

2  aggravation.  It's not a crime to aggravate someone.  If

3  you're stalling because you're building a company so you can

4  repay them, that's not evidence of a fraud.  I'm crazy, busy,

5  nuts.  What's he doing?  You don't have him on the beach, you

6  don't have him on a yacht, you don't have him driving fancy

7  cars, he's sleeping in a sleeping bag in his office so he can

8  build this company, and you have to understand that when you

9  decide whether Martin Shkreli intended to defraud these

10 people.

11          Martin never intended to defraud anyone.  Maybe he

12 was working at a pace that only superhumans like him can work

13 at and maybe he screwed up and maybe he made mistakes and

14 maybe sometimes to keep an investor from driving him crazy he

15 said something which may not have been exactly truthful at the

16 moment, but Martin Shkreli was always truthful to the mission.

17 The mission to make Retrophin a success so that he can develop

18 the medicines that treat rare childhood diseases.  He did it.

19 You can't just ignore the fact that he built a pharmaceutical

20 company in two years by himself.  Who do you know who could do

21 that?

22          Every single witness in this case who came in here

23 said something about Martin Shkreli that you can't ignore.

24 It's never been mentioned in the government's summation and I

25 understand why.  But every single witness, all of them said

Proceedings                                    5327

1    one thing that they all have in common about Mr. Shkreli, that

2    he's stunningly brilliant, that he's brilliant beyond words,

3    he's the smartest man I ever met, said Steve Aselage.  That

4    he's stunningly brilliant said everybody who invested and met

5    him and talked with him and dealt with him.  Brilliant beyond

6    words, a true genius, someone who is a visionary.

7           Steve Aselage said when he says something, he

8    believes it because Martin sees the world through rose-colored

9    glasses.  Do you remember that testimony?  What does that mean

10   when you see the world through rose-colored glasses?  It

11   doesn't mean you're a venal, corrupt person, it means you're

12   optimistic in your hope and ability to be able to make this

13   company a success and he did it.

14          Everybody had a comment.  Have you ever met somebody

15   who everybody who deals with him has a comment?  Brilliant,

16   stunningly brilliant, a genius, as smart as anyone I've ever

17   met, sheer intellect, is amazing.  Caroline Stewart, the woman

18   who no one would hire but Martin gave her a job when she

19   couldn't get a job.  She said he was mentally unstable.  What

20   are you supposed to do with that characterization?

21          We're not saying that Martin is insane as a matter

22   of law so you should acquit him because he's insane, it's not

23   an insanity defense.  What do you do with a witness who works

24   with the man who says he's mentally unstable and everybody

25   else says he's brilliant?

Proceedings                                          5328

1       Steve Richardson said Martin battled with

2  depression.  And Steve Aselage says Martin came to California

3  for three weeks and didn't leave his hotel room.  And when

4  Aselage confronted him and said, Martin, what's wrong with

5  you?  Martin said -- and it's in the testimony, Martin said

6  I'm cutting back on my medication, I'll be okay.  What do you

7  hear from these people?  Every single witness said there's

8  something wrong with Martin Shkreli.

9       Schuyler Marshall, the Texas lawyer who worked for

10  25 years as a partner in a big firm and now runs a hedge fund

11  where evaluates private companies, he said to you that Martin

12  Shkreli reminds him of a character played by Dustin Hoffman in

13  the movie "Rain Man."  That's how he reacted to Martin

14  Shkreli.  Now he then said, when I asked him, what do you

15  mean, he said, well, Martin is very intense, and so focused,

16  and so intense, and so focused, and so intense that it

17  reminded me of Dustin Hoffman in "Rain Man."

18       Well, maybe, maybe that's the proper

19  characterization of Martin, but my point is, ladies and

20  gentlemen, everybody, including David Geller who said exactly

21  that, Martin travels to the beat of his own drum.  So when you

22  go into his mind to try and determine whether Martin Shkreli

23  criminally intended to violate the law, you can't just ignore

24  who Martin Shkreli is from the testimony of the government

25  witnesses.  They're not doctors, we're not offering you a

Proceedings                              5329

1    medical defense.  But when you decide if a person is acting

2    with criminal intent, you have to look at who it is you are

3    analyzing.  What it is that they are doing and why it is that

4    they are doing it.  And you can't divorce from that analysis

5    what the person is, how they've been described.  How every

6    single government witness has told you he has issues.  And do

7    any of those issues interact with the ability to formulate a

8    criminal intent or good faith, and what does that mean to a

9    Martin Shkreli?  Not what does it mean to a witness, what does

10   it mean to a Martin Shkreli?

11          Mr. Aselage, who is no friend of Martin Shkreli's

12   today, nevertheless said in the transcript, under oath on

13   cross-examination, that Martin Shkreli actually believes what

14   he says to be true when he says it.  This is a gentleman who

15   is 65, 67 years old, who is a successful businessperson, who

16   worked with Shkreli for two years and clearly is not a defense

17   witness and clearly is not a friend of Martin Shkreli's,

18   that's a quote, Martin actually believes what he says to be

19   true when he says it.  If that's true, he should not be

20   convicted.  Because if Martin Shkreli actually believes that

21   what he's saying is true, I submit that rises to a defense of

22   good faith.  And if you can't -- if the government doesn't

23   prove beyond a reasonable doubt that Martin acted with bad

24   faith, I think the Judge will instruct you that you have to

25   acquit.

Proceedings                                            5330

1          Maybe how Martin sees things that none of us do, and
2    he does, I submit, because he made a pharmaceutical company.
3    He made a pharmaceutical company in less than two years.
4          So when the government witnesses characterize
5    Martin, it's not just gossip and it's not just name calling,
6    it's highly probative evidence that you should consider.
7    We're not injecting a defense of insanity, but based on all of
8    the witnesses collectively, everybody told you they don't see
9    Martin Shkreli as completely normal.  So you have to
10   characterize that when you discuss.  This is not irrelevant,
11   it is very relevant.  Because the government must prove Martin
12   Shkreli's bad faith beyond a reasonable doubt and if Aselage
13   said that he is right when he said that, that Martin always
14   believes it to be true, then that could be a defense requiring
15   you to acquit him of every count in the indictment even if you
16   see bad emails or even if you see a statement that you don't
17   believe to be completely accurate.
18          You know how I feel right now?  I feel like a
19   lifeguard.  I feel like a lifeguard on the beach, not at a
20   swimming pool.  You know what a lifeguard's worst fear on the
21   beach is, not to be able to rescue someone.  I see Martin
22   floating in his own little world 30 yards offshore, I'm
23   trained, I'm fit, I'm a good swimmer, I'm experienced, I could
24   swim out there and I can save him in two minutes, except if a
25   current takes him away.  That's the lifeguard's worst fear,

```
                          Proceedings                    5331
```

1   that there is a riptide or a current that drags the person

2   away and then you lose him, not because he shouldn't be saved

3   but because the current takes him.  That's what I'm afraid of.

4   Not the facts, not the law, not the testimony, that Martin be

5   swept away in the current that surrounds Martin Shkreli, God

6   bless him, wherever he goes.

7           While you promised not to consider it, and we hold

8   you to that promise, you can't ignore it, you feel it, you

9   sense it and it would be a violation of everyone's duty if

10  there were to be a conviction based not on the testimony and

11  the evidence, but based on the fact that so many people have

12  something to say about my client.  That's not how an American

13  courtroom is supposed to operate.  Everybody gets the

14  presumption of innocence.  Everybody gets a fair trial

15  including Martin Shkreli.

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1            MR. BRAFMAN:  (Cont'g.)  Let's just make one thing

2    clear so that we're not dancing about this subject, it is our

3    position that MSMB and MSMB Healthcare and Retrophin is Martin

4    Shkreli and does it at some point become a public company,

5    yes, and we'll discuss that, but there is nobody else who

6    deserves credit for being the person who took MSMB into MSMB

7    Healthcare and then ultimately into Retrophin and everyone

8    ultimately got repaid not because he stole money from anybody

9    to do it but because he saw to it that they did not lose their

10   investments.  Martin, nobody else.

11            We have a couple of government charts and I want to

12   talk to you about them.  You know, Agent Braconi testified and

13   he's a very articulate, smart young man and he did a very good

14   job and I have no criticism of him whatever as an FBI agent,

15   God bless him and I'm hope he serves our country for a long

16   time and I mean that seriously, but the charts that the

17   government prepared ignore the heart of the case.  They show

18   you a chart and it's red and it's blue and it says the bank

19   account shows X and he's telling you the investors, that their

20   value is more than X.  These charts ignore Retrophin.  You

21   can't ignore Retrophin.  Retrophin is the value.

22            When Martin Shkreli values the percentage of

23   Retrophin that each of these investors has, he turns out to be

24   100 percent right.  Somebody gets 35,714 shares, why?  Why are

25   they getting such crazy numbers?  Why aren't they getting 100

Summation - Brafman                                    5333

1    shares?  Why aren't they getting 10,000 shares?  Because

2    Martin Shkreli in his own brain is calculating the value of

3    Retrophin.

4            This chart is like, you know, I show you a corner

5    lot that is not well maintained, it's rundown but on it is a

6    beautiful mansion and I tell you look at the value of that

7    corner lot but don't count the mansion and you say, what do

8    you mean, how can I do it without the mansion, the mansion is

9    what makes it valuable.  No, no, ignore the mansion, just tell

10   me how this piece of land without the mansion, it's hard to do

11   that with the mansion that's worth 20, 40 -- $80 million is

12   Retrophin's value, according to Martin Shkreli, and he doesn't

13   value it two years after when the SEC gets involved and it

14   becomes a public company.  There is a foundation under a house

15   that has value.  Retrophin has value when it becomes an idea

16   in his mind and he discusses it with Steve Richardson in the

17   summer of 2010 that he's going to build a company that's going

18   to be involved with finding orphan drugs to cure childhood

19   diseases and he takes that idea and he turns it into a real

20   company that's now worth close to a billion dollars, just as

21   Martin Shkreli suggested.

22           So, these people who are telling you that you're

23   dealing with a special mind that is beyond brilliant, that is

24   stunningly brilliant, they're right, you know they're right

25   because he did it.  Could we collectively figure out how to

1    start a pharmaceutical company, how do you do it.

2          I want to show you something and you know it is just

3    a prop, it occurred to me the other night.  This is a bag of

4    potato chips, you can buy it downstairs or in a supermarket

5    for a couple of bucks.  You know what it takes to get this bag

6    of potato chips here, some farmer in Idaho has got to plant

7    potatoes, he's got to hope that the weather is right so that

8    the potato crop blossoms when it's ready.  Somebody has got to

9    pick up the potatoes and bring them to a factory where they're

10   shelved and sliced and diced and fried and baked and salted

11   and then they've got to put them into a conveyor belt and into

12   a package.  Then the package has got to go to a distributor

13   and the distributor has got to bring it here.  Just for a bag

14   of potato chips you got 100 people have to deal with it and do

15   their job and do it right.

16         How do you build a pharmaceutical company, how do

17   you take an idea in Martin's mind and turn it into a billion

18   dollar company alone, you have to be a genius to do that.  You

19   have to be someone who deals on a different level in terms of

20   intellect and brilliance and being able to do it is something

21   that most people, I say this with much respect, I don't think

22   any of us including all of you or me could even begin to think

23   about how do you start it, what kind of drug are you going to

24   develop, how are you going to do it, what lab are you going to

25   use, how are you going to basically understand the formula

1    that no one else has figured out up to this point in the

2    history of the world.  No one has found the cure for PKAN, a

3    terrible childhood disease.  Martin Shkreli, he did it.  How,

4    in a heartbeat.  Even Sarah Hassan who's no friend of Shkreli

5    said, oh, FDA approval could take 5, 6, 7 years but with

6    orphan drugs if you're really on to something because there's

7    a need because children are dying, the process can go faster

8    but you need to find the drug, you need to develop the drug,

9    you need to interest investors in it, you need to get the

10   pharmaceutical labs to produce it, you need to go through FDA

11   trials and then you need to get FDA approval and he did it.

12          And you can't just write him off and say, you know

13   what, you sent an email, the email isn't right because the

14   value in the bank is $6 and you said it was $12, I said it was

15   $12 because I was counting the value of my company and you

16   can't value it because you don't understand how my mind works

17   unfortunately and therefore I look like a jerk but I'm not, I

18   built this company and it works.

19          And no one has come in here, Steve Aselage who now

20   runs this gold mine, now runs this gold mine, he ticked off

21   all the drugs that the company sells, they were all made and

22   produced on Martin Shkreli's watch.  Thiola, biggest money

23   maker for Retrophin, Martin Shkreli; Chenodal, Martin Shkreli;

24   Vecamyl, Martin Shkreli.  They haven't done anything since

25   Martin Shkreli left, according to Aselage, or at least that he

1   testified to.

2        I asked you in my opening statement, I know it may

3   have sounded strange, I asked you something and I hope you

4   took it the right way, I said you've got to use your common

5   sense, you've got to keep an open mind but when you keep an

6   open mind sometimes if we're not careful, I do it all -- you

7   could let your brains fall out.  We can't, this is a very,

8   very, very critical decision you're going to make.  The judge

9   will tell you that you're not allowed to consider sympathy.

10  We're not asking you for sympathy, we're not asking you to

11  consider what happens if he's found guilty.  Make somebody a

12  felon for the rest of their life is a very, very, very tough

13  decision and when you're dealing with anyone, you have to be

14  right but when you're dealing with maybe one of the most

15  extraordinary minds of this generation, you need to be right

16  before you snuff that out.

17       The bag of potato chips just doesn't show up

18  downstairs in the concession stand so that we can buy it and

19  we can enjoy it, we can give it to our kids, somebody made

20  that bag of potato chips and if somebody has to go through so

21  many hoops just to get the chips here, think about it tonight

22  when you go home, everybody has private time, you have private

23  time when nobody is bothering you, maybe you're in the shower,

24  maybe you're trying to fall asleep, you're just laying in bed,

25  think about that, he did a pharmaceutical company from nothing

1  to production and that's why he lived in a sleeping bag like a

2  hermit in his office for two years.  He's not a Ponzi guy who

3  takes the money and is buying Cadillacs and yachts.

4          For two years their records which they combed

5  through with a fine-tooth comb showed that Martin Shkreli got

6  $26,000, $26,000 for two years and there's $72,000 of debit

7  charges and you have to include in the $72,000 the fact that

8  Sarah Hassan had dinner with Martin Shkreli which he paid for,

9  David Geller had dinner with Martin Shkreli, Kevin Mulleady

10  had dinner with Martin Shkreli, he flew to Texas to the Dallas

11  boys so he could make a presentation.  All of that came out of

12  $72,000.  So, for two years, even if you add the debit stuff,

13  it's 100,000 and he slept in his office.

14          He's not taking money from people who invest in MSMB

15  so that he can just enjoy life and run around and spend their

16  money.  There's no evidence of that whatsoever.  Yes, you'll

17  read about stuff that maybe you read about and you're going to

18  disregard that after Retrophin became a public company and

19  people had some access to shares, there's nothing wrong with

20  the CEO being able to enjoy somewhat of a life after spending

21  two years in a sleeping bag.

22          Martin Shkreli properly valued Retrophin, you can't

23  take that away and you can't ignore it.  If I have valued my

24  pharmaceutical company at $20 million and I am right and right

25  now from where we're sitting he's right, that 20 million is

1    appropriate to factor into the equation when I tell an

2    investor the value of your account, the value of your account

3    is $300,000.  And every single person got the appropriate

4    return plus a bonus for the aggravation and the nonsense that

5    they had to deal with because they're dealing with Martin

6    Shkreli.

7           I promise you a detailed discussion of every

8    investor but just for the moment I just want to show you what

9    we're talking about because the government didn't do this and

10   I want you to understand it because, as I told you before, if

11   Martin Shkreli wanted to defraud these people, he could have

12   taken a hike and said, you know what, Sarah Hassan, you got a

13   trust fund from your daddy, your dad is worth a hundred

14   million dollars, I'm sorry you lost a couple of hundred grand,

15   get over it.  He didn't, he didn't.

16          Mr. Kocher, he put in $200,000 here, his net return

17   is $350,000, that's 75 percent return on your investment.  You

18   are getting less than 1 percent in your savings account today,

19   less than 1 percent.  This guy got $150,000 more than he put

20   in.  Did he have aggravation, yes.  He's not on trial for

21   aggravation.

22          Lee Yaffe, we'll talk about him in a minute, didn't

23   invest with Martin Shkreli, Lee Yaffe's father, George Yaffe,

24   invested 12 years ago in a fund that's no longer in existence.

25   Martin Shkreli could turn around and say, excuse me, Elea

1   Capital is old news, I have nothing to do with it now, you can

2   sue, you can do whatever you want, I don't owe your father

3   anything but, no, he's an honest kid who realizes that he took

4   this man's money and he wants to pay him back and eleven years

5   later he eventually gives his son $355,000, $255,000 more than

6   his father invested.  You can't just ignore that when you're

7   asking what was Martin Shkreli's intent.

8          Lindsay Rosenwald, Mr. hedge fund guy, he's a

9   professional hedge fund guy.  He's a doctor.  He's the head

10  that owns Chelsea Pharmaceuticals which you heard so much

11  about.  He gave the PPM to his lawyer to review.  He came in

12  and said, look, I put in 100, I got back 4 to 600,000, I think

13  I did okay.  And what does he say about Martin Shkreli, Martin

14  Shkreli, on the bell curve he's way out on one end.  That's

15  how he described him.  What does that mean, the bell curve is

16  supposed to define normalcy, the closer you are to the center

17  of the bell, the more normal people think you are.  He puts

18  him on one edge way out there.  What does that tell you, that

19  Lindsay Rosenwald was defrauded?  Lindsay Rosenwald didn't

20  read the private placement memorandum and we'll go through

21  each of those and their testimony.

22         David Geller; David Geller is the brother of Al

23  Geller who the government didn't call, and we'll discuss that

24  in a minute, but David Geller had nothing to do with Martin

25  Shkreli when he got involved, he took the advice of Kevin

*Summation - Brafman*                                     5340

1  Mulleady who was Al Geller's broker and Kevin Mulleady told

2  him Martin is a genius and Martin makes a lot of money and

3  Martin has made a fortune for my brother Al and that's why

4  David Geller signed up.  Remember David, he wore a polo shirt

5  one day, a blue one, and then the next day a gray one, kind of

6  a nice man.  He said, yeah, I mean I got back 615 for a

7  $200,000 investment and you know what he said afterwards, he

8  said:  No other investment I have ever made has given me that

9  kind of return.

10        And Martin Shkreli is on trial for his life because

11  he gave David Geller three times more than he invested.

12        John Neill, rich man, Texas, 74 years old.  He

13  testified just a few days ago, came here in a gray suit and

14  glasses.  He's one of the Dallas boys who got his information

15  from Darren Blanton.  He listened to a dinner party where

16  Gloria Euclid and Darren Blanton talked about how much money

17  they were making with Martin Shkreli.  That's why he invested.

18  He never read the private placement memorandum, he told you

19  that.  He said:  I signed a subscription agreement which said

20  I read it but I didn't read it, I'm a very rich man, I'm

21  involved in 100 hedge funds.  He said:  I put in $500,000 in

22  my wife's name and I got back $1,570,000.  Why did he get back

23  $1,570,000?  He didn't threaten to sue anybody.  Because

24  Martin felt he should be getting his money back in multiples

25  because of the aggravation he put him through.  Martin Shkreli

1   didn't have to do that.  If you're committing a fraud, you

2   don't care about your victims.  If you're committing a fraud,

3   you start out with the proposition that I don't care about the

4   victims or I wouldn't be doing this.  Everything he did is

5   inconsistent with bad faith.

6           Steve Richardson, then we'll talk about him at

7   length in a minute, Steve Richardson, the chairman of the

8   board of Retrophin, he made $1.9 million, $1.9 million on a

9   $400,000 investment and he resigned one week after Aselage got

10  a report from the special commission assigned by the new board

11  and their counsel to do an investigation and he told you they

12  concluded that Steve Richardson and Martin Shkreli had a

13  personal relationship, that's what he said, a personal

14  relationship and he resigns as the chairman of the board.

15          What did Steve Richardson do for the two years he

16  was on the board except try and seduce Martin Shkreli and I

17  will discuss that in a minute and I'll explain to you why I'm

18  saying that and how respectful I'm trying to be.  But he made

19  a lot of money and then he cut and ran, he didn't care about

20  the shareholders in Retrophin, he left and while he was there

21  is there anything you could point to in the evidence, anything

22  that you could point to in the evidence that he did to better

23  the company?  One thing?  Nothing.  Neither him or Aselage.

24          Schuyler Marshall, Schuyler Marshall is my favorite

25  witness and we will discuss that in a minute, but he's the guy

1   who called him Rain Man and he's the guy who came here from

2   Texas.  He's part of the Darren Blanton group.  It's Darren

3   Blanton, Schuyler Marshall and John Neill.  And Schuyler

4   Marshall, who came here from Texas, he's about 67, 68, was a

5   lawyer for 25 years and now he's the head of a private equity

6   fund where he evaluates companies, he's the one who told you

7   that when the SEC called him, he said, "I don't want to be

8   interviewed," and he called Martin Shkreli and he testified

9   that Shkreli said, "Go down there and tell the truth, there's

10  nothing to hide, go down there and tell the truth."  That's in

11  the testimony.  And Schuyler Marshall says, "I told Martin no

12  harm, no foul, I got back my money, I got back more than I put

13  in, I don't think you tried to defraud me -- that's the import

14  of his testimony -- and I'm not going to the SEC."  And he's

15  been a lawyer for 40 years, 25 as a lawyer and the next 15 as

16  the head of an in-house counsel job.

17          Sara Hassan, remember her, first witness in the

18  trial, maybe in her early twenties, essentially her father is

19  one of the most successful pharmaceutical executives in the

20  world.  He told us at least five times in his testimony that

21  he has a very large footprint in the pharmaceutical industry,

22  remember those words.  Thank you very much, Mr. Hassan.  Then

23  why did you come into this courtroom and lie.  And I'm going

24  to do that, I'm going to go through his testimony and show

25  you, and it takes a lot of guts to call a head of a

1    pharmaceutical giant a liar but Fred Hassan came into this

2    courtroom and in 2017 the last thing he wanted to do was align

3    himself with Martin Shkreli and all of the crap that comes

4    along with that; if you're in the pharmaceutical industry, you

5    can't come in here pro-Martin Shkreli, you've got to come in

6    here and basically put your head down and hope nobody

7    understands that you're lying, but we do our homework, that's

8    why cross-examination is so important.

9              Sarah Hassan got back $1.8 million and if somebody

10   tells you that the fraud is depriving these people of the

11   right to use their money when they wanted to use it, when she

12   got back her Retrophin shares she waited a year before she

13   cashed them out and she watched the price go up.  She's

14   investing $20 million for her family and Martin Shkreli came

15   to know her through Brent Saunders.  Brent Saunders has been

16   her father's right-hand man for 20 years and she told you that

17   Brent Saunders vouched for Martin Shkreli, that Martin Shkreli

18   made a lot of money for Brent Saunders.  You didn't hear

19   anything about this from Ms. Smith this morning.  I understand

20   why she was hoping we would forget about it.  Martin Shkreli

21   didn't fool Sarah Hassan, oh, yeah, now two years later, yes,

22   I would have liked to know who the auditor was.  That's rich

23   people's BS, I won't use the real words.  You know why,

24   because Brent Saunders told her Martin Shkreli is making me

25   rich, go with him and she did.  There was nothing Martin

1    Shkreli said to her that made her want to invest.

2           And my favorite guy, my favorite guy, I'm saying

3    that sarcastically, I want the record to reflect that, is

4    Darren Blanton.  Remember Darren, remember Darren Blanton, the

5    rich Texas guy, we'll talk about him in a minute, we'll show

6    you how on cross-examination he turned into an almost

7    offensive spectacle whereas on direct examination, oh, man, I

8    heard about Martin Shkreli and he told me about the fund and I

9    invested because of what Martin Shkreli told me.  That's not

10   true.  Because on cross-examination you learned that Darren

11   Blanton met Martin Shkreli and Darren Blanton was investing

12   with Martin Shkreli and Darren Blanton made a fortune

13   investing with Martin Shkreli and that's why he invested at

14   MSMB.  Talk about a track record, Martin Shkreli had an

15   excellent track record with Darren Blanton.  He made him

16   richer than he is.

17          All right.  So, here's the proposition, it's not

18   perfect but here's what I want to ask you, here's the fraud,

19   give me $300,000, trust me, I will not let you lose that

20   money, and I go through ups and downs and peaks and valleys

21   but true to my word I don't let you lose the money and in

22   order for you not to lose the money, I sleep in my office in a

23   bag like a vagrant for two years because I'm working on a

24   company which if I am right and it is productive, not only

25   will we save children's lives but I'm going to give you back

1   three times the money that you gave me; so, here is the deal,

2   ladies and gentlemen, you see me as an extremely brilliant

3   young man who's odd and strange, I remind you of the guy in

4   Rain Man, but you give me $300,000 and a year later or

5   fourteen months later or six months later I give you back

6   $1.5 million.  Would you take that, would you take that

7   proposal right now?  Yeah, you would, you would.  These people

8   had faith in Martin.  He didn't let them down, he didn't fool

9   them, he didn't defraud them and his good faith is so real it

10  jumps off the pages of the transcripts.

11          So, when you're deciding whether or not the

12  government has proved Martin Shkreli guilty beyond a

13  reasonable doubt, you can't just do that in a vacuum, you have

14  to do it in terms of what actually happened.  What is Brafman

15  talking about, just went through emails and schedules and

16  printouts and forms over and over and over again that had

17  nothing to do with the testimony of these witnesses and on

18  paper, yeah, you know what, it doesn't look great.  You want

19  to analyze the dates and move stuff around, sure, I can show

20  you that maybe, maybe, maybe we're not getting the scoop.

21  They got the real scoop.  This is not a case where anybody was

22  defrauded and this is not a case where from the evidence you

23  should conclude that anybody intended to defraud.

24          You know there's an expression when I was growing

25  up, it loses something in the translation, but the expression

1    is:  You're smart, you're smart, you're smart, you're not so

2    smart.  It's a real expression.  You're smart, you're smart,

3    you're smart, you're not so smart.

4           Everybody says Martin Shkreli is a genius.  He's

5    not.  Maybe he is a genius in certain things but in terms of

6    people skills, he's impossible.  They deal with him, they know

7    what they're getting because everyone tells you they found him

8    odd, they found him strange, they found him really weird and

9    they gave him their money.  Why?  Because they recognized

10   genius.

11          David Geller says:  My brother told me he's the

12   smartest guy he ever met.  Steve Aselage told you he's the

13   smartest person he ever met.  Think about that, I meet smart

14   people, you meet smart people, how do you decide when you meet

15   someone they're the smartest person you will ever meet in your

16   whole life.  You've got to take off all the smart people you

17   met and then say he's smarter than all of them.  How do you

18   say that about someone unless they really are that smart.

19          But being a genius and being brilliant, there's a

20   fine line you walk between being that smart and a little bit

21   off or a little bit odd or a little bit crazy and he's all of

22   the above.  So, he's really smart.  If he wasn't so smart, we

23   wouldn't be here.  If he wasn't smart enough to make

24   Retrophin, we wouldn't be here.  They'd have lost their money

25   in MSMB, maybe they would have sued him but it's years and

1    years ago.  The SEC only got involved because it is a public

2    company, Retrophin.

3              You know, one of the people who's working with me

4    said something the other day, says, you know, you look through

5    these documents, you come away with the impression that Martin

6    Shkreli maybe wasn't 100 percent truthful on every single day

7    every time he opened his mouth, and none of us are, but he was

8    always truthful to the mission and the mission was Retrophin.

9              So, I'm going to tell you a story, it's a funny

10   story and I think you'll laugh and I think you'll find it

11   funny and I'm not telling it to you because I want to

12   entertain you, sometimes when you tell a story that resonates,

13   it really helps jurors understand what I'm talking about

14   because the government completely ignored what

15   cross-examination is about.  So, I'm going to tell you a quick

16   story and then we're going to move into the cross-examination.

17             The story begins in an old town 100 years ago at a

18   busy intersection and a horse-drawn wagon runs into the

19   intersection with the driver and a wild dog runs out and

20   scares the horse and the horse rears up on its hind legs,

21   falls onto the dog, the wagon falls down, the driver gets

22   thrown away and two years later there's a lawsuit because the

23   driver is claiming that he was injured in the accident.  And

24   the police officer who's on the scene gets called to the

25   witness stand and the government lawyer or the insurance

1   company lawyer says:  Officer, you approached the scene of the

2   accident?  Yes.  Tell me what the driver said as soon as you

3   approached him.  And he said:  The driver held up his hand and

4   said, I'm okay, I'm okay, I'm okay.  And he says no further

5   questions, and he's obviously trying to suggest that if he was

6   injured, this is a recent fabrication because at the scene he

7   said he was okay.

8           Now I stand up, I'm going to cross-examine the

9   police officer and all I do is ask him one question:  Officer,

10  tell me everything you saw and did on the day of the accident

11  before my client told you, "I'm okay."  And the police officer

12  says:  You know, I came there, it was horrible, I mean it was

13  just horrible.  The horse was on top of the dog, the dog had

14  four broken legs and was writhing in pain.  I took out my

15  service revolver and I shot the dog because I wanted to put

16  him out of pain.  Then I turned to the horse, the horse had

17  gashes through his whole side from the wagon, he was horribly

18  in pain and I took the gun out and I shot the horse because I

19  wanted to put him out of his misery.  And then I turned to the

20  driver and the driver said, "I'm okay."  "I'm okay."

21          Doesn't it change, doesn't it change when someone

22  gets up and asks the appropriate question to flesh out the

23  scene.

24          Now, no one, no one in this room right now besides

25  Mr. Shkreli understands the seriousness of this moment as much

1   as I do because I'm speaking to you not on my behalf.  When

2   this case is over, win, lose or draw, I go home.  I'm talking

3   to you about Mr. Shkreli's life.  So, yes, it was a funny

4   little aside but doesn't it teach you in the minute why

5   cross-examination is so important when you're trying to

6   understand.  This is not a science, we don't have test tubes

7   and biopsies and MRIs and CAT scans.  You have to decide is

8   someone telling me the truth, is that a person I would believe

9   beyond a reasonable doubt and not hesitate to believe in an

10  important decision in my life and in order for you to really

11  get a picture of who the person is and what really happened,

12  you need someone like me or someone like one of the other

13  defense lawyers to flesh it out, not to go through a canned

14  rehearsed direct examination and what did you do next and what

15  did you do next and what did you do next, but why did you do

16  it, what did you say, what was said to you, who said it.

17  That's my job.

18          And, ladies and gentlemen, I don't think, and I'm

19  taking a leap here, I don't think you found us to be

20  obstructionists, I don't think you found our job not to be

21  important.  I hope you leave this trial, regardless of your

22  verdict, with the respect for criminal defense lawyers who

23  sometimes have to stand up to the government and say prove it,

24  prove it with real reliable consistent evidence, not just say

25  it, not just accuse but prove it, prove it to people like you

*Summation - Brafman*                                    5350

1   who don't come into a courtroom with any prejudice, who don't

2   work for the government, who don't work for Mr. Shkreli, who

3   don't know any of the parties, who are willing to serve

4   because you're honest people and for honest people to make a

5   decision they need to know all of the facts, not a sanitized

6   version of the facts.  That's not appropriate and it can't

7   stand, certainly not on my watch.

8          In good faith I submit you can conclude from the

9   evidence that Martin Shkreli believed in his own mind that

10  Retrophin was a valuable gem of an idea and that he was going

11  to sacrifice his entire existence for two years to get that

12  into a place where it would make a fortune and cure diseases

13  and when it made a fortune and when it became successful, what

14  did he do, did he take all the money and say, screw you MSMB

15  investors, that's a long time ago, read the partnership

16  agreement, you can't really sue me, no.  He went to them and

17  he made them not whole, he made them richer than they already

18  are.  And that's something you need to understand not as a

19  complete defense but if Martin Shkreli's mindset was let me

20  damage these people and then leave, he had the ability to do

21  that.

22         Let's talk about Sarah Hassan.  Let's talk about

23  Ms. Hassan.  They touched upon it, they showed you a couple of

24  emails and a couple of letters.  Let's talk about what came

25  out from her whole testimony.  I'll do it quickly but let me

1    tell you what she said.  She came into this courtroom and she

2    basically said, I invested with Martin Shkreli because of what

3    Brent Saunders said to me.  Brent Saunders was investing with

4    Martin Shkreli and he was making a fortune and Brent Saunders

5    isn't a stranger, I grew up with him my whole life, he's my

6    father's right-hand man and everywhere Fred Hassan went Brent

7    Saunders went from Bausch & Lomb to Schering-Plough,

8    everywhere, twenty years he's been working with Fred Hassan.

9            So, he's talks to the boss's daughter.  He's going

10   to give the boss's daughter bad advice?  What's the advice he

11   gives her, bet on Martin Shkreli, he's a winner.  This

12   government trial has ignored Brent Saunders.  Brent Saunders

13   may be one of the most important witnesses in this case.

14   Brent Saunders is one of many who weren't called but he's

15   right here (indicating.)

16           Brent Saunders is one of the most important

17   witnesses in this case and he hasn't been called and nobody

18   around Fred Hassan has been called, Tim Koestler wasn't

19   called, Brent Saunders wasn't called, Robert Bertolini wasn't

20   called, Ken Banta wasn't called.  This is Brent Saunders'

21   posse.  Aselage said Shkreli had a posse.  Fred Hassan

22   traveled with these people from company to company to company,

23   all pharmaceutical executives and none of them were called by

24   the government.  Why?  Now look, I know they're going to get

25   up on rebuttal and say the defendant has the right to call

1  witnesses, doesn't have to but they have subpoena power.  Give

2  me a break.  I can't give Lee Yaffe a non-prosecution

3  agreement, I don't have the power to do that.  If I subpoena

4  someone and they tell me I'm going to take the Fifth Amendment

5  or I'm not coming, what do I got to do, move to hold them in

6  contempt to get them here.  The FBI shows up, they show up.

7  It's not the same.  And the judge will tell you that the

8  defendant never, ever, ever has the burden of proof because

9  you can't prove you're innocent.  That's why the government

10 always has the burden of proof.

11         So, Sarah Hassan, God bless her, made a lot of

12 money.  She invested her father's money and she invested it

13 herself and then she added more money through Dynagrow which

14 was what, a $20 million fund where she was investing Fred's

15 money and Fred Hassan, I'll show you in a minute, lied and

16 make believe, I don't know what Sarah was doing, I don't know

17 what she was investing in, she never told me when she got $1.8

18 million back.  It's nonsense, it's nonsense.  90 percent of

19 the $20 million was Fred's money.  He's going to let his

20 daughter just make an investment like that without him knowing

21 all of the details and vetting it through Brent Saunders.  You

22 know it was vetted through Brent Saunders because Brent

23 Saunders introduced her to Martin Shkreli.

24         She was the first witness, she was about early

25 twenties, dark straight hair, was wearing a beige and black

1  type outfit. She was a very nice young lady on direct

2  examination, turned into a crazy person the first time I asked

3  her a question. Do you want to have the testimony read back,

4  it is yes, yes, yes, no, no, no when the government asked her

5  a question; I asked her a question, ahhh, your client is a

6  bum. Give me a break. You went out to dinner with him, he

7  sent you books, you had a relationship with him. In 2015

8  after you got back your money, your last email, thank you,

9  Martin, for everything, not you son of a gun, you defrauded

10  me. Suddenly in 2017 you've got to come into a public

11  courtroom, you're not coming here to defend Martin Shkreli if

12  you're Fred Hassan's daughter.

13             (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. BRAFMAN:

2            She had her own lawyer.  Her own lawyer from a big

3    firm.  Not only vet the private placement memorandum, but

4    also her settlement agreement.  She told you that when she

5    signed her settlement agreement her lawyer, who is a lawyer

6    at Proskauer, one of the principal firms in New York and in

7    the country, was her lawyer.  She had her own lawyer who was

8    interfacing with Evan Greebel, and now they tell us that her

9    agreement is fraudulent?  That her agreement should have

10   never been signed?  Do you want to mistrust Evan Greebel

11   where you have to right to?

12           What about her lawyer?  Why is she letting him --

13   why is she letting her sign an agreement where she's getting

14   paid from Retrophin when her debt is not to Retrophin --

15   where the debt is not Retrophin?  It is Retrophin, because

16   it's Martin Shkreli.

17           This is not a civil lawsuit where Retrophin -- they

18   have a lawsuit.  They're looking for $65 million.  God bless

19   them.  This is not about that.  This is whether or not he

20   becomes a felon.  This is not about whether Retrophin has a

21   right to claw back some of its money where Sarah Hassan sued.

22           Did she tell you she had to give back her money?

23   Why not?  Why doesn't Retrophin sue her if it's a settlement

24   agreement that the Board never approved?  This is rich-people

25   BS, ladies and gentlemen.  This is the Sarah Hassan hacking

1  to go back to her daddy with a check for $1.8 million which

2  she turned out of $300,000.  And he said, That's great my

3  darling.  I'm so happy you made money for the family.  But

4  when they come here and they tell the story, Fred Hassan is

5  staying as far away from Martin Shkreli as he possibly can,

6  and we're going to show you stuff in a few minutes that's

7  going to make your head spin because it's four weeks ago, and

8  maybe you don't remember everything, but I'm trying to

9  remember everything and help you remember everything.

10          Fred Hassan came into this courtroom and he said, I

11  am really not an investor in Retrophin.  Yes, you are.

12  Dynagrow is 90 percent your money, and Dynagrow invested in

13  Retrophin.  He came into this courtroom, and he is trying to

14  distance himself from Martin Shkreli, even if an order to do

15  so, he's got to look like a fool.  Do you remember him?

16  Seventy-one years old, very well groomed, navy blue suit,

17  white shirt, red tie, very articulate, very impressive,

18  business leader, he told you five times, I think in his

19  testimony, I have a very large footprint in the

20  pharmaceutical industry.  Do you know what that means?

21  Everybody knows me in the pharmaceutical industry, and the

22  last person that I want to be associated with is that man.

23  So I'm going to stay as far away as I can until Ben Brafman,

24  just doing his job, pulls him back in and makes him confront

25  what really happened...what really happened.

1           And once you look at these things you realize that

2     he's just giving you what he thinks he can get away with.

3     And when confronted, he admits.  When confronted, he admits.

4     You know, it's his daughter.  According to her, Martin

5     Shkreli tried to defraud her.  That's her claim.  They said

6     things to her that weren't true, so therefore, he's guilty of

7     serious crimes.  If you did that to my daughter, I would not

8     be giving you glowing remarks when *The New York Times* calls

9     me and say, What do you know about this person?  I would say,

10    That guy tried to rip off my daughter.  I would not say that

11    Martin Shkreli is one of the merging leaders in the

12    pharmaceutical industry, and then write to Martin Shkreli and

13    say, Lots of good luck.  I hear you're doing great work.

14          You want to convict Martin Shkreli?  You have to

15    explain that before you do, because a doubt, a reasonable

16    doubt is a doubt for which you can give a reason.  And Sarah

17    Hassan and her father gave you rich person's -- rich people's

18    BS in their testimony, and you can't accept that.  You cannot

19    accept that.

20          Fred -- Fred Hassan said, I wasn't an investor in

21    Retrophin.  Yes, you were.  Defense Exhibit 2000 -- Defense

22    Exhibit 1211.  Let's put it on the Elmo.  I don't have a

23    PowerPoint.  Let's put it on the Elmo.

24          Do you have it on your screens, ladies and

25    gentlemen?

Summation - Brafman                    5357

1           THE JURY:  Uh-huh.

2    BY MR. BRAFMAN:

3           All right.  This Defense Exhibit 1211 in evidence.

4    It starts from the bottom.  From Brent Saunders to Tom

5    Koestler, a Fred Hassan crony; to Bob Bertolini, a Fred

6    Hassan crony; to Brent from Fred Hassan; from Brent Saunders:

7           "Tom, Fred, and Bob:  I am writing to provide

8    details regarding the investment in Retrophin, which is

9    working on a treatment for muscular dystrophy.  This is a

10   high-risk investment; however, I believe Tom, Bob, and I are

11   all in agreement that it is a good investment from both a

12   business prospective and our ability to help fund the

13   treatment for this horrible disease."

14          These three pharmaceutical executives with dozens

15   and dozens of years of experience are telling their boss that

16   it's a good investment from both a business prospective and

17   our ability to help find a treatment for this horrible

18   disease.  And what does Fred say?  Fred says back to Brent.

19   "Beth has cleared the investment of the muscular dystrophy

20   project.  Sarah will be proceeding with it early next week.

21   Fred."

22          He doesn't say, Leave my alone.  I don't want to

23   have anything to do with it.  Sarah has cleared this

24   investment because it's Fred Hassan's money.  And he is not

25   an equity partner in this company, which he requires to have

Summation - Brafman                    5358

1   there to be compliant.  Check it out.  So they check it out

2   and he tries to hide his involvement in the investment.  So

3   he does it through Dynagrow, which is his money, but the

4   person on the paper is Sarah, so he can always disavow the

5   investment when people say, You investing with Martin

6   Shkreli?  No.  I have nothing to do with this.  My daughter,

7   she's -- just I'm just trying to give her some experience.

8   He's an investor.

9           When -- when Mr. Loewy from the pharmaceutical

10  magazine called him, said:  Did you say to Mr. Loewy Martin

11  was a smart entrepreneur, yes or no?

12          Answer:  Yes.

13          Question:  This was in 2004, long after the issues

14  with your daughter arose between her and Mr. Shkreli?

15          Answer:  Yes.

16          What's going on here?  A pharmaceutical magazine

17  calls you, the head of the industry, basically, and asks you

18  about a person who your daughter claims defrauded her and

19  what do you say?  You say good things about him.

20          And then the Government shows you a slide that

21  lists Fred Hassan as a reference for Martin Shkreli.  And do

22  you remember what they said to him?  Were you a reference for

23  Martin Shkreli?  Did you allow him to list you as a

24  reference?  When someone tells *The New York Times* in a

25  pharmaceutical newspapers that you were an emerging leader

Summation - Brafman                    5359

1    that is going to do great things, that's a reference.  I have

2    a right to conclude from that that I can list you as a

3    reference when you're telling the whole world that I'm doing

4    do good work.

5            Look at this.  Look at this e-mail, Defense

6    Exhibit 1209.  From Martin:  "Hi, Fred.  I read

7    *The New York Times* article and I -- I'm sorry -- I read

8    *The New York Times* article and I really appreciate you giving

9    this to the world.  Your comments here and in other places

10   have helped me tremendously.  Thanks for making your best

11   advice available to not just a few of us, but everyone

12   willing to pick up a newspaper."

13           And he writes back:  "Martin, thanks.  It's great

14   to see hardworking young business builders like yourself gain

15   traction.  Fred."

16           This is in July 2013.  This is at the height, at

17   the height of the dispute with Sarah and Martin.  Suddenly in

18   2017 he has to acknowledge that he's given references to

19   *The New York Times*?

20           And then what happens?  Well, you know, if you're

21   an investor in a hedge fund as people have told you, you're

22   supposed to get a K1, which is a tax form that every limit

23   partner gets.  And the K1 goes out, and then all hell breaks

24   loose because Fred Hassan is listed on the K1,

25   Government Exhibit 1035, and it shows Sarah Dynagrow [sic]

Summation - Brafman                    5360

1    and Fred Hassan.  Now, obviously, it's Sarah Hassan, not

2    Dynagrow, so they typed it wrong.  But it goes to her and

3    Fred Hassan.  And Fred Hassan's office freaks out, and they

4    make them change it.  And they said, Oh, no.  It was a

5    mistake.  It was a mistake.  It was a mistake.

6              Was it a mistake?  Let's see how this mistake

7    happened, ladies and gentlemen.  This is

8    Government's Exhibit 103-16.  You can't just ignore this

9    stuff in your PowerPoint and just put up that which helps

10   your case.  This is from Fred Hassan's office.  Second -- the

11   first -- the second page of 130-16.  "Mr. Shkreli, Mr. Hassan

12   needs to sign his tax return on Thursday before he begins

13   traveling again on Friday.  Would you be able to scan the tax

14   form directly to his accountant?  I am copying him on this

15   e-mail."

16             Now, if Mr. Hassan is not an investor, why does he

17   have to sign the return, if it's only Sarah?  Why is his

18   accountant and his administrative assistant telling this

19   person at Mr. Shkreli's office that Mr. Hassan has to sign it

20   and he needs to leave, so please get this there right away.

21   And then somebody there finds out that, Oh, my God, Fred.

22   They've got you listed here.  You didn't get cleared by -- I

23   think it's your -- your compliance program for you to invest.

24   You only got cleared for her to invest.  So we need to make

25   believe like you are not an investor.  That's what happened

1    here, ladies and gentlemen.  It's not the end of the world

2    and it's not the most important exhibit in the case.  But it

3    tells you that they were not being told the whole story, the

4    whole truth and nothing but the truth by Fred Hassan.

5            And if you really have made up your mind -- I hope

6    not -- to convict Mr. Shkreli already without hearing the

7    judge's instructions, then there's nothing I can say to move

8    you.  But I hope you still have an opening statement, because

9    you're supposed to still have an open mind.  And if you have

10   an open mind and you still haven't made up your mind, you

11   have to factor that e-mail into the equation as to whether or

12   not Sarah Hassan is the victim of a fraud and whether or not

13   you can consider anything Martin Shkreli said to Sarah Hassan

14   when you decide whether to convict Mr. Shkreli.

15           Lindsay Rosenwald is the next investor, I think --

16   or one of the investors.  He put in $100,000.  He's a

17   professional hedge fund guy.  He has his own lawyer vetting

18   this.  He ultimately gets between 4 and $600,000.  You know

19   what I thought was interesting in this case?  Nobody knows

20   the difference between 4 and $600,000.  Wouldn't you know if

21   you made 400 as opposed to $600,000.  Do rich people claim

22   that they're so rich that they don't know the difference?

23   Trust me.  Rich people know exactly how much money they have,

24   exactly how much money they make.  That's how they became

25   rich.

Summation - Brafman                    5362

1           This business of, Oh, I don't pay attention, is

2    because they want you to think that this wasn't something of

3    real importance to them.  Well, Lindsay Rosenwald was not a

4    victim.  Lindsay Rosenwald is a professional hedge fund

5    person.  He's the one who founded Chelsea Therapeutics.  He's

6    the one who said, Martin was very smart.  I was impressed

7    with Martin.  He knew his stuff.  Martin is way out on the

8    bell curve somewhere, which everyone else seems to think

9    also.  But it didn't stop him from investing.  When you're on

10   the curve or on the spectrum or wherever you are, that

11   doesn't mean that you can't do good things.  It may mean that

12   you have the extra ability to do good things.

13           And Lindsay Rosenwald is a doctor.  He's a medical

14   doctor besides a hedge fund guy.  So he sees Martin.  And

15   what does he say about Martin?  Martin's on the outer fringe

16   of the bell curve.  What does that mean?  This is an illegal

17   term.  The judge isn't going to define it for you.

18           You have a right as a juror to use common sense, to

19   feel in your heart what that person is trying to tell you.

20   And what Lindsay Rosenwald is trying to tell you is that this

21   is one strange dude, but even though I am a brillant hedge

22   fund analyzer and even though I'm a medical doctor, I'm going

23   with him.  That tell you something.  He saw in Martin the

24   genius that is Martin, and he hitched his wagon to it, and he

25   turned 100,000 into 400 or 600,000, depending, you know, how

Summation - Brafman                    5363

1   much he made.

2        Nobody makes that kind of money on an investment

3   today or last year or two years ago.  The days are over when

4   the banks used to pay you 5 percent just for keeping your

5   money there.  That's gone.  So people with a lot of money

6   look to make money on their money.  And in order to make

7   money on your money when you're that rich, you need to take a

8   risk, and one of the ways you take a risk is you bet on a

9   hedge fund.  And if it comes through, you get a home run.

10  You've turned 100 into 600.  And if it doesn't -- he said,

11  This is not like a big deal for me.  That's what he said.

12  This hundred is just like play money.  I'm worth a billion,

13  so I'll give you a hundred grand.  If you turn it into a half

14  a million, I'm happy.  If I lose it, it'll deal with it.

15  They're not playing with rent money.  Nobody in this case who

16  invested with Martin Shkreli suffered any economic harm

17  whatsoever.  And listen to the Court's instructions with

18  respect to wire fraud to see if they're required to have

19  sustain some loss.

20       And Richard Kocher?  Richard Kocher is a nice man.

21  And Richard Kocher probably should not have ever gotten

22  involved with a guy like Martin Shkreli because Richard

23  Kocher and Martin Shkreli -- you know, Richard's -- you

24  got -- Martin's in the Hula Bowl and Richard Kocher's in

25  Yankee Stadium.  They're such different personalities.

Summation - Brafman                    5364

1    Richard Kocher is a buttoned-up guy who deals in real estate,

2    and he can't handle being in Martin's world.

3          But Richard Kocher didn't get involved because he

4    read the prospectuses or Martin told him anything.  He is a

5    Kevin Mulleady guy.  He was his broker, Kevin Mulleady.

6    Kevin Mulleady has more activity in this case than Martin

7    Shkreli.  He's on the list.  They didn't call him as a

8    witness.  They used his e-mails to tell you Martin's guilty.

9    They didn't call him as a witness.  Kevin Mulleady put more

10   investors in the case than Martin Shkreli did, but they

11   didn't call him as a witness.  Do you know why?  Because if

12   they did, he's subjected to cross-examination.  If they don't

13   call him, they can put in his e-mails under some rule of

14   evidence that the allows the emails, and then he doesn't have

15   to be cross-examined.  Richard Kocher was put into this case

16   by Kevin Mulleady.  Everything Kevin Mulleady had told him

17   about the deal is what prompted Mr. Kocher to get involved.

18         And what did Kevin Mulleady tell him?  Martin

19   Shkreli is a genius.  He doesn't remember being told about

20   any companies that Martin Shkreli invested in, but Martin

21   Shkreli is a genius.  And he gets a settlement agreement and

22   he has his own lawyer, his own lawyer helped draft it with

23   Evan Greebel, and no one is asking him to give back any

24   money.  And Retrophin is not suggesting that he got an

25   illegal, fraudulent settlement agreement.  Martin Shkreli

Summation - Brafman                5365

1  made Retrophin.  When Martin Shkreli made Retrophin, he has

2  the right -- now, it didn't become a public company until

3  December of 2012.  During the period in question, Martin

4  Shkreli is the only person who really has a right to deal

5  with Retrophin because nobody else has earned that right.

6  And we'll go through that in a minute.

7           I want to talk to you now about Darren Blanton, and

8  it's a very importance witness.  And I'm glad they called

9  him.  They had no choice but to call Darren Blanton because,

10  you know, he's the one who puts all the Dallas people in.

11  You know, there was a movie a few years ago called the

12  *Dallas Buyers Club*, I think it was called?  Let's call this

13  the Dallas Investment Club, because that's what you got.

14           You got Darren Blanton, who's the big guy from

15  Texas who wore a navy blue suit and a blue shirt, and he's

16  about 55 years old, and he wouldn't tell you how much money

17  he had.  Do you remember that?  He just wouldn't tell you how

18  much money he had.  He's the one who the reporter said

19  described himself as a con man.  Do you remember that, when I

20  confronted him with that?  Do you know what he said?  She

21  wrote it down wrong.

22           Ladies and gentlemen, what do you say to a reporter

23  that sounds like con man that ends up in an article about you

24  that says you're a con man?  What could you possibly have

25  said to her that translates into her misunderstanding you and

Summation - Brafman                5366

1   writing it up as con man?  This is such an offensive response

2   under oath.  He never thought I'd find the article.  Granted.

3   The Government didn't confront him with the article.  Granted

4   I'm trying to do my best to do a good job for Mr. Shkreli,

5   and when a witness tells a publication, I am a con man, that

6   resonates with me when I got to cross-examine him.

7         So what does he do when he's confronted with this,

8   sheepishly say, Yes, I'm a con man?  No.  He says the

9   reporter got it wrong.  How easy is that to do.  And I am

10  asking you, ask yourselves tonight or when you start

11  deliberating in this case, What is it that you could have

12  said to this woman who is interviewing you that translates

13  into her writing that you told her you were a con man?  That

14  doesn't happen.  If you said your name was Phillip and you

15  spell it with two L's, yes, she might spell it with one L.

16  But to just make up con man and write it a publication when

17  you are a prosperous business person in Dallas, Texas?  He's

18  just lying to you.  He had no respect for your common sense.

19        I said to him, What is your net worth?  Well, I

20  don't know.  Can you give me, is it $10 or 100 million?  I

21  don't know.  Well, did you tell the paper that your horse

22  collection was worth between 25 million or 75 million?  Well,

23  I may have.  Well, is it?  I don't know.  They're hard to

24  value, they're horses.

25        That's not acceptable.  This a case about finances.

Summation - Brafman                    5367

1   This is a case about, Is the investor a sophisticated

2   investor?  Not that it matters one way or another, but you

3   need to know if he's paying attention or if he's lying to

4   you.

5              How does that work, ladies and gentlemen?  How does

6   that work that you can come in here and essentially tell a

7   group of New Yorkers in front of a federal judge and talk to

8   a lawyer with the Government sitting there and basically

9   answer questions in a nontruthful fashion, that

10  the Government may say in their rebuttal summation, Well, you

11  know, what does it matter?  How does it -- what does it

12  matter?  He describes himself as a con man?  That matters.

13  That matters a lot if the man I'm -- that's accused of -- of

14  defrauding tells people that he's a con man?

15             And what -- what does he tell you?  He invested

16  $1,250,000.  He's the biggest earner and the biggest

17  investor, I think.  Darren Blanton invested $1 point --

18  $1,250,000.  He got 160,000 Retrophin shares and then he got

19  another 200,000 Retrophin shares.  He got cashed out -- the

20  value of his shares he got for $2.6 million, and he still has

21  150,000 Retrophin shares.  This is a person who's been

22  deprived of the use of his money by my client so that you

23  should convict him of a felony?  This is a man who is sitting

24  on 150,000 shares of Retrophin today watching the ticker

25  symbol go up and up and up.  A company Martin Shkreli

Summation - Brafman                    5368

1   started.

2           And Darren Blanton tells you, Oh, yeah, I would

3   have liked to know.  I would have like to know if

4   Elea Capital blew up.  That's rich-man BS.  Do you know why?

5   Because he hired his brother investigate Martin Shkreli, and

6   those judgments are in the investigator's report and he

7   ignored them.  So when they say to you, Yes, would you have

8   liked to know?  That is such an unfair thing to do in 2017.

9           You invested in 2014.  Why?  Because Martin Shkreli

10  was making me a fortune.  I was listening to his stock tips

11  and I was making millions of dollars.  And when he blew up --

12  when he drew up MSMB, I went in, I was happy I went in and I

13  made $5 million.

14          Now it's 2017 and you're in court.  Martin

15  Shkreli's accused of fraud.  What do you need to say in order

16  to get out of here?  I needed to say that I wanted to know

17  all of these things before I invested.  No, you didn't.  Not

18  at the time you made the investment.  All you cared about was

19  the fact that Martin Shkreli was hitting one home run after

20  another.

21          Now, they tell you, and this is really interesting,

22  and I hope you will just follow me for a minute.  They tell

23  you that Darren Blanton is one of the people who got an

24  illegal sham consulting agreement, right?  He's one of the

25  people.  They say he got an illegal agreement consulting

1   agreement and Yaffe got an illegal consulting agreement.

2   It's a cluster headache there.  He gave us all a headache,

3   but I will deal with him soon.  But Darren Blanton, Darren

4   Blanton is the other person who they claim ending up getting

5   all of this money in a sham consulting agreement.  That's not

6   true.  You can call it sham now, but look at this exhibit.

7   This is Exhibit 452 -- I'm sorry, Exhibit -- Defense

8   Exhibit 4352.

9           And it starts on the bottom:  "Martin, good talking

10  to you Friday, and I look forward to seeing you in the next

11  couple of week.  I appreciate you sending me the 400,000

12  shares of Retrophin over the last few months for my initial

13  role and investment in the company, and I hope I can help you

14  make it an even bigger success as a consultant."

15          And Martin writes back:  "Yes.  I have been talking

16  it up to the banker at -- I'm sorry -- and me writes again,

17  "I've been talking it up to the banker at Leerink loves you

18  and so does Lawrence at Prosite.  You might talk to them

19  about your deal and also maybe think of a creative loan

20  structure where they can get some shares."

21          You don't have to be a consultant who goes out and

22  work for the company and investigates new products.  Darren

23  Blanton is a big-shot investor who knows other rich

24  investors.  Schuyler Marshall and John Neill came in through

25  Blanton.  Blanton tells you in May 19, 2014 that he's looking

Summation - Brafman                     5370

1  forward.  I hope I can help you make it an even bigger

2  success as a consultant.  This isn't Martin Shkreli telling

3  him you got to make believe you're a consultant, and I'm

4  going to give you an agreement that the Government is then

5  going to point to and say, This is a sham.  This is May

6  of 2014 when Darren Blanton is obviously trying to get his

7  money back and Martin and he agrees that he's going to be a

8  consultant.  "I can help you make it an even bigger success

9  as a consultant."  Darren Blanton uses those words.  Martin

10  Shkreli's not using those words.  Martin Shkreli has a right

11  to bring consultants into mix on behalf of Retrophin so that

12  Retrophin can become a bigger company; so that Retrophin can

13  make bigger investments so that they can find bigger markets.

14         We'll go to Yaffe in a little while.  But Yaffe,

15  Yaffe was a partner in Leerink Swann, remember?  Leerink

16  Swann, which was the big investment house.  He's been in the

17  pharmaceutical industry his whole life as an investment

18  advisor.  And what does -- what was the -- what does Darren

19  Blanton say to him?  "I've been talking it up.  The banker at

20  Leerink loves you.  How is that a coincidence?  Leerink?

21  That's Leerink Swann.  That's the investment house that Yaffe

22  used to work.  He helped found it, and his friend Swanny is

23  now running it.

24         Darren Blanton is not a sham consulting agreement.

25  That's a real consulting agreement.  And now I questioned him

Summation - Brafman                     5371

1   about that e-mail, and I said to him, and here's his

2   testimony.  And when say you'd follow him, he had lots of

3   clients and contacts?

4           Answer:  Yes.

5           And you were describing Martin Shkreli in May of

6   2014 as a creative CEO?

7           Yes.

8           You weren't describing Martin Shkreli in 2014 to

9   those investment bankers as someone who scammed you, were

10  you?

11          Answer:  Well, we had done an agreement where he

12  [sic] released each other and he had paid me those shares.

13          Question:  So all was forgiven?

14          Answer:  Well, that's the purpose of a release,

15  isn't it?

16          Do you see what he said?  "That's the purpose of a

17  release."

18          They tell you it doesn't matter to get a release.

19  It matters to get a release, because if you were a new

20  company and someone wants to sue you, even if it's not a --

21  or each if it's not a real claim, if you get a release from

22  someone like Darren Blanton so you can avoid litigation?

23  Mr. Aselage told you that companies want to avoid litigation.

24  And sometimes the cost of litigation is more expensive than

25  what you're litigating about, so you settle.  You give

Summation - Brafman                    5372

1   somebody a release.  That's common sense.  People settle out

2   of court all the time.  Not all claims are valid.  But he

3   gave them a release.  And when questioned in 2014 in this

4   courtroom under oath, he's talking about his reaction in

5   2014.  That's after he claims Martin Shkreli scammed him.

6   Well, we entered into an agreement.  We got a release.

7           And you know what else is so sad, ladies and

8   gentlemen?  This does not show up in the PowerPoint.  This

9   does not show up in the Government's PowerPoint.  And I don't

10  know how to do a PowerPoint, but I know how to look at

11  documents.

12          Here is the Retrophin proxy vote.  Look at this,

13  105-41 into evidence -- in evidence.  That's a Retrophin

14  proxy statement.  Look at this.  Look at this.  Just so

15  outrageous.  Darren Blanton is signing it on May 7th, 2014.

16  And what is he doing?  He's voting for Martin Shkreli to

17  remain on the board of directors.  This is after he claims

18  Martin Shkreli perpetrated a fraud.  Why is Darren Blanton,

19  a -- one of the big investors in Retrophin, why is he voting

20  for Martin Shkreli to stay on the board?

21          And look at this.

22          Question:  And the first person who is listed as

23  someone that the company wants as their director is Martin

24  Shkreli, correct?

25          Answer:  Correct.

Summation - Brafman                    5373

1           And you voted for him, didn't you?

2           Answer:  Correct.

3           And you voted for Martin Shkreli to be director of

4     Retrophin almost three years after you had concluded that

5     Martin Shkreli, according to you, lied; is that correct?

6           Answer:  Correct.

7           Question:  And according to you almost three years

8     after you had concluded that Martin Shkreli had committed a

9     fraud on you, correct?  And yet in 2014, rather than either

10    abstaining or voting against Mr. Shkreli because of what you

11    claim to have been a fraud, you voted in favor of Martin

12    Shkreli?  And when you asked -- when they asked you in 2014

13    to approve a slate of people who are going to run this

14    company that you had a substantial amount of shares in, you

15    voted in favor of Martin Shkreli?

16          Answer:  I voted in favor.

17          Ladies and gentlemen, they're talking about

18    securities fraud.  They're telling you that the shareholders

19    of Retrophin have been defrauded by Martin Shkreli.  This is

20    the one of the big shareholders of Retrophin after he had

21    his differences with Martin Shkreli, after he believes

22    Martin Shkreli lied to him, after he believes Martin Shkreli

23    scammed him.  What's he doing?  He's voting to keep Martin

24    Shkreli as the director.  You cannot ignore that piece of

25    evidence.

Summation - Brafman                    5374

1        That piece of evidence I submit most respectfully
2   alone should cause you to hesitate when you decide whether
3   or not the Government has proved beyond a reasonable doubt
4   that Martin Shkreli committed securities fraud because it's
5   not consistent with reasonableness.
6        A reasonable doubt in part will be defined as a
7   doubt that will cause you to hesitate in a moment of serious
8   consequence in your own lives.  It's not a whim or a
9   caprice.  A reasonable doubt, a doubt for which you can give
10  a reason.
11       Here's a reason.  I don't believe Darren Blanton's
12  testimony when he said that Martin Shkreli scammed me
13  because in 2014, long after it happened, he voted to keep
14  Martin Shkreli as a director in Retrophin, which I had a
15  vested interest in; I am a shareholder; I am telling you
16  Martin Shkreli should run Retrophin.  They can't get away
17  from that.  They can't explain it, and you cannot ignore it.
18       (Continued on next page.)
19
20
21
22
23
24
25

Summation - Brafman                5375

1         MR. BRAFMAN:  Now listen to this please, ladies and

2    gentlemen, this is testimony that they have ignored

3    purposely, I submit, but you can't.

4         This is Blanton's cross-examination.  My

5    cross-examination, the cross-examination that I think you

6    should look at before you decide to pull the trigger on

7    someone's life because it's as valuable as the direct

8    examination.  They are both under oath.  Here is the

9    cross-examination.  I wrote the green that's not part of the

10   green.

11        "Question:  Among other things you told them that

12   Martin Shkreli had told you that the appropriate valuation of

13   Retrophin stock would be $20 a share?

14        "Correct.

15        "At that point it would be worth $20 a share?

16        "Yes.

17        "That was said by Martin to you years ago, correct?

18        "Correct?

19        "What is the value today, $25 a share?

20        "Answer:  Yes.

21        "He was pretty prescient, wasn't he?

22        "Yes."

23        Prescient means, I think I'm using it right, you can

24   see into the future.  Aselage saw him as a visionary.  It

25   doesn't mean you can see into the future, that means he can

Summation - Brafman                           5376

1   see things that we don't.  A visionary is someone who -- I

2   have a phone, where I can press a button and in a second I can

3   speak to my son on the other side of the world and I hear him

4   clear as a bell.  I don't know how that happens.  Do you know

5   how it happens?  Some genius figured that out.  I don't

6   understand that, that's way above my ability.  I'm not a

7   scientist.  Even if I was, I could not make a phone work and

8   let me talk to you 7,000 miles away.  Some visionary made it

9   work.

10          There are people like that in every generation.

11  This visionary made a pharmaceutical company that treats rare

12  children's diseases; started from nothing and turned it into a

13  real company.  Now these vaccines and drugs are being

14  produced, only because of Martin Shkreli.  You can't ignore

15  that.

16          Then Blanton gives you the out for anything you want

17  to do in terms of acquitting the defendant, if you question

18  his valuation.  Because when he says, my cross-examination:

19          "Did you tell the FBI that your value of Colt

20  Ventures was between 25 and $75 million?

21          "Answer:  I could have.

22          "Well, what was the value of Colt Ventures at that

23  time.

24          "I would say that's a pretty good range.

25          "How did you value something that has a $50 million

Summation - Brafman                    5377

1  spread?  You can't be more specific?

2           "Answer:  Because of public and private investments.

3           "Question:  And because the private investments are

4  very difficult to value on certain occasions, correct?

5           "Answer:  Correct."

6           Isn't that what Martin Shkreli did?  And which the

7  Government seeks to ignore.  Didn't he properly value

8  Retrophin when it was a private company in its infant stages.

9  Retrophin doesn't show up like a bag of potato chips.

10  Somebody cultivates the idea.  Some brain works on it for two

11  years.  And then, then if everything works perfectly, you

12  might be the smartest person of the generation, then maybe the

13  FDA approves your drug, and maybe, maybe, maybe it's a

14  success.

15           He did it.  Don't you understand, he did it.  He did

16  this.

17           That requires you to understand how special his mind

18  is and how careful you need to be before just tossing it in a

19  heap.

20           This is my favorite part, I'm going to repeat it.

21           "Did you say at the time when you were young after

22  your parents divorced, that it caused you to become a little

23  bit, a little bit of a renegade?

24           "Answer:  That was her rendition of what I said.

25           "Question:  Well, did you say that you had good

Summation - Brafman                      5378

1   conversational skills, but that you used them to get yourself

2   and others into trouble or to con people out of something?

3          "I think that's what she wrote.  The media doesn't

4   always write exactly what you say.

5          "Question:  Right.  And what did you say?

6          "I don't remember.

7          "Question:  What did you say that caused her to use

8   the words con man?

9          "Answer:  I have no idea."

10         But you know what, ladies and gentlemen, everything

11  Martin Shkreli said, every word that came out of his mouth,

12  they are now suggesting to you is evidence that he committed a

13  fraud.  Every e-mail, every time you hit the word send on your

14  Blackberry or iPhone or whatever device, it's forever.

15         Here is the question, I'm going to take all of your

16  e-mails, all of your e-mails for the last four years, I'm

17  going to find 20 of them to embarrass you.  Twenty of them

18  where you said something about someone you love or care about

19  or don't like or do like, and you said it and it was stupid,

20  you regret it, but after you hit send you can't take it back.

21         What did Darren Blanton say to this woman that

22  caused him not to just say con man -- listen to the whole

23  sentence, it's so important in a criminal case where he's a

24  Government witness.  "You had good conversational skills but

25  that you used them to get yourself and others into trouble, to

Summation - Brafman                              5379

1   con people out of something."  He has good conversational

2   skills, you saw him.  He's using them to get Martin Shkreli

3   into trouble.  He's a con man.  And he can't explain it.  If

4   you don't say that to a reporter, it doesn't come out this

5   way.  Maybe they make mistakes sometimes, but this is a very,

6   very big mistake.  They are publishing it in a widely read

7   magazine in Dallas, Texas.

8            Your Honor, if we could take a break for five

9   minutes, Judge?  If we could have an understanding, your

10  Honor, of when we will break today, that will help me.

11           THE COURT:  Let me ask the jurors.  Can you stay

12  until about 5:15 or 5:30?

13           (Jurors indicate.)
             MR. BRAFMAN:  Thank you very much.
14           THE COURT:  Please don't talk about the case, keep

15  your minds open.

16           (Jury exits the courtroom.)

17           THE COURT:  All right.  Is ten minutes sufficient,

18  Mr. Brafman?

19           MR. BRAFMAN:  Yes, your Honor.

20           THE COURT:  Ten minutes, please.

21           (Whereupon, a recess was taken at 4:20 p.m.)

22           *                *                *
    *
23           (Jury enters the courtroom.)

24           THE COURT:  All our jurors are present.  Have a seat

25  everybody.

1          Mr. Brafman, you may continue.

2          MR. BRAFMAN:  Thank you ladies and gentlemen for

3   listening.  I'm going to try to finish before 5:30 if I can;

4   if I can't, I'll see you tomorrow morning.

5          John Neal, John Neal came from Texas.  He was in

6   this case because of Darren Blanton.  And he went to a dinner

7   meeting in Texas.  He met Martin Shkreli and Gloria Euclid,

8   who you may have heard, but never saw, was talking about how

9   great Martin Shkreli was and how much money she made, and

10  Darren Blanton said how much money he made.  That prompted

11  Mr. Neal's investment, he didn't read the PMM.  He signed the

12  subscription agreement in which he verified to Martin Shkreli

13  that you read the Private Placement Memorandum.  He told you

14  he didn't read.  He's in a hundred hedge funds, he knows what

15  they say, he didn't read it.

16         This is not science.  It's not business knowledge.

17  This is every day stuff we deal with.  You have your kitchen

18  redone.  You have a contractor who gives you a contract.  You

19  sign it.  You pay him.  He does the kitchen.  You come back

20  from vacation, you say, I didn't pick out that kind of marble,

21  what are you doing?  He says, read the contract, you did.

22  Well, I didn't read the contract.  He says, you should have

23  read the contract.

24         It's not fair.  It's not fair not to read the

25  contract then complain because you didn't know about certain

Summation - Brafman                    5381

1  things that it says in the contract.  When you sign a private

2  placement subscription agreement that says I read the

3  contract.  I discussed it with my lawyer or my investment

4  adviser.  I know everything in it.  I don't have any

5  questions.  I'm prepared to take the risk.  You are taking the

6  risk; when you don't read it, you're taking a bigger risk.

7          That is not right, ladies and gentlemen.  You cannot

8  ignore the written materials then come back and say, well, if

9  I had known.  If you read it, you would know.  They don't care

10  what is in there.

11          To the extent it says I Rothstein Kass as my

12  auditor, do you think Martin Shkreli picked that name out of a

13  hat?  What you are auditing in the first three days of your

14  private placement, new business?  This is someone who might

15  audit when they do the audit.  There is no audit that is done.

16          I didn't say I had the MSMB audited by Rothstein

17  Kass, I said they are my auditor, but there was no time to

18  audit after the RX trade and he turned it to into MSMB.

19          Schuyler Marshall, again, a businessman from Dallas,

20  in the case because of Darren Blanton.  And after the meeting

21  with Darren Blanton, he doesn't invest right away.  He waits

22  two months.  During the two months, you know what he does, he

23  gets stock tips from Martin Shkreli.  He watches their

24  performance.  He tells you that everything Martin Shkreli told

25  him turned out to be right.  It's in the testimony.  You can't

Summation - Brafman                    5382

1   just ignore that.  That's why he invested.  He's not relying

2   on what Martin Shkreli said in the memo.  He's relying on what

3   Martin Shkreli is telling him about stock tips; what Blanton

4   is telling him; what Neal is telling them; and what Gloria

5   Euclid is telling him.  He's a sophisticated guy, a lawyer for

6   40 years, 25 years as a partner in a big firm.  You can't just

7   ignore that, ladies and gentlemen.

8           Then look at this, remember I told you these rich

9   people don't know how much money they make.  He tells you on

10  direct examination he got the shares and he sold them for two

11  or $3 a share in January 2014, that's his testimony.  He said,

12  well, I made about 40 to $100,000.  No, he didn't.  We had in

13  evidence what the stock was selling for in January and

14  February of 2014.  Do you remember when I confronted him with

15  the Yahoo finance pages?  The stock was selling between $7.18

16  to $17 a share.  He looked at it and he said, I guess you're

17  right, those numbers are correct.

18          Well, if my numbers are correct, you didn't make

19  between 40 and 100,000; you made between 264,000 and $674,000.

20  He said, I'll accept your numbers.

21          What are we doing?  What are we doing?  He said

22  under oath 40,000, now it's 264,000.  He said 40 to 100, now

23  it's 260 to 674.  And in a minute he realizes he screwed up.

24  I'm not calling him a lawyer.  But if I didn't do any

25  cross-examination you would think, well, this guy really

Summation - Brafman                         5383

1   didn't make many money, Brafman is wrong, not everyone double

2   and tripled their money.

3          He made a fortune only when I pointed it out that he

4   ultimately accepted my number.  It's not okay.  It's not okay,

5   because these numbers of what the Yahoo finance are stipulated

6   to between the Government and us.  There is no dispute about

7   what the stock was selling for in January of 2014.  You can't

8   just ignore that.

9          This is my favorite testimony, I'm sorry, my

10  favorite testimony.

11         "Do you remember telling Mr. Shkreli in words or

12  substance you received a letter from Eric Schmidt of the SEC

13  asking you to come in for a voluntary interview?"

14         Further on, "You notified Mr. Shkreli about the

15  contact with the SEC, and Mr. Shkreli encouraged you to go in

16  and tell the truth, didn't he?

17         "Answer:  In substance, yes.

18         "Question:  That you should go and cooperate fully

19  with the SEC and provide them any information to resolve the

20  interview?

21         "I believe that's correct.

22         "And when you asked Mr. Shkreli whether or not you

23  should tell them, that you should ask whether SEC understands

24  the no harm no foul concept, did you say that to Mr. Shkreli?

25         "Yes, I did.  What I meant by that I was trying to

Summation - Brafman                        5384

1   give them some encouragement.  At this point I felt that even

2   though it had taken a long time, he had ultimately paid back

3   my investment, and then some.  I appreciated it.  And I heard

4   that he did that, in fact he was trying to deal similarly with

5   all other investors.  My point here was that I had not been

6   harmed in terms of losing money; in fact, I made money.

7   That's what I meant my no harm, no fowl."  Page 2595 of the

8   transcript.

9           You cannot convict Mr. Shkreli of defrauding

10  Mr. Schuyler, Schuyler Marshall, you can't.  He is telling you

11  he didn't lose any money.

12          If Mr. Shkreli said to Schuyler Marshall, if the SEC

13  calls and go and lie, the Government would bring that in here

14  as consciousness of guilt.  When he tells him to go to the SEC

15  and tell the truth, why isn't that evidence of Mr. Shkreli

16  having a not guilty mind set?  That came out on my

17  questioning, ladies and gentlemen.

18          Even though he was their witness, David Geller is Al

19  Geller's brother.  David Geller had nothing to do with Martin

20  Shkreli.  It was Kevin Mulleady and Al Geller that caused him

21  to invest.  David Geller did not read any of the two PPMs.  He

22  said, "I briefed them."  He was the man that used the word I

23  "briefed" it.  It's a 90-page document.  What does that mean,

24  he looked through it?  It's complicated.  You can't brief it.

25          He said, I've been a trader my whole life.  I'm

Summation - Brafman                    5385

1    versed in the stock market.  I'm a trader by profession.  This

2    isn't a guy who is just, you know, running a drug store and

3    has no experience and you bring him into a hedge fund and

4    suddenly he doesn't know what the hell is going on.

5            Yes, my client gave him a little bit of aggravation.

6    You saw this guy as a relatively nice man, white hair had one

7    of these Ralph Lauren Polo shirts on each day.  First day a

8    blue one, second day a gray one.  And you know what he said,

9    he said, "Man, I'm on a cliff, Martin.  I'm on a cliff."

10           I got a guy who is suffering from anxiety and

11   depression being told by another crazy, "I'm on the cliff,

12   Martin.  I need my tomorrow."

13           He couldn't give him the money tomorrow because he

14   was building a pharmaceutical company.  When we understand

15   that this is not a client who ask going to hell I'm not going

16   to pay you, he's trying.  He says to them in the e-mail, "I'm

17   crazy nuts here."  That's true.  He's crazy nuts, does that

18   mean he's crazy nuts or crazy nuts busy?  Either way, he's not

19   doing a crime when he says that.

20           Now, every case has a witness.  And you know, you

21   live your life as a trial lawyer, you wait ten years to find a

22   Lee Yaffe.  I'm going to bring you to Lee Yaffe from a couple

23   of days ago.  After the testimony was done I think the

24   Government threw in the towel and said no more witnesses.  No

25   more witnesses after Lee Yaffe.  We were supposed to go

Summation - Brafman                    5386

1   another two weeks, no more witnesses after Lee Yaffe.  We

2   can't afford another spectacle after Lee Yaffe, that's my

3   suggestion that that's what happened.  Lee Yaffe is the

4   cluster headache guy, remember him?  He's the man who was

5   picked to do the work of cluster headaches.  He said, I never

6   did a cluster headache work.  I'm not a cluster headache guy.

7   I don't know about cluster headaches.  My consulting agreement

8   is a sham.  No, it's not.  No, it's not.

9           He was supposed to do the work, he never did that

10  work.  That doesn't mean Martin Shkreli couldn't expect him to

11  do the work.  If I am Martin Shkreli and I say to Marek

12  Biestek, Lee Yaffe, who spent his entire life in the

13  healthcare world, who has worked in the healthcare investment

14  advisory world for the last 25 years, who now runs these

15  medical clinics for substance abuse, he's the perfect guy to

16  do research in cluster headaches, give him the job.  Marek

17  Biestek says, yes Martin.  Martin is the CEO.  He's developing

18  the medicine and delegating to Marek Biestek.

19          By the way, he's the MB in MSMB.  Do you see him in

20  this case?  Do you sitting next to Martin?  Why?  He's not

21  Martin Shkreli.  Because he's not vulnerable.  He's not easy

22  to prosecute.  He's the MB in MSMB, and he's getting a pass, I

23  suggest; not a witness, not a defendant.  Why?

24          And Marek Biestek is given this assignment.  Either

25  Marek Biestek screws up or Lee Yaffe screws up.  Lee Yaffe is

Summation - Brafman                    5387

1    lying to you.  You know how you know that Lee Yaffe is lying

2    to you because at the end of the day he said to you on direct

3    examination, I never did any work on cluster headaches.  I

4    never spoke to Martin or Marek about cluster headaches.  It's

5    not true.

6               On cross-examination we got him to admit, he started

7    to admit to having conversations with Marek Biestek.  He

8    started to admit, and suddenly then he said, I had only had

9    one two-minute call.  This is what he claimed.  Read his

10   testimony.  This the longest two-minute call in the history of

11   mankind.

12              When did you tell the FBI that you knew that

13   Retrophin was working on two drugs involving cluster

14   headaches?  I don't know.  I must have told them.  It says it

15   there, I must have told them.

16              When did you tell them?  In that telephone call.

17              When did you tell the FBI that you got back the

18   information from Marek Biestek.  I don't know, I must have

19   told them on the phone call.

20              Did you know you were getting a packet of

21   information, they must have said something.  When did they say

22   something?  On the phone call.

23              How did you know that a cluster headache is a

24   migraine headache in the ninth degree?  Do you remember when I

25   asked him that question?  He said he might have found out on

1  the phone call.

2         Man, this is some two-minute phone call.  A

3  conference call with Martin Shkreli and Marek Biestek and Lee

4  Yaffe, hiring this guy to be a consultant in cluster

5  headaches.  And everything he learned about it is being said

6  on there; is that correct?  No.

7         I'll tell you why he's lying.  Yes, we can't prove

8  this phone call happened.  We can't prove that that's when he

9  was talked about cluster headaches.  But you know what we can

10 prove, we can prove beyond any doubt whatsoever that this man,

11 Lee Yaffe, was talking about being a consultant for Retrophin

12 with Martin Shkreli for months before he got his consulting

13 agreement.

14        Here is defense exhibit 106.  On the top, "We'll

15 have this done tomorrow.  Need to make changes we discussed.

16 Looking forward to your services and advice."

17        Okay, that's Martin Shkreli.  So when he says

18 advice, he can say well, it's a self-serving statement by

19 Martin Shkreli.  Well, let's see how this e-mail starts,

20 ladies and gentlemen.

21        This is Lee Yaffe to Martin Shkreli, "Cool.  That

22 would be great and most appreciated.  Dad should be rolling

23 into town shortly, so that would be huge.  Let's catch up

24 tomorrow and also help you guys.  I read all the recent press

25 releases so have some thoughts and ways I can help out.  So

Summation - Brafman                    5389

1   the value is recognized by giving me a shot on the consulting

2   side."

3           Ladies and gentlemen, please look to where I'm

4   pointing.  This is a reasonable doubt as to why you should

5   acquit Mr. Shkreli and reject that consulting agreements as

6   being a sham.  He is telling Martin Shkreli that he's grateful

7   for getting a shot on the consulting side.  What is he talking

8   about?  Then look at the rest of the email.

9           "Let's see if we get buttoned short-term.  As know

10  you are busy, needs to get done.  Then I want to pull Swanny

11  into the mix.  He can help you guys.  Will fill you in when we

12  speak."

13          Swanny is Leerink Swann, a partner of the healthcare

14  fund.  He is the person who is going to help Retrophin, who is

15  going to help Yaffe be a better consultant.  What is he

16  telling him?  You can't just ignore this.  It's an defense

17  exhibit, but he identifies as a consulting e-mail.  He's using

18  the word consulting.  "I'm going to consult with you."

19          Then what happens on the cross-examination, what

20  happens to this man who swore under oath an hour before, "I

21  never did any work as a consultant cluster headaches.  I never

22  got any materials on cluster headaches.  God bless you, I'm a

23  sham consultant."  No, he's not.

24          Exhibit 100, is the e-mail from Martin Shkreli

25  copied to Marek Biestek.  All he says is thanks.  What is

Summation - Brafman                     5390

1   Martin Shkreli thanking him for?  Look at the next page.

2   Marek Biestek, who has been assigned by Martin Shkreli to

3   supervise this cluster headache consultant writes to our guy

4   Lee Yaffe, God bless him, and he sends attachments, neurology

5   serotonergic agents.

6           And then I go through them with him.  Suddenly

7   begins to back and fill, he doesn't know what to do.  Suddenly

8   he realizes that he really was a consultant.  He really did

9   some work.  He realized, that yes, he defrauded Retrophin.

10  You know why, he never did his job.

11          Now please understand this, it's a sham consulting

12  agreement as far as Martin Shkreli is concerned if Martin

13  Shkreli had no intention of hiring this person as a

14  consultant; and therefore, they were using Retrophin money to

15  pay this person, who really wasn't a consultant.  But if he

16  was really going to be a consultant for Retrophin, it's a real

17  business undertaking.  It's a real business expense.  It's not

18  a crime.  And the public company can hire consultants.  Steve

19  Aselage told you that.  So if this is real, if he wanted Marek

20  Biestek to pay him so he could be a consultant, and then

21  Mr. Lee Yaffe decided to take the money and not do the work,

22  he owes Retrophin the money.  It's not a fraud by Martin

23  Shkreli.

24          You can't just ignore this packet of materials.

25  They are in evidence, ask to see them.  They are all

1  scientific journals.  He says, I'm not an expert in cluster

2  headaches.  He works in the healthcare industry.  He told you

3  he had over a thousand business contacts, I'm developing the

4  drug for cluster headaches.  You don't have to be a scientist,

5  I need you to be salesman.  I need you to get me healthcare

6  companies who will underwrite a drug.  That's what a

7  consultant under these circumstances does.  He doesn't have to

8  be a specialist in cluster headaches.

9          It's not a crime hiring him to do a job for

10 Retrophin that helps Retrophin earn money.  It's only a sham

11 agreement if there is no agreement for you to work.  You can't

12 just check the box and say Martin be damned.

13         This is hard.  You need to dig down and understand

14 that what I'm doing is what you're going to have to do, if you

15 even think of convicting Mr. Shkreli.  This is real evidence.

16         I'm going to show you something which should even

17 make it worse for you to accept Lee Yaffe, then I'll talk to

18 you about it in a minute.

19         Lee Yaffe tells you, first thing he tells you, when

20 he met the FBI on April 1st, I think, in his driveway.  I got

21 that.  Two FBI agents showed up.  I've had it.  I lied.  What

22 did I say?  I said I was a consultant.  I said I worked on

23 cluster headaches.  I said I know all about Retrophin's work

24 on cluster headaches.  I've had it.  I just made up stuff

25 because the FBI was there.

Summation - Brafman                    5392

1          Well, how come everything you made up is right?  How

2     is it that everything you made up, you ultimately understand,

3     turns to be true.  Well, I panicked.

4          Now of fast forward to April 20, Eastern District of

5     New York.  He has his own lawyer in the room.  He has his own

6     lawyer, there is no more panic.  He knows he going there.  He

7     tells on cross-examination, I told the FBI at that meeting I'm

8     not here to lie.  That's what he told them.  And that's what

9     he does.  He tells the truth.  Right?

10          Well, he says, I worked on cluster headaches.  I was

11     hired to be a cluster headache consultant.  Is that a lie?

12          Two weeks later he said, I lied again to the FBI.

13     Now they're telling me if you lie to an FBI agent, it's five

14     years in prison.  And if you take a phony consulting agreement

15     it's securities fraud and then 20 years in prison.  What does

16     Lee Yaffe do, he gets a non-prosecution agreement.

17          Do you want to go through door one, and be on team

18     America and get a pass and no prosecution?  Or door two, and

19     sit here facing life in prison if you're Lee Yaffe and you

20     committed these crimes intentionally.  What would you pick?

21     You pick the Government's door.  And what does he get, he gets

22     a non-prosecution agreement.

23          So this is in evidence, and now I can do this.  I

24     waited a long time to do this.  I want you to look at the

25     language.  You think he has to tell the truth, that's what he

Summation - Brafman                        5393

1    says, my agreement requires me to tell the truth.  Let's see

2    the language that's used.

3           This is Defense Exhibit 105.  It's a Government

4    non-prosecution agreement, but I'm the one who put it into

5    evidence.  Hear is the language on Paragraph B -- Paragraph

6    five, "The witness must at all time give complete, truthful

7    and accurate information and testimony, and must not commit or

8    attempt to commit any further crimes.  Should it be judged by

9    the Office" -- which is the Government -- "that the witness

10   has failed to cooperate fully, has intentionally given false,

11   misleading or incomplete information or testimony, has

12   committed or attempted to commit any further crimes" -- we go

13   down -- "the witness will be subject to prosecution for any

14   federal criminal violation of which the Office has knowledge,

15   including but not limited to the criminal activity described

16   in Paragraph 2 above perjury and obstruction of justice."

17          Here is the test, should it be judged by the Office

18   that the witness has lied?  Here is the test whether he gets

19   this agreement and he keeps it.  The people at this table, the

20   Government, who want him to say he was a sham consultant, who

21   scared him into signing this, are going to make the

22   determination as to whether he's truthful.  If they decide

23   that he's being truthful, he gets the benefit of this

24   agreement.  So here's my question, what if he lies, but they

25   believe him?  He gets the agreement.  What if he tells the

Summation - Brafman                    5394

1   truth, but the Government doesn't believe him?  He doesn't get

2   the agreement.  He gets prosecuted.

3          We're not talking about the truth.  We're talking

4   about the truth from the subjective perspective of the

5   Government who is prosecuting this case under the theory that

6   this consulting agreement was a sham and anything he says to

7   the contrary is not going to be acceptable.

8          And you know what else is interesting how all of

9   these things sort of manage to wind their way into the same

10  corner of this case, he must have passed this quickly and

11  maybe he didn't focus on it.  Let me focus you on it.

12         Lee Yaffe says to you he knows Josiah Austin,

13  remember the tall man, the rancher with the white hair.  He

14  testified early on in the case.  Very regal looking man, tall,

15  thin, from Texas.  He was with Martin Shkreli.  Martin Shkreli

16  was, we submit, helping him invest Chelsea Pharmaceuticals.

17  He had $30 million invested in Chelsea Pharmaceuticals, so why

18  is Lee Yaffe important?

19         We take the position, and we've taken the position,

20  that Martin Shkreli says to somebody, I have $35 million under

21  management, that that doesn't mean he has $35 million in the

22  fund.  Assets Under Management has never been defined for you

23  as a legal term.  I believe I'm managing $35 million.  It just

24  so happens that $30 million is Austin's money.  And I, Martin

25  Shkreli, have told him how to invest in Chelsea.  Why is that

Summation - Brafman                    5395

1   important, even though Austin said I didn't consider Martin

2   Shkreli managing my money.  It's not whether Austin considers

3   him managing his money; it's whether Martin has a right to

4   believe that he's managing his money.

5          What does Yaffe say?  Yaffe says, I knew Josiah

6   Austin.  My company invested in Chelsea Pharmaceuticals.  I

7   know that Austin was the most important investor, the biggest

8   investor in Chelsea Pharmaceuticals.  And if you read his

9   testimony, you will find that he says, he says under oath to

10  me when a question him, that I believe Martin was running

11  Josiah Austin's money.  Because he was at Leroy Swang during

12  the period in question.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Summation - Brafman                    5396

1          MR. BRAFMAN:  Because he was at Leerink Swann
2   during the period in question, an investment vehicle, do what
3   you want with it.  Austin sells some -- transferred some
4   investment.  You can't just ignore that.  They say, Well, he
5   said Austin is under management, it's only $5 million.  That
6   $30 million from Josiah Austin, Martin Shkreli has a right to
7   say I had it under management.  Because Austin tells you that
8   the brokers were calling him to ask him to have Martin
9   Shkreli stop calling me about your money.
10          Because Martin Shkreli, I think call him impulsive,
11  they call him a little bit strange.  He can get under your
12  skin.  He can call you 30 times a day, people have said.
13  We're not calling you for 30 day.  So the brokers tells Josiah
14  Austin, Tell Shkreli to stop calling me.
15          Now we get to Steve Aselage and Steve Richardson.
16  He tells you that by September of 2014, the board, the board,
17  the board is him and Richardson and Shkreli.  That's the
18  board.  Nobody else matters.  Nobody else has testified that
19  they're on the board.  These two guys are the board.
20          The board fires Shkreli.  They said they didn't see
21  a change in his behavior.  And when he testified to this, to
22  be perfectly candid with you, he's sitting in a courtroom in,
23  you know, the year 2017, I was kind of stunned that someone
24  would actually admit to this.  So what does he tell you?  He
25  says, Can you give us an example of a red flag as being a

1  party that Martin threw for Retrophin?  Did you tell the FBI

2  that this was a red flag because there was a rapper present?

3  Yes, sir, I know what a rapper is.  I'm old but I know what a

4  rapper is.

5        I recall Retrophin getting tickets and having a

6  number of employees sent to Madison Square Garden where a

7  rapper was performing.  It would seem inappropriate.

8  Pharmaceutical companies historically send employees to

9  concerts, but a rap concert is not a destination that most

10  people would consider appropriate.

11        Who the hell are you?  Who are you to the tell my

12  client, who's half your age and looks like he's half that age,

13  that he can't go to a rap concert, and if he goes to rap

14  concert, it's grounds to fire him.

15        What -- what planet are we on?  This guy has the

16  right to tell my client that you are going to lose the company

17  you paid for because you went to a rap concert where you were

18  acting immature, he says, or you were on social media?  This

19  guy is in a different generation.  He's in a different world.

20  He's living in his San Diego mansion out there, and when he

21  comes to New York and he meets Martin Shkreli, he doesn't say

22  Martin's an idiot, he doesn't say Martin's a bad guy.  He says

23  Martin went to a rap concert, you are fired.  How dare you.

24        And doesn't that tell you something about the man?

25  Doesn't it tell you about his character.  Isn't it telling you

Summation - Brafman                    5398

1   something about him that would suggest to you that he has dark

2   heart.  That he doesn't give him any room?  You want to work

3   for, me you can't listen to that music.  Well, yes, I can.  I

4   started this company.  I don't like your music, Mr. Aselage.

5   What are you listening to, the '70s?  I'm allowed to go to a

6   rap concert.

7         You use Twitter, it's embarrassing the company.  But

8   he also said a couple of things which he couldn't get away

9   from.  He said Martin was a visionary.  What's a visionary?

10  That's not a legal term.  If you hit your Google dictionary,

11  it will tell you visionary is not someone who can see the

12  future, we're not talking about somebody who's a fortune

13  teller in a carnival.  A visionary is someone who can look at

14  a protein and say I know how to turn this into a cure for

15  PKAN.  He can look at a cell and understand what the cell is

16  missing to be able to develop myotubular muscular dystrophy.

17  Every generation has a couple of these people, thank God.  So

18  that we take these vaccines and get these cures and our

19  children grow up.  Those people were not believed when they

20  were young, like Martin.  How do you know how to do this?  I

21  don't know, I just know.

22        I can't go into Martin's head and teach you how he

23  became a visionary.  You become a visionary because you're a

24  visionary.  You're blessed with certain gifts.  But is it

25  possibly for to you see a cure that nobody else has been able

LINDA D. DANELCZYK, RPR, CSR

Summation - Brafman                    5399

1    to see.  Our lives are filled with a couple of visionaries

2    that all of us rely on when we raise our kids.  The people who

3    developed the polio vaccine, and all of the other vaccines we

4    give our kids.  Those people were visionaries.

5          But the diseases that Martin Shkreli is trying to

6    find cures for are not looked at by major pharmaceutical

7    houses because they're offering drugs, like the testimony was

8    with respect to myotubular muscular dystrophy.

9          Josh Frase, who was the boy who just got to Martin

10   Shkreli brought to him, a boy who died of myotubular muscular

11   dystrophy, and Martin Shkreli said you know what, I think I

12   know how to fix this.  I can fix this.  But there are only a

13   few thousand people who suffer from this disease.  So Pfizer

14   and Schering-Plough, God bless them, they are not going to

15   make a drug for something that only cures three, or four, or

16   5,000 people, or 20,000 people, there's no money in that.

17         In said to Mr. Aselage, You called him intense,

18   right?  You called him a visionary?  Yes.

19         Were there times when he was perhaps so intense that

20   you thought he was like crazy?  Yeah, he alienated people

21   close to him by being so intense.

22         Was he able sometimes not to be able to control

23   himself?  Yes, he was very impulsive.

24         How do you define his intellect?  Unbelievable.  The

25   smartest person I've ever met in my life.  This is a man who

LINDA D. DANELCZYK, RPR, CSR

Summation - Brafman                    5400

1   has spent 40 years in the pharmaceutical industry.  Forty

2   years.

3           He left BioMarin where he made $5 million a year to

4   go to work for Martin Shkreli who he met for an hour in a

5   coffee shop in San Diego?  Why?  Why?

6           What about Martin Shkreli is so overwhelmingly

7   impressive that you meet him, you think he's a little bit

8   crazy, but you decide you're going to go to work for him when

9   you're Steve Aselage who is running BioMarin.

10          You know why?  Because when you're in that industry

11  and you see someone who you recognize has genius and you want

12  to develop a relationship because you see him as someone who's

13  going to be able to do what nobody else did, and he turns out

14  that he was right, and now Aselage is running Retrophin and

15  last year he made $7 million, and Martin Shkreli is sitting

16  here being thrown out of that company because he went to a rap

17  concert.  Are we nets?  Is that acceptable?  It's not

18  acceptable, I submit.

19          So he comes out to California, Mr. Aselage, for

20  three weeks, what happens?  He stays in his hotel.  You go to

21  California to stay in a hotel?  People go to California for

22  the weather.  He goes to California, he never leaves his hotel

23  room.  So Aselage gets a little bit upset.  He goes to see

24  him, and what does Martin say?  I'm cutting my medication, I

25  think I'll be okay.  That's his response.  And I say to

Summation - Brafman                    5401

1  Mr. Aselage, Did you ask him what was wrong?  No, I'm not a

2  doctor.

3           You're not a doctor.  He's your CEO.  You're angry

4  with him because he went to a rap concert.  He's locked in a

5  hotel room for three weeks taking medication and you don't

6  want to know what's going on in his life?

7           Going to a rap concert makes you nervous but when

8  he's taking medication in a hotel room locked in there that's

9  okay, that doesn't bother you.

10          And then Aselage said something else that you need

11 to understand.  Sometimes companies decide to settle because

12 the cost of litigation is very expensive.

13          So I might settle, I might sign settlement

14 agreements if I'm the CEO of Retrophin because the cost to

15 Retrophin is worst.  And if I'm the CEO of Retrophin and

16 you're an MSMB investor and you sue me, that's bad for the

17 company.  It's a brand new company.  The visionary genius who

18 started that company does not need to be sued.  If you are on

19 the board of directors, you have a fiduciary obligation to

20 this company to see to it that there is no litigation if it

21 can be avoided.  So you give people some money and you write

22 it off because it's cost effective.

23          And he said to me, the only way I get rid of Martin

24 Shkreli, and the only way we can rid of Martin Shkreli is if

25 he's now convicted of a felony.  That's what he said.  Hello.

Summation - Brafman                    5402

1   What are we on trial for?  Felony.

2          What happens if Martin Shkreli gets convicted of a

3   felony?  Aselage and Retrophin wins their 65 million-dollar

4   lawsuit.  That gives him a motive to try and bury Martin

5   Shkreli.

6          And you know, even though he tried, I think he

7   couldn't get away from the fact that there is some things

8   about Martin Shkreli that I think he had to admit.  For

9   example, let me focus you.

10          Did you have any concerns that Martin Shkreli was

11  not being truthful to an investor?  Listen to his answer.

12          I thought he was sometimes exaggerating a bit.  I

13  don't think that's lack of truthfulness.  I think he honestly

14  believes some of the things he is saying.  I felt that some

15  thing he was saying were probably through rose colored

16  glasses, maybe more optimistic than was realistic to believe.

17  Isn't that the end of this discussion in some respects?

18          Steve Aselage, a government witness, not a fan any

19  longer of Martin Shkreli, tells you I think he believes what

20  he says when he says them.  And he sees the world through rose

21  colored glasses.  That's not bad.  That's not bad.  Maybe it's

22  naive, and maybe you don't see the real world sometimes, but

23  that doesn't mean you're intending to defraud.  That doesn't

24  mean you're trying to commit a crime.  That means that you

25  don't see the world the way everybody else sees it.  And you

Summation - Brafman                    5403

1   need to consider that when you decided whether Martin acted in

2   good faith.  And you need to consider that maybe that's how

3   he's able to develop these drugs, because he doesn't see what

4   everybody else sees.  He sees something special.  He's

5   described as a visionary, and you can't shut that down.  And

6   you can't escape it, and you can't walk away from it.

7           What did you do, Mr. Aselage, while you were on the

8   board?  Well, you know, not much.  Remember when I asked him

9   if he had a fiduciary obligation to the company?  Yeah, I got

10  a fiduciary obligation to the company.

11          Were you on the board?  Yes, I was on the board.

12          Did you pay attention to your responsibilities when

13  you were on the board?  Yes, it's very important.

14          Oh, yeah, let me ask you:  In July of 2013, when

15  your Retrophin -- when your title with Retrophin I was a board

16  member and you were talking to Christopher Schelling?  Yes.

17          And this was during the period when you told the

18  jury you were taking your work seriously as a board member

19  answer?

20  A    Yes.

21          "QUESTION:  Did you tell Mr. Schelling on that date

22  that you're still filing around with Retrophin, although not

23  really spending in any serious time on them?

24          "ANSWER:  That's what the email says.  Yes.

25          You can't come in here and tell us and tell you

LINDA D. DANELCZYK, RPR, CSR

Summation - Brafman                    5404

1   under oath that I am a serious Retrophin board member who

2   never approved these things and took my work seriously when

3   you're telling the rest of the world that you are farting

4   around as a board member.  I apologize for the word, it's not

5   my word it's his word.  And I apologize for saying it again

6   and again.  But doesn't that tell you, in 2014, what he wasn't

7   doing as a board member?  That he was not only asleep at the

8   switch, he just didn't care.

9           So when these settlement agreements and these

10  consulting agreements came before the board, they came before

11  the board.  We have the agendas that were sent by, you know,

12  Ken Banta and Marc Panoff.  They're all on his desk.

13          Those people weren't called.  Marc Panoff is the CFO

14  of Retrophin wasn't called as a government witness.  Ken Banta

15  isn't called as a government witness.

16          He's farting around as a board member, so he doesn't

17  see the consulting agreements.  And I am Martin Shkreli and I

18  have an obligation to get this approved by the board, where,

19  quite frankly, there is no law that says that.  There's

20  nothing in this case that requires me to send this to the

21  board, but let's assume I have that obligation.

22          So I send it to the board thinking they're reading

23  it.  And little do I know that the main character is Steve

24  Aselage, who views his job responsibilities as just farting

25  around.  I don't have to read anything, do anything.  Nobody's

Summation - Brafman                          5405

1    paying me a lot of money.  I'm just hosting.

2           So I don't know that you're telling the world that

3    you're farting around.  I think you're approving these

4    agreements.  You know why I know?  Because they're filed with

5    the SEC.  And you're signing them.  And the consulting

6    agreements and the settlements agreements are referred to in

7    those documents.  I have a right as Martin Shkreli to believe

8    that the board has approved these agreements, because I sent

9    them to the board.  The board signed them.  They were filed

10   with the SEC.

11          And little do I know that 2017 you will finally

12   admit in open court that in 2014, even though you understood

13   the fiduciary obligation as a board member you really weren't

14   paying attention, you are just farting around.

15          You can't convict my client of sneaking this stuff

16   past the board.  He didn't sneak it past the board.  The board

17   didn't look at it because they didn't care.

18          So let me talk to you about Steve Richardson.  And

19   I'm going to be careful here because I don't want to offend

20   anyone and I don't want to get in trouble.

21          Steve Richardson lied to you.  That's what I submit.

22   Steve Richardson is the chairman of the board and Steve

23   Richardson came in here, and in the direct examination by the

24   government, I didn't bring this up on cross, Mr. Agnifilo

25   didn't bring this up in cross, in the direct examination from

1   the government, they started with right off the bat, Are you a

2   gay man?  Yes, I'm a gay man.  I have a partner.  I've been in

3   a relationship for 25 years.

4            That's none of my business.  I don't care whether

5   you're gay or not gay or straight or bisexual.  I don't care

6   who you love.  It's not about business, I said in my opening

7   statement, it's 2017.

8            (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation - Brafman                              5407

1    MR. BRAFMAN:  That's not why I'm disgusted, it's

2    none of our business whether Steve Richardson is or is not

3    gay.  I'll tell you when it becomes our business, when he

4    lies to you about his relationship with my client.  When he

5    lies about his relationship with Martin Shkreli, then it

6    becomes relevant to you and relevant to me and relevant to

7    this case.  So we confront him and, you know, you stand here

8    basically reasonably intelligent people and you listen to the

9    following:  Did you tell Martin Shkreli in an email, I can't

10   wait to touch your soft skin again?  Yes, I did, but I was

11   referring to the rash he had on his neck.  And the government

12   shows an email with a subject matter is rash on my neck.  So

13   here's his explanation.  Martin has a rash on his neck, I

14   want to know if the rash is better and my response is I can't

15   wait to touch your soft skin.  If you got that email from

16   Mr. Richardson you'd be freaked out by it.  If you got it

17   from colleague and all you're doing is telling him I had a

18   cold, my cold is better, I had a rash, my rash is better and

19   his response is I can't wait to touch your soft skin again?

20   That's not an appropriate response I submit.  He's not

21   telling you truth.

22       What did he tell you, Martin had sexual issues.  He

23   didn't know if he was gay or not gay and I took him to my

24   apartment and I sat him down on my bed and I said, Martin,

25   you're in the bedroom of a gay man, you need to confront this

 1  issue.  What are we doing?  He's old enough to be his father.

 2  He's the chairman of the board for which he is the CEO and

 3  then he fires him.

 4          Then the email 10:00 o'clock at night, Martin, I'm

 5  drunk, where are you?  Who sends an email like that to someone

 6  who you're not having a romantic relationship with?  That's

 7  like, Martin, I'm horny, where are you?  That's what that

 8  email is.  I'm drunk, Martin, where are you?  Why do you send

 9  that to someone who is just working with you?

10          You did not get the truth from Mr. Richardson.  You

11  know how we know that, because when Richardson gets found by

12  the independent commission of having a personal relationship

13  with Martin Shkreli, according to Aselage when they do the

14  investigation, he resigns, he's gone.  The chairman of the

15  board, he wanted to be part of Retrophin, it was his legacy he

16  told you.  Suddenly he's out of here.

17          You know, I don't know, there is so much that I can

18  say and there's so many ways I can say it, but I look at these

19  two characters and I'm saying to myself, how not fair.  How

20  not fair.  Forget the case for a minute.  How not fair what

21  they did to Martin Shkreli.  Yes, maybe he's not the proper

22  CEO because he's a little bit nuts.  Maybe he could be given a

23  job as like head of scientific research.  You don't throw him

24  out.  He made the company you're all making yourself rich

25  from.  Steve Aselage made $7 million last year.  $7 million on

Summation - Brafman                                    5409

1   Retrophin.  And Martin is sitting here fighting for his life.

2   And the only way they really get rid of him is if he gets

3   convicted of felony.  And he comes in here as a government

4   witness and he tells you he never authorized these agreements.

5   That's such BS, ladies and gentlemen, it's such a lie that you

6   should be offended by it.

7            There is something else I need to touch on, and I'm

8   doing this as quickly as I can so that you don't stay past

9   5:30 and if I can't finish, I'll finish tomorrow, but here's

10  something you need to understand.  You know, you commit a

11  fraud, that's what the government says.  You rip off people

12  for millions and millions of dollars.  Do you see any money

13  going to Martin Shkreli?  Don't people who rip off people want

14  to do it so they can live the highlife, so they can buy their

15  Maseratis and the yachts and they can go on vacation.  Martin

16  Shkreli took $26,000 over two years and there is a 72,000

17  debit card, 72,000-dollar debit card bill two years.  So a

18  total of $108,000.  The debit card includes, I submit,

19  everything that Martin Shkreli had to pay for including dinner

20  with Sarah Hassan, including traveling to Dallas to meet with

21  Dallas Club Buyers, including David Geller dinners, including

22  Al Geller dinners, including Kevin Mulleady dinners, all of

23  that is 72,000.  So let's say 50 percent is Martin's.  So for

24  two years he's sleeping in a sleeping bag.  Steve Richardson

25  told you that he had to buy him clothes.  Did you buy him

Summation - Brafman                                5410

1    clothes because you felt bad for him?  Did he buy him clothes

2    because he wanted to clean him up or dress him up?  I don't

3    know.  But he didn't have clothes.  He slept in a sleeping bag

4    on the floor of his office.  Who does that if you're

5    committing a fraud and you have millions of dollars of

6    investor's money.

7            Now Her Honor will charge you that it's not the end

8    of the rainbow if you don't find the money, but it's a fact

9    that you can consider.  Most people commit crimes because

10   there is a greed factor.  I want your money, I don't care how

11   I take it.  I want your money because I want to buy things

12   that I can't afford.  That didn't happen in this case.  He has

13   no life.  He's the hermit scientist sitting in an office and

14   sleeping there and occasionally going to a concert, which cost

15   him his company.

16           I want to talk to you about the back dating.  The

17   government must have said the word back dated 50 times and I

18   want to show you something.  You know, Mr. Massella saw this

19   and he said, oh, my God, what the hell is this.  He thought

20   Martin Shkreli dated this.  And this is one of the cockamamie

21   signature pages that was scanned in sideways that the

22   government showed you and here is Martin Shkreli's signature

23   and the date is really 11/29/12 and their position is this is

24   part of the back dating.

25           Jackson Su put that date down.  When Jackson Su

Summation - Brafman                    5411

1   testified to that it was like, whoa, if he doesn't testify to

2   that, everybody assumes Martin Shkreli signed it and dated it.

3   Why did you put down November 29th?  Because it wasn't dated.

4   Who asked you to put it down?  I just saw it there and it

5   wasn't dated.  Jackson Su, you remember him?  He's the guy who

6   has a whistleblower lawsuit against Retrophin.  He quits, he

7   files a whistleblower lawsuit, he steals all of the records

8   from Retrophin and then he goes back, goes back to work for

9   seven months.  He's the guy who couldn't remember if he was

10  arrested in Syracuse.  If you're arrested in Syracuse you'd

11  remember.  You remember if you've been arrested in Syracuse,

12  it doesn't suddenly escape your memory.  I can tell you I

13  wasn't arrested in Syracuse, I don't have to think about it.

14  If you weren't arrested in Syracuse, you should be able to

15  answer that question.  He looked and said, well, let me think,

16  I'm trying to think.  Do you remember that moment?

17         Her Honor will tell you in part that if a witness

18  seems to have lied to you about something, you have a right to

19  reject their testimony or you have a right to consider that of

20  their testimony which you believe and reject that which you

21  don't believe.  But when someone sits there and tells a jury

22  of New York people, I don't remember, I don't know whether I

23  was arrested in Syracuse and I'm the one who dated that

24  because it didn't have a date, and I filed a whistleblower

25  lawsuit and Jackson Su is always blaming somebody else.  He

Summation - Brafman                              5412

1  defied the arbitrator's award, he lost $900,000.  The

2  arbitrator wasn't right.  The Court affirmed it and I have to

3  pay the arbitration award.  I was screwed by the arbitrator.

4  He wasn't screwed by the arbitrator, he was screwed because

5  he's a dishonest man.  And he came in here -- Jackson Su comes

6  in here.  None the people who are part of this alleged

7  conspiracy, Fearnow shares, only Pierotti -- and we'll get to

8  him in a minute -- Biestek, Mulleady, Fernandez, Vaino,

9  Sullivan, Tilles, all the people who are supposed to be

10  involved in this conspiracy to manipulate the shares of this

11  stock, they're all available to the government.  Their names

12  are all over everything and they're not called as witnesses.

13  I can't give them a non-prosecution agreement if the

14  government believes that they were involved and they in a

15  conspiracy to commit securities fraud.

16        So now we have Tim Pierotti, and Tim Pierotti is a

17  thief.  Tim Pierotti is a thief.  He took $1.6 million from

18  Mr. Shkreli and he left and never came back to work.  And

19  Martin keeps sending him emails, I want you to come back to

20  work.  Tim Pierotti is not testifying against Martin Shkreli

21  because Martin Shkreli committed a crime.  Tim Pierotti is

22  testifying against Martin Shkreli because Martin Shkreli being

23  Martin Shkreli wrote a nasty letter to Tim Pierotti's wife

24  when he left.  But you know what the government didn't read

25  when they read that letter, they didn't read this paragraph,

Summation - Brafman                     5413

1    which is highlighted in green.  They didn't read this

2    paragraph.  He's writing to his wife.  He's telling his wife,

3    when Tim informed my partner Marek that he was going to sell

4    his wife's jewelry to pay for their mortgage, I immediately

5    summoned Tim to our offices and gave him a personal check for

6    5,000.  Tim promptly deposited it that day.  Tim likes taking

7    my money and doing nothing for it.  I told Tim that if he ever

8    needed funds, he could rely on me to provide them for him

9    provided that he worked hard.  Of course, Tim doesn't like

10   that part.

11           Martin feels betrayed by Pierotti, that's why this

12   letter is written.  Maybe it's not a good idea to write a

13   letter to somebody's wife when you have a dispute, and maybe

14   it doesn't sit well when the government prosecutor puts it

15   into evidence, and maybe it offends some people, that's not

16   the point.  He comes to him and says I'm going to sell my

17   wife's jewelry unless you give me money because I can't pay my

18   mortgage; he gives him money.  And then when he asks him to

19   work in return for the shares, he doesn't work.  That's not

20   part of a scheme, it's not part of a conspiracy.  It's got

21   nothing to do with this case, ladies and gentlemen.  There's

22   no manipulation of the market.  None of the witnesses who were

23   supposed to be part of that conspiracy have testified and

24   there is no evidence to support Tim Pierotti.  Tim Pierotti is

25   a liar.  He's a liar and he's angry and he never was asked to

Summation - Brafman                                      5414

1   do anything wrong by Shkreli.  Shkreli just wanted him not to

2   disappear.  He wanted him to show up at work.

3            You know, half the people who testified in this

4   case, when they dealt with Evan Greebel, have said they

5   thought Evan Greebel was a good lawyer and that the Katten

6   Muchin firm was a good firm and therefore I was comforted by

7   the fact that he was the lawyer.  Schuyler Marshall, who has

8   been a lawyer for 40 years.  I'm correct, Mr. Shkreli also

9   mentioned the name Evan Greebel?  Yes.  You know that firm,

10  right?  Yes.  And that also gave you comfort because you knew

11  the firm Katten to be very well respected?  Answer, yes,

12  that's right.  Why can't Martin Shkreli believe the same

13  thing?  Massella:  I knew the Katten firm, it's a very good

14  firm.  Aselage:  Yes, I know the Katten firm, it's a very good

15  firm.  I know Greebel is a lawyer, yes.  And David Geller said

16  the same thing and Richardson said the same thing.  And

17  Richardson said they paid him a lot of money and they thought

18  they were doing a great job.  Why can't Martin Shkreli rely on

19  the fact that his lawyer, Evan Greebel, who is a partner in a

20  big firm that everybody else respects is doing a good job.  It

21  is not leading him into crimes, he's helping him.  And, yes,

22  there's some nasty email exchanges between Greebel and Shkreli

23  and that happens even with an honest client and an honest

24  lawyer, sometimes you don't like the exchange.  Sometimes you

25  tell your lawyer to go to hell because you don't like the

Summation - Brafman                              5415

1   advice you're getting.  That doesn't mean you're involved in

2   the commission of a crime.  That happens, ladies and

3   gentlemen.

4           Your Honor, I'm not going to be able to finish

5   tonight, I mean unless the people want to stay.  I've got at

6   least another 20 minutes.

7           THE COURT:  How are the jurors feeling?  Would you

8   like to resume in the morning?

9           THE JURORS:  Yes.

10          THE COURT:  Yes.

11          MR. BRAFMAN:  Okay, thank you.

12          THE COURT:  Thank you for your ongoing attention.

13  Please remain open minded, do not discuss the case, avoid all

14  media coverage about the case and about Mr. Shkreli.

15          We will see you in morning.  Thank you so much for

16  your attention.  We will see you at 9 o'clock as usual.  Thank

17  you.

18          (Jury exits courtroom.)

19          THE COURT:  All right, thank you.  I will see you in

20  the morning and I would ask the parties to please submit the

21  draft "affiliate" definition you'd like to have incorporated.

22          MR. AGNIFILO:  Yes, Judge.

23          THE COURT:  You might also suggest where it might be

24  a stand-alone since it's not really an element, but we will

25  consider your submission.

```
                    Summation - Brafman                    5416
```

1           MS. KASULIS:  Okay.

2           MR. AGNIFILO:  When do you want it?  I know as soon

3   as possible.

4           THE COURT:  Well, soon because we have to put it in

5   the instructions, so...

6           MR. AGNIFILO:  Right.

7           MR. SRINIVASAN:  We can do it right now, Judge.

8           THE COURT:  All right.  Perfect.

9           MR. AGNIFILO:  We'll do it.

10          THE COURT:  Okay.  Thank you.

11          So do you want me to wait?

12          MR. AGNIFILO:  No.

13          THE COURT:  You'll email it, you'll submit it.

14          MR. SRINIVASAN:  We can write it or email it.

15          THE COURT:  Or you can send a letter and say it's a

16  joint submission, you reached an agreement filed on ECF I can

17  get access to it.

18          MR. AGNIFILO:  Okay.

19          MR. SRINIVASAN:  We'll do that, yes.

20          THE COURT:  Thank you.

21          (Whereupon, the trial adjourned at 5:28 p.m. to

22  resume Friday, July 28, 2017 at 9:00 a.m.)

23

24

25