5417

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
  - - - - - - - - - - - - - - - -X
3  UNITED STATES OF AMERICA,      : 15-CR-637 (KAM)

4          Plaintiff,             :
                                  : United States Courthouse
5       -against-                 : Brooklyn, New York
                                  :
6  MARTIN SHKRELI,                :
                                  : Friday, July 28, 2017
7          Defendant.             : 9:00 a.m.
  - - - - - - - - - - - - - - - -X
8

9           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
           BEFORE THE HONORABLE KIYO A. MATSUMOTO
10         UNITED STATES DISTRICT JUDGE, AND A JURY

11

12                A P P E A R A N C E S:

13 For the Government:      BRIDGET ROHDE, ESQ.
                           Acting United States Attorney
14                         Eastern District of New York
                           271 Cadman Plaza East
15                         Brooklyn, New York 11201
                           BY:  JACQUELYN M. KASULIS, ESQ.
16                              ALIXANDRA ELEIS SMITH, ESQ.
                               KARTHIK SRINIVASAN, ESQ.
17                              GABRIELA BALBIN, ESQ.
                               Assistant United States Attorney
18
   For the Defendant:      BRAFMAN & ASSOCIATES, P.C.
19                         767 Third Avenue, 26th Floor
                           New York, New York 10017
20                         BY:  BENJAMIN BRAFMAN, ESQ.
                               MARC AGNIFILO, ESQ.
21                              JACOB KAPLAN, ESQ.

22 Court Reporter:         DAVID R. ROY, RPR
                           225 Cadman Plaza East / Brooklyn, NY 11201
23                         DRROYOFCR@GMAIL.COM

24 Proceedings recorded by Stenographic machine shorthand,
   transcript produced by Computer-Assisted Transcription.
25

Proceedings                                5418

1            (In open court; outside the presence of the jury.)

2            THE COURT:  Good morning, everybody.  Please have

3       a seat.

4            So we received the party's joint submission

5       regarding the deposition affiliate.  We've incorporated it

6       into a new iteration of the jury instructions that we have

7       designated Court Exhibit 4.

8            The verdict sheet is unchanged, though, it remains

9       4-A or it will be 4-A and it appears, as you know, in

10      Count 8 at Page 78, I believe.

11           So I want to make sure that is acceptable to the

12      defense.

13           MR. BRAFMAN:  Yes, Your Honor.

14           MR. AGNIFILO:  Yeah, I'm having trouble

15      downloading it.

16           THE COURT:  We'll also try to get you a hard copy.

17           MR. BRAFMAN:  Yeah, that's fine.

18           THE COURT:  Yes, Ms. Smith.

19           MS. SMITH:  Judge, before you get started, we have

20      two issues we wanted to raise based on Mr. Brafman's closing

21      remarks yesterday.  The first is that prior to trial, we

22      filed a motion in limine that the defense should not be able

23      to argue about the defendant's future plans if he's

24      acquitted or what punishment might mean for him, and

25      Mr. Brafman on June 19th at the final pretrial conference

Proceedings                                          5419

1   said that it was not his intention to base the jury that

2   they should acquit him because this is -- the line that they

3   want, that he makes some very devastating diseases, and

4   there were two sections in his closing yesterday where he

5   said exactly that.

6            One was on Page 5336, he said, Making someone a

7   felon for the rest of their life is a very, very tough

8   decision and when you're dealing with anyone who has to be

9   right, but when you're dealing with maybe one of the most

10  extraordinary minds of this generation, you need to be right

11  before you snuff that out.

12           And then also on Page 5377 he said, That requires

13  you to understand how special his mind is and how careful

14  you need to be before just tossing it in a heap.

15           So we feel that a limine instruction to the jury

16  would be appropriate.  On Page 90 of the jury instructions

17  there's a section on -- that the jury shouldn't consider

18  punishment.

19           THE COURT:  All right.  Would you wait one moment,

20  I'm going to tell my clerk to hold off making multiple

21  copies of a 90-page document.

22           MS. SMITH:  Oh, I'm not requesting for a change,

23  I'm just asking that it be read to the jury.

24           THE COURT:  Oh, right now.  Okay.

25           MR. BRAFMAN:  Your Honor, most respectfully, I

Proceedings                                5420

1    think everything I said was fair comment on the evidence

2    that their witnesses produced.  And if you want to

3    incorporate something in the section on your charge

4    concerning sympathy of the future, I can accept that.

5            But we didn't ask the jury --

6            THE COURT:  Before you start arguing, let me just

7    please call my clerk and make sure we don't waste more time

8    and paper on instructions, which should have been finalized

9    a long time ago.

10           (Pause in proceedings.)

11           THE COURT:  All right.  Let me finish hearing from

12   Ms. Smith and then I will hear from Mr. Brafman.

13           MR. BRAFMAN:  I think she's finished.

14           MS. SMITH:  So that was point 1.

15           And then secondly Mr. Brafman made a comment about

16   Marek Biestek, and he said, Do you see him in this case?  Do

17   you see him sitting next to Martin?  Why he is not Martin

18   Shkreli.  And so we also ask that the Court read from the

19   jury instructions, again we're not asking for a new

20   instruction, but on the section that says Consider only this

21   defendant.

22           So those are the two kind of oral instructions to

23   the jury.

24           One, stop considering punishment and one about

25   considering only this defendant that we would ask the jury

1   to be instructed.  I think both of those are proper.

2          And the first argument about his plans

3   post-acquittal and about how special he is and about that's

4   the reason why you should not convict him, are arguments

5   Mr. Brafman represented he would not make.

6          MR. BRAFMAN:  Your Honor, when you make a

7   representation in preliminary instructions and then you

8   watch the trial unfold and the Government introduces

9   evidence in which every witness talks about how brilliant he

10  is and how special he is, that's fair comment on the

11  testimony.  If Your Honor wants to include something in your

12  jury instructions about this, I have no problem with that.

13         But after Ms. Smith finished, we pointed out that

14  she made a glaring error on the way she interpreted Rule 144

15  and we didn't ask you to instruct the jury at that time.  We

16  incorporated it into to the Court's Charge.  I think it

17  would be inappropriate because everything I did was fair

18  comment, and I would ask you if you are going to change your

19  instructions, so that be in your jury instructions and not

20  do it at that point.

21         She said a number of things that were

22  inappropriate and our position was you're going to cover it

23  in the jury instructions.  So I think to do it now would

24  just be unfair and it's not the way Your Honor treated her

25  error which was a glaring error and it's a glaring error as

Proceedings                              5422

1    a matter of law, so we don't even need to debate whether it

2    was fair comment or not.

3              I walked a very careful line, Your Honor, and I

4    did not -- I indicated in that comment that we're not asking

5    for sympathy and you're not going -- you're going to be told

6    by the Judge that you're not supposed to be consider

7    sentence.

8              So I had did both parts.

9              THE COURT:  Well, the consideration of sentence is

10   definitely in the instructions.  I think what the Government

11   is asking for something beyond the sentencing that there has

12   been a suggestion that somehow the great visionary of this

13   generation, if the jury convicts him, will be stuffed out,

14   that kind of a comment.  So we can look at the instructions

15   regarding --

16             MR. BRAFMAN:  I'm sorry.

17             THE COURT:  We can look at the instructions

18   regarding the jury's -- that the jury not consider

19   punishment.  We can maybe add something to the effect about

20   not considering, you know, the consequences of their

21   decision on the defendant.  I think that is fair.

22             MR. BRAFMAN:  I think it is fair if you put it in

23   your instruction.

24             THE COURT:  I am not sure we need a special

25   instruction to highlight.

1            I did have another question, though.  There was a

2    reference to the finding that Mr. Richardson had an

3    inappropriate relationship and that he was therefore

4    terminated or had to resign because of that.  I don't

5    believe that's in the record.

6            MS. SMITH:  It's not in the record, Your Honor.

7            THE COURT:  All right.  Where did that come from?

8            MR. BRAFMAN:  Well, it comes from what happened.

9            THE COURT:  But it's not in the record.

10           MR. BRAFMAN:  I thought it was.  So to the extent

11   that she said things that weren't in the record, that were

12   inaccurate, I just don't think highlighting that particular

13   point is appropriate now.  And if you want to in your

14   instructions say, if you find that any argument of counsel

15   was based on something that's not in the record, you know,

16   that's fine.

17           You know, you gave her complete latitude, we

18   didn't object.  There were a number of things that we take

19   issue with.  She made comments about exhibits which she's

20   wrong on and I'll address them in my summation.  She said

21   Evan Greebel got shares, that's not true.

22           MS. SMITH:  I didn't.  I said they were -- I said

23   that the Fearnow shares some of them were sent to Evan's

24   address because there's an exhibit -- there's a FedEx

25   label --

Proceedings                          5424

1          THE COURT:  It's in evidence.

2          MS. SMITH:  -- with his name on it.

3          MR. BRAFMAN:  Your Honor, there was evidence in

4    the record by Mr. Aselage that there was an commission

5    report that he got that indicated and then Mr. Richardson's

6    testimony indicates when he resigned.

7          I think that's fair comment.

8          THE COURT:  You went beyond that, though.  You

9    said there was a finding in the commission report that

10   Mr. Aselage had an inappropriate relationship with

11   Mr. Shkreli and was therefore forced to resign.

12         MR. BRAFMAN:  No, but he --

13         THE COURT:  My concern was that we had, you know,

14   talked about not suggesting to the jury that because of

15   someone's sexual orientation or relationship that that not

16   be grounds for --

17         MR. BRAFMAN:  But that's what Ms. Smith said.

18         MS. SMITH:  Actually he said that the commission

19   was in October and November and that all he said was that

20   there was a finding that there's a personal relationship, he

21   didn't define it, and Mr. Richardson said that he left in

22   March ark of 2015.  So temporally the one week that we're

23   not sure where that came from, and I think we can address

24   that.  We're not asking for an instruction on it.

25         MR. BRAFMAN:  They can address it in rebuttal,

Proceedings                    5425

1   Your Honor, that's how this works.  If I say something wrong

2   they can say that.  I don't think for the Court --

3            THE COURT:  No.  I am just saying that I want to

4   make sure that we stick to references of evidence in the

5   record.

6            MR. BRAFMAN:  Yes, Your Honor.

7            THE COURT:  Because that is a concern of mine.

8            MR. BRAFMAN:  Okay.

9            THE COURT:  It has nothing to do with who says it,

10  but it has to do with what is in the record and my constant

11  reminder for the jurors, they are to decide the case based

12  only on the evidence that has been admitted in the record.

13           MR. BRAFMAN:  And Ms. Kasulis can address it in

14  rebuttal.

15           THE COURT:  I beg your pardon?

16           MR. BRAFMAN:  I think Ms. Kasulis can address it

17  in --

18           THE COURT:  I am just asking all lawyers to make

19  sure that they do not refer to matters that are not in

20  evidence.

21           MR. BRAFMAN:  That's fine.

22           THE COURT:  So in any event the Government wishes

23  me to incorporate the additional language about directing

24  that the jury not consider the future impact of a conviction

25  on somebody's life or on humanity, I guess, as it was

Proceedings                                    5426

1    couched.

2              And then the second issue was.

3              MS. SMITH:  So why isn't Mr. Biestek sitting here.

4    I do think that's covered by the jury instructions.

5              THE COURT:  It is.  And I think we can just

6    incorporate it into the general jury instructions, not a

7    specific instruction.

8              MS. SMITH:  Okay.  That's fine.

9              THE COURT:  All right.  Thank you.

10             Are all the jurors here?

11             (Pause in proceedings.)

12             THE COURT:  I am going to engage the parties on

13   this language, on the instruction point blank, the

14   Government, and I think point two is covered.

15             MS. SMITH:  It is.

16             THE COURT:  Okay.  Why don't you work it out.  We

17   will then need time to incorporate something.

18             MS. SMITH:  Okay.

19             THE COURT:  Okay?

20             (Pause in proceedings.)

21             (Jury enters.)

22             (Jury present.)

23             THE COURT:  Good morning, members of the jury.

24   All are present.

25             Please have a seat.

Summations - Brafman                    5427

1          Mr. Brafman, if you would like to finish your

2     summation, you may do so.

3          MR. BRAFMAN:  Thank you, Your Honor.

4     BY MR. BRAFMAN:

5          Good morning, ladies and gentlemen.

6          THE JURY:  Good morning.

7          MR. BRAFMAN:  I hope you got some sleep last

8     night.  Sorry for keeping you until exactly 5:30, and I

9     appreciate your attention.  And to the extent that at times

10    during my summation last night I raised my voice or I

11    expressed excitement, it's coming out of me.  I'm not

12    apologizing.  I want to draw your attention to certain

13    things and hopefully, I have.

14          So I'm going to continue this morning and I'm glad

15    I wasn't required to finish because it's just too much stuff

16    that's important and you were tired and I was tired.  So

17    today is a fresh start.  I'm not going to go back, but there

18    are things that I need to explain so that your verdict is

19    accurately based on all of the evidence and not on the

20    mistaken view of the evidence.

21          Exhibit 704, and I'm going to walk over to the

22    Elmo and show it to you.  Exhibit 704 is the Government's

23    chart for MSMB Capital, and on a number of occasions in the

24    courtroom during trial and certainly on summation, Ms. Smith

25    stressed the fact that MSMB Capital didn't invest in

Summations - Brafman                    5428

1    Retrophin, so how could you even consider factoring that

2    into the equation?  Well, she used very, very careful words

3    when she said that.

4         MSMB Capital did not invest but they did receive

5    free shares from Martin Shkreli.  If they had not received

6    shares, you would have investors coming in here and saying,

7    I lost all my money.  But because Martin deposited his

8    shares, his ownership shares into MSMB Capital, they don't

9    come in here and cry that they lost their money.  They come

10   in here and say well, it took me awhile to get my money, but

11   they got it back and as you saw yesterday they got it back

12   in duplicates and triplicate and some of them quadrupled

13   their money.  So I have a 5-dollar bill in my pocket that I

14   have carried with me for almost 20 years.  One of my kids

15   gave it to me, it's important.  But if I went down to the

16   store in the lobby and bought some water and I used that

17   5-dollar bill, the owner would not care where that money

18   came from.  I'm giving it to him.  It has value.  So when

19   Martin gives money or shares to MSMB Capital, MSMB Capital

20   doesn't have to invest in Retrophin in order for the value

21   of those shares to be counted when he sends out the

22   statements which indicate what the value of the investment

23   is.

24        So I needed to straighten that out.  Because if

25   you listen carefully, and I know you did, to Ms. Smith's

Summations - Brafman                        5429

1    summation, she said MSMB never invested in Retrophin.  But

2    MSMB got Retrophin shares and they were Martin's shares and

3    they had a right to be part of the valuation, which were

4    completely ignored by the agent who when he made the charts

5    who told you candidly that he looked at the bank accounts

6    and he looked at the statements and MSMB Capital, it wasn't

7    factored at all because MSMB Capital did not invest in

8    Retrophin.  So I wanted to straighten that out.

9              Second, if you look at the next

10   Government Exhibit, which was 705, this is the

11   MSMB Healthcare chart.  And this chart is different and the

12   agent said and the Government said that even if you include

13   the Retrophin shares, even if you include the Retrophin

14   shares.  Well, first of all, you have to stop right there.

15   What do you mean, even if?  MSMB Healthcare invested in

16   Retrophin.  It is an investment of the fund.  How can you

17   have a chart on the -- of the fund without those shares?  It

18   just takes some guts to do that and just ignore the obvious.

19   So when they say, even if it wasn't included, it was

20   included.  And if you include it they say, well, it only

21   brings it up to half because the fund only invested $2

22   million.  The Government is again attempting to mislead you.

23             That's not how investments work.  You bought a

24   house for $500,000 it goes up in value over time because

25   you're in an area where developers want to buy real estate,

1    that 500,000-dollar house could go to 7, it could go to 8,

2    it could go to a million.  When you invest $2 million worth

3    of Retrophin stock into the fund, you know from what you saw

4    in evidence with the chart, Retrophin's stock kept going up.

5    And eventually the people who held it hit a home run.  So

6    you can't just say, well, even if you count the 2 million,

7    it would only be half the money he's claiming.

8            Martin is evaluating the value of the Retrophin

9    stock and when you invest 2 million, you can't just end the

10   discussion and say, well, it only was 2 million, so if you

11   look at the chart the only -- it would only rise to half

12   anyway.

13           When are you looking at the chart?  When did you

14   make that chart when Retrophin was at 2 or $3 or when

15   Retrophin was at $17.  And it changes dramatically as

16   Mr. Neill conceded, as Sarah Hassan conceded, as Darren

17   Blanton conceded.  Some of them still holding their

18   Retrophin stock because they see it going up and up and up.

19   And again, I remind you the only reason it keeps going up,

20   is because of the drugs that Martin produced and discovered

21   and made part of Retrophin, because as Aselage told you, and

22   I'll get to that in a minute, all Martin in terms of what

23   the product is that Retrophin has now that is of value, he

24   said to Thiola the drug that they have is responsible for

25   the largest percentage of income by Retrophin, and he

Summations - Brafman                          5431

1    concedes that happened like all of the other drugs on

2    Martin's watch, on -- during Martin's tenure as CEO.

3              So when you look at that Government chart and you

4    see the little red line and it doesn't go all the way up to

5    the blue line, it's because they are not really factoring in

6    the true value of Retrophin.  The anticipated value of

7    Retrophin when Martin is evaluating it.

8              There was much said about the settlement

9    agreements.  And the suggestion is by the Government that

10   Martin improperly used Retrophin stock to pay back investors

11   by using settlement agreements.  That's not a fair

12   statement.  Because even if there were no settlement

13   agreements, and he gave these people Retrophin stock, they

14   would have their money and there was no settlement

15   agreement.  The settlement agreement is an important

16   document from Retrophin's perspective because as Aselage

17   told you and as Sarah Hassan told you, you don't want a

18   lawsuit in an infant company.  You don't want a lawsuit

19   while you're trying to raise money.  So you make a business

20   decision, a business decision.  You slip and fall in the

21   supermarket and you sue them for $100,000 and the

22   supermarket says, you know what?  This is a nuisance

23   lawsuit.  We're going to give you $25,000 because we want a

24   release.  Because we don't want to supermarket to have this

25   stigma of having been sued by one of their customers.

Summations - Brafman                    5432

1        Retrophin was in its formative stages.  These

2    settlement agreements allowed Retrophin to go public without

3    litigation surrounding its CEO, its founder, and the

4    company.

5        So these people who got settlement agreements were

6    threatening litigation.  Many of the people who got

7    settlement agreements who the Government didn't call got

8    Retrophin stock, but they didn't get settlement agreements,

9    because they weren't demanding.  And then these were

10   business decisions that Retrophin had a right to make to

11   avoid litigation and Aselage told you sometimes the cost of

12   litigation is -- costs more than the payment that you're

13   involved with.

14       And Martin is paying these people, not because he

15   has to, but because he thinks it is the right thing to do.

16   And at the time he is paying them, he is doing this as a

17   business decision as the CEO and founder of Retrophin and

18   Aselage and Richardson understand this and their suggestion

19   that there were no settlement agreements that they were

20   aware of is preposterous, because let me ask this question

21   which just occurred to me in the middle of the night, quite

22   frankly.  When Aselage fires Martin and tells Richardson

23   he's got to go because he is in a chore, he went to a rap

24   consent and he's tweeting and he's just not the image we

25   want to create.  It was after the restatement by Retrophin

1   in which the settlement agreements and consulting agreements

2   became well, well -- became upfront and center in the face

3   of Retrophin's Board.  They can no longer ignore the fact

4   that those existed.  They want to tell you they didn't

5   authorize them or they don't know them when they were made,

6   that's one thing.  But they did know about them before they

7   fired Martin.  So why did Mr. Aselage not come in here and

8   say to you, We fired Martin because he gave unauthorized

9   settlement agreements?  Why didn't Richardson tell you, We

10  discovered unauthorized settlement agreements and consulting

11  agreements, so we fired Martin.  They both chimed in saying

12  Martin was fired because he was inappropriate.  Because he

13  was immature.  That's a -- that's a damming point to the

14  theory of the Government's case which suggests without

15  question that the Board knew about these consulting

16  agreements and settlement agreements before they restated

17  the filings because that was the purpose of restating the

18  filing.  They told you they had to do it because these

19  settlement agreements and consulting agreements came to our

20  attention, they tell you.  I submit they knew about them all

21  along.  But if it came to their attention and the Board's

22  position is that they were unauthorized, why not fire him

23  then?  Isn't that the quintessential moment when they, Hey

24  who told you do this?  Instead you come into a federal

25  courtroom and you testify under oath that the reason I fired

Summations - Brafman                    5434

1    him was because he went to a concert that I didn't approve

2    of.

3              And then the second thing is they tell you that

4    Martin tried to defraud Retrophin, that Martin's actions

5    were made in an attempt to defraud Retrophin.

6              So I want you to look around the courtroom and

7    tell me who is the largest Retrophin shareholder?  Not

8    sitting next to the guy with the gray hair anymore because

9    I'm here.  He's sitting there in a gray sport jacket and a

10   light blue shirt.  I've identified Martin Shkreli as most

11   people have today.  He's the largest shareholder of

12   Retrophin according to the evidence in this case.

13             Why would he do something that defrauds the

14   company that, A, you slaved over to make the company.

15             B, you made a company.

16             C, you took it public.

17             And D, when you took it public, you have the most

18   shares.

19             If he you defraud your own company it dilutes the

20   value of your shares and you know he's smart.  So he's not

21   stupid enough to do that.  Why would he do that?  Why would

22   he defraud his own company?  So the suggestion that Martin

23   was involved in an effort to defraud Retrophin is just not a

24   true argument that has merit, that you can rely on.

25             Now I just want to talk to you a little bit about

Summations - Brafman                    5435

1    some of the investors.  I'm not going to go back and repeat

2    what I said yesterday.  But there is something about them

3    that should jump out at you.  There's a group of investors

4    in this case, which make up most of the people called by the

5    Government to testify as investors, who the Government

6    proffers to you as people who would like to have known this,

7    and would like to have known this, and Martin told them this

8    and Martin told them that, suggesting that they were misled.

9    Five, five out of the small group they chose to call are

10   experts.  Now when I say experts, the Court hasn't

11   classified them as experts as you might do in if a scientist

12   came in here to testify about a drug and we qualify them as

13   an expert and therefore they were permitted to give an

14   opinion.

15           But five out of the small group they called were

16   experts in investing in hedge funds and in

17   healthcare-related hedge funds.  John Neill told you he has

18   invested in between 50 and 100 hedge funds.  Listen to -- 50

19   and a hundred hedge funds.  He signed a subscription

20   agreement in which he said, I read the private placement

21   memorandum and then he conceded under oath that he didn't

22   read it.  We covered that yesterday.

23           But John Neill is someone who is 74 years old.  He

24   said he's been doing this for over 40 years.  He has

25   hundreds of millions of dollars, you can conclude, because

Summations - Brafman                    5436

1  he has $50 million just in his wife's name in this

2  partnership and he characterized his investment of $500,000,

3  if you recall, as a small investment.

4        Now, none of us are in his league, I don't think.

5  I don't know anything about your personal finances.  But if

6  you characterize a 500,000-dollar investment as a small

7  investment, that tells you something about the amount of

8  money the man has.  And he told you very, very privately,

9  but publicly that he has invested in 50 to 100 hedge funds

10  and that he's done quite well for himself.

11        He's an expert in how you invest in hedge funds.

12  He's an expert in what you know about hedge funds and its

13  lack of liquidity and the discretion of the general partner.

14  He's an expert.

15        Schuyler Marshall is an expert.  Schuyler Marshall

16  told you that he evaluates small companies for a living.  He

17  was a lawyer for 25 years, now he's in-house counsel for a

18  private equity fund.  And if you look at the subscription

19  agreement under explanation of what you do for a living he

20  writes in stock terms, I evaluate small companies or

21  companies for a living.  He's an expert.  He understands

22  what is involved in investing in a hedge fund.  And I don't

23  have to repeat all of the testimony he gave you about how it

24  was what Darren Blanton said and it was Gloria Euclid said

25  and it was nothing about what Martin said that caused him to

Summations - Brafman                    5437

1    invest.

2          How do you know that?  Because after the dinner in

3    Texas he waited two months before investing and in those two

4    months he confirmed that he evaluated the information Martin

5    gave him in terms of stock tips, that he followed each of

6    those stock tips and he concluded from following them that

7    everything that Martin told him was right.  He invested in

8    at least one of those companies, he told you, and made

9    money.

10         Darren Blanton told him he made a lot of money and

11   he withdrew his money and Schuyler Marshall said when Darren

12   Blanton told him that he was able to withdraw his money,

13   that's what pushed him into believing that he should take a

14   ride in this fund.

15         But even with all of that -- without all of that

16   he evaluates small companies for a living.  If you have any

17   doubt, pull his subscription agreement and see how he

18   describes what he does for a living.

19         This isn't someone who owns a grocery store and

20   Martin talked him into investing and he's way out of his

21   league and he's way over his head and he doesn't understand

22   maybe the private placement memorandum, maybe he doesn't

23   lack the education necessary to understand it.  Schuyler

24   Marshall is an expert.

25         David Geller spent his entire career trading

Summations - Brafman                    5438

1   securities.  He held two separate licenses as a trading --

2   as someone licensed by the SEC to trade over people's money.

3   He's an expert.  He never read the private placement

4   memorandum.  He relied on what Al Geller told him and what

5   Kevin Mulleady told him and he never read the private

6   placement memorandum.

7           And we discussed this yesterday that that's not

8   fair to not read it and then come in here and complain.  And

9   for him to suggest I wanted liquidity.  Well, if you had

10  bothered to read the private placement memorandum you would

11  understand that liquidity could be an issue.  And if you're

12  an expert in hedge funds, we discussed this with many of the

13  people who testified, this is not putting your money into a

14  brokerage account where you call up the broker and say, Sell

15  my Google stock and send me a check and three days later you

16  get a check.  This a hedge fund.  In a hedge fund you're a

17  limited partner.  You're investing there and you're under

18  the discretion of the managing partner, Martin Shkreli.  And

19  if Martin Shkreli wanted to suspend withdrawals forever he

20  can do it, but he didn't.  He delayed withdrawals and he

21  delayed withdrawals for a reason.  You see the scrambling

22  that was going on in trying to arrange financing for

23  Retrophin.  Yes, they said at one point Retrophin was

24  hanging by a thread.  There is no dispute about it.

25          But where did it go after it was hanging by a

Summations - Brafman                    5439

1    thread?  It went up.  Do you know why?  Because he got the

2    investment of $10 million in the pipe transaction.  That's

3    what small companies do, they try and raise money.  If they

4    raise money, it's terrific; if they don't raise money, they

5    go bust.  But who is responsible for the money that they

6    raise?

7            Did anyone else participate in the effort to raise

8    money for Retrophin.  Did Aselage do it?  No.  Did

9    Richardson do it?  No.  Only Martin Shkreli.  And he did it

10   and it worked and they got paid.

11           So when they tell you, well, look at the slide,

12   Retrophin has very little money.  Yes, but that's not

13   because Martin looted the treasury by going on a yacht, it's

14   because Martin is sleeping in his office and found a way to

15   convince the institutional investors in a pipeline to give

16   them $10 million.  And the e-mail traffic shows you that

17   when any got the financing they started to repay these

18   people, not to loot Retrophin, but because MSMB Healthcare

19   had invested in Retrophin and some of these people were

20   entitled to be repaid and now we have the money and now he

21   was going to repay them and he is still the largest

22   shareholder in Retrophin.

23           So he's giving away his money in many ways.  Not

24   when you trace each share where it came from, where did it

25   go.  But it -- his company if he's defrauding Retrophin he

1    loses.  And David Geller is an expert.  You cannot discount

2    that when you decide whether he was defrauded by what

3    somebody may have said.

4              Lee Yaffe.  Lee Yaffe is the founder of

5    Leerink Swann.  Leerink Swann is an investment house that

6    specializes in health care stocks.  Think about that for a

7    minute.  Retrophin is a health care stock.  Lee Yaffe comes

8    to the table, he told you, with a whole lifetime of working

9    in this field.

10             Now, what does he do now?  Now he's still in a

11   health care-related business.  He runs abuse center clinics

12   where people are treated for substance abuse.  A health

13   care-related industry.  But you can't discount why you might

14   want Lee Yaffe to be someone -- one of your consultants.  He

15   tells you under cross-examination that he had access to over

16   1,000 contacts in the health care industry.  If you are

17   running Retrophin, a health care company, that's valuable.

18   Even if he doesn't do his cluster headache homework as he

19   obviously admits not doing.  I want him as a consultant.

20   He's an important consultant.  And what does he say in the

21   e-mail, I'm not going to go back to where he talks about

22   looking forwarding to working as a consultant.  On the next

23   e-mail he says that we're going to loop in or hoop in the

24   Swanny.  Who is Swanny?  Swanny is the partner in Leerink

25   Swann that is a health care investment house that deals with

1   the health care industry.  I'm your consultant.  I'm going

2   to help you.  It says in there, I'm going to help you.  I'm

3   going to help you in two ways:  One, if I ever do this

4   homework Marek Biestek gave you by looking at cluster

5   headaches and the Government in its summation said he

6   admitted not to be an expert in cluster headaches.  If I

7   give a college student an assignment to investigate cluster

8   headaches, college student, not someone who has spent their

9   whole life in health care.  I give a smart college student

10  an investment, do a paper on cluster headaches, tell me

11  everything there is to know about cluster headaches, who

12  makes them, how they're made, who treats them, how are they

13  treated, what is the science, what is the research.  Every

14  college student with a computer could spend a couple of days

15  and come up with a decent paper that might help me as an

16  executive to understand the market, to understand who's

17  doing it, to understand how to promote my drug if I'm

18  working on a drug.  And he says to you, he told the FBI that

19  Retrophin is working on two drugs deal with cluster

20  headaches.

21          Now he didn't say, I lied to them about that.  How

22  would he know that Retrophin is working on two drugs to deal

23  with cluster headaches?  Because he was told by Marek

24  Biestek do this research, it's going to be helpful.  Now

25  there's no testimony in the record by Marek Biestek but I'm

Summations - Brafman                    5442

1  allowed to ask you to draw reasonable inferences from his

2  testimony.

3        How would he know that Retrophin is working on two

4  drugs to develop cluster headache medicine for treatment?

5  How would he know that?  But Lee Yaffe nevertheless is still

6  an expert.  And he's an expert who invested with all of the

7  expertise that comes with a lifelong involvement in health

8  care stocks.

9        And what is his involvement, he is an investment

10 banker at Leerink Swann.  That's an investment house, not a

11 bank.  But they're the people who promote stocks they're the

12 people who research stock.  He's an expert who doesn't come

13 here without any specific knowledge and Lindsay Rosenwald is

14 the premiere expert that they produced.

15       Lindsay Rosenwald has told you that first of all,

16 he is a doctor.  He's a medical doctor that instead of

17 practicing medicine invests in biopharmaceuticals.  He is

18 the founder of Chelsea Therapeutics, which Josiah Austin put

19 $30 million into.

20       He is an investor by profession.  He told you

21 that.  And when he gets the PPM he doesn't even look at it,

22 he hands it off to his attorney.  And he invested 100 grand.

23 And he said -- he said, you know, if I win, I win; if I

24 loss, I loss or words to that effect.  He took a gamble.  He

25 saw Martin and he said, I thought Martin was very, very

Summations - Brafman                    5443

1   smart.  And Martin, if I called him a genius that fits but

2   he's certainly out there on the side of the bell curve but

3   he saw in Martin something that he felt comfortable about

4   giving him a hundred thousand dollars, and his trust in

5   Martin paid off randomly -- paid off terrifically, paid off

6   well.  Because he got 4 to $600,000 back on a 100,000-dollar

7   investment.  So they are experts.

8           And then you go to the witness who has more

9   involvement in many ways with many of the investors than

10  Martin Shkreli who some of them never spoke to before

11  investing.  Kevin Mulleady is a stockbroker by profession.

12  He is a guy out there who is hustling investors because

13  that's how he makes a living.  When a stockbroker gets a new

14  client, the stockbroker can end up making money if the

15  client invests because you get commission as a normal broker

16  relationship.

17          But forget about the brokerage issue for a minute.

18  He's a stockbroker who is responsibile for Richard Coker

19  coming into the case.  Coker told you, I spoke to Mulleady,

20  Mulleady is my broker that's who I spoke to, not Martin

21  Shkreli.  He never met Martin Shkreli before he invested.

22  Kevin Mulleady is responsible for David Geller coming into

23  this case.  Because David Geller and Al Geller, the witness

24  who you did not hear from, are both Mulleady clients and

25  Mulleady spoke about how good Martin is at his work.  And as

Summations - Brafman                    5444

1   a result both David Geller and Al Geller invested.

2          So you can't blame Martin for saying anything to

3   either of these two people which was fraudulent in nature or

4   misrepresentation which caused them to invest.  And Ed

5   Spielberg, who you never met but who you heard about on

6   summation for first time I submit, and Spielberg was hocking

7   Martin for a return of his money because he put in I think

8   $25,000 and he was upset when he didn't get a response.  He

9   doesn't call this a witness to testify that he was

10  defrauded.  But if he thinks he was, Kevin Mulleady is the

11  one who put Ed Spielberg into the mix.

12         And Michael Lavelle another person who you never

13  saw or heard testimony from was also put into the mix by

14  Kevin Mulleady.

15         Now, in the Court's instructions there will be a

16  reference to bias.  The witness has a bias if a witness has

17  a motive or a witness has a reason to testify in a manner

18  adverse to the defendant or any other party, you have a

19  right to consider it.  It doesn't mean you have to discredit

20  it or discount that testimony completely, but it is an

21  issue.  And Aselage has hold you about his bias.  Aselage

22  has told you that he has sued Martin for $65 million on

23  behalf of Retrophin and Martin has countersued alleging,

24  among other things, wrongful termination.  You terminated me

25  incorrectly or illegally without cause.  Those lawsuits

Summations - Brafman                          5445

1    Aselage told you are stayed pending the outcome of this

2    trial.

3           But there's something else that Aselage told you

4    that is pretty interesting, okay?  Aselage told you that in

5    order to fire Martin under the terms of his employment

6    agreement, he needs a felony conviction.  So let me read you

7    from Page 3432:  Retrophin is suing Mr. Shkreli for 65

8    million.

9           Answer:  That's correct.

10          Question:  And that lawsuit is stayed pending the

11   outcome of this case?

12          Answer:  That's correct.

13          Question:  You understand that one of the claims

14   made against Retrophin was that he -- meaning Martin --

15   could only be terminated if he was convicted of a felony; is

16   that correct?

17          Yes.

18          If Martin is convicted of a felony, which is what

19   happens if you conclude that he is guilty, Retrophin wins.

20   Not only do they win $65 million but they get the right to

21   legally terminate Martin Shkreli.  I as CEO of Retrophin who

22   last year made $7 million have a personal vested interest in

23   seeing to it that Martin is convicted.

24          Now he never said that, but that's the clear

25   inference that you can draw from the circumstances that

Summations - Brafman                    5446

1    surround Aselage at the time he testifies.  This trial is

2    about in part whether or not you find beyond a reasonable

3    doubt that Martin is guilty and then you convict him.  And

4    if you do, it's not just Martin who has to deal with it.

5    Retrophin pops the champagne cork.  They're really legally

6    rid of Martin and they can try and get $65 million too.

7    This is a motive.

8            And then you have something else that you need to

9    focus on.  Sometimes this stuff flies in and you don't have

10   enough time some days to focus on it or even if we have time

11   because the Court has given us all the time we need, we

12   aren't able to develop it because during the

13   cross-examination we're not permitted to argue with the

14   witness, we're permitted to question the witness.  Now is

15   the time you can look at that testimony.

16           So from Aselage's testimony there's questions

17   about who made Retrophin a success.

18           Martin is the one who at the time was the -- was

19   responsible to Thiola being brought into Retrophin?

20           That's correct.

21           What about Chenodal; is that a product?

22           Chenodal is a product, yes, sir.

23           Was that founded during Martin Shkreli's tenure?

24           It was.

25           How about Vecto -- and he said, That came with

Summations - Brafman                    5447

1    Chenodal.

2              So those three products Chenodal, Vecamyl, and

3    Thiola were -- when Martin was running the company?

4              Answer:  That is correct.

5              What about PKAN?

6              PKAN is a disease.  We have a product RE-024 which

7    is used to treat PKAN.  PKAN is an acronym.

8              And then he explained the disease, and it's

9    medical terms and I won't even try to pronounce it.  It's

10   the pantothenate kinase-associated neurodegeneration

11   disease.  PKAN is a childhood disease.  RE-024 is Retrophin.

12             Question:  RE-024 was Brent there when Mr. Shkreli

13   was in charge of Retrophin, correct.

14             Yes.  RE-024 correctly was developed when

15   Mr. Shkreli was CEO.

16             That's his answer.

17             RE-024 correctly was developed when Mr. Shkreli

18   was CEO?

19             Four major pharmaceuticals properties all

20   developed when Martin Shkreli was part of Retrophin.

21   Nothing in the record about what was developed since Martin

22   is out because then Martin started a competing company that

23   Mr. Shkreli -- that Mr. Aselage is aware of.  Martin started

24   a company called Turig which Mr. Aselage is aware of.

25             And he tells you Thiola, listen to this:

Summations - Brafman                     5448

1          Question:  Today Thiola accounts for most of the

2    revenue that Retrophin makes in a year, isn't it true?

3          Answer:  Thiola is our largest, single product.

4          Thiola is Retrophin's largest single product.

5          Why do I stress that?  I stress that because of

6    the next series of questions.  I stress that because he said

7    that if Turig is, in fact, developing a generic equivalent

8    to Thiola it would damage Retrophin substantially.  And when

9    Martin was fired the colloquy was:  I'm going to start a

10   company that competes with you.

11         And if Martin competes with Retrophin, Retrophin

12   could loose substantial part of its value and Martin has the

13   ability according to Aselage to do that because Martin

14   brought on all of these other drugs and at the end of the

15   day he has a very real motive to get Martin convicted.  He

16   gets the lawsuit over with, Martin gets fired legally and he

17   has an opportunity to shut down the science that's going

18   down.

19         Listen to this testimony:

20         Question:  Turig Pharmaceuticals is currently

21   developing a generic equivalent, if you know, to Thiola,

22   isn't that true?

23         I have no idea.

24         Question:  You have no idea?

25         Answer:  Correct.

Summations - Brafman                    5449

1          Question:  If a company has a money-making

2    medicine like Thiola and a competitor produces a generic

3    equivalent that could be made for much less, can that impact

4    on the revenue of Retrophin?

5          Answer:  Sure.

6          Question:  And it could cause substantial harm to

7    Retrophin?

8          Answer:  Sure.

9          Do you understand, ladies and gentlemen, generic

10   equivalent if you go to the pharmacy and if you ask for the

11   brand name they charge you $80.  You get the generic

12   equivalent for $20.  We all understand it happens every day.

13   You're allowed to use your common sense.

14          So if Martin is developing a competitive drug to

15   the largest income producing drug that Aselage tells you is

16   the biggest money maker for Thiola, that's bad.  Aselage and

17   it is bad for Retrophin.  And it gives them an incentive, an

18   incentive just to swing his testimony a little bit.  All he

19   has to say is I don't approve the settlement agreements and

20   the consulting agreements.  And according to the theory of

21   the Government's case, Retrophin is thereby defrauded and

22   Martin should be convicted.

23          That's how simple it is.  Because on balance

24   Aselage's testimony, even though it may have been

25   inadvertent helped Martin because it showed how petty he was

Summations - Brafman                    5450

1    and how close minded he was and how narrow minded he was for

2    the reasons he said that caused him to fire Martin.  So at

3    the end of the day, ladies and gentlemen, you cannot dismiss

4    the bias that is inherent in Aselage's mind-set.  And the

5    Judge will tell you how to treat that if you find it.  And

6    the Judge will tell you again and again in her instructions

7    that good faith by Mr. Shkreli, if you so find it, is a

8    complete defense to the charges.  And the Judge will

9    instruct you how that is defined and what it means and

10   listen to the totality of that charge.

11              (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. BRAFMAN:  (Cont'g.)  Now, I want to just touch

2    on for just a minute the private placement memorandums that

3    you must be sick of and I'm sick of and I'm not going to go

4    through all of them, I'm going to just go through a couple of

5    points because a number of investors suggested to you that

6    what they wanted when they invested was liquidity.  Now, they

7    all parroted that line because at the end of the day that's

8    what they complained about, I didn't have liquidity, I wanted

9    liquidity and because I wanted liquidity and because I thought

10   I was going to have liquidity, since I didn't get liquidity I

11   was defrauded.  No, they weren't.  That's not me saying that,

12   you look at the evidence which they ignored but which you

13   didn't and which they had no right to ignore and in a minute

14   if you read the private placement understanding -- private

15   placement memorandum, you would know without doubt that if

16   you're looking at liquidity, don't invest in this fund.

17          First of all, on the front page, and I'm just using

18   as an example the private placement memorandum dated June 9th,

19   2010 but they all have these similar paragraphs I submit, this

20   one:  An investment in the partnership will involve

21   significant risks.  There is no assurance the partnership will

22   achieve its investment objective or be profitable.

23          So, right off the bat you're ignoring the fact that

24   you're taking a risk, by jumping into this pool you could

25   drown, and if you're not a really good swimmer or you don't

1   have the ability to sustain yourself while treading water

2   until you get your money back, this is not for you.  If you

3   want to put money in an investment where you could then turn

4   around and buy it back or get it back in 15 minutes, this is

5   not for you.  This is a hedge fund and everyone who told you

6   what a hedge fund is told you that a hedge fund is not

7   something that offers liquidity because you're at the

8   discretion of the general partner which in this case is Martin

9   Shkreli.

10          Now, let's talk about express information that if

11   you were David Geller and you didn't brief it but you read it

12   or you were John Neill and you read it, the highlighted

13   portion says:  The limited partnership interest offered hereby

14   are illiquid, they are illiquid, no public market for the

15   limited partnership interest exists and in all probability

16   none will develop.  There are significant restrictions on the

17   transferability of the limited partnership interests.

18          So, you're told two things; first of all, your

19   limited partnership is illiquid, your limited partnership

20   means your money may be tied up, your limited partnership is

21   illiquid and there's no public market for them and there may

22   be no public market.  Well, maybe the government will say,

23   yeah, well, that means my interest in the partnership can't be

24   sold, my interest, I'm a limited partner and unless I find

25   someone who wants to take my limited partnership and they meet

1  the criteria, that's a problem because I may not be able to

2  get my limited partnership back.  And the government will say,

3  well, that doesn't say that the limited partnership is going

4  to invest in restricted securities or illiquid securities.

5  Yes, it does, it does, and if you read the private placement

6  memorandum, you have no right to complain about the lack of

7  liquidity because that's in there, that's what you're buying,

8  that's what you are investing in.

9         Let me show you the paragraph that says that.

10  Alternative investing generally:  The partnership is designed

11  for investors seeking potential long-term growth from

12  alternative investments who do not require regular current

13  income and who can accept a high degree of risk in their

14  investments.

15         So, first let's focus on the word "long-term."  It

16  doesn't say 20 minutes, it doesn't say you get it back anytime

17  you want to, it doesn't say you have a right to get it back

18  anytime you want to.  And then there is a very, very important

19  section which none of the people who failed to read this saw

20  but that's not to be -- Martin is not to be faulted.  Let me

21  take off the Post-It.  It says:  Investments with limited or

22  no liquidity.  The partnership will take significant positions

23  in particular securities which are relatively large as

24  compared to their trading volume or overall market

25  capitalization.  Such stocks often have less liquidity than

1   large capitalization issues.

2          You're being told that some of your investments are

3   going to be used to buy stocks that don't have liquidity or

4   buy investments that don't have liquidity.  That's in the

5   contract you are making with me.  You can't ignore that, not

6   read it and then say to me, whoa, you misled me, that's not

7   fair.  Martin assumes that every investor read this.  He has a

8   right to assume that.  You know why, because you can't get

9   into the investment without filling out a subscription

10  agreement that says:  I verify that I have read the private

11  placement memorandum, I understand it, I have no further

12  questions about it and I'm ready to do this.

13         I am the managing partner.  Why do I have to doubt

14  you when you verify that you've read the private placement

15  memorandum and find out later when I'm on trial that the

16  investor who claims to have been misled never bothered to read

17  what they verified that they read.  That's not fair.

18         I don't want to go back to the explanation I gave

19  you yesterday but when you sign a contract with someone to do

20  something and they do it and then you're not satisfied and

21  they say, well, look at what you agreed to and you read it and

22  you say, well, I wish I had read this when I signed and gave

23  you my money, that's not fair, that's not how business works.

24  If that's how business works, nothing would ever get done.

25         You hire someone to mow the lawn, they give you a

1    piece of paper to sign and it says:  I don't have to mow all

2    of the lawn.  And you look at it and you say, if I had known

3    this, I wouldn't have hired you.

4           Well, read the contract, these are expert investors,

5    they've seen these documents before, documents like this

6    before.  Maybe if one of us got that and we're not used to

7    hedge funds, private placement memorandums and we don't know,

8    we would read it with a fine-tooth comb and call a friend or a

9    lawyer and ask questions.  They didn't even bother to read it.

10          Then there's a section on the valuation of assets,

11   that for those who say, well, I thought he was investing only

12   in shorts and longs which I could look up on the stock market,

13   that's not true.  Paragraph C in this exhibit on page 29 says:

14   Securities with a limited market.  Securities or other

15   investments without an active trading market as hereinafter

16   defined shall be assigned fear value by the general partner.

17          And then they give you the factors he uses and then

18   it says:  Such other factors as the general partner in its

19   sole discretion deems appropriate.

20          You have no right to complain if Martin Shkreli

21   valued Retrophin at $20 million which turns out to be

22   100 percent accurate but it took a little while for it to

23   reach that valuation where you could actually realize the

24   gain.  These people -- this memorandum is telling the people

25   that some of these investments are going to be hard to value

1  and the general partner has the right to value them.  And then

2  they say to you, well, you know, you never told me about

3  Elea Capital and he never told people that Elea Capital was an

4  investment fund that didn't do well.  I don't have to tell you

5  when you hire me, you know, I lost a case 20 years ago.  You

6  want to ask me, ask me, I'll tell you the truth.  Nobody asked

7  him about Elea Capital and it's in the private placement

8  memorandum:  In addition to forming and operating MSMB,

9  Mr. Shkreli is the founder and portfolio manager of Elea

10 Capital Management.  And then it says he went to Intrepid and

11 he was with Cramer Berkowitz.  Well, everybody said to you,

12 when I saw Cramer Berkowitz, man, I was hooked, because Cramer

13 Berkowitz is Jim Cramer from CNBC, the man who runs around

14 that room like a lunatic, but he's brilliant and people follow

15 him and he has one of the highest viewing audiences in the

16 world on investment advice.  Is he a strange man, perhaps, but

17 he's got a following and many, many, many, many times he's

18 right, no guarantees but many times he's right.

19          So, when they saw he worked for Cramer, if they read

20 this, they could be impressed but he didn't hide Elea Capital

21 and there is not one investor who said to you, I asked Martin

22 what happened at Elea and you lied to me.  Not one investor

23 said that.  All they had to do was ask but they didn't read

24 this, but he didn't hide Elea under a rock.  And so what, a

25 prior investment fund 11 years ago doesn't do well, it doesn't

*Summation - Brafman*                                    5457

1   end your life as an investment adviser.  That happens, we lose

2   in a business proposition, we don't pack up our bags and go

3   home; you get fired from a job, you get another job.  Lee

4   Yaffe's father, not Lee Yaffe, his father invested in Elea

5   Capital 11 years ago and invested $100,000 and Martin Shkreli

6   could have said, you know what, Elea Capital is old news, I

7   don't owe you any money, Lee, stop bothering me.  He didn't,

8   he gave him back his father's investment and he gave him back

9   $250,000 more because of the aggravation.  He didn't have to

10  do that.  Yes, Lee Yaffe was a pain in the neck and he chased

11  him and he chased him and Martin said, you know what, I don't

12  want to just have a lawsuit, I've started a new company, he's

13  threatening me, he's bothering me and for the aggravation I'm

14  not giving you 100, I'm giving you 250 and I want you to work

15  for it, I want you to be a consultant, I want you to do

16  something for the bonus that I'm giving you.

17          Then they said throughout this trial over and over

18  and over again Martin told people that he graduated from

19  Columbia.  No, he didn't.  Who told you that who's believable?

20  And if you see that when he puts down in writing his

21  background, this is Government Exhibit 122-64, Bates stamp

22  11963:  Mr. Shkreli received his BBA from Baruch College,

23  which we all know is a portion of CCNY, not Columbia

24  University.  So, whatever is in writing says CCNY, Baruch

25  College.  He never told anybody that he graduated from

1    Columbia.  Why would you do that?  You think he needs to tell

2    an investor that he went to Columbia so that they would invest

3    with him.  Who told you that that was a very, very significant

4    factor in my decision?  Darren Blanton would care that he

5    graduated from Columbia?  Darren Blanton told you he invested

6    in Martin because Martin made him a ton of money.

7            Let me focus for a minute on Count Seven.  The

8    government alleges in Count Seven that Mr. Shkreli together

9    with others conspired to defraud Retrophin by causing it to

10   transfer Retrophin shares to MSMB Capital even though MSMB

11   Capital never invested in Retrophin.

12           Retrophin wasn't defrauded.  Retrophin was not

13   defrauded under the theory of Count Seven.  You know why,

14   because those shares came as follows:  Please write this down

15   if you're taking notes or please listen carefully because this

16   is important, because the government is just trying, I submit,

17   to stroke you into believing that this was a conspiracy.

18           The Retrophin shares were as follows:  Kevin

19   Mulleady, who didn't testify, transferred 10,000 shares to

20   Martin Shkreli.  That's in the evidence, in the documents.

21   Marek Biestek transferred 4,167 shares to Martin Shkreli.  Tom

22   Fernandez transferred 50,000 shares to Martin Shkreli.  Martin

23   Shkreli took these 64,127 shares and then transferred 10,000

24   of his own shares to Retrophin -- from Retrophin to MSMB

25   Capital.  These shares are not coming out of the treasury of

Summation - Brafman                          5459

1    Retrophin.  They're coming out of Mulleady, Biestek, Fernandez

2    and Shkreli and he transferred them to MSMB Capital.  Why is

3    the founder of a company not permitted to do that.  He is not

4    trying to conspire to steal from Retrophin.  These shares were

5    given to him by these people and he gave part of his own

6    shares and he invested them into -- and he gave them to MSMB

7    Capital.  He deposited them into MSMB Capital.  He did not

8    take Retrophin shares to create this interest by MSMB Capital.

9    Retrophin was never in possession of these shares at the time

10   he did it because they had already gone out to these other

11   people.  Retrophin was not defrauded when MSMB Capital

12   interest in Retrophin was created.  These agreements were

13   executed by consenting adults.  When these agreements were

14   made Retrophin was not yet even a public company.  Please

15   remember that, when these transfers were made Retrophin was

16   not yet even a public company.  It's my company, I am the

17   founder of this company, I have people, none of who testified,

18   Mulleady, Biestek, Fernandez, Martin, I gave them these shares

19   to incentivize them to work.  Well, because they worked, and

20   when I wanted to put money into MSMB, I had a right to do it,

21   I wanted to do it, I asked them to give me shares.

22           They're not taken from Retrophin.  There is no fraud

23   by Retrophin.  There is no crime in that theory under Count

24   Seven and you cannot convict him of Count Seven because it's a

25   theory, that's what it is, it's a theory.

1              And when you think about whether the releases that

2    are signed by people when they get their settlement agreements

3    and they sign a release, because in return for the settlement

4    agreements they agree to release Retrophin and MSMB and MSMB

5    Healthcare and Martin Shkreli and he openly signs on behalf of

6    all of them, you've seen those documents, there's no attempt

7    to hide what's going on.

8              What happens soon after the releases are signed.

9    Five months after the last settlement agreement Retrophin is

10   listed on NASDAQ.  You think Retrophin would have listed on

11   NASDAQ if there were eight, ten, five, four major lawsuits

12   filed by people who claim to have been defrauded by Martin

13   Shkreli.  Everybody benefits by the settlement agreements,

14   especially Retrophin, because five months after the last

15   agreement is signed Retrophin becomes a public company and you

16   cannot ignore that fact.  If the claim is that I defrauded

17   Retrophin, it's just not true from the evidence, I submit.

18             Yesterday in her summation on a number of occasions

19   Ms. Smith, and perhaps it was just a mistake, I'm not

20   suggesting that she tried to mislead you, over and over and

21   over again she told you that the employees of Retrophin are

22   affiliates under the law and as affiliates under the law, they

23   need to be treated as affiliates.  That's not accurate.  Her

24   Honor will tell you under Rule 144, I submit, affiliates don't

25   include employees.  Affiliates include officers and directors

1   but they don't include garden variety employees.  If I want to

2   give a garden variety employee a share or shares to

3   incentivize them to stay with the company because the company

4   now needs you more than ever, when the company becomes public

5   suddenly there's so much work to be done, and I give you these

6   shares, if you're an employee, that's not an illegal affiliate

7   where I am not allowed to do that.  And you listen to the

8   Court's instructions and I promise you you will hear some

9   clarification.

10          Now, let's talk about Count Eight just for a minute.

11   Count Eight has two types of conduct that the government says

12   they are using to show that Martin controlled the shares and

13   to corroborate that theory they say there was an agreement by

14   the Fearnow recipients to allow Martin to control these

15   shares.

16          Well, here are the Fearnow recipients, ladies and

17   gentlemen (indicating.)  So, let's first state the obvious,

18   you have seven people who are alleged to be part of this

19   conspiracy.  The only person called by the government to

20   establish this theory is Timothy Pierotti and I think in the

21   cross-examination he was dealt with effectively and I think if

22   you read his cross-examination, you will see that he is not

23   believable (A), he stole $1.5 million from Martin Shkreli

24   which prompted Martin Shkreli to write that letter to his wife

25   and even though it may be bad form to write a letter to

*Summation - Brafman*                                          5462

1   someone's wife, you could understand the betrayal.  When he

2   was poor and he came to Martin before selling his wife's

3   jewelry Martin gave him $5,000.  He didn't have to give him

4   $5,000.  He could have said, I can't afford to give you money,

5   I'm building a company, I'm sleeping in the office.  That

6   shows you the kind side of this person who everybody describes

7   differently.  They don't say, by the way, he also has a sweet

8   spot for people in need.  They don't tell you that Caroline

9   Stewart couldn't get a job, a divorcée with two children,

10  bouncing around, went to Germany to get a job, she told you,

11  came back, went on interview after interview after interview

12  and after three dinner dates with Martin Shkreli he gave her a

13  job because he felt sorry for her.  That nobody focuses on.

14         So, when Pierotti steals, in Martin's mind, he's

15  angry, he writes emails, he tells him come back, you've got to

16  work, you can't just take the money and run, and that's what

17  he tells his wife, your husband wants the money but he doesn't

18  want to work.  Imagine I give you a million and a half dollars

19  and then you walk out and you never come back to work.  That

20  money was so you should work, so you should stay.

21         So, they say to you, well, this shows that Martin

22  was trying to control the shares.  They're wrong, ladies and

23  gentlemen.  The bar graphs that they showed you for a second,

24  there were hundreds of slides which came up on the screen,

25  one, two, three slides gone, one, two, three slides gone.

1   Nobody here, I submit, and I'm not being disrespectful because

2   I include myself in that group, you can't remember those

3   slides, in a minute they're here, in a minute they're gone.

4   You say what you want, the jury doesn't see it for more than a

5   second and what are you supposed to do, you can't ask for the

6   summation to be re-read.  She gave you I think 350 exhibit

7   numbers in her summation.  You can ask for those exhibits but

8   you can't ask for the summations to be read.  And when you see

9   those slides quickly and the government lawyer says to you

10  that's what they mean, well, maybe you can conclude that's

11  what they mean but, you know what, on some of this stuff she

12  was wrong.

13         The bar graphs that they showed you are volume from

14  November '12 to February 2013, they use that period of time

15  because it reflects trading that is happening after the

16  reverse merger up through the time the pipe closes.  But the

17  actual records show that during that time there were 3,243

18  trades, meaning 3,243 times there were buys and sells and

19  shorts, and of those trades, 132 involve Fearnow shape

20  recipients, 132 out of 3,243 people, and 81 of the 132 trades

21  are people selling, people selling.

22         If the theory is Martin wanted them to buy to pump

23  up the share, then somebody didn't get the memo.  Pierotti is

24  selling his shares, Vainio is selling his shares.  These

25  distributions were meant to incentivize these people, not as

1   part of a conspiracy to control them.  It was during a period

2   when Retrophin was treading water.  You are the CEO, you want

3   people to buy your stock.  That's not market manipulation.

4   You want people to see that there is activity in the stock but

5   these people are selling, half of them are selling.  That's

6   not the program the government describes.

7           And there are 3,100 people out there who have

8   nothing to do with Mr. Shkreli who are buying and selling

9   because the company is starting with traction, the company is

10  getting pipe financing.  The company is getting financing

11  that's being advertised in press releases, all appropriate.

12  You get those -- those of you who are in the market or those

13  of you who listen to just the news where they give you the

14  reports every twenty -- at 10:56 and 9:56 every day, they talk

15  to you about earnings reports, they talk to you about things

16  companies are doing, company announcements.  Yesterday

17  Facebook made an announcement, their earnings were great, the

18  stock rose $5 a share, not an illegal announcement, part of

19  the ordinary course of advising people where the stock is up

20  to.  So, there is no theory here, there is no theory.

21          The government introduced that part of the

22  recipients are Lindsay Rosenwald and Kocher of these shares.

23  Lindsay Rosenwald and Kocher are threatening to sue Retrophin.

24  Retrophin doesn't want a lawsuit when they're announcing

25  financing, when the stock is starting to gain traction so they

1   settle with them, it's a business decision, it's a business

2   decision, it's not a fraud.  And the pipe investors, the

3   people who put up to $10 million, you have a duty to them not

4   to watch the company tank because of frivolous lawsuits.

5           There is no crime in Count Seven or Eight.

6   Retrophin was not defrauded.  Martin would not defraud

7   Retrophin when he is the largest shareholder in Retrophin,

8   (A), (B) this is the company he slaved to create.  He has no

9   interest in defrauding the company he created.  Why would he

10  do that to his own company.

11          And there is no backdating.  No one has testified to

12  the backdating except Jackson Su and Massella didn't

13  understand it and Massella told you, when I saw this document

14  I thought Martin Shkreli signed it.  Well, I'll put it up one

15  more time because this is very, very important, and if

16  Mr. Agnifilo had not cross-examined Jackson Su, you would go

17  away with the mistaken understanding that Martin Shkreli

18  signed it.

19          And the date is 11/29/12 and you read Jackson Su's

20  testimony, Jackson Su said to you:  I put the date down.  And

21  Mr. Agnifilo correctly said:  Why did you put the date down?

22  Because it wasn't dated.  He said:  Well, who told you to put

23  it down?  Nobody.  So, why did you put the date down?  Because

24  it wasn't dated so I put the date down.  That's his testimony

25  and whatever the government says to you on rebuttal or

1   whatever the government tries to argue, you can't get away

2   from the fact that Jackson Su, who claimed not to be involved

3   in any of the fraud, put the date down not because Martin told

4   him this is important because I'm backdating an agreement or

5   I'm backdating something which I need to backdate, he put it

6   down because he's a busybody.  He involves himself in stuff

7   that he has no business being involved in.

8             He has a whistle-blower lawsuit pending against

9   Retrophin.  He goes to the SEC and he says, you guys should

10  look at Retrophin, there's fraud stuff going on there.  And

11  what does he do, he goes back to work, sort of like secret

12  agent man, he's working there but he's already made his bed

13  with the SEC.  So, he's working there while he claims there's

14  a fraud and what's he doing, he's helping the company that he

15  claims is working as a fraud.  That's not the way a whistle-

16  blower is supposed to work.  You want to complain about a

17  company that's involved in fraud, you don't go back to work

18  there and secretly help the executive officer who you claim is

19  doing the fraud.  It's stupid and it's disingenuous and it's

20  wrong and Jackson Su not only goes back there, he steals

21  materials.  He tells you he took Martin Shkreli's personal

22  bank accounts and has them in his house.  What right does he

23  have to do that, and you know what his answer was:  I didn't

24  see a sufficient bank balance in Martin's records to comport

25  with that of a chief executive officer of a company like

1   Retrophin.

2         What does that mean?  He, among others, knows Martin

3   is sleeping in the office, you can't work there without seeing

4   Martin in the morning fast asleep when you get to work.

5   Caroline Stewart said she noticed Martin slept in the office.

6   Steve Richardson said he knew Martin was sleeping in the

7   office.  Martin wasn't hiding in a closet, he was lying on the

8   floor, it is one room or one and a half rooms.

9         And Jackson Su tells you under oath -- sometimes,

10  you know, you're stunned when you hear something because not

11  only do you know from the cross-examination you're about to do

12  that it's wrong but it doesn't sound like it's an intelligent

13  observation, and Jackson Su tells you he's a smart guy,

14  remember him, Asian-American, a young man, couldn't remember

15  if he was arrested in Syracuse, sat there, told you:  I looked

16  at Martin Shkreli's bank records and I did not believe that he

17  had enough money to be a successful hedge fund manager.  You

18  know why, because he wasn't doing this to become rich and for

19  two years he wasn't rich and for two years he didn't have

20  money in his bank.  You should applaud him for that, not

21  condemn him for that.  So, Jackson Su said something's wrong,

22  man, Martin Shkreli has got nothing in his bank account and

23  he's the head of a hedge fund.

24        Now, I want to go back just one second to the

25  Pierotti letter.  Pierotti is another wonderful man who is

*Summation - Brafman*                                          5468

1   working there, got the over-the-wall email, deleted it and

2   then went out and started to sell Retrophin stock.  If he read

3   the over-the-wall email, he would know that he's not supposed

4   to do that.  So, instead of reading it, he knew what it was

5   going to say, so he deleted it so then he could say, well, I

6   didn't read it so I'm okay.  And he's selling Retrophin stock

7   and he's selling a lot of Retrophin stock and he's doing it to

8   make money and you know how we know that, because at some

9   point from the letter that the government put into evidence, I

10  won't put it on the board, I'll just read you this section,

11  he's writing to his wife, Martin is writing to Pierotti's wife

12  after Martin refuses to give back the money:

13           When Tim informed my partner Marek that he was

14  "going to sell his wife's jewelry to pay for their mortgage" I

15  immediately summoned Tim to our office and gave him a personal

16  check for $5,000.  Tim promptly deposited that that day.  Tim

17  likes taking my money and doing nothing for it.  I told him

18  that if he ever needed funds he could rely on me to provide

19  them for him provided that he worked hard of course.  Tim

20  doesn't like that part.

21           He's a bad guy, Mr. Shkreli?  I come to you and I

22  say I'm going to sell my wife's jewelry if I can't pay my

23  mortgage and I say to you, you know what, Tim, you know,

24  Jackson Su knows I don't have any money but I'm going to give

25  you $5,000 anyway and I give you $5,000.

1            And during the trial the government showed a
2      transfer from Mr. Shkreli, once every couple of months he took
3      some money, a transfer of $10,000 and $5,000 of that money
4      went to Tim Pierotti.  He's a bad guy?  He's operating with a
5      venal corrupt heart?  Is he trying to bribe Tim Pierotti or is
6      he trying to help him?
7            So, there's a sense of betrayal that I think jumps
8      off of Pierotti's letter.  It's not just I want to aggravate
9      his wife, I want her to know what he did to me, I'm upset, I'm
10     angry, and maybe Martin shouldn't have written the letter and
11     if he had conferred with counsel before he wrote the letter,
12     chances are he wouldn't have written the letter but think of
13     it yourself, someone who you helped, someone who you were good
14     to stabs you in the heart, leaves with your money and your
15     stock and never comes back to work, that's not nice.  Maybe
16     it's not illegal but it's not nice.
17           So, the letter is not nice and leaving Martin is not
18     nice after you cry to him for money but at the end of the day
19     this is not about nice, this is about proof beyond a
20     reasonable doubt that you are guilty.
21           Amy Merrill from Standard Registrar, she gave you a
22     bunch of lists.  Let me focus you on one list, one list.
23     Brent Saunders got 343,000 shares, Robert Bertolini got
24     130,000 shares, Tom Koestler got 109,000 shares, Ken Banta got
25     101,000 shares.  That's in evidence, ladies and gentlemen.

1  Who are those people?  The four people who make up the

2  universe that surround Fred Hassan his whole life, all of

3  these people are major players in Retrophin but Fred Hassan,

4  despite that email we saw yesterday, tells you, nah, I don't

5  remember, I never heard about Retrophin, my daughter made

6  $1.8 million but I never heard about Retrophin.  It's a lie,

7  ladies and gentlemen.

8          Let's talk about Evan Greebel.  Evan Greebel is the

9  lawyer for Martin and Retrophin and MSMB and MSMB Capital from

10  the day one to day at the end.  Mr. Marshall, the witness from

11  Texas, told you that he was a lawyer and he knows the firm

12  that Evan is a partner in and it's one of the most respected

13  firms and Evan is a respected lawyer and he says to you, that

14  gave me comfort that the agreement was okay, I took comfort in

15  the knowledge that Martin was represented by a real lawyer in

16  a real law firm.  Why isn't that something that Martin could

17  take comfort in.  When you listen to the Court's reliance on

18  counsel charge, you will conclude that as to Count Seven and

19  Eight, Martin has a valid reliance on counsel defense.  It

20  doesn't end the discussion but you have to factor that into

21  the equation.

22          Remember, Marshall who told you this was himself a

23  substantial litigator for many, many years.

24          Let me show you how many other people who said that,

25  ladies and gentlemen.  Marshall, of course, page 2513:

1           "And that also gave you some comfort because you

2    knew the firm, Katten, to be a very well respected law firm?"

3           "Answer:  That's right."

4           Massella, Massella introduced Greebel, Massella is

5    the son-in-law of Citrin Cooperman, the accounting firm that

6    refers Martin to Evan Greebel and Evan Greebel starts working

7    as a result of the Massella introduction.

8           "And at one point Evan Greebel essentially put you

9    in touch with Martin Shkreli?"

10          "Well, he and the partner at Marcum."

11          Marcum, Marcum that did the evaluations, they

12   weren't called as witnesses by the government.

13          Massella:  "And you knew that he and other lawyers

14   at Katten were working with Shkreli during the reverse merger

15   process?"

16          "Answer:  Yes."

17          "And in regard to the preparation of the super 8K,

18   you knew Evan Greebel was involved in that, correct?"

19          Aselage:  "Did you tell the government that when --

20   that while you knew that Greebel backed up Shkreli it meant a

21   lot to you because he was an independent counsel from an

22   outside firm that you knew at the time?

23          "Answer:  That is correct."

24          "Question:  The outside firm Katten Muchin?"

25          "Answer:  Correct."

1          "You knew at the time that was a fairly respected

2    law firm in New York City?"

3          "Answer:  I didn't personally know them, I was told

4    they had a good reputation."

5          David Geller:  "You testified that you came to learn

6    Mr. Greebel was involved on behalf of Retrophin in the

7    negotiations with you and the terms are finalized in your

8    agreement?"

9          "Answer:  Correct."

10         "You recognized him as a lawyer who was working for

11   Retrophin?"

12         "Answer:  Retrophin, MSMB, yes."

13         "Question:  And I think it would be fair to say that

14   you told the government that you were comforted by the fact

15   that Evan Greebel was from a big firm?

16         "Answer:  Yes."

17         "Question:  And that helped calm you to believe that

18   you would ultimately be repaid, correct?"

19         "Answer:  I didn't know if I would be ultimately

20   repaid but it helped calm me."

21         Why can that fact calm the investors into believing

22   that these agreements were legal when many of them had their

23   own lawyers working on these agreements as well and yet, if

24   Martin Shkreli has Evan Greebel as a lawyer, even if he fights

25   with him on occasion, the government said, oh, Evan Greebel is

Summation - Brafman                                          5473

1   a bad guy, Martin Shkreli has no right to rely on him.  This

2   was during the period when everybody was relying on Evan's

3   skill.  And Sara Hassan had her own lawyer, when she got the

4   PPM she had a guy named Levy who reviewed the PPM with her;

5   when she got her agreement, she had a Mr. Kornreich from a law

6   firm Proskauer, who she says was a prominent law firm,

7   reviewed the agreement with her.  Richard Kocher had a lawyer

8   who reviewed the agreement with him.

9          Richardson:  "Now, you talked a lot on your direct

10  about Evan Greebel."

11          "Answer:  Yes."

12          "Evan Greebel is a partner at Katten?"

13          "Yes, which was our external counsel."

14          "Question:  You said he's external counsel but he

15  was present for the board meetings?"

16          "Yes."

17          Further down:  "And he also was someone that was a

18  great amount of email traffic that would go on with Retrophin?

19          "Answer:  Yes, he was copied on virtually

20  everything."

21          Evan Greebel was copied on virtually everything,

22  according to Richardson.

23          "And was he involved in the capitalization tables?"

24          "Answer:  Yes."

25          "Was he involved in the information that was given

1   to board members in preparation for the meetings?"

2               "Answer:  Yes."

3               "Did Martin refer legal questions to Evan, in your

4   experience?"

5               "I certainly saw a few referrals, yes.

6               "Either through email or in conversations with

7   Martin, would Martin say to you:  I need to run this past

8   Evan?"

9               "I think on one or two specific instances he

10  probably did."

11              "Well, certainly again in terms of my own -- my

12  own -- Richardson -- topping up off my own stock, that was one

13  area that he said I had to get back to Evan on.

14              "Question:  Because he wanted to be appropriate,

15  correct?"

16              "Answer:  Yes."

17              Investor after investor and even Richardson, when I

18  started this case, it seems like a long time ago, but one of

19  the things I said to you was the statement that maybe doesn't

20  cut it in a criminal case, you need proof beyond a reasonable

21  doubt, so let me tell you what the maybe-s we have.

22              Maybe Martin could have been more responsive to the

23  needy investors who griped about not getting their calls or

24  emails answered more promptly.

25              Maybe because of the way his mind operates at warped

1   speed he was doing too many things at the same time and some

2   of the investors were losing patience.

3           Maybe Martin had a right to believe that everything

4   Greebel did was legal and proper because, like the investors,

5   he saw him as a top lawyer from a top firm.

6           Maybe Martin had a right to rely on lawyers

7   representing the investors as Sara Hassan, for example, and

8   Lindsay Rosenwald and Darren Blanton, they all had lawyers

9   negotiating these agreements that the government now says are

10  frauds.  Well, if they say Evan is not real so that's why he

11  negotiated them, what about the lawyers on the other side, why

12  were they advising their clients that this was okay.  So,

13  maybe, maybe, maybe all of those lawyers are just corrupt or

14  maybe they're not and maybe by vetting these agreements they

15  were implying and saying and suggesting that they were

16  perfectly legal.

17          Maybe Martin did not need board approval for

18  consulting agreements or maybe he believed he had board

19  approval because Marc Panoff, the company CFO, who did not

20  testify, sent them to Richardson and Aselage before board

21  meetings and those agreements are referenced in SEC filings

22  signed by them, so maybe Martin had a right to assume that

23  there was nothing wrong with these agreements.

24          Maybe Mulleady and Brent Saunders told investors the

25  truth or exaggerated to them or lied to them but neither of

*Summation - Brafman*                                              5476

1   them has been called as a witness, neither of them has been

2   called as a witness and it was they who encouraged the

3   investors to invest.  Why?  Because they were making a fortune

4   on Martin's stock tips and that's in the record.

5           Maybe Kevin Mulleady and Brent Saunders got so many

6   shares of Retrophin stock because they were instrumental in

7   Retrophin getting so much investor money.

8           Maybe Martin honestly believed that the assets under

9   management was $35 million because he included and had a good

10  faith basis to include the $30 million that he put into

11  Chelsea Pharmaceuticals for Josiah Austin.  And just remember

12  that's not a figment of anyone's imagination because when I

13  cross-examined Lee Yaffe, Lee Yaffe told you he knew Austin,

14  he knows Austin was investing with Leerink Swann and Lee Yaffe

15  told you that he believed that Martin was running, that's the

16  words he used, was running Josiah Austin's money.

17          If Martin had a good faith basis to believe that he

18  was running Josiah Austin's money, then Martin is not lying

19  when he says, "I have assets under management."  What

20  definition of assets under management have you been given in

21  this case?  You will not be given any.  It's a word, it's a

22  term of art, but if I say to you I am running your money and

23  therefore I am including it in my assets under management,

24  maybe I have a good faith basis to believe that.

25          Maybe the reason all the investors and Aselage and

1   Richardson commented on the defendant as being somewhat

2   unstable or strange or Rain Man or depressed or suffering from

3   anxiety is because they saw Martin's mind work differently and

4   I submit that you may consider their comments when you focus

5   on the question of intent or good faith.

6           Maybe Martin had the concept of Retrophin in his

7   mind before he discussed it with others or do you think he got

8   up one morning and just formed a pharmaceutical company.  You

9   saw how many people have to be involved in just making a bag

10  of potato chips, think about starting a pharmaceutical company

11  to treat diseases that no one else is treating.  You don't

12  wake up one morning and say I'm going to do this.  It takes

13  planning in your mind, it takes effort, it takes 24/7 for two

14  years.

15          Maybe the government's bank charts are worthless

16  because all they show are bank balances and they completely

17  ignore the value of Retrophin stock that Martin puts into the

18  equation.  They cannot ignore that.  It's the whole case,

19  ladies and gentlemen.  Why do the values go up, because

20  Retrophin is going up, otherwise the values would drop or they

21  would disappear completely.  When Martin tells you you have

22  $139,000 in value in your account, he is factoring into the

23  equation your pro rata share of Retrophin that he then gives

24  you.  Why do people get shares like 35,714, why are those

25  strange numbers, because in Martin's mind that's the fair

1   amount when you factor in the pro rata value of Retrophin.

2   You can't just ignore that.  He didn't make these numbers up

3   and today the numbers are all good.  Even a genius who's a

4   visionary, it's hard to imagine that you could predict that

5   two years later everything I said would be 100 percent

6   accurate and all of the people would not only get their money

7   back but would get their money back with an amazing profit.

8   Some of these investors said to you, this is the greatest

9   investment I ever made, I have never had this kind of return.

10  David Geller told you that.  John Neill told you that in words

11  or substance.  And Darren Blanton, he turned a million into

12  five million and he's still sitting on hundreds of thousands

13  of shares of Retrophin.

14          Maybe every statement the government claims is a lie

15  or is false is in Martin's mind true and when said by him, he

16  had a good faith basis to believe because, according to

17  Aselage, Aselage said to you, I really think when Martin says

18  something he believes it.  If Martin believes it when he says

19  it, then on the defense of good faith you must acquit him.

20          You know, something happened in this courtroom and

21  I'm going to be finished in ten minutes and I'm going to ask

22  the Court for a break but I need to finish before we break so

23  please bear with me, you know what happened in this courtroom

24  at times wasn't fair, you know if someone walked into this --

25  this is a beautiful courtroom, if you look around, it's really

1   stunning in terms of its design, marble and wood and polished

2   woods and screens and electronic equipment, it really is state

3   of the art and very handsomely made.  It's nice, it's

4   impressive, it should be that way for the United States court.

5   But imagine someone coming in here and throwing a pizza

6   against the back of the marble splashboard, the pizza would

7   fall off but there would be a terrible mess, the toppings

8   would stick there, the cheese and the sauce, and it would

9   leave a terrible stain and then when anyone came into the

10  courtroom, the first thing they would say is not what a nice

11  courtroom, they would say what is that crap on the wall, it

12  looks terrible and it would change the whole impression of

13  what this courtroom is and how it looks like.

14          They did that to Martin Shkreli, every day you got a

15  limiting instruction from the Judge, you can't regard this,

16  you can't regard that, this is stricken, that is stricken,

17  every day we had a limiting instruction properly given to you

18  by Judge Matsumoto when evidence was put into the record that

19  had no business in the record and was prejudicial to Martin.

20  I'm not going to go through reading them, it probably wouldn't

21  be appropriate, but you got a limiting instruction, thank you,

22  Judge Matsumoto, every day to caution you that there are

23  charges in this case and stuff that isn't charged is not

24  something you can use to convict Martin Shkreli.  Throw the

25  pizza toppings at Martin.  Even if it's withdrawn, even if

1   it's removed, some of the stuff sticks and then maybe you look

2   at Martin in a different way, maybe the presumption of

3   innocence suddenly gets darkened and stained and maybe for a

4   minute you stop thinking of him as presumed to be innocent and

5   instead you say incorrectly, in violation of the rules and

6   your oath that Martin is not presumed innocent, look at all

7   the stuff that they're throwing at him.  So, thank God you

8   have an impartial judge who tells you hit the erase button,

9   who tells you that part is stricken, who tells you again and

10  again and again, you've written them down or you've listened

11  to me, you know I'm being accurate.  That's not right.

12          So, Martin Shkreli didn't testify and Her Honor will

13  instruct you that a defendant never has the obligation to

14  testify and that it is something that you cannot use against

15  him and you cannot even draw any inference from it and you may

16  not even discuss that fact in the jury room because that's the

17  way it is in every criminal case, the government always has

18  the burden of proof and a defendant doesn't have to call any

19  witnesses and a defendant doesn't have to offer a defense

20  because if they fail to prove him guilty beyond a reasonable

21  doubt, you must find him not guilty and you cannot use the

22  fact and you know what, that rule is in every single case but

23  in particular in this case what a wonderful rule, thank God

24  for that rule, because if all of the people are right about

25  Martin Shkreli, if all of the people who commented on his

1    mindset or his ability or his depression or his anxiety or his

2    mental stability are right, then this rule is needed to

3    protect someone like Martin Shkreli.  He doesn't have to

4    testify, he doesn't have to prove that he is innocent.  Nobody

5    normal, completely normal has to testify and certainly if

6    people say you're Rain Man or you're unstable or you're

7    depressed or you're taking medication, God help us if you have

8    to prove your innocence rather than they have to prove you

9    being guilty.

10            Look at the lists of the documents, all of the money

11   that's in this case and look at it and you will find that

12   little, if any money goes to Martin Shkreli during the period

13   in question and the judge will tell you that the fact that

14   someone did not profit from a fraudulent scheme is not

15   dispositive but it's a factor you can consider.

16            (Continued on next page.)

17

18

19

20

21

22

23

24

25

Summations - Brafman                    5482

1          MR. BRAFMAN (Cont'g):  Why is he doing this?  Most
2   people commit fraud to become rich or steal money or live a
3   good lifestyle, that's the way it normally is.  Ladies and
4   gentlemen, there is nothing normal about how Martin Shkreli
5   did this, confined to a room.  The Government -- the Judge
6   will tell you, the Government will tell you -- the Judge will
7   soon give you instructions and the Judge will tell you that
8   you cannot allow anything the media said or printed or wrote
9   or filmed, you're not allowed to use that in anyway.  You
10  promised us when you were chosen you would not use anything
11  out of the courtroom.  We trusted you.  Hundreds were excused
12  because they said, I can't be fair.  You said you could be
13  fair.  Every one of you swore to that.  I'm calling you on
14  that.  My client trusted you.  I trusted you.  We all trusted
15  you, both sides and the Judge.  You are the exclusive judges
16  of the facts.
17          The Government can't tell what you facts you must
18  use.  I can't tell you what facts you must use.  I can only
19  suggest to you what you should do with certain facts.  Not
20  even the Judge can tell you what specific facts you should
21  credit or not credit.
22          Proof beyond a reasonable doubt is proof that a
23  reasonable person would not hesitate to rely on in an
24  important decision in your life, that's what the judge will
25  tell you in substance.  And her definition controls, so I'm

Summations - Brafman                          5483

1   shortening.  I'm shortening it, but I'm not distorting it.

2   Reasonable doubt is a doubt in which a reasonable person can

3   say this would cause me to hesitate an important decision in

4   my life.

5           Would you rely on Mr. Yaffe's testimony in an

6   important decision in your life?  Or would you say, you know

7   what, he admitted lying so many times I can't believe him, I

8   can't go to bed thinking he is telling the truth.  He has a

9   reason now to hurt Shkreli, so he's not prosecuted for all the

10  things he said.

11          David Geller said, I didn't read anything, I briefed

12  them.  I listened to Al, who made a fortune.  Can you rely on

13  that testimony beyond a reasonable doubt to convict him?

14          The Court will tell you that the presumption of

15  innocence alone, unless overcome, is sufficient to acquit

16  Mr. Shkreli.  And the Judge will tell that you the burden of

17  proof never shifts to the defendant, who doesn't have to call

18  any witnesses.  And that if the Government fails to prove

19  every element of a charge beyond a reasonable doubt you must

20  find Mr. Shkreli not guilty.  And when you get to reasonable

21  doubt, the Judge will tell you it's a doubt that a reasonable

22  person, after weighing all of the evidence, is a doubt that

23  would cause you to hesitate.  Proof beyond a reasonable doubt,

24  means that you would not hesitate to act on that proof.  This

25  case has so many reasonable doubts you must hesitate.  You

Summations - Brafman                              5484

1    must hesitate.

2            Because the defendant is presumed innocent the

3    defendant has a defense of good faith, which they must

4    disprove beyond a reasonable doubt.  And they cannot do that.

5    They have not done it, and they can't do it with any further

6    argument that you may hear.

7            And if there is bias, if a witness has a bias, you

8    may consider that, you may consider that.

9            There is a special instruction with respect to

10   Mr. Yaffe.  He has a non-prosecution agreement because he's

11   aligned himself in that regard with the Government.  The Judge

12   will tell you the testimony of a witness who has been promised

13   that he will not be prosecuted should be examined by you with

14   greater care than the testimony of an ordinary witness.  You

15   should scrutinize it closely to determine whether or not it is

16   colored in a way as to place guilt upon the defendant in order

17   to further the witness's own interests.  You have to

18   scrutinize Mr. Yaffe's testimony more than you would anybody

19   else's in this case.  If you scrutinize it normally, you have

20   to kick it to the curb if you read all the testimony.  But the

21   Judge will tell you, you have to scrutinize it more carefully.

22   And if you scrutinize it more carefully, ladies and gentlemen,

23   you can't accept it.

24           The Judge will tell that you when someone acts

25   willfully, it's unlawful with an intent to do something the

Summations - Brafman                    5485

1  law forbids, that is to say with a bad purpose, to disobey or

2  disregard the law.  What bad purpose?  What bad purpose have

3  they demonstrated with respect to Martin Shkreli?  Did he look

4  to profit?  No.  Did he look to become a big shot?  No.  He

5  wanted to find a cure, and he did it.  That's not a bad

6  purpose; that's a good purpose.

7          You must next determine, the Judge will tell you, or

8  we'll tell you, that the fact that someone misstated something

9  that was material, there is a substantial likelihood that a

10 reasonable investor would find the misrepresentation important

11 in making the investment decision.  Not every lie is material

12 even if it's a lie.  It has to determine whether they are

13 going to be interested in doing the investment or not.

14         They didn't read the private placement, what Kevin

15 Mulleady told them, or what Alan Geller told them, or what

16 somebody else told them does doesn't matter.  If you had find

17 the defendant profited from the alleged scheme you may

18 consider that in relation to intent.  There is no profit.  So

19 when you consider that on the question of intent, we win on

20 that argument.

21         The Judge will tell you that you must use common

22 sense in deciding whether a defendant possessed or lacked

23 intent to defraud, do not limit yourself to what the defendant

24 said.  You also look at what he did and what others did in

25 relation to the defendant and in general everything that

Summations - Brafman                    5486

1  occurred.  Well, what the defendant did is build a company

2  that now is finding drugs and cures, and his work is good.  It

3  wasn't with a bad intent, ladies and gentlemen.

4         The Judge will tell you that on wire fraud, the loss

5  of right to control your assets only constitute deprivation of

6  money or property if the scheme could cause or did cause

7  tangible economic harm to the victim.  So the Government might

8  say, well, you know Sarah Hassan had to wait a year before she

9  could spend her $20 million trust fund.  She got her money

10 then waited two years before selling the stock.  Blanton still

11 has the stock.  McNeil still has the stock.  Other witnesses

12 waited months after they got their money hoping it would rise

13 so they would make more money.  They weren't caused economic

14 harm.

15        The Judge will charge you on good faith.  The

16 standard on good faith is the Government must disprove, the

17 Government must disprove the defendant's good faith beyond a

18 reasonable doubt.  I don't have to prove he acted in good

19 faith.  I can say it.  We can argue it.  But they have to

20 disprove that he acted in good faith.

21        With respect to wire fraud the Judge will tell you

22 that an intent to defraud for the purposes of wire fraud means

23 to act knowingly with specific intent to deceive for the

24 purpose of causing financial loss or property loss to another.

25 To be guilty of wire fraud you have to do it with intent to

Summations - Brafman                    5487

1   cause specific loss, financial loss.  Who lost anything?

2   Nobody.  If they say to you, well, I lost the right to use my

3   money in the way I wanted to use if for a couple of months

4   while Martin was ignoring my e-mails.  I ask you to consider

5   that he ignored the e-mails because he was building Retrophin.

6   I ask you to consider what these people had, what these people

7   invested, and what these people did after they got their money

8   back.

9            I'm done.  I'm exhausted.  I'm tired.  But I'm

10  pleased.

11           I'm pleased because I take by looking at you I hope

12  all of you or at least some you understood that what I was

13  saying is not just Ben Brafman waxing eloquently or

14  ineloquently.  It's Ben Brafman commenting on the evidence.

15  Asking a group of citizens, like you, to convict Martin

16  Shkreli of a felony, they must bring you clear and consistent,

17  and defensible, credible evidence.  They cannot throw stuff

18  against the wall and hope some of it sticks so that you use

19  that and the vulnerability of this particular defendant, I

20  submit, and use it to convict him.  It's really that simple.

21           They have not earned, the Government has not earned

22  to the right to ask you to make him a felon.  They have not

23  earned that right in a public courtroom where the warts and

24  flaws of witnesses were exposed, not on direct examination but

25  on cross-examination, and now a reasonable doubt is

Summations - Brafman                    5488

1   circulating in the atmosphere like a bunch of drones that

2   require a finding of not guilty.

3        Both sides obviously want to win.  But when a

4   defendant, I submit, who has been accused but has not been

5   proven to be guilty is acquitted everybody wins.  Because that

6   is a just verdict.  That's the right verdict if they fail to

7   prove beyond a reasonable doubt.  So when you're foreperson

8   announces the verdict that I hope is not guilty, don't slink

9   away from that verdict, be proud of that verdict.  Be proud to

10  say, I gave Martin Shkreli a fair trial even though he was

11  Martin Shkreli.  And I am proud to announce that verdict

12  because it's the right verdict under the facts and under the

13  evidence and under the law.  Proud of the fact that despite

14  the controversy you stood tall and responded to the oaths you

15  gave us when we started.

16       I just want to tell you something which you may find

17  a little bit upsetting but I'm asking to you consider it in

18  the manner in which it's intended, not to as an upfront but

19  get you to be thinking.

20       Every one of us knows an oncologist or two.  An

21  oncologist sometimes has to give very, very bad news.

22  Sometimes they have to tell you, you've got cancer.  And

23  that's a terrible thing to tell anybody.  But you know what,

24  before an oncologist makes that announcement and tells you, as

25  a practical matter, your life may be over or is certainly

Summations - Brafman                    5489

1   going to be different, they have a biopsy; they have a blood

2   work; they have an MRI; they have a CAT scan; they are able to

3   touch you and feel whether there is a lump or whether there is

4   a discoloration of the skin; they can give you every test that

5   there is.  And when all of tests come in and all the blood

6   work comes in they can say, I'm sorry to tell you you have

7   cancer.  And today, thank God, because of medical research

8   many cancers are curable maybe not always a death sentence.

9           When you deliver a verdict of guilty, God forbid,

10  that's forever.  That's A.  Regardless of the other

11  consequences, you're a felon forever.

12          You don't have blood work and tests.  There is no

13  forensic evidence.  There is no DNA.  There is no

14  fingerprints.  There is nothing in this case except the

15  testimony and the exhibits.  So when you decide whether

16  someone is guilty and they have been established guilty beyond

17  a reasonable doubt, all you really have is what we use when we

18  pick a jury, common sense, honesty, a fair evaluation of the

19  evidence, respect for the laws that have been in place for the

20  last hundreds of years, not just for Martin Shkreli but for

21  everybody.

22          I told you in my opening statement that when the

23  long, strong arm of the Government reaches out and tries, as a

24  practical matter, to change someone's life or end someone's

25  life, they have to be right.  They have to come to you beyond

Summations - Brafman                    5490

1    a reasonable doubt.  They have to convince you with evidence

2    beyond a reasonable doubt.  And I don't think, most

3    respectfully, that if you listen to all of the testimony that

4    they have done that.

5            You know the Judge is going to give you the rules of

6    law that you have to apply.  And the Judge is the law.  The

7    Judge tells you what the law is and you're required to apply

8    the law, whether you agree with it or not.  And I do hope a

9    apply the law.  I think if you apply the law you'll see the

10   sections of law that I quoted in substance I did accurately,

11   and the Judge will include those instructions in her

12   instructions.

13           But on certain things you are the law, you're the

14   judges of the facts.  Nobody can tell you who to believe.

15   Nobody can tell you what weight to give evidence.  Nobody can

16   tell you how long you should deliberate.  Nobody can tell you

17   how you should conduct your deliberations, except to say be

18   fair and listen to the opinions of each other.  No one can say

19   how long you should deliberate, and whether you deliberate for

20   three hours or three days or a week, however long it takes to

21   reach a verdict.  Nobody can come in there and say you have to

22   hurry, do this or do that.  What goes on in that jury room is

23   yours; in that respect, today you are the law.  I ask you to

24   respect that part of the law.

25           And when I sit down Ms. Kasulis after the break has

Summations - Brafman                    5491

1   an opportunity to give a rebuttal summation.  I hate that

2   rule.  All of us want the last word.  Every one of us, when we

3   argue with a friend or spouse or child or significant other,

4   you want to have the last word.  It kills you if the

5   conversation ends and they put a piece of tape over your mouth

6   and you got to walk away even though you have great things to

7   say, but that's the rule.

8           So what I need to do is two things, one, I need to

9   prepare you.  I don't know what she's going to say.  She can't

10  unwind the testimony, on that I have no concerns.  She's not

11  going to show you another several hundred exhibits like

12  flashcards so you see them for a second and you have no idea

13  what you're looking at.  Maybe she'll tell you, Mr. Brafman is

14  a good lawyer.  He tried to distract you from the facts and

15  the fact are that Martin Shkreli is overwhelming guilty.  If

16  she says that, thank you.  If you're on trial and it's this

17  important and you're Martin Shkreli, you should have a lawyer

18  who knows how to defend you.  So I'm not ashamed, if that's

19  what she says or if that's what you conclude.  Or even if she

20  says I'm a bad lawyer, but I didn't try to distract you.  I

21  may have used to bag of potato chips to make a point, but it

22  was a point worth making.  If you make a pharmaceutical

23  company with effort and time and brilliance, you don't turn

24  around one day and say here is a bag of potato chips not

25  knowing how the chips or the bag got here.  There is no

Summations - Brafman                        5492

1    distractions.  And every once in a while if I used a metaphor,

2    if I made you smile, if on occasion we couldn't smile I would

3    drop dead from the tension in this courtroom if we couldn't

4    lighten the atmosphere every once in a while.  But not to

5    suggest that what we're doing is not of serious.  This is a

6    serious as it gets, ladies and gentlemen.

7           So whatever she says, whatever she says, here is

8    what I want you to do, first of all listen and respectfully.

9    I'm sure she will like, Ms. Smith, give you a very eloquent,

10   well-prepared rebuttal.  But she doesn't have the last word.

11   You do.  In this argument you have the last word.

12          I hope that the last words are not guilty.  Thank

13   you very much.

14          THE COURT:  Thank you, Mr. Brafman.  We're going to

15   give the jurors a break at this time.  Please, it's not yet

16   the time to discuss.  Keep your thoughts and feelings to

17   yourself.  Keep your mind open.  You'll hear rebuttal and

18   we'll resume in about ten minutes.  Thank you.

19          (Jury exits the courtroom.)

20          THE COURT:  All right.  So during this break,

21   counsel, why don't we try to figure out the addition to the

22   instructions that the Government had requested.  I'm thinking

23   that perhaps on page -- it's the instruction regarding verdict

24   and deliberations, there is some language in that instruction.

25          MR. BRAFMAN:  May I step out for a minute while they

Proceedings                                    5493

1    are talking?

2              THE COURT:  Of course.

3                   (Brief recess.)

4              THE COURT:  Have we worked it out?

5              MR. SRINIVASAN:  The Government version is on the

6    top and the defense on the bottom, page 83.

7              THE COURT:  We agree that page 83 would be an

8    appropriate spot.  Let's see what you both want.

9              Well, you know, I think this instruction was

10   proposed to correct, or not correct but to address, a

11   statement that appears to contradict my instruction.  The

12   question is whether you want a more specific instruction

13   directed to what was said during closing or whether it should

14   be more general and not referential to the comment.  So I'll

15   hear from Mr. Agnifilo why the Government's proposal, or

16   Mr. Brafman, why it is not appropriate.  I'll share this with

17   my clerk.

18             MR. AGNIFILO:  I don't think the Government's

19   proposal is in anyway inappropriate.  Think it's a matter,

20   it's a stylistic matter.  And I don't know that it helps

21   necessarily, even I think what we're trying to accomplish is

22   to highlight, to put in society.  I think it is possibly a

23   more effective instruction just to say any consideration

24   because that really is the state of the law.  I know the

25   Government wants the added portion to say that they want to

Proceedings                                          5494

1  make sure there is no impact on possible society in the

2  future.  Honestly, I don't feel terribly strongly either way.

3  I think our instruction is cleaner, and basically is a

4  truthful statement of the law and solves the problem that the

5  Government has without going back into the subject matter.

6          So that's why we propose it the way we did.  I don't

7  think the Government's proposal is inappropriate in anyway.  I

8  just think ours is better, is more effective.

9          MR. SRINIVASAN:  Your Honor, our position is that

10 your Honor's instructions do contain that the general and

11 broader proposition.  But given the specific comments that

12 were made that Ms. Smith highlighted earlier today, that

13 having a more specific clarifying instruction I think would be

14 appropriate in this case to address the issues that we have

15 raised, that's why we put in the bit about society, addressing

16 various comments about visionary and throwing the person on

17 the heap.  I think it addresses the issues that arose and

18 gives the jury some additional guidance.

19         THE COURT:  There seems to be a bit of suggestion

20 that as a visionary of the generation, and how the generation

21 would suffer consequences if Mr. Shkreli were no longer able

22 to apply his extreme intelligence to developing orphan drugs

23 that could help society in general.

24         What if we added the sentence, "You cannot allow

25 consideration of the punishment that may be imposed upon a

Proceedings                                5495

1  defendant or the consequences on society if he is convicted to

2  influence."

3          MR. AGNIFILO:  That's fine.

4          MR. BRAFMAN:  When did I say "society"?

5          MR. AGNIFILO:  Our concern is that it's

6  incorporating a concept, it's interpreting what I think the

7  Government thought that Mr. Brafman was saying, but he didn't

8  actually say it.

9          THE COURT:  Somebody must have the transcript that

10  we can search.

11          MS. SMITH:  He said, "Make somebody a felon for the

12  rest of his life is a very, very tough decision.  And when

13  you're dealing with anyone you have to be right.  But when

14  you're dealing with maybe one of the most of the extraordinary

15  minds of this generation you need to be right before you snuff

16  that out."  That's one.

17          And then second, "It requires you to understand how

18  special his mind is, and how careful you need to be before

19  tossing it in a heap."

20          THE COURT:  Then I would agree with the defense that

21  we can say --

22          MR. BRAFMAN:  Thank you.

23          THE COURT:  -- "May be imposed upon defendant if he

24  is convicted" -- let me see.  Is this acceptable, "Under your

25  oath as jurors you may not consider any consequences including

Proceedings                                    5496

1    the punishment that may be imposed upon a defendant if he is

2    convicted."

3              MR. AGNIFILO:  That's fine with us.

4              MS. SMITH:  That's fine.

5              THE COURT:  What we're going to do then is to insert

6    this additional language at page 83.  We will relabel the jury

7    instructions as Court Exhibit 5 and the verdict sheet is 5A.

8    And we'll give you an opportunity to see it.  Hopefully we can

9    then charge the jury.

10             MR. AGNIFILO:  Sounds good.

11             MR. SRINIVASAN:  Thank you, Judge.

12             THE COURT:  Why don't you take a quick look at the

13   language.

14             MR. BRAFMAN:  That's fine by the defense, your

15   Honor.

16             THE COURT:  All right.  Thank you.

17             Is the Government all right with it?

18             MR. SRINIVASAN:  Yes, your Honor.

19             THE COURT:  We'll make that change.  Are you ready

20   to proceed, Ms. Kasulis?

21             MS. KASULIS:  I am.

22             (Jury enters the courtroom.)

23             THE COURT:  All our jurors are present.  Please have

24   a seat.

25             Ms. Kasulis, you may proceed with rebuttal

Rebuttal Summations - Kasulis          5497

1   summation.

2   BY MS. KASULIS:  Thank you, your Honor.

3          Good morning, everybody.  Now Mr. Brafman kept

4   asking during his summation why are we here, why are we here?

5   The answer is simple, you know the answer.  The defendant

6   defrauded his investors.  Lying to people to get them to

7   invest with you is fraud.

8          The Judge will instruct you on the law and you will

9   hear that when you lie to people knowingly and intentionally

10  to get their money, it's a crime.  And that is exactly what

11  Martin Shkreli did, he knowingly lied over and over again to

12  his investors to get their money and then to keep their money

13  I also want to be crystal clear on one point, it doesn't

14  matter if you paid people back years later after you've stolen

15  their money and you've lost all their money, those people are

16  still victims of fraud.

17         This part of the law was completely lost on

18  Mr. Brafman during his summation.  He ignored it.  He led you

19  astray.

20         After Martin Shkreli stole from MSMB Capital and

21  MSMB Healthcare investors, he then stole from Retrophin and

22  its investors to pay back those defrauded MSMB investors.

23  Think about it, ladies and gentlemen, if you rob a bank and

24  then you rob another bank to pay back the first bank, you

25  still robbed that first bank.  The evidence is clear.  Martin

Rebuttal Summations - Kasulis          5498

1  Shkreli committed fraud eight times over.  That is what we

2  have proven beyond a reasonable doubt.

3          Now in her instructions to you, the Judge will tell

4  you that what the attorneys say is not evidence and there is a

5  good reason for that.  Mr. Brafman gave an impassioned

6  summation for his client.  He did that.  But if you felt like

7  what you heard Mr. Brafman say about what happened in this

8  courtroom over the last month wasn't quite what you recalled

9  those witnesses saying, wasn't quite what you recalled about

10  the demeanor of the witnesses on that witness stand, wasn't

11  quite what you recall the documents saying to you, you are not

12  alone.  Mr. Brafman's arguments are just that, arguments.

13  They are not evidence.

14          I submit to you that the evidence in this case is

15  devastating for the defendant.  Mr. Brafman had to make up

16  evidence or skew the evidence.  Because when you don't have

17  the law and you don't have the facts on your side, you resort

18  to distractions.  Mr. Brafman actually hit that nail right on

19  the head at the end of his summation, distractions.  Do not be

20  fooled.

21          There is an avalanche of evidence in this case.  And

22  I don't use that term lightly, an avalanche that buries the

23  defendant.  Now faced with this evidence Mr. Brafman has

24  talked about a lot of different things, bags of chips,

25  *Rainman*, rap concerts, touching soft skin, horrible diseases.

Rebuttal Summations - Kasulis                    5499

1   But what was Mr. Brafman doing is he was trying to cloud your

2   judgment by appealing to your emotions, maybe your deepest

3   fears, to get you to ignore the evidence, the cold hard facts

4   in this case.

5          He harped on who did not testify instead of truly

6   dealing fairly with the witnesses who did.  The Judge will

7   also instruct you that while the defendant does not have a

8   burden to prove his innocence, he does not, let me be clear,

9   he doesn't have to put on evidence.  He does not have to call

10  a single witness.  But both the Government and the defense

11  have the same right to subpoena witnesses to testify on their

12  behalf.

13         Bottom line, ladies and gentlemen, disregard all of

14  those distractions.  Focus on what matters, the evidence and

15  the law.  Don't let the noise drown that out.  Focus on what

16  really matters here.

17         Now Mr. Brafman spent a lot of time talking about

18  the mythological Martin Shkreli.  Let's talk about who is

19  Martin Shkreli.  What does the evidence show you?  It has

20  shown you that Martin Shkreli is calculating.  It's not about

21  just the sheer volume of lies, it's the kind of lies that he

22  tells about things that really matter to people, to investors,

23  that would matter to a reasonable person making a decision

24  about how to invest their money.  He knew exactly what he was

25  doing and we have proven his intent to deceive beyond any

Rebuttal Summations - Kasulis                    5500

1  doubt.

2          Mr. Brafman want you to believe that Mr. Shkreli is

3  perhaps the smartest man on the planet.  So smart that the

4  rules and the law just don't apply to him.  He's so smart that

5  people practically faint in his presence, they throw their

6  money at him, it comes flying out of their pockets.  He's so

7  smart and so confident that he built this company in two years

8  while lying on the floor of his office in a sleeping bag that

9  entire time.

10          But let's consider the evidence, ladies and

11  gentlemen.  Of course Mr. Shkreli is a smart man, no one is

12  saying he's not smart.  He knew exactly what he was doing.  He

13  intended to deceive.  He intended to defraud these investors

14  by lying to them.  How do you know that?  Because for each

15  investor, for each mark, each intended victim, he changed his

16  lies.  He changed his lies, that's how you know he doesn't

17  believe what he was saying.  Because he lied to each one of

18  those people in the way that he thought would make them give

19  him their money.

20          Let's talk about Sarah Hassan.  He posed as a mentor

21  to her in the hedge fund world.  Sarah Hassan who actually

22  graduated from college early.  He told her about his stellar

23  track record, his Assets Under Management.  He lied to her to

24  take her money, to steal from her.

25          Let's talk about Steve Richardson.  We've heard a

1  lot about Steve Richardson over the last month.  Martin

2  Shkreli told him, I, too, have family struggles.  I, too, had

3  to drop out of college because we couldn't afford it.  He told

4  Mr. Richardson about his stellar track record, how he was a

5  prodigy.  He lied to Mr. Richardson to steal his money.  And

6  let me be clear, Mr. Richardson worked really hard for his

7  money, that was very evident from his testimony.  He started

8  on the line at American Express.  He worked his way up to

9  become the senior vice president of HR at American Express.

10  He worked years to get his money.  But according to

11  Mr. Brafman, just because Steve Richardson worked hard and he

12  did well for himself and he made his money, that he can't be

13  defrauded.  It's all rich people BS.  It's totally fine that

14  Mr. Shkreli stole from him because he's rich.  There is no

15  rich person exception to the law.  That's insulting.  Use your

16  common sense.

17       The Judge will instruct you on the law.  What

18  Mr. Brafman said is not the law.  It doesn't matter if you're

19  rich or poor.  It doesn't matter if you're sophisticated or

20  not sophisticated.  The law treats us all equal.  It protects

21  us.

22       Darren Blanton and the other Texas investors were

23  impressed by Martin Shkreli's knowledge of the health care

24  industry.  How he graduated from Columbia early on, very

25  impressive to them.  Mr. Blanton talked up all his performance

Rebuttal Summations - Kasulis                    5502

1    results, how he thought his investment was doing with Martin

2    Shkreli.  All lies.  Don't forget, Martin Shkreli had barely

3    any money in the MSMB Capital bank accounts when he went down

4    to Texas to pitch those investors.  All of these lies, all of

5    them, they go to bad faith.  Martin Shkreli knew exactly what

6    he was doing when he lied to those people to take their money.

7            Mr. Brafman wants you to believe that Martin truly

8    believes his lies because he's so special.  Mr. Brafman

9    mentioned what Steve Aselage testified to on cross-examination

10   about Martin filling in the blanks while meeting with the

11   investment bank on Retrophin on the Valeant deal.  Let me be

12   clear, Steve Aselage had nothing to do with MSMB Capital or

13   MSMB Healthcare.  He didn't even meet Martin Shkreli until

14   August 2012.  He never spoke to these investors.  He met

15   Martin Shkreli long after Martin Shkreli blew up MSMB Capital,

16   after Martin Shkreli started defrauding people like David

17   Geller.

18           Martin Shkreli told all of these people that he had

19   a successful track record, had high Assets Under Management,

20   that they had an auditor, they could get their money out.  Why

21   was he lying about these facts, because they matter.  They are

22   important.  Assets Under Management are important, it's what

23   makes a fund viable.  It's what allows a fund to sustain a

24   loss.  It shows there are other investors in the fund.  Having

25   an auditor is important.  If this case illustrates anything,

Rebuttal Summations - Kasulis                5503

1    ladies and gentlemen, it is the importance of having a

2    third-party, independent auditor to check those books.

3                    (Continued on next page.)

1    BY KASULIS:

2          And having a successful track record as a hedge

3    fund manager, of course that's important.  Who wouldn't want

4    to know that when they're making a decision about investing

5    their money?  These are all factors that are important to a

6    reasonable investor, and you can't ignore them.  They matter

7    to these investors and they matter to a reasonable person.

8    And that is the standard and that is the law.  And if these

9    people invested in Martin, it was a fairytale, Martin, a

10   fraud, and he knew it.

11         The evidence has shown you who real the Martin

12   Shkreli is.  He has been unmasked in the last month in this

13   courtroom.  He was not acting in good faith.  He lied to

14   these people to deceive them, to manipulate them.  He didn't

15   care about them.  He just wanted their money.

16         Why didn't Martin Shkreli just tell them that he

17   had blown up Elea Capital?  That maybe, in fact, he was

18   special.  Maybe he had sort of a shoddy track record, that he

19   didn't have access to management.  So why didn't he just tell

20   them that?  Because they never would have invested with him.

21   That's why.

22         Mr. Brafman asked why Martin didn't just tell the

23   MSMB Capital investors that he had blown up the fund on that

24   Orex trade in February of 2011?  He couldn't be sued,

25   according to the PPM if he had just told them that.  Why

Summation - Kasulis                    5505

1  didn't he tell them that?  Because he couldn't, because then

2  he would be a failure.  They would know who is he.  People

3  wouldn't invest with him anymore, and he desperately needed

4  people to keep investing with him.  He didn't have control of

5  Josiah Austin's money.  You heard Josiah Austin testify.  You

6  read the defendant's statement.  That's just a lie.

7         And then after he blew up that fund, he just kept

8  telling people, Oh, your money's doing great statement after

9  statement after statement just to buy time to figure out what

10  he was going to do.  And I want you to look closely at the

11  PPM.  We talked so much about that and Mr. Brafman talked so

12  much about it in his summation.  Show me where in those PPM's

13  the manager's allowed to lie?  Look at every single one.

14  Nowhere in PPM's are you allowed to lie to your investors.

15  Ladies and gentlemen, the evidence is clear that Martin

16  Shkreli doesn't think the rules apply to him and that the law

17  doesn't apply to him.  But unfortunately for him, it does.

18         Now, Mr. Brafman also spent a lot of time during

19  his summation talking about how MSMB Capital and MSMB

20  Healthcare investors weren't defrauded because they got all

21  this money back.  That is just another distraction.  Use your

22  common sense.  You will hear from the judge that success is

23  not an element of the frauds charged, and that means that

24  even if the defendant hadn't been successful in getting the

25  investors' money when he was lying to them, he could still be

Summation - Kasulis                    5506

1   guilty of fraud if all of the other elements to the crime are

2   met.

3           Now, the judge will instruct you that a belief that

4   ultimately everything would work out so that no one would

5   lose any money or that ultimately everyone would make money,

6   does not excuse fraud.  And I will say it again:  It does not

7   excuse fraud under the law.  And that makes sense.  Think

8   about it.  The defendant wants you to believe that he can lie

9   to investors' faces, get them to trust him, to give him their

10  money to use it any way that he wants, to lose it all, to

11  spend money on his lofty ideas in his head for a company, and

12  that if they get paid back years later after hounding him for

13  their money, somehow he didn't steel from them.  It's not a

14  crime.  It makes no sense.  It's not how the law works.  And

15  to boot, you certainly can't steel from a public company and

16  pay back the investors that you stole from.  You can't rob

17  Peter to pay Paul.  It doesn't work that way.

18          And just because the defendant got lucky and

19  Retrophin became a success years later through the hard work

20  of many people, not just Martin Shkreli, that he's somehow

21  not guilty of fraud.  Again, that is simply not the law.

22  Listen to the judge's instructions.

23          Ladies and gentlemen, the evidence is devastating

24  for the defendant on Counts 1 through 6.  Just devastating.

25  He defrauded these investors with reckless abandon.  He is

Summation - Kasulis                    5507

1   done.  He is done on those counts.  You could convict on

2   Sarah Hassan alone.  You could convict on the defendant's own

3   words, the bank records, the document that you saw alone.

4   You don't even need the testimony of the investors.  That is

5   how strong the evidence is in this case.

6           Now I also want to speak to you about another myth,

7   the myth of Retrophin.  We asked about who Martin Shkreli is.

8   Well, let's talk about Retrophin.  What is Retrophin?  If you

9   talk to the defendant, Retrophin is $20 million.  Is it

10  $40 million.  Is it $80 million.  All a complete and total

11  fiction, a figment of the defendant's imagination.  And he

12  knew that.  He's a very smart man.  You don't value a company

13  at $80 million and then draft a liquidation press release at

14  the end of December in 2012 announcing his demise for the

15  company.  You don't do that.  You don't say your company is

16  worth $80 million when you have $11,000, $11,000 in the bank

17  account at the end of December of 2012.

18          Mr. Brafman talked about a plot of land and a

19  mansion on that land and it's got impatents, it's a mansion.

20  What Martin Shkreli wants you to believe is if you buy a plot

21  lot of land for $10,000, and then you stand back, the street,

22  you look at the plot of land and you think, you know what,

23  I'm going to build a house on this plot of land and it's

24  going to be an 80 million-dollar house.  But you don't even

25  take one step to put a brick down, you do nothing.  That you

1    can then sell that plot of land for $80 million.  That's what

2    the defendant wants you to believe.  It's absurd.  It's

3    ridiculous.  If that's how the defendant was justifying those

4    amazing returns for MSMB Healthcare investors, there is no

5    excuse for his behavior.  None.  He is smart, he knew he was

6    lying to those people.

7              Retrophin, ladies and gentlemen, was nothing more

8    than Martin Shkreli's personal piggy bank.  It was his way of

9    getting out from under his fraud.

10             Martin Shkreli and others, including Evan Greebel

11   schemed to steal money from Retrophin, Retrophin, the company

12   we've heard so much about.  The way that Martin Shkreli was

13   to give back, use all his genius for the good of society, to

14   cure these terrible crippling diseases.  Martin Shkreli did

15   not cure PKAN.  There is no evidence in the record for that.

16   These drugs that we've heard about, Martin Shkreli didn't

17   create those drugs.  Retrophin bought those drugs.

18             What did Martin Shkreli do with Retrophin?  He

19   stole millions of dollars from Retrophin's shareholders and

20   their investors.

21             And ladies and gentlemen, remember, Retrophin did

22   not have millions of dollars lying around for the defendant

23   to steal.

24             You heard from Steve Aselage, the current CEO of

25   Retrophin, what did he tell you?  What could have been done

Summation - Kasulis                    5509

1   with that money?  It could have gone to developing drug that

2   is really could have helped people.  When people invested in

3   that 10 million-dollar pipe in February of 2013 did they

4   think two of the $10 million was going to go to pay back the

5   people that he defrauded when he had nothing to do with

6   Retrophin?  Absolutely not.

7            You heard testimony and saw documents that the

8   defrauded MSMB investors were threatening to sue the

9   defendant.  To go to the SEC to get the money that

10  Mr. Shkreli told them was owed to them in cash and in shares.

11           Martin Shkreli told them in September of 2012 that

12  he had doubled their investment.  He told them that they were

13  owed far more than MSMB Healthcare ever invested into

14  Retrophin and MSMB Capital never invested in Retrophin.  And

15  this new theory we heard that they got vested shares in 2012.

16  Where were those shares in 2011 when he was sending out all

17  those performance reports after he blew up the fund?  They

18  were nowhere.  It's a distraction.

19           The defendant -- the defendant promised those

20  people that money.  Not Retrophin.  These investors didn't

21  have any valid claim against Retrophin.  Retrophin didn't do

22  anything wrong.  It wasn't Retrophin's responsibility to

23  protect Martin Shkreli from dealing with the consequences of

24  his crime.  That's not Retrophin's business decision.  The

25  company's not responsible for that.

Summation - Kasulis                    5510

1          Now, Mr. Brafman said a lot in his summation about

2    Martin Shkreli is MSMB, MSMB is Retrophin, it's all the same

3    thing.  They're all interchangeable.  But again, that is not

4    the way the law works.  Retrophin is a public company.  It

5    has investors.  It has shareholders.  Martin Shkreli is not

6    the only shareholder of Retrophin.  That is the truth, the

7    cold-hard facts that he cannot get away from.

8          You will hear from the Judge that Mr. Shkreli had

9    the duty to the company to act in Retrophin's best interest.

10   Not his own.  And he had that duty all along.

11         And how do you know that Mr. Shkreli knew that he

12   had that duty?  We all know that document,

13   Government's Exhibit 255 when Mr. Greebel reminded

14   Mr. Shkreli about that duty, I think we all remember what he

15   said.  F-that.  F-that.  Because it's all about Martin

16   Shkreli.  It really just sums it all up, doesn't it?

17         And I want to talk briefly about these settlement

18   and consultant agreements.  The evidence is crystal clear

19   that Martin Shkreli and Evan Greebel stole from Retrophin

20   through those agreements.  Again Mr. Brafman distracted you.

21   He was not careful with the evidence.  He was not true to the

22   evidence.  How do you know that these agreements were not on

23   the up and up?  Think about it.  They weren't true, because

24   Martin Shkreli and Evan Greebel weren't forthcoming with the

25   Board of Retrophin.  They hid these agreements.  They hid

Summation - Kasulis                    5511

1    these payments.

2          Remember.  Martin Shkreli didn't take any money out

3    of his own pocket through those agreements, zero.  Zilch,

4    nothing.  He had millions of his own Retrophin shares, but he

5    didn't use those.  He used Retrophin's shares.  He used the

6    Fearnow shares to pay these people back.  He pilfered the

7    company, a company that had been on the brink of collapse.

8          The Board members could not have been more clear in

9    their testimony.  They never approved those settlement

10   agreements.  I'll say it again:  They never approved those

11   settlement agreements.

12         And by the time the auditors had discovered those

13   agreements, the vast majority of the cash and the shares were

14   gone, ladies and gentlemen.  Gone.  Stolen, taken.

15         And you don't need to just rely on the Board

16   members' testimony to know that there were no approval to

17   those agreements.  Because again, these are Martin Shkreli's

18   own words.  Government's Exhibit 322.  What does Martin

19   Shkreli say in that e-mail?

20         No Board approval for the settlement agreement.

21   None.

22         Now, once Marcum discovered those agreements did

23   Martin Shkreli and Evan Greebel sit down with the Board,

24   explain to the Board what these agreements were about?  Did

25   Martin Shkreli say, Hey, look guys got myself in a jam.  I

Summation - Kasulis                5512

1   defrauded all these people, I might get sued.  Can we talk

2   about it, please?  Of course the didn't do that.  He wasn't

3   honest with them.  He didn't tell them the truth.  They

4   didn't approve anything.

5           They trusted Martin.  He was the CEO of the

6   company, they trusted Evan Greebel.  He was counsel for the

7   company.  And Martin Shkreli told them, signed agreements

8   that he was going to pay the company back.  If these

9   settlement agreements were totally on the up and up, totally

10  Retrophin's responsibility, why did Martin Shkreli have to

11  pay the company back?  It doesn't make any sense.

12          And you know how else these agreements were a

13  fraud?  Because if they weren't a fraud, why didn't they just

14  keep using settlement agreements?

15          No.  Martin Shkreli and Evan Greebel's schemed,

16  they had to change course because they had been discovered

17  and that's how the consulting agreements came about.

18  Retrophin had no business paying those MSMB investors, no

19  business.

20          Martin was responsible for those payments, not the

21  company.

22          Darren Blanton was no consultant.  The evidence is

23  clear about that.  And Lee Yaffe, Mr. Brafman is still

24  maintaining somehow that Lee Yaffe is a cluster headache

25  specialist, that he somehow was going to be worth $200,000 on

Summation - Kasulis                5513

1   cluster headache consultation.

2          You heard him testify.  You saw him.  What he told

3   you was corroborated by the evidence, that he conspired with

4   Martin and Marek to steal money from Retrophin through a sham

5   consulting agreement, to get the money back the defendant

6   owed Mr. Yaffe's father for years.

7          The evidence is overwhelming, ladies and gentlemen,

8   on Count 7.

9          Martin Shkreli was never bullied.  He wasn't outed

10  unfairly from the company.  Martin Shkreli wasn't terminated,

11  he resigned.  That's the evidence, not what Mr. Brafman told

12  you.  The Board removed him as CEO and wanted to keep him on

13  the Board.  Martin Shkreli resigned.  This whole narrative

14  about the lawsuit needing a felony to terminate Martin

15  Shkreli.  It's a distraction.  Not what the evidence shows.

16  There is no doubt that Martin Shkreli and Evan Greebel

17  intended to deceive Retrophin's shareholders and investors.

18  Stole money and shares from the company.  There's no doubt

19  about it.  And again, with respect to this count, Martin

20  Shkreli thought that he is somehow above the law.  But we all

21  know that the law applies to Martin Shkreli.  He may not like

22  it, but it applies to him.

23          And I want to just spend two minutes on Count 8

24  because I submit to you, ladies and gentlemen, the evidence

25  on Count 8 is devastating.

1          Martin Shkreli controlled 80 percent of the

2    free-trading shares of Retrophin.  And he did it to control

3    the price, to control the trading volume.  He conspired, he

4    agreed with others to do it.  And that is the crime.  The

5    conspiracy, the agreement to do it for that purpose.  You

6    don't have to show all this trading back and forth.  I submit

7    you that on the chart show that these individuals were, in

8    fact, trading, were, in fact, trying to affect the volume of

9    Retrophin stock, the trading of that stock.  But the crime is

10   the conspiracy, the agreement to do that with others for that

11   purpose.

12         And Martin Shkreli was obsessed with the stock

13   price, obsessed with it.

14         Mr. Brafman, again, misled you.  He talked about

15   the definition of an affiliate.  You will hear from the Judge

16   that what Mr. Brafman told you is not the law.

17         Martin Shkreli didn't want the market to tank

18   Retrophin stock.  He didn't want to let the public actually

19   value this company.  He wanted to value the company.  He

20   wanted to control the company.  He wanted to control those

21   shares to make sure that stock price stayed up that when he

22   distributed out those shares people might think they have

23   some value in those restricted share pieces of paper they can

24   do nothing with for a year.

25         That's illegal.  It's a crime.  I also want to just

Summation - Kasulis                    5515

1    talk very briefly about Mr. Brafman's arguments regarding

2    Mr. Shkreli relying on Evan Greebel for advice.  Mr. Brafman

3    argued that that is why Mr. Shkreli is not guilty on Count 7

4    and 8.

5            Again, ladies and gentlemen, the evidence could not

6    be more clear, Martin Shkreli wasn't relying on Evan Greebel.

7    Evan Greebel wasn't leading him around by the nose.  You saw

8    the e-mail.  You saw the way Martin treated Evan Greebel.

9    You embarrass me.  You're lazy and stupid.  More business for

10   another firm.  Good job, Even.  God bless America.

11           Martin was the dominate person in that relationship

12   and that relationship was a criminal conspiracy.  There is no

13   doubt about it.  They worked together to defraud the company,

14   to defraud the shareholders and the investors of Retrophin.

15           You heard testimony from the Board members that

16   Evan Greebel did not put Retrophin back into the firm.  He

17   was looking out for Martin.  He was helping Martin be

18   creative about how they were going to steal the company's

19   money so that Evan could keep getting paid.  So that the MSMB

20   investors would go away.  They wouldn't sue.  They wouldn't

21   go to the SEC.  They wouldn't expose Martin for the fraud

22   that he is.

23           The defendant was not lead astray by a trusted

24   legal advisor.  There is no support in the evidence for that.

25   None whatsoever.  They were co-conspirators.  They schemed

Summation - Kasulis                    5516

1    together and the evidence supports no other conclusion.

2          I urge you to go through the evidence, go through

3    the documents, request the testimony if you need it.

4          Ladies and gentlemen, we have nothing to hide.  We

5    have the last word because we have the burden, and I submit

6    to you that we have met that burden in phase.  Use your

7    common sense.  Don't be distracted.

8          It's time, it's time for Martin Shkreli to be held

9    accountable for his choices, for his choices to lie, to

10   deceive, and to steal, to take people's money without a

11   second thought, without even a pause.  To steal from the

12   Retrophin investors and their shareholders.

13         There is law, there are rules and they apply to all

14   of us and they apply to Martin Shkreli.  He's no different

15   than anyone else.  He is not special.  The law doesn't see

16   him any differently than it sees you and it sees me and it

17   sees anyone else in this courtroom.  The last four weeks have

18   exposed Martin Shkreli for who he really is.  A con man who

19   stole millions of dollars.  And now it's up to you, it's up

20   to you.  It's time to tell the defendant that it's over.

21   It's done, no more.  This isn't about winning.  It's about

22   the truth.  We are confident that you will return the only

23   verdict that is supported by the evidence in the case.  And

24   that is a verdict of guilty on all charges.

25         Thank you.

1              THE COURT:  Members of the jury, the time has come

2    for me to give you instructions.  My instructions will be

3    lengthy and I will ask you to please pay close attention.

4    It may take some time to get through all of the

5    instructions, so I do have two options for you.  We can

6    provide that you have your lunch break now if lunch is

7    ready.  I'm advised that the lunches will not be ready until

8    1:00, so let's start with the instructions and if you're

9    feeling that a break would be welcome and I think I'll feel

10   that way, too, because I will be talking for a very long

11   time, we will -- a break -- we will break for lunch and I

12   will continue the instructions at that time.

13             I do want to thank you on behalf of the Court and

14   all of the parties in this case for your close attention,

15   for your honoring your oath to pay attention to the evidence

16   in the case.  And to keep an open mind as the case

17   progresses.

18             So let me start.  We will be discussing your

19   general duties as jurors.  We will also talk about the

20   charges that are at issue in each of the eight counts in the

21   indictment, and I will also give you general instructions

22   about your conduct as jurors during deliberations.  You are

23   about to enter your final duty which is to decide the

24   factual issues at dispute in this case.  Please do pay close

25   attention to me and I will go as slowly and be as clear as I

1    possibly can.  I told you at the very start of the trial

2    that your principal assumption during the trial would be to

3    listen carefully and observe each witness who testified.  It

4    is an obvious to me and to the attorneys that you have all

5    faithfully discharged this duty, and I do thank you again

6    for your attention in that and your service.  I realize that

7    your time in this courtroom has been at some sacrifice to

8    your personal lives and to your work lives.

9            Now that you have heard all of the evidence in the

10   case and the arguments of each side, it will be my duty to

11   instruct you on the applicable law.  As I said, my

12   instructions will be in three parts.  First I will give you

13   some general rules about your role and the way in which you

14   are to review the evidence in this case.

15           Second, I will instruct you as to the particular

16   crimes charged in this case and the elements that

17   the Government must prove with respect to each.  Again,

18   beyond a reasonable doubt.

19           And third, I will give you some general rules

20   regarding your deliberations.  Please do not single out any

21   one instruction that I give you as alone stating the law,

22   rather you should consider these instructions as a whole

23   when you retire to the jury room to deliberate on your

24   verdict.

25           First the general rules and the role of the Court.

 1    You have now heard the evidence in the case as well as the

 2    final arguments for the Government and the defendant, Martin

 3    Shkreli.  My duty is to instruct you on the law and it is

 4    your duty to accept these instructions of law and apply them

 5    to the facts as you find them; that is, as you determine

 6    them.

 7             Just as it has been my duty to preside over the

 8    trial and decide what testimony and evidence is relevant

 9    under the law for your consideration.  On these legal

10    matters you must take the law as I give it to you even if

11    any attorney or witness to you has stated a legal principal

12    different from any that I will give to you.

13             It is my instructions that you must follow.  You

14    should not, any of you, be concerned about the wisdom of any

15    rule that I state.  Regardless of any opinion that you may

16    have as to what the law is or may be, or ought to be, it

17    is -- it would violate your sworn duty to base a verdict

18    upon any other view of the law other than that which I give

19    you.  Now, your role as jurors, as members of this jury, you

20    are the sole and exclusive judges of the facts.  Your rule

21    is to pass upon the weight of the evidence, determine the

22    credibility of the witnesses, resolve such conflicts as

23    there may be in the testimony, and draw whatever reasonable

24    inferences you decide to draw from the facts as you

25    determine them.

Summation - Kasulis                    5520

1        In determining the facts you may rely upon your

2   own recollection of the evidence.  What the lawyers have

3   said in their opening statements, in their closing

4   arguments, in their objections or in their questions is not

5   evidence.  In this connection you should bear in mind that a

6   question put to a witness is never evidence.  It is only the

7   answer that is evidence.

8        Nor is anything that I may have said during the

9   trial or may say during these instructions with respect to a

10  fact matter to be taken as a substitute for you own

11  independent recollection.

12       What I say is not evidence.

13       The evidence before you consists of answers given

14  by witnesses, the testimony they gave as you recall it, and

15  the exhibits and stipulations that were received in

16  evidence.

17       The evidence does not include questions, again,

18  only the answers are evidence.  But you may not consider any

19  answer that I directed you to disregard or that I directed

20  to be stricken from the record.  Do not consider those

21  answers.  Throughout the trial I have reminded you not to

22  conduct any outside research into this case.  I've also

23  instructed you to consciously avoid any media about this

24  case or about Mr. Shkreli.  Likewise, during deliberations

25  you may only consider the evidence admitted at this trial

1  and may not utilize any other information obtained outside

2  the courtroom, including but not limited to research on the

3  Internet, opinions or statements of others outside the

4  courtroom, or any other sources.

5         You must completely disregard any report that you

6  may have read in the press, seen on television or heard on

7  the radio.

8         Indeed it would be unfair to consider such report,

9  since they are not evidence.  And the parties have had no

10  opportunity to contradict their accuracy or otherwise

11  explain them away.

12         In short, it would be a violation of your oath as

13  jurors to allow yourself to be influenced in any manner by

14  such media.

15         Because you are the sole and exclusive judges of

16  the facts and do not need to indicate any opinion as to the

17  facts or what your verdict should be.  The rulings that I

18  have made during the trial are not any indication of my

19  views of what your decision should be as to whether or not

20  the guilt of Mr. Shkreli has been proved beyond a reasonable

21  doubt.  I also ask you to draw no inference from the fact

22  that upon occasion I have asked questions of certain

23  witnesses.

24         These questions were only intended for

25  clarification or to expedite matters and certainly were not

Summation - Kasulis                    5522

1    intended to suggest any opinion on my part as to the verdict

2    you should render or whether any of the witnesses may have

3    been more credible than any other witness.

4            You are expressly to understand that the Court has

5    no opinion as to the verdict you should render in this case.

6            As to the facts, ladies and gentlemen, you are the

7    exclusive judges.  You are to consider the evidence with

8    impartiality.  Your verdict must be based solely upon the

9    evidence developed during the trial or the lack of evidence

10   before you.  In reaching your decision as to whether the

11   Government has sustained its burden of proof, it would be

12   improper for you to consider any personal feelings you may

13   have about the defendant's race, religion, national origin

14   sex or age.

15           It would be equally improper for you to allow any

16   feelings you might have about the nature of the crime

17   charged to interfere with you decision-making process.  All

18   persons are entitled to the presumption of innocence and the

19   Government has the burden of proof, as I will discuss in a

20   moment.

21           The fact that this prosecution is brought in the

22   name of the United States of America entitles the Government

23   to no greater consideration than that afforded to any other

24   party to a litigation.  By the same token, it was entitled

25   to no less consideration.  All parties, whether the

Summation - Kasulis                    5523

1  Government or individuals, are equal before the law.  If
2  have a reasonable doubt as to the defendant's guilty, you
3  should not hesitate for any reason to find a verdict of
4  acquittal.
5           But on the other hand if you should find that the
6  Government has met its burden of proof of a defendant's
7  guilt beyond a reasonable doubt, you should not hesitate
8  because of sympathy or any other reason to render a verdict
9  of guilty.
10          Proof beyond a reasonable doubt must therefore be
11  proof of a convincing character that a reasonable person
12  would not hesitate to rely upon in making an important
13  decision.
14          Under your oath as jurors you are not to be swayed
15  by sympathy.  You are to be guided solely by the evidence in
16  this case, and the crucial question that you must asked
17  yourselves as you sift through the evidence is, has
18  the Government proven the guilt of the defendant beyond a
19  reasonable doubt?  It is for you alone to decide whether the
20  Government has proven that Mr. Shkreli is guilty of the
21  crimes charged solely on the basis of the evidence and
22  subject to the law as I charge you.
23          If you follow your oath and try the issues without
24  fear or prejudice or bias or sympathy, you will arrive at a
25  true and just verdict.

Summation - Kasulis                    5524

1    I would like to talk about the conduct of counsel

2    that you may have observed during the trial.  It is the duty

3    of the attorneys on each side of the case to object when the

4    other side offers testimony or renders evidence which the

5    attorneys may believe is not properly admissible.

6         Counsel also have a right and a duty to ask the

7    Court to make rulings of law and to request conferences at

8    the sidebar out of the hearing of the jury.  All of those

9    questions of law must be decided by me, the Court.  You

10   should not show any prejudice against an attorney or his or

11   her client because the attorney objected to the

12   admissibility of evidence or asked for a conference out of

13   the hearing of the jury, or asked me to rule on an issue of

14   law.

15        During the course of the trial I may have

16   admonished an attorney.  You should draw no inference

17   against the attorney or the client.  It is the duty of the

18   attorney to offer evidence and press objections on behalf of

19   their clients.  It is my function to cut off counsel from an

20   improper line of argument or questioning or to strike

21   answers that I think when necessary.  But you should draw no

22   inference from that.  In fact, in this case, I would like to

23   express my deep gratitude to each of the attorneys in this

24   case for their conscientious effort on behalf of their

25   clients and for the hard work that they did so well.

Summation - Kasulis                5525

1          A word about the presumption of innocence and the

2     burden of proof.  The defendant, Martin Shkreli, is before

3     you today because he has been charged in a superseding

4     indictment with violations of federal law.  The superseding

5     indictment is merely a statement of the charges and is not

6     itself evidence.  Mr. Shkreli has pleaded not guilty to the

7     superseding indictment.  He is therefore presumed to be

8     innocent of the charges against him and that presumption

9     alone unless overcome is sufficient to acquit him.

10          To convict Mr. Shkreli, the burden is on

11     the Government to prove each and every element of the

12     charged offenses beyond a reasonable doubt.  The burden

13     never shifts to a defendant for the simple reason that the

14     law presumes the defendant to be innocent.  A defendant is

15     never required to prove that he is innocent and never

16     imposes upon a defendant in a criminal case the burden or

17     duty of calling any witness or producing any evidence.

18     Every defendant starts with the a clean slate and is

19     presumed innocent of each of the charges until such time, if

20     ever, that you as a jury are satisfied the Government has

21     proven the defendant guilty of a charge beyond a reasonable

22     doubt.  If the Government fails to prove every element of a

23     charge beyond a reasonable doubt, you must find Mr. Shkreli

24     not guilty as to that charge.

25          What is reasonable doubt?  It is a doubt based

Summation - Kasulis                    5526

1    upon reason.  It is a doubt that a reasonable person has

2    after carefully weighing all of the evidence.  It is a doubt

3    that would cause a reasonable person to hesitate to act in a

4    matter of importance in his or her personal life.  Proof

5    beyond a reasonable doubt must therefore be proof of a

6    convincing character that a reasonable person would not

7    hesitate to rely upon in making an important decision.  A

8    reasonable doubt is not a caprice or the whim.  It is not a

9    speculation or a suspicion.  It is not an excuse to avoid

10   the performance of an unpleasant duty.

11          The law does not require that the Government prove

12   guilt beyond all possible doubt.  Prove beyond a reasonable

13   doubt is sufficient to convict.  If after fair and impartial

14   consideration of all of the evidence, or lack of evidence,

15   concerning a particular charge against Mr. Shkreli you have

16   a reasonable doubt, you must find Mr. Shkreli not guilty of

17   that charge.

18          On the other hand if after fair and impartial

19   consideration of all of the evidence you are satisfied of

20   Mr. Shkreli's guilt beyond a reasonable doubt, you should

21   find Mr. Shkreli guilty of that charge.

22          I will now instruct you about the different forms

23   of evidence and how you should consider it.  The evidence in

24   the case comes in several forms.  First, sworn testimony of

25   witnesses both under direct and cross-examination is

Summation - Kasulis                    5527

1    evidence.

2            Second, exhibits that have been received by the

3    Court in evidence.

4            Third, certain exhibits admitted in evidence in

5    the form of charts, summaries, or demonstratives.  You

6    should consider these charts and summaries as you would

7    other evidence.

8            And, fourth, stipulations of facts which all the

9    attorneys have agreed.  A stipulation means simply that the

10   Government and the defendant have accepted the truth of a

11   particular composition or fact.  Here the attorneys for the

12   United States and the attorneys for Mr. Shkreli have entered

13   into stipulations concerning certain facts and documents

14   that are relevant to this case.  You should accept these

15   stipulations as evidence and regard those facts as true to

16   be given whatever weight you choose.  If evidence was

17   received for a limited the purpose you must consider that

18   evidence only for that limited purpose.

19           (Continued on next page.)

20

21

22

23

24

25

Proceedings                                    5528

1          THE COURT:  A word about what is not evidence.

2          Certain things are not evidence and are to be

3   disregarded by you in deciding this case and determining the

4   facts.

5          First, the superseding indictment is not evidence

6   and is not entitled to weight in your evaluation of the facts.

7          Second, arguments or statements by the attorneys are

8   not evidence.  That includes the opening statements and the

9   closing arguments.

10          A lawyer's questions of A witness in and of

11   themselves are not evidence.  Only the answer constitutes the

12   evidence.

13          Objections to the questions or to offered exhibits

14   are not evidence.  Attorneys have A duty to object when they

15   believe evidence should not be received.  You should not be

16   influenced by the objections or by my rulings on them.  If the

17   objection was sustained, ignore the question.  If the

18   objection was overruled, treat the answer to that question

19   like any other.

20          Fifth, any testimony stricken by the court is not

21   evidence.

22          Sixth, any evidence identified but not admitted into

23   evidence by the court are not evidence.  However, testimony

24   regarding such exhibits can be considered.

25          Seventh, anything that you may have seen or heard

LINDA D. DANELCZYK, RPR, CSR

Proceedings                        5529

1    outside the courtroom is not evidence.

2           Eighth, notes that you may have been taking during

3    the course of the trial are not evidence.

4           Your verdict must be based exclusively upon the

5    evidence or the lack of evidence in this case.

6           Now, A word about direct and circumstantial

7    evidence, both of which you may consider.  I told you that the

8    evidence has A very sworn -- such as the sworn testimony of

9    witnesses, exhibits, charts, summaries, and stipulations.

10   There are in addition different types of evidence, direct and

11   circumstantial.

12          Direct evidence is evidence that proves A fact

13   directly.  For example, when A witness testifies as to what he

14   or she saw, heard, or observed, that's called direct evidence.

15   On the other hand, circumstantial evidence is evidence that

16   tends to prove A disputed fact by proof of other facts.

17          To give A simple example, suppose that when you came

18   into the courthouse today, the sun was shining and it was A

19   nice day.  But the courtroom blinds, as you can see, were

20   drawn and you cannot look outside.  Later as you were sitting

21   here, someone walked in with A dripping wet umbrella, and soon

22   after somebody else walked into the courtroom with A dripping

23   wet raincoat.  In case you cannot look outside of the

24   courtroom and cannot see whether or not it is raining, you

25   have no direct evidence that it is raining.  But on the

Proceedings                                5530

1    combination of the facts about the dripping wet umbrella and

2    raincoat, it would be reasonable for you to infer that it had

3    begun to rain, and that is all there is to circumstantial

4    evidence.

5              Using your reason and experience, you would infer

6    from the established facts the existence or the nonexistence

7    of some other fact, whether A given inference should be drawn

8    is entirely A matter for you the jury to decide.  Please note,

9    however, that drawing an inference is not A matter of

10   speculation or guess, it is A matter of logical inference.

11             The law makes no distinction between direct and

12   circumstantial evidence.  Circumstantial evidence is of no

13   less value than direct evidence, and you may consider either

14   or both.  You may give them such weight as you conclude is

15   warranted.

16             Now, let's talk about inferences.  The attorneys

17   have asked you to infer, on the basis of your reason,

18   experience, and common sense, from one or more established

19   facts, the existence of some other fact.  An inference is not

20   A suspicion or A guess, it is A reasoned logical decision to

21   conclude that A disputed fact exists on the basis of another

22   fact that you know exists.

23             There Are times when different inferences may be

24   drawn from the facts, whether proved by direct or

25   circumstantial evidence.  The government may ask to you draw

Proceedings                                          5531

1   one set of inferences, while the defense may ask you to draw

2   another.  It is for you and you alone to decide what

3   inferences you will draw.

4           The process of drawing inferences from fact in

5   evidence is not A matter of guess work or speculation.  An

6   inference is the deduction or conclusion that you the jury are

7   permitted to draw but are not required to draw from the facts

8   that have been established by either direct or circumstantial

9   evidence.  In drawing inferences, you should exercise your

10  common sense.

11          So while you are considering the evidence presented

12  to you, you are permitted, but are not required, to draw from

13  the facts that you find to be proven such reasonable

14  inferences as would be justified in light of your experience.

15  Here again, let me remind you that whether based on direct or

16  circumstantial evidence, or on the logical reasonable

17  inferences drawn from such evidence you must be satisfied of

18  the guilt of Mr. Shkreli beyond A reasonable doubt before you

19  may convict him.

20          I'd also like to talk about admissions of the

21  defendant.  There has been evidence that Mr. Shkreli made

22  certain statements to this Securities and Exchange Commission,

23  also referred to as the SEC, in which the government claims he

24  admitted certain facts charged in the superseding indictment.

25  I will instruct you that are you to give those statements such

LINDA D. DANELCZYK, RPR, CSR

Proceedings                                    5532

1    weight as you feel they deserve in light of all the evidence.

2         Now, during court the concept is the defendant's

3    right not to testify.  Mr. Shkreli did not testify in this

4    case.  Under our United States Constitution, the defendant has

5    no obligation to testify or to present any evidence, because

6    it is the government's burden to prove the defendant guilty

7    beyond a reasonable doubt.  That burden remains with the

8    government throughout the entire trial and never shifts to the

9    defendant.  A defendant is never required to prove that he's

10   innocent because his innocence is presumed.

11        Therefore, you must not attach any significance to

12   the fact that Mr. Shkreli did not testify in this case.  You

13   must not draw any adverse inference against him because he did

14   not take the witness stand, and you may not consider or even

15   discuss the fact that he did not testify during your

16   deliberations in the jury room.

17        Next A word about credibility of the witnesses.  You

18   the jury are the sole judges of the credibility or the

19   believability of the witnesses and the weight the testimony

20   deserves.  You should carefully scrutinize all of the

21   testimony given, the circumstances under which each witness

22   testified, and any other matter in evidence that may help you

23   to decide the truth and the importance of each witness'

24   testimony.  Your decisions in this respect may depend on how

25   each witness impressed you, was the witness candid and

Proceedings                      5533

1    forthright, or did the witness seem to be hiding something,

2    being evasive or suspect in some way?  How did the witness'

3    testimony on direct examination compare with the witness'

4    testimony on cross-examination?  Was the witness consistent in

5    the testimony given, or were there contradictions?  Did the

6    witness appear to know what he or she was talking about, and

7    did the witness strike you as someone who is trying to report

8    that knowledge accurately?  These are examples of the kinds of

9    common sense questions you should ask yourselves in deciding

10   whether A witness is or is not truthful.

11           You should also consider whether A witness had an

12   opportunity to observe the facts he or she testified about.

13   Also, you should consider the witness' recollection of the

14   facts and what they stand up in light of the other evidence in

15   the case.

16           How much you chose to believe A witness may also be

17   influenced by the witness' bias.  Did the witness have A

18   relationship with the government or with Mr. Shkreli that

19   would affect how he or she testified?  Does the witness have

20   some incentive, loyalty, or motive that might cause him or her

21   to shade the truth?  Does the witness have some bias,

22   prejudice, or hostility that would cause the witness to give

23   you something other than A completely accurate account to the

24   facts that he or she testified to?

25           Evidence by a witness is biased, prejudiced, or

Proceedings                          5534

1    hostile toward Mr. Shkreli requires you to view that witness'
2    testimony with caution, to weigh it with care, and to subject
3    it to close and searches scrutiny.  You should also take into
4    account any evidence that the witness who testified may
5    benefit in some way from the outcome of the case.  Such an
6    interest in the outcome creates A motive to testify falsely
7    and may sway the witness to testify in A way that advances his
8    or her own interest.  Therefore, if you find that any witness
9    whose testimony you are considering may have an interest in
10   the outcome of this trial, then you should bear that factor in
11   mind when evaluating the credibility of his or her testimony
12   and inspect it with the great care.

13           This is not to suggest that every witness who has an
14   interest in the outcome of the case will testify falsely.  It
15   is for you to decide to what extent, if any, or if at all, the
16   witness' interest has affected or colored his or her
17   testimony.

18           You also heard evidence of discrepancies in the
19   testimony of certain witnesses, and counsel have argued that
20   such discrepancies are A reason for you to reject the
21   testimony of those witnesses.  Evidence of discrepancy may be
22   A basis to disbelieve A witness' testimony.  On the other
23   hand, discrepancies in A witness' testimony or between his or
24   her testimony and that of others do not necessarily mean that
25   the witness' entire testimony should be discredited.  People

Proceedings                                5535

1   sometimes forget things, and even A truthful witness may be

2   nervous and contradict himself or herself.  It is also A fact

3   that two people observing or witnessing the same event may see

4   or hear it differently.  Whether the discrepancy pertains to A

5   fact of importance or only A trivial detail should also be

6   considered in weighing the significance.

7           A wilful falsehood always is A matter of importance

8   and should be considered seriously.  If any witness was shown

9   to have willfully lied about any material matter, you have the

10  right to conclude that the witness also lied about other

11  matters.  You may also -- you may disregard all the witness'

12  testimony or you may accept whatever part of it you think

13  deserves to be believed.  It is not -- it is for you to

14  decide, based on your total impression of A witness, how much

15  to weigh his or her testimony.  You should, as always, use

16  common sense and your own good judgment.

17          You do not have to accept the testimony of any

18  witness who has not been contradicted or impeached, if you

19  find that the witness is not credible.  You also have to

20  decide which witnesses to believe and which facts are true.

21  To do this you must look at all the evidence, drawing upon

22  your own common sense and personal experience.  As you know,

23  the government called all the witnesses in this case, and

24  there were many witnesses who testified.  Mr. Shkreli has

25  chosen not to call any witnesses and you should keep in mind

Proceedings                                                    5536

1   that the burden of proof is always on the government, and that

2   the defendant is not required to call any witnesses or to

3   offer any evidence, because he is presumed to be innocent.

4           A word about government employees or law enforcement

5   witnesses.  In this case, you heard testimony from A witness

6   who works for the FBI, a law enforcement agency.  The

7   testimony of this witness should be evaluated in the same

8   manner as the testimony of any other witness.  The fact that A

9   witness may be employed by the government does not mean that

10  you may accord his or her testimony any more or less weight

11  than that of any other witness.  At the same time, it is

12  common for defense counsel to try to question the credibility

13  of A witness employed by the government, including A witness

14  who works for law enforcement, on the ground that his or her

15  testimony may be colored by A personal or professional

16  interest in the outcome of the case.  It is for you to decide,

17  after weighing all of the evidence in light of the

18  instructions I have given you about factors relevant to

19  determining the credibility of any witness, whether you accept

20  the testimony of A government employee witness and what

21  weight, if any, it deserves.

22          You may have also heard evidence that A witness made

23  A statement on an earlier occasion which counsel argues is

24  inconsistent with a witness' trial testimony.  Evidence of

25  what is arguably A prior inconsistent statement was placed

Proceedings                                    5537

1    before you for the limited purpose of helping you decide

2    whether to believe the trial testimony of the witness who

3    contradicted himself or herself.  If you find that the witness

4    has made an earlier statement that conflicts with his her or

5    her trial testimony, you may consider that fact in deciding

6    how much of his or her trial testimony, if any, to believe.

7            In making this determination you may consider

8    whether the witness purposely made a false statement or

9    whether it was an innocent mistake; whether the inconsistency

10   concerns an important fact or whether it had to do with A

11   small detail; whether the witness had an explanation for the

12   inconsistency and whether that explanation appealed to your

13   common sense.

14           It is exclusively your duty, based on all the

15   evidence and your own good judgment, to determine whether the

16   prior statement was inconsistent, and if so, how much weight,

17   if any, to give to the inconsistent statement in determining

18   whether to believe all or part or none of the witness' trial

19   testimony.

20           And during the course of the trial, you heard

21   testimony that the attorneys for the parties may have

22   interviewed witnesses when preparing for and during the trial.

23   Attorneys have an obligation to prepare their case as

24   thoroughly as possible, and in the discharge of that

25   responsibility, they may properly interview witnesses in

Proceedings                                    5538

1   preparing for A trial and from time to time as may be required

2   during the course of the trial.

3          Next, an instruction on the duty that there's no

4   duty to call witnesses or produce evidence or use particular

5   investigative techniques.

6          Although the government bears the burden the proof,

7   and although a reasonable doubt can arise from lack of

8   evidence, you are instructed that there is no legal

9   requirement that the government use any specific investigative

10  technique or pursue every investigative lead to prove its

11  case.  Therefore, although you are to carefully consider the

12  evidence produced by the government, you are not to speculate

13  as to why they used the techniques they did or why they did

14  not use other techniques.

15         In this regard, I also charge you that all persons

16  who may have been present at any time or place mentioned in

17  the case or who may appear to have some knowledge of the

18  issues in this case need not be called as witnesses.  Both the

19  government and the defense have the same right to subpoena

20  witnesses to testify on their behalf.  There is no duty on

21  either side, however, to call A witness whose testimony would

22  be merely cumulative of testimony already in evidence, or who

23  would merely provide additional testimony to facts already in

24  evidence, nor does the law require that all things mentioned

25  during the course of the trial be produced as exhibits.  I

Proceedings                                    5539

1   remind you, however, that because the law presumes the

2   defendant to be innocent, the burden of proving the

3   defendant's guilt beyond a reasonable doubt is on the

4   government throughout the trial, the defendant never has the

5   burden of proving his innocence or producing any evidence or

6   calling any witnesses at all.

7          You have heard testimony of A witness who has been

8   promised by the government that in exchange for testifying

9   truthfully, completely, and fully, he will not be prosecuted

10  for any crimes that he may have admitted, either here in court

11  or in interviews with the prosecutors.  This promise was not A

12  formal order of immunity by the court, but was instead

13  arranged directly between A witness and the government.  The

14  government is permitted to make these kinds of promises and is

15  entitled to call as witnesses people to whom these promises

16  were given.

17         You are instructed that you may convict the

18  defendant on the basis of such A witness' testimony alone, if

19  you find that this testimony proves the defendant guilty

20  beyond a reasonable doubt.  However, the testimony of A

21  witness who has been promised that he will not be prosecuted

22  should be examined by you with greater care than the testimony

23  of an ordinary witness.  You should scrutinize it closely to

24  determine whether or not it is colored in such A way as to

25  place guilt upon the defendant in order to further the

Proceedings                                    5540

1   witness' own interest.  For such A witness confronted with the

2   realization that he can win his own freedom from prosecution

3   by helping to convict another have the motive to falsify his

4   testimony.  Such testimony should be received by you with

5   suspicion and you may give it such weight, if any, as you

6   believe it deserves.

7           Now, you have heard evidence about the involvement

8   of certain other people in the crimes charged in the

9   superseding indictment.  You may not draw any inference,

10  favorable or unfavorable, towards the government or

11  Mr. Shkreli from the fact that certain persons are not on

12  trial before you or that certain persons were not named as

13  defendants in the superseding indictment or that certain

14  persons remain as coconspirators but not included.

15          MR. BRAFMAN:  Objection.

16          THE COURT:  I'm sorry, I did misread that.  Let me

17  start over.

18          You may not draw any inference, favorable or

19  unfavorable, towards the government or Mr. Shkreli from the

20  fact that certain persons are not on trial before you or that

21  certain persons were not named as defendants in the

22  superseding indictment or that certain persons were not named

23  as coconspirators but not indicted.  It is not your concern

24  that these other individuals are not on trial before you, nor

25  should be speculate as to whether or not they were indicted.

Proceedings                              5541

1    You should neither speculate as to the reason --

2              THE JURY:  Judge, we need A break.

3              THE COURT:  All right.

4              Oh, perfect.  I'm going to start with this

5    instruction, just to refresh you.  At this time I will give

6    you lunch break, and lunch is waiting for you in the jury

7    room.

8              Do not discuss the case yet.  Thank you very much.

9              We're going to ask you to return in one hour, so

10   1:30, 1:35.

11             (Jury exits the courtroom.)

12             THE COURT:  Just for the record, I just want to

13   state that we have marked as Court Exhibit Number 5 and 5A,

14   the instructions, which incorporate the agreed-upon language

15   regarding both the affiliate that we talked about last

16   evening, and also the instruction about the conflicts of the

17   conviction, and I would like to state here on the record

18   whether Court Exhibit 5 and 5A are acceptable to the

19   government and the defendant?

20             MS. KASULIS:  Yes, Your Honor, it's acceptable to

21   the government.

22             MR. BRAFMAN:  Yes, Your Honor.

23             MR. AGNIFILO:  I have A.

24             THE COURT:  5A is the verdict sheet.

25             MR. AGNIFILO:  Yes, it's fine, yes, we're good.

```
                        Proceedings                    5542

1           THE COURT:  Thank you.  Have good lunch.

2           MS. KASULIS:  Thank you, Your Honor.

3           (Government Exhibit Number 5, was received in

4   evidence.)

5           (Government Exhibit Number 5A, was received in

6   evidence.)

7           (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                                          5543

1              A F T E R N O O N     S E S S I O N

2              (Time noted:  1:45 p.m.)

3              (In open court; Jury present.)

4              (Jury enters the courtroom.)

5              THE COURT:  All the jurors are present.  Please have

6    a seat.

7              I think I did not finish fully instructing you

8    regarding the instruction that you consider only the defendant

9    before you, so I am going to start over and just complete the

10   instruction.

11             You have heard evidence about the involvement of

12   certain other people in the crimes charged in the superseding

13   indictment.  You may not draw any inference, favorable or

14   unfavorable, for government or Mr. Shkreli from the fact that

15   certain persons are not on trial before you, or that certain

16   persons were not named as defendants in the superseding

17   indictment, or that certain persons in not named as

18   coconspirators but not indicted.  It is not your concern that

19   these other individuals are not on trial before you, nor

20   should speculate as to whether or not they were indicted.  You

21   should neither speculate as to the reason these other people

22   were not on trial before you, nor allow their absence as

23   parties to influence you in any way the deliberations that you

24   will be undertaking.  Nor should you draw any inference from

25   the fact that any other person is not present at this trial or

Proceedings                                          5544

1   may not be indicted.  Your concern is solely the defendant on

2   trial before you, Mr. Shkreli.

3          Your verdict should be based only on the evidence or

4   lack of evidence as to this defendant in accordance with my

5   instructions and without regard to whether the guilt of other

6   people have or have not been proven.

7          You may notice, as I read the charges, that the

8   superseding indictment charges that the offenses at issue took

9   place in or about and between certain dates.  The proof need

10  not establish with any certainty the exact date of the alleged

11  offenses.  The law only requires a substantial similarity

12  between the dates alleged in the superseding indictment and

13  the date established by the evidence.

14         I will now turn to the charges, the second part of

15  my instructions.

16         In this part I will instruct you as to the specific

17  elements of the crimes charged that the government must prove

18  beyond a reasonable doubt to warrant a finding of guilt in

19  this case.

20         I will first summarize the charges alleged in the

21  superseding indictment and ask you to consider only the

22  charges in the indictment and also to consider each count

23  separately.

24         As I mentioned previously, the superseding

25  indictment is merely a statement of the charges and is not

Proceedings                          5545

1    evidence.  Mr. Shkreli is not charged with committing any

2    crime, other than the offenses contained in the superseding

3    indictment.  You have heard evidence of other acts allegedly

4    committed by Mr. Shkreli.  When such evidence was introduced,

5    I instruct you that Mr. Shkreli was not charged with such acts

6    in the superseding indictment, so please note that.

7              The superseding indictment contains a total of eight

8    counts.  Each count charges Mr. Shkreli with a different

9    crime.  The charges in Counts One through Three are related to

10   an entity known as MSMB Capital.

11             In Count One, Mr. Shkreli is charged with conspiracy

12   to commit securities fraud.  In Count Two, he is charged with

13   conspiracy to commit wire fraud.  And in Count Three, he is

14   charged with a substantive count of securities fraud in

15   relation to MSMB Capital.

16             The charges in Counts Four through Six are related

17   to an entity know as MSMB Healthcare.  In Count Four,

18   Mr. Shkreli is charged with conspiracy to commit securities

19   fraud.  In Count Five he is charged with conspiracy to commit

20   wire fraud.  And in Count Six, he is charged with a

21   substantive count of securities fraud in relation to MSMB

22   Healthcare.

23             In Count Seven, Mr. Shkreli is charged with

24   conspiracy to commit wire fraud.  And in Count Eight, he is

25   charged with conspiracy to commit securities fraud both in

Proceedings                                          5546

1   relation to an entity known as Retrophin.

2           You must consider each count of the superseding

3   indictment separately, and you must return a separate verdict

4   on the defendant for each count in which he is charged.

5   Whether you find Mr. Shkreli guilty or not guilty as to one

6   offense should not affect your verdict as to any other offense

7   charged.

8           During these instructions you will hear me the terms

9   "knowingly," "willfully," and "intentionally."  Therefore, I

10  will define those terms for you.

11          Knowingly.  To act knowingly means to act

12  intentionally and voluntarily and not because of ignorance,

13  mistake, accident, negligence, or carelessness.  Whether

14  Mr. Shkreli acted knowingly may be proven by his conduct and

15  by all of the facts and circumstances surrounding the case.

16          Willfully.  Certain allegations in the superseding

17  indictment require that the government prove beyond a

18  reasonable doubt that Mr. Shkreli acted willfully.  Willfully

19  means to act with knowledge that one's conduct is unlawful,

20  and with an intent to do something that the law forbids; that

21  is to say, with a bad purpose either to disobey or disregard

22  the law.  A defendant's conduct is not willful if it was due

23  to negligence, inadvertence, or mistake.

24          Intentionally.  A person acts intentionally when he

25  acts deliberately and purposefully.  That is the defendant's

Proceedings                              5547

1   act must have been the product of his conscious objective

2   decision, rather than a product of mistake or accident.

3         Whether a person acted knowingly, willfully, or

4   intentionally is a question of fact for you to determine like

5   any other fact question.  Direct proof of knowledge and

6   fraudulent intent is almost never available.  It would be a

7   rare case where it could be shown that a person wrote or

8   stated that as of a given time in the path he committed an act

9   with fraudulent intent.  Such direct proof is not required.

10  The ultimate facts of knowledge and criminal intent, though

11  subjective, may be established by circumstantial evidence

12  based upon a person's outward manifestations, his words, his

13  conduct, his acts, and all surrounding circumstances disclosed

14  by the evidence and the rational or logical inferences that

15  may be drawn therefrom.  In either case, the essential element

16  of the crime charged must be established beyond a reasonable

17  doubt.

18        So let's first talk about Counts Three and Six which

19  charge securities fraud.  The defendant, Martin Shkreli, is

20  formally charged in the superseding indictment, and I will

21  begin with the substantive securities fraud charges.

22        Counts Three and Six of the superseding indictment

23  charge Mr. Shkreli with securities fraud.

24        Count Three of the superseding indictment charges

25  Mr. Shkreli with securities fraud in relation to MSMB Capital

Proceedings                                    5548

1   as follows:

2           In or about and between September 2009 and

3   September 2014, both dates being approximate and inclusive,

4   within the Eastern District of New York and elsewhere, the

5   defendant, Martin Shkreli, together with others, did knowingly

6   and willfully use and employee one or more manipulative and

7   deceptive devices and contrivances contrary to Rule 10b-5 of

8   the Rules and Regulations of the United States Securities and

9   Exchange Commission, Title 17, Code of Federal Regulations

10  Section 240.10b-5 by:  A, employing one or more devices,

11  schemes, or artifices to defraud; B, making one or more untrue

12  statements of material fact and omitting to state one or more

13  material facts necessary in order to make the statements made,

14  in light of the circumstances in which they were made, not

15  misleading; and C, engaging in one or more acts, practices,

16  and courses of business which would and did operate as a fraud

17  and deceit upon one or more investors or potential investors

18  in MSMB Capital in connection the purchase and sale of

19  investments in MSMB Capital, directly and indirectly, by use

20  of means and instrumentalities of interstate commerce and the

21  mails.

22          Count Six of the superseding indictment charges

23  Mr. Shkreli with committing securities fraud in relation to

24  MSMB Healthcare as follows:

25          In or about and between September 2011 and

Proceedings                                    5549

1   September 2014, both dates being approximate and inclusive,

2   within the Eastern District of New York and elsewhere, the

3   defendant, Martin Shkreli, together with others, did knowingly

4   and willfully use and employee one or more manipulative and

5   deceptive devices and contrivances contrary to Rule 10b-5 of

6   the rules and regulations of the United States Securities and

7   Exchange Commission, Title 17, Code of Federal Regulations,

8   Section 240.10b-5 by:  A, employing one or more devices,

9   scheme, and artifices to defraud; B, making one or more untrue

10  statements of material facts and omitting to state one or more

11  material facts necessary in order to make the statement made

12  in light of the circumstances in which they were made, not

13  misleading; and C, engaging in one or more acts, practices,

14  and courses of business which would and did operate as a fraud

15  and deceit upon one or more investors or potential investors

16  in MSMB Healthcare in connection with the purchase and sale of

17  investments in MSMB Healthcare, directly and indirectly, by

18  use of means and instrumentalities of interstate commerce and

19  the mails.

20         I'm going to now discuss the statute and rules that

21  govern these counts.  The relevant statute is Section 10(b) of

22  the Securities Exchange Act of 1934.  That law provides in

23  relevant part that:

24         "It shall be unlawful or any person, directly or

25  indirectly, by use of any means or instrumentality of

Proceedings                                                    5550

1  interstate commerce, or of the mails, or any facility of any

2  nation securities exchange; B, to use or employ, in connection

3  with the purchase or sale of any security registered on a

4  national security exchange, or any security not so registered,

5  any manipulative or deceptive device or contrivance in

6  contravention of such rules and regulations as the Securities

7  and Exchange Commission, or SEC, may prescribe as necessary or

8  appropriate in a public interest or for the protection of

9  investors.

10         Based on its authority under that statute, the SEC

11  enacted Rule 10(b)-5 which provides:  It shall be unlawful or

12  any person, directly or indirectly, by use of any means or

13  instrumentality of interstate commerce, or of the mails, or of

14  any facility or any national securities exchange:  A, to

15  employee any device, scheme, or artifice to defraud; B, to

16  make any untrue statement of a material fact, or to omit to

17  state a material fact necessary in order to make the

18  statements made in the light of the circumstances under which

19  they were made, not misleading; or C, to engage in any act,

20  practice, or course of business which operates or would

21  operate as a fraud or deceit upon any person in connection

22  with the purchase or sale of any security.

23         Let me know try to define these elements for you.

24  In order to meets its burden of proof as to Counts Three and

25  Six, the government must establish beyond a reasonable doubt

Proceedings                                          5551

1     the following elements of the crime of securities fraud.

2              The first element:  Fraudulent act.

3              The first element that the government must prove

4     beyond a reasonable doubt is that in connection with the

5     purchase or sale of a security, MSMB Capital for Count Three,

6     and MSMB Healthcare for Count Six, Mr. Shkreli did one or more

7     of the following:

8              One, employ a device, scheme, or artifices to

9     defraud or; two, made an untrue statement of a material fact,

10    or omitted to state a material fact necessary in order to make

11    the statements made in the light of the circumstances under

12    which they were made, not misleading; or three, engage in an

13    act, practice, or course of business that operated or would

14    operate as a fraud or deceit upon a purchaser or seller of any

15    security.

16             To prove this element, it is not necessary for the

17    government to establish all three types of unlawful conduct in

18    connection with the sale or purchase of investment in MSMB

19    Capital for Count Three, or MSMB Healthcare for Count Six.

20    Any one will be sufficient for a conviction if you so find,

21    but you must all be unanimous as to which type of unlawful

22    conduct you find to have been proven beyond a reasonable

23    doubt.

24             Let me now explain some of the terms that are used

25    in the law:  Device, scheme, or artifice to defraud.

Proceedings                                        5552

1          A device, scheme, or artifice to defraud is a plan

2     for the accomplishment of a fraud.  Fraud is a general term

3     which embraces all efforts and means that individuals devise

4     to take advantage of others.  The law that the defendant is

5     the alleged to have violated prohibits all kinds of

6     manipulative and deceptive acts.  The fraudulent or deceitful

7     conduct alleged need not relate to the investment value of the

8     securities involved in this case.

9          False statement and omissions.  A statement,

10    representation, claim, or document is false if it is untrue

11    when made and was then known to be untrue by the person making

12    it or causing it to be made.  A representation or statement is

13    fraudulent if it was made with the intention to deceive.

14    False or fraudulent statements under the statute may include

15    the concealment of material facts in a manner that makes what

16    is said or represented deliberately misleading.

17          The deception need not be based upon spoken or

18    written words alone.  The arrangement of the words, or the

19    circumstances under which they are used, may convey the false

20    and deceptive appearance.  If there is deception, the manner

21    in which it is accomplished, does not matter.

22          Next, the words "in connection with."  You need not

23    find that Mr. Shkreli actually participated in any securities

24    transaction if he was engaged in fraudulent conduct that was

25    "in connection with" a purchase or sale of securities.  The

Proceedings                                              5553

1   "in connection with" aspect of this element is satisfied if

2   you find that there was some nexus or relation between the

3   allegedly fraudulent conduct and the sale or purchase of

4   securities.  Fraudulent conduct may be in connection with the

5   purchase or sale of securities if you find that the alleged

6   fraudulent conduct touched upon a security transaction.

7           It is no defense to an overall scheme to defraud

8   that the defendant may not have been involved in the scheme

9   from its inception or beginning, or may have played only a

10  minor role with no contact with the investors and purchasers

11  of the securities in question.  Nor is it necessary for you to

12  find that the defendant was the actual seller or offerer of

13  the securities.  It is sufficient if the defendant

14  participated in the scheme of fraudulent conduct that involved

15  the purchase or sale of securities.  By the same token, the

16  government need not prove that the defendant personally made

17  the misrepresentation or that he omitted the material fact.

18  It is sufficient if the government establishes that the

19  defendant caused the statement to be made or the fact to be

20  omitted.  With regard to the alleged misrepresentation and

21  omissions, you must determine whether the statement was true

22  or false when it was made, and in the case of the alleged

23  omission, whether the omission was misleading.

24          What is a material fact.  If you find that the

25  government has established beyond a reasonable doubt that the

Proceedings                                                    5554

1    a statement was false or omitted in connection with a purchase

2    or sale of any securities, you must next determine whether the

3    fact misstated or omitted was material under the

4    circumstances.  A misrepresentation is material under 10(b) of

5    the Securities Exchange Act, and under Rule 10b-5 where

6    there's a substantial likelihood that a reasonable investor

7    would find a misrepresentation important in making an

8    investment decision.  If you find that there was a material

9    misrepresentation or omission of a material fact, it does not

10   matter whether the intended victims were gullible buyers or

11   sophisticated investors, because the securities laws protect

12   the gullible and unsophisticated as well as the experienced

13   investor.

14          Nor does it matter whether the alleged unlawful

15   conduct was successful or not, or that the defendant profited

16   or received any benefits as a result of the alleged scheme.

17   Success is not an element of the crime charged.  However, if

18   you find that the defendant did profit from the alleged

19   scheme, you may consider that in relation to the element of

20   intent, which I will discuss in a moment.

21          If you find that the government has not proven this

22   element beyond a reasonable doubt, you must find Mr. Shkreli

23   not guilty.  On the other hand, if you do find that the

24   government has proven that a fraudulent act was committed by

25   Mr. Shkreli beyond a reasonable doubt, then you must consider

Proceedings                                    5555

1    the second element.  You need not find that the government has

2    proven each of the alleged fraudulent acts, but I remind you

3    that you must reach a unanimous decision as to at least one

4    fraudulent act.

5              The second element is knowledge intent and

6    wilfulness.  The second element that the government must

7    establish as to Count Three for MSMB Capital, and Count Six

8    for MSMB Healthcare, is that Mr. Shkreli acted knowingly,

9    willfully, and with intent to defraud.

10             As I explained before, a person acts knowingly if he

11   acts purposefully and voluntarily and not because of

12   ignorance, mistake, accident, negligence, or carelessness.

13             Willfully means to act knowingly and purposely with

14   an intent to do something the law forbids; that is to say,

15   with bad purpose either to disobey or disregard the law.

16   Intent to defraud in the context of the securities laws means

17   to act knowingly and with intent to deceive.

18             The question of whether a person acted knowingly,

19   willfully, and with intent to defraud is a question of fact

20   for you to determine like any other fact question.  This

21   question involves one's state of mind.

22             Direct proof of knowledge and fraudulent intent is

23   almost never available.  It would be a rare case where it

24   could be shown that a person wrote or stated that, as of a

25   given time in the past, he committed an act with fraudulent

Proceedings                                          5556

1    intent.  Such direct proof is not required.

2           The ultimate facts of knowledge and criminal intent

3    is subjective and may be established by circumstantial

4    evidence based upon a person's outward manifestations, his

5    words, his conducts, his acts, and all the surrounding

6    circumstances disclosed by the evidence and the rational or

7    logical inference that may be drawn therefrom.

8           I already have instructed you as to what

9    circumstantial evidence is and the inferences that may be

10   drawn from it.  Those instructions will also apply here.  What

11   is referred to as drawing inferences from circumstantial

12   evidence is no different from what people normally mean when

13   they say "use your common sense."  Using your common sense

14   means that you're deciding whether Mr. Shkreli possessed or

15   lacked an intent to defraud, you do not limit yourself to what

16   Mr. Shkreli said, but rather you also look at what he did and

17   what others did he in relation to Mr. Shkreli and, in general,

18   everything that occurred.

19          Circumstantial evidence, if believed, is of no less

20   value than direct evidence.  In either case, the essential

21   elements of the crime charged must be established by the

22   government beyond a reasonable doubt.

23          Under the antifraud statutes, even false

24   representations or omissions of material facts do not amount

25   to a fraud unless done with fraudulent intent.  However

Proceedings                                    5557

1    misleading or deceptive a plan may be, it is not fraudulent if

2    it was devised or carried out in good faith.  An honest belief

3    in the truth of the representations made by a defendant is a

4    complete defense, however inaccurate the statements may turn

5    out to be.

6              In considering whether or not a defendant acted in

7    good faith, you are instructed that a belief by the defendant,

8    if such belief existed, that ultimately everything would work

9    out so that no investors would lose any money does not require

10   a finding by you that the defendant acted in good faith.  No

11   amount of honest belief on the part of the defendant did the

12   scheme ultimately will make a profit for the investors will

13   excuse fraudulent actions or false representations by him.

14             As a practical matter, then, to prove the charge

15   against a defendant, the government must establish beyond a

16   reasonable doubt that the defendant knew that his conduct as a

17   participant in the scheme was calculated to deceive and,

18   nonetheless, he associated himself with the alleged fraudulent

19   scheme.

20             If you find that Mr. Shkreli did not knowingly and

21   with the intent to deceive -- I'm sorry.  If you find that

22   Mr. Shkreli did not act knowingly and with the intent to

23   deceive, then you must find the defendant not guilty.  On the

24   other hand, if you find that the government has established

25   beyond a reasonable doubt not only the first element but also

Proceedings                                         5558

1   this second element; that is, that Mr. Shkreli acted knowingly

2   and with the intent to deceive, then you must consider the

3   third element.  I remind you that you must reach a unanimous

4   decision in connection with each element.

5           The third element is instrumentality of interstate

6   commerce.  The third and final element that the government

7   must prove beyond a reasonable doubt as to Count Three for

8   MSMB Capital, and Count Six for MSMB Healthcare, is that

9   Mr. Shkreli knowingly used, or caused to be used, the mails or

10  means or instrumentalities of transportation or communication

11  in interstate commerce in furtherance of the scheme to

12  defraud.  This would include the use of a telephone, a bank

13  wire transfer, or an email sent over the internet that

14  traveled across state lines.

15          It is not necessary that a defendant be directly or

16  personally involved in any mailing, wire, or use of an

17  instrumentality of interstate commerce.  If the defendant was

18  an active participant in the scheme and took steps or engaged

19  in conduct which he knew or reasonably could foresee would

20  naturally and probably result in the use of interstate means

21  of communication, then you must find that he caused the mails

22  or an instrumentality of interstate commerce to be used.

23          When one does an act with the knowledge that the use

24  of interstate means of communication will follow in the

25  ordinary course of business, or where such use reasonably can

Proceedings                                    5559

1   be foreseen, even though not actually intended, then he causes

2   sum means to be used.

3            It is not necessary that the items sent through the

4   interstate means of communication contain a fraudulent

5   material or anything criminal or objectionable.  The

6   interstate means of communication may be entirely innocent.

7            The use of interstate communications need not be

8   central to the execution of the scheme, and may even be

9   incidental to it.  All that is required is that the use of the

10  interstate communications bear some relation to the object of

11  the scheme or fraudulent conduct.  In fact, the actual offer

12  or sale need not be accomplished by the use of interstate

13  communications, so long as the defendant is still engaged in

14  the actions that are part of the fraudulent scheme when the

15  interstate communications are used.

16           Now, the government next has to prove securities

17  fraud banking.  I have explained the elements the government

18  must prove beyond a reasonable doubt as to the securities

19  fraud charge in Counts Three and Six.  The government must

20  also prove venue.  And unlike the elements I just explained to

21  you, that the government must prove beyond a reasonable doubt,

22  the government must prove venue by what's called a

23  preponderance of the evidence.  To establish a fact by the

24  preponderance of the evidence means to prove that the fact was

25  more likely true than not.  A preponderance of the evidence

Proceedings                                                  5560

1    means the greater weight of the evidence, as if you're using a

2    scale.  Both direct and circumstantial evidence may be

3    considered.  It refers to the quality and persuasiveness of

4    the evidence, not merely to the quantity of the evidence.

5           To establish venue for securities fraud, as charged

6    in Counts Three and Six, the government must prove that it is

7    more likely than not that:  One, the defendant intentionally

8    and knowingly caused an act or transaction constituting a

9    securities fraud to occur, at least in part, in the Eastern

10   District of New York, which consist of the county of Kings,

11   also known as Brooklyn; Queens, Richmond County, also known as

12   Staten Island; or Nassau, or Suffolk counties; or two, that it

13   was foreseeable that such an act or transaction would occur in

14   the Eastern District of New York, and that it did.  The

15   government need not prove that the defendant personally was

16   present in the Eastern District of New York.  It is sufficient

17   to satisfy the venue requirement that the defendant

18   intentionally and knowingly caused an act or transaction

19   constituting a securities fraud to occur, at least in part,

20   within the Eastern District of New York.

21          The government must also prove that the act or

22   transaction must be part of the actual crime of securities

23   fraud and not merely a step taken in preparation for the

24   commission of the crime.

25          Therefore, if you find that it is more likely than

Proceedings                                    5561

1   not that an act or transaction in furtherance of the

2   securities fraud took place in the Eastern District of New

3   York, the government has satisfied its burden of proof as to

4   venue as to Count Three.

5              Again, I caution you that the preponderance of the

6   evidence standard applies only to venue.  The government must

7   prove each of the elements of securities fraud in Counts Three

8   and Six beyond a reasonable doubt.

9              In sum, if you find the government has failed to

10  prove any one of the elements for either Count Three for MSMB

11  Capital, or Count Six for MSMB Healthcare, beyond a reasonable

12  doubt, then you must find Mr. Shkreli not guilty of securities

13  fraud for that count.  To find Mr. Shkreli guilty of

14  securities fraud as charged in Count Three or Count Six, you

15  must find that the government has proven beyond a reasonable

16  doubt each element of the securities fraud charged in Counts

17  Three for MSMB Capital, or Count 6 for MSMB Healthcare, and

18  also that the government has established venue for that count

19  by a preponderance of the evidence.

20             We will next talk about Counts One and Four, which

21  is conspiracy to commit securities fraud.

22             Count One of the superseding indictment charges

23  Mr. Shkreli with conspiracy to commit securities fraud with

24  respect to MSMB Capital, and Count Four charges him with

25  conspiracy to commit securities fraud with respect to MSMB

Proceedings                                          5562

1   Healthcare.  Count One of the superseding indictment charges

2   Mr. Shkreli with conspiracy to commit securities fraud in

3   connection with MSMB Capital as follows:

4          In or about and between September 2009 and

5   September 2014, both dates being approximate and inclusive,

6   within the Eastern District of New York and elsewhere, the

7   defendant, Martin Shkreli, together with others, did knowingly

8   and willfully conspire to use and employ manipulative and

9   deceptive devices and contrivances, contrary to Rule 10b-5 of

10  the Rules and Regulations of the United States Securities and

11  Exchange Commission, Title 17, Code of Federal Regulations,

12  Section 240.10b-5 by:  A, employing devices, schemes, or

13  artifices to defraud; B, making untrue statements of material

14  facts and omitting to state material facts necessary in order

15  to make the statements made, in light of the circumstances

16  under which they were made, not misleading.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

Proceedings                              5563

1      THE COURT:  And (c) engaging in the acts, practices

2   and courses of business which would and did operate as a

3   fraud and deceit upon investors and potential investors in

4   MSMB Capital in connection with a purchase and sale of

5   investments in MSMB Capital, directly and indirectly, by use

6   of means and instrumentalities of interstate commerce and the

7   mails contrary to Title 15, United States Code, sections

8   78j(b) and 78ff.

9          In furtherance of the conspiracy to commit

10  securities fraud and to effect its objects within the Eastern

11  District of New York and elsewhere, the defendant, Martin

12  Shkreli, together with others committed and caused to be

13  committed among others, the following overt acts:

14          A.  On or about October 24, 2009, Marek Biestek sent

15  an e-mail to Steve Richardson copying Shkreli and enclosing

16  the "MSMB Capital investor kit," which included a presentation

17  and a private placement memorandum.

18          C.  On or about June 9, 2010, Shkreli sent an e-mail

19  to Darren Blanton, attaching MSMB Capital documents and

20  stated, in part:  "The fund is a 1/20 fee structure with no

21  lock-ups.  We have a daily results e-mail some people like to

22  see.  Hedge fund performance should be easy enough to

23  report/calculate estimates on a daily basis, and it is.  I'd

24  love to have you as an investor it looks like we see eye to

25  eye on a number of topics."

Proceedings                           5564

1          D.  On or about October 6, 2010, Shkreli sent an

2     e-mail to the Capital Limited Partners, including Steven

3     Richardson, and attached a letter entitled "MSMB Capital

4     Management Limited Partnership Letter for Q3 2010."  In the

5     letter Mr. Shkreli stated, in part, that the "partnership

6     performed well, returning 9 percent in Q3 2010," and that

7     brought the "gross year to date return to 44 percent."

8          E.  On or about December 3rd, 2010, Mr. Shkreli sent

9     an e-mail to Darren Blanton and stated in part that MSMB

10    Capital's current assets under management were $35 million.

11    Its auditor was Rothstein Kass and administrator was NAV

12    Consulting.

13         F.  On or about January 3rd, 2011, Shkreli sent an

14    e-mail to the Capital Limited Partners, including Steven

15    Richardson, and stated that MSMB Capital had "returned

16    +30.44 percent in 2010" and "+30.97 percent since inception on

17    November 1st, 2009."

18         G.  On or about February 2, 2011, Shkreli sent an

19    e-mail to Marek Biestek and an employee and attached a

20    spreadsheet detailing MSMB Capital's OREX trading.

21         H.  On or about February 9, 2011, Shkreli sent an

22    e-mail to the Capital Limited Partners, including Darren

23    Blanton and Steven Richardson, and stated that MSMB Capital

24    had, quote, "returned a +3.80 percent gross of fees year to

25    date and +35.95 percent since inception on November 1, 2009."

Proceedings                          5565

1            I.   On or about November 17, 2011, Darren Blanton

2    sent a letter to Shkreli provided written notice of a request

3    for a full withdrawal of his investment in MSMB Capital based

4    on the fund's net assets valued as of November 30, 2011.

5            J.   On or about January 25, 2012, Shkreli sent an

6    e-mail to Darren Blanton copying others and stating, in part

7    quote, "You invested $1,250,000 for the 12/31/2010 period.

8    The value of this period is now approximately $1,318,872 net

9    of fees.  We acknowledge your redemption and this will be your

10   last statement."

11           K.   On or about September 10, 2012, Shkreli sent an

12   e-mail to the Capital Limited Partners, including Steven

13   Richardson, and stated, in part, quote, "I have decided to

14   wind down our hedge fund partnerships with a goal of

15   completing the liquidation of the funds by November our

16   December 1st, 2012.  Original MSMB investors (2009) have just

17   about doubled their money net of fees.  Investors have will

18   have their limited partnership interests redeemed by the fund

19   for cash.  Alternatively investors may ask for a redemption of

20   Retrophin shares or a combination of Retrophin shares and

21   cash."

22           Count Four of the Superseding Indictment charges

23   Mr. Shkreli with conspiracy to commit securities fraud in

24   relation to MSMB Healthcare as follows:

25           In or about are and between February 2011 and

*Rivka Teich, CSR, RPR, RMR  -  Official Court Reporter*

Proceedings                                5566

1   September 2014, both dates being approximate and inclusive,

2   within the Eastern District of New York and elsewhere, the

3   defendant Martin Shkreli, together with others, did knowingly

4   and willfully conspire to use and employee manipulative and

5   deceptive devices and contrivances contrary to Rule 10-b-5 of

6   the Rules and Regulations of United States Securities and

7   Exchange Commission, Title 17, Code of Federal Regulations,

8   Section 240.10b-5, by:  (A) employing devices, schemes and

9   artifices to defraud; (b) making untrue statements of material

10  fact and omitting to state material facts necessary in order

11  to make the statements made in light of the circumstances

12  under which they were made not misleading; (c) engaging in

13  acts, practices and courses of business which would and did

14  operate as a fraud and deceit upon investors and potential

15  investors in MSMB Healthcare in connection with a purchase and

16  sale of investments in MSMB Healthcare directly and indirectly

17  by use of means and instrumentalities of interstate commerce

18  and the mails, contrary to Title 15, United States Code,

19  Sections 78j(b) and 78ff.

20          In furtherance of the conspiracy and to effect its

21  objects, within the Eastern District of New York and

22  elsewhere, the defendant Martin Shkreli, together with others,

23  committed and caused to be committed among others, the

24  following overt acts:

25          A.  On or about December 16, 2011, Shkreli sent an

Proceedings                          5567

1    e-mail to Kevin Mulleady and stated that MSMB Healthcare had

2    45 million in assets under management.  And 80 million in

3    assets under management if the full value of Retrophin was

4    taken into account.

5            B.  On or about April 18, 2011, Shkreli sent an

6    e-mail to Kevin Mulleady and stated that MSMB Healthcare had

7    55 million in assets under management.

8            C.  On or about April 19, 2012, in response to an

9    inquiry by a potential sophisticated investor about how MSMB

10   Healthcare could pay employee salaries with a modest asset

11   base of 55 million.  Mr. Shkreli stated, quote, "Lots of ways,

12   many of us have zero salaries or low salaries.  We have some

13   expenses the fund pays for and yet other deferments that are

14   creative.  We will tell more when we meet."

15           D.  On or about September 10, 2012, Shkreli sent an

16   e-mail to the Healthcare Limited Partners, including Alan

17   Geller and stated, in part, "I have decided to wind down our

18   hedge fund partnerships with a goal of completing the

19   liquidation of the funds by November or December 1st, 2012.

20   Original MSMB investors (2009) have just about doubled their

21   money net of fees.  Investors will have their limited

22   partnership interests redeemed by the fund for cash.

23   Alternatively, investors may ask for a redemption of Retrophin

24   shares or a combination of Retrophin shares and cash."

25           I have already explained to you the crime of

Proceedings                                5568

1  securities fraud.  To find that Mr. Shkreli is guilty of Count

2  One you must find that Mr. Shkreli conspired to commit

3  securities fraud as to MSMB Capital.  To find Mr. Shkreli

4  guilty of Count Four you must find that Mr. Shkreli conspired

5  to commit securities fraud as to MSMB Healthcare.

6         For Counts One and Four, the Government need not

7  prove that Mr. Shkreli actually committed securities fraud,

8  the unlawful acts charged as the objects of the conspiracy in

9  Counts One and Four.  However, you must find beyond a

10  reasonable doubt that Mr. Shkreli conspired with one or more

11  individuals to commit securities fraud.

12         Conspiracy, I will now instruct you on conspiracy.

13         The relevant portion of the conspiracy statute,

14  Title 18, United States Code, section 371, provides in

15  relevant part that it shall be unlawful for "two or more

16  persons to conspire either to commit any offense against the

17  United States, or to defraud the United States, or any agency

18  thereof in any manner, or for any purpose, and one or more of

19  such persons do any act to effect the object of the

20  conspiracy."

21         A conspiracy is a kind of criminal partnership, at

22  the heart of which is an agreement or understanding by two or

23  more persons to violate other laws.  A conspiracy to commit a

24  crime is an entirely separate and different offense from the

25  underlying crime that the conspirators intended to commit.

Proceedings                                                    5569

1   Thus, if a conspiracy exists, it is still punishable as a

2   crime, even if it should fail to achieve its purpose.  A

3   defendant may be found guilty of conspiracy, even if he was

4   incapable of committing the substantive crime.  Consequently,

5   for a defendant to be guilty of conspiracy there is no need

6   for the Government to prove that he or any other conspirator

7   actually succeeded in their criminal goals or that they could

8   have succeeded.

9           How are you?  Do you want to take a stretch?  Need a

10  break?  A break, okay.  I'll continue this instruction when we

11  return.

12          (Jury exits the courtroom.)

13          (Whereupon, a recess was taken at 2:30 p.m. )

14          THE COURT:  Let's take a few minutes.

15          *                    *                    *

16          (Jury enters the courtroom.)

17          THE COURT:  All jurors are present.  Please have a

18  seat.  Thank you members of the jury for your ongoing

19  attention.  I know this is a lot.

20          I was in the middle of advising you about conspiracy

21  to commit securities fraud, so I will pick up where I left

22  off.

23          To prove the crime of conspiracy to commit

24  securities fraud, the Government must prove four elements

25  beyond a reasonable doubt.

Proceedings                                    5570

1          First, that two or more persons entered into an

2    agreement to commit securities fraud, as I have defined the

3    crime of securities fraud on page 32.

4          Second, the defendant knowingly and intentionally

5    became a member of the conspiracy.

6          Third, that one of the members of the conspiracy

7    committed at least one of the overt acts charged in the

8    Superseding Indictment.

9          And Four, that at least one overt act was in

10   furtherance of some object or purpose of the conspiracy as

11   charged in the Superseding Indictment.

12         The first element existence of the agreement.  The

13   first element that the Government must prove beyond a

14   reasonable doubt for Counts One and Four is that two or more

15   persons entered into the charged agreement to commit

16   securities fraud.  One person cannot commit a conspiracy

17   alone, rather the proof must convince you that at least two

18   persons joined together in a common criminal scheme.  The

19   Government need not prove that members of the conspiracy met

20   together or entered into any express or formal agreement.  You

21   need not find that the alleged conspirators stated in words or

22   writing what the scheme was, its objects or purpose, or the

23   means by which the scheme was to be accomplished.  It is

24   sufficient to show that the conspirators tacitly came to a

25   mutual understanding to accomplish an unlawful act by means of

Proceedings                                              5571

1   a joint plan or common design.

2           You may, of course, find that the existence of an

3   agreement between two or more persons to violate the law has

4   been established by direct proof.  But since, by its very

5   nature a conspiracy is characterized by secrecy, direct proof

6   may not be available.  Therefore, you may infer the existence

7   of a conspiracy from the circumstances of this case, and the

8   conduct of the parties involved.  In a very real sense, then,

9   in the context of conspiracy cases, actions often do speak

10  louder than words.  In determining whether an agreement

11  existed here, you may consider the actions and statements of

12  all those you find to be participants in the conspiracy as

13  proof that a common design existed to act together for the

14  accomplishment of the unlawful purpose stated in the

15  Superseding Indictment.

16          The second element that must be proven beyond a

17  reasonable doubt is membership in the conspiracy.  The

18  Government must prove beyond a reasonable doubt for Counts One

19  and Four that the defendant knowingly intentionally became a

20  member of the charged conspiracy.  I've explained to you what

21  it means to act knowingly and intentionally.  A person acts

22  knowingly an intentionally, if he acts voluntarily,

23  deliberately and purposely and not because of ignorance,

24  mistake, accident, negligence or careless innocence.  In other

25  words, did the defendant participate in the conspiracy with

Proceedings                                    5572

1   knowledge of its unlawful purpose and with a specific

2   intention of furthering its business or objective?  Knowledge

3   and intent may be inferred from a secretive or irregular

4   manner in which activities are carried out.  Whether a

5   defendant acted knowingly may be proven by the defendant's

6   conduct and by all of the facts and circumstances surrounding

7   the case.

8          In order for a defendant to be deemed a member of

9   the conspiracy he need not have taken a stake in the venture

10  or its outcome.  While proof of a financial or other interest

11  in the outcome of a scheme is not essential, if you find that

12  the defendant did have such an interest, it is a factor that

13  you may properly consider in determining whether or not the

14  defendant was a member of the conspiracy charged in the

15  Superseding Indictment.

16         A defendant's participation in the conspiracy must

17  be established by independent evidence of his own acts and

18  statements as well as those of the other alleged

19  co-conspirators and the reasonable inferences that may be

20  drawn from them.

21         A defendant's knowledge may be inferred from the

22  facts proved and that connection, I instruct you that, to

23  become a member of the conspiracy a defendant need not have

24  been apprised of all of the activities of all members of the

25  conspiracy.  Moreover, a defendant need not have been fully

1   informed as to all of the details or the scope of the

2   conspiracy in order to justify an inference of knowledge on

3   his part.  In addition, a defendant need not have joined in

4   all of the conspiracy's unlawful objectives.

5         In considering whether a defendant participated in a

6   conspiracy, be advised that a conspirator's liability is not

7   measured by the extent or duration of his participation, as he

8   need not have been a member of the conspiracy for the entire

9   time of its existence.  In addition, each member of the

10  conspiracy may perform separate and distinct acts and may

11  perform them at different times.  Some conspirators play major

12  roles, while others play minor parts in the scheme.  An equal

13  role is not what the law requires.  Even a single act may be

14  sufficient to draw a defendant within the ambit of this

15  conspiracy.  The key inquiry is simply whether a defendant

16  joined the conspiracy charged with an awareness of at least

17  some of the basic aims and purposes of the unlawful agreements

18  and with the intent to help it succeed.

19        I caution you that mere knowledge or acquiescence

20  without participation, in an unlawful plan is not sufficient.

21  Moreover, the fact that the acts of a defendant, without

22  knowledge, merely happened to further the purposes or

23  objectives of the conspiracy, does not make the defendant a

24  member.  More is required under the law.  What is required is

25  that a defendant must have participated with knowledge of at

Proceedings                                          5574

1    least some of the purposes or objectives of the conspiracy,

2    and with the intention of aiding in the accomplishment of

3    these unlawful ends.  In sum, a defendant with an

4    understanding of the unlawful character of the conspiracy must

5    have intentionally engaged, advised or assisted in it for the

6    purpose of furthering the illegal undertaking.

7              The third element that the Government must prove

8    beyond a reasonable doubt is that one of the members of the

9    conspiracy knowingly committed at least one of the overt acts

10   charged in the Superseding Indictment as I have read them

11   before.

12             In order for the Government to satisfy this element

13   it is not required that all of the overt acts alleged in the

14   Superseding Indictment be proven, or that the overt act was

15   committed at precisely the time alleged in the Superseding

16   Indictment.  It is sufficient if you are convinced beyond a

17   reasonable doubt that the overt act occurred at or about the

18   time place stated.  Similarly, you need not find that the

19   defendant himself committed the overt act.  It is sufficient

20   for the Government to show that one of the conspirators

21   knowingly committed an overt act in furtherance of the

22   conspiracy, since in the eyes of the law such an act becomes

23   the act of all of the members of the conspiracy.

24             The fourth element:  In furtherance of some

25   objective of the conspiracy.  If you find that overt act or

Proceedings                                                    5575

1    acts were committed, the Government must prove beyond a

2    reasonable doubt that the overt act or acts were done

3    specifically to further some objective of the conspiracy.  In

4    order for the Government to satisfy this element it must prove

5    beyond a reasonable doubt that at least one overt act was

6    knowingly and willfully done by at least one conspirator, in

7    furtherance of some object or purpose of the conspiracy as

8    charged in the Superseding Indictment.  In this regard you

9    should bear in mind the overt act standing alone may be an

10   innocent lawful act.  Frequently however, an apparently

11   innocent act sheds its harmless character if it is a step in

12   carrying out, promoting, aiding or assisting the

13   conspiratorial believe scheme.  Therefore, you are instructed

14   that the overt act does not have to be an act which, in and of

15   itself, is criminal or constitutes an objective of the

16   conspiracy.

17          In sum, in order to prove that Mr. Shkreli is guilty

18   of Counts One and Four, the Government must prove beyond a

19   reasonable doubt:  1) that Mr. Shkreli entered into an

20   agreement with one or more individuals to commit securities

21   fraud.  2) that Mr. Shkreli knowingly and intentionally joined

22   the conspiracy.  3) that at least one of the overt acts

23   charged in the Superseding Indictment was committed by at

24   least one member of the conspiracy.  And 4) that the overt act

25   was committed specifically to further some objective of the

Proceedings                                          5576

1    conspiracy.

2              If you find that the Government has not proven any

3    one of these elements then you must find Mr. Shkreli not

4    guilty of Counts One and Four.

5              We're going to talk about venue.  I have explained

6    to you the elements the Government must prove beyond a

7    reasonable doubt as to Counts One and Four.  The Government

8    must also prove venue.  As I've previously explained to you,

9    the Government must prove venue only by a preponderance of the

10   evidence.  I remind you that to establish a fact by a

11   preponderance of the evidence, means to prove that the fact is

12   more likely true than not.

13             I've already explained venue for the securities

14   fraud counts, charged in Counts Three and Six.  To establish

15   venue for conspiracy to commit securities fraud as charged in

16   Counts One, Four and Eight, conspiracy to commit wire fraud as

17   charged in Counts Two, Five, Seven the Government must prove

18   that it is more likely than not that an overt act in

19   furtherance of the conspiracy was committed in the Eastern

20   District of New York, which consists of the counties of King,

21   also known as Brooklyn, Queens, Richmond, also known as Staten

22   Island, Nassau and Suffolk.  The overt act does not have to be

23   an overt act that is charged in the Superseding Indictment in

24   furtherance of the conspiracy.  In this regard the Government

25   need not prove that the crime charged was committed in the

Proceedings                                              5577

1  Eastern District of New York.  Or that Mr. Shkreli, or any

2  alleged co-conspirator, was even physically present here.  It

3  is sufficient to satisfy the venue requirement if an overt act

4  in furtherance of the conspiracy occurred within the Eastern

5  District of New York.  This includes acts not just by

6  Mr. Shkreli or his co-conspirators, but also acts that the

7  conspirators caused others to take that materially furthers

8  the ends of the conspiracy.

9          Therefore, if you find that it is more likely than

10  not that an overt act in furtherance of the conspiracy took

11  place in the Eastern District of New York, the Government has

12  satisfied its burden of prove as to venue as to Counts One,

13  Two, Four, Five, Seven and Eight.  Again, I caution you that

14  the preponderance of the evidence standard applies only to

15  venue.  The Government must prove each of the elements of all

16  the counts of the crimes charged beyond a reasonable doubt.

17          In sum, if you find that the Government has failed

18  to prove any one of the elements for either Count One for MSMB

19  Capital, or Count Four for MSMB Healthcare, beyond a

20  reasonable doubt then you must find Mr. Shkreli not guilty of

21  securities fraud conspiracy for that count.

22          To find Mr. Shkreli guilty of conspiring to commit

23  securities fraud as charged in Count One or Count Four, you

24  must find that the Government has proven beyond a reasonable

25  doubt each element of the conspiracy to commit securities

Proceedings                                    5578

1    fraud in Count One for MSMB Capital or Count Four for MSMB

2    Healthcare.  And that the Government has also established

3    venue for that count by a preponderance of the evidence.

4           We will next talk about Counts Two and Five, which

5    charge conspiracy to commit wire fraud.

6           Count Two of the Superseding Indictment charges

7    Mr. Shkreli with conspiracy to commit wire fraud as to MSMB

8    Capital, and Count Five charges Mr. Shkreli with conspiracy to

9    commit wire fraud as to MSMB Healthcare.

10          Count Two of the Superseding Indictment charges

11   Mr. Shkreli with conspiracy to commit wire fraud in connection

12   with MSMB Capital as follows.

13          In or about and between September 2009 and

14   September 2014, both dates being approximate and inclusive

15   within the Eastern District of New York and elsewhere, the

16   defendant, Martin Shkreli, together with others, did knowingly

17   and intentionally conspire to device a scheme and artifice to

18   defraud investors and potential investors of MSMB Capital, to

19   obtain money and property from them by means of materially

20   false and fraudulent pretenses, representations and promises,

21   and for the purpose of executing such scheme and artifice to

22   transmit and cause to be transmitted by means of wire

23   communication in interstate and foreign commerce writings,

24   signs, signals, pictures and sounds contrary to Title 18,

25   United States Code, Section 1343.

Proceedings                                    5579

1           Count Five of the Superseding Indictment charges

2   Mr. Shkreli with conspiracy to commit wire fraud in connection

3   with MSMB Healthcare as follows:

4           In or about and between February 2011 and

5   September 2014, with both dates being approximate and

6   inclusive, within the Eastern District of New York and

7   elsewhere, the defendant, Martin Shkreli, together with

8   others, did knowingly and intentionally conspire to devise a

9   scheme and artifice to defraud investors and potential

10  investors of MSMB Healthcare and to obtain money and property

11  from them by means of materially false and fraudulent

12  pretenses representations and promises.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                              5580

1          THE COURT:  And for the purpose of executing such

2    scheme and artifice to transmit and cause to be transmitted

3    by means of wire communication in interstate and foreign

4    commerce, writing, sign, signal, pictures and sound contrary

5    to Title 18, United States Code Section 1343.

6          I have already explained to you what a conspiracy

7    is.  That is, what it means to conspire to commit an

8    offense, and again, the wire fraud conspiracy.  As a

9    reminder, the Government need not prove that Mr. Shkreli

10   actually committed the unlawful act charged as the object of

11   the conspiracy in Counts 2 and 5, that is, wire fraud.

12   Rather the Government must prove each one of the following

13   two elements, beyond a reasonable doubt.  First, that two or

14   more persons entered into an agreement to commit wire fraud,

15   and, second, that Mr. Shkreli knowingly and intentionally7

16   became a member of the conspiracy.

17          The overt acts on which I instructed you with

18   respect to Counts 1 and 4 which charge conspiracy to commit

19   securities fraud do not apply to Counts 2 and 5 which

20   charges conspiracy to commit wire fraud.

21          Let's talk about wire fraud, the definition, and

22   the fifth element.  I will now define wire fraud, which is

23   alleged to be the object of the conspiracy charged in

24   Count 2 involving MSMB Capital and Count 5 involving

25   MSMB Healthcare.  The relevant statute regarding wire fraud

Proceedings                              5581

1   in Section 1343 of Title 18 of the United States Code which

2   provides that whoever, having devised or intending to devise

3   any scheme or artifice to defraud or for obtaining money or

4   property by means of false or fraudulent pretenses,

5   representation or promises transmits or causes to be

6   transmitted by means of wire, radio or television

7   communication in interstate or foreign commerce any writing,

8   sign, signal, pictures or sounds for the purpose of

9   executing such scheme or artifice shall be guilty of the

10  crime.

11          The elements of wire fraud are:  First, that there

12  was a scheme or artifice to defraud or obtain money or

13  property by false and fraudulent pretenses, representations

14  or promises as alleged in the superseding indictment.

15          Second, that the defendant knowingly and willfully

16  participated in this scheme or artifice to defraud with

17  knowledge of its fraudulent nature and with specific intent

18  to defraud.

19          And, third, that in the execution of this scheme

20  the defendant used or caused the use of interstate wires.

21          The first element, that is, the existence of the

22  scheme or artifice to defraud investors and potential

23  investors and MSMB Capital as to Count 2 and MSMB Healthcare

24  as to Count 5, and to obtain money or property from them by

25  means of false and fraudulent pretenses, representations or

Proceedings                                    5582

1    promises.

2            A scheme or artifice is simply a plan for the

3    accomplishment of an objective.  Fraud is a general term

4    which embarrasses all the various means that an individual

5    can devise and what that are used by an individual to gain

6    an advantage other another by false representation,

7    suggestion, suppression or omission of the truth or

8    deliberate disregard for the truth.

9            A scheme or artifice to defraud for the purpose of

10   the wire fraud statute is any plan, device or course of

11   action designed to obtain money or property by means of

12   false representation:  That the scheme to defraud is a plan

13   to deprive another of money or property by trick, deceit,

14   deception or swindle or overreaching.  The scheme to fraud

15   giving rise to the wire fraud conspiracy charged in Counts 2

16   and 5 are alleged to have been carried out by making false

17   representations.  The statement, representation, claim or

18   document is false if it is untrue when made and was known at

19   the time to be untrue by the person making it or causing it

20   to be made.  A representation or a statement is fraudulent

21   if it was falsely made with the intention to deceive.

22   Deceitful statements of half truths or the concealment or

23   omission of material fact and the expression of an opinion

24   not honestly entertained may compensate false or fraudulent

25   representations under the statute.

Proceedings                    5583

1          The fraudulent representation must relate to a

2    material fact or matter.  The material fact in the context

3    of wire fraud is one that reasonably would be expected to be

4    of concern to a reasonable and prudent person in relying on

5    the representation or statements in making a decision.

6          The deception need not be premised upon spoken or

7    written words alone.  The arrangement of words or the

8    circumstances in which they are used may convey a false and

9    deceptive appearance.  If there is an intentional deception,

10   the manner in which it is accomplished does not matter.

11         In addition to proving a statement was false or

12   fraudulent and related to a material fact, in order to

13   establish a scheme to defraud, the Government must prove

14   that the alleged scheme contemplated depriving another of

15   money or property.  It is not necessary that the Government

16   prove that the defendant actually realized any gain from the

17   scheme or that the intended victim actually suffered any

18   loss.

19         The second element is participation in the scheme

20   with intent.  The second element of wire fraud is that the

21   defendant participated in the scheme to defraud knowingly,

22   willfully and with the specific intent to defraud.  I've

23   already instructed you on the meaning of knowingly and

24   willfully.  I'll refer you to those instructions as they

25   apply here also.

Proceedings                          5584

1       For the purpose of the wire fraud statute, a

2  intent to defraud means to act knowingly and with specific

3  intent to deceive for the purpose of causing some financial

4  or property loss to another.

5       I will remind you, however, that the question of

6  whether a person acted knowingly, willfully and with intent

7  to defraud is a question of fact for you to determine, like

8  any other fact question.

9       This question involves the defendant's state of

10  mind.  As I said before, direct proof of knowledge and

11  fraudulent intent is not necessary.

12       The ultimate fact of knowledge and criminal intent

13  though subjective, may be established by circumstantial

14  evidence based upon a person's outward manifestation, his or

15  her words, his or her conduct, his or her acts and all the

16  surrounding circumstances disclosed by the evidence and the

17  rational or logical inferences that may be drawn from them.

18  Circumstantial evidence is believed is of no less value than

19  direct evidence.

20       Under the wire fraud scheme even if false

21  representations or statements or omissions of material fact

22  do not amount to a fraud -- under the wire fraud statute

23  even false representations or statements or omissions of

24  material facts do not amount to a fraud unless done with

25  fraudulent intent.

Proceedings                          5585

1        However misleading or deceptive a plan may be, it

2   is not fraudulent if it was devised or carried out in good

3   faith.  An honest belief in the truth of the representations

4   made by a defendant is a complete defense however inaccurate

5   the statement may turn out to be.

6            A defendant, however, has no burden to establish a

7   defense of good faith.  There is another consideration to

8   bear in mind in deciding whether or not the defendant acted

9   in good faith.  You are instructed that if the defendant

10  conspired to commit wire fraud then the belief by the

11  defendant, if such a belief existed, that ultimately

12  everything would work out so that no one would lose any

13  money does not require you to find that the defendant acted

14  in good faith.  No amount of honest belief on the part of

15  the defendant that the scheme would, for example, ultimately

16  make a profit for investors will excuse fraudulent actions

17  or false representations caused by him to obtain money or

18  property.  I reiterate, however, that an intent to defraud

19  for purposes of the wire fraud statute means to act

20  knowingly and with specific intent to deceive for the

21  purpose of causing financial loss or property loss to

22  another.  As a practical matter you may mind intent to

23  defraud if the defendant knew that his conduct as a

24  participant in the scheme was calculated to deceive and

25  nonetheless he associated himself with the alleged

Proceedings                                      5586

1   fraudulent scheme for the purpose of causing loss to

2   another.

3          The third element is use of a wire.  The third and

4   final element of wire fraud is the use of an interstate or

5   international wire communication in furtherance of the

6   scheme to defraud.  The wire communication must pass between

7   two or more states or it must pass between the United States

8   and a foreign country.  A wire communication includes a wire

9   transfer of funds between banks in different states,

10  telephone calls, e-mails and facsimiles between two

11  different states.

12         The item sent through the wires need not

13  self-contain a fraudulent representation.  However, it must

14  further or assist in the carrying out of the scheme to

15  defraud.  It is not necessary for the defendant to be

16  directly or personally involved in the wire communication as

17  long as the communication was reasonably foreseeable in the

18  execution of the alleged scheme to defraud in which the

19  defendant is accused of participating.  I remind you that

20  the Government need not prove that Mr. Shkreli actually

21  committed wire fraud, the unlawful act charged as the object

22  of the conspiracy in Counts 2 and 5.  Rather, the Government

23  must prove beyond a reasonable doubt -- what the Government

24  must prove beyond a reasonable doubt is that the purpose of

25  the conspiracy was to commit wire fraud and that the

Proceedings                    5587

1   defendant knowingly and intentionally joined that

2   conspiracy.

3           I have previously instructed you on venue for the

4   conspiracy count, and those instructions apply here.  In

5   sum, if you find that the Government has failed to prove

6   either of the elements of conspiracy for either Count 2 for

7   MSMB Capital or Count 5 for MSMB Healthcare beyond a

8   reasonable doubt, then you must find Mr. Shkreli not guilty

9   of wire fraud conspiracy for that count.

10          To find Mr. Shkreli guilty of conspiracy to commit

11  wire fraud as charged in Count 2 or Count 5, you must find

12  that the Government has proven beyond a reasonable doubt

13  both elements of conspiracy as charged in Count 2 for

14  MSMB Capital or Count 5 for MSMB Healthcare and that

15  the Government has also established venue on that count by a

16  preponderance of the evidence.

17          I will now charge you on Count 7.  Count 7 of the

18  superseding indictment charges Mr. Shkreli with wire fraud

19  conspiracy in connection with Retrophin as follows:  In or

20  about and between February 2011 and September 2014 both days

21  approximate and inclusive within the Eastern District of

22  New York and elsewhere, the defendant Martin Shkreli,

23  together with others did knowingly and intentionally

24  conspire to devise and scheme and artifice to defraud

25  Retrophin and to obtain money and property from Retrophin by

Proceedings                    5588

1  means of materially false and fraudulent pretenses,

2  representations, and promises.  And for the purpose of

3  executing such scheme and artifice, to transmit and cause to

4  be transmitted by means of wire communication in interstate

5  and foreign commerce, writing, sign, signals, pictures and

6  sound contrary to Title 18, United States Code Section 1343.

7  With regard to the conspiracy to commit wire fraud I have

8  already explained what it means to conspire to commit an

9  offense.  Those same instructions apply to Count 7.

10       I further remind you that Government need not

11  prove that Mr. Shkreli actually committed wire fraud, the

12  unlawful act charged as the object of the conspiracy in

13  Count 7, rather the Government must prove each one of the

14  following two elements beyond a reasonable doubt.

15       First, that two or more persons entered into an

16  agreement to commit wire fraud and, second, that the

17  defendant knowingly and intentionally became a member of the

18  conspiracy:  With regard to wire fraud I have already

19  instructed you on the elements of wire fraud.  Those same

20  instructions apply to Count 7.

21       As a reminder, as I instructed you on Page 63, the

22  elements of wire fraud are:  First, that there was a scheme

23  or artifice to defraud or to obtain money or property by

24  false and fraudulent pretenses, representation, or promises

25  as alleged in the superseding indictment.  A fraudulent

Proceedings                    5589

1    representation may include the failure to disclose material

2    information if the defendant was under a legal, professional

3    or contractual duty to make such a disclosure.  You have

4    heard testimony regarding the fiduciary duty of corporate

5    officers and directors.  One such duty, the duty of loyalty

6    mandates that the best interest of the corporation and its

7    shareholders take precedence over any interest to satisfy a

8    director or officer and not shared by the stockholders

9    generally.

10           However, in order for a failure to disclose

11   material information to constitute a fraudulent

12   representation, the purpose of the wire fraud statute, the

13   defendant must have actually known that such disclosure was

14   required to be made and must have failed to make such

15   disclosures with the intent to defraud.

16           Second, that the defendant knowingly and willfully

17   participated in the scheme for artifice to defraud with

18   knowledge of its fraudulent nature and specific intent to

19   defraud.

20           And third, that in the execution of that scheme

21   the defendant used or caused to be used of interstate wires.

22   Specifically as to Count 7, the Government alleges that

23   Mr. Shkreli together with others conspired the defraud

24   Retrophin by causing it to, one, transfer Retrophin shares

25   to MSMB Capital investors even though MSMB Capital -- I'm

Proceedings                              5590

1    sorry.

2           Specifically as to Count 7, the Government alleges

3    that Mr. Shkreli together with others conspired to defraud

4    Retrophin by causing it to, one, transfer Retrophin shares

5    to MSMB Capital even though MSMB Capital never invested in

6    Retrophin.

7           2:  Enter into settlement agreements with

8    defrauded MSMB Capital and MSMB Healthcare investors to

9    settle liabilities owed by MSMB funds and Shkreli.

10          And 3:  Enter into sham consulting agreements with

11   defrauded MSMB Capital or Elea Capital investors as an

12   alternative means to settle liability owed by the MSMB funds

13   and Mr. Shkreli.

14          You can find Mr. Shkreli guilty of Count 7 only if

15   the Government has proven both elements of the conspiracy

16   beyond a reasonable doubt as to one of the above means

17   satisfied in 1, 2 or 3 or as to any one of the settlement

18   and consulting agreements, but you must be unanimous as to

19   that finding.

20          Venue, with regard to venue I have already

21   previously instructed you on venue for wire fraud

22   conspiracy, and those instructions apply here.

23          Now, with regard to Count 8.  Count 8 of the

24   superseding indictment charges Mr. Shkreli with conspiracy

25   to commit securities fraud in connection with Retrophin as

Proceedings                    5591

1    follows:  In or about and between November 2012 and

2    September 2014, both days being approximate and inclusive

3    within the Eastern District of New York and elsewhere, the

4    defendant Martin Shkreli together with others did knowingly

5    and willfully conspire to use and employ manipulative and

6    deceptive devices and contrivances contrary to Rule 10B5 of

7    the rules and regulations of the United States Securities

8    and Exchange Commission Title 17, Code of Federal

9    Regulations Section 240.10B5 by, A, employing devices,

10   schemes and artifices to defraud.

11          B, making untrue statements of material facts and

12   omitting to state material facts necessary in order to make

13   the statements made in light of the circumstances under

14   which they were made not misleading.

15          And C, engaging in acts, practices and course of

16   business which would and did operate as a fraud and deceit

17   upon investors and potential investors in Retrophin in

18   connection with a purchase and sale of securities of

19   Retrophin directly and indirectly by use of means and

20   instrumentality of interstate commerce and the mail contrary

21   to Title 15, United States Code Section 7, 8 -- 78JB and

22   78FS.

23          In furtherance of the conspiracy and to effect its

24   object within the Eastern District of New York and

25   elsewhere, the defendant Martin Shkreli together with others

Proceedings                                          5592

1    committed and caused to be committed amongst others the

2    following overt acts:  A, on or about December 12, 2012,

3    Evan Greebel sent an e-mail to Marek Biestek attaching six

4    stock purchase agreements and stated in part, quote,

5    "Attached are purchase agreements for the acquisition of the

6    unrestricted stock.  Please ask each person to sign the last

7    page and return it to me," end of quote.

8            B, on or about December 13th, 2012 Evan Greebel

9    sent an e-mail to Marek Biestek and one of the seven

10   employees and contractors who received unrestricted or

11   free-trading shares and stated in part quote:  "Please send

12   me an e-mail confirming the following:  I represent that I

13   am not an officer, a director or holder of 10 percent or

14   more of the outstanding equities, securities of

15   Desert Gateway and do not alone or together with any other

16   person exercise control over Desert Gateway," end of quote.

17           C, on or about December 17th, Mr. Shkreli sends an

18   e-mail to all employees copying six of the seven employees

19   and contractors who received unrestricted and free-trading

20   shares and stated that Retrophin now had four employees and

21   that everyone else, including the employees and contractors

22   who received the unrestricted or free-trading shares were no

23   longer employees or consultants to Retrophin or MSMB, even

24   though they could continue using Retrophin's office space as

25   courtesy.  Mr. Shkreli then forwarded this e-mail to Evan

Proceedings                    5593

1   Greebel.

2           D:  On or about December 20, 2012, Evan Greebel

3   sent an e-mail to Shkreli attaching a Schedule 13D and

4   stated "Attached is a draft of the 13D.  We should discuss,"

5   end of quote.

6           E:  On or about December 20th Shkreli filed an

7   Schedule 13D with be SEC that failed to disclosure his

8   control over any of the unrestricted or free-trading shares.

9           F:  On or about January 2nd, 2013, Shkreli sent an

10  e-mail to Evan Greebel requesting Evan Greebel's thought on

11  a draft e-mail that Shkreli wanted to send to one of the

12  seven employees and consultants who received unrestricted or

13  free-trading shares and ws selling his RTRF stock.  In the

14  draft e-mail Shkreli stated in part, quote, "I have decided

15  to commence litigation against you for failing to honor the

16  agreement that we made in our office on December 10th.  You

17  agreed to work for MSMB.  Instead you have failed to come to

18  the office.  You will not even return my telephone calls."

19  End of quote.

20          Less than 30 minutes later Evan Greebel replied to

21  Shkreli and stated, quote, "Very risky given what your

22  agreement was.  Could be opening a much bigger can of

23  worms."  End of quote.

24          G:  On or about February 19, 2013 Shkreli filed an

25  amended Schedule 13D with the SEC that failed to disclosure

Proceedings                    5594

1    his control over any of the unrestricted or free-trading

2    shares.

3         H:  On or about March 8th, 2013 Evan Greebel sent

4    an e-mail to Shkreli and stated, quote, "Michael Fearnow and

5    the purchasers are signing an amendment to their purchase

6    agreement and in the amendment the purchaser is directing

7    Michael Fearnow to have the stock delivered to designated

8    people."  End of quote.

9         I:  On or about April 10th, 2013, Evan Greebel

10   sent an e-mail to Michael Fearnow and Shkreli and stated in

11   part, quote, "The 50K unrestricted or free-trading shares

12   that were owed to Marek Biestek should be broken down as

13   following," end of quote.

14        On or about -- J -- J -- on or about May 9th, 2013

15   in response to an e-mail from Evan Greebel requesting the

16   source of unrestricted or free-trading shares to settle a

17   dispute with a distraught an MSMB Healthcare investor

18   Shkreli stated, quote, "Take from anyone.  I don't care.  Do

19   the math."  End of quote.

20        Conspiracy.  Again, I've already instructed you on

21   conspiracy generally at Page 51.  Those same instructions

22   apply here.  As a reminder, the Government need not prove

23   that Mr. Shkreli actually committed securities fraud, the

24   unlawful act charged as the object of the conspiracy in

25   Count 8.  Rather, the Government must prove beyond a

Proceedings                                    5595

1    reasonable doubt the following:  First that two or more

2    persons entered into an agreement to commit securities

3    fraud.

4          Second, that the defendant knowingly and

5    intentionally became a member of the conspiracy.

6          Third, that one of the members of the conspiracy

7    knowingly committed at least one of the overt acts charged

8    in the superseding indictment.

9          And fourth, that the overt act or acts that you

10   find were committed were done specifically to further some

11   objectives of the securities fraud conspiracy.

12         With regard to securities fraud I've already

13   instructed you on the elements of securities fraud at

14   Page 32 of these instructions.

15         As a reminder the elements of securities fraud

16   are:  First, in connection with the purchase or sales of

17   securities Martin Shkreli did one or more of the following:

18         1:  Employed a device, scheme, or artifice to

19   defraud.

20         Or 2, made an untrue statement of material fact or

21   omitted to state a material fact necessary in order to make

22   the statements made in the light of the circumstances under

23   which they were made not misleading; or

24         3:  Engaged in an act, practice or course of

25   business that operated or would operate as a fraud or deceit

Proceedings                            5596

1   upon a purchaser or fellow.

2           Second, to act willfully, knowing and with the

3   intent to defraud.

4           Third, to knowingly use or cause to be used any

5   means or instrumentalities of transportation or

6   communication in interstate commerce or the use of the mail

7   in furtherance of the fraudulent conduct.

8           Any conduct that is designed to deceive or defraud

9   investors by controlling or artificially affecting the price

10  of securities is prohibited.  An essential element of

11  manipulation of securities is the deception of investors

12  into believing that the prices at which they purchase and

13  sell securities are determined by the natural interplay of

14  supply and demand.

15          You have also heard the parties use the term

16  affiliate.  An affiliate of an issuer under the law means a

17  person that directly or indirectly through one or more

18  intermediaries controls or is controlled by or is under

19  common control with such issuer.  Whether a person is an

20  affiliate of Retrophin is a question of fact for the jury.

21          With regard to venue I have previously instructed

22  you on venue for the securities fraud conspiracy, those

23  instructions apply here.

24          Now, a word about the defenses.  First, the good

25  faith attempt.  This faith is a complete defense to the

Proceedings                    5597

1    charges in this case if defendant believed in good faith

2    that he was acting properly even if he was mistaken in that

3    belief and even if others were injured by his conduct, there

4    would be no crime.  If you believe that Mr. Shkreli believed

5    in the truth of the representations that he made then it

6    does not make any difference if the representations were

7    untrue.  The burden of establishing the last of the good

8    faith in criminal intent rests on the Government.  A

9    defendant is under no burden to prove his good faith,

10   rather, the Government must prove bad faith or knowledge of

11   falsity beyond a reasonable doubt.

12          As a reminder I instruct you that when considering

13   the offense of good faith you consider it in conjunction

14   with my instructions on Page 41 and 68 regarding the

15   defendant's belief if such belief existed that ultimately

16   everything would work out so that no one would lose money.

17          The second defense is reliance on counsel.  You've

18   heard evidence that with regard to Count 7 and 8 Mr. Shkreli

19   received advice from a lawyer and you may consider that

20   evidence in deciding whether Mr. Shkreli acted willfully and

21   with knowledge and with fraudulent intent.  The mere fact

22   that Mr. Shkreli may have received legal advice does not in

23   itself necessarily constitute a complete defense.  Instead

24   you must consider whether, first, Mr. Shkreli honestly and

25   in good faith sought the advice of a competent lawyer as to

Proceedings                    5598

1   what he may lawfully do.

2           Second, whether he fully and honestly laid out all

3   the facts before his lawyer.

4           And three, whether in good faith he honestly

5   followed such advice relying on it and believing it to be

6   correct.

7           In short, you should consider whether he's seeking

8   and obtaining advice from a lawyer Mr. Shkreli intended that

9   his acts shall be lawful.  If he did so it is the law that

10  the defendant cannot be convicted of a crime that involved

11  willful and unlawful intent even if such advice was an

12  inaccurate construction of a law.

13          On the other hand a defendant cannot willfully and

14  knowingly violate the law and excuse himself from the

15  consequences of his conduct by arguing that he followed the

16  advise of his lawyer.  Whether Mr. Shkreli acted in good

17  faith for the purpose of seeking guidance as to the specific

18  acts in this case, whether he made full and complete reports

19  to his lawyer and whether he acted substantially in

20  accordance with the advice received from his lawyer are

21  questions for you to determine.

22          Now for the closing instructions.  I have now

23  outlined for you the rules and applicable -- the rules of

24  law applicable to the charges in this case and the processes

25  by which you should weigh the evidence and determine the

Proceedings                           5599

1    facts.   In a few minutes you will retire to the jury room

2    for your deliberations.

3            First, regarding the selection of a foreperson.

4    When you retire you will choose one member of the jury to

5    act as the foreperson.   That person will preside over the

6    deliberations and speak for you here in open court.   In

7    order for your deliberations to proceed in an orderly

8    fashion, you must have a foreperson, but, of course, his or

9    her opinion or both or not entitled to any greater weight

10   than that of any other juror.   The foreperson merely acts as

11   your mouthpiece here in court.

12           2:   Let me talk to you about verdict -- your

13   verdict and deliberations.   The Government to prevail must

14   prove the essential elements by the required degree of proof

15   as already explained in these instructions.   If the

16   Government succeeds, your verdict should be guilty as to the

17   count; if it fails your verdict should be not guilty as to

18   the count.

19           To report a verdict it must be unanimous, meaning

20   all of you must agree.   Your function is to weigh the

21   evidence in the case and determine whether or not the

22   defendant is guilty based solely upon the evidence.

23           Each juror is entitled to his or her opinion.

24   Each should, however, exchange views with his or her fellow

25   jurors.   That is the very purpose of jury deliberation, to

Proceedings                                    5600

1    discuss and consider the evidence, to listen to the views of

2    you fellow jurors, to present your own individual views, to

3    consult with one another, and to reach an agreement based

4    solely and wholly on the evidence, if you can do that

5    without violence to you own individual judgment.

6              Each of you must decide the case for yourself

7    after consideration with your fellow jurors of the evidence

8    in the case.  But you should not hesitate to change an

9    opinion back after discussion with your fellow jurors it

10   appears it's erroneous.  However, if after carefully

11   considering all of the evidence and the arguments of your

12   fellow jurors, you entertain a conscientious view that

13   differs from the others, you are not to yield your

14   conviction simply because you were outnumbered.

15             Your final vote must reflect your conscientious

16   conviction as to how the issues should be decided.

17   Your verdict, whether guilty or not guilty, must be

18   unanimous.  As you deliberate your function is to weigh the

19   evidence in the case and to determine whether the defendant

20   is guilty beyond a reasonable doubt solely upon the basis of

21   such evidence.  Under your oath as jurors you may not

22   consider any consequences, including the punishment that may

23   be imposed upon the defendant if he is convicted.

24             You may not permit that to influence your verdict

25   or in any way enter into your deliberation.  The duty of

Proceedings                                5601

1    imposing punishment rests exclusively with the Court.

2          In addition, during your deliberations you must

3    not communicate with or provide any information to anyone by

4    any means about this case, you may only discuss the case

5    within the confines of the jury room.  You may not use any

6    electronic device or media such as the telephone, a cell

7    phone, Smartphone, iPhone, Blackberry or computer, the

8    Internet, any Internet service, any text or instant

9    messaging service, any Internet chat room, blog or website

10   such as Facebook, MySpace, Instagram, LinkedIn, YouTube or

11   Twitter to communicate to anyone about any information

12   regarding the case or to conduct any research about this

13   case.

14         In other words, you cannot talk to anyone on the

15   phone, correspond with anyone or electronically communicate

16   with anyone about the case except with your fellow jurors in

17   the jury room during deliberations.

18         Along the same lines you should not try to access

19   any information about the case or do research on any issue

20   that arose during the trial with any outside source,

21   including dictionary, reference books, or anything on the

22   Internet.

23         Information that you may find on the Internet or

24   in a printed reference might be incorrect or incomplete and

25   in our court system it is important that you not be

Proceedings                          5602

1    influenced by anyone or anything outside of the courtroom.

2          Your sworn duty is to decide this case solely and

3    wholly on the evidence that was presented to you in this

4    courtroom.

5          A word about note taking.  Your notes are to be

6    used solely to assist you and are not to be substituted for

7    your recollection of the evidence in this case.  Do not

8    assume simply because someone appears in a juror's note that

9    it necessarily took place in court.  Instead it is your

10   collective memory that must control as you deliberate upon

11   the verdict.  The fact that a particular juror has taken

12   notes entitles that juror's views to no greater weight than

13   those of any other juror and your notes are not to be shown

14   to any other juror during your deliberations.  They are your

15   notes and yours alone.

16         A word about communications with the Court.  If it

17   becomes necessary during your deliberations to communicate

18   with me for any reason, simply send me a note signed by your

19   foreperson or by one or more other members of the jury.  No

20   member of the jury should ever attempt to communicate with

21   me or with any other court personnel by any means other than

22   a signed writing.  I will not communicate with any member of

23   the jury on any subject touching on the merits of this case

24   other than in writing or orally here in the courtroom in

25   open court.  Do not ever disclosure how the jury stands

Proceedings                    5603

1   numerically or otherwise on the question of guilt or

2   innocence.

3           You do have the right to see the evidence.  You

4   will have the exhibits and a list of exhibits received in

5   evidence during the course of the trial in the jury room

6   with you.  If you wish to have any portion of the testimony

7   repeated, you may simply indicate that in a note.  Be as

8   specific as you can if you make such a request.  Let us know

9   which exhibit or which part of which witness' testimony you

10  want to hear and please be patient while we locate it.  So

11  try to specify the name and subject matter of any testimony

12  that you would like to hear.

13          If you need further instructions on any point of

14  law, you should also indicate that in a note.

15          Now, when you have reached a unanimous verdict,

16  simply send me a note signed by your foreperson if you have

17  reached a verdict.  Do not indicate in the note what your

18  verdict is.  To record a verdict it must be unanimous and

19  you must be prepared to render a verdict for the defendant

20  as to each count of the superseding indictment, so consider

21  each count separately.

22          To help you I have prepared a verdict form that

23  may be of assistance to you in your deliberations.  On the

24  verdict sheet are spaces marked guilty or not guilty for

25  each count.  The form is in no way intended to indicate how

Proceedings                              5604

1   you must deliberate or decide the facts of this case.  The

2   foreperson should use a checkmark in the appropriate space

3   indicating guilty or not guilty for each count of the

4   superseding indictment with which Mr. Shkreli is charged.

5   The foreperson should also place his or her initials and the

6   date beside each mark on the verdict form.  So for each

7   count there be will a box that will be checked by the

8   foreperson depending on what your unanimous verdict is and

9   that foreperson will initial and date the form.

10          The foreperson should also sign the bottom of the

11  verdict form and date the verdict form.

12          Finally, I want to remind you of the oath that you

13  took when you were sworn as a juror at the beginning of this

14  case.  Remember, in your deliberations that this case is no

15  passing matter for the Government or for Mr. Shkreli.  The

16  parties and the Court rely upon you to give full and

17  conscientious deliberation and consideration to the issues

18  and evidence before you.  By so doing we carry out the

19  fullest your oaths as jurors to well and truly try the

20  issues of the case and a true verdict render.

21          Before asking you to retire to the jury room and

22  begin your deliberations, let me first consult with counsel

23  to be certain I have not overlooked any point.

24          (Continued on next page.)

25

1              (The following occurred at sidebar.)

2              MR. BRAFMAN:  Your Honor --

3              MS. KASULIS:  So -- go ahead.

4              MR. BRAFMAN:  Your Honor, we obviously reserve the

5    objections we made and if we leave in that with respect to

6    no ultimate harm but other than that, we have no objections

7    to the Court's Charge, other than what was previously named.

8              MS. KASULIS:  There are no objections from the

9    Government, Your Honor.

10             We did want to rise the issue of the alternate

11   jurors?

12             THE COURT:  Yes.  I will instruct them on that as

13   soon as we are finished here.

14             MS. KASULIS:  Okay.

15             MR. BRAFMAN:  Are you keeping them, I hope?

16             THE COURT:  Yes, I am going to keep them.

17             MS. KASULIS:  Okay, great.

18             MR. BRAFMAN:  Okay.

19             THE COURT:  They are going to be segregated, and I

20   usually -- I instruct them not talk.

21             MR. BRAFMAN:  I think you should do that.

22             I have just one question, and it's your call,

23   obviously.  Do you want to ask them whether they want to

24   begin deliberations now or whether they want to start on

25   Monday morning fresh?  It's been a long day for everyone, so

1    it's truly -- if you want to ask that question.

2            MS. KASULIS:  The Government -- we don't have a

3    position either way.

4            THE COURT:  Well, I will see how they feel.  I

5    think they will probably, hopefully, will want to get moving

6    on the deliberations.  If they would like to start fresh on

7    Monday, that is fine, too.

8            MR. BRAFMAN:  But I'm not certain they know they

9    have that option.

10           THE COURT:  I will speak to them.

11           MR. BRAFMAN:  Okay.  Thank you, Judge.

12           MS. KASULIS:  Thank you, Judge.

13           (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                           5607

1              (In open court, sidebar ends.)

2              THE COURT:  Members of the jury, there are a few

3    matters that I must just bring up with you.  The first is

4    whether you would like to begin your deliberations now or

5    start fresh on Monday?  I recognize you have been sitting

6    and paying close attention throughout the day.  So I leave

7    you with that option.

8              Is there a general view about whether to start now

9    or begin on Monday?

10             THE JURY:  Monday.

11             THE COURT:  Monday?

12             All right.  The second matter -- that is fine.

13             The second matter is that the alternate jurors,

14   those jurors sitting in Seats 13 through 18 are asked to

15   remain at the courthouse each day and not to discuss the

16   case.  You are here because if one of the 12 jurors seated

17   before you becomes unable to continue deliberations, the

18   next juror will be brought in, deliberations will begin

19   anew, and that juror will join the deliberations.

20             So what I told you before about not discussing the

21   case, still applies to all of you who are not in the jury

22   room.  So Jurors 13 through 18 may not discuss the case.

23             You will be provided with lunch, and you will be

24   held in a room, a separate area, or you may be in the

25   courthouse in a different area if you wish, but you may not

Proceedings                                    5608

1   discuss the case amongst yourselves or with any other

2   person.  If it becomes necessary to replace you in the jury

3   room, and into deliberations, as I said, you may then

4   discuss it with fellow jurors.  So the prohibition against

5   discussions apply to the alternates.

6            And with regard to Jurors 1 through 12, do not

7   discuss the case now with anybody still.  You may only

8   discuss within the confines of the jury room the evidence in

9   the case.  In addition, if one of you has not yet arrived in

10  the morning, you may not deliberate.  If one of you steps

11  out for a rest-room break, you may not deliberate.  You may

12  only deliberate when all 12 of you are present.

13           We will be sending back the exhibits, a copy of

14  the superseding indictment, and the instructions.  And those

15  will be available for you on Monday when you commence your

16  deliberations.  Once we note that you are all present here

17  Monday, hopefully it will be close to 9:00 as possible, we

18  will bring all of those materials in for your consideration.

19           There will also be a court security officer

20  sitting outside your door.  That person will be the person

21  to whom you will write notes to me with any requests for

22  evidence or questions, and that person will then contact me

23  and we will assemble here in court, or I will send a note

24  back to you to respond to your questions per your request.

25           With that, I will wish you a good weekend.  I want

Proceedings                            5609

1   to thank you all for your attention and your service.  And

2   please do not discuss the case over the weekend.

3          Please leave your notebooks on your chairs and we

4   will make sure that those come back to you on Monday.

5          (Jury exits the courtroom at 3:46 p.m. to being

6   deliberations on Monday, July 31, 2017 at 9:00 a.m.)

7          (The following matters occurred outside the

8   presence of the jury.)

9          THE COURT:  Is there anything else -- one thing we

10  would like to do is get all counsels' cell phone numbers so

11  we can call.  And we would ask you not the stray more than

12  five minutes from the courtroom.  If we get a note, we want

13  to bring you back and get you involved on whatever the note

14  may provide, all right?

15         So my clerk will take your cell phone numbers.

16  Please just confer with him and give him your cell numbers.

17  Thank you.

18         MS. KASULIS:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         MR. SRINIVASAN:  Have a good weekend.

21         MS. KASULIS:  Thank you.

22         (Matter adjourned to Monday, July 31, 2017 at

23  9:00 a.m.)

24                          -oo0oo-

25

INDEX                                              5610

1                     E X H I B I T S

2

3

4     Government Exhibit Number 5                    5542

5

6     Government Exhibit Number 5A                   5542

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25