623

1
2                         UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - X

4    UNITED STATES OF AMERICA,      : 15-CR-637(KAM)
                                    :
5                                   :
                                    :
6            -against-              : United States Courthouse
                                    : Brooklyn, New York
7                                   :
                                    :
8                                   : Thursday, June 28, 2017
     MARTIN SHKRELI,                : 9:00 a.m.
9                                   :
             Defendant.             :
10   - - - - - - - - - - - - - X

11                          TRANSCRIPT OF TRIAL
12              BEFORE THE HONORABLE KIYO A. MATSUMOTO
                UNITED STATES DISTRICT COURT JUDGE, and a jury.
13
                          A P P E A R A N C E S :
14
     For the Government: BRIDGET M. ROHDE, ESQ.
15                       Acting United States Attorney
                         Eastern District of New York
16                          271 Cadman Plaza East
                            Brooklyn, New York 11201
17                       BY:  JACQUELYN KASULIS, AUSA
                              ALIXANDRA E. SMITH, AUSA
18                            KARTHIK SRINIVASAN, AUSA

19   For the Defendant:  BRAFMAN & ASSOCIATES, P.C.
20                          767 Third Avenue
                            New York, New York 10017
21                       BY:  BENJAMIN BRAFMAN, ESQ.
                              MARC AGNIFILO, ESQ.
22                            ANDREA ZELLAN, ESQ.
                              JACOB KAPLAN, ESQ.

23   Court Reporter:  Michele D. Lucchese, RPR
                      Official Court Reporter
24                    E-mail:  MLuccheseEDNY@gmail.com

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

624

1              (In open court; prospective jurors not present.)

2         THE COURT:  I would like to go on the record,

3    please.  This is continued jury selection in United States

4    versus Martin Shkreli all counsel are present.

5              I would like to just advise you that we have at

6    least 69 more jurors which we are trying to set up now.  I

7    think at some point we need to decide here and now how many

8    jurors we need beyond the 46 we have.  The reason we are

9    having a few extra is because, as you know, jurors may

10   overnight have second thoughts about their service and so we

11   might lose additional trips.  We really only need four

12   peremptory for 60.  So the question is how much longer and how

13   much more time and how many more jurors do the parties think

14   we have to examine before we stop?

15        MR. BRAFMAN:  Good morning, Your Honor.

16        THE COURT:  Good morning.

17        MR. BRAFMAN:  I think if the people who are already

18   in the big panel all come back and not ask to be excused, then

19   I would think if we end up with a total of 60 before we start

20   exercising, I think that should be more than enough, even with

21   six alternates.

22        THE COURT:  60 will be enough.  The question is I

23   think yesterday we were at 64 --

24        MR. BRAFMAN:  Right.

25        THE COURT:  -- at the end of the day.

625

1          THE LAW CLERK:  44.

2          THE COURT:  44.  Excuse me.

3          Are you saying, then, if we get to 60 at the end of

4    the day, we will just dismiss everyone else?

5          MS. KASULIS:  That was our thought as well.

6          THE COURT:  We have 70 downstairs, and probably more

7    are coming in.  The question is how many should we send up now

8    for selection.  Our yield has been about 25 to 30 percent.

9          MR. BRAFMAN:  I would suggest, so you don't have to

10   repeat your instructions, send up 25 or 30 or more, 40.

11         THE COURT:  I was going to bring up all 70 at this

12   point.

13         MR. BRAFMAN:  That's fine, Judge.  It doesn't

14   matter.  Do it once.

15         THE COURT:  But if more come, then maybe we will

16   just turn them around and send them home.  The likelihood of

17   getting to 60 from a group of 70 when we have 44.

18         MR. BRAFMAN:  44.  I think it is safe, Judge.

19         THE COURT:  We need 16 more.

20         MS. KASULIS:  I think that makes sense, Your Honor.

21         THE COURT:  All right.  As you may have noticed, we

22   have set up juror seat numbers 57 to 63 in the front and then

23   we have continued on the front left bench up to 69, we might

24   go to 70 by the time they do the list.

25         MR. BRAFMAN:  Just so I am clear, Your Honor, if we

1  get to 60 fairly soon, we will not be required to select until

2  all 60 are in the room, so many of them won't be here until 1

3  o'clock?

4          THE COURT:  That's correct.

5          MR. BRAFMAN:  Maybe if we have that done, if we have

6  some issues to discuss with the Government in terms of

7  stipulations, Your Honor, maybe we get an earlier lunch so at

8  1:30 we can start with the jurors.

9          THE COURT:  Let's hope we can do that.  If there are

10  70, let's bring 70 up.

11          (Pause.)

12          (Prospective jurors enter.)

13          THE COURT:  Good morning, ladies and gentleman.

14  Thank you for being here.  I appreciate your presence and I

15  ask for your patience as we go through this process.  My name

16  is Judge Kiyo Matsumoto.  Ms. Sandra Jackson, my case manager,

17  met you this morning and my law clerk, Vivek Tata, is to my

18  right.

19          Can everybody hear me?  If not, please raise your

20  hand.  Please pay close attention as I go through these

21  instructions and questions and please remember don't talk

22  about this case with anybody during this process or if you are

23  selected throughout the trial.

24          You are here today because we are about to select a

25  jury to serve in a criminal case.  Trial is expected to begin

1    as soon as we finish jury selection, hopefully today, and is

2    expected to last up to six weeks.  We will not hold trial on

3    Monday, July 3rd or Tuesday, July 4th.

4            Fortunately, this particular trial promises to be

5    interesting and educational for all of those jurors selected

6    to serve.  This is a criminal case commenced by the United

7    States, which is frequently referred to as the Government.

8            Representing the United States are Assistant United

9    States Attorneys Jacqueline Kasulis, Alixandra Smith, Karthik

10   Srinivasan, and also seated with them at the Government's

11   table is Special Agent Michael Braconi.  He will be joined

12   later by Special Agent Sean Sweeney of the Federal Bureau of

13   Investigation.  Also seated with the Government is paralegal

14   specialist Gabriela Balbin.

15           The defendant in this case is Martin Shkreli.  He is

16   represented by attorneys Benjamin Brafman, Marc Agnifilo,

17   Andrea Zellan, Jacob Kaplan, and they will be joined later by

18   Teny Geragos.  The fact that this case is brought in the name

19   of the United States does not entitle the Government to any

20   greater consideration than any other party who appears in

21   court.  All parties, the Government and individuals, are

22   equals before the Court and are entitled to equal

23   consideration.  No party is entitled to sympathy or favor.

24           The purpose of jury selection is to ensure fairness

25   and impartiality to all parties in this case.  The way we try

628

1    to be sure that a jury will be fair and impartial is by going

2    through a selection process called voir dire.  Basically, I

3    will be asking you questions both as a group and individually

4    about your background and views on certain subjects.  It is

5    not my intention to invade your privacy but simply to try to

6    ensure, to the best of my ability, that all of you can sit

7    fairly and impartially in this particular case.

8              At times, this will be tedious and I ask you,

9    please, to bear with us.  If, in the course of this

10   questioning process, you do think that because of some

11   experience you have had in your life or because of something

12   you have heard or read that you could not be fair and

13   impartial, that is that you would be inclined toward the

14   Government or the defendant regardless of what the evidence

15   showed, it is your duty to tell me that.  That's because the

16   Government and the defendant have a right to a qualified

17   impartial jury, one who will decide this case without fear,

18   favor, prejudice, or passion, and will render a verdict based

19   solely on the evidence presented at the trial and the law as I

20   will instruct you.

21             Now, quite apart from whether or not I must excuse

22   you, the lawyers for both sides are entitled to exercise a

23   certain number of what are called peremptory challenges, which

24   means they may excuse a number of prospective jurors without

25   giving any reason.  If you are excused, please know that no

629

1   personal affront is intended.  It is important for all of you

2   to listen to the answers to the questions I must ask you under

3   oath.

4           I will now ask Ms. Jackson to administer the oath to

5   you.

6           (Prospective jurors sworn.)

7           THE COURT:  Thank you.  Now, this criminal case

8   comes before the Court by way of indictment.  The indictment

9   is captioned United States of America against Martin Shkreli.

10  The indictment is simply a document that the Government uses

11  to state the charges against a defendant.  It serves no other

12  purpose and it is not evidence.  I am going to summarize the

13  charges in the indictment so that you can understand what this

14  case will be about.  But, again, remember, that any evidence

15  pertaining to this case and the charges will come before you

16  only when we begin the actual trial.

17          In the indictment, the defendant, Mr. Martin

18  Shkreli, is charged with eight counts, including committing

19  various acts of securities fraud, conspiracy to commit wire

20  fraud and securities fraud.  In Counts One through Three, Mr.

21  Shkreli is charged with conspiracy to commit securities fraud,

22  conspiracy to commit wire fraud and a substantive count of

23  securities fraud in relation to an entity known as MSMB

24  Capital.

25          In Counts Four through Six, Mr. Shkreli's is charged

630

1    with conspiracy to commit securities fraud, conspiracy to

2    commit wire fraud and a substantive count of securities fraud

3    in relation to an entity known as MSMB Healthcare.

4            In Counts Seven and Eight, Mr. Shkreli is charged

5    with conspiracy to commit securities fraud and conspiracy to

6    commit wire fraud in relation to an entity known as Retrophin.

7            Mr. Shkreli has pleaded not guilty to all of the

8    charges in the indictment and has thus raised issues of fact

9    to be determined by a jury.  Let me now advise you that it is

10   the Government that has the burden of proof in any criminal

11   case to establish a defendant's guilt beyond a reasonable

12   doubt as to each element of each offense charged.  The

13   defendant is presumed to be innocent throughout the trial.  In

14   that regard, the defendant has no burden to present any

15   evidence or to testify.  Because the United States

16   Constitution protects a defendant's right to remain silent,

17   the law prohibits you from considering when you deliberate

18   that the defendant may not have testified.  This is a basic

19   principle of our criminal justice system.

20           The role of the jury in a criminal case is to hear

21   evidence and to decide the facts, that is, to decide what

22   happened.  The judge does not have any role to play in your

23   determination of the facts.  As the judge, my role will be to

24   instruct you on the applicable law.  You will apply the facts

25   as you find them to the law as I instruct you, and your

1   conclusions will be your verdict.  You must apply the law as

2   stated by me, regardless of any opinion that you personally

3   have as to what the law is, or what the law should be.  If any

4   of you would have any difficulty doing this, you must bring it

5   to my attention.

6            Now, I am going to start asking questions.  I would

7   ask that you all pay very close attention to my questions

8   because your answers will be important to the parties.

9   Remember, you are under oath and we appreciate that you

10  exercise the utmost care and candor as you answer these

11  questions.

12           It is important for all of you, as I said, to listen

13  closely, and if your answer to my question would be yes, make

14  a note of it, and when I ask you to raise your hand, please

15  raise your hand.  After we talk to you about your answers, we

16  will decide what comes next with regard to your continued

17  presence or whether you will be excused.  I will ask you also

18  to stand to sidebar if you wish to be spoken to or if you wish

19  to discuss your answers away from the hearing of the other

20  jurors.

21           Now, consistent with the oath that you have just

22  taken, please, again, remember to answer honestly and

23  conscientiously and truthfully as you are able.  For questions

24  that may require you to provide information of a personal or a

25  private nature may certainly be answered here at sidebar out

632

1   of the hearing of the other jurors.  You may also feel

2   comfortable answering certain questions from your seat.  I

3   understand we have a lot of you and there is a lot of maybe

4   climbing over your fellow jurors, and we want to prevent that,

5   but, on the other hand, we want to make sure you feel

6   comfortable being fully candid.

7        At sidebar your answers will be heard by the

8   attorneys in the case and necessary court personnel.  In

9   addition, because judicial proceedings are open and public,

10  one reporter from the press will also be present at the

11  sidebar.  If I ask you to come to sidebar to discuss your

12  answer further, I will not use your name, you will be referred

13  to only by your number that you receive this morning.  Your

14  answers will not be associated with your name but only with

15  your number.  It is critical to a parties' right to a fair

16  trial that all jurors answer openly and candidly.  So if there

17  are issues or answers that you wish to provide out of the

18  presence of the press reporter, please let me know and I will

19  ask the press reporter to stand back.

20       Is there anyone who either did not understand or

21  cannot accept any of the principles or instructions that I

22  have given you thus far?  Please raise your right hand.

23       We have a juror with her hand up.  I will speak to

24  you, ma'am.  Your number?

25            THE PROSPECTIVE JUROR:  40.

1          THE COURT:  I will ask you to come to sidebar and we

2     will speak privately.

3          (The following occurred at sidebar; prospective

4     juror present.)

5          THE COURT:  Yes, ma'am, you are Juror No. 40.

6          THE PROSPECTIVE JUROR:  Yes.  There is no way I

7     would be impartial, I am going to be quite honest.  There is

8     no way.

9          THE COURT:  Because of the nature of the case?

10         THE PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Well, we will then excuse you right now.

12         THE PROSPECTIVE JUROR:  Thank you.

13         THE COURT:  You will go back down to the jury room

14    and you will tell them that you have been excused.  I hope at

15    some point when you are called upon again to serve on jury

16    duty --

17         THE PROSPECTIVE JUROR:  Just my conscious, I can't,

18    to be fair to both sides.

19         THE COURT:  Absolutely, I appreciate your candor.

20    If called upon in another case, you would maintain an

21    impartial frame of mind?

22         THE PROSPECTIVE JUROR:  I'd try to.

23         (Prospective juror excused.)

24         (In open court.)

25         THE COURT:  My next question is whether any of you

1    have heard anything about this case before today.  I recognize

2    in cases that have received media attention, like this case,

3    it is not wrong to have an opinion.  The critical issue is

4    whether your opinion will interfere with your ability to be

5    fair and impartial to both sides and to decide this case based

6    solely on the evidence at this trial and to follow my

7    instructions on the law.

8              So I ask you this question, whether any of you have

9    heard anything about this case or read anything about this

10   case that would prevent you from serving with a fair and open

11   mind to both sides and to decide this case based only on the

12   evidence at this trial?

13             The second question that we are going to hear from

14   you on at sidebar, in addition to the one I just asked, is to

15   talk about the scheduling in this case.  As I told you, this

16   trial is expected to last six weeks at the most.  If it starts

17   today, it will be six weeks from now at the outside before

18   this case is concluded.  We will be sitting every day, Monday

19   through Friday, 9:00 to 5:30, and the question I have, which

20   we will discuss at sidebar also, is whether serving on this

21   jury would be extremely burdensome or present undue hardship.

22   I recognize that jury service is an inconvenient time for

23   some, if not all of you; it asks you to step away from your

24   jobs and your lives for a period of six weeks.  But you must

25   ask yourselves whether serving on this jury is going to be so

Sidebar                                          635

1    much more inconvenient and so much more burdensome for you

2    than for anyone else.  You should ask yourself what attitude

3    you would want jurors to have if you or someone you cared

4    about deeply were to be tried by a jury.  As you know, the

5    right to a trial by jury is a fundamental constitutional right

6    and you should bear in mind the sacrifices that have been made

7    throughout our country's history to defend the constitutional

8    rights of all of us.

9            Now, let's start with the two questions that I

10   asked:  Media exposure or knowledge about this case or reading

11   or hearing about Mr. Shkreli that may have an effect on your

12   ability to be fair and impartial and whether serving on this

13   trial would present an undue hardship.  If either of those are

14   issues that you would like to be heard on, please raise your

15   hand.

16           We will start with Juror No. 1 at sidebar and we

17   will hear from you.

18           (The following occurred at sidebar; prospective

19   juror present.)

20           THE PROSPECTIVE JUROR:  I would like to share my --

21   profession is college counselor and, actually, tomorrow is my

22   students' graduation, that is one.  Two, over the summer, I am

23   responsible for the college enrollment of my students.  And on

24   July 10th, I actually will be an interpreter for family

25   member's immigration interview.

```
                        Sidebar                          636

1            THE COURT:  So you have conflicts?

2            THE PROSPECTIVE JUROR:  Yes.

3            THE COURT:  Let me ask you to step back one moment.

4            THE PROSPECTIVE JUROR:  Sure.

5            (Prospective juror leaves sidebar.)

6            MR. BRAFMAN:  If Your Honor is inclined to excuse

7    her, we have no objection.

8            MS. KASULIS:  No objection.

9            THE COURT:  We will excuse her.

10           (Prospective juror present at sidebar.)

11           THE COURT:  Ma'am, you may go down to the jury room

12   where you checked in this morning and tell them that you have

13   been excused.  Thank you.

14           THE PROSPECTIVE JUROR:  Thank you very much.

15           (Prospective juror excused.)

16           (In open court.)

17           THE COURT:  Juror No. 2.  All right.  Did anyone

18   else in this row?

19           Please don't discuss this case with anyone or what

20   your status is.

21           The juror on this row.  Juror No. 3, please come

22   forward.

23           (Prospective juror present at sidebar.)

24           THE COURT:  You are Juror No. 3?

25           THE PROSPECTIVE JUROR:  Yes.
```

```
                        Sidebar                     637
```

1              THE COURT:  Yes.

2              THE PROSPECTIVE JUROR:  So I was a victim of a case

3      in Miami and I don't know when my trial date is because I was

4      a victim of a crime, so I have to testify.  I don't know when

5      it's going to be.

6              THE COURT:  So you think it might be scheduled

7      sometime in the next six weeks?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  You will be going to Miami to testify?

10             THE PROSPECTIVE JUROR:  It's on standby right now.

11     They called me yesterday and asked me if I was available July

12     14th, or something like that to come.

13             THE COURT:  Would you please step back a couple of

14     feet.

15             (Prospective juror leaves sidebar.)

16             THE COURT:  No objection?

17             MR. BRAFMAN:  No objection.

18             MS. KASULIS:  No objection.

19             (Prospective juror present at sidebar.)

20             THE COURT:  We are going to excuse you.  Please go

21     to the jury room where you went to check in this morning and

22     you can tell them you are excused.

23             THE PROSPECTIVE JUROR:  Okay.

24             (Prospective juror excused.)

25             (In open court.)

```
                        Sidebar                       638
```

1              THE COURT:  Juror No. 4, come up.

2              (Prospective juror present at sidebar.)

3              THE COURT:  Yes, ma'am, you are Juror No. 4, come on

4    up.

5              THE PROSPECTIVE JUROR:  Hello.

6              THE COURT:  Yes, ma'am, you are Juror No. 4;

7    correct?

8              THE PROSPECTIVE JUROR:  Yes.  Well, I'm sorry, this

9    is weird for me.  I have awareness from what the media has

10   said.  It just -- I don't know -- I could see myself trying to

11   be objective, but my concern is my work for six weeks.

12             THE COURT:  What is your work situation?

13             THE PROSPECTIVE JUROR:  I basically manage

14   scholarships.  I know it's not a big deal.  I don't know if I

15   would get paid.

16             THE COURT:  At your job, you don't know?

17             THE PROSPECTIVE JUROR:  Yeah, that would be my

18   concern, if it is over two weeks.

19             THE COURT:  It will be six weeks at most.  It will

20   likely be six weeks, but it will certainly be more than two

21   weeks.  So you will not be paid.

22             THE PROSPECTIVE JUROR:  I'd have to find out is my

23   point.

24             THE COURT:  Well, I could allow you to get your

25   phone from the court security officers and you can call to

Sidebar                                        639

1   your job to see if you would be paid.

2          THE PROSPECTIVE JUROR:  Or e-mail them.  They might

3   respond back.

4          THE COURT:  Whatever the best means is.  You should

5   let them know it is a six-week trial, will you be paid and

6   then come back.

7          Just step back one moment.

8          (Prospective juror leaves sidebar.)

9          MR. BRAFMAN:  Your Honor, to save time, she did also

10  indicate she had seen media.  Maybe if you do that.

11         THE COURT:  All right let me just ask her now.

12         (Prospective juror present at sidebar.)

13         THE COURT:  Ma'am, you indicated that you have heard

14  about the case and that you would certainly try to be fair.

15  We appreciate that.  It is fine when you hear news reports to

16  form an opinion, but the question for you is whether you could

17  commit to maintaining a fair and open mind towards both sides

18  and listen to this case with an open mind and decide the case

19  based own on the evidence, not what you have read about or

20  heard in the media.  Can you do that?

21         THE PROSPECTIVE JUROR:  I believe so.  For me it is

22  just the money.  I don't have a car.

23         THE COURT:  I understand.  I understand.  Why don't

24  you retrieve your phone and then let us know what your

25  employer says.

```
                        Sidebar                          640
```

1          THE PROSPECTIVE JUROR:  It might take a few minutes

2     or so.

3          THE COURT:  That's fine.  You can speak to your

4     employer.  When you return, Ms. Jackson or my law clerk will

5     notice that you are here and we will bring you back up.

6          THE PROSPECTIVE JUROR:  Thank you so much.

7          THE COURT:  Thank you.

8          (Prospective juror leaves sidebar.)

9          (In open court.)

10          THE COURT:  Anyone else in that row?

11          Juror No. 5, please come up.

12          (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Side Bar                      641
```

1           (The following occurred at side bar; prospective

2    juror present.)

3                THE COURT:  Juror Number 5, correct?

4                THE PROSPECTIVE JUROR:  Right.

5                THE COURT:  Is that you?  Yes, ma'am.

6                THE PROSPECTIVE JUROR:  The department I work in is

7    very small and one person is out on disability so for a

8    full-time person to be out six weeks, it would be extremely

9    hard on them.

10               THE COURT:  So, there is nobody else in your entire

11   job --

12               THE PROSPECTIVE JUROR:  Well, five for the

13   department itself.  One is per diem, two part-timers and three

14   full-timers.  I'm one of the full-timers.  So, six weeks out,

15   you know, because we're already doing overtime because one

16   person is out on disability for a while now, so if a

17   full-timer go out now, I don't know how they're going to

18   schedule patients and whatever.

19               THE COURT:  Will your employer pay you?

20               THE PROSPECTIVE JUROR:  I think they would because I

21   work in a hospital.

22               THE COURT:  I see.  And would you be able to speak

23   to your employer and find out whether or not a six-week trial

24   would be doable in terms of rescheduling?

25               THE PROSPECTIVE JUROR:  I did probably call them.

Side Bar                                     642

1          THE COURT:  Okay.  We will allow you to go and get

2    your phone and speak to your employer and find out.

3          THE PROSPECTIVE JUROR:  Uh-huh.

4          THE COURT:  What I would ask you to do is just let

5    them know that it is a six-week trial and find out whether you

6    are going to be paid for the whole time and also whether they

7    can handle with backup your position.

8          THE PROSPECTIVE JUROR:  Okay.

9          THE COURT:  The other question I had is have you had

10   any media exposure?

11         THE PROSPECTIVE JUROR:  I've heard about it but it

12   doesn't really make a difference to me because I'm not

13   trending, whatever, to follow and stuff like that.

14         THE COURT:  So you feel now that you could commit to

15   keeping an open and fair mind to both sides?

16         THE PROSPECTIVE JUROR:  I think I can do that, yes.

17         THE COURT:  Do you have any doubt as to whether you

18   would be able to do that?

19         THE PROSPECTIVE JUROR:  I can do that.  I can have a

20   fair, yes, I could have an open mind about that.

21         THE COURT:  Okay.  Good.  Then I will ask you to go

22   get your phone from the court security officer, call your

23   employer and find out and then when you come back, we will

24   notice that you are here and we will have you come back to

25   tell us your answer.

Side Bar                                         643

1          THE PROSPECTIVE JUROR:  No problem.

2          THE COURT:  Okay.

3          (Prospective juror leaves side bar.)

4          (In open court.)

5          THE COURT:  Anyone else?  Number 6.

6          (Side bar continues; prospective juror joins.)

7          THE COURT:  Hello, sir.  This is you?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.  Thank you.  What would you like

10   to tell us?

11         THE PROSPECTIVE JUROR:  So I have heard about the

12   case.

13         THE COURT:  Okay.  And it's very likely that if you

14   follow the news, you've heard about the case and it's also

15   likely that as citizen who reads media, you would have an

16   opinion.  The question is whether any opinion that you've

17   formulated would have an effect on your sense of fairness or

18   open mindedness and your commitment to this trial and listen

19   to evidence with an open mind.

20         THE PROSPECTIVE JUROR:  I had an issue with

21   pharmaceutical companies and price gouging and personal issues

22   that, with certain drugs.

23         THE COURT:  I read a summary of what the charges are

24   about.  He is not being charged with anything relating to

25   pricing of pharmaceuticals.

Side Bar                         644

1            THE PROSPECTIVE JUROR:  Right.

2            THE COURT:  It is possible there could be evidence

3      at some point in the trial regarding the price of

4      pharmaceuticals but he is not charged.

5            THE PROSPECTIVE JUROR:  Right.

6            THE COURT:  With that, if you were to hear evidence

7      about pharmaceutical pricing, would that have any effect on

8      your commitment and ability to be fair and impartial?

9            THE PROSPECTIVE JUROR:  I can't be sure but I will

10     try.

11           THE COURT:  All right.  Let me also ask you this.

12     Is a six-week trial period going to be a problem for you?

13           THE PROSPECTIVE JUROR:  Yes.

14           THE COURT:  How so, sir?

15           THE PROSPECTIVE JUROR:  Well, I was looking for work

16     now.

17           THE COURT:  I see.  Okay.  All right.  Let me ask

18     you to just step back.

19           THE PROSPECTIVE JUROR:  Oh, sure.

20           (Prospective juror leaves side bar.)

21           THE COURT:  Do you --

22           MR. BRAFMAN:  I don't have a view, but I don't have

23     any objection if you want to excuse him.

24           THE COURT:  I think he has indicated he would try

25     very hard to be fair.

Side Bar                          645

1              MR. BRAFMAN:  I don't -- I'm not moving to challenge

2      him.  I don't want his hardship to come up later.  Can you ask

3      him could he be here for six weeks.

4              MS. KASULIS:  Yes.

5              (Prospective juror joins side bar.)

6              THE COURT:  Sir?

7              THE PROSPECTIVE JUROR:  Yes.

8              THE COURT:  If you were selected to serve as a

9      juror, you would have to be here every day, Monday through

10     Friday, 9 to 5:30.  Would that present any undue hardship for

11     you?

12             THE PROSPECTIVE JUROR:  The sabbath might be

13     difficult.  It is later these days but --

14             THE COURT:  Well, we would make sure --

15             THE PROSPECTIVE JUROR:  Sometimes we go away for

16     weekends in the summer.

17             THE COURT:  You mean you go away on a Friday?

18             THE PROSPECTIVE JUROR:  Right.  We go up early so we

19     get to the country on time.

20             THE COURT:  Well, we could accommodate that if that

21     was an issue but, I wanted to make sure that serving as a

22     juror for six weeks would not have an adverse impact on your

23     focus.

24             THE PROSPECTIVE JUROR:  On my what?

25             THE COURT:  On your focus, if you are thinking about

```
                        Side Bar                        646
```

1   the job or looking for jobs.

2           THE PROSPECTIVE JUROR:  Right.

3           THE COURT:  Would you be able to sit for six weeks

4   and focus on the evidence with an open mind?

5           THE PROSPECTIVE JUROR:  I believe so.

6           THE COURT:  And could you submit to maintaining a

7   sense of fairness to both sides?

8           THE PROSPECTIVE JUROR:  Yes.  Yes.

9           THE COURT:  Okay.  All right.  I will ask you to

10  then just go back to your seat.  Thank you.

11          THE PROSPECTIVE JUROR:  Thank you.

12          (Prospective juror leaves side bar.)

13          (In open court.)

14          THE COURT:  All right.  For Jurors 7 through 12,

15  were there any hands up in that row?

16          All right.  Juror Number 9, come forward.

17          (Side bar continues; prospective juror joins.)

18          THE COURT:  I just want to confirm, this is you?

19          THE PROSPECTIVE JUROR:  That is me.

20          THE COURT:  Yes, sir.  Come forward.

21          THE PROSPECTIVE JUROR:  Yes.  I mean, I know a ton.

22  I work in financial services so I know a ton about, not just

23  this case, but background and other articles and things in the

24  media.  I would strongly disagree with a lot of his business

25  practices so I feel pretty biased.

1          THE COURT:  All right.  Than you.  We will excuse
2    you and ask you to go back to the second floor --
3          THE PROSPECTIVE JUROR:  Okay.
4          THE COURT:  -- jury room and tell them you have been
5    excused.
6          THE PROSPECTIVE JUROR:  Great.  Thanks very much.
7          (Prospective juror excused.)
8          (In open court.)
9          THE COURT:  Juror Number 10, please come forward.
10         (Side bar continues; prospective juror joins.)
11         THE COURT:  Hi, sir, come on up.  Are you Number 10?
12         THE PROSPECTIVE JUROR:  I am.
13         THE COURT:  Okay.  Come forward.  What would you
14   like to tell us about the hardship?
15         THE PROSPECTIVE JUROR:  Hardships?  I've been a jury
16   foreman, I've been on juries before, but in this particular
17   case, I think the only thing I'd be impartial about is what
18   prison this goes guy goes to.
19         THE COURT:  Okay.  We will excuse you and ask you to
20   go down to the jury room on the second floor and tell them you
21   have been excused.
22         (Prospective juror excused.)
23         THE COURT:  Just for the record, I think these
24   jurors are being excused obviously for cause.
25         MS. KASULIS:  Yes.

Side Bar                               648

1          MR. BRAFMAN:  Yes.

2          (In open court.)

3          THE COURT:  Anyone else?

4          Yes.  Juror Number 11, please come forward.

5          (Side bar continues; prospective juror joins.)

6          THE COURT:  Hello, sir?  I want to confirm this is

7    you?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Come forward.

10          THE PROSPECTIVE JUROR:  I just don't know if I can

11    afford missing work for six weeks.

12          THE COURT:  Does your employer pay you for jury

13    service?

14          THE PROSPECTIVE JUROR:  No.

15          THE COURT:  What kind of work do you do?

16          THE PROSPECTIVE JUROR:  I do sales.  I sell cameras

17    and security systems and stuff like that.

18          THE COURT:  I see.  And you are certain that they

19    would not pay you?

20          THE PROSPECTIVE JUROR:  Yes.

21          THE COURT:  All right.  I think we will then under

22    those circumstances excuse you given a hardship.

23          THE PROSPECTIVE JUROR:  Okay.

24          THE COURT:  Go to the second floor where you checked

25    in, please.

```
                          Side Bar                          649
```

1              (Prospective juror excused.)

2              (In open court.)

3              THE COURT:  Anyone else in that row?

4              Yes, ma'am.  Juror Number 12.

5              (Side bar continues; prospective juror joins.)

6              THE COURT:  Hello.  I want to confirm this is you.

7              THE PROSPECTIVE JUROR:  Yes.  So, being away from

8    work for six weeks would be a big burden on me.

9              THE COURT:  Would it be a burden on your job?  Would

10   you be paid?

11             THE PROSPECTIVE JUROR:  The job.  I'm not sure about

12   that.

13             THE COURT:  What do you do, ma'am?

14             THE PROSPECTIVE JUROR:  I'm a specialist.

15             THE COURT:  In what area?

16             THE PROSPECTIVE JUROR:  I'm at BlackRock, a

17   financial asset management firm.

18             THE COURT:  Okay.  Is there anyone else at your job

19   who could fill in or do your functions for you while you were

20   away?

21             THE PROSPECTIVE JUROR:  Possibly, but I'm a main

22   person who does what I do there.

23             THE COURT:  I see.  And is it possible for you to

24   work on weekends at the job?

25             THE PROSPECTIVE JUROR:  No.

Side Bar                            650

1          THE COURT:  All right.  Let me just ask you to step

2     back for one second.

3          THE PROSPECTIVE JUROR:  Sure.

4          (Prospective juror leaves side bar.)

5          MS. KASULIS:  Did she say anything about getting

6     paid, Your Honor?  I don't think she did.

7          THE COURT:  I think she said she wasn't entirely

8     sure.

9          MR. BRAFMAN:  Before you make her come back, also

10    inquire as to what she does as a financial management

11    specialist, is there a good deal of training.

12          (Prospective juror joins side bar.)

13          THE COURT:  Do you get paid at your job?  Do they

14    pay as part of their policy employees when they serve on jury

15    duty?

16          THE PROSPECTIVE JUROR:  I don't know.  I'm not

17    100 percent.

18          THE COURT:  I wanted to ask you, and what kind of

19    functions do you serve?  What training have you done on your

20    job?

21          THE PROSPECTIVE JUROR:  I do administrative work,

22    conference room booking, registrations, basic administrative

23    stuff.

24          THE COURT:  How many other individuals at your job

25    do what you do or can do what you do?

Side Bar                                    651

1          THE PROSPECTIVE JUROR:  There are about ten other

2     people.

3          THE COURT:  Let me ask you another question.  Have

4     you read or heard about this case?

5          THE PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Have you formed any opinions for or

7     against?

8          THE PROSPECTIVE JUROR:  Right now, it's more of a

9     negative opinion on it, on the whole thing.

10          THE COURT:  Well, the question for you is despite

11     what you have read or heard or despite any opinions you might

12     have formed from what you have read or heard, would you be

13     able to commit, maintain a fair and open state of mind as you

14     listen to the evidence in this case?

15          Could you be fair to both sides?

16          THE PROSPECTIVE JUROR:  I don't know if I could.

17          THE COURT:  All right.  Okay.  Let me ask you to

18     step back for one moment, please.

19          THE PROSPECTIVE JUROR:  Okay.

20          (Prospective juror leaves side bar.)

21          MR. BRAFMAN:  We would challenge for cause.

22          THE COURT:  Are you challenging?

23          MS. SMITH:  No.

24          (Prospective juror joins side bar.)

25          THE COURT:  Ma'am, we are going to excuse you.

```
                        Side Bar                      652
```

1    Please go down to the second floor and tell them you have been

2    excused.   Juror number 12 is excused.

3              (Prospective juror excused.)

4              (In open court.)

5              THE COURT:  I'm next going to look at Juror Numbers

6    13 through 18.

7              Number 13, please come forward.

8              (Side bar continues; prospective juror joins.)

9              THE COURT:  Hello, ma'am.

10             THE PROSPECTIVE JUROR:  Good morning.

11             THE COURT:  Come forward.  I want to make sure this

12   is you.

13             THE PROSPECTIVE JUROR:  Yes.  I am going to be away

14   the end of July.  It's my first granddaughter's baptism.

15             THE COURT:  Congratulations.

16             THE PROSPECTIVE JUROR:  Thank you.  I'm having

17   out-of-town people and then I'll be in Pennsylvania.

18             THE COURT:  Okay.

19             THE PROSPECTIVE JUROR:  I also -- I work in a health

20   insurance company so I cannot be impartial because I -- the

21   nature of my job.

22             THE COURT:  All right.

23             THE PROSPECTIVE JUROR:  I help the people.

24             THE COURT:  We will excuse you and ask you to go to

25   the second floor jury room and tell them you have been

Side Bar                          653

1   excused.

2           THE PROSPECTIVE JUROR:  All right.

3           THE COURT:  All right.  Thank you.

4           (Prospective juror excused.)

5           (In open court.)

6           THE COURT:  Anyone else?

7           Number 14, please come forward.

8           (Side bar continues; prospective juror joins.)

9           THE COURT:  Hi.  Good morning, Juror Number 14.  I

10  want to confirm this is you.

11          THE PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Yes, ma'am.

13          THE PROSPECTIVE JUROR:  My profession, I'm a

14  registered nurse and also a hospital administrator and one of

15  the departments that I was responsible for was the pharmacy

16  and I have real moral problems with the pharmaceutical

17  industry.  I have problems.

18          THE COURT:  Okay.  Thank you for telling us that.

19  This indictment has not charged Mr. Shkreli with

20  pharmaceutical pricing.  It's possible there may be evidence

21  about that but it's not 100 percent, but the question for you

22  is whether you could, based on your profession and what you

23  might have heard about this case, commit to maintaining a fair

24  and open mind to both sides as you listen to the evidence and

25  decide this case based only on the evidence.  Could you do

Side Bar                                    654

1    that?

2              THE PROSPECTIVE JUROR:  No.

3              THE COURT:  Okay.  All right.  Then we will excuse

4    you.  Please go to the jury room on the second floor where you

5    checked in and tell them you have been excused.

6              THE PROSPECTIVE JUROR:  Okay.  Thank you.

7              THE COURT:  Thank you, ma'am.

8              (Prospective juror excused.)

9              THE COURT:  Juror Number 5 is back.  We will hear

10   from her.

11             Come on up, ma'am.

12             (Prospective juror joins side bar.)

13             THE PROSPECTIVE JUROR:  They said no, they can't

14   spare me for six weeks.

15             THE COURT:  They can't spare you for six weeks?  All

16   right.  Then I will excuse you and ask you to go to the second

17   floor and tell them you have been excused.  Thank you, Juror

18   Number 5.

19             THE PROSPECTIVE JUROR:  Thank you.

20             (Prospective juror excused.)

21             (In open court.)

22             THE COURT:  Any other jurors with their hands up in

23   rows numbers 13 through 18?

24             Come on up, ma'am.  You are Juror Number 16.  Come

25   on up.

Side Bar                                    655

1              (Prospective juror joins side bar.)

2              THE COURT:  Were you 16, ma'am?

3              THE PROSPECTIVE JUROR:  I am.

4              THE COURT:  And I just want to confirm.  Come on up.

5    Yes, ma'am.

6              THE PROSPECTIVE JUROR:  I have a vacation that's

7    partially paid for.

8              THE COURT:  Okay.  When is the vacation?

9              THE PROSPECTIVE JUROR:  July 20th.

10             THE COURT:  And you've paid for part it?

11             THE PROSPECTIVE JUROR:  Yes.

12             THE COURT:  And you can't change it.

13             THE PROSPECTIVE JUROR:  No.  And in addition, as I

14   understand it, this case involves the pricing of medication.

15             THE COURT:  It actually doesn't.  He's not charged

16   with any offenses regarding medication pricing.  I summarized

17   the charges which have to do with charges of securities fraud

18   and wire fraud.  So the issue of medication pricing may come

19   into this, but that is not what he is charged with.

20             Could you maintain an open mind and a fair mind to

21   both parties in this case?

22             THE PROSPECTIVE JUROR:  I can't give up my vacation.

23             THE COURT:  Okay.  We will let you go for your

24   vacation then.  Thank you.  Ma'am, you can go to the second

25   floor jury room and tell them you have been excused.  All

```
                         Side Bar                        656
```

1  right?

2          THE PROSPECTIVE JUROR:  All right.

3          THE COURT:  Thank you.

4          (Prospective juror excused.)

5          (In open court.)

6          THE COURT:  Anyone else among Juror Numbers 13 to

7  18?

8          Okay.  Come on up.  Juror Number 17.

9          (Side bar continues; prospective juror joins.)

10          THE COURT:  This is Juror Number 17.  Hello, sir.

11          THE PROSPECTIVE JUROR:  Good morning.

12          THE COURT:  Come on up.  I want to make sure this is

13  you.

14          THE PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Yes.  What would you like to tell us?

16          THE PROSPECTIVE JUROR:  I heard about the case from

17  the beginning and I read about it yesterday.

18          THE COURT:  Oh, you read about yesterday.  The

19  question is whether you have the ability to maintain a full,

20  fully fair and open mind to both sides, whether you feel that

21  you would.

22          THE PROSPECTIVE JUROR:  No, I wouldn't have a fair

23  mind.

24          THE COURT:  You do not have a fair mind?

25          THE PROSPECTIVE JUROR:  No.  No.

Side Bar                              657

1          THE COURT:  So you formed an opinion?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  All right.  We will excuse you then,

4    sir, and I would ask you to go to the jury room on the second

5    floor and tell them you have been excused and you can get paid

6    at work for your jury service.  All right?

7          THE PROSPECTIVE JUROR:  Thank you.

8          (Prospective juror excused.)

9          (In open court.)

10          THE COURT:  Juror Number 18, do you need to speak to

11    us at side bar?  Do you have anything to tell us?  You don't

12    have to.

13          THE PROSPECTIVE JUROR:  Yes, I would like to.

14          THE COURT:  Okay.  Come forward.

15          (Side bar continues; prospective juror joins.)

16          THE COURT:  Hello.  I just want to make sure this is

17    you, sir.

18          THE PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Come forward.  Yes, sir.

20          THE PROSPECTIVE JUROR:  Your Honor, I want to make

21    sure, with all respect.

22          THE COURT:  Please try to keep your voice up.

23          THE PROSPECTIVE JUROR:  Again, with all respect, you

24    mentioned so many charges, that personally I already find him

25    guilty.  I mean --

1           THE COURT:  Okay.  All right.  So if you are not

2    able to evaluate this case with a fair mind for both sides and

3    to be fair to both sides because you have already made the

4    decision, we will excuse you.

5           THE PROSPECTIVE JUROR:  Okay.

6           THE COURT:  All right.  So please go to the second

7    floor and tell them.

8           THE PROSPECTIVE JUROR:  My apology for being honest

9    about it.

10           THE COURT:  That's all right.  No, do not apologize

11    for being honest.  We need to know that.  We need to know your

12    honest feelings.

13           THE PROSPECTIVE JUROR:  Thank you.

14           (Prospective juror excused.)

15           (In open court.)

16           THE COURT:  I'm going to ask for any jurors that had

17    your hand up in response to my questions, Numbers 19 through

18    24.  Anybody?

19           All right.  Juror Number 19, please come forward.

20           (Side bar continues; prospective juror joins.)

21           THE COURT:  Come forward.  I just want to make sure

22    this is your name.

23           THE PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Okay.  Thank you, ma'am.  Come forward.

25           What would you like to tell us about either

```
                    Side Bar                      659
```

1    scheduling issues --

2            THE PROSPECTIVE JUROR:  Scheduling.  Both, actually.

3            THE COURT:  Let's start with scheduling.

4            THE PROSPECTIVE JUROR:  I have a dear friend of mine

5    who passed.

6            THE COURT:  I'm sorry.

7            THE PROSPECTIVE JUROR:  And her memorial service is

8    on the 18th of July.  Then following that, I have a vacation

9    scheduled.

10           THE COURT:  Starting when?

11           THE PROSPECTIVE JUROR:  The 19th, for a week.

12           THE COURT:  I see.  You are going out of town?

13           THE PROSPECTIVE JUROR:  Yes.  Yes.

14           THE COURT:  Is there any way to move the date of

15   your vacation?

16           THE PROSPECTIVE JUROR:  It has to do with a 50th

17   anniversary.

18           THE COURT:  All right.  That's important.  All

19   right.  Well, we will excuse you, Juror Number 19.  So what

20   you would do is go down to the jury room, tell them you have

21   been excused and they will give you papers.

22           THE PROSPECTIVE JUROR:  Thank you so much.

23           THE COURT:  All right.

24           (Prospective juror excused.)

25           (In open court.)

Side Bar                                660

1             THE COURT:  Juror Number 20, did you have your hand

2      up?  Please come forward.

3             (Side bar continues; prospective juror joins.)

4             THE COURT:  Come forward.  I want to confirm this is

5      you.

6             THE PROSPECTIVE JUROR:  Yes.

7             THE COURT:  Yes, ma'am.

8             THE PROSPECTIVE JUROR:  It's going to be hard for me

9      Monday through Fridays, especially in the month of July.

10            THE COURT:  You have other conflicts or what is the

11     nature of your conflicts?

12            THE PROSPECTIVE JUROR:  I have a family situation

13     and family events that I have to attend.

14            THE COURT:  Okay.  We will excuse you then so that

15     you can attend to your family matters.  Go to the jury room on

16     the second floor and let them know you have been excused.

17            THE PROSPECTIVE JUROR:  Second floor?

18            THE COURT:  Where you checked in this morning.

19            THE PROSPECTIVE JUROR:  Okay.

20            (Prospective juror excused.)

21            (In open court.)

22            THE COURT:  Juror Number 21, come forward.

23            (Side bar continues; prospective juror joins.)

24            THE COURT:  I just want to make sure this is you,

25     sir.

```
                      Side Bar                   661
```

1            THE PROSPECTIVE JUROR:  Yes.

2            THE COURT:  Come forward.

3            THE PROSPECTIVE JUROR:  Sure.

4            THE COURT:  Yes.

5            THE PROSPECTIVE JUROR:  Well, the idea of serving on

6    the case makes me very anxious because of my current

7    employment.  I previously took off about a year of work, I've

8    been at my new job for ten months and I'm aware employers are

9    not supposed to hold jury duty against you, but I feel because

10   of the nature of the work and how busy it is, even though

11   they're not supposed to, it's already a little bit rocky.

12           THE COURT:  Do you get paid from your job during

13   jury service?

14           THE PROSPECTIVE JUROR:  I don't know if they would.

15           THE COURT:  Okay.

16           THE PROSPECTIVE JUROR:  So, the financial aspect of

17   it concerns me a little bit and then also, if I didn't stay at

18   this job for that long either, I worry about the year off plus

19   that, my future employment concerns me.  So, I think I would

20   be pretty anxious and I feel like I'm setting my career back

21   if I served.

22           THE COURT:  What is it that you do, sir?

23           THE PROSPECTIVE JUROR:  I work in IT.

24           THE COURT:  I see.  You don't know whether your

25   employer pays you for jury duty?

Side Bar                                    662

1          THE PROSPECTIVE JUROR:  I don't know.

2          THE COURT:  Do you know if there are other folks in

3    your department, in the IT department who could fill in for

4    you if you were selected to serve on the jury?

5          THE PROSPECTIVE JUROR:  We would be short somebody.

6          THE COURT:  Obviously, you would be short.  Are

7    there other folks who can do your job?

8          THE PROSPECTIVE JUROR:  Yes, they would have to

9    shuffle around, but I'm still concerned they would hold it

10   against me.

11         THE COURT:  Well, when you say hold it against you,

12   what do you mean?

13         THE PROSPECTIVE JUROR:  I'm already not in the

14   greatest position with them.

15         THE COURT:  Okay.

16         THE PROSPECTIVE JUROR:  I mean, that's my concern.

17   And in the future, when I look for another job, my resume

18   having taken a year off and maybe not being at this job this

19   long or what have you, it concerns me.

20         THE COURT:  Can you step back a few feet, please?

21         THE PROSPECTIVE JUROR:  Sure.

22         (Prospective juror leaves side bar.)

23         THE COURT:  I would tend to excuse him.

24         MR. BRAFMAN:  No objection.

25         MS. KASULIS:  Yes, that's fine.

```
                        Side Bar                      663
```

 1              (Prospective juror joins side bar.)

 2              THE COURT:  Sir, I will excuse you.  Please go to

 3      the jury room on the second floor and tell them that you have

 4      been excused, you can get the paperwork and go back to work.

 5              THE PROSPECTIVE JUROR:  Great.  Thank you.

 6              THE COURT:  Thank you.

 7              (Prospective juror excused.)

 8              (In open court.)

 9              THE COURT:  Come forward.  What is your number

10      again?

11              THE PROSPECTIVE JUROR:  Four.

12              (Side bar continues; prospective juror joins.)

13              THE COURT:  Okay.  Thank you, ma'am.  What have you

14      heard?

15              THE PROSPECTIVE JUROR:  I haven't heard back.

16      They're in a huge town hall meeting, my whole company.

17              THE COURT:  Do you mind just sitting tight and check

18      back with us as soon as you get an answer?

19              THE PROSPECTIVE JUROR:  I would say like at 11, I'll

20      go back and get it.  I don't know what time it is now.

21              THE COURT:  It's 10:15.

22              THE PROSPECTIVE JUROR:  Okay.

23              THE COURT:  Thanks.

24              (Prospective juror leaves side bar.)

25              (In open court.)

1            THE COURT:  All right.  We were looking at Jurors 19

2     through 24.

3            Come on up, ma'am.

4            (Side bar continues; prospective juror joins.)

5            THE COURT:  Juror Number 22?  All right.  Come

6     forward.

7            THE PROSPECTIVE JUROR:  Good morning.

8            THE COURT:  Hi.  Good morning.  How are you?

9            THE PROSPECTIVE JUROR:  My concern is on the

10    schedule.  Is that okay?  I'm a diabetic so I'm actually three

11    weeks away from an appointment.  The insurance is no longer

12    covering the medication so in order to take the new

13    medication, I have to be seen by my endocrinologist which is

14    in the middle of July.  Since you said it was six weeks, I

15    have to appear for that appointment to get my medication.

16           THE COURT:  Is it a day long appointment or just a

17    shorter appointment?

18           THE PROSPECTIVE JUROR:  It's usually an hour or two.

19    It just depends how the office works.

20           THE COURT:  What time?

21           THE PROSPECTIVE JUROR:  It's at noon.

22           THE COURT:  At noon?  Okay.

23           THE PROSPECTIVE JUROR:  It's on the 18th of July.

24    It's just unusually I have to come back three days later so

25    they could regive them, so they can look at my blood sugars to

1    see if I'm still stable.

2              THE COURT:  I see.  It's a glucose test?

3              THE PROSPECTIVE JUROR:  Yes.

4              THE COURT:  All right.  So it's at noon on the 18th

5    and you'd have to return?

6              THE PROSPECTIVE JUROR:  A few days later depending

7    on what the doctor says.

8              THE COURT:  How long would that test take?

9              THE PROSPECTIVE JUROR:  The same.  It's like another

10   point.  They check my blood sugar.

11             THE COURT:  Okay.  Let me ask you to step back a few

12   feet.

13             THE PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Thank you.

15             (Prospective juror leaves side bar.)

16             THE COURT:  I mean we could schedule around her

17   appointment.

18             MS. KASULIS:  Yes, we could.

19             MR. BRAFMAN:  It's your call.  Can you ask her the

20   media questions just in case?

21             THE COURT:  Yes.  Thank you.

22             (Prospective juror joins side bar.)

23             THE COURT:  Ma'am, do you know what time the

24   follow-up appointment is?

25             THE PROSPECTIVE JUROR:  No.  I only make that after

```
                    Side Bar                    666
```

1    I see my first appointment.

2          THE COURT:  Well, it would be helpful to the Court

3    if you would be able to schedule it early in the morning or

4    later in the day.

5          THE PROSPECTIVE JUROR:  The only thing is I live in

6    Nassau County so to get here even by 8:30, I have to leave at

7    6:30 in the morning.

8          THE COURT:  I see.  I see.  Okay.  I wanted to ask

9    you about the exposure to any media about Mr. Shkreli.

10         THE PROSPECTIVE JUROR:  I've heard about it but I

11   don't know any of the crazy details.

12         THE COURT:  Could you commit to maintaining a fair

13   state of mind, an open mind toward both sides and listen to

14   the evidence in this case?

15         THE PROSPECTIVE JUROR:  I think so.  You know.

16         THE COURT:  All right.  You indicated that you have

17   medical conditions.

18         THE PROSPECTIVE JUROR:  Yes.

19         THE COURT:  And I would assume it requires taking

20   medication?

21         THE PROSPECTIVE JUROR:  Yes.  I need to take

22   medication.

23         THE COURT:  Okay.  All right.  Does the medication

24   affect your clarity of mind?

25         THE PROSPECTIVE JUROR:  No.  I just have to eat

Side Bar                                           667

1    every certain amount of hours and give injections.

2            THE COURT:  Okay.  We can certainly accommodate

3    that.

4            THE PROSPECTIVE JUROR:  Okay.

5            THE COURT:  If you have a noon appointment on

6    July 18th, would that mean that you would have your

7    appointment and not be able to come in afterwards or since

8    it's two hours out.

9            THE PROSPECTIVE JUROR:  It's depending on how I

10   react to the new medication if it's a new one I'm not on so

11   that's why they discuss to return.  I'm going to return the

12   next day if I'm having a reaction.

13           THE COURT:  Right.

14           THE PROSPECTIVE JUROR:  That's why another

15   appointment can't be made until I'm actually evaluated first.

16           THE COURT:  I am going to excuse you.

17           THE PROSPECTIVE JUROR:  Thank you.

18           THE COURT:  Go to the second floor.

19           THE PROSPECTIVE JUROR:  Thank you.

20           (Prospective juror excused.)

21           MR. BRAFMAN:  No objection.

22           (In open court.)

23           THE COURT:  Did Juror 23 have his hand up?

24           You don't have to but if you want to be heard on

25   anything, please come on up.      (Continued on next page.)

```
                         Sidebar                        668
```

1  (Continuing)

2           (Sidebar continues; prospective juror joins.)

3           THE COURT:  This is Juror 23.  Come up.

4           This is you?

5           THE PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Yes, sir.

7           THE PROSPECTIVE JUROR:  I work in the hospital

8  setting with infectious disease, so I hear the doctors and

9  case manager talking what's happening with the trial.  So, I

10 do have some knowledge of some of this.

11          THE COURT:  It's fine to have knowledge, just let me

12 first start by saying in this case, the charges do not concern

13 drug pricing.

14          THE PROSPECTIVE JUROR:  Okay.

15          THE COURT:  But the question is whether what you've

16 heard or read about this case or about this gentleman, whether

17 that would have any impact on your ability to be fair to both

18 sides, to not prejudge the case but listen to the evidence

19 with a fair state of mind; can you do that?

20          THE PROSPECTIVE JUROR:  I don't know, to tell you

21 right now.  In the course of what I heard work in the

22 hospital...

23          THE COURT:  Have you formulated an opinion about

24 this --

25          THE PROSPECTIVE JUROR:  More because of what's

1   happening to the patients, they can't afford the drug, so I

2   can't say yes or no.

3           THE COURT:  Okay.  Sir, I'm going to excuse you.

4   You can go to the second floor jury room and tell them you've

5   been excuse.  You'll get your papers.

6           THE PROSPECTIVE JUROR:  Thank you.

7           (Prospective juror excused.)

8           (In open court.)

9           THE COURT:  Juror 24?  Come on up, ma'am.

10          (Sidebar continues; prospective juror joins.)

11          THE COURT:  Yes, ma'am.

12          THE PROSPECTIVE JUROR:  I have prior plans to go to

13  the Caribbean for a family reunion from July 14 to August 2.

14          THE COURT:  Well, have a nice trip.  I'll excuse

15  you.

16          THE PROSPECTIVE JUROR:  Thank you.

17          (Prospective juror excused.)

18          THE COURT:  Juror No. 24 is excused.

19          (In open court.)

20          THE COURT:  We're next going to hear from Juror No.

21  25 through 32.  Juror 25, please come forward.

22          (Sidebar continues; prospective juror joins.)

23          THE COURT:  Hi, sir.  I want to make sure this is

24  you.

25          THE PROSPECTIVE JUROR:  That's me.

```
                       Sidebar                          670
```

1          THE COURT:  Please come forward as close as you can.

2          THE PROSPECTIVE JUROR:  I have a schedule problem

3   and a bias problem.

4          THE COURT:  Keep your voice down.  We'll talk about

5   scheduling first.

6          THE PROSPECTIVE JUROR:  The week of July 7, I'll be

7   down in Baltimore for three days caring for my grandson.  The

8   week of July 10, I've already committed to having a

9   granddaughter upstate all week.

10          THE COURT:  We will excuse you.  Thank you.

11          THE PROSPECTIVE JUROR:  Thank you very much.

12          THE COURT:  Have a nice time.

13          (Prospective juror excused.)

14          (In open court.)

15          THE COURT:  Any other jurors?

16          Juror 26, come forward, please.

17          (Sidebar continues; prospective juror joins.)

18          THE COURT:  Is that you?

19          THE PROSPECTIVE JUROR:  Yes, ma'am.

20          I have heard of Mr. Shkreli and I also have a trip

21   planned the beginning of August.

22          THE COURT:  When do you go?

23          THE PROSPECTIVE JUROR:  August 3 through 9.

24          THE COURT:  And it's out of state?

25          THE PROSPECTIVE JUROR:  It is.  It's Massachusetts.

```
                      Sidebar                           671
```

1           THE COURT:  Is there any flexibility in your

2    vacation time?

3           THE PROSPECTIVE JUROR:  No, unfortunately.  My

4    parents are flying in from the west coast.

5           THE COURT:  We will excuse you, then.

6           THE PROSPECTIVE JUROR:  Thank you.

7           THE COURT:  Go to the jury room and tell them you've

8    been excused.

9           (Prospective juror excused.)

10          (In open court.)

11          THE COURT:  Anyone else?

12          Juror 27, please come forward.

13          (Sidebar continues; prospective juror joins.)

14          THE COURT:  Hello, ma'am.  I want to make sure this

15   is you.

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Come forward.

18          THE PROSPECTIVE JUROR:  So, I raised my hand for

19   both.

20          THE COURT:  Let's start with scheduling.

21          THE PROSPECTIVE JUROR:  I work for two mall

22   independent women-run companies and I'm one employee at one;

23   and at the other, one of only a few other employees.  So, they

24   can't pay me and I can't afford to live off that pay, and it

25   would be a hardship for both of us.

```
              LAM       OCR       RPR
```

```
                        Sidebar                        672

 1            THE COURT:  I'll excuse you then.  Go to the jury

 2    room and tell them you're excused and you'll get your

 3    paperwork.

 4            (Prospective juror excused.)

 5            (In open court.)

 6            THE COURT:  Juror 28, do you need to be heard?  All

 7    right.

 8            (Sidebar continues; prospective juror joins.)

 9            THE COURT:  Come forward.  I want to make sure, is

10    that you?

11            THE PROSPECTIVE JUROR:  Yes.

12            THE COURT:  Yes, sir.

13            THE PROSPECTIVE JUROR:  Hi, Judge.  Basically, I've

14    read about this story since it came out on Bloomberg and

15    Twitter.  I pretty much know half the facts you brought up.

16            I don't really like this person at all.  Like, I

17    just can't understand why he would be so stupid as to take a

18    antibiotic which HIV people need and jack it up 5,000 percent.

19    I mean, like, I would honestly, like, seriously like to go

20    over there --

21            THE COURT:  Sir, thank you.

22            THE PROSPECTIVE JUROR:  Is he stupid or greedy?  I

23    can't understand.

24            THE COURT:  We will excuse you.

25            THE PROSPECTIVE JUROR:  I apologize.
```

```
                       Sidebar                         673
```

1          THE COURT:  Go to the jury room and tell them you're

2     excused.

3          THE PROSPECTIVE JUROR:  I apologize.  No disrespect

4     to you or the court or to any of you.

5          THE COURT:  We appreciate your honesty.  Thank you.

6          (Prospective juror excused.)

7          (In open court.)

8          THE COURT:  Juror 29, come forward please.

9          (Sidebar continues; prospective juror joins.)

10          THE COURT:  I want to confirm your name.

11          THE PROSPECTIVE JUROR:  Yes.

12          THE COURT:  No. 29, how are you?

13          THE PROSPECTIVE JUROR:  I'm good.  How are you?

14          THE COURT:  Good.

15          THE PROSPECTIVE JUROR:  I have I heard about him

16     before.  I know he bought that HIV drug and raised the price

17     about a million times.

18          THE COURT:  The question is whether you could

19     maintain a fair mind towards both sides or whether you formed

20     an opinion that would interfere with your ability.

21          THE PROSPECTIVE JUROR:  I doubt it.  Just looking at

22     him kind of twists my stomach, to be honest with you.

23          THE COURT:  I'm going to excuse you.  Go to the jury

24     room and tell them you've been excused.

25          (Prospective juror excused.)

```
                           Sidebar                        674
```

1           (In open court.)

2           THE COURT:  Did Juror 30 have her hand up or not?

3           (Sidebar continues; prospective juror joins.)

4           THE COURT:  I want to make sure this is your name.

5           THE PROSPECTIVE JUROR:  Yes, it is.

6           It would be a hardship for me.  I have medical

7   problems.  I'm a breast cancer survivor, so I have -- and

8   thyroid, I have to get a biopsy.  So, I'd have to be excused

9   several times.

10          THE COURT:  All right.  That's fine.  We will excuse

11  you.  Please go to the jury room and tell them you've been

12  excused, Juror No. 30.  Thank you.

13          (Prospective juror excused.)

14          (In open court.)

15          THE COURT:  Did anyone else on the row for numbers

16  up through 32 need to be heard?

17          Number 31?  All right.

18          (Sidebar continues; prospective juror joins.)

19          THE COURT:  Yes, ma'am, come forward.  I want to

20  make sure this is you.

21          THE PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Come forward.  What is your scheduling

23  issue or --

24          THE PROSPECTIVE JUROR:  I have a licensing exam on

25  July 10 -- it's a Monday -- at 2 o'clock.

```
                        Sidebar                      675
```

1          THE COURT:  Is there any flexibility in that date

2    for your exam?

3          THE PROSPECTIVE JUROR:  I've been working towards it

4    for four years, no.

5          THE COURT:  What kind of license is it.

6          THE PROSPECTIVE JUROR:  New York State R.N. license,

7    registered nurse.

8          And I work in healthcare full-time as an

9    administrative secretary.  I might be exempt.

10          I can be impartial and unbiased except on July 10.

11          THE COURT:  Okay.  And how often is that exam given?

12          THE PROSPECTIVE JUROR:  Actually, it's given six

13    days a week.  I mean, if you want, if I can get an electronic

14    device, I'll look up to see if I can reschedule it.

15          THE COURT:  For late August or something?

16          THE PROSPECTIVE JUROR:  No.

17          I can't be unbiased.

18          It can't go to late August.  I have a job interview

19    on August 3 in Orlando.  I'm relocating.

20          THE COURT:  I see.

21          THE PROSPECTIVE JUROR:  And I'm relocating in

22    September.  So, it wouldn't have been a problem except for

23    July 10.

24          THE COURT:  We will excuse you and wish you well on

25    your exam.

```
                        Sidebar                          676
```

1          THE PROSPECTIVE JUROR:  Thank you.  Wish you well on
2    everything.
3          THE COURT:  Go to the second floor and tell them
4    you're excused.
5          (Prospective juror excused.)
6          (In open court.)
7          THE COURT:  Yes, sir, No. 32.
8          (Sidebar continues; prospective juror joins.)
9          THE COURT:  Hello, sir.  No. 32, that's your name?
10         THE PROSPECTIVE JUROR:  Yes.
11         THE COURT:  Yes.
12         THE PROSPECTIVE JUROR:  I have two things.
13         I have a scheduling conflict.  On July 7, I'm
14   leaving with my family to Europe for two weeks to introduce my
15   one-year-old to family and friends.
16         THE COURT:  Very nice.
17         THE PROSPECTIVE JUROR:  And then the first week of
18   August to go to Saudi Arabia for work.  It would be a
19   substantial loss of income if I didn't go.
20         THE COURT:  We'll excuse you.  Thank you.  Go to the
21   second floor, please.
22         (Prospective juror excused.)
23         (In open court.)
24         THE COURT:  Next I'll hear from jurors on that side,
25   33 to 39.

```
                        Sidebar                          677
```

1            Juror 33, please come forward.

2            (Sidebar continues; prospective juror joins.)

3            THE COURT:  Come forward.  What's your scheduling

4    issue?

5            THE PROSPECTIVE JUROR:  It's my personal vacation.

6    My boss travel on vacation this week, he's coming back next

7    Wednesday, and then I'm going on vacation, and there's no

8    vacation thereafter.  I work for Brookhaven National

9    Laboratory and we have regular schedule to meet for September

10   to start up mission again.

11           THE COURT:  So, it's set.

12           THE PROSPECTIVE JUROR:  It's set.

13           THE COURT:  All right.  Well, I will excuse you

14   then, sir.  Thank you.  You can go to the second floor and let

15   them know you've been excused.

16           THE PROSPECTIVE JUROR:  Thank you.  Have a good day.

17           (Prospective juror excused.)

18           (In open court.)

19           THE COURT:  Juror 34, did you have your hand up?

20   Okay, good.

21           Juror 35, please come forward.

22           (Sidebar continues; prospective juror joins.)

23           THE COURT:  Is this your name, No. 35?

24           THE PROSPECTIVE JUROR:  Yes.

25           THE COURT:  What is your conflict?

```
                        Sidebar                        678
```

1          THE PROSPECTIVE JUROR:  I'm starting a part-time job

2   in July.  I'm supposed to have training yesterday, actually.

3          THE COURT:  I see.

4          THE PROSPECTIVE JUROR:  I'm always going to college,

5   which is kind of in six weeks.

6          I don't think I'm going to be biased.

7          THE COURT:  You will not be biased?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  But you have conflicts.  I'm just

10  wondering, are your classes in college during the weekday?

11         THE PROSPECTIVE JUROR:  It's upstate, in Binghamton.

12         THE COURT:  When do they start.

13         THE PROSPECTIVE JUROR:  I believe it's August 18 or

14  20.

15         THE COURT:  Well, we would be finished by then, but

16  let's talk about your part-time job.

17         What are your hours for that?

18         THE PROSPECTIVE JUROR:  It's from ten to four.

19         THE COURT:  And how many days a week?

20         THE PROSPECTIVE JUROR:  Five days a week.

21         THE COURT:  Would you be paid for serving on jury

22  duty?

23         THE PROSPECTIVE JUROR:  Oh, no, I don't know because

24  I'm just starting.  I currently have a job right now that is

25  ending today actually, but I work a night shift.

```
                          Sidebar                      679
```

1            THE COURT:  Is this new job a night job too?

2            THE PROSPECTIVE JUROR:  No.

3            THE COURT:  It's ten to four.

4            THE PROSPECTIVE JUROR:  Yes.

5            THE COURT:  I suppose I'll have to excuse you given

6     your work schedule and the fact that it's a new job.  Please

7     go to the jury clerk on the second floor and tell them you've

8     been excused.  All right, sir?

9            THE PROSPECTIVE JUROR:  Okay.  Thank you.

10           (Prospective juror excused.)

11           (In open court.)

12           THE COURT:  Juror 36, please come up.

13           (Sidebar continues; prospective juror joins.)

14           THE COURT:  Is this your name?

15           THE PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Please come forward, sir.

17           THE PROSPECTIVE JUROR:  I can't serve here for six

18    weeks because I'm my parents' caregiver.  I take care of my

19    mother, she's about 75.  My father is 82.  My mother had eye

20    surgery yesterday.  My father has issues with lower back.

21           And second reason is I'm a candidate for police

22    officer and I'm actually going to therapy twice a week and I'm

23    in training.  To stay here six weeks is going to set me back

24    big time.

25           THE COURT:  And there's no one else who can care for

```
                  LAM      OCR      RPR
```

```
                           Sidebar                        680
```

1    your parents?

2            THE PROSPECTIVE JUROR:  My brother works two jobs,

3    my sister is disabled with MS.

4            THE COURT:  I see.  I will excuse you then, sir.

5    Please go to the second floor.

6            THE PROSPECTIVE JUROR:  Thank you so much.

7            (Prospective juror excused.)

8            (In open court.)

9            THE COURT:  Anyone else?

10           No. 37, come forward, please.

11           (Sidebar continues; prospective juror joins.)

12           THE COURT:  Come forward please.

13           THE PROSPECTIVE JUROR:  Good morning.

14           THE COURT:  I want to confirm this is your name, but

15   we won't -- come forward.

16           THE PROSPECTIVE JUROR:  I've been reading The Daily

17   News for the last 25 years and I'm just retired NYPD.

18           THE COURT:  So the question is?  Let's talk about

19   what?

20           THE PROSPECTIVE JUROR:  I don't think I can be

21   impartial.

22           THE COURT:  What we need are jurors who are

23   committed to maintaining a fair and impartial state of mind

24   regardless of what their backgrounds are, what they might have

25   read, because our system requires jurors to be fair and

```
                          Sidebar                        681
```

1    impartial.

2              THE PROSPECTIVE JUROR:  Yes, I understand that.

3              THE COURT:  Can you do that?

4              THE PROSPECTIVE JUROR:  No.

5              THE COURT:  I'll excuse you then.  Go to the second

6    floor and please tell them you've been excused.

7              THE PROSPECTIVE JUROR:  Okay.

8              (Prospective juror excused.)

9              (In open court.)

10             THE COURT:  Is there anybody else, 38 or 39?

11             Come on up.

12             (Sidebar continues; prospective juror joins.)

13             THE COURT:  I want to make sure that's you.

14             THE PROSPECTIVE JUROR:  That's me.

15             I have social anxiety.

16             THE COURT:  Okay, I'm sorry.  Would sitting on the

17   jury make it difficult for you?

18             THE PROSPECTIVE JUROR:  Yeah.  My mind is blown.

19             THE COURT:  All right.  I'm sorry, sir.  I will

20   excuse you, all right?

21             You can go to the second floor and tell them that

22   you've been excused.

23             THE PROSPECTIVE JUROR:  Okay.

24             (Prospective juror excused.)

25             (In open court.)

```
                        Sidebar                      682
```

1           THE COURT:  Juror 39, do you want to come forward?

2           (Sidebar continues; prospective juror joins.)

3           THE COURT:  I just want to make sure this is you.

4           THE PROSPECTIVE JUROR:  That's me.

5           THE COURT:  Come forward.

6           THE PROSPECTIVE JUROR:  I just have two scheduling

7    concerns.  One is I'm a commissioned salesperson and to be out

8    for that amount of time would be kind of difficult.

9           THE COURT:  Could you work on weekends or evenings?

10          THE PROSPECTIVE JUROR:  To an extent.  But that

11   amount of time is a long time to be out.  That's my one

12   concern.

13          The other is I have a large nonrefundable vacation

14   scheduled leaving August 2.  I don't know that you'll be done

15   by then.

16          THE COURT:  We can't guarantee that.  All right,

17   then, I guess we'll have to excuse you.  But thank you.

18          THE PROSPECTIVE JUROR:  I appreciate it.

19          THE COURT:  Have a nice trip.

20          THE PROSPECTIVE JUROR:  Thank you.

21          (Prospective juror excused.)

22          (In open court.)

23          THE COURT:  I'm next going to hear from Juror Nos.

24   41 through 47.  Does anybody in that number range need to be

25   held at sidebar?

```
                        Sidebar                        683
```

1              I only want to hear from you, again, if you would

2    have answered yes to the two questions I posed.  Anyone on

3    that row, raise your hand.

4              Juror 41, are you coming up?

5              (Sidebar continues; prospective juror joins.)

6              THE COURT:  Hello, sir.  I just want to make sure

7    this is you.

8              THE PROSPECTIVE JUROR:  Yeah.

9              THE COURT:  Come forward, please.  What are your

10   issues, scheduling or otherwise?

11             THE PROSPECTIVE JUROR:  I don't know, I was looking

12   yesterday in the newspaper and I saw the Defendant.  There was

13   something about him.  I can't be fair.

14             THE COURT:  All right.  Well, I'm sorry to hear

15   that, but I appreciate your being honest with us.  So, you're

16   telling us that despite my request that you maintain an open

17   and fair mind, you could not evaluate the evidence in this

18   case with a fair state of mind?

19             THE PROSPECTIVE JUROR:  There's something that

20   didn't look right.

21             THE COURT:  All right.  I'm going to excuse you.

22   Please go to the jury room on the second floor and tell them

23   that you've been excused.

24             THE PROSPECTIVE JUROR:  I have to go there?

25             THE COURT:  And then they'll excuse you.  Tell them

```
                        Sidebar                    684
```

1   you've been excused and you should be able to go home.

2           THE PROSPECTIVE JUROR:  All right.

3           (Prospective juror excused.)

4           (In open court.)

5           THE COURT:  Anyone else on that row?

6           No. 42, please come forward.

7           MS. KASULIS:  I think this is 43.

8           (Sidebar continues; prospective juror joins.)

9           THE COURT:  Sir, I want to confirm this is you.

10          THE PROSPECTIVE JUROR:  No. 43.

11          THE COURT:  Yes, sir.

12          THE PROSPECTIVE JUROR:  I and my family are the

13  victims of stock fraud.  Cost us a couple hundred thousand

14  dollars.  So, I have no sympathy for a defendant like this.

15          THE COURT:  So, you would not be able to evaluate

16  the evidence with an open mind?

17          THE PROSPECTIVE JUROR:  No.

18          THE COURT:  I will excuse you then, No. 43.  Please

19  go to the jury room where you checked in and tell them you are

20  excused.

21          THE PROSPECTIVE JUROR:  Thank you very much.

22          (Prospective juror excused.)

23          (In open court.)

24          THE COURT:  Anyone else, Nos. 44 to 47?

25          Okay, you must be No. 45.  Come forward.

1          (Sidebar continues; prospective juror joins.)

2          THE COURT:  No. 45, come forward.

3          THE PROSPECTIVE JUROR:  I answered yes to both.

4          THE COURT:  What's your conflict?

5          THE PROSPECTIVE JUROR:  I see about the medicine,

6  that he charged the extra.  To me, that was unethical.  I

7  can't really find him innocent.

8          THE COURT:  And you have a scheduling issue?

9          THE PROSPECTIVE JUROR:  Scheduling issue, I have a

10  vacation booked months ago in August.  It's August 1.

11          THE COURT:  We will not be finished.  I don't want

12  to promise you we will be finished.

13          So, I will excuse Juror 45.

14          Go to the second floor, get your paperwork, and tell

15  them you're finished.

16          (Prospective juror excused.)

17          (In open court.)

18          THE COURT:  Do we need to hear from 46?

19          (Sidebar continues; prospective juror joins.)

20          THE COURT:  Come forward.  This is you?

21          THE PROSPECTIVE JUROR:  Yes.

22          THE COURT:  What would you like to tell us?

23          THE PROSPECTIVE JUROR:  Basically, it's that I can't

24  continue because -- due to my neck injury that I was involved

25  in a car accident last month.  And I have the doctor's letter

```
                          Sidebar                      686
```

1   if you want to see it.  Right now, I'm continuing to do my

2   physical therapy on my neck.

3           THE COURT:  Regularly during the week?

4           THE PROSPECTIVE JUROR:  Exactly.  Because if I sit,

5   I feel stiff.

6           THE COURT:  All right, sir.  I will excuse you and

7   hope you feel better.

8           THE PROSPECTIVE JUROR:  Thank you.

9           THE COURT:  Go to the second floor and tell them

10  you've been excused, and they'll give you paperwork.

11          THE PROSPECTIVE JUROR:  Thank you, your Honor.

12          (Prospective juror excused.)

13          (In open court.)

14          THE COURT:  Did Juror 37 need to be heard?  Come

15  forward please.

16          (Sidebar continues; prospective juror joins.)

17          THE COURT:  I want to make sure that's you.

18          THE PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Please come forward.

20          Yes, sir?

21          THE PROSPECTIVE JUROR:  Right now, I would love to

22  do it.  But right now, I'm scheduled to leave in three weeks.

23  I'm an entertainer.  So, I have to go to Shanghai in three

24  weeks, so I'm not going to be here.

25          THE COURT:  Wonderful.  Have a nice trip.  I will

```
                        Sidebar                      687
```

1   excuse you.  Go to the second floor and tell them you're

2   excused.

3           (Prospective juror excused.)

4           (In open court.)

5           THE COURT:  Juror 48, do you need to be heard?

6   Thank you, ma'am.

7           (Sidebar continues; prospective juror joins.)

8           THE COURT:  Hello.  I want to make sure this is you.

9           THE PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Come forward.  Yes, ma'am?

11          THE PROSPECTIVE JUROR:  I work in campaign finance

12  in the city.  Being that it's election year, I can't take more

13  off for four to six weeks.  It will be burdensome on my

14  profession.

15          THE COURT:  Well, is there anybody else who can do

16  your job or fill in for you or perform your function?

17          THE PROSPECTIVE JUROR:  I have 16 candidates and we

18  all have 16 candidates to take care of, so it would be

19  burdensome.

20          THE COURT:  I'm just trying to think if there's

21  anybody, if you could speak to your employer about --

22          It's a city agency, right?

23          THE PROSPECTIVE JUROR:  It is.

24          THE COURT:  -- whether they can find others to help

25  out during the six-week period.

```
                        Sidebar                      688
```

1          THE PROSPECTIVE JUROR:  We're a little short staffed

2      at this point too because someone left us.  So, it would be

3      kind of impossible.

4          THE COURT:  Will you step back, please?

5          (Prospective juror leaves sidebar.)

6          THE COURT:  City agencies pay their employees.  They

7      have to have -- she's not going to lose her job.  I will ask

8      the second question.

9          (Prospective juror joins sidebar.)

10          THE COURT:  Ma'am, I asked two questions.  Have you

11      had any exposure to the media about this case or about

12      Mr. Shkreli?

13          THE PROSPECTIVE JUROR:  Very little.  I'm not really

14      sure what it's about.

15          THE COURT:  Would you be able to maintain an open

16      mind and evaluate this case based on the evidence at the

17      trial?

18          THE PROSPECTIVE JUROR:  I would.

19          THE COURT:  You're going to be paid for jury

20      service; is that correct?

21          THE PROSPECTIVE JUROR:  I actually don't know, but

22      I'm assuming I would be.

23          THE COURT:  Would you please confirm that you will

24      be paid for six weeks if you are selected?  And I'm going to

25      allow you to talk to your employer and tell them that I would

```
                          Sidebar                    689
```

1   very much like them to make you available for six weeks and be

2   under consideration as a juror.

3              THE PROSPECTIVE JUROR:  I'm also going on vacation

4   end of July.

5              THE COURT:  Where are you going?

6              THE PROSPECTIVE JUROR:  I'm going to Mexico, to

7   visit family.

8              THE COURT:  You have tickets already?

9              THE PROSPECTIVE JUROR:  Yes, for July 20.

10             THE COURT:  That's a problem, then.  I will excuse

11  you.

12             THE PROSPECTIVE JUROR:  Thank you.

13             (Prospective juror excused.)

14             (In open court.)

15             THE COURT:  I'm next going to hear from Jurors 49

16  through 56.

17             Let's start with 49.

18             (Sidebar continues; prospective juror joins.)

19             THE COURT:  Do you have scheduling issues you need

20  to tell us about?

21             THE PROSPECTIVE JUROR:  I do.  I have a travel

22  commitment in about three weeks.  My brother, his family, in

23  Vermont are hosting a family get-together, and I'm flying

24  there, as well as other family members from a few other

25  states.

```
                        Sidebar                        690
```

1           THE COURT:  Is it for just the weekend?

2           THE PROSPECTIVE JUROR:  It's almost a week.

3           THE COURT:  So, a family reunion?

4           THE PROSPECTIVE JUROR:  Of sorts, yes.

5           THE COURT:  And it's, you said, three weeks in July.

6           THE PROSPECTIVE JUROR:  Yes.

7           THE COURT:  All right.  I will excuse you, sir.

8   Just go to the second floor, please, and tell them you've been

9   excused from jury service, and they will give you papers.

10          (Prospective juror excused.)

11          (In open court.)

12          THE COURT:  Did Juror 50 need to be heard?  Come up,

13  ma'am, please.

14          (Sidebar continues; prospective juror joins.)

15          THE COURT:  Hello, ma'am.  I want to make sure this

16  is you.

17          THE PROSPECTIVE JUROR:  That's me.

18          THE COURT:  Come forward, please, Juror 50.

19          Yes, ma'am, what are you conflicts?

20          THE PROSPECTIVE JUROR:  I work for Simon & Schuster

21  in digital operations and it would be very disruptive to my

22  schedule.  And, also, financially, it would be a hardship to

23  not get paid.

24          THE COURT:  Will they not pay you?

25          THE PROSPECTIVE JUROR:  I believe it's only up to

1   you two weeks or something, but I'm not exactly sure of that.

2         THE COURT:  I would like you to find out what your

3   employer's policy would be or whether they would pay you if

4   you were selected to serve for six weeks.  It would be Monday

5   through Friday, 9 to 5:30.

6         What is it you do for Simon & Schuster?

7         THE PROSPECTIVE JUROR:  I work in digital

8   operations.  I manage accounts like Amazon, Barnes & Noble,

9   make sure e-books are up for sale.

10        THE COURT:  Is there anybody else in your

11  organization who could perform your job?

12        THE PROSPECTIVE JUROR:  Yes; it would be disruptive

13  to them, but yes.

14        THE COURT:  Would you mind going to get your phone,

15  speaking to your employer, and asking them if you would be

16  paid for six weeks if you were selected as a juror, please?

17        THE PROSPECTIVE JUROR:  I can go downstairs and come

18  back up?

19        THE COURT:  Yes.

20        Before I let you go on that, have you read anything

21  in the media about this case or Mr. Shkreli.

22        THE PROSPECTIVE JUROR:  No, I haven't.

23        THE COURT:  Please go and get your phone and make a

24  call, and you can come back, get our attention, and we'll

25  speak to you further.

```
                        Sidebar                      692
```

1           THE PROSPECTIVE JUROR:  Thank you.

2           (Prospective juror leaves sidebar.)

3           (In open court.)

4           THE COURT:  Juror 51, did you need to be heard?

5           Come forward, ma'am.

6           (Sidebar continues; prospective juror joins.)

7           THE COURT:  What can you tell us, do you have

8    conflict or any issues?

9           THE PROSPECTIVE JUROR:  Yes, I'm asking to be

10   excused.  I work for the schools, and during the summer I

11   usually keep my grandkids.  They live out of state and they're

12   here already; two of them came on Sunday, one came on Friday.

13   And I usually keep them for a few weeks and then I take them

14   back and that's my vacation.

15          THE COURT:  That's not a vacation.

16          THE PROSPECTIVE JUROR:  No, it's not.

17          THE COURT:  It must be fun, though.

18          THE PROSPECTIVE JUROR:  I only see them, like, once

19   a year.

20          THE COURT:  So this is your time.

21          THE PROSPECTIVE JUROR:  Yeah.

22          THE COURT:  Let me just ask you to step back for one

23   moment.  Before I do, have you read or heard anything about

24   this case?

25          THE PROSPECTIVE JUROR:  Yes, I've heard on the news.

```
                         Sidebar                        693
```

1           THE COURT:  Do you have a open mind to both sides or

2     have you formed any feelings.

3           THE PROSPECTIVE JUROR:  I haven't, but...

4           THE COURT:  Step back.

5           (Prospective juror leaves sidebar.)

6           THE COURT:  It sounds like she could serve, but --

7           MR. BRAFMAN:  Let her go.

8           MS. KASULIS:  Yeah.

9           (Prospective juror joins sidebar.)

10          THE COURT:  Ma'am, we will excuse you.  What you

11    should do is go down to -- you're No. 51, right?

12          Go down is to the jury room where you checked in and

13    tell them you're excused.

14          THE PROSPECTIVE JUROR:  Thank you.  You're so nice.

15    Have a blessed day.

16          (Prospective juror excused.)

17

18          (Continued on next page.)

19

20

21

22

23

24

25

```
                    Sidebar                        694
```

1          (The following occurred at sidebar; prospective

2     juror present.)

3               THE COURT:  Juror No. 52, please come forward.

4               (Prospective juror present at sidebar.)

5               THE COURT:  Hi.  How are you?  This is you?

6               THE PROSPECTIVE JUROR:  Yes, but I have no M.

7               THE COURT:  That's all right.  We are going to call

8     you number 52 if you don't mind.  What are your issues

9     regarding scheduling?

10              THE PROSPECTIVE JUROR:  Six weeks is too much.  I

11    work for myself.  I own and manage properties.  Six is too

12    much.  All of these lawyers, this is going to be more than six

13    weeks.

14              THE COURT:  All right.  So is there anyone else in

15    your organization who can help you?

16              THE PROSPECTIVE JUROR:  You are looking at the

17    organization.  My wife can't handle the tenants.

18              THE COURT:  I am going to excuse you.  You may go

19    down to the second floor where you checked in and you are go

20    off to your job.

21              THE PROSPECTIVE JUROR:  Thank you.

22              THE COURT:  Thank you, sir.

23              (In open court.)

24              THE COURT:  Juror No. 53, come on up, sir.

25              (Prospective juror present at sidebar.)

```
                        Sidebar                        695
```

1          THE COURT:  Hi, how are you.  I want to make sure

2    you are Juror No. 53; correct?

3          THE PROSPECTIVE JUROR:  Yes, ma'am.

4          THE COURT:  What issues do you have?

5          THE PROSPECTIVE JUROR:  I have two young children

6    that I pick up every day after work and I don't have nobody

7    help me fill that role for me for six weeks.

8          THE COURT:  What time do you have to pick up your

9    children.

10          THE PROSPECTIVE JUROR:  Four o'clock.

11          THE COURT:  Are they in daycare?

12          THE PROSPECTIVE JUROR:  One is in daycare and one is

13    in camp.  Also, financially, I can't be here every day, I've

14    been here for two days and I spent $67 in those two days and I

15    know you guys reimburse, I don't have the upfront money to

16    keep going everyday.

17          THE COURT:  I will excuse you.  Please go to the

18    second floor jury room, tell them you are excused, they will

19    give you paperwork and you can be excused.

20          THE PROSPECTIVE JUROR:  Thank you.

21          (Prospective juror excused.)

22          THE COURT:  Juror No. 53 is excused and there are no

23    objections?

24          MS. KASULIS:  No objection.

25          MR. BRAFMAN:  No objection.

```
                    Sidebar                        696
```

1              (In open court.)

2              THE COURT:  Juror No. 54.  Come forward.

3              (Prospective juror present at sidebar.)

4              THE COURT:  Yes, ma'am.

5              THE PROSPECTIVE JUROR:  I'm sorry, I can't afford

6     six weeks because I am a single mother with three kids.

7              THE COURT:  Does your job pay you to be on jury

8     duty?

9              THE PROSPECTIVE JUROR:  No, I'm a driver.

10             THE COURT:  You are the sole breadwinner and support

11    for three children?

12             THE PROSPECTIVE JUROR:  Yeah.

13             THE COURT:  We will excuse you then.  Please go to

14    the second floor and tell them, the jury room where you

15    checked in and tell them that you are excused.

16             THE PROSPECTIVE JUROR:  I go --

17             THE COURT:  No, you are finished.  You just need the

18    paperwork for your job and they will have a record that you

19    have been excused.

20             (Prospective juror excused.)

21             (In open court.)

22             THE COURT:  Did Juror No. 55 need to be heard?

23             (Prospective juror present at sidebar.)

24             THE COURT:  I want to make sure, is that you?

25             THE PROSPECTIVE JUROR:  Yes.

```
                        Sidebar                        697
```

1           THE COURT:  Yes, ma'am.

2           THE PROSPECTIVE JUROR:  I have a flight booked from

3    July 11th to mid August.

4           THE COURT:  Where are you going?

5           THE PROSPECTIVE JUROR:  Florida.

6           THE COURT:  So no flexibility on that trip?

7           THE PROSPECTIVE JUROR:  No, I work in the school

8    system, so I would be starting back in September.

9           THE COURT:  I see.  Thank you, then.  I will excuse

10   you.  Please go to the second floor and tell them that you

11   have been excused.

12          THE PROSPECTIVE JUROR:  Okay.

13          THE COURT:  Thank you.  You will get your paperwork.

14          (Prospective juror excused.)

15          (In open court.)

16          THE COURT:  Juror No. 56, did you need to be heard?

17          (Prospective juror present at sidebar.)

18          THE COURT:  Is this you?

19          THE PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Please come forward.

21          THE PROSPECTIVE JUROR:  I have travel plans for the

22   last two weeks of July with my wife.  It is our 10-year

23   anniversary.

24          THE COURT:  Happy anniversary.

25          THE PROSPECTIVE JUROR:  Thank you.  And I have train

1   tickets purchased.  That's all set.

2            THE COURT:  Is it possible that you can do this trip

3   in mid August?

4            THE PROSPECTIVE JUROR:  I'm going to be flying.  I

5   have flight plans for mid August to visit family in Colorado.

6   I can't move most of those dates.  There is some flexibility,

7   but I have things in August as well.

8            THE COURT:  Well, I will excuse you.  Have a happy

9   anniversary trip.  Thank you.

10           THE PROSPECTIVE JUROR:  Thank you.  All the best.

11           THE COURT:  Thank you.

12           (Prospective juror excused.)

13           THE COURT:  That was Juror No. 56.

14           We need how many more to get to 60?

15           THE LAW CLERK:  We need eight more.

16           (In open court.)

17           THE COURT:  I next going to speak to whose numbers

18   are 57 to 62, if you have issues.

19           57, come forward.

20           (Prospective juror present at sidebar.)

21           THE COURT:  Is this you.

22           THE PROSPECTIVE JUROR:  Yes.

23           For me, it's focus, concentration, retaining

24   information and stuff.  I wouldn't be able to sit through a

25   trial like this.  I have doctors' appointments coming up.

```
                        Sidebar                      699
```

1           THE COURT:  When are they scheduled?

2           THE PROSPECTIVE JUROR:  One on the 10th.

3           THE COURT:  Of July?

4           THE PROSPECTIVE JUROR:  Yeah.  One on the 20th.  I'm

5     not sure.

6           THE COURT:  Are they morning or afternoon

7     appointments?

8           THE PROSPECTIVE JUROR:  Late evening, five o'clock

9     hour, the five o'clock hour, the five o'clock hour, because I

10    usually get off of work at five o'clock and I schedule my

11    appointments for right after work.

12          THE COURT:  I'm saying maybe we will accommodate

13    your appointments.

14          THE PROSPECTIVE JUROR:  Basically no interest to you

15    but my focus and concentration and patience.  I don't think I

16    would be able to sit through it, especially six weeks.  This

17    would be the biggest burden.  I work with the Army National

18    Guard.  I work as a security officer.  All of the information

19    that I need for my job as well.  It would be a big burden for

20    me to sit through something like this for a long period of

21    time.  Six, seven days, but six weeks.

22          THE COURT:  Do you have a diagnosed condition

23    regarding concentration?

24          THE PROSPECTIVE JUROR:  Nothing, nothing, nothing

25    that can make any proof, but, you know, but I have been

```
                    Sidebar                      700
```

1   through therapy.

2        THE COURT:  Let me ask you to step back for one

3   moment.

4        (Prospective juror leaves sidebar.)

5        MR. BRAFMAN:  He some physical manifestations of

6   anxiety that you can see, I think.

7        MS. KASULIS:  Yes.  No objection.

8        THE COURT:  Okay.  I will excuse Juror No. 56.

9        (Prospective juror present at sidebar.)

10       THE COURT:  Sir, I will excuse you.  Please go to

11  the second floor and tell them that you have been excused.

12       THE PROSPECTIVE JUROR:  Thank you.

13       (Prospective juror excused.)

14       (In open court.)

15       THE COURT:  Juror No. 58, come forward.

16       (Prospective juror present at sidebar.)

17       THE COURT:  I want to make sure this is you.

18       THE PROSPECTIVE JUROR:  Yes.

19       THE COURT:  Yes, ma'am.

20       THE PROSPECTIVE JUROR:  I am a single mother of

21  three kids with out-of-state college.  This is killing me.  I

22  could never afford to take off and get my kids to Florida in

23  three and a half weeks and set up.

24       THE COURT:  Your employer will not pay you?

25       THE PROSPECTIVE JUROR:  No, just taking off the two

1    days is kind of really hard.

2          THE COURT:  We will excuse you and ask you to go to

3    the second floor.  Tell them that you are excused and get your

4    paperwork.

5          THE PROSPECTIVE JUROR:  Thank you so much.

6          (Prospective juror excused.)

7          THE COURT:  Juror No. 50 is back.  Let's hear from

8    them.

9          (In open court.)

10         THE COURT:  Juror No. 50 come back.

11         (Prospective juror present at sidebar.)

12         THE COURT:  Hello, ma'am.

13         THE PROSPECTIVE JUROR:  Hi.  I would be paid.  That

14   is good, but it would be disruptive to my job.  I was just on

15   vacation two weeks ago and I'm still catching up.  I manage 40

16   e-book accounts.  There are a lot of day-to-day

17   responsibilities that would be disruptive.

18         THE COURT:  The question is would you be able to

19   work out a situation with your employer where you could have

20   others fill in for you, where you could do some of your job

21   online or have your colleagues do the work?  It is just for

22   six weeks.  I shouldn't say "just."  It is a long time.

23         THE PROSPECTIVE JUROR:  I mean, I could figure

24   something out.  If I have to be here until 5:00, I guess I

25   could go after.  It would be Brooklyn, Manhattan, Astoria,

```
                         Sidebar                    702
```

1   where I live.  It would be tough, if I don't have a choice.

2            THE COURT:  Your employer will pay you for the six

3   weeks?

4            THE PROSPECTIVE JUROR:  Yes.

5            THE COURT:  Let me ask you to step back for a moment

6   please.

7            (Prospective juror leaves sidebar.)

8            THE COURT:  I think this juror is going to be fine.

9            MS. KASULIS:  Yes.

10           THE COURT:  She has an open mind.  She hasn't heard

11  about the case.  I think we should keep her.

12           MS. KASULIS:  Yes.

13           MR. BRAFMAN:  Yes.

14           (Prospective juror present at sidebar.)

15           THE COURT:  Ma'am, I appreciate you taking the time

16  to speak to your employer.  We would really like to retain you

17  at this time and have you considered as a juror for the

18  six-week trial.

19           THE PROSPECTIVE JUROR:  Okay.  Just go back to my

20  seat now?

21           THE COURT:  Yes, please.  Thank you.

22           (Prospective juror leaves sidebar.)

23           (In open court.)

24           THE COURT:  Does Juror No. 59 to be heard?

25           THE PROSPECTIVE JUROR:  Yes.

```
                        Sidebar                      703
```

1           THE COURT:  Come on up.

2           (Prospective juror present at sidebar.)

3           THE COURT:  Yes.

4           THE PROSPECTIVE JUROR:  Your Honor, I can't have any

5    impartial.  Totally, like, he's guilty and I just in no way

6    can I let him slide out of anything because --

7           THE COURT:  Okay.  Let me ask you this.  I don't

8    mean to cut you off.  Is that your attitude toward anyone

9    charged with a crime who has not been proven guilty?

10          THE PROSPECTIVE JUROR:  It's my attitude toward his

11   entire demeanor, what he has done people.

12          THE COURT:  All right.

13          THE PROSPECTIVE JUROR:  Can I ask you the second

14   thing?

15          THE COURT:  No, we are going to excuse you, sir.

16          THE PROSPECTIVE JUROR:  And he disrespected the

17   Wu-Tang Clan.

18          THE COURT:  Thank you.  Sir, you need to go to the

19   second floor clerk's office, the jury clerk.  Thank you.

20   Where you checked in.

21          (Prospective juror excused.)

22          (In open court.)

23          THE COURT:  Juror No. 60, please come on up.

24          (Prospective juror present at sidebar.)

25          THE COURT:  I just want to make sure.  This is you?

```
                          Sidebar                          704

1              THE PROSPECTIVE JUROR:  That's me.

2              THE COURT:  Yes, ma'am.

3              THE PROSPECTIVE JUROR:  I have several different

4    reasons.  I don't think I can be impartial.

5              THE COURT:  Let's start with scheduling.

6              THE PROSPECTIVE JUROR:  Scheduling, I'm a breast

7    cancer survivor.  I have a lot of tests in the next couple of

8    weeks.  I would have problems with that?

9              THE COURT:  Are the tests scheduled in the late

10   evening or early morning?

11             THE PROSPECTIVE JUROR:  Yes.  At 11 o'clock in the

12   morning in Ronkonkama.

13             THE COURT:  Ma'am, I am going to excuse you.  You

14   can go to the second floor jury room and tell them that you

15   are excused.

16             THE PROSPECTIVE JUROR:  Thank you.

17             (Prospective juror excused.)

18             (In open court.)

19             THE COURT:  Juror No. 61, come on up.

20             (Prospective juror present at sidebar.)

21             THE COURT:  Hello, sir.  Let me make sure I have the

22   right gentleman here.

23             THE PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Come forward.  What would you like to

25   tell me?
```

```
                        Sidebar                          705
```

1           THE PROSPECTIVE JUROR:  I cannot be fair.

2           THE COURT:  I'm sorry.  Do you have this attitude

3    towards everyone charged with an offense or something with

4    this particular case?

5           THE PROSPECTIVE JUROR:  Something with this

6    particular case.

7           THE COURT:  All right.  Is it based on something

8    that you have read?

9           THE PROSPECTIVE JUROR:  Yes, in the papers.

10          THE COURT:  So you have a strong opinion about --

11          THE PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  -- and you couldn't be fair to both

13   sides?

14          THE PROSPECTIVE JUROR:  Yes, and I have arthritis in

15   my back.

16          THE COURT:  And it hurts your back.  We will excuse

17   you and ask you to go to the jury clerk on the second floor

18   where you checked in.  Tell them you are excused.

19          THE PROSPECTIVE JUROR:  Thank you very much for your

20   patience.

21          THE COURT:  Thank you.

22          (Prospective juror excused.)

23          (In open court.)

24          THE COURT:  Did Juror No. 62 need to be heard from?

25   Did you have your hand up?  Thank you, ma'am.

```
                        Sidebar                           706
```

1             What about Juror No. 63?

2             (Prospective juror present at sidebar.)

3             THE COURT:  Hi, how are you?  I want to make sure I

4    have the right name.

5             THE PROSPECTIVE JUROR:  Yes.

6             THE COURT:  What do you have with regard to

7    scheduling first and then we will ask the --

8             THE PROSPECTIVE JUROR:  With regards to scheduling,

9    the fact that it would be a six-week trial, I just graduated

10   college and I have the opportunity to write something for a

11   very high-profile musician and that's something that would

12   hinder.  There is a line of directors waiting.  That is not as

13   much an issue as the way the media has affected my opinion on

14   Mr. Shkreli in terms of his actions and the fact that they

15   have had a direct influence on people who are near and dear to

16   me and my loved-ones.

17            THE COURT:  I will excuse you then, all right.  Good

18   luck with your music video.

19            THE PROSPECTIVE JUROR:  Thank you.

20            (Prospective juror excused.)

21            (In open court.)

22            THE COURT:  We are next going to hear from jurors

23   number 64 through 70.  Does anybody in that range need to be

24   heard?  Thank you.  Come forward, please.

25            (Prospective juror present at sidebar.)

```
                         Sidebar                        707

 1          THE COURT:  How are you?

 2          THE PROSPECTIVE JUROR:  Hi.

 3          THE COURT:  I want to make sure this is you.

 4          THE PROSPECTIVE JUROR:  Yes.

 5          THE COURT:  Yes, ma'am.  Come forward.  What is your

 6   conflict with scheduling?

 7          THE PROSPECTIVE JUROR:  Both, the scheduling, I will

 8   be leaving town July 10th for the summer.

 9          THE COURT:  For the whole summer?

10          THE PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Are you going abroad?

12          THE PROSPECTIVE JUROR:  No, I'm going to

13   Pennsylvania, D.C., and then Florida.

14          THE COURT:  Are those flexible dates at all?

15          THE PROSPECTIVE JUROR:  No.

16          THE COURT:  All right.  Thank you, I will excuse

17   you.  Please go to the second floor to the jury clerk and tell

18   them that you are excused.  Thank you.  Juror No. 64.

19          (Prospective juror excused.)

20          (In open court.)

21          THE COURT:  Anyone else?

22          Juror No. 65, do you need to be heard?  Okay.

23   Please come forward.  Hi, ma'am.  Come up.  This is you.

24          (Prospective juror present at sidebar.)

25          THE PROSPECTIVE JUROR:  Yes.
```

```
                        Sidebar                      708
```

1          THE COURT:  Yes, ma'am.

2          THE PROSPECTIVE JUROR:  I cannot sit down.  I'm

3    sorry, I cannot sit for six weeks because on Monday, I receive

4    a phone call from my country that my mother fell off the bed

5    and last night, when I speak to her, she was dizzy, so this

6    evening, myself and other siblings we will -- I don't know

7    what we going to do.

8          THE COURT:  I'm sorry to hear that, ma'am.  So you

9    might be traveling to see her?

10          THE PROSPECTIVE JUROR:  We don't know what will be

11    the outcome yet.

12          THE COURT:  So it seems to me that you are

13    understandably preoccupied with your mother's situation.  It

14    is important for the jurors to be able to listen carefully.  I

15    will excuse you and I hope your mother makes a recovery.  Go

16    to the second floor jury room and tell the clerk that you have

17    been excused.

18          THE PROSPECTIVE JUROR:  Thank you.

19          (Prospective juror excused.)

20          THE COURT:  Did Juror No. 66 need to be heard?

21    Please come forward.

22          (Prospective juror present at sidebar.)

23          THE PROSPECTIVE JUROR:  Good morning.

24          THE COURT:  Let me confirm who you are.

25          THE PROSPECTIVE JUROR:  Yes.

```
                        Sidebar                         709
```

1          THE COURT:  Yes, sir.

2          THE PROSPECTIVE JUROR:  Well, I'm familiar with the

3    defendant.

4          THE COURT:  Let me ask you first, do you have any

5    scheduling issues?

6          THE PROSPECTIVE JUROR:  I do.

7          THE COURT:  Let's hear about those first.

8          THE PROSPECTIVE JUROR:  I have a non-refundable

9    flight in mid-July, but I am also leaving a job where I'm

10   training someone and I'm also part of a short-term internship

11   that I would have to miss in order to be here for six weeks.

12         THE COURT:  If you have scheduling issues, I will

13   excuse you.  Please go to the second floor jury clerk, tell

14   them that you are excused and you will be given your

15   paperwork.

16         THE PROSPECTIVE JUROR:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         (In open court.)

19         THE COURT:  Did Juror No. 67 need to be heard?

20   Thank you.

21         (Prospective juror present at sidebar.)

22         Hi, how are you?  I want to make sure this is you.

23         THE PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Yes, ma'am.

25         THE PROSPECTIVE JUROR:  I have a few issues, I have

```
                         Sidebar                          710
```

1    read extensively about the case.

2         THE COURT:  Let's talk about your schedule.

3         THE PROSPECTIVE JUROR:  I am a full-time graduate

4    school.  Participating in this case might potentially delay my

5    graduation.  It's a time sensitive.

6         (Handing).

7         THE COURT:  When is it due?

8         THE PROSPECTIVE JUROR:  I am filming over the

9    summer.  This is the height of production.  If I miss this

10   time, I miss my window of opportunity.

11        THE COURT:  And there is no opportunity to do this

12   in August?

13        THE PROSPECTIVE JUROR:  Unfortunately, this is a

14   documentary, so the things that are happening, I have to be

15   there, too.

16        THE COURT:  I will excuse you then, ma'am.

17        THE PROSPECTIVE JUROR:  Thank you very much.

18        THE COURT:  Please go to the second floor jury clerk

19   and tell them that you are excused.  Thank you.

20        THE PROSPECTIVE JUROR:  Thank you.

21        (Prospective juror excused.)

22        (In open court.)

23        THE COURT:  Did Juror No. 68 have to be heard from?

24   Yes, sir.

25        Is this you?

```
                     Sidebar                          711
```

1           THE PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Come forward, please.

3           (Prospective juror present at sidebar.)

4           THE PROSPECTIVE JUROR:  I am a consultant and I only

5    get paid when I work.  I have these two weeks, but I have

6    appointments scheduled with clients in July.

7           THE COURT:  So you have no flexibility in terms of

8    rescheduling these client meetings?

9           THE PROSPECTIVE JUROR:  No, they're schools.

10          THE COURT:  You are only paid if you work?

11          THE PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  Do you work for yourself?

13          THE PROSPECTIVE JUROR:  No, it's a company.

14          THE COURT:  They don't have a juror policy?

15          THE PROSPECTIVE JUROR:  No, it is not salaried.

16   It's just per diems.

17          THE COURT:  I will excuse you.  Please go to the

18   second floor jury clerk, tell them that you are excused.

19          Juror No. 68 is excused.

20          THE PROSPECTIVE JUROR:  Thank you.

21          (Prospective juror excused.)

22          (In open court.)

23          THE COURT:  Does Juror No. 69 need to be heard from?

24   Thank you.

25          (Prospective juror present at sidebar.)

```
                        Sidebar                      712
```

1          Hello, you are Juror No. 69.  This is you?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Yes.

4          THE PROSPECTIVE JUROR:  I have heard about this

5     case.  I was reading it this morning.

6          THE COURT:  Okay, the question is --and it is fine.

7     There has been a lot of media coverage, so it is

8     understandable that you have heard about it and even maybe

9     formed an opinion.  The question for you is whether you could

10    commit to maintaining a fair mind, an open mind and treat both

11    sides equally and listen only to the evidence in this case and

12    consider that evidence only and reach a decision with your

13    fellow jurors?  Could you do that?

14         THE PROSPECTIVE JUROR:  I hope so.  I'm not entirely

15    sure.

16         THE COURT:  Can you tell us a little bit about the

17    yourself.

18         THE PROSPECTIVE JUROR:  I work at nonprofit for

19    school support.  The other think too is I have possibly a work

20    hardship.  We have audits starting in September because we are

21    a non-profit with our school work as well, so we have audits

22    starting in September for nine charter schools, and we do a

23    majority of our work in July and August.  I am one of two

24    accountants who work on this.

25         THE COURT:  Could you do this work in the evenings

Sidebar                                          713

1   or on the weekends.

2           THE PROSPECTIVE JUROR:  Not as well as I can just

3   because a lot of the work is going to be during the daytime

4   hours, the auditors are in-house.

5           THE COURT:  I see.  They are in-house at the school?

6           THE PROSPECTIVE JUROR:  They are in-house at our

7   offices, and then to access the files, I will need to set up

8   access through my company.

9           THE COURT:  Would your employer be open to that?

10          THE PROSPECTIVE JUROR:  Possibly.

11          THE COURT:  Would you be paid for six weeks or does

12  your employer pay?

13          THE PROSPECTIVE JUROR:  We pay for I think a week.

14  I don't think it is six weeks.

15          THE COURT:  Let me ask you to step back, please,

16  just for a moment.

17          (Prospective juror leaves sidebar.)

18          THE COURT:  I think it is going to be difficult for

19  her to be serve given her duties and employment policy, so I

20  will excuse her.

21          MS. KASULIS:  No objection.

22          (Prospective juror present at sidebar.)

23          THE COURT:  Ma'am, we will excuse you.  Please go to

24  the jury clerk on the second floor, tell them that you are

25  excused.  They will give you paperwork.  Thank you.

```
                          Sidebar                      714
```

1              THE PROSPECTIVE JUROR:  Thank you.

2              (Prospective juror excused.)

3              (In open court.)

4              THE COURT:  Did Juror No. 70 need to be heard from?

5    Come on up, ma'am.  Hello, ma'am, how are you?

6              THE COURT:  I want to make sure this is you.

7              THE PROSPECTIVE JUROR:  Yes.

8              (Prospective juror present at sidebar.)

9              THE PROSPECTIVE JUROR:  The thing is, to me, I'm not

10   going to understand the Court everything clearly.  My English

11   not that perfect.

12             THE COURT:  How long have you been in this country?

13             THE PROSPECTIVE JUROR:  25 years.

14             THE COURT:  25 years.

15             THE PROSPECTIVE JUROR:  But --

16             THE COURT:  Did you study English at any time in

17   your life?

18             THE PROSPECTIVE JUROR:  No, I'm working.  I'm still

19   working, but to understand all of this court, for me it is a

20   little too hard.

21             THE COURT:  Where do you work?

22             THE PROSPECTIVE JUROR:  NYU Medical Center.

23             THE COURT:  In your job you speak English and

24   converse with patients?

25             THE PROSPECTIVE JUROR:  Yes.  Yes, I do.

Sidebar                                          715

1          THE COURT:  What is it that you do for NYU?

2          THE PROSPECTIVE JUROR:  Unit associate.

3          THE COURT:  What does that job entail?

4          THE PROSPECTIVE JUROR:  Check with doctor, with the

5    patient, with, you know, paperwork, copy, fax, you know, call

6    doctors.

7          THE COURT:  Do you make appointments or do you --

8          THE PROSPECTIVE JUROR:  No, I don't make

9    appointments.  We have patient come in for oncology,

10   hematology, chemo.

11         THE COURT:  I see.  All right.  It seems that you

12   speak good English and you do use English in your job.

13         THE PROSPECTIVE JUROR:  I just don't understand

14   everything, you know.

15         THE COURT:  Let me ask you to just step back for a

16   moment.

17         THE PROSPECTIVE JUROR:  Sure.

18         (Prospective juror leaves sidebar.)

19         THE COURT:  All of the indicia are that she has a

20   sufficient capacity to speak and understand English given her

21   job and what she does.  I'm not sure that that is a basis to

22   dismiss her.  We could ask her about her exposure to the media

23   and scheduling conflicts, but I don't think language is an issue.

24         MR. BRAFMAN:  I don't have a strong view.  I just

25   think that she expresses some concern.  I'm not suggesting

```
                         Sidebar                        716
```

1   she's lying.  She sends faxes and making phone calls.

2   Listening to testimony about private placement memorandums and

3   investment --

4           THE COURT:  What do you all think?

5           MR. BRAFMAN:  I think it would be best, but I'm not

6   going to urge it.

7           MS. KASULIS:  I think we are fine to dismiss based

8   on her limited English.

9           THE COURT:  I will dismiss Juror No. 70 and I will

10  just give her instructions.

11          (Prospective juror present at sidebar.)

12          THE COURT:  Ma'am, we are going to excuse you,

13  please return to the second floor to the jury clerk, tell them

14  that you are excused.

15          (Prospective juror excused.)

16          (In open court.)

17          THE COURT:  Can we have Juror No. 4.  Come forward.

18          (Prospective juror present at sidebar.)

19          THE COURT:  This is Juror No. 4, she's back.  Were

20  you able to reach your employer?

21          THE PROSPECTIVE JUROR:  Not for six weeks.

22          THE COURT:  They won't pay you for six weeks?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  How long will they pay you?

25          THE PROSPECTIVE JUROR:  20 days. That is four weeks.

```
                        Sidebar                    717
```

1          THE COURT:  Okay, it is not enough here.

2          THE PROSPECTIVE JUROR:  Sorry about that.

3          THE COURT:  Let me ask you to step back for one

4     minute.

5          (Prospective juror leaves sidebar.)

6          THE COURT:  She is going to go without pay for a

7     whole pay period.

8          MS. KASULIS:  No objection.

9          MR. BRAFMAN:  No objection.

10         (Prospective juror present at sidebar.)

11         THE COURT:  Ma'am, you are excused.  You can go to

12    the second floor jury room and tell them that you are excused.

13         THE PROSPECTIVE JUROR:  Thanks so much.

14         (Prospective juror excused.)

15         THE COURT:  So just for the record, we have 10 more

16    today.  We need 6 more to get to 60.  We have how many more

17    jurors.

18         THE COURTROOM DEPUTY:  12.

19         MS. SMITH:  We also haven't done the other questions

20    for this group.

21         THE COURT:  Should I go ahead and do that now?  Hold

22    the 12 and let's see how far we get with everyone remaining.

23    Do you want me to keep them in their seats?

24         MS. KASULIS:  Keep them there.

25         THE COURT:  We will go through the rest of the voir

718

1    dire.  Thank you.

2              (In open court.)

3         THE COURT:  Thank you again for your patience and

4    your attention.  I am going to continue with some questions.

5    Please listen carefully.

6              Is there anyone who hasn't already made their issues

7    known who would have difficulty seeing, hearing, speaking,

8    understanding or reading English or who, for any other reason,

9    would find it difficult to follow the evidence presented at

10   the trial?  Raise your hand.

11             I have also introduced you to the attorneys and the

12   parties.  Does anyone here know any of the attorneys or other

13   individuals sitting at the parties' tables?  If so, please

14   raise your hand.  A hand was raised.

15             THE PROSPECTIVE JUROR:  I don't know anybody, but I

16   have read the article.

17             THE COURT:  Well, this question, we have talked to

18   you about what you have read, sir, but we are asking you now

19   whether you know any of these people.

20             Do you know anybody?

21             THE PROSPECTIVE JUROR:  No.

22             THE COURT:  Thank you.

23             I think we have heard from those individuals who

24   have heard of Mr. Shkreli or of issues relating to this case.

25             Is there anyone else who has anything else to share

719

1    about having heard about Mr. Shkreli or this case that hasn't

2    previously raised their hand or would like to be heard?

3            Do you, a family member, or close friend follow Mr.

4    Shkreli on any social media platform or service?  If so,

5    please raise your hand.

6            I will now read a list of people we expect who will

7    be called to testify at trial or whose names may be mentioned

8    at trial.  When I have finished reading this list, please

9    raise your hand if you know of or have heard of any of these

10   people:  Joe Allen, David Abramson, John Archer, Steve

11   Aselage, Josiah Austin, Ken Banta, Maria Beconi, Dr. Alan

12   Begs, Marek Biestek, Brent Blanton, Darren Blanton, George

13   Blasko, Courtney Bond, Seymour Block, Yuri Cantor, David

14   Carter, Mi Nue or Susan Chew, Mi Nue Chew or Susan Chew,

15   Barbara Cieplugh, Lloyd Clareman, Timothy Clemensen, Jeffrey

16   Cobb, Howard Cotton, Bernadette Davida, FBI Special Agent

17   Christopher Delzotto, Justin DeMartino, Diandra de Morrell

18   Douglas, Mark Erlich, Mark Fawer, Michael Fearnow, Troy

19   Fearnow, Thomas Fernandez, Frank Ferrara, David Filer, Joshua

20   Frase, John Fulvio, Alan Geller, David Geller, Evan Greebel,

21   Christine Giordano, Neal Golding, Michael Gordon, Patrick

22   Gordon, Michelle Griswold, Andrew Grumet, Edward Hackert, Cade

23   Hamner, Michael Harrison.  (Continued on next page.)

24

25

720

1          THE COURT:   (Continuing)  Fred Hassan, Sarah Hassan,

2    George Haywood, Chad Hennings, George Huang, Leonora Izerne,

3    Sunil Jain, Chris James, Robert Johnson, Meral Kerim, Kim

4    Keur, Barbara Kocher, Richard Kocher, Thomas Koestler, John

5    Kollins, Justina Kralska, David Kravitz, Susan Lane, Mark

6    LaPolla, Hudson Lau, Michael Lavelle, Sam Lieberman, Zvi

7    Lowey, Andre Logan, Gary Lyons, Pedro Machado, FBI Special

8    Agent Matthew Mahaffey, Schuyler Marshall, Corey Massella,

9    Charles McCormick, Patrick McGowan, Amy Merrill, Fazela

10   Mohamed, Gary Mohamed or Muhammed, Kevin Mulleady, John Neill,

11   Liam O'Brien, Deborah Oremland, Jeffrey Paley, Marc Panoff,

12   Timothy Pierotti, Horacio Plotkin, Craig Poschmann, Steve

13   Richardson, Stalin Rodriguez, Steven Rosenfeld, Michael

14   Rosensaft, Lindsay Rosenwald, Allison Russo, Brent Saunders,

15   Eric Schmidt, Ian Shapiro, Jesse Shefferman, Maged Shenouda,

16   Alvin Shih, Anna Shkreli, Katrina Shkreli, Leonora Shkreli,

17   Mark Shkreli, Pashko Shkreli, Michael Smith, Wendy Spaulding,

18   Spencer Spielberg, Caroline Stewart, Steven Stich, Paul

19   Stiliano, FBI Special Agent Sean Sweeney, Jackson Su, Edmund

20   Sullivan, Ron Tilles, Howard Trachtman, Molly Tschang, Edwin

21   Urrutia, Andrew Vaino, Margaret Valeur-Jensen, Michael Verde,

22   Tillman Ward, Eric Wagner, George Yaffe, Lee Yaffe.

23          Please raise your hand if you heard of or know any

24   of these people.

25          I will now read a list of entities, locations and

1    medications that may be referred to.  When I have finished,

2    please raise your hand if you have personal knowledge or

3    experience with these entities, locations and medications.

4              Allos Pharmaceuticals, AMAG Pharmaceuticals, Amgen,

5    Anslow & Jaclin LLP, Canaccord Genuity, Catalyst, Chelsea

6    Therapeutics, Citrin Cooperman, Claridge Capital, Cooley

7    Godward Kronish LLP, Cobb & Associates, Colt Ventures, Cowen

8    Group, Cramer Berkowitz, Desert Gateway, Dyangrow Capital LLC,

9    EFAY Limited Partnership, Edwards, Angell, Palmer & Dodge,

10   Elea Capital, Financial Institution Regulatory Authority also

11   known as FINRA, Fulvio & Associates, Houlihan Lokey,

12   Interactive Brokers, KaloBios Pharmaceuticals, Katten Muchin

13   Rosenman LLP, Kleinberg Kaplan Wolff & Cohen LLP, Ligand

14   Pharmaceuticals, Manchester Pharmaceuticals LLC, Marcum LLP,

15   Merrill Lynch Pierce Fenner & Smith Incorporated, McCormick &

16   O'Brien LLP, MKM Incubator, MSMB Capital Management LLC, MSMB

17   Capital Management LP, MSMB Consumer LP, MSMB Healthcare LLC,

18   MSMB Healthcare LP, MSMB Isotope Fund LP, MSMB Isotope

19   Management LLC, Myrexis, NAV Consulting, Inc., ONY, Orexigen

20   Therapeutics, Retrophin, Inc., Retrophin LLC, RBC Professional

21   Trading Group LLC, Rothstein Kass, Securities and Exchange

22   Commission or SEC, SeraCare Life Sciences, Inc., Surepoint

23   Investment Fund LLC, Standard Registrar & Transfer, Telik,

24   Turing Pharmaceuticals, UBS, Valeant Pharmaceuticals, the

25   locations 330 Madison Avenue, New York New York and 777 Third

722

1  Avenue, New York, New York, the medications Daraprim,

2  Chenodal, Thiola.

3           If you have heard of any of these additional

4  entities or places or pharmaceuticals, please raise your hand.

5           Okay.  We have Juror Number --

6           THE PROSPECTIVE JUROR:  Six.

7           THE COURT:  What have you heard about?

8           THE PROSPECTIVE JUROR:  I heard of Merrill Lynch and

9  SEC.

10          THE COURT:  Do you have any investments with Merrill

11  Lynch and SEC other than having heard about them?

12          THE PROSPECTIVE JUROR:  I don't think so.

13          THE COURT:  No?  All right.

14          Anyone else?  All right.

15          Do you or anyone among your family members or close

16  family friends, have you studied law, worked for an attorney

17  or law firm, worked for a judge or in a courthouse, worked for

18  a prosecutor, worked for a criminal defense attorney or

19  private invetigators or have relatives or close friends who

20  have in any of the positions I have mentioned?  If so, raise

21  your hand.

22          THE COURT:  Okay.  --

23          THE PROSPECTIVE JUROR:  Going back to the SEC.  I

24  mean, I do own stocks.

25          THE COURT:  You do own stocks?

1           THE PROSPECTIVE JUROR:  Yes.

2           THE COURT:  All right.  The SEC is the Securities

3      and Exchange Commission.  Have you ever had interaction with

4      the SEC?

5           THE PROSPECTIVE JUROR:  Not that I know.

6           THE COURT:  I have another hand up.  What's your

7      number, ma'am?

8           THE PROSPECTIVE JUROR:  50.

9           THE COURT:  What --

10          THE PROSPECTIVE JUROR:  I work at a courthouse on

11     Long Island for a legislative member.

12          THE COURT:  All right.  Is there anything about your

13     work for this individual that would affect your ability to

14     consider only the evidence in this case and maintain a fair

15     and open mind in to both sides?

16          THE PROSPECTIVE JUROR:  I don't think so.

17          THE COURT:  All right.  Anyone else?

18          Has anyone ever hired or consulted a lawyer for any

19     reason?  If so, if you could tell us the situation and tell me

20     whether or not your experience with this lawyer was

21     satisfactory.  Anybody?

22          I'm sorry.  Your number, sir?

23          THE PROSPECTIVE JUROR:  42.

24          THE COURT:  Yes, sir.

25          THE PROSPECTIVE JUROR:  I had a case but it doesn't

Side Bar                              724

1    deal with this type of case right now.

2           THE COURT:  Did you retain a lawyer to represent

3    you?

4           THE PROSPECTIVE JUROR:  No.

5           THE COURT:  All right.  I am going to ask further

6    questions about this so we can either address it at side bar

7    or we can talk about it now when the question comes up.  What

8    would you prefer?

9           THE COURT:  Talk now.

10          THE COURT:  You want to talk about it now at side

11   bar?  All right.  We'll hear from Juror Number 42.  Thank you.

12          (The following occurred at side bar; prospective

13   juror present.)

14          THE COURT:  Hello.  How are you?

15          THE PROSPECTIVE JUROR:  Hi.  How are you?

16          THE COURT:  You are Number 42?

17          THE PROSPECTIVE JUROR:  Yes.

18          THE COURT:  What is your experience with lawyers in?

19          THE PROSPECTIVE JUROR:  Well, I had one case which

20   was an assault case that was adjourned, that was a closed

21   case.

22          THE COURT:  Adjourned in contemplation of dismissal?

23          THE PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Were you a complaining witness, a

25   victim, a defendant or --

Side Bar                              725

1          THE PROSPECTIVE JUROR:  The defendant actually.

2          THE COURT:  Okay.  And your experience, that

3    involved the criminal justice system, correct?  You have to

4    answer out loud.

5          THE PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Did that experience have any effect on

7    your ability to be fair and impartial to both sides in this

8    case?

9          THE PROSPECTIVE JUROR:  No.

10          THE COURT:  Do you have any favorable or unfavorable

11   attitudes or feelings about prosecutors, law enforcement or

12   defense, defendants who are charged with offenses?

13          THE PROSPECTIVE JUROR:  No.

14          THE COURT:  Do you feel that you could commit to a

15   fair and open mind if you are selected as a juror?

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Okay.  Thank you.

18          All right.  Let me ask you to step two feet back and

19   we will see if there are any further questions.

20          (Prospective juror leaves side bar.)

21          THE COURT:  Does anyone have further questions for

22   this individual?

23          MR. BRAFMAN:  Since he's up here already, could you

24   find out what type of security work he does?

25          THE COURT:  Okay.

```
                          Side Bar                    726
```

1              (Prospective juror joins side bar.)

2              THE COURT:  Sir, it looks like you are a security

3      guard.

4              THE PROSPECTIVE JUROR:  Yes, I am.

5              THE COURT:  Could you tell us what kind of security

6      work you do and what kind of clients?

7              THE PROSPECTIVE JUROR:  Actually, I work for

8      Spectrum Time Warner Cable.  I guard their building and I also

9      have other sites that I've guarded as well.  So my state

10     license is actually still active.

11             THE COURT:  Okay.  So your duties include just

12     making sure that the premises are secured?

13             THE PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Do you ever work as a security guard in

15     situations where you have to deal with the general public?

16             THE PROSPECTIVE JUROR:  Yes, a lot, all the time.

17             THE COURT:  So it's not like you are on the

18     nightshift guarding the building.

19             THE PROSPECTIVE JUROR:  Actually, I do overnight.

20             THE COURT:  So the public comes in and out?

21             THE PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Are you comfortable that you could

23     listen to the evidence in this the case with a clear and open

24     mind?

25             THE PROSPECTIVE JUROR:  Yes.

727

1            THE COURT:  And would your employer pay you --

2            THE PROSPECTIVE JUROR:  Yes.

3            THE COURT:  -- to serve as a juror?

4            THE PROSPECTIVE JUROR:  Yes.

5            THE COURT:  Okay.  Let me ask --

6            MR. BRAFMAN:  No questions.

7            MS. KASULIS:  No questions.

8            THE COURT:  Sir, thank you.  I will ask you to go

9    back to your seat.  Thank you.

10           (In open court; side bar ends.)

11           THE COURT:  I'm going to keep going.

12           All right.  Was there anyone else who would have

13   raised their hand in response to my last question?

14           Has anyone at any time worked for, applied for a job

15   or had a close friend or relative employed in any law

16   enforcement related position such as at the U.S. Attorney's

17   Office, the Department of Justice, law enforcement agencies

18   such as the FBI, the U.S. Postal Inspection Service, the SEC,

19   any state or local police department, Attorney General's

20   Office, District Attorney's Office, regulatory agency like

21   FINRA, any private security entity other than that we have

22   talked to the gentleman about, security work?

23           Other than that, if we have hands up in response to

24   any other question, I am happy to hear.

25           This is Juror Number --

728

1        THE PROSPECTIVE JUROR:  Seven.  My sister is a

2   paramedic with Nassau County Police Department.

3        THE COURT:  All right.  Is there anything about your

4   sister's work that you have heard about --

5        THE PROSPECTIVE JUROR:  No.

6        THE COURT:  -- that would influence your ability to

7   be fair and impartial to both sides in this case?

8        THE PROSPECTIVE JUROR:  No, ma'am.

9        THE COURT:  Thank you.  You are Juror Number, I'm

10  sorry, 7?

11       THE PROSPECTIVE JUROR:  Correct.

12       THE COURT:  Anyone else?  Yes.

13       THE PROSPECTIVE JUROR:  I'm Number 50.

14       THE COURT:  Number 50, yes.

15       THE PROSPECTIVE JUROR:  So, my uncle is a lawyer and

16  he works for a Judge at the courthouse in Brooklyn Heights and

17  then my aunt, she's a lawyer for the Government down in the

18  Wall Street area.

19       THE COURT:  What agency does your aunt work for?

20       THE PROSPECTIVE JUROR:  I don't know.

21       THE COURT:  Has she ever talked to you about her

22  work?

23       THE PROSPECTIVE JUROR:  A little bit but I don't

24  really know the specifics.

25       THE COURT:  Okay.  And you say your uncle works in a

CMH      OCR      RMR      CRR      FCRR

729

1   courthouse in Brooklyn Heights?

2            THE PROSPECTIVE JUROR:  Yes.

3            THE COURT:  Do you know what his position is?

4            THE PROSPECTIVE JUROR:  I think he's -- I don't know

5   what it's called, assistant to the judge.

6            THE COURT:  Like a legal secretary?

7            THE PROSPECTIVE JUROR:  I mean, he's a lawyer.  I'm

8   not sure.

9            THE COURT:  Okay.  In your discussions with your

10  relatives about their legal work, is there anything that you

11  have heard or learned that would impair your ability to be

12  fair to both sides and to maintain an open mind throughout

13  this case?

14           THE PROSPECTIVE JUROR:  I don't think so.

15           THE COURT:  All right.  Now, we also heard from the

16  gentleman who is the security guard.  What's your number

17  again, sir?

18           THE PROSPECTIVE JUROR:  42.

19           THE COURT:  42.  Yes.  Did you have any additional

20  information that you would like to share with us?

21           THE PROSPECTIVE JUROR:  I have an aunt that's a

22  sergeant and then I have an uncle that was corrections as

23  well.

24           THE COURT:  Okay.  Your aunt who is a sergeant, is

25  that with the NYPD?

730

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  All right.  And your uncle is with

3    corrections, the New York City Department of Corrections?

4          THE PROSPECTIVE JUROR:  Yes.  Department of

5    Corrections, yes.

6          THE COURT:  Is there anything about your relative's

7    work and your discussions with them about your work that would

8    affect your ability to be fair to both sides in this case?

9          THE PROSPECTIVE JUROR:  No.

10          THE COURT:  Okay.  Thank you.

11          Have you or anyone in your family or close personal

12   friend ever been either a victim of a crime or accused of a

13   crime including financial crimes or have you or a close

14   relative or personal friend ever been involved in a criminal

15   case or investigation in any way, for example, as a

16   complainant or complaining witness, a victim, a target, a

17   subject, a defendant or a witness?  If so, please raise your

18   hand.

19          Juror, you are Number 50?

20          THE PROSPECTIVE JUROR:  50, yes.  If this counts as

21   financial crime, my fiancee had identity theft and went to

22   court for it.

23          THE COURT:  All right.  Your fiancee was a victim?

24          THE PROSPECTIVE JUROR:  Of identity theft.

25          THE COURT:  And is there anything about your

1   fiancee's experience that he's discussed with you that would

2   affect your ability to be fair and impartial to both sides?

3           I would add that identity theft is not charged in

4   this case.

5           THE PROSPECTIVE JUROR:  Oh, I mean he spoke to me a

6   lot about the case and I know all about it, but if it's not

7   relevant to this case, then it's probably fine.

8           THE COURT:  Well, do you have any feelings,

9   favorable or unfavorable, toward either the criminal justice

10  system, prosecutors or people accused of financial crimes?

11          THE PROSPECTIVE JUROR:  I mean, I felt that it was

12  unfair that it went to the point that it did because, I mean,

13  the person took his identity, didn't have the same name,

14  didn't have the same age and same address and he tried to

15  fight it so many times that he had to go to court for it until

16  it was resolved but, yes, it was very frustrating and he still

17  has to deal with it.

18          THE COURT:  Right.  Again, the question for you is

19  given your fiancee's experience, could you be fair to both

20  sides and maintain an open and fair mind?

21          THE PROSPECTIVE JUROR:  I mean, just would the case

22  have any relevance to that?

23          THE COURT:  I do not believe the charges involve

24  identity theft.

25          THE PROSPECTIVE JUROR:  Then I can probably be fair.

Side Bar                                    732

1              THE COURT:  I have described the case.

2              All right.  Juror Number --

3              THE PROSPECTIVE JUROR:  62.

4              THE COURT:  Yes, ma'am.

5              THE PROSPECTIVE JUROR:  Could I have a side bar,

6    please?

7              THE COURT:  Of course.

8              THE PROSPECTIVE JUROR:  Thank you.

9              (The following occurred at side bar; prospective

10   juror present.)

11             THE COURT:  Come forward.  Yes.

12             THE PROSPECTIVE JUROR:  So, I probably should have

13   come forward at the beginning and I'm not going to say

14   anything else but one thing I am deeply concerned about, a

15   little over a year ago, an FBI agent came to my home and said

16   that my husband's name was on the list for ISIS and this list

17   was a list of people that they were encouraging people to go

18   out and kill.  I don't know if you've heard of that.  It was

19   on the news.  It was April 2016.  And since then, I've had

20   concerns about hacking, I've had concerns about my personal

21   security and I'm sitting here, I want to be a good citizen but

22   if this has anything to do with any of those issues, hacking,

23   personal security, there's no way I can be objective.

24             MR. BRAFMAN:  May we speak?

25             THE COURT:  Yes.  Step back a moment.

1          (Prospective juror leaves side bar.)

2          MR. BRAFMAN:  Your Honor, as you may I recall, I'm

3   not certain that we have a ruling yet on whether or not if

4   Mr. Pierotti testifies, whether the Court would allow him to

5   talk about issues involving Mr. Shkreli and his family, he

6   made allegations to the family about Retrophin.  Mr. Shkreli

7   wrote him a letter, threatened him, and then it proceeded to

8   involve hacking into his own Facebook account and the accounts

9   of his children.  I don't think there was a ruling on the last

10  part.  We objected in a motion in limine if he testifies about

11  the hacking part and not be gone into on direct examination

12  unless we open the door.  I don't think there's a rule on it

13  yet.

14         MS. SMITH:  No, it hasn't been ruled on.  I just

15  want to make sure, it was hacking but not identity theft.

16         MR. BRAFMAN:  I know but it was hacking.

17         MS. SMITH:  It was hacking into the Facebook

18  accounts, yes.

19         MR. BRAFMAN:  Of not just Mr. Pierotti, the

20  allegation is also his children.

21         MS. SMITH:  His children.

22         THE COURT:  All right.

23         MR. BRAFMAN:  I think she has, I think she would

24  have to be excused if --

25         MS. SMITH:  I think we can ask her some follow-up

1  questions.  I mean, it's very different than a terrorist

2  organization.

3           THE COURT:  I just don't want her to be further

4  exposed, if she feels that her husband has been threatened or

5  he may be in jeopardy, I would not want her --

6           MS. SMITH:  I don't know if there is a follow-up

7  question.

8           THE COURT:  Well, what would you like me to ask her?

9           MS. SMITH:  Just if it's obviously not related to a

10 terrorist, any idea of hacking.

11          THE COURT:  Yes.  Okay.

12          (Prospective juror joins side bar.)

13          THE COURT:  So, you have understandable concerns.

14 Let me ask you whether the notion of any hacking into any sort

15 of social media or any kind of account would cause you to lose

16 your ability to be impartial or I understand there's a very

17 specific situation relating to terrorism, but the question is,

18 and that is not part of this case, terrorism is not part of

19 this case, but is your concern, would you feel that you could

20 not be impartial if anything were to, if hacking came up in

21 the case?

22          THE PROSPECTIVE JUROR:  I think so.

23          THE COURT:  All right.  Let me ask you to step back.

24          (Prospective juror leaves side bar.)

25          THE COURT:  We will have to dismiss her.

1            MR. BRAFMAN:  I move to dismiss for cause.

2            MS. SMITH:  Yes.

3            (Prospective juror joins side bar.)

4            THE COURT:  Ma'am, we are going to excuse you.

5     Please go to the jury room on the second floor where you

6     checked in, tell them you are excused and you will get the

7     paperwork.  Thanks for coming forward.  I'm sorry about your

8     situation.

9            THE PROSPECTIVE JUROR:  Okay.

10           (Prospective juror excused.)

11           MR. BRAFMAN:  It was very hard to hear all the way

12    in the back the Simon & Schuster employee.

13           THE COURT:  You want her to come up?

14           MR. BRAFMAN:  I couldn't hear.  I know it involved

15    the fiance.

16           THE COURT:  Identity theft.  We can have her come

17    up.

18           MR. BRAFMAN:  Please.

19           (In open court.)

20           THE COURT:  Juror 50, please come forward.

21           (Side bar continues; prospective juror joins.)

22           THE COURT:  I think some of us had some difficulty

23    here.

24           THE PROSPECTIVE JUROR:  Sorry.

25           THE COURT:  You said you had a fiance who was the

Side Bar                                        736

1   victim of identity theft?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And the question I was asking was

4   whether or not that experience would affect your ability to be

5   fair to both sides or whether you formed any opinions that

6   were favorable or unfavorable to prosecutors or people charged

7   with crimes, the lawyers who represent prosecutors or

8   defendants.

9          THE PROSPECTIVE JUROR:  I mean, it was definitely a

10  frustrating experience he went through, years, so I would say

11  I'm a little unhappy with the way it went.

12         THE COURT:  With the justice system in general?

13         THE PROSPECTIVE JUROR:  Yes.  I felt it could have

14  been resolved quickly.  The person had a different name,

15  different age, different state.  For some reason, it took a

16  really long time to resolve.

17         THE COURT:  Would you be able to commit to

18  maintaining a fair state of mind in this case when evidence is

19  presented based upon the summary of charges that I have given

20  you so far?

21         THE PROSPECTIVE JUROR:  I'm not sure.

22         THE COURT:  Okay.  When you say that, can you

23  explain your hesitancy?

24         THE PROSPECTIVE JUROR:  I mean, just relating to the

25  experience that I had, it just -- I just have, like, I guess

1  negative feelings towards the system, maybe, because of what

2  he went through.

3         THE COURT:  Okay.  Well, I understand the

4  frustration of having a loved one be the victim of some sort

5  of a crime, but the question is whether you would be more

6  inclined to favor a defendant or the prosecutor given your

7  fiancee's experience.

8         THE PROSPECTIVE JUROR:  I mean, I would try to be as

9  fair as possible but if it felt relevant to my fiance's

10 experience, then I'd possibly be biased towards the victim.

11        THE COURT:  Okay.  We don't expect that there's

12 going to be anything touching on identity theft in this case.

13        THE PROSPECTIVE JUROR:  Okay.

14        THE COURT:  I just ask you to step back for me one

15 second, please.

16        (Prospective juror leaves side bar.)

17        MR. BRAFMAN:  Your Honor, if she's expressing a bias

18 towards, I think she just said the victim, there are people in

19 this case who are going to be classified as victims of

20 Mr. Shkreli in connection with the financial fraud so I just

21 exercise, err on the side of caution.  I know we've spent a

22 lot of time with this juror.  There are a lot of employment

23 related issues that we've covered, so I'm not eager to excuse

24 her.  It's just what she recently said that concerns me.

25        (Prospective juror joins side bar.)

1              THE COURT:  Ma'am, I want to ask you something.  I

2     understand that you would be concerned about victims and the

3     question is whether if you heard testimony or evidence

4     regarding individuals who were considered to be victims, would

5     you be able to maintain a fair and open mind to both sides?

6              THE PROSPECTIVE JUROR:  I would do my best to

7     separate that.

8              THE COURT:  All right.  Thank you.  I just ask you

9     to step back one more time.

10             (Prospective juror leaves side bar.)

11             MR. BRAFMAN:  I'm not going to press an objection.

12             MS. KASULIS:  We want to keep her.

13             THE COURT:  I think she's --

14             MR. BRAFMAN:  I'm okay.

15             THE COURT:  Great.

16             (Prospective juror joins side bar.)

17             THE COURT:  Do you mind going back to your seat?

18     Okay.  All right.

19             (In open court; side bar ends.)

20             THE COURT:  Was there anyone else who had their hand

21     up?

22             Yes, Juror Number 6.  Did you want to be seen at

23     side bar?

24             THE PROSPECTIVE JUROR:  Not necessarily.

25             First, I couldn't think of anything but as people

Side Bar                                          739

1    are talking, I realized that of course I know people that were

2    involved --

3            THE COURT:  Okay.  You know people who were involved

4    in some regard?

5            THE PROSPECTIVE JUROR:  Victims.

6            THE COURT:  Could you maintain a fair and open

7    mind --

8            THE PROSPECTIVE JUROR:  Yes.

9            THE COURT:  -- for both sides despite what we may

10   have discussed with others?

11           THE PROSPECTIVE JUROR:  Yes.

12           THE COURT:  Have any of you either been a witness or

13   a party in any civil lawsuit or criminal case or been a

14   witness at any grand jury proceeding or deposition and if so,

15   raise your hand and tell us the circumstances.

16           Do you have at present or have you had any dispute

17   with or claim against the United States Government?

18           Have any members of your family or close personal

19   friends had any dispute or claim against the United States

20   Government?

21           Have you ever had a negative experience with or been

22   involved in a dispute, conflict or litigation with any law

23   enforcement officer or Government agency?

24           Are you currently or have you ever been a plaintiff,

25   defendant or a party in any case?    (Continued on next page.)

Jury Selection                                    740

1   (Continuing)

2           THE COURT:  For the record, we have no hands up.

3           THE COURTROOM DEPUTY:  Yes, there's a hand.

4           THE COURT:  You are juror number?

5           THE PROSPECTIVE JUROR:  42.

6           THE COURT:  Yes, sir?

7           To the extent you've already come to sidebar to

8   discuss anything with us, we don't need to hear from you

9   again.  If you have additional information, we're happy to

10  hear from you.

11          Nothing additional?

12          THE PROSPECTIVE JUROR:  No.

13          THE COURT:  Thank you.

14          Juror No. 6?

15          THE PROSPECTIVE JUROR:  A lot of the questions

16  you're asking, I really don't recall so I can't say yes or no.

17  I think back...

18          THE COURT:  To the best of your recollection,

19  obviously, you would answer.  If the answer is yes, you'll

20  raise your hand.  If you can't recall and you suddenly do

21  recall something, you can let me know.

22          THE PROSPECTIVE JUROR:  Okay.

23          THE COURT:  But if you don't recall something that

24  never happened, that's not surprising.  If you do recall

25  something that happened all of a sudden, let us know, okay?

1          THE PROSPECTIVE JUROR:  Sure.

2          THE COURT:  Thank you.

3          Do you have any opinions about defense attorneys or

4    prosecutors that would prevent you from being a fair and

5    impartial juror in this case?

6          Have you ever sat on a jury or grand jury before;

7    and, if so, I'll ask you how long ago, whether it was a civil

8    or criminal case, whether you were the foreperson, whether you

9    reached a verdict -- but do not tell me the verdict -- and

10   whether you would be able to put your jury experience or

11   anything you've learned during that experience out of your

12   mind and accept and apply instructions on the law in this case

13   solely from the Court.

14         Have any of you served on jury duty before?

15         Juror No. 2, civil or criminal?

16         THE PROSPECTIVE JUROR:  Criminal.

17         THE COURT:  Was it state or federal?

18         THE PROSPECTIVE JUROR:  It's supreme court.

19         THE COURT:  Supreme court.  All right.

20         Did you reach a verdict?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  And how long ago was that?

23         THE PROSPECTIVE JUROR:  Actually, the first week of

24   this month finished and last month, end of the last.  It

25   started May 19 through June first week.

```
                        Jury Selection                    742
```

1           THE COURT:  So it was very recent.

2           THE PROSPECTIVE JUROR:  Recent, yeah.

3           THE COURT:  All right.

4           Did you serve as a foreperson?  Were you the

5   foreperson, foreman or forewoman, of the jury?

6           THE PROSPECTIVE JUROR:  Yes.

7           THE COURT:  Is there anything about that experience

8   that would influence your ability to sit as a juror in this

9   case?

10          THE PROSPECTIVE JUROR:  No, I'm pretty fair.

11          THE COURT:  Well, we appreciate jurors who will

12  commit to the maintaining a fair state of mind.  Can you do

13  that?

14          THE PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Did anyone else have their hand up in

16  row -- you are juror number?

17          THE PROSPECTIVE JUROR:  Eight.

18          THE COURT:  Yes, sir?

19          THE PROSPECTIVE JUROR:  It was criminal, it was

20  about eight years ago, reached a verdict.

21          THE COURT:  State or the federal court, sir?

22          THE PROSPECTIVE JUROR:  It was state.

23          THE COURT:  Were you the foreperson?

24          THE PROSPECTIVE JUROR:  No.

25          THE COURT:  Did that experience affect your ability

Jury Selection                                    743

1   in any way to serve here as a fair-minded person and juror?

2               THE PROSPECTIVE JUROR:  No.

3               THE COURT:  Thank you.

4               Yes, ma'am, you're juror number?

5               THE PROSPECTIVE JUROR:  15.

6               THE COURT:  Yes, ma'am?

7               THE PROSPECTIVE JUROR:  2013, state, we reached a

8   verdict.

9               THE COURT:  Civil?

10              THE PROSPECTIVE JUROR:  Civil.  I wasn't foreperson.

11              THE COURT:  And does anything about your jury

12  experience previously affect your ability here in this case to

13  maintain a fair and open mind towards both sides?

14              THE PROSPECTIVE JUROR:  Absolutely not.

15              THE COURT:  Did anyone else have their hand up in

16  reference to the jury question?

17              Have you or members of your family or close personal

18  friends ever had a formal education, training, or exposure or

19  work experience in financial services, banking,

20  pharmaceuticals, the stock market, or securities industry?

21              Yes, Juror No. 7?

22              THE PROSPECTIVE JUROR:  My mother is in banking.

23              THE COURT:  What does she do in banking?

24              THE PROSPECTIVE JUROR:  Chief technology officer.

25              THE COURT:  Is there anything about your discussions

LAM      OCR      RPR

Jury Selection                              744

1   with your mother about her work --

2            THE PROSPECTIVE JUROR:  None whatsoever.

3            THE COURT:  Could you maintain a fair and open mind,

4   sir?

5            THE PROSPECTIVE JUROR:  Yes, ma'am.

6            THE COURT:  What is your number, sir?

7            THE PROSPECTIVE JUROR:  34.

8            THE COURT:  Tell me about your experience.

9            THE PROSPECTIVE JUROR:  My cousin works at a bank.

10           THE COURT:  Do you know what your cousin does for

11  the bank?

12           THE PROSPECTIVE JUROR:  No.

13           THE COURT:  Have you discussed your cousin's work

14  with him or her?

15           THE PROSPECTIVE JUROR:  No.

16           THE COURT:  Could you be fair and impartial on this

17  case to both sides?

18           THE PROSPECTIVE JUROR:  Yeah.

19           THE COURT:  Do you or a family member or close

20  personal friend invest in the stock market, hedge funds, or

21  privately-issued securities?  If so, raise your hand.

22           Juror No. 6?

23           THE PROSPECTIVE JUROR:  Yes, I have stocks.

24           THE COURT:  And have you ever used a broker to do

25  that?

Jury Selection                                            745

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And do you have a financial advisor?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Given your investment experience with a

5     broker, is there anything about that experience that would

6     affect your ability to fairly consider the evidence in this

7     case?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Anyone else?

10          Yes, Juror No. 8?

11          THE PROSPECTIVE JUROR:  Stocks, bonds, I have

12     advisor.

13          What were the other questions?

14          THE COURT:  It was stocks, hedge funds, or

15     privately-issued securities, have you invested in any of

16     those?

17          THE PROSPECTIVE JUROR:  Stocks with advisor.  And I

18     can be fair to both sides.

19          THE COURT:  Thank you, sir.

20          Anyone else?

21          THE PROSPECTIVE JUROR:  Same goes for Juror No. 7,

22     all of the above.

23          THE COURT:  Thank you, sir.

24          As I have told you, a person accused of a crime is

25     entitled to the presumption of innocence unless and until

1   their guilt is proven beyond a reasonable doubt after all the

2   evidence has been presented at the trial.

3           Would any of you have difficulty keeping an open

4   mind during this trial and following that principal of law

5   throughout the trial?  If so, raise your hand.

6           You may not discuss the evidence, the witnesses, or

7   testimony with anyone during the course of this trial, even

8   with your fellow jurors and family members and close friends.

9   You may only discuss the evidence with your fellow jurors

10  after the presentation of all the evidence has been completed

11  and I have given you instructions on the law.

12          Will you be able to follow these instructions not to

13  discuss the case with anybody?  If anyone will have

14  difficulty, raise your hand.

15          In addition, I will ask you not to consult any

16  media, not to do any internet research, not to look at any

17  newspapers or listen to any news reports or radio reports that

18  may touch upon or relate to this case or to Mr. Shkreli.

19          Is there anyone here who would not be able to honor

20  this request?

21          Is there anything about the fact that this is a

22  criminal case, the nature of the charges, or any other reason

23  that would interfere with your ability to decide this case

24  fairly and objectively?  If so, please raise your hand.

25          I'm asking you to try to please think back and think

1    if there was anything I have not asked you that would affect

2    your ability to be fair to both sides.

3              Do you know of any reason why you could not listen

4    to the evidence, follow my instructions on the law, and render

5    a fair and impartial verdict?  If there's any reason, please

6    raise your hand.

7              Would you be content to have a juror with your state

8    of mind on the jury if you or a loved one was on trial?  If

9    there's any reason why something in your state of mind would

10   not give you comfort, please let me know.

11             All right.  At this time, ladies and gentlemen, I'm

12   going to ask you to return to the jury room on the second

13   floor.  We will be examining additional jurors.  We ask you to

14   please not talk about the case, not allow anyone to talk to

15   you about the case, not check any social media.

16             You may well be given opportunity to take a lunch

17   break at this time; that is, to leave the building.  But

18   please don't read anything about this case.  Consciously avoid

19   any knowledge about the case outside this courtroom.  Please

20   return to the jury room at 1 o'clock.

21             Juror No. 6?

22             THE PROSPECTIVE JUROR:  You said we shouldn't look

23   at this case on internet.  But once you go on the internet, it

24   comes up.

25             THE COURT:  If it comes up, don't read it, just

Jury Selection                          748

1   avoid it.

2            THE PROSPECTIVE JUROR:  I wouldn't be looking for

3   it, but things come up on their own.

4            THE COURT:  Yes.  And if it comes up, consciously

5   make a commitment to avoid looking at it or reading it and

6   just go to the next story, all right?

7            THE PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Thank you, sir.

9            I will ask you to take your lunch break at this

10  time.  Return to the jury room at 1 o'clock.  You may retrieve

11  your electronic devices at this time, but when you come back

12  you will have to surrender them again.  Please be sure to

13  return to the jury room by one.  Thank you.

14           (Prospective jurors excused.)

15           THE COURT:  We have 53.

16           MR. BRAFMAN:  May we step out for five minutes,

17  Judge?

18           THE COURT:  Yes, of course.  We have 53 so far.

19           (Recess taken.)

20           THE COURT:  The jurors are coming in.  We're

21  starting at 71 on your list.  I think there are 13 additional.

22           (Prospective jurors enter courtroom.)

23           THE COURT:  Good afternoon, ladies and gentlemen.

24  I'm Judge Kiyo Matsumoto.  You've met Sandra Jackson, my case

25  manager; my law clerk, Vivek Tata.  Welcome and thank you for

1   your patience.

2           Can everybody hear me?  If not, please raise your

3   hand.

4           You're here today because we're about to select a

5   jury to serve in a criminal case.  It will be very important

6   for you to pay attention during this process because we will

7   be asking you many questions and we'd like your candid,

8   conscientious answers.

9           We'd also ask you during this selection process, and

10  if you are selected to serve as a juror, that you not speak to

11  anybody about the case, including your fellow jurors.

12          Trial is expected to start as soon as we conclude

13  jury selection and continue for at most six weeks.  We will

14  not hold trial on Monday, July 3, or Tuesday, July 4.

15          Fortunately, this particular case promises to be an

16  interesting and educational experience for those selected to

17  serve on the jury.

18          This is a criminal case commenced by the United

19  States, which is frequently referred to as the "Government."

20  Representing the United States is Assistant U.S. Attorneys

21  Jacquelyn Kasulis, Alixandra Smith, and G. Karthik Srinivasan.

22  Also seated at the table are Special Agent Mike Braconi and

23  Special Agent Sean Sweeney from the Federal Bureau of

24  Investigation, and paralegal specialist Gabriela Balbin.

25          Defendant in this case is Mr. Martin Shkreli.  He is

1    represented by attorneys Benjamin Brafman --

2            MR. BRAFMAN:  Good morning.

3            THE COURT:  -- Marc Agnifilo --

4            MR. AGNIFILO:  Good morning.

5            THE COURT:  -- Andrea Zellan, Jacob Kaplan, and will

6    be joined later in the case by Teny Geragos.

7            The fact that this prosecution is brought in the

8    name of the United States does not entitle the Government to

9    any greater consideration than any other party who appears in

10   court.  All parties -- the Government and individuals -- are

11   equals before the Court and are entitled to equal

12   consideration by the jury.  No party is entitled to sympathy

13   or favor.

14           The purpose of jury selection is to ensure fairness

15   and impartiality to all parties in this case.  The way we try

16   to be sure that a jury will be fair and impartial is by going

17   through a process called voir dire.  Basically, I will be

18   asking you questions, both as a group and individually, about

19   your background and your views on certain subjects.  It is not

20   my intention to invade your privacy but simply to try to

21   ensure that you can sit fairly and impartially on this

22   particular case.

23           At times, this will be tedious, and I ask you,

24   please, to bear with us during this process.  I also want to

25   thank you for the fact that you're here and paying attention.

1          If in the course of this questioning process you do

2     think that because of some experience you've had in your life

3     or because of something you've heard or read that you could

4     not be fair and impartial -- that is, you would be inclined

5     towards the Government or the Defendant regardless of what the

6     evidence in this case showed -- it is your duty to tell me

7     that.  That's because the Government and the Defendant have a

8     right to a qualified, impartial jury, one which will decide

9     the case without fear, favor, prejudice, or passion, and will

10    render a verdict based solely on the evidence presented at the

11    trial and the law as I give it to you.

12         Now, quite apart from whether or not I must excuse

13    you, the lawyers for both sides are entitled to what we call

14    peremptory challenges, which means that they may excuse a

15    certain number of prospective jurors without giving any

16    reason.  If you are excused, no personal affront is intended.

17         It is important for you to listen because the

18    answers that you give to my questions will be under oath.  I

19    will now ask Ms. Jackson to administer the oath.  Please raise

20    your right hands.

21         (Prospective jurors sworn.)

22         THE COURT:  This criminal case comes before the

23    Court by way of an indictment.  The indictment is captioned

24    United States of America against Martin Shkreli.  The

25    indictment is simply the document that the Government uses to

1    state the charges against a defendant.  It serves no other

2    purpose and it is not evidence.

3            I'm going to summarize the charges in the indictment

4    so that you can understand what this case will be about, but,

5    again, remember that any evidence pertaining to the charges

6    will come before you only when we begin the trial.

7            The Defendant, Martin Shkreli, is charged in an

8    eight-count indictment with committing various acts of

9    securities fraud, conspiracy to commit securities fraud, and

10   conspiracy to commit wire fraud.

11           In Counts One through Three, Mr. Shkreli is charged

12   with conspiracy to commit securities fraud, conspiracy to

13   commit wire fraud, and a substantive count of securities fraud

14   in relation to an entity known as MSMB Capital.

15           In Counts Four through Six, Mr. Shkreli is charged

16   with conspiracy to commit securities fraud, conspiracy to

17   commit wire fraud, and a substantive count of securities fraud

18   in relation to an entity known as MSMB Healthcare.

19           In Counts Seven and Eight, Mr. Shkreli is charged

20   with conspiracy to commit securities fraud and conspiracy to

21   commit wire fraud in relation to an entity known as Retrophin.

22           Mr. Shkreli has pleaded not guilty to all the

23   charges in the indictment and, thus, has raised issues of fact

24   to be determined by the jury.

25           Let me now advise you that it is the Government that

Jury Selection                                          753

1    has the burden of proof in any criminal case to establish a

2    defendant's guilt beyond a reasonable doubt as to each and

3    every element of each charged offense.  The defendant is

4    presumed to be innocent.

5           In that regard, the defendant has no burden to

6    present any evidence or to testify.  The United States

7    Constitution protects a defendant's right to remain silent.

8    The law prohibits you from considering when you deliberate

9    that the defendant may not have testified.  This is a basic

10   principle of our criminal justice system.

11          The role of the jury in a criminal case is to hear

12   evidence and decide the facts; that is, to decide what

13   happened.  The judge plays no role in your determination of

14   the facts.  As the judge, my role is to instruct you on the

15   applicable law.  You will apply the facts as you find them to

16   the law as I instruct you and your conclusion will be your

17   verdict.

18          You must apply the law as stated by me regardless of

19   any opinion you personally may have as to what the law is or

20   should be.  If any of you would have any difficulty doing

21   this, you must bring that to my attention.

22          I'm now going to begin asking questions of the

23   jurors.  For example, I will ask you whether you know any of

24   the attorneys or the parties in this case.  It is important

25   for all of you to listen carefully and pay close attention to

1  my questions and to make a note if your answers to my

2  questions would be yes.  You will be asked to raise your hand

3  if your answer would be yes.

4          Consistent with the oath that you have just taken,

5  you must answer the questions honestly, truthfully,

6  conscientiously, and as completely as you can.  Again, you

7  will be asked to raise your hand if your answer to my question

8  is yes or if you have something to say on the question, in

9  response to the question.

10         For some of the questions, I may ask you to answer

11 from where you are currently seated.  For other questions of

12 personal or private nature, I may ask you to come to the

13 sidebar, which is just an area to my right, where you may

14 answer out of the hearing of other jurors.

15         Many of the questions will pertain to whether you

16 have the ability to decide this case fairly, and I will ask

17 you to come to the sidebar to answer those questions.

18         Because judicial proceedings are open and public, a

19 press reporter may be present at sidebar.  If I ask you to

20 come to sidebar to discuss your answer further, I will not ask

21 your name.  You will be identified by a number so that any

22 response you give at sidebar or in this proceeding will not be

23 associated with your name, it will just refer to your number.

24         It is critical to the parties' right to a fair trial

25 that all jurors be candid and truthful in answering my

1    questions.  If there are any issues that you don't feel

2    comfortable answering or discussing in the presence of a press

3    reporter, please let me know, and I'll ask the press reporter

4    to stand back.

5              Is there anyone who did not either understand or

6    cannot accept any of the principles of law that I've just

7    explained?

8              Is there anyone who has heard anything about this

9    case before today?

10             And let me just continue to add that in cases like

11   this that have received media attention, it is not wrong to

12   have an opinion.  The critical issue is whether your opinion

13   will interfere with your ability to be fair and impartial to

14   both sides and to decide this case based only on the evidence

15   and the instructions of law that I will provide at the end of

16   the trial.

17             In addition, I will ask whether knowing that this

18   trial will last for six weeks, we will be sitting five days a

19   week, 9 to 5:30 -- we'll have Monday, the 3rd, and Thursday,

20   the 4th, off, but those be will be the expected hours, 9 to

21   5:30, that the jury will be expected to be present.  And I ask

22   whether anyone would experience extreme burden or difficulty

23   to serve on this jury.

24             I do recognize that jury service is burdensome;

25   you're away from your usual occupations or activity and you

1  will be asked to focus attentively on the evidence.  But you

2  must ask yourself whether serving on this jury will be so much

3  more inconvenient and burdensome to you than it would be to

4  anyone else.  You should also ask yourself what attitude you

5  would want if you or anyone close to you was to be tried by a

6  jury.

7           The right to a trial by jury is a fundamental

8  Constitutional right, and you should all bear in mind the

9  sacrifices that were made by many throughout our country's

10 history in order to defend our Constitutional rights.

11          Now, let me ask whether anyone has heard media

12 reports about this case or about Mr. Shkreli or would find

13 jury duty unduly burdensome.  If so, please raise your hand.

14          Juror No. 3, I will see you at sidebar.  I'm sorry,

15 you're, Juror No. -- you're in seat number three, and you

16 would be Juror No. 73.  Come to sidebar, please.

17          (The following occurred at sidebar; prospective

18 juror present.)

19          THE COURT:  Yes, ma'am.

20          THE PROSPECTIVE JUROR:  So, I have read about this

21 case online.  I work as a publicist, so my job is to basically

22 be kept on up on the news.

23          I'd also advise and disclose that my sister is a

24 former AUSA and my brother-in-law is a current U.S. marshal in

25 the Southern District.  And upon returning to work yesterday

```
                          Sidebar                          757
```

1  from jury duty on Monday, I was given information that the

2  Defendant had also been doing some business with my company

3  prior to me working there.

4         THE COURT:  Where do you work?

5         THE PROSPECTIVE JUROR:  Primary Wave Entertainment.

6         THE COURT:  Given all of that background, there are

7  a couple of important things.  Would you be able to serve on a

8  jury for six weeks and be paid and not suffer any undue

9  hardship or concerns?

10        THE PROSPECTIVE JUROR:  For work purposes, yes, I

11 would be able to.

12        Personally, I don't think that I would be a fair

13 juror for this case because I know too much about the

14 Defendant and I just don't think he's a good person.

15        THE COURT:  All right, then, we will excuse you and

16 ask you to go to the jury room on the second floor and tell

17 them you've been excused and get your paperwork and be

18 excused.

19        THE PROSPECTIVE JUROR:  Absolutely.

20        THE COURT:  Please don't discuss this with anyone.

21        THE PROSPECTIVE JUROR:  I won't.  Thank you.

22        (Prospective juror excused.)

23        (In open court.)

24        THE COURT:  Did anyone else have their hand up?

25        Juror No. 72, come forward.

```
                          Sidebar                          758
```

1          (Sidebar continues; prospective juror joins.)

2          THE COURT:  Yes, ma'am.

3          THE PROSPECTIVE JUROR:  I believe I heard about the

4   case.

5          THE COURT:  That's fine.  If you watch the news, you

6   probably have heard about it, read about it.  And the question

7   is whether -- and you may have formed an opinion about it, and

8   that's fine.

9          The question is whether what you have heard or any

10  opinion you may have would interfere with your ability to keep

11  an open mind.

12         THE PROSPECTIVE JUROR:  I work in the securities

13  industry.  I do have an opinion.  I feel for the most part

14  that most of these cases probably there is cause.

15         THE COURT:  Would you be able to keep an open mind

16  and listen to the evidence, given that the Government has the

17  burden of proof beyond a reasonable doubt and given that any

18  defendant charged with an offense is presumed innocent?

19         Would you be able to commit and maintain an open and

20  fair mind as you listen to evidence in this case?

21         THE PROSPECTIVE JUROR:  I have a very strong opinion

22  about the securities industry.  I believe the system is rigged

23  and I believe people take advantage of it.

24         THE COURT:  Let me ask you to step back for one

25  second, please.

```
                         Sidebar                        759
```

1           (Prospective juror leaves sidebar.)

2           MR. BRAFMAN:  She said enough to be challenged for

3   cause.

4           MS. KASULIS:  Agreed.

5           (Prospective juror joins sidebar.)

6           THE COURT:  Ma'am, we're going to dismiss you and

7   thank you for your time today.  Please go to the second floor

8   and tell them you've been excused.

9           THE PROSPECTIVE JUROR:  Thank you.

10          (Prospective juror excused.)

11          (In open court.)

12          THE COURT:  Is there anybody else?

13          You're Juror No. 74.  Come forward, please.

14          (Sidebar continues; prospective juror joins.)

15          THE COURT:  This is you?

16          THE PROSPECTIVE JUROR:  Yes.

17          This case is widely talked about within my company

18  and my friends as well.

19          THE COURT:  Have you formed an opinion that would

20  prevent you from being fair to both sides.

21          THE PROSPECTIVE JUROR:  I do have my opinions.

22          THE COURT:  Would it interfere with your ability to

23  be fair?

24          THE PROSPECTIVE JUROR:  Slightly.

25          THE COURT:  Given that I've told you the Government

1    has the burden of proof beyond a reasonable doubt and the

2    defendant is always presumed innocent, would you be able to

3    maintain a sense of commitment to fairness and open-mindedness

4    and listen carefully to the evidence and decide the case on

5    evidence presented at trial?

6             THE PROSPECTIVE JUROR:  I may listen, but I think my

7    judgments have been made.

8             THE COURT:  I will dismiss you.  You can go to the

9    second floor jury room and let them know you've been excused.

10            (Prospective juror excused.)

11            (In open court.)

12            THE COURT:  Anyone else on the first row?

13            Juror No. 75, come forward.

14            (Sidebar continues; prospective juror joins.)

15            THE COURT:  Come forward.  This is Juror 75.

16            THE PROSPECTIVE JUROR:  Yes, ma'am.

17            THE COURT:  You have a conflict?

18            THE PROSPECTIVE JUROR:  I was here Monday and there

19   were cameras outside.  I asked somebody else what was going

20   on, and they showed me the newspaper from Monday about this

21   particular case.

22            THE COURT:  Do you have any conflicts with your

23   schedule for the next six weeks.

24            THE PROSPECTIVE JUROR:  No.

25            THE COURT:  So, let's talk about what you saw on

```
                      Sidebar                      761
```

1   Monday.  Did you listen to the news or hear the news?

2            THE PROSPECTIVE JUROR:  No, but this particular one.

3            THE COURT:  Somebody showed you something.  It was

4   an article?

5            THE PROSPECTIVE JUROR:  Yes.

6            THE COURT:  Is there anything about that article

7   that would interfere with your ability to be fair to both

8   sides?

9            THE PROSPECTIVE JUROR:  Yeah because I took a stance

10  when I read the article.

11           THE COURT:  You read the article?

12           THE PROSPECTIVE JUROR:  Yes.

13           My brother died a year ago for cancer and

14  prescriptions were very expensive, so...

15           THE COURT:  This case doesn't charge anything

16  related to drug pricing.  Would you be able to maintain

17  fairness?

18           THE PROSPECTIVE JUROR:  I don't think so.

19           THE COURT:  I will excuse you.  You can go down to

20  the second floor jury clerk and tell them you've been excused.

21           (Prospective juror excused.)

22           (In open court.)

23           THE COURT:  Did Juror No. 76 need to be heard?  Come

24  forward, please.

25           (Sidebar continues; prospective juror joins.)

```
                      Sidebar                        762
```

1          THE COURT:  This is you, ma'am?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Do you have conflicts in your schedule

4   that would prohibit you from six-week jury service?

5          THE PROSPECTIVE JUROR:  Yes.  I'm a professor at NYU

6   and I have a three-week intensive class starting this week.

7   I'm the professor for the course.  I'm sorry.

8          THE COURT:  Is the course during the daytime or is

9   it an evening course?

10          THE PROSPECTIVE JUROR:  It's during the day.

11          THE COURT:  We will excuse you, then.  Thank you.

12   Go to the jury clerk, tell them you're excused, and you can

13   get your paperwork and go back to work.  Thank you.

14          (Prospective juror excused.)

15          (In open court.)

16          THE COURT:  We'll now look at Jurors 77 through 82.

17          Does anyone have their hand up?

18          Juror No. 78, sir, come forward.

19

20          (Continued on next page.)

21

22

23

24

25

763

1          (Prospective juror present at sidebar.)

2          THE COURT:  I want to make sure that is you.

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Come forward, 78.  What would you like

5   to tell us about your conflicts and schedules first?

6          THE PROSPECTIVE JUROR:  I'm self-employed.  I'm a

7   cab driver.  If I don't work, I don't make money.  I read a

8   lot about this guy.

9          THE COURT:  If you are a self-employed cab driver,

10  I'm not going to put you in financial hardship.

11         THE PROSPECTIVE JUROR:  Thank you.

12         THE COURT:  Go to the please go to the second floor

13  jury clerk, tell them that you are excused you will get your

14  paperwork and you can return.  Thank you.

15         THE PROSPECTIVE JUROR:  Thank you.

16         (Prospective juror excused.)

17         (In open court.)

18         THE COURT:  Juror No. 79, can you come forward,

19  please.

20         (Prospective juror present at sidebar.)

21         THE COURT:  How are you?  I want to make sure, this

22  is you?

23         THE PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Come forward, please, Juror No. 79.

25  Yes, ma'am.

764

1          THE PROSPECTIVE JUROR:  I am moving August 1st.  I

2    have a vacation scheduled on August 5th and I am covering for

3    someone on maternity leave coming back Labor Day.  Those are

4    my circumstances.

5          THE COURT:  Would you be able to sit as a juror

6    until August, when your vacation starts?

7          THE PROSPECTIVE JUROR:  I would, but regarding this

8    part.

9          THE COURT:  Okay, you said August 2nd is when you

10   have to be gone?

11         THE PROSPECTIVE JUROR:  August 1st.

12         THE COURT:  I don't want to promise that we will be

13   able to finish by August 1st.

14         MS. KASULIS:  Your Honor, she is moving on August

15   1st.

16         THE COURT:  But you are moving where?

17         THE PROSPECTIVE JUROR:  Manhattan.

18         THE COURT:  That is just a day.

19         THE PROSPECTIVE JUROR:  Yes.

20         THE COURT:  You said also a vacation starting

21   August?

22         THE PROSPECTIVE JUROR:  August 5th.

23         THE COURT:  We don't have 100 percent certainty that

24   we will finish by August 5th.  Have you bought tickets?

25         THE PROSPECTIVE JUROR:  Yes.

765

1          THE COURT:  They are not refundable?

2          THE PROSPECTIVE JUROR:  No.

3          THE COURT:  I will excuse you then.  Thank you.

4          THE PROSPECTIVE JUROR:  Thank you.

5          THE COURT:  Please go to the second floor jury

6     clerk, tell them that you are excused.

7          (Prospective juror excused.)

8          (In open court.)

9          THE COURT:  Anyone else on that row?  Juror No. 81,

10    please come forward.

11          (Prospective juror present at sidebar.)

12          THE COURT:  Hi.  Is this you?

13          THE PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Come forward No. 81.  Yes.

15          THE PROSPECTIVE JUROR:  I'm a program director at a

16    nonprofit and we have 10 new counselors that I have to train

17    starting July 19th.

18          THE COURT:  Is there anyone else who can do that for

19    you?

20          THE PROSPECTIVE JUROR:  No, they are all my direct

21    reports and that I have to train to get ready for the new

22    school year.  Yeah.

23          THE COURT:  You are sure there is nobody else who

24    can fill in for you?

25          THE PROSPECTIVE JUROR:  No, we are a pretty small

766

1    organization.  I'm sorry.

2         THE COURT:  It's all right.  I will excuse you then,

3    please go to the second floor jury clerk, tell them you are

4    excused.  You can get your paperwork.  Thank you.

5         THE PROSPECTIVE JUROR:  Thank you.

6         (Prospective juror excused.)

7         (In open court.)

8         THE COURT:  Is there anyone else in this row?

9         Juror No. 82, please come forward.

10        (Prospective juror present at sidebar.)

11        THE COURT:  Yes, sir.

12        THE PROSPECTIVE JUROR:  Hello.

13        THE COURT:  You are number?

14        THE PROSPECTIVE JUROR:  82.

15        THE COURT:  Yes, sir.  What is your conflict with

16   scheduling?

17        THE PROSPECTIVE JUROR:  I actually have a really

18   long commute.  Would this be grounds for dismissal on this?

19   No?

20        THE COURT:  Well, where our jurors come from the

21   entire Eastern District which consists of Montauk, Long

22   Island, Staten Island, Queens, and Brooklyn.

23        THE PROSPECTIVE JUROR:  I was just curious.  I

24   didn't think that would.  Also, you have mentioned if I have

25   heard about --

767

1          THE COURT:  Can I ask you one question first, do you

2     have any conflicts with your job?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Or plans that would prevent you from

5     serving?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  Why don't you come closer.  It is fine

8     to have heard about the case.  This has received media

9     attention.  It is fine if you have formulated an opinion.  The

10    key question is could you maintain a fair mind towards both

11    sides knowing that the Government has the burden of proof

12    beyond a reasonable doubt and any defendant charged with an

13    offense is presumed innocent?

14         THE PROSPECTIVE JUROR:  I believe so.

15         THE COURT:  All right.  You have read about this

16    case in the media, is that right?

17         THE PROSPECTIVE JUROR:  Yes, and I have heard about

18    him before too.

19         THE COURT:  Would you be able to put what you have

20    read about this gentleman out of your mind and maintain a fair

21    and open mind towards both sides?

22         THE PROSPECTIVE JUROR:  Yes.  Yes.

23         THE COURT:  Thank you.  Let me ask you to step back

24    for one second.

25              (Prospective juror leaves sidebar.)

768

1          THE COURT:  Let me speak to the lawyers.  I am going

2     to ask him to maintain a seat.  All right.

3          MR. BRAFMAN:  No objection.

4          THE COURT:  Juror No. 32, we will ask you to please

5     maintain your seat.

6               (In open court.)

7          THE COURT:  Did you have any response to any of my

8     questions?  Juror No. 83, did you need to talk to us in

9     response to any of those questions?

10          THE PROSPECTIVE JUROR:  No.

11          THE COURT:  Ma'am, I'm sorry.  I didn't see your

12     hand was up.  Come talk to us.  Juror No. 80, yes.

13               (Prospective juror present at sidebar.

14          THE COURT:  You are Juror No. 80, correct?

15          THE PROSPECTIVE JUROR:  Yes.  I don't know a thing

16     about this person and I would like to be on the jury, but I

17     have tickets to go to Africa for three weeks that I purchased

18     the tickets, August 3rd until the 18th, and then I am going

19     away from there.

20          THE COURT:  I don't think we can guaranty

21     100 percent that we will be finished by August 3rd.  We will

22     have to excuse you.  Have a nice, safe trip.

23          THE PROSPECTIVE JUROR:  Thank you.

24          THE COURT:  Please go to the jury clerk and tell

25     them you are excused.

769

1          THE PROSPECTIVE JUROR:  Okay.  Thank you.

2          (Prospective juror excused.)

3          MR. BRAFMAN:  Can I ask a question about logistics,

4    nothing with this juror.  After the people come back at 1

5    o'clock, it is very hard to visualize who they are.  When you

6    get them back, are you going to have to put them in the seats

7    because you have additional questions for the 1 o'clock

8    people?

9          MS. SMITH:  Are you having them read their

10   occupation?

11         THE COURT:  Just so you know, I am going to put them

12   in order of the way we went through the process.

13         MR. BRAFMAN:  Right.

14         THE COURT:  So they will just go -- the first 40

15   that we are dealing with will be whoever falls into those in

16   order.  So we will do the questionnaire that we will read out

17   loud and you will have a chance to visualize and we will ask

18   them to stay around.

19         MR. BRAFMAN:  Thank you.

20         THE COURT:  Okay.

21         (In open court.)

22         THE COURT:  Is there anybody who has difficulty

23   seeing, hearing, speaking, understanding or reading English or

24   who, for any other reason, would find it difficult to follow

25   the evidence presented at the trial?

770

1          I have already introduced you to the attorneys and

2     the parties.  Does anybody here know of the attorneys or other

3     individuals sitting at the parties' tables?  If so, raise your

4     hand.

5          Does anyone here know Mr. Martin Shkreli?

6          Do you or any family member or close friend follow

7     Mr. Shkreli on any social media platform or service?

8          I will now read a list of the people who we expect

9     to call during the trial.  When I have finished reading the

10    list, please raise your hand if you know of or have heard of

11    any of these people.  Joe Allen, David Abramson, John Archer,

12    Steve Aselage, Josiah Austin, Ken Banta, Maria Beconi, Dr.

13    Alan Begs, Marek Biestek, Brent Blanton, Darren Blanton,

14    George Blasko, Courtney Bond, Seymour Block, Yuri Cantor,

15    David Carter, Mi Nue or Susan Chew, Mi Nue Chew or Susan Chew,

16    Barbara Cieplugh, Lloyd Clareman, Timothy Clemensen, Jeffrey

17    Cobb, Howard Cotton, Bernadette Davida, FBI Special Agent

18    Christopher Delzotto, Justin DeMartino, Diandra de Morrell

19    Douglas, Mark Erlich, Mark Fawer, Michael Fearnow, Troy

20    Fearnow, Thomas Fernandez, Frank Ferrara, David Filer, Joshua

21    Frase, John Fulvio, Alan Geller, David Geller, Evan Greebel,

22    Christine Giordano, Neal Golding, Michael Gordon, Patrick

23    Gordon, Michelle Griswold, Andrew Grumet, Edward Hackert, Cade

24    Hamner, Michael Harrison, Fred Hassan, Sarah Hassan, George

25    Haywood, Chad Hennings, George Huang, Leonora Izerne, Sunil

1   Jain, Chris James, Robert Johnson, Meral Kerim, Kim Keur,

2   Barbara Kocher, Richard Kocher, Thomas Koestler, John Kollins,

3   Justina Kralska, David Kravitz, Susan Lane, Mark LaPolla,

4   Hudson Lau, Michael Lavelle, Sam Lieberman, Zvi Lowey, Andre

5   Logan, Gary Lyons, Pedro Machado, FBI Special Agent Matthew

6   Mahaffey, Schuyler Marshall, Corey Massella, Charles

7   McCormick, Patrick McGowan, Amy Merrill, Fazela Mohamed, Gary

8   Mohamed or Muhammed, Kevin Mulleady, John Neill, Liam O'Brien,

9   Deborah Oremland, Jeffrey Paley, Marc Panoff, Timothy

10  Pierotti, Horacio Plotkin, Craig Poschmann, Steve Richardson,

11  Stalin Rodriguez, Steven Rosenfeld, Michael Rosensaft, Lindsay

12  Rosenwald, Allison Russo, Brent Saunders, Eric Schmidt, Ian

13  Shapiro, Jesse Shefferman, Maged Shenouda, Alvin Shih, Anna

14  Shkreli, Katrina Shkreli, Leonora Shkreli, Mark Shkreli,

15  Pashko Shkreli, Michael Smith, Wendy Spaulding, Spencer

16  Spielberg, Caroline Stewart, Steven Stich, Paul Stiliano, FBI

17  Special Agent Sean Sweeney, Jackson Su, Edmund Sullivan, Ron

18  Tilles, Howard Trachtman, Molly Tschang, Edwin Urrutia, Andrew

19  Vaino, Margaret Valeur-Jensen, Michael Verde, Tillman Ward,

20  Eric Wagner, George Yaffe, Lee Yaffe.

21          If you heard of any of these people or know them,

22  please raise your hand.

23          Please raise your hand if you know of or have heard

24  of any of these people?

25          I will now read a list of entities, locations and

772

1   medications that may be referred to during the trial.  When I

2   have finished reading the list, please raise your hand if you

3   have personal knowledge of or experience with any of these

4   entities, locations, or medications.

5           Allos Pharmaceuticals; Amag Pharmaceuticals; Amgen;

6   Anslow & Jaclin, LLP; Canaccord Genuity; Catalyst; Chelsea

7   Therapeutics; Citrin Cooperman; Claridge Capital; Cooley

8   Godward Kronish, LLP; Cobb & Associates; Colt Ventures; Cowen

9   Group; Cramer Berkowitz; Desert Gateway; Dynangrow Capital,

10  LLC; EFAY, Limited Partnership; Edwards Angell Palmer & Dodge;

11  Elea Capital; Financial Institution Regulatory Authority, also

12  known as FINRA; Fulvio & Associates; Houlihan Lokey;

13  Interactive Brokers; KaloBios Pharmaceuticals; Katten Muchin

14  Rosenmann, LLP; Kleinberg Kaplan Wolff & Cohen, LLP; Ligand

15  Pharmaceuticals; Manchester Pharmaceuticals, LLC; Marcum LLP;

16  Merrill Lynch Pierce Fenner & Smith, Incorporated; McCormick &

17  O'Brien, LLP; MKM Incubator; MSMB Capital Management, LLC;

18  MSMB Capital Management, LP; MSMB Consumer, LP; MSMB

19  Healthcare, LLC; MSMB Healthcare, LP; MSMB Isotope Fund, LP;

20  MSMB Isotope Management, LLC; Myrexis; NAV, Consulting, Inc.;

21  O-N-Y, all caps; Orexigen Therapeutics; Retrophin, Inc.;

22  Retrophin, LLC; RBC Professional Trading Group, LLC; Rothstein

23  Kass; Securities & Exchange Commission, also known as SEC;

24  SeraCare Life Science, Incorporated; Surepoint Investment

25  Fund, LLC; Standard Registrar & Transfer; Telik; Turing

773

1    Pharmaceuticals; UBS; and Valeant Pharmaceuticals..

2              And now two places:  333 Madison Avenue, New York,

3    New York; 777 Third Avenue, New York, New York.  And the

4    medications:  Daraprim, Chenodal, Thiola.  If you have heard

5    of any of these places or locations, medication, or entities,

6    please raise your hand.

7              Do you or your close family members or friends have

8    a background in the law?  Have you taken courses in the law,

9    worked for an attorney or law firm, worked for a judge or in a

10   courthouse, worked for a prosecutor, worked for a criminal

11   defense attorney, private investigator or have relatives or

12   close friends who have worked in those positions?

13             Okay, Juror No. 71.  Yes, ma'am.

14             THE PROSPECTIVE JUROR:  My brother works for the

15   IRS.

16             THE COURT:  Is he an agent.

17             THE PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Yes.

19             THE PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Is there anything about your brother's

21   work that you have heard about or talked with him about that

22   would interfere with your ability to fairly evaluate the

23   evidence and maintain a state of fair mindedness for both

24   sides?

25             THE PROSPECTIVE JUROR:  No.

774

1          THE COURT:  Thank you.

2          We had a hand up, juror number?

3          THE PROSPECTIVE JUROR:  82.

4          THE COURT:  Yes, sir.

5          THE PROSPECTIVE JUROR:  I have an uncle who works in

6     the Mineola courthouse, I believe in an administrative

7     position.

8          THE COURT:  Is there anything about your discussions

9     with your uncle about his work that would affect your ability

10    to be fair to both sides in this case?

11         THE PROSPECTIVE JUROR:  I do not believe so.

12         THE COURT:  Thank you.

13         Has anyone ever hired or consulted an attorney for

14    any reason?  If so, please describe the situation and tell me

15    if your representation or experience with an attorney was

16    satisfactory?

17         Anyone?

18         Has anyone at any time worked for, applied for a job

19    in or had a close friend or relative employed in any law

20    enforcement-related position, such as the U.S. Attorney's

21    Office, the Department of Justice, any law enforcement agency,

22    such as the FBI, the U.S. Postal Inspection Service, the SEC,

23    or any state or local police department, the attorney

24    general's office, district attorney's office, or any

25    regulatory agency, such as FINRA, or any private security or

1  investigation firm or any position connected to the criminal

2  justice system, such as a jail or prison or probation or

3  parole office?

4           Yes, ma'am, Juror No. 71.

5           THE PROSPECTIVE JUROR:  My father is a retired NYPD.

6           THE COURT:  Given your father's former occupation

7  and anything that he might have discussed with you about his

8  work, do you have any favorable or unfavorable feelings about

9  law enforcement, prosecutors, or people charged with crimes?

10          THE PROSPECTIVE JUROR:  No.

11          THE COURT:  Could you be fair and impartial to both

12  sides in this case, ma'am?

13          THE PROSPECTIVE JUROR:  I believe so.

14          THE COURT:  Thank you.

15          Anyone else?

16          Would you be able to put out of your mind anything

17  that your dad might have talked to you about his job and just

18  evaluate and come to a decision with your fellow jurors based

19  only on the evidence and instructions of law in this case?

20          THE PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Thank you.  I would like to remind you

22  that law enforcement witnesses, such as FBI agents and

23  Government regulators, are not entitled to any greater or

24  lesser weight with regard to their testimony, if they do

25  testify.  You are to evaluate the weight and credibility of

776

1   each witness who testifies and decide what value their

2   testimony has to the issues in the case.  Is there anyone who

3   could not do this?

4          Would the fact that you or a member of your family

5   or close friend was involved with law enforcement prevent you

6   from deciding this case based on the evidence and evaluating

7   the weight and credibility of each witness in the same manner?

8   If you would have difficulty, raise your hand.

9          Have you or anyone in your family or a close

10  personal friend ever been either a victim of a crime, accused

11  of a crime, including a financial crime?  Or have you been

12  involved in a criminal investigation in any way as a

13  complaining witness, a victim, a target, subject, defendant or

14  witness?  If so, please raise your hand.

15         Have you ever been a witness or a party in any civil

16  lawsuit or a criminal case or have you been a witness in any

17  grand jury proceeding or deposition?  If so, please raise your

18  hand.

19         Do you have at present or have you had any dispute

20  with or claim against the United States Government or have any

21  members of your family or close friends had any dispute or

22  claim against the United States Government?

23         Have you ever had a negative experience with or been

24  involved in a dispute, conflict or litigation with any law

25  enforcement officer or Government agency?  If so, please raise

777

1    your hand.

2         Are you currently or ever been a plaintiff or a

3    defendant or a party in any case?

4         Do any of you have any opinions about defense

5    attorneys or prosecutors that would prevent you from being a

6    fair and impartial juror in this case?

7         Have you ever sat on a jury or grand jury before?

8    And if so, how long ago?  Was it in state or federal court?

9    And was it a civil or criminal case?  And, also, did you reach

10   a verdict?  Please do not tell me what the verdict was, but

11   please let me know if you did reach a verdict.

12        Did anyone here have prior jury experience?  No.

13        Have you, members of your family, or a close

14   personal friend ever had any formal education, training, or

15   experience, or work exposure in financial services, banking,

16   pharmaceuticals, the stock market or the securities industry?

17        Do you or a family member or close personal friend

18   regularly invest in the stock market, hedge fund or

19   privately-issued securities?

20        Have any of you ever used a financial advisor who

21   manages your assets?

22        As I told you previously, a person accused of a

23   crime is entitled to the presumption of innocence unless and

24   until their guilt is proven beyond a reasonable doubt after

25   all of the evidence has been presented.  Would you have any

778

1  difficulty keeping an open mind and a fair mind to both sides

2  during this trial and following that principle of law

3  throughout the trial?

4          As I have instructed and will continue to instruct

5  you, you may not discuss the evidence, the witnesses or

6  testimony with anyone during the course of the trial, even

7  with your fellow jurors and family members.  You may only

8  discuss the evidence with your fellow jurors after the

9  presentation of all of the evidence is complete and after I

10  have instructed you on the law.

11          Will you follow those instructions about not

12  discussing this case with anyone?

13          THE PROSPECTIVE JUROR:  Yes collectively.

14          THE COURT:  Is there anything about the fact that

15  this is a criminal case or the nature of the charges or any

16  other reason that would interfere with your ability to decide

17  this case fairly and objectively?

18          I know I have asked you a lot of questions.  I ask

19  you now to think about whether there is something that I

20  didn't ask you that you would like to or should share with us

21  that would bear on your ability to be fair to both sides and

22  to follow the instructions about the presumption of innocence

23  and the burden of proof.  Is there anything else that you can

24  think of that you would like to share with us?

25          THE PROSPECTIVE JUROR:  I'm sorry, I don't know if

779

1   you asked, but I have a trip planned during the four to six

2   weeks that you are talking about.

3            THE COURT:  I did ask.  I did.  Can you tell me what

4   your situation is regarding your travel?

5            THE PROSPECTIVE JUROR:  It is a trip to California

6   July 20th for my niece's wedding.  I will be returning on the

7   24th.

8            THE COURT:  Well, we definitely wouldn't want you to

9   miss your niece's wedding, so I will excuse you.  You should

10  go down to the jury room on the second floor, tell them that

11  you have been excused and you will be given papers.  That is

12  Juror No. 71.  Thank you.

13           (Prospective juror excused.)

14           THE COURT:  Thank you.

15           Is there anyone else who has a conflict with the

16  schedule that we didn't address?

17           Let me ask one final question.  Would you be content

18  to have a juror with your state of mind sit on a jury if you

19  or a loved one was charge in a case involving criminal

20  charges?  Is there any reason why your current state of mind

21  or sense of our system of justice would interfere with that

22  ability?  If so, raise your hand.

23           No?  Thank you.  All right.  What we will do at this

24  time is let me confer briefly with the lawyers at sidebar.

25           (Continued on the next page.)

```
                         Sidebar                        780
```

1           (Sidebar held outside the hearing of the jury.)

2           THE COURT:  Do any of you have any further questions

3    that you need to ask?

4           MR. BRAFMAN:  No.

5           THE COURT:  What I am going to do is tell them go

6    down to the jury room.  We are going to reassemble everybody,

7    put them in order, which might be a bit of a challenge.

8           THE COURTROOM DEPUTY:  We have a brand-new list.

9           THE COURT:  So this is the list of everybody who is

10   still in play.  We will bring them up and put them in seats

11   1 through 40 and put the rest in the back.  We will then do

12   the questionnaires.

13          Does anybody want to do the questionnaire or just do

14   the first 40?

15          MR. BRAFMAN:  Just the first 40.  Can we get 15

16   minutes.  I need to get something to eat, I have a migraine

17   headache.

18          THE COURT:  Yes.  15 minutes.  We are going to have

19   to reassemble all of those folks.  Let's be up here by 1:30.

20          MS. KASULIS:  Thank you, Judge.

21          MR. BRAFMAN:  That's fine.  Thank you, Judge.

22          (Sidebar concluded.)

23          (Continued on the following page.)

24

25

781

1           (In open court.)

2           THE COURT:  What I am going to do is now ask the

3    three to return to the jury room at 1:30.  If you want to

4    retrieve your telephones or get a bite to eat on the third

5    floor of our building or go to the snack bar on the first

6    floor of our building, please do so.  I ask you don't discuss

7    this case with anybody.  If you check your phone and see a

8    popup news feed about something related to this case,

9    consciously avoid reading it.  Don't read anything about this

10   case.  If you would return to the jury room at 1:30, we will

11   bring you back up here and we are almost at the end of this

12   process.  Thank you very much.

13           (Prospective jurors exit.)

14           THE COURT:  Go down to the second floor jury room

15   where you started out and just let them know you are going to

16   be available at 1:30.

17           If everybody wants to take a break, we will take a

18   break.

19           MR. BRAFMAN:  Thank you.

20           MS. KASULIS:  Thank you.

21           (Lunch recess.)

22

23

24

25

782

1            AFTERNOON SESSION

2            (In open court; prospective jurors not present.)

3            THE COURT:  All right.  We are ready to go back on

4    the record with the continuing jury selection in United States

5    versus Martin Shkreli.  All parties and counsel are present.

6            I had like to just note that we have provided a

7    revised list of all the jurors from whom peremptories will be

8    made or against whom peremptories will be made.

9            I also wanted to bring to the parties' attention a

10   letter filed today from Cooley regarding the concern that it

11   has expressed about use of attorney-client privilege

12   communications during Mr. Shkreli's trial.  I would ask that

13   the counsel for Mr. Shkreli and the Government confer with

14   Cooley and make sure that we do not have any disruptions.  If

15   there are issues that cannot be resolved, we will resolve them

16   early in the morning or late at night, but we are not going to

17   disrupt the trial or have interruptions or objections from the

18   gallery.

19           Is there anything that the parties need to address

20   before we move forward?

21           MR. BRAFMAN:  No, Your Honor.

22           MS. KASULIS:  No, Your Honor.

23           THE COURT:  All right.  We will be bringing the

24   jurors up, they will be given questionnaires from which they

25   will read responses in a narrative form.  I believe our count

1    is about 56.  Is that right?

2            THE LAW CLERK:  That's right.

3            THE COURT:  All right.  We have 56 jurors coming up

4    for the last phase of this and my estimate is that we will

5    have opening statements around 3:00.  Does that sound logical

6    and doable?

7            After we go through the process of exercising

8    peremptories, I think that what we will do is at that point,

9    we will swear the jury and I will give preliminary

10   instructions and we will be prepared to open.

11           Is everyone all right with that?

12           MR. BRAFMAN:  Yes, Your Honor.

13           MS. KASULIS:  Yes, that's fine.

14           THE COURT:  Good.  We are still predicting a half

15   hour on the government's end and then an hour for the defense?

16           MS. KASULIS:  That's correct.

17           MR. BRAFMAN:  Yes.

18           THE COURT:  Thank you.

19           MS. KASULIS:  Your Honor.

20           THE COURT:  Yes.

21           MS. KASULIS:  The parties have a question about how

22   Your Honor intends to proceed with the strikes.  Are we doing

23   a pool of 28 and striking from that pool and separately

24   striking from a pool for the alternates or is it all 40 that

25   we're striking?

784

1          THE COURT:  I was going to have all 40, but if

2     someone has a different way of doing it, I am happy to do it

3     differently.  I think that it is probably more efficient to

4     put the 40 in the seat and have everyone run through their

5     challenges.

6          Did you want to do it differently?

7          MR. AGNIFILIO:  Let me think about it for two

8     seconds.  I was thinking that way.

9          THE COURT:  That's how I typically do it.

10         The jurors are outside the door.  Can we bring them

11    in?

12         MR. AGNIFILIO:  That's good, Judge.

13         THE COURT:  We will have a side bar.

14         MR. AGNIFILIO:  All right.

15         THE COURT:  Thank you.

16         (Prospective jurors enter.)

17         THE COURT:  Please have a seat everybody.

18         Good afternoon, ladies and gentlemen.  Thank you for

19    returning to the courthouse.  We are at the final phase of the

20    jury selection and I appreciate your ongoing attention and

21    patience.

22         I wanted to just advise counsel that Juror 42 did

23    not appear here today so you can scratch that individual off

24    your list.

25         What we will be doing, ladies and gentlemen of the

785

1    jury, is asking you to read from the questionnaire in order.

2    So what you will do is get up in order, Jurors 1 through 40,

3    and you will say:  I live in X town, I've lived there for five

4    years, I rent or I own, I've attended this level of schooling,

5    this is what I studied, et cetera.  We will have a microphone

6    which is due here at any second so that you will be able to

7    speak into the microphone so that we can all hear you and then

8    pass the microphone.

9            At the end of that process, we will give the lawyers

10   an opportunity to exercise their peremptory challenges.

11           I did want to ask all of you, once again, the two

12   questions that were asked previously when you were here for

13   previous questioning.

14           First is we will need to know now whether any of you

15   would have any difficulty serving for six weeks on a jury if

16   you are selected.  We will sit Monday through Friday, from

17   9:00 until 5:30 on most days, and it is important to have your

18   full attention during that time and to have you focus with a

19   fair mind on the evidence.

20           The second question is whether, given what you may

21   or may not have read in the media about this case or about

22   Mr. Shkreli, whether you could remain committed to maintaining

23   a fair and impartial mind as you listen to the evidence in

24   this case and that you commit to not discussing this case with

25   anybody until I ask you to go to the jury room and deliberate

1   at the very end of this case after you have heard all of the

2   evidence.

3           The third question I must ask is whether you could

4   commit to not reading about or listening to any media reports

5   about this case, not doing any research on social media or the

6   internet about either Mr. Shkreli or this case or anything

7   relating to this case.

8           Is there anyone here who would have any difficulty

9   following those three general rules?

10          All right.  We have jurors now who have their hands

11  up.  We did ask these questions previously, but if there has

12  been a change or something that you suddenly remembered that

13  requires our attention, I am happy to hear from you.

14          All right.  You would be Juror Number 14.  Would you

15  come to side bar, please.

16          (The following occurred at side bar; prospective

17  juror present.)

18          THE PROSPECTIVE JUROR:  I recently starting my job.

19  I'm son probation and my employer doesn't even know I'm on

20  jury duty and I have, I have to do my probation.  Six weeks,

21  from 9 to 5:30?  I start at 6:15 so it's going to

22  inconvenience me.

23          THE COURT:  Where is your job, sir?

24          THE PROSPECTIVE JUROR:  It's 299 Park Avenue.

25          THE COURT:  So you would have to get from here to

1    Park Avenue?

2            THE PROSPECTIVE JUROR:  And I wouldn't make it

3    because that's, like, like, a 40, like, a 45-minute commute.

4            THE COURT:  All right.  Sir, it will be a great

5    hardship for you to serve here?

6            THE PROSPECTIVE JUROR:  Yes, because first of all,

7    I'm on probation.

8            THE COURT:  You have a probationary employee?

9            THE PROSPECTIVE JUROR:  Yes.  I just started last

10   Friday so this is my first week.

11           THE COURT:  Okay.  I don't want to jeopardize your

12   employment opportunities so with everyone's permission --

13           MR. BRAFMAN:  Yes, Your Honor.

14           THE COURT:  -- I will excuse Juror Number 14.

15           Okay.  Sir, you can go down to the jury room on the

16   second floor and pick up your papers that verify your jury

17   service and your excused.

18           THE COURT:  Thank you, ma'am.  Thank you.

19           (Prospective juror excused.)

20           THE COURT:  Juror 14 is excused.  The question is do

21   you want to move someone into his seat now or we need to hear

22   from 40 people --

23           MS. ZELLAN:  There are people in the back with hands

24   up.

25           THE COURT:  Yes, I know.  We are going to be moving

Side Bar                                788

1   them around.  I guess we will wait until we get through this.

2              (In open court.)

3              THE COURT:  Who else had their hand up?

4              All right.  Juror Number 15, come on up now.

5              (Side bar continues; prospective juror joins.)

6              THE COURT:  Yes, ma'am.

7              THE PROSPECTIVE JUROR:  I'm Number 15.  I find out

8   yesterday, I went to work and they asked, I told them about

9   the proceeding.  I work in a seven person office.  So, I said

10  something that's long term, it might be a problem.  I'm

11  administrative assistant office manager.

12             THE COURT:  Okay.  I think we talked to you -- did

13  you call your employer yesterday to speak to them?

14             THE PROSPECTIVE JUROR:  No, I went today.

15             THE COURT:  So, did you tell them it would be six

16  weeks?

17             THE PROSPECTIVE JUROR:  I told them it would be

18  about six weeks and they said it might be a problem.  It's not

19  an actual office.

20             THE COURT:  It might be?

21             THE PROSPECTIVE JUROR:  It will probably be because

22  they will have to get somebody to come in temporarily.

23             THE COURT:  Will you be paid for your employment if

24  you are serving jury duty?

25             THE PROSPECTIVE JUROR:  I don't know.

Side Bar                              789

1          THE COURT:  You didn't ask?

2          THE PROSPECTIVE JUROR:  But I served before.

3          THE COURT:  With this job?

4          THE PROSPECTIVE JUROR:  With this job, but four

5     days.  It's downsized.  It's a smaller office right now.

6          THE COURT:  Well, it's important for you to know

7     whether you are going to be paid for the entire six weeks.

8          THE PROSPECTIVE JUROR:  Right.

9          THE COURT:  You don't know?

10         THE PROSPECTIVE JUROR:  I don't because they might

11    need to get a temp so I don't know if they will give her my

12    pay.

13         THE COURT:  I understand.  Let me have you step back

14    for a minute, please.

15         (Prospective juror leaves side bar.)

16         THE COURT:  I don't know.  I could ask her to go

17    down and find out.

18         MR. BRAFMAN:  I just think we should -- we have

19    enough, I think.

20         THE COURT:  Yes.  Do you have any objection to

21    letting --

22         MS. SMITH:  I think she should find out.

23         MS. KASULIS:  She should find out.

24         THE COURT:  Could you get your telephone and go down

25    and call your job and say this is going to be a six week

1  trial, will I be paid, and will I suffer any adverse

2  consequences if I do serve the six weeks?

3          THE PROSPECTIVE JUROR:  Okay.  Should I do that now?

4          THE COURT:  Yes, please, and come back as soon as

5  you can.

6          THE PROSPECTIVE JUROR:  Come back here or second --

7          THE COURT:  Come back right here.

8          THE PROSPECTIVE JUROR:  Sure.

9          THE COURT:  Thank you.

10         (Prospective juror leaves side bar.)

11         (In open court.)

12         THE COURT:  Did anyone else in this group have their

13  hand up?

14         Okay.  Sir, what is your number?  Come on up.  Juror

15  Number 28.

16         (Side bar continues; prospective juror joins.)

17         THE COURT:  Come on up, sir.

18         THE PROSPECTIVE JUROR:  We will finish by the 29th

19  of August?

20         THE COURT:  We will be finished.

21         THE PROSPECTIVE JUROR:  19th of August?

22         THE COURT:  Yes, we'll be finished by the 19th.

23         THE PROSPECTIVE JUROR:  I have tickets.

24         THE COURT:  Well, have a nice trip.  Do you have any

25  other issue?

```
                        Side Bar                      791

1            THE PROSPECTIVE JUROR:  No, I wanted to clarify the

2    19th.

3            THE COURT:  August 19th, they have promised they

4    will be finished.  Okay.  Thank you.

5            THE PROSPECTIVE JUROR:  I appreciate it.

6            (Prospective juror leaves side bar.)

7            (In open court.)

8            THE COURT:  Anyone else with their hand up?  Hold up

9    your numbers, please, if you have a problem.

10           Okay.  Number 53.

11           (Side bar continues; prospective juror joins.)

12           THE PROSPECTIVE JUROR:  Your Honor.

13           THE COURT:  Hello, sir.  How are you, Number 33?

14           THE PROSPECTIVE JUROR:  Good.

15           THE COURT:  Come a little closer.

16           THE PROSPECTIVE JUROR:  I wonder if I could ask you

17   something without the press here.

18           THE COURT:  Yes.

19           Press, please step back.

20           (Press representative leaves side bar.)

21           (Continued on next page.)

22

23

24

25
```





1          (Side bar continues; prospective juror present.)

2          (Press representative joins sidebar.)

3          THE PROSPECTIVE JUROR:  I guess just I got an alert

4   about the defendant buying domain registrations.

5          MR. BRAFMAN:  I'm sorry?

6          THE COURT:  He got an alert about domain

7   registrations.

8          THE PROSPECTIVE JUROR:  Of journalists that are

9   following the case.

10         THE COURT:  Yes.

11         THE PROSPECTIVE JUROR:  I don't know if he's trying

12  to discredit the journalist, that's a subtle way of doing

13  that, but I guess the way he did it kind of bothered me.  I

14  don't know if that was at direction of counsel or sanctioned

15  by counsel, an extracurricular activity, but --

16         MR. BRAFMAN:  It wasn't sanctioned by counsel or at

17  the direction of counsel, I assure you.

18         THE PROSPECTIVE JUROR:  Okay.

19         THE COURT:  Will that affect your ability to be fair

20  and impartial to both sides or does that make it more

21  difficult for you to be biased to both sides?

22         THE PROSPECTIVE JUROR:  I mean, it did help that he

23  said it's not a direction of counsel.

24         MR. BRAFMAN:  Well, I'm not on trial.

25         THE COURT:  He's not on trial.  And he's presumed to

Side Bar                                    795

1    be innocent of the charges.

2            THE PROSPECTIVE JUROR:  Yeah.

3            THE COURT:  Would that have any effect on your

4    ability to maintain a fair mind and commit to having an

5    impartial mind for both sides?

6            THE PROSPECTIVE JUROR:  I don't think so.  I just

7    thought that it was a little outlandish and I don't know if

8    this was a ploy to get a mistrial or something.

9            THE COURT:  Sir, what you must do is put all of that

10   out of your mind, if you are able to do so, and to focus only

11   on the evidence that's presented during the trial of this

12   case.

13           THE PROSPECTIVE JUROR:  Okay.

14           THE COURT:  And you shouldn't be reading anything

15   regarding the media.

16           THE PROSPECTIVE JUROR:  Okay.

17           THE COURT:  If it pops up, just overlook it.

18           THE PROSPECTIVE JUROR:  It's just hard in this day

19   and age.

20           THE COURT:  Yes, I know, but on the other hand, we

21   have a well-informed populous here but you have to avoid

22   anything regarding Mr. Shkreli on the case.

23           THE PROSPECTIVE JUROR:  Now.

24           THE COURT:  Now, could you maintain a fair mind to

25   both sides despite seeing that news report about the purchase

```
                        Side Bar                      796
```

1    of domain names?

2            THE PROSPECTIVE JUROR:  Yes.

3            MS. SMITH:  Can we just speak?

4            THE COURT:  Yes.

5            (Prospective juror leaves side bar.)

6            MS. SMITH:  The Government is concerned that a

7    there's an evasive counsel defense and a potential juror was

8    told that he's not following the judge's instruction.

9            THE COURT:  The lawyers' instructions.

10           MS. SMITH:  We're just a little concerned that

11   that's outside information that wouldn't be coming to trial

12   and it's not going to alter anything.

13           MR. BRAFMAN:  You want to challenge him?

14           MS. SMITH:  I'm raising the issue.

15           MR. BRAFMAN:  I'm prepared to challenge him because

16   I do think that his use of the word "outlandish" suggests that

17   it was more than just an alert.  I thought he focused on it,

18   thought about it.

19           MS. ZELLAN:  He made a judgment.

20           MS. SMITH:  That's fine.  We consent.

21           MR. BRAFMAN:  You consent?

22           MS. KASULIS:  Yes.

23           THE COURT:  All right.  We will dismiss him.

24           (Prospective juror joins side bar.)

25           THE COURT:  We are going to dismiss you and thank

Side Bar                                    797

1    you for your time and your candor.

2                THE PROSPECTIVE JUROR:  Yes.

3                THE COURT:  And ask you to go down to the second

4    floor and get your jury papers.

5                THE PROSPECTIVE JUROR:  Okay.

6                THE COURT:  And go back.  Thank you.  Nice to see

7    you.

8                Juror 53 is dismissed with consent.

9                (Prospective juror excused.)

10               (In open court.)

11               THE COURT:  Who else had an issue?

12               Number 53, come forward, please.

13               (Side bar continues; prospective juror joins.)

14               THE COURT:  Hi.  Come on up.  Nice to see you again.

15               THE PROSPECTIVE JUROR:  Yes.

16               THE COURT:  This is Juror 53.

17               THE PROSPECTIVE JUROR:  I know I mentioned earlier

18   that my fiance was involved in identity theft.  I just

19   realized I have a little resentment toward what happened.  He

20   was innocent and the justice system didn't serve him correctly

21   and I'm a little bit worried that I won't be able to be fair.

22               THE COURT:  All right.  Well, I appreciate you

23   telling us this.  I'm sorry about -- I hope you will find

24   faith in the justice system at some point.  I understand.

25   Okay.  Let me ask you to step back.

Side Bar                                   798

1            THE PROSPECTIVE JUROR:  Sure.

2            (Prospective juror leaves side bar.)

3            MR. BRAFMAN:  She's been trying to get out for a

4    whole day.

5            MS. KASULIS:  Yes, she has.

6            THE COURT:  She's been very honest and is trying.

7            MR. BRAFMAN:  Yes.

8            THE COURT:  We will, on consent of the parties,

9    dismiss Juror Number 53.

10            (Prospective juror joins side bar.)

11            THE COURT:  Ma'am, we are going to dismiss you.  Go

12   downstairs and you may let the clerks know that you have been

13   excused and can go back to your job or life.

14            This is you, right?

15            THE PROSPECTIVE JUROR:  Yes.  Thank you.  Have a

16   good day.

17            (Prospective juror excused.)

18            (In open court.)

19            THE COURT:  Number 54, come forward.

20            (Side bar continues; prospective juror joins.)

21            THE COURT:  Hello, ma'am.  Come forward.  Juror

22   Number 54.

23            THE PROSPECTIVE JUROR:  Yes.  I have previously

24   purchased tickets for my vacation.

25            THE COURT:  Your tickets for vacation when?

Side Bar                                              799

1          THE PROSPECTIVE JUROR:  On July 22nd.

2          THE COURT:  Oh, okay.  I'm sorry that we didn't hear

3    from you earlier about that because I did ask about vacations

4    for the next six weeks, but you have tickets that you

5    purchased?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  All right.  Well, I think we will have

8    to dismiss juror number 54 given that she's had tickets for

9    her vacation.

10          I'm sorry.  You are Number 54?

11          THE PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Go down to the second floor to the jury

13    room and tell them that you have been dismissed.

14          THE PROSPECTIVE JUROR:  Okay.

15          THE COURT:  All right.  Thank you.

16          (Prospective juror excused.)

17          (In open court.)

18          THE COURT:  Who else?  55.

19          (Side bar continues; prospective juror joins.)

20          THE COURT:  Hello, Juror Number 55.  How are you?

21          THE PROSPECTIVE JUROR:  I'm good.  Having heard,

22    again, how long the case could take, I actually have

23    identified a burden that I should be excused from.

24          THE COURT:  Okay.  What is that, sir?

25          THE PROSPECTIVE JUROR:  I recently graduated from

```
                        Side Bar                    800
```

1    college and --

2              THE COURT:  Congratulations.

3              THE PROSPECTIVE JUROR:  Thank you.  For excellence

4    in my course work, I was awarded a voucher for a certification

5    in my industry.  That voucher actually expires within the time

6    frame of the case.

7              THE COURT:  I see.  So you have to take the

8    certification?

9              THE PROSPECTIVE JUROR:  Right.  And missing that

10   time frame would be an impediment to my career advancement.

11             THE COURT:  And it can't be extended?

12             THE PROSPECTIVE JUROR:  Well, it was a voucher.

13             THE COURT:  I see.  So this allows you to take

14   courses or something towards your certification?

15             THE PROSPECTIVE JUROR:  Yes.  It's a significant

16   discount.

17             THE COURT:  Okay.  All right.  Then when does the

18   certification expire?

19             THE PROSPECTIVE JUROR:  It would expire the end of

20   next month.

21             THE COURT:  Well, we can't promise that we will be

22   finished by then, so let me just take your number, please, and

23   I will ask you to step back for two seconds.

24             (Prospective juror leaves side bar.)

25             THE COURT:  We have to let him go as well.

```
                        Side Bar                      801
```

1              MR. BRAFMAN:  Yes.

2              MS. KASULIS:  Yes.

3              THE COURT:  55, on consent?

4              MS. KASULIS:  On consent.

5              (Prospective juror joins side bar.)

6              THE COURT:  Sir, we will excuse you.  Go down to the

7    second floor.  Thank you.

8              (Prospective juror excused.)

9              (In open court.)

10             THE COURT:  All right.  Number 56, please come

11   forward, ma'am.

12             (Side bar continues; prospective juror joins.)

13             THE COURT:  Hello.

14             THE PROSPECTIVE JUROR:  Hello.

15             THE COURT:  Thank you.  This is Juror 56.  Yes,

16   ma'am.

17             THE PROSPECTIVE JUROR:  I have two babies.

18             THE COURT:  You have two babies?

19             THE PROSPECTIVE JUROR:  They're small and I don't

20   have the money.

21             THE COURT:  How old are your children?

22             THE PROSPECTIVE JUROR:  One is four and one is one.

23             THE COURT:  They're very young.  And you are the

24   only caregiver?

25             THE PROSPECTIVE JUROR:  Right now, they're in day

1    care so this would be my last week for the day care so other

2    than that, I've got to go to back to work on Monday.

3              THE COURT:  You have to go back to work on Monday?

4              THE PROSPECTIVE JUROR:  Yes.

5              THE COURT:  So your job would not allow you to be

6    off in six weeks on jury duty?

7              THE PROSPECTIVE JUROR:  I don't think so.

8              THE COURT:  Do you work for a public agency or

9    private?

10             THE PROSPECTIVE JUROR:  No, school bus, I work with

11   special needs.

12             THE COURT:  Okay.  I see.  I see.  Do you know if

13   they pay during jury service?

14             THE PROSPECTIVE JUROR:  No.

15             THE COURT:  No?

16             THE PROSPECTIVE JUROR:  No.

17             THE COURT:  All right.  If you could just step back

18   for one second, I would appreciate it.

19             (Prospective juror leaves side bar.)

20             MR. BRAFMAN:  No objection.

21             THE COURT:  I think we are going to dismiss Juror

22   Number 56.

23             MS. KASULIS:  No objection.

24             THE COURT:  Okay.  So what we will done is move

25   seats starting with Juror 41 and they will be just put back in

1    order so if you could hand these out as I call the numbers

2    just to be clear we've dismissed jurors 14, 15, 33, 53, 54 --

3              THE CLERK:  I think 15 may come back.

4              MS. KASULIS:  She was going to make a phone call.

5              THE COURT:  Oh, that's right.  Well, I will hold 15

6    right now but let's put jurors in the seats.  You don't mind

7    if we have a placeholder for 15.  We might have to put someone

8    in.

9              MR. AGNIFILIO:  Sure.

10             THE COURT:  So we're going to start with Juror 41,

11   right?

12             (Prospective juror joins side bar.)

13             THE COURT:  Juror Number 56, we are going to excuse

14   you.  You will go down to the second floor jury office, tell

15   them you have been excused and you will get your paperwork and

16   be free.  Okay?

17             THE PROSPECTIVE JUROR:  Thank you so much.

18             THE COURT:  All right.  Take care.

19             (Prospective juror excused.)

20             (In open court; side bar ends.)

21             THE COURT:  Juror 41, are you here?  Yes.  Please

22   come forward, sir.  Juror 41, you are going to be sitting in

23   the seat for Juror 14.

24             (Continued on next page.)

25

```
              Jury Selection                      804
```

1     (Continuing)

2              THE COURT:  Is Juror 43 here?

3              Okay, ma'am, please come forward.  We're going to

4     swap numbers and put you in the seat that was number 33.

5              Juror 44, are you here?  Thank you, ma'am, please

6     come forward.

7              We're just waiting for one more juror to come back.

8              (Pause in proceedings.)

9              THE COURT:  This is a microphone.  What you'll do,

10    you'll speak into the microphone.  You push the button and

11    when you see the green light come on --

12             THE COURTROOM DEPUTY:  You release it and speak.

13             THE COURT:  We will call upon you to speak in one

14    moment.  Each of you will just pass the mic.

15             I'm just waiting for the juror to return.

16             (Pause in proceedings.)

17             THE COURT:  Do the attorneys object to hearing from

18    the jurors while we await the return of Juror 15?

19             MR. BRAFMAN:  No, your Honor.

20             MS. KASULIS:  No, your Honor.

21             THE COURT:  At this time, those of you with the

22    questionnaires, we'll start with Juror No. 1 and follow down

23    the line.  There's a microphone.  You press it, wait for the

24    green light, and you speak close to the microphone.

25             Please answer the questions in a narrative form,

Jury Selection                                           805

1    starting with Juror 1.  If you could stand and speak, that

2    would be appreciated.

3              THE PROSPECTIVE JUROR:  I'm Juror No. 1.  I live in

4    Borough Park, Brooklyn; I've been living there for nine years.

5    I rent.  I have a bachelor's degree in financial services.  I

6    am currently working for the credit union to the United

7    Nations.  I am the operations principal.  I supervise seven --

8              THE COURT:  We've lost the microphone, sorry.

9              THE PROSPECTIVE JUROR:  I can speak louder.

10             THE COURT:  As loud as you can.

11             You supervise how many people?

12             THE PROSPECTIVE JUROR:  I supervise seven people.

13   My daily work is to approve trades and ensure that the

14   registered representatives are doing their jobs correctly.

15             I have been in the military for seven years total;

16   four years active duty, three years reservist.  I held the top

17   secret clearance.  I did computer information systems

18   technician role in the U.S. Navy.

19             I'm not married; I'm divorced.  I do not have grown

20   children.  And, yes, I can be fair and impartial.

21             THE COURT:  Can you tell us what your former spouse

22   did for a living?

23             THE PROSPECTIVE JUROR:  He is an editor for the

24   website for Barnes & Noble Corporate.

25             THE COURT:  Thank you.  If you could please pass the

Jury Selection                                      806

1    microphone to Juror No. 2.  You'll have to speak loudly

2    because I can't vouch for the use of that microphone.

3              THE PROSPECTIVE JUROR:  I'm Juror No. 2.  I live in

4    Brooklyn.  I have been living there just over 29 years.  I do

5    not have a home.

6              THE COURT:  Do you rent or do you own, sir?

7              THE PROSPECTIVE JUROR:  Neither.

8              THE COURT:  Okay.

9              THE PROSPECTIVE JUROR:  My former school was in the

10   Caribbean; secondary school education, maybe equivalent to

11   high school.  I'm not currently working.  I used to work with

12   MTA as bus maintainer.

13             THE COURT:  You were with the MTA?

14             THE PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Doing what, sir?

16             THE PROSPECTIVE JUROR:  Auto mechanic.

17             THE COURT:  Thank you.

18             THE PROSPECTIVE JUROR:  I never serve in the

19   military.  I am a widower.  I have four grown children; one is

20   a school psychologist, one is social worker, one is a day care

21   teacher, and my last one told me he's a scanner.  Maybe

22   scanning bar codes.

23             I am impartial person, and, yes, I can be an

24   impartial juror in this case.

25             THE COURT:  Thank you, sir.

```
                        Sidebar                        807
```

1          Please, let's hear from Juror No. 3.  Speak as
2     loudly as possible.
3          THE PROSPECTIVE JUROR:  I live in Brooklyn.  I've
4     lived there for 25 years.  I own my home.  I have a degree of
5     doctor of pharmacy.  I am working in the hospital.  I'm a
6     staff pharmacist and I'm working there almost ten years and I
7     don't supervise anyone.  I don't have military service.  I
8     divorced and I have no children and I can be fair to this
9     case.
10          THE COURT:  Can you tell us, please, what your
11     former spouse did.
12          THE PROSPECTIVE JUROR:  He's a professor.
13          THE COURT:  A professor of what subject?
14          THE PROSPECTIVE JUROR:  Biology.
15          THE COURT:  Thank you.
16          I see that we have Juror No. 15.  Let's just return
17     to sidebar quickly.  Come down, ma'am.
18          (The following occurred at sidebar; prospective
19     juror present.)
20          THE COURT:  This is Juror 15.  She checked with her
21     employer.
22          So, let's hear from you.
23          THE PROSPECTIVE JUROR:  They had a conference.
24     That's why I couldn't get anybody.  I was calling everybody.
25          THE COURT:  Okay.

```
                        Sidebar                    808
```

1          THE PROSPECTIVE JUROR:  That's our financial

2     services person, who said they think it might be okay but they

3     can't make decision without speaking to my boss first.

4          THE COURT:  And this is your boss' number?

5          THE PROSPECTIVE JUROR:  My company number.

6          THE COURT:  Okay.  I wouldn't know who to ask for.

7          THE PROSPECTIVE JUROR:  Right here.

8          THE COURT:  Oh, him.

9          Let me have you step back for one second, please,

10    ma'am.

11         (Prospective juror leaves sidebar.)

12         THE COURT:  She's tried very hard to help us get

13    information that she needs regarding her service, but she

14    hasn't been successful.  I think we need to keep moving.

15    Unless somebody has an objection, I'd be prepared to dismiss

16    her at this time.

17         MR. BRAFMAN:  No objection.

18         MS. SMITH:  No objection.

19         THE COURT:  We'll put Juror 45 into the seat of

20    Juror 15.

21         (Prospective juror joins sidebar.)

22         THE COURT:  We're going to excuse you, and I thank

23    you very much.

24         THE PROSPECTIVE JUROR:  I'm sorry.

25         THE COURT:  I appreciate all your efforts to find

Jury Selection                                                809

1   out.  We're going to excuse you.  You can get your paperwork

2   from the clerk's office in the jury room on the second floor

3   and then you can return to work.

4           THE PROSPECTIVE JUROR:  Thank you so much.  I'm so

5   sorry.

6           (Prospective juror excused.)

7           (Sidebar ends; in open court.)

8           THE COURT:  We will put Juror 45 in the seat

9   formerly occupied by Juror No. 15.

10          We were going to hear from Juror No. 4.  Would you

11  please speak in as loud a voice as possible?  If you're more

12  comfortable, you can stand at the podium and use the

13  microphone here.  But if you don't need the mic, you don't

14  need to use it.

15          THE PROSPECTIVE JUROR:  Hi.  I live in New Hyde Park

16  in Nassau County.  I've been there since 2008, nine years.  I

17  own my home.  My highest degree is doctorate in veterinary

18  medicine.  I retired last year.  For the 21 years previously,

19  I worked as sole veterinarian and was also the proprietor.

20  I've never been in the military service.  I am a widow.  My

21  husband was a union carpenter.  I have two older teenagers;

22  both of them are in school and are not working.  And, yes, I

23  can be a fair and impartial juror in this case.

24          THE COURT:  Thank you, ma'am.

25          Juror No. 5.

1          THE PROSPECTIVE JUROR:  Sunset Park, just over 27

2     years.  I rent.  Highest form of schooling was high school.

3     I'm currently unemployed; previously, restaurant manager and

4     doorman.  I've never served in the military, not married, I

5     have no children, and, yes, I can be fair and impartial in

6     this case.

7          THE COURT:  Thank you, sir.

8          Juror No. 6.

9          THE PROSPECTIVE JUROR:  I live in Rockaway Avenue in

10    Brooklyn.  I've been living there for 17 years and I rent.  I

11    have a high school diploma and I'm currently working with the

12    Department of Human Resources for 15 years.  I have never

13    served in the military.  I am divorced.  I have one daughter,

14    she is in college.  And I can be a fair and impartial juror in

15    the case.

16         THE COURT:  Thank you, ma'am.

17         Do you supervise anybody in your job?

18         THE PROSPECTIVE JUROR:  No, I don't.

19         THE COURT:  Can you tell me what your former spouse

20    did?

21         THE PROSPECTIVE JUROR:  He was self-employed.

22         THE COURT:  Do you know what kind of business it

23    was?

24         THE PROSPECTIVE JUROR:  Sorry.  Office machines.

25         THE COURT:  Thank you very much.

Jury Selection                          811

1              THE PROSPECTIVE JUROR:  You're welcome.

2              THE COURT:  Juror No. 7.  Loudly, please.

3              THE PROSPECTIVE JUROR:  I was born in Brooklyn, all

4     my life, and I've been living there for --

5              THE COURT:  All your life is good enough.

6              THE PROSPECTIVE JUROR:  I didn't want to say a

7     number.

8              I rent.  I have a year of college.  I studied -- in

9     that year, I studied business administration.  I am currently

10    working for the Department of Probation; I've been there for

11    25 years.  I supervise four people.  I've never been in the

12    military.  I am married.  My spouse is retired.  He used to

13    work as a floor clerk.  I have three grown children; one who

14    is medically disabled, one works for Fresh Direct -- that's a

15    home delivery food company -- and my third child is a

16    probation officer.  And I can be fair and impartial.

17             THE COURT:  Thank you, ma'am.

18             Juror No. 8?

19             THE PROSPECTIVE JUROR:  Juror No. 8.  I lived in

20    Brooklyn for 56 years.  I rent.  I have an associate's in

21    accounting.  I work for Department of Finance.  I worked there

22    for eleven years.  I'm not a supervisor.  I've been in the

23    military, the Navy, as a machinist.  I'm married and my wife

24    is a CNA.  I have no children.  And I can be fair and

25    impartial.

Jury Selection                                          812

1          THE COURT:  Thank you, sir.

2          Juror No. 9.

3          THE PROSPECTIVE JUROR:  I live in Staten Island.

4    Been living there my whole life, so 22 years.  I do own my

5    home.

6          And I have an education.  I have a bachelor's in

7    computer information systems with a minor in networking and

8    computer security.  And that was at SUNY-Polytechnic Institute

9    in Upstate New York.

10          I'm currently working for Salon Technology, which

11    they specialize in retail point-of-sale systems and I do

12    specialist software support.  I've been there for almost a

13    year now.  And I have not served in the military, I'm not

14    married and I don't have any children, and I could be

15    impartial at this trial.

16          THE COURT:  Thank you.  And do you supervise anybody

17    at your job?

18          THE PROSPECTIVE JUROR:  No.

19          THE COURT:  Thank you, sir.

20          You don't need to tell us the name of your employer,

21    you can just tell us what kind of employment or what kind of

22    work you do.  But thank you for the information.

23          Juror No. 10, please speak very loudly.

24          THE PROSPECTIVE JUROR:  Juror No. 10.  I live in

25    Queens.  I live there about, like, 12 years.  I own house over

LAM        OCR        RPR

Jury Selection                                813

1  there.  I do high school diploma.  I work in restaurant.  I'm

2  a sushi chef.

3           THE COURT:  Sushi chef?

4           THE PROSPECTIVE JUROR:  Yes.  I'm working there,

5  like, one years.

6           I don't have military service.  I'm not married.  No

7  children.

8           THE COURT:  And can you be fair and impartial in

9  this case?

10          THE PROSPECTIVE JUROR:  Yes, I'm fair.

11          THE COURT:  Thank you, Juror No. 10.

12          Juror No. 11?

13          THE PROSPECTIVE JUROR:  Hollis, Queens.  Been there

14  three years.  I rent.  I'm certified medical assistant.  Now

15  I'm doing -- I'm a customer service rep.  I've been there six

16  years.  I do not supervise anyone.  I've never been in the

17  military.  I'm not married, I don't have any grown children,

18  and, yes, I can be fair and impartial.

19          THE COURT:  Thank you, ma'am.

20          Juror No. 12?

21          THE PROSPECTIVE JUROR:  I live in Queens, New York;

22  Glendale.  I've been living there since I'm 13 years old.  I

23  own a home.  I graduated high school and have some college.

24  I'm not currently working, I am retired.  I retired June 2016,

25  and I used to be a director of religious education.

1            I don't know if you want to know what that is.

2            THE COURT:  Well, did you supervise anybody in your

3    work?

4            THE PROSPECTIVE JUROR:  Yes.

5            THE COURT:  How many people did you supervise?

6            THE PROSPECTIVE JUROR:  We had about 20 teachers.

7            THE COURT:  And was this a parochial school?

8            THE PROSPECTIVE JUROR:  Yes, it is -- was -- is --

9    whatever.

10           THE COURT:  Thanks.

11           THE PROSPECTIVE JUROR:  I was never in the military.

12   I am married, 47 years.

13           THE COURT:  Congratulations.

14           THE PROSPECTIVE JUROR:  Thank you.  To the same man.

15           My spouse is also retired.  And I have grown

16   children, I have two daughters; one is a graphic designer and

17   one is a speech pathologist.  And I believe I can be fair and

18   impartial.

19           THE COURT:  Would you kindly tell us what your

20   husband or spouse did before retirement?

21           THE PROSPECTIVE JUROR:  He retired from New York

22   Life.  He worked in Met Life life then he got a job at New

23   York Life.

24           THE COURT:  What kind of work did he do?

25           THE PROSPECTIVE JUROR:  Analyst, rates, insurance

Jury Selection                                    815

1   rates.

2              THE COURT:  Thank you.

3              Juror No. 13.

4              THE PROSPECTIVE JUROR:  I live in Queens.  I've been

5   living there for 39 years.  I rent.  I have a bachelor's

6   degree in political science.  I'm currently retired.  Prior to

7   retirement, I was a director a housing education program.

8   I've never been in the military.  I'm not married, I have no

9   children, and, yes, I can be a fair and impartial juror in

10  this case.

11             THE COURT:  Thank you, ma'am.

12             Juror No. 14.

13             THE PROSPECTIVE JUROR:  I live in Brooklyn most of

14  my life -- all my life.  I own a home.  I have associate's

15  degree in dental hygiene.  I'm currently working for a

16  dentist; that's been my job for 15 years.  I do not supervise

17  anyone.  And I've never been in the military.

18             I am married and my spouse does work outside the

19  house.  He is --

20             THE COURT:  What kind of work does your spouse do?

21             THE PROSPECTIVE JUROR:  Importer/exporter of plastic

22  extruders.  I have two children who do work -- one is an

23  occupational therapist, my daughter; and my son, computers --

24  and, yes, I can be fair and impartial.

25             THE COURT:  Thank you, ma'am.

Jury Selection                                  816

1              Juror No. 15.

2              THE PROSPECTIVE JUROR:  I live in New Hyde Park, New

3    York.  I've been there seven years and I own the house.  I

4    have a four-year microbiologist degree, but I work only one

5    year.  Currently, I'm working in United States Postal Service

6    as a supervisor and as a part-time I'm a licensed real estate

7    agent.  And I'm also supervising medium group and large group:

8    Medium group mean 30 employees; large, 100 employees I can

9    manage, and I can go more than that.  I never serve in the

10   military.  I was married for 17 years and 9 years I'm

11   divorced.  I have 17-year-old child in high school right now.

12   I can be fair and impartial for this case.

13             THE COURT:  Thank you.

14             What did your former spouse do?

15             THE PROSPECTIVE JUROR:  He was a manager in the

16   electronics store.

17             THE COURT:  All right.  Thank you.

18             Juror No. 16.

19             THE PROSPECTIVE JUROR:  I live in Brooklyn.  I've

20   been living there 21 years.  I own my home.  I have a master's

21   degree in speech pathology.  I work with preschool children

22   with special needs; I've been there for 12 years.  I've not

23   been in the military, not married, I don't have grown

24   children.  Yes, I can be fair and impartial.

25             THE COURT:  Okay.  Thank you.

LAM        OCR        RPR

1              Juror No. 17.

2              THE PROSPECTIVE JUROR:  I live in West Hempstead and

3    been there for 17 years.  I do rent.  I have degree in

4    associate's in science.  I'm currently working as a surgical

5    tech in a hospital.  I do not supervise anybody.  I never been

6    in the military.  I'm divorced.  I have five grown kids; one

7    is an electrician assistant, one is a manager of a store, my

8    daughter is a nurse, and another two in college.  I can be

9    fair and impartial.

10             THE COURT:  Thank you, ma'am.

11             What did your former spouse do, please?

12             THE PROSPECTIVE JUROR:  I think it was engineering,

13   but it's been twentysomething years, so...

14             THE COURT:  Thank you.

15             Juror No. 18.

16             THE PROSPECTIVE JUROR:  I live in Smithtown in

17   Suffolk County.  I've been there about 41 years.  We own the

18   home.  I've had high school and hairdressing.  I'm a licensed

19   hairdresser.  I'm not currently working.  I did supervise

20   people when I was working in retail sometimes.  And I've never

21   been in the military; my husband was, but I'm not.  And my

22   husband doesn't work outside the house, we're both retired.  I

23   have three grown children, two work; one is a manager in

24   retail, and one is -- I forget, something in the school

25   district.  I've forgotten the word, sorry.  And I can be fair

Jury Selection                                    818

1   and impartial juror.

2           THE COURT:  You said you have three grown children.

3   What does your third child do?

4           THE PROSPECTIVE JUROR:  My third child is kind of on

5   disability right now.  A lot of issues.

6           THE COURT:  And what about your spouse, what did he

7   or she do --

8           THE PROSPECTIVE JUROR:  New York State, Department

9   of Military Naval Affairs, as a maintenance supervisor.

10          THE COURT:  Thank you, ma'am.

11          Does one of the jurors have the tiny mic?  Thank

12  you.

13          Juror No. 19, please speak loudly.

14          THE PROSPECTIVE JUROR:  I live in Hampton Bays out

15  in Suffolk County.  I've been there five years.  I own my

16  house there.  I have a couple of years of college, couple

17  years of technical school after that.  I'm currently working.

18  I've been employed for 32 years at the same company in the

19  broadcast field.  I am a supervisor, I supervise 20 to 25

20  people.  I've never been in the military.  I am married.  My

21  wife is an executive assistant.  I have one child who is an

22  attorney.  And I can be fair and impartial.

23

24          (Continued on next page.)

25

819

1          THE COURT:  What kind of law does your child

2  practice?

3          THE PROSPECTIVE JUROR:  Torts law, asbestos.

4          THE COURT:  Okay.  Thank you.

5          We are going to try to give you a microphone and see

6  how that works.  We are going to give you a microphone and see

7  how that works.

8          THE PROSPECTIVE JUROR:  Juror No. 20.  I live in

9  Staten Island, New York.  I have been living there for about

10  20 years.  I own.  I have a master's degree in clinical social

11  work and four years of training in psychoanalysis.

12          It's off again.  And I've been working for about 30

13  years as a psychotherapist, and I am currently also working as

14  a school counselor in an independent school of about 400 kids.

15  How long?  About ten years in that position.  I supervise

16  people there, about seven people in my department, and I do

17  consultations.  Also -- no, I have not been in the military.

18  I'm not married.  I'm divorced.  My spouse had been teaching

19  on a university level, a doctorate in music therapy.

20          I do have a grown child, 23, who has a first job as

21  an admin assist at a school for nursing.  I can be fair and

22  impartial.

23          THE COURT:  Thank you.

24          Juror No. 21, we are going to try to fix the

25  microphone again.  Thank you.  Just loudly as possible.

820

1          THE PROSPECTIVE JUROR:  I live in Queens.  I have

2   lived there for 38 years.  I own my home.  I have a Bachelor's

3   in business administration.  I currently work at Community

4   College in human resources.  I supervise two people.  I have

5   never been in the military.  I am married.  My spouse works

6   for the Department of Sanitation.  I have two grown children,

7   one works for the fire department and the other works with

8   autistic adults, and I can be fair and impartial.

9          THE COURT:  Thank you, ma'am.

10          Juror No. 22.

11          THE PROSPECTIVE JUROR:  22.  I live in Staten

12   Island.  I have been there all my life.  I do own my home.  I

13   have a Bachelor's in business.  I am currently working as a

14   project manager in an IT department for a bank.  I have been

15   there seven years.  I don't supervise anybody.  I have not

16   been in the military.  I am married.  My wife's a nurse.  I

17   have two children.  They are both in college right now, and I

18   could be fair and impartial.

19          THE COURT:  Thank you, sir.

20          Juror No. 23.

21          THE PROSPECTIVE JUROR:  I living in Queens, Flushing

22   Meadow.  I live 28 year.  I live with my father.  I only went

23   to high school one year.

24          THE COURT:  Okay.

25          THE PROSPECTIVE JUROR:  I working for Marriott

821

1    Courtyard.  I never been to the military.  I marry.  I have

2    two kid.

3              THE COURT:  Does your wife work, sir?

4              THE PROSPECTIVE JUROR:  My wife working nail salon.

5    I will be fair.

6              THE COURT:  Juror No. 24.

7              THE PROSPECTIVE JUROR:  I live in Bayside, Queens.

8    I have lived there for about 27 years.  I own a house, and I

9    have master's degree in linguistics.  I'm retired.  Number

10   six, no.  Number seven, yes.  And my husband was an engineer.

11   Number eight, I don't have any children.  Number nine, I can

12   be fair.

13             THE COURT:  Thank you, ma'am.

14             Juror No. 25, please speak very loudly, if you can.

15             THE PROSPECTIVE JUROR:  I live in Farmingdale,

16   Nassau County.  I have been there 33 years.  I own my own

17   home.  I have a bachelor of science in mechanical engineering.

18   I'm currently working as a mechatronics engineer for 21 years.

19   I don't supervise anybody.  I've never been in the military.

20   I'm married.  I have five children.  My wife works part-time

21   one day a week as a nursing lab instructor.  My children, one

22   is a teacher, one is an electrician's helper, one is a nurse,

23   one is multiply handicapped, and the other is in college.  I

24   can be fair and impartial.

25             THE COURT:  Thank you, sir.

1          Juror No. 26.

2          THE PROSPECTIVE JUROR:  I live in Rego Park, Queens,

3    I have lived there for four years.  I own my own home.  I have

4    a Bachelor's in business administration.  I am retired.

5    Previous retirement, I worked for the utility company as a

6    statement procurement specialist where I primarily bought

7    transmission and distribution equipment.  I've never been in

8    the military.  I am married.  My husband works for Emblem

9    Health as an IT specialist.

10         I have two grown children, one is a teacher, one is

11   disabled, and I can be fair and impartial.

12         THE COURT:  Thank you, ma'am.

13         Juror No. 27.

14         THE PROSPECTIVE JUROR:  I live here in Brooklyn

15   where I rent.  I've been here for seven years.  I have a

16   Bachelor's degree.  I study literature and music.  I am

17   current employed by the College Publishing Company.  I work as

18   a program manager.  I have been in this job for seven years.

19   I supervise two people.  I've never served in the military.  I

20   am married.  My wife works in marketing for a women's fashion

21   company.  I have no grown children, and I can be fair and

22   impartial.

23         THE COURT:  Thank you very much.

24         Juror No. 28.

25         THE PROSPECTIVE JUROR:  I live in Hollis, Queens, 27

823

1   years.  I own my own home.  High school, two years of high

2   school, two years of vocation education studying agricultural,

3   agricultural science, Jamaica, retired UPS, 30 years.  Never

4   been in the military.  Married with six kids, one work at the

5   bank, one work at Home Depot, one is a teacher, one is a

6   social worker, one work with GEICO.

7           My wife work as a union receptionist at the Long

8   Island Jewish hospital, and I can be fair and impartial in

9   this case.

10          THE COURT:  Thank you very much, sir.

11          Juror No. 29.

12          THE PROSPECTIVE JUROR:  So I live in Patchogue,

13  Suffolk County.  I've lived there for four years.  I'm

14  currently renting.  So, I have a Bachelor's in physics.  I

15  currently work in the collided-accelerator department for

16  National Laboratory as an engineer.  I have been there four

17  years.  I do not supervise, no military service.  I'm

18  currently not married.  I do not have children, and I can be

19  fair and impartial.

20          THE COURT:  Thank you, sir.

21          Juror No. 30.

22          THE PROSPECTIVE JUROR:  I live in Rockville Centre,

23  Nassau County.  I have been living there for about six months.

24  I do rent.  I have my associate's in electrical engineering.

25  I repair parking meters for a village.  I do not supervise

824

1    anybody.  I have never been in the military.  I am married for

2    about five years.  My wife is a home health aide.  I do have

3    an eighth-month old child, and I can be fair and impartial.

4              THE COURT:  Thank you, sir.

5              Juror No. 31.

6              THE PROSPECTIVE JUROR:  Juror No. 31.  I live in

7    Jamaica, Queens.  I've been there for 25 years.  I have a

8    husband with three kids.  We own a home.  As far as I got was

9    business school.  I was a stay-at-home mom and I'm not

10   working.  I have --

11             THE COURT:  Can you tell us what does your

12   husband --

13             THE PROSPECTIVE JUROR:  My husband is a retired

14   correction officer.

15             THE COURT:  Thank you.

16             THE PROSPECTIVE JUROR:  I've never been in the

17   military.  I've been married for 31 years and have three sons,

18   one is unemployed, the oldest.  The middle one is a web

19   designer and the youngest is in college.

20             THE COURT:  Thank you.  And can you be fair and

21   impartial, ma'am?

22             THE PROSPECTIVE JUROR:  Yes, I can.

23             THE COURT:  Thank you.

24             Juror No. 32.

25             THE PROSPECTIVE JUROR:  I live in Elmhurst, Queens,

825

1  I have been there for about 23 years.  My mother and father

2  live with me.  We rent.  I have a Bachelor's degree in

3  facility manager.  I have 89 credits toward a bachelor's

4  degree in accountancy.  I have an associate in accountancy.  I

5  have an associate's in environmental control technology.  I'm

6  not currently working.  I have not been in the military.  I'm

7  not married.  No children.  And I can be fair and impartial.

8           THE COURT:  Thank you, sir.

9           Juror No. 43.

10          THE PROSPECTIVE JUROR:  33 now.

11          THE COURT:  I'm sorry, 33, yes.

12          THE PROSPECTIVE JUROR:  I live in Baldwin, New York

13 in Long Island for 17 years with my husband and three

14 children.  We own our home.  I have a Bachelor of Arts in

15 English.  I currently work as a mortgage loan officer.  I've

16 been doing that for over 25 years.  I do not supervise anyone

17 on the job.  I do not own my own business.  I've never been in

18 the military.  I've been married 25 years next month.  My

19 husband is a manager for the railroad/foreman.  As I said,

20 three children.  My eldest is 21, but he's not working; he's

21 in school still, and I can be fair and impartial.

22          THE COURT:  Thank you very much, ma'am.

23          Juror No. 34.

24          THE PROSPECTIVE JUROR:  I live in Staten Island, New

25 York.  I've been living there 20 years.  I own my home.  I

1    have some college.  I'm currently a UPS driver.  I've been

2    working there three years.  I don't supervise anybody.  I've

3    never been in the military.  I'm not married.  I have no

4    children, and I can be fair and impartial.

5            THE COURT:  Thank you, sir.  Juror No. 35.

6            THE PROSPECTIVE JUROR:  I've lived in Brooklyn for

7    12 years.  I rent with a roommate, two roommates.  I have my

8    associate's in massage therapy.  I've been working at a spa

9    for the past year but I have had a small private practice for

10   seven years.  I don't supervise anybody.  Never done any

11   military service.  Never been married.  No kids.  And I'm

12   confident I can be fair and impartial.

13           THE COURT:  Thank you, ma'am.

14           Juror No. 36.

15           THE PROSPECTIVE JUROR:  I live in Valley Stream,

16   Long Island.  I've been there about eight years with my

17   domestic partner and two children.  I rent.  I have some

18   college.  I studied electrical engineering.

19           I'm currently a court officer for New York State.

20   I've been there for about 13 years.  Sometimes supervise maybe

21   one to three other officers if we're really shorthanded.  I

22   have also been a merchandiser for Poland Springs, never owned

23   a business, no military service.  Domestice partnership.

24   She's a stay-at-home mom and she was a phlebotomist before

25   that.

827

1          THE COURT:  Thank you very much.  Juror No. 37.

2          THE PROSPECTIVE JUROR:  I'm No. 37.  I live in

3    Brooklyn.  I've been living there for eight years.  I rent the

4    apartment and live with my parent.  So I have a bachelor's

5    degree in accounting.  I work as a full-time employee for a

6    bank and I work in the control function for financial

7    reporting.  I do not supervise anyone.  I've never been in

8    military service.  I'm not married.  I don't have any

9    children.  I can be fair and impartial.

10          THE COURT:  Thank you, ma'am.

11          Juror No. 38.

12          THE PROSPECTIVE JUROR:  38, currently live in

13    Brooklyn, East Flatbush, born and raised.  Been there majority

14    of my life.  I live with my fiancée.  We rent.  I have my

15    associate's degree in music performance and music business.

16    I'm currently working as a station cleaner.  I've been doing

17    that for two years, two months.  I don't supervise anybody.

18    Before that I was a sound engineer.  I don't own my own

19    business.  Never been in the military.  Not married.  Don't

20    have any children and I would be fair.

21          THE COURT:  Thank you, sir.  What does your fiancée

22    do for a living?

23          THE PROSPECTIVE JUROR:  She is unemployed.

24          THE COURT:  Thank you, sir.  Juror No. 39.

25          THE PROSPECTIVE JUROR:  I currently live in Astoria,

828

1    Queens.  I've lived there for about five years.  With me lives

2    my wife.  We rent.  I have a Bachelor's degree in theater.

3    Currently, I teach adults with intellectual disabilities

4    social and vocational skills.  I have been there for a year.

5    I do not supervise anyone.

6              I have, in recent years, been a former director,

7    worked in publishing as an assistant, cleaned apartments,

8    worked as a bank teller, and various other jobs.

9              I have never been in the military.  I am married

10   nine months.  My wife is a therapist.  I do not have any

11   children, and I can be fair and impartial in this case.

12             THE COURT:  Thank you, sir.

13             Juror No. 40.

14             THE PROSPECTIVE JUROR:  Juror No. 40, I live in Long

15   Island for over 40 years with my husband.  I'm an owner.  I

16   have a master's degree in public administration.  I'm

17   currently a statistical analysis and compliance manager.  I do

18   not supervise people.  Other positions I've held are child

19   protective investigator, EEO investigator and affirmative

20   action supervisor.  No military service.  I am married for

21   nine years to a detective.  I have two adult-age children who

22   do not work.  I can be fair and impartial.

23             THE COURT:  Thank you, ma'am.

24             Let's hear from Juror No. 41 and then I think we

25   will proceed with the next step.

829

1          Juror No. 41.

2          THE PROSPECTIVE JUROR:  I live in Nassau County.  I

3   own a home.  I've been living there for 15 years.  I have a

4   master's degree in English.  I am currently working as a

5   contracting manager for a tour company.  I do not supervise.

6   I have been at this job for nearly two years now.  I have

7   never served in the military.  I am married.  My husband is an

8   analyst for the City of New York.  I have children in college.

9   I can be fair and impartial in this case.

10          THE COURT:  Thank you, ma'am.

11          Are there any other questions that the attorneys

12   have for this panel that they would like to discuss at

13   sidebar?

14          MR. BRAFMAN:  No, Your Honor.

15          THE COURT:  Does the Government?

16          MS. KASULIS:  No questions, Your Honor.

17          THE COURT:  All right.  At this time, ladies and

18   gentleman, I would ask you to just maintain your seats.  The

19   next phase of this is what I told you about earlier where

20   attorneys may exercise peremptory challenges.

21          If anybody needs to use the facilities, right now

22   might be a good time.  I could give you five minutes or ten

23   minutes to do that.  I would ask you to please return to your

24   seats.  For the rest of you who didn't get up and talk to us

25   about your backgrounds, I am just going to have one moment at

830

1   sidebar with counsel and we will give you further directions.

2   Those of you who are numbers 42 and up, please sit tight for

3   one moment.

4                (Continued on the next page.)

831

1          (Sidebar held outside the hearing of the prospective

2     jurors.)

3          THE COURT:  I just wanted to know whether anyone had

4     any objection to me excusing 42 and up?  Is there any need to

5     keep them further?

6          MS. KASULIS:  I think we are going to probably do

7     this relatively quickly.  I think we should try to hold them

8     through, Your Honor, as we select.

9          MR. BRAFMAN:  I don't mind, but we have no

10    challenges for cause.

11         MS. KASULIS:  No.

12         MR. BRAFMAN:  Neither do we.  The math goes to.

13         THE COURT:  Just the peremptory challenges.

14         MS. SMITH:  Judge, are you doing the whole pool?

15         THE COURT:  We were going to talk about how you

16    wanted to proceed.

17         MR. AGNIFILO:  That's fine.

18         MR. BRAFMAN:  Just so we are clear, if we exercise a

19    peremptory challenge, for example, number 18, we are not

20    passing on the first 18.

21         THE COURT:  No.

22         MR. BRAFMAN:  In the second round, we can go back.

23         THE COURT:  Sure.  If you pass on a round, it will

24    knock off number 40.  If you don't exercise your challenge, it

25    will eliminate the highest numbered juror.

832

1              MS. KASULIS:  Okay.

2              MR. BRAFMAN:  I want to make sure if we exercise all

3     of the 12 that doesn't mean the first 12 who are sitting there

4     are our jury, right?

5              THE COURT:  Yes.  You can strike from the entire

6     pool of 40.  Is that acceptable to everybody?

7              MS. KASULIS:  Yes, your Honor.

8              MR. BRAFMAN:  Yes.

9              MR. AGNIFILO:  Yes.

10             MR. BRAFMAN:  Can we go into the hall?

11             THE COURT:  Yes.  How long will you need?

12             MR. BRAFMAN:  15 minutes.

13             MR. AGNIFILO:  Not even.

14             THE COURT:  Please come back as soon as you are

15     ready.

16             (Continued on next page.)

17

18

19

20

21

22

23

24

25

```
                          Side Bar                        833
```

1               (In open court.)

2               THE COURT:  We are ready.  Everybody, come up.

3               (The following occurred at side bar.)

4               THE COURT:  All right.  Do you have the chart?  You

5     get two the first round and the defense goes first.

6               MR. BRAFMAN:  Ms. Zellan is going to pick.

7               THE COURT:  The first strike is by the defendant.

8     They have two strikes.

9               MR. BRAFMAN:  Yes, Your Honor.

10              MS. ZELLAN:  Your Honor, we're striking Number 1.

11              THE COURT:  Okay.

12              MS. ZELLAN:  And striking Number 7.

13              THE COURT:  All right.  Thank you.

14              And the Government?

15              MS. SMITH:  We're going to strike Number 5.

16              THE COURT:  Five?  All right.

17              The Government goes first in round two.

18              MS. SMITH:  Number 20.

19              THE COURT:  All right.  And the defense gets two

20    strikes in round two.

21              MS. ZELLAN:  We're going to go with Number 19 and

22    Number 22.

23              THE COURT:  And defense goes first in round three

24    for two strikes.

25              MS. ZELLAN:  Number 27 and Number 31.

```
                          Side Bar                      834
```

1              THE COURT:  Thank you.

2              The Government goes next in round three.

3              MS. SMITH:  Number 14.

4              THE COURT:  And you have the first strike in round

5     four.

6              MS. SMITH:  Number 18.

7              THE COURT:  Defense has two strikes in round four.

8              MS. ZELLAN:  All right.  Number 35.

9              MS. KASULIS:  Wait a moment.

10             (Pause.)

11             THE COURT:  The defense has two strikes in round

12    four.

13             MS. ZELLAN:  Okay.  Number 35.

14             THE COURT:  Okay.

15             MS. ZELLAN:  And Number 36.

16             THE COURT:  Thank you.

17             And you have one strike in round five.

18             MS. ZELLAN:  39.

19             THE COURT:  All right.  The Government has one

20    strike in round five.

21             MS. SMITH:  23 and 10.

22             THE COURT:  All right.  And the defense has a strike

23    in round six.

24             MS. ZELLAN:  Number 11, Your Honor.

25             THE COURT:  Okay.  Now, let's review who the strikes

Side Bar                                    835

1    were of the jurors.

2            We have the defense striking 1 and 7, the Government

3    striking 5, in round one.  For round two, the Government

4    struck 20, the defense struck 19 and 22.  Round three, the

5    defense struck 27 and 31, the Government struck 14.  Round

6    four, the Government struck 18, defense struck 35 and 36.

7    Round five, the defense struck 39 and the Government struck

8    23.  And for round six, the Government struck Juror 10 and the

9    defense struck Juror 11.

10           Now, is that accurate?

11           MR. BRAFMAN:  Yes, but will we now have these people

12   removed and the other jurors move into their seats?

13           THE COURT:  No.

14           MS. SMITH:  We're striking from the whole --

15           THE COURT:  From the whole 40.

16           So, you have the first strike for alternate one.

17           MS. ZELLAN:  Number 13, Your Honor.

18           THE COURT:  Okay.  And the who does the Government

19   strike for the alternates?

20           MS. SMITH:  Number 2.

21           THE COURT:  And the defense gets to strike an

22   alternate in round two.

23           MS. ZELLAN:  Number 17.

24           THE COURT:  And the Government strikes --

25           MR. BRAFMAN:  Can we a minute, Your Honor.

Side Bar                                    836

1          THE COURT:  I'm sorry.  I jumped over.  I meant to

2     give the strike to the Government.  I'm sorry.

3          MS. SMITH:  It's okay.  We'll do 29.

4          THE COURT:  So for round two, the Government strikes

5     Juror 29.

6          The defense strikes.

7          MS. ZELLAN:  17.

8          THE COURT:  Juror 17.

9          You want just a quick minute?

10          MR. BRAFMAN:  Yes.

11          MS. SMITH:  Yes.

12          (Pause.)

13          MR. BRAFMAN:  Do we go first, Judge?

14          THE COURT:  Okay.  This is round three of the

15     alternates.

16          MR. BRAFMAN:  Juror Number 15.

17          THE COURT:  Okay.  The defense strikes 15.

18          And the Government?

19          MS. SMITH:  Number 12.

20          THE COURT:  All right.  Let's just double check.

21     Who is in charge?  We've reviewed the main jurors.  Does

22     anyone want to review that?

23          MR. BRAFMAN:  No.

24          THE COURT:  So the alternates, the defense struck

25     13, 17 and 15.  And the Government struck 2, 29 and 12.

```
                        Side Bar                      837
```

1           MS. SMITH:  Yes.

2           THE COURT:  So, what we are going to do now is I am

3    going to excuse the other jurors.  We are going to move those

4    jurors who are left into seats 1 through 18.

5           Let's make sure we do have 18.  Otherwise, we have

6    done something very wrong here.  Okay?  So sit down for one

7    second while we do our totals.  Okay?

8           (Pause.)

9           THE COURT:  Can I speak to you for a moment.  I just

10   want to read who is left.

11          These are going to be our 18 jurors:  Number 3,

12   Number 4, Number 6, Number 8, Number 9, Number 16, Number 21,

13   Number 24, 25, 26, 28, 30, 32, 33, 34, 37, 38 and 40.

14          Does that line up with everybody?

15          MR. BRAFMAN:  Yes.

16          MS. SMITH:  Yes.

17          THE COURT:  So what I am going to do is I am going

18   to call the names of those who are 1 through 18, who will be

19   Jurors 1 through 18.  I will tell everyone else they will be

20   excused.  Is that all right?

21          MS. KASULIS:  Your Honor, not names.

22          THE COURT:  Not names.  I am only going to call the

23   numbers.

24          MS. SMITH:  And you don't tell the jurors they are

25   alternates?

838

1          THE COURT:  I just put them 1 through 18 and ask
2     them to pay attention.
3          MR. BRAFMAN:  Is the Court then, once the jury is
4     impaneled, going to give your preliminary instructions before
5     openings or are you just going to go straight to openings?
6          THE COURT:  I usually give the instructions.  We
7     swear the jury first before.
8          MR. BRAFMAN:  Is the court intent on doing the
9     openings tonight?  I just want to know if it's 5 or 5:30.
10         THE COURT:  I would like to go to 5:30.
11         MR. BRAFMAN:  Okay.
12         THE COURT:  All right.  Thank you.
13         MR. BRAFMAN:  I just want two minutes after the
14    government's opening before I start.
15         THE COURT:  We are going to be shuffling chairs.  We
16    are going to be moving jurors.  You'll have a chance to sneak
17    out.
18         MR. BRAFMAN:  I'll just sneak out.
19         (In open court; side bar ends.)
20         THE COURT:  Is every juror familiar with the numbers
21    that you were giving this afternoon?
22         Please listen carefully.  I will be calling numbers
23    and if your number is called, I will give you further
24    directions.
25         Please listen carefully:  3, 4, 6, 8, 9, 16, 21, 24,

1    25, 26, 28, 30, 32, 33, 34, 37, 38, and 40.

2         If you did not hear your number, you may retire to

3    the jury room downstairs.  I want to thank you for your

4    attention during this process.  You will get paperwork from

5    the jury clerk and you may return to your jobs and thank you

6    very much for your attention.

7         For those of you whose numbers were not called, let

8    me just review those.  If your numbers were not called, please

9    stay in the courtroom and we will ask you to move seats and I

10   will give you further directions.

11        Juror Number 3, you are going to sit in seat number

12   1.  So seat number 1 is right there.  Juror Number 4, you will

13   be in seat number 2.  Juror Number 6, you will be in seat

14   number 3.  Juror Number 8 will be in seat number 4.  Juror

15   Number 9, you will be in seat number 5.  Juror Number 16, you

16   will be given seat number 6.  Juror Number 21, you will be

17   given seat number 7.  Juror Number 24, will you be in seat

18   number 8.  Juror Number 25, you will be in seat number 9.

19   Juror Number 26, you will be in seat number 10.  Juror Number

20   28, you will be in seat number 11.  Juror Number 30, you will

21   be in seat number 12.  Juror Number 32, you will be in seat

22   13.  Juror Number 33, you will be in seat 14.  Juror Number

23   34, you will be in seat 15.  Juror Number 37, you will be in

24   seat number 16.  Juror Number 38, you will be in seat number

25   17.  And Juror Number 40, you will be in seat number 18.

840

1            We are going to ask you briefly to speak with
2     Ms. Jackson.  She will need your contact information and she
3     will give you our contact information and then we will start
4     the trial.  You will hear opening statements.  I will give you
5     some preliminary instructions.
6            So, let me ask Ms. Jackson to take you back to our
7     jury room briefly so that we can exchange contact information
8     but we will take a five-minute break or ten-minute break,
9     however long it takes to get your contact information.  Please
10    follow Ms. Jackson.  She will show you where the jury room is
11    and will give you further information.  I just want to make
12    sure we have your contact information.
13           Follow Ms. Jackson, please.
14           (Recess taken.)
15           (In open court.)
16           THE COURT:  Please have a seat.
17           This is the trial, United States of America versus
18    Martin Shkreli, 15-CR-637.
19           At this time, I will ask whether all counsel are
20    ready to proceed.
21           MR. BRAFMAN:  Yes, Your Honor.
22           THE COURT:  Is counsel for the Government ready to
23    proceed?
24           MR. BRAFMAN:  Yes.
25           MS. KASULIS:  Yes, Your Honor.

841

1          THE COURT:  I will ask Ms. Jackson to administer the

2     oath to the jurors.  Please raise your right hand.

3          (Jurors sworn.)

4          THE CLERK:  Thank you.

5          THE COURT:  Thank you.

6          Members of the jury, now that you have been sworn, I

7     will give you some preliminary instructions to guide you in

8     your participation during this trial.

9          It will be your duty to find from the evidence what

10    the facts are.  You and you alone will be the judges of the

11    facts.  You will then have to apply those facts to the law as

12    I give it to you.  I alone am the judge of the law.  You must

13    follow that law whether you agree with it or not.  Nothing

14    that I may say or do during the course of the trial is

15    intended to indicate or should not be taken by you as an

16    indication of what your verdict should be.

17         The evidence from which you will find the facts will

18    consist of the sworn testimony of the witnesses, documents and

19    other things received into the record as exhibits and any

20    facts that the lawyers agree to or stipulate to or that the

21    court may instruct you to find.  Certain things are not

22    evidence and must not be considered by you.  I will list some

23    of those for you now.

24         Statements, arguments and questions by the lawyers

25    are not evidence.  Objections to questions are not evidence.

842

1    Lawyers have an obligation to their clients to make objections

2    when they believe that the evidence being offered is improper

3    under the rules of evidence.  You should not be influenced by

4    the objection or by the Court's ruling on it.  If the

5    objection is sustained, ignore the question.  If the objection

6    is overruled, treat the answer like any other.  You may not

7    consider any answer more significant because counsel objected

8    and because I overruled that objection.  If you are instructed

9    that some item of evidence is received for a limited purpose

10   only, you must follow that instruction.  Testimony that the

11   Court has excluded or told you to disregard is not evidence

12   and must not be considered.

13         Anything you may have heard or seen outside the

14   courtroom is not evidence and must be disregarded.  You are to

15   decide the case solely on the evidence presented here in this

16   courtroom during the trial.

17         There are two kinds of evidence:  Direct and

18   circumstantial.  Direct evidence is direct proof of a fact

19   such as testimony by an eye witness.  Circumstantial evidence

20   is proof of facts from which you may infer or conclude that

21   other facts exist.  I will give you further instructions on

22   these as well as other matters at the end of the case, but

23   keep in mind that you may consider both kinds of evidence.  It

24   will be up to you to decide which witnesses to believe, which

25   witnesses not to believe, and how much of any witness'

1    testimony to accept or reject.  I will give you some

2    guidelines for determining the credibility of witnesses at the

3    end of the case.

4           Although we will try to avoid such instances, there

5    will be times when counsel or the Court may ask that you be

6    excused when arguments or objections are made.  Those

7    arguments may include matters of evidence that the Court may

8    eventually exclude.  These arguments may also involve legal

9    issues that are not the province of the jury.  The reason that

10   I ask you to step out or we turn on that annoying white noise

11   is be sure that you will not hear evidence or legal arguments

12   that are not properly admissible.

13          As you know, this is a criminal case.  There are

14   certain important basic rules about criminal cases that you

15   must keep in mind throughout this case.

16          First, the defendant is presumed innocent until

17   proven guilty beyond a reasonable doubt as to each element of

18   the charged offense.  The indictment brought by the Government

19   against the defendant is only an accusation.  Nothing more.

20   It is not proof of guilt, evidence or anything else.  This

21   presumption of evidence remains with the defendant throughout

22   the trial and may be overcome only if and until, after

23   appropriate deliberation, the jury finds that the Government

24   has proven the defendant's guilt of each and every element of

25   one or more of the crimes charged beyond a reasonable doubt.

844

1     The defendant therefore starts with a clean state.

2          Second, the burden of proof is on the Government

3     until the very end of the case.  The defendant has no burden

4     to prove his innocence or to present evidence or to testify.

5     Because the defendant has the right to remain silent, you must

6     not draw any adverse inference against the defendant from the

7     fact that he may not have testified.

8          Third, the Government must prove the defendant's

9     guilt beyond a reasonable doubt.  I will give you further

10    instructions on this point later on, but bear in mind that in

11    this respect, a criminal case is different from a civil case.

12         In this case, there are eight crimes charged in the

13    indictment.

14         In Counts One through Three, Mr. Shkreli is charged

15    with conspiracy to commit securities fraud, conspiracy to

16    commit wire fraud and a substantive count of securities fraud

17    in relation to an entity known as MSMB Capital.

18         In Counts Four through Six, the defendant is charged

19    with a conspiracy to commit securities fraud, conspiracy to

20    commit wire fraud and a substantive count of securities fraud

21    in relation to an entity known as MSMB Healthcare.

22         In Count Seven and Eight, the defendant is charged

23    with conspiracy to commit securities fraud and conspiracy to

24    commit wire fraud in relation to an entity known as Retrophin.

25         Because there are multiple charges and they are

1   somewhat complex, I will give you detailed instructions on the

2   law at the end of the case and those instructions will control

3   your deliberations and decisions.

4           Now, a few words about your conduct as jurors.

5           First, I instruct you that during the trial, you are

6   not to discuss this case with anyone, family members, friends,

7   or each other or to permit anyone to discuss this case with

8   you.  If someone asks you what you have been doing here, you

9   simply must say:  I have been selected to serve as a juror in

10  a criminal case and have been instructed by the judge not to

11  discuss the case.  Until you retire to the jury room at the

12  very end of the case to deliberate, you simply are not to talk

13  about the case.

14          I know that many of you use cell phones,

15  smartphones, the internet and other tools of technology.  You

16  also must not talk to anyone about this case or use those

17  tools to communicate electronically with anyone about this

18  case.  This includes your family and friends.  You may not

19  communicate with anyone about the case on your cellphone,

20  through e-mail, your Blackberry, iPhone or other smartphone

21  device, text messages, Twitter or through any blog or website,

22  through any internet chat room or by way of any social

23  networking websites including, but not limited to Facebook,

24  MySpace, Instagram, LinkedIn and YouTube or anything else

25  relating to social media.

846

1           I have also instructed the parties that they are not

2    to have any contact with members of the jury.  Therefore, if

3    you see any of the parties or lawyers in the hallway of this

4    courthouse or on the street or any other location and they

5    look away and do not speak to you and keep walking, please do

6    not hold that against them.  This is simply the best method of

7    avoiding any possible appearance of impropriety and of

8    ensuring the absolute impartiality required of you as jurors

9    in this case.

10          Second, do not read or listen to anything touching

11   on this case in any way.  This includes newspaper, magazines,

12   radio, television and internet.

13          If while serving on this jury any attempt is made by

14   any person to converse with you about this case or any

15   incident occurs within your knowledge involving an attempt by

16   any person to improperly influence any members of the jury,

17   you must promptly bring that to my attention.

18          (Continued on next page.)

19

20

21

22

23

24

25

Preliminary Instructions                    847

1   (Continuing)

2          THE COURT:  If you are approached by someone who

3   asks you about the case, please report it immediately to me;

4   my case manager, Ms. Jackson; or my law clerk, Mr. Tata.  Do

5   not discuss it with other jurors.  Please simply report

6   whatever incident may occur in this regard and please do it as

7   quickly as possible.

8               Third, during the course of the trial, you must not

9   conduct any independent research about this case or the

10  matters in this case or the individuals or corporations

11  involved in the case.  In other words, you should not consult

12  dictionaries or reference materials, search the internet,

13  websites, blogs, or any other electronic media.

14              It is important that you decide the case based only

15  on the evidence presented in this courtroom.  Do not try to

16  find out any information from other sources and do not visit

17  or view any locations where the offenses charged allegedly

18  took place.

19              Finally, do not form any opinion until all the

20  evidence is in.  Keep an open mind until you start your

21  deliberations at the end of the case.  These admonitions apply

22  whenever the Court stands in recess and I will repeat them

23  each time we break.

24              In addition, this will be a long and complex trial.

25  If you would like to take notes during the course of the trial

1   you may do so, and the Court will provide you with a notebook;

2   however, bear in mind that it is difficult to take detailed

3   notes and pay attention to what the witnesses are saying and

4   observe their demeanor at the same time.  It is important that

5   you observe the demeanor as you listen to the witness

6   testimony because you are going to be the judges of the

7   credibility and weight of each witness' testimony.

8           If you do take notes, be sure that your note taking

9   does not interfere with your listening to, observation of, and

10  consideration of all of the evidence.  If you do take notes,

11  do not discuss your notes with anyone before you begin

12  deliberations.  You will not be allowed to take your notebooks

13  out of this courtroom at the end of the day or during a break.

14  You will leave them facedown on your chair and we will collect

15  the notebooks and secure them each time.

16          If you choose not to take notes, remember that it is

17  your own individual responsibility to listen carefully to the

18  evidence.  You cannot give responsibility to someone else who

19  is taking notes.  We depend on the judgment of all members of

20  the jury.  You must all remember the evidence in this case.

21          The trial will now begin.  First, the Government

22  will make an opening statement, which is simply an outline to

23  help you understand the evidence as it comes in.  Next, the

24  defendant's attorneys may, but are not required to, make an

25  opening statement.  Opening statements are not evidence or

1    arguments.  You may consider the opening statement as a

2    preview or roadmap of what each side says the evidence in the

3    case will show or will not show.

4            The Government will then present its witnesses,

5    which is called direct examination.  And counsel for the

6    defendant may cross-examine them.  Then, there may be further

7    questions asked of the witnesses on what we call redirect and

8    recross-examination.  This process will be repeated with each

9    witness.

10           Following the Government's case, the Defendant may,

11   if he wishes, present direct testimony of witnesses, whom the

12   Government may cross-examine.  Again, bear in mind that there

13   is no obligation on the part of a defendant to offer evidence

14   because the entire burden of proof beyond a reasonable doubt

15   remains upon the Government.

16           After all the evidence is in, the attorneys will

17   present their closing arguments to summarize and interpret the

18   evidence for you, then I will instruct you on the law, and

19   after that you will retire to deliberate on your verdict.

20           We will now proceed with the next step of the trial,

21   which is an opening statement by the Government.

22           Are you ready to proceed?

23           MR. SRINIVASAN:  Yes, your Honor.

24           THE COURT:  Please proceed.

25           MR. SRINIVASAN:  Thank you.

1          Lying to get investors' money.  Stealing from a

2     public company and its shareholders to pay off the investors

3     he stole from.  Piling lies on top of lies on top of lies.

4     This is what that man, the Defendant, Martin Shkreli, did for

5     years.

6          He was the manager of two investment funds, and to

7     get money for those funds he lied to investors.  Once

8     investors had given him their money, he continued to lie to

9     them, telling them that the funds were doing well when in

10    reality he had lost millions of dollars.

11         Rather than own up to the lies and admit that the

12    funds were failures, the Defendant doubled down by engaging in

13    an even bigger fraud.  This time, he stole more than

14    $10 million of cash and stock from a public company to pay off

15    the investors he swindled, his own personal debts, and to

16    conceal his lies.  The Defendant's actions were crimes.  That

17    is why we are here today.

18         Good afternoon.  My name is Karthik Srinivasan and

19    I'm an Assistant United States Attorney here in the Eastern

20    District of New York.  With me are my colleagues Jacquelyn

21    Kasulis, Alixandra Smith, paralegal Gabriela Balbin, FBI

22    Special Agent Mike Braconi, and Special Agent Sean Sweeney of

23    the FBI.  Together, we represent the United States.

24         During the course of this case, you're going to hear

25    about four frauds that were orchestrated by the Defendant.

1   They involved two investment funds, MSMB Capital and MSMB

2   Healthcare; and a public company called Retrophin.  Let's

3   start with the first fraud, which was MSMB Capital.

4          In the fall of 2,009, the Defendant and his friend

5   Marek Biestek opened a hedge fund called MSMB Capital.  A

6   hemorrhage fund is a specific type of investment fund in which

7   investors pool their money and a manager, like the Defendant,

8   makes the investments for those investors.  They named it MSMB

9   after their initials; MS for Martin Shkreli, MB for Marek

10  Biestek.

11         But MSMB Capital was built and sold on lies.  From

12  the beginning, the Defendant lied to investors to get them to

13  invest in MSMB Capital.  For example, he told them that he had

14  a successful track record as a Wall Street fund manager.  That

15  was a lie.

16         You'll learn that the Defendant previously ran a

17  hedge fund called Elea Capital and it lost all its investors'

18  money.  He never told the investors in MSMB Capital that Elea

19  Capital went bust; instead, he falsely led them to believe

20  that he was a successful fund manager with a successful track

21  record.

22         Now, throughout the history of MSMB Capital, the

23  Defendant repeatedly told his investors that MSMB Capital

24  itself was a successful fund.  That was a lie.  From the

25  beginning, MSMB Capital went through repeated cycles of new

1   investors putting in money followed by big losses.  Despite

2   the Defendant's claims in marketing materials to potential

3   investors, performance reports to current investors, MSMB

4   Capital did not make profits for its investors.

5            To get investors comfortable with the idea of

6   investing with him, he told them MSMB Capital had an auditor.

7   Now, an auditor is an independent company that checks a fund's

8   financial information.  That was a lie.  You'll learn that

9   MSMB Capital never had an auditor.

10           To get investors to believe MSMB Capital was

11  successful, he told them that the fund had millions of dollars

12  under management.  That was a lie.  You'll learn that MSMB

13  Capital never had more than a few million dollars under

14  management.

15           The Defendant's lies worked.  You will hear that the

16  Defendant got eight investors to put over $3 million into MSMB

17  Capital based on those lies.

18           Throughout 2009, 2010, the Defendant consistently

19  lost his investors' money.  But none of his investors knew

20  this.  He sent them false performance reports, informing them

21  that their investments were doing very well.  Without an

22  auditor, there was nobody there checking the books.  In fact,

23  at times during this period, there was almost no money at all

24  left in the fund.  And when this happened, the Defendant went

25  out, got new investors, told them the same lies, and then used

1   the new money to keep gambling with other people's money.

2           But the Defendant's house of cards came crashing

3   down on February 1, 2011.  On that day, the Defendant bet all

4   the money that was left in MSMB Capital on one stock in the

5   stock market; a stock called Orex or Orexigen.  He bet that

6   that stock would go down that day.  And he was wrong.

7           Not only did he lose all of the money that was left

8   in MSMB Capital, he ended that day $7 million in debt to MSMB

9   Capital's broker Merrill Lynch.  That was more money than he

10  had ever raised for MSMB Capital.  He didn't tell his

11  investors, he didn't tell them he had loss all the money;

12  instead, he continued to lie to them about MSMB Capital's

13  performance.

14          For months after the fund had gone under and had

15  about zero dollars in assets, he continued to send the

16  investors monthly statements telling them that the fund was

17  profitable and that their investments had healthy returns.

18  These were lies.  In reality, the fund was effectively

19  bankrupt and it ceased trading activity on February 1, 2011.

20  But the failure of MSMB Capital did not deter the Defendant

21  from committing more fraud.

22          Once MSMB Capital failed, he moved on and he founded

23  a new hedge fund called MSMB Healthcare, just days after the

24  failed trade of MSMB Capital.  MSMB Healthcare was the second

25  fraud.  And once again, he used the same lies to recruit new

 1   investors and to deceive them.  He told MSMB Healthcare

 2   investors that MSMB Capital, the first fund, was a success.

 3   That was a lie.  He told MSMB Healthcare investors that this

 4   fund had an auditor.  That was a lie.  He told MSMB Healthcare

 5   investors that the fund had millions of dollars under

 6   management.  That was a lie.

 7          And, again, his lies worked.  Between February of

 8   2011 and November of 2012, new investors put about $5 million

 9   into MSMB Healthcare.

10          At around the same time he started MSMB Healthcare

11   in February 2011, he also started a new company called

12   Retrophin.  In the beginning, this is a company that had no

13   products, no assets, no sales, no property.  The Defendant

14   took the money from MSMB Healthcare and put it into Retrophin,

15   ultimately making MSMB Healthcare the biggest investor in

16   Retrophin.  The Defendant was on both sides of the deal.  But

17   he never told the MSMB Healthcare investors that their main

18   investment was in another one of his companies; instead, he

19   told investors that MSMB Healthcare was a profitable hedge

20   fund.  And he based that statement on the value that he,

21   himself, set on MSMB Healthcare's investment in Retrophin.

22          In reality, from its founding in February 2011 until

23   late 2012, Retrophin was a struggling company with few assets

24   and no sales.  Multiple times it almost went bust.  And

25   repeatedly, the Defendant took the monies from MSMB

1  Healthcare, put it into Retrophin to keep it afloat.  Again,

2  his lies worked for the MSMB Healthcare fraud.  Very few

3  investors asked for their money back.  Indeed, the Defendant

4  led them to believe that they were making double-digit

5  profits, more than ten percent on their investment.

6         But the Defendant's lies from the first two frauds

7  started to catch up with him.  By September 2012, he had been

8  lying to MSMB Capital investors about their investment for

9  more than a year and a half, telling them that their

10 investments were growing when, in fact, there was nothing left

11 in this fund.  He had also been lying to the MSMB Healthcare

12 investors, telling them that their investments were growing

13 when, in fact, he had stopped trading and had sunk all of the

14 money into Retrophin, which was not doing well.  And to top it

15 all off, he still owed millions of dollars to Merrill Lynch

16 for that disastrous trade on February 1, 2011.

17        You will learn that in early September of 2012, the

18 Defendant and MSMB Capital finalized an agreement with Merrill

19 Lynch that would require them to pay Merrill Lynch more than a

20 million dollars to resolve the matter.  The money was due in

21 just three months.

22        Faced with the debt that he owed to Merrill Lynch

23 and all of the fake profits that he had told investors that

24 they were making in MSMB Capital and MSMB Healthcare, did

25 Defendant come clean?  He did not.  Instead, he committed even

1   more frauds.  He stole money from MSMB Healthcare to pay the

2   debt to Merrill Lynch and MSMB Capital.  He didn't ask for

3   permission from the MSMB Healthcare investors to use their

4   money to repay this debt, nor did he ever later tell the MSMB

5   Healthcare investors that he had done that.  Instead, a few

6   days after the Merrill Lynch agreement, the Defendant told

7   MSMB Capital and MSMB Healthcare investors that he was

8   shutting down the funds.  And he promised that he would pay

9   them back.

10          From the very beginning of these funds, he had told

11  investors that they could get their money out in cash.  So, in

12  September 2012, he told them you can choose to be paid either

13  in cash or with stock from Retrophin.  That was a lie.

14  Because he didn't have the cash to pay back his investors.  In

15  fact, MSMB Capital was bankrupt.  And all of MSMB Healthcare's

16  money was locked up in his company Retrophin.

17          So, not surprisingly, when some investors wanted the

18  cash that they were promised, he came up with more lies to

19  string them along.  He knew that he was in deep trouble with

20  his hedge fund investors.  Facing demands for millions of

21  dollars in cash, he orchestrated a plan, together with a

22  lawyer, a coconspirator named Evan Greebel, to use Retrophin's

23  money to pay off his hedge fund investors.

24          So, how did he do this?  He did it by executing the

25  third and the fourth frauds.

1        During the third fraud, you'll learn that the

2    Defendant tried to secretly control Retrophin shares so that

3    he could manipulate the price of those shares.  And having

4    control of Retrophin shares allowed him to carry out the

5    fourth fraud:  He stole millions of dollars from Retrophin to

6    pay off his hedge fund investors and old debts.

7        Let's turn to the third fraud, the manipulation of

8    Retrophin stock.  By late 2012, Retrophin was still a

9    struggling company and the Defendant needed many more

10   investors in the company to pay off the fund investor's, MSMB

11   Capital's, debt to Merrill Lynch and to keep Retrophin afloat.

12   So, he took Retrophin public.  He changed from a private

13   company to a public company.  This allowed Retrophin to sell

14   shares on the stock market.  The Defendant controlled

15   Retrophin as its chief executive officer, or CEO, the head of

16   the company.

17       Now, when Retrophin became a public company, it had

18   two and a half million shares that could be traded on the free

19   market.  These are known as unrestricted or free-trading

20   shares.  Defendant desperately needed control of these shares.

21   That's because he needed to pay the old MSMB investors

22   somehow.  And without any cash, the only option was shares of

23   Retrophin.  And to make sure that these shares were actually

24   worth something, he had to keep the price of Retrophin shares

25   from collapsing as soon as it went public.

1          So, the Defendant attempted to illegally control the

2     price of these free-trading shares by giving the shares to

3     people he thought he could trust to do what he wanted:

4     Employees and other people affiliated with his companies.  By

5     giving the shares to these people, he attempted to secretly

6     control the trading of these shares without the shares

7     officially belonging to him.  And by controlling the trading,

8     he tried to illegally prop up the price of Retrophin shares.

9          Control of Retrophin shares and manipulation of its

10    share price allowed the Defendant to carry out the fourth

11    fraud, with Greebel:  Stealing cash and stock from Retrophin

12    to pay off the defrauded MSMB Capital and MSMB Healthcare

13    investors and other personal debts.

14         You'll learn that as CEO of Retrophin, the Defendant

15    was responsible to a board of directors and was required to

16    act in the interests of the shareholders of the company.

17    You'll also learn that the assets of the company belong to the

18    shareholders.  But the Defendant acted against the best

19    interests of the company; rather than own up to his frauds, he

20    used Retrophin's money and assets as his own.

21         Now, remember, MSMB Capital never invested in

22    Retrophin.  The investors never invested in Retrophin.  They

23    couldn't have.  The fund was bankrupt before Retrophin even

24    started.  We learned that the Defendant lied and backdated

25    documents to make it looks like MSMB Capital had actually

1  invested in Retrophin.  While MSMB Healthcare had invested in

2  Retrophin, that investment was worth a fraction of what the

3  Defendant told the investors it was worth.

4        Remember too that the MSMB Capital and MSMB

5  Healthcare investors were hounding the Defendant for cash; the

6  cash that they were promised that he didn't have.  So, his

7  solution was simply to give these investors shares of

8  Retrophin.  Some of the investors didn't want these shares.

9  They threatened to sue the Defendant and expose his lies to

10  others.

11        To keep the investors from exposing him as a

12  fraudster, he came up with a plan to pay off the MSMB

13  investors.  First, the Defendant and Greebel paid off some

14  investors by entering into settlement agreements in exchange

15  for not suing.  The Defendant forced Retrophin to pay off

16  these investors with cash and stock even though Retrophin owed

17  these investors nothing.  The Defendant owed these debts to

18  the MSMB investors, not Retrophin.  And you'll learn that the

19  Defendant pulled off this heist in secrecy by not telling

20  Retrophin's board of directors at the time.

21        His illegal plan worked at first because Retrophin

22  was starting to become a successful company with real assets.

23  So, it was easy see prey for the Defendant, as the head of the

24  company.  But the plan didn't go undetected.

25        In the late summer of 2013, Retrophin's accountants

1    learned about these settlement agreements.  And they told the

2    Defendant that these agreements weren't proper because

3    Retrophin owed MSMB investors nothing.  So, the Defendant and

4    Greebel couldn't use these settlement agreements any longer to

5    steal from Retrophin.  And since he couldn't just settle with

6    the defrauded MSMB investors, he decided to change tactics.

7           He pretended to hire some of these investors as

8    consultants to Retrophin.  These consulting agreements were

9    shams because these people did not do legitimate work for the

10   company.  Nevertheless, the Defendant forced Retrophin to pay

11   some of these fund investors millions of dollars in cash and

12   stock.

13          You'll also learn that well after the fraud

14   happened, Retrophin became a successful drug development

15   company and stock price rose.  Many of the defrauded MSMB

16   investors were able to sell their Retrophin shares and make a

17   profit.  They got their money back only because the Defendant

18   stole from a public company that eventually turned out to be

19   successful.  He had no right to use Retrophin's cash and stock

20   to pay off the MSMB investors.

21          Ladies and gentlemen, all tolled, the Defendant

22   stole more than $10 million from Retrophin and its

23   shareholders.  As a result of his conduct related to MSMB

24   Capital, MSMB Healthcare, and Retrophin, the Defendant is

25   charged with eight counts of securities fraud, conspiracy to

1   commit securities fraud, and conspiracy to commit wire fraud.

2   You'll learn that a conspiracy is simply an agreement between

3   two or more people to commit a crime and taking some step in

4   furtherance of that agreement.

5              Over the course of this trial, the Government will

6   prove that the Defendant is guilty beyond a reasonable doubt

7   and we will prove it through witness testimony and documents.

8   You'll hear from the investors in MSMB Capital and MSMB

9   Healthcare.  They will tell you exactly what the Defendant

10  said to them to get them to invest in these funds and what he

11  said to them to prevent them from withdrawing their money from

12  these funds.

13             You'll also hear from employees of MSMB Capital and

14  Retrophin.  You'll hear from them about the Defendant's

15  trading failures, including that big loss on February 1, 2011.

16

17             (Continued on next page.)

18

19

20

21

22

23

24

25

1           MR. SRINIVASAN:   (Continuing) and you will hear

2      about the Defendant's lies and his deceit to conceal those

3      failures.  You will learn how he used the Retrophin employees

4      to manipulate the stock price of the company and its trading

5      volume.  You will also hear from board members at Retrophin

6      and you will hear them tell you that Retrophin was lied to and

7      the defendant took huge sums of money to pay off the defrauded

8      MSMB Capital and MSMB Healthcare investors while keeping the

9      board in the dark.

10          You will see the backdated investors' documents,

11     falsified investor statements, and numerous false promises

12     made to the MSMB investors.  You will see that Merrill Lynch

13     settlement agreement where the defendant admitted that MSMB

14     Capital had exactly zero dollars in assets.  You will see that

15     faced with a lawsuit that he could not hide from, the

16     defendant admitted the truth to Merrill Lynch, while he

17     continued to lie to his investors at the same time.

18          You will the bank records, the share transfer

19     records that will allow you to follow the money.  You will see

20     the fraudulent settlement agreements, the consulting

21     agreements that the Defendant used to make Retrophin pay off

22     his old debts.  You will also see the defendant's e-mails that

23     will provide you with an inside look at the frauds.  You will

24     see the defendant's own words and you will see the way in

25     which he orchestrated and executed these frauds.

1          Ladies and gentleman, the evidence will prove that

2     the defendant broke the law repeatedly, took investors' money

3     based on lies and he continued to lie to them for months after

4     he had lost all of the money.  He did this by convincing them

5     that he was a Wall Street genius.  In reality, he was just a

6     con man.

7          At the end of this case, we will come back to you

8     and we will ask you to return the only verdict that is

9     consistent with all of the evidence that you will see in this

10    case, that the defendant is guilty as charged.

11         THE COURT:  Would the defense like to open?

12         MR. BRAFMAN:  Yes, your Honor.

13         THE COURT:  All right.

14         MR. BRAFMAN:  Your Honor, may I stand from here so I

15    can introduce the people at the table?

16         THE COURT:  Yes.

17         MR. BRAFMAN:  Good afternoon, ladies and gentleman.

18    My name is Benjamin Brafman.  I represent Mr. Shkreli, along

19    with Marc Agnifilo, Andrea Zellan, and Jacob Kaplan.

20         This is Martin Shkreli.  I would ask if you could

21    stand just for a moment so that you can look at him.  Martin

22    Shkreli is the person on trial and the Government witnesses

23    will tell you about Martin Shkreli.  They will confirm under

24    oath that when they worked with Martin Shkreli, behind his

25    back and sometimes to his face, they made fun of him.  They

1    called him an odd duck.  Some of them wondered whether he was

2    autistic.  They referred to him as Rain Man, the man in the

3    Rain Man movie played by Dustin Hoffman, someone with

4    Asperger's syndrome.  They will admit that it was Martin's

5    vulnerability that they took advantage of.  They will admit

6    that they challenged his sexuality.  None of that matters,

7    ladies and gentleman.  As Lady Gaga says, he was born this way

8    and it has nothing to do with this trial.

9             Now, as you get older, you find yourself quoting

10   different people.  When I was younger, I used to quote my

11   generation of music.  Now I quote my grandchildren's

12   generation of music.  Forgive me if I refer to Lady Gaga

13   because when I'm in the car, that's all I hear.

14            Ladies and gentlemen, the Government has just opened

15   and I think it was a very good opening.  It was clear.  It was

16   eloquent and the word lie was used I think 50 times.  So if he

17   is right, why are we here?  If the evidence is so

18   overwhelming, what are we doing here?  We are here because

19   when these charges were filed, Martin Shkreli came into this

20   building and through a loud, clear voice said I'm not guilty,

21   I want my day in court.  That's what this is.  It's Martin

22   Shkreli's day in court.  Is he strange?  Yes.  Will you find

23   him weird?  Yes.  Will the witnesses tell you how they laughed

24   about him repeatedly?  Yes.  But they used his genius and they

25   relied on his genius and every single Government witness will

1   concede that Martin Shkreli, despite his flaws and

2   dysfunctional personality, is brilliant beyond words.  Those

3   are the words they will use to describe Martin Shkreli.

4          This trial will start tomorrow morning and when it's

5   over, I will submit, most respectfully, you will conclude that

6   Martin Shkreli is not guilty, and one of the things that you

7   need to do is ignore the current that, God bless Martin

8   Shkreli, he creates wherever he travels.  We are trying this

9   case in this courtroom.  And if I am a lifeguard, my greatest

10  fear is not the evidence; my greatest fear is the current.

11  You all know about it and you all agreed to be fair and you

12  all agreed to not listen to the roar of the current outside

13  the courtroom that we will decide this case on what happens in

14  the well of this courtroom.

15         You know, I have looked forward to this moment for

16  months, maybe more than that.  And now that it has arrived,

17  I'm somewhat awed by the responsibility I have undertaken

18  because I am speaking on behalf of another human being and I

19  recognize that my ability to articulate words for Martin

20  Shkreli, or perhaps my inability to articulate words for

21  Martin Shkreli, may impact on the quality of life that he gets

22  to deserve in the years ahead.  Well, despite the tension of

23  this moment, do you know what comforts me?  Two things:  One,

24  we have a fair judge who's going to make sure this case

25  proceeds like any other case, even though Martin Shkreli is

1   sitting in that chair.  The trial of Martin Shkreli under the

2   supervision of Judge Matsumoto, I submit, will be conducted in

3   the same manner in which every criminal case in federal court

4   is conducted, with the same rules, the same instructions, and

5   the same fundamental fairness.  And if you embrace the

6   presumption of innocence that cloaks Martin Shkreli today and

7   if you require the Government to prove his guilt beyond a

8   reasonable doubt, they won't do it.  You will acquit him,

9   despite the number of lies that were just responded or just

10  mentioned in the Government's opening.  You will conclude that

11  he never intended to defraud anyone and you will conclude that

12  no one was defrauded.  Let me say that again:  You will

13  conclude that Martin Shkreli never intended to defraud anyone

14  and that nobody in this case was defrauded.  Martin Shkreli

15  was MSMB and MSMB Healthcare and Martin Shkreli was Retrophin.

16  When you understand the case, not just a broad outline that

17  you were just given, and if you understand who the people are,

18  who the players in this drama are, I think you will recognize

19  that Martin Shkreli is not guilty.  I do not suggest

20  Government misconduct in bringing this case.  I'm not

21  suggesting that the lawyers on this table did anything wrong,

22  but what the Government did is they relied on people who had

23  their own agenda and a map that they just gave you is only as

24  good as the guy who drew the map, and the guy who drew the

25  Government's map that brought us through this point, the guys,

1    are former Retrophin employees, former Retrophin board

2    members, and former investors in Martin Shkreli's funds who

3    made millions of dollars in the final analysis, and who will

4    come in here and grudgingly admit that they are not victims.

5    When you see the investors, not just hear about them -- he

6    didn't mention a single name of a single investor or a single

7    board member, I am going to go through a litany of these

8    people and I am going to explain to you what you're going to

9    see.

10          But what we need is your patience.  That's more

11   important than my words.  You need to be patient.  This is not

12   a movie that ends in two hours, with a beginning, a middle and

13   an end and you leave with a box of popcorn.  This is a long

14   trial.  It could be over in less than six weeks.  I will do

15   everything I can to make that happen and so will the Court.

16   But a trial comes to you in bits and pieces.  You may not

17   understand how important something is until two weeks from

18   now.  So I ask you to wait.  I'd ask you to be patient.  I'd

19   ask you not to make snap judgments because if you make snap

20   judgments, ladies and gentleman, I submit you will conclude

21   after the fact that maybe you convicted an innocent man.  If

22   you wait, you will acquit Martin Shkreli.  You may not like

23   Martin Shkreli and you may have reasons to hate Martin

24   Shkreli, but that is not a basis upon which to convict.  You

25   must have reliable, consistent credible evidence beyond a

1   reasonable doubt when you must vote not guilty.

2           What this case requires is jurors to keep an open

3   mind.  I have heard that in 100 cases and I try and say it to

4   myself, keep an open mind.  Sometimes when you say that, you

5   are afraid if you keep too big an open mind, your brains are

6   going to fall out and no one wants that to happen.  So,

7   respectfully, ladies and gentleman, please, keep an open mind

8   but keep your eye on the ball.  You are savvy New Yorkers.

9   There is no expertise that you require to understand this

10  case.  There is no science.  There's no math.  There is no

11  special knowledge that you need to have to find Martin Shkreli

12  not guilty.  You need street smarts.  You need to be able to

13  understand when a witness testifies whether he or she is

14  telling you the truth or whether they are not telling you the

15  whole truth and nothing but the truth.

16          And you need to pay attention not just to direct

17  examination but to the cross-examination.  And the way it

18  works is a witness will testify and then be cross-examined and

19  then maybe testify on direct and then be cross-examined again.

20  And it is the entire testimony that you use to determine

21  whether they told you the whole truth and nothing but the

22  truth or did we drag the truth out of them.  Not drag it

23  physically, but with words, with questions.  And that's our

24  job.  Our job is to expand the level of knowledge that you

25  need to have before someone can ask you to convict someone.

1   So you need to know not only what happened but why it

2   happened.  And I submit to you if you keep an open mind, you

3   will reject the theory of this case.  If you listen to the

4   Court's instructions at the end of the trial, you will have

5   substantial reasonable doubts about what happened and why it

6   happened, and then you must acquit, even if it's someone like

7   Martin Shkreli.

8           Ladies and gentleman, when the trial is over, and

9   you are permitted to deliberate, before you do, we are going

10  to have final argument and one of the questions I promise to

11  ask you then is what was wrong with this picture which the

12  Government painted of a fraud case.  And the question then is

13  not going to be whether Martin Shkreli is nuts, the question

14  is going to be whether the case is nuts.  Nobody was

15  defrauded.  Nobody lost any money.  The witnesses who are

16  going to come in here are grudgingly going to admit that they

17  made millions of dollars on the advice of Martin Shkreli.

18          Let me stop for a minute and just point out

19  something.  The people at this table are lawyers.  They are

20  advocates, just like me and the people at out table.  They

21  have a privilege, and I'm an officer of the Court.  So it's an

22  important privilege.  When they stand up, they get to say

23  Government.  They get to say the Government offers an exhibit.

24  They get to say the Government calls a witness.  The Court

25  refers to them as the Government.  We refer to them as the

1    Government.  But they are not the Government.  You are the

2    Government.  All of the people in this room are the

3    Government.  Even Martin Shkreli is part of the Government.

4    And before the Government can reach out and snap someone and

5    make them a convicted felon, they have to come before people

6    like you with credible proof beyond a reasonable doubt and

7    convince you that they are right, not just that the defendant

8    on trial is notorious.  They must convince you that they are

9    right.  They must give you proof, not that he is weird.  They

10   must give you proof that he intentionally committed the crimes

11   that he is charged with.  And in this case, they will fail

12   because from the evidence they cannot possibly convict Martin

13   Shkreli.

14            Now, there are two parts of this case, three parts

15   of this case, four parts.  They went through a lot parts of

16   this case.  Maybe right now, it's all a blur.  So let me see

17   if I can break it down for you.  The settlement agreements,

18   the consulting agreements, they will all approved by the

19   Retrophin board of directors, the Retrophin board of directors

20   who are going to come in here and tell you that's not true are

21   going to lie to you.  And when we show them board minutes that

22   they had and got and received that say we are approving these

23   consulting agreements, we are approving these consulting

24   agreements, they're going to be stuck in their lie, and you

25   will then try to understand why are they lying?  What's in it

1  for them to lie?  And you will understand, I promise you, in a

2  -- you can't convict Martin Shkreli of the Retrophin fraud, I

3  submit, charged in Count Seven for two reasons:  One, he was

4  the largest shareholder of Retrophin.  It was his genius,

5  which I will explain in a minute, which made this company an

6  extraordinary success.  Today, worth close to a billion

7  dollars, a billion dollars.

8          And while the Government witnesses threw Martin

9  Shkreli out because he was, quote, an odd duck, close quote,

10  not conforming to their idea of what a CEO of a public company

11  should look like or dress like or talk like, you will see that

12  Martin Shkreli created their wealth, that all of them are

13  still raping the company he formed and that Martin Shkreli was

14  kicked to the ground.  But when Retrophin signed the

15  settlement agreements and consulting agreements, ladies and

16  gentleman, they were represented by one of the biggest law

17  firms in the country.  They paid $10 million to this law firm

18  for the legal advice that got Martin Shkreli indicted.  $10

19  million for legal fees to craft these consulting agreements,

20  to craft these settlement agreements, and the people who got

21  those agreements had their own lawyers on the other end of

22  these agreements.  This isn't Martin Shkreli performing magic.

23  You will reject that theory of the case.

24          If you wait until the end of the case before you

25  decide, you will find Martin Shkreli not guilty.  If you rush

1  to judgment based on what you have heard or what you may have

2  read or what you see on the first or the second day of trial,

3  you may unjustly convict an innocent man.  And if that

4  happens, we all lose, and it is your responsibility to see to

5  it that that doesn't happen.

6        Now, some of the Government witnesses you will see

7  have sort of changed their testimony as the case has evolved.

8  Some of them started with one-story, but then the FBI knocked

9  on their door and suddenly the FBI said we're investigating a

10 fraud and we're investigating Martin Shkreli and we want you

11 to cooperate.  And then these witness had a choice, let me

12 see, should I join team Shkreli or join the team FBI?  Joining

13 team Shkreli comes with a lot of aggravation.  You know that.

14 Everybody knows that, because he is an odd duck.

15       So educate me.  Help me.  I'll come into court and

16 say I'm a victim, but that doesn't happen in a real trial.

17 This isn't Law and Order.  This isn't is a movie, this is a

18 real drama that unfolds before you.  I promise you -- many of

19 you had thoughts about maybe I don't want to serve.  It is

20 going to be a great experience.  It's going to be an

21 interesting trial.  You are going to see up close and personal

22 how it happens.  It's not magic.  When a witness' memory is

23 tested and you conclude that the witness is not telling you

24 the whole truth, you will feel it.  You will not only see and

25 hear it, you will feel it, just like when somebody in your

1   family or in your community or in a business transaction is

2   trying to handle you.  You will see it when these witnesses

3   testify.  I don't want these witnesses on team Shkreli, but

4   I'm not giving them a pass on behalf of Martin Shkreli to let

5   them come in here and say just what they want to say to get

6   by.  If they want to lie, they're going to have to, in a

7   public courtroom, be questioned in front of you, in front of

8   the whole world, and you decide then are they telling the

9   truth, are they worthy of belief, would you rely on them in an

10  important decision in your life, and I would submit to you

11  that you would conclude that you would not.

12          Some of the witnesses, some of the major witnesses

13  in this case, including the board members of Retrophin are

14  twice Martin Shkreli's age, old enough to be his father, very

15  rich men, very, very powerful men, and we will show you

16  exactly how they bullied him, exactly how they manipulated

17  Martin Shkreli, exactly how they frightened Martin Shkreli

18  into eventually taking his company, the company he developed

19  from nothing, just from his genius, into a billion-dollar

20  company.

21          Some of these witnesses will tell you openly that

22  they challenged Martin Shkreli's sexuality.  Whether Martin

23  Shkreli is gay or straight or bisexual is irrelevant.  It is

24  2017.  Get a life, Board of Retrophin.  Martin Shkreli doesn't

25  have to defend his sexuality to you and you can't push him

1    around because of it, not in the United States of America.

2         Bias is important.  What a witness says and how they

3    say it and why they say it is important.  But why they say it

4    sometimes explains that what they're saying is not true,

5    because if they have a bias to embellish or lie, you need to

6    know that.

7         Let me take a moment and explain that we are dealing

8    with a hedge fund in MSMB or MSMB Capital.  We are not dealing

9    with a stock account.  You open a stock account with a

10   brokerage house and it's in your name and you have a right to

11   call them and say buy me 1,000 shares of Google, I want to buy

12   X, and they buy it and they pay it and you know you have a

13   thousand shares of Google.  When you want to sell it, you call

14   them and you execute a sale.  A hedge fund is not that, you

15   will learn from this case.  The people who invested in MSMB

16   are all high rollers.  They are all multimillionaires.  This

17   wasn't open to the public.  You had to certified that you were

18   worth more than a million dollars.  And the people who

19   invested, Al Geller and Darren Blanton.  Names you did not

20   hear from the Government as they opened.  Sarah Hassan.  All

21   of these people are worth tens of millions of dollars.  They

22   play in hedge funds all their lives.  Martin Shkreli didn't

23   defraud them.  Martin Shkreli didn't lie to them.  They were

24   betting on Martin Shkreli's genius.

25         (Continued on next page.)

1            MR. BRAFMAN:  (Continuing)   The limited partner

2    signed agreements.  The hedge fund was a partnership.  Martin

3    Shkreli was the general partner.  They had no right under the

4    terms of the partnership to demand immediate liquification of

5    their position.

6            Wait until they testify.  Martin lied to them when

7    he invested their money in a hedge fund?  The hedge fund

8    documents say, You can lose all of your money, we're investing

9    in risky investments, don't invest in this fund if you can't

10   afford to lose all your money.  And they signed.  And they

11   said, Here, go, Martin, use your genius, make me rich.

12           Many of the people, the Darren Blanton, the Al

13   Geller, the Brent Saunders, names he did not tell you, people

14   who claimed to be victims, have made millions and millions of

15   dollars in the course of their relationship with Martin

16   Shkreli, before MSMB.  They weren't relying on Martin saying

17   anything about these companies.  They were investing in

18   Martin, Martin, Martin, the genius.

19           Al Geller will tell you.  Al Geller invested more

20   than $1 million.  He made 5, 6, 7, $8 million.  He will tell

21   you:  Martin's nuts but he's a genius and I was betting on the

22   genius and it was a good bet.

23           What the Government has ignored is that when these

24   people got their valuations, he ignored completely that

25   Retrophin, even before it became public, had an valuation at

1   $20 million which went to 40 million which went to 80 million,

2   and now it's $800 million.  So, even before it became public,

3   these people were given pieces of Retrophin that had

4   substantial real honest value and everything Martin said and

5   did was proven to be right.

6            These people signed agreements which said, look,

7   this is risky, we're betting on short positions.  A short

8   position -- a broker who let's you bet on a short position is

9   betting that the stock will go down.  What Martin Shkreli did

10  while he was in the hedge fund business, he used his genius

11  and his science to look at health care companies that he

12  didn't think had the potential of becoming successful and when

13  he looked at their drug trials and their information, he bet

14  that the stocks would go down and if you figure out how to do

15  this, you make a lot of money when the stock goes down.

16           So, for years and years and years, Martin Shkreli

17  was giving Darren Blanton and Al Geller and Brent Saunders and

18  all of the people who are the big names in this case short

19  positions in which they made fortunes.

20           When he bet on Orex to go down and Orex did not go

21  down and he lost 2, $2.5 million, you will hear that he

22  immediately called Darren Blanton, one of his biggest

23  investors, who together with his wife Julie had invested in

24  Martin's company.  You know what they said to him?  It's okay,

25  Martin, Jesus is going to save you, go to Retrophin, make us

1    rich with Retrophin.  They're not going to tell him, Oh, my

2    God, you lost the money, I'm calling the SEC.  Darren Blanton

3    was nonplussed.  He's worth $100 million.

4         Martin called him.  He said:  I bet on the Orex

5    trade, it didn't go well.  Darren said:  Retrophin, make us

6    money in Retrophin.

7         Let me tell you why that's important.  Let me tell

8    you why.

9         You know, he said lie, lie, lie.  So let me be

10   candid with you.  Martin is Martin.  So you are going to

11   analyze everything that comes out of his mouth and you're

12   going to find that not every time he said something to a

13   particular investor on a certain date when was he was

14   frantically trying to make the company succeed, not every

15   single thing he said to the investor on that date was

16   100 percent accurate, but he was always truthful to the

17   mission and the mission was make Retrophin a very big success

18   and we will pay everybody the money that they entrusted with

19   me.

20        Nobody lost any money.  Martin didn't lie to anybody

21   to get any money.  They bet on Martin.  And when they come in

22   here and tell you that, Oh, you know, I didn't know he didn't

23   have an asset manager.  You know what we're going to be able

24   to show him?

25        I'll say:  Mr. Geller, when you went up to Retrophin

1   to talk to Martin about your investment, you found Martin

2   walking around in fluffy slippers wearing a stethoscope.  What

3   you said to Martin is, Martin, you're not a doctor, and Martin

4   said, Yes, I know, but I'm comfortable this way and I like

5   working this way.  And you know what you said, Al Geller?

6   Some geniuses are like that.  I'm betting on the genius.  You

7   didn't say, Holy crap, this guy is crazy and a liar and I'm

8   going to run away and I'm going to save my money.  You gave

9   him more money, didn't you, Mr. Geller?  Yes, I gave him more

10  money.  And why did you give him more money when you saw him

11  in fluffy flippers and a stethoscope and thought he was crazy?

12  Because geniuses are sometimes just on the other side of crazy

13  and Martin was the boy genius that I bet on.

14          The horse came in, ladies and gentlemen.  There was

15  no MSMB fraud, none of the investors that the Government

16  refers to as victims were victimized and none of them have

17  lost anything.

18          So, who are they?  They didn't mention a single

19  name.  Let me be up front and personal because we're not shy.

20  If you want to convict Martin, you are going to have to get

21  through me and the other lawyers first because he's no longer

22  the nerd who is battling these powerful people all by himself.

23  Now he's in a public courtroom with a federal judge ensuring

24  him a fair trial and he has lawyers who are going to stand up

25  to the Government.  Good lawyers for both sides.  Buckle up

1   your seatbelts, ladies and gentlemen.  You're in for a good

2   ride.  It's interesting, but you will find it fascinating.

3           You will see how someone who is not guilty of a

4   crime might appear to be guilty when you take a little piece

5   of evidence on a specific date and you say, oh, my God, that's

6   not 100 percent accurate, but if you wait, you will see that

7   it is.

8           All of the investors in this fund, first of all, fit

9   the following classification.  They all had to be rich to be

10  able to invest.  They have to sign a subscription agreement

11  that said they were worth millions of dollars so they could

12  not buy in.  This was not open to the public.  They were not

13  being asked to invest rent money and they had to verify in

14  writing that they could sustain a total loss.  Okay?  Four

15  things:  Rich, know that they are risky investments, two,

16  delegate Martin as the general partner to make decisions for

17  you and your money and as a limited partner, you've got to

18  grin and bear it and you've got to verify that you can lose

19  all of your money, all of your money and that's part of the

20  gamble.

21          None of these investors end up losing, but the

22  Government is going to say, well, if on Thursday they said

23  something, Martin said something which wasn't true, then they

24  must have been defrauded.  Wait until you see the whole story.

25          All of these investors are high rollers.  A high

1  roller is someone who is ready to gamble because they're not

2  gambling with rent money or food money or education money.

3  They have so much money, they don't know what to do with it.

4         So, they look for risky investments.  You know why?

5  Because when you invest on a risky investment, you can hit a

6  home run.  They all hit Retrophin home runs here.  Some had

7  doubles and triples and some had home runs.  Al Geller had a

8  grand slam.  Sarah Hassan had a home run.  Darren Blanton hit

9  a home run.

10        Martin Shkreli is in here charged with defrauding

11  them and he's fighting for his life.

12        Let me read a couple of names that you'll hear about

13  in the court room and give you some numbers just to give you

14  an understanding of why they're so wrong.

15        Lindsay Rosenwald who may be one of the first

16  witnesses invested $100,000.  He made back over $400,000 and

17  substantially more if we figure out how much he sold all of

18  his Retrophin shares for.

19        Sarah Hassan, the first witness, I think, tomorrow

20  morning, a very young woman who basically inherited a hedge

21  fund from her daddy because her father is Fred Hassan, one of

22  the richest men in the pharmaceutical industry, and right

23  after getting out of college, he gave her $10 million.  Here,

24  play with this.

25        She didn't invest with Martin Shkreli because Martin

CMH      OCR      RMR      CRR      FCRR

1   Shkreli seduced her into investing.  Brent Saunders, who is

2   her father's right-hand man and who has worked for him for 10,

3   15, 20 years, made a lot of money with Martin Shkreli.  He's

4   the one who introduced Martin Shkreli to Sarah Hassan.  Sarah

5   Hassan didn't invest with Martin Shkreli because of anything

6   Martin said to her and if she comes in here and tries to

7   change her tune, it's not going to sound right because it's

8   not true.

9           Al Geller, Al Geller made a fortune with Martin

10  Shkreli.  Al Geller is going to tell you it was Martin's

11  craziness that he loved.  It was this wild ride that gave him

12  the adrenaline rush when he put money into Martin Shkreli's

13  hand.

14          Darren Blanton and his wife Julie who you will see

15  is somewhere on the dysfunctional spectrum themselves, they

16  tried to adopt Martin Shkreli, not literally, but

17  figuratively.  They were giving him religious advice.  They

18  were buying him stupid presents.  And he was making them a lot

19  of money.

20          These people don't look at Martin Shkreli as a

21  thief.  These people made a lot of money with Martin Shkreli.

22          So, Alan Geller invested $1 million.  When came out

23  with several million dollars including, including 800,000

24  shares of Retrophin that Martin gave him because Al Geller put

25  in another $200,000 after the $1 million because Retrophin

1    needed the money when it was going public.

2         Sarah Hassan is a young woman.  Nice woman.  Maybe

3    she's, I don't know, 25 years old when she meets Martin

4    Shkreli.  She gets introduced to him by her father's powerful

5    CEO, right-hand man, who is a brilliant executive in the

6    pharmaceutical industry and he says to her, Martin Shkreli is

7    a health care genius, I want you to meet him.  She's looking

8    for ideas for her own fund set up with family money.  The

9    family gives her $10 million.  She's right out of school.  She

10   graduates in May.  In July, she's got $10 million to play with

11   but she doesn't know what to do with it.

12        So, her father's right-hand man, a family friend who

13   she knew her whole life, Brent Saunders, tells her, I want you

14   to meet Martin Shkreli, I made a fortune with Martin Shkreli,

15   I want you to meet him.  He meets her for dinner and he gives

16   her books and they correspond and they e-mail and they text.

17   For years, she's enamored with Martin Shkreli until one day,

18   the FBI shows up.

19        Sarah will tell you that she carefully reviewed the

20   materials with her own lawyer, a lawyer from a major law firm

21   in New York that Martin wasn't paying.  She's a very rich

22   girl.  She hired a powerful law firm to vet these documents,

23   as she says, to look for red flags.  They advised her and she

24   will tell you that they didn't say it's a bad investment.

25   They said it's risky.  She said, I know it's risky, that's

1  what hedge funds do.  They invest money at risk and sometimes

2  you win and sometimes you lose.  Neither Sarah Hassan or her

3  father are victims.

4          Darren Blanton, another name you did not hear in the

5  government's introduction, opening statement.  So let me tell

6  you the Darren Blanton story because it's very important and

7  it's really part of the case.

8          Darren Blanton befriended Martin Shkreli and he

9  realized he was a genius and Darren Blanton had a family

10  friend and the young boy was suffering from muscular

11  dystrophy.  Some of the kids like you see, God forbid, on the

12  Jerry telethon, Labor Day telethon who are trapped in their

13  bodies in this terrible disease.

14          Josh Frase is the little boy and he dies.  Darren

15  Blanton tells him about it and it suddenly occurs to Martin,

16  I'm using my genius to work in hedge funds, let me take my God

17  given gift, which you will see is real, and use it for

18  science.  Let me find the cure for some of these diseases that

19  big pharmaceutical companies ignore.

20          Martin is motivated by Blanton and Blanton will tell

21  you this and he changes the whole focus of his life.  He's

22  going to find a cure for myotubular dystrophy, the one protein

23  that children with this disease don't have that makes them

24  unable to survive past a young age or unable to walk or unable

25  to live a normal life.

1          Martin knows's been blessed with the crazy gift but

2     up to this point, he's been using it in the stock market.

3          At 16 or 17, Martin was an intern for Jim Cramer of

4     MSNBC, the Mad Money man who runs around his movie set, his

5     television set banging horns and tweeting things and a little

6     bit *meshuga*, a little bit crazy, he's like Martin.  He's a

7     genius but maybe a little bit on the curve himself.  Martin

8     talks himself into an internship.  He works there.  He's

9     enthralled with the market, he likes the math, but now Darren

10    Blanton introduces him to science.

11         You know why this is important?  Because there's

12    something called an orphan drug.  An orphan drug is a drug

13    that only treats a small population.  An orphan drug is a drug

14    that the big pharmaceutical companies really don't want to

15    spend hundreds of millions of dollars researching.  You know

16    why?  Because it only meets the needs of a small group of

17    people who suffer from the disease.

18         In the whole world, there are approximately 60,000

19    people who suffer from muscular dystrophy.  If you're a big

20    pharmaceutical house like Pfizer or one of the big companies,

21    you want to make Lipitor.  Lipitor people take every day for

22    the rest of their lives.  Billions of people use it.  You want

23    to make metformin.  You want to make drugs that billions

24    around the world need for the rest of their life.  You don't

25    want to make a little bit of medicine that only affects a

1   certain number of people.

2          So, under the Orphan Drug Act, there are certain

3   incentives for companies to research these drugs and that's

4   what Martin started to do.  He's looking at drugs which

5   haven't been researched, that hadn't been patented, and to his

6   credit, he figures it out.  He's a self-educated scientist:

7   Chemistry, biology, organic chemistry.  Self-taught.  Sleeping

8   in his office year after year in a sleeping bag or on his

9   sister's couch or in his parent's home, not at the

10  Ritz-Carlton where Blanton and Geller and the Hassans stay.

11  In an office on a sleeping bag working seven days a week to

12  figure out the mystery of myotubular dystrophy.

13         He comes up with this brilliant idea of how to

14  manufacture the missing protein and he gets investors and they

15  develop Retrophin into a new company.  Retrophin now is a

16  public company.  You can trade it on the market.  You can call

17  up a broker and say, I want to buy a thousand shares of

18  Retrophin, and it's trading millions of shares freely.

19         Martin did that.  He made that company.  Today,

20  there's a board of directors without Martin, there's a CEO

21  without Martin, but they would have nothing without Martin

22  Shkreli.  As soon as they realized what they had, they threw

23  him out.  As soon as realized how valuable this company was,

24  they discarded him.  You know why?  You'll see from the e-mail

25  traffic.  Because Martin Shkreli embarrassed them.

1          Martin Shkreli did not fit the image of a corporate

2   CEO.  Martin Shkreli came to work in T-shirts and sneakers and

3   wore a stethoscope and bunny slippers and they couldn't handle

4   it.  Very powerful men, with 50, 60 years of experience, 50,

5   60 years of age, took the company and the Retrophin board, a

6   bunch of thugs.  These people are liars and they took his

7   company.

8          When they come in here and said, "I never approved

9   the settlement agreement," you will squirm because watching

10  somebody commit perjury, I submit, is very uncomfortable when

11  you're an honest person.  In this case, that's what's going to

12  happen because in order for the Government to survive this

13  case and prove this case beyond a reasonable doubt, the

14  Retrophin board of directors have to come in and say, "I never

15  approved the settlement agreement, I would never have approved

16  the settlement agreement."  It's just not true.

17         You'll see the board minutes where the settlement

18  agreements were preserved and mentioned and they were

19  approved.  You will see the lawyers who signed the settlement

20  agreements, their names, and you will understand that the

21  people who got the settlement agreements, wanted them, felt

22  they were entitled to them.

23         Martin, rather than telling them, to his

24  credit -- and this is something you need to understand.

25  Martin Shkreli, when he lost all of the Orex money, could have

1    closed MSMB and MSMB Healthcare and said, I tried, investors,

2    I didn't hit a home run this time, I hope you forgive me but

3    that's the big leagues, you jumped into the pool and you knew

4    that you might get wet, you got wet, and I'm really sorry and

5    I'll go on with my life.  You can't even sue him because he

6    had a right to invest in the Orex trade and he lost the money

7    and when you're in the stock market, sometimes you win and

8    sometimes you lose.

9              So, Al Geller and Darren Blanton are major, major

10   players.

11             Al Geller is retired oil trader, fabulously wealthy.

12   He will tell you that Martin is a genius, that he is betting

13   that Martin is a little flaky but will one day make a company

14   and me a billion dollars.  He was right.  He was right.

15             Darren Blanton.  Darren Blanton is a very wealthy

16   man.  He runs a money industry.  He and his wife are

17   fabulously wealthy.  They invested with Martin because that's

18   what they do.  They put their money to work to see if they can

19   win.

20             Now, you know, some of the people here want Martin

21   to blow up, to self-destruct, and they've tried so hard,

22   they've sort of wrapped him in oil soaked rags hoping someone

23   will throw a match at him.  Well, he didn't blow up and he

24   didn't plead guilty and he didn't run away.  He's here and he

25   wants his day in court and if you give him his day in court,

1    you are going to see you have to find him not guilty.

2         So, when you listen to Al Geller and Darren Blanton

3    and the Sarah Hassan and the Fred Hassan and Steven Aselage

4    who is now running Retrophin and came there when Martin was

5    there, Martin hired him, and Aselage managed to arrange for

6    Martin to be thrown to the curb.

7         Now Aselage is the CEO, making millions of dollars a

8    year, moved the company from Third Avenue in Manhattan to San

9    Diego because that's where Aselage lives, and Martin could go

10   to hell as far as Aselage cares.  He's not going to go to

11   hell.  He's going to go to this courtroom.  Aselage, if he has

12   the guts, is going to come into this courtroom and he's going

13   to testify and if he testifies, you are going to have to

14   understand who he is, what he is, and when you see what he has

15   told you, you'll understand what his motive is.

16        Steve Richardson, he's one of the witnesses I can't

17   figure out.  Steve Richardson is a very wealthy man and he

18   befriended Martin Shkreli, really befriended him.  What his

19   motive was, I don't know.  You will conclude.  I'm not going

20   to accuse him.  You will see the e-mail traffic and you'll

21   decide did he want Martin Shkreli, did he want Martin Shkreli

22   or did he want Martin Shkreli to make money.  You'll see his

23   testimony at the end of the day hurts Martin Shkreli or

24   exonerates Martin Shkreli.

25        When you see these board members, they were flying

1   around.  Every Tuesday or Thursday, Steve Richardson was

2   flying to Mykonos or some island and Martin Shkreli was like a

3   hermit in his office creating the gene patterns, the gene

4   patents, the DNA sequencing for this wonderful drug that is

5   extraordinary and these board members were flying around and

6   now they come in here and say, Oh, by the way, while we were

7   asleep at the switch and while we weren't paying attention and

8   while we were not acting as a fiduciary board member as

9   required to act when you're a member of the board of

10  directors, Martin stole our company.  Well, that's not true

11  and those are not the facts and you'll ultimately conclude

12  that.

13          You will find Steve Aselage not just to be

14  untruthful, you will find him to be a bully, a mean-spirited

15  bully and when you're a mean-spirited bully and a tough guy

16  and Martin Shkreli is on the other end alone, the bully and

17  the tough guy generally win.

18          So, when Steve Aselage comes into this court -- I

19  hope he shows up.  No one has told us yet whether he's

20  definitely going to be a witness.  I hope he shows up because

21  he is the person who I think implodes the government's case.

22  You will see what the motive was here, you will see it and you

23  will hear it and I think you will actually sense it.

24          Please understand, they make believe like MSMB and

25  MSMB Healthcare and Retrophin were big three separate

1    entities.   They were technically three separate entities but

2    they were Martin Shkreli.   There's no MSMB and there's no MSMB

3    Healthcare and there's no Retrophin without Martin Shkreli.

4    And Retrophin, Martin Shkreli was the largest shareholder, not

5    just the inventor of the protein.   He was the single largest

6    shareholder.

7            The shares that some of these investors got to pay

8    them back for the unraveling of MSMB when he didn't have to

9    pay them back, many of his, much of this came from his own

10   shares.   This was a lot of his own money.   And when Retrophin

11   approved these settlement agreements, they had a choice:

12   Should we let these settlement agreements be paid or are we

13   going to have lawsuits by these crybabies that will undermine

14   the effectiveness of a public company when it's first going

15   public.

16           (Continued on next page.)

17

18

19

20

21

22

23

24

25

1    (Continuing)

2         MR. BRAFMAN:  There is no fraud in Counts One

3    through Six.

4         And on Counts Seven and Eight, Mr. Shkreli paid a

5    big law firm in New York $10 million in legal fees.  And you

6    will see during this trial that the $10 million included the

7    drafting of the settlement agreements.

8         Frauds?  These settlement agreements went from one

9    big law firm to another big law firm, being edited not just by

10   Evan Greebel but by ten lawyers at Katten, the firm he worked

11   with.  And on the other side, it was Steve Richardson's

12   lawyers and Blanton's lawyers.

13        You know, I said something before and it just passed

14   through quickly, but I want you to understand it.  And

15   everybody has private time, I hope.  I hope you have private

16   time, when you're either taking a shower or you're just about

17   to go to sleep and you can't sleep and you're just laying in

18   bed.  You're allowed to think about the case; you can't talk

19   about the case, but you're allowed to think about the case.

20        And I want you to think about teaching yourself

21   chemistry alone, teaching yourself biology alone, teaching

22   yourself organic chemistry alone, teaching yourself

23   microbiology alone.  Reading hundreds and hundreds and

24   hundreds of academic studies and papers and understanding what

25   the message is to -- what the sequence is of this DNA, why is

 1   there gene therapy that isn't being produced, why is there not

 2   fixes to these terrible diseases.

 3          Ladies and gentlemen, I didn't want to keep you, so

 4   I'm going to walk through a couple of areas quickly and I'm

 5   going to try not to be -- I'm trying not to be repetitive.

 6          The settlement agreements and the consulting

 7   agreements were not frauds.  You can't explain that in this

 8   case.  They were approved by the board of directors.  And the

 9   people on the board who approved them are among the

10   Government's witnesses.  And when they come in here and they

11   say I didn't see these boards minutes, I was on the call and I

12   was taking notes and I know lawyers were on the call, but I

13   don't want to tell you I approved it.

14          Because if they approved a settlement agreement or a

15   consulting agreement that was incorrect or illegal, they are

16   sitting next to Martin Shkreli.  So, they have to suggest, Oh,

17   man, he snuck this by.  These agreements were blessed by them.

18          You know, there's a saying in the criminal justice

19   system that the word "maybe" doesn't cut it in the criminal

20   case.  You can't convict someone on "maybes," you need to be

21   proof beyond a reasonable doubt.

22          Maybe some investors, now with revisionist history,

23   are going to tell you they were misled by Martin Shkreli;

24   maybe they weren't.  Maybe some investors didn't care what

25   Martin said because they will tell you they were a hundred

1   percent investing in Martin's genius, not his prior

2   experience.

3           Maybe some investors really believe they were

4   cheated, but in truth they were not.  Maybe some investors

5   will acknowledge that they have been substantially enriched as

6   a result of their interaction with Martin.

7           Maybe MSMB's loss was the result of a huge

8   completely legal stock market bet.  That is not criminal, a

9   risk agreed to by every investor.

10          Maybe when Martin gave out evaluations that included

11  the valuation of Retrophin they didn't understand that.  They

12  thought, Oh, my God, I got $1,600 sitting in this account, I

13  want it.  That's not how a hedge fund works.  A hedge fund

14  manager doesn't have to call you and say I'm buying Orex.  The

15  subscription agreement, partnership agreement, gives him the

16  discretion.  And you hope that he wins, but nobody in the

17  stock market always within.

18          Maybe some investors first got their shares of

19  Retrophin that said "restricted," they didn't understand the

20  value of what Martin was giving them.  And maybe there should

21  have been a covering letter that said that these shares are

22  real, they are valued at X, and they will have the restricted

23  legend removed, please be patient.

24          Maybe he doesn't have people skills that would have

25  avoided this case.  Maybe he's just nuts.  But that doesn't

1   make you guilty.  I'm not suggesting that he's legally insane

2   so that you should acquit him and I'm not suggesting that you

3   acquit him because you feel sorry for him.  No.  But you can't

4   convict him because the people skills he lacked suggested to

5   someone else that they didn't understand what they were being

6   given.

7           Maybe a handful of members from the Retrophin board

8   will grudgingly admit it and exonerate Martin Shkreli.

9           "Maybe" it's not sufficient, period.  They need

10  prove beyond a reasonable doubt.

11          You know, there's a saying I grew up with that you

12  can't force a square peg into a round hole.  We all heard

13  that, right, from a mother, from a grandmother?  You can't

14  force a square peg into a round hole.

15          You know, you can.  You can shave off each corner

16  and then you can force that formerly square peg into a round

17  hole.  But then it's not a square peg anymore.

18          And you can come in here and you can testify and I

19  can shave off the parts of the testimony that you were given

20  so it's no longer the truth, and then you can say, Well, you

21  know, I was relying on different facts.  And maybe they're

22  going to give you alternate facts.  Well, maybe alternate

23  facts work in politics, but alternate facts doesn't work in

24  the criminal justice system.

25          Ladies and gentlemen, our job through this trial, as

1   as Mr. Shkreli's lawyers, is to expose as much facts as

2   possible, not to hide facts.  To give color.

3          During the lean years when Martin was consumed with

4   finding a cure for this disease that took Martin's life,

5   nobody was working with him in that cramped office when he was

6   sleeping on the floor.  It was a mad scientist at work.

7          You want to call him names, call him names.  Just

8   don't call him guilty.  Because he's not guilty.

9          I submit to you that if you feel that there is some

10  passion in this is opening statement, I want you to share it

11  at the end of the trial once you hear the evidence.  And when

12  you stand up and you say Martin Shkreli is not guilty, I want

13  you to be proud of that verdict.  I don't want you to be

14  afraid to acquit Martin Shkreli and have to defend that to

15  your neighbors.  He's not on trial for all of the other stuff

16  that makes him a household name, he's on trial for these

17  crimes.  And he did not commit them, you will conclude, based

18  on the evidence.

19         You know you're not allowed to talk to each other

20  about the case until the case is given to you by

21  Judge Matsumoto, and she will give you legal instructions.  Me

22  and the other lawyers in this case can't talk to you again

23  directly until the end of the case when we come to you in

24  final argument.  And a lot is going to happen during that

25  period and a lot is going to happen where we're talking to

1   witnesses and their witnesses are answering us.  And we're

2   really talking to you.  The only reason we're asking these

3   questions is to inform you, not the witness or us.  We're not

4   doing it for practice.  So, when we question these witnesses,

5   although we're not talking directly to you, that's what's

6   going on.

7          When you go into the jury room when this trial

8   starts or in two weeks, look at each other.  You can't talk

9   about the case, but if you look at each other you will see

10  what we see, all of us:  You will see that among you is a

11  group of people as different as you can possibly imagine;

12  different races, different educational backgrounds, different

13  jobs, different cultural heritage, different ages.  Look at

14  each other.  You're all different.

15         You know what makes you the same?  Two things.

16         One, you promised that you would be fair.  Hundreds

17  of people were excused; they had vacations, they could not be

18  fair, whatever the reason.  You did not ask to be excused.

19  You said you could serve.

20         And you also said despite what I may have read or

21  heard, and I won't let it affect me, I will be fair.  We

22  looked you in the eye and you gave us your word.  And Martin

23  is betting his life on it and I'm calling you on it.  That's

24  all we want:  An honest verdict, ladies and gentlemen.

25         You're sitting here today because all of the

LAM      OCR      RPR

1   lawyers, on both sides, and the Court accepted your words.

2   So, we're not asking for sympathy, but we are insisting on

3   fairness.  We're not trying this case or Facebook or Twitter

4   or any aspect of social media.  This is as serious as life

5   gets.  This is not a game.  We are trying this case in the

6   courtroom.  If you or someone you loved were in Martin's seat

7   today, you would want people who promised to be fair.  You

8   would want honest citizens from a cross-section of the Eastern

9   District of New York to be honest and fair and truthful.

10          That's all we ask.  No games.  Just accept the

11  evidence that I think you will see.

12          I'm done, so I'm going to end maybe the way I

13  started.  I thank you for listening.  I thank you for the

14  ordeal of coming up and going down and waiting and waiting and

15  waiting.  We can't do this without you.

16          I don't mean this in a disrespectful fashion:

17  Judge Matsumoto is in charge, but even the judge has to have

18  you before a trial can be taking place.  The lawyers can show

19  up, the judge can be here, we all do our jobs hopefully well,

20  but without you the system doesn't work.  And as someone who

21  believes in the integrity of the system and has spent his life

22  in this system, thank you for showing up.  Thank you for

23  working.  You will have the final words in this case, and the

24  final words, I submit, are going to be "not guilty."

25          A trial is awkward and it's difficult and it is in

1  many ways an inconvenience.  But we could not change this

2  system and get anything better.  And anyone who has tried has

3  come up short.  This is how it's done in America:  A person

4  accused enters a plea of not guilty, and then he or she has

5  the right to a jury like you, not exactly the same as Martin

6  Shkreli.  None of you are like him.  That's not what's

7  required.  But all of you are fellow citizens and your job is

8  to care about serving justice.

9        You know, I finish this case the way I started, and

10  I'm not embarrassed to do it because I think it's appropriate.

11  So, I'm not going to quote from a law book and I'm not going

12  to quote from a legal scholar or a judge or a lawyer.  I'm

13  going to again quote from my friend Lady Gaga because her

14  latest song is A Hundred Million Reasons, right?  Some of you

15  may hear it blasting from your kid's room.

16        So, the Government is going to stand up and give you

17  a hundred reasons to convict Martin Shkreli.  You need one

18  good reason to acquit him.  That's her song:  I got a hundred

19  million reasons to leave.  Give me one good reason to stay.

20        I'm going to listen to their hundred reasons for you

21  to convict Mr. Shkreli and I'm going to give you one good

22  reason to find him not guilty:  Because he's not guilty.  And

23  because they won't prove their case beyond a reasonable doubt,

24  then the law requires you to find even Martin Shkreli not

25  guilty.

Proceedings                                                899

1          Hundred million reasons?  I got one:  He didn't

2   intend to defraud, he's not guilty under the law, and when the

3   trial is over and you listen to her Honor, you will understand

4   why your only verdict should be a verdict of not guilty.

5          Thank you very much.

6          THE COURT:  Ladies and gentlemen, at this time we're

7   going to excuse you for the evening.  Please do not look at

8   media, do not talk about the case.  As I instructed you, the

9   most you can say to your loved ones is you've been selected to

10  serve on a trial in Brooklyn Federal Court and you are not to

11  discuss the case.

12         I thank you for your attention and your service.  We

13  will excuse you for the day.  Please return to the courthouse

14  no later than 9 a.m. tomorrow.  Please check in at the second

15  floor jury room.  When you are all here, we will start.

16         Thank you for your ongoing attention and for your

17  service.

18         (Jury exits.)

19         THE COURT:  Thank you.  We will see you tomorrow

20  morning at 9 o'clock.

21         (Matter adjourned until June 29, 2017, at 9 o'clock

22  a.m.)

23

24

25