900

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
       - - - - - - - - - - - - - X
 3
       UNITED STATES OF AMERICA,      : 15-CR-637(KAM)
 4                                    :
                                      :
 5                                    :
            -against-                 : United States Courthouse
 6                                    : Brooklyn, New York
                                      :
 7                                    :
                                      : Thursday, June 29, 2017
 8     MARTIN SHKRELI,                : 9:00 a.m.
                                      :
 9            Defendant.              :
                                      :
10     - - - - - - - - - - - - - X
11                         TRANSCRIPT OF TRIAL
                  BEFORE THE HONORABLE KIYO A. MATSUMOTO
12            UNITED STATES DISTRICT COURT JUDGE, and a jury.
13                       A P P E A R A N C E S :
14     For the Government: BRIDGET M. ROHDE, ESQ.
                           Acting United States Attorney
15                         Eastern District of New York
                           271 Cadman Plaza East
16                         Brooklyn, New York 11201
                      BY:  JACQUELYN KASULIS, AUSA
17                         ALIXANDRA E. SMITH, AUSA
                           KARTHIK SRINIVASAN, AUSA
18
       For the Defendant:  BRAFMAN & ASSOCIATES, P.C.
19                         767 Third Avenue
                           New York, New York 10017
20                    BY:  BENJAMIN BRAFMAN, ESQ.
                           MARC AGNIFILO, ESQ.
21                         ANDREA ZELLAN, ESQ.
                           JACOB KAPLAN, ESQ.
22
       Court Reporter:  Michele D. Lucchese, RPR
23                      Official Court Reporter
                        E-mail:  MLuccheseEDNY@gmail.com
24
       Proceedings recorded by computerized stenography.  Transcript
25     produced by Computer-aided Transcription.
```

1          (In open court; outside the presence of the jury.)

2          THE COURT:  This is the trial of the United States

3  of America versus Martin Shkreli, 15-CR-63.  Will the parties

4  state their appearances, please.

5          MS. KASULIS:  Yes, your Honor.  Jacqueline Kasulis,

6  Alixandra Smith, Karthik Srinivasan, FBI Special Agents

7  Michael Braconi and Sean Sweeney, and our paralegal, Gabriela

8  Balbin, has stepped out momentarily.

9          THE COURT:  Thank you.

10          MR. BRAFMAN:  Good morning, Your Honor.  Benjamin

11  Brafman, Marc Agnifilo, Jacob Kaplan, Andrea Zellan, and Teny

12  Geragos, who is no longer pending admission.

13          THE COURT:  Welcome.  What would you like to raise

14  with us?

15          MR. KAPLAN:  One of the Government's first witnesses

16  will be Steven Stich, who will be testifying about the Orex

17  trade with Merrill Lynch.  As part of his testimony, I

18  believe, based on 3500 material, they will try to elicit

19  certain misrepresentations that Mr. Shkreli may have made to

20  Mr. Stich.  Some of them pertain to assets under management,

21  which will be reflected throughout the whole case.  But some

22  of the misrepresentations that they want to focus on deal

23  exclusively with the Orex trade, how the trade took place,

24  lies about whether or not he had stock located to cover the

25  short, and possibly any lies he may have said after, once the

1    trade went through.

2           It is our position that those misrepresentations,

3    one, are not relevant to the case at hand.  The only relevance

4    of the Orex trade is possibly the misstatements about assets

5    under management and whether or not he told his potential

6    investors about the Orex loss.  What he actually told Merrill

7    Lynch as part of the trade has no relevance on the issues of

8    the investor relationship to MSMB Capital or Healthcare or

9    Retrophin.  The only thing it does is it creates the

10   impression that Martin Shkreli just lies about everything.

11   There is no probative value, but there is highly prejudicial

12   value, that they are going to think there's a propensity that

13   when he had an issue with Merrill Lynch -- and, once again,

14   the fact of the trade is relevant.  How the trade actually

15   went through, I don't believe is relevant.  And at the end of

16   the day, it just serves to give propensity evidence to the

17   jury.

18           THE COURT:  Thank you.

19           I will hear from the Government.

20           MS. SMITH:  Your Honor, just to walk you through a

21   little bit in detail so you have some context.  There is also

22   the 3500 for Steven Stich includes this information.  So to

23   the extent that Your Honor wants more background information,

24   that is a good place to look.

25           But the Orex trade, which happened on February 1st,

1   which is the trade that resulted in the loss of all of the

2   investors' assets in MSMB Capital, it happened because the

3   defendant was betting that Orex would go down, obviously was

4   shorting Orex.  And Orex was a difficult to locate stock.  So

5   unlike Apple, where there's lots of it around.  Orex was a

6   very small company and there wasn't a lot of stock around.

7   And part of the witness' story is that -- has to do with why

8   he called the defendant during the day and the reason he

9   called the defendant was because he noticed that the defendant

10   was doing a very high volume of a stock that was very

11   difficult to locate and he was concerned about the ability for

12   the trade to go through.  So when he saw that, he called and

13   spoke to the defendant and asked the defendant if he had what

14   they call a locate on the stock; basically, had the defendant

15   gone out and looked to see whether there was enough stock for

16   him to actually cover the trades that he was making.

17          And the other thing that the witness noticed was

18   that the defendant was making many, many small purchases.  So

19   it wasn't one large purchase but it was lots and lots of

20   purchases of this stock over the course of the day.  They

21   called the defendant.  They discussed this.  The defendant

22   said that he did have a locate on the stock, and so Merrill

23   Lynch allowed the trading to continue.  At the end of the day,

24   there is this massive loss, and there is obviously additional

25   testimony about it.

1          The defendant has lied about the fact that he had a

2    locate.  It's actually very important to the witness's

3    testimony because without understanding how the trade was

4    happening and why he called the defendant and why he didn't

5    stop the defendant's trading, you can't really understand what

6    happened at the end of the day.  So the lie is not for the

7    truth of the matter, obviously, because it wasn't a truthful

8    statement.  It is very necessary to the narrative.

9          It is also important because at least one witness is

10   going to say that Mr. Shkreli described what happened with the

11   Orex trade as what they call a fat finger, which is when you

12   are trading and all of a sudden you put in one trade for like

13   a bajillion shares when you really meant to put in a trade for

14   a smaller number of shares.  So Mr. Shkreli described the Orex

15   trade to this witness as oh, I screwed up, I put in a huge

16   trade, and I couldn't cover it, and it was just a mistake,

17   when, in fact, he had put in many, many tiny trades over the

18   day because he was actually trading with a deliberate

19   strategy.  He thought he would work his way out of the trade

20   and that wasn't true.  But it wasn't a mistake.  He

21   deliberately purchased those shares in that manner over the

22   course of a day.

23          So it is very important for us to establish not only

24   that the Orex trade happened in the way that it did and the

25   witness' testimony is incomplete without that additional

1    conversation, but also to establish that it wasn't some sort

2    of giant accident, in the sense that it was deliberate

3    trading.  I'm not saying necessarily that Mr. Shkreli intended

4    to lose all of the money that he did, but the trading and the

5    manner in which he did it was deliberate, it wasn't a fat

6    finger accident.

7              So for both of those reasons that testimony is

8    actually important.  To the extent the defense would like a

9    limiting instruction that that particular lie is not to an

10   investor or doesn't go to materiality of Counts One to Six,

11   the material misrepresentations that were made to investors,

12   you know, that this lie to Merrill Lynch isn't one of those

13   misrepresentations, we are fine with a limiting instruction.

14   But the witness needs to be able to provide that information

15   to give the context and then also, you know, so that when the

16   witness later on testifies that Mr. Shkreli told him it was a

17   fat finger mistake it will be clear that that is not, in fact,

18   true.  So that was a lie to an investor.  We can't establish

19   that second lie to the investor without establishing the

20   sequence of events that led up to the trade itself.

21             MR. KAPLAN:  Judge, if I may respond.

22             THE COURT:  Yes.

23             MR. KAPLAN:  So the two reasons why they said they

24   would need that information, one is because it would explain

25   why Merrill Lynch didn't stop the trade.  That's not relevant,

1   why they didn't stop the trade.  The only real relevance is

2   that the trade happened and that he lost money and that he

3   didn't tell the investors about their money.  No one is

4   blaming Merrill Lynch for the fact that this trade went

5   through.  It's simply the fact that at the end of the day the

6   trade happened.  How specifically it happened, the fact that

7   he said he had a locate and didn't have a locate is not

8   relevant.

9           Going to the second point about the fat finger

10  mistake, I have no problem with them eliciting evidence that

11  there were a number of tiny trades.  Mr. Stich can talk about

12  the 1,000 trades that went through which clearly showed it's

13  not affecting their mistake.  They're not going to be

14  precluded from arguing that simply because he doesn't say Mr.

15  Shkreli advised me about a locater.  They can still get that

16  information in in a way that's not prejudicial and showing

17  propensity against Mr. Shkreli.

18          THE COURT:  All right.  Ms. Smith.

19          MS. SMITH:  The statement that he had a locate shows

20  that this was a very deliberate pattern of trading.  I know

21  there is a statement that Merrill Lynch won't be blamed for

22  the trade, but that has been kind of in the defendant's

23  statements to people all along, that this was an accident.  It

24  was described at various points in that way.  So it is

25  important for establishing the deliberate nature of the trade

1   and his knowledge of the deliberate nature of the trade.

2   THE COURT:  All right.  I think that to the extent

3   that the jury would be instructed that the statements that Mr.

4   Shkreli made to Merrill Lynch were not statements to an

5   investor and are not charged in Counts One Through Six but are

6   relevant to understanding what was mentioned during open about

7   this huge loss of Orex and the subsequent negotiations and

8   discussions with Merrill Lynch is relevant to the background

9   of Mr. Shkreli's alleged conduct vis-à-vis his investors

10  thereafter.  So I think that evidence is necessary for the

11  jurors' understanding.  There are a series of very complex

12  financial transactions.  I think what you are proposing is

13  just he testify that Merrill Lynch sustained a loss in X

14  amount and then move forward, but I think that it is important

15  to understand the genesis of that.

16  I am happy to consider mutually agreeable language

17  or instructions to the jury if you and counsel for the

18  Government want to talk about that and how we might want to

19  instruct the jury and I can do that before or at some point

20  during or after this witness testifies.

21  MR. KAPLAN:  Thank you, Your Honor.

22  THE COURT:  Do you want to talk about that for just

23  take a few minutes before we bring the jury up?

24  MS. SMITH:  Yes.  I don't believe this witness is

25  going to go on before lunch.  We can discuss and make sure we

908

1   have it to you before he testifies.

2            THE COURT:  Good.

3            MR. KAPLAN:  Thank you.

4            THE COURT:  Let me see how the jury is doing down

5   there.  Hopefully we have everybody.

6            (Pause.)

7            THE COURT:  We are missing six jurors so far, so we

8   have to wait.

9            THE COURT:  Who is the first witness?

10           MS. KASULIS:  Sarah Hassan.

11           THE COURT:  Is there a list?  Do you have a lineup

12   for me?

13           MS. KASULIS:  For today?

14           THE COURT:  Yes.

15           MS. KASULIS:  Yes, we can provide that, Your Honor.

16           THE COURT:  The jurors are all here, so they are

17   going to be bringing them all in momentarily.

18           (Pause.)

19           (Jury enters the courtroom.)

20           THE COURT:  All jurors may be seated.  It looks like

21   we are missing somebody.

22           You all can be seated.  Thank you.

23           (Pause.)

24           THE COURT:  All right.  All jurors are present.

25           Thank you very much, ladies and gentlemen of the

1  jury.  Please have a seat.  Good morning, and we are about to

2  hear from some witnesses.

3            Is the Government prepared to call its first

4  witness?

5            MS. KASULIS:  Yes, your Honor.  Shall I call our

6  first witness?

7            THE COURT:  Yes, please.

8            MS. KASULIS:  The Government calls Sarah Hassan to

9  the stand.

10           THE COURT:  Thank you.

11           Good morning.  Come on up.

12           (Witness the witness stand.)

13           THE COURT:  Please raise your right hand.

14           (The witness was sworn.)

15           THE COURT:  Please have a seat.  Scoot closer to the

16  microphone.  There is water here if you would like.

17           THE WITNESS:  Thank you.

18           THE COURT:  You may proceed.

19           MS. KASULIS:  Thank you, Your Honor.

20  **SARAH HASSAN**,

21      called by the Government, having been duly

22      sworn, was examined and testified as follows:

23  DIRECT EXAMINATION

24  BY MS. KASULIS:

25  Q    Please state and spell your name for the record.

S. Hassan - direct - Kasulis                    910

1    A    My name is Sarah Hassan, S-a-r-a-h H-a-s-s-a-n.

2    Q    Where do you currently live?

3    A    In Boca Raton, Florida.

4    Q    Did you grow up in Florida?

5    A    No, I grew up in New Jersey.

6    Q    When did you move to Florida?

7    A    About seven years ago.

8    Q    How old are you, Ms. Hassan?

9    A    27.

10   Q    Are you currently married?

11   A    Yes, I am.

12   Q    What is your spouse's name?

13   A    Melissa.

14   Q    Can you please describe your education for the jury?

15   A    I have an undergraduate degree from Fairleigh Dickinson

16   University with a major in entrepreneurial studies.  I also

17   have a master's from Fairleigh Dickinson University with a

18   dual major in finance and pharmaceutical management.

19   Q    When did you obtain your undergraduate degree from

20   Fairleigh Dickinson?

21   A    I think I formally got my degree in February of 2009.

22   Q    And how old were you at the time?

23   A    I was 19 years old.

24   Q    And your master's degree, when did you obtain your

25   master's degree?

S. Hassan - direct - Kasulis                911

1   A    In May of 2010.

2   Q    And how old were you at that time?

3   A    I was 20 years old.

4   Q    Can you please describe your employment for the jury?

5   A    I currently work with a family business.  We have a

6   family medical foods business.  I act as our CFO.  I'm also a

7   junior partner at a venture capital group, and I'm a manager

8   of a family hedge fund called Dynagrow Capital.

9   Q    When you say that you are the CFO, what is a CFO?

10  A    It's the chief financial officer.

11  Q    And what is a chief financial officer?

12  A    So I manage, basically, any monetary or money decision we

13  make.  I'm also responsible for making sure that all of your

14  financial statements are accurate.

15  Q    And that was for a family business that you were a CFO?

16  A    Yes.

17  Q    And what is that family business?

18  A    It's a medical foods business.

19  Q    What is the name of that business?

20  A    IM Health Science.

21  Q    You said that you also work for a venture capital group;

22  is that right?

23  A    Yes.

24  Q    What is a venture capital group?

25  A    We basically make investments in private companies.

S. Hassan - direct - Kasulis                    912

1    Q    And then what is Dynagrow Capital?  You mentioned

2    Dynagrow Capital.

3    A    That is a family hedge fund.

4    Q    When you say family hedge fund, what do you mean by that?

5    A    I manage family assets and I make various investments in

6    it.

7    Q    What is a hedge fund?

8    A    It's basically a pool of money that's used for

9    investments.  By its very nature, you hedge your bets.  There

10   should be a balancing of the portfolio, in terms of if you do

11   have an investment that goes down, you have another sort of

12   waiting it out.

13   Q    Now, are any of your family members involved in the

14   pharmaceutical industry?

15   A    Yes.

16   Q    Who are they?

17   A    I have an uncle who is involved in R and D and my father

18   was involved in the pharmaceutical industry.

19   Q    When you say R and D, what do you mean by that?

20   A    Research and development.

21   Q    And then you said your father was also involved in the

22   pharmaceutical industry; is that right?

23   A    Yes.

24   Q    And who is your father?

25   A    My father's name is Fred Hassan.

S. Hassan - direct - Kasulis                   913

1          THE COURT:  I'm sorry.  This should not be

2     happening.  I apologize.

3          THE WITNESS:  No.  Please.

4          THE COURT:  If anyone has cell phones on at the

5     counsel table.  Please turn them off.  Thank you.  Sorry about

6     that.

7          Why don't you start where you left off and maybe go

8     back one question.

9          MS. KASULIS:  Thank you, Your Honor.

10    Q     Who is your father?

11    A     My father's name is Fred Hassan.

12    Q     And you said he was involved in the pharmaceutical

13    industry?

14    A     Yes.

15    Q     How is he involved in the pharmaceutical industry?

16    A     He was the CEO and chairman of several large companies,

17    like Pharmacia and Schering-Plough, and he has been involved

18    in a couple boards.

19    Q     Which boards is he currently involved in?

20    A     Well, he's not necessarily the pharma industry, but Time

21    Warner.  He's part of Amgen now.

22    Q     Is he involved with any private equity groups?

23    A     Yes.  Yes.  He's still involved with Warburg Pincus,

24    which is a private equity group.  He looks at a lot of their

25    healthcare investments and manages their healthcare

S. Hassan - direct - Kasulis                 914

1  investments.

2  Q    When was Dynagrow Capital founded?

3  A    Probably the midyear 2010.

4  Q    What was your role in Dynagrow?

5  A    I'm the manager.

6  Q    What does that mean, to be the manager of Dynagrow?

7  A    I'm responsible for various investments that we make.

8  Q    What kind of investments, generally, do you make in

9  Dynagrow Capital?

10 A    The bulk of our investments are in ETF's, but I do trade

11 some other equities.

12 Q    When you say ETF's, what do you mean by that?

13 A    Exchange trade funds.  They are essentially funds that

14 mirror certain pieces of the market.  It can mirror the total

15 market.  It can mirror a certain industry.  Those are the bulk

16 of my investments.

17 Q    What, if any, role does your father play in Dynagrow

18 Capital?

19 A    He's just a limited partner in the fund, which

20 essentially means he's kind of like a shareholder investor.

21 Q    And you said that he is a limited partner in the fund.

22 Are there any other kinds of partners in Dynagrow Capital?

23 A    There is a GP.

24 Q    What is GP?

25 A    The general partnership is responsible for managing the

S. Hassan - direct - Kasulis                    915

1  fund.

2  Q    Who is the general partner in Dynagrow Capital?

3  A    Well, it's technically Dynagrow Capital, LLC is the GP of

4  Dynagrow Capital, LLP.

5  Q    And who manages Dynagrow Capital --

6  A    LLC.

7  Q    -- what was it?

8  A    LLC.  I'm the manager of Dynagrow Capital LLC, which is

9  the GP.

10 Q    Who is responsible for making investing decisions with

11 respect to Dynagrow Capital?

12 A    I am.

13 Q    Do you know an individual named Martin Shkreli?

14 A    Yes.

15 Q    And how do you know him?

16 A    Well, I've made investments with him in the past and I

17 know him through several, I guess, long-time colleagues of my

18 father.

19 Q    And when did you first hear of Martin Shkreli?

20 A    The first time I heard of Martin Shkreli was October of

21 2010.  I go to the same charity event every year called

22 Community of Hope of New Jersey and I see some very familiar

23 faces there, some people I have known for the majority of my

24 life.  One of those people was by the name of Brent Saunders

25 and Mr. Saunders just happened to mention he made an

S. Hassan - direct - Kasulis                916

1   investment with someone who was a rising star in the hedge

2   fund world, so it was a probably a good idea for me to meet

3   him and possibly learn from him since I was starting to do

4   some investing in the investment world.

5   Q    What was your understanding as to who was the individual

6   Brent Saunders was referring to?

7   A    Excuse me.

8   Q    Who was the individual -- when you say Brent Saunders had

9   referred to an individual who was a rising star in the hedge

10  fund world, who was that individual?

11  A    Martin Shkreli.

12  Q    And can you explain who Brent Saunders is?

13  A    Well, at the time he was the CEO of Bausch & Lomb.  He

14  has worked with my dad for many, many years.  I have seen him

15  since I was much smaller.

16  Q    With respect to the Community of Hope fundraiser, is your

17  family associated with that fundraiser in any way?

18  A    Yes.

19  Q    How?

20  A    My dad was the gala chair for many, many years for this

21  particular fundraiser.  He really helped get the pharma

22  industry engrained in it.  They fund raise for mostly adults

23  who have some kind of mental disorder and they do a lot of

24  work with Veterans as well.

25  Q    So after this Community of Hope fundraiser in the fall of

1  2010, did you have any contact with Martin Shkreli?

2  A    Yes.

3  Q    And how did that come about?

4  A    I received an e-mail from Martin saying that Mr. Saunders

5  had recommended that the two of us link up.

6  Q    And did you have an understanding as to why Mr. Saunders

7  thought that it would be a good idea that the two of you link

8  up?

9  A    Yes.

10  Q    What is your understanding?

11  A    Mr. Saunders had suggested that we meet up because I was

12  trying to learn a bit about the hedge fund world.  He thought

13  Martin would be a good mentor.  He was particularly excited

14  about his track record and the wonderful returns he had been

15  getting investing in Martin, so he thought it was an

16  opportunity for me to build a relationship and an opportunity

17  for me to potentially make money as well.

18  Q    When you say investing in Martin, did you know what in

19  particular he was investing with respect to Martin Shkreli?

20  A    Yes.

21  Q    What was he investing in?

22  A    MSMB Capital.

23  Q    How old were you at the time, Ms. Hassan, when you spoke

24  with Brent Saunders about Martin Shkreli?

25  A    I had recently turned 21.

S. Hassan - direct - Kasulis                     918

1   Q    And at that point in time did you have an interest in

2   finance?

3   A    Yes.

4   Q    What was that interest?  Can you please explain that?

5   A    Well, we had already started the family hedge fund at

6   this point.  It was an area of focus for me.  Even some of my

7   prior work experience, the last internship I had at college

8   was at Goldman Sachs.  I was always interested in the

9   industry.

10  Q    So how did your first contact with Martin Shkreli come

11  about?

12  A    When I received an e-mail from him.

13  Q    And do you know approximately when that was?

14  A    It would have been sometime after October.

15  Q    And do you know how Martin Shkreli got your e-mail

16  address?

17  A    I'm assuming he obtained it from Mr. Saunders.

18  Q    Did you eventually meet Martin Shkreli?

19  A    Yes, I did.

20  Q    And how did that meeting come about?

21  A    We agreed to meet for dinner to discuss his fund.

22  Q    Do you know approximately when you met him for dinner?

23  A    I don't recall the exact date.  It was late 2010.

24  Q    So I'm showing you what has been marked for

25  identification.  It is in tab 1 of your binder.  It is

S. Hassan - direct - Kasulis                  919

1    Government Exhibit 103-1.

2           MS. KASULIS:  Are we having some technical

3    difficulties?

4           THE COURT:  Can you not see it on your screen?

5           MS. KASULIS:  I cannot, Your Honor.

6    Q    Do you recognize Government Exhibit 103-1?

7    A    Yes, I do.

8           MR. BRAFMAN:  There is no objection from me, Your

9    Honor.

10          THE COURT:  So you are moving to admit 103-1?

11          MS. KASULIS:  Yes, your Honor.

12          THE COURT:  Without objection, it is admitted.  You

13   may publish.

14          MS. KASULIS:  Thank you.

15          (Government's Exhibit 103-1 was received in

16   evidence.)

17   Q    What is Government Exhibit 1031?  Can you please explain

18   to the jury?

19   A    It's an e-mail between Martin and myself to confirm a

20   dinner meeting.

21   Q    And what is the date on the e-mail from Martin Shkreli at

22   the bottom of the document?

23   A    Saturday, December 11, 2010.

24   Q    And the subject?

25   A    The subject is Monday, dinner at Pera, 6:00 p.m. 303

S. Hassan - direct - Kasulis                    920

1   Madison Avenue.

2   Q    And did you, in fact, meet Mr. Shkreli for dinner at

3   Pera?

4   A    Yes, I did.

5          MS. KASULIS:  Your Honor, does the jury have small

6   screens that they can also look at?

7          THE COURT:  Yes.  To your left on your seat should

8   be a screen.  If you see a wooden platform, you can pull them

9   up.  It slides up.  Be careful not to pinch yourselves.  You

10  should be able to see it.  I still think it is incredibly

11  small.  If you would make it larger, that would be great.

12  Thank you.

13          Please proceed.

14          MS. KASULIS:  I'm sorry, I just lost it.

15  Q    And so the date of this e-mail is Saturday, December 11,

16  2010 and it refers to a Monday dinner.  Would that be December

17  13, 2010?

18  A    Yes.

19  Q    And did you, in fact, meet Mr. Shkreli for dinner on

20  December 13, 2010?

21  A    Yes, I did.

22  Q    And who else attended that dinner?

23  A    It was just the two of us.

24  Q    Why did you meet Mr. Shkreli for dinner?

25  A    He was telling me about MSMB Capital and the potential of

S. Hassan - direct - Kasulis                921

1   in investing there and to give me some guidance, someone that

2   was new in the hedge fund space.

3   Q    What did you discuss at that dinner?

4   A    We discussed MSMB Capital and he gave me a few pieces of

5   advisor things to look forwards towards.

6   Q    When you say you discussed MSMB Capital, what was MSMB

7   Capital?

8   A    MSMB Capital was his healthcare hedge fund.

9   Q    What did you discuss in particular about MSMB Capital?

10  A    He just went over some of, I guess, the basics with me

11  about it.  He told me it was a $40- to 50-million fund.  I

12  believe he mentioned his investors were pretty happy with him,

13  including people like Mr. Saunders, who introduced the two of

14  us.  He gave me some additional advice about the hedge fund

15  world.  He was saying you should really find a sector to focus

16  in on.  He gave me some book recommendations.  He also did say

17  it is fairly typical for people in this space to make

18  investments with people they're trying to build relationships

19  with, and that oftentimes, he said, friends will invest in

20  each other's funds.

21  Q    When you say it was a $40- to 50-million fund, what do

22  you mean by that?

23  A    That MSMB Capital had $40 to $50 million under

24  management.

25  Q    When you say under management, what do you mean by that?

S. Hassan - direct - Kasulis                922

1  A    That between the money that he had raised and the growth

2  on the money that he had raised that the value of that fund or

3  the value of the money that he was managing was $40 to $50

4  million.

5  Q    And was it your understanding that Mr. Shkreli was

6  soliciting an investment from you in MSMB Capital at that

7  dinner?

8  A    Yes.

9  Q    Did Mr. Shkreli speak to you at all about his own

10 background in the finance industry?

11 A    Briefly.  I know he mentioned sometime that he worked for

12 Jim Cramer and he referenced his own track record with MSMB

13 Capital as being quite strong.  But not much else outside of

14 that.

15 Q    Who is Jim Cramer?

16 A    He is a fairly well-known investor.  He is kind of a TV

17 personality too at this point.

18 Q    And at this point in time, Ms. Hassan, what was your own

19 level of experience in the hedge fund world?

20 A    It was fairly minimal.  We had started our family fund

21 just a few months prior.

22 Q    And did Mr. Mr. Shkreli discuss any other hedge funds

23 that he had managed in the past?

24 A    No.

25 Q    When you said that MSMB Capital was a healthcare fund,

1    what do you mean?

2    A    That the investments that he was making were focused the

3    healthcare sector.

4    Q    And what was your impression of the defendant at this

5    dinner -- excuse me, of Martin Shkreli at this dinner?

6    A    He seemed to be pretty smart.  He certainly talked

7    faster, sometimes maybe a little distracted, but -- those are

8    my general takeaways.

9              MR. BRAFMAN:  I'm sorry, Your Honor.  Can we have

10   the end of that answer?

11             THE COURT:  Do you want it read back?

12             MR. BRAFMAN:  Please.

13             THE COURT:  Will the court reporter please read it

14   back.

15             (The record was read back by the reporter.)

16   Q    Was he someone who you were interested in pursuing a

17   friendship at that point in time?

18   A    Not necessarily a friendship.  I was more interested in

19   building a working relationship with him to learn from him.

20   Q    And approximately how old was he at that point in time?

21   What was your impression, generally speaking, of how old he

22   was?

23   A    Late 20's.

24   Q    And did you discuss your own family background in the

25   pharmaceutical industry at the dinner?

1    A    No.  He seemed to be fairly cognizant of who my father

2    was.  I'm sure when Mr. Saunders introduced him he must have

3    made him aware.

4              (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2    BY MS. KASULIS:

3    Q    And at that dinner, did Mr. Shkreli discuss with you

4    whether he had started a company at all?

5    A    No.

6    Q    Did he discuss with you any ideas that he had for

7    starting a company?

8    A    No.

9    Q    Do you see Martin Shkreli anywhere in the courtroom?

10   A    Yes, I do.

11   Q    Can you please point to him and identify an --

12            MR. BRAFMAN:  Stipulate to the identification.

13            THE COURT:  I want it on the record, please.

14            THE WITNESS:  He's over that way.  He has a white

15   shirt, gray suit jacket, and glasses.

16            THE COURT:  I'll note she's identified Mr. Shkreli.

17            MS. KASULIS:  As the Defendant, thank you.

18   Q    After the dinner in December of 2010, did you have any

19   additional contact with Defendant?

20   A    Yes.

21   Q    What form of contact did you have?

22   A    Most of our communication was via e-mail.

23   Q    In terms of the e-mails, generally speaking, what sorts

24   of information did you exchange with Mr. Shkreli?  What was

25   the subject of those e-mails?

S. Hassan - Direct - Kasulis                926

1   A    We had some e-mails -- I did eventually follow-up on the

2   investment, investing in MSMB Capital.  Beyond that, he would

3   often send out some potential investment thesis that he

4   thought was interesting.

5   Q    Did he ever recommend any sort of stock picks for you?

6   A    Yes, he would send out recommendations.  I don't know if

7   they were specifically for me.  It seemed to be part of a

8   chain e-mail he would send out, but I did get several

9   recommendations.

10  Q    Did he ever discuss with you in those e-mails shorting a

11  stock?

12  A    Yes.

13  Q    And what does it mean to short a stock?

14  A    You're essentially making a bet that the stock is going

15  to go down.

16  Q    And have you ever heard of the term "going long" in a

17  stock?

18  A    Yes.

19  Q    And what does that mean to you?

20  A    That you're betting on the stock long-term and that the

21  value will increase.

22  Q    So, I'm showing you what's been marked for identification

23  as Government Exhibit 103-38.  It's in Tab 2 of your binder.

24       And do you recognize this exhibit?

25  A    Yes.

S. Hassan - Direct - Kasulis          927

1    Q    And what is it?

2    A    E-mails between myself and Martin.

3    Q    And what is the date on the last e-mail on the chain?

4    A    Saturday, December 25, 2010.

5         MS. KASULIS:  Your Honor, the Government moves this

6    exhibit into evidence.

7         MR. BRAFMAN:  No objection.

8         THE COURT:  We admit Government's Exhibit 103 in

9    evidence -- 103-38, is that all you're moving?

10        MS. KASULIS:  Yes, your Honor.

11        THE COURT:  103-38 is admitted.

12        (Government Exhibit 103-38 so marked.)

13        (Exhibit published to the jury.)

14   Q    This appears to be a two-page document e-mail exchange

15   between yourself and Martin Shkreli at the end of

16   December 2010; is that correct?

17   A    Yes.

18   Q    If you start on the second page, the first e-mail in the

19   chain, can you just generally describe what this e-mail is?

20   A    There was a company called MannKind, and he believed that

21   there would be a significant falloff in the stock price.  So,

22   he was making the recommendation to short the stock.

23   Q    And the date on this e-mail is December 25, 2010; is that

24   right?

25   A    Yes.

S. Hassan - Direct - Kasulis                    928

1    Q    It appears to be, on the prior pages, it says from Martin

2    Shkreli, then it says to Martin Shkreli.

3          Is it your understanding you were a recipient of

4    this e-mail?

5    A    Yes.

6    Q    Is this an example of the kind of stock suggestions that

7    Mr. Shkreli would e-mail to you periodically during this time

8    period?

9    A    Yes, it's extremely typical.

10   Q    If we go to the first page of the document, the bottom of

11   the page --

12          MS. KASULIS:  If you would please zoom in.

13   Q    -- it appears that Mr. Shkreli then sent this to you and

14   stated:  Hi, Sarah.  I thought I'd send my latest idea over

15   your way.  Every now and then a trade becomes so compelling I

16   write it up to my current investors.  Hope you are well.

17          Then in response, you sent him an e-mail dated

18   December 27, 2010.  Can you please read the last two sentences

19   of the first paragraph of your e-mail?

20   A    I remember you mentioned your fund is approximately

21   $40 million.  What did you set your minimum investment for a

22   fund of that size?

23   Q    And when you mentioned, you stated, "your fund," what

24   fund were you referring to?

25   A    MSMB Capital.

S. Hassan - Direct - Kasulis                    929

1   Q    And when you say 40 million, approximately 40 million,
2   what do you mean by that?
3   A    Again, referring to his assets under management at MSMB
4   Capital.
5   Q    And when you said what is your minimum investment for a
6   fund of that size, what do you mean by that?
7   A    Typically, funds will set some kind of minimum investment
8   and you can't invest any less money than that minimum.
9   Q    If we can go to the response to this e-mail.  That
10  response is dated the same day, from Mr. Shkreli, on
11  December 27, 2010 to you.
12          If you could, please read the last sentence of the
13  first paragraph.
14  A    I mostly sent them to my clients for the reasons you
15  suggested and only rarely when I feel -- sorry, last sentence.
16          My stated minimum is $250,000.  But for friends or
17  strategic clients, there is no minimum.
18  Q    Thank you.  You can set that exhibit aside.
19          Did the Defendant ever approach you about meeting
20  your father, Fred Hassan?
21  A    At a certain point, yes.
22  Q    And when was that?
23  A    I believe at the JP Morgan conference.
24  Q    And when was the JP Morgan conference?
25  A    I don't exactly recall.

S. Hassan - Direct - Kasulis                    930

1    Q     Was it shortly after you first met Mr. Shkreli?

2    A     It was some time after.  I forget exactly when.

3    Q     And what is the JP Morgan conference that you're

4    referring to?

5    A     It's a large healthcare conference.

6    Q     And what is your understanding as to how often the

7    conference is held?

8    A     I believe it's an annual conference.

9    Q     Did you reach out to your father about Mr. Shkreli and

10   the JP Morgan healthcare conference?

11   A     I did ask if he would take a couple of minutes to meet

12   with Martin.

13   Q     And did your father agree to do that?

14   A     Yes.

15   Q     Now, I'm showing you what's been marked for

16   identification as GX, or Government Exhibit, 103-2.  It's Tab

17   3 of your binder.

18         Do you recognize this exhibit?

19   A     Yes.

20   Q     And what is it?

21   A     E-mails between myself and Martin.

22   Q     And what is the date on the e-mail, the last e-mail on

23   the chain?

24   A     It's January 8, 2011.

25   Q     And on the first page, the very last e-mail, at the top

S. Hassan - Direct - Kasulis                    931

1    is January 11 of 2011?

2    A    Yes.

3              MS. KASULIS:   Government moves this exhibit into

4    evidence, your Honor.

5              MR. BRAFMAN:   No objection, your Honor.

6              THE COURT:   We admit Government 103-2.

7              (Government Exhibit 103-2 so marked.)

8              (Exhibit published to the jury.)

9    Q    Referring to the second page of this document, the first

10   e-mail in the chain, it appears to be from the Defendant to

11   you, dated January 8 of 2011.  Mr. Shkreli writes to you:  Hi

12   there.  I was wondering if you'd be in San Francisco for the

13   JP Morgan healthcare conference next week.

14             Is this the healthcare conference that you were

15   referring to?

16   A    Yes, it is.

17   Q    He then states:  If not, I did hear from Brent that

18   Mr. Hassan would be attending.

19             What is your understanding of who Brent is?

20   A    Brent Saunders.

21   Q    I'd love to sit down with him if possible.  I've known

22   Ken and Brent for a while now and I'm going to have them ask

23   as well but figured I should approach you too.

24             Mr. Shkreli, the Defendant, appears to reference

25   "Ken."  Do you know who Ken is?

S. Hassan - Direct - Kasulis                932

1    A    Mr. Banta, Ken Banta.

2    Q    Who is Ken Banta?

3    A    A gentleman my dad worked with for quite some time.  I

4    believe he works in PR.

5    Q    Sorry, I didn't hear that at the end?

6    A    I believe he works in PR, public relations.

7    Q    And did he work at any of the companies that your father

8    previously worked at?

9    A    I forget which ones he worked at, but him and Mr. Banta

10   worked together for quite some time.

11   Q    And in response to your e-mail -- his e-mail, on the

12   first page at bottom, dated January 11, 2011, can you please

13   read your response?

14   A    Hi, Martin.  Sorry for the delay.  I am not in San

15   Francisco for the conference; however, you are correct in that

16   my father is there.  I'm trying to get him this morning to see

17   if he can meet with you for a few minutes today.  What does

18   your availability look like for the day?  Hope all is well.

19   Best, Sarah.

20   Q    Is it your understanding that your father is someone who

21   meets with a lot of individuals at this conference?

22   A    Yes, his schedule is pretty full when he's there.

23   Q    What is the purpose of the conference?

24   A    It's a general healthcare conference.  It's a place that

25   you can potentially go to find new investments in the

S. Hassan - Direct - Kasulis                933

1  healthcare world, you can continue networking.  It's just a

2  large healthcare conference.

3  Q    And in response, it appears that Mr. Shkreli gives you

4  some information about his availability?

5  A    Yes.

6  Q    And then you write, and I'm going to direct your

7  attention to your response at the top, dated January 11, 2011

8  at 7:45 a.m.

9            Can you please read your response to Mr. Shkreli?

10 A    Martin, just to keep you updated, I was able to get ahold

11 of my father.  He said he would spend a few minutes with you

12 this afternoon.  He just needs to confirm a meeting time with

13 someone and he'll let me know what time works for him.  It

14 will be some time in the afternoon.  I'll e-mail you as soon

15 as I get a time from him.  Sarah.

16 Q    And in response, he writes:  Thanks a lot, Sarah; at the

17 top?

18 A    Yes.

19 Q    And it's your understanding that your father did, in

20 fact, meet with Mr. Shkreli?

21 A    Yes.

22 Q    Now, during this same time period, January 2011 time

23 period, did you make any decisions regarding whether you

24 wanted to invest in MSMB Capital?

25 A    In that time period, yes.

S. Hassan - Direct - Kasulis                934

1    Q     And how much did you decide to invest?

2    A     $300,000.

3    Q     And why that amount?

4    A     He had stated at some point that $250,000 was his

5    minimum.  And I was trying to build a relationship, so I

6    wanted to make a sign or some kind of showing that I was very

7    interested in facilitating that relationship and investing in

8    him and MSMB Capital.

9    Q     And who made this investment?

10   A     I made this investment personally.

11   Q     As opposed to the investment being from Dynagrow?

12   A     Yes.

13   Q     And why did you decide to invest personally as opposed to

14   investing through Dynagrow?

15   A     It was a relationship that I was trying to build.  I

16   didn't -- it seemed inappropriate to invest out of the fund.

17   Q     Did your father invest in MSMB Capital?

18   A     No.

19   Q     What was your father's role, if any, in MSMB Capital?

20   A     None whatsoever.

21   Q     Was your father aware that you had invested in MSMB

22   Capital?

23   A     I don't know if he was aware.

24   Q     Did you receive any materials from the Defendant

25   regarding MSMB Capital to review prior to your investment?

1    A    Yes.

2    Q    And did you, in fact, review those materials?

3    A    Yes.

4    Q    I'm showing you what's been marked for identification as

5    Government Exhibits 5 and 103-3.  They're in Tabs 4 and 5 of

6    your binder, Ms. Hassan.

7         And do you recognize these documents?

8    A    Yes, I do.

9    Q    And what are they?

10   A    It's the subscription agreement, the PPM, wiring

11   instructions, and an investor questionnaire.

12   Q    And are these the materials that were sent to you to

13   review prior to investing in MSMB Capital?

14   A    Yes.

15   Q    And is Government Exhibit 5 a subset of Government

16   Exhibit 103-3?

17   A    Yes.

18        MS. KASULIS:  The Government moves both of these

19   exhibits into evidence.

20        MR. BRAFMAN:  No objection, your Honor.

21        THE COURT:  Government Exhibits 5 and 103-3 are

22   admitted without objection.

23        MS. KASULIS:  Thank you, your Honor.

24        (Government Exhibit 5 so marked.)

25        (Government Exhibit 103-3 so marked.)

1  Q    Are these the documents you reviewed prior to investing?

2  A    Yes.

3  Q    Let's starts with Government Exhibit 103-3.

4       (Exhibit published to the jury.)

5  Q    It appears to be e-mail from the Defendant to you, dated

6  January 14, 2011.  The subject is documents.  You made some

7  references to the various documents that are attached.  Let's

8  just first start with what each of these documents is.

9       So, first, MSMB Capital Management, LP, wiring

10 instructions, what is your understanding as to why wiring

11 instructions were attached?

12 A    If we decided to move forward with the investment, I

13 would already have them to be able to send funds over.

14 Q    And MSMB Capital Management, LP, the next attachment,

15 subscription agreement, what is your understanding as to what

16 a subscription agreement is?

17 A    It's an agreement you sign when you want to buy stock in

18 a private company.

19 Q    And the next attachment, MSMB Capital Management, LP,

20 private placement memorandum --

21      THE COURT:  Would you refer to a Bates stamp number,

22 please?

23      MS. KASULIS:  Yes.  The first page SH-EDNY0000133.

24      THE COURT:  Thank you.

25 Q    And it appears that the date on this attachment is

1    August 3 of 2010.

2              What is a private --

3    A    Sorry, August 3?

4    Q    If you look at the title of the document, it's MSMB

5    Capital Management, LP, Private Placement Memorandum, and then

6    8-3-2010.

7    A    Okay.

8    Q    What is a private placement memorandum?

9    A    It's another document that's commonly used when

10   purchasing a stock or equity in a private company.  It usually

11   is an opportunity to give some disclosures to the investors.

12   Q    And is a private placement memorandum commonly referred

13   to as a "PPM"?

14   A    Yes.

15   Q    And then the next document is entitled MSMB Capital

16   Management, LP, Individual Questionnaire.

17             What is an individual questionnaire?

18   A    It's a form you fill out about the individual investor

19   just to make sure they are an accredited investor that can

20   execute an investment in the company.

21   Q    And then it appears the attachments are just duplicated

22   again; is that right?

23   A    Yes, that's correct.

24   Q    Let's turn to the subscription agreement, which is Bates

25   No. SH-EDNY0000135.  Is this the subscription agreement,

1    Ms. Hassan?

2    A    Yes, it is.

3    Q    Let's look at the second page, with the Bates number

4    ending 136.  In the first paragraph, the first sentence is:

5    You have informed the undersigned, the subscriber, that MSMB

6    Capital Management, LP, has been organized as a Delaware

7    limited partnership.

8              And it's defined as the partnership; do you see

9    that?

10   A    Yes.

11   Q    And then it goes on to say:  Of which MSMB Investors,

12   LLC, is the general partner.

13             And then it's defined as the general partner; do you

14   see that?

15   A    Yes.

16   Q    And then the last sentence of the paragraph states:

17   Limited partnership interests in the partnership, partnership

18   interests, are described in an offer pursuant to the

19   memorandum.

20             Is it your understanding it's a reference to the

21   PPM?

22   A    Yes.

23   Q    And the minimum investment therein is $1 million unless

24   the general partner of the partnership otherwise consents.

25             What was your understanding at this time as to what

S. Hassan - Direct - Kasulis                939

1    the minimum investment was in the fund?

2    A    The stated minimum was $1 million, but it's not atypical

3    for a GP or a manager to leave some leeway in there for them

4    to be able to offer a lower amount, usually for friends and

5    family.

6    Q    And who was the GP at this time, the general partner, of

7    the MSMB Capital fund?

8    A    MSMB Investors, LLC.

9    Q    And did you have an understanding as to who controlled

10   that entity?

11   A    Yes.

12   Q    Who was that?

13   A    Martin Shkreli.

14   Q    Now, let's turn to the page ending in 145.

15        Can you describe this page for the jury?

16   A    This is the signature page.  This is where you sign off

17   that you are investing.

18   Q    And let's now turn to Government Exhibit 5 and the first

19   page of the document, which ends in --

20        Again, this is a subset of the GX103-3; is that

21   right?

22   A    Yes, that's correct.

23   Q    And the first page of the document, which is Bates

24   numbered SH-EDNY0000227, is this the first page of the PPM?

25   A    Yes, it is.

1  Q    And it's for MSMB Capital, the hedge fund that you were

2  investing in?

3  A    Yes, that's correct.

4  Q    And if you look at the managing partner, who is listed

5  there?

6  A    Martin Shkreli.

7  Q    And the date on this document?

8  A    June 9, 2010.

9  Q    Now, if you turn to the second page, which ends in Bates

10  No. 228, it appears that in the first sentence it states that

11  the PPM relates to the offering by MSMB Capital Management,

12  LP.  It goes on to define it as the partnership of limited

13  partner interests, quote, the partnership interests in the

14  partnership.  The partnership interests are being offered to a

15  limited number of individual or institutional investors that

16  generally have a net worth of $1 million or meet certain other

17  qualifications and meet certain suitability standards.

18        Did you, in fact, have at the time a net worth of

19  $1 million?

20  A    Yes.

21  Q    And in terms of -- you had stated that you had decided to

22  invest $300,000.  How much of that or what percentage of that

23  was your net worth?

24  A    My net worth was just over a million, so it was probably

25  about 30 percent of my net worth.

S. Hassan - Direct - Kasulis                    941

1   Q    Was that a sizeable amount of money for you at the time?

2   A    It was quite significant.

3   Q    It then goes on in the paragraph to state:  The sole

4   general partner of this partnership will be MSMB Investors,

5   LLC.

6          And it defines the general partner, and then:  The

7   general partner will have responsibility for the management

8   and control of the partnership.

9          Again, what was your understanding as to who was

10  controlling the general partner at MSMB Capital?

11  A    Martin Shkreli.

12  Q    Last sentence of this paragraph states:  Martin Shkreli

13  will act as the portfolio manager for the partnership and will

14  be responsible for all investment decisions regarding the

15  partnership on behalf of the advisor.

16         Was this statement consistent with your

17  understanding as to who was controlling MSMB Capital?

18  A    Yes.

19  Q    The next sentence -- excuse me, the next paragraph, first

20  sentence, explains that the partnership's investment objective

21  will be to seek superior absolute returns while attempting to

22  minimize portfolio volatility, primarily through long and

23  short equity investments.

24         What is your understanding of what long and short

25  equity investments is?

S. Hassan - Direct - Kasulis                942

1   A    My understanding is that there would be purchasing some

2   equities with the anticipation of them going up over time and

3   that they would be short selling some with the anticipation

4   that those stocks would go down.

5   Q    Was it important to you that there was this mix of long

6   and short equity investments?

7   A    Yeah.  I think it's important to have a balance in a

8   portfolio.

9   Q    Was there any discussion here or at the time of investing

10  MSMB Capital money in any private company run by the

11  Defendant?

12  A    Not that I was aware of.

13  Q    Now, lower down on the page, in bold, it states:  An

14  investment in the partnership will involve significant risks.

15  There is no assurance that the partnership will achieve its

16  investment objective or be profitable.  Then it references the

17  risk factors section.

18       What was your understanding about the degree of risk

19  for your investment in MSMB Capital?

20  A    Again, I think there's some level of risk in any

21  investment you can make.  But, again, my understanding was

22  this was also a hedge fund, and, as I stated earlier, by its

23  very nature there's usually some diversification or offsetting

24  investments or -- you know, it's just a portion of the fund,

25  there should be things offsetting it somewhere else.

1  Q    What or who were you relying on in assessing that risk to

2  your investment at MSMB Capital?

3  A    Martin.

4  Q    Are you referring to the Defendant, Martin Shkreli?

5  A    Yes.

6  Q    Now, directing your attention to the page of this

7  document ending in Bates No. 255, and directing your attention

8  to the section entitled "management fee," what is a management

9  fee?

10  A    It's the fee that the manager gets for managing the fund.

11  Q    And the first sentence of this paragraph explains that

12  the advisor will be entitled to receive a management fee from

13  the partnership, payable quarterly at the rate of .25 percent

14  per calendar year and 1 percent per annum.

15         What does that mean?

16  A    It means that he essentially made one percent of the

17  assets under management annually and he paid it out quarterly.

18  Q    Paid it out to whom?

19  A    Himself.

20  Q    And if we go to the next page, ending in Bates No. 256,

21  and the third paragraph, it explains that the general partner

22  will receive its pro rata share based on its capital account

23  of the net profits, and then it's defined as any excessive

24  investment gains and net operating profits over investment

25  losses and net operating losses of the partnership for each

1  fiscal year plus incentive allocation equal to 20 percent of

2  the net profits originally allocated to each limited partner

3  for such fiscal year as more fully described below.

4          Can you please explain what this 20 percent number

5  is to you?

6  A    So, 20 percent of the net profits would also go to the

7  GP.  And you look at all the profits and you take away any

8  losses, take away natural expenses from operating the fund,

9  and 20 percent of that goes to the GP.

10 Q    And who was the controlling -- the GP at this point in

11 time?

12 A    Martin Shkreli.

13 Q    Now, directing your attention to the page that ends in

14 260, and then the section entitled "auditors," the first two

15 sentences read:  Rothstein Kass & Company, New York, New York,

16 will serve as the partnership's independent accountants.  Such

17 firm will audit the annual financial statements of the

18 partnership and prepare a statement of each partner's capital

19 account for such year.

20         What is an auditor?

21 A    A third/independent party who essentially verifies and

22 validates all of your financials.

23 Q    And what do you mean by the financials?

24 A    You have different financial statements to show profit

25 and loss and cash flow and, basically, the movement of money

S. Hassan - Direct - Kasulis                945

1   within a company.

2   Q    And was it important to you that MSMB Capital had an

3   auditor when you were making your decision to invest?

4   A    Yes.

5   Q    Why is that?

6   A    It's important to have a third party/independent party

7   validate all of the information.

8   Q    And now directing your attention to the page ending in

9   263, this section, entitled "withdrawals by partners," the

10  first sentence reads:  Limited partners may withdraw any or

11  all of their capital account subject to certain reserves which

12  may be established by the general partner to cover contingent

13  liabilities of the partnership monthly as of the last day of

14  each calendar month, commencing one full month after the date

15  of their initial investment in the partnership, upon not less

16  than 30 days prior notice to the general partner.

17         What was your understanding of what the parameters

18  were with respect to withdrawing the money from MSMB Capital?

19  A    My understanding is that you did have the ability to

20  withdraw money, but you have to give at least a month's notice

21  to be able to do so and that there may be some stipulations in

22  terms of if there's some absolute minimum amount the GP needs

23  to continue in certain investments.

24         But generally speaking, you could obtain your funds

25  in about 30 days.

S. Hassan - Direct - Kasulis                946

1  Q    So, that ability to withdraw your funds, is that often

2  referred to as being able to redeem or asking for a redemption

3  of your money?

4  A    Yes.

5  Q    And was the ability to redeem or to ask for redemption of

6  your money from MSMB Capital important to you when you made

7  your decision to invest?

8  A    Yeah, it's generally helpful to have an investment that's

9  more liquid.

10  Q    And what do you mean by "more liquid"?

11  A    If it's -- it's easy to turn into cash if you need to.

12

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2    Q    And prior to investing at MSMB Capital, did you know

3    about any other investors in the fund?

4    A    The only one I think I was aware of was Mr. Saunders.

5    Q    Now, which factors were important to you when you decided

6    to make your investment in MSMB Capital?

7    A    Several things.  I mean, I knew he was managing a 40 to

8    $50 million fund, which is a generally really healthy fund

9    size, and I knew he had really phenomenal returns.  But the

10   one investor I did know was fairly ecstatic about them.

11   Q    And why was the fund size important to you?

12   A    It's a healthy size.  If it's too small, you have a hard

13   time really, you know, getting any movement or momentum.  It's

14   hard to make any significant investments.  And if it's too

15   big, it's hard to get solid returns.

16   Q    And was having an auditor important to you?

17   A    Yes.

18   Q    And the ability to redeem your money?

19   A    Yes.

20   Q    And the mix of long and short equity positions in the

21   fund?

22   A    The short positions weren't as necessary to me, they

23   weren't as essential to me.  But it was necessary, in my mind,

24   to have long positions.

25   Q    Now, at this time, if the defendant had run a prior hedge

1   fund that had performed poorly, would that have been important

2   for you to know at the time you were making your investment in

3   MSMB Capital?

4           MR. BRAFMAN:  Objection.

5           THE COURT:  I'm going to overrule the objection.

6           You may answer.

7   A    Yes.

8   Q    Why is that?

9   A    It's very important to know what someone's track record

10  is.  It's very common in the hedge fund world that you make

11  investments in someone's current fund based on their track

12  records of old funds.  So, if there was an old fund that I

13  could have used to make a decision, that would have been very

14  helpful.

15  Q    If MSMB Capital had not performed well prior to

16  January of 2011 when you had invested in the fund, would that

17  have been important for you to know?

18  A    Yes.

19  Q    Why?

20  A    For the same reason; it's important to get an

21  understanding of a manager's track record.

22  Q    And when you invested in MSMB Capital, what was your

23  understanding of what the hedge fund was investing in?

24  A    Generally, healthcare investments.

25  Q    And when you say healthcare investments, what kind of

Hassan - direct - Kasulis                    949

1    investments?

2    A    I thought mostly public equities.

3    Q    When you say public equities, what do you mean?

4    A    I thought he was trading stocks of public companies.

5    Q    What about private companies?

6    A    We had never really discussed it.  I didn't, I, I didn't

7    think it was a big portion.  Or if at all.

8    Q    At this point in time, January of 2011, had you heard of

9    a company called Retrophin?

10   A    No, I had not.

11   Q    Did you even know if that company existed or not?

12   A    I was not aware of its existence.

13   Q    Up until this point in time, had you invested in any

14   other hedge funds?

15   A    No.

16            THE COURT:  Can we just define point of time,

17   please.

18            MS. KASULIS:  Yes.

19   Q    In the January of 2011 time period when you invested in

20   MSMB Capital.

21            At that point in time, had you invested in any other

22   hedge funds?

23   A    No, I had not.

24   Q    Why not?

25   A    I was fairly new to the space.  It was the first

Hassan - direct - Kasulis                 950

1   interesting opportunity I had looked at.

2   Q    And did you, in fact, invest the $300,000 in January of

3   2011?

4   A    Yes, I did move forward with the investment.

5   Q    Now, after you invested your money, did you begin to

6   receive performance updates regarding your investment in MSMB

7   Capital?

8   A    Yes, I did.

9   Q    And how often did you receive those updates?

10  A    It depended.  They were somewhat sporadic.  I don't know

11  that there was a set time to get them.

12  Q    Was it on a weekly basis?  A monthly basis?  A yearly

13  basis?  Do you recall?

14  A    I believe they initially started off as being monthly,

15  but they, they, they came less and less frequent.

16  Q    And in what form did you receive those performance

17  updates?

18  A    I'd usually get an e-mail from Martin.

19  Q    What was your understanding of who prepared the

20  performance updates for MSMB Capital?

21  A    I didn't know who prepared them.  I thought Martin did.

22  Q    Did you know of any anyone else who was involved in MSMB

23  Capital other than the defendant Martin Shkreli?

24  A    No.

25  Q    And what kind of information was included on those

1    performance updates that you received for MSMB Capital?

2    A    They would update me as to how much my investment was

3    worth.  It would often compare my investment and the growth of

4    my investment in MSMB Capital versus the S&P 500, both on a

5    monthly basis and on a year-to-date basis.

6    Q    And what is the S&P 500?

7    A    It's a group of 500 stocks that are used to essentially

8    represent the market.  So, you can use it as a benchmark to

9    see how well you're doing against the market.

10   Q    Was there any information in the performance updates

11   about what the fund was actually invested in?

12   A    No.

13              MS. KASULIS:  I'm showing you two Exhibits that have

14   been marked for identification at tabs seven and eight.  They

15   are GX 80-1 and 80-2.

16              THE WITNESS:  Hiccups, sorry.

17   Q    Do you recognize these two Exhibits?

18   A    Yes, I do.

19   Q    What are they?

20   A    These are some of the common statements that I would get.

21              MS. KASULIS:  The Government moves Government's

22   Exhibits 80-1 and 80-2 into evidence.

23              THE COURT:  Any objection, Mr. Brafman?

24              MR. BRAFMAN:  No, Your Honor.

25              THE COURT:  We will admit Government's Exhibits 80

1   will one and 80-two without objection.

2              (Government's Exhibits 80-1 and 80-2 received in

3   evidence.)

4              (Exhibit published to jury.)

5   Q    And let's look at the first Exhibit.  Government's

6   Exhibit 80-1.

7              What is the date on this e-mail?

8   A    It's March 2nd, 2011.

9   Q    And who is the e-mail from?

10  A    Martin Shkreli.

11  Q    And the recipient?

12  A    Myself.

13  Q    And is that your e-mail address?

14  A    Yes, it is.

15  Q    The subject of the e-mail?

16  A    MSMB performance estimate.

17  Q    And is this type of document reflective of one of the

18  performance updates that you would receive from the defendant

19  Martin Shkreli?

20  A    Yes.  There were essentially all in this format.

21  Q    Let's look at the body of the e-mail.  The first section

22  is entitled gross returns.

23              What are gross returns?

24  A    The overall returns.

25  Q    Can you please read the first line under gross returns.

Hassan - direct - Kasulis                    953

1   A    MSMB returned a positive 4.24 percent in February 2011.

2   The S&P 500 Index returned 3.2 percent of February 2011.

3   Q    And was this the first performance update you received

4   after you invested in MSMB Capital?

5   A    I believe so.

6   Q    Can you please explain the positive 4.24 percent in

7   February 2011.

8            What does that mean?

9   A    It means that the overall increase of the assets under

10  management, assuming there were no other investments, was

11  increased by 4.24 percent.  So, through his investing, he had

12  a profit of 4.2 percent.

13  Q    And then, in the next sentence, that's the comparison to

14  the S&P 500 Index that you were referencing?

15  A    Yes, it is.

16  Q    And what was the return for that month for the S&P 500

17  Index?

18  A    It was 3.2 percent.

19  Q    And so MSMB Capital, according to this document, had

20  higher returns in the month of February 2011 than the S&P 500

21  Index; is that right?

22  A    Yes, by roughly 30 percent.

23  Q    The next sentence, can you please read that sentence.

24  A    MSMB has returned 8.2 percent year-to-date.  The S&P 500

25  Index has returned 5.54 year-to-date.

1    Q    And so YTD, is that year to date?

2    A    Yes, sorry, YTD is year-to-date.

3    Q    And we're seeing this on multiple references to MSMB.

4         What was MSMB to you?

5    A    MSMB Capital.

6    Q    Were you aware of whether there were any other hedge

7    funds that the defendant was managing at this point in time?

8    A    No, I was not.

9    Q    And the next sentence, can you please read this for the

10   jury.

11   A    MSMB has returned 41.71 percent since inception on

12   11/1/2009.  The S&P 500 Index has returned 28.04 percent

13   during this period.

14   Q    And what is inception?

15   A    Since the start of this fund.  He started the fund,

16   started investing in November 1st, 2009.

17   Q    And there was a 41 percent --

18   A    Yeah.

19   Q    -- gross return?

20   A    Yes, there was.

21   Q    And the next section is entitled account values.

22        Can you please read that sentence under account

23   values.  The two sentences.

24   A    You invested $300,000 on the first -- on the 17th of

25   January 2011.  The value of this investment is now

Hassan - direct - Kasulis                               955

1    approximately $324,600 gross of fees.

2    Q    What is gross of fees?

3    A    It's saying, even with fees.

4    Q    So, in one month, according to this document, you made

5    over $24,000 on your investment?

6    A    Yes.

7    Q    What was your reaction when you received this update?

8    A    I was fairly ecstatic, I was quite excited about the

9    investment at this point.

10   Q    Now, in this time period, March, early March of 2011, did

11   the defendant say anything to you about any losses in

12   MSMB Capital in the prior month, February 2011?

13   A    I don't believe so.

14   Q    And this Exhibit, Government's Exhibit 80-1, does it

15   reflect any losses to the fund in February of 2011?

16   A    No.

17   Q    Does it, in fact, reflect a gain in the fund for that

18   month?

19   A    Yes.

20   Q    During this time period, did the defendant speak to you

21   about any sort of short position that had not performed well

22   that he had taken in MSMB Capital?

23   A    I don't believe so.

24   Q    At this point in time, did you consider asking for a

25   redemption of your money?

Hassan - direct - Kasulis                956

1   A    No.

2   Q    Why not?

3   A    I mean, already in a short time there was pretty healthy

4   returns so I wasn't anxious to redeem the capital and I didn't

5   have any other immediate need for it.

6   Q    And if we look at the next document, Government's

7   Exhibit 80-2.  It's dated April 10th of 2011.  It's an e-mail

8   from the defendant to you.

9        Again, is this just a performance update for the

10  next month, for March of 2011?

11  A    Yes.

12  Q    And what were the gross returns for MSMB that month?

13  A    .67 percent.

14  Q    And under the account value section, can you please read

15  those two sentences?

16  A    You invested $300,000 on 1/17/2011.  The value of this

17  investment is approximately $326,778 gross of fees.

18  Q    So, according to this document, you again had increased

19  your investment in MSMB Capital over the course of March 2011?

20  A    Yes, it had grown.

21  Q    For what period of time did you receive performance

22  updates for MSMB Capital?

23  A    I don't recall the last date I got them.

24  Q    Do you generally recall over what period of time you

25  received updates?

1   A    Probably a year-and-a-half?

2   Q    And who sent those updates to you?

3   A    I always received them from Martin.

4   Q    Based on those updates, what was your impression of the

5   performance of MSMB Capital over that time?

6   A    I thought that the fund had done extremely well.

7   Q    Did you have any reason to question the accuracy of those

8   performance updates?

9   A    No.  I trusted Martin and trusted the numbers I was being

10  presented with.

11  Q    Separate from the investor updates that you received, did

12  you speak to the defendant in the 2011 time period about the

13  performance of MSMB Capital?

14  A    I don't know if we had a direct conversation on it.

15  Q    And during this time period, the 2011 time period, did

16  the defendant ever speak to you about any trading losses that

17  MSMB Capital had sustained?

18  A    I don't believe he told me about any specific losses, but

19  I don't recall.

20  Q    And during this time period -- again, the 2011 time

21  period -- what was your understanding as to what MSMB Capital

22  was invested in?

23  A    I believed that they were mostly invested in different

24  public healthcare securities or equities.

25  Q    And did you believe that there was a mix of investments

1   in the portfolio at that time?

2   A    Yes.

3   Q    And what was your understanding of the assets under

4   management or the size of MSMB Capital in 2011?

5   A    That they were between 40 to $50 million.  And I also

6   thought they were diversified because it was one of the

7   questions I did ask him about in our correspondence.  He told

8   me unless there was some extraordinary circumstance, that

9   usually the individual investments don't make up more than

10  five percent of the portfolio.

11            MS. KASULIS:  I'm going to direct your attention to

12  tabs 9 through 19 of your binder.  It's Government's

13  Exhibits 80-3 through 80-13.

14  Q    Do you recognize these documents?

15  A    Yes, I do.

16  Q    And what are they?

17  A    They are more of these MSMB Capital performance

18  estimates.

19  Q    Do they appear to be for the time period between

20  April 2011 through December of 2011?

21  A    Yes.

22            MS. KASULIS:  The Government moves these Exhibits

23  into evidence.

24            MR. BRAFMAN:  No objection, Your Honor.

25            THE COURT:  We will receive Government's

Hassan - direct - Kasulis                959

1   Exhibits 80-3 through 80-13.

2           (Government's Exhibits 80-3 through 80-13 received

3   in evidence.)

4           (Exhibits published to jury.)

5           MS. KASULIS:  Directing your attention to the last

6   Exhibit, Government's Exhibit 80-13.  That would be tab 19.

7           MR. BRAFMAN:  Excuse me, Your Honor, could the

8   document be made a little bit larger?

9           Thank you.

10  Q   Does this appear to be a performance update that you

11  received from the defendant dated March 4th of 2012?

12  A   Yes.

13  Q   Is it for -- it's entitled MSMB performance estimate.

14  A   Yes, it is.

15  Q   What was your understanding as to what MSMB referred to?

16  A   MSMB Capital.

17  Q   Does this document appear to be a performance update for

18  MSMB Capital for December of 2011?

19  A   Yes, it does.

20  Q   And so, you received this document in March, multiple

21  months after December of 2011.

22          Was that typical in terms of receiving these

23  performance updates?

24  A   Not initially, but they did become more sporadic as time

25  went on.

Hassan - direct - Kasulis                    960

1   Q     And did you speak to the defendant about the more

2   sporadic nature of the performance updates for MSMB Capital?

3   A     I don't believe so.

4   Q     Why not?

5   A     They were still coming.  I was still getting some form of

6   update.

7   Q     If you look under the section of net returns, can you

8   please read the last sentence.

9   A     The last two sentences?

10  Q     Actually --

11        MS. KASULIS:  Withdrawn.

12  Q     Why don't we read the first sentence under net returns?

13  A     MSMB returned 13.61 percent net in December 2011.  The

14  S&P 500 Index returned .85 percent in December 2011.

15  Q     And the last sentence in that section.  The last two

16  sentences.

17  A     MSMB has returned 48.29 percent net of fees since

18  inception on 11/1/2009.  The S&P Index has returned

19  21.37 percent during this period.

20  Q     And so what was your understanding of the performance of

21  the fund at this point in time?

22  A     That he was more than doubling the performance of the

23  market.

24  Q     And what was your reaction to that?

25  A     I was very excited about it.

Hassan - direct - Kasulis                961

1   Q    Then let's look at the next section entitled account

2   values.

3            Can you please read those two sentences for the

4   jury.

5   A    You invested $300,000 on January 17th, 2011.  The value

6   of this investment is now approximately $359,600 net of fees

7   or 19.87 percent year-to-date and since the inception of your

8   investment.

9   Q    So, according to this update you had made almost

10  20 percent on your investment with MSMB Capital?

11  A    Yes.

12  Q    And that was almost 59 or a little over $59,000 that you

13  had made on your investment?

14  A    Yes.

15  Q    Did you have any access to MSMB Capital's brokerage or

16  trading accounts?

17  A    No, I did not.

18  Q    And did you have any access to MSMB Capital's bank

19  accounts?

20  A    No, I did not.

21  Q    At any point in the time you invested in MSMB Capital did

22  you have access to either brokerage accounts for MSMB Capital

23  or bank accounts for MSMB Capital?

24  A    No, I did not.

25  Q    Did you ever receive statements from those brokerage

1  accounts and bank accounts from MSMB Capital?

2  A    No, I did not.

3  Q    What were your sources of information as to the

4  performance of MSMB Capital throughout the time that you

5  invested in the fund?

6  A    I relied, essentially, exclusively on these estimates.

7  Q    And who were you receiving these estimates from?

8  A    Martin Shkreli.

9  Q    Throughout 2011 did you consider redeeming or withdrawing

10 your money from MSMB Capital?

11 A    No, I did not.

12 Q    Why not?

13 A    Because they were pretty phenomenal returns.

14 Q    After your initial investment of $300,000 in MSMB Capital

15 in January of 2011, did you see the defendant again?

16 A    Yes.

17 Q    And do you know approximately when you saw him?

18 A    A couple months later.  More like March or April.

19 Q    And that was of 2011?

20 A    Yes.

21 Q    And why did you see him?

22 A    He said that there was some kind of new company or idea

23 he was working on and he wanted to share it with me.

24 Q    And where did you see him?

25 A    We first met for lunch, I don't exactly recall where.

And then we went to his office.

Q    Where was the office?

A    It was in Manhattan, but I don't recall where.

Q    Was there anyone else with you when you met him?

A    There was someone else in the room, but to be frank, I
don't remember who it was.

Q    And this was at the office itself?

A    Yes.

Q    During that meeting, did you have any discussions with
the defendant regarding MSMB Capital?

A    Not that I recall.

Q    And at this point this time, April of -- March/April, you
said, of 2011, were you aware of whether the defendant had any
other hedge funds that he was managing?

A    No.

Q    What did you discuss with Martin Shkreli during that
meeting in his office?

A    He went over a pitch deck for a company called Retrophin.

Q    Did you discuss that pitch deck?

A    Yes, he went through it.

Q    What do you recall that you discussed about Retrophin?

A    I recall him saying that there was some kind of either
patents or research that had been done in the space of
muscular dystrophy that he thought were really interesting,
and I think there was some evidence in mice at that point that

1  seemed really promising, and that he had taken that and was

2  going to be starting a new business of which he would just be

3  temporarily getting off the ground and would eventually have

4  someone else run, but that he would start.

5  Q    And what was the nature of the business?

6  A    It was pharmaceutical company for -- particularly

7  interested in muscular dystrophy.

8  Q    Have you ever heard of the expression orphan drugs?

9  A    Yes.

10 Q    What does that mean to you?

11 A    Orphan drugs are used for disease states where the

12 population with the disease is fairly small.

13 Q    Did you discuss orphan drugs with the defendant?

14 A    Yes, I did.

15 Q    What did you discuss?

16 A    That, by its very nature, it's a faster, generally faster

17 pathway to bring a drug forward onto the market and that you

18 can make a lot of money in orphan drugs because the price per

19 patient is quite high.  So, even though the number of patients

20 is not high, the price, ultimately the income, you can get

21 from it is quite high.

22 Q    And were you discussing orphan drugs in relation to

23 Retrophin?

24 A    Yes.

25 Q    Did the defendant speak to you about his desire to cure

Hassan - direct - Kasulis                     965

1    diseases?

2    A     If he did, it was a brief mention, but we primarily

3    talked about more of the true business side of the company.

4    Q     And when you say true business side, what do you mean?

5    A     Where there was money to be made in the company.   And

6    again, going through some of the trial and tribulation.

7    Q     You had made a reference to he wanted to get the company

8    off the ground.

9           And then what he did he say that he wanted to do

10   with this company?

11   A     He told me he was starting this company because he

12   thought that whatever research or patents he had come across

13   were too valuable to pass up, but that he didn't have the

14   time, especially managing the fund, to be able to focus all of

15   his attention there, so he would eventually have someone else

16   run it.

17   Q     Had you discussed this idea for a company previously with

18   the defendant?

19   A     No.

20   Q     So, this was the first time you heard anything about

21   Retrophin or this idea for a company from the defendant?

22   A     Yes.

23   Q     That's in the March/April 2011 time period?

24   A     Yes.

25   Q     You had mentioned that the defendant showed you a pitch

Hassan - direct - Kasulis                    966

1    deck.

2              What is a pitch deck?

3    A    When you want to get an investment in a company,

4    oftentimes they will put together a presentation that they

5    will use to then pitch or propose potential investors, and you

6    outline the thesis of the company and why you think it's a

7    good investment.

8    Q    After the meeting with the defendant in his office in

9    March/April of 2011, did the defendant send you the pitch deck

10   that you reviewed in his office?

11   A    Yes --

12   Q    Regarding -- I'm sorry.

13             Regarding Retrophin?

14   A    Yes, he did.  Sorry.

15   Q    No problem.

16             MS. KASULIS:  I'm showing you what's been marked for

17   identification as Government's Exhibit 103-5.  And that's tab

18   20 in your binder, Ms. Hassan.

19   Q    Do you recognize this Exhibit?

20   A    Yes, this looks like the presentation we reviewed.

21             MS. KASULIS:  The Government moves this Exhibit into

22   evidence.

23             MR. BRAFMAN:  No objection.

24             THE COURT:  We will receive Government's

25   Exhibit 103-5 without objection.

1              (Government's Exhibit 103-5 received in evidence.)

2              (Exhibit published to jury.)

3   Q    Directing your attention to the first page of this

4   Exhibit.

5              Does this appear to be an e-mail from the defendant

6   to you dated April 11th of 2011?

7   A    Yes.

8   Q    And the subject is:  Great to see you?

9   A    Yes.

10  Q    Does this refresh your recollection as to when exactly

11  you met with the defendant in his office?

12  A    Yes.

13  Q    When was that?

14  A    It was either that day or a couple days before, so it was

15  in April of 2011.

16  Q    It appears that attached are the document that's entitled

17  the same thing, so it appears to be attached twice, entitled

18  Retrophin presentation dash PPTX.

19             Do you see that?

20  A    Yes, I do.

21  Q    And then the body of the e-mail states:  Attached in the

22  presentation.

23             And that's signed by Martin Shkreli?

24  A    Yes, that's correct.

25  Q    So, directing your attention to the attachment.  It's

1    Bates Number SH-EDNY-0000000686.

2              Is this the first page of the pitch deck that you

3    referred to?

4    A    Yes.

5    Q    And there on the first page it states:  Martin Shkreli.

6    And then:  Interim CEO.

7    A    Yes.

8    Q    What is interim CEO?

9    A    That's just, essentially, a temporary CEO until you find

10   the one that's meant to be for the long-term.

11   Q    What is a CEO?

12   A    It's the chief executive officer.  It's essentially the

13   highest position in the company.  Outside the Board as a

14   whole.

15   Q    And when you say Board, are you referring to the Board of

16   Directors of a company?

17   A    Yes.

18   Q    What is the difference between the Board of Directors and

19   the CEO?

20   A    Well, the CEO is the individual managing and in charge of

21   the day-to-day operations and direction of the company.  And

22   the Board of Directors is sort of a group of people to oversee

23   and help guide him or her.

24             MS. KASULIS:  Directing your attention to the page

25   ending in 704.

1   Q     The title of this page is:  Key Management.

2           Who is listed there under key management?

3   A   Martin Shkreli, James MacDonald and Ken Banta.

4

5           (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S. Hassan - direct - Kasulis                    970

1   DIRECT EXAMINATION

2   BY MS. KASULIS: (Continuing)

3   Q     And for Martin Shkreli, he is listed as managing partner

4   at MSMB Capital Management; is that correct?

5   A     Yes.

6   Q     And what was your understanding of what MSMB Capital

7   Management was at this time?

8   A     That was the healthcare hedge fund I had invested in.

9   Q     What do you base that understanding on?

10  A     My conversations with Martin and just the documents.

11  Q     And then it goes on to explain that he will serve as

12  interim CEO until new management is hired; is that correct?

13  A     Yes, that's correct.

14  Q     The next bullet point, James MacDonald, do you know who

15  that is?

16  A     I'm not familiar with him.

17  Q     And the next bullet point, Ken Banta, is that the same

18  Ken Banta who we spoke about earlier?

19  A     Yes.

20  Q     Who is an individual your father knows?

21  A     Yes.

22  Q     If you turn to the next page ending in Bates stamp number

23  705, this page is entitled board of directors.  The first

24  bullet point is Brent Saunders, CEO of Bausch & Lomb, former

25  Schering-Plough, EVP.  Do you know what EVP is?

S. Hassan - direct - Kasulis                971

1    A    Executive vice president.

2    Q    Bausch & Lomb and Schering-Plough, what kind of companies

3    are those?

4    A    Bausch & Lomb are mostly in optics or eye health.

5    Schering-Plough was a pharmaceutical company.

6    Q    And below that is Martin Shkreli listed and below that is

7    Josiah Austin listed as a private investor and former board

8    director of North Fork Bank.  Do you know who Josiah Austin

9    is?

10   A    I'm sorry, I don't know him.

11   Q    Below that bullet point is Darren Blanton of Colt

12   Ventures.  Who is Darren Blanton?

13   A    I'm not familiar with him either.

14   Q    And then directing your attention to the next page ending

15   in 706.  This page is entitled Investors and it lists a number

16   of individuals, including Brent Saunders, Josiah T. Austin,

17   Martin Shkreli, and Darren Blanton, and the last bullet point,

18   more available under confidentiality.  Did you discuss any

19   additional investors with the defendant in Retrophin in the

20   April 2011 time period?

21   A    I don't believe that we did.

22   Q    We can put that document aside.  What was your

23   understanding as to why the defendant was showing you this

24   Retrophin pitch deck?

25   A    He wanted me to make an investment in it.

S. Hassan - direct - Kasulis                    972

1   Q     Did you do that?

2   A     Yes, I did.

3   Q     Why?

4   A     Well, I did want to try and continue to build a

5   relationship.  I just started building this relationship a

6   couple of months prior and he seemed to be very excited about

7   it.  It seemed like it was an exciting idea.

8   Q     How much did you invest?

9   A     $150,000.

10  Q     What was the source of the 150,000?

11  A     I invested that through Dynagrow Capital.

12  Q     Why did you invest through Dynagrow Capital?

13  A     Well, I had just invested $300,000 of my personal money a

14  couple of months prior, which was quite a significant portion

15  of my personal net worth.  I didn't want to continue investing

16  from my personal money, but I did want to show a sign of good

17  faith and I still believed in him, still trying to build a

18  relationship.

19  Q     At the time, in April of 2011, how much money were you

20  managing for Dynagrow Capital?

21  A     $20 million.

22  Q     When did you invest money from Dynagrow in Retrophin?

23  A     It was sometime in that April 2011 time frame.

24  Q     Did you discuss investing in Retrophin with your father,

25  Fred Hassan?

1  A    I made him aware that I was planning on investing in it.

2  Q    Why?

3  A    Just to let him know.  Generally speaking, before I made

4  investments, I would let him know that I was making them.

5  Just a courtesy.

6  Q    Were you seeking his permission to invest in Retrophin?

7  A    No.

8  Q    Is there any sort of compliance or vetting process that

9  you need to go through in order to make investments?

10  A    No.  It's typical for me to present them and oftentimes

11  they would give me guidance.  If they thought an investment

12  was a bad idea, or maybe if they thought I had already

13  invested too much in a certain market, they would give me

14  overall advice, but it wasn't necessarily a formal process.

15  Q    When you say "they," who are you referring to?

16  A    Both my mother and father.

17  Q    And was there any sort of process that you had to go

18  through to approve investments in relation to your father's

19  employment at Warburg Pincus?

20  A    Yes.

21  Q    Can you please explain that process?

22  A    Sure.  Whether it was investing personally, as Sarah

23  Hassan, or whether it was investing through Dynagrow Capital,

24  because of his employment at Warburg Pincus, I would actually

25  have to submit saying that I wanted to buy so many numbers of

S. Hassan - direct - Kasulis                    974

1    stocks at such price within a certain time frame.  I would

2    have to get approvals for that, which would take up to a week

3    to turn around, and then they also have a limited time frame

4    to which I could execute.  Once I got the approval, I could

5    then move forward, if I chose to.

6    Q    Why did you need to seek the approval?

7    A    Because Warburg Pincus deals with several public

8    companies, so before I could make any kind of trade, even for

9    myself, I would have to get approval just to make sure there

10   were no conflicts.

11   Q    When Dynagrow Capital was investing in Retrophin, did

12   that mean that Fred Hassan was investing in Retrophin?

13   A    No.

14   Q    Why?

15   A    Well, I can't send a form saying Sarah Hassan wants to

16   invest in Retrophin and Dynagrow invests, and vice versa.  I

17   can't make a submission saying Dynagrow wants to invest and

18   then invest personally.  They are very distinct and separate

19   entities.

20   Q    What role, if any, did your father play in Retrophin?

21   A    I don't believe he played any role.

22   Q    Did the defendant ever suggest to you that your father

23   played a role in Retrophin?

24   A    I don't believe so.

25   Q    Or that your father was his advisor for Retrophin?

S. Hassan - direct - Kasulis                    975

1    A     I had seen that in the news article and I tried to make

2    it very clear that that was not the case.  In order for him to

3    be an advisor, have any kind of title of anything, he also has

4    to go through a similar Warburg compliance process and where

5    he gets approval.  He is fairly diligent about those, and I

6    know for certain we never got to a point of even remotely

7    discussing about this.

8              THE COURT:  I'm sorry to interrupt, but could you

9    explain what Warburg Pincus is and why it's going to be

10   necessary to get their approval, please.

11             THE WITNESS:  Sure.  Warburg Pincus is a private

12   equity company and they make big investments, sometimes, in

13   public companies.  So you have to be very careful about making

14   sure there is no kind of issue or conflict with any

15   investments that you might be making or, you know, for

16   example, if I was interested in investing in an eye care

17   company when they are invested in Bausch & Lomb, there may be

18   a conflict there.  So they would have to let me know if they

19   saw any potential conflicts, and not everything is always

20   already known.  They could have had something in a deal

21   somewhere that wasn't already public knowledge, but with a

22   public company, so they have to go through and make sure that

23   there is no place that they see any potential conflict.

24             Is that helpful?

25             THE COURT:  Yes, thank you.

S. Hassan - direct - Kasulis                976

1   Q    Did you ever give permission to the defendant to use your

2   father's name as a reference in any promotional materials?

3   A    Most certainly not.

4   Q    After you invested in Retrophin in April of 2011, did you

5   have any discussions with the defendant about Retrophin

6   throughout the 2011 time period?

7   A    Can you be a little more specific?

8   Q    Do you recall speaking to the defendant about any

9   developments in relation to Retrophin or the growth of

10  Retrophin?

11  A    I don't think we had a lot of direct interaction about

12  it.

13  Q    What was your role vis-à-vis Retrophin throughout the

14  2011 time period?

15  A    I was more of a passive investor.

16  Q    Did you periodically receive e-mail updates, for example,

17  regarding Retrophin from the defendant?

18  A    I do know at one point he sent me an e-mail saying you

19  may have noticed we've raised a $10 million round, or

20  something like that.  He might have sent an e-mail when they

21  did a reverse merger with a publish company so that shares

22  could eventually be publicly traded, but I don't remember

23  anything specific outside of that in terms of our

24  communication.

25  Q    So within the 2011 time period, was your understanding

S. Hassan - direct - Kasulis                977

1   that the defendant was managing MSMB Capital and Retrophin at

2   the same time?

3   A    I'm sorry, which time period?

4   Q    2011.

5   A    It was my understanding that he was primarily managing

6   MSMB Capital, but that he was just helping start this company

7   in 2011.

8   Q    Were you aware any other hedge funds that the defendant

9   was managing in the 2011 time period?

10  A    No, I was not.

11  Q    In 2011, did you have any understanding as to whether

12  MSMB Capital had invested in Retrophin?

13  A    I don't believe so.  At some point, I had seen a cap

14  table.  I don't recall if it was in 2011 or 2012 where I saw

15  MSMB listed.

16  Q    Did the defendant ever ask you for permission to invest

17  MSMB Capital money into Retrophin?

18  A    No.

19         MR. BRAFMAN:  Objection to the question.  It assumes

20  that he needed her permission.

21         THE COURT:  All right.  Well, if you can pose an

22  appropriate --

23         MS. KASULIS:  I can rephrase the question, Your

24  Honor.

25  Q    Did the defendant ever discuss with you investing MSMB

S. Hassan - direct - Kasulis                    978

1   Capital money into Retrophin?

2   A    No, he did not.

3   Q    Based on your review of the fund materials and your

4   discussions with the defendant, did you believe that Mr.

5   Shkreli could invest MSMB Capital money in Retrophin?

6   A    I guess it was possible.

7   Q    And did you have an understanding as to what the primary

8   focus of MSMB Capital was?

9         MR. BRAFMAN:  Objection.  Asked and answered three

10  times.

11        THE COURT:  Sustained.

12        MR. BRAFMAN:  Thank you, Your Honor.

13  Q    In the 2011 time period, what was your understanding of

14  the assets under management at MSMB Capital?

15        MR. BRAFMAN:  Objection.  Asked and answered.

16        THE COURT:  Sustained.

17        MR. BRAFMAN:  Is that sustained, Your Honor?

18        THE COURT:  Yes, sustained.

19  Q    You had testified that the defendant had not talked to

20  you about investing MSMB Capital money into Retrophin; is that

21  right?

22        MR. BRAFMAN:  Objection, Your Honor.

23  A    Yes.

24        THE COURT:  Overruled.

25  Q    And he separately spoke with you about investing

S. Hassan - direct - Kasulis                    979

1    Retrophin money into MSMB Capital?

2    A    Yes.

3    Q    Did he discuss with you ever rolling your money -- in the

4    2011 time period, did he ever discuss rolling your money from

5    MSMB Capital into Retrophin?

6    A    No.

7    Q    Did the defendant ever tell you that MSMB Capital and

8    Retrophin were the same entity?

9    A    No, he did not.

10   Q    In 2011, did the defendant ever tell you that he --

11   withdrawn.

12           Were you aware, in 2011, as to whether the defendant

13   had continued to trade stock with respect to MSMB Capital?

14   A    I was not.  I presumed they were still trading some kind

15   of equities.

16           MR. BRAFMAN:  Objection.

17           THE COURT:  Overruled.

18           Go ahead.  Your understanding, ma'am, you can

19   testify as to.

20   A    My understanding is, just by the nature of operating a

21   fund, that there was still some kind of equities that were

22   being traded in there, but I wasn't made aware of specifically

23   which ones.

24   Q    In 2011, did the defendant ever tell you whether or not

25   he had stopped trading in MSMB Capital funds?

S. Hassan - direct - Kasulis                980

1    A    No.  And it would have been surprising, given that there

2    was still such an interesting fluctuation in the returns.

3    Q    Directing your attention to earlier 2012, the early time

4    period, did you ever learn from the defendant who else had

5    invested in Retrophin?

6    A    I don't recall specifically.  At certain points, I think

7    I was copied in e-mails with people, and I made assumptions,

8    but I don't recall if I was specifically informed.

9    Q    Have you heard of the expression "capitalization table"?

10   A    Yes.

11   Q    What is that?

12   A    The cap table is basically a document that just shows how

13   much of a company the individual investors or investment

14   companies own in that company.  It shows number of shares, it

15   can derive percentages too.

16   Q    Did you ever receive a capitalization table for

17   Retrophin?

18   A    Yes, I did.

19   Q    I'm showing you what has been marked for identification

20   as Government Exhibit 103-7.  It is tab 23 of your binder.

21        Do you recognize this exhibit?

22   A    Yes, I do.

23   Q    What is it?

24   A    This is the cap table for Retrophin.

25        MS. KASULIS:  The Government moves Exhibit 103-7

S. Hassan - direct - Kasulis                    981

1    into evidence.

2              MR. BRAFMAN:  No objection.

3              THE COURT:  We will receive without objection

4    Government Exhibit 103-7.

5              (Government's Exhibit 103-7 was received in

6    evidence.)

7              MR. BRAFMAN:  Is it a two-page document?

8              MS. KASULIS:  Yes.  It is a two-page document.

9              MR. BRAFMAN:  Thank you.

10   Q    This appears to be an e-mail from the defendant Martin

11   Shkreli dated March 16th, 2012?

12   A    Yes.

13   Q    Let's go through the recipients of this e-mail.  The

14   first recipient appears to be an individual name Tom Koestler,

15   K-O-E-S-T-L-E-R.  Who is Tom Koestler?

16   A    He is a gentleman my dad worked with for many years.

17   Q    And next on the list is an e-mail addressed

18   brent.saunders@ymail.com.  Again, who is Brent Saunders?

19   A    He is another gentleman my dad has worked with for years.

20   Q    The next e-mail address is fred.hassan@carrotgroup.com.

21   Whose e-mail address is that?

22   A    That's my dad's e-mail address.

23   Q    Do you have an understanding as to why your father's

24   e-mail address is listed in this group of recipients?

25   A    Actually, I was quite surprised at the time.

S. Hassan - direct - Kasulis                982

1   Q     Why?

2   A     Well, because he hadn't made an investment there so it

3   didn't make sense for him to be copied on the e-mail of

4   capitalization tables.

5            MR. BRAFMAN:  Objection, Your Honor.  Can we have a

6   sidebar.

7            THE COURT:  Excuse me, just one second.  Let's have

8   a sidebar.

9            (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                         983
```

1              (Sidebar held outside the hearing of the jury.)

2              MR. BRAFMAN:  Your Honor, I have been trying to be

3    patient and limited in my objections, but throughout the

4    witness' testimony there were a series of questions asked by

5    Ms. Kasulis which began with did Martin ever tell you this,

6    did Martin ever tell you that.  That assumes an obligation by

7    Mr. Shkreli to tell her these things.  The question should be

8    what did Martin tell you.  She didn't argue that in summation,

9    but what's happening is Ms. Kasulis is essentially testifying

10   through the question as to what she thinks this witness should

11   be asked.

12              Now the witness is being asked to explain why she

13   was surprised to see Fred Hassan's name because she didn't

14   know that Fred -- that Fred Hassan had invested.  He is going

15   to testify.  They can ask Fred Hassan did you ever invest.

16              For her to say she didn't know whether Fred Hassan

17   invested or not, she is assuming that.  That's essentially

18   what she is doing.  She presumed he didn't have any

19   involvement.  You will see that's not true.  She is assuming

20   that he didn't invest and we will discuss that with Fred

21   Hassan, but Ms. Kasulis is very cleverly, in effect, becoming

22   a 50 percent witness in this, asking did Martin ever tell you

23   a series of things.  Assuming that's an obligation to have

24   that discussion every time you see someone, and it's not true.

25   She could say what did Martin tell you and then argue in

Sidebar                                984

1    summation Martin's failure to discuss all of these other

2    things.

3            THE COURT:  Well, I think what she is trying to do,

4    as I interpreted the questions, except for the one that I did

5    sustain, is that she is trying to get to the point if she asks

6    an open-ended what did he tell you, we will have a long

7    narrative.  She is trying to guide the witness.  I did sustain

8    that one objection because I did think it assumed certain

9    facts that hadn't been established.  But in terms of this

10   witness, her reaction upon seeing her father's name on an

11   e-mail chain, you are right, she doesn't know what her father

12   necessarily did, but she is just describing her reaction to

13   it.

14           MR. BRAFMAN:  Okay.

15           THE COURT:  We can make clear she is not necessarily

16   going to know what her father has been doing; correct?

17           MS. KASULIS:  Right.

18           MR. BRAFMAN:  I am fine with that, but since we are

19   up here, not to waste time later, I want Your Honor to be

20   respectfully alert to my concern that by -- if I say to a

21   witness what did you say to this witness and -- to this

22   person, and they say I don't remember, I can refresh their

23   recollection with something like a 302 or prior testimony or a

24   document or an e-mail, as was done here.  But if I say I had a

25   conversation with Martin Shkreli and he told me he's excited

Sidebar                                    985

1   about Retrophin, I don't think it's appropriate for you to

2   then have 15 questions did he tell you this, did he tell you

3   that, because that presumes an obligation by Mr. Shkreli to

4   affirmatively say that.  I didn't object when she asked the

5   track record question, because that's sort of the package

6   presentation.  But testifying, in effect, as to what she

7   believes Mr. Shkreli should have said, I want to draw your

8   attention to it not to be the current theme of the direction

9   examination.

10              THE COURT:  Just one moment.  We want to give them a

11  restroom break?

12              THE COURTROOM DEPUTY:  Yes.

13              THE COURT:  Ladies and gentleman, we are going to

14  give you a break at this time.  You may retire to the jury

15  room and refresh yourselves, and have some coffee or tea,

16  whatever you would like.  Please don't talk about the case

17  amongst yourselves.  Thank you.

18              (Jury exits the courtroom.)

19              MS. KASULIS:  Your Honor's understanding as to what

20  my intent was is exactly accurate, to help move this along, to

21  guide the witness, but also omissions are an important part of

22  our case.  Instead of saying did the defendant ask you about

23  or tell you about trading losses, I can say what, if anything,

24  did the defendant say to you about trading losses, because

25  that is, as we know, our case is about the fact that he is

Sidebar                                986

1   making representations about the performance of the funds that

2   weren't true.  So it is important to establish that she was

3   not, in fact, being told what was happening with respect to

4   the losses.  That was my purpose in asking those questions.

5        We are actually moving on now to the 2012 wind-down

6   period.  I don't anticipate any more of these kinds of

7   questions.  It is important for our case to establish the lack

8   of sharing of knowledge with our investors.

9        MR. BRAFMAN:  Yes, but direct examination is

10  generally what did the defendant say, and then if she answers

11  that question, you can ask did he tell you anything else, no,

12  I don't recall.

13       For you to ask 10 questions suggesting that he had

14  an obligation to tell her every time he spoke to her about

15  other things happening in the fund, I think it is a form of

16  leading the witness or putting into evidence questions that

17  are not being answered because all she is saying is he never

18  told me that, he never told me that.  That presumes he had an

19  obligation every time he spoke to her to tell her these

20  things.  There's a lot of repetition, which Your Honor did

21  sustain asked and answered three times.

22       THE COURT:  If you would like her to ask more

23  open-ended questions on direct and have a longer narrative and

24  then follow up with more targeted questions about what he said

25  or didn't say, that's fine.  We will go that route.

```
                           Sidebar                        987
```

1           MR. BRAFMAN:  It amounts to the same thing.

2           THE COURT:  Well, no.  Look, they have to be able to

3    put in evidence that is relevant to their -- to the charges in

4    this case which involve allegations of material misstatements

5    or material omissions, and, so, she has to be able to elicit

6    that testimony.  Now, whether there is going to be some other

7    witness or an argument as to whether or not there was an

8    obligation to disclose, that's something that obviously is

9    within your ability to do and it seems that it would be

10   appropriate.

11          MR. BRAFMAN:  Yes.

12          THE COURT:  But if you would try to ask more

13   open-ended questions, maybe Mr. Brafman will be more satisfied

14   with the way the questions are going.  I did interpret it as

15   this being trying to guide her through a lot of material.  We

16   can do it in a more traditional way.

17          MR. BRAFMAN:  I hear you.  Can we step out for a

18   second too?

19          THE COURT:  Of course.

20          MR. BRAFMAN:  Thank you, Judge.

21          (Sidebar concluded.)

22          (Continued on the following page.)

23

24

25

1            (Recess taken.)

2            (In open court.)

3            THE COURT:  Are we ready to bring the jury back?

4            MR. BRAFMAN:  Yes, Judge.  I think so.

5            THE COURT:  The jurors are coming back.

6            MS. KASULIS:  When does the Court plan on taking the

7     lunch break?

8            THE COURT:  Usually 12:45.

9            MS. KASULIS:  I'm going to aim to get the direct

10    examination done by then.

11           MR. BRAFMAN:  Whenever the direct is over, can we

12    take the lunch break then?

13           THE COURT:  She thinks about 12:45.

14           MR. BRAFMAN:  That's great, because I will need to

15    get certain exhibits ready.

16           (Jury enters the courtroom.)

17           THE COURT:  Do we have all of the jurors back?

18           THE COURTROOM DEPUTY:  Yes, Judge, all 18.

19           THE COURT:  Thank you.  Please be seated.

20           Ms. Kasulis, you may proceed.

21           MS. KASULIS:  Thank you, Your Honor.

22    Q    Directing your attention, Ms. Hassan, to Government

23    Exhibit 103-7, I believe we were talking about this exhibit

24    prior to our break.  I believe the question that we ended with

25    was what was your reaction to seeing your father's e-mail

S. Hassan - direct - Kasulis                989

1   listed on this exhibit?

2   A    I was quite surprised.

3   Q    And why is that?

4   A    Well, I didn't know why he would be on the e-mail.  It's

5   not something we had talked about very much after maybe the

6   initial time or last time I was investing, but he certainly

7   was an investor, so to be copied on the cap table wouldn't

8   make sense.

9             THE COURT:  Can you pull the mic closer.

10            THE WITNESS:  I tend to speak softly, I apologize.

11  Q    And the next recipient on this e-mail, is that yourself,

12  Sarah Hassan?

13  A    Yes, it is.

14  Q    And the next recipient is an individual named Robert

15  Bertolini.  Do you recognize that name?

16  A    Yes, I have known Mr. Bertolini for many years as well.

17  Q    Who is he?

18  A    He's another one of my dad's former colleagues.

19  Q    If you look to the "by" of the e-mail itself, the first

20  e-mail is from an individual named Evan L. Greebel and the

21  e-mail address is evan.greebel@kattenlaw.com.

22            Who is Evan Greebel, do you know?

23  A    He is an attorney.

24  Q    Do you have an understanding as to whose attorney he was

25  at that time?

S. Hassan - direct - Kasulis                990

1    A    Martin's.

2    Q    Had you had any interaction with Mr. Greebel at all up to

3    this point in time?

4    A    No, I had not.

5    Q    If you turn to the attachment here, entitled Retrophin

6    Capitalization Table, parens, revised February 27, 2012.  It

7    appears to be an Excel spreadsheet.  The next page of this

8    document is entitled Retrophin, LLC Capitalization Table as of

9    February 16, 2012.

10           Does this appear to be the attachment to the e-mail?

11   A    Yes.

12   Q    Can you please explain for the jury this capitalization

13   table?

14   A    In terms of what specifically would you like me to

15   explain?

16   Q    Can you just please explain the layout of the

17   capitalization table and then the list of investors at the

18   bottom?

19   A    Sure.  So it lists out the various people who are

20   shareholders and then it lists the number of shares that they

21   own.  The first section seems to be -- I guess the managers in

22   Class A.  In Class B, common incentive unit.  Again, there's a

23   similar -- there is another list of individuals and then, to

24   the right, how many shares they own and at the bottom the

25   Series A preferred units.  It states the date there was an

1   investment, who the individual investor was, and then the

2   dollar amount that they invested and the number of units they

3   own.

4   Q    Thank you.  Directing your attention to that bottom part

5   of the capitalization table and to the date April 28, 2011,

6   there are, I believe, multiple entries for that date.

7   A    Yes.

8   Q    Do you see under the investment column Dynagrow/Sarah and

9   Fred Hassan?

10  A    Yes.

11  Q    And the amount listed is $150,000 and the units is 7,500

12  units.  Do you see that?

13  A    Yes.

14  Q    Did you have any sort of reaction to seeing

15  Dynagrow/Sarah and Fred Hassan listed on this table?

16  A    Yes, I was a little confused.  I've never really seen

17  anything listed that way.  I do believe I actually reached out

18  to Martin to try to clarify that issue, but I also wasn't too

19  worried because, from the e-mail, it said it wasn't finalized

20  numbers or there may still be some shifting.  So it didn't

21  seem like a finalized table, it was some kind of interim

22  working cap table, but I wanted to make sure he knew it was

23  not correct.

24  Q    Why is this not correct the way this is listed, the

25  Dynagrow/Sarah and Fred Hassan?

S. Hassan - direct - Kasulis                    992

1  A    I'm not sure what entity or person that could be

2  referring to, it is a little confusing.  And there was no

3  confusion, if you were to look at the subscription agreement,

4  that it was Dynagrow Capital LLP that made the investment.

5  Q    And then is this -- in April 2011, is this the $150,000

6  investment, does this reflect the $150,000 investment that

7  Dynagrow Capital LLP had paid in April of 2011?

8  A    Yes, it is.

9           (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2    BY MS. KASULIS:

3    Q    Farther down in this area of the capitalization table,

4    there are multiple entries for MSMB Healthcare, including the

5    dates of October 27, 2011.

6    A    Yes.

7    Q    And then January 19, 2012, January 23, 2012, and then

8    there appears to be an investment on February 1, 2012, by MSMB

9    Healthcare, LP, and that investment itself is for $900,000; do

10   you see that?

11   A    Yes, I do.

12   Q    What is your understanding of what MSMB Healthcare, LP,

13   was at this time?

14   A    Frankly, I thought that that was MSMB Capital.  I was

15   never told there was any other fund, so -- I mean, the way my

16   fund's name had been incorrectly written, I thought this was

17   either just a name they used to refer to MSMB Capital or that

18   maybe there was some kind of d/b/a, doing business as, that I

19   didn't know about, but I thought that MSMB Capital had also

20   made investment in Retrophin at this point.

21   Q    What was your reaction to seeing what you believed to be

22   MSMB Capital's investment in Retrophin at this point in time?

23   A    I was a little surprised, but I also wasn't quite as

24   concerned if you see a million dollar investment or so out of

25   a 40 or 50 million dollar fund, it is still sort of within

1    line with what he had been saying about the investment size

2    that he takes on.  So, it wasn't -- it didn't seem like such a

3    huge piece of the fund that I was concerned, but I was still

4    surprised.

5             MS. KASULIS:  If you could actually zoom out to the

6    entire capitalization table, please.

7    Q    Again, at the top of the capitalization table in the

8    Class A column, investment units, Martin Shkreli is listed

9    and, again, MSMB Healthcare LP; do you see that?

10   A    Yes, I do.

11   Q    And what was your understanding, again, of what MSMB

12   Healthcare, LP, was on the cap table at this entry?

13            MR. BRAFMAN:  Objection, asked and answered.

14            THE COURT:  Overruled.

15   A    I believed it to be MSMB Capital.

16   Q    Where, if at all, on this capitalization table do you

17   actually see MSMB Capital listed, those words?

18   A    Nowhere.

19   Q    You had stated that you had expressed some concern to the

20   Defendant about the way in which Dynagrow's investment had

21   been listed on the capitalization table; is that right?

22   A    Yes, I did.

23   Q    I'm going to direct your attention to Tab 24, Government

24   Exhibit 103-9.

25            Do you recognize this exhibit?

S. Hassan - direct - Kasulis                    995

1    A    Yes, I do.

2    Q    What is it?

3    A    An e-mail correspondence between myself and Martin.

4              MS. KASULIS:  The Government moves this exhibit into

5    evidence.

6              MR. BRAFMAN:  No objection.

7              THE COURT:  I'll receive in evidence without

8    objection Government's Exhibit 103-9.

9              (Government Exhibit 103-9 so marked.)

10             (Exhibit published to the jury.)

11   Q    Directing your attention to the bottom of this exhibit,

12   did this appear to be the same e-mail chain that you had seen

13   in the prior exhibit, Government Exhibit 103-7?

14   A    Yes.

15   Q    And does it appear in this exhibit that you then respond

16   to Mr. Shkreli's e-mail?

17   A    Yes.

18             MS. KASULIS:  I'm just going to make sure we can

19   pull that up.  Sorry for the delay.

20             And one more up.  Thank you.

21   Q    So, this e-mail from you is dated March 21, 2012 to

22   Mr. Shkreli; is that right?

23   A    Yes, that's correct.

24   Q    Could you please read this e-mail to the jury?

25   A    Dear Martin, Since I am the manager of Dynagrow Capital,

S. Hassan - direct - Kasulis                996

1   which manages our family's money, I would appreciate it if you
2   would list in any investor list or otherwise Dynagrow Capital
3   as the investor.  If you feel the need to identify me as the
4   manager, please feel free to describe it as Dynagrow/Sarah
5   Hassan.  My dad is not a direct investor and cannot do so
6   because of compliance obligations.  I also understand that any
7   new investments by Dynagrow into anything outside of ETS will
8   need to be precleared with him and the firm where he became a
9   partner in January 2011.  This is now a tightly regulated
10  entity.  I hope you understand.  Best, Sarah Hassan.
11  Q    When you make the reference to the firm where he, in
12  reference to your father, became partner in January 2011, what
13  firm is that?
14  A    Warburg Pincus.
15       MS. KASULIS:  And if we can now move up in the
16  document to Mr. Shkreli's response.
17  Q    This appears to be response from Mr. Shkreli, the
18  Defendant, sent on March 21, 2012, to you, Ms. Hassan, with a
19  carbon copy to Evan Greebel at kattenlaw.com.  In response,
20  Mr. Shkreli states:  Thank you, Sarah.  I hope I have not
21  upset you or caused any unnecessary stress.  I will make sure
22  Evan Greebel, our attorney, corrects the document.  Thank you,
23  Martin Shkreli.
24       Is that an accurate recitation of his response to
25  you?

S. Hassan - direct - Kasulis                997

1    A    Yes.

2    Q    Did Dynagrow ever receive any additional shares of

3    Retrophin in the 2012 time period?

4    A    Yes.

5    Q    Can you please explain that for the jury?

6    A    There was some point in 2012 where I got an e-mail from

7    Martin essentially saying:  Thank you for your support in the

8    early stage of this company.  I'm assigning you 5,000 more

9    shares.

10        It was somewhat of a surprise.

11   Q    Why were you surprised?

12   A    It was just out of the blue.  It wasn't a conversation we

13   had had.  There was no request, there was no sort of phone

14   call, there was no mention.  It was just an e-mail that popped

15   up one day that said we're awarding Dynagrow Capital 5,000

16   more shares.

17   Q    Do you know approximately when that occurred?

18   A    It was sometime in the 2012 period.  I'd have to look.

19   Q    Directing your attention to Government Exhibit 103-10,

20   it's Tab 25.  You can take a minute to review this document.

21        Does this document refresh your recollection as to

22   when you received the additional shares or Dynagrow received

23   the additional shares in Retrophin?

24   A    Yes.

25   Q    When was that?

S. Hassan - direct - Kasulis          998

1    A    This e-mail was Monday, April 16, 2012.

2    Q    What, if any, conversations did you have with the

3    Defendant in this time period, the 2012 time period, about

4    whether your father was interested in investing in any hedge

5    funds?

6    A    I know there was some point he made a request to see if

7    my dad was interested in investing.  But I knew he wasn't, so

8    I didn't forward it to him.

9              THE COURT:  Investing in what?

10             THE WITNESS:  Well, he actually sent over an e-mail

11   asking if he'd be interested in investing in Retrophin or in

12   one of his funds.

13             THE COURT:  Thank you.

14             THE WITNESS:  It was sort of a broad e-mail.

15   Q    Did you approach your father about that request?

16   A    No, I did not.

17   Q    Why not?

18   A    I knew he wouldn't have been particularly interested.

19   Q    Why is that?

20   A    He gets approached on these things all the time and he

21   would have -- and at this point, he was aware that I had used

22   some of the family money to invest in Retrophin, so he

23   probably wouldn't want any additional exposure.  But I get

24   approached fairly frequently for him to invest in things, so I

25   don't always approach him with them.

S. Hassan - direct - Kasulis                999

1            I also do think that he might have -- in the e-mail,

2   he referenced one of my dad's colleagues, so it seems like it

3   was something my dad had already heard about through a

4   colleague anyway, so I didn't want to bombard him.

5   Q    I'm showing you what's been marked for identification as

6   Government Exhibit 103-11.  It's Tab 26 of your binder.

7            Do you recognize this exhibit?

8   A    Yes I do.

9   Q    What is it?

10  A    It's an e-mail from Martin to me.

11           MS. KASULIS:  The Government moves this exhibit into

12  evidence.

13           MR. BRAFMAN:  No objection.

14           THE COURT:  We will receive without objection

15  103-11.

16           (Government Exhibit 103-11 so marked.)

17           THE COURT:  Did the Government want to move in

18  103-10?

19           MS. KASULIS:  No, your Honor.  We just used it for

20  refreshing the witness' recollection.

21           THE COURT:  Thank you.

22           (Exhibit published to the jury.)

23  Q    This e-mail appears to be from the Defendant, sent on

24  May 2, 2012, to you with the subject of investment; is that

25  correct?

LAM      OCR      RPR

S. Hassan - direct - Kasulis                    1000

1    A    Yes.

2    Q    Can you please read this e-mail to the jury?

3    A    Hi, Sarah.  Fred mentioned to Brent that Dynagrow will

4    not be able to invest directly into Retrophin due to

5    conflicts; however, I'm curious if Dynagrow would be willing

6    to invest in MSMB Healthcare, LP, our healthcare fund.  This

7    would go along way in supporting the effort, but is clearly

8    not a direct investment.  Best, Martin.

9    Q    Was this the e-mail that you were referring to

10   previously?

11   A    Yes, it was.

12   Q    At this time, in May of 2012, what was your understanding

13   as to what MSMB Healthcare, LP, was?

14   A    To be frank, I still thought this was essentially the

15   same as MSMB Capital.  When I invested in MSMB Capital, it was

16   described to me as his healthcare fund, not one of his

17   healthcare funds.  And this was now described to me as one of

18   the healthcare funds.  So, frankly, I thought it was still the

19   same entity.

20   Q    And what was your reaction to receiving this e-mail?

21   A    I do receive things like this somewhat regularly so it

22   wasn't necessarily a surprise.  I do recall, now that I have

23   this in front of me, I was a little bit uncomfortable with

24   some of this e-mail.

25            Usually if someone tells you you can't invest in a

S. Hassan - direct - Kasulis                1001

1   company because of a conflict and then they ask you to invest

2   in an alternate vehicle to still help that company that was a

3   conflict, that's something I'm not comfortable with.  I do

4   recall reading this e-mail I was a bit uncomfortable with that

5   nature.

6   Q     So we can put this document aside.

7         In the 2012 time period, were you still invested in

8   MSMB Capital?

9   A     Yes.

10  Q     Did you continue to receive performance updates from the

11  Defendant regarding MSMB Capital?

12  A     I did receive some in 2012.

13  Q     And in what form did you receive those updates?

14  A     They were e-mails similar to the ones we saw earlier.

15  Q     Showing you what's been marked for identification as

16  Government's Exhibit 80-14 through 80-19.  And those are Tabs

17  27 through 32 in your binder.

18        Do you recognize these documents?

19  A     Yes, I do.

20  Q     What are they?

21  A     They're more of the same MSMB performance estimates that

22  we saw earlier.

23        MS. KASULIS:  Government moves these exhibits into

24  evidence, your Honor.

25        MR. BRAFMAN:  No objection.

LAM        OCR        RPR

1      THE COURT:  We will receive Government Exhibit 80-14

2  through 80-19 without objection.

3      (Government Exhibits 80-14 through 80-19 so marked.)

4      (Exhibits published to the jury.)

5  Q    Do these appear to be the monthly performance estimates

6  for the time period between January 2012 and June 2012?

7  A    Yes, they do.

8  Q    And directing your attention to the last performance

9  statement -- it's Government Exhibit 80-19, Tab 32 of your

10 binder -- what is the date on this e-mail?

11 A    It's September 9, 2012.

12 Q    And the time?

13 A    8:08 p.m.

14 Q    And it appears to be from Martin Shkreli to you; is that

15 correct?

16 A    Yes, that's correct.

17 Q    With the subject MSMB June performance estimate, Dynagrow

18 Capital, LLP; is that right?

19 A    That's correct.

20 Q    And is this e-mail reflective of the monthly performance

21 update for June 2012; is that right?

22 A    Yes, that's correct.

23 Q    So, this is for a time period a couple of months prior to

24 this e-mail; is that right?

25 A    That's correct.

S. Hassan - direct - Kasulis          1003

1   Q    And can you please just step through the net returns

2   section of this e-mail for the jury?

3   A    MSMB returned 8.57 percent net in June 2012.  MSMB has

4   returned 21.04 percent net of fees here to date, June 2012.

5   MSMB has returned 79.49 net of fees since inception on

6   11/1/2009.  You invested --

7            Should I keep going?

8   Q    Sure.  I was going to ask you to then go to the next

9   section.

10           Can you please read those two sentences to the jury?

11  A    You invested $300,000 on 1/17/2011.  The value of this

12  investment is now approximately $435,266 net of fees or plus

13  45.09 percent since inception.

14  Q    What does "net of fees" mean?

15  A    Usually, it's referring to -- I believe it's after, he

16  said it was.  I believe it was after fees.

17  Q    So, based on this e-mail, how much money had you made on

18  your $300,000 investment in MSMB Capital?

19  A    Approximately $135,000.

20  Q    What was your reaction to this e-mail?

21  A    I was thrilled.

22  Q    Why is that?

23  A    It was a very significant return.  This was the single

24  biggest investment I had, so to see it being the best

25  performing one too was very exciting.

LAM      OCR      RPR

1    Q    Below this account value section, there is a sentence

2    that states:   These values are estimates only and inaccuracies

3    may exist.

4            Did you ever receive corrections or updates from the

5    Defendant regarding these performance updates?

6    A    I think there was one time at some point one of them said

7    sorry, there was something inaccurate in the last numbers.

8    But not to these.

9    Q    Then below that, the Defendant says:   We apologize for

10   the delay in sending this report.

11           Do you see that?

12   A    Yes.

13   Q    Did you have any concerns about the delay in this report,

14   reporting time period, as compared to the date of the e-mail?

15   A    Yeah, I had remembered being curious about where this

16   investment was, but -- and I remember even thinking that it

17   was worth asking, but before I had an opportunity to do that I

18   did get this.

19   Q    Do you have an understanding as to whether you received

20   any performance updates regarding your investment in MSMB

21   Capital after the date of this e-mail?

22   A    I think this was the last one.

23   Q    What happened with respect to MSMB Capital after this

24   e-mail?

25   A    Eventually, I got an e-mail.  I was part of an e-mail

1    chain that wasn't necessarily directed to me, stating that he

2    was going to be winding down the fund and that if I wanted to,

3    I could take the rest of my investment in the form of cash and

4    he would distribute the cash to me, or, if I wanted to

5    reinvest, that I could roll the money over into Retrophin.

6    Q    Up until that point in time, until you received that

7    e-mailed, had you had any discussions with the Defendant

8    regarding rolling over your investment from MSMB Capital into

9    Retrophin?

10   A    No, I have not.

11   Q    Showing you what's been marked for identification as

12   Government Exhibit 103-13 -- it's Tab 33 of your binder -- do

13   you recognize this document?

14   A    This looks to be the e-mail I was just referring to.

15            MS. KASULIS:  The Government moves this exhibit into

16   evidence.

17            MR. BRAFMAN:  No objection, your Honor.

18            THE COURT:  It is received without objection,

19   Government 103-13.

20            (Government Exhibit 103-13 so marked.)

21            (Exhibit published to the jury.)

22            MS. KASULIS:  Thank you.

23   Q    If we could focus on the very top portion of this e-mail.

24   A    Okay.

25            MS. KASULIS:  Actually, the date, to, from, the

S. Hassan - direct - Kasulis                1006

1   recipient.

2   Q    This appears to be an e-mail from the Defendant dated

3   September 9, 2012 at 8:44 p.m.; is that right?

4   A    Yes, that's correct.

5   Q    And just to refresh your recollection, the prior e-mail

6   that we looked at, Government Exhibit 80-19, the June

7   performance update you received, that was dated September 9,

8   2012 at 8:08 p.m.; is that right?

9   A    Yes.

10  Q    So, this e-mail that we're looking at, 103-13, came

11  shortly after 80-19; is that right?

12  A    Yes, it did.

13  Q    And the subject is message from MSMB Capital, and it

14  appears to have an attachment entitled

15  MSMBlettertoinvestors.pdf.

16          If we could now turn to the body of this exhibit.

17  I'm not going to have read this entire e-mail to the jury, I

18  think we can just focus on the first paragraph?

19  A    Okay.

20  Q    It appears to be starting with:  To our limited partners.

21          And then the first paragraph, if you could read this

22  to the jury.

23  A    To our limited partners, I have decided to wind down our

24  hedge fund partnership with the goal of completing the

25  liquidation of the fund by November or December 1, 2012.  As

1  you know, MSMB has found increasingly compelling opportunities

2  in private equity.  We are going to focus our efforts on

3  managing money in a hybrid public private structure, one which

4  is not generally amenable to the opened-ended private hedge

5  fund partnership structure.

6  Q     Thank you.  With respect to that first sentence, "I have

7  decided to wind down our hedge fund partnership with the goal

8  of completing the liquidation of the fund by November or

9  December 1, 2012," what was your reaction to seeing this or

10  reading this sentence?

11  A     I was pretty surprised.  I had never really gotten a

12  notice that that was a plan.  We never had a conversation.

13  And I was surprised that he was doing so well in this hedge

14  fund that he wanted to move on to something else.  When you're

15  that successful in something, you found the recipe for

16  success, you should be able to forward that.  So, I was a bit

17  surprised.

18  Q     With respect to the second sentence, "As you know, MSMB

19  has found increasingly compelling opportunities in private

20  equity.  We are going to focus our efforts on managing money

21  in a hybrid public private structure which is not generally

22  amenable to an open-ended private hedge fund partnership

23  structure," what was your understanding of what this sentence

24  meant?

25  A     He hadn't really updated me on some of the investments

S. Hassan - direct - Kasulis          1008

1   that he was looking at, so I wasn't really sure what his

2   intention was.

3            MS. KASULIS:  And if we could zoom back out.

4   Q    I'll direct your attention to the bottom, the last

5   paragraph of the e-mail, can you please read this last

6   paragraph to the jury?

7   A    Last paragraph on the page or the e-mail?

8   Q    I'm sorry, the last paragraph on the page, the first

9   page, ending in 926.

10  A    I cannot thank you, the partners, enough.  I have the

11  most loyal investors in the world.  We have received two

12  redemptions since inception and are thankful for your patience

13  and tolerance while we went through operational mishaps and

14  switched strategies several times.  Original MSMB investors

15  from 2009 have just about doubled their money net of fees.  I

16  regret terminating the fund, but I feel tremendous private

17  equity opportunities are abundant at the moment and we need

18  the latitude to explore them.

19  Q    What was your reaction to reading this paragraph?

20  A    Again, I was still a little surprised.  I also wasn't

21  very familiar with what the operational mishaps or switching

22  strategies was.  I had never really been kept abreast of that

23  information.  And, again, it was still surprising for someone

24  that was able to double their investors' money over what

25  seemed to be a three-year period, it was still surprising he

S. Hassan - direct - Kasulis                    1009

1    was shutting it down.

2    Q    In the sentence about "I regret terminating the fund but

3    I feel tremendous private equity opportunities are abundant at

4    the moment," do you have an understanding as to what he was

5    referring to with respect to private equity opportunities?

6    A    No.  The only one that could have been a private equity

7    opportunity that he was -- that I knew he was working on was

8    Retrophin, but I didn't know what the multiple opportunities

9    could have been.

10   Q    And directing your attention to the next page of this

11   exhibit, the last paragraph of this e-mail, can you please

12   read this to the jury?

13   A    A few operational notes.  Investors will have their

14   limited partnership interests redeemed by the fund for cash.

15   Alternatively, investors may ask for a redemption of Retrophin

16   shares or a combination of Retrophin shares and cash.  Keep in

17   mind, Retrophin shares are illiquid and no liquid market may

18   develop; however, if you feel the desperate need to keep

19   investing with me, Retrophin will embody all of my investment

20   activities and attention.  I think it will prove to be a

21   successful public company and investment, however different

22   from a hedge fund it may be.  MSMB will halt reporting at the

23   9/30/12 period and begin offering cash to repurchase limited

24   partnership interest shortly thereafter.  If all goes

25   according to plan, you will either be a Retrophin, LLC, unit

1    holder or have cashed out by 10/31/12.

2    Q    What was your reaction to reading this paragraph?

3    A    Again, I was still very much surprised.  I was told he

4    would be an interim head of Retrophin, but my reaction was to

5    request that the initial capital investment I made be

6    returned -- well, the whole thing be returned, and that I

7    would keep the initial capital investment and just reinvest

8    the initial profit.

9    Q    So, when you're talking about your initial investment and

10   the return, can you explain the dollar amounts that you were

11   considering at this time?

12   A    Yes.  So, I initially invested $300,000, so I asked that

13   he send me all of the cash back and that, subsequently, I was

14   likely to reinvest the profit.  So, my investment grew from

15   $300,000 to about $435,000, so I was planning on reinvesting

16   the difference, $135,000, back into Retrophin pending all of

17   the appropriate paperwork.

18          I didn't know exactly what it meant to just have

19   something roll over into the shares and what that would

20   actually mean for value or how many shares and how much it

21   would be worth, so I thought it would make more sense to just

22   request my cash back.

23   Q    In the middle of this paragraph, the Defendant wrote,

24   "Keep in mind, Retrophin shares are illiquid and no liquid

25   market may develop."  What does illiquid mean to you?

S. Hassan - direct - Kasulis                1011

1   A    That means that it's not available on the public market.

2   You can't just say I want to trade it tomorrow and obtain your

3   cash.  You have those stocks, but it's -- there may be some

4   underlying value, but, again, you can't take it in for money.

5            A very common illiquid investment is, like, a house.

6   It's not something you can get cash for tomorrow, at least not

7   easily.

8   Q    What, if any, concerns did you have about Retrophin

9   shares being illiquid at this time?

10  A    Well, that was a big concern for me.  I had an

11  opportunity to get my cash from a very healthy investment, but

12  it's important to me at least somewhat to be able to trade

13  money.  I certainly didn't want to roll over such a

14  significant portion of my net worth into an illiquid asset.

15  It's important for me to be able to have at least some kind of

16  redemption for my money.

17  Q    In the middle of the paragraph, it states MSMB will

18  halt -- the Defendant wrote MSMB will halt reporting at the

19  9/30 or September 30, 2012 period.

20           Did you receive -- do you recall receiving any

21  performance updates through -- for the fund through

22  September 30, 2012?

23  A    No.  I believe the last one we viewed, I believe that was

24  the last statement I saw.

25  Q    And just to be clear for the record, that was Government

LAM      OCR      RPR

S. Hassan - direct - Kasulis                1012

1   Exhibit 80-19, the e-mail that had the performance update for

2   June 2012; that would be Tab 32?

3   A    Yes, 80-19.

4   Q    Thank you.  And the last sentence states, "You will

5   either be a Retrophin, LLC, unit holder or cashed out by

6   October 31, 2012."

7        Did you cash out of your MSMB Capital investment by

8   October 31, 2012?

9   A    No, I did not.

10  Q    Attached to this e-mail appears to be a two-page letter

11  and a performance chart.  Do you see that attachment?

12  A    Yes.

13  Q    Does the attachment, which starts at SH-EDNY0000928, to

14  the next page, through 29, does this attachment appear to just

15  be the same information that was contained in the e-mail to

16  which this letter is attached?

17  A    Yes.

18       MS. KASULIS:  And with respect to the last page of

19  this document, it's Bates number ending in 930, I will give

20  Ms. Balbin a second to rotate the chart, if possible.

21

22       (Continued on next page.)

23

24

25

LAM      OCR      RPR

1   (Continuing)

2   Q    Does this appear to be -- it's entitled track record; is

3   that right?

4   A    That's correct.

5   Q    And for which fund did you believe this track record was

6   for?

7   A    MSMB Capital.

8   Q    And that was the fund that you had been invested in?

9   A    Yes.

10  Q    If you look at the bottom right-hand corner of this

11  chart, under the column ITD, there's a listing of a hundred

12  percent -- 100.7 percent.

13          Do you see that?

14  A    Yes.

15  Q    What does ITD mean to you?

16  A    Inception to date.

17  Q    And what does 100.7 percent mean?

18  A    It means that he, essentially, returned a hundred

19  percent.  He doubled the money of anyone that invested upon

20  inception.

21  Q    Did you communicate with the defendant after receiving

22  this e-mail on September 9th, 2012 about redeeming your

23  investment in MSMB Capital?

24  A    Yes, I did.

25  Q    In what form did you communicate with him?

1    A    Via e-mail.

2         MS. KASULIS:  I'm showing you what's been marked for

3    identification as Government's Exhibit 103-14.  It's tab 34 of

4    your binder.

5    Q    Do you recognize this document?

6    A    Yes, I do.

7    Q    What is it?

8    A    It's the e-mail that I sent in response.

9    Q    In response to the September 9th, 2012 e-mail that the

10   defendant sent?

11   A    Yes.

12        MS. KASULIS:  The Government moves this Exhibit into

13   evidence, Your Honor.

14        MR. BRAFMAN:  No objection.

15        THE COURT:  We receive Government's Exhibit 103-14

16   without objection.

17        (Government's Exhibit 103-14 received in evidence.)

18        (Exhibit published to jury.)

19   Q    This appears to be an e-mail from you, sent to the

20   defendant Martin Shkreli, dated September 28th, 2012 which he

21   then responds to on the same day, September 28th, 2012.

22        And it appears to be in response to that

23   September 9th, 2012 e-mail about the dissolution of the fund;

24   is that right?

25   A    Yes.

Hassan - direct - Kasulis                    1015

1    Q    Directing your attention to the middle of the page, your

2    e-mail dated September 28th, 2012.

3    A    Yes.

4    Q    It appears to be from you to Mr. Shkreli, the subject is:

5    Confidential:  For Martin Shkreli's eyes only.

6           Did you change the subject line of the e-mail, the

7    original e-mail?

8    A    Yes, I did.

9    Q    Why did you do that?

10   A    Well, I had put my account number in there, so I didn't

11   know if anyone else monitored his e-mails for him, like an

12   administrative assistant, but I didn't want too many people to

13   see my personal banking information.

14   Q    And can you please read this e-mail that you wrote to the

15   jury.

16   A    Dear Martin, thank you for updating me on your fund.  I

17   have the following requests:  One, please liquidate my

18   position and send the cash at my account number at Bank of

19   America.  Subsequent to this, please plan on receiving

20   $100,000 as investment into Retrophin.  This investment is

21   subject to the appropriate paperwork being in place.

22   Q    And then how did you end the e-mail?

23   A    Looking forward to hearing from you, best, Sarah.

24   Q    And then if we could scroll up to the top of the e-mail.

25          And the defendant's response to you that day was:

1    Thank you, Sarah.

2         Is that correct?

3    A    Yes.

4    Q    Now, subsequent to this e-mail, this e-mail was

5    September 2012.

6         Did you have any understanding as to whether

7    Retrophin remained a private company or went public?

8    A    I know at some point they did a reverse merger with

9    Desert Gateway, but I don't exactly remember the timeline.

10        MS. KASULIS:  Directing you to, for identification,

11   to Government's Exhibit 103-17.

12   Q    Do you recognize this Exhibit?

13   A    Yes, I do.

14   Q    And what is it?

15   A    This is an e-mail he had sent out with it looks like a

16   press release attachment of:  Retrophin completes reverse

17   merger with Desert Gateway, Inc.

18   Q    And when you say "he," who are you referring to?

19   A    Martin Shkreli.

20        MS. KASULIS:  The Government moves this Exhibit into

21   evidence.

22        MR. BRAFMAN:  No objection, Your Honor.

23        THE COURT:  We receive Government's Exhibit 103-17

24   without objection.

25        (Government's Exhibit 103-17 received in evidence.)

Hassan - direct - Kasulis                                    1017

1           (Exhibit published to jury.)

2    Q    This e-mail is dated December 18th, 2012 from the

3    defendant with a BCC, a blind carbon copy, of a number of

4    individuals, including yourself; is that correct?

5    A    Yes.

6    Q    The subject is:  Retrophin or RTRX completes reverse

7    merger?

8    A    Yes.

9    Q    What is RTRX to you?

10   A    It's the ticker sign for Retrophin.

11   Q    What is a ticker sign?

12   A    When you go to trade a stock, you don't usually type in

13   the full company name.  Usually, they have kind of an

14   abbreviation to use to trade.

15   Q    And your understanding from this e-mail is to notify the

16   recipients regarding Retrophin's reverse merger?

17   A    Yes.

18   Q    What is the entity to which Retrophin had reverse merged?

19   A    Desert Gateway.

20   Q    After your request in Government's Exhibit 103-14 to

21   redeem your investment in MSMB Capital in cash, did you

22   receive your cash shortly after that e-mail?

23   A    No, I did not.

24   Q    Did you communicate with the defendant at all regarding

25   redeeming your investment?

1    A    I did ask for an update.

2    Q    In what form did that update take?

3    A    I made a request via e-mail.

4         MS. KASULIS:  Showing you what's been marked for

5    identification as Government's Exhibit 103-19.

6    Q    Do you recognize this document?

7    A    Yes, I do.

8    Q    What is it?

9    A    An e-mail correspondence between Martin and I.

10        MS. KASULIS:  The Government moves this Exhibit into

11   evidence.

12        MR. BRAFMAN:  No objection.

13        THE COURT:  We receive 103-19 in evidence without

14   objection.

15        (Government's Exhibit 103-19 received in evidence.)

16        (Exhibit published to jury.)

17        MS. KASULIS:  Directing your attention to the e-mail

18   at the bottom of the page.

19   Q    And e-mails at the bottom of the page are typically

20   earliest point in time in an e-mail chain; is that correct?

21   A    Yes, that's correct.

22   Q    It appears to be from you, dated December 19th, 2012.

23        The prior e-mail was in September, is that correct,

24   2012?

25   A    Yes.

Hassan - direct - Kasulis                              1019

1    Q     To Mr. Shkreli and the subject is:  MSMB Capital.

2          Can you please read this e-mail to the jury.

3    A     Sure.

4          Hi Martin, congratulations on the transition with

5    Retrophin.  I was wondering when you are going do be sending

6    out the disbursements from MSMB Capital.  In our previous

7    conversations you mentioned I could expect something plus or

8    minus week of Thanksgiving.  I know you have been busy with

9    Retrophin, but do you have any updates on MSMB?  Thank you for

10   your time, thanks, Sarah Hassan.

11   Q     And if we could scroll up to the response to this e-mail.

12         It appears that Mr. Shkreli responded to you on the

13   same day, within one minute, on December 19th, 2012.  And he

14   states:  I will definitely give you an update soon.  I am

15   trying to keep my head above water for now.  I'm sorry about

16   this, I promise I will try to do something ASAP.

17         Is that correct?

18   A     Yes.

19   Q     And then, if we could scroll up to your response.

20         Which is dated January 3rd, 2013; is that correct?

21   A     Yes.

22   Q     And I'll direct your attention to the middle of this

23   e-mail starting with:  I know you are busy.

24         Can you please read that to the jury.

25   A     Just starting at that point?

1    Q    Yes.

2    A    I know you are busy, but at your earliest convenience can

3    you please give me some kind of update on the disbursements

4    from MSMB Capital?  Hope all is well, Sarah.

5    Q    And immediately prior to that, you wished Mr. Shkreli a

6    Happy New Year and fruitful new year, right?

7    A    Yes.

8    Q    And did you receive any updates from Mr. Shkreli shortly

9    after this e-mail regarding your investment in MSMB Capital?

10   A    I don't recall exactly what the next update was, but I do

11   know I still had to follow up from this point.

12   Q    And in what fashion did you follow up with the defendant?

13   A    I almost always follow up in e-mail.

14        MS. KASULIS:  I'm showing you what's been marked for

15   identification as Government's Exhibit 103-20.

16   Q    Do you recognize this document?

17   A    Yes, I do.

18   Q    And what is it?

19   A    An e-mail, another e-mail chain between Martin and

20   myself.

21   Q    And is it dated at the top January 21st, 2013?

22   A    Yes.

23        MS. KASULIS:  And I'm also going to show you

24   Government's Exhibit 103-21.  It's behind tab 38.

25   Q    Do you recognize this document?

1   A     Yes.

2   Q     What is it?

3   A     More e-mails between Martin Shkreli and myself.

4           MS. KASULIS:  The Government moves these Exhibits

5   into evidence.

6           MR. BRAFMAN:  Say the numbers again, please?

7           MS. KASULIS:  Sure, Government's Exhibits 103-20 and

8   103-21.

9           MR. BRAFMAN:  No objection.

10          THE COURT:  We will receive 103-20 and 103-21

11  without objection.

12          (Government's Exhibit 103-20 and 103-21 received in

13  evidence.)

14          (Exhibit published to jury.)

15  Q     Look at the first document, Government's Exhibit 103-20.

16  This e-mail appears to be dated the top of the chain,

17  January 21st, 2013.  I think the last e-mail we looked at was

18  in early January, right after New Years.  It's from you to

19  Martin Shkreli with various attachments.

20          Now, before we look at the body of this e-mail, do

21  you have a recollection of how you felt at this point in time

22  about your investment in MSMB Capital?

23  A     I mean, I was still excited with the overall return that

24  I had, but I was starting to get a little frustrated and upset

25  that it was becoming increasingly difficult to actually

Hassan - direct - Kasulis                    1022

1    collect my money.

2    Q    So, let's turn to the body of this e-mail.  And we will

3    step through portions of this, but apparently it's quite

4    lengthy.

5              Why did you send this e-mail to the defendant?

6    A    Sorry, I'm just going to read it.

7              (Pause in the proceedings.)

8    A    This was after a couple of back and forths of asking for

9    updates and then not really getting any concrete answers.  You

10   know, I just wanted to remind him that, you know, he was a

11   fiduciary of these funds.  He was responsible for managing and

12   distributing the funds as discussed and I just wanted to

13   remind him that he decided to dissolve the fund, and several

14   months prior had stated that I should have received my funds

15   several months prior, and I was trying to be patient, but I

16   was also frustrated and concerned that I wasn't getting my

17   funds.

18             I also wanted to remind him not to use my father as

19   an investor and advisor because I thought I had cleared that

20   up in a couple of e-mails I had already sent, but I'd seen an

21   article pop up, so it seemed like there was still somehow some

22   confusion, so I wanted to remind him that that was not okay.

23   Q    And so directing your attention to the very first

24   paragraph.

25             Could you please read that paragraph.  It's just a

Hassan - direct - Kasulis                    1023

1    couple of sentences.

2    A    I continue to have faith in your integrity.  I still

3    consider you the fiduciary of the money that I entrusted to

4    you both from my personal funds and through Dynagrow funds,

5    where I am the manager.

6    Q    You had mentioned the word fiduciary.

7         What does fiduciary mean to you?

8    A    He is responsible for managing that money and making sure

9    that, especially things like if he commits to liquidating the

10   fund and offering a cash position, he has to follow through

11   with those commitments.

12   Q    And then, directing your attention to the next paragraph,

13   can you please read that.

14   A    I would like you to tell me why you are refusing to

15   return my cash after dissolving the fund.  If you need money,

16   you can ask for it, and I will consider it.

17   Q    And then the next paragraph.

18   A    You had already told all investors in MSMB Capital that

19   their funds would be returned in cash, unless instructed

20   otherwise, in an e-mail dated September 9th, 2012.

21        And I had attached it and made a reference.

22        I asked for my funds to be returned fully in cash

23   with the subsequent transaction of $100,000 investment into

24   Retrophin subject to the appropriate paperwork being in place.

25        And I also attached that e-mail.

VB        OCR        CRR

Hassan - direct - Kasulis                              1024

1    Q    And those are the two e-mails that we've seen already?

2    A    Yes.

3    Q    And then two paragraphs down, can you please read that

4    paragraph into evidence.

5    A    Can you please -- there's a typo.

6         Can you please tell show me the calculations that

7    would help me determine what is now the current market value

8    of my personal investment and the Dynagrow investment.

9    According to an e-mail you sent on September 9th, 2012, my

10   personal investment was valued at $435,266 net of fees as of

11   June 2, 0120.  This is separate from the Dynagrow investment,

12   which was made exclusively into Retrophin.  I have not

13   received any updates since.

14   Q    And then the next paragraph you make a reference about

15   you had agreed to invest because of recommendations from

16   Mr. Saunders and Mr. Banta; is that right?

17   A    Yes.

18   Q    And you had said:  I hope you would not let them down at

19   this time.

20        What did you mean by that?

21   A    I was my gentle reminder that we had mutual contacts in

22   the industry and I didn't think this was the reputation that

23   he wanted to create for himself.

24   Q    And the next paragraph, would you please read that one.

25   A    Also, I continue to see comments being made that my

Hassan - direct - Kasulis                    1025

1  father is an investor or an advisor to you.  As I reiterated

2  to you in an e-mail sent March 21st, 2012, Section C of the

3  attachment, my connection to you is due to my decision and my

4  decision alone.  At no point was my father an investor or an

5  advisor to you.  Therefore, I trust you will drop my father's

6  name in any of your dealings.

7           And I referenced an article where I saw my father

8  misappropriately labeled.

9  Q    And then the next two sentences, can you just read that

10 last sentence starting:  As a friend.

11 A    As I friend I will continue to trust you.  I hope, as the

12 CEO of a public company, you do not betray my trust.

13 Q    Why did you say as the CEO of a public company?

14 A    It just didn't make sense to me that he was operating a

15 company that was now public, but he still wasn't settling his

16 old private -- his private funds, that just didn't make sense

17 to me.  It's -- you don't want to have a public company's CEO

18 sort of in limbo with this stuff.

19           MS. KASULIS:  If you turn to the next Exhibit that's

20 already admitted into evidence.  It's 103-21, Government's

21 Exhibit, tab 38.

22           (Exhibit published to jury.)

23 Q    And just to be clear, at the prior Exhibit, 103-20, the

24 attachments that you reference in your e-mail are attached to

25 this Exhibit; is that right?

1   A     Sorry.

2           (Pause in the proceedings.)

3   A     That's correct.

4   Q     So, 103-21.  Does this appear to be the response that

5   Mr. Shkreli had to your prior e-mail that was in Government's

6   Exhibit 103-20.

7   A     Yes, yes, it is.

8   Q     Sorry, tab 38.

9           In the first paragraph Mr. Shkreli writes:  Hi

10  Sarah, thanks.  I should be more clear.  The fund has

11  continued to invest in Retrophin and this is the only

12  investment in the fund at this moment.  There is no longer any

13  cash at the fund level.  I would not be alarmed.  The plan as

14  I see it, is to distribute the funds holding Retrophin stock.

15  At this point Retrophin can buy back your Retrophin stock for

16  the value mentioned.  I can see your cash returned in the next

17  two weeks.

18          What was your reaction to reading that paragraph?

19  A     To be frank, I felt somewhat betrayed at that point.

20  Q     Why?

21  A     I was told that I could get my cash from the fund months

22  ago.  A long time prior to this.  So, actually, probably about

23  a year prior.  So, I didn't understand; if he had already

24  committed, he wrote to me I could redeem my investment in the

25  form of cash if I wanted to and I'd let him know that.

1    That's, in fact, what I wanted.  So to hear over a year later

2    that that cash is gone, it was, well, it was, it was

3    upsetting.

4    Q    Prior to this point in time, January 2013, did you have

5    any awareness as to what Mr. Shkreli wrote, that the fund had

6    continued to invest in Retrophin and this is the only

7    investment in the fund at this moment?

8    A    No, I had no idea that that was taking place.

9    Q    And what was your reaction to that?

10   A    I was upset.  Again, I saw that as being my cash.  I was

11   told that I could have access to that cash over a year prior.

12   It just seemed like it was, it was just not right.

13   Q    And then, in the next paragraph, the defendant talks

14   about:  The comments in 2012 were blessed by your father, to

15   my understanding, and are the only public comments in this

16   regard.  Ken Banta and our PR advisory set that interview up

17   and this is what came out of it.

18        What was your reaction to reading that?

19   A    I had a hard time believing that.  My dad is very, very

20   careful.  I can't listen -- even for my own personal dealings

21   if I wanted to list him as an advisor on something, I

22   personally would still have to go through the Warburg Pincus

23   approval process and I know he didn't do that.  So, he's very

24   careful.  I had a hard time believing that that was accurate

25   information.

Hassan - direct - Kasulis                    1028

1   Q     And then the last paragraph the defendant wrote:  I wish

2   the funds did not need to support Retrophin as much as it did.

3         He uses this word funds plural.  Did you have an

4   understanding as to which funds he was talking about?

5   A    I did not realize that was a reference to funds as in

6   hedge funds.  I thought it was referring to funds as in money.

7   And I assumed it was money from the fund.

8   Q     And then he goes on to state:  The reality is the last

9   few months have been very trying.  Thankfully, we have

10  survived.

11        And then he later wrote:  I hope you will continue

12  to bet on me as a friend and as an investor.  I am around

13  tomorrow if you want more clarifications.  I understand this

14  has not been the most transparent or straightforward process.

15  I wish I handled it differently but ultimately, I believe I've

16  maximized results for all parties.  Retrophin was on the

17  brink, but is now in good shape.  Thank you for your

18  confidence.  I read everything in this e-mail carefully.

19        What was your reaction to reading this paragraph

20  about the state of Retrophin and the funds support of

21  Retrophin?

22  A    Again, it was still very much a surprise to me.  I was

23  never told that Retrophin was in such a distressed state that

24  even needed like, funds that badly.  I didn't put it together

25  from the one e-mail asking if my dad would invest.  I didn't

Hassan - direct - Kasulis                          1029

1    think it was a dire state like this.

2           And again, I just still, I was very frustrated to

3    see that, regardless of the state of Retrophin and MSMB, he

4    committed to returning that money.  So, regardless of the

5    state of Retrophin, it didn't make sense to me that my money

6    was gone.  So, that was sort of still my feeling.

7    Q    And did you respond then to this e-mail from the

8    defendant?

9    A    I don't recall if I -- I must have responded.  I don't

10   recall specifically.

11          MS. KASULIS:  I'm showing you what's been marked for

12   identification as Government's Exhibit 103-22.

13   Q    Do you recognize this Exhibit?

14   A    Yes, I do.

15   Q    And what is it?

16   A    It's follow-up correspondence to the previous e-mails.

17   Q    And that's dated within a day -- excuse me.

18          MS. KASULIS:  The Government moves Government's

19   Exhibit 103-22 into evidence.

20          MR. BRAFMAN:  No objection.

21          THE COURT:  We receive 103-22 without objection.

22          (Government's Exhibit 103-22 received in evidence.)

23          (Exhibit published to jury.)

24   Q    Directing your attention to the middle of the first page

25   of this Exhibit.  This appears to be a response to

Hassan - direct - Kasulis                    1030

1    Mr. Shkreli's prior e-mail dated January 22nd, the next day,

2    2013; is that correct?

3    A    Yes.

4    Q    Directing your attention to the middle of the paragraph,

5    starting:  So here are my new questions.

6              Can you please read that until the end of the

7    friendship sentence, please.

8    A    If Retrophin buys back my Retrophin stock, how much will

9    I receive based on today's market price?  Also, would this

10   constitute a loss or a gain to my original investment in your

11   fund?  Even after the stock repurchase, how many shares of

12   Retrophin will I still own and what will their value be on

13   today's prices?  You were the only person I decided to invest

14   in because of our friendship.

15   Q    So, did you have any understanding as to the price of

16   Retrophin stock at this point in time?

17   A    I don't recall.  I don't think I had a sense of it.

18   Q    And the next sentence?

19   A    Continue reading?

20   Q    Yes.

21   A    I hope you understand my anxiety since I have not

22   received paperwork to give me information on what happened to

23   my money.

24   Q    And you concluded by saying:  Thanks again for working on

25   this, I look forward to hearing from you, best, Sarah.

1          Is that right?

2   A    Yes.

3   Q    It appears that you're still taking a -- why were you --

4   why did you still have this tone in your e-mails with respect

5   to your correspondence with the defendant?

6   A    I'm generally somewhat, I don't really like conflict and

7   I'm not, I, I, I wanted to make sure we got to an end result

8   but at the same time, this gentleman still is holding my money

9   and it was a very significant portion of my money.  So, it was

10  in my best interest to try and keep it friendly.

11  Q    And then his, the response from the defendant is dated --

12  your e-mail is January 22nd of 2013 and his response is dated

13  February 14th, 2013.  So, apparently a couple weeks later.

14         The defendant wrote:  You might have noticed we

15  raised $10 million in the financing.  This is a big milestone

16  for Retrophin.  I can now fully turn my attention to helping

17  resolve the fund situation.  I will be in touch later today

18  with some thoughts on how to proceed.

19         What was your reaction to seeing that there had been

20  this $10 million in financing?

21  A    Well, when he said you might have noticed, I didn't know

22  until he mentioned it and then I went to look it up.  I really

23  didn't have much to think on it.  I was honestly just so

24  fixated on what does this mean in terms of when you're

25  actually going to return my funds.  I didn't understand what

1    it meant for me.

2    Q    And then did you have continued correspondence with the

3    defendant regarding attempting to get back your investment in

4    MSMB Capital?

5    A    Yes, I did.

6              MS. KASULIS:  Directing your attention to

7    Government's Exhibit 103-23.

8    Q    Do you recognize this Exhibit?  It's tab 39, I apologize.

9    Oh, actually, tab 40.

10   A    Thanks.

11   Q    Do you recognize this Exhibit?

12   A    Yes, I do.

13   Q    And what is it?

14   A    It's additional e-mail correspondence between Martin

15   Shkreli and I.

16             MS. KASULIS:  The Government moves this Exhibit into

17   evidence.

18             MR. BRAFMAN:  No objection.

19             THE COURT:  We receive 103-23 without objection.

20             (Government's Exhibit 103-23 received in evidence.)

21             (Exhibit published to jury.)

22   Q    Starting at the bottom of this e-mail chain.  It appears

23   to be a message from Leonora.

24             Do you know who that is?

25   A    I'm not familiar.

Hassan - direct - Kasulis                    1033

1    Q    At a Retrophin address.

2         It's dated March 20th of 2013 with the subject -- to

3    Martin Shkreli, with the subject:  Sarah has called for you.

4    With your phone number there.

5         It appears then that Mr. Shkreli then writes an

6    e-mail to you on the same day stating:  Hi Sarah, got your

7    message.  On our West Coast road show.  Don't have a minute to

8    chat.  Will call when back in the City.  You are on the top of

9    my mind.

10        Do you know why you were calling the defendant at

11   this time?

12   A    I believe it was more follow-up on trying to obtain my

13   funds.

14   Q    And then in response, at the top of the e-mail chain

15   dated March 27th, 2013, you respond.  Can you please read your

16   response to the jury.

17   A    Hi Martin, it was a pleasure speaking with you today.  I

18   know you're busy, so thank you for taking the time to hammer

19   out these last few issues.  Attached you will find my personal

20   wiring instructions.  Please shoot me a quick e-mail when the

21   wire has come through.  To confirm my understanding of our

22   conversation sometime either today or this week you will wire

23   approximately $300,000 to my account as I am selling just some

24   of my shares back and I can expect the remaining $200,000 or

25   show will come in stock.  Did I understand that correctly?

Hassan - direct - Kasulis                    1034

1    Looking forward to hearing from you soon, best Sarah.

2    Q    So, with respect to the sentences starting:  To confirm

3    my understanding from our conversation.

4           At this point in time, what had you discussed with

5    the defendant about getting your investment back from

6    MSMB Capital?

7    A    Can you expand just a little bit?

8    Q    Sure.

9           So, with respect to what you memorialized here

10   regarding your conversation with the defendant, what do you

11   recall about that conversation with the defendant as to how to

12   resolve your outstanding issue with respect to getting your

13   investment back from MSMB Capital?

14   A    My understanding was that I was going to obtain my

15   initial investment, the $300,000 in cash, and that anything

16   remaining would -- I would receive in the form of shares.

17   Q    At this point in time or at any point in time in this

18   time period, the 2013 time period, did you receive any shares

19   of Retrophin?

20   A    I did at one point receive from my personal investment, I

21   received a stock certificate for Desert Gateway, essentially

22   Retrophin, yeah.

23   Q    And did you receive any other stock certificates?

24   A    For Dynagrow Capital I received a stock certificate for

25   Retrophin.              (Continued on following page.)

VB        OCR        CRR

1   DIRECT EXAMINATION

2   BY MS. KASULIS: (Continuing)

3   Q    And so with respect to the Desert Gateway stock

4   certificate, did you have any understanding as to why you

5   received that stock certificate?

6   A    No.  I was -- I was sort of stumped.  I wasn't told I was

7   going to be getting it.  This is still when I was expecting to

8   be getting some type of cash at some point.  We hadn't quite

9   worked all this out, and then one day I was opening mail and I

10  think I had a Fed Ex, or something, and I opened it up and

11  there was a stock certificate for Desert Gateway.  And I

12  really didn't understand how that came to be or what that was

13  worth or what it meant, and it was very odd.

14  Q    And you were saying that was for your personal

15  investment.  What personal investment are you referring to?

16  A    My investment in MSMB Capital.

17  Q    Did you reach out to the defendant at all regarding the

18  -- regarding getting the Desert Gateway shares in Fed Ex?

19  A    Yes, I believe so.

20  Q    Do you recall the discussion you had with the defendant?

21  A    Not exactly.

22  Q    Do you recall any explanation the defendant gave you with

23  respect to why you had received those shares?

24  A    I don't recall.

25  Q    In this e-mail, when you talk about "As I am selling some

Hassan - direct - Kasulis                    1036

1   of my shares back," which shares are you referring to?

2   A    I was under the impression that I was going to get

3   $500,000 worth of Retrophin shares but that the company

4   Retrophin would be immediately buying back $300,000 worth of

5   those shares.

6   Q    And what is your understanding based on?

7   A    Just from the phone call that I had had with Martin.

8   Q    And did you have -- were you able, after this e-mail, did

9   you, in fact, get a wire transfer of $300,000 into your

10  account?

11  A    No, I did not.

12  Q    Did you continue to have communications with the

13  defendant regarding your MSMB Capital investment?

14  A    Yes, I did.

15  Q    I am directing your attention to Government Exhibit

16  103-27.  It's tab 44 of your binder.

17  A    I'm sorry, tab what?

18  Q    I'm sorry, 44.  Do you recognize this document?

19  A    Yes, I do.

20  Q    And what is it?

21  A    E-mail correspondence between Martin and I.

22            MS. KASULIS:  The Government moves this exhibit into

23  evidence.

24            MR. BRAFMAN:  No objection.

25            THE COURT:  We have received Government Exhibit

1    103-27 without objection.

2              (Government's Exhibit 103-27 was received in

3    evidence.)

4    Q    Starting at the bottom of the page, it appears to be a

5    two-page e-mail exchange between yourself and the defendant

6    from March 9, 2013 to April 2, 2013; is that correct?

7    A    Yes.

8    Q    Starting at the bottom of page 1 -- or excuse me, the

9    bottom of page 2, it appears to be an e-mail from yourself,

10   dated March 29, 2013, to the defendant.  You write, in the

11   middle of the e-mail:  "On the phone, you mentioned that if

12   you weren't able to send the funds to my account on Wednesday,

13   3/27, that you would send them by the end of this week.  Are

14   we still on target for that?  Thank you.  Best, Sarah."

15             And then, if you look at the next e-mail, there

16   appears to be a response from the defendant at the bottom of

17   the first page.  This is an e-mail from the defendant to you,

18   with a carbon copy to Evan Greebel, and the defendant writes:

19   "Unfortunately, my lawyers think we should sign an agreement

20   to document the transaction.  We will get you that this

21   weekend."

22             What was your response to receiving this e-mail

23   about needing to have an agreement?

24   A    Part of me thought it was another delay, another delay

25   tactic, just because it had been so long that I had been

1  trying to obtain my funds.  And the second part of me was

2  confused because I didn't know what kind of agreement he was

3  trying to imply that we needed to sign.  I thought it was some

4  kind of like fund disbursement agreement or something like

5  that.  I wasn't exactly sure what it was.

6  Q    Up until this point in time, had you been communicating

7  with Evan Greebel at all regarding the disbursement of your

8  investment in MSMB Capital?

9  A    No.

10  Q    In response, you can go a little higher up in the chain,

11  it's dated March 31st, 2013.  You write:  "Martin, that's

12  fine.  Obviously, it doesn't fit the discussed timing last

13  week.  For my knowledge, when can we execute the paperwork and

14  transaction?  Thank you.  Best, Sarah."

15        And then, in response, farther up in the chain, Mr.

16  Shkreli writes:  "Tomorrow afternoon.  Sorry for the delay and

17  incorrect timing.  Evan has promised the documents by then.

18  Assume brief review by you tomorrow afternoon should work."

19        Do you recall receiving the paperwork in a timely

20  manner after this?

21  A    No.  I required some follow up just to make sure.

22  Q    I'm showing you what has been marked for identification

23  as Government Exhibit 103-29.  It's tab 46 of your binder.

24        Do you recognize this exhibit?

25  A    Yes.

1    Q    What is it?

2    A    More correspondence between Martin and I.

3         MS. KASULIS:   The Government moves this exhibit into

4    evidence.

5         MR. BRAFMAN:   No objection.

6         THE COURT:   We've received 103-29 without objection.

7         (Government's Exhibit 103-29 was received in

8    evidence.)

9    Q    Now, directing your attention to the second page of this

10   exhibit.  The bottom of that page, it appears to be an e-mail

11   from you, dated April 5, 2013, to the defendant Martin

12   Shkreli, entitled settlement and release agreement.

13        What are you referring to with respect to the

14   settlement and release agreement?

15   A    Well, in the other e-mail, he referenced my attorneys

16   think we should sign an agreement before moving forward.  And

17   it wasn't some kind of funds distribution agreement or

18   something, it was a settlement and release agreement.

19   Q    What did that mean to you?  What's the difference?

20   A    Usually, when you have -- and frankly, I had thought I

21   had never gone through the process of doing a settlement and

22   release agreement before, but I always thought it was a way of

23   avoiding getting sued or like coming to an agreement before

24   getting sued or after getting sued.  That was my understanding

25   of it.  But basically it was so that -- were agreeing to

Hassan - direct - Kasulis                    1040

1    the terms that he would give me a certain amount of money and

2    a certain amount of shares and that I wouldn't take action

3    against him, or any of the entities he was involved in, and

4    that I wouldn't say any negative or disparaging comments

5    against him or any of those entities.

6    Q    And had you threatened to take any legal action against

7    Mr. Shkreli at this point in time?

8    A    None at all.

9    Q    Why is that?

10   A    I trusted him.  I thought that he was a strong hedge fund

11   manager, that he had done well.  I trusted him, so I didn't

12   think that it required legal action.

13   Q    If you go higher in the e-mail chain, Mr. Shkreli

14   responds within three days to you:  "I sent to our attorney to

15   blast."

16          Do you have an understanding as to who he is

17   referring to there?

18   A    I believe he was referring to Evan Greebel.

19   Q    If we look at the first page of the document, it appears

20   to be additional back and forth e-mails regarding updates or

21   changes to the settlement and release agreement; is that a

22   fair characterization of the e-mail chain?

23   A    Yes.

24   Q    Directing your attention to the e-mail dated April 16,

25   2013, you state:  "Hi, Martin.  I tried you calling today --

1    tried calling today and left a message with your office.  Were

2    you able to get in touch with Evan to see if he made any

3    revisions or if he is fine with the minor changes so that we

4    can move forward?  I would really like to close this

5    transaction as soon as possible.  Considering the amount of

6    time since the announcement of MSMB winding down, and the

7    travels to get us to this point, I'm sure you can understand.

8    Please let us know where you are with this.  Looking forward

9    to speaking with you soon.  Best, Sarah."

10           What was your understanding of Evan Greebel's

11   involvement in dealing with the settlement and the release

12   agreement?

13   A    I wasn't totally familiar.  I didn't really have many

14   interactions with him.  It seemed to be administrative stuff.

15   I don't know.

16   Q    So with respect to who you believed you were negotiating

17   with at this point in time regarding the settlement and

18   release agreement, who would that be?

19   A    Martin.  I mean, even on the phone, I forget if it was at

20   this point or later on, but there were certain times where we

21   actually agreed to terms on the phone in regards to

22   compensation from the settlement and release agreement.

23   Q    After this point in time, did you continue to exchange

24   drafts of the settlement agreement with the defendant?

25   A    Yes, there were a few back and forth's.

Hassan - direct - Kasulis                1042

1   Q    And ultimately did you reach a resolution, a final

2   version of the settlement and release agreement?

3   A    Yes, we did.

4   Q    I am directing your attention to Government Exhibit

5   103-31.

6        Do you recognize this exhibit?

7   A    Yes.

8   Q    And what is it?

9   A    E-mail correspondence between myself and Martin and Evan.

10       MS. KASULIS:  The Government moves this exhibit into

11  evidence.

12       MR. BRAFMAN:  No objection.

13       THE COURT:  We have received Government Exhibit

14  103-31 in evidence without objection.

15       (Government's Exhibit 103-31 was received in

16  evidence.)

17  Q    If you look at the earliest e-mail in this chain, the

18  second page of the e-mail --

19  A    This?

20  Q    It's the second page, I'm sorry.  The bottom e-mail, the

21  very first e-mail in the chain.  It is from Mr. Shkreli, the

22  defendant, dated April 17, 2013, to you, Sarah Hassan.  He

23  states:  "I gave Evan an update on the document.  Two or three

24  things need to be added and we should be done."

25       When you were going back and forth with drafts of

Hassan - direct - Kasulis                    1043

1    the document, was it your understanding that Mr. Shkreli was

2    included in going -- in those exchanges back and forth

3    regarding the agreement?

4    A    Yes.

5    Q    And then it appears that -- farther up in the chain, you

6    state:  "Thanks for the update.  When will you be able to send

7    these changes along?"

8              And then Mr. Shkreli writes, on April 18th, 2013,

9    with a cc to Mr. Evan Greebel:  "I don't know, Evan, did you

10   get and incorporate my thoughts?"

11             Now, was this reflective of the nature of your

12   interactions with Mr. Shkreli and Mr. Greebel during this time

13   period?

14   A    Yes.

15   Q    Were you ultimately able to execute the settlement and

16   release agreement?

17   A    Yes, I was.

18   Q    I am showing you what has been marked for identification

19   as Government Exhibit 52.  It is tab 50 of your binder.

20             Do you recognize this document?

21   A    Yes.

22   Q    And what is it?

23   A    More correspondence between Martin and myself.

24             MS. KASULIS:  The Government moves this exhibit into

25   evidence.

Hassan - direct - Kasulis                    1044

1        MR. BRAFMAN:  No objection.

2        THE COURT:  We have received Government Exhibit 52

3   without objection.

4        (Government's Exhibit 52 was received in evidence.)

5   Q    It appears to be an e-mail dated April 26, 2013, from Mr.

6   Greebel to you, with a carbon copy to Martin Shkreli, and it

7   is a forward entitled settlement and release agreement with an

8   attachment; is that correct?

9   A    Sorry, where are you looking?

10  Q    I'm sorry, I was looking at tab -- I'm wrong.  I'm sorry,

11  it is tab 51.  It is Government Exhibit 52.  I apologize.

12  A    Yes.

13  Q    Do you recognize Government Exhibit 52?

14  A    Yes.

15  Q    Just for the record, you recognize it?

16  A    Yes.  This is when we finished the settlement agreement.

17  Q    Okay.  And, again, does this exhibit reflect an e-mail

18  with an attachment and the body of the e-mail states attached

19  is the duly executed settlement agreement?

20  A    Yes.

21  Q    Then directing your attention to the next page of this

22  document, is this, in fact, the settlement and release

23  agreement that you entered into?

24  A    Yes.

25  Q    Directing your attention to the second-to-the-last page

MDL   RPR

Hassan - direct - Kasulis                    1045

1   of this exhibit, Bates number R 017081, is that your signature

2   there on the left-hand side above Sarah Hassan individually?

3   A    Yes, it is.

4   Q    And then on the right-hand side, do you see entities

5   listed out, including Mr. Shkreli, individually; Retrophin,

6   Inc.; MSMB Capital Management, LLC; MSMB Capital, LP; MSMB

7   Healthcare, LP; and then on the next page of this exhibit.

8   MSMB Healthcare Investors, LLC; MSMB Healthcare Management,

9   LLC.  Do you see Mr. Shkreli has signed for all of those

10  entities; is that correct?

11  A    Yes.

12  Q    With respect to the MSMB entities that were listed, did

13  you have an understanding as to the difference between these

14  entities?

15  A    No, I did not.

16  Q    Can you explain for the jury -- so to go back to the

17  first page of the settlement and release agreement, Bates

18  number R-018165?

19           MR. BRAFMAN:  I'm sorry, is this agreement in

20  evidence?

21           THE COURT:  Yes.

22           MS. KASULIS:  Yes.

23           MR. BRAFMAN:  Thank you.

24  Q    The first paragraph, what is the date for this agreement?

25  A    April 25, 2013.

Hassan - direct - Kasulis                    1046

1   Q    And subsequent to that, it appears to be entered into

2   between yourself and then all of the entities that had been

3   listed in the signature pages of this agreement; is that

4   right?

5   A    Yes.

6   Q    And then directing your attention, there are a number of

7   whereas clauses in the middle of this agreement.  The second

8   to last whereas clause -- I'm sorry, the third to last,

9   states:  "Releasor made $300,000 personal investment in MSMB

10  Capital, LP in January of 2011."

11        What is your understanding of who the releasor is?

12  A    Me.

13  Q    Then the next whereas clause states:  "Whereas each of

14  the MSMB entities intends to liquidate and wind up," what was

15  your understanding of which MSMB entity -- what was your

16  understanding of which MSMB fund was referred to there?

17  A    Again, I thought MSMB Capital was the fund.  I thought

18  the others were just associated entities.

19  Q    Then below that, it states:  "Whereas, in connection with

20  the liquidation, the parties are entering into this Agreement

21  in order to settle and comprise fully and finally certain

22  claims as provided herein."

23        And then at the very bottom, it says, number one,

24  "Payment Terms."

25        Can you please describe for the jury what payment

1  terms were reached and memorialized in this settlement and

2  release agreement?

3  A    $400,000 in cash, and 58,306 shares of Retrophin.

4  Q    And is the 58,306 shares of Retrophin memorialized on the

5  second page of this document?

6  A    Yes.

7  Q    In the Ownership and Delivery of Shares section?

8  A    Yes.

9  Q    And what was your understanding as to whether these

10 Retrophin shares were liquid or illiquid at the time?

11 A    I knew he had made it a publicly traded company, but I

12 didn't know that these shares were restricted.

13 Q    What do you mean by restricted?

14 A    I wouldn't have had the ability to go sell them the next

15 day if I wanted to.

16 Q    Over what period of time were those shares restricted?

17 A    I forget exactly the period, it was a minimum of six

18 months.  I forget exactly the period.

19 Q    Did you have an understanding as to the value of the

20 shares at that point in time?

21 A    Not entirely, but I wasn't -- again, if it wasn't liquid,

22 I wasn't sure if there would be any value.

23 Q    Why do you say is that?  Can you please explain that for

24 the jury?

25 A    I mean, it's -- I had gotten e-mails at this point saying

1   that Retrophin was really distressed at certain points and

2   required the fund's money just to survive.  So, I mean, I

3   didn't know what the state of the company was going to be in,

4   it was such a difficult process obtaining my money the first

5   time.  I just sort of felt like the odds were not in my favor

6   to do particularly well with the shares.

7   Q    And within this agreement, did you agree to release any

8   sort of claims against the defendant or the entities listed in

9   the signature block of this agreement?

10  A    Yes.

11  Q    Directing your attention to the first page of this

12  document, in the payment term section.  The beginning of this

13  first sentence reads:  "Retrophin agrees to deliver or caused

14  to be delivered to Releaser the total amount of $400,000 in

15  cash upon execution and delivery of this Agreement."

16            Is it fair to say that Retrophin here is reflected

17  as the payor of the $400,000 that you -- that this agreement

18  memorializes that you would receive?

19  A    I believe so.

20  Q    What, if any, concerns did you have about Retrophin being

21  the company that was paying, according to this agreement?

22  A    I hadn't thought that deeply into it, but I also assumed

23  that there must have been some correlation between Retrophin

24  and MSMB.  I mean, I had close to half a million dollars

25  towards the end of the capital accounts that was supposed to

1  have gotten invested into there.  I didn't know exactly how

2  the mechanics worked.

3  Q    When you are saying that MSMB supposedly invested in

4  Retrophin, what were you basing that on, where did you get

5  that understanding from?

6  A    Well, from -- I mean, a long time ago, the cap table had

7  listed MSMB and then, even when I was asking to redeem my cash

8  and I was told there was no cash left at the fund level, I was

9  told it was because it all had to go to support Retrophin.  So

10  I'm assuming it wasn't just my cash, I'm assuming there were

11  other investors who then had money maybe greater than my

12  almost half a million rolled over into there.

13  Q    Who told that you the money had been put into -- that the

14  MSMB capital money had been put into Retrophin?

15  A    This is from the e-mail with Martin when he stated that

16  there was no longer any money at the fund level.

17  Q    Did you have any understanding as to whether Retrophin's

18  board of directors had approved this agreement or not?

19  A    I didn't know.

20  Q    Now, subsequent to this agreement -- so this is dated

21  April 25, 2013; is that correct?

22  A    Yes, that's correct.

23  Q    And you had received the e-mail about dissolution of the

24  fund in September of 2012; is that right?

25  A    Yes.  Yes.

Hassan - direct - Kasulis                1050

1   Q    Did you -- subsequent to this agreement, did you actually

2   receive the $400,000?

3   A    Yes, I did.

4   Q    Now, with respect to your Retrophin shares, did there

5   come a point in time when you were able to sell those shares?

6   A    Eventually, yes.

7   Q    And do you recall when that was?

8   A    I think it was March of 2015.

9   Q    So a couple years after this agreement?

10  A    Yes.

11  Q    Can you explain for the jury, you know, how much money

12  you derived from selling your shares of Retrophin?

13  A    Those shares ultimately become worth about $900,000.

14  Q    Did you have, with respect to your separate investment in

15  Retrophin -- when I say "your," Dynagrow's LLP's investment in

16  Retrophin -- do you still retain any shares from that

17  investment?

18  A    No.  I sold them in the same period.

19  Q    And how much did you sell those shares for?

20  A    I believe the total sale was around 1.4 million.

21  Q    Did you have any issues at any point in time with respect

22  to any tax documents you received from your Retrophin

23  investment?

24  A    Can you expand?

25  Q    Did you ever receive any K-1 forms regarding your

1   investment in Retrophin?

2   A    The Dynagrow investment?

3   Q    Yes, including the Dynagrow investment in Retrophin.

4   A    Yes, I did.

5   Q    I am showing you what has been marked for identification

6   as Government Exhibit 103-35 and Exhibit 103-36, they are tabs

7   53 and 54 of your binder.

8         MS. KASULIS:  Your Honor, I have approximately five

9   more minutes to finish.

10        THE COURT:  All right.  When she finishes, we will

11   provide lunch breaks to the jury.

12   Q    Those are tabs 53 and 54 of your binder.  Do you

13   recognize these exhibits?

14   A    Yes.

15   Q    What are they?

16   A    They are K-1's.

17        MS. KASULIS:  The Government moves these exhibits

18   into evidence.

19        MR. BRAFMAN:  No objection.

20        THE COURT:  We have received 103-35 and 103-36 in

21   evidence without objection.

22        (Government's Exhibits 103-35 and 103-36 were

23   received in evidence.)

24   Q    I'm showing you what has been marked as 103-35.  The

25   first page of this document -- within this document, it is

Hassan - direct - Kasulis                    1052

1    addressed to Sarah Dynagrow and Fred Hassan?

2    A    Yes.

3    Q    And it appears to attach a copy of the 2012 Partnership

4    Form 1065 Schedule K-1.  What is a K-1?

5    A    It's a necessary tax document for investors.

6    Q    And then if you turn to the second page of the document,

7    does this appear to be for the tax year time period of January

8    1, 2012 to September 20, 2012?

9    A    Yes.

10   Q    And it is for, if you look at it, Part 1, Section B,

11   Retrophin, LLC; is that correct?

12   A    Yes.

13   Q    And then the recipient, in Section F, is Sarah Dynagrow

14   and Fred Hassan, the same recipients from the prior page; is

15   that right?

16   A    Yes.

17   Q    Do you recall receiving this K-1?

18   A    Yes, I do.

19   Q    Do you recall your reaction to receiving it?

20   A    Yes, I do.

21   Q    What was that?

22   A    I was very frustrated.

23   Q    Why is that?

24   A    We had already corrected this issue, I thought, in the

25   past.  And it didn't even make sense, there is no entity

1    called Sarah Dynagrow.  It was frustrating.

2    Q    Directing your attention to a Government exhibit already

3    in evidence, 103-36, do you recognize this document?

4    A    Hang on one second.

5    Q    I'm sorry, it is tab 54.

6    A    Yes, I do.

7    Q    What is it?

8    A    More e-mail correspondence.

9    Q    Does this e-mail reflect -- if you focus on the middle of

10   the page, it is dated September 26, 2013, from you to Mr.

11   Shkreli with a cc to Evan Greebel.  Can you please read this

12   e-mail into evidence?

13   A    "Hi, Martin and Evan.  I hope all is well.  I recently

14   received the K-1 for Retrophin.  I think there is still some

15   confusion.  You listed Sarah Dynagrow and Fred Hassan as the

16   partners.  As previously -- as we previously discussed in the

17   e-mails below, my father's name should not be listed as he is

18   not an investor.  In addition, we have no entity name called

19   Sarah Dynagrow.  If you don't mind, can you please make sure

20   this is corrected to read Dynagrow Capital, LLP instead of

21   Sarah Dynagrow and Fred Hassan?  Your time and help would be

22   greatly appreciated.

23        Thank you.  Best, Sarah Hassan."

24   Q    And in response, at the top of this page, e-mail dated

25   September 26, 2013, Mr. Shkreli writes:  "Sarah.  I am so

1   embarrassed.  I don't know how this happened.  Certainly not

2   due to me.  We will fix it.  Martin."

3          Why is it important for the K-1 to reflect the

4   correct investors in a partnership?

5   A    Well, this is a legal tax document.  It makes it more

6   complicated when you are trying to do the filings if you are

7   filing with a document that has a name that is very far off

8   from the actual entity name.  It makes complications around

9   tax time.

10  Q    Are K-1's the kind of documents that are attached to IRS

11  filings?

12  A    Yes.

13  Q    Did you, in fact, attach these K-1's to your tax returns

14  during that time period?

15  A    Yes.

16  Q    Now, this e-mail exchange was in September of 2013.  At

17  this point in time, what were your feelings towards the

18  defendant?

19          MR. BRAFMAN:  Objection.

20          Relevance.

21          THE COURT:  I will sustain it.

22  Q    After this point in time, did you have any contact with

23  the defendant?

24  A    Not really.  I think at one point he reached out to share

25  another pitch deck from someone that I think was a friend of

1    his, but beyond that, we really didn't have much contact.

2    Q    Have you made any additional investments with the

3    defendant?

4    A    No, I have not.

5    Q    Why not?

6                MR. BRAFMAN:  Objection.

7                THE COURT:  Overruled.

8    A    I'd had a very troubling experience in the past.  It was

9    not something that I would choose to opt into again in the

10   future.

11               MS. KASULIS:  Just one moment, Your Honor.

12               (Pause.)

13               MS. KASULIS:  Your Honor, I have no further

14   questions at this time.

15               THE COURT:  All right.  At this time, ladies and

16   gentlemen of the jury, we are going to give you a lunch break.

17   You may retire to the jury room.  I admonish you again, please

18   don't talk about the case with anybody.  I would like you to

19   return to the jury room, if you would, please, at 2:00 p.m.

20   sharp.  When you are all here, we will bring you back in to

21   resume the trial.  Thank you.

22               (Jury exits the courtroom.)

23               THE COURT:  All right.  Let's take a one-hour break,

24   please.

25               MR. BRAFMAN:  Yes, your Honor.  Thank you.

1          MS. KASULIS:   Thank you.

2          (Lunch recess.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       AFTERNOON SESSION

2               (In open court; jury not present.)

3               THE COURT:  Have a seat everybody.  Is everybody

4    read to proceed?

5               MS. KASULIS:  Yes.

6               THE COURT:  I think our jurors are back.

7               Do you want to have Ms. Hassan resume the stand.

8               MR. BRAFMAN:  Can I get up, Your Honor.

9               THE COURT:  Yes.  Go ahead and set up.

10              (Jury enters the courtroom.)

11              THE COURT:  We have all jurors back.  Please have a

12   seat, everybody.

13              Mr. Brafman, if you would like to proceed with your

14   cross examination, you may do so.

15              You are still under oath, ma'am.

16   CROSS-EXAMINATION

17   BY MR. BRAFMAN:

18   Q    Good afternoon, Ms. Hassan.

19   A    Good afternoon.

20   Q    We have never met; is that correct?

21   A    No, we have not.

22   Q    I am Benjamin Brafman.  I am Martin Shkreli's lawyer.

23   I'm just going to ask you questions, many of them similar to

24   the questions that you were asked by Ms. Kasulis.  Okay?

25   A    Okay.

Hassan - cross - Brafman                    1058

1   Q    Just relax.  If you don't understand a question, tell me

2   and I will repeat it.  And we may be looking at some exhibits

3   that you may have already seen and others which I'll be asking

4   you to identify.  Okay?

5   A    Okay.

6   Q    Would it be a fair statement that dealing with Martin

7   Shkreli can at times, as you explained, be frustrating?

8   A    Yes.

9   Q    And, indeed, Martin made you frustrated; is that correct,

10  on different times?

11  A    Yes.

12  Q    He also made you a lot of money at the end of the story,

13  didn't he?

14  A    Well, after a period of time, the settlement agreement, I

15  did make money from the settlement agreement.

16  Q    If we could just do the math.  We will start backwards

17  from where Ms. Kasulis left off with, you invested $300,000 in

18  MSMB Capital; correct?

19  A    Yes.

20  Q    And then you invested another $150,000?

21  A    Yes, that's correct.

22  Q    Let me start again.  Don't let me rush you.  Take your

23  time.

24          You invested $300,000 in MSMB Capital; is that

25  correct?

Hassan - cross - Brafman                    1059

1   A     Yes.

2   Q     And then you also invested $150,000 in Retrophin; is that

3   correct?

4   A     Yes.

5   Q     So you put in a total of $450,000?

6   A     Yes.

7   Q     Ultimately, you got back $400,000 in cash by wire

8   transfer; correct?

9   A     Yes.

10  Q     And then you got 58,000 shares of Retrophin; is that

11  correct?

12  A     Yes.

13  Q     When you first got the stock, some of it was restricted

14  or all of it was restricted; correct?

15  A     Yes.

16  Q     But ultimately, it was tradeable and saleable; is that

17  correct?

18  A     Yes.

19  Q     In total, after you sold the Retrophin shares, you got an

20  additional $1,400,000 as a result of the stock; correct?

21  A     From the sale of which stock?  The Dynagrow Capital?

22  Q     Either Dynagrow Capital or Retrophin, or your personal

23  stock, you made $900,000 for yourself from the personal;

24  right?

25  A     Yes.

Hassan - cross - Brafman                    1060

1  Q     And then you made an additional $400,000 for Dynagrow

2  Capital; is that correct?

3  A     That was the agreement, yes.

4  Q     But you realized the terms of the agreement, when you

5  sold the stock, you got money; right?

6  A     Yes.

7  Q     So, in total, you made, on a $450,000 investment, about

8  1.8 million dollars between what you got personally and what

9  Dynagrow got; correct?

10 A     Yes.

11 Q     Okay.  Now, I know it was frustrating, trust me, I've

12 dealt with him, and you've had a lot of e-mail traffic, but at

13 the end of the day, you had a successful investment with

14 Martin Shkreli because you more than tripled your money;

15 correct?

16 A     Well, it wasn't -- I mean, from the settlement agreement,

17 I did personally make money, but the straight Retrophin

18 investment didn't truly make money as its own investment.  But

19 my own in the settlement agreement, I did eventually make

20 money, yes.

21 Q     But the Retrophin stock was given to you?

22 A     Yes.

23 Q     You didn't buy the Retrophin stock and then sell it;

24 correct?

25 A     No, I personally didn't intend to have any Retrophin,

1    but, yes.

2    Q    But it came became a valuable piece of stock certificate

3    at some point?

4    A    Yes, it eventually became worth something.

5    Q    And Martin kept telling you it would be; didn't he?

6    A    Yes.

7    Q    Now, these are not trick questions.  Just answer

8    truthfully and we will be fine.

9              MS. KASULIS:  Objection.

10             THE COURT:  Sustained.

11             MR. BRAFMAN:  I'm sorry.

12   Q    At the end of the day, the bottom-line is what Martin

13   told you about Retrophin came true, it became a public company

14   and it became very valuable; is that correct?

15   A    Well, at one point, it did.  But I do have to mention at

16   one point it seemed like it was going to collapse.  In fact,

17   my investment went toward feeding it because it almost

18   collapsed.  It did ultimately become valuable, I agree with

19   you, but it certainly was not without fear.

20   Q    But the anxiety that you had ultimately paid off;

21   correct?

22   A    Yes.  Sure.  It was -- I don't know that you can say that

23   it was a payoff.  I did become very fortunate in how the trade

24   went.  But, again, it wasn't money I personally made from

25   investment.  It was money from a settlement agreement and I

1  never requested those shares.  It was just sent to me.

2  Q    And 5,000 of those shares he gave you?  You didn't pay

3  for anything?  One day they just showed up in your Fed Ex

4  envelope; right?

5  A    Actually, the entire portion for myself just showed up in

6  a Fed Ex envelope when I was still anticipated getting cash.

7  Q    So, Martin didn't even tell you he was giving you 58,000

8  shares until it showed up?

9  A    No.  He didn't make me aware he was giving me the stock

10  instead of the cash.

11  Q    Ultimately, when you signed the settlement agreement,

12  Martin, or the other side, Retrophin had Evan Greebel as a

13  lawyer; is that correct?

14  A    Yes, he seemed to be an attorney listed on there.

15  Q    But you had a lawyer as well; didn't you?

16  A    Yes.

17  Q    Ron Kornreich?

18  A    Yes.

19  Q    A very big law firm in New York, Stroock, Stroock &

20  Lavan?  Or Proskauer?

21  A    Yes.

22  Q    Proskauer; right?

23  A    Yes.

24  Q    And he was chosen by you to represent you in connection

25  with the settlement agreement?

1   A    Yes.

2   Q    And at any point in time did your lawyer tell you that

3   this settlement agreement was an illegal way to resolve this

4   debt?

5   A    No.

6   Q    Would you have participated in signing the agreement if

7   your lawyer told you it was a crime to do it?

8   A    No, I would not have.

9   Q    Okay.  So your settlement agreement went back and forth

10  -- and we will get to the e-mails in a minute.  I just want

11  the jury to understand that the settlement agreement you

12  ultimately got went back and forth between your lawyer and Mr.

13  Greebel because each side was editing it and changing some of

14  the terms until both sides felt it was appropriate.  Would

15  that be a fair statement?

16  A    Yes.

17  Q    Okay.  Now, let's go back to the beginning.  After you

18  graduated with a master's degree in the summer of 2010, you

19  founded Dynagrow Capital; is that correct?

20  A    Yes.

21  Q    And Dynagrow Capital was a private equity fund; correct?

22  A    Yes.

23  Q    And Dynagrow Capital was a fund that originated out of

24  the Hassan family money; is that correct?

25  A    Yes.

Hassan - cross - Brafman                    1064

1  Q    There were no other investors in that fund; correct?

2  A    No, that's correct.

3  Q    Your family is -- has been blessed with a great deal of

4  financial success earned by them and part of that is the $10

5  million that they put in Dynagrow Capital that they let you

6  manage; is that correct?

7  A    Yes.

8  Q    Now, your father, Fred Hassan, is a legend in the

9  pharmaceutical industry; isn't that correct?

10 A    Some might say that.

11 Q    And he's well-known?

12 A    Yes, in the industry.

13 Q    And he speaks at investment conferences on healthcare on

14 a regular basis; correct?

15 A    Yes.

16 Q    And he participates as an expert panelist in many of

17 these conferences; is that correct?

18 A    Yes.

19 Q    And would it be a fair statement that your father has

20 gone from one major success to another in the pharmaceutical

21 industry?

22 A    He's been very fortunate within the pharmaceutical

23 industry.

24 Q    But also very smart?

25 A    Yes, he's a smart gentleman.

1    Q    And many of the people in the pharmaceutical industry

2    have expressed a great deal of admiration and success for him

3    over the years; would that be a fair statement?

4    A    Yes.

5    Q    Your father has been profiled repeatedly as one of the

6    leading figures in the pharmaceutical industry?

7    A    Yes.

8    Q    Articles and biographies have been done about him in

9    professional journals?

10    A    Yes.

11    Q    So it didn't strike you as a surprise that Martin

12    Shkreli, one of the young, if you will, pharmaceutical

13    investors wanted to be able to meet your dad?  A lot of people

14    want to meet your dad?

15    A    Yes.  That's fairly common.

16    Q    Fairly common; right?

17    A    I get approached fairly regularly.

18    Q    But in the pharmaceutical industry, he is sort of like

19    celebrity from that world; would that be a fair statement?

20    A    I guess you could say so.

21    Q    So your father was at Schering-Plough in 2009 when it

22    merged with Merck; is that correct?

23    A    Yes.

24    Q    And you know that when companies like that merge, a lot

25    of filings with the SEC indicate, you know, how much money was

1    involved, and this was like a humongous merger in the

2    pharmaceutical industry at that time; is that correct?

3    A    Yes.

4    Q    After working at Schering-Plough, your father then went

5    to Warburg Pincus, which is a private equity fund?

6    A    Yes.

7    Q    And it's one of the biggest in the country, isn't it?

8    A    It's fairly large, yes.

9    Q    It manages at some different times between 40 and 50

10   billion dollars, with a B; is that correct?

11   A    Yes.

12   Q    And your father, is he a principal at Warburg Pincus?  Is

13   he an equity partner?  What is his title at Warburg Pincus?

14   A    He's a partner.

15   Q    And their largest investment at the time was in Bausch &

16   Lomb, the company your father helped merged with other

17   pharmaceutical giants; is that correct?

18   A    Yes.

19   Q    Now, when your father became a CEO of Bausch & Lomb, he

20   had people around him that he took from company to company as

21   they left and they were his core group of his right hands,

22   left hands, of aids?  Am I right?

23   A    He was not the CEO, but he did -- the pharma industry is

24   fairly small and there were a few people that he worked with

25   in several companies.

Hassan - cross - Brafman                    1067

1   Q    Well, let's talk about Brent Saunders.  Brent Saunders is

2   the person who introduced you to Martin Shkreli; correct?

3   A    Yes.

4   Q    And Brent Saunders is the man who vouched for Martin

5   Shkreli, telling you that he had done well with Martin

6   Shkreli; is that correct?

7   A    Yes.  He told me he was essentially a rising star and

8   that he had had some phenomenal returns in the fund.

9   Q    Did you think that Brent Saunders was lying to you?

10  A    No.

11  Q    And Brent Saunders is a man you have known your whole

12  life, you told the Government?

13  A    I've known him for quite some years.

14  Q    Is he a close family friend and a colleague of your

15  father's as well?

16  A    Yes.

17  Q    And he met your father when he was at Pricewaterhouse and

18  your father was at Schering-Plough; is that correct?

19  A    I believe so.  I haven't perfectly tracked their

20  relationship through the years.  So I don't know everyone's

21  backgrounds.

22  Q    But when your father went to Bausch & Lomb, Brent

23  Saunders became the CEO of Bausch & Lomb; isn't that correct?

24  A    Yes.

25  Q    And when your father was with a company called Pharmacia,

1  Tom Koestler worked with him there; is that correct?

2  A    Yes.

3  Q    Do you know Tom Koestler?

4  A    I know Mr. Koestler.

5  Q    Is it pronounced "Kessler"?

6  A    I believe so.

7  Q    Okay.  Mr. Koestler was a close colleague of Brent

8  Saunders and also a close colleague of your dad's; is that

9  correct?

10 A    Honestly, I can't speak for -- they've worked together in

11 many places, but I don't know who is a close colleague or

12 who's not.

13 Q    But every time your father went to a different company,

14 Brent Saunders went with him, isn't it true?

15 A    They did work together at several companies, but there's

16 quite a list of people that all worked in the same company

17 with him in several companies.

18 Q    Okay.  We will go through some of them if they're related

19 to this case.  For example, Ken Banta was your father's

20 right-hand man when your father was at Schering-Plough; is

21 that correct?

22 A    I can't speak if he's his right-hand man.  They did work

23 together.  I don't know the nature of the relationship.

24 Q    Let me ask you this, Ken Banta, a man named Robert

25 Bertolini and Tom Koestler all at one point worked with each

1    other and with your father; is that correct?

2    A    Yes.

3    Q    And you said you didn't know anything about Mr. Shkreli's

4    track record other than what Brent Saunders told you.  Did Ken

5    Banta tell you that he had invested $250,000 in Elea Capital?

6                MS. KASULIS:  Objection.

7                THE COURT:  Sustained.

8    Q    Did you ever discuss Ken Banta's investment relationship

9    with Martin Shkreli?

10   A    No, I did not.

11   Q    Did you know whether he had previously invested with him

12   or not?

13   A    I did not know.

14   Q    Excuse me?

15   A    Initially, I didn't know.

16   Q    Do you know now?

17   A    Well, yes, I've seen all the cap tables and things like

18   that.

19   Q    And Martin Shkreli -- you told the Government that after

20   you spoke to Brent Saunders, he gave you Martin Shkreli's name

21   and he told you you should look him up or he's going to call

22   you, in words or substance; is that correct?

23   A    Yes.

24   Q    And I think when you were interviewed by the Government,

25   and correct me if I am wrong, you said that Brent Saunders had

1  recommended him in glowing terms?

2  A    Yes.  He said he had a very strong track record, which

3  was also mirrored in my initial conversation with Mr. Shkreli

4  at dinner.

5  Q    We'll get to Mr. Shkreli's conversation, but before you

6  ever meet Martin Shkreli, one of the men who you have known

7  for a long time who also had a long employment relationship

8  with your father told you that Martin Shkreli had a very

9  strong track record of success and you should look to invest

10 some money with him fair statement?

11 A    Well, he said I should consider building a relationship

12 with them that may include that, yes.

13 Q    He was not speaking about a personal relationship?  He

14 was talking about a business relationship?

15 A    He was referring to his success at MSMB Capital and

16 saying that he had had a very strong track record, that he had

17 brought him some 40 percent returns in a relatively short

18 period of time, that he was very happy with how he was doing

19 and he may be a very good person to learn from.

20 Q    And it was as a result of the Brent Saunders's

21 introduction that you ultimately come to actually meet Martin

22 Shkreli, would that be a fair statement?

23 A    Yes.

24 Q    And at the time, you were relatively new in the business

25 and you were looking for investment opportunities that people

1  could recommend; correct?

2  A    Frankly, I was looking just as much for the opportunity

3  to learn from him as I was to invest, but, yes.

4  Q    Because Brent Saunders, you know, characterized him as a

5  brilliant, young healthcare guy, in words or substance; right?

6  A    Yes.

7  Q    Now, there then comes a time when you get an e-mail from

8  Martin Shkreli and you were talking about having a meeting of

9  some kind.  Do you remember getting that e-mail?

10  A    Yes, I do.

11        MR. BRAFMAN:  Excuse me one minute, Your Honor.

12        Could we have Government Exhibit 103-2 put up on the

13  screen, if it is already in evidence.  I think it is.

14        No, I'm sorry.

15  Q    When was the dinner date with Martin?  I think you

16  testified to it.

17  A    I believe it was for Monday, December 13th.

18  Q    Okay.

19  A    2010.

20  Q    Before that, in or about December 1st, you received an

21  e-mail from Mr. Shkreli telling you he had gotten your contact

22  information from Brent Saunders, do you recall?

23  A    Yes.

24        MR. BRAFMAN:  Your Honor, I want to put this up just

25  for the witness to see if she remembers it.

Hassan - cross - Brafman                          1072

1          THE COURT:  This is 103-2?

2          MR. BRAFMAN:  No, it is Defendant's Exhibit 1213.

3     It precedes the 103-2.  It is a defendant's exhibit.  The

4     government has it and the Court has it.

5          THE COURT:  Please let us know the number.  It is

6     Defendant's Exhibit 1213.

7     Q    Ms. Hassan, you can see it, the judge can see it, the

8     Government can see it, but we are going to try and ask you if

9     you can identify Defendant's Exhibit DX 1213 as an e-mail

10    chain that you and Martin Shkreli began in November at the end

11    of 2010 and ended on December 1, 2010.

12         Do you recognize this document?

13    A    Yes, I do.

14    Q    Do you recognize it as the e-mail Mr. Shkreli sent to

15    you, there is an e-mail you then sent to Mr. Shkreli at the

16    time?

17    A    Yes.

18         MR. BRAFMAN:  Your Honor, I offer Defendant's

19    Exhibit DX 1213 in evidence.

20         MS. KASULIS:  Your Honor, we object.

21         THE COURT:  I will have a sidebar.  Mr. Brafman, you

22    can make a proffer.

23         (Continued on the next page.)

24

25

Sidebar                                              1073

1          (Sidebar held outside the hearing of the jury.)

2          MS. KASULIS:  Your Honor, it's hearsay.  He's trying

3    to put in a statement.

4          THE COURT:  From his client, yes.  Part of this is

5    not already in evidence.

6          MS. KASULIS:  No.

7          MR. BRAFMAN:  Your Honor, they have been using

8    e-mails as evidence that contain information from people that

9    they haven't even been able to identify.  This is not hearsay.

10   This is witness' e-mail chain with Mr. Shkreli.  The fact that

11   it talks about Mr. Saunders, she has already acknowledged that

12   it was him, so the reliability of the document isn't called

13   into question.  We gave the Government these defense exhibits.

14   They never said that they were going to object to any of them.

15   Why do you think I gave them to you?

16         MS. KASULIS:  What we talked about was we were not

17   objecting to them based on authenticity.  We didn't talk about

18   the fact that you gave all of your exhibits and we would never

19   object to your exhibits.

20              This is clearly hearsay, Your Honor.  We took great

21   efforts to make sure when we were introducing exhibits there

22   were exhibits that Mr. Shkreli was on and that they were

23   admitted for completeness with respect to the other statements

24   in the exhibits.  This is clear hearsay.  If he wants to ask

25   her about, you know, any recollection of what's contained in

Sidebar                                              1074

1   these sorts of documents, he can.  On its face, this is

2   hearsay.  This is the defendant's own statements he's trying

3   to get in.

4              MR. BRAFMAN:  This is Sarah Hassan telling Mr.

5   Shkreli about Mr. Saunders, not Mr. Shkreli talking.  This is

6   Sarah Hassan talking to my client about the man who introduced

7   her to Martin Shkreli.  I don't know how that's not

8   admissible.  It completes the narrative that you started.

9              MS. KASULIS:  But she's testified that she did, in

10  fact, meet with Mr. Sanders.

11             MR. BRAFMAN:  Okay, but this has specific language.

12             MS. KASULIS:  You're offering it for its truth.

13             MR. BRAFMAN:  That's correct.  You offered it for

14  its truth as well.

15             THE COURT:  What she did was she offered your

16  client's statements to, which she can do under the rules of

17  evidence, an adverse party's statements or admissions can be

18  offered by the opposing party.  You're offering your client's

19  own statements and exchanges with this witness.  Why don't you

20  just ask her the question and you can refresh her recollection.

21             MS. KASULIS:  Thank you, Your Honor.

22             (Sidebar concluded.)

23             (Continued on the following page.)

24

25

MDL   RPR

Hassan - cross - Brafman                    1075

1           (In open court.)

2           THE COURT:  The objection is sustained.

3   Q    Do you have the document in front of you, Defendant's

4   Exhibit 1213?

5   A    Not at this moment.

6   Q    I am going to put it up.  It is not in evidence.  I am

7   going to ask you if you need to use it to refresh your

8   recollection, you may use it for that purpose.

9           On November 30, 2010, did you write to Martin

10  Shkreli?

11  A    Yes.

12  Q    And did you thank him for reaching out to you?

13  A    Yes.

14  Q    And did you thank him for reaching out to you at the

15  advice of Brent Saunders?

16  A    Yes.

17  Q    And did you tell him that you were someone that you

18  wanted to meet and perhaps go over some methods that might be

19  usable by you for selecting stocks or balancing your --

20          MS. KASULIS:  Objection, Your Honor.

21          THE COURT:  Sir.  Sir --

22          MR. BRAFMAN:  I am asking her about her statements.

23          THE COURT:  I am sustaining the objection.

24          Sir, basically, you are reading to the witness from

25  a document that I did not admit.  You may ask her questions,

1    but don't read the document, please, or parts of it.

2    Q    As a result of the correspondence, did you and Martin

3    Shkreli agree to meet in New York?

4    A    Yes.

5    Q    And did you meet in New York at the Pera Restaurant?

6    A    Yes.

7    Q    And that was near Madison and 41st or 42nd Street?

8    A    I don't recall specifically where it was.

9    Q    Do you recall specifically what time it was?

10   A    I think the e-mail said 6:30.  6 o'clock.

11   Q    Look at Government Exhibit 103-1.

12   A    I have it in front of me.

13   Q    So you were going to meet him there at 6 o'clock; is that

14   correct?

15   A    Yes, that's correct.

16   Q    And at this meeting, did you have a conversation with

17   Martin Shkreli?

18   A    Yes.

19   Q    And how long did that dinner last?

20   A    I don't recall.

21   Q    How about three hours?  Does that refresh your

22   recollection?

23   A    It could be accurate.

24   Q    Okay.  You don't know whether it was 20 minutes or three

25   hours?

Hassan - cross - Brafman                    1077

1  A    It wasn't 20 minutes.  I didn't recall exactly how long

2  it was.

3  Q    But it was approximately several hours, could we agree on

4  that?

5  A    Sure.  It sounds like it could be.

6  Q    And among the things that happened at that dinner, Martin

7  Shkreli told you a little bit about himself; is that correct?

8  A    Can you expand?

9  Q    Well, you told us on direct examination that among the

10  things he told you is that he had worked with Jim Cramer, the

11  MSNBC Mad Money personality?

12  A    Yes.

13  Q    And did you talk to him about that experience?

14  A    A little bit.

15  Q    And did he also tell you that he had worked at Cramer

16  Bernstein, which is Jim Cramer's hedge fund?

17  A    I believe so, but I don't recall specifically.

18  Q    Did he tell you about his company?

19  A    He told me about MSMB Capital.

20  Q    And after the -- at the dinner, he also told you about

21  stock that he thought you should short identified as MannKind;

22  is that correct?

23  A    I don't recall if he brought it up at dinner or it was an

24  e-mail form.

25  Q    But he did on many occasions, by e-mail and through

MDL   RPR

1   conversations, recommend that you short MannKind; is that

2   correct?

3   A    Yes.

4   Q    And he told you that Brent Saunders, who you knew, had

5   made a fortune in MannKind, didn't he?

6   A    I don't know that he referenced or linked Mr. Saunders in

7   MannKind directly.

8   Q    Did you ever talk to Brent Saunders about his investment

9   in MannKind after Martin recommended that you do it?

10  A    No, I never spoke to him about.  I've only talked to Mr.

11  Saunders about Martin when we had that first meeting at the

12  charity where he was referencing Martin's great returns on

13  MSMB Capital.

14  Q    And you never spoke to Mr. Saunders again after that

15  about Martin Shkreli?

16  A    I don't believe so.

17  Q    And how often do you see Brent Saunders?

18  A    Once a year.

19  Q    That's it, at the conference?

20  A    Correct.  I'm sorry, at the charity event.  I see him at

21  the same event every year.

22  Q    Do you also see him at the pharmaceutical conference, the

23  JP Morgan conference?

24  A    I don't go out to that. (Continued on following page.)

25

1    (Continuing)

2    BY MR. BRAFMAN:

3    Q    But you know that he and your father go.

4    A    I know my dad goes out there.

5    Q    Did you have an e-mail exchange with Martin Shkreli in or

6    about January 12, if you recall, about Mannkind?

7    A    At some point, we did have an exchange, yes.

8    Q    So, I'm going to put up on here what I've marked as

9    Defense Exhibit, DX-12 --

10   A    Wait.  That's not my e-mail.  I don't know this

11   particular e-mail.  Sorry, I'm not familiar with this e-mail.

12   Q    Okay.  Did you have a e-mail conversation with Martin

13   Shkreli in or about Christmas of 2010?

14   A    Can you please expand?  I don't recall specific dates of

15   when we had all of our conversations.

16   Q    Okay.  In or about December 25, 26, 27, did you and

17   Martin Shkreli have a series of e-mail exchanges?

18   A    Can you give me something to refer to?

19   Q    About MannKind?

20   A    I don't recall specifically.

21   Q    Did you ever ask Martin Shkreli also about your idea to

22   invest in CADX, Cadence Pharmaceuticals?

23   A    I believe so.

24   Q    I'm going to put up on here Defendant's 1215.  If you

25   could look and that and tell me if it refreshes your

1    recollection about a conversation in or about --

2              MS. KASULIS:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q    Did you ever short MannKind?

5    A    Not personally.

6    Q    What do you mean by "not personally"?

7    A    I believe that Martin shorted MannKind through MSMB

8    Capital, which I was invested in.  But I thought that if he

9    made that execution, that that was enough exposure and I

10   didn't need to do it myself.

11   Q    Do you know how much money Martin netted on MannKind?

12   A    No, I do not.

13   Q    Do you know how much MSMB netted on MannKind?

14   A    No, I do not.

15   Q    Do you know what a short sale is?

16   A    Yes, again, I'm assuming he did it mostly through option.

17   Q    Well, do you know whether Martin in his recommendation to

18   you recommended that you short MannKind?

19   A    He did make a recommendation that I short MannKind, but I

20   don't have the physical ability to do that.  I don't trade in

21   options and I don't do shorts.

22   Q    I understand.  But do you sit next to a machine that

23   would allow you to check the ticker and see what MannKind was

24   trading at?

25   A    Yes.

S. Hassan - Cross - Brafman                1081

1  Q     And did you notice that after Martin recommended that you

2  short MannKind it went from $8 to $2?

3  A     I didn't track it.

4  Q     Did you ever track Retrophin in all the time you and

5  Martin talked about Retrophin?

6  A     Yes.

7  Q     Did you see the spread that Retrophin traveled from the

8  day it became public until other points when it was up to as

9  much as $20, $30 a share?

10  A     Yes, I saw the ups and downs, yeah.

11  Q     Do you know what the value of Retrophin is today?

12  A     I don't know.

13  Q     You don't know at all?

14  A     I don't know.  I was also told not to look it up anywhere

15  close to the trial, with the advice of my attorney.  So, I

16  haven't been following it.

17  Q     Did you look it up when the you got the shares?

18  A     When I got the share, the valuation was closer to $5.

19  Q     And when you sold it?

20  A     When I sold it I think two years later, it was worth

21  about 19.

22  Q     $19?

23  A     Yes.

24  Q     So it traveled up between the time you got the stock and

25  the time you sold it.

S. Hassan - Cross - Brafman                    1082

1   A     Yes, two years later I sold it around 19.

2   Q     58,000 shares?

3   A     Yes.

4   Q     Now, let's talk about what a hedge fund is.  A hedge fund

5   is essentially what you are running in Dynagrow, isn't it?

6   A     It could be.  We do run a family hedge fund, but many of

7   them operate in different ways.

8   Q     And a hedge fund is not having like a bank account, it's

9   run by a general partner, correct?

10  A     Yes.

11  Q     And the general partner has the discretion to do what he

12  or she thinks is in the best interest of the fund, correct?

13  A     Yes.

14  Q     The general partner doesn't have to call you and say I

15  want to by ten shares of Google before he or she does it,

16  right?

17  A     No.

18  Q     And the hedge fund has certain rules that you agree to

19  abide by when you become a limited partner, right?

20  A     Yes.

21  Q     And, in fact, you can't invest in a hedge fund unless you

22  sign either a subscription agreement or you receive a private

23  placement memorandum; is that correct?

24  A     Yes.

25  Q     And I think what you told the Government was that at some

S. Hassan - Cross - Brafman                 1083

1   point when you got the private placement memorandum for MSMB

2   Capital, you went through it with your own lawyer.

3   A    Yes.

4   Q    And you were looking for red flags; is that correct?

5   A    Yes.

6   Q    And a red flag is sort of like a warning sign, like

7   danger, don't invest, right?

8   A    Yes.

9   Q    And who was your lawyer who you went through this with?

10  A    My attorney's name is Andrew Levy.

11  Q    And where is he based or was he based at the time?

12  A    South Florida.

13  Q    And do you still use him as a lawyer?

14  A    Yes.

15  Q    And he and you went through and it was only after you

16  went through it that you agreed to participate, correct?

17  A    Yes.

18         MR. BRAFMAN:  Now, I want to, if we can, put up

19  Government Exhibit 5, which is the private placement

20  memorandum.

21  Q    Do you have the book?  Look at the screen.  We'll do it

22  that way.

23         THE COURT:  Are you asking the Government to put it

24  up?

25         MR. BRAFMAN:  Yes.  It's a Government exhibit.  I'd

LAM       OCR       RPR

S. Hassan - Cross - Brafman                 1084

1   like Government Exhibit 5 to be on the screen.

2          MS. KASULIS:  Your Honor, for the record, I believe

3   it is in evidence.

4          THE COURT:  Yes.  I wasn't sure if he was asking the

5   Government's paralegal to put it up.

6          THE PARALEGAL:  Ms. Jackson would have to change...

7          THE COURTROOM DEPUTY:  It's on prosecution.

8          THE COURT:  It's up now.

9          MR. BRAFMAN:  Can we make it just a little bit

10  larger type?  Thank you.

11  Q    This is the private placement memorandum you got before

12  you agreed to participate as an investor many MSMB, correct

13  Ms. Hassan?

14  A    It looks like it, yes.

15  Q    That's what Ms. Kasulis showed you on direct examination

16  and you positively identified it as the document.  This is the

17  document, isn't it?

18  A    Yes.  I'm just looking at one page, but I'm assuming the

19  rest is the same, yes.

20         MR. BRAFMAN:  If we could go to the second page

21  after the front page and bring it up a little bigger so people

22  can read it.  And I want to focus on the second paragraph.

23  Q    Do you have that in front of you?

24  A    Yes, I do.

25  Q    I want to start from halfway through that, where it says

S. Hassan - Cross - Brafman                    1085

1    the partnership positions; do you see that, the partnership

2    positions?

3    A    Yes.

4    Q    I'm going to read it and then I'm going to ask you some

5    question.

6            The partnership positions are anticipated to consist

7    of a number of long positions which the advisor believes have

8    the potential to experience significant price appreciation and

9    short positions which the advisor believes have the potential

10   to experience significant price declines.  The portfolio

11   manager believes that the combination of its research and

12   analysis, along with its strategy to invest in equities and

13   other investments on a global basis, will provide the

14   partnership with an advantage over other investment vehicles

15   that focus solely on the U.S. market.

16           Did I read that correctly?

17   A    Yes.

18   Q    When you read this, you, as someone with a master's

19   degree in finance and running a fund, understood that to mean

20   that what you were investing in is essentially what the

21   advisor felt would be appropriate at the time he or she makes

22   the investment, correct?

23   A    Yes, I trusted the advisor, yes.

24   Q    And the advisor in this case is Martin Shkreli.

25   A    Yes.

1    MR. BRAFMAN:  If we do move further down that page

2  to the bold language and if we could highlight that, please?

3  Q    Do you have that before you, Ms. Hassan?

4  A    Yes.

5  Q    It tells you in bold language an investment in the

6  partnership will involve significant risk.  There is no

7  insurance that the partnership will achieve its investment

8  objective or be profitable.  See risk factors.

9        Did you read that before you invested.

10  A    Yes, I did.

11  Q    So, you understood that there was a possibility that you

12  are $300,000 could go down the drain even if everybody did

13  everything appropriately, right?

14  A    I did.

15        It wasn't until later on that it became an issue.

16  Q    When you signed up, you believed that you had this

17  $300,000 at risk; is that correct?

18  A    Yes.

19        And later on, I thought my investment had

20  appreciated to $450,000.

21  Q    Well, you got a million eight, so we'll talk about that

22  later.  But when you invested, you thought --

23        MS. KASULIS:  Objection.

24        THE COURT:  Sir, don't argue with the witness like

25  that.

S. Hassan - Cross - Brafman                    1087

1      MR. BRAFMAN:  The witness was arguing with me, your

2  Honor.  I asked an easy question.

3      THE COURT:  Sir, no, we can't have that kind of

4  treatment of witnesses.

5  Q    Ms. Hassan, when you invested your $300,000 on the day

6  you and Mr. Levy went through this, you knew that this was a

7  risky investment.

8  A    All investments have some level of risk, yes.

9  Q    And all investments on the stock market are subject to

10  the vagaries of the stock market; is that correct?

11  A    Yes.  But generally speaking, there are also certain

12  protections, I think, even in an e-mail exchange.  Mr. Shkreli

13  mentioned that he typically doesn't go beyond 5 percent in

14  terms of any one investment making up the portfolio.

15      So, again, you do assume there's risk where you

16  could lose everything, but, generally speaking, you invest in

17  a portfolio of some sort so even if you're not -- even if you

18  expect losses, you don't expect to loss it all.

19  Q    Just to be clear, you didn't lose anything.

20  A    No.  For a period it certainly seemed like it was very

21  possible, but at the end I agree, I didn't.

22  Q    Lose anything.

23  A    I didn't lose it at the end.  I ended up with a

24  settlement agreement.

25  Q    And a lot of money.

S. Hassan - Cross - Brafman                    1088

1   A    I did end up making money, yes.  So, I was very excited

2   that I didn't lose it.

3   Q    Now, if you turn over to the next page --

4        MR. BRAFMAN:  The top paragraph -- that's it.

5   Q    It also tells you, and I'll read it out loud:  This

6   memorandum has not been filed with or reviewed by the

7   Securities & Exchange Commission or any state securities

8   commission.  Neither the Securities & Exchange Commission or

9   any state or federal governmental agency has passed upon the

10  accuracy or adequacy of this memorandum or endorsed the merits

11  of this offering.  Any representation to the contrary is

12  unlawful.

13       Did you read that with Mr. Levy before you signed?

14  A    Yes, we reviewed the entire document.

15  Q    And you understood that there was no governmental

16  oversight of any kind watching this investment at that date;

17  is that correct?

18  A    Yes.

19  Q    And no government agency had approved this memorandum or

20  would recommend it from a government perspective; is that

21  correct?

22  A    That's true, but I still believed --

23  Q    I'm asking you yes or no, is that true?

24  A    Sorry, could you repeat the question?

25  Q    You understood from reading that that no government

S. Hassan - Cross - Brafman                1089

1    agency had approved this document or was going to review this

2    document; correct?

3    A    Yes, but I feel like that requires some further

4    explanation.

5    Q    When Ms. Kasulis wants you to you do that, she'll have

6    that opportunity, okay?

7    A    I was just explaining for myself, though.  I do think

8    it's a little confusing.

9    Q    So, why don't you explain?

10   A    The way you're stating that, that doesn't make the entire

11   agreement not binding.  There's still other things that have

12   to be upheld too, but, yes, I do agree that it was made clear

13   this was not being regularly watched by the SEC.

14   Q    Now, do you know, who was the general partner in this

15   investment vehicle?

16   A    Mr. Shkreli.

17   Q    And you were you a limited partner; is that correct?

18   A    Yes, that's correct.

19        MR. BRAFMAN:  And if we look at the next

20   paragraph -- no, it's the next one down, "this memorandum."

21   Q    Now, are you on page iii?

22   A    I'm on page ii.

23   Q    Next one, sorry.

24   A    Oh, sorry.

25   Q    This first big paragraph.  Starting from where it says:

1   All investment performance is inherently subject to

2   significant uncertainties and contingencies, many of which are

3   beyond the control of the general partner.  Any significant

4   change therein can materially affect the future results.

5   Accordingly, there can be no assurance that the partnership's

6   investment objectives will be achieved or that the partnership

7   will not incur losses.

8              Did I read that correctly?

9   A    Yes.

10  Q    And Martin Shkreli was the general partner; is that

11  correct?

12  A    Yes.

13             MR. BRAFMAN:  Now, if we can turn to Page 1, regular

14  number one.

15  Q    Before we get to the document, I'm just going to ask you

16  a couple of questions.  You knew that in this private

17  placement memorandum, anyone who wanted to invest needed to

18  meet certain personal criteria, correct?

19  A    Yes.

20  Q    That this was not something that was available or open to

21  the general investing public, correct.

22  A    Yes.

23  Q    And that it was basically opened to only people who were

24  financially sound?

25  A    Yes.

S. Hassan - Cross - Brafman                1091

1   Q    And were able to verify that they had a net worth of at

2   least $1 million, correct?

3   A    Yes.

4   Q    And they had -- and if you look at Page 1, it basically

5   says that you have to qualify as an investor, correct?

6   A    Yes.

7   Q    And later, right below it, it says that there's a minimum

8   initial investment of $1 million; is that correct?

9   A    Yes.

10  Q    And Martin Shkreli waived that minimum requirement for

11  you so that you could become an investor, correct?

12  A    Well, it's states that it has to be a minimum of

13  $1 million, but somewhere it did state unless the GP decides

14  otherwise.

15  Q    Right.  And he did that.  He decided otherwise and

16  allowed you to invest below the minimum investment number,

17  correct?

18  A    Yes.  He actually stated in e-mail to me that the minimum

19  was $250,000.

20  Q    And you wanted to show him your enthusiasm so you sent

21  $300,000.

22  A    Yes.

23  Q    So, you sent an extra $50,000 not because Mr. Shkreli

24  requested it, but because you wanted to impress him with your

25  enthusiasm and the fact that you had money to spend, right?

S. Hassan - Cross - Brafman                1092

1    A    No.

2    Q    You wanted him to be happy with you as a client?

3    A    No.  I certainly didn't want to show him that I was

4    looking to just do the bare minimum, but I was also making an

5    investment.  Again, both Mr. Saunders and Mr. Shkreli himself

6    had told me that they had really phenomenal returns.  So, this

7    was also from an investment perspective, I thought it was

8    going to be a good investment.

9    Q    An investment advisor, portfolio manager, if you look at

10   the bottom of the page?

11        MR. BRAFMAN:  If you can blow that up, please.

12   Q    It reads:  MSMB Capital Management, LLC, a Delaware

13   Limited Liability Company, and an affiliate of the general

14   partner, the advisor, and collectively with the general

15   partner, MSMB will serve as an investment advisor of the

16   partnership and will have full discretionary authority --

17        MR. BRAFMAN:  If we can week go to the next page

18   please.

19   Q    -- full discretionary authority, responsibility, and

20   responsibility to invest the assets of the partnership.

21   Mr. Shkreli, the founder and managing member of the advisor,

22   will serve as the portfolio manager of the partnership on

23   behalf of the advisor, and, as such, will be the individual

24   primarily responsible for investing the assets of the

25   partnership.

1          Correct?

2     A     Yes.

3     Q     And you what you were signing up for was essentially an

4     investment where you did not have any real -- necessarily any

5     real input or control, correct?

6     A     Yes.

7     Q     They weren't going to call you to tell you what they

8     chose to invest in, you just assumed that they were going to

9     act in good faith, correct?

10    A     Yes, I trusted Mr. Shkreli.

11    Q     Now, you also knew that the partnership was going to

12    invest in both long and short positions; is that correct?

13    A     Yes.

14    Q     And the memorandum explained that the risk of investing

15    in short positions was sometimes substantially more than the

16    risk of investing in long positions; do you remember that?

17    A     Yes.

18    Q     Now, did you have an understanding that you could take

19    your money out whenever you wanted to?

20    A     I had the understanding that if I wanted to, I could

21    submit a request.  And in about a 30-day or month period, that

22    that can be granted back to me.

23          And I know there's some language around, you know,

24    if there's necessary funds that have to maintain -- be

25    maintained in the fund or can't being liquidated, there can be

S. Hassan - Cross - Brafman                    1094

1    circumstances.  But generally speaking, I could have 30-days

2    notice for recall of it.

3    Q    But you also know that according to the terms of the

4    memorandum, the general partner could suspend redemptions,

5    period, if he thought it was in the best interest of the fund.

6              Didn't you signed up for that as well?

7    A    If it's in the PPM.  I believe it is.

8    Q    Look at Page 4.

9              MR. BRAFMAN:  If we may have Page 4, please.

10   Capital withdrawals, if you could highlight that section,

11   please.

12   Q    The last two sentences of that paragraph reading capital

13   withdrawals reads:  The general partner will have the right to

14   suspend redemptions under certain circumstances.  The general

15   partner may withdraw any portion of its capital act without

16   prior notice to the limited partners.

17             Did you agree to those terms when you signed?

18   A    Yes.

19   Q    Did your lawyer tell you that it might be not possible to

20   get your money when you wanted it, based on that paragraph?

21             MS. KASULIS:  Objection, your Honor.  It's asking

22   for --

23             THE COURT:  Sustained.

24   Q    Now, you indicated that at some point, Mr. Shkreli sent

25   you securities in either Desert Gateway or Retrophin that were

S. Hassan - Cross - Brafman                1095

1    marked restricted, right?

2    A    Yes.

3    Q    And just so the jury is clear, when a security

4    certificate says "restricted," you can't sell it in a

5    brokerage account until that legend is removed, correct?

6    A    Yes.

7    Q    And sometimes when a new company opens or a new IPO

8    begins, the shares that they give out are restricted.  You're

9    familiar with that; are you not?

10   A    Yes.

11   Q    And in this case, some of the stock certificates you got

12   initially had the word "restricted" on it.  I think you've

13   said that already, right?

14   A    Yes.

15   Q    But, ultimately, you were able to sell those securities

16   and have the legends removed, correct.

17   A    Yeah, some time later, yes.

18   Q    Now, in this memorandum where --

19            MR. BRAFMAN:  If we can go to Page 7, if we go to

20   the bottom of that page and highlight the start of the last

21   paragraph, and then we'll go over the bottom, the last

22   paragraph, and then we'll go over to the next period.

23   Q    It actually refers specifically to restricted securities;

24   do you see it?

25   A    Yes.

S. Hassan - Cross - Brafman                1096

1    Q    It says:  The partnership may invest in so-called

2    restricted securities, i.e., meaning securities as to which

3    the public resale is currently restricted under the Securities

4    Act of 1933 --

5              And it continues over on top?

6    A    Yes.

7    Q    -- amended the Securities Act and which are not

8    immediately convertible into freely tradable securities, the

9    portfolio manager intends to purchase restricted securities

10   where pricing and growth characteristic justify the limited

11   liquidity and which provides the means of achieving eventual

12   marketability, such as registration rights under the

13   Securities Act or the right to convert into marketable

14   securities.  The partnership's overall investments in

15   restricted securities will be limited, however, to a maximum

16   of 10 percent in terms of their cost at time of purchase of

17   current market value of partnership assets.

18             Now, when you read this before you signed, did you

19   understand that you could get part of your money invested in

20   restricted securities?

21   A    Yes, a piece, yes.

22   Q    And you understood that the general partner had that

23   right, right?

24   A    Yes.

25   Q    And you knew from someone who's familiar with hedge funds

1  that if your money was restricted in part in restricted

2  securities, it might not be liquefiable; is that correct?

3  A    Yes.  The only reason I presumed my money was liquid was

4  because I was told so but not because of --

5  Q    We'll get to that.

6  A    -- conflicting information.

7  Q    But the information you were given got before you signed

8  clearly told you you could lose all of your money and part of

9  your money could be invested in restricted securities,

10 correct?

11 A    It did have those disclaimers, yes.

12 Q    What is a disclaimer?  A disclaimer is a legal statement

13 that allows you to do something --

14      THE COURT:  Sustained.

15 Q    What do you understand the word to mean?

16 A    It's a qualifier just to let someone know that something

17 may or may not take place or there may or may not be something

18 there.  It's to let someone know about a certain piece of

19 information.

20 Q    To alert the investor?

21 A    Yes.

22      MR. BRAFMAN:  We can go to Page 9, bottom of Page 9,

23 last paragraph, please.

24 Q    Notwithstanding the above risk management practices, the

25 partnership's investment strategy inherently involves certain

S. Hassan - Cross - Brafman                    1098

1    significant risks.  See risk factors below.  Moreover, there

2    can be no assurance that the above practices will necessarily

3    be applied in all cases or if applied will successfully limit

4    risk to acceptable levels.

5              Do you see that?

6    A    Yes.

7    Q    So, you understood when you signed up that there were

8    some risks that could not be foreseen and that the

9    partnership's investment strategy inherently involves certain

10   significant risks, yes?

11   A    Yes.

12   Q    Did you ask Mr. Shkreli what the significant risks are

13   before you signed this document and sent $300,000 in?

14   A    Not above and beyond -- I mean, there's risk in literally

15   every investment.

16   Q    But you signed this, you sent the money in, and you

17   didn't either ask your personal lawyer or Mr. Shkreli to

18   explain what this sentence meant; would that be a correct

19   statement?

20   A    No, I did review this with my attorney.

21   Q    Yes.  And he did not stop you from investing despite that

22   paragraph, correct?

23   A    No.

24   Q    So, both you and he understood what you were doing.

25   A    Yes.

S. Hassan - Cross - Brafman                1099

1    Q    Now, you said -- I think you told the Government that one

2    of the things you wanted to do before you invested was look

3    for red flags; is that correct?

4    A    Yes.

5    Q    And a red flag is a warning sign that essentially says

6    wait, slow down, this may not be the smart thing or this may

7    not be a good thing for you; is that a red flag?

8    A    Yes.

9         And just to be clear, it wasn't the Government, it

10   was in our conversation today.

11   Q    Okay.  You never told the Government that you were

12   looking important red flags?

13   A    Just that I was reviewing it to make sure everything

14   looked okay, but I don't believe I said red flags.

15   Q    Do you remember meeting with the Government January 28,

16   2016?

17   A    Yes, I don't recall the specific date.  It is possible.

18   Q    Do you remember when you met with the Government that

19   there were also a couple of agents in the room?

20   A    Yes.

21   Q    One of the agents is present in the courtroom today.

22   A    I believe so.

23   Q    I'm going to give you what's marked for identification

24   only as 3500SH-1.  Hold it for a minute, and when I get back

25   to the podium ill refer you to a specific place.  It's not in

LAM      OCR      RPR

S. Hassan - Cross - Brafman                    1100

1    evidence.

2    A    Thank you.

3    Q    I want you to look at the second page of this document

4    and tell me -- read it to yourself, the last paragraph, and

5    tell me whether or not it refreshes your recollection that you

6    had your attorney -- that you told the Government that you had

7    your attorney help you go through the document for MSMB

8    Capital investment prior to investing to see if there were any

9    red flags.

10         Did you tell the Government that?

11   A    This is, again, I think someone's recollection of the

12   conversation I had had.  I'm here today just to share my

13   experience, my knowledge, to the best of my ability, but this

14   is someone else's language.

15   Q    So, you never said "red flags," you don't think you ever

16   used those words.

17   A    I don't believe I used those words.

18   Q    You're not denying you said them, you just don't

19   remember.

20   A    I don't recall.

21   Q    Look at Page 10, if we can, of the private placement

22   memorandum?

23         MR. BRAFMAN:  In the same exhibit, Exhibit 5, Page

24   10.

25         (Exhibit published to the jury.)

LAM      OCR      RPR

1        MR. BRAFMAN:  Can you highlight the paragraph right

2   under the bold risk factor section, please?

3   Q    I'll read it and then ask you a question, Ms. Hassan.

4        All securities investments risk the loss of capital.

5   There can be no assurance that the partnership will be

6   profitable or that it will not incur losses.  Prospective

7   investors should, among other matters, consider the risks

8   summarized below before investing in the partnership.  An

9   investment in the partnership is speculative, involves a high

10  degree of risk, and is suitable only for persons who are

11  willing and able to assume the risk of losing their entire

12  investment.

13       Did I read that correctly?

14  A    Yes.

15  Q    And now below that, they have a paragraph that refers to

16  the portfolio manager's track record.  I think you said that

17  you were interested in what kind of success he had; is that

18  correct?

19  A    Yes.

20       MR. BRAFMAN:  If we could put that paragraph up,

21  lack of operating history.  It's on Page 10.

22  Q    Lack of operating history.  Experience of portfolio

23  manager.

24       You told us that Brent Saunders told you that

25  Mr. Shkreli had a substantially profitable good track record,

1    correct?

2    A    Yes.

3    Q    And this entity, MSMB Capital, had no operating history

4    at all; you understood that?

5    A    I didn't put that together.

6    Q    Let's read it:  The partnership is a newly-formed

7    enterprise and will have no operating history upon which basis

8    potential investors may evaluate its performance.

9           When you read that now to yourself, doesn't it tell

10   you that MSMB Capital has no prior history of performance?

11   A    That's what it says, but there's also -- I mean,

12   frankly --

13   Q    Is that what it says?

14   A    It could have also been an older format for the document.

15   He never specifically stated this was a new fund.  He was

16   telling me about his track record of success and to invest in

17   the fund that was successful.  I would hope that one would

18   explain that I was not investing in that fund.

19   Q    This is what you're investing in.  This is what you

20   reviewed with your lawyer and signed.  It's this fund, isn't

21   it?

22   A    Yes, but this is also a little bit conflicting to what I

23   was told.

24   Q    But you read this before you paid any money.

25   A    Yes, I did.  I also --

S. Hassan - Cross - Brafman                    1103

1   Q    Okay.

2   A    -- prior to that.

3   Q    And after, going down to the word "any":  Any past

4   success with Mr. Shkreli's investments or investment strategy

5   should not be construed as indicative of the future results of

6   the partnership.  There is no historical performance for the

7   partnership upon which a prospective investor could base its

8   investment decision.  As such, the partnership is a risky

9   investment and investors could lose all or substantially all

10  of their investment.

11          You read that before you put your money down,

12  correct?

13  A    Yes.  And it's fairly typical language in almost all

14  PPM's that are signed.

15  Q    So, why did you go through it with your lawyer if it's

16  typical language?

17  A    Just to see if there was anything that really stood out.

18          This is language that I've seen in almost every PPM

19  I've ever been engaged with.

20  Q    Because that's the rules of the game, right?  You could

21  lose all your money, it's a high risk investment.  Put your

22  money down and if you lose, you lose; if you win, you win.

23          Is that correct?

24  A    Yes, all investments have some level of risk.

25  Q    Now, if we could look down to the lower portion of the

S. Hassan - Cross - Brafman                1104

1    page to alternative investing generally.

2           MR. BRAFMAN:  Alternative investing generally.

3    Q    The partnership is designed for investors seeking

4    potential long-term growth for alternative investments who do

5    not require regular current income and who can accept a high

6    degree of risk in their investments.

7           Let me stop there.  What do you understand the word

8    "alternative investments" to mean?

9    A    Nontraditional equities, that doesn't necessarily have to

10   be traditional stock equities of some sort.

11   Q    Could it be investing in an IPO?

12   A    Hypothetically.

13   Q    Could it be investing in a private company?

14   A    Hypothetically, yes.

15   Q    Could it be investing in a building?

16   A    Yes.

17   Q    So, when you're putting down your money based on what

18   you're reading, it says, continuing:  In view of, among other

19   things, the partnership's ability to invest in a wide range of

20   securities and instruments and use a broad variety of

21   investment techniques, the partnership may be deemed

22   speculative in nature and is not intended to be a

23   comprehensive investment program.  The partnership is intended

24   for investments solely by sophisticated investors who are

25   accustomed to and fully understand the risk of such

S. Hassan - Cross - Brafman                    1105

1    investments.

2            Did you consider yourself to be a sophisticated

3    investor?

4    A    I considered myself to understand these investments.

5    Q    And you have a master's in finance, right?

6    A    Yes, I do.

7    Q    And you were operating the family hedge fund at the time

8    you made this decision.

9    A    Yes.

10   Q    So, you're not just a plain person with no formal

11   education and no experience in these matters, correct?

12   A    No, I had some level of education and experience.

13   Q    And you could certainly read the risk factors, correct?

14   A    Yes.

15           MR. BRAFMAN:  Now, if we could go to Page 16 in the

16   book, please.

17   Q    You understand how the general partner was permitted

18   under the terms of this agreement to value the investments in

19   your account?

20   A    Can you be a little more specific?

21   Q    Let's read it and then I'll discuss it with you.

22           If we look at the bottom of Page 16, it explains

23   quite clearly, the last paragraph, valuations.

24           Valuations and other matters.  The general partner

25   will be responsible for a variety of important matters

1  affecting the partnership.  Among other matters, the general

2  partner will determine the --

3          MR. BRAFMAN:  Please turn the page.  Thank you.

4  Q    -- value of the securities held by the partnership.

5          Did you understand that Martin Shkreli could

6  determine the value of securities that perhaps as restricted

7  securities you couldn't value by just going and looking up the

8  ticker?

9  A    Yes, but I also trusted the audit process to verify that.

10 Q    Let's continue:  Furthermore, in the event the general

11 partner provided with or otherwise comes into possession of

12 information which leads the general partner to determine that

13 one or more valuations of the partnership's assets for a

14 period are inaccurate, the general partner will have the

15 authority to adjust or amend such prior valuations as the

16 general partner deems appropriate and to adjust or amend any

17 reports or statements of the partnership, whether or not

18 previously issued, with respect to such prior periods.

19          You were providing a substantial amount of

20 discretion to the general partner when you signed up for this,

21 weren't you?

22 A    Yes.

23

24          (Continued on next page.)

25

S. Hassan - cross - Brafman                1107

1   EXAMINATION CONTINUING

2   BY MR. BRAFMAN:

3   Q    Now, if you look at Page 18, please.  If we look at

4   information, the third paragraph from the bottom.  Right there

5   (indicating).  It reads as follows:

6              Information provided by the portfolio manager,

7   factual information contained in this memorandum including,

8   without limitation, intended investment strategy and policies,

9   performance or financial data, if any, and biographical and

10  certain other information has been furnished largely by the

11  portfolio manager and in general has not been independently

12  confirmed or verified.  Therefore, limited partners should

13  seek to confirm such information, seek additional information

14  or conduct further investigation as they deem appropriate in

15  connection with a decision to invest in the partnership.

16             Did you do any independent investigation of any of

17  the facts laid out in this memorandum?

18  A    I didn't have an independent investigator.

19  Q    And did you discuss this with your lawyer as to whether

20  you should get an independent accountant or investigator to

21  check the facts in this memorandum?

22  A    I -- he didn't recommend it.

23  Q    Now, when you talk about the responsibility of the

24  general partner to act in good faith, you are agreeing to,

25  essentially, hold him harmless if at the end of the day he

SAM      OCR      RMR      CRR      RPR

S. Hassan - cross - Brafman                    1108

1  loses your money, aren't you?

2  A    I don't know if that's always the case.

3  Q    Well, let's see the bottom of page 21.  Exculpation,

4  right?

5         MR. BRAFMAN:  If you could blow that up, please,

6  exculpation and the paragraph under it.

7  Q    Can you tell me what to your understanding the word

8  exculpation means?

9  A    I'm not familiar on how to define that word.

10  Q    Okay, well, what do you understand this heading to tell

11  you, that the general partner may not be held legally

12  responsible under certain circumstances?

13  A    Can I take the time to read it?

14  Q    Sure.

15         (Pause.)

16  A    Yes, unless there's something like gross negligence,

17  willful misconduct or a willful breach of the partnership,

18  then yes.

19  Q    So the general partner and the advisor as fiduciaries

20  will have a responsibility to the limited partners to exercise

21  good faith and fairness in all dealings affecting the

22  partnership; however, the partnership has agreed in the

23  partnership agreement to indemnify and exculpate the general

24  partner, the advisor, and their respective members, managers,

25  employees and agents, including without limitation, the

S. Hassan - cross - Brafman                    1109

1   portfolio manager, from any liability or losses, damages or

2   expenses resulting from the respective status as general

3   partner and advisor or their acts of omissions, and then you

4   can read and continue absent gross negligence or willful

5   misconduct.

6           Do you see that?

7   A    Yes.

8   Q    All right, now, when you invested in MSMB and if Martin

9   Shkreli as the advisor used his discretion to invest in a

10  short sale that went very bad and you lost all of your money,

11  is it your understanding that he could have walked away from

12  it and just said, I'm sorry, Sarah, I lost all your money?

13  A    I don't know if that would have been categorized as one

14  of the things in here such as gross negligence or some kind of

15  misconduct; I don't know.

16  Q    Well, the memo tells you you are going to be investing in

17  short sales and long sales, correct?

18  A    It tells me I'll be investing in both and that there will

19  be some kind of mix.

20  Q    But when you invest in a short sale you know you can lose

21  all your money really fast if the stock doesn't go down

22  because then you have to cover the short sale, right?

23  A    Yes.

24  Q    And you can lose millions of dollars in ten minutes if

25  you're a big gambler in the market, isn't that correct?

S. Hassan - cross - Brafman                1110

1    A    Yes.

2    Q    And in this case if you understand, correct me if I'm

3    wrong, what happened was there was a OREX trade, O-R-E-X trade

4    early on and when you look back that's what cost MSMB a lot of

5    its capital, correct?

6             MS. KASULIS:  Objection, Your Honor.

7    A    I'm actually not familiar.

8    Q    You never asked how this happened after all these years?

9    A    I did not know.

10   Q    Okay, so let's move on from there.

11            At the end of the day, did you have any right, to

12   your knowledge, to get 58,000 shares of Retrophin when the

13   last evaluation you got suggested that your account was worth

14   $425,000?

15   A    I was actually disappointed when I got those shares.  At

16   the time when I did the calculation on them they were worth a

17   little less than $300,000.

18   Q    But they were also restricted?

19   A    They were restricted, and they were less than -- worth

20   less than $300,000 and I thought that my account had grown to

21   be worth about 435.

22   Q    Okay.  But you also eventually got back your 400,000 in

23   cash, right?

24   A    Yes, and that's how we came to that because I was, you

25   know, still disappointed with the outcome and eventually we

1   landed there.

2   Q    So, ultimately, whatever demands you made were met by

3   Mr. Shkreli, it just took some time?

4   A    Well, ultimately, we came to an agreement on the

5   settlement.

6   Q    And he paid the 400, he gave you the 58,000 in Retrophin

7   shares, which you sold for more than a million dollars,

8   collectively?

9            MS. KASULIS:  Objection.

10           THE COURT:  Overruled.

11  BY MR. BRAFMAN:

12  Q    You may answer.

13  A    Yes.

14  Q    Now, do you know what it means when a security has a

15  limited market?

16  A    Can you please explain?

17  Q    Yes.  There are securities that you can buy on the stock

18  exchange, that anyone can buy, big public companies, correct,

19  you're familiar with stocks like that, like Amazon and Google

20  and Facebook, right?

21  A    Yes.

22  Q    You call up your broker and you say, Buy me a thousand

23  shares; they execute the trade, you have a thousand shares and

24  you pay the price it's trading at at the time of the trade,

25  right?

S. Hassan - cross - Brafman                    1112

1    A    Yes.

2    Q    And when you sell it, you get the amount of money that is

3    valued on the date of the sale, right?

4    A    Yes.

5    Q    And when you have a private company that's not public,

6    how do you -- how do you trade those securities, if you know?

7    A    It's much more limited to do so.

8    Q    And it's much more limited because not everybody wants to

9    invest in a startup or a private company, even if one day it

10   becomes a homerun, right?

11   A    Yes.

12   Q    And in this case when you got the Retrophin shares, they

13   were not tradable?

14   A    No, they were not.

15   Q    And even if you wanted to sell them for 3 or $4 a share,

16   you couldn't sell them, right?

17   A    That's correct.

18   Q    But the best thing that happened to you financially was

19   the fact that you couldn't sell them because when you did sell

20   them, they were at $19 a share, right?

21   A    I did become lucky with where the share price ended.  It

22   could have become zero, and it did ultimately become 19.

23   Q    Right, and who do you recognize as the brains behind

24   Retrophin, anybody but Martin Shkreli?

25   A    I'm not personally familiar with the Retrophin executive

1    team.

2    Q     No, but he made a presentation to you about Retrophin,

3    we'll get to it in a minute.  He made a presentation, right?

4    A     Several years prior, yes.

5    Q     And he made the presentation explaining the science he

6    was developing?

7    A     Yes.

8    Q     And you know that it involved research and doing genetic

9    coding for myotubular dystrophy, which is a form of muscular

10   dystrophy?

11   A     Yes.

12   Q     And you know that, ultimately, Martin figured this out

13   and it became a very successful company, isn't that correct?

14   A     My understanding is that it did eventually grow, yes.

15   Q     Now, in addition to the memorandum, there is also a

16   subscription that you signed and participated in, right?

17   A     Yes.

18   Q     And the subscription agreement is all part of Exhibit 5,

19   which the Government put into evidence.  If we could move

20   to -- I'm sorry, page 45 still of the memorandum.

21   A     Sorry, where would you like me to turn?

22   Q     I'm sorry.  I would like them to put up page 45 of the

23   private placement memo.

24              (Exhibit published.)

25   BY MR. BRAFMAN:

1    Q    Without reading it again, would it be a fair statement if

2    you looked throughout this memo that on various places, both

3    at the beginning, the middle and right here towards the end,

4    they tell you, again, to be careful of the risk factors?

5    A    Where specifically would you like me to look?

6    Q    I'm sorry, page 45, the last big paragraph.  It starts

7    with:  An investment in the partnership interest will involve

8    a significant degree of risk and is suitable only for persons

9    having substantial financial resources.

10            They tell you that in several different places in

11   the memo, correct?

12   A    Yes, it's very typical of a PPM.

13   Q    But it tells you that, whether it's typical or not, you

14   are warned that this is a very risky investment, right?

15   A    Yes, there's some level of risk in all investments.

16   Q    But this is a particularly risky, there is some level of

17   risk if you buy a stock and it drops you lose money; but this

18   is a brand new offering memorandum for a company that has no

19   track record, which it tells you in black and white, is that

20   correct?

21   A    Well, usually, I think there's a little bit less -- less

22   risk in a hedge fund than there is in individual stock.  One

23   stock can have one bad piece of news that wipes it out

24   tomorrow.  Usually a hedge fund has a portfolio where it's a

25   little more balanced, but yes, I do agree, there is still a

S. Hassan - cross - Brafman                1115

1   level of risk.

2   Q    If we could look at the subscription agreement, please,

3   which is Exhibit B.  I'm sorry, never mind.  If you could look

4   at Government Exhibit 1035 -- 103-5.

5           Now, before we do that, if we could go to the

6   settlement agreement that the Government put into evidence,

7   which you ultimately get.  Do you have that in front of you?

8   A    No, I do not.

9           THE COURT:  Do you want to give her an exhibit

10  number so she can put her hands on it?

11          THE WITNESS:  It would be nice if I could refer to

12  the hard copy.

13          MR. BRAFMAN:  Do you have the exhibit number?

14          MS. SMITH:  I believe it's 52, Your Honor.

15          THE COURT:  52.

16          MR. BRAFMAN:  Yes.  If you could put it up to the

17  next page to the actual agreement, I'm sorry, if you could

18  blow that up.

19          MS. KASULIS:  And it's Tab 51 for the witness.

20          THE WITNESS:  Thank you.

21          (Exhibit published.)

22          MR. BRAFMAN:  If you could raise that top portion

23  up.

24  BY MR. BRAFMAN:

25  Q    This settlement agreement is between you, you are the

S. Hassan - cross - Brafman                1116

1    releaser, and Martin Shkreli, MSMB Capital, MSMB Capital, LLC,

2    MSMB Healthcare and all of the other MSMB entities and

3    Retrophin, is that correct?

4    A    Yes.

5    Q    Did you ever have a contract with Retrophin which

6    required them to give you all of these shares?

7    A    No, I did not.

8    Q    Okay.  If we could turn to the next, I'm sorry, move it

9    up to the whereas, the $300,000.  And it says:  Whereas,

10   releaser, you, Sarah Hassan, made a $300,000 personal

11   investment in MSMB Capital in January 2011, the investment,

12   that's accurate, correct?

13   A    Yes.

14   Q    And if you could move it up, please, to payment terms.

15        The settlement agrees to give you $400,000 in cash

16   upon the execution and delivery of the liquidation -- of this

17   agreement, the liquidation amount, as full and final

18   satisfaction of any and all claims; so by accepting the

19   $400,000 in this agreement, you are giving up your right to

20   sue any of the entities that are listed in this contract, is

21   that correct?

22   A    Yes.

23   Q    And if we could turn to the next page, paragraph 2, if we

24   could highlight that.

25        (Exhibit published.)

S. Hassan - cross - Brafman                    1117

1    BY MR. BRAFMAN:

2    Q    With respect to the 58,306 shares, it's Shkreli,

3    Retrophin and the MSMB entities represent and warrant to

4    releaser on the date of this agreement that releaser has been

5    validly issued and is the record and beneficial owner of and

6    has good and valid title to 58,306 shares of common stock, and

7    then it goes on to tell you that their value at the time

8    you're getting it, but you ended up with 58,306 shares that

9    were given to you by Mr. Shkreli, Retrophin and the MSMB

10   entities collectively, is that correct?

11   A    Yes.

12   Q    So you got a total of money that you personally invested

13   in, plus a hundred-grand, yes?

14   A    Yes.

15   Q    And MSMB, Retrophin and Shkreli collectively gave you

16   58,306 shares of common stock?

17          MS. KASULIS:  Objection, Your Honor,

18   mischaracterizes the document.

19          THE COURT:  I will sustain the objection.  Can you

20   rephrase, Mr. Brafman?

21          MR. BRAFMAN:  I'm sorry?

22          THE COURT:  Sustained.  Please rephrase.

23          MR. BRAFMAN:  Rephrase.

24   BY MR. BRAFMAN:

25   Q    The document provides that Shkreli, Retrophin and the

S. Hassan - cross - Brafman          1118

1   MSMB entities represent and warrant to releaser on the date of

2   this agreement that releaser has been validly issued and is

3   the record and beneficial owner of and has good and valid

4   title to 58,306 shares of common stock of Retrophin, correct?

5   A    Yes.

6   Q    All right.  So MSMB, Martin Shkreli and Retrophin in

7   return for your investment gave you 58,306 shares, is that

8   correct?

9         MS. KASULIS:  Objection.

10  A    No, that's not necessarily --

11        THE COURT:  Sustained.

12        MR. BRAFMAN:  I'll move on.

13  BY MR. BRAFMAN:

14  Q    Now, what's the date that you got the $400,000?

15  A    I would have to see some kind of note.  I don't recall

16  the date.

17  Q    Sometime in 2014 or '15?

18  A    Um --

19  Q    We'll get to it in a minute, let me move on to something

20  else.

21        What is the date that Martin Shkreli made the

22  presentation to you in the offices of Retrophin, if you

23  recall?

24  A    I don't recall.  Can I refer --

25  Q    We can --

S. Hassan - cross - Brafman                1119

1          MR. BRAFMAN:  I'm sorry, if we could put up

2    Government Exhibit 103-5.  If we could blow that up, please.

3          (Exhibit published.)

4    BY MR. BRAFMAN:

5    Q    This is April 11th is when he made the presentation on

6    Retrophin, is that correct?

7    A    Yes, April 11th, 2011.

8    Q    Okay.  Now, when did you first invest with MSMB?

9    A    In January of 2011.

10   Q    So we are talking about three months after your

11   investment, three-and-a-half months after your investment he

12   was giving you a presentation of Retrophin, which based on a

13   presentation was already a company that he had developed, is

14   that correct?

15   A    I don't know what the status of the formal organization

16   was.

17   Q    But you see it, the presentation that was made to you,

18   which the Government walked you through in part, was done on

19   April 11th, is that correct?

20   A    Yes.

21   Q    And you are only in Martin Shkreli's business world from

22   January of 2011?

23   A    Yes.

24   Q    So within three months of joining the MSMB investors, you

25   are already being shown the Retrophin presentation, correct?

S. Hassan - cross - Brafman                    1120

1  A    Yes.

2  Q    So you knew that Retrophin existed, at least in Martin

3  Shkreli's mind, as early as April 11th, 2011?

4  A    Yes, that seemed -- I'm not certain that it -- wasn't

5  certain that it was a formal company.  He had described it as

6  being, you know, I recently found this really interesting IP

7  under research and I think it's an interesting concept, I want

8  to move it forward, but he never -- he never made it clear if

9  it was a formalized company or if he was just putting together

10  a plan for it.

11  Q    Well, let's look at the -- let's look at the presentation

12  that you read.  Let's go to 0000688, Bates stamp 688, which is

13  part of exhibit -- which is part of the same exhibit.  Let me

14  read the first paragraph:

15          Retrophin is an emerging biotechnology company

16  dedicating developed drugs for rare and life-threatening

17  diseases.  Specifically our mission is to become the first

18  company to receive FDA approval for a new treatment for

19  Duchenne muscular dystrophy.

20          Did I read it correctly?

21  A    Yes.

22  Q    And Mr. Shkreli and you were looking at this slide or

23  this presentation together on his computer in his office,

24  correct?

25  A    Yes.

S. Hassan - cross - Brafman                    1121

1  Q    And when you were looking at it, he was describing it to

2  you and explaining it to you, correct?

3  A    Yes.

4  Q    And when you go to page 690, Bates stamp 690, I am

5  leaving off the zeros, this explained the mechanism of the

6  action that Martin had developed concerning how the proteins

7  would be developed, correct?

8  A    I believe so.

9  Q    And look at page 693, Bates stamp 693.  That's the next

10 one, I believe.  And this reads:  The key problem is

11 intracellular transduction.

12         Do you know what that means?

13 A    I probably wouldn't do a good job of defining it today.

14 Q    Protein replacement therapy is a well-known tool for many

15 diseases; insulin, EPO, ERT, I, et cetera.  Dystrophin must

16 cross the cell membrane, transduce; to be useful, a very

17 difficult test.  RE-001 is designed to solve this problem by

18 using a cell penetration peptide known as TAT, T-A-T.

19         Do you see that?

20 A    Yes.

21 Q    And this was the science that Martin was explaining to

22 you that he had under development, isn't that true?

23 A    Yes.

24 Q    And it wasn't just Martin and a group of slides, several

25 of your father's key friends and key colleagues were part of

1    this company, weren't they?

2    A    I hadn't spoken to any of them about it.

3    Q    But look at the slide.  Let me just move to 0000704.

4    A    I am familiar with Mr. Saunders or Mr. Banta being listed

5    somewhere in the investors.

6    Q    I just want to go back to the slide, okay.  Let the jury

7    see what you saw.

8              Key management:  Martin Shkreli is the CEO, interim

9    CEO, and then on the bottom it says Ken Banta is consulting

10   senior vice president for strategy, former Schering-Plough

11   senior vice president for corporate strategy.

12             That's the Ken Banta who is one of your father's

13   closest business associates; isn't it?

14   A    I don't know if I'd characterize him as one of the his

15   closest business associates, but that is the gentleman that's

16   worked for my dad, yes.

17   Q    For how many years?

18   A    I don't know.

19   Q    Fifteen?

20   A    I don't know.

21   Q    Many years?

22   A    I don't know.  Some of these people I've heard their

23   names throughout the years, but I don't know closely how many

24   years they worked together.  If they worked together a year at

25   one company and then a year at another.  I -- I honestly

1    couldn't tell you.

2    Q    And they just show up at these companies after your dad

3    takes them over by accident?

4              MS. KASULIS:  Objection, Your Honor.

5              THE COURT:  Sustained.

6    BY MR. BRAFMAN:

7    Q    Well, did you ever say to either Mr. Saunders, who was

8    your friend, or Ken Banta, who you knew through your dad or

9    could call up, what do you know about Retrophin?

10   A    I didn't talk to him about this investment.

11   Q    And now, Brent Saunders, the person you said you'd known

12   for most of your life, if we could turn to the next

13   page 000705, Brent Saunders is on the Board of Directors of

14   this company, is that correct?

15   A    Yes, I see that listed.

16   Q    And he is the person who put you in Martin's world?

17   A    Yes.

18   Q    And you never went back to Brent Saunders and said,

19   Martin is pitching me on Retrophin, what can you tell me about

20   it, you're on the board; you never had that conversation with

21   Brent Saunders?

22   A    I didn't discuss it with Mr. Saunders.

23   Q    Now, if you look at the people who are among the

24   investors, can you turn to 000706, can you look at that page?

25   Do you have it?

S. Hassan - cross - Brafman                    1124

1    A    Yes.

2    Q    Brent Saunders is listed first, right?

3    A    Yes.

4    Q    And he's identified as the CEO of Bausch and Lomb,

5    correct?

6    A    Yes.

7    Q    The company that your father was chairman of?

8    A    Yes.

9    Q    Now, if you can look at 713, the appendix also has

10   suggested timelines for how this company is going to be

11   developed, is that correct?

12   A    I'm not there yet.

13   Q    I'm sorry, 713.

14   A    One moment.  Yes.

15   Q    And it's obvious from this timeline, if these slides are

16   accurate, that as early as June 2011 that they have already

17   done some testing, is that correct?

18   A    It was not clear if this was for Retrophin.  My

19   understanding was that there was testing done, but it was

20   never made clear to me if that was done by Retrophin.  I just

21   thought this was the timeline of what he was working on.

22   Q    So what this is, this is the Retrophin presentation.  He

23   is not showing you this because it's a stroll down memory

24   lane, this is the Retrophin presentation?

25   A    No, I --

1          MS. KASULIS:  Objection, Your Honor.

2          THE COURT:  Sir, you can just ask the

3    cross-examination question without arguing with the witness.

4          MR. BRAFMAN:  Okay.

5    Q    The appendix of this presentation lists June 2011 spinal

6    muscular atrophy mouse study completes.

7          Does that indicate to you that the testing that is

8    being done or the trials that are being done with mice are

9    going to be completed by then?

10   A    Yes.

11   Q    And you as someone who's worked in healthcare for many

12   years, you know that before the FDA approves drugs for humans,

13   it generally first tests it on some type of laboratory animal,

14   isn't that correct?

15   A    Yes.

16   Q    And it's fairly common?

17   A    Yes.

18   Q    And in order to get FDA approval for use on humans, you

19   need to go through various trials, is that correct?

20   A    Yes.

21   Q    And if you successfully complete those trials, it can

22   substantially improve the likelihood of the company's success

23   once it's approved for use on human beings, is that correct?

24   A    Yes, that's correct.

25   Q    And what Martin was explaining to you in this

S. Hassan - cross - Brafman                    1126

1   presentation, if you look at page 714, the last two

2   highlighted or the last three highlighted:  Battery of

3   Duchenne muscular dystrophy mouse studies begin to read out;

4   pre-(indicating) meeting with FDA; and 1.175 million spent so

5   far without overhead.

6            Do you see that?

7   A    Yes.

8   Q    Do you know that Retrophin and MSMB shared the same

9   office at Madison Avenue where you were reviewing the slides?

10  A    I believe so.

11  Q    And were you up there, were they lavishly furnished or

12  were they modest?

13  A    I don't really recall.

14  Q    Well, you sat in the room for several hours looking at

15  slides.  You were at the same desk because there was only one

16  laptop that you could use?

17           MS. KASULIS:  Objection.

18           THE COURT:  Sustained.

19

20           (Continued on the following page.)

21

22

23

24

25

1  CROSS-EXAMINATION (CONTINUING)

2  BY MR. BRAFMAN:

3  Q    Now, when Martin was showing you these slides -- if you

4  go to 716, please.  Do you see there where it says investigate

5  opportunities and more disease and the first one listed as

6  myotubular myopathy?

7  A    Yes.

8  Q    Did Martin discuss that with you?

9  A    I don't recall.

10 Q    Did Martin tell you anything about a young man who died

11 of muscular dystrophy that spurred his interest in Retrophin?

12 He never told you about a little boy name Josh Frase?

13        MS. KASULIS:  Objection, Your Honor.

14        THE COURT:  Sustained.

15 Q    Did he ever tell you why he got started on Retrophin?

16 A    I don't recall.

17 Q    Did you ask him what brought on this passion for

18 Retrophin?

19 A    Honestly, our earliest conversation that I remember was

20 him saying he found some interesting research or studies that

21 are being done that seem like there could be a promising

22 product for a disease, but I don't remember those

23 conversations that you're asking about.

24        MR. BRAFMAN:  Give me one second, please.

25 Q    Now, if you look at page 721, under appendix timelines,

Hassan - cross - Brafman                    1128

1   he lists Children's National Medical Center, Washington, D.C.;

2   Children's Hospital Boston, Boston, Massachusetts; Baylor

3   University Medical Center, Dallas, Texas; NYU Medical Center

4   New York, New York; and $100,000 in consulting costs.  Did you

5   ask him what the relationship was with any of those medical

6   facilities?

7   A    Honestly, I don't recall.  This was a conversation that

8   was sometime ago.

9   Q    If you look at 722.  722, he says that in March 2002

10  phase one study of RE-0001 begins and then it drops down,

11  Retrophin valuation of $200 million.  Do you see that?

12  A    Yes.

13  Q    Do you know what Retrophin's valuation is today?

14       MS. KASULIS:  Your Honor, just to correct the

15  record, I believe he said 2002.  It is 2012.

16  Q    It's March 2012, valuation he lists for the Retrophin is

17  $200 million.  Do you see that?

18  A    Yes.

19  Q    As you sit here today, do you know if that's an accurate

20  statement in 2012?

21  A    I do not know.

22  Q    When you left, did you check to see what Retrophin was

23  valued at?

24  A    I know the stock price but I don't know the overall

25  market cap.

1   Q    Do you know what the market cap is today?

2   A    No.  I've been advised not to follow it.  I don't know.

3   Market cap.

4   Q    Now, if you look at 0724, it says in May 2012, continued

5   reports to RE-0001 outcomes, 10 patients enrolled.  Drop down

6   and it says, FDA allows 12 weeks of human RE-0001 dosing.

7        Does this slide suggest that as early as May 2012

8   the FDA had already approved this drug for human dosing?

9        MS. KASULIS:  Objection, Your Honor.  This is in

10  2011, this presentation?

11       MR. BRAFMAN:  It is projecting what is going to

12  happen in 2012.

13       THE COURT:  It's the way you phrased it, sir.

14       MR. BRAFMAN:  I'm sorry.

15  Q    Does this suggests to you that in May of 2012 Mr. Shkreli

16  was projecting that the FDA would already approve it for human

17  testing?

18  A    Yes.

19  Q    Do you know how long it generally takes for the average

20  drug, a brand-new drug to get from development through FDA

21  approval, approximately?

22  A    Something like seven years, ten years.

23  Q    It takes a long time?

24  A    Yeah.

25  Q    You have to go through different levels of bureaucracy at

Hassan - cross - Brafman                    1130

1    the FDA?

2    A     Yes.

3    Q     And differently levels of scientific testing?

4    A     Yes.

5    Q     And you need to have different good results at the

6    different clinical trials?

7    A     Yes.

8    Q     And if you fail at any one of those, it could be a

9    terrible setback; correct?

10   A     Yes.

11   Q     And many companies fail in the pharmaceutical industry

12   and never get approved for human usage; is that correct?

13   A     Yes.

14         THE COURT:  Mr. Brafman, are you at a point where it

15   might be good to give the jurors an afternoon break?

16         MR. BRAFMAN:  Yes.

17         THE COURT:  Jurors, please leave your notes face

18   down on your chairs.  I would ask you to take a little break,

19   have coffee, stretch.  Please don't talk about the case.

20   Thank you for your attention.

21         (Jury exits the courtroom.)

22         THE COURT:  All right.  Let's take ten minutes.

23         (Recess taken.)

24         (Jury enters the courtroom.)

25         THE COURT:  Thank you.  We have all jurors present.

1   Please have a seat, everybody.  Mr. Brafman, you may resume

2   your cross.

3            MR. BRAFMAN:  Thank you very much.

4            May I have just one second, Your Honor?

5            THE COURT:  Sure.

6            (Pause.)

7   Q    I think you told us on direct examination that at some

8   point in April of 2012 you received 5,000 shares of Retrophin

9   from Mr. Shkreli that you were not expecting; is that correct?

10  A    I don't recall the specific date, but, yes, the content

11  did occur.

12           MR. BRAFMAN:  If I may show the witness DX 122 for

13  identification only, if we could put it on the ELMO for her.

14  I don't have it.

15           I can walk up and show it to her, Your Honor.

16           THE COURT:  That might work better.

17           MS. KASULIS:  What was the exhibit number?

18           MR. BRAFMAN:  DX 122.

19  A    Thank you.

20  Q    You're welcome.  By looking at DX 1722, does it refresh

21  your recollection that you received the 5,000 shares from

22  Martin on or about April 16, 2012?

23  A    Yes.

24  Q    Indeed, Martin gave you that and thanked you for being

25  one of the early supporters of Retrophin; is that correct?

Hassan - cross - Brafman                    1132

1  A    Yes.  That's correct.

2  Q    AND he also advised you that there was a zero basis in

3  those 5,000 shares; is that correct?

4  A    Yes.  There's a zero cost basis.

5  Q    Do you know what that means in terms of tax liability to

6  you?

7  A    I wasn't sure of the implication.

8  Q    When you buy a stock and you pay $10 for the stock,

9  that's your basis; is that correct?  Do you understand that?

10 A    Yes.

11 Q    And when you sell the stock for $20, your profit is $10;

12 is that correct?

13 A    Yes.

14 Q    So if you either had a short-term capital gain or a

15 long-term capital gain, they divide the 10 from the 20 and you

16 have $10 worth of income that's taxable to you; correct?

17 A    Yes.

18 Q    Now, in this case he is giving you this; is that correct?

19 A    I understood the zero cost basis, I wasn't sure of the

20 taxation implications.

21 Q    BUT you did not have to buy these units, it's a gift from

22 Martin Shkreli to you essentially thanking you for the

23 aggravation, isn't it true?

24         MS. KASULIS:  Objection, Your Honor.

25         THE COURT:  Sustained.

1   Q    He was thanking you for being one of the early

2   supporters; is that correct?

3   A    Yes, he did.

4   Q    And for the last 11 months, as you went through it on

5   direct examination, you have been going back and forth with

6   Martin to try and get out of the fund; is that correct?

7   A    Those are unrelated.  I'm sorry, this was an award of

8   5,000 units that was for Dynagrow Capital and Dynagrow

9   Capital's investment in Retrophin from day one, but that was

10  unrelated.  It was not a personal gift to me.  It was a gift

11  to Dynagrow Capital.

12  Q    But Dynagrow Capital is your family's money?

13  A    Yes.  But as I clarified in several e-mails, it's very

14  different from any individual.

15  Q    I understand that, but the only people who participate in

16  the growth or loss of Dynagrow is you and your immediate

17  family; correct?

18  A    Yes.

19  Q    At some point, even if it's not a direct gift to you,

20  some of this trickles down to Sarah Hassan, doesn't it, if you

21  make a profit on it?

22  A    I guess in some convoluted way, but, again, this was

23  nothing to do with me personally.

24  Q    But you were the Dynagrow person who dealt with Martin

25  Shkreli, nobody else?

1  A    I made an investment out of Dynagrow for Retrophin and

2  there weren't many interactions in terms of that integral

3  piece.

4  Q    Did you testify on direct examination that the K-1 that

5  they showed you had Sarah, Dynagrow, and Fred Hassan on it and

6  that you wanted it redacted because Fred had nothing to do

7  with this investment?

8  A    Yes.

9  Q    Do you know how your father or you or Dynagrow came to

10 get that K-1?

11 A    Can you please expand?

12 Q    How did that show up on your doorstep?

13 A    I was sent a K-1.

14 Q    I know, but did you or your father or your assistants or

15 your father's assistant call and ask for a K-1?

16 A    It's something that's commonly sent out every year.

17 Q    Have you seen any of the correspondence between Johanna

18 Olsher and Martin Shkreli relating to the K-1?

19 A    Johanna?

20 Q    I'm sorry, Johanna Olsher?

21 A    She was one of my admins.

22 Q    One of your administrative assistance?

23 A    Yes.

24 Q    Did you go through her e-mail traffic related to this to

25 see how this came about?

1  A    No, I'm not familiar with any of that.

2  Q    And any one of the --

3        MR. BRAFMAN:  Government Exhibit 103-36, can we put

4  that up, please?  That's a two-page exhibit.  If we could go

5  to the second page please, the top portion, if we could direct

6  the witness' attention to this exhibit and raise it for the

7  jurors to see.

8  Q    This is an e-mail that you sent to Martin; is that

9  correct?

10 A    Yes.

11 Q    And it says, "Since I am the manager of Dynagrow Capital,

12 which manages our family's money, I would appreciate it if you

13 would list in any investor list or otherwise Dynagrow Capital

14 as the investor.  If you feel the need to identify me as the

15 manager, please feel free to describe it as Dynagrow/Sarah

16 Hassan.  My dad is not a direct investor and cannot do so

17 because of compliance obligations."  Do you see that?

18 A    Yes.

19 Q    Why wasn't your dad a direct investor, as opposed to an

20 investor?  What does the word "direct" to you?

21 A    I'm sorry, I think you are looking for semantics on

22 there.  It was to say that he's not an investor.  I generally

23 try to speak nicely.  That was my way of speaking, but he is

24 in no way an investor.

25 Q    But he is an investor in Dynagrow, isn't he?

Hassan - cross - Brafman                    1136

1    A    He is a shareholder of Dynagrow.

2    Q    Now, your father worked for Warburg Pincus; is that

3    correct?

4    A    Yes.

5    Q    That's a major private equity fund?

6    A    Yes.

7    Q    In order for him to invest in something, he would need

8    clearance; is that correct?

9    A    Yes.

10   Q    He would need clearance from their compliance department

11   to make sure there was no conflict; correct?

12   A    Yes.

13   Q    If your father wanted to invest directly in Retrophin

14   personally that could present a problem for compliance if, in

15   fact, Retrophin was competing with another healthcare company

16   that Warburg Pincus was helping; right?

17   A    That could be a potential conflict.

18   Q    Okay.  So the fact that you say he is not a direct

19   investor, you think that's just language that you chose to

20   make the point?

21   A    Yes.  I actually made it clear in several e-mails that

22   he's not an investor.  I think we also saw several e-mails

23   today that I stated very clearly he is not an investor, so if

24   there was any confusion, it should have been cleared well

25   before this time.

1    Q    Do you know if your father is going to testify?

2            MS. KASULIS:  Objection, Your Honor.

3            THE COURT:  Sustained.

4            MR. BRAFMAN:  There are some documents.  I won't

5    press now.

6            THE COURT:  Well, that's a conversation that you

7    should have with the Government, all right, not with this

8    witness.

9            MR. BRAFMAN:  Now, if we could put up Government

10   Exhibit 103-13.  It is the wind down e-mail that's in

11   evidence.

12   Q    Do you remember getting this wind down e-mail?

13   A    Yes.

14   Q    And you weren't expecting it; correct?

15   A    No, I was not.

16           MR. BRAFMAN:  If we could raise the print so we can

17   go to the second paragraph.  I'm sorry, let's start with the

18   first paragraph.

19   Q    It begins by saying, from Martin Shkreli to you as an

20   investor, "I have decided to wind down our hedge fund

21   partnerships with a goal of completing the liquidation of the

22   funds by November or December 1, 2012.  As you know, MSMB has

23   found increasingly compelling opportunities in private equity.

24   We are going to focus our efforts on managing money in a

25   hybrid private structure, one which is generally not amenable

1    to the open-ended private hedge funds partnerships structure.

2    Did I read that correctly?

3    A    Yes.

4    Q    And what did you understand that you were to be -- that

5    Mr. Shkreli was going to be pursuing opportunities in private

6    equity?

7    A    Well, I mean, that could be a variety of things.  To be

8    frank, today, I can say that would include Retrophin, among

9    possibly other things.  But at the time when I got this letter

10   I was more focused on the overall message of it, which was

11   it's winding down, how would you like to receive this

12   investment?

13   Q    And he is telling you this shortly after you received the

14   Retrophin presentation; right?

15             MS. KASULIS:  Objection.

16             THE COURT:  Sustained.

17             MR. BRAFMAN:  I'm sorry?

18             THE COURT:  She has objected and it was sustained.

19   Q    Did you get this letter after you saw the Martin Shkreli

20   presentation of Retrophin in 2011?

21   A    Yes.  Sometime after.

22   Q    Okay.  And you didn't put two and two together when he

23   referred to private equity that he was talking about

24   Retrophin?

25   A    Again, my interest was more just reading that he was

1   winding down the fund and that he gave me two options on how

2   to liquidate.  I wasn't so concerned with what the future

3   plans were.  My immediate concerns were about redemptions.

4   Q    Let's look at the second paragraph of this wind down

5   e-mail.  He tells you, right in that paragraph, we have

6   decided the best structure for such an entity is a public

7   company or private corporation.  Retrophin, LLC or MSMB

8   founded biotechnology operation will be that company.  Let me

9   stop there.

10        When you saw that, did you relate Retrophin to the

11  company that he showed you that was going to be approved by

12  the FDA in his judgment?

13  A    Yes.

14  Q    Then it says, Retrophin has made a lot of progress since

15  its inception 2011.  Today the company has a full pipeline and

16  several marketed cash-generated products.  Retrophin is

17  currently valued at a modest $80 million, but I personally

18  feel the shares are worth closer to $1 billion and will reach

19  that lofty number when all is said and done.  We anticipate

20  taking the company public in the first half of 2013.  We will

21  see what the market thinks then.

22        You were told in the wind down that MSMB has turned

23  into Retrophin as practical matter, didn't you?

24  A    I'm sorry.  Again, it's not that it wasn't stated on this

25  piece of paper, but my focus was we're winding it down, how do

1  I get the redemption.  I wasn't fixated on how to put the

2  pieces of the rest of this letter together.

3  Q    But they didn't hide the fact that MSMB and Retrophin

4  were becoming one and the same?  They told you that?

5  A    I honestly didn't put together that it was one and the

6  same.  My understanding was that he was refocusing his

7  efforts.  He was winding down this fund.  This fund would come

8  to a conclusion and that the new and other company or the

9  other company he was working on was Retrophin.

10  Q    But he tells you in the e-mail that MSMB founded

11  biotechnology operation was related to Retrophin, isn't that

12  what this says?

13  A    Yes, but he's also the operator of MSMB.  My

14  understanding is he founded Retrophin.  So it's not that

15  farfetched, but, again, I wasn't obsessing with the language.

16  Q    I am not asking about obsessing, I'm asking about

17  understanding.  From the memo, we went through it

18  exhaustively, you knew that one of the things he could do as

19  the general partner was invest in private equity, start-ups

20  and IPO's; right?

21  A    Yes, a portion of it.  Yes.

22  Q    And he told you that his office, he was very excited

23  about the science of Retrophin and its potential; correct?

24  A    Yes.

25  Q    Everything Martin Shkreli told you ultimately came true,

1    it just didn't happen as quickly as you would have liked it to

2    have happened; isn't that correct?

3    A    Again, these are very different and separate actions.  I

4    feel like some of this might be a little bit confused.

5    Q    Let me ask you, when you signed the settlement agreement

6    prepared and agreed to by your lawyer and Retrophin's lawyer,

7    it clearly said that you are settling with MSMB and Retrophin

8    is giving you 58,000 shares of stock, why would Retrophin give

9    you 58,000 shares of stock?

10           MS. KASULIS:  Objection.  Mischaracterizes the

11   agreement.

12           THE COURT:  Sustained.

13           Would you rephrase, sir?

14           MR. BRAFMAN:  Can we move up into the -- if you go

15   to the bottom of the page, the last paragraph.

16           THE COURT:  We are still on 103-13, sir?

17           MR. BRAFMAN:  Yes, your Honor.

18   Q    I cannot thank you, the partners enough.  I have the most

19   loyal investors in the world.  We have received two

20   redemptions since inception and are thankful for your patience

21   and tolerance while we went through operational mishaps and

22   switched strategies several times.  Original MSMB investors

23   2009 have just about doubled their money, net of fees.  I

24   regret terminating the fund, but I feel tremendous private

25   equity opportunities are abundant at the moment and we need

1    the latitude to explore them.

2         Do you know who the two redemptions are in that

3    paragraph?

4    A    No, I do not.

5    Q    You're not one of them, are you?

6    A    I was not.

7    Q    Because you didn't double your investment, you tripled or

8    almost quadrupled your investment; is that correct?

9    A    Not at this point in time.

10   Q    No.  But you did, as a matter of fact, quadrupled your

11   investment at the end of the day; isn't it true?

12   A    Well, after going through sort of a long and arduous

13   process to get to the settlement agreement and waiting several

14   years, yes, many years later.

15   Q    How much time was caused by your own lawyer in the

16   drafting and finalization of the settlement agreement, if you

17   know?

18   A    I don't know offhand.

19   Q    Did the settlement agreement go back and forth between

20   Mr. Greebel and Mr. Rothchild, your lawyer, for many, many

21   weeks with each one changing different drafts?

22   A    There were edits made, but I couldn't speak to how much

23   time it spent in one place versus another.

24   Q    Who hired Mr. Kornreich?  You did?

25   A    Yes.

1  Q     You hired him so that you would have independent

2  representation by a top law firm when you were dealing with

3  Katten Muchin, which is Evan Greebel's top law firm; correct?

4         MS. KASULIS:  Objection.

5         THE COURT:  Sustained.

6  Q     Did you ever investigate what Katten Muchin, what kind of

7  a law firm that is?

8  A     No, I didn't do an investigation of them.

9  Q     When you got an e-mail from Evan Greebel out of the blue,

10 did you try and figure out who he was?

11 A     No, I honestly looked at his e-mail address and I saw

12 that it was at Katten Law and I made the assumption that he

13 was Martin's lawyer.

14 Q     Now, did you put your lawyer in touch with him or did you

15 act as the middle person without the two lawyers speaking to

16 each other?

17 A     I don't recall the conversations offhand.

18 Q     Isn't it true that all of the correspondence relating to

19 your settlement agreement goes from Evan Greebel to you, from

20 you to your lawyer, from your lawyer back to you, and from you

21 to Evan Greebel, and not once do the two attorneys talk to

22 each other?

23 A     I don't recall.  I don't know.

24 Q     Well, you were part of it, weren't you?

25 A     I certainly had correspondence.  I don't know how much of

1    it was myself versus the attorneys.

2    Q    Do you remember any of the edits?

3    A    I don't remember a lot of them offhand.

4    Q    You don't remember any of them?

5    A    I know some of the terms I negotiated with Martin on the

6    phone.

7    Q    What terms?

8    A    Well, at one point I thought that -- again, to your

9    point, the stock ended up having some value, but when I didn't

10   think the stock had value, I think initially it was a $300,000

11   settlement and I told him I didn't even need the shares, I was

12   concerned about making sure I got my money back.  On the

13   phone, he agreed to increasing that from 300 to $400,000.

14   Q    And he agreed to give you additional $100,000, and even

15   though you didn't want any shares, he agreed to give you

16   58,000 shares, which you later sold for a million dollars or

17   more; correct?

18   A    I didn't ask for those shares.  Even then I was more

19   concerned about the cash.

20   Q    But you got both?

21   A    Yes, he did ultimately give me both.

22   Q    Was Martin apologetic to you about the waiting and the

23   aggravation that he caused you and that's why he gave you a

24   gift of over a million dollars?

25   A    At that time it was not worth over a million dollars, but

Hassan - cross - Brafman                        1145

1   it ended up being worth about million dollars, but at that

2   time it was not, and he didn't explain it specifically as to

3   what all of it was for.

4   Q    When you were in Martin's office going over the Retrophin

5   presentation, Martin was listing it as a one billion-dollar

6   company in his mind; correct?

7   A    That seemed --

8            MS. KASULIS:  Objection.

9            THE COURT:  Overruled.

10  Q    Correct?

11  A    It seemed to be a little -- I mean, I typically see

12  projections for companies all the time that are a bit

13  overzealous.  The reality is at that time they were not worth

14  something like one billion dollars.

15  Q    He told you it was going to be worth a billion dollars?

16  He didn't tell you it was worth at that time a billion

17  dollars; correct?

18  A    Yes.  It could have also been worth zero.

19  Q    But it wasn't.  It was worth a billion dollars because

20  you made more than a million just on your shares; isn't that

21  correct?

22           MS. KASULIS:  Objection, Your Honor.

23           THE COURT:  Overruled.

24  A    Again --

25  Q    His projections to you came true.  That's all I am trying

1  to have you say yes or it was correct?

2  A    I'm sorry, I don't know accurately what the company is

3  worth today.

4  Q    When you got it, they were worth in your mind really not

5  a lot of money; right?  When you got the shares?

6  A    They were worth under $5 a share but they weren't liquid.

7  Q    They eventually became liquid and you sold them at $19 a

8  share; correct?

9  A    Yes.

10       MR. BRAFMAN:  Now, if we can have Government Exhibit

11  103-20, please.

12  Q    This e-mail is dated January 21, 2013.  Do you see that?

13  A    Yes.

14  Q    In the middle of the page, with the paragraph beginning,

15  "I agreed," if we could highlight that paragraph, please.

16       Now, this is during the difficult time when you are

17  trying to negotiate an end to this saga; would that be a fair

18  statement?

19  A    Sure.

20  Q    And one of the things that you said to Martin in this

21  e-mail, "I agree to give you our time and our money because of

22  recommendations from Brent Saunders and Ken Banta.  I would

23  hope you would not let them down at this time."  Is that a

24  correct statement?

25  A    Yes.

1    Q    That both Ken Banta and Brent Saunders recommended that

2    you invest with Martin Shkreli?

3    A    Well, Mr. Saunders recommended that I invest.  To be

4    frank, at this point I was just trying to remind him that we

5    have mutual contacts and that it would be in his best interest

6    not to continue dragging this out.

7    Q    You used Ken Banta's name.  Did you know anything about

8    Ken Banta's relationship with Mr. Shkreli?

9    A    No, I did not.

10   Q    Did you know that Ken Banta had invested in Elea Capital?

11   A    I don't know what that is.

12   Q    Why do you use his name if you don't know about his

13   relationship with Martin Shkreli?

14   A    I just knew that he had been involved with Martin

15   Shkreli.

16   Q    In what capacity?

17   A    It was just the other name.  I could have just as easily

18   written Tom Koestler.

19   Q    But you didn't.  You used Brent Saunders, who did invest

20   in Retrophin and Ken Banta who was listed in the presentation

21   on Retrophin; is that correct?

22   A    Yes.

23   Q    You weren't just picking names out of the sky.  You used

24   these names because you knew that Martin Shkreli respected

25   them and they were powerful people in the pharmacology

1    business; isn't it true?

2    A    The reason I used them is because they were mutual

3    contacts.  Again, Mr. Saunders is the one who made the

4    introduction and I knew Mr. Banta was involved in Retrophin

5    itself.  As you mentioned, it was even in the presentation.

6    Q    So you use those two names to sort of not pressure

7    Martin, but to give him a little bit of a jump start to get

8    this done because these guys are in your world and in my

9    world; would that be a fair statement?

10   A    Again, I just wanted to remind him that we had mutual

11   contacts.  As anyone, I don't think this is the reputation he

12   wants to build for himself.

13   Q    Now, if you go down to the end of the e-mail, you end it

14   by saying, "As a friend, I will continue to trust you.  I hope

15   as the CEO of a public company you do not betray my trust, I

16   hope to get an early reply," and that's how you signed it; is

17   that correct?

18   A    Yes.

19              (Continued on following page.)

20

21

22

23

24

25

1    (Continuing)

2    BY MR. BRAFMAN:

3    Q    And if we could then go to the next page, there's a spot

4    on the same e-mail chain -- I'm sorry.

5              MR. BRAFMAN:  If we could put up 103-21.  It's a

6    separate exhibit, I apologize.

7    A    No problem.

8              (Exhibit published to the jury.)

9    Q    This e-mail you get from Mr. Shkreli in January 2013,

10   shortly after the start of 2013.

11             MR. BRAFMAN:  If we could bring the first paragraph

12   up.

13   Q    He's making it clear to you:  Thanks.  I should be more

14   clear.  The fund has continued to invest in Retrophin and this

15   is the only investment in the fund at this moment.  There is

16   no longer any cash at the fund level.  I would not be alarmed.

17   The plan, as I see it, is to distribute the fund's holding

18   Retrophin stock.  At this point, Retrophin can buy back your

19   Retrophin stock for the value I mentioned.  I can see your

20   cash return in the next two weeks.

21             Now, when you get this e-mail, you have absolute

22   clarity that the only investment in the fund now, at that

23   date, is Retrophin, correct?

24   A    Yes.

25   Q    And you also know that he has no longer any cash at the

S. Hassan - Cross - Brafman                    1150

1   fund level; correct?

2   A     Yes.

3   Q     Where did the $400,000 that you got back come from; do

4   you know?

5   A     I don't know.

6   Q     So, how did Martin -- how was Martin able to pay you

7   $100,000 more than you invested in cash?

8   A     I don't know.

9             But my understanding was my investment had grown to

10  be worth more than $400,000, but I don't know.  I don't know

11  where that came from.

12  Q     But you said you agreed to $300,000 and Martin gave you

13  an additional $100,000, right?

14  A     That was prior to being sent the settlement and release

15  agreement.  And then once I was sent the settlement and

16  release agreement, I thought there would be no more

17  back-and-forth.  And what I asked for on the phone was for the

18  $400,000 and I told him I don't even need the shares, I don't

19  need to be made whole in terms of being told my investment was

20  worth more than $400,000.

21            But with still an interesting return like that, I

22  was comfortable signing the settlement agreement.  At the end

23  of the day, it was kind of forced upon me.  I thought that we

24  were just going to have some kind of dissolution of the fund

25  or something.  And before I was able to actually get my funds,

S. Hassan - Cross - Brafman          1151

1    which I was told would be distributed to me, I was sent the

2    settlement agreement.  So, it was trying to figure out the

3    right terms for that.

4              I'm very happy with the outcome of the shares

5    themselves, but that was not my request.

6    Q    They were forced upon you?

7    A    No, the shares weren't; the settlement agreement was.

8    Q    And the settlement agreement was forced upon you when you

9    were represented by an independent lawyer who could have

10   rejected the terms of the agreement on your behalf, correct?

11   A    I just wanted to get my money at that point.

12   Q    And you did.

13   A    When we came to terms on the settlement agreement, yes.

14   Q    And at the end of the day, you were more than made whole,

15   you made a hefty profit on this investment.

16   A    Yes, there was even more than I asked for in there.

17   Q    Now, were there times when the delay in getting the

18   finalized settlement agreement was the result of delay on your

19   end?

20   A    I can't recall what the timings were, I'm sorry.

21   Q    Let me show you Exhibit DX 4415, and I'm just going to

22   show you for identification.  If you could, read it to

23   yourself.

24             And does it refresh your recollection that in April

25   of 2013, you wrote to Mr. Shkreli to apologize for the delay

1    in getting the agreement back to him?

2    A    Can you move the document down a little bit?

3    Q    I'm sorry.  Can you see it now?

4         THE COURT:  You might need to make it a little

5    bigger.

6         MR. BRAFMAN:  It's clear on my screen.  It's not a

7    Government exhibit.

8    Q    Is it on your screen?

9    A    Yes, it's on my screen.

10        But just to be clear, I received the paperwork on

11   April 3.  I think it was a two-day delay.

12   Q    But when did you get this back to him?  Do you have any

13   idea how long your lawyers worked on it before you got it back

14   to him?

15   A    He sent me a draft of it on April 2 or 3, and I sent it

16   back to him on April 5.

17   Q    How many drafts did you exchange before signing off on

18   it?

19   A    I don't know, I don't recall.

20   Q    Were there five?

21   A    I don't recall.

22   Q    Were there ten?

23   A    I'm sorry, I really don't recall.

24   Q    Could it have been as many as ten drafts?

25   A    I don't think there were that many.

1   Q    Were there five or six?

2         MS. KASULIS:  Your Honor, objection.

3         THE COURT:  Sustained.

4   Q    And did you ultimately when you got the final copy, did

5   you send the thank you e-mail to Martin, thanking him for all

6   of his time and effort in getting this resolved?

7   A    I believe so.

8   Q    You are a very cordial person by nature, aren't you?

9   A    I try to be.

10  Q    In all of your e-mails, even though you are insistent,

11  they're always ending in some type of friendly statement of

12  one kind or another, aren't they?

13  A    Yes.  I generally don't like conflicts.

14  Q    In fact, after you got this settled, you sent Martin an

15  e-mail in which you hoped that you could continue to be

16  friends; isn't that correct?

17  A    I don't recall.

18  Q    When did you sign the settlement agreement, if you know?

19  A    I don't know the date offhand.

20        MR. BRAFMAN:  Could we have the Government

21  settlement agreement put up, please?

22        MS. SMITH:  Your Honor, it's Government Exhibit 52.

23        THE COURT:  Thank you.

24  Q    If you look at the next page, on the front page, the

25  settlement agreement has a date into in it.

S. Hassan - Cross - Brafman                 1154

1          MR. BRAFMAN:  We can bring up the first top part of

2   that page?

3          THE WITNESS:  Do you know what time it is, by any

4   chance?

5          MR. BRAFMAN:  What time it is?

6          MS. KASULIS:  What tab.

7          THE COURT:  What tab?

8          MS. KASULIS:  51.

9   Q    Do you have it?

10  A    Yes.

11  Q    And you look at it, it's dated April 25, 2013; is that

12  correct?

13  A    Yes.

14  Q    So, despite the fact that you get it back to your

15  attorney or Martin's attorney on April 5, it's a complete 20

16  days to expire before it's actually settled; do you see that?

17         April 25 is the date of the agreement.

18  A    Yes.

19  Q    When you look at the signature page --

20         MR. BRAFMAN:  If we can go to the signature page,

21  please.

22  Q    The signature page contains your signature where you

23  signed Sarah Hassan individually, correct?

24  A    Yes.

25  Q    Then it has Mr. Shkreli signing on behalf of himself

S. Hassan - Cross - Brafman                1155

1    individually, correct?

2    A    Yes.

3    Q    On behalf of Retrophin as CEO?

4    A    Yes.

5    Q    And on behalf of MSMB Capital as Martin Shkreli, managing

6    member?

7    A    Yes.

8    Q    On behalf of MSMB Capital Management as general partner?

9    A    Well, as managing member, yes.

10   Q    But it lists under the -- above his signature, it's

11   general partner, right?

12   A    Oh yes, yes.

13   Q    And MSMB Healthcare, listing Martin Shkreli as its

14   general partner, correct?

15   A    Yes.

16            MR. BRAFMAN:  And the next page?

17   Q    Additional signatures of Mr. Shkreli on behalf of MSMB

18   Healthcare Investors and MSMB Healthcare Management; is that

19   correct?

20   A    Yes.

21   Q    So, it wasn't a secret to anyone who saw this agreement

22   that Mr. Shkreli was, in effect, signing on behalf of all

23   these legal entities, correct?

24   A    Yes.

25   Q    Including Retrophin?

1    A    Yes.

2    Q    And this agreement, besides Evan Greebel blessing it, if

3    you will, was blessed by Mr. Levy, your personal attorney; is

4    that correct?

5    A    Mr. Levy wasn't the one who reviewed this.

6    Q    Ron Kornreich?

7    A    Yes.

8    Q    And Ron Kornreich was a lawyer at Proskauer?

9    A    Yes.

10   Q    And he vetted this with you, correct?

11   A    Yes.

12   Q    And did Mr. Kornreich at any time say to you that you

13   should not sign this agreement because it combines a hedge

14   fund and a public company and it's not kosher in any way; did

15   he ever say that to you?

16   A    No.

17   Q    And you relied on him for the legal advice in connection

18   with this document.

19   A    Yes.

20   Q    And you trusted him.

21   A    Yes.

22   Q    Now, on April 29, 2013 --

23        MR. BRAFMAN:  Is Government Exhibit 103-33 in

24   evidence?

25        SPECIAL AGENT BRACONI:  No.

S. Hassan - Cross - Brafman                1157

1      MR. BRAFMAN:  Can we have a copy of 103-33?  Do you

2  have a clean copy that's not marked?

3          103-33 is a Government exhibit.

4      MS. SMITH:  Right.  But we have it on the system.

5      MR. BRAFMAN:  Is it on the system?

6      MS. SMITH:  Yes.

7      MR. BRAFMAN:  If you could put it up just so that

8  the witness can look at it.

9      THE COURT:  It's up.

10     MR. BRAFMAN:  Can you bring it up a little bit

11 bigger, please?

12 Q    Do you recognize this as an e-mail that you sent to

13 Mr. Shkreli on April 29, 2013 and an e-mail that he sent to

14 you on April 26, 2013, related to the settlement agreement?

15 A    Yes.

16     MR. BRAFMAN:  I offer this in evidence, your Honor.

17     MS. KASULIS:  Objection, your Honor.

18     THE COURT:  Sustained unless you want to lay a

19 foundation for why it would be admissible.

20 Q    Let me ask you this:  Do you recall telling Martin

21 Shkreli at the end of this saga after the settlement agreement

22 that you don't have a bad taste in your mouth or anything of

23 that nature in connection with these transactions?

24     MS. KASULIS:  Objection, your Honor.

25     THE COURT:  Sustained.

S. Hassan - Cross - Brafman                    1158

1           MR. BRAFMAN:  I don't understand the objection.

2    It's a conversation she had with Mr. Shkreli.

3           THE COURT:  Would you like to have a sidebar?

4

5           (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                              1159

1          (The following occurred at sidebar.)

2          MR. BRAFMAN:  Your Honor, the authenticity is not

3   in dispute.  The timing of this coincides with the settlement

4   agreement.  There is dialogue between the punitive victim of

5   a fraud and the person who is alleged to have committed a

6   fraud where they apologize to each other for the delay in

7   closing the document.

8          And we've gone exhaustively through the timing on

9   this and I don't understand what the objection is.  This is

10  sort of the end of the saga, and what she is says, in her own

11  words -- no one else is being quoted -- it's the Defendant

12  apologizing, it's not hearsay, it's part of the narrative, it

13  goes to his state of mind, and it goes to her state of mind.

14         She is not a defrauded person, Judge.  And coming

15  here now and saying this, is just -- I could get this in under

16  806 as a prior inconsistent statement, if I wanted to.  Your

17  Honor, this is clearly -- anyway, it's not being admitted for

18  the truth of it.

19         THE COURT:  Sandy, is the bench conference noise up

20  sufficiently?  I feel like it's very loud right now.  Sorry.

21         You're saying it is a prior inconsistent statement.

22         MR. BRAFMAN:  Either a prior inconsistent statement

23  or it is not admitted for the truth of it or it is her state

24  of mind and my client's state of mind.  It is admissible under

25  five different theories.

Sidebar                                           1160

1        MS. KASULIS:  Your Honor, he hasn't laid any

2   foundation for what -- he's trying to admit this document.  He

3   hasn't asked her anything about what, if anything, they said

4   or communicated with each other afterwards.  If Martin, in

5   fact, apologized to her anything along those lines.  He is

6   trying to admit it for the truth.  I don't think the

7   foundation has been laid properly.

8        You're reading from the document.  You can't do

9   that.  It's about what she recalls.  And if it's an

10  inconsistent statement, she has to testify first for it to

11  then be inconsistent.

12       MR. BRAFMAN:  Her testimony in effect today has been

13  inconsistent with the tenor of this e-mail.

14       MS. KASULIS:  She's explained the tenor of the

15  e-mails.  It's not inconsistent.

16       MR. BRAFMAN:  The first question I asked her, she

17  said she doesn't recall.  So, I pulled this document out.

18       You want me to use it to refresh her recollection?

19       MS. KASULIS:  Yes.  If she says she doesn't recall,

20  that's the appropriate usage.

21       MR. BRAFMAN:  When you were introducing all of the

22  correspondence, you weren't asking her whether she remembers,

23  you were putting it in as a to complete-the-narrative.  We

24  have 15, 20 Government exhibits that are just e-mails between

25  the parties.

```
                          Sidebar                       1161
```

1          MS. KASULIS:  Because they are statements of the

2     Defendant.  We have the ability to do that.

3          MR. BRAFMAN:  You could have put this in as an

4     admission against interest because he -- it's a false

5     exculpatory statement, if you want to argue it, that I had no

6     malicious intent --

7          THE COURT:  They don't have to put in all admissions

8     by your client.  They put in --

9          MR. BRAFMAN:  But what they are doing is cherry

10    picking, and it's really -- the narrative is not being

11    completed.  They cherry pick the nasty ones and they leave out

12    the really kind ones that they exchange.

13         THE COURT:  Why don't you ask her, if you want, it

14    seems to me --

15         MR. AGNIFILO:  There's not a truthful statement to

16    be found here.  The relevance is that it was said.  There are

17    two things; there's a foundation issue I'm hearing and a

18    hearsay issue.

19         I don't see the hearsay issue because it's not a

20    factual statement that's relevant because the statement is

21    true.  This is relevant because this was the nature of the

22    discussion.  The discussion is the event, that there was a

23    discussion.  And the tenor of the discussion is what's

24    relevant, so it's permitted for hearsay.

25         MS. KASULIS:  And you're offering it for the truth;

Sidebar                                              1162

1   because of the tenor, there was no mal intent.  You want to

2   offer it for the truth of the matter.  You believe Mr. Shkreli

3   was asserting at the time --

4          MR. BRAFMAN:  But it's also for her state of mind.

5   She is apologizing for how long this took.

6          MS. SMITH:  That's actually not inconsistent with

7   her testimony.  She said she was purposely being nice in order

8   to be cordial and maintain relationships.

9          THE COURT:  You can ask if she apologized for the

10  length of time it took, whether they ended on a pleasant note,

11  but you can't offer your client's own statement for the truth

12  in terms of his statement that there was no mal intent.

13         MR. BRAFMAN:  But she is accepting his statement.

14  When she -- don't worry about an apology.  She's accepting his

15  statement --

16         THE COURT:  Right.

17         MR. BRAFMAN:  -- that there was no malicious intent.

18         MS. SMITH:  She can testify whether she accepted the

19  apology or not, but you can't just read from the document.

20         MR. BRAFMAN:  I know that.  But she's not going to

21  recall it.

22         MS. SMITH:  Then you can use this to refresh her

23  recollection.

24              (Continued on next page.)

25

LAM      OCR      RPR

S. Hassan - Cross - Brafman                1163

1            (Sidebar ends; in open court.)

2            THE COURT:  The objection to the admission of

3   Government 103-33 by the defense is sustained.

4   Q    Is it possible, Ms. Hassan, for you to remember every

5   exchange you had with Mr. Shkreli either verbally on the phone

6   or by e-mail?  Is it possible for you to remember all of them?

7   A    No.

8   Q    Do you remember a conversation or an exchange of e-mails

9   you had with Mr. Shkreli on or about April 29, 2013?

10  A    I wouldn't be able to recall it offhand.

11  Q    Did you have an exchange or conversation with Mr. Shkreli

12  in which he discussed an apology?

13  A    I have it in front of me.

14  Q    Let me ask you this:  Does it refresh your recollection

15  that on April 29 --

16            MS. KASULIS:  Objection, your Honor.

17            THE COURT:  The appropriate way to do it is to show

18  her the document.

19            MR. BRAFMAN:  She has it.

20            THE COURT:  Ask her to read it and ask if it

21  refreshes her recollection.

22  Q    I ask you to read the document to yourself and tell me

23  whether it refreshes your recollection as to what you said to

24  Martin Shkreli on April 29, what he said to you on April 26,

25  and what you said to him on April 26.

1          MS. KASULIS:  Your Honor.

2          THE COURT:  Are you intending to read this exchange

3    into the record?

4          MR. BRAFMAN:  I'm asking if it refreshes her

5    recollection.  I'm just pointing to the date -- that's

6    innocuous -- just to focus the witness because she doesn't

7    remember the conversation on that date.

8          THE COURT:  Do you recall this exchange of e-mails?

9          THE WITNESS:  Yes.

10   Q    Can you tell us what you said to Martin and what Martin

11   said to you?

12   A    I tried to give him some kind words.  To be frank, we

13   signed the settlement agreement, but I still hadn't received

14   my actual money.  We were just having a friendly exchange back

15   and forth.

16   Q    Is that the last exchange you had with Martin, to your

17   knowledge?

18   A    To my knowledge.

19          I'm presuming he also knew that I was ultimately

20   still frustrated because he didn't really reach out to me

21   again.

22   Q    Is this a frustration conversation or is this a friendly

23   chitchat among friends?

24   A    Again, I try to be generally polite, so it is a friendly

25   conversation.

S. Hassan - Redirect - Kasulis                1165

1        MR. BRAFMAN:  I have nothing further, your Honor.

2        THE COURT:  Is there any redirect by the Government.

3        MS. KASULIS:  Yes, your Honor, briefly.

4   REDIRECT EXAMINATION

5   BY MS. KASULIS:

6   Q    Good afternoon, Ms. Hassan.

7   A    Good afternoon.

8   Q    Did Martin Shkreli ever tell you that he had suspended

9   redemptions in MSMB Capital?

10        THE COURT:  Could you speak louder, into the

11   microphone?

12        MS. KASULIS:  Yes.

13   Q    Did Martin Shkreli ever tell you he had suspended

14   redemptions in MSMB Capital?

15   A    No.

16   Q    From January 2011, when you invested in MSMB Capital, to

17   September 2012, do you know what happened to the money that

18   you had invested in MSMB Capital?

19   A    No.

20   Q    I'd like to direct your attention to Government Exhibit

21   5, the private placement memorandum for MSMB Capital, and I

22   want to direct your attention to the page ending in Bates 240.

23        (Exhibit published to the jury.)

24   Q    At the bottom of the page, the restricted securities

25   section, I believe it reads:  The partnership may invest in

LAM      OCR      RPR

S. Hassan - Redirect - Kasulis                    1166

1   so-called restricted securities, i.e., securities as to which

2   the public resale is currently restricted under the Securities

3   Act of 1933 as --

4            MS. KASULIS:  And if we can go to the next page, at

5   the top.

6   Q    -- as amended and which are not immediately convertible

7   into freely tradeable securities.

8            At the end, it says, to go on:  The portfolio

9   manager intends to purchase restricted securities where

10  pricing and growth characteristics justify the limited

11  liquidity and which provide the means of achieving eventual

12  marketability.

13           The last sentence reads:  The partnership's overall

14  investments in restricted securities will be limited, however,

15  to a maximum of 10 percent in terms of their cost at time of

16  purchase of current market value of partnership assets.

17           Do you see that sentence?

18  A    Yes.

19  Q    What does that sentence mean to you?

20  A    It means for these restricted securities, they can't make

21  up more than 10 percent of the overall assets.

22  Q    Does this language in the private placement memorandum

23  allow the Defendant to invest all of MSMB's capital funds in

24  restricted shares?

25  A    No.

S. Hassan - Redirect - Kasulis                    1167

1   Q    Did you expect that Martin Shkreli would tell you the

2   truth about how MSMB Capital's funds were performing?

3   A    Yes.

4   Q    If Martin Shkreli had lost all the money in MSMB Capital

5   on a risky investment, did you expect him to tell you that he

6   lost all the money --

7              MR. BRAFMAN:  Objection.

8   Q    -- due to the risky investment?

9              THE COURT:  Overruled.

10  A    Yes.

11  Q    Is there anywhere in the PPM for MSMB Capital that allows

12  Mr. Shkreli to lie to his investors about the performance of

13  the fund?

14             MR. BRAFMAN:  Objection, your Honor.

15             THE COURT:  Will you rephrase, ma'am?

16  Q    Is there anywhere in the private placement memorandum for

17  MSMB Capital that allows the Defendant to report inaccurate

18  numbers regarding the status of the fund?

19             MR. BRAFMAN:  Objection, your Honor.

20             THE COURT:  Sustained.

21  Q    Now, did Martin Shkreli tell you about the performance of

22  MSMB Capital prior to your investment in the fund?

23  A    He referenced it, yes.

24  Q    And Mr. Saunders also referenced the performance of his

25  investment in MSMB Capital; is that right?

S. Hassan - Redirect - Kasulis                1168

1   A    Yes.

2   Q    And do you have a recollection as to when MSMB Capital

3   was founded?

4   A    I don't recall.

5   Q    I'm going to direct your attention to Government Exhibit

6   80-19.

7              (Exhibit published to the jury.)

8              THE COURT:  Was this one in evidence, Ms. Jackson?

9              THE COURTROOM DEPUTY:  Yes, Judge.

10             THE COURT:  Counsel, it would be helpful for both of

11   you when you refer a witness to an exhibit to just mention

12   whether it's in evidence or for identification.

13             MS. KASULIS:  Yes, your Honor.

14             THE COURT:  This one is in evidence.  Thank you.

15             MS. KASULIS:  Yes.

16   Q    So, this was one of the e-mails, the performance updates,

17   that we had reviewed earlier today; is that right, Ms. Hassan?

18   A    Yes.

19   Q    Make sure you can see the document.  Do you see under the

20   net returns section it states:  MSMB has returned

21   79.49 percent net of fees since inception on November 1, 2009?

22   A    Yes.

23   Q    Based on this document, does it appear that MSMB was

24   founded in November of 2009?

25   A    Yes.

LAM      OCR      RPR

1   Q     And who sent you this document?

2   A     Martin Shkreli.

3   Q     And let's look at Government Exhibit 103-13.  This

4   document is in evidence.  It's what we refer to as the

5   wind-down e-mail.

6          (Exhibit published to the jury.)

7   Q     If we can look at very bottom paragraph of this e-mail,

8   do you see here in the middle of the paragraph that

9   Mr. Shkreli writes:  Original MSMB investors, and then in

10  parentheses 2009.

11         Is that correct?

12  A     Yes.

13  Q     And you invested in January of 2011; isn't that correct?

14  A     Yes.

15  Q     So, that was -- 2009 is over a year before your

16  investment in MSMB Capital?

17  A     Yes.

18  Q     Now, was it your understanding that MSMB Capital's

19  financials were audited?

20  A     Yes.

21  Q     And where did you get that understanding.

22  A     It was part of the disclosures in the PPM.

23  Q     Did the Defendant ever tell you that he did not have an

24  auditor for MSMB Capital?

25  A     No.

S. Hassan - Redirect - Kasulis                1170

1          MR. BRAFMAN:  Your Honor, this was not gone into on

2    cross.  It's beyond the scope of cross.

3          THE COURT:  I will sustain the objection.

4          MS. KASULIS:  Your Honor, may we have a brief

5    sidebar?

6          THE COURT:  Yes.

7

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                              Sidebar                          1171
```

 1              (The following occurred at sidebar.)

 2              MS. KASULIS:  Your Honor, the reason we believe

 3     that this is responsive to cross-examination was that she

 4     testified on cross-examination that she relied on audited

 5     financials.

 6              And, also, Mr. Brafman made the point that her

 7     attorney reviewed the PPM and signed off on the PPM, saying

 8     there were no red flags.  So in the PPM, it's listed that

 9     there is, in fact, an auditor, and I believe it's fair on

10     direct examination to ask her whether if there had not been an

11     auditor, would that have been a red flag.

12              So, that's why we're offering it.

13              MR. BRAFMAN:  But you're trying the case backwards.

14     You're assuming a fact not in evidence.  There's been no

15     testimony about whether was or wasn't an auditor.

16              MS. KASULIS:  We intend to prove that there was no

17     auditor.  I don't actually think that's a dispute between the

18     parties.

19              MR. BRAFMAN:  It was not gone into on cross.  That's

20     the nature of my objection.

21              THE COURT:  I understand and I did sustain.  But her

22     point is that you raised during her cross that her attorney

23     reviewed the settlement agreement.

24              He did not necessarily review the PPM, did he?

25              MS. KASULIS:  She said she reviewed the PPM with her

```
                        Sidebar                    1172
```

1  attorney and the attorney didn't raise any issues about the

2  PPM.

3            THE COURT:  That was the representation in the PPM,

4  that there was an auditor.

5            MS. KASULIS:  Yes.

6            THE COURT:  All right.  Then I will overrule the

7  objection and allow the witness to answer the question.

8

9            (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

S. Hassan - Redirect - Kasulis                1173

1          (Sidebar ends; in open court.)

2          THE COURT:  You may proceed with your question.

3          MS. KASULIS:  Thank you, your Honor.

4    BY MS. KASULIS:

5    Q    If there was not an auditor for MSMB Capital, would that

6    have been a red flag for you?

7    A    It would have been a concern.

8    Q    And why is that?

9    A    You need auditors to verify that the information that

10   you're receiving is actually accurate.

11   Q    I next want to turn to the settlement agreement,

12   Government Exhibit 52.

13         MS. KASULIS:  If we turn to the actual agreement --

14   this is in evidence, Government Exhibit 52 -- I want to look

15   at the bottom of the first page, the section entitled payment

16   terms.

17   Q    The first sentence reads:  Retrophin agrees to deliver or

18   cause to be delivered a total amounts of $400,000 in cash upon

19   execution and delivery of this agreement in satisfaction of

20   any and all claims, et cetera.

21         Based on the settlement agreement, who paid you

22   $400,000?

23   A    Retrophin.

24

25         (Continued on next page.)

LAM      OCR      RPR

S. Hassan - redirect - Kasulis                1174

1    EXAMINATION CONTINUING

2    BY MS. KASULIS:

3    Q    Is Martin Shkreli listed here as one of the parties who

4    paid you $400,000?

5               MR. BRAFMAN:  Objection.  He signs on behalf of

6    Retrophin, Your Honor.

7               THE COURT:  All right.

8               MR. BRAFMAN:  The document --

9               THE COURT:  Okay.  The objection is overruled, and I

10   would ask the parties to refrain from speaking objections.

11              You may answer the question.

12   A    Can you repeat the question?

13   Q    Yes.  In this paragraph, in this section, is Martin

14   Shkreli listed as a party who paid you $400,000?

15   A    No.

16   Q    And I want to turn to Government Exhibit 103-5.

17              MS. KASULIS:  This is in evidence.

18   BY MS. KASULIS:

19   Q    And then if you go to, this is the Retrophin

20   presentation, the pitch deck.  If you go to the next page.

21              You received this presentation from Mr. Shkreli, is

22   that right?

23   A    Yes, I believe so.

24   Q    And was it your understanding that Mr. Shkreli had

25   prepared this presentation?

S. Hassan - recross - Brafman          1175

1    A    Yes.

2    Q    And do you know whether the information in this

3    presentation is accurate, Ms. Hassan?

4    A    No, I don't.

5              MS. KASULIS:  I have no further questions.

6              MR. BRAFMAN:  I just have a couple, Your Honor.

7              THE COURT:  All right, go ahead.

8    RECROSS-EXAMINATION

9    BY MR. BRAFMAN:

10   Q    Look at Government Exhibit 5 and turn to bottom of

11   page 7, please.  At the bottom of page 7, the last two lines,

12   you were just asked a few minutes ago as to what percentage of

13   the portfolio could be in restricted securities.

14             Do you remember that question just a few minutes

15   ago?

16   A    Yes.

17   Q    And I think you said 10 percent, is that correct?

18   A    Yes.

19   Q    Did you read the whole paragraph to understand what you

20   said or you just jumped at the 10 percent?

21   A    I was asked to read the last sentences.

22   Q    Let's turn it back to page 7, please, on the bottom.  We

23   will read the whole paragraph to see what the restriction is.

24             Restricted securities:  The partnership may invest

25   in so-called restricted securities, i.e., meaning securities

S. Hassan - recross - Brafman                1176

1  as to which the public resale is currently restricted under

2  the Securities Act of 1933 as -- continuing on page 8 --

3  amended the Securities Act and which are not immediately

4  convertible into freely-tradable securities.  The portfolio

5  manager intends to purchase restricted securities where

6  pricing and growth characteristics justify the limited

7  liquidity and which provide the means of achieving eventual

8  marketability, such as registration rights under the

9  Securities Act or the right to convert into marketable

10 securities.  The partnership's overall investment in

11 restricted securities will be limited, however, to a maximum

12 of 10 percent in terms of their cost at time of purchase of

13 current market value of partnership assets.

14          Do you have any idea what the cost of purchase of

15 the limited securities was at the time of purchase?

16 A    I do not know.

17 Q    So you don't know whether it's below 10 percent or above

18 10 percent?

19 A    Well, I was told that all of the money had gone into the

20 stocks, so my understanding was that it was a hundred percent.

21 Q    And you were also told in this piece that they just

22 showed you that the maximum of 10 percent is in terms of their

23 cost at time of purchase, not 10 percent of the value of the

24 fund, is that correct?

25 A    Yes.

SAM        OCR        RMR        CRR        RPR

S. Hassan - recross - Brafman                    1177

1    Q    Okay.  Now, in terms of the settlement agreement, I think

2    Ms. Kasulis asked you just a minute ago that Retrophin is the

3    person who is paying you the $400,000, not Mr. Shkreli,

4    correct?

5    A    Yes.

6    Q    And they showed you the settlement agreement, which is

7    52.

8              MR. BRAFMAN:  If we could put that up, please.

9              (Exhibit published.)

10   BY MR. BRAFMAN:

11   Q    And on the paragraph they pointed to you, page 1 --

12   paragraph 1, if you could lift that, please.

13             Payment terms:  Retrophin agrees to deliver or cause

14   to be delivered to releaser the amount of $400,000 upon

15   execution and delivery of this agreement.

16             And they asked you whether Martin Shkreli's name is

17   there and it's not, it says Retrophin, right?

18   A    Yes.

19   Q    But who signs this agreement on behalf of Retrophin?

20   A    Martin Shkreli.

21             MR. BRAFMAN:  Thank you very much, I have nothing

22   further.

23             THE COURT:  All right, Ms. Hassan, you are excused,

24   thank you for your time.

25             THE WITNESS:  Thank you.

S. Hassan - recross - Brafman          1178

1      Thank you.

2      THE COURT:  You can step down; thank you.

3      (Witness steps down.)

4      THE COURT:  We can have one or two choices.  I think

5  the jury, I was thinking perhaps I would excuse you a little

6  early tonight.  Usually I like to sit until 5:30, unless it

7  made sense to start with a very short direct.  I don't know

8  how much time you have with your next witness, but maybe it

9  would not make sense to start, interrupt, and then begin

10  tomorrow.

11      MS. SMITH:  Your Honor, that's fine.  We can start

12  first thing tomorrow morning with the next witness.

13      THE COURT:  All right, I would ask the jurors again

14  to leave the notebooks face down on their chairs.  Do not

15  discuss the case and please do not read anything in the media

16  or do any separate research regarding this case.  Consciously

17  avoid any exposure to media.  Thank you and have a good night.

18  We will see you tomorrow morning.  Please show up no later

19  than 9.

20      Thank you.

21      (Jury exits.)

22      THE COURT:  All right, is there anything we need to

23  address before we adjourn for the day?

24      MR. BRAFMAN:  Not by us, Judge.

25      MS. KASULIS:  No, Your Honor.

S. Hassan - recross - Brafman                    1179

1           THE COURT:  Thank you.  I'll see you tomorrow

2    morning at 9 o'clock.

3           MS. KASULIS:  Thank you, Your Honor.

4           MR. SRINIVASAN:  Thank you.

5           THE COURT:  Thank you.

6

7

8                            ooo0ooo

9

10          (Matter adjourned to Friday, June 30, 2017 at

11   9 o'clock a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1180

**I N D E X**

**WITNESS**                                                    **PAGE**


**SARAH HASSAN**

    DIRECT EXAMINATION BY MS. KASULIS          909

    CROSS-EXAMINATION BY MR. BRAFMAN           1057

    REDIRECT EXAMINATION BY MS. KASULIS        1165

    RECROSS-EXAMINATION BY MR. BRAFMAN         1175

1181

1                              **E X H I B I T S**

2

3        Government's Exhibit 103-1                          919

4

5        Government Exhibit 103-38                           927

6

7        Government Exhibit 103-2                            931

8

9        Government Exhibit 5                                935

10

11       Government Exhibit 103-3                            935

12

13       Government's Exhibits 80-1 and 80-2                 952

14

15       Government's Exhibits 80-3 through 80-13            959

16

17       Government's Exhibit 103-5                          967

18

19       Government's Exhibit 103-7                          981

20

21       Government Exhibit 103-9                            995

22

23       Government Exhibit 103-11                           999

24

25       Government Exhibits 80-14 through 80-19            1002

1182

Government Exhibit 103-13                          1005

Government's Exhibit 103-14                        1014

Government's Exhibit 103-17                        1016

Government's Exhibit 103-19                        1018

Government's Exhibit 103-20 and 103-21             1021

Government's Exhibit 103-22                        1029

Government's Exhibit 103-23                        1032

Government's Exhibit 103-27                        1037

Government's Exhibit 103-29                        1039

Government's Exhibit 103-31                        1042

Government's Exhibit 52                            1044

Government's Exhibits 103-35 and 103-36            1051