1183

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - X

4    UNITED STATES OF AMERICA,    : 15-CR-637(KAM)
                                   :
5                                  :
                                   :
6         -against-               : United States Courthouse
                                   : Brooklyn, New York
7                                  :
                                   :
8                                  : Friday, June 30, 2017
     MARTIN SHKRELI,              : 9:00 a.m.
9                                  :
           Defendant.             :
10   - - - - - - - - - - - - - X

11                   TRANSCRIPT OF TRIAL
12        BEFORE THE HONORABLE KIYO A. MATSUMOTO
          UNITED STATES DISTRICT COURT JUDGE, and a jury.
13
                     A P P E A R A N C E S:
14
     For the Government:  BRIDGET M. ROHDE, ESQ.
15                        Acting United States Attorney
                          Eastern District of New York
16                            271 Cadman Plaza East
                              Brooklyn, New York 11201
17                        BY:  JACQUELYN KASULIS, AUSA
                              ALIXANDRA E. SMITH, AUSA
18                            KARTHIK SRINIVASAN, AUSA

19   For the Defendant:  BRAFMAN & ASSOCIATES, P.C.
20                            767 Third Avenue
                              New York, New York 10017
21                        BY:  BENJAMIN BRAFMAN, ESQ.
                              MARC AGNIFILO, ESQ.
                              ANDREA ZELLAN, ESQ.
22                            JACOB KAPLAN, ESQ.

23   Court Reporter:  Michele D. Lucchese, RPR
                      Official Court Reporter
24                    E-mail:  MLuccheseEDNY@gmail.com

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

1184

1        (In open court; outside the presence of the jury.)

2        THE COURT:  United States versus Martin Shkreli,

3   15-CR-637.  All counsel are present.

4        I am happy to hear from you.

5        MS. KASULIS:  Your Honor, we were able to come to an

6   agreement with respect to the to the limiting instruction that

7   we spoke about yesterday regarding the Merrill Lynch witness,

8   Steve Stich, so we can hand it up to the Court.

9        THE COURT:  Is he the next witness?

10       MS. KASULIS:  He is not.  I believe he will be the

11  third witness for the day.  So we can hand it up to the Court

12  prior to that.

13       THE COURT:  Would you like me to read it before he

14  is sworn and after he testifies?

15       MS. KASULIS:  After he testifies about the

16  misrepresentation at issue.

17       THE COURT:  All right.

18       MR. KAPLAN:  Yes.

19       THE COURT:  When that occurs, you will ask me to

20  read the instruction.

21       MS. KASULIS:  Yes.

22       THE COURT:  Great.  Thank you.

23       MR. KAPLAN:  Yes.

24       THE COURT:  The jurors are ready to come in.

25       (Jury enters the courtroom.)

Austin - direct - Smith                    1185

1          THE COURT:  Good morning, ladies and gentlemen of

2    the jury.  Please be seated, everybody.

3          Is the Government prepared to call its next witness?

4          MS. KASULIS:  Yes, your Honor.

5          The Government calls Josiah Austin.

6          THE COURT:  Thank you.

7          Good morning, sir, please step up to the witness

8    stand.  Ms. Jackson will administer the oath.

9          THE WITNESS:  Good morning.

10         (The witness was sworn/affirmed by the Clerk.)

11         THE COURTROOM DEPUTY:  Please have a seat and state

12   and spell your full name for the record.

13         THE WITNESS:  Josiah Thompson Austin.  Date of

14   birth, 4/9/47.

15         THE COURT:  Sir, just the spelling of your name.

16         THE WITNESS:  J-O-S-I-A-H, middle name Thompson,

17   T-H-O-M-P-S-O-N.  Last name Austin, A-U-S-T-I-N.

18         THE COURT:  Thank you, sir.  Please proceed.

19   **JOSIAH THOMPSON AUSTIN**,

20       called by the Government, having been duly

21       sworn, was examined and testified as follows:

22   DIRECT EXAMINATION

23   BY MS. SMITH:

24   Q    Good morning, Mr. Austin.

25   A    Good morning.

Austin - direct - Smith                    1186

1   Q      How old are you?

2   A      70.

3   Q      Where do you live?

4   A      I live in Arizona.

5   Q      What is your highest level of education?

6   A      I graduated from college and I did a little bit of

7   graduate work.

8   Q      What college did you attend?

9   A      University of Denver.

10  Q      In what subject was your degree?

11  A      Finance.

12  Q      What did you do for work after you graduated college?

13  A      I was a stock broker for a few years with Baker Watts in

14  Baltimore.  Then I was a commercial banker with Manufacturers

15  Hanover in New York for a little while.

16  Q      What did you do after you worked for Manufacturers

17  Hanover?

18  A      After Manufacturers Hanover, I went off on my own and did

19  investments on my own, mainly financial institution.

20  Q      When you were doing investments on your own, were you

21  doing it through personal accounts or through an entity?

22  A      Well, personal accounts and an entity that my wife and

23  all own called El Coronado Holdings.

24  Q      When was El Coronado Holdings founded?

25  A      Probably about -- somewhere around 1990, but I am not

1    actually sure of the date.

2    Q    And until when was El Coronado Holdings an entity?

3    A    2013.

4    Q    What kinds of investments did El Coronado Holdings make?

5    A    Pretty eclectic.  It started off mainly in financial

6    institutions and then it moved on to oil and gas, biotech,

7    many public corporations, some hedge funds.

8    Q    Who made the investment decisions for El Coronado

9    Holdings?

10   A    I did.

11   Q    Where did you get the ideas where to invest in on behalf

12   of El Coronado Holdings?

13   A    Oh, a number of people.  Frank Ferrara, Jennie

14   Montgomery, Sheldon Clark, Bill Rueckert.

15        You know, in 2006, I got some names from Martin

16   Shkreli, Tom Sheldon down in Florida.  There are any number of

17   people that I would get ideas from.

18   Q    In addition to getting ideas from other people, did you

19   also do your own research on various investment ideas?

20   A    Yes.

21   Q    In addition to running El Coronado Holdings between the

22   1990 and 2013 periods, what other positions or jobs did you

23   hold?

24   A    I was a director of a number of public companies, New

25   York Bank Corp., North Fork, Monterey Bay Bank, Good Rich

Austin - direct - Smith                          1188

Petroleum.

Q     In the 2006 time period that you mentioned, what was the
size of El Coronado Holdings in terms of assets?

A     El Coronado Holdings was in excess of 300 million.

Q     You mentioned earlier the defendant, Martin Shkreli.  How
did you first learn about Mr. Shkreli?

A     I met Martin at UBS when I was visiting Matt Moustaffik
and Ned Lord.

Q     And what is UBS?

A     UBS is a large Swiss Bank.

Q     Why were you working with Ned Lord and Matt Moustaffik at
UBS?

A     I had an account there.

Q     What did Ned Lord and Matt Moustaffik do in connection
with that account?

A     Basically they just -- they, you know, it was a brokerage
account.  I would buy and sell stocks through that account.
They would also supply me with some ideas of stocks.

Q     Where were you living at the time that you met Mr.
Shkreli?

A     I was living in Arizona.

Q     What city did you meet Mr. Shkreli in?

A     Excuse me?

Q     What city did you meet Mr. Shkreli in?

A     New York.

Austin - direct - Smith                         1189

1   Q    What were you doing in New York at the time that you met

2   him?

3   A    Well, I was on the board of New York Bank -- no, when I

4   was on the board of North Fork, I would have board meetings

5   and generally, when I come into town, I would stop by UBS or i

6   other people that I knew and got ideas from.

7   Q    Approximately what time period was it that you met Mr.

8   Shkreli?

9   A    I would say it would be 2005, maybe 2005, 2006.

10  Q    What do you remember from Mr. Shkreli about those first

11  meetings?

12  A    Young.  I thought Martin was young, smart, a little

13  cocky.  You know, I like Martin.  Knew biotech.  I did have

14  some biotech investments, not many, so I was very interested

15  in his ideas.

16  Q    Mr. Austin, would you please take a look around the

17  courtroom and tell us if you see the defendant Martin Shkreli?

18  A    Over on the right.  My right side on the table next to

19  the gentleman with the green tie.

20          THE COURT:  We will note that the witness has

21  identified Mr. Shkreli.  Thank you.

22  Q    In the time period when the defendant was at UBS, what

23  were your interactions with him like?

24  A    I can't remember how long he was at UBS.  I don't think

25  it was too long, when I would go there, I would talk to him

1   about biotech stocks, that sort of things.  I said if he ever

2   went out on his own that I would be interested in continuing

3   to talk to him.

4   Q    During the time that he was at UBS, did you discuss

5   biotech stocks with him?

6   A    I did.

7   Q    I am going to show you what has been marked for

8   identification as Government Exhibit 100-1.  It is tab 1 in

9   your binder.

10          Mr. Austin, do you recognize this document?

11  A    I recognize it.  It's an e-mail from me responding to an

12  e-mail from Martin, June 2005.

13  Q    And you sent the e-mail in response to smells Mr.

14  Shkreli's e-mail?

15  A    I did.

16          MS. SMITH:  Your Honor, the Government Exhibit moves

17  to admit.

18          MR. BRAFMAN:  No objection, Your Honor.

19          THE COURT:  We will receive Government Exhibit 100-1

20  without objection.

21          (Government's Exhibit 100-1 received in evidence.)

22  Q    I am going to point you to the bottom e-mail on the

23  chain, which is Saturday, June 1, 2005, and if you'll notice

24  there, Mr. Shkreli has an e-mail line, it is says Intrepid

25  Capital Management?

1  A    Intrepid Capital Management was a hedge fund in New York

2  that Martin was working for.

3  Q    Did Mr. Shkreli work there after UBS?

4  A    Yes.

5  Q    What were your interactions with the defendant like while

6  he was at Intrepid?

7  A    You know, I think we had a number of phone conversations

8  and occasionally when I was in New York, I would stop by.  I

9  recall going up to the office at least once.  I can't remember

10  if I went up to the Intrepid office more than one.

11  Q    If you look at the e-mail that is Government Exhibit

12  100-1, Mr. Shkreli says, "Did you notice the move in VPHM?

13  We're very happy about this."  And he says, "It is a shame

14  RGEN hasn't had the same move."

15         And you respond, in part, "Yes, from $2 over $6 is a

16  very nice move."

17         What were you discussing in this e-mail?

18  A    I think he was talking about BioPharma, if I am not

19  mistaken.  There was movement in that stock.

20  Q    So how often did you and Mr. Shkreli discuss different

21  biotech stocks?

22  A    Fairly often.  You know, in terms of how many times a

23  week or how many times a month -- you know, it was certainly I

24  think in the -- at one stage it was fairly often.  It

25  certainly wasn't on a daily basis, like I would talk to some

Austin - direct - Smith                    1192

1    of the other people.

2    Q    Did the defendant ever make recommendations to you

3    regarding particular companies that he thought you should buy

4    stock in?

5    A    Yes, he did.

6    Q    How often did you take the defendant's recommendations

7    about what stocks to purchase?

8    A    I would say I would -- would you repeat the question,

9    please?

10   Q    Sure.  How often did you take the defendant's

11   recommendations about what stocks to purchase?  And I will

12   limit it to this time period when he was at UBS and Intrepid.

13   A    I'd say occasionally.

14   Q    Did you always take the defendant's recommendations about

15   stock purchases?

16   A    No.

17   Q    Was the defendant your exclusive source of information

18   about biotech stocks during that period?

19   A    No.

20   Q    What particular companies do you remember the defendant

21   recommending to you?

22   A    Well, BioPharma, I remember that.  Chelsea.

23         During that period -- I know there were others, but

24   I can't remember which they were.  Basically Chelsea and

25   BioPharma.

Austin - direct - Smith                1193

1      Later, he was very negative on Mann, but I think

2  that was after 2005, 2006.

3  Q    What was Chelsea?

4  A    Chelsea was a small biotech that had a drug called

5  Droxidopa that was -- they had headquarters down in the

6  Carolinas and a company that I bought a fair amount of and at

7  one point owned, I think, over 10 percent of it.

8  Q    When did the defendant first recommend Chelsea to you?

9  A    It was somewhere in the 2005, 2006 time frame.

10  Q    Was the defendant your only source of information about

11  Chelsea?

12  A    No.

13  Q    Was all of the stock that you purchased from Chelsea

14  based on the defendant's recommendations?

15  A    Well, certainly the first bit that I bought was probably

16  in part because of the recommendation, but then, you know, I

17  also talked to a number of other people about it and, you

18  know, other brokerage firms, research outfits.  So it was --

19  I'd say the initial investment was because of Martin and then

20  I confirmed that, confirmed the idea with others.

21  Q    You mentioned that at one point you had over 10 percent

22  of the company of Chelsea; is that correct?

23  A    That's correct.

24  Q    Was your investment in Chelsea Therapeutics ultimately

25  profitable?

1   A     No.

2   Q     What was the ultimate result of your investment in

3   Chelsea?

4   A     Well, I had a pretty substantial loss.

5   Q     What about the other stocks that the defendant

6   recommended, as a whole, were they profitable picks for you?

7   A     I'd say no.

8   Q     What, if anything, did you promise the defendant in

9   return for his stock recommendations?

10  A     I didn't promise anything.

11         You know, when he had the hedge fund, he had the

12  normal, I think -- I'm not sure if it was 20/20, but on just

13  the regular recommendations, there wasn't anything promised.

14  Q     You mentioned a hedge fund.  Which hedge fund was that?

15  A     Elea Capital.

16  Q     Separate from Elea Capital, and we will get to Elea

17  Capital in a minute, what, if anything, did you promise the

18  defendant in terms for a stock recommendation outside of Elea

19  Capital?

20  A     I can't remember anything.

21  Q     At any point during the time that you knew the defendant,

22  did you have an advisory relationship with him?

23  A     Well, would you define advisory relationship?

24  Q     Did you ever employ the defendant as an investment

25  advisor?

1   A     No.

2   Q     At any point in time during the time you knew him, was he

3   employed by you in any capacity?

4   A     No, other than Elea Capital.

5   Q     And in your conversations with the defendant, what, if

6   anything, did he say about his career ambitions?

7   A     Well, I think Martin wanted to be -- wanted to be

8   successful, wanted to make a lot of money.  I think -- I mean,

9   I thought Martin Shkreli wanted to be Stevie Cohen.

10  Q     Who is Stevie Cohen?

11  A     Stevie Cohen is a hedge fund guy out of Connecticut, runs

12  S.A.C. Capital, or did run S.A.C. Capital.

13  Q     Did Mr. Shkreli ever work at S.A.C. Capital?

14  A     I don't think so.

15  Q     So you have mentioned Elea Capital.  What was Elea

16  Capital?

17  A     It was a hedge fund Martin started either in 2005, 2006.

18  I think it was 2006, but it could have been 2005.

19  Q     I'm sorry.  Go ahead.  What did the defendant tell you

20  about Elea Capital?

21  A     It was going to be the typical fund and he had some

22  investors that he was -- that were in the fund and he thought

23  it was a good opportunity, so I put some money in Elea

24  Capital.

25  Q     Why did you decide to invest in Elea Capital?

1   A     Well, I thought Martin was a young, smart individual, and

2   I put money in Elea Capital to make more money.

3   Q     How much did you invest in total in Elea Capital?

4   A     In total, I put $3.3 million in Elea Capital in 2006, I

5   think, and then I put 1.5 in 2007, so it would have been, you

6   know, 4.8 million.

7   Q     How do you know that this is the amount that you invested

8   in Elea Capital?

9   A     I went back and looked at my records.

10  Q     Was that investment made all at once or was it made

11  separately over time?

12  A     Over time.

13  Q     Did you know how many other investors put money into Elea

14  Capital?

15  A     I didn't.

16  Q     Did you have any role in Elea Capital other than as an

17  investor?

18  A     No.

19  Q     Once you had invested in Elea Capital, what did the

20  defendant tell you about the fund's performance?

21  A     Well, at times he said the performance was good and at

22  times said the performance was not good, and there were one or

23  two times where he asked me to put more money into Elea

24  Capital.  So my initial investment was $2 million and then I

25  added to that, to where it got up to a total of 4.8 million.

Austin - direct - Smith                    1197

1   Q    How did you receive updates about Elea Capital's

2   performance?

3   A    Sometimes by e-mail.  Sometimes on the phone.

4   Q    And during the time that you were an investor in Elea

5   Capital, how often were you communicating with the defendant?

6   A    I'd say on a weekly basis.

7   Q    What did you discuss in those communications?

8   A    Generally discussed companies.  Often Chelsea, because I

9   was very interested in Chelsea and I was constantly buying

10  Chelsea through various brokerage accounts, but he also talked

11  about other companies also.

12  Q    Other than the money that you invested in Elea Capital,

13  did the defendant have any ability to buy or sell stock on

14  your behalf?

15  A    No.

16  Q    Did the defendant ever have discretionary trading

17  authority over your money?

18  A    No.

19  Q    I am going to show you what has been marked for

20  identification as Government Exhibit 100-2, which is tab 2 in

21  your binder.

22            THE COURT:  I just want to make a correction for the

23  record, I believe when you admitted the prior exhibit, I said

24  101-1, and I meant to say 100-1, so if the court reporter

25  would kindly correct that, I would appreciate it.

1          MS. SMITH:  Thank you, Your Honor.

2    Q    Mr. Austin, do you recognize this document?

3    A    I recognize the document is from me to somebody that

4    works for me, Cindy Shaw.

5    Q    And the bottom e-mail on the document, do you recognize

6    that as well?

7    A    Yes, I recognize the document.  I don't remember the

8    document, but I recognize it.

9    Q    And what is that document?

10   A    It is wiring instructions, it says.

11   Q    Without reading from the document, just generally, is it

12   an e-mail between you and Mr. Shkreli?

13   A    It is an e-mail between Mr. Shkreli and myself, yes.

14          MS. SMITH:  Your Honor, the Government moves to

15   admit Government Exhibit 100-2 into evidence.

16          MR. AGNIFILO:  No objection.

17          THE COURT:  We will admit Government Exhibit 100-2

18   without objection.

19          (Government's Exhibit 100-2 was received in

20   evidence.)

21   Q    If you turn to the bottom e-mail on the screen, you had

22   said that these were wiring instructions?

23   A    Yes.

24   Q    What were these wiring instructions for?

25   A    To send $100,000 to Elea Capital.

Austin - direct - Smith                    1199

1    Q    So does this document represent one of your investments

2    into Elea Capital?

3    A    Yes.

4         THE COURT:  Can we clarify who is giving the wiring

5    instructions to whom?

6         MS. SMITH:  Yes, your Honor.

7    Q    In the bottom e-mail, who is providing you with wiring

8    instructions?

9    A    Martin Shkreli sent me the wiring instructions on the

10   bottom e-mail.  The top e-mail, I am asking Cindy Shaw to wire

11   $100,000 to the account of Elea Capital down below.

12   Q    Who is Cindy Shaw?

13   A    Cindy Shaw is a bookkeeper that works with me.

14   Q    And what's the date on which you ask Ms. Shaw to wire the

15   $100,000 to Elea Capital?

16   A    8/18/2006.

17   Q    I am going to show you what has been marked for

18   identification as Government Exhibits 100-3, 100-4, which are

19   tabs 3 and 4 in your binder.

20        Do you recognize these two documents?

21   A    I recognize they are documents from me -- one to Martin

22   Shkreli and one from Martin Shkreli to me on -- that's tab 3

23   and the same thing tab 4.

24        MS. SMITH:  Your Honor, the Government Exhibit moves

25   to admit 100-3 and 100-4 into evidence.

Austin - direct - Smith                    1200

1          MR. BRAFMAN:  No objection.

2          THE COURT:  We admit those exhibits without

3     objection.

4          (Government's Exhibits 100-3 and 100-4 were received

5     in evidence.)

6          (Exhibit published.)

7  Q    Let's start with Government Exhibit 100-3 and if you look

8     at the bottom e-mail on the chain, who is the e-mail from?

9  A    It is from Martin.

10  Q    And who is it to?

11  A    It is to me, Josiah Austin.

12  Q    And what is the date of the e-mail?

13  A    It is January 26, 2007.

14  Q    And what is the subject line?

15  A    Margin call.

16  Q    The e-mail says, "Hi, Joe, I could really use 500K to

17     meet a call that I'm in.  I think AGIX is close to a sure

18     thing and I want to be there in some decent size for you, I

19     think this will be the last time I'll ask for help."

20          Can I ask you what you understand 500K to mean?

21  A    $500,000.

22  Q    What was AGIX?

23  A    I can't remember.  It was a stock that Elea Capital had.

24  Q    What did you understand the defendant to be asking you in

25     this e-mail?

Austin - direct - Smith                    1201

1   A    My understanding was he got a margin call and needed

2   $500,000 to cover that margin call for Elea Capital.

3   Q    And what is a margin call?

4   A    A margin call, you know, if you have a margin account,

5   you're buying -- well, margin call is a call that a brokerage

6   account will give you on your margin account if your margin

7   account goes under a certain amount.

8   Q    And so what was your response at the top there?

9   A    I said for him to call me.

10  Q    What's the date of that response?

11  A    1/26/2007.

12  Q    If you turn to Government Exhibit 100-4, what is the date

13  on the top e-mail there?

14  A    1/29/07.

15  Q    So is this three days after the e-mail we just looked at?

16  A    It is.

17  Q    If you look at the bottom e-mail for Government Exhibit

18  100-4.  What is in the bottom e-mail?

19  A    It is an e-mail from somebody to Martin Shkreli with

20  wiring instructions.

21  Q    And if you go to the middle of that document of Exhibit

22  100-4.

23  A    From Martin Shkreli dated January 29, 2007 to me, which

24  basically just forwards me the wiring instructions.

25  Q    And then if you look at the very top e-mail.

MDL   RPR

1   A    Right.

2   Q    Who is that from?

3   A    Well, that's from me, Josiah T. Austin, to Martin

4   Shkreli, and I was confirming that it was for 500,000.

5   Q    So did you, in fact, provide Mr. Shkreli with $500,000 as

6   requested?

7   A    Yes.  I provided it to Elea Capital.

8   Q    And what made you do that in response to the defendant's

9   request?

10  A    Well, I was afraid that Elea Capital couldn't cover the

11  margin call and that it would affect the -- all of investments

12  that Elea Capital had.

13  Q    Did you and the defendant have any kind of standing

14  agreement that you would personally cover any losses to Elea

15  Capital if the fund got into trouble?

16  A    No.

17  Q    Was the decision on whether to help the defendant out of

18  situations like this, with a margin call, made on a

19  case-by-case basis?

20  A    Yes.

21  Q    I'm going to ask you to turn to tabs 5 and 6 in your

22  binder, which are Government Exhibits 100-5 and 100-6 for

23  identification.

24  A    Okay.

25  Q    Do you recognize these documents?

Austin - direct - Smith                    1203

1    A    I recognize that they are documents -- e-mails from

2    Martin Shkreli to me and from me to Martin Shkreli.

3    Q    And what time frame are these documents?

4    A    March 31st, 2007, March 30, 2007 from Martin to me.

5              MR. BRAFMAN:  Your Honor, we don't see them on our

6    screen.

7              MS. SMITH:  I think it still says searching.

8              MR. AGNIFILO:  As long as the jury can see them.  I

9    have a hard copy.

10             THE COURT:  The jury cannot see them because they

11   haven't been moved.

12             MR. AGNIFILO:  It just popped up.

13             THE COURT:  Okay.

14             (Continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing)

2   BY MS. SMITH:

3   Q    Mr. Austin, what time frame are these documents?

4   A    March 2007.

5            MS. SMITH:  Your Honor, the Government moves to

6   admit Government Exhibits 100-5 and 100-6 in to evidence.

7            MR. BRAFMAN:  We don't object.

8            THE COURT:  We'll admit those two exhibits without

9   objection.

10           (Government Exhibits 100-5 and 100-6 so marked.)

11           (Exhibit published to the jury.)

12  Q    Turning to 100-5, the bottom e-mail there, who is this

13  e-mail from?

14  A    It's from Martin Shkreli.

15  Q    Who is it to?

16  A    It is to me, Josiah.

17  Q    What's the subject matter or the subject line?

18  A    Subject line, Elea Alpha, LP.

19  Q    What is it sent on March 30, 2007?

20  A    It was.

21  Q    If you look at the body of the e-mail, the Defendant

22  writes:  My new institutional fund starts on the first.  A

23  nominal subscription would be of great help.

24           That's in the first paragraph.

25           If you look at the second paragraph, the third or

Austin - Direct - Smith                    1205

1   fourth sentence in says:  Perhaps something that does not

2   interest you, but even 100K would go a long way.

3              What does 100K mean?

4   A    It means a hundred thousand dollars.

5   Q    What is the Defendant asking you in this e-mail?

6   A    He's asking me to put a hundred thousand into his Elea

7   Alpha fund, and that if I did that there would be no fees and

8   no lockup.

9   Q    What does it mean to have no lockup?

10  A    It means I could get out any time I would want.

11  Q    What did the Defendant tell you about this new Elea Alpha

12  fund?

13  A    I'd have to read the e-mail.  I can't remember.

14  Q    Would it help refresh your recollection just to read it?

15  A    It would.

16  Q    Okay.

17             (Pause in proceedings.)

18  A    I mean 2007, ten years ago, I can't remember the specific

19  conversation.  But my recollection is that it was going to be

20  sort of a low volatility fund and that he had a number of

21  investors, other investors, that were going to go in the fund.

22  Q    And, again -- sorry, go ahead.

23             If you -- again, the date of that e-mail is?

24  A    That e-mail is March 30, 2007.

25  Q    And if you look at the top e-mail, which is March 31,

Austin - Direct - Smith                    1206

1    2007, you write:  The last few days have been pretty hectic.

2    Sorry I've not gotten back to you.  Let's talk this weekend.

3            Is that right?

4    A    That's right.

5    Q    If you'll turn to Government Exhibit 100-6.

6    A    Okay.

7    Q    And the two e-mails in this exhibit are dated April 2,

8    2007; is that right?

9    A    That's correct.

10   Q    So, that's three days after the e-mail that we just

11   looked at?

12   A    Yes.

13   Q    And if you look at the bottom e-mail, Mr. Shkreli is

14   sending you wire instructions; is that correct?

15   A    That's correct.

16   Q    What's the account name for the wire instructions?

17   A    Elea Capital Management.

18   Q    And what was the fund that he had asked you to put a

19   hundred thousand dollars into?

20   A    Elea Alpha Fund, I think it was.

21        Elea Alpha, LP.

22   Q    And if you look at the top e-mail, what are you directing

23   Ms. Shaw to do in that e-mail?

24   A    I'm directing her to wire a hundred thousand dollars.

25   Q    So on April 2 you wired a hundred thousand dollars on

Austin - Direct - Smith                    1207

1   these instructions; is that right?

2   A    That's right.

3   Q    Do you know whether or not Elea Alpha was, in fact,

4   founded as a fund?

5   A    I don't.

6        MR. AGNIFILO:  I'll object to the form of the

7   question, Judge.

8        THE COURT:  Overruled.

9   Q    If you could turn to what's been marked for

10  identification as Government Exhibit 100-7, do you recognize

11  this document?

12  A    I recognize it.  It's an e-mail from Martin to me on the

13  lower and from me on to Martin on the top, dated May 24 and

14  26, 2007.

15       MS. SMITH:  Your Honor, the Government moves to

16  admit Government Exhibit 100-7 into evidence.

17       MR. AGNIFILO:  One minute, your Honor.

18       I believe the bottom portion of the e-mail does not

19  concern Mr. Austin.  I'm objecting to the entirety of the

20  exhibit.

21       MS. SMITH:  Do you want to go to sidebar?

22       THE COURT:  Yes.

23

24       (Continued on the next page.)

25

LAM     OCR     RPR

```
                          Sidebar                    1208
```

1            (The following occurred at sidebar.)

2            MR. AGNIFILO:  The basis of the objection is in

3    regard to 100-7.  I have no idea who this

4    kevin@vantheedgepoint.com is and I contend all of that is

5    inadmissible hearsay.

6            MS. SMITH:  Your Honor, he's in another kind of day

7    trade call and he goes to Mr. Austin again for help and asks

8    him to help him get out of the day trade, and then Mr. Austin

9    responds.

10           There's a series of these.  And the reason that

11   these are relevant is because Mr. Shkreli after the fact,

12   after Elea Capital kind of belows up, says that Mr. Austin

13   agreed to backstop the fund.  And in fact, what had happened

14   was on a number of occasions Mr. Shkreli had big losses, went

15   to Mr. Austin for help, and on a case-by-case basis he agreed

16   to help.

17           But there's no standing agreement, as he's

18   testified, to backstop the fund, and these are various

19   examples where Mr. Shkreli came to him asking for additional

20   money.

21           THE COURT:  The question I have is was this lower

22   part of the e-mail from kevin@vantheedgepoint.com, the May 24,

23   2007 e-mail, was that forwarded to Mr. Austin?  It appears

24   that it was.

25           MR. AGNIFILO:  It appears to be.

```
                        Sidebar                        1209
```

1    MS. SMITH:  So, Mr. Shkreli then forwards that whole

2   bottom part to Mr. Austin to explain why he's stuck in that

3   situation.  So, it's context for the request.

4    MR. AGNIFILO:  I still think it's hear --

5    THE COURT:  I agree with you that the May 24 portion

6   between Kevin and Mr. Shkreli would be hearsay.  But this was

7   then forwarded to Mr. Austin to give him an explanation as to

8   why the ask was being made.

9    We could redact this and admit it that way and have

10   him testify if he's been refreshed as to what happened, but

11   we'll have to take some time to block it out.

12    MR. AGNIFILO:  I don't want to do that.  That's

13   fine.  I think it's technically hearsay, I lodged my

14   objection, but I'm fine with it coming in.

15    THE COURT:  We can ask the Government to redact it,

16   if you want.

17    MR. AGNIFILO:  I don't think it's necessary.

18    THE COURT:  What would you like them to do?

19    MR. AGNIFILO:  We'll leave it the way it is.

20    THE COURT:  You'll admit it as is?

21    MR. AGNIFILO:  Yes.

22    One thing, since we're here, I'm going to want a

23   charge at some point, because he's not charged with any Elea

24   stuff.  Mr. Shkreli was not part of the indictment.  I think

25   we need a jury charge on this point and we can put one

```
              LAM       OCR       RPR
```

Sidebar                                        1210

1   together.

2            And, also, I just caution -- I know what the

3   Government is trying to do.  Since he's not charged with it, I

4   don't know that we have to really prove this beyond a

5   reasonable doubt.

6            MS. SMITH:  I'm not planning on -- you've seen the

7   e-mails we've marked as exhibits.  We're not going beyond

8   those.

9            MR. BRAFMAN:  I think a charge is appropriate.

10           THE COURT:  Sure.

11           MR. BRAFMAN:  Because in the questioning, I think

12  one of the things that they're implying is that he was lying

13  to Mr. Austin with respect to where the money was even going

14  because it was wired to Elea and he was asking it to go to

15  Elea Alpha.

16           MS. SMITH:  We can discuss a limiting instruction on

17  the representation.  Once he finishes, then?

18           MR. AGNIFILO:  That would be great.

19           MS. SMITH:  We can take a break when he's done and

20  figure out something.

21           THE COURT:  All right.

22           MR. AGNIFILO:  Very good.

23

24           (Continued on next page.)

25

1              (Sidebar ends; in open court.)

2              MR. AGNIFILO:  After speaking to the Court at the

3    sidebar, we'll withdraw the objection.

4              THE COURT:  Then we will admit Government Exhibit

5    100-7 without objection.

6              (Government Exhibit 100-7 so marked.)

7              (Exhibit published to the jury.)

8              MS. SMITH:  Ms. Balbin, can you focus on everything

9    but the top e-mail, to begin with?

10             THE WITNESS:  Would you repeat that, please?

11             MS. SMITH:  I was asking Ms. Balbin to zoom in on an

12   area for the jury.

13   Q    So, if you look at the top e-mail, in the middle, the one

14   from Mr. Shkreli to you, dated May 24, at 9:45 a.m., that has

15   a subject matter forward account status; do you see that

16   e-mail?

17   A    I do.

18   Q    That e-mail says:  Hey, Joe.  I'm in a day trading call

19   which doesn't let me day trade again until I deposit it the

20   specific amount.  It is 502,092.  If you have some liquidity,

21   that'd be great.  If not, I think I can talk myself out of it.

22             And if you look below at the forwarded e-mail,

23   there's an e-mail from May 24 at 12:43 p.m., and that says:

24   With the trading you've done today, your margin call has been

25   met; however, the only way the day trading call can be met is

Austin - Direct - Smith                    1212

1    the deposit of cash or marginable assets.

2           I also want you to look at the e-mail below that

3    which says, in part:  The day trade call of $502,000 is still

4    outstanding.

5           So going back to Mr. Shkreli's e-mail to you, what

6    was your understanding of what he was asking you for in this

7    e-mail?

8    A    He was asking -- it was my understanding he was asking if

9    I had any liquidity.  And if I could send Elea $502,092, it

10   would clear up his margin account so he could start day

11   trading again.

12   Q    What's a margin account?

13   A    Margin account is you actually borrow against that

14   account.

15   Q    And did you have any understanding of what the Defendant

16   meant by if not having liquidity, I can talk myself out of it?

17   A    No, no idea.

18   Q    What was your e-mail in response, at the very top?

19   A    My response is I've been out until today and just reading

20   your e-mail.  Sorry.

21   Q    I'm going to show you what's been marked as Government

22   Exhibit 100-10 for identification.

23   A    Okay.

24   Q    Do you recognize this document?

25   A    Yes, I recognize the document.  I recognize that it's an

```
                    Austin - Direct - Smith              1213
```

1    e-mail exchange between Martin and myself.

2            MS. SMITH:  Your Honor, the Government moves to

3    admit Government Exhibit 100-10 into evidence.

4            MR. AGNIFILO:  No objection.

5            THE COURT:  We will receive 100-10.

6            (Government Exhibit 100-10 so marked.)

7            (Exhibit published to the jury.)

8    Q    Mr. Austin, I'll direct your attention to the bottom

9    e-mail of the chain.  What's the date on that e-mail?

10   A    7/10/2007.

11   Q    And who is the e-mail from?

12   A    It's from Martin Shkreli to Josiah T. Austin.

13   Q    What was the subject matter of that e-mail?

14   A    Subject, Up 400K today.  Whew.

15   Q    What does "400K" mean?

16   A    It means the fund is up 400,000.

17           MS. SMITH:  And Ms. Balbin, if you can expand this

18   to see the e-mails on top, all three of them.  Thanks.

19   Q    And your response to that initial e-mail was:  The fund?

20   A    Yes.

21   Q    Why were you asking about whether or not the up 400K was

22   in reference to the fund?

23   A    I wanted to make sure that it was the fund that was up

24   $400,000.

25   Q    As opposed to?

Austin - Direct - Smith                    1214

1  A    As opposed to, you know, his own investments or something

2  else.

3  Q    And Mr. Shkreli's response is:  Yet no profits from CHTP.

4  Just short a few things that worked well.

5         What was CHTP?

6  A    That was Chelsea.

7  Q    During this time period where you were investing in Elea,

8  were you still discussing Chelsea with the Defendant?

9  A    I was.

10 Q    If you look at the top e-mail, you say in response:  I

11 will expect that performance every day.  Remember the taxes.

12         What is the reference to the taxes there?

13 A    We had been trying to get the taxes for 2006 for a while.

14 So, my accountant was asking me to get the taxes from Elea so

15 he could finish up my taxes, so I was reminding Martin that

16 please, please get me the K-1.

17 Q    And in this time period, what had the Defendant told you

18 about the performance of Elea?

19 A    I can't remember.

20 Q    All right.  If you turn to Government Exhibits 100-11 and

21 100-12, do you recognize these two documents?

22 A    I do.

23 Q    What are these two documents?

24 A    They are e-mail exchanges from Martin and myself, and

25 they're in reference to the tax question I had.

Austin - Direct - Smith                    1215

1           MS. SMITH:  And your Honor, the Government moves to

2    admit Government Exhibit 100-11 and 100-12.

3           THE COURT:  Mr. Agnifilo?

4           MR. AGNIFILO:  I'm going to object on relevance

5    grounds.  I don't know what the relevance is of the taxes for

6    Elea or is meant to do in this case.

7           THE COURT:  I'll sustain the objection.

8    Q    Mr. Austin, did you eventually get tax information from

9    the Defendant for Elea Capital?

10   A    We eventually got some information, yes.

11   Q    What was the quality of the information that you got --

12          MR. AGNIFILO:  I'm going to object.

13   Q    -- in connection with...

14          MR. AGNIFILO:  I object to the relevance.

15          THE COURT:  I'll sustain the objection.

16          Ladies and gentlemen, Mr. Shkreli is not being

17   charged with any offenses relating to Elea Capital, so just

18   bear that in mind, please.

19   Q    Was there any big event that happened with Elea Capital

20   in 2007?

21   A    I think it was 2007 that Elea could not come up with a --

22   I think it was a margin call from Lehman Brothers.  And then

23   Lehman Brothers apparently sued Martin and then turned around

24   and sued me.

25   Q    Let's unpack that a little bit.  When you say that there

Austin - Direct - Smith                    1216

1    was a margin call Elea couldn't make, what do you mean by

2    that?

3    A    Meaning the value of the account went down below what it

4    needed to be to support the margin.

5    Q    Was that based on a trade or trading?

6    A    I think that was -- well, I'm not sure, but I suspect it

7    was based on trading.

8    Q    Who was responsible for trading for Elea Capital?

9    A    Martin.

10   Q    What details did the Defendant provide about the trading

11   that led to the margin call?

12   A    No details.

13   Q    What was the impact on Elea Capital from that margin

14   call?

15   A    I think Elea basically after that just, you know, went

16   bankrupt.  I mean, it just disappeared.

17   Q    What happened to all of the money that had been in the

18   fund?

19   A    I'm not sure what happened with all the money that was in

20   the fund.  I lost everything that I put in there.

21   Q    And what was the result with respect to Lehman Brothers?

22   Why was Lehman Brothers suing the Defendant?

23   A    He was suing -- Lehman Brothers was suing the Defendant,

24   from what I understand, to get their money back, to get the

25   money owed to Lehman Brothers back.

Austin - Direct - Smith                    1217

1   Q     And how much money was owed to Lehman Brothers by the

2   Defendant?

3   A     I think it was in excess of $2 million, but I'm not sure

4   of the exact amount.

5   Q     So as a result of the margin call, Elea Capital went

6   bankrupt; is that correct?

7   A     That's basically what I understood.

8   Q     And in addition to going bankrupt, the Defendant owed

9   Lehman Brothers $2 million?

10  A     Yes.

11  Q     Now I'm going to show you what's been marked as

12  Government Exhibit 100-13, which is Tab 13 in your binder.

13  A     Okay.

14        THE COURT:  May I just ask a question of this

15  witness?

16        Mr. Austin, you were also sued by Lehman Brothers

17  for this loss; is that correct?

18        THE WITNESS:  I was.

19        THE COURT:  Were you also sued for $2 million or

20  were they seeking to recover $2 million from you as well.

21        THE WITNESS:  Yes.

22        THE COURT:  And what was the nature of the lawsuit

23  against you as an investor?

24        THE WITNESS:  They had come to understand that I

25  would cover any losses that Martin had.  That was my

Austin - Direct - Smith                    1218

1   understanding.

2         THE COURT:  Did you communicate that you were going

3   to cover Mr. Shkreli's losses to Lehman Brothers?

4         THE WITNESS:  No.

5         THE COURT:  Was that an accurate understanding on

6   the part of Lehman Brothers, believing you would cover his

7   losses?

8         THE WITNESS:  No, I don't believe it was accurate.

9         THE COURT:  Thank you.

10  BY MS. SMITH:

11  Q    How did Lehman Brothers come to understand -- how did

12  Lehman Brothers come to believe that you would cover

13  Mr. Shkreli's trading loss?

14        MR. AGNIFILO:  I object to the form of the question.

15        THE COURT:  Sustained.

16  Q    Did you ever tell the Defendant you would cover the

17  trading losses for Elea Capital?

18  A    No.

19  Q    Did the Defendant ever tell you that he told Lehman

20  Brothers that you would cover those losses?

21  A    No.

22  Q    Do you know how Lehman Brothers came to understand that

23  or did you know how Lehman Brothers came to sue you for those

24  losses?

25  A    No.

LAM      OCR      RPR

Austin - Direct - Smith                1219

1   Q    I've shown you what had been marked as Government Exhibit

2   100-13 for identification.  Do you recognize this document?

3   A    Yeah, I recognize it's an e-mail from Martin to me, dated

4   8/16/07, and it says -- subject line says:  Performance.

5              MS. SMITH:  Your Honor, the government moves to

6   admit Government Exhibit 100-13 in evidence.

7              MR. AGNIFILO:  We have no objection.

8              THE COURT:  Received 100-13 without objection.

9              (Government Exhibit 100-13 so marked.)

10             (Exhibit published to the jury.)

11  Q    Who was this e-mail from?

12  A    It's from Martin Shkreli to me.

13  Q    And what's the date of the e-mail?

14  A    8/16/07.

15  Q    And what is the subject line?

16  A    Performance.

17  Q    And can you read the first two sentences?

18  A    Markets go up, markets go down, but there are no excuses.

19  I'm embarrassed by my performance but steadfast in my

20  conviction on top ideas.

21  Q    And then can you just read the last sentence of that

22  e-mail?

23  A    Last sentence...

24  Q    It starts:  Sorry for all the inconvenience.

25  A    Sorry for all the inconvenience I've caused you, dash, I

1    know sorry doesn't cut it, period.

2    Q    What is your understanding of what the Defendant was

3    referring to in this e-mail?

4    A    Basically, that I had lost the entire amount that I put

5    into Elea Capital.

6    Q    What was your reaction to this e-mail?

7    A    I was very upset.

8    Q    After Elea Capital went bankrupt, was your relationship

9    with the Defendant the same or was it different?

10   A    It was different.

11   Q    How was it different?

12   A    Well, I had lost around $4.8 million.  I certainly looked

13   at his ideas and his recommendations with a different view.

14   You know, I still thought Martin was an intelligent, smart

15   guy, but I didn't particularly want to do any more business

16   with him.

17   Q    I'm going to show you what's been marked as Government

18   Exhibit 100-14 for identification, which is Tab 14 in your

19   binder.

20   A    Okay.

21   Q    Do you recognize this document?

22   A    Yeah, it's an e-mail from Martin Shkreli sent to a number

23   of people, one of which is me.  I recognize a few people;

24   Frank Ferrara, few other people.  Subject line is:  Long idea.

25            MS. SMITH:  Your Honor, the government moves to

Austin - Direct - Smith                    1221

1    admit Government Exhibit 100-14 in evidence.

2              MR. AGNIFILO:  No objection.

3              THE COURT:  We will receive 100-14.

4              (Government Exhibit 100-14 so marked.)

5              (Exhibit published to the jury.)

6    Q    So, this is an e-mail from Mr. Shkreli to a number of

7    people, including you, on February 11, 2011; is that right?

8    A    Yes.

9    Q    And one of the recipients on this e-mail, second line

10   from the bottom is Marek Biestek.

11   A    Yes.

12   Q    And who is Marek Biestek?

13   A    Who is Marek?  I think Marek -- I met Marek on a couple

14   of occasions.  I think Marek worked with Martin.

15   Q    And if you look at the signature line for Mr. Shkreli in

16   this e-mail, it says Martin Shkreli, MSMB Capital Management,

17   LP.

18              What was your understanding of MSMB Capital

19   Management?

20   A    It was another entity that Martin started.

21   Q    What did the Defendant tell you about MSMB Capital?

22   A    I can't remember what he told me.  I just remember him

23   saying that he was starting another entity and that he had a

24   number of good investors that were going to invest with him.

25   Q    Do you remember any of the investors that he mentioned

Austin - Direct - Smith                    1222

1    for MSMB Capital?

2    A     I remember the name Ken Banta because it was the same

3    name as a dentist that I had.  Hassan, I think.

4          And I know there are other names that I'd probably

5    recognize if I heard the name, but those are the names I

6    recognize sort of off the bat.

7    Q     Did the Defendant ask you to become an investor in MSMB

8    Capital?

9    A     He did ask me to invest in -- I don't know if he asked me

10   to invest in MSMB Capital, but he did ask me to invest in the

11   company that they bought.

12   Q     Staying with MSMB Capital for a minute, did you become an

13   investor in MSMB Capital?

14   A     I did not.

15   Q     And then let me just show you -- sorry, one other

16   question.

17          You had mentioned an investor named Hassan?

18   A     Yes.

19   Q     Do you remember that investor's first name?

20   A     Maybe Fred.

21   Q     I'm going to show you what's already in evidence as

22   Government Exhibit 103-17.

23          (Exhibit published to the jury.)

24   Q     This has a lot of BCCs.  It's dated December 18, 2012.

25   And can you see in the middle of the screen there that you are

LAM      OCR      RPR

Austin - Direct - Smith                    1223

1    one of the people that is BCC'd on this e-mail?

2    A    I do.

3    Q    What's the subject of this e-mail, which is at the

4    bottom?

5         It's also -- sorry, Mr. Austin, it's also Tab 15 in

6    your binder.

7    A    Okay.  That's easier for me.

8         Retrophin completes reverse merger.  He's talking to

9    me about investing in Retrophin.

10   Q    If you turn to the next page, it says:  Please see the

11   attached press release.  As many of you know, I started a

12   biotechnology company, Retrophin.  This is my primary focus

13   going forward and I hope you will support me in this new role.

14        What do you remember the Defendant telling you about

15   Retrophin?

16   A    You know, I can't remember too much about Retrophin.  He

17   did say that he wanted to make good on the money that I lost

18   and he was going to give me four percent of his holdings in

19   Retrophin.  And he did talk a little bit about the board of

20   Retrophin and some of the people that he was thinking about

21   putting on the board.  I don't have a lot of memory about it.

22   Q    Okay.  Did you ever invest in Retrophin?

23   A    I did not.

24   Q    Did the Defendant ever give you four percent of his

25   shares in Retrophin?

1    A    He did not.

2    Q    Were you ever on the board of directors for Retrophin?

3    A    I was not.

4    Q    Did you ever invest in MSMB Capital?

5    A    No.

6    Q    Why didn't you invest in MSMB Capital or Retrophin?

7    A    Well, I had already lost a fair amount of money with

8    Martin and I didn't -- you know, I didn't want to lose any

9    more.  Plus, it was -- you know, 2012 was also a very tough

10   time for me financially because some of my other investments

11   were not doing well.

12   Q    Did the Defendant ever repay you for the losses that he

13   suffered in connection with Elea Capital?

14   A    No.

15   Q    What's been the nature of your communications with the

16   Defendant since Elea Capital occurred?

17   A    You know, rarely.  I haven't talked to Martin -- I don't

18   know when the last time.  I probably haven't talked to him for

19   a couple of years.

20           MS. SMITH:  One minute, your Honor.

21           THE COURT:  Yes.

22           (Pause in proceedings.)

23           MS. SMITH:  Your Honor, nothing further.

24           THE COURT:  Thank you.

25           Before we begin cross-examination, does anybody need

Austin - Direct - Smith                    1225

1    a break or are Mr. Austin and the jurors doing fine?  Is

2    everybody fine?

3              Good.  We will proceed with cross-examination.

4    Thank you.

5

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. AGNIFILO:

3    Q    Good morning, sir.

4    A    Good morning.

5    Q    My name is Mark Agnifilo.  I'm one of Martin Shkreli's

6    lawyers.  I'm going to ask you some questions this morning.

7    It won't be too long.  If I ask you a question that you find

8    is not clear, ask me to rephrase it and I'm more than happy to

9    do that.

10              You and I have never met; is that right?

11   A    We have never met.

12   Q    So we're talking for the first time this morning?

13   A    For the first time.

14   Q    What I would like to start with, if you don't mind, I

15   think the Government put one of these e-mails into evidence

16   and I'm going to try to find it real quick.  It's Government's

17   Exhibit 100-13.  I don't know what the Government's system is

18   in your tabs there, but it's Government's Exhibit 100-13.  And

19   just look up when you find it.

20              MS. SMITH:  It's Tab 13.

21   A    All right.

22   Q    I know you read part of this when you were asked

23   questions on direct examination.  I'm going to read the rest

24   of it and you tell me if I have read it correctly.  This is

25   essentially Martin Shkreli on August 16, 2007 sending you an

Austin - cross - Agnifilo                  1227

1  e-mail apologizing; fair to say?

2  A    Yes.

3  Q    Okay.  And he says, "Markets go up, markets go down but

4  there are no excuses.  I'm embarrassed by my performance but

5  steadfast in my conviction on top ideas.  I take advantage of

6  weak prices and all of my favorite names.  In modified order,

7  CHTP," that's Chelsea Therapeutic?

8  A    Yes.

9  Q    "PCOP" that's Pharmacopeia, do you remember?

10  A    I don't recall.

11  Q    That's fine.  "VNDA," that's Vanda?

12  A    I don't remember.

13  Q    Okay.  "ELN.  These are well-vetted, long-term

14  investments that I have spent a lot of time and money on and I

15  urge you to get incrementally involved if you have not

16  already.  I think the market may go lower taking these stocks

17  with them and I don't know your exposure profile 'too much

18  when they're going down, not enough when they're going up'

19  makes sense to me, but this stuff except for ELN is

20  Valeant-oriented and unless the market is going to trade them

21  in cash it's worth it.  This too will pass.  It might be over

22  right now, it might be over in three years, but buying quality

23  assets at a discount is what I like to do.  Sorry for all the

24  inconvenience I've cost you.  I know sorry doesn't cut it."

25         That's what he said; correct?

Austin - cross - Agnifilo                    1228

1    A    That's correct.

2    Q    From your conversations with him and from this e-mail,

3    did you get the sense that he was genuinely sorry?

4    A    I did.

5    Q    And he was expressing his sincere regret that he had

6    failed you?

7    A    Yes.

8    Q    Okay.  Did you find in your time with him that he looked

9    up to you?

10   A    I did.

11   Q    And that he thought well of you?

12   A    Yes.

13   Q    He showed you respect?

14   A    He did.

15   Q    He spoke kindly to you whenever the two of you would

16   speak?

17   A    Yes.

18   Q    And could you tell from your perspective he wanted you to

19   think well of him; fair to say?

20   A    Yes.

21   Q    And, so, for him to have to come to you and apologize in

22   this fashion, you found that that was a sincere, genuine

23   apology; correct?

24   A    I did.

25   Q    Fair to say that he did work hard on your behalf?  I

1    understand not a lot of these investments worked out.  I

2    suppose some did, I suppose a lot didn't, but over the

3    preceding year or two, he did work hard on your behalf; is

4    that fair to say?

5    A    Yes, he worked hard on -- he seemed to work hard on

6    behalf of Elea Capital.

7    Q    And the two of you, you said, would communicate by phone

8    on a weekly basis; is that about right?

9    A    I think there are probably sometimes more than on a

10   weekly basis, other times less time.

11   Q    Okay.  And you and he sometimes would see each other in

12   New York; is that right?

13   A    Occasionally, yes.

14   Q    And you also communicated by e-mail; right?

15   A    Yes.

16   Q    Would you say that was the most frequent way that you and

17   Mr. Shkreli would communicate, by e-mail?

18   A    Yes.

19   Q    What I am going to do, I'm going to give you some e-mails

20   and they're just going to sit there in front of you and we're

21   going to talk.  If they refresh your recollection, then your

22   recollection will be refreshed.  If you don't remember it,

23   then I might ask you some other questions.

24            MS. SMITH:  Your Honor, may we have a brief sidebar?

25            THE COURT:  Yes.  (Continued on next page.)

```
                        Sidebar                        1230
```

1              (The following occurred at sidebar.)

2              MS. SMITH:  Your Honor, I don't have any objection

3     to them showing these e-mails but there needs to be a

4     question, do you remember X and if he doesn't --

5              MR. AGNIFILO:  I didn't do anything yet.

6              MR. BRAFMAN:  He's going to leave them on the desk

7     so he doesn't have to walk.

8              MR. AGNIFILO:  I'm going to give him what you guys

9     have.  I'm going to say that do you remember in April Martin

10    sent you an e-mail and if he says no -- and if you remember on

11    your questioning --

12             MS. SMITH:  He doesn't always remember, yes.

13             MR. AGNIFILO:  None of this is offered for the

14    truth.  This is Martin's work product.  This is what Martin

15    was hired to do.

16             MS. SMITH:  Is this in connection with Elea?  He

17    specifically said he didn't pay him for any of this other

18    stuff.

19             MR. AGNIFILO:  It's the whole relationship between

20    the two of them which I think is relevant and if he doesn't

21    remember, I'm going to ask to put the e-mail in evidence.

22             MS. SMITH:  If you ask him if he got an e-mail when

23    he first -- it has to be the subject matter.

24             THE COURT:  I think you don't put it in that way.

25    If they want it in, you can use it to refresh.  You do not

```
                        Sidebar                    1231
```

1  offer it.

2          MR. AGNIFILO:  Not in the first instance.  If he

3  recognizes that that's my e-mail and --

4          MS. SMITH:  First ask if you had a conversation

5  about phenoxodiol and then refresh his recollection.

6          MR. AGNIFILO:  I'm alerting everybody to the hearsay

7  issue.  I don't think you'll have a problem with the

8  foundation.  That will be fine.  The question is I'm taking

9  the position that none of these are offered for truth.  It's

10  not a truthful statement.

11          MS. SMITH:  Then why do you want to put them in?

12  It's the truth of the relationship so this is the way the

13  relationship developed.

14          MR. AGNIFILO:  No.

15          MS. KASULIS:  Are you saying that Martin's

16  statements --

17          MR. AGNIFILO:  If Martin says I think you should buy

18  phenoxodiol, that's not the truth.  He's saying that's an act.

19  That's what he was hired to do.

20          MS. SMITH:  He wasn't hired by him.

21          MR. AGNIFILO:  That's a relationship between the

22  investor and Martin.

23          MS. KASULIS:  You are offering it for truth.  You're

24  saying Martin said that he should buy phenoxodiol --

25          MR. AGNIFILO:  I'm offering it to show that Martin

Sidebar                                         1232

1    said that he should buy phenoxodiol.

2              THE COURT:  That's what the prosecutor just said.

3              MR. AGNIFILO:  It's not -- it's not a statement

4    that's able to be truthful.  It's not saying I just saw

5    someone rob the deli.  That's being offered for the truth if

6    you want to say that somebody robbed the deli.  To say buy

7    phenoxodiol, there's no truth or falsity in the statement.

8              It's a statement that's relevant in the fact that it

9    was made.  That's not a hearsay objection.  I mean -- if we

10   need to do in a larger context, this is important and

11   heartland stuff so if we need to do it in a larger context we

12   need to do it, but I don't think my very experienced

13   colleagues actually understand the rules of hearsay.

14             None of this is offered for the truth.  If he would

15   have said I just made $1 million and I wanted to use that to

16   show he made $1 million, then I'm offering it for the truth.

17             THE COURT:  I think you said earlier that you were

18   offering these e-mails which contain untruths, right?

19             MR. AGNIFILO:  No, no.  It's not truths or untruths.

20   It's that this is how the relationship progressed.  This is

21   how the communications between Martin and Mr. Austin --

22             MS. SMITH:  You're alleging --

23             MR. AGNIFILO:  Can I finish?

24             MS. SMITH:  Sorry.

25             MR. AGNIFILO:  This is how their relationship

SN        OCR        RPR

```
                         Sidebar                      1233

1    progressed.  It progressed through e-mails.

2              THE COURT:  I'm going to let the jury have a break.

3              (Sidebar ends.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1234

1        (Continuing.)

2        THE COURT:  Ladies and gentlemen, why don't we take

3   our mid-morning break now.  Put your notebooks face down.  Do

4   not talk about the case to anyone or to each other.  Please

5   have coffee or whatever you'd like back there and refresh

6   yourself.

7        I will tell Mr. Austin he may also step down and

8   stretch and take a ten-minute break, if you would like, sir.

9   You may step down, thank you.

10       (Jury exits.)

11       (Witness leaves the stand.)

12       MR. BRAFMAN:  May we have a five-minute break to

13  talk among ourselves, me and Mr. Agnifilo?  We'll step out for

14  two minutes and come back from the jury gets back.

15       THE COURT:  I would like to resolve this.  Is it

16  about this issue?

17       MR. BRAFMAN:  Yes.

18       (Recess taken.)

19       (In open court, outside the presence of the jury.)

20       THE COURT:  Go ahead, Mr. Agnifilo.

21       MR. AGNIFILO:  So under Rule 801(c)(2), none of what

22  I intend to offer is offered for proof of the truth of the

23  matter asserted in the statement.

24       The distinction I think that's important is if there

25  would be an out-of-court statement that seeks to prove the

1235

1   truth of something asserted in the statement, I just saw

2   someone commit a fraud, I just saw someone is run a red light,

3   I just saw someone rob a bank, that's hearsay.

4          The reason it's hearsay is because you can't

5   cross-examine the declarant on the basis of their knowledge.

6   None of this is hearsay because, for instance, to be more

7   specific, the first e-mail that I am seeking to ask Mr. Austin

8   about, on April 13, 2005, Mr. Shkreli sends Mr. Austin an

9   e-mail concerning a stock called Novogen that I believe

10  Mr. Austin is an investor in.

11         And Mr. Shkreli sends a piece of research having to

12  do with a drug called phenoxodiol and there's a study going on

13  concerning this drug that Mr. Shkreli wants Mr. Austin to know

14  about.  Mr. Austin significantly then forwards Mr. Shkreli's

15  e-mail to his trader, Frank Ferrara, so that Frank Ferrara,

16  his trader, can trade or not trade on the information that

17  Mr. Shkreli just provided.

18         There's no way of bringing out that reality and that

19  critical chain of information that Mr. Shkreli gave actionable

20  information to Mr. Austin.  Mr. Austin forwarded the e-mail to

21  Frank Ferrara so that Frank Ferrara, his trader, could trade

22  or not trade on it, and none of this is offered for the truth.

23         MS. SMITH:  Your Honor --

24         THE COURT:  The way to get to that, sir, is to ask

25  the witness whether he recalls getting a recommendation from

1236

1   Mr. Shkreli regarding X drug.  If he doesn't recall, you can

2   show him the document.  It doesn't get admitted under Rule

3   612.  You can then ask him whether he then gave directions to

4   his broker based on that information.

5           But I think that when there is a statement that is

6   being offered, like the one that you are suggesting is being

7   offered for the truth, the truth of the matter being that

8   Mr. Shkreli recommended a particular drug or purchase to

9   Mr. Austin.

10          So, for example, if somebody writes a note to a

11  roommate saying go buy milk, that's going to come in for the

12  truth that somebody directed someone to buy milk.

13          MR. AGNIFILO:  It's the truth of -- they added words

14  and the words that they added are important, "Prove the truth

15  of the matter asserted in" -- not the truth of the statement,

16  the truth of the matter asserted in the statement.  You have a

17  statement --

18          THE COURT:  Right.  So the matter asserted in the

19  statement you are proffering is Mr. Shkreli telling Mr. Austin

20  you should buy this, right?

21          The truth of the matter is that Mr. Shkreli's

22  telling Mr. Austin I recommend that you buy this.  But I think

23  that the way you can get this in as I said is you can refresh

24  the recollection, but the document itself is not coming in.

25          MR. AGNIFILO:  I am -- I'm going to start by trying

1   to refresh his recollection.  Your Honor -- I honestly, and I

2   don't speak in strong terms all the time, I think this is

3   wrong.  This is just -- and I will tell you why.

4          Because if he would he have said I want you to buy

5   this, I was just at a certain place and I did a certain thing

6   and I saw a certain thing, then you might be right.  You might

7   be right because then if the relevance -- also it's an

8   exception to hearsay if it's relevant on its effect on the

9   listener.  Then it's no longer being offered for the truth.

10          So here is what I will do:  We're going to get to

11   the hearsay issue eventually because I think what Mr. Austin

12   is going to say is I recognize that as my e-mail.  I don't

13   remember that I got this recommendation twelve years ago from

14   Martin Shkreli and I don't remember that I forwarded it on to

15   is Frank Ferrara.

16          That's critical.  It's not critical for any hearsay

17   reasons.  It's critical because it shows Josiah Austin is

18   listening to Martin Shkreli's recommendations and sending them

19   to Frank Ferrara.  They wanted to call this witness.  They

20   wanted to get into all of this background stuff and now we

21   have to get into the background stuff.

22          They brought it out on direct examination; what are

23   the different ways you communicated?  We communicated by

24   phone, we communicated in person, we communicated by e-mail.

25   They communicated by e-mail.

1238

1    These are the e-mails that they're referring to in

2    their direct examination.

3        MR. AGNIFILO:  Those e-mails referred to

4    Mr. Austin's communications with Mr. Shkreli about his

5    investment in Elea. But Elea didn't fall out of the sky.

6    There's background.  He didn't just meet him with Elea.

7    There's background.  They don't get to pick and choose where

8    the case starts?

9        MS. SMITH:  Your Honor --

10       MR. AGNIFILO:  I just --

11       THE COURT:  You need to calm down.

12       MR. AGNIFILO:  But, Judge, it's important.

13       THE COURT:  I understand.

14       MR. AGNIFILO:  It's important because they're trying

15   to keep out the important part of the story.  And I can't let

16   that happen.  This man has a track record with Martin Shkreli.

17   A lot of it is very positive.  He thinks he's a hard worker

18   and dedicated and smart.  I have a right to show why he thinks

19   Martin Shkreli is smart.

20       Do you know why he thinks he's smart?  He thinks

21   he's smart because he talks about these day in and day out.

22   Shkreli is sending him studies and talking to doctors and

23   telling him about the science.  That's why he thinks he's

24   smart.

25       He thinks he's smart because of all the hard work

1   that Shkreli does.  Your Honor is not saying that none of that

2   can be asked, but it's in e-mails.

3          It's e-mailed.  For the most part it's e-mails.

4   Shkreli says here is a study that was in the New England

5   Journal of Medicine.  This could be important for Novogen.

6   Here is a study that was in Lancet.  This could be important

7   for viral pharma.  That is the nature of the relationship and

8   we run the risk of gutting the entire reason that this witness

9   got on the witness stand and despite losing his money is

10  saying I still think that Martin is smart; I think that Martin

11  made some mistakes, but I think he was smart and I stayed with

12  him because of all of the good information he gave me through

13  the years.

14         That is what they brought out and for me to not go

15  into that in full is just not fair.  I apologize that -- yes,

16  I'm going to calm down but it's important because I can't let

17  the relationship be taken out of context.

18         They brought him here from Arizona.  He's not even

19  part of the indictment.  They brought him here so that they

20  could show that he did bad things with Elea also, but I have

21  to show the entire nature of the relationship.  He's here.  He

22  said things on direct.  I have to be able to explore them and

23  the fact is that he has reached these opinions because of

24  e-mails that he got --

25         MS. SMITH:  Your Honor --

1240

1       MR. AGNIFILO:  -- among other things.

2       MS. SMITH:  Your Honor, just to make clear, the

3  defendant in multiple places claimed to investors that MSMB

4  Capital's AUM was a certain amount in part because he was

5  managing Josiah Austin's money.  It's very clear why it's

6  relevant along with Elea Capital.

7       I think Mr. Agnifilo fundamentally misunderstands

8  our objection.  The objection is not can I ask the

9  defendant -- can I ask the witness what is the nature of the

10  relationship; did he recommend particular drugs, did you

11  forward that information to your financial advisor, did you

12  take it seriously, did you buy stock based on the

13  recommendation.  These are all totally legitimate questions.

14       He cannot, however, put in 94 e-mails that are

15  hearsay without an objection -- without a specific exception

16  for a particular e-mail.  They are out-of-court statements and

17  they are being offered for their truth.  They're being offered

18  for the truth of exactly what Your Honor pointed out; I

19  recommended this stock and then I took or didn't take this

20  recommendation.

21       We're not trying to limit what the defendant wants

22  to do here at all.  He just needs to do it in the proper way.

23       MR. AGNIFILO:  We are not quoting the hearsay rule

24  accurately.  It's proof -- "prove the truth of the matter

25  asserted in the statement," the matter asserted in the

1241

1   statement.  There's a statement and there's a matter asserted

2   in the statement.

3           THE COURT:  The matter asserted in the statement is

4   a recommendation that he buy a certain stock.  So --

5           MR. AGNIFILO:  I humbly --

6           THE COURT:  What is the matter?

7           MR. AGNIFILO:  There is no matter.  That's why it's

8   not hearsay.

9           THE COURT:  There would be no hearsay rule if we

10  took your argument to the logical strength.  Sir, I

11  respectfully disagree with your interpretation.

12          MR. AGNIFILO:  That's not what hearsay is for.

13  Hearsay is to say I just saw something happen.  That's the

14  matter in the statement and since that can't be cross examined

15  because the declarant is not in open court to ask questions.

16  We don't think that's reliable so through the years that's

17  been kept out as hearsay.

18          The simple statement I think -- I think you look

19  nice today.  That's not a hearsay statement.

20          MS. SMITH:  If it's offered for truth it would be

21  hearsay.

22          MR. AGNIFILO:  If I want to show that you're

23  thankful and you say "thank you" then it's offered for the

24  effect on the listener.  The other thing, Judge, they say that

25  Josiah Austin is here to show that Martin Shkreli in good

1242

1    faith could not have thought he had his money under

2    management.  I have no problem if Mr. Austin recalls the

3    issues that are in the e-mails.  I don't need to go right into

4    the e-mails, but if he says, I get so many e-mails, I

5    recognize this e-mail but I don't remember anything of what's

6    in it then for me to not be able to get into the e-mails-

7              THE COURT:  Sir, sir, there's a difference between

8    what you can get into on cross through your cross-examination

9    and what you can put into evidence via documents.  All right,

10   I'm not precluding it and I think the Government is not

11   arguing against your exploring on cross whether Mr. Shkreli

12   offered investment advice to Mr. Austin who from time to time

13   followed that advice, okay.

14             Nobody is tying your hands on that.  That is proper

15   cross.  You can explore whether or not Mr. Shkreli did or did

16   not provide -- was or was not given authority to manage

17   Mr. Austin's investments.  All of that paragraph for cross but

18   to throw documents into the record that are hearsay without a

19   proper route for admission, it's not going to be appropriate.

20   I'm sorry.  The documents can't come in.

21             (Continued on next page.)

22

23

24

25

1    MR. AGNIFILO:  I agree with your statement of law.

2  My contention is they're not hearsay.  Here's what I will do:

3  I will give Mr. Austin the documents.  I will ask if they

4  refresh his recollection as to the events in the documents.

5    THE COURT:  Well, you have to ask the question, did

6  there come a time sometime in March of 2007 when Mr. Shkreli

7  e-mailed you about a recommendation he had for a particular

8  drug.  I don't remember.  Please look at Government exhibit or

9  defense exhibit whatever, does that refresh your recollection,

10  yes, it does.

11    MR. AGNIFILO:  I agree.

12    THE COURT:  Do you recall now that he did, in fact,

13  recommend that you purchase a certain drug on whatever date it

14  was.  That you can do.

15    MR. AGNIFILO:  I agree.

16    THE COURT:  All right.  But you can't evade the

17  hearsay rule by proffering a document.  If you will look at

18  Rule 612, only the opposing party can admit a document that is

19  used to refresh a recollection.

20    MR. AGNIFILO:  But it could have an independent

21  basis.  It is not -- I'm looking for it -- my contention is

22  not hearsay.

23    THE COURT:  You don't have an independent basis to

24  admit it.  It is hearsay.  You are offering it for the truth,

25  that is that Mr. Shkreli recommended a certain drug to Mr.

Austin - cross - Agnifilo                    1244

1    Austin.

2           MR. AGNIFILO:  My objection is noted obviously.

3           THE COURT:  All right.

4           MR. AGNIFILO:  Thank you.

5           THE COURT:  You can ask whatever questions you'd

6    like.  The limitation is the admission of the document in

7    evidence.  It is hearsay.  I'm sorry, sir.

8           MR. AGNIFILO:  No.  Thank you.

9           THE COURT:  We will bring the jury back in.

10          By the way, what are the numbers of the exhibits

11   that you have been referring to?

12          MR. AGNIFILO:  Defense 1001 through 1094.

13          THE COURT:  Thank you.

14          (Jury enters the courtroom.)

15          THE COURT:  All of our jurors are back.  Please be

16   seated, everybody.

17          Sir, you may resume your cross-examination of Mr.

18   Austin.

19   CROSS EXAMINATION

20   BY MR. AGNIFILO:  (Continuing)

21   Q    Good morning, Mr. Austin.  I want to ask some more

22   questions of you, if it's all right.  Do you recall from time

23   to time, would Martin Shkreli send you research or things from

24   medical literature concerning drugs that some -- of companies

25   that you had investments in?

Austin - cross - Agnifilo                    1245

1   A    Yes.

2   Q    Okay.  And do you recall a drug called Phenoxodiol?

3   A    Yes.

4   Q    And do you recall what company made Phenoxodiol?

5   A    I don't.

6   Q    And do you recall Phenoxodiol because you had an interest

7   in that drug because one of the companies you had invested in

8   was developing that drug?

9   A    I'm assuming so, but I don't have a recollection.

10  Q    Okay.  Did you have an investment at one point in a

11  company called Novogen?

12  A    Yes.

13  Q    Do you recall when you got into Novogen as an investor?

14  A    I think it was somewhere around 2000.

15  Q    You were an investor in Novogen in 2005, fair to say?

16  A    I was.

17  Q    And do you recall if Martin Shkreli, in April of 2005,

18  sent you some research concerning Phenoxodiol made by the

19  Novogen Company?  I know I am asking a very specific question.

20  A    I can't recall.

21            MR. AGNIFILO:  Your Honor, can I show the witness

22  something?

23            THE COURT:  Yes, you may.

24            MR. AGNIFILO:  I have Defense Exhibit 1001 for

25  identification.  May I approach?

Austin - cross - Agnifilo                    1246

1          THE COURT:  Of course you can.

2    Q    I am handing you an e-mail.  Read it to yourself.  Don't

3    read it out loud.  Look up at me when you have had a chance to

4    look at it.

5              Do you recall that Phenoxodiol was going to be the

6    subject of a study being done at Yale University?

7    A    I don't recall.

8    Q    And fair to say you got some information from Mr. Shkreli

9    about Phenoxodiol; correct?

10   A    That's what this e-mail says.

11   Q    Right.  And you got it in the form of an e-mail?

12   A    Yes.

13   Q    And who's Frank Ferrara?

14   A    Frank Ferrara is a stockbroker that worked for Janney

15   Montgomery that I did a lot of business with.

16   Q    Do you recall from time to time that Mr. Shkreli would

17   give you a stock recommendation and you would forward that

18   information on to Frank Ferrara?

19   A    I would.

20   Q    Okay.  And do you recall doing that specifically with

21   this information concerning Phenoxodiol?

22   A    I don't recall that.

23   Q    Could I ask you, sir, do you recognize this as your

24   e-mail?

25             MS. SMITH:  Objection, Your Honor.

1          MR. AGNIFILO:  I'm just asking the question.

2          THE COURT:  Overruled.  Is this an e-mail that you

3    recognize?

4          THE WITNESS:  I recognize my name.  I don't

5    recognize this e-mail, but I'm assuming it came from me.

6    Q    Now, did you and Mr. Shkreli discuss your investment in

7    Novogen around this time, 2005?

8    A    I can't recall.  I'm sure we discussed it, but I can't

9    recall discussing it.

10   Q    All right.  Do you recall if you also had an investment

11   in a company called Repligen?  I might be saying it wrong.

12   A    What was the question?

13   Q    Did you have an investment in a biotech company called

14   Repligen?

15   A    I might have.  I don't recall.

16   Q    Okay.  Do you recall if Mr. Shkreli ever sent you

17   information concerning Repligen in April of 2005?

18   A    I don't recall.

19   Q    I understand.

20         MR. AGNIFILO:  If I could, I'm going to show Mr.

21   Austin Defense Exhibit 1002.

22         What I will do is hand you this and take the other

23   one.

24         THE WITNESS:  Thank you, sir.

25         MS. SMITH:  Your Honor, can we have a time frame on

Austin - cross - Agnifilo                    1248

1    this as well?

2              THE COURT:  He said April 2005.

3              MR. AGNIFILO:  Yes, April 2005.  April 24, 2005.

4    Q    And I know it is 12 years ago and I apologize for asking

5    such a detailed question.  Does reading that refresh your

6    recollection as to any of this?

7    A    No, it doesn't.

8    Q    All right.  I understand.  Fair to say that you thought

9    Martin Shkreli was smart, you said that in direct examination;

10   correct?

11   A    I do.

12   Q    And it is fair to say that he, from time to time, would

13   send you medical research; correct?

14   A    Yes.

15   Q    And he would send you papers from medical journals, fair

16   to say?

17   A    Yes.

18   Q    And he would communicate with you and talk about and tell

19   you about different sort of scientific processes that caused

20   these drugs to work from time to time; correct?

21   A    From time to time, yes.

22   Q    And sometimes you would send him reports for him to look

23   at; correct?

24   A    Correct.

25   Q    Okay.  And you did that with some frequency, is that fair

Austin - cross - Agnifilo                    1249

1    to say?

2    A    Yes, I did that with a number of people with fair

3    frequency.

4    Q    Now, in 2005, did you have an investment in BioPharma?

5    A    I'm not sure if it was -- I had an investment in

6    BioPharma.  I don't know if it was 2005.

7    Q    And would Mr. Shkreli stay abreast of the progress of

8    some of the stocks that you were invested in, including

9    BioPharma?

10   A    Yes.

11   Q    Okay.  And do you recall if he, in August of 2005,

12   specifically August 16, 2005, if he gave you a rundown on the

13   performance of BioPharma stock on that day?

14            If you knew, you would have a wonderful memory.

15   A    I have no idea.

16   Q    So here's what I am going to do, if you don't mind, I'm

17   going to show you Defense Exhibit 1005 and my only question to

18   you, sir, is whether it refreshes your recollection.

19            Thank you.  I will take the other one.

20   A    It does not refresh my memory.

21   Q    That's fine.  You can just put it down.  Thank you, sir.

22            Now, you said that you had established a very large

23   position in Chelsea Therapeutics; correct?

24   A    I did.

25   Q    I think you said on direct examination that Mr. Shkreli

1   really introduced you to that particular company?

2   A    He did.

3   Q    I understand there were others who would talk about

4   Chelsea as well; is that right?

5   A    Yes.

6   Q    But Martin really pressed Chelsea on you, is it fair to

7   say?

8   A    He did.

9   Q    And Martin told you he thought Chelsea was a very good

10  company?

11  A    He did.

12  Q    Now, do you recall you and Martin going to the Chelsea

13  offices in Charlotte, North Carolina?

14  A    We did.

15  Q    Okay.  And do you recall about when that might have been?

16  A    I don't.

17  Q    I am going to throw it out, do you think it could have

18  been June 2006?  Does that sound about right?

19  A    It could have been any time.

20  Q    Okay.  Do you recall what led to the trip with you and

21  Mr. Shkreli going to the offices of Chelsea Therapeutics in

22  North Carolina?

23  A    I don't.

24  Q    And do you remember picking him up at the airport?

25  A    I don't.  I don't think I picked him up at the airport.

Austin - cross - Agnifilo                    1251

1   I think he met me at the offices, but I'm not sure.

2   Q    And when you went to the offices, do you recall who you

3   met with?

4   A    Simon Pedder, who was president, and some of the other

5   senior people.

6   Q    And it was you and Mr. Shkreli together?

7   A    It was.

8   Q    And Mr. Shkreli, by this point, had spoken to you pretty

9   extensively about Chelsea Therapeutics?

10  A    Yes.

11  Q    At this point, Mr. Shkreli had even spoken with different

12  doctors who were involved in the testing of various of

13  Chelsea's drugs; correct?

14  A    That was my understanding.

15  Q    And you knew that Mr. Shkreli was going and speaking to

16  these doctors about Chelsea; true?

17  A    What was the question?

18  Q    Did you know -- did you know at the time that Mr. Shkreli

19  was going to speak to these doctors about Chelsea?

20  A    I did not.

21  Q    Do you recall having communications with him about that?

22  A    I could have, but I just don't remember.

23  Q    Just give me one second, sir.

24       Do you remember at one point -- before we get to

25  that, let's talk about the Chelsea trip for a second.  You say

MDL   RPR

Austin - cross - Agnifilo                1252

1   you don't remember -- you don't remember that you picked him
2   up at the airport; correct?
3   A    I don't.  I could have.  I don't remember.
4   Q    I understand.  I am going to show you Defendant's Exhibit
5   1046.  It is an e-mail from 6/25/07.  On the top is an e-mail
6   from you to Martin.  Just read it to yourself.
7          Does it refresh your recollection that you picked
8   him up at the airport?
9   A    No, I still think that I met him at the office.
10  Q    Do you remember making arrangements to pick him up at the
11  airport?
12  A    I don't.
13  Q    Do you remember having any e-mail correspondence with Mr.
14  Shkreli about picking him up at the airport?
15  A    I don't.
16  Q    And this doesn't refresh your recollection?
17  A    It doesn't.
18  Q    Okay.  Thank you, sir.  I'm going to take it from you.
19          Now, do you recall that very often you and Mr.
20  Shkreli would talk about Mr. Shkreli having conversations with
21  Simon Pedder from Chelsea?
22  A    I remember talking with Martin about him talking to
23  Simon.
24  Q    So Martin was speaking to Simon Pedder at Chelsea about
25  the performance of the company?

Austin - cross - Agnifilo                    1253

1  A    I'm assuming so, yes.

2  Q    And Martin would come back to you and report to you quite

3  frequently about the nature of the conversation with Mr.

4  Pedder, is that fair to say?

5  A    Fair to say.

6  Q    I think you said earlier when you were speaking -- in

7  your estimation, Martin Shkreli worked very hard on on your

8  accountant; correct?

9  A    I think Martin worked hard.

10  Q    Do you remember asking him to do anything where he said

11  no to you?

12  A    I can't recall.

13  Q    Okay.  Did you ever say Martin, I want you to read this

14  medical report, and he said Mr. Austin, I would love to, I'm

15  just too busy, he never said that; right?

16  A    I can't recall.

17  Q    And you can't recall that ever happened?

18  A    No.

19  Q    But you can recall that he would give you pretty detailed

20  analyses of these medical reports that he gave you from time

21  to time; correct?

22  A    He would.

23  Q    Do you remember at one point you had asked Martin who the

24  different shareholders were of Chelsea Therapeutics other than

25  yourself?

Austin - cross - Agnifilo                1254

1   A    I don't remember asking him.  I know I asked a few people

2   and also looked into it myself.  I wouldn't be a bit surprised

3   if I had asked him.

4   Q    If you did?

5   A    I would not be surprised if I had asked him.

6   Q    And do you remember him telling you the answer?

7   A    I don't remember that, no.

8   Q    Do you know who Lindsay Rosenwald is?

9   A    Yes.

10  Q    Who is Lindsay Rosenwald?

11  A    Lindsay Rosenwald is a biotech investor that Martin knew

12  and that I met, who was an investor in Chelsea.

13  Q    All right.  And do you remember Martin telling you that

14  Lindsay was one of the major investors in Chelsea?

15  A    I assume he told me.  I can't remember.

16  Q    What I am going to do is show you Defense Exhibit 1035.

17  I'm trying to make it easier.  I have highlighted certain

18  parts.  Take a look at it, sir.

19       Do you remember if one of the names he gave you was

20  Lindsay Rosenwald as being one of the major Chelsea investors?

21  A    What was the question?

22  Q    Did Martin tell you at some point that Lindsay Rosenwald

23  had a big stake in Chelsea?

24  A    That's what this says here.

25  Q    Do you remember -- other than what the document says; the

Austin - cross - Agnifilo                1255

1  e-mail says, do you have an independent recollection of Martin

2  telling you that?

3  A    I have a vague recollection of Martin -- because Martin

4  knew Lindsay, and, so, I have a vague recollection.  I don't

5  have a specific recollection.

6  Q    Fair enough.  Fair enough.  I am going to take the

7  exhibits from you.  Thank you, sir.

8          Now, when Martin first told you about Chelsea, did

9  you have any position at Chelsea at that time?

10 A    I don't think so.

11 Q    So the entirety of your position in Chelsea came after

12 Martin first introduced you to the stock?

13 A    I think so, yes.

14 Q    And you said at one point you were a 10 percent

15 shareholder?

16 A    I was over 10 percent shareholder.

17 Q    Over 10 percent.  As you sit here, do you remember at its

18 high point how many shares of Chelsea you had?

19 A    I don't.

20 Q    At its high point, do you remember what the value of your

21 shares in Chelsea was?

22 A    I don't know the exact number, but I think it was

23 somewhere around $30 million.

24 Q    So let's talk about how you amassed your position in

25 Chelsea.  From time to time Martin would give you updates on

Austin - cross - Agnifilo                1256

1    the performance of the stock; correct?

2    A    Yes.

3    Q    And you already said that you went with Martin to North

4    Carolina to the Chelsea offices; correct?

5    A    I did once.  I went to the office a number of times and

6    one of the times I went with Martin.

7    Q    Was there any particular reason that you brought Martin

8    along with you at the time that you did?

9    A    He asked to come.

10   Q    Okay.  And let me -- give me one second.  Do you remember

11   including him on an e-mail chain with Katheryn McNeal?  Do you

12   remember who that is?

13   A    Yes, Katheryn McNeal was a public relations person.

14   Q    And do you recall you and Ms. McNeal were talking about

15   your visit to Chelsea?  This is --

16   A    I can't remember.

17   Q    I understand.  And I think Ms. McNeal might have said to

18   you she was in San Francisco so you had to do the visit on a

19   Monday.

20        I'm sorry.  I know.  I know what I am doing, I'm

21   sorry for all of the detail.

22        Do you remember?

23   A    No.

24   Q    Do you remember at one point that you included Martin on

25   the e-mail chain so that Martin and you could make plans to go

Austin - cross - Agnifilo                1257

1    to Chelsea the following Monday?

2    A    I don't remember.

3    Q    So you and Martin go to Chelsea and you meet with Simon

4    Pedder, he's the CEO of Chelsea?

5    A    Yes.

6    Q    You meet with Katheryn McNeal, she is the chief of

7    investor relations of Chelsea; correct?

8    A    I'm assuming.  I don't know.  I can't remember.

9    Q    And you met with other executives of Chelsea; right?

10   A    Yes.

11   Q    And you and Martin were together the whole day?

12   A    Yes.

13   Q    Did you tell anybody at Chelsea what your connection to

14   Martin was?

15   A    I don't recall.

16   Q    Fair to say that Martin would be pretty active in terms

17   of the conversation with these folks at Chelsea; true?

18   A    True.

19   Q    Fair to say, from your perspective, Martin seemed

20   somewhat honored to be in your presence at Chelsea from what

21   you could see?

22   A    Yes.

23   Q    He wanted to show you that he knew what he was talking

24   about from your perspective?

25             MS. KASULIS:  Objection to what the defendant

Austin - cross - Agnifilo                    1258

1    wanted.

2         THE COURT:  Sustained.

3    Q    In your presence, Martin would speak about the science

4    behind some of the Chelsea drugs with the Chelsea executives;

5    correct?

6    A    Correct.

7    Q    And it seemed, from your perspective, he knew the science

8    very well; correct?

9    A    Yes.

10   Q    And fair to say that's part of his role at this meeting,

11   Right?  He really does know the science; correct?

12   A    I can't answer that.

13   Q    That's fine.  At the time you are a major investor in

14   Chelsea; right?

15   A    Correct.

16   Q    So you are obviously providing tremendous financial

17   support as an investor of the company; correct?

18   A    Correct.

19   Q    And Martin went there with you that day and had

20   discussions about medicine and science with the different

21   Chelsea executives; right?

22   A    I can't remember what we discussed that day.

23   Q    Do you remember being down there in the offices the

24   better part of the whole day at that time?

25   A    I remember flying, yes.  We were down there the better

Austin - cross - Agnifilo                    1259

1   part of the day.

2   Q    Now, in addition to going down to the Chelsea offices,

3   Martin helped you assemble your position in Chelsea, is it

4   fair to say?

5   A    Martin helped to a degree.  I would say most of the stock

6   I got outside of Martin.

7   Q    But Martin did help you assemble that position?

8   A    Martin was one of the people that helped me with that

9   position.

10  Q    Okay.  Would Martin tell you from time to time that there

11  were blocks of Chelsea stock available?  Do you remember that?

12  A    Yes.  I had a number of people that were looking for the

13  stock.  It was -- Martin was one of the many.

14  Q    Right.  And Martin would communicate with you from time

15  to time that he located a block of Chelsea stock that you

16  could buy if you found the price attractive; correct?

17  A    Correct.

18  Q    And he came to you on several different occasions and

19  said hey, I found someone who's willing to sell you a block of

20  Chelsea stock at X price; right?

21  A    Correct.

22  Q    More than five or six?  I mean, he came to you many, many

23  times and said I located a block of Chelsea stock for you?

24  A    Yes, I had a number of people that would come to me very,

25  very often because it was known that I was out there looking

Austin - cross - Agnifilo                    1260

1    for Chelsea.

2    Q    I understand Martin is not the only one helping you

3    assemble your position in Chelsea, but I am only asking about

4    his involvement at this point.

5    A    Uh-hum.

6    Q    You have to say yes or no so she can write it down.

7         So he would come to you with blocks of Chelsea stock

8    and you would either buy them or not buy them based on the

9    individual pricing?

10   A    Correct.

11            (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Austin - Cross - Agnifilo                    1261

1   (Continuing)

2   BY MR. AGNIFILIO:

3   Q    And there were times when you asked Martin to see if

4   there was any flexibility in the price, correct?

5   A    Correct.

6   Q    Because the offerer, whoever it was, wanted a certain

7   price.  You didn't want it at that price, and, so, you would

8   say to Martin:  If you could do better, I might be interested

9   in the block of Chelsea.

10            Correct?

11  A    Correct.

12  Q    And just so the jury understands and the judge and all of

13  us, how does -- it's not easy, fair to say, to assemble a

14  large position in a company like Chelsea?

15  A    Correct.

16  Q    It takes a great deal of time, correct?

17  A    It takes time, yes.

18  Q    And it takes effort.

19  A    Yes.

20  Q    And you have to diligently go out and locate blocks of

21  Chelsea stock to assemble your position, right?

22  A    Yes.

23  Q    And that's why you said just a little while ago you had

24  many different people going out trying to help you assemble

25  your Chelsea position, correct?

1  A    Yes.

2  Q    Which at one point was $30 million.

3  A    I think at one point it was that high.

4  Q    And Martin was one of the people helping with assembling

5  your position.

6  A    Martin was one of the people.

7  Q    Did you ever bring anybody else to the Chelsea office in

8  North Carolina, other than Martin?

9  A    Yes.

10 Q    Who else did you bring?

11 A    Bill Rickert.  I can't think of any others.  I

12 probably...

13        And then I went down there myself a number of time.

14 Q    And Bill Rickert was someone else who was giving you

15 investment advice from time to time?

16 A    Yes.

17 Q    Do you recall Martin and Bill Rickert speaking with each

18 other?

19 A    I don't recall them speaking together; I think they did

20 speak together.

21 Q    Okay.  And do you recall if they were on common e-mail

22 chains?  Only if you recall.

23 A    I can't recall.

24 Q    But it wouldn't surprise you if they were?

25 A    It would not surprise me.

Austin - Cross - Agnifilo                1263

1  Q    Because, essentially, Martin was doing something similar

2  to what Bill Rickert was doing, which was helping you assemble

3  your position in Chelsea.

4  A    Yes.

5  Q    And do you know offhand how often Martin would speak to

6  Simon Pedder, the CEO of Chelsea?

7  A    I don't.

8  Q    It's more than a handful of times, though; fair to say?

9  A    It was a number of times because I remember that Simon at

10 one point asked me to please have Martin stop calling him.

11 Q    So it was probably maybe two handfuls or three handfuls

12 of times.

13 A    Yes.

14 Q    Martin can be kind of persistent, right?

15 A    To say the least.

16 Q    Okay.  Fair enough.

17        Persistent almost to the point of maybe even being

18 annoying from time to time?

19 A    Yes.

20 Q    But you thought it all -- and correct me if I'm wrong --

21 you always thought at all times when Martin was dealing with

22 Chelsea, he was dealing with your best interest at heart.

23 A    Yes.

24 Q    So you didn't mind -- maybe Mr. Pedder minded, but you

25 didn't mind that Martin was talking to Chelsea with your best

Austin - Cross - Agnifilo                    1264

1   interest at heart.

2   A    No.  I thought it was both my best interest and Elea's

3   best interest.

4   Q    Right, right.  So, your interests aligned to a certain

5   extent.

6   A    Yes.

7   Q    But you knew that part of what -- that Martin would have

8   these conversations with Simon Pedder and then come back to

9   you and tell you exactly how it went, right?

10  A    Actually, I don't know that.  I'm assuming yes, but I'm

11  sure there are times he talked to Simon that I didn't know

12  about.

13  Q    Okay.  All right.  And when he reported back to you, on

14  those occasions when he reported back to you after speaking to

15  Simon, he gave you a fair full debriefing about their

16  conversation; fair to say?

17  A    I'm assuming he did.

18  Q    You mentioned a few minutes ago Bill Rickert.  Does

19  Mr. Rickert have a medical degree, do you know?

20  A    Excuse me?

21  Q    Does he have a medical degree?

22  A    He does not.

23  Q    And who is he?  I don't mean everything, but what's his

24  role in your life?

25  A    Bill Rickert is a very good friend of mine.  We have been

Austin - Cross - Agnifilo               1265

1   doing business together for many years.  And he was also a

2   director of Chelsea.

3   Q    So, he was a director of Chelsea as well.

4   A    Yes, he was.

5   Q    Do you remember in 2007 Martin having a correspondence

6   with Simon Pedder, Kathryn McNeil, and you in regard to a drug

7   that was a competitive drug of one of Chelsea's drugs?

8        I know it's a very detailed question.  Do you

9   remember?

10  A    I don't.

11  Q    I'm going to show you Defense Exhibit 1038.

12       Chelsea had a drug called droxidopa?

13  A    It does.

14  Q    Do you recall, as you're sitting here today, what

15  droxidopa did?  And if you don't, that's okay.

16  A    I don't.

17  Q    That's fine.  So, I want to show you Exhibit 1038.  It's

18  an e-mail from Martin on 6/8/07 to you and the other two

19  executives at Chelsea.

20       Do you recall if from time to time, including on

21  this occasion, that Martin would give you sort of updates of

22  how the competition was doing?

23  A    Yes.

24  Q    Thank you, sir.  I'm just going to take that from you.

25       Because that's an important thing to know; fair to

1    say, right?

2    A    Yes.

3    Q    Because the success of the company is going to be based

4    in part on the internal quality of the company, right?

5    A    Yes.

6    Q    But it's also going to be based on the quality of its

7    competitors, right?

8    A    Correct.

9    Q    One of the things Martin would do is research the entire

10   field to try to see where the competition was and what the

11   competition was doing, correct?

12   A    Yes.  Most of the analysts would do that also.

13   Q    I'm not saying he's the only one doing it, but that's one

14   of the things he would do?

15   A    Yes.

16   Q    And he would give this information to you and Simon

17   Pedder and Kathryn McNeil, correct?

18   A    Yes.

19   Q    Now, do you recall through the years getting very

20   lengthy, detailed e-mail communications from Martin about

21   different drugs and the science behind different drugs?

22   A    I do.  I remember -- I mean, I recall getting very

23   technical, lengthy e-mails.

24   Q    And this would happen with some degree of frequency,

25   correct?

1  A    It would happen occasionally.

2  Q    You'd go to your computer, you open it up, and here's a

3  thousand words from Martin Shkreli using terms that unless

4  you're a scientist you might not know, correct?

5  A    I don't think they'd be a thousand words.  They'd often

6  be publications, you know, a copy of a publication that he

7  read.

8  Q    Right.  Sometimes he sent you his own thoughts, correct?

9  A    Yes.

10  Q    And his own thoughts would be fairly detailed and fairly

11  lengthy and fairly informative, correct?

12  A    Sometimes.

13  Q    Now, not all of these drugs were home runs, correct?

14  A    In terms of?

15  Q    I mean he would tell you I think this is a good drug

16  correct?

17  A    Correct.

18  Q    And he would tell you I think it's a good drug because it

19  attacks this medical issue in this specific way, which is

20  better than all the other drugs attack the medical issue, in

21  sum and substance, correct?

22  A    Correct.

23  Q    And sometimes the companies that made those drugs went

24  up, right?

25  A    Occasionally.

Austin - Cross - Agnifilo                    1268

1    Q      And sometimes they went down?

2    A      Yes.

3    Q      Or like Chelsea, didn't go up as much as Martin had told

4    you it would, right?

5    A      Correct.

6    Q      Let's talk about Chelsea for a second.  Martin, fair to

7    say, was sending you a great deal of literature on Chelsea in

8    your early days after he introduced it to you, correct?

9    A      Correct.

10   Q      And he really wanted you to buy Chelsea.

11   A      He did.

12   Q      And he was giving you all these reasons -- medical

13   reasons scientific reasons -- why you should buy Chelsea,

14   correct?

15   A      Correct.

16   Q      And he also said they had a strong board of directors,

17   remember?

18   A      I don't remember that.

19   Q      Might have been from another major pharmaceutical

20   company, I don't remember.  You don't remember?

21   A      No recollection.

22   Q      And he was saying you should buy Chelsea because I,

23   Martin Shkreli, think Chelsea is a very good company from a

24   scientific standpoint, correct?

25   A      Yes.

Austin - Cross - Agnifilo                    1269

1    Q    And he would send you a great deal of information to back

2    up that conclusion?

3    A    Yes.

4    Q    And it turns out Chelsea didn't do all that well, right?

5    A    No.

6    Q    And can I ask you, do you hold Martin in part responsible

7    for the fact that Chelsea didn't do better?

8    A    No.

9    Q    Do you hold him responsible for giving you strong

10   opinions that ended up not coming true?

11   A    No.

12   Q    Did you always think that he was doing the best he could?

13   A    I think in terms of recommendations he was doing the best

14   he could.

15   Q    And he was giving you sort of the science, as he

16   understood it?  That was from your perspective?

17   A    Correct.

18   Q    Do you remember if at one point you gave Martin -- you

19   sent him a check of some sort, money, funds?

20        And I don't mean the funds that we talked about in

21   the investment context.  As payment.

22   A    I don't.  I remember I either gave Martin or gave his

23   sister money for rent.

24   Q    And tell us what you remember about that, if you could.

25   A    I think Martin's sister was having a tough time.  I can't

Austin - Cross - Agnifilo          1270

1    remember too much about it.  I had not met the sister.  And I

2    remember Martin just saying the sister was having a real hard

3    time and was having some financial problems.  And I think I --

4    I don't know if I sent it to Martin or sent it to his sister,

5    but I believe I paid her rent for at least a couple months.

6    Q    And that was a gift, in essence?

7    A    It was a gift.

8    Q    It wasn't a quid pro quo for any aspect of Martin's

9    business, it's because you're a nice person and you wanted to

10   help out Martin's sister.

11   A    Yes.

12   Q    Do you recall from time to time Martin would send you and

13   Simon Pedder detailed breakdowns of different pharmacy

14   companies?

15   A    I can't recall but -- I can't recall.

16   Q    What I'm going to do, I'm going to ask you to just look

17   at Defense Exhibit 1050.

18        Actually, you're saying that you think it happened,

19   you can't recall the specifics?

20   A    I cannot recall.  I would not be at all surprised.

21   Q    All right.  Now, I know Simon Pedder at some point said

22   tell Martin to stop contacting me, but from your perspective,

23   I mean, Martin gave you and Mr. Pedder a great deal of

24   scientific information, correct?

25   A    Yes.  At least I think that's what Martin felt.

Austin - Cross - Agnifilo                    1271

1  Q    Okay.  Well, you were getting these lengthy e-mails,
2  correct?
3  A    Yes.
4  Q    And from time to time, Mr. Pedder would be copied on the
5  e-mails, correct?
6  A    Yes.
7  Q    And from time to time, Kathryn McNeil, the head of
8  investor relations at Chelsea, would be copied on the e-mails,
9  correct?
10 A    I can't recall, but I'm assuming, yes.
11 Q    And did -- now, do you know anything about Simon Pedder's
12 background, just based on your personal knowledge as
13 10 percent shareholder in Chelsea?
14 A    At the time I knew a lot about his background.  If you
15 ask me about his background right now, I couldn't tell you.
16 Q    Fair enough.
17        Now, did Simon Pedder ever say to you:  This
18 scientific stuff we're getting from Martin is just all wrong?
19 A    I don't think so.
20 Q    I'm just going to ask you if you remember.  Do you
21 remember if in 2005 you sent a check addressed to Intrepid
22 Capital with Martin's name on it on El Coronado letterhead in
23 the amount of $5,000?
24 A    I don't remember.
25 Q    Are you saying it conclusively didn't happened or you

Austin - Cross - Agnifilo                    1272

1   just don't --

2   A    No, I'm not saying it didn't happen, I'm just saying I

3   don't remember.

4   Q    Now, at one point did ViroPharma rise in price and cause

5   you to have sort of a positive investment in ViroPharma?

6   A    I can't remember.

7            I did go back and ask my office to look into

8   ViroPharma, and they told me that I had, I think, a $200,000

9   loss in ViroPharma.

10  Q    Overall?

11  A    Overall.

12  Q    My question is at some point, only if you remember, that

13  there was sort of a spike in ViroPharma and that the stock

14  went up for a period of time?

15  A    I can't recall.  I can't recall either way.

16  Q    I understand.  And you have no recollection as to whether

17  the $5,000 check was being thankful to Martin for putting you

18  into ViroPharma?

19  A    I would be very surprised if it was.

20  Q    Why is that?

21  A    I just can't recall doing that.  It's the kind of thing I

22  normally don't do.

23  Q    Do you recall Martin having meetings with people from

24  Lehman in connection with raising money for Novogen?

25  A    I remember meeting some people with Lehman -- at Lehman

1   Brothers and talking about Novogen.  I can't remember what it

2   was about.

3   Q    And is there another company related to Novogen,

4   Marshall?

5   A    Marshall Edwards.

6   Q    Marshall Edwards.  Okay.

7         Do you remember conversation with people from Lehman

8   in regard to raising money both for Novogen and for Marshall

9   Edwards?

10  A    I don't.

11  Q    Do you remember that Martin actually set some of these

12  meetings up with Lehman; do you have any recollection of that?

13  A    I don't, but I wouldn't be surprised because I had

14  meetings with Janney Montgomery about the same thing that was

15  set up by Frank Ferrara and other people, that were set up by

16  other people also.

17  Q    Right.  And, so, these would be meetings that were

18  related to -- Novogen and Marshall Edwards were companies that

19  you had investments in at the time, correct?

20  A    Yes.

21  Q    And those companies needed funding at the time?

22  A    Yes.

23  Q    And that funding was going to come from Lehman.

24         THE COURT:  Is that a question?

25         MR. AGNIFILO:  Yes.

Austin - Cross - Agnifilo                    1274

1    Q    Those fundings that they needed were going to come from

2    Lehman, the company?

3    A    It did not come from Lehman.

4    Q    But there were meetings towards that end?

5    A    The meeting was to see if Lehman had any interest.  And

6    you know, I had a number of meetings with other people about

7    that same thing also.

8            THE COURT:  Counsel, I don't know about Mr. Austin,

9    but it would really help me hear you much more clearly if you

10   would use the mic.

11           MR. AGNIFILO:  Sure, Judge.

12           THE COURT:  Thank you.

13   Q    So in addition to Chelsea, Martin suggested other stocks

14   for you, correct?

15   A    He did.

16   Q    And some of those stocks you followed his selections and

17   some of them you didn't; fair to say?

18   A    Fair to say.

19   Q    And he would give you information on the stocks that he

20   suggested to you on a regular basis, correct?

21   A    Yes.

22   Q    In other words, with Chelsea, he would pepper you with

23   information about Chelsea over the course of a lengthy period

24   of time, correct?

25   A    Yes, I got information from Chelsea from Martin and, you

Austin - Cross - Agnifilo                    1275

1    know, from many other people.

2    Q    But when Martin gave you information about Chelsea, he

3    would give you information on a weekly or biweekly basis; fair

4    to say?

5    A    Yes.  Most people did.

6    Q    And that's true with Novogen as well; correct, he gave

7    you a lot of information about Novogen?

8    A    I can't recall.  He gave me -- he did give me information

9    about Novogen.  I can't recall how much information it was.

10   Q    ViroPharma as well?

11   A    Again, I can't really remember.  ViroPharma was I think

12   one of the names he liked.  And I was an investor in

13   ViroPharma, so I'm assuming he gave me information.

14   Q    And Amgen do you remember that company?

15   A    Yes.

16   Q    And Pharmacopia?

17   A    Yes.

18   Q    Do you remember he thought that you should short a

19   company called Telik?

20   A    I don't recall.

21   Q    Did he recommend from time to time that you should short

22   companies?

23   A    He did.

24   Q    And correct me if I'm wrong, he would say to you that he

25   thought that this company's drug, whichever one it was, was

1  going to fail some FDA clinical trial, correct?

2  A    Yes.

3  Q    And what would typically happen in your experience is if

4  the drug failed in the clinical trial, the stock would lower

5  in price.

6  A    Yes.

7  Q    And Martin, fair to say, would give you a great deal of

8  information from time to time on why he thought these

9  different drugs would fail their clinical trials?

10 A    Yes.

11 Q    And sometimes he was right, right?

12 A    I can't recall.  I never took him up on any of his

13 shorts.

14 Q    All right.  You think never?

15 A    I think I did with Mann, but I did not short it, I bought

16 a put.

17 Q    Tell the jury, what's a "put."

18 A    A put is an option that if it goes down, you would

19 make -- it was profitable.

20 Q    And it was Mankind, does that sound right?

21 A    Yes.

22 Q    What do you recall about that particular trade?

23 A    I don't recall.

24 Q    But you remember you bought a put?

25 A    I bought a small put.

1    Q    Which means that if the stock lowers in price you, as an

2    investor, make money?

3    A    Yes.

4    Q    And that was based on Martin's suggestion?

5    A    Martin and in other research reports also.

6    Q    And you said that at least in regard to Chelsea -- I know

7    other people as well -- Martin was out looking for available

8    stock for you to buy, correct?

9    A    Correct.

10   Q    So that you could assemble your Chelsea position.

11   A    Correct.

12   Q    Which you did, over ten percent.

13   A    Correct.

14   Q    And at that point, you were Chelsea's largest

15   shareholder?

16   A    Correct.

17         THE COURT:  I think we're starting to circle around.

18         MR. AGNIFILO:  We're getting there, Judge.

19         THE COURT:  Okay.

20   Q    Now, when Martin started Retrophin, the company he ended

21   up starting, you said that he had conversation with you about

22   that, correct?

23   A    Correct.

24   Q    And he offered you his own shares, correct?

25   A    Correct.

Austin - Cross - Agnifilo                    1278

1  Q    So you understood he was the founder of Retrophin, right?

2  A    Yes.

3  Q    And he was giving you basically his own shares and he

4  wanted you to join the board, correct?

5  A    I can't remember if he wanted me to join the board or

6  not.  He could have, I just can't recall.

7  Q    I mean, you were still having some communication with him

8  from time to time, correct?

9  A    From time to time.

10 Q    It wasn't the same as it was before the whole mess with

11 being sued, correct?

12 A    Correct.

13 Q    But he was still talking to you, right?

14 A    Yes.

15 Q    And did you get the sense that he wanted to sort of win

16 you back, win your faith back in him?

17 A    I did.

18 Q    And he wanted you to be part of Retrophin and the

19 Retrophin board; do you remember him asking you that?

20 A    I don't.  I do remember talking about it and him asking

21 also for me to buy some.

22 Q    And you didn't want to join the Retrophin board, correct?

23 A    I did not.

24 Q    Now, in regard to -- was it Lehman who sued you?

25 A    Yes.

Austin - Cross - Agnifilo                    1279

1  Q    You don't know why Lehman decided to sue you, correct?

2  A    I was told Lehman -- Lehman was told that I was the

3  backup.  And I'm not sure what that meant at the time.

4  Q    And Lehman told that to you?

5  A    I'm not sure if Lehman told that or the lawyer that I had

6  told me that.

7  Q    But Lehman sued you and Martin Shkreli, correct?

8  A    Yes.

9  Q    Now, Martin at the time was essentially broke, correct?

10 A    Correct.

11 Q    You, through your hard work, were solvent, correct?

12 A    Correct.

13 Q    So, you know how things work:  Lehman might have just

14 wanted to go after the solvent guy, right?

15 A    Correct.

16 Q    That could be the reason, right?

17 A    It could be the reason.

18       MR. AGNIFILO:  Give me one second.

19       (Pause in proceedings.)

20       MR. AGNIFILO:  Mr. Austin, I thank you for your

21 time.  I hope you enjoy your time in New York?

22       THE WITNESS:  Thank you.

23       THE COURT:  Is there any redirect of this witness?

24       MS. SMITH:  Yes, very briefly, your Honor.

25       THE COURT:  All right.  Thank you.

```
                    Austin - Redirect - Smith              1280
```

1   REDIRECT EXAMINATION

2   BY MS. SMITH:

3   Q    Mr. Agnifilo just asked you about the Lehman Brothers

4   suit.  Where could Lehman Brothers have gotten your name or

5   information from?

6           MR. AGNIFILO:  Objection to the form of the question

7   where Lehman Brothers could have gotten his name.

8           THE COURT:  Ask whether he knows.

9   Q    Do you know where Lehman Brothers could have gotten your

10  name from?

11          MR. AGNIFILO:  I object to the form of the question,

12  where Lehman Brothers could have gotten his name.

13          THE COURT:  Rephrase it, please.

14  Q    Are you aware of under what circumstances an investor in

15  a fund could be sued if the manager of the fund causes the

16  fund to fail?

17          MR. AGNIFILO:  I object.  It's a legal conclusion.

18          THE COURT:  I will overrule the objection.

19          If you know the answer...

20  A    Repeat the question, please.

21  Q    Are you aware of under what circumstances could an

22  investor in the fund be sued when the manager of the fund

23  causes the fund to fail?

24  A    If the investor had agreed to be a backstop to the fund.

25  Q    Did you ever agree to be a backstop to Elea Capital?

Austin - Redirect - Smith                    1281

1   A     No.

2   Q     In connection with the way the Defendant -- on cross, you

3   were asked if you believed that the Defendant had your best

4   interest in heart when he was making scientific

5   recommendations or stock recommendations to you.

6          In connection with how the Defendant handled the

7   loss of Elea and the suit from Lehman Brothers, do you believe

8   he had your best interest at heart?

9          MR. AGNIFILO:  Objection to the form of the

10  question.

11         THE COURT:  Overruled.

12  A     No, I don't think he had my best interest at heart.

13  Q     You were also asked a lot on cross about Chelsea.

14  A     Yes.

15  Q     The Defendant was also an investor in Chelsea; is that

16  right?

17  A     Elea was an investor in Chelsea.  And it was my

18  impression that Martin was also an investor in Chelsea, but

19  I'm not -- I didn't know that.

20  Q     And did you authorize the Defendant to talk to Chelsea on

21  your behalf as your personal representative?

22  A     No.

23  Q     You were asked on cross about the value of your total

24  position in Chelsea at its height, and I believe you said it

25  was $30 million.

Austin - Recross - Agnifilo                    1282

1       What was the ultimate value of that position?

2  A    Well, I think the ultimate value was much, much less.  I

3  think I ended up losing five to six million dollars on that

4  investment.

5  Q    And you also were asked on cross about shorting these

6  various biotechnology stocks.  When the Defendant was

7  recommending shorting a biotechnology stock based on the

8  science or the FDA process, he's asking you to bet that the

9  company drug will fail; is that right?

10 A    Yes.

11         MS. SMITH:  No further questions, your Honor.

12         MR. AGNIFILO:  I have a few.

13         THE COURT:  Okay.

14 RECROSS EXAMINATION

15 BY MR. AGNIFILO:

16 Q    You brought Martin to North Carolina with you to meet at

17 Chelsea, correct?

18 A    No.

19 Q    You knew of -- he surprised you there?  Did he surprise

20 you when he showed up at the Chelsea office the same time you

21 did?

22 A    No.

23 Q    You knew he was coming?

24 A    I knew he was coming.  He asked to come with me.

25 Q    And you said okay?

Austin - Recross - Agnifilo                    1283

1   A    I said okay.

2   Q    And then you had walked around the Chelsea offices with

3   him side-by-side for several hours, correct?

4   A    Yes.

5   Q    And he spoke to Chelsea people in your presence, correct?

6   A    Yes.

7   Q    And you knew he was having conversations with Chelsea

8   people on the phone when you were not on the phone, correct?

9   A    Yes.

10  Q    And he would report these back to you, correct?

11  A    Yes.

12  Q    You don't know why, you don't know why Lehman sued you,

13  correct?

14       THE COURT:  Use the microphone, please.

15  Q    You don't know why you were put in that lawsuit, correct?

16  A    Correct.

17  Q    I mean you suspect, but you don't know, right?

18  A    Correct.

19  Q    And isn't it fair to say Martin denied that he told

20  anything to Merrill to put you in that lawsuit?

21  A    Merrill or Lehman?

22  Q    I'm sorry, the lawsuit?

23  A    The lawsuit.

24  Q    There's only one lawsuit, right?

25  A    Only one lawsuit.

Austin - Recross - Agnifilo                 1284

1   Q     Fortunately.  One is too many.

2   A     Yes.

3   Q     And there's been -- you have no evidence that Martin said

4   to Lehman that you were backing him, correct?

5   A     I have no evidence.

6   Q     And the Lehman suit got dismissed against you.

7   A     Yes.  Lehman went bankrupt.

8   Q     Right.  But the suit got dismissed.

9   A     I'm not sure what happened with the suit.  Lehman went

10  away.

11  Q     Right.  Not because of you.

12  A     Not because of me.

13        MR. AGNIFILO:  Thank you, sir.

14        MS. SMITH:  No further questions, your Honor.

15        THE COURT:  Mr. Austin, thank you for your time.

16  You're excused.

17        THE WITNESS:  Thank you.

18        THE COURT:  Have a nice weekend.  Safe travels back.

19        (Witness excused.)

20        THE COURT:  How are the jurors doing?  Are you in

21  need of a little break or can you continue for another hour?

22  Yes?  Okay.

23

24        (Continued on next page.)

25

F. Hassan - direct - Kasulis                    1285

1           (Continuing.)

2           MS. KASULIS:  Your Honor, shall we call our next

3    witness?

4           THE COURT:  Yes.

5           MS. KASULIS:  The Government calls Fred Hassan to

6    the stand.

7           THE COURT:  Good morning, sir, have a seat.

8    **F R E D    H A S S A N,**

9    called by the Government, having been first duly sworn, was

10   examined and testified as follows:

11          THE COURT:  Have a seat and spell and state your

12   full name for the record.

13          THE WITNESS:  Fred Hassan, H-A-S-S-A-N.

14          THE COURT:  Thank you.  Please proceed.

15          MS. KASULIS:  Thank you, Your Honor.

16   DIRECT EXAMINATION

17   BY MS. KASULIS:

18   Q    Good morning, Mr. Hassan.

19   A    Good morning.

20   Q    Where do you currently live?

21   A    In Boca Raton, Florida.

22   Q    And how long have you lived there?

23   A    We've had a house there since '03, but we moved there

24   around 2011, 2012.

25   Q    And where did you live before you moved to Boca Raton,

F. Hassan - direct - Kasulis                    1286

1   Florida?

2   A     In New Jersey.

3   Q     And where did you grow up?

4   A     In Pakistan.

5   Q     How old are you, sir?

6   A     I'm 71.

7   Q     Are you married?

8   A     Yes.

9   Q     And what is your spouse's name?

10  A     Noreen.

11  Q     Do you have any children?

12  A     Yes.

13  Q     How many children do you have?

14  A     Three.

15  Q     And what are their names?

16  A     Sabrina, Daniel and Sarah.

17  Q     And Sarah, is her full name Sarah Hassan?

18  A     That is correct.

19  Q     Could you please describe your education to the jury.

20  A     I grew up in Pakistan.  I went to school in England.  I

21  got my degree in chemical engineering from Imperial College in

22  London.  Then I went back and worked in Pakistan for three

23  years in a fertilizer company.

24        Then I came back to this country to study business

25  in Harvard Business School.  I got my MBA in 1972 and then I

F. Hassan - direct - Kasulis                    1287

1  joined the pharmaceutical industry right after that.

2  Q    Do you have a Ph.D. or doctorate, sir?

3  A    No, I don't.

4  Q    Could you please step the jury through your employment

5  history?

6  A    So, I started with Sandoz in 1972 which is now called

7  Novartis.  It's a large pharmaceutical company.  I was with

8  Sandoz to 1989.  My last job there was running the largest

9  operation in Sandoz USA.  Then I joined another large company

10  called Wyeth, also in -- as the head of the pharmaceuticals

11  area and my job there was expanded by gaining the other units

12  in Wyeth.  In 1997 I left Wyeth to become the chief executive

13  officer of Pharmacia & Upjohn a publicly traded company.

14  Q    Mr. Hassan, what is a CEO?

15  A    Chief executive officer.

16  Q    And what is a chief executive officer of a company?

17  A    Generally chief executive officer works with the board on

18  the strategy and the oversight of the company and also tries

19  to set the culture and the direction in the company.  That's

20  primarily the job in a larger company.

21  Q    And when you referred to the board, what are you

22  referring to?

23  A    The board of directors represents the shareholders and

24  they work -- they are independent of the chief executive

25  officer and they oversee the work of the management and the

F. Hassan - direct - Kasulis                    1288

1    head of management is the chief executive officer.

2    Q    And before we proceed with your employment history, why

3    did you join the pharmaceutical industry?

4    A    I always loved innovation.  I love chemistry.  I was a

5    chemical engineer.  This was my way of trying to get into an

6    industry that would do a lot of innovation and hopefully do

7    some good things for people.

8    Q    Now, directing your attention back to your employment

9    history, you say that you were the CEO of Pharmacia; is that

10   right?

11   A    That is correct.

12   Q    And when did that position begin?

13   A    So I first joined a company called Pharmacia & Upjohn

14   which was a company formed with the merger of the old Upjohn

15   company with Pharmacia, a Swedish company.  And I was the CEO

16   of that company from 1997 to 2000.

17          Then Pharmacia & Upjohn combined with a large

18   company called Monsanto and the new name of the company was

19   called Pharmacia and I was the CEO of that company and that

20   went from 2000 to 2003, at which point there was a merger with

21   Pfizer and I went on to become chief executive officer of a

22   different company.

23   Q    And what company was that?

24   A    That company was called Schering-Plough and I became the

25   I chief executive officer of Schering-Plough in 2003.

1   Q     And the companies that you referred to, Pharmacia,

2   Pharmacia & Upjohn, Monsanto, Schering-Plough, what kind of

3   companies are these?

4   A     These are very large companies that typically operate in

5   65 countries around the world.  They spend a lot of money in

6   basic research and in translational and development research

7   to take that science and bring it into a drug that can be of

8   use to the patients and they also have commercial operations

9   in all of these countries.  They are very large operations.

10  Q     And how long were you the CEO of Schering-Plough?

11  A     I was the CEO of Schering-Plough for about six and a half

12  years, from April '03 until '09; late, late '09.

13  Q     And what was your next position?

14  A     So in late '09, after the merger with Merck,

15  Schering-Plough merged with Merck, I joined a private equity

16  firm Warburg Pinkus as a senior advisor and subsequently I

17  went on to become the chairman of their largest portfolio

18  company, Bausch & Lomb.  About a year after I joined this

19  company, they invited me to join them as a partner.

20  Q     And what is Warburg Pincus?  You referred to it as a

21  private equity firm.  What is that?

22  A     So private equity companies primarily build up big funds

23  which are funds coming from pension funds or sovereign wealth

24  funds or individuals, just big funds, and they use these funds

25  to invest in businesses and to also help the management teams

F. Hassan - direct - Kasulis                    1290

1    with these businesses.

2            And then typically five to ten years out, they would

3    return the money on the investors.  Hopefully more money than

4    what the investors put in.

5    Q    And as part of your employment with Warburg Pinkus, you

6    said that you were chairman of Bausch & Lomb; is that correct?

7    A    Yes.  So Warburg Pincus had taken Bausch & Lomb private

8    after it faced severe problems as a public company and they

9    needed some help and they asked me to become the chairman of

10   this company.

11   Q    And what were your responsibilities in that role?

12   A    Primarily I was successful in attracting a very good

13   colleague who had worked with me at Schering-Plough before

14   called Brent Saunders.  He became the chief executive officer.

15           My responsibility there was to primarily be the

16   chairman of the board of directors and also, on a personal

17   basis, to be of some help to Brent as he tried to improve the

18   operations at Bausch & Lomb.

19   Q    And for how long were you the chairman of Bausch & Lomb?

20   A    From March 2010 until August 2013 when there was a sale

21   of Bausch & Lomb to Valeant.

22   Q    And then what did you do after there was the sale of

23   Bausch & Lomb to Valeant?

24   A    I remained with Warburg Pincus.  Warburg Pincus is a

25   large private equity firm and we typically have over 100

F. Hassan - direct - Kasulis                    1291

1    companies in our portfolio and we typically look at many, many

2    companies to invest in every year.  So I've had a pretty busy

3    life there since then looking at different companies,

4    investing in companies, being on the board of certain

5    companies, just quite a busy life.

6    Q    And you said that about being on the board of certain

7    companies.  Currently which companies are you on the board of?

8    A    The two portfolio companies that I'm on the board of

9    right now for Warburg -- is it Warburg Pincus or outside

10   companies, outside Warburg Pincus.  I just wanted to clarify.

11   Q    Thank you.  Outside of Warburg Pincus.

12   A    Thank you.  I am on the board of directors of three

13   companies at this time; Time Warner here in New York City,

14   Intrexon a company in Palm Beach, Florida -- in west Palm

15   Beach, Florida and also Amgen, a biotechnology company in

16   California.

17   Q    Are you involved with any charity organizations?

18   A    Yes.  I have quite an active role there.

19   Q    And can you please explain your involvement with charity

20   organizations?

21   A    I try to be helpful wherever I can.  I'm trying to give

22   back as much as I can.  Perhaps the most physical charity

23   organization is something that I founded in 1997 called

24   Community Hope.  We raise a lot of money every year in New

25   Jersey.  It's primarily for the benefit of veterans and also

F. Hassan - direct - Kasulis                1292

1   other people with mental illness.

2          It's now become a pretty large nonprofit thing in

3   New Jersey and every year there's a big fundraiser.  It just

4   gets bigger and bigger every year.  So that's something I'm

5   very proud of.

6          I also am -- until recently I was on the board of

7   American Institute of Stuttering here in New York City.  I'm a

8   stutterer myself, so I sponsored that.  They try to help

9   stutterers deal with very difficult situations and I'm also

10  supporting an autism charity in Florida.

11  Q    Thank you.  Have you authored any books or publications?

12  A    I have been in many business books, primarily Harvard

13  Business Review.  I authored a very good article -- well, my

14  opinion a good article in 2011 called The Frontline Advantage

15  and then also a book in 2013 called Reinventing Leaders, A

16  Playbook For Serial Success.

17  Q    Have you heard of a fund called Dynagrow Capital?

18  A    Yes.

19  Q    What is Dynagrow Capital?

20  A    This was a family fund that my wife and I put together so

21  our daughter Sarah could be the manager of this fund.  She had

22  come out of school and we did believe very strongly in her and

23  her abilities and we put this fund together for her to manage.

24  Q    And what is your role in Dynagrow Capital?

25  A    As a passive investor.  We wanted to give Sarah the

F. Hassan - direct - Kasulis                    1293

1  breadth of being able to do what a fund manager needs to do.

2  Q    And what if any control do you exercise as far as

3  investing decisions of Dynagrow Capital?

4  A    There are no formal controls, but Sarah is welcome to

5  always ask me about an opinion about a portfolio company or a

6  possible investment that she might be making but there are no

7  formal controls.

8  Q    And who ultimately makes the decisions with respect to

9  how Dynagrow capital's funds are invested?

10 A    Sarah.

11 Q    When was Dynagrow Capital founded?

12 A    It was -- my recollection is around 2010.  This is

13 shortly after Sarah came out of school, MBA and we thought

14 this would be a very good way for her to get going.

15 Q    And in the 2010/2011 time period how much -- what was the

16 assets under management for Dynagrow Capital?

17 A    My recollection is they vary between 10 and $20 million

18 which was about 20 percent of our net worth.

19 Q    Do you know an individual named Martin Shkreli?

20 A    Yes.

21 Q    How do you know him?

22 A    He was introduced to me via Sarah through a meeting in a

23 large networking event that occurs in our industry every year,

24 every January.  I got to meet him there the first time.

25 Q    Had you heard of Martin Shkreli prior to meeting him?

1    A    I believe I might have.  I believe I did hear about him,

2    I don't know exactly when, from my Schering-Plough colleagues

3    especially Brent Saunders as being a very good person to

4    invest in.

5    Q    And who is Brent Saunders?

6    A    Brent Saunders is the person I mentioned earlier on who I

7    brought in to be the CEO of Bausch & Lomb.  He's been my

8    colleague since 2003.  I hired him into Schering-Plough to run

9    our compliance function which was a new function we created.

10   Because at that time Schering-Plough was facing severe

11   problems with various authorities and also with various other

12   matters related to just good business practices.  So we

13   brought in a new person to help us change that and that was

14   Brent Saunders and he worked with me for a long time after

15   that.

16   Q    Have you heard of an individual named Ken Banta?

17   A    Yes.

18   Q    And who is he?

19   A    He was somebody working at Pharmacia and Upjohn in 1997

20   when I went there as chief executive officer.  The job was

21   strategic communication.

22   Q    When you say "strategic communications" what do you mean

23   by that?

24   A    This was a function that existed at Pharmacia & Upjohn in

25   reporting to the chief financial officer of Pharmacia & Upjohn

F. Hassan - direct - Kasulis                1295

1   at that time.  It had been put in there before I got there and

2   it was essentially doing project work around communications

3   and Ken Banta is very good at that.  He's a very good

4   communicator.

5   Q    How would you describe your relationship with Mr. Banta?

6   A    Good relationship good business colleague.  He's very

7   helpful in communications matters.  I tend to have a pretty

8   large footprint in the industry and he's clearly out there

9   with many people, along with many people who worked with me.

10  Basically it's a good relationship.

11  Q    Do you consider yourself to be close to Mr. Banta?

12  A    No.  I have a very small circle of very close friends,

13  probably two dozen.  He's certainly part of my circle but a

14  much, much larger circle.

15  Q    And how often do you speak to Mr. Banta?

16  A    Rarely, but when he tries to reach me I tried to be

17  responsive, but rarely.

18  Q    Now; directing your attention back to the defendant,

19  Mr. Shkreli, when do you believe was the first time you met

20  him?

21  A    It was at J.P. Morgan conference.  This large networking

22  conference that was occurring in San Francisco in January of

23  2011.

24  Q    And how do you believe you came to meet Mr. Shkreli at

25  that conference in January 2011?

1   A     It's quite a busy conference.  About 6,000 people come to

2   this place with a lot of intense networking.

3             And it's not easy to have formal short meetings with

4   lots of people, but in this case Sarah reached out to me and I

5   juggled my calendar and did have a short meeting with

6   Mr. Shkreli while I was there.

7   Q     And let's talk a little bit about the conference itself.

8   How often does the conference occur?

9   A     This occurs once a year.

10  Q     And can you describe what the conference is about?

11  A     It's many different things happen.  Many different groups

12  in the healthcare ecosystem go there for different reasons.

13  We have the CEOs of the large companies that come and present

14  about the company's future, to analysts in the brokerage

15  houses who might be there, or investors as well who might be

16  there.

17            Also there may be a lot of other networking going on

18  between suppliers to the industry who use that as an

19  opportunity to get to meet a lot of people, consultants,

20  headhunters, lots of people would show up there.

21  Q     And for how long have you been attending the J.P. Morgan

22  healthcare conference?

23  A     Since January 2010.

24  Q     And so when you met Mr. Shkreli in January 2011 at the

25  J.P. Morgan healthcare conference, that was the second time

F. Hassan - direct - Kasulis                    1297

1  you had attended that conference?

2  A     That is correct.

3  Q     Have you attended that conference every year since that

4  time?

5  A     Yes.

6  Q     And on average how many people do you meet at the J.P.

7  Morgan healthcare conference in a given year?

8  A     Typically about 100, maybe 150.  Every time -- I do have

9  a large footprint and also it's a very efficient way to meet a

10 lot of people so one does get to meet quite a few people when

11 one is there.

12 Q     Now you had mentioned that Sarah had asked you to meet

13 with Mr. Shkreli?

14 A     Yes.

15 Q     At the J.P. Morgan healthcare conference in January of

16 2011.

17        Why did you agree to meet with Mr. Shkreli?

18 A     I already heard he was a good person to invest in, but

19 that aside, Sarah asked me to do it and I did it as a favor to

20 my daughter.

21 Q     And how old was your daughter at the time, do you recall?

22 A     I'm trying to do some math here.  Probably 20 or 21.  I'm

23 totally wrong on the math.

24 Q     And you did in fact meet with Mr. Shkreli; is that right,

25 at that conference?

F. Hassan - direct - Kasulis                1298

1   A     Yes.

2   Q     And where did you meet him?

3   A     I don't remember exactly where, but typically people

4   would meet in a public place or in the room that is set aside

5   for these meet and greet meetings which could be in many

6   different places in San Francisco.  I don't remember exactly

7   where I met him.

8   Q     And for how long did you meet with Mr. Shkreli?

9   A     About 20 to 30 minutes.

10  Q     And what was your understanding as to the nature of

11  Mr. Shkreli's relationship with your daughter, Sarah Hassan at

12  the time that you first met Mr. Shkreli?

13  A     I didn't know exactly what was the context of that

14  relationship but she asked me to meet him and I met him so

15  I -- I don't know what was going on at that time.

16  Q     And why did you meet Mr. Shkreli for only approximately

17  20 to 30 minutes?

18  A     Typically that's a meet and greet time that one does to

19  keep it very -- very -- it's a long ways to get to San

20  Francisco so one tries to be careful not to make it too short

21  but one typically tends to have half hour slots in the

22  calendar for these meet-and-greet-type meetings.

23  Q     And was anyone else at the meeting between yourself and

24  Mr. Shkreli?

25  A     Not that I remember.

F. Hassan - direct - Kasulis                    1299

1    Q    And at that meeting, what do you recall discussing with

2    Mr. Shkreli?

3    A    I don't remember the contents.  I know it was a pleasant

4    experience.  He was a pleasant person.  Very respectful.  A

5    little intimidated by me.  Just a little -- just very

6    respectful, a pleasant person.  He seems to be very much a

7    homework kind of person.  He had done his homework about me

8    and very analytical kind of person.

9    Q    What, if anything, did you discuss about Martin Shkreli's

10   businesses at the time?

11   A    I don't remember what we discussed.

12   Q    Did you exchange contact information with Mr. Shkreli

13   during that meeting?

14   A    Tax?

15   Q    Contact information.

16   A    I'm sorry, I'm trying to understand what you said.

17   Q    Did you exchange any sort of contact information?

18   A    Oh, contact information, no, no, no.

19   Q    And after you met with Mr. Shkreli in January of 2011,

20   did you ever see him again?

21   A    I don't remember.

22   Q    Now after you met Mr. Shkreli in January of 2011, did you

23   come to have an understanding of Sarah's relationship with

24   Martin Shkreli in the 2011/2017 time period?

25   A    At some point she did tell me that she had invested in

F. Hassan - direct - Kasulis                    1300

1   the company that he was running.

2   Q     And do you know the name of that company?

3   A     Retrophin.

4   Q     And what role, if any, did you play in Retrophin?

5   A     Very little.

6   Q     What do you mean by "very little"?

7   A     I didn't know the product.  I didn't know the mission of

8   the company.  I mispronounced the name a few times.  Until

9   recently I used to call it something else so I wasn't that

10  close to it.

11  Q     And when you say you weren't that close to it, were you

12  close to it at all?

13  A     I wasn't close to it at all.

14  Q     What was your -- you had mentioned Brent Saunders.  Do

15  you know if Brent Saunders had any role in Retrophin?

16  A     No.

17  Q     Now, as an employee of Warburg Pincus, what if any

18  limitations are there in you making investments in companies?

19  A     Warburg is a very cautious firm and they have very strict

20  compliance procedures for partners to go through before

21  investments can be made and they often make sure that if a

22  possible investment is being made that there are no conflicts

23  with the firm; that the company that is being invested in is

24  not on a special status where there might be a conflict or

25  also that the company that one is investing in not be

F. Hassan - direct - Kasulis                1301

1   conflicting with a possible investment that Warburg itself

2   might wish to make so they do go through a lot of these checks

3   before an employee or a partner can make an investment.

4   Q    So is it important for you to understand which companies

5   you are in fact invested in?

6   A    I do my best.  In this case, Sarah was able to

7   communicate directly with whichever compliance person was

8   involved and got those clearances.

9   Q    And the clearances were with respect to Dynagrow's

10  investment in receipt phene; is that correct?

11  A    That's my understanding, yes.

12  Q    Did you ever personally invest your money with Martin

13  Shkreli?

14  A    No, I didn't.

15  Q    Do you know if Sarah, your daughter, ever invested her

16  own money with Martin Shkreli?

17  A    At some point in time I learned she had invested money in

18  the previous hedge fund that he had.

19  Q    Do you know the name of that hedge fund?

20  A    MSMB Capital.

21  Q    Do you recall ever speaking to Martin Shkreli on the

22  phone, sir?

23  A    No, I don't.

24  Q    Can you describe your relationship with Martin Shkreli in

25  the 2011/2012 time period?

F. Hassan - direct - Kasulis                    1302

1   A     Probably cordial and encouraging, but beyond that there

2   was no personal contact as to the best of my knowledge.

3   Q     Did you see yourself as a mentor to Martin Shkreli during

4   that time period?

5   A     No.

6   Q     Did you serve as a reference for him during that time

7   period?

8   A     No.

9   Q     Did you serve as an advisor to Martin Shkreli with

10  respect to any of his businesses in the 2011/2012 time period?

11  A     No.

12  Q     Or any time period?

13  A     No.

14              (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

F. Hassan - direct - Kasulis                    1303

1   DIRECT EXAMINATION (continuing)

2   BY MS. KASULIS:

3   Q    What, if any, agreements did you have with Martin Shkreli

4   about his use of your name in connection with any of his

5   businesses?

6   A    There was no agreement.

7   Q    Did you periodically receive e-mail communication from

8   Martin Shkreli in the 2011, 2012 time period?

9   A    I didn't read all of my e-mails, but it is entirely

10  possible that he might have included my name on some e-mails.

11  I don't remember them very well.

12  Q    Do you have an understanding as to why Mr. Shkreli would

13  be e-mailing you?

14  A    He knew a lot of my former colleagues, so it is possible

15  in one ever those e-mails he might have put my name in there

16  too.

17  Q    Now, on average, during this time period, 2011, 2012, in

18  2013, how many e-mails, on average, would you receive in a

19  given day?

20  A    A lot.  Enough that -- so many that I couldn't read them

21  all and I often used my admin to help me them, just a lot,

22  just a lot.  Dozens.

23  Q    When you say your admin, who are you referring to?

24  A    I had different admins at different times during that

25  time period.  I had an admin called Johannah.

F. Hassan - direct - Kasulis                1304

1    Q    Who was her last name?

2    A    Olsher, O-L-S-H-E-R.

3    Q    Any other admin individuals who worked for you that you

4    recall?

5    A    Johannah Olsher was followed by another admin called

6    Debbie Noel, N-O-E-L.

7    Q    And did you ever respond to any of Mr. Shkreli's e-mails?

8    A    I believe I responded to one e-mail that he sent to me,

9    which was a congratulatory note regarding an article that came

10   in the *New York Times* where I was interviewed in the Sunday

11   business section.

12   Q    Why did you respond to him at that time?

13   A    I have a tendency to respond to e-mails where it is a

14   little bit more personal kind of a thing of that type, just to

15   turn that thing around within 48 hours, and I typically send

16   some kind of acknowledgment to let them know that I read the

17   e-mail.

18   Q    Is it possible when you responded to Mr. Shkreli in the

19   same sorts of e-mails that he had sent you in 2011, 2012 time

20   period?

21   A    Very possible.  By nature I don't like to see e-mails not

22   be acknowledged.  I do try to turn around and send them.  I am

23   not always there with that target, but I try to turn them

24   around.

25   Q    I am showing what has been marked and it is tab 1 in your

F. Hassan - direct - Kasulis                    1305

1  binder, sir, in front of you.  It has been marked for

2  identification as Government Exhibit 103-18.  It is in the

3  binder in front of you.

4  A    Okay.

5  Q    Do you recognize this e-mail, Mr. Hassan?

6  A    No.

7  Q    Does this e-mail include your e-mail address?

8  A    Yes.  My caretgroup address.

9         MR. BRAFMAN:  Your Honor, I have no objection if you

10  would like to offer it.

11        THE COURT:  Did you want to offer it, ma'am?

12        MS. KASULIS:  Yes, Your Honor.  The Government

13  Exhibit moves 103-18 into evidence.

14        THE COURT:  We will admit that exhibit without

15  objection.

16        (Government's Exhibit 103-18 was received in

17  evidence.)

18  Q    Mr. Hassan, I know you have been coughing a little bit.

19  Do you have water there available for you?

20        THE COURT:  He has water.  There is plenty more.

21        THE WITNESS:  Thank you.

22        MS. KASULIS:  No problem.

23  A    Yeah.  So I do not recognize this e-mail.

24  Q    Do you not recognize it or do you not recall the e-mail?

25  A    I don't recall the e-mail.  This e-mail must have

F. Hassan - direct - Kasulis                    1306

1   happened.  I don't recall it.

2   Q    So it appears at the bottom of the e-mail, it looks to be

3   an e-mail from Mr. Shkreli to himself, which appears to be

4   some sort of a group entitled Retrophin (RTX) completes

5   reverse merger.  It appears then that you respond to him on

6   Thursday, December 20, 2012.  Is that your e-mail address,

7   sir, fred.hassan@caretgroup.com?

8   A    Yes, it is one of my addresses.

9   Q    Do you believe that you did, in fact, write this e-mail,

10  sir?

11  A    I either wrote it or it's the kind of e-mail that I very

12  quickly send when I get news of this type.

13  Q    So you don't recall specifically sending this e-mail --

14  A    No.

15  Q    -- is that right?

16  A    No.

17  Q    And in the e-mail, it's written, "Martin, I wish you

18  success.  Happy holidays, Fred."

19  A    Yes.

20  Q    In response, Mr. Shkreli writes, "Thanks, and happy

21  holidays" at the top of the e-mail chain.  Is this the typical

22  e-mail that you would typically write in response to these

23  sorts of e-mails from individuals?

24  A    If I knew the individual better, I might add a few other

25  things in there, but in this case this was a standard way of

F. Hassan - direct - Kasulis                1307

1  encouraging somebody, but saying thank you for sending me this
2  e-mail and saying happy holidays.
3  Q    So you don't recall this e-mail exchange?
4  A    No, I don't.
5  Q    Now, is your reputation in the healthcare important to
6  you?
7  A    Yes.
8  Q    Why is that?
9  A    Because I worked so hard year after year trying to build
10 it.  It's just something that's very dear to me, very
11 important to me.
12 Q    And have you ever heard of a company called SeraCare?
13 A    No.
14       MS. KASULIS:  Your Honor, I have no further
15 questions at this time.
16       MR. BRAFMAN:  Your Honor, I just need two minutes
17 before I proceed on a personal nature.
18       THE COURT:  All right.  Of course.  Would you rather
19 take the lunch break first or --
20       MR. BRAFMAN:  It is up to you.  We are not going to
21 finish before the lunch, so we may as well give the jury lunch
22 now.
23       THE COURT:  How much cross do you have?
24       MR. BRAFMAN:  I think about 45 minutes to an hour.
25       THE COURT:  Well, how are the jurors doing?  Would

1308

1    you like to take a quick break?  Why don't we take a lunch

2    break then.

3              Would you mind please coming back to the jury room

4    no later than 1:15.  It is a little less than an hour.  We

5    will proceed at that time.  Please leave your notebooks on the

6    chair face down.

7              Please don't talk about the case with anyone and

8    please don't read any social media or talk to anyone about

9    this case.  Thank you.

10             (Jury exits the courtroom.)

11             THE COURT:  Mr. Hassan, you may step down and have a

12   break.

13             (Lunch recess.)

14

15

16

17

18

19

20

21

22

23

24

25

1309

```
 1                      AFTERNOON SESSION

 2              (In open court; jury not present.)

 3              THE COURT:  Counsel, we had a juror complain that

 4    when the document goes up on the screen, it is very small and

 5    they can't read the whole document, and then when it is blown

 6    up, the document seems to disappears off the screen.

 7              Do you have a way to adjust that so it can be read

 8    by the jurors once it is in evidence?  It is probably a

 9    technical thing, but is that something that you could help

10    with?

11              MS. SMITH:  Your Honor, we can talk to the Court,

12    the IT, and see if there is any way for them to blow up even

13    more.  I mean, what we are trying to have Ms. Balbin do is

14    highlight the portions we are discussing and make those big

15    enough to see, and I understand when you do that, you can't

16    see the rest of the document.  So we can try to scroll, maybe,

17    rather than focus on one area.

18              THE COURT:  All right.  Thank you.

19              (Jury enters the courtroom.)

20              THE COURT:  We have all jurors present.  Please have

21    a seat, ladies and gentleman.

22              Mr. Brafman, you may begin your cross.

23              Sir, you are still under oath.

24    CROSS EXAMINATION

25    BY MR. BRAFMAN:
```

F. Hassan - cross - Brafman                    1310

1    Q    Good afternoon, Mr. Hassan.

2    A    Good afternoon.

3    Q    My name is Benjamin Brafman.  I represent Mr. Shkreli.

4    You and I have never met, sir; is that correct?

5    A    That is correct.

6    Q    Are you really seventy-one?

7    A    That is correct.

8    Q    You look great.

9    A    Thank you, sir.

10   Q    While we have never had the pleasure of meeting, I did

11   have the pleasure of meeting your daughter Sarah yesterday and

12   questioned her, and I just have a few questions of you, sir,

13   and I will try to be brief.

14           You said, on cross-examination, that you heard of

15   Martin Shkreli in 2010 or you met him for the first time in

16   2010?

17   A    I met him for the first time in 2011 at the JP Morgan

18   conference.  I heard about him in late 2010 from my friends at

19   Schering-Plough, especially Brent Saunders.

20   Q    Okay.  And would it be a fair statement, sir, that the

21   things that you heard about Martin Shkreli from Brent Saunders

22   could be described as glowing?

23   A    Positive, good fund manager.  Good return.

24   Q    A very smart guy?

25   A    Smart guy.  Hard worker.

F. Hassan - cross - Brafman                  1311

1  Q    Did Brent Saunders also tell you, sir, that he had

2  personally made a lot of money with Martin Shkreli's

3  investments?

4  A    He did tell me that he had invested in him and that he

5  had done well.

6  Q    Thank you.  Now, I think you explained at the beginning

7  that I think you used the word "large footprint" in the

8  pharmaceutical industry, and I know people don't like to say

9  things about themselves, but you are pretty much a legend in

10 the pharmaceutical industry; would that be a fair

11 characterization?

12 A    I think we need to be careful how we describe me.  I'm

13 very hard working, humble kind of guy.

14 Q    I get it, but everybody in the pharmaceutical industry

15 sort of knows the name Fred Hassan as the leader of the

16 industry; would that be a fair statement?

17 A    I've been in the industry a long time and I worked in a

18 few companies, so I have gotten to know lots of people, and I

19 remained engaged even beyond the age of 65.  So, yes, I am

20 quite well-known in the industry.

21 Q    And people have profiled you in very positive ways in

22 leading pharmaceutical periodicals?

23 A    I do get profiled, yes, sir.

24 Q    And you have also authored books and articles yourself;

25 correct, sir?

F. Hassan - cross - Brafman                    1312

1   A    Yes.

2   Q    So when you say that a young Martin Shkreli met you and

3   appeared to be a little bit intimidated, a lot of young

4   pharmaceutical entrepreneurs or investors would like to get

5   ten minutes with Fred Hassan because it is like talking to a

6   giant of the industry; would that be a fair statement?

7   A    I think the giant is a bit of an exaggeration.

8   Q    I'm not a giant either, but I'm talking not physically,

9   I'm talking leading figure in your industry?

10  A    I'm well-known in the industry and, yes, people do try to

11  see if they can approach me or get to spend time with me.  I

12  certainly try my very best to be as approachable as possible.

13  Q    Okay, so let's talk about that.  I think you mentioned

14  that, at this charity dinner, which you host and as part of

15  the philanthropy that you undertake, you believe that was the

16  first time you met Martin Shkreli?

17  A    I did not meet him at the dinner.  I heard about him

18  either at the dinner or shortly thereafter at the end of 2010,

19  but I met him in 2011, January 2011.

20  Q    And that January 2011, that was a different dinner, it

21  was the JP Morgan Health Conference; correct?

22  A    That's the networking event, a very big thing, yeah.

23  Q    It is an annual event that JP Morgan sponsors and

24  virtually anyone who is a who's who in the pharmaceutical

25  industry ends up being there at some point?

F. Hassan - cross - Brafman                1313

1   A    Many, many people do.  I didn't ever attend the event

2   until 2010, partly because there was another big thing that

3   occurs here in New York that Goldman Sachs does, but a lot of

4   people try to go there at that time because it is an

5   opportunity to meet people, not only who work inside the U.S.

6   environment, but also people from around the world.

7   Q    And I assume you must meet literally hundreds of people

8   over the years at these or other conferences, and it is

9   physically impossible to remember every person you met and

10  spoke with; is that correct?

11  A    That is correct.

12  Q    So let me see if I can refresh your recollection as to

13  the first time you may have met Martin Shkreli.  Do you recall

14  attending a Healthcare Unplugged Conference in 2005 at a hotel

15  in New York?

16  A    There was a conference called CEO's Unplugged that

17  Goldman Sachs used to host every January.  I don't know about

18  Healthcare Unplugged, but there was, yes, one.

19  Q    In 2005, do you remember -- I'll call it an incident, if

20  you will, when you got up to leave with Ken Banta and Robert

21  Bertolini, two of your business colleagues, you went into the

22  elevator, and a young nerdy kid, maybe 20, ran into the

23  elevator and was in there with the three of you for however

24  long it took to hit the lobby; do you remember that?

25  A    No recollection of that.

F. Hassan - cross - Brafman                    1314

1   Q    No recollection?

2   A    No.

3   Q    Of a young person asking you and Mr. Banta questions upon

4   question about Vytorin?

5   A    No, no recollection whatsoever.

6   Q    You are not saying it didn't happen, you just don't

7   remember?

8   A    I don't remember.

9   Q    Okay.  Do you know how Martin Shkreli came to the

10  attention of Ken Banta?

11  A    No, I don't.

12  Q    And, so, you don't know whether, in that elevator, Martin

13  Shkreli handed his card to Ken Banta?

14  A    No, I don't.

15  Q    But there came a time where it was clear to you that both

16  Brent Saunders and Ken Banta knew Martin Shkreli; is that

17  correct?

18  A    I knew about the Brent Saunders conversation with me,

19  toward the end of 2010.  The Ken Banta association, I learned

20  about later on.

21  Q    Okay.  And let's -- let me just walk you through, very

22  quickly, your very prestigious resume.  In 2003, you were at

23  Schering-Plough when you met Brent Saunders, who was then at

24  Pricewaterhouse; is that correct?

25  A    Yes.

F. Hassan - cross - Brafman                    1315

1    Q    And you took him with you, from Pricewaterhouse, and you

2    gave him a job at Schering-Plough?

3    A    Yes.

4    Q    And then Schering-Plough merged with Merck in 2009; is

5    that is correct?

6    A    Yes.

7    Q    And it was a substantial merger in the pharmaceutical

8    industry; would that be a fair statement?

9    A    Substantial merger, yes.

10   Q    And it was well-publicized; is that correct?

11   A    Yes.

12   Q    Now, among the people who were part of your team of

13   pharmaceutical colleagues, if you will, was certainly Brent

14   Saunders; is that correct?

15   A    Yes.

16   Q    And Tom Koestler, was he a part of your team?

17   A    Yes.

18   Q    And Bob Bertolini?

19   A    Yes.

20   Q    And Ken Banta?

21   A    I wouldn't put Ken Banta in the same group.  These were

22   people who had worked with me in the executive leadership team

23   for many years.  Ken Banta never reported to me directly.  And

24   also, in the leader companies I was at, he was not on the

25   company payroll.

F. Hassan - cross - Brafman                    1316

1   Q    Okay.  Now, did Ken Banta ever tell you that he had

2   developed either a personal or business relationship with

3   Martin Shkreli in or about 2005?

4   A    No.

5   Q    Did you ever know that they became personal friends, that

6   Ken Banta and his husband, Tony Powe, became very close

7   friends?

8   A    No, I was never aware of that.

9   Q    You had no knowledge of it whatsoever?

10  A    No.

11  Q    Now, at Schering, Schering also merged with a company

12  called Oreganon; is that correct?

13  A    Yes, Organon.

14  Q    Organon, I'm sorry.  And they were developing a fairly

15  valuable cancer drug at the time; is that correct?

16  A    At that time it wasn't very visible, but it was in the

17  portfolio.  It became more visible after the merger with

18  Merck.  It has become a very valuable asset now.

19  Q    Was Ken Banta one of the leading figures in that merger,

20  if you recall?

21  A    He participated along with many others; however, he was

22  not part of the executive team, so.

23  Q    What was his job, if you will, at that time?

24  A    He is helping with communications as an independent

25  contractor and reporting to someone else other than me.

F. Hassan - cross - Brafman                1317

1    Q    Did you have any knowledge of the fact that Ken Banta, in

2    2006, had invested $250,000 in Elea Capital, a hedge fund that

3    Martin Shkreli was running at that time?

4    A    I'm not aware of that.

5    Q    In 2008, when Schering sold the company to Merck, it was

6    probation a $60 billion merger; is that correct?

7    A    People have different estimates.  Some call it a $41

8    billion merger, some call it a $52 billion dollar merger.  It

9    really depended on what the stock ended up at on the day of

10   the closing.  It was closer to $52 billion in '09.

11   Q    And one of the things that you have learned over the

12   years in the pharmaceutical industry is that the valuation, if

13   you will, of a company may vary from time to time, and when

14   the valuations are made, they may be made in good faith, but

15   they still could change?

16   A    Yes.  Valuations change all the time.

17   Q    Did Brent Saunders ever tell you --  withdrawn.

18        Brent Saunders is one of your closest business

19   colleagues?

20   A    He is very close to me, but I have many other close

21   business colleagues, but he's definitely in my close circle.

22   Q    I'm not suggesting he is exclusively your colleague, but

23   he is a prominent person in your inner circle?

24   A    Yes.

25   Q    And Bob Bertolini, is he a prominent person in your inner

F. Hassan - cross - Brafman                1318

1    circle?

2    A    Yes.

3    Q    Did Brent Saunders and Bob Bertolini ever tell you that

4    there came a time where, after a meeting in New Jersey, they

5    were talking to Martin Shkreli about the three of them

6    starting a private equity fund?

7    A    I was not aware of that.

8    Q    Never?

9    A    No.

10   Q    Okay.  Now, at the same time of the merger, you joined

11   Warburg Pincus shortly thereafter; is that correct?

12   A    Yes, sir.

13   Q    And Warburg Pincus was a private equity fund?

14   A    Yes.

15   Q    Does the amount that they have under management vary from

16   time to time depending on the asset?

17   A    Yes.

18   Q    So it would not be possible for you to sit there and say,

19   on June 21st, the amount under management was X without doing

20   a lot of checking; right?

21   A    I'm sorry, I didn't clearly understand you.

22   Q    It is a badly formed question.

23        The valuation of a private company can change from

24   time to time?

25   A    Yes.

F. Hassan - cross - Brafman                    1319

1    Q    And even Warburg Pincus, which is a very prominent, very

2    well-respected fund, if I were to ask you today what was their

3    valuation of assets under management in 2012, you would need

4    to do a lot of checking without offering an answer off the top

5    of your head; would that be a fair statement?

6    A    Yes.  Well, in this case, they were a large company so

7    they themselves would publish the valuations and those would

8    be accessible to many investors, and these were pretty

9    reliable ways of making the valuations for large companies.

10   There are methods of evaluating private operations, like

11   Warburg and others, yes.  But -- so I would not need to do

12   independent checking, I could rely on the number that would be

13   published.

14   Q    Approximately, Warburg Pincus manages at different times

15   as much as $40 billion, with a B?

16   A    Yes.

17   Q    So it is considered -- I don't want to be repetitive, but

18   it is considered a large private equity fund?

19   A    It is among one of the larger ones, yes.

20   Q    How many people are either associated with Warburg Pincus

21   or employed by Warburg Pincus?

22   A    I don't know the total head count.

23   Q    Hundreds?

24   A    Hundreds, yes.

25   Q    Where is it headquartered?

F. Hassan - cross - Brafman                1320

1    A    In New York City.

2    Q    Where were the pharmaceutical companies that you

3    mentioned earlier, was any one of them located in Kenilworth,

4    New Jersey?

5    A    Yes, that was Schering-Plough.

6    Q    Now, you don't have any knowledge of a meeting in

7    Kenilworth, New Jersey, between Bob Bertolini, Ken Banta and

8    Martin Shkreli concerning Martin providing them with stock

9    tips?

10   A    I'm not aware of that meeting.

11   Q    Do you know if Brent Saunders ever used Martin Shkreli's

12   stock tips to make money?

13   A    I'm not aware of that.

14   Q    When you testified earlier, sir, about the fact that

15   Brent Saunders told you that he had done very well as a result

16   of his relationship with Martin Shkreli, what did you

17   understand that to mean?

18   A    I understood that to mean that he had invested in Martin

19   Shkreli's fund and the returns on his investment were quite

20   good.

21   Q    Did you ever ask him the name of the fund?

22   A    No, I did not.

23   Q    Now, do you know whether or not Brent Saunders uses an

24   individual named William Thrush, at Merrill Lynch, to do his

25   trading?

F. Hassan - cross - Brafman                    1321

1   A    I was not aware of that.

2   Q    Now, I'm going to ask you whether you know a couple of

3   different companies, or know whether or not Mr. Saunders

4   invested in these companies, and I will do them one at a time.

5   Okay, sir?

6   A    Yes.

7   Q    Do you know whether he ever invested in MannKind?

8   A    I was not aware of that.

9   Q    Do you know of the company?

10  A    I vaguely remember that as selling an inhaled insulin.

11  Q    Do you remember that, after Mr. Shkreli -- if you know,

12  complained to the FDA, MannKind sort of almost went out of

13  business?

14  A    I was not aware of that.

15  Q    You were aware that MannKind stock plummeted at some

16  point?

17  A    I was not aware of that.

18  Q    Do you know whether Mr. Saunders made a small fortune as

19  a result of the his investment in MannKind at the advice of

20  Martin Shkreli?

21  A    I was not aware of that.

22  Q    How often would you see Brent Saunders?

23  A    It depends on our degree of engagement.  These days, I

24  don't see him that much because he is a very busy person,

25  running a global company, but he tries to make time.  We have

1  a social relationship, my wife and I and he and his wife meet.

2  So, if he is in Florida where I live, we try to meet there,

3  but these days I don't see him that much because he is a very

4  busy person.

5  Q    In 2011, 2012, 2013, were you seeing him on a regular

6  basis?

7  A    I was seeing him more often until 2013, because he was

8  the CEO of Bausch & Lomb and I was the chairman of Bausch &

9  Lomb, but I was still residing in Florida, so I wouldn't see

10 him everyday, but I would see him more regularly at that time

11 than I see him these days.

12 Q    And I think you indicated, sir, that your wife and his

13 wife and Brent and you also enjoyed a personal relationship;

14 is that correct?

15 A    Yes, we had a good social relationship.

16 Q    A friendship, besides being business colleagues?

17 A    Yes.

18 Q    Before he mentions Martin Shkreli's name to you as

19 someone who he has done well by, he doesn't ever mention any

20 of his investments with Mr. Shkreli, sir?

21 A    The only time he brought it up at that time was in the

22 context of him investing in his fund, Martin's fund, and doing

23 well with that fund.

24 Q    When he mentioned the name, did the name Martin Shkreli

25 ring a bell to you, sir?

1  A    At that time, it did not.

2  Q    So did you say to him who is this guy?

3  A    I just heard it, listened, and that was it.  That's all I

4  remember at this stage.

5  Q    And there came a time when you had -- you knew that Brent

6  Saunders gave your daughter's contact information to Mr.

7  Shkreli; correct?

8  A    I did find that out afterward.

9  Q    Now, you trust Brent Saunders?

10  A    He is very trustworthy.

11  Q    He is someone who you have known to be a good, honest

12  family friend?

13  A    Very good, honest family friend.

14  Q    And it would be inconceivable to you, would it not, that

15  he would give your daughter's name to someone who he felt in

16  the least bit to be untrustworthy?

17  A    It is unusual -- it's not to be expected that you would

18  have him bringing a person to my daughter who he didn't think

19  was worthy, but I don't know the context in which he brought

20  Mr. Shkreli to my daughter.  It is conceivable that he was

21  seen -- Mr. Shkreli is an opportunity for Sarah to learn about

22  financial investing because she was fresh out of school.  I

23  don't know the context of the meeting.

24  Q    But since the meeting with Mr. Shkreli, did you ever talk

25  to your daughter about how she came to meet Mr. Shkreli and

1    what happened at that meeting?

2    A    She talked to me later on, in 2011, that she had met Mr.

3    Shkreli.

4    Q    And did she tell you she had met him as a result of an

5    introduction by Brent Saunders?

6    A    Yes.

7    Q    Did she tell you that she was going to personally invest

8    $300,000 in Mr. Shkreli's hedge fund?

9    A    I didn't know about the hedge fund investment, but I did

10   learn about the Retrophin investment later on in 2011.

11              (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F. Hassan - Cross - Brafman                    1325

1    (Continuing)

2    BY MR. BRAFMAN:

3    Q    I think you testified that you really have no

4    relationship with Retrophin directly either as an investor or

5    as a director; is that correct?

6    A    That is correct.

7    Q    Now, you are, however, as a practical matter, partner in

8    Dynagrow; is that correct?

9    A    I'm not a partner, I'm a passive investor.  The manager

10   is my daughter Sarah.

11   Q    And this is a private family fund that really Sarah

12   invests family money.

13   A    Yes.  It's a way for her to get started.  Eventually, she

14   wants to be doing more of this down the road, so we thought

15   we'd give her a start.

16   Q    I'm not being critical, I'm just trying to ask.

17   A    Yes.

18   Q    So, this fund, which had about 10 or 20 million dollars

19   under Sarah's control, was essentially your money and your

20   wife's money.

21   A    Essentially our money, yes.

22   Q    And at the time Sarah took over the management of the

23   fund, she had just recently got her MBA; is that correct?

24   A    That is correct.

25   Q    And that would be her first real opportunity to work as a

LAM      OCR      RPR

1   manager of a fund like that; is that correct?

2   A    Yes.

3   Q    Now, you said on direct examination that you did not

4   exercise any formal control of Dynagrow; do you recall saying

5   that?

6   A    That is correct.

7   Q    But since it was your money and since the fund manager

8   was your daughter would it be a fair statement that from time

9   to time you looked in on the fund to see what Sarah and how

10  Sarah was doing?

11  A    She would talk to us periodically about it.  We have a

12  lot of faith in her.  She had worked very hard to come through

13  college and through MBA at a young age.  She's also spent time

14  at Goldman Sachs and at Merrill Lynch and is pretty

15  sophisticated.  We just believed in her very much.

16           So, as a result we did not put in the controls that

17  many people might do.  We just trusted her.  She is a very

18  careful person, very thorough person.

19  Q    In order for her to do an investment of Dynagrow money,

20  because you are a passive partner, she would have to clear the

21  trade with the compliance people at Dynagrow to make certain

22  there were no conflicts; is that correct?

23  A    She was trying to learn the procedures.  And at that

24  time, there was an abundance of caution around these

25  compliance clearances.  So, there was a sense that wherever

F. Hassan - Cross - Brafman                1327

1   possible, get them cleared in a formal manner even if they're

2   in the gray zone, whether they be subject to compliance or

3   not.  So, the assumption was just assume that you should get

4   the clearance.

5   Q    And she tried her best to follow that procedure.

6   A    She tried her best to do that.

7   Q    And you're familiar with the e-mail traffic between Sarah

8   and the fund, for example, when she was about to invest in

9   Retrophin on behalf of the Dynagrow and she got clearance; is

10  that correct?

11  A    I believe so.

12  Q    So, did Mr. Saunders ever tell you whether or not he

13  invested in Retrophin?

14  A    No.

15  Q    You have no knowledge today whether he did or he didn't?

16  A    No knowledge.

17  Q    And how about Mr. Banta, do you know whether he invested

18  in Retrophin?

19  A    No knowledge.

20  Q    And how about Mr. Bertolini, do you know if he invested

21  in Retrophin?

22  A    No knowledge.

23  Q    Would there be a reason if Mr. Saunders had invested in

24  Retrophin to keep that information from you, that you can

25  imagine?

F. Hassan - Cross - Brafman                    1328

1   A    I think generally that would be his business and he

2   wouldn't need to share that with me.

3   Q    Now, both in 2011, 2012, there was a conference by JP

4   Morgan, sponsored by JP Morgan, in San Francisco?

5   A    So, every year there was a conference in January of every

6   year and, yes, there was one in 2012 as well in San Francisco.

7   Q    Do you know an individual named Vavek, V-A-V-E-K,

8   Ramaswamy, R-A-M-A-S-W-A-M-Y?

9   A    Yes, I know Vavek, yes.  Investor person.

10  Q    And he's a biotech giant at the age of 29; would that be

11  a fair statement?

12  A    He's a smart person and has done a very good job with his

13  small company.  I don't know where he's at right now but he's

14  a very smart person.

15  Q    How did you come to know him as a smart person?

16  A    I believe he was introduced to me by Mr. Banta.

17  Q    Now, do you know whether or not Mr. Ramaswamy is or is

18  not one of Retrophin's largest investors?

19  A    I was not aware of that.

20  Q    Now, did there come a time when your daughter Sarah asked

21  if you would set out some time to possibly meet with Martin

22  Shkreli at the conference at JP Morgan in 2011?

23  A    Yes, I was there already and I heard from Sarah that she

24  wanted me to meet Mr. Shkreli and I made the time to make it

25  happen.

LAM      OCR      RPR

F. Hassan - Cross - Brafman                    1329

1   Q    And did you do that?

2   A    Yes, sir.

3   Q    I think what you said on direct examination when

4   questioned that you did it for two reasons:  One was to

5   accommodate your daughter because she's your daughter.

6   A    Re.

7   Q    And, two, you were kind of curious to meet Martin

8   Shkreli; isn't that true?

9           MS. KASULIS:  Objection, your Honor.

10          THE COURT:  Sustained.

11  Q    Why did you agree?  You said you had two reasons for the

12  meeting.

13          What was the second reason, besides what Sarah asked

14  you?

15  A    The main reason was Sarah asked me to see him.  I was

16  aware that Mr. Saunders thought highly of his fund

17  performance.

18  Q    Now, I think you testified on direct examination that you

19  really don't remember the meeting.

20  A    No, I don't.

21  Q    You don't deny it happened?

22  A    I don't deny it happened.

23  Q    But you don't remember what was discussed?

24  A    I don't remember.

25  Q    Now, when you were at these meetings, because you're in

F. Hassan - Cross - Brafman                1330

1    such demand, is it common for your office or administrative

2    assistant, for example, Deborah Noel, to prepare a daily

3    calendar for you of where your meetings are going to be and

4    when they're going to be?

5    A    Yes, sir.

6              MR. BRAFMAN:  May I approach, your Honor?

7              THE COURT:  Yes.

8    Q    I'm showing you what's marked as Defendant's Exhibit

9    1200, a two-page document, and ask if you can look at the top

10   page and if you could look at the sheet behind it, sir.

11   A    Thank you.

12   Q    Do you recognize it, sir?

13   A    I recognize it, yes.  It looks like my calendar.

14   Q    And this is a document, a two-page document, that you

15   recognize as reminder prepared by your administrative

16   assistant about the time and place of your meetings, and then

17   attached to it is your full calendar date for January 2011; is

18   that correct?

19   A    Yes.

20   Q    And these are prepared by your office in the ordinary

21   course of business not just specifically for this meeting,

22   correct?

23   A    Yes.

24             MR. BRAFMAN:  Your Honor, I offer the document into

25   evidence.

F. Hassan - Cross - Brafman                1331

1    MS. KASULIS:  No objection.

2    THE COURT:  We will admit Defendant's Exhibit 1200

3    in evidence without objection.

4    (Defendant's Exhibit 1200 so marked.)

5    MR. BRAFMAN:  If we could put this up on the screen.

6    (Exhibit published to the jury.)

7  Q    Now, on the top of the meeting Deborah Noel, is that your

8  administrative assistant in January 2011?

9  A    She was helping me at that time.  But the administrative

10 assistant I had was Johannah Olsher.

11 Q    She was one of your employees, if you will?

12 A    Yes.

13 Q    And it's not uncommon during that period for her to

14 prepare an e-mail like this on your behalf, right?

15 A    It's not uncommon.

16 Q    The subject reads:  Meet Martin Shkreli, MSMB Capital,

17 per SH -- that I assume is Sarah Hassan -- in The Cliff Hotel

18 at the concierge desk; do you see that?

19 A    Yes.

20 Q    So, this confirms that not only was the meeting at

21 Sarah's request, but the subject of the meeting was going to

22 be MSMB Capital; is that correct?

23 A    This only says MSMB Capital.  It doesn't say that the

24 subject was MSMB Capital.

25 Q    If you look to the left, it's on the line that reads

F. Hassan - Cross - Brafman                    1332

1    "subject;" am I right?

2              On the front page.  The subject line says MSMB

3    Capital, correct?

4    A    It could be defining what he did as opposed to wanting to

5    talk to me about MSMB Capital.

6    Q    I understand.  Now let's look at the actual calendar, and

7    we'll hone in, if we can, on the 4:15 half-hour block.  It

8    says:  Meet Martin Shkreli, MSMB Capital, per Sarah Hassan,

9    telephone number, in The Cliff Hotel at the concierge desk.

10             And that relates to the half-hour meeting you had

11   with Mr. Shkreli on that date; is that correct?

12   A    That is correct.

13   Q    So, when you say you have no recollection of the

14   conversation, you're aware, are you not, that shortly before

15   this meeting, your daughter put $300,000 into MSMB Capital; do

16   you know that?

17   A    I was not aware of that.

18   Q    And when she asked you to meet Martin Shkreli for a

19   half-hour in the hotel and she identified him from MSMB

20   Capital, you did not know that your daughter had put $300,000

21   which according to her was 30 percent of her personal net

22   worth, into MSMB Capital?

23   A    I was not aware of that.

24   Q    Why did she want you to meet Martin Shkreli?

25   A    I don't know.  I assume that he was teaching her how to

F. Hassan - Cross - Brafman                1333

1    manage a portfolio.  But I was there to help her.  And I'd

2    heard about Martin, so I agreed to the meeting.

3    Q    So, you knew that Brent Saunders had done well with

4    Martin, correct?

5    A    That is correct.

6    Q    And you new that Brent Saunders had introduced Sarah to

7    Martin, correct?

8    A    Yes.

9    Q    And shortly after the introduction to Martin, she asked

10   you to meet with Martin Shkreli and the subject line is MSMB

11   Capital, correct?

12             MS. KASULIS:  Objection, your Honor.

13             THE COURT:  Sustained.

14   Q    Do you recall Mr. Shkreli explaining anything about MSMB

15   Capital to you?

16   A    No, I don't.

17   Q    No recollection whatsoever?

18   A    No recollection.

19   Q    And after the meeting, did you ever talk to Sarah

20   again -- shortly after the meeting, did you report back to

21   Sarah that you had met Mr. Shkreli?

22   A    I don't remember doing that.

23   Q    Now, look at the other items on the calendar.

24   A    Yes, sir.

25   Q    Do you remember any of those meetings?

F. Hassan - Cross - Brafman               1334

1  A    Yes, these are people I know, so I would customarily meet

2  them.  Exactly what happened inside these meetings, I don't

3  remember.

4  Q    Okay.  You can put that exhibit aside, sir.  Thank you.

5            MR. BRAFMAN:  Give me just one moment, your Honor.

6            (Pause in proceedings.)

7  Q    Now, did you ever have a telephone conversation in May of

8  2011 with Ken Banta in which you discussed with him Martin

9  Shkreli's venture?

10 A    I don't remember that.

11           MR. BRAFMAN:  I'm handing the witness Defendant's --

12 marked for identification DX 1201.

13           THE WITNESS:  Thank you.

14           MR. BRAFMAN:  You're welcome.

15 Q    Can you look at that document, sir?

16 A    Yes.

17 Q    And you recognize this document as a document that is

18 similar to the first one as an e-mail from Deborah Noel

19 reminding you about either a meeting or a conference call?

20 A    It does.  It's similar to the previous one.  It's a

21 calendar.

22 Q    And it's in the ordinary course of your business

23 operation for you to get materials like this; is that correct?

24 A    Yes.

25           MR. BRAFMAN:  Your Honor, I move it into evidence.

F. Hassan - Cross - Brafman                1335

1      MS. KASULIS:  No objection.

2      THE COURT:  We will receive Defendant's Exhibit 1201

3  into evidence without objection.

4      (Defendant's Exhibit 1201 so marked.)

5  Q   Mr. Hassan, I'm going to put it up on the screen and ask

6  you to look at it, sir, and tell me if you're able to see it

7  once I adjust it.

8      (Exhibit published to the jury.)

9  Q   Can you read it from the screen?

10 A   Yes, I can.  Do you want me to read it?

11 Q   No, I'm going to read it to you, I want to make sure you

12 can see it?

13 A   Yes, I can see it.

14 Q   This document, since it's in evidence, we can read it.

15      Subject:  9:45 a.m. call with Ken Banta,

16 585-354-0826, re Martin Shkreli's venture.  JO to place call.

17      Who is JO?

18 A   That's Johannah Olsher.  And Debbie Noel used to Johannah

19 Olsher.

20 Q   So, "JO" is your administrative assistant at the time; is

21 that correct?

22 A   That is.

23 Q   The date is 5/10/2011, and the meeting organizer is

24 listed -- meeting status, meeting organizer.  You're listed as

25 the organizer.  And the subject is to discuss with Ken Banta

F. Hassan - Cross - Brafman                    1336

1    Martin Shkreli's venture.

2             Do you know what was involved in that call?

3    A    I don't remember that call at this stage.

4    Q    Now, do you know what date your daughter actually made

5    the investment into Retrophin?

6    A    No.

7    Q    Do you know that this call is one month after the

8    Dynagrow investment?  Would you accept my representation?

9    A    Yes.

10   Q    Now, Dynagrow, although you were only a passive partner,

11   it was your money that was in there; your money and your

12   wife's money, right?

13   A    Primary -- yes, both our money and a small amount of

14   Sarah's money, all three.

15   Q    It was a family fund.

16   A    It was a family fund.

17   Q    So, what venture were you talking to Ken Banta about a

18   month after Dynagrow, your money, was some of it put unto

19   Retrophin?

20   A    I don't know.

21   Q    Isn't it true, sir, that you wanted Ken Banta to give you

22   an update about Martin Shkreli's company?

23   A    I'm not sure if I initiated this call.

24   Q    Well, it says that you are the organizer.  I don't know

25   whether that means you initiated it, but your administrative

LAM        OCR        RPR

1    assistant initiated the call.

2    A    It's quite common that people who wanted to talk to me

3    would get a time set with my administrative assistant and then

4    I would talk to them.

5    Q    I understand that.  But Ken Banta was certainly not a

6    stranger at the time, right?

7    A    He was not.  But, again, he probably would have organized

8    a call with me.

9    Q    Okay.

10   A    And I know that this is thing calls it me being the

11   organizer, but customarily he would have set this time up with

12   my assistant for me to talk to him.

13   Q    Let's give you the benefit of the doubt or let's just

14   assume Ken Banta organized the call, okay?

15   A    Yes.

16   Q    What was your understanding going into the call about

17   what Martin Shkreli's venture was that he wanted to talk to

18   you about?

19   A    I don't remember.

20   Q    But when you have a call that you're about to participate

21   in, isn't it helpful before you get on the phone to know what

22   they're going to be talking about?

23   A    It's possible that he wanted to talk to me about

24   something and he didn't want to send any advance

25   documentation.  I don't know.

F. Hassan - Cross - Brafman                1338

1    Q    And you have no recollection whatsoever about what was

2    being discussed on the call.

3    A    No.

4    Q    You don't doubt that the call took place, though,

5    correct?

6    A    I don't doubt that, no.

7    Q    Now, I think you testified that you never acted as a

8    reference for Martin Shkreli; is that correct?

9    A    That's what I said, yes.

10   Q    That word "reference" is a fairly broad word; isn't that

11   correct?

12   A    Yeah, it means somebody who would be --

13   Q    Say something nice about you, if called?

14   A    Generally, if you're applying for a job, you are a

15   reference if you say yes, this person is worth giving the job

16   to.  That's the context.

17   Q    It doesn't take on a legal meaning.  It means it's

18   social, meaning you can list someone as a reference on your

19   resume and hope that if they call you, you'll say something

20   nice about them.

21   A    That is correct.  You would assume that the reference

22   that's being given would know something about you.

23   Q    Whether or not you were ever a formal reference for

24   Mr. Shkreli, there were times when you publicly did say nice

25   things about him, both in e-mails and verbally, to other

LAM      OCR      RPR

1    people; isn't that correct?

2    A    I don't remember the public comments.  I do remember

3    encouraging him in e-mails, but I don't remember anything

4    else.

5    Q    We'll get to it in a minute.

6    A    Sure.

7    Q    Did you ever discuss with Martin Shkreli or Brent

8    Saunders or your daughter or Mr. Bertolini or Mr. Kessler the

9    potential merger of Retrophin with a company called Telik,

10   T-E-L-I-K?

11   A    I don't remember.

12   Q    Do you know what Telik is?

13   A    I don't know much about it.  The name rings a bell, but I

14   don't know much else.

15   Q    When it rings a bell, does it ring a bell as a

16   pharmaceutical company?

17   A    Yes.

18   Q    Now, did you ever have a meeting with Martin Shkreli and

19   Michael Wick, the CEO at Telik, in order to discuss the

20   possible merger of Retrophin and Telik?

21   A    I don't remember that.

22   Q    I'd like to show you what's marked for identification as

23   DX 1202, which, again, is a calendar entry.

24           MR. BRAFMAN:  I'll hand it to the witness.

25           Does your Honor have a copy?

F. Hassan - Cross - Brafman                    1340

1          THE COURT:  I do.

2          Do you want mine?  Just return it.

3          MR. BRAFMAN:  Thank you, your Honor.

4          THE COURT:  You're welcome.

5    Q    Now, the front page is, again, a cover page which bears

6    Deborah Noel's name on the top, and it appears to be similar

7    to the other calendar entries that schedule meetings; is that

8    correct?

9    A    Yes.

10   Q    Now in January of 2012, were you once again at the JP

11   Morgan health conference?

12   A    Yes.

13   Q    And the second page of the document is a copy of your

14   calendar for January 10; is that correct?

15   A    Yes.

16          MR. BRAFMAN:  I'd offer it into evidence, your

17   Honor.

18          MS. KASULIS:  No objection.

19          THE COURT:  We will accept into evidence Defense

20   Exhibit 1202 without objection.

21          (Defendant's Exhibit 1202 so marked.)

22          (Exhibit published to the jury.)

23   Q    Do you have the document, sir?

24   A    Yes, sir.

25   Q    It's also on the screen.  I hope the jurors can see it.

F. Hassan - Cross - Brafman                1341

1    So this document, the subject is, meeting with

2    Martin Shkreli and the telephone number is 646-217-2783, and

3    Michael Wick, CEO Telik, at Oak Room.

4    Is the oak room one of the meeting rooms in the

5    hotel where the JP Morgan conference was held?

6    A    Yes.

7    Q    And the time of the meeting is going to be 8:30 to 9:30;

8    correct?

9    A    Yes.

10   Q    And, again, the meeting organizer is listed as Fred

11   Hassan, and this was prepared by someone in your office,

12   correct, sir?

13   A    Yes.

14   Q    Now, the next page shows -- and I'm going to circle this

15   copy in red -- that the slot for 8:30 a.m., there is a meeting

16   scheduled with Martin Shkreli, and I assume that's the

17   telephone number for Mr. Shkreli, and the meeting is with

18   Michael Wick, CEO Telik, at Oak Room.

19   Do you recollect this meeting at all?

20   A    No.

21   Q    None whatsoever?

22   A    No.

23   Q    Now, do you know -- well, you don't know what was

24   discussed at the meeting, you don't know who participated in

25   the meeting?

1   A    No.

2   Q    Would you know if Mr. Banta or Mr. Saunders were at that

3   meeting as well?

4   A    No, I don't know who was there.

5   Q    Were Mr. Saunders and Mr. Banta at the conference with

6   you?

7   A    Yes -- no, I don't know about Mr. Banta.  Mr. Saunders

8   was there.

9   Q    And you don't know whether he was at the meeting?

10  A    At this meeting?  No idea.

11  Q    If you look at the next entry right underneath, the

12  meeting with Mr. Wick ends at 9:30 a.m. and Mr. Saunders was

13  actually one of the people presenting at the conference that

14  day, right?

15  A    Yes.

16  Q    So a half-hour after your meeting with Mr. Shkreli,

17  Mr. Saunders is actually one of the people speaking at the

18  conference.

19  A    Yes.

20  Q    But you have no recollection of meeting Mr. Wick at all?

21  A    No.

22  Q    Do you know who organized this meeting?

23  A    I don't know.

24  Q    Isn't it a fact that it was your daughter, again, who

25  asked you to set up the meeting for Mr. Shkreli?

F. Hassan - Cross - Brafman                      1343

1   A    The second meeting?

2   Q    Second meeting.

3   A    I don't remember.

4   Q    Do you remember whether -- I'm going to show you this for

5   identification only?

6           MR. BRAFMAN:  Not offering it into evidence.

7   Q    DX 1225.  Now, just looking at the document, not reading

8   from it, have you ever seen this e-mail before?

9   A    May I just see it for one second?

10  Q    Yes, sir.

11  A    Thank you.

12          (Pause in proceedings.)

13  A    No, I don't remember seeing this.

14  Q    And it doesn't refresh your recollection that the meeting

15  with Mr. Wick at the conference was going to be about a

16  potential merger between Retrophin and Telik?

17  A    No, I don't remember the meeting.

18  Q    Now, when did you learn that Sarah had invested in

19  Retrophin?

20  A    Sometime after she had done the investment she mentioned

21  that to me.

22  Q    Didn't you get a note from Brent Saunders before her

23  investment that she had been cleared by Warburg Pincus for the

24  investment?

25  A    You may want to rephrase the question because I think you

LAM      OCR      RPR

F. Hassan - Cross - Brafman                    1344

1    meant somebody else other than Brent Saunders.

2    Q    No, I'm asking you accurately.  I'm using Brent Saunders.

3            Didn't you get an e-mail from Brent Saunders in

4    April of 2011 telling you personally, through this e-mail,

5    that Sarah had been cleared to invest in Retrophin?

6    A    I don't remember that e-mail.

7    Q    Let me show you a document marked DX 1211.

8    A    This e-mail exchange occurred, yes.  I don't remember

9    this one at this time.

10   Q    But you don't deny that the e-mail was sent from Brent

11   Saunders to you and that you responded to Brent?

12   A    I don't dispute that.

13   Q    And you recognize this as an e-mail that was addressed to

14   you and then you addressed it to Brent; is that correct?

15   A    Yes.

16           MR. BRAFMAN:  Your Honor, I would offer Defendant's

17   Exhibit DX 1211.

18           MS. KASULIS:  Objection, your Honor.

19           THE COURT:  Let's briefly speak at sidebar about the

20   document DX 1211.

21

22           (Continued on next page.)

23

24

25

LAM      OCR      RPR

F. Hassan - Cross - Brafman          1345

1              (The following occurred at sidebar.)

2              MR. BRAFMAN:  Your Honor, do you have a copy of the

3    e-mail?

4              THE COURT:  Yes, I do.

5              MR. BRAFMAN:  This e-mail substantially contradicts

6    his testimony; I mean directly contradicts his testimony that

7    he learned of the investment after it was made.  It's

8    absolutely clear that he learned of it before it was made.

9    So, because it's -- the investment comes after this e-mail

10   when she's cleared by Dynagrow.

11             THE COURT:  I thought the investment was in January.

12             MR. BRAFMAN:  That's MSMB.

13             THE COURT:  This is for the Dynagrow investment.

14             MR. BRAFMAN:  Yes, ma'am.

15             So, this is clearly inconsistent with the testimony

16   he just gave in terms of when he learned of her investment.

17             THE COURT:  Okay.  I thought he was talking about

18   her personal investment.

19             MR. BRAFMAN:  I'll clear that up.  That's Retrophin.

20             But this is also something that he responds to.  And

21   it also confirms that he also knew about Brent Saunders'

22   investment.  So, under 806, this goes in as a prior

23   inconsistent statement even if it has hearsay in it.

24             THE COURT:  All right.  But I think what you need to

25   do is clarify the record about when he learned about his

F. Hassan - Cross - Brafman                 1346

1   daughter's personal investment and when he learned about

2   Dynagrow's investment and --

3          MR. BRAFMAN:  I will.  And this clearly relates to

4   Retrophin and I'm going to make it clear on the record.

5          THE COURT:  Okay.

6          MS. KASULIS:  As long as he establishes the

7   predicate.

8          THE COURT:  Because I was confused.

9          MS. KASULIS:  I was as well.

10          MR. BRAFMAN:  Thank you.

11          THE COURT:  You'll have to clarify which entity and

12   which fund is being invested, okay?

13          MR. BRAFMAN:  Yes.

14          MS. KASULIS:  And who was then investing.

15

16          (Sidebar ends.)

17          (Continued on next page.)

18

19

20

21

22

23

24

25

1   BY MR. BRAFMAN: (Continuing)

2   Q    If you could put the document down, sir, and just rely on

3   what you remember because you already testified to what you

4   remembered before I showed you the document.  I just want to

5   made absolutely clear we're all on the same page.

6   A    Sure.

7   Q    There came a time is where you learned that your daughter

8   invested in Retrophin; is that correct?

9   A    Yes.

10  Q    And I believe you testified just a few minutes ago that

11  you learned about her investment after she made the

12  investment; correct?

13  A    That's my recollection.

14  Q    After Dynagrow made the investment in Retrophin; correct?

15  A    I didn't know the name Retrophin until a lot later.

16  Q    A lot later, okay.  And you testified also that you

17  didn't know that Brent Saunders had invested in Retrophin; is

18  that correct?

19  A    At some point -- you mean in terms of in -- at that time?

20  I was not -- I don't remember that at this date.

21  Q    And with respect to Bob Bertolini, do you know if he

22  invested in Retrophin at that time in April of 2011?

23  A    I don't know.

24  Q    And how about Tom Koestler?

25  A    I don't know.

Hassan - cross - Brafman                    1348

1        MR. BRAFMAN:  Your Honor, I would offer DX 1211 in

2   evidence.

3        THE COURT:  Did you have an objection?

4        MS. KASULIS:  Your Honor, I believe he said he

5   didn't know any of that.

6        MR. BRAFMAN:  Your Honor, I think they stated their

7   objection.

8        THE COURT:  Do you want to refresh his recollection

9   with this document and see if it will help him refresh?

10  BY MR. BRAFMAN:

11  Q    Look at the document, DX 1211.

12  A    Yes, sir.

13  Q    You indicated that you recognized the document including

14  an e-mail on the bottom from Mr. Shkreli to Mr. Saunders and

15  an e-mail from Brent Saunders to Tom, Fred and Bob and then a

16  response from you to this e-mail; correct?

17  A    Yes.

18  Q    Does this e-mail refresh your recollection that you

19  learned about your daughter's investment through Dynagrow into

20  Retrophin before she actually made the investment?

21  A    No.

22  Q    And does it refresh your recollection that Mr. Saunders,

23  Bertolini and Koestler all invested in Retrophin in 2011?

24  A    I don't remember that.

25       MR. BRAFMAN:  I offer it into evidence, Your Honor.

1          THE COURT:  I'll admit Defendant's 1211 in evidence

2     over the Government's objection.

3          (Defendant's Exhibit 1211 received in evidence.)

4          THE COURT:  You may publish it.

5          MR. BRAFMAN:  Instead of circling it in red, I'm

6     going to point on the highlighted section anyway.

7          THE COURT:  That's fine.

8          (Exhibit published.)

9     Q    I'd like to go through the e-mail with you, Mr. Hassan.

10    If you can look at the copy of your screen, sir, this is

11    dated -- this is an e-mail from you, Fred Hassan, to Brent

12    Saunders, Tom Koestler, Bob Bertolini concerning Retrophin

13    subscription details.  Do you see that?

14    A    Yes.

15    Q    And we'll start from the bottom up, if we can, where you

16    have an e-mail to Brent Saunders on Tuesday, April 19th.  "An

17    individualized private placement memorandum," PPM "has to be

18    provided by myself.  Contact Martin@msmbcapital.com.  A copy

19    of the rest of the documents is provided here.  You may

20    forward your individualized PPM at your own free will."

21         Do you see that?

22    A    Yes.

23    Q    And you understand that when someone invests in a hedge

24    fund, they are generally given a private placement memorandum

25    if it's to be investing in a company startup or an IPO;

1    correct?

2    A    I know there are some documents.  PPM, I'm not that close

3    to, but yeah generally there are documents.

4    Q    Okay.  I'm going to give to you the e-mail from Brent to

5    Tom, Fred and Bob.  And Tom we've agreed is Tom Koestler;

6    correct?

7    A    Yes.

8    Q    And what is Tom Koestler's relationship to you at the

9    time?

10   A    He used to be the head of research and development at

11   Schering-Plough.

12   Q    And that's a pretty responsible position; correct?

13   A    Yes.

14   Q    And as head of research and development at

15   Schering-Plough, part of what he does is he vets new

16   companies; correct?

17   A    Yes.

18   Q    And new research?

19   A    Yes.

20   Q    Is he a doctor?

21   A    No, he's not.

22   Q    But he has scientific training and background?

23   A    Yes.

24   Q    And Bob Bertolini at the time is -- who is he to you at

25   that time?

Hassan - cross - Brafman                    1351

1    A    He used to be the chief financial officer of

2    Schering-Plough.

3    Q    And Fred Hassan is you and you are chairman of the board;

4    correct?

5    A    Of Schering-Plough I was the CEO also, yeah, the chief

6    executive officer.

7    Q    And who was Brent Saunders?

8    A    Brent Saunders did different jobs at Schering-Plough, but

9    his last job was running the consumer healthcare business.

10   Q    So the four people who are either writing the e-mail or

11   getting the e-mail are pretty heavy-duty executives in the

12   healthcare industry, correct, at that time?

13   A    At that time they were not in any particular large

14   company, but they were quite knowledgeable about the business,

15   yes.

16   Q    And the e-mail reads as follows:  "Dear Tom," who is

17   Bertolini, Fred who is you -- sorry.  Tom is Koestler, Fred is

18   you, Bob is Bertolini and the e-mail reads as follows:  "I am

19   writing to provide details regarding the investment in

20   Retrophin which is working on a treatment for muscular

21   dystrophy.  This is a high-risk investment.  However, I

22   believe Tom, Bob and I are all in agreement that it is a good

23   investment from both a business perspective and our ability to

24   help fund a treatment for this horrible disease.  If you all

25   agree, I need to provide you contact information to Martin's

SN        OCR        RPR

Hassan - cross - Brafman                    1352

1   lawyer so he can create a specific subscription document for

2   you.  Below are the versions for me.  I plan to invest

3   $200,000.  We have the option of putting it anywhere from zero

4   dollars to $250,000 each.  Please confirm that you are okay

5   with me sending your e-mail to Martin."

6             Did I read it correctly?

7   A    Yes.

8   Q    And it's signed "Brent" who you understood to be Brent

9   Saunders?

10  A    Yes.

11  Q    And then you write back.  You write back at the top the

12  first section, "Dear Brent:  Bess has cleared the investment

13  in the muscular dystrophy project.  Sarah will be proceeding

14  with it early next week."  Signed "Fred."

15            Does that mean that Bess is a compliance person at

16  Dynagrow?

17  A    No, Bess was the person at Warburg Pincus and she would

18  ordinarily have to be okay with this.  So if I'm

19  reconstructing all of this, Sarah may have tried to clear this

20  project with Bess and then at some point informed me to answer

21  Brent in this manner.

22  Q    Okay.  Just so -- I think I misspoke, Bess works for

23  Warburg Pincus not Dynagrow; correct?

24  A    For Warburg Pincus, yes.

25  Q    And Warburg Pincus has a compliance department which

Hassan - cross - Brafman                    1353

1    reviews investments from you or Dynagrow, since you're a

2    passive investor, to make certain there are no conflicts;

3    correct?

4    A     Yes.   Rather than saying compliance department I would

5    say compliance procedure.

6    Q     Okay.   So the compliance procedure means when a new

7    investment is contemplated, someone at Warburg Pincus needs to

8    look at the investment; correct?

9    A     Yes.

10   Q     Understand the nature of the investment?

11   A     Yes.

12   Q     Understand who the people are who are going to be

13   investing?

14   A     Yes.

15   Q     To determine whether or not there is any conflict with

16   anything that Warburg Pincus might be doing either of a

17   similar nature or a conflicting nature; correct?

18   A     Yes.

19   Q     Because if Retrophin was going to be a competing company

20   with a company Warburg Pincus, for example, was in

21   underwriting, you would maybe have a conflict investing in the

22   competition; correct?

23   A     Yes, yes.

24   Q     And that's why it was very important for someone at

25   Warburg Pincus to review these investments?

1  A    Yes, it was a clearance that Sarah felt -- I'm speaking

2  for Sarah.  She was here yesterday, but I'm assuming she

3  wanted this clearance.

4  Q    I'm not being critical.  I think it's a good thing to do.

5  Does this in any way refresh your recollection that all of the

6  chief people around you, and when I say "the chief people" a

7  lot of the major executives that traveled with you from

8  company to company are agreeing that this is a good investment

9  from a business perspective and it may also help fund

10 treatment for a horrible disease?

11              MS. KASULIS:  Objection.

12              THE COURT:  Sustained.

13              Will you rephrase, Mr. Brafman?

14              MR. BRAFMAN:  Yes.

15 BY MR. BRAFMAN:

16 Q    Does this refresh your recollection that Brent Saunders

17 whom you've known for years as an important business colleague

18 has already invested in this company or going to?

19 A    I don't remember the details of this note, but at that

20 time, I was aware that my former colleagues in Schering-Plough

21 were quite high on Mr. Shkreli in general.

22 Q    And quite high, according to this e-mail, on this new

23 company?

24 A    I don't know the details of this company at that time.

25 Q    But it clearly says that, does it not?

Hassan - cross - Brafman                    1355

1    A    That's what the e-mail says, yes.

2    Q    And your response isn't anything about the quality of the

3    investment.  You just confirmed that someone at Warburg Pincus

4    has cleared the investment; correct?

5    A    Yes.  So if I were to reconstruct this, this is a way to

6    say that there is no need to send me anymore e-mails on this,

7    essentially.

8    Q    Okay.  That -- I'm only in it through Dynagrow which is

9    your daughter's fund managing family money.

10   A    My daughter is the manager and she is proceeding with

11   this early next week.

12   Q    How much of the 10 or $20 million in Dynagrow is yours

13   and your wife's?

14   A    A very large percentage, over 90 percent.

15   Q    90 percent?

16   A    Yes.

17   Q    So a fund that you and your wife own is essentially worth

18   90 percent of either 10 or $20 million is investing in this

19   company and you now know that a lot of your business

20   colleagues are doing it as well; correct?

21        MS. KASULIS:  Objection.

22   A    All I was staying was that in this e-mail that this is

23   really Sarah's province and she had already proceeded to make

24   her -- I'm not -- I'm not discussing this investment in any

25   way as a private investor.  This is really Sarah's project and

1    that's the context of this e-mail.

2    Q    Do you know who Douglas Madden is?  It's not on that

3    e-mail.  Do you know who Douglas Madden is?

4    A    He is the head of compliance at Warburg.  He's at least

5    an important compliance officer at Warburg.

6    Q    And would he be in the chain, if you will, of people who

7    might have to clear something for Warburg Pincus and allow you

8    to invest?

9    A    There were different procedures at different times.  At

10   some point he definitely was part of the chain.  I don't know

11   what procedures were in place at that time in 2011.

12   Q    Now, I think you told us that last time you believed you

13   spoke to Martin Shkreli was at the second J.P. Morgan

14   conference in 2012; is that correct?

15            MS. KASULIS:  Objection, Your Honor.

16            THE COURT:  Sustained.

17            MR. BRAFMAN:  Withdrawn.

18   BY MR. BRAFMAN:

19   Q    When was the last time you believe you spoke with Martin

20   Shkreli?

21   A    My recollection is in 2011 when I met him.  This 2012

22   meeting I don't remember although you showed it to me in the

23   calendar.

24   Q    It didn't refresh your recollection that you had a

25   one-hour meeting with Mr. Shkreli, did it?

Hassan - cross - Brafman                    1357

1    A    No, it did not.

2    Q    Or a Mr. Wilk (phonetic)?

3    A    Correct.

4    Q    When you met with Martin Shkreli, I think you

5    characterized him as being somewhat intimidated in your

6    presence?

7    A    It was the first meeting and obviously he was happy that

8    he got to see me and he just was very respectful.

9    Q    Did he appear to be excited?

10   A    I didn't see the excitement.  I didn't know Martin

11   Shkreli very well, but it was clear that he was very

12   respectful and it was a pleasant recollection of what

13   happened.  He seemed to be a kind of homework kind of person.

14   Q    Overt?

15   A    Homework.

16   Q    Someone who studied hard, knowledgeable?

17   A    Who studied hard, yes.

18   Q    And what about that brief meeting led you to conclude

19   that; that he was someone who studied hard?  How did he

20   impress you in that way in that short period of time?

21   A    I think Brent might have mentioned that to me ahead of

22   the meeting so maybe I just said to myself that this person

23   looks like the type of person who studies a lot.

24   Q    Is it a fair characterization that he was jumping out of

25   his skin to meet you?

Hassan - cross - Brafman                    1358

1    A    He was not that expressive at the meeting.

2    Q    Was he expressive enough for you to conclude on your own

3    in addition to what Brent Saunders said that he is, like,

4    super smart?

5    A    I could not conclude that based on that short meeting.

6    Q    Didn't Brent Saunders tell you that he was a genius?

7    A    Brent said that he got a good return on his investment in

8    the fund.

9    Q    Now, do you remember whether in March of 2012, Ken Banta

10   talked to you about an individual named Tom Haverty?

11   A    I don't remember that.

12   Q    And are you familiar with a company named Scopia Capital?

13   A    No, I'm not.

14   Q    Did you have any understanding as to whether or not Ken

15   was asking your opinion with Scopia merging with Retrophin?

16   A    I don't remember.

17   Q    No recollection whatsoever?

18   A    No.

19   Q    I'm going to show you marked for identification only --

20   it's marked R018664 as a -- this is not in evidence.  The

21   Bates number is R018864.

22          MS. KASULIS:  The exhibit number?

23          MR. BRAFMAN:  1038.

24          MS. KASULIS:  It's marked for identification as a

25   Government's sticker.  I'm not offering it in evidence.  I

Hassan - cross - Brafman                    1359

1   just want to hand it to the witness.

2          THE COURT:  You're handing him Government 1038?

3          MR. BRAFMAN:  Yes, Your Honor.

4          THE COURT:  Thank you.

5   BY MR. BRAFMAN:

6   Q    If you could read that to yourself, sir.

7   A    Yes, thank you.

8   Q    Have you had a chance to read it, sir?

9   A    Yes.

10  Q    Does it refresh your recollection that on March 20th of

11  2012 Mr. Shkreli wrote to Mr. Banta who then wrote to you

12  about a possible merger with Retrophin?

13         MS. KASULIS:  Objection, Your Honor.

14         THE COURT:  I'm going to overrule the objection.

15         MS. KASULIS:  Your Honor, let's have a brief

16  sidebar.

17         MR. BRAFMAN:  Your Honor, I just asked if it

18  refreshed his recollection.  I wasn't going to offer it.

19         THE COURT:  We'll have a sidebar.  I think there's

20  something else troubling the Government right now.

21         (Continued on next page.)

22

23

24

25

```
                         Sidebar                        1360
```

1           (The following occurred in sidebar.)

2           MR. BRAFMAN:  Scopia is investing and I said merging

3    and I misspoke.

4           MS. KASULIS:  That was our objection, Your Honor.

5           MR. BRAFMAN:  Is there going to be an objection to

6    this being offered in evidence?

7           MS. KASULIS:  We have to see what is testified to.

8           MR. BRAFMAN:  I misspoke.

9           (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hassan - cross - Brafman                1361

1            (Continuing.)

2            THE COURT:  Mr. Brafman will withdrew that last

3    question and rephrase.

4            MR. BRAFMAN:  Your Honor, I misspoke.

5    BY MR. BRAFMAN:

6    Q    Mr. Hassan, you read this document that's marked

7    Government 1038 that's not yet in evidence?

8    A    I just read it, yes, sir.

9    Q    And does it refresh your recollection that Tom Koestler

10   and Ken Banta wanted your input on a potential investment into

11   Retrophin by Scopia Capital?

12   A    That's what the document says here.

13   Q    But I'm asking you, sir, do you remember this document at

14   the time it came to you?

15   A    I don't.

16   Q    Do you doubt the authenticity of this document?

17   A    I don't know how to confirm that it was received by me.

18   Q    I think the Government will stipulate to its

19   authenticity.  I'm just trying to discuss admissibility.  Am I

20   right?  It's marked as a government exhibit.

21   A    I haven't seen this before or at least I don't remember

22   seeing it before.

23   Q    But it doesn't refresh your recollection; is that

24   correct?

25   A    It does not refresh my recollection.

Hassan - cross - Brafman                    1362

1         MR. BRAFMAN:  Your Honor, without an objection as to

2    authenticity, I'd like to offer it in evidence and I'll change

3    the marking from Government Exhibit 1038 to Defendant's

4    Exhibit 1228.

5         MS. KASULIS:  Objection.

6         THE COURT:  Let's have another sidebar.  Excuse me.

7         (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                            1363

1          (The following occurred at sidebar.)

2          MS. KASULIS:  Your Honor, our objection is that he

3    is just saying it doesn't refresh his recollection.  That's

4    not a basis on admit the document under the rules of evidence.

5          MR. BRAFMAN:  Judge, when a witness who in my view,

6    and I don't say this disrespectfully, clearly has a selective

7    memory, if you will, and the document will never refresh his

8    recollection, there is no question as to its authenticity.

9          That's been stipulated by the parties and it is his

10   e-mail to Ken Banta who is already described as a close

11   business associate.  That's how they correspond.

12         THE COURT:  These are Mr. Shkreli's e-mails to Ken

13   Banta who then writes to --

14         MR. BRAFMAN:  He sends it to Mr. Fred Hassan.  I'll

15   redact Mr. Shkreli's --

16         THE COURT:  This is not Mr. Hassan's e-mail.  He

17   just doesn't remember this e-mail.

18         MR. BRAFMAN:  But it's important for me to show that

19   whenever it comes to something involving Mr. Shkreli, I

20   believe in 2017 it's not great for the pharmaceutical legend

21   to be associated so deeply with Mr. Shkreli and that is a fair

22   argument from the way he has selectively not remembered

23   meetings about mergers.  They can argue he had a million

24   meetings, I get it, but I think I can probe him on this.

25         MS. KASULIS:  Your Honor, the appropriate way in

```
                          Sidebar                    1364
```

1   which to make the point in which Mr. Brafman is making would

2   be to call Ken Banta to say I spoke --

3           MR. BRAFMAN:  He's on your witness list.

4           MS. KASULIS:  He's on yours too.  That's my point if

5   you want to make that point make it through Mr. Banta.

6           MR. BRAFMAN:  We're trying to shorten the trial, not

7   lengthen the trial.

8           THE COURT:  Anyone can call Mr. Banta if there's a

9   point to make in his testimony.

10          MR. BRAFMAN:  I'll move back.

11          MS. KASULIS:  Thank you, Your Honor.

12          (Sidebar ends.)

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1              (Continuing.)

2    BY MR. BRAFMAN:

3    Q    Sir, in March OF 2012, did you come to learn about a

4    person named Tom Haverty who was interested in becoming or

5    acting as CEO of Retrophin?

6    A    I don't remember that.

7    Q    Do you know who Tom Haverty is?

8    A    Yes.

9    Q    Who?

10   A    He used to work in the R&D department in Schering-Plough

11   at a lower level.

12   Q    Right.  And do you remember whether Tom Koestler made

13   that recommendation to either Ken Banta or you?

14   A    I don't remember that.

15   Q    And do you have any recollection of whether Scopia

16   Capital wanted to invest in Retrophin?

17   A    I don't remember that.

18   Q    Do you know who Scopia Capital is?

19   A    No.

20   Q    You never heard of them?

21   A    I never heard of them.

22   Q    Okay.  You can put the document down, sir.

23            Did you learn in September of 2012 that there was a

24   potential deal between Retrophin and Valeant pharmaceuticals?

25   A    No, I didn't.

1    Q    You never learned that in 2012?

2    A    I don't recall that, no.

3    Q    And do you know who Mike Pearson is?

4    A    Yes.

5    Q    Who is Mike Pearson?

6    A    The former chief executive officer of Valeant.

7    Q    Had you ever done business with him?

8    A    He used to work as a consultant in some of the companies

9    I was at and then later on he became chief executive officer

10   of Valeant and then briefly he joined the board after Valeant

11   purchased Bausch & Lomb.

12   Q    So Valeant was one of the giant pharmaceuticals companies

13   for a period of time; correct?

14   A    It used to be a large company but not quite in the

15   category of the very large companies.

16   Q    And when did Valeant and Bausch & Lomb hook up?

17   A    August of 2013 is when the deal closing occurred.

18   Q    And that received a lot of publicity in the financial

19   world and also in the pharmaceutical world; correct?

20   A    Yes.

21   Q    Now, I want to show you what's marked as DX 1203 and ask

22   you to look at it, read it, and then I will ask you some

23   questions, sir.

24        MR. BRAFMAN:  I am not offering it into evidence,

25   Your Honor.  Well, I might.

1   Q     Just first read it first.

2   A     Okay.

3   Q     Do you recognize DX 1203 as an e-mail you were copied on

4   from Mr. Shkreli in September of 2012?

5   A     Yes.

6              MR. BRAFMAN:  I offer it into evidence, Your Honor.

7              MS. KASULIS:  Objection.

8              THE COURT:  Look, I will overrule this objection.

9              MR. BRAFMAN:  Thank you, Your Honor.

10             (Defendant's Exhibit 1203 received in evidence.)

11  Q    DX 1203 is now in evidence.  I'm going to place it on the

12  screen --

13             MS. KASULIS:  Your Honor, may I have a sidebar.

14             THE COURT:  I'm sorry, the Government is asking for

15  a sidebar.

16             (Continued on next page.)

17

18

19

20

21

22

23

24

25

```
                            Sidebar                        1368
```

1           (The following occurred at sidebar.)

2           MS. KASULIS:  Your Honor, I think we have the same

3    issue here.  He says he doesn't remember anything --

4           THE COURT:  He did remember this.

5           MS. SMITH:  He said is this an e-mail --

6           MR. BRAFMAN:  He said I remember getting it.

7           THE COURT:  I think he confirmed that he got it.  We

8    can ask the court reporter to check.

9           (Record read.)

10          MS. KASULIS:  He didn't ask if he remembered

11   receiving it.

12          MR. BRAFMAN:  Your Honor, so we don't have to have

13   another sidebar, this is an e-mail which can be arguably

14   introduced to show bias of the witness because shortly after

15   the Retrophin Valeant deal fell apart Bausch & Lomb ended up

16   in a deal with Valeant and Mr. Hassan knew that Retrophin was

17   on the hunt for the merger or the purchase and he needs to be

18   confronted with that.

19          MS. KASULIS:  He doesn't say he knew.  He said he

20   doesn't know about the Valeant and Retrophin deal.

21          MR. BRAFMAN:  Trust me, he knows.  I'm going to the

22   e-mail.  If he recognizes it as having received it, I have a

23   right to introduce it in evidence.

24          THE COURT:  No.  He testified that he gets many,

25   many, many e-mails and he has an assistant read his e-mails.

Sidebar                                           1369

1   He doesn't read every e-mail.  So you need to establish that

2   he saw this e-mail.

3            MR. BRAFMAN:  Okay.

4            THE COURT:  He was aware of the contents of it

5   before you can make the leap to your next step, okay?

6            MR. BRAFMAN:  Yes.

7            THE COURT:  All right.  Mr. Brafman, so what I will

8   do is this:  I am going to say it is admitted subject to your

9   ability to establish that those grounds that we talked about

10  here; that he remembers receiving it, that he remembers this

11  discussion.

12           MR. BRAFMAN:  I'll ask those questions.

13           MS. KASULIS:  Your Honor, I am confused as to what

14  the sequencing is here.  Is it your understanding that he said

15  that he had no recollection this Valeant/Retrophin merger?

16           MR. BRAFMAN:  I have a right to show --

17           MS. KASULIS:  Can I be heard?

18           MR. BRAFMAN:  Sure.

19           MS. KASULIS:  You asked him the question does he

20  recall this potential deal and then you're showing this e-mail

21  where he says yes that's an e-mail I may have received.  He's

22  saying I don't remember a fact and then you're showing him an

23  e-mail where he says I recognize this e-mail.

24           It doesn't mean that it's admissible.  You have to

25  establish a basis from which an e-mail is admissible to either

Sidebar                                          1370

1   impeach him or you can show it to him to refresh his

2   recollection about a potential deal but just because someone

3   recognizes an e-mail doesn't mean that it's therefore

4   admissible.  It has to be admissible for a purpose and I don't

5   know what this purpose is right now.

6                MR. BRAFMAN:  Can I proceed with the questions and

7   we'll see where we get?

8                THE COURT:  You are confident that upon seeing this

9   he will recall that he became aware at some point that the

10  Valeant --

11               MS. KASULIS:  It's not even clear this is Retrophin.

12  It says MSMB Capital.  It's not even clear from this e-mail

13  this is a Retrophin deal.

14               MS. SMITH:  He's writing from an MSMB account.  It

15  doesn't say anything about Retrophin.

16               THE COURT:  It's addressed to Valeant.  You are

17  right, it is an MSMB e-mail.

18               MR. BRAFMAN:  Let me see if I can clear this up by

19  questioning him before I introduce it, okay?

20               THE COURT:  Then let us wait on its admissibility to

21  see whether you can clear it up, the confusion, all right?

22               MR. BRAFMAN:  Okay.

23               MS. KASULIS:  Your Honor, should we take a short

24  break?  Does the jury need a break?

25               THE COURT:  I can ask them.  (Sidebar ends.)

                    SN      OCR      RPR

1371

1       THE COURT:  Does the jury need an afternoon break

2   right now?

3       All right.  Please put your notebooks face down on

4   the chairs.  Don't talk about the case and we will` come to

5   retrieve you at approximately 3 o'clock.

6               (Recess taken.)

7               (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1372

1       MS. SMITH:  We have another witness who is in from

2  Texas, and it's relatively short, but if possible, we would

3  like to get him on and off today.

4       THE COURT:  All right.  If that's possible.

5       MS. SMITH:  Yes.

6       THE COURT:  Did you want to be heard, Mr. Brafman?

7       MR. BRAFMAN:  If you ask me to be heard, I will, but

8  I would ask if we could stop at 5:00 today.

9       THE COURT:  Well, can we see where we are with the

10  witnesses, if that's possible?

11       MR. BRAFMAN:  Yes.

12       THE COURT:  I mean, if we can, I certainly will.  I

13  just don't want to have someone have to spend the night or

14  spend the weekend or come back.  I guess we'll have to come

15  back.  Let's see if we can get started.  This is a very long

16  break, so if we can get started, I'd appreciate it.

17       MR. BRAFMAN:  We can get started.  I will move on

18  and come back to this.

19       THE COURT:  All right.

20       (Jury enters the courtroom.)

21       THE COURT:  We have all jurors.  Please be seated.

22       Mr. Brafman, you may resume your cross of this

23  witness.

24       MR. BRAFMAN:  Thank you.

25  CROSS EXAMINATION (Continuing)

F. Hassan - cross - Brafman                1373

1   BY MR. BRAFMAN:

2   Q    Mr. Hassan, I'm going to refer your attention to

3   Government Exhibit 103-18, which is in evidence.  I am putting

4   it up here, or if you want to put it up on the screen,

5   whichever is easier.

6            I want the jurors to be able see it, it is in

7   evidence.

8            MR. BRAFMAN:  Tab one of your binder, sir.

9            THE WITNESS:  Thank you.  Yes.

10  Q    Mr. Hassan, if we could look at the screen, please,

11  Government Exhibit 103 in evidence.

12           MR. BRAFMAN:  If we could bring it up, please?  I

13  can't read it.  I don't know if anybody else can.

14           THE COURT:  Can you make it bigger?

15           MR. BRAFMAN:  Do the bottom portion, it is an e-mail

16  from Mr. Shkreli.  Okay.

17  Q    Now, on direct examination, Ms. Kasulis showed you this

18  document, which is an e-mail from Martin Shkreli, essentially

19  to Martin Shkreli, but you ended up getting because you

20  responded to it, and it says:  "Subject:  Retrophin completes

21  reverse merger."  And it reads:  "Friends, please see the

22  attached press release.  As you many of you know, I have

23  started a biotechnology company, Retrophin.  This is my

24  primary focus going forward and I hope you will support me in

25  this new role as the I will use my 12 years of professional

F. Hassan - cross - Brafman                    1374

1    investing in healthcare stocks to guide Retrophin create

2    shareholder value."

3              And then, if we could bring it down so we can see

4    your response -- and you respond, am I correct, sir, "Martin,

5    I wish you success.  Happy holidays.  Fred."

6              Do you see that?

7    A    Yes, sir.

8    Q    It also had attached to it a press release?

9              MR. BRAFMAN:  If we could bring it up again, please,

10   the bottom portion.

11   Q    It had a press release announcing Retrophin completes

12   reverse merger.  Gateway creates publically-traded

13   biotechnology company.

14             When Ms. Kasulis asked you why did you respond to

15   this e-mail, you said, you know, I try to be nice, when I get

16   something, even if I don't know what it's about, I respond to

17   it.  Words or substance, is that what you said?

18   A    Yes, largely.  I get lots of peoples giving me updates on

19   what's going on and I customarily send them an encouraging

20   note.

21   Q    At the time you got this e-mail, you didn't know

22   Dynagrow, of which you are a passive investor, had invested in

23   Retrophin and that is why you were getting this press release?

24   A    I probably knew at that time, yes.

25   Q    So this wasn't just a hello, how are you.  This is

F. Hassan - cross - Brafman                    1375

1  telling you that your fund has Retrophin, which is now going

2  to be a publicly traded company; correct?

3  A    My daughter was the manager of the fund, I was a passive

4  investor in the fund, but the reason this was sent, and I do

5  this all the time just to encourage people and acknowledge the

6  good news.

7  Q    But you weren't picked out of the Yellow Pages to get

8  this.  You were targeted because you had a connection, through

9  your daughter and through Dynagrow, to Retrophin; isn't that

10  true?

11                MS. KASULIS:  Objection.

12                THE COURT:  Sustained.

13  Q    Do you think this was just a blast e-mail that you got

14  with no reason?

15  A    I don't know who else got the e-mail.

16  Q    But you got it?

17  A    I did get it.

18  Q    And your response isn't to Martin why is someone sending

19  me an e-mail about a company I know nothing about, you said

20  congratulations and you wished him success and happy holidays,

21  right?

22  A    I wrote a note, which is generally very brief, and that's

23  what I sent out here.  I didn't get into the details of this

24  announcement.

25  Q    Did you know that, before they went public, Martin

MDL   RPR

F. Hassan - cross - Brafman                    1376

1  Shkreli gave your daughter 5,000 additional shares of
2  Retrophin without any cost basis?
3  A    I wasn't aware of that.
4  Q    Now, this comes to you, if we can, in December of 2012;
5  is that correct?  If we can drop down again to the date, do
6  you see the date on top, sir?
7  A    Yes.
8  Q    It comes to you in December 2012, almost at the end of
9  the year; correct?
10 A    Yes.
11 Q    Did you have any clue, at that time, that your daughter
12 and Mr. Shkreli are having a series of disagreements about her
13 wanting to get back her investment in MSMB?
14 A    At some point I became aware of it.
15 Q    Did you become aware of it then?
16 A    I can't say whether this was related to that or not.
17 Q    Now, when you said congratulations, I wish you success to
18 Martin Shkreli, you did not say and by the way, give my
19 daughter back her investment; correct?  This is a pleasant
20 response to Mr. Shkreli; correct?
21 A    Yes, I just get lots of things at the end of the year,
22 and I just wanted to wish him happy holidays.  As far as the
23 other part is concerned, at some point, I did learn about it.
24 Yeah.
25 Q    I'm sorry, at some point in 2013, 2014, or 2015?

F. Hassan - cross - Brafman                    1377

1  A    It was around the time when she said she was not getting

2  her money from the fund when it had been promised to her and I

3  became aware of that.  Exactly at what point she talked to me

4  about it, I don't remember.

5  Q    And did you have any conversation with Brent Saunders,

6  your -- one of your right-hand men about the fact that the

7  person you introduced my daughter to and she invested with is

8  not being responsive, did you ever say hey, Brent, what did

9  you get Sarah involved in?

10 A    No, I -- first of all, Brent is a close friend, but I

11 have some others too, so I wouldn't call him a right-hand man,

12 but I really believed that this could get resolved between

13 Sarah and Martin.  And I did not want to get involved with it

14 directly or involve Brent, because my relationship with Brent

15 is a pretty broad relationship, and I just didn't want to get

16 to this subject with Brent.

17 Q    Going to July 30th of 2013, did you know by then whether

18 there is any disagreement between your daughter and Mr.

19 Shkreli concerning her investment in MSMB or Retrophin?

20 A    I became aware at some point that she felt that some

21 money was owed to her and it was not given, it caused her a

22 lot of distress.

23 Q    When was that?

24 A    Late '12 or early '13.

25 Q    Okay.  So if it is late '12 or early '13, I am going to

F. Hassan - cross - Brafman          1378

1  ask you to look at this document marked for identification as

2  DX 1029, and ask you if you recognize this as an e-mail that

3  Mr. Shkreli wrote to you and your response?

4  A    So, I don't recall this e-mail.

5  Q    Do you recognize it as an e-mail coming from you to Mr.

6  Shkreli?

7  A    Yes.

8  Q    And do you remember, in July 30th of 2013, that the *New*

9  *York Times* did an article about you and your discussion of

10  emerging leaders in the pharmaceutical industry?

11  A    I don't remember the subject of the article, but I know I

12  was featured in the *New York Times*.

13  Q    At or about that date?

14  A    Sometime in the 2013 period.  This probably could have

15  followed my book that came out earlier in 2013.

16  Q    Well, let me show you what's marked for identification as

17  DX 1210, and tell me if that's the article that the *New York*

18  *Times* did about you?

19  A    I now remember this article.

20  Q    We are not putting the article in evidence.  The date of

21  the article is July 27th of 2013; is that correct?

22  A    That is correct.

23  Q    Now, I am asking you to look again at DX 1209, which is

24  dated July 30th of 2013, three days after the article appears,

25  and tell me if it -- you recognize it as an e-mail chain that

F. Hassan - cross - Brafman                  1379

1  you received from Martin Shkreli and an e-mail response from

2  you?

3  A    Yes.  While I don't recall it today, this is an e-mail

4  that I did receive from Martin Shkreli and I did respond to

5  that.

6           MR. BRAFMAN:  I offer it into evidence, Your Honor.

7           MS. KASULIS:  Objection, Your Honor.

8           THE COURT:  Well, I am going to overrule the

9  objection and admit 1209.

10          MR. BRAFMAN:  Thank you, Judge.

11 Q    Now that it is in evidence, if we could put it up on the

12 ELMO, ignore my highlighting, but I'm going to refer to it

13 anyway, so I would just be underlining it while we speak.

14          This is now DX 1209 in evidence and I want to read

15 it with you, sir.  It is from Fred Hassan, with your e-mail

16 dated July 30, 2013 at 1:00 p.m., to Martin Shkreli, and the

17 subject is the *New York Times* interview; am I correct, sir?

18 A    Yes, sir.

19 Q    We start from the bottom of Mr. Shkreli's note to you.

20 It says:  "Hi, Fred.  July 29th.  I read the *New York Times*

21 article and I really appreciate you giving this to the world.

22 Your comments here, and in other places, have helped me

23 tremendously.  Thanks for making your best advice available to

24 not just a few of us, but everyone willing to pick up a

25 newspaper.  Thanks.  Martin Shkreli of Retrophin, Inc."

F. Hassan - cross - Brafman                1380

1           Did I read that correctly?

2   A    Yes.

3   Q    Now, I think you told us a minute ago that you learned of

4   the disagreement between your daughter and Mr. Mr. Shkreli

5   sometime in late 2012, or early 2013, did you say that a few

6   minutes ago?

7   A    Yes.

8   Q    So now it is the middle of 2013, we are at the end of the

9   seventh month of 2013, and what you say to Mr. Shkreli is:

10  "Many thanks.  Great to see hardworking young business

11  builders like yourself gain traction.  Fred."

12          Did you say that?

13  A    Yes.

14  Q    And this was after you telling us that you've learned

15  that your daughter was having disagreements with Mr. Shkreli,

16  trying to get her money back; is that correct?

17  A    Yes.

18  Q    Now, did there come a time that you learned that

19  Retrophin had been placed on the stock exchange, the NASDAQ

20  Stock Exchange?

21  A    I don't remember the exact time when it happened, but at

22  some point it did get to NASDAQ, yes.

23  Q    And if I can show you DX 1206, which is not in evidence

24  yet, and ask you, please, to look at it and tell me whether

25  you recognize this document as an e-mail you received, among

F. Hassan - cross - Brafman                1381

1  other people, from Martin Shkreli?

2  A    I don't remember this e-mail.

3  Q    Do you see your name copied on it?

4  A    Yes.

5  Q    Okay.  You're not telling us you didn't get it, you're

6  just telling us you don't remember whether you got it?

7  A    That's right.

8  Q    Does the e-mail refresh your recollection that you and

9  your daughter were thanked by Mr. Shkreli on January 10, 2014?

10            MS. KASULIS:  Objection, Your Honor.

11            THE COURT:  Sustained.

12 Q    Do you remember being thanked in an e-mail by Mr.

13 Shkreli?

14            MS. KASULIS:  Objection.

15            THE COURT:  Sustained.

16 Q    You told you didn't know the date upon which NASDAQ

17 approved Retrophin.  Does the e-mail refresh your recollection

18 about the date?

19 A    No, it doesn't.

20 Q    Is it on or about 2014 or is it before or after?

21 A    Sometime in 2014.  I wasn't following it that closely.

22 Q    Do you know that your daughter made about a

23 million-and-a-half dollars profit because of her relationship

24 with Mr. Shkreli?

25 A    I was not aware of the exact figure, but in the end it

F. Hassan - cross - Brafman                1382

1   turned out okay for her.

2   Q    That's not a lot of money to you?

3   A    She did fine with her investment.

4   Q    Okay.  So I'm asking you do you know approximately how

5   much money she made on her investment?

6   A    I don't know.

7   Q    Did she ever come to you and say dad, I hit a home run

8   with my Retrophin and my MSMB investment?

9   A    She didn't talk to me about it.  She was relieved that

10  she managed to get her money out of this.  She was, at one

11  point, very concerned about the money being totally gone and,

12  beyond that, she felt very unhappy with the whole situation.

13  Q    And very unhappy until she got the million-and-a-half

14  dollar check?

15  A    That happened a lot later, a lot down the road.

16  Q    Do you know when it happened?

17  A    I think a couple of years ago.

18  Q    But you don't know when she got the money, do you?

19  A    At some point she got it, when she got all the approvals

20  and commissions.  She needed to get out of a restricted stock,

21  or something.  She was not able to do a lot of things for a

22  long time, but in the end, she was able to trade the stock.

23  Q    And in the end, she was very happy with the money she

24  made?

25  A    The investment was -- it did return a good multiple, yes.

F. Hassan - cross - Brafman                    1383

1   Q    Well, when you invest a total of 450,000 and you get back

2   1.8 million, that's a pretty good investment; isn't that true?

3   A    This one turned out good for her, yes.

4   Q    Okay.  Now, in April of 2014, do you remember having a

5   discussion with a person named William Looney?

6   A    I remember receiving an e-mail from him.

7   Q    Who is William Looney?

8   A    William Looney used to work with Pfizer and I got to know

9   him.  I used to be the head of the International Federation

10  for Pharmaceutical Manufacturers Association that used to meet

11  in Geneva, and he was a representative of Pfizer, in Geneva,

12  Switzerland, and then he went on to work for Pharmaceutical

13  Executive.  So I did keep up my relationship with him.

14  Q    Was he someone who you respected?

15  A    Yes.

16  Q    Was he someone who was well considered in the

17  pharmaceutical industry?

18  A    He wasn't a senior person.  He was the European

19  representative in this organization, but generally well

20  regarded, but not very well known.

21  Q    But you knew him?

22  A    Yes, I did.

23  Q    And you knew him to be the editorial director of Advance

24  Star; is that correct?

25  A    I thought it was Pharmaceutical Executive magazine.

F. Hassan - cross - Brafman                1384

1    Q    Okay.  And Pharmaceutical Executive magazine, on

2    occasion, did profiles on emerging leaders in the

3    pharmaceutical industry; is that correct?

4    A    That is correct.

5    Q    If you remember, in April of 2014, Mr. Looney inquired of

6    you as to who you could recommend as an emerging -- among the

7    emerging young people in the pharmaceutical industry; is that

8    correct?

9    A    Something to that effect.  I have some recollection of

10   that, yes.

11   Q    And a person you mentioned was Martin Shkreli?

12   A    I don't believe I recommended him.

13   Q    He mentioned Martin Shkreli to you and you confirmed that

14   Martin Shkreli was a good person in the pharmaceutical

15   industry?

16             MS. KASULIS:  Objection.

17             THE COURT:  Sustained.  Rephrase.

18   Q    Let me show you what's being marked for identification as

19   Defense Exhibit 1229, dated April 28, 2014.

20             MS. KASULIS:  Your Honor, we don't have that.

21             MR. BRAFMAN:  I'm going to give you a copy.

22             THE WITNESS:  Thank you.

23             MR. BRAFMAN:  You're welcome.

24             THE COURT:  Thank you.

25   Q    Have you had a chance to look at it?

MDL   RPR

F. Hassan - cross - Brafman                1385

1    A    Yes, sir.

2    Q    Does it refresh your recollection that, on April 28th,

3    Mr. Looney contacted you and explained that he was looking for

4    young people as emerging leaders in pharma, and Martin Shkreli

5    came up, along with a reference that you had been advising

6    him?

7    A    This is what it says here, yes.

8    Q    How did you respond, if you recall?

9    A    So --

10        MS. KASULIS:  Objection, Your Honor.  It is not

11   responding to Mr. Looney.

12   Q    Do you recall your response?

13        THE COURT:  Are you saying responding to Mr. Looney?

14        MR. BRAFMAN:  Yes.

15   Q    Can you tell me if you recall your response?

16   A    I do.

17   Q    And what did you say?

18   A    It was meant to be a very neutral response.

19   Q    What did you say?

20   A    I didn't want to --

21   Q    What did you say?

22   A    I said I don't want to get into -- he wanted to find out

23   if he was in the top 15, and I didn't want to confirm or deny

24   -- I did not want to confirm that he was going to be in the

25   top 15.

F. Hassan - cross - Brafman                1386

1  Q    But what did you say about Martin Shkreli?  It is a

2  simple question.

3  A    I can read it for you if you want me to.

4  Q    Read it for me.

5         MS. KASULIS:  Objection, Your Honor.

6         THE COURT:  Excuse me.  The question is are you

7  asking for his response to Mr. Looney or to others?

8         MR. BRAFMAN:  Yes.  No.  Let me do it this way.

9  Q    It's a fair statement that what you said to Mr. Looney,

10 in part, was Martin is certainly a smart entrepreneur?

11        THE COURT:  You can't read this into the record.

12        MR. BRAFMAN:  I am not.  I'm asking him the

13 question.

14 Q    Did you say to Mr. Looney that Martin was a smart

15 entrepreneur; yes or no?

16 A    Yes.

17 Q    This was in 2014, long after the issues with your

18 daughter arose between her and Mr. Shkreli; is that correct?

19 A    Yes.

20 Q    And then, there was another comment from you to Mr.

21 Looney, two days later, and I will show 10337, and see if it

22 refreshes your recollection.  I think it's marked as

23 Government 10337.

24        MS. KASULIS:  It is -- Your Honor, Mr. Looney is not

25 on Defense Exhibit 1229.  I think there has been multiple

F. Hassan - cross - Brafman                    1387

1    statements that he was and he is not.

2             THE COURT:  Well, I think these are the kind of --

3    you know, we shouldn't be making speaking objections in front

4    of the witnesses or the jury.

5             MS. KASULIS:  I apologize, Your Honor.

6             THE COURT:  The jury should disregard all of that

7    conversations.

8             And we want to discuss this further at sidebar, I do

9    think there is a clarification needed.  Mr. Brafman and the

10   Government may step to the sidebar, please.

11            MR. BRAFMAN:  Your Honor, Mr. Looney --

12            THE COURT:  Sir, we are not going to do this in

13   front of the jury.  Both of you, the Government and Mr.

14   Brafman.

15            (Sidebar held outside the hearing of the jury.)

16            (Continued on the following page.)

17

18

19

20

21

22

23

24

25

```
                    Sidebar                        1388
```

 1           (The following sidebar held outside of the hearing

 2    of the jury.)

 3           MR. BRAFMAN:  Your Honor, the previous exhibit, 1229

 4    says Martin is a smart entrepreneur, is a response to Mr.

 5    Looney.

 6           THE COURT:  No, he is not responding.  He is

 7    forwarding this to these folks.  Do you see?  Saying he is a

 8    smart entrepreneur.  If there are other young people you could

 9    think of, let me know.  He is not telling Mr. Looney.

10           MR. BRAFMAN:  But the next exhibit, which I am about

11    to introduce, if they had given me a second, is a -- I will

12    show you another.  I need that next exhibit.

13           MS. KASULIS:  This one is forwarded to Mr. Hassan's

14    friend.

15           THE COURT:  1229 is forwarded.  It is not a response

16    to Mr. Looney.

17           MS. KASULIS:  This one is a response, GX 103-37.

18           MR. BRAFMAN:  That's the one I am going through.

19           THE COURT:  You have created an impression that this

20    is the response.  This response from Mr. Hassan dated

21    April 28, 2014 was a response to Mr. Looney.

22           MR. BRAFMAN:  It's the same.

23           THE COURT:  But it's not.  Mr. Looney is not copied

24    here.

25           MR. BRAFMAN:  I will clear it up.

```
                         Sidebar                          1389
```

1          THE COURT:  That's the misperception that it is

2    creating.

3          MR. BRAFMAN:  I will clear it up.

4          MS. KASULIS:  Your Honor, I apologize, I really do.

5          THE COURT:  It's all right.  I understand.

6          (Sidebar ends.)

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F. Hassan - cross - Brafman                    1390

1    Q    I want to go back and clear something up.  If you could

2    look at 1229, that is marked for identification, dated April

3    28 of 2014.

4              Do you have it before you?

5    A    1229.

6    Q    Do you have it, sir?

7    A    Yes, sir.

8    Q    Who is that an e-mail from?

9    A    Which one?

10   Q    Is it from you?

11   A    The e-mail arrived from Bill Looney and I sent the e-mail

12   out to some people.

13   Q    Okay.  So you got an e-mail from Bill Looney, which you

14   then forwarded to some people; correct?

15   A    Yes.

16   Q    And the people you forwarded it to are your basically

17   closest people; Tom Kessler, Amy Brent, Amy Saunders, Bob

18   Bertolini.  Correct?

19   A    That is correct.

20   Q    And the subject of it was emerging leaders in pharma; is

21   that correct?

22   A    Yes.

23   Q    And what you essentially, if you recall, said to them was

24   Martin is certainly a smart entrepreneur; correct?

25   A    That is correct, although we should probably read the

F. Hassan - cross - Brafman                1391

1  whole answer.

2  Q    But at the time you said that, this was in 2014, you

3  still believed that Martin was a smart entrepreneur; correct?

4  A    Yes.

5  Q    And then you encouraged them to say if there are any

6  other people you could think of for the list of 15 in this

7  magazine, please let me know, and you signed it Fred; correct?

8         MS. KASULIS:  Objection, Your Honor.

9  A    Correct.

10        THE COURT:  Sustained.  Sorry.  Sustained.

11 Q    Now, I want to know you what is marked as Government

12 Exhibit 103-37.

13        Do you have that, sir?

14 A    What's the number?

15 Q    103-37.  It has a Government Exhibit sticker on it.

16 A    Yes.

17 Q    And you recognize that as an e-mail directly from you to

18 Bill Looney, no one else is being copied on it?

19 A    Yes.

20 Q    And do you remember sending it on April 30, 2014?

21 A    Yes.

22        MR. BRAFMAN:  I offer it into evidence, Your Honor.

23        MS. KASULIS:  No objection.

24        THE COURT:  We will admit 103-37.  This is

25 Government Exhibit 103-37.

1           Did you want to re-designate it as a Defense
2    Exhibit?
3           MR. BRAFMAN:  I am going to mark it as a Defense
4    Exhibit, as DX 1230.  Yes, your Honor.
5           THE COURT:  We will admit Defense Exhibit 1230,
6    formerly admit as Government Exhibit 103-37.
7           MR. BRAFMAN:  Your Honor, if I may approach the
8    witness, because I want to get a clean copy because mine is
9    all marked up.  And I'll put in on the screen, if I get the
10   clean copy, you will see it.
11   Q    Can I have the document, sir?
12   A    This one?
13   Q    Yes.  Thank you.
14          You are taking it out of your Government binder; is
15   that correct?
16   A    Yes.
17   Q    But it wasn't introduced by the Government, was it?
18   A    Probably not.
19          MR. BRAFMAN:  This is now marked DX 130; is that
20   correct?
21          THE COURT:  DX 1230, sir.
22   Q    Now, that it is in evidence, I am going to place it on
23   the screen, and hopefully the jury can see it.
24          On the bottom, you have an e-mail from Mr. William
25   Looney, who we discussed earlier; is that correct?

F. Hassan - cross - Brafman                1393

1    A    Yes.

2    Q    And it is addressed to you, and it reads:  "Fred, I have

3    been looking for some very young people to add to our annual

4    citation feature on emerging leaders in pharma and Martin

5    Shkreli's name came up, along with a reference that you have

6    been advising him in his effort to launch a start-up.   I

7    wonder, number one, you would find him suitable given you're

8    familiarity with the magazine.   And two, would be able to flag

9    an invitation and put it in front of him.   As you know, we

10   chose 15 people each year and prepare a career profile, based

11   on an interview, as part of a group portrait in the magazine.

12   We have a pretty diverse group lined up this year, including

13   the 38 year-old CEO of a Russian drug company, who also

14   happens to be a world-class poker player.   If there is anyone

15   else you can recommend, please let me know.   Thanks, Bill

16   Looney."

17        Did I read that correctly?

18   A    Yes.

19   Q    And what he wanted is you to say something about Martin

20   Shkreli, who, according to him, was someone who you had been

21   advising in his effort to launch a start-up biotech; correct?

22   A    That's what he had heard, yes.

23   Q    And he has also been looking for someone who would be an

24   emerging leader in pharma; correct?

25   A    Yes.

F. Hassan - cross - Brafman                1394

1   Q    By pharma, he means to be pharmacology; correct?

2   A    Pharmaceuticals.

3   Q    Pharmaceuticals, okay.  Now, you respond now, in April of

4   2014, long after your daughter has started her e-mail

5   correspondence with Mr. Shkreli, and what you say is:  "Dear

6   Bill, I have been giving more thought to your note about

7   emerging leaders in pharma.  I cannot think of anyone new

8   right now that obviously comes to mind.  As I said, Martin

9   Shkreli is a smart entrepreneur.  I was introduced to him at a

10  JPMorgan meeting, but have not had any opportunity to work

11  with him.  I look forward to your issue.  Sincerely, Fred."

12       Did I read that correctly?

13  A    Yes.

14  Q    Is that a reference for Martin Shkreli?

15       MS. KASULIS:  Objection, Your Honor.

16       THE COURT:  Overruled.

17  Q    In your mind, is that a reference for Martin Shkreli?

18  A    I think given the context, I am being very neutral about

19  him.

20  Q    Neutral?  He's asking you to identify emerging leaders in

21  pharmaceuticals and you describe Shkreli as someone you think

22  of as a smart entrepreneur, that's neutral?

23  A    What I really went to say was that I was introduced to

24  him at a meeting and have not had a chance to work with him.

25  Q    But your daughter has been dealing with him for three

F. Hassan - cross - Brafman                    1395

1    years?

2    A    Yeah, she had a separate relationship with him which I

3    did not have.

4    Q    But you had all of the people around you, Brent Saunders,

5    Bob Bertolini, Ken Banta, had been dealing with him for years;

6    is that correct?

7    A    They had more interactions with him than I did.

8    Q    But at this point, the man is asking you for -- about

9    Martin Shkreli's name come up where they are doing a feature

10   on emerging leaders in pharma; you didn't say to him, not

11   Martin Shkreli, he's ripping off my family.  You didn't say

12   that to him, did you?

13   A    Maybe that's my nature, I just didn't want to hurt a

14   young man.

15   Q    You didn't want to hurt him, you helped him?

16   A    I'm not sure if I -- I was trying to telegraph to Bill

17   Looney that I was neutral on Martin Shkreli.

18   Q    Why is when Fred Hassan, sort of the dean of the

19   pharmaceutical industry, describes someone as a smart

20   entrepreneur, why isn't that a recommendation or a reference,

21   or at the very least, a compliment?

22             MS. KASULIS:  Objection to form.

23             THE COURT:  Well, it is a complex question and

24   somewhat argumentative.

25             Do you want to just ask him what he meant when he

F. Hassan - cross - Brafman                1396

1    said smart or whether he intended it to be a positive

2    statement?

3              MR. BRAFMAN:  Yes.

4    Q    Did you intend that as a positive?

5    A    I meant that aspect to be a positive, but I didn't want

6    to nominate him to be among the fifteen.

7    Q    But you didn't say that.

8    A    I just didn't want to hurt a young man, but I tried to

9    telegraph Bill Looney that I did not know Martin very well.

10   Q    You knew him well enough to conclude that he was a smart

11   entrepreneur?

12   A    I had that impression of him at that time.

13   Q    In April of 2014, two-and-a-half years after your

14   daughter is trying to get back her money, you still believed

15   that Martin was a smart entrepreneur?

16             MS. KASULIS:  Objection, Your Honor.

17             THE COURT:  Sustained.

18   A    I --

19             THE COURT:  Sustained.

20             I sustained the objection, you don't have to answer

21   it.

22   Q    You said, sir, that you never permitted Martin Shkreli to

23   use your name in any materials as a recommendation for

24   Retrophin; is that correct?

25   A    That's correct.

F. Hassan - cross - Brafman          1397

1  Q    Did you ever see any materials where you are listed as a

2  reference for Martin Shkreli?

3  A    No, I didn't see the materials.

4  Q    Did you ever see any materials where you were listed as

5  an advisor?

6  A    No, I did not.

7  Q    Did the Government ever show you materials that list Ken

8  Banta and Brent Saunders as people who are invested in the

9  company?

10 A    In the preparation part, I did see that.

11 Q    When they prepared you, they showed you these documents?

12 A    Yes.

13 Q    And did you see that -- did you see in the documents

14 concerning Retrophin that --

15        MR. BRAFMAN:  Give me one second, Your Honor.

16 Q    That Ken Banta was a consulting strategic vice president

17 and a former Schering-Plough vice president for corporate

18 strategy?

19 A    I recall something to that effect, yes.

20 Q    Did you call Ken Banta and say when did you become a

21 senior corporate strategist for Retrophin?  Did you ever ask

22 him that?

23 A    I don't remember that question.  I have not talked with

24 Ken Banta for a very long time.

25 Q    What about Brent Saunders, did you tell him hey, you are

F. Hassan - cross - Brafman                    1398

1   now on the board of directors of Retrophin, former

2   Schering-Plough CEO, you are on the board of directors of

3   Retrophin?  Did you ever ask him?

4   A    I saw this information relatively recently and I was

5   instructed not to talk to Brent or to Ken.

6   Q    And the only time you knew that he was on the board of

7   directors of Retrophin is when the Government showed you this

8   material in preparing for your testimony in this case?

9   A    Yes.

10  Q    When Martin Shkreli was arrested and indicted to giant

11  fanfare, did you ever say to Brent Saunders, oh, my God, are

12  you connected to him in any way?

13  A    I did not follow all those news, at that time, and I

14  really don't talk -- I do see Brent a lot.  I saw him only

15  four weeks ago, but I really don't talk about Martin Shkreli

16  with Brent.

17  Q    Brent Saunders you saw four weeks ago, did you tell him

18  you were going to be testifying in the Martin Shkreli trial as

19  a Government witness?

20  A    No, I did not.

21              (Continued on following page.)

22

23

24

25

F. Hassan - Cross - Brafman                    1399

1    (Continuing)

2    BY MR. BRAFMAN:

3    Q    You specifically did not?

4    A    I'm very sure I did not.

5    Q    Did Brent Saunders tell you he was on the government

6    witness list?

7    A    He did not talk to me about this case.

8    Q    Now, did you see in the document when you were looking at

9    it in the government office that Fred Hassan, you, were listed

10   as one of the investors?

11   A    Something to that effect, yes.

12   Q    Well, you are a passive investor in Retrophin, aren't

13   you?

14   A    I'm a passive investor in the fund, but I was not myself

15   an investor in Retrophin.

16   Q    Let's see if we can break this down.  Dynagrow is a fund

17   that basically has your money, your wife's money, and a little

18   bit of your daughters' money, correct?

19   A    Yes.

20   Q    And your money and your wife's money is 90 percent of

21   Dynagrow, correct?

22   A    More than 90 percent.

23   Q    And Dynagrow invested in Retrophin, correct?

24   A    Among the -- in the portfolio, Retrophin was one of the

25   investments.

LAM      OCR      RPR

F. Hassan - Cross - Brafman                1400

1  Q    So, 90 percent of that investment is yours or your wife's

2  or both.

3  A    I think you have to look at it from a fund point of view.

4  Q    Fun or fund?

5  A    Fund.

6         So, the fund was 10 to 20 million, and of that

7  $150,000 was invested in this particular asset.

8  Q    I know $150,000 may not mean a lot to a person in your

9  position, but --

10        MS. KASULIS:  Objection.

11        THE COURT:  Excuse me.

12        MR. BRAFMAN:  I'm sorry.

13        THE COURT:  Sustained.

14 Q    $150,000 invested into Retrophin, 90 percent of that is

15 your money, correct?

16 A    I'm not sure if I can segregate my money in a particular

17 asset.  All I had was ownership of a fund.  It's hard for me

18 to see me owning a piece of any particular asset in the same

19 ratio.

20 Q    When your daughter got the money back from Dynagrow's

21 investment, did she keep it or did she put it back into

22 Dynagrow?

23 A    I don't know what happened to the money.  I would assume

24 it went back, but I don't know.

25 Q    And if it went back into Dynagrow, your share and your

1   wife's share would total about 90 percent of the payment,

2   correct?

3   A    The fund has an overall value that goes up or down

4   depending on individual investments.  So, this clearly helped

5   that overall value, but there are other investments that did

6   not do very well.

7   Q    I don't want to talk about any investment besides

8   Retrophin.  You testified earlier today that the return on the

9   investment that your daughter made was significant, correct?

10  A    On this particular investment, re.

11  Q    And on this particular investment, she more than tripled

12  the amount of her investment, correct?

13  A    I don't know what the multiple was, but it was a good

14  return.

15  Q    And the good return was in large part a Dynagrow return,

16  correct?

17  A    The return helped the overall Dynagrow portfolio, yes.

18  Q    And the Dynagrow portfolio is partly owned by you as a

19  passive investor?

20  A    The overall portfolio, the fund is owned by me and my

21  wife predominantly, yes.

22  Q    Would it be true or false to say that Fred Hassan was an

23  investor in Retrophin as a result of your passive interest in

24  Dynagrow?

25  A    I don't think that's the way one would normally define

F. Hassan - Cross - Brafman                1402

1    it.  Generally, when people invest in a fund, they entrust it

2    with a fund manager to really -- investor.  The people who

3    invest in the fund are really investors in the fund, not

4    investors in the company.

5    Q    But your investor -- your fund is managed by your

6    daughter.

7    A    That is correct.

8    Q    It's not a stranger.

9    A    No.

10   Q    Someone who you are, I think you testified, not giving

11   formal control but taking an interest to see that she's doing

12   well, correct?

13   A    Doing well and having a lot of faith that she can

14   actually handle it, given her credentials, because they were

15   pretty impressive for a young person.

16   Q    I agree, they were.  No doubt about it.  You should be

17   very proud of her.

18   A    Thank you.

19        MS. KASULIS:  Objection, your Honor.

20   Q    But she made a lot of money for the fund that she was

21   managing as a result of the investment in Retrophin, correct?

22   A    That part of the investment helped the fund quite a bit,

23   yes.

24   Q    When you say "helped the fund," as a practical matter

25   Fred Hassan and your wife ended up with more money in the

1  fund, if you wanted to take it out then, than you had before

2  the investment in Retrophin, correct?

3  A    If we wanted to withdraw money from the fund, it will

4  certainly help the valuation of the fund.  We have not, to the

5  best of my knowledge, taken money out of the fund.

6  Q    I'm not suggesting that you did.

7         But that was a decision you made, correct?

8  A    Correct.

9  Q    But the fund, as a result of a redeposit of these funds,

10 grew in size.

11 A    Yes.

12 Q    And if it made a million dollars, the fund was increased

13 in valuation.

14 A    Yes.

15 Q    And if 90 percent of that was yours, Fred Hassan enjoyed

16 a growth in valuation as a result of the return on the

17 investment in Retrophin; correct, yes or no?

18 A    Yes, in the fund.  But we didn't take the cash out of the

19 fund.  But you're right, the valuation did go up by that

20 amount, yes.

21 Q    Now, on direct examination -- excuse me.

22         In evidence as Government Exhibit 103-35, which is a

23 cover sheet and a K-1 that has been put into evidence through

24 your daughter, and it's listed as Sarah Dynagrow and Fred

25 Hassan.  You can look at that and tell me if you're familiar

F. Hassan - Cross - Brafman                    1404

1  with that document.

2  A    It's customary for these K-1s to be issued.  I don't

3  remember the details of this one.

4  Q    Did you ever see it before today?

5  A    Yes.

6  Q    Did the Government show it to you?

7  A    Yes.

8         MR. BRAFMAN:  So, now that it's in evidence, I want

9  to put it up.  Can you put up 103-35, please?

10        You don't have it?  Would it save time if I just put

11 it up on the Elmo?

12        MS. SMITH:  Yes.

13        MR. BRAFMAN:  Can we allow the jury to see this

14 document, Judge?  It's in evidence but to save some time...

15        THE COURT:  Yes.

16 Q    You have it in front of you, sir?

17 A    Yes.

18 Q    You understand that when you invest in a partnership, at

19 the end of the tax year the investor receives a K-1, which you

20 use when you file your tax returns; is that right?

21 A    Yes.

22 Q    You've seen that in almost every partnership that you've

23 ever been in; the tax year ends, they send you what's known as

24 a K-1.

25        That's just the name of the form, right?

LAM     OCR     RPR

F. Hassan - Cross - Brafman                    1405

1    A    Yes.

2    Q    Now this is addressed to Sarah Dynagrow and Fred Hassan.

3    It says:  Attached is your copy of the 2012 partnership Form

4    1065 Schedule K-1.  This schedule summarizes your information

5    from the partnership.  This information has been provided to

6    the Internal Revenue Service with the U.S partnership return

7    of income Form 1065.  The information provided on this

8    schedule should be entered on your tax return in accordance

9    with the instructions on Schedule K-1, Page 2.  If your return

10   will be prepared by your accountant or attorney, you should

11   provide a copy of this schedule to the preparer with your

12   other tax information.  We thank you for the opportunity to

13   serve you.  Very truly yours, Retrophin, LLC.

14        Do you see that?

15   A    Yes.

16   Q    And I think you told us that you never invested

17   personally in Retrophin, correct, sir?

18   A    Correct.

19   Q    And the tax document which arrived had Sarah Dynagrow and

20   Fred Hassan listed under 101 Plaza Real South, Suite 203-S

21   Boca Raton, Florida, with the ZIP code, correct?

22   A    Yes.

23   Q    And it comes from Retrophin, correct?

24   A    Yes.

25   Q    And it indicates that -- and it gives you the tax

F. Hassan - Cross - Brafman                1406

1    information, correct, on the other schedules?

2    A    Yes.

3    Q    Now, you never saw this before the Government showed it

4    to you?

5    A    No.

6    Q    And you never discussed it with your accountant?

7    A    No, I did not.

8         At some point, Sarah did tell me that there was a

9    lot of this stuff going on, but I don't remember this

10   particular document, where my name was getting put on these

11   things.  And her name too should not be here.  It should have

12   been just Dynagrow.

13             MR. BRAFMAN:  Just a second, your Honor.

14             (Pause in proceedings.)

15   Q    Can you tell me who Steve Cavalli was in 2012?

16   A    He was our tax accountant.

17   Q    And did he do your personal tax work as well?

18   A    Yes.

19   Q    And can you tell me, who was Johannah Olsher?

20   A    She was an admin who worked for me and Sarah.

21   Q    Now, do you know how this document -- what caused this

22   document to arrive?

23   A    This particular document?

24   Q    Yes.

25   A    I don't know.

F. Hassan - Cross - Brafman                    1407

1   Q    Was it at the request of your assistant that caused it to
2   arrive?
3   A    Sometimes my understanding is that this is a little bit
4   like a form that either one party sends in or the other party
5   looks for, but it's supposed to be filed with the taxes.
6   Q    But this document, if you recall -- and if you don't,
7   tell me -- was specifically requested on behalf of you and
8   Sarah by your administrative assistant Johannah Olsher because
9   you needed to file your tax return; isn't that correct?
10  A    Yes, probably.
11  Q    And why would your executive assistant ask for a K-1 for
12  you if you were not an investor in Retrophin?
13           MS. KASULIS:  Objection, your Honor.
14           THE COURT:  Sustained.
15           MR. BRAFMAN:  Your Honor, he said --
16  Q    Well, do you know whether this was requested by your
17  administrative assistant?
18  A    If it was requested by my administrative assistant, she
19  was also working for Sarah.
20  Q    Let me save some time.  Look at DX 1205 for
21  identification, formerly Government 103-16.
22           Can you read that e-mail chain to yourself, please?
23  A    Should I read all these e-mails?
24  Q    Yes.  Please start from the back and work your way
25  forward from the last one.

LAM        OCR        RPR

1   A    This comes from Fred Hassan to Martin Shkreli --

2            MS. KASULIS:  Your Honor.

3   Q    I'm not asking you to read it out loud, I'm asking you to

4   read it to yourself.

5   A    Oh, okay.

6            (Pause in proceedings.)

7   A    Yes.

8   Q    Am I correct that reading this document refreshes your

9   recollection that the document was requested by your

10  accountant?

11  A    It doesn't refresh my recollection, but this is exactly

12  what happened.

13  Q    Your accountant requested it, correct?

14  A    Yeah, he was -- it was in October.  October 15 was the

15  deadline, so --

16  Q    And what your accountant asked Mr. Shkreli to provide is

17  the K-1 for Retrophin, telling him he needed it immediately

18  because you had to travel and you had to sign your tax return

19  before you traveled; isn't that correct?

20           MS. KASULIS:  Objection.

21           THE COURT:  Sustained, sustained.

22  Q    Do you remember how this came about, that this document

23  came to your office?

24  A    I don't remember.

25  Q    Does reading this document -- look at the e-mail on

F. Hassan - Cross - Brafman                 1409

1    October 9 -- refresh your recollection that Steve Cavalli

2    asked for it?

3    A    He wanted the documents completed.

4    Q    Because you had to travel, correct?

5    A    That's what the documents say.

6    Q    Were you going away at that time?

7    A    I don't remember what I was doing, but I travel a lot.

8    Q    And why would you have to sign a tax return or a K-1 or a

9    tax return for an investment in Retrophin if you weren't an

10   investor?

11   A    I have no idea what these documents were for, but

12   typically K-1s have to be filed before the end of the year.

13        I do notice here, by the way, that there are very

14   strong instructions not to have my name anywhere since I'm not

15   an investor.

16   Q    I understand that and we'll get to that point.

17        But originally you're the accountant, your tax

18   advisor, asked for this document because he believed you had

19   to sign it; is that correct?

20        MS. KASULIS:  Objection, your Honor.

21        THE COURT:  Sustained.

22        MR. BRAFMAN:  Your Honor, he read from the document

23   when it helped the Government just a minute ago.

24        MS. KASULIS:  Objection.

25        MR. BRAFMAN:  Can I offer this into evidence?

F. Hassan - Cross - Brafman                1410

1    THE COURT:  You're arguing with me.

2    MR. BRAFMAN:  I'm not, your Honor.

3    THE COURT:  It's bad enough you argue with the

4  witness, sir.  Don't argue with me either.

5    MR. BRAFMAN:  I won't argue with you, your Honor.

6    THE COURT:  All right.

7  Q    Do you recognize these materials that --

8    THE COURT:  The question's frame was improper, so

9  I'm sustaining the objection.

10    MR. BRAFMAN:  Yes, your Honor.

11    THE COURT:  You were asking whether or not he could

12  intuit what his account believed, and you need to rephrase

13  phrase.

14    MR. BRAFMAN:  Yes, Judge.

15  Q    In the e-mail from your accountant to Mr. Shkreli, do you

16  understand from reading the e-mail that he wanted you to sign

17  your tax return before you left?

18  A    At one point, it does say I need to sign my tax return,

19  yes.

20  Q    And the subject was the Retrophin K-1; is that correct?

21  A    Yes.

22  Q    Mr. Cavalli has been with you for a number of years,

23  correct?

24  A    Yes.

25  Q    And he does all of your tax work?

LAM      OCR      RPR

F. Hassan - Cross - Brafman                1411

1  A    Yes.

2  Q    Why would your personal accountant feel that you had to

3  sign the tax return, which included a Retrophin K-1, if you

4  were not an investor?

5            MS. KASULIS:  Objection, your Honor.

6            THE COURT:  Sustained.

7  Q    Do you understand that this document arrived at your

8  office because your accountant requested it?

9  A    My accountant wanted these documents done.

10  Q    And to get it done before you left so you could sign the

11  return, correct?

12  A    That is correct.

13            MS. KASULIS:  Objection, your Honor.

14  A    However, I don't know why.

15            THE COURT:  Sustained.

16  Q    When this happened, did you ask Mr. Cavalli:  Why did you

17  ask for a K-1 for me to sign?

18            MS. KASULIS:  Objection, your Honor.

19            THE COURT:  Sustained.

20  Q    You were interviewed by the FBI and the Government on

21  January 28, 2016 for the first time; is that correct?

22  A    Yes.

23  Q    And do you remember going there with your lawyer and

24  meeting with Assistant United States Attorneys and the FBI

25  agents when they interviewed you about your knowledge or

F. Hassan - Cross - Brafman                    1412

1   relationship with Mr. Shkreli?

2   A    Yes.

3   Q    And that was after he had been criminally charged; is

4   that correct?

5   A    Yes.

6   Q    And it was all over the news when Mr. Shkreli was

7   arrested, correct?

8   A    Yes.

9   Q    At that meeting, did you talk to the FBI?

10  A    They were part of the meeting.

11  Q    And before you sat down and talked to them, did you

12  execute any kind of agreement with respect to that meeting?

13  A    I do understand that there was some kind of an agreement

14  signed.  I relied on my lawyer.

15  Q    Let me showed you 3500FH1-1-B and ask if you recognize

16  this document.

17  A    Sure.  Yes, I do remember this document.

18  Q    And it has your signature on the back?

19  A    Yes.

20  Q    And it has the signature of your lawyer?

21  A    Yes.

22  Q    And it has the signature of several prosecutors -- one of

23  them Ms. Smith -- and two FBI agents, correct?

24  A    Yes.

25  Q    And you understood that this was a document that provides

F. Hassan - Cross - Brafman                    1413

1    you with some protection in connection with the statements you

2    would be making in the U.S. Attorney's Office, correct?

3    A    Yes.  My lawyer said.

4    Q    I understand you had a lawyer with you.  But on the

5    second page, you verify that you read --

6              MR. BRAFMAN:  I'm offering it into evidence, your

7    Honor.

8              MS. KASULIS:  Objection.

9              THE COURT:  Sustained.

10             MR. BRAFMAN:  Your Honor I would like a sidebar.

11

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                        1414
```

1          (The following occurred at sidebar.)

2          MR. BRAFMAN:  Your Honor, first, this is a benefit

3     that the witness received from the Government.  Not everybody

4     gets a proffer agreement, not everyone signs it and admits

5     that they understood it.

6          Second, when you read his 302, it's almost like zero

7     recollection of virtually half the things we discussed today.

8     I submit that without this document, there is a 1001 violation

9     just based on his testimony, your Honor.

10          MS. KASULIS:  Your Honor --

11          MR. BRAFMAN:  Let me finish, okay?

12          MS. KASULIS:  This is outrageous.

13          MR. BRAFMAN:  It is outrageous.  What's outrageous

14     is the witness' testimony.

15          I believe that the jury has a right to infer that

16     this witness has not told the whole truth and nothing but the

17     truth today.  And I have a right to argue that from the

18     record.

19          THE COURT:  Tell me where he's been inconsistent or

20     where he has --

21          MS. KASULIS:  Right.

22          THE COURT:  -- based on the 302.

23          MR. BRAFMAN:  Your Honor, I don't have to leave it

24     just for the 302.  I had no intention of doing this, but this

25     witness has made me pull things out of his mouth like I was a

Sidebar                                    1415

1   dentist on areas where it's absolutely clear that he knew the

2   answer and just didn't want to give it.  What you have here is

3   a witness who doesn't want to be involved in saying anything

4   good about Mr. Shkreli in 2017 because he's the dean of the

5   pharmaceutical bar.

6            And as a practical matter, Judge, on a number of

7   occasions we believe that he hasn't been completely truthful.

8   And part of the reason I couldn't produce that was because

9   some of the evidence was circumstantial, some of it is

10  hearsay, some of it relies on Mr. Banta or Mr. Saunders and

11  they may or may not be witnesses.

12           But any time a witness receives a benefit from the

13  Government -- and this is a benefit from the Government -- it

14  is appropriate to question him on the benefit because it

15  allows him to tailor his testimony to some degree.  This is

16  not a cooperation agreement, but if it was you certainly would

17  allow me to question him on his cooperation agreement.  And I

18  will bring out the fact that it's not a cooperation agreement,

19  but it does provide him with a degree of immunity for false

20  statements, statements is made to the agents at the meeting.

21  And I --

22           THE COURT:  It doesn't provide protection for false

23  statements.

24           MR. BRAFMAN:  Not false statements --

25           THE COURT:  You just said that.

```
                          Sidebar                        1416
```

1          MR. BRAFMAN:  I withdraw that.

2          THE COURT:  Slow down.

3          MR. BRAFMAN:  It's false.  This is their view that

4    he's telling the truth.  I don't believe he's telling the

5    truth.  And the fact that he has an agreement that prevents

6    them from prosecuting him for anything he said in the U.S.

7    Attorney's Office is something I'm allowed to explore.

8          THE COURT:  But you have to show where the

9    inconsistency is.  What did he say in the 302 that contradicts

10   what he's saying on the stand?

11         MR. BRAFMAN:  Your Honor, most of the things he

12   identified here he had no recollection of when he was shown

13   those documents in the 302.  And if you look at the 302, he

14   probably says at least a dozen times:  I have no recollection

15   of ever seeing this document.

16         MS. KASULIS:  He's been saying that he has no

17   recollection the entire time he's testified.

18         MR. BRAFMAN:  Yes.  And then when we showed him the

19   document and we pulled it out of him --

20         MS. KASULIS:  No, you didn't pull it out of him.

21   You showed him a document and had him read from a document.

22         MR. BRAFMAN:  The same documents that you showed him

23   and he tells me he doesn't remember them.

24         MS. KASULIS:  He doesn't know, as he's said here.

25         MR. BRAFMAN:  You can't make a judgment on this

```
                            Sidebar                      1417
```

1   record, most respectfully, as to whether or not this witness

2   in his mind is relying on this document to feel free to say

3   whatever he thinks is appropriate.

4          MS. SMITH:  Your Honor, for the record, in the

5   proffer agreement, the carve-out is for false statements.  So,

6   if he lied to us in that proffer session, that's why it's

7   called a --

8          MR. BRAFMAN:  Then you --

9          MS. SMITH:  -- king for a day, number one.  And

10  number two, it doesn't give him any coverage for anything that

11  he says on the stand.

12         MR. BRAFMAN:  So you won't be able to do that on

13  redirect.

14         MS. SMITH:  No.

15         MS. KASULIS:  No.

16         He has not proven there's any inconsistency from

17  what Mr. Hassan said in that meeting.  He has not done that,

18  not one time.  He's just saying the man doesn't remember.

19  It's exactly what he said in these meetings.

20         What Mr. Brafman has been doing is putting documents

21  in front of him and have him read from it and he's saying he

22  doesn't remember.

23         MR. BRAFMAN:  Your Honor, if you read his 302 --

24         MS. KASULIS:  If you want to make argument to the

25  jury that you don't believe him, you can do that.  You're

```
                        Sidebar                      1418
```

 1    saying things like Banta and Saunders.  That is not evidence

 2    in this court.

 3              It's how you feel.  That's a completely

 4    inappropriate thesis --

 5              MR. BRAFMAN:  Your Honor, I don't want to belabor

 6    the issue because the hour is late.  I believe I have a

 7    perfect right to question him about the fact that he signed

 8    the proffer agreement, which he read and agreed to and said he

 9    fully understood.  And if they want to probe him on redirect

10    to show he has no immunity from making a false statement, God

11    bless them.

12              THE COURT:  The agreement says clearly that if you

13    make a false statement, you can be prosecuted.

14              MR. BRAFMAN:  If he makes a false statement in their

15    judgment.  Same thing that's in a cooperation agreement:  If

16    in the opinion of the Government the witness has lied or

17    otherwise not lived up to the agreement.

18              I've done this cross so many times --

19              MS. KASULIS:  That's a cooperator.

20              MR. BRAFMAN:  Your view of who is and is not the

21    cooperator doesn't carry the weight.

22              THE COURT:  There are many different kinds of

23    agreements.  But one is a proffer agreement, which has quite a

24    number of obligations on the part of the witness.  And there's

25    a proffer agreement which is really I think to ensure that a

Sidebar                                                1419

1    witness is going to tell the truth and warning him or her that

2    if they don't, they could be prosecuted.

3              So, I think to try to confuse the jury --

4              MR. BRAFMAN:  Your Honor.

5              THE COURT:  I don't want the jurors to get confused.

6              MR. BRAFMAN:  There are 75 witnesses in this case

7    who came in, did testimony, gave interviews, and they didn't

8    get proffer agreements.

9              MS. KASULIS:  Yes, they did.

10             MR. BRAFMAN:  No, they didn't.

11             MS. KASULIS:  Many of them asked for it and they

12   did.

13             MR. BRAFMAN:  You haven't produced it.

14             MS. KASULIS:  Yes, we have, Ben.

15             MS. SMITH:  Any witness who asked for one got one.

16             MR. BRAFMAN:  Anyone who asked for one got one?

17             MS. SMITH:  If their lawyer asked for it.  Most of

18   them don't have any idea of whether they should be or should

19   not be asking.

20             MR. BRAFMAN:  Are you precluding me from doing this

21   cross?

22             THE COURT:  No, I'm not precluding you from doing

23   the cross, but I'm precluding from putting in this 3500

24   material, the 302, regarding his statement.

25             You can cross-examine him.  You can ask him whether

Sidebar                                                          1420

1    he signed a proffer agreement and if he understands what the

2    proffer agreement provided.  I understand he says he relied on

3    his lawyer's advice in signing the document.  Whether he

4    understands anything more than that, I don't know.

5              MR. BRAFMAN:  Thank you.

6

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F. Hassan - Cross - Brafman                1421

1          (Sidebar ends; in open court.)

2    BY MR. BRAFMAN:

3    Q    Mr. Hassan, we're not going to offer the document into

4    evidence but I'm going to refer you to it in case you have to

5    refresh your recollection.  And I'm referring to 3500FH1-1-B,

6    which you acknowledge bears your signature and the signature

7    of your lawyer.  Do you have it in front of you?

8    A    Yes.

9    Q    And in pertinent part, did you understand this agreement

10   when you signed it?

11   A    As well as I could.  I'm a lay person, not a lawyer.

12   Q    But you're a pretty well-educated individual.

13   A    Quite good in some areas.  I don't understand legal stuff

14   too well.

15   Q    But you've verified that you read the agreement and

16   discussed it with the attorney and you understand all of its

17   terms and you entered into it knowingly and voluntarily; is

18   that correct?

19   A    Yes, but relying heavily on the attorney.

20   Q    I understand.

21          I want to refer you to Paragraph 2, and I want to

22   ask you, sir -- I'm not going to read it, I'm just going to

23   ask you did you understand that as a result of signing this

24   agreement, that the Government could not use any evidence

25   against you in the event that there was a case made against

F. Hassan - Cross - Brafman                    1422

1   you?

2              MS. KASULIS:  Objection.

3              THE COURT:  Sustained.

4   Q    Read Paragraph 2 and tell me what you understood.

5              THE COURT:  Read it to yourself.

6   Q    Read it to yourself and tell me what you understood.

7              (Pause in proceedings.)

8   A    I do get a rough idea of what this means.

9   Q    Tell me.

10  A    It says if you say something that is blatantly or

11  willfully false, then that's not going to protect you.

12  Otherwise, you are partially protected based on what you tell

13  the Government.  I think that's basically what it's saying

14  here.

15  Q    I'm sorry, I didn't follow.  Are you protected that they

16  can't use anything you tell them in that office during this

17  meeting against you?

18             MS. KASULIS:  Objection.

19             THE COURT:  Sustained.

20  Q    Unless you lie, they can't use anything you tell them

21  against you in any prosecution; correct?

22  A    Roughly, that's the idea.  Unless there's something

23  willful, a willful lie, yes.

24             MR. BRAFMAN:  I have nothing further.  Thank you

25  sir.

F. Hassan - Cross - Brafman                1423

1            THE COURT:  Do you have redirect?

2            MS. KASULIS:  Yes, I do, your Honor.

3     REDIRECT EXAMINATION

4     BY MS. KASULIS:

5     Q     Good afternoon, Mr. Hassan.

6     A     Good afternoon.

7     Q     I want to refer you back to Government Exhibit DX 1205.

8     Do you have it there in front of you?

9     A     Yes.

10    Q     Do you recognize this e-mail chain?

11    A     Yes.

12    Q     Are you a recipient of the e-mail at the top of this

13    chain?

14    A     Yes.

15            MS. KASULIS:  The Government moves this exhibit unto

16    evidence, your Honor.

17            MR. BRAFMAN:  Can I just see which one they're

18    talking about, Judge?

19            MS. KASULIS:  It's you're exhibit, DX 1205.

20            MR. BRAFMAN:  I know.  I'm just trying to find it.

21    Give me the number again, please.

22            MS. KASULIS:  DX 1205.

23            MR. BRAFMAN:  Give me one second.  I'm a little out

24    of order here in the sequence.

25            (Pause in proceedings.)

F. Hassan - Cross - Brafman                    1424

1          Your Honor, I offered this and they objected.

2          THE COURT:  No sir, you did not offer it.  You used

3     it to refresh the witness' recollection.

4          MR. BRAFMAN:  I have no objection.

5          THE COURT:  We will admit Defendant's Exhibit 1205

6     in evidence without objection.

7          (Defendant's Exhibit 1205 so marked.)

8          MS. KASULIS:  Thank you.

9          THE COURT:  You may publish.

10         MS. KASULIS:  Thank you, your Honor.

11         (Exhibit published to the jury.)

12

13         (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Continuing.)

2              THE COURT:  Do you have it, sir?

3              THE WITNESS:  Yes.

4    BY MS. KASULIS:

5    Q    Do you have that in front of you, Mr. Hassan?

6    A    Yes.

7    Q    Do you recall that Mr. Brafman was asking you about a K-1

8    document that had Sarah, Dynagrow and Fred Hassan on it?  Do

9    you recall that?

10   A    Yes.

11   Q    And do you recall that you discussed on cross-examination

12   that you used a tax preparer named Steve Calvelli; is that

13   right?

14   A    That's correct.

15   Q    And also you testified that you used an administrative

16   assistant Ms. Johanna Olsher; is that right?

17   A    At that time she was my admin, my administrative

18   assistant, yes.

19   Q    Let's take a minute to go through this exhibit that

20   Mr. Brafman used to refresh your recollection.  At the bottom

21   of the second page, it's the first e-mail in this chain.  It

22   appears to be from you.  That's your e-mail address; is that

23   right, Mr. Hassan?

24   A    That is correct.

25   Q    And it's dated October 8, 2012, to Mr. Shkreli; is that

1  right?

2  A    Yes.

3  Q    And the subject is "K-1 tax form from Retrophin"; is that

4  correct?

5  A    Yes.

6  Q    And if you look at the next page it's, "Dear

7  Mr. Shkreli," and the rest of the e-mail is at the top of the

8  page.  "Neither of the Hassans or Sara Hassan have received

9  the K-1 tax form for Retrophin.  It is the last document the

10  Hassans need before they file their tax return.  Can you help

11  me get this form, please?  Thank you."  And it's signed by

12  Johanna Olsher; is that right?

13  A    Yes.

14  Q    Does this e-mail appear to be from your assistant,

15  Johanna Olsher --

16  A    Yes.

17  Q    -- to Mr. Shkreli?

18  A    Yes.

19  Q    And she is using your e-mail address to send this e-mail?

20  A    That is correct.

21  Q    If we look at the response, Mr. Shkreli writes, "Yes.

22  You will receive K-1s today or tomorrow."  Do you see that?

23  A    Yes.

24  Q    And then farther up in the chain, again this appears to

25  be your e-mail address, but, again, this appears to be signed

1    by Johanna Olsher; do you see that?

2    A    Yes.

3    Q    She writes, "Mr. Shkreli, Mr. Hassan needs to sign his

4    tax return on Thursday before he begins traveling on Friday.

5    Would you be able to scan the tax form directly to his

6    accountant?  I'm copying him on this e-mail," and then she

7    lists here Mr. Calvelli's information; is that right?

8    A    Yes.

9    Q    And then she writes, "Would you mind sending me the phone

10   number?  All I seem to have is your e-mail address," and she's

11   saying that to Mr. Shkreli; is that right?

12   A    Yes.

13   Q    So your assistant doesn't have Martin Shkreli's phone

14   number, does she?

15   A    No.

16   Q    She only has his e-mail address?

17   A    That is right.

18   Q    And she has access to your contact information; is that

19   right?

20   A    Yes.  And customarily most calls she would put through

21   for me so she would have access to phone numbers.

22   Q    And is Ms. Olsher an accountant, Mr. Hassan?

23   A    Johanna Olsher is she an accountant?

24   Q    Are you aware of whether Ms. Olsher is an accountant?

25   A    I'm not aware of that.

1  Q      Is she a tax preparer?

2  A      No, she is not.

3  Q      Does she prepare your taxes?

4  A      I know for sure she does not.

5  Q      And so in response it appears that Mr. Shkreli responds

6  "Yes" and then lists here his phone number.  Do you see that?

7  A      Yes.

8  Q      And the e-mail chain continues on the next page, the

9  first page of this document, where again it appears that

10  Johanna Olsher is signing this next e-mail, again using your

11  e-mail address and says, "Dear Mr. Shkreli:  Thank you for

12  sending us a copy of the K-1 tax return.  Please note for the

13  future, it should be addressed to Sara Hassan care of Dynagrow

14  Capital.  Fred Hassan's name should not be on the documents.

15  Please confirm back to me that you are able to make this

16  change.  Thank you for your assistance."

17          And she CCs Mr. Calvelli on this e-mail; isn't that

18  right?

19  A      Yes.

20  Q      And then in response Mr. Shkreli acknowledges

21  Ms. Olsher's e-mail; is that right?

22  A      Yes.

23  Q      And she states, "I just want to make sure Fred's name

24  should not be on the document whatsoever.  We can make that

25  change."

1       Is it your understanding that the Fred that

2  Mr. Shkreli is referring to here is you, Mr. Hassan, Fred

3  Hassan?

4  A     Yes.

5  Q     And in response Mr. Calvelli -- who is your tax preparer;

6  is that right?

7  A     Yes.

8  Q     -- states to Martin Shkreli and yourself, "Martin, please

9  eliminate Fred's name.  The investment is owned by a family

10 partnership named Dynagrow and Sarah is the manager.  Thanks.

11 And it's signed by Steve Calvelli.

12          Do you see that, Mr. Hassan?

13 A     Yes.

14 Q     Now we heard a lot on cross-examination about your

15 relationship with Mr. Shkreli, about whether you had e-mail

16 correspondence with him, whether you served as a reference for

17 him.

18          Do you consider yourself to be a close friend of

19 Mr. Shkreli?

20          MR. BRAFMAN:  Objection.  I didn't say that on

21 cross.

22          MS. KASULIS:  I'm asking my own question now.

23          THE COURT:  Let's stay within the bounds of cross,

24 Ms. Kasulis.

25 BY MS. KASULIS:

1   Q    Do you consider yourself to be close to Mr. Shkreli?

2            MR. BRAFMAN:  Objection Your Honor.

3            THE COURT:  Overruled.

4   A    No.

5   Q    And do you consider yourself to be an advisor to

6   Mr. Shkreli?

7   A    No.

8   Q    Have you given him permission to use your name as a

9   reference?

10  A    No.

11  Q    Would you expect if someone was going to use your name as

12  a reference, they would ask you permission first to do that?

13            MR. BRAFMAN:  Objection, Your Honor.

14            THE COURT:  Overruled.

15  A    Yes.  They would normally -- they would -- it's the right

16  way of doing it; first ask for permission to use as a

17  reference.

18  Q    And did you give Mr. Shkreli permission to use your name

19  as a reference at any point in time, sir?

20  A    No.

21  Q    Who is Francois Maison Rouge?

22  A    He is a senior person, very senior person, at an

23  investment banking firm -- it's a big financial services firm

24  called Evercore Capital Advisors.  It's a big firm.  They do a

25  lot of work in New York.

1          MS. KASULIS:  May I approach, Your Honor?

2          THE COURT:  Yes, you may.

3    Q    I'm showing you what's been newly marked as Government

4    Exhibit 103-40.

5          MS. KASULIS:  I'm going to show it to you now,

6    Mr. Brafman.

7    Q    You can take a minute to review this document,

8    Mr. Hassan.

9    A    Yes, I have.

10   Q    Do you recognize this document?

11   A    Yes.

12   Q    What is it?

13   A    It's an e-mail from Francois Maison Rouge to me.

14         MR. BRAFMAN:  Objection.  If we're going to offer

15   it, I would ask for a sidebar.

16         THE COURT:  All right.

17         (Continued on next page.)

18

19

20

21

22

23

24

25

Sidebar                                                1432

1          (The following occurred at sidebar.)

2          MS. KASULIS:  Your Honor, Mr. Brafman attacked

3   Mr. Hassan's credibility on cross-examination as serving as a

4   reference for Mr. Shkreli.

5          In this e-mail chain it is clear that Mr. Shkreli is

6   using Mr. Hassan's name as a reference in trying to solicit

7   business from Francois Maison Rouge and it is after the time

8   period that his daughter had invested and withdrawn the money

9   and gotten the money.

10          Mr. Hassan thanks Mr. Maison Rouge and then

11  Mr. Saunders acknowledges that he, himself, had nothing to do

12  with this and therefore under the rules of evidence, in order

13  to rehabilitate the declarant's credibility when attacked on

14  other grounds, we say this is not hearsay and this should be

15  admitted for the purpose of rehabilitating his credibility.

16          MR. BRAFMAN:  There's a relevance issue.

17  Mr. Shkreli is already fired from Retrophin or resigned from

18  Retrophin in December, but it was certainly after she got her

19  money back.  This is the kind of hearsay that they objected

20  from me using whenever we wanted to offer something said by

21  someone else.  This is being admitted for the truth of it.

22          THE COURT:  She is using this to rehabilitate the

23  witness which is a different means by which you can permit an

24  exhibit on evidence.

25          You attacked his credibility in terms of questioning

Sidebar                                                              1433

1   him on cross whether he was allowing Mr. Shkreli to use him as

2   a reference or describe him as a mentor or positive things

3   about him and this is what?  Give me the number.

4            MS. SMITH:  Its Rule 801(d)(1)(b)(2).  And it's

5   rehabilitating declarant's credibility.  So it is not hearsay.

6   Alternatively, under 801(d)(1)(b)(1), it's rebutting the

7   charge that Mr. Brafman made on cross that he recently

8   fabricated that he doesn't know --

9            MR. BRAFMAN:  We're not rehabilitating the declarant

10  here.  Mr. Hassan is not -- the declarant is Mr. Shkreli or

11  it's Francois is the one who's the declarant.  He hasn't been

12  attacked.  The key piece of information is Francois.  He's not

13  the declarant of this e-mail.

14           MS. KASULIS:  The purpose of this document is to

15  show that Mr. Shkreli was using Mr. Hassan as a reference when

16  he had not been given permission to do that and you attacked

17  him, sir.

18           MR. BRAFMAN:  The declarant testifies on the subject

19  of cross-examination.  That's Francois.

20           THE COURT:  This declarant, Mr. Hassan, is saying

21  "Thanks for the heads up."

22           MR. BRAFMAN:  But the "thanks for the heads up" is

23  meaningless unless you get the declarant from --

24           MS. SMITH:  Under Rule 106 for completeness --

25           THE COURT:  Sir, these are the rules.

```
                            Sidebar                        1434
```

1    MR. BRAFMAN:  I understand the rules, Your Honor.

2    THE COURT:  I am sure you know them better than

3    anyone in this courthouse or my courtroom I should say.  I am

4    not speaking for my colleagues, dare I not, but Martin Shkreli

5    is making a statement and Mr. Maison Rouge then gives

6    Mr. Hassan notice that this is -- that his name is being used

7    by Mr. Shkreli still invoking the name and Mr. Hassan replies

8    "Thanks for the heads up."

9            So the context of this, the statement of the

10   declarant who has been attacked vigorously which is what you

11   should be doing on cross, this allows the Government to use

12   this document.

13   MR. BRAFMAN:  They can do it the same way you asked

14   me to do it.  You can ask him did you ever receive indication

15   that Mr. Shkreli was using your name, yes, I got -- I received

16   information and I told him that I had nothing to do with it.

17   THE COURT:  There is a rule that allows for

18   admission of this.

19   MR. BRAFMAN:  Saunders' name is in here.  His two

20   cents needs to be redacted.

21   MS. KASULIS:  We'll redact Mr. Saunders.

22   THE COURT:  We will redact that.

23   MR. BRAFMAN:  "Thanks for the heads up" is fine.

24   MS. SMITH:  We'll fold it down and we'll do a

25   cleaner version.

Sidebar                                          1435

1          (Sidebar ends.) (Continued on next page.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          MS. KASULIS:  Your Honor, the Government moves

2     103-40 with the top portion folded down into evidence as we

3     discussed.

4          MR. BRAFMAN:  There's an objection whether redacted

5     or not, but as redacted --

6          MS. KASULIS:  As redacted.

7          THE COURT:  We will admit Government 103-40 with the

8     last or top e-mail in this series redacted.

9          (Government's Exhibit 103-40 received in evidence.)

10          THE COURT:  You may publish, ma'am.

11          (Exhibit published.)

12    Q    Mr. Hassan, do you see this first e-mail here?

13    A    Yes.

14    Q    And it appears to be from Martin Shkreli dated December

15    9, 2014.  Do you see that?

16    A    Yes.

17    Q    And it's to the individual who we just spoke about,

18    Francois Maison Rouge.  Do you see that?

19    A    Yes.

20    Q    With the subject being "Martin Shkreli/Turing

21    Pharmaceuticals"?

22    A    Yes.

23    Q    And then Mr. Shkreli writes, "Hello, Francois," and it's

24    only to Mr. Maison Rouge; is that right?

25    A    That is correct.

1  Q    And then he writes, "Hello, Francois.  I hope you are

2  doing well.  We met briefly at the Palace Hotel a year or two

3  ago.  I am a close friend of Brent Saunders and Fred Hassan,

4  the founder of Retrophin.

5           "I started a new business, Turing Pharmaceuticals AG

6  recently.  We are based in New York and in Basel.  I would

7  love to catch up with you even for five minutes on some of the

8  activity we are doing.  I have a large pool of capital and

9  your relationships and advice could come in handy with the

10  specific deal we are in the throes of at the moment."

11          And it's signed by Mr. Shkreli; is that right?

12  A    Yes.

13  Q    In this next e-mail which appears to be forwarded to you,

14  Mr. Francois Maison Rouge writes, "Gosh, still invoking your

15  name.  See below," and he sends this to you and you respond on

16  Tuesday, December 9, 2014 CC'g Mr. Saunders and saying,

17  "Francois, thanks for the heads up.  Fred."

18  A    Yes.

19  Q    Did Mr. Shkreli ever give you -- did you ever give

20  Mr. Shkreli permission to use your name in soliciting Francois

21  may?

22  A    No.

23  Q    For a meeting?

24  A    No.

25  Q    Of any kind?

1    A    No.

2    Q    Do you consider yourself to be a close friend of

3    Mr. Shkreli?

4    A    No.

5    Q    Do you have an understanding as to why Mr. Maison Rouge

6    forwarded this e-mail to you?

7    A    Yes.

8    Q    What is your understanding, sir?

9    A    He had called me at some time earlier on to alert me to

10   the fact that Mr. Shkreli was using my name for some work,

11   some fundraising that he was trying and he called me to just

12   tell me he was surprised that this was going on.

13         I didn't have any concrete evidence so I didn't do

14   anything about it.

15   Q    And does this -- sir, is this concrete evidence to you

16   that Mr. Shkreli was using your name without permission to

17   solicit meetings or business for himself?

18   A    Yes.  He called me to do just -- to warn me because he's

19   somebody I've known for many years, that this -- this is going

20   on where your name is being used.

21   Q    And this e-mail here, sir, is this evidence to you that

22   Mr. Shkreli was using your name without permission?

23         MR. BRAFMAN:  Objection.

24         THE COURT:  Overruled.

25   A    No, this e-mail is just saying that here is another

1    example of the same problem.

2    Q    So it is, in fact, an example of Mr. Shkreli using your

3    name without your permission?

4    A    Yes.

5    Q    Thank you.

6              MS. KASULIS:  No further questions, Your Honor.

7              MR. BRAFMAN:  Can I have a brief recross on this?

8              THE COURT:  Of course.

9              MR. BRAFMAN:  Leave the document there, please.

10             MS. KASULIS:  Sure.

11   RECROSS-EXAMINATION

12   BY MR. BRAFMAN:

13   Q    If you can look at this document just so we're clear.

14   Mr. Shkreli writing to Francois says, "I am a close friend of

15   Brent Saunders and Fred Hassan."  He's including Mr. Saunders

16   in that; is that correct?

17   A    Yes.

18   Q    Do you know if Mr. Shkreli was, in fact, a close friend

19   of Brent Saunders at the time?

20   A    I don't know the extent of their relationship.

21   Q    And it was Brent Saunders who originally introduced

22   Mr. Shkreli to your daughter and your family; correct?

23   A    Yes.

24   Q    So what he is doing is saying to Francois that he is a

25   close friend of Brent Saunders and you, and he was telling him

1  he's the founder of Retrophin and he's signing it not on

2  behalf of is Retrophin but Turing Pharmaceuticals; is that

3  right?

4  A    Yes.

5  Q    And if we could look at what's noted as Defendant's

6  Exhibit 1202 which is the schedule of meetings on January 11,

7  2011.  Do you remember seeing this?

8  A    The earlier one?

9  Q    Do you see it?  Do you have it?

10 A    Yes, yes.

11 Q    Do you remember we went into this on cross-examination?

12 A    Yes.

13 Q    At 4:15 to 4:45 you met with Martin Shkreli at MSMB

14 Capital in the Clift Hotel at the concierge desk.  Do you see

15 that?

16 A    Yes.

17 Q    And right after that meeting, beginning at the minute

18 that meeting ends, you have listed here, "Say hello to

19 Francois Maison Rouge at the Clift Hotel."  Do you see that?

20 A    Yes.

21 Q    Do you know whether or not you introduced Mr. Shkreli to

22 Maison -- Francois at that meeting on that date?

23 A    I don't believe so.

24 Q    You said you don't have any recollection of even meeting

25 with Mr. Shkreli?

1           MS. KASULIS:  Objection, Your Honor.

2           THE COURT:  Sustained.

3    Q    Did you remember the meeting with Mr. Shkreli on that

4    date where you met him for a half an hour on January 11,

5    2011?

6    A    That first meeting which my daughter arranged, yes, I do

7    remember that.

8    Q    Did you remember talking to him at that meeting?

9    A    I don't remember the contents of the conversation, I --

10   Q    Do you remember who was there?

11          MS. KASULIS:  Objection, Your Honor, asked and

12   answered.

13          THE COURT:  Sustained.

14          MR. BRAFMAN:  Excuse me, what was the objection?

15          MS. KASULIS:  It was asked and answered.

16          MR. BRAFMAN:  But we're getting a clarification now

17   as to his recollection.

18   BY MR. BRAFMAN:

19   Q    Do you know whether or not Mr. Francois Maison Rouge was

20   introduced to Mr. Shkreli the minute your meeting ended?

21          MS. KASULIS:  Objection.  Introduced to --

22          THE COURT:  Sustained.

23   BY MR. BRAFMAN:

24   Q    Do you think this is just a coincidence that you and

25   Mr. Shkreli are meeting at 4:45 and the next person you're

Hassan - recross - Brafman                1442

1    meeting at the same hotel in the same place minutes after is,

2    "Say hello to Francois Maison Rouge"?

3    A     From everything I know, it looks like a coincidence

4    because Francois Maison Rouge typically had a suite where he

5    would host people who would come and go and, so, I did meet

6    Mr. Shkreli somewhere outside, somewhere near the concierge

7    desk and it's unlikely that he would have come out of the room

8    to meet me.  Also the original letter said Palace Hotel and

9    this is the Clift Hotel.  It's likely that there was a

10   coincidence here.

11   Q     Just a coincidence?

12   A     It looks like it.

13   Q     Okay.  Now --

14         THE COURT:  May I make a clarification for the

15   record, sir?  I think you referred to Defendant's Exhibit

16   1202.  This, in fact, is Defendant's Exhibit 1200.

17         MR. BRAFMAN:  You are right.  No, I have it as 1202,

18   Judge.  It is the calendar entry for January 10, 2012.

19         MS. KASULIS:  No.

20         THE COURT:  This is January 11, 2011, sir.

21         MR. BRAFMAN:  But the exhibit is on the front page

22   which is the meeting organizer.

23         THE COURT:  My point is that we're talking about two

24   different years in January of 2011.

25         MR. BRAFMAN:  Yes.

1          THE COURT:  That's what is reflected in Defendant's

2     Exhibit 1200.  And in Defendant's Exhibit 1202, the year is

3     January 10, 2012.  It's a different year.

4          MR. BRAFMAN:  The one that I'm referring to

5     unfortunately has the cover page 1202, but I'm specifically

6     referring to January 11, 2011 for this reference.

7          THE COURT:  I believe you referred to it as 1202

8     and, in fact, it is 1200.

9          MR. BRAFMAN:  I was reading the exhibit sticker and

10    I'm changing it to make it accurate.

11          THE COURT:  Mine is accurate, sir.

12          MR. BRAFMAN:  I trust you.

13    BY MR. BRAFMAN:

14    Q    Now, Ms. Kasulis just a minute ago read the e-mail chain

15    now in evidence as DX 1205 which relates to the K-1s.  Do you

16    remember that, sir?

17    A    Yes.

18    Q    Do you have it with you, sir?

19    A    Yes.

20    Q    All right.  I want to start from the back just the way

21    she did and I'm going to put it up on the screen and mine is

22    marked, but I was going to circle it anyway so it doesn't have

23    comments.  It just has red marking and I'll put on the second

24    page on the bottom where it begins.

25          On the bottom of that page, there is an e-mail from

Hassan - recross - Brafman                    1444

1   Fred Hassan to Mr. Shkreli dated October 8th, 2012; correct?

2   A    Yes.

3   Q    And it's signed by your administrative assistant or your

4   executive assistant Johanna Olsher; correct?

5   A    Yes.

6   Q    And it says "Executive assistant to Fred Hassan."

7   A    Yes.

8   Q    Now, she's the one who actually wrote this e-mail for

9   you; correct?

10  A    Either she wrote it for me or for Sarah or she wrote it

11  on her own.  I don't know.

12  Q    How long has she worked for you?

13  A    Before that?  She started in late '09.

14  Q    Okay.

15  A    So.

16  Q    And this e-mail is in 2012, so she's been working for you

17  for three years?

18  A    Yes.

19  Q    And she says, "Neither the Hassans nor Sarah Hassan have

20  received K-1 tax forms from the Retrophin.  It is the last

21  form the Hassans," plural, "need before they file the tax

22  return.  Can you help me get this form, please."

23         Am I correct?

24  A    Yes, that's what it says.

25  Q    And what information would she be using to send an e-mail

Hassan - recross - Brafman                    1445

1   asking for a K-1 that included not just Sarah Hassan and not

2   Dynagrow but the Hassans, meaning you and your wife I assume,

3   and Sarah --

4           MS. KASULIS:  Objection.

5   Q    -- what information could she be relying on to draft that

6   e-mail?

7           MS. KASULIS:  Objection.

8           THE COURT:  Sustained.

9   Q    What do you understand her to be asking for; your K-1 or

10  Sarah's or both?

11  A    I think someone asked her to send this reminder to Martin

12  Shkreli to get the paperwork in for the end of the year.

13  Q    Now, go back if you could to your accountant.

14          How long has he been your accountant?

15  A    Quite a long time.  Over ten years.

16  Q    And he's the one who gets all of your tax documents and

17  prepares your tax return; correct?

18  A    That is correct.

19  Q    And he sends you the following e-mail, "Mr. Hassan needs

20  to sign his tax return on Thursday before he begins traveling

21  again on Friday.  Would you be able to scan the tax form

22  directly to his accountant?  I am copying him on this e-mail."

23          Who is that e-mail from, your secretary?

24  A    Yes, it's from my admin.

25  Q    So she is sending it to the accountant indicating that

1  you need to sign your tax return before you leave and she

2  wants it to be scanned immediately?

3  A    I think she's asking Martin Shkreli to get in touch

4  directly with my accountant.

5  Q    Yes.  But do you know why she would believe that you had

6  to sign your tax return and get a K-1 from Retrophin if you

7  have nothing to do with Retrophin?

8              MS. KASULIS:  Objection.

9              THE COURT:  Sustained.

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. BRAFMAN: (Continuing)

3    Q    Now, ultimately your accountant tells them never again

4    put Fred Hassan's name on the K-1; correct?

5    A    Yes.

6    Q    Did you ever get another K-1 that has your name on it?

7    A    I don't know.

8    Q    Thank you.

9              THE COURT:  Is there any redirect?

10             MS. KASULIS:  No, Your Honor.

11             THE COURT:  Sir, you are excused.  Thank you for

12   your time.  Have a nice weekend.

13             THE WITNESS:  Can I leave these here?

14             THE COURT:  All the documents may be left there.

15   You can take your water with you, however.

16             MS. KASULIS:  Your Honor, we can call a next

17   witness.

18             MR. BRAFMAN:  Your Honor, can we have a quick

19   sidebar?

20             THE COURT:  Yes, sir, of course.

21             (Continued on the next page.)

22

23

24

25

```
                          Sidebar                         1448
```

 1            (Sidebar held outside the hearing of the jury.)

 2            MR. BRAFMAN:  Your Honor, for a number of reasons

 3   I'd ask you to adjourn today, respectfully.  It is a quarter

 4   of 5:00, I had asked at the beginning at trial to adjourn on

 5   Fridays at 5 o'clock, and particularly the day of the eve of

 6   the 4th of July weekend.  It takes me three hours to get to

 7   where I have to travel to.  I'm observant and I don't travel

 8   on the Sabbath.  If I could ask you to accommodate, not as to

 9   inconvenience the Court, but I have to get going where I have

10   to be, and I am exhausted.

11            THE COURT:  You speak for all of us on that.

12            MS. SMITH:  Unfortunately, our next witness is from

13   Texas.

14            MR. KAPLAN:  He has to come back anyway.

15            MS. SMITH:  I would like to get him on and off, but

16   cross is going to be three-and-a-half hours.  Just given that,

17   it is going to take us -- and we had two other witnesses for

18   today.  It is going to take us -- we have to reshuffle

19   everyone for next week, so we will let defense know who we

20   might call.  It may take a day or two to arrange.

21            THE COURT:  We have a nice long weekend to sort it

22   all out and be prepared.  Can you let them know.

23            MS. SMITH:  I am hoping to let them know by

24   tomorrow.  It is a matter of our travel division is closed

25   over the weekend.

```
                            Sidebar                        1449

 1          MR. BRAFMAN:  Thank you, Judge.

 2          THE COURT:  Thank you.  I will excuse the jurors.

 3          (Sidebar ends.)

 4          (Continued on the following page.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1450

1    THE COURT:  Members of the jury, at this time, I

2 will excuse you for the weekend.  Please don't talk about the

3 case or expose yourself to any media.

4    As I told you during jury selection and at the

5 beginning, we will not sit on Monday, July 3rd or Tuesday July

6 4th, so you have a nice long weekend.  I appreciate your

7 attention here this week.  We will continue first thing on

8 Wednesday morning at 9:00 a.m.  Please report to the jury

9 room.  When you are all here, we will get started immediately.

10 And thank you again.  Have a safe and fun weekend.

11    Please leave your notebooks down face down on your

12 chairs.  If you don't mind taking your cups and bottles with

13 you, we would be grateful.

14    (Jury exits the courtroom.)

15    THE COURT:  Thank you.  Have a good weekend

16 everyone.

17    MR. BRAFMAN:  Thank you, Your Honor.  Thank you very

18 much.  You too.

19    THE COURT:  I apologize.  Juror No. 18 noticed that

20 Mr. Brafman referred to an exhibit as 1130 or something like

21 that, even though it was marked 12, the series is 12.  They

22 saw it on the ELMO, I suppose when you put it up.  They want

23 to make note this that there is a discrepancy between the

24 exhibit.

25    MR. BRAFMAN:  They're paying attention.

1451

1      THE COURT:  Mr. Brafman, check your exhibits and

2  make sure we straighten it out on Wednesday.

3      MR. BRAFMAN:  I will.  Thank you.

4      THE COURT:  I think the juror said 1230.

5      THE COURTROOM DEPUTY:  He said 1230 but that you

6  wrote 130 or 150.

7      You wrote a different number.

8      MR. BRAFMAN:  I am delighted that they are paying

9  attention.

10      (Matter adjourned to Wednesday, July 5, 2017, at

11  9:00 o'clock a.m.)

12

13                      ooo0ooo

14

15

16

17

18

19

20

21

22

23

24

25

1452

1       I N D E X

2

3    WITNESS                                      PAGE

4

5    JOSIAH THOMPSON AUSTIN

6        DIRECT EXAMINATION

7        BY MS. SMITH                             1185

8        CROSS-EXAMINATION

9        BY MR. AGNIFILO                          1226

10       REDIRECT EXAMINATION

11       BY MS. SMITH                             1280

12       RECROSS EXAMINATION

13       BY MR. AGNIFILO                          1282

14   FRED HASSAN

15       DIRECT EXAMINATION

16       BY MS. KASULIS                           1285

17       CROSS EXAMINATION

18       BY MR. BRAFMAN                           1309

19       REDIRECT EXAMINATION

20       BY MS. KASULIS                           1423

21       RECROSS-EXAMINATION

22       BY MR. BRAFMAN                           1439

23

24

25

1453

1                    **E X H I B I T S**

2

3

4     Government's Exhibit 100-1                    1190

5     Government's Exhibit 100-2                    1198

6     Government's Exhibits 100-3 and 100-4         1200

7     Government Exhibits 100-5 and 100-6           1204

8     Government Exhibit 100-7                       1211

9     Government Exhibit 100-10                      1213

10    Government Exhibit 100-13                      1219

11    Government Exhibit 100-14                      1221

12    Government's Exhibit 103-18                    1305

13    Defendant's Exhibit 1200                       1331

14    Defendant's Exhibit 1201                       1335

15    Defendant's Exhibit 1202                       1340

16    Defendant's Exhibit 1211                       1349

17    Defendant's Exhibit 1203                       1367

18    Defendant's Exhibit 1205                       1424

19    Government's Exhibit 103-40                    1436

20

21

22

23

24

25