JMK:GKS/AES
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                                                                    15 CR 637 (KAM)

MARTIN SHKRELI,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT MARTIN SHKRELI'S MOTION FOR A JUDGMENT OF ACQUITTAL

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
G. KARTHIK SRINIVASAN
Assistant U.S. Attorneys
    (Of Counsel)

1

PRELIMINARY STATEMENT

On August 4, 2017, the defendant Martin Shkreli was convicted of two counts of substantive securities fraud and one count of conspiracy to commit securities fraud. His conviction of three of the four fraudulent schemes with which he was charged came after six weeks of trial, the testimony of two dozen witnesses and the admission into evidence of thousands of pages of emails, business records, financial records and trading data. In his motion pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure ("Rule 29(c)") filed on September 8, 2017[1] (see Dkt. No. 363 ("Def. Br.")), the defendant now challenges but one count of conviction: Count Eight, conspiracy to commit securities fraud in connection with the unrestricted Retrophin shares referred to as the "Fearnow shares."

In his submission, Shkreli raises two primary arguments for acquittal. He first contends that the government's summation improperly instructed the jury on the meaning of an "affiliate" as that term is used in 17 C.F.R. § 230.144 ("Rule 144"). He then argues that this supposed misimpression left by the government led the jury to convict him of securities fraud conspiracy although, he says, there was insufficient evidence of a criminal agreement to violate the securities laws.

It is well-established that the defendant's burden in advancing a Rule 29(c) motion is strict. The Court must deny the motion unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999)

---

[1] The government's response brief was initially due on October 6, 2017. Due to unexpected circumstances, the government was unable to file its brief on that date. The government contacted defense counsel on the evening of October 6, 2017, and defense counsel consented to a short extension of the due date for the response brief to October 7, 2017.

(citing United States v. White, 673 F.2d 299, 301 (10th Cir. 1982)).  The defendant's arguments fail to surmount the high bar set by Rule 29(c).

First, Shkreli neglects to mention that it was he who requested that the Court instruct the jury on the Rule 144 definition of an "affiliate" after the government's lead summation and that he agreed to language instructing the jury that whether or not an individual is an "affiliate" is a question of fact for the jury's determination.  Having raised the issue and won a jury instruction—an instruction that the government in no way undermined during its rebuttal summation—the defendant cannot now be heard to complain that the definition of "affiliate" somehow prejudiced him.  Regardless, the government's arguments were consistent with the Court's jury instructions because the evidence established that the defendant's attempt to control the Fearnow share recipients was a key part of the charged conspiracy to control the price and trading volume of Retrophin's unrestricted shares.

Moreover, the defendant's arguments are a red herring.  The central relevance of the "affiliates" is not the question of whether certain individuals were "affiliates."  Rather, the primary issue is the fact that the defendant and Evan Greebel, one of his co-conspirators, acted as if they needed to prevent the Fearnow Share recipients from remaining or becoming "affiliates" such that those individuals could receive free-trading shares of Retrophin.  In other words, the "affiliates" issue arises because the defendant and Greebel took steps to ensure that the Fearnow share recipients were not and would not be affiliates, not because the recipients' status as "affiliates" is an element of the charged crime or a fact that the government needed to prove at trial.  Those steps helped the defendant conceal his de facto control over the free-trading shares of Retrophin.

Finally, as to whether the defendant conspired with others to commit securities fraud, the defendant ignores a wealth of evidence that supports the jury's determination of guilt, instead cherry-picking a handful of documents and snippets of testimony that do not support his position. The jury's verdict is well-supported by the record and there is no basis to disturb it.[2]

## LEGAL STANDARD

In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991). All permissible inferences must be drawn in the government's favor. Id. "In addition, the court must be careful to avoid usurping the role of the jury." Guadagna, 183 F.3d at 129. As the Second Circuit noted in United States v. Mariani, upon a motion for judgment of acquittal, "the Court 'must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" 725 F.2d 862, 865 (2d Cir. 1984) (quoting Curley v. United States, 160 F.2d 229, 232 (D.C. Cir. 1947)).

Rule 29(c) does not provide the trial court with an opportunity to "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Id. In fact, if the court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." Mariani, 725 F.2d at 865; see also Guadagna, 183 F.3d at 129.

---

[2] For purposes of responding to the defendant's motion, the government only highlights a limited subset of the voluminous evidence in the case, including the evidence presented at trial.

Where a motion for acquittal is premised on misstatements by the government in summation or prosecutorial misconduct, the defendant faces a similarly high bar. The Second Circuit has held that "inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding . . . [S]uch remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." United States v. Evangelista, 122 F.3d 112, 120 (2d Cir. 1997) (citing United States v. Friedman, 909 F.2d 705, 709 (2d Cir. 1990)). The Second Circuit focuses on three factors: "the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct." United States v. Melendez, 57 F.3d 238, 241 (2d Cir. 1995); Evangelista, 122 F.3d at 120. An "immediate curative instruction" and the "weight of the evidence" against the defendant militate strongly against a finding that a statement by the prosecutor had any effect on an "otherwise fair proceeding." Evangelista, 122 F.3d at 120; United States v. Thomas, 377 F.3d 232, 245 (2d Cir. 2004) (noting that a curative instruction helped mitigate any prejudice from a statement by the prosecutor).

## ARGUMENT

I. The Defendant Suffered No Prejudice From The Definition Of "Affiliate" That Was Submitted To The Jury

The defendant argues that the government improperly instructed the jury as to meaning of the term "affiliates" under Rule 144. The defendant's argument fails for three reasons. First, the defendant specifically requested and agreed to a jury instruction—one he fails to quote in his motion—on the definition of "affiliates" <u>after</u> the government's lead summation. That instruction defined the term consistently with the law and committed the question of whether an individual is an "affiliate" to the jury as a fact question. He thus cannot claim undue

5

prejudice from the definition of "affiliates" that was submitted to the jury. Second, the government's description of various individuals as affiliates of Retrophin was nevertheless consistent with the law as given to the jury. Finally, the "affiliates" issue is relevant for the defendant's intent and knowledge, not whether any particular individual was in fact an "affiliate" under Rule 144. The overwhelming evidence that the defendant and his co-conspirators cared deeply about whether the Fearnow share recipients were "affiliates" supports the jury's determination that the defendant conspired with others to use the Fearnow shares to control the price and trading of Retrophin stock.

      A.      <u>The Defendant Received The Jury Instruction He Requested</u>

Notably absent from the defendant's submission is any discussion of the context in which the "affiliates" issue arose at trial. That context is fatal to his argument that the jury was driven to a legally insupportable verdict via the government's summation.

At the conclusion of the government's lead summation, defense counsel argued that the government inaccurately defined the term "affiliate" under Rule 144. (Trial Tr. at 5316-17.) The defendant did not move for a mistrial. Rather, defense counsel indicated that the parties would confer and provide the Court with a definition of the term "affiliate" for inclusion in the jury instructions. (<u>Id</u>.) The parties submitted their agreed-upon proposal to the Court, which the Court then incorporated into the jury instructions. The instruction read:

> You have also heard the parties use the term affiliate. An affiliate of an issuer under the law means a person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such issuer. Whether a person is an affiliate of Retrophin is a question of fact for the jury.

(Dkt No. 295, Final Jury Instructions, at 78-79; Trial Tr. at 5596.) The definition provided by the Court to the jury is consistent with the definition of "affiliate" contained in Rule 144. <u>See</u> 17

6

C.F.R. § 230.144 ("[a]n affiliate of an issuer is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer"). Moreover, the defendant's contention in his moving papers that "affiliates" are individuals who "are not directors, officers or five-percent shareholders of [Retrophin]" is incorrect as a matter of law and inconsistent with the definition to which he agreed. (Def. Br. at 3.)

Ironically, it was the defendant who cited the law incorrectly in his summation. The defendant told the jury that "affiliates don't include employees. Affiliates include officers and directors but they don't include garden variety employees." (Trial Tr. 5460-61.) That definition is plainly inconsistent with Rule 144, which focuses on whether a person controls or is controlled by or is under common control with an issuer. The correct definition given by the Court did not categorically exclude employees, as the defendant suggested in his summation. Nevertheless, in its rebuttal summation, the government properly referred the jury to the Court's instructions on the law, not the arguments of counsel: "Mr. Brafman, again, misled you. He talked about the definition of an affiliate. You will hear from the Judge that what Mr. Brafman told you is not the law." (Trial Tr. at 5514.)

That the defendant requested a jury instruction on a particular legal issue and received it defeats the inference that he suffered any prejudice from the jury relying on that instruction. See, e.g., Evangelista, 122 F.3d at 120 (noting that a curative instruction militates against a finding of prejudice).

B. The Government's Discussion of "Affiliates" Was Consistent with the Court's Jury Instructions

The Court's definition of "affiliate"—consistent with Rule 144—appropriately charged the jury with determining whether a particular Retrophin share recipient was controlled

7

by or under common control with the issuer of shares.  The government did not argue that the mere fact of employment at Retrophin ipso facto meant that a Fearnow share recipient was an "affiliate" within the definition of Rule 144.  Rather, and as described in further detail below, the government's summation focused on the defendant's level of control over the Fearnow share recipients before and after the Fearnow share transfers to demonstrate that Shkreli controlled those shares as part of its proof in support of the charged securities fraud conspiracy.  Whether a Fearnow share recipient continued to be an employee of Retrophin after receiving Fearnow shares is certainly a factor that the jury could consider in determining whether any of the Fearnow share recipients were indeed "affiliates" of Retrophin.  That is especially the case since the defendant took numerous steps with Greebel to prevent the Fearnow share recipients from appearing to be "affiliates."  And the government's summation merely emphasized that factor as a strong indicator that the defendant sought to and, in some instances did, control the Fearnow shares, and that he attempted to conceal his control of those shares; it did not state that employment is synonymous with "affiliate."

    The evidence demonstrating that the defendant conspired with others, including Greebel, to control the Fearnow share recipients for the purpose of controlling Retrophin's share price and trading volume was overwhelming.  When Retrophin completed a reverse merger with Desert Gateway in December 2012 and became a public company, it had approximately 2.5 million freely-trading shares.  Before the merger, these shares (then shares of Desert Gateway) were held by Troy Fearnow—thus, they became known as the "Fearnow shares."  These shares were valuable because they represented the only market liquidity in Retrophin shares at the time.  Indeed, on November 22, 2012—a few weeks before the merger—Greebel asked the defendant, "Is there any reason other than the 2.5m that you want this shell?  A new 'clean' shell will

definitely be cheaper, we never gave a deposit for [Desert Gateway] and ive (sic) told you I have some capitalization concerns." (GX 220.) The defendant responded simply: "The 2.5m help a lot[.]" (Id.) The evidence at trial showed that the defendant schemed with Greebel to allocate those shares to employees and friends whom he could control. A key move was to try to ensure that these employees and friends were not "affiliates" of Retrophin because being an "affiliate" could, by law, limit the ability of the affiliate to freely trade those shares. And if the Fearnow shares could no longer be freely traded, they could not be used to control the price and volume of Retrophin stock.

In November 2012, the defendant had certain Retrophin employees—Kevin Mulleady, Thomas Fernandez and Marek Biestek—transfer Retrophin shares they had received as compensation for their work at Retrophin to him via share transfers that were backdated to appear as if such transfers had occurred in June and/or July 2012. In exchange for agreeing to those backdated share transfers, the defendant arranged for the employees to receive Fearnow shares. For example, on November 30, 2012, the defendant wrote to Mulleady and Fernandez and told them that they would surrender all of their stock to the defendant and then buy freely-trading shares from Fearnow for a nominal amount. (GX 223 (Mulleady); GX 224 (Fernandez).)

At the same time, the defendant selected additional employees and associates—Ronald Tilles, Timothy Pierotti, Edmund Sullivan and Andrew Vaino—to receive the remainder of the Fearnow shares. As Pierotti testified, the defendant was "going to make [him] a part of the buying group of people that are going to buy the shares," in reference to the Fearnow shares. (Trial Tr. at 4260 (Pierotti Testimony).) The defendant not only determined who among his employees and associates would be in this buying group, but he also determined the number of free-trading shares each individual would receive. (Trial Tr. at 4260-61.) The defendant and

9

Greebel then had the various Fearnow shareholders execute purchase agreements with Fearnow. (See, e.g., GX 120-10.) Greebel facilitated the execution of the agreements and collected them for the defendant, informing him on December 12, 2012 that they were complete: "I got the signed purchase agreements." (GX 232.)

The next day, Greebel began to send the intended Fearnow share recipients emails requesting confirmation that they were not affiliates of Retrophin. For example, Greebel had sent the following request to Fearnow share recipients Biestek and Sullivan on December 13, 2012:

> From: Greebel, Evan L. <evan.greebel@kattenlaw.com>
> Sent: Thursday, December 13, 2012 10:58 PM
> To: Martin Shkreli (Martin@msmbcapital.com)
> Subject: FW:
>
> Fyi to deal with his latest request
>
> EVAN L. GREEBEL
> Partner
> Katten Muchin Rosenman LLP
> 575 Madison Avenue
> New York, NY 10022-2585
> (212) 940-6383
> (212) 894-5883 (f)
>
> From: Greebel, Evan L.
> Sent: Thursday, December 13, 2012 5:57 PM
> To: Marek Biestek (Marek@msmbcapital.com); Sullivan, Edmund (Edmund.Sullivan@cowen.com)
> Subject:
>
> Please send me an email confirming the following
>
> I represent that I am not an officer, a director, or holder of 10% or more of the outstanding equity securities of Desert Gateway and do not, alone or together with any other person, exercise control over Desert Gateway. I am not an affiliate (as such term is defined in the Securities Act of 1933) of Desert Gateway. I am in no position to issue or propose to issue any security relating to the Desert Gateway.
>
> Marek, please ask each of the other investors to send the same email to me. If it is easier, please print it out and have them sign it.

(GX 364.) Greebel received assurances from the Fearnow share recipients that they were not officers, directors or holders of 10% or more of the equity of Desert Gateway (which became Retrophin via reverse merger at the time of the email exchanges); did not, alone or together with

10

any other person, control Desert Gateway; and were not in any position to issue or propose to issue any security relating to Desert Gateway, and subsequently informed the defendant of these and other similar exchanges by email. (See, e.g., GX 236, 365, 366, 367.) Greebel collected these assurances on the defendant's behalf.

Greebel then communicated the confirmation that these individuals were not affiliates to the law firm Anslow & Jaclin, which issued a legal opinion to the stock transfer agent Standard Registrar authorizing the distribution of the free-trading Retrophin shares to the Fearnow share recipients. (GX 125-4.) This legal opinion was critical to the conspiracy to control the price and trading volume of Retrophin's free-trading shares, because it ensured that the Fearnow shares would remain free-trading, preserving the defendant's and his co-conspirators' ability to control the price and trading volume of those shares in the market. Ultimately, through the Fearnow share recipients, the defendant controlled 80% of the free-trading shares of Retrophin. (GX 701.)

Moreover, the defendant actively concealed his control of approximately 80% of Retrophin's free-trading shares to the market. In December 2012, for example, he and Greebel discussed and then filed a Schedule 13-D form for Retrophin with the U.S. Securities and Exchange Commission that detailed Shkreli's personal holdings and the holdings of the MSMB entities, but did deliberately failed to disclose Shkreli's control over the Fearnow shares. (GX 603.)

C.  The "Affiliates" Issue Is Relevant To The Defendant's Intent

It is thus clear that the defendant's focus on the "affiliates" issue is misplaced. The central relevance of the "affiliates" issue is not whether certain individuals were, in fact, "affiliates." Rather, and as described above, the defendant and Greebel acted as if they needed to

11

prevent the Fearnow share recipients from remaining or becoming "affiliates" so that those individuals could receive and hold free-trading shares in furtherance of the charged conspiracy.

That the defendant and Greebel took steps to ensure that the Fearnow share recipients would not appear to be "affiliates" is important evidence of the charged conspiracy to control the price and trading of Retrophin's free-trading shares. He and Greebel went to extraordinary lengths to address the "affiliates" issue with the Fearnow share recipients. He and Greebel also concealed the defendant's control over the Fearnow shares at issue by failing to disclose his beneficial ownership of the shares to the investing public, by, for example, filing false Schedule 13-D forms. These actions—all of which were presented to the jury—indicate that the defendant, with Greebel's assistance, consciously concealed his beneficial ownership of the free-trading shares of Retrophin so that he could control the price and the trading of those shares.

There was thus no prejudicial misimpression left by the government's arguments to the jury. The jury instructions—to which the defendant agreed—properly instructed the jury on the definition of an "affiliate" under Rule 144 and committed the question of whether an individual was in fact an "affiliate" to the jury's judgment. The jury was entitled to conclude from the totality of the evidence, including that the Fearnow share recipients remained employees of Retrophin and thus could have continued to exercise control over the company in tis nascent stage, that these individuals were "affiliates." The jury was further entitled to conclude that the defendant's efforts to ensure that the Fearnow share recipients did not appear to be "affiliates" by, among other things, pretending to fire them from Retrophin while still attempting to control their actions, was evidence of his knowledge and active participation in the conspiracy.

II. Evidence of the Defendant's Participation in a Conspiracy to Control the Price and Trading Volume of Shares of Retrophin was Overwhelming

The defendant argues next that there was insufficient evidence of an agreement between him and others, including Greebel, to attempt to control the price and trading volume of Retrophin shares. The defendant emphasizes that there was little evidence of practices such as wash sales, matched orders or rigged prices that are sometimes cited as traditional tools of market manipulation or of a "pump and dump" scheme. (See, e.g., Def. Br. at 17-18.) He argues that, as a result, there was no conspiracy to deceive the investing public.

The defendant's arguments omit the well-settled principle that a conspiracy conviction does not require proof that the conspiracy was actually successful. Rather, the crime with which the defendant was charged and of which the jury convicted him is the knowing and intentional agreement to commit securities fraud. Whether or not certain Fearnow share recipients actually bought or sold shares of Retrophin at the defendant's direction is perhaps probative, but not dispositive, and the defendant vociferously argued at trial that the jury should return a not guilty verdict on precisely these grounds. Where the evidence is susceptible to differing interpretations, the issue is committed to the jury, and not to the Court in the context of a Rule 29(c) motion. Guadagna, 183 F.3d at 129. And, as set forth below, in contrast to the defendant's arguments, the evidence supporting the jury's verdict of guilty on Count Eight was overwhelming.

A. Legal Standard

The law of securities fraud conspiracy is well-established and largely not in dispute. The defendant, however, fails to discuss two essential aspects of the law. First, as the Court instructed the jury, "the government need not prove that [the defendant] actually committed securities fraud," but simply that he "conspired with one or more individuals to

13

commit securities fraud." (Dkt. No. 295 at 51; id. at 76-77 ("As a reminder, the government need not prove that Mr. Shkreli actually committed securities fraud, the lawful acts charged as the objects of the conspiracy in Count Eight.").) "Although the government need not prove commission of the substantive offense or even that the conspirators knew all the details of the conspiracy, it must prove that the intended future conduct they agreed upon includes all the elements of the substantive crime." See, e.g., United States v. Pinero, No. 12-CR-695 (ENV), 2014 WL 12681905, at *2 (E.D.N.Y. Apr. 20, 2014). "A defendant may be found guilty of conspiracy even if he was incapable of committing the substantive crime. Consequently, for a defendant to be guilty of conspiracy, there is no need for the government to prove that he or any other conspirator actually succeeded in their criminal goals or even that they could have succeeded." (Dkt. No. 295 at 52.)

Second, it is well established that Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 prohibit the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. United States v. Royer, 549 F.3d 886, 899-900 (2d Cir. 2008). This language applies to manipulation of all kinds, including "forms of misconduct that have the same practical effect as a conventional fraud" without any "specific oral or written statement." Id. at 900. Indeed, "[m]anipulation is 'virtually a term of art when used in connection with securities markets.'" Santa Fe. Indus, Inc. v. Green, 430 U.S. 462, 476-77 (1977) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)); see also Dietrich v. Bauer, 76 F. Supp. 2d 312, 338 (S.D.N.Y. 1999)). Although practices such as wash sales or matched orders have been cited by courts as examples of manipulative activity, see id., such practices have not been held to define the limits of the securities laws' prohibition on

14

manipulative conduct. Indeed, "[n]o doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." Green, 430 U.S. at 477.

These legal principles undermine the defendant's arguments for acquittal in this case. The government was required to prove that the defendant entered into a criminal conspiracy to violate the securities laws, not that he actually committed securities fraud. Moreover, the evidence firmly established that the defendant entered into an agreement with Greebel and others to manipulate the price and trading volume of Retrophin stock by attempting to exercise his control over the Fearnow share recipients and what they did with their allocated portion of Fearnow shares. The defendant took affirmative steps to conceal his conduct, including by placing the shares under the nominal control of the Fearnow share recipients and by failing to disclose his beneficial ownership of the shares to the investing public by filing false Schedule 13-D forms with Greebel's assistance. As set forth below, construing the evidence in the light most favorable to the government, the jury had more than enough evidence before it to conclude that a conspiracy existed and that its aim was securities fraud.

> B. The Evidence of an Unlawful Agreement to Control the Price and Trading of Retrophin Shares Was Significant

The evidence of a criminal agreement among and between the defendant, Greebel and the Fearnow share recipients in connection with Count Eight was substantial, and easily supported the jury's guilty verdict as to Count Eight.

As set forth above, Greebel asked the Fearnow share recipients to certify that they were not "affiliates" of Retrophin, a step that he and the defendant knew was essential to conceal the defendant's de facto control of Retrophin's free-trading shares and to maintain the unrestricted status of those shares. And as Pierotti testified, it was the defendant who decided who got the Fearnow shares. (Trial Tr. at 4260-61.) For example, the defendant chose to give

15

Pierotti 350,000 freely-trading shares of Retrophin, and as Pierotti testified, Shkreli's plan for the Fearnow share recipients, which the defendant repeatedly vocalized to them, was for them to buy and sell the stock repeatedly. (Id. at 4271, 4352-53.) As Pierotti explained, such trading activity gives the investing public the misimpression of liquidity in Retrophin stock, which makes the stock appear more valuable and attractive than it actually is. (Id. at 4271.) Additionally, before the Fearnow shares were distributed to the recipients, the defendant directed the recipients to give him a "summary of their holdings every morning." (GX 120-11; Trial Tr. at 4279 (Pierotti Testimony).) He also told certain Fearnow recipients (and other shareholders of Retrophin) that one of his "priorities for the future is increasing the trading volume in [Retrophin] stock – anything anyone can do to help in this regard is welcome." (GX 120-14.) Moreover, when Retrophin did not have enough money to pay for the Desert Gateway shell, it was Shkreli and Greebel alone who determined the re-allocation of Fearnow shares among the recipients—that is, how many Fearnow shares should be held in escrow for each recipient. (GX 233.)

        To take another example of the defendant's intent to control the price and trading volume of Retrophin's unrestricted shares, in late December 2012, Pierotti began selling his Fearnow shares without the defendant's permission or knowledge, which triggered deep concern by the defendant and Greebel. On December 28, 2012, he wrote to Greebel: "The stock is trading like crazy – someone is selling the shit out of it." (GX 249.) Greebel wrote back: "I don't know-there is no freely trading stock other than you guys and the 500k that Fearnow has." (Id.) Later that day, the defendant again wrote to Greebel: "Amazing, someone shorted 60k in the last two days." (GX 245.) He continued, "I think it might be Tim [Pierotti] selling." (Id.) The defendant then tried to contact Pierotti on December 29, 2012, who asked the defendant to communicate with him through Biestek. (GX 246.) The defendant forwarded his email

16

exchange with Pierotti to Greebel, who responded: "leave it alone-you are an affiliate and it will only create problems." (GX 246.)

The very next day—December 30, 2012—Greebel and the defendant discussed how to bring Pierotti "over the wall," that is, put him in possession of material non-public information, in order to halt his trading of Fearnow shares. (GX 248.) When the defendant discussed his plan to do so with Greebel, Greebel responded: "I like it." (Id.) Then, on January 2, 2013, the defendant emailed Greebel a proposed message to Pierotti in which the defendant asked Pierotti to "honor the agreement we made in our office on December 10th" and gave Pierotti the choice of returning the remaining Fearnow shares or of being sued in federal court. (GX 251.) When the defendant notified Greebel of this communication to Pierotti, Greebel responded in a way that shows his knowledge of, and ongoing participation in, the conspiracy: "Very risky given what you (sic) agreement was-could be opening a much bigger can of worms." (Id.)

The defendant's demand that Pierotti return the shares was extremely probative of his guilt. If the shares were truly Pierotti's and market forces set the trading and price, then there would be no basis for the defendant's demand that the Fearnow shares be returned. It is only because the defendant believed that the Fearnow shares belonged to him and that he controlled their trading that he made such a demand to Pierotti. The defendant then sent a version of the email later that day to Pierotti and copied Greebel. In mid-January 2013, when Pierotti refused to return the shares, the defendant began a campaign of harassment against Pierotti and his family that further showed the jury the degree to which the defendant believed he controlled the Fearnow shares. When that campaign of harassment was not successful, the defendant and

17

Greebel ultimately caused Retrophin to sue Pierotti in a further attempt to restrict his ability to sell the Retrophin shares. (GX 120-18; GX 275.)[3]

Faced with this mountain of evidence, the defendant makes a series of arguments that merely seek to re-argue facts that were before the jury. As detailed below, none of his arguments demonstrate the legal insufficiency of the evidence or that the jury's verdict was legally insupportable, and they should be rejected under the exacting standard that applies to Rule 29(c) motions.

The defendant argues that the "trading records introduced undercut any finding that there was any agreement to deceive" because some Fearnow share recipients bought shares and others sold shares. (Def. Br. at 12.) First, this argument was made to and rejected by the jury. And second, the defendant again confuses the elements of securities fraud conspiracy with substantive securities fraud. The evidence cited above establishes that there was an agreement to manipulate the price and trading volume of Retrophin stock. Whether or not the conspiracy was successful does not undermine the jury's verdict.

The defendant next argues that emails between the defendant and Greebel fall into the category of advice of counsel. (Id.) Yet again, this issue was submitted to the jury and was

---

[3] In his motion, the defendant argues that the Fearnow share recipients transferred their shares to the defrauded MSMB investors at the defendant's direction because the Fearnow share recipients wished to settle legal claims against Retrophin. (Def. Br. at 21.) This argument is meritless. There is no evidence in the record that the Fearnow share recipients—in their personal capacity or as shareholders of Retrophin—would have been liable for debts owed by the defendant and the defunct MSMB entities. Indeed, there is no evidence of any communications evincing an intent by the Fearnow share recipients to settle potential claims against Retrophin by transferring shares to the defrauded MSMB investors. There is no evidence, for example, that Sullivan negotiated the transfer of his free-trading Retrophin shares—for no consideration whatsoever— to defrauded MSMB Capital investor Lindsay Rosenwald to settle the defendant's and the MSMB entities' debts.

rejected. The jury instructions clearly informed the jury that advice of counsel is a species of a good faith defense that can defeat the necessary fraudulent intent required to sustain a conviction. The jury weighed the evidence and did not find that argument persuasive. The jury's conclusion is entirely reasonable. The emails between the defendant and Greebel do not constitute advice of counsel but instead demonstrate an agreement to attempt to control the price and trading of the Fearnow shares. Thus, the defendant's argument fails, particularly under the high burden placed by Rule 29(c).

        The defendant next submits that, when he challenged the government's proof as to Count Eight at the Rule 29(a) stage, the Court "was reading far more into" the emails between the defendant and Greebel than it should have, and contends that the Court should not make the same mistake at the Rule 29(c) stage. But this is a classic argument about the weight of the evidence that is committed to the jury, not an argument about the legal insufficiency of the verdict.

        The defendant also cites a smattering of the defendant's emails to argue that these specific emails are not evidence of a securities fraud conspiracy. (Def. Br. at 16-18.) The defendant ignores the evidence establishing that the defendant, with the assistance of Greebel, directed the Fearnow share distribution from the start, knew that he needed no-affiliate certifications from the Fearnow share recipients to ensure that the Fearnow shares remained free-trading, directed the Fearnow share recipients to buy and sell the stock, demanded information about trading activity from the Fearnow share recipients and then behaved as if the Fearnow shares belonged to him when faced with Pierotti's intransigence. For example, the defendant cites GX 120-14 as evidence that the defendant did not hide his plans because the defendant sent it to, among others, shareholders Brent Saunders, Darren Blanton and George Haywood. This

email, however, did not inform Saunders, Blanton or Haywood that the defendant controlled the Fearnow shares through proxies. It was in no way a disclosure of the scheme. The jury viewed the totality of the evidence, not a smattering emails in isolation, when it reached its verdict. As set forth above, that verdict was amply supported by the record.

In sum, the defendant was not merely "encouraging legitimate trading" by Retrophin shareholders. (Def. Br. at 18.) Rather, together with Greebel and others, he orchestrated the distribution of Fearnow shares to a group of individuals who were made to look to the market as if they legitimately held and could freely trade those shares, when in reality the defendant secretly exercised control over those shares in an attempt to control the price and volume of Retrophin stock.

## CONCLUSION

For the foregoing reasons, the defendant's motion for a judgment of acquittal should be denied.

Dated: Brooklyn, New York
October 7, 2017

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York

/s/
Jacquelyn M. Kasulis
Alixandra E. Smith
G. Karthik Srinivasan
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (KAM)
Defense Counsel (By ECF and Email)