

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SLR:LDM:CSK                                    *271 Cadman Plaza East*
F. #2014R00501                                 *Brooklyn, New York 11201*

November 30, 2017

By Hand and ECF

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re:  United States v. Martin Shkreli
        Criminal Docket No. 15-637 (S-1) (KAM)

Dear Judge Matsumoto:

    The United States respectfully submits this letter along with the attached summary charts (Exhibits A and B) and Declaration of FBI Special Agent Sean Sweeney, dated November 30 2017 ("Declaration"), in support of its post-trial motion for forfeiture against the convicted defendant Martin Shkreli ("Shkreli"). By this motion, the government seeks forfeiture of the following amounts:

    (a) $2,998,000.00 based upon Shkreli's conviction on Count Three (securities fraud regarding MSMB Capital from September 2009 through September 2014);

    (b) $3,402,450.00 based upon Shkreli's conviction on Count Six (securities fraud regarding MSMB Healthcare from February 2011 through September 2014); and

    (c) $960,000.00 based upon Shkreli's conviction on Count Eight (conspiracy to commit securities fraud regarding unrestricted shares of Retrophin from November 2012 through September 2014).

    The Court should hold Shkreli financially accountable for his criminal conduct by requiring him to forfeit the amounts above, which total $7,360,450.00, and enter a forfeiture money judgment against him in that total amount. As set forth herein, this total amount represents a conservative computation of the proceeds Shkreli personally obtained as a result of his three different securities fraud crimes of conviction. Furthermore, pursuant to 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2, the government seeks forfeiture of certain substitute assets of Shkreli in order to partially satisfy the forfeiture money judgment. For the Court's convenience,

a proposed Preliminary Order of Forfeiture is also included with this submission, which the
United States respectfully requests be entered by the Court, pronounced as part of Shkreli's,
sentencing, and attached to his Judgment and Conviction pursuant to Fed. R. Crim. P. 32.2.

I.    Procedural Background

On or about June 3, 2016, a Superseding Indictment against Shkreli was
returned, which included criminal forfeiture allegations.  (Dkt. No. 60 at ¶¶ 60-61).  On August 4,
2017, following an approximate six-week trial, Shkreli was convicted of Counts Three, Six and
Eight of the Superseding Indictment (Verdict Sheet, Dkt. No. 305).  Before the jury deliberated on
the substantive criminal charges, the parties stipulated to waive any right to a jury and to have the
forfeiture allegations determined by the Court.  The Stipulation and Order was entered by the
Court on July 26, 2017.  (Dkt. No. 288).

II.    Applicable Forfeiture Laws

A.    The Criminal Forfeiture Rules and Statutes

Rule 32.2 of the Federal Rules of Criminal Procedure governs the criminal
forfeiture sought by the government in this case.  See e.g., United States v. Capoccia, 503 F.3d
103, 109 (2d Cir. 2007) (quoting Fed. R. Crim. P. 32.2(b)(1)), aff'd after remand, 2010 WL
4942213 (summary order) (2d Cir. Dec. 7, 2010).   In this regard, Rule 32.2(b)(1)(A) provides, in
pertinent part:

> As soon as practicable after a verdict  . . . of guilty . . . on any
> count in an indictment . . . regarding which criminal forfeiture is
> sought, the court must determine what property is subject to
> forfeiture under the applicable statute.  If the government seeks
> forfeiture of specific property, the court must determine whether
> the government has established the requisite nexus between the
> property and the offense.  If the government seeks a personal
> money judgment, the court must determine the amount of
> money that the defendant will be ordered to pay.

Fed. R. Crim. P. 32.2(b)(1)(A).  See United States v. Galestro, No. 06-CR-285 (ARR), 2008
WL 2783360, at * 11 (E.D.N.Y. 2008) (finding that where the government seeks forfeiture of
only a personal money judgment, no nexus determination need be made; defendant has no right
to a jury and there is no need for pre-trial disclosures).  Further, Rule 32.2(b)(1)(B) provides, in
pertinent part:

> The court's determination may be based on evidence already in
> the record, . . ., and on any additional evidence or information
> submitted by the parties and accepted by the court as relevant and
> reliable.

See Capoccia, 503 F.3d at 109; United States v. Roberts, 660 F.3d 149,166 (2d Cir. 2011)
(holding that "district courts may 'use general points of reference as a starting point' for

2

forfeiture calculation and 'make reasonable extrapolations' supported by a preponderance of the evidence.").

Here, the government seeks forfeiture pursuant to the following forfeiture statutes: 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p). See Superseding Indictment (S-1) (Dkt. Nos. 60, 296-1) at ¶¶ 60-61.

## B. Criminal Forfeiture Based on Securities Fraud Convictions

Title 18, United States Code, Section 981(a)(1)(C) specifically provides for forfeiture of:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to. . .any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

"Fraud in the sale securities" or conspiracy to commit securities fraud (Counts Three, Six and Eight), are each unlawful activities as defined in 18 U.S.C. §1956(c)(7)(A). See 18 U.S.C. § 1961(1)(D) (relating to "any offense involving… fraud in the sale of securities…"). See also United States v. Contorinis, 692 F.3d 136, 145 n. 2 (2d Cir. 2012).

Further, as the Second Circuit has held in the context of insider trading securities fraud cases, the applicable definition of "proceeds" is set forth in 18 U.S.C. § 981(a)(2)(B). Id. at 145-146 n. 3. Specifically, 18 U.S.C. § 981(a)(2)(B) defines proceeds as follows:

> In cases involving lawful goods or lawful services, that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The [defendant] shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

See also, United States v. Jiau, 624 Fed. Appx. 771, 773 (2d Cir. 2015) (summary order) (in a securities fraud case, upholding $814,736 forfeiture based on, inter alia, a temporal connection between the tip and the trades, incriminating phone recordings, and a co-conspirator's expressions of gratitude after the trades were placed); United States v. Bonventre, 646 Fed. Appx. 73, 90-92 (2d Cir. 2016) (summary order) (in a securities fraud case, upholding forfeiture of over $19.7 million based on client investments during the fraud scheme).

As the Second Circuit has explained, criminal forfeiture "serves no remedial purpose, [and] is designed to punish the offender. . . ." Contorinis, 692 F.3d at 146.

Furthermore, criminal forfeiture is mandatory, and a creature of statute.  See SEC v. Contorinis, 743 F.3d 296, 307 (2d Cir. 2014).[1]

C.      The Burden of Proof

In contrast to the guilt phase of the criminal trial, the government bears the burden of establishing the amount of money subject to forfeiture only by a preponderance of the evidence.  See United States v. Finazzo, 682 Fed. Appx. 6, 14-15 (2d Cir. 2017) (summary order); Capoccia, 503 F.3d at 116 (sentencing courts determine forfeiture amounts by a preponderance of the evidence); United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of sentencing).  The Second Circuit has expressly held, "where the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise, the government need only establish that the forfeited assets have the 'requisite nexus' to that scheme, conspiracy or enterprise by a preponderance of the evidence."  Capoccia, 503 F. 3d at 117-18.

The government is not required to provide a precise calculation of the amount of money a defendant must forfeit.  United States v. Basciano, No. 03-CR-929 (NGG), 2007 WL 29439, at *2 (E.D.N.Y. Jan. 4, 2007); United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011) ("the calculation of forfeiture amounts is not an exact science").  Instead, the money judgment amount can be conservatively estimated, but such estimates may not be based upon evidence that is overly speculative.  Id.  Sentencing courts may consider trial evidence, hearsay, as well as evidence or information submitted by the parties and accepted by the Court as relevant and reliable, in determining forfeiture.  Capoccia, 503 F.3d at 109-110 (citing United States v. Gaskin, 364 F.3d 438, 462-63 (2d Cir. 2004)); Fed. R. Crim. P. 32.2(b)(1)(A) and (B).

III.      Shkreli Must Forfeit $7,360,450.00 to the United States

In this case, the trial testimony and exhibits established that during the relevant periods of Shkreli's securities fraud schemes, Shkreli himself had control of and accessed millions of dollars.   As the majority of federal courts have held, a defendant must forfeit those funds he would not have had but for his criminal offenses.  See, e.g., United States v. Nicolo, 597 F. Supp. 342, 346 (W.D.N.Y. 2009) ("To put it another way, 'proceeds are property a person would not have but for the criminal offense…'") (citations omitted).

As noted above, Shkreli's forfeiture liability should be a total of the following amounts that Shkreli obtained:  (a) the amount of funds invested by defrauded investors in MSMB Capital; (b) the amount of funds invested by defrauded investors in MSMB Healthcare;

---

[1] As the Court is well aware, criminal forfeiture is distinguishable from any restitution that may be imposed for any victim losses.  See United States v. Kalish, 626 F.3d 165, 169 (2d Cir. 2010) (holding forfeiture and restitution are separate obligations mandatorily required by separate statutes); United States v. Pescatore, 637 F.3d 128, 138 (2d Cir. 2011) ("[f]orfeiture and restitution are separate remedies with different purposes").

and (c) the funds generated from the Retrophin unrestricted shares transferred to defrauded MSMB investors to pay them off.  Each of these components is discussed in detail below.

A.   Shkreli Obtained and Controlled Monies Directly as a Result of the MSMB Capital Securities Fraud Scheme

As the attached summary chart for MSMB Capital (Exhibit A) reflects, approximately seven different investors invested a total of approximately $2,998,000.00 in MSMB Capital.[2]  Shkreli should be held financially responsible and forfeit this amount as it was obtained by him as a result of the fraud. But for these investments and the material misrepresentations that induced these investments and caused investors to refrain from making redemption requests, the securities fraud scheme involving MSMB Capital would not have been able to occur.  These funds were, in essence, the life blood that fueled the fraud scheme.  Indeed, Shkreli lost all of the MSMB Capital investors' money in a series of ill-fated trades in late 2010 and early 2011, culminating in the February 1, 2011 trade in Orexigen stock that effectively ended MSMB Capital's existence as an active hedge fund and left the defendant with millions of dollars of debt to Merrill Lynch.  Shkreli reaped the benefits of having access to all such funds. For example, Shkreli cited to investments made in the fund to perpetrate the MSMB Capital securities fraud scheme; gambled with the MSMB Capital investors' money by making very risky trades; falsely touted the purported success of MSMB Capital to portray himself as a successful hedge fund manager while soliciting investments in MSMB Healthcare; similarly cited his investment experience while promoting Retrophin to investors; and perpetuated the MSMB Capital securities fraud scheme.

B.   Shkreli Obtained and Controlled Monies Directly as a Result of the MSMB Healthcare Securities Fraud Scheme

Similarly, as the attached summary chart for MSMB Healthcare (Exhibit B) reflects, approximately twelve different investors invested a total of approximately $3,402,450.00 in MSMB Healthcare.  Shkreli should be held financially responsible and forfeit this total amount as it was obtained by him as result of the fraud.  But for these investments, the securities fraud scheme involving MSMB Healthcare would not have been able to occur.  As with the MSMB Capital investments, these funds were, in essence, the life blood that fueled the fraud scheme. Again, Shkreli reaped the benefits of having access to all such funds.  For example, by funneling

---

[2] The summary charts (attached hereto as Exhibits A and B), reflect both testifying and non-testifying investors during the Shkreli trial.  During the Shkreli trial, for those investors who testified, the Court admitted both the subscription agreements and the investor statements.  For the non-testifying investors, the Court excluded the subscription agreements, but allowed into evidence the investor statements that were either sent out by Shkreli himself or were received by an investor from the fund administrator (i.e. NAV).  See Shkreli Trial Transcript at pp. 4457, 4467, 4494-95.  References to the government exhibits admitted during the Shkreli trial on the summary charts correspond to the amounts invested by the multiple investors and are indicated as "GX___".

almost all of the money invested into MSMB Healthcare to Retrophin—without the permission
or knowledge of the MSMB Healthcare investors, who were not told that Retrophin, a privately-
held company controlled by Shkreli, was the only investment made by what was purportedly a
diversified healthcare hedge fund—Shkreli kept Retrophin afloat for the approximately 22
months between its founding and the reverse merger that allowed the company to go public.

    C.  **Shkreli Obtained An Indirect Benefit from His Control Over Certain**
       **Unrestricted Shares of Retrophin As A Result of His Participation in the**
       <u>**Conspiracy Charged in Count Eight**</u>

    Shkreli's conviction on Count Eight for conspiracy to commit securities fraud in
connection with the unrestricted shares of Retrophin (referred to as the "Fearnow shares")
warrants an award of forfeiture.

      1.  <u>Shkreli's Ultimate Control Over Certain Fearnow Shares</u>

    The evidence at trial established conclusively that Shkreli conspired with others,
including co-defendant Evan Greebel, to control the price and trading volume of Retrophin stock
by seeking to exercise control over the majority of the unrestricted or free-trading shares of
Retrophin at the time of the reverse merger in December 2012.  <u>See, e.g.</u>, Gov't Resp. to Defs.
Mot. for Acquittal, dated October 7, 2017 (Dkt. No. 397) at 8-20.  To achieve this fraudulent
objective, Shkreli and Greebel, together with others, caused 2.4 million free-trading shares
attached to the Desert Gateway shell (also known as "Fearnow shares") to be distributed among
a group of seven individuals (known as the "Fearnow share recipients") who were close
associates and/or employees of entities related to Shkreli.  In mid-December 2012, each Fearnow
share recipient directly received the majority of the shares that had been allocated to him, while a
portion of such shares were held in escrow pending Retrophin's payment of the remainder of the
cost of the Desert Gateway shell. Subsequently, Shkreli and Greebel attempted to control, and in
some instances succeeded in controlling, the Fearnow shares in order to control the price and
trading volume of Retrophin stock.  For example, Shkreli and Greebel successfully prevented
certain of the Fearnow recipients from selling their Fearnow shares during a period when trading
volume in Retrophin stock was extremely low, in order to ensure that the price of Retrophin
would remain stable.

    As a result of the successful execution of the conspiracy charged in Count Eight,
Shkreli—with the assistance of Greebel and others—exercised control over certain Fearnow
shares.  Some of the ways in which Shkreli exercised such control ultimately resulted in a benefit
to him personally, separate and apart from any benefit he received from controlling the price and
trading volume of Retrophin stock in order to keep the company afloat.  These included transfers
of Fearnow shares to pay off liabilities owed by the MSMB funds and Shkreli personally, as well
as transfers of Fearnow shares directly to Shkreli.

    First, in the spring of 2013, Shkreli and Greebel were able to direct certain
Fearnow share recipients to transfer their escrowed Fearnow shares to repay defrauded MSMB
Capital and Healthcare investors Lindsay Rosenwald and Richard Kocher.  Specifically, as the
evidence at trial demonstrated, Shkreli and Greebel directed Fearnow share recipients Marek
Biestek and Edmund Sullivan to transfer a total of 80,000 escrowed Fearnow shares to

Rosenwald in satisfaction of his settlement agreement.  (See GXs 51 (settlement agreement), 271, 283, 125-23, 125-25 at 2, and 125-26).  Similarly, Shkreli and Greebel directed Fearnow share recipient Andy Vaino to transfer a total of 47,128 escrowed Fearnow shares to Kocher in partial satisfaction of his settlement agreement.  (See GXs 54, 298, 299, 125-28).  These transfers resulted in an ancillary benefit to Shkreli, which was that the shares were used to pay liabilities owed by the MSMB funds and Shkreli personally and for which Shkreli would otherwise have been responsible.

In addition, Shkreli and Greebel orchestrated the transfer of certain Fearnow shares to Thomas Koestler, an individual to whom Shkreli owed shares personally.  (GX 370).  Shkreli and Greebel directed Fearnow share recipient Biestek to transfer a total of 20,000 escrowed Fearnow shares to Koestler.  (GX 299, 125-26).

Finally, in connection with the transfer to Kocher, certain "remaining" escrowed Fearnow shares were transferred directly to Shkreli.  Specifically, 2,872 Fearnow shares in escrow for Vaino were transferred to Shkreli personally in connection with the Kocher transfer. (GXs 299, 125-28).

In sum, but for Shkreli's participation in the securities fraud conspiracy charged in Count Eight, Shkreli would not have been in a position to exercise control over the shares detailed above, and thus would not have been able to reap the ancillary benefit of transferring such shares to others (to satisfy personal debts) and/or to himself directly.  Consequently, the benefit he derived from such transfers—a total of $960,000, as calculated below—should be ordered as forfeiture in connection with Count Eight.  See, e.g., United States v. Torres, 703 F.3d 194, 199-200 (2d Cir. 2012) (finding that "[s]o long as there is a causal nexus between the wrong-doer's possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense" and rejecting defendant's argument that she only received an intangible benefit from her offense); Contorinis, 692 F.3d at 146 (in a conspiracy to commit securities fraud and insider trading case, finding that the calculation of a forfeiture amount is usually based on the defendant's actual gain and concluding that "proceeds" for forfeiture had to be funds that the defendant "acquired" and over which he had control).

### 2.   Valuation of Shares

The value of the indirect benefit to Shkreli from certain shares that he ultimately controlled as a result of his participation in the conspiracy charged in Count Eight was approximately $960,000.  The following chart utilizes Bloomberg data (GX 606) reflecting the price of Retrophin stock on the date of each share transfer to calculate the benefit to Shkreli:

| Recipient of Share Transfer | Date of Transfer | Shares | Price | Total |
|---|---|---|---|---|
| Rosenwald | 4/17/2013 | 80,000 | $6.60 | $528,000 |
| Koestler | 4/17/2013 | 20,000 | $6.60 | $132,000 |
| Kocher | 5/23/2013 | 47,128 | $6.00 | $282,768 |
| Shkreli | 5/23/2013 | 2,872 | $6.00 | $17,232 |

IV.        Forfeiture of Substitute Assets Is Mandatory and Warranted

Pursuant to Fed. R. Crim. P. 32.2(e) and 21 U.S.C. § 853(p), the government is entitled to seek the forfeiture of substitute assets from Shkreli up to the value of any forfeiture money judgment that may be imposed.  See United States v. Capoccia, 402 Fed. Appx. 639 (2d Cir. 2010) (summary order) (reaffirming the application of the procedures of 21 U.S.C. § 853 to include the forfeiture of substitute assets as well as to the imposition of an in personam forfeiture money judgment); United States v. Bermudez, 413 F.3d 304, 305-06 (2d Cir. 2005) (upholding forfeiture of substitute assets in partial satisfaction of $14.2 million money judgment); United States v. Alamoudi, 452 F.3d 310, 314 (4th Cir. 2006) ("Section 853(p) is not discretionary. . . [W]hen the Government cannot reach the property initially subject to forfeiture, federal law requires a court to substitute assets for the unavailable tainted property."); United States v. Numisgroup Intl. Corp., 169 F. Supp. 2d 133, 137 (E.D.N.Y. 2001) (forfeiture of substitute assets to satisfy forfeiture money judgment was lawful, authorized and warranted).

As set forth in the accompanying Declaration, diligent efforts have been made to locate traceable assets of Shkreli's securities fraud crimes without success.  See 21 U.S.C. § 853(p)(1)(A);  Declaration at ¶¶ 8-9.  Accordingly, the conditions for forfeiting substitute assets, as set forth in Section 853(p), have been met.  Further, as set forth in the accompanying Declaration, now that Shkreli has been convicted, substitute assets of his have been located and should be applied to partially satisfy the forfeiture money judgment.  See 21 U.S.C. § 853(p)(1)(B)("has been transferred or sold to, or deposited with, a third party"), (C) ("has been placed beyond the jurisdiction of the court"), and (E) ("has been commingled with other property which cannot be divided without difficulty");  Declaration at ¶¶ 8-10.  See also, United States v. Gotti, 155 F.3d 144 (2d Cir. 1998) (holding that pre-trial restraint of substitute assets is not authorized under the racketeering criminal forfeiture statute, 18 U.S.C. § 1963(d)(1)(A) and (m)).

Specifically, the following substitute assets owned by Shkreli have, to date, been identified and now that Shkreli has been convicted, the Court should direct that they be forfeited to the United States in partial satisfaction of his forfeiture money judgment:  (a) $5 million in cash that is currently held in an E*Trade brokerage account ending in the digits "0258" as security for Shkreli's bond, pursuant to orders of the Court dated January 7, 2016, August 24, 2016 and October 19, 2017; (b) Shkreli's interest in and the monetary value of any and all shares held in an entity called Turing Pharmaceuticals; (c) the album "Once Upon a Time in Shaolin" by the Wu Tang Clan, as well as any proceeds derived from the sale of such album; (d) the album "The Carter V" by Lil Wayne, as well as any proceeds derived from the sale of such album; (e) an Enigma machine, as well as any proceeds derived from the sale of such machine; and (f) a Picasso painting, as well as any proceeds derived from the sale of such painting.  See Declaration at ¶ 11. (hereinafter "the Substitute Assets").

V.   <u>Preservation of Assets Is Necessary</u>

In order to ensure that the forfeiture money judgment is collectible and satisfied by Shkreli and pursuant to this Court's broad authority under Fed. R. Crim. P. 32.2(b)(3), 21 U.S.C. §§ 853(g) and (o), the United States respectfully requests that the proposed Preliminary Order of Forfeiture also include provisions to ensure that, the value of the Substitute Assets and any funds to satisfy the forfeiture money judgment are preserved for criminal forfeiture and pending any appeal.  <u>See</u> Proposed Preliminary Order of Forfeiture at ¶¶ 5, 6, and 10; Fed. R. Crim. P. 32.2(b)(3); 21 U.S.C. §§ 853(g) and (o).  <u>See also</u>, <u>United States v. Awad</u>, 598 F.3d 76, 78 (2d Cir. 2010) (holding that a forfeiture money judgment can be imposed on a defendant who possesses no assets at the time of sentencing); <u>United States v. Peterson</u>, No. 04-CR-752 (DC), 2010 WL 2331990, at * 2 (S.D.N.Y. June 9, 2010) ("Courts have broad power to protect the Government's interest in property that is subject to criminal forfeiture"); <u>United States v. Kirtland</u>, No. 10-10178-03-WEB, 2011 WL 3624997, at * 2 (D. Kan. Aug. 17, 2011) (Section 853(g) authorizes the court to enjoin defendant and his wife from transferring property the government seeks to forfeit as substitute assets); <u>United States v. McCorkle</u>, 143 F. Supp. 2d 1311, 1318 (M.D. Fla. 2001) (under 21 U.S.C. § 853(g), a court may authorize the Attorney General to seize property named in the preliminary order or take any other action to preserve government's interest, including the requirement of a bond and without regard to the location of the forfeited property).  Asset preservation is particularly critical in this case, now that Shkreli has been convicted and the United States seeks a significant forfeiture money judgment against him.

VI.     Conclusion

For the reasons set forth above, the government respectfully requests that the Court impose against defendant Shkreli a forfeiture money judgment in the amount of $7,360,450.00, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and Rule 32.2. Furthermore, in partial satisfaction of the forfeiture money judgment, the government respectfully requests that the Court order Shkreli to forfeit the Substitute Assets, pursuant to 21 U.S.C. § 853(p) and Rule 32.2.  The government respectfully requests that the enclosed proposed Preliminary Order of Forfeiture be entered against Shkreli as part of his sentence and attached to his Judgment and Conviction pursuant to Fed. R. Crim. P. 32.2(b).

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

*Claire S. Kedeshian*

By: _____
Claire S. Kedeshian
Laura D. Mantell
Jacquelyn M. Kasulis
Alixandra E. Smith
G. Karthik Srinivasan
Assistant U.S. Attorneys
(718) 254-7000


Enclosures

cc:     Clerk of Court (KAM)(by Hand and ECF)
        Defense Counsel (via ECF and Email)