# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN

ANDREA ZELLAN
JOSHUA D. KIRSHNER
JACOB KAPLAN
TENY R. GERAGOS
ADMITTED IN NY AND CA

MARK M. BAKER
OF COUNSEL

MARC AGNIFILO
OF COUNSEL
ADMITTED IN NY AND NJ

January 11, 2018

**VIA ECF**
Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   United States v. Martin Shkreli, Crim. No. 15-637 (KAM)

Dear Judge Matsumoto:

Martin Shkreli respectfully submits this letter in response to the government's Motion for a Preliminary Order of Forfeiture against Martin Shkreli. See Dkt. No. 464, Gov't Forfeiture Motion. As argued below, this Court should deny the government's motion because the government has failed to establish, by a preponderance of the evidence, that there are any forfeitable proceeds traceable to Mr. Shkreli's crimes of conviction.

This case has never been about money as far as Mr. Shkreli is concerned. As the evidence at trial demonstrated, during the MSMB Capital time period, Mr. Shkreli was paid a mere $26,000 for two years of work, lived with his parents, and often slept in his office. The evidence was clear that Mr. Shkreli never intended to take or divert a dime of his investors' money for his own use. The government is attempting to fit Mr. Shkreli's conduct into the crude framework of the forfeiture statutes and has developed a theory that is both at odds with the law and with common sense.

Simply put, Mr. Shkreli was not indicted because he stole anyone's money. Ironically, he appears to have been convicted in Counts Three and Six of making statements to potential investors that made them money. The clearest evidence of this fact is that he made them millions of dollars. This did not happen as a result of luck or divine intervention; it happened because of the tireless work and undying effort of one man: Martin Shkreli. The government absolutely ignores this central truth of the case in their arguments to the Court. Fortunately, however, Your Honor has now sat through two trials and has heard months of evidence on these issues. As a result, we believe the Court will deny the government's motion which, respectfully, ignores the facts of the case.

**BRAFMAN & ASSOCIATES, P.C.**

A.  **Legal Standard**

The government seeks relief under 18 U.S.C. § 981(a)(1)(C), which allows forfeiture for "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [various sections of 18 U.S. Code] or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." To determine what constitutes "proceeds" in securities cases, the Second Circuit relies on 18 U.S.C. § 981(a)(2)(B), which defines proceeds as follows:

> In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, <u>less the direct costs incurred in providing the goods or services</u>. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

18 U.S.C. § 981(a)(2)(B) (emphasis added). In making a forfeiture determination, a court can rely on "evidence that is already in the record" as well as additional information or evidence submitted by the parties that the Court accepts as relevant and reliable. Fed. R. Crim. P. 32.2(b)(1)(A).

The Second Circuit has further noted that criminal forfeiture

> focuses on the disgorgement by a defendant of his ill-gotten gains. <u>Thus, the calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain.</u>

United States v. Contorinis, 692 F.3d 136, 146-47 (2d Cir. 2012) (citations omitted; emphasis added). Forfeiture is "concerned not with how much an individual has, but with how much he received in connection with the commission of the crime." United States v. Viloski, 814 F.3d 104, 113 (2d Cir. 2016) (citing United States v. Awad, 598 F.3d 76, 78 (2d Cir. 2010) (noting Congress' premise in enacting criminal forfeiture statutes)). "Notably, the Supreme Court has stated that the meaning of proceeds in [18 U.S.C. § 981 (a)(2)(B)] is 'profits' rather than receipts." United States v. Hollnagel, No. 10 Cr. 195-1,3, 2013 WL 5348317, at *3 (N.D. Ill. Sept. 24, 2013) (quoting United States v. Santos, 553 U.S. 507, 512 (2008)).

B.  **Mr. Shkreli Did Not Obtain Any Forfeitable Proceeds From Counts Three, Six, or Eight**

As part of its motion, the government seeks to forfeit the "amount of funds invested by defrauded investors" in the MSMB entities–$2,998,000 for MSMB Capital (Count Three) and $3,402,450 for MSMB Healthcare (Count Six). Gov't Forfeiture Motion at 4. The government also seeks $960,000 forfeiture relating to the conduct in Count Eight. We will address each of these counts in turn.

2

**BRAFMAN & ASSOCIATES, P.C.**

    a.    **Count Three**

In support of its forfeiture claim, the government argues that the monies invested in MSMB Capital "were, in essence, the life blood that fueled the fraud scheme, and that Mr. Shkreli "reaped the benefits of having access to all such funds." Id. at 5. These arguments miss the point. In securities fraud cases, the term "proceeds" means the "amount of money acquired through the illegal transactions resulting in the forfeiture." 18 U.S.C. § 981(a)(2)(B). To forfeit the full value of the invested funds, this Court would need to find that Mr. Shkreli obtained all of the investor funds through "illegal transactions." As was evident at trial, however, many of the investors did not rely on Mr. Shkreli's representations in deciding whether to invest in MSMB Capital. Instead, many were impressed with Mr. Shkreli's intellectual prowess and knowledge of the pharmaceutical industry.

For example, Sarah Hassan invested $300,000 in MSMB Capital[1] because of her father's long-time business associate Brent Saunders—the CEO of Bausch & Lomb and former Executive Vice President at Schering-Plough—encouraged her. Ms. Hassan testified that Mr. Saunders was impressed with Mr. Shkreli. See Tr. 915-917. In fact, "Brent Saunders…characterized [Mr. Shkreli] as a brilliant, young healthcare guy…" Tr. 1071. Similarly, Schuyler Marshall also characterized Mr. Shkreli as "smart and highly focused." Tr. 2522. He testified that Mr. Shkreli reminded him of the main character from the movie "Rain Main":

> [Marshall]:    What I thought was that this was a person who was intensely focused on one small segment of the stock marketing and just lived it day and night and was so focused that that was his investment advantage.
>
> [Brafman]:    And that reminded you of "Rain Man"?
>
> [Marshall]:    I would say that my recollection of the movie was that the character was very -- very, very focused in one area and one area, or maybe had to do with math, and that he could come up with answers that other people wouldn't come up with. And the reference here was just that this was an intensely focused, bright guy who knew his stuff.

Tr. 2520-21.

John Neill also did not invest based on material misrepresentations by Mr. Shkreli about assets under management, an auditor, or an administrator. See Tr. 4052. Instead, he invested because other people, like Darren Blanton, "sponsored" Mr. Shkreli. See Tr. 4051. Mr. Neill, too, was impressed by how smart Mr. Shkreli was. See Tr. 4047, 4051.

---

[1] Exhibit A to the Government's Motion indicates that Dynagrow Capital LLP invested on behalf of SH [Sarah Hassan]. This is not the case. Sarah Hassan invested $300,000 personally into MSMB Capital (See Tr. 934); Dynagrow Capital LLP invested $150,000 into Retrophin (See Tr. 972).

3

**BRAFMAN & ASSOCIATES, P.C.**

Given this testimony at Mr. Shkreli's trial, there is simply no basis for the government to claim that all of the MSMB Capital investments were obtained through illegal transactions.

Furthermore, even if this Court finds that all of the MSMB Capital investments were made through illegal transactions, there are still no forfeitable proceeds here, as Mr. Shkreli used the invested funds for their intended purposes: investment in the stock market. As the government itself notes in its motion, "Shkreli lost all of the MSMB Capital investors' money in a series of ill-fated trades in late 2010 and early 2011 . . . ." Gov't Forfeiture Motion at 5. Under the forfeiture statute, the value of the forfeitable "proceeds" are reduced by "the direct costs incurred in providing the goods or services." 18 U.S.C. § 981(a)(2)(B). Because Mr. Shkreli used the investors' funds to provide the "goods," *i.e.*, invest the funds in the market, the amount of these investor funds are not forfeitable. Cf. United States v. Bonventre, 646 F. App'x 73, 90 (2d Cir. 2016) (affirming the district court's refusal to deduct direct costs because the investment firm "never purchased any securities on behalf of its [] clients in exchange for their investments"); United States v. Mahaffy, 693 F.3d 113, 136-38 (2d Cir. 2012) (noting that forfeiture under 18 U.S.C. § 981(a)(2)(B) in insider trading cases requires calculation of net gain, not gross gain.).

Moreover, the forfeiture amount in this case should also be reduced to zero because, as undisputedly proven at trial, all MSMB Capital investors received a robust return for their investments. Indeed, because § 981(a)(2)(B) "targets the profits that [the defendant] enjoyed, not net gains or intended losses," the forfeiture proceeds should be reduced by the money that was returned to investors, as these payments are in this case, part of the direct costs incurred in providing goods and services. United States v. Hollnagel, 2013 WL 5348317, at *4 (deducting the funds paid back to the investors from the forfeiture analysis under 18 U.S.C. § 981(a)(2)(B) as these payments were "direct costs 'incurred in providing the goods or services.'").

  b.  **Count Six**

As with Count Three, the government seeks forfeiture under Count Six equivalent to <u>all</u> the funds invested in MSMB Healthcare, by alleging that <u>all</u> of the money "was obtained by [Mr. Shkreli] as result of the fraud." Gov't Forfeiture Motion at 5. Notably, however, only <u>two</u> of the twelve MSMB Healthcare investors (David Geller and Richard Kocher) testified at trial. The remaining ten investors (Alan Geller, Molly Tschang, Seymour Block, Steven Rosenfeld, Robert Johnson, Michael Lavelle, Spencer Spielberg, Patrick McGowan, George Blasko, and Diandra Douglas) were conspicuously absent from Mr. Shkreli's trial. This fact is important because, as the government noted at Mr. Shkreli's trial, it could not "argue that these individuals relied on those specific misrepresentations that Mr. Shkreli made . . . because we not obviously, we have not heard testimony from them." (Tr. 4450; see also Tr. 4450-51: "But the fact that they invest, again like we said, we can't say the person specifically relied—we can't make that—we would not make that argument. We can't make that argument."). Accordingly, without presenting a shred of evidence that any of these ten investors relied on Mr. Shkreli's representations or were actually defrauded by him, the government has failed to meet its burden of proof to establish that Mr. Shkreli acquired their investments though illegal transactions as required by 18 U.S.C. § 981(a)(2)(B).

**BRAFMAN & ASSOCIATES, P.C.**

Moreover, all of the non-testifying investors were brought into MSMB Healthcare through Kevin Mulleady and Ron Tilles, not Mr. Shkreli. See Tr. 4455-56 (Court's finding that admitting the non-testifying investor's subscription agreements "would create an unfair impression that [the investors] did come to the table because of Mr. Shkreli . . . [w]hen in fact, it doesn't appear that that is accurate."). While the government alleged that Mr. Mulleady and Mr. Tilles were unindicted co-conspirators under Counts Four and Five, the jury rejected this alleged conspiracy argument by acquitting Mr. Shkreli of these counts. Consequently, there is no basis for the government to argue that Mr. Shkreli obtained money from these investors through illegal transactions.

As for the testifying investors, David Geller and Richard Kocher, they invested a total of $400,000 in MSMB Healthcare ($200,000 each). Mr. Shkreli then invested these funds into Retrophin. While the government argues that this investment was "without the permission or knowledge of the MSMB Healthcare investors" (Gov't Forfeiture Motion at 6), the argument is belied by the private placement memoranda presented at trial that specifically allowed Mr. Shkreli to invest in illiquid investments such as Retrophin at his discretion.[2] Regardless, because Kocher and Geller's $400,000 was actually invested in Retrophin, that amount is part of the direct costs incurred in providing the goods or services and should not be included in the forfeiture analysis.

Finally, whether the Court only considers the $400,000 invested by the testifying witnesses or the full $3.4 million invested by all MSMB Healthcare investors, the forfeiture amount for Count Six is still zero because, as with Count Three, each of these investors received a robust return for their investments. See United States v. Hollnagel, 2013 WL 5348317, at *4 (deducting the funds paid back to the investors from the forfeiture analysis under 18 U.S.C. § 981(a)(2)(B) as these payments were "direct costs 'incurred in providing the goods or services.'").

    c.    **Count Eight**

The government seeks a $960,000 forfeiture on Count Eight by arguing that as "a result of the successful execution of the conspiracy in Count Eight, Shkreli . . . exercised control over certain Fearnow shares" to his own personal benefit. Gov't Forfeiture Motion at 6. In making this argument, the government alleges that the Count Eight conspiracy personally benefited Mr. Shkreli by allowing him to pay off his MSMB liabilities with Retrophin stock. Id. Specifically, the government alleges that Mr. Shkreli used his control over the Fearnow shares to have his co-conspirators send shares to Lindsay Rosenwald and Richard Kocher to satisfy Mr. Shkreli's MSMB liabilities. Id.

This argument should be rejected because this alleged benefit has nothing to do with the alleged conduct in Count Eight. Specifically, Count Eight charged Mr. Shkreli with a conspiracy to commit securities fraud by engaging in a "scheme to defraud investors and potential investors

---

[2] For example, the October 2011 Private Placement Memorandum declared MSMB Healthcare's "intent to invest in illiquid securities, including venture capital, private equity, limited partnerships and other hedge funds." (GX 109-6).

5

**BRAFMAN & ASSOCIATES, P.C.**

in Retrophin by concealing Shkreli's beneficial ownership and control of Retrophin's unrestricted or free trading shares." See Indictment at ¶¶ 36-40, 57-59. In short, the government alleged that Mr. Shkreli and his co-conspirators conspired to control the price and trading volume of the Fearnow Retrophin shares. See Gov't Forfeiture Motion at 6.

But rather than basing its forfeiture request on the conduct underlying this alleged market manipulation, the government instead relies on a different theory—that Mr. Shkreli personally benefited from controlling the Fearnow shares to pay off his MSMB liabilities.[3] This benefit, however, has no connection to the alleged manipulation of the price and trading volume of the shares. If anything, this alleged personal benefit relates to the government's failed theory in Count Seven that Mr. Shkreli used settlement and consulting agreements to repay MSMB investors with Retrophin stock–a theory soundly rejected by the jury. To the extent forfeiture is limited to proceeds that are traceable to "specified unlawful activity" (see 18 U.S.C. § 981(a)(1)(C))–in this case, the market manipulation alleged in Count Eight, not the acquitted conduct in Count Seven–the government forfeiture request must be rejected.

Additionally, as noted above, the term "proceeds" is defined in security fraud cases as "the amount of money acquired through the illegal transactions resulting in the forfeiture." 18 U.S.C. § 981(a)(2)(B). Count Eight, however, does not include any "illegal transactions." In fact, the government has never claimed that Mr. Shkreli acquired the Fearnow shares through illegal means; rather, the government alleges that Mr. Shkreli failed to disclose his "beneficial ownership or control of more than five percent of a voting class of [Retrophin's] equity securities." See Indictment at ¶ 38. Without evidence of illegal transactions, the government is not entitled to forfeiture.

Lastly, this Court should reject the government forfeiture request because the government has failed to establish that Mr. Shkreli's "personal benefit" was based on his alleged control of the Fearnow shares. In its motion, the government alleges that co-conspirators Marek Biestek, Edmund Sullivan and Andrew Vaino all transferred their Fearnow shares to MSMB investors on behalf of Mr. Shkreli. Gov't Forfeiture Motion at 6-7. At trial, however, the government opted not to call any of these witnesses. Without this testimony, the government is asking this Court to assume, without any evidence, that Messrs. Biestek, Sullivan and Vaino had no legitimate business interest in trying to settle the MSMB claims to assist in Retrophin's long-term survival. In reality, these three Fearnow recipients had their own financial interests in mind when they helped settle these claims as they stood to gain handsomely if Retrophin succeeded as a company and was not smothered in its infancy with lawsuits by MSMB investors.

---

[3] In support of this argument, the government relies on United State v. Torres, 703 F.3d 194, 199-200 (2d Cir. 2012) for the proposition that "[s]o long as there is a causal nexus between the wrong-doers possession of the property and her crime, the property may be said to have been 'obtained' by her 'indirectly' as a result of her offense." See Gov't Forfeiture Motion at 6. This case is irrelevant as it relates to a different forfeiture provision, § 18 U.S.C. 981(a)(2)(A), that does not apply to securities fraud cases.

**BRAFMAN & ASSOCIATES, P.C.**

C.  **Forfeiture of Substitute Assets Is Unwarranted**

The government has failed to establish that the counts of conviction resulted in any forfeitable proceeds. In the event that this Court orders forfeiture against Mr. Shkreli, the government should not be permitted to substitute assets. As an initial matter, the New York State Department of Taxation and Finance ("NYSDTF") has already seized at least one of Mr. Shkreli's assets that the government is now trying to forfeit. For example, the 3 Rotor Enigma Machine was seized by NYSDTF and has already been sold at auction.

The government also seeks Mr. Shkreli's interest in Vyera Pharmaceuticals (formerly known as Turing Pharmaceuticals). As we have repeatedly stated, the shares of Vyera are not liquid. To force a sale would result in nearly half of the company's shares being sold at "fire sale" rates. A fire sale for the benefit of the government will have a devastating impact on innocent people—including current Vyera employees, current Vyera shareholders, and countless patients waiting for Vyera's anticipated treatments for certain orphan and rare diseases.

The government also seeks forfeiture of the $5 million in the E*Trade account that is securing Mr. Shkreli's bond. We respectfully ask the Court to note that these funds represent the majority of Mr. Shkreli's liquid assets. Furthermore, despite the NYSDTF seizure and auction of the Enigma machine, Mr. Shkreli still owes New York State more than $450,000 in taxes. In addition, he also owes the Internal Revenue Service more than $1 million. We also note the significant amounts of fees owed to his civil attorneys at Fox Rothschild, his accountants at Marks Paneth, and to this firm for trial and our continuing efforts on appeal. See Shkreli Reply to the Government Response to Motion to Release Bond Obligation 9/25/17. Each of these creditors would be severely penalized if the assets on deposit to secure his bail were seized to satisfy a forfeiture judgment, especially in a case where the legal theory on which the government relies is so deeply flawed.

Finally, we ask Your Honor to consider that Mr. Shkreli intends to file an appeal of his conviction. If the Court grants the government's motion and also grants its request for substitute assets, we respectfully request that execution of any forfeiture money judgment should be stayed pending appeal.

**BRAFMAN & ASSOCIATES, P.C.**

D.  **Conclusion**

For the reasons stated above, the government's motion should be denied in its entirety.

Respectfully submitted,

Benjamin Brafman

cc: AUSA Jacquelyn Kasulis (via ECF)
AUSA Alixandra Smith (via ECF)
AUSA Karthik Srinivasan (via ECF)
AUSA Claire Kedeshian (via ECF)