

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SLR:LDM:CSK
F. #2014R00501

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 5, 2018

By Hand and ECF
Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Martin Shkreli
     Criminal Docket No. 15-637 (S-1)(KAM)

Dear Judge Matsumoto:

   The United States respectfully submits this letter in response to the January 11, 2018 letter filed by defendant Martin Shkreli ("Shkreli") (Dkt. No. 515, herein after "Def. Opp.") and in further support of the government's motion for the entry of a forfeiture money judgment and preliminary order of forfeiture. (Dkt. No. 464, hereinafter "Gvt. Forfeiture"). In his opposition to the government's motion, Shkreli argues that he should forfeit nothing, despite the fact that the applicable forfeiture statutes impose *mandatory* forfeiture for the offenses in Counts Three, Six and Eight of which Shkreli stands convicted.  18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) ("the court shall order the forfeiture of the property as part of the sentence in the criminal case"); *see United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); *United States v. Castello*, 611 F.3d 116 (2d Cir. 2010) (vacating a district court's imposition of no forfeiture and reinstating $12 million in forfeiture, including the defendant's equity interest in his home), *cert. denied*, 562 U.S. 1251 (2011).

   As set forth below and in the government's November 30, 2017 submission, because none of Shkreli's arguments has any merit, a forfeiture money judgment in the amount of $7,360,450 should be entered against him at his sentencing.  Oral argument on the issue of forfeiture, if necessary, is currently scheduled for Friday, February 23, 2018 at 9:30 a.m.

1

## I. Forfeiture Is Mandatory, and the Court Should Reject Shkreli's Attempt to Collaterally Attack His Convictions Via His Forfeiture Filing

In an effort to obfuscate the issues, Shkreli relies primarily on the same flawed arguments he repeatedly raised during trial and which were squarely rejected by the jury: namely, that he did not intend to or in fact commit fraud, so that none of the conduct he engaged in was illegal and thus forfeiture is not appropriate. (Def. Opp. at 2-6). As a threshold matter, this attempt by Shkreli to collaterally attack his conviction in the forfeiture phase should be summarily rejected. *See United States v. Warshak*, 631 F.3d 206, 331 (6th Cir. 2010) (affirming district court's refusal to let defendant introduce evidence tending to show his conduct was not illegal; in the forfeiture phase the legality of the conduct is "no longer a live issue;" the only question is the nexus between the conduct and the offense).

In addition, Shkreli also contends broadly that the forfeiture statutes are inapplicable, and forfeiture "should be reduced to zero," because the victims of his frauds in Counts Three and Six did not ultimately suffer any losses but instead "received a robust return for their investments." (Def. Opp. at 4, 5). However, forfeiture serves a punitive purpose—the "disgorgement by a defendant of his 'ill-gotten gains,'" *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012)—that is entirely distinct from the calculation of the intended and/or actual loss amount for Guidelines purposes and from the calculation of the appropriate amount of restitution that should be afforded to victims. That punitive purpose would not be served if forfeiture were somehow limited by those separate loss and/or restitution determinations. *See United States v. Peters*, 732 F.3d 93, 101-02 (2d Cir. 2013) (finding that "doing no more than returning a wrongdoer to the economic position he occupied before he committed his criminal offense does not provide much of a deterrent to those who might be tempted to follow in his footsteps"); *United States v. Pescatore*, 637 F.3d 128, 138 (2d Cir. 2011) ("Forfeiture and restitution are separate remedies with different purposes . . . ."); *United States v. Torres*, 703 F.3d 194, 196 (2d Cir. 2012); *United States v. Kalish*, 626 F.3d 165, 169 (2d Cir. 2010); *United States v. Phillips*, 704 F.3d 754, 771 (9th Cir. 2012) (unlike a restitution order, which is reduced by the amounts the victims have been reimbursed because the purpose of restitution is to make the victim whole, a forfeiture order is not reduced to reflect restitution; its purpose is punishment). Thus the ultimate losses—or lack thereof—suffered by the victims of Shkreli's schemes in Counts Three and Six are simply not relevant to the application of the mandatory forfeiture statutes. (The government addresses Shkreli's related arguments regarding deductions from forfeiture for "direct costs" in Point II below).

Shkreli's additional arguments as to why no forfeiture is required on Counts Three, Six and/or Eight are similarly unavailing, in large part because they seek to improperly relitigate the jury's determination that he in fact committed the charged crimes.

### A. Count Three

With respect to Count Three, Shkreli contends that forfeiture of all of the funds invested in MSMB Capital is not appropriate because certain investors did not in fact

rely on his misrepresentations. (Def. Opp. at 3-4). This argument must be rejected, as it is well-established that reliance is not an element of the fraud offenses of which Shkreli was convicted. *See United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) ("Conspicuously absent from this list of elements [to prove a *criminal* violation of Section 10(b) and Rule 10b-5] is 'reliance'") (emphasis added). Similarly, to the extent Shkreli seeks to limit his forfeiture liability based upon claims about a particular investor's subjective experience or impressions, such arguments are misplaced. (Def. Opp. at 3-5). The relevant standard for proving guilt, and the mandatory forfeiture liability that flows from it, is whether "a reasonable investor would find . . . the misrepresentation important in making an investment decision." *Vilar*, 729 F.3d at 89. In fact, both the defendant and the Court acknowledged this standard during trial. *See* Tr. 2475 (defense counsel stated that the "the standard is an objective standard. It's a reasonable investor. It's not any one particular investor. It's not a subjective standard"); Tr. 4613 (the Court noted that "the specific investor's investment decisions do[] not change the objective standard, the objective nature of the materiality test under the securities and wire fraud laws."). As such, what matters is what a "reasonable investor" would find, and not Shkreli's claims about the subjective decision-making process of any individual investor. In convicting Shkreli on Count Three, the jury clearly found that a "reasonable investor" in MSMB Capital would find the misrepresentations made by Shkreli that both induced the investors to invest in the fund, and prevented such investors from making redemptions from the fund, were material.[1] Consequently, forfeiture in the amount of $2,998,000.00 is appropriate for Count Three, for the reasons detailed in the government's initial brief.[2] (Gvt. Forfeiture at 5).

### B.    Count Six

With respect to Count Six, Shkreli argues that forfeiture should be limited to the sums of money invested by those investors who in fact testified at trial, because the government did not seek to argue at trial that the remaining MSMB Healthcare investors were induced to invest in MSMB Healthcare as a result of Shkreli's material misrepresentations. (Def. Opp. at 4-5). Such argument is both misleading and wrong.

---

[1] Moreover, Shkreli's letter opposing forfeiture mischaracterizes the evidence at trial regarding MSMB Capital. For example, while MSMB Capital investor Sarah Hassan did testify that Brent Saunders spoke highly of Shkreli (Def. Opp. at 3), she also testified that specific misrepresentations made by Shkreli about MSMB Capital—including the fund's purported assets under management, Shrekli's alleged successful track record as an investor and the representation that the fund had an auditor—were material to her decision to invest. (Tr. 945, 947-48).

[2] The defendant correctly notes that Sarah Hassan, and not Dyangrow Capital, made a $300,000 investment in MSMB Capital. The government attaches a revised Exhibit A to this filing that makes this correction.

First, while the government did not argue that non-testifying MSMB Healthcare investors were induced to invest by specific misrepresentations, the government both introduced evidence and successfully argued that Shkreli *also* committed securities fraud with respect to MSMB Healthcare by seeking to and successfully preventing redemptions by MSMB Healthcare investors based on the misrepresentations he made in the investor statements sent to all MSMB Healthcare investors regarding the performance of the fund. (*See* GXs 83-1 to 83-4 (Kocher), 84-1 to 84-13 (Alan Geller), 85-1 to 85-4 (Tschang), 86-1 to 86-2 (Block), 87-1 (Rosenfeld), 88-1 to 88-4 (Johnson), 89-1 to 89-16 (Lavelle), 90-1 to 90-9 (Spielberg), 91-1 to 91-10 (David Geller), 92-1 to 92-11 (McGowan), 93-1 to 93-5 (Blasko), 94-1 (Douglas)). Special Agent Braconi testified that these performance statements did not accurately recount the performance of MSMB Healthcare, and detailed the factual support for such testimony in a chart that compared the information in the performance statements (which included Shkreli's alleged valuation of Retrophin) to the funds in the bank and brokerage accounts for MSMB Healthcare. (*See* GX 705). The government also introduced additional evidence, including documents and the testimony of Robert Barnett, to show that the alleged "valuation" of Retrophin Shkreli solicited from the company Valuation Research Corporation ("VRC") (which formed the basis for his own valuation) was not in fact a legitimate valuation Retrophin itself, but simply a reiteration of the share price that Shkreli told VRC that MSMB Healthcare had paid for Retrophin shares (Tr. 4634-35 (Barnett testimony that VRC was not evaluating the "enterprise value" of Retrophin but rather confirming the share price paid for by MSMB Healthcare; Tr. 4687-88 (VRC relied only on information provided by MSMB Healthcare and Retrophin, and did not conduct a separate analysis)); and since Shkreli himself controlled both sides of the transactions wherein MSMB Healthcare purchased Retrophin shares, Shkreli was able to manipulate that share price as he wished. Taken together, it is clear that Shkreli's misrepresentations in the performance updates that were sent to all MSMB Healthcare investors in order to prevent redemptions also constituted securities fraud.[3]

Moreover, Shkreli's argument that forfeiture should be limited to testifying investors should be rejected out-of-hand, as forfeiture is mandatory for *all* ill-gotten gains received by the defendant in connection with the relevant fraud scheme. The MSMB

---

[3] Shkreli also suggests that forfeiture is not appropriate because the non-testifying MSMB Healthcare investors were induced to invest by misrepresentations made by Ron Tilles and Kevin Mulleady, who Shkreli alleges the jury "rejected" as unindicted co-conspirators. (Def. Opp. at 5). This argument is flawed for a number of reasons. First, misrepresentations made by Mulleady and Tilles to investors, such as those concerning the fund's assets under management and Shkreli's prior alleged success as a hedge fund manager, clearly originated with false information provided by Shkreli himself. Furthermore, Shkreli's conviction on Count Six was also based on misrepresentations in the performance updates that prevented redemptions, and such misrepresentations were made by Shkreli and sent to the MSMB Healthcare investors either directly by Shkreli or via statements issued by NAV Consulting ("NAV"), which simply provided to the investors the information that Shkreli had provided to NAV.

4

Healthcare scheme detailed in Count Six—of which Shkreli was convicted by a jury—clearly encompasses all investors in that scheme. *See United States v. Kahale*, 2010 WL 3851987, at *31 (E.D.N.Y. Sept. 27, 2010) (Matsumoto, J.) (holding defendants must forfeit all funds obtained as part of overall scheme to defraud, regardless of whether only a subset of all investors were identified in the indictment), *aff'd, sub. nom., United States v. Graham*, 477 Fed. Appx. 818 (2d Cir. 2012); *United States v. Emor*, 850 F. Supp. 2d 176, 217 (D.D.C. 2012) (explaining forfeiture is "not limited to the proceeds gained through the particular mailing or wire transaction on which the conviction was based; rather, it 'extends to the entire scheme' of which the mailing or wire transactions was a part") (citations omitted). S*ee also, Peters,* 732 F.3d at 103 (in the context of section 982, requiring a defendant to forfeit proceeds obtained "indirectly" through a corporation that he "extensively controls, or dominated" and had the "authority to direct the disposition of corporate assets" and use "corporate assets for his personal expenses"); *United States v. Daugerdas*, 837 F.3d 212, 231 (2d Cir. 2016) (in a tax fraud case, upholding $164,737,500 forfeiture based upon funds received by a law firm that were generated by the defendant's criminal conduct); *United States v. Perry*, No. 13-CR-156, 2014 WL 7499372 (E.D.Va. Dec. 22, 2014) (finding the defendant exercised "compete and unfettered dominance over the corporate entity" and "used corporate assets to directly pay personal and familial expenses", including credit card payments and taxes), *aff'd,* 659 Fed. Appx. 146 (4th Cir. 2016).

### C. Count Eight

Finally, Shkreli contends that there should be no forfeiture on Count Eight because the personal benefit he received from his beneficial control of certain Fearnow Shares was "disconnected" from the charged conduct in Count Eight. (Def. Opp. at 5-6). However, as detailed at length in the government's opening brief, *but for* the conspiracy to control the price and volume of Retrophin shares charged in Count Eight, which resulted in Shkreli exerting beneficial control over at least certain of the Fearnow Shares, Shkreli would not have had the ability to subsequently transfer those Fearnow Shares for his personal benefit. (*See* Govt. Forfeiture at 6-7). Shkreli provides no legal authority to suggest that forfeiture is inappropriate when the personal benefit he received from the transfer of the shares was a benefit that he was able to receive *only* because of his participation in the conspiracy charged in Count Eight (which involved nominally assigning those Fearnow Shares to others but in fact controlling them in an attempt to manipulate the share price of Retrophin). Shkreli's further argument that there were no "illegal transactions" at issue in Count Eight (Def. Opp. at 6) is just another attempt to suggest that there was no crime committed with respect to Count Eight—in fact, the jury concluded that there was a conspiracy to manipulate the price and volume of Retrophin stock for the benefit of Shkreli and his co-conspirators.[4] The government introduced evidence that there were in fact illegal

---

[4] Shkreli's additional argument that forfeiture should be limited because his co-conspirators did not testify as to their purported motives in transferring their Fearnow shares also fails. (Def. Opp. at 6). The evidence at trial (as well as at the trial of Shkreli's co-defendant, Greebel) made it eminently clear that Shkreli and his co-conspirators, including Greebel, transferred those Fearnow shares to defrauded MSMB Capital and Healthcare

5

transactions in furtherance of that conspiracy, including the agreements among the co-conspirators to sell or not sell Fearnow shares in a certain manner at certain times, or to make unshortable certain Fearnow shares, all at Shkreli's direction and without disclosing Shkreli's beneficial ownership of those shares. (*See*, *e.g.*, GXs 120-11, 120-17, 245, 246, 248, 702).

Finally, Shkreli's attempt to limit forfeiture with respect to Count Eight by arguing that the benefit he received from the subsequent transfer of Fearnow shares he controlled to defrauded MSMB Capital and MSMB Healthcare investors lacks merit. As detailed above, Shkreli received this benefit as a direct result of his participation in the conspiracy charged in Count Eight—regardless of the success or failure of the scheme charged in Count Seven, or his guilt on that count. Moreover, it is well-settled in the Second Circuit that frauds which were not specifically proven during the guilt phase of the trial, but which arose out of the same schemes for which the defendant was convicted, can be considered by the court during the forfeiture phase of the trial. *See United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir. 2005) ("Although we have not previously considered whether proceeds derived from conduct forming the basis of a charge for which the defendant was acquitted can be counted as 'proceeds' of racketeering activity, it seems plain that it can."); *United States v. Hatfield*, 2010 WL 4177159, at * 6 (E.D.N.Y. Oct. 10, 2010) ("[T]he Government can also seek forfeiture of proceeds derived from 'uncharged executions' of Defendants' fraud schemes"); *United States v. Jafari*, 85 F. Supp. 3d 679, 688 (W.D.N.Y. 2015) ("Considering uncharged conduct as part of a fraud scheme is consistent with the law as articulated by courts in the Second Circuit."), *aff'd*, 663 Fed. Appx. 18, 24 (2d Cir. 2016). *See also, United States v. Holland,* 2018 WL 416459 at * 7 (11th Cir. Jan. 16, 2018) (*per curiam*) (holding with approval that district court's forfeiture calculation can be based on both acquitted and uncharged conduct).

## II. Shkreli Does Not and Cannot Demonstrate that He is Entitled to a Deduction for Any Direct Costs From the Calculation of Forfeiture For Counts Three and Six

Shkreli further contends that even if forfeiture is applicable with respect to Counts Three and Six (and it clearly is), the calculation of any such forfeiture must be offset by "direct costs." As the Court is aware, Section 981(a)(2)(B) provides that the proceeds of a crime subject to forfeiture are "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." Shkreli contends that Section 981(a)(2)(B) applies to this case because the Second Circuit previously concluded that Section 981(a)(2)(B) provides the definition of "proceeds" for securities fraud cases in the narrow context of insider trading cases. *See* Def. Opp. at 6, Govt. Forfeiture at 3 (citing to *Jiau* and *Bonaventure*).[5] Shkreli further argues that there are

---

investors to repay debts owed by Shkreli personally, and that the transferees received nothing in return for those shares. (Govt. Forfeiture at 6-7).

[5] Though no "direct costs" are proven by him, Shkreli argues that he is entitled to a deduction for such costs under Section 981(a)(2)(B)'s definition of forfeitable proceeds. Section 981(a)(2)(B) defines "proceeds" as "money acquired through the illegal transactions"

6

two sources of "direct costs" that must be deducted from the forfeiture amounts imposed in Counts Three and Six: (1) any Retrophin shares or money ultimately provided to the MSMB Capital and MSMB Healthcare investors, and (2) any investments in healthcare stocks that were made by the funds. (Def. Opp. at 4-5). These arguments are unavailing.

---

in cases involving "lawful goods or lawful services that are sold or provided in an illegal manner," and allows a deduction based upon "direct costs incurred in providing the goods or services" if proven by the defendant. In contrast, Section 981(a)(2)(A) defines "proceeds" in cases involving "illegal goods, illegal services, and unlawful activities," as "property of any kind obtained directly or indirectly" as a result of the offense, and "is not limited to the net gain or profit realized from the offense."

While the Second Circuit has held that Section 981(a)(2)(B)'s definition of "proceeds" applies in insider trading cases, *United States v. Contorinis*, 692 F.3d at 145 n.3 (2d Cir. 2012); *United States v. Mahaffy*, 693 F.3d 113, 136-38 (2d Cir. 2012), it is far from clear that this more limited definition as opposed to the gross definition of "proceeds" set forth in Section 981(a)(2)(A) should apply to other types of fraud cases, such as this, where the offenses consist of securities fraud premised on the inducement to invest and the prevention of redemptions based on material fraudulent misrepresentations. Notably, a number of other courts both within and outside the Second Circuit have held that fraudulent schemes constitute "unlawful activities" such that the gross definition of proceeds under Section 981(a)(2)(A) applies to forfeiture. *See United States v. Bodouva*, 853 F.3d 76, 80 (2d Cir. 2017)(finding § 981(a)(2)(A) to apply where scheme involved embezzlement from 401(k) investment plan); *United States v. Uddin,* 551 F.3d 176, 181 (2d Cir. 2009)(finding § 981(a)(2)(A) to apply where scheme involved food stamp fraud); *United States v. Sigillito*, 899 F. Supp. 2d 850, 864-65 (E.D. Mo. 2012) (defendant in a mail and wire fraud scheme must forfeit the gross amount he took from investors, without credit for his use of the later investments to pay the early investors; § 981(a)(2)(A) applies because the scheme was entirely unlawful); *Kahale*, 2010 WL 3851987, *31-32 (E.D.N.Y. Sept. 27, 2010) (applying § 981(a)(2)(A) in an investment fraud scheme; forfeiture is based on amount defendant took from victims, not on victims' net losses); *United States v. Nicolo*, 597 F. Supp. 2d 342, 350 (W.D.N.Y. 2009) (defendant must forfeit all money he received as a consequence of his fraud scheme without any reduction for the value of the services actually provided to his victims; § 981(a)(2)(A) applies). Application of the gross definition of proceeds under Section 981(a)(2)(A) to schemes aimed at defrauding investors is more consistent with the principle that forfeiture is intended to deprive a defendant of property he would not have had "but for" the commission of the offense. *Nicolo*, 597 F. Supp. 2d at 345. (*See* Gvt. Forfeiture at 4). In this regard, "proceeds" from a fraudulent scheme, *i.e.* misrepresentations to induce investments, are distinguishable from "proceeds" of specific "illegal transactions," such as those in *Contorinis* where the only ill-gotten gain is the difference between the amount the defendant received from the illegal sale of stock and what he paid for it.

7

As an initial matter, when Section 981(a)(2)(B) applies, the burden of proof as to any "direct costs" is on the defendant. *See United States v. Mandell*, 752 F.3d 544, 553 (2d Cir. 2014) (in a securities fraud case, finding that defendant "failed to present any evidence and no more than cursory argument" as to the issue of direct costs); *United States v. Bonventre*, 646 Fed. Appx. 73, 90-91 (2d Cir. 2016) (in a securities fraud case, upholding over $19.7 million forfeiture and finding that there were no direct costs to deduct); *United States v. Blech*, 550 Fed. Appx. 70 (2d Cir. 2014) (in securities fraud case, district court did not err in holding defendant failed to meet his burden of proof with respect to issue of direct costs under § 981(a)(2)(B); *United States v. Naranjo*, 2015 WL 2381322 at * 1 (S.D.N.Y. May 13, 2015) (in an underpayment of construction workers wages case, rejecting defendant's arguments regarding direct costs and finding that defendant failed to provide an affidavit and that the records submitted by defendant were "facially fraudulent" and entitled to no weight), *aff'd*, 645 Fed. Appx. 50 (2d Cir. 2016); *United States v. Morrison*, 656 F. Supp. 2d 338, 352 (E.D.N.Y. 2009) (refusing any deduction of the over $6.1 million forfeiture because defendant failed to meet his burden of coming forward with sufficient information). *See also, United States v. Gorski,* 2018 WL 460204 at *12-13 (1st Cir. Jan. 18, 2018) (in government contract fraud case, court upheld $6.7 million forfeiture and rejected defendant's argument that personal income taxes paid and value of his work performed under the contracts were directed costs under § 981(a)(2)(B)).

Here, Shkreli has entirely failed to meet his burden of identifying with any specificity—let alone proving—any "direct costs" that could be deducted, and thus is not entitled to a reduction in forfeiture. *See Mandell*, 752 F.3d at 533. That is, Shkreli does not point to any specific legitimate and deductible expenses incurred in connection with generating the proceeds he is liable to forfeit.

In fact, there is no evidence that *any* of what Shkreli gestures to with his insufficient and "cursory argument[s]" could be considered legitimate "direct costs." First and foremost, much of the money invested in MSMB Capital and MSMB Healthcare was used for "overhead expenses" of running the funds (or, in the case of MSMB Healthcare, funneled to Retrophin and then used for expenses associated with running Retrophin), such as employee salaries, bank fees, research fees, securities purchases, etc. (*See, e.g.,* GXs 501-507 A-E series, 520, 520-A, 521, 521-A and 521-B). Such expenses are explicitly excluded from the calculation of direct costs. 18 U.S.C. § 981(a)(2)(B) ("direct costs shall not include any part of the overhead expenses of the entity providing the goods and services, or any part of the income taxes paid by the entity"). Moreover, there is no evidence that the Retrophin shares or money provided to MSMB Capital or MSMB Healthcare investors after the funds ceased to function constituted direct costs. To the contrary, for example, as MSMB Capital never in fact invested in Retrophin, shares returned to MSMB Capital could not be considered "direct costs," nor could money or shares provided via settlement and consulting

8

agreements, as they were improperly obtained from Retrophin and were unrelated to the actual operation of the funds.[6]

In support of his "direct costs" argument Shkreli cites primarily to *United States v. Hollnagel, et. al.*, No 10 CR 195-1, 2013 WL 5348317 (N.D. Ill. Sept. 24, 2013), a case which is neither binding on this court nor analogous to the facts of this case. The defendants in *Hollnagel* were convicted of fraudulent financing schemes related to loans and investments involving the buying, selling and leasing of commercial airplanes. At the forfeiture phase, the defendants put on affirmative evidence (including the testimony of at least one witness and various documents) in order to meet their burden and demonstrate that, based on the direct operation of those schemes, they had made monthly distributions on the investors' loans and investments and had also returned capital directly to investors that could deducted as "direct costs." *Id.* at *8-15. Unlike the defendants in *Hollnagel*, Shkreli has advanced no specific evidence to meet his burden of demonstrating the existence of direct costs. Moreover, in contrast to the defendants in *Hollnagel*, Shkreli has not demonstrated that he did not profit from the offenses in Counts Three and Six; nor could he, given that the proceeds he obtained as a result of his misrepresentations enabled him to control millions of dollars that were used to fund and enable the success of Retrophin, pay his personal debts and expenses, and perpetuate additional frauds. Further, the *Hollnagel* court relied, in part, on Section 981(a)(2)(C), *id.* at * 6, which applies only when a fraudulent loan or extension of credit is at issue. However, that subsection does not apply to securities fraud offenses. *See Kahale*, 2010 WL 385198 at * 32, n. 20 (declining to apply § 981(a)(2)(C) where defendant requested credit for amounts returned to victims in an investment fraud scheme). Furthermore, to the extent the *Hollnagel* court ultimately concluded that no funds were subject to forfeiture—a conclusion at odds with the Second Circuit's holding in *Castello*—a survey of the relevant case law has revealed that no other federal court has followed *Hollnagel* when addressing forfeiture issues.

### III. Shkreli Should Be Restricted From Dissipating Any Substitute Assets That May Be Used To Satisfy the Proposed Forfeiture Money Judgment

The forfeiture of substitute assets is mandatory where, as here, the government has met the conditions of Section 853(p)(1). 21 U.S.C. § 853(p)(2)("the court *shall* order the forfeiture of [substitute assets]" if the conditions of Section 853(p)(1) have been met)(emphasis added). *See* Fed. R. Crim P. Rule 32.2(e)(1) and (2) (mandating forfeiture of

---

[6] The government further notes that the only MSMB Capital investor who received a direct return of funds was Darren Blanton, who received $200,000—a small fraction of his initial $1.125 million investment—in February 2012, several months after making a redemption request for his entire investment. However, these funds were not returned from MSMB Capital, but were in fact stolen by Shkreli from Michael Lavelle, an MSMB Healthcare investor, routed from MSMB Healthcare through a Retrophin bank account to disguise the source of the funds, and then routed back out through a bank account in the name of MSMB Healthcare Management to Blanton. (Tr. 2696-2700, GXs 503-E, 505-E, 509-E).

substitute assets); *United States v. Bermudez*, 413 F.3d 304, 306-07 (2d Cir. 2005) (affirming forfeiture of substitute assets in partial satisfaction of $14.2 million money judgment); *United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006) ("Section 853(p) is not discretionary…"[W]hen the Government cannot reach the property initially subject to forfeiture, federal law requires a court to substitute assets for the unavailable tainted property."); *United States v. Tremblay*, 2008 WL 4571548 (S.D.N.Y. 2008) (finding that a defendant has no standing to object to forfeiture of substitute assets on the ground that the property belongs to someone else).[7]

Nowhere does Shkreli cite to any evidence to challenge whether the government has met the conditions of Section 853(p) or offer any legal support for his claim that the forfeiture of substitute assets is "unwarranted." Instead, Shkreli argues that he has a number of other creditors, that his interest in Vyera Pharmaceuticals (formerly known as Turing Pharmaceuticals) should not be liquidated, and that he intends to file an appeal of his conviction and seek a stay of the forfeiture pending appeal. As set forth below, because none of these arguments has any bearing on Shkreli's mandatory forfeiture obligations and the government consents to a stay with respect to the seizure of substitute assets, a Preliminary Order of Forfeiture ("POF") should be entered.

The government does not oppose a stay with respect to that portion of a POF authorizing the seizure of substitute assets, including Shkreli's interest in Vyera, until the completion of the appeal that Shkreli intends to file. Accordingly, the concerns raised about Shkreli's interest in Vyera being liquidated may be premature. However, to preserve the government's right to satisfy any forfeiture judgment, Shkreli should not be permitted to dissipate his interest in Vyera or any of the other substitute assets named in a POF while his appeal remains pending. In the event he intends to liquidate his interest in Vyera or any of the other substitute assets, the government requests that a POF require Shkreli to consult with the government in advance of any proposed sale to advise of its terms and demonstrate that the proposed sale is an arms-length transaction, place any proceeds up to the amount of any forfeiture money judgment in an escrow account so that they be made available for forfeiture, and provide an accounting of any proceeds (in any form including but not limited to monies, stock shares, etc.) derived from the proposed sale.[8] *See* Fed. R. Crim. P. 32.2(b)(3), (b)(7), and 32.2(d); *United States v. Peterson*, 2010 WL 2331990 at * 3-4

---

[7] To the extent any potential third parties may have a claim or interest in any substitute asset, those potential claims are not currently before the Court and are most appropriately addressed in the context of an ancillary proceeding. *See* Fed. R. Crim. P. 32.2(b)(c); 21 U.S.C. § 853(n).

[8] The government acknowledges that one of the substitute assets, namely "the 3 Rotor Enigma Machine" is no longer available to be forfeited because, although Shkreli does not indicate any specifics as to the date or amount, this item appears to have been already seized by the New York State Department of Taxation and Finance and sold at auction. Accordingly, this substitute asset should be omitted from a POF.

(S.D.N.Y. 2010) (setting forth, in a post-conviction restraining order, pursuant to 21 U.S.C. § 853(g), specific prohibited activities and restrictions regarding two pieces of real property).

As the government has already argued, preservation of assets is particularly critical now that Shkreli has been convicted and the forfeiture sought is significant. (*See* Govt. Forfeiture at p. 9). While the government consents to a stay of execution of any POF with respect to substitute assets pending appeal, the government respectfully requests any such stay must provide that any substitute assets be preserved pending any final decision of this case in any appeal. As Fed. R. Crim. P. 32.2(d) expressly provides: "If a defendant appeals from a conviction or any order of forfeiture, the court may stay the order of forfeiture *on terms appropriate to ensure that the property remains available pending appellate review*." (emphasis added). In this case, even if a stay of execution of a POF is granted to Shkreli, the government respectfully requests that any such stay must include provisions to ensure that the value of the substitute assets is preserved so that they remain available for forfeiture at the conclusion of any appeal.

Shkreli's other arguments opposing the forfeiture of the $5 million in the E*Trade account and claims regarding other creditors, including his attorneys, are unavailing. First, Shkreli's pre-sentence report ("PSR") indicates he has a net worth (*after* outstanding federal and state tax liabilities, judgments and legal fees) of over $27.1 million. *See* Shkreli PSR at ¶ 117 (emphasis added). Notably, the PSR's finding as to his net worth belies Shkreli's prior representations to the Court claiming undue financial hardship during his multiple unsuccessful attempts, both prior to and following his conviction, to have the $5 million in the E*Trade account released. *See e.g.,* Dkt. Entry on Oct. 19, 2017 Order denying Motion to Release Bond. Furthermore, even if the Court were to accept as true the claim that the E*Trade account represents "the majority of Shkreli's liquid assets," there is no basis to not include the account as a substitute asset merely because Shkreli has other creditors, especially where he appears to have sufficient assets to satisfy all his debts.

### IV. Conclusion

For the reasons set forth above as well as those set forth in its November 30, 2017 submission, the government respectfully requests the Court impose against Shkreli a forfeiture money judgment in the amount of $7,360,450; that Shkreli be ordered to forfeit certain substitute assets to satisfy the forfeiture judgment; that a POF be entered as part of the Judgment and Conviction, pursuant to Fed. R. Crim. P. 32.2 (b); and for such

terms and conditions as may be appropriate to ensure that any substitute assets are not dissipated pending any appeal.

                                      Respectfully submitted

                                      RICHARD P. DONOGHUE
                                      United States Attorney

By:   */s/ Claire Kedeshian*
                                      Claire S. Kedeshian
                                      Laura D. Mantell
                                      Jacquelyn M. Kasulis
                                      Alixandra E. Smith
                                      G. Karthik Srinivasan
                                      Assistant U.S. Attorneys
                                      (718) 254-7000

cc:    Clerk of Court (by ECF)
        Defense Counsel (via ECF and Email)