# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN

ANDREA ZELLAN
JOSHUA D. KIRSHNER
JACOB KAPLAN
TENY R. GERAGOS
ADMITTED IN NY AND CA

MARK M. BAKER
OF COUNSEL

MARC AGNIFILO
OF COUNSEL
ADMITTED IN NY AND NJ

February 9, 2018

**VIA ECF**
Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   **United States v. Martin Shkreli, Crim. No. 15-637 (KAM)**

Dear Judge Matsumoto:

Martin Shkreli respectfully submits this letter to address the Guidelines loss calculation for his upcoming sentencing on March 9, 2018. While Mr. Shkreli is being sentenced on three counts of securities fraud, this case stands in stark contrast to the usual fraud case in that he did not use investor funds to line his own pockets or for personal use. Rather, Mr. Shkreli worked hard to ensure his investors made millions of dollars on their investments.

Despite making his investors rich and despite the fact that Shkreli was not convicted of any offense having loss as an element, the government and Probation Department seek to increase Mr. Shkreli's sentencing exposure by arguing that the Guidelines base offense level of 7 should be increased 20 levels based on a $20 million loss enhancement. However, as argued below, this Court should find that there is *no* loss enhancement because there is no evidence that Mr. Shkreli caused an actual loss, or intended to cause a loss, to any of the investors in this case.

Specifically, this Court should find that there was no actual loss to Mr. Shkreli's MSMB investors in Counts Three and Six because they all made significant returns on their investments. Moreover, there is no intended loss for these counts because Mr. Shkreli *never purposely sought to inflict pecuniary harm on his investors* as required by the Guidelines. As to the acquitted conduct in Count Seven, this Court should find no loss as well, because of the almost non-existent evidence that Mr. Shkreli intended to defraud Retrophin, coupled with Mr. Shkreli's strong reliance-on-counsel defense to that charge. Moreover, as recently decided by the Supreme Court, "[a]bsent a conviction of a crime, one is presumed innocent" in addressing sentencing penalties. Finally, this Court should find no loss amount for Count Eight because there was no

**BRAFMAN & ASSOCIATES, P.C.**

actual loss suffered by the Retrophin investors and because there is no evidence that Mr. Shkreli intended any loss to these investors or anyone else. The government's loss calculation is entirely speculative.

### I. The Trial Evidence Failed to Establish Any Loss–Actual or Intended–for Counts Three and Six

The Court's analysis of loss should start from the premise that Shkreli was acquitted of each of the three charges having as an element a "scheme . . . to deprive another of money or property." (*See* Dkt. No. 295: Jury Charge at 65-67). In particular, Shkreli was found not guilty of each of the three counts charging either wire fraud or conspiracy to commit wire fraud, counts Two, Five and Seven, which have the actual or intended deprivation of property as an essential element. Indeed, Mr. Shkreli was convicted only of those offenses, specifically securities fraud and conspiracy to commit securities fraud, which do *not* require any intended or actual deprivation of property as an element of the offense.

Accordingly, as the Court examines each of the charges that could conceivably lead to a finding of loss under the guidelines, the Court should, respectfully, proceed from the standpoint that the jury did not find a loss or deprivation, nor can such a finding be inferred from the jury's verdict. On the contrary, a reasonable explanation for the five acquittals and three convictions can be the simple fact that Mr. Shkreli plainly did not cause, nor intend to cause, anyone to be deprived of money or property. That is why he was acquitted of the three counts in the indictment alleging wire fraud, the statute requiring proof that Mr. Shkreli intended to deprive another of property and cause loss.

From this analytical starting point, we proceed to a review of actual and intended loss.

#### A. Actual Loss

The government and Probation Department argue that Mr. Shkreli's actual loss amounts for Counts Three and Six should be equal to the full investments of the MSMB investors: $2,998,000 for Count Three and $3,402,450 for Count Six. At trial, however, the evidence established that each investor made significant profit. In fact, because of these returns, the government is not seeking restitution in this case.[1] For example, Sarah Hassan testified that she invested a total of $450,000 in Mr. Shkreli's entities and walked away with $1.8 million. Similarly, Steven Richardson invested $400,000 in the entities and made approximately $1.9 million, while Darren Blanton invested $1.25 million and made $5.8 million. Given these enormous returns, there is no basis for finding that the MSMB investors suffered any actual loss.[2]

---

[1] As acknowledged in the PSR, "the Government has confirmed that the investors were already fully compensated with Retrophin shares and funds." (PSR ¶ 44).

[2] Although some investors claimed that they "suffered" because they were stressed while waiting to receive their profits, the Guidelines do not include emotional distress in determining pecuniary harm. *See* U.S.S.G. § 2B1.1, comment. (n.3(A)(iii)) ("'Pecuniary harm' means harm that is

2

**BRAFMAN & ASSOCIATES, P.C.**

Despite Mr. Shkreli making millions for his investors and the government's concession that restitution is not appropriate here, the government nonetheless argues that he caused an actual loss to his investors because MSMB Capital "was effectively bankrupt as of February 1, 2011," and MSMB Healthcare's performance "never matched the representations made by Shkreli." Gov't 1/25/18 Letter to Probation at 4. The government further argues that "[m]uch of the money and shares given to the investors years later in fraudulent settlement and consulting agreements did not come from redemptions for the funds," but "[r]ather, those funds were taken from Retrophin." *Id.* The government and Probation Department further argue that, under the Guidelines (U.S.S.G. § 2B1.1 comment. (n.3(E)(i)), Mr. Shkreli does not get credits against losses for the Retrophin payments because the payments were made after Darren Blanton, an MSMB Capital investor, filed a complaint with the SEC. *Id.* at 3.

These arguments are based on the government's theory that the MSMB investors lost the full value of their investment but were later paid back for their losses with Retrophin stock. This theory misunderstands the relationship between the MSMB entities and Retrophin and, furthermore, mistakenly assumes that a fund's value is solely determined by the amount of money in its bank account as opposed to the value of its investments. Specifically, the trial evidence established that MSMB Healthcare was an investor in Retrophin as early as October 2011 and, as noted in Retrophin's capitalization tables, the fund made eighteen separate investments in the company before August 2012.[3] For example, on April 2, 2012, MSMB Healthcare invested $50,000 in Retrophin in exchange for 1,250 Retrophin shares–equal to $40/share. (*See* GX 214 at 3). It is important to note that this share price reflected market value as other investors, such as Steve Richardson, Edmund Sullivan and Thomas Koestler, personally bought Retrophin stock for $40/share during that time frame. (*See Id.*). In June 2012, the share price was up to $80/share as evidenced by the fact that independent investors (Richard Heinick, Craig Pomeranz, Elizabeth B. Knowles and Thomas O. Murtha), not just MSMB Healthcare, were paying $80/share for Retrophin stock. (*See Id.*).

Because MSMB Healthcare itself was a Retrophin shareholder, each of the fund's investors had an actual financial interest in Retrophin. More importantly, each investor was entitled to a redemption for his percentage of the fund's Retrophin investment. At the time of the September 2012 wind-down email, MSMB Healthcare held approximately 56,000 Retrophin shares that were worth $80 per share based on the market value at that time[4]–valuing MSMB

---

monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.").

[3] As the manager of the MSMB entities, Mr. Shkreli had the discretion, under the terms of MSMB Healthcare's private placement memoranda ("PPM") to invest in Retrophin. (*See, e.g.*, GX 11-A & 11-B).

[4] Again, this market value is based on the most recent Retrophin stock purchases made by *independent* investors, not just MSMB Healthcare. (*See* GX 214 at 3). To the extent the government argues in its forfeiture papers that Mr. Shkreli was able to manipulate that share price when MSMB Healthcare purchased Retrophin shares because he controlled both sides of the transactions (Dkt. 523 at 4), this argument ignores the government's own exhibit that

**BRAFMAN & ASSOCIATES, P.C.**

Healthcare's investment in Retrophin at $4.4 million. Consequently, when the MSMB Healthcare investors received payments from Retrophin it was not payback for the fund's losses, as the government contends, because the investors did not lose the value of their investment. Rather, the payments were redemptions of MSMB Healthcare's investment in Retrophin.

The same is true for MSMB Capital. Although MSMB Capital did not invest any money in Retrophin, it is clear that the fund's assets included Retrophin stock. For example, on August 1, 2012, Mr. Shkreli sent investor Darren Blanton an MSMB Capital Management LP Limited Partner List and Balance Sheet. (*See* GX 105-15). This Balance Sheet, dated April 30, 2012, shows MSMB Capital held $3,480,000 in Level III Securities, which is consistent with an interest of 75,000 shares at a $46.40 share valuation. Blanton testified in Mr. Greebel's trial that those securities represented Retrophin shares:

> [Mastro]: Did you ultimately have an understanding of what Level III Securities were listing here?
>
> [Blanton]: We've, our attorney asked what those Level III Securities were and *Martin told us that they were shares of Retrophin.*

(Greebel Tr. 3630; emphasis added). Thus, at least as of April 2012, MSMB Capital and its investors were all Retrophin shareholders. Consequently, at the time of the wind down email– when MSMB Capital was ending–the fund had approximately $6 million worth of Retrophin stock (75,000 shares at $80/share), which was more than the total amount invested in the fund by its investors. Accordingly, any subsequent Retrophin payments to MSMB Capital investors were not pay back for a loss, but rather redemptions of the investors' Retrophin shares.

Because Retrophin's payments to the MSMB investors were not paybacks for losses, the Guidelines "credits against loss" provision is irrelevant. Under that rule, a defendant's loss amount will be reduced by "the money returned, and the fair market value of the property returned and services rendered, by the defendant . . . to the victim before the offense was detected." U.S.S.G. § 2B1.1 comment. (n.3(E)(i)). That provision is only applicable when there is an actual loss to a victim followed by a payback for that loss, with the theory that a defendant does not get credit for payments that he makes to the victim only after the fraud is discovered. Here, the payments were redemptions, not paybacks following a loss. Even assuming this Guidelines provision applied to MSMB Capital (*i.e.*, that MSMB Capital sustained its losses in February 2011), Mr. Shkreli would still get credit for the Retrophin payments because MSMB Capital investors were Retrophin shareholders before Darren Blanton filed his SEC complaint in or around September 2012. Accordingly, this Court should find that there is no actual loss for Counts Three and Six.

---

demonstrates that other independent investors were purchasing Retrophin stock at the same price.

4

BRAFMAN & ASSOCIATES, P.C.

### B. Intended Loss

This Court should also find that these counts do not have an intended loss either. Under the Guidelines, intended loss "means the pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)(I)); *see also United States v. Middlebrook*, 553 F.3d 572, 578 (7th Cir. 2009) ("[T]he true measure of intended loss [is] in the mind of the defendant."). Before making an intended loss determination, however, a district court must make a specific factual finding regarding the scope of the defendant's subjective intent. *See United States v. Stanley*, 12 F.3d 17, 21 (2d Cir. 1993) (remanding case for resentencing where the district court accepted the PSR's loss calculation without first specifically determining how many victims the defendant actually intended to defraud); *United States v. Confredo*, 528 F.3d 143, 152 (2d Cir. 2008) (remanding case for resentencing for the district court to consider the defendant's subjective intent before determining the intended loss amount); *see also United States v. Yihao Pu*, 814 F.3d 818, 826 (7th Cir. 2016) (remanding the case for resentencing where there was no evidence in the record that the defendant intended any loss to the victims).

Consequently, in order to base the loss amount on intended loss for these counts, the evidence would need to establish that Mr. Shkreli "purposely sought to inflict" monetary harm on his MSMB investors. There is no evidence whatsoever, at trial or otherwise, supporting such an assertion. Moreover, as noted, the jury's verdict is inconsistent with such a conclusion. Rather, the evidence established, and the jury apparently believed, that Mr. Shkreli worked extremely hard to make money for his investors, spending numerous nights sleeping on the floor of his office. (*See* Tr. 3004-05). Moreover, the evidence also established that Mr. Shkreli endeavored to recoup MSMB's trading losses even though, as a hedge fund manager and per the terms of MSMB's PPM, Mr. Shkreli was not personally liable for these losses. While some MSMB Capital investors may have lost value at points through Mr. Shkreli's investing, these losses fail to provide any basis to conclude that Mr. Shkreli "purposely sought to inflict" pecuniary harm to his investors. This case is simply not comparable to the usual investment fraud cases where the defendant fails to invest the funds and instead misappropriates the investors' funds to support his own lifestyle–demonstrating that defendant's subjective intent to deprive the investors of their money.[5] Unlike these cases, the evidence here established that Mr. Shkreli was paid a mere total of $26,000 for nearly two years of work at MSMB Capital. Thus, the evidence supports the conclusion that Mr. Shkreli had no intent to cause any pecuniary harm to anyone, and so there is no intended loss amount.

The government argues, however, that the jury's guilty verdict for Counts Three and Six precludes the defense from arguing that Mr. Shkreli did not intend for his investors to lose money. Gov't 1/25/18 Letter to Probation at 3. This argument erroneously conflates the intent to

---

[5] The First Circuit has long recognized that there are two types of fraud: "The first type of fraud implicates the 'true con artist,' ... who intends only to pocket the money without rendering [anything] in return. The second type of fraud involves a person who would not have attained the contract or loan but for the fraud, but who fully intends to perform." *United States v. Blastos*, 258 F.3d 25, 30 (1st Cir. 2011) (quoting *United States v. Haggert*, 980 F.2d 8, 12-13 (1st Cir. 1992)).

5

**BRAFMAN & ASSOCIATES, P.C.**

defraud (which is an element of Counts 3 and 6) and the subjective intent to cause pecuniary harm, which, as set forth above, is not an element of securities fraud. This distinction was delineated by the Court in its charge to the jury, which allowed the jury to find that Mr. Shkreli had the "intent to defraud"–defined as "to act knowingly and with intent to deceive"–even if it found that Mr. Shkreli did not intend for any investor to lose money:

> Under the anti-fraud statutes, even false representations or omissions of material facts do not amount to a fraud unless done with fraudulent intent. However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by a defendant is a complete defense, however inaccurate the statements may turn out to be.
>
> In considering whether or not a defendant acted in good faith, you are instructed that a belief by the defendant, if such belief existed, that ultimately everything would work out so that no investors would lose any money does not require a finding by you that the defendant acted in good faith. No amount of honest belief on the part of a defendant that the scheme ultimately will make a profit for the investors will excuse fraudulent actions or false representations by him.

(Dkt. No. 295: Jury Charge at 39, 40-41). Given this instruction, the jury was able to convict Mr. Shkreli on these counts based on a finding that he intended to defraud, even if the jury specifically found that Mr. Shkreli did not intend to cause any pecuniary harm. Accordingly, despite the government's contention otherwise, the jury's verdict has no bearing on whether Mr. Shkreli intended to cause any harm.

As succinctly noted by the Tenth Circuit: "the term [intended loss] means exactly what it says: to be included in an advisory guidelines calculation the intended loss must have been an object of the defendant's purpose." *United States v. Manatau*, 647 F.3d 1048, 1048, 1056-57 (10th Cir. 2011) (remanding the case for resentencing because a sentencing court "cannot simply calculate "intended loss" by toting up credit limits without any finding that the defendant intended to inflict a loss reasonably approaching those limits."). Without any evidence establishing Mr. Shkreli's subjective intent to purposely inflict monetary harm on his investors, there is no basis for this Court to include any loss amount for Counts Three and Six, especially when, as in this case, all investors made back many times their initial investments.

    **II. This Court Should Not Include the Acquitted Conduct Charged in Count Seven to Artificially Inflate the Guideline's Loss Calculation**

The PSR alleges that, as charged in Count Seven, "Shkreli misappropriated Retrophin funds/assets to pay back the victim investors of MSMB Capital and MSMB Healthcare in an attempt to avoid detection of the securities fraud involving those hedge funds." (PSR ¶ 21).

6

**BRAFMAN & ASSOCIATES, P.C.**

Notwithstanding the jury's acquittal of Count Seven, the government and the PSR use this acquitted conduct to increase the loss amount by $10,000,000. (PSR ¶ 43).

Under *United States v. Watts*, 519 U.S. 148 (1997), a sentencing court had discretion to consider acquitted conduct where it had been proven by a preponderance of the evidence. That analysis has changed, however, given the Supreme Court's recent decision in *Nelson v. Colorado*, 137 S. Ct. 1249, 1252 (2017), where the Court ruled that, when a defendant's conviction is overturned, the state is not allowed to retain the defendant's previous payments for restitution and court costs because, "[a]bsent a conviction of a crime, one is presumed innocent."

Specifically, in *Nelson*, the court addressed whether Colorado was required to refund defendants for restitution and court costs they had paid before their convictions were overturned and either the defendant was acquitted on a retrial or the government elected not to retry the case. *Id.* at 1253. In both those situations, the Supreme Court ruled that, "once those convictions were erased, the presumption of [the defendants'] innocence was restored." *Id.* at 1255 (citing *Johnson v. Mississippi*, 486 U.S. 578, 585 (1988) (After a "conviction has been reversed, unless and until [the defendant] should be retried, he must be presumed innocent of that charge.")). Thus, given the defendants' re-acquired presumption of innocence, Colorado had no basis to retain the defendants' money.

Mr. Shkreli's case is even more compelling than the *Nelson* defendants. Here, Mr. Shkreli never lost his presumption of innocence as to Count Seven because he was acquitted by the jury. More importantly, the *Nelson* case only involved money. If "Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions" (*Nelson*, 137 S. Ct. at 1257), the government surely cannot find Mr. Shkreli guilty *enough*, despite his acquittal on Count Seven, to attempt to increase his sentencing range. In other words, to the extent the Supreme Court ruled the presumption of innocence prevented Colorado from retaining restitution and court costs, the presumption–which "lies at the foundation of our criminal law" (*Nelson*, 137 S. Ct. at 1257)–should certainly prevent the government from inflating the Guidelines, and therefore Mr. Shkreli's sentence, through acquitted conduct.

Moreover, even under the outdated *Watts* analysis, the Second Circuit, in an opinion written by then-Circuit Judge Sotomayor, has stressed that

> while district courts may take into account acquitted conduct in calculating a defendant's Guidelines range, they are not required to do so. Rather, district courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence.

*United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005). Considering the very weak evidence that Mr. Shkreli ever intended to defraud Retrophin as charged in Count Seven, coupled with Mr. Shkreli's strong reliance-on-counsel defense to that charge, this Court should not include the acquitted conduct as part of its Guidelines analysis.[6]

---

[6] While a preponderance of the evidence is the usual standard for this analysis, because the extraordinary increase in the loss amount based on acquitted conduct would "dramatically

7

**BRAFMAN & ASSOCIATES, P.C.**

In support of its argument to include the acquitted conduct, the PSR, relying solely on allegations in the indictment, lists three ways that Mr. Shkreli and Mr. Greebel defrauded Retrophin: (1) transferring Retrophin shares to MSMB Capital even though MSMB Capital never invested in Retrophin ("backdating scheme"); (2) entering into settlement agreements with MSMB investors to settle their claims; and (3) entering into "sham" consulting agreements with defrauded investors to settle claims. (PSR ¶ 22).

As an initial matter, this Court dismissed the backdating scheme during the Greebel trial after finding that no crime was committed because the alleged backdating did not defraud Retrophin. (Greebel Tr. 9408, 10900). Defense counsel Benjamin Brafman made that same argument in summations at Mr. Shkreli's trial. (Tr. 5458-59).

Regarding the settlement and consulting agreements, the jury's acquittal was a reflection of the dearth of evidence establishing Mr. Shkreli's "criminal intent" when entering these agreements. At the point when these agreements were negotiated and signed, Retrophin was a young company with tremendous potential. The last thing that any company in that situation wants is for its founder and CEO to be sued by his former investors for losing their money. This is particularly true as many of these investors invested in Retrophin at its infancy and all of the investors became actual Retrophin shareholders through their MSMB investments. Faced with potentially devastating lawsuits, Mr. Shkreli relied on his counsel, Greebel, to enter into these agreements to shield Retrophin as all the agreements included a release insulating Retrophin from being sued. (Tr. 3514). This is a point that Retrophin CEO Steve Aselage acknowledged at trial:

[Brafman]: You understand that when Retrophin is released from liability, it essentially ends it as far as Retrophin is concerned?

[Aselage]: It ends as far as the company's liability to the person on the other end of the form, yes.

---

increase the sentence," the defense asserts that Due Process requires the higher clear and convincing standard of proof in this case. *See United States v. Watts*, 519 U.S. 148, 156 n2 (1997) citing (*McMillan v. Pennsylvania*, 477 U.S. 79, 91 (1986)); *United States v. Cordoba-Murgas*, 233 F.3d 704, 708-709 (2d Cir. 2000) (quoting *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996)) ("The preponderance standard is no more than a threshold basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures. With regard to upward adjustments, a sentencing judge should require that the weight of the factual record justify a sentence within the adjusted Guidelines range . . . . Where a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly.") (emphasis omitted)). Regardless, this Court should not include this acquitted conduct under either evidentiary standard given the weak evidence of the alleged Retrophin scheme.

**BRAFMAN & ASSOCIATES, P.C.**

(Tr. 3514). In other words, the jury was presented with compelling evidence that entering these agreements was a business decision that Shkreli made to save Retrophin, not defraud it.[7] This Court recognized this point when it asked the government the following:

> Why is it improper for Retrophin as a corporation to give more of its shares if there was a disagreement about the valuation of the MSMB Healthcare investment, the value of that investment and how it was converted into a certain level of shares? *Why would it not be a prudent decision by a CEO to say, look – or even the corporation -- these people are threatening to sue and rather than get tied up in all of this, let's give them some additional money and shares of the corporation so that we, Retrophin, can get a release.*

(Tr. 4485; emphasis added).

Moreover, during Shkreli's trial, defense counsel argued that Shkreli relied on Greebel—a respected attorney from a prominent law firm—before entering into the settlement and consulting agreements. In fact, every testifying investor that entered into one of these agreements testified that they, or their attorneys, negotiated with Greebel before signing the agreement. In entering these agreements, the investors relied on their attorneys that these agreements were legitimate and legal. (*See* Sarah Hassan's testimony at Tr. 1063; Darren Blanton's testimony at Tr. 1821; Richard Kocher's testimony at Tr. 2377-78, 2398, 2415). Mr. Shkreli did the exact same thing: he relied on his attorney before entering these agreements. As Mr. Brafman argued to the jury during summation:

> You know, half the people who testified in this case, when they dealt with Evan Greebel, have said they thought Evan Greebel was a good lawyer and that the Katten Muchin firm was a good firm and therefore I was comforted by the fact that he was the lawyer. Schuyler Marshall, who has been a lawyer for 40 years. I'm correct, Mr. Shkreli also mentioned the name Evan Greebel? Yes. You know that firm, right? Yes. And that also gave you comfort because you knew the firm Katten to be very well respected? Answer, yes, that's right. Why can't Martin Shkreli believe the same thing? Massella: I knew the Katten firm, it's a very good firm. Aselage: Yes, I know the Katten firm, it's a very good firm. I know Greebel is a lawyer, yes. And David Geller said the same thing and Richardson said the same thing. And Richardson said they paid him a lot of money and they thought they were doing a great job. *Why can't Martin Shkreli rely on the fact that his lawyer, Evan Greebel, who is a partner in a big firm that everybody else respects is doing a good job. It is not leading him into crimes, he's helping him.*

---

[7] The jury was also provided with evidence through cross-examination that the consulting agreements were not shams.

9

**BRAFMAN & ASSOCIATES, P.C.**

(Tr. 5414; emphasis added).

The evidence at trial more than established that Mr. Shkreli relied on Mr. Greebel in negotiating and entering these agreements, leading this Court to instruct the jury on Mr. Shkreli's reliance-on-counsel defense, which was a complete defense to Count Seven:

> In short, you should consider whether he's seeking and obtaining advice from a lawyer Mr. Shkreli intended that his acts shall be lawful. If he did so it is the law that the defendant cannot be convicted of a crime that involved willful and unlawful intent even if such advice was an inaccurate construction of a law.

(Tr. 5598).

That Mr. Greebel was convicted of the Retrophin fraud at a separate trial does not change this analysis. Unlike Mr. Shkreli, Mr. Greebel was a well-established securities attorney (a tenet of his trial defense); to the extent the Greebel jury found these agreements to be improper they held Mr. Greebel responsible because of his legal training and professional obligations. In contrast, the jury in this case found that Mr. Shkreli, a non-lawyer, did not break the law because he reasonably relied on the advice of his counsel.

In light of the weak evidence of Mr. Shkreli's criminal intent, as well as his reliance-on-counsel defense, the government failed to establish by a preponderance of the evidence that Mr. Shkreli committed the acquitted conduct charged in Count Seven. Accordingly, the acquitted conduct should not be included as part of this Court's Guideline's loss calculation.

### III. The Trial Evidence Failed to Establish Any Loss Amount for Count Eight

Under the Guidelines, a sentencing court may use any method that is appropriate and practical under the circumstances to determine the appropriate loss amount when addressing the fraudulent inflation of a publically traded security. U.S.S.G. § 2B1.1, comment. (n.3(F)(ix)). In trying to determine the loss amount under Count Eight, the PSR does not allege that there was an actual loss suffered by the Retrophin investors. (PSR ¶¶ 43, 45). That is because, as with Counts Three and Six, the Retrophin investors in Count Eight made money as the stock price increased.

Rather, the PSR uses an intended loss calculation, stating that the object of the scheme "was to control the price and volume" of Retrophin's shares from December 2012, when Retrophin became a public company, until at least mid-February 2013, when Retrophin issues 3.2 million shares in a private placement offering ("PIPE") at $3 per share. (PSR ¶ 43). The PSR argues that the purpose of the scheme was to inflate Retrophin's stock price so that the financially-struggling company could attract investors, such as the two private placement offerings in February 2013. To calculate intended loss to the market, the PSR calculates the difference between the average artificial high value of Retrophin stock between December 17, 2012 and February 28, 2013 ($5 per share) and the price that the private placement investors paid for the stock ($3 per share). The PSR then multiplies the $2 per share difference in price by the 2

**BRAFMAN & ASSOCIATES, P.C.**

million Fearnow shares involved in the scheme to estimate that Mr. Shkreli "intended to cause the market" a $4 million intended loss.[8] (PSR ¶ 43).

While a court "need only make a reasonable estimate" of loss," U.S.S.G. § 2B1.1, comment. (n.3(C)), the PSR's calculation is both unfounded and unreasonable for several reasons. First, the PSR's analysis requires that Mr. Shkreli and his co-conspirators sought to maintain an "artificially high price" for Retrophin stock to attract investors. (PSR ¶ 43). The PSR goes as far as to argue that Mr. Shkreli himself purchased Retrophin stock days before the private placement "in an effort to prop up the stock price." (PSR ¶ 43). The problem with this analysis is that even the government has acknowledged that it has "never alleged that the object of Shkreli's conspiracy was to inflate the price of Retrophin stock in order to make gains at the expense of investors who were defrauded into buying a worthless stock." Gov't 1/25/18 Letter to Probation at 5.

The government has made this concession because there is no rational basis to infer from the evidence that Mr. Shkreli and his co-conspirators intended any loss to the market. While the jury convicted Mr. Shkreli of Count Eight, finding that Mr. Shkreli and others conspired to control the price and volume of the stock, this verdict did not require a finding that Mr. Shkreli intended to cause loss to Retrophin's investors. This is because, as with Counts Three and Six, the Count Eight jury charge allowed the jury to find that Mr. Shkreli had the intent to defraud even if he did not intend to cause any pecuniary harm. (Dkt. 295: Jury Charge at 77-78 (referring the jury to the Court's previous Securities Fraud instruction for Counts Three and Six)).

To establish intended loss for Guidelines purposes, however, the evidence must show that Mr. Shkreli "purposely sought to inflict" pecuniary harm. *See* § I.B. above. Here, a review of Retrophin's stock transfer records demonstrates that there were a total of 3245 stock transfers (including buying, selling and short selling) during the timeframe specified in the PSR, only 146 of which involve members of the Count Eight conspiracy. (*See* GX 730 and 731). To the extent 82 of the 146 transactions were sales, which *decreases* the price of a stock rather than inflate it, there is no basis to find that Mr. Shkreli intended any loss to the market.

To support its theory that Mr. Shkreli intended for the market to lose money when he artificially inflated the stock, the PSR relies on the fact that Mr. Shkreli bought 1000 shares at $3.55 per share and 400 shares at $3.75 per share two days before Retrophin completed a private placement of over 3 million shares at $3.00 per share. (PSR ¶ 43). The PSR argues that Mr. Shkreli purchased this stock "in an effort to prop up the stock price" before the private placement. In making this statement the PSR ignores the market reality that CEOs often buy stock in their own company to show support. This was not an attempt to artificially inflate the stock, rather a sign that the CEO believes his company is doing well.

---

[8] Notably, this is the first time that Count Eight's loss amount has been discussed in this case, as the government did not provide any evidence at trial relating to the intended loss amount and failed to address this issue in any of its numerous pre-trial submissions.

11

**BRAFMAN & ASSOCIATES, P.C.**

Moreover, the PSR also ignores the fact that Timothy Pierotti, one of the Fearnow recipients, *sold* 10,000 shares at $3.74 per share that same exact day, which would have the effect of driving the price of the stock down. Similarly, alleged co-conspirator, Andrew Vaino, sold 16,000 shares within the two weeks leading to the private placement. That co-conspirators lowered the stock value by selling stock at a crucial juncture dispels the notion that Mr. Shkreli and his co-conspirators intended to cause the market a loss by artificially inflating the stock price.

Second, besides being inconsistent with the government's theory of guilt, the PSR's intended loss analysis is also based on rank speculation. For example, the PSR states the success of the private placement offerings "depended in part on [Shkreli] and his co-conspirators maintaining the price of Retrophin stock at an artificially high price during the time period—approximately $5.00 per share, which they were able to do." (PSR ¶ 43). Without testimony from any private placement investors,[9] the PSR then speculates that it "is doubtful whether investors would have purchased shares at $3.00 per share if the stock traded at or below that level." (PSR ¶ 43). The PSR makes this statement without having spoken to any of the investors who purchased Retrophin stock during this period.

Additionally, the PSR also speculates that the increase in stock price is solely attributable to Mr. Shkreli and his co-conspirators. There is no basis for this assumption because, as noted above, Mr. Shkreli's alleged co-conspirators were selling stock at this time, which decreases the value of the stock. Ostensibly, there must have been other external market forces that were driving the Retrophin stock higher. The PSR erred by not taking these considerations into account in its analysis. *Cf.* U.S.S.G. 2B1.1, comment. (n.3(F)(ix)) (Noting that, when determining "reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (*e.g.*, changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry specific or firm-specific facts, conditions, or events)").

Third, even assuming the PSR's method of determining the intended loss was correct (it was not), the PSR still erred by using $5.00 per share as the average artificial high price when the precise average Retrophin stock price between December 17, 2012 and February 12, 2013 (the actual date of the private placement offering) was only $3.96 per share. (*See* GX 606). Moreover, the PSR multiplies the loss per share amount by the 2 million Fearnow shares even though there is no evidence that all 2 million shares were used, or intended to be used, as part of the Count Eight Fraud.

In sum, because there was no actual loss suffered by the Retrophin investors and because there is no evidence that Mr. Shkreli intended any loss to these investors or anyone else, the government and Probation Department have failed to establish any loss amount for Count Eight.

---

[9] The government conspicuously chose not to call any PIPE investors at trial.

**BRAFMAN & ASSOCIATES, P.C.**

## IV. Conclusion

For the reasons stated above (and summarized below), this Court should reject the PSR's loss analysis:

- Mr. Shkreli never purposely sought to inflict pecuniary harm on his investors as evidence by the fact that the jury acquitted him on each count (Two, Five, and Seven) that required them to find intent to inflict pecuniary harm.

- As to Counts Three and Six, this Court should find that there is no loss enhancement because there is no evidence that Mr. Shkreli caused an actual loss, or intended to cause a loss, to any of the investors in this case.

- As to the acquitted conduct in Count Seven, this Court should find no loss amount because of the weak evidence that Mr. Shkreli intended to defraud Retrophin, coupled with Mr. Shkreli's strong reliance-on-counsel defense to that charge. It would be a miscarriage of justice for Mr. Shkreli to be saddled with a $10,000,000 loss enhancement for conduct that Mr. Shkreli was acquitted and presumed innocent of under *Nelson v. Colorado*, 137 S. Ct. 1249 (2017).

- As to Count eight, this Court should find no loss amount because there was no actual loss suffered by the Retrophin investors and because there is no evidence that Mr. Shkreli intended any loss to these investors or anyone else.

**BRAFMAN & ASSOCIATES, P.C.**

  Accordingly, this Court should find no loss enhancement as part of its Guidelines calculation in this case.

Respectfully submitted,

**Brafman & Associates, P.C.**
Benjamin Brafman
Marc Agnifilo
Andrea Zellan
Jacob Kaplan
Teny Geragos

cc: AUSA Jacquelyn Kasulis (via ECF)
   AUSA Alixandra Smith (via ECF)
   AUSA Karthik Srinivasan (via ECF)
   AUSA Claire Kedeshian (via ECF)