# BRAFMAN & ASSOCIATES, P.C.

### ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN

———

ANDREA ZELLAN

JOSHUA D. KIRSHNER

JACOB KAPLAN

TENY R. GERAGOS
ADMITTED IN NY AND CA

MARK M. BAKER
OF COUNSEL

MARC AGNIFILO
OF COUNSEL
ADMITTED IN NY AND NJ

February 12, 2018

**VIA ECF**
Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  **United States v. Martin Shkreli, Crim. No. 15-637 (KAM)**

Dear Judge Matsumoto:

Martin Shkreli thanks the Court for permitting this sur-reply to the government's forfeiture motion and reply. (See Dkt. No. 464: Gov't Forfeiture Motion; Dkt. No. 523: Gov't Forfeiture Reply). While Mr. Shkreli relies on his response to the government's original motion (see Dkt. No. 515: Shkreli Forfeiture Response), we write now to briefly address several issues prior to the forfeiture hearing on February 23, 2018.

First, the government argues that Mr. Shkreli's position that there should be no forfeiture must be rejected because "the applicable forfeiture statutes impose mandatory forfeiture" for Counts Three, Six and Eight. (Gov't Forfeiture Reply at 1). The government has argued several times in its original motion and reply that forfeiture is mandatory in this case. (Gov't Forfeiture Motion at 4; Gov't Forfeiture Reply at 1, 2, 3, 9). This position is misleading. The relevant forfeiture statute requires forfeiture only if there are forfeitable assets. Specifically, 18 U.S.C. § 981(a)(1)(C) allows forfeiture for "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . 'specified unlawful activity.'" Obviously, to the extent there are no "proceeds" there can be no mandatory forfeiture.

Moreover, the definition of proceeds in securities cases is defined in 18 U.S.C. § 981(a)(2)(B), which provides as follows:

> In cases involving lawful goods or lawful services that are sold or
> provided in an illegal manner, the term "proceeds" means the
> amount of money acquired through the illegal transactions

BRAFMAN & ASSOCIATES, P.C.

resulting in the forfeiture, <u>less the direct costs incurred in providing the goods or services</u>.

18 U.S.C. § 981(a)(2)(B) (emphasis added).[1] Thus, even if there are forfeitable proceeds, the amount of the "mandatory" forfeiture should still be reduced to zero by deducting "direct costs." This is exactly what the court did in <u>United States v. Hollnagel</u>, No. 10 Cr. 195-1, 3, 2013 WL 5348317 (N.D. Ill. Sept. 24, 2013) (cited in Shkreli Forfeiture Response at 2, 4, 5), and, as argued below, this is what this Court should do here as well.

Second, the government argues that Mr. Shkreli must forfeit all the money invested as part of Counts Three and Six because "forfeiture is mandatory for <u>all</u> ill-gotten gains received by the defendant in connection with the relevant fraud scheme." (Gov't Forfeiture Reply at 4). This argument might be valid if the forfeitable proceeds in this case were defined by 18 U.S.C. § 981(a)(2)(A), which includes "property of any kind obtained directly or indirectly as the result of the commission of the offense giving rise to the forfeiture." Under that statute, forfeiture would include all monies that were part of the scheme for which the defendant was convicted. Notably,

---

[1]     In its original moving papers, the government correctly noted that the Second Circuit uses this "net" definition of proceeds in addressing securities fraud cases. (Gov't Forfeiture Motion at 3 (citing <u>United States v. Contorinis</u>, 692 F.3d 136, 145-46 n.3 (2d Cir. 2012); <u>United States v. Jiau</u>, F. App'x 771, 773 (2d Cir. 2015) (summary order); and <u>United States v. Bonventure</u>, 646 F. App'x 73, 90-92 (2d Cir. 2016) (summary order)). The defense agrees with this analysis because this case involves the "lawful goods or lawful services that are sold or provided in an illegal manner" as provided for in 18 U.S.C. § 981(a)(2)(B).

The government now argues in its reply that this Court should use "gross" proceeds under 18 U.S.C. § 981(a)(2)(A) because Mr. Shkreli's crimes should be considered "unlawful activities" under that statute. (Gov't Forfeiture Reply at 6-7 n.5). This argument should be rejected because the Second Circuit has specifically ruled that "the sale of a security is not an inherently unlawful activity" as defined by 18 U.S.C. § 981(a)(2)(A) and that a "security is a 'lawful good[ ]' for the purposes of § 981(a)(2)(B)." <u>Contorinis</u>, 692 F.3d at 145 n.3; <u>see also</u> <u>United States v. Mahaffy</u>, 693 F.3d 113, 137-38 (2d Cir. 2012) (rejecting the government's argument for "gross" proceeds and directing the District Court to use "net" proceeds because "[t]rading those securities, as a general matter, is not unlawful"). Because Mr. Shkreli provided "lawful goods," <u>i.e.</u>, purchasing securities in the market, this case is significantly different than a Ponzi scheme where the defendant takes the investors' money without providing any goods or services. In those cases, such as the Madoff case, the Second Circuit has affirmed the use of the "gross" proceeds under 18 U.S.C. § 981(a)(2)(A) to determine forfeiture because the defendants "never purchased any securities on behalf of [the defendants'] clients in exchange for their investments." <u>Bonventre</u>, 646 F. App'x at 90 (affirming the District Court's forfeiture order against several of Bernard Madoff's former employees). Consequently, because it is uncontested that Mr. Shkreli purchased "lawful goods," this Court should use the "net" definition of proceeds.

BRAFMAN & ASSOCIATES, P.C.

all of the cases relied on by the government for this proposition (Gov't Forfeiture Reply at 5) either involve that definition of proceeds (see United States v. Kahale, No. 09 Cr. 159, 2010 WL 3851987 (E.D.N.Y. Sept. 27, 2010) (Matsumoto, J.); United States v. Emor, 850 F. Supp. 2d 176 (D.D.C. 2012)) or involve a criminal forfeiture statute with a similar definition (see United States v. Peters, 732 F.3d 93 (2d Cir. 2013); United States v. Daugerdas, 837 F.3d 212 (2d Cir. 2016); United States v. Perry, No. 13 Cr. 156, 2014 WL 7499372 (E.D. Va. Dec. 22, 2014)).

The forfeitable proceeds in this case, however, are defined by 18 U.S.C. § 981(a)(2)(B), which limits forfeiture to "the amount of money acquired through the illegal transactions resulting in the forfeiture." Id. (emphasis added). Thus, forfeiture here must be based on the property obtained through illegal transactions, not the total amount of the crime. As argued previously, the government cannot establish that all of the MSMB investments were obtained through illegal transactions. (Shkreli Forfeiture Response at 3-5).

That the jury convicted Mr. Shkreli of Counts Three and Six does not mean they found all of the MSMB investors were defrauded. For example, only two of the twelve MSMB Healthcare investors testified at trial. For the other ten investors, the government relied on Special Agent Michael Braconi's testimony that these investors received investor statements from Mr. Shkreli that contained misrepresentations meant to prevent redemptions. (See Gov't Forfeiture Reply at 4). While the jury convicted Mr. Shkreli of Count Six relating to MSMB Healthcare, it does not necessarily mean the jury found that Mr. Shkreli committed any crime relating to these non-testifying investors[2]; rather, the jury could have found him guilty based only on his conduct related to the two testifying investors.

Furthermore, there is good reason to doubt the jury found that Mr. Shkreli defrauded the non-testifying witnesses because of the government's questionable evidence that the investor statements were fraudulent. At trial, Special Agent Braconi used a chart he made (Government Exhibit 705) to contrast the funds in MSMB Healthcare's bank and brokerage accounts with Mr. Shkreli's valuation of MSMB Healthcare's performance. Based on this comparison, the government argued that the statements did not accurately reflect MSMB Healthcare's performance because the fund's accounts had low cash balances. This comparison was misleading though because, in making his chart, Special Agent Braconi relied only on the amount of money in the fund's bank and brokerage accounts to determine the fund's assets. Special Agent Braconi purposely did not include the value of MSMB Healthcare's investment in Retrophin—a clear asset—in determining the fund's value. (See Braconi Testimony at Tr. 4797: "It's the total of the investor statements versus the total of MSMB Healthcare's bank and brokerage accounts."). The jury may well have found the investor statements were not misleading when one considers the Retrophin investment. This is particularly true because Mr.

---

[2]   Tellingly, one of these non-testifying investors recently advised the Probation Department that he "suffered no loss as a result of Mr. Shkreli's conduct" and that, as far as he was aware, "Mr. Shkreli did not do anything wrong." (See Second Addendum to the PSR at 1).

BRAFMAN & ASSOCIATES, P.C.

Shkreli's valuation of Retrophin shares was based on share price paid by independent investors, not only the price paid by MSMB Healthcare.[3]

This is just one example of why, despite the jury's verdict, the government cannot show that Mr. Shkreli obtained the MSMB investments through illegal transactions as required for forfeiture.[4] Absent this showing, the government is not entitled to forfeiture.

Third, as argued previously, the forfeiture amounts for Counts Three and Six should be reduced to zero because the money returned to investors on their investments were part of the direct costs of providing goods and services. (See Shkreli Forfeiture Response at 3-5 (relying on Hollnagel, 2013 WL 5348317, at *4)).

_____

[3]     In attacking Mr. Shkreli's valuation of Retrophin, the government relies on Robert Barnett's trial testimony that his company's valuation of Retrophin was apparently not legitimate because it was "simply a reiteration of the share price that Shkreli told [the valuation company] that MSMB Healthcare had paid for Retrophin shares." (Gov't Forfeiture Reply at 4). The government then argues that the price paid by MSMB Healthcare is not a valid valuation of Retrophin's value because Mr. Shkreli controlled both sides of the transaction. (Gov't Forfeiture Reply at 4).

This, however, distorts the trial record. First, Mr. Barnett did not testify that he was simply "confirming the share price paid for by MSMB Healthcare" as the government now contends. Mr. Barnett testified, and as is reflected by the government's own exhibit admitted through Mr. Barnett, that his company, VRC, would evaluate Retrophin's share based on the recent transaction price. The engagement letter and the testimony were clear: VRC would "utilize the then-most recent transaction price of $20 per share of Series A Preferred for the 12/31/11 valuation date, and the then-most recent transaction price of $40 per share of Series A Preferred for the 2/2/9/12 valuation date. (See Tr. 4634; GX 127-4 at 2). At the time MSMB Healthcare retained VRC for valuation services of Retrophin, the "most recent transaction price of $20 per share" was not by MSMB Healthcare—it was by Wayne Saunders. (See GX 127-3 at 152). And the "most recent transaction price of $40 per share" was not by MSMB Healthcare—it was by Blue Monkey LLC. (Id.). Therefore, the government's argument that Mr. Shkreli "manipulated" Retrophin's share price because "Shkreli himself controlled both sides of the transactions wherein MSMB Healthcare purchased Retrophin shares" is simply inaccurate and ignores their own witnesses and trial exhibits (See GX 214 at 3; GX 703; Sarah Hassan testimony at Tr. 972; Steve Richardson testimony at Tr. 2810) that demonstrate other independent investors were purchasing Retrophin stock at the same price MSMB Healthcare was.

[4]     For a more detailed analysis of the government's evidentiary issues proving "illegal transactions" for Counts Three, Six and Eight, see the Shkreli Forfeiture Response at 3-6.

## BRAFMAN & ASSOCIATES, P.C.

Should the Court reject this argument, the forfeiture amounts for these Counts should still be significantly reduced by the amount of the investor's money used to provide goods and services—i.e., purchase securities. For example, the government alleges that Mr. Shkreli should forfeit $2,998,000 for Count Three—equal to the amount invested by seven MSMB Capital investors. The bank records for the fund's investment account at Interactive Brokers demonstrates that all of this money went into this investment account and was invested. See GX 502-A, 502-B & 502-2. These bank records also show that $1,057,807 was disbursed out of this investment account. See GX 502-C & 502-D. Of these disbursements, $535,075 went to Interactive Brokers for broker interest, commissions and fees; only $505,414 was disbursed to MSMB Capital. See GX 502-C & 502-D. To the extent the $505,414 that went to MSMB Capital could be considered overhead expenses and cannot be included in direct costs,[5] only that amount should be forfeitable under Count Three.

As for Count Six, the government requests $3,402,450 in forfeiture. The trial evidence clearly demonstrates, however, that at least $2,535,000 of this money was used to provide goods and services, specifically, to purchase Retrophin shares. See GX 214 at 3. Thus, the forfeiture amount for Count Six would be, at most, $867,450.[6]

Accordingly, for the reasons stated above and the reasons stated in our original response, the government's forfeiture motion should be denied.

Respectfully submitted,

**Brafman & Associates, P.C.**
Benjamin Brafman
Marc Agnifilo
Andrea Zellan
Jacob Kaplan
Teny Geragos

cc:   AUSA Jacquelyn Kasulis (via ECF)
AUSA Alixandra Smith (via ECF)
AUSA Karthik Srinivasan (via ECF)
AUSA Claire Kedeshian (via ECF)

---

[5]   18 U.S.C. § 981(a)(2)(B) excludes overhead expenses of the entity providing the goods and services from direct costs, in this case, MSMB Capital. The disbursements that went to Interactive Brokers should not be excluded from direct costs because the broker was not the entity providing the goods and services.

[6]   The defense acknowledges that it has the burden of establishing the direct costs under 18 U.S.C. § 981(a)(2)(B), which we have done above using the government's own trial exhibits.