

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JMK:AES/GKS
F.#2014R00501

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 16, 2018

By Hand and ECF

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:  United States v. Martin Shkreli
            Criminal Docket No. 15-637 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter to detail the appropriate calculation of the loss amount pursuant the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") that is applicable in this case, as well as to respond to the defendant Martin Shkreli's February 9, 2018 filing on this subject.  (See Defendant's Letter dated February 9, 2018, at Dkt. 527 ("Def. Let.")).

      The total loss amount for the three counts of conviction is approximately $10.4 million:  $2,998,000 in money taken and/or kept by Shkreli from MSMB Capital investors resulting from his material misrepresentations and/or omissions (Count Three); $3,402,450 in money taken and/or kept by Shkreli from MSMB Healthcare investors resulting from his material misrepresentations and/or omissions (Count Six); and $4 million in intended losses suffered as a result of the scheme to control the price and volume of Retrophin stock (Count Eight).  This amount falls within the $9.5 million to $25 million offense level bracket for Section 2B1.1(b)(1) purposes, and results in a 20-level increase in the applicable offense level.  See U.S.S.G. § 2B1.1(b)(1)(k).  In addition, Shkreli caused a loss of more than $10 million to Retrophin as a result of settlement and sham consulting agreements used to repay defrauded MSMB investors (Count Seven)—conduct of which Shkreli was acquitted at trial but which the government has clearly proven against Shkreli by a preponderance of the evidence.  Consequently, the total loss amount attributable to Shkreli's relevant conduct for the four fraud schemes is more than $20 million, which similarly results in a 20-level increase in the applicable offense level.  See U.S.S.G. § 2B1.1(b)(1)(k).

      As set forth herein, these loss amounts are based on the evidence presented at the six-week trial in this case, at which Shkreli was convicted of securities fraud and conspiracy to

commit securities fraud with respect to Counts Three, Six and Eight, and at which evidence was introduced proving by a preponderance that Shkreli is also guilty of conspiracy to commit wire fraud with respect to Count Seven.  Such evidence is already detailed in large part in the Presentence Investigation Report dated December 12, 2017 ("PSR") and first addendum to the PSR dated February 21, 2018 ("PSR Addendum").  Furthermore, the Probation Department ("Probation") has adopted these loss amounts as the legally correct loss amounts for Guidelines purposes, and has maintained its position with respect to those loss amounts despite Shkreli's myriad objections to the PSR, many of which were substantively identical to the arguments raised in his submission regarding loss.  Compare Def. Let. at 2-3 (arguing that the defrauded MSMB investors suffered no "actual loss") to Shkreli's PSR Objections at 4-6 (same); see PSR Addendum at 2 (explaining why, despite Shkreli's objections, the loss calculation in the PSR for Counts Three and Six is accurate).

        The arguments advanced in Shkreli's submission regarding the applicable Guidelines loss calculation—in which Shkreli brazenly asserts that his many crimes resulted in no losses for Guidelines purposes—should similarly be rejected by this Court.  These arguments, much like the arguments advanced in connection with Shkreli's opposition to the government's motion for forfeiture, seek to relitigate not only issues of fact that were squarely established during his trial, but the jury's verdict that Shkreli was guilty of three separate fraud schemes. Moreover, such arguments lack any legal basis.  For these reasons, the government submits that the loss calculations detailed above, and set forth in the PSR and PSR Addendum, should be adopted by the Court.

## I.    Applicable Law

        Pursuant to the Guidelines, a defendant who commits an offense involving fraud or deceit will be held accountable for the greater of their actual or intended loss.  U.S.S.G. § 2B1.1, comment. (n.3(A)) (emphasis added).  Actual loss "refers to the reasonably foreseeable pecuniary harm that resulted from the offense," while intended loss means the "pecuniary harm that the defendant purposely sought to inflict" and includes "intended pecuniary harm that would have been impossible or unlikely to occur."  Id.  The Guidelines further define "pecuniary harm" as "harm that is monetary or that otherwise is readily measurable in money," and "reasonably foreseeable pecuniary harm" as that harm that the "defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  Id.

        The amount of loss attributable to a particular defendant at sentencing includes all relevant conduct for which that defendant is responsible.  According to U.S.S.G. § 1B1.3(a), relevant conduct for sentencing purposes is assessed on the basis of:

        (1)    (A)    all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

                (B)    in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were (i) within the scope of the jointly undertaken

criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3(a), comment. (n.2).  Because relevant conduct encompasses "all acts and omissions" caused by a defendant, without limitation, it may include conduct of which a defendant was acquitted if such conduct can be established by a preponderance of the evidence. United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) ("there is no logical inconsistency in determining that a preponderance of the evidence supports a finding about which there remains a reasonable doubt"); United States v. Watts, 519 U.S. 148 (1997) (per curiam).

        After the scope of the defendant's relevant conduct is determined, a court must make a "reasonable estimate" of the loss amount for the defendant's offense or offenses. U.S.S.G. § 2B1.1, comment. (n.3(C)).  In calculating loss, the law provides that "[t]he court need only make a reasonable estimate of the loss resulting from the defendant's crime[s]." United States v. Abiodun, 536 F.3d 162, 167 (2d Cir. 2008).  "The sentencing court is not required to calculate the amount of loss with certainty or precision." United States v. Norman, 776 F.3d 67, 79 (2d Cir. 2015).  "In keeping with this philosophy, it is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." United States v. Bryant, 128 F.3d 74, 76 (2d Cir. 1997); see also U.S.S.G. § 2B1.1, comment. (n.3(C)) (a court may consider, among other things, the "approximate number of victims multiplied by the average loss to each victim," and "general factors, such as the scope and duration of the offense").  In fact, in applying the Guidelines to cases involving large-scale or complex fraud, the Second Circuit has repeatedly recognized the inherent imprecision of loss computations and emphasized the discretion accorded sentencing judges in estimating loss based on the available facts.  See, e.g., United States v. Sutton, 13 F.3d 595 (2d Cir. 1994) (rejecting a challenge to the district court's use of estimates and assumptions derived from the available facts to approximate loss, noting that amount of loss "need not be determined with precision" and that the loss figure may "be based on the approximate number of victims and an estimate of the average loss to each victim") (quoting former language of U.S.S.G. § 2F1.1, comment. (n. 8)); United States v. Lohan, 945 F.2d 1214 (2d Cir. 1991) (upholding the district court's loss computation as reasonable where it was based on the number of investors called and the amount solicited from each as a measure of intended loss); United States v. Burns, 104 F.3d 529 (2d Cir. 1997) (upholding district court's loss computation based on estimates).

        Following the determination of the appropriate loss amount, the Guidelines contemplate that a court will also consider whether to reduce that loss amount by any "credits against loss." See U.S.S.G. 2B1.1(b)(1) , comment. (n.3(E)).  Specifically, the Guidelines prescribe that the loss amount may be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant … to the victim before the offense was detected." Id.  The time of detection is the earlier of (1) the time "the offense was discovered by a victim or government agency" or (2) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." Id.  Importantly, the consideration of whether to allow any offset against the applicable loss amount is the second step in a two-step process:  "first, the [court

must make a] determination of the foreseeable pecuniary harm resulting from the fraud, and second, the [court must make a] determination of any credits against loss from sale of the collateral, as required by Application Note 3(E)(ii)."  United States v. Turk, 626 F.3d 743, 749 (2d Cir. 2010); see United States v. Crowe, 735 F.3d 1229, 1237 (10th Cir. 2013) ("[I]f we were to state the method for determining 'loss' for purposes of § 2B1.1(b)(1) as a mathematical equation, it would be as follows: loss equals actual loss (or intended loss) minus credits against loss.").

Finally, like all facts pertinent to sentencing, a sentencing court need only determine the loss amount by a preponderance of the evidence.  See, e.g., United States v. Coppola, 671 F.3d 220, 250 (2d Cir. 2012).  This determination is reviewed for clear error and is entitled to deference, particularly where "the sentencing judge also presided over a weeks-long trial and heard a great deal of live testimony."  United States v. Lacey, 699 F.3d 710, 720 (2d Cir. 2012).

## II.     The Total Loss for Shkreli's Four Fraud Schemes Is In Excess of $20 Million

### A.     Loss Calculation for Counts Three and Six

#### 1.     The Actual Loss for Counts Three and Six is Approximately $6.4 Million

With respect to the MSMB Capital scheme, Shkreli was convicted of securities fraud on Count Three for defrauding investors by making material misrepresentations and omissions to both induce investment in MSMB Capital and to prevent redemptions from MSMB Capital.  As proven at trial, and detailed in the PSR, Shkreli made a series of material misrepresentations and omissions to convince investors to give him their money to invest in MSMB Capital, which purported to be a long-short hedge fund that invested in healthcare stocks.  These lies included falsely inflating the fund's assets under management; misrepresenting his record as a hedge fund manager (touting himself as successful when in fact his prior hedge fund, Elea Capital, had failed, and MSMB Capital was not itself successful); stating that the fund had an auditor and administrator when it did not; falsely assuring investors that they could withdraw their funds with 30 days' notice; and stating that the fund would be a long-short fund when Shkreli instead routinely used it to take huge gambles on single positions.  Shkreli also made a series of material misrepresentations and omissions in order to prevent MSMB Capital investors from seeking a redemption of their invested funds, including sending out false performance reports to all MSMB Capital investors showing positive returns when the fund in fact was not performing or had no money (for example, this happened both in October and November 2010, when the fund was out of money prior to an influx in new investments from Sarah Hassan, Darren Blanton, Brent Saunders, Schuyler Marshall and John Neill, and after February 2011, when the fund was wiped out in the OREX trade), making other verbal and written assurances that the fund was doing well, and representing in the wind-down email that investors could redeem their investments for cash.  (See PSR ¶¶ 8-15; see also, e.g., Tr. 921-22, GXs 5, 80-1 to 80-9, 103-13, 103-38, 502, 520).

As the evidence demonstrated at trial and the jury found beyond a reasonable doubt, Shkreli made these material misrepresentations and omissions to MSMB Capital investors knowingly and willfully, and with the intent to defraud those investors.  In other words, Shkreli told these lies in order to get money from the MSMB Capital investors to put into MSMB Capital, and to prevent the investors from taking that money out of the fund.  The crime of securities fraud was complete as soon as Shkreli either obtained or retained investors' money by material misrepresentations or omissions.  Consequently, the proper measure of loss is the actual loss suffered by the MSMB Capital investors when they invested in MSMB Capital and/or were induced not to redeem those investments; that is, the total amount given to and/or which remained invested with MSMB Capital as a result of the fraud.  See, e.g., United States v. Komar, 529 F. App'x 28, 29 (2d Cir. 2013) (holding that "the 'loss' was the money that the investors were fraudulently induced to invest," and explaining that "the Sentencing Commission knows how to provide for an offset against actual loss," and if that provision does not apply, then there is no offset, regardless of what the investment was actually worth); United States v. Lyttle, 460 F. App'x 3, 10 (2d Cir. 2012) (affirming loss amount based on the total amount invested in connection with fraud rather than actual money lost following fraud, and explaining that "'loss in fraud cases includes the amount of property taken, even if all or part has been returned'") (quoting United States v. Coriaty, 300 F.3d 244, 251 (2d Cir. 2002)); United States v. Bryson, 101 F. Supp. 3d 147, 155-56 (D. Conn. 2015) (in an investment fraud scheme, actual loss is the "entire investment fraudulently induced," regardless of what the investment was worth) (citing, inter alia, United States v. Byors, 586 F.3d 222 (2d Cir. 2009); United States v. Hsu, 669 F.3d 112 (2d Cir. 2012); Komar, 529 F. App'x at 29)).

As set forth in the PSR Addendum at Paragraph 10, there were seven MSMB Capital investors who invested a total of $2,998,000 in MSMB Capital.  Consequently, the actual loss for the MSMB Capital scheme charged in Count Three is $2,998,000.  As discussed in more detail below, this loss amount should not be offset by any credits against loss.

Similarly, with respect to the MSMB Healthcare scheme, Shkreli was convicted of securities fraud on Count Six for defrauding investors by making material misrepresentations and omissions to both induce investment in MSMB Healthcare and to prevent redemptions from MSMB Healthcare.  As proven at trial, and as detailed in the PSR, Shkreli made a series of material misrepresentations and omissions in order to convince investors to give him their money to invest in MSMB Healthcare, which purported to be a long-short hedge fund that invested in healthcare stocks.  These lies included falsely inflating the fund's assets under management; misrepresenting his record as a hedge fund manager (touting himself as successful when in fact his prior hedge funds had both failed); stating that the fund had an auditor when it did not; falsely assuring investors that they could withdraw their funds with 30 days' notice (or, in the case of investor Richard Kocher, within a week); and stating that the fund would be a long-short fund when Shkreli instead used the fund simply as a way to get and funnel money to Retrophin and/or to pay his personal debts and obligations.  Shkreli also made a series of material misrepresentations and omissions in order to prevent MSMB Healthcare investors from seeking a redemption of their invested funds, including sending out false performance reports to all MSMB Healthcare showing positive returns when the fund in fact was not performing, making other verbal and written assurances that the funds were doing well, representing in the wind-down email that investors could redeem their investments for cash, and advising investors that the

changes in the amended Private Placement Memorandum ("PPM") were made to permit a "small" investment in Retrophin when in fact Shkreli put all of the money invested in MSMB Healthcare into Retrophin.  (See PSR ¶¶ 16-20; see also, e.g., Tr. 2318-19, 3097-99, 3104, 3127, 4222-23; GXs 11-A, 11-B, 83-1 to 83-4, 91-1 to 91-4, 107-11, 109-9, 350, 507-D, 521, 521-A, 704, 705).

        As with the MSMB Capital scheme, the evidence at trial demonstrated, and the jury found beyond a reasonable doubt, that Shkreli made these material misrepresentations and omissions to MSMB Healthcare investors knowingly and willfully, and with the intend to defraud those investors.  Again, the crime of securities fraud was complete as soon as Shkreli either obtained or retained investors' money by material misrepresentations or omissions.  As a result, the proper measure of loss is the actual loss suffered by the MSMB Healthcare investors when they invested in MSMB Healthcare and/or were induced not to redeem those investments, or the total amount given to and/or which remained invested with MSMB Capital as a result of the fraud.  As set forth in the PSR Addendum at Paragraph 16, there were twelve MSMB Healthcare investors who invested a total of $3,402,450 in MSMB Healthcare.  Consequently, the actual loss for the MSMB Healthcare scheme charged in Count Six is $3,402,450.  This loss amount should similarly not be offset by any credits against loss.

        In addition, there is clear evidence that after the MSMB Healthcare investors placed their money in the fund, Shkreli stole at least $1.1 million from the fund for his personal use.  Specifically, Shkreli took $200,000 from an investment made by Michael Lavelle into MSMB Healthcare, routed it through a Retrophin bank account to disguise the source of the funds, and then routed that money back out through a bank account in the name of MSMB Healthcare Management to Blanton (via Colt Ventures).  (Tr. 2696-2700, GXs 503-E, 505-E, 509-E).  In addition, Shkreli took $900,000 from MSMB Healthcare and invested it in Retrophin on February 1, 2012, only to reverse that investment in December 2012, and then force Retrophin to "repay" MSMB Healthcare the $900,000, which Shkreli subsequently took from MSMB Healthcare and used to pay his personal debt to Merrill Lynch for the failed OREX trade (routing that money either directly to Merrill Lynch or to his personal bank account and then to Merrill Lynch).  (GXs 506-E, 510-E).  While this number should not be considered a loss in addition to the loss amount calculated above—which encompasses those funds—it is notable, particularly in light of the defendant's arguments discussed below.

        Finally, it is noteworthy that while the PSR relies on the calculation of actual losses for both Count Three and Count Six, if Probation or the Court were to rely on intended loss for either count, the loss amount might well be higher than the actual losses listed above.  Intended loss is the measure of  "pecuniary harm that the defendant purposely sought to inflict" and includes "intended pecuniary harm that would have been impossible or unlikely to occur" U.S.S.G. § 2B1.1, comment. (n.3(A)), and there is evidence in the record that Shkreli purposely sought to defraud additional investors in connection with MSMB Capital and/or MSMB Healthcare but failed.  For example, in March 2011—after the OREX trade that wiped out all of MSMB Capital's assets—Shkreli attempted to get an individual named Steve Harasym to invest $4 million in MSMB Capital.  (GX 204).  Shkreli sought to have his friend Edmund Sullivan provide Harasym with additional false information to induce Harasym's investment in MSMB Capital, including advising Sullivan to tell Harasym that the fund's law firm was McCormick &

O'Brien (a lie), and asking him to "stay away from legal & audit & accounting" and not to mention the "OREX drama." (Id.).  Ultimately, Harasym did not invest with Shkreli; he later advised Neill that he had learned that Shkreli had lied to him about graduating from Columbia. (Tr. 4060-61).  However, the $4 million that Shkreli unsuccessfully attempted to swindle from Harasym—through a series of what are clearly material misrepresentations and omissions— could potentially be included in a calculation of intended loss because there is evidence that Shkreli purposely sought to take $4 million from Harasym through fraud.  See U.S.S.G. § 2B1.1, comment. (n.3(A)) ("intended loss includes loss that was impossible or unlikely"); United States v. Booker, 543 U.S. 220, 264 (2005) ("A paramount goal of sentencing is that it should reflect the scope of the intended harm, i.e., one who intends (or risks) a greater harm deserves a bigger sentence than one who does not.  The Guidelines reflect this common sense proposition.  So does the law."); see also United States v. Ravelo, 370 F.3d 266, 271 (2d Cir. 2004) (affirming district court's calculation of intended loss based on a series of failed attempts to use stolen credit cards to fraudulently obtain advances).

Taken together, and in light of the relevant law and facts, the loss amounts for Counts Three and Six is approximately $6.4 million.

**2.      Shkreli's Arguments That There Is No Actual or Intended Loss for Counts Three and Six Are Unavailing**

**a.      The Total Amount of Investments Fraudulently Induced and Kept in the MSMB Entities Constitutes the Actual Loss**

Shkreli makes two primary arguments in support of his brazen assertion that there is no loss attributable to his criminal conduct in connection with Counts Three and Six: (1) there was no actual loss with respect to Counts Three and Six because all of the MSMB investors were ultimately repaid with money and shares taken from Retrophin, and (2) there was no intended loss with respect to Counts Three and Six because Shkreli never subjectively intended to cause the MSMB investors any pecuniary harm.  (Def. Let. at 2-6).  For the reasons set forth below, both arguments should be rejected in their entirety.

With respect to the actual loss calculation—which is the measure by which both the government and Probation calculated loss with respect to Counts Three and Six—Shkreli contends that the evidence at trial established that "each investor [in MSMB Capital and MSMB Healthcare] made a significant profit."  (Def. Let. at 2).  While Shkreli concedes that the so-called "profit" the MSMB investors allegedly realized was the result of their ultimate receipt of money and shares taken from Retrophin, he nevertheless contends that such money and shares must be seen as a valid "redemption" of those investors' original investments into each hedge fund.  (Def. Let. at 3-4).

Shkreli's assertion that he can simply deem the losses suffered by the investors whose money was invested and kept in MSMB Capital and MSMB Healthcare as a result of his securities fraud schemes as "nonexistent" because, after he committed fraud, he subsequently provided the MSMB Capital and Healthcare investors with money and shares from Retrophin, is incorrect as a matter of law.  As set forth above, both the caselaw and the Guidelines establish

7

that the determination of loss is a two-step process—first a court must calculate the actual or intended loss that resulted from the crime, and only then may the court determine whether any offsets are appropriate.  Turk, 626 F.3d at 749; U.S.S.G. §2B1.1, comment. (n.3(A) & 3(E)).  And, as set forth above, the law also mandates that when a defendant commits securities fraud, the appropriate measure of actual loss in that first step is the "entire investment fraudulently induced, regardless of what the investment was worth."  Bryson, 101 F. Supp. 3d at 155-56 (collecting Second Circuit cases); see also Komar, 529 F. App'x at 29; Lyttle, 460 F. App'x at 10.

The caselaw and the Guidelines measure actual loss for fraud schemes like Shkreli's, where investments have been induced and/or retained as a result of fraud, as the total amount of such investments and not as Shkreli contends because "[t]o accept [Shkreli's] argument would be to encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk."  Turk, 626 F.3d at 750.  In other words, if a defendant could commit fraud in order obtain and keep money from investors and use it for his or her own ends, but he or she would only be held accountable for committing the fraud if he or she was unable to ultimately return the money to investors, then there would be a perverse incentive for defendants to commit fraud to get access to money and take the chance that they would ultimately be able to pay it back.  See id.; United States v. Evans, No. 11 Cr. 481, 2012 WL 6190316, at *4 (D. Colo. Dec. 11, 2012) (calculating the actual loss in an investment fraud scheme as the total amount invested based on fraudulent representations, as such loss was "reasonably foreseeable" to the defendant, and finding that "[t]his approach is necessary to ensure that defendants who fraudulently induce investors to assume the risk of investing in their companies are responsible for the natural consequences of their fraudulent conduct.  One natural and foreseeable consequence of making fraudulent misrepresentations to investors is that the investors may lose the principal that they originally invested"); cf. U.S. Commodity Futures Trading Comm'n v. Southern Trust Metals, Inc., 880 F.3d 1252, 1269-70 (11th Cir. 2018) (rejecting argument that defendants should not have to pay restitution where they invested customers' funds "contrary" to their instructions, but that investment did not fare more poorly than the investment customers expected; explaining that accepting the defendants' argument "would create perverse incentives").[1]  Consequently, it is clear that the legally proper calculation of the actual loss for Counts Three and Six is the total amount induced and kept through material misrepresentations and omissions—approximately $6.4 million.[2]

_____

[1] Another reason why this is the approach enshrined in the caselaw and Guidelines is to avoid unwanted sentencing disparities—if the law is as Shkreli alleges, the Guidelines would not distinguish between a defendant who defrauded a single person of $100 on a single day and defendant like Shkreli who preyed on multiple people to the tune of millions of dollars in separate schemes across several years, so long as each was somehow able to find (or, like Shkreli, steal) money from a different source and ultimately return it.

[2] Shkreli also suggests that there is no actual loss because the government is not generally pursuing restitution for the victims of the MSMB Capital and MSMB Healthcare schemes (Counts Three and Six).  (Def. Let. at 2).  This is both wrong and a red herring.  The victims all ultimately received money from and/or shares of Retrophin from Shkreli subsequent to their investments in MSMB Capital and MSMB Healthcare; in many cases, this money and/or shares were stolen from Retrophin by Shkreli and Greebel, while in other cases the victims received

### b.       There Is No Evidence of Any "Credits against Loss"

Entering the second step of the analysis—whether there are any credits against loss applicable here pursuant to Application Note 3(E)—the question is whether Shkreli's remaining arguments can be fairly construed to make a case by a preponderance of the evidence that he is entitled to such credits.  For the reasons set forth below, they cannot.

With respect to MSMB Capital, Shkreli audaciously contends that while that MSMB Capital "did not invest any money in Retrophin, it is clear that the fund's assets included Retrophin stock" and thus "any subsequent Retrophin payments to MSMB Capital investors were not pay back for a loss, but rather redemptions of the investors' Retrophin shares." (Def. Let. at 4).  Construing this as an argument for a credit against loss for the distribution of Retrophin stock to MSMB Capital investors in January 2013, it fails both because it is factually inaccurate and because the distribution happened after both the offense was detected by a victim and by a government agency.  Shkreli's support for his argument is based on a single document—the so-called MSMB Capital "balance sheet" that Shkreli provided to attorneys for MSMB Capital investor Darren Blanton in the summer of 2012 which purports to show that MSMB Capital held $3,480,000 in "Level III Securities." (GX 105-15).  This so-called "balance sheet," which was created by Shkreli in response to Blanton's repeated requests for a redemption of his MSMB Capital investments (which started in November 2011 and persisted until March 2014, during which period Shkreli repeatedly lied to Blanton about his MSMB Capital investment), was dated April 1, 2012 by Shkreli.  (Id.)  There was testimony from Blanton at the trial of Shkreli's co-defendant, Evan Greebel, that Shkreli told Blanton that the "Level III Securities" were shares of Retrophin.  (Greebel Tr. 3630).  Shkreli now argues that the so-called "balance sheet" and his own statement to Blanton, taken together, are definitive proof that "at least as of April 2012, MSMB Capital and its investors were all Retrophin shareholders" and that consequently prior to Blanton's complaint to the SEC and "at the time of the wind down email [on September 9, 2012]" MSMB Capital had "approximately $6 million worth of Retrophin stock" which was more than the total amount invested in the fund by investors."  (Def. Let. at 4).

This preposterous argument, which is premised entirely on the written and verbal lies made by Shkreli in an attempt to forestall Blanton's attempts at redemption, is directly contradicted by the facts established at trial.  First and foremost, the many capitalization tables generated for Retrophin in 2012—which Shkreli received and revised at various points—make it clear that MSMB Capital did not hold any Retrophin stock either as of April 1, 2012 (the date of the fabricated "balance sheet") or as of September 9, 2012 (the date of the wind-down email).

---

distributions of Retrophin stock as a result of either the backdated interest in Retrophin or Shkreli's theft of funds from MSMB Healthcare to support Retrophin.  As a result, the government is not seeking to pursue restitution from Shkreli—however, for the reasons explained above, this does not negate the actual loss suffered by the victims as a result of their investments, but may simply reduce the availability of further restitution from Shkreli.  To the extent that a victim can demonstrate loss as a result of their investment in Shkreli's hedge funds in excess of the money or shares they ultimately received from Shkreli, such victim's claim should be evaluated by the Court on its merits.

(See, e.g., GXs 103-7, 119-4, 119-10, 119-13).  Moreover, in connection with the settlement agreement that Shkreli, MSMB Capital and Merrill Lynch entered into on September 5, 2012 to repay the losses from the OREX trade—the very trade that wiped out all of the assets in MSMB Capital—Shkreli swore under penalty of perjury that MSMB Capital's "Asset/Liabilities for MSMB Parties as of September 4, 2012" was "$0." (GX 117-6).  Instead, the evidence at trial clearly showed that MSMB Capital didn't receive any shares of Retrophin until December 3, 2012, when Shkreli simultaneously transferred 75,000 shares of Retrophin to MSMB Capital via a backdated share transfer agreement and revised the capitalization table to show that transfer. (GXs 119-24, 119-25).  As a result, Shkreli's argument that the subsequent distribution of Retrophin shares to MSMB Capital investors in January 2013 should be considered a "redemption" of their investment in the hedge fund fails, and there is no question that the "actual loss" for Count Three is $2,998,000, for the reasons set forth above.

Moreover, as noted above, even if the distribution of the Retrophin shares in January 2013 could be conceived as redemption from the fund—keeping in mind that at the time the shares were distributed they were restricted and had little to no value—such distribution was not made until long after Shkreli's scheme was detected by both a fraud victim and the government.  Again, Blanton had sought a redemption of his MSMB Capital investment in November 2011 and should have received it in 30 days (GX 105-6); after that 30 days expired with no redemption as required by the PPM, Blanton believed that he had been the victim of fraud, which was only reinforced by Shkreli's behavior over the next year or so (stating that he would return Blanton's money and then failing to do so on multiple occasions, refusing to answer phone calls and emails for periods of time, providing conflicting information about the status of the fund, etc.).  Blanton subsequently reported Shkreli to the U.S. Securities and Exchange Commission ("SEC") in the fall of 2012, which was also prior to the share distribution in January 2013.  Moreover, two other individuals had already reported Shkreli's fraud related to MSMB Capital and MSMB Healthcare to the SEC as of that time:  Caroline Stewart in August 2011 (see 3500-CS-4), and Jackson Su in June 2012 (see 3500-JS-1).

With respect to MSMB Healthcare, Shkreli also contends that because MSMB Healthcare invested in Retrophin—approximately $2.3 million between October 2011 and September 2012, though ultimately $900,000 of that investment was reversed, for a total of about $1.4 million—"each of the fund's investors had an actual financial interest in Retrophin," such that when the MSMB Healthcare investors ultimately received a distribution of Retrophin shares in March 2013, it was "not payback for the fund's losses" but "redemptions of MSMB Healthcare's investment in Retrophin."  (Def. Let. at 4).

First, Shkreli also cannot fairly argue that this distribution in March 2013 was a "credit against loss" because it was made only after Shkreli's fraud was detected by at least some of his victims—for example, Spencer Spielberg (GX 112-1) and Richard Kocher (GX 107-15) had requested redemptions in cash and been unable to get such redemptions prior to the distribution—and was known to the SEC based on, among other things, information provided by Jackson Su in June 2012.  (See 3500-JS-1).  To the extent that Shkreli argues he was permitted to invest MSMB Healthcare funds into Retrophin by the revised MSMB Healthcare PPM, and thus he did not commit fraud when he funneled all of the money in MSMB Healthcare into Retrophin, there are several responses.  This is, once again, an attempt to relitigate the jury verdict—Shkreli

made this argument repeatedly at trial and nonetheless was found guilty of making material misrepresentations and omissions to his investors, including with respect to the operation of MSMB Healthcare to prevent redemptions (i.e., continuing to advise investors that it was a long-short hedge fund long after the sole investment in the fund was Retrophin, telling Mulleady to tell investors that the changes in the PPM were made to make a "small" investment in Retrophin, etc.).  Moreover, it is clear that plain language of the revised PPM in the fall of 2012—and there is no evidence that all investors actually received the revised PPM—still did not permit Shkreli to take all of the fund's money, cease trading, and invest those funds in a single asset.  (GX 11-B).  Tellingly, by the spring of 2012, when MSMB Healthcare had ceased trading and served only to funnel money to Retrophin, Shkreli continued to solicit new investments in MSMB Healthcare as if it were still a hedge fund.  (See, e.g., Tr. 2326-27, GXs 36, 521).

Finally, even if Shkreli could prove that the distribution was a "credit against loss," he would have to provide a reasoned calculation for how that credit would be valued—keeping in mind that only $1.4 million from MSMB Healthcare was ever actually invested in Retrophin (the rest was simply stolen and/or lost, including the $1.1 million detailed above that went to Blanton and to pay Shkreli's personal debts) and that the shares were restricted at the time of their distribution.[3]

### c.   Shkreli's Additional Arguments Regarding Intended Loss Are Incorrect

As set forth above, both the government and Probation calculated loss for Counts Three and Six based on actual loss.  Consequently, the Court need not address Shkreli's argument that there is no intended loss with respect to Counts Three and Six if it agrees with the government and Probation's analysis that the actual loss is approximately $6.4 million.

To the extent that the Court considers an intended loss analysis, however, Shkreli's argument that there is no evidence that he "purposely sought to inflict" pecuniary harm on the MSMB Capital and MSMB Healthcare investors is also unavailing.  (Def. Let. at 5-6).

_____

[3] Shkreli also argues at various points that securities fraud does not have as an element a "scheme … to deprive another of money or property," but that this was an element in the wire fraud conspiracies charged in Counts Two, Five and Seven of which he was acquitted, such that the jury must have found that he didn't intend to deprive anyone of money and thus he did not cause "pecuniary harm."  This argument is simply wrong.  As detailed at length above, the proper calculation of actual loss in a securities fraud investment scheme is the value of the money invested and/or retained in securities based on material misrepresentations or omissions; the deprivation of the investor of the money in the fraudulently obtained or retained security is clearly "pecuniary harm" under the plain language of the Guidelines.  See U.S.S.G. § 2B1.1, comment. (n.3(A)) ("harm that is monetary or that otherwise is readily measurable in money").  Moreover, the fact that Shkreli was not convicted of Counts One, Two, Four and Five, all of which charged conspiracies related to the MSMB Capital and MSMB Healthcare schemes, is not an indication that the jury felt Shkreli was not guilty of the frauds (as they clearly did not, with convictions on Counts Three and Six), but rather that they believed he was solely responsible for the frauds that he masterminded and perpetuated.

Shkreli accurately identifies caselaw stating that the court should consider a defendant's subjective intent before determining the intended loss amount.  United States v. Confredo, 528 F.3d 143, 152 (2d Cir. 2008).  However, Shkreli has twisted this caselaw to stand for the proposition that despite the fact that—as the jury found—he knowingly and intentionally made material misrepresentations and omissions in order to induce and retain investments in MSMB Capital and MSMB Healthcare, if he ultimately wanted his investors to make money, he could not have had the "intent" to cause them harm.  (Def. Let. at 5).

This argument fails for the same reason that Shkreli's actual loss arguments fail.  The goal of Shkreli's schemes was to obtain money by fraud—thus he intended to, and did, cause the MSMB Capital and MSMB Healthcare investors to hand over money and leave money with the funds based on fraud.  This is the beginning and the end of the analysis for the loss amount, because the fraud was complete when the money was obtained or retained through such material misrepresentations and omissions.  In fact, as detailed above, under an intended loss analysis, the loss amount might well be higher than the actual loss calculated here, as Shkreli attempted to solicit via material omissions and misrepresentations multiple additional investors for MSMB Capital and MSMB Healthcare who did not ultimately invest in the funds.

The cases that Shkreli cite in his brief are inapposite for this reason.  For example, in United States v. Manatau, 647 F.3d 1048 (10th Cir. 2011), the defendant stole credit card convenience checks with a total credit limit exceeding $30,000.  The defendant cashed the checks for a little over $1,800.  Id. at 1049.  The district court enhanced his Guidelines range under U.S.S.G. § 2B1.1 by utilizing the total credit limit as the measure of intended loss.  Id.  The defendant argued that could not have possibly intended to cause such a loss because he did not know that the convenience checks had such a high credit limit.  Id.  The Tenth Circuit vacated the sentence and remanded, holding—in language not fully quoted by the defendant here—that "'intended loss' means a loss the defendant *purposely* sought to inflict. 'Intended loss' does not mean a loss that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated."  Id. at 1050.  Crucially, the Court cited a number of cases noting that a defendant "subjectively intended to cause the loss in question."  Id. at 1054.

This case falls squarely within Manatau's ambit.  The defendant lied repeatedly to MSMB Capital and MSMB Healthcare investors prior to and during the course of their investments.  These lies had readily apparent purposes:  to induce investments in the MSMB entities that Shkreli could otherwise not have secured, and to forestall redemption requests that would have exposed the truth about the funds' performance and his theft of investor money to pay off his personal debts.  Indeed, Darren Blanton initially tried to redeem his investment in MSMB Capital in November 2011 and—with the exception of $200,000 that Shkreli stole from an MSMB Healthcare investor—had still had not received such redemption by the time the defendant notified investors that the funds were winding down.  In the meantime, the defendant used investor money to, among other things, pay off a judgment to Merrill Lynch that he, Marek Biestek and MSMB Capital owed, and to keep Retrophin afloat.  Even after the defendant sent the wind-down email in September 2012, it took approximately six months for the first investors to receive Retrophin money and shares.  The defendant lied to investors with the subjective intent to deprive them of their money both to hide his performance at the MSMB funds and to

give him time to pay off debts and start Retrophin.  These were actual losses, but to the extent the Court considers intended loss, it is clear that he "subjectively intended" to deprive investors of their money.  Indeed, unlike the defendant in <u>Manatau</u>, the defendant here knew exactly how much investors had invested in the MSMB funds and knew exactly what to tell them to keep them invested in the funds.  As <u>Manatau</u> noted, "'intended loss' can be shown by looking to what loss was 'expected' because . . . a person is presumed to have 'intended the natural and probable consequences of his or her actions.'  <u>Id.</u> at 1055 (citation omitted).

    Finally, the defendant's reliance upon the "no ultimate harm" jury instruction in the context of his arguments regarding "intended loss" is misplaced.  That instruction ensures that the jury reaches a verdict based upon the defendant's good or bad faith as to the relevant misrepresentations and omissions <u>at the time they are made</u>.  The instruction keeps the fraud statutes from becoming a nullity because every fraudster will say he had good intentions.  Yet, the defendant now reads that instruction to render loss calculations at sentencing a nullity on the same basis.  Notably, he cites no authority for the proposition that a defendant facing sentencing for securities fraud cannot be held responsible his intended losses.

**B.  Loss Calculation for Count Eight**

  **1.  The Intended Loss for Count Eight is $4 Million**

    With respect to the Retrophin unrestricted shares scheme, Shkreli was convicted of securities fraud conspiracy on Count Eight for seeking—and in some cases succeeding—in controlling the price and volume of Retrophin shares through his beneficial ownership of almost all of the free-trading shares of Retrophin, also known as the "Fearnow" shares.  As the evidence demonstrated at trial, Retrophin was in dire straits following the reverse merger that made it a public company in December 2012: the company had only $11,000 in its bank account, and had been unsuccessful in raising capital from private equity funds.  Shkreli and his co-conspirators desperately needed Retrophin's share price to remain stable through the early part of 2013 so that they could attract investors to the company through a series of private placements ("PIPEs"), which ultimately took place in January and February 2013.  In order to do this, and in connection with the reverse merger, Shkreli distributed two million free-trading shares of Retrophin in December 2012 to seven associates on the understanding that he would control the disposition of those shares.  (GX 701).  At the time, these free-trading shares represented the vast majority of the free-trading shares of the company, which was extremely thinly traded.[4]  (<u>Id.</u>; Greebel Tr. at 5758-59).  As a result, control of those free-trading shares allowed Shkreli to manipulate the price and volume of Retrophin shares.

    There is ample evidence in the record that Shkreli sought to and did exercise that control in an effort to manipulate the price and volume of Retrophin shares to ensure the company's survival.  For example, Shkreli sought to monitor the trades of individuals who

---

[4] An additional 400,000 free-trading shares that were originally set to be distributed to those associates were held in escrow until March 2013 as collateral for money that Retrophin owed for its purchase of the Desert Gateway shell; another 100,000 free-trading shares were distributed to an individual associated with Michael Fearnow.

received Fearnow shares (GX 120-11), and on multiple occasions between December 2012 and February 2013, Shkreli sought to and/or did prevent the sale of the free-trading shares in order to prevent the price of Retrophin from falling. (See, e.g., GXs 120-17, 120-18, 120-19, 245, 246, 248, 251, 255; Tr. 4301). During this period, Shkreli also shored up the share price of Retrophin by seeking to have the recipients of the free-trading shares make those shares "unshortable"— that is, unavailable for others in the market to borrow so that the stock could not be shorted. (GXs 245, 246, 120-17). Coupled with other actions Shkreli took in the market at the same time, such as the purchase of shares from the market on various dates, Shkreli's control of the free-trading shares was intended to, and in some cases did, result in the favorable manipulation of the share price of Retrophin.

In order to determine the intended loss that resulted from this fraud scheme, Probation sought to estimate the differential between the actual valuation of the Retrophin shares in this time period and the price that Shkreli and his co-conspirators attempted to set in the market for Retrophin shares through Shkreli's control of the price and trading volume of the free-trading shares. (PSR ¶ 43). This differential represents the loss Shkreli and his co-conspirators intended to cause the market by artificially propping up the price of Retrophin shares. (Id.). Probation determined that $3.00/share was a conservative estimate of the "true" market value of Retrophin shares during this period, as it was the price that the investors were willing to pay in the private placement rounds, and that $5.00/share was a conservative estimate of the artificially inflated price that Shkreli and his co-conspirators intended to achieve as a result of the securities fraud conspiracy in Count Eight. (Id.). Probation then multiplied the $2.00 differential by the 2 million Fearnow shares that Shkreli controlled and/or sought to control during this period to get a total intended loss of $4 million. (Id.).

The method detailed in the PSR is legally permissible and amply supported by the record. First, the Guidelines expressly provide that the Court may use "any method that is appropriate and practicable under the circumstances" to calculate loss. U.S.S.G. § 2B1.1, comment. (n.3(C)). While the Guidelines do identify "one such method" that the Court "may consider" in the case of securities fraud—namely a classic "pump and dump" price inflation scenario (see U.S.S.G. § 2B1.1 (Note 3(F)(ix))— this is by no means the only method permitted under the Guidelines, and it is not applicable to the facts at hand.

Second, the PSR adopts this method by reasonably inferring that the PIPEs in January and February 2013 would not have occurred at the same price point had Shkreli not conspired to control the price and volume of Retrophin's shares. Indeed, Shkreli's conspiracy helped to keep the shares of Retrophin above $3.00—the price used during the private placements—which was crucial for making the capital raises attractive to investors. If the stock trended much below $3.00, investors buying Retrophin shares in a private placement at that price would be buying at an instant loss. Shkreli's conspiracy helped keep Retrophin afloat by deceiving the market about the price and trading volume of the company's shares. The PSR's loss calculation of $4 million is thus eminently reasonable.

14

2.    **Shkreli's Arguments That He Never Intended Any Loss To the Market Are Unavailing**

Shkreli contends that there is "no rational basis to infer from the evidence that [he] and his co-conspirators intended any loss to the market," and then proceeds to make a series of arguments in support of this position, all of which are unavailing.  (Def. Let. at 11-12).

First, Shkreli notes that the securities fraud conspiracy in Count Eight "allowed the jury to find that [he] had the intent to defraud even if he did not intend to cause any pecuniary harm," and that, in fact, he did not intend to cause "any loss to the market." (Id.).  Shkreli's argument is specious.  The charged conspiracy alleged that the defendant and his co-conspirators sought to manipulate the price and volume of Retrophin stock, and the evidence at trial clearly established the co-conspirators' intent to do so in order to deceive or defraud investors by controlling or artificially affecting the price of securities for their own economic benefit.  For example, in email exchanges between Shkreli and Greebel in December 2012, Shkreli and Greebel checked with Standard Registrar regarding the "float" for Retrophin—or the number of outstanding free-trading shares—and confirmed that it consisted almost entirely of the Fearnow shares (including those held at the time in escrow that could not be traded).  (GX 245).  Shkreli advised Greebel that someone "shorted 60K in the last two days" and Greebel responded by asking "how will they cover?"  (Id.).  This is because Greebel and Shkreli knew that Shkreli controlled almost all of the available free-trading shares, and that it is clear he has not authorized anyone to either sell that many shares or make them available to borrow for short sales.  (Id.).  It is thus not surprising that Shkreli's response was to correctly guess that "I think it might be tim selling" because he knew that Timothy Pierotti, a Fearnow share recipient who refused to join the conspiracy, was not likely to follow his instructions.  (Id.).  What happened next demonstrates exactly Shkreli's intent to control the price and volume of Retrophin shares: because Pierotti's sales were driving down the price of Retrophin precipitously at a vulnerable time for the company, he sought to immediately regain control of those shares and prevent further sales in those volumes.  As detailed at trial, this involved threatening Pierotti and his family; freezing Pierotti's brokerage account; and ultimately causing Retrophin to sue Pierotti.  Shkreli's actions to control of the price and volume of the free-trading shares were thus plainly intended to fool the market into continuing to value Retrophin at a price that favored Shkreli.  This is exactly the manipulation of the public market—to the detriment of everyday investors—that the securities laws were designed to prevent.

Second, Shkreli argues that because there were only 3245 stock transfers during the timeframe specified in the PSR, and only 146 involved members of the Count Eight conspiracy—and furthermore that 86 of the 146 stock transfers were sales, which Shkreli notes has a tendency to decrease the stock rather than inflate it—this is proof that there is no basis to find that Shkreli intended any loss to the market.  (Def. Let at 11).[5]  Not only is this argument

---

[5] Shkreli cites GXs 730 and 731 in support of this proposition.  There were no GXs 730 and 731 at the Shkreli trial; the government believes this is a reference to GXs 630 and 631, which consist of bluesheet data for Retrophin for the relevant time period.  However, Shkreli provides no information about the analysis he conducted in connection with the bluesheet data to

unpersuasive, but the statistics that Shkreli relies on actually constitute clear evidence of an agreement between Shkreli and the co-conspirators not to trade in the stock. Those numbers show that while the co-conspirators held the vast majority of the free-trading shares during the relevant time period, they only participated (by the defendant's own calculations) in approximately 4.5% of the stock transfers. As both the government's expert and a defense expert testified at the trial of Greebel, if a group of people were seeking to maintain or prop up the price of a stock, they would either hold the stock (making fewer shares available for sale and reducing the volume) or buy stock. (Greebel Tr. 5759-60, 8473, 8490). The fact that the co-conspirators almost entirely abstained from trading during this period is evidence of the scheme to control the price and trading volume of Retrophin shares.

Third, Shkreli cites sales of stock by Pierotti, a Fearnow share recipient, as evidence that such sales would drive the price down and run contrary to the goal of the conspiracy, such that a conspiracy did not exist. (Def. Let. at 12). This argument should be rejected both because it seeks to relitigate Shkreli's guilt as to Count Eight, but more importantly because the evidence at trial established that Pierotti refused to join the conspiracy and did not permit Shkreli to control his shares (though Shkreli took various steps, including freezing Pierotti's brokerage account, in order to continue to exercise control). (Tr. 4205-4360). As a result, his actions in selling free-trading shares cannot be seen as evidence that the conspiracy did not exist.[6]

Fourth, Shkreli alleges that Probation made a series of unfounded "assumptions" in connection with its loss estimate on Count Eight that undermine the validity of the estimate. For example, Shkreli states that because the government did not call any investors in the Retrophin PIPEs at trial, Probation cannot speculate that "it is doubtful whether investors would have purchased shares at $3.00 per share [in the PIPEs] if the stock traded at or below that level." (Def. Let. at 12). However, Probation's statement is based on basic market principles: as Retrophin's PIPEs in January and February 2013 were for common stock (not preferred stock) (see GX 611), there is no logical reason why investors would be willing to pay $3.00/share in connection with the PIPEs if those same investors could buy the same common stock on the market for a far lower price. Shkreli also complains that any "increase in the stock price of Retrophin during this time period would not be wholly attributable to the actions of the conspiracy" and thus the estimate overstates any intended loss. (Def. Let. at 12). However, as Shkreli and his co-conspirators sought to and in some cases did control the vast majority of Retrophin's free-trading shares, it is fair to estimate that their actions were intended to and in some cases did serve as the main driver of the price and volume of Retrophin stock, particularly in this early period where the stock was so thinly-traded. Finally, Shkreli contends that Probation erred by using $5.00 as the "artificial high price when the precise average Retrophin

arrive at these numbers, and no such analysis (in the form of charts or expert testimony) was presented by Shkreli at trial.

[6] Shkreli also cites certain sales of stock by co-conspirator Andrew Vaino as evidence that Shkreli could not have intended to cause harm to the market. However, Vaino held and did not trade about 75% of the free-trading shares that were assigned to him during the relevant time period. (See GX 701, Greebel Trial DX 221-02).

stock price [during the relevant time period] was only $3.96 per share." (Def. Let. at 12). But Probation's estimate is one of underlined loss, not actual loss; it estimated what the artificial high price of the stock would likely have been if the conspiracy to control the price and volume of Retrophin stock in Count Eight was successful in order to reach a measure of the total loss intended by the scheme.

### C. Loss Calculation for Count Seven

#### 1. Shkreli Does Not Dispute the Loss Calculation For Count Seven

With respect to Count Seven—of which Shkreli was acquitted at trial, but which the government has proven against Shkreli by a preponderance of the evidence—Shkreli was charged with stealing money and shares from Retrophin via a series of settlement and sham consulting agreements in order to repay defrauded MSMB investors. The actual loss to Retrophin as a result of these settlement and consulting agreements is estimated to be at least $10 million, based on totaling the amount of money taken from Retrophin's bank account and the value of the shares taken from Retrophin pursuant to these agreements. (PSR ¶ 35). Shkreli does not dispute this loss calculation, nor does he contend that there was no actual loss as a result of the scheme detailed in Count Seven. Consequently, to the extent that the Court does consider Shkreli's conduct in connection with the crime in Count Seven as relevant conduct for purposes of the Guidelines calculation, the Court should adopt the loss calculation set forth in the PSR.

#### 2. This Court May Consider Acquitted Conduct At Sentencing

Shkreli advances a novel argument—which is squarely at odds with existing Second Circuit precedent, existing statutory language and the plain text of the Guidelines—that this Court may not consider Shkreli's conduct in connection with Count Seven, and thus should not consider any actual loss related to Count Seven in calculating the total loss amount for Guidelines purposes. Shkreli's argument is premised entirely on the recent Supreme Court case Nelson v. Colorado, 137 S.Ct. 1249 (2017). However, Nelson is wholly inapplicable.

In Nelson, the Supreme Court concluded that a Colorado state law violated due process where that law required defendants whose convictions have been reversed or vacated to additionally prove their innocence in a subsequent civil proceeding by clear and convincing evidence in order to obtain a refund of funds paid to the state, including restitution payments. Id. at 1254-58. In Nelson, the defendants were initially convicted, but their sentences were later reversed, resulting in an acquittal on retrial as to one defendant and a declination to prosecute as to the other. Id. The state court had initially imposed costs, fees, and restitution on both defendants as part of their original sentences. The Supreme Court held that "once those convictions were erased, the presumption of their innocence was restored," and a state "may not presume a person, adjudged guilty of no crime, nonetheless guilty enough for monetary exactions," including costs, fees, and restitution. Id.

Nelson thus said nothing about the use of acquitted conduct during the sentencing of a duly convicted defendant. There is nothing in the case that worked a sea change in federal criminal practice. Rather, it stands for the common sense proposition that a person who is guilty

of no crime cannot be made to pay any kind of criminal penalty.  However, once a defendant is
convicted of a crime, this Court is permitted by statute and by the Guidelines to consider all of
the defendant's conduct—including acquitted conduct—in fashioning a sentence.  See 18 U.S.C.
§ 3661 ("No limitation shall be placed on the information concerning the background, character,
and conduct of a person convicted of an offense which a court of the United States may receive
and consider for the purpose of imposing an appropriate sentence"); U.S.S.G. § 1B1.3.  Nelson
did not cite Section 3661 or the Guidelines, much less purport to limit their coverage to exclude
acquitted conduct on constitutional grounds.  Nor did it overrule a long line of cases in the
Second Circuit, affirming the use of acquitted conduct at sentencing.  See, e.g., Vaughn, 430
F.3d at 527.  Consequently, this Court may consider Shkreli's conduct in connection with Count
Seven as relevant conduct for the purpose of sentencing.[7]

### 3. The Government Has Proven Shkreli's Guilt With Respect to Count Seven By a Preponderance of the Evidence

Based on the evidentiary record developed at the trials of both Shkreli and
Greebel, which spanned a total of 17 weeks, it is clear that the government has established by a
preponderance of the evidence that Shkreli was guilty of the wire fraud conspiracy charged in
Count Seven:  namely, that Shkreli and Greebel employed settlement and sham consulting
agreements to steal money and shares from Retrophin to repay defrauded MSMB investors.  The
government described the evidentiary support of Shkreli's guilt on Count Seven at great length
during its summations in both trials (see Tr. 5150-5316; Greebel Tr. 10216-10382), and the most
pertinent facts are set forth in the PSR.  (See PSR ¶¶ 21-35).[8]

In response, Shkreli contends that the government has failed to prove by a
preponderance that Shkreli acted with criminal intent when he entered into the settlement and
sham consulting agreements because (1) the agreements were a "business decision that Shkreli

---

[7] In a footnote, Shkreli contends that because "the extraordinary increase in the loss
amount based on acquitted conduct [related to Count Seven] would dramatically increase the
sentence," the Court should only consider such conduct if it has been proven by clear and
convincing evidence.  (Def. Let at 7-8, note 6).  To the contrary, the Second Circuit has expressly
rejected the argument that a higher standard of proof than preponderance should apply to any
fact to be established at sentencing (or that acquitted or relevant conduct should be disregarded)
due to the "potential for significant unfairness."  United States v. Cordoba-Murgas, 233 F.3d
704, 709 (2d Cir. 2002).

[8] Shkreli suggests that the Court "dismissed the backdating scheme during the Greebel
trial after finding that no crime was committed."  (Def. Let. at 8).  This is incorrect.  The Court
did not dismiss any portion of the government's case during the Greebel trial; rather, the
government stated that it would not argue in closing that the backdating of the share transfers
between Shkreli, Mulleady, Biestek and MSMB Capital in and of themselves defrauded
Retrophin, but only that the backdating (and subsequent false statements in the 13D form that
Shkreli filed with the SEC) were evidence in furtherance of the conspiracy charged in Count
Seven.  The government takes the same approach to the backdating evidence here.

made to save Retrophin, not defraud it" and (2) Shkreli relied on legal advice from Greebel when he entered into the agreements.  Both of these arguments are unavailing.[9]

   First, the evidence at both trials proves that Shkreli's decision to steal money and shares from Retrophin in order to repay defrauded MSMB investors was not a business decision necessary to save Retrophin.  As an initial matter, Shkreli had the ability to repay the defrauded MSMB investors with his own shares of Retrophin.  The records from the transfer agent show that Shkreli had 2,577,755 shares of Retrophin at the time that the reverse merger was completed on December 12, 2012—and that he still had those same 2,577,755 shares of Retrophin on January 15, 2014, after most of the settlement and consulting agreements had been finalized.  (GX 125-1).  Shkreli simply did not want to use his own shares or money to repay defrauded investors; he instead stole shares and money from Retrophin.  This is further evidenced by the fact that once the auditors discovered the settlement agreements and confirmed, as Shkreli and Greebel had known all along, that they were not the responsibility of Retrophin to pay, Shkreli agreed to enter into promissory notes to allegedly "repay" the amounts stolen from Retrophin knowing full well that he had no intention of doing so.  Rather, he and Greebel planned that they would have Retrophin write the notes off as "bad debt" so Shkreli would not have to dig into his pocket.  (GX 322).  It defies logic to conclude that Shkreli's actions in encumbering Retrophin with massive liabilities in its nascent stages that were in fact his personal responsibility, and then deliberately failing to repay those liabilities when caught, constituted a series of business decisions "in the best interest" of Retrophin.  Shkreli can also offer no reasonable explanation for why it was in Retrophin's best interest to pay the cash portion of the final settlement agreement with Schuyler Marshall, which was signed after the control memo setting forth the auditors' conclusion that such liabilities were not the responsibility of Retrophin; notably, Shkreli failed entirely to deliver to Marshall the shares he owed personally under the shares component that agreement.  (GXs 57-A, 57-B).  Nor is it clear how Retrophin benefitted from paying off additional MSMB investors in the guise of sham consulting agreements where the evidence at both trials demonstrated that such consultants did not perform any legitimate services for Retrophin.  Finally, and most significantly, if Shkreli and Greebel's decision to enter into the settlement and sham consulting agreements was a business decision designed to benefit the company, there was no reason to conceal—as they did—the existence and true purpose of the

---

[9] To the extent that Shkreli's argument that the Court should not consider his conduct on Count Seven is based on the notion that the jury must have believed in Shkreli's innocence and/or adopted his reliance-on-counsel defense, the government notes that public statements from jurors after the verdict was rendered suggest that the jury was actually convinced of Shkreli's guilt on Count Seven, but simply misunderstood the applicable legal standard.  In an article published in the Daily Beast on September 18, 2017, two jurors who had been interviewed discussed at length the jurors' confusion about the intent element of wire fraud conspiracy, and stated that they regretted having acquitted Shkreli of the wire fraud conspiracy counts, including Count Seven, after having a better understanding of the intent element of that crime.  See http://www.thedailybeast.com/witf-two-martin-shkreli-jurors-say-they-regret-letting-him-walk-on-top-charges.

settlement and sham consulting agreements from the Board of Directors, the company's auditors and the investing public.

Second, the evidence at both trials showed that Shkreli did not simply rely on Greebel's advice in entering into the settlement and sham consulting agreements at issue. Instead, as summarized in the government's summations at each trial, the evidence showed that Shkreli was a willing and active co-conspirator with Greebel and others to steal from Retrophin to pay back investors who had been defrauded by Shkreli. In fact, the evidence shows that Shkreli often directed Greebel to take certain actions in furtherance of the conspiracy, without any consultation with Greebel for legal advice. For example, Shkreli directed Greebel not to raise the issue of the Blanton consulting agreement at a March 2014 Board meeting (GX 343); Shkreli directed Greebel to pay the Sarah Hassan settlement agreement with funds taken from Retrophin (GX 285); Shkreli dictated how Greebel should handle requests from defrauded MSMB investors (GXs 295, 307, 309); and after the auditors discovered the settlement agreements, Shkreli directed Greebel to "FIX THE FUCKING ISSUE" because "THERE IS NO ISSUE" (GX 316) and to "be creative" in finding a solution that would continue to conceal their conspiracy. (GX 320). To the extent that Greebel occasionally appeared to warn Shkreli about the potential consequences of certain of his actions, Shkreli did not seek further advice from Greebel or follow his initial warning—for example, when Greebel advised Shkreli that he owed a duty of loyalty to Retrophin and it might be problematic for Shkreli to obtain stock at a below-market price, Shkreli's response was "F that." (GX 255).

Moreover, as noted above, in considering Shkreli's guilt regarding Count Seven, the jurors did not appear to credit Shkreli's reliance-on-counsel defense, but rather appeared confused about the intent element of wire fraud conspiracy. It is also significant that Shkreli advanced the same reliance-on-counsel defense on Count Eight and the jurors did not credit the defense there, even though the time period for the conduct for both counts was coterminous and Shkreli and Greebel had a consistent relationship throughout that period. And the jury's determination in the Greebel trial that Greebel was guilty of Count Seven does not, as Shkreli argues, indicate that the jury found that Greebel was a lone actor in defrauding Retrophin. To the contrary, Greebel's conviction on Count Seven makes clear that the jury found that Greebel conspired to defraud Retrophin with others—logically, the jury most likely concluded that at least one of Greebel's co-conspirators regarding Count Seven was Shkreli.

## III.    Conclusion

For the reasons set forth above, the government submits that the total loss amount that resulted from Shkreli's criminal conduct in connection with the four fraud schemes—defrauding MSMB Capital and MSMB Healthcare investors, stealing money and shares from Retrophin and manipulating the price and volume of Retrophin stock—for Guidelines purposes is more than $20 million, and that, when completing the final offense level calculation for

Guidelines purposes, the Court should increase Shkreli's offense level by 20 levels.  <u>See</u>
U.S.S.G. § 2B1.1(b)(1)(k).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:    <u> /s/                </u>
        Jacquelyn M. Kasulis
        Alixandra E. Smith
        G. Karthik Srinivasan
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    All counsel (via ECF)