# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN

ANDREA ZELLAN
JOSHUA D. KIRSHNER
JACOB KAPLAN
TENY R. GERAGOS
ADMITTED IN NY AND CA

MARK M. BAKER
OF COUNSEL

MARC AGNIFILO
OF COUNSEL
ADMITTED IN NY AND NJ

February 20, 2018

**VIA ECF**

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     **United States v. Martin Shkreli, Crim. No. 15-637 (KAM)**

Dear Judge Matsumoto:

  Martin Shkreli respectfully submits this reply in response to the government's February 16, 2018 letter addressing the loss amount in this case. (Dkt. No. 532). While Mr. Shkreli relies on the arguments contained in his original letter (Dkt. No. 527: Shkreli 2/9/18 Letter), we write now to briefly address several issues prior to the February 23, 2018 oral argument on this matter.

  Before discussing specific issues, however, we wish to address the government's oft-used criticism that Mr. Shkreli is seeking to "relitigate" the jury's verdict when the defense argues that there is no loss or forfeiture in this case. *See, e.g.*, Gov't 2/16/18 Letter at 2, 10; Dkt. 523, Government Forfeiture Reply at 2. Although Mr. Shkreli disagrees with the jury's guilty verdicts on Counts Three, Six and Eight, he still respects the jury's decision. The government, on the other hand, simply focuses on the convictions in this case and therefore assumes that the jury must have believed all the testimony and evidence in this case, no matter how incredible the testimony and evidence may have been.

  In reality, the jury, after careful deliberations lasting nearly five days, voted to unanimously acquit Mr. Shkreli on five out of eight counts. These acquittals are significant because three of these counts (Two, Five and Seven, charging either wire fraud or conspiracy to commit wire fraud) required the jury to find actual or intended deprivation of property as an element of the offense. Equally important, the jury only convicted Mr. Shkreli of the counts that did <u>not</u> require actual or intended deprivation of property. Thus, as argued in original letter addressing loss, the fact that the jury convicted Mr. Shkreli of these counts does not mean that the jury determined, or that this Court should determine, that Mr. Shkreli intended to deprive another of property or cause any pecuniary harm. Shkreli 2/9/18 Letter at 2, 5-6. We respectfully

**BRAFMAN & ASSOCIATES, P.C.**

submit that this Court should consider the entire verdict, not just the convictions, in deciding the loss and forfeiture amounts demanded by the government—the facts and verdict be damned.

I. **Counts Three and Six**

Mr. Shkreli relies on the arguments made in his original letter as to why this Court should find no loss amount for Counts Three and Six. Shkreli 2/9/18 Letter at 2-6. In its response, the government argues that Mr. Shkreli is not entitled to credits against loss for Count Three because MSMB Capital did not receive a redemption from Retrophin until January 2013. Gov't 2/16/18 Letter at 10. As argued in our original papers, MSMB Capital investors were already Retrophin shareholders months earlier as demonstrated by an April 30, 2012 balance sheet to investor Darren Blanton showing that MSMB Capital held $3,480,000 in Level III Securities, which is consistent with an interest of 75,000 shares at a $46.40 share valuation. Shkreli 2/9/18 Letter at 4. Moreover, Mr. Blanton testified that Mr. Shkreli told Mr. Blanton's attorney that these were Retrophin shares. Greebel Tr. 3630.

The government then argues that this argument is "preposterous" because Retrophin's capitalization tables do not include MSMB Capital's interest in Retrophin until December 2012. Gov't 2/16/18 Letter at 9-10. Whether or not the shares were or were not on the capitalization table is not dispositive. The fact is that Martin Shkreli, as CEO of Retrophin, had committed these 75,000 shares to MSMB Capital well before the January 2013 redemption. As such, the MSMB investors were entitled to these shares as well as any future redemption on these shares. Accordingly, any subsequent Retrophin payments to MSMB Capital investors were not to pay them back for a loss, but rather redemptions of the investors' Retrophin shares.

Thus, to the extent MSMB Capital investors were entitled to these shares before Jackson Su went to the SEC in June 2012 and before Blanton went to the SEC in September 2012, the value of these shares must be considered credits against loss because the investors received the shares before the offense was discovered by a victim or a government agency. *See* U.S.S.G. § 2B1.1 comment. (n.3(E)(i)) (a defendant's loss amount will be reduced by "the money returned, and the fair market value of the property returned and services rendered, by the defendant . . . to the victim before the offense was detected."). While the government argues that Caroline Stewart reported Mr. Shkreli's fraud to the SEC in 2011 (Gov't 2/16/18 Letter at 10), her SEC complaint involved a potential hostile takeover of an unrelated company and had nothing to do with the alleged frauds in this case. *See* 3500-CS-4. Moreover, Ms. Stewart acknowledged in her complaint that she did not "know if anything illegal has been done." *Id.*

II. **Count Seven**

A. *Nelson* Case

In its original letter to this Court addressing the loss amount, the defense argued, based on the Supreme Court's recent decision in *Nelson v. Colorado*, 137 S. Ct. 1249 (2017), that this Court should not include the acquitted conduct in Count Seven because "'[a]bsent a conviction of a crime, one is presumed innocent'" and that if "'Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions,'" the government

**BRAFMAN & ASSOCIATES, P.C.**

surely cannot find Mr. Shkreli guilty *enough*, despite his acquittal on Count Seven, to attempt to increase his sentencing range." Shkreli 2/9/18 Letter at 7 (quoting *Nelson*, 137 S. Ct. at 1252, 1257).

In its response, the government seeks to distinguish *Nelson* by arguing that the Supreme Court ruling said "nothing about the use of acquitted conduct during the sentencing of a duly convicted defendant" and that the case merely stood for the "common sense proposition that a person who is guilty of no crime cannot be made to pay any kind of criminal penalty." Gov't 2/16/18 Letter at 17-18. The *Nelson* Court's logic, however, applies equally in both scenarios. Mr. Shkreli, just like the *Nelson* defendants, is now cloaked in the presumption of innocence relating to the acquitted conduct in Count Seven. If this presumption of innocence prevents a state from retaining monetary penalties, it should certainly prevent the government from inflating the Guidelines, and therefore impacting Mr. Shkreli's sentence, through acquitted conduct.

Also, even as alleged, the so-called Retrophin scheme of Count Seven is independent from, and not a continuation of, the MSMB Capital Scheme (Counts One through Three), the MSMB Healthcare Scheme (Counts Four through Six) or the alleged securities fraud of Count Eight. The jury's verdict on Count Seven clearly means that the alleged Retrophin scheme has not been proven. There is nothing about the remainder of the jury's verdict that alters that basic fact. The *Nelson* case reminds us that criminal defendants are presumed innocent unless and until they are convicted by a jury. The *Nelson* decision therefore precludes the government from deeming Mr. Shkreli guilty of a crime for which he has been acquitted.

### B.   Intent to Defraud

Mr. Shkreli also argued in his original letter that this Court should not include Count Seven's acquitted conduct because of the weak evidence that Mr. Shkreli intended to defraud Retrophin as charged in Count Seven. Specifically, Mr. Shkreli argued that, regarding the settlement and consulting agreements, "the jury was presented with compelling evidence that entering these agreements was a business decision that Shkreli made to save Retrophin, not defraud it." Shkreli 2/9/18 Letter at 8-9.

The government argues in response that it was not a business decision because Mr. Shkreli had the ability to pay off the MSMB investors with his own Retrophin shares but instead used the company's shares. Gov't 2/16/18 Letter at 19. Whether Mr. Shkreli could have resolved the MSMB issues with his own shares is beside the point. Retrophin was facing the potential of having its CEO sued and being sued itself by MSMB investors. In fact, one MSMB investor, Lindsey Rosenwald, had his attorneys send a letter to Mr. Shkreli threatening to sue Mr. Shkreli, MSMB Capital and Retrophin. See Greebel Tr. at 3475-76. By settling with the MSMB investors, Retrophin was able to get a release and prevent devastating lawsuits. This is why it made business sense for Retrophin to enter into the settlement and consulting agreements.[1]

---

[1] The government seems to argue that the agreements with the MSMB investors could not have been a business decision because Retrophin's auditors concluded that the MSMB liabilities were not Retrophin's responsibility. Gov't 2/16/18 Letter at 19. This argument is unavailing because, as one of Retrophin's auditors, Sunil Jain, testified at Mr. Greebel's trial, the auditors were

3

**BRAFMAN & ASSOCIATES, P.C.**

### C.    Reliance on Counsel

In addition to the lack of evidence that Mr. Shkreli intended to defraud Retrophin in Count Seven, the defense also argued that this Court should not consider the acquitted conduct because Mr. Shkreli had a reliance on counsel defense to that count. Shkreli 2/9/18 Letter at 9-10. Specifically, during trial, defense counsel argued that Mr. Shkreli relied on Mr. Greebel, a respected attorney from a prominent law firm, before entering into the settlement and consulting agreements. Defense counsel further argued at trial that every testifying investor that entered into one of these agreements testified that they, or their attorneys, negotiated with Greebel before signing the agreement. The investors also testified that they relied on their attorneys that these agreements were legitimate and legal. Defense counsel argued to the jury that Mr. Shkreli did the exact same thing: he relied on his attorney before entering these agreements. *See* Shkreli 2/9/18 Letter at 9-10.

In response, the government argues that the jury did not credit Mr. Shkreli's reliance on counsel defense because the evidence established that "Shkreli was a willing and active co-conspirator with Greebel." Gov't 2/16/18 Letter at 20. In making this argument, the government relies on several email exchanges between Mr. Shkreli and Mr. Greebel. For example, the government relies on an email where Mr. Shkreli "directed Greebel not to raise the issue of the Blanton consulting agreement at a March 2014 Board meeting." Gov't 2/16/18 Letter at 20 (citing GX 343). This misleading characterization of the email implies that Mr. Shkreli was trying to hide the consulting agreement from the board. In truth, Mr. Shkreli merely told Mr. Greebel to raise it "another time" because the "board meeting [was] going too long." GX 343. Moreover, it makes little sense to believe that they were trying to hide the Blanton consulting agreement from the board when they had already provided the board with the Al Geller and Ken Banta consulting agreements six months earlier on September 9, 2013. GX 122-48.

The government also relies on emails where Mr. Shkreli "dictated" how Mr. Greebel should handle requests from defrauded MSMB investors, "directed" Mr. Greebel that Retrophin will pay Sarah Hassan's settlement agreement and "directed" Mr. Greebel to "be creative" in fixing the issues raised once the auditors discovered the settlement agreements. Gov't 2/16/18 Letter at 20. None of these emails, however, show that Mr. Shkreli was conspiring to defraud Retrophin with Mr. Greebel. Rather, these emails are consistent with Mr. Shkreli relying on Mr. Greebel's advice that these agreements are legal and simply "directing" how the legal agreement should be carried out.

The government further argues that it is unlikely the jury credited Mr. Shkreli's reliance on counsel defense for Count Seven because the jury rejected that defense for Count Eight and "the time period for the conduct for both counts was coterminous and Shkreli and Greebel had a

---

focused only on whether these agreements were properly accounted into the company's financial statements in accordance with generally accepted accounting principles. *See* Greebel Tr. at 5454; *see also id.* at 5442 (Mr. Jain testifying that he had no basis to believe that the agreements were improper). More importantly, even if Retrophin was not technically responsible for the MSMB liabilities, this would not have prevented the MSMB investors from suing Retrophin along with Mr. Shkreli.

4

**BRAFMAN & ASSOCIATES, P.C.**

consistent relationship throughout that period." Gov't 2/16/18 Letter at 20. This argument is meritless because the two counts involved remarkably different conduct. While the jury believed that Mr. Shkreli relied on Mr. Greebel's advice that the agreements were legal–just like the MSMB investors did before signing the same agreements–the jury may have believed that Mr. Shkreli did not have a basis to rely on Mr. Greebel's advice regarding the dispersement of the Fearnow shares. Furthermore, the government admitted an email at trial where Mr. Greebel advised Mr. Shkreli that Mr. Shkreli should not buy stock below market price because, as CEO, Mr. Shkreli has a duty of loyalty to Retrophin; in response, Mr. Shkreli said "f that." GX 255. To the extent this email related to the Fearnow shares in Count Eight, the jury may have relied on this email to find that Mr. Shkreli did not establish the necessary requirements for a reliance on counsel defense on that count.

Lastly, the government argues that the jury acquitted Mr. Shkreli of Count Seven because the jurors were confused about the intent element of wire fraud conspiracy and not because they credited his reliance on counsel defense. Gov't 2/16/18 Letter at 19 n.9, 20. To support its argument, the government relies on an interview that two Shkreli jurors gave anonymously to a reporter for The Daily Beast weeks after the verdict in which the jurors suggested that "the jury was actually convinced of Shkreli's guilt on Count Seven, but simply misunderstood the applicable legal standard." *Id.* at 19 n.9. This Court should reject the government's argument and The Daily Beast article because the Federal Rules of Evidence specifically prohibit a court from receiving evidence of a juror's statement on "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." *See* Fed. R. Evid. 606(b)(1). Furthermore, to the extent the two jurors state that they were "bull[ied]" into acquitting on Count Seven, this statement stands in direct contrast to the answers these jurors gave this Court when it polled the jury asking if the verdict sheet reflected each juror's verdict.

### III.  Count Eight

The government seeks to defend its baseless $4 million intended loss amount for Count Eight by arguing the Mr. Shkreli and his co-conspirators intended to cause a loss to the market "by artificially propping up the price of Retrophin shares." Gov't 2/16/18 Letter at 14. In doing so, the government relies on the oft-cited proposition that a court may use "'any method that is appropriate and practicable under the circumstances' to calculate loss." *Id.* (citing U.S.S.G. § 2B1.1, comment. (n.3(C))).

As argued in Mr. Shkreli's original letter on loss, the jury's conviction on Count Eight, finding that Mr. Shkreli and others conspired to control the price and volume of the stock, did not require a finding that Mr. Shkreli intended to cause loss to Retrophin's investors. Shkreli 2/9/18 Letter at 11. This is because the jury charge for that Count allowed the jury to find that Mr. Shkreli had the intent to defraud even if he did not intend to cause any pecuniary harm. Mr. Shkreli further argued that there was no basis to determine that Mr. Shkreli "purposely sought to inflict" pecuniary harm on the market because, after reviewing Retrophin's stock transfer records, it was evident that only 146 of the 3245 total stock transfers (including buying, selling and short selling) during the relevant timeframe involved members of the Count Eight

**BRAFMAN & ASSOCIATES, P.C.**

conspiracy and that 82 of the 146 transactions were sales, which *decreases* the price of a stock rather than inflate it. *Id.* at 11 (relying on GX 630 and 631).

In response, the government argues that the fact that the Count Eight co-conspirators only participated in 4.5% of Retrophin's stock transfers supports its argument that Shkreli intended to artificially inflate Retrophin's stock price. In making this argument, the government relies on expert witnesses who testified at the Greebel trial (and were not subject to cross-examination by Mr. Shkreli's attorneys) that those "seeking to maintain or prop up the price of a stock . . . would either hold the stock (making fewer shares available for sale and reducing the volume) or buy stock." Gov't 2/16/18 Letter at 16.

This argument fails for several reasons. First, it ignores the market reality that there are innocent reasons why a shareholder would keep his stock and not trade it on the market–most obviously, that the shareholder believes the stock price will increase and make him a profit. Under the government's theory, however, a shareholder's decision to hold a stock somehow "constitute[s] clear evidence" of an agreement to manipulate the market. Gov't 2/16/18 Letter at 16. Second, if the co-conspirators were trying to artificially inflate Retrophin's stock price by not trading their shares they would not have sold their shares at the same time. This is because, as one of the experts the government relies on testified, selling a stock typically causes the share price to decline. Greebel Tr. 8473. Moreover, this expert further testified that people would not sell the stock if they wanted the stock price to remain stable. Greebel Tr. 8490. Thus, the fact that the Count Eight conspirators were selling the stock (82/146 transactions) demonstrates that there were not holding onto the shares to artificially increase the share price.

Even assuming the evidence supported the government's argument that Mr. Shkreli intended a market loss, the PSR's loss calculation is still wrong. Under the government's theory, Mr. Shkreli intended to artificially inflated the share price above $3 because Retrophin needed to attract PIPE investors and "there is no logical reason why investors would be willing to pay $3.00/share in connection with the PIPEs if those same investors could buy the same common stock on the market for a far lower price." Gov't 2/16/18 Letter at 16. To determine the loss amount, the PSR calculates the difference between the average artificial high value of Retrophin stock between December 17, 2012 and February 28, 2013 ($5 per share) and the price that the private placement investors paid for the stock ($3 per share). PSR ¶ 43. Even if the government's theory is correct, the PSR erred in using $5.00 per share as the average artificial high price because the precise average Retrophin stock price between December 17, 2012 and February 12, 2013 (the date of the private placement) was only $3.96 per share. *See* GX 606. Thus, even if the Court rejects all of Mr. Shkreli's arguments relating to Count Eight (Shkreli 2/9/18 Letter at 10-12), the loss amount would only be $1.92 million (2 million shares multiplied by $.96).

## Brafman & Associates, P.C.

### IV.     Conclusion

For the reasons stated above and in our February 9, 2018 letter, this Court should reject the PSR's Guidelines loss calculation and find no loss enhancement amount as part of its Guidelines calculation in this case.

Respectfully submitted,

**Brafman & Associates, P.C.**
Benjamin Brafman
Marc Agnifilo
Andrea Zellan
Jacob Kaplan
Teny Geragos

cc:     AUSA Jacquelyn Kasulis (via ECF)
AUSA Alixandra Smith (via ECF)
AUSA Karthik Srinivasan (via ECF)
AUSA Claire Kedeshian (via ECF)