```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
```

UNITED STATES OF AMERICA                    **MEMORANDUM AND ORDER**

        - against -                          15-cr-637(KAM)


MARTIN SHKRELI,

            Defendant.

```
-----------------------------------X
```

**MATSUMOTO, United States District Judge:**

            On August 4, 2017, a jury convicted defendant Martin

Shkreli of two counts of Securities Fraud (Counts Three and Six)

and one count of Conspiracy to Commit Securities Fraud (Count

Eight).  (Verdict Sheet, ECF No. 305.)  Before the court is Mr.

Shkreli's motion for a judgment of acquittal, pursuant to

Federal Rule of Criminal Procedure 29 ("Rule 29").  (ECF No. 363

("Def Mem."); ECF No. 397 ("Gov. Mem."); ECF No. 419 ("Def.

Reply").)  On February 23, 2018, the court heard argument on

defendant's motion for a judgment of acquittal, and on the loss

amount in this case.  (*See* Defendant's Letter regarding loss

amount, ECF No. 527; Government's Letter regarding loss amount,

ECF No. 532; Defendant's Letter reply regarding loss amount, ECF

No. 534.)

            For the reasons set forth below, Mr. Shkreli's motion

for a judgment of acquittal is denied.  For purposes of

sentencing, the court will apply a loss amount of $2,998,000 on Count Three, $3,402,450 on Count Six, and $4,000,000 on Count Eight.

## Background

### I.   The Charges

The Superseding Indictment, filed on June 3, 2016, charged Mr. Shkreli with six counts of securities fraud, conspiracy to commit securities fraud, and conspiracy to commit wire fraud in relation to two hedge funds, MSMB Capital and MSMB Healthcare, and with conspiracy to commit wire fraud and conspiracy to commit securities fraud in relation to a pharmaceutical company known as Retrophin.[1]  (Superseding Indictment, ECF No. 60.)  The Superseding Indictment described the charged conduct as follows:

### A. Counts One through Three: the "MSMB Capital Scheme"

Count One charged Conspiracy to Commit Securities Fraud, in violation of Title 18, United States Code Section 371; Count Two charged Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code Section 1349; and Count Three

---

[1] The Superseding Indictment also charged Evan Greebel, Retrophin's outside counsel, with Count Seven, charging wire fraud conspiracy in relation to Retrophin, and Count Eight, charging securities fraud conspiracy in relation to Retrophin (*Id.*)  The defendants jointly moved for severance, and the court granted their motion on April 19, 2017.  (Order Granting Motions for Severance, ECF No. 198.)  On December 27, 2017, a jury found Mr. Greebel guilty on both Counts Seven and Eight.

charged Securities Fraud in violation of Title 15, United States Code Sections 78j(b) and 78ff.

These counts related to Mr. Shkreli's solicitation of, and communications with, investors in a hedge fund he founded, known as MSMB Capital.[2]  At trial, the government submitted evidence that Mr. Shkreli secured investments in the fund by misrepresenting, *inter alia*, the size of the fund, the nature of its investing approach, Mr. Shkreli's personal investing and educational background, and the extent of third-party oversight of the fund's operations.  The government also presented evidence that Mr. Shkreli induced or convinced investors to keep their money in MSMB Capital by circulating periodic performance reports to investors that materially misstated the value of their investments and the fund's performance.

**B. Counts Four through Six: the "MSMB Healthcare Scheme"**

The Superseding Indictment described the conduct charged in Counts Four through Six as the "MSMB Healthcare Scheme."  The government alleged that Mr. Shkreli founded MSMB Healthcare, also a hedge fund, after MSMB Capital lost almost all of its assets in February 2011.  The conduct charged in the MSMB Healthcare counts was similar to the conduct charged in the

---

[2] "MSMB" was named based on the initials of Martin Shkreli and the fund's co-founder, Marek Biestek, who later worked with Mr. Shkreli at Retrophin.  (Tr. 2750:1-19 (testimony of Mr. Richardson).)  The Superseding Indictment referred to Mr. Biestek as Co-Conspirator 1.

MSMB Capital counts:  that Mr. Shkreli solicited, secured and retained investments in his hedge fund based on material misrepresentations relating to various aspects of MSMB Healthcare's assets, performance, and structure.  Counts Four through Six respectively charged Conspiracy to Commit Securities Fraud, Conspiracy to Commit Wire Fraud, and Securities Fraud.

### C. Count Seven: the Retrophin Misappropriation Scheme

Mr. Shkreli founded Retrophin, a biopharmaceutical company, in the Spring of 2011.  In Count Seven, the Superseding Indictment charged Mr. Shkreli with a conspiracy to commit wire fraud, based on three theories: (1) that he caused Retrophin to transfer Retrophin shares to MSMB Capital even though MSMB Capital had not invested in Retrophin; (2) that he caused Retrophin to enter into, and pay for, settlement agreements with disgruntled MSMB Capital and MSMB Healthcare investors; and (3) that he caused Retrophin to enter into "sham" consulting agreements with disgruntled investors in MSMB Capital, MSMB Healthcare, and Elea Capital (a prior hedge fund founded by Mr. Shkreli) as a mechanism to settle liabilities the investors claim were owed to them by defendant or his MSMB and Elea Capital hedge funds.  With regard to the settlement and consulting agreements, the government argued that Mr. Shkreli had conspired with others, including Retrophin's outside counsel Evan Greebel, to cause Retrophin to pay off, with Retrophin

4

funds and shares, MSMB Capital and MSMB Healthcare investors who were trying to redeem their investments from the MSMB hedge funds.

### D. Count Eight: the Unrestricted Shares Scheme

In Count Eight, the Superseding Indictment charged Mr. Shkreli with Conspiracy to Commit Securities Fraud.  The Superseding Indictment charged, and the government asserted, that Mr. Shkreli entered into a conspiracy with Mr. Greebel and others, the purpose of which was to control the price and trading of Retrophin stock.  Specifically, the government asserted that when Mr. Shkreli caused Retrophin to go public by engaging in a "reverse merger" transaction with a shell company called Desert Gateway, he also conspired with Mr. Greebel and others to arrange for the distribution of free-trading shares in the new company to certain Retrophin employees and former employees of the MSMB funds.  The government then argued that Mr. Shkreli conspired with Mr. Greebel and others, in some cases successfully,  to exert control over the free-trading shares nominally held by these individuals, but did not disclose that control on a Form 13D filed with the Securities and Exchange Commission.

## II.  The Trial

After a two-and-a-half day jury selection, trial commenced with opening statements on June 28, 2017.  Over the

following five weeks, the government introduced voluminous documentary evidence, including emails, bank records, and transactional documents, and called as witnesses former MSMB Capital and MSMB Healthcare investors and employees, Retrophin employees and board members, accountants, and summary fact witnesses.  The government rested on July 27, 2017.  (Tr. 5149:19-20).  Mr. Shkreli did not present a case.  (*Id.* at 23-24.)  After summations, the court instructed the jury on July 28, 2017, and the jury began deliberations on July 31, 2017.

### A. The Verdict

The jury returned its verdict on August 4, 2017, after five days of deliberations.  Mr. Shkreli was convicted of Count Three, Securities Fraud in relation to MSMB Capital; Count Six, Securities Fraud in relation to MSMB Healthcare; and Count Eight, Conspiracy to Commit Securities Fraud in relation to Retrophin.  (ECF No. 305, Verdict, at 1-3.)  Mr. Shkreli was acquitted on Counts One, Two, Four, Five, and Seven.  (*Id.*)

### B. Evidence at Trial

The following summary is limited to the trial testimony and documentary evidence necessary to discuss issues raised in the defendant's Rule 29 motion.  The government called multiple witnesses not specifically discussed below, including the case agent, who introduced a number of significant

6

documents, including communications between Mr. Shkreli, Mr. Greebel and others.

Furthermore, in summarizing the evidence, the court is mindful that "[i]n reviewing a challenge to the sufficiency of the evidence underlying a guilty verdict [pursuant to Rule 29, the court] 'must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor.'" *United States v. Cain*, 671 F.3d 271, 302 (2d Cir. 2012) (quoting *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004)).

### *Sarah Hassan*

The government's first witness was Sarah Hassan, who made investments for herself and for her family's hedge fund, Dynagrow Capital.  (Tr. 912:1-3.)  Ms. Hassan is the daughter of Fred Hassan, a well-known executive in the pharmaceutical industry.  (Tr. 913:11-18.)  Ms. Hassan first heard of Mr. Shkreli in October 2010 through Brent Saunders, who, at the time, was the CEO of Bausch & Lomb, a health products company. Mr. Saunders had worked for Ms. Hassan's father, and had told Ms. Hassan that Mr. Shkreli was "a rising star in the hedge fund world" and was someone who could teach Ms. Hassan about investing in pharmaceuticals.  (Tr. 915:20-916:15.)  Mr. Saunders had also told Ms. Hassan about Mr. Shkreli's excellent investing returns.  (Tr. 917:11-17.)

Ms. Hassan met Mr. Shkreli for dinner on December 13, 2010, and they discussed MSMB Capital, Mr. Shkreli's hedge fund. (Tr. 919:23-920:4.)  Mr. Shkreli told Ms. Hassan that MSMB Capital had $40 to $50 million in assets under management ("AUM").  (Tr. 921:10-24.)  The government introduced a December 27, 2010 email thread between Ms. Hassan and Mr. Shkreli in which Ms. Hassan referenced their discussion and the $40 million fund size.  (GX 103-38.)  In his response, Mr. Shkreli did not dispute or correct that $40 million AUM figure.

In January 2011, Ms. Hassan invested $300,000 from her personal funds into MSMB Capital.  (Tr. 933:22-934:2-16.)  She explained that this investment represented approximately 30% of her net worth, a "quite significant" amount from her perspective.  (Tr. 940:24-941:2.)  The government introduced copies of Ms. Hassan's Private Placement Memorandum ("PPM"), the document describing the MSMB Capital investment.  (GX-5, GX 103-3.)  Ms. Hassan testified that, based on the PPM, she understood that MSMB Capital would make a mix of "long" and "short" investments, and that she believes it is "important to have a balance in a portfolio."  (Tr. 941:19-942:8.)  She testified that she recognized the risks of investing in a hedge fund, but, based on the representations made in the PPM, thought there would be "some diversification or offsetting investments" that would limit the risk of a total loss.  (Tr. 942:23-25.)  Based

8

on the PPM, Ms. Hassan testified that she understood the
management fee to be 1% paid quarterly based on AUM, plus 20%
net profits (Tr. 943:16-944:9.)  She also explained that, based
on the PPM, she believed that the auditors for the fund would be
a firm called Rothstein Kass, and that it is "important to have
a third party [or] independent party validate all of the
information" in the hedge fund's financial statements.  (Tr.
944:13-945:7.)

Ms. Hassan explained that there were "several" factors
that were important to her investment decision, including Mr.
Shkreli's purported investing returns and Mr. Shkreli's
representations that "he was managing a [$]40 to $50 million
fund", which Ms. Hassan considered a "really healthy fund size."
(Tr. 947:7-10.)  Ms. Hassan explained that from her perspective,
fund size is important to her investing decision because "[i]f
it's too small, you have a hard time . . . getting any movement
or momentum . . . if it's too big, it's hard to get solid
returns."  (Tr. 947:12-15.)

Ms. Hassan testified that following her investment in
MSMB Capital, she received periodic performance reports.  (*See*
GX 80-1 – GX 80-19 (performance reports sent from Mr. Shkreli to
Ms. Hassan).)  Mr. Shkreli initially emailed these reports on a
monthly basis, but then sent them only sporadically.  (Tr.
950:10-14.)  Ms. Hassan did not have any reason to question the

accuracy of these reports.  (Tr. 957:7-9.)  As an example of the performance reports, Ms. Hassan testified about her performance report for February 2011.  (GX 80-1.)  This report stated that MSMB Capital had returned 4.24% in February 2011, beating the performance of the S&P 500 index in that month.  (Tr. 953:1-2; GX 80-1.)  The report also claimed a 41.71% return since the inception of the fund, on November 1, 2009.  (Tr. 954:11-13; GX 80-1.)  Based on this email, Ms. Hassan believed that, in one month, she had earned over $24,000 on her $300,000 investment, which made her "fairly ecstatic."  (Tr. 955:4-8.)  She testified that she did not request redemption at this point, because "in a short time there was pretty healthy returns."  (Tr. 956:3-5.)

In April 2011, Mr. Shkreli also pitched Ms. Hassan on Retrophin, which she understood to be a pharmaceutical company. (Tr. 963:12-964:7.)  Ms. Hassan agreed to invest $150,000 from her family's investing fund, Dynagrow Capital.  (Tr. 962:17-963:18; 967:14-15; 972:9-11; GX 103-5 (email indicating the pitch meeting occurred in April 2011.)  At this time in 2011, she was not aware of "any other hedge funds" Shkreli was managing.  (Tr. 977:8-10.)  Ms. Hassan stated that Mr. Shkreli did not tell her that he had stopped trading stock in MSMB Capital in 2011, and explained that this news "would have been surprising, given that there was still such an interesting fluctuation in the returns."  (Tr. 980:1-2.)

10

On September 9, 2012, Ms. Hassan received two emails
from Mr. Shkreli.  The first was a "performance estimate" for
the month of June 2012, suggesting that Ms. Hassan had earned a
$135,000 return on her $300,000 investment in MSMB Capital.  (GX
80-19.)  Ms. Hassan was "thrilled" by this report because "[i]t
was a very significant return."  (Tr. 1003:21-24.)  Less than an
hour later, Mr. Shkreli sent an email indicating that he was
going to "wind down" the "hedge fund partnership with the goal
of completing the liquidation of the fund by November or
December 1, 2012."  (GX 103-13.)  The email stated that
investors would have the choice of redeeming their investment in
cash or in Retrophin shares, such that they would "either be a
Retrophin, LLC unit holder or cashed out by October 31, 2012."
(*Id.*)  Ms. Hassan was "pretty surprised" to receive the "wind
down" email given the positive returns.  (Tr. 1007:11-17.)

On September 28, 2012, Ms. Hassan emailed Mr. Shkreli
with a request to "liquidate [her] position and send the cash at
[her account number] at Bank of America."  (Tr. 1015:17-20; GX
103-14.)  She also indicated that following the return of her
funds, she would invest $100,000 in Retrophin.  (*Id.*)

Ms. Hassan did not receive her redemption in cash and,
in December 2012, began emailing with Mr. Shkreli to check on
the progress of redemption.  (GX 103-19.)  The government
presented Ms. Hassan's testimony regarding a series of emails

11

she exchanged with Mr. Shkreli, in which he admitted that there
was "no longer any cash at the fund level" but advised that she
could redeem her interest in Retrophin shares.  (GX 103-21.)
Several months later, in March 2013, Ms. Hassan and Mr. Shkreli
negotiated an agreement whereby Ms. Hassan would receive
$300,000 in cash and $200,000 in Retrophin stock.  (GX 103-23.)
After further email conversations, Ms. Hassan signed a
settlement agreement between Mr. Shkreli individually, Retrophin
Inc., MSMB Capital LLC, and other MSMB entities including MSMB
Healthcare LLC.  (GX 52.)  Pursuant to the agreement, she
received $400,000 in cash and 58,306 shares in Retrophin.  (Tr.
1047:3.)

### *Josiah Austin*

Josiah Austin, a former commercial banker and
investor, invested a total of $4.8 million into Elea Capital, a
hedge fund run by Mr. Shkreli, between 2006 and 2007.  (Tr.
1196:4-12.)  Mr. Austin testified that on one specific occasion,
at Mr. Shkreli's request, he had agreed to provide Mr. Shkreli
with $500,000 to cover a margin call related to trading in Elea
Capital, but also testified that he did not have a standing
agreement that he would cover losses for Mr. Shkreli.  (Tr.
1200:16-1202:16.)  On another occasion, in 2007, Elea could not
cover a margin call from Lehman Brothers, which sued Mr. Shkreli
and then Mr. Austin, for $2 million.  (Tr. 1216:21-1217:4.)  Mr.

Austin testified that Lehman Brothers sued him because it had "come to understand" that Austin would cover "any" of Mr. Shkreli's losses, but this was not true and he did not know how Lehman Brothers came to believe this. (Tr. 1217:19-1218:25.) Subsequent to the Lehman margin call and lawsuit, Mr. Shkreli revealed that he had lost Mr. Austin's entire investment in Elea. (Tr. 1219:5-1220:15.) Mr. Austin testified that he "still thought Martin was an intelligent, smart guy, but [] didn't particularly want to do any more business with him." (Tr. 1220:14-16.)

After his experience with Elea, Mr. Austin continued to receive Mr. Shkreli's recommendations on what stocks to purchase, and would occasionally act on those recommendations. (Tr. 1192:2-16.) Mr. Austin testified that he received investment ideas from a number of people, but ultimately made his own investment decisions, and that other than his investment in Elea Capital, Mr. Shkreli never had discretionary trading authority over Mr. Austin's money. (Tr. 1187:7-17; Tr. 1197:12-18.) Mr. Austin did not invest in MSMB Capital or in Retrophin. (Tr. 1222:12-1223:-23.)

***Steven Stitch***

In 2011, Steven Stitch was an employee of Merrill Lynch's electronic trading sales group. (Tr. 1493:9-16; 1495:11-1498:22.) Tillman Ward, a member of Merrill's research

13

sales group, introduced Mr. Stitch to Mr. Shkreli, and Mr.
Stitch met with Mr. Shkreli in April 2010. (*Id.*; GX 117-11
(email introduction).) Mr. Shkreli told Mr. Stitch that MSMB
Capital "had approximately $35 million under management" and was
"up 53 percent year-to-date". (Tr. 1499:9-17.) Mr. Shkreli
also sent Mr. Stitch an example of a performance estimate dated
April 29, 2010, which reported that MSMB Capital "returned
+58.86 percent since inception". (GX 117-1.) At the time,
Merrill Lynch was not trying to add prime brokerage clients with
under one hundred million dollars in assets, but Mr. Ward raised
the possibility of offering MSMB Capital a prime brokerage
account. (Tr. 1505:4-18.) At a meeting to discuss the fund in
August 2010, Mr. Shkreli "mentioned that the fund was growing"
and Mr. Stitch left with the impression that the fund had
"approximately $125 million in assets under management." (Tr.
1505:21-1506:14.) Although MSMB Capital did not become a prime
brokerage client of Merrill Lynch, it was an "execution client,"
so Merrill Lynch would execute certain trades placed by MSMB
Capital. (Tr. 1500:15-24; 1542:3.)

On February 1, 2011, Mr. Stitch testified that he was
at his office when he "noticed that MSMB Capital was trading in
a security [named] Orexigen, that they were trading in a large
size that increased throughout the day, and that they were
shorting the stock." (Tr. 1507:6-9.) Mr. Stitch explained that

14

shorting a stock meant trying to profit from a decline in the price of a stock. (Tr. 1508:24-1509:5.) He also explained that shorting a stock required borrowing a stock from one's prime broker in order to implement the short trade. (*Id.*) He was concerned because in order to short a small stock such as Orexigen (also known as OREX), which was seeing high trading volumes, MSMB Capital would need a "locate," or to obtain a commitment from its prime broker, Interactive Brokers, to set aside the quantity of shares required to implement the trade. He explained that because on that day Merrill Lynch "didn't have the ability to find any [OREX] stock to lend" to its own prime brokerage clients, he wanted reassurance that Mr. Shkreli had, in fact, been able to get a "locate" for MSMB Capital from Interactive Brokers. (Tr. 1510:1-4.) Mr. Shkreli told Mr. Stitch that MSMB Capital had a "locate" on the stock.[3] (Tr. 1511:10-12.)

Over the course of the day, Mr. Shkreli made "hundreds of trades" of over 60 million shares of OREX, and then asked for a commission rate reduction from Merrill Lynch, which charges commissions on a per trade basis at a per-share rate. (1513:4-1514:10; GX 117-2 (February 1, 2011 email from Martin Shkreli

---

[3] The jury was instructed that evidence of any misrepresentations made by Mr. Shkreli in the course of the OREX trade was offered only for the "limited purpose of providing the background of the OREX trade," and that "the OREX trade is not charged as a crime in this case." (Tr. 1511:23-1512:6.)

requesting "a special exception for very high volume commission
on a small priced stock.").)  On a call on February 2, 2011 to
discuss the commission rate, Mr. Stitch testified that Mr.
Shkreli stated that he "could not pay for the trade."  (Tr.
1519:5-9.)  According to Mr. Stitch, on a second call on
February 2nd, Mr. Shkreli claimed that the trade was the result
of some "system issues," that it was a "mistake," and then
apologized to Mr. Stich for "putting [Mr. Stitch] in this
position," while also stating that "he knew people, that he
would try to find ways to pay [Merrill Lynch] back," and that
"it would not be wise to go to legal proceedings to try to get
this back or to make anybody aware of it."  (Tr. 1520:5-11.)
Mr. Stitch interpreted this as a threat by Mr. Shkreli.  (Tr.
1521:15-18.)

     Mr. Stitch testified that Merrill Lynch had to buy
OREX stock to cover Mr. Shkreli's trade, resulting in a loss of
over $7 million.  (Tr. 1522:9-16.)  After an arbitration between
Merrill Lynch and MSMSB Capital and Mr. Shkreli, Mr. Shkreli
arranged for payment of $1.3 million in settlement of Merrill
Lynch's claim.  (Tr. 1522:19-1523:2.)

**Darren Blanton**

     Darren Blanton is a Dallas, Texas based investor, who
invests through an entity known as Colt Ventures.  (Tr. 1548:15-
21.)  Tillman Ward, the Merrill Lynch employee, introduced Mr.

Blanton to Mr. Shkreli.  (Tr. 1551:5-12.)  Mr. Shkreli told
Blanton that MSMB Capital had "approximately $35 million under
management."  (Tr. 1552:10-13.)

In December 2010, Mr. Shkreli travelled to Dallas,
where he met with a number of local investors, including Mr.
Blanton and future MSMB Capital investors Schuyler Marshall and
John Neill.  (Tr. 1561:6-1563:22; GX 105-37).  On December 2,
2010, Mr. Blanton asked Mr. Shkreli to provide the name of the
fund's auditor, administrator, and AUM.  (GX 105-3; Tr. 1566:16-
20.)  Mr. Shkreli responded on the same day, stating in the
email that the firm's auditor was Rothstein Kass, the
administrator was NAV consulting, the firm's lawyer was
McCormick and O'Brien, and the firm's AUM was $35 million.  (Tr.
1567:7-8; GX 105-3.)  Mr. Blanton explained that a fund
administrator "keep[s] the fund accountable to investors and
they're another set of eyes on the money," and that AUM was
important to his investment decision because "it's a sign that
other investors have done due diligence and that they have
committed money to the fund," and that the firm has enough money
to pay its employees and operate on an ongoing basis.  (Tr.
1568:3-5, 15-17, 1568:23-1569:5.)  Mr. Shkreli also sent Mr.
Blanton a slide deck about MSMB Capital, which also listed
Rothstein Kass as the accountant and auditor and NAV Consulting
as the administrator.  (GX 105-1.)  Mr. Blanton invested $1.25

17

in MSMB Capital in two investments:  $1 million on December
2010, and $250,000 in January 2011.  (Tr. 1584:2-11.)

Mr. Blanton testified that Mr. Shkreli represented to
him that he had assets under management from Josiah Austin, and
that Mr. Austin paid Mr. Shkreli to manage his money.  (Tr.
1570:1; 1862:4-11.)  Mr. Blanton also recalled that Mr. Shkreli
claimed to have "graduated very young from Columbia."  (Tr.
1583:8-9.)  Mr. Shkreli disclosed the OREX trade to Mr. Blanton,
in part, but claimed that it was a "fat finger" trading error -
"where you push sell but meant to push buy."  (Tr. 1587:25-
1588:8.)  Mr. Shkreli told Mr. Blanton that the trade "could
cause the fund to lose a lot of its money".  (Tr. 1588:7-8.)

Mr. Blanton received sporadic performance reports from
Mr. Shkreli.  (Tr. 1586:25; see GX 79-1 through 79-3.)  For
example, the April 10, 2011 performance report for March 2011
reported that "that MSMB has returned 6.7 percent in March 2011"
and that Mr. Blanton's investment of $1.25 million had a net
asset value of $1,324,905.  (Tr. 1589:8-1590:4; GX 79-2.)  Based
on the March 2011 performance report, Mr. Blanton came to
believe that notwithstanding the OREX trade, "everything was
okay, at least at [the time of the performance report]."  (Tr.
1590:8-10.)

In the summer and fall of 2011, after "questioning
some of the trades and . . . the performance of the fund," Mr.

18

Blanton learned that Rothstein Kass and NAV Consulting were not actually the auditors and administrators of the fund.  (Tr. 1601:8-1602:8.)  Mr. Blanton had several conversations regarding redeeming his funds with Mr. Shkreli, and made a formal request for redemption on November 17, 2011.  (GX 105-6; Tr. 1604:4-24.) He did not receive the funds by the date he requested, November 30, 2011.  (Tr. 1605:14-17).  Mr. Blanton stated that it was difficult to get in touch with Mr. Shkreli (Tr. 1606:4-6), and the government introduced multiple emails between Mr. Shkreli and Mr. Blanton and his staff, and Mr. Blanton relating to Mr. Blanton's redemption request and attempts to receive payment. (*See* GX 105-8 through 105-12; GX 105-40).  Mr. Shkreli remitted partial redemption payments to Mr. Blanton starting in February 2012, and blamed banking transfer limits for the pace of redemption.  (Tr. 1623:13-18.)  By April 2012 Mr. Shkreli had sent Mr. Blanton $200,000, and had invested $300,000 of Mr. Blanton's money into Retrophin.  (Tr. 1629:13-22; 1631:23-1632:4.)

On June 27, 2012, Mr. Shkreli sent Mr. Blanton a document stating that MSMB Capital would suspend withdrawals. (GX 105-13.)  Mr. Blanton hired a lawyer, who asked for a review of the fund's books and records.  Through this lawyer, Mr. Blanton received a list of the limited partners and how much money they had invested.  (Tr. 1635:25-1636:1; GX 105-15.)  The

document listed only seven other investors: Lindsay Rosenwald ($100,000 on October 30, 2009); Steven Richardson ($200,000 on October 30, 2009, $100,000 on February 9, 2010, and $100,000 on February 22, 2010); Edmund Sullivan ($30,000 on October 30, 2009); Brent Saunders ($150,000 on August 13, 2010 and $100,000 on January 12, 2010); Dynagrow Capital ($300,000 on January 17, 2011); Schuyler Marshall ($200,000 on January 27, 2011); and John Neill ($500,000 on January 28, 2011. (GX 105-15; Tr. 1636:24-1637:9.) Mr. Blanton was surprised to see that he was the biggest investor in MSMB Capital, and that the fund did not have $35 million in AUM. (Tr. 1637:10-17.) He contacted and provided the SEC with documents he had been given. (Tr. 1640:1-17.)

Eventually, following months of communication with Mr. Shkreli, Mr. Blanton received 160,318 shares in Retrophin on February 19, 2013.[4] (GX 105-23.) Then, following more than a year of sporadic discussions about additional redemption payments (including through an "option agreement" or a "settlement agreement" with Retrophin), Mr. Blanton entered into a consulting agreement with Retrophin on March 6, 2014, which provided him with 200,000 shares of Retrophin stock in exchange for "consulting services on strategic and corporate governance

---

[4] The stock certificate was for shares of Desert Gateway, the shell company used in the reverse merger. Following the merger, Desert Gateway became Retrophin.

matters." (Tr. 1678:1-5; GX 61 (consulting agreement); *see* Tr. 1661:23-1677:25 (describing discussions and negotiations over repayment).) Mr. Blanton testified that he entered into the agreement with Retrophin to "get the remainder of [his] investment out of MSMB Capital." (Tr. 1681:7-13.) Mr. Blanton testified that with regard to the services he provided Retrophin, he did not do anything that he would not have done for any other investment. (Tr. 1683:23-1684:1.)

### *Lindsay Rosenwald*

Dr. Lindsay Rosenwald, trained as a medical doctor, is a biotechnology investor who invested in MSMB Capital. (Tr. 1928:3-1930:16.) Mr. Shkreli solicited an investment from Dr. Rosenwald on September 7, 2009 (GX 101-1), claiming that the fund would request "small" contributions from limited partners, in the range of $100,000 to $500,000, but would "probably take more from" Josiah Austin. (*Id.*; Tr. 1936:4-19.) Dr. Rosenwald knew of Mr. Austin as a "big investor" who "invests a lot in biotech." (Tr. at 1936:23-25.) In an October 15, 2009 email, Mr. Shkreli claimed that MSMB had $3 million in assets, and had a $250,000 minimum investment. (GX 101-2.) Dr. Rosenwald agreed to invest $100,000 on October 27, 2009. (GX 21; Tr. 1954:11-25.)

On direct examination, Dr. Rosenwald testified about his MSMB Capital PPM. (GX 1B.) Dr. Rosenwald explained that

several of the purported features of the fund were important to his investing decision: first, the fact that the fund permitted redemption in cash on short notice, because it showed that the fund was "highly liquid" (Tr. 1942:16); second that the fund had accountants and auditors, which Dr. Rosenwald explained were "standard in the industry," (GX1-B at LR00119; Tr. 1943:19-1944:18 (stating that he would not have made the investment if the fund did not have an auditor); Tr. 1952:20-21); and third, that the firm had legal counsel (identified as Cobb & Associates), because in Dr. Rosenwald's experience "everybody in the hedge fund business has lawyers to keep everybody doing things legally". (Tr. 1945:15-24.)

Dr. Rosenwald received performance reports from Mr. Shkreli. (*See* GX 76-1 through 76-26.) For example, the February 2011 performance report stated that his $100,000 investment was worth $135,008. (GX 76-16.) Dr. Rosenwald testified that these reports were important to his continued investment in MSMB Capital. (Tr. 1957:7-10.)

Like Ms. Hassan, Dr. Rosenwald received the "wind down" email on September 9, 2012, in which Mr. Shkreli stated that he was planning to "wind down [the] hedge fund partnerships with a goal of completing the liquidation of the funds by November or December 1, 2012." (GX 101-11.) Dr. Rosenwald requested cash, but instead received a stock certificate in

22

Desert Gateway.  (1979:20-1980:8.)  After further communication,
Dr. Rosenwald turned the matter over to his legal counsel and
CFO.  Dr. Rosenwald reached a settlement on March 13, 2013 with
Mr. Shkreli, MSMB Capital, and Retrophin.  (Tr. 1981:24-1982:8;
GX 51 (settlement agreement).)  Pursuant to the settlement
agreement, Dr. Rosenwald received 80,000 shares of free trading
Retrophin common stock.  (Tr. 1983:21-23; GX 51.)

**Jackson Su**

Jackson Su started as chief operating officer of MSMB
"and all its entities" on January 4, 2012.  (Tr. 2123:1-2124:6.)
After he started working for Mr. Shkreli, he learned that there
were "a lot of entities under MSMB," including "MSMB Healthcare,
MSMB Isotope, MSMB Consumer, and Retrophin LLC."  (Tr. 2124:10-
13.)  Mr. Su's understanding was that Retrophin was "incubated
by MSMB Healthcare."  (Tr. 2124:20-23.)  Mr. Su was not
initially aware of MSMB Capital, but came to understand that
"several people had cross duties" between Retrophin and MSMB
Capital.  (Tr. 2124:14-16; 2135:11-12.)

Mr. Su testified that he was told during his interview
that MSMB Healthcare had an AUM of "$70 million," but that after
he started the AUM would be described as $70 million or $100
million "depending on who was speaking, Martin [Shkreli] or

Kevin [Mulleady]."[5]  (Tr. 2131:11-17.)  He heard Mr. Mulleady "t[ell] people that the fund had $100 million in assets" and that it "was up 30 percent."  (Tr. 2153:3-18.)

Mr. Su recalled hearing Mr. Mulleady pitch MSMB Healthcare to an investor named Michael Lavelle, who was Mr. Mulleady's cousin.  (Tr. 2153:20-25.)  Mr. Su recalled that in January or February 2012, Retrophin was "pursuing a license with a larger pharmaceutical company and []needed the funds to pay for that license."  (Tr. 2154:5-13.)  Mr. Lavelle made a "sizeable" investment into MSMB Healthcare at that time, and, thereafter, on February 1, 2012, MSMB Healthcare apparently made a $900,000 equity investment into Retrophin in order to enable Retrophin to pay for the license.  (Tr. 2154:3-2156:14; Tr. 2168:1-14 (testimony that Government Exhibit 119-4 reflected the $900,000 February 1, 2012 equity investment from MSMB Healthcare into Retrophin); GX 119-4 (February 16, 2012 capitalization table).)  Mr. Lavelle's subscription agreement for his $850,000 MSMB Healthcare investment, and the Retrophin capitalization table, also memorialized the sequence of these transactions. (Tr. 2168:2-8; GX 119-10 (Retrophin capitalization table

---

[5] Although the jury acquitted Mr. Shkreli of the MSMB Capital and MSMB Healthcare-related conspiracy counts (that is, Counts One, Two, Four, and Five) the communications between Mr. Shkreli and Mr. Mulleady, an alleged co-conspirator, and Mr. Mulleady's communications with investors, provide important background and corroboration of the government's evidence against Mr. Shkreli for Counts Three and Six.

reflecting the MSMB Healthcare equity investment for preferred units).)

In November 2012, Mr. Shkreli "dropped off" a promissory note on Mr. Su's desk. (Tr. 2199:21-2200:1). Mr. Su had not seen the note before, but it purported to be a February 1, 2012 $900,000 promissory note to MSMB Healthcare from Retrophin. (Tr. 2200:2-12; GX 119-36.) Mr. Su described the effect of the note as "MSMB loaned $900,000 to Retrophin and the note says that Retrophin has to pay MSMB Healthcare back the $900,000, plus interest." (Tr. 2200:19-21.) In Retrophin capitalization tables, between November and December 2012, the $900,000 February 2012 equity investment from MSMB Healthcare into Retrophin "disappeared". (Tr. 2206:3-4.)

Mr. Su also discussed testified regarding specific freely-tradable Desert Gateway/Retrophin shares, which were known as the "Fearnow" shares. These shares were so named because the last name of "[t]he gentleman that had control of the [Desert Gateway] shell at the time" was Fearnow. (Tr. 2236:7-8.) Mr. Su explained that there were two-and-a-half million freely trading Fearnow shares. (Tr. 2236:3-5.) According to Mr. Su, after the reverse merger with Desert Gateway, some of the Fearnow shares were "distributed amongst individuals that Martin chose." (Tr. 2237:1-4.) Mr. Su identified the seven Fearnow share recipients as Kevin Mulleady,

25

Thomas Fernandez, Marek Biestek, Timothy Pierotti, Claridge
Capital LLC, Andrew Vaino, and Edmund Sullivan (together, the
"Fearnow shareholders").  (2239:11-21.)  Claridge Capital LLC
was controlled by an individual named Ron Tilles, a fund-raiser
for both MSMB and Retrophin, and Edmund Sullivan was a "friend
of Martin Shkreli."  (Tr. 2239:11-2240:13; *see* GX 119-35.)

### Schulyer Marshall

Schuyler Marshall, formerly CEO and now Chairman of
the Board of the Rosewood Corporation, met Mr. Shkreli for the
first time in the summer of 2010 after being introduced by
Darren Blanton.  (Tr. 2425:4-2426:18.)  On January 2, 2011, Mr.
Marshall invested $200,000 into MSMB Capital through his
personal IRA.  (Tr. 2434:10; 2439:22; GX 25.)  Among the factors
that Mr. Marshall identified as influencing his decision to
invest was the MSMB Capital fund's requirement of only 30 days'
notice for redemptions and the representation that Rothstein
Kass, which Mr. Marshall knew to be "a well-regarded,
independent CPA firm," was MSMB Capital's independent auditor.
(Tr. 2432:5-11 (referencing GX 6); 2433:2-6).)

Mr. Shkreli sent Mr. Marshall performance reports on a
periodic basis.  (*See* GX 81-1 - 81-8.)  In addition, Mr.
Marshall spoke to Mr. Shkreli about the fund's performance.
(Tr. 2443:1-5.)  Mr. Marshall testified that he did not attempt
to redeem his investment before September 2012 because, based on

26

the performance reports, his investment was performing as he had hoped. (Tr. 2443:11.)

On September 10, 2012, Mr. Shkreli sent Mr. Marshall the same "wind down" email he sent to Ms. Hassan and Dr. Rosenwald. (GX 109-9.) At the time, based on Mr. Shkreli's performance reports, Mr. Marshall believed that the value of his $200,000 investment in MSMB Capital had grown to approximately $282,000. (Tr. 2449:3-4.) For "pretty much the whole spring of 2013," Mr. Marshall attempted to redeem his investment. (Tr. 2449:9.) Mr. Marshall communicated to Mr. Shkreli that he "wanted to get the cash back in [Mr. Marshall's] IRA" because Mr. Shkreli "had represented[] that they would be distributing cash." (Tr. 2449:14-18.) Mr. Shkreli would respond intermittently, claiming that he was busy. (Tr. 2449:24.)

At some time in the spring of 2013, Mr. Marshall received a share certificate for 37,809 shares in Retrophin, although he had not requested any such distribution. (2450:12-21.) Between February and April 2013, Mr. Marshall and Mr. Shkreli exchanged emails regarding redemption. (GX 104-4.) Among other things, Mr. Shkreli claimed that MSMB Capital had invested in Retrophin, but "the value of Retrophin did fall from when MSMB invested in it." (*Id.*) Nevertheless, Mr. Shkreli promised to give Mr. Marshall the "$265k of value that you deserve". (*Id.*) On June 24, 2013, following discussions of a

27

potential settlement and "further delay", Mr. Marshall emailed
Mr. Greebel, indicating that he was still willing to pursue
settlement but requesting the "preservation of documents"
related to his investment in MSMB Capital and Mr. Shkreli's
investment in Desert Gateway/Retrophin. (2462:7-2463:24; GX
104-7.) After additional discussions, on August 29, 2013, Mr.
Marshall entered into two agreements: one between Mr. Marshall
and MSMB entities, including MSMB Capital LP and MSMB Healthcare
LP, for 6,300 shares of Retrophin stock, and the other between
Mr. Marshall and Retrophin, for $300,000. (GX 57A, 57B.) Mr.
Marshall received the $300,000, but never received the 6,300
Retrophin shares. (Tr. 2472:1-4.)

### Steven Richardson

Steven Richardson, a former human resources executive
at American Express, invested in both MSMB Capital and
Retrophin, and eventually became Chairman of the Board of
Retrophin. After meeting Mr. Shkreli at a party, Mr. Richardson
invested $200,000 in MSMB Capital at the end of October 2009.
(Tr. 2766:4-9.) Among the factors that appealed to Mr.
Richardson was that Mr. Shkreli represented that MSMB Capital
was a highly liquid fund, which Mr. Richardson thought important
because it enabled the fund to be "very nimble." (Tr. 2759:5).
Mr. Richardson also noted that the engagement of outside counsel
and auditors named in the MSMB Capital PPM was an "important

28

factor" in his investment in MSMB Capital because it
demonstrated the "rigor" with which Mr. Shkreli and Mr. Biestek
were managing the fund.  (Tr. 2765:9-17.)

Mr. Richardson became friendly with Mr. Shkreli, and
they discussed the similarities in their backgrounds.  Among
other things, Mr. Shkreli told Mr. Richardson that he had not
finished college.  (Tr. 2784:3-8.)  Mr. Richardson made an
additional investment of $200,000 in MSMB Capital in February
2010.  (Tr. 2777:5-2780:3.)

Mr. Richardson also invested in Retrophin.  He began
to discuss the idea of a pharmaceutical company with Mr. Shkreli
at the end of 2010 and, in March 2011, Mr. Shkreli sent Mr.
Richardson a presentation concerning a pharmaceutical company
called Retrophin, Inc., of which Mr. Shkreli was listed as
interim CEO.  (Tr. 2805:15-2807:9; GX 122-6.)  On April 19,
2011, Mr. Richardson invested $50,000 into Retrophin, and in the
same time period also agreed to convert $50,000 of his
investment in MSMB Capital into an investment into Retrophin.
(Tr. 2811:5; GX 122-8.)  Mr. Richardson also joined the board of
directors of Retrophin.  (Tr. 2812:12-16.)

As an MSMB Capital investor, Mr. Richardson received
performance reports from Mr. Shkreli.  (*See* GX 77-1 through 77-
25.)  Based on the emailed performance reports, by May 2012, Mr.
Richardson believed that his $400,000 investment in MSMB Capital

was worth $583,482.[6]  (Tr. 2830:14-19; *see* GX 77-25 (May 2012 performance report reflecting an account value of $583,482).) On June 14, 2012, Mr. Richardson agreed to exchange his entire investment in MSMB Capital for units in Retrophin.  The documentation of the exchange agreement reflected that Mr. Richardson was exchanging his interest in MSMB Capital for 14,631 units of Retrophin.  (GX 122-24.)

In March 2013, in connection with his submission of a Form 4 to the Securities and Exchange Commission, Mr. Richardson asked Mr. Shkreli about his total holdings in Retrophin.  (GX 122-97.)  Based on Mr. Shkreli's verbal commitments and the Retrophin capitalization table, Mr. Richardson believed that he would be given approximately five percent of the post-merger Retrophin company stock.  (Tr. 2883:17-19.)  Following an email discussion with Mr. Shkreli, Mr. Richardson became concerned with Mr. Shkreli's description of Mr. Richardson's holdings in Retrophin.   (Tr. 2890:20-2892:5 GX 122-41.)  After further discussion, Mr. Shkreli agreed to give some of his Retrophin shares to Mr. Richardson to "top up" Mr. Richardson's holdings. (Tr. 2902:12-14; 2903:18-19.)

Following a February 2014 Retrophin Board meeting at the Norwood Club in Manhattan, Mr. Richardson raised several

---

[6] This amount purported to include the value of the $50,000 MSMB Capital investment Mr. Richardson had converted into units of Retrophin.  (GX 77-25.)

issues with Mr. Shkreli regarding his conduct that the board
members had previously discussed amongst themselves.  The issues
included Mr. Shkreli's treatment of subordinates, specifically
Horatio Plotkin, MD, the company's Chief Medical Research
Officer; Mr. Shkreli's Twitter practices; and Mr. Shkreli's use
of the Retrophin business development group to engage in stock
trading.  (Tr. 2937:7-2943:10).  After speaking with Mr. Shkreli
about these issues, Mr. Richardson testified that he believed
Mr. Shkreli understood the board's position, and Mr. Shkreli
specifically agreed to limit his trading using company money.

        Mr. Richardson testified that by September 2014, Mr.
Shkreli was losing support of the board.  Mr. Shkreli had
continued to permit the business development group to conduct
trading, and had even put a commission structure in place,
contrary to what he had told the board.  (Tr. 2967:10-17.)  At a
dinner in mid-September, however, Mr. Shkreli denied that this
was the case.  Mr. Richardson's perception was that Mr. Shkreli
was "lying" about the trading operations.  (Tr. 2968:1.)
Stephen Aselage, who had previously stepped down as Retrophin
CEO and was, at the time a member of the board, agreed to the
board's request that he serve as interim CEO, though the board
agreed that Mr. Shkreli should serve on the board in an advisory
capacity.  (Tr. 2969:15-16.)

On September 29, 2014, Mr. Shkreli, Mr. Aselage, and
Mr. Richardson met at Mr. Shkreli's office, and Mr. Richardson,
as chairman of the company, explained that they wanted Mr.
Shkreli to step down as CEO.  He articulated three reasons:
first, Mr. Shkreli's "blatant[]" disregard of the Board's
directions to limit trading by the business development group;
second, that Mr. Shkreli had impermissibly traded in Retrophin
stock outside of the permitted trading periods[7]; and third, he
had issued stock grants to new employees without keeping track,
with the result that he had exceeded the available pool of stock
for employees.  (Tr. 2971:2-9; 2977:6-12.)

**David Geller**

David Geller, who invested $200,000 in MSMB
Healthcare, testified on July 12 and 13, 2017.  Alan Geller, Mr.
Geller's brother, introduced him to Mr. Shkreli in the
"beginning of 2011."  (Tr. 3095:20-23; 3115:6-9)  Mr. Geller
explained that his prior experience investing in illiquid
investments and hedge funds was not positive, and as a result he
wanted a "liquid fund" with "[l]ow volatility"; based on
representations in the PPM and his discussions with Mr. Shkreli,
he felt that MSMB Healthcare fit that description, as it was a
"long/short balanced fund" which had a 30-day redemption notice

---

[7] The jury was instructed that Mr. Shkreli was not charged with
any offenses relating to this trading in Retrophin stock.
2977:2-4.

period.  (Tr. 3094:10-3095:23; 3097:2-3098:22; 3109:4-12.)  It was also essential to his investment that the fund had an auditor and certified public accountant.  (Tr. 3110:25-3111:1.)

Mr. Geller received investor statements and relied on these statements to keep track of his investments in MSMB Healthcare.  (Tr. 3118:5-7.)  The September 2011 statement, which Mr. Geller received on October 27, 2011, showed that his balance was $210,354, a return of $10,354 since his investment on June 29, 2011.  (GX 91-2; Tr. 3116:2; 3119:7-14.)

On October 31, 2011, Mr. Geller received an email from NAV Consulting including "an important notice from the fund" and "a materially revised PPM."  (GX 109-6; GX 11B.)  A letter attached to the email explained that MSMB Healthcare had "expanded its disclosure regarding its ability and intent to invest in illiquid securities including venture capital, private equity limited partnerships and other hedge funds" and that "[i]f you disagree with these changes, we will facilitate your redemption within our standard parameters."  (GX 109-6; Tr. 3124:11-18.)  Mr. Geller had a "[v]ery negative reaction" to this letter, because it was "[i]nconsistent" with his investment objectives.  (Tr. 3125:8-14.)

On November 30, 2011, Mr. Geller received a performance report for October 2011, indicating that his balance was $199,938.  (GX 91-3; Tr. 3120:3-8.)  This performance report

33

stated in a footnote that "MSMB Healthcare, LP has accepted the transfer of 30,000 investment units consisting of Class A common units of Retrophin, LLC, a Delaware limited liability company focused on developing biopharmaceutical products . . . as a gift." (GX 91-3.)

On January 24, 2012, Mr. Geller wrote an email to Mr. Shkreli and Mr. Mulleady asking to redeem his investment, because his "portfolio already has too much private equity and illiquid components in it." (GX 109-7; Tr. 3126:14-19.) Mr. Geller then had a conversation with Mr. Shkreli, and recalled that Mr. Shkreli claimed that the private securities at issue would be a "small part of the portfolio and . . . wouldn't really affect anything." (Tr. 3291:16-20.) This conversation had a "big influence" on Mr. Geller's decision not to continue to seek redemption at the time. (Tr. 3295:19.)

On September 10, 2012, Mr. Shkreli sent an email announcing that he had "decided to wind down our hedge fund partnerships with a goal of completing the liquidation of the funds by Nov or December 1st, 2012." (Tr. 3142:23-3143:4; GX 109-9.) The email stated that "[i]nvestors will have their limited partnership interests redeemed by the fund for cash, alternatively investors may ask for a redemption of Retrophin shares or a combination of Retrophin shares and cash." (Tr. 3143:12-15; GX 109-9.)

34

Mr. Geller waited for some contact regarding redemption procedures, but "did not get any communication at all." (Tr. 3144:7-21.) On March 14, 2013, he unexpectedly received a share certificate for 30,154 restricted shares of Retrophin. (GX 109-10.) Mr. Geller recalled that he was "bewilder[ed]" by the certificate, which had no letter of instruction. (Tr. 3146:2.) Following email conversations with Mr. Shkreli and a conversation with his brother Alan, Mr. Geller wrote Mr. Shkreli that, based on his understanding, it appeared that MSMB Healthcare had "put all my fund money into Retrophin stock at the high valuation," despite assurances that it would only be a small part of the portfolio. (GX 109-12; Tr. 3149:22-3150:2.) Mr. Geller discussed his concerns with Mr. Shkreli, who put Mr. Geller in touch with Mr. Greebel. Mr. Shkreli agreed that Mr. Geller would receive $300,000 and keep 30,000 shares. (Tr. 3154:5-9.) After additional email communications with Mr. Shkreli and Mr. Greebel, Mr. Geller received a settlement agreement from Mr. Greebel on May 22, 2013, memorializing the terms of his agreement with Mr. Shkreli. (Tr. 3163:6-11; GX 109-22; GX 55.) The parties to the settlement agreement included MSMB Capital, MSMB Healthcare, and Retrophin. (GX 55.) Although the agreement was executed on May 30, 2013, Mr. Geller did not receive the $300,000 in cash until October 13, 2013. (Tr. 3169:25.)

***Stephen Aselage***

Stephen Aselage is the CEO of Retrophin, Inc.  Mr.
Aselage has a background in pharmaceutical sales and in
pharmaceutical startups.  Prior to his involvement with
Retrophin, he worked at a company known as BioMarin, leaving in
2012 as an Executive Vice President and Chief Business Officer.
(Tr. 3299:19-3301:25.)  In the fall of 2012, Mr. Aselage was
contacted "out of the blue" by Mr. Shkreli, who asked Mr.
Aselage to join Retrophin.  (Tr. 3303:12.)  Mr. Aselage started
as Retrophin's CEO in October 2012.  (Tr. 3298:13-3299:1.)  At
the time, Retrophin "did not have really much of anything,"
other than a licensing agreement with the pharmaceutical company
Ligand.  (Tr. 3312:2-7.)  Based on what he had been told by Mr.
Shkreli, Mr. Aselage though that Retrophin had the money to
complete the deal, but testified that in the fall of 2012, he
had to focus on "trying to raise the money to actually complete"
the licensing transaction.  (Tr. 3317:12-16.)  Mr. Aselage
decided to step down as CEO in December 2012 because Mr. Aselage
thought that Mr. Shkreli was really running the company, and
because he was alarmed by the company's failure to have paid its
premium for Director and Officer insurance.  (Tr. 3337:3-11;
3339:1-6.)

Mr. Aselage chose to remain on Retrophin's board.
(Tr. 3339:7-8.)  Mr. Aselage explained his decision to stay on

the board by describing Mr. Shkreli as a "brilliant intellect and a visionary" who "tells a story, sings a song, and everyone just wants to follow him." (Tr. 3339:19-22.) He explained that Mr. Shkreli sometimes "did such a good job that people would write a check for everything they had," but also noted that sometimes Mr. Shkreli was " a little bit not as credible as he could have been in addressing things that didn't seem to be areas of knowledge but where he was trying to answer questions anyway." (Tr. 3318:17-25.)

In the spring of 2014, at request of the Retrophin Board, Mr. Aselage returned to an operating position, becoming COO until September 2014. (Tr. 3298:23-3299:1.) As with Mr. Richardson, Mr. Aselage explained that members of the board became concerned over the summer of 2014 about a number of issues relating to Mr. Shkreli's behavior as CEO, mentioning specifically Mr. Shkreli's Twitter usage, the business development group's trading using company funds, and Mr. Shkreli's interpersonal style with subordinates such as Dr. Plotkin. (Tr. 3391:1-18.) Mr. Aselage became interim CEO when the board removed Mr. Shkreli as CEO, and, after Mr. Shkreli resigned, Mr. Aselage became permanent CEO in November 2014. (Tr. 3298:13-3299:1; 3412:24-3413:1; 3419:13-20 (describing Mr. Shkreli's agreement to resign).)

*Corey Massella*

Corey Massella, while employed at the accounting firm Citrin Cooperman, provided accounting services to Retrophin. Mr. Massella founded his own accounting firm, SEC Solutions, which merged into Citrin Cooperman in 2009.  (Tr. 3871:22-3873:1.)  Mr. Massella explained that Evan Greebel, Retrophin's outside counsel, was the son-in-law of Niles Citrin of Citrin Cooperman.  (Tr. 3874:1-2.)  Retrophin engaged SEC Solutions to provide accounting services on January 19, 2012.  (GX 119-3 (engagement letter).)  Mr. Massella described Retrophin's accounting at the beginning of the engagement as "very chaotic".  (Tr. 3885:4-6.)

In providing accounting services to Retrophin, Mr. Massella and his team used capitalization tables for the company to "see that the cash that went through the bank account agrees to the ownership and what was paid for the ownership in the company."  (Tr. 3889:4-7; 119-4.)  Mr. Massella testified regarding several entries on the Retrophin capitalization tables.  Mr. Massella testified that on February 1, 2012, the capitalization table showed an equity investment from MSMB Healthcare into Retrophin; the transaction was $900,000 for 22,500 shares.  (Tr. 3891:21-23.)  Subsequently, in a November 16, 2012 email, Mr. Massella's associate Susan Chew inquired concerning a "Secured Promissory Note," because the company's

38

records included two references to $900,000 February 2012
transfers from MSMB Healthcare to Retrophin:  the promissory
note and the equity investment.  (GX 119-14.)  Mr. Massella
explained that Ms. Chew could only locate one $900,000 transfer
from MSMB Healthcare into the relevant Retrophin bank account,
whereas she would have expected $1.8 million if there were two
$900,000 transactions.  (Tr. 3902:3-3905:1.)

Mr. Massella also testified regarding a December 3,
2012 email, which attached several share transfers: a transfer
from Mr. Mulleady to Mr. Shkreli of 10,000 Retrophin shares
(dated July 1, 2012), a transfer from Mr. Fernandez to Mr.
Shkreli of 50,000 Retrophin shares (dated July 1, 2012), a
transfer from Mr. Biestek to Mr. Shkreli of 4,167 Retrophin
shares (dated June 1, 2012), and a transfer from Mr. Shkreli to
MSMB Capital of 75,000 Retrophin shares (dated July 1, 2012).
(GX 119-25.)  With regard to Mr. Biestek's transfer of shares to
Mr. Shkreli, Mr. Massella testified that based on his
experience, it was "unusual" for a CEO to receive shares from,
as opposed to give shares to, an employee.  (Tr. 3911:18-19.)

Mr. Massella testified that Citrin Cooperman resigned
the engagement with Retrophin on May 8, 2013, after the
relationship became "a little contentious".  (Tr. 3946:19.)  Mr.
Massella explained that, in his view, Retrophin would not
provide Citrin Cooperman with information required for the

audit, and then company employees, including Mr. Shkreli, would criticize the Citrin Cooperman team.  (Tr. 3949:8-19.)  Joel Cooperman, the managing partner of Citrin Cooperman, terminated the engagement after reviewing a heated email exchange.  (Tr. 3946:20-3950:19 (discussing GX 123-12).)

**_John Neill_**

John Neill, a businessman who ran "retirement-related operations," such as retirement apartments and nursing homes, invested in MSMB Capital in early 2011.  (Tr. 3989:13-16; 3999:11.)  Mr. Neill met Mr. Shkreli through Mr. Blanton, and attended a dinner in the fourth quarter of 2010 at which Mr. Shkreli discussed MSMB Capital.  At this dinner, the discussion of MSMB's returns "stuck" in Mr. Neill's mind; Mr. Neill recalled them as "40%-a-year kind of returns."  (Tr. 3991:23-25.)  Mr. Neill invested $500,000 on January 31, 2011, through his wife's separate property account, which he managed.  (Tr. 3999:11-4000:3.)  Mr. Neill intentionally invested before February 1, 2011.  (Tr. 4008:3-24.)

Mr. Neill received and relied on performance updates, which reflected positive performance by MSMB Capital.  (Tr. 4003:15-24; GX 82-1 through 82-17.)  For example, Mr. Neill's September 9, 2012 statement showed returns of approximately $149,897 on his $500,000 investment.  (GX 82-17.)  Mr. Neill also exchanged emails with Mr. Shkreli, including an April 13,

2011 email from Mr. Shkreli, who stated that he had just covered one of the fund's short trades, resulting in a "30 percent return in 10 days." (GX 102-5; Tr. 4010:23-4011:11.) Mr. Neill did not recall the names Orexigen or OREX being discussed over the course of his investment. (Tr. 4008:15-17.)

Mr. Neill received the same September 2012 wind-down email as Ms. Hassan, Mr. Marshall, and Dr. Rosenfeld. (GX 102-16.) After email communications with Mr. Shkreli requesting redemption of his MSMB Capital investment, Mr. Shkreli sent Mr. Neill an email on January 13, 2013, claiming that the value of Mr. Neill's investment had declined from $756,162 in July of 2012 to $444,245 in December of 2012. (GX 102-21.) The email explained that "[t]hrough the partnership, your account owns 94,520 shares of Retrophin" and that the values of Retrophin stock had dropped over the prior six months. (*Id.*) On February 19, 2013, Mr. Shkreli sent Mr. Neill 94,521 restricted shares in Retrophin. (GX 102-22.)

**Deborah Oremland**

Deborah Oremland, an attorney at the Financial Regulatory Authority ("FINRA"), testified as a summary witness. Among other things, Ms. Oremland testified regarding charts she prepared that showed Retrophin's share price and trading volume by date from December 17, 2012 through September 30, 2014. (GX 606 (summary chart); GX 805 (stipulation); Tr. 4157:1-9.) Ms.

41

Oremland described restricted securities to the jury, explaining
that restricted shares were those usually issued by the company
that included restrictions on how long they had to be held
before they could be sold.  (Tr. 4167:15-19.)  She also
described the process of lifting the restriction on a stock to
make it "free trading."  (Tr. 4168:9-13.)  The government asked
Ms. Oremland about restrictions on stock arising under SEC Rule
144, and she explained that, pursuant to the rule, "affiliates
are limited in[] how many shares they can sell, even if they are
not restricted."  (Tr. 4170:7-8.)  She defined an affiliate
under Rule 144 as "someone who can exert a certain amount of
control over a company, either they are an officer or director
or they own a large amount of shares or they are controlled by
someone who is an affiliate."  (Tr. 4170:1-4.)

Ms. Oremland prepared charts relating to the
distribution of free trading and restricted shares in Retrophin.
She testified that GX 701 showed the distribution of free
trading shares on December 17, 2012, and that in the aggregate,
the total free trading shares distributed to the Fearnow
shareholders was approximately 80% of the total free trading
shares.  (GX 701; Tr. 4172:11-4173:9 (explaining that there were
8.3 million total outstanding shares, of which 2 million of the
2.5 million free trading shares were distributed to the Fearnow
group.)  Another chart, GX 702, showed that Edmund Sullivan,

42

Claridge Capital, and Thomas Fernandez, did not trade Retrophin shares during the period December 17, 2012 through February 28, 2013. (Tr. 4188:4-4189:12.)

Ms. Oremland also testified that Rule 13D of the Securities Act of 1934 requires that, when one "either directly or indirectly [owns] five percent or more of a company's stock, you have to file a disclosure document called a schedule 13D, to indicate how many shares you own." (Tr. 4171:13-17.) Among other issues, she explained that Retrophin's December 20, 2012 Form 13D claimed that, prior to the merger, MSMB Healthcare held Retrophin shares purchased with "working capital," which were then converted into 473,274 post-merger shares. (GX 603 (December 20, 2012 13D); 4179:3-10.) This Form 13D also stated that MSMB Capital held 75,000 pre-merger shares, "purchased with working capital", which "converted into 375,000 shares of [post-merger] common stock." (GX 603; 4179:18-24.) Ms. Oremland then testified that a February 19, 2013 amendment to the Form 13D, showed that MSMB Capital had no shares. (GX 605; Tr. 4183:4-5.)

*Timothy Pierotti*

Timothy Pierotti is a former employee of a fund known as MSMB Consumer LP. Mr. Pierotti described his career in finance, which included employment at the Galleon Group. (Tr. 4207:1-4209:12.) Mr. Pierotti acknowledged that, while at Galleon, he had traded using insider information. (Tr. 4209:13-

43

4210:6.)  Mr. Pierotti testified that he had provided
information to prosecutors from the United States Attorney's
Office for the Southern District of New York regarding the
circumstances of his insider trade.  (Tr. 4210:21-4211:8.)  He
received a non-prosecution agreement from the Southern District
of New York, but ultimately did not testify in the case against
Galleon's founder, Raj Rajaratnam.  (Tr. 4211:20-4212:9.)

Mr. Pierotti met Mr. Shkreli through a friend, and was
hired to be the consumer portfolio manager for what Mr. Pierotti
understood to be a suite of funds under the MSMB umbrella.  (Tr.
4214:9-4215:9.)  The hiring entity listed on Mr. Pierotti's
employment agreement, dated April 9, 2011, was MSMB Healthcare
LLC.  (GX 120-1.)  Mr. Pierotti recalled Mr. Shkreli saying that
the MSMB funds had $80 million in AUM, though he also recalled
Mr. Shkreli using a figure of $100 million.  (Tr. 4215:12-15.)
Mr. Pierotti did not start actively trading for MSMB Consumer
until October 2011, and did not recall hearing about Retrophin
until approximately March or April of 2012.  (Tr. 4223:15-19.)

Mr. Pierotti testified that MSMB Consumer had
approximately $4.5 million to invest, which, based on what Mr.
Shkreli represented, came from the MSMB Healthcare fund.  (Tr.
4224:16-20.)  Mr. Pierotti recalled the performance of MSMB
Consumer as being "approximately flat . . . with the market,"
but in the spring of 2012, Mr. Shkreli began pulling money out

of the fund.  (Tr. 4225:11-17.)  The MSMB Consumer fund pursued a "single-stock strategy," investing, with Mr. Shkreli's approval, in a company called Rick's Cabaret.  (Tr. 4229:1-11.) During the summer of 2012, Mr. Shkreli asked Mr. Pierotti to quickly sell the Rick's Cabaret position because Mr. Shkreli "need[ed] the money."  (Tr. 4230:2-16.)  After MSMB Consumer stopped investing, in approximately July 2012, Mr. Shkreli wanted Mr. Pierotti to "look for special projects" in healthcare.  (Tr. 4232:3-6.)  Mr. Pierotti, working with Mr. Biestek, focused on a company called Garreco, which made dental gypsum for dentures.  (Tr. 4232:7-9.)

Mr. Pierotti was terminated from employment on November 12, 2012.  (*See* 120-7; 120-9 (severance and termination agreements).)  The termination documents reflected that Mr. Pierotti was being terminated from Retrophin, but Mr. Pierotti testified that he had "never worked for Retrophin," though he sometimes had received checks from Retrophin or Mr. Shkreli directly.  (Tr. 4241:1-4.)  Mr. Pierotti explained that he had never considered working for Retrophin because he was a "consumer portfolio manager and Retrophin is [a] biotech" company.  (Tr. 4243:14-15.)  After termination, Mr. Pierotti pursued the Garreco transaction with Marek Biestek, and stated that this effort was independent of either MSMB or Retrophin,

45

though Mr. Shkreli was a potential investor in the deal. (Tr. 4259:9-13.)

Mr. Pierotti described a December 2012 conversation with Mr. Shkreli in which Mr. Shkreli offered him the opportunity to be "part of the group that was buying shares in Desert Gateway." (Tr. 4260:25-4261:1.) Mr. Pierotti subsequently purchased 400,000 shares for $400.00 from Troy Fearnow. (4263:8; 120-10 (Purchase agreement between Troy Fearnow and Mr. Pierotti).) Mr. Pierotti recalled a conference call with Michael Fearnow, in which the purchase of Desert Gateway by Retrophin was discussed. The price was to be $400,000, but Retrophin did not have sufficient funds, so the participants on the call discussed adding Retrophin shares to the price as part of the compensation. (Tr. 4275:13-16.) Mr. Pierotti testified that although he purchased 400,000 shares from Troy Fearnow, he actually received 350,000 shares. (Tr. 4275:19.) Mr. Shkreli explained that, for some of the Fearnow shareholders, "some shares will be held back." (Tr. 4275:25-4276:1.) Mr. Pierotti testified that each of the Fearnow shareholders purchased up to 4.9 percent of Retrophin's shares, because otherwise they would "have to make a filing every time [they] made a transaction." (Tr. 4264:13-14 (explaining his belief that exceeding a 5% shareholding threshold would make an individual an "insider").)

46

Mr. Pierotti testified that following his purchase of
Fearnow's shares, "there were conversations and there were
discussions and there were comments by [Mr. Shkreli] that people
who have trading experience should trade the stock; buy it, sell
it, buy it, sell it." (Tr. 4264:20-25.) He also testified
regarding an email from Michael Smith, Mr. Shkreli's assistant.
(GX 120-11; Tr. 4238:5-6 (describing Mr. Smith as Mr. Shkreli's
assistant).) In the email, Mr. Smith requested a summary of all
of the Retrophin stock holdings every morning from each of the
Fearnow shareholders. (GX 120-11.) The email references a
Scottrade account, and Mr. Pierotti testified Mr. Shkreli had
the idea of opening Scottrade accounts for the Retrophin stock
received in the Fearnow purchase agreements. (Tr. 4279:3-9.)
Mr. Pierotti also testified that he had received the email
identified as GX 120-12, which asked him to confirm, in writing,
that he was not an officer or director of Retrophin. (GX 120-
12.) Mr. Pierotti stated that he felt comfortable affirming
that he was neither an officer or director of Retrophin because
he was not working for Retrophin or Desert Gateway. (Tr.
4281:18-23.)

Mr. Shkreli stated that Mr. Pierotti would at some
point have to stop working out of the Retrophin offices, which
Mr. Pierotti was still occasionally visiting to work with
Mr. Biestek. (Tr. 4259:20-4260:4.) Following Mr. Pierotti's

47

purchase of the Fearnow shares, however, Mr. Shkreli told Mr. Pierotti to work from the Retrophin offices.  Mr. Pierotti stated that he was concerned about becoming privy to non-public information, and had no reason to be in the Retrophin office because he was not employed by either the MSMB entities or Retrophin.  (Tr. 4285:15-24.)  At Mr. Shkreli's direction, Mr. Pierotti discussed his concerns about becoming exposed to non-public information with Mr. Greebel, who advised Mr. Pierotti to shut the door of his office; Mr. Pierotti was not satisfied with that advice and continued not to go in to the Retrophin office. (Tr. 4286:8-22.)  Mr. Pierotti did not use the Scottrade account that Mr. Shkreli had wanted him to use, but instead slowly sold his 350,000 shares over time through a smaller company called MLV & Co.  (Tr. 4286:4-15.)

In a December 28, 2012 email, Mr. Shkreli asked to meet Mr. Pierotti, but Mr. Pierotti declined and told Mr. Shkreli that they could communicate through Mr. Biestek.  (GX 120-16.)  In response, Mr. Shkreli offered to buy Mr. Pierotti's 300,000 shares "for the same price you paid for them", and that if Mr. Pierotti were to agree, "this nightmare will end for everyone." (*Id.*)  Mr. Pierotti also recalled a phone call from Mr. Shkreli, involving "[a] lot of screaming and yelling" in which Mr. Shkreli "demanded" that Mr. Pierotti sell back his shares for $400.  (Tr. 4288:11-4289:8.)  On December 30, 2012,

Mr. Shkreli sent Mr. Pierotti and the other Fearnow recipients an email with the subject line "OVER THE WALL: Retrophin Marketing PIPE".  (GX 120-17 (the "over the wall email").)  Mr. Pierotti explained that "[o]ver the wall means that you are making yourself available to nonpublic, inside information . . . which would make it impossible for them to be in the market transacting" in the shares.  (Tr. 4290:20-25.)

          In the December 30, 2012 email, Mr. Shkreli also wrote:

> I must admit . . . that I have been extremely stressed about Retrophin.  The declining stock price is particularly alarming.  Please consider . . . making [your stock] unshortable – this is obviously in all shareholders' best interest.  As we are contemplating these financings it is not a [*sic*] good for the stock to be declining.  Obviously, now that you are "over the wall" you may not sell any stock until these transactions are completed.

(GX 120-17.)  Mr. Pierotti explained that broker-dealers compensate shareholders for loaning out stock for the purpose of permitting short trades, and that Mr. Shkreli's reference to making shares "unshortable" was effectively a request that the Fearnow shareholders agree to refuse to lend out shares for this purpose.  (Tr. 4291:16-20.)  If the Fearnow shareholders refused to lend out stock to short-sellers, it would "make[] it less possible and more expensive for anybody to try to short [Retrophin stock]."  (Tr. 4291:21-22.)

Subsequently, on January 15, 2013, Mr. Shkreli sent a letter to Mr. Pierotti's wife, Kristen, accusing Mr. Pierotti of having stolen money.  (GX 120-19.)  The letter claimed that "[w]e recently renegotiated Tim's association with our companies which would provide him, in exchange for showing up to work every day and applying his efforts to grow our collective wealth, 400,000 shares of Retrophin" but that "Tim took the stock and ran off."  (*Id.*)  Mr. Shkreli threatened to "sue both you and your husband for fraud" and that "I hope to see you and you four children homeless and will do whatever I can to assure this."  (*Id.*)  Mr. Pierotti stated that "virtually nothing" in the letter was true.  (Tr. 4298:3-4.)

Mr. Pierotti ultimately reached an agreement with Mr. Shkreli whereby Pierotti relinquished the remaining 50,000 held in "escrow," in return for $165,000.[8]  (Tr. 4304:5-23.)

### Standard of Review

I.   **Rule 29 Motion for a Judgement of Acquittal**

"The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir.

---

[8] Mr. Shkreli referred to the shares he withheld from the Fearnow shareholders as "escrowed stock," but stated in an email with Mr. Greebel that there was, in fact, no escrow agreement.  (GX 268.)

2002) (citing *In re Winship*, 397 U.S. 358, 364 (1970)).

Consequently, a "mere modicum" of evidence is insufficient to

meet the Due Process requirement of proof of guilt beyond a

reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 320

(1979), *superseded on other grounds by* 28 U.S.C. § 2254(d).

In resolving Rule 29 motions, a court should "avoid

usurping the role of the jury." *United States v. Guadagna*, 183

F.3d 122, 129 (2d Cir. 1999).  A court must "defer to the jury's

assessment of witness credibility and the jury's resolution of

conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93-

94 (2d Cir. 2000).  Moreover, a court cannot "substitute its own

determination of the weight of the evidence and the reasonable

inferences to be drawn for that of the jury." *Guadagna*, 183

F.3d at 129 (citation and quotation omitted).  Therefore, the

jury's verdict will be upheld even when it is based entirely on

inferences from circumstantial evidence.  *Glenn*, 312 F.3d at 64.

Furthermore, "the task of choosing among permissible competing

inferences is for the jury, not a reviewing court," *United*

*States v. Salmonese*, 352 F.3d 608, 618 (2d Cir. 2003) (citation

omitted), and "in assessing whether the government has met its

burden, [the court must] view pieces of evidence 'not in

isolation but in conjunction.'" *United States v. Torres*, 604

F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Maldonado-*

*Rivera*, 922 F.2d 934, 978 (2d Cir. 1990)).  In addition, the

court "must draw all favorable inferences and resolve all issues of credibility in favor of the prosecution." *United States v. Jespersen*, 65 F.3d 993, 998 (2d Cir. 1995) (quoting *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986)).

In order to grant a motion for a judgment of acquittal pursuant to Rule 29, the court must find that "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna,* 183 F.3d at 130 (internal quotation marks and citations omitted); *see also United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant Rule 29 motion for judgment of acquittal on grounds of insufficient evidence only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"). Accordingly, a conviction must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Consequently, "[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002) (citing *United States v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001)).

## II.  **Loss Amount**

Mr. Shkreli has challenged the Probation Department's calculation of loss in his Presentence Report ("PSR").  For purposes of sentencing, the Base Offense Level calculation in a fraud case is dependent in part on the loss resulting from the fraud offense.  "The district court's factual findings relating to loss must be established by a preponderance of the evidence." *United States v. Finazzo*, 682 F. App'x 6, 13 (2d Cir. 2017) (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)).  "A sentencing court is not required to compute the loss resulting from a fraud offense with precision . . . .  Moreover, because the district court occupies a unique position to assess the evidence and estimate the loss based upon that evidence, the court's loss determination is entitled to appropriate deference."  *United States v. Kumar*, 617 F.3d 612, 632 (2d Cir. 2010) (internal quotation marks omitted and citing, *inter alia*, *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir.1997)).

Subject to exclusions not relevant here, "loss is the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1 comment n.3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense," whereas "'[i]ntended loss' means [] the pecuniary harm that the defendant sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur."  *Id.*

"The court need only make a reasonable estimate of the loss."
*Id.* at n.3(C).  The Sentencing Guidelines application notes
suggest several possible factors for the court's consideration
in determining loss, such as "[t]he approximate number of
victims multiplied by the average loss to each victim" or "the
reduction that resulted from the offense in the value of equity
securities . . . ."  *Id.*

The Second Circuit repeatedly has held that "loss in
fraud cases includes the amount of property taken, even if all
or part has been returned."  *United States v. Lyttle*, 460 F.
App'x 3, 10 (2d Cir. 2012) (quoting *United States v. Coriaty* 300
F.3d 244, 251 (2d Cir. 2002); *see United States v. Komar*, 529 F.
App'x 28, 29 (2d Cir. 2013) (Rejecting the defendant's argument
that the value of his fraud victim's equity in his partnership
should be subtracted from the loss amount, and holding that
"[t]he 'loss' was the money that the investors were fraudulently
induced to invest . . . irrespective of the value of the
[property].").

The Sentencing Guidelines provide for specific
"Credits Against Loss," whereby loss calculations may be reduced
by, *inter alia*, "[t]he money returned . . . by the defendant to
the victim before the offense was detected."  U.S.S.G. § 2B1.1,
comment n.3(E).  The Guidelines define "time of detection" for
purposes of credit against loss as "the earlier of (I) the time

54

the offense was discovered by a victim or government agency; or
(II) the time the defendant knew or reasonably should have known
that the offense was detected or about to be detected by a
victim or government agency."[9]  *Id.*

## Discussion

### I.  The Sufficiency of the Evidence on Counts Three and Six

The court heard oral argument on defendant's Rule 29
motion on July 26, 2017 and February 23, 2018.  At the July 26,
2017 Rule 29 hearing, the defense argued, with regard to Counts
One through Six, that "the specific statements and the specific
omissions that the Government is alleging . . . are . . . not
material.  And . . . not things that a reasonable investor would
rely on and, in fact, not things that the individual investors
who ended up investing, in fact, relied on."  (Tr. 5046:7-13;
*see id.* at 5042:25-5043:4 (making a similar argument with a
particular reference to Counts One through Three); 5045:12-
5046:13 (arguing that MSMB investors did not rely on
representations made in the Private Placement Memorandums, but
instead invested due to their own experience investing with Mr.

---

[9] The Sentencing Guidelines also provide that, "[i]n a case
involving a fraudulent investment scheme . . . loss shall not
be reduced by the money or the value of the property
transferred to any individual investor in the scheme in excess
of that investor's principal investment (*i.e.*, the gain to an
individual investor in the scheme shall not be used to offset
the loss to another individual investor in the scheme).  *Id.* at
n.3(F).

Shkreli or because of Mr. Shkreli's reputation.))  Defense
counsel acknowledged, however, that there was sufficient
evidence on these counts to send them to the jury.  (Tr.
5050:22-25 ("with Counts 1 through 6, I fully expect that – that
given the burden that we have and the light most favorable to
the Government, Your Honor's going to let those counts go to the
jury").)

        In its charges, the court explained that for the jury
to find Mr. Shkreli guilty of Securities Fraud as charged in
Counts Three and Six, the government would have to prove, beyond
a reasonable doubt, that: Mr. Shkreli (i) employed a device,
scheme, or artifice to defraud or made an untrue statement of a
material fact; (ii) omitted to state a material fact necessary
in order to make the statements made in the light of the
circumstances under which they were made not misleading; or
(iii) engaged in an act, practice or course of business that
operated or would operate as a fraud or deceit upon a purchaser
or seller of any security.  (Tr. 5551:2-15.)  The court also
instructed the jury that the government had to prove, beyond a
reasonable doubt, that Mr. Shkreli acted knowingly, willfully,
and with the intent to defraud, and that he used an
instrumentality of interstate commerce.  (Tr. 5555:5-9; 5558:5-
14.)  Consistent with Second Circuit precedent, *see United
States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007), the court

instructed the jury that the government had to prove venue for Counts Three and Six by a preponderance of the evidence. (Tr. 5560:5-24.)

Neither party has discussed Counts Three and Six in their briefing for the instant motion. Nonetheless, the court has undertaken a comprehensive review of the record and concludes that the evidence is more than sufficient to support the jury's guilty verdicts on Counts Three, Six and Eight.

### A. Count Three

With regard to the conduct at issue in Count Three, a substantive count of Securities Fraud charged as part of the "MSMB Capital Scheme," the government argued that Mr. Shkreli not only lied in the course of soliciting investors to join MSMB Capital, but also continued to make material misrepresentations and omissions to investors after they had invested in order to prevent the redemptions of their MSMB Capital investments. (*E.g.* Tr. 5164:7-25 (describing the performance reports Mr. Shkreli provided to Ms. Hassan as a "lie").) The government argued that the trial evidence established that Mr. Shkreli made material misrepresentations relating to his educational background,[10] the names of his investors, his successful

---

[10] The government argued that Mr. Shkreli told prospective investors what he thought they might wish to hear with regard to his educational background. (Tr. 5198:14-5199:5.) Mr. Shkreli told Mr. Blanton and Mr. Neill, among others, that he

experience in the financial sector, and the size and performance of the MSMB Capital fund, and that he lied about the fund's use of a third-party auditor, accountant, law firm, and administrator.[11]  For the purposes of the instant motion, the court will focus on the evidence concerning misrepresentations of MSMB Capital's size (as measured by its AUM) and performance.

    1.   *Fund Size*

       The evidence at trial, including investor testimony, bank records, and emails, established that Mr. Shkreli repeatedly represented to prospective investors that MSMB

---

had attended Columbia.  (Tr. 1583:8-9 (Mr. Blanton's testimony); Tr. 3992:4-8 (Mr. Neill's testimony that he "thought [Mr. Shkreli] graduated Columbia at 16").)  Mr. Richardson, who had not completed college for financial reasons, recalls that Mr. Shkreli stated that he also had not completed college.  (Tr. 2784:1-8.)  In fact, Mr. Shkreli attended Baruch College, and the government elicited testimony from Barry Kane, Columbia University's Associate Vice President and University Registrar, that Mr. Shkreli had never "enrolled in or graduated from any school affiliated with Columbia University."  (Tr. 4451:20-24 (testimony of Mr. Kane); GX 903 (testimony from an arbitration between Mr. Shkreli and Merrill Lynch, in which Mr. Shkreli states that he attended "CUNY Baruch").)

[11] Mr. Shkreli represented to various MSMB Capital investors that the fund received auditing services from Rothstein, Kass & Co., administration services from NAV Consulting, Inc., and legal services from Cobb & Assocs.  (*E.g.*, GX-1B (Dr. Rosenwald's PPM); GX 5 (Ms. Hassan's PPM); GX 105-3 (email from Mr. Shkreli to Mr. Blanton stating that the fund's administrator was NAV Consulting and the auditor was Rothstein, Kass & Co.).)  The defendant stipulated that none of these organizations provided services to MSMB Capital.  (GX 806 (Stipulation regarding NAV Consulting, Inc.); GX 807 (Stipulation regarding Cobb & Assocs.); GX 809 (Stipulation regarding Rothstein, Kass & Co.).)

Capital's AUM was in the tens of millions of dollars.  (*E.g.* Tr. 921:10-24.  (testimony of Sarah Hassan); Tr. 1499:9-11 (testimony of Steven Stitch); GX 103-38 (email between Mr. Shkreli and Ms. Hassan); GX 105-3 (email from Mr. Shkreli to Mr. Blanton claiming a $35 million AUM).)  The fund, however, never had more than approximately $1.13 million at one time, and only approximately $3.04 million in total investments.  (GX 520 (bank records); Tr. 4776:17-4777:4 (testimony of case agent).)

Multiple investors testified that fund size was an important consideration for their investment decision.  For example, Ms. Hassan explained that if a fund was "too small" it was difficult for it to get "movement or momentum", whereas if it were "too big" it was difficult to achieve "solid returns." (Tr. 947:12-15.)  Mr. Blanton testified that a significant AUM was "a sign that other investors have done due diligence and that they have committed money to the fund," and also that it ensured that the fund could pay staff appropriately and maintain operations.  (Tr. 1568:3-17; 1568:23-1569:5.)  From this testimony, the jurors could reasonably have determined that Mr. Shkreli's statements about AUM would have been material to a reasonable investor.

Mr. Shkreli's counsel argued that specific investors did not in fact rely on Mr. Shkreli's representations regarding fund size in making their investment decision.  (*E.g.*, Tr.

5343:20-5344:1 ("Martin Shkreli didn't fool Sarah
Hassan . . . Brent Saunders told her Martin Shkreli is making me
rich, go with him[,] and she did.  There was nothing Martin
Shkreli said to her that made her want to invest."); Tr. 5382:1-
5 ("[Shuyler Marshall's] not relying on what Martin Shkreli said
in the [PPM].  He's relying on what Martin Shkreli is telling
him about stock tips; what Blanton is telling him . . .").)  The
jury had sufficient evidence to the contrary to reject this
defense argument.  As a threshold issue, in a criminal
securities fraud case, the test for materiality is objective –
whether or not there is "a substantial likelihood that a
reasonable investor would find the omission or misrepresentation
important in making an investment decision, and not actual
reliance." *United States v. Vilar*, 729 F.3d 62, 89 (2d Cir.
2013).  Thus, whether or not a specific investor did or did not
rely on a specific representation made by Mr. Shkreli is not
dispositive of whether that representation was material to a
reasonable investor.  Furthermore, the jury was entitled to
credit the testimony of those investors who in some cases
specifically sought information regarding the fund's AUM and who
testified that they relied on Mr. Shkreli's representations.
(*E.g.*, GX 105-3 (Mr. Blanton's email, sent prior to investing,
requesting information on the fund's AUM).)  *See Bala*, 236 F.3d
at 93-94 (the court must "defer to the jury's assessment of

witness credibility and the jury's resolution of conflicting testimony").

### 2.   *Fund Performance*

The government's evidence also showed that Mr. Shkreli had in fact lost almost all of the fund's capital in a series of trades on February 1, 2011, when he bet against the stock of Orexigen Therapeutics.  Notwithstanding this sequence of losing trades – referred to as "the OREX trade" at trial – Mr. Shkreli continued to provide his investors with performance reports reflecting positive returns.

Mr. Shkreli's counsel argued in his summation that Mr. Shkreli's representations about the performance of the MSMB fund were not fraudulent, because they reflected MSMB Capital's interest in Retrophin.  (Tr. 5429:1-3 ("MSMB got Retrophin shares and they were Martin's shares and they had a right to be part of the valuation  . . .").)  There was ample evidence at trial that, even assuming that a jury could find that MSMB Capital had a financial interest in Retrophin, such interest did not, and could not, explain Mr. Shkreli's claims about MSMB Capital's AUM or performance.  Even assuming that Mr. Shkreli gifted shares in Retrophin to MSMB Capital on July 1, 2012,[12] the

---

[12] The nature of MSMB Capital's interest in Retrophin was also at issue in Count Seven, on which the jury acquitted Mr. Shkreli. The government argued that in November 2012, faced with an SEC inquiry prompted by Mr. Blanton's SEC complaint, Mr. Shkreli

fund had essentially no assets between the date of the OREX trade through June 2012.  Nevertheless, the performance statements Mr. Shkreli sent to MSMB Capital investors during this period showed positive returns.  (*See* GX 704 (summary chart comparing MSMB Capital performance reports from February, March, and November 2011 to the fund's actual bank balances).)

## B. Count Six

Count Six charged Securities Fraud in relation to MSMB Healthcare.  The government's theory and evidence on Count Six was similar to its theory on Count Three:  that Mr. Shkreli had secured investment in the fund through material misrepresentations, and then lied to investors about positive

---

needed to "fabricate" an MSMB interest in Retrophin to justify his claims to the SEC about MSMB Capital's assets.  (5255:16-20.)  In December 2012, Mr. Shkreli caused several individuals, including Mr. Biestek, to transfer him their Retrophin shares in return for an opportunity to purchase the Fearnow shares, and then backdated those transfers to the summer of 2012.  (GX 119-25.)  The government alleged that Mr. Shkreli then transferred those shares to MSMB Capital, also pursuant to an agreement backdated to July 1, 2012.  (*Id.*)  The government supported its arguments concerning backdating with a variety of evidence, including Retrophin capitalization tables that did not list MSMB Capital as a shareholder until December 2012, and email exchanges showing that the share transfer was actually initiated in November 2012.  (GX 213-214 (July and September 2012 capitalization tables that do not list MSMB Capital as an investor); GX 221, 223-224 (emails in November 2012 regarding initiation of transfers to Mr. Shkreli, including a November 30, 2012 email in which Mr. Shkreli offers Mr. Fernandez the opportunity to purchase shares from Troy Fearnow in exchange for surrendering all of his Retrophin shares to Mr. Shkreli); GX 225 (December 2012 capitalization table listing MSMB Capital as a shareholder).)

returns in order to ensure that they did not seek to redeem their funds. (Tr. 5208:15-18.)  The primary difference between MSMB Capital and MSMB Healthcare was that it is uncontested that MSMB Healthcare had a financial interest in Retrophin. (Tr. 5209: 22-24 (government acknowledging "MSMB Healthcare did in fact invest in Retrophin").)  The government's theory was that unbeknownst to its investors, MSMB Healthcare was primarily used to "funnel" money to Retrophin despite Mr. Shkreli's claims that it would be a diversified, balanced hedge fund. (Tr. 5213:7-22.)

As with MSMB Capital, the government's evidence regarding the charged fraud concerning MSMB Healthcare was sufficient for a jury to find that the government proved, beyond a reasonable doubt, that Mr. Shkreli made material misrepresentations and omissions concerning the valuation and investments of MSMB Healthcare in order to secure investor funds for MSMB Healthcare.  For example, Mr. Pierotti testified that Mr. Shkreli claimed that the "MSMB funds" had between $80 million and $100 million. (Tr. 4215:12-15.)  In December 2011, a prospective investor contacted Mr. Mulleady requesting, among other things, the AUMs of MSMB's "consumer and health funds" to "see if they fit in with what we are looking at in the sector specific space." (GX 211.)  Mr. Mulleady asked Mr. Shkreli for the "AUM of healthcare"; Mr. Shkreli responded that it was "45",

or "80 . . . if you count full value of Retrophin which I sometimes do." (*Id.*)

The evidence also supports the jury's conclusion that Mr. Shkreli did not manage MSMB Healthcare for the benefit of investors, but instead used it to fund his own personal or unrelated professional debts and to support the development of Retrophin.  For example, although Darren Blanton had invested in MSMB Capital, Mr. Shkreli used $200,000 from MSMB Healthcare to partially satisfy Mr. Blanton's demands for redemption.  (GX 503-C (showing $200,000 payment from MSMB Healthcare to Colt Ventures, Mr. Blanton's investing vehicle).)  After March 2012, MSMB Healthcare did not make the diversified investments as represented in the PPMs, but instead funneled money into Retrophin.  (GX 521 (bank accounts showing funding flows); 521A (summary chart showing a generally declining or flat bank balance after March 2012).)

Of particular note is the sequence of transactions following MSMB Healthcare's investment of $900,000 into Retrophin on February 1, 2012, following Mr. Lavell's investment of $850,000 into MSMB Healthcare.[13]  (GX 126-5; 505-E at 26-27.) This transaction resulted in MSMB Healthcare owning $900,000

---

[13] The MSMB Healthcare bank account records track Mr. Lavelle's investment and the $900,000 transfer to Retrophin by the transaction's "clear date", which in both cases was February 3, 2012.

worth of equity units in Retrophin, as reflected on
capitalization tables in the subsequent months. (*E.g.* GX 213,
GX 214 (capitalization tables from July and September 2012
recording a $900,000 February 1, 2012 investment by MSMB
Healthcare for 22,500 shares of preferred units).)  In November,
however, Mr. Massella's associate, Ms. Chew, noticed that
Retrophin's files listed two $900,000 transactions for February
1, 2012 between Retrophin and MSMB Healthcare:  the MSMB
Healthcare equity investment, resulting in 22,500 Retrophin
preferred units, and a promissory note by Retrophin to MSMB
Healthcare.  (GX 119-14.)  The bank accounts, however, listed
only one $900,000 transfer.  (Tr. 3902:3-3905:1.)  On December
3, 2012, Mr. Shkreli sent Mr. Su a capitalization table that
effectively cancelled MSMB Healthcare's $900,000 investment for
22,500 Retrophin shares.  (GX 119-24 (showing the $900,000
investment followed by a line indicating that the same amount
should be subtracted from the table); Tr. 2206:3-4 (testimony of
Mr. Su).)  Effectively, Mr. Shkreli retroactively transformed
the $900,000 equity investment by MSMB Healthcare into a loan
from MSMB Healthcare to Retrophin, which Retrophin would need to
repay.

        MSMB Healthcare never received the benefit of its
$900,000 investment in, or an equivalent loan to, Retrophin.
Over five transactions in January to early March of 2013, Mr.

65

Shkreli caused Retrophin to pay approximately $1 million to MSMB Healthcare, but then transferred $900,000 from MSMB Healthcare to Merrill Lynch.  (Tr. 506-E at 13-16.)  Through this sequence of transactions, Mr. Shkreli used a significant portion of MSMB Healthcare's investment funds to satisfy debts owed as a result of his failed OREX trade with MSMB Capital.

David Geller's testimony, and the investment documents and performance reports Mr. Shkreli sent Mr. Geller, demonstrate that Mr. Shkreli misstated the nature of MSMB Healthcare's holdings.[14]  As Mr. Geller explained, his prior investing experience made him wary of illiquid investments, and Mr. Shkreli's representations regarding the purportedly liquid and balanced nature of the fund and 30-day redemption notice appealed to his investing goals.  (Tr. 3094:10-3095:23; 3097:2-3098:22.)  In October 2011, MSMB Healthcare issued a revised PPM warning that the composition of the fund could change to include more illiquid investments, prompting Mr. Geller's initial request to redeem his funds.  Mr. Shkreli dissuaded Mr. Geller

---

[14]In relation to MSMB Healthcare, the government also called Richard Kocher, a construction executive who invested in MSMB Healthcare on the advice of Kevin Mulleady.  Because Mr. Kocher mostly interacted and communicated with Mr. Mulleady, not Mr. Shkreli, the court does not generally rely on Mr. Kocher's evidence in evaluating the sufficiency of the evidence against Mr. Shkreli on this count.  Importantly, however, Mr. Kocher's testimony about what he was told by Mr. Mulleady is consistent with Mr. Geller's testimony about what he was told by Mr. Shkreli.

from doing so, by reassuring Mr. Geller in approximately January 2012 that "the private securities . . . would be a very small part of the portfolio." (Tr. 3291:16-20.) Despite Mr. Shkreli's reassurance, as MSMB Healthcare's transaction records show, the fund did little else after March 2012 than invest in Retrophin, an illiquid, high-risk startup. (*See* GX 505, 506.)

Based on the evidence at trial, the jury could reasonably conclude that Mr. Shkreli made intentional, material misstatements and omissions regarding the assets, performance, and investment strategy of MSMB Healthcare.

## II.  **The Sufficiency of the Evidence on Count Eight**

Count Eight charged a conspiracy to commit securities fraud in relation to Retrophin.  The government argued that Mr. Shkreli conspired with Mr. Greebel and Mr. Biestek, along with others, to "control the price and trading volume of Retrophin stock . . . by concealing Mr. Shkreli's ownership of the Fearnow shares and his control of them." (Tr. 5296:25-5297:4.)  The court instructed the jury on the law of securities fraud conspiracy.  (Tr. 5568:6-5569:9.)

In his motion, Mr. Shkreli attacks the sufficiency of the government's evidence, arguing that the evidence did not establish an illegal agreement to control the price and trading of Retrophin stock.  Mr. Shkreli focused in particular on Mr. Pierotti's testimony, which he argues was insufficient to

support a conviction on a conspiracy count, and on the
government's use of the word "affiliate" in its summation.  (*See*
Def. Mem.)  The court respectfully disagrees.  There is ample
evidence in the record to support Mr. Shkreli's conviction on
Count Eight.

### A. The Fearnow Shares

At trial, the government used the term "Fearnow
shares" to refer to Troy Fearnow's sale of 2.5 million free-
trading shares in the Desert Gateway shell company.  Troy
Fearnow sold the shares, for a nominal amount, to the seven
individuals and entities chosen by Mr. Shkreli and Mr. Greebel.
Mr. Su identified the Fearnow share recipients as follows: Kevin
Mulleady, Thomas Fernandez, Marek Biestek, Timothy Pierotti,
Claridge Capital, Andrew Vaino, and Edmund Sullivan.  (GX 701.)
The government argued that Mr. Shkreli conspired with Mr.
Greebel to hand-pick these Fearnow shareholders, and then sought
to exert control over their shares.  The evidence at trial
supported the government's arguments and the jury's verdict.

### 1.   *Choosing the Fearnow Shareholders*

On November 22, 2012, weeks before the reverse merger,
Mr. Greebel asked Mr. Shkreli if there was "any reason other
than the 2.5m that you want this shell?  A new 'clean' shell
will definitely be cheaper . . . ive told you I have some
capitalization concerns."  (GX 220; *see* Gov. Opp. at 8-9.)  Mr.

68

Shkreli responded that "[t]he 2.5m help a lot[.]"  (*Id.*)  Based
on Ms. Oremland's testimony regarding the distribution of free-
trading and restricted shares, it is evident that the "2.5m"
referenced in this email thread is the 2.5 million free-trading
Fearnow shares.  (Tr. 4172:11-4173:9)  Mr. Shkreli was making
clear that one reason for choosing and paying for Desert Gateway
– despite the fact that, as Mr. Greebel wrote, there were
"cheaper" shell companies available – was because he would have
access to free-trading shares.[15]

There is sufficient evidence for the jury to have
found that, after being advised of Mr. Shkreli's purpose in
acquiring the Desert Gateway shell, Mr. Greebel conspired with
Mr. Shkreli and others to distribute and to control the Fearnow
shares.  The Fearnow share purchases were ostensibly independent
of Retrophin, which was not a party to the purchase agreements
between Fearnow and the seven designated purchasers.  (See GX
234 (email attaching executed purchase agreements).)
Nevertheless, Mr. Greebel – Retrophin's outside counsel –

---

[15] The Fearnow shares originated from a suit between Troy Fearnow
and Desert Gateway, in which Troy Fearnow had received shares
of Desert Gateway "pursuant to the conversion of a promissory
note."  (*See* GX 125-4 (attaching legal opinion describing
origin of the Fearnow shares).)  In a December 7, 2012 email,
Mr. Greebel explained his plan:  Troy Fearnow was to convert
the note into 2.5 million free trading Desert Gateway shares
which would be sold to "certain buyers" – the Fearnow
shareholders – prior to the closing of the reverse merger.  (GX
228.)

facilitated the purchase of the Fearnow shares. (*E.g. id.* (requesting that the transfer agent "send all stock certificates" for the Fearnow shareholders to Mr. Greebel).) In reference to the Fearnow stock and prospective Fearnow shareholders, Mr. Greebel explained to Mr. Shkreli that "[u]nder the securities laws, stockholders can act by written consent (ie not have a meeting) as long as no more than 6 stockholders represent 50% of the outstanding equity. I want to confirm that the numbers work so that you +5 = at least 50% (ie a majority)[.]" (GX 229.) In the same email, Mr. Shkreli also confirmed to Mr. Greebel that each Fearnow shareholder would purchase just under five percent of the company's shares. (*id; see* Tr. 4264:13-14 (Mr. Pierotti's testimony that each Fearnow shareholder received just under 5% of the shares so they did not have to "make a filing" when they transacted).) As Ms. Oremland explained, shareholders of over five percent of a company's shares are subject to Rule 13D's disclosure requirements. (Tr. 4171:13-17 (Ms. Oremland's testimony that concerning disclosure requirements for shareholders who hold over five percent of the shares in a company)).

Mr. Shkreli then purportedly terminated the employment of all of the Fearnow shareholders by email on December 17,

2012.[16]   (GX 242.)   Mr. Greebel directed each Fearnow shareholder

to confirm that among other things, they were not an "officer, a

director, or holder of 10% or more of the outstanding equity

securities of Desert Gateway *and do not, alone or together with*

*any other person, exercise control over Desert Gateway*".   (GX

236 (emphasis added).)   These facts, combined with the nominal

prices paid for the free trading Fearnow shares by the select

group, and Mr. Greebel's involvement in receiving and

distributing the share certificates, show that Mr. Greebel, Mr.

Shkreli and others acted in concert to distribute 80% of the

free-trading shares in the company to select recipients, and

then took steps to conceal the relationship between the Fearnow

shareholders, Retrophin, and Mr. Shkreli.

> 2.   *Control of the Fearnow Shares*

        The evidence established that, after distributing the

Fearnow shares, Mr. Shkreli, Mr. Greebel and others conspired to

---

[16] The government showed that at least some of the Fearnow
shareholders who received Mr. Shkreli's termination email were
not, in fact, terminated from Retrophin.   Thomas Fernandez was
employed at Retrophin both before and after this email was
sent.   (*See e.g.* Tr. 3308:17-3309:5 (Mr. Aselage describing Mr.
Fernandez as "vice president of investor and corporate
communications of Retrophin", and stating that, in September of
2012, Mr. Fernandez was "making the transition from MSMB to
Retrophin" and remained at Retrophin until "late [2015]").)
Similarly, Mr. Massella testified that Ron Tilles, and then Mr.
Biestek, became Citrin Cooperman's "point person" at Retrophin
after Mr. Su left Retrophin in late December 2012.   (Tr.
3909:22-25 (Mr. Massella's testimony); Tr. 2243:15-16 (Mr. Su's
testimony that he left MSMB Capital in "December 2012,
approximately a week prior to the holidays").)

control trading in the shares.  First, in the course of
arranging the distribution of Fearnow shares purchased by the
select group, Mr. Shkreli decided to hold back between 50,000
and 100,000 of each individual's shares.[17]  Pursuant to the
Fearnow purchase agreements, all of these shares should have
been the property of the respective purchasers, but as discussed
below Mr. Shkreli and Mr. Greebel later used these shares to
satisfy investors in the MSMB entities.

Second, after Mr. Shkreli became concerned that Mr.
Pierotti was selling the Fearnow shares, he began to take
actions intended to prevent Mr. Pierotti and the other Fearnow
shareholders from trading, including sending the Fearnow
shareholders the "over the wall" email to restrict their ability
to trade or sell their Fearnow shares.[18]  (GX 245 (email on

---

[17] On December 11, 2012, Mr. Mulleady, Mr. Fernandez, Mr.
Pierotti, and Mr. Tilles's Claridge Capital each purchased
400,000 shares; Mr. Biestek purchased 350,000 shares; Mr. Vaino
purchased 300,000 shares, and Mr. Sullivan purchased 150,000
shares.  (GX 234. (see attachments).)  On December 13, 2012,
Mr. Greebel sent Mr. Shkreli an email listing this
distribution.  (GX 233.)  Mr. Shkreli responded with an email
revising the number of shares listed for each purchaser – for
example, showing that Mr. Pierotti should receive only 350,000
shares.  (*Id.*)  Mr. Greebel then sent an email to request that
the transfer agent issue the Fearnow share certificates in the
amounts actually purchased, but asked that the certificates be
sent directly to Mr. Greebel's office.  (GX 234.)  Mr. Pierotti
confirmed that he only received 350,000 shares, and eventually
settled with Mr. Shkreli for the outstanding 50,000 that were
part of his purchase agreement.  (Tr. 4304:5-23; Tr. 4275:19.)
[18] The email discussion between Mr. Shkreli and Mr. Greebel
reveals that the goal of the "over the wall" email was to stop

72

December 28, 2012 in which Mr. Shkreli tells Mr. Greebel that he thinks Mr. Pierotti is "selling"); *see* GX 248 (December 30, 2012 email between Mr. Shkreli and Mr. Greebel discussing Mr. Shkreli's plan to send the "over the wall" email and Mr. Shkreli's theory that the subject line of the email was "enough to put everyone [over the wall]").) This email included a request that the Fearnow shareholders make their shares "unshortable," which, as Mr. Pierotti explained, would "make[] it less possible and more expensive for anybody to try to short [Retrophin stock]." (Tr. 4291: 21-22 (discussing GX 120-17).)

Consistent with the government's theory of Mr. Shkreli's control, certain Fearnow shareholders – Edmund Sullivan, Ron Tilles's Claridge Capital, and Thomas Fernandez – did not trade their shares, constraining the supply of available free trading shares and ensuring that the shares remained in control of Retrophin insiders. (Tr. 4188:4-4189:12 (Ms. Oremland's testimony.) Mr. Shkreli did not disclose his control and attempts to control the Fearnow shares to the marketplace. For example, he did not list any of the Fearnow shares on the Form 13D filed with the SEC. (GX 603 (December 20, 2012 Form 13D); GX 604 (February 19, 2012 amended Form 13D).)

---

Mr. Pierotti and others from selling by forcing them "over the wall." (*See* GX 248.) Mr. Greebel provided Mr. Shkreli feedback on the email, commenting that it was an "[i]nteresting idea," and asking what would happen if Mr. Pierotti did not read the email. (*Id.*)

Mr. Shkreli's intent to control the Fearnow shares is further exemplified by his email discussions with Mr. Greebel in the months that followed the December 2012 reverse merger. Their emails in March 2013 reveal that they were focused on using some of the Fearnow shares to compensate MSMB investors, but were concerned about "a Pierotti problem" – that is, a Fearnow recipient not doing what he was told to do with the shares. (GX 271.) Mr. Shkreli described a "plan" to "[g]et as many people to forgo their holdings as possible", transfer some of those shares through Troy Fearnow to Lindsay Rosenwald and Sarah Hassan, and "others if necessary," and then "transfer the rest" to Mr. Shkreli. (GX 268 (emails of March 7, 2013).) Mr. Greebel responded "[t]he plan works" but described his concern that Mr. Fearnow could "screw the back-end people." (*Id.*) Mr. Shkreli then made his intent even more explicit, writing "I don't care how you protect me on the fearnow thing just make sure that after they agree to give up their 'escrowed stock' (despite there being now [*sic*] escrow agreement), that we can still access the fearnow stock." (*Id.*) On March 8, 2013, Mr. Greebel proposed to have the Fearnow shareholders amend their purchase agreements to direct that the stock be delivered to specific MSMB investors. (GX 271.) Mr. Shkreli responded that "what I would prefer is that the marek et al group would just reassign their stock to fearnow and he would then assign/sell it

74

to the parties", explaining that he thought this was "best" as "its anonymous and the 5 people doing it don't know exactly where its going"; Mr. Greebel replied "[y]our idea may work, although there may be a tax issue for troy [Fearnow.]"[19]   (*Id.*)

### B. The Testimony of Timothy Pierotti

Mr. Pierotti's testimony supplements the foregoing evidence of Mr. Shkreli's attempts to control the Fearnow shares.  Mr. Pierotti explained that Mr. Shkreli sought to track the Fearnow shareholders' trading by directing the opening of and monitoring of their Scottrade accounts.  (Tr. 4279:3-9; GX 120-11 (email from Mr. Shkreli's assistant regarding daily reporting of Scottrade balances); *see* GX 237 (email from Mr. Biestek to Mr. Greebel, requesting "some sort of supporting letter each of us could provide to Scottrade to ease the deposit of the certificates").)  Mr. Pierotti also testified in detail as to Mr. Shkreli's attempts to cause Mr. Pierotti to sell his shares to Mr. Shkreli.  (*E.g.*, GX 120-16 (Mr. Shkreli's email stating, "I would like to buy the 300,000 shares from you"); GX

---

[19] Mr. Shkreli argues in his motion that, to the extent Fearnow shareholders transferred some of their holdings to satisfy MSMB investor settlements, they did so because, as investors in and employees of Retrophin, they had an interest in helping settle potential litigation against the company.  (Def. Mem. at 21.) The email conversations from March 2013 show, however, that it was Mr. Shkreli and Mr. Greebel who arranged the distribution of Fearnow shares as compensation to disgruntled MSMB investors, and that Mr. Shkreli specifically expressed his intention to *avoid* letting the Fearnow shareholders know how their shares would be redistributed.  (*See, e.g.*, GX 271, 272.)

120-19 (a letter Mr. Shkreli sent to Mr. Pierotti's wife claiming both that Mr. Pierotti had "stolen 1.6 million from my organization" and that he had "stolen $1.6 million from me," and threatening "legal action to get it back"); Tr. 4289:7-8 (describing a phone conversation in which Mr. Shkreli "demanded that I sell the shares to him")).

The defense attacks Mr. Pierotti's credibility by arguing that Mr. Shkreli arranged for Mr. Pierotti to receive Fearnow shares as compensation for pursuing the Garreco transaction under the "Retrophin umbrella." (Def. Mem. at 20.) Not only is the jury to resolve conflicting views of the evidence, the court finds that the jury had sufficient evidence to conclude otherwise. First, Mr. Pierotti purchased the shares from Troy Fearnow in a nominally arms-length transaction, without any monetary contribution from Retrophin and without any indication that the opportunity to purchase Fearnow shares was intended as a form of compensation. (GX 234 (attaching Mr. Pierotti's purchase agreement).) Second, further undermining Mr. Shkreli's claim that Mr. Pierotti's Fearnow shares were unearned corporate compensation, Mr. Shkreli asked Mr. Pierotti to sell the shares to Mr. Shkreli personally, not to return the shares to Retrophin. (GX 120-16; Tr. 4288:11-4289:8.) Third, Mr. Pierotti's testimony that he was not affiliated in any way with Retrophin by late December 2012 is corroborated by his

separation paperwork, executed in November 2012, and Mr. Shkreli's own purported termination of all of the Fearnow shareholders from Retrophin on December 17, 2012. (Tr. 4281:18-20; GX 120-7 (email regarding severance checks, sent on October 25, 2012); 120-9 (severance and termination agreement); GX 242 (termination email).)

Far from exculpating Mr. Shkreli, the record evidence discussed above was sufficient for the jury to find that the Fearnow shares were not a form of compensation, and that Mr. Shkreli's claims to the contrary were pretextual and part of his plan with Mr. Greebel to gain control over the shares.

## C. The Advice of Counsel Defense

Mr. Shkreli argues that his correspondence with Mr. Greebel reveals only that he relied on "advice of counsel" and does not provide evidence of criminal agreement. (Def. Mem. at 12.) The jury was instructed on the advice of counsel defense (Tr. 5597:17-5598:21), and rejected that defense in finding Mr. Shkreli guilty. On a review of the record, including the emails between Mr. Shkreli and Mr. Greebel discussed above, the court concludes that there was sufficient evidence to support the jury's determination that Mr. Shkreli and Mr. Greebel together planned the scheme to control the Fearnow shares, and that Mr. Shkreli did not necessarily rely on the advice of Mr. Greebel. (*E.g.* GX 220 (Mr. Shkreli explaining to Mr. Greebel why he chose

the Desert Gateway shell); GX 233 (Mr. Shkreli instructing Mr. Greebel on how much should be held back from each Fearnow shareholder's allocation); GX 248 (Mr. Shkreli's draft of an email to Mr. Pierotti and other Fearnow shareholders, which intentionally included inside information in the subject line, to prevent the recipients from being able to trade their Retrophin stock); GX 298 (Mr. Greebel asking Mr. Shkreli if the shares that would be provided to satisfy MSMB Healthcare investor Richard Kocher should come "from the Fearnow block").)

In addition, the jury could find, based on testimony at trial, that Mr. Greebel, far from offering professional advice to Retrophin, operated to assist Mr. Shkreli personally and often took direction from Mr. Shkreli.  (Tr. 3394:10-3395:10 (Mr. Aselage's testimony that between Mr. Shkreli and Mr. Greebel, "Mr. Shkreli was the dominant personality" and that Retrophin terminated Katten Muchin in part because "Mr. Greebel [was] functioning not as responsive to the entire Board but only to Mr. Shkreli.").)

### D. The Definition of "Affiliate"

Mr. Shkreli contends that certain references in the government's summation to the term "affiliate" created a "prejudicial misimpression" for the jury.  The dispute over the definition of "affiliate" relates to Mr. Greebel's December 13, 2012 email requesting that the Fearnow shareholders confirm that

78

they were not "affiliate[s] (as such term is defined in the Securities Act of 1933)."  (GX 236.)

In summation, the government made several statements relating to whether certain of these individuals were, in fact Retrophin affiliates:

> [A]s you heard Deb Oremland testify, if you're an affiliate of the company, if you work there, if you own a certain amount of stock, you actually can't get free trading shares, they're going to be subject to a restriction.[20]

(Tr. 5300:1-5.)

> [S]ome of the people who were affirming that they had nothing to do with Desert Gateway or Retrophin were, in fact working there at the time . . . .
>
> So Mulleady was working for Retrophin, when he received Fearnow shares . . . he get[s] the Fearnow shares, he's an affiliate . . . . Vaino was a Retrophin employee through 2015. So when he gets the Fearnow shares, he's an affiliate.
>
> Fernandez was a Retrophin employee through 2015.  When he gets the Fearnow shares, he's also an affiliate.
>
> And Ron Tilles was a consultant for Retrophin, so when he got shares of Retrophin, he was also considered an affiliate.

(Tr. 5301:24-5302:12.)

---

[20] Ms. Oremland defined an affiliate under Rule 144 as "someone who can exert a certain amount of control over a company, either they are an officer or director or they own a large amount of shares or they are controlled by someone who is an affiliate." (Tr. 4170:1-4.)

Counsel for Mr. Shkreli did not object at the time, but, following the government's summation, the defense raised a concern with the court that the government's definition of the term "affiliate" was inaccurate. (Tr. 5316:9-13.) The parties submitted a joint definition of "affiliate" for inclusion in the court's jury charges. (*See* ECF No. 293.) On the following day, during the defense summation, defense counsel told the jury:

> [O]ver and over and over again [the prosecutor] told you that the employees of Retrophin are affiliates under the law . . . . That's not accurate. Her Honor will tell you under Rule 144 . . . affiliates don't include employees. Affiliates include officers and directors but they don't include garden variety employees . . . . And you listen to the Court's instruction and I promise you will hear some clarification.

(Tr. 5460:18-5461:9.)

In their reply, the government stated that:

> Mr. Brafman . . . misled you. He talked about the definition of an affiliate. You will hear from the Judge that what Mr. Brafman told you is not the law.

(Tr. 5514:14-16.)

Following summations, the court incorporated the parties' proposed definition of "affiliate", which was based on Rule 144, into its charge. (Tr. 5596:15-20 (The instruction read to the jury provided in relevant part: "An affiliate of an issuer under the law means a person that directly or indirectly

80

through one or more intermediaries controls or is controlled by
or is under common control with such issuer.  Whether a person
is an affiliate of Retrophin is a question of fact for the
jury.")); *see* 17 C.F.R. § 230.144.  In addition, the court
instructed the jury that counsel's summations are not evidence
and that the court's instructions must be followed whether or
not counsel states a different proposition of law.  (Tr. 5150:2-
7; Tr. 5528:7-9; 5519:9-12.)

          The defense now contends that, notwithstanding the
court's instruction on the definition of "affiliate", the
government's closing argument created a "prejudicial
misimpression" with the jury that certain Retrophin employees
were "affiliates" of Retrophin.  Mr. Shkreli does not contend
that this is the "rare" case requiring a new trial on the basis
of some form of prosecutorial misconduct.  *See United States v.
Caracappa,* 614 F.3d 30, 41 (2d Cir. 2010*)* ("Flaws in the
government's summation will require a new trial only in the rare
case in which improper statements—viewed against the entire
argument to the jury—can be said to have deprived the defendant
of a fair trial.").  Instead, he argues that "the balance of the
evidence of guilt on Count 8 was remarkably weak, leading to the
conclusion that the jury convicted [Mr.] Shkreli based [on] its
fundamental misunderstanding of 'affiliate,' as created by
Government."  (Def. Mem. at 4.)

The court concludes that the evidence against Mr. Shkreli – aside from any evidence relating to the "affiliate" email – was more than sufficient to support the jury's verdict. Furthermore, in light of the "wide latitude" given to both parties during summation, and the court's jury instructions, the court disagrees that the government's summation prejudiced Mr. Shkreli. *See United States v. Knox*, 687 F. App'x 51, 53 (2d Cir.), *cert. denied*, 138 S. Ct. 224, 199 L. Ed. 2d 145 (2017) ("the prosecution and defense are entitled to wide latitude during closing arguments, so long as they do not misstate the evidence . . . [e]ven if a remark is deemed improper, it must cause substantial prejudice to result in a new trial." (internal quotation marks and citations omitted)).

Mr. Shkreli correctly notes that the definition of affiliate is not based solely on an employment relationship. The fact that certain individuals were employees (or, in the case of Mr. Tilles, a consultant) of Retrophin would not by itself make them affiliates of Retrophin.  To the extent the government's summation incorrectly broadened the definition of "affiliate" to include mere employees, however, the court provided the correct definition of the term in its charges, copies of which were also provided to the jury for their deliberations.  (*See* Court Exhibit 5 (jury instructions).) Moreover, *both* parties told the jury that the judge would

82

instruct the jury on the meaning of "affiliate." (*See* Court Exhibit 5 (jury instructions); Tr. 5461:7-9; 5514:14-16.)

Furthermore, whether or not the intended Fearnow share recipients were in fact "affiliates" is a collateral issue. Mr. Greebel sent the December 13, 2012 email to Marek Biestek, who subsequently sent it to others, seeking confirmation that no Fearnow shareholder was an affiliate of Retrophin because Mr. Fearnow's legal counsel required such confirmations in order to write the opinion letter directing the transfer agent to issue free trading shares. (GX 125-4; Tr. 4548:5-14.) Thus, by sending the December 13, 2012 email, Mr. Greebel triggered the distribution of the Fearnow shares. (Tr. 5315:3-6 (in the government's summation, listing as one of the "overt acts" charged in the Superseding Indictment "the affiliate email[] that was sent by Evan Greebel to Marek Biestek.").) The government did not contend, however, and did not need to prove, that all of the Fearnow recipients were affiliates. Indeed, the government elicited testimony that Mr. Pierotti was not an affiliate, because he had no connection to Retrophin at the time that he received the Fearnow shares. (Tr. 4281:18-23.)

Notwithstanding any error in its summation relating to the term "affiliate," the government clearly stated, and proved, that the illegal conduct charged in Count Eight was that Mr. Shkreli fraudulently agreed to control the price and trading of

Retrophin stock.  The court then clearly defined "affiliate" using a definition supported by the law and jointly proposed by the parties.  Thus, to the extent any juror may have been briefly confused by the government's argument, Mr. Shkreli was not prejudiced.

### III. Loss Amount

#### A. Loss Amount Calculations for Counts Three and Six

The Probation Department and the government assert that the appropriate loss amount for Counts Three and Six is the amount of money respectively invested in MSMB Capital ($2,998,000) and MSMB Healthcare ($3,402,450).  (Government Letter, ECF No. 532 at 5-6.)  Mr. Shkreli contends that investors in Mr. Shkreli's MSMB Capital and MSMB Healthcare funds did not suffer any actual losses, "because they all made significant returns on their investments."  (Defendant's Letter, ECF No. 527 at 1.)  Mr. Shkreli further argues that the MSMB funds were both invested in Retrophin, and that because "Retrophin's payments to the MSMB investors were not paybacks for losses" but rather were "redemptions," "the Guidelines 'credit against loss' provision" does not apply.  (*Id.* at 4.) The evidence does not support, and indeed contradicts, Mr. Shkreli's position.  Consequently, the court will apply the

actual loss amounts calculated by the Probation Department and the government.[21]

### 1.    Count Three

With regard to Count Three, relating to MSMB Capital, Mr. Shkreli contends that evidence from his co-defendant Mr. Greebel's separate trial shows that MSMB Capital had invested in Retrophin in April 2012, such that Retrophin's payments to MSMB Capital investors in 2013 were simply redemptions for invested capital.  Not only is Mr. Shkreli's contention based on double hearsay by Mr. Shkreli to an investor's attorney elicited at another trial,[22] but it is wholly contradicted by the record evidence, which showed, as discussed in Section I.A above, that MSMB Capital did not have any funds to invest after the total losses sustained in the OREX trade in February 2011. Furthermore, as discussed, Retrophin capitalization tables did not reflect any investment from MSMB Capital until after the allegedly backdated investment in June 2012. *See supra*, n.12.

---

[21] Because the court will use the actual loss amount, it will not address the parties' arguments regarding intended loss which, pursuant to Sentencing Guideline Section 2B1.1, is an appropriate alternative measure of loss.

[22] Specifically, at Mr. Greebel's trial, Mr. Greebel's attorneys confronted Mr. Blanton with a document purporting to be an MSMB Capital balance sheet from April 2012, reflecting a $3,480,000 investment in "Level III securities." (GX 105-15.) Mr. Blanton testified at Mr. Greebel's trial that Mr. Shkreli represented to Mr. Blanton's attorney that the referenced "Level III securities" were shares of Retrophin. (Greebel Tr. 3620:6-7.)

Consistent with Second Circuit precedent, the appropriate calculation of loss for Count Three is $2,998,000, which is amount "that the investors were fraudulently induced to invest" and keep invested in MSMB Capital, based on Mr. Shkreli's many misrepresentations relating to the size, investing strategy, and performance of his MSMB Capital fund. *See Komar*, 529 F. App'x at 29.  By the time Mr. Shkreli began to funnel money from Retrophin to his MSMB Capital investors, many of the investors, as well as the Securities and Exchange Commission, had detected the fraud.  Thus, even if Mr. Shkreli were to claim a credit for payments to MSMB Capital investors in 2013, pursuant to Sentencing Guideline Section 2B1.1 Application Note 3(E), no such credit would be appropriate.

### 2.    Count Six

The court's analysis with regard to the loss amount for Count Six is similar to the foregoing analysis of Count Three.  As discussed in Section I.B above, the key distinction between MSMB Capital and MSMB Healthcare was that the latter fund did in fact invest in Retrophin.  Contrary to Mr. Shkreli's contentions, however, this investment does not give rise to "redemptions" that reduce the loss amount, because MSMB Healthcare's investment in Retrophin was an element of the fraudulent scheme charged in Count Six:  the government's trial evidence established that Mr. Shkreli used MSMB Healthcare funds

86

to funnel money to Retrophin.  *Komar*, 529 F. App'x at 29 (noting that the Sentencing Commission comments "significantly omit any direction to apply the value of an equity stake as a credit against actual loss"); *Lyttle*, 460 F. App'x at 10 ("For sentencing purposes, however, 'loss in fraud cases includes the amount of property taken, even if all or part has been returned.'" (citations omitted)).  After transferring money from MSMB Healthcare into Retrophin, Mr. Shkreli used some the funds to satisfy both personal and unrelated professional obligations.  *See supra*, pp. 62-67.  For example, on February 3, 2012, Mr. Shkreli transferred $200,000 from MSMB Healthcare to Retrophin's bank account, and then back to an MSMB Healthcare account, before transferring those funds to Mr. Blanton, who had invested in MSMB Capital, not MSMB Healthcare.  (Tr. 2699:19-2700:23.)  In addition, the government presented evidence that Mr. Shkreli converted a $900,000 MSMB Healthcare investment into Retrophin on February 1, 2012 into a loan in which Retrophin was to repay MSMB Healthcare.  Mr. Shkreli then used the $900,000 to pay a personal debt to Merrill Lynch, which arose from the OREX trading loss.  (Tr. 506-E at 13-16.)

The court will not credit Mr. Shkreli with any payments made by Retrophin to MSMB Healthcare investors in the spring of 2013, for the following additional reasons.  First, these payments were made after various investors grew suspicious

87

of Mr. Shkreli, over the five months following Mr. Shkreli's
September 2012 notification of his decision to wind down the
MSMB funds and to falsely claim that the funds were in a
position to make cash redemptions for any investor who so
requested.  David Geller, for example, wrote that Mr. Shkreli
had "put all my money into Retrophin stock at a high valuation"
despite assurances to the contrary (GX 109-12), and only after
protracted delays by Mr. Shkreli did Mr. Geller receive a
settlement agreement.  Second, Mr. Blanton and Mr. Su had
already reported Mr. Shkreli's MSMB-related activity to the SEC
prior to Spring 2013.  Finally, the court will not consider any
credits against loss resulting from payments made by Retrophin
because such payments are at the heart of the conduct charged as
Count Seven.

### B. Count Seven

As the court explains below, it will not, in its
discretion, include Mr. Shkreli's acquitted conduct charged in
calculating the total loss amount.  Nor will the court give Mr.
Shkreli credit for engaging in that conduct.  The jury acquitted
Mr. Shkreli of Count Seven.  The government asserts that it "has
established by a preponderance of the evidence that [Mr.]
Shkreli was guilty" of conspiring with Mr. Greebel to "employ[]
settlement and sham consulting agreements to steal money and
shares from Retrophin to repay defrauded MSMB investors."  (Gov.

88

Letter at 18.)  The government also notes, correctly, that the
court may consider acquitted conduct at sentencing.[23] *United
States v. Ulbricht*, 858 F.3d 71, 128 (2d Cir. 2017) ("A district
court may consider as part of its sentencing determination
uncharged conduct proven by a preponderance of the evidence as
long as that conduct does not increase either the statutory
minimum or maximum available punishment."); *United States v.
Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005).

The court concludes that the government did prove, at
least by a preponderance of the evidence, that Mr. Shkreli
conspired with Mr. Greebel to engage in the conduct charged in
Count Seven.  Nevertheless, mindful of its obligation to impose
a sentence on convicted conduct charged in Counts Three, Six and
Eight, that will address the sentencing objectives of
punishment, deterrence, and rehabilitation, *see* 18 U.S.C. §
3553(a), the court in its discretion will not include the PSR's
loss amount calculation for the acquitted conduct in Count Seven
in its Sentencing Guidelines calculation, for two reasons.

First, in calculating loss amounts for Count Three and
Six, the court has not given Mr. Shkreli any credit for
Retrophin's payments to the defrauded MSMB Capital and MSMB
Healthcare investors.  Thus, Mr. Shkreli will not benefit from

---

[23] The court is not persuaded by Mr. Shkreli's arguments that
*Nelson v. Colorado*, 137 S. Ct. 1249 (2017), precludes the use
of acquitted conduct for sentencing purposes.

his decision to use Retrophin assets to repay defrauded
investors in his hedge funds.  Second, the court notes that
pursuant to Sentencing Guideline Section 2B1.1(b)(1)(k), the
applicable Base Offense Level, and therefore the Sentencing
Guidelines range, will be the same whether or not the court
includes the conduct charged in Count Seven.  *Cf.* U.S.S.G.
§ 1B1.3, comment n.1 (in "determining the applicable guideline
range," the "the focus is on the specific acts and omissions for
which the defendant is to be held accountable").

### C. Count Eight

In contrast to Counts Three and Six in which the court
determined actual loss, both the government and the Probation
Department urge the court to consider the intended, as opposed
to the actual, loss amount.  *See* U.S.S.G. § 2B1.1 comment n.3(A)
("loss is the greater of actual loss or intended loss.").  As
discussed in Section II above, Mr. Shkreli's plan to control the
Fearnow shares was not completely successful – he was not, for
example, able to control Mr. Pierotti's allocation of Retrophin
shares.  For that reason, the court concludes that it is
appropriate to apply an "intended," as opposed to an "actual,"
loss calculation.  For the reasons that follow, the court finds
that Mr. Shkreli had the subjective intent to cause loss to the
investing public by fraudulently controlling the price and
trading volume of Retrophin's shares.  *See* U.S.S.G. § 2B1.1,

90

comment n.3(A)(ii)(I)("Intended loss" [] means the pecuniary harm that the defendant sought to inflict.").

Mr. Shkreli argues that he did not "intend" any loss to the market (Def. Letter at 12). The court finds, based on the trial evidence, that Mr. Shkreli conspired with Mr. Greebel and others to manipulate the price and trading volume of Retrophin stock, and thereby attempted to cause the share-buying public to overpay for the stock. The court further finds that a reasonable measure of the loss Mr. Shkreli sought to inflict is the difference between the price that the unsuspecting investing public would have paid for Retrophin stock had the conspiracy been successful, and the value of the shares absent the fraud. The Probation Department calculates the loss amount for Count Eight as $4 million dollars, or $2 multiplied by the two million free-trading Fearnow shares that Mr. Shkreli sought to control.

Specifically, the government and Probation contend that Mr. Shkreli did not want Retrophin's share price to fall below $3.00, because between December 2012 and mid-February 2013 Mr. Shkreli was soliciting private investment in Retrophin (the PIPEs) at a $3.00 per-share price. If the stock price had fallen below $3.00, common sense supports the position of the government and Probation that the private investors would not have invested in the PIPE, and would have instead purchased shares on the open market. (Gov. Letter at 14 (describing PSR

91

calculations).)  Probation then calculated a $5.00 artificial
high price based on the stock's approximate highest price during
the relevant period, December 17, 2012 and February 14, 2013.[24]
(*See* GX 606 (chart showing closing prices, reflecting that
Retrophin closed at or slightly above $5 on four occasions, and
below $3.00 on one occasion, from December 17, 2012 to February
14, 2013); GX 702 (reflecting the same data in graphical form).)

       The court finds that Probation's calculation of the
intended loss is reasonable and appropriate.  *See* U.S.S.G.
§ 2B1.1, comment n.3(C) ("The court need only make a reasonable
estimate of the loss.").  From December 17, 2012 through
February 14, 2013, Mr. Shkreli took numerous actions to try to
limit and control trading in the Fearnow shares when the share
price fell below $5.00.  In particular, after the Retrophin
share price fell from $7.69 on December 17, 2012 to $2.90 on
December 28, 2012, Mr. Shkreli sent the "over the wall" email to
the Fearnow shareholders, expressing his concern at the low
share price, and requesting that the Fearnow shareholders make
their shares "unshortable."  (GX 120-17 (sent on December 30,
2012).)  This email was but one instance of Mr. Shkreli's

---

[24] The PSR states that the applicable period ended February 28,
2012, but the second PIPE occurred on February 14, 2012.  (*See*
PSR at ¶ 43; GX 702.)  For that reason, the court will apply an
end date of February 14, 2012.  Between December 17, 2012 and
February 14, 2012, Retrophin's highest closing price was $5.15
on December 18, 2012.  (GX 606; GX 702.)

efforts to stop Mr. Pierotti, in particular, from trading away the 350,000 Retrophin shares that Mr. Pierotti had purchased from Troy Fearnow. *See supra* n.18.  By January 9, 2013, the share price had climbed back to $5.10, but declined again over the following week.  On January 15, 2013, Mr. Shkreli sent Mr. Pierotti's wife, Kristen, a threatening letter.  (GX 120-19.)  A $5.00 artificial high share price is therefore a reasonable estimate of the price that Mr. Shkreli would have been able to sustain, had all of his attempts been successful.[25]

        In addition to being a reasonable estimate of the intended loss, Probation's proposed loss calculation results in a more conservative loss amount than the alternatives the court has considered.  First, the court notes that the $3.00 per share price is itself a relatively high basis from which to calculate intended loss, resulting in a lower loss calculation.  Evidence at trial showed that during the relevant period, Retrophin was

---

[25] At oral argument on February 23, 2018, the government referenced an email between Mr. Shkreli and Mr. Greebel in which Mr. Shkreli referenced a $5.00 share price target. Although the government did not cite to a specific exhibit, the record evidence includes a November 1st and 2nd, 2012 series of emails between Mr. Shkreli and Mr. Greebel, in which Mr. Shkreli states that he "[n]eeds the price of DGTE to be $5 and then it should be easy," explaining in response to a question from Mr. Greebel about the $5.00 per-share target that "[l]ess shares out, better optics/comfort from investors there will not be 500 million shares out[.]"  (GX 217.)  Absent additional context for this email exchange, and given the other trial evidence weighing in favor of a $5.00 artificial high price, however, the court does not rely on this exhibit.

close to failure, with approximately $11,000 in its accounts.
(Tr. 4805:9-16 (discussing GX 609, Retrophin's 2012 10-K).)
Indeed, Mr. Shkreli had drafted a "Liquidation Press Release" on
December 29, 2012, informing the public that Retrophin had
decided to declare bankruptcy.  (GX 247.)  As a result of the
charged conspiracy, investors were unaware that what purported
to be a public company with over two million free-trading shares
was, in fact, a company on the brink of financial disaster that
was closely controlled by Mr. Shkreli and his co-conspirators,
after Mr. Shkreli and Mr. Greebel carefully secured and then
allocated free-trading shares in Retrophin in order to ensure
control.  (GX 220; GX 229.)  There is, therefore, a plausible
argument that the loss amount charged in Count Eight should be
based not on a floor of $3 per share, but rather on a lower
figure, because – but for Mr. Shkreli and Mr. Greebel's
concealment of the ongoing fraud – the investing public would
reasonably have valued Retrophin at less than $3 per share.

        Second, Probation limited its calculation of loss to
the two million shares Mr. Shkreli allocated to the Fearnow
group.  Probation, therefore, did not include in its calculation
the 400,000 shares nominally sold to the Fearnow shareholders
but in fact held in "escrow" for the benefit of Mr. Shkreli, and
used by Mr. Shkreli and Mr. Greebel to compensate defrauded MSMB
investors.  Because Mr. Shkreli controlled these "escrowed"

94

Fearnow shares, and these otherwise free-trading shares did not trade during the relevant period, the restricted supply of free-trading shares was consistent with Mr. Shkreli's efforts to maintain Retrophin's share price at artificially high levels.

Third, because Mr. Shkreli's attempt to manipulate the price and trading of Retrophin stock would have affected the price of *all* shares in the market, the court also considered applying the $2.00 per share loss figure across all trading shares, rather than simply limiting its calculations to the two million shares held by the Fearnow shareholders.

Had the court based its calculations on a lower price "floor," included the 400,000 "escrow" shares in its calculations, or sought to apply the $2.00 per share loss amount to the total volume of trading shares, the loss amount for Count Eight would have been significantly higher. Nevertheless, in order to fashion a sentence that is "appropriate and practicable under the circumstances," U.S.S.G. § 2B1.1 comment n.3(C), the court will adopt Probation's proposed calculation for the intended loss by Mr. Shkreli in Count Eight.

## Conclusion

For the reasons set forth above, the court respectfully denies defendant's motion for a judgment of

acquittal.[26]  For the purposes of sentencing, the court will

apply a loss amount of $2,998,000 on Count Three, $3,402,450 on

Count Six, and $4,000,000 on Count Eight.

**SO ORDERED.**

Dated: February 26, 2018
Brooklyn, New York

_____/s/_____

KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York

---

[26] Mr. Shkreli did not move for a new trial pursuant to Federal
Rule of Criminal Procedure 33, and, based on the trial record,
the court would in any event deny such a motion.