**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**15-cr-637 (KAM)**

_____

**UNITED STATES OF AMERICA**

**-against-**

**MARTIN SHKRELI,**

**Defendant.**

_____

**SENTENCING MEMORANDUM ON**
**BEHALF OF MARTIN SHKRELI**

**BRAFMAN & ASSOCIATES, P.C.**
*Attorney for Defendant*
*Martin Shkreli*
767 Third Avenue - 26th Floor
New York, New York 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

BENJAMIN BRAFMAN
MARC AGNIFILO
ANDREA ZELLAN
JACOB KAPLAN
TENY GERAGOS
         *Of Counsel*

**Table of Contents**

I.   PRELIMINARY STATEMENT .......................................................................1

A.   A Case of Contradictions .................................................................1

B.   The Jury's Verdict ███████████████████████..................3

II.  INDIVIDUALIZED ASSESSMENT OF MARTIN SHKRELI ..........................6

   ██   ███████████████████████████████████

      ██   █████████████████████████████████

         ██   ████████████████████████████████

         ██   ████████████████████████████████

            ██   ██████████████████████████████

            ██   ██████████████████████████████

            ██   ██████████████████████████████

            ██   ██████████████████████████████

         ██   ████████████████████████████████

         ██   ████████████████████████████████

         ██   ████████████████████████████████

         ██   ████████████████████████████████

         ██   ████████████████████████████████

      2.   The True Nature of Martin Shkreli ..........................................20

         i.   Martin's Early Years..................................................20

         ii.  Martin Has Committed Himself to Life Sciences and the Rare
              Disease Community ..........................................26

            a.   Retrophin..............................................26

            b.   Turing Pharmaceuticals ........................................30

i

        iii.     Martin Is Deeply Committed to His Employees and Their Successes…..................................................................35

        iv.     Martin Uses His Limited Spare Time to Help and Inspire Those in Need ……...............................................40

        v.     Martin Has Assisted Many Suffering Through Medical Related Issues and Abuse, Both Personally and Through the Shkreli Foundation ...................................44

        vi.     Martin Is Deeply Devoted to Education .........................................49

   B.     The Nature and Circumstances of the Offense Conduct........................................54

        1.     Martin Shkreli Begins His Career............................................................56

        2.     MSMB Healthcare and Retrophin's Beginnings .....................................59

        3.     Retrophin's Reverse Merger and the Fearnow Shares.............................61

        4.     The Retrophin Settlement and Consulting Agreements............................62

        5.     Martin's Remorse....................................................................................64

III.   ANALYSIS...............................................................................................................66

   A.     The Law Permits a Below Guideline Sentence.....................................................66

        1.     Guidelines Range ...................................................................................66

        2.     The Sentence Guidelines in This Case Do Not Properly Reflect the Degree of Martin Shkreli's Culpability .....................................66

        3.     The Court's Discretion to Vary from the Advisory Guidelines Is Well Established ...............................................68

   B.     The Factors Set Forth in 18 U.S.C. § 3553 as Applied in This Case Do Not Require Substantial Additional Incarceration........................................71

        1.     Substantial Additional Incarceration Is Not Required to Reflect the Seriousness of the Offense, to Promote Respect for the Law, or to Provide Just Punishment for the Offense..................................................71

        2.     Martin Shkreli's Character and Background Militate Against Substantial Additional Incarceration...........................................73

3.  Neither Specific nor General Deterrence Will Be Served by Substantial Additional Incarceration ....................................................... 77

    i.   A Sentence of Substantial Additional Incarceration Will Not Further the Goals of Specific Deterrence or the Need to Protect the Community ................................................................ 77

    ii.  A Sentence of Substantial Additional Incarceration Will Not Further General Deterrence ........................................................... 78

4.  A Sentence of Substantial Additional Incarceration Would Result in Unwarranted Sentencing Disparity ............................................. 81

5.  Other Sentencing Considerations ................................................ 83

IV.  CONCLUSION ............................................................................. 84

**Table of Authorities**

Statutes

18 U.S.C. § 3553.............................................................................................71, 79

18 U.S.C. § 3553(a) ...............................................69-71, 73-75, 77-78, 80, 86

18 U.S.C. § 3553(a)(l)-(7)...........................................................................70

18 U.S.C. § 3553(a)(2)(A) ........................................................................ 72-73

18 U.S.C. § 3553(a)(2)(A)-(D) ...................................................................70

18 U.S.C. § 3553(a)(6)..................................................................................81

18 U.S.C. § 3563...........................................................................................72

18 U.S.C. § 3661 ...........................................................................................74

U.S.S.G. §1B1.4.............................................................................................74

U.S.S.G. § 5B1.3............................................................................................72

Cases

United States v. Adelson, 441 F. Supp. 2d 506 (2006)............................ 67, 68, 73, 78

Agudelo v. United States, 724 F. Supp. 1110 (E.D.N.Y. 1989) ....................................55

United States v. Ali, 508 F.3d 136 (3d Cir 2007)...........................................75

United States v. Booker, 543 U.S. 220 (2005)..........................................68, 69, 70, 74

United States v. Cavera, 550 F.3d 180 (2d Cir. 2008)...................................79

United States v. Cooper, 394 F.3d 172 (3d Cir. 2005) ...............................75, 76

United States v. Corsey, 723 F.3d 366 (2d Cir. 2013)...................................79

United States v. Edwards, 595 F. 3d 1004 (9th Cir. 2010)....................................79, 80

United States v. Emmenegger, 329 F. Supp. 2d 416 (S.D.N.Y. 2004)........................67

United States v. Faibish, No. 12-CR-265,
2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015)....................................................68

Gall v. United States, 552 U.S. 38 (2007) ...................................................69, 70, 72, 73

United States v. Gupta, 904 F. Supp. 2d 349 (2012) ............................................67

United States v. Jones, 531 F.3d 163 (2d Cir. 2008) ...............................................70

Kimbrough v. United States, 552 U.S. 85 (2007)......................................................69

Koon v. United States, 518 U.S. 81 (1996) ..............................................................74

United States v. Merritt, 988 F.2d 1298 (2d Cir. 1993)............................................73

United States v. Milikowsky, 65 F.3d 4 (2d Cir. 1995)..............................................6

Nelson v. United States, 555 U.S. 350 (2009) ....................................................68, 69

United States v. Nesbeth, 188 F. Supp. 3d 179 (E.D.N.Y. 2016)................................77

Pepper v. United States, 131 S. Ct. 1229 (2011) ......................................................86

Peugh v. United States, 133 S. Ct. 2072 (2013) ...................................................69, 71

United States v. Rita, 551 U.S. 338 (2007)...........................................................69-71, 74

United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) ...........................................74-76

United States v. Smith, 445 F.3d 1 (1st Cir. 2006)...................................................71

United States v. Spears, 533 F.3d 715 (2008)..........................................................71

Spears v. United States, 555 U.S. 261 (2009)...........................................................71

United States v. Springer, 684 F. App'x 37 (2d Cir. 2017) ........................................72

United States v. Thurston, 544 F.3d 22 (1st Cir. 2008) ............................................75

United States v. Tomko, 562 F.3d 558 (3d Cir. 2009)........................................75-76, 78

United States v. Warner, 792 F.3d 847 (7th Cir. 2015)............................................80

United States v. Woods, 159 F.3d 1132 (8th Cir. 1998)............................................76

United States v. Yeaman, 248 F.3d 223 (3d Cir. 2001)............................................78

United States v. Zimmerman, No. 10-CR-598 JG,
2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012) ....................................................72

## Other Authorities

Mirko Bagaric, A Rational Theory of Mitigation and Aggravation in Sentencing:
Why Less Is More When It Comes to Punishing Criminals,
62 Buff. L. Rev. 1159, 1203 (2014).........................................................................79

Amy Baron-Evans, Sentencing by the Statute, at 7 (Apr. 27, 2009) ............................79

Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm:
 Restorative Justice And White Collar Crime,
8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ........................................................78

Raymond Paternoster, How Much Do We Really Know About Criminal Deterrence?,
100 J. Crim. L. & Criminology 765, 817 (2010) .........................................................79

Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1 (2006)............... 78-79

Robert Weisberg, Reality-Challenged Philosophies of Punishment,
95 Marq. L. Rev. 1203, 1248 (2012) .........................................................................79

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

**15-cr-637 (KAM)**

_____

**UNITED STATES OF AMERICA**

**-against-**

**MARTIN SHKRELI,**

**Defendant.**

_____

**SENTENCING MEMORANDUM ON
BEHALF OF MARTIN SHKRELI**

Defendant MARTIN SHKRELI, through his counsel, respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence in this case following a trial in which Martin was acquitted of five counts of the Indictment but convicted of Counts Three, Six and Eight.

**I.    PRELIMINARY STATEMENT**

**A.    A Case of Contradictions**

This case is a study of almost unimaginable contradictions. How is it, for example, that Martin Shkreli would help create medicines to treat otherwise untreatable diseases that kill children; that he would take a personal interest in a family ▮▮▮▮▮▮▮▮ with the fatally degenerative disease PKAN and be willing to personally pay for their treatment; that he would create a company around yet another disease (Duchenne muscular dystrophy) that also kills children; that he would offer gainful employment to a homeless man–ironically calling himself JP Morgan–who beat him in chess; that he would offer a job to another man who previously was driving a taxi; that he would read patent applications and scientific literature day and night (even

while incarcerated), despite having no formal education in this area in order to understand and treat fatal diseases that the rest of the world ignored; that he would be awarded multiple patents for his innovative treatments for deadly childhood diseases; that he would use his time incarcerated in the Metropolitan Detention Center ("MDC") teaching and inspiring fellow inmates; and that despite all of this, would nevertheless end up being the most hated man in America? How is it that someone who made millions of dollars for his investors, albeit causing these millionaires "frustration" along the way, would become the target of a federal prosecution and end up before a sentencing court?

████████████   ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

     There is not a shred of credible evidence in this case, nor did the jury find, that Martin was motivated by greed or by causing financial injury to his investors in connection with the three counts of conviction for securities fraud. Indeed, the crime of securities fraud on which Martin was convicted does not have as an element an intent by the perpetrator to realize financial gain or to cause any victim financial loss. It is therefore, highly significant that Martin was **acquitted** of every count in which loss to the victim was an essential element. Consequently, the common thread in the jury's verdict, which we accept for purposes of sentencing, is that the jury found that Martin lied, but that he did not do so to injure his investors.

**B.**   <u>The Jury's Verdict</u> █████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

██████████

█████████████████████████████████████████████████

████████████ the evidence at trial and the jury's verdict, acquitting him of wire fraud (which requires the element of loss and intent to cause loss). Indeed, every highly successful,

sophisticated investor who testified, from Josiah Austin to Darren Blanton to Schuyler Marshall, indicated the respect Martin exhibited and his undying efforts to impress them. For example, Martin sent them lengthy analyses of different clinical trials at all hours of the day and night and their likelihood of success and failure. In the case of Josiah Austin, Martin spent countless hours helping Austin amass a controlling interest in Chelsea Therapeutics and then accompanied Austin to Chelsea's headquarters to speak with management. In the case of Darren Blanton, when Blanton told Martin that Joshua Frase suffered from myotubular myopathy, Martin started Retrophin to find a cure for that disease.  Then, in a vignette showing Martin's supreme faith in his own intelligence and hard work, when Blanton told Martin to find a cure for this dreaded disease, Martin asked for a month to be left alone and he would find it.

More generally, the evidence showed that Martin wanted to achieve success by impressing these impressive people, not by inadvertently losing their money through ill-fated investments and certainly not by stealing from them. The problem was not that Martin tried to cheat or steal from his investment partners; rather, the problem was that Martin was so driven to make them money that he could not bring himself to admit failure. █████ ████████████

███ █████████████████████████████████████████████

███████████████ ██████████████████████████████████

████████████████

As counsel stated in summation, and as was apparently accepted by the jury in its verdict of five acquittals, Martin did not have to keep trying. He could have walked away after the Orexigen ("OREX") trade. Had he done that, he would not have been in the same position. However, had he stopped trying to recoup his investment partners' money, he would have been

something worse than a felon, at least in his mind.  He would have been a failure, and he could not let himself be a failure ████████████████████████████████

     After understanding Martin's true history and characteristics ██████████████████, this Court is now faced with the question of what is an appropriate sentence in this case. As will be argued more fully below, we believe that a sentence between 12-18 months incarceration, followed by court-mandated therapy and 2000 hours of community service,[1] is "sufficient, but not greater than necessary" to accomplish the goals of sentencing for the following reasons:

- The Guidelines range in this case as argued by the government significantly overstates Martin's criminal conduct;

- While Martin has been convicted of lying to his investors, he worked tirelessly to make sure that they ultimately received positive returns on their investment;

- Unlike the usual fraud case, there is no evidence that Martin used any of the investors' money to fund a lavish lifestyle;

- Martin has already served six months at the MDC–effectively a maximum security facility–where he has endured multiple lockdowns as a result of terrifying acts of violence by other inmates not involving Martin[2];

---

[1] Specifically, we propose that this community service be performed at a non-profit organization that helps prisoners reintegrate into society after completing their sentences by providing these individuals with employment services, education, mental health services and more. Martin is willing to serve as a volunteer tutor for this organization so that he may help teach formerly incarcerated individuals just as he has tried to help fellow inmates at the MDC for the past six months.

[2] Martin's bail was revoked because of his comments regarding Hillary Clinton. Absent his arrest and conviction for fraud in this case, the Court would not have had jurisdiction to remand Martin.  Standing alone, Martin's comments regarding Mrs. Clinton are unlikely to have resulted in any charges being filed and unlikely to have resulted in his arrest or incarceration. Thus, his current incarceration is punishment arising solely from the fact that he was convicted in this case.

     We note that, to the extent Martin has made occasional comments implying that he is having an easy time in prison, these comments were intended to comfort those concerned about his wellbeing, not to make light of the current conditions of his incarceration.

- Martin has persuasively demonstrated that he has a rare capacity for develop treatments to horrific diseases that have been overlooked by the larger companies. Rather than imposing a substantial sentence and thereby crushing his already vulnerable spirit, a sentence involving meaningful, intensive psychological counseling and a chance to redeem himself would foster maturity in Martin, and would put him in a position to use his unparalleled gifts toward positive ends; and

- Martin is not a danger to community and does not require specific deterrence.[3]

As the Second Circuit has noted, "the Sentencing Guidelines 'do not require a judge to leave compassion and common sense at the door to the courtroom.'" United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995). We respectfully ask this Court to use its compassion and common sense when sentencing Martin.

## II.   INDIVIDUALIZED ASSESSMENT OF MARTIN SHKRELI

In determining the appropriate sentence for a defendant, a sentencing court must "make an individualized assessment based on the facts presented," which includes "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" Gall v. United States, 552 U.S. 38, 50 & n.6, 128 S. Ct. 586, 596 & n.6, 597 (2007) (emphasis added). In this case, both the circumstances of the offense and the history and characteristics of this very unique defendant urge a sentence between 12-18 months incarceration, followed by court-mandated therapy and 2000 hours of community service.

---

[3] We are acutely mindful of Martin's inappropriate behavior following the verdict. However, his actions, for which he bears complete responsibility, were plainly a function of the stress he was under as he contemplated his uncertain fate. ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ The remedy is therefore meaningful treatment, and, most respectfully, not an extended prison sentence.



iii. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████









**vii.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Retrophin CEO Stephen Aselage testified

that Martin went to San Diego to spend time in Retrophin's California office, but stayed in his

hotel the entire trip and refused several times to meet with Aselage. (Tr. at 3474). When Martin

finally met with Aselage, he explained that "they've cut my medications in half. I think I'm

going to be okay." (Id.; see also Tr. 3007-09 (Steven Richardson testifying that Martin took

medication for his depression and often refused invitations to go out)).

Similarly, MSMB analyst Caroline Stewart testified about Martin's depressed state after

the failed OREX trade:

> Everything was very quiet and it became that, you know, the lights were not turned
> on. People had stopped coming in to work. I came in. It was just Martin and
> myself, but, you know, he was just slouched in his chair with his hoodie up and
> depressed in a way I had not seen him before.

(Tr. 2063-64).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████

███████████████████████████████████████████ after the devastating OREX trade, Martin tried

to save face by telling investor Darren Blanton the OREX loss was based on a "fat finger"

mistake. (Tr. at 1740).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

the following exchange between defense counsel Benjamin Brafman and Stephen Aselage:

> [Brafman]    Let me focus you. Did you have any concerns that he wasn't being
> truthful to an investor?
>
> [Aselage]    I thought he was sometimes of exaggerating a bit. I don't think
> that's lack of truthfulness. I think he honestly believes some of
> things he was saying. **I felt some things he was saying were
> probably through rose-colored glasses, maybe more optimistic
> than was realistic to believe**.

(Tr. at 3502) (emphasis added).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ Court in the best position to fashion

a sentence that is fair to society and to Martin, who we all hope will move beyond the realm of

social-media distraction and devote his full effort to being a man of significance and moral

strength.

### 2.     The True Nature of Martin Shkreli

In the pages that follow, people who live alongside Martin share with the Court the story of the young boy with the "sparkle of smile" eager to please his father; ███████ ████████ █████████████████; the business person who takes time to offer assistance to employees facing life challenges or health crises; the caring intellectual who longs to pull back the curtain hiding the secrets of biopharmaceuticals so that everyone has a chance for treatment and a better life; the friend who answers the call for help when no one else chooses to hear it; and the man always struggling with personal demons hell bent on self-destruction. Each aspect of Martin's life and character as told to this Court by family, friends and colleagues fits together with a different piece of the complex puzzle ███████████████.

### i.     Martin's Early Years

Pashko and Katrina Shkreli came to the United States as immigrants from Albania with hopes of making the American dream a reality for their children. Martin Shkreli was born March 17, 1983, the second of four children. Pashko and Katrina Shkreli recall wistfully that "March is a month of joy in simplest things, a cool breez[e], flowers coming out barren trees are being clothed with leaves . . . in other words a new life, a new beginning, a new rebirth." (Ex. 1: Letter of Pashko Shkreli at 1). Pashko knew early on that Martin's "mindset consisted of challenges, also in the beginning we were challenged how to adjust to him by talking with him." (Id.) Martin's extraordinary intellect made it hard to not only "adjust to him," but Pashko and Katrina also had to navigate the fact that Martin did not have the same social skills and abilities as other children. (Id.) These parenting challenges were compounded by their immigrant status—English was not their first language and their children grew up in a culture with completely new and different traditions. Raising and guiding Martin under these circumstances was exceedingly

difficult for Pashko and Katrina, as they had three other children to raise and care for ████ ████

████████████████████████████ █

From Martin's perspective, he was young boy who had difficulty connecting on social and emotional levels with an intellect that surpassed his peers. As a child, assuming he could conjure the socialization skills to communicate effectively, who could he relate to? Who could communicate with him on the right wavelength to give him the guidance, support and affection every child needs? No doubt his parents tried their best, but one can imagine that it was very difficult; as a result, Martin felt separate and alone as a young boy ████████████

████████████████████████ █

██████████████████████████ Martin was loved and cared for by his parents who share fond memories of Martin's childhood in their letter to the Court. Pashko remembers taking Martin to Yankees and Mets games and fondly recalls Martin as a boy who "had friends with easy going attitude, and a sparkle of smile, and his magnet ability, no matter where he was, people were attracted to him." (Letter of Pashko Shkreli at 1). He proudly recalls helping Martin begin his career as an investor at the age of 13: "Martin was excelling in math, and one Christmas for a gift, he asked me to buy him the book Alchemy of Finance, which I did. When Martin was like 13 plus years old I the father gave Martin $2000 to play stock markets. And did play under my name." (Id.)

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

  _____

█ █████████████████████████████████
██████████████████████████████████████



Leonora states how Martin still excelled in school. She remembers Martin at the age of six recalling square roots, multiplication tables, the Periodic Table of Elements and doing long division. (Id. at 3). She also remembers that Martin could review sports

statistics and evaluate which players might break certain records, or who could win a championship. (Id.) According to Leonora, Martin always strove to learn as much as possible and enjoyed "brainiac" activities over recreation:

> His main hobbies were chess, basketball, video games, playing guitar, listening to "underground" rock, rap music and computer science/programming. He was always atypical this way, probably fitting in more with likewise ambitious and intellectually-stimulated students, enjoying "brainiac" activities, as opposed to mainly recreational ones. In this way, I don't think I've ever known anyone who wastes less time than Martin, nor multitasks as effectively. He rarely takes vacations or does something leisurely (or even takes breaks); for him, its simply not as enjoyable and definitely not productive.

(Id.)

Martin's younger brother, Mark, ██████████████████████████ ████████████████ recalls in his letter always wanting to be "like Martin" and he admits that the same is true today. (Ex. 3: Letter of Mark Shkreli at 1). He idolizes his big brother, referring to him as an inspiration and a guide who is always hard at work. (Id.) ███████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████ They went to see Wrestlemania, concerts and other fun live events together. In closing his letter, Mark says of his big brother, "I think Martin may be difficult to understand simply because there is really no one else like him." (Id. at 2).

Franky Guttman, Martin's friend from 7th grade, echoes this sentiment. They met as students at Hunter College High School. The two boys bonded over their "love of rock music," formed a band together and played small concerts all over New York City. (Ex. 4: Letter of Franky Guttman at 1). Today, Franky is an Editor and Writer of television programs, but, back in 2007, he worked for Martin at Elea Capital when he was between assignments. Consequently, Franky has seen all sides of the "real" Martin over the years, seeing him "grow from a shy skinny kid from Coney Island into the man he is today." (Id.) During their years of friendship,

Franky observed Martin's relationship with his family and confirms that young Martin's family life was quite hard. Franky notes that he was never invited to Martin's family home and believes it was because of Martin's shame about their low-income life:

> Growing up, [Martin] received little support from his parents, and in fact he was ashamed of his own upbringing. In our dozens of years of friendship, including all of middle school, high school and college, not once did I meet his parents or go to his house, as he did not want me to see his living situation. Martin would show up to school without any money for lunch, so I would siphon off some of my modest allowance so that he would be able to eat during the day. His grades in school suffered because he had no support system.

(Id.) According to Franky, when Martin became interested in finance, "[s]uddenly he was always carrying around the newspaper, circling stock listings." (Id.) Franky notes how impressed he was when Martin landed at Cramer Berkowitz as an intern: "this boy who came from nothing found himself in the center of massive wealth, he could not pay for his own lunch, but was witnessing million-dollar transactions on a daily basis." (Id.)

One of Martin's oldest friends is Jordan Walker. Jordan met Martin 16 years ago when they were both college students. When Mr. Walker met Martin, he knew that Martin was "unique" and "marched to the beat of his own drummer." (Ex. 5: Letter of Jordan Walker at 1). Even though Jordan and Martin had not been in touch for many years, Martin was always available to provide encouragement when needed. Jordan notes how Martin was supportive when Jordan was launching a start-up called Kindly, an "app and website that provides an emotional support platform for young people with anxiety, depression and certain mental illness with the help they need":

> The moment he heard the pitch, Martin offered to become my first investor. ████
> ████████████████████████████
> Martin was immediately moved by Kindly's mission and the possibilities of helping so many people through the very devices that are in their pockets. I am very grateful to Martin and we have in fact actually saved lives through Kindly's product . . .

(Id.)[9]



    This pressure continues as Martin feels financially responsible for his siblings. (See Letter of Franky Guttman at 2 ("Martin also felt the burden of care for his sisters and brother. He felt a responsibility to help lift them out of poverty, employing his older sister as the receptionist at the fund, and guiding his brother along as he struggled through high school."); Ex. 6: Letter of David Zheng at 1 (Martin's friend from Hunter High School who witnessed "first-hand" Martin's diligent efforts to "support and nurture his sisters and brother both financially and emotionally")). He did not want to fail and have his family destitute. As a teenager and young man that reality had to exacerbate his anxiety about failure. If he failed, how would his siblings survive?

---

[9] Jordan also notes how, when Jordan's girlfriend needed a CT scan, Martin offered to pay for the expensive procedure because she had no insurance coverage. (Id.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ Soon, Martin's resources will be the only resources that his parents and his two younger siblings will rely on to survive. Sadly, he is incarcerated due to his choices, and all that he worked so hard to achieve, including financial security for his family, is at risk. Although this continues to be a source of anxiety for Martin, it is abundantly clear from the letters that follow that Martin wants to help, not just his family, but also friends, employees and strangers. This side of Martin is best displayed by his drive to help those in the rare disease community.

### ii.    Martin Has Committed Himself to Life Sciences and the Rare Disease Community

For Martin, helping those with rare diseases is a life mission that he has focused on through his years at Retrophin and Turing/Vyera.

### a.    Retrophin

In 2010, after spending his entire professional career studying drug trials, chemistry, and biopharmaceutical stocks, Martin became inspired to form his own drug company, Retrophin. With encouragement from investor Steve Richardson (Tr. 3030-31) and motivation from Joshua Frase's recent death from muscular myotubular myopathy (Tr. 1590-91), Martin began intense efforts to start a pharmaceutical company focused on orphan drugs. His efforts at curing and treating rare disease have never wavered in the years since. Martin has worked diligently and persistently to develop new treatments and to focus on a segment of healthcare that most pharmaceutical companies forget: children and adults with rare diseases.

When Martin's efforts at finding a treatment for myotobular myopathy and Duchenne muscular dystrophy became too costly for Retrophin at its infancy, he switched his efforts to fund a treatment for patients with PKAN. PKAN is a rare, neurological disorder characterized by the progressive degeneration of specific regions of the central nervous system. The typical patient with PKAN is diagnosed in childhood and the systems worsen rapidly, with some cases causing death. In April 27, 2012, Martin, Andrew Vaino, and Marek Biestek filed a patent for a treatment for PKAN called RE-024.[10] With this patent, Retrophin was able to begin studies and clinical trials to drastically improve the lives of thousands of patients suffering from this terrible disease.

Armed with these drug developments and his pharmaceutical knowledge, Martin soon became a champion of multiple patient support organizations, as well as individual patients and their families. Martin has become "one of the most dedicated advocates for an important community of people very few talk about, rare disease patients." (Ex. 7:  Letter of Patricia Hildreth at 1).[11]

Most notably, Martin was a patient advocate for the ███████████████████████ ████████████████████ who were all diagnosed with PKAN. After ██████████ learned that Retrophin was developing a possible drug RE-024 as a treatment for PKAN, the ████████' friend, ████████████ reached out to Martin via Twitter:

> My tweet to Martin, ███████████████████████████████████
> ███████████████, was answered within the hour. . .We conversed via email
> and eventually by phone over the weekend. I requested an in-person meeting at
> the Retrophin office in New York City, which he happily agreed to.



---

[10]  USPTO Applicaton #: #20130289001; USPTO Applicaton #: #20160015727; USPTO Applicaton #: #20140135294

[11]  P███ H███ █████████████████████████ ██████████████████████████ ████████████████████████████████████

(Ex. 8: Letter of R████ A█████ at 1). As ███████████ describes the visit, Martin "was able to put a face to someone that had the disease he was working so feverishly to develop the cure for." (Ex. 9: Letter of ███████████ at 1). She felt that "this was his way to so called get in the trenches with a family that was struggling to find hope for a long future with their children." (Id.) At this meeting, Martin and his team described their vigorous efforts to push through the treatment for PKAN:

> The team spent over two hours with us, discussing the research being done on animals with PKAN treated with RE-024 ████████████████████████
> All members of the team, and especially Martin, were very sympathetic to our cause and were even emotional in the meeting listening to ███████████ tell the story of ███████████ their struggle to lead a normal life. They were supportive of us lobbying the Senators serving on the Sub-Committee and offered to help us in any way possible.

(Letter of R████ A█████ at 1). Martin remained in contact with the ███████████ ███████ hroughout his tenure at Retrophin. ███████████ felt that Martin "had a connection to the patient and truly felt the pain that these boys were going [through], he is a person who showed empathy." (Letter of ███████████ at 1).

At Retrophin, Martin and his team continued their efforts to receive FDA approval for RE-024. This hard work eventually culminated in Retrophin treating select patients in Cyprus. Martin "offered to treat the ███████████ overseas, even offering to pay all travel expenses to do so." (Letter of R████ A█████ at 2). Unfortunately, the boys were not able to participate in this trial. However, the trial was successful for those patients who did participate.

Dr. Horacio Plotkin, Retrophin's former Chief Medical Officer describes how Martin's "insight in the work of science" led to amazing developments:

> Martin thought of a simple solution for the problem, and three patients that had the disease and were unable to walk, started doing so days after starting treatment. I was in Cyprus when the first patient started the treatment. He was in a wheel chair and within days he started to walk.

(Ex. 10: Letter of Dr. Horacio Plotkin at 2). Of the four patients who participated in the clinical trial, three are now doing well.

While that news is uplifting, access to RE-024 for ██████████ has been stagnant. Since Martin's departure from Retrophin, the company's communications with ████████████ ██████████ have become scarce. As ██████████ explains: "[t]he new CEO had no interest in working with us and it was obvious ██████████ were no longer a priority internally. Even conversations with Retrophin's Physician and VP of Patient Advocacy became few and far between." (Letter of R███A█████ at 2). Despite Retrophin's lack of empathy, Martin remains sympathetic. As ██████████ notes: "Martin has always been a complete gentleman showing true compassion for ██████████ and has "provided us hope when we needed it most and still does in his continued fight to help children with rare diseases." (Id.) He has continued to reach out to ██████████████ over the years "offering support in any way he could." (Id.) She pleads for leniency for Martin, stating that "Martin showed up for us when we needed him and continued to do so. While he, like everyone else in this world, may have shortcomings he has also been a blessing to many." (Id.)

Martin's scientific acumen was also beneficial for other drug developments at Retrophin. For example, Martin focused a significant amount of time and money researching a treatment for Focal Segmental Glomerulosclerosis ("FSGS"). FSGS is a rare kidney disease that causes scarring to the kidney and it affects both children and adults. In February 2012, within just one year of starting Retrophin, the company licensed RE-021 ("DARA" or "sparsentan") from Ligand Pharmaceuticals to repurpose the drug to treat patients of FSGS. (Ex. 11: DX 3419). Dr. Plotkin describes how Martin's forward-thinking benefitted people suffering with this particular rare disease:

> He had no formal science education or training, and maybe in part because of that, he was able to think out of the box and repurpose a drug that was developed for hypertension, for the treatment of a rare kidney disease called FSGS. Retrophin [ran] a clinical study demonstrating that Martin's idea that the drug could potentially help those patients was right.

(Ex. 10: Letter of Dr. Plotkin at 2). Notably, the drug that Martin repurposed for treatment of FSGS is currently in a Phase III Clinical Trial at Retrophin, after the Phase II trials showed positive results for patients.[12] These results are directly due to Martin's "out of the box" thinking to use a drug that Ligand was not using and to help patients afflicted with the disease.

The treatments for PKAN and FSGS that Martin developed during his tenure at Retrophin are now the company's two main drugs in its pipeline. In fact, Retrophin's website landing page states that their focus is "on advancing the development of our lead pipeline assets: fosmetpantotenate (RE-024) for PKAN, a life-threatening neurological disorder that typically begins in early childhood, and sparsentan for FSGS, a serious kidney disorder that often leads to end-stage renal disease. Both treatments are in their Phase III trial.[13] Dr. Plotkin tells this Court that while Martin's hand in these significant and life-changing developments are not widely known, it suggests "that Martin has a lot to give our society, and in particular patients suffering with rare diseases." (Id.)

### b.    Turing Pharmaceuticals

After departing from Retrophin in October 2014, Martin renewed his dedication to build a pharmaceutical company focused on curing and treating rare diseases. Martin immediately formed a new company, Turing Pharmaceuticals ("Turing"), with a mission on funding the discovery of new drugs for unmet and neglected medical needs—the majority being parasitic diseases. As explained by Turing employee Walter Drane: "Martin reiterated his vision for

---

[12] See http://www.retrophin.com/content/pipeline/sparsentan.php: last accessed 2/18/18.

[13] See http://www.retrophin.com/content/pipeline/index.php: last accessed 2/18/18.

building a company dedicated to alleviating the burden of devastating conditions . . . [,] diseases that large pharmaceutical companies overlooked or did not deem important enough to find a cure." (Ex. 12: Letter of Walter Drane at 1). Martin supported the company with his own personal resources, even foregoing a salary (PSR ¶ 107) in the name of researching new treatments to rare diseases that are ignored by big pharmaceutical companies.

Martin recruited top talent to work at Turing, including Adam Brockman, a PhD chemist and board-certified toxicologist with two decades of experience in the biopharmaceutical industry. While Dr. Brockman was trained as a fellow in Parasitology, he was unable to work on any serious efforts to cure parasitic diseases until Turing because the companies he worked for (Pfizer and Merck) were not interested in parasitic diseases as these diseases were "viewed as an unprofitable/charitable endeavor." (Ex. 13: Letter of Adam Brockman at 1). Dr. Brockman describes how Martin's focus on these diseases led to significant progress:

> Martin's initiative in founding Turing to pursue new treatments for parasitic diseases such as toxoplasmosis and Chagas disease drew my attention and I joined the company on June 1 of 2015 to do what I could to help advance those projects. Industrial funding put several chemists, [drug metabolism pharmacokinetics] scientists, and clinicians to work on parasitic disease and resulted in rapid progress.

(Id.) Funding this life-saving research is prohibitively expensive. Given this reality, one way that drug companies subsidize their research departments is by raising drug prices. Thus, in 2015, Turing raised money for its research department by acquiring the drug Daraprim and raising its price from $13.50 a tablet to $750. Daraprim is used as a treatment for toxoplasmosis, a parasite infection that causes serious problems for young children, pregnant women, and those with compromised immune systems—such as AIDS patients. Overnight, this business decision made Martin "the most hated man in America." As a result, Martin was also labeled as "anti-gay." Since that time, as this Court well knows, Martin has been vilified in the press.

31

The truth about Daraprim and Martin however, is far different. In his letter to this Court, Dr. Brockman explains how the funds from the price increase were used to create a new and improved Daraprim with fewer side effects:[14]

> When Turing brought Daraprim (pyrimethamine), it was a neglected product. It was still being sold in glass bottles, a fed/fasted study had never been performed, and no one had ever bothered to carefully study the pharmacokinetics of the drug it neonates. Martin's uncompensated work at Turing has helped to launch those studies and more. Furthermore, Turing became the first company to develop new toxoplasmosis drugs and now a more potent, selective drug is headed to the clinic for testing. This new drug (TUR-0006) could obviate the need for sulfa drugs, and thus remove the allergic complications that up to 60% of HIV patients experience – in addition to kidney stones and the other complications of sulfa drugs.

(Id.) In other words, Turing was (and still is) using the money from the price increases to develop a better and more efficient version of Daraprim. Extraordinarily, this improved Daraprim is already in clinical trials and exhibiting positive results. Martin did not raise the price of the drug for pure economic benefit to himself (he was not even taking a salary); he raised the price to fund Turing's research and development department.

Walter Drane was a new employee at the time the Daraprim price increase was announced, and he was recently promoted to West Region Sales Director. In his letter to the Court, he describes Martin's "unwavering commitment" to the discovery of treatments for rare diseases and some of the events that unfolded following the price increase. He shares that:

> [I]n all that you have learned about Martin at trial, or has been reported about him, and in all that Martin has done to further a public persona, I believe what has been lost, is any portrayal of the Martin I know; a man with an altruistic passion and unwavering commitment to the discovery of treatments for rare diseases . . . . I was traveling to training when the story broke of our product's price increase . . . . Martin addressed us to explain the rationale of his price-hiking action and to set the vision for his new company. That first speech was intense, albeit impressive.

---

[14] As one Turing employee explained: "the current version, while killing off the associated infection, also inflicts the patient with a host of terrible side of effects." (Ex. 14: Letter of Ralph Holzmann at 1).

> Martin is not an immediately likeable fellow. He went on for over an hour about several obscure disorders he had researched and demonstrated his command of complex areas of science. He reminded me of a slightly mad genius whose grandiose ideas to tackle multiple rare diseases could either be the product of inflated ego run amok or a brilliant visionary.

(Letter of Walter Drane at 1). Mr. Drane recalls speaking with Martin after this meeting, discussing Martin's "vision for building a company dedicated to alleviating the burden of devastating conditions:"



> I approached Martin later that evening and discovered he was singularly interested in learning what drove me. During our conversation I revealed that, ███
> ████████████████████████████████
> ████████████████████████████████
> ████████████████████████████████
>
> Martin reiterated his vision for building a company dedicated to alleviating the burden of devastating conditions ████ ████ ████ that large pharmaceutical companies overlooked or did not deem important enough to find a cure. What he failed to tell me, and I later found out on my own, ██████
> ████████████████████████████████
>
> Martin's strengths are not in understanding how emphasizing his benevolence or sharing his private side helps humanize him.

(Id.)

After the price hike, Martin's next steps show his true motivations. At first, news of the price hike understandably worried employees such as Curtis Fisher. Mr. Fisher joined Turing in August 2015 as a field representative in Baltimore, Maryland, to "ensure our inner-city AIDS patient population would be assured of access to the drugs they need to live." (Ex. 15: Letter of Curtis Fisher at 1). Just a couple weeks later, Turing raised the price of Daraprim, which caused him great concern. Mr. Fisher described how Martin swiftly alleviated his concerns:

> I immediately approached our senior leadership team, headed by Martin, and expressed my sincere concerns. Within a matter of hours I had received word from Martin that the Johns Hopkins Hospital group would not only receive an inpatient use discount of over 50% but also the inpatient/outpatient pharmacies would be allowed direct access to Daraprim making the drug more easily available to our patients.

(<u>Id.</u>) Notably, the majority of these patients received the drug through the 340B Drug Discount Program, a U.S. federal government program that requires drug manufacturers to provide outpatient drugs to eligible health care organizations and covered entities at significantly reduced prices. Mr. Fisher notes how "Turing loses significant profit each time our 340b program is used, but that didn't matter to Martin. These decisions were made and are still in effect today throughout the entire nation, having had a positive impact on our patients and those helping them." (<u>Id.</u>) Mr. Fisher explains how this showed "what Martin's true motives were." (<u>Id.</u>)

Although Turing, now called Vyera, continues in Martin's absence, those close to the company are concerned that, without Martin's guidance and presence, many of their critical goals may not be reached. As Mr. Drane explains:

> Martin's vision of creating a second-generation therapy for those suffering from toxoplasmosis may soon be a reality, and would never have been possible without him. Martin is no longer running Vyera, but his goals are far from reached. Critical medical advancements in rare diseases are necessary, and Martin's vision and passion are essential for that common goal.

(Letter of Walter Drane at 1). In a similar vein, Akeel Mithani, the current Executive Director of Vyera notes how the "world of cures needs Mr. Shkreli's innovative genius":

> There is no doubt that Martin's leadership propelled his ventures into unchartered waters regarding initiatives he was leading on two specific very rare pediatric diseases. Regrettably, without Martin's vision and distinct enthusiasm and because these types of programs do not "slot" well into the risk-reward profiles of most pharmaceutical companies, our efforts have not met with optimal success. The world of cures needs Mr. Shkreli's innovative genius.

(Ex. 16: Letter of Akeel Mithani at 1-2; <u>see also</u> Letter of Adam Brockman at 1 ("I feel the program [for new drug TUR-006] could be canceled without Martin's insistence that it proceed as the major shareholder . . . .")).

### iii.   Martin Is Deeply Committed to His Employees and Their Successes

At Retrophin, Turing, and even his software start-up company Godel Systems, Martin has utilized a reasonable and approachable leadership style—prioritizing equality, opportunities, and passion for the work. As a result, company employees are dedicated and feel like they are part of a family. (See Ex. 17: Letter of Catherine Chen at 1 (former Retrophin and Turing employee: working with Martin was "the first and only time I encountered someone that treated everyone equally at a workplace, like a family."); Ex. 18: Letter of James Rodina at 1 (Godel Systems employee: "Martin always puts our needs and concerns ahead of his own, even referring to us [as] his coworkers rather than employees.")).

Former employee Megan Roberts, a PhD who worked for Retrophin and Turing, writes that she "owes Martin everything" for her "greatest professional challenge" and "the opportunity to change the trajectory" of her career. (Ex. 19: Letter of Megan Roberts at 1). At the companies, Dr. Roberts worked on a drug called Vecamyl,[15] which she described as her "greatest challenge," but conversely that the degree of success was her "most rewarding professional experience." (Id.) Martin gave her "a rare opportunity to provide significant help to people where nothing else helped." (Id.) She describes the culture Martin fostered at the companies:

> Martin was a great boss, someone that cares deeply for his employees. He was engaging to all employees, knew all their names, and took interest in their lives. Within the first few weeks of starting at Retrophin, I was provided the opportunity directly from him to participate and learn more about another division in our company. That type of crossover is rare in the pharmaceutical space. If anyone had an interest, he cultured that curiosity. In my experience, other companies claimed to support that curiosity but rarely supported it, seeing it more valuable to keep their employees focused on their own job and out of the way of others. Martin followed through on his open-door policy. He is the first boss that I truly felt I could approach, and so I did.

---

[15] Vecamyl treats moderately severe to severe essential hypertension and uncomplicated cases of malignant hypertension.

(Id.) Dr. Roberts is "forever thankful" for the opportunities that developed from their working relationship. (Id.)

Another former employee Catherine Chen, who worked with Martin at Retrophin and Turing, also describes the inclusive environment at both companies. She notes that Martin "never excludes anyone from an activity nor cho[]se participants by hierarchy." (Letter of Catherine Chen at 1). Rather, he "gets uncomfortable when people offer to do things for him and he will insist on doing things himself. He takes colleagues to fancy dinners but prefers ramen noodles and hot dogs himself." (Id.) As a testament to Martin's commitment to his employees and his leadership at Turing, Martin "never took a salary" and "never gave himself a bonus"; instead, "he gave to his employees and wanted to make everyone else happy." (Id.)

This sentiment is echoed by other women who work with Martin. Kristen Lewis began working for Turing in April 2015 and describes the collegiate atmosphere Martin created:

> Martin would walk around the office and invite people to lunch. He invited everyone out after work. He wanted to include everyone and never wanted to make anyone feel left out. Although I've always heard about his moments, I never saw him in any other light than being just a really nice, charismatic, and brilliant guy. When we went out as a group to a small dinner he tried to speak with everyone on the same level. It never mattered who you were.

(Ex. 20: Letter of Kristen Lewis at 1).[16]

---

[16]    At Martin's trial, the government elicited testimony from Mr. Richardson and Mr. Aselage about Martin's treatment of Dr. Plotkin, Retrophin's Chief Medical Officer, at a February 2014 board meeting. Both Mr. Richardson and Mr. Aselage overstated Martin's reaction to missed deadlines for a clinical trial. Indeed, Mr. Aselage described this as "a very lively hostile interaction between Dr. Plotkin and Mr. Shkreli at this meeting" (Tr. 3372) where "Mr. Shkreli was very upset and angry at Mr. Plotkin and berated Mr. Plotkin extensively through the meeting" (Tr. 3380). Mr. Richardson also testified that "Martin was very forceful with [Dr. Plotkin] in the meeting and he used some pretty forceful language expressing his disappointment and it did create quite an atmosphere in the room." (Tr. 2934).

Despite the government's efforts to proactively impugn Martin's leadership style, Dr. Plotkin, the subject of these alleged attacks, disagrees with Mr. Aselage's version of events:

Similarly, Maureen Lohry has worked with Martin as a business development analyst for nearly a year. In her letter, she describes Martin's "compassion," good character as a leader, and commitment to her success:

> Martin is an exceptionally dedicated boss who has taken a vested interest in ensuring my career is successful. Over the summer and fall, Martin spent countless hours teaching me the ins and outs of investing, finance, the drug approval process, and business in general, topics I knew close to nothing about. He has continued this mentorship throughout his incarceration, despite having only limited access to communication. Martin has never lost his patience or belittled me; in contrast, he has always made me feel as though I am his intellectual equal.

(Ex. 21: Letter of Maureen Lohry at 1).

As a boss, Martin took extraordinary interest in mentoring many people and showed exceptional dedication to others as well. Former investor Ken Banta writes: "I have observed Martin mentor a number of young scientists and executives, many of whom have gone on to significant roles. Some of these individuals have conveyed to me that Martin's support made a critical difference to their progression." (Ex. 22: Letter of Ken Banta at 1-2).

Martin has always been willing to provide opportunities to anyone he meets, giving "people chances based on trust before proof" "with the innocence and hope of a child." (Letter of Catherine Chen at 1). This is illustrated by several letters detailing how Martin gave them a chance and a job when no one else did. One example is Tashdid Hasan, who met Martin in 2012 when Mr. Hasan was driving a taxi cab in New York City to help pay his college tuition. (Ex. 23:

---

> For the record, Martin did not shout at me. He did blame me for some missed deadlines, maybe not in the best tone, but I have seen much worst in boardrooms. Working for someone as passionate [as] Martin has its challenges, but they need to be seen in light of the final goal. As a reference, with very few exceptions, no employees of Retrophin resign[ed] during Martin's tenure. We were all working towards a common goal."

(Ex. 10: Letter of Dr. Plotkin at 1 (emphasis added)).

Letter of Tashdid Hasan at 1). After spending the entire ride discussing the financial markets, Martin encouraged Mr. Hasan to complete his college degree and learn more about investing. (Id.) When Mr. Hasan graduated, Martin offered him an internship at Retrophin. As Mr. Hasan explains:

> Martin employed me as an intern at Retrophin, Inc. Later I joined Turing Pharmaceuticals as an analyst where I worked with Martin until his removal from the company in December 2015.
>
> Working with Martin was a turning point in my life. He gave me a chance to break into an industry with high potential. I received opportunities to grow into my roles within two organizations under his mentorship. We spent many hours studying global pharmaceutical industry as he not only imparted knowledge, but also kindled enthusiasm for the industry within me. This, combined with Martin's inspiring work ethic, made me a capable professional. For this I am grateful.

(Id.) Mr. Hasan writes that Martin is "an inspiring manager who drove me to my limits to achieve professional excellence." (Id.)

Martin's longtime friend, Gary Mohamed, writes to this Court with "many examples of Martin extended opportunity to people of lesser means"—even those people who he does not know at all. (Ex. 24: Letter of Gary Mohamed at 1). For example, he remembers a time when Martin invited a homeless gentleman to interview for a job at MSMB Capital:

> JP Morgan was a chess hustler who worked in the park near Martin's office. I suspect he was homeless. The park had a number of chess hustlers and the games were 5 minutes long and the standard wager was $5. Martin and I visited the park often at lunch and he usually played a game. As I recall Martin usually won. That is until he played JP Morgan and lost a number of times. Intrigued by his defeat Martin recognized something very special about this man and invited him to interview for a job at the hedge fund. Needless to say the day this homeless man showed up at the reception are of a respectable office for his job interview the scenario caused quite a ruckus.

(Id.) Mr. Mohamed describes Martin's inspiring personal choice in "[s]eeing a homeless man and a recent immigrant as equals." (Id.)

Ryan Macy, the current CEO of Godel systems, Martin's software start-up, also thanks Martin for being "compassionate and caring"—giving Mr. Macy a job when he did not have one. (Ex. 25: Letter of Ryan Macy at 1). When Mr. Macy first met Martin, Martin was "comforting and making numerous practical recommendations to a person who just found out they had cancer." (Id.) When Mr. Macy lost his job and had no means to provide for his family, Martin lent him a "helping hand": "Martin comforted me and helped me understand how to create the best situation possible for everyone. Having two kids and a mortgage, I was at a loss − Martin offered me a job at Godel because he believed in me and saw potential." (Id.) Mr. Macy is now the CEO of Godel and thanks Martin for "[c]reating economic opportunities for others." (Id.)

Akeel Mithani, the current Executive Director at Vyera, also thanks Martin for the opportunity Martin extended to him, despite having no pharmaceutical experience. Like many others, Mr. Mithani approached Martin via Twitter with a question. Nearly a year later, in 2015, Martin agreed to interview him. As Mr. Mithani describes it, "[t]o that point, I had enjoyed a relatively successful career in real estate, but my interaction with Martin led me to change my career path." (Ex. 16: Letter of Akeel Mithani at 1). Martin began mentoring Mr. Mithani by recommending books on pharmaceutical development and answering any of Mr. Mithani's questions. Eventually, Martin extended Mr. Mithani an opportunity to be considered for a position as a Junior Business Development Analyst even though Mr. Mithani "sorely lacked the qualifications." (Id.) Martin lobbied the company to hire Mr. Mithani and now Mr. Mithani has risen to a senior level position.

Even though Martin did not know these people well, he gave them opportunities to excel at a variety of different jobs. Martin's sister, Leonora, who worked with him at MSMB and Retrophin has "witnessed him give people multiple chances, especially employees (who have

always told me that he is more generous than most employers).” (Ex. 2: Letter of Leonora Izerne at 4). These are just a few examples of “what a thoughtful, humble and generous person he is.” (Letter of James Rodina at 1). There are countless more.

For as long as Martin has been at the helm of a company, he has been there for his employees as they navigated the complexities of life. Catherine Chen gives one example how Martin was “kind and generous” to an employee whose spouse had cancer:

> I have witnessed him at work on his way to a meeting and overheard a colleague sitting three feet away from me on the phone discussing cancer treatment for her terminally husband. He stopped to inquire if there is sufficient help, indicated he knows a few highly respected doctors to introduce her to. Then proceeded to ask if there is insurance coverage for the treatment. When he found out it was not covered due to our not so stellar health care system, he casually mentioned he has a foundation to help with all necessary fees. Then he continued walking to his meeting. In the mere 90 second conversation, he lifted all the worries of someone without a second thought. He never mentioned it to anyone and I know, from our colleague, he took no time to do what he said he would.

(Letter of Catherine Chen at 1).

Martin’s kindness to this employee is not uncommon. Ralph Holzmann is the current Chief Technology Officer at Martin’s start-up Godel Systems; he writes about witnessing Martin’s “compassion” for his employees during their time of need. Mr. Holzmann remembers a time when Martin “paid a former contractor’s rent because they were struggling and unable to find new work.” (Ex. 14: Letter of Ralph Holzmann at 1). He treats his employees as family, giving them chances to succeed in their field.

### iv.   Martin Uses His Limited Spare Time to Help and Inspire Those in Need

In addition to starting companies and researching scientific developments, Martin spends a lot of time online, where he has developed friendships and helped those facing terrifying medical issues. While Martin’s social media presence is often portrayed negatively, Martin actually spends a great deal of his time online speaking “to cancer patients, to people suffering

from AIDS, [and] to parents of terminally ill children" from all over the world. (Ex. 18: Letter of James Rodina at 1). The sentencing letters show several examples of these close relationships Martin has developed online. The letters show how Martin exhibits "compassion and patience" when "[s]trangers often bombard him asking for help and the latest research findings. Instead of ignoring these people, Martin takes the time to respond and to get to know the person." (Ex. 26: Letter of Laura Castro at 1). He has touched each one of these people's lives "by sharing his knowledge of the pharmaceutical developments to give them hope, and offer[ing] his support in their time of need." (Letter of James Rodina at 1). To those afflicted with disease who feel forgotten by the pharmaceutical industry, Martin's "mind and his drive are invaluable." (Ex. 7: Letter of █████ H█████ at 1).

 For example, Martin formed a bond with P████ H█████ a terminally ill patient suffering from ████████████████████ a rare disease ███████████████████████ ████████████████████████████████████████████████████████ ███████████ After meeting Martin in an online forum dedicated to a drug in development for this forgotten disease, she admits that she was "unprepared for the relationship that would come from that initial conversation given many of us in the Rare Disease community often feel we are not seen or heard by those in the Pharmaceutical Industry." (Id. at 1). Since their friendship began over two years ago, ███████████ and Martin began speaking regularly, with Martin "asking how [she] was doing, if [she] needed anything or what [her] current medical testing was showing." (Id.) Martin has continued to correspond with ███████████ while at the MDC. Even while incarcerated, Martin continues to be "the kind and compassionate person with a relentless drive to help the rare disease community." (Id. at 2).

Sophia ████████ a German native who suffers from ██████████████████████ ████████████████ met Martin online through his live streams in late 2015. After getting to know his "caring and gentle" personality, Sophia and Martin developed a close friendship. (Ex. 27: Letter of Sophia ██████████ at 1). She writes that "Martin gave me a sense of hope regarding my own condition, apart from hearing him describing his own life experiences, he personally gave me great advice on how to treat my ██████████ best whereas all the doctors over here told me I'm a lost cause and had no interest in helping me get back on my feet." (Id.) Sophia credits Martin's encouragement and effort with allowing her to "reconcile [her] own past experiences, successfully [beating her] own demons and [moving] forward in a manner more conducive to successful future developments…" (Id.)

Additionally, Martin has remained in touch with R███ A████████ ████████████████ ████████████████████ Recently, in June 2017, she "reached out to a family who had been denied a drug for their four-year-old son who was suffering with a terminal cancer." (Ex. 8: Letter of R███ A████████ at 2). After researching the drug, ████████████ asked Martin for insight on the drug. Despite the stress of trial preparation, Martin "took the time to research the drug and provide his insight on how the family might be able to request approval for treatment. Once again offering his sympathy to the situation." (Id.) She remains "fortunate that Martin Shkreli has been part of my story" because "Martin showed up for us when we needed him and continued to do so." (Id.) She writes that Martin "provided us hope when we needed it most and still does in his continued fight to help children with rare diseases." (Id.)

P███ M████████ a Brazilian investor who was diagnosed with the incurable disease ██████████████████ in late 2012, emailed Martin shortly after his diagnosis and has come to know Martin well in the years since. Despite having just taken Retrophin public, Martin "promptly"

answered █████████ and they exchanged "maybe a hundred emails in a couple days around New Year's Eve." (Ex. 28: Letter of R███ M████ at 1). Intent on learning about his disease and prognosis, ██████████ basically kept asking him questions about everything related to ██ and medical research…dialysis, Medicare, HIV, nutrition, etc." (Id.) Touched by Martin's helpfulness and knowledge of the industry, █████████ decided to invest in Retrophin, received a great return on his investment and sold all of his shares the day Martin was fired in 2014. █████████ "as a patient with an incurable devastating disease like hundreds of millions of others around the world" asks this Court to punish Martin "in a way that makes society benefit from his mental capacity." (Id.)

Beyond his support for a community of people facing medical concerns, Martin has also developed important friendships online with individuals who were going through rough patches in their life. For example, Martin met R███ V███ online on a "website called Blab that's sole purpose, inevitably, was to create communities." (Ex. 29: Letter of R███ V███ at 1). She explains how "Martin was simply there for me in a way that many people don't know how to be" during a devastating time in her life:

> In July of 2016 I was raped on the evening of a networking event. I arrived home in shock, which quickly dissolved into panic. I was frightened, insecure, belittled, and alone. I desperately went through my list of personal contacts trying to find anyone who would help me; phoning some people many times in a row. Martin was the only person who answered that night. We talked for what felt like hours. He listened to me, calmed me down, helped me think and see straight, guided me toward what my next steps should be, encouraged me to call the police. And, he let me cry.
>
> Over the next couple months getting through my day to day life felt next to impossible. I became a recluse; refusing to leave the safety of my home unless absolutely necessary. I was haunted by nightmares, and chose to forego sleep instead. Even though Martin couldn't physically be near me, he sat with me through most of those days and nights via internet voice calls. We would talk, or not. Play games, or not. Do our own thing, or not. But, we were always connected. Something about knowing he could hear me made me feel safe. And,

hearing him made me feel like I wasn't alone. He suggested to me music, books, videos, and any other art form that he said had helped him through the rough patches in life.

(Id. at 1-2). ████ ████ acknowledges that while "healing isn't that simple," she feels like herself again. Id. She has Martin to thank for this renewal in strength and thanks him because "[h]e offers the truest form of friendship I have ever known." (Id.)

Similarly, Ryan Macy, the current CEO of Martin's software company, fondly remembers first meeting Martin when Martin "was comforting and making numerous practical recommendations to a person who had just found out they had cancer." (Ex. 25: Letter of Ryan Macy at 1). To those suffering, "Martin has been the long needed voice for those of [whom] it is 'less than profitable to help.'" (Letter of ████ ████ at 2). As Ken Banta writes, "[t]here is no question that Martin's talents and commitment must be channeled appropriately. But I believe that Martin can and will be a continuing force for health innovation and the good of patients. (Ex. 22: Letter of Ken Banta at 2).

**v.    Martin Has Assisted Many Suffering Through Medical Related Issues and Abuse, Both Personally and Through the Shkreli Foundation**

Martin has also supported many charitable causes, eventually forming a family foundation—the Shkreli Foundation—to support ongoing medical research and victims of abuse. Prior to forming the Foundation, Martin "had already provided donations to various charitable organizations," but was eager to help on a wider scale "[o]nce he heard about children in need, patients without medication, shelter animals or under-funded programs . . . ." (Ex. 2: Letter of Leonora Izerne at 4).

These charitable undertakings began at Retrophin where the environment Martin created focused on patients. In 2014, Martin arranged for the delivery of a one-year supply of medicine to an 11-month-old Venezuelan boy who was awaiting a liver transplant. Due to protests in

44

Venezuela, the boy's father had been unable to secure crucial medicine the boy needed to survive until the transplant. The father was forced to travel through security checkpoints in the mountainous border region dividing Venezuela from the Columbian border town of Cucuta— where he paid five times the price to secure his son's medicine. (Ex. 30: Bloomberg Article). Martin heard about this and used his company's resources to provide aid. Dr. Plotkin, recounts the immediacy with which Martin operated after learning of this story:

> he immediately contacted Tom Fernandez (head of patient advocacy and at Retrophin) and me to try to help the baby. We quickly got in touch with his treating physician in Venezuela, and put her in touch with a pediatric GI specialist in Boston, who happened to be from Venezuela also and knew her well. He agreed to write a prescription for the baby, and I personally bought the medication from a local pharmacy, enough medication to cover one year's treatment.

(Ex. 10: Letter of Dr. Plotkin at 1). The boy's father was thankful for Martin's help, noting, "This has been a blessing to us . . . a whole family and many hearts are grateful for the help of the treatment." (Bloomberg Article). Even though Retrophin did not manufacture this medicine, Martin said, "it is our obligation to take responsibility for the community of people that we have joined by being drug developers." (Id.) Martin has continued this obligation at Turing. For example, employee Mr. Holzmann remembers when Martin "spent an hour on the phone comforting the family member of a patient in South America that needed Daraprim" despite the fact that Turing does not have distribution rights outside of the United States. (Ex. 14: Letter of Ralph Holzmann at 1).

On other occasions, Martin helped strangers and friends alike with necessary funds for medical procedures if they were without insurance. Dr. Plotkin remembers an "example of Martin's generosity" during Martin's tenure at Retrophin. (Letter of Dr. Plotkin at 1). The company learned of a young girl with PKAN, who was the daughter of an undocumented woman from Central America. "She had no medical insurance, and the girl needed a wheel chair. Martin

[not only] donated the money to get the girl a wheelchair, he also gave the family extra money to help them." (Id.)

Martin is also a strong supporter of philanthropic organizations that assist those with autism, mental illness, or depression. James Rodina remembers when "when Martin came to the defense of an autistic teenager that was being bullied by the rapper 50 Cent. Martin started a crowdfunding campaign, donating thousands of dollars of his own money and inspiring many others to do the same." (Ex. 18: Letter of James Rodina at 1). In fact, Martin pledged $10,000 to this campaign. Dr. Plotkin also remembers calling Martin "to tell him about a little girl in Boston, who was blind and autistic" whose parents could not afford the tuition at the special needs school. (Id.) "Without hesitation, [Martin] responded that he was going to pay for it. The family ended up not accepting Martin's offer, as they considered that it was too much money." (Id.)

Martin's charity is not limited to the medical community. For example, despite the media's claim that the Daraprim price hike has disparately damaged the gay community, Martin has used his resources to support LGBT charitable missions that help improve communities. In 2014, well before Martin acquired Daraprim, Martin contributed $30,000 to The Lesbian, Gay, Bisexual & Transgender Community Center. (Ex. 31: The Center Letter to Martin Shkreli at 1). The Center's goal is to foster a welcoming environment where everyone is celebrated for who they are.

In conjunction with his personal donations, in late 2014, Martin formed the Shkreli Foundation to donate to "causes that touched his heart, whether board members mentioned charities close to them, or strangers needed help." (Id.) Martin enlisted the help of his sister Leonora Izerne to run the charity. Leonora's first task was to pay "the doctor's bills for a PKAN

patient's mother. Her daughter needed a wheelchair, monthly nutritional supplements and a new van for transportation for the many doctor's appointments." (Letter of Leonora Izerne at 4). This donation was not the last. Leonora recalls that later that year, at Christmas, "[Martin] suggested that we buy all of her daughters Christmas presents, which was for me a true pleasure, taking me to American Girl Place to purchase their dolls of choice." (Id.)

The foundation has also donated to other causes—mostly focusing on medical research. For example, it made donations for the purpose of supporting the research and treatment of Duchenne Muscular Dystrophy ("DMD"), despite the fact that Retrophin could not find a treatment for the disease.[17] Even after leaving Retrophin, Martin stayed laser-focused on making sure a treatment for this disease was still funded. Thus, the Shkreli Foundation approved a grant to Charley's Fund in September 2015 "in an amount up to $150,000 . . . for the purpose of supporting the research and treatment of Duchenne muscular dystrophy." (Ex. 32: Shkreli Foundation Letter to Charley's Fund). Additionally, the Shkreli Foundation supported Matt's Promise, an organization "dedicated to making a difference in the lives of young people affected by terminal illnesses," specifically, "research for the treatment and cure of DMD." (Ex. 33: Shkreli Foundation Letter to Matt's Promise). In May 2015, the Foundation donated $34,000 to the Matt's Promise. The Foundation's "extreme generosity" ensures that Matt's Promise can continue cutting edge research. (Id.)[18] The Foundation has also supported research in the area of

---

[17] As this Court may remember, at Retrophin's founding, Martin focused on finding a treatment for Duchenne muscular dystrophy. (See GX 122-6).

[18] Personally, Martin has continued his support of PKAN patients. Martin's friend, Christina Germano, writes the Court with one instance where Martin called the father of a child suffering from PKAN "because he saw on the news that a PKAN donation box had been stolen from the man's store. Martin insisted on covering the cost and then some and offered to meet with the family to provide whatever solace he could." (Ex. 34: Letter of Christina Germano at 1).

spinal cord injury. In 2014, one of the members on Martin's team had a child with a spinal cord injury. This inspired Martin to explore research advances in this area. He contacted Dr. Andrei Krassioukov, a professor of medicine at the University of British Columbia ("UBC") in Canada, whose research "involves the examination of potential health conditions of Paralympic athletes with spinal cord injury."  (Ex. 35: Letter of Andrei Krassioukov at 1). Martin had accumulated "personal knowledge in [the] area of spinal cord injury and complications that these individuals experience" and wanted to "support ongoing research" in Dr. Krassioukov's laboratory. (Id. at 2). In early 2015, the Shkreli Foundation donated $50,000 to the UBC Department of Medicine. (Ex. 36: Shkreli Foundation Letter to UBC). The Shkreli Foundation donated this money "to support . . . ongoing research efforts, as well as to fund educational clinics conducted during International Paralympic events." (Id.) In fact, a portion of the donation was used to support research during the Pan American games that examined "difference in heart rate responses during international wheelchair rugby competition between athletes with and without a cervical spinal cord injury and across standardized sport classifications." (Ex. 37: Spinal Cord Injury Impairs Cardiovascular Capacity in Elite Wheelchair Rugby Athletes). Martin's hope was "[t]his work will provide critical benefits for individuals with SCI, their caregivers, and medical personnel and will enhance and improve the quality of life for these individuals." (Shkreli Foundation Letter to UBC).

Through the Shkreli Foundation, Martin and Leonora have helped "support [] victims of abuse and domestic violence." (Letter of Leonora Izerne at 2). In September 2015, The Foundation donated $25,000 to the New York Center for Children "for the purpose of evaluating, treating, and preventing child abuse, including the provision of quality medical and mental health services free of charge to children who have been sexually, physically and/or emotionally

abused." (Ex. 38: Shkreli Foundation Letter to NYCC at 1). Martin and Leonora "hope to continue lending support to victims of abuse and domestic violence through, and beyond the Shkreli Foundation. Even if this is not publicly or directly shared, we will make it a point to somehow give back to that cause." (Letter of Leonora Izerne at 2).

Martin has even continued his philanthropic intentions by adopting a foster cat. After meeting Amber Emmertz through his online community and hearing about the cat Ms. Emmertz's mom was fostering, Martin decided to adopt her. Ms. Emmertz describes the connection that Martin and the cat formed:

> She was initially skittish due to either poor eyesight or deafness, the adoption center was unable to confirm, but Martin took the time and effort to gain her trust. They formed a strong bond, and he provided a good home for a disabled cat that had been in a shelter for two years and would otherwise be there.

(Ex. 39: Letter of Amber Emmertz at 1).

### vi.   Martin Is Deeply Devoted to Education

In addition to supporting medical related causes, Martin has made remarkable financial and personal commitments to education. Martin made a $1 million donation to Hunter College High School—the largest donation that Hunter College has ever received. The impetus for this donation was Martin wanting "to give back to the school where he experienced (per the Summer 2015 *AlumNotes* publication of the HCHSAA) a 'vibrant and rigorous education that was simultaneously friendly and sociable.'" (Ex. 40: Letter from Hunter College Foundation at 1) He explained that "'Hunter helped me during some unique life challenges. I know there are plenty of other students with similar challenges.'" (Id.) Due to the sizeable donation, Hunter College High School has divided this money between the Endowment and to immediately support students at the school:

> The gift has been used to create an Internship/College Coordinator, who works to connect needy students with summer internships and also helps link qualified 11[th]

and 12th grade students to appropriate college-credit courses at Hunter College. The funds have also been used to upgrade a language laboratory, to maintain a writing center within the English department at the school, and to provide overnight college visits for students of families of modest means and who otherwise might not be able to see first-hand what a college looks and feels like outside the urban environment of New York City. Funds from the endowed portion of the gift will be used to help support a significant capital project that will directly benefit the lives of all students in the school building (grades K-12).

(Id. at 1-2). Donations such as these "make a tremendous difference in the quality of the education [Hunter] students receive." (Id. at 2). Additionally, funds from the Endowment Account support grants to fund a total of four "'allowances' (course reductions for full-time faculty members) to support science and computer science. One of these allowances is supported by the Martin Shkreli Funds." (Ex. 41: HCHS Report Expenditures of Shkreli Funds at 2). Martin's money is still working to support education through this high school in New York City.

Martin's commitment to education is much broader than this substantial donation to Hunter City High School and his on-line lessons detailed earlier. Seasoned educator Kenneth McCarthy writes to this court that "Mr. Shkreli is a highly unusual and I imagine aggravating man, but I have rarely in my 35+ years as an educator encountered any individual in any setting with his depth of sincerity towards uplifting others through education." (Ex. 42: Letter of Kenneth McCarthy at 1). Martin is interested in helping people succeed in life and better themselves. In doing so, he has, in the past, incentivized students to learn.

Another example of Martin's unique approach relates to his speech at Princeton University in the spring of 2017, when Martin posted a math problem on the screen for the audience. Princeton student Yuan Wang remembers that "some cajoling was required to direct attention to a math problem, so Martin offered to the first student to answer the question with a rigorous proof,  payment for the remainder of their tuition at Princeton." (Ex. 43: Letter of Yuan Wang at 1). Mr. Wang arrived at the answer to the proof and approached Martin about his prize

even though, as a Senior, Mr. Wang had no tuition left to pay. Mr. Wang "asked instead if [Martin] would be willing to finance my continued education outside of school via a scholarship" to work at a startup. (Id.) Martin agreed to award Mr. Wang a "generous scholarship" and urged Mr. Wang to explore the startup work that excited Mr. Wang. Martin began serving as Mr. Wang's mentor:

> Upon following up with him in the next week, what was initially a checkup on whether my proof was validated turned into a sequence of career-advising phone conversations where we discussed topics ranging from effective altruism to startup financing to K-12 STEM education to our immigrant parents After he validated my original solution to my problem, he agreed to award me a generous (by my view anyways) scholarship, urged me to use it to explore the work that so captivated me about my startup.  It was an unprecedented act of generosity on his part, towards a student who probably classified him as no more than Internet troll who happened to be wealthy.  In hindsight, it was some of the best mentorship I had received in a while.

(Id.) Mr. Wang is now the founding CEO of a marine research start-up company, American Marine Research Company. He notes how Martin chooses to focus on work and not his own wellbeing:

> …When I asked him how as a health industry investor and avid reader of medical research why didn't exercise better and take simple effective measures to combat his sickliness, he replied that he could probably do better, but that when there is work to be done, it was hard to justify exercise and self-care that his blue-collar parents couldn't even think of prioritizing.

(Id. at 2). Mr. Wang, who typically shies away from attention, found it important to write the Court because if Martin's dealing with him "a humble recent college grade [is an] indication of his character and motivations, [he] believes [Martin] is a good man." (Id.)

Martin's commitment to education is further demonstrated by his efforts to teach as many people as possible through social media. Many individuals who know Martin through his education series he posts on YouTube and Facebook wrote to this Court. One individual, Laura Castro, first encountered Martin as "America's Most Hated Man" and was intrigued to find out

more about him. (Ex. 26: Letter of Laura Castro at 1). After watching Martin's lessons on finance and chemistry, she now respects and admires Martin because he "has a natural ability to make difficult topics understandable" and she "could tell that teaching made Martin incredibly happy." ((Id.); see also Ex. 44: Letter of Lisa Whisnant at 2 (noting how Martin enjoys "sharing information with anyone willing to respectfully listen"); Ex. 21: Letter of Maureen Lohry at 1 (Martin has amassed a large following of his educational videos because "he engaged with his students . . . to really ensure that he is teaching in a clear and concise manner"). Another online student, Jennifer Kong, notes how "[a]lthough Martin is an entrepreneur and not an academic, he strikes me as a natural educator because he puts his students needs first." (Ex. 45: Letter of Jennifer Kong at 1). Ms. Kong continues that "many of my past college professors could learn a thing or two from Martin Shkreli about how to engage (and entertain) their students." (Id.)

Martin's lessons have inspired those who study them to continue their education. For example, Kristan Ramirez states that Martin's encouragement has helped her during her years of study; she thanks Martin for spending time "altruistically teaching others" the subjects he knows well:

> Because of [Martin] and his inclination to ignite distinction in others, many have gone fourth (sic) to strive for something great, myself deciding to apply to PA school. I have him to thank for my educational focus and newly found ambition. What he provides myself and others is invaluable and truly a gain to the community.

(Ex. 46: Letter of Kristan Ramirez at 1; see also Ex. 34: Letter of Cristina Germano at 2 ("He has inspired me to not only have confidence in who I am but to pursue my passions and continue my education so that I may one day be able to help people in a similar fashion")).

Although incarcerated, Martin continues to try to help those around him through education and mentorship. While at the MDC, for example, Martin taught basic math classes and business classes to the fellow inmates. Ken McCarthy an educator writes that since Martin's

incarceration, his "sole interest, besides personal preservation, has been to acquire materials to assist him in teaching fellow inmates. He has requested dictionaries, basic math books, grammars, and self-help books. . . ." (Letter of Kenneth McCarthy at 1).

One inmate who has benefitted from Martin's help Lamark Mulligan, writes Your Honor that "Martin has been the most positive and influential part of my experience [at MDC] thus far." (Ex. 47: Letter of Lamark Mulligan at 1). Mr. Mulligan previously attended Pennsylvania State University, where he studied Computer Science and Sociology, yet he learns "just as much, if not more, sitting in at one of Martin's classes. [Martin's] always so excited to teach the class is always very informal and patient." (Id.) Remarkably, Martin "has made something as horrific as being incarcerated a positive and impactful learning experience" for Mr. Mulligan. (Id. at 2).

Yet, another inmate, Patrick Sutherland, describes how Martin at the MDC "always put[s] effort into helping the people around him." (Ex. 48: Letter of Patrick Sutherland at 1). Mr. Sutherland expresses his thanks to Martin for extending "a helping hand" whether it be teaching chess or finding a good book to read. (Id.) In addition, Martin extended a most thoughtful "helping hand" when he asked his sister Leonora to help Mr. Sutherland's girlfriend who had just given birth. As Mr. Sutherland recalls, "Martin found out that my twins who were born months early was still in the NICU he had diapers, wipes and various supplies send (sic) to my girlfriend. That was the most caring gesture anyone has done for my family in these stressful times and it shows the true character of Martin Shkreli." (Id.) Even when Martin is struggling himself in prison, he is moved to help others, just as he did when he saw a child like Joshua Frase pass away, or when he finds out a child in Venezuela does not have life-saving medicine, or when he meets someone online struggling with a medical condition.

In the last few sections, we have portrayed a side of Martin that is vastly different than the Court and the pubic are familiar with. This is the caring, benevolent and thoughtful side of Martin that unfortunately gets missed with the distraction that Martin has become. As Vyera employee Mr. Drane describes, "Martin's strengths are not in understanding how emphasizing his benevolence or sharing his private side helps humanize him." (Ex. 12: Letter of Walter Drane at 1). Martin can be best explained by longtime friend, Gary Mohamed, who has known Martin since 2002:

> To say Martin is a very complex man is an understatement. Equal parts brilliant and impossible, and always struggling with personal demons hell bent on self-destruction. In fact Martin's lifelong dream of running a publicly traded pharmaceutical company was derailed pre-maturely by this compulsion for self destruction.
>
> Much has been made of Martin's short comings; labeled the 'most hated man in America,' pilloried in the popular press, and publicly called a 'spoiled brat' by none other than the President of the United States of America, yet this persona that the public knows is only a part of the story. Again, Martin is a very complex man.
>
> Martin is also a very generous person who has zero regard for personal luxury and comfort. I would dare say that this is a rarity for people convicted of financial fraud. Martin would much rather quietly give of his time and capital than to waste a penny on a personal comfort. I have heard many stories, never directly from Martin, where Martin arranged for medicine and medical treatments for desperately ill people of little means.

(Ex. 24: Letter of Gary Mohamed at 1). We hope that, in fashioning its sentence, the Court does not focus only on Martin's criminal conduct, but rather focus on the "kind, compassionate, engaged" person who is "always willing to help." (Ex. 8: Letter of R██████ A██████ at 2).

## B.    The Nature and Circumstances of the Offense Conduct

Martin Shkreli was indicted for four different schemes: (1) the MSMB Capital Scheme (Counts One through Three) for making material misrepresentations and omissions to investors related to the fund's assets under management ("AUM") and retention of a fund administrator

and an independent auditor, as well as preventing redemptions in the fund by providing investors with fabricated performance statements and concealing trading losses; (2) the MSMB Healthcare Scheme (Counts Four through Six) for making material misrepresentations to investors by concealing his past performance as a portfolio manager, misrepresenting the fund's AUM and preventing redemptions in the fund by providing investors with fabricated performance statements; (3) the Retrophin Misappropriation Scheme (Count Seven) for settling liabilities using settlement and consulting agreements to repay MSMB investors with Retrophin shares and cash; and (4) the Unrestricted Share Scheme (Count Eight) for conspiring to control the price and trading volume of the free trading Retrophin shares.

Ultimately, Martin was acquitted of five counts (Counts One, Two, Four, Five, and Seven) and convicted of three counts (Counts Three, Six, and Eight). By now, the Court has considered lengthy testimony throughout the Shkreli and Greebel trials, and we do not intend to restate the facts, but choose instead to highlight certain features that are, in our judgment, relevant for sentencing.[19] In doing so, we are not ignoring the incriminating trial evidence or trying to relitigate the jury's verdict. Rather, we seek to focus the Court on important mitigating factors that separate this case from nearly all other fraud cases, namely that Martin worked

---

[19] Counsel submitted lengthy objections to the December 12, 2017 Presentence Investigation Report and filed our submissions stating our position on Forfeiture (Dkt. Nos. 515 and 529) and Loss (Dkt. Nos. 527 and 532). Probation chose not to consider these objections—opting instead to "defer[] to the government regarding any objections to factual information," as the government informed Probation that "the PSR is accurate, and was either proven beyond a reasonable doubt at trial or can be proven by a preponderance of evidence." (Addendum to the PSR at 2). Counsel are somewhat dismayed that Probation in this case has chosen to simply defer to the prosecution instead of fulfilling its role as a "neutral gatherer of information." See Agudelo v. United States, 724 F. Supp. 1110, 1111 (E.D.N.Y. 1989) ("A federal probation officer is an arm of the court and not an agent of the government qua prosecutor. The probation officer's role in the sentencing process is not an adversarial one. Rather, he acts as a neutral gatherer of information from many sources to be used by the judge in imposing sentence."). Despite the fact that Probation did not consider this information, we still rely on these specific objections which we also submitted to the Court and will not revisit these objections herein.

tirelessly to ensure his investors profited from their investment and that he did not use investor funds to support his personal lifestyle.

### 1. Martin Shkreli Begins His Career

At 17 years-old, while still in school, Martin began an internship at the investment firm Cramer Berkowitz, where he found a niche studying healthcare stocks. After Cramer Berkowitz, he then joined UBS, where he focused on healthcare and met Josiah Austin (Tr. 1189). Josiah Austin became "very interested in [Martin's] ideas" because Martin clearly "knew Biotech" well. (Tr. 1189). The two began discussing pharmaceutical stocks "fairly often." (Tr. 1191). Martin spent countless hours helping Austin amass a controlling interest in Chelsea Therapeutics, even accompanying Austin to Chelsea's Headquarters in North Carolina to speak with Management. (Tr. 1193, 1250, 1257). Unfortunately, Austin lost millions in his Chelsea investment but nevertheless admits that Martin worked very hard on Austin's account. (Tr. 1253). In fact, Martin's persistence often bubbled over to annoyance in that he called the top executives at Chelsea so often that they asked Austin to call him off. (Tr. 1263).

During this time period, in 2006, Martin started Elea Capital and acted as the hedge fund's managing partner. Separate from Austin's Chelsea investment, Austin also invested about $4.8 million into Elea Capital. Unfortunately, the entirety of this investment was lost, which eventually led to Lehman Brothers suing Martin, Austin, and Elea Capital. (See PSR ¶ 112). This loss—both of the money and the loss of Austin's trust—crushed Martin. He wrote to Austin following this failure: "Markets go up, markets go down, but there are no excuses. I'm

embarrassed[20] by my performance but steadfast in my conviction on top ideas." (See GX 100-13; Tr. 1222-24). Stunted by litigation, Martin shut down Elea.

Not accepting Elea's failure as a setback, Martin continued his deep analysis of healthcare stocks hoping to impress the upper echelon in biopharmaceutical companies in New York. In 2009, he formed MSMB Capital with his friend Marek Biestek. Martin used the relationships he formed from his job at Cramer Berkowitz—with bankers like Tillman Ward for example—to amass a trading portfolio. Mr. Ward, after getting to know Martin found "Martin to be a very smart individual" (Tr. 1525) and referred him to Merrill Lynch to set up MSMB Capital's trading platform (Tr. 1497).

Martin spent an inordinate amount of time researching biopharmaceutical stocks and sending his stock picks and research to his investors and potential investors. One investor, Darren Blanton, testified at trial that Martin had given him valuable stock tips before he decided to invest with Martin, and that he continued working with Martin because those tips were valuable. (See Darren Blanton at Tr. 1703; see also Lindsay Rosenwald at Tr. 2001-02 (noting that Martin would send "a lot more stuff than other people would"); Sarah Hassan at Tr. 926-27 (describing how Martin regularly emailed stock recommendations as part of an email chain)). Often times, investors would trade and make money off Martin's stock picks without any of this profit going to Martin.

It was thus clear from the start that most investors found Martin to be intellectually bright, but oftentimes off or odd. As one investor, Lindsay Rosenwald described at trial: Martin was "different" (Tr. 2001)—when looking "at a bell curve of people, he's on the far side of either one" (Tr. 2002). While people who met Martin often viewed him as "smart" (see Sarah

───────────────

■ ████████████████████████████████████████████████
████████████████████████████████████████

Hassan at Tr. 923; Fred Hassan at Tr. 1310; Blanton at Tr. 1724; Rosenwald at Tr. 1990), many described him based on his atypical personality and lacking inter-personal skills as "a little distracted" (Sarah Hassan at Tr. 923) or "a little bit mercurial" (Caroline Stewart at Tr. 2039). As a result, "if [Martin] was in a bad mood or if he was impatient about something, he could be quite cutting or nasty . . . i]t's all intensity all the time." (Stewart at Tr. 2039). While he was "pleasant," "respectful," and "intimidated," Martin was "very much a homework" and "analytical kind of person." (Fred Hassan at Tr. 1299). This intensity bled into Martin's work at MSMB Capital. To everyone, it was clear that Martin was working hard to be a good hedge fund manager. (See Rosenwald at Tr. 1992-93).

Based on this earned reputation, Martin was able to bring investors into the fund. For example, Martin met Brent Saunders, the former CEO of Bausch & Lamb, who received tremendous returns on his personal investments from Martin's stock tips. (Tr. 915). Saunders was so impressed with Martin that he introduced him to Sarah Hassan, daughter to Fred Hassan—a giant in the pharmaceutical world. Ms. Hassan testified that, while Martin told her MSMB Capital was a $40 to $50 million hedge fund (Tr. 921-22, 929), she was also swayed by their growing friendship and glowing reviews.[21]

In starting this fund, Martin genuinely believed he could make all his investor's money and that, in return, they would accept him as worthy of being at their elevated status. To do so, Martin worked hard to show that his ideas were legitimate money-makers. He worked all day and night and even slept in a sleeping bag in his office—disregarding basic hygiene in order to not stop working. (See Blanton at Tr. 1707; Richardson at Tr. 2786).

---

[21] Similarly, Darren Blanton testified that he agreed to invest with Martin after conducting a background check and speaking to Martin's former employers. (Tr. at 1779).

Blanton, impressed with Martin, introduced him to investors John Neill and Schuyler Marshall. (Tr. 1704). Marshall, too, was blown away that Martin was spot on with his ideas:

> One thing that was unique in the meeting and after the meeting was that Martin shared his ideas about specific companies and the reasons why he thought they were under-valued; and therefore he was long or over-valued and he was short. He continued to do that after the meeting. And so I followed that. I was frankly quite impressed because he was right on all of his ideas.

(Tr. 2429). Fellow Texan John Neill testified that when evaluating a potential hedge fund investment he looks at:

> "Will that person be able to make money going forward? And so you look at what they've done. You look at what they're doing. You look at their work ethic. You look at the people who surround them. And then try to come to a conclusion in your mind of whether you think that person will be able to produce better returns than you'll get just by buying one of the indexes."

(Tr. 3992). To most investors, including Neill, Martin was one of those people. At trial, Neill testified that he invested with Martin after hearing "positive things" about Martin's investment strategies and work ethic from Blanton. (Tr. at 4054).

Martin worked hard for his MSMB Capital investors and invested all of their money. (See GX 502-A, 502-B & 502-2). Despite his long hours and tireless effort, Martin was paid merely $26,000 for his years of work.

## 2.    MSMB Healthcare and Retrophin's Beginnings

In 2010, investors Steven Richardson and Darren Blanton started inspiring Martin to build his own company. Richardson, the former head of human resources at American Express, wanted Martin to put his muscle behind a product rather than "short sales." Richardson expressed his desire for Martin "to want to be behind drugs that were succeeding not failing." (Tr. 3031). During this time frame, Blanton met a child named Joshua Frase, who suffered from a disease called muscular myotubular myopathy. (Tr. 1590). Blanton called Martin after this

meeting and told him that finding a treatment for this disease "could be a good company idea" (Tr. 1590); Martin "got motivated by hearing about the kid" (Tr. 1591) and the idea for Retrophin was born.

Soon thereafter, Martin engaged in a disastrous trade for MSMB Capital by short selling a stock called OREX. As a result of the OREX trade, Martin failed to cover his short position and "the fund imploded." (Tr. 2063). Caroline Stewart, an analyst at MSMB Capital, described the spiritual funeral in the office that day:

> the office was normally very tense, very high energy, very -- very -- very intense, you know, sense of urgency, but when the fund imploded it just -- sort of all that energy just sort of deflated. Everything was very quiet and it became that, you know, the lights were not turned on. People had stopped coming in to work. I came in. It was just Martin and myself, but, you know, he was just slouched in his chair with his hoodie up and depressed in a way I had not seen him before.

(Tr. 2063-64).

The OREX failure was a devastating blow to Martin.[22] Although Martin could have walked away from the fund after the losing trade because, as a hedge fund manager and per the terms of MSMB's PPM, Martin was not personally liable for these losses, Martin instead used this failure, and fear of continued failure, as inspiration to make his investors back their money. To do so, Martin focused on two companies he created underneath the MSMB Capital umbrella: Retrophin and MSMB Healthcare.

MSMB Healthcare was created in February 2011, after the OREX trade. Like MSMB Capital, this new fund began by investing his healthcare stocks. After months of trading, MSMB Healthcare began investing heavily into Retrophin. At this time, Retrophin was a growing

---

[22] It is hard to imagine a worse scenario for a person ████████████████ ████████████████████ than to watch the unfolding of a failed trading strategy as everything he worked for, and all the money he raised from the investors he most wanted to impress, is lost. In a true state of panic, rather than stopping the bleeding, Martin continued trading OREX until all of the fund's money was gone.

pharmaceutical company focusing on treatment for Duchenne muscular dystrophy and muscular myotubular myopathy. In October 2011, Martin, through MSMB Healthcare's third-party administrator, NAV Consulting, issued a revised PPM which declared MSMB Healthcare's "intent to invest in illiquid securities, including venture capital, private equity, limited partnerships and other hedge funds" (GX 109-6), such as Retrophin. From October 2011 through August 2012, MSMB Healthcare made eighteen separate investments in Retrophin.

The MSMB entities and Retrophin continued operating through 2011 and 2012, with Retrophin expanding by licensing a drug from Ligand Pharmaceuticals and filing several patents. In August 2012, Retrophin signed a significant licensing deal. Soon after, Martin sent out a "winddown" email to the MSMB investors on September 10, 2012 indicating that he was closing the funds to focus on Retrophin. Although the MSMB entities had little money in their accounts, Martin offered the MSMB investors the opportunity to redeem their fund investments with cash, Retrophin shares or a combination of Retrophin shares and cash. At this time, Retrophin shares were being bought by independent investors, not just MSMB Healthcare, for $80 per share.

### 3.    Retrophin's Reverse Merger and the Fearnow Shares

Martin spent the next few months trying to find funding for Retrophin's licensing deal. At the end of November 2012, it became clear that Retrophin could not fund its licensing deal without going public. Within a short period of time, Martin took Retrophin public via a reverse merger with a shell company called Desert Gateway. Desert Gateway had 2.5 million unrestricted shares attached to it and its owners Michael and Troy Fearnow. Around 2 million of these Fearnow shares were ultimately bought by seven Retrophin employees and contractors (Marek Biestek, Tim Pierotti, Andrew Vaino, Thomas Fernandez, Kevin Mulleady, Ron Tilles,

and Edmund Sullivan) for a nominal amount. Evan Greebel, Retrophin's attorney, prepared purchase agreements for the employees and contractors to sign upon purchase of these shares.

Over the next few months, the Fearnow share recipients bought and sold Retrophin shares in the market. Through emails and trading records, the government alleged at trial that Martin was controlling the Fearnow shares without properly disclosing his control in order to manipulate Retrophin's share price leading up to the private placement investment.

### 4.    The Retrophin Settlement and Consulting Agreements

During this same time period—from the wind down email through the reverse merger—investors began looking for their returns. ████████████████████████████

████████████████████ Martin was not responsive while focusing on making Retrophin a success. In February 2013, Retrophin received a significant private placement investment. At the time of the private placement, Retrophin stock was trading at $3.50 a share; a year later, in February 2014, Retrophin stock was trading at more than $19 per share.

After being stabilized through the private placement, Retrophin issued a redemption to the MSMB entities for their Retrophin stock in February and March 2013 when the stock was trading in the $5 per share range. Although the MSMB investors received their redemption, many investors were irate because the Retrophin shares were restricted for at least six months. Some of these investors threatened to sue Martin and Retrophin. Through months of intense negotiations, the MSMB investors–through their attorneys–and Martin–through Retrophin's attorney Mr. Greebel–reached agreements to settle the potential claims against Martin and Retrophin.  With these settlement and consulting agreements, Retrophin received valuable releases that prevented the company from being smothered in litigation. As a result of the

agreements, the MSMB investors made significant returns on their investment with Martin as detailed by the below chart based on the trial testimony:

| INVESTOR | AMOUNT INVESTED | RETURN ON INVESTMENT |
|---|---|---|
| Sarah Hassan | $300,000 in MSMB $150,000 in Retrophin | $1.8 million |
| Steven Richardson | $400,000 in MSMB | $1.9 million |
| Darren Blanton | $1,250,000 in MSMB | $5.8 million |
| Lindsay Rosenwald | $100,000 in MSMB | $400,000 - $600,000 |
| John Neill | $500,000 in MSMB | $1,570,000 |
| Schuyler Marshall | $200,000 in MSMB | $1 million |
| Richard Kocher | $200,000 in MSMB | $350,000 |
| David Geller | $200,000 in MSMB | $615,000 |

Considering these enormous returns, it is not surprising that one investor, Schuyler Marshall, describes his interactions and investment with Martin as "no harm no foul." (Tr. 2594-95).

While the government claimed at trial that these agreements were illegal, the jury disagreed and acquitted Martin of Count Seven alleging the Retrophin fraud. As argued in our submissions on loss, the jury had good reason to reject Count Seven because of the weak evidence that Martin intended to cause any loss to the company and because Martin had a strong reliance on counsel defense.[23]

---

[23] That Mr. Greebel was convicted of the Retrophin fraud at a separate trial does not change this analysis. Unlike Mr. Shkreli, Mr. Greebel was a well-established securities attorney (a tenet of his trial defense); to the extent the Greebel jury found these agreements to be improper they held Mr. Greebel responsible because of his legal training and professional obligations. In contrast, the jury in this case found that Mr. Shkreli, a non-lawyer, did not break the law because he reasonably relied on the advice of his counsel. For a more detailed analysis of our position on Count Seven, see Shkreli's Objections to the PSR at 20-28.

### 5.      Martin's Remorse

Martin acknowledges and accepts the jury's verdict and has spent a great deal of his time while incarcerated reflecting on the trial, the testimony and most importantly, his decisions. Martin appreciates that he made serious and preventable mistakes; as he writes in his letter to this Court:

> I understand it, I am very far from blameless. I caused this entire mess to happen. I lost the trust of my investors who now have questioned my motives and integrity. This is a painful realization that I will never forget. I had pride in the final results of MSMB, but after hearing the investor testimony, the concept of "all's well that ends well" is clearly a poor attempt to excuse my many preventable mistakes.

> Investors deserve truth. Investors deserve transparency. . . . At times, I dodged answering questions at other times I provided answers that were only correct if put in a certain assumed context. These choices are now seen as attempts by me to deceive and manipulate, and it is my fault.

(Ex. 49: Letter of Martin Shkreli at 1).

Martin is intent on learning from his mistakes, promising that "never again will I prevaricate or omit or mislead intentionally or not." (Id. at 2). Martin "take[s] responsibility for the fact that I used to behave and communicate in this way. It was wrong. I was a fool. I should have known better." (Id.)

Martin assures this Court that he will rebuild his life on a foundation of honesty and integrity.  He explains:

> I have also been lucky in my life to be surrounded by some wonderful people who have been better to me than I deserve. I owe them a life built on honesty, integrity and achievement that advances humanity. I assure you that any mercy shown at sentencing will be met with a strict adherence to this oath and I hope to make Your Honor proud of me in the years ahead. I promise to be more careful, open and honest in my business dealings so that I never again have to hear people who once had faith in me and trusted me testify or complain that I misled them or let them down terribly.

(Id. at 3).

Martin also notes how his time in prison has changed his perspective:

> Prison has been both the most frightening experience in my life but also an opportunity for me to see a side of the world seldom seen or discussed. I have tried my best to make a positive impact on many of the people I encounter here. If I have something to teach my fellow inmates, I implored them to listen and learn. I have comforted the forlorn and forgotten men facing long sentences, many are severely depressed, and sadly, suicidal. I try my best to set a good example for these individuals too, knowing my fame and achievements were something they might know of, and I try my best to explain that in order to have a chance to succeed, they had to make a serious commitment to lifelong education and move far away from poisonous surroundings and attitudes that lead to a temptation to cut corners and commit crimes.

(Id.)

In ending his letter, Martin pledges to do his "absolute best to use [his] skills and whatever talents [he has] been blessed with for the betterment of humanity," and asks this Court to give him a chance to "contribute and really make a difference." (Id.)

## III.   ANALYSIS

### A.   The Law Permits a Below Guideline Sentence

#### 1.   Guidelines Range

Probation's Pre-Sentence Report contains the following Guidelines analysis:

| CATEGORY | POINTS |
|---|---|
| Base Offense Level - § 2B1.1(a)(1) | 7 |
| Loss Enhancement - § 2B1.1(b)(1)(K) | +20 |
| Victim Enhancement - § 2B1.1(b)(2)(A)(i) | +2 |
| Sophisticated Means - § 2B1.1(b)(10)(C) | +2 |
| Investment Advisor - § 2B1.1(b)(19)(A)(iii) | +4 |
| Role in the Offense - § 3B1.1(a) | +4 |
| Obstruction of Justice - § 3C1.1 | +2 |
| **Total Offense Level:** | **41** |

(PSR ¶ 52-65). Martin has no prior criminal history; therefore his criminal history level for purposes of the Sentencing Guidelines is a Category I. (PSR ¶ 69). The advisory Guidelines range associated with an adjusted offense level of 41 for an individual with a criminal history Category I is 324-405 imprisonment.

Martin objects to this Guidelines analysis and has filed formal objections with the Probation and this Court. (See Objection Letter to the PSR at 3-15). Although we will not cite these objections in this Sentencing Memorandum, we incorporate the objections by reference.

#### 2.   The Sentence Guidelines in This Case Do Not Properly Reflect the Degree of Martin Shkreli's Culpability

The Guidelines analysis in this case, even if legally correct, demonstrates an oft-criticized aspect of the Sentencing Guidelines:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, **human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.**

United States v. Gupta, 904 F. Supp. 2d 349, 350 (2012) (Rakoff, J.) (emphasis added); see also

United States v. Adelson, 441 F. Supp. 2d 506, 509 (2006) (Rakoff, J.) ("As many have noted,

the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear

'objective,' tend to place great weight on putatively measurable quantities, such as the weight of

drugs in narcotics cases or the amount of financial loss in fraud cases, without, however,

explaining why it is appropriate to accord such huge weight to such factors."). This is

particularly true when addressing the Guidelines' loss enhancements, which are "a relatively

weak indicator of the moral seriousness of the offense or the need for deterrence." United States

v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.).

These insights into the Guidelines are remarkably relevant in this case where, although

Martin may have stumbled and sometimes failed, he never turned his back on his investors. Why

else would he have not walked away after the OREX trade? Why else would he have worked

night and day and slept in a sleeping bag in the office? Martin certainly could have done things

differently, but that does not mean that he should bear the brunt of a 20-level increase for loss

amount, especially considering that all of his investors were made whole several times over. Yet,

under the cold, calculated Guidelines, Martin is treated the same as a defendant who takes all his

investors money to spend on himself without even trying to provide for his investors. While the

profit of Martin's investors may not help with the overly-technical Guidelines calculation, it

should matter when this Court considers the degree of his criminal culpability in determining sentence.

We anticipate that not even the government will seek a Guidelines sentence in this case and will instead join the defense in asking this Court for a significant variance. That is because, while a Guidelines range in a usual case is not presumed reasonable (Nelson v. United States, 555 U.S. 350, 352 (2009)), the Guidelines range in this case–324-405 months (27 to 33.75 years)–is entirely unreasonable to the point that it cannot honestly serve as a real starting point of the Court's sentencing considerations, otherwise, this could be the epitome of "the harm that guideline calculations can visit on human beings if not cabined by common sense." Adelson, 441 F. Supp. 2d at 512; see also United States v. Faibish, No. 12-CR-265, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.) (refusing to "peg [the defendant's] fate to a guidelines-computed loss amount" where, using "common sense," the court found that "a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon [the defendant's] sentencing range beyond any reasonable proportion to his crimes").

We understand that this Court may, as a technical matter, be required to look to the Guidelines calculation as a "starting point." We pray, however, that Your Honor will agree that a level 41 is draconian and offensive under the facts of this case as to this defendant and, accordingly, when deciding on the degree of variance to impose, will temper justice with mercy and impose a sentence not greater than necessary to meet the ends of justice.

### 3.   The Court's Discretion to Vary from the Advisory Guidelines Is Well Established

In United States v. Booker, 543 U.S. 220, 226-46 (2005), the Supreme Court held that the then-mandatory Sentencing Guidelines system violated the Sixth Amendment. As a result, the Booker Court rendered the Sentencing Guidelines merely "advisory." Booker, 543 U.S. at 245,

125 S. Ct. at 756-57. Later, the Court further clarified its position, holding that, in addition to being advisory, the Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence." Kimbrough v. United States, 552 U.S. 85, 90, 128 S. Ct. 558, 564 (2007).

To be sure, while a sentencing court must begin the process of determining an appropriate sentence for a criminal defendant by calculating the applicable Guidelines range, it "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Gall v. United States, 552 U.S. 38, 49-50, 128 S. Ct. 586, 596 (2007); see also Peugh v. United States, 133 S. Ct. 2072, 2080 (2013) ("Under the resulting scheme, a district court is still required to consult the Guidelines. But the Guidelines are no longer binding, and the district court must consider all of the factors set forth in § 3553(a) to guide its discretion at sentencing." (citations omitted)).

The Supreme Court has since re-emphasized that the Guidelines are both advisory and not to be presumed reasonable:

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. In Rita we said as much, in fairly explicit terms: "We repeat that the presumption before us is an appellate court presumption. . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." And in [Gall] we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable."
>
> . . . . The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.

Nelson v. United States, 555 U.S. 350, 352, 129 S. Ct. 890, 892 (2009) (citations omitted).

Section 3553(a), "as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Kimbrough, 552 U.S. at 101, 128 S. Ct. at 570 (citing the sentencing goals

set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)). The § 3553(a) factors include the following:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the advisory guideline range; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(l)-(7); see also Booker, 543 U.S. at 224, 125 S. Ct. at 744.

While a court may impose a Guideline-authorized downward departure in an appropriate case, such downward departure is no longer required in order to justify a below-guidelines sentence. After Booker, a sentencing court need not find that a particular § 3553(a) factor is "extraordinary" or sufficient to take a case out of the "heartland" in order to justify a below-guidelines sentence. See Gall, 552 U.S. at 47, 128 S. Ct. at 595; United States v. Rita, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007). Even those factors that would not necessarily result in the granting of a downward departure-or that were expressly prohibited or deemed irrelevant by the Sentencing Guidelines-must now be considered under the mandate of § 3553(a). See United States v. Jones, 531 F.3d 163, 182 (2d Cir. 2008) ("[J]ust as we may not bar a district court from considering facts simply because they were also considered by the Commission, the district court 'may not presume' the reasonableness of the Commission's Guidelines sentencing ranges. Rather, in every case, the district court 'must make an individualized assessment' of the

70

appropriate sentence 'based on the facts presented' and the factors detailed in §3553(a)." (citations omitted)); United States v. Smith, 445 F.3d 1, 5 (1st Cir. 2006) ("That a factor is discouraged or forbidden under the guidelines does not automatically make it irrelevant when a court is weighing the statutory factors apart from the guidelines. The guidelines-being advisory-are no longer decisive as to factors any more than as to results.").

A non-Guidelines sentence is also warranted where a sentencing judge finds that a particular Guideline or Guideline range fails to properly reflect § 3553(a) considerations, reflects "unsound judgment" or when "the case warrants a different sentence regardless."  Rita, 551 U.S. at 351, 357, 127 S. Ct. at 2465, 2468. The Supreme Court clarified this point:

> "Even when a particular defendant . . . presents no special mitigating circumstances, such as no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post-offense rehabilitation, a sentencing court may vary downward from the advisory guideline range. . . . The only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines . . . ."

Spears v. United States, 555 U.S. 261, 263-64, 129 S. Ct. 840, 842 (2009) (per curiam) (quoting United States v. Spears, 533 F.3d 715, 719 (2008) (Colloton, J., dissenting), rev'd Spears, 555 U.S. at 261-68, 129 S. Ct. at 841-46); see also Peugh, 133 S. Ct. at 2080 ("The district court 'may not presume that the Guidelines range is reasonable,' and it 'may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views.'" (citation omitted)).

### B.   The Factors Set Forth in 18 U.S.C. § 3553 as Applied in This Case Do Not Require Substantial Additional Incarceration

#### 1.   Substantial Additional Incarceration Is Not Required to Reflect the Seriousness of the Offense, to Promote Respect for the Law, or to Provide Just Punishment for the Offense

In fashioning an appropriate sentence, one consideration for this Court is whether the imposed sentence is sufficient "to reflect the seriousness of the offense, to promote respect for

71

the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). There are

several reasons why these concerns are met in this case with a sentence between 12-18 months

incarceration, followed by court-mandated therapy and 2000 hours of community services. First,

Martin has already served six months of his sentence under the harsh conditions of the MDC,

which Judge Cheryl Pollak of this District described in 2016 as a "Third World Country" prison

based on its unconscionable conditions.[24] See http://www.nydailynews.com/newyork/brooklyn/

judge-refuses-send-women-horrifying-brooklyn-jail-article-1.2820551 (last visited February 22,

2018). Second, even after Martin is discharged from prison, his restricted liberty will continue

when he is placed on supervised release for a number of years. As noted by former Judge John

Gleeson from this District:

> Imprisonment is not the only way we punish. Supervised release brings
> with it a series of significant restrictions on a defendant's liberty. Offenders on
> supervised release, like the probationer in Gall, "may not leave the judicial
> district, move, or change jobs without notifying, and in some cases receiving
> permission from, their probation officer or the court. They must report regularly
> to their probation officer, permit unannounced visits to their homes, refrain from
> associating with any person convicted of a felony, and refrain from excessive
> drinking." Imprisonment is concededly a more onerous form of punishment, and
> different in kind from supervision, but Zimmerman is being punished.

United States v. Zimmerman, No. 10-CR-598 JG, 2012 WL 3779387, at *6 (E.D.N.Y. June 19,

2012) (citing and quoting Gall v. United States, 552 U.S. 38, 48-49 (2007); see also United

States v. Springer, 684 F. App'x 37, 40 (2d Cir. 2017) (referring to Supervised Release as

"conditional liberty").[25]

---

[24] While Judge Pollack's comments referred specifically to MDC's female housing section,
many of the same severe conditions exist next door at the men's housing facility.

[25] For a list of mandatory and discretionary conditions of probation, see 18 U.S.C. § 3563 and
U.S.S.G. § 5B1.3.

Third, in addition to losing his liberty, Martin will also be required to pay a significant forfeiture amount for his misconduct even though none of his investors actually lost money. Fourth, as part of our sentencing recommendation, Martin would need to complete 2000 hours of community service. This community service obligation is a serious commitment of time and energy by a defendant and should a defendant fail to meet the requirement for any reason, the defendant risks a violation of the terms of release. Finally, as part of our sentencing recommendation, Martin would be subject to court-mandated therapy upon his release. As with community service, a failure to participate in the treatment program would be a violation of Martin's supervised release.

Considering the severe nature of these punishments, our proposed sentence is sufficient to satisfy the factors in 18 U.S.C. § 3553(a)(2)(A) listed above.

### 2.    Martin Shkreli's Character and Background Militate Against Substantial Additional Incarceration

Section 3553(a) allows a sentencing court to consider a defendant in all of his unique humanity. It is long been recognized that a defendant's character is always "a central consideration in the fashioning of a just sentence." United States v. Merritt, 988 F.2d 1298, 1307 (2d Cir. 1993).

As Judge Jed S. Rakoff of the Southern District of New York so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

United States v. Adelson, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006); accord Gall v. United States, 552 U.S. 38, 52, 128 S. Ct. 586, 598 (2007) ("'It has been uniform and constant in the

federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue'" (quoting Koon v. United States, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996))); see also 18 U.S.C. § 3661; U.S.S.G. §1B1.4 (sentencing court not limited with respect to the information concerning a defendant's background, character and conduct that it may consider for the purpose of imposing an appropriate sentence).

The letters submitted on behalf of Martin Shkreli demonstrate his good deeds and charitable works.  Post-Booker, a defendant's history of charitable activities can be considered as one of the factors appropriate in imposing a sentence under the advisory guidelines. See Rita, 127 S. Ct. at 2473 (Stevens, J., concurring) ("Matters such as . . . charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider.")

Notably, several courts have granted a defendant a variance or downward departure based on the defendant's "exceptional" good works. For example, in United States v. Serafini, 233 F.3d 758, 773, 774 (3d Cir. 2000), the Third Circuit upheld the district court's downward departure where many of the letters supporting Serafini, an elected official, "contain[ed] substantive descriptions of Serafini's generosity with his time as well as his money." Serafini, 233 F.3d at 773. Indeed, "several constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need." Id. at 773.  The Third Circuit specifically noted three letters describing Serafini's good works:  (1) a letter from a friend who sought and received from Serafini a $300,000 guarantee to secure treatment for a family member's brain tumor; (2) a letter from Serafini's constituent who, having sustained

74

serious injury in an accident that rendered him incapacitated, was hired by Serafini and who credits Serafini with "turning his life around"; and (3) a letter from a widow who approached Serafini because she was about to lose her home and to whom Serafini gave a check for $750 with no expectation of repayment. Id. at 773-74. Finding that Serafini was "an exceptionally giving person," the Third Circuit upheld the District Court's downward departure for community and charitable activities. Id. at 774, 775.

As Serafini and other cases make clear, whether it is categorized as a downward departure or the basis for a non-guidelines variance owing to the criteria delineated in 18 U.S.C. § 3553(a), a life of extraordinary good works towards others remains a vital factor for a sentencing court to consider. See, e.g., United States v. Tomko, 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance to a sentence of probation due largely to the defendants "exceptional" charitable acts and good works); United States v. Thurston, 544 F.3d 22, 26 (1st Cir. 2008) (affirming a sentence of three months incarceration and 24 months supervised release from a recommended guideline sentence of 60 months imprisonment based in part on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); United States v. Ali, 508 F.3d 136, 150 & n.19 (3d Cir 2007) (upholding downward departure where the defendant, inter alia, "helped organize fundraising banquets for the [school where she worked], contributed her 'personal assistance from leading to scrubbing floors,' spent several hours 'counseling and comforting' a student's parent who was struggling to overcome drug-addiction, and became the 'legal guardian' to two nieces to ensure that they attended better schools." (record citation omitted)); United States v. Cooper, 394 F.3d 172, 177, 178 (3d Cir. 2005) (noting that "[d]ownward departures for good works . . . are permissible when the works are exceptional," and  upholding the departure where the defendant's good works included

"hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others"); United States v. Woods, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding defendant's downward departure for charitable activities, which included bringing two troubled young women into her home and paying for them to attend a private high school, as well as helping to care for an elderly friend").

Tellingly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time and energy is more valuable than simply his monetary contributions. See, e.g., Tomko, 562 F.3d at 572 (describing how the defendant's "charitable acts that involved not only money, but also his personal time."); Cooper, 394 F.3d at 177 (noting that personal sacrifices "are qualitatively different from the detached donation of money"); Serafini, 233 F.3d at 775 (noting that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving one's self").

Here, Martin's history of contributions to medicine and charitable works are truly remarkable. He has selflessly helped others in need—in many instances, those who he has only met or heard of online—often spending his own funds to get them their required medicine. He spends seemingly the majority of his free time helping near strangers navigate terrifying medical diagnoses. He ensures that those of lesser means can access the medicines his own company owns.  He has shown his commitment to charity by forming his own Foundation with his sister, that contributes to medical research and community outreach. Martin is ultimately a compassionate man perhaps pursuing success with a brash and, at times, arrogant style, but always shares the fruits of his success—whether financial fruits distributed to investors, scientific fruits dispensed in the form of treatment, or hope for those whose health is failing. These charitable activities, along with his sentence already served and community service

proposal, demonstrate Martin's commitment to his community and further support the conclusion that substantial additional incarceration is neither appropriate nor necessary.

### 3. Neither Specific nor General Deterrence Will Be Served by Substantial Additional Incarceration

Congress has instructed that, in fashioning an appropriate sentence, the Court should take into account the need for deterrence, and to protect the public from the potential that the defendant will commit additional crimes in the future. Under this prong of § 3553(a), courts assess whether a sentence will sufficiently deter the defendant from committing further crimes, and the public at large from committing similar offenses.

### i. A Sentence of Substantial Additional Incarceration Will Not Further the Goals of Specific Deterrence or the Need to Protect the Community

Specific deterrence is achieved by sending a clear message to the defendant. Martin has received this message. Since 2015, Martin has been indicted, charged by the SEC and sued numerous times. Due to the nature of his indictment, he has had to step down as the CEO of Turing, the pharmaceutical company he started with a substantial amount of his net worth. He has also suffered by sitting through a five-week trial, which ended in convictions on three felony counts. During that process, Martin went through a very public jury selection—with the names that potential jurors called him smeared across the news media day after day. Also, he has spent the last six months in the MDC–which has included numerous locks downs and heating outages during the winter. Given the punishment that Martin has already received, and the punishment he will continue to receive as a convicted felon, there is no basis to believe that he would commit any other crimes in the future. See United States v. Nesbeth, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (urging sentencing courts to consider the collateral consequences facing a convicted felon). Moreover, given the public nature of this prosecution, it is extremely unlikely that Martin

would or could ever commit another securities fraud crime. As such, there is no need for substantial additional incarceration to further the goal of specific deterrence.

## ii. A Sentence of Substantial Additional Incarceration Will Not Further General Deterrence

General deterrence has also been achieved here, given the public nature of this prosecution and Martin's already six-month long incarceration at the MDC. Imposing a sentence of substantial additional incarceration will not serve the general deterrence purposes under § 3553(a). Indeed, research has consistently shown that, while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006); see also United States v. Yeaman, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes."). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Moreover, a short sentence can also send a strong message to potential white collar offenders. See Adelson, 441 F. Supp. 2d at 514 (describing the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders"); United States v. Tomko, 562 F.3d 558, 573 (3d Cir. 2009) (declining to adopt government's argument that district court's probation-only sentence in complex securities fraud case, which government described as a "100% variance," would harm general deterrence; see also Gabbay, supra, at 448-49 ("[T]here is no decisive evidence to support the conclusion that

78

harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").[26] "[E]mpirical research shows no relationship between sentence length and deterrence."[27] With respect to the question of whether there is any "particular quantum of punishment that results in increased deterrence and thus decreased crime":

> Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects . . . ."[28]

Furthermore, "general deterrence" alone cannot support the weight of a sentence sending an individual to prison. See United States v. Corsey, 723 F.3d 366, 381 (2d Cir. 2013) (Underhill, J., concurring) (where the district court's § 3553 analysis relied "almost exclusively on one word – 'deterrence,'" that factor simply could not "'bear the weight assigned it under the totality of circumstances in the case,'" (quoting United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008))). Several courts have recognized the over-emphasis on "general deterrence" as a basis for imposing prison sentences. For example, in United States v. Edwards, 595 F. 3d 1004

---

[26] See generally Raymond Paternoster, How Much Do We Really Know About Criminal Deterrence?, 100 J. Crim. L. & Criminology 765, 817 (2010) (summarizing empirical studies of deterrence and concluding there is no apparent deterrent effect from more severe punishments, a modest deterrent effect for the perceived certainty of legal punishment, and "an even stronger effect for the certainty of non-legal or informal sanctions"); Mirko Bagaric, A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals, 62 Buff. L. Rev. 1159, 1203 (2014) ("[S]tudies repeatedly show that awareness of potentially severe sanctions does not produce less crime."); Robert Weisberg, Reality-Challenged Philosophies of Punishment, 95 Marq. L. Rev. 1203, 1248 (2012) (summarizing empirical research on general deterrence which concludes that "although the general deterrent effect may operate at some base rate to reduce crime, changes in penal policy or enforcement play little role in sending a message that crime does not pay").

[27] Amy Baron-Evans, Sentencing by the Statute, at 7 (Apr. 27, 2009), available at http://www.fd.org/docs/select-topics---sentencing/Sentencing_by_the_Statute.pdf.

[28] Id. (quoting Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research, at 28-29 (2006) (emphasis in original)).

(9th Cir. 2010), the defendant, who was convicted of bankruptcy fraud and bank fraud, was sentenced to a five-year period of probation with house arrest in lieu of the recommended guideline sentence of 27-33 months. 595 F. 3d 1004. During sentencing, the district court first noted that the defendant was unlikely to re-offend because of his post-offense rehabilitation. Then, the district court explained that "general deterrence" was not a significant factor in the case. Id. at 1011. The district court reasoned that the conditions of probation and restitution constituted sufficient "specific deterrence" to prevent Edwards from engaging in similar conduct in the future. Id. In upholding the district court's sentence, the Ninth Circuit held that § 3553(a) "does not require the goal of general deterrence be met though a period of incarceration." Id. at 1016; see also United States v. Warner, 792 F.3d 847, 860-61 (7th Cir. 2015) (finding the message sent by probationary sentence in tax evasion case sufficient to satisfy general deterrence under § 3553(a)).

A sentence substantially below-Guidelines would still reflect the need for general deterrence. The deterrent effect is particularly strong in this case, where Martin's trial, conviction, and subsequent remand in a maximum security prison facility have already been widely reported in the news. While the remand was an indirect consequence of his convictions, the last six months have been extraordinarily harsh on Martin (who typically sits behind his computer in his apartment for most hours of the day) and any additional sentence will not generate additional deterrence.

Moreover, because deterrence is only one factor to be considered under § 3553(a), in assessing the deterrent value of any aspect of a sentence, this Court can and should assume that people learning of the sentence will also be aware of all the facts the Court considered, including

Martin's determination and hard work, set forth above, rather than just the limited and mostly inaccurate details described in the press.

**4.      A Sentence of Substantial Additional Incarceration Would Result in Unwarranted Sentencing Disparity**

Another factor that a sentencing court must consider before imposing sentence is the need to avoid unwarranted sentence disparities. See 18 U.S.C. § 3553(a)(6). As stated throughout this submission, Martin's case is significantly different from most other fraud cases because his investors made money from their investment and because Martin actually invested the majority of their money and did not spend it on himself. This Court should also consider that, unlike most fraud cases, Martin's criminal conduct did not lead his investors to any financial hardship. Because of these factors, we respectfully submit that a sentence of substantial additional incarceration would create unwarranted sentencing disparities with cases where the fraud was even larger, the conduct more egregious and where the defendant was required to pay restitution because the fraud victims lost money. A non-exhaustive list of such cases is detailed in the below:

| CASE | NATURE OF OFFENSE | GUIDELINE RANGE | SENTENCE |
|---|---|---|---|
| U.S. v. Block[29] (SDNY) 16 Cr. 595 (JPO) | Conspiracy to Commit Securities Fraud;  Securities Fraud; False Statements in Filings with SEC | Life | 18 months $100,000 fine (after trial) |

---

[29] Block was the former CFO of a real estate investment trust that manipulated financial results of the trust in various SEC filings. The government argued the loss in the case to be $315 million based on the market drop following disclosure of the fraud.

| | | | |
|---|---|---|---|
| U.S. v. Adelson[30] (SDNY) 05 Cr. 325 (JSR) | Securities Fraud | Life | 42 months $50 m restitution $1.2.m forfeiture (after trial) |
| U.S. v Caspersen[31] (SDNY) 16 Cr. 414 (JSR) | Securities Fraud; Wire Fraud | 151-188 months | 48 months $47m forfeiture $36m restitution (plea) |
| U.S. v. Lamm[32] (EDNY) 15 Cr. 43 (FB) | Securities Fraud | 78-97 months | 36 months $15m restitution (plea) |
| U.S. v. Lumiere[33] (SDNY) 16 Cr. 483 (JSR) | Conspiracy to Commit Securities Fraud | 135-168 months | 18 months $1,000,000 fine (after trial) |
| U.S. v. Hochfeld[34] (SDNY) 13 Cr. 21 (PAC) | Securities Fraud; Wire Fraud | 78-97 months | 24 months $2.1m forfeiture (plea) |
| U.S. v. Sekaran[35] (SDNY) 12 Cr. 821 (RPP) | Securities Fraud; Mail Fraud | 41- 51 months | 30 months $2.2m restitution (plea) |

---

[30] Adelson was Chief Operating Officer and President of Impath, Inc. who conspired with others to materially overstate Impath's financial results, thereby artificially inflating the price of its stock. Adelson enriched himself by increasing salary and exercising stock options at the artificially increased share price. The government alleged a loss amount of more than $200 million.

[31] Caspersen defrauded friends, family and college classmates in a Ponzi scheme, using their money to make payments on a house and an apartment. Caspersen never used the investor funds to make the secured loans as he had promised his investors.

[32] Lamm was the "operational expert" of multiple, overlapping fraud schemes in which individual investors lost life savings and retirement funds.

[33] Lumiere's offense involved fraudulently inflated performance results and misleading investors about performance results.

[34] As general manager of an investment fund, Hochfeld misappropriated over $2 million from the fund for use on personal vacations and antiques.

[35] Sekaran made numerous misrepresentations to family and friend investors, including false statements to prevent redemptions. In total, more than ten investors lost approximately $2.3 million while Sekaran personally took more than $500,000 for himself.

| U.S. v. Trebitsch[36] (SDNY) 15 Cr. 450 (VSB) | Securities Fraud | 51-63 months | 24 months $5.9m restitution (plea) |
|---|---|---|---|

These sentences in the chart above are consistent with the statistics compiled by the United States Sentencing Commissions for 2016 regarding sentences in all fraud cases (not just securities fraud cases) showing that the average fraud sentences nationally, in the Second Circuit, in all New York Federal Courts and in the Eastern District of New York as follows[37]:

| JURISDICTION | MEAN | MEDIAN |
|---|---|---|
| Nationwide | 34 months | 24 months |
| Second Circuit | 30 months | 18 months |
| NY Federal Court | 29 months | 18 months |
| EDNY | 33 months | 24 months |

Considering these sentences, and sentencing averages, a sentence of substantial additional incarceration in this case would create unwarranted sentencing disparities.

## 5.      Other Sentencing Considerations

Martin has spent the last six months incarcerated at the MDC–effectively a maximum security facility. Should this Court sentence Martin to additional incarceration, Martin will be designated to a Bureau of Prisons ("BOP") facility to serve the remainder of his sentence.

---

[36] During a seven-year scheme, Trebitsch promised outsized returns, failed to adhere to his purported investment strategies, stole or lost his investors' money and lied to his investors about their returns.

[37] United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, Eastern District of New York, Table 7 at p. 10; United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, Second Circuit, Table 7 at p. 10; United States Sentencing Commission, Statistical Information Packet Fiscal Year 2016, New York State, Table 7 at p. 10.

According to Joel Sickler, the head of the Justice Advocacy Group, an inmate like Martin, with a non-violent conviction, no history of violence and no prior criminal records, would ordinarily be designated to a minimum-security camp. (See Ex. 50: Affidavit of Joel Sickler at ¶ 7).

In making its designation considerations, the BOP utilizes Management Variable and Public Safety Factors to account for special security considerations. (Id. at ¶ 8). Due to Martin's remand for comments concerning Hillary Clinton, however, Mr. Sickler believes that the BOP staff may apply a Public Safety Factor for "Threat To Government Officials" that will make him ineligible for a minimum-security camp. (Id.) As Mr. Sickler details, the differences between a minimum-security camp and a low-security prison are significant and include heightened security measures, more violent criminals, overcrowding and more difficult visitation. (Id. at 9-15).

Considering that Martin has no prior criminal record and his convictions are for non-violent offenses, we respectfully request that, if this Court sentences Martin to additional incarceration, it include in its Judgment a recommendation that the BOP waive the Public Safety Factor for "Threat To Government Officials."

## IV.    CONCLUSION

The Court is now faced with determining an appropriate sentence for a unique individual with enormous potential that can do a lot of good if his intellect is channeled appropriately. ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████ From helping an 11-month old baby getting medicine in a foreign country, to comforting a rape victim, to helping educate prisoners so they

have a better life upon release, these letters are replete with personal vignettes demonstrating that Martin is comprised of more than his criminal conduct: specifically, he is a kind, caring and generous person who uses his time and effort to help those in need. If not warehoused in prison, Martin could literally save lives ███████████████████████████████

███████████████████████████████████████████████

We also ask this Court to consider that, although Martin was convicted of fraud, he was not looking to hurt or damage his investors like many other fraudsters. In other words, while Martin made mistakes and should have been more forthcoming with his investors, he sincerely believed that he could make them money if he worked hard enough. As Retrophin CEO Stephen Aselage noted:

> I think [Martin] honestly believes some of things he was saying. **I felt some things he was saying were probably through rose-colored glasses, maybe more optimistic than was realistic to believe**.

(Tr. at 3502) (emphasis added).

We appreciate that this Court may have concerns given Martin's criminal conduct as well as his sometimes poor judgment as demonstrated by his conduct relating to Hillary Clinton. The answer to these concerns, however, is not substantial additional incarceration but rather to treat the issues underlying this conduct through therapy and counseling. ██████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ ███████████████████████

█████████ We hope this Court's sentence will allow Martin to ███

████████ start this therapy in the near future.

In sum, after weighing all those factors delineated in 18 U.S.C. § 3553(a), we respectfully submit that a substantial additional period of incarceration would be inimical to the ends of justice because "the punishment should fit the offender and not merely the crime" Pepper v. United States, 131 S. Ct. 1229, 1240 (2011). A sentence between 12-18 months incarceration, followed by court-mandated therapy and 2000 hours of community service, is "sufficient, but not greater than necessary" to accomplish the goals of sentencing and consistent with the interests of justice.

Dated:     February 27, 2018
           New York, New York

                                    Respectfully submitted,

                                    **Brafman & Associates, P.C.**
                                    Benjamin Brafman
                                    Marc Agnifilo
                                    Andrea Zellan
                                    Jacob Kaplan
                                    Teny Geragos

cc:     Clerk of the Court (by hand)
        AUSA Jacquelyn Kasulis (via ECF and email)
        AUSA Alixandra Smith (via ECF and email)
        AUSA Karthik Srinivasan (via ECF and email)