# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

## 15-cr-637 (KAM)

---

## UNITED STATES OF AMERICA

### -against-

## MARTIN SHKRELI,

### Defendant.

---

## SENTENCING MEMORANDUM ON
## BEHALF OF MARTIN SHKRELI

## APPENDIX

**BRAFMAN & ASSOCIATES, P.C.**
*Attorney for Defendant*
*Martin Shkreli*
767 Third Avenue - 26th Floor
New York, New York 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

BENJAMIN BRAFMAN
MARC AGNIFILO
ANDREA ZELLAN
JACOB KAPLAN
TENY GERAGOS
       *Of Counsel*

# United States v. Martin Shkreli
## Docket No. 15 Cr. 637 (KAM)
## Sentencing Memorandum Exhibits

| | |
|---|---|
| Exhibit 1 | Pashko Shkreli |
| Exhibit 2 | Leonora Izerne |
| Exhibit 3 | Mark Shkreli |
| Exhibit 4 | Franky Guttman |
| Exhibit 5 | Jordan Walker |
| Exhibit 6 | David Zheng |
| Exhibit 7 | ███████ |
| Exhibit 8 | ███████ |
| Exhibit 9 | ██████ |
| Exhibit 10 | Dr. Horacio Plotkin |
| Exhibit 11 | Defense Trial Exhibit 3419 |
| Exhibit 12 | Walter Drane |
| Exhibit 13 | Dr. Adam Brockman |
| Exhibit 14 | Ralph Holzmann |
| Exhibit 15 | Curtis Fisher |
| Exhibit 16 | Akeel Mithani |
| Exhibit 17 | Catherine Chen |
| Exhibit 18 | James Rodina |
| Exhibit 19 | Megan Roberts |
| Exhibit 20 | Kristen Lewis |
| Exhibit 21 | Maureen Lohry |
| Exhibit 22 | Ken Banta |

| | |
|---|---|
| Exhibit 23 | Tashdid Hasan |
| Exhibit 24 | Gary Mohamed |
| Exhibit 25 | Ryan Macy |
| Exhibit 26 | Laura Castro |
| Exhibit 27 | Sophia ███ |
| Exhibit 28 | ███████ |
| Exhibit 29 | ██████ |
| Exhibit 30 | Bloomberg Article |
| Exhibit 31 | The Center Letter to Martin Shkreli |
| Exhibit 32 | Shkreli Foundation Letter to Charley's Fund |
| Exhibit 33 | Shkreli Foundation Letter to Matt's Promise |
| Exhibit 34 | Christina Germano |
| Exhibit 35 | Andrei Krassioukov |
| Exhibit 36 | Shkreli Foundation Letter to UBC |
| Exhibit 37 | Spinal Cord Injury Impairs Cardiovascular Capacity in Elite Wheelchair Rugby Athletes |
| Exhibit 38 | Shkreli Foundation Letter to NYCC |
| Exhibit 39 | Amber Emmertz |
| Exhibit 40 | Hunter College Foundation |
| Exhibit 41 | HCHS Report Expenditures of Shkreli Funds |
| Exhibit 42 | Kenneth McCarthy |
| Exhibit 43 | Yuan Wang |
| Exhibit 44 | Lisa Whisnant |

**United States v. Martin Shkreli**
**Docket No. 15 Cr. 637 (KAM)**
**Sentencing Memorandum Exhibits**

| | |
|---|---|
| Exhibit 45 | Jennifer Kong |
| Exhibit 46 | Kristan Ramirez |
| Exhibit 47 | Lamark Mulligan |
| Exhibit 48 | Patrick Sutherland |
| Exhibit 49 | Martin Shkreli |
| Exhibit 50 | Affidavit of Joel Sickler |
| Exhibit 51 | Jackson Sadowski |
| Exhibit 52 | Julie McConville |
| Exhibit 53 | Lauren Payne |
| Exhibit 54 | Taylor Reiners |

# EXHIBIT 1

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Re: <u>United States v. Martin Shkreli,</u> 15 Cr. 637 (KAM)

Dear Judge Matsumoto,

       In the beginning: Martin was born in the middle month of March, March is a month of joy in simplest of things, a cool breez, flowers coming out, barren trees are being clothed with leaves, birds and animals making noise in other words a new life, a new beginning, a new rebirth. Since early age Martin's mind-set consisted of challenges, also in the beginning we were challenged how to adjust to him by talking with him. I Pashko (Father) bought him a chess game and a guitar, and I saw how quickly he learned how to play them. He started reading my news papers, he was interested a little on sports, but immediately started reading on Stock Markets, and liked math. Soon I bought Martin a computer, in which in the beginning is where he spent most of his time, and was very happy checking what he liked most on stock market. The early years, we went to beach, went to see Mets and Yankee games, and we took him to the old country where we his parents were born. Early years of school, at times he was bored and frustrated, the school called and I had a teachers meeting on couple occasions, after talking how he behaves at home and how he behaves at school we came to a realization the extent of his abilities. The teachers placed him to a more challenging classes of english, math, and science, after that he was skipped grades, and won many rewards, and chess trophies for P.S 197
In school Martin never caused any trouble, he got along well with students and teachers, he liked basketball while playing he landed on his arm and fractured it.
At home, he got along well with his sisters and brother, at times he helped them with home work.There were times when there was loud talking and Martin requested to be please keep at down.
Martin was excelling in math, and one Christmas for a gift , he asked me to buy him the book Alchemy of Finance, which I did. When Martin was like 13 plus years old I the father gave Martin $2000,00 to play stock markets. And did play under my name. Martin constantly read a lot of books, like Shakespeare, Aristotle, Schopenhauer, and many other books. Martin, had friends with his easy going attitude, and a sparkle of smile, and his magnet ability, no matter where he was, people were attracted to him,Martin did not like to dress-up to go to church on Sundays. Couple times Martin and his brother Mark played music in Manhattan clubs. Learning and being challenged for Martin is a joy. Martin use to recite Shakespeare, Aristotle, and other literature, science, english, math. Martin liked and played video games from an early age, and still like to play video games.
To enter Hunter High School, a test was designated for highly-gifted kids, which he passed that difficult test, at that time over 2000 kids applied for that test only 100 students made it.How proud he made me that day, and many times before, and after that, when he invited me to see his office and meet Mr. Kramer Berkowitz and he told you have a smart son, later we were driven by a limousine to a hotel at the hotel everyone was a middle age or older, Martin was a kid, I was so proud of him, business people there from all over U. S. Martin commuted by bus from Brooklyn to Manhattan Hunter High School daily hour an half each way. What I want to say is Martin worked hard to achieve what he has. Than Martin went to work as intern for Kramer Berkowitz of Kramer and Kramer.On couple different occasions Martin brought home his girl friends, we were happy about it, each time he brought home a girl, we told Martin to get married and to settle down, his answer was sure pop, sure pop.Martin worked very hard. I am so proud of him, he never got into trouble. Martin is supportive what others are

interested, especially in dark times, he helped people in need and also through charities. Martin has a quick understanding of how people think so different thought  processes. He doesn't use an opportunity to dump blame or criticism. Martin concepts (ideas) have been useful to those who may hold a diverse set of beliefs, even though at times he is misunderstood and because people don't have an open mind, or chose not to have an open mind of that he suffers some what. I don't know, maybe  sometimes he hovers at the edge of our awareness, and he will tell you the truth, and in truth lie much of our suffering. To close, to us as  Martin'.s  parents  he means everything to us, our pride and  joy, our life, please give him a new beginning, a better beginning of life, please give him a chance to make better for himself and community. From the bottom of our hearts, we thank you, Honorable Judge Matsumoto.

# EXHIBIT 2

Honorable Kiyo A. Matsumoto

United States District Judge

Eastern District of New York

United States Courthouse

225 Cadman Plaza East

Brooklyn, NY 11201


Re: <u>United States v. Martin Shkreli</u>, 15 Cr. 637 (KAM)


Dear Judge Matsumoto,

My name is Leonora Izerne and I am Martin Shkreli's older sister. We grew up together in Brooklyn with our younger siblings, and I helped my parents raise them. I have a B.A. degree in English, and have worked with Martin on and off since 2005. I worked in hybrid administrative, accounting and H.R. roles at Elea Capital, MSMB Capital, Retrophin and Turing Pharmaceuticals. I have been the Executive Director of The Shkreli Foundation since its inception in early 2014.

Your Honor, writing this letter has been a challenging task, feeling the weight of your perspective on his future, along with the potential publication of what should be private discourse.



It has been surreal, confusing and heartbreaking for our family, fearing for Martin's safety and health. The hardest parts are the unknown, regarding his charges and sentence, as well as the feeling of helplessness related to media coverage and public perception. In particular, I couldn't fathom how it was possible for someone who had worked non-stop his whole life to suddenly have that taken away from him; I struggled (and still do) to make sense of how he could be accused of these allegations after refusing to give up until he repaid investors. I was haunted by colleagues who had mostly seemed to be in his corner, then suddenly turned against him for their own greedy gain. Many of them were given opportunities, salaries and freedom that they would not have had elsewhere, at least not at that point in their careers. This side of the story didn't make the headlines, but it has been a sad theme for him, on account of his generosity and faith in others. The other strike against him was others' envy of his ability (and, at such a young age, no less). On many occasions, I heard others' criticisms and disbelief over his skills, yet they eagerly accepted all the perks and advantages of their employment or association with him, or his companies.

Clearly, something went awry: he was suddenly the scapegoat for an entire industry, being pawned by the media, as though he were the sole creator and perpetrator of these rules and practices. Where were the investigative journalists, documenting the decades-long pricing trends of the lobby-riddled, skewed industry called pharmaceuticals? They didn't exist, or were swept under the mayhem caused by all the negative press. I can't imagine how that must have felt for him, as though however he tried to initially clarify his side, there were heaps of betrayal stacked against him at every turn. People he had known in situations he thought he understood were probably now a blur, and he likely just didn't know where to turn. He has never stated this directly and I can't speak for him, but I imagine that this staggering turn of events became harder to handle. While I am aware of his controversial or inappropriate remarks, he hasn't been the first or last to make them. Sometimes, even the most intelligent people don't make wise choices, especially in the face of adversity. Perhaps certain people turn to the wrong coping mechanism, with the wrong approach and outcome, only realizing their critical error after the fact. Social media can have this snowball effect, where the commentary and its consequences are

increasingly building up to a disastrous end. It had inadvertently all gone too far, and the anxiety and stress behind his predicament had reached its pinnacle: he probably couldn't even comprehend how misunderstood and mischaracterized he could become. Unfortunately, this ensued on a very public platform, regarding a very public figure. What I can say with absolute certainty, however, is that he meant no harm and has never intended such harm against another person. It's very unfortunate that so much about him has been misunderstood, misconstrued and mischaracterized, despite his many philanthropic deeds and dedication to helping patients and people in need.

Since early childhood, Martin has continually demonstrated an enhanced propensity for all-things math and science. His comprehension and retention of, information is astounding. I remember that before the age of 6, he could quickly recall square roots, multiplication tables, the Periodic Table of Elements and do long division. He excelled in school and was supposed to skip years ahead twice in grammar school, but the teachers thought it was just too soon. He had an advanced understanding of biology, chemistry, physics, astronomy and statistics. He could review sports statistics and evaluate which players might break certain records, or who could win a championship. He always strove to learn as much as possible, expanding his breadth of knowledge on a variety of subjects. His main hobbies were chess, basketball, video games, playing guitar, listening to "underground" rock, rap music, and computer science/programming. He was always atypical in this way, probably fitting in more with likewise ambitious and intellectually-stimulated students, enjoying "brainiac" activities, as opposed to mainly recreational ones. In this way, I don't think I've ever known anyone who wastes less time than Martin, nor multitasks as effectively. He rarely takes vacations or does something leisurely (or, even takes breaks); for him, it's simply not as enjoyable and definitely not productive.

By working with him for this long, I discovered the application of his business and science acumen. The pursuit of knowledge and sharing that with others are the hallmarks of his ambition; once he had learned the tenets of the stock market, I suppose he made it his mission to expand it to particular sectors. I have seen him "in action" among employees or in meetings with senior management, and astound everyone with his precise methods of collecting data and "walking encyclopedia-" knowledge. His physical and mental acuity and agility are remarkable, in that his brain seems to comprehend three steps ahead of everyone else. Doctors, scientists, senior executives, experts and consultants have all told me that they were shocked that Martin didn't have Master's or PhD degrees and is self-taught. It has been extraordinary to watch him grow his inklings of ideas about different market opportunities, diseases and drugs into full-fledged companies. Perhaps more noteworthy, he has always

taught/tutored relatives, friends, colleagues and employees around him; if he had had more time, he would have created additional workshops or seminar-type lessons to share his tips. He has exhibited that in many ways since, whether internally for his employees, or externally with online tutorials.

Few people know him well enough with respect to his kind, compassionate, generous and sensitive side. He certainly has flaws and negatives like any human. Yet, I've witnessed him give people multiple chances, especially employees (who have always told me that he is more generous than most employers). I have discovered many new stories from people I did and did not know. There were stories of how he gave them a loan, bought them a computer, gave them a big tip or bonus, paid them in advance or shared his own research with them regarding medical conditions. There are many other stories that I don't know... I believe Martin's certain enigmatic attributes might be interpreted as "awkward," or impatient, because he literally doesn't think or operate like the average person. This inadvertently causes misinterpreted signals or confusion from misunderstood exchanges, even amongst his closest friends and family.

His combined academic excellence and phenomenal professional goals have always been tied to charitable endeavors and altruistic motivations. His donations were both personal and professional, causes that touched his heart, whether board members mentioned charities close to them, or strangers needed help. Once he heard about children in need, patients without medication, shelter animals or under-funded programs, he was genuinely eager to help. He had already provided donations to various charitable organizations before officially launching The Shkreli Foundation. Much to my delight, he asked me to run the Foundation on his behalf and begin with paying the doctor's bills for a pKAN patient's mother. Her daughter needed a wheelchair, monthly nutritional supplements and a new van for transportation for the many doctor's appointments. Since the Foundation's paperwork was not in order yet, Martin wrote a personal check to this woman. Later in the year, he suggested that we buy all of her daughters Christmas presents, which was for me a true pleasure, taking me to American Girl Place to purchase their dolls of choice. He also made grants or contributions to Paralympic athletes with SCI (Spinal Cord Injury), DMD, educational programs, scientific research.

Later, we would face unfortunately misplaced backlash in the form of unspeakable comments on the social media pages of our grantees – of all things, a charity for abused children, another two for a rare, deadly childhood disease. It was utterly disappointing and disheartening to witness the general public show such misplaced, unabashed hatred for completely innocent groups, mostly children. Furthermore, it was shocking that they failed to acknowledge

the blatant irony of making claims against Martin or his funds, with complete disregard for these recipients' challenging circumstances. Instead of positive remarks or articles about helping these organizations or raising awareness about those causes – which was the entire purpose – it somehow became all about him. On the morning of Martin's arrest, I happened to be preparing for a meeting with a charity in Washington, DC and was informed by email that the meeting had to be cancelled. With a few phone calls, internet searches and click of the television, I was informed of the shocking, grim news of Martin's arrest. I felt so guilty for not being home in NY with him, even though we were preparing for more charitable grants. I felt afraid for him and my family and had no idea what was going on until I returned home a few days later. The media storm that ensued included unwelcome requests for interviews and visits to our homes. Once again, it had a negative impact with some sponsors or parties related to our grantees backing out of the association, or requesting removal of our name. We immediately obliged, fully respecting and understanding the unfair treatment heaped upon them. As a matter of fact, everyone that had been a grantee of the Foundation or recipient of his philanthropy expressed their gratitude for his generosity, as well as sympathy for his circumstances, wishing him the best. The *only* things stopping additional grantees and recipients from writing their support letters were either HIPAA laws protecting their patient-privacy rights OR the terrible, unjust media backlash received by these groups via letters or social media comments. If it were not for that reaction, they would have written letters, too. They all supported Martin, vouching for the impact his donations made, as well as his undeniable compassion for these recipients and their respective causes.

Martin has certainly had lofty ambitions and behemoth undertakings since his late teens, with an endeavor to create and grow a series of different companies. Since he is so introverted about these experiences, he hasn't admitted it, but there was a tremendous amount of stress and pressure on his shoulders. Of course, this was amplified when he not only lost the company that he founded, but also when the media took the opportunity to malign his image. It has been undoubtedly painful (certainly for his loved ones), to witness false accusations and accounts, particularly because certain claims were tied to common industry practices. While that doesn't make certain actions permissible, the media did not accurately portray the way particular industries work. It's possible that Martin was incredibly overwhelmed by his case, the loss of his company and this negative attention probably caused him to lose his usual focus and clarity. I think this might have exacerbated any stress-related anxiety, resulting in some misguided, inappropriate errors. It's hard to explain, but I don't believe anything was intentional, nor does it represent Martin's true character. The Martin I know tutored me in math, convinced our mother to join him in my first concert, (extremely quickly) typed my essays for me when I was

sick, bought me my first cell phone, asked me to work with him and been a wonderful brother. Unfortunately, I believe that this has become a common pitfall of social media, wherein misunderstood or misjudged posts can instantly change any person's reputation. I'm sure that Martin has been aware of this and using much of his time for self-reflection. Ultimately, I know that he absolutely intends to use his talents to make impactful changes, continuing paths to research, education, innovation, and philanthropy. We were in the middle of drafting at least three grants for autism, pKAN studies, and psychiatric research. Since all of these aforementioned endeavors have been practically halted by his circumstances, I respectfully plea for the most lenient sentence deemed appropriate. Thank you very much for your time and consideration.

Sincerely,

# EXHIBIT 3

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Re: <u>United States v. Martin Shkreli,</u> 15 Cr. 637 (KAM)

Dear Judge Matsumoto,

      My name is Mark Shkreli. I am Martin Shkreli's brother. I am 30 years old. I live in ██████ ████████████████ I currently am unemployed. I attended Borough of Manhattan Community College for about a year and a half.

      I believe that my brother, Martin Shkreli, is a wonderful person who is misunderstood because he has been unfairly portrayed by the media as a villain. The Martin Shkreli who I know is an incredibly intelligent, hard worker, who is also very giving and kind. If the public and media knew the Martin Shkreli who I know, he would be thought of as a very different person.

      Growing up I always wanted to be like Martin and that hasn't changed much. From the time that he was accepted to one of the most academically challenging and rigorous schools in New York City to the time that he started working at a top hedge fund at a young age, he has been an inspiration and a guide. Martin can nearly always be found hard at work, always finding or making the time to read medical journals and scientific studies. Even when we would go out to concerts or live events he would seem to get lost in his medical journal, sometimes unaware of the event.

      I remember years before Martin was ever known taking a trip with him to Miami, Florida. At the time I was only thinking about going to Wrestlemania, which is professional wrestling's biggest event of the year. We were both very excited to go to our first Wrestlemania together. I did not know that Martin would be meeting with a doctor to have a discussion about pharmaceuticals and the pharmaceutical industry. While I have always known that Martin is extremely smart, I was honestly blown away by Martin when he started talking to this doctor. Martin clearly understood what this doctor was saying and was able to hold his own in the conversation. Even the doctor was impressed by Martin's knowledge of pharmaceuticals. Martin is misunderstood because I almost feel like Martin is sometimes playing a character as wrestlers do, but at the same time Martin is an immensely gifted, intense individual, who is very dedicated to discovering new drugs and treatments for rare diseases.

      I think that my brother may have been caught off guard by all of the negative media attention surrounding the raising of the price of the drug Daraprim. It was not just another story, it became headline news. He was harshly criticized online on social media, in person, through phone calls, and mail. Not only was the decision to raise the price of Daraprim scrutinized, but Martin became the face associated with pharmaceutical companies and price increases. Shortly after he raised the price of Daraprim he was arrested and put in the spotlight again. I think that being in the spotlight for raising the price of Daraprim, and then being arrested, Martin may have made some mistakes as he was never in a situation like this before. But who wouldn't make mistakes if they were young, wealthy, and successful, and suddenly had their life put under a microscope?

      Martin Shkreli is a unique guy. He is a young, brilliant, wealthy man who wants to leave his

mark on the world by discovering and creating drugs and treatments for rare diseases. I think Martin may be difficult to understand simply because there really is no one else like him. He was focused on creating drugs and then thrust into the spotlight because he raised the price of a drug. Maybe he responded inappropriately at times to the media and the attention he received. But I think that Martin has learned from everything that he has gone through over the past two years. I expect Martin to show a much more humble and reserved side of himself, that I am familiar with, when he is free.

I can't help but think about all of the patients he has helped and will continue to help, or even save, because of his dedication to finding treatments for these rare diseases that are overlooked by many pharmaceutical companies. I believe Martin has unlimited potential and will use all of his gifts to really make the world a better place. I think that over time Martin will no longer be known as the guy who raised the price of a drug, but rather as someone who has truly made a very positive impact on society.

Sincerely,
Mark Shkreli

# EXHIBIT 4

February, 22, 2018

Franky Guttman

███████████████

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Martin Shkreli, 15 Cr. 637 (KAM)

Dear Judge Matsumoto,

My name is Franky Guttman. I currently live in ███████████████ and work in the Entertainment industry as an Editor and Writer of television programs. I am however a New York native, having grown up in the Bronx and attended high school at Hunter College High School on the Upper East Side.

It is at Hunter, in my seventh grade music class, that I met Martin Shkreli. Martin and I became fast friends, bonding over our love of rock music. We were in a band together, with Martin on guitar and myself on vocals, and played small gigs all over the city. Martin was my date to the senior prom, because none of the girls I was interested in wanted to go with me. I even worked for Martin at his first hedge fund, Elea Capital Management, in 2007. I think more than anyone, I can confidently say I know the "real" Martin Shkreli, as I have seen him grow from a shy skinny kid from Coney Island into the man he is today.

It is well known that Martin is a very intelligent and imaginative person, especially when it comes to finance, and biopharmaceuticals in particular. Not many people know that Martin is entirely self-taught. Growing up, he received little to no support from his parents, and in fact he was ashamed of his own upbringing. In our dozens of years of friendship, including all of middle school, high school and college, not once did I meet his parents or go to his house, as he did not want me to see his living situation. Martin would show up to school without any money for lunch, so I would have to siphon off some of my modest allowance so that he would be able to eat during the day. His grades in school suffered because he had no support system.

All of this changed when Martin became interested in finance. Suddenly he was always carrying around the newspaper, circling stock listings. He eventually landed an internship at the hedge fund Cramer Berkowitz, and suddenly this boy who came from nothing found himself in the center of massive wealth. He could not pay for his own lunch but was witnessing million dollar transactions on a daily basis. He learned the tricks of the trade, and soon focused in on the biopharmaceutical industry. Because biopharma

is so complex, at the time it was not covered by very many market analysts. Martin realized that by teaching himself the complex science, he could have a leg up on the competition. He taught himself how to read medical journals and studies, and soon opened his first hedge fund, where I worked between entertainment jobs in 2007. Martin, once a part of my high school punk band, was now on the phone with CEOs of pharmaceutical companies, going toe-to-toe with them on conference calls. He worked nonstop and expected the same of his small team of employees.

Martin and I stopped talking about seven years ago, after I moved to ███████████ As he became more and more enmeshed in the world of finance, he became difficult to deal with. The affable, funny guy I knew (and let me be clear, having now worked with some of the best comedians on the planet, Martin is quicker and funnier than most of them) slowly gave way to his public persona. It is one of the greatest disappointments and sadnesses in my life that I wasn't able to support Martin and help him get through this time of his life, and to help him avoid his recent mistakes. I feel like I failed him, and hope that we don't fail him again by punishing him in a way that puts his immense talents to waste.

I know Martin deep down to be a funny, polite and kind human being. I don't write this letter to excuse his behavior, or minimize his crimes. I only ask that you take this information about his background, and what I know to be true about the content of his character into account in making your sentence. Martin can contribute a lot to society if he's able to focus his energies into the service of good, and with a support system that he has lacked for most of his life.

Thank you,

Franky Guttman

**EXHIBIT 5**



Jordan Walker

November 2, 2017

Your Honor,

I wanted to add my voice to what I can only imagine is a growing chorus of fans, friends, and supporters of Martin Shkreli. While not a man without faults, I hope anyone who peers under the surface would see that Martin is gifted, passionate and has the potential to contribute improvements to society at great scale. My only hope with this letter is that you might consider granting Martin some leniency with his sentencing so that he can continue his work in entrepreneurship, teaching, and helping people.

I met Martin 16 years ago during our college years, and while I had very little interest in stocks & business at the time, we bonded over our love of music and the internet. I knew back then that he was unique - with a thoughtfulness, wit and emotional honesty I had seen in few others. He kept a blog in 2001 before "blogging" was a thing - a public diary on a website called Live Journal where he mused openly about his interests, anxieties, philosophical beliefs, and relationships. He was an open book, true to himself, raw and impossible to label back then, as he is today. He marched to the beat of his own drummer; apologies for the cliche.

We had lost touch through the years, however in 2014 I was re-introduced to Martin after I launched my startup called Kindly. Our product is an app and website that provides an emotional support platform for young people with anxiety, depression, and certain mental illness, with the help they need (professional counselors, trained volunteers, and a community of peers). The moment he heard the pitch, Martin offered to become my first investor. ████████████████████████ ████████████████████████
████ Martin was immediately moved by Kindly's mission and the possibilities of helping so many people through the very devices that are in their pockets. I am very grateful for Martin, and we have in fact actually saved lives through Kindly's product by providing a positive community and funneling high risk individuals over to crisis/suicide hotlines giving them the help they need before it's too late.

I have witnessed other examples of Martin's generosity. He once offered to pay for my girlfriend's CT Scan when she got a concussion and had lost her insurance. I've heard similar stories of Martin helping others with their health issues, not to mention significant donations to numerous charities, including a very significant one to his old high school. I imagine it's extremely rare to find other self-made wealthy young people who have given as much as Martin has.

Many things come to mind when I think of Martin. Ill intentioned criminal is not one of them. It pains me to think of him in a jail cell, when I know in my heart he belongs in a lab or workspace where he can continue with his inventions and spend time with his colleagues and students.

I do consider Martin to be a teacher - a selfless one at that. As I'm sure you are well aware, in the past couple years Martin was often devoting several hours a day (and well into the night) on the internet teaching finance, science, and computer programing to thousands of tuned-in protoges. I have seen him open young peoples' eyes to new ideas and the many possibilities and opportunities that come to those with the discipline and curiosity to learn. He would occasionally lecture at universities as well. As with his charity, I think you would be hard pressed to find another person of means who has dedicated as much time as Martin has to helping young people improve their lives with no tangible gain for himself. I imagine this passion for helping others must have emerged from growing up in a working class immigrant family that had to work extra hard to survive.

I'm well aware that Martin has made mistakes in his time, and some of his actions have been controversial and offensive, however I believe Martin is largely misunderstood. I *know* he is well intentioned and exceedingly selfless. I hope that you'll at least consider these thoughts during Martin's sentencing. Thank you for reading!


Sincerely yours,

Jordan Walker

# EXHIBIT 6

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Matsumoto,

My name is David Zheng.  I am a software engineer at a small firm based in ███████, a graduate of New York University, and a friend of Martin Shkreli.  Today I am writing to humbly ask for leniency with regard to his sentencing.

I have known Martin for over 20 years, as we attended the same high school starting in 1996: Hunter College High School, on the Upper East Side of Manhattan.  We shared a group of friends that remains close to this day and I believe I speak for both of us when I say that high school was a watershed period in our lives that we recall fondly.  Sadly, Martin was not able to complete his time at Hunter and entered a program called City-As-School, while I and the rest of our friends went off to college.  After college, I briefly worked together with Martin at Elea Capital on a daily basis during which time I was able to closely observe his character and evolution since high school.  I eventually moved on to other firms (and industries) and had much less contact with him, though we did still always keep in touch to some extent.

Martin is a highly intelligent and capable person that can still make a strong positive impact on this world.  He has demonstrated a particular passion and dedication toward the cause of treating rare diseases (particularly those that affect children, such as Duchenne muscular dystrophy).  If he continues to apply himself, I really think that he can do a lot of good – and this is indeed an underserved area that needs attention.

Martin has always made a special effort to take care of his friends and family, especially his siblings.  I have seen first-hand his diligent efforts to support and nurture his sisters and brother both financially and emotionally.  Additionally, he made an extremely charitable donation to our high school – sorely needed funds for a publicly funded school that enrolls disproportionately poor children yet sends almost all of its graduates to top college and universities.

It is my hope that you will take into account Martin's demonstrated positive qualities, as well as his potential future contributions, and mercifully regard the misguided and foolish mistakes of his past.  Thank you for your time.

Sincerely,
David Zheng

# EXHIBIT 7

I



26 October, 2017

**Honorable Judge Kiyo Matsumoto**
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**RE: United States V. Martin Shkreli**
**15-cr-00637**

Dear Judge Matsumoto:

I am writing on behalf of Martin Shkreli who is appearing before your court on January 16, 2018.

My name is F█████ H█████ and I have been a friend of Martin for a little over 2 years. In that time, i have come to see that he is one of the most dedicated advocates for an important community of people very few talk about, rare disease patients. █████████████████████ ████████████████████████████ it is my hope to portray the impact Martin has had on our lives. I met martin by chance during an online forum while learning of a drug in the research and development phase specifically designed to treat ████████████ I knew nothing of Martin prior to this first conversation as it turned out the company creating this drug, Turing Pharma, was his very own company. ████████████████████████ ███████,admittedly, unprepared for the relationship that would come from that initial conversation given many of us in the Rare Disease community often feel we are not seen or heard by those in the Pharmaceutical Industry. Martin has been, without question, an invaluable resource to both myself and several other members of this community. Very quickly after we met, Martin and I began texting daily, more often than not it was him asking how I was doing, if I needed anything or what my current medical testing was showing. At the time I was, for the most part, unaware of the charges or legal trouble he was facing.

Being inquisitive, I quickly became aware of the legal issues surrounding Martins arrest. I was impressed he never allowed those issues to interrupt or interfere with his focus on rare disease patients. His relentless pursuit for the wellbeing of said patents and cures for diseases many companies won't spend time on is something that cannot be replaced. As time continued, I did notice a drastic change in Martin's interactions online. In the age of social media, the attention one gets is often intoxicating. I honestly believe he got caught up in a world he didn't fully

understand the scope of or know how to get out of. I make no excuses for his behavior and, in fact, neither does he. We have continued to correspond while he has been incarcerated and I can say without reservation, Martin has come full circle from when I first met him. The kind, compassionate person with a relentless drive to help the rare disease community is who I see again in these letters.  At the end of the day he acknowledges the poor choices he has made and that his actions have benefited no-one, especially those he initially sought to help. The qualities in him that are invaluable to the medical community, particularly terminal patients, are redeemable. It has been very difficult watching him make and learn from his mistakes, coming full circle in a situation that was sure to end negatively. He is paying the price, as we speak, for allowing his public image/persona to impact his personal life and real world legal issues.

I realize, as does Martin, he is accountable to both the court and society for his actions. That being acknowledged, there is a real threat to the rare disease community, and its potential for new discovery, with a prolonged incarceration at sentencing. His currently pending and owned patents are advances and cures waiting to be brought to market and we as patients waiting for those cures have felt his absence almost immediately. It's simply not profitable for large companies to concentrate on a small piece of the population and Martin has been the long needed voice for those of us it is "less than profitable to help". He has worked, often around the clock, to help  find cures for more than one disease. In our community, his mind and his drive are invaluable.

I say these things with the utmost respect for both the judicial process and the subsequent jury decision. I know there is accountability for our actions everyday. Martin made poor choices and was found guilty by a jury of his peers. That is not what we are questioning at this stage. Now the question is how long does he need to reflect and learn from his mistakes to qualify as "justice served". One thing I can tell you from the opinion of a "regular citizen" would be one of, if not the main goals of incarceration should be redemption and rehabilitation to enable our inmates to rejoin society and contribute to our community. This is why we have programs within our jails to help inmates learn and grow as people. While there are courses available for advancement in education as well as vocational programs to allow inmates to leave with a skill/trade, the level and type of work Martin does cannot be replicated in a jail like setting. There are no programs available within our judicial system that would allow him to continue making huge advancements and discoveries that end up saving lives or greatly increasing the quality of life for patients. I am not saying that he should be let go without consequence ,however, there is a question as to how long is long enough without taking away the possibility of a better tomorrow, not only for Martin, but for society as a whole. Many people have different definitions as to what justice means. Martin will have served approximately 6 months at the time of his sentencing, you have the power to sentence him to much more. How much longer is needed to serve for justice to be met? That is a tough question and one I am glad it is not my responsibility to determine. Redemption comes in many forms and, for me, Martin is absolutely capable of letting go of the public image he has held onto and is already returning to who he was when I first met him.

Before you is a very difficult decision none of us could imagine having to render. I also realize

there are many factors you must consider. It is my hope, however, that you see and hear us. The patients needing the cures and formulas locked in his head as well as the family members of those individuals hoping for just one more good day with their loved one consider time to be a luxury ██████████████████████████████████████████████████████ ████████████████████████████████████████████ prolonged incarceration would directly impact hundreds of lives dependent on the information and resources Martin brings to light. The mistakes and poor choices made by Martin Shkreli do not define who he is; his relentless quest to help as many patients as he can does.

Thank you for your time and consideration.

Sincerely,

██████████████



**EXHIBIT 8**

December 20, 2017

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Martin Shkreli, 15 Cr. 637 (KAM)

Dear Judge Matsumoto,

My name is ███████████ and I live in ███████████. I am married and have three children ages 19, 17 and 14. I grew up in a town of 180 people in rural ███████████ and have a Bachelor's Degree in Business Administration. I work remotely as Sales Manager for National Information Solutions Cooperative, a software company providing accounting, engineering and mapping software to over 800 telecommunications and utility cooperatives in rural America.

I met Mr. Shkreli in March of 2014. I reached out to him via twitter regarding RE-024, a drug that was in development with Retrophin, ██████████████████████████████████████████████████████ █████████████ Pantothenate kinase-associated neurodegeneration (PKAN), a degenerative disease of the brain that can lead to parkinsonism, dystonia, dementia, and ultimately death. ████████ ████████ Dr. Michael Kruer, had filed a Physician Investigational New Drug (IND) trial to the Food and Drug Administration (FDA █████████████ The IND was denied. Dr. Kruer then filed an Emergency IND trial to the FDA, which was also denied. ████████ had discussed lobbying the Senate sub-committee overseeing the FDA to urge Commissioner Hamburg, then seated as the head of the FDA, to overturn the decision.

My tweet to Martin, ██████████████████████████████████████████████████████████████was answered within the hour. Martin informed me that he was the developer of the drug. We conversed via email and eventually by phone over the weekend. I requested an in-person meeting at the Retrophin office in New York City, which he happily agreed to. The following Thursday, ████████ flew to New York and met with Martin, Tom Fernandez (Vice President of Patient Advocacy at Retrophin) and others from the executive team. The team spent over two hours with us, discussing the research being done on animals with PKAN treated with RE-024 █████████████████████████████ . ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████

████████████████████████████████████████████████████ I traveled to Washington, DC to meet with the staff of several Senators regarding the denied IND trials. We also met with four individuals at FDA, including Dr. Ali Mohamadi, Medical Officer Team Lead. Through-out our meetings, Martin and his team offered the expertise on lobbying for investigational trials and provided information about RE-024.

While we weren't able to reverse the decision by the FDA, Martin and his team continued to work on their efforts to receive approval for treatment of PKAN with RE-024, eventually treating an individual in Cypress that fall. When Retrophin received approval to treat in Cyprus, Martin reached out to me ██████████████████████

Unfortunately, FDA approval didn't come until much later, which was only for Phase 1 of the trial and included treatment of healthy subjects only. In the meantime, Martin was no longer employed with Retrophin and communications with the company became very difficult. █████████████████████████

███████████████████████████████████████ Yet, Martin continued to stay in touch, offering support in any way he could.

The last conversation I had with Martin was in June of 2017. A friend of mine asked me to reach out to a family who had been denied a drug for their four-year-old son who was suffering with a terminal cancer. I did some research on the drug and spoke to the mother. My next step was to reach out to Martin to get his insight on this specific drug. He took the time to research the drug and provide his insight on how the family might be able to request approval for treatment. Once again offering his sympathy to the situation. ███████████████ ██████████████████████████

Over the past several years, I was fortunate to have many conversations with Martin and looked forward to each of them. ██████████████████████████████████████████████████ He has reached out to me over the years to see how they are doing, each time expressing concern and sadness that their conditions have worsened. I've never encountered the kind of person that the media has made him out to be. The person I worked with was kind, compassionate, engaged and always willing to help.

Living in rural ████████ my entire life, I haven't encountered many people like Martin Shkreli. It can be intimidating to sit down in mid-town Manhattan with the CEO of a drug company, asking for help. But after the first meeting, any unsettling feelings were lost. I often say that everyone we meet in life plays a part in our story. I feel fortunate that Martin Shkreli has been part of my story and that of ███████████ and I will always be thankful for him.

Martin showed up for us when we needed him and continued to do so. While he, like everyone else in this world, may have shortcomings he has also been a blessing to many. He provided us hope when we needed it most and still does in his continued fight to help children with rare diseases. With his impending sentencing, I ask that you consider the most lenient sentence the court would deem appropriate under the law. Martin Shkreli can help people. I've seen him help people. The best thing for society would be to see him working again. The longer he is incarcerated, the less chance someone suffering from a rare disease is going to get the much-needed help they need.

# EXHIBIT 9



12/20/17

Judge Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Matsumoto:

My name is ███ ███ and am the mom of ███████. My husband, ███████ and I live in ███████ on a farm raising our kids and livestock. Our family was struck with devastating news 6 years ago with the diagnosis of PKAN ███████. PKAN is a rare genetical deadly disease that affects few in the world. They tell us ███████ are one in a million! Over the years ███████ have often been referred to as ███████.

After the diagnosis of ███████ we were on a mission to find anything that would help ███████ as there was no treatment or cure ███████. With the help of a friend, we found out about a new possible drug RE-024 that was being developed by Martin and his company, Retophin. Being bold we reached out to him to ask about it and he responded back quickly. At that time, we developed a friendship with Martin and he genuinely wanted to help ███████ He invited my friend and I to New York to visit with him and his staff. He was able to put a face to someone that had the disease he was working so feverishly to develop the cure for. I feel this was his way to so called get in the trenches with a family that was struggling to find hope for a long future ███████.

He saw a fight in us to help ███████ and he had a fight about him. He was developing the drug RE-024 (possible cure for PKAN) and being a researcher, he had a connection to the patient and he truly felt the pain ███████ were going thru, he is a person who showed empathy. He began to push thru more testing to get this drug ready for a trial and approved by the FDA. At one point he decided to proceed with an extremely costly test the FDA was requiring, and I believe he did because he saw the decline ███████ in a video. Martin was trying many ways to get this medicine to ███████ even willing to send them overseas to have a trial there. Our family was beginning to plan for an extended time in another country and then those plans ended abruptly. Martin was let go from Retrophin and then life changed in a quick hurry. We no longer had an advocate for ███████ and we became just another statistic with PKAN. You could say Martin treated us like we were family and he really wanted to help ███████. To this day, we still are not able to get RE-024 for ███████. Retrophin tried to make promises to us that ███████ would be the first to try the medicine in the US, but that has not happened. Retrophin has taken RE-024 into a trial but in adult patients only. If Martin would have been there, ███████ would have had the

medicine and been on the road to recovery. I tell you this story because, the Martin I know would go to great lengths to make a difference in persons life.

When Martin sees something broken he feels like he can fix it, he saw that determination in us too. The FDA requires very strict regulations, I very much appreciate this except when you have a loved one battling an illness that continues to decline in health and you cannot get a medicine approved or the process for an emergency IND takes many hours to complete. Martin knew there needed to be a change and it would take lots of time. We knew we could help with that change. We worked and lobbied in our state of ⬛ and helped pass the Right to Try bill. Many other states also did pass the same bill. Because of that, the FDA started to loosen up some of those extensive regulations, especially the time it takes doctors to submit an IND. Currently the movement has continued and there is a Right to Try bill sitting in Washington DC going thru the House and Senate for approval. The reason I tell you this story is because he is so passionate about getting medicine to patients, so they can live a better life without having to go thru all the red tape.

Often, Martin has been misunderstood but when a person gets to know him he really is a kind, caring and true hearted person. What kind of person still reaches out to someone to just see how the family is doing and if we need anything, I can say a person who cares and wants the best, that is Martin. He is unique in many ways, quite frankly he is on the level of genius in his knowledge and ideas, he can and will do good in this world. I believe he wants to fix things that are broken and in many ways, that has been the part that has hurt him. Please consider Martin and his true self and good he can do when given the chance.



Re: United States v. Martin Shkreli, 15 Cr. 637 (KAM)

# EXHIBIT 10

Honorable Kiyo A. Matsumoto
   United States District Judge
   Eastern District of New York
   United States Courthouse
   225 Cadman Plaza East
   Brooklyn, New York 11201

Re: United States v. Martin Shkreli, 15 Cr. 637 (KAM)

Arlington, MA, Jan 19 2018

Dear Judge Matsumoto:

Please allow me to introduce myself. My name is Horacio Plotkin, and I was Retrophin's Chief Medical Officer for three years, reporting to Martin Shkreli. I am a pediatrician. I don't have an MBA, and I don't understand the stock market. I just care for people with rare diseases. I've practiced for 20 years caring for patients with rare diseases, and after that worked for 10 years (so far) in biotechnology companies developing treatments for patients with rare diseases. I started working at Retrophin in May 2013, when there were about 8 employees in the company, and started the Research and Development Department from my kitchen, building up a team of about 40 people. I will not comment on the matters that brought Martin to court, but would like to have a chance to tell you about sides of Martin that were not discussed in the trial, as far as I know.

You probably do not know it, but you heard about me during the trial. Stephen Aselage mentioned that Martin shouted at an officer during a board meeting. I was that officer. For the record, Martin did not shout at me. He did blame me for some missed deadlines, maybe not in the best tone, but I have seen much worst in boardrooms. Working for somebody as passionate a Martin has its challenges, but they need to be seen in the light of the final goal. As a reference, with very few exceptions, no employees of Retrophin resign during Martin's tenure. We were all working towards a common goal.

What probably did not come up in the trial, was that Martin is a very generous person. When Martin learned about a baby in Venezuela that needed a medication for his congenital liver disease (which he needed to take awaiting for a liver transplant) that was not available in that country, he immediately contacted Tom Fernandez (head of patient advocacy at Retrophin) and me to try to help the baby. We quickly got in touch with his treating physician in Venezuela, and put her in touch with a pediatric GI specialist in Boston, who happened to be from Venezuela also and knew her well. He agreed to write a prescription for the baby, and I personally bought the medication from a local pharmacy, enough medication to cover one years' treatment. We shipped the medication and got a beautiful thank you letter from the father of the baby.

In another occasion, I called Martin to tell him about a little girl in Boston, who was blind and autistic. There is a special school for children with those conditions, that is very expensive. I told Martin that the family could not afford the tuition. Without hesitation, he responded that he was going to pay for it. The family ended up not accepting Martin's offer, as they considered that it was too much money.

Yet another example of Martin's generosity involves a little girl with PKAN, a terrible metabolic disease, who was the daughter of an undocumented woman from Central America that came to the US to try to give her daughter a better chance. She had no medical insurance, and the girl needed a wheel chair. Not only Martin donated the money to get he girl a wheelchair, he also gave the family extra money to help them.

Martin's generosity is not known by many people. On the other hand his insight in the world of science is agreed upon many scientists and clinicians. He had no formal science education or training, and maybe in part because of that, he was able to think out of the box and repurpose a drug that was developed for hypertension, for the treatment of a rare kidney disease called FSGS. Retrophin run a clinical study demonstrating that Martin idea that the drug could potentially help those patients was right. Martin also developed the initial concept for a treatment of another devastating disease, called PKAN. Patients with PKAN cannot use vitamin B5 because they lack an enzyme that puts the vitamin in a pathway that ends up in production of energy by the cells. Martin thought of a simple solution for the problem, and three patients that had the disease and were unable to walk, started doing so days after starting treatment. I was in Cyprus when the first patient started the treatment. He was in a wheel chair, and within days he started to walk. Last time I've heard from the family, he continued to make progress and was able to walk independently for a progressive amount of time each day. Retrophin is now about to run a clinical study to confirm those results.

Again, the intent of this letter is not to comment on the events that brought Martin to your courtroom. But just to add some information about him that may not be widely known, and suggests, in my humble opinion, that Martin has a lot to give our society, and in particular patients suffering with rare diseases. He is far from perfect, and I would even say that some of his actions are hard to explain or justify. I personally hope that he learned a big lesson, and that he will change many of his actions and focus on helping develop science and treatments for people in need.

Thank you for taking the time to read this letter.

Sincerely



Horacio Plotkin, MD, FAAP



# EXHIBIT 11

**John Neill**

| | |
|---|---|
| From: | Martin Shkreli ████████████████ |
| Sent: | Sunday, February 19, 2012 11:08 AM |
| To: | Martin Shkreli |
| Subject: | Ligand Licenses DARA Program to Retrophin |
| Attachments: | Ligand Licenses DARA Program to Retrophin.pdf; DARA NonConfidential Overview_2011.pdf |

Friends and Shareholders,

Please see the attached news indicating Retrophin has completed the license for RE-021 (or "DARA") from Ligand Pharmaceuticals (Nasdaq: LGND).

I've told some of you about RE-021 before, but allow me to re-introduce the product. RE-021, an endothelin receptor antagonist and angiotensin receptor blocker (dual acting receptor antagonist) was developed and discovered by Bristol-Myers and subsequently licensed to Pharmacopeia, where I was a major shareholder. Pharmacopeia was then purchased by Ligand. We were successful in licensing the product from Ligand, principally because of our ability to identify an orphan population who could benefit substantially from the drug.

I feel the best patient population for RE-021 is the rare nephropathy constellation of diseases, including Focal Segmental Glomerulosclerosis, IgA Nephropathy and others, where patients have a hard time controlling idiopathic proteinuria. Right now, patients take ARBs and steroids simply to reduce their proteinuria, the marker that physicians watch closely in these diseases. These patients typically have renal failure within 5 to 10 years of their diagnosis and are a major contributor to ESRD in the US. There are probably 100,000 patients with these diseases in the U.S., and they cost the healthcare system $25,000 to $100,000 annually. These terrible diseases have precious few options – steroids simply don't work in a lot of these patients (unlike nephrotic syndrome secondary to minimal change disease, for instance). Worse yet, transplantations often do not cure the patient and the disease frequently relapses despite this last-ditch effort. While ARBs lower proteinuria and undoubtedly prolong kidney survival, they are not effective enough. The hope is that with RE-021, we can lower proteinuria ever further for these patients and extend their kidney survival. All endothelin receptor antagonists studied in kidney disease show a dramatic decline in proteinuria and I fully expect RE-021 to do so as well. Safety issues have plagued some companies and company disorganization has hurt others. DARA happens to be very safe and specific for the right receptors, and we will execute a fast two-trial clinical program to ask for FDA approval.

Thank you for supporting Retrophin. I never thought we would build a company would two very exciting drug candidates in less than 12 months. Without your support, no matter how large or small, I would have never been able to build this company with you. We are planning on making two more major news announcements in the next few weeks. We are also conducting a raise of capital at a $40 million valuation and your participation is encouraged. We are hoping to raise $3,000,000 (maximum allowed $5,000,000) and have raised $1,250,000 so far.

It is particularly amazing to me that, without your support, not one, but two, drugs would have "sat on the shelves" and likely never have been developed. RE-001 has the potential to truly change the world for the tens of thousands of patients dying of Duchenne Muscular Dystrophy and your effort took this drug from an idea at a university into a clinical program. RE-021 is now the second "rescued" drug that patients with FSGS desperately need. Without you, these patients who have never had one FDA-approved drug to use, may now have something to look forward to.

Martin Shkreli
████████████████

JN 0086

DEFENDANT'S EXHIBIT
3419

 **LIGAND**  **Retrophin**

Contacts:
Ligand Pharmaceuticals Incorporated

LHA



Retrophin, LLC
Martin Shkreli, Chief Executive Officer

**Ligand Licenses DARA Program to Retrophin**

**Potential for over $75 million in milestone payments to Ligand plus royalties**

**Retrophin plans to develop DARA for rare nephropathies and other indications**

San Diego and New York (February 21, 2012) – Ligand Pharmaceuticals Incorporated (NASDAQ: LGND) and Retrophin, LLC announced that the companies have entered into an agreement in which Ligand has licensed rights to DARA (a Dual Acting Receptor Antagonist of Angiotensin and Endothelin receptors) to Retrophin. Under the terms of the agreement, Ligand will receive a net upfront payment of $1 million, and may receive, net of amounts owed to third parties, over $75 million in milestone payments based on clinical and regulatory progress as well as 9% in royalties on potential future worldwide sales by Retrophin.

"DARA has the promise to be a significant medicine, and we are excited to partner with Retrophin to advance the development of the program and bring it closer to patients in need," said John Higgins, President and Chief Executive Officer of Ligand Pharmaceuticals. "This is an attractive deal for Ligand and our shareholders. We have partnered DARA with a team that has great credentials, is highly motivated to advance the program and has a compelling development plan. This is another valuable asset in our late-stage portfolio."

Retrophin intends to develop DARA for orphan indications of severe kidney diseases including Focal Segmental Glomerulosclerosis (FSGS) as well as conduct proof-of-concept studies in resistant hypertension and diabetic nephropathy. Certain patient groups with severely compromised renal function exhibit extreme proteinuria resulting in progression to dialysis and a high mortality rate. DARA, with its unique dual blockade of angiotensin and endothelin receptors, is expected to provide meaningful clinical benefits in mitigating proteinuria in indications where there are no approved therapies.

"We are pleased to execute this agreement with Ligand as it is consistent with our mission of improving the lives of patients with rare and life-threatening diseases," said Martin Shkreli, Chief Executive Officer of Retrophin, LLC. "An estimated 50,000 patients in the United States are afflicted with FSGS and DARA has the potential to make a meaningful difference in their lives. DARA may help patients who are at a high risk of losing their kidneys to their diseases by delaying the progression and reversing severe markers of kidney damage such as proteinuria. We

1



will work to advance DARA into a pivotal trial as quickly as possible, as these desperate patients currently have few treatment options available to them."

## About DARA

Ligand acquired DARA (PS433540) in its acquisition of Pharmacopeia in December 2008. The compound possesses two clinically validated mechanisms of action that selectively block two potent vasoconstrictor and mitogenic agents, angiotensin II and endothelin 1, at their respective receptors. In Phase IIb studies for hypertension completed in 2009, DARA was found to be safe and well tolerated, and demonstrated statistically significant greater reduction in blood pressure compared with placebo and with irbesartan.

The 261-patient, randomized, double-blind, placebo- and active-controlled study evaluated safety and efficacy at three different doses in subjects with Stage 1 and Stage 2 hypertension over 12 weeks of treatment. The high dose of DARA produced a statistically significantly greater reduction in blood pressure than the active comparator, irbesartan, which was tested at its highest approved dose.

## About Retrophin, LLC

Retrophin, LLC is a privately-held New York-based, biotechnology company focused on discovering and developing treatments for rare and life-threatening diseases. Retrophin is currently developing treatments for Duchenne muscular dystrophy, spinal muscular atrophy, cystic fibrosis and myotubular myopathy. Retrophin's lead internally discovered compound, RE-001, is a protein replacement therapy for Duchenne muscular dystrophy. Retrophin will hereinafter refer to DARA as RE-021 and intends to initially develop the drug for rare nephropathies, including Focal Segmental Glomerulosclerosis. Retrophin's Series A financing was led by MSMB Capital and several current and former senior executives at global pharmaceutical and healthcare companies.

## About Ligand Pharmaceuticals

Ligand is a biopharmaceutical company with a business model that is based upon the concept of developing or acquiring royalty revenue generating assets and coupling them to a lean corporate cost structure. Ligand's goal is to produce a bottom line that supports a sustainably profitable business. By diversifying the portfolio of assets across numerous technology types, therapeutic areas, drug targets and industry partners, we offer investors an opportunity to invest in the increasingly complicated and unpredictable pharmaceutical industry. We believe Ligand has assembled one of the largest and most diversified asset portfolios in the industry with future revenue-generating potential. These therapies address the unmet medical needs of patients for a broad spectrum of diseases including hepatitis, muscle wasting, Alzheimer's disease, dyslipidemia, diabetes, anemia, asthma, rheumatoid arthritis and osteoporosis. Ligand's Captisol platform technology is a patent protected, chemically modified cyclodextrin with a structure designed to optimize the solubility and stability of drugs. Ligand has established multiple alliances with the world's leading pharmaceutical companies including GlaxoSmithKline, Merck, Pfizer, Eli Lilly & Company, Baxter International, Bristol-Myers Squibb, Celgene, Onyx Pharmaceuticals, Lundbeck Inc., The Medicines Company, Curis, Inc. and Rib-X Pharmaceuticals. Please visit www.captisol.com for more information on Captisol. For more information on Ligand, please visit www.ligand.com.

2

JN 0105



Follow Ligand on Twitter @Ligand_LGND.

**Caution Regarding Forward-Looking Statements**

This news release contains forward looking statements by Ligand and Retrophin that involve risks and uncertainties and reflect Ligand's and Retrophin's judgment as of the date of this release. Actual events or results may differ from Ligand's or Retrophin's expectations. For example, there can be no assurance that DARA or any product in the Ligand or Retrophin pipelines will be successfully developed, that any of the milestone triggers will be achieved, that regulatory approvals will be granted, that patient and physician acceptance of these products will be achieved, that final results of human clinical trials will be consistent with any interim results, that final results will be supportive of regulatory approvals required to market products or that any revenue will be achieved from this partnered program. In addition, if Retrophin chooses to sub-license the program the actual financial amounts Ligand receives may be lower than licensing terms specified in this press release. Additional information concerning these and other risk factors affecting Ligand's business can be found in prior press releases available via www.ligand.com as well as in Ligand's public periodic filings with the Securities and Exchange Commission at www.sec.gov. Ligand and Retrophin disclaim any intent or obligation to update these forward-looking statements beyond the date of this release. This caution is made under the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

# # #

3

JN 0106



## PS433540

## Dual Acting Angiotensin and Endothelin Receptor Antagonist (DARA)

*Non-Confidential Summary*

## DARA Opportunity Overview

### *First-in-class Dual Acting Angiotensin and Endothelin Receptor Antagonist (DARA)*

➢ Ligand owns the rights to PS433540, a Dual Acting Receptor Antagonist (DARA) that possesses two clinically validated mechanisms of action

- Angiotensin II (Type 1) Receptor Blockers (ARBs)
- $ET_A$ selective Endothelin Receptor Antagonists (ERAs)

➢ Both mechanisms of action are individually proven in the clinical setting, leading to a high probability of expected pharmacological activity

➢ $ET_A$ receptor selectivity provides the desirable effects of endothelin blockade without $ET_B$ receptor side effects

➢ DARA's combination of these two drug classes has the potential to significantly advance the management of a broad set of cardiovascular and renal related disease states



JN 0108

## DARA: Development Package

➤ Discovery of PS433540 resulted from a program at BMS to identify an endothelin A receptor antagonist with selective vasoconstrictive activity

➤ Completed Development Package Includes:

- Significant Clinical Experience
  - Seven Phase I studies: 160 normal volunteers
  - Two Phase II studies: >200 hypertensive patients
    - Positive Phase IIa study in hypertensive patients
    - Positive Phase IIb study, including a head-to-head comparison with Avapro (irbesartan) – superior efficacy to irbesartan at the approved dose (300mg)
  - Affirmative angiotensin-challenge test
  - Favorable safety profile with no SAEs, no notable vital sign changes or major clinically significant abnormalities in laboratory tests
  - Dose-related pharmacokinetic profile
- Robust preclinical characterization with proof-of-concept of dual mechanism in experimental models of hypertension, and excellent safety profiles in multiple acute and chronic toxicity studies.



JN 0109

## DARA: Development Consideration

➢ **Potential Indications**
  - Resistant Hypertension (RHT)
  - Diabetic Nephropathy (DN)
  - Pulmonary Arterial Hypertension (PAH)
  - Congestive Heart Failure (CHF)

➢ **Looming patent expirations in cardiovascular agents**
  - Registration and launch possible at a time when significant patent expires for existing anti-hypertensive agents occurs, including ARBs

➢ **Competitive advantage**
  - Clinical findings from Phase IIb set the stage for an improvement over irbesartan (Avapro®, BMS/Sanofi-Aventis), which is approved for both the management of hypertension and the treatment of diabetic nephropathy

> *Ligand is seeking a partner to advance clinical development and commercialization of PS433540*

 LIGAND

Non Confidential

4

JN 0110

# DARA: Preclinical Overview

| Physical Form | Crystalline, non-hydroscopic solid |
|---|---|
|  | MW = 592.76 |
| | m.p. 146°C (DSC) |
| | Single polymorph |
| | Log P = 2.3 @ pH 7.5 |
| | Water solubility = 1 mg/mL @ pH 6 |
| | No solid or solution stability issues |
| **Plasma protein binding (10 µM)** | <u>Rat</u>      <u>Human</u><br>99.9%      99.7% |
| **Caco-2 permeability (nm/sec)** | <u>pH 5.5</u>   <u>pH 6.5</u>   <u>pH 7.4</u><br>233      320      271 |

JN 0112

## DARA: Potency/Selectivity *In Vivo*

| Assay | Potency |
|---|---|
| Human $AT_1$ receptor, $K_i$ | 0.8 nM |
| Human $ET_A$ receptor, $K_i$ | 9.3 nM |
| Human $AT_2$ receptor, $IC_{50}$ | 1000 nM |
| Human $ET_B$ receptor, $IC_{50}$ | > 10,000 nM |
| MDS Panel (100 targets) | No activity @ 10 $\mu$M |

JN 0113

# DARA: Dual Action Demonstrated

## PS433540 Blunts the Increase in MAP by Angiotensin-II and ET-1 in S-D Rats

### Big-ET-1 Challenge



### Angiotensin-II Challenge



JN 0114

## DARA: Safety Studies

➢ Safety Pharmacology (25-1000 mg/kg)
  ▪ Respiratory (rat) — No significant findings at any dose
  ▪ CNS (rat) - No significant findings at any dose
  ▪ Cardiovascular (primate) — No QT prolongation

➢ Genotoxicity Studies
  ▪ Negative in genotoxicity studies (ICH panel)
    – In vitro Ames and chromosome aberration tests
    – In vivo micronuclei study in rats

➢ Acute Toxicity
  ▪ No significant toxicity in mice and rats up to 2000 mg/kg

➢ Chronic Toxicity
  ▪ Rat one-month, 3-month, and 6-month daily oral administration toxicity studies completed
  ▪ Monkey one-month, 3-month, and 9-month toxicity studies completed

JN 0115

## DARA: CMC Overview

➢ GMP API is available for clinical studies (kilogram quantities)

➢ Stability data available through 24-months

   ▪ Material currently stored in controlled GMP environment at room temperature

   ▪ API is stable and remains within release specifications

   ▪ Additional stability data may be obtained by partner

➢ An alternate 5-step synthetic route has been investigated; the raw materials and reagents are inexpensive



JN 0116

# DARA: *Clinical Development*

JN 0117

# DARA: Phase I Development

| Study | Objective | Key Observations |
|---|---|---|
| SAD −001 | Single dose safety and tolerability / Pharmacokinetics | 20, 50, 100, 250, 500,1000 mg. Well tolerated at all doses; Dose proportional AUC; $T_{1/2}$ ~15 hrs |
| MAD −003 | Multiple dose safety and tolerability / Pharmacokinetics | 50,100,250,500,1000 mg. No safety issues; Linear PK |
| $AT_2$ challenge −002 | Dose response for $AT_2$ blockade | 250 and 500 mg dose complete $AT_2$ blockade for 24 hours. |
| Comparative bioavailability −004 | Compare bioavailability of solution vs. capsule | Capsule and powder in bottle similar PK profile |
| Food effect −007 | Effect of food on absorption from capsule formulation | AUC: ↑20% and Cmax: ↑50% with food |
| ADME -009 | $^{14}$C ADME (dosimetry) | Rapidly absorbed, 82% recovered. Excretion mostly in feces. Only minor excretion in the urine |
| Age/gender PK -010 | Age/Gender PK | Elderly 65% higher exposure (AUC). No gender differences. Well tolerated, no safety issues |

## DARA: Summary of Phase I Studies

➢ Exhibits rapid absorption and consistent dose related increases in systemic exposure following single and once daily multiple doses up to 1000 mg

➢ Mean elimination half-life is ~15hr across the dose range allowing for once daily dosing; anticipated accumulation (1.1–1.3 fold) following once daily dosing, consistent with linear pharmacokinetics up to 1000 mg

➢ Bioavailability from capsule is similar to that from powder-in-bottle

➢ Food increases systemic exposure (AUC by 20% and Cmax by 50%), but no food restriction is expected due the modest change in AUC

➢ Angiotensin II challenge study in healthy subjects showed a complete blockade of $AT_2$ for 24 hrs. at 250 and 500 mg doses

➢ Rapid absorption of radioactivity; biliary secretion as the major elimination route whereas, urinary excretion is minor (4%)

➢ AUC is 67% higher in elderly compared to young healthy subjects

➢ Similar PK in males and females



JN 0119

# DARA: Phase II Development

| Study | Objective | Key Observations |
|---|---|---|
| Phase IIa −008 | Proof of Concept in Hypertension (HT)<br><br>Initial tolerability in HT subjects<br><br>24-hour efficacy | Statistically and clinically significant greater blood pressure decrease compared with placebo<br><br>Well tolerated |
| Phase IIb −006 | Dose related efficacy and safety<br><br>Comparative efficacy vs. irbesartan | Statistically and clinically significant, dose dependent blood pressure decrease at all doses compared to placebo and higher doses compared to irbesartan 300mg.<br><br>Favorable safety profile |

JN 0120

# Phase IIa: Study Design



**← 3-4 weeks →** | **← 4 weeks →**

Mean seated
SBP ≥150 - ≤ 179 mmHg
DBP < 110 mmHg

| Screening | Single Blind Placebo |

R A N D O M I Z A T I O N

Placebo

PS433540 200 mg

PS433540 500 mg

Mean daytime
SBP ≥140 - ≤ 179 mmHg
DBP < 110 mmHg

24 HR ABPM

24 HR ABPM

## Endpoints
- **Primary**
  - Mean 24 hr Systolic ABPM
- **Secondary**
  - Mean 24 hr Diastolic ABPM
  - Office SBP and DBP
- **Other**
  - Mean Daytime SBP and DBP
  - Mean Nighttime SBP and DBP
  - SBP and DBP during final 2 hours of dosing

## Statistical Considerations
- 30 subjects per group
- Delta 10 mmHg; STD 12 mmHg
- 95% power; α=0.05

JN 0121



## Phase IIa: Blood Pressure Measurement Definitions

**SBP** = Systolic blood pressure (highest value)

**DBP** = Diastolic blood pressure (lowest value)

- ➢ Mean 24 HR ABPM
    - ▪ Average of all blood-pressure measurements taken every 20 minutes over an entire 24 hour period*
- ➢ Mean seated office
    - ▪ Average of 3 seated office blood pressure measurements taken in the morning, at the end of the dosing interval (trough)
    - ▪ Most commonly used parameter to assess efficacy of antihypertensive drugs
- ➢ Daytime ABPM
    - ▪ Average of all blood-pressure measurements taken every 20 minutes between 8:00 am and 4:00 pm*
- ➢ Nighttime ABPM
    - ▪ Average of all blood-pressure measurements taken every 20 minutes between midnight and 6:00 am*

Primary and secondary endpoints

Statistical testing performed

Other endpoints

Summary Statistics

* Taken by automated ambulatory blood pressure measurement device

JN 0122

# Phase IIa: Change from Baseline Mean 24Hr ABPM

## Primary Endpoint



**Mean Δ (mmHg) 95% CI**

PS433540

| | Placebo N=25 | 200 mg N=35 | 500 mg N=33 |

DBP values: 0.3, -9.3, -10.1
SBP values: -0.4, -12.2, -14.8

□ DBP ■ SBP

\* P < 0.001 vs. placebo

JN 0123

# Phase IIa: Mean Change from Baseline

**Systolic & Diastolic Blood Pressure was controlled within the first week for both doses of PS433540**

### Systolic BP



### Diastolic BP




Placebo N = 34
PS433540 200 mg N = 37
PS433540 500 mg N = 37

Placebo N = 34
PS433540 200 mg N = 37
PS433540 500 mg N = 37

JN 0124

## Phase IIa: Study Conclusions

- ➢ PS433540 effectively lowers systolic and diastolic blood pressure in Stage I and II hypertensive patients
  - Lowers blood pressure within one week and sustained over 4 weeks

- ➢ The magnitude of the treatment effect
  - Appears greater than that of existing monotherapies (eg. ARBs)
  - May suggest dual pharmacology ($AT_1$ + $ET_A$) of PS433540

- ➢ PS433540 was safe and well tolerated in this study
  - No LFT elevation > 2x ULN
  - Adverse event profile similar across treatment groups
  - Three discontinuations due to AEs (all placebo)
  - Mild decreases in hematologic parameters
  - No clinically significant changes in other laboratory parameters or vital signs
  - Two Serious Adverse Events
    - Syncopy/hyponatremia (placebo)
    - Basal cell carcinoma (placebo lead-in)



JN 0125

## Phase IIb: Study Design



**4 weeks** ⟵⟶  **12 weeks** ⟵⟶

Mean seated
SBP ≥140 - < 180 mmHg
DBP ≥ 90 - ≤ 109 mmHg

R A N D O M I Z A T I O N

| Placebo |
| PS433540 200 mg |
| PS433540 400 mg |
| PS433540 800 mg |
| Irbesartan 300 mg |

Screening | Single Blind Placebo

## Endpoints

➢ **Primary**
  - Mean seated SBP after 12 weeks
➢ **Secondary**
  - Mean seated DBP after 12 weeks
  - % of patients achieving control <140/90 mm Hg

SBP = systolic blood pressure
DBP = diastolic blood pressure

JN 0126

# Phase IIb: Primary Efficacy Endpoint

## Mean Change from Baseline in Sitting BP after 12-weeks



* P < 0.001 vs. placebo
** P = 0.003 vs. irbesartan
*** P = 0.004 vs. irbesartan

## Phase IIb: Study Conclusions

➢ DARA reduces mean SBP and DBP in a dose-dependent manner – its onset of action is rapid, within 3 hours; efficacy is sustained over 12 weeks

➢ % of responders (<140/90 mmHg) at 400 and 800 mg doses of DARA is significantly higher than irbesartan; 52% vs. 62% vs. 32%, respectively

➢ No SAE reported during active treatment

➢ No notable vital sign changes or major clinically significant abnormalities in laboratory tests.

➢ Statistically superior blood pressure control over 12-weeks was seen in subjects on DARA 400 & 800 mg compared to irbesartan 300 mg, with a favorable safety profile

**Full data set available under CDA**


JN 0128

# DARA: *Commercial Opportunity*

**JN 0129**

## DARA: Development Opportunities

*The MOA of DARA is sufficiently different from what is currently used in HTN treatment, that it needs to be thought of as completely new and first-in-class approach*

➢ The dual-action of PS433540 is well-suited to impact multiple patient populations

- Resistant Hypertension (RHT)
- Diabetic Nephropathy (DN)
- Pulmonary Arterial Hypertension (PAH)
- Congestive Heart Failure (CHF)

JN 0130

## RHT: Resistant Hypertension

➤ **Definition:** Blood pressure remaining above goal (< 140/90 mmHg) in spite of concurrent use of 3 antihypertensive agents of different classes

➤ Currently, there are no drugs approved to specifically treat RHT

  ▪ Hypertension patients require multi-drug regimens to achieve their target blood pressure, creating a large pill burden

  ▪ PS433540 shows much higher reductions in blood pressure compared to existing agents based on historical results, indicating potential efficacy in the RHT population

➤ According to the National Health and Nutrition Examination Survey (NHANES)*

  ▪ Only 53% of participants with hypertension were controlled to <140/90 mmHg,

  ▪ Only 37% of participants with chronic kidney disease were controlled to <130/80 mmHg



*Slide Adapted from:* Defined Health Project 7331- DARA, December 2006
*Sources:* JNC VII, ALLHAT Website: allhat.sph.uth.tmc.edu, DH Estimates

JN 0131

## DN: Diabetic Nephropathy

- Diabetes is a disease of epidemic proportion; projected to increase from ~240 million worldwide today to 380 million by 2025

- Approximately 20-30% of type 1 and type 2 diabetic patients develop evidence of DN -- the incidence of DN has doubled in the last decade

- DN is the leading cause of end stage renal disease (ESRD) in the US and Europe; 20% of people with diabetes die of renal failure

- Diabetes is the leading cause of kidney failure, accounting for 44% of new cases in 2005

- 70% of patients progress despite treatment with approved therapies



U.S. Prevalence of Diabetes

*Source:* [1]Diabetes Statistics, American Diabetes Association, www.diabetes.org accessed March 2009; [2]American Diabetes Association *Diabetes Care* (27 Suppl 1); Jan 2004; Wolf, G & Ritz, E *J Am Soc Nephrol* 2003;14:1396-1405; International Diabetes Federation, Facts & Figures, Accessed March 2, 2009; Ossman, APRN, BC, CDE; *Diabetes Spectrum* 2006;19:153-156;

JN 0132

**DARA**
*PS433540*

**PRECLINICAL**
- Supportive animal toxicity data
- Unique dual mechanism of action confirmed in experimental models
- Large API Inventory

**CLINICAL**
- Statistically superior BP lowering compared to PBO at all doses studied
- Favorable safety profile
- Higher % of subjects on DARA achieved BP control vs. irbesartan

**COMMERCIAL**
- Will address underserved medical needs in several patient populations
  - RHT • PAH
  - DN • CHF

JN 0133

## DARA: Partnering Opportunity

### *PS433540 Partnering Opportunity*

➢ For partnering, Ligand is offering entire DARA program
  - Phase III-ready PS433540

➢ Partnership Objectives
  - Flexible deal structure
  - Partner to assume development and commercialization going forward
  - License consideration to include upfront license fee, milestone payments, and royalty on sales



JN 0134

**John Neill**

| | |
|---|---|
| **From:** | Martin Shkreli ████████████████ |
| **Sent:** | Thursday, January 26, 2012 11:50 PM |
| **To:** | John Neill |
| **Subject:** | Retrophin |
| **Attachments:** | Retrophin Investor Presentation.pdf |

Here is some information on Retrophin.

JN 0135

# EXHIBIT 12

**Walter Gordon Drane** • ███████████████████████████████████████

█████████████████████████████████

The Honorable Judge Kiyo A. Matsumoto
United States District Court for the Eastern District of New York
225 Cadman Plaza East, Room S905
Brooklyn, New York 11201

November 22, 2017

Dear Judge Matsumoto,

I am writing to humbly appeal for your consideration for leniency when sentencing my ex-boss, Martin Shkreli. In all that you have learned about Martin at trial, or has been reported about him, and in all that Martin has done to further a public persona, I believe what has been lost, is any portrayal of the Martin I know; a man with an altruistic passion and unwavering commitment to the discovery of treatments for rare diseases. I respectfully ask that this letter be included in your deliberation.

I began working for Martin's pharmaceutical company in 2015. I was traveling to training when the story broke of our product's price increase and seemingly overnight Martin became the media's poster boy for all that was wrong with the entire pharmaceutical industry. Martin addressed us to explain the rationale of his price-hiking action and to set the vision for his new company. That first speech was intense, albeit impressive. Martin is not an immediately likeable fellow. He went on for over an hour about several obscure disorders he had researched, and demonstrated his command of complex areas of science. He reminded me of a slightly mad genius whose grandiose ideas to tackle multiple rare diseases could either be the product of an inflated ego run amok or a brilliant visionary.

I approached Martin later that evening and discovered he was singularly interested in learning what drove me. During our conversation I revealed that, in addition to cancer, my father had suffered from odd, unexplained neurologic behavior prior to his passing. Martin asked me about my personal struggle and the frustration my family experienced resulting from my father's deteriorating health. Martin reiterated his vision for building a company dedicated to alleviating the burden of devastating conditions like my father's; diseases that large pharmaceutical companies overlooked or did not deem important enough to find a cure. What he failed to tell me, and I later found out on my own, was the very personal fact that Martin's brother also suffered from a debilitating illness. Martin's strengths are not in understanding how emphasizing his benevolence or sharing his private side helps humanize him.

I humbly present to you that Martin remained true to his commitment and dedicated his new company to the treatment of a rare parasitic infection. Martin's vision of creating a second-generation therapy for those suffering from toxoplasmosis may soon be reality, and would never have been possible without him. Martin is no longer running Vyera, but his goals are far from reached. Critical medical advancements in rare diseases are necessary, and Martin's vision and passion are essential for that common goal. I am available to talk if you need any further information from me.

Thank you,

Walter Gordon Drane

# EXHIBIT 13

07 December 2017

Hon. Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Matsumoto,

I am a PhD chemist and board certified toxicologist with twenty years of experience in the biopharmaceutical industry. I am writing to you to request leniency for Martin Shkreli.

While in graduate school, I was an NIH training fellow in Parasitology but was never able to work on a serious, industrial effort to cure parasitic disease. I have worked with companies such as Pfizer and Merck, but they were not interested in launching a major effort in parasitology because drug discovery in parasitic diseases historically has been viewed as an unprofitable/charitable endeavor. That all changed during the second half of my career when I focused on working with startup biotech companies that are pursuing new treatment for unmet medical needs and met Martin Shkreli. Martin's initiative in founding Turing to pursue new treatments for parasitic diseases such as toxoplasmosis and Chagas disease drew my attention and I joined the company on June 1 of 2015 to do what I could to help advance those projects. Industrial funding put several chemists, DMPK scientists, and clinicians to work on parasitic disease and resulted in rapid progress.

The Martin Shkreli I know is a socially awkward, gentle, and kind person who is not a threat to himself or others. He has randomly donated money to children in need with no notoriety attached to the gifts whatsoever. I lament his regrettable outbursts on social media but I assure you that the Martin I know is not a danger to himself or others.

Martin has a consistent track record of funding the discovery of new drugs for unmet medical needs. Martin's efforts at Retrophin lead to a new treatment for orphan disease. When Turing bought Daraprim (pyrimethamine), it was a neglected product. It was still being sold in glass bottles, a fed/fasted study had never been performed, and no one had ever bothered to carefully study the pharmacokinetics of the drug in neonates. Martin's uncompensated work at Turing has helped to launch those studies and more. Furthermore, Turing became the first company to develop new toxplasmosis drugs and now a more potent, selective drug is headed to the clinic for testing. This new drug (TUR-006) could obviate the need for sulfa drugs, and thus remove the allergic complications that up to 60% of HIV patients experience – in addition to kidney stones and the other complications of sulfa drugs. I fear the program could be canceled without Martin's insistence that it proceed as the major shareholder, so please do not seize his shares.

Martin Shkreli deserves the same, reasonable sentence a non-famous, first time offender would receive and a second chance to make a positive impact on the world. Mass media pundits and comedians have described Martin as having "the most 'punchable' face in America" and other media outlets propagated the meme. He has been publicly threatened, lambasted, humiliated, and ostracized. Justice should be blind, not fixated on Wu Tang Clan albums. Please be fair to Martin Shkreli in the sentencing process.

Thank You,

Adam Brockman, PhD DABT

# EXHIBIT 14

Honorable Judge Kiyo Matsumoto,

My name is Ralph Holzmann. I'm software engineer by trade, formerly a Senior Software Engineer at Twitter and currently the Chief Technology Officer of Godel Systems, Inc., founded by Martin Shkreli. I'm writing to you in regards to my employer, mentor, and friend. I first encountered Martin's persona online in 2015 after his controversial price increase of the drug Daraprim made rounds in the news. I read the headlines and came to the same conclusion that most people did -- here's an entitled kid using his company to take advantage of the health care system to line his own pockets.

I didn't give him another thought until early in 2016 when he appeared as a guest on a podcast I regularly listen to. During his interview, Martin got the opportunity to explain in his own words, the controversy over the price change, including the fact that he wasn't pocketing the profits but was instead rolling that money back into research and development for a better version of Daraprim, because the current version, while killing off the associated infection, also inflicts the patient with a host of terrible side effects. That was the first time I got a sense of Martin's true character, as well as the realization that he had been treated unfairly in the media. After that interview, I followed Martin on some of his social media accounts and quickly discovered from some of his posts that he was working on learning how to write software. More specifically, he was learning the programming language, JavaScript, of which I have expert knowledge. I reached out to him and began helping him with some of the finer points of the language, and we became friends. As it turns out, Martin was intent on building a software company, and in typical Martin fashion, he wanted to learn everything there was to learn (almost to a fault) about the programming language and technology that he would be building his company on. I can tell you from my personal experience, that most non-technical founders of software companies do not start off by purchasing a small library of programming books and proceed to read them cover to cover, but that's what Martin did.

Fast forward to the end of 2016 and Twitter announces it's second round of layoffs, which included entirely eliminating the team that I work on. I had a couple of options at that point: 1) I could transfer into another team at Twitter that had reached out to me. 2) I could begin exploring opportunities from many big name companies that already had their recruiters filling up email inbox. Or 3) I could help Martin Shkreli build his software company. This decision was not just my own. I have been blessed with a beautiful and supportive wife and five beautiful children, with one on the way. This decision would impact us all. I gave away the ending to the story at the beginning of this letter, but I'd like to explain why I believe I made the right choice to work for Martin instead of taking one of the other two options (which would have been much easier and safer).

The first reason which I alluded to earlier is his unbridled passion for whatever he puts his mind to. Whether its learning how to program, building a pharmaceutical company, becoming a better chess player, or even researching and treating rare childhood diseases, Martin does not let anything get in his way. I knew that he would bring that passion to the software company. Second, I've witnessed Martin's compassion first hand. For example, when he paid a former contractor's rent because they were struggling and unable to find new work. Or when he spent an hour on the phone comforting the family member of a patient in South America that needed Daraprim. Unfortunately, Turing only has distribution rights for Daraprim in the United States, so there was nothing tangible that Martin could do for him, but that didn't stop him from spending his time and being there for him in that moment of fear and vulnerability. These are the anecdotes that never make it to the press, but people close to Martin often observe. Finally, I chose to work for Martin because I believe in his vision for the company. As I write this, we have engineers working on a groundbreaking way to leverage the cloud for pharmaceutical drug research that could dramatically increase the speed at which new treatments are discovered for many of the world's deadliest diseases. The sooner its completed and tested, the sooner it can be used to improve the quality of life of those around the world.

Everyone at the company is anxiously awaiting his return, not only for his intuition, product leadership, and charisma, but also because we all care deeply about him and his mission. I kindly ask you to consider us and our company when you determine his sentencing.

Sincerely,

Ralph Holzmann

# EXHIBIT 15

Curtis Fisher 

November 10, 2017

To whom it may concern,

   My name is Curtis Fisher and I am writing this letter to express my complete support for Martin Shkreli and to share the positive outcomes he has had on my life, both professionally and personally. I was first introduced to Martin when I joined Turing Pharmaceuticals as a field representative in Baltimore, Md. in August, 2015. One major reason I had for joining Turing was to ensure our inner city AIDS patient population would be assured of access to the drugs they need to live. Daraprim is such a drug. Within the first two weeks of my employment Daraprim's price was dramatically increased. This increase in price raised great concerns amongst myself and my peers at Johns Hopkins Hospital. In addition, another issue facing our inner city patient population was there was only one way to get Daraprim which involved many steps and multiple patient touch points. This process and the price increase put our inner city population at a tremendous disadvantage. I immediately approached our senior leadership team, headed by Martin, and expressed my sincere concerns. Within a matter of hours I had received word from Martin that the Johns Hopkins Hospital group would not only receive an inpatient use discount of over 50% but also the inpatient/outpatient pharmacies would be allowed direct access to Daraprim making the drug more easily available to our patients. This action was the first time I saw what Martin's true motives were. He dramatically reduced the price and improved access of Daraprim for our Baltimore City patients. What's even more important to note is these patients are a majority 340b type. Turing loses significant profit each time our 340b program is used. But that didn't matter to Martin. These decisions were made and are still in effect today through out the entire nation, having had a positive impact on our patients and those helping them.

   I also want to point out that I continue to be a team member of Vyera Pharmaceuticals. (Formally Turing) This job has allowed me to continue to provide for my family of 5. I have one child in college and two more ages 3 and 6! I face daily responsibilities to provide and protect my family and Martin through his vision and actions has allowed me the opportunity to continue to pursue my career and family dreams.

   I can't express enough the positive influences Martin has had on my professional and personal life. I know many others who feel exactly the same way. I am very grateful. Please feel free to reach out to me at any time should any questions or concerns arise.

Sincerely,

11/10/17

Curtis Fisher

# EXHIBIT 16

January 19, 2018


To the Honorable Kiyo Matsumoto:

My name is Akeel Mithani and I write on behalf of Martin Shkreli who is scheduled to appear before you for sentencing. While not the most popular stance to take, I unequivocally claim him as both a mentor and a friend.

In 2014, I approached Martin on Twitter with a question. All he knew was that a random individual with an "egg avatar" wanted some information. He responded quickly and answered my inquiry in a kind, thorough, and respectful manner. In 2015, he agreed to an interview, an encounter destined to change my life.

As we talked, I saw the numerous cards on his desk – thank you notes from parents of desperately sick children. The youngsters suffered from diseases Martin was seeking to combat. His work had, in many cases, slowed a disease's progression and extended a young life.

To that point, I had enjoyed a relatively successful career in real estate, but my interaction with Martin led me to change my career path. During the interview, Martin recommended several books on the basics of pharmaceutical development. He promised he would assist me with any obstacles I might encounter.

Later that year, Martin afforded me the opportunity to be considered as a Junior Business Development Analyst even though I sorely lacked the qualifications. My interviews met with mixed results. Despite opposition within the company, Martin directly lobbied for my employment. Currently, I am an Executive Director at Vyera Pharmaceuticals (formerly: Turing).

Due to Martin's efforts at Turing, there are currently five drugs in development. Two address rare pediatric diseases – conditions lacking an available drug protocol. The drug development cycle spans seven to ten years from the inception of an idea to completion of the project. Even at the conclusion, fewer than 1% of the drugs in development arrive at the New Drug Application (NDA) stage. At Vyera we plan to submit two NDA in year 2019-2020. Retrophin is currently enrolling patients in last stage of the clinical trials for two of their drugs. Working without Martin has significantly impeded the progress we might otherwise have made and delayed the process of bringing new drugs (designed to treat rare diseases) to the clinical trial stage.

I make no claim to Martin's innocence. My appeal is for your leniency. Perhaps you are aware of the comment attributed to Rene Descartes, "Perfect numbers like perfect men are very rare." Martin Shkreli is not a perfect man. He is as flawed and fissured as the rest of us. His very human hubris drew him into a lamentable and untenable position – one I am sure he regrets. While some punishment is called for in this case, incarceration punishes society as much as – or more than – Mr. Shkreli.

There is no doubt that Martin's leadership propelled his ventures into unchartered waters regarding the treatment of rare diseases. Since his departure, at Vyera I have done my best to revive two

initiatives he was leading on two specific very rare pediatric diseases. Regrettably, without Martin's vision and distinct enthusiasm and because these types of programs do not "slot" well into the risk-reward profiles of most pharmaceutical companies, our efforts have not met with optimal success. The world of cures needs Mr. Shkreli's innovative genius.

I have known Martin since before his arrest. In the aftermath, I have witnessed an eye-opening maturation process as he evolves into a more sensitive and self-aware individual. I believe Martin has learned a series of valuable lessons. Vyera operates with constant vigilance for conflicts of interest and an attitude of extreme conservatism towards all investors. Martin will not repeat his mistakes. Unlike in his earlier days, he has surrounded himself with a coterie of individuals who are selfless, forthright, and honest. "Authenticity" is not a buzzword at work – it is our guiding principle.

I am no one of any importance, but I bear witness to Martin's ability to help prolong and save lives. Removing his brilliance from the pharmaceutical sphere will protract the search for cures and treatments the world so desperately needs.

Despite his over-hyped, public arrogance, I know Martin Shkreli as a kind-hearted man whose mission lies in providing life-changing drugs to people in need – especially to children.

With every fiber of my being – from the perspective of one whose life was altered for the better – I plead for leniency in Martin Shkreli's sentence. Now chastened, I have every confidence he will dedicate his life to the betterment of the human condition.

Thank you for receiving my communication.

Most Humbly,

Akeel Mithani



# EXHIBIT 17

Dear Judge Kiyo Matsumoto,

I am writing to appeal to you in regards to Martin Shkreli. I met Martin as an employee at one of his companies, Retrophin, over three years ago before all the media, fame, and internet followers. It was the first and only time I encountered someone that treated everyone equally at a workplace, like family. I witnessed many counts of kindness, consideration, thoughtful acts that he probably does not remember himself. He never excludes anyone from an activity nor choose participants by hierarchy. He gets uncomfortable when people offer to do things for him and he will insist on doing things himself. He takes colleagues to fancy dinners but prefers ramen noodles and hot dogs himself. He cares freely to anyone who will accept it with the innocence and hope of a child. He gives people chances based on trust before proof.

Despite his media reputation and online persona, I firmly believe he remains the same kind, generous, trusting person he was that I observed for the last few years. I have witnessed  him at work on his way to a meeting and overheard a colleague sitting three feet away from me on the phone discussing cancer treatment for her terminally husband. He stopped to inquire if there is sufficient help, indicated he knows a few highly respected doctors to introduce her to. Then proceeded to ask if there is insurance coverage for the treatment. When he found out it was not covered due to our not so stellar health care system, he casually mentioned he has a foundation to help with all necessary fees. Then he continued walking to his meeting. In the mere 90 second conversation, he lifted all the worries of someone without a second thought. He never mentioned it to anyone and I know, from our colleague, he took no time to do what he said he would. This is just one of the many many acts of kindness that I have witnessed of him. True acts of kindness are not advertised. He opened Vyera not to make more money or to proof he is not a failure like the District Attorney claims. He did it to thank the people that has faith in him and simply wants to and enjoys working for him. He did it to provide us with jobs. He refused to take a salary at Vyera and we could not even sign him up for company medical benefits because of it.

I am writing to you because his real self is not like what the media perceived. He does not cater to saying what the public wants to hear just to gain their favor. He is always honest and I think the public is angry he refuses to play by their rules than truly believes his words said in jest are true. He has been taken advantage of many times and yet he does not lose faith in humanity. As a bystander, I lost faith in humanity seeing how people used him as their personal unlimited piggy bank with no shame. But he continues to give a second, third, fourth etc. chance to anyone that apologize and asks to come back to enjoy his generosity again. As an adult, I honestly do not think I will meet another person as pure hearted as him. He has the ability to love without cynicism, trust with a child's faith, and forgive at a higher than human power.

I implore you to take this into consideration when it is time for his sentencing. I know he will adapt to anything but it pains me to see him punished severely for never wanting to let someone down.

Sincerely,


Catherine Chen

# EXHIBIT 18

October 28, 2017

To the Honorable Judge Matsumoto,

I am writing to you regarding my friend Martin Shkreli. I first met Martin about 2 years ago, around when his time in the media spotlight was getting into full swing. At the time, I was a recent college graduate working in the healthcare industry as a scientist in a reference laboratory. At first, I had a hard time believing that a CEO who could have anything he wanted and hang out with celebrities would want to associate with a nobody like me. But I began to learn that we had many things in common, such as growing up in New York City with a poor immigrant family and many similar interests. As our friendship developed over things like video games, chess, and computer programming, any preconceived opinions based on the "most hated man in America" persona portrayed in the media quickly vanished. Over time, I came to admire and believe in Martin and his vision so much that I changed careers when he gave me an opportunity to work at his startup, Godel Systems. My hope is that in this letter, I can share what I know about Martin and his character, so that you also might see him in the same light that I do.

The main reason why I admire Martin so much is that he is willing to do sacrifice his time, money, and reputation for the sake of a good cause. It's not as difficult to do the right thing when people are showering you with praise and congratulations. However, if you tried to do something positive for the world and people were actively working against you and painting you in a negative light without even giving you an opportunity to defend yourself, most people in that position would come to the conclusion that it's not worth the effort. But not Martin. It was incredibly humbling to watch him devote both his company's and his own personal resources to researching new treatments to rare diseases that other drug companies won't touch, in spite of all the negativity he's had to face.

If you could witness Martin in his day-to-day life, you would see what a thoughtful, humble and generous person he is. Instead of buying fancy cars, expensive clothing and other things like you would expect a multimillionaire to buy, Martin prefers to walk around Manhattan in jeans and t-shirts, often shirts that he received as gifts from the various organizations he's donated to. I remember when Martin came to the defense of an autistic teenager that was being bullied by the rapper 50 cent. Martin started a crowdfunding campaign, donating thousands of dollars of his own money and inspiring many others to do the same.

At a time when Martin was in the fight of his life, he still made time to listen and give advice to countless people, including myself. I watched people from cancer patients, to people suffering from AIDS, to parents of terminally ill children speak to Martin online. It was amazing to see the way he touched each one them by sharing his knowledge of pharmaceutical developments to give them hope, and offered his support to them in their time of need. Working for Martin has also been a wonderful experience. Martin always puts our needs and concerns ahead of his own, even referring to us his coworkers rather than his employees. Hearing the news about Martin's arrest was devastating to me and my colleagues. Nevertheless, I still stand firmly by Martin and don't regret staking my career with him because I really believe in his potential to do great things for humanity.

Over the past year, I attended several of his court proceedings all the way through the week of jury deliberation, silently watching in support as he and his legal team fought for his freedom. I'm grateful that now I have the opportunity to speak up as an advocate for him and testify towards his good character. I hope my letter can give you some insight into what a wonderful person Martin is. In addition to all the great things he's accomplished so far, I believe his greatest accomplishments still lie ahead in the future, if he is given the opportunity to pursue them. Please grant Martin the most lenient sentence that you deem fit, so that he can continue to improve the lives of many more people.

Sincerely,

James Rondina

# EXHIBIT 19

January 17, 2018

Honorable Kiyo Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

RE: Martin Shkreli

Dear Judge Matsumoto,

My name is Megan Roberts, Ph.D., a Medical Science Liaison in Women's Health in ███████████ I have known Martin for four years now, since I first move to the city. I came to know Martin at my first job at Retrophin after moving to the city, and then at Turing. Since Martin's arrest, I have been asked by many friends and family about him, and if the characterization of him is accurate. I feel it is not, and wanted to share my own opinion and experience of Martin Shkeli.

Martin was a great boss, someone that cares deeply for his employees. He was engaging to all employees, knew all their names, and took interest in their lives. Within the first few weeks of starting at Retrophin, I was provided the opportunity directly from him to participate and learn more about another division in our company. That type of crossover is rare in the pharmaceutical space. If anyone had an interest, he cultured that curiosity. In my experience, other companies claimed to support that curiosity but rarely supported it, seeing it more valuable to keep their employees focused on their own job and out of the way of others. Martin followed through on his open-door policy. He is the first boss that I truly felt I could approach, and so I did.

Martin gave me the opportunity to change the trajectory of my career, for that I am forever thankful. He gave me a rare opportunity to provide significant help to people where nothing else helped. Professionally, working on mecamylamine (Vecamyl) was my greatest challenge; conversely, my degree of success was my most rewarding professional experience. I have since moved on from those companies, but my experiences shaped me and allow me better serve patients' needs. I owe Martin everything for that experience.

I will be the first to admit that Martin is unlike any person I know. He is undeniable brilliant, generous, a bit tactless, blunt, but cares deeply for those close to him. I feel most are shocked that I would describe Martin as reserved, an introvert. I know that Martin's behavior may not appear that way based on his interactions with media, or reports of his behavior. But behind that façade is a gentle shy person, who truly cares for others. He has so much good to offer not just our community, but also the world. I hope you take this into consideration, as there are parents with children afflicted with rare diseases that Martin can help. There are so many healthcare

issues our society faces that Martin has sincere desire to fix.  I thank you for your time and hope my words can help as you consider Martin's sentencing.

Thank you.

Sincerely,
Megan Roberts

**EXHIBIT 20**

Kristen Lewis


January 8, 2018

Honorable Judge Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Martin Shkreli, 15 Cr. 637 (KAM)

Dear Judge Matsumoto,

I'm writing to you in regards to Martin Shkreli, who I've known professionally for about 3 years. I knew about him before I met him. I was told he was a little quirky, but brilliant and charismatic. I heard about his donations to charities and that he sent money to a family in need because their child had a rare disease.

I met him in October 2014 and in April 2015 I joined Turing and started working to build out his team from within the company. Martin would walk around the office and invite people to lunch. He invited everyone out after work. He wanted to include everyone and never wanted to make anyone feel left out. Although I've always heard about his moments, I never saw him in any other light than being just a really nice, charismatic, and brilliant guy. When we went out as a group to a small dinner he tried to speak with everyone on the same level. It never mattered who you were.

Publicly Martin comes off much differently than he really is. In public he tries to come off like this bad guy, but that's really not the case. He has his moments just like everybody else. I've never seen those moments outside of social media though. Martin asks how I'm doing. He asks about my family and always sends good wishes to us. I never saw him as this bad guy people make him out to be.

Martin has his moments, but deep down he really does care about people. He donated to charities, to people, and is always open to opportunities to give back. At Turing he never

took a salary. He never gave himself a bonus. Instead, he gave to his employees and wanted to make everyone else happy. His goal has always been to ensure nobody ever loses a dollar investing in him. I assume that's where he's gotten himself into the predicament where he is now.

I know what he did was wrong and that you must sentence him. I'm asking that you please be lenient in his sentencing. I'm almost certain that right now he's acting like typical Martin – reading STEM books I would never be able to comprehend. I hope his public persona doesn't influence you negatively because he really isn't the vile man the public makes him out to be. In reality he's just a typical guy who gets caught up in social media and searching for a little extra publicity.

Sincerely,

*Kristen Lewis*

Kristen Lewis

# EXHIBIT 21

19 January 2018

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Re: Martin Shkreli

Dear Judge Matsumoto:

My name is Maureen Lohry, and I am an employee and friend of Martin Shkreli. I have a Bachelor of Science in Mechanical Engineering and a Bachelor of Arts in Music from Southern Methodist University, where I also spent two years conducting research in a biochemistry lab. Martin hired me upon graduation in May, and I currently work for him as a business development analyst. My tasks include financial modeling, detailed drug research, and aiding in the discovery of novel medicines. I often work with Martin one-on-one; as such, I feel I know him well and am qualified to speak of his character. Martin is an incredibly compassionate person who is truly committed to bettering the world through his work and I feel very fortunate to be working for him.

Martin is an exceptionally dedicated boss who has taken a vested interest in ensuring my career is successful. Over the summer and fall, Martin spent countless hours teaching me the ins and outs of investing, finance, the drug approval process, and business in general, topics I knew close to nothing about. He has continued this mentorship throughout his incarceration, despite having only limited access to communication. Martin has never lost his patience or belittled me; in contrast, he has always made me feel as though I am his intellectual equal.

In contrast to his online persona, Martin is actually very humble and enjoys the simpler things in life. His favorite place to unwind is at a dive bar across the street from his apartment, and he spends most of his weekends and free time working while ordering take-out and playing with his cat. Martin loves to livestream while working via YouTube, which allows the viewers to see his computer screen and gives us a glimpse into how a "pro" analyzes stocks. In addition to these informal livestreams, Martin has several organized series of videos on investing, finance, and chemistry that are taught in a lecture-style format, complete with PowerPoint slides and Martin's own personal financial models and notes. There is a total of sixty-three videos in these series, amounting to over seventy-eight hours of lectures and nearly 1.6 million views. I think part of the reason Martin has been able to amass such a large following for these series is the fact that he engages with his students (the videos are recorded live with a chat feature) to really ensure that he is teaching in a clear and concise manner. It is no surprise to me that Martin has continued his teachings while incarcerated, helping his fellow inmates learn valuable skills so they can have the opportunity to be financially stable when free. I have been in correspondence with three other inmates at MDC Brooklyn who keep me updated on what "classes" Martin is teaching and occasionally request that I send them additional materials.

Martin and I are currently developing a cure for an extremely rare pediatric disease that carries a significant risk of fatality in infancy. Those who survive past the initial stage are fraught with persistent symptoms, immunodeficiencies, and low quality of life and available medicines do little to ameliorate these issues. Despite being characterized as early as the 1930s, this condition has been almost entirely ignored by the pharmaceutical industry. To the best of my knowledge, we are currently the only people actively researching a cure for this condition; its incidence is simply too low to be recognized by most as a worthwhile investment. Martin, however, sees patients as more than dollar signs and is entirely dedicated to curing this disease. Indeed, his involvement in this project cannot be overstated, as he is the one who identified the proteins that needed to be targeted after countless hours of research.

I attended Martin's trial over the summer and was very surprised when the jury returned a guilty verdict. However, I am confident that any mistakes made in the past are unlikely to be repeated. The corporate environment he currently has set up is nearly paranoid in how careful it does business. Martin is acutely aware of potential conflicts of interest and legal threats and always errs on the side of caution, even for seemingly innocuous situations such as taking paper home from the office to print work materials. Martin has absolutely no tolerance for sexism or discrimination in any form and is quick to correct his colleagues and friends who refer to me as a "girl" instead of a "woman", knowing that this bothers me intensely but that I am generally too shy to say anything. Further, Martin has no intent to harm or take advantage; such behavior is entirely at odds with his personality. I believe these examples stem from strong ethical values and not from fear of getting caught, as he has always been consistent with me in these regards. Martin has expressed remorse for his actions on more than one occasion, and I truly believe he will not be found in a court room again.

In closing, I respectfully ask that you consider leniency when deciding Martin's sentence. I thank you in advance for your time and consideration.

Sincerely yours,

Maureen E. Lohry

# EXHIBIT 22

10-25-2017


Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
New York, NY 11201


RE:    United States v. Martin Shkreli
        15 CR 637 (KAM)


Dear Judge Matsumoto,


I am writing regarding Martin Shkreli.


I have known Martin for more than ten years.


During that time, I have always been impressed by Martin's commitment to creating new
medical innovations, and to the patients who need them.


Despite his comments that sometimes suggest he has been driven mainly by financial
considerations, I have found Martin's actions generally to be different. Martin has been directly
involved in the creation of several potentially life-saving treatments. He has also been a
champion of multiple patient support organizations and individual patients and their families.


My experiences of Martin have been as a loyal and committed friend. He has always had time
to be a sounding board, and to give advice and support on various projects. I have observed
Martin mentor a number of young scientists and executives, many of whom have gone on to

significant roles. Some of these individuals have conveyed to me that Martin's support made a critical difference to their progression.

This is very important because medical science is all about talented people doing innovative work. I am confident that in supporting young science talent, Martin has made a significant contribution to medical science.

I have also seen first-hand the way in which Martin would connect directly with the families of children with severe diseases, and how those experiences led Martin to develop potential new treatments, such as Fosmetpantotenate for a rare and devastating neurological disease.

This program, and other programs that Martin has championed, reflect Martin's talent and commitment to advancing health innovation. Contrary to some popular images of Martin in the media, in my experience he has spent nearly all his time on a computer figuring out how to do something new, and better, in biopharmaceuticals. This is all the more notable because I came to learn that Martin is a self-taught biology and chemistry expert who has impressed PhDs with his insights.

It is my impression that one reason for Martin's commitment to life science ███████████████

███████ It is clear to me that this experience has made Martin very empathetic to the health issues of others, and has contributed a lot to his commitment to patients.

There is no question that Martin's talents and commitment must be channeled appropriately. But I believe that Martin can and will be a continuing force for health innovation and the good of patients.

I would ask your consideration of these important aspects, and the future value that Martin can bring to society.


Sincerely

Ken Banta

The Vanguard Group for Leadership



**EXHIBIT 23**

Tashdid Hasan



December 18, 2017

RE: Character Reference for Martin Shkreli

To The Honorable Judge Matsumoto,

I am writing on behalf of Martin Shkreli to ask for your mercy in his sentencing. I worked with Martin for approximately sixteen months. During this period he has proven to be an astute investor and an inspiring manager who drove me to my limits to achieve professional excellence. I was surprised to hear news of Martin's entanglement with law enforcement. I provide this character reference in full knowledge of charges brought against Martin for conspiracy and securities fraud.

I met Martin in 2012 when I drove a yellow cab to pay for college in New York City. During the ride we mostly discussed investing in public markets. Martin encouraged me to do everything within my ability to complete my degree and read books on investing. We met again in 2014. This time, upon learning that I was looking for a job, Martin employed me as an intern at Retrophin, Inc. Later I joined Turing Pharmaceuticals as an analyst where I worked with Martin until his removal from the company in December 2015.

Working with Martin was a turning point in my life. He gave me a chance to break into an industry with high potential. I received opportunities to grow into my roles within in two organizations under his mentorship. We spent many hours studying global pharmaceutical industry as he not only imparted knowledge, but also kindled enthusiasm for the industry within me. This, combined with Martin's inspiring work ethic, made me a capable professional. For this I am grateful.

Contrary to my experience working with Martin in a professional setting, I noticed that the general public has mixed feelings about him. Martin is likely misunderstood by those who dislike him due to his occasional aloof and tackles demeanor. Many people noticed his name in news related to raising the price of Daraprim; this casts Martin under a negative light. However, based on my experience, I say with confidence that Martin cares about the ill and the unfortunate which is evident through his philanthropic activities and relentless effort to find treatment options for those afflicted with rare diseases without cure.

Martin Shkreli was convicted for securities fraud; he must be sentenced. Despite his run-in with law enforcement I can attest, based on my professional relationship with Martin for approximately sixteen months, that he is a good person. He made a positive impact on my life and helped me become a better professional. He spends a considerable amount of time to find treatment options for rare diseases, which can potentially bring hope to countless patients. I hope that you will have mercy on him as you decide the duration of his sentence for his failure to obey the law.

Sincerely,

Tashdid Hasan

Tashdid Hasan

# EXHIBIT 24

November 2, 2017


Honorable Kiyo A. Matsumoto

United States District Judge

Eastern District of New York

United States Courthouse

225 Cadman Plaza East

Brooklyn, NY 11201


Dear Judge Matsumoto,


My name is Gary Mohamed and I write to you on behalf of Martin Shkreli. I met Martin in 2002 through my work as a financial advisor when Martin was a young hedge fund analyst. To say that Martin is a very complex man is an understatement. Equal parts brilliant and impossible, and always struggling with personal demons hell bent on self-destruction. In fact, Martin's lifelong dream of running a publicly ' traded pharmaceutical company was derailed pre maturely by this compulsion for self-destruction.

Much has been made of Martin's short comings; labeled the 'most hated man in America', pilloried in the popular press, and publicly called a 'spoiled brat' by none other than the President of the United States of America, yet this persona that the public knows is only a part of the story. Again, Martin is a very complex man.

Martin is also a very generous person who has zero regard for personal luxury and comfort. I would dare say that this is a rarity for people convicted of financial fraud. Martin would much rather quietly give of his time and capital than to waste a penny on a personal comfort. I have heard many stories, never directly from Martin, where Martin arranged for medicine and medical treatments for desperately ill people of little means. I trust others will write to you with the details of these acts of grace.

Martin's charity towards others is evident in how he seeks the good in everyone he meets. There are many examples of Martin extending opportunity to people of lesser means. Martin hired his Uber driver for a junior executive role in one of his companies after a single ride. This young man was a recent immigrant to the US and had no corporate experience but that mattered little to Martin. Impressive as this act was, its only one of many. The example that stands out most to me is the 'JP Morgan' interview. JP Morgan was a chess hustler who worked in the park near Martin's office. I suspect he was homeless. The park had a number of chess hustlers and the games were 5 minutes long and the standard wager was $5. Martin and I visited the park often at lunch and he usually played a game. As I recall Martin

usually won. That is until he played JP Morgan and lost a number of times. Intrigued by his defeat Martin recognized something very special about this man and invited him to interview for a job at the hedge fund. Needless to say the day this homeless man showed up at the reception are of a respectable office for his job interview the scenario caused quite a ruckus.

An obsessive compulsion for self-destruction is a debilitating affliction. Seeing a homeless man and a recent immigrant as equals is a rare and inspiring personal choice.

Your honor it is with all due respect that I humbly ask you to impose the lowest appropriate sentence on Martin Shkreli.

Respectfully,

Gary Mohamed

# EXHIBIT 25

Dear Honorable Judge Kiyo Matsumoto,


My name is Ryan Macy and I'm the current CEO of Godel Systems, Inc. I'm writing you to share my experiences with Martin Shrekli -- however before I begin, I want to give you a little background on myself. I come from an economically challenged childhood, served in the US Army for 8 years, and found the path to a better life as a startup entrepreneur. I've successfully created economic opportunities for others through the companies I've had the fortune to build. Martin shares these life experiences. He wasn't born in a wealthy family and he created opportunity for himself and others through the companies he has built. Martin is an eccentric person. In fact, when I first heard of Martin, it was reading the news. I was, like most people, convinced that Martin was a greedy businessperson who didn't care about anyone but himself. That couldn't be further from the truth. Martin is a very compassionate and caring person that has helped others on numerous occasions. I've come to appreciate and admire Martin's humanity, which is very much different from the person the media and even himself (on social media) portrays.


I've seen Martin spend numerous hours education and helping others learn more about pharmaceuticals, the financial markets, and how to get past life's various challenges. It's all recorded and available on YouTube for anyone to consume. He's given an inordinate amount of effort to see others be successful like himself. When I first met Martin, he was comforting and making numerous practical recommendations to a person who just found out they had cancer. While I've known him, Martin has continued this trend of helping and educating others. Martin has even helped me. When the board of directors, of a company I founded and spent 4 years building, decided that they wanted to bring an older, more seasoned operator to take my place, Martin comforted me and helped me understand how to create the best situation possible for everyone. Having two kids and a mortgage, I was at a loss – Martin offered me a job at Godel because he believed in me and saw potential. He knew my situation in stepped in to offer me a helping hand.


Everyone that knows Martin, knows that he is a good person that contributes positively to society. We think it would be a shame to have his intellect and heart held at bay. I respectful ask that you consider Martin's contributions to medicine, his involvement in companies that are creating economic opportunities for others, and his passion to make the world a better place for all, when you determine his sentencing.


Warmest regards,


Ryan Macy

# EXHIBIT 26

01/02/18

Honorable Kiyo A. Matsumoto/

U.S. District Court, Eastern District of New York

225 Cadman Plaza East, Brooklyn, NY 11201


RE: Mr. Martin Shkreli

Dear Judge Matsumoto,

My name is Laura Castro and I work in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. I have been fortunate to know Martin Shkreli the past two years. I learned of Martin the way most people do: the media. I believed that he was a terrible person and deserved all the public hatred he received. I read numerous articles detailing the life of "America's Most Hated Man" and was intrigued to find out that he regularly live streamed his life on YouTube and various other social media websites. I decided to check it out for myself late one night and was surprised by what I saw.

Martin's stream was not what I expected. All I saw was a quiet, young man studying from a chemistry textbook. The chat was filled with people asking him science and pharmaceutical questions and Martin would try to respond to as many as possible. I also witnessed a steady flow of hate. People criticized his appearance, his apartment and anything they could come up with. I would watch Martin glance up at all the hate and casually go back to reading his book. I could not imagine how it felt to have all that hate and anger directed at me. I was fascinated and came back the next day.

The next day was pretty much the same. Martin is constantly in work mode. I witnessed him work from day to night on researching rare diseases. I discovered that many pharmaceutical companies ignore patients suffering from rare diseases because they do not see a profit. Martin is different. He is focused on developing medicines to help these people because he truly cares. Strangers often bombard him asking for help and the latest research findings. Instead of ignoring these people, Martin takes the time to respond and get to know the person. I found this truly touching and was impressed with his compassion and patience.

My favorite thing about Martin is his love of teaching. It began with some quick lessons on chemistry. These were such a success that he began to branch out into other topics – mainly pharmaceuticals and finance. He began to provide weekly classes on the basics of the financial industry. People from all around the world would join these classes every week eager to learn from him. Martin was patient and took the time to explain concepts that often confuse people. As an educator myself, I could tell that teaching made Martin incredibly happy. He has a natural ability to make difficult topics understandable. He has continued educating while waiting for sentencing in MDC. It's important that I convey that this is not an 'act'. Martin is teaching because this is what he loves to do.

Despite Martin's patience and openness, he was still bombarded by cruel comments, taunting and media abuse. It is my personal belief that Martin created a cocky, eccentric online persona to protect himself against the hatred he was receiving daily. I realize that not everyone can understand his sense of humor or see the sarcasm in his online postings and that this often gets him into trouble. Please know that Martin has no intention of hurting or harming anyone. He is a complex individual that may rub some people the wrong way, but at his core if he is a very giving, kind individual.

I truly believe that Martin has learned from this experience. I believe it has helped him grow as a person and will create a positive change in Martin. I hope I have helped to show the real Martin and not just the eccentric side often talked about in the media. Every conversation I ever had with him, he was kind and considerate. I am honored to call him a friend.

Sincerely,

Laura Castro



# EXHIBIT 27

2/13/2018

Dear Judge Matsumoto,

My name is Sophia. I'm an artist from ███████████. In late 2015, I came to know about Martin Shkreli like most probably did. He's even widely reported about over here. As I was born into a doctors family, reading those articles made me feel very negative about him at first. I have exchanged thoughts about his case with said family and they suggested to me that Toxoplasmosis is quite an interesting parasitic disease and that I should research more on it and Martin's deed. I eventually did, and I came across interviews with Martin, as well as his live streams. He explained things further and my opinion started to change.
Whether Martin intended to or not, by doing what he did involving his business methods, he exposed some of the more questionable practices of America's Corporate Pharmaceutical system. Why, you may ask, are America's corporate practices relevant to me as a German? American industrial & corporate practices tend to lead the way for both the first world & western economic developments overall.

More so did my opinion change the more I ended up being a regular watcher of his live streams and his other media output. I experienced Martin's personal character for what is, being a very caring and gentle person when appropriate, who doesn't mean any harm, although some people may not perceive him like that because they don't share his relatively dark sense of humor.

I really appreciate a lot of his social media output, which I see on par with some forms of performance art. I realize how he's parodying the general behavior of users on the internet, who sadly more often than not mean what they write and do online. At the the end of the day, Martin is capable of being a provocateur due to constantly shifting social paradigms. In the grand scheme of things, I know that some of his jokes have gone too far.
Overall he's a human being and has good and bad days like everyone else, where sometimes we tend to cross lines and learn from it. Twitter, as well as Facebook and other platforms, is full of jokes about politicians and other people of fame and public life, and judging by that how could someone think that his actions were criminal or wrong in regard to social media behaviour when many others behave far worse and suffer zero ramifications for their actions or their words.

Martin gave me a sense of hope ███████████████████████████████████████ best
whereas all the doctors over here told me I'm a lost cause and had no interest in helping me get back on my feet.
I'm very thankful for this effort of his, as this, as well as seeing him overcome his own struggles to reach his current level of personal success, allowed me to reconcile my own past experiences, successfully beat my own demons and move forward in a manner more conducive to successful future developments in my own life.

Apart from that I also appreciated his countless free lessons in math, chemistry, finance, that he continues to teach while in custody. Even though these topics are not my field of interest nor my strength, as an artist I still was able to learn from them, and I saw how many people, regardless of gender, were positively influenced and guided by his generous effort. At the end of the day, I realized what an intelligent, talented and gifted but also misunderstood guy he is.

In short, what I am asking for is your mercy in sentencing Martin Shkreli. He has helped me and I am doing whatever I can to help him. Please consider all factors involved in this case before giving Martin his sentence.

Sincerely,
Sophia 



# EXHIBIT 28

This letter is addressed to:

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Re: **United States vs. Martin Shkreli, 15 Cr. 637 (KAM)**

Dear Judge Matsumoto,

My name is ████ █ ██████, and I am a 29-year-old ███████ investor. ██████████████ █

████████████████████████████████████████████████████████████████████ While I read about healthcare online, I somehow found Martin's name and decided to send him an email. He promptly answered me and I would say we exchanged maybe a hundred emails in a couple days around New Year's Eve. I basically kept asking him questions about everything related to ██ █ ████████████, but if I remember correctly my questions also ranged from █████, █████ █, █. Martin was extremely kind to me and told me about how he was starting a drug company called Retrophin and I decided to invest. I had a great return on my investment, and sold all of my shares the day Martin was fired by the board in late 2014.

During these past few years until Martin's latest arrest I have come to know him relatively well and I feel like I have a valid opinion to share with your honor. My definition of Martin would be: He is a genius, yet extremely misunderstood. Unfortunately for him, I believe he is to blame for that misunderstanding.

Martin has been portrayed by the media as an evil person who raises prices of medicines and does not care for dying patients. His arrogant behavior in public reinforced that impression. Martin is paying for his bad PR, excessive social media presence and immaturity. For those mistakes, I believe he has already paid with all the negative issues he has faced recently. I truly hope that once he is free he decides to act in a more discreet and thoughtful manner.

I have no opinion to voice whether Martin is innocent or not, as that decision was up to the Jury and has already been made.

What I, as ██████████████████████████████████████████████████████████
██████, ask, is that Martin be punished in a way that makes society benefit from his mental capacity. He could be of great help to medical research in general. I would use as examples Mr. Michael Milken and Mr. Frank Abganale Jr., two outstanding individuals who faced problems with the law, yet have given back to their country and society in an honest and decent manner. Each day that those two fellows were free instead of behind bars helped to make the world a better place. I honestly believe this could be true with Mr. Martin Shkreli.

Thank you,

█ M████.



# EXHIBIT 29

Honorable Kiyo A. Matsumoto

United States District Judge

Eastern District of New York

United States Courthouse

225 Cadman Plaza East

Brooklyn, New York 11201


Re: <u>United States v. Martin Shkreli</u>, 15 Cr. 637 (KAM)

Dear Judge Matsumoto,

My name is ███ ██. I live in ████████ where I am surrounded by beautiful mountains every day. I recently began to work for a locally based merchandising company as their lead convention representative. This requires me to travel to thirty events on average per year. Our company mainly works as a production and distribution means for musicians, graphic designers, Youtubers, and convention hosts themselves.

I met Martin Shkreli around two years ago, when my life was very different. At the time I was working in the film industry, ████████████████████████████████ █████. My schedule was filled with long days, odd hours, and countless hotel stays. That environment made it difficult to develop friendships, especially since I had just moved to ███. So I turned to the internet, where many a lonely night-owl like me reside. This is where I met Martin; on a website called Blab that's sole purpose, inevitably, was to create communities.

In July of 2016 I was raped on the evening of a networking event. I arrived home in shock, which quickly dissolved into panic. I was frightened, insecure, belittled, and alone. I desperately went through my list of personal contacts trying to find anyone who would help me; phoning some people many times in a row. Martin was the only person who answered that night. We talked for what felt like hours. He listened to me, calmed me down, helped me think and see straight, guided me toward what my next steps should be, encouraged me to call the police. And, he let me cry.

Over the next couple months getting through my day to day life felt next to impossible. I became a recluse; refusing to leave the safety of my home unless absolutely necessary. I was haunted by nightmares, and chose to forego sleep instead. Even though Martin couldn't physically be near me, he sat with me through most of those days and nights via internet voice calls. We would talk, or not. Play games, or not. Do our own thing, or not. But, we were always connected. Something about knowing he could hear me made me feel safe. And, hearing him made me feel like I wasn't alone. He suggested to me music, books, videos, and any other art form that he said had helped him through the rough patches in life.

Martin was simply there for me in a way that many people don't know how to be. Other people I knew would expect me to vent over coffee, and then we would each go back to our normal and separate lives. Unfortunately, healing isn't that simple. I will never be able to say that I feel like it never happened, but I can say that I now feel like myself again. I have a lot of this to thank Martin for. He was there for me to lean on when I wasn't strong enough to carry myself. He never complained, made me feel guilty, or expected anything in return. He offers the truest form of friendship I have ever known.



# EXHIBIT 30

GO   PRINT   HELP   NEWS   MSG   MENU   PG BA   PG FW   SEND   SAVE   EQUIT   CORP   PASTE   MONIT   CA

‹ › KEPPEL CORP LTD Equity    ▾  NSN ▾  Related Functions Menu  ˅

<Menu> to Return

0 Previous   0 Next   66) Send   98) Actions ▾
03/10/2014 14:26:09 [BN]  **B**                                    Trans

## Ailing Venezuelan Toddler Receives Liver Medicine After Donation

By Corina Pons

March 10 (Bloomberg) -- An 11-month-old Venezuelan boy awaiting a liver transplant received a one-year supply of medicine his father struggled to find due to shortages of pharmaceuticals and protests in the South American nation.

New York-based Retrophin Inc. sent the supplies of ursodeoxycholic acid after executives read how the boy's father, Joel Correa, had to take eight-hour trips to the Colombian border to buy the medicine. The drug keeps his toddler's liver working until a transplant can be carried out.

The biopharmaceutical company learned of the boy's plight from a Bloomberg News article on Feb. 14. Delivery of the medicine was delayed by a week as protests in Venezuela over shortages of goods, including medicine, disrupted transport.

"This has been a blessing to us," Correa, a 26-year-old tool salesman, said in a phone interview from San Cristobal. "A whole family and many hearts are grateful for the help with the treatment," Correa wrote separately in an e-mail to Retrophin executives.

Chronic shortages of basic goods have sparked the world's highest rate of inflation and provoked violent protests on a daily basis in Caracas and other Venezuelan cities since Feb. 12, killing at least 21 people. Health workers marched today in Caracas as demonstrations against President Nicolas Maduro's government continue.

After being contacted by an investor citing Correa's difficulties, Retrophin Chief Executive Officer Martin Shkreli and Chief Medical Officer Horacio Plotkin arranged for a supply of the medicine, which Retrophin does not manufacture, to be shipped on Feb. 28.

Media



Ailing Venezuelan
Toddler Receives
Liver Medicine ...

<Menu> to Return

Previous | Next | 66) Send | 98) Actions ▾

03/10/2014 14:26:09 [BN]   **B**                                    Tr

After being contacted by an investor citing Correa's difficulties,
Retrophin Chief Executive Officer Martin Shkreli and Chief Medical Officer
Horacio Plotkin arranged for a supply of the medicine, which Retrophin
does not manufacture, to be shipped on Feb. 28.

**'Our Obligation'**

"It is our obligation to take responsibility for the community of
people that we have joined by being drug developers," Shkreli said in an
e-mail to Bloomberg News.
Retrophin focuses on development of drugs to treat debilitating and
life-threatening diseases including pantothenate kinase-associated
neurodegeneration and focal segmental glomerulosclerosis, a kidney
disorder.
The delivery means Correa can avoid trips through security
checkpoints in the mountainous border region dividing Venezuela from
the Colombian border town of Cucuta, where he paid five times the price
to secure his son's medicine.
"Traveling to Cucuta to find medicines is even harder now with the
protests," Correa said.

For Related News and Information:
Top Stories:TOP<GO>
Venezuela economic snapshot: ESNP VZ <GO>
Venezuela government bonds: VENZ <CORP> <GO>
Venezuela economy snapshot: ESNP VE <GO>

--With assistance from Jose Orozco in Caracas.

To contact the reporter on this story;
Corina Pons in Caracas at +58-212-750-3740 or
cpons@bloomberg.net

**TOPLive: Keep up on events with Bloomberg's live**

# EXHIBIT 31



**THE CENTER**

THE LESBIAN, GAY, BISEXUAL &
TRANSGENDER COMMUNITY CENTER

January 28, 2015

Mr. Martin Shkreli

████████████████████

Dear Mr. Shkreli,

Your support of The Center has been invaluable in 2014. With your help, every week more than 6,000 people from all over the world visited The Center to find support, hope, culture and community. Thanks to donors like you, The Center's doors are able to stay open 365 days a year to welcome each and every visitor.

Last year was very eventful at The Center! Not only did we complete a substantial renovation of our building, but we have also been hard at work developing new services to meet the LGBT community's ever-changing needs. One particularly exciting development is that we have completed the initial roll-out of a new Youth Leadership Model to improve our services to the more than 1,000 LGBT young people that we serve annually. This model focuses on ensuring that all LGBT youth have an opportunity to develop leadership, academic and workforce skills. Stay tuned for more exciting programming updates in 2015 to see how your support is helping us better serve the community!

The total amount of your cash contributions received by The Lesbian, Gay, Bisexual & Transgender Community Center for 2014 was $30,000.00. Below is a summary of your charitable contributions to The Center.

Donations to The Center may be tax deductible. The tax deductibility of your donation may be affected by the fair market value of benefits you may have received. The following information can be used by your tax advisor in determining the fair market value of tickets to Center events in 2014:

Center Dinner (4.3.2014) – $212          Garden Party (6.23.2014) – $20
MASQ (2.8.2014) – $19                     Women's Event (11.15.2014) – $75
Women's Event After Party (11.15.2014) - $40

See you at The Center!

Sincerely,

Jeffrey Klein
Chief Development Officer

**Below is a summary of your charitable contributions to The Center.**

| Date | Amount | Description |
|------|--------|-------------|
| 3/24/2014 | $30,000.00 | Center Dinner |

# EXHIBIT 32







Main:
Fax:
shkrelifoundation.org

September 15, 2015

Tracy Seckler
Charley's Fund Inc.

Dear Tracy,

I am pleased to inform you that the Board of Directors of The Shkreli Foundation (the "Foundation") has approved a grant to Charley's Fund Inc. ("Charley's Fund") in an amount up to $150,000 to be used by Charley's Fund for the purpose of supporting the research and treatment of Duchenne muscular dystrophy.

This grant is intended to be a matching grant in connection with Charley Fund's October 4, 2015 "Race Against Time" fundraising events in New York City, Great Barrington, and satellite locations (the "Event"). In making a matching grant, the Foundation will match dollar for dollar all qualified contributions (as defined below) up to $150,000 made in connection with the Event. For the purposes of this grant, qualified contributions are (i) donations made in connection with the Event and received between August 1, 2015 and the day of the Event and (ii) pledges made in connection with the Event and collected no later than November 30, 2015.

This grant will entitle the Foundation to be acknowledged as the "Signature Sponsor" of the Event. As such, the Foundation will receive: (i) acknowledgement as the "Signature Sponsor" in all promotional materials related to the Event; (ii) top logo billing on race shirt and all race items: charleysfund.org web page, dedicated race promotion web pages, dedicated race emails before and after the run, race day material; (iii) acknowledgment in co-founder send-off or celebratory speeches on race day; (iv) the opportunity to draft a thank you to be shared by Charley's Fund with participants; and (v) acknowledgement on social media, including at least one sponsor-only post.

Within ten (10) business days of receiving a final accounting of the amount of funds raised in connection with the Event and such final accounting being satisfactory to the Foundation, the Foundation will make the grant payment to Charley's Fund.




Please read carefully the enclosed Terms and Conditions. In order for us to process this grant award, you must sign and return this letter to:

The Shkreli Foundation

If you have any questions, please call me at ▮▮▮, or email ▮
We look forward to supporting your work and wish you every success with the Event!

Best Regards,

Leonora (Shkreli) Izerne
Executive Director

This letter and its Terms and Conditions are accepted and agreed to:

By: __Leonora Izerne__    Title: __09/15/2015__
*Type or print name of person authorized to enter into contractual agreements*

Signature: _____    Date: __9/15/2015__

Tracy L. Seckler
Charley's fund, Inc.

 



**Main:**
**Fax:**
shkrelifoundation.org

## Terms and Conditions

By signing this letter, Charley's Fund Inc. ("Grantee") agrees to the following terms and conditions:

1. <u>Purposes</u>. The grant is to be used by Grantee solely for the following purpose: supporting the research and treatment of Duchenne muscular dystrophy. Any portion of the grant not used for this purpose shall be returned to The Shkreli Foundation. Please note that no portion of the grant described herein may be used for activities outside the United States. Grantee agrees to keep financial and other records adequate to show the use of the grant exclusively for the grant purposes.

2. <u>Prohibited Activities</u>. No portion of the grant described herein may be used to:
- carry on propaganda, or otherwise attempt to influence legislation (as defined by section 4945 of the Internal Revenue Code of 1986, as amended (the "Code"));
- influence the outcome of any specific public election, or carry on, directly or indirectly, any voter registration drive (as defined in section 4945 of the Code);
- make an individual grant or regrant funds to another organization unless the requirements of section 4945 of the Code are met; or
- advance any purpose other than one specified in section 170(c)(2)(B) of the Code.

In addition, Grantee may not assign, or otherwise transfer, its rights or delegate any of its obligations under this grant without prior written approval from The Shkreli Foundation.

3. <u>Charitable Status</u>. Grantee warrants that:
- It is exempt from federal income taxes under section 501(a) of the Code by virtue of being an organization described in section 501(c)(3) of the Code.
- It is neither a "private foundation" as defined in section 509(a) of the Code nor a "supporting organization" described in section 509 of the Code;
- It has received a determination letter from the Internal Revenue Service to that effect, and that such letter has not been modified, limited or revoked;
- It is in compliance with all terms, conditions and limitations, if any, contained in such letter; the facts and circumstances which formed the basis of such a letter continue to exist substantially as represented in the Internal Revenue Service.

Grantee will notify the Foundation if the IRS determination letter is modified, limited or revoked.

4. <u>Publicly Supported Status</u>. Grantee further warrants that the receipt of this grant will not result in the Grantee's loss of its classification as a publicly supported organization pursuant to Code sections 170(b)(1)(a)(vi) and 509(a)(1).



5. Conditions for Payment. Within ten (10) business days of receiving a final accounting of the amount of funds raised in connection with the Event and such final accounting being satisfactory to the Foundation, the Foundation will make the grant payment to Charley's Fund.

6. Reasonable Access for Evaluation. Grantee will permit The Shkreli Foundation and its representatives, at its request, to have reasonable access during regular business hours to Grantee's files, records, accounts, personnel and clients or other beneficiaries for the purpose of making such financial audits, verifications or program evaluations as the Foundation deems necessary or appropriate concerning this grant award.

7. Publicity. Grantee will allow The Shkreli Foundation to review and approve the text of any proposed publicity concerning this grant prior to its release. The Foundation may include information regarding this grant, including the amount and purpose of the grant, any photographs Grantee may have provided, Grantee's logo or trademark, or other information or materials about Grantee and its activities, in The Foundation's periodic public reports, newsletters, and news releases.

The Shkreli Foundation will allow Grantee to review and approve any text of any proposed publicity concerning this grant prior to its release. Grantee may include information regarding this grant, including the amount and purpose of the grant, The Foundation's logo or trademark, or other information about The Foundation and its activities, in Grantee's periodic public reports, newsletters, and news releases.

8. Right to Modify or Revoke. The Shkreli Foundation reserves the right to discontinue, modify or withhold any payments to be made under this grant award or to require a total or partial refund of any grant funds if, in The Foundation's sole discretion, such action is necessary: (1) because Grantee has not fully complied with the terms and conditions of this grant; (2) to protect the purpose and objectives of the grant or any other charitable activities of The Foundation; or (3) to comply with the requirements of any law or regulation applicable to Grantee, of the Foundation or this grant.

9. Reporting Requirements. Grantee agrees to provide the Foundation with a report detailing Grantee's use of the grant funding no later than July 1, 2016 in such form as is acceptable to the Foundation.



# EXHIBIT 33



June 12, 2015

Randy Reiff
President

Jennifer Wiederkehr
Vice President

Matt's Promise
c/o Drinker Biddle & Reath
LLP
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714

Attn: Leonora
The Shkreli Foundation



Dear Leonora,

On behalf of Matt's Promise and the more than 100 thousand boys around the world afflicted with Duchenne Muscular Dystrophy (DMD), I offer my heartfelt gratitude and appreciation for your donation to this year's Matt's Promise 10th Annual Benefit Concert, which took place on May 14, 2015 at Cipriani Wall Street. We received your generous contribution of $27,500.00 on 5/11/2015.

Matt's Promise is dedicated to making a difference in the lives of young people affected by terminal illnesses. Our commitment, through select funding of treatment, research, education, and support programs, is to advance the fight against these diseases and to assure the most comprehensive, innovative, and compassionate care.

As you know our cornerstone project is research for the treatment and cure of DMD. The disease, which affects approximately 100,000 male children, is traced to a genetic mutation that results in the degeneration of the muscles. Typically, by the time a child with DMD enters his teens, he is confined to a wheelchair, and in most cases, by the time he is twenty, he dies from respiratory or heart failure.

I want to personally thank you for your participation in our 10th Annual Benefit Concert. Your extreme generosity ensures that we can continue our support of this crucial and cutting edge research.

Please keep this written acknowledgment of your donation for your personal records.

Again, we thank you for your support and helping us succeed in our mission.

Sincerely,

Jeff Sobel
Executive Director, Matt's Promise

Matt's Promise is a project of the Promise Foundation (EIN: 20-1618720), an organization exempt from federal income tax as a public charity. Your contribution is tax deductible, except as may be limited under federal law.



June 15, 2015

Randy Reiff
President

Jennifer Wiederkehr
Vice President

Matt's Promise
c/o Drinker Biddle & Reath
LLP
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714



Martin Shkreli
The Shkreli Foundation

Dear Martin,

On behalf of Matt's Promise and the more than 100 thousand boys around the world afflicted with Duchenne Muscular Dystrophy (DMD), I offer my heartfelt gratitude and appreciation for your purchase of Ten Tickets to this year's Matt's Promise 10th Annual Benefit Concert, which took place on May 14, 2015 at Cipriani Wall Street. We received your generous contribution of $7500.00 on 5/13/2015. This letter will also confirm that in exchange for your contribution you received goods and services that we estimate at a value of $1500.00.

Matt's Promise is dedicated to making a difference in the lives of young people affected by terminal illnesses. Our commitment, through select funding of treatment, research, education, and support programs, is to advance the fight against these diseases and to assure the most comprehensive, innovative, and compassionate care.

As you know our cornerstone project is research for the treatment and cure of DMD. The disease, which affects approximately 100,000 male children, is traced to a genetic mutation that results in the degeneration of the muscles. Typically, by the time a child with DMD enters his teens, he is confined to a wheelchair, and in most cases, by the time he is twenty, he dies from respiratory or heart failure.

I want to personally thank you for your participation in our 10th Annual Benefit Concert. Your extreme generosity ensures that we can continue our support of this crucial and cutting edge research.

Please keep this written acknowledgment of your donation for your personal records.

Again, we thank you for your support and helping us succeed in our mission.

Sincerely,

Jeff Sobel
Executive Director, Matt's Promise

Matt's Promise is a project of the Promise Foundation (EIN: 20-1618720), an organization exempt from federal income tax as a public charity. Your contribution is tax deductible, except as may be limited under federal law.



**EXHIBIT 34**

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201


November 2, 2017


Cristina Germano

██████████████

Dear Judge Matsumoto,

My name is Cristina Germano and I work as a Medical Biller for a large Ophthalmology practice
or ███████. I am writing in regards to Martin Shkreli and his upcoming sentencing. I have
been communicating with Martin for over two years now and while we have not yet met in
person, I can say with total confidence that he is an incredibly intelligent, generous and
productive member of society.

Like many in the public eye, Martin has a public persona that is markedly different from his
actual self. While he may engage in antics that don't make sense to all, he is a natural entertainer
who "puts on a show" through his livestream videos for thousands of people who appreciate and
share his humor. I can't really explain why I've spent so many hours watching Martin read from
textbooks, answer phone calls from fans or play with his adorable cat Trashy, other than he is
extremely charming and charismatic. It doesn't take long after observing Martin to realize that he
has a huge heart and gentle soul. I greatly admire his fortitude in the face of negative and often
misinformed media coverage and how he always stayed true to himself when it may have been
easier not to.

Martin is someone who cares deeply about people and about the work he does. I remember one
video where Martin called the father of a child suffering from PKAN; a very rare, fatal,
childhood disease with no known cure. Through his research, Martin was able to create a drug
that may just put an end to this horrible disease. I watched Martin light up when speaking of the
progress he and his colleagues had made and the good possibility that no other child would have
to succumb to this illness again. He had called the child's father because he saw on the news that
a PKAN donation box had been stolen from the man's store. Martin insisted on covering the cost
and then some and offered to meet with the family to provide whatever solace he could. Those
suffering from rare diseases need people like Martin to be a voice for them, to focus on research
and cures and not strictly profits, something most major drug companies are not willing to do.

In addition to being an accomplished scientist, Martin is also a gifted teacher. He has created
dozens of videos with in-depth lessons in Finance, Chemistry and Investing which he generously

shares with the public. Hearing Martin speak about topics in which he has expertise in is truly an honor and I would probably pay money for these lessons if they weren't free.

Martin has contributed to society in a profound way and if there is anything I'm sure of, it's that he will continue to do so. He has inspired me to not only have confidence in who I am but to pursue my passions and continue my education so that I may one day be able to help people in a similar fashion. Martin is one of a kind, his ability and determination know no bounds and my only hope is that he is able to get back to work soon.

Thank you for taking the time to read this letter, it is greatly appreciated.

Sincerely,

Cristina Germano

# EXHIBIT 35




*International Collaboration on Repair Discoveries: a research centre in the UBC Faculty of Medicine and VCH Research Institute*

November 20, 2017

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza east
Brooklyn, New York, 11201

RE: My interactions with Mr. Martin Skreli

Your Honor,

My name is Dr. Andrei Krassioukov I am a full professor of medicine at the University of British Columbia, Vancouver, BC, Canada. My laboratory and clinical work is focused on various secondary complications of devastating spinal cord injuries (SCI). For over twenty years, since I moved to North America, I have established a clinical/research center for investigation of autonomic dysfunctions (abnormal control of the heart, blood vessels, urinary bladder, bowel, sweating and thermoregulation) that negatively impact the health and quality of life of individuals with spinal cord injury. My research also involves the examination of potential health conditions of Paralympic athletes with spinal cord injury.

During the last decade my team was involved in numerous research projects during the Paralympic Games including Vancouver, 2010; London 2012, Sochi 2014; and Pan American games in Toronto in 2015.

Obtaining research funding is integral to the work of clinicians and scientists involved in academic and clinical research. At the present time, numerous national and international granting agencies support research in my laboratory, including the following:
- Canadian agencies: Canadian Health Research Institute (CIHR), Heart and Stroke Foundation (HSF) of Canada, Canadian Foundation for Innovation (CFI), Rick Hansen Foundation and Institute;
- USA agencies: Department of Defence (DOD); Crag Nielsen Foundation, Christopher and Dana Reeve Foundation;
- International agencies: Wings for Life.

My laboratory is also involved in numerous clinical trials that are sponsored by various pharmaceutical companies: Pfizer, Purdue, Coloplast, and Wellspect.

With deference to above, the call that I received from Mr. Skreli's office sometime in 2014 was not a surprise given that during the last twenty years, numerous companies and granting organisations have approached me with requests and/or offers regarding research activities in my laboratory and potential collaborations, as well as to gauge my interest in such collaborations.

I interacted with Mr. Skreli and his colleagues on several occasions via conference calls, discussing various issues related to spinal cord injury and secondary complications. It was my

understanding that one of the members of his team had a child with spinal cord injury and Mr. Skreli and his team were genuinely interested in supporting research advances in this area.

During the few conference calls that I had with Mr. Skrelli and his team I was impressed with his personal knowledge in area of spinal cord injury and complications that these individuals experience. During our discussions Mr. Skreli expressed his interest in Paralympic games and courage of Paralympic athletes with spinal cord injury who have to overcome many hurdles in order to reach and participate in the Games.

During my interactions with Mr. Skreli he presented what appeared to be a genuine interest in supporting SCI research. Mr. Skreli expressed interest to provide a personal donation in support of ongoing research in my laboratory specifically related to Paralympic athletes.

In the spring 2015, the UBC Department of Medicine received a donation from Mr. Skreli in amount of $50,000.00 US that was dedicated to the Paralympic research.

This funding was used to support research that my laboratory conducted during the Pan American games in 2015 in Toronto, Canada. Some of the results of this research have been already published and Mr. Skreli's donation was acknowledged together with other research funding that my laboratory received to conduct these studies.

Following the conclusion of our work in Toronto, I also submitted a brief update to Mr. Skreli and his sister (who was helping to organise the donation) and he replied with a cordial email acknowledging the work of my students and my laboratory during the Toronto Games.

I acknowledge the fact that my interactions with Mr. Skreli were very short and only via several conference calls and emails. However, during my interactions with him I felt that he was a young man who was genuinely interested in charitable support for the causes that were close to his heart.


Sincerely,


Andrei Krassioukov MD, PhD, FRCPC,
Professor, Dep. Medicine, Div. Phys .Med. & Rehab.
Chair, Rehabilitation Medicine
Associate Director and Scientist, ICORD, Director of Autonomic
Research Unit, Staff physician, Spinal Cord Program, GF Strong
Rehabilitation Centre, University of British Columbia

# EXHIBIT 36

# THE SHKRELI FOUNDATION

January 28, 2015

Andrei Krassioukov, MD, PhD, FRCPC,
Professor, Dep. of Medicine, Div. Phys. Med. and Rehab.
Associate Director and Scientist, ICORD,
University of British Columbia,

███████████████████████

Re:  The Shkreli Foundation Supports Research Related to Paralympic Athletes

Dear Dr. Krassioukov,

The Shkreli Foundation is pleased to support your inspiring work related to the impact of cardiovascular and autonomic dysfunctions on Paralympic athlete performance during competition. Your collaboration with the International Paralympic Committee (IPC) to design a cardiovascular /autonomic classification for Paralympic athletes will have a significant impact on the lives of countless individuals who are living with spinal cord injury (SCI).

In recognition of your innovative work in this area, The Shkreli Foundation will donate the sum of Fifty Thousand Dollars ($50,000USD) to the University of British Columbia to support your ongoing research efforts, as well as to fund educational clinics conducted during International Paralympic events. This work will provide critical benefits for individuals with SCI, their caregivers and medical personnel and will enhance and improve the quality of life for these individuals.

The Shkreli Foundation is excited to support this important work related to Paralympic athletes. We would be grateful to receive periodic updates on your achievements in this area and we wish you much continued success.

Sincerely,

Martin Shkreli, President
The Shkreli Foundation

██████████████████

# EXHIBIT 37

Original Research

# Spinal Cord Injury Impairs Cardiovascular Capacity in Elite Wheelchair Rugby Athletes

Cameron M. Gee, MExSc,* Katharine D. Currie, PhD,* Aaron A. Phillips, PhD,* Jordan W. Squair, MSc,*† and Andrei V. Krassioukov, MD, PhD, FRCPC*‡§

**Abstract**
**Objective:** To examine differences in heart rate (HR) responses during international wheelchair rugby competition between athletes with and without a cervical spinal cord injury (SCI) and across standardized sport classifications. **Design:** Observational study. **Setting:** The 2015 Parapan American Games wheelchair rugby competition. **Participants:** Forty-three male athletes (31 ± 8 years) with a cervical SCI (n = 32) or tetraequivalent impairment (non-SCI, n = 11). **Main Outcome Measures:** Average and peak HR (HRavg and HRpeak, respectively). To characterize HR responses in accordance with an athletes' International Wheelchair Rugby Federation (IWRF) classification, we separated athletes into 3 groups: group I (IWRF classification 0.5-1.5, n = 15); group II (IWRF classification 2.0, n = 15); and group III (IWRF classification 2.5-3.5, n = 13). **Results:** Athletes with SCI had lower HRavg (111 ± 14 bpm vs 155 ± 13 bpm) and HRpeak (133 ± 12 bpm vs 178 ± 13 bpm) compared with non-SCI (both *P* < 0.001). Average HR was higher in group III than in I (136 ± 25 bpm vs 115 ± 20 bpm, *P* = 0.045); however, SCI athletes showed no difference in HRavg or HRpeak between groups. Within group III, SCI athletes had lower HRavg (115 ± 6 bpm vs 160 ± 8 bpm) and HRpeak (135 ± 11 bpm vs 183 ± 11 bpm) than non-SCI athletes (both *P* < 0.001). **Conclusions:** This study is the first to demonstrate attenuated HR responses during competition in SCI compared with non-SCI athletes, likely due to injury to spinal autonomic pathways. Among athletes with SCI, IWRF classification was not related to differences in HR. Specific assessment of autonomic function after SCI may be able to predict HR during competition and consideration of autonomic impairments may improve the classification process.
**Key Words:** tetraplegia, cardiovascular system, heart rate, sympathetic nervous system, exercise

(*Clin J Sport Med* 2017;00:1–7)

## INTRODUCTION

Wheelchair rugby is a Paralympic team sport invented in 1977 by individuals with tetraplegia as an alternative to wheelchair basketball and the aim to be more inclusive of individuals with impaired upper limb function.[1] Originally, almost all wheelchair rugby players were individuals with a complete cervical spinal cord injury (SCI). However, as the sport became more popular, individuals with less severe SCI and those with

Submitted for publication June 13, 2017; accepted October 15, 2017.
From the *International Collaboration on Repair Discoveries (ICORD), Faculty of Medicine, University of British Columbia, Vancouver, BC, Canada; †MD/PhD Training Program, Faculty of Medicine, University of British Columbia, Vancouver, BC, Canada; ‡Division of Physical Medicine and Rehabilitation, Faculty of Medicine, University of British Columbia, Vancouver, BC, Canada; and §G. F. Strong Rehabilitation Centre, Vancouver Coastal Health, Vancouver, BC, Canada.

Research in the laboratory of Dr A. V. Krassioukov is supported by the Canadian Institutes of Health Research, the Canadian Foundation for Innovation, the Heart and Stroke Foundation, the Craig H. Neilsen Foundation, The Shkreli Foundation, Coloplast, Wellspect HealthCare, Purdue, and a personal donation from Dr John Le Nobel. Dr K. D. Currie is supported by a fellowship from the Craig H. Neilsen Foundation. Dr A. A. Phillips is a Killam Laureate who is supported by the Heart and Stroke Foundation of Canada, the Craig H. Neilsen Foundation, and the Michael Smith Foundation for Health Research. Mr J. W. Squair is supported by a Frederick Banting and Charles Best Canada Graduate Scholarship and a Vancouver Coastal Health-University of British Columbia MD/PhD Studentship from the Canadian Institutes of Health Research and a 4-Year Fellowship from the University of British Columbia. The remaining author reports no conflicts of interest.

Corresponding Author: Andrei V. Krassioukov, MD, PhD, FRCPC, International Collaboration on Repair Discoveries—Blusson Spinal Cord Centre, 818 West 10th Ave, Vancouver, BC V5Z 1M9, Canada (andrei.krassioukov@vch.ca).

Copyright © 2017 Wolters Kluwer Health, Inc. All rights reserved.
http://dx.doi.org/10.1097/JSM.0000000000000561

tetraequivalent impairments (eg, amputations, polio, cerebral palsy, and muscular dystrophy) (non-SCI)[1] began to compete.[2]

According to the International Paralympic Committee's (IPC's) classification code,[3] classification aims to minimize the impact on an individual's impairment has on the outcome of competition[4] that, given the array of impairments represented in wheelchair rugby at both the local and elite level, can be a difficult process.[1] The International Wheelchair Rugby Federation's (IWRF's) classification process currently uses a combination of an off-court physical evaluation and on-court based assessments, both of which are primarily focused on motor function of the upper extremities and trunk. However, many athletes believe that the process needs to be improved.[5] In fact, a recent survey of wheelchair rugby athletes found that 56% of respondents believed that the classification system required adjustments, whereas 41% believed that the system needed to be completely reperformed.[5] In addition, over a third of athletes (36%) felt that only individuals with an SCI should be allowed to compete.[5] Although classification has traditionally focused on upper limb and, more recently, trunk function,[2] a potential index of performance that is not currently considered in the classification process is autonomic function.

Autonomic dysfunction is a common sequela after SCI,[6,7] and athletes with such dysfunction may be at a competitive disadvantage despite similar motor function to their similarly classified competitors. Sympathetic preganglionic neurons (SPNs) that provide input to the cardiac and vascular smooth muscle cells exit the spinal cord at the T1-T5 and T1-L2 spinal

Copyright © 2017 Wolters Kluwer Health. Unauthorized reproduction of this article is prohibited.

segments, respectively.[7] Therefore, injury to the spinal cord at or above these segments (ie, cervical injury) can disrupt descending autonomic spinal pathways and alter the sympathetic control of the heart and large vascular beds predisposing individual to an altered cardiovascular responses to exercise. In fact, many nonathletic individuals with cervical SCI do not exhibit the same increase in blood pressure (BP) and heart rate (HR) during exercise as able-bodied individuals.[8,9]

However, because of the specific localization of descending autonomic pathways within the spinal cord, some individuals with severe motor/sensory impairment may have sparing of autonomic spinal pathways[9–11] and thus be able to achieve a relatively normal cardiovascular response to exercise.[9,12] The possibility of various degrees of injury to autonomic spinal pathways and associated clinical implications have been recognized during the last decade and new standards to determine autonomic completeness such as the International Standards to Document Remaining Autonomic Function after Spinal Cord Injury (ISAFSCI)[13] have been introduced. Currently, the only data available on the cardiovascular response in SCI versus non-SCI wheelchair rugby athletes were collected during practice matches and found HR to be significantly lower in SCI (100 ± 20) than in non-SCI (143 ± 27).[14] Although we assume these values to be average HR (HRavg), it is unclear whether data represent only time on court or includes data collected when off court. Data collected during wheelchair rugby game play[15] and training[16] have only looked at athletes with SCI. Given the altered response to exercise after cervical SCI,[8,9] the current literature does not provide a full picture of the cardiovascular demands of wheelchair rugby, nor does it address the perceived issues around classification regarding SCI versus non-SCI athletes.[5]

Given the potential range of cardiovascular responses among wheelchair rugby athletes, the increasing number of non-SCI competitors and the associated implications on exercise performance, the assessment of such responses during competition is critical in strengthening the classification process to ensure a level playing field. We chose to use HR monitoring during competition as an index of cardiovascular capacity due to the assessments ease of use and noninvasive

nature. Therefore, the purpose of this study was to monitor HR during game play such that we, as researchers and/or classifiers, may gain greater insight into the cardiovascular demands of the sport for athletes both with and without SCI. We hypothesized that (1) athletes with non-SCI impairments would achieve higher HRavg and peak HR (HRpeak) than athletes with SCI during games and (2) HRavg and HRpeak in athletes with SCI would not change across IWRF classifications, as this classification is based solely on motor function.

## METHODS

### Participants

We recruited 53 elite wheelchair rugby athletes from 5 international teams (Argentina, Brazil, Chile, Colombia, and United States) competing at the 2015 Parapan American Games. Ten athletes were excluded because they did not play in their respective games; hence, a total of 43 male athletes (31 ± 8 years) were included in the present study. Athletes of each IWRF classification (range: 0.5-3.5) were assessed and both those with (SCI, n = 32) and without (non-SCI, n = 11) SCI were included in the study. The non-SCI group comprised athletes with Charcot-Marie-Tooth disease (n = 4), muscular dystrophy (n = 2), hereditary sensory autonomic neuropathy (n = 1), and triple (n = 1) and quadruple amputations (n = 3). We stratified athletes into the following 3 groups according to their IWRF classification: IWRF group I—primarily defensive players ("blockers") with classifications 0.5 to 1.5 (n = 15); IWRF group II—players with both defensive and offensive ("playmaker") abilities with a classification of 2.0 (n = 15); and IWRF group III—primarily offensive players with classifications of 2.5 to 3.5 (n = 13). Height (meters) and weight (kilograms) were self-reported and are presented in Table 1. All data were collected at the Mississauga Sports Complex in Ontario, Canada. Informed consent was obtained from all participants included in the study. All procedures performed in this study were in accordance with the ethical standards of the University of British Columbia's Research Ethics Board, the Medical Committee of the IPC, and with the

[T1]

| Group | Classification Range | n | Age, yrs | Height, m | Weight, kg | Pregame SBP/DBP, mm Hg | Postgame SBP/DBP, mm Hg |
|---|---|---|---|---|---|---|---|
| **All subjects** | | | | | | | |
| I | 0.5-1.5 | 15 | 32 ± 8 | 1.76 ± 0.10 | 63 ± 11 | 111* ± 13/70 ± 11 | 118 ± 32/73 ± 25 |
| II | 2 | 15 | 30 ± 7 | 1.75 ± 0.18 | 71 ± 10 | 115 ± 15/64 ± 11* | 115 ± 15/67 ± 11 |
| III | 2.5-3.5 | 13 | 30 ± 7 | 1.66 ± 0.17 | 67 ± 11 | 128 ± 15/74 ± 9 | 122 ± 13/70 ± 13 |
| **SCI only** | | | | | | | |
| I | 0.5 | 12 | 33 ± 12 | 1.81 ± 0.12 | 69 ± 13 | 111 ± 14/69 ± 12 | 119 ± 36/70 ± 27 |
| II | 1-1.5 | 13 | 33 ± 5 | 1.78 ± 0.05 | 63 ± 10 | 114 ± 16/63 ± 11 | 115 ± 16/66 ± 12 |
| III | 2-2.5 | 7 | 31 ± 7 | 1.77 ± 0.12 | 73 ± 10 | 126 ± 8/71 ± 9 | 118 ± 7/62 ± 7 |
| **SCI vs non-SCI** | | | | | | | |
| SCI | 0.5-3 | 32 | 32 ± 7 | 1.78 ± 0.1 | 69 ± 10 | 116 ± 15/67 ± 11 | 117 ± 23/66 ± 18 |
| Non-SCI | 1-3.5 | 11 | 28 ± 7 | 1.57† ± 0.18 | 61‡ ± 11 | 124 ± 18/76 ± 8§ | 122 ± 15/79 ± 11 ‡ |

**TABLE 1.** Demographic and BP Data Presented in the 3 Levels for Which Analysis Was Performed

*P < 0.05 compared with group III.
† P < 0.001 compared with SCI group.
‡ P < 0.05 compared with SCI group.
§ P < 0.01 compared with SCI group.
DBP, diastolic blood pressure; SBP, systolic blood pressure.

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

1964 Helsinki Declaration and its later amendments or comparable ethical standards.

### Pregame and Postgame Hemodynamics

A single, discrete measure of BP was recorded for each athlete in the seated position within 90 minutes of each game and no more than 15 minutes after the conclusion of each game using an automated BP cuff (Dinamap Pro 300V2; General Electric, Tampa, Florida). The 90-minute time frame for the assessment of pregame BP was chosen (1) so as to not interfere with team preparations and (2) athletes typically began pregame preparations ~90 minutes before the start of the game. Postgame BP was assessed as close to the end of the game as possible to record episodes of postexercise hypotension while not interfering with normal postgame procedures. During the pregame assessment, participants were outfitted with HR monitors (Polar team System 2.0; Polar Electro Oy, Kempele, Finland).

### Heart Rate Response to Exercise

Beat-by-beat HR was recorded throughout the warm-up and duration of the game. Data were collected once on each of the athletes that participated in the study, and all athletes from a single team were assessed during the same game. During each game, the times that each athlete was on or off the court were recorded by a member of the research team (C.M.G.) on the laptop that synced with HR monitors to ensure HR data and times on/off court were time aligned. As the playing time of each individual may vary for tactical purposes,[17] only the times that each individual was on the court were analyzed (24.02 ± 13.80 minutes, range: 3.32-65.32 minutes). Using this data, HRavg was determined as the average of all beat-by-beat HR during their playing time, whereas HRpeak was determined as the peak value from rolling 5-second averages.

### Data Analyses

Four levels of analyses were performed to determine the cardiovascular demands of wheelchair rugby. First, we compared BP and HR data in subjects of all classifications according to their impairment (ie, SCI vs non-SCI) and within IWRF group comparisons of SCI versus non-SCI; second, we compared these variables in all subjects according to their IWRF group (ie, I-III); third, we compared these variables in only subjects with an SCI according to their IWRF group; and finally, we compared variables across team performance at the 2015 Parapan American Games.

### Statistics

All statistical analyses were conducted using SPSS software (IBM, New York, NY). Differences in BP and HR between SCI and non-SCI subjects as well as within IWRF group comparisons of SCI versus non-SCI were determined using independent samples $t$-tests. Differences between IWRF groups I to III were assessed using 1-way analysis of variance (ANOVA). Because of the small number of non-SCI athletes in IWRF groups I and II, analyses between SCI and non-SCI athletes were not performed; differences between SCI and non-SCI athletes in group III were, therefore, performed using independent samples $t$-tests, which can lead to an inflation of type I error. Differences between teams were assessed using ANOVA. Tukey-corrected post hoc

comparisons were conducted when appropriate. Comparisons of pregame variables and those collected during or postgame were assessed using dependent samples $t$-tests. Standardized effects were calculated using Cohen $d$, or if samples sizes were uneven, Hedges $g$ was used. Threshold values for magnitudes of standardized effects were 0.20, 0.50, 0.80, 1.20, and 2.00 for small, moderate, large, very large, and huge, respectively.[18,19] Data are presented as mean ± SD and level of significance for all tests was set at $P < 0.05$.

## RESULTS

### Effect of Spinal Cord Injury on Cardiovascular Response

The non-SCI group were significantly shorter ($P < 0.001$) and lighter ($P < 0.027$) (Table 1) and presented with higher HRavg ($155 ± 13$ bpm vs $111 ± 14$ bpm; $P < 0.001$, $g = 3.20$) and HRpeak ($178 ± 13$ bpm vs $133 ± 12$ bpm; $P < 0.001$, $g = 3.67$) during competition than the SCI group (Figures 1 and 2). Among athletes in group III, HRavg ($160 ± 8$ bpm vs $115 ± 8$ bpm; $P < 0.001$, $d = 5.63$) and HRpeak ($183 ± 11$ bpm vs $135 ± 11$ bpm; $P < 0.001$, $d = 4.36$) were higher in the non-SCI group (Figure 3). Because of the small number of non-SCI athletes in groups I and II, statistical analyses were not performed.

[F1]
[F2]
[F3]

### Effect of International Wheelchair Rugby Federation Group on Cardiovascular Response in All Athletes

No significant differences in age, height, or weight existed between IWRF groups. It should be noted that there was





Figure 1. A, Average HR achieved during game by athletes with (closed circles) and without (open squares) SCI. B, Peak HR achieved during game by athletes with and without SCI.

3

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



**Figure 2.** HR traces of 2 athletes. One with an SCI (grey line) at C5 neurological level (HRpeak 131 bpm; HRavg 115 bpm; IWRF classification 2.5). One with muscular dystrophy (black line) (HRpeak 184 bpm; HRavg 155 bpm; IWRF classification 2.0). Shaded sections indicate when both athletes were on the court.

a higher proportion of non-SCI athletes in IWRF group III (7 SCI and 6 non-SCI) than in IWRF groups I (12 SCI and 3 non-SCI) or II (13 SCI and 2 non-SCI). IWRF group III achieved a significantly higher HRavg than IWRF group I during competition ($P = 0.045$, $d = 0.93$) while HRpeak approached significance ($P = 0.050$) [T2] (Table 2).



**Figure 3.** A, Average HR achieved during games by athletes with (closed circles) and without (open squares) SCI of each classification group. B, Peak HR achieved during games by athletes with and without SCI of each classification group.

### Effect of International Wheelchair Rugby Federation Group on Cardiovascular Response in Athletes With Spinal Cord Injury

When non-SCI athletes were removed from the analysis, no significant differences in BP or HR remained between IWRF groups I, II, and III (Table 2).

### Effect of Team Performance on Cardiovascular Response

Average HR and HRpeak for each team are presented in Table 3. No differences were found between either HRavg or [T3] HRpeak when comparing all athletes. However, when only athletes with SCI are included in analyses, significant differences existed between HRavg of athletes representing United States and Colombia ($P = 0.015$, $g = 2.5$) and Brazil ($P = 0.032$, $g = 1.71$).

## DISCUSSION

This study is the first to measure HR during elite wheelchair rugby competition, and only the second time that such data have been presented in any athletes with SCI competing at an international level.[11] Moreover, it is the first to compare HR in SCI and non-SCI athletes competing against one another, and our findings highlight that differences do exist that may have implications on performance that are not considered under the current IWRF classification system.[20]

Our findings demonstrate that wheelchair rugby athletes with an SCI (of all classifications) have a blunted HR response during wheelchair rugby games, whereas non-SCI individuals were not impaired from a cardiovascular perspective and in fact were able to achieve an HR similar to that recorded in able-bodied individuals competing in court-based team sports.[21] Our laboratory has previously shown that reduced capacity to elevate HR after SCI is due to disrupted descending sympathoexcitatory pathways independent of exercise intensity or capacity.[22,23]

The observed HRavg in the present study (111 ± 14 bpm) was slightly higher than what Griggs et al[14] reported (100 ± 20 bpm) during practice matches in 17 athletes with SCI. Previous studies that have documented HRpeak in wheelchair

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

| TABLE 2. | HR Response to Exercise in Each Group for All Athletes and Only Athletes With SCI | | |
|---|---|---|---|
| **Group** | **n** | **HRavg, bpm** | **HRpeak, bpm** |
| All athletes | | | |
| I | 15 | 115 ± 20*† | 137 ± 21* |
| II | 15 | 118 ± 22* | 141 ± 19* |
| III | 13 | 136 ± 25* | 157 ± 27* |
| SCI only | | | |
| I | 12 | 107 ± 13* | 130 ± 15* |
| II | 13 | 112 ± 17* | 134 ± 11* |
| III | 7 | 115 ± 8* | 135 ± 11* |

*$P < 0.001$ compared with HRrest.
†$P < 0.05$ compared with group III.
HRrest, resting heart rate.

athletes with cervical SCI have reported higher HRpeak during a 40-minute maximal push test (153 ± 15 bpm),[24] lower HRpeak during training (118 ± 17 bpm),[16] and similar HRpeak during incremental arm ergometry (134 ± 19 bpm).[25] Large variations in HRpeak between athletes were also measured in each of these studies, which highlight the heterogeneity of cardiac function among individuals with SCI.

Although athletes in higher classification groups have been reported to cover greater distances[26] at faster peak speeds,[27] it is apparent that the higher HRs achieved by group III (those with IWRF classifications 2.5-3.5) can be attributed to the fact that this group contains a greater number of non-SCI athletes because there is no evident relationship between classification and the ability to achieve a higher HRavg or HRpeak when assessing only athletes with an SCI. By comparing SCI and non-SCI athletes of similar IWRF classification, it is evident that the observed differences are not due to greater motor function among non-SCI athletes. This suggests that the ability of athletes with an SCI to achieve a higher HR during competition is not limited by functional ability but by the pathophysiology of the injury itself.

The disruption of descending spinal sympathetic pathways prevents the transmission of sympathoexcitatory input from cardiovascular regulatory centers to SPNs located caudal to the site of injury. This is likely the case in the present study

because all athletes with an SCI had lesions at the cervical level (ie, above the levels at which SPNs exit the spinal cord). It has been demonstrated previously that some athletes with tetraplegia can obtain what would be considered a normal HR response during exercise,[10,11] and it is postulated that this is due to the sparing of descending spinal sympathetic pathways that provide neural drive to the sinoatrial node and cardiac muscle.[7]

Non-SCI athletes were able to achieve and maintain higher HRs in response to exercise than athletes of similar motor function with an SCI (as determined by IWRF classification). This is due to most of their impairments not being of the central nervous system; although, it should be noted that these individuals did have an array of impairments. In fact, only 1 tetraequivalent athlete did not achieve an HRpeak of ≥160 bpm, whereas not a single athlete with an SCI did so. Only 1 non-SCI athlete had an HRavg <147 bpm, whereas no athlete with an SCI had an HRavg >133 bpm.

The difference in HRavg, but not HRpeak, between athletes with SCI representing United States and Colombia or Brazil may be explained by the nature of the particular game in which data were collected as we did not collect data on stoppages in play due to goals, penalties, or the ball going out of bounds. Furthermore, the performance of the team they were competing against may have an impact on HRavg as data collected in athletes representing United States was collected versus Chile, whereas data from Brazilian and Colombian athletes were collected versus United States. There was no difference in the average shift times of athletes with SCI of each team, so the discrepancy in HRavg cannot be explained by a lack of playing time to elevate and maintain HR.

As the lack of significant differences in average and HRpeak among athletes with an SCI suggests that classification does not predict remaining autonomic function, so too does the lack of significant differences in pregame or postgame BP. However, the assessment of BP did provide clinically relevant cases that elucidate the extreme variability of BP in individuals with cervical SCI. Two athletes experienced episodic hypertension, known as autonomic dysreflexia (AD),[28] postgame due to bladder overdistension. One of whom (age 31 years; IWRF classification 1.0; pregame BP 111/61 mm Hg) presented postgame with hyperhydrosis and a BP of 214/145 mm Hg—a recording that has previously been associated with various adverse events such as cerebral hemorrhage,[29]

| TABLE 3. | HR Response to Exercise Across Teams for All Athletes and Only Athletes With SCI | | | | |
|---|---|---|---|---|---|
| **Team** | **United States** | **Colombia** | **Brazil** | **Argentina** | **Chile** |
| Team rank | 1 | 2 | 3 | 4 | 5 |
| All athletes | | | | | |
| n | 9 | 6 | 9 | 8 | 11 |
| HRavg, bpm | 107 ± 26 | 134 ± 18 | 117 ± 11 | 125 ± 27 | 130 ± 26 |
| HRpeak, bpm | 138 ± 24 | 155 ± 19 | 135 ± 11 | 148 ± 26 | 149 ± 30 |
| SCI only | | | | | |
| n | 8 | 4 | 9 | 5 | 6 |
| HRavg, bpm | 99 ± 10 | 124 ± 10* | 117 ± 11† | 106 ± 9 | 112 ± 17 |
| HRpeak, bpm | 131 ± 13 | 143 ± 6 | 135 ± 11 | 130 ± 6 | 128 ± 19 |

Team rank is determined by their placing at the 2015 Parapan American Games among those teams that participated in the study.
*$P < 0.02$ compared with United States.
†$P < 0.04$ compared with United States.

5

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

myocardial ischemia,[30] seizures,[31] arrhythmias,[32] and even death.[33,34] However, another athlete (age 24 years; IWRF classification 1.0; pregame BP 121/58 mm Hg) experienced severe postexertional hypotension with symptoms of presyncope such that they required medical intervention to normalize their hypotensive symptoms.[35] These findings suggest that even in highly trained individuals with cervical SCI, there is an abnormal cardiovascular response to exercise due to neuroanatomical changes after SCI rather than training status.

From a fair play perspective, it is of paramount importance that an athletes' classification represents their true ability to perform the sport. Considering that autonomic dysfunction impairs aerobic capacity and that having an SCI resulted in a blunted, but highly variable, cardiovascular response to exercise, assessing autonomic dysfunction, via established tests such as the sit-up test[15] (an assessment of descending vasomotor function)[36] or sympathetic skin responses[11] (an assessment of descending sudomotor function)[37] among athletes with SCI may be a future consideration for the IWRF classification system. Clearly, further research is required to identify which assessments best predict the cardiovascular responses to exercise.

### Methodological Considerations

In the previous literature, there has been no consensus on how to group players according to their classification. This makes it difficult to compare the results of these studies. Molik et al[38] grouped athletes as lower (0.5-2.0) and higher (2.5-3.5) classification groups, Rhodes et al[39] compared defensive (0.5-1.5) and offensive (2.0-3.5) players, whereas the IWRF Classification Manual describes "low-pointers" (0.5-1.5), "mid-pointers" (2.0-2.5), and "high-pointers" (3.0-3.5).[20] Because of the grey area that is the 2.0 classification and the distribution of athletes across classifications at the Parapan Games, we chose to group athletes into the following 3 groups (group I: 0.5-1.5; group II: 2.0; and group III: 2.5-3.5).

### Limitations of Study

Because of the manner of field testing and the associated time constraints, we did not assess each athlete's injury according to the International Standards for Neurological Classification of SCI (ISNCSCI).[40] However, it has previously been shown that ISNCSCI classification (American Spinal Injury Association Impairment Scale A-D) is not a predictor of resting cardiovascular function nor is it related to the autonomic completeness of an injury in Paralympic athletes.[41] As we have described previously,[42] some athletes may intentionally induce AD (ie, "boosting"), which has the potential to improve aerobic performance[43,44] and may result in bradycardia or tachycardia and affect the measurements of HR in the present study. The non-SCI group represents individuals with myriad functional impairments and as such as we are careful not to draw conclusions about the cardiovascular function of individual athletes from data collected on this group.

### CONCLUSIONS

Wheelchair rugby athletes without SCI are able to achieve substantially higher HRs compared with athletes with SCI, despite being classified similarly according to the presently established classification criteria. These differences in HRs are

most likely a result of injury to descending spinal sympathetic pathways caused by the SCI; however, this is the first time it has been shown to have an impact on cardiovascular capacity during elite wheelchair sports in which athletes with and without SCI compete. Among athletes with an SCI, remaining upper limb and trunk function was not related to the ability to elevate HR in response to increasing aerobic demand. Specific assessment of remaining autonomic function after SCI may be able to predict the HR response during competition, and future research in this area may have implications not only for classification but also individualized training programs for athletes with an SCI. Future research should be directed at how best to implement the IPC mandate of improving athlete classification and incorporating cardiovascular capacity as a factor effecting performance.

### ACKNOWLEDGMENTS

*The authors express their gratitude to all the wheelchair rugby athletes that participated in the study during the 2015 Toronto Parapan American Games from Argentina, United States, Brazil, Colombia, and Chile.*

### References

1. International Wheelchair Rugby Federation. Introduction to wheelchair rugby. Available at: http://www.iwrf.com./resources/iwrf_docs/Introduction-to-Wheelchair-Rugby-2012.pdf. Accessed September 5, 2015.
2. Altmann VC, Groen BE, van Limbeek J, et al. Reliability of the revised wheelchair rugby trunk impairment classification system. *Spinal Cord.* 2013;51:913–918.
3. International Paralympic Committee. IPC Classification Code and International Standards. Available at: http://www.paralympic.org/sites/default/files/document/120201084329386_2008_2_Classification_Code6.pdf. Accessed September 5, 2015.
4. Tweedy SM, Vanlandewijck YC. International Paralympic Committee position stand—background and scientific principles of classification in Paralympic sport. *Br J Sports Med.* 2011;45:259–269.
5. Altmann VC, Hart AL, van Limbeek J, et al. Improvement of the classification system for wheelchair rugby: athlete priorities. *Adapt Phys Activ Q.* 2014;31:377–389.
6. Weaver LC, Fleming JC, Mathias CJ, et al. Disordered cardiovascular control after spinal cord injury. *Handb Clin Neurol.* 2012;109:213–233.
7. Krassioukov A. Autonomic function following cervical spinal cord injury. *Respir Physiol Neurobiol.* 2009;169:157–164.
8. Coutts KD, Rhodes EC, McKenzie DC. Maximal exercise responses of tetraplegics and paraplegics. *J Appl Physiol.* 1983;55:479–482.
9. Currie KD, West CR, Hubli M, et al. Peak heart rates and sympathetic function in tetraplegic nonathletes and athletes. *Med Sci Sports Exerc.* 2015;47:1259–1264.
10. West CR, Romer LM, Krassioukov A. Autonomic function and exercise performance in elite athletes with cervical spinal cord injury. *Med Sci Sports Exerc.* 2013;45:261–267.
11. West CR, Gee CM, Voss C, et al. Cardiovascular control, autonomic function, and elite endurance performance in spinal cord injury. *Scand J Med Sci Sports.* 2015;25:476–485.
12. Krassioukov A, West C. The role of autonomic function on sport performance in athletes with spinal cord injury. *PM R.* 2014;6: S58–S65.
13. Krassioukov A, Biering-Sørensen F, Donovan W, et al. International standards to document remaining autonomic function after spinal cord injury. *J Spinal Cord Med.* 2012;35:201–210.
14. Griggs KE, Havenith G, Price M, et al. Thermoregulatory responses during competitive wheelchair rugby match play. *Int J Sports Med.* 2017; 38:177–183.
15. Squair JW, Phillips AA, Currie KD, et al. Autonomic testing for prediction of competition performance in Paralympic athletes. *Scand J Med Sci Sports.* 2017 [epub ahead of print].
16. Barfield JP, Malone LA, Arbo C, et al. Exercise intensity during wheelchair rugby training. *J Sports Sci.* 2010;28:389–398.

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

17. Rhodes JM, Mason BS, Malone LA, et al. Effect of team rank and player classification on activity profiles of elite wheelchair rugby players. *J Sports Sci.* 2015;33:2070–2078.

AU4 18. Cohen J. *Statistical Power Analysis for the Behavioral Sciences.* 1988:567.

19. Sawilowsky SS. New effect size rules of thumb. *J Mod Appl Stat Methods.* 2009;8:597–599.

20. International Wheelchair Rugby Federation. *IWRF Classification Manual.* 3rd ed. Available at: http://www.iwrf.com/resources/iwrf_docs/IWRF_Classification_Manual_3rd_Edition_rev-2015_(English).pdf. Accessed March 9, 2017.

21. Torres-Ronda L, Ric A, Llabres-Torres I, et al. Position-dependent cardiovascular response and time-motion analysis during training drills and friendly matches in elite male basketball players. *J Strength Cond Res.* 2015;30:60–70.

22. West CR, Krassioukov AV. Autonomic cardiovascular control and sports classification in Paralympic athletes with spinal cord injury. *Disabil Rehabil.* 2017;39:127–134.

23. Phillips AA, Krassioukov AV. Contemporary cardiovascular concerns after spinal cord injury: mechanisms, maladaptations, and management. *J Neurotrauma.* 2015;32:1927–1942.

24. West CR, Leicht CA, Goosey-Tolfrey VL, et al. Perspective: does laboratory-based maximal incremental exercise testing elicit maximum physiological responses in highly-trained athletes with cervical spinal cord injury? *Front Physiol.* 2016;6:419.

25. Goosey-Tolfrey V, Castle P, Webborn N, et al. Aerobic capacity and peak power output of elite quadriplegic games players. *Br J Sports Med.* 2006;40:684–687.

26. Sarro KJ, Misuta MS, Burkett B, et al. Tracking of wheelchair rugby players in the 2008 demolition derby trial. *J Sports Sci.* 2010;28:193–200.

27. Rhodes JM, Mason BS, Paulson TA, et al. A comparison of speed profiles during training and competition in elite wheelchair rugby players. *Int J Sports Physiol Perform.* 2017;12:777–782.

28. Krassioukov A, Warburton DE, Teasell R, et al. A systematic review of the management of autonomic dysreflexia after spinal cord injury. *Arch Phys Med Rehabil.* 2009;90:682–695.

29. Pan S, Wang Y, Lin H, et al. Intracerebral hemorrhage secondary to autonomic dysreflexia in a young person with incomplete C8 tetraplegia: a case report. *Arch Phys Med Rehabil.* 2005;86:591–593.

30. Ho CP, Krassioukov A. Autonomic dysreflexia and myocardial ischemia. *Spinal Cord.* 2010;48:714–715.

31. Yarkony GM, Katz RT, Wu YC. Seizures secondary to autonomic dysreflexia. *Arch Phys Med Rehabil.* 1986;67:834–835.

32. Colachis SC, Clinchot DM. Autonomic hyperreflexia associated with recurrent cardiac arrest: case report. *Spinal Cord.* 1997;35:256–257.

33. Eltorai I, Kim R, Vulpe M, et al. Fatal cerebral hemorrhage due to autonomic dysreflexia in a tetraplegic patient: case report and review. *Paraplegia.* 1992;30:355–360.

34. Wan D, Krassioukov A. Life-threatening outcomes associated with autonomic dysreflexia: a clinical review. *J Spinal Cord Med.* 2013;37:2–10.

35. Mills PB, Fung CK, Travlos A, et al. Nonpharmacologic management of orthostatic hypotension: a systematic review. *Arch Phys Med Rehabil.* 2015;96:366–375.e6.

36. Claydon VE, Krassioukov AV. Orthostatic hypotension and autonomic pathways after spinal cord injury. *J Neurotrauma.* 2006;23:1713–1725.

37. Cariga P, Catley M, Mathias CJ, et al. Organisation of the sympathetic skin response in spinal cord injury. *J Neurol Neurosurg Psychiatry.* 2002;72:356–360.

38. Molik B, Lubelska E, Kosmol A, et al. An examination of the International Wheelchair Rugby Federation classification system utilizing parameters of offensive game efficiency. *Adapt Phys Activ Q.* 2008;25:335–351.

39. Rhodes JM, Mason BS, Perrat B, et al. Activity profiles of elite wheelchair rugby players during competition. *Int J Sports Physiol Perform.* 2015;10:318–324.

40. Kirshblum SC, Waring W, Biering-Sorensen F, et al. Reference for the 2011 revision of the international standards for neurological classification of spinal cord injury. *J Spinal Cord Med.* 2011;34:547–554.

41. West CR, Wong SC, Krassioukov AV. Autonomic cardiovascular control in paralympic athletes with spinal cord injury. *Med Sci Sports Exerc.* 2013;46:60–68.

42. Gee CM, West CR, Krassioukov AV. Boosting in elite athletes with spinal cord injury: a critical review of physiology and testing procedures. *Sports Med.* 2015;45:1133–1142.

43. Wheeler G, Cumming D, Burnham R, et al. Testosterone, cortisol and catecholamine responses to exercise stress and autonomic dysreflexia in elite quadriplegic athletes. *Paraplegia.* 1994;32:292–299.

44. Schmid A, Schmidt-Trucksäss A, Huonker M, et al. Catecholamines response of high performance wheelchair athletes at rest and during exercise with autonomic dysreflexia. *Int J Sports Med.* 2001;22:2–7.

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

# EXHIBIT 38

The Shkreli Foundation





 shkrelifoundation.org

FOUNDATION

September 11, 2015

Bettina Bennett
The New York Center for Children, Inc.

Dear Bettina,

I am pleased to inform you that the Board of Directors of The Shkreli Foundation (the "Foundation") has approved a grant to The New York Center for Children, Inc. ("NYCC") in an amount of $25,000 to be used by NYCC for the purpose of evaluating, treating, and preventing child abuse, including the provision of quality medical and mental health services free of charge to children who have been sexually, physically and/or emotionally abused.

This grant is made in connection with NYCC's Masquerade Soirée on September 21, 2015 (the "Event"). This grant will entitle the Foundation to be acknowledged as the sole lead sponsor and the "Platinum Benefactor" of the Event. As such, the Foundation will receive: (i) acknowledgement as the sole lead sponsor and the "Platinum Benefactor" in all promotional materials related to the Event, including all press releases, NYCC's website and social media, and NYCC's media wall graphics; and (ii) up to two (2) tickets for representatives of the Foundation to attend the Event.

Within five (5) business days of receiving a signed copy of this letter from NYCC, the Foundation will make the grant payment.

Please read carefully the enclosed Terms and Conditions. In order for us to process this grant award, you must sign and return this letter to:

    The Shkreli Foundation

The Shkreli Foundation   

shkrelifoundation.org

If you have any questions, please contact me: █████████████████████████
We look forward to supporting your work and wish you every success with the Event!


Best Regards,

*Leonora Izerne*

Leonora (Shkreli) Izerne
Executive Director


This letter and its Terms and Conditions are accepted and agreed To:

By: __Christine Crawther__ Title: __Administrative Director__
*Type or print name of person authorized to enter into contractual agreements*

Signature: __Ch C__ Date: __9|11|15__

 The Shkreli Foundation

 shkrelifoundation.org

## Terms and Conditions

By signing this letter, The New York Center for Children, Inc. ("Grantee") agrees to the following terms and conditions:

1. <u>Purposes</u>. The grant is to be used by Grantee solely for the following purpose: evaluating, treating, and preventing child abuse, including the provision of quality medical and mental health services free of charge to children who have been sexually, physically and/or emotionally abused. Any portion of the grant not used for this purpose shall be returned to The Shkreli Foundation. Please note that no portion of the grant described herein may be used for activities outside the United States. Grantee agrees to keep financial and other records adequate to show the use of the grant exclusively for the grant purposes.

2. <u>Prohibited Activities</u>. No portion of the grant described herein may be used to:
   - carry on propaganda, or otherwise attempt to influence legislation (as defined by section 4945 of the Internal Revenue Code of 1986, as amended (the "Code"));
   - influence the outcome of any specific public election, or carry on, directly or indirectly, any voter registration drive (as defined in section 4945 of the Code);
   - make an individual grant or regrant funds to another organization unless the requirements of section 4945 of the Code are met; or
   - advance any purpose other than one specified in section 170(c)(2)(B) of the Code.

In addition, Grantee may not assign, or otherwise transfer, its rights or delegate any of its obligations under this grant without prior written approval from The Shkreli Foundation.

3. <u>Charitable Status</u>. Grantee warrants that:
   - It is exempt from federal income taxes under section 501(a) of the Code by virtue of being an organization described in section 501(c)(3) of the Code.
   - It is neither a "private foundation" as defined in section 509(a) of the Code nor a "supporting organization" described in section 509 of the Code;
   - It has received a determination letter from the Internal Revenue Service to that effect, and that such letter has not been modified, limited or revoked;
   - It is in compliance with all terms, conditions and limitations, if any, contained in such letter; the facts and circumstances which formed the basis of such a letter continue to exist substantially as represented in the Internal Revenue Service.

Grantee will notify the Foundation if the IRS determination letter is modified, limited or revoked.




4. <u>Publicly Supported Status</u>. Grantee further warrants that the receipt of this grant will not result in the Grantee's loss of its classification as a publicly supported organization pursuant to Code sections 170(b)(1)(a)(vi) and 509(a)(1).

5. <u>Conditions for Payment</u>. Within five (5) business days of receiving a signed copy of this letter from NYCC, the Foundation will make the grant payment.

6. <u>Reasonable Access for Evaluation</u>. Grantee will permit The Shkreli Foundation and its representatives, at its request, to have reasonable access during regular business hours to Grantee's files, records, accounts, personnel and clients or other beneficiaries for the purpose of making such financial audits, verifications or program evaluations as the Foundation deems necessary or appropriate concerning this grant award.

7. <u>Publicity</u>. Grantee will allow The Shkreli Foundation to review and approve they text of any proposed publicity concerning this grant prior to its release. The Foundation may include information regarding this grant, including the amount and purpose of the grant, any photographs Grantee may have provided, Grantee's logo or trademark, or other information or materials about Grantee and its activities, in the Foundation's periodic public reports, newsletters, and news releases.

8. <u>Right to Modify or Revoke</u>. The Shkreli Foundation reserves the right to discontinue, modify or withhold any payments to be made under this grant award or to require a total or partial refund of any grant funds if, in The Foundation's sole discretion, such action is necessary: (1) because Grantee has not fully complied with the terms and conditions of this grant; (2) to protect the purpose and objectives of the grant or any other charitable activities of The Foundation; or (3) to comply with the requirements of any law or regulation applicable to Grantee, of the Foundation or this grant.

9. <u>Reporting Requirements</u>. Grantee agrees to provide the Foundation with a report detailing Grantee's use of the grant funding no later than December 31, 2015 in such form as is acceptable to the Foundation.

# EXHIBIT 39

To the Honorable Judge Matsumoto,


As a brief background, I am twenty-eight living in the Philadelphia area. I currently work for a chiropractor as a medical assistant. I previously worked for an information technology company at the time of meeting Martin. I have some college experience, and I am currently taking independent classes online for web design.

I met Martin in 2016. I had first met him in an online video chat group, where people from all over can meet one another. I enjoyed the possibility of safely meeting new and interesting people online with different backgrounds, in different places. The environment was fun, and I continued to frequent the site. After speaking online, for about a month, we made plans to meet in person. I first met him on Easter of 2016.

When we met in person, I jokingly offered Martin a cat that my Mom was fostering.  That was eventually adopted by one of my relatives. He expressed interest in that, so I took it upon myself to adopt a cat for him. That cat was Trashy. She was initially skittish due to either poor eyesight or deafness, the adoption center was unable to confirm, but Martin took the time and effort to gain her trust. They formed a strong bond, and he provided a good home for a disabled cat that had been in a shelter for two years and would otherwise be there.

Having been less fortunate himself, I believe he empathizes with those that are in a similar position. I feel that his intentions in life are to help others succeed like he has. I would like to ask for the most lenient sentence deemed fit, and I thank you for reading my letter.


Amber Emmertz



# EXHIBIT 40



THE
HUNTER COLLEGE
FOUNDATION, INC.

November 1, 2017

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Dear Judge Matsumoto:

My name is Barbara Gunn, and I am employed as the Executive Director of The Hunter College
Foundation. Although I have not met Martin Shkreli personally, I write today as the
representative of the Hunter College Foundation, to describe how his philanthropic support has
benefited the students of the Hunter College Campus Schools.

In 2012, Mr. Shkreli reached out to the Hunter College High School Alumni Association
(HCHSAA) and the Hunter College Foundation, stating that, as an alum, he wanted to give back
to the school where he experienced (per the Summer 2015 *AlumNotes* publication of the
HCHSAA) a "…vibrant and rigorous education that was simultaneously friendly and sociable."
Hunter College High School is a publically funded grade 7-12 school that is part of the Hunter
College Campus Schools (grades K-12), publicly funded, selective admission schools for
intellectually talented and gifted students.

Mr. Shkreli subsequently made a generous $1 Million donation to the school, the largest gift the
institution has ever received, saying, "Hunter helped me during some unique life challenges. I
know there are plenty of other students with similar challenges."

His donation was divided into two separate programs: a Spend-Down Fund for immediate use
under the direction of the HCHSAA, and an Endowment Fund, of which the interest income is
used to provide long-term support. The gift has been, and will continue to be, used to support
students at Hunter College High School. The gift has been used to create an Internship/College
Coordinator, who works to connect needy students with summer internships and also helps link
qualified 11th and 12th grade students to appropriate college-credit courses at Hunter College.
The funds have also been used to upgrade a language laboratory, to maintain a writing center
within the English department at the school, and to provide overnight college visits for students
of families of modest means and who otherwise might not be able to see first-hand what a

college looks and feels like outside the urban environment of New York City. Funds from the endowed portion of the gift will be used to help support a significant capital project that will directly benefit the lives of all students in the school building (grades K-12).

In our estimation, Mr. Shkreli's gift has had a positive impact on the school, which is attended by brilliant students who go on to top colleges, but, as a public institution, has a very limited budget. Private donations make a tremendous difference in the quality of the education our students receive.

Sincerely,

Barbara Gunn
Executive Director, The Hunter College Foundation

# EXHIBIT 41

**REPORT: Expenditures from Martin Shkreli Funds**

**As of December 2017**

**SPEND-DOWN ACCOUNT**

**<u>PERSONNEL</u>**
**Writing Center**
The Writing Center, entering its fifth year in 2017-2018, came about as the result of a 2012-2013 Task Force of faculty from several disciplines, led by English and Communications & Theatre Department Chair.  The Writing Center is staffed by two faculty members five days per week and one additional faculty member two days per week, and is fully part of the fabric of the High School learning community.  It has become an integral support service for students in all grades.

The Writing Center is now supported by the Martin Shkreli Funds.  The salary stipend for 2016-2017 was $19,040, for one faculty member; in 2017-2018 it is $16,567, split between two faculty members.  We allow for up to $2,000 in administrative/office costs.

**Internship/College Course/Study Abroad Coordinator**
Over the past five years, the number of senior year internships had decreased, largely because many past internships took place in the financial sector, and those internships are now closed off to high school students. In addition, the number of students taking Hunter College courses has dramatically increased, requiring additional coordination.  Finally, students who wish to study abroad have to find their own placements.  In 2016-2017, we hired a consultant for $500 to coordinate efforts with the HCHS Parent-Teacher Association and the HCHSAA, in order to find and promote additional options for rising Seniors.  Senior internships rose from five in the Fall of 2016 to sixteen in the Fall of 2017.  Thanks to the Martin Shkreli funds, we are expanding the External Affairs Office to handle this increase, as well as the increase in off-campus courses.  We also expect the expansion to allow for the exploration of study-abroad opportunities for students.  The salary stipend for 2017-2018 is $17,237, based on the salary of the participating faculty member.  We allow for up to $2,000 in administrative/office costs.

**<u>PROGRAM</u>**
**College Visit/Test Prep Support**
Funds are dedicated to increase access to both standardized test preparation for HCHS fee-waiver juniors and seniors, and college visitation for all HCHS students, especially fee-waiver students.  In June, Hunter took 45 Juniors (approximately 25% of the Class of 2018) on an extremely successful tour of Cornell University, Ithaca College, Binghamton University and Vassar College, our second such tour.  The total cost of the tour was $8,425.  In addition, we entered into an agreement with Kaplan to provide "almost free" test preparation classes for members of the Classes of 2018 and 2019 who are on the school's fee-waiver list.  To date, nineteen students have taken advantage of this service, for a cost of $7,325.

**ENDOWMENT ACCOUNT**

<u>**PERSONNEL**</u>
**Science and Computer Science**
The combined grants from the Hunter College Foundation fund a total of four "allowances" (that is, course reductions for full-time faculty members) to support science and computer science. One of those allowances is supported by the Martin Shkreli Funds. The salary stipend for 2016-2017 was $18,949 and for 2017-2018 is $21,546, based on the salary of the participating faculty member. We allow for up to $3,000 for equipment, materials and journals, and $2,000 in administrative/office costs.



**EXHIBIT 42**

# Ken McCarthy

U.S. District Judge Kiyo Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza
East Brooklyn, New York 11201

Dear Judge Matsumoto,

Like many people, my first introduction to the defendant Martin Shkreli was through the news media. He appeared to me to be a most unsympathetic, if not contemptible person.

Then a colleague sent me a video of a presentation he gave at Harvard which I watched in its entirety. I also sought out and watched a video of a presentation he gave at Princeton. Based on his remarks and how he conducted himself my opinion of him changed significantly.

This led me to view his videos on YouTube. Quite frankly, much of it is juvenile and inexplicable.

However, among his output I found a course he created and gave away on investing made up of 18 multi-hour sessions. It is, without question, one of the finest courses on this subject I have ever seen and I say that as someone who has worked for First Boston and Bakers Trust, has a personal library full of investment and finance books, and has guest lectured at the Graduate Business Schools of MIT, Columbia University and NYU. He also created and gave away a 15 part course on basic chemistry.

I have been corresponding with Mr. Shkreli since he was incarcerated and his sole interest, besides personal preservation, has been to acquire materials to assist him in teaching fellow inmates. He has requested dictionaries, basic math books, grammars, and self-help books which I have sent him.

Mr. Shkreli is an highly unusual and I imagine aggravating man, but I have rarely in my 35+ years as an educator encountered any individual in any setting with his depth of sincerity towards uplifting others through education.

In an article written by Tony Haile and published by Time Magazine on March 9, 2014, I was credited with having one of the fundamental insights that made the commercialization of the Internet possible. In my career, I have encountered and had to deal with many people with extraordinary intellectual gifts. The fact is not all such people develop evenly especially in the area of social interaction.

Mr. Shkreli has a great deal to offer the world. Based on my admittedly limited interaction with him, I take him at his word that he is committed to doing the kind of primary research in rare diseases that large pharmaceutical companies do not. It's entirely congruent with his demonstrated attitude towards uplifting others through education. I strongly feel that society would be better served by him returning to and focusing on this work as quickly as possible. I will certainly use any influence I have on him to assist him in avoiding the behaviors that take him away from this focus.

Thank you for taking the time to read my letter.

Sincerely,

Kenneth J. McCarthy

# EXHIBIT 43

Honorable Kiyo A. Matsumoto

United States District Judge

Eastern District of New York

United States Courthouse

225 Cadman Plaza East

Brooklyn, New York 11201

Re: <u>United States v. Martin Shkreli,</u> 15 Cr. 637 (KAM)

Dear Judge Matsumoto:

By way of introduction, I am the founding CEO of a marine research startup (American Marine Research Company) tasked with selective control of invasive species. I am writing to you to provide my experience in interacting with Martin Shkreli.

Martin and I met first at a lecture he gave at Princeton University in spring semester of my senior year at Princeton University. As an aspiring mathematician working on his senior thesis, these sorts of campus talks by celebrities would generally not draw me away from my work, but I attended as a function of the venue's proximity to the math department's Fine Hall and the spectacle that such a celebrity-villain could bring to an otherwise quiet suburban New Jersey campus. In the first minutes of his talk Martin presented a slide presenting a yes-no math question, which he said was a good illustration of how unintuitive reality can sometimes be. Like most American students, some cajoling was required to direct attention to a math problem, so Martin offered to the first student to answer the question with a rigorous proof payment for the remainder of their tuition at Princeton. I was fortunate to arrive at the solution in short order and submitted a short but rigorous answer to Martin. As Martin intended, the answer was unintuitive, and the most elegant proof required a return to fundamental definitions of numbers.

In the QA and discussion after the structured lecture, I approached Martin about redeeming my prize. He recognized me as the first student to submit and I admitted that as a senior, I had no tuition left to pay. I asked instead if he would be willing to finance my continued education outside of school via a scholarship to work the startup that has since grown into I am proud to be a part of now. He heard out my pitch, and agreed to have the conversation over the next few weeks. I was disappointed, however, to learn that he needed to ask a professor to validate the proof before he would award a prize.

Upon following up with him in the next week, what was initially a checkup on whether my proof was validated turned into a sequence of career-advising phone conversations where we discussed topics ranging from effective altruism to startup financing to K-12 STEM education to our immigrant parents. After he validated my original solution to my problem, he agreed to award me a generous (by my view, anyways) scholarship, and urged me to use it to explore the work that so captivated me about my startup. It was an unprecedented act of generosity on his part, towards a student who probably classified him as no more than an Internet troll who happened to be wealthy. In hindsight, it was some the best mentorship I had received in a while.

If I may highlight some bits from our conversations, I asked Martin once, probingly, how a supposedly intelligent and practical man like him could justify wasting time trolling the internet and making unnecessary enemies. He answered that he grew up with an internet that was not unlike Wild West, and where there was almost nothing *but* trolling. He further admitted that the internet of is childhood is gone, probably for the better, and he wish he had realized that earlier. When I asked him how as a health industry investor and avid reader of medical research why he didn't exercise better and take simple, effective measures to combat his sickliness, he replied that he could probably do better, but that when there was work to be done, it was hard to justify exercise and self-care that his blue-collar parents couldn't even think of prioritizing.

In our interactions, I've come find Martin to be an intelligent and kind individual. I understand that as the recipient of a prize, my opinion is likely to be discounted, and I suppose that may be valid. But I also want to add that I have tried to limit my connection to Martin; the journalist harassment and my general dislike of attention made it difficult to bring myself to write this letter. I write this letter because I believe if Martin's dealing with me, an humble recent college grad are any indication of his character an motivations, I believe he is a good man.

With that, trusting in the wisdom and justice of our legal system, I submit this plea for leniency for Martin.

Sincerely,

Yuan Wang

# EXHIBIT 44

12/12/17

**Honorable Kiyo A. Matsumoto/**
U.S. District Court, Eastern District of New York
225 Cadman Plaza East, Brooklyn, NY 11201

**RE: Mr. Martin Shkreli**

Dear Judge Matsumoto,

My name is Lisa Whisnant. I work in the financial service industry for a firm that provides investment and wealth management advice to commercial and retail clients in ███████████. I have known Mr. Shkreli for a little more than two years. I learned of Martin's existence the way most people did, via the vast amount of negative press he receives. I decided to delve deeper into his story because, much to the delight and intent of the media, he quickly amassed a large amount of public hatred that didn't seem to fully fit his deeds. All drug companies regularly raise their prices, and we are all entitled to invoke our Fifth Amendment Rights, so I couldn't understand why there was so much venom for one man? I felt strongly compelled to understand the full details of Martin's story. I was delighted when I found out that he regularly shared his life online, which made him accessible in ways that most people in his position aren't.  After watching him for a few days on his YouTube channel, I reached out to him through direct message. Much to my surprise, he wrote back in a considerate and cordial manner. We have met in person several times, and our friendship has continued to grow over the years.

I have spent many research hours following Martin's case and personal life. My perspective and basis for my opinions come from knowing the off-camera Martin, and many of his real-life friends. The following examples are but a fraction of the things I have learned about him. Martin puts his work before his personal life on a regular basis. He works many tireless hours of the day and night to build companies and develop treatments to help people who otherwise would have had no hope were it not for Martin and his team's tireless efforts.

It is likely that most people have not had to use a treatment that Martin has helped develop, or know anyone else who has since Martin specializes in rare diseases. But to those patients and to their families, his work is a godsend. An immeasurable blessing in which they are exceedingly grateful. There is no price too high to have more time with a loved one. Martin's desire to help those who are often overlooked by bigger pharmaceutical companies is a deep calling that drives him every day. Martin's work saves lives!  Even if he never develops another medicine his current work will still outlive us all, and positively impact lives far into the future. As soon as he's allowed to move forward with his life he can be free to continue the work he's meant to do.

Despite his, at times, pugnacious online persona, Martin at his core is a person who is dedicated to making the world a better place. Martin is a gracious host who is a surprising far cry from the brusque and controversial character he portrays online. He is thoughtful and genuinely interested in furthering his knowledge and understanding the world at large. Believe it

or not, he is a caring individual who enjoys sharing information with anyone who is willing to respectfully listen and expects nothing in return other than for people to leave his presence with more understanding and enlightenment, even if they disagree with him.

Martin has a rare talent and is passionate about teaching. He can effectively convey information about subjects that are considered by some, hard to learn and uninteresting. Being new to the financial industry myself, I have found some areas to be quite daunting to understand. Martin holds weekly sessions where he explains how the industry works, as well as shares his opinions about some of his personal holdings. The classes are both educational and entertaining. Aside from the classes, Martin has personally patiently explained things to me when I have a question about finance. He could talk down to me, or simply ignore me, but he doesn't. This has helped me do my job more effectively with more understanding.

Martin is a caring pet-parent. He adopted an abused cat who he affectionately named Trashy. She was afraid of everything. The world watched as he spent months patiently winning her trust and love. Martin became her whole world, she still hides from everyone else. Many people say that Martin is incapable of empathy but if anyone struggles to see what he does for humanity at large, it is undeniable that he shows his capacity for genuine tenderness and love towards her.

Martin has an undeniably eccentric sense of humor. He behaves in ways that others may not understand and could construe negatively. It can be difficult to see who Martin really is or see the good that he does because of the rhetoric surrounding him and sometimes even his own actions. Even though he can get carried away with his social media posts Martin has no intention of harming anyone. I kindly ask when you deliberate Martin's sentence that you will consider the complex person he is, and genuinely believe that he is not a threat to society in any way. It really is quite the opposite as I hope you can see.

There is no doubt that Martin has learned from this and will move forward in his life with greater wisdom and a clearer perspective that this experience has surely given him. He has been blessed with an uncommon ability, not only to change his own reality in ways that most can only dream of, but also to bring a positive change and healing in other's lives as well. It is an honor for me to know this man and to write this letter in hopes that it will in some way help to shed some light on who he truly is.

Sincerely,

Lisa Whisnant

# EXHIBIT 45

November 14, 2017

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201


Re: United States v. Martin Shkreli, 15 Cr. 637 (KAM)

Dear Judge Matsumoto,

Martin Shkreli has had a positive impact on my life and I hope this letter can give you a better sense of who he is as an investor, a mentor and educator. I apologize for the length of my testimony and I thank you in advance for taking the time to read it.

Of all of Martin's online content, my favorite is his most recent series, "This Week in Investing." In each video (there are 21 episodes), Martin goes over relevant news in pharmaceuticals and tech, weighs in on which stocks the believes are undervalued, over valued and fairly valued, and updates us on his investment portfolio positions and performance. For his viewers' convenience, he also uploads the recordings to his YouTube channel so people can watch them later in their own time. In case you are curious, you may access his videos at this link: https://www.youtube.com/channel/UC8gjB1PSXv_oAUSAQ16S0fA/playlists

To provide you with some background information, I am not the best learner. I am 23 years old and finished with school now, but when I was a student at Boston College, I often fell asleep during my lectures and struggled to absorb and retain information.  The only class I really enjoyed and exceled at was Introduction to Philosophy. I believe the reason why I liked the class so much was because of how it was taught. My professor had a way of explaining ancient and sophisticated concepts in a manner that anyone could understand. In addition to making the course material relevant to our modern lives, he also tailored the class to fit our preferences and suggestions. His style of teaching reminds me precisely of Martin's. Although Martin is an entrepreneur and not an academic, he strikes me as a natural educator because he puts his students' needs first. I think many of my past college professors could learn a thing or two from Martin Shkreli about how to engage (and entertain) their students.

What I love about "This Week in Investing" is how interactive it is. Martin streams the episodes live and responds to his audience's comments on the spot. He also encourages us to e-mail him any questions or suggestions, which he then addresses at the end of his videos. In doing this, he allows his viewers go from

passive watchers to active participants. One thing that made me laugh is that contrary to the adage "there's no such thing as a stupid question," Martin separated inquiries into "dunce" questions and "real" questions. I'll admit: he put almost all my questions in the dunce category, but he always answered them adequately. Make no mistake: Martin probably would not be a good elementary teacher and he is no Mother Theresa, but his colorful personality makes learning about finance more fun than I ever could have imagined.

Another aspect of Martin's investing videos that appeals to me is he is never afraid to admit his limitations and shortcomings. When people ask him questions about macroeconomics or industries he is not familiar with, he simply says he does not know and encourages us to search for answers in reputable academic journals. Inevitably, Martin is wrong about certain stocks, and I find it very refreshing that he confronts his mistakes head-on rather than avoid talking about them. Indeed a few months ago, when I was considering quitting my job to invest full-time, I messaged Martin asking how much money he thinks could make investing $100,000 of capital (that's how much money my dad generously put in my brokerage account). Much to my disappointment, he replied with just "$10,000—10% a year is very good." His realistic expectations are quite a departure from the false promises of trading coaches who promise 100% annual returns or more. But then again, Martin is not trying to sell us anything. His content is free.

In addition to reminding me of my favorite professor in college, Martin also reminds me of my dad, who leveraged our house to gamble on Internet stocks during the Dot.com bubble. Although he lost our entire life savings, he paid us back and then some by working day and night to start his own successful diagnostics company called Biohelix Corporation. I am infinitely grateful for my dad's risk-taking and hard work, and I'm sure Martin's investors feel the same way, even if they won't admit it publicly. Investing is incredibly challenging and many people lose money, my dad and myself included. Just like my dad has learned from the Dot.com bubble and I have learned from my investing mistakes, I know Martin has learned from his hedge fund's implosion. He always emphasizes risk management, hedging and position sizing as a means of protecting one's capital over being right, since he says being wrong about a stock is inevitable.

Since I live in Midtown, Manhattan, I have also had the privilege of meeting Martin on several occasions. I remember one time he said I was so bad at chess, I should team up with his chess teacher (a Grandmaster) as a handicap to even out the game. I find Martin's brutal honesty hilarious and particularly helpful when it comes to my investments. When I first told Martin about my investing strategy, which involves buying beaten-up microcaps with high book values in hopes of a rebound, he nearly choked on his salad and said I would lose all my capital if I continued to gamble in this high-risk way. He was right. In particular, I lost $18,000 on an investment in DRYS and $1,000 on a stock called GALE. Martin took it upon himself to show me that both stocks were heading to zero. I did not want to face my losses (and I doubted whether or not he was correct at all), so I did not sell when he

told me to. If I had, I would have saved myself thousands of dollars. Regardless of his prescience about these companies, Martin encourages me to be more inquisitive and less complacent in my approach to investing. Being an introvert, Martin is one of the few people I wish I could spend more time with, since our encounters have always been highly rewarding for me.

Let me conclude by saying Martin wants nothing more than to provide value to others. This is crystal clear to anyone who has watched and benefited from his educational videos on YouTube. Shouldn't prison be reserved for those who intentionally cause harm? Putting an educator and entrepreneur like Martin behind bars would be a huge disservice to countless students and aspiring investors like myself who have learned a tremendous amount from his delightfully nuanced news analysis and in-depth lessons. I am usually good with deadlines, but I put off writing this letter for weeks because I have so many positive things to say about Martin and I am anxious whatever I get down on paper won't do justice to how I feel. Martin is one of the most hardworking, helpful and inspiring people I have ever met, and I hope that you take these qualities into consideration when you decide his fate. Thank you again for your time and attention.

Sincerely,

Jennifer Kong

# EXHIBIT 46

10/29/2017

Kristan D. Ramirez

███████

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

United States v. Martin Shkreli

Your Honor,

This letter is being written to provide you with a personal depiction of Martin Shkreli, and to plead for leniency in your conclusion of my friend's fate.

I've spent countless hours in the company of Martin and can assure you he is not the villain he occasionally portrays. In reality, Martin Shkreli is kind, humble, and courteous not only to his friends and supporters, but to complete strangers as well.

Martin has made such a positive impact in my life and on my academic career that I find it hard to fathom his possible fate, mostly because I know he still has so much to offer society, whether it be scientifically, educationally, or as a friend. For years he has served as an anchor by helping me escape the separation that so many hardworking individuals endure, as dedication can be such a secluding experience. Martin's comic relief and encouragement in times of doubt often helped soften the blow of my felt isolation during my years of study, and I cannot thank him enough for that. He has brought so many people together over common interests (mostly educational) and I beg you let him continue to provide this unification.

Apart from his teaching on chemistry, pharmacology, and philosophy, I've learned about the person he truly is; dedicated. He is dedicated to helping others-even during the most stressful time of his life-by frequently spending countless hours performing research on behalf of those with life-threatening illnesses and altruistically teaching others, including myself, the subjects of his expertise. Martin has supplied me with a vast amount of inspiration, knowledge and gratitude by sharing not only academic materials, but just as importantly, sharing his experiences and hardships. Over the years, I've observed an abundant number of encounters where he has given career, educational and life advice. Because of him and his inclination to ignite distinction in others, many have gone fourth to strive for something greater, myself deciding to apply to PA school. I have him to thank for my educational focus and newly found ambition. What he provides myself and others is invaluable and truly a gain to the community.

I hope this letter is enough to arouse your contemplation on the unobserved ways he extends his hand, prompting you to perceive the genuine aspects of Martin Shkreli.

Though he may be flawed, I believe his contributions outweigh his failings abundantly in comparison, and it is my candid opinion that society is truly better off when Martin is a free and participating member of it. It's my hope you conclude that he has endured sufficient punishment through the cumulative hardships this legal process has generated, and allow my study partner to return home.

I appreciate your time and rumination.

Respectfully,

Kristan D. Ramirez, LBSW

# EXHIBIT 47

Lamark Mulligan



November 17, 2017

Dear Judge Matsumoto,
    My name is Lamark Mulligan, I am currently one of Mr. Martin Shkreli's students here at MDC Brooklyn. I am writing this letter as a character witness on Mr. Shkreli's behalf. I have been incarcerated here at MDC Brooklyn since September 7th, 2017 and I can undoubtedly say that Martin has been the most positive and influential part of my experience here thus far. He teaches an abundance of classes including business, mathematics and finance to which all I attend daily. Prior to my arrest I attended The Pennsylvania State University studying Computer Science and Sociology, and it amazes me how I learn just as much, if not more sitting in at one of Martin's classes. He's always so excited to teach the class and is always very informal and patient. His teaching style is certainly admired by me as well as the rest of the class I believe. Although significant,

Martin's classes wasn't his most intrusive teaching apparatus to me, it was what I learned from him on a personal level. We'd talk about some mistakes he has made in the past and what intrest me about those conversations were that he would always give off the impression that he realized he was wrong and wished that he'd never made the mistake at all, instead of wishing he'd never been caught, which is what I typically hear engaging in conversations as such. He taught me that I should learn from my mistakes and use those experiences to better myself or to not repeat history. He also taught me how to Channel my energy and time to things that would ensure prosperity and that there are too many opportunities in the world for me to take advantage of, rather than following people down detrimental paths to end up back here in jail. To conclude, Martin is a very inspiring and influential person. He has made something as horrific as being incarcerated a positive and impactful learning experience for me and I believe that says so much about the kind of person he is. I ask that you look past his mistakes and see

how he could positively contribute to the community as he demonstrated here for me. There is more to Martin than what meets the eye and I hope my letter helps paint a picture as to the type of person he really is. Thank you.

Sincerely, Lamark Mulligan

# EXHIBIT 48

11/27/17

To whom it may concern,

My name is Patrick Sutherland I am currently in the same unit as Martin Shkreli. Over these last few months of knowing Martin and living with him he has always extended a helping hand to me if it was teaching me the game of chess or find me a good book to read he always put effort into helping the people around him. The greatest blessing is when Martin found out that my twins who were born months early was still in the NICU he had diapers, wipes and various sundries sent to my girlfriend. That was the most caring gesture anyone has done for my family in these stressful times and shows the true character of Martin Shkreli.

# EXHIBIT 49

MARTIN SHKRELI  Inmate # 87850-053
MDC BROOKLYN
METROPOLITAN DETENTION CENTER
P.O. BOX 329002
BROOKLYN, NY  11232

February 26, 2018 .

Your Honor,

I hope my trial gave the Court sufficient insight into the case, and also to me as a person. I hope Your Honor will treat me as an individual. I acknowledge and respect the Jury's verdict, but the verdict is not who I am.

Despite the Jury's verdict, I maintain that I never intended to actually harm anyone. I am not trying to be defiant or obstinate. I accept the fact that I made serious mistakes, but I still believe that I am a good person with much potential.

I have watched this process unfold, from indictment to verdict and although Mr. Brafman and his colleagues are peerless defenders, they cannot fully reproduce my own perspective, only I can try. I understand it, I am very far from blameless. I caused this entire mess to happen. I lost the trust of my investors who now have questioned my motives and integrity. This is a painful realization that I will never forget. I had pride in the final results of MSMB, but after hearing the investor testimony, the concept of "all's well that ends well" is clearly a poor attempt to excuse my many preventable mistakes.

Investors deserve truth. Investors deserve transparency. Any loss of trust in the sacred relationship between investor and manager is the manager's fault and could have been avoided. At times, I dodged answering questions at other times I provided answers that were only correct if put in a certain assumed context. These choices are now seen as attempts by me to deceive and manipulate, and it is my fault.

The truth is somewhere in between. I wanted to be more than I was. I exaggerated if I felt I had any basis to make the claim. I am now, however, a more self confident and secure person. The demons that haunted me – the root cause of my insecurity in my life – no longer all

exist. I have learned a very painful lesson. Never again will I prevaricate or omit or mislead-intentionally or not. There are ways to communicate which eliminate the possibility of doubt and alternative interpretations of fact. I take responsibility for the fact that I used to behave and communicate in this way. It was wrong. I was a fool. I should have known better. Watching my trial was a very scary experience. For the first time in my life I saw me from other people's perspective and realized that most people don't share my perspective.

It breaks my heart that good and honest people were dragged into this mess because of me. Some of my investors who took a chance on me; my colleagues, many of whom now regret having partnered with me; my family and friends, whose worry is more painful to me than anything else; patients and charitable organizations, whose lives and activities have been upended in some cases; and the huge loss of economic resources and productivity that this case represents. It wouldn't have happened if I was more careful, more honest, more reasonable and far wiser.

Today I am the majority owner of businesses worth many millions of dollars, but more importantly, I employ over a hundred people globally, in high-paying jobs who have critical roles and responsibilities. They are counting on me, and I let them down. I have learned a harsh lesson. The trial and six months in a maximum security prison has been a frightening wake-up call. I now understand how I need to change.

I feel I should try to explain my personality. ████████████████████████ ████████████████████████████ I personally need to try to explain. I am an irreverant and free-wheeling individual, who has never been shy about speaking my mind. I am an individual who prizes equal rights, scholastic achievement and individuality. Please understand that when I get into a public war of words with someone, my comments do not always reflect my true nature. Sadly, when I get dragged into mud fight, I often dive in, head first. I pray Your Honor doesn't hold this behavior against me or mistake it for my regular approach to life. At times, I have been characterized totally incorrectly at trial by some who are

biased, as litigation opponents for example do not make fair critics. I regret where my temper can take me when I get angry or feel betrayed. I have worked on this bad habit for some months now and will try to find equanimity in the future.

Prison has been both the most frightening experience in my life but also an opportunity for me to see a side of the world seldom seen or discussed. I have tried my best to make a positive impact on many of the people I encounter here. If I have something to teach my fellow inmates, I implored them to listen and learn. I have comforted the forlorn and forgotten men facing long sentences, many are severely depressed, and sadly, suicidal. I try my best to set a good example for these individuals too, knowing my fame and achievements were something they might know of, and I try my best to explain that in order to have a chance to succeed, they had to make a serious commitment to lifelong education and move far away from poisonous surroundings and attitudes that lead to a temptation to cut corners and commit crimes.

My own advice has not gone unheeded by me. I have also been lucky in my life to be surrounded by some wonderful people who have been better to me than I deserve. I owe them a life built on honesty, integrity and achievement that advances humanity. I assure you that any mercy shown at sentencing will be met with a strict adherence to this oath and I hope to make Your Honor proud of me in the years ahead. I promise to be more careful, open and honest in my business dealings so that I never again have to hear people who once had faith in me and trusted me testify or complain that I misled them or let them down terribly. Just as important, however, is my pledge to Your Honor that if you find it appropriate to impose a sentence that does not include an extended period of incarceration, I will do my absolute best to use my skills and whatever talents I have been blessed with for the betterment of humanity. I honestly believe that I can contribute and really make a difference if Your Honor gives me a chance.

Respectfully,

# EXHIBIT 50

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Docket No. 1:15-CR-00637-001 KAM |
| ) | |
| v. ) | **AFFIDAVIT OF** |
| ) | **JOEL A. SICKLER** |
| MARTIN SHKRELI, ) | |
| ) | |
| Defendant. ) | |

I, Joel A. Sickler, hereby declare under penalty of perjury that the following is true and

correct:

## INTRODUCTION

1.      I have been retained by the defendant, Martin Shkreli to advise him and his

counsel on matters pertaining to confinement in the federal Bureau of Prisons (BOP).

2.      I have worked in the field of sentencing and corrections for more than 35 years

and currently head the Justice Advocacy Group, LLC, a consortium of criminal justice

professionals based in Alexandria, Virginia. I have worked consistently since 1980 on federal

sentencing and federal prison-related matters and have experience as a correctional counselor in

the District of Columbia's Department of Corrections and with prior tenure as Director of Client

Services at the National Center on Institutions & Alternatives in Washington, DC.

3.      I have visited 51 federal prisons and have advised clients with inmate matters in

86 of the BOP's 122 institutions. Before the abolishment of parole, I represented hundreds of

1

federal inmates before the U.S. Parole Commission. Based on more than three decades of experience assisting clients who have been committed to the care and custody of the BOP, I have extensive knowledge of the BOP and its stated mission, services, policies, program statements, regulations, institutions, and standard practices.

4.     Mr. Martin Shkreli and his defense counsel have asked me more specifically to provide information and my professional opinion regarding the BOP's policies, facility assignments (facility placements are called "designations") and the circumstances of institutionalization as they relate to this defendant should he be ordered to serve a custodial sentence of any length.

5.     I have reviewed and am thoroughly familiar with the following Program Statement of the Federal Bureau of Prisons: *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 12, 2006); and the information available on the website for the Federal Bureau of Prisons (www.bop.gov). I have spoken on numerous occasions with personnel at the Bureau's Designation and Sentence Computation Center ("DSCC")[1] and regional and central officials in the correctional programs administration when seeking clarification about a specific policy or program statement. Finally, here, I have additionally conferred with defense counsel and Mr. Shkreli and reviewed case materials regarding the defendant's case before Judge Matsumoto in the Eastern District of New York (Docket No. 1:15-CR-00637-001 KAM).

---

[1] The DSCC is an office within the BOP's Office Complex located in Grand Prairie, Texas. All facility designations or assignments and inter-facility transfers are processed and made by the DSCC.

6.     On March 9, 2018, Mr. Shkreli will come before the Court to be sentenced for his role in two counts of *Securities Fraud, 15 U.S.C. §78j(b), 15 U.S.C. §78ff* and one count of *Conspiracy to Commit Securities Fraud, 18 U.S.C. §371.*

7.     Ordinarily, an inmate with Mr. Shkreli's underlying non-violent conviction, no history of violence, no prior criminal record, and no outstanding detainers would be designated by the BOP to a minimum-security camp.[2]

8.     Although Mr. Shkreli will have a total of only eight (8) security designation points, the BOP designators also utilize Management Variables (MGTV) and Public Safety Factors (PSF) to account for security considerations not included in the security designation points. For instance, there are PSFs of "deportable alien" and "sex offender" which both require at least a secure facility-security (i.e., non-camp) classification. In Mr. Shkreli's case, it is my opinion that the mention of a "threat" against former First Lady and Secretary of State, Hillary Clinton in the Presentence Investigation Report (PSR) will cause the DSCC staff to apply a PSF of "Threat To Government Officials" to the defendant's security classification scoring resulting in a final classification above the "minimum" (or camp) range.[3][4] It is highly probable that Mr.

---

[2] Mr. Shkreli's BOP security level scoring utilizing the BP-A337.051 (Inmate Load and Security Designation Form) is estimated to be as follows: he will not likely be allowed to surrender voluntarily (0 pts.); his offense (property offense > $250,000) severity should be rated "Moderate" (3 pts.); he has no prior criminal history (0 pts.); no history of prior violence; no history of escape (0 pts.); no outstanding detainers (0 pts.); he is 34-years old (4 pts.); he graduated high school (0 pts.); and he has a history of substance abuse within the last five years (1 pt.). Therefore, his total security designation points are *eight* (8) yielding a security level of "**Minimum**." Per BOP P.S. 5100.08 (9/12/2006) at Table 5-2, Security Point Totals of 0-11 equate to an Inmate Security Level of Minimum.

[3] *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 12, 2006), page 9 (CODE G).

[4] *Presentence Investigation Report* prepared by Senior Probation Officer Michelle Murphy in the Eastern District of New York on December 12, 2017, page 5, ¶5. There were two other individuals the defendant was accused of threatening as well. The court found Mr. Shkreli posed a danger to these individuals and perhaps even the community at large.

Shkreli will be designated as a low-security inmate and will be assigned to a secure institution. Low-security prisons have security protocols and living conditions far different than what exists at a minimum-security camp.

9.     There are four main differences between a minimum-security camp versus a low-security setting.

10.     The **first difference is the perimeter security and other forms of heightened security**. Camps are fenceless compounds and have the feel of an austere college campus. This is not the case at a Federal Correctional Institution (FCI). An FCI is a secure, fortress-type prison surrounded by perimeter barriers (high fence entangled with razor ribbon), gun towers, detection devices, and mobile patrols. In effect, at an FCI you are mindful of being in prison. While this is so at the various camps as well (no one really forgets they are in prison), the atmosphere at an FCI feels somewhat more oppressive and the environment is certainly more crowded. In effect, you are living in a real "prison." The FCIs in particular have very clear and unbending rules that create a certain level of stress. For example, there are no "sick days" in prison, and even if an inmate didn't sleep well the night before, he has to clear the unit (leave) by a given time. Movement throughout the facility is controlled, with access from one location to the other allowed only for 10 minutes at the top of each hour. Camps do not have "controlled movements."

11.     **The second difference is the institution mindset and overcrowding:** the FCIs are five to ten times larger than the camps. As a general rule, the bigger the institution, the more impersonal it is. The large FCIs are cramped work mills with generally more stress due to overcrowding. Most BOP facilities house more inmates than they are designed for; however, the camps are less crowded than the low-security FCIs (and other higher security facilities). For instance, the closest low-security FCI to New York City is located on the Fort Dix Army base in

4

New Jersey and currently houses 4,072 inmates.[5] The next closest are FCI Allenwood – Low (current population of 1,260 is 27 percent above the rated capacity of 992) and FCI Danbury (current population of 814 is 46.9 percent above the rated capacity of 554).[6] In contrast, these four camps located in the Northeast Region close to New York City (Otisville, NY; Fairton, NJ; Canaan, PA; and Lewisburg, PA) currently house anywhere from 100 to 490 inmates – two of them are operating under capacity while the other two are 9.6 and 19.0 percent over capacity.

12.  Overcrowding results in rooms/cubicles which are doubled or tripled, and in some facilities, inmates are placed on mattresses on the floor temporarily. Sleep disturbances (cots, snoring, head counts, light, and movement): Noise is incessant in a secure correctional facility, and in some (those that have cubicles, for example), there is little to absorb or otherwise block night time noise. Inmates may be awakened repeatedly for head counts.

13.  Other problems exist in the more crowded FCIs, for instance, there are longer lines to use the telephone, wait to see a member of your unit team, wait in line for medications and checkups or to use the library. During mealtime, the bustling, noisy cafeteria serves, of course, "institution" food, pre-packaged, pre-made, sometimes days before it is served. Naturally there are also long lines to use toilets, sinks and showers.

14.  **The third difference is the type of inmate**. The camps house generally younger offenders principally caught up in the War on Drugs that are serving short sentences (less than 10 years) and have often cooperated with the government. The inmates generally are first-time offenders who have committed nonviolent crimes. They tend to generally behave well out of fear they will end up in a higher security institution (infractions can penalize an inmate with a transfer

---

[5] All population figures are current as of January 25, 2018 and are available at https://www.bop.gov/about/statistics/population_statistics.jsp#pop_report_cont.

[6] All capacity figures are current as of February 2016.

to a low-security facility). Otherwise, camps house "white-collar" property offenders convicted of fraud offenses such as those Mr. Shkreli was convicted of. Inmates at the Low FCIs (which also house poor minority drug offenders; but those of the more serious kind), are serving sentences greater than 10 years, likely have a prior record involving a gun or violent offenses, may be gang-affiliated, or are otherwise poor security or flight risks. FCIs also house all deportable aliens, members of organized crime, drug cartel leaders and all sexual offenders. Statistically, there is a 135% greater chance of being assaulted at an FCI as opposed to a camp.[7] Furthermore, the rate of "serious assault" is 431% higher in low-security institutions than minimum-security camps.[8][9]

15.     Lastly, and in my mind, the **most important difference regards visitation**. At a camp your family can drive up to the compound, park in a lot next to the visiting room, walk in unescorted, show ID and presto, your incarcerated loved-one appears. At an FCI, your visitors must pass through metal detectors, be subjected to a random pat down searches (with vehicles on the property also subject to inspection), be escorted through several check points and wait interminably for their friend or family member to brought to the visiting room, a crowded indoor environment. The average camp has an outdoor picnic area for visitation during warm months.

16.     Mr. Shkreli has never been involved with law enforcement in the past. His offense conduct in the instant offense is absolutely non-violent. Mr. Shkreli is a bright young man who

---

[7] See data files on assaults in BOP prisons from 2005 - 2009 available at https://www.bop.gov/about/statistics/statistics_prison_safety.jsp. This percentage is based on the average rate (per 5,000 inmates) of assault (serious and less serious) over this five year period. This is the most recent period of data files available on the BOP Website.

[8] Ibid.

[9] Serious assault is defined in the *Inmate Discipline Program* (P.S. 5270.09, August 1, 2011), page 44, Table 1 (CODE 101 - Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished)).

6

has used his earnings to set up a non-profit foundation to help children around the world. There is no past history which would suggest that Mr. Shkreli is a violent individual who requires a heightened level of BOP security classification.

17.  Mr. Shkreli has detailed to the Probation Office the abuse he was subject to at the hands of his parents while growing up (the abuse continued until he was age 13 or 14). He witnessed his mother battered regularly by his father. Though the physical abuse against him had stopped, the mental abuse continued eventually resulting in panic attacks. His mental health was further impacted by the events of September 11, 2001 as following that date his panic attacks worsened (increasing from the already rate of three times daily). Mr. Shkreli has been prescribed Effexor XR which he must take daily to reduce the occurrence of panic attacks or face severe withdrawal symptoms.

18.  The application of the PSF of "Threat To Government Officials" can be waived and we believe that it would be appropriate in this case. Judicial recommendations must be considered by the BOP's DSCC, and we would respectfully implore the Court to consider making such a recommendation in Mr. Shkreli's case.

### CONCLUSION

In summary, Mr. Shkreli is a relatively young man (34-years-old) who has been found guilty of several counts of Securities Fraud. He stands ready to accept the sentence imposed by the Court. Due to postings by the defendant on *Facebook* and *Twitter*, and his subsequent remand to custody, Mr. Shkreli may be viewed by the BOP as a security risk and incarcerated in a large, overcrowded institution at a heightened security level than the non-violent nature of this property offense suggests. He would be housed among offenders who have committed much more serious and sometimes even violent crimes. Given his lack of criminal background and his

fragile mental state, a low-security setting would not be conducive to his institutional adjustment. This non-violent young man would be best suited for placement in the benign setting of a minimum-security camp.

_____     2-27-18
JOEL A. SICKLER          DATE

Affirmed to before me on
this 27th day of February 2018.

_____
NOTARY PUBLIC

ALFREDA C COLEMAN
NOTARY PUBLIC
REG # 7561866
MY COMMISSION
EXPIRES
8/31/2021
COMMONWEALTH OF VIRGINIA

# EXHIBIT 51

October 30th, 2017

Dear Honorable Judge Kiyo Matsumoto,

Two years ago I was working for J.P. Morgan Chase, looking to learn more about investing. Not only was I searching for investment ideas, but I was looking for educational content about the markets and how they worked.

I came across Martin's videos about finance and chemistry on YouTube. In his spare time he creates free content for people, sharing his vast knowledge of finance and pharmaceuticals with the world. The content extremely well done and very informative.

I spent the next few weeks binge-watching all of his past episodes. During his live episodes he would occasionally answer questions from the viewers. That particular week he answered one of mine and we quickly became friends.

Our conversations eventually turned into a job opportunity at his new technology startup, Godel. I was the first real employee and have been working with him for over one year. Godel a technology company that's main focus is finance products.

If I have learned anything about Martin Shkreli in the past year, it is that he is truly a great person. He is kind, selfless, motivated and driven to make greatness happen in the world. At Godel he has offered healthcare for all of our employees, spent one on one time with each of us to see how we're enjoying the company and provided us with any computers or services that we need to see his vision through.

Martin doesn't have the greatest media presence. His creative mind and no-filter approach to life has created problems for him, but this doesn't define him. In my opinion, Martin is of zero threat to the outside world. He is a huge asset that the world is missing out on.

Thank you for reading this letter, and I humbly ask you to take this letter into consideration.

Regards,

Jackson Sadowski

# EXHIBIT 52

Dear Judge Matsumoto,

My name is Julie McConville and I have known Martin since February of 2016. Since then, and especially as we became closer over this past summer, I have been proud to call myself his friend. I am no expert in law, or finance, or pharmaceuticals. However, one thing I can express confidently is my absolute conviction of Martin's strong moral character. I hope my perspective will contribute to a more complete understanding of Martin as an individual that will be of use to you in deciding a just sentence.

A hasty Google search or passing glance at newspaper headlines tends to present a one-dimensional caricature of Martin that needs little introduction. Far too often, these distorted portrayals describe him as brash, egotistical, and virtually unfeeling. For those who know Martin Shkreli beyond this sensationalized exterior, nothing could be further from the truth. Yes, he has reveled in his commonly vilified public persona to no one's detriment but his own-- an unfortunate habit he has kicked and will not let define him. But that is all it is: an act.

The Martin I know is a thoughtful and gracious friend, one who deeply cares about the well-being and intentions of others. In short, he is the kind of person I consider myself privileged to know. Whether it be my role as both a beneficiary and witness of the insightful personal advice Martin is in no way obliged to give myself and others, or his quiet, consistent support for mutual friends facing daunting medical and financial burdens, I have not once questioned my faith in Martin's sincere and earnest nature.

Of course, the widespread public misunderstanding of Martin is certainly no excuse for any of the ill-thought-out social media posts or other detrimental past behaviors which have caused so much unnecessary strife. My intention in this letter is not to trivialize any of those actions. He has expressed deep regret for his lapses in judgement, but far more importantly, I am assured his conduct will not be an issue in the future.

Martin is a man of seemingly endless ambition whose dedication to his work is rivaled only by his loyalty to family and friends. It is true, as the media often claims, that he aims to establish a reputation for himself and his accomplishments that will not easily be forgotten. Yet it is not among the ranks of Wall Street crooks where he belongs-- he strives to join those of Alan Turing and Percy Julian. Knowing Martin, I have no doubt he will.

Thank you for considering this letter,

Julie McConville

# EXHIBIT 53

Dear Judge Kiyo A. Matsumoto,

The intention in writing this letter is to express support for Martin Shkreli. Mr. Shkreli and I have been friends for about 3 years. His kind, caring nature has been a paramount blessing in my life. Being a single mom with limited resources, Martin regularly keeps in contact to make sure my family is okay. I am continually inspired seeing him maintain a focus on medical research and keep an upbeat, stable outlook even during incarceration.

With much politically-motivated hearsay related to his case, to get to the true reality one suggestion is to talk to Martin about rare diseases to get a glimpse of his vast wealth of knowledge and the importance that his research does in this field. There are a multitude of illnesses for which Martin has a hand in developing new treatments. Although the news might have portrayed the opposite view: someone who only cares about money, there is evidence to the contrary showing Martin to have a deep passion for healing, through study done while employing and working alongside other innovative researchers and scientists. It is a matter of life and death to folks with these diseases (many are babies born with genetic disorders that kill within the first year of life) to see Martin Shkreli free to continue his work in this historically neglected medical field.

Kind regards,

Lauren Payne
somseedv@aol.com

# EXHIBIT 54

December 08, 2017

Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Martin Shkreli, 15 Cr. 637 (KAM)

Dear Judge Matsumoto,

The first time that I learned of Martin Shkreli was in the summer of 2013; I had been reading the *Forbes 30 Under 30 in Finance* list and stumbled upon a young biotech entrepreneur who happened to have worked at the same investment firm where I was interning at the time. Martin's background fascinated me; much like me, he had come from humble means and ended up in the world of finance. Growing up, my dream was to be the first in my family to obtain a college degree, and hearing Martin's story was inspiring. I grew up in a small town in western Colorado, attended college at Oberlin on a classical trombone scholarship, and through an alumni connection found myself interning at the same investment firm where Martin had worked years before. Later on, I reached out to Martin over LinkedIn and have since been in touch with him regularly.

In getting to know Martin, I've witnessed firsthand his constant drive to learn and create. I've spent quite a bit of time getting to know his latest startup, a software company called Gödel Systems, and Martin has frequently requested input given that I now work as an analyst specializing in the software industry. The amount of passion that he's ignited from his employees is remarkable, and I believe that he truly cares about all of them and is trying to build another successful company that will support their livelihoods while providing a freemium software product that makes the world of investing more accessible to the broader population. I've seen firsthand the amount of work that he's put into both building the product itself and mentoring his employees, and I sometimes wonder where he gets the energy to do it. Beyond his entrepreneurial pursuits, Martin's passion for democratizing the world of investing is also evidenced in his online content, including a regular video series called "This Week in Investing" where he dives into a variety of topics related to the investment world and fields questions from those who tune in. He's also created educational videos related to science, which I am admittedly less familiar with, and has also attempted to spread his knowledge by giving lectures at a number of universities. While I can't speak to Martin's pursuits within the pharmaceutical world, the way that he talks about the patients with rare diseases that benefit from his drugs suggests that he cares very deeply about their livelihoods.

Finally, Martin has touched my life personally, and has been incredibly valuable in terms of teaching me about the investment industry. More than that, I've come to know Martin as a friend. Your Honor, it is with this in mind that I am writing this letter today, and am pleading for leniency in his sentencing. I believe that despite his many personality quirks and (at times) odd sense of humor, Martin is a good, caring, and hard-working person who truly cares about his employees, the patients that his drugs benefit, and the broader public at large, which is evidenced by his emphasis on democratizing education. I appreciate your consideration and thank you for taking the time to read this letter.

Sincerely,

Taylor Reiners