```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
UNITED STATES OF AMERICA                    MEMORANDUM AND ORDER

        - against -                         15-cr-637(KAM)

MARTIN SHKRELI,

            Defendant.

-------------------------------------X
```

**MATSUMOTO, United States District Judge:**

Before the court is the government's post-trial motion for forfeiture in this criminal securities fraud case, pursuant to Federal Rule of Criminal Procedure 32.2, Title 18 United States Code Section 981(a)(1)(C), Title 28 United States Code Section 2461(c), and Title 21 United States Code Section 853(p). (Government's Motion ("Gov. Mot."), ECF No. 464; Defendant's Response ("Def. Resp."), ECF No. 515; Government's Reply ("Gov. Reply"), ECF No. 523; Defendant's Sur-Reply ("Def. S.R."), ECF No. 523.)  The court heard argument on the motion on February 23, 2018.  (February 23, 2018 Transcript ("Tr.").)  This order presumes familiarity with this court's prior orders in this case, in particular the February 26, 2018 Memorandum and Order denying Mr. Shkreli's Motion for Judgment of Acquittal and discussing the loss amount in this case.  (Memorandum and Order ("Rule 29 Order"), ECF No. 535.)

## I. Standard of Review

### A. Criminal Forfeiture

Pursuant to Title 18, United States Code Section 981(a)(1)(C), a court may order the forfeiture of "[a]ny property . . . which constitutes or is derived from proceeds" of criminal securities fraud, through what the Second Circuit has described as a "roundabout statutory mechanism":

> 18 U.S.C. Section 981(a)(1)(C) allows a court to order forfeiture for 'any offense constituting 'specified unlawful activity' as defined in 18 U.S.C. § 1956(c)(7).' Section 1956(c)(7)(A) incorporates 'any act or activity constituting an offense listed in 18 U.S.C. § 1961(1).' And § 1961(1)(D) lists 'any offense involving . . . fraud in the sale of securities.' While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c).

*United States v. Contorinis*, 692 F.3d 136, 145 n.2 (2d Cir. 2012) (alterations in the original). "In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes," the term "proceeds" is defined to include "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture." 18 U.S.C. § 981(a)(2)(A). For cases involving "lawful goods or lawful services that are sold or provided in an illegal manner . . . proceeds means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in

2

providing the goods and services." 18 U.S.C. § 981(a)(2)(B). Such "direct costs "shall not include any part of the overhead expenses of the entity . . . or any part of the income taxes paid by the entity." *Id.*

The government has the burden of establishing that forfeiture is warranted by a preponderance of the evidence. *United States v. Finazzo*, 682 F. App'x 6, 14 (2d Cir. 2017) (citing *United States v. Daudergas*, 837 F.3d 212, 231 (2d Cir. 2016)); *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (citing *United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005)). In cases involving "lawful services . . . provided in an illegal manner," the defendant has the burden of proving "direct costs" which may be deducted from the amount to be forfeited. 18 U.S.C. § 981(a)(2)(B).

### B. Substitute Assets

The procedures in Title 21 United States Code Section 853 apply to criminal forfeitures. 28 U.S.C. 2461(c); *United States v. Capoccia*, 402 F. App'x 639, 641 (2d Cir. 2010) (citing, *inter alia*, *United States v. Kalish*, 626 F.3d 165 (2d Cir. 2010)). Pursuant to Section 853(p), if, because of acts or omissions of the defendant, property subject to forfeiture "cannot be located," "has been transferred," "has been placed beyond the jurisdiction of the court," "has been substantially diminished in value," or "has been commingled with other

3

property which cannot be divided without difficulty," "the court shall order the forfeiture of any other property of the defendant, up to the value of [the forfeitable] property." 21 U.S.C. § 853(p).

## II. Discussion

### A. Counts Three and Six

The government requests forfeiture of $2,998,000 on Count Three and $3,402,450 on Count Six. These amounts represent the total investments by defrauded investors into Mr. Shkreli's MSMB Capital and MSMB Healthcare hedge funds. (Gov. Mot. at 5.) Mr. Shkreli argues that no forfeiture is appropriate on either count.[1] In the alternative, Mr. Shkreli argues that any forfeiture amount for Counts Three and Six "should [] be significantly reduced by the amount of [investors'] money used to provide goods and services – *i.e.* purchase securities." (Def. S.R. at 5.) In support of this argument, he provides only bare citations to various government exhibits, with minimal analysis.

---

[1] In opposing the government's motion for forfeiture, Mr. Shkreli also argues that (1) investors in his MSMB hedge funds did not rely on his representations in choosing to invest in MSMB Capital and MSMB Healthcare, and (2) the forfeiture amount should be zero for both Counts Three and Six because "each of the[] investors received a robust return for their investments." (*See* Def. Resp. at 5.) The court has considered, and rejected, these arguments in a prior order. (Rule 29 Order.)

4

The court agrees with the parties[2] that the applicable definition of "proceeds" for this case is set forth in Title 18 United States Code Section 981(a)(2)(B), which governs forfeiture for "lawful goods or lawful services . . . sold or provided in an illegal manner." 18 U.S.C. § 981(a)(2)(B). For such transactions, "the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." *Id.* The Second Circuit has explained that Section 981(a)(2)(B) "supplies the definition of 'proceeds' in cases involving fraud in the purchase or sale of securities," whereas Section 981(a)(2)(A) is reserved for cases involving "inherently unlawful" activity, such as "the sale of

---

[2] In their opening briefs, the parties agreed that the court should apply Section 981(a)(2)(B). (Gov. Mot. at 3 ("as the Second Circuit has held in the context of insider trading securities fraud cases, the applicable definition of proceeds is set forth in 18 U.S.C. § 981(a)(2)(B)"); Def. Resp. at 2.) Although the government acknowledged that the court should apply Section 981(a)(2)(B), the government noted in its reply brief and during oral argument that Mr. Shkreli's conduct was "more like the fraud and inducement cases where the Second Circuit has held no costs or expenses should be deducted." (Tr. 42:10-11 (Section 981(a)(2)(B) is the "definition of proceeds to be applied here"); *id.* at 42:12-15 (contrasting this case with insider trading cases); Gov. Reply at 6 n.5; ("it is far from clear that [Section 981(a)(2)(B)'s] more limited definition[,] as opposed to the gross definition of 'proceeds' set forth in Section 981(a)(2)(A) should apply to . . . fraud cases[] such as this").)

foodstamps[] or a robbery." *United States v. Contorinis*, 692 F.3d 136, 145 n.3 (2d Cir. 2012).

Although the court will apply the definition of "proceeds" set forth in Section 981(a)(2)(B), the court concludes that Mr. Shkreli is not entitled to deduct "direct costs" from the forfeiture amounts in Counts Three and Six, for two related reasons:  First, he has not borne his burden of proving direct costs, and, second, the few purported direct costs he specifically references in his papers would not be deductible.

With regard to Count Three, Mr. Shkreli argues that MSMB Capital's trading losses, brokerage fees and trading commissions constitute "direct costs" under Title 18 United States Code Section 981(a)(2)(B), such that they reduce the forfeitable amount to, at most, $505,414.  (Def. S.R. at 5.)  As support, he cites MSMB Capital's bank records, without any detailed analysis.  (*Id.*)  At oral argument, defense counsel also referenced MSMB Capital's loss resulting from conduct in the OREX trade (*see* Rule 29 Order at 15-16 (testimony of Steven Stitch, describing the OREX trade)), as an example of the "direct costs" Mr. Shkreli incurred at MSMB Capital.  (Tr. 45:16-23.)

Not only does the defense fail to provide any detailed analysis of the various government exhibits Mr. Shkreli now

6

proffers in support of his argument on direct costs, but the defense also ignores the jury's verdict in this case. By the time Mr. Shkreli lost MSMB Capital's investment capital in the OREX trade, he had repeatedly lied to his investors regarding the size, nature, and performance of his fund. (*See, e.g.*, Rule 29 Order at 58-62 (describing investor testimony).) Investors believed, based on Mr. Shkreli's representations, that MSMB Capital had tens of millions of dollars in assets, with a diversified investing strategy and third-party oversight. (*See id.*) Although MSMB Capital investors recognized the risks of investing in a hedge fund, they believed, also based on Mr. Shkreli's representations, that the fund was diversified in long/short investments and had a record of positive performance. (*See, e.g., id.* at 8 (testimony of Sarah Hassan); 40-41 (testimony of John Neill).)

With regard to the OREX trade in particular, Mr. Shkreli falsely claimed to his execution broker, Merrill Lynch, that MSMB Capital's prime broker, Interactive Brokers, had been able to obtain the necessary "locate" on OREX shares to enable the short trade. (*Id.* at 15 (testimony of Steven Stitch explaining the purpose of a "locate").) In part as a result of Mr. Shkreli's failure to follow the proper procedures in executing the trade, MSMB Capital suffered a multiple-million dollar loss, in excess of its assets. Far from being a "direct

7

cost" of "lawful services" within the meaning of Section 981(a)(2)(B), the costs related to the OREX trade are the result of the fraudulent conduct for which Mr. Shkreli was convicted: he deceived investors into believing that they were invested in a sophisticated and diversified hedge fund, but chose instead to gamble the money entrusted to him on a series of improperly-conducted trades in a single stock.

To the extent Mr. Shkreli's other investments on behalf of MSMB Capital could be characterized as "lawful services" within the meaning of Section 981(a)(2)(B), he has not provided *any* detailed analysis or breakdown of MSMB Capital's "direct costs" related to such investments, nor explained how any such costs of MSMB Capital should be deducted from his own forfeiture obligations. *See Contorinis*, 692 F.3d at 145 n.3 (Noting that because the defendant's employer, and not the defendant himself, bore "all direct costs" in an insider trading case, "any money that [the defendant] can fairly be considered as having 'acquired' as a result of his [illegal] activities may be subject to forfeiture under § 981.") Therefore, he has failed to carry his burden. *See United States v. Mandell*, 752 F.3d 544, 554 (2d Cir. 2014) (holding that a defendant who "failed to present any evidence and no more than cursory argument" regarding direct costs "failed to meet his burden")).

As to Count Six, Mr. Shkreli argues that MSMB Healthcare invested $2,535,000 million into Retrophin, such that "the forfeiture amount would be, at most, $867,450." (*Id.*)  As with Mr. Shkreli's arguments on Count Three, he has failed to provide any analysis or detailed explanation of why the court should deduct $2,535,000 million as "direct costs" from the total forfeiture amount.  Indeed, as the court has already explained, the trial evidence showed that (1) Mr. Shkreli improperly used MSMB Healthcare to funnel money to Retrophin, notwithstanding his representations that MSMB Healthcare was a diversified fund; and (2) Mr. Shkreli improperly used approximately $1.1 million of the money MSMB Healthcare invested into Retrophin for his own personal and unrelated professional obligations.  (Rule 29 Order, ECF No. 535 at 64-67; 86-88.)  Even if Mr. Shkreli were to have made a more detailed submission regarding direct costs of MSMB Healthcare for Count Six, he would not be able to establish that his acts of improperly funneling investor money into Retrophin resulted in "direct costs" of providing a "lawful service[]."  Furthermore, as with Count Three, Mr. Shkreli has failed to provide any analysis to establish that any other trading activity in MSMB Healthcare resulted in legitimate "direct costs" to him.  *See Mandell*, 752 F.3d at 554; *Contorinis*, 692 F.3d at 145 n.3.

9

### B. Count Eight

With regard to Count Eight, the evidence at trial showed that Mr. Shkreli conspired with Retrophin's attorney, Evan Greebel, and others, to control the price and trading of shares in Retrophin. (Rule 29 Order at 67-78.) In order to achieve this control, Mr. Shkreli and Mr. Greebel directed the distribution of the Fearnow shares to various Retrophin insiders. (*Id.* at 68-71 (describing the "Fearnow shares").) In addition to using his control over some of the Fearnow shares to attempt to increase the trading price of Retrophin shares in the market, Mr. Shkreli used the shares to mollify frustrated investors in his MSMB Capital and MSMB Healthcare hedge funds. (*Id.* at 71-75.)

The government now seeks forfeiture of $960,000, which it argues is the amount of the benefit Mr. Shkreli received, both indirectly and directly, from having his co-conspirators transfer Fearnow shares held in their names to two MSMB investors (Dr. Lindsay Rosenwald and Richard Kocher), to a Retrophin investor (Thomas Koestler), and to Mr. Shkreli himself. (Gov. Mot. at 7.) Mr. Shkreli argues that the government's request is improper, because it has "nothing to do with the alleged conduct in Count Eight" and is instead related to the alleged conduct in Count Seven, of which the jury acquitted Mr. Shkreli. (Def. Resp. at 5-6.) Mr. Shkreli also

10

argues that Mr. Shkreli's co-conspirators transferred their Fearnow shares to the dissatisfied MSMB investors for their own legitimate reasons. (*Id.* at 6 ("these three Fearnow recipients had their own financial interests in mind when they helped settle [the MSMB] claims as they stood to gain handsomely if Retrophin succeeded . . . and was not smothered in its infancy with lawsuits by MSMB investors."))

The court concludes that the Fearnow shares used to satisfy the demands of Dr. Rosenwald, Mr. Kocher, Mr. Koestler and Mr. Shkreli constituted property which "derived from" the transactions at issue in Count Eight. *See* 18 U.S.C. §§ 981(a)(1)(C), (a)(2)(B).[3] The court has previously described in detail how Mr. Shkreli and Mr. Greebel obtained the Fearnow shares and distributed them to Retrophin and MSMB insiders. (Rule 29 Order at 68-71.) As this court has also explained, Mr. Shkreli and Mr. Greebel extensively discussed how to use the Fearnow shares to compensate MSMB investors, and took action to try and prevent another "Pierotti problem" – a Fearnow share recipient refusing to accede to Mr. Shkreli's directives regarding trading or not trading their Fearnow shares. (*Id.* at 74-75.) Indeed, Mr. Shkreli specifically wrote in an email to

---

[3] For substantially the reasons stated in its discussion of Counts Three and Six, the court concludes that the definition of "proceeds" for Count Eight is determined by the application of Title 18 United States Code 981(a)(2)(B). *See Contorinis*, 692 F.3d 145 n.3.

11

Mr. Greebel that he wanted to make the transfers from the Fearnow shareholders "anonymous" if possible, so that the Fearnow shareholders "don't know exactly where [their shares] are going." (*Id.* (quoting GX 271.)) Mr. Shkreli wrote to Mr. Greebel that after the Fearnow shares held in "escrow" were used to satisfy dissatisfied MSMB investors, "the rest" should be transferred to him. (*Id.* (discussing GX 268); *see id.* at 50 n.8 (describing the shares held in "escrow").) The government also introduced documentary evidence demonstrating that Mr. Shkreli and Mr. Greebel specifically directed the transfer of Retrophin shares to Mr. Koestler. In February 2013, Mr. Greebel asked Mr. Shkreli whether to use "Fearnow stock or new restricted grant from company" to provide Mr. Koestler with the shares he should have received for investing in Retrophin in 2012. (GX 370.) Mr. Shkreli responded "combo would be great." (*Id.*)

       The trial evidence, therefore, supports the government's position that Mr. Shkreli and Mr. Greebel – not the Fearnow shareholders themselves – made the decision to transfer the shares to Dr. Rosenwald, Thomas Koestler, Richard Kocher, and Mr. Shkreli. The evidence also establishes that Mr. Shkreli used these transfers to stave off lawsuits or government investigations which may have targeted him personally, or which might have resulted in government investigations of the various improprieties in the MSMB hedge funds. (*See, e.g., id.* at 22-23

12

(describing testimony of Dr. Rosenwald, in which he stated that prior to settlement he had involved his legal counsel).) Mr. Shkreli thereby received a personal benefit from the distribution of these shares.

### II. Substitute Assets

The government asks the court to approve the seizure of substitute assets, pursuant to Federal Rule of Criminal Procedure 32.2(e) and Title 21 United States Code Section 853(p). (Gov. Mot. at 9.) The government provides the sworn declaration of FBI Special Agent Sean Sweeney to support its position that Mr. Shkreli has "transferred," "substantially diminished," or "commingled" the forfeitable assets, and thus mandating that "the court shall order the forfeiture of any other property of the defendant, up to the value of the [forfeitable property]," here $7,360,450.00. (*See* Declaration of Special Agent Sean Sweeney, ECF No. 464-2 at ¶¶ 8-9 (stating that Special Agent Sweeney and other agents "have made a diligent effort to locate traceable proceeds to the offenses subject to forfeiture" but that such assets "appear to have been dissipated or otherwise disposed of.") The evidence at trial shows that direct proceeds of Mr. Shkreli's criminal conduct were either dissipated (*i.e.* the OREX trade) or transferred to Retrophin or the MSMB investors, or Mr. Shkreli.

13

Mr. Shkreli has opposed the forfeiture of substitute assets, in part because he owes significant amounts of money to New York State, the Internal Revenue Service, his accountants, and his attorneys.[4] (Def. Mot. at 7.) Mr. Shkreli has provided no authority, however, for the proposition that otherwise forfeitable proceeds should not be subject to forfeiture because the defendant owes money to other potential creditors.

---

[4] Mr. Shkreli also noted that one of the substitute assets listed in the government's initial proposed preliminary order of forfeiture had already been seized by New York State. (Def. Mot. at 7.) The government has addressed this issue in its revised proposed preliminary order of forfeiture. (See Revised Proposed Preliminary Order of Forfeiture, ECF No. 539-1.) To address Mr. Shkreli's concerns about a premature "fire sale" of his stake in Vyera Pharmaceuticals (formerly known as Turing Pharmaceuticals), the government has also indicated that it does not oppose a stay of "that portion of a [preliminary order of forfeiture] authorizing the seizure of substitute assets . . . until completion of the appeal that [Mr.] Shkreli intends to file," on the condition that the substitute assets be preserved pending any final decision on appeal. (Gov. Reply at 10.)

14

**Conclusion**

For the foregoing reasons, the court concludes that the government has established that forfeiture of substitute assets, up to $7,360,450.00, is warranted in this case. As the government has requested, the court will so-order the government's proposed preliminary order of forfeiture, which includes provisions ensuring the preservation of assets and appropriately staying seizure of assets pending appeal. (*See* Revised Proposed Preliminary Order of Forfeiture at ¶¶ 10-11.)

**SO ORDERED.**

Dated: March 5, 2018
Brooklyn, New York

_____/s/_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York