JMK/AES/GSK
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                    15 CR 637 (KAM)

MARTIN SHKRELI,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## THE GOVERNMENT'S SENTENCING SUBMISSION


RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
G. KARTHIK SRINIVASAN
Assistant U.S. Attorneys
     (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

I.   FACTUAL BACKGROUND ...................................................................... 3

    A.  Shkreli's Four Fraudulent Schemes ........................................... 3

    B.  Additional Conduct By Shkreli That Resulted in Court Sanctions ...................... 12

II.  APPLICABLE PENALTIES ...................................................................... 16

    A.  The Applicable Guidelines Range is 324 to 405 Months' Imprisonment ............. 16

    B.  Shkreli's Objections to the PSR are Unavailing .................................. 17

    C.  Shkreli Has the Ability to Pay a Fine, and A Substantial Fine is Warranted ....... 26

    D.  The Court Has Ordered Forfeiture On the Counts of Conviction ...................... 28

III. LEGAL STANDARD .............................................................................. 28

IV.  ARGUMENT ...................................................................................... 30

    A.  The Nature and Seriousness of Shkreli's Offenses Warrant a Substantial Sentence of Incarceration ................................................................ 30

    B.  Shkreli's History and Characteristics Warrant a Substantial Term of Incarceration ...................................................................... 36

    C.  A Substantial Sentence of Incarceration Would Serve the Goals of Specific and General Deterrence ................................................................. 63

    D.  Shkreli's Arguments Regarding Unwarranted Sentencing Disparities are Unavailing .......................................................................... 65

CONCLUSION ............................................................................................ 67

PRELIMINARY STATEMENT

The government submits this sentencing memorandum in anticipation of the defendant Martin Shkreli's sentencing, which is currently scheduled for Friday, March 9, 2018. As set forth in detail below, based on the defendant's counts of conviction and the factors outlined in 18 U.S.C. § 3553(a), the government urges the Court to sentence Shkreli to a term of imprisonment of no less than 180 months.

At its core, this case is about Shkreli's deception of people who trusted him. Investors in the MSMB funds, members of Retrophin's Board of Directors (the "Board"), Shkreli's former employees, members of the investing public—all of these individuals relied on statements by Shkreli that proved to be lies.  Indeed, he compounded the lies with a pattern of corrupt behavior designed to cover up those lies.  He lied to get investors' money, he lied to keep them invested in his funds and he lied once those investors wanted their money back. He stole money from investors to pay off personal debts to, among others, Merrill Lynch.  He lied to Retrophin's Board, and stole millions of dollars and shares from the company.  He lied to a market that believed the price of Retrophin's shares was set by natural market forces.

To carry out these frauds, Shkreli was all things to all people.  And over time, this shifting persona built trust that Shkreli subsequently abused.  The trial record bears this out and furnishes numerous counter-examples to the letters submitted in support of Shkreli. Steven Richardson, for example, testified that Shkreli would say things about his personal life because "he thought [Richardson] would want to hear them rather than things he necessarily believed in."  (Tr. at 2786-87).  Shkreli thus tried to cultivate Richardson by misrepresenting his personal life.  To Caroline Stewart, Shkreli was alternately kind and "mercurial" or "could be quite cutting or nasty."  (Tr. at 2039-40).  He led Schuyler Marshall and many other

investors to believe he was a successful hedge fund manager running a "fairly sizeable" fund with "impressive" returns.  (Tr. at 2428).  Shkreli traded on the reputation of others, including prominent pharmaceutical executive Fred Hassan, to make himself look impressive and to solicit investors.  (See, e.g., Tr. at 2809-10 (Richardson) ("It was impressive.  Martin had talked to me about particular dialogues he's had with Brent Saunders and with Fred Hassan.  They were two names, I didn't know them personally, but they were two names that were very credible in the whole pharmaceutical space.  So it looked like a very impressive list.")).  In sum, Shkreli was adept at finding what he thought people wanted to hear.  And he molded himself accordingly to deceive and defraud.

The depiction of Shkreli as set forth in his sentencing memorandum (see Dkt. No. 538 ("Shkreli Mem.")) is that of a changed man.  In support of this image, Shkreli cites to a psychological evaluation, various letters of support, his own charitable acts and a letter he has authored.  Against this backdrop, Shkreli asks for the Court's mercy and leniency.

As set forth below, however, this portrayal of Shkreli is skewed.  It does not accurately reflect who he truly is—a man who stands before this Court without any showing of genuine remorse, a man who has consistently chosen to put profit and the cultivation of a public image before all else, and a man who believes the ends always justify the means.

Thus, the "real" Martin Shkreli may not be known to anyone save himself.  Rather than rely on self-aggrandizing statements made on the eve of sentencing or hand-picked testimonials submitted in support of his request for leniency, the Court should rely on his actions as the best guide to who he truly is and render an appropriate, significant sentence accordingly.

I.      FACTUAL BACKGROUND[1]

A.      Shkreli's Four Fraudulent Schemes

The Court is extremely familiar with the offense conduct in this case, having

presided over not only Shkreli's six-week trial, but also the eleven-week trial of Shkreli's co-

defendant, Evan Greebel.  In fact, in its February 26, 2018 Memorandum and Order denying

Shkreli's Rule 29 motion (Dkt. No. 535), the Court has already detailed at length the key

evidence supporting the jury's guilty verdict on Counts Three, Six and Eight, as well as the

evidence demonstrating that the government has proven Shkreli's guilt on Count Seven by a

preponderance.  In addition, a comprehensive overview of the offense conduct is set forth in

the Pre-Sentence Investigation Report dated December 12, 2017 ("PSR").  (See PSR ¶¶ 7-40).

As a result, the following sections are intended to provide only a high-level overview of the

basic facts of the four fraudulent schemes with which Shkreli was charged and proven

criminally culpable, either due to a jury verdict of guilty or the Court's finding that the

government proved Shkreli's participation in the fraud by a preponderance of the evidence.

---

[1] The version of his sentencing memorandum that Shkreli filed on the public docket is
heavily redacted.  While the government agrees with some of Shkreli's redactions—for
example, PII of individuals submitting letters on Shkreli's behalf, ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—the government does not agree with all of Shkreli's redactions,
such as the conclusions reached by Dr. Salsberg that Shkreli relies on heavily in support of his
submission.  As an initial step, the government has redacted its sentencing memorandum to
mirror the redactions in Shkreli's sentencing memorandum, but submits that the Court should
review the parties' submissions and determine if any of the redactions should be lifted.

1.      Shkreli's Failed Track Record at Elea Capital and RBC

Shkreli began work in the financial industry at Cramer Berkowitz in 2000, followed by stints at UBS and Intrepid Capital, before starting a hedge fund called Elea Capital in 2006.  (PSR ¶¶ 112-116).  Shkreli recruited a number of investors in Elea Capital, including Josiah Austin (who invested approximately $4.8 million in the fund) and George Yaffe (who invested $200,000), but ultimately lost all of the money invested in the Elea Capital fund in a series of risky trades in 2007.

Following the failure of Elea Capital, Shkreli worked at RBC Professional Trading Group LLC ("RBC") for several months in 2008, where he served as a portfolio manager responsible for managing a portfolio of assets worth several million dollars.  (PSR ¶ 111 (the entity is identified as "Royal Bank of Canada" in the PSR)).  The PSR notes that Shkreli reported that he was a portfolio manager and that he was terminated from his position, but did not provide detailed information of what led to his termination.  (Id.).  As the government outlined in a motion in limine filed on May 31, 2017, Shkreli was fired from that position because he executed trades away from the firm's supervision, despite several verbal warnings he had received from firm management not to engage in such trades, and then sought to conceal such trades by failing to promptly update the trade blotter to reflect such trades as required by the firm's written procedures.  (See Dkt. No. 230; see also 3500-DA-1).  Shkreli's actions caused the portfolio in which he was trading to suffer serious losses, which were only discovered at the time of his termination due to the steps he took to conceal those losses.  (Id.).

Shkreli's actions in connection with Elea Capital and RBC—his risky trading that caused Elea Capital to fail, after which he did not repay his investors, and his termination

4

from RBC for disobeying warnings about certain trades, which he improperly concealed and which led to large losses—were never disclosed to the MSMB Capital and MSMB Healthcare investors that Shkreli subsequently induced to invest in his hedge funds.  To the contrary, as established at trial and detailed below, Shkreli repeatedly and disingenuously touted to potential investors his trading acumen and his successful track record as a portfolio and hedge fund manager in order to induce investors to put money into MSMB Capital and MSMB Healthcare.

     2.   <u>The MSMB Capital Scheme</u>

With respect to the MSMB Capital scheme, Shkreli was convicted of securities fraud on Count Three for defrauding investors by making material misrepresentations and omissions to both induce investment in MSMB Capital and to prevent redemptions from MSMB Capital.  As proven at trial, and detailed in the PSR, Shkreli made a series of material misrepresentations and omissions to convince investors to give him their money to invest in MSMB Capital, which purported to be a long-short hedge fund that invested in healthcare stocks.  These lies included falsely inflating the fund's assets under management; misrepresenting his record as a hedge fund manager (touting himself as successful when in fact his prior hedge fund, Elea Capital, had failed, and MSMB Capital was not itself successful); stating that the fund had an auditor and administrator when it did not; falsely assuring investors that they could withdraw their funds with 30 days' notice; and stating that the fund would be a long-short fund when Shkreli instead routinely used it to take huge gambles on single positions.  Shkreli also made a series of material misrepresentations and omissions in order to prevent MSMB Capital investors from seeking a redemption of their invested funds, including sending out false performance reports to all MSMB Capital

investors showing positive returns when the fund in fact was not performing or had no money (for example, this happened both in October and November 2010, when the fund was out of money prior to an influx of new investments from Sarah Hassan, Darren Blanton, Brent Saunders, Schuyler Marshall and John Neill, and after February 2011, when the fund was wiped out in the OREX trade), making other verbal and written assurances that the fund was doing well, and representing in the wind-down email that investors could redeem their investments for cash.  Ultimately, Shkreli induced seven MSMB investors to invest a total of $2,998,000 in the fund.  (See PSR ¶¶ 8-15; see also, e.g., Tr. at 921-22, GXs 5, 80-1 to 80-9, 103-13, 103-38, 502, 520).[2]

### 3. The MSMB Healthcare Scheme

After MSMB Capital failed, Shkreli started a new hedge fund called MSMB Healthcare and recruited an entirely new set of investors based on the same set of lies that had worked for the MSMB Capital investors.  As proven at trial, and as detailed in the PSR, Shkreli made a series of material misrepresentations and omissions in order to convince investors to give him their money to invest in MSMB Healthcare, which purported to be a long-short hedge fund that invested in healthcare stocks.  These lies included falsely inflating the fund's assets under management; misrepresenting his record as a hedge fund manager

---

[2] In his sentencing memorandum, Shkreli contends that he was able to bring investors into the fund because of his "earned reputation" for picking good stocks.  (Shkreli Mem. at 58).  While there was evidence at trial that Shkreli researched and distributed stock picks to potential investors, some of which were successful, there is an enormous difference between accurately picking stocks that perform well and managing a balanced portfolio.  Shkreli's unsuccessful performance at Elea, RBC and MSMB Capital make clear that Shkreli did not properly manage risk across a portfolio, instead electing to place bigger and bigger gambles on risky stocks.

(touting himself as successful when in fact his prior hedge funds had both failed); stating that the fund had an auditor when it did not; falsely assuring investors that they could withdraw their funds with 30 days' notice (or, in the case of investor Richard Kocher, within a week); and stating that the fund would be a long-short fund when Shkreli instead used the fund simply as a way to get and funnel money to Retrophin and/or to pay his personal debts and obligations.  Shkreli also made a series of material misrepresentations and omissions in order to prevent MSMB Healthcare investors from seeking a redemption of their invested funds, including sending out false performance reports to all MSMB Healthcare showing positive returns when the fund in fact was not performing, making other verbal and written assurances that the funds were doing well, representing in the wind-down email that investors could redeem their investments for cash, and advising investors that the changes in the amended Private Placement Memorandum ("PPM") were made to permit a "small" investment in Retrophin when in fact Shkreli put all of the money invested in MSMB Healthcare into Retrophin.  (See PSR ¶¶ 16-20; see also, e.g., Tr. at 2318-19, 3097-99, 3104, 3127, 4222-23; GXs 11-A, 11-B, 83-1 to 83-4, 91-1 to 91-4, 107-11, 109-9, 350, 507-D, 521, 521-A, 704, 705).

          4.     Retrophin Misappropriation Scheme

Shkreli's third fraud scheme involved the theft of funds from Retrophin, a pharmaceutical company that Shkreli founded in 2011 at the same time as MSMB Healthcare. (See PSR ¶¶ 21-35).  To raise capital for the company, as detailed above, he caused MSMB Healthcare to invest significant sums into Retrophin between 2011 and mid-2012.  By the fall of 2012, Shkreli and Greebel were preparing to take Retrophin public, and Shkreli announced to the MSMB investors that he was winding down the funds.  However, as detailed above,

MSMB Capital had no funds that could be used to repay the investors, let alone at the falsely inflated rates of return that Shkreli had been reporting for years.  Similarly, although MSMB Healthcare had invested in Retrophin—and, as a result, would be entitled to receive some Retrophin stock at the time that the company went public, if it was able to do so—Shkreli did not have the cash to provide redemptions to MSMB Healthcare investors who did not wish to receive Retrophin stock.  At the same time, Shkreli owed more than a million dollars to Merrill Lynch by December 2012 and had significant other personal and professional debts.  Additionally, the United States Securities and Exchange Commission ("SEC") had reached out to Shkreli in September 2012 in connection with an investigation of the MSMB hedge funds; in response to a query, Shkreli sent an email in November 2012 in which he falsely advised the SEC that, inter alia, MSMB Capital was still an active entity with $2.6 million in assets under management.

By the time the reverse merger for Retrophin was finalized in December 2012, several MSMB Capital and MSMB Healthcare investors had become deeply suspicious of the process by which Shkreli had liquidated the hedge funds.  For example, Shkreli failed to provide cash redemptions for MSMB investors who requested such redemptions, and the method by which he purported to convert their investments into Retrophin stock was opaque and unsupported by documentation.  As a result, several MSMB investors began threatening to sue Shkreli if they did not get answers about what happened to their investments.

Faced with disgruntled investors, Shkreli, Greebel and others engaged in a scheme to defraud Retrophin by misappropriating Retrophin's assets through material misrepresentations and omissions in an effort to satisfy Shkreli's personal and unrelated professional debts and obligations.  As an initial step, Shkreli and Greebel create the false

appearance that MSMB Capital had invested in Retrophin and received shares in return. Specifically, in November and December 2012, Shkreli and Greebel orchestrated a transfer of shares from Shkreli to MSMB Capital and backdated that agreement to the summer of 2012. As a result of the backdated agreement, it appeared that MSMB Capital had made an investment in Retrophin in the summer of 2012 in exchange for a stake in the company when, in fact, MSMB Capital had never invested in Retrophin and had no interest in the company. Shkreli and Greebel also subsequently filed a Form 13-D falsely stating that MSMB Capital had purchased its shares in Retrophin.

Shkreli and Greebel then caused Retrophin to enter into a series of settlement agreements with several of the defrauded MSMB Capital and MSMB Healthcare investors, which effectively caused Retrophin to reimburse those investors for their investments in the MSMB entities as well as for the fabricated returns that Shkreli had reported on those investments, even though Retrophin was not responsible for repaying the defrauded investors. Shkreli and Greebel also caused Retrophin to enter into a series of sham consulting agreements with additional defrauded MSMB Capital and MSMB Healthcare investors, as well as one defrauded Elea Capital investor, which again caused Retrophin to reimburse those investors for their lost investments in Shkreli's hedge funds. Notably, the defrauded investors who entered into these sham consulting agreements did not perform any legitimate consulting services for Retrophin. Shkreli and Greebel did not seek authorization from Retrophin's Board prior to entering into these fraudulent agreements. In total, Shkreli and Greebel caused Retrophin to pay more than $10 million in cash and Retrophin stock through the settlement and sham consulting agreements.

5.     Retrophin Unrestricted Shares Scheme

In the fourth and final fraud scheme, Shkreli and his co-conspirators sought to control—and in some cases succeeded in controlling—the price and trading volume of Retrophin shares through his beneficial ownership of almost all of the free-trading shares of Retrophin, also known as the "Fearnow" shares.  As the evidence demonstrated at trial, Retrophin was in dire straits following the reverse merger that made it a public company in December 2012: the company had only $11,000 in its bank account, and had been unsuccessful in raising capital from private equity funds.  Shkreli and his co-conspirators desperately needed Retrophin's share price to remain stable through the early part of 2013 so that they could attract investors to the company through a series of private placements ("PIPEs"), which ultimately took place in January and February 2013.  In order to do this, and in connection with the reverse merger, Shkreli distributed two million free-trading shares of Retrophin in December 2012 to seven associates on the understanding that he would control the disposition of those shares.  (GX 701).  At the time, these free-trading shares represented the vast majority of the free-trading shares of the company, which was extremely thinly traded. [3]  (Id.; Greebel Tr. at 5758-59).  As a result, control of those free-trading shares allowed Shkreli to manipulate the price and volume of Retrophin shares.

There is ample evidence in the record that Shkreli sought to and did exercise that control in an effort to manipulate the price and trading volume of Retrophin shares to

---

[3] An additional 400,000 free-trading shares that were originally set to be distributed to those associates were held in escrow until March 2013 as collateral for money that Retrophin owed for its purchase of the Desert Gateway shell; another 100,000 free-trading shares were distributed to an individual associated with Michael Fearnow.

ensure the company's survival.  For example, Shkreli sought to monitor the trades of

individuals who received Fearnow shares (GX 120-11), and on multiple occasions between

December 2012 and February 2013, Shkreli sought to and/or did prevent the sale of the free-

trading shares in order to prevent the price of Retrophin from falling.  (See, e.g., GXs 120-17,

120-18, 120-19, 245, 246, 248, 251, 255; Tr. at 4301).  During this period, Shkreli also shored

up the share price of Retrophin by seeking to have the recipients of the free-trading shares

make those shares "unshortable"—that is, unavailable for others in the market to borrow so

that the stock could not be shorted.  (GXs 245, 246, 120-17).  Coupled with other actions

Shkreli took in the market at the same time, such as the purchase of shares from the market on

various dates, Shkreli's control of the free-trading shares was intended to, and in some cases

did, result in the favorable manipulation of the share price of Retrophin.

      6.   Procedural History

Shkreli was indicted and charged with securities fraud conspiracy, wire fraud

conspiracy and securities fraud for the MSMB Capital scheme (Counts One, Two and Three),

and the MSMB Healthcare scheme (Counts Four, Five and Six), and with wire fraud

conspiracy for the Retrophin Misappropriation scheme (Count Seven) on December 15, 2017.

Shkreli was subsequently charged with securities fraud conspiracy for the the Retrophin

Unrestricted Shares scheme (Count Eight) in a superseding indictment on June 3, 2016.  The

Court granted the defendant a severance from Greebel in the spring of 2017, and the parties

proceeded to trial on June 22, 2017.

On August 4, 2017, following a six-week jury trial, Shkreli was found guilty of

securities fraud on Counts Three and Six, and of securities fraud conspiracy on Count Eight.

The Court held in a subsequent ruling that the government had proven Shkreli guilty by a

preponderance of the evidence at trial of the conduct charged in Count Seven.  (See Dkt. No. 535 at 2).  Following Shkreli's violation of his bail conditions in September 2017 (detailed below), the Court remanded Shrkeli into custody.  He is scheduled to be sentenced on March 9, 2018.

      B.    <u>Additional Conduct By Shkreli That Resulted in Court Sanctions</u>

      In addition to the offense conduct outlined above, the government briefly details two incidents of additional conduct that resulted in the Court sanctioning Shkreli:  his deliberate attempts to disrupt the trial and, post-verdict, his escalating online threats to various women, including Secretary Hillary Clinton and journalist Lauren Duca, which constituted a violation of his bail conditions and resulted in Shkreli being remanded into custody.

      1.    <u>Shkreli's Deliberate Attempts to Disrupt the Trial</u>

      Since his indictment in December 2015, Shkreli has consistently made public statements that show he has little respect for the law or the criminal justice system.  For example, in November 2016, Shkreli told the <u>Financial Times</u> that his plan was to make the case "more polarizing and popular" by creating a circus-like atmosphere in order to obtain an acquittal, similar to the trials of OJ Simpson, Casey Anthony and Sean "P Diddy" Combs, all of whom were found not guilty under similar circumstances.  (See Dkt. No. 160, Ex. 12).  In the same article, Shkreli stated he was "spending millions to influence the jury pool in Brooklyn."  (Id.).  Shkreli also made numerous public statements characterizing his prosecution as a  "chess match of public opinion," claimed that the criminal case against him was "all for political show," and complained he was only "being prosecuted for being a jerk."  (See Dkt No. 162).

In fact, Shkreli's behavior was so extreme that counsel for Greebel sought a severance based in part on an argument that Shkreli was likely to disrupt any trial by, inter alia, "attacking prosecutors [and] public figures" and "trying to turn this trial into a circus as part of a deliberate strategy to obtain jury nullification rather than have the jury focus on and carefully consider the evidence." (See Dkt. No. 161). Counsel for Shkreli insisted that Shkreli would not engage in such behavior, stating that "there will be no disruption of these proceedings by Mr. Shkreli. He's not going to do anything to undermine the integrity of these proceedings." (Apr. 7, 2017 Tr. at 43:1-12). At the time, based on Shkreli's appropriate behavior in the courtroom during status conferences, the Court noted that it did not "control [Shkreli's] conduct right now outside the courthouse as long as its not having an adverse impact on the proceedings before me." (Apr. 7, 2017 Tr. at 48:10-22.)

Despite the assurances of defense counsel prior to trial—as well as efforts by defense counsel to control Shkreli—once the jury was selected and empaneled, Shkreli embarked on a campaign of disruption by commenting on trial evidence and witnesses to the press and on social media, and by making a spectacle of himself and the trial directly on the courthouse grounds. During the lunch break on June 30, 2017, the defendant paid a highly-publicized visit to reporters and members of the public in the overflow viewing room, which is located on the same floor of the courthouse in which the trial was taking place. Among other things, the defendant repeatedly commented on evidence the jury had heard just the day before and the credibility of testifying witnesses. Shkreli even previewed his response to evidence that was only partially before the jury, telling reporters that he "did not prepare tax documents or Retrophin marketing documents that Hassan testified about on Thursday. Other people did that, he said." In addition to his comments on the evidence and witnesses, Shkreli

also made inappropriate personal attacks on current and former prosecutors in this case.  (See Dkt. No. 261).  Following the end of the court day on June 30, 2017, Shkreli and his counsel were interviewed on camera by a journalist as they exited the door of the courthouse and headed toward Tillary Street.  Shkreli interrupted a question posed to counsel and stated, referring to himself in the third person, said "He'll do whatever he wants."  Throughout the video of the interview, Shkreli grinned broadly.  (See id.).

Subsequently, the government made a motion to limit Shkreli's extrajudicial statements in the courthouse and the Court reprimanded Shkreli for his actions, and then required Shkreli to refrain from speaking about the case during the pendency of the trial within and near the courthouse.  (See Tr. at 1475-87).

### 2.   Shkreli's Online Threats Culminate in the Revocation of His Bail

Following his arrest on December 17, 2015, Shkreli was released on a consent $5 million bond secured by a lien on assets in an E*Trade brokerage account controlled by Shkreli.  Among the standard conditions of release to which Shkreli agreed is that he would not commit any federal, state or local crime.  (See Dkt. No. 362).

However, near the end of his trial and since his conviction on August 4, 2017, Shkreli made at least two public threats of violence against women.  First, on July 27, 2017— on the eve of the final summations—Shkreli made the following statements on Facebook: "Trial's over tomorrow, bitches.  Then if I'm acquitted, I get to fuck Lauren Duca[.]"  Shkreli also stated "And Anna Kasperian, she's pretty hot," referring to a political pundit.  Shkreli's previous harassment of Duca had led to him being permanently banned from Twitter in January 2017.  Thus, just as the case was to be submitted to the jury, Shkreli made a public

threat of sexual violence against two women whom he dislikes and with whom he has feuded in the past.  (See Dkt. No. 362).

Shkreli's threats subsequently escalated following his conviction.  On September 5, 2017, Shkreli posted on Facebook that he would pay $5,000 to anyone who assaulted Secretary Clinton to steal some of her hair.  Specifically, the post stated that "on HRC's book tour, try to grab a hair from her.  I must confirm the sequences I have.  Will pay $5,000 per hair obtained from Hillary Clinton.  Payment after the sequence matches.  Good luck, patrollers."  Shkreli's threat was widely circulated in the media, and was posted right before Secretary Clinton was scheduled to begin a tour to promote a new book, during which she is scheduled to make numerous public appearances.  After a period of several hours during which the threat received widespread attention, including from the United States Secret Service (see below), Shkreli "edited" the post to add a line describing it as "satire, meant for humor[.]"  (See Dkt. No. 362).

As a result of Shkreli's threat, the Secret Service launched an investigation and expended significant additional resources to ensure Secretary Clinton's protection.  In connection with that investigation, the Secret Service sought to interview Shkreli.  He declined, and subsequently posted a message on Facebook that revealed that he did not take his actions or their consequences seriously:  "The Secret Service has requested an interview with me.  I am declining that interview—schedule is full."  (See Dkt. No. 362).

On September 13, 2017, this Court revoked Shkreli's bail and remanded him to custody for violating conditions of his release pursuant to 18 U.S.C. § 3143.  Specifically, the Court found that Shkreli could not show by clear and convincing evidence that "he does not

pose a danger to the safety of any other person and the community."  (Order dated September 13, 2017, Dkt. No. 367).

II.    APPLICABLE PENALTIES

        For the reasons set forth below, the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") calculation detailed in the PSR is accurate and the applicable Guidelines range of imprisonment is 324 months to 405 months.  In addition, Shkreli has the ability to pay a fine, and a substantial fine is warranted due to the seriousness of the offenses, to promote respect for the law, to deter others, and to provide just punishment.  Finally, forfeiture is mandatory on the offenses of conviction and has been ordered by the Court in the amount of $7,360,450.

        A.    The Applicable Guidelines Range is 324 to 405 Months' Imprisonment

        The government respectfully submits that the appropriate Guidelines calculation is set forth in the PSR and below (PSR ¶¶ 52-65):

Base Offense Level (U.S.S.G. § 2B1.1(a)(1))                                                                 7

Plus:  Loss Greater Than $9.5 Million (§ 2B1.1(b)(1)(K))                                      +20

Plus:  More Than 10 Victims (§ 2B1.1(b)(2)(A)(i))                                                 +2

Plus:  Sophisticated Means (§ 2B1.1(b)(10)(C))                                                      +2

Plus:  Investment Advisor (§ 2B1.1(b)(19)(A)(iii))                                                 +4

Plus:  Leader of Criminal Activity With More Than 5 Participants (§ 3B1.1(a))          +4

Plus:  Obstruction of Justice (§ 3C1.1)                                                                   +2

Total Offense Level:                                                                                            <u>41</u>

        Shkreli has a criminal history score of zero, and thus a criminal history category of I.  (PSR ¶ 69).  Based on a total offense level of 41 and a criminal history

category of I, the defendant's Guidelines range of imprisonment is 324 to 405 months.  (See id. ¶ 123).

B.   Shkreli's Objections to the PSR are Unavailing

Shkreli filed extensive objections to the PSR with the Probation Department ("Probation") and the Court on January 3, 2018 ("Shkreli PSR Objections"), which included objections to the applicability of the following sentencing enhancements:  (a) a loss amount greater than $9.5 million (U.S.S.G. § 2B1.1(b)(1)(K)); (b) more than 10 victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)); (c) sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)); (d) leader or organizer with more than five participants (U.S.S.G. § 3B1.1(a)); and (e) obstruction of justice (U.S.S.G. § 3C1.1).  (Shkreli PSR Objections at 4-15).  In fact, the only applicable sentencing enhancement that Shkreli did not dispute was the enhancement for being an investment advisor (U.S.S.G. § 2B1.1(b)(19)(A)(iii)).

On February 1, 2018, Probation released an addendum to the PSR ("PSR Addendum") in which it rejected Shkreli's objections, and maintained that all of the sentencing enhancements should be applied.  (PSR Addendum at 1-5).  In his sentencing memorandum, Shkreli maintained his objections to the application of these sentencing enhancements.  (Shkreli Mem. at 66).  For the reasons set forth below and in the government's response to Shkreli's PSR objections, which were filed with the Court and Probation on January 25, 2018 ("Government PSR Response") and which are incorporated here by reference, all of Shkreli's objections are unavailing.

1.   The Court Found The Loss Amount to Be In Excess of $9.5 Million

The Court has already resolved Shkreli's objection to the applicable loss amount for the Guidelines calculation.  Specifically, the PSR and the PSR Addendum initially

calculated a total loss amount of more than $20 million based on the following loss amounts: $2,998,000 on Count Three, $3,402,450 on Count Six, $4 million on Count Eight, and more than $10 million on Count Seven, of which Shkreli was acquitted at trial but the government and Probation argued had been proven by a preponderance of the evidence.  The parties subsequently filed extensive briefs in which the government argued in favor of the loss amount calculation in the PSR and Shkreli renewed his objections to that calculation (contending that the loss amount should be zero).  (See Dkt. Nos. 527, 532, 534).  The Court also heard oral argument on the issue on February 23, 2018.  On February 26, 2018, the Court issued an order stating that it would apply a loss amount of $2,998,000 on Count Three, $3,402,450 on Count Six, and $4 million on Count Eight, for a total loss amount of more than $10 million.  (See Dkt. No. 535 at 2).  The Court further advised that while the government had established Shkreli's guilt on Count Seven by a preponderance of the evidence, the Court "in its discretion" would not include the loss amount for Count Seven in calculating the total loss amount for Guidelines purposes.  (Id. at 89).

As the loss amount found by the Court was in excess of $9.5 million, a sentencing enhancement for loss of 20 offense levels is applicable pursuant to U.S.S.G. § 2B1.1(b)(1)(K).

> 2.  The Sentencing Enhancement For "10 or More Victims" Is Warranted

Shkreli objected to the application of an enhancement for an offense involving more than 10 victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), arguing that the Guidelines defines a victim as an individual or entity that sustained an "actual loss," and there was "no actual loss on Counts Three and Six."  (Shkreli PSR Objections at 12).  Probation rejected this argument, finding that the enhancement was warranted because the money that the investors

in MSMB Capital and MSMB Healthcare invested in and/or did not redeem from those funds

as a result of Shkreli's material misrepresentations and omissions constituted actual losses.

(PSR Addendum at 4).  More significantly, the Court has already found—consistent with

binding Second Circuit precedent—that there were, in fact, actual losses on Counts Three and

Six in the amounts of $2,998,000 on Count Three and $3,402,450 on Count Six.  See Dkt. No.

535 at 54, 84-85; see also United States v. Lyttle, 460 F. App'x 3, 10 (2d Cir. 2012) (finding

that "loss in fraud cases includes the amount of property taken, even if all or part has been

returned") (quoting United States v. Coriaty, 300 F.3d 244, 251 (2d Cir. 2002)); United States

v. Komar, 529 F. App'x 28, 29 (2d Cir. 2013)).  Consequently, the individual investors who

either invested or failed to redeem their money in MSMB Capital and MSMB Healthcare are

all victims within the meaning of the Guidelines.  U.S.S.G. § 2B1.1, comment. (n.1); see also

United States v. Abiodun, 536 F.3d 162, 167 (2d Cir. 2008) (finding that even individuals

who have been reimbursed for their actual losses may be deemed victims for Guidelines

purposes).  As there were seven such investors in MSMB Capital (PSR ¶ 10) and 12 such

investors in MSMB Healthcare (PSR ¶ 16), all of whom are victims of the crimes for which

Shkreli was convicted in Counts Three and Six, the victim enhancement for 10 or more

victims is warranted and must be applied.  U.S.S.G. § 2B1.1(b)(2)(A)(i).

       3.    The Sentencing Enhancement For "Sophisticated Means" Is Warranted

       Shkreli objected to the application of the "sophisticated means" enhancement

pursuant to U.S.S.G. § 2B1.1(b)(10)(C), arguing that the PSR relied entirely on "acquitted

conduct" in Count Seven for the enhancement, and the Court was not permitted to rely on

such conduct for Guidelines purposes.  (Shkreli PSR Objections at 12).  However, as

Probation noted in response to these objections, the conduct in Count Seven is properly

19

considered as relevant conduct pursuant to U.S.S.G. § 1B1.3 because the government proved

such conduct at trial by a preponderance of the evidence.  (PSR Addendum at 5).

Subsequently, the Court issued a decision in which it held both that the government had the

defendant is guilty of the conduct charged in Count Seven by a preponderance of the evidence

at trial (Dkt. No. 535 at 89) and that the Court, pursuant to longstanding Second Circuit

precedent, may in fact consider acquitted conduct in connection with the calculation of the

Guidelines.  (Id.).  As a result, the sophisticated means enhancement is applicable based on

Shkreli's conduct in connection with Count Seven.

   In addition, the conduct of Shkreli and his co-conspirators in connection with

Count Eight separately supports a sophisticated means enhancement.  Application Note 9(A)

defines sophisticated means as "especially complex or intricate offense conduct pertaining to

the execution or concealment of the offense."  In order to accomplish and then conceal the

securities fraud conspiracy charged in Count Eight, the defendant and his co-conspirators—

including Greebel, an attorney—took a series of steps including the following:  (i) Shkreli and

Greebel arranged for the owner of Desert Gateway to distribute the free-trading shares

attached to the shell to a number of Shkreli's close friends and associates; (ii) Shkreli and

Greebel disguised that distribution as a series of arms-length sales, which Greebel papered to

make them look legitimate; (iii) following the reverse merger between Desert Gateway and

Retrophin, Shkreli and Greebel filed a Form 13-D with the SEC that falsely stated that Shkreli

did not exercise beneficial ownership over those free-trading shares, such that his beneficial

ownership of the vast majority of the free-trading shares of Retrophin was concealed from the

public; (iv) the remaining co-conspirators agreed to allow Shkreli to direct them as to when

they could sell or not sell the free-trading shares; and (v) Shkreli and his co-conspirators

agreed to sell, hold or make unshortable the free-trading shares in a manner that would allow them to control the price and trading volume of Retrophin (and specifically, ensure the price of Retrophin did not drop).  These acts in furtherance of Count Eight, among others, clearly demonstrate a level of complexity and sophistication that warrants a sophisticated means enhancement under the Guidelines.

      4.     <u>The Sentencing Enhancement for Shkreli's Role as an Organizer/Leader with Five Participants is Warranted</u>

Shkreli objected to Probation's determination that a role enhancement was applicable pursuant to U.S.S.G. § 3B1.1(a) because Shkreli acted as a leader or organizer of the fraudulent scheme charged in Count Eight, which had more than five participants. Specifically, Shkreli argued that the evidence was not sufficient to show that Shkreli had a leadership role; that either Shkreli's co-defendant, Evan Greebel, or the other six individuals who received free-trading shares and allowed Shkreli to control those shares, were co-conspirators; or that the conduct was extensive.  (Shkreli PSR Objections at 13-14).  In responding to and rejecting this objection, Probation noted that the enhancement was warranted because the Guidelines define a "participant" in a crime as an individual is criminally responsible but need not have been convicted, and there were at least seven individuals who qualified for Count Eight:  co-defendant Greebel and six of the seven individuals who received free-trading shares (all but Timothy Pierotti, who refused to participate in the conspiracy).  (PSR Addendum at 5).  In addition, Probation noted that the Guidelines require that a defendant must have been an organizer or leader in connection with at least one of the participants, and that the evidence at trial clearly showed Shkreli directing

21

the participants who were Fearnow share recipients how to buy, sell or allocate those shares in furtherance of the conspiracy.  (PSR Addendum at 5, citing § 3B1.1(a), comment (n.2)).

        The evidence supporting Shkreli's role as a leader or organizer with respect to Count Eight was overwhelming.[4]  In particular, the evidence showed, among other things, communications between Shkreli and at least seven co-conspirators (including Evan Greebel and the Fearnow share recipients), Shkreli and Greebel directing the allocation of various Fearnow shares on an ongoing basis, Shkreli's and Greebel's attempts to prevent Timothy Pierotti from selling shares of Retrophin by sending him an "over-the-wall" email and Shkreli threatening Pierotti's family when Pierotti was acting contrary to the conspiratorial plan. (PSR ¶¶ 36-43).  Thus, the notion that Shkreli did not have a supervisory role in the securities fraud conspiracy charged in Count Eight is entirely unsupported in the trial record.  He has thus earned the four-level role enhancement pursuant to U.S.S.G. § 3B1.1(a).

        5.    <u>The Sentencing Enhancement for Obstruction of Justice is Warranted</u>

        Finally, Shkreli objected to the application of an enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 based on Shkreli's obstruction of an investigation by the SEC via false statements made in a subpoena response and during testimony before the SEC.  Specifically, Shkreli contended that his statements to the SEC in November 2012 in response to a subpoena requesting information about MSMB Capital's assets—in which

---

[4] The government does not take the position that Shkreli is the only criminal participant in the conduct in Count Eight who could be considered an organizer or leader. <u>See</u>, <u>e.g.</u>, <u>United States v. Bahena</u>, 223 F.3d 797 (8th Cir. 2000) (finding that a defendant "need only be 'an' organizer or leader" and not "'the' organizer or leader" because there "can be more than one organizer or leader of a criminal activity for purposes of § 3B1.1").

Shkreli told the SEC that MSMB Capital had $2.6 million in assets under management, when in fact the fund had no assets (GX 218)—were (1) "not testimony," and (2) not false, because Shkreli "remained steadfast in MSMB Capital's interest in Retrophin" and "always intended for MSMB Capital to have an interest in Retrophin," as evidenced by statements Shkreli made to defrauded MSMB Capital investor Darren Blanton in the summer of 2012. (Shkreli Objections at 14-15).

As an initial matter, Shkreli's argument that he "always intended for MSMB Capital to have an interest in Retrophin" (Shkreli PSR Objections at 15) is a clear admission that MSMB Capital did not in fact have an interest in Retrophin at the time that Shkreli falsely told the SEC that MSMB Capital had $2.6 million in assets under management.[5]  Regardless, Shkreli's submission to the SEC was replete with misrepresentations.  He stated that MSMB Capital had $2.6 million in assets under management when, in fact, it had ceased all activity as a hedge fund back in February 2011, had no money in its bank or brokerage accounts, and had no other assets.  (GX 520)  Moreover, just two months before Shkreli's subpoena response—on September 5, 2012—Shkreli, Marek Biestek and MSMB Capital entered into a settlement agreement with Merrill Lynch in which they admitted that MSMB Capital had $0

---

[5] In its briefing related to the proper calculation of the loss amount for Count Three, the government explained at length why Shkreli's argument, that his lies to Blanton in the summer of 2012 about how a document detailing "Level III Securities" allegedly held by MSMB Capital (see Shkreli PSR Objections at 14) constitute proof that MSMB Capital in fact invested in Retrophin, is contrary to the evidence at trial and should be dismissed.  See Government's Letter re Loss, Dkt. No. 532 at 9-10.  To the contrary, the evidence at trial clearly showed that MSMB Capital did not receive any shares of Retrophin until December 3, 2012, more than a month after Shkreli's false statements to the SEC in his subpoena response. (GXs 119-24, 119-25).

in assets.  (PSR ¶ 14, GX 117-6).  Shkreli's contention, apparently, is that MSMB Capital was worth over $3 million as of August 1, 2012, $0 as of September 5, 2012 and $2.6 million as of November 4, 2012.  (Shkreli PSR Objections at 14-15.)  The reality was that the fund was worth nothing, and Shkreli admitted as much in a legal settlement with Merrill Lynch in which he was forced to be truthful.  In sum, Shkreli's statements to the SEC in November 2012, including his false statements relating to MSMB Capital's liquidation and his relationship with Josiah Austin (which Shkreli notably does not address, and which were proven false at trial),[6] were untruthful and obstructed a lawful investigation.

Moreover, Shkreli's contention that his statements to the SEC in a subpoena response cannot support an obstruction of justice enhancement because they did not constitute "testimony" is wrong.  The obstruction enhancement does not depend on a defendant giving false testimony in a courtroom or official proceeding.  Rather, Application Note 3 to U.S.S.G. § 3C1.1 furnishes a non-exhaustive list of obstructive conduct and acknowledges that "the conduct to which this adjustment applies is not subject to precise definition[.]"  Application Note 4 to U.S.S.G. § 3C1.1 furnishes eleven examples of obstruction, three of which cover various forms of providing false statements to judges, law enforcement officers or probation officers.  Making false statements to and providing false information in documents submitted

---

[6] Specifically, Mr. Austin testified at trial that Shkreli never invested in MSMB Capital, never bought or sold stock on his behalf (or had the authority to do so) and had no discretionary trading authority over his money.  (Tr. at 1197, 1222).  This is directly contrary to Shkreli's false statement to the SEC in November 2012 that Shkreli had a "long-term advisory relationship with Josiah T. Austin" which "represented the bulk of MSMB's activities" for many years.  (GX 218).

to a federal agency conducting a duly predicated investigation into Shkreli's conduct fits

within the capacious definition of obstruction of justice contained with the Guidelines.

In addition, the obstruction of justice enhancement is also warranted by

Shkreli's false statements during his testimony before the SEC on August 7, 2013 and

February 24, 2014.  Ironically, Shkreli's argument now that a sentencing enhancement is not

warranted is directly contrary to his arguments at trial, where he strongly (and successfully)

objected before and during trial to the admission of various portions of his SEC testimony on

the ground that the superseding indictment did not charge him with lying to the SEC and such

statements could confuse the jury into convicting him for lying to the SEC.  (See Shkreli Mot.

in Limine, Dkt. No. 229 at 2 (May 31, 2017)).  The motion reflected Shkreli's

acknowledgment of and concern about the admission of his false statements to the SEC.  As

the government noted in opposition to Shkreli's motion in limine, the SEC record is replete

with deceptions about, among other things, the assets under management for MSMB

Healthcare, investors' requests for cash once the MSMB entities wound down and MSMB

Capital's interest in shares of Retrophin.  See, e.g., Gov't Opp. To Mot. in Limine, Dkt. No.

235 at 7-10 (June 7, 2017).  For example, Shkreli told the SEC that he believed he notified all

of MSMB Capital's investors about the fund's lack of an auditor.  (GX 919).  As was evident

from the testimony of investors like Blanton, Sarah Hassan and Lindsay Rosenwald, Shkreli

made no such notification of this material fact.  (See Tr. at 1169 (Hassan), 1567-68, 1573

(Blanton), 1943 (Rosenwald)).  Shkreli also testified before the SEC that he spoke to all of his

investors about the failed OREX trade.  (GX 921).  Again, the trial testimony revealed that the

MSMB Capital investors were entirely unaware of the OREX trade, with the exception of

Blanton—who knew the trade had occurred but was not told it had wiped out the fund.  (Tr. at

1587-90).  And Shkreli testified to the SEC that some of the money he stole from MSMB

Healthcare to pay off the Merrill Lynch settlement was a "personal loan" from MSMB

Healthcare that he intended to repay.  (GX 924).  However, the evidence showed that funds

were in fact not a loan but simply stolen from MSMB Healthcare, and that the MSMB

Healthcare investors were never reimbursed for those stolen funds.  (GX 521).

      For all of these reasons, Shkreli's false statements to the SEC in his November

2012 subpoena response and during his testimony before the SEC on August 7, 2013 and

February 24, 2014, warrant the application of a sentencing enhancement for obstruction of

justice.

      C.     <u>Shkreli Has the Ability to Pay a Fine, and A Substantial Fine is Warranted</u>

      Title 18, United States Code, Section 3572(a) sets forth the factors to be

considered by the Court before imposing a fine, in addition to the factors set forth in Section

3553(a).  Such factors include: (1) the defendant's income, earning capacity, and financial

resources; (2) the burden that the fine will impose upon the defendant and any of his or her

dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4)

whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains

from the offenses; and (6) the expected costs to the government of any imprisonment.  18

U.S.C. § 3572(a).  The Guidelines provide, in turn, that a district court "<u>shall</u> impose a fine in

all cases, except where the defendant establishes that he is unable to pay and is not likely to

become able to pay any fine," and employs a similar eight-factor test to determine the size of

any such fine.  U.S.S.G. §§ 5E1.2(a), 5E1.2(d).  The Guidelines further provide that "[t]he

amount of the fine should always be sufficient to ensure that the fine, taken together with

other sanctions imposed, is punitive."  <u>Id.</u>  The defendant bears the burden of demonstrating

26

an inability to pay a fine.  See United States v. Camargo, 393 F. App'x 796, 798 (2d Cir. 2010); United States v. Salameh, 261 F.3d 271, 276 (2d Cir. 2001).

Here, as detailed in the PSR, the statutory maximum fine for Counts Three and Six is $5 million on each count, and the statutory maximum fine for Count Eight is $250,000 (PSR ¶ 130), while the Guidelines fine range for the offenses of conviction is $25,000 to $10,000,000 (PSR ¶ 132).  See U.S.S.G. § 5E1.2(c)(4) (Shkreli was convicted under 15 U.S.C. § 78ff, which is a statute authorizing a maximum fine greater than $500,000, so that the Court may impose a fine up to the maximum authorized by the statute); United States v. Gushlak, 495 F. App'x 132, 136 (2d Cir. 2012).  As Shkreli has an individual net worth of more than $27 million, it is not in dispute that he has the ability to pay a fine, nor has he demonstrated that the payment of a fine would be a burden.  (PSR ¶ 121).[7]  While Shkreli is likely to face civil obligations as a result of the pending action brought by the SEC related to similar conduct, the remaining factors in the analysis also weigh in favor of a substantial fine, as the defendant was not previously fined for his conduct; the expected costs to the government of the defendant's incarceration are significant (almost $35,000 per year of incarceration, and more than $4,000 per year for any term of supervised release (PSR ¶ 133)); and, for the reasons detailed at length below in Section IV, there is a strong need for a substantial financial penalty in light of the seriousness of the defendant's crimes, the defendant's utter disregard for the law, and the need for specific and general deterrence.

---

[7] Significantly, the defendant did not dispute the PSR's finding that he has the ability to pay a fine.  (See Shkreli PSR Objections).  Shkreli also did not argue in his sentencing memorandum that the payment of a fine would be a burden.  (See Shkreli Mem.).

As the Guidelines mandate that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine" (U.S.S.G. § 5E1.2(a)), and Shkreli has demonstrated the ability to pay such a fine, the imposition of a fine is required in this case. Given the need for the sentence imposed here to reflect the seriousness of the offenses, to promote respect for the law, to deter others, and to provide just punishment, the government submits that such fine should be substantial.

    D.    <u>The Court Has Ordered Forfeiture On the Counts of Conviction</u>

The parties previously briefed the issue of forfeiture at length, and the Court heard oral argument on those briefs on February 23, 2018. (<u>See</u> Dkt. Nos. 464, 515, 523, 529). For the reasons set forth in its prior filings and at oral argument, the government sought forfeiture—which is mandatory on the counts of conviction—of $2,998,000 on Count Three, $3,402,450 on Count Six, and $960,000 on Count Eight, for a total forfeiture amount of $7,360,450. At the Court's request, the government filed a revised Preliminary Order of Forfeiture on March 2, 2018. (<u>See</u> Dkt. No. 539). On March 5, 2018, the Court entered the Preliminary Order of Forfeiture, ordered forfeiture in the amount of $7,360,450 and found that forfeiture of substitute assets is warranted. (<u>See</u> Dkt. Nos. 540, 541). The government further requests that the Court attach the executed Preliminary Order of Forfeiture to the judgement and conviction following sentencing.

## III.    LEGAL STANDARD

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial

benchmark." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a

sentencing court should "consider all of the § 3553(a) factors to determine whether they

support the sentence requested by a party.  In so doing, [it] may not presume that the

Guidelines range is reasonable. [It] must make an individualized assessment based on the

facts presented." <u>Id.</u> at 50 (citation and footnote omitted).

   Title 18, United States Code, Section 3553(a) provides that, in imposing

sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for
> > the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct; [and]
> >
> > (C) to protect the public from further crimes of the defendant.

   Section 3553 also addresses the need for the sentence imposed "to provide the

defendant with needed educational or vocational training, medical care, or other correctional

treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  "[I]n determining

whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed,

in determining the length of the term, [the Court] shall consider the factors set forth in section

3553(a) to the extent that they are applicable, recognizing that imprisonment is not an

appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

   It is well settled that, at sentencing, "the court is virtually unfettered with

respect to the information it may consider."  <u>United States v. Alexander</u>, 860 F.2d 508, 513

(2d Cir. 1988).  Indeed, Title 18, United States Code, Section 3661 expressly provides that

"[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV.   ARGUMENT

As explained in greater detail below, a substantial sentence of incarceration is warranted given the nature and seriousness of Shkreli's criminal offenses; Shkreli's history and characteristics, including his demonstrated lack of remorse, lack of acceptance of responsibility, and lack of respect for the law; the need for both specific and general deterrence; and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a). For these reasons, the government respectfully submits that a sentence of imprisonment of no less than 180 months is sufficient, but not greater than necessary, to satisfy the goals of sentencing. Id.

A.   The Nature and Seriousness of Shkreli's Offenses Warrant a Substantial Sentence of Incarceration

It is without dispute that Shkreli's four fraudulent schemes were serious in nature and broad in scope, spanning a period of almost six years and resulting in the theft of millions of dollars of funds from MSMB Capital and MSMB Healthcare investors and from Retrophin, as well as the deception of the investing public via the manipulation of a publicly-traded stock. Despite the egregious nature of Shkreli's crimes, however, he maintains that those crimes do not in and of themselves warrant a substantial custodial sentence. Shkreli makes two main arguments in support of his position: first, that he did not steal the investors' money to benefit himself, as evidenced by the fact that his investors ultimately made a profit;

30

and second, that the Guidelines calculation in this case grossly overstates Shkreli's criminal culpability.  Both of these arguments lack merit.

In support of his first argument, Shkreli contends that his crimes were not serious because he "never actually turned his back on his investors" (Shkreli Mem. at 67), "none of his investors actually lost money" (id. at 68) and he "should not be treated the same as a defendant who takes all his investors['] money to spend on himself without even trying to provide for his investors" (id.).   This argument thus rests on two fatally-flawed myths that Shkreli has been peddling since the moment he was indicted:  that he did not personally benefit from his crimes, and that the investors he defrauded were ultimately repaid as a result of Shkreli's heroic and noble efforts.  The Court should reject both myths, once and for all, as the evidence demonstrates that Shkreli reaped enormous financial and reputational benefits from his frauds, and that his investors were only ultimately repaid because of the astonishing success of those frauds and Shkreli's uncanny ability to conceal his ongoing crimes from detection, including through his repeated and brazen false statements to the SEC.

First and foremost, Shkreli did in fact spend money stolen via his frauds directly "on himself"—for example, he stole $200,000 in cash from MSMB Healthcare to make a partial payment to defrauded MSMB Capital investor Darren Blanton; reversed a $900,000 investment that MSMB Healthcare made into Retrophin and then stole those funds to repay his personal obligations in connection with the Merrill Lynch settlement; and caused Retrophin to pay in excess of $10 million in money and shares to defrauded MSMB Capital

and MSMB Healthcare investors that he would otherwise have had to pay.[8]  Those stolen funds allowed Shkreli to perpetuate each fraud long enough to move forward with his next criminal scheme:  for example, the $200,000 he stole from MSMB Healthcare to make a payment to Blanton permitted him to hold Blanton off for a period of time; the $900,000 that Shkreli stole from MSMB Healthcare allowed him to pay off his obligation to Merrill Lynch and ensure that the MSMB Capital fraud would not come to light; and the $10 million that Shkreli and Greebel stole from Retrophin allowed him to continue to conceal both the MSMB Capital and MSMB Healthcare frauds.

Moreover, the fact that Shkreli was able to obtain and retain investments from MSMB Capital and MSMB Healthcare investors via fraud—specifically, Shkreli's material misrepresentations and omissions that induced investors to put money in the funds, and the false performance statements Shkreli crafted month after month that prevented the investors from realizing that they had been defrauded for a period of years—allowed Shkreli to continue to portray himself as a successful hedge fund manager and attract additional funds that he used to perpetuate both hedge fund schemes and to ultimately finance Retrophin. Without those continuing investments, and the fact that investors did not seek to withdraw their money because they did not know the funds were failing or had failed, the entire façade

---

[8] Again, the Court found that the government has proven by a preponderance of the evidence that Shkreli is guilty of the conduct charged in Count Seven—the theft from Retrophin via the settlement and sham consulting agreements—and that it should be considered relevant conduct at sentencing.  The fact that Shkreli does not owe restitution to Retrophin for the more than $10 million that he and Greebel stole because he was not convicted at trial of that count does not mean that the theft did not occur, or that Retrophin did not suffer a substantial loss as a result of Shkreli's criminal conduct.

constructed by Shkreli's lies would have collapsed; MSMB Capital and MSMB Healthcare investors would have demanded a return of their investments just at the time that Shkreli's personal debt to Merrill Lynch was coming due and Retrophin was seeking to go public.  Had that occurred, Shkreli would have owed the investors the return of their initial investments (close to $6 million); would have owed an additional $1.5 million to Merrill Lynch; and would have been unable to take Retrophin public, lacking even the funds to purchase a portion of the Desert Gateway shell, such that he never would have profited from the 2.5 million shares of Retrophin that he held through the pendency of the frauds and ultimately sold for tens of millions of dollars.

Thus, the fact that Shkreli used the stolen funds to perpetuate and hide his various fraudulent schemes, and to pay off personal debts that he would have otherwise had to expend assets to pay himself (such as the 2.5 million shares in Retrophin),[9] represent a tangible and substantial monetary benefit to Shkreli far in excess of $40 million.  There can also be no question that Shkreli received a significant reputational benefit from his crimes, as he was able to hold himself out for years as a successful hedge fund manager and pharmaceutical wunderkind to potential investors, adoring fans on social media and industry figures whose respect Shkreli craved.  Any suggestion that Shkreli did not greatly benefit from his frauds is thus deeply disingenuous.

---

[9] Throughout his sentencing memorandum, Shkreli continually references the fact that he "did not take a salary" from his various business endeavors, including Turing.  (See, e.g., Shkreli Mem. at 32).  This is a red herring, as Shkreli gave himself (both at Retrophin and at Turing) a majority stake in the company and thus stood to benefit enormously from each company's success.

The second myth that Shkreli has perpetuated—that it was his hard work that allowed his investors to be repaid—can be dispelled alongside the tome that Shkreli did not personally benefit from his crimes.  The truth is that the MSMB Capital and MSMB Healthcare investors did not ultimately suffer monetary losses—as measured over a period of, in some cases, five or six years—only because of Shkreli's ability to avoid detection of his prior frauds, and to keep them going long enough to successfully manipulate the price and trading volume of Retrophin shares so that the shares he distributed to MSMB Capital and MSMB Healthcare investors had value.  That is, because Shkreli's frauds were so successful for so long, and because he was able to conceal them from his investors, the SEC and the public through a staggering number of lies, Shkreli was able to steal enough money from MSMB Healthcare and from Retrophin to pay the Merrill Lynch settlement, prevent investors from realizing that their funds were gone, and cause Retrophin to go public in a transaction where Retrophin was forced to pay for the free-trading shares attached to the Desert Gateway shell which Shkreli then controlled for his own benefit.  At that point, Shkreli and his co-conspirators—due to an additional lie to the SEC and the investing public about his beneficial ownership of those free-trading shares—manipulated the price and trading volume of Retrophin shares long enough to make it to the PIPEs in January and February 2013, and ensure that the shares Shkreli ultimately distributed to MSMB Capital and MSMB Healthcare investors in early 2013 had enough value to further hold off any suspicious investors.  To satisfy those defrauded investors who were not placated by the share distribution, Shkreli and Greebel proceeded to orchestrate the settlement and sham consulting agreements and steal at least an additional $10 million from Retrophin.

Taken together, these facts show that the defrauded MSMB Capital and MSMB Healthcare investors were not repaid due to Shkreli's personal generosity or honest hard work, but were ultimately renumerated due to Shkreli's continuing crimes.

Shkreli's second argument regarding the nature and seriousness of Shkreli's crimes is that the Guidelines calculation does not properly reflect the degree of Shkreli's culpability.  (Shkreli Mem. at 66-68).  In making this argument, Shkreli cites to caselaw suggesting that Section 2B1.1 of the Guidelines is too heavily weighted towards financial loss in fraud cases, and that it would be unfair for Shkreli to "bear the brunt of a 20-level increase for loss amount."  (Id.).

Shkreli is correct that the government is not seeking a sentence within the applicable Guidelines range of imprisonment is 324 to 405 months, but instead is seeking a substantial sentence of no more than 180 months' imprisonment.  However, Shkreli is wrong to suggest that the Guidelines in fact overstate Shkreli's culpability.  More than half of the offense level points that accrued to Shkreli in connection with his Guidelines calculation are due to the specific, egregious nature of his criminality.  For example, he received an enhancement for 10 or more victims because he defrauded more than 15 separate investors in the two separate hedge fund schemes out of millions of dollars of their hard-earned money through lies, and then kept that money by telling those individuals more lies.  He received a sophisticated means enhancement because, in connection with the two Retrophin schemes— stealing money from Retrophin via settlement and sham consulting agreements that were hidden from the company's Board, and manipulating the price and volume of Retrophin stock to deceive the investing public—Shkreli and his co-conspirators took many complex steps in furtherance and in concealment of those frauds.  He received an investment adviser

enhancement because he held himself out as a trustworthy, honest broker dealing with his investors' money, and instead deceived them again and again.  He received an enhancement for being a leader of the market manipulation scheme in Count Eight, which involved directing the activities of <u>seven</u> co-conspirators.  And finally, he received an obstruction of justice enhancement for his repeated lies to the SEC about his criminal conduct—lies which helped him to avoid detection of his crimes for years.  Thus, the nature and seriousness of Shkreli's offenses warrant a substantial sentence of incarceration.

B.      <u>Shkreli's History and Characteristics Warrant a Substantial Term of Incarceration</u>

As set forth below, Shkreli's history and characteristics demonstrate that he does not respect the rule of law or the operation of the criminal justice system; has failed to demonstrate any acceptance of responsibility for his crimes; and lacks genuine remorse for his conduct.  This section addresses, in turn:  (1) Dr. Salsberg's psychological evaluation and why it does not support a plea of leniency; (2) Shkreli's conduct that demonstrates a lack of respect for the law and a lack of remorse, including his public statements post-indictment and post-verdict, his disruption of the trial proceedings and recent statements about remorse; (3) Shkreli's charitable donations and promotion of orphan drugs, which do not mitigate his conduct;  (4) additional conduct the Court should consider, including Shkreli's threats to Secretary Clinton, Duca and Pierotti, and his treatment of his employees, and (5) ███████

███████████

1.      <u>Dr. Salsberg's Psychological Evaluation Does Not Support Leniency</u>

Shkreli relies heavily in his sentencing submission on a psychological evaluation prepared by Dr. David Salsberg between August and October 2017, which was

36

provided to the government and the Court on February 7, 2018 ("Salsberg Rep."). Although the government does not challenge Dr. Salsberg's qualifications, his report is a limited assessment that ignores crucial evidence and actually counsels in favor of sentencing Shkreli to a significant term of imprisonment in order to achieve the goal of specific deterrence.

First, Dr. Salsberg's report is based <u>solely</u> on his interviews with Shkreli and certain family members, and his review of clinical notes from another doctor that Shkreli consulted between September 2005 and December 2016.[10] (Shkreli Mem. at 7; Salsberg Rep. at 1). Significantly, Dr. Salsberg did not review any information related to the criminal conduct for which Shkreli will be sentenced (for example, he did not read the trial record or any trial exhibits, which detailed Shkreli's communications with others during the course of his commission of the four frauds), nor did he review and evaluate Shkreli's many public statements, including the escalating threats against women (such as Lauren Duca and Secretary Hillary Clinton), that led to his incarceration in September 2017. (<u>Id.</u>). It is not clear whether Dr. Salsberg chose to complete his evaluation based on limited information or whether he was specifically asked by Shkreli not to consider certain information.[11] Either way, because Dr. Salsberg failed to consider any objective measures of Shkreli's behavior—for example, communications authored by Shkreli that would show how he in fact interacted with defrauded investors, employees or other members of the public—and instead relied

---

[10] Dr. Salsberg's report does not indicate on how many occasions Shkreli was treated by Dr. Saltiel after his initial visit in 2005. (Salsberg Rep. at 1). However, Dr. Salsberg's report notes that these visits were "sporadic" and information from the records is "limited."

[11] Shkreli has also failed to disclose how much Dr. Salsberg was paid to provide his evaluation in support of Shkreli's sentencing submission.

exclusively on reports of Shkreli's actions from Shkreli and his family members, his evaluation is neither a complete nor an impartial assessment of Shkreli's true nature.

Second, even based on the limited information that he did review, Dr. Salsberg's report is replete with observations of Shkreli's propensity to lie and obfuscate due to his overconfidence, his refusal to admit failure and his fundamental, unshakable belief that the ends <u>always</u> justify the means, no matter the cost—all personal qualities that indicate Shkreli's unwillingness to acknowledge or accept responsibility for his criminal behavior, and thus an unwillingness to alter such behavior in the future, which evidences a need for a significant sentence of incarceration in order to serve the goal of specific deterrence.  For example, Shkreli made multiple statements to Dr. Salsberg that seek to attribute many of his actions to being misunderstood by others or to having a sense of humor others do not appreciate—a way to shift the blame away from himself for his actions:

- "[Shkreli] endorsed some exaggerating and dishonesty to further his image as successful and smart, but also genuinely believed that he was helping people." (Salsberg Rep. at 5).

- Shkreli reported only "some shame, and regret for his actions and desires to make changes." (<u>Id.</u>).

- Shkreli was "reflective on some of his impulsive and misguided actions, albeit framing much of it as not being understood correctly and getting caught up in what he perceived as his sense of humor and actions to draw attention."  (<u>Id.</u>).[12]

---

[12] The government notes that some of Shkreli's letters of support try to excuse his behavior for the same reasons proffered by Shkreli.  (<u>See</u>, <u>e.g.</u>, Shkreli Mem. Exhibit 5 ("Martin has made mistakes in his time, and some of his actions have been controversial and offensive, however I believe Martin is largely misunderstood.  I know he is well intentioned and exceedingly selfless."); Exhibit 23 ("Martin is likely misunderstood by those who dislike him due to his occasional aloof and tac[tless] demeanor …"); Exhibit 27 ("I realized what an intelligent, talented and gifted but also misunderstood guy he is")).

Similarly, many of Dr. Salsberg's own observations and conclusions are consistent with the personality traits of deceit, rationalization and a failure to accept responsibility:

- "His difficulty with accurately assessing people and events leaves him prone to use arbitrary reasoning to explain decisions he has made, to employ faulty judgment, and to draw erroneous conclusions. In essence, Mr. Shkreli demonstrates a tendency to act on ill-conceived perceptions. He is also likely to deal with challenging situations in an escapist manner, especially when under stress. Rather than clearly thinking through what he can do, he may withdraw in his imagination or intellectualization." (Id. at 8-9).

- "He demonstrates tendencies to become preoccupied with his own views at the expense of taking perspective from all angles. This is consistent with a narcissistic outlook, in that he possesses a sense of entitlement and a tendency to externalize responsibility." (Id. at 9).

- "When he does not achieve the outcomes he perceives as successful, he is likely to experience panic-like anxiety, frustration and negativity, and to employ maladaptive defenses such as denial and rationalization in order to preserve his self-image." (Id.).

- "Also salient is a seeming preoccupation with thoughts of success and a rather undisciplined imagination that takes liberties with reality at times. Relatedly, he is cognitively inclined to transform failures into successes and construct intricate rationalizations. He may have illusions of invincibility and truly believes that he can undertake and accomplish more than is realistic. But again, he has had reinforcement of this style by actual successes. Whatever uncertainty he may have in his abilities is likely suppressed." (Id.).

In spite of these observations, Dr. Salsberg states towards the end of his report that he believes that Shkreli "has gained insight and remorse from recent events and presents with a different outlook and perspective and is in a unique and new place for his receptivity to such interactions." (Id. at 13). However, Dr. Salsberg provides absolutely no empirical basis for this conclusion, no explanation of any concrete steps or statements Shkreli took or made between August 23, 2017 (the date of Dr. Salsberg's first meeting with Shkreli) and October 31, 2017 (the date of Dr. Salsberg's last meeting with Shkreli) to make clear that he has

"gained insight" from recent events or "presents with a different outlook" than the remainder of the report would suggest.  In fact, since Dr. Salsberg is entirely unfamiliar with the facts and circumstances of "recent events"—which appears to be a colloquialism for Shkreli's criminal conduct and subsequent conviction—it is not clear how Dr. Salsberg could fully evaluate their impact on Shkreli.  When empirical, objective evidence is taken into account— Shkreli's <u>actual</u> behavior and statements throughout the course of the commission of these four frauds and his subsequent indictment, conviction and incarceration—it is clear, as detailed below, that Shkreli has no remorse for his actions and has shown no desire to do anything other than obfuscate and deceive others in order to obtain the ends he seeks.  <u>See</u> Section IV.B.2.

Third, while the three diagnoses that Dr. Salsberg claims that Shkreli meets under the DSM-V—generalized anxiety disorder, major depressive disorder and unspecified personality disorder (Salsberg Rep. at 11)—may provide some explanation for certain actions that Shkreli has taken, those diagnoses do not, as Shkreli himself admits, "undermine findings of guilt and personal responsibility" or change the fact that Shkreli alone is "uniquely responsible for all of his actions and choices."  (Shkreli Mem. at 19).  That is, to the extent that Shkreli may "experience panic-like anxiety, frustration and negativity, and to employ maladaptive defenses such as denial and rationalization in order to preserve his self-image," it does not excuse any of the lies he told to investors, steps he took to steal money and shares from Retrophin or actions he took to manipulate the price and trading volume of Retrophin stock.  Moreover, many aspects of Shkreli's frauds—which were the result of calculated planning over a period of time and served no purpose other than to benefit Shkreli financially—cannot even be <u>explained</u> by a claim that Shkreli's "deficits with stress-tolerance

are not sufficient to handle the great deal of pressure and responsibility he has taken on in his life."

    For example, Shkreli claimed (in sworn testimony before the SEC in February 2014) that $775,000 of the money he stole from MSMB Healthcare to pay off the Merrill Lynch settlement constituted a "personal loan" from MSMB Healthcare that he intended to repay to the MSMB Healthcare investors.  (GX 923).  However, Shkreli never repaid the alleged "loan" to the MSMB Healthcare investors:  instead, he only returned the money to a MSMB Healthcare bank account in May 2015, after he learned of the criminal investigation; never redistributed those funds to MSMB Healthcare investors; and ultimately kept the funds for his personal benefit.  (Tr. at 2666, GX 506-E).  It wasn't Shkreli's "panic-like anxiety" or "stress-intolerance" that caused him to steal that money from MSMB Healthcare and then fail to repay the money for a period of several years when he had the funds to do so—it was pure greed.  As another example, in December of 2013, Shkreli caused Retrophin to sign a sham consulting agreement with Lee Yaffe, the son of an Elea Capital investor whose $200,000 investment Shkreli had lost in 2007.  That sham consulting agreement was used to steal money and stock from Retrophin—which was not even in existence at the time that Elea Capital failed—to repay Yaffe's father's investment from six years prior, and was entered into at a time when Shkreli personally owned millions of shares of Retrophin and could have repaid Yaffe himself.  Again, there was no "panic-like anxiety" that spurred this decision, as Shkreli had been putting Yaffe off for years and at that point personally owned sufficient Retrophin shares to make the repayment.  Rather, Shkreli owed a debt that he simply did not want to pay himself, and decided he would rather steal money and shares from Retrophin to pay off a person with no connection to the company than take from his own assets.  The same

is true of the other settlement and sham consulting agreements (which Shkreli had the assets to repay on his own), and in fact the trial record is replete with similar instances.

Finally, it is notable that Shkreli's own correspondence indicates that he sees even Dr. Salsberg's report itself as a means to an end.  On January 8, 2018, prior to receiving Dr. Salsberg's final report, Shkreli stated in email correspondence from prison that he was "going to enjoy the psych test results."  Shkreli then discussed having report disseminated publicly because, as he stated, "I want to watch the press squirm when they see I have a 150 IQ and no overt psychological issues."[13]  That is, Shkreli wanted to use the report as a means to prove his intelligence to members of the press with whom he frequently disagrees.

       2.    <u>Shkreli Has Not Demonstrated Respect for the Law or Genuine Remorse</u>

Shkreli argues in his sentencing submission that the Court should consider leniency because that he "acknowledges and accepts the jury's verdict," is intent on "learning from his mistakes" and "will rebuild his life on a foundation of honesty and integrity." (Shkreli Mem. at 64-65).  However, Shkreli's own words in his letter to the Court, along with his actions since his indictment—and particularly since his conviction and incarceration— clearly demonstrate that he does not accept the jury's verdict, has no respect for the law, and feels no genuine remorse for his criminal conduct.

       a.    <u>Shkreli's Conduct Prior To His Incarceration</u>

As detailed above, since his indictment in December 2015, Shkreli has consistently demonstrated that he has no respect for the law or the criminal justice system. <u>See</u> Section I.B.1.  Post-indictment, Shkreli told news outlets that his plan was to make the

---

[13] Dr. Salsberg's report does not state that Shkreli has an IQ of 150.

case "more polarizing and popular" by creating chaos in the media to obtain an acquittal, and further stated that he was "spending millions to influence the jury pool in Brooklyn."  He also made numerous public statements characterizing his prosecution as a  "chess match of public opinion," claimed that the criminal case against him was "all for political show," and complained he was only "being prosecuted for being a jerk."  Shkreli's attacks on the justice system were so egregious that Greebel sought a severance in part by arguing that Shkreli's behavior would create a circus-like atmosphere which would make it impossible for Greebel to get a fair trial; the Court, after hearing promises from counsel that Shkreli would "not do anything to undermine the integrity" of the trial, did not grant a severance on that basis.

But once the jury was selected and empaneled in late June 2017, Shkreli escalated his attacks on the criminal justice system by—contrary to his specific pre-trial promises to the Court—embarking on a campaign of disruption.  This behavior included commenting on trial evidence and the credibility of trial witnesses to the press and on social media.  In addition, during a lunch break on June 30, 2017, Shkreli entered the overflow viewing room in the courthouse and repeatedly attacked the credibility of witnesses, previewed his response to evidence that was only partially before the jury at that stage of the case, and made inappropriate personal attacks on current and former prosecutors.  At the end of the same day, in a response to a reporter's question to counsel about the incident, Shkreli interrupted to state that he would "do whatever he wants" and was videotaped grinning broadly.  Only after the government sought a gag order and the Court reprimanded Shkreli for his actions did counsel, on behalf of Shkreli, acknowledge that his behavior was inappropriate.  The Court also required Shkreli not to speak about the case within the courthouse for the duration of the trial.

The moment the trial was over and the verdict was announced, however, Shkreli took to the courthouse steps to resume his attacks on the justice system and make it clear that he thought his conviction was a non-event.  In a televised press conference mere moments after he was convicted, Shkreli stated that he was "delighted in many ways" with the verdict, characterizing his prosecution as a "witch hunt of epic proportions and maybe they found one or two broomsticks."[14]  Subsequently, Shkreli broadcast himself from his home on several occasions in August and September 2017, during which he declared that the trial proved "I didn't make money through illicit means" and that, post-verdict, "[i]t doesn't seem like life will change very much for Martin Shkreli, basically ever … I think there's a decent chance that there's a complete vacation of the charges for any sentence."[15]  Shkreli also joked that if he did go to jail, it would be "Club Fed" and that he was "prepared" because he was "across the street from 9/11."[16]  He further characterized his guilty verdict as follows: "Martin, here's a slap on the wrist, God bless ya."[17]

---

[14] Bloomberg News, "Shkreli Decries 'Witch Hunt' After Being Convicted of Securities Fraud," August 4, 2017, available at https://www.bloomberg.com/news/articles/2017-08-04/martin-shkreli-convicted-of-fraud-by-u-s-jury-in-new-york.

[15] Time.com, "I think I Can Get Probation.  Martin Shkreli Unshaken After Fraud Conviction," August 4, 2017, available at http://time.com/4888561/martin-shkreli-fraud-case-conviction/.

[16] Id.; see also The Daily Mail, "Pharma Bro boasts that seeing 9/11 prepared him for jail as he faces up 20 YEARS for fraud," August 7, 2017, available at http://www.dailymail.co.uk/news/article-4765720/Martin-Shkreli-says-witnessing-9-11-prepared-jail.html.

[17] Id.

b.     Shkreli's Statements Post-Incarceration

Following his incarceration in September 2017 for violating the conditions of

his bail by making an escalating series of threats against multiple individuals online—

discussed in greater detail below—Shkreli continued to privately express disdain for his

conviction, the process by which he would be sentenced and the idea of expressing remorse,

even while publicly (in his sentencing memorandum and letter to the Court) gesturing towards

acceptance of the verdict and regret for his actions.

For example, in an email conversation from jail in January 2018, Shkreli made

the statement "fuck the feds" and went on to have the following dialogue:

> Shkreli: . . . I shaved.  may sit out [the] forfeiture [hearing] . . .
>
> Email Recipient: Ok! Don't blame me if [the prosecutor] takes
> all your money. I think kiyo might be disappointed, too.
>
> Shkreli: 0% chance and its not 'all my money'
>
> Email Recipient: Nope. Not 0% and Kiyo really will think
> you're blowing it off (correctly), and think less of you for that.
> Yes I know it's not all your money. I'm being hyperbolic.
>
> Shkreli: maybe a big portion of my liquid money![18] but that
> picture changes frequently. i hope the irs gives me a big refund
> soon.

Shkreli's statements that he might not bother to attend the forfeiture hearing, that he is not

worried about forfeiture because it only affects his "liquid money" and that he hopes the

---

[18] Shkreli references his "liquid money" despite making repeated requests for a reduction of his bail on the ground that he lacked the liquid assets to pay tax assessments and attorney's fees.  Indeed, Shkreli's pre-trial claims of impoverishment—in a gambit to lower his bail in the spring of 2016—were finally put to rest with the revelation in the PSR that his net worth is tens of millions of dollars.  (PSR ¶ 117).

Internal Revenue Service ("IRS")—to which Shkreli owes a significant outstanding debt of $3.4 million—will give him a "big refund soon" demonstrate that, even post-incarceration, he does not take either the jury's verdict or the sentencing process seriously.

Shkreli expressed similar disregard for his conviction in another email communication from jail on December 20, 2018 (prior to the verdict in Greebel's trial), in which he stated:

> i think I've told you what we're expecting - Time Served on the low end and maybe 24 months on the high end there is no analog case. this case is a loss for the government … they won 3 out of 8 counts (so far), where they proved a fraud where no losses occurred. it's as close to a loss as a loss gets. it's a reckless embarrassment, especially when count 8 gets dropped for rule 29, evan wins in 15 minutes of deliberation and we appeal for the next 10 years on the remaining two counts and government coercion is brought to light.

Moreover, Shkreli's email communications confirm that any remorse he may express publicly is a carefully constructed façade.  In email conversations in November and December 2017, an individual corresponding with Shkreli ("Individual-1") warned Shkreli that "Getting convicted and acting out on social media doesn't imply you're taking things very seriously."  Shkreli responded by explaining that because he believed the loss amount for the Guidelines would be zero, his sentence would be extremely low such that any expression of remorse was not required:  "[W]e really feel strongly there's no loss here … so all the lack of remorse in the world doesn't change the numbers.  [The judge is] not going to upward depart."  Further up the same email chain, after further prodding from Individual-1 about "not bet[ting] on remorse not mattering," Shkreli wrote that he has "a lot of remorse" and then immediately stated that he "will do everything and anything to get the lowest sentence possible except for giving up the handful of constitutional rights I have."  (Emphasis added).

46

In a follow-on conversation several weeks later, Shkreli stated, "if you believe you are innocent, it is a bit of a shame to ask someone to show remorse isn't it?"  Individual-1 replied that Shkreli "[could] probably be remorseful for being a dick, overselling yourself, not being entirely forthcoming and truthful, eg, without giving up your Constitutional rights, I think."  Shkreli replied "being a dick to who?  perhaps 2 out of 3 but <u>I don't think the giraffe apologizes for his long neck</u>.  it's what makes me, me."  (Emphasis added).

c.    <u>Shkreli's Letter to the Court</u>

In a letter filed with his sentencing memorandum, Shkreli attempts to erase the conduct outlined above, claiming that he "acknowledge[s] and respect[s] the jury's verdict" and that he understands "how I need to change."  (Shkreli Mem. Exhibit 49 at 1, 2).  He further tells the Court that he wishes to create a life "built on honesty, integrity and achievement that advances humanity," and seeks for the Court to show him "mercy … at sentencing."  (<u>Id.</u> at 3).

As an initial matter, Shkreli's letter to the Court must be considered against the backdrop of the conduct outlined above—Shkreli's repeated public and private statements since his indictment, including after his conviction and incarceration, that show he does not in fact respect the jury's verdict or have any remorse for his actions.  But even taken alone, Shkreli's letter does not demonstrate genuine remorse.  Instead, Shkreli uses the letter to shift blame for his actions elsewhere—to his victims, to the government, to others he has encountered on social media and to "demons who haunted me."  (<u>Id.</u> at 1).

Not once does Shkreli acknowledge that he lied to investors and committed fraud; instead, he describes his actions as "preventable mistakes" and based on misunderstandings by investors of "alternative interpretations of fact."  (<u>Id.</u>).  He further

47

states:  "At times, I dodged answering questions at other times I provided answers that were only correct if put in a certain assumed context.  These choices are now seen as attempts by me to deceive and manipulate, and it is my fault." (Id.).  In essence, he blames his own investors for his predicament, because his answers were "correct if put in an assumed context" and they got upset simply because they failed to grasp that "assumed context."  He also attempts to recast his criminal behavior as a matter of perception—"[t]hese choices are now seen as attempts by me to deceive and manipulate"—instead of acknowledging that he engaged in a pattern of deliberate deception and manipulation over a period of many years. Shkreli similarly suggests that his public statements—those that show a lack of respect for the law and a lack of remorse, as well as those in which he has mercilessly and viciously attacked and threatened others—do not "always reflect my true nature" and that the blame for such statements lies with his social media targets (he states that "when I get dragged into a mud fight, I often dive in, head first") and/or the government (and by extension, the trial witnesses, as he notes that characterizations of him at trial were biased because "litigation opponents for example do not make fair critics").  (Id. at 2-3).

But as the government argued in connection with its motion to revoke Shkreli's bail, the responsibility for Shkreli's statements—to investors, to the media and to the public—lies squarely with him.  He cannot simply recast his own patently false statements—e.g., that MSMB Capital and MSMB Healthcare each had an auditor when neither ever had an auditor, that the funds' assets under management were in the tens or hundreds of millions of dollars when neither fund ever had above several million dollars, etc.—as "misunderstandings," nor can he disavow years of public harassment of others and contempt for the criminal justice system as just his knee-jerk, I'm-not-actually-serious reaction to a "mud fight."  Shkreli's

letter is ultimately disingenuous because it entirely fails to grapple with and accept the very real misrepresentations and omissions that he made in the commission of his frauds, and for which the jury held him responsible.  Nor does it take stock of the true damage that his words (separate and apart from the frauds) have had on others, including on himself.

Ultimately, the letter even shifts responsibility for his post-verdict rehabilitation to the Court, by conditioning his promise to be a better person on the Court's grant of leniency.  Shkreli states that "if you find it appropriate to impose a sentence that does not include a period of extended incarceration, I will do my absolute best … I honestly believe I can contribute and really make a difference if Your Honor gives me a chance."  (Id. at 3).  He similarly states that "any mercy shown at sentencing will be met with a strict adherence to" a life of honesty.  An individual showing true remorse might well still ask for leniency, but does not condition any declaration that he or she is a changed person who will seek to live a life of "honesty, integrity and achievement" only if the Court gives him a light sentence.

3.  Shkreli's Charitable Donations and Promotion of Orphan Drugs Do Not
     Mitigate His Conduct

Shkreli also argues the letters submitted on his behalf demonstrate his "good deeds and charitable works" and that this "history of commitments to medicine and charitable works [is] truly remarkable" such that he qualifies for a variance under 18 U.S.C. § 3553(a).  (Shkreli Mem. at 73-77).  The government disagrees.  As an initial matter, U.S.S.G. § 5H1.11 provides that "[c]ivic, charitable or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."  Charitable work warrants a downward departure only where it is "present to an exceptional degree or in some other way makes the case different from the

49

ordinary case where [charitable work] is present." United States v. Canova, 412 F.3d 331, 358 (2d Cir. 2005). As discussed below, the defendant's emotional support of his family and friends, his donations to charitable organizations and his promotion of orphan drugs for profit during his employment at Retrophin and Turing are not so extraordinary, nor are they "present to an exceptional degree," such that they make this case different from the ordinary case. See Canova, 412 F.3d at 358.

In support of his argument that "several courts have granted a defendant" a downward departure for "exceptional" good works, the defendant analogizes his circumstances exclusively to cases outside the Second Circuit, and primarily to cases in the Third and Eighth Circuits. (Shkreli Mem. at 74-75). The government notes that these circuits have both recognized that, in terms of a downward departure for charitable works, "more is expected of high-level business executives who enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities." United States v. Cooper, 394 F.3d 172 (3d Cir. 2005) (quoting United States v. Haverstat, 22 F.3d 790, 796 (8th Cir. 1994)). And, in fact, the cases cited by Shkreli show that those individuals who were convicted of white collar crimes and received downward departures made sustained, years-long contributions of time and money to better the lives of others. For example, in United States v. Cooper, 394 F.3d 172 (3d Cir. 2005), the defendant, a former CEO and CFO of a publicly-traded corporation who pled guilty to one count of tax fraud and one count of securities fraud, received a downward departure due to his "hands-on personal sacrifices" that included—in addition to financial donations made personally to various charitable organizations—organizing and running a youth football team in a depressed area of Pittsburgh; paying for four players on the team to attend a suburban high school and finding a

50

school that would accept the boys together; and paying for college for one of his players.

Similarly, in United States v. Woods, 159 F.3d 1132, 1136-37 (8th Cir. 1998), the defendant,

who pled guilty to bankruptcy fraud and money laundering, received a downward departure

for bringing two troubled young women—her niece who had dropped out of school, and an

employee who had stolen from the defendant—into her home and paying for them to attend a

private high school, as well as for helping to care for an elderly friend so that he could "live

out his remaining years with greater independence."

      Cases within the Second Circuit also indicate that a defendant's charitable

works and good deeds must be truly extraordinary to warrant a departure.  For example, in

Canova, the court found the defendant's public service and good works exceptional where he

had served honorably for six years in the Marine Corps, had served for seven years as a

volunteer firefighter, sustaining injuries while trying to save lives, and on three occasions

rushed to help others during emergencies as a Good Samaritan.  Id. at 358-59.  Likewise, in

United States v. Greene, the court found that the defendant was entitled to a downward

departure for his charitable works because his "contributions [we]re distinctly different" from

the typical white collar defendant.  249 F. Supp. 2d 262, 264 (S.D.N.Y. 2003).  Green—who,

as a file clerk at a law firm, was at "the lowest end of the scale" among white collar

employees—had long volunteered as a foster father and eventually adopted six

underprivileged children.  Id.  The court found that Greene had "devoted his entire life, all day

every day, to parenting very disturbed and hard to place orphaned children.  Greene's level of

commitment to good works is truly extraordinary."  Id.

      In contrast to the defendants in Canova and Greene, Shkreli has not devoted

himself to public service or charitable works during his entire life, let alone a significant

portion of his life.  His contributions to charity, either personally or through the Shkreli Foundation, appear to be limited to a brief period between 2014 and 2015 (see Shkreli Mem. at 46-49), and some cases were made in exchange for a benefit to Shkreli or to friends and family.  For example, his $30,000 donation to the LGBT Center in 2014 went to purchase a table at a charity dinner.  (See Shkreli Mem. Exhibit 31).  Similarly, his $35,000 donation to Matt's Promise was in connection with a concert hosted by the charity at Cipriani Wall Street, and was discounted by $1500 for "goods and services" that Shkreli received in return for part of his contribution.  (See Shkreli Mem. Exhibit 33).[19]  Moreover, it is significant that these donations were made in 2014 and 2015, right after Shkreli profited enormously from his frauds:  for example, had Shkreli been forced to repay the defrauded MSMB Capital and MSMB Healthcare investors from his own assets rather than stealing those funds from Retrophin via settlement and sham consulting agreements (at a cost in excess of $10 million), or had he not successfully manipulated the price and trading volume of Retrophin stock to his advantage (which gave significant value to his 2.5 million Retrophin shares and allowed the company to attract significant, critical investments to keep it afloat), Shkreli would not have had money available to make such donations.  And, in any event, these and other similar charitable donations do not distinguish him from many other white collar defendants.

---

[19] The government also notes that the Shkreli Foundation appears to have only been formally founded as a charitable organization in New York State in October 2015, and to date has filed no tax returns and made no public reports of its donations or activities.  See, e.g., Listing for Shkreli Foundation at the New York State Charities Bureau, available at https://www.charitiesnys.com/RegistrySearch/show_details.jsp?id={85CEFEB7-B5C0-4F7E-8D05-53A4674311D1}.

Nor should Shkreli receive a downward departure with his employment-related promotion of orphan drugs for profit in connection with his work at Retrophin and Turing. See U.S.S.G. § 5H1.11 (providing that "employment-related contributions" are generally not relevant to a sentencing analysis). The vast majority of Shkreli's personal financial worth was directly tied to the success of first Retrophin and then Turing (now Vyera)—Shkreli owned 2.5 million shares of Retrophin and had a majority stake in Turing (which he retains for Vyera)—and thus the success of any orphan drugs that were successfully developed by those companies would result in enormous profit to Shkreli.

Notably, Shkreli makes multiple references in his sentencing memorandum to his primary desire to find cures for rare diseases (see Shkreli Mem. at 26-34), and that he, in the words of one of his supporters, has become "one of the most dedicated advocates for an important community of people very few talk about, rare disease patients." (Id. at 27). Shkreli's prior statements and actions, however, belie this messianic portrayal of his motivations. Instead, it is clear that Shkreli's involvement in the orphan drug industry is primarily motivated by the potential to make tremendous profits for himself and the shareholders of his companies. At trial, Sarah Hassan testified about how she met with Shkreli in approximately March or April of 2011 to discuss Retrophin. (Tr. at 963-65). During that meeting, she stated that she and Shkreli discussed the business of orphan drugs in relation to Retrophin, and that an orphan drug "by its very nature, it's a faster, generally faster pathway to bring a drug forward onto the market and that you can make a lot of money in orphan drugs because the price per patient is quite high. So, even though the number of patients is not high, the price, ultimately the income, you can get from it is quite high." (Id. at 964). When asked about whether Shkreli discussed his desire to cure diseases with her during

53

that meeting, she stated, "[i]f he did, it was a brief mention," and that Shkreli was primarily focused on the "true business side of the company," which she described as "[w]here there was money to be made in the company." (Id. at 965).

Shkreli's subsequent track record, culminating in his decision as the CEO of Turing to significantly inflate the price of Daraprim, which treats a deadly parasitic infection called toxoplasmosis that afflicts individuals with HIV/AIDS and transplant patients, from $13.50 per pill to $750 in late 2015, demonstrates that Shkreli continues to be motivated by profit in focusing his attention on orphan drugs. In documents disclosed to the Congressional Committee on Oversight and Reform by Turing, Shkreli, in reference to the company's acquisition of Daraprim, stated "$1bn here we come" in an email to the chairman of Turing's Board of Directors, in reference to the potential profit that Turing—including Shkreli and the rest of the company's shareholders—stood to make. (See, e.g., http://money.cnn.com/2016/02/03/news/shkreli-turing-daraprim-price-house-hearing/index.html).[20]

---

[20]     In another email produced by Turing to the Congressional Committee, Shkreli wrote, in reference to Daraprim, "We raised the price from $1,700 per bottle to $75,000 . . . So 5,000 paying bottles at the new price is $375,000,000—almost all of it is profit and I think we will get 3 years of that or more. Should be a very handsome investment for all of us. Let's all cross our fingers that the estimates are accurate." http://money.cnn.com/2016/02/03/news/shkreli-turing-daraprim-price-house-hearing/index.html. In light of these emails, Shkreli's proffered explanation for Daraprim's price hike—to develop a better and more efficient version of Daraprim—as set forth in his sentencing submission (see Shkreli Mem. at 32) rings hollow. Shkreli, as the majority shareholder of Turing, stood to gain substantially from any profits derived from the price increase, despite the fact that he was "not even taking a salary." (Id.).

Additionally, in December 2015, at the Forbes Healthcare Summit, Shkreli was asked about whether he would have done anything differently in relation to the Daraprim drug increase after he received significant negative publicity, and he replied, "I probably would have raised the price higher is probably what I would have done." (See https://www.forbes.com/sites/matthewherper/2016/01/20/solving-pharmas-shkreli-problem/#4b0abb066be3). He explained, "I could have raised it higher and made more profits for our shareholders. Which is my primary duty. Again, no one wants to say it. No one's proud of it. But it is a capitalist system and capitalist rules. My investors expect me to maximize profits. Not to minimize them or go half or go 70% but to go to 100% of the profit curve that we're all taught in M.B.A. class." (Id.).

In a recent email from jail dated February 12, 2018, Shkreli provides further evidence that his involvement in orphan drugs and research into rare diseases is largely motivated by the potential to make millions of dollars. In that email exchange, Shkreli stated the following:

> I'm also starting to make generic drugs, which means undercutting prices instead of raising them. that'd actually be a decent story for [a news outlet]. kind of doing a 180. but no one spends millions of dollars on drug projects out of the goodness of their heart (maybe bill gates does). the people who put up the money have one thing on their mind: making more. whether its cutting prices or raising them, its just a business and that can never change.

(Emphasis added).

In addition, Shkreli's portrayal of his work on a drug to cure PKAN at Retrophin (Shkreli Mem. at 26-30) is highly misleading. While Shkreli is on the patent for RE-024 along with Andrew Vaino and Marek Biestek, his insistence on taking shortcuts in order to get PKAN to market drastically delayed the development of the drug while he was

the CEO of Retrophin.  Because the Food and Drug Administration ("FDA") has rigorous

safety processes and procedures that must be followed before a new drug can be provided to

patients, even on an experimental basis, Shkreli was unable to simply give the drug directly to

patients like ██████████ as he had promised.  Instead, he—as with any other drug

developer—needed to secure a series of approvals from the FDA, a process that can be long

and painstaking.  Shkreli, however, did not want to wait for that process to play out and

instead launched an unmonitored drug trial in Cyprus.  Because that trial did not have controls

and its operation was unacceptable to the FDA, the trial itself was not (as Shkreli has claimed)

part of Retrophin's "efforts to receive FDA approval," but instead a way to get single-patient

results that could be—and were subsequently—reported in Retrophin's 8-K filings.  See, e.g.,

Retrophin's 8-K filing dated August 11, 2014, available at http://ir.retrophin.com/static-

files/37e64473-da0f-4199-b1e0-f00a2a4ae647 (detailing clinical data for a period of less than

three months from two individuals in the RE-0024 study; the 8-K does not disclose that the

study is being undertaken in Cyprus).  By the time Shkreli left Retrophin, no pre-clinical work

that would qualify for FDA approval had been done to advance RE-0024.  Ultimately, all

steps towards the development for RE-0024 for FDA approval were taken after Shkreli's

departure from the company.

        Finally, while Shkreli's stated emotional and occasional support of family and

friends—including individuals whom he knows exclusively from encounters on the Internet

and has never met in person—is admirable, it is not extraordinary.[21]

---

[21] The government raises two concerns with letters of support submitted by Shkreli.  First, the
government notes that Shkreli received a letter of support from an individual named Yuan
Wang, who met Shkreli at a lecture Shkreli gave at Princeton University in the spring of 2017.

For these reasons, Shkreli's charitable donations and work for Retrophin and Turing fall far short of the "exceptional degree" required for a variance.

### 4. Shkreli's Other Conduct, Including His Online Threats, Does Not Warrant Leniency

In addition to the conduct detailed above, the Court should consider Shkreli's reprehensible conduct towards members of the public, as well as his own prior employees, in fashioning an appropriate sentence.

As the Court is aware, Shkreli has a long history of making threats and harassing individuals, especially women, via social media. (See, e.g., Dkt. No. 160 (detailing various online insults and threats made by Shkreli between late 2015 and February 2017)). As detailed at length in the government's bail revocation motion, this behavior intensified towards the end of Shkreli's trial and in the weeks following his conviction. (See Dkt No.

---

As the Court may remember, Shkreli had promised a $40,000 scholarship to Wang after he solved a math theorem, and the government cited that promise in opposing Shkreli's bail modification motion on June 19, 2017, noting that Shkreli clearly had access to significant funds if he could offer $40,000 to a student on a whim just before the bail hearing. June 19, 2017 Conference Tr. at 19. In response, counsel for Shkreli noted that the examples cited by the government, including the promise to Wang, were "preposterous promises that Mr. Shkreli has made in recent weeks [that] have never been paid forward." (Id. at 25). And, in fact, Shkreli did not actually pay Wang the $40,000—as Wang's letter states, Shkreli offered him a "generous scholarship" to put towards Wang's start-up company. What neither Wang's letter nor Shkreli's sentencing memorandum mentions is that Wang was not paid that "generous scholarship" until at least February 21, 2018—mere days before Shkreli's sentencing submission was made. Email communications between Shkreli and others, including co-conspirator Kevin Mulleady, indicate that Shkreli told Mulleady and another individual that he owed "a guy" $15,000, and asked for money to help pay the debt; in a subsequent email on the same day, Shkreli provided Wang's address to Mulleady.

Second, the government notes that an individual named Amber Emmertz who submitted a letter of support on behalf of Shkreli (Shkreli Mem. Exhibit 39) subsequently wrote to the Court to withdraw that letter of support, claiming that the decision to write the original letter was a "poor decision."

362).  On the eve of trial summations in July 2017, Shkreli posted on Facebook about

journalist Lauren Duca—who Shkreli had previously harassed via Twitter so extensively that

he was banned from the social media platform—"Trial's over tomorrow, bitches.  Then if I'm

acquitted, I get to fuck Lauren Duca."  (Id.).  He made a similar statement about another

journalist, noting that she was "pretty hot."  (Id.).  Subsequently, Shkreli made a series of

online posts harassing Secretary Hillary Clinton, which escalated in seriousness until, on

September 4, 2017, he posted that he was willing to "pay $5000 per hair obtained by Hillary

Clinton" and advised his followers to "grab a hair from her" and wished them good luck.

(Id.).  In a subsequent hearing on September 13, 2017, this Court concluded that Shkreli's

directive to his many online followers regarding Secretary Clinton constituted a serious threat,

and that he could not prove by "clear and convincing evidence that he does not pose a danger

to the safety of any other person and the community," and revoked Shkreli's bail.  (Order

dated September 13, 2017, Dkt. No. 367).

    In addition, there is extensive evidence that Shkreli harassed and threatened

former employee Timothy Pierotti when Pierotti refused to permit Shkreli to control free-

trading shares of Retrophin that Pierotti had received from Fearnow.  Shkreli took the

following series of escalating steps in December 2012 and January 2013 after he realized that

Pierotti would not follow his directives with regard to the shares:  he screamed at Pierotti on a

phone call in December 2012 and demanded the return of the shares; he sent Pierotti a letter

threatening litigation; he had Pierotti's brokerage account frozen in an attempt to force

Pierotti to return the shares; he sent an email to Pierotti containing insider information to force

Pierotti "over the wall" in a further attempt to prevent him from selling his shares; he sent

Pierotti's wife a threatening letter in which he stated "Your husband has stolen $1.6 million

from me and I will get it back. I will go to any length necessary to get it back … I hope to see you and your four children homeless and will do whatever I can to assure this"; and then he subsequently caused Retrophin to file a baseless lawsuit against Pierotti.  As the lawsuit progressed, Shkreli continued to send threatening text messages to Pierotti and his wife.  Then, in December 2013, Shkreli simultaneously hacked into five email and social media accounts held by Pierotti and his children in order to post information about the lawsuit.  When Pierotti contacted the local police department to report Shkreli's harassment, that department reached out to Shkreli directly; Shkreli initially denied knowing who Pierotti was, then joked about the encounter.

Shkreli has not only admitted to his harassment of Pierotti, but has bragged about it publicly.  For example, in an interview given in December 2015, which was published the day before his arrest in the current case, Shkreli made the following statements about his harassment of Pierotti:

> Shkreli: Did you see that thing where I threatened that dude and his fucking kids, right?

> Interviewer: I did.

> Shkreli: That was over $3 million, I want to say. He had to call the police, that guy. There's a little "Shmurda" in me, too. [Laughs] . . . I'm definitely the real fucking deal. This is not a fucking act. I threatened that fucking guy and his fucking kids because he fucking took $3 million from me and he ended up paying me back.

> He called my bluff. He said, "You're not fucking going to go after me." [I said] "Yes I motherfucking will." I had two guys parked outside of his house for six months watching his every fucking move. I can get down.

See Justin Hunte, Martin Shkreli Plans To Bail-Out Bobby Schmurda, HipHopDx.com (Dec. 16, 2015, 4:13 p.m.), http://hiphopdx.com/interviews/id.2825/title.martin-shkreli-plans-to-bail-outbobby-shmurda.

While far less serious than the above-described conduct, there is also significant evidence that Shkreli treated many of his employees poorly, contrary to his assertions in his sentencing memorandum that he was "deeply committed to his employees and their successes."  (Shkreli Mem. at 35-40).  While there may have been particular employees that Shkreli favored and thus treated well, a consistent theme at trial was Shkreli's mistreatment of his employees at the MSMB entities and at Retrophin.  For example, Caroline Stewart testified that "if [Martin] was in a bad mood or if he was impatient about something, he could be quite cutting or nasty . . . [i]t's all intensity all the time." (Tr. at 2039).  In a contemporaneous email about Stewart in the summer of 2011, Shkreli wrote that it was "humorous" that Stewart was upset that Shkreli refused to pay her salary on time and that he was lying about MSMB Capital's assets under management.  (GX 349).  In addition, witnesses including Stephen Aselage, Stephen Richardson and Jackson Su testified that Shkreli was difficult to work with and/or for, and was often verbally abusive.  Shkreli's own emails to Greebel—in which he repeatedly curses at Greebel (e.g., telling Greebel to "FIX THE FUCKING ISSUE" (GX 311)) or belittles his intelligence or his legal acumen (e.g., telling Greebel that "new counsel will handle from here" and stating sarcastically "God Bless America.  Good job Evan" (GX 268)) —are further evidence of this behavior.

Tellingly, in an email communication from jail dated November 24, 2017, Shkreli stated as follows:

> i tend to motivate people, but i use far too much negative
> reinforcement which seldom works... it works really well for the
> 10% of the world that is super motivated and it alienates the
> other 90%. i try to use negative reinforcement for the 10% and
> positive for the 90%. hard to predict who is who sometimes.
> best to be positive all the time. at retrophin i was negative all the
> time. i'm not sure i ever gave a pat on the back and 'good job,
> but let's try it this way next time' feedback. i fixed that a bit at
> turing.

Finally, the government notes that Shkreli's conduct towards his online targets

and certain employees contrasts dramatically with the portrait of Shkreli painted in his

sentencing submission, in which Shkreli is described using his "limited spare time to help and

inspire those in need," devoting himself to the education of his fellow prisoners and assisting

friends, family members and even near-strangers online through emotional and medical

difficulties.  (See Shkreli Mem. at 40-54).  That Shkreli chose to exhibit warmth and

compassion in the circumstances described in those pages only further highlights the

deliberate cruelty and fear that he routinely and voluntarily chooses to inflict on those who do

not agree with him or who dare to challenge him.





███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

C.    A Substantial Sentence of Incarceration Would Serve the Goals of Specific and General Deterrence

Shkreli contends that a substantial sentence of incarceration is not necessary to serve the goal of specific deterrence because, "[g]iven the punishment [Shkreli] has already received"—specifically, having to step down as CEO of a public company, go through a public jury selection process and serve six months at the MDC after violating the conditions of his bail—there is "no basis to believe he would commit any other crimes in the future." (Shkreli Mem. at 77).  Shkreli also contends that a substantial sentence of incarceration is not necessary to serve the goal of general deterrence because "a short sentence can [] send a strong message to potential white collar offenders."  (Id. at 78-81).  Both of these arguments are unavailing.

With respect to specific deterrence, the discussion of Shkreli's history and characteristics above demonstrates that he has no respect for the law and exhibits no remorse for his actions.  (See Section IV.B).  Shkreli's inability to acknowledge that his actions constituted crimes, coupled with his utter disdain for the criminal justice system (which has only escalated since his conviction), demonstrate that Shkreli is likely to commit similar crimes in the future.

As for general deterrence, the legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); see also United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white collar crime is "of central concern to Congress").  Courts have found it to be an important sentencing factor in fraud cases, because it is believed to be most effective in such cases.  Martin, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks and citation omitted)); see also Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  The nature of fraud generally renders it more difficult to uncover, since individuals engaged in fraud often take affirmative steps to conceal their conduct—such as Shkreli did, when he sent false performance reports to the MSMB Capital and MSMB Healthcare investors to hide that the funds had failed; stole $1.1 million from MSMB Healthcare to pay the Merrill Lynch settlement and make an initial payment to defrauded MSMB Capital investor Darren Blanton; stole more than $10 million from Retrophin to repay defrauded MSMB Healthcare and MSMB Capital investors; and filed a false Form 13-D with the SEC to hide his beneficial ownership of the majority of Retrophin's free-trading shares; and then lied repeatedly to the SEC about his crimes, including during sworn testimony.  Accordingly, additional sanction is necessary to counterbalance the lower risk of apprehension, particularly for an individual like Shkreli who

obstructed the investigation into his conduct by the SEC at the very time his crimes were being committed.

The defendant's related assertion that increasing the severity of punishments generally does not result in greater deterrence (Shkreli Mem. at 78) flies in the face of logic and human experience. And at least one recent study indicates that there are indeed marginal deterrence effects of increased sentences. See Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence."). The defendant's argument that deterrence does not require lengthier terms of incarceration for more serious conduct also conflicts with Congress's directive to the Sentencing Commission to consider, among other things, the deterrent effects of the "length of a term of probation, imprisonment, or supervised release." 28 U.S.C. § 994(c). Furthermore, adopting such an approach would lead to similarly short sentences in all fraud cases, regardless of the size, scope, complexity or steps taken to conceal the fraud, which would frustrate proportionality, an important goal at sentencing. United States v. Booker, 543 U.S. 220, 264 (2005) (sentencing should serve goals of "avoiding unwarranted sentencing disparities" and "proportionality").

D.   Shkreli's Arguments Regarding Unwarranted Sentencing Disparities are Unavailing

Shkreli's final argument is that a substantial sentence of incarceration would lead to unwarranted sentencing disparities pursuant to 18 U.S.C. § 3553(a) because Shkreli's case is "significantly different from most other fraud cases because his investors made money

from their investment and because Martin actually invested the majority of their money and did not spend it on himself." (Shkreli Mem. at 81). Shkreli then provides the Court with a series of cases in which he contends that investors suffered "financial hardship" and thus the fraud in question was "more egregious" than his own crimes, and suggests that he should receive a lower sentence than defendants in those cases to avoid unwarranted sentencing disparities. (Id.) These arguments are unpersuasive.

As noted multiple times throughout this memorandum, Shkreli did in fact spend money stolen via his frauds "on himself," including $200,000 from MSMB Healthcare to make a partial payment to Blanton; $900,000 from MSMB Healthcare to repay the Merrill Lynch settlement; and in excess of $10 million in money and shares from Retrophin to defrauded MSMB Capital and MSMB Healthcare investors that he would otherwise have had to pay. That the MSMB Capital and MSMB Healthcare investors did not suffer monetary losses was solely due to Shkreli's ability to keep the MSMB Capital and MSMB Healthcare frauds going long enough to successfully manipulate the price and trading volume of Retrophin shares so that the shares he distributed to MSMB Capital and MSMB Healthcare investors had some value. That is, the investors were not repaid due to Shkreli's personal generosity but were ultimately renumerated due to Shkreli's continuing crimes. Shkreli should not get to reap the benefit at sentencing of arguing that his victims were repaid and that he is different from a defendant who was ordered to repay his victims via restitution, when it was Shkreli's own criminal conduct that rendered restitution unnecessary in this case. As a result, the cases listed in Shkreli's memorandum do not represent "more egregious" frauds than were perpetrated by Shkreli, and should not be considered as such.

In addition, there are cases in both the Southern and Eastern Districts of New York that were <u>not</u> cited by Shkreli where defendants convicted of securities fraud received far more significant sentences.  The following are a few examples:

- <u>United States v. William Lange</u>, 10-CR-968 (DLI) (EDNY) – The defendant William Lange was convicted of conspiracy to commit wire fraud and conspiracy to commit wire fraud and securities fraud, had a Guidelines range of 210 to 262 months, and was sentenced to 262 months' imprisonment, $10 million in forfeiture and approximately $10 million in restitution.

- <u>United States v. Eric Aronson</u>, 12-CR-245 (ADS) (EDNY) – The defendant Eric Aronson was convicted of securities fraud, had a Guidelines range of 292 to 365 months, and was sentenced to 124 months' imprisonment, $21.7 million in forfeiture and $26 million in restitution.

- <u>United States v. George Porrata</u>, 16-CR-93 (DLI) (EDNY) – The defendant was convicted of conspiracy to commit securities fraud, had a Guidelines range (and statutory maximum) of 60 months, and was sentenced to 60 months' imprisonment, $400,000 in forfeiture and $1.05 million restitution.

- <u>United States v. Jason Galanis</u>, 16-CR-371 (RA) (SDNY) – The defendant was convicted of securities fraud conspiracy, investment adviser fraud conspiracy and securities fraud, had a Guidelines range of 188 to 235 months, and was sentenced to 173 months' imprisonment, $43.3 million in forfeiture and $43.8 in restitution.

- <u>United States v. Pedro Jaramillo</u>, 17-CR-04 (LTS) (SDNY) – The defendant was convicted of commodities fraud and wire fraud, had a Guidelines range of 78 to 97 months, and was sentenced to 144 months' imprisonment, $1.2 million in forfeiture and $994,000 in restitution.

Accordingly, Shkreli's argument that a substantial sentence of incarceration would lead to unwarranted sentencing disparities is without merit.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the Court should sentence the defendant to a substantial sentence of no less than 180 months'

imprisonment, which is sufficient, but not greater than necessary, to advance the goals of sentencing.

Dated:  Brooklyn, New York
        March 6, 2018

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York

                        By:      /s/
                                 _____
                                 Jacquelyn M. Kasulis
                                 Alixandra E. Smith
                                 G. Karthik Srinivasan
                                 Assistant U.S. Attorneys
                                 (718) 254-7000

cc:     Clerk of the Court (KAM)
        Defense Counsel (By ECF and Email)