

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JMK:AES/GKS
F. #2014R00501

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 23, 2018

<u>By Hand and ECF</u>

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Martin Shkreli
                <u>Criminal Docket No. 15-637 (KAM)</u>

Dear Judge Matsumoto:

        The government respectfully submits this letter in response to the defendant Martin Shkreli's letter regarding restitution dated March 13, 2018.  (<u>See</u> Dkt. No. 558).  For the reasons set forth below, the Court should award defrauded MSMB Healthcare investor Richard Kocher $388,316.49 in restitution pursuant to the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A.[1]

---

[1] In support of his restitution claim, Kocher initially submitted a declaration with exhibits dated February 28, 2018 ("Kocher Initial Declaration," attached hereto as Exhibit A) to the Probation Department for the Eastern District of New York ("Probation").  That declaration was provided to the parties on the day of Shkreli's sentencing hearing.  As set forth in its March 16, 2018 letter, the government contacted Kocher after receiving the Kocher Initial Declaration to obtain additional information regarding his claim.  (<u>See</u> Dkt. No. 560).  Kocher subsequently submitted an updated declaration with additional exhibits dated March 19, 2018 declaration ("Kocher Updated Declaration" or "Kocher Decl.", attached hereto as Exhibit B).  As both of the declarations include personally identifiable information ("PII") for Kocher and other individuals, the government has filed redacted versions of both Exhibit A and Exhibit B on the public docket, and provided unredacted versions of those exhibits to the Court and defense counsel.

I.      Background

        In early 2012, Richard Kocher invested a total of $200,000 in MSMB Healthcare in two tranches: $100,000 on February 1, 2012 (GX 505-E)[2], and $100,000 on May 3, 2012 (GX 506-E). In connection with the second investment in May 2012, Kocher obtained a side-agreement from Shkreli with a commitment that Kocher would be able to redeem his investment on a week's notice. (GX 107-11; Kocher Decl. Ex. A). This side-agreement was material to Kocher decision because he "needed to access [his] capital quickly when real estate investments presented themselves in the course of [his] business." (Kocher Decl. ¶ 4). At trial, Kocher testified at length that the redemption promise was crucial to his decision to make a second investment in MSMB Healthcare. (See, e.g., Shkreli Trial Tr. at 2313-15, 2324-30). After Shkreli sent the wind-down email to investors in September 2012, Kocher understood that his investment would be redeemed in cash—the form of redemption he needed given his capital-raising requirements. (Kocher Decl. ¶ 5).

        In December 2012, Kocher contracted to purchase a building located in Jersey City, New Jersey and put down a 10% deposit. The purchase agreement required closing by March 14, 2013, or Kocher would be required to pay penalties for late closing. Moreover, the seller could require Kocher to close within 15 days or lose his deposit. (Kocher Decl. ¶ 7). Kocher expected to be able redeem his investment in MSMB Healthcare quickly so that he could put his money to productive use elsewhere. He arranged for a business loan (in exchange for a first mortgage) that left his remaining capital requirement to close on the real estate deal at approximately $300,000—just about the amount he believed to be the value of his MSMB Healthcare investment accounting for investment gains. (Kocher Decl. ¶ 8). In other words, Kocher structured his real estate in specific reliance upon Shkreli's promise to redeem his MSMB Healthcare investment in cash on a week's notice.

        As the trial record established, the wind-down email was yet another of Shkreli's material misrepresentations to defrauded MSMB investors. And the specific redemption promise made to Kocher was a lie. Kocher made numerous attempts to redeem his MSMB Healthcare for cash, but was unsuccessful. (Kocher Decl. ¶¶ 12-15). As a result, Kocher lacked the capital necessary to close on the real estate deal and was forced to find the funds elsewhere quickly. With days left before closing, Kocher was unable to find funding from a bank or other finance company. As related in the Kocher Declaration, such financing would have taken months and the first mortgage on the property made it very unlikely that another lender would provide capital and take a second lien position. (Kocher Decl. ¶ 17).

        Kocher then hired counsel to pressure Shkreli into honoring his promises. That effort eventually resulted in a settlement agreement that paid Kocher approximately

---

[2] References to government exhibits from Shkreli's trial are denoted as "GX," and references to the trial transcript are denoted as "Tr."

2

$123,711 in cash plus 47,128 free-trading shares of Retrophin. (GX 54).[3] The shortfall forced Kocher to take on a partner under unfavorable terms that included a profit-sharing agreement. Kocher would not have been forced to agree to those terms had he timely received his money from MSMB Healthcare as promised. (Kocher Decl. ¶¶ 19-22). The Kocher Declaration indicates that Kocher paid the partner $769,477.13 pursuant to this deal. (Kocher Decl. ¶¶ 21-22).

Subsequently, Kocher sold the free-trading Retrophin shares that he received in connection with the settlement agreement on the open market over a period of time. Based on tax and brokerage records, it appears that Kocher sold those shares for a total of $266,710.14. Thus, Kocher made a total of $390,421.14 from the sale of Retrophin shares plus the cash received as part of his settlement agreement with Shkreli.[4]

Kocher's overall losses are thus as follows:

| | |
|---|---|
| Settlement Agreement Cash + Retrophin Stock Sales: | $390,421.14 |
| Loss Associated With Real Estate Transaction: | ($769,477.13) |
| Attorney's Fees: | ($9,280.50)[5] |
| Total Loss: | (**$388,316.49**) |

II. Argument

  A. Legal Standard

The Mandatory Victims Restitution Act ("MVRA") requires that a defendant convicted of specific offenses "in which an identifiable victim or victims has suffered a ...

---

[3] Kocher received a stock certificate for 23,654 restricted Retrophin shares in late March 2013, after the real estate deal closed, which Shkreli claimed were a "partial redemption" of Kocher's investment from MSMB Healthcare. (GX 107-18; Tr. 2355-56). As part of the settlement agreement, Kocher returned that stock certificate to Shkreli. (GX 54).

[4] Shkreli agrees that this amount should be factored into any restitution award. (Dkt. No. 558 at 2 n.1).

[5] Kocher incurred $9,280.50 in legal fees to enforce his rights against Shkreli. (Kocher Decl. ¶ 25). Under the MVRA, such legal fees shall be included in a restitution order. 18 U.S.C. § 3663A(b)(4). Kocher also incurred $217.26 in transportation costs related to his testimony at trial. While these costs may also be included in a restitution order pursuant to the MVRA, the government does have a process for reimbursing witnesses for travel related to trial testimony, and is working with Kocher and the Office's witness coordinator to have these costs reimbursed by the Office.

pecuniary loss" be ordered to make restitution to the victim. 18 U.S.C. § 3663A(a)(1), (c)(1). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).

The MVRA grants a substantive right of restitution to the "victim" of certain criminal offenses, with "victim" defined as those persons who are "directly harmed by the defendant's criminal conduct." 18 U.S.C. § 3663A(a)(2); see also United States v. Archer, 671 F.3d 149, 171 (2d Cir. 2011) (discussing Section 3663A(a)(2)). Whether a person is a victim depends on whether the person's losses were caused by the offense of conviction. See id. at 170. Where, as here, the offense of conviction "involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim includes "a person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

A victim need not be specifically named in the count of conviction. See Archer, 671 F.3d at 170 (statute does not require that "the conduct that caused the loss was an element of the crime"); United States v. Battista, 575 F.3d 226, 231 (2d Cir. 2009). Likewise, the victim's loss may be "caused not by the devising of the scheme alone but by its implementation." United States v. Oladimeji, 463 F.3d 152, 159 (2d Cir. 2006); see also Archer, 671 F.3d at 172 (though not required to result from conduct underlying an element of the offense, a victim's loss must nevertheless result from "an integral part" of the criminal scheme, such as when the loss is caused by "the mechanism through which [the defendant] profited from his conspiracy").

"[T]he purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury." United States v. Boccagna, 450 F.3d 107, 115 (2d Cir. 2006). The "primary and overarching" goal of the MVRA is "to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." Id. (quoting United States v. Simmonds, 235 F.3d 826, 831 (3d Cir. 2000)). The Second Circuit has noted that it is "significant that the statute mandates that courts 'order restitution to each victim in the full amount of each victim's losses as determined by the court[.]'" United States v. Quarashi, 634 F.3d 699, 703 (2d Cir. 2011) (quoting 18 U.S.C. § 3664(f)(1)(A)). Thus, "when determining the appropriate amount of restitution, district courts must choose a valuation method that best accomplishes this purpose." United States v. Scott, 321 F. App'x 71, 72 (2d Cir. 2009). The Second Circuit "construe[s] 'value' as used in the MVRA to be a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose." Boccagna, 450 F.3d t 115.[6] However, the award cannot "allow[ ] a

---

[6] As Shkreli acknowledges, "[a]ny dispute as the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." United States v. Bahel, 662 F.3d 610, 647 (2d Cir. 2011) (quoting 18 U.S.C. § 3664(e)); see Dkt. No. 558 at 2. This

4

victim to recover more than his due." United States v. Nucci, 364 F.3d 419, 424 (2d Cir. 2004).

Applying these principles, the Second Circuit has held that because "sentencing courts are required to compensate victims for 'the full amount of each victim's losses,' there is no reason to exclude losses that result from the deprivation of the victim's ability to put its money to productive use." Quarashi, 634 F.3d at 703. In Quarashi, the Second Circuit further noted: "In light of the inherent difficulty of determining in the 'but for' world the earnings that would have resulted from the use of the wrongfully acquired funds, prejudgment interest stands in to provide a rough but fair approximation of such losses." Id. The Second Circuit, however, did not state that prejudgment interest is the only proxy for losses caused by "deprivation of the victim's ability to put its money to productive use." Id. In Quarashi, the defendant proposed a rule requiring claimants to prove "how they would have used the lost funds" to earn restitution and the Second Circuit flatly rejected that rule: "The MVRA does not impose such a requirement." Id. Indeed, "in the absence of evidence that [a victim] would not have put the money at issue to productive use," restitution—in the form of prejudgment interest or otherwise—should be awarded. Id. at 704. Crucially, compensation for losses attributable to a defendant depriving a victim of the ability to put his or her money to productive use is not the same as non-compensable "expectation damages." Id. The MVRA "is not concerned with a victim's disappointed expectations but only with his actual loss." Id. (quoting Boccagna, 450 F. 3d at 119).[7] Restitution, as the Second Circuit emphasized, is appropriate where it "ensure[s] that the . . . victims are fully compensated for their actual loss, which includes the loss of the ability to put their money to productive use." Id.

The Second Circuit has further upheld restitution orders based on the value an investment would have had but for criminal conduct. In United States v. Scott, for example, the defendant stole his clients' assets from three retirement accounts. 321 F. Appx. 71, 72 (2d Cir. 2009). As the Second Circuit concluded: "Had the assets remained in those accounts, two of the three accounts would have increased in value by the date of sentencing. Moreover, in light of the fraudulent account statements issued by [the defendant] to his victims and the victims' inaction, it is apparent that the funds would have remained in those accounts but for his theft. Accordingly, the actual value of the stolen property, the funds in

---

burden of proof is consonant with the MVRA's purpose in according the Court flexibility to compensate victims of crime.

[7] In Boccagna, the Second Circuit vacated a restitution order that used the nominal sale price of a property instead of the fair market value of a property to calculate a victim's losses, but did not require the use of a fair market value standard. Boccagna, 450 F. 3d at 114-118. Boccagna, furthermore, expressly indicated that "consequential losses"—losses that "naturally and directly flow" from criminal conduct—are the proper subject of restitution orders. Id. at 120-21 (citing Globecon Grp. LLC v. Hartford Ins. Co., 434 F.3d 165, 176 (2d Cir. 2006)).

5

the retirement accounts, at the time of sentencing was the nominal value of the stolen funds plus the subsequent investment gains lost as a result of the theft. . . . In valuing the stolen retirement assets in this case, the district judge therefore appropriately included in the restitution award the investment earnings that would have accrued as of the date of sentencing." Id. This analysis indicates that a well-founded request that details the significance and value a victim's money would have had but for the crime is sufficient to support the imposition of restitution.

  B.  <u>Analysis</u>

   Shkreli defrauded investors using material misrepresentations and omissions that induced them to invest in his funds and, crucially, prevented them from redeeming their investments. The Court is familiar with the evidence demonstrating Shkreli's fraudulent intent and the various ways he prevented investors from redeeming their investments, which included performance reports sent to both MSMB Capital and MSMB Healthcare investors that falsely showed the funds with positive returns (see, e.g., GXs 80-1 to 80-19, 83-1 to 83-4), false statements made to both MSMB Capital and MSMB Healthcare investors regarding monthly liquidity (see, e.g., GXs 2, 11-A, 11-B, 105-1, 107-11), and false statements to MSMB Healthcare investors regarding the percentage of the fund that would be invested in Retrophin (see, e.g., Tr. 3291-95; GX 350). (See also Rule 29 Mem. and Order, Dkt. No. 535 at 55-67). These lies allowed Shkreli to obtain and retain investments from MSMB Capital and MSMB Healthcare investors via fraud, which in turn permitted Shkreli to continue to portray himself as a successful hedge fund manager and attract additional funds that he used to perpetuate both hedge fund schemes and to ultimately finance Retrophin. Without those continuing investments, and the fact that investors did not seek to withdraw their money because they did not know the funds were failing or had failed, the entire façade constructed by Shkreli's lies would have collapsed; MSMB Capital and MSMB Healthcare investors would have demanded a return of their investments just at the time that Shkreli's personal debt to Merrill Lynch was coming due and Retrophin was seeking to go public. Shkreli's efforts to prevent redemptions were thus an "an integral part" of the criminal scheme and a crucial "mechanism through which [the defendant] profited from his conspiracy." Archer, 671 F.3d at 172.

   Kocher's case is emblematic of Shkreli's frauds, and he faced uniquely dire consequences as a result. Kocher's construction business had frequent short-term capital needs. He initially invested in MSMB Healthcare based on representations that he would be able to redeem his investment within 30 days, and made a second investment in the fund only because he received a specific, written promise from Shkreli that he could redeem his entire investment on a week's notice. In fact, Kocher was the only investor with such an agreement, which was in the form of a contract personally signed by Shkreli. Shkreli's fraud therefore caused Kocher direct and proximate harm when Kocher found himself short of the capital he counted on and was rightfully his.

   All of the evidence submitted by Kocher indicates that, but for Shkreli's crimes, Kocher would have reaped all the benefits of the underlying real estate deal, and

would not have had to borrow money on highly unfavorable terms to salvage that deal. Kocher structured the real estate deal so that he could close on it alone with the return of the money he had invested in MSMB Healthcare, which Shkreli had promised him on a week's notice. When Shkreli failed to honor that agreement, Kocher had no option but to find an alternate source of capital to replace the money that Shkreli failed to return on very short notice. Unfortunately, Kocher did not have enough time to obtain loan approval from a new bank; another lender would not have taken a second lien position on the property; and the existing lender would not have provided additional funds. Nor could Kocher have simply pulled out of the real estate deal, because he stood to lose his 10% deposit as well as daily penalties for not closing. Consequently, he was forced to borrow money on highly unfavorable terms.

Kocher's request is well-supported by the Kocher Declaration, the attached exhibits and the trial record. Quarashi expressly rejected requiring a victim to detail how he would have used his money but for the fraud. 634 F.3d at 703. But Kocher has done precisely that. He has given the Court sufficient evidence of his legitimate redemption expectations and how he planned to use his money to complete the real estate transaction. Kocher has thus met and exceeded the Second Circuit's requirements for awarding restitution. Furthermore, he has shown how his losses—resulting from a profit-sharing agreement he was forced to enter into—flowed "naturally and directly" from Shkreli's fraudulent conduct. Boccagna, 450 F. 3d at 120-21.

As to attorney's fees, Kocher has shown that he would not have had to pay $9,280.50 to an attorney had he not been defrauded by Shkreli. Kocher made numerous efforts in early 2013 to redeem his investment. Faced with obstruction and obfuscation by Shkreli and a looming deadline to close the real estate deal, Kocher was forced to enlist counsel to try and get his money returned. He would not have had to that pay money to an attorney had Shkreli honored his redemption agreement. See, e.g., Bahel, 662 F.3d at 647-48 (affirming restitution for legal fees incurred when the United Nations hired outside counsel to conduct an internal investigation instead of using in-house counsel); United States v. Amato, 540 F.3d 153, (2d Cir. 2008) (imposing restitution for attorney's fees and accounting costs incurred during an internal investigation that uncovered fraud notwithstanding that all of the effort and cost was incurred at the request of the government because the victim had "assisted in gathering and producing evidence necessary to the government's prosecution").

In opposition to Kocher's request, Shkreli argues that Kocher's real estate transaction was a non-compensable "business expense." (Dkt. No. 558 at 2). The sole case Shkreli cites—United States v. Maynard, 743 F.3d 374 (2d Cir. 2014)—is inapposite. In that case, the defendants robbed five banks and were ordered by the district court to compensate the banks for the money taken during the robberies as well as the following: "1) paid time-off for the bank's regular staff, and the pay of replacement staff ($7,991.68); 2) mileage expenses for the replacement staff ($213.34); 3) the cost of wanted posters ($106.66); and 4) the cost of a temporary security guard at the bank after the robbery ($574.52)." Id. at 377. At a hearing, a bank employee testified that the bank staff was sent home the day of the robbery because the bank was a crime scene and, for two days following, the bank hired temporary

7

staff because it chose to give the regular workers the day off to handle any trauma associated with the robbery.  Id.  The defendants challenged the restitution award as to these additional expenses.

The Second Circuit noted that "property loss" is a specifically enumerated compensable loss under the MVRA.  Id. at 379.  The district court erred in ordering the defendants to pay the full amount of staff wages for the day of the robbery because "the bank would have paid the regular staff in any event."  Id. at 380.  However, restitution properly lay for the portion of the day that the bank was closed because the bank received no benefit from the wages as a direct result of the crime.  Id.  Restitution for the wages paid to temporary workers was not proper because that was a business expense that the bank chose to undertake to allow the regular workers time for psychological recovery.  Id.  The wanted posters and security guard were "gratuitous" and not necessary to the prosecution of the offense.  Id.

Maynard is distinguishable from this case.  Maynard examined the categories of compensable expenses under the MVRA and found non-compensable the following: (1) expenses the victim would have had to pay anyway (i.e., employee wages for the portion of the day prior to the closure of the bank); and (2) expenses that a victim simply chooses to make (e.g., wages of temporary workers, wanted posters and security guard costs) that are not plausibly connected to the crime.

Kocher, by contrast, had no choice but to conclude an unfavorable deal with a partner given the defendant's fraudulent conduct.  Kocher reached the real estate deal in December 2012 and had three months to close.  He arranged bank financing that covered the deal but for approximately $300,000—the money he invested in MSMB Healthcare and expected to be returned to him by Shkreli.  He thus structured the deal in specific reliance on Shkreli's fraudulent misrepresentations.  Kocher made numerous efforts in that time period to redeem his investment, but Shkreli again failed his investor.  Faced with a looming deadline and no other options, Kocher incurred hundreds of thousands of dollars in losses/foregone profits that would not have otherwise occurred had Shkreli redeemed the investment as promised.  Kocher did not choose to conclude an unfavorable deal with a partner; he was forced to.  His losses are thus compensable and are not merely voluntary or "gratuitous" business expenses.

Also, Maynard reaffirmed the principle the district court should award restitution for expenses the bank would not have incurred but for the fraud.  In particular, the defendants in Maynard were properly held liable for staff wages on the day of the robbery from which the bank derived no benefit because the bank became a crime scene.  743 F.3d at 380.  Similarly, Kocher would not have incurred his losses had Shkreli not defrauded him.  His losses were directly traceable to the crime.  He is thus seeking recompense for his losses, not a windfall.[8]

---

[8] The argument that Kocher will receive a windfall is misplaced because he has provided specific causation evidence linking Shkreli's fraudulent conduct to his losses.  Moreover, the Court should reject the notion that Shkreli has already paid Kocher.  The

III.  Conclusion

        For the foregoing reasons, the Court should order the defendant Martin Shkreli to pay $388,316.49 in restitution to defrauded MSMB Healthcare investor Richard Kocher.

        Respectfully submitted,

        RICHARD P. DONOGHUE
        United States Attorney

By:    /s/
        Jacquelyn M. Kasulis
        Alixandra E. Smith
        G. Karthik Srinivasan
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Clerk of Court (KAM) (by ECF)
        Counsel for Shkreli (by ECF)

---

Court found by a preponderance of the evidence that Shkreli defrauded Retrophin via the settlement and consulting agreements that he used to pay off defrauded MSMB investors like Kocher. (Rule 29 Mem. and Order, Dkt. No. 535 at 88-89 ("The court concludes that the government did prove, at least by a preponderance of the evidence, that Mr. Shkreli conspired with Mr. Greebel to engage in the conduct charged in Count Seven.")).  If anything, Shkreli would be receiving a windfall by using his fraudulent conduct with respect to Retrophin as a shield against Richard Kocher's legitimate claims to restitution.  In fact, that Court has already rejected a similar attempt by Shkreli to benefit from the Retrophin misappropriation scheme.  As the Court wrote in its February 26, 2018 ruling, it did not include the Retrophin fraud in calculating losses, but it would not "give Mr. Shkreli credit for engaging in that conduct."  (Id. at 88).