1454

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 15-CR-00637(KAM)
                                 :
                                 :
        -against-                : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
                                 : Wednesday, July 5, 2017
MARTIN SHKRELI,                  : 9:00 a.m.
                                 :
        Defendant.               :
                                 :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE KIYO A. MATSUMOTO
UNITED STATES DISTRICT JUDGE, and a jury

A P P E A R A N C E S :

For the Government:   BRIDGET M. ROHDE, ESQ.
                      Acting United States Attorney
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                BY:   JACQUELYN M. KASULIS, ESQ.
                      ALIXANDRA ELEIS SMITH, ESQ.
                      G. KARTHIK SRINIVASAN, ESQ.
                      Assistant United States Attorneys

For the Defendant:    BRAFMAN & ASSOCIATES, P.C.
                      767 Third Avenue
                      New York, New York 10017
                BY:   BENJAMIN BRAFMAN, ESQ.
                      MARC AGNIFILO, ESQ.
                      ANDREA ZELLAN, ESQ.
                      JACOB KAPLAN, ESQ.

Court Reporter:   Stacy A. Mace, RMR, CRR
                  Official Court Reporter
                  E-mail:  SMaceRPR@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

SAM      OCR      RMR      CRR      RPR

Proceedings                                    1455

1          (In open court - jury not present.)

2          THE COURT:  Are the parties ready to proceed with

3    argument on the two weekend submissions?

4          MR. SRINIVASAN:  Yes, Your Honor.

5          MR. BRAFMAN:  Yes.

6          MR. AGNIFILO:  Yes, Judge.

7          THE COURT:  I will note the appearances of all

8    counsel and Mr. Shkreli.  Everybody is present.

9          Two submissions were filed this weekend.  The first

10   was an application by the Government to seek either a court

11   order restraining Mr. Shkreli from further public comment

12   during the pendency of this trial or, in the alternative, to

13   semi-sequester the jury.  Mr. Brafman, on behalf of his

14   client, strongly objects to the issuance of a gag order.  He

15   did not really comment on the issue of sequestration.

16         And the second application was, in my view, a

17   belated explanation as to why certain e-mails that the defense

18   seeks to submit should be admissible and not barred under the

19   hearsay rule.

20         My order that I issued yesterday was really in

21   response to, again, what I believe to be a nonspecific attempt

22   to admit documents in a wholesale manner without specifically

23   identifying the documents and the hearsay exceptions that

24   would allow the admission of specific documents.  I

25   respectfully disagree that the defense could not have made

Proceedings                                          1456

1    these applications sooner or that doing so would have

2    telegraphed to the government their defense theory, which has

3    been quite clear from the beginning, in terms of the view that

4    government witnesses are not accurately recollecting and that

5    you wish to confront them with e-mail exchanges between

6    Mr. Shkreli and the witness.

7              My concern is that we will have numerous sidebars

8    with each defense proffer of an exhibit, which will only delay

9    the trial.  Courts oftentimes, if not always, schedule

10   pretrial motions in limine specifically for the purpose of

11   resolving these issues before trial and avoiding numerous

12   repeated delays over each piece of evidence where there is an

13   objection.  And I do want to keep in mind that we have 18

14   members of our district, citizens of our district who are

15   giving up six weeks of their lives.  They are forbidden from

16   reading media that the rest of us can read.  They are

17   forbidden from speaking about the case with their loved ones.

18   And I think that to prolong the trial by having repeated

19   sidebars is not the ideal way to proceed.  So what I was

20   hoping was, at a minimum, the defense would be willing to

21   identify documents so that I could review them in advance,

22   because surely you could not expect me to have read every

23   single exhibit that each party wants to submit and to keep it

24   in my mind and be able to in my mind call up Rules of Evidence

25   that the parties may belatedly proffer as a basis for

Proceedings                                          1457

1   admission.  And that is pretty much what you are asking me to

2   do when you hand me a stack of 94 e-mails like this and you

3   say, I want to move them all in because it is not hearsay.

4           It is not an acceptable way to proceed.  I have got

5   to, at least, read these and understand the bases for the

6   admission.  These were the Austin e-mails.  And I want to be

7   able to afford you an opportunity to submit exhibits, but it

8   is difficult when you do it in the way that you did last week,

9   and that was my only reference in the order yesterday that we

10  need to have some orderly appropriate way of having me review

11  documents if there is a government objection.  And if you can

12  lay an appropriate basis for admission I am going to admit it,

13  but that was not an appropriate way.

14          I felt like the July 4th letter yesterday gave me

15  for the first time a clear basis for your arguments, but it

16  did not relate to any specific document so it was impossible

17  for me in a vacuum to think, all right, I do not know what is

18  coming, but I will just have to keep all five of those bases

19  in mind and hope that I can figure out which basis you are

20  going to invoke for admission.

21          I am just asking for some cooperation so we can make

22  this trial move a little bit more smoothly, but I am happy to

23  hear from you Mr. Agnifilo, I am assuming this is your motion.

24          MR. AGNIFILO:  It is; thank you.

25          THE COURT:  Okay.

SAM      OCR      RMR      CRR      RPR

Proceedings                                    1458

1          MR. AGNIFILO:  Just to be clear, I wasn't trying to

2     go backwards with my letter from yesterday.

3          THE COURT:  I understand that.

4          MR. AGNIFILO:  What my perception, the way it

5     appeared to me, Judge, is what I was doing through Josiah

6     Austin wasn't trying to admit the e-mails at the time, I was

7     trying to telegraph at sidebar and what I saw is that this was

8     an issue, I agree with Your Honor conceptually, I am

9     absolutely a hundred percent.  Meaning that some of the

10    issues, the hearsay-related issues are a little tricky.  They

11    are not always self-evident, and so my idea of why I sat down

12    yesterday on July 4th to write the Court and the Government a

13    six-page letter, and you might look at me funny when I say

14    this, really it was to be helpful.

15         THE COURT:  No, everybody was working on July 4th,

16    and unfortunately, but that is how it is.

17         MR. AGNIFILO:  I really was looking to be helpful.

18    I went back, I looked at the record that I made with Austin, I

19    read it over and I said, you know, Mr. Agnifilo, you could

20    have been clearer for Judge Matsumoto on this stuff.  So I

21    took the time and I set it out.

22         And you're right, it's not specific to any

23    particular e-mail and it might not even be something that the

24    Court needs, but I thought that it might be valuable to put

25    down in one letter, that I tried to make in a friendly form

SAM        OCR        RMR        CRR        RPR

Proceedings                                    1459

1    and not in the form of a motion, that said, hey, here are some

2    of the things that are going to come up in the future.

3              Now, I absolutely, 100 percent understand why Your

4    Honor read the letter and said, Well, wait a minute, you can't

5    do this in a vacuum.  Tell me what you're talking about.  You

6    want me to make rulings on specific pieces of evidence, so

7    link the two together.  And I understand that and I want -- I

8    want to cooperate.  I want to give the Court what it needs by

9    way of forewarning, but my concern this:  For instance, and I

10   am only using Josiah Austin as an example only, solely because

11   he is the only witness that I questioned so I can tell you.

12   If Mr. Austin would have said, Oh, yeah, I remember, I

13   remember I discussed that with Martin and I remember I said

14   this.  I would put that e-mail to the side and move on to the

15   next one.  I wouldn't seek to admit it because there is no

16   reason to because he answered the question and we move on.

17             The issue that we all have on the defense side is we

18   really have no idea how the witnesses are going to respond to

19   things.  And I can tell you from the way I do things on cross,

20   I don't have a script.  I don't know what the witnesses is

21   going to say.  If the witness is going to say, I remember

22   having that conversation and I remember I said this and Martin

23   said this; that is done.  We move on to the next subject.

24             THE COURT:  Well, I guess my view is, and I am not

25   criticizing anything that you have done or any party has done

Proceedings                                          1460

1   here, but I guess if I had those e-mails and Mr. Austin did

2   not have a clear recollection, you could use these to refresh

3   his recollection; and even if he did not specifically remember

4   on this date via this e-mail that Mr. Shkreli informed him of

5   a particular drug that might be of interest from an investment

6   point of view, you could have asked him, Well, do you recall

7   from time to time Mr. Shkreli would send you e-mails regarding

8   the properties of certain pharmaceuticals and that you in

9   response to that would pass those on to your broker?

10          Now, the link that you want to make that is not

11   evident, at least in some of the e-mails that you proffered,

12   is that Mr. Austin might have forwarded those to his broker,

13   but we do not know what happened.  He said he forwarded

14   everything to his broker.  He got a lot of e-mails from a lot

15   of people about a lot of pharmaceuticals.

16          Then the other piece of this in your July 4th letter

17   that you wanted to proffer some of these to show Mr. Shkreli's

18   knowledge.  I am not doubting that he is knowledgeable or that

19   he learned about the different chemical properties and their

20   effects on the body, but I am a layperson and I do not know

21   that you can necessarily lay a foundation to establish his

22   knowledge because I do not know whether what he is saying in

23   his e-mails regarding the drugs and the by chemical effects on

24   the body are correct or not.

25          And so to establish knowledge would require you to

Proceedings                                    1461

1   also establish that his scientific summaries regarding these

2   drugs are, in fact, appropriate and correct.  They might be,

3   but I am not going to know that and I want be able to rule

4   without some verification of the knowledge piece of it.  There

5   may be other bases for admission, but I am just saying to ask

6   me sort of in the ether to make rulings on documents that I am

7   not even sure, I do not know what they are, will cause delay

8   and sidebars and I need to read the document.

9              MR. AGNIFILO:  Understood.

10             THE COURT:  Because some of those documents have

11   personal information like cell phone numbers or account

12   numbers or just other information that should not be published

13   and so as we have seen, sometimes we have to make redactions.

14   But it makes it very difficult, your method of proceeding, and

15   I am not being critical, but just come on, we need to --

16             MR. AGNIFILO:  The reason for the July 4th -- so to

17   make -- to follow up on Your Honor's point, I think I got what

18   I need out of Austin.  I mean I think what ended up happening

19   was exactly what Your Honor said.  He said, As a general

20   matter I got this information, I forwarded it to Frank

21   Ferrara.  So sort of all's well that ends well with Austin.

22   So the point wasn't really with Austin.

23             My perception of what happened with Austin, quite

24   frankly, is that I -- we had the sidebar and I thought the

25   Court was uncomfortable with the amount of material that I had

Proceedings                                          1462

1  given the Court and with the limited time that we had to

2  discuss the hearsay issues.  So the letter really was a

3  general letter to lay things out.

4          What we will absolutely try to do is to figure out

5  what we think that is going -- we are going to need to put

6  into evidence, but just the point, and this is what makes it

7  difficult, we've -- I don't know, for instance, what

8  Mr. Blanton, I think he is going to testify later today, we

9  have no idea what he's going to say.  We really don't.  We

10 don't know where he's going to fight us.  We don't know what

11 he's going to say.  We don't know what he's going to say is

12 important.  I mean we have 302 reports, we have things like

13 that, but they're really -- they're brief and sometimes they

14 deal with other things because they are doing their

15 investigation to a certain extent at that point.

16         And so it puts us in a -- what I really want Your

17 Honor to hear is I understand where the Court is coming from

18 and we will do everything in our power to give the Court the

19 forewarning that it's asking for.

20         THE COURT:  It will just give me the opportunity to

21 review the exhibit and to apply one of the five hearsay

22 exceptions that you have proffered and then to make a ruling

23 so we do not have to run to sidebar, but the problem was 94

24 e-mails.  What I am supposed to do, read these over a break or

25 tell the jury to go away for two hours while I read them and

Proceedings                                          1463

1    try to figure out how to admit them?

2            MR. AGNIFILO:  No, no.  The idea, Judge, was that I

3    was going to admit them at a one-at-a-time basis if I needed

4    to.  At the end of the day I got enough out of Mr. Austin --

5            THE COURT:  I agree.

6            MR. AGNIFILO:  -- that I really didn't need to, and

7    I listened to Your Honor's ruling.  But here is our concern,

8    our concern is this, and it's really a heartland sort of

9    cross-examine concern, which is let's say we think we are

10   going to be able to trip Mr. Austin up on some topic.  If we

11   telegraph the e-mail, the document, the correspondence, the

12   Government being very diligent and very good lawyers are going

13   to go back and say, Hey, you know what, you might get tripped

14   up on this, so if this question comes you got to think about

15   what the answer is.  They would be absolutely doing their job

16   in doing that, but at the same time we would be getting

17   deprived of an opportunity to show the jury something that is

18   absolutely critical, which is that maybe this particular

19   witness, whoever it might be, is not being entirely truthful

20   or candid or worthy of belief.  This is our concern.  And

21   there is no way of making that point once the cat's out of

22   bag.  Once the cat's out of the bag, the bag is empty and we

23   don't know what the jury would have thought.  We don't know

24   what use we could have made of it on cross-examination.

25           I mean cross-examination is so much -- and I am not

Proceedings                              1464

1  trying to be inconsistent with the Court's very valid

2  concerns, is so much based on instinct and feel in the moment.

3  I mean Josiah Austin, for instance, I thought he was

4  essentially telling the truth.  I thought he was a candid,

5  straightforward man who was doing the best he could.  I would

6  never in front of this jury try to trip him up on

7  trivialities, that would be would be bad lawyering on my part.

8  And so I decided not to because I thought he was, essentially,

9  telling the truth and doing the best he could.

10        I don't know what the next witness is going to do.

11 So if the next witness seems to be digging in his heels

12 unreasonably, one of the things we might want to do is show,

13 well, wait a minute, you're not so believable, you're not so

14 sure of these things and pick away at him, and then the whole

15 examination changes.

16        So that's my concern.  It's just sort of a unique,

17 sort of defense lawyer's cross-examination concern, and I

18 place that alongside -- the one thing that I really want to

19 end with, and this really is an important part of the whole

20 presentation, and I am not blowing smoke because this is too

21 important to do that.  Your Honor is devoting so much time and

22 care and preparation to this case and we are mindful and

23 appreciative of it every day.  We talk about it.  We are

24 mindful of it and we understand it, and we think it's also

25 natural that Your Honor would want this because Your Honor

Proceedings                                    1465

1   puts great deliberation into these matters and we appreciate

2   that and we don't want anything different.

3          The concern is we have two juxtaposed sort of

4   inconsistent concerns.  I want to do what the Court wants, A,

5   because the Court wants me to do it and, B, because I see how

6   Your Honor does things and I want to help.  But if we give the

7   government a preview of not the general defenses, the micro

8   things that happen in the twists and turns of a witness, we

9   are giving away really, essentially, the only thing we have in

10  cross-examination, which is to show a jury it's not really the

11  way it looks on direct and this guy maybe or woman isn't being

12  so credible or forthright.  And so we give that away, and once

13  we give it away it's gone forever.

14         THE COURT:  Well, all I am asking you to do is

15  identify which exhibits you would like me to read and the

16  evidentiary rule that supports admission of a document that

17  appears to be hearsay --

18         MR. AGNIFILO:  Okay, Judge.

19         THE COURT:  -- or is hearsay.

20         Did you want to be heard, Ms. Kasulis?

21         MS. KASULIS:  Yes, Your Honor, just briefly.

22         We too want to move this trial along and don't want

23  to spend our entire trial day at sidebar fighting over these

24  exhibits.  And we appreciate a preview of some of the

25  evidentiary grounds that the defense will proffer, we assume,

Proceedings                                              1466

1    with respect to exhibits that they intend to use going forward

2    and we are certainly in a position to respond to those.

3           One of the things we did want to raise with the

4    Court is in Mr. Agnifilo's second July 4th letter he invoked

5    the Rule 16 prohibition that the criminal defendant can only

6    disclose materials it intends to use on the defendant's

7    case-in-chief to the government.  And with respect to this

8    notice issue, we did want to raise for the Court that, and we

9    are happy to provide these citations to the Court as well,

10   there appears to be a distinction in the law regarding what

11   the defendant's case-in-chief means.

12          There are sort of two ways in which the defense is

13   crossing or appears to be crossing the witnesses.  One is for

14   impeachment purposes.  So, for example, if the witness

15   testified on direct that they believed that there is a

16   hundred-million-dollars of AUM and they want to try to impeach

17   the witness with materials to say no, you didn't think that,

18   isn't that true because I have X document that shows

19   otherwise; that is fair cross-examination and it's for

20   impeachment purposes.

21          But if they are trying to then put in affirmative

22   evidence of their defense, that that is, in fact, considered

23   to be the defendant's case-in-chief and that they are to

24   provide notice to the Government and to provide the documents

25   that they are then trying to use and admit through those

Proceedings                                              1467

1   witnesses to support their, quote, case-in-chief.

2          So it is not just that these are, quote, the

3   government's witnesses and then there is a separate point in

4   time at which the defense puts on their witnesses and then the

5   government rebuts; that the law is clear or we have a number

6   of citations here which I shared with Mr. Agnifilo before we

7   started today, that there appears to be a little bit more to

8   the concept of case-in-chief than, I think, that we have all

9   really been considering up until this point.

10          And so along the lines of what Your Honor is saying,

11  we too didn't get these 92 e-mails and then we too want to

12  have an opportunity to review them to understand if there is

13  an evidentiary basis for what purposes they're being used, et

14  cetera, but I think the Josiah Austin e-mails really sort of

15  illustrated this issue and the distinction between impeaching

16  a witness and, you know, affirmatively putting in evidence

17  with respect to the defense's case-in-chief.

18          And so we are happy to provide the citations to the

19  Court about what we believe it is a real distinction there and

20  why Rule 16 compels the defense to provide us with those kinds

21  of documents as compared to what Mr. Agnifilo is saying is to

22  cross-examine witnesses with respect to what they've testified

23  on direct for impeachment purposes, to undermine the

24  Government's theory of the case, et cetera.

25          So we just wanted to raise that with the Court

1   because we do believe that's a distinction that I don't think

2   that we've all been discussing up until now.

3          THE COURT:  All right.

4          MR. AGNIFILO:  Very brief on that.

5          THE COURT:  Of course.

6          MR. AGNIFILO:  It will be very brief.

7          And I appreciate -- the government did share those

8   case cites with me before today and I appreciate it.

9          There are no published decisions on this, none.  The

10  Rule 16 says, obviously, we have to give discovery in

11  connection with the defense -- the direct case of the

12  defendant.  There are five cases that the Government was good

13  enough to share with me.  None of them are published.  There's

14  a District Court decision from D.C.  There is a District of

15  Idaho, unpublished decision.  There is a District of Oregon,

16  unpublished decision; a District of New Jersey, unpublished

17  decision; and a Northern District of California, unpublished

18  decision.  And nothing from the Second Circuit, nothing from

19  either the Eastern or Southern Districts of New York, nothing.

20  So we are talking about unpublished decisions from district

21  courts elsewhere in the country, and what these unpublished

22  decisions from district courts elsewhere in the country

23  basically say is if there is, essentially, what we would call

24  an affirmative cross, meaning you're not just responding to

25  the direct, you're essentially asking questions that

Proceedings                                                    1469

1   technically could be out of the scope of cross-examination,

2   that sort of de facto that is tantamount to being on the

3   defense, part of the defense case, even though it's not really

4   the defense case.

5           I mean my counterargument is when Rule 16 talked

6   about the defense case, it has meaning.  It means the

7   witnesses that the defendant is putting on as affirmative

8   evidence.  What these unpublished district court decisions say

9   from out of the country [sic] is when the cross-examination

10  essentially goes beyond the scope of direct and into other

11  areas, that that could be considered to be the defense case.

12          Now, first of all, I dispute that as a matter of law

13  and I don't think there's any certainly binding precedent,

14  because the precedent -- there's not even a reported decision

15  and there is no decision from this circuit or the Southern or

16  Eastern District.  But even more to the point, I think

17  everything -- and we keep coming back to Josiah Austin because

18  it's the best historical example -- is Josiah Austin, for

19  instance, said he had contact with Shkreli by e-mail.  By

20  showing the actual e-mails is very much within the scope of

21  the direct.  So I don't think that, A, the cases apply.  They

22  are not published decisions.  They are from elsewhere.  And I

23  still think that we do not have any obligation to give

24  certainly to the government, I mean I think that's an

25  important part too, Judge.  It's one thing to give our

Proceedings                                    1470

1   exhibits to the Court in camera because Your Honor is not our

2   adversary, it's quite another to give them to our adversary.

3   Your Honor is not going to prepare any witnesses any

4   particular way, our colleagues at the Government are.

5          So I don't think that they have any basis to see any

6   of our defense materials that we are going to use in

7   cross-examination.  And I think that, most respectfully, any

8   order requiring us to, I believe, is inconsistent with

9   Rule 16.

10         MR. BRAFMAN:  Your Honor, I know Mr. Agnifilo signed

11  the letter, but we've been trying to split up some of the

12  work, especially because we are working so many days that are

13  supposed to be holidays.  And we are working 18-hour days

14  anyway, as is the Court and the government.

15         But we discussed this issue at length and it was my

16  suggestion that Rule 16 be noted because in no trial that I've

17  ever been involved in in this courthouse or in the Southern

18  District or anywhere else have we been required in advance to

19  turn over to the government documents we intend to use to

20  confront the witness on cross-examination.  And I preface that

21  by just saying the following, which the Court may or may not

22  be aware of:

23         Before trial we exchanged exhibits.  I would say

24  that we gave them thousands of pieces of paper.  They gave us

25  thousands of pieces of paper.  And we provided copies of

Proceedings                                              1471

1   defense exhibits to the Court as well.

2          The Government has given us hundreds of exhibits,

3   thousands of exhibits, and yet they have carefully selected a

4   handful that they use in the direct examination of their

5   witnesses and they have not told us in advance, By the way,

6   even though we gave you 60 government exhibits on this

7   witness, we are only going to use the following, and

8   cherry-pick out the 10 that they are going to use.  So there

9   is a lot of scrambling that goes on before the cross to find

10  out what government exhibits did they use, which didn't they

11  use, and are some of those government exhibits not used by the

12  government and then become defense exhibits.  So it's

13  virtually impossible to do what Your Honor suggests.

14         I also indicate that when you cross-examine a

15  witness on issues that tend to either go to credibility by

16  showing that the testimony isn't to be believed or to personal

17  bias or vindictiveness or to show why the witness is otherwise

18  not believable, none of that is ordinarily discoverable by the

19  government in advance of the cross-examination.

20         THE COURT:  All right, so, Mr. Brafman, I challenge

21  you, has any court in your vast experience throughout the

22  United States and in this circuit ever allowed the defendant

23  to throw up 94 exhibits and say, These are not hearsay, I want

24  them to come in?

25         They are self-serving statements of the defendant,

Proceedings                                                     1472

1    and without any other showing at the time you are proffering

2    those multiple exhibits as to why they should be admitted, why

3    they are not hearsay, has any court ever allowed you to do

4    that --

5              MR. BRAFMAN:  No, but --

6              THE COURT:  -- and taking time at sidebar for hours

7    to go through each of 94 e-mails?

8              MR. BRAFMAN:  No, and with the benefit of hindsight

9    both Mr. Agnifilo and I both agree that the Josiah Austin

10   series of e-mails should have been handled differently, but I

11   am suggesting that Your Honor's order over the weekend that we

12   give the government in advance of the cross, for example, of

13   Mr. Blanton, who he is all over the place on so many issues,

14   it's impossible to tell them what exhibits we intend to use

15   for the cross, nor should we.

16             And to answer Your Honor's question, no, I am not

17   aware of any prior incident similar to the Josiah Austin, but

18   I am also not aware of any judge ever directing me to provide

19   the government with the list of exhibits to be used on

20   cross-examination, even under Rule 16.  And many of the judges

21   in this building have concluded that Rule 16 applies to the

22   defendant's case-in-chief, not to exhibits you intend to

23   introduce during the cross-examination of a witness, and even

24   if that indirectly advances your defense.

25             THE COURT:  Well, then, perhaps, you should be

Proceedings                               1473

1   better prepared going forward during cross-examination to set

2   forth the basis for admission because all we were doing at

3   sidebar was looking at these 94 e-mails, and there was a date

4   raised at the sidebar as to whether these were or were not

5   hearsay, and there was no specificity, there was no

6   identification of specific exhibits or specific e-mails that

7   you felt should be used against Mr. Austin.  It was just done

8   in a very gross way.

9            I do not mean that in a pejorative way, I mean just

10  it was a wholesale way.

11           MR. BRAFMAN:  En masse.

12           THE COURT:  In an en masse way without specificity,

13  and it made it virtually impossible, absent my ability to sit

14  down and read all the e-mails, and try to think of why it was

15  not hearsay.  That is all I'm asking you to do.

16           MR. BRAFMAN:  That's why in our letter we made it

17  very clear that we were not revisiting the Austin issue and

18  that on a going-forward basis we will be much more selective

19  and the Court will not be forced or requested to read

20  substantial number of documents; and to the extent that there

21  is any witness where that applies, we will try and highlight

22  those issues for the Court.

23           And I echo Mr. Agnifilo's suggestion.  It's one

24  thing for us to give them to Your Honor, it's another thing to

25  give them to the government in advance, and that no one has

SAM      OCR      RMR      CRR      RPR

Proceedings                                    1474

1    ever required us to do.  And it's impossible, quite frankly,

2    until we've heard the direct in this case to really understand

3    which government exhibits will be turned into defense

4    exhibits.  They have all of the e-mails that we will be using

5    in large measure with the exception of a handful.  They have

6    all of the e-mails we will be using to cross-examine their

7    witnesses because virtually all of them came from government

8    discovery.  So it's not like we're surprising them.  They may

9    be surprised in how we intend to use them, but not the actual

10   document, itself.

11            Thank you.

12            THE COURT:  Yes.

13            MS. KASULIS:  Your Honor, just very briefly.  There

14   is a Western District of New York case, I did skip over that,

15   Mr. Agnifilo.  And these are case management orders, Your

16   Honor.  So with respect to them being unpublished, again we're

17   happy to provide them to the Court, but again these cases do

18   make a distinction between cross-examination, which no one is

19   saying that Mr. Brafman can't do in terms of bias and

20   credibility, et cetera, but it's the separate sort of

21   affirmative sort of evidence, as evidenced by these 94 e-mails

22   which we didn't have.

23            And, again, we are trying to move this along, we're

24   trying not to cause delay, and so we just raise this issue

25   with the Court.  And, obviously, we'll provide the citations

Proceedings                                          1475

1    to make sure that we are all understanding the distinction as

2    to what we're asking and why we're asking for it, to just,

3    again, to speed things along.

4              Thank you.

5              THE COURT:  All right, thank you, I appreciate it.

6              So let's talk about the next application that the

7    Government has made to impose a gag order or in the

8    alternative to sequester the jurors.

9              MS. KASULIS:  Your Honor, you know, just after two

10   days of testimony in this case the government did feel

11   compelled to file this motion.  You know, Mr. Shkreli's

12   behavior appears to be escalating in the last week.  We felt

13   compelled to file the motion either for a gag order or in the

14   alternative to -- for semi-sequestration of the jury.

15             It is of paramount importance to us that we avoid

16   the circus-like atmosphere that we had all discussed, most

17   particularly with respect to the severance motion, that this

18   was a very real concern.  And Mr. Brafman assured the Court

19   and all the parties that Mr. Shkreli would not contribute in

20   any way to this sort of environment.  And just to be clear, we

21   understand that Mr. Brafman has cautioned his client to not

22   speak in the way that he has been over the past week, and so

23   this is by no means any sort of criticism with respect to

24   defense counsel.

25             But what I do think is clear is that Mr. Shkreli has

1    stated that he will, quote, do whatever he wants, and that was

2    even with Mr. Brafman saying that I hope he doesn't speak any

3    further about these issues.  And that is a real concern to us.

4           Mr. Shkreli did enter on his own volition the

5    overflow room on Friday afternoon.  He then did speak with

6    members of the press and the public for over five minutes.  He

7    is doing such things, Your Honor, as commenting on the

8    evidence, commenting on the credibility of the witnesses,

9    talking about his own involvement with respect to preparing

10   certain documents and certain evidence that has been admitted.

11   He has also commented, for example, about plea negotiations in

12   this case, saying, for example, that he has not considered a

13   plea offer by the Government, which now compels us, and we

14   have raised this with defense prior to having this discussion

15   today, that for 2255 purposes we do need to create a record

16   that the government and the defense did engage in multiple

17   rounds of plea discussions in the last two months, each time

18   initiated by the defense.  That a formal plea offer was

19   extended at the request of defense on April 28th, 2017 and it

20   expired on May 4th, 2017.  And that there were two other

21   informal plea requests made by the defense on two other

22   separate occasions, recently immediately prior to Memorial Day

23   weekend and the date of the pretrial status conference.

24          So, again, we are now having to respond to what is

25   happening in the courtroom and then having to respond to what

Proceedings                                            1477

1    is happening outside the courtroom because many of

2    Mr. Shkreli's statements are just inaccurate.  So these

3    statements that Mr. Shkreli is making he makes himself, and

4    then the press, obviously, is interested in what he has to

5    say, as is the public.  They are discussing these statements

6    in the hallways.  They are discussing it here in the

7    courtroom.  And, of course, he is also speaking right outside

8    the courthouse in the same entry and exit way that the jurors

9    use.

10              And so while Your Honor has made clear to the jury

11   on multiple occasions they are not to consult media, social

12   media, I think it's very difficult for jurors to not be sort

13   of inherently exposed to what Mr. Shkreli is saying about this

14   case outside the courtroom.  And so we are very, very

15   concerned, Your Honor, that we are going to find ourselves in

16   a situation where we can't unring the bell and jury selection

17   took very long.  We all worked very hard to find 18 impartial

18   jurors, and really I think the last thing we need are these

19   sorts of actions that really sort of jeopardize a fair and

20   impartial trial, which is the right of both parties, and that

21   we are not veering into a mistrial, a jury nullification area,

22   which is what we've been concerned about all along.

23              So we understand that a gag order is a significant

24   request, we don't make it lightly.  And so if Your Honor feels

25   that the record is not sufficient at this point in time for a

Proceedings                                    1478

1    gag order, we are asking for a semi-sequestration of the jury.

2           THE COURT:  Meaning specifically what?

3           MS. KASULIS:  So specifically it would mean that the

4    jurors would meet somewhere in the vicinity of the courthouse.

5    Together they would then be escorted in and out of the

6    courthouse by the marshals.  That lunch would be provided for

7    them so that they would not have to leave the courthouse on

8    their own or have to go through the hallways where they may be

9    exposed to the sorts of statements that Mr. Shkreli has been

10   making.  And that they are generally escorted so that they are

11   shielded from any of these sorts of extrajudicial information

12   that is of real paramount concern to the government.

13          And so that is what we are asking for in the

14   alternative.

15          MR. BRAFMAN:  Your Honor, I know it's 9:30, but

16   there have been some statements made much to my, quite

17   frankly, shock and dismay that I think I need to address

18   because to the extent that the Government seeks to try this

19   case in the courthouse and not put into the public record

20   materials that are damaging to defendant, I can't imagine

21   anything more damaging to a defendant for the Government to

22   violate Rule 11 than put into the record the fact that there

23   were plea negotiations.

24          So let me state categorically as an ethical officer

25   of the Court I did raise the potential of resolving this case,

Proceedings                                          1479

1   and I can tell you without violating the privilege that in

2   each instance when I discussed it with Mr. Shkreli he

3   categorically rejected any suggestion of pleading to anything,

4   period, and that his position at all times was I would never

5   plead guilty to something I did not do.  We are going to

6   trial.

7           So to the extent that the jurors were to read the

8   government's statement, Ms. Kasulis' statement, I think they

9   should read the whole statement.  Although, we, too, hope that

10  they follow Your Honor's instructions.  And the hypocrisy of

11  this application it should be apparent.  The day after jury

12  selection was completed there was extraordinarily adverse

13  publicity that was patently false on the front page of one of

14  the major daily newspapers in the city suggesting that

15  everybody who was excused was excused because they hate

16  defendant or could not be fair.  It prompted an application

17  for a mistrial, which the Court denied.  The Court properly

18  did inquire of jurors and they assured you that -- but the

19  government's position at that time was these jurors are going

20  to follow the Court's instructions and they are going to

21  ignore everything that's in the media and they are going to be

22  able to do that.

23          You know, Mr. Shkreli has been baited, and I use

24  that word advisedly.  He has been baited by one personal

25  member of the media who has had a vendetta against Mr. Shkreli

SAM      OCR      RMR      CRR      RPR

Proceedings                                              1480

1   personally for more than a year.  How she is still allowed to

2   cover this case is shocking to me because in every time we

3   leave the building or come into the building the questions she

4   asks in a snide, almost childish, way are not designed to

5   elicit information, they are designed to bait Mr. Shkreli.

6   And he has met with us in the morning, we escort him into the

7   building.  We escort him out of the building.  We have done

8   everything we can to keep there from being any inappropriate

9   comments by him.

10          On --

11          THE COURT:  So what happened on Friday?

12          MR. BRAFMAN:  I will tell you what happened on

13   Friday.

14          THE COURT:  There are four lawyers.  He walks into

15   the pressroom and starts talking about the case.

16          MR. BRAFMAN:  Yes, I will tell you what happened on

17   Friday.

18          Much to my dismay, your marshal came up to me and

19   said, I think your client just went into the overflow room.

20   And he had to tell me where the overflow room was because I

21   had no idea, I thought it was next door.  I ran to the end of

22   the hallway, he was in there, he was chatting.  I don't know

23   whether he thought it was off the record or on the record.  He

24   was in there less than five minutes and, obviously, the next

25   day the press reported with glee some of the things he said.

Proceedings                                    1481

1            It will not happen again.  It was ill-advised.  He

2       was not left -- you know, Judge, I must tell you this:  The

3       first day we came to court, the onslaught of the press, and I

4       have gone through this a hundred times so it didn't intimidate

5       me, but for a man like Mr. Shkreli who suffers from anxiety to

6       begin with, to be confronted with 40, 50 members of the press

7       pushing cameras in your face and microphones and saying

8       terrible things about him -- and the one thing the Government

9       never focuses on, in every single article about this case

10      almost I think every single article about this case, despite

11      the fact that this case has nothing do with Daraprim or price

12      increases, every single article refers to it and every single

13      article to Mr. Shkreli's great prejudice leads with that or

14      has it in there in spades, and it is prejudicial beyond words

15      and it's not fair and at some point he is only human, Judge.

16      He responded more to that than anything else.

17            So I am sorry it happened.  I hope Your Honor just

18      understands he's relatively young and this it is not easy

19      position for him to be in.

20            The suggestion of sequestration of this jury is

21      preposterous because if they go home at night and they want to

22      defy your Court's order, the fact that they're picked up by my

23      marshals and escorted into the building, he hasn't said

24      anything to the jurors, he hasn't approached any of the

25      jurors.

Proceedings                                    1482

1          THE COURT:  But, Mr. Brafman, you cannot deny that

2     when comments are being made within the courthouse about this

3     trial, the evidence, the witnesses, the prosecutors, and on

4     the streets directly out front of the courthouse, I was

5     shocked that there were these comments and statements as he

6     walked along Cadman Plaza East in front of the courthouse

7     toward the corner.  Any juror could have been there.  They

8     could have overheard that.  They could have overheard comments

9     within the courthouse halls.

10          The concern is the jurors have been instructed to

11     decide this case based only on the evidence presented at the

12     trial, and what is happening, based on your own client's

13     conduct, there is a danger that those jurors will be exposed.

14          I believe they're following my orders and

15     consciously avoiding media reports, but when a party goes into

16     a pressroom and seeks them out and gives statements about

17     evidence in the case and continues to do that within the

18     immediate courthouse perimeter, there is a great risk that

19     jurors will be exposed and will hear that.  So he does not

20     need to speak directly to them.  If he is doing this where

21     they are likely to be, where jurors are likely to be, coming

22     and going into the courthouse, it raises concerns.

23          Is it fair to 18 citizens of this district to put

24     them in a room for 10 hours a day, not allow them to have any

25     contact with, they have been told, they have been gagged, they

Proceedings                                          1483

1   cannot talk about the case.  They cannot read about the case.

2   Their personal rights have been restricted in order to give

3   everybody here a fair trial.  They are not allowed to read

4   about the case.  They are not allowed to talk about the case.

5   The least I can do is allow them to go out into the park at

6   lunchtime and have fresh air or go and eat food that they

7   choose to eat, not food that we provide for them.  And so to

8   think about restricting them even further when they are just

9   doing their civic duty has great concerns.  All your client

10  has to do is to stop talking in the courthouse --

11              MR. BRAFMAN:  He will.  He will.

12              THE COURT:  -- and around the immediate perimeter of

13  the courthouse because they come and go.  The only way to

14  protect them from that is to put them in a marshals bus and to

15  drive them to a different location so they do not get exposed.

16              I am trying so hard.  I know you have tried hard and

17  the government has tried hard, to select 18 men and women who

18  are committed to remaining fair-minded to both sides and to

19  consciously avoid media, but when there is talk being

20  generated in public areas in the courthouse and immediately

21  outside the courthouse we have a problem, a potential problem.

22  And to put this, the burden of further sequestration on the

23  jury, to me is a concern.

24              So it seems to me that the least we can do is have

25  some ground rules because this is not going to help

SAM      OCR      RMR      CRR      RPR

Proceedings                                    1484

1   Mr. Shkreli in the end.  He is risking exposure in the media

2   that could be harmful to your ability to defend him.

3          MR. BRAFMAN:  Your Honor, there has been so much

4   negative exposure in the media that's harmful to Mr. Shkreli

5   that it is humanly impossible for any juror not to have been

6   exposed to it, and many of the people who are on this jury

7   have told you that candidly that while they have been exposed

8   to it and know about it, they can still be fair.

9          This was an isolated incident that happened.  It

10  will not happen again.  To the extent that it's humanly

11  possible we will have one member of the defense time with

12  Mr. Shkreli at all times.

13          And I must respectfully note, Your Honor, that there

14  was one word uttered by Mr. Shkreli in that video in response

15  to repeated heckling from this one reporter.  I have watched

16  the video.  I was standing next to Mr. Shkreli as we were

17  trying to get to the car, and this one woman, who is intent on

18  becoming a mega star, was on Mr. Shkreli's back.  You know, at

19  some point, Judge, it is a human reflexive defensive action

20  and he is trying very, very hard and we are too.  So I

21  understand Your Honor's concerns.  I am concerned as well.  I

22  think the press accurately reported my displeasure.  It wasn't

23  something I encouraged or something I wanted to do.

24          But I ask, Your Honor, under all of the

25  circumstances that we be given another chance to proceed.  I

Proceedings                                    1485

1   think sequestration of the jury is an inappropriate measure

2   and it is not going to keep them from hearing all of the

3   negative evidence that they are going to be able to if they

4   violate Your Honor's order, and there will be no more

5   conversations by Mr. Shkreli outside the courthouse between

6   getting from the building to the car.  It's a hundred yards,

7   Judge, that we have to traverse every day surrounded by

8   cameras and people shouting questions.

9           So I know better than to respond or at least say We

10  can't talk about the case as the only response, and

11  Mr. Shkreli, I think, has learned a lesson and we don't need

12  to revisit and will not need to revisit this again.

13          So I ask Your Honor to allow the trial to continue.

14  I think there are no measures that are required because I

15  think this is an isolated incident and it will not proceed.

16          THE COURT:  Will Mr. Shkreli commit to refraining

17  from speaking about witnesses and evidence or any issues

18  touching on this case --

19          MR. BRAFMAN:  Yes.

20          THE COURT:  -- within this courthouse and within the

21  immediate surrounding environment, meaning Cadman Plaza East,

22  Tillary Street, down to the back --

23          MR. BRAFMAN:  Yes.

24          THE COURT:  -- road of the courthouse; will he

25  commit to doing that?

Proceedings                                    1486

1          MR. BRAFMAN:  Yes, he has and he has just told me

2     that.

3          And, Your Honor, to be honest with you, we have

4     taken extraordinary measures at great personal expense to meet

5     up with Mr. Shkreli in the morning so he is not walking to the

6     building alone; and we all walk out together every night

7     precisely so that this should not happen.

8          So we are cognizant of the issue and he has assured

9     me that this will not happen again.  He apologizes to the

10    Court.

11         THE COURT:  All right, well, I think that if he is

12    agreeing, I would like to so order the agreement of

13    Mr. Shkreli and Mr. Brafman and his team, that he will not

14    make comments within this courthouse about the evidence and

15    the witnesses and he will not do so within the immediate

16    perimeter roads surrounding the courthouse.

17         MR. BRAFMAN:  Yes, Your Honor.

18         THE COURT:  I just think it is inappropriate and the

19    concern is that all the work that we have done together for

20    the last week to select 18 men and women from our district to

21    sit with a fair mind and decide the issues would be

22    jeopardized if he continues this.

23         MR. BRAFMAN:  And just so it's clear, Your Honor,

24    because this will be, you know, the headline tomorrow I fear,

25    I have an ethical obligation in every case before I go to

SAM      OCR      RMR      CRR      RPR

1   trial to see if the matter can be resolved.  I then go back to

2   my client and I ask the client, Is this something you want to

3   do?  And when the client says no, end of discussion and we are

4   on trial.

5              So there were discussions between me and counsel.

6   There were never discussions between Mr. Shkreli and the

7   government or any reverse proffer where Mr. Shkreli was

8   present.  I told him about my discussions.  He told me, No, I

9   am not pleading guilty to something I did not do; and here we

10  are on trial.  So to the extent that this is a unfortunate

11  headline in the making, I hope the press treats it

12  respectfully and accurately.

13             THE COURT:  All right, thank you.

14             Is there anything else from the government?

15             MS. KASULIS:  No, Your Honor.

16             THE COURT:  All right, so why don't we call the

17  jurors in.  Are they all hear, Ms. Jackson?

18             THE COURTROOM DEPUTY:  Yes, Judge.

19             THE COURT:  All right, thank you.

20             MR. KAPLAN:  The first witness we call today is

21  Steen Stich, and we previously discussed a limiting

22  instruction.

23             THE COURT:  Yes.  Did you want me to read it before

24  his testimony or after?

25             MR. KAPLAN:  Well, I was going to hope the Court

```
                        Proceedings                    1488
```

1   would read it at the point that he starts talking about any

2   possible misrepresentation that my client may have made.

3            MS. SMITH:  Your Honor, the limiting instruction is

4   limited to misrepresentations about the locate, which is on

5   February 1st.  There were other misrepresentations that the

6   limiting instruction does not cover.

7            THE COURT:  Well, why don't you review what you have

8   submitted to me.  As far as I can see, it's about the OREX

9   trade.

10           MR. KAPLAN:  Yes, OREX trade.

11           THE COURT:  What was the word you used, the

12  dislocate?

13           MS. SMITH:  The locate.  Just a locate, because it

14  is a small volume of stocks and we had to go out and locate it

15  before he can short it.

16           THE COURT:  Oh, okay.  I mean is this instruction

17  still acceptable to both sides?

18           MS. SMITH:  Yes, Your Honor.  I think it makes sense

19  at the end of the testimony, but is there going to be a couple

20  of places where there are misrepresentations, but it's up to

21  defense counsel.

22           MR. KAPLAN:  I prefer that it doesn't, you know, get

23  four or five misrepresentations and at the end of the Court

24  says, oh, by the way --

25           (Continued on following page.)

Proceedings                                     1489

1   (Continuing)

2          THE COURT:  Well, what you should do is stand and

3   say, I'd like a limiting instruction or something to that

4   effect and then we will read it, all right?

5          MR. KAPLAN:  That's fine, Your Honor.

6          THE COURTROOM DEPUTY:  All rise.

7          (Jury enters.)

8          THE COURT:  Good morning, Ladies and Gentlemen of

9   the Jury.

10          All are present, please have a seat, nice to see

11  you, I hope you had a good weekend.  Please have a seat,

12  everybody.

13          Is the Government prepared to call its next witness?

14          MS. SMITH:  Yes, Your Honor, the Government calls

15  Steven Stitch.

16          THE COURT:  Thank you.

17          Ms. Smith, is this binder supposed to be up here?

18          MS. SMITH:  Yes, Your Honor, that's for the witness.

19          (Witness enters and takes stand.)

20          THE COURT:  Sir, please come to the witness stand.

21          THE COURTROOM DEPUTY:  Please, raise your right

22  hand.

23

24          (Continued on following page.)

25

1    **S T E V E N     E D W A R D     S T I T C H**,

2              called as a witness having been

3              first duly sworn, was examined and testified

4              as follows:

5              THE COURT:  Good morning.

6              THE COURTROOM DEPUTY:  Please, have a seat and state

7    and spell your full name for the record.

8              THE WITNESS:  My name is Steven Edward Stitch

9    S-T-E-V-E-N, E-D-W-A-R-D, S-T-I-T-C-H.

10             THE COURT:  Thank you.

11             Please, proceed.

12   DIRECT EXAMINATION

13   BY MS. SMITH:

14   Q    Good morning, Mr. Stitch.

15   A    Good morning.

16   Q    How old are you?

17   A    I am 40 years old.

18   Q    Where do you live?

19   A    I live in Dallas, Texas.

20   Q    What is your highest level of education?

21   A    I have a college degree in computer science.  Bachelor of

22   Science in computer science.

23   Q    Where did you graduate from college?

24   A    South Methodist University.

25   Q    When did you graduate from college?

Stitch - direct - Smith                    1491

1    A    I graduated in 2000.

2    Q    Where did you work when you first graduated from college?

3    A    I worked for a hedge fund called Tarpon Capital

4    Management.

5    Q    Where was Tarpon located?

6    A    In Dallas, Texas.

7    Q    What was the size of the fund?

8    A    We managed approximately $80 million in the hedge fund

9    and we also managed about $40 million for a family office.

10   Q    What's a family office?

11   A    Family office is the investments just for a wealthy

12   individual or family, family members, separate from the hedge

13   fund.

14   Q    What did you do for Tarpon?

15   A    When I first started there I built the technology systems

16   to allow the hedge fund to see their performance, their

17   positions, track their holdings.  I also worked in operations

18   settling trades and then I became a research analyst in

19   technology stocks.  I also traded stocks for the hedge fund.

20   Q    How long did you stay at Tarpon?

21   A    I stayed there until September of 2003.

22   Q    Where did you work next?

23   A    I became, initially, a contractor for Bank of America

24   before I was hired full-time by Bank of America in February of

25   2004.

1   Q     Within Bank of America, what division or group did you

2   work with?

3   A     So, when I was hired by Bank of America Securities in

4   2004 I initially started in their prime brokerage group.  And

5   then, shortly, I was one of the original members of the

6   electronic trading services group that we started.

7   Q     What was your role at Bank of America?

8   A     So, my role there was to help acquire a company that was

9   an electronic trading platform.  It was also to work with the

10  technology team to design and build a technology platform for

11  hedge fund clients.  We called it the asset management

12  platform.  That consisted of the tools and the systems that a

13  hedge fund would need to manage their hedge fund on a daily

14  basis.  And then it was to go out and deliver and sell those

15  services to our hedge fund clients, whether they were existing

16  hedge fund clients or as we looked to bring on new hedge fund

17  clients.

18  Q     When you say an electronic trading platform, what do you

19  mean?

20  A     Electronic trading platform is, the easiest way to

21  describe would be just like you would use for trading your own

22  stocks.  For example, e-trade.  So, it's a technology system

23  that allows an individual to buy or sell a stock in the market

24  directly in the market on their own.

25  Q     During your time at Bank of America, did the division you

1   worked for ever change?

2   A    It did.  In 2009 Bank of America bought Merrill Lynch

3   Pierce Fenner and Smith and I became an employee of Merrill

4   Lynch Pierce Fenner and Smith.

5   Q    And is Merrill Lynch Pierce Fenner and Smith sometimes

6   known by its acronym MLPFS?

7   A    Yes.

8   Q    And what were you doing for Merrill Lynch?

9   A    For Merrill Lynch I was primarily acting as an electronic

10  trading sales person.  I was mainly working with the equities

11  team, the different groups inside of that.  So, cash trading,

12  research, sales, derivatives, trying to find hedge fund

13  clients of those different desks.  And then meet with those

14  hedge funds and see if they would be interested in using

15  Merrill Lynch's electronic trading platform as a way to pay

16  for the services of those groups.

17  Q    What types of hedge fund clients did you have in the

18  trading platform?

19  A    We had both prime brokerage clients as well as nonprime

20  brokerage clients.

21  Q    So, what does it mean to be a prime brokerage client?

22  A    Prime brokerage client would mean that we were acting as

23  the custodian for the hedge fund holding the securities and

24  the money that that hedge fund had from their -- the money

25  that they had taken in from their investors and then, as the

Stitch - direct - Smith                    1494

1   hedge fund bought securities or sold securities, the prime

2   broker is holding those securities and the cash, reporting on

3   it, providing financing or leverage for the hedge fund.

4   Q    And you said there was another type of client that was

5   not a prime broker client?

6   A    Sure.  So, a nonprime brokerage client.  So, if you were

7   just say, an execution client of Merrill Lynch, we would just

8   be executing the trades and then delivering the executed buy

9   or sell to your prime broker or custodian.

10  Q    When a hedge fund used Merrill Lynch as an executing

11  broker, what kind of information did Merrill Lynch have about

12  the assets or the money in the hedge fund?

13  A    Typically, the person making the introduction or who had

14  the relationship would have had a conversation with the hedge

15  fund manager in regard to what their assets under management

16  are, their trading strategy, you know, what markets and

17  countries they traded in, the products they trade for example,

18  et cetera.

19  Q    How does Merrill Lynch get paid when it serves as the

20  executing broker for a hedge fund?

21  A    So, specifically in electronic trading it's an

22  agency-based commission rate.  So, the client is buying or

23  selling at a price of their choosing and we're tacking on or

24  charging a commission per share.

25  Q    How many hedge funds did you work with during the course

Stitch - direct - Smith                                    1495

1   of your work with electronic trading platforms at Bank of

2   America and Merrill Lynch?

3   A     Several hundred.

4   Q     Okay.  How did those hedge fund vary, if at all, in size?

5   A     They vary from start-ups with say, $10 million of assets

6   under management all the way up to clients with multiple

7   billions of assets under management.

8   Q     Are you familiar with an entity named MSMB Capital?

9   A     I am.

10  Q     How did you first learn of MSMB Capital?

11  A     I was introduced to MSMB by a gentleman named Tillman

12  Ward.

13  Q     And who is Tillman Ward?

14  A     Tillman works in our research sales group or worked in

15  our research sales group in Dallas, Texas and he was a

16  gentleman that I worked with when for -- as an example, of

17  trying to find hedge funds in Dallas, Texas that would be

18  interested in using our electronic trading platform or

19  anywhere in the country for that matter.

20         MS. SMITH:  I'm now going to show you what's been

21  marked for identification as Government's Exhibit 117-11,

22  which is tab 11 in your binder.

23         THE WITNESS:  Okay.

24  Q     Do you recognize this document?

25  A     I do.

Stitch - direct - Smith                          1496

1   Q    And what is this document?

2   A    This is an e-mail from Tillman to Martin Shkreli and

3   myself asking if I can go with --

4   Q    I'm sorry, just tell me kind of who is on the e-mail and

5   the timeframe.

6   A    Sure.

7        It's an e-mail from Tillman Ward to Martin Shkreli

8   and myself, and it is dated April 29th, 2010.

9        MS. SMITH:  Your Honor, the Government moves to

10  admit in evidence Government's Exhibit 117-11.

11       MR. KAPLAN:  No objection.

12       THE COURT:  We will admit Government's

13  Exhibit 117-11 without objection.

14       (Government's Exhibit 117-11 received in evidence.)

15       (Exhibit published to jury.)

16       MS. SMITH:  And Ms. Balbin can you start on page 2.

17  Q    So, looking at the e-mail on the second page, who is that

18  an e-mail from?

19  A    It's an e-mail from Martin Shkreli to Tillman Ward.

20  Q    What's the subject line?

21  A    Let's do it.

22  Q    And what's the date of the e-mail?

23  A    April 29th, 2010.

24  Q    And what is the information contained in the e-mail

25  itself?

1  A    It is the address of MSMB Capital.

2          MS. SMITH:  And Ms. Balbin can we turn to page 1.

3  Q    And the e-mail at the bottom?

4  A    This is an e-mail from Tillman to Martin Shkreli and

5  myself.  It's dated April 29th, 2010.

6  Q    And can you read the content of e-mail.

7  A    Sure.

8          Steve, can you go meet with Martin tomorrow.  He

9  trades like a machine and we need to get him hooked up

10 electronically.  Options, international, domestic, et cetera.

11 Martin and I are old buddies and I use to cover him at Cramer

12 Berkowitz.  Thanks for the help, Tillman.

13         MS. SMITH:  And Ms. Balbin, can we just scroll up to

14 the next two e-mails.

15 Q    The middle e-mail from you?

16 A    Sure.

17 Q    What is your response to Mr. Ward?

18 A    I replied back:  Absolutely, Martin, what time works best

19 for you.  I am free up to 2:00 p.m. tomorrow, Steve.

20 Q    And what was Martin's response to you?

21 A    How is 12:30.

22 Q    What happened as a result of this e-mail?

23 A    I went to MSMB Capital's office and met with Martin

24 Shkreli and Marek Biestek at their office and discussed their

25 interest in using our electronic trading platform.  And I also

1    learned about Martin and his background and about

2    MSMB Capital.

3    Q    You mentioned an individual named Marek Biestek?

4    A    Yes.

5    Q    Who was that individual?

6    A    My understanding is that Marek was a partner at

7    MSMB Capital and was their, I believe was their chief risk

8    officer.

9    Q    Where did the meeting take place?

10   A    It took place at their office, which was 330 Madison

11   Avenue, 6th floor.

12   Q    Who attended the meeting?

13   A    Myself, Martin and Marek.

14   Q    Was that the first time that you met Mr. Shkreli?

15   A    Yes.

16   Q    Mr. Stitch, would you please take a look around the room

17   and tell us if you see the defendant Martin Shkreli.

18   A    I do.

19   Q    Can you please identify him by a piece of clothing that

20   he's wearing.

21   A    It looks like he's wearing a dark colored suit, a white

22   shirt and no tie.

23           THE COURT:  All right, the record will reflect that

24   Mr. Stitch has identified Mr. Shkreli.

25   Q    What, if anything, did the defendant tell you about

1   himself during that meeting?

2   A    Martin told me that he had been at Columbia University

3   and that he had dropped out to work for Cramer Berkowitz, that

4   he knew Jim Cramer well.  He told me that he left

5   Cramer Berkowitz to work for SAC Capital and then Intrepid

6   Capital after SAC.

7   Q    What, if anything, did the defendant tell you about

8   MSMB Capital at that meeting?

9   A    Martin told me that he started MSMB Capital in 2009, that

10  they were a healthcare and biotech-focused hedge fund, that

11  the hedge fund had approximately $35 million under management,

12  that they were up 53 percent year-to-date, that they traded

13  globally for equities, they traded options, that they turned

14  over the portfolio multiple times a day trading very actively,

15  told me that about 90 percent of their trading was done in

16  equities and about ten percent was in options.  I believe

17  that's what I had put in my notes.

18  Q    What was your understanding of the relative roles of the

19  defendant and Marek Biestek at MSMB Capital?

20  A    My understanding was that Martin was in charge of the

21  portfolio management and construction, determining what names

22  to buy.  And my understanding was that Marek was the risk

23  officer ensuring that not undue risk was taken in the

24  portfolio.

25          Martin showed me a spreadsheet that he had created

1  that tracked all of the names that he followed in their

2  universe.  It showed what positions they had put on in the

3  portfolio, their exposure, their P&L, and he said that it was

4  a system that he used to manage the fund, but they didn't take

5  a lot of individual stock-specific risk.

6  Q    What was discussed at the meeting in terms of the role

7  that Merrill Lynch would serve for the hedge fund?

8  A    We were looking to provide our electronic trading

9  platform for MSMB Capital to use to pay for the services that

10 Tillman was providing for research sales.  So, we were going

11 to offer -- we are offering them our electronic trading

12 platform as a way to buy and sell stocks and options, directly

13 in the market, and we would charge a commission for those

14 excuses.

15 Q    Was MSMB Capital to be a prime brokerage client or not a

16 prime brokerage client.

17 A    They were a nonprime brokerage client.

18 Q    As a result, what insight did Merrill Lynch have into the

19 assets of MSMB Capital?

20 A    Only what I was told by Martin and by Tillman, which was

21 at the time of that meeting, that their assets were

22 $35 million.  Other than that, the only information that we

23 would have would be the trades that were executed directly

24 with Merrill Lynch.  We would not be aware of any of their

25 other executions or any of the positions that they held since

Stitch - direct - Smith                          1501

1   they were a nonprime broker client.

2   Q    At the time of the meeting did the defendant ever mention

3   owning or founding a pharmaceutical company?

4   A    No.

5   Q    At the time of the meeting, did the defendant mention a

6   company called Retrophin?

7   A    No.

8   Q    And looking back very briefly at Government's

9   Exhibit 117-11, the date on that e-mail is April 29th.

10           What was the date of the meeting with Mr. Shkreli

11   and Mr. Biestek?

12   A    I believe it was the 30th, because -- I believe it was

13   the next day.

14           MS. SMITH:  I'm going to show you what's been marked

15   as Government's Exhibit 117-1 for identification.  It's tab 1

16   in your binder.

17   Q    Do you recognize this document?

18   A    I do.

19   Q    And what is this document?

20   A    This is an e-mail from Tillman to myself.  It is from

21   Thursday, April 29th, 2010 and it's a forwarded e-mail that

22   Tillman forwarded to me of an e-mail that Martin had sent out

23   to what, I would assume, would be people interested in

24   receiving the performance information for MSMB Capital.

25           MS. SMITH:  Your Honor, the Government moves to

VB      OCR      CRR

Stitch - direct - Smith                    1502

1    admit Government's Exhibit 117-1 in evidence.

2              MR. KAPLAN:  No objection.

3              THE COURT:  We admit 117-1.

4              (Government's Exhibit 117-1 received in evidence.)

5              (Exhibit published to jury.)

6              MS. SMITH:  And Ms. Balbin, if we can focus on the

7    lower e-mail from Mr. Shkreli.

8    Q    And Mr. Stitch, what is the date of this e-mail?

9    A    The date is April 29th, 2010.

10   Q    Is that the same date of the e-mail this we were just

11   looking at previously?

12   A    Yes.

13   Q    Okay.  What's the subject line?

14   A    MSMB Capital Management LP performance estimate.

15   Q    And who is the e-mail from?

16   A    Tillman Ward, to me.

17   Q    I'm going to direct your attention to the fourth line

18   down which says:  MSMB Capital Management LP has returned plus

19   58.86 percent since inception on 11/1/2009.  The S&P 500 Index

20   returned plus 14.98 percent during this period.

21              What is your understanding of what that meant?

22   A    My understanding is that this is showing the performance

23   of MSMB Capital since the inception of the fund, their

24   performance to date which at that time was, according to this,

25   58.86 percent, and they were showing the relative

1    out-performance of the fund to the S&P 500 Index, which at

2    that point had returned 14.98 percent during that period.

3    Q    And what's the S&P 500 Index?

4    A    The S&P 500 Index is an index of 500 large companies in

5    the United States that represent a broad diversity of

6    industries, but are leading companies in their industries.

7    Q    Does the S&P 500 Index serve as a benchmark for the

8    industry?

9    A    Yes.

10   Q    Based on your experience working with hedge funds, plus

11   58.86 return, how does that compare to hedge funds generally?

12   A    So, on a basis from November 1st, 2009 through

13   April 29th, 2010 a return of 58.6 percent relative to a

14   market, an index such as the S&P 500 Index being up

15   14.98 percent would be exceptionally strong performance in

16   that short period of time.

17        MS. SMITH:  And Ms. Balbin, can we scroll up to the

18   top of the e-mail.

19   Q    So, who is the top e-mail from?

20   A    So, if I understand correctly, the section from Martin

21   Shkreli to Martin Shkreli -- I'm sorry.  So, that top.

22        So, from Tillman Ward to myself.

23   Q    And is it forwarding Mr. Shkreli's e-mail?

24   A    Yes.

25   Q    Why did you receive this forwarded e-mail?

1   A    Tillman was sending me information to help me better

2   understand the performance of MSMB Capital and why he thought

3   we should have a relationship with them since they were a

4   hedge fund performing very well in the market, that they were

5   growing their assets.  It was information to help me

6   understand what was going on at MSMB.

7   Q    What happened as a result of the meeting at MSMB Capital?

8   A    Martin agreed to use our electronic trading platform.

9   Q    And who handled the set-up for the MSMB Capital account

10  at Merrill Lynch from MSMB Capital?

11  A    Marek Biestek.

12  Q    How quickly after the meeting was the process of set-up

13  completed?

14  A    It took a while to get all of the required electronic

15  trading documents back, so I don't remember offhand exact

16  number of months, but it was not a number -- it was not a

17  matter of a few days.

18  Q    After the trading platform was set up, did you have any

19  additional in-person meetings with the defendant?

20  A    I did.

21  Q    How many additional meetings did you have?

22  A    One.

23  Q    What was the purpose of that additional meeting?

24  A    The purpose of the meeting was to introduce a gentleman

25  named Joe Manning, who worked in our prime brokerage sales

1  group, to Martin.

2  Q    And how did the meeting to discuss or how did that

3  meeting come about?

4  A    Tillman, Tillman Ward sent an e-mail to the head of

5  Merrill Lynch prime brokerage group discussing MSMB Capital

6  and Martin and telling him how good of a job Martin was doing,

7  and that fund was growing, and that we should set up a meeting

8  to discuss having MSMB Capital become a prime brokerage

9  client.  And that led to a meeting to introduce Joe to Martin

10 to discuss and learn about MSMB Capital and to discuss and

11 have Martin learn about the services of our prime brokerage

12 group.

13 Q    At the time was there a size requirement for a hedge fund

14 to go from a nonprime brokerage client to a prime brokerage

15 client?

16 A    Yes.  At the time Merrill Lynch prime brokerage really

17 was not looking to add any me prime broke clients unless they

18 had a hundred million dollars of assets or more.

19 Q    When did the meeting about MSMB Capital becoming a prime

20 broke client take place?

21 A    I believe that was in August of 2010.

22 Q    Where did the meeting take place?

23 A    The Campbell Apartments.

24 Q    Where is the Campbell Apartments?

25 A    It is in Grand Central Station.

1   Q    Who attended the meeting?

2   A    Myself, Martin Shkreli and Joe Manning.

3   Q    And what was discussed during the meeting?

4   A    We discussed again, Martin's background.  We discussed

5   the strategy of the hedge fund which I mentioned earlier,

6   healthcare and biotech focus, et cetera.

7            Martin mentioned that the fund was growing, he

8   talked about the performance.  He also mentioned that he had

9   doubled the size of the fund and wanted investment from the

10  Bill and Melinda Gates Foundation.

11  Q    Based on that conversation, what did you understand the

12  assets under management of MSMB Capital to be at that time?

13  A    My understanding is that they were approximately

14  $125 million of assets under management.

15  Q    As a result of that meeting did MSMB Capital, in fact,

16  become a prime broke client?

17  A    They did not.

18  Q    What, if anything, did you notice about the trading

19  activity of MSMB Capital once the electronic trading platform

20  was set up?

21  A    Initially, MSMB Capital did, you know, a handful of

22  trades of relatively small size; my understanding, getting

23  used to the trading platform.  And then after that, the

24  trading stopped for a period of time before it picked up again

25  in larger size and quantity.

Stitch - direct - Smith                    1507

1  Q     I'd like to turn your attention to February 1st, 2011.

2         Where were you on that date?

3  A     I was at my office at 1 Bryant Park.

4  Q     What, if anything, happened on the morning of

5  February 1st, 2011 with respect to MSMB Capital?

6  A     The morning of February 1st I noticed that MSMB Capital

7  was trading in a security Orexigen, that they were trading in

8  a large size that increased throughout the day, and that they

9  were shorting the stock, which was a little unusual in the

10 sense that the stock had opened down, if I recall correctly,

11 over 50 percent, well over 50 percent.

12        And when I saw that he was shorting the stock, I

13 looked into what was going on and checked to see if we had the

14 ability to allow our clients to borrow or locate that

15 security.  We did not.

16        I noticed that Martin was indicating that he had the

17 locate from his prime broker Interactive Brokers and I called

18 Martin and asked him if he, indeed, did have the locate for

19 the security for Orexigen.

20        And he said yes.

21        I asked him if he was sure.

22        And he said yes.

23        And --

24 Q     So, just to stop you.  Let me just break that down a

25 little bit.

VB        OCR        CRR

Stitch - direct - Smith                    1508

1            You said that the stock that you noticed

2   MSMB Capital trading was Orexigen?

3   A     Yes.

4   Q     Is that also known as OREX?

5   A     Yes.

6   Q     And I believe you said that there was MSMB Capital was

7   trading a large size of OREX.

8            What do you mean by that?

9   A     At that time MSMB Capital had not executed significant

10  volume in the millions of shares in any one security and so, I

11  noticed that day that throughout the day they eventually

12  accumulated a trade of over 60 million shares of OREX during

13  the day.  So, it was a lot of volume in one stock in that one

14  day.

15  Q     And in terms of the trading in that stock, was that one

16  big trade that wound up with that 60 million or is it a bunch

17  of little trades?

18  A     It was a lot of small trades that accumulated to 60

19  million total shares executed.  And they left -- at the end of

20  day the hedge fund had an 11-million share, approximately just

21  over 11-million share short position.

22  Q     You also mentioned that the trades involved shorts.

23            What is a short?

24  A     Shorting a stock means that you're going to bet that you

25  can sell it at the price today and buy it back at a cheaper

VB      OCR      CRR

1   price in the future.  And to do that, you borrow the stock

2   from your prime broker so that you can sell it and then, in

3   the future buy it back and return it, return the borrowed

4   stock when you buy it back.  And because you're selling it at

5   a high price and buying at the low price, you make a profit.

6   Q     Is it also a bet that the stock price will go down?

7   A     Yes.

8   Q     You mentioned a locate as well.

9         What does it mean to locate a stock?

10  A     Locating a security means that you've talked to your

11  prime broker and that they -- you ask them if you can borrow

12  that specific security.  And they say yes and they

13  specifically set that quantity of stock aside specifically for

14  you.

15  Q     Who served as the prime broker for MSMB Capital?

16  A     Interactive Brokers.

17  Q     Okay.  Why were you interested on whether or not

18  Mr. Shkreli had a locate for OREX?

19  A     That morning, having seen that stock trading down on

20  news, down a very large percentage and based on my experience

21  and my years in following the stock market and working with

22  hedge funds around trading, I was concerned that people might

23  have already been short the stock and he was overriding or

24  indicating that he had to borrow from Interactive Brokers, and

25  I wanted to understand what was going on.

1        And when Merrill Lynch didn't have the ability to

2   find any stock to lend to our prime brokerage clients, it made

3   me concerned that maybe other prime brokers didn't have the

4   availability to find stock to lend to their hedge fund

5   clients.

6   Q    Was OREX an easy-to-borrow stock or not-an-easy-to-borrow

7   stock?

8   A    It was not an easy-to-borrow stock.  Meaning, we didn't

9   have the availability to lend it to any of our clients.

10  Q    What's an example of a stock that's generally easy to

11  bore re?

12  A    GE, Microsoft.  Any large stock that people hold in their

13  accounts that banks are able to then lend to their clients.

14  So, GE, Microsoft.

15  Q    You mentioned that you had a conversation with the

16  defendant on February 1st, 2011?

17  A    Yes.

18  Q    So, what was that conversation?

19  A    That conversation was specifically to ask Martin if he

20  had located OREX from his prime broker Interactive Brokers.

21        And he said he did.

22  Q    And what else did you discuss in the conversation?

23  A    On that conversation, that was it.

24  Q    Why is it important to have a locate on a stock?

25  A    It's important to have a locate on a stock because when

Stitch - direct - Smith                    1511

1   you sell something, you need to be able to -- so, in the

2   process of shorting a stock, you don't own it.  So, you're

3   borrowing it from your prime broker and then you're selling it

4   to a buyer and in that process it's important to be able to

5   make sure you can get the stock, so that he we can deliver it

6   to the buyer, so they can have what they bought.  And if you

7   don't have the locate, then Merrill Lynch in this example

8   would not be able to deliver the stock to the person that

9   bought it.

10  Q    You stated that the defendant told you that he did have a

11  locate on the stock; is that correct?

12  A    That is correct.

13  Q    Did you later come to learn whether the defendant, in

14  fact, had a locate on the stock?

15  A    He did not have a locate on the stock.  Interactive

16  Brokers told us that they did not inform him that he had a

17  locate.

18          MR. KAPLAN:  Judge, I would ask for a limiting

19  instruction.

20          THE COURT:  All right, thank you.

21          Ladies and Gentlemen of the Jury, at this time I

22  wish to advise you and please, listen carefully.

23          As part of Mr. Stitch's testimony you will hear

24  evidence of alleged misrepresentations by Mr. Shkreli relating

25  to the OREX trade with Merrill Lynch.  I would like to advise

1   you that the OREX trade is not charged as a crime in this case

2   and this evidence may not be considered by you for the purpose

3   of proving that Mr. Shkreli had a propensity or predisposition

4   to lie or commit the crimes charged in this case.  This

5   evidence is admissible for the limited purpose of providing

6   the background of the OREX trade.

7           Thank you.

8   BY MS. SMITH:  (Continuing)

9   Q   Mr. Stitch, did you know on February 1st, 2011 that the

10  defendant did not have a locate?

11  A   I did not.

12  Q   What happened after the phone call if the middle of the

13  day?

14  A   Late that afternoon or after the market closed I got an

15  e-mail from Martin Shkreli asking for a reduction in the

16  commission rate that we charged.  I had a conversation, we had

17  multiple conversations that afternoon with Martin in regard to

18  potentially lowering the commission rate -- which we did, in

19  fact, lower the commission rate, at least agreed to lower the

20  commission rate, I believe, to 30 mills or -- I'm sorry, I

21  believe 35 mills, I need to see the notes.

22          But we agreed to lower the commission rate until we

23  had more information the next morning to understand what our

24  exact costs were so we could understand what the appropriate

25  commission rate could be, the lowest we could possibly go.

Stitch - direct - Smith                    1513

1    Q    And did you testify earlier that the commission rate is

2    the rate that Merrill Lynch charges per trade?

3    A    Per share, per trade.  So, we charge a commission on each

4    trade and that rate gets a per-share rate.

5    Q    And how many trades did you say the defendant had

6    executed on February 1st, 2011 with Merrill Lynch?

7    A    I don't recall the exact number, but it was hundreds of

8    trades, but the total number of shares was approximately

9    60 million shares that we would have charged a commission rate

10   on the total number of shares of approximately 60 million.

11              MS. SMITH:  I'm going to show you what's been marked

12   as Government's Exhibit 117-2 for identification.

13              And it's tab 2 in your binder.

14   Q    Do you recognize this document?

15   A    I do.

16   Q    How do you recognize the document?

17   A    So, this is an e-mail from Martin sent on Tuesday,

18   February 1st, 2011 to me.

19              MS. SMITH:  Your Honor, the Government moves to

20   admit Government's Exhibit 117-2 into evidence.

21              MR. KAPLAN:  No objection.

22              THE COURT:  We will receive 117-2 in evidence.

23              (Government's Exhibit 117-2 received in evidence.)

24              (Exhibit published to jury.)

25              MS. SMITH:  And Ms. Balbin, can we start on the

Stitch - direct - Smith                    1514

1    second page.

2    Q    Mr. Stitch, if you can look at the e-mail at the bottom

3    of the second page from Mr. Shkreli.

4              What is the date of that e-mail?

5    A    Tuesday, February 1st, 2011.

6    Q    And who is the e-mail to?

7    A    It is to myself.

8    Q    What's the subject line?

9    A    Can you make a special exception for very high volume

10   commission on a small priced stock.

11   Q    What is the defendant asking you in that subject line?

12   A    He's asking me if I can lower our commission rate for his

13   executions on that stock on that day.

14             MS. SMITH:  And Ms. Balbin, if you can scroll up to

15   the next e-mail.

16   Q    And the next e-mail, that's an e-mail from you in

17   response to Mr. Shkreli; is that right?

18   A    That's correct.

19   Q    And what's the date of that e-mail?

20   A    February 1st, 2011.

21   Q    And can you just read the first two lines.

22   A    Martin, first, thank you very much for the business

23   today.  I discussed with my management and I think the best

24   thing to do in this case is to take your rate down to.0035 per

25   share.

1    Q    And what are you saying in that response?

2    A    What I was saying was, is that in discussing the amount

3    of volume that he did on the low-priced stock, that we would

4    agree to take our commission rate down from .004 per share to

5    .0035 per share.

6              MS. SMITH:  And Ms. Balbin, if you can go to page 1

7    of the e-mail chain.  And the top two e-mails.

8    Q    If you can look at the e-mail, the second e-mail, which

9    is at 5:50 p.m.

10             That's an e-mail from you to the defendant?

11   A    Yes.

12   Q    Can you read the content of that e-mail.

13   A    Martin, in discussing with my management they have

14   instructed me to book the trade out tonight at 30 mills per

15   share.  Please give me a call to discuss if you would like to

16   discuss in more detail or let me know when I can give you a

17   call.  Thanks, Steve.

18   Q    And what does the defendant write in response to your

19   e-mail?

20   A    His response was:  Please do better than 30 mills.  We

21   trade a lot and we always take.  We should be getting huge

22   rebates and never asked for a favor.  This is a favor.

23   Q    What is the defendant asking in that e-mail?

24   A    He is asking me to lower the commission rate to lower

25   than 30 mills per share.  He's asking me to do him a favor.

1   Effectively, asking us to lose money on the trade by lowering

2   the rate below 30 mills.

3   Q    In additions to that e-mail exchange, did you have any

4   other contact with the defendant at the end of day on

5   February 1st, 2011?

6   A    No.

7   Q    Did you speak to him on the phone other than that phone

8   call in the middle of the day at any point?

9   A    Yeah, we spoke that evening in regard to this e-mail

10  chain.

11  Q    What was discussed on that phone call?

12  A    We discussed the need to get the data to determine what

13  our exact cost of execution was, to see how low we could go on

14  the commission rate because -- effectively, what we talked

15  about, what was discussed in the e-mail just on the phone.

16         So, I needed to get the data to see what we could do

17  as the best rate, and that I would discuss with management

18  once I had that data the next morning, and we agreed to follow

19  up the next important.

20  Q    What was the defendant's demeanor on that phone call?

21  A    He sounded fine, normal, as if we did any other day that

22  we would have talked on the phone.

23  Q    Did he express any concerns to you about the size of the

24  position at the end of day?

25  A    No.

Stitch - direct - Smith                    1517

1   Q    And what was the size of the position at Merrill Lynch at

2   the end of day?

3   A    So, the short position was just over 11 million shares

4   short at the end of day.

5   Q    And does that mean that the shares need to be delivered

6   to somebody to satisfy the short?

7   A    So, at the end of day, as the executing broker, we would

8   deliver the short -- we would settle the trade with

9   Interactive Brokers.  So, and we would basically look for

10  Interactive Brokers to deliver us the stock, the short shares,

11  11 million shares, so we could then settle that trade out of

12  the market.

13  Q    On February 1st, 2011, when you saw that the position was

14  11 million shares short, did you have any concerns?

15  A    I did not.

16  Q    Why not?

17  A    Knowing that we only saw a part of whatever Martin and

18  MSMB Capital were doing, just what they did with us, and

19  Martin talking about trading with other counter-parties and

20  hedging his trades, I assumed that for a hedge fund that had

21  over a hundred million dollars, $125 million of assets under

22  management, that typically manage their risk appropriately,

23  that this was an appropriate size -- it's up to the hedge fund

24  to determine what is the appropriate positions for them.  And

25  this did not seem like an inappropriate position.

1           THE COURT:  Sorry, did you say 135 million or 125

2    million?

3           THE WITNESS:  125 million.

4           THE COURT:  Thank you.

5    Q    So, let's turn to the next day, which is February 2nd,

6    2011.

7           Did you have any contact with the defendant on that

8    day?

9    A    I did.

10   Q    What contact did you have with him on February 2nd?

11   A    Initially, on February 2nd, we either got an e-mail from

12   Martin in regard to settling the trade with Interactive

13   Brokers.  There was a need to break up the buy, sell and short

14   trades into smaller pieces to be delivered to Interactive

15   Brokers for settlement and then, there was a conversation

16   about that on the phone to discuss what exactly those sizes

17   needed to be.

18          We also discussed that I was waiting to get the data

19   that I needed in regard to the commission rate and that once I

20   had that, I would follow up and have a conversation with him

21   and with my manager to discuss what we could do there.  And

22   those were the initial conversations.

23   Q    Did you have a follow-up call with you and your manager

24   and the defendant?

25   A    I did the approximately mid-morning say, 11:00-ish.  Once

Stitch - direct - Smith                    1519

1   my manager Michael Lynch was in the office and I had the data

2   that I needed, I called Martin from Michael's office to

3   discuss the commission rate.

4   Q    What did the defendant say on that call?

5   A    When I introduced Michael to Martin to discuss what we

6   could do on the commission rate, Martin's first comment back

7   to us after the introduction was that the commission rate was

8   the least of our problems; that he could not pay for the

9   trade.

10  Q    What does it mean when he said he can't pay for the

11  trade?

12  A    I took that to mean that he did not have enough money,

13  enough assets in the hedge fund to hold a position of that

14  size to pay for that trade, to have that exposure on.

15  Q    What was your reaction to the defendant's comment?

16  A    I was shocked and was trying to understand what was going

17  on.

18        We asked a couple of high-level questions with

19  regards to what he meant by that, but we were shocked and we

20  needed to figure out what, what, what were the appropriate

21  next steps.  And so, we told him we would need to call him

22  back.

23  Q    Did you have any other phone calls with the defendant on

24  that day?

25  A    I did.

1    Q    And what happened during that next phone call?

2    A    On the next phone call Michael Lynch and I called Martin

3    back.  We asked him to explain what was going on and why he

4    couldn't pay for the trade.

5           Martin said that he had some system issues on his

6    side, that it was a mistake, that he apologized for putting me

7    in this position, that he said it would not be in our -- it

8    was not be in our best interests to pursue this, that he knew

9    people, that he would try to find ways to pay us back, that it

10   would not be wise to go to legal proceedings to try to get

11   this back or to make anybody aware of it.

12          And that was about, yeah, that was about it.  But

13   that he didn't have the money to pay for the trade.

14   Q    Did he say anything about Merrill Lynch absorbing the

15   trade to you?

16   A    He did.  Martin explained that he had traded OREX with

17   other brokers but that he had bought and sold the same

18   quantities with those brokers, so there was no position.

19   Those brokers were going to take that trade on their own and

20   flatten it out since they had bought and sold the same

21   quantity, but that since Bank of America Merrill Lynch was one

22   of the largest banks, that we could absorb the loss since we

23   were one of the largest banks and that he was leaving us with

24   the 11-plus million share short position.

25   Q    When he talked about a system issue on his end, did he

Stitch - direct - Smith                    1521

1    explain what he meant by that?

2    A    He did not.

3    Q    Based on your experience with the electronic trading

4    platforms, do you see any evidence of a system issue?

5    A    There was no system issue on our side.  He was referring

6    to a system issue, some other technology of his own.  There

7    was no issue with our electronic trading platform.  He was

8    referring to a system on his side separate and apart from our

9    electronic trading platform.

10   Q    Was there any issue with the system that he was using to

11   place trades at Merrill Lynch?

12   A    No.

13   Q    What was your reaction to the defendant's comments on

14   that last phone call?

15   A    Anger.  The fact that effectively threatened us was

16   upsetting.  The fact that he left us with a open

17   11-million-plus share short position and a stock that volume

18   was drying up was very frustrating.

19          Short and simple, angry.

20   Q    What was the dollar amount that the 11-million-share

21   short position represented?

22   A    I'm blanking out.  I believe it was... I don't, I can't

23   remember off the top of my head.  It was, I want to say,

24   60 million -- no.

25          I'm sorry, I can't remember off the top of my head

Stitch - direct - Smith                                    1522

1   all of a sudden.

2   Q    Do you have an idea of what the share price was on

3   February 1st for OREX approximately?

4   A    I think it was around $3.  So, I'm guessing it was around

5   a $30 million position, if I'm -- I have to go back and look,

6   but I believe it's probably around a $30 million position.

7   Q    Did Merrill Lynch wind up with the loss for the entire

8   $30 million position?

9   A    We did.  We had to go out and buy the stock, 11.3

10  million-roughly shares, if I remember correctly, in the open

11  market, which caused us to lose over $7 million to be able to

12  buy the stock to be able to deliver to the person that had

13  bought the stock that Martin had shorted.

14  Q    So, the final loss for that OREX trade for MSMB Capital

15  to Merrill Lynch was $7 million?

16  A    Yes.

17  Q    What steps, if any, did Merrill Lynch take to recover

18  that loss?

19  A    We went to arbitration with -- we went into arbitration

20  proceedings with MSMB Capital and Martin Shkreli.

21  Q    What was the end result of that arbitration?

22  A    My understanding was the end result was there was a

23  settlement that was reached between Merrill Lynch and

24  MSMB Capital for, I believe, $1.3 million.

25  Q    Who paid the $1.3 million?

VB        OCR        CRR

Stitch - direct - Smith                    1523

1   A    My understanding is that Martin Shkreli paid the
2   $1.3 million.
3   Q    Have you had any contact with the defendant since
4   February 2nd, 2011?
5   A    I have not.
6   Q    Earlier, at the beginning of the day, you said that you
7   worked with hundreds of hedge funds.
8        In all of your years of experience, had you ever
9   seen anything similar to this situation?
10            MR. KAPLAN:  Objection.
11            THE COURT:  You will have to rephrase the question,
12   Ms. Smith.
13   Q    In your experience, had you ever had a hedge fund leave a
14   large position open and not be able to cover it?
15            MR. KAPLAN:  Objection, Your Honor.
16            THE COURT:  Well, will you try one more time to
17   rephrase your question, Ms. Smith.
18   Q    Had you ever had the experience where a hedge fund said
19   that it had a locate when it did not have a locate?
20            MR. KAPLAN:  Objection, Your Honor.
21            THE COURT:  Overruled.
22   A    Not specifically around having a locate, no.  There was
23   another example of, in my experience, a hedge fund that was
24   fraudulent around the assets they had under management and not
25   being able to pay for their trades.

1            MS. SMITH:  Your Honor, just one moment.

2            (Pause in the proceedings.)

3            MR. KAPLAN:  Move to strike the last answer.

4            THE COURT:  I will sustain the motion.

5            We will strike the last answer.  The jury should

6    disregard it.

7            MS. SMITH:  Your Honor, I have no further questions

8    for the witness.

9            THE COURT:  All right.

10           Would you like to cross, sir?

11           MR. KAPLAN:  Yes, I would.

12   CROSS-EXAMINATION

13   BY MR. KAPLAN:

14   Q    Good morning, Mr. Stitch?

15   A    Good morning.

16   Q    My name is Jacob Kaplan, I'm one of the attorneys

17   representing Martin Shkreli.

18           I'm going to ask you a few questions today about

19   your time at Merrill Lynch and about the OREX trade.  If for

20   some reason you don't understand what I'm saying, want me to

21   repeat it, let me know I will try it again.

22           Let's start from the beginning.  You first met

23   Martin Shkreli through Tillman Ward; correct?

24   A    That is correct.

25   Q    And based on your conversations with Tillman Ward, would

Stitch - cross - Kaplan                1525

1   it be fair to say that you believed Martin Shkreli was a smart

2   individual?

3   A    Tillman represented Martin to be a very smart individual,

4   yes.

5   Q    And the purpose of this introduction was for business

6   purposes; correct?

7   A    That is correct.

8

9                   (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. KAPLAN:

3    Q    And is it fair to say that you were interested in Martin

4    Shkreli because you had heard from Tillman Ward that he was an

5    active trader?

6    A    Yes.

7    Q    In fact, Tillman Ward said he trades like a machine;

8    correct?

9    A    That is correct.

10   Q    And Merrill Lynch made a commission off of every trade;

11   correct?

12   A    Yes.

13   Q    The more trades you made, the more money Merrill Lynch

14   would make; correct?

15   A    At the commission rate that we had of 40 mills, yes.

16   Q    Now, when you first met Martin Shkreli you knew that he

17   was using Interactive Brokers as his prime broker; is that

18   right?

19   A    When I met with Martin, he informed me that he was using

20   Interactive Brokers as his prime broker.

21   Q    But you hoped you could convince him to use Merrill Lynch

22   as his prime broker?

23   A    Once we were aware that his assets were over $100

24   million, we were interested in having a conversation with him

25   about being a prime brokerage client.

1  Q    But when his assets were 35 million, your only interest

2  was him being an executing client?

3  A    That is correct.

4  Q    Martin Shkreli never ends up using Merrill Lynch as a

5  prime broker; correct?

6  A    That is correct.

7  Q    Is it fair to say in the role that Merrill Lynch had

8  limited to an executing broker, that Merrill Lynch did not

9  have to actually finance any of Martin Shkreli's trades?

10  A    As an executing broker we were not financing MSMB

11  Capital's trades.

12  Q    And that's because the financing was done by Interactive

13  Brokers, his prime broker?

14  A    That is correct.

15  Q    And as far as you knew, Martin Shkreli and MSMB Capital

16  were using other executing brokers to place trades?

17  A    That is correct.

18  Q    So at this point he didn't work exclusively with Merrill

19  Lynch, but you wanted him to.

20  A    That's not correct.

21  Q    You were fine with him using other brokers and giving

22  commissions on trades to other brokers?

23  A    Yes.

24  Q    One of the main purposes of your trading platform is to

25  generate revenue for Merrill Lynch?

1   A    Correct.

2   Q    And in order to generate revenue you need clients to use

3   your services?

4   A    That's correct, but we don't require our executing

5   clients to solely execute Merrill Lynch.

6   Q    I didn't ask if you require it.  I asked you if part of

7   your business plan was to have him use solely Merrill Lynch as

8   executing broker?

9   A    That's incorrect.

10  Q    Now, in order to make money off of Martin Shkreli and

11  MSMB Capital, you needed to make him happy that he continued

12  to use Merrill Lynch as executing broker?

13  A    Can you describe what you mean by "make him happy"?

14  Q    Otherwise if he had problems with Merrill Lynch he would

15  simply use other trading platforms and not use Merrill Lynch;

16  is that correct?

17  A    We were providing a service to MSMB Capital through

18  Tillman Ward which has access to our research and access to

19  our analysts.  One way to do that is to trade electronically

20  with us to pay for those services.  We would hope that he

21  would be happy with the quality of our research and the

22  quality of our analysts and the quality of our execution that

23  he was paying for a service.

24  Q    And how much money did he end up paying Merrill Lynch in

25  commissions?

Stich - cross - Kaplan                    1529

1   A    I don't know off the top of my head what he paid in total

2   to Merrill Lynch over the course of his relationship.

3   Q    Do you have a ballpark?  Would it be in the tens of

4   thousands, hundreds of thousands, millions?

5   A    It would probably be, in the short period of time they

6   traded with us, in the tens of thousands, maybe in the

7   hundreds of thousands.

8   Q    And was your yearly bonus in any way tied to how much

9   revenue you raised for Merrill Lynch?

10  A    No.  Well, my bonus was discretionary based on

11  performance, so it would have to do with how much profit

12  Merrill Lynch made.

13  Q    So if Martin Shkreli would trade with you more often and

14  you would make more profit, you would get more money in terms

15  of compensation?

16  A    In general, yes.  The total revenue that I brought in

17  across all of my electronic trading relationships would

18  determine what my discretionary bonus would be based on how

19  well the equity group did, how well Merrill Lynch did, how

20  well Bank of America did overall.  It was a completely

21  discretionary bonus.

22  Q    And one of those clients that it was based on was MSMB

23  Capital and Martin Shkreli?

24  A    Yes.

25  Q    Is it fair to say that Merrill Lynch had no issues with

1  MSMB Capital and Martin Shkreli until the Orex trade?

2  A     Until the Orex trade did not settle, correct.

3  Q     So he kept on trading and Merrill Lynch kept making money

4  on commissions?

5  A     When we initially started trading and we were charging

6  commissions, Merrill Lynch was making money and we were

7  happily settling -- executing and delivering these trades to

8  his prime broker for settlement.

9  Q     You testified earlier that it was Tillman Ward who first

10 spoke with Martin Shkreli; correct?

11 A     That's my understanding, yes.

12 Q     And it was Tillman Ward who first spoke to him about

13 assets under management?

14 A     Yes.

15 Q     And you were not part of that conversation; correct?

16 A     I was not part of that initial conversation.

17 Q     And you don't know the context of that conversation;

18 right?

19 A     I do not.

20 Q     Did you, on behalf of Merrill Lynch, ever do any due

21 diligence on MSMB Capital's assets under management?

22 A     I did not.

23 Q     Do you know if Tillman Ward did any due diligence on MSMB

24 Capital's assets under management?

25 A     Not beyond asking Martin Shkreli what his assets were.

1   Q     Did you or Merrill Lynch ever request any documentation

2   from MSMB Capital as to assets under management?

3   A     Not that I'm aware of.

4   Q     And Merrill Lynch wasn't financing any of these trades,

5   were they?

6   A     We were not financing any of MSMB's trades.

7   Q     Is it fair to say that a client's assets under management

8   is more important to a prime broker who is financing the

9   trades than to an executing broker like Merrill Lynch here who

10  is just placing the trades?

11  A     In general, yes, but an executing broker such as Merrill

12  Lynch would need to make sure that the hedge fund had over

13  $500,000 of assets under management.  Otherwise, the prime

14  broker would not be allowed to allow their hedge fund client

15  to execute with a waiver.  I believe the number is $500,000.

16  Q     But despite this requirement neither you, Tillman Ward or

17  anyone at Merrill Lynch requested any sort of documentation

18  from MSMB Capital about assets under management?

19  A     We didn't ask for any of those documents from any of our

20  other non-prime brokerage executing clients.  It's not the

21  standard practice at the time to ask for documents asking for

22  what are assets under management.

23  Q     At some point Merrill Lynch decides to raise MSMB's

24  trading limit from 50 million to 100 million; is that correct?

25  A     We raised the total exposure cap from 50 million to $100

1    million, which is a -- yes.

2    Q    And, again, at no point did anyone request any

3    documentation or anything before raising the trade limit?

4    A    It was explained to me that Martin had raised assets,

5    that his assets under management had gone up and at the time

6    that's all that's required.  I asked for approval from my

7    manager.  That approval was given and we raised the total

8    exposure cap.

9    Q    It's fair to say that you provide services to many

10   institutional investors over your career; correct?

11   A    Yes.

12   Q    And you would agree that there was always a risk that an

13   investment or trade will not be profitable?

14   A    When you say a trade or investment may not be profitable,

15   there's always -- can you rephrase that question?  When you

16   say "profitable," from an execution standpoint there's only

17   the risk that the hedge fund will not settle, the prime broker

18   will not settle that trade.

19   Q    I'll be clearer.  There's always a risk that an investor

20   made lose their investment?

21   A    Sure.

22   Q    And this is true whether it's a short position like Orex

23   or even if it's a long position; isn't that right?

24   A    I'm not sure what you're asking there in that -- if

25   you're asking that as an executing broker is it possible that

Stich - cross - Kaplan                    1533

1  we could lose money on a trade, the only time that an

2  executing broker would lose money on a trade --

3  Q    I'm not talking about executing broker.  I'm not talking

4  about Merrill Lynch.

5  A    All right.

6  Q    I'll rephrase.

7  A    Please.

8  Q    I'm referring to an investor.  Given your experience in

9  the market, would you say or would you agree that whenever

10 there's an investment by an investor there's a risk that they

11 may lose all of their money?

12 A    Yes.

13 Q    And, in this case, the Orex trade was done by MSMB

14 Capital and not Martin Shkreli personally; correct?

15 A    Correct.

16 Q    And at this point Martin Shkreli did not have a personal

17 trading account at Merrill Lynch; is that correct?

18 A    That is correct.

19 Q    Were you aware of the Orex stock before February 1, 2011?

20 A    I was not.

21 Q    You had never discussed Orex with Martin Shkreli before

22 that date?

23 A    No.

24 Q    So you would have no idea how much time Mr. Shkreli may

25 have spent researching before deciding to short Orex?

1    A    No.

2    Q    You testified earlier that there were 60 million shares

3    involved in MSMB Capital's Orex trade on February 1, 2011; is

4    that correct?

5    A    Yes.

6    Q    And of those 60 million, is it correct to say that 35

7    million shares involved the short or sale?

8    A    I don't remember the exact numbers of what the buy, sell

9    and short were.  I just remember what the total number of

10   shares executed were and what the net short position was.

11   Q    But all the 60 million shares weren't sells -- short or

12   sell; there was also a large amount of buying; isn't that

13   correct?

14   A    Yes, but net of the buys and the sells and the shorts,

15   which total 60 million shares executed was an 11.3 million

16   share short position approximately.

17   Q    So if there's 11 million short position, it had to have

18   been millions of Orex shares that Mr. Shkreli was able to buy

19   on that date?

20   A    Correct.

21   Q    And this wasn't one trade for 60 million shares; you

22   mentioned numerous trades.

23   A    That's correct.

24   Q    Could it have been hundreds of trades?

25   A    Yes.

1    Q    Possibly thousands?

2    A    Yes.

3    Q    Sand once again not all of these thousands were all

4    shorting, many of them were also buys?

5    A    That's right.

6    Q    You testified that you spoke with Mr. Shkreli about

7    noontime on February 1, 2011 and he indicated to you that he

8    had a locate on the Orex trades, on Orex shares; is that

9    correct?

10   A    Yes.

11   Q    Now his trading went on throughout the whole day, well

12   past this noon phone call?

13   A    Yes.

14   Q    With him shorting and buying stock for the next few

15   hours?

16   A    Yes.

17   Q    So at noon when you spoke to Mr. Shkreli, it's possible

18   that he actually had a source to buy the Orex shares as he was

19   buying Orex shares throughout the whole day?

20   A    I'm sorry, can you repeat the question?

21   Q    Sure.  So at noon when you spoke with Mr. Shkreli and he

22   said he had a locate on Orex shares, isn't it possible that he

23   actually had a locate because he had already purchased

24   millions of shares of Orex on that date?

25   A    It's my understanding that buying stock does not preclude

1   you from needing a locate later in the day or at that time of

2   day to then short stock.

3           So my understanding of industry practice is that if

4   you're going to short a stock, you need to get a borrow or a

5   locate.  In this example I asked specifically for a locate

6   because I would indicate that the prime broker specifically

7   set aside those shares for that customer.  So I'm not aware of

8   clients accumulating a long position to then short to use

9   those shares to short a stock.

10          But regardless of that, my understanding is that the

11  first thing Martin did in the morning on the 1st was to short

12  Orex, if I recall correctly.

13  Q    So if is Martin was shorting Orex in the morning but was

14  able to buy shares of Orex at a lower price than he was

15  shorting, wouldn't he be covering the short?

16  A    You could do that depending on how he indicates to his

17  prime broker to settle that trade, yes.

18  Q    So my point is at noontime when you spoke with him, isn't

19  it possible that Martin Shkreli had bought the shares of Orex

20  at a lower price in order to cover the short at that point?

21  A    Sure.

22  Q    You testified that Orex wasn't on Merrill Lynch's

23  easy-to-borrow list or whatever you called it.

24  A    That's correct.

25  Q    But that doesn't necessarily mean that the stock was hard

1    to find?

2    A    When a stock is not on our easy-to-borrow list it does

3    mean that it is typically harder to find and when I checked

4    with our stock loan desk that day, I was informed that it was

5    not able to be found on the street.

6    Q    But Mr. Shkreli bought millions of shares of the Orex

7    stock at that time; isn't that correct?

8    A    Yes, but -- sure.

9    Q    So when you say it's difficult to find, there is a market

10   of millions of shares of Orex out there that Mr. Shkreli was

11   able to buy at a lower price than a short?

12   A    Borrowing a stock and shorting it is different than

13   buying a stock in the market.  To be able to short stock and

14   borrow stock, a prime broker has to be able to have either

15   clients that hold the stock in their account at that

16   institution that they are able to then borrow from their

17   clients and lend to another client like MSMB Capital or they

18   have to be able to go out into and talk to other institutions

19   that have stock that they hold long and see if they can borrow

20   stock.

21        So, in this is example, there are active brokers

22   borrowing stock from another institution, say Fidelity or

23   State Street; borrow the stock to then lend to their prime

24   brokerage client MSMB Capital, to allow them to short.

25        Just because there are millions of shares bought and

1  sold in the market during the day does not mean that there are

2  millions of shares easily available to locate and lend to the

3  hedge fund client.

4  Q    But in order to cover a short, you don't necessarily only

5  have to borrow.  If you buy a stock at the lower price,

6  wouldn't that also cover the short?

7  A    You can buy stock at a lower price to cover the short,

8  sure.

9  Q    So at noon when you spoke to Mr. Shkreli, it's possible

10  that he had covered the short at that point already by

11  purchasing millions of shares of Orex at a lower price?

12  A    I don't remember at noon what his net position was

13  between buys and shorts to know.  At noon MSMB Capital could

14  have been flat in Orex or not, I don't remember at that

15  specific time of the day.

16         I know that approximately before noon I had a

17  conversation about whether or not he had a locate in Orex and

18  he said that he did.  At the end of the day, though, that

19  short position was 11.3 million shares approximately.

20  Q    You're familiar with Merrill Lynch's locate feature;

21  correct?

22  A    Yes.

23  Q    Are you familiar with Interactive Brokers' locate

24  feature?

25  A    No.

Stich - cross - Kaplan                                    1539

1   Q    Do you know if Interactive Brokers even has a locate

2   feature?

3   A    I believe in discussion with counsel after the fact that

4   they do not -- if I remember correctly, they do not have an

5   electronic locate feature.

6   Q    And instead is it your understanding that Interactive

7   Brokers simply list the available stocks on its website?

8   A    I don't know.

9   Q    You testified that after the trade day there was a

10  conversation between you and Martin Shkreli about commissions;

11  is that correct?

12  A    Yes.

13  Q    Had you had conversations with other clients about

14  reducing communications?

15  A    Yes.

16  Q    It happens all the time, doesn't it?

17  A    Yes.

18  Q    The following day on February 2, 2011 you testified that

19  you had numerous conversations with Martin Shkreli; correct?

20  A    I believe it was a total of three conversations if I

21  remember correctly.

22  Q    At some point Merrill Lynch becomes aware that Martin

23  Shkreli cannot cover his 11 million shares; correct?

24  A    We discovered that he didn't have the money to finance or

25  pay for the short trade, yes.

1   Q     At this point does Merrill Lynch reach out to Interactive

2   Brokers?

3   A     There was a point after the second conversation with

4   Martin Shkreli that I had with Michael Lynch that Merrill

5   Lynch did reach out to Interactive Brokers.

6   Q     Isn't it true that Martin Shkreli told Merrill Lynch to

7   reach out to Interactive Brokers?

8   A     Martin asked us in an initial conversation that day to

9   reach out to Interactive Brokers in regards toe breaking up

10  the trade to what was required by Interactive Brokers due to

11  their systems to be able to settle the trade.

12          So Martin asked us to reach out to Interactive

13  Brokers in regards to settling the trade.  That was in terms

14  of matching up like sides by stern dollar amounts.  That was

15  separate and apart from Merrill Lynch reaching out to

16  Interactive Brokers in regards to our contractual agreement

17  with them in regards to settling their -- the trades that MSMB

18  Capital did with the MSMB prime brokerage client.

19  Q     At this point you believed that Interactive Brokers would

20  be the ones who were covering the trade, not Merrill Lynch;

21  correct?

22  A     Interactive Brokers, if my understanding is correct, has

23  the ability to, within the first 24 hours, determine whether

24  or not they're willing to settle a trade for a prime brokerage

25  client or not.

1         But it was our understanding that MSMB Capital as a

2    prime brokerage client of Interactive Brokers that Interactive

3    Brokers would be settling their trades.  Interactive

4    Brokers -- we later discovered that Martin never recorded the

5    trade with Interactive Brokers and told them not to settle the

6    trade with Merrill Lynch.

7    Q    At some point MSMB and Merrill Lynch go to arbitration;

8    correct?

9    A    Yes.

10   Q    And at as part of that arbitration Martin Shkreli agrees

11   to pay the debt?

12   A    He agreed to pay what was the agreed-upon settlement

13   amount is my understanding.

14   Q    So when Martin Shkreli said to you in the second phone

15   call on February 2, 2011 that he would pay for it, he then

16   ends up paying for it; correct?

17              MS. SMITH:  Objection, Your Honor.

18              THE COURT:  Sustained.

19              You will have to rephrase.

20              MR. KAPLAN:  No further questions, Your Honor.

21              THE COURT:  Any more redirect?

22              MS. SMITH:  Yes, Your Honor, just briefly.

23   REDIRECT EXAMINATION

24   BY MS. SMITH:

25   Q    Mr. Stich, on cross-examination you were asked about

Stich - cross - Kaplan                    1542

1   trading limits.  Does Merrill Lynch require documentation for

2   trading limits for its executing brokers' clients?

3   A    Yes, so for our execution clients, our executing clients,

4   that are non-prime brokerage clients at the time, we did not

5   ask for any documents in regards to assets under management.

6   Q    You were also asked whether or not Mr. Shkreli had a

7   personal account at Merrill Lynch.  The account that he was

8   trading in was the account from MSMB Capital; is that correct?

9   A    That is correct.

10  Q    So the funds that he was trading with were funds that

11  belonged to the investors of MSMB Capital; is that right?

12  A    That is correct.

13           MR. KAPLAN:  Objection, Your Honor.

14           THE COURT:  Overruled.

15  BY MS. SMITH:

16  Q    You were also asked about the conversation you had with

17  Mr. Shkreli about the locate at noon?

18  A    Yes.

19  Q    When Mr. Shkreli told you that he had a locate, did you

20  later learn from Interactive Brokers that he did not, in fact,

21  have a locate?

22  A    We did.

23  Q    You were also asked about purchasing stock in connection

24  with a locate.  In order to short a stock, do you need to have

25  a locate so that you can borrow the stock first?

Stich - cross - Kaplan                    1543

1    A    Yes.

2    Q    And you were asked about the conversation between

3    Mr. Shkreli and Mr. Tillman at the time that the account was

4    set up about AUM.

5            You, yourself, had two separate conversations

6    directly with Mr. Shkreli about the AUM; is that right?

7    A    That is correct.

8    Q    The first conversation was on April 30th when he told you

9    there were $35 million assets under management for MSMB

10   Capital; is that right?

11   A    That is correct.

12   Q    And then the second conversation was sometime in August

13   2010 when Mr. Shkreli told you that he had in fact doubled the

14   size of the fund; is that right?

15   A    That is correct.

16   Q    And at that second conversation he also told you he had

17   gotten additional investors; is that right?

18   A    Yes.

19   Q    And as a result of that conversation, it was your

20   understanding that MSMB Capital had $125 million in assets

21   under management; is that right?

22           MR. KAPLAN:  Objection to the leading nature of the

23   question.

24           THE COURT:  Objection, try to rephrase if you could,

25   please.

1    BY MS. SMITH:

2    Q    Based on that second conversation in August 2010 with

3    Mr. Shkreli directly, what was your understanding of MSMB

4    Capital's assets under management in August 2010?

5    A    My understanding was their assets under management were

6    $125 million.

7                 MS. SMITH:  No further questions, Your Honor.

8                 THE COURT:  Do you have any recross?

9                 MR. KAPLAN:  No recross, Your Honor.

10                THE COURT:  Mr. Stich, thank you for your time.  You

11   are excused.

12                (Witness excused.)

13                (In open court.)

14                MR. BRAFMAN:  Would the court consider a five-minute

15   break?

16                THE COURT:  Sure.

17                Please leave your books fact down on your chairs.

18   Retire to the jury room, please, and do not discuss this case.

19   Thank you.

20                (Jury exits.)

21                (In open court outside the presence of the jury.)

22                THE COURT:  All right.  So how about ten minutes or

23   so.  Thank you.

24                (Recess taken.)

25                (In open court outside the presence of the jury.)

Blanton - direct - Smith                    1545

1            THE COURT:  Are we ready to bring the jury back?

2            MR. KAPLAN:  Yes, Your Honor.

3            MS. SMITH:  Yes, Your Honor.

4            (Jury enters.)

5            THE COURT:  We have all the jurors back.

6            Please have a seat, ladies and gentlemen.

7            Is the Government ready to proceed with its next

8    witness?

9            MS. SMITH:  Yes, Your Honor.  The Government calls

10   Darren Blanton.

11           THE COURT:  Okay.  Thank you.

12           Sir, come on up.  Right here.

13   **D A R R E N   B L A N T O N**,

14           called by the Government, having been

15           first duly sworn, was examined and testified

16           as follows:

17           THE COURTROOM DEPUTY:  State and spell your name for

18   the record.

19           THE WITNESS:  My name is Darren Blanton, D-A-R-R-E-N

20   B-L-A-N-T-O-N.

21           THE COURT:  Thank you.

22           Please proceed.

23   DIRECT EXAMINATION

24   BY MS. SMITH:

25   Q    Good morning, Mr. Blanton.

1   A     Good morning.

2   Q     How old are you?

3   A     52.

4   Q     Are you married?

5   A     Yes.

6   Q     Do you have any children?

7   A     Yes.

8   Q     How many children do you have?

9   A     Three.

10  Q     Where do you live?

11  A     Dallas, Texas.

12  Q     What's your highest level of education?

13  A     One year of college.

14  Q     What did you do after you finished your college courses?

15  A     Real estate.

16  Q     What specifically did you do in real estate?

17  A     I was an agent, commercial real estate agent.

18  Q     How long were you a commercial real estate agent?

19  A     Approximately twelve years.

20  Q     What did you do after you were a commercial real estate

21  agent?

22  A     Invested in real estate.

23  Q     Did you invest in real estate personally or was it

24  through a particular entity or a vehicle?

25  A     Through entities, Able Investments.

Blanton - direct - Smith                    1547

1    Q    What was Able Investments?

2    A    It was a partnership that I raised money for other people

3    to invest in shopping centers.

4    Q    Where was Able Investments located?

5    A    Dallas, Texas.

6    Q    And how long did you run Able Investments?

7    A    Around three years.

8    Q    What did you do after you ran Able Investments?

9    A    I had another investment partnership called The Harvest

10   Fund.

11   Q    What was The Harvest Fund?

12   A    A partnership to invest in commercial real estate.

13   Q    How long did you work for The Harvest Fund?

14   A    Three years.

15   Q    And what did you do after The Harvest Fund?

16   A    I worked for a family office called the Esping Family

17   Office.

18   Q    And where was that located?

19   A    In Dallas.

20   Q    And what were you doing for that family office?

21   A    Investing in private companies and in other types of

22   investments.

23   Q    How long did you work for the Esping Family Office?

24   A    A couple of years.

25   Q    What did you do afterwards?

Blanton - direct - Smith                    1548

1   A    I had a technology venture capital fund called Vortex
2   Partners.
3   Q    Approximately when was Vortex Partners founded?
4   A    '99.
5   Q    How many partners did you have in Vortex?
6   A    Three.
7   Q    Did Vortex have any particular industry that it invested
8   in?
9   A    Mostly in technology venture capital?
10  Q    How long did you work in Vortex?
11  A    Until 2001.
12  Q    What did you do after Vortex?
13  A    I invested in other companies until I formed Colt
14  Ventures.
15  Q    When was Colt Ventures formed?
16  A    2003.
17  Q    And what is Colt Ventures?
18  A    It's my personal investment company.
19  Q    And where does the money or assets for Colt Ventures come
20  from?
21  A    Primarily from me and my family.
22  Q    How many employees does Colt Ventures have?
23  A    Today, three.
24  Q    Who are the employees of Colt Ventures?
25  A    JD McCulloch and Megan Moore.

1   Q      What does JD McCulloch do for Colt Ventures?

2   A      He is my financial administrator and CFO.

3   Q      Who's responsible for making investment decisions for

4   Colt Ventures?

5   A      Primarily me.

6   Q      What kinds of investments does Colt Ventures make?

7   A      Private investments in biotech, in energy and a number of

8   other industries; just opportunistic private investments as

9   well as we invest in hedge funds and in real estate.

10  Q      Over the course of your career, approximately how many

11  hedge funds have you invested in?

12  A      Over 20.

13  Q      When you were considering a new investment for Colt

14  Ventures, what's your process for evaluating that investment?

15  A      We look at the background of the portfolio manager.  We

16  look at what their track record is and we look at their

17  knowledge of an industry.  We check and see who their

18  accountants are, who their administrators are, who their

19  auditors are and we basically look at what they have done in

20  the past and how their fund is set up and what their

21  investment thesis is.

22  Q      And where do you get ideas for investments in Colt

23  Ventures?

24  A      Word of mouth, prime brokers, other family offices, other

25  investment companies and through just being involved in

Blanton - direct - Smith                    1550

1   industries that we're investing in.

2   Q    In addition to investing through Colt Ventures, do you

3   also invest your personal money independently?

4   A    Yes.

5   Q    Do you go through a similar process for investments that

6   you make personally?

7   A    Yes.

8   Q    Have you been a board member for any organizations?

9   A    Yes.

10  Q    What organizations are those?

11  A    Most recently the Esping Family foundation, which is a

12  charitable foundation; a company called Colt Oil and Gas; a

13  company Colt Unconventional Resources.  I was on the board of

14  a company called Amorcyte Therapeutics and the SMU MBA Venture

15  Fund.

16  Q    Are you involved in any charities?

17  A    Yes.

18  Q    What charities are those?

19  A    A charity called New Life Outreach which is a charity

20  that mentors inner city and children in distress that have

21  come out of broken homes or are that in the gangs.  And

22  another foundation called Mobilize which is an extension of

23  that that we're trying to bring nationwide.

24         And then the SM Wright Foundation which is an inner

25  city foundation to help underprivileged people in south

Blanton - direct - Smith                    1551

1   Dallas.

2   Q      Are you familiar with the defendant, Martin Shkreli?

3   A      Yes.

4   Q      How did you first learn about Mr. Shkreli?

5   A      Through a broker, prime broker for Merrill Lynch, Tillman

6   Ward.

7   Q      And how did you know Tillman Ward?

8   A      He lives in Dallas and he and I discussed hedge fund

9   investments and he basically was a trader and he facilitated

10  capital intro for hedge funds.

11  Q      Is he the individual who introduced you to Mr. Shkreli?

12  A      Yes.

13  Q      Where did you first meet Mr. Shkreli?

14  A      In New York at a restaurant.

15  Q      When you traveled to New York for that meeting what

16  airport did you fly into?

17  A      La Guardia.

18  Q      And how do you know that?

19  A      I always fly into La Guardia.

20  Q      Who attended the lunch meeting?

21  A      Tillman Ward and myself and Martin.

22  Q      What was the purpose of the meeting?

23  A      Tillman said Martin was a very smart, young hedge fund

24  manager that he thought would be interesting for me to meet

25  and potentially investing.

Blanton - direct - Smith                    1552

1    Q    Did Mr. Shkreli pitch his fund at the meeting?

2    A    Yes.

3    Q    What was the name of the fund?

4    A    MSMB.

5    Q    What, if anything, did is Mr. Shkreli tell you about the

6    fund during the meeting?

7    A    That they were investing in biotech and life sciences and

8    that they are a long/short hedge fund so they take long

9    positions in stocks and they also short stocks.

10   Q    What, if anything, did Mr. Shkreli say about the assets

11   under management at that initial lunch meeting?

12   A    He said that they had approximately $35 million under

13   management.

14   Q    And in that discussion were you discussing the MSMB

15   Capital fund specifically?

16   A    Yes.

17   Q    What did Mr. Shkreli tell you about his background?

18   A    That he had worked for a number of hedge funds at -- he

19   worked for Jim Kramer at Kramer -- I forgot the other

20   partner's name.  He worked for a number of other hedge funds

21   and kind of told me that he had traded stocks in biotech in

22   his past.

23   Q    Did Mr. Shkreli represent that his track record in these

24   hedge funds was successful or not successful?

25   A    Successful.

Blanton - direct - Smith                    1553

1   Q     What was your initial impression of the defendant?

2   A     That he was smart and knew the pharmaceutical biotech

3   space.  It seemed like he had a good handle on it.

4   Q     And how long did that meeting last?

5   A     I would say an hour and a half.

6   Q     Was that the first time that you met Mr. Shkreli in

7   person?

8   A     Yes.

9   Q     Mr. Blanton, would you please take a look around the

10  courtroom and tell us if you see the defendant, Martin

11  Shkreli?

12  A     Yes.

13  Q     Could you identify him by a piece of clothing that he is

14  wearing?

15  A     A white shirt and dark jacket.

16        THE COURT:  We will note that Mr. Blanton has

17  identified Mr. Shkreli.

18  BY MS. SMITH:

19  Q     What contact did you have with the defendant after that

20  initial meeting?

21  A     We spoke over the phone and through e-mail and started

22  talking about different ideas.

23  Q     When you say "ideas," what do you mean?

24  A     Stocks that he thought -- mostly at that time that he

25  thought that were probably not going to do well.

Blanton - direct - Smith                    1554

1   Q    Did Mr. Shkreli send you any information about the fund?

2   A    Yes.

3   Q    I'm going to show you what's been marked for

4   identification as Government Exhibits 105-1 and Government

5   Exhibit 4.  So those are tabs one and two of the binder.

6          Do you recognize knows two documents?

7   A    Yes.

8   Q    What are those two documents?

9   A    The private placement memorandum and the offering

10  memorandum as well as a PowerPoint on the hedge fund.

11         MS. SMITH:  Your Honor, the Government moves to

12  admit Government's Exhibit 105-1 and Government Exhibit 4.

13         MR. KAPLAN:  No objection.

14         THE COURT:  We will receive Government Exhibits 4

15  and 105-1.

16         (Government Exhibits 4 and 105-1 received in

17  evidence.)

18  BY MS. SMITH:

19  Q    Can we start by looking at Government's Exhibit 105-1

20  first which is tab one of the binder?

21         Mr. Blanton, who is this e-mail from?

22  A    Martin Shkreli.

23  Q    And who is it to?

24  A    Me, Darren Blanton.

25  Q    And in the first line there it says, "Here is all of our

Blanton - direct - Smith                1555

1   fund documentation.  The fund is a 1/20 fee structure with no

2   lockups."

3              What does that mean to you?

4   A    That means if you submit your request to redeem or get

5   your money back, that there is no lockup; that they will send

6   your money back in 30 days.

7   Q    What does the 1/20 fee structure mean to you?

8   A    1 percent annually of the amount that you have committed

9   to the fund or invested and 20 percent of any of the profits.

10  Q    And the 1 percent annually, what is that for?

11  A    Administration of the fund.

12  Q    And what does it mean to get 20 percent of the profits of

13  the fund?

14  A    Well, if you invest in a fund and the fund goes up above

15  what your original investment was, then you basically -- the

16  manager gets 20 percent and you get 80 percent of the profits.

17  Q    And what happens if the fund doesn't increase above the

18  initial amount of the investment; what does the manager

19  receive then?

20  A    Nothing, except for the 1 percent.

21  Q    The second -- the next line reads, "My philosophy is if

22  someone doesn't want to be a partner anymore, no problem; 30

23  days notice."

24             What does that mean to you?

25  A    Once an investor submits his redemption request, they get

Blanton - direct - Smith                          1556

1   the money back in 30 days.

2   Q    The e-mail also says a little bit further down, "Finally,

3   we have a daily results e-mail some people like to see.

4   Weekly and monthly are also options.  My thoughts on that are

5   it is 2010; hedge fund performance should be easy enough to

6   record and calculate estimates on a daily basis and it is."

7            What did you understand the defendant to be saying

8   in that sentence?

9   A    That you can get performance according to the day on how

10  much his stocks and his portfolio is up or down.

11  Q    Does that also mean that you can get, on a daily basis,

12  the value of your investment in the fund?

13  A    Yes.

14  Q    And what's the date on this e-mail?

15  A    June 9, 2010.

16  Q    And what's the subject line?

17  A    "MSMB details."

18  Q    And does the e-mail have a number of attachments?

19  A    Yes.

20  Q    Let's just walk through those attachments for a minute.

21            MS. SMITH:  If you turn to page two, Ms. Balbin,

22  which is the page that ends in Colt 306.

23  Q    What's the title of this document?

24  A    "MSMB Capital Management LP."

25  Q    Is that the purchaser questionnaire for individuals?

Blanton - direct - Smith                    1557

1    A    Yes.

2    Q    And then if you can turn to the second attachment which

3    is on the page ending Colt 315, and what is this second

4    attachment?

5    A    MSMB Capital Management LP.

6    Q    And is this the private placement memorandum for the

7    fund?

8    A    Yes.

9    Q    If you can turn to the third attachment which is on the

10   page that ends in Colt 369, and what is this attachment?

11   A    MSMB Capital Management's subscription agreement.

12   Q    And then if you can turn to the final attachment which is

13   on the page Colt 384.  And what's the final attachment to the

14   e-mail?

15   A    "MSMB Capital Management LP General Partner, Martin

16   Shkreli."  It's a PowerPoint.

17   Q    And then if you can turn to Government Exhibit 4.

18            MS. SMITH:  And Ms. Balbin, if you can put that side

19   by side with page 11 of Government Exhibit 105-1.

20   Q    Is Government Exhibit 4 the same attachment that's

21   attached to Government Exhibit 105-1, the private placement

22   memorandum?

23   A    Tab four?

24   Q    Tab two.  The two documents are up on your screen.

25   A    Got it.

Blanton - direct - Smith                    1558

1    Q      Are those the same private placement memorandums?

2    A      Yes, it looks like it is.

3    Q      Did you review the materials --

4    A      Yes.

5    Q      -- that Mr. Shkreli sent you; the purchaser

6    questionnaire, the PPM, the subscription agreement and the

7    PowerPoint presentation when you received them?

8    A      Yes, me and my staff and my lawyer did.

9    Q      Okay.  And turning back to page one of Government Exhibit

10   105-1, you received these materials on June 9, 2010.  Did you

11   invest in MSMB Capital at the time that you received the

12   materials?

13   A      Shortly thereafter.

14   Q      Between the time that you received the materials and the

15   time that you decided to invest, what interactions did you

16   have with the defendant?

17   A      My brother worked for me at the time and he did a

18   background check and then he and -- we had asked questions

19   just about different issues that came up.

20   Q      So taking a step back from the background check and the

21   follow-up questions, in that time period you had said earlier

22   that you and Mr. Shkreli were in communication about stock

23   tips?

24   A      Yes.

25   Q      What were those communications like?

Blanton - direct - Smith                    1559

1    A    He would just call me or I would talk to him about

2    different stocks that he was watching and basically we talked

3    about mostly shorting some stocks that were related to

4    obesity.

5    Q    I'm going to show you what's been marked as Government

6    Exhibit 105-2 for identification and that's tab 3 in your

7    binder.

8         Do you recognize this document?

9    A    Yes.

10   Q    And what is this document?

11   A    It's an e-mail talking about a --

12   Q    Just could you say who the document is from and to?

13   A    It's from Martin to me and a few other people.

14   Q    And what's the date of the deal?

15   A    Friday, December 3, 2010.

16        MS. SMITH:  Your Honor the Government moves to admit

17   Government Exhibit 105-2 in evidence.

18        MR. KAPLAN:  No objection.

19        THE COURT:  We'll receive 105-2.

20        (Government Exhibit 105-2 in evidence.)

21   BY MS. SMITH:

22   Q    So, once again, who is this e-mail from?

23   A    Martin Shkreli.

24   Q    And who is it to?

25   A    Darren Blanton and it's copied to Brent Saunders.

SN        OCR        RPR

Blanton - direct - Smith                    1560

1    Q    Who is Brent Saunders?

2    A    He is another biotech executive or pharmaceutical

3    executive that was a CEO at the time of Bausch & Lomb.

4    Q    Did you ever meet Brent Saunders in person?

5    A    Yes.

6    Q    What's the subject line of this e-mail?

7    A    It says "Orex I would double down the trade except do the

8    ball too."

9    Q    What is being discussed in the e-mail?

10   A    He's saying that he would buy 10,000 shares of Orex and

11   then sell some puts and sell some calls in the stock, so

12   options around the stock.

13   Q    Is this an example of some of the stock tips that you

14   mentioned that the defendant would send to you?

15   A    A little bit more complex, but it's similar.

16   Q    And did you also discuss those stock tips on the phone?

17   A    Yes.

18   Q    I'm going to show you what's been marked as Government

19   Exhibit 105-37 for identification which is tab five in your

20   binder.  Do you recognize this document?

21   A    Yes.

22              (Continued on next page.)

23

24

25

SN        OCR        RPR

Blanton - direct - Smith                      1561

1    EXAMINATION CONTINUING

2    BY MS. SMITH:

3    Q    And what is this document?

4    A    This is an e-mail from Martin to me.

5    Q    And what is the date on the e-mail?

6    A    It is December 5th, 2010.

7            MS. SMITH:  Your Honor, the government moves to

8    admit Government Exhibit 105-37 into evidence.

9            MR. BRAFMAN:  No objection.

10           THE COURT:  We will receive Government Exhibit

11   105-37.

12           (Government's Exhibit 105-37 was received in

13   evidence.)

14           MS. SMITH:  And, Ms. Balbin, if we can focus on the

15   e-mail first in the middle of the page.

16           (Exhibit published.)

17   BY MS. SMITH:

18   Q    Who is this an e-mail from, the e-mail in the middle of

19   the page at 7:41?

20   A    It is from Martin Shkreli.

21   Q    And who is the e-mail to?

22   A    It is to me -- actually, it's to Martin, to Marek,

23   Tillman Ward, to me, to Andre Logan.

24   Q    And who is Marek Biestek?

25   A    Marek was Martin's partner in MSMB.

1   Q     And who is Andre Logan?

2   A     Andre was an analyst that worked for MSMB.

3   Q     What is the subject line of the e-mail?

4   A     Martin Shkreli Dallas itinerary 12/6 through 8.

5   Q     Had you ever met the defendant in Dallas prior to this

6   e-mail?

7   A     Not that I remember.

8   Q     And did the defendant, in fact, travel to Dallas around

9   this time?

10  A     Yes.

11  Q     Did you meet with the defendant on that trip?

12  A     Yes.

13  Q     If we can just take a look at the itinerary.  There is a

14  reference at 2:30 p.m. on Monday to somebody named Steve

15  Harasym?

16  A     Yes.

17  Q     Who is Steve Harasym?

18  A     He is an investor that worked for a family office called

19  Belmont.

20  Q     And then later on down on that same day there is a

21  reference to Perry's Steakhouse?

22  A     Yes.

23  Q     Did you know what that was in reference to?

24  A     It was a dinner where a number of investors came to

25  discuss Biotech and to meet Martin.

1   Q    Did you attend the dinner?

2   A    Yes.

3   Q    Who else was at the dinner?

4   A    Steve Harasym, Dave Mumert, Gloria Yulich, I can't

5   remember exactly who else.

6   Q    Were there other individuals from the Dallas investing

7   community --

8   A    Yes.

9   Q    -- at the dinner?

10  A    Yes.

11  Q    Was there an individual -- who is Schuyler Marshall?

12  A    Schuyler Marshall was another gentleman that invests in

13  private deals and invests in hedge funds.  He runs a firm

14  called Rosewood Capital.

15  Q    And was Schuyler Marshall at the dinner?

16  A    I think he was.  I can't remember exactly, but I think he

17  might have been.

18  Q    Who was John Neill?

19  A    John Neill is another investor in Dallas that invests in

20  hedge funds.

21  Q    And was John Neill at the dinner?

22  A    I think he was too.

23  Q    What was the purpose of that dinner?

24  A    To meet Martin, discuss the industry, and talk about his

25  fund and what he was doing.

1  Q    And when you say his fund, are you referring to MSMB

2  Capital?

3  A    Yes.

4  Q    What did the defendant say about his fund MSMB Capital at

5  the dinner?

6  A    I don't remember exactly what he said, but, you know,

7  probably some of the same things that he had told me in our

8  first meeting.

9  Q    And what did the defendant say about himself at the

10 dinner?

11 A    That, I -- I don't remember everything he said.

12 Q    Was what the defendant said at the dinner consistent with

13 what he had said to you previously about his track record and

14 MSMB Capital?

15 A    I would assume.  I would assume it was.

16          MR. BRAFMAN:  Objection.

17          THE COURT:  Sustained.

18 BY MS. SMITH:

19 Q    Do you have a memory of the defendant giving you any

20 different information at the dinner than he had told you

21 previously about his fund and his track record?

22 A    No.

23 Q    I am going to show you what's been marked as Government

24 Exhibit 105-3 for identification, which is tab 4 in your

25 binder.

Blanton - direct - Smith                          1565

1            Do you recognize this document?

2   A    Yes.

3   Q    And what is this document?

4   A    It's an e-mail from Martin to me.

5   Q    And what is the date range of the document?

6   A    November 23rd is the first e-mail, November 23rd, 2010.

7   Q    And what is the date of the last e-mail?

8   A    December 3rd, 2010.

9            MS. SMITH:  Your Honor, the government moves to

10  admit Government Exhibit 105-3 into evidence.

11           MR. BRAFMAN:  Objection.

12           THE COURT:  All right, do you need a sidebar to

13  discuss this, Mr. Brafman?  I am not sure of the basis of your

14  objection.

15           MR. BRAFMAN:  No, I will withdraw the objection.

16           THE COURT:  All right, we will admit 105-3 without

17  objection.

18           (Government's Exhibit 105-3 was received in

19  evidence.)

20           (Exhibit published.)

21           MS. SMITH:  And, Ms. Balbin, if you can focus on the

22  bottom e-mail first.  Thank you.

23  BY MS. SMITH:

24  Q    So, Mr. Blanton, looking at the bottom e-mail in the

25  chain, this is an e-mail from Mr. Shkreli to yourself on

1   November 23rd, 2010, right?

2   A    Yes.

3   Q    What's the subject line?

4   A    MSMB.

5   Q    And Mr. Shkreli says:  We can fill out some of this stuff

6   for you if you want.  Will you be investing personally or

7   through a vehicle?  Is the exact amount $750,000?  Happy to

8   help in whatever way I can.  Obviously the wire is the

9   important part.

10           What is Mr. Shkreli discussing in this e-mail?

11   A    How to make an investment in the fund MSMB Capital.

12           MS. SMITH:  And, Ms. Balbin, if you can, scroll up

13   to see Mr. Blanton's response.

14   BY MS. SMITH:

15   Q    And what is the date of your response there?

16   A    December 2nd, 2010.

17   Q    And can you read what you put in your response?

18   A    Martin, who is your auditor and administrator?  What are

19   the current assets under management or AUM?  Sorry if I

20   sent -- if you sent it, I am operating on Blackberry tonight.

21   Q    Why did you ask these questions about the auditor, the

22   administrator and the AUM?

23   A    As part of my due diligence to decide whether to invest

24   in the fund.

25           MS. SMITH:  And, Ms. Balbin, if you can scroll up to

1    Mr. Shkreli's response.

2    BY MS. SMITH:

3    Q     What is the date of his response?

4    A     December 2nd, 2010.

5    Q     And can you read what Mr. Shkreli writes to you in

6    response to your questions?

7    A     Auditor Rothstein Kass, administrator NAV Consulting,

8    lawyer McCormick and O'Brien, AUM 35m.

9    Q     What does 35m mean to you?

10   A     35 million.

11   Q     What is AUM?

12   A     Assets under management.

13   Q     What does an auditor do for a fund?

14   A     They make sure that the numbers are all in line and that

15   there is no accounting fraud or accounting non-compliance.

16   They, basically, look at all the numbers and make sure the

17   trades are done right.

18   Q     What does an administrator do for a fund?

19   A     They do -- send out the administration on the fund.  So

20   they, basically, are the ones that are reporting what the

21   trades are and how the fund's performance is doing and,

22   basically, they oversee the trade performance.

23   Q     And was the answer to the question about who the auditor

24   for MSMB Capital was, was that important to your decision to

25   invest in MSMB Capital?

1    A    Yes.

2    Q    Why was it important?

3    A    Just shows checks and balances and that the firm has

4    credible auditors and administrators, and enough money under

5    management.

6    Q    Would you have invested in MSMB Capital if the fund had

7    not had an auditor?

8    A    No, probably not.

9    Q    And in terms of your question about the administrator,

10   was the answer to the question about whether the fund had an

11   administrator important to your decision to invest in MSMB

12   Capital?

13   A    Yes.

14   Q    Why was that?

15   A    Because they keep the fund accountable to investors and

16   they're another set of eyes on the money that you've invested

17   with the portfolio manager.

18   Q    And was the answer to the question about what the AUM for

19   the fund was, was that important to your decision to invest in

20   MSMB Capital?

21   A    Yes.

22   Q    Why was that important?

23   A    Because some funds that don't have enough AUM or assets

24   under management are not credible and they -- it's a sign that

25   other investors have done due diligence and that they have

Blanton - direct - Smith                1569

1    committed money to the fund.  They also give the fund enough

2    money to pay their employees and to operate feasibly.

3    Q    So what did it mean to you that the fund had an AUM of

4    35 million?

5    A    That it was small, but up and coming.

6    Q    And what did it say to you about the number of investors

7    in the fund?

8    A    That there was enough investors to give it critical mass.

9    Q    At this time in 2010 what was your practice with respect

10   to the size of a hedge fund in which you would invest?

11   A    We were looking for smaller hedge funds that were

12   talented managers that could grow, but this was definitely on

13   the small side.  Sometimes we seeded hedge funds.  We did seed

14   one that -- where we were the first investor, but we were

15   given a piece of the general partnership.

16   Q    So when you said that this fund was on the small side, do

17   you mean with an AUM of 35 million?

18   A    Yes.

19   Q    This was one of the smaller funds that you invested in?

20   A    Yes.

21   Q    Are you familiar with an individual named Josiah Austin?

22   A    I've heard of him.

23   Q    Where did you hear about Josiah Austin?

24   A    From Martin.

25   Q    And what did the defendant tell you about Josiah Austin?

1   A    He said that he done some investing for Josiah Austin.

2   Q    And the AUM that's reflected in this e-mail, 35 million

3   for MSMB Capital, was that separate from the investing that

4   Mr. Shkreli did for Josiah Austin?

5   A    I think I was under the assumption it was.

6   Q    So earlier you said that you had looked at the documents

7   that Mr. Shkreli sent to you prior to investing, is that

8   right?

9   A    Yes.

10  Q    Okay.  So let's go back and walk through those in a

11  little more detail, starting with Government Exhibit 105-1 in

12  evidence.

13         MS. SMITH:  And can we start with the PowerPoint

14  which is on page 81?  And it's COLT 385.  It's towards the

15  back of that document.

16         (Exhibit published.)

17         MS. SMITH:  And actually, Ms. Balbin, can we go back

18  one page just for a minute?

19  BY MS. SMITH:

20  Q    I know it's a thick stack.  It's all the way at the back

21  of the document.  The document behind the first tab.

22  A    Got it.

23  Q    So is this the PowerPoint that Mr. Shkreli sent you in

24  connection with the MSMB Capital fund?

25  A    Yes.

1    Q     And who is listed as the general partner?

2    A     Martin Shkreli.

3    Q     Okay.  If you can turn to the second page of the

4    PowerPoint overview.  The first line here says Market Neutral

5    Global Equity Hedge Fund.

6              What did that mean to you?

7    A     It means that the shorts and the longs are balanced out

8    and that it's equities that are traded globally.  They are

9    either in the U.S. or outside of the U.S., publicly traded.

10   Q     And the second line says, Experienced manager, Martin

11   Shkreli has a decade of top-tier hedge fund investing

12   experience.

13             What did that mean to you?

14   A     He was not just starting out.  It was -- he had had other

15   hedge fund experiences and had traded stocks in the past with

16   other funds.

17             MS. SMITH:  And, Ms. Balbin, you can turn to the

18   next page.

19   BY MS. SMITH:

20   Q     And so this page is titled Organization.  The first

21   person listed is Martin Shkreli as portfolio manager and it

22   lists Intrepid Capital Management and Cramer Berkowitz.

23             Did Mr. Shkreli talk about any of the other places

24   he had worked prior to starting MSMB Capital?

25   A     I don't remember him talking about it.

Blanton - direct - Smith                        1572

1   Q    Did Mr. Shkreli ever mention that he had worked at a fund

2   that had not performed well?

3   A    I don't remember.

4   Q    Was his track record important to your decision to

5   invest?

6   A    Yes.

7   Q    If you look down the page, who is Edward Painter?

8   A    I don't know.  He -- I never met him that I can recall.

9   Q    And then if you look down the page further, Marek

10  Biastek?

11  A    Yes.

12  Q    Did you meet Marek Biastek in person?

13  A    I did.

14  Q    And where did you meet him?

15  A    At an office in New York for the first time.

16  Q    Was that an office for MSMB Capital?

17  A    Yes, I think so.

18  Q    And who is Andre Logan?

19  A    He was the analyst.

20  Q    And was he the analyst for MSMB Capital?

21  A    Yes.

22  Q    Who is Gary Mohamed?

23  A    I don't know.

24  Q    Was that an individual you remember meeting ever?

25  A    No.

Blanton - direct - Smith                    1573

1    Q    Who is listed here as the prime broker for MSMB Capital?

2    A    Interactive Brokers.

3    Q    Who is listed as the accountant/auditor?

4    A    Rothstein Kass.

5    Q    Who is listed as the administrator?

6    A    NAV Consulting.

7    Q    And who is listed as the legal?

8    A    McCormick and O'Brien.

9    Q    If you can turn to the results page, which is, I believe,

10   page 90, the Bates stamp is COLT 396.

11   A    Uh-hum.

12              (Exhibit published.)

13   BY MS. SMITH:

14   Q    What was your understanding of what was on this Results

15   slide?

16   A    It's kind of a process overview of how he makes trades.

17   Q    And is it -- it says, Daily performance reporting sets

18   the standard for transparency.  What did that mean to you?

19   A    That means that he was trying to let his investors know

20   who he's doing on a daily basis.

21   Q    And if you turn to the next page, which also is titled

22   Results.

23   A    What's the Bates?

24   Q    The Bates Number is COLT 396 at the bottom.

25   A    Yes.

Blanton - direct - Smith                    1574

1    Q    The first line of this page says, Since inception on

2    11/1/2009, the fund has returned plus 40.89 gross of fees as

3    of 3/31/2010.   The S&P returned plus 13.69 percent during this

4    period.

5             What did that mean to you?

6    A    He had beat the S&P in performance with his portfolio.

7    Q    These are results as of March 31st, 2010.   The e-mail

8    that we were looking at where you asked Mr. Shkreli about the

9    AUM and the auditor was in December of 2010, as was that

10   meeting in Dallas.

11            In December of 2010 what did Mr. Shkreli tell you

12   about the performance of the fund?

13   A    I don't remember what he told us then, but I would assume

14   it was --

15            MR. BRAFMAN:   Objection.

16   A    -- Similar to --

17            THE COURT:   Sustained.

18            Sir, don't assume.   Just what you best recall.

19   BY MS. SMITH:

20   Q    In December of 2010 did Mr. Shkreli ever tell you that

21   the fund was performing poorly?

22   A    No.

23   Q    Did Mr. Shkreli ever tell you that there was no money in

24   the fund?

25   A    No.

1  Q    And then if you turn to the next page, which is titled

2  Fund Terms.  What is the minimum investment listed here?

3  A    One million.

4  Q    And it says, No lockup, thirty-day notice period.  What

5  does that mean again?

6  A    That if you make a redemption request, you can get your

7  money back in thirty days.

8  Q    And then finally, it says 1 percent/20 percent,

9  management/performance.  Is that right?

10  A    Yes.

11  Q    Is that the same 1/20 that we discussed from the prior

12  e-mail?

13  A    Yes.

14  Q    If you can, look at Government Exhibit 4, which is in

15  evidence.  It is the second tab in your binder.

16          (Exhibit published.)

17  BY MS. SMITH:

18  Q    And you testified that this was the private placement

19  memorandum for MSMB Capital, is that right?

20  A    Yes.

21  Q    And it's tab 2.

22  A    Yes.

23  Q    And who is listed as the managing partner for MSMB

24  Capital Management?

25  A    Martin Shkreli.

Blanton - direct - Smith                    1576

1   Q    If you turn to the first page of the document and then

2   focus on the top portion, the first two sentences say:

3          This confidential private offering memorandum

4   relates to the offering by MSMB Capital Management LP, of

5   limited partner interests in the partnership.  The partnership

6   interests are being offered to a limited number of individual

7   or institutional investors that generally have a net worth of

8   1 million or meet certain other qualifications and meet

9   certain suitability standards.

10          Did you qualify as an investor for MSMB Capital?

11  A    Yes.

12          MS. SMITH:  If you can scroll down, Ms. Balbin, to

13  the section that says Risk Factors.  And there is a section

14  there in bold that says:

15          An investment in the partnership will involve

16  significant risks.  There is no assurance that the partnership

17  will achieve its investment objective or be profitable.

18  BY MS. SMITH:

19  Q    What did you understand that language to mean?

20  A    That he could make bad investments and lose money.

21  Q    And, again, if you see the last line of the first

22  paragraph at the end is:  The minimum investment of the

23  partnership interests will be $1 million.  Is that right?

24  A    Yes.

25  Q    If you turn to page 8, which has a Colt 183 as a Bates

SAM      OCR      RMR      CRR      RPR

Blanton - direct - Smith                    1577

1    stamp.

2              (Exhibit published.)

3    Q    And if you focus in on the general partner.  And it says:

4              The general partner will have full responsibility

5    for the management and control of the partnership.  Mr. Martin

6    Shkreli is managing member of the general partner.  As such,

7    Mr. Shkreli will be the individual primarily responsible for

8    the management and control of the partnership.

9              What did that mean to you?

10   A    That he was the main investor and was making the

11   decisions to invest, what stocks to invest in.

12   Q    If you turn to the next page, and at the bottom of that

13   page there is a section called Incentive Allocation.  It says:

14             The general partner will receive an incentive

15   allocation from each limited partner's account for each fiscal

16   year equal to 20 percent of the limited partner's share of

17   partnership net profits for the year.

18             Is that the 20 percent performance fee that we

19   talked about earlier?

20   A    Yes.

21   Q    If you turn to the next page, which ends in Colt 185, and

22   there is a section called Management Fee.

23   A    Yes.

24   Q    And it says:  The advisor will be entitled to receive a

25   management fee from the partnership equal to .25 percent

```
                    Blanton - direct - Smith                    1578
```

1    calendar quarter, 1 percent per annum of the partnership's net

2    assets.

3            Is that the management fee we talked about earlier?

4    A    Yes.

5    Q    So that's the 1/20 structure we were discussing?

6    A    Yes.

7    Q    And you had said that the management fee the general

8    partner gets regardless of profits, but the 20 percent

9    performance fee the partner only gets if the fund actually

10   makes profits, is that right?

11   A    Yes.

12

13           (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Blanton - direct - Smith                    1579

1   (Continuing)

2          MS. SMITH:  If you turn to page that ends in

3   Colt 189.  And there's a section in the middle called long and

4   short positions.  It says:  The portfolio manager anticipates

5   that when fully vested, the long and short positions in the

6   partnership's portfolio will consist of between 100 and 200

7   positions.  No single position is expected to exceed ten

8   percent of the partnership's assets.

9          And it says:  In terms of cost at time of investment

10  the advisor intends to utilize short selling both to enhance

11  returns and to hedge long positions.

12  Q    What did it mean to you that it said that there would not

13  be a position that was more than ten percent of the

14  partnership's assets?

15  A    That it would be diversified over a number of

16  investments.

17  Q    Was that important to your decision to invest?

18  A    Yes.

19  Q    Why was that?

20  A    Because it gives you the portfolio effect to where if one

21  goes down, it doesn't -- you don't lose all your money.

22  Q    And if you look at the bottom of that same page there's a

23  section called restricted securities.

24  A    Yes.

25  Q    And it says that:  The partnership may invest in

Blanton - direct - Smith                    1580

1   restricted securities, securities as to which public resale is

2   currently restricted.  And then it goes over to the next page.

3          And it says in the last line:  The partnership's

4   overall investments in restricted securities will be limited,

5   however, to a maximum of ten percent in terms of their cost at

6   times of purchase of current market value partnership assets.

7          What did that mean to you?

8   A    That there would be freely-tradable stocks; 90 percent of

9   your investment would be in freely-tradable stocks.

10  Q    And was that important to you?

11  A    Yes.

12  Q    Why was that important to you?

13  A    Because if you want to redeem your investment, you cannot

14  get illiquid stocks out, you can't get cash for the redemption

15  of illiquid stocks.

16         MS. SMITH:  Would you turn to the page that has 21

17  at the bottom or it's Colt 203.

18         THE WITNESS:  Yes.

19  Q    And if you look at the bottom section, the title is

20  exculpation of the general partner, the investor and the

21  portfolio manager.

22  A    Yes.

23  Q    It says there:  However, the partnership has agreed in a

24  partnership agreement to indemnify and exculpate the general

25  partner, the investor and the respective members, managers,

Blanton - direct - Smith                1581

1   employees and agents from any liability for losses, damages or

2   expenses resulting from their respective status as general

3   partner and investor or their acts or omissions the

4   partnership's business or their management of the

5   partnership's affairs unless gross negligence, willful

6   misconduct or willful breach of the partnership agreement on

7   the part of the general partner, the investors or other such

8   parties is involved.

9           What did that section mean to you?

10  A    That as long as the partner was doing normal trading and

11  not being deceptive or lying about the trades, he -- for

12  making an investment in a stock that went down, he couldn't be

13  liable.  He could only be liable if he did fraud or lied about

14  what trades and put them into something other than what he had

15  said he would put them in.  Invested in.

16          MS. SMITH:  If you turn to page that ends in

17  Colt 209.  And there's a section at the bottom that says

18  attorneys and auditors.

19  Q    What is the attorney that's listed for the fund?

20  A    Cobb and Associates of West Port, Connecticut.

21  Q    And what's the auditor that's listed for the fund in

22  here?

23  A    Rothstein Kass of New York.

24          MS. SMITH:  And if you turn to page 37, Ms. Balbin.

25  There's a section that says withdrawals by partners.

1    Q    Do you have that on the screen there?

2    A    Yes.

3    Q    And so this section says that:  Limited partners may

4    withdraw all or any of their capital accounts, subject to

5    certain reserves, as of the last day of each calendar month

6    commencing one full month after the date of their initial

7    investment in the partnership upon not less than 30 days prior

8    written notice to the general partner.

9              What did that mean to you?

10   A    That you could withdraw your money if you gave 30 days

11   notice.

12   Q    And was that important to your decision to invest?

13   A    Yes.

14   Q    Why was that?

15   A    Just gives you liquidity in case something's going wrong

16   with the markets or you need the money.

17   Q    Earlier you mentioned that you had done a background

18   check on Mr. Shkreli?

19   A    Yes.

20   Q    Why did you do a background check?

21   A    To check and see.  We typically do that on investment

22   managers just to see if there's any history of fraud or

23   history of bad activities or behavior.

24   Q    When you say we, do you mean you and the other

25   individuals at Colt Ventures?

1   A    Yes.  And at the time it was my brother that was doing

2   it.

3   Q    What, if anything, did the background check say about

4   Mr. Shkreli's education?

5   A    I don't remember seeing anything about the education.  I

6   think that -- I can't remember what it said.

7   Q    What had Mr. Shkreli told you about his education?

8   A    He had said that he had graduated very young from

9   Columbia.

10  Q    What, if anything, did the background check show about

11  any outstanding judgments against the defendant?

12  A    I don't remember any judgments.  I just remembered a

13  issue, there was a trading issue that had been settled with

14  Lehman.

15  Q    What do you remember about that issue?

16  A    I remember that my brother called and discussed it with

17  someone at Lehman and they said that the issue had been

18  resolved.

19             And I had asked Martin and he said that it was based

20  on a trade that he did with Josiah Austin and that they had

21  had a misunderstanding.  And he resolved it.

22  Q    Did the defendant satisfy any concerns that you had about

23  the trade?

24  A    Yes.  That, and what my brother found out.

25  Q    What investment did you ultimately make into

1  MSMB Capital?

2  A    My first investment was a million.  Million dollars in

3  the fund.

4  Q    And was that in December of 2010?

5  A    Yes.

6  Q    And did you make a second investment into the fund?

7  A    Yes.

8  Q    What was that second investment?

9  A    250,000.

10  Q    Was that in January of 2011?

11  A    Yes.

12  Q    And why were there two separate investments?

13  A    I remembered vaguely that there was a trade that he was

14  doing and he said that would be good, if I could get into that

15  trade war with more money and that we would be able to get it

16  back within a month after the, after the investment because

17  the trade was going to happen pretty fast.

18  Q    And was that the second investment of $250,000?

19  A    Yes.

20        MS. SMITH:  I'm going to show you what's been marked

21  as Government's Exhibit 79-1 for identification, which is

22  tab 7 in your binder.

23  Q    Do you recognize this document?

24  A    Yes.

25  Q    What is this document?

1    A    It's a performance report.

2    Q    And is it sent by the defendant?

3    A    Yes.

4         MS. SMITH:  Your Honor, the Government moves to

5    admit Government's Exhibit 79-1 into evidence.

6         MR. BRAFMAN:  No objection.

7         THE COURT:  We will receive 79-1.

8         (Government's Exhibit 79-1 received in evidence.)

9         (Exhibit published to jury.)

10   Q    Sol, is this an e-mail from the defendant?

11   A    Yes.

12   Q    And who is bcc'd on the e-mail?

13   A    SGRichardson@aol and LAR@paramountbio, Brent

14   Saunders@ymail, me and Sarah Hassan.

15   Q    And what is the subject line?

16   A    MSMB Capital Management LP performance estimate.

17   Q    And the first line of the e-mail says:  MSMB Capital

18   Management LP returned plus 3.8 percent gross of fees in

19   January 2011.  The S&P 500 Index returned plus 2.26 percent in

20   January 2011.

21        Who does that mean to you?

22   A    That the fund was up in January and it was higher, it was

23   more, it was up higher than the S&P in January 2011.

24   Q    And then the last line there says:  MSMB Capital

25   Management LP has returned plus 35.95 percent since inception

Blanton - direct - Smith                1586

1    on 11/1/2009.  The S&P 500 Index has returned plus 24.07

2    percent since inception on 11/1/2009.

3             What did that mean to you?

4    A    The fund was up 35.95 percent since it started in 2009.

5    And it was up more than the S&P in that same time period.

6    Q    And what's the date of this performance update?

7    A    It is February 8th, 2011.

8    Q    So, this is after you put both the one million and then

9    the 250,000 into the fund?

10   A    Yes.

11   Q    And what is the month for which this is a performance

12   estimate for?

13   A    January 2011.

14   Q    Was it common to get the performance estimate for a hedge

15   fund for the prior month in the next month?

16   A    It was not common to get monthly performance reports all

17   the time.  Some people gave them, but yes.

18   Q    And in terms of reporting, how frequently had the

19   defendant said that he was going to provide the reporting to

20   you?

21   A    He said he could provide daily reporting, weekly or

22   monthly.

23   Q    And how often did you receive reporting from the

24   defendant for MSMB Capital?

25   A    I don't remember, but it was sporadic.

                    VB        OCR       CRR

Blanton - direct - Smith                    1587

1   Q    Earlier we had discussed a trade that the defendant

2   suggested in a stock called OREX.

3        MS. SMITH:  Can we put back up Government's

4   Exhibit 105-2, which is tab 3.

5        (Exhibit published to jury.)

6   Q    So, you testified earlier that this was a stock trade

7   that the defendant was recommending; is that right?

8   A    Yes.

9   Q    In addition to this e-mail in December of 2010, did you

10  have other discussions with the defendant about trades in

11  OREX?

12  A    I don't remember what year, what exact date it was.  I

13  think it was in 2010.  Yes.

14  Q    And what do you remember about that discussion?

15  A    I think that I remember after he had made the trade it

16  didn't go the way he thought it, and he said that he or --

17  actually, he said that he meant to type in buying the stock or

18  selling the stock short versus buying the stock.  And it went

19  the other way.  And he thinks that there was going to be a

20  conflict with his broker.

21  Q    Did that discussion take place after you had invested in

22  MSMB Capital?

23  A    Yes.

24  Q    And what is a "fat finger?"

25  A    It was like, where you push sell but you meant to push

Blanton - direct - Smith                    1588

1    buy.

2    Q    Did Mr. Shkreli describe his trade in OREX as a fat

3    finger?

4    A    Yes.

5    Q    What did he tell you, if anything, about the impact of

6    that trade on MSMB Capital?

7    A    He said that it was under dispute and that it could cause

8    the fund to lose a lot of its money.

9              MS. SMITH:  I'm going to show you what's been marked

10   as Government's Exhibit 79-2 for identification, which is

11   tab 10 in your binder.

12   Q    Do you recognize this document?

13   A    Yes.

14   Q    And what is this document?

15   A    It is a performance report in March 10th of 2011.

16   Q    And is it from the defendant?

17   A    Yes.

18             MS. SMITH:  Your Honor, the Government moves to

19   admit Government's Exhibit 79-2 into evidence.

20             MR. BRAFMAN:  No objection.

21             THE COURT:  We will receive Government's

22   Exhibit 79-2.

23             (Government's Exhibit 79-2 received in evidence.)

24             (Exhibit published to jury.)

25   Q    So, what is the date of this e-mail?

1    A    April 10th, 2011.

2    Q    And who is it from?

3    A    Martin Shkreli.

4    Q    And who is it to?

5    A    Me and JD McColloch and Joseph Hildebrand our accountant.

6    Q    And what is the subject line?

7    A    MSMB performance estimate.

8    Q    If you look at the first line under gross returns it says

9    that MSMB has returned plus 6.7 percent in March 2011.

10        The second line says:  MSMB has returned plus

11   7.49 percent YTD.

12        What does YTD mean?

13   A    Year-to-date.

14   Q    Does that mean between January 1st and March 2011?

15   A    Yes.

16   Q    And then the last line says MSMB has returned plus

17   42.57 percent since inception on 11/1/2009.

18        So, what does that mean?

19   A    Since the fund started, it's up 42.57 percent.

20   Q    Then in the account value section it says that you've

21   invested 1.25 million for the month beginning January 2011.

22   And then it gives the two dates of the million dollar

23   investment and the $25,000 investment.

24        And then at the bottom there it gives net NAV.

25        What is NAV?

1  A     Net asset value.

2  Q     And so, what's the net NAV on March 31st, 2001, per your

3  account -- sorry 2011 for your account?

4  A     $1,324,905.

5  Q     So, when you received this performance update, what was

6  your understanding of the impact that the OREX trade that you

7  had discussed with the defendant had on MSMB Capital?

8  A     That would, it must not have been taken out of the

9  account; that it was -- everything was okay, at least at this

10  time.

11  Q     So, just to shift gears for a bit.

12        Are you familiar with an entity called Retrophin?

13  A     Yes.

14  Q     And how did you first hear of Retrophin?

15  A     Through Martin.

16  Q     And what did the defendant say to you about Retrophin?

17  A     It was a company that was he wanted to start based on a

18  conversation that we had had about a disease that a kid had

19  had that I met.

20  Q     What was that conversation?

21  A     I had called him after having breakfast with a kid, Josh

22  Frase, who had a disease called muscular myotubular myopathy.

23  And I told him that that this could be a good company idea, a

24  good indication to start a company around.

25        Because these kids, it was a very small group of

Blanton - direct - Smith                    1591

1   kids that had this disease and it's a rare disease, so it

2   could get approval faster and maybe he could figure out a way

3   to or we should talk about doing something about it.

4           Or actually, I just told him about it and he said we

5   should try to start a company around curing this disease.  He

6   got motivated by hearing about the kid.

7   Q    And he had said there was something about faster approval

8   for a drug.

9           What did you mean by that?

10  A    When a disease has a small number of patients, the FDA

11  will give expedited approval for getting a drug to market on

12  those diseases.

13  Q    And are there any other business reasons to focus on a

14  drug that has a smaller subset of patients?

15  A    They extend the patent life on the drug so they have

16  longer exclusivity.

17  Q    And are those drugs sometimes known as orphan drugs?

18  A    Yes.

19  Q    What was your contribution to the founding of Retrophin?

20  A    Just, we discussed it a lot and bantered back and forth

21  and I met with the founder of the, the, the Frase Foundation

22  and then we -- I flew Martin and a number of people up to

23  Harvard where he made a presentation based on some research he

24  had done.

25          He had found a drug candidate at University of

Blanton - direct - Smith                    1592

1    Wisconsin and so, we basically flew up to Harvard to be with a

2    guy named Dr. Alan Beggs and he was a expert at muscular

3    myotubular myopathies.

4    Q    And just to take a step back.

5         What was the Frase Foundation?

6    A    The Frase Foundation was a entity that had been set up by

7    the parents of Josh Frase to help find cures for these

8    diseases.

9         MS. SMITH:  And I'm going to show you three

10   documents that have been marked Government's Exhibit 105-5,

11   105-38 and 105-39, which are tabs 8, 9 and 11 in your binder.

12   Q    Do you recognize these documents?

13   A    Yes.

14   Q    And are these three documents all e-mails from the

15   defendant regarding Retrophin?

16   A    Yes.

17        MS. SMITH:  Your Honor, the Government moves to

18   admit what have been marked as Government's Exhibits 105-5,

19   105-38 and 105-39 into evidence.

20        MR. BRAFMAN:  No objection.

21        THE COURT:  We receive 105-5, 105-38 and 105-39

22   without objection.

23        (Government's Exhibits 105-5, 105-38 and 105-39

24   received in evidence.)

25        (Exhibit published to jury.)

Blanton - direct - Smith                    1593

1      MS. SMITH:  So, let's start with Government's

2  Exhibit 105-5, which is tab 8.

3      THE WITNESS:  Yes.

4  Q    Who is this an e-mail from?

5  A    Martin Shkreli.

6  Q    And it's to you; is that right?

7  A    Yes.

8  Q    What's the date on the e-mail?

9  A    February 9, 2011.

10 Q    And what's the subject line?

11 A    Retrophin tax ID.

12 Q    And it says, it gives a number and says:  That's the

13 Retrophin, Inc. tax ID incorporated in Delaware.

14      And then it says:  There are 100 shares outstanding

15 and we will mail you the stock certificate for 100 shares.

16      What did you understand the defendant to be saying

17 there?

18 A    He said to me that he was going to let me decide who got

19 what percentage of the company because we formed it together.

20 Q    What was your reaction to that?

21 A    I said that I was just helping and that he deserved the

22 majority of the company.

23 Q    What was your understanding after that conversation of

24 what percentage of the company you would receive?

25 A    We talked about 70/30 where he got 70 and I got 30.  And

VB        OCR        CRR

Blanton - direct - Smith                    1594

1    I think it ended up being 80/20.

2    Q    There's a list there afterwards of next steps.

3         The first one is negotiate license with

4    Wisconsin/WARF/Ervasti.

5         What did that mean?

6    A    That's where he had found a potential drug candidate at

7    the University of Wisconsin and the primary inventor

8    investigator was Ervasti.

9    Q    And then there's a line that says:  Find CEO.  I can be

10   interim CEO if need be.

11        What was your understanding of what the defendant

12   was saying there?

13   A    That he was run it in the early days of the company to

14   get it going.

15   Q    Did you have an understanding of or did you have a

16   discussion with him about why he was saying he would be

17   interim CEO?

18   A    He would eventually find someone else that could run it

19   that was more qualified.

20   Q    And then it says:  Finalize preclinical and manufacturing

21   plan to enable IND with FDA.

22        What does IND mean?

23   A    It's an initial new drug filing application.  So, you

24   basically have to put together a clinical trial plan in order

25   to get a drug in clinical trials with humans.

Blanton - direct - Smith                    1595

1    Q    Okay.

2         And what's the FDA?

3    A    Food and Drug Administration.

4    Q    At the time that this e-mail's written, which is

5    February 9th, 2011, does Retrophin have any assets?

6    A    No.

7    Q    Has it acquired or developed any drugs at this point?

8    A    No.

9    Q    And had it actually taken, other than the tax ID, any of

10   the steps outlined in this e-mail?

11   A    No, not to my knowledge.

12   Q    Okay.

13        MS. SMITH:  And I'm going to turn to the next

14   document, which is Government's Exhibit 105-38.

15        (Exhibit published to jury.)

16   Q    And this is also an e-mail from Martin Shkreli; correct?

17   A    Yes.

18   Q    What's the date on the e-mail?

19   A    March 27th, 2011.

20   Q    And you can see there are a number of people cc'd,

21   including you.  I'm just going to ask you about a few of them.

22        Who are Alison and Paul Frase?

23   A    They were the parents of the kid Josh Frase that had the

24   disease muscular myotubular myopathy.

25   Q    Who is Chad Hennings?

1    A    He was a friend of Paul Frase's that introduced me to

2    Paul.

3    Q    We talked about Marek Biestek.

4         Who was Edmund Sullivan?

5    A    He was a broker friend of Martin's that I had met after

6    meeting Martin.

7    Q    And the subject line there says:  Final Retrophin

8    pre-money capital structure.

9         What does pre-money mean?

10   A    Prior to raising venture capital.

11   Q    So, this is sent on March 27th, 2011.

12        Does that mean at that point that Retrophin had not

13   yet raised any money?

14        MR. BRAFMAN:  Objection.  He doesn't know.

15        THE COURT:  Well.

16        What did it mean to him?

17        THE WITNESS:  I assumed that it was pre-money.  So,

18   pre-raising any money.

19        MR. BRAFMAN:  Objection to assumption.

20        THE COURT:  Yes.

21        Sir, only if you know or if you can recollect, but

22   no assumptions, sir.

23        You can talk about your understanding.

24        THE WITNESS:  My understanding was pre-money.

25   Before any money had gone into.

```
                    Blanton - direct - Smith              1597
```

1    Q    If you look here, what does the capital structure mean?

2    A    Who owns the company prior to investment in the company.

3    The founders of the company.

4    Q    And so, if you look here the first line says:  Martin

5    Shkreli?

6    A    Yes.

7    Q    And then it gives the ownership percentage at

8    65.5 percent?

9    A    Yes.

10   Q    And then you're on the second line and it says that your

11   ownership is 20 percent?

12   A    Yes.

13   Q    And then the third line there says:  Joshua Frase

14   Foundation receives 3.3 percent; is that right?

15   A    Yes.

16   Q    And then there's another line there for Paul Frase?

17   A    Yes.

18   Q    And that ownership is 3.3 percent as well?

19   A    Yes.

20   Q    And why had shares been given to the Josh Frase

21   Foundation and Paul Frase?

22   A    Because of their son and his inspiration for starting the

23   company.

24   Q    Are there any MSMB entities listed here as receiving

25   shares of Retrophin?

1    A    No.

2    Q    What was your understanding at this point of the

3    connection, if any, between MSMB Capital and Retrophin?

4    A    Nothing here at this time.

5    Q    Was it your understanding that MSMB Capital was going to

6    invest in Retrophin at this time?

7    A    Not at this time.

8    Q    And if you look down, there's something that says market

9    cap.  It says 20 million.

10            What does market cap mean?

11   A    It means the market capitalization of a company.  The

12   value.

13   Q    And then there's also a value per share.  It says 200.

14   A    Yes.

15   Q    Were you aware of how this price was set?

16   A    No.

17   Q    Did you know whether there was any independent valuation

18   of Retrophin at this point in time?

19   A    No.

20            MS. SMITH:  If you turn to Government's

21   Exhibit 105-39 in evidence.

22            (Exhibit published to jury.)

23            MS. SMITH:  Which is tab 11.  And we can just look

24   at the bottom e-mail to start.

25            It's from Chad Hennings on Friday, May 20th, 2011

VB        OCR        CRR

Blanton - direct - Smith                          1599

1    and it's to Martin Shkreli, Darren Blanton, Paul Frase and

2    Alison Frase.

3              And the e-mail says:  That he's checking everyone's

4    availability for a conference call.

5              And then if you scroll up, Ms. Balbin.

6              Mr. Shkreli's response on the same day is regarding

7    the conference call.  And then he says:  For the benefit of my

8    co-workers Blanton, Frase and Hennings own a large minority

9    stake in Retrophin and were basically co-founders of the

10   company.

11   Q    What did you understand him to mean by that?

12   A    That we helped him found the company.

13   Q    Then it says:  The purpose of the call is a general

14   update on Retrophin.

15             At this point in time, were you still involved in

16   developing and growing Retrophin?

17   A    Yes.

18   Q    And what were you doing at this point in time for

19   Retrophin?

20   A    I was talking to Martin and a gentleman that had been

21   involved with the sharing cloud.  I don't remember his name.

22   But we were talking about just different things we could do to

23   help bring in other drugs or bouncing ideas about this one

24   drug for the disease.

25             And then also, talking about how the negotiations

1    were going with Dr. Ervasti at Wisconsin.  Martin was trying

2    to license this drug from them and there was resistance.

3

4              (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing.)

2   BY MS. SMITH:

3   Q    So, this e-mail is May of 2011.  At the same time that

4   you were working with the defendant on Retrophin in the summer

5   of 2011, you still had your separate investment in MSMB

6   Capital; is that right?

7   A    Yes.

8   Q    What happened with MSMB Capital in the summer and fall of

9   2011?

10  A    We had started questioning some of the trades and we had

11  questioned the performance of the fund and I brought on JD

12  McCulloch in my office and he called the auditor that Martin

13  had stated on his PowerPoint and he also called the

14  administrator and the auditor --

15          MR. BRAFMAN:  Objection.

16          THE COURT:  Sustained.

17  BY MS. SMITH:

18  Q    When you said "we" at the beginning of your answer, were

19  you talking about you and other people at Colt Ventures?

20  A    Yes.

21  Q    What information were you able to find out about the

22  auditor that was listed in the PPM?

23          MR. BRAFMAN:  Objection, Your Honor.

24          THE COURT:  Overruled.

25  BY MS. SMITH:

1  A    They said that --

2          MR. BRAFMAN:  Objection.

3          THE COURT:  She's asking what you learned, not

4  necessarily what someone said.

5  A    They were not the auditor.

6  Q    And what about the information you found out about the

7  administrator?

8  A    They were not the administrator.

9  Q    Was there any other information that you learned during

10  this time period that concerned you?

11  A    We were not getting proper reporting and basically we

12  were starting to question what -- the practices of the fund,

13  if they were legitimate.  Actually, I want to restate my

14  answer.

15          One of the -- the auditor said no comment.  They did

16  not say they were not his auditor at this first contact and

17  the administrator said they were not the administrator for the

18  fund.

19  Q    And did you have conversations with the defendant during

20  this period about your concerns?

21  A    I don't recall, but I think I might have.  I don't recall

22  exactly what conversations I had.  JD was talking to him, my

23  coworker.

24  Q    And JD is someone who works for you?

25  A    Yes.

Blanton - direct - Smith                    1603

1    Q    How did those concerns with MSMB Capital affect your

2    involvement in Retrophin?

3    A    I pulled back and I was offered a board seat and I

4    decided not to do it at the time because I was worried that

5    Martin might be lying to me and not credible.

6    Q    I'm going to show you what's been marked as Government's

7    Exhibit 105-6 for identification which is tab twelve in your

8    binder.

9            Do you recognize this document?

10   A    Yes.

11   Q    And what is this document?

12   A    It's a redemption notice from the fund where I asked for

13   all of my money back.

14   Q    And what's the date of the document?

15   A    November 30, 2011.

16   Q    If you look at the top --

17   A    November 17, 2011.

18           MS. SMITH:  Your Honor, the Government moves to

19   admit Government Exhibit 105-6 in evidence.

20           MR. BRAFMAN:  No objection.

21           THE COURT:  We receive 105-6.

22           (Government Exhibit 105-6 received in evidence.)

23   Q    So taking a look at Government's Exhibit 105-6, is this

24   the letterhead for Colt Ventures?

25   A    Yes.

Blanton - direct - Smith                                1604

1   Q      And what's the date of the request again?

2   A      The date of the request is November 30, 2011.

3   Q      And what's the date of the document up in the top left?

4   A      November 17, 2011.

5   Q      And who were you sending the request to?

6   A      Martin Shkreli at MSMB Capital Management LLC.

7   Q      What does the re line say?

8   A      "Darren Blanton withdrawal of LP interest in MSMB Capital

9   LP."

10  Q      Can you read the content of the letter?

11  A      "Dear Martin:  Based on our previous conversations, this

12  letter will serve as written notice that I request full

13  withdrawal of my investment balance in MSMB Capital Management

14  based on fund NAV as of November 30, 2011.

15          "In addition, our account requests that your fund

16  administrator provide us their statement of changes in capital

17  balance and performance returns for any LP interest for the

18  year-to-date period ending November 30, 2011.  Thank you very

19  much for managing our investments.  Sincerely, Darren Blanton

20  managing partner."

21  Q      The first sentence says, "Based on our prior

22  conversations."  Had you spoken with the defendant about

23  withdrawing your money from MSMB Capital?

24  A      Yes.

25  Q      And, again, it says "based on fund NAV."  What does that

1   mean?

2   A    Net asset value.

3   Q    Does that mean your investment in MSMB Capital?

4   A    Yes.

5   Q    And then in the last sentence you are requesting

6   statement of changes in capital balance and performance

7   returns.  What are you requesting there specifically?

8   A    A new net asset value for the last period prior to my

9   redemption request.

10  Q    And at this point had you received any recent written

11  updates on the performance of the fund?

12  A    I don't remember getting anything past the March

13  statement but I do not remember.

14  Q    This requests a full withdrawal of your balance by

15  November 30, 2011, as well as the performance returns.  Did

16  you get performance returns as requested by November 30, 2011?

17  A    No.

18  Q    Did you get the withdrawal of your funds?  Did you get

19  your funds back as of November 30, 2011?

20  A    No.

21  Q    What about as of December 31, 2011, the end of the year,

22  had you received your money back out of the fund?

23  A    No.

24  Q    What discussions, if any, did you have with the defendant

25  in this time period?

Blanton - direct - Smith                    1606

1   A    We went back and forth discussing a range of options

2   where he would give me partial redemptions.  I don't remember

3   the details.

4   Q    Did you ever have any difficulty getting ahold of the

5   defendant during this time period?

6   A    Yes.

7   Q    I'm going to show you what's been marked as Government's

8   Exhibit 105-7 for identification which is tab 13 in your

9   binder.

10           Do you recognize this document?

11  A    Yes.

12  Q    And is this an e-mail from Mr. Shkreli?

13  A    Yes.

14           MS. SMITH:  The Government moves to admit Government

15  Exhibit 105-7 into evidence.

16           MR. BRAFMAN:  This is 105-7?

17           THE COURT:  Yes.

18           MR. BRAFMAN:  Does Your Honor have it?

19           THE COURT:  I have it, sir.

20           MR. BRAFMAN:  I would object on relevancy.  It

21  doesn't say anything.

22           THE COURT:  Well, are you -- I can limit it subject

23  to connection.  Are you prepared to do that?

24           MS. SMITH:  Yes, Your Honor.  That's fine.

25           THE COURT:  All right.

Blanton - direct - Smith                    1607

1           MS. SMITH:  So the Government moves to admit

2    Government Exhibit 105-7, subject to connection.

3           THE COURT:  Yes.  Granted.

4           (Government Exhibit 105-7 received in evidence.)

5    Q    So if you look at the bottom e-mail here, who is Carolyn

6    Bradley?

7    A    He was my assistant at the time.

8    Q    What's the date of this e-mail at the bottom?

9    A    January 20, 2012.

10   Q    And at this point, January 20, 2012, had you received any

11   money back from your MSMB Capital investment as a result of

12   your redemption request?

13   A    I don't recall.  I might have received 200,000.  He gave

14   me a partial payment of 200,000, but I can't remember exactly

15   when he gave that to me.

16   Q    And the top e-mail there is from Mr. Shkreli?

17   A    Yes.

18   Q    And he says he's having an emergency tooth extraction and

19   he's cancelling the conference call; is that right?

20   A    Yes.

21   Q    Was this an example of the difficulty that you had

22   getting in contact with Mr. Shkreli during this time period?

23           MR. BRAFMAN:  Objection.

24   A    Yes.

25           THE COURT:  Sorry.  I'd like you to rephrase the

1    question.

2            So disregard that last response.

3            Please rephrase the question.

4    Q    What was your understanding of what Mr. Shkreli was

5    saying here?

6    A    He couldn't do a call about the fund in my redemption

7    status.

8    Q    I'm going to show you what's been marked as Exhibit 79-3

9    for identification which is tab 14.

10            Do you recognize this document?

11   A    Yes.

12   Q    Who is this e-mail from?

13   A    Martin Shkreli.

14   Q    And is it a performance estimate?

15   A    Yes.

16   Q    And is it dated January 25, 2012?

17   A    Yes.

18            MS. SMITH:  Your Honor, the Government moves to

19   admit Government Exhibit 79-3 into evidence.

20            MR. BRAFMAN:  No objection.

21            THE COURT:  We will receive 79-3.

22            (Government Exhibit 79-3 received in evidence.)

23   BY MS. SMITH:

24   Q    So, again, this is an e-mail from Mr. Shkreli to yourself

25   on January 25, 2012; is that right?

1  A    Yes.

2  Q    And the first line here says "MSMB returned minus 4.08

3  net in November 2011."  The second line says, "MSMB has

4  returned plus 5.51 percent net of fees Y2D through the end of

5  November 2011" and then "MSMB has returned plus 30.53 percent

6  net of fees since inception on 11/1/2009."

7  A    Yes.

8  Q    So in terms of the year-to-date performance of MSMB

9  Capital, that middle line, what is your understanding of what

10  that was saying?

11  A    They were up 5.51 percent in November of 2011.

12  Q    And was that the amount that the fund was up between

13  January 2011 and November 2011?

14  A    Yes.

15  Q    And then if you look in the Account Founding section, it

16  says, "You invested 1.25 million for the 12/31/2010 time

17  period.  The value of this investment is now approximately

18  1.318 million net of fees or plus 5.51 percent year-to-date

19  and since inception.  We acknowledge your redemption and this

20  will be your last statement."

21       What was this saying about the value of your

22  investment in MSMB Capital as of November 2011?

23  A    That it was $1,318,872.

24  Q    And how much of that investment had you requested to be

25  redeemed?

1    A    All of it.

2    Q    And as of this date, does the performance estimate

3    reflect that you received any money back yet --

4    A    No.

5    Q    -- from MSMB Capital?

6    A    No.

7              MR. BRAFMAN:  As of the date of the e-mail?

8              MS. SMITH:  As of the date of the e-mail.

9              MR. BRAFMAN:  Thank you.

10             THE COURT:  Are you at a good stopping point now?

11             MS. SMITH:  Yes, Your Honor.

12             THE COURT:  I would like to give the jurors a lunch

13   break.  Please leave your notebooks face down on your chairs

14   and do not discuss the case and also please consciously avoid

15   any exposure to media on this case.

16             I'd like you to come back, if you could by -- is one

17   hour enough for all of you?  So please return to the jury room

18   at 1:45.  Thank you for your ongoing service.

19             (Jury exits.)

20             (In open court.)

21             THE COURT:  So I will see everybody back in the

22   courtroom by 1:40, please, unless there is something I need to

23   discuss.  Then please call my chambers and we will convene

24   earlier.  Thank you.

25             (Luncheon recess taken.)

Blanton - direct - Smith                    1611

 1                        AFTERNOON SESSION

 2                (In open court - jury not present.)

 3           THE COURT:  Are there any issues that we need to

 4   address before we bring the jury out?

 5           MR. BRAFMAN:  No, Your Honor.

 6           MS. SMITH:  No, Your Honor.

 7           THE COURT:  Okay.  If they are all back, we will

 8   bring them out.

 9           (Jury enters.)

10           THE COURT:  All the jurors are back.  Have a seat,

11   ladies and gentlemen.

12           Mr. Blanton, you will resume the stand.  You are

13   still under oath and, Ms. Smith, you may resume your

14   examination.

15   **D A R R E N   B L A N T O N**,

16       called as a witness, having been previously duly

17       sworn, was examined and testified as follows:

18   CONTINUED DIRECT EXAMINATION

19   BY MS. SMITH:

20   Q    Mr. Blanton, before we broke for lunch we discussed

21   Government Exhibit 79-3, the document on the left side of the

22   screen and I've also put back up Government's Exhibit 105-6 on

23   the right side of the screen.

24           If you look at Government's Exhibit 105-6 on the

25   right, what is this document again?

VB        OCR        CRR

Blanton - direct - Smith                    1612

1    A     That's the redemption request.

2    Q     And in the last line of that document, what are you

3    asking for?

4    A     All of the capital balance of my LP investment.

5    Q     And is that as of November 30, 2011?

6    A     As of -- yes.

7    Q     And the date of on that document is November 17, 2011?

8    A     Yes.

9    Q     And if you look at Government Exhibit 79-3 which is on

10   the left what is the date of that e-mail?

11   A     January 25, 2012.

12   Q     And does that e-mail that's Government Exhibit 79-3

13   provide you with the statement of changes and capital balance

14   and performance return through November 2011?

15   A     Yes.

16   Q     Did the defendant provide any explanation for why it took

17   between November 17, 2011 and January 25, 2012, to get that

18   information?

19   A     No.

20   Q     After you got the statement that is Government Exhibit

21   79-3, did you continue to discuss your request for redemption

22   with the defendant?

23   A     Yes.

24   Q     I'm going to ask you to look at six documents which are

25   marked as Government's Exhibit 105-8, 105-9, 105-10, 105-11,

Blanton - direct - Smith                    1613

1    105-12 and 105-40, which are tabs 15 to 20 in your binder.

2    A     Okay.

3    Q     Are those all e-mails from the defendant, Martin Shkreli?

4    A     Yes.

5    Q     And are all of those documents discussing your redemption

6    request?

7    A     Yes.

8            MS. SMITH:  Your Honor, the Government moves to

9    admit Government Exhibits 105-8, 105-9, 105-10, 105-11, 105-12

10   and 105-40 into evidence.

11           MR. BRAFMAN:  No objection.

12           THE COURT:  We will receive those exhibits in

13   evidence, thank you.

14           (Government Exhibits 105-8, 105-9, 105-10, 105-11,

15   105-12 and 105-40 received in evidence.)

16   Q     I'm going to show you what's been marked Government's

17   Exhibit 105-8 which is tab 15.  And if you look at the bottom

18   of this document, is that bottom portion the same as

19   Government Exhibit 79-3 that we just looked at, the

20   performance estimate through November 2011?

21   A     Yes.

22   Q     Okay.  If you scroll up -- and this is an e-mail in

23   response on January 7, 2012.  Who is the e-mail from?

24   A     JD McCulloch of my office.

25   Q     And who is the e-mail to?

Blanton - direct - Smith                                1614

1   A    Martin Shkreli.

2   Q    And can you read the content of this e-mail?

3   A    "Hey Martin:  Darren has updated me on recent

4   conversations on the state of his capital redemption and noted

5   that you and your attorneys are working on a proposal for us.

6   I can't stress enough we are experiencing ing a lot of

7   pressure from trustees and accountants to wrap this up, so we

8   would like to discuss your proposal that involves a cash

9   redemption of our LP investment by early next week.

10          Also we -- while our redemption request was made for

11  November 30th redemption, that request was done in the spirit

12  of receiving redemption proceeds late December or 1st of

13  January.  We are now approaching the beginning of February and

14  would expect that our capital is still earning performance for

15  the month of December.  Please let us know where you stand

16  with your proposal.  Thanks very much, JD.

17  Q    What did you mean by -- what was your understanding of

18  what JD meant by the last sentence, "We are now approaching

19  the beginning of February and would expect that our capital is

20  still earning performance for the month of December"?

21  A    That if there is any changes in the capital account

22  value, it would be reflected in our redemption.

23  Q    So that the last information that you have is from

24  November and you would want to know if there were any changes

25  in December as well; is that right?

Blanton - direct - Smith                    1615

1    A    Right.

2         MS. SMITH:  And then if you scroll up, Ms. Balbin.

3    Q    And what is the defendant's response?

4    A    "Can we chat?"  And he gave his phone number.  "I'm happy

5    to include December if you sent your former redemption notice

6    and provide the new one for the December period."

7    Q    Did you receive from the defendant more information about

8    what the capital balance for your investment was for December

9    of 2011?

10   A    Not that I remember.

11   Q    If you turn to the document that's been marked

12   Government's Exhibit 105-9?

13   A    Yes.

14   Q    And is this an e-mail from the defendant?

15   A    Yes.

16   Q    And what -- what's the date of the e-mail?

17   A    January 31, 2012.

18   Q    And what does he say in the e-mail?

19   A    "Sorry for the delay.  I still might make changes to the

20   agreement, for instance the value."

21   Q    And then you can see there in the attachment line that

22   says "LP purchase agreement Blanton/Shkreli"?

23   A    Yes.

24   Q    Was there an attachment to this document?

25   A    Yes.

Blanton - direct - Smith                      1616

1          MS. SMITH:  Ms. Balbin, if you can show the first

2    page of the attachment.

3    Q    At the top here it says a limited partnership operating

4    agreement?

5    A    Yes.

6    Q    And it was to be between is Martin Shkreli and Darren

7    Blanton?

8    A    Yes.

9    Q    And then the second paragraph there says that "Seller,"

10   which is defined as you, Mr. Blanton, "owns a limited

11   partnership interest with a current capital balance of 1.318

12   million" and then the purchaser who's Mr. Shkreli decides to

13   purchase it from the seller.

14          And if you look farther down the page the terms of

15   payment it says, "Purchaser will deliver to seller $500,000 by

16   February 29, 2012 by wire transfer to the account of seller's

17   choice.  Purchaser will then deliver the remaining balance to

18   sellers of $818,000 by March 30, 2012."

19          So what was this operating agreement that you

20   received designed to do?

21   A    Divide up the redemption into pieces.

22   Q    And so would one piece going to be paid by Mr. Shkreli on

23   February 29th?

24   A    Yes.

25   Q    And was the second fees going to be paid on March 30th?

Blanton - direct - Smith                    1617

1   A    Yes.

2   Q    Did you, in fact, execute this agreement or sign this

3   agreement?

4   A    I don't think so, no.

5   Q    All right, if you turn to Government's Exhibit 105-10.

6   And if you look at the -- actually the e-mail on the second

7   page to begin with, is that the same e-mail that we just

8   looked at with the attachment?

9   A    I assume it is, yes.

10  Q    If you go back to the first page and then look at the

11  e-mail towards the bottom dated January 31 at 8:15, JD writes,

12  "Martin:  We want you to send us an offer.  You are truly

13  willing to stand behind the values and terms that don't change

14  from your perspective.  Can you send us something in that

15  spirit by tomorrow?"

16          The response from Martin is, "This is that offer,"

17  referring to the purchase agreement.  And then JD's response

18  to that is, "Your offer doesn't consider anything related to

19  Retrophin stock ownership that you and Darren had previously

20  discussed that separate from the LP interest in MSMB Capital?"

21          Was your understanding of what that meant?

22  A    The founder's shares from being a part of the cofounding

23  team.

24  Q    So in your discussions with Mr. Shkreli you're both

25  discussing your redemption for MSMB Capital and your request

1    for a founders share; is that right?

2    A    Yes.

3    Q    And what is the request for a founders share based on?

4    A    The document that said I would have 20 percent of the

5    company or some portion of it.

6    Q    And that is entirely separate from your investment in

7    MSMB Capital; is that right?

8    A    Right.

9    Q    And at this time did you know whether or not MSMB

10   Capital -- what had the defendant said to you at this time

11   about whether MSMB Capital had invested in Retrophin?

12   A    Not much.  I don't remember exactly what he said, but I

13   didn't get a definitive answer on what they had invested in.

14   Q    If you look at Government's Exhibit 105-11 --

15            THE COURT:  May I just clarify?

16            Were you told that MSMB had invested in Retrophin or

17   were you just given no information on that?  What was the --

18            THE WITNESS:  I wasn't given any information.

19            THE COURT:  Did you have any knowledge from any

20   source that MSMB had invested in Retrophin?

21            THE WITNESS:  No.

22            THE COURT:  Thanks.

23            (Continued on next page.)

24

25

1    EXAMINATION CONTINUES

2    BY MS. SMITH:

3    Q    So if you look at the document that's Government Exhibit

4    105-11 and we will start with the bottom e-mail, what's the

5    date on the bottom e-mail here?

6    A    February 2nd, 2012.

7    Q    And it's an e-mail from JD to Martin, is that right?

8    A    Yes.

9    Q    And just to clarify, when the judge was asking you

10   questions just now there was a reference to MSMB, was that

11   MSMB Capital?

12   A    Yes.

13   Q    Turning back to Government Exhibit 105-11, JD writes:

14        Martin, as we discussed on the phone, the following

15   are wiring instructions for the $250,000 cash that you have

16   agreed to send us tomorrow morning.  And then there are wiring

17   instructions.  And then he says:  As we discussed, we can

18   reassess your liquidity later this week with the expectation

19   that the next $250,000 cash tranche will be wired by 2/15 at

20   the latest.  After that, we can discuss how we can handle our

21   remaining investment balance in MSMB Capital.

22        So what is JD saying in this e-mail?

23   A    That we want to get this wire done and he was just asking

24   Martin if he had done it, and then what would the next steps

25   be to get all our money back.

Blanton - direct - Smith                    1620

1   Q    And then there is a second sort of section at the bottom

2   of the e-mail that says:  As for Retrophin, because there was

3   some confusion on share amounts and types of securities I am

4   attaching the cap table that you originally drafted with

5   Edwards and Wildman for your review.

6            What was the cap table that's being referred to in

7   this e-mail?

8   A    I assume it's the cap table of Retrophin.

9   Q    And what was your understanding of what the cap table of

10  Retrophin reflected in terms of your investment?

11  A    I was understanding that I would have some founder's

12  shares in the company, but I wasn't sure how many.

13           MS. SMITH:  And if you can scroll up to the response

14  to JD.

15  BY MS. SMITH:

16  Q    So the e-mail at the bottom is February 2nd.  What is the

17  e-mail in the middle here from JD, what is the date on it?

18  A    February 3rd.

19  Q    And he writes:  Martin, I just wanted to follow up to see

20  if you had initiated the wire for the $250,000 today.

21           And what is Martin's response, Martin Shkreli's

22  response at the top?

23  A    I was just about to send it.  Are you sure you want it

24  into that account?  I'm not sure that was the account it was

25  sent from.

1    Q    And now I am going to show you what's been marked as

2    Government Exhibit 105-12.  And this is a six-page e-mail

3    chain, is that right?

4    A    What tab is that?

5    Q    I'm sorry, it's tab 19.

6              (Exhibit published.)

7    A    Yes.

8    Q    And if you look on the second-to-last and last page, is

9    the bottom of the e-mail chain the same e-mail that we were

10   just looking at from JD?

11   A    105-12?

12   Q    Yes.

13   A    The second-to-the-last page?

14   Q    Yes, the second-to-last page and over onto the last page.

15   A    Is it referring to --

16   Q    If you look back at Government Exhibit 105-11, is it the

17   same e-mail there on February 2nd at the bottom of this e-mail

18   chain?

19             MS. SMITH:  And, Ms. Balbin, can you go to page 5 of

20   the document?

21   A    I don't see 105-11.  I see 105 -- what tab is 105-11?

22   Oh, here it is.

23   Q    Sorry, it's Government Exhibit 105-40.

24   A    Oh, 105-40.

25   Q    Yes, which is tab 19.

Blanton - direct - Smith                    1622

1    A    And you're asking?

2    Q    I'm asking about the last e-mail in that chain, whether

3    it's the same e-mail that we just looked at in Government

4    Exhibit 105-11 that included the wire instructions and the

5    requests for the $250,000?

6    A    The last e-mail in this chain on 105-12 is on April 30th.

7    Q    So is 105-40, which is tab 19?

8    A    Yes.

9    Q    And I apologize because I misspoke and said 105-12

10   originally.

11   A    Okay, so 105-40 and you're asking?

12   Q    I'm asking if the last e-mail in that chain is the same

13   e-mail that we just looked at in Government Exhibit 105-11

14   with the wiring instructions and the request for the $250,000?

15   A    Yes.

16   Q    If you can go to the page before that.

17           THE COURT:  What exhibit are we on now?

18           MS. SMITH:  We're in Exhibit 105-40.

19           THE COURT:  Okay.

20   BY MS. SMITH:

21   Q    And if you look at the second, the bottom e-mail there on

22   February 3rd, it was a follow-up to see if Mr. Shkreli had

23   initiated the wire?

24           (Exhibit published.)

25   Q    And then if you scroll up to see Mr. Shkreli's response,

SAM      OCR      RMR      CRR      RPR

Blanton - direct - Smith                          1623

1   he says:  I am sending $200,000 today due to a spending limit

2   we have.  I will send $50,000 promptly on Monday and then we

3   can do a conference call.

4            And what's the date of that e-mail?

5   A   February 3rd, 2012.

6            MS. SMITH:  And then, Ms. Balbin, if you go to

7   page 4 of the e-mail chain, the page before.

8   BY MS. SMITH:

9   Q   And then if you look in the middle, those middle two

10  e-mails, please.  On February 3rd JD says:  Martin, we

11  received a hundred-thousand into our account.  Can we expect

12  the other 150 on Monday?

13           And then what does Mr. Shkreli say in response?

14  A   Yes, although given the darn banking system the most I

15  can guarantee is 100k.  Then 50k on Tuesday.  My limit is

16  being reviewed and they have always -- and they always say

17  yes, but I'm not too sure.  I did 20 wires today so my brain

18  is a bit fried.

19           MS. SMITH:  And then, Ms. Balbin, can you scroll up

20  and see the response to that?

21  BY MS. SMITH:

22  Q   And this is an e-mail from JD on February 6th, 2012 to

23  Mr. Shkreli.

24           What does he say in response?

25  A   Martin, I wanted to confirm that you will be wiring the

SAM     OCR     RMR     CRR     RPR

1   remaining 150 -- 150,000 today.  Please let us know the

2   status.

3   Q    Then if you can look on the second page of the e-mail

4   chain.

5            MS. SMITH:  One page back.

6   BY MS. SMITH:

7   Q    If you look at the three e-mails in the middle there.

8            MS. SMITH:  Thank you.

9   Q    If you look at the bottom here, what is the date on this

10  e-mail from JD?

11           (Exhibit published.)

12  A    February 6th, 2012.

13  Q    Okay.  And then the e-mail just up from that, February

14  7th at 10:40 a.m., what does JD say in that e-mail?  It's the

15  page that ends in COLT 437.

16  A    In the middle e-mail?

17  Q    Yes, the one that starts:  Hey Martin, I left you a

18  voicemail.

19  A    Okay.  Hey Martin, I left you a voicemail with your

20  assistant at 3 p.m. Eastern Time yesterday.  Sounds like you

21  were tied up in a meeting.  Thanks for sending the wire for

22  100k yesterday.  That should leave us with 50k to complete

23  this first tranche of 250k.  Can we expect that 50k today?

24  Also, I'm around all day today if you want to catch up on the

25  phone.  Thanks, JD.

1    Q     And then JD follows up again, that e-mail is at 10:40

2    a.m., is that right?

3    A     Yes.

4    Q     And the JD follows up at 4:22 p.m. and says:  Martin, do

5    you have time today to catch up on this?  And what is Martin's

6    response at 5:16 p.m.?

7    A     Today got crazy busy all of the sudden, how is tomorrow

8    morning?

9    Q     Then if you can look at the first page of the e-mail in

10   the bottom section there.  And this is a continuation of the

11   same e-mail chain, is that right?

12   A     Yes.

13   Q     And what's the date on this bottom e-mail, February 8th?

14   A     February 8th, 2012.

15               (Exhibit published.)

16   BY MS. SMITH:

17   Q     And JD has kind of two sections here, ones says Retrophin

18   and one says MSMB Capital, is that right?

19   A     Yes.

20   Q     And for Retrophin he says:  We'd like to get your

21   proposal on the Blanton Groups, Darren, Chad, Frase Foundation

22   and Paul Frase, equity ownership interest in the company.

23   What is he referring to with the Blanton Group?

24   A     That is the people that we were named in that cap table,

25   the pre-money cap table in the prior exhibit.

1    Q    And who is Chad?

2    A    Chad Hennings.

3    Q    And then the Frase Foundation and Paul Frase are the

4    individuals you spoke about earlier?

5    A    Yes.

6    Q    And then in the MSMB Capital section there JD says:  We'd

7    like to get the remaining 50k wired today that will complete

8    the first 250k tranche that was supposed to completed on

9    Friday.  Please confirm if you'll be able to fill this request

10   today.

11            And then if you go to the next page the e-mail

12   carries over.

13            JD continues:  The ability to make a decision on

14   what to do with the remainder of our capital balance in MSMB

15   will be based on having some granularity as to what MSMB fund

16   holds; for example, company names, position sizes, amount

17   invested in each private situation, including Retrophin.

18            What was your understanding of what he was asking

19   for in this portion of the e-mail?

20   A    I think he was asking -- at that time we had talked about

21   that the fund had made an investment in Retrophin and we

22   wanted to know what percentage it owned or what other types of

23   stocks the fund had in the fund.

24   Q    And was the time of this e-mail chain, which is early

25   February 2012, the first time that you had heard that MSMB

Blanton - direct - Smith                    1627

1    Capital had invested in Retrophin?

2    A    To my knowledge.

3         MS. SMITH:  And, Ms. Balbin, if you can go back to

4    the first page.

5         (Exhibit published.)

6         MS. SMITH:  And focus on the top three e-mails.

7    BY MS. SMITH:

8    Q    So in response to JD's requests about Retrophin and MSMB

9    Capital, on February 9th he says, the defendant says:  We

10   propose 3 percent for the Blanton Group and I will give you a

11   breakdown of what the fund owned as of your redemption date.

12        Did Mr. Shkreli ever give you a breakdown of what

13   the fund owned as of your redemption date?

14   A    No.

15   Q    In response JD says:  Can you also confirm the status of

16   the 500,000 or the 50,000 that we agreed would be wired last

17   week as part of the $250,000 tranche?

18        That's on February 9th, is that right?

19   A    Yes.

20   Q    And then Mr. Shkreli responds at the very top of the

21   e-mail chain on February 9th:  I might be a few more days on

22   the $50,000.

23   A    Yes.

24   Q    Did you ever receive $50,000 back from Mr. Shkreli in

25   connection with this request and this tranche?

1    A    No.

2    Q    So was the money that you received back just the $200,000

3    that had been wired?

4    A    Yes.

5    Q    If you turn now to tab 20, and this is now Government

6    Exhibit 105-12.  And focusing on the first page here, the

7    bottom e-mail.

8              (Exhibit published.)

9    BY MS. SMITH:

10   Q    Who is this an e-mail from?

11   A    It's from me to Martin.

12   Q    And what's the date on the e-mail?

13   A    April 30th, 2012.

14   Q    And the prior e-mails we've been discussing, those were

15   in February of 2012, is that right?

16   A    Right.

17   Q    What is the -- there are two sections again, one says

18   MSMB Capital Management Investment and one says Retrophin.

19             You say:  Martin, per our conversation you will

20   provide me with the following, and under the MSMB Capital

21   Management Investment you list an executed partnership

22   agreement, the 2010 and 2011 K-1s, and the return of our

23   entire LP capital balance less 200,000 cash already received

24   and less 300,000 transferred and converted into Retrophin

25   preferred stock at the original pre-money valuation within

1    15 business days.

2         Why were you asking for these documents?

3    A    I think to try to get an accounting of what my money had

4    been allocated towards.

5    Q    And at this point you had made your redemption request in

6    November of 2011, is that right?

7    A    Yes.

8    Q    And this is April of 2012?

9    A    Yes.

10   Q    And at this point what had you received back from the

11   defendant?

12   A    200,000.

13   Q    And in that third bullet point there you say:  Less

14   300,000k transferred and converted into Retrophin preferred

15   stock.

16        What are you talking about with that $300,000?

17   A    He had told us he invested 300,000 of our money in

18   Retrophin in between these e-mails.

19   Q    And so was it your understanding that you wanted the

20   return of the balance, you know, separate and apart from the

21   200,000, and then the 300,000 that he told you he invested in

22   Retrophin?

23   A    Yes.

24   Q    And in terms of Retrophin, that second kind of section at

25   the bottom there, you're asking for copies of all latest

Blanton - direct - Smith                    1630

1    amended formation documents, complete and most current

2    detailed capitalization table, and the e-mail continues on the

3    next page.

4    A    Yes.

5    Q    Stock certificates evidencing our base ownership of

6    2 percent of founder's shares and latest investor

7    presentation.

8              And then what do you say after that?

9    A    From the time of our redemption in November 2011 we have

10   tried to be patient with the situation.  However, we need to

11   get this resolved in the next 15 business days or we will have

12   to pursue a different course.

13             MS. SMITH:  And, Ms. Balbin, if we can go back to

14   the first page.

15             (Exhibit published.)

16   BY MS. SMITH:

17   Q    And just look at the response from Mr. Shkreli.  So the

18   response is dated April 30th as well, and he says:  There is

19   no 2010 K-1.  2011 K-1 is not owed to investors until the

20   extension date.  I still haven't received K-1s for some funds.

21             What is a K-1?

22   A    Accounting for the prior year.

23   Q    Is it a tax document?

24   A    A tax document, yes.

25   Q    Did you ever receive any tax documents for MSMB Capital?

1    A    I don't think so.  I don't remember receiving any.

2    Q    Then the second part of this e-mail says:  As of right

3    now, you are not a shareholder or unit-holder of Retrophin,

4    LLC, no agreements to this end have been signed and none of

5    these documents requested are owed to you unless you become a

6    shareholder of Retrophin.  I am debating the value of

7    converting your stake LP stake into Retrophin stock versus

8    just continuing with redemption of your investment in cash or

9    PIK/distribution.

10            So when he says I am debating the value of

11   converting your LP stake into Retrophin stock, what is the

12   defendant saying to you there?

13   A    He is saying we don't own anything.  He's, basically,

14   going back and forth about different percentages that we would

15   own and now he's saying we don't own any.

16   Q    And in terms of the LP stake, what do you understand that

17   to be a reference to?

18   A    The amount of money that my investment in the fund was

19   converted into Retrophin stock.

20   Q    Had you given the defendant permission to convert any of

21   your investment in MSMB Capital into Retrophin?

22   A    No.

23   Q    Had he asked you prior to converting your stake in MSMB

24   Capital into Retrophin?

25   A    We had debated putting a portion of it, the 300,000, that

Blanton - direct - Smith                    1632

1   was what that e-mail was referencing.  And I don't remember

2   the exact details, but it was -- it was debated going back and

3   forth on that amount at the pre-money valuation in the first

4   round.

5   Q    And what about the remainder of your investment in MSMB

6   Capital?

7   A    No.

8   Q    Had you agreed to allow that to become Retrophin?

9   A    No.

10  Q    Then the last sentence there says:  A good part of the

11  value of the MSMB funds is Retrophin, LLC units.  So these

12  units may accrue to you anyway.

13         There is a reference there to MSMB funds with an S,

14  did you know of any fund other than MSMB Capital?

15  A    No.

16  Q    And when he says a good part of the value of the MSMB

17  funds is Retrophin, LLC units, what does that mean to you?

18  A    I was confused.

19  Q    Were you surprised?

20  A    Yes.

21  Q    Why were you surprised?

22  A    Because we hadn't discussed details on how to convert the

23  money that we had put in illiquid stock, and it was just all

24  news to me.

25  Q    At the time of this e-mail chain in April of 2012 had you

Blanton - direct - Smith                    1633

1   received anything back other than that $200,000 towards your

2   redemption?

3   A    No.

4   Q    What was your feeling about the situation at that time?

5   A    That it was -- that I was being lied to and that I didn't

6   know what was gonna happen with the investment.

7   Q    And what was your relationship with the defendant like at

8   this point, were you in contact?

9   A    Occasionally.  I was just trying to get as much as I

10  could, talk to him on the phone or text, do whatever I could

11  do to try to get my money back.

12  Q    I am going to ask you to look at a document that's marked

13  Government Exhibit 105-13 for identification, which is tab 22

14  in your binder.

15          Do you recognize this document?

16  A    Yes.

17  Q    Is this a document that you received from the defendant?

18  A    Yes.

19          MS. SMITH:  Your Honor, the government moves to

20  admit Government Exhibit 105-13 into evidence.

21          MR. BRAFMAN:  No objection.

22          THE COURT:  We will receive 105-13.

23          (Government's Exhibit 105-13 was received in

24  evidence.)

25          (Exhibit published.)

SAM       OCR       RMR       CRR       RPR

1    BY MS. SMITH:

2    Q    So what's the date on this document?

3    A    June 27th, 2012.

4    Q    And who is it addressed to?

5    A    Me, Darren Blanton.

6    Q    And the re line says Suspension of Withdrawals?

7    A    Yes.

8    Q    And then the letter, itself, says:

9            Pursuant to Article 6 of that certain limited

10   Partnership Agreement of MSMB Capital Management dated on or

11   about February 2011 by and between the company MSMB Investors,

12   LLC and certain limited partners, the undersigned is

13   exercising its right to suspend all withdrawals by the

14   company's limited partners from their capital accounts at this

15   time.

16           What was your understanding of what that meant?

17   A    He wasn't gonna redeem my investment.

18   Q    And when he said he was suspending all withdrawals by the

19   company's limited partners with an S, did you understand this

20   to be specific to you or for all of the limited partners?

21   A    For all of the limited partners.

22   Q    The next line says:  The company is experiencing a state

23   of affairs that makes the determination of the price or value

24   of the partnership's investments impractical or prejudicial to

25   the partners.  And it's signed Martin Shkreli.

Blanton - direct - Smith                    1635

1        What was your reaction to receiving this document?

2   A    I didn't like it and I thought it was -- it meant that I

3   wasn't gonna get my money back or I might not see anything out

4   of this investment.

5   Q    Did you ever speak to the defendant about this document?

6   A    I don't recall.  I don't think I was able to.

7   Q    What action, if any, did you take in response to

8   receiving this letter?

9   A    We hired an attorney to help us try to pursue the act of

10  getting our money back.

11  Q    And what steps did your attorney take on your behalf?

12  A    They asked for review of the books and records.

13  Q    And when you say books and records, what do you mean?

14  A    The accounting for the fund, the investment -- investor

15  LP interest details on who invested what in the fund.

16  Q    Did the defendant ultimately provide you with a copy of

17  the books and records for MSMB Capital?

18  A    He gave a few pieces of paper.

19  Q    I am going to ask you to look at a document that's marked

20  as Government Exhibit 105-15 for identification, which is

21  tab 21 in your binder.

22       Do you recognize this document?

23  A    Yes.

24  Q    What is this document?

25  A    This is the name of the limited partners and how much

1    money they have invested and when they had invested.

2    Q    Were you provided with this document by the defendant?

3    A    Through my attorney.

4         MS. SMITH:  Your Honor, the government moves to

5    admit Government Exhibit 105-15 into evidence.

6         MR. BRAFMAN:  No objection.

7         THE COURT:  We will receive 105-15.

8         (Government's Exhibit 105-15 was received in

9    evidence.)

10        (Exhibit published.)

11   BY MS. SMITH:

12   Q    And you said earlier that your attorney had made a

13   request for the books and records of MSMB Capital?

14   A    Yes.

15   Q    Were these the documents that he received in response?

16   A    Yes.

17   Q    So starting on the first page, the limited partner list.

18   What are the limited partners of MSMB Capital?

19   A    Investors that have put money in the fund.

20   Q    And if you can see here there are eight individuals or

21   entities listed?

22   A    Yes.

23   Q    And we can just walk through each one very quickly.

24        The first is Lindsay Rosenwald, and it says a

25   hundred-thousand on 10/30/2009.  The second one says Steven

Blanton - direct - Smith                     1637

1    Richardson, he has three investments of 200,000, 100,000 and

2    100,000 on 10/30/2009, 2/9/2010 and 2/22/2010.  Edmund

3    Sullivan he has an investment of 30,000 on 10/30/2009.  Brent

4    Saunders has an investment of 150,000 on 8/13/2010 and a

5    hundred-thousand on 1/12/2011.  And then you were number 5

6    here, Darren Blanton, you have 1.25 million, on 12/8/2010.

7    Number 6 is Dynagrow Capital for 300,000, on 1/17/2011.

8    Schuyler Marshall for 200,000 on 1/27/2011.  And then John

9    Neill for 500,000 on 1/28/2011.

10            Looking at this list of investors, are you the

11   investor who put the most amount of money into the fund?

12   A    Yes.

13   Q    Were you surprised to learn that?

14   A    Yes.

15   Q    Why was that?

16   A    That wasn't what I was told and this isn't 35 million

17   AUM.

18   Q    At the time that you invested, it says 12/8/2010, if you

19   look up above at the investors that invested before you, you

20   have Lindsay Rosenwald has 100,000; Steven Richardson has

21   400,000; Edmund Sullivan has 30,000 and Brent Saunders puts in

22   150,000 on August 13th.

23            So prior to your investment on December 8th, 2010 is

24   it fair to say there is about $680,000 in the fund?

25   A    Yes.

Blanton - direct - Smith                    1638

1  Q    And what had the defendant represented to you as of the

2  time you invested was the AUM for the fund?

3  A    35 million.

4  Q    And just looking on this list, Schuyler Marshall, who is

5  Schuyler Marshall again?

6  A    He's a Dallas investor.

7  Q    Who is John Neill who is Number 8?

8  A    He also is a Dallas investor.

9  Q    And so were those individuals also at that dinner with

10 you --

11 A    Yes.

12 Q    -- in Dallas in December 2010?

13 A    Yes.

14 Q    What was your reaction to receiving this information?

15 A    I was shocked and scared that I was gonna lose all my

16 money.

17 Q    If you look at the second page of the document, and this

18 says it's a balance sheet as of April 30th, 2012.  The top

19 section there says about $7300 in cash, and then it says Level

20 III securities 3.48 million.

21        Did you have an understanding of what Level III

22 securities were?

23 A    No, I thought it would be traded securities.

24 Q    And specifically, did you have an understanding of what

25 Level III securities were in MSMB Capital?

Blanton - direct - Smith                              1639

1   A    No, I assumed it could be Retrophin.

2   Q    And then it says settlement pending, and then it says

3   7.28 million.  With total assets of 10.7 million, is that

4   right?

5   A    Yes.

6   Q    Then in the liabilities section it says deferred trading

7   loss liability, 7.2 million.  Is that right?

8   A    Yes.

9   Q    And the total liabilities are 7.2 million?

10  A    Yes.

11  Q    Did you have an understanding of why the same amount was

12  listed both as a settlement and as a liability on this balance

13  sheet?

14  A    No.

15  Q    Then if you look at the last few pages of the document

16  and these look to be -- well, there are a number of numbers

17  and names here.  Did you have an understanding of what these

18  numbers and names were tracking?

19  A    No.

20  Q    After you received these documents as the books and

21  records of MSMB Capital, did you REF anything back in terms of

22  YU redemption request?

23  A    No.

24  Q    What action did you take after you saw that these were

25  the books and records of MSMB Capital?

1  A    Through our attorney, we contacted the police or the SEC.

2  Q    And specifically what do you mean when you say you

3  contacted the SEC?

4  A    We -- our attorney connected us with someone at the SEC

5  that where we told them that we thought there might be some

6  type of fraud.

7  Q    And what is the SEC?

8  A    Securities Exchange Commission.

9  Q    And just to clarify, did you contact law enforcement

10 other than the SEC?

11 A    No.

12 Q    And when you contacted the SEC, what information did you

13 provide?

14 A    Everything that we had been given and just told them that

15 there was a concern that there was fraud going on and that we

16 didn't get -- we weren't getting any information on a

17 consistent basis.

18

19             (Continued on the following page.)

20

21

22

23

24

25

Blanton - direct - Smith                    1641

1   (Continuing)

2   Q     And why did you contact them?

3   A     At our advice of Counsel they said this is the best path

4   to go at and we wanted to make sure that, you know, this

5   wasn't going to continue in the future.  And we were going to

6   try to get some of our money back.

7   Q     And are there any possible benefits to you personally

8   from contacting the SEC and providing that information?

9   A     At the time they told us that there could be some type of

10  a whistle-blower benefit, but it's at their discretion.

11          MS. SMITH:  I'm going to ask you to take a look at

12  what's been marked as Government's Exhibit 105-16 for

13  identification, and it's tab 24 in your binder.

14  A     Yes.

15  Q     Do you recognize this document?

16  A     Yes.

17  Q     Is this an e-mail from Mr. Shkreli to you?

18  A     Yes.

19  Q     And is it dated August 31st, 2012?

20  A     Yes.

21          MS. SMITH:  Your Honor, the Government moves to

22  admit Government's Exhibit 105-16 into evidence.

23          MR. BRAFMAN:  No objection.

24          THE COURT:  We will receive 105-16.

25          (Government's Exhibit 105-16 received in evidence.)

Blanton - direct - Smith                          1642

1           (Exhibit published to jury.)

2    Q    Looking at the bottom e-mail on this chain, which is

3    dated August 31st, 2012.

4           Who is it from?

5    A    Martin.

6    Q    And who is it to?

7    A    Me.

8    Q    And the subject is:  Settlement distribution redemption.

9    A    Yes.

10   Q    And Martin says:  We finally have some liquidity.  I'll

11   be in a position to return $500,000 to you by September 30th

12   and rest within a few months.  Can you provide wire

13   instructions and will send the first payment in good faith and

14   the second will be subject to contractual release, hope you're

15   well.

16          And then in response you say:  I will have Carolyn

17   send you the wiring instructions.  Sorry have been out of the

18   loop on this and have no powers to negotiate anything.

19          What are you talking about in that e-mail?

20   A    I had basically turned over a lot of this to JD and the

21   lawyers and so, I now wasn't making all the decisions.

22   Q    And Martin in response at the top of the e-mail says:

23   Thank you and likewise.

24   A    Yes.

25   Q    Did you, in fact, receive a $500,000 payment as part of

Blanton - direct - Smith                    1643

1    your redemption by September 30th, 2012?

2    A    No.

3         MS. SMITH:  I'm going to ask you to take a look at

4    what's been marked for identification as Government's

5    Exhibit 105-17.

6    Q    Do you recognize this document?

7    A    Yes.

8    Q    Is this document from your files?

9    A    Yes.

10   Q    And is this a letter from the defendant?

11   A    Yes.

12        MS. SMITH:  Your Honor, the Government moves

13   Government's Exhibit 105-17 into evidence.

14        MR. BRAFMAN:  No objection.

15        THE COURT:  We will receive 105-17.

16        (Government's Exhibit 105-17 received in evidence.)

17        (Exhibit published to jury.)

18   Q    And Mr. Blanton, how did you receive this document?

19   A    I got it from one of the other investors.  I can't

20   remember which one, maybe John Neill.

21   Q    And when you say one of the other investors, you mean one

22   of the other investors in MSMB Capital?

23   A    Yes.

24   Q    And did you ever receive this document directly from

25   Mr. Shkreli?

1    A    No.

2    Q    If you read the first paragraph of the e-mail or -- sorry

3    -- the letter.

4    A    I have decided to wind down our hedge fund partnerships

5    with the goal of completing the liquidation of the funds by

6    November or December 1st, 2012.  As you know, MSMB has found

7    increasingly compelling opportunities in private equity.  We

8    are going to focus or efforts on managing money in a hybrid

9    private/public structure, one which is not generally amenable

10   to the open-ended private hedge fund partnership structure.

11   Q    Were you surprised to read that the defendant had decided

12   to wind down our hedge fund partnerships?

13   A    Yes.

14   Q    Why were you surprised by that?

15   A    Because we had talked about redeeming our investment in

16   the partnership and it just went on a totally different path.

17   Q    And again, it says:  Hedge fund partnerships with an S.

18        Were you aware of any other hedge fund that

19   Mr. Shkreli was running other than MSMB Capital?

20   A    No.

21        MS. SMITH:  If you look at the second page of the

22   document.  And then focus on the last paragraph and the

23   signature line.

24        In this document it says:  A few operational notes.

25   Investors will have their limited partnership interests

Blanton - direct - Smith                    1645

1   redeemed by the fund for cash.

2   Q    Had you made a redemption request at this point?

3   A    Yes.

4   Q    And had you been able to get your redemption in cash?

5   A    No.

6   Q    Was this surprising to you?

7   A    Yes.

8   Q    And then it says:  Alternatively, investors may ask for a

9   redemption of Retrophin shares or a combination of Retrophin

10  shares and cash.  Keep in mind Retrophin shares are illiquid

11  and no liquid market may develop.

12       And at the end it says:  If all goes according to

13  plan, you will either be a Retrophin LLC unit holder or have

14  cashed out by October 31st, 2012.

15       And it's signed by the defendant.

16       Were you, in fact, cashed out of MSMB Capital by

17  December 31st, 201?

18  A    No.

19  Q    During the fall of 2012, were you and the defendant in

20  contact at all about Retrophin?

21  A    I don't recall exactly.  Occasionally, I think I'd talk

22  to him via text.

23  Q    And in addition to trying to get your MSMB Capital

24  redemption, was there anything else you recall trying to do in

25  that time period?

Blanton - direct - Smith                    1646

1    A    I was trying to get some stock in Retrophin as some -- I

2    was trying anything I could do to get some value out of this

3    investment.

4    Q    And in terms of the stock of Retrophin, what was your

5    understanding of what that stock was going to be for?

6    A    Primarily, for the founding shares that I had gotten and

7    then I was hoping that he would give me any shares that my

8    investment in MSMB Capital had been converted to.

9    Q    What event took place with respect to Retrophin at the

10   end of 2012?

11   A    Is that when -- I don't remember.  It may have been when

12   they went public.

13              MS. SMITH:  Let me show you a document that's been

14   marked as Government's Exhibit 105-18 for identification.

15   A    Yes.

16   Q    And do you recognize this as an e-mail chain between your

17   self and the defendant?

18   A    Yes.

19   Q    And is it from December of 2012?

20   A    Yes.

21              MS. SMITH:  Your Honor, the Government moves to

22   admit Government's Exhibit 105-18 into evidence.

23              MR. BRAFMAN:  No objection.

24              THE COURT:  We receive Government's Exhibit 105-18.

25              (Government's Exhibit 105-18 received in evidence.)

1              (Exhibit published to jury.)

2    Q    If you look at the bottom e-mail, it's an e-mail from

3    Mr. Shkreli to you on December 17th, 2012; is that right?

4    A    Yes.

5    Q    And the subject line is RTRX.

6              And then in response you say:  Is that the new

7    symbol?  How many shares do I have and how many outstanding?

8    A    Yes.

9    Q    So, does that remind you of the event that took place in

10   December of 2012?

11   A    Yes.

12   Q    And so, what was that?

13   A    It had become public.

14   Q    And when you say "it," do you mean Retrophin?

15   A    The company, Retrophin.

16   Q    And then, when you say:  How many shares do I have and

17   how many outstanding, why are you asking that question?

18   A    In response to my investment in MSMB Capital and what he

19   might have converted, along with any founders shares that I

20   was supposed to get.

21              MS. SMITH:  And Ms. Balbin, you can scroll up.

22   Q    And what is Mr. Shkreli's response?

23   A    That is a new symbol effective today.  I will calculate

24   how much stock to get back to you.  It's a lot.  And there's

25   more available if you want it.

Blanton - direct - Smith                    1648

1   Q    Did you have an understanding of why Mr. Shkreli didn't

2   know how much stock you had in Retrophin at this point?

3   A    I think it was his understanding or -- I didn't know.  I

4   don't know why.  I think it was an arbitrary decision that he

5   was making.

6              MR. BRAFMAN:  Objection, move to strike.

7              THE COURT:  Sustained.

8              Just what you know or recall, sir.

9   Q    So, did you have an understanding of why the defendant

10  had to calculate the amount of stock you had at this point?

11             MR. BRAFMAN:  Objection.

12             THE COURT:  Overruled.

13             You can answer if, it you can.

14  A    Based on the amount of equity ownership I had as a

15  founder and the amount of investment that he converted to the

16  company's stock was why he had to calculate it.

17  Q    And so, you're talking about two different buckets of

18  stock at this point.  One is for the founders share and one is

19  for your MSMB Capital investment?

20  A    Yes.

21  Q    And for the MSMB Capital investment, did you have an

22  understanding of how much the defendant had invested from that

23  fund into Retrophin?

24  A    No.

25  Q    And again, did he have permission from you to invest the

1    MSMB Capital money into Retrophin?

2    A     No.

3              MS. SMITH:  If you scroll up, Ms. Balbin.

4    Q     Your response is:  Cool, let me know.

5              MS. SMITH:  And if you scroll up one more time.

6    Q     Mr. Shkreli says:  Could you do me a favor and try to buy

7    a hundred shares.

8              Did you understand why he was asking you to buy a

9    hundred shares at this point?

10   A     I don't know.  I mean, I think he just wanted to support

11   the stock or... I assume.

12             MS. SMITH:  I'm going to ask you to look at a

13   document or documents that have been marked Government's

14   Exhibits 105-19 and 105-20, which are tabs 27 and 28 in your

15   binder?

16   Q     Do you recognize these two documents?

17   A     Yes.

18   Q     Are they both e-mails with the defendant?

19   A     Yes.

20   Q     And are they from December of 2012?

21   A     Yes.

22             MS. SMITH:  Your Honor, the Government moves to

23   admit Government's Exhibits 105-19 and Government's

24   Exhibit 105-20.

25             MR. BRAFMAN:  No objection.

1              THE COURT:  We receive 105-19 and 20.

2              (Government's Exhibits 105-19 and 105-20 received in

3      evidence.)

4              (Exhibit published to jury.)

5              MS. SMITH:  And if you look at the document on the

6      left, which is Government's Exhibit 105-19, it's dated

7      December 18th, 2012.  It's from Mr. Shkreli to you and the

8      subject is stock.

9              He says:  One of our guys may want to sell you

10     35,000 shares of stock.  Call me when you can.

11             And then if you also look at the second document,

12     which is Government's Exhibit 105-20.

13             (Exhibit published to jury.)

14             MS. SMITH:  The bottom e-mail there is Mr. Shkreli

15     to you and also someone named Tim Pierotti.

16     Q    Who is Tim Pierotti?

17     A    He was some guy that worked at MSMB for Martin.  With

18     Martin.

19     Q    And at the top of that Government's Exhibit 105-20, which

20     is on the right, you write in response:  Try my cell today

21     about the stock.

22             With these two e-mails, what were you and the

23     defendant discussing?

24     A    The possibility of buying stock that was illiquid for

25     some kind of a discount as a part of the giving me back my

Blanton - direct - Smith                    1651

1   founder shares.

2   Q    And did you, in fact, purchase any stock from

3   Mr. Pierotti?

4   A    No.

5        MS. SMITH:  I'm going to ask you to take a look at

6   Government's Exhibit 105-21 and 105-22.

7        THE WITNESS:  Yes.

8        MS. SMITH:  For identification.

9   Q    And are these also e-mails with the defendant in

10  December of 2012?

11  A    Yes.

12       MS. SMITH:  Your Honor, the Government moves to add

13  Milt Government's Exhibits 105-20 and 105-21.

14       MR. BRAFMAN:  No objection.

15       THE COURT:  Those Exhibits, 105-20 and 105-22 are

16  admitted.

17       (Government's Exhibit 105-20 and 105-21 received in

18  evidence.)

19       (Exhibit published to jury.)

20       MS. SMITH:  And if you can look just quickly at the

21  bottom e-mail on 105-21.  It's an e-mail from someone named

22  Evan Greebel to Martin Shkreli attaching a schedule 13D.

23  Q    What's a schedule 13D?

24  A    I would assume it's the ownership of the company.

25       MR. BRAFMAN:  Objection.

1          THE COURT:  Sir, again, assumptions are not --

2    A    I'm not sure.

3    Q    And who was Evan Greebel?

4    A    The attorney for Retrophin.

5    Q    Prior to this time period, December 2012, had you had any

6    contact with Mr. Agreeable?

7    A    I don't think so.

8          MS. SMITH:  And if you can zoom in on the top

9    e-mail.

10   Q    So, this is an e-mail forwarding the schedule 13D from

11   Mr. Shkreli to you and to JD on December 20th.

12         And Mr. Shkreli writes:  I spoke with Darren and he

13   mentioned there's some skepticism as to Colt's ownership in

14   Retrophin.  Please allow me to clear it up.  See attached the

15   schedule 13D, which will be filed with the SEC today.

16         What did you understand the SEC to mean?

17   A    Securities and Exchange Commission.

18   Q    As you can see, MSMB Capital LP owns 375,000 shares of

19   RTRX.

20         What was RTRX?

21   A    That's the symbol for Retrophin.

22   Q    Mr. Shkreli continues:  Darren is at this point

23   approximately 40 to 60 percent of that fund.  Many of the

24   investors in that fund have swapped their LP stake for

25   Retrophin common stock, (Brent, et cetera) and I expect many

1    will continue to do so.

2            So, just to kind of take this piece by piece.

3            It says:  Darren is at this point approximately 40

4    to 60 percent of that fund.  Referring to MSMB Capital.

5            Did you have an understanding about why the

6    percentage of the fund that you own was a range from 40 to

7    60 percent?

8    A    No.

9            THE COURT:  This is the fund being MSMB Capital?

10           MS. SMITH:  The fund being MSMB Capital

11   Management LLC.

12   Q    And then you can see the second paragraph, he says:  I

13   also discussed with Darren the possibilities of granting more

14   stock.  I have some I would be willing to part ways with in

15   good faith.

16           So, what did you understand him to be saying there?

17   A    That he would find other stock that he could give me to

18   somehow get my money back.

19   Q    Was there an attachment to this e-mail?

20   A    Yes.

21   Q    So, if you turn to the first page of the attachment.

22           And is this titled schedule 13D?

23   A    Yes.

24   Q    And what's the entity that's listed up here?

25   A    Desert Gateway, Inc.

Blanton - direct - Smith                    1654

1  Q     And then in the middle there it says:  Martin Shkreli.

2  And it lists a number of MSMB entities, one of which is MSMB

3  Healthcare Management LLC, MSMB Healthcare LP and then MSMB

4  Healthcare Investors LLC.

5           Had you ever heard of an entity or entities called

6  MSMB healthcare?

7  A     No.

8  Q     And what's the date on the filing?

9  A     It is December 12th, 2012.

10 Q     And then, if you turn to the next page of the document it

11 lists the name at the top here.

12          MS. SMITH:  Can we zoom on this a little bit.

13 Q     The name at the top here is MSMB Capital Management.  And

14 then -- sorry.

15          MS. SMITH:  Sorry, if we can zoom in the middle of

16 the document, numbers 7, 8, 9, 10.

17 Q     And then it says on the left:  Number of shares

18 beneficially owned by each reporting person.

19          And it says:  375,000 shares.

20          So was it your understanding that MSMB Capital has

21 375,000 shares of Desert Gateway?

22 A     Yes.

23 Q     And then if you turn to the back of the attachment and

24 the page that's ending Colt 429.  I believe that's page 14 of

25 the .pdf.

1    A    Yes.

2    Q    This document here at the top, it says:  After reasonable

3    inquiry and to the best of my knowledge and belief I certify

4    that the information set forth in this statement is true,

5    complete and correct.  And then there are a bunch of signature

6    lines on the right there.

7              Who is the person that's signing for all of these

8    different entities?

9    A    Martin Shkreli.

10   Q    And then does it continue on to the next page as well?

11   A    Yes.

12   Q    And who is signing on that page?

13   A    Martin Shkreli.

14             MS. SMITH:  And I'm going to show you now what's in

15   evidence as Government's Exhibit 105-22.

16             (Exhibit published to jury.)

17   Q    And if you look here, the e-mail that's kind of in the

18   middle of the page, is that the same e-mail we were just

19   looking at in Government's Exhibit 105-21?

20   A    Yes.

21             MS. SMITH:  If you can scroll up.

22             And JD says:  What would be the timing for

23   physically receiving our stock certificates in Darren's name

24   related to his quote 40 to 60 percent ownership in

25   MSMB Capital?

1           And then at the top of that document Martin's

2    response is:  If you can work with me on the processing it can

3    be just a few days.

4    Q    And what's the date on Martin's e-mail at the top there?

5    A    December 20th, 2012.

6    Q    Did you, in fact, receive stock certificates from the

7    defendant within a few days?

8    A    No.

9           MS. SMITH:  I'm going to show you what have been

10   marked as Government's Exhibits 105-23 and 105-24.

11   Q    Do you recognize those documents?

12   A    Yes.

13   Q    Is one an e-mail from the defendant?

14          THE COURT:  You mean 105-24.

15   Q    105-24.

16   A    Yes.

17   Q    And is the other document a document you received from

18   the defendant?

19   A    Yes.

20          MR. SRINIVASAN:  Your Honor, the Government moves to

21   admit Government's Exhibits 105-23 and 105-24 into evidence.

22          MR. BRAFMAN:  No objection.

23          THE COURT:  We receive is 05-23 and-24.

24          (Government's Exhibits 105-23 and 105-24 received in

25   evidence.)

Blanton - direct - Smith                          1657

1           (Exhibit published to jury.)

2           MS. SMITH:  So, starting with Government's

3  Exhibit 105-24, which is at tab 32 and it's also the e-mail on

4  the right-hand of the screen.

5  Q    The defendant says -- this is dated February 20th, 2013.

6  And he says:  Have you received your certs yet.  I'd be

7  willing to give you some more stock that makes certain you

8  generated a profit on your investment with us.  I think it's

9  very important that this investment ends with a robust profit.

10 Let me know and we can discuss this possibility further.

11          So, the certs that are being referred to there, what

12 is he talking about when he says certs?

13 A    Stock certificates.

14 Q    And was that for your MSMB Capital interest?

15 A    Yes.

16 Q    And this is dated February 20th.

17          The last e-mail we looked at was dated

18 December 20th?

19 A    Yes.

20 Q    And in that last e-mail, how long did the defendant say

21 that it would take to receive the stock certificates?

22 A    A couple of days.

23 Q    He also says in this e-mail:  I'd be willing to give you

24 some more stock that makes certain you generated a profit on

25 your investment with us.

Blanton - direct - Smith                    1658

1          Is that a reference to your investment in

2    MSMB Capital?

3    A    Yes.

4    Q    Did he give you an explanation for why he would be giving

5    you additional stock on top of what he had sent to you?

6    A    Not at this time.  He did say he would give me additional

7    stock for being a part of the founder team.

8              MS. SMITH:  If you can turn to --

9              THE COURT:  Excuse me, I'm confused.

10             Is this additional stocks in MSMB or Retrophin?

11             MS. SMITH:  Let me see if I can clear that up.

12   Q    When he says:  Have you received your certs yet.  Did

13   you, in fact, receive a stock certificate around that time?

14   A    Yes, in Retrophin.

15   Q    And was that stock certificate for your investment in

16   MSMB Capital?

17   A    I wasn't certain what it was, but I assumed it was for

18   what he had said in a prior e-mail, that it was my investment

19   in MSMB Capital and the certificate was for Desert Gateway,

20   which became Retrophin.

21   Q    So, the stock certificate is marked Government's

22   Exhibit 105-23.

23             MS. SMITH:  So, can we look at that.

24   Q    And so, is this the stock certificate that you received

25   from the defendant?

Blanton - direct - Smith                    1659

1   A     Yes.

2   Q     And what's the date on it in the bottom left-hand corner?

3   A     February 19th, 2013.

4   Q     And you said that Desert Gateway became Retrophin?

5   A     Yes.

6   Q     So, did this stock certificate eventually become

7   Retrophin stock?

8   A     Yes.

9   Q     At the top of this certificate it says:  Restricted

10  securities.

11  A     Yes.

12  Q     What did that mean?

13  A     You couldn't sell it.  I couldn't sell it.

14        MR. BRAFMAN:  I'm sorry?

15        THE WITNESS:  I couldn't sell it.

16  Q     And how long of a period could you not sell the

17  restricted securities for?

18  A     At least 12 months.

19  Q     And if you look at the top right-hand corner and then

20  also it says it's the record holder.

21        What's the number of shares that this certificate

22  represents?

23  A     160,318.

24  Q     And did he provide you with an explanation of how he

25  determined you should receive approximately 160,000 shares out

VB        OCR        CRR

1  of the 375 he told you that MSMB Capital had?

2  A     No.

3  Q     And do you know what the share price was for Retrophin at

4  the time that you received the certificate in February of

5  2012?

6  A     I don't remember.

7  Q     Did you have an understanding of whether, given the share

8  price at the time this 160,000 shares was more or less than

9  the remainder of the investment in MSMB Capital, that you had

10  not yet gotten back?

11         MR. BRAFMAN:  Objection.  He said he doesn't

12  remember the share price.

13         THE COURT:  Well, can you try to rephrase the

14  question.

15         MR. SRINIVASAN:  Sure.

16         THE COURT:  If you remember.

17         THE WITNESS:  I can, I mean, I can, I remember -- I

18  don't remember exact share price.

19         THE COURT:  All right, you can answer the question.

20         Overruled, sir.

21  A     In the range of, in a range of three quarters of my

22  investment in illiquid stock.  So, it was somewhere around $4,

23  I think, a share.

24  Q     And so, if the shares were restricted, did that mean that

25  you could sell the shares at the time that you received them?

1    A    No.

2    Q    And did you know what the share price of Retrophin would

3    be in the future?

4    A    No.

5    Q    And so, what was the value to you of the certificate at

6    the time that you received it?

7    A    It was basically a hope certificate to maybe get a part

8    of my investment back.  But it could not be traded.

9    Q    And if you had been able to trade the shares, the 160,000

10   shares at the time, what was your understanding of what would

11   happen if you tried to sell 160,000 shares at the same time?

12   A    It would probably make the stock go down.

13   Q    And why is that?

14   A    It's a newly-trading company that was just brought on the

15   stock market.  And typically, those don't have very much

16   volume.

17   Q    And so, when you say it would make the stock go down, you

18   mean the stock price go down?

19   A    Yes.

20   Q    After you received these shares in February of 2013, did

21   you have any further conversations with the defendant about

22   your redemption request for MSMB Capital?

23   A    I don't recall exactly the conversations, but I think we

24   did have conversations more about trying to get -- he was

25   saying he would give me more stock.

1   Q    Did you discuss at all kind of your founders stake in

2   Retrophin as well?

3   A    Yes.

4   Q    And in the spring and summer of 2013, did the defendant

5   kind of provide you with any additional stock or money related

6   to either MSMB Capital or your Retrophin founders share?

7   A    No.

8            MS. SMITH:  I'm going to ask you to look at

9   document, which is Government's Exhibit 105-27 for

10  identification, which is tab 35 in your binder.

11  Q    Do you recognize this document?

12  A    Yes.

13  Q    And is this an e-mail chain between you and the defendant

14  from August of 2013?

15  A    Yes.

16           MS. SMITH:  Your Honor, the Government moves to

17  admit Government's Exhibit 105-27 in evidence.

18           MR. BRAFMAN:  No objection.

19           THE COURT:  We will receive Government's

20  Exhibit 105-27.

21           (Government's Exhibit 105-27 received in evidence.)

22           (Exhibit published to jury.)

23           MS. SMITH:  You can look at the second page of the

24  document, which is the end of the e-mail chain.

25           THE WITNESS:  Yes.

1  Q    And if you look at the bottom part of the e-mail, is that

2  a request from Tim Pierotti on Quora?

3  A    Yes.

4  Q    And in response, what do you do with that request?

5  A    Nothing.

6  Q    Did you forward that request to the defendant?

7  A    Oh, yes.

8  Q    And what did the defendant say in response at the top?

9  A    LOL, you know, I sued his ass off.

10 Q    What does LOL mean?

11 A    Laugh out loud.

12 Q    And do you know what the defendant was referring to when

13 he said he sued Tim Pierotti?

14 A    Not specifically.

15          MS. SMITH:  If you look at the next page of the

16 document, the front part.

17          And you can see there's some back and forth at the

18 bottom.  And then in the middle on Tuesday August 6th, 2013,

19 the defendant writes to you:  I'm actually at the SEC all day

20 tomorrow, thanks to you, LOL.  But I think that will go fine

21 as we all want to move forward and focus on success.

22 Q    What did you understand him to be saying about:  I'm at

23 the SEC all day tomorrow thanks to you?

24 A    I think that he assumed that I had called them.  And that

25 he was having to meet with them.

Blanton - direct - Smith                      1664

1    Q    And had you told the defendant that you had gone to the

2    SEC and filed a complaint?

3    A    No.

4    Q    And did you ever have any discussions with the defendant,

5    additional discussions, about the SEC?

6    A    He asked me about it, but I never confirmed or denied it.

7    Q    And in this time period, are you still trying to get

8    additional portion of your investment redeemed?

9    A    Yes.

10   Q    And as of August 2013, what had you received in terms of

11   redemption?

12   A    250,000.

13   Q    And then in addition to that, had you also received the

14   shares in February of 2013?

15   A    Yes.

16   Q    And in terms of the shares, did you specifically request

17   them or did they just get sent to you at some point?

18   A    He sent them to me.

19        MS. SMITH:  I'm now going to ask you to look at

20   what's been marked Government's Exhibit 105-29.

21        I'm also going to ask you to look at 105-30 and is

22   05-31.  And those are tabs 37, 38 and 39.

23   Q    Are all three of these documents e-mails from you or

24   between you Evan Greebel and the defendant?

25   A    And JD.

Blanton - direct - Smith                    1665

1    Q    And JD.

2    A    Yes.

3    Q    And are they between August 2013 and October 2013?

4    A    Yes.

5         MS. SMITH:  Your Honor, the Government moves to

6    admit Government's Exhibits 105-29, 105-30 and 105-31 into

7    evidence.

8         MR. BRAFMAN:  Moe objection, Your Honor.

9         THE COURT:  We will receive those Exhibits in

10   evidence.

11        (Government's Exhibits 105-29, 105-30 and 105-31

12   received in evidence.)

13        (Exhibit published to jury.)

14   Q    So, starting with Government's Exhibit 105-29.  If you

15   look at the very bottom e-mail from Martin on August 10th,

16   2013.

17   A    Yes.

18   Q    Martin writes:  Hi guys, Darren and I have agreed that I

19   will give him 100,000 shares of my stock.

20        Had you had a conversation with the defendant before

21   he received this e-mail?

22   A    Yes.

23   Q    What did the defendant say to you in that conversation?

24   A    He was trying to figure out a way to get me some more

25   stock based on my founders shares and what I had lost in

VB        OCR        CRR

```
                    Blanton - direct - Smith                 1666
```

1    Retrophin -- I mean, in MSMB Capital.

2    Q    So, this additional stock was both because you had been a

3    founder of Retrophin and because of your MSMB investment?

4    A    Yes.

5    Q    And that was an investment in MSMB Capital, right?

6    A    Yes.

7    Q    And that's on August 10th.

8         MS. SMITH:  If you can scroll up to the next e-mail,

9    which is on August 15th.

10   Q    You respond:  Is there anything we need to be doing?  Are

11   we still moving forward with this?

12   A    Yes.

13        MS. SMITH:  And then if you look at the top e-mail.

14   That's dated August 15th, 2013.

15   Q    And Evan Greebel writes:  Hi Darren, attached as

16   requested is the draft of the escrow agreement, I am

17   simultaneously sending it to our client and it is subject to

18   their review and comment.

19        When he says:  I am simultaneously sending it to our

20   client, what does that mean?  To you?

21   A    Retrophin and Martin.

22

23             (Continued on following page.)

24

25

```
                    VB        OCR        CRR
```

1        (Continuing.)

2   Q    And then was there an attachment to this e-mail?

3   A    Yes.

4   Q    So if we can take a look at the attachment, the first

5   page and it's titled "Option Agreement."  And it's an

6   agreement, a draft agreement, between you and Mr. Shkreli; is

7   that right?

8   A    Yes.

9   Q    And that first whereas clause, it says "Whereas Shkreli

10  is the record and beneficial owner of 100,000 shares of common

11  stock of Retrophin Incorporated," and then the second whereas

12  says, "Shkreli has agreed to grant the optionee the option to

13  purchase some or all of the shares on the terms and conditions

14  set forth below."

15           So what was the purpose of this option agreement?

16  A    It was to give me some stock and then get some type of a

17  release.

18  Q    And what was the release going to be for?

19  A    That I would agree that this was full payment for what I

20  had invested in the company what I was owed as a founder.

21  Q    When you say invest in the company, you mean invest in

22  MSMB Capital?

23  A    Right.

24  Q    And who in this agreement would be providing the shares

25  of Retrophin?

Blanton - direct - Smith                    1668

1  A    Martin Shkreli.

2  Q    And if you look on the first page of this attachment

3  which is page six of the entire document and it has the Bates

4  stamp GR 1745 at the bottom.  If you look in the middle

5  section there, Section 3.3 "Release," this section of the

6  agreement it says "In consideration of the delivery and

7  exercise of the options," and then it lists a bunch of

8  different entities and it says, that you will release and

9  forever discharge Mr. Shkreli, the company, which is defined

10  as Retrophin and then all of these other entities in

11  connection with this agreement.

12        What was your understanding of what the purpose of

13  this provision was?

14  A    To pay me off with 100,000 shares and then basically

15  release everyone that's involved with the ownership of

16  Retrophin from the funds that Martin Shkreli managed.

17  Q    And when you say "released," what do you mean?

18  A    Take that as a final payment and not sue them or have any

19  claim against them.

20  Q    And does this option agreement get signed --

21  A    No.

22  Q    -- by you and Mr. Shkreli?

23  A    No.

24  Q    If you look at the next document which is Government

25  Exhibit 105-30, what's the date of this e-mail?

1   A     September 12.

2   Q     And is that 2013?

3   A     Yes.

4   Q     Is that approximately a month after the last e-mail that

5   we looked at with the option agreement?

6   A     Yes.

7   Q     And this is from Mr. Greebel to you and copies

8   Mr. Shkreli.  And what's the subject line?

9   A     "Blanton consulting agreement doc."

10  Q     And in the e-mail, it says -- Evan says, "As per your

11  conversation with Martin, attached is a draft consulting

12  agreement.  The agreement has a three-year term during which

13  you will receive 300,000 shares of Retrophin common stock each

14  year and $300,000 each year as compensation for your

15  consulting services."

16           Prior to receiving this document, had you ever

17  discussed serving as a consultant to Retrophin?

18  A     No.

19  Q     Had you ever discussed with the defendant at any time

20  doing consulting work for Retrophin?

21  A     No.

22  Q     And had you requested a consulting agreement?

23  A     No.

24  Q     Did you ask the defendant why you got this document as a

25  consulting agreement?

1    A    I don't remember.

2    Q    And the e-mail says that the consulting agreement --

3    you'll receive 300,000 shares of common stock each year and

4    $300,000 each year for a three-year term.  So does that mean

5    it would be for 900,000 shares of Retrophin and $900,000?

6    A    Yes.

7    Q    Did you have an understanding of why this agreement had

8    $900,000 shares of Retrophin and $900,000 as opposed to the

9    $100,000 that had been in the prior agreement that was sent to

10   you?

11   A    No, I didn't know why these numbers were different.

12   Q    And again it includes this language in the e-mail, "and

13   simultaneously sending this to our client and it's subject to

14   their review and comment."

15           What was your understanding of what that sentence

16   meant?

17   A    To Retrophin and Martin.

18   Q    And if you look at the attachment on page one --

19           MS. SMITH:  You can zoom in on everything up to the

20   compensation section -- including the compensation section.

21   Q    And this is an agreement between Retrophin and you; is

22   that right?

23   A    Uh-huh, yes.

24   Q    And if you look in the compensation agreement it says,

25   "In exchange for the services, the company shall issue to the

Blanton - direct - Smith                    1671

1   consultant an aggregate 300,000 shares per year of common

2   stock," and then at the bottom part, part B, it says, "In

3   addition to the shares, the consultant will receive a fee at a

4   rate of $300,000 per year which will be paid in accordance

5   with the customary payroll practices of the company."

6           So focusing on the 300,000 shares, it says the

7   company shall issue to the consultant.  So who was going to be

8   providing the shares in connection with this agreement?

9   A    The company.

10  Q    And if you look about the portion about the money, who

11  was going to be providing the money in connection with this

12  agreement?

13  A    The company.

14  Q    And did you have an understanding of why it changed from

15  the defendant providing you his shares to the company

16  providing shares?

17  A    No.

18          THE COURT:  Just to be clear, the company here is

19  Retrophin?

20          MS. SMITH:  The company here is Retrophin.

21  BY MS. SMITH:

22  Q    And if you look back up to the description of services,

23  it says "Consultant will serve as an advisor to the company

24  and provide consulting services on strategic and corporate

25  governance matters to the management of the company."

Blanton - direct - Smith                    1672

1         Had you ever discussed providing consulting services

2    on strategic and corporate governance matters to Retrophin?

3    A    No.

4    Q    Were you currently employed at the time that you received

5    this consulting agreement?

6    A    Yes.

7    Q    What were you doing?

8    A    Running Colt Ventures, making investments.

9    Q    And, finally, if you look through the document again on

10   page four of the attachment which should be page five of the

11   PDF, there's a -- paragraph ten has a release in it?

12   A    Yes.

13   Q    Is this similar to the release that we looked at for the

14   option agreement?

15   A    Yes.

16   Q    Did this agreement ever get signed?

17   A    No.

18   Q    And if you can turn to what's been marked as Government

19   Exhibit 105-31, what's the date on the e-mail here?

20   A    October 24, 2015.

21   Q    And who is it from?

22   A    Evan Greebel.

23   Q    And who is it to?

24   A    Me, and Martin is copied.

25   Q    Here it says a draft settlement agreement; is that right?

Blanton - direct - Smith                    1673

1   A    Yes.

2   Q    Did you have an understanding about why you originally

3   received an option agreement and then a consulting agreement

4   and then a settlement agreement?

5   A    No, I was just trying to get my money back or some form

6   of value.

7   Q    What was your understanding of the purpose of all three

8   draft agreements that were sent to you?

9   A    Some type of agreement to release the liability of all of

10  these funds, MSMB funds and the company, in exchange for

11  giving me shares.

12  Q    When you received this third agreement, did you expect

13  that it would get signed and you would actually receive shares

14  in response -- in connection with it?

15  A    At that point, I had -- I didn't have a lot of confidence

16  that anything would get signed.

17  Q    So looking at the e-mail itself it says, "As per my

18  conversation with your colleague, attached is a draft

19  settlement agreement.  I'm simultaneously sending it to our

20  client and is subject to their review and comment."

21       Again, what's your understanding of what that second

22  language meant -- the second sentence?

23  A    He was the company attorney and he was going to make sure

24  that the company was okay with it and that Martin was okay

25  with it.

Blanton - direct - Smith                    1674

1   Q    And, again, if we can turn to the first page of that

2   document, and just focus on through the first paragraph, so

3   including the first paragraph.  So this is settlement

4   agreement is between yourself and Retrophin; is that right?

5   A    Right.

6   Q    And the first whereas clause says, "In connection with

7   the liquidation, the parties are entering into this

8   agreement."

9         When it says "the liquidation" what did you

10  understand that to mean?

11  A    I didn't.  I assumed it could be MSMB Capital.

12  Q    And if you look at the payment terms, it says "Retrophin

13  agrees to deliver or cause to be delivered to Blanton the

14  total amount of 100,000 shares in common stocks.  That is full

15  and final satisfaction for any and all claims, obligations,

16  liabilities, et cetera."

17        Then further down it paragraph it says, "Blanton

18  agrees that any interest it may have had in any of the MSMB

19  entities are immediately cancelled and that you're not

20  entitled to any payments from such interests."

21        Did you have an understanding of why you had moved

22  from the 900,000 shares and $900,000 from the last agreement

23  back to 100,000 shares of stock?

24  A    No.

25  Q    What were your discussions with the defendant at the time

Blanton - direct - Smith                    1675

1  that you were receiving these agreements like?

2  A    It was -- I don't remember exactly, but it was just

3  trying to negotiate for more stock and trying to figure out a

4  way to get my money back and see if there's any way to

5  recover.

6  Q    And were all of these negotiations in connection with

7  your redemption for MSMB Capital and the founders stock in

8  Retrophin?

9  A    Yes.

10 Q    And does this is settlement agreement -- go to the next

11 page, also contain a similar release?

12 A    Yes.

13 Q    The date of this e-mail was October of 2013.  Was there

14 any agreement signed by you in October of 2013 regarding your

15 redemption, MSMB Capital or your founder's stock share?

16 A    No.

17 Q    Was there any agreement signed at all in 2013?

18 A    Not to my knowledge, no.

19 Q    And when had you made your original redemption request

20 for MSMB Capital?

21 A    2011.

22 Q    Was that in November of 2011?

23 A    Yes.

24 Q    So by December of 2013, more than two years later, had

25 you received anything back other than the $200,000 and then

Blanton - direct - Smith                    1676

1    the stock certificate?

2    A    No.

3    Q    If you can look at what has been marked as Government

4    Exhibits 105-32 and then also Government Exhibit 61 and those

5    are tabs 40 and 41 in your binder.

6         Do you recognize these two documents?

7    A    Yes.

8    Q    And are they -- is one -- is Government Exhibit 105-32 an

9    e-mail from Evan Greebel?

10   A    Yes.

11   Q    And is Government Exhibit 61 a document that both you and

12   the defendant signed?

13   A    Yes.

14        MS. SMITH:  Your Honor, the Government moves to

15   admit Government Exhibit 105-32 and Government Exhibit 61.

16        MR. BRAFMAN:  No objection.

17        THE COURT:  We will receive those exhibits in

18   evidence.

19        (Government Exhibits 105-32 and 61 received in

20   evidence.)

21   Q    So looking at the document on the left which is

22   Government Exhibit 105-32, is this another e-mail from Evan

23   Greebel?

24   A    Yes.

25   Q    And is it attaching another draft of the consulting

SN        OCR        RPR

1    agreement?

2    A    Yes.

3    Q    And did you have an understanding of why it had moved

4    again from a settlement agreement back to a consulting

5    agreement?

6    A    No.

7    Q    And what's the date on the e-mail?

8    A    2/17/2014.

9    Q    So at this point in 2014, were you and the defendant

10   going back -- continuing to go back and forth on a resolution

11   of both your MSMB Capital redemption and the Retrophin stock?

12   A    Yes.

13   Q    And during this process did you have an attorney?

14   A    Yes.

15   Q    Did your attorney review the documents that you were

16   receiving from Mr. Shkreli?

17   A    Yes.

18   Q    And Government Exhibit 105-32, does it attach another

19   version of the consulting agreement?

20   A    Yes.

21   Q    If you turn to Government Exhibit 61 in evidence, is this

22   the final signed consulting agreement between you and

23   Retrophin?

24   A    Yes.

25   Q    What is the date of the agreement on the first page?

Blanton - direct - Smith                    1678

1    A    March 6, 2014.

2    Q    And if you look at the description of services, it says,

3    "Consultant will serve as an advisor to the company and

4    provide consulting services on strategic and corporate

5    governance matters."

6              Is that what's written there?

7    A    Yes.

8    Q    And then in compensation it says, "In exchange for the

9    services, the company shall issue to consultant an aggregate

10   of 200,000 shares of common stock."

11   A    Yes.

12   Q    And the company is Retrophin?

13   A    Yes.

14   Q    So is it your understanding that Retrophin would be

15   providing the 200,000 shares?

16   A    Yes.

17   Q    Again, had you ever discussed with the defendant

18   providing consulting services to Retrophin?

19   A    No.

20   Q    And what was your understanding of why you were entering

21   into this consulting agreement and release?

22   A    To get my shares in the company and to try to receive a

23   redemption of my funds from the MSMB Capital.

24   Q    And if you turn to the fourth page of the agreement, at

25   the top of paragraph 10-A did it contain a release in

1   connection with signing the agreement?

2   A    Yes.

3   Q    And then if you turn to the last page of the document,

4   who signed on behalf of Retrophin?

5   A    Martin Shkreli.

6   Q    And is that your signature at the bottom there?

7   A    Yes.  And for clarification though, I wouldn't say that

8   in all companies that we invested in we did -- I did offer

9   help and would love to encourage people to do things to

10  benefit the company, so it's a normal practice for us as an

11  investor in companies to try to do some of these services, you

12  know.  I didn't ever -- I was never formally requested to do

13  corporate governance or consulting.

14  Q    So when you say it's your common practice as an investor,

15  when you or Colt Investments invest in a fund or a company,

16  what kinds of things do you tend to do to help support an

17  investment?

18  A    Any kind of business development or any, you know,

19  finding out ways to help them get in front of other investors

20  or in front of potential buyers of the stock.

21  Q    And why do you engage in those activities with companies

22  or funds that you've invested in?

23  A    To benefit -- for the wellbeing of the company.

24  Q    And why is it important to you that the company do well?

25  A    Because we're owners of the company and our shares go up

Blanton - direct - Smith                1680

1   and also it's basically our project that we were trying to

2   increase the value of.

3   Q    And, so, do you do that in connection with many of your

4   investments for both personally and Colt Ventures?

5   A    All of them that I can add value.

6   Q    And do you do that in connection with a particular

7   payment or do you just do that because you want the investment

8   to be successful?

9   A    Because I want the investment to be successful.

10  Q    And so in terms of this consulting agreement, what was

11  the purpose of this consulting agreement and release from your

12  perspective?

13  A    It was a condition upon getting rid of these shares.

14  Q    So in order in order to receive shares -- and remind us,

15  why were you looking to receive shares from Retrophin?

16  A    Because I had invested in MSMB Capital and they were

17  supposedly converted into Retrophin or Desert Gateway and I

18  was also a founder and, therefore, I was due some shares for

19  helping found the company, according to Martin and according

20  to the company.

21  Q    And why in order to get your investment in MSMB Capital

22  redeemed and your founders share, why was the form of the

23  agreement, a consulting agreement, involved?

24  A    I didn't know.  That was Martin and Even Greebel's idea.

25  Q    So who decided on the form of the document?

Blanton - direct - Smith                    1681

1  A    Retrophin, Martin and Evan Greebel.

2  Q    And how long after you had sent in your original

3  redemption request in November of 2011, how much later than

4  that did you sign the consulting agreement and release, if you

5  look at the first page?

6  A    Almost four years -- I mean, three years.

7  Q    And so was it your understanding that this was the form

8  of document that would allow you to get the remainder of your

9  investment out of MSMB Capital?

10         MR. BRAFMAN:  Objection, Your Honor.  It's been

11  asked and answered several times.

12         THE COURT:  Overruled.

13  A    Yes.

14  Q    The agreement says that you will receive 200,000 shares;

15  is that right?

16  A    Yes.

17  Q    How many shares did you actually receive in Retrophin

18  after entering into this agreement?

19  A    400.

20  Q    And did you have an understanding --

21         MR. BRAFMAN:  Excuse me, 400 --

22  A    400,000 shares.

23         MR. BRAFMAN:  Thank you.

24  Q    Did you have an understanding of why you received 400,000

25  shares instead of 200,000 shares?

SN        OCR        RPR

Blanton - direct - Smith                    1682

1    A    No.  I had asked Martin via text if it was because of my

2    founding or -- part of my founding shares and if I could keep

3    them.

4    Q    And what was Martin's response?

5    A    I don't remember the exact response.  I think there's a

6    text that talks about it, but I think it was that basically

7    yes, and then they were at -- and I'll try to get you more,

8    but I think that after that I was required to give them back

9    from Evan Greebel.

10   Q    Let's look at is Government Exhibit 105-34 for

11   identification which is behind tab 44.

12          Do you recognize this document?

13   A    Yes.

14   Q    And is it an e-mail chain between you, the defendant and

15   Evan Greebel?

16   A    Yes.

17   Q    Is it from May of 2014?

18   A    Yes.

19          MS. SMITH:  Your Honor, the Government moves to

20   admit Government Exhibit 105-34 into evidence.

21          MR. BRAFMAN:  No objection.

22          THE COURT:  We've received 105-34.

23          (Government Exhibit 105-34 received in evidence.)

24   Q    And if we can start with the e-mail at the bottom of the

25   page, that's an e-mail from you to the defendant?

Blanton - direct - Smith                    1683

1   A    Yes.

2   Q    And the subject is "Shares"?

3   A    Yes.

4   Q    And it says, "Good talking to you Friday and I look

5   forward to seeing you in the next couple of weeks.  I

6   appreciate you sending me the 400,000 shares in Retrophin for

7   the last few months for my initial role in investing in the

8   company and I hope I can make it an even bigger success as a

9   consultant?"

10           The 400,000 shares that you were referring to, were

11  those the 400,000 shares that you received after you signed

12  the agreement?

13  A    Yes, yes.

14  Q    And when you said, "I hope I can make an even bigger

15  success as a consultant," what were you referring to there?

16  A    Just per the agreement if there was a way to do anything,

17  I was willing to do it.

18  Q    And when you say the word "consultant," where did you get

19  that word from?

20  A    The agreement.

21  Q    And who had suggested the agreement?

22  A    Martin and Evan.

23  Q    Did you, in fact, provide any services with respect to

24  the agreement as opposed to services that you would have

25  provided with any investment?

Blanton - direct - Smith                         1684

1   A    No.

2   Q    And then if you can scroll up --

3        MS. SMITH:  Ms. Balbin.

4   Q    In response, Martin says, "Thanks, Darren.  Our share

5   price has been sagging.  Is there any way you could introduce

6   me to folks where I could pitch the stock as an investment

7   to?"  And you say there, "Yes.  I've been talking it up.  The

8   banker at Learink loves you and so does Lawrence at ProCyte.

9   You might talk to them about your deal also and maybe think of

10  a creative loan structure where they could get some shares."

11       And, so, the kind of response that you are giving

12  the defendant here, what kind of information are you providing

13  him with?

14  A    Just advice or introductions to call investment bankers

15  or investors.

16  Q    And is this the kind of advice you would give in

17  connection with any of your investments?

18  A    Pretty much.

19  Q    And did the defendant say in response to you saying at

20  the bottom that you received 400,000 shares that there was

21  something wrong with the fact that you received 400,000 shares

22  or that you needed to give some of them back?

23       MR. BRAFMAN:  Objection to believing, Your Honor.

24       THE COURT:  Please rephrase.

25  BY MS. SMITH:

SN       OCR       RPR

Blanton - direct - Smith                          1685

Q    Did the defendant have any response to you saying, I
received 400,000 shares of Retrophin?

A    No.

Q    And ultimately did you get to keep all of the 400,000
shares that you had received?

A    No.

Q    And what happened to some of the shares or what happened
with those 400,000 shares?

A    I sent back 200,000 of them.

Q    Why did you send back 200,000?

A    I was asked to by Evan Greebel.

Q    Between the 150,000 shares that you got in connection
with that first stock certificate and the 200,000 shares that
you received in connection with the agreement, did you sell
all of those shares or hold them?  What was the status of the
shares?

A    I sold a portion of them.

Q    And were you able to sell those shares immediately or
not?

A    Not.

Q    And why weren't you able to sell them immediately?

A    They were not registered shares and they had a legend on
them so the company had to remove the restrictions.

Q    Were they restricted when you first received them?

A    Yes.

Blanton - direct - Smith                    1686

1   Q    In connection with the portion of the shares that you

2   sold, how much money did you make on that portion?

3   A    Around 2.4 million.

4   Q    And how many shares do you still own?

5   A    Approximately 150,000.

6   Q    When was the last time that you saw the defendant?

7   A    2015.

8   Q    And where did you see him?

9   A    San Francisco.

10  Q    And what was the reason that you saw him in San Francisco

11  at that time?

12  A    I was at a conference, a J.P. Morgan conference, and I

13  saw him at a hotel.

14  Q    And did you speak to the defendant when you saw him at

15  the hotel?

16  A    Yes.

17  Q    What did you discuss?

18  A    We discussed the fact that I -- he wanted me to release

19  any claims I had against him or the company.

20              (Continued on next page.)

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MS. SMITH:

3   Q    And was that after you had signed the agreement?

4   A    Yes.

5   Q    Did he mention anything else in that conversation?

6   A    I don't remember the details of the conversation.

7   Q    I am going to ask you to take a look at one more document

8   which is Government Exhibit 105-41.  Is this a document you

9   signed as a shareholder of Retrophin?

10  A    What tab is that?

11  Q    I'm sorry, tab 43.

12  A    Yes.

13  Q    And is that your signature on the second page?

14  A    Yes.

15       MS. SMITH:  Your Honor, the government moves to

16  admit Government Exhibit 105-41 into evidence.

17       MR. BRAFMAN:  No objection.

18       THE COURT:  We receive 105-41.

19       (Government's Exhibit 105-41 was received in

20  evidence.)

21       (Exhibit published.)

22  BY MS. SMITH:

23  Q    And what is this document?

24  A    It's a proxy statement for board members.

25  Q    And what is a proxy statement?

1    A    Vote.

2    Q    And was it a proxy statement that you filled out as a

3    Retrophin shareholder?

4    A    Yes.

5    Q    And why do you fill out a proxy statement?

6    A    As a shareholder you can vote for who's on the board.

7    Q    And is it in the place of voting in person?

8    A    Yes.

9    Q    And if you look at the top portion of this proxy

10   statement, does it say that the annual meeting of stockholders

11   of Retrophin on Friday, May 9th, 2014 will take place at the

12   offices of Katten, Muchin and Rosenman, LLP?

13   A    Yes.

14   Q    And then if you look at the second page, is that your

15   signature on the second page?

16   A    Yes.

17   Q    And if you look on the left there it says, Election of

18   directors to the Board of Directors?

19   A    Yes.

20   Q    And is that your vote for the various Board of Directors?

21   A    Yes.

22   Q    Do you know whether the agreement and release that you

23   signed was approved by the Board of Directors of Retrophin?

24   A    I assumed it was, but I don't know.

25   Q    At the beginning of your testimony I had asked you how

1    many hedge funds you had invested in personally or through

2    Colt Ventures.

3                Approximately how many hedge funds was that?

4    A    I don't remember the exact number, but over 20.

5    Q    And of all of those hedge fund investments had you ever

6    had a situation where you requested a redemption and not

7    received it in a timely manner?

8                MR. BRAFMAN:  Objection.

9                THE COURT:  Overruled.

10   A    No.

11   Q    The other question I wanted to ask was in the beginning

12   we had looked at a series of -- we had looked at a cap table

13   that showed that Joshua Frase Foundation and the Frase family

14   had received shares in Retrophin?

15   A    Yes, I remember.

16               MS. SMITH:  And, Ms. Balbin, if you can pull that

17   up, it's Government Exhibit 105-38.

18   BY MS. SMITH:

19   Q    And this is the original cap table from March 27, 2011,

20   right?

21   A    Yes.

22   Q    To your knowledge, did the Joshua Frase Foundation ever

23   actually receive shares of Retrophin?

24               MR. BRAFMAN:  Objection.

25               THE COURT:  If you know, you may answer.  Overruled.

1    A    No.

2    Q    And how about Paul Frase?

3    A    No.

4              MS. SMITH:  Your Honor, just one moment.

5              THE COURT:  Go ahead.

6              (Pause.)

7              MS. SMITH:  Your Honor, no further questions.

8              THE COURT:  All right, let's give the jurors an

9    afternoon break.  Please do not talk about the case during

10   your break.  Put your notebooks face down on your chair.  We

11   will come and retrieve you.  It will be roughly 10 to 15

12   minutes.  Okay, thank you.

13             (Jury exits.)

14             THE COURT:  All right, you can step down.

15             (Witness steps down.)

16             THE COURT:  Let's take 10 minutes, please.  Please

17   return to the courtroom by 10 of.

18             Are there any exhibits that I should be reviewing

19   now in case we have any issues regarding objections?

20             MR. BRAFMAN:  I don't think there will be any

21   hearsay issues, Your Honor.

22             THE COURT:  All right, thank you.

23             MR. AGNIFILO:  There is one issue.  We can tackle it

24   whenever Your Honor wants to with regards to a witness who is

25   testifying to named Jackson Su.  We can do it now, do it

Blanton - cross - Brafman                    1691

1   later.

2              THE COURT:  Did you want to do it now or later?

3              MR. BRAFMAN:  I would rather do it later, Your

4   Honor.

5              THE COURT:  All right, we'll do it later.  Thank

6   you.

7              (Recess taken.)

8              (In open court - jury not present.)

9              THE COURT:  Okay, please have a seat everybody.  Are

10  we ready to proceed?

11             MR. AGNIFILO:  Yes, Your Honor.

12             MS. KASULIS:  Yes, Your Honor.

13             THE COURT:  All right, we will get the jury.

14             (Witness resumes the stand.)

15             (Jury enters.)

16             THE COURT:  All right, all the jurors are back.

17  Please have a seat, ladies and gentlemen.

18             Mr. Brafman, you may proceed with your cross and,

19  Mr. Blanton, you are still under oath.

20             MR. BRAFMAN:  Thank you.

21  CROSS-EXAMINATION

22  BY MR. BRAFMAN:

23  Q    Good afternoon, Mr. Blanton.

24  A    Good afternoon.

25  Q    If you could, sit a little bit closer to the microphone

1  because sometimes it's hard to hear you.

2          Mr. Blanton, you and I have never met, is that

3  correct?

4  A    That's correct.

5  Q    And I've never asked you any questions?

6  A    That's correct.

7  Q    And would it be a fair statement, I'm not suggesting

8  there is anything wrong with it, but would it be a fair

9  statement that before coming into court today to testify

10  you've met on several occasions with the prosecutors in this

11  case?

12  A    Yes.

13  Q    And would it be a fair statement that virtually every

14  question that you were asked today you have been asked before

15  by either Ms. Smith or a member of the prosecution team?

16  A    I wouldn't say that.

17  Q    Would you say that the general scope of your direct

18  examination was gone over with them?

19  A    Maybe in a general way.

20  Q    And did they show you specific exhibits that they

21  intended to use?

22  A    Some of them.

23  Q    And did you have a chance to review them in their office?

24  A    In their office.

25  Q    Now, I just want to start backwards, if we can.  We have

Blanton - cross - Brafman                    1693

1   a lot to cover, but I want to go to the last part of your
2   testimony or, at least, one of the last parts and ask you to
3   do the math with me, if we could.  Okay?
4   A    (No response.)
5   Q    If we could put up Government Exhibit 79-3.  That's in
6   evidence.
7            (Exhibit published.)
8   A    What tab?
9   Q    They will put it up on your screen ask in a moment, sir.
10           THE COURT:  Would the government be able to assist
11  this witness with a tab number, if he has it?
12           MS. SMITH:  Yes, Your Honor.  Which exhibit number?
13           MR. BRAFMAN:  79-3.
14           MS. SMITH:  I believe that's tab 14.
15  A    I see it.
16  Q    Okay.  That's the exhibit that was introduced a little
17  while ago and it's dated January 25th, 2012, is that correct,
18  sir?
19  A    Yes.
20  Q    And if you look at the account value, it reads as
21  follows:  You invested $1,250,000 for the 12/31/2010 period.
22  The value of this investment is now approximately $1,318,872,
23  net of fees.
24           Do you see that?
25  A    Yes.

Blanton - cross - Brafman                    1694

1  Q    So based on your investment and what you believe to be

2  its increase in value, you believe that you are owed by Martin

3  Shkreli $1,318,872, is that correct?

4  A    For the fund plus investment in the Retrophin company for

5  founder's shares.

6  Q    But we're talking about MSMB?

7  A    For MSMB Capital that was what I was owed.

8  Q    That was what you would be expected to be paid, is that

9  correct?

10  A    In cash.

11  Q    Okay.  Now, you ultimately -- let's just understand how

12  much money you got back between MSMB cash and stock in

13  Retrophin.

14        You received 200,000 in cash, is that correct?

15  A    Yes.

16  Q    And you received 150,000 shares from Martin Shkreli,

17  correct?

18  A    I received 160 some-odd thousand shares.

19  Q    Okay.  And you also received approximately 200,000 shares

20  at a later date, is that correct?

21  A    After I called the police.

22  Q    The police?

23  A    Yes.

24  Q    You mean you went to the SEC?

25  A    Yes.

SAM      OCR      RMR      CRR      RPR

Blanton - cross - Brafman                    1695

1   Q     You never called the police?

2   A     Well, the --

3   Q     You never went to the U.S. Attorney's office or the FBI,

4   you went to the SEC, correct?

5   A     Correct.

6   Q     And you filed a whistleblower lawsuit, correct?

7   A     Correct.

8   Q     And in return for a whistleblower lawsuit, if there is a

9   recovery, you stand to get between 10 and 30 percent of

10  whatever is recovered, is that correct?

11  A     Whatever the SEC determines is what they said.

12  Q     But that's the only place you ever went, correct?

13  A     That was where my attorney advised me to go.

14  Q     Let's just be clear, you filed a whistleblower lawsuit

15  with the SEC, correct?

16  A     Right.

17  Q     Now, you still hold 150,000 shares of Retrophin stock,

18  correct?

19  A     Correct.

20  Q     That's your decision?

21  A     Correct.

22  Q     It's not restricted?

23  A     Correct.

24  Q     You could sell it at any point in time.  If you sold it

25  today it's worth $20 a share; isn't it?

Blanton - cross - Brafman                    1696

1    A    Under 20.

2    Q    How much under?

3    A    A few pennies.

4    Q    A few pennies?

5    A    Yes.

6    Q    Okay.  So you did sell some and you made $2.4 million on

7    the sale of some Retrophin shares once the restrictions were

8    lifted, correct?

9    A    After I called the SEC.

10   Q    Will you just answer my question without adding your

11   editorial comment?  You didn't do that when Ms. Smith asked

12   you these questions.

13            The question was did you sell $2.4 million worth of

14   Retrophin stock once the restrictions were lifted?

15   A    Yes.

16   Q    And you got $2.4 million, is that correct?

17   A    That's correct.

18   Q    And on top of that, you got 200,000 in cash, correct?

19   A    That's correct.

20   Q    So in return for your $1.3 million, you've already gotten

21   2.6 million, is that correct?

22   A    Yes.

23   Q    And you also are sitting on another 150,000 shares that's

24   worth, for ease of math, approximately $20 a share?

25   A    Yes.

SAM        OCR        RMR        CRR        RPR

1   Q    Which is an additional $3 million?

2   A    Yes.

3   Q    So you sit there with this $3 million because you believe

4   that the stock could go even higher?

5   A    Yes.

6   Q    You believe that Retrophin is now valued between

7   800 million and $1 billion, isn't that correct?

8            MS. SMITH:  Objection.

9            THE COURT:  Sustained.

10  BY MR. BRAFMAN:

11  Q    Your understanding of the current valuation of Retrophin

12  is between 800 million and $1 billion, correct?

13  A    I don't have an understanding of the value.  It's just

14  whatever the stock trades at.

15  Q    And the stock is now trading at 20?

16  A    Yes.

17  Q    And when you sold it a while back, what did you sell it

18  for?

19  A    I think the average was in the $13 a share range, 14.  I

20  don't remember exactly.

21  Q    But the decision to keep that stock now is yours, you are

22  not required to keep it, is that correct?

23  A    That's correct.

24  Q    Now, you understand, and we'll go back to your consulting

25  agreement and ultimately discuss it, but at the end of the day

Blanton - cross - Brafman                    1698

1   when you signed a consulting agreement you were represented by

2   independent counsel, correct?

3   A    Correct.

4   Q    Counsel of your choice?

5   A    Yes.

6   Q    Not provided by Martin Shkreli?

7   A    No.

8   Q    And on the other end of that transaction was a lawyer

9   named Evan Greebel, correct?

10  A    Correct.

11  Q    And one of the things you told the government when you

12  met was that you were comforted by the fact that Evan was a

13  partner in a very well-known, well-respected firm, isn't that

14  correct?

15  A    No, I don't remember saying that.

16  Q    You never said that?

17  A    No.

18  Q    Now, did your lawyer confer with Mr. Greebel about the

19  consulting agreement?

20  A    Yes.

21  Q    And as you sit here today do you have a signed consulting

22  agreement?

23  A    Yes.

24  Q    And in return for the consulting agreement you received

25  200,000 shares of Retrophin stock, correct?

1    A    Correct.

2    Q    Now, you know, do you not, that Retrophin has filed a

3    lawsuit against Mr. Shkreli, you know that, don't you?

4    A    Yes.

5    Q    And have you seen the lawsuit?

6    A    No.

7    Q    It came with your documents that you turned over to the

8    government.  You never saw the lawsuit?

9    A    I don't remember seeing it.

10   Q    Do you know that as part of that lawsuit they claim that

11   the Darren Blanton consulting agreement with Retrophin was a

12   fraud?

13              MS. SMITH:  Objection, Your Honor.

14              THE COURT:  I am going to sustain that objection.

15   BY MR. BRAFMAN:

16   Q    Are you aware that in this Indictment Mr. Shkreli is

17   charged with defrauding Retrophin because of your consulting

18   agreement, among others?

19   A    I'm -- I'm aware that he is in -- under Indictment for

20   signing consulting agreements, but not --

21   Q    Do you know that yours is one of them?

22   A    Yes.

23   Q    Okay.  Now, has anyone ever asked you to give back the

24   money to Retrophin because you signed a fraudulent consulting

25   agreement?

1   A    Not to my knowledge.

2   Q    Well, you would know if they asked you to give back

3   200,000 shares of stock valued at $20 a share, wouldn't you?

4   A    I gave that 200,000 shares --

5   Q    No, the 200,000 you gave back was given to you by a

6   mistake by the registrar, isn't that correct?

7   A    So what's your question?

8   Q    When you got 400,000, you were only entitled to 200,000

9   and when your lawyer was informed of the mistake by the

10  registration company, you gave back the 200,000, correct?

11  A    Correct.

12  Q    Okay.  So you were never supposed to get 400,000 shares,

13  correct?

14  A    Not according to Martin.

15  Q    Okay.  But your consulting agreement was signed for

16  200,000 shares, right, not 400,000?

17  A    But Martin said if he -- it was up to him he would give

18  me a million.

19  Q    If it was up to Martin he would give you a million; but

20  it wasn't up to Martin it was up to Retrophin, isn't that

21  correct?

22  A    Yes.

23  Q    And Retrophin's lawyers told you you got 200,000 for your

24  consulting agreement and that's what your lawyers agreed to,

25  correct?

Blanton - cross - Brafman                    1701

1    A    Correct.

2    Q    And as you sit here today, years after you got this

3    $200,000 and this consulting agreement that Martin is on trial

4    for, has anyone come to you and said, you owe Retrophin

5    200,000 shares because that was a fraudulent consulting

6    agreement?

7    A    No.

8    Q    When you signed that agreement, did you believe you were

9    committing a crime?

10   A    No.

11   Q    Did you discuss it with your attorney?

12   A    Yes.

13   Q    We'll get to them at the end of the cross, but your

14   attorney edited the consulting agreement, it went back and

15   forth between Evan Greebel on several occasions, is that

16   correct?

17   A    Yes.

18   Q    And your consulting agreement as finally signed by you

19   was approved by your personal lawyer, correct?

20   A    Yes.

21   Q    And was one of your lawyers Sam Lieberman?

22   A    Yes.

23   Q    And is he the lawyer who was also sitting with you when

24   you were being interviewed by the government?

25   A    Yes.

1  Q     Now, before you invested in MSMB, before you gave Martin

2  Shkreli a penny, he had given you some very valuable stock

3  tips, hadn't he?

4  A     He gave me some stock tips that were valuable.

5  Q     And you used them?

6  A     In certain cases.

7  Q     And you made a lot of money?

8  A     That's a term that I don't -- I don't -- I don't remember

9  how much I made.  I made some money.

10 Q     You made some money?

11 A     Some money.

12 Q     You have so much money that several hundred-thousand

13 dollars doesn't register with you?

14         MS. SMITH:  Objection, Your Honor.

15         THE COURT:  Sustained.

16 BY MR. BRAFMAN:

17 Q     Did you make several hundred-thousand dollars on the

18 sale, on the short sale of Arena, A-R-E-N-A?

19 A     I didn't make several hundred thousand, I don't remember

20 exactly how much I made.

21 Q     Well, approximately?

22 A     It wasn't as much as I thought it was gonna make.  I

23 don't remember exactly how much I made on that one trade, it's

24 been seven years.

25 Q     And did you tell the government that you made several

Blanton - cross - Brafman                    1703

1    hundred thousand on Arena?

2    A    I don't remember.

3    Q    Did you make money on Orexigen?

4    A    I don't remember on Orexigen how much money I made.  I

5    think I made some money.

6    Q    Well, what's some money, is it hundreds of thousand?

7    A    Over 50,000.

8    Q    And you can't be any closer than that?

9    A    It was six years ago.

10   Q    Okay.  Now, did you also short MannKind at the suggestion

11   of Martin Shkreli?

12   A    I did not short MannKind because we couldn't get the

13   borrow on the short.

14   Q    How many shorts did Martin Shkreli give you before you

15   ever invested in MSMB and how much money did you make as a

16   result of that information?

17   A    I don't remember and I don't remember.

18   Q    You don't remember and you don't remember?

19   A    How many trades and how much I made.

20   Q    All right.  Well, would it be a fair statement that on

21   some of the trades that Martin Shkreli suggested you to make

22   that you were successful?

23   A    On some of the trades I was successful, and that's why I

24   continued to go forward with him.

25   Q    And you believed that he was a smart guy, right?

SAM      OCR      RMR      CRR      RPR

1   A    I believed he was a smart guy.

2   Q    And you told all of your friends to invest with Martin

3   Shkreli, didn't you, many of them?

4   A    No, I told a few people that already invested in Biotech

5   that they should meet him.

6   Q    And they met him?

7   A    They met him.

8   Q    And after meeting him they also invested, correct?

9   A    Two of them did.

10  Q    At your recommendation?

11  A    At my introduction.  I don't recommend people to invest,

12  I just tell them about things and let them make their own mind

13  up.

14  Q    When Martin Shkreli called you to tell you the OREX trade

15  went bad, isn't what you said to him:  Oh, my God, now I got

16  to make good on John Neill and Schuyler Marshall?

17  A    No.

18  Q    You never said that?

19  A    No.

20  Q    Do you remember being interviewed extensively by the FBI

21  when you met with them, the first time you met with them?

22  A    Yes.

23  Q    And was there a gentleman or gentlemen or women in the

24  room taking notes of what you said to them?

25  A    Yes.

SAM      OCR      RMR      CRR      RPR

Blanton - cross - Brafman                    1705

1   Q    And did you understand at that meeting that lying to an

2   FBI agent intentionally was a crime?

3   A    Yes.

4   Q    So you were careful, correct?

5   A    Yes.

6   Q    All right, I am going to give you something that I am not

7   going to ask you to read out loud or even look at right now.

8   I am just going to give it to you in case you have to use it

9   to refresh your recollection.  Okay?

10  A    Okay.

11          MR. BRAFMAN:  Providing the witness with 3500-DB3.

12  BY MR. BRAFMAN:

13  Q    Just look at the document and tell me if it refreshes

14  your recollection that the date of your meeting with the

15  government was November 10th, 2015?

16  A    Yes.

17  Q    And were the prosecutors in this room present?

18  A    Yes.

19  Q    And were the agents in this room present, at least one of

20  them?

21  A    Yes.

22  Q    All right, now, did you tell the government that you

23  estimated the value of Colt Ventures to be 25 to $75 million?

24  A    I -- I don't remember exactly what I told them because

25  it's been a few years ago.

1   Q    Okay.  You're testifying today about conversations with

2   Mr. Shkreli that happened six years ago.  I'm asking you about

3   a conversation on 2015.

4          Did you tell the FBI that your value of Colt

5   Ventures was between 25 and $75 million?

6   A    I could have.

7   Q    Well, what is the value of Colt Ventures at that time?

8   A    I would say that's a pretty good range.

9   Q    And how do you value something that has a $50 million

10  spread, you can't be more specific?

11  A    Because of public and private investments.

12  Q    And because the private investments are very difficult to

13  value on certain occasions, correct?

14  A    Correct.

15  Q    All right, now, did you tell the agents that Shkreli was

16  a very smart man?

17  A    I think I might have.  I don't remember exactly however I

18  described him.

19

20          (Continued on the following page.)

21

22

23

24

25

1   (Continuing)

2   Q    Well, look at the bottom of the Exhibit.  Just read it to

3   yourself on the bottom of the last paragraph on the first page

4   and tell me if it refreshes your recollection that you told

5   the agents that Martin Shkreli was -- seemed smart.

6   A    Yup.  That's what it says:  Seems smart.

7   Q    Does it refresh your recollection?

8   A    Yes.

9   Q    And do you believe that Martin Shkreli is very smart?

10  A    I think he's smart.

11  Q    Now, isn't it true that before you invested in MSMBC,

12  Martin Shkreli gave you some shorting advice on obesity drugs?

13          MS. SMITH:  Objection.  Just to clarify, it's

14  MSMB Capital.

15          MR. BRAFMAN:  MSMB Capital sorry.

16  A    Yes.

17  Q    And did you tell the Government that Martin Shkreli

18  worked all day and night and slept in the office?

19  A    Yes.

20  Q    And did you believe that when you told them that?

21  A    Yes.

22  Q    Now --

23  A    Sometimes.

24  Q    Sorry?

25  A    Sometimes.  I don't think he slept there every day.

W. Name - direct/cross - Atty                    1708

1   Q     But you do know that he slept there in the office on

2   occasion working?

3   A     That's what he said.

4   Q     But you told the FBI that; correct?

5   A     Yeah, that's what he said.

6   Q     Now, did you tell the Government that you bought some

7   Arena puts and that you made a few hundred thousand dollars?

8   A     Yes.

9   Q     So, it refreshes your recollection that you made a few

10  hundred thousand on that one stock tip?

11  A     Well, buying puts and shorting a stock is not the same.

12  Q     Well, buying a put means you're betting against the

13  stock.

14  A     Right.

15  Q     And buying a put was a Martin Shkreli piece of advice?

16  A     Yes.

17  Q     And you used it.

18  A     Yes.

19  Q     And so now you remember you told the Government that as a

20  result of his advice, you made a few hundred thousand dollars?

21  A     I don't remember, but if it says that in this document,

22  let me read it and see.

23  Q     Well, read the middle of the large paragraph, one

24  paragraph from the top, to yourself, and tell me if it

25  refreshes your recollection that you bought Arena puts and you

W. Name - direct/cross - Atty                1709

1    made a few hundred thousand dollars.

2    A    Yes.  It says that I bought Arena --

3    Q    No, you're not supposed to read from it.

4         The question is:  Does it refresh your recollection

5    that you bought Arena puts and you made a few hundred thousand

6    dollars?

7    A    I still don't recall exactly how much I made.

8    Q    But if you said it to the FBI, you meant it as true,

9    right?

10   A    Yes.  But I don't remember because it's been a few years.

11   Q    And did you tell them that the stock tips from Shkreli

12   were working out?

13   A    Some of the stock tips did work out.

14   Q    And these are tips you received before you invested in

15   MSMB Capital; correct?

16   A    Correct.

17   Q    And did Mr. Shkreli tell you that you should invest in

18   MSMB because he was going to short Mannkind?

19   A    He said that he was, that was one of the trades that he

20   was looking at.

21   Q    Did you ever look to see how many trades MSMB Capital

22   engaged in before the OREX trade?

23   A    No.

24   Q    Did you ever check to see whether there was hundreds of

25   stocks that were bought and sold in MSMB Capital before the

1    OREX trade?

2    A    We never were given any of that information.

3    Q    Well, Mr. Blanton, did you ever ask Martin what he was

4    investing in?

5    A    Yes.

6    Q    And did he tell you about Mannkind?

7    A    He told me about Mannkind.

8    Q    And Mannkind went down because the nasal inhaler for the

9    insulin drug was not approved for the FDA; correct?

10   A    Yes.

11   Q    And it went from $8 to $2?

12   A    Yes.

13   Q    And you know that?  You just remember that?

14   A    I think that's close.

15   Q    And if you had bought Mannkind and shorted Mannkind or

16   bought puts in Mannkind, depending on how much you invested,

17   you could have made a lot of money.

18   A    He didn't make as much money as he thought he was going

19   to make on it.

20   Q    But if you had invested, you don't know how much you

21   could have made because you don't know how much you would have

22   invested; correct?

23   A    It depends on the cost to borrow.

24   Q    Now, at the end of day, you realized that Martin Shkreli

25   was giving you good advice, at least with respect to those two

1    stocks.

2    A    Yes.

3    Q    Now, you told the Government that what you liked to see

4    before you hook up with a hedge fund person is a track record;

5    correct?

6    A    Correct.

7    Q    And with respect to Martin, as a result of the way he is,

8    did you consider him a little bit cowboy-ish, in your words?

9    Or a little bit loose?

10   A    I thought he told the truth.

11   Q    And you nevertheless asked your brother to do a

12   background check on Martin?

13   A    Yes.

14   Q    And your brother retained a private investigator's firm;

15   correct?

16   A    Yes.

17   Q    Now, did you ever read the report that they gave you?

18   A    Yes.

19   Q    And did the report tell you that Elea Capital had ended

20   in a bust?  Lost all its money?

21   A    I don't think the report told us that.

22            MR. BRAFMAN:  I'm going to give you a copy of the

23   report so you can look at it and use it to refresh your

24   recollection, if you're required.  It's marked as a Defense

25   Exhibit 4302.

W. Name - direct/cross - Atty                    1712

1    Q    Do you recognize this covering letter and the attached

2    report?

3    A    Yes.

4    Q    And that's the report your brother Brett Blanton arranged

5    to have?

6    A    Yes.

7    Q    And you got that report before you invested; correct?

8    A    Yes.

9              MR. BRAFMAN:  Your Honor, I move it into evidence.

10             MS. SMITH:  Objection, Your Honor.

11             MR. BRAFMAN:  I will use it to refresh his

12   recollection, Your Honor.  We don't have to argue this point

13   now.

14             THE COURT:  All right.

15             MR. BRAFMAN:  Okay?  All right.

16   Q    Do you know what a default judgment is?

17   A    Generally.

18   Q    Tell the jury what your understanding of the term is.

19   A    When you owe money to someone.  It's a judgment that says

20   you owe money to someone.

21   Q    Okay.

22             MR. BRAFMAN:  I'd like you to look at the pages

23   marked with Colt Bates Numbers 000484, the lower right-hand

24   corner of that number, that page.

25   Q    Do you see that number?

W. Name - direct/cross - Atty                    1713

1  A    Yes.

2  Q    It should be the third page in, fourth page in?

3  A    Got it.

4  Q    And if you look at the top of that page, does it report

5  that Elea Partners and Martin Shkreli owe Lehman Brothers

6  $2,331,190?

7            MS. SMITH:  Objection, Your Honor.  It's not

8  refreshing the witness's recollection.

9            THE COURT:  Why don't you ask the question in the

10  proper form, Mr. Brafman, to refresh.

11  Q    Can I ask you, sir, does it refresh your recollection

12  that this report, which you claim to have read does, in fact,

13  set out the Lehman default judgment?

14  A    We called and they said it was a trading

15  misunderstanding.  My brother did.  That's what he reported to

16  me.

17  Q    But it indicates it was a default judgment?

18  A    I don't understand that, no.  It didn't indicate that to

19  me.

20            MR. BRAFMAN:  Your Honor, I'd like to reoffer this

21  into evidence.  I don't understand the nature of the

22  objection.

23            MS. SMITH:  It's hearsay.

24            MR. BRAFMAN:  I'm sorry?

25            MS. SMITH:  The entire document is hearsay.

Side-Bar                                          1714

1          MR. BRAFMAN:  It's a document he relied on before he

2     invested with the defendant and it shows that, Your Honor.

3          Side-bar?

4          THE COURT:  Sure.  Come on.

5          (Side-bar conference held on the record out of the

6     hearing of the jury.)

7

8          (Side-bar.)

9          MR. BRAFMAN:  This is a document prepared at the

10    defendant's request and it's a document.

11         MS. SMITH:  It's not at the defendant's, it's the

12    witness.

13         MR. BRAFMAN:  I'm sorry, prepared on the witness's

14    request.  It's a document he claims to have received.  It's a

15    document he claims to have reviewed.  It is substantially

16    inconsistent with his direct testimony.  They opened that

17    door, in which they asked him if they rely on the defendant's

18    track record before he invested.

19         This indicates that the defendant's track record

20    here is dismal and yet, he continued to invest.

21         THE COURT:  Well, you are focusing on page Colt 484,

22    the top entry regarding a civil action and Default Judgment in

23    the amount of 2.3 million; correct?

24         MR. BRAFMAN:  Yes.

25         THE COURT:  This is what you want to --

```
                        Side-Bar                    1715
```

1           MR. BRAFMAN:  In part.

2           THE COURT:  Okay.

3           And this witness testified about this transaction.

4    And his brother followed up with Lehman.

5           MR. BRAFMAN:  So, he can explain it.

6           THE COURT:  But you are offering this for the truth,

7    are you not; to show that there's a $2.3 million default?

8           MR. BRAFMAN:  Yes.

9           THE COURT:  Okay.

10          MR. BRAFMAN:  It's a matter of -- and there is a

11   Lehman judgment which I can file as a an official court

12   document, which is in here.

13          MS. SMITH:  Your Honor, I just don't understand what

14   the purpose is.  On direct testimony he testified that he, in

15   fact, was told that there was a judgment, and that he spoke to

16   the defendant, and the defendant told him that it was going to

17   go away.

18          MR. BRAFMAN:  I will withdraw the offer.  I have too

19   much important stuff to cover.  I will withdraw the offer.

20          THE COURT:  You are withdrawing the request to admit

21   this document.

22          MR. BRAFMAN:  Yes, I will just refer to it to

23   refresh his recollection.

24          THE COURT:  Okay.  All right.

25          (Side-bar end.)

1          (In open court.)

2          MR. BRAFMAN:  I am going to withdraw the offer to

3   enter it into evidence and just use it to refresh the

4   defendant's recollection, Your Honor, if necessary.

5   BY MR. BRAFMAN: (Continuing)

6   Q    Were you aware that the defendant had been sued

7   successfully by Lehman Brothers?

8   A    We talked to Lehman and they said the matter had been

9   resolved.  At least, that's what my brother reported to me.

10  Q    Could you look at the document and look at 00493 and tell

11  me, sir, whether or not there is a Default Judgment entered by

12  Lehman Brothers against Mr. Shkreli, if that refreshes your

13  recollection?

14  A    I see what you're talking about on 484 about contract

15  expedited amount 2331.

16          Is that what you're referring to as a Default

17  Judgment?

18  Q    Yes.

19  A    I'm not familiar with that type of reference.

20  Q    How long have you been in the hedge fund business?

21  A    I'm not in the hedge fund business.

22  Q    How long have you been managing 25 to $75 million?

23  A    Since -- I manage my own money.  I don't manage other

24  people's money.

25  Q    Okay.  And do you also manage your wife's money?

Blanton - cross - Brafman                    1717

1   A    I manage some money for my wife.

2   Q    And your wife inherited money from her father?

3   A    Yes.

4   Q    Okay.

5        Now, did you tell the Government that Martin Shkreli

6   was, at times, cowboy-ish?

7   A    I don't remember what I called him.

8   Q    You don't remember what you called him?

9   A    I don't remember what I called him.

10       MR. BRAFMAN:  Give me just one minute, sir.

11  A    But I'm sure you can refresh my memory.

12  Q    Did you say that he was loose?

13  A    Is that what the document says.

14  Q    No, I am asking you what you remember?

15  A    I don't remember.

16  Q    Now, did you tell the Government that when Martin told

17  you that the fund would have liquidity, you did not believe

18  him?

19  A    I said that I did not think that he would be able to

20  provide daily liquidity statements.

21  Q    Because it's a hedge fund, right?

22  A    Right.

23  Q    And hedge funds can't do that?

24  A    Well, they can, but it's very difficult.

25  Q    Did you ever provide daily liquidity to any of your -- do

Blanton - cross - Brafman                    1718

1    any of the hedge funds that you invest in ever provide daily

2    liquidity?

3    A    No.

4    Q    Okay.  So, when Martin said that to you, you told him --

5    you just told the Government you didn't believe him?

6    A    I said that I found it would be hard to do.

7    Q    And yet, you invested anyway?

8    A    Yes.

9    Q    All right.  So, would it be a fair statement that what

10   you were investing in was really Martin's genius because he

11   had made so much money for you and not necessarily anything

12   you knew or didn't know about MSMB?

13           MS. SMITH:  Objection, Your Honor.

14           THE COURT:  Sustained.

15           Can you rephrase the question, please.

16   Q    You were investing in Martin Shkreli, weren't you?

17   A    If Martin Shkreli was honest.

18   Q    But that's what you were investing in, Martin Shkreli;

19   correct?

20   A    In Martin Shkreli if he was honest.

21   Q    And you didn't know anything about MSMB; is that correct?

22   A    I knew what he sent me.

23   Q    And did you read it?

24   A    Yes.

25   Q    And you read all of the risk factors, right?

Blanton - cross - Brafman                    1719

1    A    Yes.

2    Q    And you read all of the information which indicated that

3    they had no track record; correct?

4    A    And I read the bad-boy clauses that said if he does

5    fraud, that he was in trouble.

6    Q    Okay.  And according to you, obviously, he did fraud?

7    A    Correct.

8    Q    But not you.  Not you.  Fraud.

9         THE COURT:  The question is unclear to me.

10   Q    But you didn't commit fraud, did you?

11   A    Investing in a fund?

12   Q    No, entering into a consulting agreement with Retrophin

13   that Martin is on trial for.

14        You're on the other end of that agreement, aren't

15   you?

16   A    I'm not in a trial being convicted of fraud.

17   Q    He's not convicted.  He's presumed innocent.  I beg your

18   pardon.

19        THE COURT:  The jury will disregard that last

20   response.  I remind the jury that anyone charged with an

21   offense enjoys the presumption of innocence throughout the

22   trial.

23   Q    Did you tell the Government that sometimes Martin went

24   dark?

25   A    I don't remember.  Oh, yes, when I say went dark, yes.

Blanton - cross - Brafman                    1720

1    He would never call me back or wouldn't respond to me.

2    Q    Did you refer to the word dark as meaning that Martin had

3    an anxiety disorder and sometimes you couldn't find him?

4    A    No, I referred dark meaning you can't get ahold of him.

5    Q    And did you know why?

6    A    Because he wouldn't call me back.

7    Q    How many times have you spoken to Martin Shkreli in the

8    last five years.  A hundred?

9    A    I would -- I don't know exactly.  A lot.

10   Q    A lot.  So, he never called you back but you spoke to him

11   a lot?

12   A    Yeah.  At periods, he went dark.

13   Q    Now, when you spoke to the Government about Retrophin,

14   you told them that the Retrophin shares, according to Martin,

15   had an approximately $20 per share valuation.

16            Did you tell them that?

17   A    Right now?

18   Q    When you were interviewed in 2015, did you tell the

19   Government that Mr. Shkreli told you that the Retrophin shares

20   had an approximate valuation of $20 a share?

21   A    That was publicly-traded information.  I don't remember

22   what they were.

23   Q    Did you tell the Government that?

24   A    I don't remember.

25   Q    Would you look at page 6 of this document.  In the middle

Blanton - cross - Brafman                    1721

1   of the page, starting with the paragraph:  Shkreli.

2           Read that to yourself and tell me whether it

3   refreshes your recollection that you could get a portion of

4   your investment with Retrophin shares that had a $20 share

5   valuation according to Martin Shkreli.

6           Did he tell you that?  Did you tell that to the

7   Government?

8   A    It's on page 6?

9   Q    Six, in the middle of the page.

10           THE COURT:  Referring back to 3500-DB --

11           MR. BRAFMAN:  Yes, Your Honor.

12           THE WITNESS:  This is the statement.

13           THE COURT:  3500-DB-3.

14   A    Shkreli said he could return a portion of Blanton's

15   investment.

16           MS. SMITH:  Objection, Your Honor.

17           MR. BRAFMAN:  Just read it to yourself and tell us

18   if it refreshes your recollection that you told the Government

19   that Mr. Shkreli said that the Retrophin shares had an

20   approximate valuation of $20 a share.

21           MS. SMITH:  Your Honor, can we have the portion that

22   was read in just struck?

23           THE COURT:  Yes, we will strike it.

24           MS. SMITH:  Thank you.

25           THE WITNESS:  I don't understand the question.

VB      OCR      CRR

Blanton - cross - Brafman                    1722

1    Q    What don't you understand about that question?

2    A    You want me to say what Martin Shkreli said?

3    Q    I want you to say what you told the Government that

4    Martin Shkreli said.

5            Let me do it easier.  In 2015 you were interviewed

6    by the FBI, right?

7    A    Yes.

8    Q    Right?

9    A    Yes.

10   Q    And at that time they ask you about Martin Shkreli;

11   correct?

12   A    They ask me about Martin Shkreli.

13   Q    And among other things, you told them that Martin Shkreli

14   had told you that the approximate valuation of Retrophin stock

15   would be $20 a share; correct?

16   A    At that point it would be worth $20 a share?

17   Q    Yes.

18   A    Yes.

19   Q    And that was said by Martin to you years ago; correct?

20   A    Correct.

21   Q    What's the value today, $25 a share?

22   A    Yes.

23   Q    He was pretty prescient, wasn't he?

24   A    Yes.

25   Q    And as a result of his prescience, you made a lot of

Blanton - cross - Brafman                    1723

1    money, and still have a lot of money.

2              MS. SMITH:  Objection to the as a result of.

3              THE COURT:  Sustained.

4    Q    Did Martin also give you a tip about ONTY, Oncothyreon, a

5    biotech company?

6    A    I really don't, I don't remember that one.

7    Q    Do you remember sending Martin a letter congratulating

8    him on picking a winner?

9    A    I don't remember it, but I could have.

10   Q    Okay.  And did you invest in that stock?

11   A    I don't remember, but I could have.

12   Q    And if you could have, do you have an approximation of

13   how much money you made?

14             MS. SMITH:  Objection, Your Honor.

15             THE COURT:  Sustained.

16   A    I don't remember.

17             MR. BRAFMAN:  Could we have Government's

18   Exhibit 105-37 up on the screen, please.  It's in evidence.

19             (Exhibit published to jury.)

20   Q    Do you remember this document being used on direct

21   examination?

22   A    Yes.

23   Q    And this was before you agreed to invest in MSMB;

24   correct?

25   A    Correct.

Blanton - cross - Brafman                    1724

1    Q    And you were going to have several days with Martin

2    Shkreli; correct?

3    A    Correct.  I was going to have several meetings with him.

4    He was going to be in town for several days.

5    Q    And "town" is Dallas, right?

6    A    In Dallas.

7    Q    And if you look on Monday, you have a meeting with Steve

8    Harasym of Belmont.

9         Do you know who that is?

10   A    Yes.

11   Q    Who is that?

12   A    He's an investment manager at a firm called Belmont

13   Capital.

14   Q    And do you do business with him?

15   A    Yes.

16   Q    And were you present at that meeting?

17   A    I don't remember if I was there.  I don't think I was at

18   the meeting, but I think he met with them.

19   Q    Was that meeting arranged by you?

20   A    I think I introduced him to Steve.

21   Q    For the purposes of doing business with him?  Hopefully?

22   A    I told him that I thought he was an interesting guy that

23   was smart.

24   Q    And did you have a meeting at 5:30 p.m. at Perry's Steak

25   House?

                    VB      OCR      CRR

1    A    Yes.

2    Q    And who was at that meeting?

3    A    I don't remember, like I said, to Alix.  I don't remember

4    who exactly was there, but I do believe it was Steve, Gloria

5    and a number of other investors.

6    Q    And a number of other investors including Ward Tillman?

7    A    Yes.

8    Q    And Ward Tillman was the person who referred you?

9    A    Tillman Ward.

10   Q    Tillman Ward, I'm sorry, was an individual who referred

11   you to Mr. Shkreli?

12   A    Yeah.  He set it up, too.  He invited some of the people,

13   too, I think.

14   Q    Who is Tillman Ward?

15   A    He was a, he is a friend of mine that is a investment

16   banker and a prime broker for Merrill Lynch.

17   Q    Is he an expert in the biotech field?

18   A    No, he's more of a hedge fund expert.

19   Q    And you arranged for this meeting or did Tillman Ward

20   arrange for this meeting?

21   A    It was a joint effort.

22   Q    And at that meeting did he have a chance to question

23   Mr. Shkreli?

24   A    It was an informal meeting dinner, but everyone talked

25   about different biotechs and Martin did do a lot of talking.

Blanton - cross - Brafman                    1726

1    Q    And to your knowledge, based on what you saw, did Martin

2    impress the people at that meeting?

3    A    I think some of them thought he was very impressive.

4    Q    And these were people who had their own knowledge in the

5    area; correct?

6    A    Correct.

7    Q    These were not just lay-people who never saw a biotech

8    company.

9         These were people who dealt in the area; correct?

10   A    They were.

11   Q    And then Mr. Shkreli met with, he had breakfast with

12   Mr. Tillman the next morning.

13        Were you at that breakfast?

14   A    I don't remember if I was at that breakfast or not.

15   Q    And then in the afternoon he had a meeting with David

16   Mumert of Mount Vernon, correct?

17   A    David Mumert.  And I was not at that meeting.

18   Q    Who is David Mumert?

19   A    He was another investment advisor for a family office.

20   Q    And at 3:30 there was a meeting with you, Starcher,

21   Blanton and Lazard at the Crescent.

22        Who is Lazard?

23   A    I don't know who that would be referring to.  Mike

24   Starcher is another investor.

25   Q    And at any of those meetings did you say anything

VB        OCR        CRR

1    negative about Martin Shkreli?

2    A    I don't remember what I said at any of those meetings.

3    Q    And on the next page at 6:00 o'clock, dinner with

4    Pettigrew and Starcher.

5              Who were Pettigrew?

6    A    I was not at that meeting.

7    Q    Do you know who he is?

8    A    He was an investor that invested in biotech stock.

9    Q    And do you know who set up that meeting?

10   A    I think Mike Starcher.

11   Q    All right.

12             Now, before you invested, Mr. Shkreli pretty much

13   met with half a dozen people, who you personally know, who are

14   all part of, would it be a fair statement, the investment

15   community in Dallas?

16   A    They're people that I know that do invest in different

17   pharmaceutical and biotech stocks in Dallas.

18

19             (Continued on following page.)

20

21

22

23

24

25

Blanton - cross - Brafman                    1728

1    (Continuing.)

2    BY MR. BRAFMAN:

3    Q    Now, I think you told us that -- if we could quick put up

4    105-4 in evidence.

5            MS. SMITH:  Tab six in his binder.  That one is not

6    in evidence, Your Honor.

7            THE COURT:  105-4 is not evidence.

8            MR. BRAFMAN:  I think it is, Your Honor.

9            THE COURTROOM DEPUTY:  I don't think so.

10   BY MR. BRAFMAN:

11   Q    I'd like to show you a copy of an e-mail that we will

12   mark for identification as Defendant's Exhibit 4347.  It's not

13   in your binder.

14           MR. BRAFMAN:  Does Your Honor have a copy of it?

15           THE COURT:  Is it cross-referenced?

16   A    It's in the binder.

17   Q    It's in the binder?

18   A    Tab six.

19   Q    You can use the one in the Government binder.

20           MS. SMITH:  Government Exhibit 105-4 was marked.

21           THE COURT:  Thank you.

22   BY MR. BRAFMAN:

23   Q    Do you recognize this document?

24   A    I see this document.

25   Q    Do you recognize it as an e-mail from Mr. Shkreli to you?

SN        OCR        RPR

Blanton - cross - Brafman                    1729

1    A    It looks like I was copied.

2    Q    And who is Brent Saunders?

3    A    He's a biotech CEO.  It's now the CEO of Allergan.

4    Q    And he used to work for Fred Hassan?

5    A    I think so.

6    Q    I think so too.  Do you know why he's copied on this

7    e-mail?

8    A    No.

9    Q    Did you ever -- did you ever discuss MSMB with Brent

10   Saunders?

11   A    Yes.  I met him through Martin.

12   Q    And do you know that he was an investor in Retrophin?

13   A    Martin told me that he was and I saw that at the end and

14   we actually worked together a little bit on Retrophin.

15   Q    Now, this e-mail that you were copied on is Martin's

16   explanation, if you will, about his idea concerning Retrophin;

17   correct?

18   A    It looks like it.  It's kind of cryptic.  I was trying to

19   figure out if it was about a publicly traded stock or about

20   Retrophin.

21   Q    He's talking about a new idea; isn't he?

22            MS. SMITH:  Objection, Your Honor.  The document is

23   not in evidence.

24            THE COURT:  It is not in evidence.  Are you moving

25   it in?

1        MR. BRAFMAN:  No, I'm not, Your Honor unless there's

2   no objection so I can not have a sidebar.

3        MS. SMITH:  No objection, Your Honor.

4        THE COURT:  All right.  So you are using it to

5   refresh his recollection at this point.

6   Q    Now, before Retrophin became a company, you told Martin

7   the story about Josh Frase; is that correct?

8   A    Yes.

9   Q    And Josh Frase was the son of a family friend?

10  A    He was the son of a friend that I worked with.

11  Q    And he was a little boy who died; is that correct?

12  A    He eventually died.  He hadn't died when I told Martin.

13  Q    And he died eventually if myotubular dystrophy; correct?

14  A    Yes, muscular myotubular myopathy.

15  Q    And after you told Martin about the disease, Martin in

16  words or substance told you he thinks he can figure out a

17  cure; didn't he say that?

18  A    Yes.

19  Q    And that was the impetus behind Retrophin?

20  A    You got it.

21  Q    And then Martin spent how many months, if you know,

22  locked in his office in a sleeping bag figuring out the gene

23  sequencing of myotubular dystrophy?

24  A    I don't think he was locked in his office.  I think he

25  was traveling around talking to people.

1    Q    And did he eventually come up with a gene coding that

2    eventually formed Retrophin?

3    A    No.  I don't think he did that.  I think he found some

4    drugs that are similar to that, but he was trying to license

5    the drug from a guy at the University of Wisconsin and I don't

6    think he was able to do that.  So I don't think it was exactly

7    what he or we set out to do.

8    Q    But eventually it became a company; correct?

9    A    It eventually became a company.

10   Q    And it eventually became a public company?

11   A    It eventually became a public company once he was able to

12   buy an exist existing drug.

13   Q    And did he?

14   A    Yes, but it had nothing to do with Retrophin.

15   Q    And eventually what was it used for?

16   A    I don't remember the exact indication.

17   Q    What was the success of Retrophin based on?

18   A    I think it was based on building a company around a

19   number of drugs.  Very similar to most good startups, he had a

20   portfolio of drugs that were addressing different diseases,

21   some further along than others.

22   Q    And were you doing any of the research?

23   A    No research.  I don't do research.

24   Q    Okay.  Martin did the research; is that correct?

25   A    I don't think he does actual research.  I think he

Blanton - cross - Brafman                    1732

1   does -- he looks into the different opportunities and finds

2   them.  He doesn't do clinical trial research at least at that

3   time he didn't.

4   Q    And then you went to Harvard with Martin; is that

5   correct?

6   A    I took him to Harvard to meet with the leading expert on

7   dystrophin deficiencies and muscular myotubular myopathy.

8   Q    And who did the presentation at Harvard?

9   A    Both of them.

10  Q    Martin and this expert?

11  A    Dr. Alan Beggs, yes.

12  Q    And after that were impressed with Martin's knowledge at

13  that meeting?

14  A    I asked Alan Beggs f he thought Martin was on to

15  something and he said yes and I was impressed.

16  Q    And ultimately Retrophin becomes a real company?

17  A    Eventually.

18  Q    And Martin offered you as much as you wanted of Retrophin

19  at the outset; correct?

20  A    Correct.

21  Q    And you didn't agree to take all of it; correct?

22  A    Correct.

23  Q    But at the end of the day because Martin suggested that

24  you could be considered one of the founders, ultimately you

25  had access to a lot of Retrophin stock; is that correct?

Blanton - cross - Brafman                    1733

1    A    He didn't decide that I could be -- we basically thought

2    of the idea together.

3    Q    And if you look at Government's Exhibit 105-38 --

4    A    What tab?

5             MR. BRAFMAN:  If you could put it up on the screen.

6             THE COURT:  Do you have a tab for Mr. Blanton?

7             MS. SMITH:  Yes, Your Honor.  It's tab nine.

8    BY MR. BRAFMAN:

9    Q    In that document that's on the screen --

10            MR. BRAFMAN:  Can we bring it up closer, please, the

11   part with the numbers?  Thank you.

12   Q    You see the number of shares being allocated to you is

13   20,000 shares?

14   A    Yes.

15   Q    And the value is $4 million.

16   A    I see that on the screen.

17   Q    Did you see this at the time it was sent to you?

18   A    Yes.

19   Q    And did you dispute the valuation as being $4 million?

20   A    I don't think we responded at that time because of the

21   lack of communication during that period.

22   Q    But this is a communication?

23   A    From him to me.

24   Q    Right.  And you didn't respond because it was a lack of

25   communication?

Blanton - cross - Brafman                1734

1    A    I think at that time we were very skeptical.

2    Q    And if you look at it, when you saw the valuation of $4

3    million, that was based on an evaluation of $20 a share?

4    A    It was an arbitrary valuation.

5    Q    But the math works out to $20 a share?

6    A    According to this document.

7    Q    And that's the value of the stock today; correct?

8            MS. SMITH:  Objection, Your Honor, mischaracterizing

9    the document.

10           THE COURT:  All right, sustained.

11           MR. BRAFMAN:  I'm sorry, I didn't hear the

12   objection.

13           MS. SMITH:  It's mischaracterizing the document.  It

14   says 200 per share, not 20.

15   A    At today's valuation, 20 percent of the stock would be

16   worth a lot more than 4 million.

17   Q    How much would it be worth?

18   A    I don't know the exact number of shares outstanding.

19   Q    Now, does Chad Hennings work for you?

20   A    Yes.

21   Q    And you're telling me that there is no communication

22   between Martin and you during this period because you're a

23   little bit skeptical.  Aren't people from Colt Ventures

24   communicating with Martin?

25   A    I think we're trying to figure out if he was going to

1    give Chad and the Frase Foundation some stock.

2    Q    So there was communication?

3    A    I'm just saying it wasn't between me and Martin.  I think

4    it was more between Chad and Martin.  I don't remember

5    exactly, but we didn't communicate about the valuation.  We

6    never discussed it.

7    Q    Now, when did you invest in Retrophin?

8    A    I didn't ever invest in Retrophin directly.  I had money

9    allocated from my fund invested in Retrophin.

10   Q    And when did you get the MSMB Capital Management

11   questionnaire?

12   A    You mean the original investment questionnaire?

13   Q    Yes.

14   A    Sometime in 2010.

15   Q    And when did you ultimately actually make your

16   investment?

17   A    Early 2011.

18   Q    So how many months did you have the materials before you

19   invested?

20   A    Probably a month.  I don't remember exactly.

21   Q    And during that period, did you review it with your

22   attorney and JD McCulloch?

23   A    No, JD didn't work for me at that time.

24   Q    So who did you review it with at that time?

25   A    My brother and I reviewed it.

Blanton - cross - Brafman                    1736

1  Q    With your attorney?

2  A    I don't remember reviewing it with an attorney at that

3  time.

4       MR. BRAFMAN:  Just give me one second.

5  Q    Do you have that document I gave you before, the

6  interview notes?

7  A    Yes.

8       MR. BRAFMAN:  Just a moment, Your Honor.

9  Q    Who was your attorney at the time you received the MSMB

10 memorandum?

11 A    I don't remember if I had an attorney to look at this

12 specific document.  I don't think I did.

13 Q    We'll come back to that in a minute.  Did you -- when you

14 filled out the whistleblower lawsuit to the SEC, did you try

15 and be accurate in the information you gave them?

16 A    Yes, but I don't think it was a whistleblower lawsuit.

17 Q    A whistleblower claim?

18 A    Yes.

19 Q    You have never filed a lawsuit against is Martin Shkreli,

20 have you?

21 A    No.

22 Q    You are just a claimant in an SEC whistleblower claim; is

23 that correct?

24 A    Yes.

25 Q    Now, do you remember the Super Bowl in January of 2011?

Blanton - cross - Brafman                    1737

1    A    Yes.

2    Q    And do you remember inviting Mr. Shkreli to come to your

3    private suite at the event?

4    A    I don't remember, but I could have.

5    Q    And he told you that he couldn't come because he was

6    working on Retrophin?

7    A    I don't remember that, but he could have been.

8    Q    Well, did you tell him you were going to have Carlos

9    Slim, one of the richest men in the world there?

10   A    No.

11   Q    Did you have him there?

12   A    No.

13   Q    Were the Black Eyed Peas performing at that Super Bowl?

14   A    Yes.

15   Q    And did you invite them to your suite afterwards?

16   A    No, they came up to my suite.

17   Q    And did you tell Martin Shkreli that you missed a good

18   party because the Black Eyes Peas came to your suite?

19   A    I don't remember, but I could have.

20   Q    Well, did you indicate to the SEC at the time you filed

21   the whistleblower lawsuit --

22        MS. SMITH:  Objection, Your Honor.

23   Q    Do you know if you --

24        THE COURT:  Hold on.

25   Q    Not a lawsuit.  I misspoke.

SN      OCR      RPR

Blanton - cross - Brafman                    1738

1        When you filed your claim with the SEC as a

2   whistleblower, did you understand what among other things

3   could disqualify you from being a whistleblower?

4   A    No.

5   Q    Did you understand that if you are a participant in or

6   culpable for securities law violations, you could be barred

7   from being a claimant under the whistleblower statute?

8   A    No.

9   Q    Did you read the whistleblower lawsuit application before

10  you filed it?

11           MS. SMITH:  Objection, Your Honor.

12           THE COURT:  Sustained.

13  BY MR. BRAFMAN:

14  Q    Did you read the whistleblower application before you

15  signed it?

16  A    I do believe I did.

17  Q    Okay.  Now, one of the things you claim that Mr. Shkreli

18  did wrong was that he was acting in a conflict capacity; is

19  that correct?

20  A    Explain that.

21  Q    Did you claim that Mr. Shkreli was operating a hedge fund

22  but he was also operating a private company, a public company?

23  A    No, not to my knowledge.

24  Q    Let me show you the -- what's marked as 3500 DD-5.  Do

25  you recognize it as the addendum to the confidential

Blanton - cross - Brafman                1739

1    whistleblower submission?

2    A    That's what it says.

3    Q    Do you recognize the document as something you have read?

4    A    Yes.

5    Q    And could you look at the fourth dot paragraph, read it

6    to yourself, and tell me whether or not it refreshes your

7    recollection that one of the things that you were complaining

8    about is that Mr. Shkreli had a conflict because he was a

9    founder of a public company and also had a hedge fund, which

10   is in a conflict with him?

11                MS. SMITH:  Objection, Your Honor.

12                THE COURT:  Sustained.

13   BY MR. BRAFMAN:

14   Q    Would you read it to yourself and tell me if it refreshes

15   your recollection that one of the complaints that you made

16   about Mr. Shkreli was that he was in a conflict of interest?

17   A    I see that.

18   Q    Do you believe that Mr. Shkreli never advised you of

19   Retrophin while you were an investor in MSMB; is that your

20   position?

21                MS. SMITH:  Objection, Your Honor.

22                THE COURT:  Sustained.

23   BY MR. BRAFMAN:

24   Q    What did you understand the conflict to be?

25   A    I don't know.          (Continued on next page.)

Blanton - cross - Brafman                    1740

1    EXAMINATION CONTINUES

2    BY MR. BRAFMAN:

3    Q    You don't know?

4    A    I think it was -- it was trading stocks and not putting

5    them into publicly-traded stocks, but putting the majority of

6    them into a private company.

7    Q    The private company being MSMB?

8    A    Yes.

9    Q    Now, let me ask you a question concerning your investment

10   in MSMB.  Do you remember Mr. Shkreli calling you after the

11   OREX trade?

12   A    Vaguely.

13   Q    Vaguely?

14   A    Vaguely.

15   Q    You don't remember getting on the phone with your wife

16   and Mr. Shkreli telling you that he invested in OREX and he

17   lost all the money?

18   A    I remember him telling me that he made a mistake, he

19   thinks he did a bad finger trade.

20   Q    But he told you he lost the OREX money, right?

21   A    He said that it -- he was gonna dispute it and that he

22   didn't know if he could dispute it.  He was worried.

23   Q    And did your wife and you tell him, Martin, it's okay,

24   pray Jesus will save you, you still have Retrophin?

25   A    No.

1   Q    You never said that?

2   A    Never.

3   Q    Did you and your wife ever pray with Martin?

4   A    I don't remember, we could have.

5   Q    What?

6   A    We could have.

7   Q    You and your wife are both, is that correct?

8   A    Yes.

9   Q    And you don't remember in your house with you, your wife

10  and Martin holding hands and praying?

11  A    I don't remember that, but we had good talks with him

12  about --

13  Q    You had good talks with him?

14  A    Yeah.

15  Q    Did you tell him that it was an abomination of God if he

16  was a homosexual?

17           MS. SMITH:  Objection, Your Honor.

18           THE COURT:  Sustained.

19           MS. SMITH:  Can we have a sidebar, please?

20           MR. BRAFMAN:  No, may I --

21           THE COURT:  We are going to have a sidebar.  There

22  has been a request for sidebar.

23           (Sidebar held outside the hearing of the jury.)

24           (Continued on the following page.)

25

SAM       OCR       RMR       CRR       RPR

```
                          Sidebar                         1742
```

1        (The following sidebar took place outside the

2   hearing of the jury.)

3        MR. BRAFMAN:  Your Honor, there is a whole slew of

4   offensive things that this witness has said to Martin Shkreli

5   in the course of their relationship.  Some of them in an

6   e-mail, some of them personally.

7        The reason Martin went dark and didn't call him back

8   is because he humiliated Martin, he offended him.  He did it

9   publicly and he did it repeatedly.  There is an e-mail of

10  Martin going to San Francisco and the advice Mr. Blanton gives

11  him is:  Don't be raped by a fag.  That is his words in an

12  e-mail to Martin.  Martin was offended by it.  I have the

13  e-mail.

14       MS. SMITH:  I have never seen the e-mail.

15       MR. BRAFMAN:  Do you want me to give it to you?

16       THE COURT:  You should.

17       MR. BRAFMAN:  Your Honor, they have the e-mail.  We

18  got it from you.

19       MS. SMITH:  We have never seen an e-mail like that.

20       MR. BRAFMAN:  She is bringing it.

21       Your Honor, this witness in a public arena with

22  other people present referred to Martin as his little faggot.

23  This witness in a public arena referred to him as an

24  Obama-loving liberal commie faggot.  This is a repeated series

25  of offensive comments made to this witness, he can deny if and

Sidebar                                               1743

1   if we have to, if it's not considered by Your Honor, we can

2   collaterally produce the witnesses besides Mr. Shkreli who

3   were present and reported it to us.

4           This is an e-mail from Mr. Blanton, from Mr. Blanton

5   to Shkreli saying:  Don't get raped by a fag.  Hope you guys

6   are making great progress.  And the only reason it's whited

7   out is because there is language from us to him that's

8   privileged.  But this is an e-mail.  He can deny it, but we

9   have a good faith basis to ask the question.  And his answer

10  of Martin going dark because Martin was tough to get ahold of

11  and tough to talk to, it's Martin getting dark because this

12  man is an animal.

13          I know he comes across as a good old boy and he's

14  very soft spoken and he comes across as a very eloquent

15  gentleman, he is a racist and he is homophobic and Martin is

16  the brunt of that criticism.  So in terms of bias, I have a

17  right, I have a good faith basis to delve into this, however

18  offensive it might be.

19          MS. SMITH:  Your Honor, I've never seen that e-mail

20  before.  It doesn't have a Bates stamp so it wasn't produced

21  to us.

22          MR. BRAFMAN:  Okay.

23          MS. SMITH:  I don't know what's underneath those.

24  From the text messages that I have seen and that we have

25  produced there is some back and forth about rap lyrics and

SAM      OCR      RMR      CRR      RPR

Sidebar                                      1744

1   Mr. Shkreli is engaging in it and sometimes is the one who

2   kind of starts it.  This other stuff is not anything that I

3   have ever heard or seen in an e-mail.

4           MR. BRAFMAN:  Well, why can't I just show him this

5   without reading it and ask him if that's an e-mail that he

6   sent to Martin and if that's a term he used when he talked to

7   Martin.

8           MS. SMITH:  And I don't understand how this is

9   relevant.  It's highly prejudicial and it's --

10          MR. BRAFMAN:  It's not relevant if a witness so

11  intimidates a defendant like Mr. Shkreli who has been accused

12  by him of being a homosexual in front of a number of people?

13          THE COURT:  Well, this e-mail is to just to

14  Mr. Shkreli.  You have got other situations where you have

15  evidence that he made comments --

16          MR. BRAFMAN:  He did it in the presence of David

17  Hunt, one of his closest friends, and we can call Mr. Hunt and

18  he can deny it, but the fact is we have a good faith basis to

19  use it.  He can poo-poo it, but this shows an animus of the

20  witness to the defendant because of the manner in which he

21  perceives the defendant.

22          MS. SMITH:  I don't understand.  I mean this is

23  highly inflammatory and I don't understand how it is relevant.

24          MR. BRAFMAN:  Yes, I understand it's highly

25  inflammatory.

Sidebar                                            1745

1          THE COURT:  Let her finish.

2          MS. SMITH:  I don't understand how it's relevant to

3    the crimes being charged at all.

4          MR. BRAFMAN:  You made a point out of the fact that

5    there were times when Martin was hard to get ahold of.

6          MS. SMITH:  That's right.

7          MR. BRAFMAN:  And you put in an e-mail when Martin

8    said he had a toothache and that was an example of Martin not

9    being responsive.

10         There are other reasons why Martin was not

11   responsive to this man because Martin detested him and there

12   was a stream of profanities used by this man when he spoke

13   about Martin.  And on good days Martin would talk to him and

14   on bad days Martin didn't want to have to deal with it.  And

15   you opened this door.  You said why did Martin not call you

16   back, because Martin was trying to hide, Martin was offended

17   and that's why he didn't call him back.  And this is during

18   the period you're covering.  You talked about the San

19   Francisco trip.  This is the trip that you talked about.

20         MS. SMITH:  Okay, well, I don't know what else was

21   said or what Martin responded.  From what I have seen of his

22   e-mails, to the extent that they are engaging in

23   conversations, and I have never seen that word used, but it is

24   back and forth.  So I would want to see what is underneath

25   there.

Sidebar                                    1746

1        MR. BRAFMAN:  This is an e-mail from Martin Shkreli

2   to me telling me that he found this and it's an e-mail from me

3   to him.  I will make it as a court exhibit.

4        MS. SMITH:  And did Martin respond to this e-mail?

5        MR. BRAFMAN:  No, no.

6        MS. SMITH:  You have no e-mails where he responded?

7        MR. BRAFMAN:  I have no response to this e-mail.

8   What should he have said, I'm not going to get raped by a fag?

9        MS. SMITH:  I have seen him respond to other e-mails

10  in kind.

11       MR. BRAFMAN:  Okay, if you have one.

12       MS. SMITH:  But I still don't see how this is

13  remotely relevant.

14       THE COURT:  What is it that you're trying to show,

15  the reasons that he went dark?

16       MR. BRAFMAN:  I'm trying to show the reasons he went

17  dark.  Martin hated him.  This man made fun of Martin.  He

18  publicly humiliated him, and this witness has selective memory

19  of these events because it's embarrassing to have to admit

20  this.  That's why I want to probe the witness' relationship

21  with Mr. Shkreli.

22       MS. SMITH:  Your Honor, there are a whole bunch of

23  text messages going back and forth where they're joking like

24  friends for years.

25       THE COURT:  Well, are those going to be -- I mean --

SAM      OCR      RMR      CRR      RPR

```
                            Sidebar                      1747
```

1        MS. SMITH:  I wasn't planning on putting them in

2   because they include language by Mr. Shkreli using the N

3   word --

4        MR. BRAFMAN:  And this witness, right, and I wasn't

5   going to put them in because --

6        MS. SMITH: -- and this witness, right, but I will.

7        MR. BRAFMAN:  -- they use the N word for both of

8   them.

9        MS. SMITH:  -- that's right, your witness too.

10       THE COURT:  I just want you to know, I mean I think

11  it is relevant to explain why Mr. Shkreli refused or stopped

12  communicating with him, but if as the government says this is

13  part of their pattern of joking back and forth and bantering

14  in this manner, then it is fair ground for him to put those

15  e-mails in to explain that this, in fact, may not have been so

16  offensive to Mr. Shkreli, but rather he engaged in this kind

17  of thing himself.

18       I think it is off the path of what is relevant here

19  and it is also inflammatory, but I understand your reasons for

20  wanting to proffer them.  It is just that the government will

21  then be in a position to offer other e-mails.

22       MR. BRAFMAN:  Can I ask you --

23       THE COURT:  I just want to warn you.

24       MS. SMITH:  Or to ask other questions, for example,

25  was he ever derogatory about women?  I mean if we're going to

Sidebar                                          1748

1   do down this path, we're going to go down this path.  I don't

2   think it's appropriate, I think it's a complete side show.

3          MR. BRAFMAN:  Can I ask you for a professional

4   courtesy because this is important issue, I'd like to discuss

5   it with my client; I mean I'd like if we could break now and

6   revisit this in the morning?

7          THE COURT:  I think you should do that.  I think you

8   should both exchange e-mails so that you both know what the

9   other has.

10          MR. BRAFMAN:  We'll figure something out before the

11   morning.

12          MS. SMITH:  We have produced to the defense

13   everything we have.

14          MR. BRAFMAN:  I have the texts.

15          THE COURT:  Do you have anything else besides that

16   one?

17          MR. BRAFMAN:  I just don't want to go into it if

18   we're not going to use it.  I'd like to wait.

19          MS. KASULIS:  And if you are, if you would produce

20   those to us so we have an opportunity to review them, just to

21   be clear.

22          THE COURT:  So we will take a break for the evening,

23   speak to each other.

24          MS. SMITH:  Thank you.

25          MR. BRAFMAN:  Thank you, Your Honor.

                              Sidebar                      1749

1          MS. KASULIS:   Thank you, Your Honor.

2

3          (Sidebar concluded.)

4          (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

```
                        Proceedings                    1750
```

 1              (In open court - jurors present.)

 2              MR. BRAFMAN:  Thank you, Your Honor.

 3              THE COURT:  All right, ladies and gentlemen of the

 4     jury, at this time we are going to excuse you for the evening.

 5     I want to thank you again for your attention and your service.

 6     Please leave your notebooks face down on your chairs.  Do not

 7     discuss the case and please consciously avoid any exposure to

 8     anything regarding this case or Mr. Shkreli that does not

 9     occur within this courtroom.

10              All right, thank you and have a good evening.

11              (Jury exits.)

12              THE COURT:  The jurors will return at 9 o'clock.

13     Please have a seat.

14              Did you want to discuss another matter?

15              Oh, sir, you are excused for the evening, thank you.

16     We will start at 9, so if you could return.  Actually, we will

17     get the jury in the box by 9:30, so if you return between 9

18     and 9:30, we would appreciate it.

19              THE WITNESS:  Thank you.

20              THE COURT:  Thank you, have a good night.

21              THE WITNESS:  You, too.

22              THE COURT:  You can leave those documents right on

23     the desk.

24              (Witness steps down.)

25              THE COURT:  I believe the parties had an issue to

Proceedings                                    1751

1    raise about a witness.

2         MR. AGNIFILO:  We do.  We are trying to see if we

3    can work it out.

4         THE COURT:  All right.

5         (Pause.)

6         MR. AGNIFILO:  Just very briefly.  We think we can

7    work most of it out, but one thing that I want to make sure is

8    I give Your Honor sort of -- I don't want to have something

9    come up tomorrow that's really out of the blue, so here is the

10   issue with Jackson Su.

11        Jackson Su was an employee of Retrophin for a period

12   of time, for about a year.  It appears that he, from my

13   perspective, stole e-mails from Retrophin.  He gained access

14   to Martin Shkreli's e-mail addresses at Retrophin.  He took,

15   by his own admission, 250 e-mails.  I guess he downloaded them

16   in hard copy.  He kept them in a safe deposit box for a period

17   of time, and my concern, and I am not raising it to the Court

18   because I don't think that I can't resolve it with my

19   colleague from the Government because I think we can, but if

20   something should go awry, I want Your Honor to be aware of the

21   issue in a general sense, is Jackson Su is a little bit

22   different than some of the other witnesses because his 302s

23   certainly are expressed in a very accusatorial tone and a very

24   conclusory tone.  Martin Shkreli intentionally committed

25   securities fraud, he says things like that.

Proceedings                                1752

1        Now, what I think he did, and I won't know until he

2   takes the witness stand, is he also filed an SEC claim as a

3   potential whistleblower.  So putting the pieces together, and

4   this has not been confirmed to me, it seems to me that at some

5   point he downloaded these e-mails to substantiate his

6   whistleblower claim.  And so he sort of became at some point

7   his own private investigator to see if he could bring a

8   meritorious SEC claim by gaining access to Mr. Shkreli's

9   e-mails.

10       The first step is something we just discussed a

11  minute ago, which is a step in the right direction, is the

12  government is not going to seek to use any of the e-mails.

13  It's a different e-mail server.  It's not the regular e-mail.

14  There is a separate backup sort of e-mail system that they

15  created, and it seems to me that he got the e-mails from that

16  system.

17       THE COURT:  This is an e-mail server at Retrophin

18  that who created?

19       MS. KASULIS:  It's an archiving system, Your Honor.

20       MR. AGNIFILO:  Martin created.

21       MS. KASULIS:  It's an archiving system.  So Mr. Su,

22  as part of his administrative responsibilities as the chief

23  operating officer of MSMB Capital, at Mr. Shkreli's direction

24  he set up -- he actually contacted a company to set up an

25  archiving system at the company because there was concern,

Proceedings                    1753

1   because they were doing a lot of research into stocks that

2   there was a concern that there may be some insider trading

3   going on potentially, and so as part of a compliance function

4   they were trying to put compliance measures in place that

5   Mr. Jackson Su went ahead and got this archiving system set

6   up, and then periodically monitored the employees' e-mails to

7   ensure that there was no insider trading as part of his

8   compliance functions.

9          So obviously we, in terms of what Mr. Agnifilo is

10  saying about his representations as to Mr. Su's motives, et

11  cetera, I don't think that there is any reason why we have to

12  sort of go back and forth about this at this point in time.

13  We don't intend to use those e-mails with Mr. Su.  If he wants

14  to cross-examine Mr. Su about his motivations and bias and any

15  of those things, he's certainly able to do that.  We, of

16  course, are making sure that our witnesses are testifying as

17  to their own personal knowledge and within the Rules of

18  Evidence and so, you know, I understand those rules.  We make

19  sure that when we're eliciting testimony that we are within

20  those, in that framework, and so I do think we can work this

21  out.

22         I don't think there are any concerns here, to be

23  honest, but Mr. Agnifilo wanted to raise it with the Court.

24

25         (Continued on the following page.)

SAM       OCR       RMR       CRR       RPR

Proceedings                                    1754

1   (Continuing)

2        MR. AGNIFILO:  Well, my concern is that listen, it's

3   still -- I trust my colleague.  It's still an adversarial

4   system and I still have to keep alert to inadmissible

5   evidence.  My concern is that Jackson Su is going to testify

6   based on his personal knowledge, based on things that he saw

7   in these e-mails that I don't think he had a right to have.

8   Because if he didn't have a right to have them, he wouldn't

9   have kept them in a safe deposit box.  That just seems

10  suspicious.

11       THE COURT:  What is Retrophin's view about these

12  e-mails as the CEO as Mr. Su was a COO and was directed by the

13  former CEO to create this system and review and monitor

14  e-mails?

15       Is Retrophin taking a position as to whether or not

16  Mr. Su misappropriated these e-mails?

17       MS. KASULIS:  I don't know Retrophin's position.

18       MR. AGNIFILO:  I can inquire.  I can call

19  Retrophin's lawyers tonight and see if they have a view.

20       I mean, my concern is I think Jackson Su, try as

21  they might, that the Government might try to confine him to

22  e-mails that he himself got, conversations he himself

23  participated in or witnessed.  I don't know that he is going

24  to confine himself to those types of sources.  And we'll deal

25  with it as it comes.

VB        OCR        CRR

Proceedings                              1755

1        I'm putting the issue on Your Honor's radar screen

2   now so if something happens, Your Honor at least has this as a

3   base; that it may very well be that he testifies to things

4   that he claims are personal knowledge that he actually learned

5   through looking at these e-mails.

6        I absolutely trust that the Government will try to

7   carve that out, but it's my position, I think Jackson Su has a

8   motive, he's looking to make money, that why he filed the SEC

9   whistle-blower claim.  And so, my concern is, try as they

10  might to keep him testifying to reliable legitimate sources, I

11  don't know that we can trust Jackson Su to testify to that.

12       So, my point is, so if there's an objection that I

13  raise and it seems like it's something that he doesn't know

14  from personal knowledge, that I want to give Your Honor the

15  basis so Your Honor knows where I'm coming from with an

16  objection.

17       That being said, there was at least one Exhibit, I

18  know in the Jackson Su materials, I think that was marked as a

19  Government's Exhibit, which was one of these global relay

20  e-mails.  I think the Government's representation is they're

21  not going to use that e-mail and I appreciate it, so we

22  alleviate that problem.  And the rest we'll see how it goes

23  tomorrow.

24       I just wanted to give, Your Honor, that background.

25       THE COURT:  All right.

Proceedings                                              1756

1          MR. AGNIFILO:  That's it.

2          THE COURT:  All right.  Well, let's hope we do not

3    have anymore conflicts and sidebars, but that's wishful

4    thinking.

5          May I just make a point.  As you know, speaking of

6    Jackson is not appropriate but on the other hand when I get an

7    objection and I don't get a one word guide like leading or --

8    I think that did happen a couple of times today -- or compound

9    question or states a fact not in evidence, whatever it may be,

10   that would be helpful, too.  We might alleviate some sidebars.

11         ALL:  Okay, Your Honor.

12         THE COURT:  Sometimes I think there is an objection

13   and I am not really sure the objector knows why they objected,

14   they just did not want it coming out.

15         So, let's just try to do that so we can avoid too

16   many sidebars.

17         MR. AGNIFILO:  Very good, Your Honor.

18         MS. KASULIS:  Okay.

19         THE COURT:  Thank you.  Have a good night.

20

21         (Matter adjourned to Thursday, July 6th, 2017 at

22   9:30 a.m.)

23                              ooo0ooo

24

25

VB        OCR        CRR

1757

I N D E X

WITNESS                                              PAGE

**STEVEN EDWARD STICH**                              1490

   DIRECT EXAMINATION BY MS. SMITH            1490

   CROSS-EXAMINATION BY MR. KAPLAN            1524

   REDIRECT EXAMINATION BY MS. SMITH          1541

                                                     1545

**DARREN BLANTON**

   DIRECT EXAMINATION BY MS. SMITH            1545

   CROSS-EXAMINATION BY MR. BRAFMAN           1691

E X H I B I T S

EXHIBIT                                              PAGE

Government Exhibit 117-11                            1496

Government Exhibit 117-1                             1502

Government Exhibit 117-2                             1513

Government Exhibits 4 and 105-1                      1554

Government Exhibit 105-2                             1559

Government Exhibit 105-37                            1561

Government Exhibit 105-3                             1565

SAM      OCR      RMR      CRR      RPR

1758

1                              E X H I B I T S

2     EXHIBIT                                            PAGE

3     Government Exhibit 79-1                            1585

4     Government Exhibit 79-2                            1588

5     Government Exhibits 105-5, 105-38 and 105-39       1592

6     Government Exhibit 105-6                           1603

7     Government Exhibit 105-7                           1607

8     Government Exhibit 79-3                            1608

9     Government Exhibits 105-8, 105-9, 105-10, 105-11,  1613

10    105-12 and 105-40

11    Government Exhibit 105-13                          1633

12    Government Exhibit 105-15                          1636

13    Government Exhibit 105-16                          1641

14    Government Exhibit 105-17                          1643

15    Government Exhibit 105-18                          1646

16    Government Exhibits 105-19 and 105-20              1650

17    Government Exhibit 105-20 and 105-21               1651

18    Government Exhibits 105-23 and 105-24              1656

19    Government Exhibit 105-27                          1662

20    Government Exhibits 105-29, 105-30 and 105-31      1665

21    Government Exhibits 105-32 and 61                  1676

22    Government Exhibit 105-34                          1682

23    Government Exhibit 105-41                          1687

24

25

                    SAM      OCR      RMR      CRR      RPR