1759

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,        : 15-CR-00637(KAM)
4                                     :
                                      :
5                                     :
          -against-                   : United States Courthouse
6                                     : Brooklyn, New York
                                      :
7                                     :
                                      : Thursday, July 6, 2017
8    MARTIN SHKRELI,                  : 9:00 a.m.
                                      :
9            Defendant.               :
                                      :
10   - - - - - - - - - - - - - - - X

11           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE KIYO A. MATSUMOTO
12          UNITED STATES DISTRICT JUDGE, and a jury

13                 A P P E A R A N C E S:

14   For the Government:   BRIDGET M. ROHDE, ESQ.
                           Acting United States Attorney
15                         Eastern District of New York
                           271 Cadman Plaza East
16                         Brooklyn, New York 11201
                     BY:   JACQUELYN M. KASULIS, ESQ.
17                         ALIXANDRA ELEIS SMITH, ESQ.
                           G. KARTHIK SRINIVASAN, ESQ.
18                         Assistant United States Attorneys

19   For the Defendant:    BRAFMAN & ASSOCIATES, P.C.
                           767 Third Avenue
20                         New York, New York 10017
                     BY:   BENJAMIN BRAFMAN, ESQ.
21                         MARC AGNIFILO, ESQ.
                           ANDREA ZELLAN, ESQ.
22                         JACOB KAPLAN, ESQ.

23   Court Reporter:   Stacy A. Mace, RMR, CRR
                        Official Court Reporter
24                      E-mail:  SMaceRPR@gmail.com

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.

                SAM    OCR    RMR    CRR    RPR

Proceedings                          1760

1          (In open court - jury not present.)

2          THE COURT:  Do the parties want to bring anything to

3    my attention this morning?

4          MR. BRAFMAN:  Yes.  Respectfully, Your Honor, we

5    spoke briefly this morning and I agreed that I am not going to

6    continue the line of cross-examination that we moved to the

7    sidebar on.

8          I also have a question logistically as to how we

9    proceed today.  I am told that the paralegal who was handling

10   the exhibits is not available today and that I should use the

11   ELMO.  So my question is if I want the witness just to either

12   use something to refresh his recollection or ask him to look

13   at it for identification before I offer it, if I put it up on

14   the ELMO, will he see it, will the government see it and will

15   the Court see it and the witness without the jury seeing it?

16         MS. KASULIS:  Yes, I do believe there's capability

17   for that.

18         THE COURT:  Yes.

19         MR. BRAFMAN:  Okay, and then once it's admitted into

20   evidence, then we can get the jury to see it?

21         MS. KASULIS:  Yes.

22         MR. BRAFMAN:  Okay, thank you.

23         MS. KASULIS:  And, Your Honor, we did consult, both

24   myself and Mr. Agnifilo, last night with Retrophin regarding

25   the documents that Mr. Agnifilo raised at the end of court

Proceedings                                      1761

1   yesterday for Jackson Su, a witness we do intend hopefully to

2   call today.

3            THE COURT:  Yes.

4            MS. KASULIS:  Retrophin has taken no position with

5   respect to the documents.  We are not intending to introduce

6   any of those documents through Mr. Su today.  There may be a

7   couple of documents with respect to other witnesses we intend

8   to call that we may try to use those documents with, but we

9   are going to work with the defense and Retrophin to see if

10  there is a way to swap those documents out to avoid the issue

11  completely.  So it is a work in progress, I guess is our

12  update.

13           MR. AGNIFILO:  Agreed, yes.

14           THE COURT:  Okay, thank you.

15           (Pause in the proceedings.)

16           THE COURT:  All right, the jurors are here.  Are we

17  ready to proceed?

18           MR. BRAFMAN:  Yes, Your Honor.

19           (Pause.)

20           (Witness resumes the stand.)

21           (Jury enters.)

22           THE COURT:  Good morning, Ladies and gentlemen of

23  the jury.  All the members are present.

24           Is Mr. Brafman ready proceed with his

25  cross-examination?

SAM      OCR      RMR      CRR      RPR

Blanton - cross - Brafman                1762

1          MR. BRAFMAN:  Yes, Your Honor.

2          THE COURT:  And, Mr. Blanton, you are still under

3     oath, sir.

4          MR. BRAFMAN:  Good morning, Mr. Blanton.

5          THE WITNESS:  Good morning.

6          MR. BRAFMAN:  Your Honor, may I proceed?

7          THE COURT:  Yes.

8     D A R R E N   B L A N T O N,

9          called as a witness by the Government, having been

10         previously duly sworn, was examined and testified

11         further as follows:

12    CROSS-EXAMINATION

13    BY MR. BRAFMAN:

14    Q    Mr. Blanton, I think yesterday in words or substance you

15    said that on occasion you believed that Martin lied to you, is

16    that correct?

17    A    Correct.

18    Q    And you, I think, identified one of those lies as

19    suggesting that he had an independent auditor by the name of

20    Rothstein and Kass, is that correct?

21    A    Yes.

22    Q    Did you call Rothstein and Kass to inquire about whether

23    they were providing auditing work for MSMB Capital?

24    A    My brother was in charge of that and according to him, he

25    did.

SAM    OCR    RMR    CRR    RPR

Blanton - cross - Brafman                    1763

1    Q    And did you call them before you invested?

2    A    I don't recall exactly, but I think so.

3    Q    And did Martin give you the name of Andrew deMartelli of

4    Rothstein and Kass as the contact person there?

5    A    I don't remember, but I -- no, I don't remember.

6    Q    And do you know if Martin picked that name of that

7    accounting firm out of blue or did you know if they provided

8    actual accounting services for some of Martin's consulting

9    companies?

10   A    It was an e-mail that he sent me when I asked him the

11   question.

12   Q    Okay.  And do you know what, if any, the professional

13   relationship was with Rothstein and Kass and Martin Shkreli?

14   A    No.

15   Q    Do you know whether or not they actually performed

16   consulting work or auditing work for MSMB Consumer?

17   A    All I asked of him was on the fund that I am investing

18   in, who is the auditor.

19   Q    And he provided you with the name of Rothstein Kass?

20   A    Correct.

21   Q    And as you sit here today, you don't know why he chose

22   that name, correct?

23   A    I don't know why he does anything.

24   Q    Don't know why he does anything?

25   A    No, I don't have an insight to his brain.

1   Q    Do you consider Martin an odd duck?

2   A    No, I just don't know why anyone does anything.  I can't

3   read their minds.

4   Q    And despite not knowing what Martin does, at the end of

5   the day as the result of Martin's efforts, you are $5 million

6   ahead, are you not?

7   A    After I called the regulators.

8   Q    But you are $5 million ahead, is that a yes or no answer?

9   A    Yes.

10  Q    Okay.  Now, your investment in MSMB Capital came at the

11  end of the year, is that correct?

12  A    I think it was at the beginning of 2011.

13  Q    Okay.  And the prior year in 2010 you knew, did you not,

14  that MSMB Capital had only operated for two months before your

15  investment?

16  A    I wasn't -- I don't know -- I don't remember how long

17  they had operated.

18  Q    But we've established through documents that you've

19  identified that Martin began MSMB Capital in late 2009, in

20  November 2009, is that correct?

21  A    I could look at the documents if you want to show me the

22  track record.

23  Q    Well, you have worked with hedge funds that were audited,

24  am I correct?

25  A    Yes.

Blanton - cross - Brafman                    1765

1   Q    And if a hedge fund starts, for example, in November of
2   2010, would you expect a full year audit from the auditing
3   company?
4   A    I think they audit whatever the trades that have been
5   done in that year.
6   Q    And when you get an audit report, when do you generally
7   get an audit report, at the end of the year after the year
8   closes?
9   A    Yes.
10  Q    Sometime in mid year?
11  A    Yes.
12  Q    So generally speaking, an audit report from a hedge fund
13  in your experience if the year that they are auditing is 2010,
14  you would get an audit report sometime in the middle of 2011?
15  A    Yes.
16  Q    So there was nothing unusual about not getting an audit
17  report for the 2010 year in mid 2010, correct?
18  A    I just asked who the auditor was.
19  Q    Okay.  But the fact that you didn't get a report before
20  you invested was not something that you relied on, correct?
21  A    I didn't asked for an audited report.
22  Q    Did you ever ask for an audited report during the period
23  of your investment?
24  A    After I had been in the investment for a while.
25  Q    Okay.  Now, did Mr. Shkreli call you and tell you about

1    the OREX trade soon after the trade?

2    A    I don't remember how quickly after the trade it was.

3    Q    But you knew about it fairly soon after the trade?

4    A    I don't remember exactly how quickly it was.

5    Q    Well, when you heard about the OREX trade from Martin,

6    whenever that call was, Mr. Shkreli told you that it was not

7    good news, would that be a fair statement?

8    A    Yes.

9    Q    And at the end of the day the OREX trade was a bad trade,

10   in the parlance of what investors would say about good trade

11   or a bad trade, correct?

12   A    That's -- that's what he indicated on the phone, that it

13   was a mistake and that he was hoping to reverse it.

14   Q    Now, when a general partner in a hedge fund makes a

15   mistake, based on your experience does he have a legal

16   obligation to make that trade good or is it just part of the

17   business?

18   A    I don't understand the question.

19   Q    Well, you've been in hedge funds, correct?

20   A    Yes.

21   Q    As a limited partner?

22   A    Yes.

23   Q    And sometimes those hedge funds do well and sometimes

24   they don't?

25   A    Yes.

Blanton - cross - Brafman                    1767

1   Q     And sometimes they make good trades and sometimes they

2   make bad trades?

3   A     Yep.

4   Q     And if you are a limited partner, you have to defer to

5   the judgment and discretion of the general partner in a hedge

6   fund, correct?

7   A     Correct.

8   Q     And if a general partner blows a trade, meaning he bets

9   on a trade that the stock is going to go down, he shorts it,

10  loses money, so long as the hedge fund general partner acted

11  appropriately, do you have a right to demand that he reimburse

12  you for the loss of that trade?

13  A     No.

14  Q     Okay.  Now, did you ever call Josiah Austin?

15  A     I don't recall if I did.  I think I might have tried to

16  call him.  I don't think I ever got ahold of him.

17  Q     But Martin gave you his cell phone, isn't that correct?

18  A     I do believe he did, but I can't -- I don't recall

19  exactly.

20  Q     Were you aware of who Josiah Austin was before Martin

21  mentioned his name?

22  A     No.

23  Q     And then after he mentioned his name, you being from

24  Texas, Mr. Austin being from Texas, it was pretty easy for you

25  to check him out to see who he was, correct?

1          MS. SMITH:  Objection, Your Honor.

2          THE COURT:  Overruled.

3   BY MR. BRAFMAN:

4   Q    You may answer, sir.

5   A    It was easy if I could have gotten ahold of him, I don't

6   remember getting ahold of him.

7   Q    Do you know whether he is a rancher?

8   A    I don't know if he is a rancher.

9   Q    Did you ever Google him to see who he was?

10  A    I don't remember.

11  Q    And did Martin, in words or substance, tell you he was

12  managing Mr. Austin's money?

13  A    I don't remember exactly what extent he told me that he

14  was doing it, but he did mention Mr. Austin and he did say

15  that he had a business relationship with him, especially in

16  the trade with Lehman.

17  Q    And as an investment advisor to Mr. Austin?

18  A    I don't remember exactly how his role was, some form of

19  that.

20  Q    And did he tell you that he had Mr. Austin's, some of

21  Mr. Austin's money under management?

22  A    I do recall some type of statement like that, yes.

23  Q    Okay.  And do you know what the definition is used by the

24  SEC when the words assets under management are used in

25  connection with an investment?

1    A    No.

2    Q    Do you know what assets under management mean in terms of

3    their legal significance?

4    A    I -- when I asked that question it was what are the

5    assets under management of the fund I'm investing in.

6    Q    Okay.  And you understand that to mean what is the fund's

7    bottom -- what is the fund's assets under management, what is

8    in the fund, is that correct?

9    A    Right.

10   Q    And do you know whether assets under management as the

11   legal definition includes assets over which you have

12   discretion to invest on behalf of another person?

13   A    What was the question?

14   Q    Do you understand whether or not the definition of assets

15   under management also includes money that you are investing on

16   behalf of another person as his or her investment advisor?

17   A    I think my question was pretty clear.

18   Q    I think my question is pretty clear.  Can you answer my

19   question?

20   A    No.

21   Q    Do you know whether or not the legal term assets under

22   management includes assets that you are managing on behalf of

23   an investor?

24            MS. SMITH:  Objection, Your Honor.  Legal --

25            THE COURT:  He has answered the question.  I think

Blanton - cross - Brafman                    1770

1    it has been asked and answered.

2    BY MR. BRAFMAN:

3    Q    Is your answer you don't know?

4    A    I've asked that assets under management of the fund -- I

5    asked what the assets under management of MSMB Capital were.

6    Q    What do you understand the words assets under management

7    to mean?

8           MS. SMITH:  Your Honor, asked and answered.

9           THE COURT:  Sustained.

10   Q    Now, do you know whether MSMB Capital ever invested any

11   cash into Retrophin?

12   A    I know that they said they did.

13   Q    Okay.  And do you know whether MSMB invested -- MSMB

14   invested Mr. Shkreli's -- withdrawn.

15          Do you know whether Mr. Shkreli's shares of

16   Retrophin were ever put into MSMB?

17   A    No, I don't know that.

18   Q    Where did you get your money back from?

19   A    Where did I get my money back from?

20   Q    Yes.

21   A    From MSMB.

22   Q    And where did MSMB get the money back from?

23   A    I don't have any idea.

24   Q    But MSMB was being controlled by Martin at the time, is

25   that correct?

1  A    Yes.

2  Q    And MSMB was an investor in Retrophin, is that correct?

3  A    I don't -- I don't know if they were at that point.  I

4  assume they could have been.

5  Q    And Mr. Shkreli was also one of the people who are in

6  charge of Retrophin, is that correct?

7  A    Correct.

8  Q    Now, did you ever see any money from MSMB that was taken

9  out by Mr. Shkreli?

10  A    What was that question again?

11  Q    Did you ever see from the books and records that you

12  received any money going to Martin Shkreli from MSMB?

13  A    There wasn't any information in the books and records.

14  Q    And do you know of any -- do you have any independent

15  knowledge of any money taken by Mr. Shkreli out of MSMB?

16  A    I don't.

17  Q    Now, would it be a fair statement that one of the

18  skillsets you have is in introducing people and networking

19  them?

20  A    Yes.

21  Q    And at the beginning when you set up those meetings with

22  Mr. Shkreli in Texas and in other places, that would be a term

23  that would include sort of networking, correct?

24  A    Yes.

25  Q    And networking broadly defined means that you are trying

SAM    OCR    RMR    CRR    RPR

1  to establish business relationships between and among people

2  who might have the same interests?

3  A    Yes.

4  Q    And the people who you invited to the meetings with

5  Mr. Shkreli were pretty much people who had an interest in

6  biotech, correct?

7  A    Correct.

8  Q    And they were knowledgeable people, according to your

9  testimony?

10 A    Yes.

11 Q    Mr. Blanton, we are going to be using this contraption on

12 my left here.  So you are going to have to look at your

13 screen, if you can.

14           I've put on 79-2 in evidence.

15           MR. BRAFMAN:  Are the screens working?

16           THE WITNESS:  I see it.  It's kind of blurry.

17           MR. BRAFMAN:  Yes, my screen doesn't have it at all,

18 Your Honor.

19 BY MR. BRAFMAN:

20 Q    Are you able to see it now, sir?

21 A    Yes.

22           THE COURT:  Can the jurors see the document?

23           MR. BRAFMAN:  No, neither my screen nor the jurors'

24 screens are working, Your Honor.  And it is not on the screen

25 over there either.

```
 1            (Pause.)
 2            MR. BRAFMAN:  It is now on my screen.  Do the jurors
 3  have it?
 4            THE JURY:  No.
 5            MR. BRAFMAN:  Okay, it's off again.
 6            THE COURTROOM DEPUTY:  Someone is coming down.
 7            THE JURY:  Now we have it.
 8            (Exhibit published.)
 9            MR. BRAFMAN:  I have it now.  Does the jury have it?
10            THE JURY:  Yes.
11  BY MR. BRAFMAN:
12  Q    Mr. Blanton, can you see the document?
13  A    Yes.
14  Q    This was introduced by the government as Exhibit 79-2,
15  and it's an e-mail from Martin Shkreli to you and JD McCulloch
16  dated April 10th, 2011.  Is that correct, sir?
17  A    Yes.
18  Q    And if you go down to the part that I am pointing at, can
19  you see that?
20  A    Yes.
21  Q    It says Account Values, correct?
22  A    Yes.
23  Q    And it says at the bottom as of March 31st, 2011, the net
24  account value was $1,324,905, is that correct?
25  A    Yes.
```

Blanton - cross - Brafman                    1774

1  Q    Now, this e-mail and this value is sent to you after the

2  OREX trade blows up, is that correct?

3  A    Correct.

4  Q    And it's after Mr. Shkreli, essentially, tells you in

5  words or substance that the OREX trade lost all of the money

6  in the fund, correct?

7          MS. SMITH:  Objection, Your Honor, mischaracterizing

8  testimony.

9          THE COURT:  Sustained.

10  BY MR. BRAFMAN:

11  Q    Did Mr. Shkreli tell you whether the OREX trade

12  essentially wiped out the assets of the fund?

13  A    No.

14  Q    Did you believe there were other assets?

15  A    He said that he could -- it could be construed as that,

16  but that he was telling them it was a bad finger trade.  And

17  so with this -- this statement, I assumed he got it resolved.

18  Q    Well, do you know whether that million-324,000 includes

19  any Retrophin shares that Mr. Shkreli deposited into MSMB?

20  A    There would be no way to derive that value from Retrophin

21  shares at that point of the company.

22  Q    Well, at that point in the company Retrophin had been

23  valued at $20 million, is that correct?

24  A    No.

25  Q    You were never told that?

1   A    That company could not have been valued at $20 million at

2   that stage of its -- its formation.

3   Q    Do you remember being asked in 2014 to prepare and fill

4   out a proxy statement?

5   A    I do.

6   Q    I show you what's in evidence as 105-41.

7        (Exhibit published.)

8   BY MR. BRAFMAN:

9   Q    Do you remember this document was shown to you by

10  Ms. Smith on direct examination?

11  A    Yes.

12  Q    Okay.  And this was a Retrophin proxy statement that you

13  ultimately signed.  If I turn to the last page, do you see

14  your signature on the bottom?

15  A    Yes, I remember doing that.

16  Q    Okay.  Now, this is a form you signed in 2014, correct?

17  A    Correct.

18  Q    May 7th, 2014 it says on the bottom, correct?

19  A    Correct.

20  Q    Now, let me see if I can explain, with your help, what a

21  proxy statement is.  A proxy statement is a request by the

22  company for you to vote on certain matters that the company is

23  considering doing, is that correct?

24  A    Correct.

25  Q    And this allows you to vote without actually having to

1    show up and go to the meeting and vote in person, correct?

2    A    Correct.

3    Q    So what you're doing by this proxy is you are authorizing

4    someone else in the company to cast your vote as if you went

5    to the meeting, correct?

6    A    Correct.

7    Q    And in this proxy statement, among the things you were

8    being asked to approve of is the Board of Directors recommends

9    a vote for Proposals 1, 2, 4 and 5 and three years for

10   Proposal 3.

11          Now, Proposal 1 is election of directors.  Do you

12   see that?

13   A    Yes.

14   Q    And the first person who is listed as someone that the

15   company wants as a director is Martin Shkreli, correct?

16   A    Correct.

17   Q    And you voted for him, did you?

18   A    Correct.

19   Q    And you voted for Martin Shkreli to be a director of

20   Retrophin almost three years after you had concluded that

21   Martin Shkreli, according to you, lied, is that correct?

22   A    Correct.

23   Q    And according to you, almost three years after you had

24   concluded that Martin Shkreli had committed a fraud on you?

25   A    Correct.

Blanton - cross - Brafman                    1777

1    Q    And yet in 2014, rather than either abstaining or voting

2    against Martin Shkreli because of what you claimed to have

3    been a fraud, you voted in favor of Martin Shkreli, is that

4    correct?

5    A    Correct.

6    Q    Now, never once did you tell the Board of Directors of

7    Retrophin that this man you got running the company had

8    committed a fraud in connection with a hedge fund that I and

9    others invested in, correct?

10   A    I had not talked to any of the board members.

11   Q    Ever?

12   A    I don't recall talking to them.

13   Q    And you didn't write them a letter or have your lawyers

14   contact them, right?

15   A    I don't recall.

16   Q    And when they asked you in 2014 to approve a slate of

17   people who were going to run this company that you had a

18   substantial number of shares in, you voted in favor of Martin

19   Shkreli, correct, sir?

20   A    I voted in favor.

21   Q    Okay.  Now, I think you -- on direct examination I think

22   the government -- on direct examination the government

23   introduced as 105-51 this PowerPoint of MSMB Capital

24   Management that you -- 105-1, I'm sorry, that you received

25   when you got the materials from Mr. Shkreli before you

Blanton - cross - Brafman                    1778

1    invested, correct?

2              (Exhibit published.)

3    A    Correct.

4    Q    And did you read it?

5    A    Yes.

6    Q    Okay.  Now, I want to turn your attention to what is

7    really the first page after the cover page.  It's with the

8    Bates Number Colt T00385.

9              Incidentally, Colt is your company, correct?

10   A    Correct.

11   Q    And this is included among the documents that you turned

12   over to the government?

13   A    What is?

14   Q    This document.

15             (Exhibit published.)

16   A    Okay.

17   Q    Is it?

18   A    I don't know, I can only see a part of it.

19   Q    Well, when you turned them over, your documents, to the

20   government did your attorneys or you Bates stamp them in the

21   bottom with Colt so they can be identified as your documents?

22   A    I don't think we did that.

23   Q    The government did that?

24   A    I assume.

25   Q    But you said you read this, right?

1   A     This -- I can't see it.

2          THE COURT:  Can you zoom it out so he can see the

3   whole document?

4          MR. BRAFMAN:  Sorry.

5   BY MR. BRAFMAN:

6   Q     You say you --

7   A     Is this the PowerPoint that was part of the presentation?

8   Q     Yes.  Do you recognize it?

9   A     Yes.

10  Q     Okay.  Now, it says experienced manager, and that

11  references to Mr. Shkreli, is that correct?

12  A     Yes.

13  Q     And it says Martin Shkreli has a decade of top-tier hedge

14  fund investing experience.  Do you see that?

15  A     Yes.

16  Q     And at the time did you know whether that was true or

17  not?

18  A     I assumed it was.

19  Q     And did you check to see which of his hedge funds he had

20  been manager of?

21  A     Well, we -- we had talked to the people at Intrepid and

22  my brother talked to some of the other people, Kramer

23  Rosenthal.

24  Q     And Cramer Berkowitz --

25  A     Cramer Berkowitz.

Blanton - cross - Brafman                    1780

Q     -- Cramer Berkowitz is Jim Cramer, the investment guru on
TV?

A     I think so.

Q     Yes.  And after speaking with them, you still agreed to
invest, correct?

A     Correct.

Q     Now, if we could look at the following page, sir, do you
see it on your screen?

            (Exhibit published.)

A     Yes.

Q     And it says that Martin Shkreli was previously with
Intrepid Capital Management and Cramer Berkowitz?

A     Yes.

Q     At the time you invested, did you have any reason to
believe that that was not true?

A     No.

Q     And then it says, Edward Painter, director of research.
Do you know Mr. Painter?

A     No.

Q     Had you ever met him?

A     Not to my knowledge.  I can't remember meeting him.

Q     Okay.  And it says Mr. Painter was previously with
Ameriprise Financial, UBS, Salomon Brothers and Goldman Sachs.

            Now, with respect to UBS, you know what that is,
right?

1    A     Yes.

2    Q     And that is a substantial bank investment company?

3    A     Yes.

4    Q     And Salomon Brothers is a big hedge fund?

5    A     I think it's an investment bank.

6    Q     Okay.  And do you know that Goldman Sachs is an

7    investment bank, is that correct?

8    A     Yes, sir.

9    Q     And have you ever heard of Ameriprise Financial?

10   A     Yes.

11   Q     And are they also a big hedge fund or a big investment

12   bank?

13   A     I don't think so.

14   Q     What do you know them to be?

15   A     I would think they're more of a lender.

16   Q     Okay.  Now, did you contact any of these institutions to

17   see if Edward Painter was really affiliated with them?

18   A     I didn't do that, my brother did that.  He was in charge

19   of the due diligence.

20   Q     And nothing your brother learned from any of these

21   institutions caused you to not invest, correct?

22   A     There were a few things that we discussed and we

23   basically -- he went back and called, made further calls, and

24   I don't -- it's been so long ago, I don't remember exactly.

25   But there were some red flags that we were able to get over.

```
                  Blanton - cross - Brafman              1782
```

1   Q    That you were able to get over?

2   A    Right.

3   Q    And you chose to invest, correct?

4   A    Correct.

5   Q    And Marek Biastek, you've met him, correct?

6   A    I met him later.

7   Q    And do you know whether or not Mr. Biastek was previously

8   with Yorkville Capital and RBC Proprietary Trading?

9   A    I assumed he was.

10  Q    Now, I want you to move to the next page, sir, which has

11  a Bates stamp of Colt 000387.  Do you have that, sir?

12           (Exhibit published.)

13  A    Yes.

14  Q    And pointing to the third arrow, MSMB has traded 293

15  securities to date, including options contracts.  193 have

16  been profitable.

17           Do you see that?

18  A    Yes.

19  Q    At the time you invested did you know whether that was

20  true or not?

21  A    No.

22  Q    Now, if we could look at the next page.

23           (Exhibit published.)

24  BY MR. BRAFMAN:

25  Q    The top line reads:  Value every healthcare stock we can

1    using private equity style approaches.  Do you see that?

2    A    Yes.

3    Q    If a company is not yet public so you can't use last sale

4    to value the stock, how do you value it in your experience?

5    A    You would value it based on private equity style

6    approaches.

7    Q    Now, you understand what last sale is, correct?

8    A    Yes.

9    Q    So if I invest in Google and I want to know what my

10   hundred shares are worth, I can look at the board to see what

11   someone paid for the last purchase of Google, correct?

12   A    Correct.

13   Q    And that would tell me what my stock is going to be worth

14   on the day I buy it?

15   A    In the public markets it's trading?

16   Q    Yes.

17   A    Yes.

18   Q    And this is before Retrophin becomes public so there is

19   no ability to use last sale to value it, correct?

20   A    Right.

21   Q    Now, nevertheless, in your experience you have invested

22   in private equity, correct?

23   A    Yes, and that's why I don't think Retrophin was worth

24   what he said it was.

25   Q    I understand what your opinion is, but I'm asking you in

Blanton - cross - Brafman                    1784

1    valuing a private equity position, what are some of the things

2    you consider?

3    A    Retrophin was a venture capital deal, it wasn't a private

4    equity deal.

5    Q    So what do you consider in terms of evaluating Retrophin

6    as a company?

7    A    You look at the management team.  You look at the assets

8    that they are putting in their -- in their portfolio, their

9    platform assets, which would be drug compounds that they had

10   licensed or any type of property that would potentially become

11   a drug that could go through federal trials.

12   Q    Okay, thank you.  Now, there came a time I think you said

13   yesterday.

14            MR. BRAFMAN:  If we could have 105-31.

15   BY MR. BRAFMAN:

16   Q    105-31 is an e-mail and an attachment that I think

17   Ms. Smith entered into evidence yesterday.  Do you recognize

18   this e-mail as coming from Evan Greebel to you on October

19   24th, 2013, and it has the subject Draft Settlement Agreement?

20            (Exhibit published.)

21   A    Yes.

22   Q    At that time did you know who Evan Greebel was?

23   A    He identified himself as the company corporate counsel.

24   Q    And did you ever talk to him in person?

25   A    I think so.

Blanton - cross - Brafman                    1785

1   Q    And did you have a lawyer of your own who spoke with Evan

2   Greebel?

3   A    Yes.

4   Q    And your lawyer and Mr. Lieberman and others interfaced

5   with Mr. Greebel on numerous occasions to try and resolve this

6   matter, isn't that correct?

7   A    They did.

8   Q    And attached to this is a proposed settlement and release

9   agreement.  Do you see that?

10  A    Yes.

11  Q    Now, you testified yesterday that this came to you out of

12  the blue?

13  A    I don't know what you mean by out of the blue.

14  Q    Did you have any indication that your lawyer or

15  Mr. Greebel was negotiating a potential settlement of your

16  claim?

17  A    I remember discussing the potential of getting my shares

18  back or my -- getting shares or getting my money back.

19  Q    By working out some type of a settlement, correct?

20  A    Correct.

21  Q    And this proposal came to you and it was rejected by you

22  or your attorneys or both of you, correct?

23  A    If this is one of the ones that was rejected, then yes.

24  Q    Okay.  Now, were you bartering for a better settlement

25  agreement?

SAM    OCR    RMR    CRR    RPR

Blanton - cross - Brafman                    1786

1   A    I don't remember what the circumstances were, but I just

2   remember the attorney said it wasn't acceptable.

3   Q    The attorney was telling you it wasn't acceptable?

4   A    Right.

5   Q    And if you look at the first cover page of the settlement

6   and release agreement, can you see it, sir?

7   A    Yes.

8   Q    The first paragraph indicates that you are going to get a

9   hundred-thousand shares of Retrophin if you sign this

10  settlement, correct?

11  A    Correct.

12  Q    You wanted more?

13  A    I assume that is part of the reason that we didn't think

14  it was acceptable.

15  Q    And you eventually got more?

16  A    Yes.

17  Q    So it was a negotiation by you to get additional shares

18  of Retrophin, this is why it wasn't acceptable, correct?

19  A    Part of the reason.

20  Q    Okay:  Now, when you got this document, did you remember

21  if you called Martin Shkreli?

22  A    I don't remember, but I could have.

23  Q    All right.

24       MR. BRAFMAN:  Give me 105-30.

25  BY MR. BRAFMAN:

Blanton - cross - Brafman                    1787

1   Q    This is 105-30, which the government put into evidence

2   yesterday.

3            (Exhibit published.)

4   BY MR. BRAFMAN:

5   Q    Do you recognize this as an e-mail from Greebel to you,

6   copying Martin Shkreli, listing draft consulting agreement?

7   A    Yes.

8   Q    And did you request a consulting agreement?

9   A    No.

10  Q    Do you know if your lawyers requested a consulting

11  agreement because the settlement agreement wasn't

12  satisfactory?

13  A    They did not --

14  Q    I'm sorry?

15           MS. SMITH:  Objection, Your Honor, just the dates.

16  This is --

17           MR. BRAFMAN:  It's September 12th, 2013.

18           MS. SMITH:  Yes, and the one that you showed him

19  before was from October, so this is actually before then.

20           MR. BRAFMAN:  Okay.

21  BY MR. BRAFMAN:

22  Q    So this came to you before the settlement agreement,

23  correct?

24  A    I don't -- yeah, I mean I guess if it's September and the

25  other one is October, then this was before.

Blanton - cross - Brafman                1788

1    Q    And do you know why this draft was not acceptable to you

2    or your attorneys?

3    A    I don't remember.

4    Q    Okay.  Now, ultimately you did sign a consulting

5    agreement, correct?

6    A    Correct.

7    Q    Now, before signing it, do you know whether or not your

8    attorneys sent edits to the drafts that they were receiving

9    from Mr. Greebel?

10   A    They could have.

11   Q    Well, did you discuss the consulting agreement with your

12   attorneys after you received the draft?

13   A    Yes, I'm sure I did.

14   Q    And I am going to show you only for identification.

15              MR. BRAFMAN:  So if we can just show it to the

16   witness and not the jurors yet.

17              THE COURT:  Yes.

18   BY MR. BRAFMAN:

19   Q    Now, I'm showing you what's marked, sir, as Defense

20   Exhibit 4325, marked for identification only.  Do you see it?

21   A    Yes.

22   Q    Are you able to see it on your screen?

23   A    Yes.

24   Q    All right.  Do you know whether this is a draft of a

25   consulting agreement that came from your lawyer to Mr. Greebel

1    in an attempt to edit it?

2    A    I don't -- I don't know.

3    Q    Okay.  Well, look down at paragraph four, the edits

4    contained in the section iii in parentheses.  Do you see that

5    that I'm pointing to?

6    A    Yes.

7    Q    All right.  Read that to yourself and tell me whether or

8    not this is an edit by your attorney discussing the nature of

9    the consulting work that you are going to do.

10            (Pause.)

11            MS. SMITH:  Objection, Your Honor, the document is

12   not in evidence.

13            MR. BRAFMAN:  I'm asking if it refreshes his

14   recollection.

15   A    No.

16   Q    It doesn't?

17   A    No.

18   Q    Okay.  Now, ultimately you get a signed consulting

19   agreement, which is dated March 6th, 2014.

20            MR. BRAFMAN:  And it's in evidence so I am going to

21   place it on the screen and hope everyone can see it.  It's

22   Government Exhibit 61.

23            THE WITNESS:  Is this in my book?  Is there a tab?

24            MS. SMITH:  Tab 41.

25   BY MR. BRAFMAN:

Blanton - cross - Brafman                    1790

1    Q    Let me know when you have it, sir.

2    A    I have it.

3    Q    And do you remember ultimately signing this after

4    reviewing it with your lawyer and approving it?

5    A    Yes.

6    Q    And if you look at the last page, there is a signature

7    line for yourself and Mr. Shkreli, do you see that?

8    A    Yes.

9    Q    And Mr. Shkreli signs it as the CEO of Retrophin,

10   correct?

11   A    Yes.

12   Q    And that's your signature, sir?

13   A    Yes.

14   Q    So on March 6th of 2014, you agreed by this agreement to

15   serve as a consultant for Retrophin, is that correct?

16   A    Yes.

17   Q    And you had this agreement vetted by your attorney who

18   was interfacing with Retrophin's attorneys before you signed

19   it and before Mr. Shkreli signed it, is that correct?

20   A    Yes.

21   Q    And if you look at paragraph 1, it indicates that

22   description of services, do you have that, sir?

23   A    Yes.

24   Q    Consultant will serve as an advisor to the company and

25   provide consulting services (the services) on strategic and

1   corporate governance matters to the management of the company

2   as requested upon reasonable notice.  Consultant shall be

3   permitted to undertake other employment or activities provided

4   that such employment and activities are not in violation of

5   terms of this agreement or compete with the business or

6   activities of the company.

7           So that's the services that you agreed to perform on

8   behalf of Retrophin, correct?

9   A    And I was willing to do that, but never asked to do it.

10  Q    Never asked, okay, that's your answer?

11  A    Yes.

12  Q    So did you ever perform consulting services for the

13  government --

14          MS. SMITH:  Objection.

15  BY MR. BRAFMAN:

16  Q    -- for Retrophin?

17  A    I was never asked.

18  Q    I asked you whether or not you ever performed consulting

19  services for Retrophin; yes or no?

20  A    I was never asked.

21          THE COURT:  So is it a no?

22  Q    Is that a no?

23  A    No.

24  Q    That's a no; yes, correct?  Yes, that's a no?

25  A    Yes.

1          MS. SMITH:  Objection.

2          THE COURT:  Wait, the record is getting very

3    muddled.  Just did you ever perform consulting services for

4    Retrophin?

5          THE WITNESS:  What's the definition?  Under this it

6    says I am to be available.

7          MR. BRAFMAN:  Okay.

8    BY MR. BRAFMAN:

9    Q    You are the consultant according to this agreement, yes?

10   A    Yes.

11   Q    And what did you understand your obligations to be when

12   you signed this binding agreement?

13   A    From March 6th till the end of the year to be available

14   for doing whatever they told me to do based on this paragraph.

15   Q    And to help the company in a consultant capacity?

16   A    Right.

17   Q    All right.  Now, when you signed this agreement did you

18   believe that you were intending to commit a crime?

19   A    No.

20   Q    And when you signed this agreement did you consider this

21   a sham agreement or a real agreement?

22   A    It says in paragraph B or B(i) that the company has the

23   requisite power and authority to enter into and consummate the

24   transactions set forth in this agreement, and I signed it with

25   the CEO and corporate counsel.

Blanton - cross - Brafman                    1793

1    Q    So you believed it was a real agreement?

2    A    I assumed that it was a way that I could get my money

3    back, get my shares for founding the company and for some of

4    my investment in MSMB, and it was all approved by the company.

5    Q    And you agreed to this without anybody forcing you to

6    agree to it, correct?

7    A    Correct.

8    Q    And in time you believed it was in your best interest in

9    terms of resolving your dispute with Martin, MSMB and

10   Retrophin to enter into this agreement, correct?

11   A    I -- yes.

12   Q    Okay.  And in return for entering into the agreement, you

13   got 200,000 shares of Retrophin, correct?

14   A    Well, they sent me more and Martin said I could keep

15   them, but they asked for them back.

16   Q    But at least you got 200,000 shares, those were never

17   returned, correct?

18   A    Correct.

19   Q    And you even have 150,000 of those shares still in your

20   portfolio as we speak, correct?

21   A    Correct.

22   Q    All right.  Now, so you got the degree of compensation

23   called for in the agreement, correct?

24   A    Correct.

25   Q    And it's your testimony under oath that you didn't

Blanton - cross - Brafman                    1794

1  perform any work as a consultant?

2  A    I am not testifying that I didn't perform any work, I am

3  testifying that I was available to perform.  I wasn't asked.

4

5                (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. BRAFMAN:

3    Q    But you did do work on behalf of Retrophin, didn't you?

4    A    I did whatever work I would normally do for a company.

5    Q    Did you ever have a signed consulting agreement with

6    another company that's gone out of business, MSMB?

7    A    This isn't a consulting agreement with MSMB.

8    Q    I know, but it's a consulting agreement to reimburse you

9    for the loss that you sustained as an investor in MSMB, isn't

10   it?

11   A    No.

12   Q    It's not?

13   A    It's a consulting agreement that gives me shares in a

14   company that I was partial founder of.

15   Q    And you agreed to release MSMB from any and all claims

16   that you might otherwise have for the activities in MSMB;

17   correct?

18   A    According to this document there are releases from a

19   bunch of entities.

20   Q    Well, let's look at that, if you don't mind, sir.  On

21   page four on the exhibit is paragraph ten.  Do you have that,

22   sir?

23   A    Yes.

24   Q    So you are releasing, among others, if you move down with

25   me to the bold caps, to the caps, Martin Shkreli personally;

1    correct?

2    A    Yes.

3    Q    MSMB Capital Management LP; correct?

4    A    Yes.

5    Q    MSMB Capital Management LLC; correct?

6    A    Correct.

7    Q    MSMB Healthcare LP; correct?

8    A    Correct.

9    Q    MSMB Healthcare Investors LLC correct?

10   A    Correct.

11   Q    MSMB Healthcare Management LLC; correct?

12   A    Correct.

13   Q    You're not releasing Retrophin from anything, you're

14   releasing all of these other companies; correct?

15        MS. SMITH:  Objection, Your Honor, mischaracterizing

16   the document.

17        THE COURT:  Sustained.

18        Rephrase, please.

19   Q    So these are all of the MSMB-related companies you are

20   releasing; correct?

21   A    In my opening testimony, I described my educational

22   background and there was nothing about legal or lawyer, being

23   a lawyer in it.

24   Q    I understand that.  You graduated high school with a year

25   of college; correct?

Blanton - cross - Brafman                    1797

1    A    Correct.

2    Q    But you've managed to turn your life into an

3    extraordinary financial success, didn't you?

4    A    I guess that's opinion.

5    Q    Well, how much is your current net worth, Mr. Blanton,

6    forgive me for intruding?

7    A    I have no idea right now.

8    Q    You have no idea?

9    A    No, it's based on a lot of private investments or I don't

10   have a current statement.

11   Q    Your testimony under oath today is you have no idea how

12   much money you're worth, you and your wife and your family?

13   A    I have an idea, but I don't choose to disclose that.

14   Q    I'm asking you the question and Her Honor will determine

15   if you have to answer the question.

16        Your sophistication as an investor is what we are

17   trying to determine.  You have in excess of $100 million

18   personal net worth, do you not?

19        MS. SMITH:  Objection, Your Honor.  Can we do a

20   sidebar?

21        THE COURT:  Yes.

22        MR. BRAFMAN:  Your Honor, I'll move on.

23   Q    Do you have a horse investment.  Do you invest in horses?

24   A    I buy horses.

25   Q    Yes.  And have you on occasion told people including

                    Blanton - cross - Brafman                1798

1   Mr. Shkreli that you own approximately $70 million worth of

2   horses?

3   A    No.

4   Q    Did you never said that ever?

5   A    I don't recall saying 70 million at all.

6   Q    What is the value of the horses that you own?

7   A    I have -- it's relative to whatever somebody pays for

8   them.

9   Q    So you don't know how much your horse collection is

10  worth?

11  A    No.

12  Q    It more than $25 million?

13  A    I have no idea.

14  Q    Is it more than $100?

15  A    Yes.

16  Q    So you're telling me that one of the reasons that you

17  have trouble discussing this is because you're not a lawyer;

18  is that what you said at the beginning?

19  A    No.  I said I have trouble explaining this because I'm

20  not a lawyer.

21  Q    But you had a lawyer working with you; in fact, he

22  accompanied you on all of your meetings to the government;

23  correct?

24  A    Yes.

25  Q    And you had the opportunity to review this with him

Blanton - cross - Brafman                    1799

1  before you signed it?

2  A    Yes.

3  Q    And ask him any questions if you didn't understand any

4  part; correct?

5  A    Correct.

6  Q    And when you were signing it, did you understand that by

7  signing this consulting agreement you were releasing all of

8  the MSMB-related affiliates from any future liability that you

9  might be able to hold them accountable for; isn't that

10  correct?

11  A    Correct.

12  Q    All right.  So you understand that what you're doing is

13  you are settling any claims or lawsuits against these entities

14  that you might otherwise have; correct?

15  A    And that's -- I didn't file a lawsuit.

16  Q    But you can't now that you signed this agreement;

17  correct?

18  A    Correct.

19  Q    All right.  And one of the people you were also releasing

20  was Martin Shkreli personally?

21  A    And I didn't file a lawsuit against Martin Shkreli.

22  Q    And you're releasing him in this agreement personally;

23  correct?

24  A    Correct.

25  Q    And, now, at the time you're releasing him, Martin is the

Blanton - cross - Brafman                    1800

1   CEO of Retrophin; correct?

2   A    I don't recall because -- yes, yes, he was the CEO of

3   Retrophin.

4   Q    He was the CEO of Retrophin --

5   A    Yes, yes.

6   Q    -- that you had a substantial investment in; correct?

7   A    I didn't have an investment.  They converted my shares in

8   MSMB and also they basically gave me the founder's shares or

9   some of them, a portion.

10  Q    So at the time you released Martin Shkreli personally,

11  you had a substantial amount of Retrophin stock, let's just

12  ask it that way; correct?

13  A    Correct.

14  Q    And you were giving up your right to sue Martin Shkreli

15  by signing this agreement; correct?

16  A    Yes.

17  Q    So even though you hadn't sued him up to that point, you

18  were giving up the right to sue him should you have thought

19  about doing it at a later time; correct?

20  A    Correct.

21  Q    Now after you signed a consulting agreement, did there

22  come a time when you began to send investors to Retrophin?

23  A    I basically had told people about the company and I think

24  that they had hired some good people at the company and I told

25  them I thought it had a good potential to be -- grow larger.

Blanton - cross - Brafman                    1801

1    Q    Okay.  Now this is in evidence as Government Exhibit 105-

2    34, correct, sir?  You saw that yesterday?

3    A    Yes.

4    Q    And this is an e-mail dated May 18, 2014, several months

5    after you signed your consulting agreement; correct?

6    A    Correct.

7    Q    And I think you testified under oath that you didn't

8    provide any work as a consultant; correct?

9    A    Correct.

10   Q    Now, I want you to read the bottom part from -- from you

11   to Martin.  "Good talking to you Friday and I look forward to

12   seeing you in the next couple of weeks.  I appreciate you

13   sending me the 400,000 shares in Retrophin over the last few

14   months from my initial role and investment in the company and

15   I hope I can help you make it an even bigger success as a

16   consultant."

17            Is that the word you used?

18   A    Yes.

19   Q    That's your word, it's not Mr. Shkreli's word?

20   A    And if you notice there's a question mark because I was

21   getting the shares for my investment in the company and for my

22   initial role.

23   Q    But the word you used to describe yourself was as a

24   consultant; right?

25   A    Yes.

SN        OCR        RPR

Blanton - cross - Brafman                1802

1   Q    Now Martin answers you, if you look further up on the

2   chain, on May 18:  "Thanks, Darren.  Our share price has been

3   sagging.  Is there any way you could introduce me to folks who

4   I could pitch the stock as an investment to," and you respond

5   by saying, "Yes, I have been talking it up.  The banker at

6   Leerink loves you and so does Lawrence at Prosight.  You might

7   talk to them about your deal also and maybe think of a

8   creative loan structure where they could get some shares."

9        Do you see that?

10  A    Yes.

11  Q    And when you said to Martin Shkreli that the banker at

12  Leerink loves you, were you being truthful?

13  A    Yes.

14  Q    Who's the banker at Leerink or who is described that way?

15  A    I think it was a guy named Neil Sullivan.

16  Q    Did you speak to him about Retrophin?

17  A    Yes.

18  Q    And about Martin?

19  A    Yes.

20  Q    And he obviously said good things about Martin?

21  A    Yes.

22  Q    And did you say to Mr. Leerink (sic), by the way this guy

23  scammed me for two years out of my investment in MSMB or did

24  you agree that Martin was a good guy?

25  A    I don't remember what I said.

1  Q    But did you say to him in words or substance anything

2  about the ordeal you testified about in this courtroom in

3  connection with Martin Shkreli?

4  A    I don't remember.

5  Q    Well, wouldn't you have remembered -- if you said it,

6  would you then still be telling Martin that Leerink loves you

7  or would you tell Martin, stay away from Leerink, he thinks

8  you're a crook?

9  A    Martin?

10 Q    Yeah.

11 A    I wasn't talking to Martin.

12 Q    You say, "Yes, I have been talking it up.  The banker at

13 Leerink loves you."  Let's stop there.  That's a statement

14 from you to Martin; correct?

15 A    Right.

16 Q    And you're telling Martin if you want to talk up

17 Retrophin or pitch Retrophin, one of the people who likes you

18 or loves you is the banker at Leerink; correct?

19 A    Right.

20 Q    And you talked to him about Martin?

21 A    I talked to him about Retrophin.

22 Q    And Martin.  He said that he loves you, no Retrophin?

23 A    He said it.  I didn't say it.

24 Q    When you spoke to this man in 2014, did you tell him, by

25 the way, Martin has stolen money from me or lied to me or

Blanton - cross - Brafman                    1804

1    defrauded me; did you say any of those things?

2    A    I don't remember.

3    Q    If you had said that, then he would no longer love Martin

4    and you wouldn't be asking him to call Martin, isn't that a

5    fair conclusion?

6              MS. SMITH:  Objection, asked and answered.

7              THE COURT:  Overruled.

8    Q    You may answer.

9    A    There was a lot of bad press about Martin at that time

10   and people, even with the bad press, still liked the company.

11   The company had assets and people that Martin had hired that

12   were doing well so I don't remember exactly what the

13   circumstances were.

14   Q    But you were not saying he loves Retrophin.  The word is

15   "you," Martin Shkreli; correct?

16   A    The banker.

17   Q    Correct?

18   A    Correct.

19   Q    Who you spoke to?

20   A    Correct.

21   Q    And you were telling Martin that he should call this man

22   to talk to him about investing; correct?

23   A    Correct.

24   Q    And then Lawrence at Prosight, who is that?

25   A    He's a fund manager.

Blanton - cross - Brafman                    1805

1    Q    And he is a friend?

2    A    He -- yes.

3    Q    And what's his last name?

4    A    Lawrence Atwood -- no, I can't remember his last name.

5    Lawrence -- I can't remember his last name.

6    Q    Let's call him Lawrence?

7    A    Yeah, Lawrence.

8    Q    Lawrence at Prosight we'll call him.

9         Lawrence at Prosight was someone you knew

10   personally?

11   A    Yes.

12   Q    And he was a fund manager?

13   A    Yes.

14   Q    And you said nothing to Lawrence about your alleged

15   experience with Martin Shkreli and MSMB, did you?

16   A    I don't remember but I could have.

17   Q    And you think you could have said to him, by the way,

18   Shkreli is crook but you should invest with him?

19   A    No, I could have said that I've had issues but they've

20   been resolved and the company is better than I think -- it's

21   not just about him.

22   Q    But when you had pitched Martin Shkreli to call these

23   people, did you tell any of these people that you had already

24   filed a claim with the SEC as a whistleblower against Martin

25   and MSMB?

1  A    I didn't tell anybody that.

2  Q    That was private; right?

3  A    Right.

4  Q    I'm going to ask you to look at this.

5        MR. BRAFMAN:  It's for identification only, Your

6  Honor, if we could?  Am I able to go?

7        THE COURTROOM DEPUTY:  Yes.

8        THE COURT:  Yes.

9        MR. BRAFMAN:  If I may give Your Honor and the

10 Government a copy.  It's Defendant's Exhibit 4352 marked for

11 identification.  I'm just doing this as a precaution.  I don't

12 know if they were included in the other exhibits, Your Honor.

13        THE COURT:  Thank you.

14        MR. BRAFMAN:  You're welcome.

15 BY MR. BRAFMAN:

16 Q    Mr. Blanton, do you see DX 4352 on your screen?

17 A    Yes, part of it.

18 Q    Well, let me move it so you can see the whole document.

19 Do you see the whole document?  Are you able to -- tell me if

20 you're able to read it.  I'll start at the top you read it

21 through and tell me if you are able to see that this document

22 includes a series of exchanges between you and Mr. Shkreli --

23 A    Yes.

24 Q    -- in May of 2014; correct?

25 A    Yes.

Blanton - cross - Brafman                    1807

1   Q    You recognize this as e-mails you received from

2   Mr. Shkreli and e-mails you sent to Mr. Shkreli?

3   A    Yes.

4             MR. BRAFMAN:  Your Honor, I offer it into evidence.

5             MS. SMITH:  Objection, Your Honor.  There's no basis

6   for offering this.

7             THE COURT:  Well, do you want to make a proffer?

8             MR. BRAFMAN:  Could we do it at sidebar?

9             THE COURT:  Sure.

10            (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                         Sidebar                    1808
```

1              (The following occurred at sidebar.)

2              MR. BRAFMAN:  Your Honor, this is a continuation of

3    the e-mail that's already in evidence.  The only part that's

4    been added is another e-mail from Mr. Blanton to Mr. Shkreli

5    in which he is describing some rich guys who are interested

6    in -- who would be interested and you could pitch and having

7    him telling them how creative you are as a CEO.

8              I don't know the nature of the objection.  It goes

9    to the state of mind about Mr. Shkreli and it's directly about

10   him.

11             MS. SMITH:  You can't ask him about it.

12             MR. BRAFMAN:  Why?

13             MS. SMITH:  It's hearsay and you're offering it for

14   the truth that he said he was a creative CEO.

15             MR. BRAFMAN:  If I'm going to ask him about it and

16   if you allow him to testify to it, then it's admissible as a

17   document.

18             MS. SMITH:  That's not true.  That's not the basis

19   for factually admitting a document in evidence.  You certainly

20   can ask him about it.

21             MR. BRAFMAN:  I also understand the rules of

22   evidence.  This is a continuation of a document that's already

23   in evidence and it is an issue of completeness and it's the

24   same e-mail chain.  I found it after the other one was already

25   admitted and I just want to complete the chain.

```
                        Sidebar                      1809

 1          THE COURT:  Well, I think in order to --

 2          MR. BRAFMAN:  The other one is in evidence, Your

 3   Honor.

 4          THE COURT:  I understand.  You want this document in

 5   because of the last response from Mr. Blanton?

 6          MR. BRAFMAN:  Right.

 7          THE COURT:  And to the extent it may impeach his

 8   statements that he was talking up the company but not the

 9   individual?

10          MR. BRAFMAN:  Yes.

11          THE COURT:  All right.  I'm going to overrule the

12   objection.

13          MR. BRAFMAN:  Thank you, Your Honor.

14          (Sidebar concludes.)

15

16

17

18

19

20

21

22

23

24

25
```

1   (Continuing.)

2            THE COURT:  The objection is overruled.

3            MR. BRAFMAN:  I may offer it into evidence?

4            THE COURT:  Yes, you may.  We will receive

5   Defendant's Exhibit 4352 with the Government's objection

6   overruled.

7            MR. BRAFMAN:  Thank you, Your Honor.

8            (Defendant's Exhibit 4352 received in evidence.)

9   Q    Now, Mr. Blanton, it's now in evidence so we're going to

10  be able to read it together.  It's DX 4352.  Do you have it on

11  your screen?

12  A    Yes.

13  Q    All right.  And let's begin at the top just to get the

14  date and context.  The top says Monday May 18, 2014; correct?

15  A    19.

16  Q    I'm sorry, May 19th is the date on top; correct?

17  A    Correct.

18  Q    And if you start from the bottom it begins -- the

19  dialogue begins on May 18; correct?

20  A    Correct.

21  Q    And this is an e-mail chain; correct?

22  A    Correct.

23  Q    Between you and Mr. Shkreli; correct?

24  A    Correct.

25  Q    Now, if you see that this e-mail starts on the bottom

Blanton - cross - Brafman                1811

1    with Martin saying, "Good talking to you Friday and I look

2    forward to seeing you in the next couple of weeks.  I

3    appreciate you sending me the 400,000 shares in Retrophin over

4    the last few months for my initial role and investment in the

5    company.  I hope I can help you make it be as big of a success

6    as a consultant."

7           That's an e-mail you sent to Mr. Shkreli on May

8    18th; correct?

9    A    Correct.

10   Q    And if you then go up on May 18th, Mr. Shkreli e-mails

11   you at 7:54 p.m. and says, "Thanks, Darren.  Our share price

12   has been sagging.  Is there any way you can introduce me to

13   folks who I can pitch the stock as an investment to?"  Do you

14   see that?

15   A    Yes.

16   Q    And then you respond, "Yes.  I have been talking it up.

17   The banker at Leerink loves you and so does Lawrence at

18   Prosight.  You might talk to them also and maybe think of a

19   creative loan structure where they could get some shares."

20   Correct?

21   A    Yes.

22   Q    And then you say to Mr. Shkreli on May 19th at 3:04 a.m.

23   "He has some Rich guys who listen to him and could buy size.

24   Let's talk about it.  Also, Aaron has a huge following and I

25   have been telling him how creative you are as a CEO."

1            Do you see that?

2   A    Yes.

3   Q    Who is Aaron?

4   A    He is another investor in Dallas.

5   Q    Another investor in Dallas but not in Retrophin?

6   A    No.

7   Q    And what's his last name?

8   A    Aaron Fletcher.

9   Q    And it's someone you know?

10  A    Yes.

11  Q    Someone you respect?

12  A    I know him.  He's a decent investor.

13  Q    And it's someone who you wanted to discuss Martin Shkreli

14  with; correct?

15  A    Yes.

16  Q    "And he has some rich guys that listen to him and could

17  buy size."

18            By "size" were you referring to a large position in

19  Retrophin?

20  A    Yeah, but I think that was more related to Lawrence.

21  Q    Okay.  But when you talked about it -- let's just stop at

22  the period and talk about -- "let's talk about also Aaron has

23  a huge following and I've been telling him about how creative

24  you are as a CEO."

25  A    Yes.

Blanton - cross - Brafman                1813

1   Q    And this is Aaron Fletcher; correct?

2   A    Yes.

3   Q    And when you say "huge following" he has lots of clients

4   and contacts?

5   A    Yes.

6   Q    And you were describing Martin Shkreli in May of 2014 as

7   a very creative CEO?

8   A    Yes.

9   Q    You weren't describing Martin Shkreli in 2014 to these

10  investment bankers as someone who scammed you, were you?

11  A    Well, we had done an agreement where we released each

12  other and he had paid me those shares.

13  Q    So all was forgiven?

14  A    Well, that's the purpose of a release, isn't it?

15  Q    But when you're talking to people even after a release

16  has been signed, you're vouching for the character of the

17  individual as a creative CEO, aren't you?

18  A    On paragraph eight it says non-disparagement.

19  Q    So that means you can't say anything bad about Martin

20  Shkreli, doesn't it?

21  A    That's not what I'm doing.

22  Q    But it doesn't require you to rave about Martin Shkreli,

23  doesn't it?

24  A    That's a thin -- a blurred line.  I don't know what

25  you're talking about.

1    Q    "The creative CEO to an investment advisor" that's not

2    a -- kind of a good review?

3    A    You'll have to determine that.

4    Q    Mr. Blanton, as you sit here today, are you telling this

5    jury that when you say "Martin is a creative CEO" that's for

6    us to determine what you meant?

7    A    Well, you said it's not a rave -- you said a rave review.

8    Q    So let me bring it down a notch.  It's a good review,

9    isn't it?

10   A    He did some good things in the company and I still think

11   the company is benefitting from those creative things.  That

12   doesn't take away that he lied and tried to defraud me out of

13   my investment.

14   Q    So now that you have said that Martin lied and tried to

15   defraud you, you are talking to people you know, people in the

16   Texas investment community and you are essentially vouching

17   for Martin Shkreli?

18   A    I said what I said in the e-mail.

19   Q    And that's vouching for Martin Shkreli, isn't it?

20   A    That's what I said in the e-mail.

21   Q    Does that mean that you were vouching for Martin Shkreli?

22   A    I was trying to tell them about the company.  I thought

23   it was good.

24   Q    That's not what you say.  There isn't a word about

25   Retrophin.  It's about Martin Shkreli as a creative CEO;

1    right?

2    A    There's words in there in the other text.

3    Q    In the text where we're looking at now, it's about Martin

4    Shkreli as a creative CEO.  It doesn't say a word about

5    Retrophin in your e-mail; correct?

6    A    But the company -- it up -- it means the company and the

7    paragraph below that.

8    Q    When you value an asset, is it essentially what the

9    market will bear if it's not a public company?

10   A    Any asset?

11   Q    I'm sorry?

12   A    Any asset?

13   Q    Let's assume you're an experienced buyer and seller of

14   horses, would that be a fair statement?

15   A    Yes, yes.

16   Q    So if you have a colt that has good breeding and good

17   lineage and you decide to sell it for $100,000, you value that

18   horse at $100,000; correct?

19   A    Yes.

20   Q    And part of what you value is the animal itself; correct?

21   A    Yes.

22   Q    And if somebody wants to buy that from you and pay

23   $100,000, how do you value the asset in your own mind?

24   A    What they will pay.

25   Q    Okay.  And you know, do you not, that Steve Richardson,

Blanton - cross - Brafman                1816

1   Sarah Hassan, Ed Sullivan all invested in Retrophin before it

2   became a -- a public company and their investment value was

3   $20 million.  You know that, don't you?

4              MS. SMITH:  Objection, Your Honor.

5              THE COURT:  Sustained.

6   Q    Did you have an estimate in your own mind as to what the

7   value of Retrophin was when you invested?

8              MS. SMITH:  Objection, Your Honor.

9   A    I wasn't --

10             THE COURT:  Overruled.

11  A    I didn't invest.

12  Q    When you saw Retrophin be formed, were you able to

13  determine a valuation in your own mind of what the company's

14  potential was?

15  A    No.

16  Q    Martin did, didn't he?

17  A    I assume he did when he sent me this agreement.

18  Q    And the agreement that he sent you was valuing the

19  company how?

20  A    Can you pull it up?  I think it was at 20 million.

21  Q    Okay.  Do you know how he came to that number?

22  A    No.  That was at a time when we were not talking.

23  Q    You were not talking?

24  A    Not during that time when he sent that -- about what he

25  valued it, I didn't get -- I wasn't privy to his valuation.

Blanton - cross - Brafman                    1817

1   Q     But when you got the consulting agreement and put a value

2   of $20 million, you and your lawyers didn't dispute that.

3   A     The consulting agreement didn't have the value of $20

4   million.

5   Q     What had the value?

6   A     It didn't have the value.

7   Q     What had the value of $20 million?

8   A     There was a tab in the binder that I got that had -- it

9   was part of the exhibits.

10  Q     I'll put it up for you.  You're talking about 105-38 in

11  evidence?

12  A     Yes, yes.

13  Q     Excuse me?

14  A     Yes.

15  Q     And you and the other investors received this document;

16  correct?

17  A     Correct.

18  Q     And you see where I'm pointing where it says "Market cap,

19  $20 million"?

20  A     Yes.

21  Q     And do you know where Martin got that number?

22  A     First of all, a private company doesn't have a market

23  cap.  Second of all, it's called a pre-money evaluation.

24  Q     Okay.

25  A     You can't -- market cap and pre-money evaluation are like

1   cats and dogs.

2   Q     All right.  Let's stay with only the cats, okay?

3         Market cap, forget it.  Valuation of the company was

4   $20 million?

5   A     It's -- the valuation is not -- is not the market cap.

6   Q     I understand that, but what was the company's valuation

7   from reading this?

8   A     I didn't execute anything on this document.  This was

9   just a document sent to me to look at.

10  Q     I know, but do you understand where and how Martin picked

11  the number 20 million?

12  A     No, I do not.

13  Q     And did you have an opportunity in recent weeks since you

14  still own 150,000 shares to determine the value of Retrophin?

15  A     That's publicly traded information.

16  Q     And am I correct, sir, that it's in excess of $750

17  million as we speak?

18  A     I think it's close to that.  I don't know the exact

19  number.

20  Q     Okay.  So it's substantially more than the markets --

21  than Martin's valuation before it went public; correct?

22  A     Correct.

23  Q     And you had no idea do you where Martin took the number

24  $20 million from?

25  A     No.

Blanton - cross - Brafman                    1819

1    Q    Did you ever ask him?

2    A    I don't recall asking him.

3    Q    Do you know if your lawyers ever asked his lawyer where

4    are you getting this number from?

5    A    I think the most important thing was the share

6    percentage, the percentage of ownership.

7    Q    Well, a percentage of ownership is irrelevant if you

8    don't know what the company's value is; right?

9    A    Most startup company's valuations are irrelevant.

10   Q    Okay.  So at the end of the day, whether you want to

11   agree with it or not, Martin was right on Retrophin; correct?

12          MS. SMITH:  Objection, Your Honor.

13   A    No.

14          THE COURT:  Sustained.

15   Q    Now, if you could look at -- I'm going to put up just for

16   identification an e-mail which begins at the bottom of the

17   page.  It's the only e-mail that I'm going to ask you about on

18   this page.  It's Defendant's Exhibit 3545 for identification

19   only.

20          Do you recognize this as an exhibit that -- an

21   e-mail that you exchanged with Mr. Shkreli in March of 2012?

22   A    I'm reading it.  I don't remember, but I see what you

23   sent me.

24          MS. SMITH:  Your Honor, just for the record, this is

25   marked Defendant's Exhibit 4345.

Blanton - cross - Brafman                    1820

1            MR. BRAFMAN:  I misspoke, 4345.  Thank you,

2    Ms. Smith.

3    A    Is this in my binder?

4    Q    No.  Do you know who prepared the binder that you keep

5    referencing, the Government?

6    A    I just was given it.

7    Q    You didn't have anything to do with preparing it?

8    A    No.

9    Q    Or choosing which items to put in?

10   A    I didn't.

11   Q    Okay.

12           MR. BRAFMAN:  Your Honor, I'm asking the witness to

13   look at DX 4345.

14   Q    And tell me whether or not this is an e-mail from you to

15   Martin Shkreli on March 11, 2012?

16   A    It looks like it -- it looks like it is.

17   Q    I'm sorry?

18   A    It looks like an e-mail from me to Martin Shkreli in

19   2012.

20           MR. BRAFMAN:  Your Honor, I offer it in evidence.

21           MS. SMITH:  Objection, Your Honor.  Basis?

22           THE COURT:  Sustained.

23           MR. BRAFMAN:  I'm sorry?

24           THE COURT:  Sustained unless you want to make a

25   proffer at sidebar.

Blanton - cross - Brafman                1821

1    Q    In connection with your consulting agreement were you

2    ever required to sign Retrophin's code of ethics and insider

3    trading policy?

4    A    Not to my knowledge.

5    Q    I'm going to show you what's marked for identification

6    only as Defendant's Exhibit 4330 and ask you to look at this

7    and tell me whether it refreshes your recollection that you

8    were indeed asked to sign Retrophin's code of ethics.

9    A    I see it.  I don't remember it.  It doesn't bring back my

10   recollection.

11   Q    Was Sam Lieberman your lawyer at the time?

12   A    Yes.

13   Q    Excuse me?

14   A    Yes.

15   Q    In connection with the consulting agreement?

16   A    Yes.

17   Q    And was he interfacing with Evan Greebel on your behalf?

18   A    Yes.

19   Q    And are you familiar with correspondence they exchanged

20   during this time period?

21   A    I know they did.  I don't remember all of them.

22   Q    Do you recognize this as a document that they exchanged

23   among themselves?

24   A    I see this.  I don't -- yes, it's a document that they

25   exchanged.

Blanton - cross - Brafman                    1822

1   Q    It came with a fully executed copy of the consulting

2   agreement; correct?

3   A    Assume it did.  I don't remember everything.

4   Q    Well, do you see the --

5            MR. BRAFMAN:  Your Honor, I offer this into

6   evidence.  It was attached to the final consulting agreement

7   that they offered yesterday.

8            MS. SMITH:  Objection, Your Honor.

9            THE COURT:  I will overrule the objection.

10            MS. SMITH:  Your Honor, can we have a sidebar

11   please?

12            THE COURT:  All right, sidebar.

13            (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                    1823
```

1          (The following occurred at sidebar.)

2          MS. SMITH:  Your Honor, the witness isn't on this

3     documents and said it doesn't refresh his recollection.  The

4     actual consulting agreement is in evidence and it itself says

5     that the consultant shall sign and agree to be bound by the

6     company's code of ethics and insider trader policies.

7          THE COURT:  So just use this.

8          (Sidebar concludes.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Continuing.)

2            THE COURT:  The objection to Defendant's Exhibit

3    4330 is sustained.

4    BY MR. BRAFMAN:

5    Q    Now, Mr. Blanton, I'm asking you again do you remember

6    having to sign Retrophin's code of ethics and insider trading

7    policy?

8    A    No.

9    Q    I'm going to ask you to look at the executed copy of your

10   consulting agreement which is in evidence as Government

11   Exhibit 61.  Do you have that in front of you?

12            MS. SMITH:  Tab 41.

13   A    Yes, I have it right here.

14            MR. BRAFMAN:  One moment, Your Honor.

15   Q    If you look at -- I'm going to put it up on the screen.

16   This is Government Exhibit 61 in evidence.  Do you see that?

17   A    Yes.

18   Q    And this is the final copy of the agreement you signed on

19   or about March 6, 2014; correct?

20   A    Correct.

21   Q    Okay.  Ignore the highlighting.  That's just my notes.

22   I'm going to ask you to turn to the bottom of page four.  Turn

23   to the top of page five.  I apologize, I'm going to read the

24   beginning at the top of page five.

25            In accordance with the company's policies,

Blanton - cross - Brafman                    1825

1   consultants shall sign and agree to be bound by the company's

2   code of ethics and insider trading policy."

3           Do you see that?

4   A    Yes.

5   Q    So does it refresh your recollection that as part of the

6   consulting agreement you agreed to be bound by the company's

7   code of ethics and the insider trading policy?

8   A    That's what it says.

9   Q    Well, you signed it before you read it, right -- you read

10  it before you signed it, right?

11  A    Yes.

12  Q    And one of the things that you agreed to is to be bound

13  by the company's code of ethics and insider trading policy;

14  correct?

15  A    Correct.

16  Q    Did you ask your lawyer to explain what the company's

17  code of ethics were and what the insider trading policy was?

18  A    I don't remember.

19  Q    Do you have any clue as you sit here now what the

20  company's code of ethics was and what its insider trading

21  policy was?

22  A    No.

23  Q    Now, the individual you described previously as Aaron --

24  and that's Aaron Fletcher; is that correct?

25  A    Yes.

Blanton - cross - Brafman                1826

1    Q    I'm going to show you what's been marked for

2    identification as Defendant's Exhibit 4351.  Do you see that,

3    sir?

4    A    Yes.

5    Q    And I ask if you recognize this to be an e-mail exchange

6    from you to Mr. Shkreli -- I'm sorry, from Mr. Shkreli to you

7    and from you to Mr. Shkreli and Aaron Fletcher at or about May

8    19th or May 20th of 2014?

9    A    Yes.

10             MR. BRAFMAN:  Your Honor, I offer it into evidence.

11             MS. SMITH:  Your Honor, what's the basis?

12             MR. BRAFMAN:  4351.

13             THE COURT:  Your basis for offering this document is

14   what, sir?

15             MR. BRAFMAN:  To establish his role as a consultant.

16             MS. SMITH:  Objection to that basis, Your Honor.

17             THE COURT:  All right.  Why don't you ask him

18   questions and see if you can provide an appropriate basis to

19   admit this document.

20   BY MR. BRAFMAN:

21   Q    Do you recall sending Martin an e-mail on May 20th of

22   2014 telling him that you've got private investors who are

23   interested in Retrophin?

24   A    I think it was public then.

25   Q    You were asking him to -- that you have certain private

SN        OCR        RPR

1    investors, and that's referring to the company, private

2    investors who are interested in Retrophin?

3    A    I don't know what you're -- when you say "private" --

4    Q    Well, did you use the term private investors?

5    A    I mean, if you want to show me the document.

6    Q    It's on the screen, Mr. Blanton, as Defendant's Exhibit

7    4351 for identification.

8    A    I don't remember.

9    Q    Do you recall sending this document and getting a

10   document from -- sending this document to Mr. Shkreli and also

11   sending an e-mail to Aaron Fletcher?

12            MS. SMITH:  Your Honor, just the top of the document

13   is getting cut off on the screen.

14            THE COURT:  Why don't you just show him the whole

15   document because he cannot see it.

16            MR. BRAFMAN:  I did.

17   BY MR. BRAFMAN:

18   A    I see it I see it.  It was cut off, I'm sorry.

19   Q    Does it refresh your recollection?

20   A    Yes, yes.

21   Q    And did you in about May 20th send an e-mail to Martin in

22   which you asked him for the latest PPT for Retrophin?

23   A    Yes.

24   Q    What's PPT?

25   A    It would be like a presentation, a corporate presentation

Blanton - cross - Brafman                     1828

1    that they have.

2    Q     And did you tell him that you had several private

3    investors that are interested?

4    A     On that e-mail, yes.

5    Q     And was that true at the time?

6    A     I assume it was.

7    Q     Okay.  Now -- well, you said it; right?

8    A     Exactly.

9    Q     Now, did you then send an e-mail, if you recall, to

10   Mr. Shkreli and Aaron Fletcher?

11   A     Yes.

12   Q     And it was an e-mail by way of introduction; is that

13   correct?

14   A     Yes.  And this refreshes my memory.  Aaron is a

15   consultant to hedge funds so he tells people about ideas and

16   he does research on biotech companies.

17   Q     And in the conversation that you recall, you are telling

18   Aaron that you and he had visited a bunch about Retrophin; is

19   that correct?

20   A     Yes.

21   Q     Was that true?

22   A     Yes.

23   Q     So you had tried to interest Aaron in Retrophin; is that

24   correct?

25   A     I think I was asking him his opinion on it and we

Blanton - cross - Brafman                    1829

1   discussed it back and forth.  I would ask people what they

2   thought.  He was more of a consultant.

3   Q    A consultant to you?

4   A    To me and to others.

5   Q    And what you also said, if you recall, was that despite

6   the fact that you and he had visited a bunch, it was nothing

7   like hearing the story from the CEO; correct?

8   A    Correct.

9   Q    And did you tell him that Martin is doing some great

10  things and it's worth sharing with his clients?

11  A    Yes.

12  Q    And this was in May of 2014; correct?

13  A    Correct.

14  Q    And Martin was doing great things with Retrophin; isn't

15  that correct, that's what you meant to say?

16  A    I think so.

17  Q    Do you have any doubt that's what you said?

18  A    No, I would think that he would cause Retrophin stock to

19  go up.

20  Q    And you were, in effect, recommending him; is that

21  correct?

22  A    It looks like I was recommending him them to talk to him.

23  Q    Now, did you visit Martin and his team at Retrophin?

24  A    Yes.

25  Q    And did you ever tell Martin after the visit that your

Blanton - cross - Brafman                    1830

1   office and team are impressive, let's roll, R-O-L-L?

2   A    I could have.  I don't remember exactly.  If you have the

3   document, show me?

4         MR. BRAFMAN:  Your Honor, if I may approach to

5   explain why I'm going to be only showing him part of the

6   document?

7         THE COURT:  Sure, just show him.  That's fine.

8         MR. BRAFMAN:  I'm not offering the document or the

9   top part, for reasons we discussed earlier.

10        THE COURT:  All right could you just tell us the

11  exhibit number.

12        MR. BRAFMAN:  Defendant's Exhibit 4350.

13        THE COURT:  Thank you.

14  BY MR. BRAFMAN:

15  A    Yes, that's in 2014.

16  Q    So it refreshes your recollection that in 2014 you

17  visited Martin's team?

18  A    Yes.

19  Q    And you then told him that your office and team are

20  impressive?

21  A    Yes.

22  Q    And did you mean that at the time?

23  A    Yes.

24  Q    And you then said in words or substance let's roll;

25  correct?

Blanton - cross - Brafman                    1831

1    A    Yes.

2    Q    And by using that phrase, you meant let's essentially

3    move ahead?

4    A    I assume.

5    Q    Well, it was your words.  What did you mean?

6    A    I meant that let's make it bigger.  Let's, you know, keep

7    going.

8    Q    Now, I want to put up on the screen 105-34 which is in

9    evidence.  I'm sorry, we used that already.

10            Now, did you sometimes text to Martin besides

11   e-mails?

12   A    Yes.

13   Q    All right.  But I want to refer you to June 11, 2014 to

14   what appears to be a brief e-mail exchange from you to Martin

15   Shkreli marked DX 4346 for identification and ask if you --

16   and look at the top of the document and tell me whether you

17   recognize this as an e-mail to you -- from you to Martin

18   Shkreli.  Do you see that?

19   A    Yes.

20   Q    Do you recognize the document?

21   A    Yes.

22            MR. BRAFMAN:  Your Honor, I offer it into evidence

23   as DX 4346.

24            MS. SMITH:  Objection, Your Honor.  Same issue.

25            THE COURT:  Sustained.

Blanton - cross - Brafman                    1832

1    BY MR. BRAFMAN:

2    Q    Did you on June 11, 2014, tell Martin that you want to

3    work on the deals that you and he were talking about?

4    A    It looks like I said something.

5    Q    And did you tell him that you looked at another company

6    in New York called IRX that you wanted him to look at?

7    A    Yes.  I think that they were presenting to me and they

8    were in New York and some of the other deals were just

9    companies that people had sent to me and so I thought I'd run

10   it by him.

11   Q    And you told Martin that IRX might be an interesting

12   immuno-oncology company?

13   A    Right.

14   Q    Why did you invite Martin to look at it?  Did you value

15   his opinion as a scientist?

16   A    Yes, I thought -- I didn't value it as a scientist, but I

17   thought I would get his opinion on it.

18   Q    Okay.  But this was you inviting Martin, not Martin

19   pushing himself on you; correct?

20   A    Right.

21   Q    Now, this isn't during the period when you were having

22   trouble contacting Martin, is it?

23   A    I don't think I had trouble contacting him after the

24   consulting agreement was signed.

25   Q    And you had constant -- almost constant back and forth

1   with Martin after the consulting agreement was signed;

2   correct?

3   A    I wouldn't call it constant.

4   Q    Regular?

5   A    It wasn't as hard to get ahold of him.

6   Q    In fact, every time you sought him out he e-mailed you

7   back within minutes?

8   A    I don't think it's that quick, but I think it was a

9   little -- it was easier than when there was a dispute.

10  Q    Once the dispute was resolved; correct?

11  A    Yes, it was better.

12  Q    Now, it was during the period where you still had your

13  SEC whistleblower claim on file; correct?

14  A    And we had alerted the SEC during the whole process of

15  the negotiations.

16  Q    But you never told Martin during this period that you had

17  gone to the SEC and filed a whistleblower claim against him;

18  correct?

19  A    I don't recall.  He mentioned it.

20  Q    But never told him or confirmed it?

21  A    I don't think I did.

22  Q    And did you ever tell any of the people that you were

23  referring Martin to for them to look at Martin as a creative

24  CEO, did you ever tell any of them that you had a

25  whistleblower claim pending against Martin Shkreli at the

1   time?

2   A    I don't think I told anyone.

3   Q    Now, as someone who believed he was a founder of

4   Retrophin, if you had wanted to and you didn't get your

5   agreement, you could have filed a lawsuit against Martin and

6   Retrophin; is that not correct?

7   A    I think that could be accurate.

8   Q    And if you had not resolved your claim, you could have

9   and would have filed a lawsuit against him and Retrophin,

10  wouldn't you?

11  A    It's a possibility.

12  Q    Okay.  And part of the release that you and Martin

13  negotiated was that so there would be no lawsuit; correct?

14  A    Yes.

15  Q    Now, on occasion did Martin, if you know, correspond with

16  JD McCulloch --

17  A    Yes.

18  Q    -- by e-mail?

19  A    I think he did.

20  Q    And did Mr. McCulloch on your behalf respond on occasion

21  to Martin?

22  A    Yes.

23  Q    And explain again if you could very briefly is

24  Mr. McCulloch sort of your chief of staff?

25  A    Yes.

Blanton - cross - Brafman                    1835

1   Q    And you rely on him for the detail work of many of your

2   investments?

3   A    Yes.

4   Q    And he was in the loop, if you will, on the entire

5   controversy between MSMB and you -- MSMB Capital and you, and

6   then later with the deal with Retrophin; correct?

7   A    Yes.

8   Q    Now, I want to show you what's in evidence as Government

9   Exhibit 105-24.  And this is an e-mail from Martin to JD

10  McCulloch in February of 2013.  Do you recognize it?

11  A    Yes.

12  Q    You saw it yesterday.  You identified it as something

13  coming from Mr. Shkreli to Mr. McCulloch; correct?

14  A    Yes.

15  Q    And I want to read it to you.  "Martin is asking

16  McCulloch, have you received your certs yet" and you

17  understood that to be stock certificates; correct?

18  A    Yes.

19  Q    I'm sorry?

20  A    Yes.

21  Q    And then it says, "Also, I'd be willing to give you more

22  stock that makes certain you generated a profit on your

23  investment with us.  I think it is very important that this

24  investment ends with a robust profit.  Let me know how and we

25  can discuss this possibility further."

Blanton - cross - Brafman                    1836

1          Is that a correct reading of it?

2    A    Yes.

3    Q    And this was -- the robust profit was your investment in

4    MSMB; correct?

5    A    I don't know, you know, which thing you're talking about,

6    but that was the only thing I made an investment in, so I

7    assume it is.

8    Q    So it's referring to MSMB.  You didn't invest in

9    Retrophin; correct?

10   A    Right.

11   Q    But MSMB was the company you invested in at one point

12   $1,250,000?

13   A    Yes.

14   Q    This says, "I'd be willing to give you some more stock

15   that makes certain you generated a profit on your investment

16   with us."  I'm going to stop there.

17          Investment with us, in your understanding, applies

18   to your investment in MSMB; correct?

19   A    Yes.

20   Q    MSMB Capital?

21   A    Yes, yes.

22   Q    And it was a $1,250,000 investment?

23   A    Yes.

24   Q    And at that time you were in negotiations; correct?

25   A    With -- for the settlement?

SN        OCR        RPR

Blanton - cross - Brafman                    1837

1   Q    Yes.

2   A    Yes.

3   Q    Or the consulting agreement?

4   A    I think so.

5   Q    And Mr. McCulloch was involved; correct?

6   A    Yes.

7   Q    And this is Martin Shkreli telling him that he wanted to

8   make certain that you generated a profit on your investment;

9   correct?

10  A    Yes.

11  Q    Now, if Martin had walked away from you and just said,

12  look, you're a big boy, you invested in MSMB, you would have

13  to sue him; correct?

14  A    I assume.

15  Q    But you didn't have to sue him.  He made you a profit in

16  MSMB as a result of the Retrophin shares te gave you; is that

17  an accurate statement?

18            MS. SMITH:  Objection, Your Honor.

19            THE COURT:  Overruled.

20  Q    You may answer, sir.

21  A    I think the company rising in value made me a profit.

22  Q    And Martin was in charge of Retrophin when it rose in

23  value; correct?

24  A    Part of the time.

25  Q    Well, up until you signed a consulting agreement, Martin

SN       OCR       RPR

1  was in charge of the company; isn't that correct?

2  A    Yes.

3  Q    All right.  And then he goes on to say, "And I think it's

4  very important that this investment ends with a robust profit.

5  Let me know how and we can discuss this possibility further."

6          When you refer -- when he refers to "this

7  investment," it's your investment in MSMB; correct?

8  A    Yes.  And this was while the SEC was putting a lot of

9  pressure on him.

10 Q    Did you have to volunteer that every time I ask you a

11 question?  That has nothing to do with the question I asked

12 you, does it?

13          MS. SMITH:  Objection.

14          THE COURT:  Sir, sir, do not argue, please.

15          MR. BRAFMAN:  I'll withdrew it and ask it again.

16 BY MR. BRAFMAN:

17 Q    This is Shkreli telling Mr. McCulloch, your chief of

18 staff, that he wants to have this investment end with a robust

19 profit; correct?

20 A    Correct.

21 Q    And this investment into MSMB by you ultimately ended

22 with a robust profit; correct?

23 A    Yes.

24 Q    Now, are you familiar with the term reverse merger?

25 A    Yes.

1   Q     And when a private company wants to go public, there are

2   different ways that it could do that; correct?

3   A     Yes.

4   Q     And one of the ways to do it is through a reverse merger;

5   is that correct?

6   A     That's correct.

7   Q     And that means you merge with a company that's already

8   public and then their shares become your shares and they can

9   be traded unless there's a restriction; correct?

10  A     Yes.

11  Q     And you've done that before; you've invested in reverse

12  mergers; correct?

13  A     Yes.

14  Q     Nothing illegal about that?

15  A     No.

16  Q     And you knew that there came a time when Retrophin

17  entered into a reverse merger with a company called Desert

18  Gateway; correct?

19  A     That's the shares that I got certs in.

20  Q     Yes.  And we're talking about Government Exhibit 105-25

21  which is in evidence.

22          MS. SMITH:  Your Honor, that exhibit is not

23  evidence.

24          MR. BRAFMAN:  It's not in evidence?

25          MS. SMITH:  No.

SN        OCR        RPR

Blanton - cross - Brafman                    1840

1   Q    Let me show you a document, a Government e-mail marked as

2   Defendant's Exhibit 4353 and ask you if you remember getting

3   this e-mail concerning Retrophin stock?

4          MS. SMITH:  Your Honor, the document is still cut

5   off on the top and the sides.

6          THE COURT:  Could you try to zoom out so we can see

7   the entire document, please?  Do you have an extra copy?

8          MR. BRAFMAN:  Yes, Your Honor.  I apologize, I

9   thought it was a Government exhibit.  I'll just use the share

10  certificate.  I'll just use the share certificate.  It's

11  already in evidence, Your Honor.

12         THE COURT:  That's Government Exhibit --

13         MR. BRAFMAN:  I'm sorry, 105-23.

14  A    Okay.

15         (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Blanton - cross - Brafman                1841

1   (Continuing)

2   Q    Now, this is stock certificate you got after the reverse

3   merger; correct?

4   A    Correct.

5   Q    And in the upper right-hand corner, if you can see it, it

6   has shaded in the box 160,318 which is the number of shares;

7   correct?

8   A    Correct.

9   Q    And it's marked restricted securities.

10  A    Correct.

11  Q    And when you got these Desert Gateway shares, you

12  understood that company to have merged with Retrophin in a

13  reverse merger; correct?

14  A    Yes.

15  Q    And this stock certificate, although restricted at the

16  time you got it, was later freed up as regular stock; correct?

17  A    It was.

18  Q    And converted into Retrophin stock?

19       Share for share you got 160,318 Desert Gateway and

20  you ended up with 160,318 of Retrophin shares; correct?

21  A    Yes.

22  Q    And you ultimately were able to sell the Retrophin shares

23  if you wanted to?

24  A    Yes.

25  Q    And you sold some of them; correct?

1  A    Yes.

2  Q    I think we discussed that yesterday and you made about

3  $2.2 million?

4  A    Somewhere around there.

5        MR. BRAFMAN:  Now, yesterday the Government showed

6  you an e-mail from Martin Shkreli, Exhibit 105-7, which is in

7  evidence.

8        (Exhibit published to jury.)

9  Q    And if you recall, it was an exchange between you and

10 Martin in which Carolyn Bradley, who works for you, was trying

11 to get ahold of Mr. Shkreli and he sends this e-mail to all:

12 I am having an emergency tooth extraction, in excruciating

13 pain as I type this, Allison can you reschedule.

14       Do you remember getting this?

15 A    Yes.

16 Q    And yesterday you testified that this was one of the

17 e-mails that suggested to you that Martin was consciously

18 trying to avoid you; correct?

19 A    Yes.

20 Q    Do you know whether Mr. Shkreli had an emergency dental

21 extraction on that date?

22 A    I don't.

23 Q    Do you know whether he was actually in pain when he was

24 writing that to you?

25 A    I don't.

Blanton - cross - Brafman                    1843

1   Q    You're just guessing that it was one of his ways of

2   stalling you; correct?

3   A    I think it was part of a number of times that we had

4   postponed.

5   Q    But they had showed you this document and you have no

6   personal knowledge as to whether what Martin Shkreli is

7   telling your assistant on that day is true or not; isn't that

8   correct?

9   A    That's correct.

10  Q    Do you still have 3500-DB-3, which I gave you yesterday,

11  which are notes of your interview with the FBI and the

12  Government on November 10th, 2015?

13       Do you still have it up there, sir?

14  A    Yes.

15  Q    Okay.  So, I may ask you to read it to yourself to see if

16  it can refresh your recollection as to certain matters.

17       Isn't it true that you told the FBI that when you

18  invested, you did not believe that it was going to be easy to

19  redeem your investment?

20       Just look at me before you have to look at the

21  document.

22       Did you tell the FBI that when you invested in

23  MSMB Capital, that you did not believe it would be easy for

24  you to redeem your investment?

25  A    I think I might have said something that it might not be

1  easy to have daily reports or liquidity.

2  Q    That's not my question.  My question is:  Did you tell

3  the FBI on that date that you did not believe it would be easy

4  for you to redeem your investment?

5  A    I don't remember, but you can refresh my memory if you

6  want.

7  Q    Look at page 3 of the document before you.

8         THE COURT:  3500-DB-3?

9         MR. BRAFMAN:  Yes, Your Honor.

10         THE COURT:  Page 3.

11         MR. BRAFMAN:  Yes, Your Honor.

12  Q    And look at the paragraph that's second from the bottom.

13         Read it to yourself and tell me whether or not you

14  told the FBI that you did not think it would be easy to redeem

15  your investment.

16  A    And this is 3500-DB-5?

17  Q    Yes.  Page 3.  The numbers are on the top right-hand

18  corner of the page, sir.

19  A    Mine are on the bottom.

20  Q    All right, well, page 3 of the document.  And look at the

21  bottom to the last page, bottom of the last paragraph.  Read

22  it to yourself and tell me whether it refreshes your

23  recollection that you told the FBI before you invested that

24  you did not think it would be easy to redeem your investment.

25         MS. SMITH:  Objection, Your Honor, to telling the

Blanton - cross - Brafman                    1845

1   FBI before he invested.

2          THE COURT:  Why don't you rephrase the question

3   Mr. Brafman.

4   Q    Does it refresh your recollection that when being

5   interviewed by the Government, that you told the people in

6   that room that you did not believe it would be easy to redeem

7   your investment?

8   A    I still don't see where I said that in this, I'm sorry.

9          THE COURT:  I will give him my copy.

10          MR. BRAFMAN:  May I point him to the right page,

11   Your Honor?

12          THE COURT:  Yes.

13          MR. BRAFMAN:  No, you are looking at the wrong

14   document.  It is this.  3500-DB-3.

15          THE WITNESS:  Sorry.

16          THE COURT:  Page 3.

17          MR. BRAFMAN:  Page 3, second paragraph from the

18   bottom.

19          THE WITNESS:  Yes, I see it.

20   Q    Well, does it refresh your recollection that you told the

21   Government that before you invested, you knew that it might be

22   hard for you to redeem your investment?

23   A    Yes.

24   Q    Okay.  And it was hard for you to redeem your investment;

25   correct?

1  A    Yes.

2  Q    All right.

3        Now, did the shares that Martin Shkreli offered you

4  to redeem your MSMB investment, were they Martin Shkreli's

5  personal shares, if you know?

6  A    Which tranche?

7  Q    Any or all of them.

8  A    I don't know.

9  Q    You don't know.

10       Did you tell the Government in your interview that

11  the Retrophin shares that you were offered by Shkreli were his

12  personal shares?

13  A    I don't recall.

14  Q    Look at page 5 of the same document and look at the third

15  paragraph from the bottom -- I'm sorry.  The fourth paragraph

16  from the bottom beginning with your name.  Read it to

17  yourself, sir.

18  A    Yes.

19  Q    Does it refresh your recollection that you told the

20  Government that the shares you were getting were Martin

21  Shkreli's personal shares?

22  A    Yes.

23  Q    And by personal shares, means he was giving you, in

24  effect, his money, not Retrophin's money.  His money because

25  they were his personal shares; correct?

Blanton - cross - Brafman                    1847

1    A    That looks like what I had thought happened.

2    Q    That's not what you thought happened.  It's what you said

3    happened.

4    A    Right.  That's what I said here.

5    Q    Now, did you ever do an evaluation of Retrophin before it

6    became a public company?

7    A    No.

8    Q    Have you ever done a valuation of a nonpublic company in

9    connection with your investment?

10   A    Yes.

11   Q    Do you know how to do it?

12   A    Yes.

13   Q    But you didn't do it with Retrophin?

14   A    Because I didn't invest.

15   Q    But you were getting a lot of shares; correct?

16   A    But when I got the shares it was public.

17   Q    Okay.  Now, let's talk about MSMB.

18        Did you ever evaluate -- do an evaluation of MSMB?

19   A    MSMB had a publicly-traded portfolio, companies that were

20   different after I invested.

21   Q    But at any point in time did you ever do an evaluation of

22   MSMB?

23   A    Nothing except for what Martin sent me.

24   Q    Okay.

25        MS. KASULIS:  Your Honor, perhaps we could take a

Blanton - cross - Brafman                    1848

1    break.

2              THE COURT:  Is now a good breaking point for

3    everybody?

4              MR. BRAFMAN:  As good as any other time, Your Honor.

5              THE COURT:  All right, I think the jurors might

6    enjoy a break at this time.

7              Please, leave your notebooks face-down.  Do not talk

8    about the case and we will come retrieve you in about -- well,

9    we will get you by 11:00, how is that.

10             Thank you.

11             (Jury exits.)

12             (In open court; outside the presence of the jury.)

13             THE COURT:  All right.  Let's take a break.  Please

14   return to the courtroom by 11:00.  Thank you.

15             ALL:  Thank you, Your Honor.

16             (Recess taken.)

17             (In open court; Judge KIYO A. MATSUMOTO enters the

18   courtroom.)

19             THE COURT:  Have a seat.

20             Are we ready to proceed?

21             ALL:  Yes, Your Honor.

22             THE COURT:  All right.  Do you have a lot more,

23   Mr. Brafman?

24             MR. BRAFMAN:  No, about 20 minutes to a half-hour.

25             THE COURT:  Okay.

                        Blanton - cross - Brafman                1849

1                Will the Government have much re-cross?

2                MS. SMITH:  I don't think so, Your Honor.  I think

3       it will be pretty brief.

4                THE COURT:  I am just worried about the pace of this

5       trial.

6                MR. BRAFMAN:  We are trying our best, Judge.

7                THE COURT:  We will see what it takes.

8                (Jury enters.)

9                THE COURT:  All jurors are present, please have a

10      seat everybody.

11               Please, resume your cross, Mr. Brafman.

12               MR. BRAFMAN:  Yes, Your Honor, just waiting for the

13      jurors to get settled.

14      CROSS-EXAMINATION

15      BY MR. BRAFMAN:  (Continuing)

16      Q    Mr. Blanton, do you recall I asked you approximately how

17      many hedge funds you had invested in before MSMB and do you

18      recall the number that you gave us?

19      A    I think I said over 20.

20      Q    Isn't it hundreds?

21      A    No.

22      Q    No.

23               Do you remember being interviewed by Eric Schmidt of

24      the SEC in November of 2013?

25      A    Yes.

                           VB      OCR      CRR

1  Q    And do you remember that you were being interviewed by

2  Eric Schmidt about MSMB Capital Management?

3  A    Yes.

4  Q    All right.  I'm going to hand you what I marked for

5  identification as 3500-DB-1 and just asking you to keep it in

6  front of you in case you need it to refresh your recollection,

7  but don't read it out loud, okay?

8           Isn't it true, sir, when you were interviewed by

9  Mr. Schmidt among other things you said that over the last 20

10  years you had been involved in investing in hundreds of hedge

11  funds, capital venture funds, private placements, as well as

12  investments in oil and gas and real estate?

13  A    That's what this says.

14  Q    Well, does it refresh your recollection as to what you

15  said to Mr. Schmidt at the SEC?

16           MS. SMITH:  Objection, Your Honor.

17  A    Yes.

18           THE COURT:  Sustained.

19  Q    Does it refresh your recollection as to what you told

20  Mr. Schmidt on November 7, 2013 with respect to your

21  investment in hedge funds, capital venture funds, private

22  placements and investments in oil and gas and real estate?

23           MS. SMITH:  Objection, Your Honor.

24           MR. BRAFMAN:  Let me rephrase the question.

25           THE COURT:  All right, thank you.

Blanton - cross - Brafman                    1851

1    Q    Isn't it true that before you invested in MSMB, you

2    invested in hundreds of either hedge funds, capital venture

3    funds, private placements or investments in oil and gas and

4    real estate?

5    A    Hundreds of deals, yes.

6    Q    Hundreds of deals?

7    A    Yes.

8    Q    Okay.  And how many of those were strictly hedge funds?

9    A    I do not know.

10   Q    So, when you said 20 the other day, you were basically

11   guessing?

12   A    I said over 20.

13   Q    Okay.  Well, is it over 20 and less than a hundred?

14   A    Yes.

15   Q    So, is it 50 hedge funds before you invested in MSMB?

16   A    I really don't remember.

17   Q    And how many capital venture funds have you invested in,

18   in the past 20 years?

19   A    Venture capital funds?

20   Q    Yes.

21   A    Several.

22   Q    And how many private placements have you invested in, in

23   the past 20 years?

24   A    A number of them.

25   Q    Hundreds?

Blanton - cross - Brafman                   1852

1    A    No, I wouldn't say it's hundreds.

2    Q    Fifty?

3    A    I don't, I don't know exactly.

4    Q    A lot?

5    A    A lot.

6    Q    Okay.  And how about investments in oil and gas and real

7    estate?

8    A    A decent amount.

9    Q    What does that mean?

10   A    Over five.

11   Q    Now, when I asked you the other day whether you had used

12   the words cowboy-ish to describe Mr. Shkreli, you said you

13   didn't recall using that word, is that true?

14   A    I might describe me as a cowboy because I ride horses,

15   but I wouldn't describe Martin as a cowboy.

16   Q    Let's look at page 2 of this document, the fourth

17   paragraph from the top beginning with:  In retrospect.

18           And tell me -- I'm sorry, the third -- the second

19   full paragraph from the top beginning with:  When considering.

20           Read it to yourself and tell us whether or not when

21   you were interviewed by the SEC this refreshes your

22   recollection that you described Mr. Shkreli as a little

23   cowboy-ish and that he was too loose.

24   A    I think this document may say something like that, but I

25   don't remember, I don't remember it.  And I think this was

Blanton - cross - Brafman                    1853

1   done after he had made some misrepresentations.

2   Q    Well, what does cowboy-ish mean?  You're a cowboy, you

3   ride horses, you have a ranch.  What does that have to do with

4   Mr. Shkreli?

5   A    I don't know, I wouldn't say it now.

6   Q    You said it then.

7   A    I don't know.  I'm reading this document, I don't recall

8   saying it.

9   Q    But if you said it, what would it mean?

10              MS. SMITH:  Objection, Your Honor.

11              THE COURT:  Sustained.

12  Q    Now, did you tell the SEC that you were comforted by the

13  fact that Martin Shkreli was receiving payment from Josiah

14  Austin for investment advice?

15  A    I don't understand the question.

16  Q    You remember discussing with the SEC Josiah Austin?

17              Just look at me for a minute, sir.

18  A    No.

19  Q    Okay.  I ask you to look at the bottom of page 2, read

20  that to yourself and go over to the next page and tell me

21  whether it refreshes your recollection that when you were

22  concerned about 35 million being a small fund, you took

23  comfort from the fact --

24              MS. SMITH:  Objection, Your Honor.  He's reading

25  from the document.

Blanton - cross - Brafman                1854

1          THE COURT:  Sustained.

2   Q    Can you read that to yourself first, beginning on the

3   bottom of page 2, beginning on the top of page 3.

4   A    Yeah.

5   Q    Did you remember telling the SEC that although it was a

6   small fund, you took comfort from the fact that fees were

7   being generated in connection with the management of Austin's

8   money?

9          MS. SMITH:  Objection, Your Honor.

10          THE COURT:  Sustained.

11  Q    Did you tell the SEC that you were comforted by the fact

12  that Mr. Shkreli was receiving money from the management of

13  Austin's money?

14  A    That's what I see here, but I don't remember saying that.

15  If it says it, I probably said it.

16  Q    But when you spoke to Eric Schmidt, did you ever meet him

17  before this conversation?

18  A    No.

19  Q    This was a formal interview by the SEC; is that correct?

20  A    Yes.  Over the phone.

21  Q    And how would he know, if you can tell me, whether or not

22  you --

23          MS. SMITH:  Objection, Your Honor.

24          THE COURT:  Sustained.

25  Q    Did you tell him about Josiah Austin?

Blanton - cross - Brafman                    1855

1   A    I must have said something about Josiah Austin.

2   Q    Well, did you tell him that Martin Shkreli was getting

3   money from Josiah Austin for managing his investments?

4          MS. SMITH:  Asked and answered.

5          THE COURT:  Sustained.

6   Q    What did you tell him about Josiah Austin?

7   A    I don't remember.

8   Q    Nothing?

9   A    I don't remember.  I just remember saying that he had

10  mentioned Josiah Austin.

11  Q    Well, when you read this, it doesn't refresh your

12  recollection as to whether you said anything more?

13  A    It looks like I said some things about Josiah Austin, but

14  I don't remember exactly what I said.

15  Q    And did you also tell them that that your brother

16  called -- did you tell the SEC that your brother may have

17  called NAV Consulting as part of his due diligence?

18  A    He was supposed to.

19  Q    Well, he's your brother.  Did you ask him whether he

20  called NAV Consulting?

21  A    I don't remember exactly, but I think I did, yes.

22  Q    And that was important to you; to determine whether

23  NAV Consulting was, in fact, working on behalf of MSMB;

24  correct?

25  A    Right.

1   Q    And as you sit here today you don't remember whether your

2   brother answered that question?

3   A    I think he did, but I think -- I don't remember the exact

4   answer that they gave.

5   Q    Well, would you have remembered it if he said they have

6   no clue who Martin Shkreli is?

7   A    I think I would have.

8   Q    Well, so he didn't say that.

9   A    I don't think so.

10  Q    So, you don't know whether NAV Consulting confirmed they

11  did or did not do work on behalf of Mr. Shkreli; correct?

12          MS. SMITH:  Objection, Your Honor, can we have a

13  time period?  Is this before the investment?  After the

14  investment?

15          THE COURT:  All right.

16          Can you frame your questions with time frames.

17          MR. BRAFMAN:  Yes.

18  Q    Before your investment in MSMB, do you know whether your

19  brother called NAV Consulting?

20  A    I assume he did.  I think he did.

21  Q    And do you remember what, if anything, he told you after

22  that conversation?

23  A    I don't remember what he told me after that conversation.

24  It must have been positive in order for me to invest.

25  Q    Thank you.

Blanton - cross - Brafman                    1857

1        Now, did you tell the SEC that when Martin Shkreli

2   told you about the OREX trades that he told you that he could

3   have lost a lot of money, perhaps most of the fund's money?

4   A    I don't remember what I told him.

5   Q    Now, do you remember telling the SEC that Martin asked

6   you to be a consultant, but you turned it down?

7        MS. SMITH:  Objection, Your Honor, can we have a

8   side-bar on this line?

9        THE COURT:  Yes.

10       (Side-bar conference held on the record out of the

11   hearing of the jury.)

12

13       (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Side-Bar                                    1858

1              (Side-bar.)

2              MS. SMITH:  Your Honor, this entire line of

3     questioning is just asking him about what he told the SEC.

4     That's hearsay.  If he wants to impeach him, he's already

5     asked him about OREX trade.  His testimony to the SEC is

6     consistent with what he said here.  He can't impeach him with

7     what he said to the SEC.  He can't just get his prior

8     statement in to the SEC with no basis.

9              You have to set it up and then, if there's a

10    discrepancy or if he doesn't remember, then you can do it.

11             MR. BRAFMAN:  Thank you.

12             MS. SMITH:  But, he's testified on these subjects

13    before.

14             MR. BRAFMAN:  Thank you for the lesson.

15             If he tells the SEC something inconsistent with the

16    testimony he gave in court, I have a right to use it as a

17    prior inconsistent statement and probe his memory.  If he

18    doesn't remember, however convenient that may be at this

19    point, I have a right to show him the document, to see if it

20    refreshes his recollection.  If it does, fine.  If it doesn't,

21    fine.

22             He has just testified that he believes he got a

23    positive response from his brother about NAV Consulting.  That

24    is substantially inconsistent with the thrust of his direct

25    testimony.  So, you may not like what he's doing, but I have a

Side-Bar                                 1859

1   right to explore it.

2          MS. SMITH:  I didn't object to the NAV part.  I'm

3   objecting to OREX, Josiah Austin where all of this is

4   consistent with what he's already testified to.

5          MR. BRAFMAN:  No, he never testified that part of

6   the reason he felt comforted by the investment in MSMB was

7   because he believed that Josiah Austin was paying him a

8   management fee.  He has never said that.

9          MS. SMITH:  You never asked him that.  You can't

10  just go through the SEC and say did you tell the SEC X, did

11  you tell the SEC Y.  Ask him the question first.

12         MR. BRAFMAN:  Okay.

13         MS. SMITH:  If he doesn't remember, then --

14         THE COURT:  You can then refresh.  Well, you know

15  how to do this.

16         MR. BRAFMAN:  I know how.

17         THE COURT:  But you do not do it by reading the

18  document and asking him if he remembers saying that or did he

19  say that.  That is not the right way to do it.

20         MR. BRAFMAN:  I'm trying to cut through the chase,

21  but I will do the chase.

22         THE COURT:  We have to do this appropriately.

23         MR. BRAFMAN:  I understand.

24         ALL:  Thank you.

25         (Side-bar end.)

1

2          (In open court.)

3    BY MR. BRAFMAN:

4    Q    Mr. Blanton, in November of 2013, could we agree that you

5    were interviewed by the SEC on the telephone?

6    A    Yes.

7    Q    And did you make notes of that interview?

8    A    I don't have any.

9    Q    Do you remember the entire interview?

10   A    No.

11   Q    Okay.  Now, am I correct, sir, that among the things you

12   were asked about was Josiah Austin?

13   A    I, I think that it's mentioned in here, so I would assume

14   so.

15   Q    No, let's not do that.  Let's ask for your recollection

16   of whether or not the SEC asked you about your knowledge of

17   Josiah Austin before you invested in MSMB.

18   A    I don't remember if it was them that asked me or if I

19   mentioned him.

20   Q    Okay.  Well, if you look at the document in front of you

21   and look at the bottom of page 2 and read it over to yourself,

22   the top of page 3, and then I will ask you some questions.

23   A    Yes.

24   Q    Do you remember being asked questions about assets under

25   management?

Blanton - cross - Brafman                    1861

1   A     Yes.

2   Q     And do you remember telling the SEC that assets under

3   management were a significant factor for you?

4   A     Yes.

5   Q     And did you tell them that you were comforted when

6   discussing assets under management because you believed that

7   Martin Shkreli was earning fees from his connection with the

8   management of Josiah Austin's money?

9             MS. SMITH:  Objection, Your Honor.

10            THE COURT:  Overruled, go ahead and answer it.

11  A     This document reflects what they said.

12  Q     No, what you said.

13  A     What they, they, their understanding of what I said.  I

14  don't remember exactly what I was talking about back then.  I

15  think that my questions and comments about Josiah Austin, you

16  know, if he did have money under management with Martin, would

17  be, it would be better than him not having money.

18  Q     But did you know before you invested in MSMB whether he

19  did or he didn't?

20  A     Due to the fact of all the lies and confusion with what

21  Martin had said after my investment, I really wasn't sure what

22  to believe.

23  Q     When the SEC asked you, what did you tell them?

24  A     I don't remember, but I think I might have said this,

25  some -- I might have said something like that.

VB        OCR        CRR

Blanton - cross - Brafman                          1862

1    Q    Something like that?

2    A    That it was good if he had assets from Martin from Josiah

3    Austin.

4    Q    And did Martin tell you that he had assets under

5    management from Josiah Austin?

6    A    I think he did.

7    Q    And did he tell that you Josiah Austin paid him to manage

8    his money?

9    A    I think he did.

10   Q    And is that why you believe you told that to SEC?

11   A    I think so.

12   Q    Now --

13   A    It's better than if he didn't.

14   Q    Now, Mr. Blanton, do you have a clear recollection of

15   whether Martin Shkreli identified Retrophin -- I'm sorry,

16   identified Rothstein Kass as an auditor in NAV Consulting as

17   an administrator or is your recollection of that fuzzy?

18   A    It was on that -- I've been -- my recollection has been

19   revived by the e-mails that I've seen in the last few days.

20   Q    But when you spoke to the SEC, do you remember whether or

21   not you told them that your recollection about that was fuzzy?

22   A    I could have.

23   Q    Well, this is November 13th when you're interviewed,

24   which is much closer to the dates of these conversations.

25            Is your recollection now that your memory was fuzzy

Blanton - cross - Brafman                    1863

1   at that time?

2              MS. SMITH:  Objection, Your Honor.

3              THE COURT:  Sustained.

4              Rephrase.

5   Q    Did you tell the SEC that your memory --

6              MR. BRAFMAN:  Withdrawn.

7   Q    You told us on direct testimony that Martin Shkreli told

8   you that Rothstein Kass was an auditor and NAV Consulting was

9   an administrator of the fund; correct?

10  A    Correct.

11  Q    And in November of 2013, were you asked about that by

12  SEC?

13  A    I could have been.

14  Q    And at the time, did you tell them that your recollection

15  as to those matters was fuzzy?

16  A    I could have.

17  Q    And it's been refreshed by working with the Government

18  and looking at documents that they showed you?

19             MS. SMITH:  Objection, Your Honor.

20             THE COURT:  Sustained.

21  Q    Now, do you remember filling out an affidavit in

22  connection with your whistle-blower claim declaration of

23  Darren Blanton under 28 U.S.C., Section 1746?

24  A    I think so.

25             MR. BRAFMAN:  I'm going to show you what's been

Blanton - cross - Brafman                    1864

1  marked for identification only as 3500-DB-2.

2  Q    I ask you to look at that document and tell me whether it

3  refreshes your recollection that you filed an affidavit under

4  oath in connection with your whistle-blower claim.

5  A    Yes.

6  Q    And look at the bottom of the document, paragraph 14.

7  A    Yes.

8  Q    Incidentally, this is your signature on the documents;

9  correct?

10  A    Yes.

11  Q    And would it be fair to say that the last thing you

12  advised the SEC, if you recall, was that the claim was

13  settled?

14  A    In November 12, 2014?

15  Q    Yes.  Your claim was settled; correct?

16  A    I'd have to read this to see.

17       I did advise them, I can't remember how exactly I

18  stated or said it, but I think I might have, yes.

19  Q    And the claim was against Martin Shkreli and

20  MSMB Capital, among others?

21  A    If this is what that says.

22  Q    Well, read it to yourself and see if it refreshes your

23  recollection.

24       THE COURT:  Do you want to direct him to a specific

25  paragraph to speed this along?

Blanton - cross - Brafman                    1865

1    MR. BRAFMAN:  Fourteen, Your Honor.

2    A    It says this claim has been settled.

3    Q    And the claim you are talking about is the claim that you

4    had or would have had against MSMB or Martin or MSMB Capital?

5    A    Yes.  Yes.

6    Q    All right.  Now, do you recall getting a letter from

7    Retrophin's lawyers in February of 2012 telling you in words

8    or substance at that point any offer to give you founder

9    shares was being withdrawn?

10   A    I don't recall.

11   MR. BRAFMAN:  I ask you to look at what's been

12   marked as a Defense Exhibit DX-4309 for identification.

13   Q    Do you have it?

14   THE COURT:  Is this in the binder, sir?

15   MR. BRAFMAN:  Yes, it is, Your Honor.  D-4309.

16   THE COURT:  Thank you.

17   A    Yes.

18   Q    Do you recognize the document?

19   A    Yes.

20   Q    Do you remember getting it on or about the date in

21   question?

22   A    Yes.

23   Q    Do you recognize it as coming from Katten's lawyers?

24   A    Yes.

25   Q    I'm sorry, Retrophin's lawyers at Katten Muchin Roseman?

Blanton - cross - Brafman                    1866

1   A      Yes.

2   Q      And signed by Evan Greebel; is that correct?

3   A      Correct.

4   Q      And directly to you via Federal Express and e-mail;

5   correct?

6   A      Correct.

7          MR. BRAFMAN:  Your Honor, I offer it into evidence.

8          MS. SMITH:  Objection, Your Honor.

9          THE COURT:  Sustained.

10         MR. BRAFMAN:  Your Honor, may I approach?

11         THE COURT:  Yes.

12         (Side-bar conference held on the record out of the

13  hearing of the jury.)

14

15         (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

Side-Bar                          1867

1          (Side-bar.)

2          MR. BRAFMAN:  Your Honor, they made an issue about

3     the fact that he did -- on several occasions about the fact

4     that Martin offered him founders shares and that that offer

5     was later rescinded.  The offer was rescinded because

6     Mr. Blanton did not comply with the directions of Retrophin

7     Counsel.  That's what this letter says.

8          He identifies it, he remembers getting it and if you

9     look at the last page, Your Honor, it's withdrawing all of the

10    previous offers of stock because he wouldn't sign the document

11    that former Counsel sent to him.  And I think for them to

12    suggest that Martin Shkreli withdrew it on his own is not

13    accurate, it's not true.  And I can't call Evan Greebel

14    because Evan Greebel is, unfortunately, a defendant.  And he

15    recognizes the document, and he understands it's significant,

16    and I think I have a right to introduce it and question him

17    about it.

18         THE COURT:  I did not hear him say that Mr. Shkreli

19    withdrew the founders shares.  He never testified to that.

20         MR. BRAFMAN:  He said that he was offered 400,000

21    shares and that he had to give back 200.  The 200 that he had

22    to give back is because of this letter.

23         MS. SMITH:  That's not true.  This is two years

24    later.  This is February 2012.

25         MR. BRAFMAN:  But this is why he had to had to give

```
                        Side-Bar                    1868
```

1   them back.

2          MS. SMITH:  They're completely different events and

3   to suggest that these are somehow conflated --

4          MR. BRAFMAN:  Let the witness tell me.

5          THE COURT:  Do not interrupt here.  I am trying to

6   make a record here, all right?  Please.

7          MS. SMITH:  So, this is February 2012.  He gets the

8   shares after the consulting agreement in March of 2014.

9   Martin makes a separate, independent, verbal promise to him

10  that when he gets the extra 200,000 shares, it's for the

11  founders shares.

12         I don't understand how a letter from two years prior

13  has any implication on those 200,000 shares.

14         MR. BRAFMAN:  Your Honor, part of the reason he's

15  getting a consulting agreement is to settle claims that he

16  otherwise would have against Retrophin as a founder because he

17  was all over the e-mails as an initial founder.  And this is a

18  formal document telling him that part of your life as a

19  founder is withdrawn, it's over and now, he is negotiating a

20  way out and he gets 200,000 shares.  This is all part of the

21  chain.

22         THE COURT:  I think to try to interpret what the

23  author is saying and what is motivating him and the reasons he

24  is withdrawing is really not appropriate.

25         MR. BRAFMAN:  I will question him about the letter.

Side-Bar                                         1869

1   Let's see what he understands it to be, I will ask him about
2   did.
3          MS. SMITH:  I think conflating those two issues is
4   really problematic.  You have to explain the letter.
5          MR. BRAFMAN:  I will.
6          MS. SMITH:  And he also is withdrawing the shares
7   for Joshua Frase and the Frase Foundation.
8          MR. BRAFMAN:  So why don't you want the letter in if
9   it's all that helpful.
10         MS. SMITH:  I am not saying that it is.  I am just
11  saying this is more than just returning his shares and has
12  nothing to do with the 200,000 shares in 2014.
13         MR. BRAFMAN:  There are two ways to do this.
14         I can ask him question after question.  He has
15  identified the letter.  He remembers getting it at the time of
16  the date and you can query him on redirect if I give a
17  misinterpretation or he does about the import of the letter.
18         I want to know his understanding upon receiving this
19  letter.  That's all.
20         MS. SMITH:  And you can ask him.  That doesn't mean
21  you can put it into evidence.
22         THE COURT:  The effect of this letter on the
23  listener; what he understood this to be.
24         MR. BRAFMAN:  But the jury doesn't see the letter.
25         THE COURT:  Oh, you are not offering it into

```
                        Proceedings                     1870
```

 1   evidence.

 2          MR. BRAFMAN:  I would like to offer it into evidence

 3   because otherwise, his answers are in a vacuum, Your Honor.

 4          THE COURT:  So, I was asking you whether you are

 5   offering it into evidence based on its effect on the listener

 6   as Mr. Agnifilo said.

 7          MR. BRAFMAN:  Yes, yes.

 8          THE COURT:  And you said no.

 9          MR. BRAFMAN:  No, I'm sorry, I'm sorry.

10          THE COURT:  I got confused.

11          MR. BRAFMAN:  I'm sorry, I'm offering it into

12   evidence based on the effect of the listener.

13          THE COURT:  Or the recipient.

14          MR. BRAFMAN:  The recipient.

15          THE COURT:  Yes, okay.

16          That's fine.  We will allow you to offer it.

17          MR. BRAFMAN:  Thank you.

18          (Side-bar end.)

19

20          (Continued on following page.)

21

22

23

24

25

Blanton - cross - Brafman                 1871

1          (In open court.)

2          MR. BRAFMAN:  Your Honor, I renew my offer of

3    Defendant's Exhibit 4309 into evidence.

4          THE COURT:  We will admit the Exhibit over the

5    objection of the Government.

6          MR. BRAFMAN:  Thank you.

7          (Defendant's Exhibit 4309 received in evidence.)

8          (Exhibit published to jury.)

9    Q    Do you have the document, sir?

10   A    Yes.

11   Q    All right, I'm going to put it up on the screen so the

12   jury can see it now that it's in evidence.

13         Do you see the name Katten up there?

14   A    Yes.

15   Q    Do you recognize that to be the law firm that Evan

16   Greebel, pointing to his name, was associated with?

17   A    Yes.

18   Q    And Greebel is the lawyer who dealt with your lawyer from

19   time to time in connection with your consulting agreement.

20   A    He did.

21   Q    Now, when you got this letter February 10th of 2012, did

22   you read it?

23   A    Yes.

24   Q    And did you discuss it with your lawyer, if you recall?

25   A    Yes.

Blanton - cross - Brafman                    1872

1   Q     And the letter begins:  Dear, Mr. Blanton.

2         And it's dated February 10th, 2012; correct?

3   A     Correct.

4   Q     Years before you signed your consulting agreement.

5   A     Yes.

6   Q     And it says:  We have been retained by Retrophin LLC as

7   legal Counsel.  On multiple occasions in 2011, including

8   September 8th, October 6th, Edwards Wildman, prior counsel to

9   Retrophin sent the following documents to you either

10  electronically or via Federal Express.

11        And they are listed in documents 1 through 20 on

12  this page, and on the next page, continuing from 21 to 28.

13        Do you see that?

14  A     Yes.

15  Q     And then it goes on to say:  In each of the

16  correspondence Edwards Wildman advised you that such documents

17  required your attention and signature and that Retrophin would

18  not issue unit certificates to you until you provided executed

19  documents to Retrophin or its Counsel.  Notwithstanding the

20  repeated attempts of Retrophin and its Counsel to finalize the

21  various agreements referenced above with you and Messrs.

22  Hennings, Frase, Ward and Bass, such documents were never

23  executed by you or Messrs. Hennings, Frase, Ward and Bass.

24        Do you recall what he is talking about?

25  A     Yes.

Blanton - cross - Brafman                1873

1   Q    And you didn't sign those documents; correct?

2   A    They were not acceptable.

3   Q    I'm sorry?

4   A    They were not acceptable.

5   Q    Okay.  But you made the decision after consulting with

6   your own Counsel that for whatever reason you found those

7   documents not acceptable; correct, sir?

8   A    Correct.

9   Q    And you refused to sign them?

10  A    Correct.

11  Q    And then what Mr. Greebel informs you:  As such,

12  Retrophin hereby withdraws the offers set forth in such

13  agreements referenced above and declares such offers and

14  agreements void ab initio.

15       Do you know what void ab initio means?

16  A    No.

17  Q    It means void from --

18       MS. SMITH:  Objection, Your Honor.

19       THE COURT:  Sustained.

20  Q    Based on this withdrawal, Retrophin will not honor such

21  offers or agreements delivered to you or Messrs. Hennings,

22  Frase, Ward or Bass unit certificates for any investment units

23  as defined in Retrophin's amended and restated limited

24  liability company agreement, dated as of June 30th, 2011 or

25  incentive units as defined in Retrophin's amended and restated

Blanton - cross - Brafman                    1874

1    limited liability company agreement, dated as of June 30th,

2    2011, or reflect any ownership by you or Messrs. Hennings,

3    Frase, Ward or Bass in its books and records.  If you have any

4    questions, please call.

5              Did you call?

6    A    We had numerous discussions after this.

7    Q    And numerous discussions between your lawyer and

8    Retrophin's lawyers?

9    A    Yes.  And we also received the gap table that you showed

10   me earlier after that.

11   Q    And you had numerous discussions and, ultimately, you

12   came to an agreement; correct?

13   A    Yes.

14   Q    And the documents which were offered to you in

15   February of 2012 were not acceptable to you and on the advice

16   of your lawyer you rejected them; correct?

17   A    Yes.

18   Q    And ultimately, when your lawyer and the Retrophin's

19   lawyers came to an agreement, you ultimately signed; correct?

20   A    Correct.

21   Q    Now, Ms. Smith yesterday asked you whether or not the

22   Frase family or the Frase Foundation owns any shares of

23   Retrophin and you said they do not.

24   A    They do not.

25   Q    Did you ever offer them any of the hundreds of shares

1    that Martin gave you from his personal cache?

2    A    I have not offered them shares from mine.

3    Q    And did you ever offer to put any of the 150,000 shares

4    that you still own into the Frase Foundation?

5    A    Not yet.

6    Q    Not yet?

7    A    No.

8    Q    It's been five years.

9    A    Well, we haven't offered them yet.  We've given them --

10   we give -- contributed to their foundation.

11   Q    But not the Retrophin shares?

12   A    Not my Retrophin shares.

13            MR. BRAFMAN:  Now, I want to put up here, it's

14   105-13 in evidence.

15            (Exhibit published to jury.)

16            THE COURT:  Government's Exhibit.

17            MR. BRAFMAN:  Yes.  Government's Exhibit 105-13.

18   Q    It's in evidence, and this is a letter to you in June of

19   2012, and it's entitled:  Suspension of withdrawals; correct?

20   A    Correct.

21   Q    And it says as follows:  Dear Darren, pursuant to

22   Article 6 of that certain limited partnership agreement, the

23   LP agreement of MSMB Capital Management, the company dated on

24   or about February 1st, 2011, by and between the company MSMB

25   Investors, the general partner, and certain limited partners

1    as such term is defined in the partnership agreement, the

2    undersigned is exercising its right to suspend all withdrawals

3    from the company's limited partners from their capital

4    accounts at this time.  The company has experienced a state of

5    affairs that makes the determination of the price or value of

6    the partnership investments impractical or prejudicial to the

7    partners.  The undersigned will notify you of the termination

8    of such suspension as may be applicable.

9              Do you remember getting that?

10   A    Yes.

11   Q    And did you look to see what Article 6 of the limited

12   partnership agreement says?

13   A    I don't remember.

14   Q    But the limited partnership agreement says what this

15   says; that in words or substance the general partner may

16   suspend withdrawals if he determines that it's prejudicial to

17   the other partners or the fund; correct?

18   A    Correct.

19   Q    And you've seen that in a lot of the funds you've

20   invested in.  The general partner has certain discretion.

21   A    Right.

22   Q    And you're required to get written notice and that's your

23   written notice, isn't it?

24   A    Yes.

25             MR. BRAFMAN:  Now, 105-17 is in evidence.  That's

Blanton - cross - Brafman                1877

1    the Exhibit number.

2              (Exhibit published to jury.)

3    Q    And this is a letter you testified to having received

4    from MSMB Group.

5              Do you recall?

6    A    I received it from another limited partner.  I didn't

7    receive that from MSMB.

8    Q    Well, you got it from MSMB Group.

9              It says that on the top, right?

10             MS. SMITH:  Objection, Your Honor.

11             THE COURT:  Sustained.

12   Q    Do you know who you got it from?

13   A    I think it was either John Neill or Schuyler Marshall.

14   Q    Okay.  And it says:  To our limited partners.

15             Those two people you identified, Schuyler Marshall

16   and John Neill, were people you recommend that they invest in

17   MSMB, right?

18   A    No, I just introduced them.

19   Q    And they invested.

20   A    They did eventually invest.

21   Q    And they were people you knew.

22   A    Yes.

23   Q    And this says:  To our limit would partners, I have

24   decided to wind down our hedge fund partnerships with a goal

25   of completing the liquidation of the funds by November or

```
                    Blanton - cross - Brafman              1878
```

1    December 1st, 2012.  As you know, MSMB has found increasingly

2    compelling opportunities in private equity.  We are going to

3    focus our efforts on managing money in a hybrid public/private

4    structure, one which is not generally amenable to the

5    open-ended private hedge funds partnership structure.

6              Do you see that?

7    A    Yes.

8    Q    And you understand that to tell that you the fund was

9    winding down?

10   A    Yes.

11

12              (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Blanton - cross - Brafman                    1879

1   EXAMINATION CONTINUES

2   BY MR. BRAFMAN:

3   Q    And the part where he says we are going to focus our

4   efforts on managing money in a hybrid public/private

5   structure, do you understand that to mean at the time

6   Retrophin?

7   A    Yes, I do looking back.

8   Q    Okay.  And Retrophin at the time was still private with

9   the potential for going public, correct?

10  A    Yes, but in the documents it said they would never have

11  more than 10 percent --

12  Q    We'll get to that in a minute, that wasn't the question,

13  sir.  When you got this you understood that the fund was

14  winding down, correct?

15  A    Correct.

16  Q    Now, 105-15 is in evidence and this is what your

17  attorneys received from MSMB Capital, is that correct?

18  A    Correct.

19  Q    And among the things they asked you for was a list of

20  investors, correct?

21  A    Yes.

22  Q    And Lindsay Rosenwald, do you know who that is?

23  A    I know who it is.

24  Q    Do you recognize him to be one of the most successful

25  investors in the biotech industry?

1  A    He is a successful investor in biotech.

2  Q    He is also a doctor, right?

3  A    Yes.

4  Q    And Steve Richardson, do you know who he is?

5  A    No.

6  Q    And Edmund Sullivan, do you know him?

7  A    I've met him.

8  Q    Who do you know him to be?

9  A    He was -- worked for an investment bank an investment

10 professional.

11 Q    And Brent Saunders you know who that is, right?

12 A    Yes.

13 Q    And Darren Blanton is you.  Dynagrow Capital, do you know

14 if that has any relationship to the Hassan family?

15 A    I didn't have any idea who they are.

16 Q    And Schuyler Marshall is someone you know?

17 A    Yes.

18 Q    And recommended to MSMB?

19 A    Yes.

20 Q    And John Neill was someone you know and recommended to

21 MSMB, correct?

22 A    Yes.

23 Q    So out of the eight people listed here, you know Lindsay

24 Rosenwald, Edmund -- Ed Sullivan, Brent Saunders, Schuyler

25 Marshall and John Neill, is that correct?

Blanton - cross - Brafman                    1881

1   A    Correct.

2   Q    So that's five out of the eight investors you knew

3   personally, correct?

4          MS. SMITH:  Objection, Your Honor.

5   BY MR. BRAFMAN:

6   Q    Or knew of?

7          THE COURT:  Sustained.

8   A    Knew of.

9   Q    You knew of, correct?

10  A    (No response.)

11  Q    Correct sir?

12  A    Correct.

13  Q    Now, you also got page 2, which is identified as it's

14  part of the exhibit as Colt 000469.  Do you see that document?

15  A    Yes.

16  Q    It lists Level III securities $3,480,000.  Do you see

17  that?

18  A    Yes.

19  Q    What Level III securities did you know were invested in

20  MSMB?

21  A    I didn't know for sure, I assumed it could be Retrophin.

22  Q    And do you know whether that constitutes Martin's

23  personal stock that was put back into MSMB?

24  A    I have no idea.

25  Q    But you knew when you saw it that Level III securities is

Blanton - cross - Brafman                    1882

1    restricted stock?

2    A    Yes.

3    Q    And you had just gotten a letter, a wind-down letter

4    telling you that they were going to be focusing on private

5    equity, correct?

6              MS. SMITH:  Objection, Your Honor.

7              THE COURT:  Sustained.

8    BY MR. BRAFMAN:

9    Q    Did you understand at the time that you saw this, that

10   this was probably $3,480,000 worth of Retrophin stock?

11   A    I didn't know what it was.

12   Q    Did you ask?

13   A    I didn't get -- I didn't -- I didn't -- no, I don't think

14   I did.

15   Q    You got this?

16   A    No, I don't remember.  I don't remember asking personally

17   to Martin or anyone.  I don't remember what -- what happened

18   after we got that.

19             MR. BRAFMAN:  I want to put up on the screen what's

20   in evidence as 105-24, which is an e-mail and a stock

21   certificate.  It is all part of one exhibit.

22             MS. SMITH:  Your Honor, there are actually two

23   exhibits.  105-23 is the stock certificate.

24             MR. BRAFMAN:  I'm sorry.

25             THE COURT:  Wait, what were you saying?

```
                    Blanton - cross - Brafman              1883
```

1           MS. SMITH:  105-23 is the stock certificate; 105-24

2    is an e-mail.  They are not the same exhibit and they are

3    not -- one was not attached to the other.

4           MR. BRAFMAN:  Okay.

5           THE COURT:  Are they both in evidence?

6           MR. BRAFMAN:  Yes.

7           MS. SMITH:  Yes.

8           THE COURT:  Okay.

9           MR. BRAFMAN:  So we'll start with 105-24, so we

10   avoid the confusion.

11          (Exhibit published.)

12   BY MR. BRAFMAN:

13   Q    This is 105-24, which is in evidence.  This is an e-mail

14   from February of 2013 from Martin Shkreli to JD McCulloch.

15   You identified it yesterday, correct?

16   A    Yes.

17   Q    Have you received your certs yet?  And certs being

18   certificates, correct?

19   A    Correct.

20   Q    Also I'd be willing to give you some more stock that

21   makes certain you generated a profit on your investment with

22   us.  I think it's very important that this investment ends

23   with a robust profit.  Let me know and we can discuss the

24   possibility further.

25          Do you remember getting this?

Blanton - cross - Brafman                    1884

1          MS. SMITH:  Objection, Your Honor.

2          THE COURT:  We have gone over this exhibit before

3     the break.

4          MR. BRAFMAN:  Sorry, Your Honor.

5          THE COURT:  All right.

6     BY MR. BRAFMAN:

7     Q    I am going to refer you to 105-18, which is in evidence,

8     and ask you if you remember this e-mail chain.  There came a

9     time when Martin told you that Retrophin became public, is

10    that correct?

11    A    Yes.

12    Q    And that was in December of 2012?

13    A    Yes.

14    Q    And when did the process begin, if you know, for

15    Retrophin to become public?

16    A    I don't remember exactly, but somewhere around here.

17    Q    Well, at this point it was already public.  I'm asking

18    you when the process began to make it public.

19    A    When it became publicly traded.

20    Q    But how long was the process to get to that point?

21    A    I do not know.

22    Q    Well, Retrophin doesn't start until the end of when,

23    2000 -- the beginning of 2011?

24    A    Somewhere -- yes, in 2011.

25    Q    Okay.  And at the beginning of 2011 you talked to

SAM     OCR     RMR     CRR     RPR

Blanton - cross - Brafman                    1885

1    Mr. Shkreli about the Frase child who passed away or who was

2    dying, right?

3    A    Yes, yes.

4    Q    And you testified that was the impetus for Retrophin?

5    A    Yes.

6    Q    And that was in about the first quarter of 2011?

7    A    Yes.

8    Q    And here in 2012 it's already now a public company,

9    correct?

10   A    I think so, at the end of 2012.

11   Q    And based on your expression, tell me if I'm wrong, that

12   is a pretty short track; isn't it?

13   A    With reverse mergers it's usually shorter.

14   Q    I understand that, but to go from conception to public

15   company in, essentially, eighteen months is pretty quick?

16   A    Pretty quick.

17   Q    Now, it's an orphan drug, so that speeds it up, correct?

18   A    It speeds up the approval process of the drug, but it

19   doesn't speed up the process for it to get public.

20   Q    So for it to get public in that record time is pretty

21   amazing, isn't it?

22              MS. SMITH:  Objection, Your Honor.

23              THE COURT:  Sustained.

24   BY MR. BRAFMAN:

25   Q    Mr. Shkreli in December 17th is telling you subject RTRX

Blanton - cross - Brafman                     1886

1  , from Martin Shkreli to Darren Blanton, you then write back,

2  Is that the new symbol?  How many shares do I have and how

3  many outstanding?

4          He says, This is the new symbol effective today.  I

5  will calculate how much stock and get back to you - it's lot

6  and there is more available if you want it.

7          Do you see that?

8  A     Yes.

9  Q     And then you say, Cool, let me know; correct?

10  A     Correct.

11  Q     And then he asks you to do him a favor and buy a hundred

12  shares.  Did you understand that to be Martin trying to

13  determine whether the symbol is correct and it was registered

14  properly and you could buy and sell?

15  A     I had no idea what he was talking about.

16  Q     Well, why did he ask you to buy a hundred shares?

17  A     I don't know.

18  Q     Well, did you?

19  A     I don't think so.

20  Q     But on that date did you recognize the company had a

21  formal symbol and was tradable?

22  A     I assumed it did.

23  Q     Now, this was during a period when you were not having

24  trouble any longer, apparently, reaching Martin and

25  corresponding with Martin, correct?

SAM      OCR      RMR      CRR      RPR

Blanton - cross - Brafman                    1887

1   A     It fluctuated.

2   Q     But in this you're responding to him and he's responding

3   to you in minutes?

4   A     Yes, I think by these e-mails it looks like we're

5   talking.

6              MR. BRAFMAN:  I am going to put up on the screen

7   what's in evidence as 105-5.

8              (Exhibit published.)

9   BY MR. BRAFMAN:

10  Q     Do you recognize this e-mail dated February 9th, 2011?

11  A     Yes.

12  Q     And that's an e-mail where Martin is, essentially,

13  telling you about the steps he is going to need to take in

14  order to get Retrophin recognized as a real company, correct?

15  A     Correct.

16  Q     And he indicates the next steps:  Negotiate a license

17  with Wisconsin; convince Ervasti to join Retrophin as

18  president; find CEO, he can be interim CEO if need be;

19  finalize pre-clinical and manufacturing plan to enable IND

20  with FDA.

21             What's IND?

22  A     Initial new drug filing.

23  Q     And the FDA would need to approve a drug that you are

24  going to try and use, correct?

25  A     They would have to approve the clinical trial.

1   Q     Okay.  And file a pre-initial new drug by May 2011,

2   correct?

3   A     Correct.

4   Q     File IND by December 2011, correct?

5   A     Correct.

6   Q     And begin dose ranging study January 2012, correct?

7   A     Correct.

8   Q     And he indicates on it hugely ambitious plan, correct?

9   A     Yes.

10  Q     And he did it?

11        MS. SMITH:  Objection, Your Honor.

12        THE COURT:  Sustained.

13  BY MR. BRAFMAN:

14  Q     Did he do it?

15        MS. SMITH:  Objection to "it."

16        THE COURT:  Did he do what?

17  Q     Did he get through all of these and go public in 2012?

18        MS. SMITH:  Objection, Your Honor.

19        THE COURT:  Sustained.

20  Q     Did you agree this was a hugely ambitious plan?

21  A     Yes.

22  Q     And do you have any knowledge in advance for how long

23  clinical trials are going to take?

24  A     Yes, and that drug didn't go into the company.

25  Q     Do you know what the FDA approval process, how long it

Blanton - cross - Brafman                1889

1    takes?

2    A    It varies, varies depending on which kind of drug.

3    Q    It can take years?

4    A    It can take years.

5    Q    And in December of 2012, as we just learned, Retrophin

6    already had a publicly-traded symbol, correct?

7    A    December 2012, yes.

8    Q    I am going to show you what's been marked into evidence

9    as 105-12.  105-12 I am going to pull it down so you can focus

10   on the top part.

11          Do you recognize this as an e-mail from Shkreli to

12   you?

13   A    Yes.

14   Q    And copied to JD McCulloch and Joseph Hildebrand.  Who is

15   Joseph Hildebrand?

16   A    My accountant.

17   Q    Okay.  So in April of 2012, April 30th, you get the

18   e-mail and just look at paragraph 2.  The bottom of that

19   e-mail he tells you that a good part of the value of the MSMB

20   funds is Retrophin, LLC units, so these units may accrue to

21   you anyway.

22          Do you see that?

23   A    Yes.

24   Q    So there is no doubt that in April of 2012 Mr. Shkreli

25   informs you that MSMB is going to end up with Retrophin stock,

1  correct?

2  A    Correct.

3  Q    And he tells you that they are going to accrue to you

4  because you invested in MSMB and he's putting Retrophin into

5  MSMB, so you are going to get some.  Isn't that what it says?

6  A    That's what this says.

7  Q    And that's what happened, isn't that true?

8  A    Yes.

9  Q    Now, would it be a fair statement that in your native

10  State of Texas as that you are somewhat of a public figure?

11  A    No.

12  Q    You're not?

13  A    No.

14  Q    Are you from time to time profiled?

15  A    I have been.

16  Q    And articles have been written about you?

17  A    Yes.

18  Q    And you are, among other things, considered a successful

19  horseman, correct?

20  A    Yes.

21  Q    And do you remember in connection with articles that have

22  been written about you, you saying in words or substance that

23  you have been able to do everything by basically using the

24  skill of networking and asking questions?

25  A    Yes.

1    Q    And that's a quote attributed to you, correct?

2    A    Yes.

3    Q    And it's true, isn't it?

4    A    Yes.

5    Q    You've been networking, essentially, your whole life

6    trying to develop business contacts, and then used the

7    introductions to either further your businesses or their

8    businesses, correct?

9    A    Correct.

10   Q    And that's among the people who you introduced Martin to,

11   I think you've said over and over again, that it's all part of

12   networking, correct?

13   A    Correct.

14   Q    And when you were interviewed in any of the articles did

15   you describe yourself as a cowboy venture capitalist?

16   A    They described it.

17   Q    And that's because as part of your wealth or holdings

18   involves a great many horses that are valuable, is that

19   correct?

20            MS. SMITH:  Objection to relevance, Your Honor.

21            THE COURT:  Sustained.

22   BY MR. BRAFMAN:

23   Q    Well, when you --

24            THE COURT:  It's also been asked and answered.

25   BY MR. BRAFMAN:

Blanton - cross - Brafman                    1892

1   Q    Didn't you tell them that your friends call you a cowboy

2   venture capitalist?

3            MS. SMITH:  Objection, Your Honor.

4            THE COURT:  Sustained.

5   Q    You said they were using that word.  Did you use that

6   word?

7            MS. SMITH:  Objection, Your Honor.

8            THE COURT:  Let's just let him answer and move on.

9            MR. BRAFMAN:  Yes, Your Honor.

10  A    I don't -- I don't remember the context of it.  I don't

11  think I called myself that.

12  Q    Did you tell them that your companies, many of your

13  companies were private and difficult to value?

14  A    Yes.

15  Q    And that's true, correct?

16  A    That's true.

17  Q    And did you talk about your personal upbringing?

18  A    In what?

19  Q    Did you discuss the fact that you actually made yourself,

20  yourself, a made man, you have very little formal education

21  besides high school and yet you became very successful.

22  That's true; isn't it?

23  A    I think it depends on your -- your definition of success.

24  Q    Would you consider yourself a successful man?

25  A    Not yet.

Blanton - cross - Brafman                    1893

1    Q    Well, do you ever tell anyone that your goal is to become

2    a billionaire and you are almost there?

3    A    No.

4    Q    Never said that?

5    A    No, they misquoted that, that was in an article.

6    Q    And what did the article -- what did you say to make them

7    misquote it, if you remember?

8              MS. SMITH:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   BY MR. BRAFMAN:

11   Q    We asked you before -- well, let me withdraw.

12             Did you tell them in words or substance that you

13   have good conversational skills and you use them to get

14   yourself or others into trouble or to con people out of

15   things?

16             MS. SMITH:  Objection, Your Honor, relevance.

17             THE COURT:  Can we just go to sidebar?

18             MR. BRAFMAN:  Let me just ask him if he remembers

19   saying that.

20             THE COURT:  No, I want a proffer of relevance here,

21   please, at sidebar.

22             (Sidebar held outside the hearing of the jury.)

23             (Continued on the following page.)

24

25

SAM      OCR      RMR      CRR      RPR

```
                         Sidebar                          1894
```

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          THE COURT:  Why are we going here?

4          MR. BRAFMAN:  Why?  Because it's relevant to his

5    entire testimony.  If he calls himself a con man in a publicly

6    filed article, he can deny saying it and he can say they

7    misquoted him.  But this is a profile about the cowboy venture

8    capitalist.  It has a picture of Mr. Blanton.  It was filled

9    with his quotes, many of them he has confirmed to be accurate.

10   This is him (indicating) posing with his horses, and at the

11   end he describes himself as a young man.  And I have a right,

12   I think, to inquire as someone who was a renegade --

13         MS. SMITH:  Can we see a copy of the article?

14         MR. BRAFMAN:  Sure.  I'm surprised that you don't

15   have it.  All you need to do is Google him.

16         MS. SMITH:  Doesn't mean you are going to use it.

17         MR. BRAFMAN:  Well, he's quoted throughout this

18   article and he talks about his deals.

19         THE COURT:  It seems a little bit like you are just

20   trying to go after his character with irrelevant --

21         MR. BRAFMAN:  No, it's not irrelevant.  If the

22   witness describes himself as follows -- can I have my copy

23   that's marked up?

24         I have good conversational skills, but I use them to

25   get myself or others into trouble or to con people out of

```
                         Sidebar                          1895
```

1   something.

2           MS. SMITH:  What is the timeframe on that?

3           MR. BRAFMAN:  It's when he was a young man, and I am

4   going to ask him that.

5           MS. SMITH:  What does a young man mean?

6           MR. BRAFMAN:  It says after his parents' divorce --

7           MS. SMITH: So --

8           MR. BRAFMAN:  No, I'll ask him.  You want him to say

9   that when he's 30 years old he said that, that's fine.  It's

10  relevant if you describe yourself as a con man.

11          THE COURT:  Well, but the way you are asking the

12  question is a little bit deceptive honestly, with all due

13  respect because you are just saying did you say this, but you

14  are not giving it the full context.

15          MR. BRAFMAN:  I'll give it the full context.

16          MS. SMITH:  Can I just say on the record that this

17  witness' credibility has been attacked repeatedly?

18          THE COURT:  Yes.

19          MR. BRAFMAN:  Yes, but the witness' description of

20  himself as a con man is relevant on issue, and I will go into

21  when he said it, about when he said it.  Okay?

22          THE COURT:  The context is when he was young and his

23  parents divorced?

24          MR. BRAFMAN:  Yes.

25          MS. SMITH:  I just want it on the record that his

```
        SAM      OCR      RMR      CRR      RPR
```

Sidebar                                                    1896

1   credibility is being attacked.

2            THE COURT:  Yes.

3            MR. BRAFMAN:  Yes, thank you.

4            MS. SMITH:  Thank you.

5            (Sidebar concluded.)

6            (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR      RMR      CRR      RPR

1          (In open court - jurors present.)

2          MR. BRAFMAN:  Can I give a copy to the witness,

3    Judge?

4          THE COURT:  You may.

5          MR. BRAFMAN:  Handing the witness a copy of Defense

6    Exhibit 4344, just for identification.

7    EXAMINATION CONTINUING

8    BY MR. BRAFMAN:

9    Q    Do you recognize the document, Mr. Blanton?

10   A    Yes.

11   Q    And do you recognize this as a profile that was done of

12   you in or about 2015?

13   A    It was an article.

14   Q    An article about you?

15   A    Yes.

16   Q    And did you read it at the time?

17   A    Yes.

18   Q    Now, I want to ask you, sir, and I want to be precise to

19   follow the Court's instructions.

20          Did there come a time in this article where you were

21   asked to essentially describe yourself at a time when you were

22   a young man and it was after your parents were divorced?

23   A    I think so.

24   Q    And did you say at the time when you were young after

25   your parents divorced that it caused you to become a little

1    bit of a renegade?

2    A    That was her rendition of what I said.

3    Q    Well, did you say that you had good conversational

4    skills, but that you used them to get yourself and others into

5    trouble or to con people out of something?  Did you say that?

6    A    I don't think I said exactly that.  I think that's what

7    she wrote.  The media doesn't always write exactly what you

8    say.

9    Q    Right, and what did you say?

10   A    I don't remember.

11   Q    So what did you say that caused her to use the words con

12   man?

13   A    I have no idea.

14        MR. BRAFMAN:  Thank you very much.  I have no

15   further questions.

16        THE COURT:  Any redirect?

17        MS. SMITH:  Yes, Your Honor.

18   REDIRECT EXAMINATION

19   BY MS. SMITH:

20   Q    Hi, Mr. Blanton.

21   A    Hello.

22        MS. SMITH:  Ms. Balbin, can you bring up Government

23   Exhibit 105-5?

24        (Exhibit published.)

25   Q    Mr. Brafman just asked you about this exhibit and

1  specifically kind of the Next Steps section, the negotiating

2  the license, convincing Ervasti, all the way through begin

3  dose ranging study January 2012.  So Mr. Brafman was asking

4  you about the bottom portion here where it says Next Steps and

5  it gives a whole timeline of events?

6  A    Yes.

7  Q    Was it your testimony that this particular drug didn't,

8  in fact, become part of the company or have a clinical trial?

9  A    Yes.

10  Q    And did any drug have a clinical trial as far as you know

11  in the first year or so of Retrophin's existence?

12  A    I don't remember exactly which ones.  There could have

13  been some drugs that were in early stage clinical trials, a

14  couple of them, but this drug was not.

15  Q    And so this drug was not connected at all to the reverse

16  merger that happened a year-and-a-half later, is that correct?

17  A    Not in my knowledge.

18  Q    And a reverse merger just means that a private company

19  merges with a public company to become public, is that right?

20  A    Yes.

21  Q    And so any private company that wants to merge with a

22  public company can do so, is that correct?

23  A    There are some requirements, but basically yes.

24  Q    And is there any requirement that you complete a clinical

25  study in order to go public?

Blanton - redirect - Smith                    1900

1    A    No.

2    Q    I'd like to show you what's --

3         MS. SMITH:  Actually, can we switch to the ELMO for

4    just one minute?  Sorry.  And this is in evidence, it's

5    Defendant's Exhibit 4309.

6    BY MS. SMITH:

7    Q    And Mr. Brafman showed you this document, right?

8    A    Right.

9    Q    And he said this was the document where Mr. Shkreli was

10   withdrawing your founder's share, is that correct?

11   A    Right.

12   Q    What's the date on that document?

13   A    February 10th, 2012.

14        MS. SMITH:  Ms. Balbin, can we switch back to the

15   laptop?  And can we pull up Government Exhibit 105-40?  And

16   zoom in on the top there.

17   BY MS. SMITH:

18   Q    So the date that Mr. Shkreli is withdrawing your

19   founder's share is February 10th.  And on February 9th,

20   according to Government Exhibit 105-40, is when he's in the

21   process of giving you some of the money back for your

22   redemption request, right?

23   A    Right.

24   Q    And on February 9th he tells you he's going to give you

25   another $50,000, right?

Blanton - redirect - Smith                    1901

1   A     Right.

2   Q     And you never actually get that money?

3   A     Right.

4   Q     And at this point you put in your request for the entire

5   amount and you've only gotten 200,000 back, is that right?

6   A     Correct.

7   Q     And at the exact same time Mr. Shkreli is pulling back

8   your founder's share from the company, is that right?

9   A     Right.

10  Q     And you testified that you, yourself, gave the Frase

11  Family Foundation a donation, is that right?

12  A     In some -- I can't remember exactly what we did.

13  Q     And do you know whether or not the defendant ever gave

14  the Frase Family Foundation --

15              MR. BRAFMAN:  Objection.

16  BY MS. SMITH:

17  Q     -- a donation after withdrawing the shares?

18              THE COURT:  Overruled.

19  A     I don't think so.

20  Q     On cross you were asked about Mr. Shkreli giving you his

21  personal shares in connection with trying to make up for the

22  redemption for MSMB Capital, is that right?

23  A     Yes.

24  Q     And you were also shown Government Exhibit 105-24.

25              And this is where Mr. Shkreli was asking you, told

1   you that he wanted to make sure you got a profit on your MSMB

2   Capital investment, is that right?

3           (Exhibit published.)

4   A    Yes.

5   Q    That he personally wanted to ensure that you profited?

6   A    Yes.

7   Q    And this was after you had received the original set of

8   shares from Retrophin.  So that in and of itself wasn't enough

9   for your original investment, is that right?

10  A    Yes.

11  Q    And so you understood from conversations with Mr. Shkreli

12  that he was going to make you whole for your MSMB Capital

13  investment, right?

14  A    According to this.

15  Q    And that also was what he told you in conversations?

16  A    Yes.

17          MS. SMITH:  If we can go back to Government Exhibit

18  105-29.

19          (Exhibit published.)

20          MS. SMITH:  And zoom in on the top portion.

21  BY MS. SMITH:

22  Q    And this is one of the agreements that was sent to you by

23  Mr. Shkreli and his counsel to kind of make you whole for your

24  MSMB Capital investment, is that right?

25          MR. BRAFMAN:  Your Honor, beyond the scope of cross.

Blanton - redirect - Smith                         1903

1    I did not touch this agreement.

2            MS. SMITH:  Your Honor, there were a number of

3    agreements discussed.

4            MR. BRAFMAN:  Only the consulting agreement.

5            MS. SMITH:  I am happy to discuss at sidebar.

6            THE COURT:  All right, let's have a sidebar.

7            MR. BRAFMAN:  I don't want to waste the time, let

8    her just do it.

9            THE COURT:  All right.  You are withdrawing the

10   objection, sir?

11           MR. BRAFMAN:  Yes, Your Honor.

12           THE COURT:  Go ahead.

13   BY MS. SMITH:

14   Q    And this is one of the agreements you received?

15   A    Yes.

16   Q    And this is an option agreement, right, on August 25th,

17   2013?

18   A    Yes.

19   Q    And if we can look at the first page of that agreement

20   that's attached.

21           MS. SMITH:  And if we can zoom in on the top half

22   there.

23   Q    And in this option agreement it's between actually you

24   and Mr. Shkreli personally, right?

25           (Exhibit published.)

Blanton - redirect - Smith                    1904

1    A    Yes.

2    Q    And it says:  Whereas, Shkreli is the record and

3    beneficial owner of 100,000 shares of common stock of

4    Retrophin, right?

5    A    Right.

6    Q    And in the next paragraph it says that he will give you

7    those shares personally, is that right?

8    A    Yes.

9    Q    And after you got this option agreement, you continued to

10   get multiple drafts of various agreements that were all

11   drafted by the defendant and his lawyer, is that right?

12   A    Right.

13   Q    And the next agreement that you got is Government Exhibit

14   105-30.  And this one you get about a month later, is that

15   right?

16             (Exhibit published.)

17   A    Right.

18   Q    And in this agreement you are being offered not a

19   hundred-thousand shares, but actually over the course of three

20   years 900,000 shares and $900,000, is that right?

21   A    Yes.

22   Q    And if you look at the agreement, itself, on the first

23   page.

24             MS. SMITH:  And zoom in all the way through

25   paragraph 2B.  Thank you.

Blanton - redirect - Smith                          1905

1    BY MS. SMITH:

2    Q    This agreement is not between Mr. Shkreli personally and

3    you, is it, it's between Retrophin and you; is that right?

4              (Exhibit published.)

5    A    Right.

6    Q    And it says that the company will issue shares, 900,000

7    shares and $900,000, is that right?

8    A    Yes.

9    Q    So with this agreement it's not Mr. Shkreli repaying you

10   for the MSMB Capital investment, but, in fact, Retrophin is

11   giving you that money and those shares, is that right?

12   A    Right.

13   Q    And it's significantly more generous than when the shares

14   were coming from Mr. Shkreli personally; isn't it?

15   A    Yes.

16   Q    And if we can look at Government Exhibit 61, which is the

17   consulting agreement you actually signed.

18            MS. SMITH:  And zoom in all the way through

19   paragraph 2.

20            (Exhibit published.)

21   BY MS. SMITH:

22   Q    And the consulting agreement you signed was between you

23   and Retrophin, is that right?

24   A    Yes.

25   Q    And in that agreement the company issued shares, correct,

SAM      OCR      RMR      CRR      RPR

Blanton - redirect - Smith                    1906

1   not Martin Shkreli personally?

2   A     Yes.

3   Q     At the time of the agreement that you signed here,

4   Retrophin was a public company, right?

5   A     Yes.

6   Q     And Mr. Shkreli was the CEO of the company, is that

7   right?

8   A     Yes.

9   Q     And when you're CEO of a public company, you are not the

10  owner of the company, are you?

11            MR. BRAFMAN:  Objection.

12            THE COURT:  Well, if you know you can answer it.  Do

13  you know?

14            THE WITNESS:  No, you're not the owner.

15  BY MS. SMITH:

16  Q     And who is the owner of a public company?

17  A     The shareholders.

18  Q     And the CEO can't just do whatever he wants with the

19  shares of a public company, can he?

20            MR. BRAFMAN:  Objection, Your Honor.

21            THE COURT:  You should reframe the question, please.

22  BY MS. SMITH:

23  Q     Can the CEO give out shares of a public company without

24  permission of the shareholders or the Board of Directors just

25  on his own?

1    A    No.

2    Q    On cross you were asked about a lot about dealing with

3    Retrophin in connection with these various drafts of

4    agreements, right?

5    A    Yes.

6    Q    And during that period when you were dealing with

7    Retrophin, you were dealing with Mr. Shkreli and Mr. Greebel,

8    is that right?

9    A    Yes.

10   Q    Were you dealing with anybody else at Retrophin during

11   this time period?

12   A    No.

13   Q    And so Mr. Greebel and Mr. Shkreli are the people who are

14   providing you with all of these different draft agreements, is

15   that right?

16   A    Yes, because -- I just assumed that he's the CEO and

17   Greebel was the corporate counsel.

18   Q    But other than those two, you weren't dealing with the

19   Board of Directors of Retrophin or Retrophin's accountants or

20   anybody else?

21   A    No.

22   Q    So all of your information about what Retrophin was

23   willing to pay you for the MSMB Capital fund came from

24   Mr. Shkreli and Mr. Greebel, is that right?

25   A    Right.

1  Q    I am also going to show you what's been marked as

2  Government Exhibit 105-1 in evidence.  And we are going to go

3  to page 80, I believe, which is the PowerPoint presentation.

4           (Exhibit published.)

5           MS. SMITH:  And we are going to go, this is the

6  first page and then we are going to go two pages into the

7  organization section.

8  BY MS. SMITH:

9  Q    And Mr. Brafman asked you about this PowerPoint and

10 walked you through everyone's kind of background as listed

11 here, correct?

12 A    Correct.

13 Q    And he walked you through where Marek Biastek had worked

14 and Andre Logan and Edward Painter, and what is said here

15 about where Mr. Shkreli worked?

16 A    Intrepid Capital and Cramer Berkowitz.

17 Q    Does it say anywhere there that Mr. Shkreli worked at RBC

18 Trading?

19 A    No.

20 Q    And if it had said that Mr. Shkreli worked at RBC

21 Trading, is that something you would have looked into as well?

22           MR. BRAFMAN:  Objection.

23           THE COURT:  Overruled.

24 A    Possibly.

25 Q    And was it important to know his performance and his

1  track record, you were asked about that, right?

2  A    Yes.

3  Q    And would it have been important to know if his track

4  record at some of the places that he was listing was not a

5  good track record?

6  A    Yes.

7  Q    And would it have been important to know if he left

8  something off of this presentation because it would have shown

9  that he didn't have a good track record?

10 A    Yes.

11          MR. BRAFMAN:  Your Honor, ask to strike any

12 reference to RBC.  You ruled that not part of the case in the

13 in limine motions.

14          MS. SMITH:  Your Honor, we can have a sidebar.

15          THE COURT:  All right.

16          (Sidebar held outside the hearing of the jury.)

17

18          (Continued on the following page.)

19

20

21

22

23

24

25

```
               Sidebar                              1910
```

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          THE COURT:  If I ruled that something was not

4    admissible, you do not want to say it in front of the jury and

5    bring it up in front of them.

6          I did not hear RBC in that.

7          MS. SMITH:  I did ask about RBC.

8          THE COURT:  Oh, okay, I'm sorry.

9          MS. SMITH:  My understanding was Your Honor had

10   reserved decision and what actually happened at RBC may or may

11   not come in, whether or not we can lay the foundation with

12   these investors.

13         MR. BRAFMAN:  But you just told the jury that what

14   happened at RBC is obviously not good.

15         MS. SMITH:  I said what if, it was a question, and

16   he said he would want to know.

17         MR. BRAFMAN:  Oh, come on.

18         THE COURTROOM DEPUTY:  Excuse me, Judge, I am going

19   to give the jury a break.

20         THE COURT:  Okay.

21         (Jury exits.)

22         MS. SMITH:  Well, how am I supposed to lay the

23   foundation for whether the track record was important and if

24   something was missing was important without asking

25   him whether -- he's the one that walked through every single

```
                          Sidebar                    1911
```

 1    thing that's on there and asked him if he called.  The

 2    defendant deliberately left how the RBC Trading, as he had

 3    elsewhere, and I didn't say -- I said if it had been

 4    problematic for the track record, would you have wanted to

 5    know.

 6             MR. BRAFMAN:  Right, so the jury now believes that

 7    the Government believes that the RBC track record was bad and

 8    you've never gotten permission from the Court to go into RBC.

 9             MS. SMITH:  But I didn't go into what happened.  I

10    think it's a significant difference.  How am I supposed to lay

11    the foundation?

12             MR. BRAFMAN:  Not through a witness.  You asked to

13    discuss this at sidebar.  This witness doesn't know RBC from a

14    hole in the wall.

15             MS. SMITH:  That's right, he doesn't, because it

16    wasn't on the PowerPoint and, therefore, he didn't investigate

17    it the way he investigated all the other things.

18             MR. BRAFMAN:  Yeah, and Elea is not on the

19    PowerPoint and he investigated it, found out it was a bust,

20    and he invested anyway.

21             MS. SMITH:  You asked him about that.

22             MR. BRAFMAN:  Okay.

23             MS. KASULIS:  You asked him about that.

24             THE COURT:  Okay, I think you should have alerted me

25    in advance, but what you are planning to do --

```
                           Sidebar                       1912
```

1          MS. SMITH:  I didn't say was terminated.

2          THE COURT:  What are you planning to elicit?

3          MS. SMITH:  I'm actually not planning.  I was just

4    laying the foundation.  I mean Your Honor may ultimately rule

5    that we can't put that in.

6          MR. BRAFMAN:  I'd like it all stricken at this point

7    and the jury instructed that they are not to consider anything

8    that may have happened with RBC.

9          THE COURT:  Okay, this is the thing.  I think you

10   walked him through the qualifications and background and

11   emphasized how important it was and got him to admit that he

12   had his brother conduct a due diligence, background check on

13   these individuals -- individual, meaning Mr. Shkreli.  And

14   there was testimony, quite a bit, that you elicited from this

15   witness about that whole process and the background.

16         MR. BRAFMAN:  And I didn't mention RBC, and I didn't

17   mention RBC because we had discussed it and in Your Honor's

18   ruling you had not ruled that that was going to be admissible

19   in this trial as of that date.

20         MS. SMITH:  But there is no evidence about RBC.  My

21   question -- he doesn't know that.

22         MS. KASULIS:  Also you can't emphasize that he has

23   all this good performance and then not open yourself to

24   redirect about if there had been other funds listed on the

25   PowerPoint would that have been relevant and would you have

Sidebar                                                    1913

1   looked into it and would a track record at that place be

2   relevant to you or not.

3           He clearly opened the door to the fact that it's not

4   listed on the PowerPoint, that all of his diligence, he makes

5   the point that Mr. Shkreli had a very good track record and

6   they relied on it.  So we were then entitled to be able to

7   inquire about what wasn't on the slide to rebut the point that

8   they are making.

9           THE COURT:  Look, I think that with respect to it

10  you did open the door in terms of going through how important

11  the background was, questioning him about whether his brother

12  did sufficient due diligence, and also repeatedly talking

13  about Mr. Shkreli's reputation and the fact that he was held

14  in high regard by this witness and heard good things about

15  Mr. Shkreli.

16          So if that fact would have been important to him,

17  i.e., his full background, where he had worked previously,

18  then I think that it's fair ground for the government to ask

19  whether omissions about someone's background would have been

20  of interest and whether they would have checked it out.

21          MR. BRAFMAN:  They checked out Mr. Shkreli

22  completely.  Elea Capital came up, Lehman Brothers came up,

23  Cramer Berkowitz came up.  There was nothing in there about

24  RBC.

25          THE COURT:  But they checked out, in part, what they

SAM      OCR      RMR      CRR      RPR

```
                        Sidebar                          1914
```

 1   found on their own and, in part, what was revealed to them.

 2          MR. BRAFMAN:  They did a background check through a

 3   corporate investigation firm.

 4          THE COURT:  But they didn't see anything about RBC,

 5   I don't know how likely it would be that they would have found

 6   it.

 7          MS. SMITH:  He was only there --

 8          THE COURT:  Had it been disclosed, I think that it

 9   is something that has been opened and certainly is fair

10   ground, I think, for redirect given there was quite a bit of

11   time spent on this issue.

12          MR. BRAFMAN:  We'll note our objection.  I assume

13   they're not going further --

14          MS. SMITH:  No.

15          MR. BRAFMAN:  -- with that now.

16          MS. SMITH:  I do while we're at sidebar, given that

17   we've all agreed that the witness' credibility has been

18   attacked, I am planning on introducing into evidence

19   Mr. Blanton's signed declaration from the SEC on redirect.

20

21          (Continued on the following page.)

22

23

24

25

1   (continuing)

2           (Side-bar.)

3           MR. BRAFMAN:  Well, the signed declaration from the

4   SEC is just bolstering the witness by a prior statement.

5           All I did was ask whether or not he told the SEC

6   that the matter was settled.  I did not go near any word of

7   the other parts of that document.

8           MS. SMITH:  The other parts of the document include

9   whether or not it was important to him about the auditor and

10  the administrator, whether or not Josiah Austin -- you've

11  attacked his credibility on all of those grounds and under

12  801(d)(1)B(ii), we have the opportunity to rehabilitate the

13  credibility on a witness when attacked on another ground.  You

14  actually attacked him on many of the grounds in the

15  declaration itself.  We all agreed to that at side-bar.

16          MR. BRAFMAN:  Yes, and you can do that.  You can

17  rehabilitate him until the horses come home -- I was going to

18  say cows come home, but until the horses come home -- but you

19  can't offer in a document which is a self-serving statement

20  when the only reference I made to the document that's not in

21  evidence, neither by you or me, was the fact that it was he

22  told the SEC the case was settled.

23          MS. SMITH:  It's not hearsay.  It's a hearsay

24  exception because you've attacked credibility.

25          MR. BRAFMAN:  Okay.  Judge, I made myself clear, you

Side-Bar                                    1916

1   want to put it in, I'm not going to belabor the point.

2           THE COURT:  All right.  I mean, it is a statements

3   that is admissible as a rehabilitation under 801(d)(1)B(ii).

4           MR. BRAFMAN:  But as a prior inconsistent statement.

5           MS. SMITH:  Yes.

6           THE COURT:  Yes.  It's consistent with a declarant's

7   testimony and is offered to rehabilitate the declarant's

8   credibility as a witness when attacked on another ground or to

9   rebut an express or implied charge -- this is under (b)(1) --

10  that the declarant recently fabricated or acted from a recent

11  improper influence or motive in testifying.

12          MS. SMITH:  Part two is because you rehabilitate the

13  declarant's credibility as a witness.

14          MR. BRAFMAN:  Your Honor's ruled.  I don't want to

15  belabor the issue.  We have an objection and Your Honor's

16  overruled it.

17          THE COURT:  All right.

18          So, just to be clear.  You've mentioned or you will

19  be able to mention that there may have been omissions from the

20  PowerPoint regarding his --

21          MR. BRAFMAN:  She's agreed not to go back to that.

22          MS. SMITH:  Yeah, I think whatever I said is already

23  fine.

24          THE COURT:  All right.  So, the request to strike

25  that part of it is respectfully denied.

Side-Bar                                                1917

1        And with regard to the Government's intention to

2   introduce the SEC affidavit that Mr. Blanton signed, it is, I

3   believe, admissible under 801(d)(1)B(ii).

4            MS. KASULIS:  Should we just take the lunch break?

5            THE COURT:  We can do that now.

6            MR. BRAFMAN:  We can, I think we have two more

7   minutes with this witness.

8            MR. AGNIFILO:  The redirect on this?

9            MS. SMITH:  It's probably closer to ten minutes.

10           THE COURT:  Well, I was going to give them a break

11  at quarter of 1:00, so if you can finish up by quarter of

12  1:00, could we do that?

13           MR. BRAFMAN:  I don't know.  I don't know what else

14  she's going to do and I need to get these Exhibits out.  If

15  they're out already, may as well just send them to lunch and

16  ask them to come back earlier.  It might be easier.

17           THE COURT:  Do you all want to take a break now

18  then?

19           MS. SMITH:  Sure.

20           MR. BRAFMAN:  Why don't we finish the redirect and

21  then take a break before we cross.

22           THE COURT:  All right.

23           MR. KAPLAN:  It's only a couple of minutes.  It's

24  12:24.

25           MS. SMITH:  It's fine.

```
                           Proceedings                    1918
```

1          THE COURT:  Okay.  We will bring the jurors back and

2    then take our lunch break after you have finished your

3    redirect.

4          MS. SMITH:  Okay.

5          (Side-bar end.)

6

7          (In open court.)

8          THE COURT:  The jurors are not quite ready to come

9    back.

10         Should we just take the lunch break?  That might

11   make more sense.

12         I am going to go speak to the jurors and just give

13   them the admonishments and give them a one-hour lunch break.

14         ALL:  Thank you.

15         (Recess taken.)     (In open court.)

16         (Judge KIYO A. MATSUMOTO enters the courtroom.)

17         THE COURT:  All right, so the jurors were admonished

18   about speaking to one another or anyone about the case and

19   avoiding media.  And they will be back at 1:30.

20         So, if you would all kindly get back here by 1:30, I

21   would appreciate it.

22         ALL:  Thank you, Your Honor.

23         THE COURT:  Thank you.

24         (Continued on following page with AFTERNOON

25   SESSION.)

1919

1                         AFTERNOON SESSION

2                  (In open court - jury not present.)

3           THE COURT:  Have a seat, please.  Are all the jurors

4     back?  Are we ready to go forward?

5           MR. BRAFMAN:  Yes.

6           THE COURT:  Okay, good.

7           MS. SMITH:  Your Honor, just so you know, we've

8     thought about it at the lunch break and in the interest of

9     moving this along, we are not going to introduce that

10    document.

11          THE COURT:  Okay.

12          MS. SMITH:  I have a short amount of redirect left.

13          THE COURT:  Good.  I was going to try to mention

14    that.  I know I understand everybody is being zealous

15    advocates, but we will be here until kingdom come if we keep

16    going.

17          MS. SMITH:  Yes, thank you.

18          THE COURT:  All right, thank you.

19          (Pause.)

20          (Witness resumes the stand.)

21          (Jury enters.)

22          THE COURT:  All jurors are present.  Please have a

23    seat, everybody.

24          Redirect of Mr. Blanton will continue.  And, sir,

25    you are still under oath.

Blanton - redirect - Smith                    1920

1   **DARREN BLANTON**,

2       resumed the stand, having been previously duly sworn, was

3       examined and testified further as follows:

4   REDIRECT EXAMINATION CONTINUING

5   BY MS. SMITH:

6   Q    On cross Mr. Brafman asked you about an investment in

7   Retrophin.  You didn't actually invest in Retrophin, right?

8   A    Right.

9   Q    You got all of those 360,000 odd shares of Retrophin

10  because Mr. Shkreli took or Mr. Shkreli told you that he took

11  your separate MSMB Capital investment and put it in Retrophin,

12  right?

13  A    Yes.

14  Q    And as a result by the date of the consulting agreement,

15  which is March 6th, 2014, you had amassed those 360,000 shares

16  of Retrophin; is that right?

17  A    Right.

18  Q    And that was a pretty big stake in the company, right?

19  A    It was a -- probably a small percentage, and I think some

20  of those shares came from the founding or were supposed to

21  come from the founding.  I wasn't sure how the allocation was.

22  Q    But in terms of your investments, 360,000 shares was

23  sizeable, right?

24  A    Right.

25  Q    And so you were invested, at that point, given that you

SAM    OCR    RMR    CRR    RPR

Blanton - redirect - Smith                    1921

1   had 360,000 shares in making sure that Retrophin as a company

2   succeeded, right?

3   A    Right.

4   Q    And so if you look at Government Exhibit 105-34, which

5   should be the tab 44, right in front of you.

6   A    Yes.

7              (Exhibit published.)

8   BY MS. SMITH:

9   Q    And the date of this document is May 18th, 2014, right?

10  A    Right.

11  Q    And that's after you signed the agreement, right?

12  A    Yes.

13  Q    And when you have a big investment in a company and you

14  want the company to do well, you take steps to help the

15  company, right?

16  A    Yes.

17  Q    And this here is an example, talking the company up,

18  looking for investors, of how you were helping Retrophin in

19  that way, right?

20  A    Yes.

21  Q    And if you can look at Government Exhibit 105-12, which

22  is tab 20, and if we can go to the second page of the document

23  and then the e-mail at 12:25.

24  A    Yes.

25  Q    And the date of this e-mail is March 13th, 2012, right?

Blanton - redirect - Smith                                    1922

1              (Exhibit published.)

2    A    Yes.

3    Q    And you are doing the same thing here, right, you have a

4    founder's stake in Retrophin and you are helping the company

5    by getting qualified investors, setting up calls, right?

6    A    Yes.

7    Q    And this is dated March 13th, 2012?

8    A    Yes.

9    Q    And it's two years before you signed the agreement,

10   right?

11   A    Yes.

12   Q    And you are taking these steps independent of any

13   agreement, right?

14   A    Yes.

15   Q    And if you turn to page 1 of that exhibit, Government

16   Exhibit 105-12, and focus on the top e-mail.

17              (Exhibit published.)

18   BY MS. SMITH:

19   Q    This is an e-mail from the defendant, right?

20   A    Yes.

21   Q    And Mr. Brafman asked you about that last sentence on

22   cross, right?

23   A    (No response.)

24   Q    And it says a good part of the value of the MSMB funds,

25   with an S.  Did you know what funds the defendant was

Blanton - redirect - Smith                    1923

1  referring to here?

2  A    No.

3  Q    What fund had you invested in?

4  A    MSMB Capital.

5  Q    And at the time of this e-mail, which was April 30th,

6  2012, had you seen any bank or brokerage records that showed

7  that money from MSMB Capital had been put into Retrophin?

8  A    No.

9  Q    So the only basis for your knowledge of what Mr. Shkreli

10  is saying here that a good portion of MSMB funds had been put

11  into Retrophin was the word of the defendant?

12  A    Yes.

13         MS. SMITH:  No further questions, Your Honor.

14         MR. BRAFMAN:  Your Honor, I just have two minutes.

15         THE COURT:  Sure.

16  RECROSS-EXAMINATION

17  BY MR. BRAFMAN:

18  Q    Do you remember before the lunch break, Mr. Blanton,

19  Ms. Smith asked you whether or not in all of the

20  correspondence concerning your consulting agreement and your

21  agreement with Retrophin, the only person who ever

22  corresponded with you on behalf of Retrophin was Evan Greebel?

23         MS. SMITH:  Objection, Your Honor.

24         THE COURT:  Sustained.  Rephrase.

25  Q    Was there any other lawyer besides Evan Greebel who you

Blanton - redirect - Smith                    1924

1    dealt with in connection with the finalization of your

2    consulting agreement?

3    A    Not to my knowledge.

4    Q    How about Michael Rosenham [sic]?

5    A    I don't remember.

6    Q    Rosensaft?

7    A    I don't remember.

8    Q    Okay.  I'd just like to show you Exhibit 4355 and 4356

9    just for identification only.

10          MR. BRAFMAN:  I have a copy for the Court and for

11   the witness.

12          THE COURT:  Thank you.

13   BY MR. BRAFMAN:

14   Q    Just look at these documents -- don't read them, they are

15   not in evidence -- and tell me whether it refreshes your

16   recollection that in addition to Mr. Greebel, you also dealt

17   with Michael Rosensaft who corresponded with your lawyer

18   Mr. Lieberman?

19          MS. SMITH:  Objection, Your Honor, to "you dealt

20   with."

21          THE COURT:  All right, can you rephrase,

22   Mr. Brafman?

23   BY MR. BRAFMAN:

24   Q    Does it refresh your recollection that there was another

25   lawyer from Katten named Michael Rosensaft who was involved in

1    this transaction?

2    A    No, I don't remember it.

3    Q    Don't remember it?

4    A    No.

5    Q    Okay.

6             MR. BRAFMAN:  Thank you.  Nothing further.

7             THE COURT:  All right, sir, you are excused.  Thank

8    you.

9             THE WITNESS:  Thank you.

10            THE COURT:  You may step down.  Have a nice day.

11            (Witness steps down and is excused.)

12            MR. SRINIVASAN:  Sorry, Your Honor, we are just

13   checking which witness is next.  Our next witness will be

14   Lindsay Rosenwald.  He is in the restroom.  He will be here in

15   just a minute.

16            THE COURT:  Too much information.  We will wait for

17   him.

18            MR. SRINIVASAN:  Fair enough.

19            (Pause.)

20            MR. SRINIVASAN:  Your Honor, may I approach and put

21   some binders?

22            THE COURT:  Of course.

23            MR. SRINIVASAN:  Thank you.

24            THE COURT:  You can also retrieve what's there.

25            (Pause.)

Blanton - redirect - Smith                    1926

1          THE COURT:  Sir, come on up to the witness stand,

2     please.  Please raise your right hand.

3          (Witness sworn by the Court.)

4          THE COURT:  Please have a seat and state and spell

5     your full name for the record.  You can pull yourself to the

6     microphone.

7          THE WITNESS:  Lindsay Rosenwald, L-I-N-D-S-A-Y,

8     R-O-S-E-N-W-A-L-D.

9          THE COURT:  Thank you.

10          Please proceed.

11          MR. SRINIVASAN:  Thank you, Your Honor.

12

13          (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1   **L I N D S A Y   R O S E N W A L D**,

2        called as a witness by the Government, having been

3        duly sworn by the Court, was examined and testified as

4        follows:

5   DIRECT EXAMINATION

6   BY MR. SRINIVASAN:

7   Q     Good afternoon, sir.

8   A     Hi.

9   Q     How old are you?

10  A     62.

11  Q     Are you married?

12  A     Yes.

13  Q     Do you have any children?

14  A     Five.

15  Q     In what town do you live?

16  A     Lawrence, New York.

17  Q     How long have you lived there?

18  A     Too long, about 17 years.

19  Q     Do you receive mail at your residence in Lawrence?

20  A     Yes.

21  Q     Do you sometimes manage your business affairs at your

22  residence?

23  A     Yes.

24  Q     Do you sometimes manage your personal investments at

25  home?

1    A    Yes.

2    Q    Can you please describe your educational background?

3    A    High school degree, a college degree, a BS in finance and

4    economics, and then a medical degree.

5    Q    Where did you get your medical degree?

6    A    Temple University School of Medicine in Philadelphia.

7    Q    And what did you do after medical school?

8    A    I did a year of internship, then I practiced medicine for

9    two-and-a-half years, and then I came up to Wall Street.

10   Q    What sort of medicine did you practice?

11   A    General medicine.

12   Q    And you mentioned working on Wall Street.  What have you

13   done in the financial industry?

14   A    Started out as a -- as a Wall Street analyst, a sell side

15   analyst, and I went into investment banking.  And then I set

16   up my own business doing everything in venture capital,

17   broker/dealer and asset management.

18   Q    So let's break that down a little bit.

19   A    Sure.

20   Q    When you talk about being an analyst, what does that

21   mean?

22   A    It means you look at -- for other investors you look, for

23   a broker/dealer you look for investment opportunities, you

24   look at publicly-traded stocks to see if they're attractive to

25   acquire or to recommend to clients.

Rosenwald - direct - Srinivasan                1929

1    Q      And you used the phrase sell side?

2    A      Yes.

3    Q      What does that mean?

4    A      Well, there's -- the sell side is -- is if you work at an

5    investment bank in the brokerage business where you're making

6    recommendations to the firm's clients, so you're selling them

7    on ideas that they then use their own money through their

8    broker to buy the stock.

9    Q      Okay.  And you mentioned that you had a career in

10   investment banking followed by your own venture capital work?

11   A      Yes.

12   Q      Can you please briefly describe that work in venture

13   capital?

14   A      Sure.  I have a history of starting biotech companies.

15   For many years I hired lots of medical doctors and PhDs and we

16   would scour the world looking for investable opportunities to

17   build new companies around.  So drugs for cancer, drugs for

18   Alzheimer's, for any -- any malady that was an unmet medical

19   need.  We would look all over the world, university

20   laboratories, companies, foreign companies, domestic.  We

21   would find drugs that were in clinical trials or close to

22   clinical trials, and we would first see if it was possible to

23   acquire a license to them.  And if it was possible, then we

24   would do due diligence on them taking a look at the science,

25   how the drug works, if it was in the clinic, what the clinical

SAM    OCR    RMR    CRR    RPR

Rosenwald - direct - Srinivasan                1930

1   data looked like, what the patents looked like, was it easy or

2   hard to manufacture; things like that; what the competitive

3   landscape was or is, and done that hundreds and hundreds of

4   times.

5   Q    And when you say "we," are you doing this through a

6   company?

7   A    So I've had several companies that I've done this

8   through.  Currently I'm doing it, yes, I'm doing it currently

9   through a company, yes.

10  Q    What's the name of the company?

11  A    Fortress Biotechnology.

12  Q    And in the 2009-2010 timeframe, were you working with

13  Fortress Biotech or a different company?

14  A    No, at that point I was not doing much in the way of

15  venture capital.  I was doing asset management through a firm

16  called Opus Point Partners.

17  Q    And about how long did you work with Opus?

18  A    Well, I still -- I still -- we started Opus in either '08

19  or '09 and it still exists today.  That's a separate business

20  from Fortress.

21  Q    Do you know an individual named Martin Shkreli?

22  A    Yes.

23  Q    When were you introduced to him?

24  A    I'm not sure, sometime prior -- you know, 2008 to 2010

25  timeframe is my best guess.

Rosenwald - direct - Srinivasan                1931

1   Q    In what context?

2   A    Best I can recall, he was -- I don't know if he was an

3   analyst.  Anyway, he would have stock ideas and he was looking

4   for stock ideas.

5   Q    Have you met him in person?

6   A    Yes.

7   Q    Do you see him in the courtroom today?

8   A    Yes.

9   Q    Can you please point him out and identify him by a piece

10  of clothing?

11  A    Well, can I stand up?

12          THE COURT:  Sure.

13  A    Blue shirt and a jacket and glasses.

14          THE COURT:  All right, the record will reflect that

15  Dr. Rosenwald has identified Mr. Shkreli.

16          MR. SRINIVASAN:  Thank you, Your Honor.

17  BY MR. SRINIVASAN:

18  Q    And when you were first introduced to him, did you have

19  any conversations with him about his background?

20  A    The one -- one sticks out that he had worked for

21  Kramer -- Cramer Berkowitz; Cramer Berkowitz, a hedge fund.

22  Q    Okay.  Is Cramer Berkowitz a well-known name?

23  A    I don't know if it's a well-known name, but that's Jim

24  Cramer who is a well-known fellow on CNBC who was my best

25  friend in nursery school, so that always stuck out in my mind.

Rosenwald - direct - Srinivasan                1932

1   Q    Did you learn anything about his educational background,
2   meaning the defendant?
3   A    No.
4   Q    Did the defendant mention anything about any companies
5   that he was running at the time?
6   A    I have, at best, a vague recollection of anything from
7   that far along -- far away, but I said I don't remember any
8   companies.
9   Q    At some point did you and the defendant have any
10  discussions about an investment that you might make?
11  A    To the best of my recollection, at some point he was
12  going to start an investment partnership.
13  Q    Did you exchange any communications with him about that?
14  A    I mean I think we had some e-mails about it, yes.
15  Q    Okay.  Dr. Rosenwald, you have two binders that are right
16  to your left, the bigger one and the skinnier one, and I am
17  going to refer to those at different points.  Let's start with
18  the bigger binder.
19           And I'd like you to turn to Tab Number 1, which is
20  Government's Exhibit 101-1.
21  A    Okay.
22  Q    It's marked for identification as Government's Exhibit
23  101-1.  Do you recognize this document?
24  A    I mean I recognize that it's an e-mail from Martin to me.
25  Q    What is the date on the top e-mail?

Rosenwald - direct - Srinivasan                1933

1   A     September 7th, 2009.

2           MR. SRINIVASAN:  Your Honor, we move Government's

3   Exhibit 101-1 into evidence.

4           MR. AGNIFILO:  No objection, Your Honor.

5           THE COURT:  We will receive 101-1 in evidence.

6           (Government's Exhibit 101-1 was received in

7   evidence.)

8           (Exhibit published.)

9   BY MR. SRINIVASAN:

10  Q     Dr. Rosenwald, before we go through this e-mail in a

11  second, I believe you've mentioned a second ago that you

12  manage your personal investments from home, is that right?

13  A     Yes.

14  Q     In the 2009 through about 2013 timeframe, did you live in

15  Lawrence, New York?

16  A     Yes.

17  Q     What county is Lawrence in?

18  A     Nassau.

19  Q     And would the management of your personal investments

20  involve checking e-mail and receiving mail --

21  A     Yes.

22  Q     -- at your home?

23  A     Yes.

24  Q     Okay.  Now, I'd like to call your attention, turning to

25  this document, Government's Exhibit 101-1, to the third e-mail

Rosenwald - direct - Srinivasan                1934

1    on the page.

2    A    Uh-hum.

3    Q    And this is an e-mail from Martin Shkreli -- to Martin

4    Shkreli.

5    A    Uh-hum.

6    Q    Is this a document that you received?

7    A    Yes.

8    Q    And the defendant wrote:  Here are the returns for the

9    portfolio I started managing in May 2009 with my colleague

10   Marek Biastek.  We have registered and launched a fund in case

11   we decide to take outside money in the coming months.  The

12   funds are currently primed at RBC and held in custody at

13   Goldman, and official documents are available.  If you would

14   like more information, please let me know.

15         Do you see that language?

16   A    Yes, I do.

17   Q    Did you have any understanding of who Marek Biastek was?

18   A    No.

19   Q    Did you know one way or another whether this individual

20   worked with the defendant?

21   A    He said it was his colleague, so I assumed he worked with

22   him.

23   Q    Now, going up one e-mail.

24   A    Yes.

25   Q    And this is from you to the defendant, is that right?

Rosenwald - direct - Srinivasan                1935

1          (Exhibit published.)

2     A     Yes, it is.

3     Q     What's the date on this e-mail?

4     A     September 7th, 2009.

5     Q     And what did you write?

6     A     Definitely interested.  Forward any docs, et cetera, when

7     you get a chance.  Thanks.

8     Q     And when you wrote any docs, what was that a reference

9     to?

10    A     Documents.

11    Q     And if we go up one more e-mail, to the top e-mail, and

12    this is an e-mail from the defendant to you dated September

13    7th, 2009, is that right?

14          (Exhibit published.)

15    A     Yes.

16    Q     And the defendant wrote:  Thanks for the lunch the other

17    day.  Here's the PPM.  Do you see that?

18    A     Yes, I do.

19    Q     What is a PPM, if you know?

20    A     Private Placement Memorandum.

21    Q     And what is a PPM used for?

22    A     So if you're raising money for a Private Offering,

23    whether it's a fund or a company, whatever the investment

24    vehicle is, the person who's raising the money sends you a

25    Private Placement Memorandum.  It's something that discloses

SAM    OCR    RMR    CRR    RPR

1  all the risk factors, discloses the business description, the

2  people behind it; everything that should be pertinent to that

3  investment.

4  Q    And then continuing on in the e-mail, the defendant I

5  writes:  We are rolling the money we're managing now into a

6  fund open to outsiders on October 1st, 2009.  So far it's

7  100 percent our money and it's a little less than 1m.

8  A    Yes.

9  Q    What did you understand "it's a little less than 1m" to

10  mean?

11  A    I assumed it was less than $1 million.

12  Q    And when it says it's, is that a reference to the fund?

13  A    It's a little -- the money they were rolling into the

14  fund was a little less than a million dollars was how I

15  interpreted that.

16  Q    Okay.  And he continues:  We want to keep it small,

17  probably looking for 100,000 to 500,000-dollar contributions

18  from LP, except from Josiah Austin who we'll probably take

19  more from.

20          Do you see that?

21  A    Yes, I do.

22  Q    Do you know who Josiah Austin is?

23  A    I mean I know of him.  He's a big investor.  I think he

24  invests a lot in biotech, but I don't think I've he ever met

25  him and I don't know that I've ever had cause to speak to him.

Rosenwald - direct - Srinivasan          1937

1   Q    And near the end of the e-mail, the defendant writes:

2   Monthly liquidity and daily performance is also a plus.  The

3   stuff I do in healthcare is best done with a handful of

4   investors with long-term lockups.

5        Do you see that?

6   A    Yes.

7   Q    What was your understanding of what monthly liquidity and

8   daily performance meant?

9   A    So monthly liquidity meant you could take your money out

10  every month with some amount of warning to the fund manager;

11  and daily performance means he would, you know, one way or the

12  other tell us what the -- how the fund did that day.

13  Q    Okay.  Now, if you look at the line that says

14  attachments, do you see that?  If you go up to the from, to,

15  sent subject section at the top.

16  A    Oh, yes, sure, sure.

17  Q    Do you see where it says attachments?

18  A    Yes.

19  Q    And it says MSMB Capital Management LP PPM?

20  A    Yes.

21  Q    9-07-09.docx do you see that?

22  A    Yes, I do.

23  Q    I'd like to go to page 3 of this exhibit, so we just go

24  two more pages.  That's Bates Number LR00000044.

25  A    Yes.

Rosenwald - direct - Srinivasan                1938

1    Q    What is this document?

2    A    It's the front page of the private placement offering

3    memorandum for the limited partnerships in MSMB Capital

4    Management LP.

5    Q    Who is listed as the managing directors?

6    A    Martin Shkreli, Marek L. Biastek and Gary Mohamed.

7    Q    And what is the date on the front of this document?

8    A    September 7th, 2009.

9    Q    Dr. Rosenwald, I'd like you to just keep a finger on this

10   page for a second.  I am going to ask you to turn to a later

11   tab.

12   A    Sure.

13   Q    If you could turn to tab 32 of your binder, and that is a

14   document that has been marked for identification as

15   Government's Exhibit 1-A.

16   A    Okay.

17   Q    Do you have that in front of you?

18   A    Yes, I do.

19   Q    Okay.  And, Dr. Rosenwald, what is this document here?

20   A    It's the confidential Private Offering Memorandum for the

21   limited partnership interests in MSMB Capital Management LP.

22   Q    Okay.  And this is on September 7th, 2009 also?

23   A    Yes, it is.

24   Q    Dr. Rosenwald, looking at this exhibit and the

25   attachments to Government's Exhibit 101-1 -- the one that you

1    have your finger on?

2    A    Uh-huh.

3    Q    -- are these the same document?

4    A    I think so, yeah.

5    Q    Okay.

6              MR. SRINIVASAN:  Your Honor, we move Government's

7    Exhibit 1-A into evidence?

8              MR. AGNIFILO:  No objection.

9              THE COURT:  All right, we will receive Government's

10   Exhibit 1-A.

11             (Government's Exhibit 1-A was received in evidence.)

12             (Exhibit published.)

13   BY MR. SRINIVASAN:

14   Q    Dr. Rosenwald, let's stick with Government's Exhibit 1-A,

15   so that's tab 32 in your binder.

16   A    Yes.

17   Q    Was the information contained in this document important

18   to your investing decision?

19   A    Yes.

20   Q    Did you rely on it?

21   A    Sure.

22   Q    Did you believe that the information in this document was

23   accurate?

24   A    Yes.

25             MR. SRINIVASAN:  Ms. Balbin, if we can go to page 10

Rosenwald - direct - Srinivasan                    1940

1    of this PDF, that's Bates Number LR00053.

2    BY MR. SRINIVASAN:

3    Q    Do you see the paragraph that starts Management Fee?

4            (Exhibit published.)

5    A    Yes.

6    Q    The first sentence says:  The advisor will be entitled to

7    receive a management fee; the, quote, management fee from the

8    partnership equal to .25 percent per calendar quarter.

9    1.0 percent per annum of the partnership's net assets.

10           Do you see that?

11   A    Yes, I do.

12   Q    What did you understand the advisor, the capitalized word

13   advisor to mean?

14   A    Martin and his two partners.

15   Q    And what did you understand management fee to be?

16   A    No matter how the fund does, they get 1 percent a year of

17   the assets for doing the work.

18   Q    Now, was this information about a 1 percent management

19   fee important to your investing decision?

20   A    Not really.

21   Q    So let's go to the next page of the exhibit, which is

22   Bates Number LR000054.

23   A    Okay.

24   Q    Do you see the paragraph that starts Capital Withdrawals?

25           (Exhibit published.)

SAM    OCR    RMR    CRR    RPR

Rosenwald - direct - Srinivasan                1941

1    A    Yes.

2    Q    Okay.  The first sentence of that paragraph reads:

3    Limited partners may withdraw any or all of their capital

4    accounts, subject to certain reserves which may be established

5    by the general partner to cover contingent liabilities of the

6    partnership, monthly at the last calendar day of each month,

7    commencing one full month after the date of their initial

8    investment in the partnership, upon not less than thirty days

9    prior written notice to the general partner.

10              Do you see that language?

11   A    Yes, I do.

12   Q    What did you understand that to mean?

13   A    That as an investor I'd be able to get my money back with

14   thirty days' notice, and they could withhold a certain percent

15   in case there were any, you know, contingent liabilities that

16   hadn't been met within that thirty-day period.

17

18              (Continued on the following page.)

19

20

21

22

23

24

25

Rosenwald - direct - Srinivasan                1942

1   (Continuing)

2   Q    Now, based on the language in this paragraph, did you

3   understand what form you could get your investment back in?

4   A    I don't know.  The assumption was, I assume, is cash.  We

5   put in cash, we get cash back.

6   Q    Did you believe that you could get your investment back

7   in cash?

8   A    Yes.

9   Q    Okay.  Was this language important to your investing

10  decision?

11  A    Sure.

12  Q    And how so?  How was that important?

13  A    You know, you divide your investments between things like

14  real estate, bonds, liquid investments, not liquid

15  investments.  This was a liquid investment, so cash or

16  tradable securities.  Liquid, highly liquid.

17  Q    Okay.  And if your investment was not liquid, would that

18  have affected your investing decision?

19  A    Probably, sure.

20  Q    And how?

21  A    I mean, it would, you know, have to be some threshold of

22  return in order for us to make -- for me to take cash and put

23  it into an illiquid investment, it's a different pocket.  So,

24  it would have to be a different form of investment.

25            MR. SRINIVASAN:  So, let's go to the next page,

Rosenwald - direct - Srinivasan                    1943

1   which is Bates Number LR-00055.

2   Q    Do you see the paragraph at that starts:  Auditors?

3   A    Yes.

4   Q    The first sentence reads the general partner has selected

5   Fulvio and Associates LLP as the partnership's independent

6   certified public accountants.

7   A    Yes.

8   Q    Which firm will issue an audit report on the annual

9   financial statements of the partnership.

10             Do you see that?

11  A    Yes.

12  Q    Based on that language, did you believe that MSMB Capital

13  had an auditor?

14  A    Yes.

15  Q    Was at that important to your investing decision?

16  A    Sure.

17  Q    Why?

18  A    Because you're giving people money and you're expecting

19  audited returns.  That's standard in the industry.

20  Q    Have you invested in hedge funds before?

21  A    Yes.

22  Q    Have you had any experience run or managing a hedge fund?

23  A    Yes.

24  Q    And in those past experiences, have the hedge funds had

25  auditors?

Rosenwald - direct - Srinivasan                 1944

1    A    I assume so.

2    Q    If MSMB Capital did not have an auditor, would that have

3    affected your investing decision?

4    A    Sure.

5         MR. AGNIFILO:  Object to the form of the question.

6    The hypothetical.  If something, then would that affect.  I

7    know what he's trying to get at.  I'm not trying to get in the

8    way.

9         THE COURT:  I am overruling the objection.

10        You may answer the question, sir.  Do you need it

11   read back?

12        THE WITNESS:  Yes, please.

13        MR. SRINIVASAN:  I can rust re-ask the question.

14   Q    If MSMB Capital did not have an auditor, would that have

15   affected your investing decision?

16   A    Sure.

17   Q    How?

18   A    I probably would not have made the investment.

19        MR. SRINIVASAN:  Now, let's go to Page 35 of the

20   .pdf, so that's Bates Number LR00078, 20 pages from where you

21   are right now.

22   Q    Do you see the paragraph that starts:  Attorneys?

23   A    Yes.

24        MR. SRINIVASAN:  If we can zoom in, Ms. Balbin, on

25   the paragraph that starts:  Attorneys.

VB        OCR        CRR

Rosenwald - direct - Srinivasan                1945

1          Thank you.

2  Q    The first sentence reads:  Cobb and Associates LLC, West

3  Port, Connecticut has acted as Counsel to the partnership in

4  connection with organizational matters.

5          Do you see that?

6  A    Yes, I do.

7  Q    Based on this language in the PPM, did you believe that

8  MSMB Capital had Lehman Counsel?

9  A    Sure.

10 Q    Was the presence of legal counsel for the fund important

11 to your investing decision?

12 A    It's not the sole criteria, but it's certainly important,

13 yeah.

14 Q    Why is it important?

15 A    You know, because I was in the hedge fund business and

16 everybody in the hedge fund business has lawyers to keep

17 everybody doing things legally.

18 Q    If the fund did not have legal counsel, would that have

19 affected your investing decision?

20 A    Probably.

21 Q    How?

22 A    I would have asked why isn't there a lawyer.  If there

23 was a good reason for it, maybe I would have invested, maybe

24 not.

25 Q    Now, based on your experience as an investor, do you have

VB        OCR        CRR

Rosenwald - direct - Srinivasan                1946

1   an understanding of what an administrator is for a hedge fund?

2   A    Yeah.  They're the ones that make sure the money's where

3   the money's supposed to be and, you know, keeps an eye on

4   everything.

5   Q    Okay.  Did you believe that MSMB Capital had an

6   administrator?

7   A    I don't remember.

8   Q    Now, Dr. Rosenwald, after you received this PPM in

9   September 2009, did you continue to discuss a potential

10  investment in MSMB Capital with the defendant?

11  A    I mean, I don't, I can't say I remember what went on in

12  2009, whether I discussed it or just made the investment.  I

13  don't know if there was two steps or three steps or I just

14  made the investment.

15  Q    Okay.  Maybe discuss is the wrong word.

16       Did you have communications with the defendant?

17  A    And again, I don't remember.

18  Q    Okay.

19       MR. SRINIVASAN:  Dr. Rosenwald, I'll ask you to turn

20  to tab two in the binder.  And this is Government's

21  Exhibit 101-2 marked for identification.

22  Q    And do you recognize this document?

23  A    Sure.

24  Q    What is this document?

25  A    It's my chief financial officer asking to have sent to us

Rosenwald - direct - Srinivasan                1947

1   the private offering memorandum for the fund.

2   Q    Okay.  And then looking further down the page, what is

3   that?

4   A    That's Martin saying here's the docs, you need to sign,

5   you may have a subscription agreement and the wire.

6   Q    I don't mean to ask you to read the document.  Just

7   identify what type of a document is this.

8           Is it an e-mail?

9   A    It's an e-mail, yeah.

10  Q    Okay.

11  A    Sorry.

12  Q    Okay.  And it was sent from the defendant to you; is that

13  right?

14  A    Yeah, it was sent from Martin to my CFO Steve Pilatzke.

15  Oh, I'm sorry, no.  It was sent to me, correct.  Yes.  And

16  then I must have sent it to Steve.

17  Q    Okay.  And what is the date on the second e-mail?

18  A    October 18th, 2009.

19           MR. SRINIVASAN:  Your Honor, we move Government's

20  Exhibit 101-2 into evidence.

21           MR. AGNIFILO:  No objection.

22           THE COURT:  We received 101-two.

23           (Government's Exhibit 101-2 received in evidence.)

24           (Exhibit published to jury.)

25           MR. SRINIVASAN:  Dr. Rosenwald, let's start with the

1    second page of this document.  And we'll start with the bottom

2    e-mail on this page.

3    Q    And this is an e-mail from the defendant to you dated

4    October 14th, 2009?

5    A    Yes.

6    Q    And he writes:  Let's hope CHTP fixes itself, my

7    impression is they'll end up okay.  Curious if you're

8    interested in an investment in my new fund.  Anything I

9    receive by November 1st will work.

10             Do you see that?

11   A    Yes, I do.

12   Q    What is CHTP?

13   A    A company called Chelsea Therapeutic.

14   Q    Did you have any connection with Chelsea Therapeutic?

15   A    Sure, I was the founder.

16   Q    If we go up one more e-mail.  This is you writing to the

17   defendant October 15th.

18             What did you write?

19   A    I wrote:  Sure, will invest, don't want to tie up much

20   cash these days, what's the minimum, how much is in the fund

21   currently.

22   Q    When you say:  Don't want to tie up much cash these days.

23   What did you mean when you wrote that?

24   A    I didn't want to put too much cash into the investment.

25   Q    And what's the min or minimum?  What is that?

Rosenwald - direct - Srinivasan                    1949

1   A    The minimum amount that it takes to invest in to have the
2   fund manager accept your contribution.
3   Q    Okay.
4   A    Or your investment.
5   Q    And then you ask:  How much is in the fund currently?
6   A    Right.
7   Q    What are you asking that?
8   A    I guess I want to know, you know.  I guess if it was --
9   you know what?  Just curious how much is in it.  I don't know.
10  Q    Okay.  And then if you go up one more e-mail.
11  A    Yeah.
12  Q    It's from the defendant to you again, dated October 15th.
13  And he writes 3M in the fund.  25,000 minimum.  Sorry to
14  hassle you so much but you know how this fund-raising is.  No
15  lockups.  By the way, took a lock at Coronado.
16           When the defendant wrote 3M in the fund, what did
17  you understand that to mean?
18  A    $3 million.
19  Q    Did that make any impression on you at the time?
20  A    I can't remember.
21  Q    And then he writes:  No lock-ups.
22           What did you understand that to mean?
23  A    That if I want to redeem my investment, get my money
24  back, I could get it back.
25  Q    Then going up one more e-mail.  I'm sorry, going up here

1    yes, this is you writing to the defendant on October 17th and

2    you wrote:  Send the docs, we will put something in.

3            Do you see that?

4    A    Yes.

5    Q    And then going up one more e-mail from there.

6            The defendant wrote back on October 18th to you and

7    wrote:  Here are the docs you need to sign as you may know the

8    subscription agreement and the wire are the important parts,

9    the individual questionnaire asks many nosey questions and you

10   don't have to answer them if you don't deem it necessary.

11   Thanks again for this great opportunity and I will not let you

12   down, Martin.

13           Do you see that?

14   A    Yes, I do.

15   Q    Dr. Rosenwald, if you go to the next or sorry two more

16   pages in that document.  LR000108.

17           Do you see that?

18           And is this one of the documents that he sent you?

19   A    Yes.

20   Q    Okay.  And Dr. Rosenwald, this appears to be another PPM;

21   is that right?

22   A    Correct.

23   Q    What's the date on this document?

24   A    October 5th, 2009.

25   Q    And is it for MSMB Capital?

Rosenwald - direct - Srinivasan                1951

1    A    Yes, it is.

2    Q    All right.  Now, Dr. Rosenwald, I'm going to ask you to

3    just again put a finger on this document and turn to tab 33 of

4    your binder:  It's marked for identification as Government's

5    Exhibit 1-B.

6              Do you have that in front of you?

7    A    Yes, I do.

8    Q    Dr. Rosenwald, is this document dated October 5th, 2009?

9    A    Yes, it is.

10   Q    Is it a PPM from MSMB Capital?

11   A    Yes, it is.

12   Q    Okay.  Is this the same document that was an attachment

13   to Government's Exhibit 101-2?

14   A    Yes.

15   Q    Okay.

16             MR. SRINIVASAN:  Your Honor, we move Government's

17   Exhibit 1-B into evidence.

18             MR. AGNIFILO:  No objection.

19             THE COURT:  We will receive Government's

20   Exhibit 1-B.

21             (Government's Exhibit 1-B received in evidence.)

22             (Exhibit published to jury.)

23   Q    And Dr. Rosenwald, let's stick with 1-B for a minute.

24   A    Okay.

25   Q    Now, this document you received in October, a month

1  later; is that right?

2  A    Yes.

3  Q    Okay.  Now, if you go to Bates Number LR00119, I think

4  it's page 11 in the .pdf.

5            And do you see the section that says auditors there?

6  A    Yes.

7  Q    It says:  The general partner selected Rothstein Kass and

8  Company as the partnership's independent certified public

9  accountants.

10 A    Yes, I do.

11 Q    Which firm will issue an audit report on the annual

12 financial statements of the partnership.

13 A    Yes.

14 Q    Based on this language, as of October 2009, did you

15 believe that MSMB Capital had an auditor?

16 A    Yes.

17 Q    And is it true it's still important to your investing

18 decision?

19 A    Sure.

20 Q    For the reasons we discussed a minute ago?

21 A    Yeah.

22 Q    Now, Dr. Rosenwald, what did you understand was your

23 ability to withdraw your investment?

24 A    On 30 days notice, whenever I wanted to.

25 Q    Okay.  And is that also the case for this document in

Rosenwald - direct - Srinivasan                    1953

1   October?

2   A    Well, I have to look.

3   Q    Okay.  Maybe I can -- you can go to previous page.

4   A    Capital withdrawals.

5   Q    Capital withdrawals.

6        I'm just looking at that first sentence.

7   A    Yes, yes, it seems to be the same.

8   Q    Okay.  And does that confirm your understanding?

9   A    Yes.

10  Q    Okay.  And by this point in October 2009, did you still

11  believe that MSMB Capital had an attorney?

12  A    Yes.

13  Q    Dr. Rosenwald, did you, in fact, invest in MSMB Capital?

14  A    Yes, I did.

15  Q    Did you sign any agreements in connection with your

16  investment?

17  A    Sure.

18  Q    What did you sign?

19  A    I don't remember.  I know I signed because I wouldn't

20  have paid the investment without signing.

21  Q    Okay.

22  A    I think it's a subscription agreement.

23  Q    A subscription agreement, okay.

24        MR. SRINIVASAN:  I'd like you to turn to tab 30 in

25  your binder.  That's Government's Exhibit 21 for

Rosenwald - direct - Srinivasan                    1954

1   identification.

2   Q    Do you recognize this document?

3   A    Sure.

4   Q    What is it?

5   A    It is the subscription agreement.

6   Q    And if you go to, this is the 11th page of the .pdf for

7   you LR0001659.

8        Dr. Rosenwald, did you sign this agreement?

9   A    Yes, I did.

10  Q    On what date?

11  A    October 27th, 2009.  No, I'm sorry, October 27th,

12  2009, -- yeah, same thing.

13       MR. SRINIVASAN:  Your Honor, we move Government's

14  Exhibit 21 into evidence.

15       MR. AGNIFILO:  No objection.

16       THE COURT:  We receive Government's Exhibit 21.

17       (Government's Exhibit 21 received in evidence.)

18       (Exhibit published to jury.)

19  Q    And Dr. Rosenwald, if you go to the second page of the

20  document, that's Bates number LR0001650.

21  A    Okay.

22  Q    And the paragraph that says subscription.

23  A    Yes.

24  Q    How much was your investment?

25  A    $100,000.

Rosenwald - direct - Srinivasan                1955

1   Q    You can set this document aside for now.

2        Dr. Rosenwald, did you get performance updates about

3   your investment in MSMB Capital?

4   A    Yes, I did.

5   Q    Who sent them to you?

6   A    I don't -- I think it was Martin sent them to me.

7   Q    You have a skinny binder there that's labeled 76 series.

8        Do you see that?

9   A    Yeah.

10  Q    Within that document are documents behind 26 tabs.

11       Do you see that?

12  A    Yes.

13  Q    Okay.  And these are marked for identification as

14  Government's Exhibits 76-1 through 76-26.

15  A    Yes.

16  Q    Dr. Rosenwald, looking at these documents, do you

17  recognize them?

18  A    What I see so far, I recognize, yes.

19  Q    Okay.  What are they?

20  A    They are the daily returns of the fund.

21  Q    Are they performance updates that he received for

22  MSMB Capital?

23  A    Yes.

24  Q    Did you receive these documents?

25  A    I think I did, yes.

1  Q    Okay.  Did you rely on these performance updates?

2  A    Sure.

3          MR. SRINIVASAN:  Your Honor, we move to admit

4  Government's Exhibits 76-1 through 76-26.

5          MR. BRAFMAN:  That's fine, no objection.

6          THE COURT:  We will receive Government's Exhibits

7  76-1 through 76-26.

8          (Government's Exhibits 76-1 through 76-26 received

9  in evidence.)

10         MR. SRINIVASAN:  Thank you, Your Honor.

11         Dr. Rosenwald, let's go to tab 14 in that binder,

12 which is Government's Exhibits 76-14 and it's Bates number

13 LR00956.

14         THE WITNESS:  Okay.

15         (Exhibit published to jury.)

16 Q    Now, let's focus on the top of this document before the

17 table.

18         Now there's a line there that says MSMB Capital

19 Management returned minus 6.02 percent in December 2010.

20         Do you see that?

21 A    Yes.

22 Q    And next line:  MSMB Capital Management LP returned plus

23 30.44 percent in 2010?

24 A    Yes.

25 Q    And it says MSMB Capital Management has returned plus

1   30.97 percent since inception on 11/1/2009.

2            Do you see that?

3   A    Yes, I do.

4   Q    Dr. Rosenwald, did you believe these numbers to be

5   accurate at the time?

6   A    Sure.

7   Q    And were these numbers and other numbers you received

8   from that performance update important to for your continued

9   investment in MSMB Capital?

10  A    Yeah, yes.

11  Q    Now, focusing on this 2009-2010 time frame.

12           Did you consider redeeming your investment in

13  MSMB Capital?

14  A    At this point no.  Not that I can remember, no.

15  Q    Okay.  And were these performance numbers a factor in

16  that at all?

17  A    I don't remember.  I assume they were, but I don't, I

18  certainly don't have a good recollection.

19  Q    Dr. Rosenwald, you can put the binder labeled that you

20  have in front of you aside for a moment.

21           And throughout your time as an investor in

22  MSMB Capital, did you get correspondence from the defendant by

23  e-mail?

24  A    Yes.

25           MR. SRINIVASAN:  Okay.  So, let's go back to the big

Rosenwald - direct - Srinivasan                1958

1    binder and go to tab 3.  That is what is marked for

2    identification as Government's Exhibit 101-4.  I'm sorry,

3    101-3, I'm sorry.

4    Q    What is this document?

5    A    It's an e-mail from Martin to his portfolio managers

6    Zanos Limited Partners and other parties saying that they're

7    going to stop using third-party research.

8    Q    Okay.  And what is the date on this document?

9    A    September 22nd, 2010.

10   Q    And did you receive this document?

11   A    Yes.

12        MR. SRINIVASAN:  Your Honor, we move to admit

13   Government's Exhibit 101-3.

14        MR. AGNIFILO:  No objection.

15        THE COURT:  We will receive that Exhibit in

16   evidence.

17        (Government's Exhibit 101-3 received in evidence.)

18        (Exhibit published to jury.)

19   Q    Now, Dr. Rosenwald, I'd like to focus on the first two

20   lines of this document.  It says:  Effective immediately we

21   will begin -- I'm sorry.

22        Effective immediately we will begin reducing our

23   dependance on third-party research.  This measure will save us

24   millions of dollars, returning it to our investors accounts

25   where it belongs.

VB        OCR        CRR

1              Do you see that?

2    A    Yes.

3    Q    Did the language:  This measure will save us millions of

4    dollars make any impression on you?

5    A    I mean, I assumed that he had a lot of money under

6    management because third-party research is expensive.  It's

7    not hugely expensive.

8    Q    Could you just explain that for a second, why would that

9    mean --

10   A    Third-party research is usually a percentage of the value

11   of your trades, things like that, and it's a way that brokers

12   get paid for their research.

13   Q    So, the reference to millions of dollars?

14   A    Right.  The assumption is that if you save millions of

15   dollars in fees, then you have millions times some number in

16   assets under management.

17   Q    Okay.

18              MR. SRINIVASAN:  Now I'm showing you what's been

19   marked for identification as Government's Exhibit 101-4, which

20   is tab 4 in your binder.

21   Q    Looking at the front page of this, what is this?

22   A    It's the MSMB Capital Management third quarter letter to

23   investors.

24   Q    What's the date that it was sent?

25   A    October 5th, 2010.

Rosenwald - direct - Srinivasan                1960

1    Q    Did you receive this document?

2    A    Yes.

3              MR. SRINIVASAN:  Your Honor, we move to admit

4    Government's Exhibit 101-4.

5              MR. AGNIFILO:  No objection.

6              THE COURT:  We will receive 101-four.

7              (Government's Exhibit 101-4 received in evidence.)

8              (Exhibit published to jury.)

9              MR. SRINIVASAN:  Now, Dr. Rosenwald let's go to the

10   last page of this document, LR000481.  I think it's page 5 of

11   the .pdf.

12             THE WITNESS:  Yes.

13   Q    Okay.  Dr. Rosenwald, what does this table show?

14   A    It shows the returns of the fund gross before fees

15   monthly from November 2009 through September 2010.

16   Q    And as of the date of this document, what was the

17   year-to-date return?

18   A    44.04 percent.

19   Q    And since inception?

20   A    44.58 percent.

21   Q    Did these numbers make any impression on you at the time?

22   A    So, at the time I would have said well, how was it

23   compared to what the biotech stocks did.  So, that number, I

24   don't know whether it made a tremendous impression or not.

25   Q    Okay.  Were these positive returns?

Rosenwald - direct - Srinivasan                1961

1   A    Yes, very positive returns.

2   Q    And did these have any influence on your decision to stay

3   invested in MSMB Capital?

4   A    I'd have to go back and -- I can't, I don't have total

5   recall.  I stayed in.  I'm sure this didn't hurt my decision,

6   but I'm not going to, you know, usually you give fund managers

7   some period of time to invest and it certainly, it's usually

8   the reverse, that the returns are bad.  Then that makes you

9   think otherwise.

10  Q    So, if the returns had been bad, would that have had an

11  effect on your --

12  A    I didn't even think about it.  My investing pattern is if

13  the returns are good and I like the manager, I like the, you

14  know, what they're doing, what their strategy is, I stay with

15  it.  Unless there's losses.  And then you talk to the manager

16  and sometimes you put more money in.  I've done that in the

17  past.  And other times you say, you know, I don't have the

18  stomach for it.  So, that's why I can't tell you what this

19  meant.

20          MR. SRINIVASAN:  Okay.  Dr. Rosenwald, let's go to

21  tab 5 in your binder, that's Government's Exhibit 101-5, it's

22  Bates number LR000986.

23  Q    Do you have that in front of you?

24  A    Yes, I do.

25  Q    What is this document?

Rosenwald - direct - Srinivasan                1962

1    A    It's a letter from Martin to -- it's just a press release

2    saying that MSMB Capital Management proposed acquisition of

3    SeraCare for 4.25 a share.

4    Q    And what is the date on this document?

5    A    June 23rd, 2011.

6    Q    Did you receive this?

7    A    Yes.

8              MR. SRINIVASAN:  Your Honor, we move Government's

9    Exhibit 101-5 into evidence.

10             MR. AGNIFILO:  One second, Your Honor.

11             THE COURT:  Yes.

12             (Pause in the proceedings.)

13             MR. AGNIFILO:  No objection, thank you.

14             THE COURT:  We will receive 101-5.

15             (Government's Exhibit 101-5 received in evidence.)

16             (Exhibit published to jury.)

17   Q    Dr. Rosenwald, the title of this document in bold there,

18   MSMB Capital Management proposes acquisition of SeraCare for

19   $4.25 per share.

20             Do you see that?

21   A    Yes.

22   Q    Now, let's go to the first paragraph.

23   A    Yes.

24   Q    And actually, the first two paragraphs.

25   A    Okay.

VB        OCR        CRR

Rosenwald - direct - Srinivasan          1963

1    Q     It starts:  MSMB Capital Management a fund specializing

2    in long-term strategic investments in healthcare and

3    biotechnology businesses today announced that it has made a

4    proposal to the Board of Directors of SeraCare Life Sciences,

5    Inc. to acquire all the outstanding common stock of SeraCare

6    for $4.25 per share or an aggregate of $82 million.

7              And then going to the next paragraph it says:

8    MSMB's offer is conditioned on completion of cursory due

9    diligence and other customary provisions.  MSMB's offer is not

10   subject to any financing condition.

11             Do you see that?

12   A     Yes, I do.

13   Q     The language:  MSMB's offer is not subject to any

14   financing condition.

15             Did that make any impression on you?

16   A     I do remember this, yes.  It meant that he either had the

17   capital or he had access to the capital to make the

18   acquisition.

19   Q     And why did it mean that, if you could explain?

20   A     Well, if you're going to buy a public company and you

21   know you've got to pay for it, so you -- one of two things,

22   either the fund has enough money in it or it has investors on

23   the side lined up that have committed to putting the money in

24   to finish off the investment.

25   Q     And when it says:  Not subject to any financing

Rosenwald - direct - Srinivasan                1964

1    condition.

2          Does that phrase financing condition mean anything

3    to you?

4    A    Sure.  If there's a financing condition then, you know,

5    you've got to worry that they have to get the financing.  So,

6    if I'm a SeraCare shareholder, you know, I'm, you know,

7    assuming that the cursory due diligence is good, then I'm

8    going to assume I'm going to get four-and-a-quarter a share

9    and I'm probably pretty happy.  I don't remember the deal.

10          Again, it doesn't, you know, as long as he has the

11   money or access to the money, then it gives me confidence it's

12   going to happen with this condition, then there's no

13   guarantee.

14   Q    Okay.  To what extent, if any, did this affect your

15   confidence in MSMB Capital?

16   A    Again, I'd have to go back to try to remember.  I

17   remember, I do remember this and but I don't remember how it

18   affected my confidence.

19

20          (Continued on following page.)

21

22

23

24

25

Rosenwald - direct - Srinivasan                    1965

1   (Continuing.)

2   BY MR. SRINIVASAN:

3   Q    Dr. Rosenwald, have you heard of the name Retrophin or

4   Retrophin?

5   A    Sure, Retrophin.

6   Q    Retrophin, okay.

7   A    That's how I call it.

8   Q    Did the defendant ever send you any correspondence about

9   Retrophin?

10  A    Yes, he did.

11  Q    I'd like to -- I'd like you to turn to tab eight.  And

12  that's what's marked for identification as Government Exhibit

13  101-8 and Bates number LR 001096.

14          What is this document?

15  A    It's a letter from me to Martin and he's talking about

16  starting a company called Retrophin.  They have three

17  medicines and the hedge fund is him stock in the company at no

18  cost.

19  Q    What is the date on the top e-mail?

20  A    May 13, 2012.

21          MR. SRINIVASAN:  Your Honor, we move Government

22  Exhibit 101-8 into evidence.

23          MR. AGNIFILO:  No objection.

24          THE COURT:  We receive 101-8.

25          (Government Exhibit 101-8 received in evidence.)

SN        OCR        RPR

Rosenwald - direct - Srinivasan                1966

BY MR. SRINIVASAN:

Q    Dr. Rosenwald, let's start with the bottom e-mail.

A    Okay.

Q    It's from the defendant to you dated May 13, 2012?

A    Right.

Q    And he says, "I started a drug company called Retrophin
and we are working on these inflammatory autoimmune rare
nephropathies.  Some of the incidences have increased 20 times
in the last 20 years.  Pretty amazing."

         Dr. Rosenwald, when he writes "I started a drug
company called Retrophin," to the best of your recollection is
this the first time you've heard about Retrophin?

A    You know, I'd have to speculate.  I mean, he's saying
that he's introducing it to me so I assume it was, but it
doesn't mean we didn't talk about it before.  I don't know.  I
can't recall.

Q    Do you have any recollection of hearing about Retrophin
before this?

A    No, no.

Q    Now, going up one e-mail, this is from you to the
defendant on that same day.  What did you write?

A    "Indeed.  Is the hedge fund involved?  It sounds
interesting."

Q    And when you wrote "hedge fund" is that MSMB Capital?

A    Yes.

Rosenwald - direct - Srinivasan                1967

1    Q    Going up one more e-mail from the defendant to you on the

2    same day, he writes, "Yes, we started Retrophin and now we

3    have three medicines.  The hedge fund gets stock in the

4    company at no cost."  Do you see that?

5    A    Yes, I do.

6    Q    What did that second sentence mean to you?

7    A    That they were going to give founder's stock in Retrophin

8    to the company.

9    Q    And who is "they"?

10   A    I assumed, you know, the -- whoever started Retrophin.

11   It says I started Retrophin.  I assumed he was giving the

12   hedge fund shares from Retrophin -- of Retrophin.

13   Q    And based on this language did you believe that MSMB

14   Capital had a stake in Retrophin at no cost?

15   A    Yes.

16   Q    As of May 2012?

17   A    Yes.

18   Q    At some point did the defendant ask you to convert your

19   MSMB Capital investment into Retrophin stock?

20   A    Yes, he did.

21   Q    I'm showing you what's marked for identification as

22   Government Exhibit 101-9 and that's tab nine in your binder.

23   And what is this document?

24   A    It's an e-mail from Martin to me, subject thank you.

25   Q    What's the date?

Rosenwald - direct - Srinivasan                    1968

1   A    August 1, 2012.

2          MR. SRINIVASAN:  Your Honor we move to admit

3   Government Exhibit 101-9.

4          MR. AGNIFILO:  No objection.

5          THE COURT:  We'll receive 101-9.

6          (Government Exhibit 101-9 received in evidence.)

7   Q    Now, Dr. Rosenwald, the defendant writes, "Thank you very

8   much for taking your time today and for the advice, I drafted

9   an agreement that would effectively redeem your hedge fund

10  investment for Retrophin stock.  It would be a great huge

11  favor if you could do this.  No problem either way.  We can

12  return the cash to you if you'd like as well.  Let me know

13  what you think.  Any additional investment would also be

14  fantastic.  We think you can probably get out at the IPO at

15  $200 million-ish.  The FSGS drug is exciting.  If it works,

16  stock might trade at 500 million to $1 billion.  The

17  commercial stuff we are constantly adding with debt not equity

18  so that just adds to the value."

19          Do you see that?

20  A    Yes, I do.

21  Q    When the defendant wrote, "We can return the cash to you

22  if you would like as well," what was your understanding of

23  that?

24  A    That I was given the option of taking the cash or taking

25  the stock.

Rosenwald - direct - Srinivasan                1969

1   Q    Were you ever told by the defendant, either on the; phone

2   or in writing, that withdrawals from MSMB Capital had been

3   suspended?

4   A    I don't recall hearing that at the time.  I don't

5   remember.

6   Q    Okay.  And did you, in fact, exchange your investment in

7   MSMB Capital for Retrophin stock in August 2012?

8   A    I ended up getting stock in Retrophin.  I don't remember

9   the date.

10  Q    So in August 2012, did you -- did you actually sign an

11  agreement that exchanged your investment for shares?

12  A    You know, again, eventually I got shares for it and I

13  signed an agreement, but I don't know if it was in August or I

14  don't know -- I don't remember when it was.

15  Q    Okay.  No, Dr. Rosenwald, if we can turn back to the

16  binder that you have that's labeled 76 series.  And let's go

17  to Government Exhibit 76-15.  It's tab 15 in your binder.

18        Is this one of the performance updates that you got?

19  A    Yes, it was.

20  Q    For what month is this performance update?

21  A    January of 2011.

22  Q    And according to this document, what was MSMB 's -- MSMB

23  Capital's performance for January, 2011?

24  A    3.8 percent gross before fees.

25  Q    Let's go to 76-16 which is tab 16 in your binder,

Rosenwald - direct - Srinivasan                1970

1    Government Exhibit 76-16.

2            For what month is this statement?

3    A    February of 2011.

4    Q    What was the performance?  It says "MSMB has returned a

5    plus 4.24 percent in February of 2011."

6            When it said "MSMB" did you understand it to be MSMB

7    Capital?

8    A    Yes.

9    Q    And in the sort of the next paragraph, what was the value

10   of your investment for this month according to this document?

11   A    So it says I invested 100,000 on 11/1/2009 and the value

12   is now $135,000 after fees.

13   Q    Dr. Rosenwald, did you -- did you rely on these numbers?

14   A    Sure.

15   Q    Did you believe them to be accurate?

16   A    Yes.

17   Q    Dr. Rosenwald, did the defendant say anything to you

18   about any large losses in MSMB Capital in February 2011?

19   A    I don't remember a discussion about that, no.

20   Q    During your time as an MSMB Capital investor, did the

21   defendant or anyone else at MSMB Capital mention Orexigen or

22   Orex to you?

23   A    Not that I recall.

24   Q    Did you have any understanding of a trade that MSMB

25   Capital placed on Orex or Orexigen in February of 2011?

Rosenwald - direct - Srinivasan                    1971

1    A    No.

2    Q    Did the defendant communicate to you in writing or

3    verbally the results of any trade in Orex?

4    A    No.

5    Q    So let's go to tab 19 which is Government Exhibit 76- k19

6    in evidence.  Now, looking at the e-mail which is from the

7    defendant to you, do you see that?

8    A    Yes, I do.

9    Q    What is the date on the e-mail?

10   A    October 2, 2011.

11   Q    And for what month is this statement?

12   A    It's for August.

13   Q    August of?

14   A    2011, sorry.

15   Q    Okay.  And what was the value of your investment

16   according to this document?

17   A    $128,694.

18   Q    Let's go to tab 23.  That's Government Exhibit 76-23 in

19   evidence.

20        When did the defendant send you this statement?

21   A    Sunday, March 4, 2012.

22   Q    For what month?

23   A    December.

24   Q    December of 2011?

25   A    Yes.

Rosenwald - direct - Srinivasan                    1972

1   Q     Is there anything unusual about getting a December

2   statement in March, in your experience?

3   A     Yeah, we usually get them as soon as practical after the

4   end of the month.

5   Q     And what was the -- what was the value of your investment

6   according to this document?

7   A     $148,000.

8   Q     Now going to tab 25 of your binder, which is Government

9   Exhibit 76-25, when did the defendant send you this statement?

10  A     September 10, 2012.

11  Q     And for what month is this statement?

12  A     For May.

13  Q     And was there anything unusual about getting a May

14  statement in September?

15  A     It's a pretty long time from the close of the books in

16  May.

17  Q     Did that make any impression on you?

18  A     It does now.  I don't remember if it did back then.

19  Q     What was the value your investment in May of 2012?

20  A     $165,000.

21  Q     Let's go to the next tab which is Government Exhibit

22  76-26 in evidence.  When was this statement sent to you?

23  A     September 10, 2012.

24  Q     For what month is the statement?

25  A     June.

Rosenwald - direct - Srinivasan                    1973

1   Q    What was the value of your investment according to this

2   statement?

3   A    $179,000.

4   Q    Dr. Rosenwald, so taking all of these investor statements

5   together did you believe that they were accurate?

6   A    Yes.

7   Q    And did you rely on them?

8   A    Yes, yes.

9   Q    If they were not accurate, would that have affected your

10  decision to keep your money in MSMB Capital?

11  A    You mean if I knew that they were not accurate?

12  Q    If they were not accurate, right.

13  A    I certainly would have tried to find out why they weren't

14  accurate.

15  Q    Okay.  And would that have affected your decision to keep

16  the investment?

17  A    Sure.  It depends on the answer.

18  Q    Okay.  And what was your overall impression up until

19  September 2012 regarding your investment in MSMB Capital,

20  positive or negative?

21  A    I mean, it was positive.  Again, from my perspective as a

22  biotech investor, I -- I don't remember.  It would really be

23  compared to what other funds are doing, what the biotech

24  indexes were doing, so I don't -- I don't know what those

25  numbers were like back then, but it was positive and that was

Rosenwald - direct - Srinivasan                1974

1   nice.

2   Q    From your time as an MSMB Capital investor, did you have

3   access to MSMB Capital's banking or brokerage records?

4   A    No.

5   Q    Did you receive any financial statements from those banks

6   or brokers about MSMB Capital?

7   A    I don't remember getting any but -- I don't remember.

8   Q    Okay.  Were these performance estimates your sole source

9   of information about MSMB Capital's performance?

10  A    I don't remember.

11  Q    Okay.  Do you recall any other sources of information

12  about MSMB Capital's performance numbers?

13  A    I've got to ask my CFO because normally I'll get them.

14  I'll look at the top line and I'll send it to him and that

15  will be that.  So if there were holding -- statement of

16  holdings and things like that I would send it straight to my

17  CFO and he would deal with it.

18  Q    Did you interact with anyone at MSMB Capital other than

19  the defendant?

20  A    No, not that I can recall, no.

21  Q    Did the defendant ever advise you about MSMB Capital

22  stopping trading at any point?

23  A    The only recollection I have -- yes, at some point, I

24  don't remember now if it was by e-mail or verbally at some

25  point, Martin said he was going to wind down the fund and do

Rosenwald - direct - Srinivasan                1975

1    the more private investing.

2    Q    Before that point, were you ever told anything about MSMB

3    Capital stopping trading?

4    A    That's all -- I don't remember.

5         THE COURT:  I am just going to ask the lawyer and

6    the witness not to speak over one another, please.

7         MR. SRINIVASAN:  Yes, Your Honor.

8         THE COURT:  Thank you.

9         MR. SRINIVASAN:  Sorry.

10   BY MR. SRINIVASAN:

11   Q    So, up until about this period, September 2012, did you

12   believe that your investment was liquid?

13   A    Yes.

14   Q    Did you believe that you could redeem your investment in

15   cash?

16   A    Sure.

17   Q    Now, Dr. Rosenwald, you mentioned a second ago you

18   learned about the fund winding down.  If you could turn to tab

19   11 in the big binder, and that's been marked for

20   identification as Government Exhibit 101-11.

21        Do you have it in front of you?

22   A    Yes.

23   Q    What is this document?

24   A    It's a letter from MSMB to the investors limited partners

25   that he's winding down the hedge fund.

Rosenwald - direct - Srinivasan                1976

1    Q    Who wrote the e-mail?  On the first page, who wrote the

2    e-mail?

3    A    It's from Martin, signed by Martin.

4    Q    Okay.  And did you receive this document?

5    A    Yes.

6             MR. SRINIVASAN:  Your Honor, we move Government

7    Exhibit 101-11 into evidence.

8             MR. AGNIFILO:  No objection.

9             THE COURT:  We receive 101-11.

10            (Government Exhibit 101-11 received in evidence.)

11   Q    Dr. Rosenwald, let's start with the first paragraph?

12            THE COURT:  Could we just get a date for the record,

13   please?

14   Q    I'm sorry, Dr. Rosenwald what's the date on the e-mail?

15   A    September 9, 2012.

16   Q    Thank you.  And starting with the first paragraph the

17   defendant writes, "i have decided to wind down our hedge fund

18   partnerships with a goal of completing the liquidation of the

19   funds by November or December 1, 2012."

20            Do you see that?

21   A    Yes, I do.

22   Q    Okay.  What did you understand that sentence to mean?

23   A    That they were going to close down the hedge fund and

24   liquidate which meant sell all of the assets.

25   Q    By November or December 1st of 2012?

1    A    Yes.

2             THE COURT:  Is now a good time to take a break?

3             MR. SRINIVASAN:  Yes, Your Honor, whenever.

4             THE COURT:  Okay.  I'm thinking the jurors can use

5    an afternoon break.  Please place your notebooks face down and

6    please do not talk about the case and avoid any media.

7             (Jury exits.)

8             THE COURT:  Thank you, sir, you can step down if you

9    like.

10            THE WITNESS:  Thank you.

11            (Witness leaves the stand.)

12            THE COURT:  We will reconvene at five after.

13            (Recess taken.)

14            THE COURT:  Is everybody ready?  Mr. Srinivasan, how

15   much more time do you have?

16            MR. SRINIVASAN:  Half an hour, 45 minutes, Judge.

17            THE COURT:  Okay.  Would you mind speaking into the

18   mic.

19            MR. SRINIVASAN:  Yes, Your Honor.

20            (Witness resumes stand.)

21            (Jury enters.)

22            THE COURT:  All jurors are present.  Please have a

23   seat everybody.

24            Please proceed.

25            MR. SRINIVASAN:  Thank you Your Honor.

Rosenwald - direct - Srinivasan                1978

1   BY MR. SRINIVASAN:

2   Q    Dr. Rosenwald, before the break we were on Government

3   Exhibit 101-11 in evidence.  This is the wind down e-mail.

4   I'd like to go to the second -- I'm sorry, the second page and

5   the second paragraph on that page, the one that starts "I

6   cannot thank you, the partners, enough."

7   A    Right.

8   Q    So the defendant writes, "I cannot thank you, the

9   partners, enough.  I have the most loyal investors in the

10  world.  We have received two redemptions since inception and

11  are thankful for your patience and tolerance while we went

12  through operational mishaps and switched strategies several

13  times.

14          "Original MSMB investors 2009 have just about

15  doubled their monies net of fees.  I regret terminating the

16  fund, but I feel tremendous private equity opportunities are

17  abundant at the moment and we're need the latitude to explore

18  them."

19          Do you see that?

20  A    Yes, I do.

21  Q    Dr. Rosenwald, you invested on October 27, 2009, is that

22  what you testified to earlier?

23  A    Yes, correct.

24  Q    So the language, original MSMB investors 2009, have just

25  about doubled their money net of fees?

Rosenwald - direct - Srinivasan                    1979

1    A    Right.

2    Q    What was your understanding of what that meant for your

3    investment?

4    A    That my $100,000 was worth $200,000 or close to it.

5    Q    And then let's go to the next paragraph, the one that

6    starts "a few operational notes."  It says, "A few operational

7    notes; investors will have their limited partnership interests

8    redeemed by the fund for cash.  Alternatively investors may

9    ask for a redemption of Retrophin shares or a combination of

10   Retrophin shares and cash."

11            Do you see that?

12   A    Yes, do I.

13   Q    What did you understand these two sentences to mean?

14   A    You could get your cash back.  You could exchange it for

15   Retrophin shares or you could take a percentage from cash and

16   a percent in stock.

17   Q    Based on this language did you believe that it was your

18   choice?

19   A    Yes.

20   Q    And what was your choice?

21   A    My choice was the cash.

22   Q    Now, Dr. Rosenwald, did you communicate that to the

23   defendant?

24   A    Yes, I did.

25   Q    And what, if any, response did you get in the months that

1    immediately followed the September e-mail?

2    A    I mean, I didn't get the cash.  I don't remember much of

3    the exchange, but I didn't get the cash.

4    Q    At some point did you get a stock certificate?

5    A    Yes.

6    Q    Was that for Retrophin?

7    A    It was a company -- it was, I think, a shell company that

8    Retrophin was going to merge into, I think.

9    Q    And what was your reaction, if anything, to getting that

10   stock certificate?

11   A    I wanted the cash.  Again, as I said earlier, investors

12   have different buckets.  This was my illiquid bucket.  In

13   order to take stock in the company, I'd have to do my own due

14   diligence on the company and I didn't have the time to do it,

15   so I just wanted to have the cash.

16   Q    So up to that point had you signed any agreements to

17   redeem your investment in cash?

18   A    I don't remember.

19   Q    Had you told the defendant go ahead send me the stock

20   certificate instead of cash or anything like that?

21   A    I don't think so, no.

22   Q    Okay.  Did the defendant ever tell you how your

23   investment in MSMB Capital translated into the shares of that

24   shell company?

25   A    I mean, at some point he offered a certain number of

1    shares and that was the extent of it.

2    Q    Did you have any understanding of the valuation of

3    Retrophin?

4    A    No.  I don't remember.  I certainly don't remember.

5    Q    Okay.  Was there anything that concerned you about the

6    stock that you initially got?

7    A    Well, again, number one it's in a company and, so, it's a

8    company in my industry so I would like to do my due diligence

9    but it wasn't worth the time for me to do the due diligence

10   and then there was a question of liquidity.

11        You know, it's -- new companies when they go public

12   like this are very illiquid and so you get a discount for

13   liquidity what's the discount and it's a lot of work and I

14   didn't want to do the work.

15   Q    Were the shares that you initially got tradable or not

16   tradable?

17   A    I don't remember.  I remember that I felt they were

18   illiquid, so I thought they were non-tradable or thinly

19   traded.

20   Q    So what happened after you received the stock

21   certificate?

22   A    I asked for my -- I said I want my money back.

23   Q    Did you engage any lawyers in the matter?

24   A    I had my own internal legal counsel and I think I turned

25   it over to them.

Rosenwald - direct - Srinivasan                 1982

1    Q     When you said you turned it over to them did they --

2    A     I don't remember if I had internal -- I don't remember.

3    I think my CFO did a lot of the negotiating or talking.

4    Q     And did you have legal counsel in the matter?

5    A     I don't remember.

6    Q     Dr. Rosenwald, did you eventually reach a settlement with

7    the defendant?

8    A     Yes.

9    Q     And did you sign any documents in connection with that

10   settlement?

11   A     I think I did, yes.

12   Q     I'm showing you what's been marked for identification as

13   Government Exhibit 51.  That's tab 31 in your binder.  Do you

14   recognize this document?

15   A     Yes.

16   Q     What is it?

17   A     It's a settlement and release agreement between myself

18   and Martin Shkreli, MSMB Capital Management and Retrophin.

19   Q     And if you go to the last page of the document, R 011460.

20   A     Yes.

21   Q     And do you see some signatures on the right-hand side?

22   A     Yes.

23   Q     Whose signatures are those?

24   A     Martin Shkreli's.

25   Q     And on what date did he sign this document?

Rosenwald - direct - Srinivasan                1983

1   A     March 13, 2013.

2          MR. SRINIVASAN:  Your Honor, we offer Government

3   Exhibit 51 into evidence.

4          MR. AGNIFILO:  No objection.

5          THE COURT:  We've received Government Exhibit 51.

6          (Government Exhibit 51 received in evidence.)

7   Q     And if we could go to the first page of the document.

8   And focusing on that first paragraph, Dr. Rosenwald, you

9   mentioned a minute ago that this was an agreement between

10  yourself, Martin Shkreli, MSMB Capital Management and

11  Retrophin?

12  A     Correct.

13  Q     Did you have any understanding why Retrophin was a party

14  to the agreement?

15  A     Not that I could remember, no.

16  Q     Okay.  Now, let's go to the paragraph -- it's about

17  two-thirds of the way down on the page that says "settlement

18  payment."

19         What were the terms of the settlement here in this

20  paragraph?

21  A     80,000 shares of common stock of free-trading Retrophin

22  shares, not subject to restriction or transfer, as full and

23  final satisfaction for all claims.

24         (Continued on next page.)

25

Rosenwald - cross - Srinivasan                    1984

1    EXAMINATION CONTINUES

2    BY MR. SRINIVASAN:

3    Q    Okay.  And just so we break that down, it says Shkreli

4    agrees to deliver or cause to be delivered to Rosenwald the

5    total amount of 80,000 shares of common stock, meaning you

6    were going to get the 80,000 shares --

7    A    Yes.

8    Q    -- of Retrophin, which is freely trading and not subject

9    to restriction on transfer?

10   A    Correct.

11   Q    And it says, Full and final satisfaction for any and all

12   claims by Rosenwald against Shkreli, MSMB or Retrophin, do you

13   see that?

14   A    Yes.

15   Q    So was this intended to be a final settlement?

16   A    Yes.

17   Q    As between you and the defendant?

18   A    Correct.

19   Q    Now, Dr. Rosenwald, did you, in fact, receive the shares

20   after this agreement?

21   A    As I recall I did, yes.

22   Q    I am going to ask you to turn to tab 27 of your binder,

23   which is Government's Exhibit 101-27 marked for

24   identification.  And what is this document?

25   A    This is a letter from Evan Greebel to me.

VB        OCR        CRR

1          Dear Dr. Rosenwald, in connection with your

2     settlement agreement with Martin Shkreli -- yeah, with Martin

3     Shkreli, MSMB and Retrophin, enclosed please find a stock

4     certificate Number 1763.  Please send an e-mail to Evan

5     Greebel confirming your receipt of this stock certificate.

6     Q     Dr. Rosenwald, what is the date on this letter?

7     A     April 18th, 2013.

8     Q     Okay?

9          MR. SRINIVASAN:  Your Honor, we move Government's

10    Exhibit 101-27 into evidence.

11          MR. AGNIFILO:  That's fine, yes.

12          THE COURT:  We'll receive 101-27.

13          (Government's Exhibit 101-27 was received in

14    evidence.)

15          (Exhibit published.)

16    BY MR. SRINIVASAN:

17    Q     And, Dr. Rosenwald, I think the jurors can see it now, so

18    I will just read those paragraphs into the record.

19          Dr. Rosenwald, in connection with your settlement

20    agreement with Martin Shkreli, MSMB and Retrophin, enclosed

21    please find a stock certificate Number 1763.

22          Did I read that correctly?

23    A     (No response.)

24    Q     Dr. Rosenwald, did I read that correctly?

25    A     Yes.  Yes, you did, sir.

1    Q    Now, Dr. Rosenwald, if you go to the next page of this

2    exhibit, is this the stock certificate that you got?

3            (Exhibit published.)

4    A    Yes, it is.

5    Q    And how many shares does it represent?

6    A    80,000.

7    Q    Dr. Rosenwald, at some point did you sell your shares in

8    Retrophin?

9    A    Yes, I did.

10   Q    Did you do that all at once or over a period of time?

11   A    Over a period of time.

12   Q    As compared to your initial investment of $100,000, did

13   you make a profit?

14   A    Yes, I did.

15   Q    Do you know approximately how much you made?

16   A    You know, it's somewhere between 4 and $600,000, I think.

17   Q    Now, Dr. Rosenwald, you received that wind-down e-mail in

18   September 2012.  Is that what you testified to a minute ago?

19   A    Yes.

20   Q    And received this stock certificate on April 18th, 2013?

21   A    Correct.

22   Q    Is that about a seven-month gap?

23   A    Yes.

24   Q    Dr. Rosenwald, other than this settlement agreement, did

25   you sign any other agreements exchanging your interest in MSMB

1    Capital for Retrophin shares?

2    A    Not that I remember, no.

3    Q    Dr. Rosenwald, during the course of your investment, to

4    what extent, if any, were you advised that MSMB Capital owed

5    any debts?

6    A    I don't remember knowing anything about any debt.

7    Q    Any debts to Merrill Lynch?

8    A    I don't recall that.

9    Q    Okay.

10              MR. SRINIVASAN:  No further questions at this time,

11   Your Honor.  Thank you.

12              THE COURT:  All right, Mr. Agnifilo.

13              MR. AGNIFILO:  Thank you, Judge.

14   CROSS-EXAMINATION

15   BY MR. AGNIFILO:

16   Q    Good afternoon, Dr. Rosenwald.

17   A    Hi.

18   Q    I am going to do something at trial a lawyer almost never

19   does, I am going to be brief.

20   A    Okay.

21   Q    I am really just going to take you through a couple of

22   things you said in your direct testimony and just ask you a

23   few questions about them, if that's okay.

24              My book is not brief, but I'll be brief.

25              Okay, on direct examination you were asked some

Rosenfeld - cross - Agnifilo                    1988

1   questions about the Private Placement Memorandum.  Do you

2   remember that series of questions?

3   A    Yes.

4   Q    And one of the questions that my colleague with the

5   government asked you about was that management fees, that the

6   portfolio manager would take a fee, correct?

7   A    Correct.

8   Q    And I think you said that the fee was not of particular

9   importance to you in deciding whether to invest or not,

10  correct?

11  A    Correct.

12  Q    And then you were asked about liquidity, and correct me

13  if I'm wrong, liquidity is one of the many factors you will

14  consider alongside other factors, correct?

15  A    Correct.

16  Q    And I think what you said on direct is liquidity is

17  something you would want, but if the return promises to be

18  favorable enough, you will give up a little bit on the

19  liquidity, correct?

20  A    Everything -- yeah, everything is dependent on a whole

21  bunch of different criteria.

22  Q    Okay.  And you understood this was a new fund, correct?

23  A    Yes.

24  Q    A relatively small fund, as funds go, correct?

25  A    Yes.

SAM     OCR     RMR     CRR     RPR

1  Q    And you had come to know Martin, not well, but to a

2  certain extent, correct?

3  A    Yes.

4  Q    And you were placing some trust to a certain extent in

5  Martin, is that fair to say?

6  A    That's correct.

7  Q    All right.  Would you characterize Martin Shkreli as a

8  genius?  Strong words, I know.

9  A    I am not capable of determining who is a genius.

10  Q    Me neither.  Do you remember --

11  A    Except my wife, she's a genius.

12  Q    Smart man.

13  A    She married me.

14  Q    There you go.

15        MR. AGNIFILO:  I have no other questions, no, I'm

16  kidding.

17  BY MR. AGNIFILO:

18  Q    Do you remember speaking with the folks from the FBI and

19  the U.S. Attorney's office at one point maybe a year ago or

20  so?

21  A    Yes, yes.

22  Q    All right.  And do you remember they were asking you

23  about Martin and you said he's probably a genius?

24        Only if you remember.  Do you remember that?

25  A    I don't remember that.

Rosenfeld - cross - Agnifilo                    1990

1   Q     Here is what I am going to do.  It makes me turn my

2   pages, though.  I am just going to show you one page and my

3   only question is whether it refreshes your recollection, sir.

4   That's all I'm asking you to do.

5            MR. AGNIFILO:  And it's 3500-LR-1 and it's the first

6   page of that document.

7   BY MR. AGNIFILO:

8   Q     And, Doctor, what I am going to ask you to do is just

9   look at the last full paragraph.  It's the paragraph that, I

10  think, has four lines.  Just read part of it to yourself and

11  then just look up at me when you're done.

12  A     The last paragraph?

13  Q     The last full paragraph.

14  A     The last full.

15            (Pause.)

16  A     Okay.

17  Q     Okay.  Do you see any -- does this refresh your

18  recollection as to whether you might have told anyone that in

19  addition to your wife for marrying you, Martin Shkreli is

20  probably a genius?

21  A     The truth is, I dealt with a thousand, 2,000 people since

22  then, so it doesn't refresh my memory; but it says it, so I

23  must have said it.

24  Q     Okay, that's fine.  Thank you, Doctor.  Thanks.

25            The reason that I asked you that question is I would

SAM     OCR     RMR     CRR     RPR

1   imagine you run into very, very smart people on a regular

2   basis --

3   A     Yes.

4   Q     -- other than yourself?

5   A     Well, the mirror is very smart.

6   Q     Well, you're a doctor, correct?

7   A     Correct.

8   Q     You have a great deal of experience in biotechnology

9   stocks, correct?

10  A     Sure do.

11  Q     Biotechnology companies?

12  A     Yes.

13  Q     I think when you were talking to my colleagues with the

14  government you said you were looking for opportunities all

15  over the world in biotech, correct?

16  A     That's correct.

17  Q     So I would imagine you run into some pretty smart people?

18  A     Yes, I do.

19  Q     And did you think -- and let me have you characterize it.

20        Did you think Martin Shkreli was a smart person?

21  A     Again, I don't remember, so I can't make anything up.  I

22  don't remember what I thought.  I invested, so I assume I

23  thought that.

24        But do I remember thinking he's a smart guy?  No.

25  But I don't remember thinking that about almost anybody.

Rosenfeld - cross - Agnifilo                    1992

1    Q    That's fine, that's fine.

2         Now, at one point you decided to invest and you

3    invested a hundred-thousand dollars?

4    A    Correct.

5    Q    Is that a large, medium or small investment for you?

6    A    It's not large, so closer to small.

7    Q    And at one point I think you looked at an e-mail, if we

8    need to look at it again we will, it's 101-2.  And Martin says

9    to you, I will not let you down.

10        Do you remember seeing that?

11   A    Yes.

12   Q    Yes, just maybe an hour ago?

13   A    Yes.

14   Q    Okay.  From what you could tell, did it seem like Martin

15   looked up to you?

16   A    Looked up to me?

17   Q    Looked up to you.

18   A    I don't -- I don't know.

19   Q    Okay.

20   A    I don't remember back.  That's a long time ago.

21   Q    But you remember when he wrote to you that he will not

22   let you down?

23   A    I remember reading it, yes.

24   Q    And from what you could tell, if you could tell, did it

25   seem like he was working hard to be as good a hedge fund

1   manager as he could be?

2   A    Yeah.

3   Q    And he would send you information from time to time about

4   drugs and stocks and things like that, correct?

5   A    Yes.

6   Q    And I would imagine a lot of people in the world send you

7   information from time to time about those things, correct?

8   A    A whole lot.

9   Q    Probably more than you ever want to receive?

10   A    Much more.

11   Q    Okay.  And Martin was among those people who would send

12   you these things, correct?

13   A    Yes, but I read -- try to read all of them.

14   Q    Okay.  And fair to say that some of the things he sent

15   you were, at least, somewhat helpful, correct?

16   A    Again, I can't remember anybody sending me anything

17   specifically that was helpful or not helpful.  That's really

18   draining my limited memory.  I can't remember --

19   Q    Fair enough?

20   A    -- stuff like that.

21   Q    That's fine.

22        Do you remember earlier, earlier maybe an

23   hour-and-a-half ago or so or an hour ago my colleague showed

24   you two different PPMs, it was 1-A and 1-B, do you remember?

25   A    Yes.

1    Q     Okay.  And I think that one of the differences is that

2    the name of the auditor changed in one, correct?

3    A     Right.

4    Q     All right.  Do you remember if you read, when you got

5    these PPMs, do you remember if you read them cover to cover,

6    every word of it?

7    A     So I usually have a lawyer who reads.  I don't know if he

8    reads cover to cover, I am assuming he reads cover to cover.

9    Q     Bills you just like he reads cover to cover?

10   A     Yes, cover to cover and back again.

11   Q     So you don't read this whole thing yourself, correct?

12   A     No.

13   Q     And I would imagine a man in your position it's

14   impossible to read all of the things that people send to you,

15   correct?

16   A     That's correct.

17   Q     All right, so you have this lawyer read the PPM on your

18   behalf, correct?

19   A     Correct.

20   Q     And I think my colleague with the government also showed

21   you a number of these performance reports that Martin would

22   send you every month?

23   A     Yes.

24   Q     And some of them were multiple pages long with lots of

25   figures and percentages, correct?

Rosenfeld - cross - Agnifilo                    1995

1    A    Correct.

2    Q    Did you read all of those cover to cover?

3    A    So if somebody sends me a performance report, I will look

4    at the returns, for sure.

5    Q    Okay.  That's something you will look at?

6    A    Absolutely.  If there's a lot of words behind it I

7    probably won't read those, I'll look at the numbers.

8    Q    So you're interested in the numbers?

9    A    Yes.

10   Q    And you said -- at one point I think that you were shown,

11   it was 101-5, it talked about the fact that there were --

12   Martin was looking to possibly buy a company called SeraCare.

13   Do you remember?

14   A    Yes.

15   Q    Okay.  And you said that what this meant to you, the fact

16   that there was going to be an offer made for SeraCare is

17   either that Martin's fund had a lot of money or had access to

18   capital, correct?

19   A    Yes, committed capital.

20   Q    So it's one of two things, right, you could either have

21   the money in your coffers, itself, correct?

22   A    Yes.

23   Q    Or you have access to committed capital, correct?

24   A    Yes.

25   Q    You were asked questions on direct examination as to

1  whether Martin had mentioned to you any particular loss in any

2  particular trade.  Do you remember those questions?

3  A     Say that again.

4  Q     Sure.  I think you were asked questions, did Martin say

5  to you at a certain point in time that there was a large loss

6  that the fund had suffered in a particular trade; do you

7  remember that question?

8  A     Yes.

9  Q     Okay.  And you said you can't recall any discussion about

10  a loss, correct?

11  A     Correct.

12  Q     Fair to say in hedge funds you don't always have

13  visibility in regard to the individual trades, is that fair to

14  say?

15  A     That's -- that's correct.

16  Q     I mean isn't that sort of the whole idea in a sense of

17  the hedge fund that makes it different than, say, other types

18  of more public investments?

19  A     Yeah.

20  Q     Okay.  And you've been involved in many hedge funds,

21  you're very knowledgeable in the hedge fund business, correct?

22  A     Yes.

23  Q     Just to make it simple:  A hedge fund, basically, is a

24  bunch of people who get together and say, We are going to pool

25  our money and one of you, the portfolio manager, is going to

1   make investments on all of our behalf; correct?

2   A    Correct.

3   Q    All right.  It's not open to the public, right?

4   A    Correct.

5   Q    It's a limited group, it's like an investment club,

6   correct?

7   A    Right.

8   Q    And the investment club can, essentially, adopt any rules

9   that the investment including all agrees to, correct, within

10  reason?

11  A    Whatever is in the documents.  Whatever is in the

12  documents.

13  Q    Right, whatever is in that Private Placement Memorandum?

14  A    Right.

15  Q    The documents we looked at about an hour ago?

16  A    Right.

17  Q    So in terms of, you know, how the fund is going to work,

18  how it's going to sort of send out performance estimates, how

19  it's going to calculate certain things, that's all included in

20  the PPM, correct?

21  A    Right.

22  Q    And the PPM is, in a sense, the whole universe for how

23  the fund is going to work, right?

24  A    Right.

25  Q    Okay.  So unlike, for instance -- so, for instance, the

1   PPMs are not given to the Securities and Exchange Commission,

2   correct?

3   A    Correct.

4   Q    They're private, right?

5   A    That's right.

6   Q    They're not even -- and you can look at this one if you

7   need to.  You are not even allowed to make copies and give it

8   to other people who are not limited partners, correct?

9   A    I don't remember seeing it, but that certainly can be

10  true in many instances.

11  Q    Okay.  So it's really something that is agreed upon by

12  the limited partners, right?

13  A    Correct.

14  Q    Okay.  And so if there were a large loss in an individual

15  trade, you wouldn't necessarily expect to be told about it,

16  fair to say?

17  A    Oh, that's why all I ever do is look at the numbers every

18  month and see if we make money or not.  That's all I care

19  about.  I don't care what the trades are.  I don't care about

20  anything else.

21  Q    And one of the things a hedge fund can do, and this

22  particular hedge fund can do is invest in illiquid securities,

23  correct?

24  A    Yes.

25  Q    So in addition you can buy stock, right?  You can buy the

Rosenfeld - cross - Agnifilo                    1999

1    more traditional investments; stocks, bonds, whatever it is

2    that you might want to buy as part of the fund, correct?

3    A    Again, yeah.  I mean I'd have to review to see exactly.

4    I don't remember now exactly what the documents said that the

5    fund can do.  But generally funds go everywhere from, you

6    know, they're usually pretty definitive.  Some funds purely

7    liquid investments, some are purely bonds, some are liquid

8    cash, others have a side pocket for -- for private

9    investments.  It's a whole smorgasbord.

10   Q    Let me see if I can find a particular page, just so it's

11   easy.  Here is what I want to ask you to do.  I am going to

12   give you one page of what's been marked in evidence as

13   Government's Exhibit 1-A.  And I am going to put it where my

14   thumb is, it's right here (indicating).

15        Here you go, take a look to yourself.  And this is

16   already in evidence.  We can read it, but I just want you to

17   take a look at that paragraph.

18        MR. SRINIVASAN:  Which page?

19        MR. AGNIFILO:  I'm sorry, it's page -- let me see at

20   the bottom of the page.

21        THE WITNESS:  Page 2.

22        MR. AGNIFILO:  Thank you, sir.

23        Page 2.

24        (Pause.)

25        THE WITNESS:  This is why I hire lawyers.

SAM     OCR     RMR     CRR     RPR

1          (Pause.)

2          THE WITNESS:  Okay.

3     BY MR. AGNIFILO:

4     Q    So you used the term smorgasbord, right?

5     A    Yes.

6     Q    That is the proverbial smorgasbord of investment

7     possibilities that this hedge fund could invest in, correct?

8     A    Yes.

9     Q    It's pretty much everything; it's illiquid securities,

10    it's restricted securities, it's cats, dogs, stocks, bonds,

11    right?

12    A    We call it a waste basket.  Everybody does.

13    Q    All right, there you go.  Thank you.  Thank you, Doctor.

14    A    Sure.

15    Q    Do you remember ever describing, and I don't mean this in

16    the least bit in a derogatory sense, do you ever remember

17    describing Martin Shkreli as sort of strange, a strange man?

18    A    Do I remember him as a strange man?

19    Q    No, did you describe him that way to anyone?

20    A    I don't know him well enough to say he's strange.

21    Q    Okay.  I am going to give you, unless I lost it, the FBI

22    report that I had a minute ago.

23         THE COURT:  It might still be up with the witness.

24         MR. AGNIFILO:  Yes, you know, it might be.

25    BY MR. AGNIFILO:

1   Q    Doctor, do you see that?  I think I gave you a page to

2   look at, maybe I didn't take it back and maybe I did and maybe

3   I lost it.

4   A    I think you took it back, so I don't know what's here

5   because don't think I changed the page.

6   Q    I think you're right, hold on a second.  The hardest

7   thing about being a lawyer is finding things.

8         Give me a second, Doctor, I'm sorry.

9   A    No problem.

10        (Pause.)

11  BY MR. AGNIFILO:

12  Q    I got it.  Okay it's 3500-LR-1.  It's the first page,

13  it's the bottom of the first full paragraph.  Just read it to

14  yourself.

15  A    Which paragraph?

16  Q    I'm sorry, down here (indicating).  There you go.

17        (Pause.)

18  A    Okay, read it.

19  Q    Is he sort of an odd guy?

20  A    Is he sort of odd?

21  Q    You're under oath.

22  A    Yeah, believe me, I know I'm under oath.  He's different.

23  He's different.

24  Q    What do you mean?

25  A    You know, he, you know, would send you a lot more stuff

Rosenfeld - cross - Agnifilo                    2002

1   than other people would.  He would, you know, promote things

2   more than other people would.  And he was out there more than

3   other people, or is out there.  I don't want to say -- he's

4   still alive, but that's the memory I have is that, you know,

5   if you look at a bell curve of people, he's the one the far

6   side either one, I don't care, that was more out there.

7   Q    Okay.

8   A    With lots more ideas and very promotional about the ideas

9   and a lot of energy and things like that.

10  Q    Okay.  Did you ever think he might be on the spectrum?

11           MR. SRINIVASAN:  Objection.

12           THE COURT:  Sustained.

13  BY MR. AGNIFILO:

14  Q    You can't answer it if it's sustained.

15  A    Okay.

16  Q    You're a doctor, correct?

17  A    Correct, still have my license.

18  Q    Good for you.  I'll try and keep my law license through

19  the trial.

20           When you say out there, what do you mean by that

21  phrase?

22  A    So on Wall Street, you know, there's a thing called

23  promoting your book, right?  You know, Wall Street is loaded

24  with analysts that are very shy.  They have great ideas, they

25  can never get anybody to buy into their ideas; and there's

Rosenfeld - cross - Agnifilo                    2003

1    other guys that are out there with the same ideas that are

2    very promotional and can sell their ideas and, therefore, make

3    things happen for themselves, right?

4              And so he's more out there.  He's more promotional.

5    He's more aggressive.

6    Q    Let me -- I think we went over this e-mail a little while

7    ago, let me go back to it.

8              MR. AGNIFILO:  One second.

9              (Pause.)

10   BY MR. AGNIFILO:

11   Q    Give me one second, Doctor.

12   A    Sure, I'm not going anywhere.

13   Q    Okay.

14             (Pause.)

15   Q    I think a little while ago we talked about a exhibit,

16   Government's 101-4, which is in evidence and I think we read

17   part of it.  And I don't know if you have that in your binder.

18   If I have their system down, I think it might be tab 4.

19             MR. SRINIVASAN:  It is tab 4.

20   Q    So tab 4.

21   A    Okay.

22   Q    All right.

23   A    In the big binder?

24   Q    Yes, in the big binder.

25   A    What page?

1    Q    Tab 4, I think it's -- the exhibit starts with an e-mail,

2    and then the letter starts with the next --

3    A    Yes.

4    Q    -- full thing.  All right, so I'm going to read since

5    this is in evidence.

6              THE COURT:  Wait a minute.  Would the government's

7    paralegal kindly put it up on the screen so the jurors can

8    follow along?

9              MR. SRINIVASAN:  Sure.

10             MR. AGNIFILO:  Thank you.  Thank you, Judge.  And we

11   are going to be looking at that last paragraph.  I will wait

12   until it comes up.

13             MR. SRINIVASAN:  Which page?

14             MR. AGNIFILO:  It's -- I can put it on the ELMO.

15             THE COURT:  Yes, put it on the ELMO, that's fine.

16             (Exhibit published.)

17             MR. AGNIFILO:  Just for the record, all that color

18   stuff, that's not part of the actual evidence.

19   BY MR. AGNIFILO:

20   Q    Okay, so what it says is Q3, the third quarter, was

21   sleepy until September.  In September we made enormous gains

22   while simultaneously generating sizeable losses.  The result

23   was a great month, which should have been a record-breaking

24   month.  Very often, after a good streak of gains, our fund

25   finds itself in psychological disarray.

SAM       OCR       RMR       CRR       RPR

Rosenfeld - cross - Agnifilo                    2005

1          Now, let's stop there for a second.  Do a lot of

2    portfolio managers describe their hedge funds as being in

3    psychological disarray?

4    A    I couldn't tell you.  I would be speculating, I'm not

5    supposed to do that.

6

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Rosenwald - cross - Agnifilo                    2006

1   (Continuing)

2   Q    This was caused by the distraction of a large short sale

3   but also by the gains of that short sale, will do better to

4   control our ego in the future.  This "amateur hour" type of

5   trading is harmful but good self-awareness and quick 12-step

6   programs keep our Formula One-style hedge fund alive and

7   humming.

8          Right?

9   A    Yeah.

10  Q    This is like, this is Martin, right?  This is what it

11  means to be in business with Martin Shkreli; correct?

12          MR. SRINIVASAN:  Objection.

13          THE COURT:  Sustained.

14  Q    Is this, you get these sorts of letters to the investors

15  from time to time; correct?

16  A    Yes, we do get letters, that's correct.

17  Q    Okay.  Is this letter different than the typical letter

18  you get?

19  A    It's different, yes.

20  Q    Okay.

21  A    We do get some that are pretty wild.

22  Q    Okay.  And Martin is one to be a little off the beaten

23  track; correct?

24  A    It's definitely not typical.

25  Q    Okay.  And you knew that going in; correct?

1  A    Yeah.  Again, you know, I look at these things and, you

2  know, I don't care if I read Warren Buffet's letters every

3  year, he's a very interesting guy, right?  He says very

4  interesting things, too.  So, a lot of very smart people do

5  say very interesting things.

6  Q    All right.  When you got this letter that the fund was in

7  psychological disarray and amateur hour trading, you didn't

8  throw up your hands and say, oh, my goodness, I've got to get

9  out of this crazy fund, right?

10  A    To be honest, I don't even know that I read the letter.

11  So, I don't know.

12  Q    All right.

13  A    I certainly don't remember it, but I don't -- it's a lot

14  for me to remember.  It's a long time ago.

15  Q    Understood.

16       Now, at some point I think you testified on direct

17  examination you wanted to basically cash out on the investment

18  and receive cash; correct?

19  A    That's correct.

20  Q    Okay.  And the cash was slow in coming, fair to say?

21  A    I guess so, yeah.

22  Q    Yeah.  Okay.

23       And at one point you said that you thought you

24  engaged a lawyer, whether it be an external lawyer, an

25  internal lawyer.

Rosenwald - cross - Agnifilo                    2008

1            Some lawyer on your behalf was brought into the

2    picture; correct?

3    A    Correct.

4    Q    Okay.  And you remember at one point before getting the

5    80,000 shares you got about 24,000 shares.

6            Does that ring a bell?

7    A    I remember I got less than the 80 originally, yes.

8    Q    Okay.

9    A    But I don't remember the exact number.

10            THE COURT:  So, I understand; you got 24,000 shares

11    and then additional shares totaling 80 or were there two

12    separate?

13            THE WITNESS:  I don't remember how much it was.  Oh,

14    there was, yeah, something called Desert Gateway where I got

15    24,000 shares and as I recall, I think those were exchanged

16    for the 80,000, but again, I don't have total recall or

17    anything within the realm of total recall.

18            THE COURT:  Thank you.

19            MR. AGNIFILO:  Okay.  For the time-being I'm going

20    just to ask if this refreshes your recollection as to the

21    number of shares.

22    Q    Do you recall getting 24,046 shares of Desert Gateway on

23    February 19th, 2013?

24    A    I remember getting the shares, but the date...

25    Q    That's fine.

VB        OCR        CRR

1    A    Yes.

2    Q    All right.  And this would be a stock certificate that

3    you received?

4    A    Yes.

5    Q    Do you recall?

6    A    Yes.

7    Q    Okay.

8              MR. AGNIFILO:  I would offer it as Defense -- we

9    will put a Defense Exhibit on it.  I thought it was part of

10   the Government's submission, but we will have to give it a

11   Defense Exhibit.

12             THE COURT:  Did you not put that one in?

13             MR. SRINIVASAN:  No, we put in the 80,000

14   certificate.

15             THE COURT:  All right.

16             What will this be?  Defense Exhibit what?

17             MR. AGNIFILO:  We will have to see what we're up to.

18             THE COURT:  All right.

19             Is there an objection?

20             MR. SRINIVASAN:  No.

21             THE COURT:  We will admit it as soon as you identify

22   it.

23             MR. AGNIFILO:  All right.

24   Q    And then, what you said a few minutes ago is that you

25   also got 80,000 shares; correct?

1   A    Correct.

2   Q    And what you can't remember clearly is whether the 24,000

3   shares was in addition to the 80,000 shares or the 24,000

4   shares kind of tumbled into the 80,000 shares.

5   A    The recollection I have, it could be wrong, is that we

6   sent those back and got the 80,000.  That's my, that's my

7   memory, but don't hold me to it.

8   Q    Okay.  And you said -- do you recall if you sold the

9   shares for about $6 a share?

10  A    Somewhere, yeah.  Somewhere in that range, that's

11  correct.

12  Q    All right.

13  A    I don't remember the exact dollars.

14  Q    And you said that you made somewhere between 400 and --

15  A    600,000, yeah.

16  Q    On the $100,000 investment?

17  A    Yeah.

18  Q    Okay.  And do you know if any of the 400 to $600,000 you

19  took as part of your investment, if Mr. Shkreli took a fee

20  from that?

21  A    Not that I recall.

22          MR. AGNIFILO:  I don't think I have any other

23  questions, but just bear with me one second?

24          Just one second, Your Honor.

25          (Pause in the proceedings.)

1          THE COURT:  I think the jurors would like a break so

2    you can step down, sir.

3          (Witness steps down.)

4          THE COURT:  Jurors, please do not discuss the case,

5    obviously.  I know you are going to be tired of me telling you

6    over and over, but I just need to keep saying it.

7          (Jury exits.)

8          (In open court; outside the presence of the jury.)

9          THE COURT:  We need the Exhibit number,

10   Mr. Agnifilo.

11         MR. AGNIFILO:  Yes, Your Honor.

12         THE COURT:  All right.

13         When the jurors come back, you can put the Exhibit

14   number on the record.

15         Have a seat, we are going to take a few minutes,

16   about a ten-minute break.

17         (Recess taken.)    (In open court.)

18         (Judge KIYO A. MATSUMOTO enters the courtroom.)

19         THE COURTROOM DEPUTY:  All rise.

20         THE COURT:  Do you have an Exhibit Number for that

21   Exhibit?  You will put it in the record, good.

22         And we will get the jurors back.

23         MR. AGNIFILO:  Okay, Judge.

24         THE COURT:  It's going to be 4170, I will have you

25   say it in front of the jurors.

Rosenwald - cross - Agnifilo                    2012

1                (Pause in the proceedings.)

2                MS. KASULIS:  Your Honor, can we have one moment

3      with Defense Counsel?

4                THE COURT:  Yes, the jurors are lining up, you can

5      talk over here.

6                (Jury enters.)

7                THE COURT:  All right.  All of our jurors are

8      present.

9                Is our witness ready to come back?

10               Please, have a seat, everybody.

11               (Witness resumes stand.)

12               THE COURT:  Are you ready to continue, sir?

13               MR. AGNIFILO:  Yes, thank you.

14               THE COURT:  All right.

15               MR. AGNIFILO:  Dr. Rosenwald, just a couple more

16     questions.

17               THE COURT:  Before you start, let's just identify

18     your Exhibit.

19               MR. AGNIFILO:  Very good.

20               THE COURT:  By number, please.

21               MR. AGNIFILO:  Yes, absolutely.

22               So, the Desert Gateway restricted securities stock

23     certificate for 24,046 shares has been marked in evidence as

24     Exhibit DX-4170.

25               THE COURT:  All right, thank you.  It is admitted.

Rosenwald - cross - Agnifilo                    2013

1           (Defendant's Exhibit DX-4170 received in evidence.)

2           MR. AGNIFILO:  Thank you.

3    Q    Are you aware that the current share price of Retrophin

4    is almost $20 a share?

5    A    Yes, I am.

6    Q    So, had you held the shares in your investment would be

7    worth $1.6 million today?

8    A    That's correct.

9           MR. SRINIVASAN:  Objection.

10          THE COURT:  Well, I would have sustained but yes,

11   sustained.

12          Strike the response.

13   Q    Now, as it was, you made a fairly handsome profit on the

14   investment; correct?

15   A    Yes.

16   Q    And fair to say that at all times that you were dealing

17   with Mr. Shkreli, you were a fairly prominent person in the

18   bioscience space; correct?

19   A    That's not for me to determine, but I'm certainly

20   well-known in the industry, yes.

21   Q    Okay.  And I think we discussed before that in one of the

22   earlier e-mails that Martin Shkreli said to you is:  I'm not

23   going to let you down; correct?

24   A    That's correct.

25   Q    And at the end, he didn't let you down, right?

Rosenwald - redirect - Srinivasan                2014

1   A      I, I made money.

2   Q      Do you think Martin Shkreli intended to defraud you?

3           MR. SRINIVASAN:  Objection, Your Honor.

4           THE COURT:  Sustained.

5   Q      Do you think that Martin Shkreli worked hard to make your

6   investment work, from what you could tell?

7   A      To me it's a black box, so I don't, I, I don't know.  I

8   don't know.

9   Q      But you agree that your investment in this particular

10  instance performed fairly well, correct?

11  A      Yes.

12  Q      Not every investment makes five times its original

13  source; correct?

14  A      Hundred percent correct.

15          MR. AGNIFILO:  I have nothing else for

16  Mr. Rosenwald.

17          THE COURT:  Thank you.

18          Is there any redirect?

19          MR. SRINIVASAN:  Just briefly, Your Honor.

20          THE COURT:  All right.

21          MR. SRINIVASAN:  May I proceed, Judge?

22          THE COURT:  Yes.

23  REDIRECT EXAMINATION

24  BY MR. SRINIVASAN:

25  Q      Dr. Rosenwald, do you recall being asked some questions

VB        OCR        CRR

1    about SeraCare and the press release?

2    A    Yes.

3    Q    You used a term committed capital in your response to

4    Mr. Agnifilo?

5    A    Correct.

6    Q    What is committed capital?

7    A    So, when you do a tender, when you're going to buy a

8    company like that, to the best of my knowledge because I have

9    never done one, you should have the money either in your, if

10   you're doing it personally in your brokerage account, you

11   should have it in your fund or you should have it committed

12   from a, you know, either a lender or another fund so you have

13   the money to purchase it.

14   Q    So, funds that are confirmed that you have already?

15   A    Yes.

16   Q    Okay.  And then you were asked about whether you expected

17   to be notified about losses in the fund.

18         Do you recall that?

19   A    Yes.

20   Q    And I recall your testifying that you look to the

21   statements, monthly statements?

22   A    Yeah, that's all I ever look at, is the, am I up or am I

23   down, that's all I ever care about.

24   Q    Okay.  Did you expect those monthly statements to be

25   accurate?

1    A    Yes.

2    Q    Now, Dr. Rosenwald, you were asked about the private

3    placement memorandum on cross-examination and on direct.

4         Do you recall that?

5    A    Yes.

6         MR. SRINIVASAN:  Okay.  If you go to the big book

7    that's in front of you, Government's Exhibit 1-B, which is tab

8    33 in your binder.

9         And this is in evidence.

10        MS. SMITH:  Can we switch to the prosecution laptop.

11        THE COURTROOM DEPUTY:  Yes.

12        THE COURT:  It's not working?

13        THE COURTROOM DEPUTY:  No.

14        (Pause in the proceedings.)

15        MR. SRINIVASAN:  Could we go to the first page of

16   this document, please.

17        (Exhibit published to jury.)

18   Q    Dr. Rosenwald, the date on this document is October 5th,

19   2009; is that right?

20   A    Yes, it is.

21   Q    And you invested on October 27th, 2009; is that right?

22   A    Yes.

23   Q    Okay.  Let's go to Bates Number LR00017.

24   A    What's the number again?

25   Q    I'm sorry, LR000117.

Rosenwald - redirect - Srinivasan          2017

1    A     Oh, 117, okay.

2    Q     I'll call your attention to the paragraph on management

3    fees.

4    A     Yes.

5    Q     And do you recall Mr. Agnifilo asking you some questions

6    about the management fee?

7    A     Yes, I do.

8    Q     If the fund manager exceeded this one percent management

9    fee, would that have been important for you to know?

10   A     Yes.  Yes.

11   Q     And would that have been important to your investing

12   decision?

13   A     It depends how high the fee is and depends on the track

14   record.

15   Q     My question was about exceeding the stated management

16   fee.

17         Would that have been important to your investing

18   decision?

19   A     To some degree.

20   Q     Now, Dr. Rosenwald, if we go to LR00012 -- 122, sorry.

21         Do you recall being asked some questions about the

22   mix of investments that this fund could invest in?

23   A     Yes.

24   Q     I don't remember, what was the phrase that you used to

25   describe it?

Rosenwald - redirect - Srinivasan                    2018

1  A    It's, in the business we call it the waste basket.

2  You're thrown all the potential investments you might ever

3  make.

4  Q    Okay.  Now, if you go to the paragraph that says

5  restricted securities.

6  A    Yes.

7  Q    The first sentence says:  The partnership may invest in

8  so-called reconvicted securities; i.e., securities as to which

9  the public resale is currently restricted under the Securities

10  Act of 1933 as amended.

11  A    Right.

12  Q    Which are not immediately convertible to freely-tradable

13  securities.

14        Do you see that?

15  A    Yes, I do.

16  Q    What's your understanding of a restricted security?

17  A    My understanding of restricted security is a security

18  that if you wanted to sell today, you couldn't sell it.

19  Q    Is that a similar concept to illiquid investment?

20  A    Yes.

21  Q    And if you go to the last sentence, it says:  The

22  partnership's overall investments in restricted securities

23  will be limited, however, to a maximum of ten percent --

24        MR. AGNIFILO:  We lost the screen.

25        MR. SRINIVASAN:  I will start that sentence again,

Rosenwald - redirect - Srinivasan                2019

1  Dr. Rosenwald.

2  Q    The last sentence of that paragraph, the restricted

3  securities paragraph says --

4  A    Yes.

5  Q    The partnership's overall investments in restricted

6  securities will be limited however, to a maximum of ten

7  percent in terms of their cost as time of purchase of current

8  market value of partnership assets.

9         Do you see that?

10 A    Yes, I do.

11 Q    Based on this language, did you expect that the fund's

12 portfolio would not consist of more than ten percent of

13 restricted securities in terms of their cost at the time of

14 purchase?

15         MR. AGNIFILO:  I object, that's not what this says.

16         THE COURT:  Well, why don't you try to rephrase the

17 question.

18         MR. AGNIFILO:  Or just ask what he understands,

19 that's a different question.  It's still his witness and he's

20 leading.

21         THE COURT:  All right.  He will rephrase the

22 question.

23 Q    Dr. Rosenwald, what was your understanding, if any, of

24 the ability of the fund to invest in restricted securities

25 based on this language?

VB        OCR        CRR

Rosenwald - redirect - Srinivasan                2020

1  A    So, based on reading today, it shouldn't -- when you make

2  the investment, it shouldn't be more than ten percent of the

3  assets, all the assets in the fund.

4  Q    Dr. Rosenwald, you were asked some questions by

5  Mr. Agnifilo about your ability to cash out and it was slow

6  coming; is that right?

7  A    Yes, that's correct.

8  Q    Dr. Rosenwald, did you actually get cash or just the

9  80,000 in shares?

10 A    Just the shares.

11 Q    So, let's talk about the shares for just a minute.

12           MR. SRINIVASAN:  Could we have 4170, I believe I

13 left that.

14           THE COURT:  You can have my copy.

15           MR. SRINIVASAN:  I'm sorry, Judge, I have it here,

16 it was just underneath.

17           Can we have the ELMO, please.  This is Defendant's

18 Exhibit 4170, which is in evidence.

19           (Exhibit published to jury.)

20 Q    Dr. Rosenwald, this is the stock certificate for 24,046

21 shares of Desert Gateway.

22           You testified that you believe you exchanged these

23 shares?

24 A    That's how I recall it, yes.

25 Q    Okay.  And do you see at the top there's some language

1    there, restricted securities?

2    A    Yes.

3    Q    What did that mean to you?

4    A    I would not be able to sell it.

5    Q    Okay.  And why is that?

6    A    Because they're restricted.  So, if you wanted to sell

7    it, you know, a broker is going to say where's the shares.

8    You're going to have to deposit it at the brokerage house

9    first and then they're going to look to see if they're

10   restricted.

11          MR. SRINIVASAN:  If we can go to Government's

12   Exhibit 101-27, which is in evidence.

13          And if we could get the monitor, please.  Thank you.

14          (Exhibit published to jury.)

15          MR. SRINIVASAN:  Is it up on everyone's screen but

16   mine?

17          ALL:  Yes.

18          MR. SRINIVASAN:  That's okay, I don't need it on my

19   screen, as long as the jurors have it.

20          THE COURT:  Do the jurors have the document?

21          THE JURY:  Yes.

22          THE COURT:  I'm sorry.

23          MR. SRINIVASAN:  I can proceed, Judge or I can wait.

24          It's okay, I don't need it on my screen, Your Honor.

25          If we go to this page, second page of this Exhibit,

1    Bates number LR001222.

2    Q    Dr. Rosenwald, this is the 80,000 share certificate for

3    Retrophin; is that right?

4    A    Correct.

5    Q    Okay.  Does it say restricted securities on here

6    anywhere?

7    A    Not that I can see.

8    Q    Was it important to you to have securities that were not

9    restricted?

10   A    Yes.

11   Q    Why is that?

12   A    Because I, as I said earlier, you know, I am a biotech

13   investor.  In order for me to make an investment in a illiquid

14   company, a private company or an unregistered stock in a

15   company that's not going to be registered soon, I want to do

16   due diligence, do my own homework, see if I want to make the

17   investment.

18        It was too small of an investment to take all the

19   time to do that and so, if I couldn't get cash, if I get

20   stock, I'll sell the stock.  To me, the stock was cash.

21            MR. SRINIVASAN:  Just one moment, Your Honor.

22            (Pause in the proceedings.)

23            THE COURT:  Just to clarify.  Unrestricted stock was

24   cash.

25            THE WITNESS:  To me, I looked at it as cash, yes.

1          MR. SRINIVASAN:  Thank you, Dr. Rosenwald.

2          No further questions.

3          MR. AGNIFILO:  I only have two minutes, maybe one

4    minute.

5          THE COURT:  All right.

6    RECROSS EXAMINATION

7    BY MR. AGNIFILO:

8          MR. AGNIFILO:  We can keep this on the screen.  Can

9    you put it right back?  Never mind, we'll do it on ELMO.  Oh,

10   it's back.  Okay.

11   Q    Doctor, do you see that?

12   A    Yes.

13   Q    At $6 a share, that's worth $480,000, right?

14   A    Yes.

15   Q    Now, take a look at, do you have in front of you the

16   Government's Exhibit 1-B?  We were just looking at it before,

17   page 8, that talks about the restricted securities?

18   A    Yes.

19   Q    All right.  It says ten percent parentheses, in terms of

20   their cost at the time of purchase, end parentheses; correct?

21   A    Correct.

22   Q    So, if you're getting them for nothing, there's no limit

23   on how many of them you can have; correct?

24   A    If that's the cost basis is zero, it's infinite.

25        MR. AGNIFILO:  Thank you.

Proceedings                                      2024

1          Nothing else.

2          THE COURT:  Any redirect?

3          MR. SRINIVASAN:  Just one question, Judge.

4          THE COURT:  All right.

5          MR. SRINIVASAN:  I can do it from right here if

6   that's okay.

7          THE COURT:  Sure.

8   REDIRECT EXAMINATION

9   BY MR. SRINIVASAN:

10  Q    Dr. Rosenwald, Mr. Agnifilo just asked you about getting

11  shares at no cost basis.

12          Do you know one way or the other whether

13  MSMB Capital received any shares or interest in Retrophin at

14  any cost?

15  A    I, I've never known.  I have no idea.

16          MR. SRINIVASAN:  Thank you, Your Honor.

17          No further questions.

18          THE COURT:  All right.  Thank you, sir.  You are

19  excused.

20          THE WITNESS:  Thank you.

21          THE COURT:  Nice to see you, have a nice trip back.

22          THE WITNESS:  Thanks.

23          (Witness excused.)

24          THE COURT:  Do the parties want to come retrieve

25  their documents?

```
                        Proceedings                    2025
```

1           ALL:  Yes.

2           (Pause in the proceedings.)

3           THE COURT:  Does the Government have another

4   witness?

5           MR. SRINIVASAN:  Yes, Your Honor, but before we do

6   that, we would like to read a stipulation into evidence.

7           THE COURT:  All right.

8           MR. SRINIVASAN:  And then call the witness right

9   after.

10          THE COURT:  Okay.

11          Ladies and gentlemen, the Government is going to

12  read a stipulation, which is another word for an agreement

13  between the parties.  So, please listen carefully.

14          MR. SRINIVASAN:  Your Honor, just in terms of

15  process, would you like me to read it before publishing it to

16  the jury or is it okay if they read along as I put it on the

17  ELMO?

18          THE COURT:  It is fine to put it on the ELMO so that

19  jurors can read along.

20          MR. SRINIVASAN:  Thank you.

21          THE COURT:  Are you marking this as an Exhibit?

22          MR. SRINIVASAN:  It is, Your Honor, Government's

23  Exhibit 803.

24          (Exhibit published to jury.)

25          MR. SRINIVASAN:  Stipulation, it is hereby

Proceedings                                 2026

1   stipulated and agreed by and between the undersigned parties

2   that from 2007 to 2014, both dates being approximate and

3   inclusive, the auditing firm of Fulvio and Associates LP

4   and/or its employees were not retained by and did not act as

5   auditors for the defendant Martin Shkreli, MSMB Capital

6   Management LP, MSMB Capital Management LLC, MSMB Healthcare

7   LP, MSMB Healthcare LLC and/or any other MSMB entity.

8            This stipulation, marked Government's Exhibit 803 is

9   admissible in evidence as trial, dated June 30th, 2017.

10           And it is signed by representatives of both parties.

11           THE COURT:  All right, thank you.

12           So, this is accepted as Government's Exhibit 803,

13  that is the stipulation.

14           (Government's Exhibit 803 received in evidence.)

15           THE COURT:  It's in evidence, thank you.

16           MR. SRINIVASAN:  Thank you, Your Honor.

17           We call Caroline Stewart to the stand.

18           I'd like to put a binder up for the witness,

19  Your Honor.

20           THE COURT:  All right.

21           (Witness enters and takes stand.)

22           THE COURT:  Ma'am, please come up to the witness

23  stand here

24

25

Stewart - direct - Srinivasan                    2027

1    .

2            THE COURTROOM DEPUTY:  Please, raise your right

3    hand.

4    **C A R O L I N E    S T E W A R T**,

5            called as a witness having been

6            first duly sworn, was examined and testified

7            as follows:

8            THE COURTROOM DEPUTY:  Please, state and spell your

9    name.

10           THE WITNESS:  My name is Caroline Stewart --

11   C-A-R-O-L-I-N-E, S-T-E-W-A-R-T.

12           THE COURT:  Thank you.

13           Please proceed.

14           MR. SRINIVASAN:  Thank you, Your Honor.

15   DIRECT EXAMINATION

16   BY MR. SRINIVASAN:

17   Q    Good afternoon.

18   A    Good afternoon.

19   Q    Where do you live, ma'am?

20   A    Englewood, New Jersey.

21   Q    How long have you lived there?

22   A    About four or five years now.

23   Q    Do you have any children?

24   A    Yes.  I have twin girls who are currently eight years

25   old.

VB        OCR        CRR

Stewart - direct - Srinivasan                    2028

1    Q    Could you please describe your educational background.

2    A    I have a bachelors in chemistry as well as a masters in

3    chemistry and a masters in molecular and cellular biology.

4    Q    Where did you go to school?

5    A    Undergraduate was at Barnard College Columbia University

6    and both my masters degrees were from Brandies University in

7    Massachusetts.

8    Q    And then what did you do after your graduate education?

9    A    I did work as a chemist for a short while but the

10   majority of my career has actually been on Wall Street.

11         So, for approximately ten years I was a sell-side

12   analyst.  Sell-side analyst means that I was the person who

13   would write research reports on specific companies and

14   specifically as a biotech analyst and I was a person who would

15   write, who would give stocks buy/sell hold ratings as well as

16   assigned price targets to those stocks.

17   Q    What sorts of companies did you work for?

18         What sorts of companies did you work for when you

19   were doing this work?

20   A    Oh, so, I'm sorry.

21         I worked for a range of small- as well as mid- and

22   large-tier.  So, I was an associate at places like Deutsche

23   Bank and Citibank.  I guess most people from the buy-side who

24   are the people who buy and sell stocks would know me from my

25   days at Piper Jaffray.

VB        OCR        CRR

Stewart - direct - Srinivasan                     2029

1    Q    And about when were you working at Piper Jaffray?

2    A    From 2006 through 2009.

3    Q    What did you do after you were at Piper Jaffray?

4    A    So, the financial crisis hit in 2008, 2009 and I was laid

5    off along with most of the biotech staff over at

6    Piper Jaffray.  A couple months later I got a job as a

7    director of investor relations at Merck KGaA and I moved

8    myself and my family, my two children and my mother, to

9    Darmstadt, Germany.

10   Q    If we step back for a second.

11        What is Piper Jaffray?

12   A    I'm sorry.  So, Piper Jaffray is an investment bank,

13   basically.

14   Q    What is Merck KGaA?

15   A    Merck KGaA is a hybrid of a pharmaceutical and a

16   chemicals company.

17   Q    And you said that you moved to Germany?

18   A    Yes.

19   Q    How long did you work for Merck KGaA?

20   A    I worked for Merck KGaA for six months, I was in Germany

21   for a total of seven months.  I had, as I said before, I moved

22   with my family, with my two children and my mother, and I had

23   quit after six months because they were unable to obtain

24   health insurance for my mother who was 65 at the time, and

25   Medicare doesn't work overseas, and they couldn't provide her

Stewart - direct - Srinivasan                    2030

1    insurance.  So, I quit and came back to the U.S.

2    Q    What did you do after you came back to the U.S.?

3    A    So, I came back to the U.S. in the spring but I didn't

4    come back to New York until the summer of 2010 and I looked

5    for a job, it was very hard.  The economy still wasn't doing

6    very well and so, I spent several months just kind of

7    networking with people I didn't know just from being an

8    analyst for so many years.

9    Q    Have you held any professional licences in your career?

10   A    Yes.  So, as a sell-side analyst you have to have a

11   series 86, 87 and a set series 7 and 63.

12

13              (Continued on following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Stewart - direct - Srinivasan                    2031

1   (Continuing.)

2   BY MR. SRINIVASAN:

3   Q    Could you just briefly describe for the jurors what a

4   series license means?

5   A    So, the series licenses are basically to ensure that,

6   one, you're competent to do the job and you know enough about

7   financial modeling as well as the markets.

8            And then two of those exams are more ethically

9   driven exams that are supposed to show you what you can and

10  can't do and what you should and shouldn't do.

11  Q    And are those exams for professionals in the securities

12  business?

13  A    Yes.  You actually have to be licensed in order to be a

14  publishing analyst.

15  Q    Do you know an individual named Martin Shkreli?

16  A    Yes.

17  Q    How were you introduced to Martin Shkreli?

18  A    So, my very first interaction with Martin would have been

19  back in 2004/2005.  I worked for a small, basically publishing

20  house called Independent Research Group.

21           At that time post-Spitzer where they divided banking

22  from research, there were a slew of companies that came out,

23  including IRG, which proposed to publish research that was not

24  backed at all by banking so that you would get a truly

25  independent analysis and recommendation of companies.

Stewart - direct - Srinivasan                2032

1          So, I was working there as an analyst and I had a

2    company under coverage called AtheroGenics and I had a sell

3    rating on the stock and I had gotten a call -- the buy side

4    frequently calls the sell side, but I had gotten a call in

5    from Martin and one of his colleagues about this particular

6    stock that I covered.

7          You know, the conversation started out normal in the

8    sense that there was some scientific questions, but then it

9    quickly became obvious that the purpose of the call was more

10   to mock me, to kind of make me feel stupid.

11         MS. ZELLAN:  Objection.

12         THE COURT:  Well, all right.  The jury should

13   disregard that last statement.

14         The witness may testify about how she felt, but she

15   cannot testify about what is in the mind of someone else.

16         THE WITNESS:  Sorry.

17         MR. SRINIVASAN:  Certainly, Your Honor.  We'll go on

18   from there.

19   BY MR. SRINIVASAN:

20   Q    Ms. Stewart, do you see Martin Shkreli in the room today?

21   A    Yeah, he's over there smiling.  He's got glasses on.

22   At -- over between the gentleman with the gray hair and the

23   other gentleman.

24         MS. ZELLEN:  Thank you very much.

25         THE COURT:  We will note that the witness has

1   identified Mr. Shkreli.

2   BY MR. SRINIVASAN:

3   Q    Ms. Stewart, if we can go back to the original call that

4   you talked about relating to AtheroGenics --

5   A    Yes.

6   Q    -- could you describe what was said on the conversation

7   between you and the defendant?

8   A    It was a bunch of -- as I said it started out as a bunch

9   of scientific questions but then the questions started veering

10  towards things that were a little bit too easy or a little bit

11  too softball and inane.

12  Q    And how did that conversation, what the defendant said,

13  make you feel?

14  A    I didn't feel stupid.  I just felt -- I felt it was a

15  waste of my time.

16  Q    And did you have any interactions with the defendant

17  after that 2004/2005 time frame?

18  A    So, after that I had just decided, you know, that was one

19  buy-sider who I wasn't going to talk to going forward and the

20  only -- it's a rather small community, so, you know, I would

21  see him at bank conferences and such, just being in my line of

22  vision, but I never interacted with him one-on-one until late

23  2010.

24  Q    And what happened in late 2010?

25  A    So, in late 2010, as I said I had come back to the U.S.

Stewart - direct - Srinivasan                    2034

1   from Germany and I was looking -- I was looking for a job.  So

2   I was networking around which included just kind of going out

3   and socializing with people that I knew and a mutual friend of

4   ours had taken a picture of us as we were at some

5   restaurant/bar and she had posted that picture on Facebook and

6   Martin had reached out to this mutual friend of ours and put

7   us in touch.

8   Q    And what happened after that?

9   A    So, we had gone out on a date and, you know, this is the

10  first time I had spoken to him in many years and we just

11  talked about various things including the markets, including

12  my search for a job.

13  Q    And did you discuss your search for a job?

14  A    Yes.

15  Q    And what was that conversation?

16  A    Specific -- I mean, it was just kind of normal, you know,

17  I've been doing this for a long time, I'm looking for a job, I

18  don't know what the -- what is the buy side like, what's open

19  on the sell side, how does the market feel because I've been

20  out of the loop for a while.

21  Q    So this is about four or five years after that initial

22  contact?

23  A    Correct.

24  Q    What were your -- what were your impressions of the

25  defendant from this conversation?

Stewart - direct - Srinivasan                    2035

1    A    Benign, I guess.  You know, it was certainly different

2    than my first interaction with him.  It was just -- it was an

3    innocuous dinner date.

4    Q    Did you have any discussions about your working for him?

5    A    At that point, no.

6    Q    At some point did that come up?

7    A    So we had gone out two or three times in total, I think.

8    All were fairly just -- just very benign, innocuous outings

9    and he had -- other than that, we had kept in communication

10   via e-mail and he had recommended two or three people for me

11   to, you know, call or contact to talk to.  Those didn't amount

12   to anything and --

13   Q    When you say to contact to, what was the purpose of

14   contacting --

15   A    To just introduce myself and say I'm looking for a job.

16   Q    And, I'm sorry, I interrupted you.

17   A    Yeah.  And then in late -- in late December of 2010, of

18   course I was still unemployed and that's the time of year when

19   there's just no hiring on Wall Street.

20         Basically, once you get past mid-summer and into the

21   fall and winter, people just don't leave their jobs because

22   they want to get paid their bonus at the beginning of the

23   following year.  So there's -- it's just dry.  There's nothing

24   happening.

25         Martin at that point in late December offered to

Stewart - direct - Srinivasan                    2036

1  take me on as a consultant to work for him at MSMB Capital.

2  Q    What were you to be doing at MSMB Capital?

3  A    My role would be just to do what I had done for many

4  years which was to research stocks, you know, research the

5  disease areas, the models, make recommendations.  So the

6  same -- functionally the same type of research part of work

7  that I had been doing for years.

8  Q    Were you going to be paid for this work?

9  A    Yes.

10 Q    How much?

11 A    So, the agreement was that it would be the -- roughly the

12 equivalent of a base salary of $150,000 a year.

13 Q    And you mentioned MSMB Capital.  What was MSMB Capital?

14 A    As far as I knew, it was the hedge fund that he had

15 started along with his partner.

16 Q    And who was his partner?

17 A    Marek Biestek.

18 Q    Now when did you start at MSMB Capital?

19 A    So that would have been in late December 2010.

20 Q    And as far as Mr. Bee's role, what understanding did you

21 have of that?

22 A    My understanding was that his initials were on the back

23 half of MSMB, but other than that it was Martin who was really

24 kind of the captain of the ship.

25 Q    Was Mr. Biestek a partner in the fund, if you know?

Stewart - direct - Srinivasan                    2037

1   A     I don't know.

2   Q     After you joined, were you paid regularly, irregularly?

3   A     Irregularly.  So it would come -- I would get -- I would

4   work regularly, but the paychecks would come, you know, kind

5   of when he wanted or when he remembered and at varying

6   amounts.

7   Q     Did you work in an office?

8   A     Yes.  He had a room in a building that was in the Grand

9   Central area.  So when I first joined it was a -- it was a

10  really -- it was a tiny room, kind of more like a walk-in

11  closet type of room, but shortly after I joined because it was

12  very crowded in there, he switched to -- he switched us to

13  another larger room that was actually -- that actually had

14  windows.  It was larger, in the same building.

15  Q     Okay.  And focusing on the second offices, could you just

16  describe the offices, the layout of them?

17  A     Sure.  So, it's -- basically obviously it's a square

18  room.  From the door there would be two desks to the right

19  facing each other and then two desks to the left facing each

20  and when you'd walk into the office towards the right, I was

21  close to the door facing Martin and Martin was on the window

22  side facing my direction, but there were computer screens so

23  it's not --

24        I didn't look directly into his face.  I was facing

25  him, but we had the computer monitors between us.

SN        OCR        RPR

Stewart - direct - Srinivasan                2038

1    Q    Did you say there were two other desks in the room?

2    A    Yes.  I'm sorry.  So, two other desks -- there were two

3    other desks there and Marek sat parallel to Martin so with his

4    back to the window and to the left would -- would be Kevin

5    Mulleady eventually.

6    Q    And was Marek Biestek a regular employee there?

7    A    Yes.

8    Q    Did he come there regularly?

9    A    Yes.

10   Q    Was he an active employee there?

11   A    As far as I know, yes.

12   Q    And now focusing on the early days, were there any

13   other -- the early days meaning shortly after you joined in

14   2010, were there any other employees of MSMB Capital?

15   A    Yeah.  So when I first joined -- so there's obviously me

16   and Martin and Marek and a young man by the name of Andre

17   Logan.

18          He was only there for a -- very briefly.  We only

19   overlapped very briefly before he left and there was another

20   gentleman who was there kind of part-time and had more of a

21   gofer role.  His name was Stalin Rodriguez.

22   Q    And did you work -- you worked in the same room as the

23   defendant?

24   A    Yes.

25   Q    And for how long during your employment with MSMB Capital

Stewart - direct - Srinivasan                    2039

1    did that arrangement hold true?

2    A     So -- so I was always in the same room as Martin and

3    there was a time later on where he did rent a second room

4    where Stalin and, I think, Mark went, but I stayed the whole

5    time in the same room as Martin.

6    Q     Based on your experience, how would you describe the

7    workplace atmosphere?

8    A     It was tense.  It was a very, very intense work

9    experience.  It's probably -- I've worked for some very

10   intense people, but this was by far the most intense work

11   experience.  It was -- it wasn't always, but it could be very

12   nerve wracking.

13   Q     Could you elaborate on that?  Why is that?

14   A     I guess because there was -- you know, Martin was a

15   little bit mercurial.  So if he was in a bad mood or if he was

16   impatient about something, he could be quite cutting or nasty

17   but there was always --

18           You know, when you're sitting in a room and

19   everybody is working, there's not breathing room really.  It's

20   all intensity all the time.

21   Q     So did you observe the defendant in the office

22   interacting with other employees?

23   A     Yes.

24   Q     Did you also observe him interacting with investors or

25   people outside the firm?

Stewart - direct - Srinivasan                    2040

1   A     Yes.

2   Q     When you were in the office, about how far away were your

3   desks?  I don't know if you said that.

4   A     The desks are actually touching seated away from each

5   other.  I don't know, maybe five feet, six feet.

6   Q     And when you were in the office together were you able to

7   overhear his conversations?

8   A     Yes.  It's just -- it's not a large room.

9   Q     Including with people outside the firm --

10  A     Correct.

11  Q     -- like MSMB Capital investors?

12  A     I could hear him on the phone.  Whether I knew who the

13  other person was he was talking to on the other line,

14  sometimes yes, sometimes no because I can't hear the other

15  person on the phone.  I can only hear his half of the

16  conversation.

17  Q     When you say sometimes yes sometimes no, would that

18  include banks, would it include investors?

19  A     Sure.

20  Q     Okay.  When you started at MSMB Capital what, if

21  anything, did you learn about the defendant's educational

22  background?

23  A     Well, he had told investors that he went to Columbia.

24  Q     And did you hear him saying that?

25  A     Yes.

Stewart - direct - Srinivasan                    2041

1  Q    What, if anything, did he say about his employment

2  background?

3  A    Well, I knew he had worked at Intrepid because that's

4  where he worked when we had that first conversation years ago.

5  Other than that, I knew that he had worked, I think, at UPS

6  and I knew -- I guess his claim to fame at that time was the

7  fact that he had worked -- as a very young man he had worked

8  for Jim Kramer.

9  Q    Now focusing on the conversations with people outside the

10 firm, did the name Elea Capital come up during your time at

11 MSMB Capital?

12 A    I know he had his own fund called Elea Capital at one

13 point.

14 Q    Focusing on the conversations with people outside the

15 firm, do you recall the name Elea Capital ever coming up in

16 any of those conversations?

17 A    No.

18 Q    And I take it you have an understanding of Elea Capital

19 or some understanding?

20 A    I just know it was a fund that he had had before that had

21 not gone well.  So it was nonexisting anymore.

22 Q    And how did you know that?

23 A    I think it -- I think it was common knowledge because

24 people on the buy side and sell side kind of know what funds

25 are in existence and which ones are still existing and which

Stewart - direct - Srinivasan                    2042

1    ones go under.

2    Q    Now, to what extent if any did you hear the defendant

3    talk about his track record while running MSMB Capital?

4              MS. ZELLAN:  Objection.

5              THE COURT:  You mean while she was in the office?

6              MR. SRINIVASAN:  Yes, Your Honor, or at all.

7              MS. ZELLAN:  Your Honor, I'm going to ask for a

8    sidebar.

9              THE COURT:  All right.

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                         Sidebar                    2043
```

1        MS. ZELLEN:  So we don't know who she's talking to.

2   We don't know when she's talking to them or if they're even

3   investors, bankers, friends, old college friends.  I have no

4   idea.  I don't know when they're talking.

5        MR. SRINIVASAN:  Judge, I can lay a slightly

6   different foundation for the meetings.

7        THE COURT:  Okay.

8        MR. SRINIVASAN:  That's fine.

9        MS. ZELLEN:  I'm not sure why any of this is

10  relevant.

11       MR. SRINIVASAN:  It's the defendant's statements.  I

12  think this witness is going to testify that she was at

13  meetings with banks, investors, various people outside the

14  firm and she heard about representations relating to asset

15  management and about his educational background; a lot of the

16  representations and omissions we've been talking about

17  throughout this case.

18       And now we have a witness that was there throughout

19  parts of the story.  There's statements of the defendant that

20  she is relaying.

21       MS. ZELLEN:  With the telephone calls though she

22  doesn't know who he was talking to.  How many people were on

23  the phone --

24       MR. SRINIVASAN:  I can lay a different foundation

25  because I think these conversations also occur in meetings so

```
                         Sidebar                        2044

  1    I can do that.

  2              THE COURT:  All right.  Thank you.

  3              MR. SRINIVASAN:  Thank you.

  4              (Sidebar ends.)

  5

  6

  7

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Stewart - direct - Srinivasan                2045

1          (Continuing.)

2    BY MR. SRINIVASAN:

3    Q    Ms. Stewart, did you ever go to meetings outside the

4    office with the defendant?

5    A    Yes.  We went to meetings up -- there are various kinds

6    including with salespeople from banks or later with potential

7    investors.

8    Q    Okay.  And about how often would these meetings outside

9    the firm occur?

10   A    Well, the ones that I went to is probably only once every

11   two or three weeks because my babies were still two then so

12   late in the evening not often good for me.

13   Q    Now during these meetings when you were present did you

14   ever hear the defendant talk about Elea Capital?

15   A    No.

16   Q    Did the defendant talk about MSMB Capital fund?

17   A    Yes.  He talked about the fund.  He talked about the size

18   of the fund, the performance of the fund in vague terms, but

19   he did talk about them.

20   Q    What did he say about the size of the fund?

21   A    He indicated that it was around 200, 250 million and that

22   performance was in the 20 -- usually in the somewhere to 20 to

23   25 percent range.

24   Q    And was that consistent across meetings or is that

25   inconsistent across --

Stewart - direct - Srinivasan                    2046

1    A    It was fairly consistent.  It was never a pinpoint

2    number, but it was consistent in terms of being within this

3    range.

4    Q    I want to break that down a little bit because we might

5    be talking about the size of the fund and performance, so --

6    A    Both.

7    Q    So what did you hear the defendant say about the size of

8    the fund?

9              MS. ZELLEN:  Objection, Your Honor, with respect to

10   the foundation.

11             THE COURT:  All right.  These were at the meetings?

12             MR. SRINIVASAN:  At the meetings.  We're in the

13   context of the meetings.  I haven't stepped outside.

14             MS. ZELLEN:  Your Honor, I can go to sidebar or I

15   can add to the objection.

16             THE COURT:  Do you have a nonspeaking objection to

17   make?

18             MS. ZELLEN:  It's hearsay and we don't know who

19   she's talking to and when the meetings took place or who's in

20   the room.  We don't know --

21             THE COURT:  All right.  Overruled on the hearsay

22   point since he's asking for the defendant's statement.

23             If you could, provide the context about the

24   statements and when they are being made into the room.

25             MR. SRINIVASAN:  Yes, Your Honor.

Stewart - direct - Srinivasan                    2047

1   BY MR. SRINIVASAN:

2   Q    In what time frame did meetings with people outside the

3   fund occur?

4   A    I'm not sure I understand the question.  Sorry.

5   Q    Throughout your time working at MSMB Capital, did you

6   participate in meetings with people outside the fund?

7   A    Yes.

8   Q    And did that include investment banks?

9   A    Yes.

10  Q    Did that include potential investors?

11  A    Yes, but -- you know, I want to -- okay, potential

12  investors, yes, but I -- you know, I don't know if they were

13  actual or -- or --

14  Q    Did -- did anyone ever -- or I should -- withdrawn.

15        Did the defendant tell you that they were potential

16  investors either before or during a meeting?

17  A    Are you talking about MSMB or Retrophin?

18  Q    MSMB Capital.

19  A    MSMB Capital.  Mostly what I remember from MSMB would

20  have been -- in terms of meetings, would have been with banks.

21  Q    Okay.

22        MS. ZELLEN:  I'm going to object again, Your Honor,

23  in terms of relevance.

24        THE COURT:  If we need to go to sidebar to get an

25  explanation, why don't we do that.  Excuse us.

1          (Continued on next page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                          2049
```

1              (The following occurred at sidebar.)

2              THE COURT:  I think it would be helpful to the jury

3     and certainly to me if we established when she was employed --

4              MR. SRINIVASAN:  Sure.

5              THE COURT:  -- at MSMB, but I do not understand the

6     objection that you are making.

7              MS. ZELLEN:  I'm sorry, Your Honor.  The objection

8     is now because he's asking a question about banks, meetings

9     with banks.  In the indictment there's no allegation involving

10    misrepresentations to the banks.  It's misrepresentations to

11    investors and potential investors.

12             MR. SRINIVASAN:  Your Honor, she's working at the

13    fund in the same time frame that Darren Blanton and a number

14    of other investors have invested.

15             I think what her testimony does is corroborates

16    things we say are in investor statements and representations

17    about the AUM to Darren Blanton, for example, as well as

18    testimony we heard from Steven Stich where Steven Stich heard

19    from the defendants that the fund was, like, 125 million.

20             Our purpose is not to say these are

21    misrepresentations to banks and that's part of the charged

22    conduct.  That's not what we're saying.  It's corroborative

23    from a witness who has firsthand knowledge about what the jury

24    is hearing from other witnesses.

25             MR. BRAFMAN:  If Martin Shkreli went out on the

Sidebar                                    2050

1  street and said I have an investment fund that's worth $200

2  million, that would not come in.  Maybe she exaggerates.  We

3  don't know what the banks are or what their connection to

4  MSMB, if at all, is and they're just conversations of Martin

5  Shkreli's in the presence of this woman.  That's corroborative

6  of nothing.

7          MR. SRINIVASAN:  We don't have to establish

8  materiality through this witness.  It lays the foundation for

9  what the defendant was saying externally and proving up

10  materiality.

11          I think we can do through other witnesses, whether

12  it's investors or otherwise, so I don't think this witness

13  does everything for us, but it lays a foundation for what was

14  happening at the time.

15          MS. SMITH:  And she was employed.

16          MR. SRINIVASAN:  She was employed at the company.

17  She was there.  She was in the same room as him during these

18  conversations or meetings.

19          THE COURT:  I think your concern is that we may

20  misrepresent to the jury that he made misrepresentations to

21  the banks, which wasn't the case.

22          Was she present for conversations with the investors

23  like Blanton or the other folks, Mr. Austin or others, or

24  Dr. Rosenwald?

25          MS. SMITH:  We could do a limiting instruction, Your

SN        OCR        RPR

```
                         Sidebar                      2051
```

1    Honor.  We did that for Steven Stich.

2              MR. BRAFMAN:  A limiting instruction is not a

3    Band-Aid for a heart attack.

4              MR. SRINIVASAN:  This isn't a heart attack.

5              MR. BRAFMAN:  You can't have Mr. Shkreli accused of

6    making misrepresentations to the banks that have nothing to do

7    with this case or the charges in this case and just because he

8    exaggerates to these people doesn't mean it's relevant to the

9    charges.

10             MS. ZELLEN:  If you're looking for corroboration,

11   but she's not saying who is in the meeting with her.  Is

12   Dr. Rosenwald in the meeting or in a meeting with any of the

13   people that were investing in MSMB Capital?  Otherwise it's

14   not relevant.

15             MR. SRINIVASAN:  Your Honor, the test for relevance

16   is if it makes it more probable.  It's probative that

17   something happened and I think it does make it more probable

18   that the defendant actually made misrepresentations.

19             If the objection is a 403 objection, I think it's

20   more probable that the defendant made these statements and

21   misrepresentations and omissions to other people.

22             It's not particularly high bar and not unduly

23   prejudicial or inflammatory evidence, Your Honor.

24             MR. AGNIFILO:  I don't think we disputed the

25   statements.  We didn't say he said 35 million to Mr. Blanton.

```
                    Sidebar                      2052
```

1    THE COURT:  They have the burden of proof and they

2    have to prove their case.

3    MR. AGNIFILO:  They're putting in vague, ambiguous

4    meetings with unknown people at unknown times to establish

5    something that we really didn't dispute in terms of what he

6    said to Mr. Blanton.

7         If Mr. Blanton is in the meeting, one of the actual

8    named victims were in the meeting, different ball game, but

9    she doesn't know the date or the people.  It's just utterly

10   speculative.  It's like a fog of nonevidence.

11   MR. SRINIVASAN:  It's the opposite of speculative,

12   Your Honor.  She's saying she heard the defendant say the

13   funds are performing with 20, 25 percent returns, which

14   matches what the other witnesses are saying about the size of

15   the fund.

16   THE COURT:  Can she testify that any of these

17   meetings were with potential investors?  I think she said

18   that.

19   MR. BRAFMAN:  She backed off and said she doesn't

20   remember any meetings with any potential investors in MSMB.

21   She said Retrophin.  That was at the tail end of her answer.

22   THE COURT:  I thought she said that the majority of

23   them were with banks.

24   MS. ZELLEN:  The majority were with banks.

25   MR. BRAFMAN:  She qualified it at the end.

```
                        Sidebar                    2053
```

1          THE COURT:  She was asked and did not qualify it.

2          MR. SRINIVASAN:  He wasn't saying this on the

3     street.  The meetings with banks and other investors and other

4     institutions is part of the operation of the fund.

5          THE COURT:  Try to focus the questions on meetings

6     with potential investors of MSMB during -- during the time

7     frame that she was accompanying him and what representations

8     he made.  Can you do that?

9          MS. ZELLEN:  She has to identify who's in the

10    meeting.

11         MR. BRAFMAN:  She's never had a meeting with a

12    potential MSMB investor.

13         MR. SRINIVASAN:  The allegations in the indictment

14    are not tied to he made misrepresentations to just the people

15    who are on the government's witness list.  That's not how this

16    works.

17         It's he made misrepresentations and omissions in

18    relation to the securities and we can prove it up through

19    testimony of investors and other testimony that also goes to

20    this.  I don't think it's limited to the fact of, you know,

21    Dr. Rosenwald, Blanton and other investors.

22         MS. ZELLEN:  But the Government submitted a letter

23    to the Court with respect to each count which investors were

24    the subject of the fraud alleged in the account.

25         THE COURT:  But it was not to bind them.  It was to

Sidebar                                                    2054

1   give you clarification.  That was the whole point because

2   there was a lot of complaining about not understanding with

3   clarity the types of conduct that was being specifically

4   charged and I think they tried to give you that without

5   prejudice to their proof that this was not going to be a

6   limitation.

7          Look, I think if she is able to say I went to these

8   meetings with potential investors, this is what he said about

9   whatever the subjects are that you are going to explore, that

10  is fine.  Okay?

11         MR. SRINIVASAN:  Okay.

12         MR. BRAFMAN:  "Potential" refers in MSMB or

13  Retrophin, not just the universe of people who may one day

14  want to be investors.

15         MR. SRINIVASAN:  Your Honor, I think the

16  corroboration and misrepresentation goes beyond just specific

17  meetings with investors.  It's about the overall operations of

18  the fund; meeting with banks and, for example, Mr. Stich's

19  testimony where he admitted -- the testimony where he heard

20  about the AUM of the fund, the influence that that had on

21  Merrill Lynch as far as giving them the trading account and

22  allowing them to trade.

23         So I think in this case already these

24  representations are broader than whether it goes to one

25  particular investor or not.

```
                        Sidebar                    2055
```

 1          We're not alleging he defrauded a bank or

 2    institution.  The test is that it's more likely or not that he

 3    made these representations.  I think the limiting instruction

 4    is, I think, appropriate and sort of the same purpose as it

 5    was with Stich.

 6          MR. BRAFMAN:  The difference between Stich and this

 7    woman is we were able to cross-examine Stich.  These

 8    investor/banker -- it was a two-way conversation.  It wasn't

 9    Mr. Shkreli making a speech and if you don't have the dialogue

10    and the dialogue is inadmissible, how are you going to

11    cross-examine them?

12          MR. SRINIVASAN:  Because we're not going to have an

13    e-mail for everything so that's why we called the witness to

14    get testimony about what she heard and the basis for it.  To

15    undermine her credibility, that's all argument for closing.

16          THE COURT:  Are you soliciting mostly the things

17    that she heard Mr. Shkreli say?

18          MR. SRINIVASAN:  That's correct.

19          THE COURT:  Or also responses that people heard?

20          MR. SRINIVASAN:  It's what she heard the defendant

21    say.

22          MR. BRAFMAN:  But the context in who they're talking

23    to and what their response was is sometimes extremely

24    important to neutralize the statement's prejudicial impact and

25    you're not going to be able to put that in and we don't even

```
                          Sidebar                        2056
```

1    know who these people are.

2         MR. SRINIVASAN:  Ms. Zellen can cross-examine her

3    and in closing they can argue that the jury should not give

4    this witness that much weight given the vagueness in her

5    testimony, but that's not the standard for whether we should

6    ask the question.

7         MR. BRAFMAN:  We'll just press a Rule 403 objection.

8    The probative value of Mr. Shkreli saying something outside of

9    the office to a bank that's not affiliated to this case is

10   relevant to what?

11        MR. SRINIVASAN:  In furtherance of the conspiracy

12   and the charges, the fund's operations.  These are all

13   intertwined.

14        MS. ZELLEN:  One more thing, that Mr. Stich was an

15   employee of the bank and he was coming in as a representative

16   of the bank to talk about what happened at the bank.

17        She is not coming in to talk about a meeting that

18   she sat in on or a conversation that she overheard with people

19   present to talk about the impact of those statements.

20        THE COURT:  Sh is testifying about Mr. Shkreli's

21   statements to these individuals, right, and I would say that

22   their responses are less relevant than the statements made by

23   Mr. Shkreli to these individuals regarding MSMB, its AUM,

24   its -- you know, the other subjects, the performance, et

25   cetera.  That is important and corroborative and the

```
                           Sidebar                       2057
```

1   statements by Mr. Shkreli.

2           MR. BRAFMAN:  Without waiving the objection, could

3   you at least pin down a time and a place of who he was

4   speaking to as opposed to just general conversations by

5   Mr. Shkreli?

6           MR. SRINIVASAN:  I mean, I think she testified that

7   the meetings happened fairly frequently.  I don't think she

8   can say on January 22, 2010 --

9           MR. BRAFMAN:  Can she identify who Shkreli is

10  talking to?

11          MR. SRINIVASAN:  There are banks and potential

12  investors.

13          MR. BRAFMAN:  I think you should clarify that there

14  are no potential investors in MSMB who she spoke with.

15          THE COURT:  I do not think she testified to that,

16  sir.  I think she said the majority were banks, but there were

17  also potential investors for MSMB, did she not?

18          MR. SRINIVASAN:  I think she said MSMB Capital.

19          THE COURT:  You can clarify that.

20          MR. SRINIVASAN:  I can clarify that.

21          THE COURT:  And I think you need to set up a time

22  frame, if you can.

23          MR. SRINIVASAN:  Okay.

24          THE COURT:  Thank you.

25          MR. SRINIVASAN:  And I will give the clarifying

Sidebar                                             2058

1    instruction if you like.

2              MS. ZELLEN:  Without waiving the objection.

3              THE COURT:  Okay.

4              (Sidebar ends.)

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court - jury present.)

2   EXAMINATION CONTINUES

3   BY MR. SRINIVASAN:

4   Q    Ms. Stewart, why don't we start by putting sort of a

5   timeline a little bit, a timeline on your employment there.

6   A    Sure.

7   Q    You started working you said in December of 2010 --

8   A    Yes.

9   Q    -- at MSMB Capital?

10  A    Uh-hum.

11  Q    Okay.  And at some point did you work for Retrophin also,

12  Retrophin?

13  A    Yes.

14  Q    And when did you complete your employment with MSMB

15  Capital or Retrophin, when did you finish?

16  A    In -- I worked through July of 2011.

17  Q    Okay.  So focusing on the timeframe from December or

18  January and February of 2011, focusing your attention then,

19  did you have meetings outside the office in which both you and

20  the defendant participated?

21  A    Yes.

22  Q    And who were you meeting with?

23  A    For meeting outside during the December, January

24  timeframe would have been mostly banks.

25  Q    And do you recall any of the banks?

Stewart - direct - Srinivasan                    2060

1   A     I do recall, for instance, Morgan Stanley.

2   Q     And what kind of people at, for example, Morgan Stanley

3   would you be meeting with?

4   A     Usually like the salesperson or, yeah, mainly salespeople

5   I believe it was.

6   Q     And what was the purpose of meetings with banks?

7   A     I believe the purpose is when you meet with banks, so the

8   buy siders have relationships with various banks that they get

9   invited to the bank's conferences.  They get -- they might do

10  trading for the banks.  So it's kind of a symbiotic

11  relationship, in exchange for analyst research reports and

12  access to their conferences where companies present and CEOs

13  come, et cetera, funds usually will direct things like their

14  trades through that bank.

15  Q     And in that, you know, December, January, February of

16  2010-2011 timeframe, were any of the meetings that you and the

17  defendant had with banks focused on any of the activities that

18  you were just talking about?

19  A     Yes.

20  Q     Did --

21  A     So the banks would try to feel out, you know, what kind

22  of business they could get from -- from MSMB Capital.

23  Q     And so were these meetings part of the normal operation

24  of the firm?

25  A     I would say probably, yes.  It's the only hedge fund I've

SAM       OCR       RMR       CRR       RPR

Stewart - direct - Srinivasan                2061

1    ever worked at, but it seems quite normal.

2    Q    But for that specific fund, was it part of the normal

3    course of business for the fund?

4    A    Yes.

5    Q    And during those meetings did the defendant describe MSMB

6    Capital to the people that you were meeting with?

7    A    Yes.

8    Q    And what did he say about MSMB Capital?

9    A    So he would describe the people that he had working under

10   him, the assets under management and performance track record.

11   Q    What did he say about the assets under management at MSMB

12   Capital?

13   A    So he would never pinpoint an exact number, he would just

14   indicate that it was in the 200 and above range, 200 million,

15   excuse me.

16   Q    And, again, focusing on those meetings in the December,

17   January, February timeframe, what, if anything, did he say

18   about the track record of the fund?

19            MS. ZELLAN:  Objection, Your Honor.  Just could the

20   Court please offer the limiting instruction that we offered at

21   sidebar?

22            THE COURT:  Yes, as soon as we get the answer I will

23   do that, ma'am.

24            MS. ZELLAN:  Thank you, Your Honor.

25   A    So he would -- he would recite a range of performance,

Stewart - direct - Srinivasan                2062

1    both on the gross basis and a net basis in the 20-something

2    percent range usually, 20, 25, that sort of thing.

3             THE COURT:  All right, ladies and gentlemen of the

4    jury, I am going to remind you we talked earlier at the

5    beginning of the case about the nature of the charges in the

6    Indictment.  Mr. Shkreli is not being charged with anything

7    related to bank fraud in this case, so please keep that in

8    mind as you listen to the testimony.

9             MR. SRINIVASAN:  May I proceed, Your Honor?

10            THE COURT:  Yes.

11   BY MR. SRINIVASAN:

12   Q    Ms. Stewart, from your time working at MSMB Capital, were

13   you familiar with the name Josiah or Joe Austin at all?

14   A    I'm familiar with the name Joe Austin.

15   Q    What was your understanding of who that was?

16   A    Martin said that he was like a -- like a -- like a father

17   figure to him, but I didn't actually know anything beyond

18   that.

19   Q    And from your time at MSMB Capital, were you familiar

20   with the name Fred Hassan or Hassan at all?

21   A    He's famous in the industry as the former CEO of

22   Schering-Plough.

23   Q    And did the defendant ever talk with you about Fred

24   Hassan?

25   A    Yes.  So I don't know how, but Martin knew Brent Saunders

Stewart - direct - Srinivasan                    2063

1    who was a CEO of Bausch & Lomb.  And I know in the context of

2    this, I bring this up in this context, which is that Fred,

3    Fred Hassan had basically, you know, picked out Brent

4    Saunders.  I believe Brent Saunders was at one of the big six

5    accounting firms and under -- he took him sort of as his

6    protégé, and so Martin knew Brent and I don't know if he knew

7    Fred, but it was kind of a, you know, six degrees of

8    separation, except in this case it's two degrees of

9    separation.

10   Q    Did you ever observe Fred Hassan in the MSMB Capital

11   offices?

12   A    No.  I saw his daughter, his daughter came to visit once.

13   Q    Did you take part in any meetings with Fred Hassan?

14   A    No.

15   Q    From your time at MSMB Capital, were you aware of any

16   audited financial records for the fund?

17   A    No.

18   Q    Now, I want to focus your attention on February 1st,

19   2011.  Did anything unusual happen on that day?

20   A    The -- the -- the fund had imploded.  There was a bad

21   trade on a stock Orexigen.  We just called it OREX or its

22   ticker, and I didn't find out immediately, but as I mentioned

23   before, the office was normally very tense, very high energy,

24   very -- very -- very intense, you know, sense of urgency, but

25   when the fund imploded it just -- sort of all that energy just

Stewart - direct - Srinivasan                    2064

1    sort of deflated.  Everything was very quiet and it became

2    that, you know, the lights were not turned on.  People had

3    stopped coming in to work.  I came in.  It was just Martin and

4    myself, but, you know, he was just slouched in his chair with

5    his hoodie up and depressed in a way I had not seen him

6    before.

7    Q    Did the defendant ever talk to you about this OREX trade?

8    A    He did.

9    Q    What did he say, if anything?

10   A    He said that he owed Bank of America, Merrill Lynch

11   $10 million.

12   Q    Did he say anything else?

13   A    No, it was just he -- he was -- he said that he wanted to

14   make sure that the bank didn't get -- get hold of Retrophin,

15   but that was a little bit later in the timeline.

16   Q    And did you continue to come to work at MSMB Capital?

17   A    I did.

18   Q    And were you in the same room with the defendant at that

19   point, too --

20   A    Yes.

21   Q    -- in terms of working with him?

22   A    Yes.

23   Q    Did you observe the defendant making any phone calls

24   right after the OREX trade on February 1st, 2011?

25   A    No.

Stewart - direct - Srinivasan                    2065

1    Q    Do you know one way or the other whether the defendant

2    called any MSMB Capital investors after the OREX trade?

3    A    I showed up to work every day and worked the normal hours

4    and I never was -- I was never -- I never heard any phone --

5    such phone call.

6    Q    Did you have any understanding of MSMB Capital's

7    financial position after February 1st, 2011?

8    A    So my impression was that it had, you know, gone

9    completely bust, obviously, since he owed $10 million to Bank

10   of America, Merrill Lynch.  And there was one day when for

11   whatever reason most of the other people were not in the

12   office, they had gone out to some meeting or such, and I was

13   called into the room, to the second room, by Stalin because

14   Marek was not in that office at that time and he called me

15   over and we looked at Marek's ticker screen where it looked

16   like from what we understood of the monitor that the assets

17   were about -- just -- just barely north of 2 million.

18   Q    Okay.

19            THE COURT:  The assets of what, MSMB?

20            THE WITNESS:  Yeah.  So this would be a ticker

21   screen with all the stocks, like you would see on your Schwab

22   or eTrade account.

23            THE COURT:  Thank you.

24   BY MR. SRINIVASAN:

25   Q    Did you in the period after, in the months after the OREX

Stewart - direct - Srinivasan                    2066

1    trade, did you have access to MSMB Capital's bank accounts?

2    A    No.

3    Q    Brokerage accounts?

4    A    No.

5    Q    Are you familiar with a company called Retrophin?

6    A    Yes.

7    Q    When did you first hear about Retrophin?

8    A    So Retrophin was, essentially, after the implosion of

9    MSMB Capital, that was the catalyst that was the genesis, the

10   birth -- I mean that gave birth to Retrophin, the company, the

11   biotech company.

12           MR. SRINIVASAN:  Your Honor, we are about to start a

13   new chapter.

14           THE COURT:  All right, I think the jurors have paid

15   close attention.  I am very grateful, but I am going to excuse

16   them for the evening and thank you.  Please avoid any media

17   exposure about this case or Mr. Shkreli.  Leave your notebooks

18   face down.  Please do not talk about the case at all with

19   anyone.  Thank you.

20           Have a good night and I will see you tomorrow at

21   9 o'clock.

22           (Jury exits.)

23           THE COURT:  All right, you can step down, thank you.

24           THE WITNESS:  Thank you.

25           (Witness steps down.)

SAM      OCR      RMR      CRR      RPR

```
                Stewart - direct - Srinivasan              2067
```

1           THE COURT:  Is there anything that anyone needs to
2    bring to my attention right now?
3           MS. KASULIS:  Not from the Government, Your Honor.
4           THE COURT:  All right, so I will see you tomorrow at
5    9 o'clock.  Thank you, everybody.  Have a good night.
6           MS. KASULIS:  Thank you.
7           MR. BRAFMAN:  Have a good night.
8
9           (Proceedings adjourned to Friday, July 7, 2017 at
10   9:00 a.m.)
11
12
13
14
15                          ooo0ooo
16
17
18
19
20
21
22
23
24
25

```
           SAM      OCR      RMR      CRR      RPR
```

2068

1                           I N D E X

2

3     WITNESS                                        PAGE

4     **DARREN BLANTON**

5         CROSS-EXAMINATION BY MR. BRAFMAN           1762

6         REDIRECT EXAMINATION BY MS. SMITH          1898

7         RECROSS-EXAMINATION BY MR. BRAFMAN         1923

8

9

10    **LINDSAY ROSENWALD**

11        DIRECT EXAMINATION BY MR. SRINIVASAN       1927

12        CROSS-EXAMINATION BY MR. AGNIFILO          1987

13        REDIRECT EXAMINATION BY MR. SRINIVASAN     2014

14        RECROSS EXAMINATION  BY MR. AGNIFILO       2023

15        REDIRECT EXAMINATION BY MR. SRINIVASAN     2024

16

17

18    **CAROLINE STEWART**

19        DIRECT EXAMINATION BY MR. SRINIVASAN       2027

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

2069

```
 1                        E X H I B I T S

 2       EXHIBIT                                        PAGE

 3       Defendant's Exhibit 4352                       1810

 4       Defendant's Exhibit 4309                       1871

 5       Government's Exhibit 101-1                      1933

 6       Government's Exhibit 1-A                        1939

 7       Government's Exhibit 101-2                      1947

 8       Government's Exhibit 1-B                        1951

 9       Government's Exhibit 21                         1954

10       Government's Exhibits 76-1 through 76-26        1956

11       Government's Exhibit 101-3                      1958

12       Government's Exhibit 101-4                      1960

13       Government's Exhibit 101-5                      1962

14       Government's Exhibit 101-8                      1965

15       Government's Exhibit 101-11                     1976

16       Government's Exhibit 51                         1983

17       Government's Exhibit 101-27                     1985

18       Defendant's Exhibit DX-4170                     2013

19       Government's Exhibit 803                        2026

20

21

22

23

24

25
```

SAM      OCR      RMR      CRR      RPR