2070

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 15-CR-00637(KAM)
                               :
                               :
     -against-                 : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
                               : Friday, July 7, 2017
MARTIN SHKRELI,                : 9:00 a.m.
                               :
        Defendant.             :
                               :
- - - - - - - - - - - - - - X

          TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
          BEFORE THE HONORABLE KIYO A. MATSUMOTO
          UNITED STATES DISTRICT JUDGE, and a jury

               A P P E A R A N C E S:

For the Government:   BRIDGET M. ROHDE, ESQ.
                      Acting United States Attorney
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                 BY:  JACQUELYN M. KASULIS, ESQ.
                      ALIXANDRA ELEIS SMITH, ESQ.
                      G. KARTHIK SRINIVASAN, ESQ.
                      Assistant United States Attorneys

For the Defendant:    BRAFMAN & ASSOCIATES, P.C.
                      767 Third Avenue
                      New York, New York 10017
                 BY:  BENJAMIN BRAFMAN, ESQ.
                      MARC AGNIFILO, ESQ.
                      ANDREA ZELLAN, ESQ.
                      JACOB KAPLAN, ESQ.

Court Reporter:  Stacy A. Mace, RMR, CRR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

SAM      OCR      RMR      CRR      RPR

```
                        Proceedings                    2071
```

1        (In open court - jury not present.)

2        THE COURT:  Please note that all counsel and

3   Mr. Shkreli are present.

4        MS. KASULIS:  Thank you, Judge.

5        MS. SMITH:  The exhibits, so the reason we are using

6   the prosecution laptop instead of the ELMO is just the volume

7   of paper that it would take to shuffle, I am concerned that in

8   itself would slow things down.

9        THE COURT:  No, that's fine.

10       MS. SMITH:  So we are going to try to side by side

11  where they can see the whole page on the left and the excerpt

12  on the right.

13       THE COURT:  Okay.

14       MS. SMITH:  And maybe you guys can just ask the

15  jurors if that is helping, and then we can adjust again.

16       THE COURT:  They made a complaint about not seeing

17  the exhibits.

18       THE LAW CLERK:  Yes, I think it was just the concern

19  that when the whole document is up, I think it's the way it

20  works, they can't really read anything.

21       THE COURT:  It is just small.

22       MS. SMITH:  Yes.  So that is, unfortunately, a

23  function.  So what we are going to do is we are going to put

24  the whole document on the left side and then the zoom-in part

25  on the right, and that way if someone wants to read through

```
                        Proceedings                    2072
```

 1    the documents they can, and then also the zoomed-in part.

 2            So if you can just -- we are going to do that today

 3    and if you can just ask them if that's better.  You know, we

 4    will do whatever they think is easiest.

 5            THE COURT:  I mean my practice is to allow the

 6    jurors to have the exhibits in the jury room, so they will get

 7    them eventually.

 8            MS. SMITH:  I know.

 9            THE COURT:  I think they are just having trouble

10    following when they cannot read it.

11            MS. SMITH:  Yes.

12            THE COURT:  They feel frustrated, they just

13    expressed the frustration.

14            MS. SMITH:  And we want to, obviously, not have

15    that.  We'll try it this way today, and if you can get

16    feedback and if it is not better, we will try adjusting.

17            THE COURT:  All right.

18            MR. SRINIVASAN:  Your Honor, there is one exhibit

19    that we are currently discussing with the defense to see if

20    there is an objection.  Hopefully, we can find out fairly soon

21    and address that with the Court.

22            THE COURT:  Okay, thank you.

23            (Pause in the proceedings.)

24            (Jury enters.)

25            THE COURT:  We have all jurors present.

```
                    Proceedings                      2073
```

1        Good morning, ladies and gentlemen.  Please have a

2   seat.

3           THE JURY:  Good morning.

4           THE COURT:  Have a seat, everybody.

5           Is the government ready to proceed with direct?

6           MR. SRINIVASAN:  Yes, Your Honor.

7           THE COURT:  Good morning.  Come on up.  Ms. Stewart,

8   you are still under oath and we will continue with your

9   examination.  Thank you.

10          (Witness resumes the stand.)

11          MR. SRINIVASAN:  May I proceed, Your Honor?

12          THE COURT:  Yes, you may.

13          MR. SRINIVASAN:  Thank you.

14

15          (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Stewart - direct - Srinivasan                    2074

1   **CAROLINE STEWART**,

2        called as a witness by the Government, having been

3        previously duly sworn, was examined and testified further

4        as follows:

5   DIRECT EXAMINATION

6   BY MR. SRINIVASAN:

7   Q    Good morning Ms. Stewart.

8   A    Good morning.

9   Q    We ended yesterday talking about the Orexigen trade and

10  the days that followed.  Let's break that down a little bit.

11       I'll call your attention again to February 1st,

12  2011.  Yesterday, I believe that -- I believe that you

13  testified that was the date of the OREX trade, is that right?

14  A    Yes.

15  Q    Were you working in the MSMB Capital office that day?

16  A    Yes.

17  Q    Was the defendant working in the office too that day?

18  A    Yes.

19  Q    Now, thinking about the beginning part of the day, what

20  was the atmosphere in the office like?

21  A    The beginning part of the day it started out just like

22  any other day.  It was just, you know, heads down, you know,

23  doing your own work, working away, all of us.

24  Q    At some point did that change?

25  A    Yeah.  Usually during the day even though, you know,

Stewart - direct - Srinivasan                    2075

1    we're all very intensely working, you know, there would be

2    talk, a little bit like you would in any office setting.  And

3    usually Martin would say something, you know, make a comment

4    about a stock or some such news, but as the day kind of wore

5    on I noticed that it was just kind of becoming kind of deathly

6    quiet.

7    Q    Was that unusual?

8    A    Yes, there was a stillness that was -- that was eerie.

9    Q    What do you remember about the defendant's behavior in

10   the office on February 1st, 2011?

11   A    Things were just very quiet in a very somber, almost

12   funereal way and I definitely sensed that there was something

13   wrong, but there was no talk.  And so I didn't know at that

14   moment what was going on.

15   Q    When did you learn about the OREX trade?

16   A    It was either later that day or the day after when I was

17   told that the OREX trade had happened and that, basically --

18   Q    I'm sorry, and who told you?

19   A    Martin, excuse me.  Martin told me that he had shorted

20   more shares than were outstanding and that, you know, he owed

21   Bank of America - Merrill Lynch $10 million.

22   Q    And did anything change about your work at MSMB Capital?

23   A    Yes.  So shortly before the OREX blow-up I had, you know,

24   when I first started and continued to do is I did research on

25   stocks, research on disease areas, built models, et cetera,

Stewart - direct - Srinivasan                    2076

1    but then shortly before then I had started a mock account.

2    It's a simulation account where it would almost be like my

3    portfolio where I would buy and sell stocks as, again, it's

4    mock, it's a simulation, where I would actually get more of

5    the feel of the buy side as opposed to, you know, just the

6    research that I had been doing and which I had done on the

7    sell side as well.  And that immediately stopped when the

8    OREX -- when OREX caused the fund to implode.

9         And so my work at MSMB in terms of research just

10   stopped dead in its tracks.

11   Q    And focusing your attention on the week that immediately

12   followed February 1st, what was the atmosphere like in the

13   MSMB Capital offices?

14   A    Oh, it was like somebody had died.  I mean it -- in

15   essence, that somebody was the fund, but it had died.  It was

16   just very quiet, very morose, very somber and, you know, other

17   people had not -- were not bothering to show up into the

18   office anymore except for Martin and myself.

19   Q    What did you observe about the defendant's behavior in

20   that week period?

21   A    You know, as I described before, he was normally very

22   energetic, very hyper, and this was different.  He was very

23   dejected, very down and nice, if I could say that.

24   Q    Ms. Stewart, I am showing you Government's Exhibit 118-3

25   marked for identification.

Stewart - direct - Srinivasan                     2077

1              MR. SRINIVASAN:  If I could have the ELMO, please.

2              THE COURTROOM DEPUTY:  Do you see it?

3              THE WITNESS:  It's crooked on my screen, so it's cut

4    off on the left side.

5              THE COURTROOM DEPUTY:  Adjust.

6              MR. SRINIVASAN:  Sorry, I just didn't see it on my

7    screen.

8              THE WITNESS:  It's okay, it's perfect now.

9    BY MR. SRINIVASAN:

10   Q    Ms. Stewart, do you recognize this document?

11   A    Yes, it's an e-mail that I sent to Martin.

12   Q    When?

13   A    It's dated February 2nd, 2011 at 5:22 p.m.

14             MR. SRINIVASAN:  Your Honor, we offer Government's

15   Exhibit 118-3 into evidence.

16             MS. ZELLAN:  No objection, Your Honor.

17             THE COURT:  We will receive government's 118-3.

18             (Government's Exhibit 118-3 was received in

19   evidence.)

20             (Exhibit published.)

21   BY MR. SRINIVASAN:

22   Q    Ms. Stewart, what did you write to the defendant?

23   A    Would you like me to read it?  It's basically an e-mail

24   trying to cheer him up.

25   Q    Yes, please.  If you could read it into the record,

1   please.

2   A    I know things must seem bleak to you, but try not to be

3   too disheartened.  I think the mistake was one anybody could

4   have made.  You're the smartest, most ambitious/driven, and

5   also the kindest person I've ever come across, so I believe in

6   you.  You're a long-term hold.  Smiley face.  And you'll

7   bounce back to even greater success.  I truly believe that.

8   In the meantime, I'll come in and just keep busy until such

9   time that I can't.

10  Q    Why did you write this e-mail?

11  A    I guess because I felt a little bad for him.  You know,

12  he just -- he was normally full of swagger and, you know, kind

13  of larger than life and he seemed beaten and I felt grateful

14  to him for giving me a job in the first place when I didn't

15  have a job and I wanted to cheer him up.

16  Q    And you write:  In the meantime, I'll come in and just

17  keep busy until such time that I can't.

18        Why did you write that?

19  A    Well, like I said, so, one, I felt, you know, I owed him

20  one.  And so even though he had fallen, I wasn't going to just

21  up and leave.  But also, you know, obviously I have a family

22  to support and I need to feed the mouths, but I also need to

23  find a job, but in the meantime, you know, it's easier to find

24  a job when you have a job or at least it appears like you have

25  a job.  So I stayed on.

Stewart - direct - Srinivasan                2079

1    Q    And after the OREX trade and the week long period we were

2    just talking about, what was the defendant working on

3    afterward?

4    A    He was brainstorming on what the next move would be, on

5    what was next.

6    Q    And so what was the project he worked on after that?

7    A    So for a couple days, again, it was just -- it was very

8    somber.  After a couple days, though, he bounced back and he

9    bounced back with the idea for a biotech company Retrophin

10   that would focus on rare diseases.

11   Q    And from that point on, did you work for Retrophin?

12   A    Yes.

13   Q    Ms. Stewart, who is Kevin Mulleady?

14   A    Kevin Mulleady joined the firm some time after I had

15   joined the firm, and my understanding is just that he was kind

16   of like a sales guy type -- type person.

17               THE COURT:  When you say joined the firm, do you

18   mean MSMB Capital?

19               THE WITNESS:  Yeah, MSMB Capital.

20   BY MR. SRINIVASAN:

21   Q    What was his role?

22   A    My understanding was that he was CEO of the firm.

23   Q    Did you work with Kevin Mulleady?

24   A    We worked in the same office, but our functions were

25   different, so I didn't work with him.

Stewart - direct - Srinivasan                    2080

1   Q    Who did Kevin Mulleady report to?

2   A    Martin.

3   Q    And, again, what did he do at the fund?

4   A    So my understanding of his function was to -- to serve as

5   the networker to bring in more money to the funds and to -- to

6   the firm.

7   Q    More money from whom?

8   A    Investors, I'm sorry.

9   Q    Ms. Stewart, focusing you on about May through July of

10  2011, was the defendant paying you regularly?

11  A    No, he was still paying at irregular time points, as well

12  as in irregular amounts.

13  Q    What were you supposed to earn?

14  A    We had agreed on $150,000 a year.

15  Q    And were you getting your full paycheck every pay period?

16  A    No.  So when I did get a paycheck, sometime it would be

17  for that amount, but sometimes it would be for a

18  hundred-thousand dollars a year, rather than 150.

19  Q    Did you raise this issue with anyone at MSMB?

20  A    I did raise it with Kevin Mulleady.

21  Q    I am showing you what's been marked for identification as

22  Government's Exhibit 349-A.  Do you have that on your screen?

23  A    I do.

24  Q    Do you recognize this?

25  A    I do.

1    Q    What is it?

2    A    It's an IM chat that I had with Kevin.

3    Q    And approximately when did it take place?

4    A    It would have been shortly before I was terminated.

5         MR. SRINIVASAN:  Your Honor, we move Government's

6    Exhibit 349-A into evidence.

7         MS. ZELLAN:  Your Honor, subject to connection, we

8    have no objection at this time.

9         THE COURT:  All right, I will admit subject to

10   connection.

11        MR. SRINIVASAN:  Yes, Your Honor.

12        (Government's Exhibit 349-A was received in

13   evidence.)

14        MR. SRINIVASAN:  And if we could publish to the

15   jury, please.

16        (Exhibit published.)

17        MR. SRINIVASAN:  Thank you.

18   BY MR. SRINIVASAN:

19   Q    Ms. Stewart, I'd like to read this conversation in.  I

20   will read the parts that say Kevin Mulleady, if you could read

21   the parts that have your name.

22   A    Okay.

23   Q    Would you like to go in that other office if the

24   opportunity arose?

25   A    Martin wants to stick me in there and I don't mind.  If

Stewart - direct - Srinivasan                    2082

1  he fucks me over with respect to money one more time, I'm

2  going to expose him though.

3  Q    What happened with money?

4  A    He was gonna pay me back -- I'm sorry, he was gonna pay

5  me backpay three months in one lump sum, then he said he would

6  do it piecemeal.  Gave me one check, said on Sunday that he

7  would pay me on Monday, this week, and offered relocation

8  expenses for my moving.  By Monday he completely forgot about

9  everything.  I'm working at two-thirds the salary I had

10 before.

11 Q    Going to the second page of this document which is Bates

12 Number RO21051.

13 A    He fucked Andre this way too.  He blew up maybe a year or

14 so ago.  Didn't pay people, made more promises, et cetera.

15 Now he's paying Vaino 150,000.  San Diego is 60 cents on the

16 dollar for cost of living versus New York and he wants to

17 bring in a med tech analyst, probably for the same amount.

18 Q    Two-thirds the salary you had before here?

19 A    Yep.  He started me at 150.  Then after he started paying

20 again, he said he thought 150 for me again was doable.  Then,

21 of course, that never materialized.  He's full of shit.  And

22 I'm sorry, but if he doesn't get IP for Retrophin, that's

23 worth zero.  I don't even have a copy of a piece of paper that

24 says I own any shares.  I should call the lawyer and ask for a

25 copy for my records.  The good news is that I'm sure after a

SAM     OCR     RMR     CRR     RPR

Stewart - direct - Srinivasan                2083

1  few weeks he'll stop paying Vaino and whoever else whatever he

2  promised as well.

3  Q    How have you discussed your concerns about comp with him?

4  A    What am I supposed to say?  He knows what he's paying and

5  not paying.  He told me on Sunday he would have another check

6  for me on Monday.  Then nothing.  What do you say to a guy who

7  shoots off at the mouth and has no intention whatsoever of

8  delivering?  I just need to find another job, but like I said,

9  he pulls another one and I'm exposing him.

10 Q    I would write an e-mail with your concerns to him.

11 Expose him to who?

12 A    It won't matter.  Investors.  He's a scam artist.  He's

13 already racking up bills and he's only got so much money

14 raised.  What happens when that runs out?  I can't deal with

15 somebody who just lies all the time.  So yeah, I'm working --

16 I'm okay with being stuck in the other room.  I'm so sick of

17 hearing him say all his canned shit on the phone.  Nobody

18 knows the FDA better than we do.

19 Q    I am going to the next page.

20          THE COURT:  What is FDA?

21          THE WITNESS:  Food and Drug Administration.

22          THE COURT:  Oh, sorry.

23 A    Nobody's smarter or better funded than we are.  What

24 utter crap.

25 Q    I still think if you have concerns about comp, you should

SAM      OCR      RMR      CRR      RPR

1    write him a professional e-mail in the evening or weekend.

2    A    Whatever, I don't mean to influence your judgment.  I'm

3    100 percent sure, though, that when pay time comes again, and

4    I'm talking when the Retrophin money falls short because we

5    have to pay for Lonza and the lawyers or when it's supposed to

6    be, quote, bonus time, pray I'm not still here then, that he

7    won't pay anywhere near what he's promised, if he pays at all.

8    Q    I hope that's not the case.

9    A    It's his MO.  He's done it several times.  What makes you

10   think it'll be any different now?

11   Q    Who else has he done it with?

12   A    Andre.  There was another guy Jason, and supposedly there

13   have been others.  I've only been here for six months.  He's

14   just mentally unstable.

15   Q    And he just stopped paying them?

16   A    Yep, he blew up, just like earlier this year.

17   Q    He blew up twice?

18   A    Yes, once was before my time, but Stalin was around.

19   Q    What did he say?

20   A    I didn't ask more than that.  I can if you want me to.  I

21   was just told that he blew up, Stalin didn't get paid for a

22   month.  I'm sure Stalin doesn't really get paid anyway.  Look,

23   he reduced my salary from 150 to 100, but he just hired Andrew

24   for 150.

25   Q    Going to the next page.

1           He told you what he is paying Andrew?

2    A    And who knows how much money he owes to the people he

3    blew up.  He said it on the phone yesterday.  He said Andrew

4    asked for 75 and he doubled that.  It's all for appearances,

5    to keep the game going.  Marek was shocked too.

6    Q    Marek was shocked about the salary?

7    A    By the way, San Diego is 60 cents on a New York City

8    dollar.  Yes.  Andy said he'd be happy with 75.  Then he gets

9    150.  It's crazy.  Like I said, the only consolation is that I

10   don't think that'll last long.  I don't have Andre's contact

11   info.  I wish I did.  Maybe Marek or Stalin does.

12   Q    Why do you want to talk to him?

13   A    No, I meant so that you could talk to Andre and get his

14   side of the story.  I'm a bit short on belief here.  I'm done

15   trusting Martin.  I can't believe a word that comes out of his

16   mouth.

17   Q    I understand where you are coming from.

18   A    I just can't do anything about it until I find another

19   job.  So I'm angry/frustrated.  I have a family to support,

20   you know.  I could have taken another job.

21   Q    I know.  You have a lot of people that rely on you.  If

22   these are concerns, you should address them with him.

23   A    He knows my situation.  Ask yourself, Kevin, how is he

24   going to pay everyone?  The fund has a negative return right

25   now, and he's probably got tiny assets under management

Stewart - direct - Srinivasan                    2086

1    anyway.   Retrophin is just going to keep sucking costs.

2    Q    Going to the next page.

3             Negative returns for what period?

4    A    He absolutely must pay Lonza and the manufacturers, as

5    well as the lawyers, since he started the new fund.

6    Q    When was that?

7    A    He closed the other one when he blew up, so that's maybe

8    two months or something now.

9    Q    This is not a conversation to be had on AIM?

10   A    Understood.

11   Q    Let's grab some coffee tomorrow?

12   A    K.

13   Q    Ms. Stewart, approximately how long after this chat were

14   you terminated?

15   A    Not too long after, shortly afterwards.

16            THE COURT:  Can we get a date on this chat, please?

17   BY MR. SRINIVASAN:

18   Q    Ms. Stewart, approximately when did this chat take place

19   in relation to when you were terminated?

20   A    So I worked through the end of July, so it probably

21   happened sometime in July, June at the earliest.  I don't

22   recall exactly.

23   Q    Thank you, Ms. Stewart.

24            MR. SRINIVASAN:  No further questions.

25                            ///

1    CROSS-EXAMINATION

2    BY MS. ZELLAN:

3    Q    Good morning, Ms. Stewart.  My name is Andrea Zellan, I'm

4    one of the attorneys representing Mr. Shkreli here today.  I

5    have a few questions for you.  If I ask you any question that

6    you don't understand, please ask me to repeat it.

7    A    Sure.

8    Q    So let's go back to your direct from yesterday.  Can you

9    hear me?

10   A    Yes.

11   Q    Let's go back to your direct from yesterday.

12           You testified that you started working at MSMB

13   Capital in December of 2010, correct?

14   A    Yes.

15   Q    Prior to that time, you were looking for work, right?

16   A    Yes.

17   Q    And it was Martin Shkreli who was helping you to look for

18   work?

19   A    He was one of the people, yes.

20   Q    And he was introducing you to people, correct?

21   A    Yes, he introduced me or he tried to introduce me to two

22   or three people, yes.

23   Q    He introduced to Ken Banta, right?

24   A    Yes, he did.

25   Q    And you had conversations with Mr. Banta?

Stewart - cross - Zellan                    2088

1    A    I met him for coffee, yes.

2    Q    And Mr. Banta was trying to also help you find

3    employment, correct?

4    A    No.  I think that he was shocked at the -- I don't think

5    he had any clue what the purpose of the meeting was.

6    Q    In October of 2010 did Mr. Banta send you an e-mail?

7    A    I don't recall, he might have.

8              MS. ZELLAN:  Your Honor, may I approach the witness?

9              THE COURT:  Yes.

10             MS. ZELLAN:  Your Honor, marked for identification I

11   have Defense Exhibit 4772.

12             THE COURT:  Thank you.

13   BY MS. ZELLAN:

14   Q    Ms. Stewart, could you just take a look at this document.

15   Don't read out loud for it.

16   A    Sure.

17   Q    Review it and see -- when you're done reviewing, just

18   look up and let me know.

19             (Pause.)

20   A    Yes.

21   Q    So does that refresh your recollection that Mr. Banta was

22   working to introduce you to people?

23   A    Yes, but when I first met him for coffee --

24   Q    That was the question, thank you.

25             Did Mr. Shkreli also introduce you to Mr. Brett

SAM      OCR      RMR      CRR      RPR

1   Saunders?

2   A    Yes.

3   Q    And did you attempt to have a meeting with Mr. Saunders?

4   A    A meeting was attempted, yes.

5   Q    Was that a meeting that ever took place?

6   A    For that purpose, no.

7   Q    Prior to Mr. Shkreli had you ever had contact with

8   Mr. Saunders?

9   A    No.

10  Q    And do you recall in November of 2010 Mr. Shkreli put you

11  in contact with Dr. Lindsay Rosenwald?

12  A    Yes.

13  Q    And do you recall calling Dr. Rosenwald?

14  A    Yes, I think I left him a message.

15  Q    And as a result of those efforts, did you find

16  employment?

17  A    No.

18  Q    And you testified on direct that there did come a time

19  when Mr. Shkreli offered you a position, right?

20  A    Yes.

21  Q    And when he offered you that position, he warned you not

22  to get used to anything, is that right?

23  A    Yes.

24  Q    And he warned you that there were no guarantees, right?

25  A    Yes.

Stewart - cross - Zellan                              2090

1   Q    And he warned you that you may not like it?

2   A    Yes.

3   Q    And that the conditions may not always be favorable,

4   correct?

5   A    Yes.

6   Q    And you accepted the position?

7   A    Yes.

8   Q    Despite those warnings?

9   A    Yes.

10  Q    And when you were looking for work, Mr. Shkreli reached

11  out to help?

12  A    Yes.

13  Q    Seven months later the employment wasn't working out,

14  correct?

15  A    That sounds about right.

16  Q    And the employment ended, correct?

17  A    Yes -- oh, I'm sorry, yes.

18  Q    Did you ever buy any gifts for Martin Shkreli?

19  A    Me?

20  Q    Yes.

21  A    Did I buy him gifts?

22  Q    For instance, did you ever buy him a book?

23  A    I just don't recall.

24  Q    In January of 2011 you were working at MSMB Capital

25  Management, is that right?

1    A    Yes.

2    Q    And do you recall Mr. Shkreli working on spinal muscular

3    atrophy at that time?

4    A    No.

5              MS. ZELLAN:  Your Honor, may I approach the witness?

6              THE COURT:  Yes.

7              MS. ZELLAN:  This is Government Exhibit marked for

8    identification 118-1.

9              (Pause.)

10   BY MS. ZELLAN:

11   Q    Have you had a chance to review that?

12   A    Yes.

13   Q    And does it refresh your recollection that Mr. Shkreli

14   was working on spinal muscular atrophy at that time?

15   A    I just -- I mean I don't remember it.

16   Q    You don't remember what exactly?

17   A    I don't remember this e-mail.

18   Q    Well, do you remember that -- withdrawn.

19             Did there come a time when you took a trip with

20   Mr. Shkreli and others to Boston?

21   A    Yes.

22   Q    And what was the purpose of that trip?

23   A    We went to see -- we went to some -- maybe it was Harvard

24   Medical Center or some such place, and we went to, I think to

25   a presentation in front of like a -- a -- one the doctors

Stewart - cross - Zellan                    2092

1  there, I think.

2  Q    And who led that presentation?

3  A    I don't remember exactly.

4  Q    Was Martin Shkreli there?

5  A    Yes.

6  Q    Were they talking to Dr. Alan Begs?

7  A    I don't remember who the doctor was.

8  Q    Were you present when they were talking about myotubular

9  myopathy?

10  A    I don't know about myotubular myopathy, I remember it was

11  Duchenne.

12  Q    Duchenne muscular dystrophy?

13  A    Yeah.

14  Q    And was an investor present?

15  A    Yes, I believe that those persons were investors that

16  were with us.

17  Q    It was Darren Blanton, correct?

18  A    Yes.

19  Q    Do you recall in March -- withdrawn.

20       In March 2011 you received a PowerPoint presentation

21  from Martin Shkreli regarding Retrophin, correct?

22  A    I would assume so.  I don't recall the exact date.  I did

23  look at a PowerPoint for him.

24       MS. ZELLAN:  Your Honor, may I approach the witness?

25       THE COURT:  Yes.

SAM    OCR    RMR    CRR    RPR

1        MS. ZELLAN:  Marked for identification, Government's

2   Exhibit 118-4.

3   BY MS. ZELLAN:

4   Q    Ms. Stewart, you don't need to look at the entire

5   document.  If you could just look at the front page, please.

6   A    The e-mail you mean?

7   Q    Yes, ma'am.

8        (Pause.)

9   A    Okay.

10  Q    Ms. Stewart, can you confirm that e-mail comes from

11  martin@msmbcapital.com?

12  A    Yes.

13  Q    And it was received by you at caroline@msmbcapital.com?

14  A    Yes.

15  Q    And the other -- one of the other people on that e-mail

16  is Marek Biastek at marek@msmbcapital.com?

17  A    Yes.

18  Q    Thank you.

19       You testified on direct that you do not know how

20  many investors there were in MSMB Capital, is that correct?

21  A    Correct.

22  Q    And you testified on direct examination that you often

23  had an opportunity to overhear conversations that Mr. Shkreli

24  was having on the telephone, is that correct?

25  A    Yes.

Stewart - cross - Zellan                    2094

1   Q    And you testified on direct that during those

2   conversations you never heard Mr. Shkreli tell anybody about

3   what happened with the OREX trade, is that correct?

4   A    Yes.

5   Q    I'm sorry, I am going to go back.

6        When you were working at MSMB Capital, what were

7   your hours on a day-to-day basis?

8   A    As I remember them, I probably started around 8 or 8:30

9   in the morning until 5.

10  Q    And this was your first job at a hedge fund, correct?

11  A    Yes.

12  Q    And did you sometimes work from home?

13  A    On an absolute term, I don't remember that ever -- I

14  don't know if I've ever worked from home for a day or two, but

15  it was never a regular thing that I worked from home.

16  Q    There were occasions when you worked from home, is that

17  right?

18  A    On a snow day, perhaps.

19  Q    When you left the office for the day, Mr. Shkreli was

20  usually still in the office, is that right?

21  A    Yes, I would say so.

22  Q    Did you ever come into the office and find him sleeping

23  on the office floor?

24  A    Yes.

25  Q    So you weren't with Mr. Shkreli twenty-four hours a day,

Stewart - cross - Zellan                    2095

1    seven days a week?

2    A    No, of course not.

3    Q    So you don't know all the conversations he may or may not

4    have had?

5    A    That's correct.

6    Q    And you don't know who he may have talked to about the

7    OREX trade?

8           You do not know whether or not he made calls when

9    you were not present, is that correct?

10   A    That's correct.

11          MR. SRINIVASAN:  Objection; two questions.

12          THE COURT:  Which question did you want her to

13   answer?  Let's break them down.

14          MS. ZELLAN:  Okay, Your Honor.

15   BY MS. ZELLAN:

16   Q    You do not know every call that Martin Shkreli made, is

17   that correct?

18   A    That's correct.

19   Q    And you were not with him twenty-four hours, seven days a

20   week, correct?

21   A    No, of course not.

22   Q    So you do not know if outside your presence he made phone

23   calls to discuss the OREX trade, is that correct?

24   A    That's correct.

25   Q    And you did not have access to his e-mail account, is

1    that correct?

2    A    That's correct.

3    Q    And so you do not know if he had e-mail exchanges

4    regarding the OREX trade with his investors, is that correct?

5    A    That would be correct.

6    Q    You testified on direct that you heard other telephone

7    calls with Mr. Shkreli, correct?

8    A    Yes.

9    Q    And that you only heard one end of those conversations,

10   is that right?

11   A    Yes.

12   Q    And so you do not know how many people were on those

13   calls with him, is that right?

14   A    Do you mean in a conference call type situation?

15   Q    So you don't know if it was a conference call, correct?

16   A    I don't know how many people would have been on the other

17   line, presumably one, but I don't know.

18   Q    And you were only hearing one side of that conversation,

19   that's correct?

20   A    Yes.

21   Q    So you do not know the topics that they were, in fact,

22   discussing during that conversation, correct?

23   A    That's not necessarily true, it depended on the topic.

24   If you can hear one side, if a person said a drug name you

25   know they're talking about that drug.

Stewart - cross - Zellan                    2097

1    Q    Did you know the questions that were being asked by the

2    people on the other end of the telephone?

3    A    No.

4              MS. ZELLAN:  One moment, please, Your Honor.

5    BY MS. ZELLAN:

6    Q    You testified a few moments ago that on occasion you

7    returned to the office in the morning and Mr. Shkreli was

8    sleeping on the office floor, correct?

9    A    I remember one occasion in particular when I came to the

10   office and he was asleep in the office, yes.

11   Q    Did you discuss that with Mr. Shkreli?

12   A    It's not really a topic of discussion.  I closed the door

13   and waited for him to, you know, ready himself.

14   Q    You never asked him about why he was sleeping on the

15   office floor?

16   A    I don't recall.

17             MS. ZELLAN:  One moment, Your Honor.

18             (Pause.)

19   BY MS. ZELLAN:

20   Q    On your direct examination you testified regarding an

21   e-mail that you sent to Mr. Shkreli on February 2nd, 2011,

22   right?

23   A    I'm sorry, can you repeat that?

24   Q    Sure.  On your direct examination --

25   A    Uh-hum.

1  Q     -- Mr. Srinivasan asked you questions regarding an e-mail

2  that you sent to Mr. Shkreli on February 2nd, 2011?

3  A     Yes, the pep talk e-mail, yes.

4

5            (Continued on the following page.)

Stewart - cross - Zellan                    2099

1   (Continuing)

2   Q    I know we went through this on direct, I want to bring it

3   out again.

4          At that time you wrote to him that:  You are the

5   smartest, most ambitious, driven and kindest person I've ever

6   come across.

7          Right?

8   A    Yes.

9   Q    And when you wrote that, you wrote that, in part, because

10  he had given you an employment opportunity when nobody else

11  did; is that right?

12  A    He gave me an employment opportunity when I did not have

13  a job, yes.

14  Q    Do you still have in front of you Government's

15  Exhibit 349-A, admitted subject to connection?

16          (Exhibit published to jury.)

17  Q    Do you have that in front of you?

18  A    I'm not sure I know which one you are referring to.

19          MS. ZELLAN:  I will put it on the ELMO.

20          It's all right, I'll just ask you questions about

21  it.

22  Q    On your direct examination Mr. Srinivasan asked you about

23  an IM conversation you had with a gentleman named Kevin

24  Mulleady; correct?

25  A    Yes.

Stewart - cross - Zellan                    2100

1    Q    During that IM conversation you referred to Martin

2    Shkreli as mentally unstable; correct?

3    A    Yes.

4    Q    And when you referred to him as mentally unstable, what

5    were you referring to?

6    A    I meant that, in my opinion, it's crazy to lie so much,

7    especially about things that are easily uncovered.

8    Q    Did you ever tell anybody that you thought Martin Shkreli

9    was unusual?

10   A    Probably, but a lot of people are unusual.

11   Q    Did you ever tell anybody you thought some of his

12   mannerisms were odd?

13   A    I don't recall.

14   Q    Did you ever tell anybody that you thought that he may be

15   on the spectrum?

16            MR. SRINIVASAN:  Objection.

17            THE COURT:  I will overrule it.

18   A    I'm sorry, I actually don't know what that means on the

19   spec- -- what are you referring to?

20            THE COURT:  So, is the answer; yes or no?

21            THE WITNESS:  No, then.  I don't remember.

22   Q    Did you ever tell anybody that you thought that

23   Mr. Shkreli might need mental health treatment?

24   A    I don't recall.

25   Q    Your IM communication with Mr. Shkreli, you -- I'm sorry.

1           In your IM communication with Mr. Mulleady, you

2      state that:  You should call the lawyer and ask for a copy of

3      your records.

4           Correct?

5      A    Yes.

6      Q    And when you made that statement to Kevin Mulleady, you

7      were referring to records of the shares you believed that you

8      own; is that correct?

9      A    Yes, I believe so.

10     Q    Did you ever make that phone call to the lawyer?

11     A    No.

12     Q    Do you know what standard register is?

13     A    No.

14     Q    Do you know what a transfer agent is?

15     A    I know the name, I don't actually know what they do.

16     Q    When was the last time you talked about Martin Shkreli?

17     A    That would have been when he terminated me.

18     Q    You testified on direct that you don't believe you ever

19     received the shares that you were promised by Mr. Shkreli; is

20     that correct?

21     A    Correct.

22     Q    Do you recall receiving notice that, in fact, you did

23     have shares?

24     A    In my termination agreement he said I had X number of

25     shares.

Stewart - cross - Zellan                    2102

1   Q    Do you recall ever receiving notice in December of 2012

2   that you, in fact, owned shares?

3   A    I received an e-mail asking, yeah, something to that

4   effect.  I don't recall the exact nature of the document.

5           MS. ZELLAN:  Your Honor, may I approach the witness?

6           THE COURT:  Yes.

7           MS. ZELLAN:  Marked for identification only, Defense

8   Exhibit 4776.  I don't believe -- for identification only,

9   Your Honor.

10          THE COURT:  Did you provide me with a copy or is it

11  in your binder?

12          MS. ZELLAN:  Your Honor, let me see if I have an

13  extra copy, I apologize.

14          THE COURT:  That is all right, we will get it later.

15  Q    Ms. Stewart, can I direct your attention to page 2 of

16  that document, please take a look.

17  A    Okay.

18  Q    Three-quarters of the way down the page.  Can you look at

19  that entry next to your name.

20  A    I'm sorry, I'm having trouble locating my name.

21  Q    I'll count up from the bottom.  About the sixth name up

22  from the bottom.

23  A    Oh, you mean in the top half?

24          MS. ZELLAN:  I'm sorry, may I approach the witness,

25  Your Honor?

Stewart - cross - Zellan                    2103

1          THE COURT:  Yes.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  Just point it out.

4          MS. ZELLAN:  It is hard to see, Your Honor.

5          I'm sorry, it's page 3, my mistake.

6          THE WITNESS:  Oh, here I am, okay.

7    Q    Ms. Stewart, can you put the document down.

8    A    Sure.

9    Q    Does that refresh your recollection as to whether or not

10   you own any shares in Retrophin?

11         MR. SRINIVASAN:  Objection, Your Honor.

12         THE COURT:  Sustained.

13   Q    Did you ever contact Mr. Shkreli to find out about your

14   shares?

15   A    No.

16   Q    When Mr. Shkreli left the company, did you ever contact

17   anybody at Retrophin to find out about your shares?

18   A    No.

19   Q    And you never contacted the attorneys to find out

20   anything about your shares?

21   A    No.  I didn't know who the attorneys were.

22   Q    What makes you think you owned shares in the first

23   instance?

24   A    There was a paper that he had given back closer towards

25   the inception where he -- I signed a document that said I had

Stewart - redirect - Srinivasan                2104

1   a thousand shares.  I never received a copy of the document

2   back.

3   Q    When you didn't receive a copy of the document indicating

4   that you owned Retrophin shares, did you follow up?

5   A    No.

6   Q    Did you call Mr. Shkreli?

7   A    No.

8   Q    Did you call the attorneys?

9   A    No, I didn't know who they were.

10  Q    Did you call anybody else who worked at Retrophin?

11  A    No.

12              MS. ZELLAN:  One moment, Your Honor, please.

13              (Pause in the proceedings.)

14              MS. ZELLAN:  No further questions at this time,

15  Your Honor.

16              THE COURT:  Is there any redirect?

17              MR. SRINIVASAN:  Very briefly, Your Honor.

18  REDIRECT EXAMINATION

19  BY MR. SRINIVASAN:

20  Q    Ms. Stewart, just a minute ago you were asked about why

21  you thought you had shares of Retrophin.

22              Do you recall that?

23  A    Yes.

24              MR. SRINIVASAN:  I'm showing you what's in evidence

25  as Government's Exhibit 105-38.

```
                         Proceedings                        2105

 1              (Exhibit published to jury.)

 2   Q    And this is an e-mail from Martin Shkreli?

 3   A    Yes.

 4   Q    And it's dated March 27th, 2011?

 5   A    Yes.

 6   Q    Did you receive this document?

 7   A    Yes.

 8   Q    And is that your name right there?

 9   A    Yes, yes, it is, that's me.

10   Q    Okay.

11              Now, looking at this table, do you see your name on

12   here?

13   A    I do.

14   Q    And how many shares does it say that you have?

15   A    1,000.

16              MR. SRINIVASAN:  Thank you.

17              No further questions.

18              THE COURT:  Is there anything else, Ms. Zellan?

19              MS. ZELLAN:  No, Your Honor.

20              THE COURT:  Thank you, Ms. Stewart, you are excused,

21   you may step down.

22              Have a nice day.

23              THE WITNESS:  Thanks.

24              (Witness excused.)

25              THE COURT:  Do the parties want to come and retrieve
```

```
                        Proceedings                    2106
```

1     their documents from the witness stand.

2               ALL:  Yes.

3               THE COURT:  You can call your next witness.

4               MS. KASULIS:  Yes, Your Honor, the Government calls

5     Jackson Su to the stand.

6               (Witness enters and takes stand.)

7               THE COURT:  Sir, step up here, please.

8               THE COURTROOM DEPUTY:  Please, raise your right

9     hand.

10

11              (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  J A C K S O N    S U,

2          called as a witness having been

3          first duly sworn, was examined and testified

4          as follows:

5          THE COURTROOM DEPUTY:  Please, have a seat.  State

6  and spell your full name for the record.

7          THE WITNESS:  It's Jackson Su -- J-A-C-K-S-O-N, S-U.

8          MS. KASULIS:  May I proceed, Your Honor?

9          THE COURT:  Yes.

10 DIRECT EXAMINATION

11 BY MS. KASULIS:

12 Q    Good morning, Mr. Su.

13 A    Good morning.

14 Q    Where do you live?

15 A    In Dallas, Texas.

16 Q    And how long have you lived in Texas for?

17 A    For the last three-and-a-half, four years.

18 Q    And where did you live before that?

19 A    New York City.

20 Q    And when did you live in New York City?

21 A    From 2010 through end of 2012, 2013.

22 Q    And before you lived in New York City, where did you

23 live?

24 A    In Dallas, Texas.

25 Q    How old are you?

Su - direct - Kasulis                    2108

1    A    Forty-two years old.

2    Q    Are you married?

3    A    Yes.

4    Q    Do you have any children?

5    A    Not yet.

6    Q    Can you briefly describe your education for the jury.

7    A    Graduated from Syracuse University in finance in 1997.

8    Q    And are you currently employed?

9    A    Yes.

10   Q    What do you do for a living?

11   A    I'm in property management and real estate investments.

12   Q    And where do you do that?

13   A    In Dallas, Texas.

14   Q    And do you have a partner in that business?

15   A    Yes.  His name is George Huang.

16   Q    And when did you start becoming involved in real estate?

17   A    In 2013.

18   Q    And can you just describe briefly what your employment

19   is.

20   A    The company buys single-family houses, remodels them and

21   leases them to tenants.

22   Q    Now, prior to your current position, why don't we start

23   from actually, once you graduated from college and move

24   forward to your present day job.

25              So, when you graduated from college, what did you do

1  for work?

2  A    My first job was at Goldman Sachs.

3  Q    And what did you do at Goldman Sachs?

4  A    I was a -- analyst, was my title.

5  Q    And for how long were you at Goldman Sachs?

6  A    A little less than two years.

7  Q    And when, do you know approximately when you were at

8  Goldman Sachs?

9  A    1997 through 1998, '99.

10  Q    And when you say analyst, what do you mean by that?

11  A    I worked on their trading desk on the asset management

12  division.

13  Q    And why did you leave Goldman Sachs?

14  A    I was dismissed because I incorrectly filled out one of

15  their forms.

16  Q    So, which form did you fill out incorrectly?

17  A    It was a securities form to get a license for FINRA.

18  Q    For what was that?  I'm sorry.

19  A    It was a FINRA license that was required as part of my

20  job and I incorrectly filled that form out.

21  Q    And how did you incorrectly fill the form out?

22  A    I got, I had gotten -- I got into a altercation with a

23  cab driver and I was charged with a felony for having a fight,

24  a fight instead of what I thought was a misdemeanor.

25  Q    And so then, how did that cause you to fill the form out

Su - direct - Kasulis                                    2110

1    incorrectly?

2    A    One of the questions was, were you ever charged with a

3    felony.

4    Q    And did you, in fact, were you convicted of a felony?

5    A    No.

6    Q    What happened with your case?

7    A    It was dismissed.

8    Q    After you left Goldman Sachs, where did you go next?

9    A    To Weiss, Peck & Greer.

10   Q    And what is Weiss, Peck & Greer?

11   A    It is a money management/asset management firm.

12   Q    And what was your position there?

13   A    I was a trader there.

14   Q    And when you say trader, what do you mean by that?

15   A    I traded equity securities and stocks for the company.

16   Q    And how long were you at Weiss, Peck & Greer for?

17   A    For three-and-a-half years.

18   Q    Did you then leave Weiss, Peck & Greer?

19   A    Yes.

20   Q    Why did you leave that firm?

21   A    We, I left because they asked me to put something -- I

22   was dismissed there.

23   Q    And why was that?

24   A    Because the portfolio manager mis-traded a stock and

25   asked me to put it into a client account, which I felt

1    uncomfortable doing.

2    Q    And so then you were asked to leave the firm?

3    A    Yes.

4    Q    And what was your next position?

5    A    Cramer Rosenthal & McGlynn.

6    Q    And what kind of company is that?

7    A    It is a asset management firm.

8    Q    And how long were you there for?

9    A    For two years.

10   Q    And what was your position there?

11   A    I was a trader as well there.

12   Q    And what did you do after Cramer Rosenthal & McGlynn?

13   A    I went to a Dallas firm to work for another money

14   management firm.

15   Q    And what was the name of that firm?

16   A    Bonanza Capital.

17   Q    And when did you move?

18        You said you moved to Dallas; is that right?

19   A    I moved to Dallas for the opportunity.

20   Q    And what year was that?

21   A    2004.

22   Q    And for how long were you at Bonanza?

23   A    For two years.

24   Q    And what did you do at Bonanza?

25   A    I traded stocks for the company.

Su - direct - Kasulis                          2112

1   Q    And what did you do after your employment with Bonanza

2   Capital?

3   A    I had the opportunity to open my own asset management

4   firm.

5   Q    And what was the name of that firm?

6   A    Othello Capital Management.

7   Q    And what was Othello Capital Management?

8   A    We bought and sold stocks, and shorted stock as well.

9   Q    And when you say "we," who are you referring to?

10  A    The company and myself.

11  Q    And who was employed by the company?

12  A    Myself.  Me.

13  Q    And how long was Othello Capital Management in existence

14  for?

15  A    For five years.

16  Q    And did you have assets under management at Othello

17  Compital Management?

18  A    Yes.

19  Q    And what were those?

20  A    Total assets ranged between five to 10 million.

21  Q    And did you have investors in Othello Capital Management?

22  A    Yes.

23  Q    Approximately how many?

24  A    Ten to twelve investors.

25  Q    And at some point did you cease working for Othello

1    Capital Management?

2    A    Yes.

3    Q    Why is that?

4    A    I had gotten an opportunity to go to MSMB Capital.

5    Q    And so why don't we start breaking that down a little

6    bit.

7              Do you know an individual named Martin Shkreli?

8    A    Yes.

9    Q    How do you know him?

10   A    He is the manager for MSMB.

11   Q    And did you ever work for Mr. Shkreli?

12   A    Yes.

13   Q    When did you first become aware of Mr. Shkreli?

14   A    In 2009.

15   Q    And how did you become aware of him?

16   A    He posted a job posting on a industry site, Bloomberg

17   Terminal.

18   Q    This was in 2009; is that correct?

19   A    That's correct.

20   Q    And what were you doing for employment in 2009?

21   A    I was working for Othello Capital.

22   Q    And you were reviewing postings on Bloomberg?

23   A    Yes.

24   Q    Why were you doing that at the time?

25   A    I wanted the opportunity to move back to New York and at

1    the time, Othello Capital was winding down.  So, I decided to

2    look for other opportunities back, to come back to New York.

3    Q    What do you recall about the Bloomberg posting?

4    A    It was looking for a CEO to manage the hedge fund itself.

5    Q    After you saw the Bloomberg posting, what did you do?

6    A    I responded to the posting.

7    Q    Did you then have any contact with Mr. Shkreli?

8    A    I did.

9    Q    What happened next?

10   A    We exchanged e-mails and, I believe, a phone call and set

11   up an interview for me to fly to New York for an interview.

12   Q    Let's discuss the phone call that you just referenced.

13            What did you discuss with the defendant on that

14   phone call?

15   A    Mainly my experience and going through my resume.

16   Q    And did you discuss the position at all?

17   A    Yes.

18   Q    What did you discuss?

19   A    It was a, what was described to me similar to what the

20   posting said.  It was a CEO position to manage the company and

21   the hedge fund without the responsibility of raising capital

22   or investing for the company.

23   Q    When you say responsibility for raising capital, what do

24   you mean by that?

25   A    Looking for new investors to invest into the company.

Su - direct - Kasulis                              2115

1    Q    And did that job description appeal to you at the time?

2    A    It did not, no.

3    Q    Meaning, the raising capital part?

4    A    Correct.

5    Q    Meaning, that you did not want to be in a position that

6    you were raising capital and recruiting investors.

7    A    Correct.

8    Q    Why is that?

9    A    There -- having managed a hedge fund or a money

10   management firm, it's, it's a hard job to get investors and to

11   keep investors happy.

12   Q    Did you then travel to New York after having your phone

13   call with Mr. Shkreli?

14   A    Yes.

15   Q    And when did that occur?

16   A    In 2009.

17   Q    Where was the interview?

18   A    It was on Broadway, Downtown New York City.

19   Q    And was that, at the time, the office for MSMB Capital?

20   A    That's where I met Martin Shkreli.  I believe that's

21   where the company was located.

22   Q    And when you went to the interview, who did you meet

23   with?

24   A    I met with Martin Shkreli, Marek Biestek and another

25   trader, who I spoke to briefly.

1  Q    Do you see Martin Shkreli anywhere here in the courtroom?

2  A    Yes.

3  Q    Can you please point to him and describe an article of

4  clothing?

5  A    Blue shirt.

6         THE COURT:  We will note that he has identified

7  Mr. Shkreli, thank you.

8  Q    What did you discuss with Mr. Shkreli during your

9  interview?

10 A    Discussed the position, discussed my background, my

11 resume and the industry in the money management business in

12 general.

13 Q    Did you speak about the fund at all?

14 A    Yes.

15 Q    What did you discuss?

16 A    A number of things.  The volatility of the fund, what the

17 strategy was, some of the references that he had.  He showed

18 me a marketing pitch book, an Excel sheet with his stocks.

19 Q    And when you said that there was volatility of the fund,

20 what do you recall about that portion of your discussion?

21 A    I found the volatility of the fund pretty significant.

22 It was up three percent one day, down five percent the next

23 day, up seven percent.  It was just extremely volatile for

24 a -- for any fund.

25 Q    You referenced a marketing pitch book.

1          What is a marketing pitch book?

2    A    It's generally used to solicit investors and tell

3    investors about your fund, your company.  It's a marketing

4    book.

5    Q    And what do you recall from that marketing pitch book

6    that you reviewed with Mr. Shkreli?

7    A    I recall the references that he used and that was

8    primarily what I -- it, that I can recall right now.

9    Q    And when you say the references that he used, why do you

10   recall the references?

11   A    Because they were pretty high-profile individuals and

12   companies in the business.  In the money management business.

13   Q    Did Mr. Shkreli discuss with you anything about his own

14   background?

15   A    He did, yes.

16   Q    What did you discuss?

17   A    He, his background was from Wall Street.  He started on

18   Jim Cramer's firm and then moved to Tiger Cub, which was

19   Intrepid Capital.

20   Q    And who is Jim Cramer?

21   A    He was a successful money manager in the 1980s who worked

22   at Goldman and had really high returns during his time period

23   managing money.

24   Q    And what did Mr. Shkreli say about Mr. Cramer and his

25   relationship with Mr. Cramer?

Su - direct - Kasulis                                    2118

1   A    I asked him if he still spoke to Jim Cramer and he said
2   he did.
3   Q    You had mentioned the term Tiger Cub; is that right?
4   A    That's right.
5   Q    And what does that mean?
6   A    Tiger Management was a very high-profile money management
7   firm run by Julian Robertson.  He had really high returns and
8   he closed his money management firm and used his personal
9   wealth to put money with individuals that he thought would be
10  successful in managing money.  And anybody that he gave money
11  to was considered a Tiger Cub.
12  Q    And you had referenced that Intrepid Capital was a Tiger
13  Cub; is that right?
14  A    Yes.
15  Q    And your understanding is that the defendant had worked
16  there?
17  A    Yes.
18  Q    Did the defendant discuss any prior hedge funds that he
19  had managed with you?
20  A    No.
21  Q    What was your impression of Mr. Shkreli at this point
22  during the interview?
23  A    He was smart.  He understood the healthcare space.  He
24  understood the money management business.
25  Q    Did you interview with Marek Biestek?

1    A      I did.

2    Q      And what do you recall from that interview?

3    A      It was very short interview.  We just spoke about my,

4    his, my, my, my resume.  Went through my resume, that's all.

5    Q      And where did you actually meet with Mr. Biestek in the

6    office space?

7    A      It was -- for a short time we met in small office off the

8    trading desk.  And then I spent the better part of the day

9    there and I sat with him outside on the trading desk and we

10   just talked about personal things.

11   Q      And based on your interview, what was your understanding

12   of the relationship between Mr. Shkreli and Mr. Biestek?

13   A      They were business partners.

14   Q      And with respect to the name of the fund, MSMB, did you

15   have any understanding as to where those letters came from?

16   A      Yes, it was the founders' initials, MS and MB.

17   Q      And MS meaning Martin Shkreli?

18   A      Yes.

19   Q      And MB meaning who?

20   A      Marek Biestek.

21   Q      How long did the interview last for?

22   A      Better part of the day that I was there.  Martin came in

23   and out of the office.  I spent most of the day on the trading

24   desk.

25   Q      And how did you conclude the interview?  How did you

1  leave it with Mr. Shkreli?

2  A    He said he'd call me.  Send him receipts for

3  reimbursement.

4            And I said I'd follow up with him.

5  Q    When you say receipts for reimbursement, reimbursement

6  for what?

7  A    My plane ticket to interview in New York City.

8  Q    Did you send him your receipt for your plane ticket?

9  A    I did.

10 Q    And did you ever receive reimbursement from Mr. Shkreli?

11 A    No.

12 Q    When was the next time you had contact with the

13 defendant?

14 A    2011.

15 Q    And so, approximately how much time elapsed between your

16 interview that we just discussed and your next contact with

17 Mr. Shkreli?

18 A    A year-and-a-half, approximately.  Two years.

19 Q    And how did you come to have contact at that point in

20 time with Mr. Shkreli?

21 A    He reached out to me and asked me how everything was

22 going and if I was well-situated.

23 Q    Did you discuss anything else with him?

24 A    He said he had a position open for a chief operating

25 officer within his company.

1    Q      And what company was your understanding that he was

2    referring to?

3    A      The previous company that I interviewed for, MSMB.

4    Q      And that was in the 2011 time period; is that right?

5    A      Correct.

6    Q      And do you recall when in 2011 that occurred?

7    A      August-September time frame.

8    Q      And did he discuss anything with you at that point in

9    time about the fund itself?

10   A      There was -- before I joined a phone interview or a phone

11   call that I had with him I asked him how his fund was doing,

12   if the strategy of his fund was still the same.  I asked him

13   about the assets that he had under management.

14   Q      And how did he respond?

15   A      Said things were going really well.  He was still hiring.

16   He had $70 million in assets at that time.  And it was

17   healthcare-focused.

18   Q      When you were referring to the strategy of the fund, what

19   were you referring to earlier?

20   A      What kind of sectors that he was investing in.  And he

21   responded it was primarily healthcare.

22   Q      And when he mentioned this COO position to you, were you

23   excited for that opportunity?

24   A      Yes.

25   Q      What happened next?

1    A    He invited me in for a face-to-face interview.  I think,

2    a refresher.

3    Q    And where were you living at that point in time?

4    A    In New York City.

5    Q    Did you actually go to another interview at the office?

6    A    Yes.

7    Q    And which office did that interview or which office did

8    you go to for that interview?

9    A    330 Madison in New York City.

10   Q    And when did you go to that interview, approximately?

11   A    I think we set something up for the following week after

12   the initial contact.

13   Q    And who did you interview with?

14   A    No one.

15   Q    Can you describe what happened?

16   A    I went there, I met his secretary, she didn't know where

17   he was.  I waited.  Half an hour later she reached Martin and

18   he basically said he couldn't make it, so that was, that was,

19   that was my interview.  There was no interview.

20   Q    And then did you -- you then left the office?

21   A    Then I left the office, yes.

22   Q    What happened after that?

23   A    I believe a week or two thereafter, we made contact

24   again, I'm not sure who initiated the contact again, I might

25   have followed up or he reached out to me, I don't remember.

1  And we discussed the position again.

2  Q    And what, ultimately, did you decide to do with respect

3  to the position that he was offering you?

4  A    He offered me the position and hired me to start in

5  January of 2012.

6  Q    Did you discuss your compensation with Mr. Shkreli?

7  A    Not at that time, but when I first started, that's when

8  we start to go through compensation.

9  Q    What was your compensation?

10 A    It was 150,000 base salary, profit-sharing in several of

11 the funds that he managed, healthcare, vacation days and some

12 incentive unit agreements in Retrophin.

13 Q    When you say 150,000, is that per year?

14 A    That is per year, yes.

15 Q    And when did you actually start working with Mr. Shkreli?

16 A    January 4th, I believe, 2012.

17 Q    And was it the same office that you had attempted to

18 interview in, 330 Madison Avenue?

19 A    Correct, yes.

20 Q    And your job title, what was that?

21 A    Chief operating officer.

22 Q    And what were your responsibilities as chief operating

23 officer?

24 A    Basically, the management of the entire business.

25 Q    And when you say management of the entire business, what

Su - direct - Kasulis                    2124

1    do you mean by that?

2    A    I mean employees, technology, administration, compliance.

3    Anything that had to do with running a business.  Accounting.

4              THE COURT:  So, were you COO of MSMB at this point?

5              THE WITNESS:  I was COO -- I was chief operating

6    officer of MSMB and all its entities.

7    Q    So, when you started working for the defendant, you just

8    made a reference to MSMB and all its entities.

9              What did you learn about the entities?

10   A    There were a lot of entities under MSMB.

11   Q    What were those entities?

12   A    I recall MSMB Healthcare as a fund.  MSMB Isotope as a

13   fund.  MSMB Consumer as a fund.  And Retrophin LLC.

14   Q    Were you aware of whether there was a separate fund

15   called MSMB Capital?

16   A    I was not.

17   Q    And what did you learn about the company you just

18   mentioned, Retrophin?

19             What is Retrophin?

20   A    Retrophin, at the time, was a small company that was

21   incubated by one of the funds.

22   Q    Which fund was that?

23   A    MSMB Healthcare.

24   Q    Did you enter into any kind of employment agreement or

25   agreements regarding your position as COO of MSMB Capital and

1    its entities?

2    A    Yes.

3         MS. KASULIS:   I'm showing you what's been marked for

4    identification as Government's Exhibits 119-11 and 119-2.

5    They are behind tabs 1 and 2 of your binder.

6    Q    Do you recognize these two documents, Mr. Su?

7    A    Yes, that's my employment agreement that I signed with

8    Martin and MSMB.

9    Q    And the second document, Government's Exhibit 119-2?

10   A    That is the incentive unit agreement with, between myself

11   and Retrophin.

12        MS. KASULIS:   The Government moves these two

13   Exhibits into evidence, Your Honor.

14        MR. AGNIFILO:   No objection.

15        THE COURT:   We will receive Government's

16   Exhibits 119-11 and 119-2.

17        (Government's Exhibit 119-11 and 119-2 received in

18   evidence.)

19        MS. KASULIS:   Okay, let's look at the first

20   Document 119-11.

21        (Exhibit published to jury.)

22   Q    Can you please describe, generally, what this document

23   is.

24   A    It's an employment agreement.

25   Q    And whose employment agreement?

Su - direct - Kasulis                2126

1    A    It's mine and the company's.

2    Q    And if you look at the last page of 119-11.

3         Whose signatures are there at the bottom of the

4    page?

5    A    Martin Shkreli's and mine.

6    Q    And can you actually see the date on this agreement?

7    A    It's signed January 12th, 2012.

8         MS. KASULIS:  And if we can go to the first page of

9    the document, please.  And if we can zoom in on the first

10   paragraph there.

11   Q    And do you see there that the agreement, it states that

12   it's an employment agreement between Martin Shkreli,

13   MSMB Capital Management LLC, MSMB Healthcare Management LLC,

14   MSMB Isotope LLC, SurePoint Fund Management LLC, Retrophin LLC

15   and its affiliated entities defined as the companies, and you,

16   Mr. Su, as the employee.

17        Do you see that?

18   A    Yes.

19

20        (Continued on following page.)

21

22

23

24

25

Su - direct - Kasulis                    2127

1    DIRECT-EXAMINATION (Continuing)

2    BY MS. KASULIS:

3    Q     What is Surepoint Fund Management, LLC?

4    A     Surepoint was a company operated by Frank Delaney who, at

5    the time, was affiliated with Martin, but Martin didn't have

6    any ownership of Surepoint.

7    Q     Okay.  And then if we can look at that number two there,

8    term of employment.  Do you see how the employment begins

9    retroactively on January 1, 2012; is that right?

10   A     That's correct.

11   Q     If we look at the number three, the section right

12   underneath this section, and what is your salary listed there

13   as?

14   A     150,000 per year.

15   Q     And if we scroll down to the next section, the section

16   entitled incentive payments .4.

17         MS. KASULIS:  If you could just zoom out a little,

18   Ms. Balbin, please.

19   Q     Could you please describe this section, for the jury, of

20   this agreement?

21   A     It's performance agreement depending how well the company

22   did.  It says A, 25 percent of MSMB Isotope's profit; B, 25

23   percent of MSMB Consumer's profit; C, 18 percent of MSMB

24   Healthcare and other affiliated funds' profits, up to 25

25   percent; and D, 2,500 units of Retrophin, LLC.

MDL   RPR

Su - direct - Kasulis                          2128

1   Q    When you see there the 18 percent of MSMB Healthcare and

2   other affiliated funds, which funds did you believe that was

3   referring to?

4   A    MSMB Healthcare.

5   Q    Well, it says MSMB Healthcare and other affiliated funds,

6   what are the other affiliated funds?  Do you recall?

7   A    I don't recall.  I don't know.

8   Q    If we move down to Section 6.  It lists there your duties

9   and positions; is that right?

10  A    Yes.

11  Q    And can you please read that to the jury?

12  A    It says duties and position, the companies hire the

13  employee in the capacity of chief operating officer.

14  Employee's duties may be reasonably modified at the company's

15  discretion from time to time.

16  Q    Do you see anywhere in this document where the COO's

17  duties are actually listed out?

18  A    No.

19  Q    Okay.  Let's move the next exhibit, Government Exhibit

20  119-2.  That is tab two of your binder.

21        What is this agreement?

22  A    It is incentive unit agreement.

23  Q    And if we can turn to the last page of the agreement, or,

24  excuse me, the page ending in Bates stamp number 289.

25        MS. KASULIS:  Thank you, Ms. Balbin.

Su - direct - Kasulis                                    2129

1    Q    Do you see the two signatures here?

2    A    Yes.

3    Q    And the first signature, whose signature is that?

4    A    Martin Shkreli.

5    Q    And you recognize his signature?  Are you familiar with

6    it?

7    A    Yes.

8    Q    And he is listed as the COO of Retrophin, LLC?

9    A    Yes.

10   Q    Is that your signature lower there on the page?

11   A    Yes.

12   Q    And then let's refer to the first page of this exhibit

13   again.

14        The first paragraph reads The incentive unit

15   agreement is entered into as of January 20, 2012 by and

16   between Retrophin, LLC, defined as the company, and Jackson

17   Su.

18        So this is what you were referring to earlier about

19   an incentive agreement between Retrophin and yourself, Mr. Su?

20   A    Yes.

21   Q    And if we turn to page 2 of this document under

22   subsection 2.  If you look at the incentive units, 2-A

23   section, and do you see here where it says, The company hereby

24   issues to the service provider 2,500 incentive units for a

25   purchase of zero dollars?

1    A    Yes.

2    Q    And were you defined as the service provider on the prior

3    page of this document?

4    A    Yes.

5    Q    If we can put that aside.

6              Now, with respect to the three funds that you were

7    aware of, MSMB Healthcare, MSMB Isotope, and MSMB Consumer,

8    did you come to have an understanding of the assets under

9    management for each of those funds?

10   A    Yes.

11   Q    How did you come to have that understanding?

12   A    It was -- two funds were -- I could see the two funds'

13   statements and the third one was just told by me.

14   Q    By whom?

15   A    By Martin Shkreli.

16   Q    And was there anyone else that you learned any assets

17   under management information from at the office?

18   A    Yes, his marketing officer.

19   Q    Who was that?

20   A    Kevin Mulleady.

21   Q    Who was Kevin Mulleady?  You said he was his marketing

22   officer.  What do you mean by that?

23   A    He was the one that went out and raised investor capital.

24   Q    And investor capital for which entities, if you know?

25   A    MSMB Healthcare and Retrophin.

1  Q    And what were the assets under management for each of the

2  funds that you were aware of?

3  A    MSMB Consumer had approximately $500,000 in assets and

4  MSMB Isotope had $100,000 in assets.

5  Q    And MSMB Healthcare, what was your understanding of the

6  assets under management in that fund?

7  A    I didn't have a clear understanding of how much assets

8  the fund had.

9  Q    Did you have any sense of how much the assets were for

10  the fund?

11  A    It ranged from what I was initially told was $70 million

12  during my interview and then during the -- while I was in the

13  office that number changed depending on who was speaking,

14  Martin or Kevin, but both of them were along the lines of 70

15  million to $100 million, but $100 million was used most often.

16  Q    What were your responsibilities regarding MSMB Consumer

17  and MSMB Isotope?

18  A    I was told to streamline the process and make the flow of

19  the funds' infrastructure improve on that process that they

20  had in place.

21  Q    When you say you were told to do that, who told you to do

22  that?

23  A    Martin Shkreli.

24  Q    And when you say streamline the processes that were in

25  place, what do you mean specifically?

Su - direct - Kasulis                              2132

1  A    From accounting, to administration, to reporting, to

2  audits.

3  Q    And, so, that was with respect to the two funds, MSMB

4  Consumer and MSMB Isotope?

5  A    That's correct.

6  Q    Were you given any access to any records with respect to

7  those two funds?

8  A    Yes, I had access to the administrator.  I had access to

9  the brokerage accounts.  I had access to the bank accounts.

10 Q    And who was the administrator for those two funds?

11 A    It first started with a firm called NAV and later it

12 became Cascade Portfolio.

13 Q    What were your responsibilities regarding the third hedge

14 fund that we have discussed, MSMB Healthcare?

15 A    I didn't have any responsibilities.

16 Q    Why is that?

17 A    Martin told me that I should make a really good process

18 for the first two funds, MSMB Consumer, MSMB Isotope, and use

19 that as a template to put that to Healthcare.

20 Q    And did you ever use that as a template for MSMB

21 Healthcare?

22 A    No.

23 Q    Were you given any access to MSMB Healthcare's bank or

24 brokerage accounts?

25 A    No, I was not.

Su - direct - Kasulis                        2133

1   Q    Did you ever have access to Retrophin's bank accounts?

2   A    Yes, I did.

3   Q    Where were those accounts?

4   A    Retrophin's accounts were at Chase bank.

5   Q    What was your understanding as to why you had access to

6   Retrophin's bank accounts?

7   A    The normal day-to-day activities for Retrophin for

8   accounting, primarily sending out bank statements, the

9   bookkeeping for Retrophin.

10  Q    Did you have access to Mr. Shkreli's personal accounts?

11  A    I did not.

12  Q    For how long did you work for the Defendant?

13  A    From January 2012 through December 2012.

14  Q    Now, when you starting work for the Defendant, you said

15  that MSMB Capital and Retrophin were both in operation at that

16  time; is that right?

17  A    Correct.

18  Q    Did they share an office space?

19  A    Yes.

20  Q    Who was employed by MSMB Capital when you first started

21  with the fund?

22  A    It was Martin Shkreli, Marek Biestek, Tim Pierotti,

23  Allison Russo, Andrew Vaino, and myself.

24  Q    Was Mr. Kevin Mulleady also employed at that time?

25  A    I'm sorry, and Kevin Mulleady.

MDL   RPR

1  Q    We have spoken about obviously Mr. Shkreli, Mr. Mulleady.

2  Mr. Biestek, did he have the same role that you had seen him

3  in when you had interviewed with Mr. Shkreli previously?

4  A    I believe so.  I only say that because I'm not sure

5  exactly what role -- what role he played.

6  Q    With respect to Tim Pierotti, who is Tim Pierotti?

7  A    He was the portfolio manager for MSMB Consumer.

8  Q    Who is Allison Russo?

9  A    She is the administrative assistant.

10 Q    Who is Andrew Vaino?

11 A    He was the analyst for MSMB Capital.

12 Q    And did he play any other roles?

13 A    He worked for Retrophin also.

14 Q    And can you just briefly describe the layout of the

15 office?

16 A    There was -- it was a shared space, so it was a full

17 office floor, which MSMB rented out a room and that was the

18 office.  There was a main office and then there was a

19 secondary office right next to it.  Both had open doors.

20 There was a desk on each corner, so there were four desks in

21 each room.

22 Q    And where did everyone sit, if you recall?

23 A    If you walk into the door, when you first walk in,

24 Martin's desk was on the far right, Allison Russo's was on the

25 far left, Marek was on the near left and Tim Pierotti was on

1    the near right.

2    Q     What about the other room?

3    A     The other room, if you are facing the same way into the

4    room, my desk was on the far left.  Kevin Mulleady's desk was

5    on the near left.  The far right was empty at the time and

6    then the near right was empty and Andrew Vaino came into the

7    office periodically traveling from San Diego.

8    Q     When you first started your job in early 2012, who worked

9    for Retrophin?

10   A     There was a cross between -- there was no defined

11   responsibility.  I think several people had cross duties

12   between the two companies.

13   Q     And, so, with the way in which you described the office

14   space, were you able to observe the other employees throughout

15   the course of the day during your employment at MSMB Capital?

16   A     Yes.

17   Q     And you were actually in the same room as Mr. Kevin

18   Mulleady?

19   A     Yes.

20   Q     Over the course of the year that you were employed at

21   MSMB Capital, were there any additional employees that were

22   hired?

23   A     Yes.

24   Q     Who was hired?

25   A     Michael Smith, George Huang, Steve Aselage, Smoot Carter,

1   Tom Fernandez, Ron Tilles, Leonora, I don't remember her last

2   name.

3   Q    Do you have an understanding as to what her relationship

4   was to Mr. Shkreli?

5   A    It was Martin's sister.

6   Q    And anybody else?

7   A    Not that I could recall at this moment.

8   Q    Who is Tom Fernandez?

9   A    He was hired to be the president of MSMB.

10            THE COURT:  Which MSMB?

11            THE WITNESS:  I don't know.  MSMB Capital, in

12   general, the umbrella firm.

13   Q    Just to be clear, you perceived MSMB Capital to be the

14   umbrella firm and then there were entities underneath it?

15   A    Correct.

16   Q    And the entities were the funds that we discussed?

17   A    Correct.

18   Q    And that was separate from Retrophin?

19   A    Correct.

20   Q    Who is Michael Smith?

21   A    He took the place of Allison Russo, the administrative

22   assistant when she left.

23   Q    Who is Steve Aselage?

24   A    He was hired as a CEO to replace Martin in Retrophin.

25   Q    Ron Tilles?

Su - direct - Kasulis                    2137

1    A    He was the marketing person to raise investor capital.

2    Q    Raise investor capital for which entity or entities?

3    A    I believe both.

4    Q    When you say both?

5    A    For MSMB Healthcare and Retrophin, LLC.

6    Q    Martin's sister, what role did she play?

7    A    Just administration.

8    Q    And the last individual who you mentioned, I'm sorry, you

9    mentioned Smoot Carter.  Who is Smoot Carter?

10   A    He was hired to, again, raise money for Martin and I'm

11   not sure which entity.

12   Q    And George Huang, who is he?

13   A    He is the analyst at the time for MSMB and Retrophin.

14   Q    Is he the individual who you mentioned earlier that you

15   are currently partners with in your real estate business?

16   A    Yes.

17   Q    Do you recall the e-mail addresses for MSMB Capital and

18   Retrophin employees who you worked with?

19   A    Yes, it is msmbcapital.com and retrophin.com.

20   Q    So that's sort of the end portion of the e-mail

21   addresses?

22   A    Yes.

23   Q    So at msmbcapital.com and at retrophin.com?

24   A    Yes.

25   Q    Which e-mail address did you have?

1    A    msmbcapital.com.

2    Q    And Mr. Shkreli, do you recall which e-mail address or

3    addresses he had?

4    A    He had both, retrophin.com and msmbcapital.com.

5    Q    In your role and responsibilities at MSMB Capital, who

6    was responsible for assigning which e-mail addresses went to

7    which individuals?

8    A    Martin was.

9             THE COURT:  Is now a good time for the jurors'

10   midmorning break?

11            Are you ready for a break, ladies and gentleman?

12   Thank you.  Why don't you place your notebooks face down on

13   your chairs, please.  Don't speak about the case and we will

14   see you in about ten minutes.

15            (Jury exits the courtroom.)

16            THE COURT:  Sir, you are welcome to step down.

17   Let's come back at 11:00, please.  Thank you.

18            (Recess taken.)

19            THE COURT:  Shall we bring the jurors back?

20            MS. KASULIS:  Yes, your Honor.

21            (In open court.)

22            (Jury enters the courtroom.)

23            THE COURT:  All jurors are present.  Please have a

24   seat, everybody.

25            MS. KASULIS:  May I proceed, Your Honor?

1              THE COURT:  Yes, you may.

2    Q    Mr. Su, in your role as COO of MSMB Capital, did you

3    institute any policy or process for monitoring employees

4    e-mails?

5    A    Yes.

6    Q    Could you please explain what you instituted?

7    A    It was an archiving system from a firm called Global

8    Relay.

9    Q    Why did you institute that system?

10   A    It was Martin and Marek Biestek asked me to.

11   Q    Could you just scoot a little bit closer.

12   A    Sorry.

13   Q    Thank you.  When did Mr. Shkreli and Mr. Biestek ask you

14   to set that up?

15   A    It was in the old office, around May time frame.  May,

16   June time frame.

17   Q    Did you discuss with them why you wanted to set up or why

18   they wanted you to set up this system?

19   A    They wanted me to set the system because Martin did a lot

20   of activist-type investments, he said, and he didn't want

21   employees to trade on the stocks that he was going to go

22   active on, so he wanted to monitor people's trading

23   activities.

24   Q    So, then, what were the steps that you took to set up

25   this system?

1  A    I called around for vendors, started with the e-mail

2  system that we were using at the time and they recommended all

3  other vendors that adapted to their system.  I reached out to

4  them, to Global Relay, and the system was set up.

5  Q    After the system was set up, what did you do?

6  A    I told them to set up the system.  I told Martin and

7  Biestek I set up the system.  I gave them the password.  I

8  gave them the bill.

9  Q    And what happened with respect to that bill?

10 A    It was never paid.

11 Q    When you said you gave them the password, who had access

12 to this system?

13 A    The three of us had access to the system.

14 Q    And the three of you meaning you, Mr. Biestek.  And Mr.

15 Shkreli?

16 A    Yes.

17 Q    Now, we had discussed Mr. -- just after the system was

18 set up, I'm sorry.  Before we move on.  After the system was

19 set up, what, if anything, did you do with that system?

20 A    Monitor e-mails, it was up to the compliance officer to

21 monitor the e-mail.  I sent an e-mail to everyone in the firm

22 asking -- rather, I sent an e-mail to Marek and Martin saying

23 who's going to be the compliance officer.  Martin didn't

24 respond.  Marek hesitated, said he wanted to discuss the role

25 before -- he wanted to discuss the role before moving forward

1  with that role.  Never heard back and it just got defaulted to

2  my job title.

3  Q    And you saw compliance as part of your job

4  responsibilities as COO of MSMB Capital?

5  A    That's what it got defaulted to, yes.

6  Q    What did you then do with the Global Relay archiving

7  system?

8  A    I monitored everyone's e-mail.

9  Q    For what period of time did you do that?  When did that

10  begin?

11  A    I believe it started -- when the time the archive

12  started.  I believe it was March -- I'm sorry, May 2012 or

13  June 2012 when it got instituted, 2012.

14  Q    What, if anything, did you do with the e-mails that you

15  reviewed?

16  A    I flagged the ones that I thought were -- that had I had

17  concerns about, so I printed those out or I saved them on the

18  -- on the -- on a computer.

19  Q    Did you save any of these e-mails or documents anywhere

20  else?

21  A    I printed them out and I did a lot the e-mail reviews at

22  home.  I printed out some that were -- printed out some of the

23  e-mails and just left it at home.

24  Q    And that was during the time period that you were COO of

25  MSMB Capital?

1    A    Correct.

2    Q    Did you -- now, shifting a little bit.  We had spoken

3    about Kevin Mulleady.  Did you ever actually hear him speaking

4    to potential investors about MSMB?

5    A    Yes.

6    Q    And how did you come to hear him having those

7    conversations?

8    A    He sat in the same office as me.

9    Q    And how did you know that he was speaking to potential

10   investors?

11   A    He had a call sheet or I'll call it index cards that he

12   used and those were potential investors, as he described it,

13   from his earlier days at his previous role at another bank.

14   Q    And did you actually hear any of the phone conversations?

15   A    Yes.

16   Q    And did you only hear one side of those conversations?

17   A    At times.  Other times they were on speakerphone when

18   Martin came into the room and wanted to speak to an investor.

19   There was a speakerphone and everyone in the office heard it,

20   in my office heard it.

21   Q    So there were occasions where Martin and Kevin Mulleady

22   were speaking to investors on speakerphone and you heard those

23   conversations?

24   A    Yes.

25   Q    With respect to Mr. Mulleady's conversations with

Su - direct - Kasulis                    2143

1   potential investors, did he say anything about the assets

2   under management?

3            MR. AGNIFILO:  I am going to object on hearsay

4   grounds what Mr. Mulleady said.

5            THE COURT:  Are you asking about Mr. Mulleady or Mr.

6   Shkreli?

7            MS. KASULIS:  Mr.  Mulleady.

8            THE COURT:  I will sustain the objection.

9            MS. KASULIS:  Your Honor, can we have a sidebar with

10  respect to this?

11           THE COURT:  Sure.

12           (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                            Sidebar                      2144
```

1           (Sidebar held outside the hearing of the jury.)

2           MS. KASULIS:  Your Honor, we have charged some

3    conspiracy counts with respect to the fund.  We are alleging

4    that Mr. Mulleady is one of Mr. Shkreli's co-conspirators and

5    that we have established that by preponderance that he is, in

6    fact, a co-conspirator for purposes of offering his statements

7    to investors in recruiting them to the fund.

8           THE COURT:  It's not certain who those individuals

9    are.  Okay.

10          MR. AGNIFILO:  Can I be heard?

11          THE COURT:  Of course.

12          MR. AGNIFILO:  Without knowing who they were talking

13   to, when it is being said, they have to prove it is a

14   co-conspirator's statement during the time frame of the

15   conspiracy and that the statements are in furtherance of the

16   conspiracy after the conspiracy began.  If he can start giving

17   timeframes and specific people he is talking to, maybe it

18   would be less speculative.  But I think there are two

19   problems.  Even if they're saying it is somehow relevant as a

20   co-conspirator's statement there are still 403 issues, which I

21   don't think are dealt with because of the uncertain nature of

22   who they're talking to.

23          Also, I don't think they have established that these

24   are statements in furtherance of an active conspiracy.

25          THE COURT:  We know the timeframe is 2012, because

Sidebar                                              2145

1   that's what Mr. Su has said.  She has identified Mr. Mulleady

2   as a co-conspirator.

3           If you want to respond to the rest of his point.

4           MS. KASULIS:  Yes, your Honor.  I think we have

5   established that Mr. Mulleady was, in fact, promoting the

6   funds to potential investors, and he was doing that with Mr.

7   Shkreli and recruiting investors to the fund.  That is

8   squarely within the charges and what we have charged in this

9   case.  Your Honor is correct it is within the time period

10  charged in the indictment.

11          With respect to who he is potentially talking to, we

12  actually will have witnesses who will talk about having spoken

13  with Mr. Mulleady.  Separate and apart from that, that just

14  goes to credibility.  That is not an admissibility.

15          As to who else was on the other line, we have

16  established he was calling potential investors.  We have done

17  that through Mr. Su.  So we believe we have established the

18  bases for co-conspirator statement and it should be admitted.

19          MS. SMITH:  And Ms. Stewart has already testified

20  that Mr. Mulleady's role was to recruit investors and there

21  will be additional witnesses, including Mr. Kocher, for

22  example, who will testify later today possibly, who will say

23  he was recruited to invest in MSMB Healthcare by Mr. Mulleady.

24          MR. BRAFMAN:  But being recruited isn't sufficient

25  to make a co-conspirator.  It is being recruited with your

Sidebar                                          2146

1   knowledge of what you were saying to investors was false.  Mr.

2   Mulleady can be an active recruiter without the mental

3   capacity to make him a co-conspirator.

4            THE COURT:  I guess what I am wondering is if Mr.

5   Mulleady were to give information regarding -- I think you

6   asked about assets under management.

7            MS. KASULIS:  Yes.

8            THE COURT:  -- and if he knew those statements were

9   not true.  That's my question.

10           MS. KASULIS:  We do believe, Your Honor, that we

11  will be able to provide that basis going forward.  Even

12  Caroline Stewart heard chat with Mr. Mulleady where she was

13  putting Mr. Mulleady on notice about her concerns with respect

14  to the funds, lies Mr. Shkreli had talked about regarding the

15  funds.  Mr.  Mulleady continued to work and recruit investors

16  for Mr. Shkreli after this time period.  So we believe we have

17  provided the basis.  It is a preponderance standard, Your

18  Honor.

19           MS. SMITH:  In addition, there are a number of

20  statements between Mr. Shkreli and Mr. Mulleady that will only

21  come in through the case agent that will show that there were,

22  in fact, co-conspirators.  I recognize that some of this

23  hasn't yet come in, but there definitely has been a foundation

24  so far.

25           THE COURT:  I think I am able to professionally

```
                           Sidebar                      2147
```

 1   admit it because the order of their presentation, they intend

 2   to be able to prove Mr. Mulleady's active participation in the

 3   conspiracy and his knowledge of the falsity of the statements

 4   that he was making to the investors.  Is that a fair proffer?

 5              MS. KASULIS:  Yes, your Honor.

 6              MR. AGNIFILO:  I understand Your Honor's ruling.  My

 7   concern is as we sit here today they do have the burden under

 8   United States versus Bourjelais to prove by a preponderance

 9   and I don't think there is anything in the text messaging that

10   we just read that shows that Mr. Mulleady knows that the

11   assets under management are incorrect.

12              THE COURT:  That's correct.  You are right.  Again,

13   in 2011, she just generally described him as a liar.

14              MS. SMITH:  She did say that he blew up the fund.

15              MR. AGNIFILO:  Well, he blew up the fund through a

16   short trade that has nothing to do with assets under

17   management.

18              THE COURT:  It depends when the assets under

19   management, as Mr. Stewart testified basically were, you know,

20   destroyed, there was nothing there.

21              Is Mr. Mulleady as of this timeframe, in 2012,

22   recruiting investors to MSMB Capital or MSMB Healthcare?

23              MS. KASULIS:  At this timeframe he is recruiting

24   investors to MSMB Healthcare.  Again, we believe we have laid

25   the foundation that he should have known that what he was

1   saying was not accurate to his investors.

2        THE COURT:  Is this witness going to testify as to

3   what access Mr. Mulleady had to the MSMB Healthcare brokerage

4   or bank accounts?

5        MS. KASULIS:  I don't believe he can.

6        THE COURT:  Okay.

7        MR. BRAFMAN:  Your Honor, let me express our

8   collective concern.  They didn't indict Mulleady.  I have gone

9   through all of the 3500 material.  I don't see a head shot or

10  a shoulder shot on Mulleady.  I think what they have with

11  Mulleady is that he has recruited investors, but the question

12  is when he recruited the investors, and one will testify today

13  that he was recruited by Mulleady himself, they have to show

14  that when he told him things he knew that they were false, not

15  that he just was a booster of the fund or a believer of the

16  fund or a believer in Mr. Shkreli.

17        I don't know what witness they are going to call

18  that is going to put in evidence that Mulleady acted with the

19  requisite knowledge to make him a co-conspirator.

20        THE COURT:  Is he going to testify?

21        MS. KASULIS:  Mr. Mulleady, no.

22        Mr. Su can testify that he, in fact, recruited an

23  investor from his cousin, Michael Lavelle, to MSMB Healthcare

24  and they immediately used that money to purchase a drug for

25  Retrophin because they were hard up for cash on Retrophin.  So

```
                    Sidebar                    2149
```

1   I think there is indicia, Your Honor, that he knew something

2   was not right with the fund and he continued to promote the

3   fund to investors.  I know Mr. Su, if Your Honor permits, that

4   we can elicit from this witness.

5          Did you want to add something?

6          MS. SMITH:  No.  I was going to look for one of the

7   exhibits that we have marked.

8          MS. KASULIS:  With respect to Mulleady?

9          MS. SMITH:  Yes.

10         This is the unredacted full version of Government

11  Exhibit 349.  A was the redacted version; the 349 unredacted,

12  which we plan on putting in later in the case.

13         THE COURT:  You mean the unredacted conversation

14  between --

15         MS. KASULIS:  What appears that what happened is Mr.

16  Mulleady forwarded this chat with Caroline Stewart to Marek

17  Biestek, who we are also alleging is a co-conspirator, and who

18  then forwards it on to Mr. Shkreli.  So, Your Honor, we

19  believe we have established by a preponderance these are

20  co-conspirator statements.

21         MR. BRAFMAN:  She accuses Martin of lying.  There's

22  nothing in this that shows that Mulleady believed her or that

23  Mulleady understood it.

24         MS. KASULIS:  That's not the standard.  He was on

25  notice of this issue.  He was on notice of the issue.  There

Sidebar                                        2150

1   is even just one sample that Mr. Su can talk about, how he was

2   recruiting investors to the hedge fund and then immediately

3   redirecting his cousin's money to purchase a drug for

4   Retrophin.  I mean, that in and of itself, there's indicia

5   that he knew something was amiss at the hedge fund and was on

6   notice of that, enough to establish that he was a

7   co-conspirator for evidentiary purposes.

8            MR. BRAFMAN:  Your Honor, at the end of the trial we

9   are going to revisit this issue.  Obviously, if they fail to

10  prove by a preponderance, we're then going to have a position

11  where we have to strike a lot of testimony.  I don't know how

12  you do that.

13           THE COURT:  Well, we would have to instruct the jury

14  that they would have to disregard testimony.  Many times

15  during a trial the Government is putting in evidence at

16  various points about an indicted co-conspirator and sometimes

17  it is admitted subject to their ability to establish by a

18  preponderance that this individual was a co-conspirator and

19  the statements were made in furtherance of a conspiracy.

20           One thing that strikes me about this e-mail chain is

21  that after being told by Ms. Stewart that Mr. Shkreli has been

22  lying and lying to people and that there is a lot of false

23  information, he forwards it to Mr. Biestek and Mr. Shkreli,

24  which raises an inference that he was part of it because he

25  was informing his two colleagues, Biestek and Shkreli, that

```
                    Sidebar                         2151
```

1    there was an employee who was telling him that Mr. Shkreli had

2    been lying.  It raises an inference, a preponderance.

3              I will admit it subject to further evidence that Mr.

4    Mulleady knew that the information he is providing to these

5    prospective investors was false.  He is getting information

6    directly from Mr. Shkreli or from the books and records of

7    MSMB Healthcare.  I don't know whether he has access to those

8    accounts.  But he was the CFO at this point, is he?

9              MS. KASULIS:  He is the CEO.

10             THE COURT:  He is the CEO.  Sorry.  And his role is

11   to recruit?

12             MS. KASULIS:  One of his roles was to recruit

13   investors, which Mr. Su has provided testimony regarding.

14             THE COURT:  Alternatively, we can wait and see what

15   other witnesses and evidence you have.  Is this the first time

16   you have notified the defense that Mr. Mulleady is a

17   co-conspirator?

18             MS. SMITH:  I believe so.

19             MR. AGNIFILO:  I mean, we assumed.  I don't think

20   they actually told us.  I assume everybody is.  Fortunately,

21   I'm not.  Maybe I will be.

22             THE COURT:  Well, I am going to allow the answer,

23   subject to your ability to tie up the loop.

24             MS. KASULIS:  Thank you, Your Honor.

25             MR. AGNIFILO:  Thank you, Judge.

Sidebar                                                2152

1          THE COURT:  Thank you.

2          (Sidebar concluded.)

3          (Continued on the following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Su - direct - Kasulis                          2153

1          THE COURT:  You may proceed.

2          MS. KASULIS:  Thank you, Your Honor.

3     Q    Mr. Su, we were talking about overhearing phone

4    conversations that Mr. Mulleady had with potential investors.

5    Do you recall that?

6     A    Yes.

7     Q    What, if anything, do you recall him saying regarding the

8    funds -- let me back up.  Was there a particular fund that Mr.

9    Mulleady was recruiting investors to that you heard?

10    A    MSMB Healthcare.

11    Q    And with respect to MSMB Healthcare, what, if anything,

12   did Mr. Mulleady say to potential investors regarding assets

13   under management of the fund?

14    A    He told people that the fund had $100 million in assets.

15    Q    And did he say anything else regarding the fund to

16   potential investors?

17    A    That it was up 30 percent.  It was up 30 percent last

18   year.  Martin was the -- ran Jim Cramer's Healthcare desk.

19   He's young, he's smart, and that was the pitch to investors.

20    Q    Were you aware of any investors who were, in fact,

21   recruited by Mr. Mulleady?

22    A    One person that comes to mind, Michael Lavelle.

23    Q    Do you have any understanding as to Mr. Lavelle's

24   relationship with Mr. Mulleady?

25    A    It was a family relationship, that they were cousins.

Su - direct - Kasulis                    2154

1   Q     And why do you recall Michael Lavelle as an investor in

2   MSMB Healthcare?

3   A     Because he made -- he made a sizeable investment into the

4   fund.

5   Q     Do you recall anything with respect to the timing of that

6   investment?

7   A     It was in the January, February 2012 timeframe.

8   Q     Why does that timeframe stand out to you?

9   A     Because we were pursuing a license with a larger

10  pharmaceutical company and we needed the funds to pay for that

11  license.

12  Q     When you say we were pursuing, who is that?

13  A     Retrophin.

14  Q     So you were saying you were needing the funds for what

15  purpose?  Can you explain that, please?

16  A     To buy the license from Ligand, which is a large

17  publicly-traded pharmaceutical company.

18  Q     So what was your understanding of the relationship

19  between Mr. Lavelle's investment and MSMB Healthcare and the

20  need to fund for Retrophin a Ligand?

21           MR. AGNIFILO:  Objection to the form, Your Honor.

22  It seems speculative to me, just the way it was asked.

23           THE COURT:  Do you want to try to rephrase it, Ms.

24  Kasulis?

25           MS. KASULIS:  Sure.

1   Q    With respect to Michael Lavelle's investment in MSMB

2   Healthcare and the timing of that investment, why is that

3   timing significant to you with respect to Retrophin's dealings

4   with Ligand?

5              MR. AGNIFILO:  Same objection.

6              THE COURT:  Overruled.

7   A    Retrophin needed to pay Ligand for that license, and when

8   I looked at the bank account there was an investment from MSMB

9   Healthcare for $900,000.

10             (Continued on following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Su - direct - Kasulis                    2156

1    (Continuing.)

2            THE COURT:  You looked at the bank account for

3    Retrophin?

4            THE WITNESS:  Correct.

5            THD COURT:  And saw a --

6            THE WITNESS:  Investment from MSMB Healthcare.

7            THE COURT:  When you say a license, is that for a

8    particular pharmaceutical?

9            THE WITNESS:  That was for a drug that Retrophin was

10   pursuing from Ligand.

11           THE COURT:  Thank you.

12           THE WITNESS:  And at that same time it was because

13   of Michael Lavelle's investment that helped us pay -- helped

14   Retrophin pay for that license.

15   EXAMINATION CONTINUING

16   BY MS. KASULIS:

17   Q    Now, in the course of your employment, did you learn who

18   the investors in Retrophin were?

19   A    Yes.

20   Q    How did you learn that information?

21   A    Through subscription documents into Retrophin and a

22   capitalization table for Retrophin.

23   Q    And you reviewed the capitalization table for Retrophin?

24   A    There was a stock ledger attached to the capitalization

25   table, so yes, I looked at both.

1  Q     And who was the largest investor in Retrophin?

2  A     MSMB Healthcare.

3  Q     Now, in the first couple of months of your employment,

4  directing your attention to the January/February 2012 time

5  period, what was your understanding of what the plans were for

6  Retrophin?

7  A     It was to bring it public.

8  Q     And how did you come to have that understanding?

9  A     It was discussed between myself, Martin, and the

10  attorney, Evan Greebel.

11  Q     And when you say Evan Greebel, the attorney, who is he?

12  A     He is the outside law firm that Martin used.

13  Q     And do you recall the law firm?

14  A     Katten Muchin.

15  Q     And what do you recall about your discussions with

16  Mr. Shkreli and Mr. Greebel about taking Retrophin public?

17  A     Needed financial statements for Retrophin in order to

18  start that process.

19  Q     And what did you discuss with respect to the financial

20  statements?

21  A     We needed to hire a -- an accounting firm because

22  Retrophin didn't have books for the company when I arrived in

23  2012 and we needed audited statements for it to start the

24  process of becoming public.

25  Q     And were there any discussions with respect to which

1  accounting firm to use?

2  A    Evan Greebel suggested that we use Citrin Cooperman.

3  Q    And do you have an understanding of Mr. Greebel's

4  relationship to Citrin Cooperman?

5  A    He was married to one of the founders of Citrin or

6  Cooperman's daughter.

7  Q    And did Retrophin then, in fact, hire Citrin Cooperman?

8  A    Retrophin did, yes.

9  Q    And for what purpose, specifically?

10 A    To put together financial statements for the company.

11 Q    And who were the -- who at MSMB Capital or Retrophin was

12 the point of contact for Citrin Cooperman?

13 A    I was.

14 Q    And who did you interface with at Citrin Cooperman?

15 A    Corey Massella and -- who was the partner, and Susan

16 Chew, which was his accountant.

17 Q    And you were interfacing with them as part of your

18 responsibilities?

19 A    Yes.

20 Q    And is Citrin Cooperman referred to by any other name?

21 A    SEC Solutions.

22 Q    I'm showing you what's been marked for identification,

23 it's Government Exhibit 119-3.  It's behind tab 3 of your

24 binder.

25       Do you recognize this document?

W. Name - direct/cross - Atty                 2159

1   A    It's an e-mail and engagement letter.

2   Q    And who is the e-mail between?

3   A    It's been myself and Corey Massella.

4   Q    And what is the date on the e-mail?

5   A    January 24th, 2012.

6           MS. KASULIS:  Your Honor, the government moves this

7   exhibit into evidence.

8           MR. AGNIFILO:  No objection.

9           THE COURT:  We will receive Government's 119-3 in

10  evidence.

11          MS. KASULIS:  Thank you.

12          (Government's Exhibit 119-3 was received in

13  evidence.)

14          (Exhibit published.)

15  BY MS. KASULIS:

16  Q    I am just referring to the very bottom of the e-mail,

17  it's dated January 24th, 2012.

18          Do you see that e-mail, sir?

19  A    Yes.

20  Q    And is that from yourself to Mr. Massella?

21  A    Yes.

22  Q    And you state:  Please give me an update on where we are

23  in the process.  Thanks.

24          Do you see that?

25  A    Yes.

W. Name - direct/cross - Atty                    2160

1    Q    Do you have an understanding of what you were asking

2    here?

3    A    Just an update on what the process after giving him some

4    documents, where we stood.

5              MS. KASULIS:  And if we could go to the next e-mail

6    in the chain.

7              (Exhibit published.)

8    BY MS. KASULIS:

9    Q    It appears to be a response from Mr. Massella to you on

10   the same day, January 24th, 2012.  If we could just look at

11   the second paragraph.  Mr. Massella states:  Until we receive

12   these items, we cannot begin to set up the QuickBooks file for

13   you.

14             Do you see that?

15   A    Yes.

16   Q    And then below that he states:  We did receive the wire

17   yesterday.  Thanks, but also scan and e-mail us the executed

18   engagement letter.

19             Do you see that?

20   A    Yes.

21   Q    What is QuickBooks?

22   A    Accounting software.

23   Q    And you respond to this e-mail from Mr. Massella, is that

24   right?

25   A    Yes.

1          MS. KASULIS:  Can we please look at that very top

2    e-mail, Ms. Balbin?  Thank you.

3              (Exhibit published.)

4    BY MS. KASULIS:

5    Q    And you appear to attach what you call an engagement

6    letter.  And then you state:  I'll get ADP as soon as I can.

7              Can you please refer to the attachment starting at

8    Bates Number 870, ending in 870, and that goes through 873.

9              Do you see that?

10   A    Yes.

11   Q    What is the date of this letter?

12   A    Dated January 19th, 2012.

13   Q    And it looks like it's addressed to Mr. Shkreli as CEO of

14   Retrophin?

15   A    Yes.

16         MS. KASULIS:  Ms. Balbin, if you could just zoom

17   out.

18   Q    If you look at the first two to three paragraphs there.

19         MS. KASULIS:  One more down.  Thank you.

20   Q    The first sentence here:  We appreciate the opportunity

21   to support the growth and development of Retrophin, LLC,

22   defined as the company.

23              Do you see that?

24   A    Yes.

25   Q    And then it states further below:  In order to document

W. Name - direct/cross - Atty                2162

1    our understanding as to the scope of the professional services

2    that SEC Solutions Group, LLC.

3              Is this the same SEC Solutions Group that you had

4    referred to as also referencing Citrin Cooperman?

5    A    Yes.

6    Q    We will perform -- we are entering into this agreement

7    with the company, and that company had been defined as

8    Retrophin, LLC, is that right?

9    A    Yes.

10   Q    And then lower down it says SSG, which was the definition

11   or how SEC Solutions Group was defined, it states:

12             We will perform the following services' and then

13   states; assist in compiling from information you provide the

14   unaudited financial statements for the year-end in

15   December 31st, 2011.

16             Do you see that?

17   A    Yes.

18   Q    All right, so after Citrin Cooperman was --

19             MS. KASULIS:  Oh, and can we actually just look at

20   the very last page, I'm sorry, of this letter?

21   BY MS KASULIS:

22   Q    Do you see who has signed this letter or agreement?

23   A    Martin.

24   Q    And when you say Martin, you mean Martin Shkreli?

25   A    Yes, Martin Shkreli.

W. Name - direct/cross - Atty                    2163

1   Q    And then it's signed on behalf of Corey Massella, is that

2   right?

3   A    Yes.

4   Q    And the date on this agreement is?

5   A    January 19th, 2012.

6   Q    And so after Citrin Cooperman was first retained, did

7   they request that you send them any materials?

8   A    Yes.

9   Q    What kinds of materials did they request?

10  A    Bank statements, company formation documents,

11  subscription agreements, capitalization table.

12  Q    When you say subscription agreements, what do you mean by

13  that?

14  A    An investor invests money and to memorialize that

15  investment, they sign an agreement that -- that tells them --

16  tells us that they are going to invest.

17          THE COURT:  May I just ask, subscription agreements

18  between investors and what entity?

19          THE WITNESS:  And Retrophin, LLC.

20          MS. KASULIS:  Thank you, Your Honor, for the

21  clarification.

22  BY MS. KASULIS:

23  Q    Okay, when you said capitalization table, what is a

24  capitalization table?

25  A    It breaks down the shares or the interests a individual

W. Name - direct/cross - Atty                    2164

1   has with the company.

2   Q    So I'm showing you -- and did you, in fact, send these

3   kinds of documents Citrin Cooperman?

4   A    Yes.

5   Q    I am showing you what's been marked for identification as

6   Government Exhibit 119-4.  It's behind tab 4 of your binder.

7        Do you recognize this document?

8   A    Yes.

9   Q    And what is it?

10  A    It's an e-mail and a capitalization table for Retrophin.

11  Q    And what is the date on the top portion of the e-mail?

12  A    February 16th, 2012.

13       MS. KASULIS:  The government moves this exhibit into

14  evidence.

15       MR. AGNIFILO:  No objection.

16       THE COURT:  We will receive Government's 119-4.

17       (Government's Exhibit 119-4 was received in

18  evidence.)

19       (Exhibit published.)

20  BY MS. KASULIS:

21  Q    If you look at the very bottom of the first page, it

22  appears to be an e-mail between -- it's from Evan Greebel to

23  yourself with a cc to Martin Shkreli and David Kravitz.

24       Is this the Evan Greebel that you had referred to

25  earlier as the lawyer?

SAM      OCR      RMR      CRR      RPR

W. Name - direct/cross - Atty                    2165

1    A    Yes.

2    Q    And who is David Kravitz, do you know?

3    A    He worked for Evan Greebel.

4    Q    And the first bullet point of his e-mail where he states:

5         Jackson, per your e-mail earlier today attached are

6    numbered responses to your bullet point requests, and the

7    first is the 12/31/2011 capitalization table is attached.  We

8    have a more current one that reflects all transactions since

9    12/31/2011 as well.

10        Do you have an understanding as to what role

11   Mr. Greebel played with respect to the capitalization table at

12   Retrophin?

13   A    He kept the capitalization table.

14   Q    And if you look further up in the chain, the next e-mail,

15   you then write back to him with a cc to the same recipients:

16        Evan, thank you.  Please send over the most recent cap

17   table as well.  Jackson.

18        And then in response Mr. Kravitz responds:

19        Jackson, the most recent cap table is attached.

20   Regards, David.

21        And then if you see there his signature block, it

22   was David Kravitz, associate at Katten Muchin.  Do you see

23   that?

24   A    Yes.

25   Q    And then if we can just go to the top, it appears that

W. Name - direct/cross - Atty                    2166

1   you are then forwarding this e-mail to Ms. Chew and Corey

2   Massella, is that right?

3   A    Yes.

4   Q    And that there is an attachment there, is that correct,

5   Mr. Su?

6   A    Yes, that's correct.

7   Q    And if we can refer to the attachment, it's the third

8   page of this document.  Do you recognize this attachment?

9            (Exhibit published.)

10  A    Yes.

11  Q    And what is it?

12  A    It's Retrophin's capitalization table as of February

13  16th, 2012.

14  Q    And can you break -- can you just explain to the jury how

15  this capitalization table works?

16  A    It's interest and shares of a company and each individual

17  has their share in the middle column.  For example -- and it's

18  broken down by different classes and the different classes

19  institute different terms of the class.

20           And then below that in the bottom those are the

21  investments that was made and the units of shares that that

22  investment bought.

23  Q    And when you were referring to this bottom part of the

24  page, this Series A Preferred Units, did you have any

25  involvement with respect to preparing that portion of the

1    capitalization table?

2    A    Not this one, no.

3    Q    Generally speaking, did you have involvement with respect

4    to preparing that portion of the capitalization table as part

5    of your job responsibilities?

6    A    Yes, I update it after 2012 when I started.

7    Q    And what do you refer to this bottom part of the

8    capitalization table as?

9    A    A stock ledger.

10   Q    And if you look at that, we can just look at that portion

11   of this.

12           THE COURT:  That's the portion that says Series A?

13           MS. KASULIS:  Yes, Your Honor, Series A Preferred

14   Units.

15   BY MS. KASULIS:

16   Q    Is that right, Mr. Su?

17   A    Yes.

18   Q    And you see a number of entries for MSMB Healthcare, LP,

19   is that right?

20   A    Yes.

21   Q    And do those entries reflect purchases made by MSMB

22   Healthcare on those dates of stock or shares of Retrophin?

23   A    Yes.

24   Q    Can we look at the very last entry here?  What is the

25   date of that entry?

1    A    February 1st, 2012.

2    Q    And does that appear to reflect a date that MSMB

3    Healthcare, LP made an investment in Retrophin?

4    A    Yes.

5    Q    And what is the amount?

6    A    900,000.

7    Q    And for how many units?

8    A    22,500.

9         MS. KASULIS:  And if we could zoom out again to the

10   full document.

11   BY MS. KASULIS:

12   Q    Do you see anywhere on this capitalization table, Mr. Su,

13   any investments made by MSMB Capital?

14   A    No.

15        MS. KASULIS:  Now, we can put that one aside.

16   Q    Now with respect to that February 1st, 2012 investment

17   made by MSMB Healthcare for $900,000, do you recall seeing a

18   subscription agreement for that investment?

19   A    Yes.

20   Q    I am showing you what's been marked for identification as

21   Government Exhibit 42.  It's actually in the pocket of your

22   binder.

23        Do you recognize this agreement, sir?

24   A    Yes, it's Retrophin, LLC's subscription agreement.

25   Q    For which entity, who was investing with respect to this

W. Name - direct/cross - Atty                2169

1    agreement?

2    A     MSMB Healthcare, LP.

3            MS. KASULIS:  Your Honor, the government moves this

4    exhibit into evidence.

5            MR. AGNIFILO:  No objection.

6            THE COURT:  We will receive Government's Exhibit 42

7    in evidence.

8            (Government's Exhibit 42 was received in evidence.)

9            (Exhibit published.)

10   BY MS. KASULIS:

11   Q     And what is this document, Mr. Su?

12   A     It's an -- it memorializes the investment made by MSMB

13   Healthcare to Retrophin.

14   Q     And if we look at the last page of this document.

15           MS. KASULIS:  And if we could just zoom in on that

16   upper portion to make it a little easier to read.

17   Q     And do you see the date that's been completed in this

18   document for the agreement?

19   A     Yes, it's the 1st of February, 2012.

20   Q     What is the time?

21   A     3:23 p.m.

22   Q     And what are the number of investment units for this

23   agreement?

24   A     22,500 shares.

25   Q     The total amount of money committed?

W. Name - direct/cross - Atty                    2170

1   A     $900,000.

2   Q     And what is the name of the entity that's making this

3   investment?

4   A     MSMB Healthcare, LP.

5   Q     And who signs on behalf of MSMB Healthcare, LP?

6   A     Martin Shkreli.

7   Q     Thank you.

8           Now, separate from this document you state you had

9   sent Citrin Cooperman formation documents, is that right?

10  A     Yes.

11  Q     For Retrophin?

12  A     Yes.

13  Q     I am showing you what's been marked as Government Exhibit

14  119-5.  It's tab 5 of your binder.

15          Do you recognize this document?

16  A     Yes.

17  Q     And what is it?

18  A     It's an e-mail and an EIN number from the IRS and

19  formation documents from the State of Delaware.

20  Q     And are you sending this e-mail to anybody?

21  A     I am sending this to the accountants at Citrin Cooperman,

22  Corey Massella and Susan Chew.

23          MS. KASULIS:  The government moves this exhibit into

24  evidence.

25          MR. AGNIFILO:  No objection.

W. Name - direct/cross - Atty                2171

1          THE COURT:  We receive Government's 119-5.

2          (Government's Exhibit 119-5 was received in

3     evidence.)

4          (Exhibit published.)

5     BY MS. KASULIS:

6     Q    If you look at this first e-mail, Mr. Su, it appears to

7     be dated February 22nd, 2012 from yourself to Corey Massella

8     and Susan Chew.  Is that right?

9     A    Yes.

10    Q    And it looks like there is a number of attachments here

11    that you sent to them?

12    A    Yes.

13    Q    If we refer to the attachment ending in Bates Number 327,

14    it's the fourth page of this exhibit.

15          MS. KASULIS:  If we could just blow this up a little

16    bit, please.  Thank you.

17    Q    What is this document?

18    A    It's a formation document from the State of Delaware.

19    Q    And what entity is it for?

20    A    Retrophin, Inc.

21    Q    And if you look to the portion that's bolded fifth, it

22    says the name and mailing address of the incorporator.  Who is

23    listed there?

24    A    Martin Shkreli.

25    Q    And that mailing address, 330 Madison Avenue, what

SAM      OCR      RMR      CRR      RPR

1    address is that or what's located there?

2    A     That is where MSMB offices are and Retrophin's offices

3    are.

4    Q     And if you look at the next bullet point, what is the

5    date here for the incorporation?

6    A     February 8th, 2011.

7    Q     And who signs this document?

8    A     Martin Shkreli.

9    Q     Now, I am showing you what's been marked for

10   identification as Government Exhibit 119-6.  It's tab 6 of

11   your binder.

12          Do you recognize this document?

13   A     Yes.

14   Q     What is it?

15   A     It's an e-mail and formation documents.

16          MS. KASULIS:  Your Honor, the government moves this

17   exhibit into evidence.

18          MR. AGNIFILO:  No objection.

19          THE COURT:  We will receive Government's 119-6.

20          (Government's Exhibit 119-6 was received in

21   evidence.)

22          (Exhibit published.)

23   BY MS. KASULIS:

24   Q     Now, Mr. Su, what is the -- who is this e-mail exchange

25   between?

W. Name - direct/cross - Atty                2173

1    A    Between myself and the accountants, Corey Massella and

2    Susan Chew.

3    Q    And does this appear, the bottom of this e-mail chain,

4    does this appear to be the same e-mail that we just looked at

5    as Government Exhibit 119-5?

6    A    Yes.

7    Q    And if we look further up in the e-mail chain dated

8    February 23rd, 2012, Mr. Massella writes to you and Ms. Chew

9    stating:

10            All these documents relate to Retrophin, Inc., a

11   Delaware corporation, not a limited liability corporation.

12   Please ask if they sent the wrong documents and, if so, what

13   is this corporation about?

14            And then you respond earlier up in the chain or

15   later in the chain, I guess?

16   A    Yes.

17   Q    You then respond:  Disregard the Inc., just these two for

18   LLC.  And then you attach some documents here, is that right?

19   A    That's correct.

20   Q    Do you understand the difference between Retrophin, Inc.

21   and Retrophin, LLC?

22   A    They're different companies.

23   Q    Did you understand the significance at all at this point

24   in time of the difference between them, if any?

25   A    No, I didn't.

W. Name - direct/cross - Atty                    2174

1   Q    And let's look at the attachments.  There appear to be

2   multiple attachments.  I can direct your attention to the page

3   ending in 480.

4           And do you have that in front of you, Mr. Su?

5   A    Yes.

6   Q    What is this document?

7   A    It is a formation document from the State of Delaware for

8   Retrophin, LLC.

9   Q    And what is the date on this document?

10  A    It's dated March 11th, 2011.

11  Q    And if you refer to the attachment with the Bates range

12  ending in 484 through 6, just go to the first page ending in

13  484.

14  A    Yes.

15  Q    And do you see there that it appears to be a New York

16  State employer registration, and in the first section that's

17  for Retrophin, LLC?

18  A    Yes.

19  Q    And the first date of operation under section -- it's the

20  Part B, Business Employer, that date there for Number 1, it

21  says Enter date of first operations in New York State.  Do you

22  see that?

23  A    Yes.

24  Q    What is the date listed there?

25  A    April 1st, 2011.

W. Name - direct/cross - Atty                    2175

1    Q    If you turn to the second page of this document, if you

2    look at the very bottom of the page under Part E, Business

3    Information.

4    A    Yes.

5    Q    And it states:  Complete the following for sole

6    proprietor, household employer, domestic services, all

7    partners, all members and all corporate officers.  And who is

8    listed there?

9    A    Martin Shkreli.

10   Q    Thank you, you can put that document aside.

11           You had mentioned retaining an accounting firm to

12   help Retrophin get their financials in order to, ultimately,

13   take the company public.  You also mentioned auditing, is that

14   right?

15   A    Yes.

16   Q    Did there come a point in time where an auditing firm was

17   retained for Retrophin?

18   A    Yes.

19   Q    And what was the name of that firm?

20   A    Marcum.

21   Q    And why did auditing function need to occur?

22   A    It's a stamp of approval that the accounting for the

23   company is accurate.

24   Q    And with respect to Marcum, what entity was Marcum

25   auditing?

W. Name - direct/cross - Atty                2176

1   A      Retrophin.

2   Q      Any other entities?

3   A      Not that I'm aware of.

4   Q      And --

5          THE COURT:  I'm sorry, was this Retrophin, LLC?

6   BY MS. KASULIS:

7   Q      Do you know if it was for LLC or Inc.?

8   A      It was for Retrophin, LLC.

9   Q      Thank you.

10         And with respect to the auditing function, what was

11  Marcum hired to do?

12  A      They were hired to certify that the financial statements

13  were accurate.

14

15         (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Su - direct - Kasulis                    2177

1   (Continuing)

2   Q    And was there a particular period of time that they were

3   focused on when initially hired by the company?

4   A    For 2011.

5   Q    And who was your -- do you recall when Marcum was

6   retained, approximately?

7   A    April 2012 time frame.

8   Q    And who was your primary point of contact at Marcum?

9   A    Ed Hackert.

10  Q    And was there anybody else at Marcum?

11  A    Sunil Jain.

12  Q    And did you interact at all with the Mr. Hackert and

13  Mr. Jain from Marcum?

14  A    Yes.

15  Q    And what was the nature of your interaction with them?

16  A    I was the point of contact.

17  Q    And did you ever send them any materials that they

18  requested from the company?

19  A    Yes.

20  Q    Now, we had discussed Evan Greebel earlier.

21       Did you interact with Mr. Greebel?

22  A    Yes.

23  Q    And can you describe the nature of your interactions with

24  him?

25  A    Any legal issues, even investments, subscription

Su - direct - Kasulis                    2178

1  documents, capitalization table.  We just, myself and my

2  colleagues would ask him or go to him for some easy

3  record-keeping things like the cap table.

4  Q    Did you observe Mr. Greebel's interactions with

5  Mr. Shkreli at all?

6  A    From time to time, yes.

7  Q    And what did you observe about those interactions between

8  Mr. Greebel and Mr. Shkreli?

9  A    They were professional.  They talked about the business

10 or anything that had to do with Retrophin.

11 Q    What was your impression of Mr. Greebel?

12 A    He was a smart, smart lawyer, yes.  Yeah.

13 Q    And in terms of their relationships, between Mr. Shkreli

14 and Mr. Greebel that you observed, did you actually observe

15 them interacting together?

16 A    Yes.

17 Q    And did you observe anything about their relationship?

18 A    Martin was the one that mostly directed Evan to do

19 whatever he needed and he, Martin controlled the conversation

20 more, normally.

21 Q    Now, with respect to Retrophin's capitalization table,

22 you had said earlier that you updated the ledger; is that

23 right?

24      The stock ledger portion of the table?

25 A    Yes.

Su - direct - Kasulis                              2179

1  Q    And did you do that regularly as part of your

2  responsibilities?

3  A    Yes, as investments came in.

4             MS. KASULIS:  I'm showing you what's been marked for

5  identification as Government's Exhibit 119-10.  And that's tab

6  ten of your binder.

7  Q    Do you recognize this document?

8  A    Yes.

9  Q    What is it?

10 A    It's an e-mail and capitalization table for Retrophin

11 LLC.

12 Q    Who was the e-mail from?

13 A    It's from me.

14 Q    To whom?

15 A    To Martin Shkreli.

16 Q    And what is the date on it?

17 A    August 30th, 2012.

18            MS. KASULIS:  The Government moves this Exhibit into

19 evidence, Your Honor.

20            MR. AGNIFILO:  No objection.

21            THE COURT:  We will receive Government's

22 Exhibits 119-10.

23            (Government's Exhibit 119-10 received in evidence.)

24            (Exhibit published to jury.)

25            MS. KASULIS:  If we could just zoom in on that, or

Su - direct - Kasulis                    2180

1  do a side-by-side or zoom in.

2  Q    And this appears to be an e-mail from you, Mr. Su, to

3  Mr. Shkreli, dated August 30th, 2012; is that right?

4  A    Yes.

5  Q    And you attach a Retrophin capitalization table.  The

6  document appears to state that, in the title:  Revised

7  June 27th, 2012; is that right?

8  A    Yes.

9  Q    Did you periodically send Mr. Shkreli the Retrophin

10 capitalization table in the course of your job

11 responsibilities?

12 A    Yes.

13 Q    And why would you do that?

14 A    As investments came along, I would update the stock

15 ledger and send that.

16 Q    And you write here:  Since May 1st, 2012, MSMB Healthcare

17 LP has invested 765,000 in Retrophin LLC.

18        Do you see that?

19 A    Yes.

20 Q    And then you go on to state:  Attached is the full cap

21 table.

22 A    Yes.

23 Q    Do you recall why you sent this e-mail to Mr. Shkreli?

24 A    I don't recall.

25        MS. KASULIS:  If we look at the attachment to this

1    e-mail.  I know it's a little dense, hard to read.

2            Under the series A preferred unit section, which is

3    about halfway down.

4    Q    Again, is this what you refer to as the stock ledger?

5    A    Yes.

6    Q    And this is the ledger that you would update periodically

7    with subscription agreements as they came in?

8    A    Yes.

9    Q    And do you see there listed MSMB Healthcare has a number

10   of entries; is that right?

11   A    Yes.  They were the biggest investors.

12   Q    If you look at February 1st, 2012, the entry there.

13           Do you see MSMB Healthcare LP listed there as making

14   an investment on February 1st, 2012?

15   A    Yes, for $900,000.

16           MS. KASULIS:  Thank you, you can put that aside.

17   Q    And as part of your responsibilities, did you

18   periodically send the capitalization table to Susan Chew and

19   Corey Massella of Citrin Cooperman?

20   A    Yes.

21           MS. KASULIS:  I'm showing you what's been marked for

22   identification as Government's Exhibit 119-13.  It's tab 11 of

23   your binder.

24   Q    Do you recognize this document?

25   A    Yes.

1    Q     And what is it?

2    A     It's a capitalization table along with a stock ledger.

3    Q     The first page of the document, what is that?

4    A     It's an e-mail from myself to the folks at Citrin

5    Cooperman.

6    Q     And who is Di Jia Liang?

7    A     My wife, currently.  Now.

8    Q     Were you married to her at this time?

9    A     Was not.  And -- was not.

10   Q     Did you meet her there this, through your interactions

11   with her in relation to your job?

12   A     Yes.

13   Q     She, I take it, was an employee of Citrin Cooperman at

14   this point in time?

15   A     She filled in for Susan for a week when she was on

16   vacation, for vacation.

17   Q     So, you met her in that one-week time period?

18   A     Yes.

19   Q     And what is the last document we looked at, the e-mail

20   that was Government's Exhibit 119-10.  That e-mail from you to

21   Mr. Shkreli was dated August 30th, 2012.

22         What is the date on this e-mail?

23   A     November 14th, 2012.

24   Q     And it appears you write:  Latest cap table.

25         For which company were you referring to when you say

1   cap table?

2   A     For Retrophin LLC.

3   Q     And the subject is:  Copy of 11/5 Retrophin

4   post-conversion cap table.

5            Do you see that?

6   A     Yes.

7   Q     What do you mean by post-conversion?

8   A     This was when the share price changed.

9   Q     And do you have an understanding as to why the share

10  price had changed?

11  A     No.

12           MS. KASULIS:  And if we look at the attachment to

13  this e-mail and I'm sorry, just to go back.

14  Q     On that first e-mail, it says 11/5 and the date of the

15  attachment -- I'm sorry the name of the attachment.

16           What does 11/5 indicate to you?

17  A     November 5th.

18  Q     And of what year?

19  A     2012.

20  Q     Thank you.

21           MS. KASULIS:  If we could now refer to the

22  attachment.  And if we could look at the second page of this

23  attachment.

24           (Pause in the proceedings.)

25           MS. KASULIS:  Oh, I'm sorry, Your Honor, we move

Su - direct - Kasulis                         2184

1   this Exhibit into evidence, I'm sorry.

2            THE COURT:  All right.

3            MR. AGNIFILO:  That's fine.

4            THE COURT:  Okay.

5            We will admit Government's Exhibit 119-13 in

6   evidence.

7            (Government's Exhibit 119-13 received in evidence.)

8            (Exhibit published to jury.)

9            MS. KASULIS:  I'm sorry, Your Honor.

10           THE COURT:  That's all right.

11           MS. KASULIS:  And then if we could go ahead and show

12  this cover e-mail to the jury.

13  Q    So, it's from yourself to Mr. Massella, your now-wife and

14  Susan Chew; is that right?

15  A    Yes.

16  Q    And then there was the language we were talking about

17  with the name of the attachment:  Copy of 11/5 Retrophin

18  post-conversion cap table?

19  A    Yes.

20  Q    And your e-mail states:  Latest cap table; is that right?

21  A    Yes.

22  Q    And we talked about what you meant with post-conversion;

23  correct?

24  A    Yes.

25  Q    Okay.

VB        OCR        CRR

Su - direct - Kasulis                    2185

1            MS. KASULIS:  And so, let's go to the attachment.

2    And the second page, this is the first page.

3            (Exhibit published to jury.)

4    Q    Is this a capitalization table for Retrophin?

5    A    Yes.

6    Q    And if we look at the second page, does this appear to be

7    a stock ledger that you referred to previously?

8    A    Yes.

9    Q    And again, I want to go to the date of February 1st,

10   2012.

11   A    Yes, MSMB Healthcare.

12   Q    And what do you see there?

13   A    An investment by MSMB Healthcare for 22,500 shares of

14   $900,000 investment with a share price of $40 per share.

15   Q    And this capitalization table, this is as of

16   November 5th, 2012; is that right?

17   A    Correct.

18   Q    And if you want to take a moment to look at this

19   capitalization table.

20           Do you see anywhere on this table an investment by

21   MSMB Capital into Retrophin?

22   A    No.

23           THE COURT:  Can I ask a question?

24           MS. KASULIS:  Yes.

25           THE COURT:  Where did you get the information for

                          VB      OCR      CRR

Su - direct - Kasulis                    2186

1    the number of shares, the investment amount and the price per

2    share?

3              What was the source of the information that you used

4    to prepare this investor table?

5              THE WITNESS:  The subscription document.

6              THE COURT:  Okay.

7              And then, did you see bank statements also or some

8    sort of financial statements that would verify the amount of

9    the investment?

10             THE WITNESS:  Yes, the Chase Bank account.

11             THE COURT:  And then price per share.

12             Where did that come from?

13             THE WITNESS:  From the subscription document.

14             THE COURT:  Thank you.

15             MS. KASULIS:  Thank you, Mr. Su.  You can put this

16   document aside.

17   Q    Did there come a point in time where Retrophin moved

18   offices?

19   A    Yes, October 2012.

20   Q    And were you involved in that office move?

21   A    I found the office space.

22   Q    And what was the new office space, where was that?

23   A    777 Third Avenue.

24   Q    That was in New York, New York?

25   A    That was in New York City, yes.

Su - direct - Kasulis                    2187

1   Q    And prior to the move, the office, where was it located

2   again?

3   A    330 Madison.

4   Q    Which entity actually paid for the rent for 330 Madison,

5   do you recall?

6   A    It was Retrophin.

7   Q    And which entity did Retrophin pay rent to for that

8   location, 330 Madison Avenue?

9   A    Power Space.

10  Q    And when the office moved to 777 Third Avenue, New York,

11  New York, who paid for the rent at that office space?

12  A    Retrophin.

13  Q    And who was the leaseholder on that space?

14  A    MSMB.

15  Q    And so, why did MSMB sign the lease?

16  A    Because the landlord required a more established company.

17           THE COURT:  Was it MSMB Healthcare that paid or that

18  was on the lease or was it MSMB Capital?

19           THE WITNESS:  I can't remember.

20  Q    And was there any deposit that had to be paid?

21  A    Yes.

22  Q    And who paid that deposit?

23  A    150,000 was paid by Retrophin.

24  Q    And do you recall the move itself?

25  A    Yes.

1   Q     What do you recall about it?

2         MR. AGNIFILO:  I'm going to object, Your Honor, can

3   we have a side-bar?

4         THE COURT:  Yes.

5         Is now a food time for the jurors' lunch or do you

6   want to hang in for a couple more minutes?

7         THE JURY:  Couple more.

8         THE COURT:  Okay.

9         A couple more minutes is all you have, Mr. Agnifilo.

10        MR. AGNIFILO:  I understand, Judge, I'm good.

11        (Side-bar conference held on the record out of the

12   hearing of the jury.)

13

14        (Continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

Side-Bar                                              2189

1              (Side-bar.)

2              MR. AGNIFILO:  I'm expecting that the next series of

3    questions is going to be along the lines of that the move took

4    place in the middle of the night to stiff the old landlord

5    somehow with unpaid rent and I just don't think that has any

6    role at this trial.  I mean, it has nothing to do with any of

7    the charges.  It's unduly prejudicial.  It doesn't further any

8    of the charged conduct and it's just, I don't know, it's

9    almost like propensity.

10             There's a lot of evidence that we're starting to get

11   into that's sort of general lying and deceiving propensity

12   evidence which I think is, I have a 403 issue with.

13             So, I don't think it's horribly relevant that they

14   moved in the middle of the night or in the middle of the day

15   or whether he paid the old landlord or whether he didn't and

16   that's why I'm objecting.

17             THE COURT:  It's news to me but the reason it seemed

18   to be relevant to me is that it would show or be indicia of

19   the financial health of the companies.

20             Since representations are being made about the

21   health of the funds, the health of the corporation.  I thought

22   the money was relevant and how they conduct their business.

23             MR. AGNIFILO:  I think, though -- listen, I think

24   the cap tables show there's either money -- I think there's

25   more concrete ways of showing whether or not there's money.

Side-Bar                          2190

1   They can put in bank accounts, they can do things like that.

2   To show whether or not they moved in the middle of the night

3   like a bunch of college kids, which is what they did, I just

4   don't think it advances the ball.  And I just think the jury's

5   going to think oh, he's a shyster and that's exactly what

6   they're not supposed to think.

7              MS. KASULIS:  Your Honor, this is October of 2012.

8   This is right around the time of the wind-down e-mail where

9   Mr. Shkreli is saying that everyone can be reimbursed in cash

10  with respect to their investments in funds.

11             And we agree that we offer this to show the

12  financial health of Retrophin and the entities during this

13  time period.  This time period is critical for us in that

14  regard.

15             MR. BRAFMAN:  But you can ask whether the fund had

16  any money at the time.  You can have money and still decide to

17  stiff your landlord.  One thing has nothing to do with the

18  other.

19             The decision to move out in the middle of the night

20  is exactly what Mr. Agnifilo said.  You can ask him whether or

21  not the fund had any money at the time and I think the

22  decision to decide not to pay a bill is --

23             MS. KASULIS:  Mr. Shkreli precluded him from

24  actually having access to MSMB Healthcare's bank accounts, so

25  he wouldn't have that information.

Side-Bar                                    2191

1          MR. AGNIFILO:  This evidence is coming in later in

2     the trial.  I think, you guys have all this information.

3     There's charts.

4          The Government is going to regale you with pages and

5     pages of wonderful charts and so we're going to have the

6     actual numbers.  We're going to know exactly how much money

7     they had, as far as I can tell from the charts.  So, I think

8     this is more of a moral issue than it is a financial issue.

9     They're running out on the landlord.  That's not right, but

10    that's not charged.

11         MS. SMITH:  I think it's actually an old chief

12    issue.  We have the bank accounts but how does Mr. Su know

13    that there's a financial -- there's problems with the

14    finances?  And one of the ways he knows is they move in the

15    middle of the night and don't pay their rent.

16         THE COURT:  Is he going to testify as to why they

17    moved in the middle of the night?

18         MS. KASULIS:  Yes, because they weren't paying the

19    prior bill.

20         THE COURT:  All right.

21         Is he going to testify as to who told him that the

22    financial condition of the company required this move in the

23    middle of the night?

24         MS. KASULIS:  I anticipate that he will say

25    Mr. Shkreli.  Of course, I can't guarantee that, but this is

VB        OCR        CRR

Side-Bar                        2192

1   what I anticipate.

2          MR. BRAFMAN:  Judge, that's the point.  You have

3   decisions being made by characters around Mr. Shkreli who are

4   CEOs, CFOs, Mulleady, Biestek.  None of them have been charged

5   and they're not in the case.  The decision whether he moves in

6   the middle of night or 10:00 o'clock in the morning to the

7   extent that you owe the landlord rent, what does that have to

8   do with this case?

9          MS. KASULIS:  Because the financial health of the

10  entities is critically important to the case.

11         MR. BRAFMAN:  But you don't know that that's why

12  they're deciding not to pay the rent.  Maybe he had an

13  argument with the landlord.  Maybe he just did it on principle

14  because the landlord didn't provide good services.

15         There are a lot of reasons shy you may want to stiff

16  a landlord, trust me, I know why you pay want to stiff a

17  landlord.  That has nothing to do with the financial health of

18  the company.  People have arguments with vendors all the time

19  and they refuse the pay the bill, not because they're

20  financially bankrupt; because something happened in the

21  relationship.  And you don't know that here.

22         MR. SRINIVASAN:  Well, we certainly have additional

23  evidence that we can put in, all of the unpaid bills.  This is

24  one example around that time period.  So, we can spend a lot

25  of time going over all the unpaid bills.  This happens to be

VB        OCR        CRR

Side-Bar                                              2193

1    one that's illustrative of this time period, but he speaks

2    about -- Mr. Pierotti can also testify about this.  And it was

3    a signal to the people working there that as they're trying to

4    pull together the Valeant deal and go public, there was no

5    actual money.  Salaries aren't getting paid, rent's not

6    getting paid.  Like I say, we have a whole litany of bills.

7               THE COURT:  I can give an instruction to the jury

8    that obviously, this is not a landlord/tenant dispute and he

9    is not being charged with that because it is being offered by

10   the Government to show --

11              MR. AGNIFILO:  I appreciate it.

12              THE COURT:  I can give an instruction.

13              MR. AGNIFILO:  I think they know the evidence still

14   better than me.

15              THE COURT:  A lot better than I do, too.

16              MR. AGNIFILO:  At some point you're going to put in

17   evidence of exactly how much money they had at this point in

18   time.

19              MS. SMITH:  Yes, we are putting in bank records.

20              MR. AGNIFILO:  So, why are we doing this?

21              MS. SMITH:  Because you made arguments about

22   Retrophin being a real company, it was robust and this is a

23   very significant event for them about the -- as Ms. Smith

24   said, it's indicia of something's wrong.  There's real issues

25   with the company and the finances of the company and so, we're

Side-Bar                    2194

1    offering it for that purpose; to show that this was not the

2    robust company that had been alleged.

3              MR. AGNIFILO:  The jury's going to have the actual

4    evidence.

5              MS. KASULIS:  Employees don't have access to the

6    accounts.  This is their experience working for this company

7    that the Defense has emphasized the significance of the

8    company.  The employees' experience at the company with

9    respect to this issue and how it is reflective of the

10   financial distress to the company is relevant.

11             MR. AGNIFILO:  I disagree with you.  I don't think

12   his opinion about the company is relevant at all.  The reason

13   you're putting this in is you're trying to say that, as a

14   matter of fact, the company didn't have any money.  But you're

15   going to put in actual evidence of that at some point in this

16   trial, so why are you beating around the bush?

17             MR. SRINIVASAN:  It's not just the company.

18   Mr. Shkreli was the only person who had access to the

19   Retrophin books and the MSMB Capital books and the MSMB

20   Healthcare books.  He only has access to Retrophin.  He

21   doesn't know what else is going on.  This is a way that he can

22   see that not only -- he can see into Retrophin but clearly,

23   the funds don't have any money, otherwise somebody's going to

24   be paying the rent.  This is the way that we show kind of what

25   his experience was and what his knowledge was so that he can

Side-Bar                                          2195

1   testify about it.

2        THE COURT:  I think that to the extent this witness

3   is going to testify about his knowledge based on what

4   Mr. Shkreli told him, if that is what you are proffering, that

5   the reason for this move in the middle of the night and its

6   relation to the financial status of the company, I think it is

7   relevant and can be admitted.

8        I do not think on balance, in terms of the probative

9   prejudicial analysis, that it shows or would establish undue

10  prejudice to Mr. Shkreli because it is being proffered really

11  to show the financial status at the time and what measures the

12  decision-makers took to make sure that the mission of the

13  entities could continue, whatever they might be.

14       MR. BRAFMAN:  Right.

15       Without waiving our objection then we would ask for

16  a limiting instruction.

17       THE COURT:  Okay, what would you like me to tell

18  them?

19       MR. BRAFMAN:  That this evidence is being offered

20  solely as evidence to determine the financial position of the

21  company at the time.  It is not being offered to suggest that

22  Mr. Shkreli did anything wrong by not paying the landlord.

23       THE COURT:  So we will say the MSMB and Retrophin

24  companies --

25       MR. BRAFMAN:  That's fine.

```
                        Proceedings                    2196

 1            THE COURT:  Okay.

 2            (Pause in the proceedings.)

 3            MR. BRAFMAN:  My colleagues have talked me out of

 4   giving a limiting instruction.

 5            THE COURT:  You do not want a limiting instruction?

 6            MR. AGNIFILO:  I don't want to look to the finances

 7   of the company.  I just, I'd rather it just sail right over

 8   their heads and think they're a bunch of hillbillies, not that

 9   there's anything wrong with that, Judge.

10            THE COURT:  Watch it, you do not know who you're

11   insulting.

12            So, no limiting instruction and your objection is

13   noted.

14            MR. AGNIFILO:  That's fine, Judge.

15            ALL:  Thank you.

16            (Side-bar end.)

17

18

19            (Continued on following page.)

20

21

22

23

24

25
```

                        VB        OCR        CRR

Su - direct - Kasulis                    2197

1   DIRECT EXAMINATION (continuing)

2   BY MS. KASULIS:

3           THE COURT:  Don't you wish you asked for lunch.

4           MS. KASULIS:  May I proceed, Your Honor?

5           THE COURT:  Yes, you may.

6   Q     Do you recall the actual move, Mr. Su, from 330 Madison

7   to 777 Third Avenue in New York, New York?

8   A     Yes.

9   Q     What do you recall about that?

10  A     The morning that I walked in to the office, Martin and

11  Michael Smith was moving their -- moving the office out with

12  computers and whatever they could take in their hand.  Martin

13  told me that he moved overnight, throughout the night and

14  moved things into the new office.

15  Q     Did he tell you why he had done that, moved it overnight?

16  A     Financially, it was we owed rent to Power Space and there

17  was upcoming rent due also and since we had new office space,

18  decided to skip -- skip rent and paying Power Space.

19  Q     Did Retrophin ultimately go public?

20  A     Yes, in 2012, December of 2012.

21  Q     What was the process for -- are you familiar with the

22  process as to how Retrophin went public?

23  A     Yes.

24  Q     What was that process?

25  A     It was through financial statements, having the financial

Su - direct - Kasulis                    2198

1   statements audited, registering with the SEC with a document

2   that's called a Super 8-K and that was managed by Evan Greebel

3   at Canton.

4   Q    Was there IPO or was there another way that Retrophin

5   went public?

6   A    It was through a reverse merger by buying a shell company

7   that's already public.

8   Q    What was the name of that shell company?

9   A    Desert Gateway.

10  Q    And were you involved in the reverse merger process for

11  Retrophin?

12  A    Yes.

13  Q    How were you involved?

14  A    Giving documents and coordinating between the service

15  providers like Citrin Cooperman, Marcum, and coordinating

16  phone calls between the two as well.

17  Q    Now, directing your attention to the time period leading

18  up to the reverse merger and going public, you said that was

19  in -- they went public in mid December 2012?

20  A    That's correct.

21  Q    Meaning Retrophin; is that right?

22  A    Retrophin, yes.

23  Q    And directing your attention to the time period right

24  before that, November of 2012, had you ever heard of the term

25  promissory note?

1   A     Yes.

2   Q     What is that to you?

3   A     It's a contract that memorializes a debt that is owed

4   from one person to the other.

5   Q     And were you familiar with any promissory notes that

6   Retrophin had entered into?  Were you familiar with any of

7   those notes, you yourself, in the November 2012 time period?

8   A     Yes, there were two.

9   Q     And can you explain those two promissory notes?

10  A     The first promissory note that Retrophin had was with one

11  of my colleagues, George Huang, and that promissory note came

12  about because there were royalty payments that were due to

13  Ligand from the license that Retrophin acquired from the

14  company and Retrophin didn't have any money in its bank

15  account, so George Huang took his personal money, $30,000, and

16  gave it to Retrophin to pay for that license agreement in

17  exchange for the promissory note.

18  Q     And approximately what time period was that?

19  A     It was the November timeframe, 2012.

20  Q     I think you referred to another promissory note?

21  A     The second promissory note that I saw was the one that

22  Martin dropped off on my desk from MSMB Healthcare to

23  Retrophin.

24  Q     And when did Martin drop that promissory note off on your

25  desk?

1  A    November 2012 timeframe.

2  Q    And had you seen that promissory note before that point

3  in time?

4  A    I have not.

5  Q    And can you describe that promissory note for the jury?

6  A    It was a $900,000 promissory note from MSMB to Retrophin

7  for $900,000.

8  Q    When you say MSMB, who are you referring to?

9  A    MSMB Healthcare.

10 Q    What was -- according to the agreement, what was the date

11 of that promissory note?

12 A    February 1, 2012.

13          THE COURT:  You said the note was from MSMB

14 Healthcare to Retrophin.  Are you saying that MSMB owed

15 $900,000 to Retrophin?

16          THE WITNESS:  MSMB lent $900,000 to Retrophin.

17          THE COURT:  So the note was signed by Retrophin in

18 favor of the MSMB Healthcare?

19          THE WITNESS:  So MSMB loaned $900,000 to Retrophin

20 and the note says that Retrophin has to pay MSMB Healthcare

21 back the $900,000, plus interest.

22          THE COURT:  Thank you.

23          MS. KASULIS:  Thank you, Your Honor.

24 Q    And were there any other notes that you were aware of

25 during this time period besides the George Huang note, the

Su - direct - Kasulis                          2201

1    $900,000 MSMB Healthcare note?  Were there any other notes?

2    A    Not that I am aware of.

3    Q    I'm showing you what has been marked for identification

4    as Government Exhibit 119-36.  It is tab 12 of your binder.

5    A    Yes.

6    Q    Do you recognize this exhibit?

7    A    Yes.  It's the promissory note.

8    Q    Which promissory note?

9    A    From -- between Retrophin, LLC and MSMB Healthcare, L.P.

10              MS. KASULIS:  Government moves this exhibit into

11   evidence.

12              MR. AGNIFILO:  One second, Judge.

13              No objection.  That's fine.

14              THE COURT:  We will admit Government Exhibit 119-36.

15              (Government's Exhibit 119-36 was received in

16   evidence.)

17   Q    Can you please explain this document to the jury, Mr. Su?

18   A    It's a promissory note, again, from -- between MSMB

19   Healthcare L.P. and Retrophin for $900,000 and it must be paid

20   back before December 31, 2012.  It carries an interest rate of

21   12 percent per annum.

22   Q    Okay.  So let's just focus on the top half through to A,

23   the middle of 2-A.  Thank you.

24              So, do you see -- it looks like underneath some

25   language about the Securities Act -- Retrophin, LLC and then

1    secured promissory note.  Do you see that?

2    A    Yes.

3    Q    Do you see right underneath it there is the date of

4    issuance?  What is that date there?

5    A    February 1, 2012.

6    Q    On the right-hand side of your screen, what is the amount

7    there?

8    A    $900,000.

9    Q    And in the first paragraph it reads, For value received,

10   Retrophin, LLC, defined as the borrower, hereby promises to

11   pay to the order of MSMB Healthcare LLP, defined as the

12   lender, an initial principal amount of $900,000, together with

13   interest thereon calculated from the date hereof in accordance

14   with the provisions of this promissory note, defined as the

15   note.  Do you see that?

16   A    Yes.

17   Q    The next paragraph relates to the interest that you had,

18   I believe, just referenced.  The first sentence reads,

19   Interest will accrue daily at a rate of 12 percent per annum.

20   What does that mean, 12 percent per annum?

21   A    12 percent per year.

22   Q    It goes on to say, Compounded monthly on a calendar basis

23   on the unpaid principal amount of this note outstanding from

24   time to time.  Do you see that?

25   A    Yes.

Su - direct - Kasulis                    2203

1   Q    And then in subsection two, entitled Payment of

2   principal, do you see that first sentence reads Borrower,

3   which has been defined as Retrophin, LLC, will pay $900,000,

4   the outstanding principal amount of this note, plus all

5   accrued unpaid interest then outstanding in cash on or prior

6   to December 31, 2012.  Do you see that?

7   A    Yes.

8   Q    I want to direct your attention to the last page of this

9   document ending in Bates number 240.

10  A    Yes.

11  Q    And the top of this page reads In witness thereof,

12  borrower has excused the secured promissory note on the date

13  first above written.  Was that date earlier in the document

14  February 1, 2012?

15  A    Yes.

16  Q    It appears to be between the two parties, Retrophin, LLC.

17  Who signs on behalf of Retrophin, LLC?

18  A    Martin Shkreli.

19  Q    And if you look further down there for MSMB Healthcare,

20  who signs on behalf of MSMB Healthcare?

21  A    Martin Shkreli.

22  Q    So Martin Shkreli is signing on behalf of both entities;

23  is that right?

24  A    Yes.

25  Q    And you had said that you had never seen this document

Su - direct - Kasulis                           2204

1   before November 1, 2012?

2   A    Correct.

3   Q    I'm sorry, before November of 2012?

4   A    Correct.

5   Q    And when you received this note -- I think you said it

6   was dropped on your desk by Mr. Shkreli -- what was your

7   reaction to receiving it?

8   A    I was surprised and taken back.

9   Q    Why?

10  A    Because this replaced the equity investment made by MSMB

11  Healthcare in February 1st of 2012.

12  Q    Why were you surprised?  What was your concern?

13  A    Because it was reclassified for something that happened

14  in February, which is a big -- which I thought was -- it

15  didn't seem right to me.

16  Q    And did you have any understanding as to why the $900,000

17  investment by MSMB Healthcare was reclassified as a loan per

18  the promissory note that we saw --

19  A    I don't.

20  Q    -- as Government Exhibit 119-36?

21  A    I don't know why, what the purpose was.

22            MS. KASULIS:  Just one moment, Your Honor.

23            (Pause.)

24  Q    Mr. Su, do you know an individual -- we talked about

25  Steve Aselage before; is that right?

MDL   RPR

1   A     Yes.

2   Q     Who was he again?

3   A     He was and is the CEO of Retrophin.

4   Q     And when did he begin as the CEO of Retrophin?

5   A     October of 2012.

6   Q     And do you have an understanding as to why he was brought

7   on as the CEO of Retrophin?

8   A     It's... from my understanding, I think he was a better --

9   a better leader to represent Retrophin than what Martin was

10  according to investors.

11            MR. AGNIFILO:  I am going to object to that answer

12  and move to strike, unless he has had conversations with

13  investors.  His impression.  I think it is inadmissible.  I

14  move to strike.

15            THE COURT:  I will grant the application to strike

16  his response.  The jury should disregard it.

17  Q     How much interaction do you have with Mr. Aselage?

18  A     We spoke often, daily.

19  Q     And what was your impression of him?

20  A     Professional, successful, knowledgeable.

21  Q     In the November, December 2012 time period, were you

22  familiar with the Retrophin cap table at that point in time?

23  A     Yes.

24  Q     And with that $900,000 investment that we saw from MSMB

25  Healthcare from February 1, 2012, what happened to that

Su - direct - Kasulis                    2206

1   investment with respect to the cap table in that time period,

2   November, December, 2012?

3   A    The equity investment from MSMB Healthcare disappeared

4   from the cap table.

5              MS. KASULIS:  Your Honor, this might be a good

6   stopping point.

7              THE COURT:  Why don't we give the jurors lunch.

8   Please don't speak about the case and please leave your

9   notebooks in your folders on your chairs.  Thank you.  Please

10  return to the jury room in one hour, at 1:35.  Thank you.

11             (Jury exits the courtroom.)

12             THE COURT:  Thank you.  Have a seat.  Is there

13  anything that we need to address during the lunch hour?

14             MS. KASULIS:  No, Your Honor.

15             THE COURT:  1:35.  I will see you back in the

16  courtroom.

17             MS. KASULIS:  Thank you, Judge.

18             (Lunch recess.)

19

20

21

22

23

24

25

1                      **AFTERNOON SESSION**

2                   (In open court - jury not present.)

3              THE COURT:  Is there anything that we need to

4    discuss before we get started?

5              MS. KASULIS:  No, Your Honor.

6              THE COURT:  Thanks.  Everyone can sit down.

7              (Pause.)

8              (Witness resumes the stand.)

9              (Jury enters.)

10             MS. SAUNDERS:

11             THE COURT:  We have all jurors present.  Thank you.

12   Please have a seat.

13             MS. KASULIS:  May I proceed, Your Honor?

14             THE COURT:  Yes, you may.

15   **JACKSON SU**,

16        called as a witness by the Government, having been

17        previously duly sworn, was examined and testified further

18        as follows:

19   DIRECT EXAMINATION CONTINUES

20   BY MS. KASULIS:

21   Q    Good afternoon, Mr. Su.

22   A    Good afternoon.

23   Q    As part of your job responsibilities did you provide any

24   kind of administrative services to Mr. Shkreli?

25   A    Yes.

W. Name - direct/cross - Atty                    2208

1    Q    And what kind of administrative services did you provide?

2    A    Including everything from scanning, looking for office

3    space, that was -- putting furniture together for our new

4    office.

5    Q    What kinds of documents would you scan?

6    A    Mostly subscription agreements, transfer agreements,

7    those sorts of documents, contracts that the company signed.

8    Q    When you say transfer agreements, what do you mean by

9    that?

10   A    Transfer of shares between Martin and other people, other

11   individuals.

12   Q    And we had reviewed the capitalization table for the

13   November 2012 time period for Retrophin.  Do you recall that?

14   A    Yes.

15   Q    And then what was your understanding, again, as to

16   whether MSMB Capital appeared on Retrophin's capitalization

17   table in November of 2012?

18   A    Can you point back to the document?  I'm sorry, I just

19   want to make sure I'm --

20   Q    Sure.  Let's look at Government Exhibit 119-13, it's

21   tab 11.

22             (Exhibit published.)

23   BY MS. KASULIS:

24   Q    Do you recall this exhibit, it's in evidence?

25   A    Yes.

W. Name - direct/cross - Atty                    2209

1   Q    And it appears to be an e-mail from you dated

2   November 14th, 2012?

3   A    That's correct, yes.

4   Q    And that was from you to Corey Massella, and your now

5   wife Susan Chew, do you see that?

6   A    Yes.

7   Q    And when we had talked earlier, you had stated that the

8   11-5 in the attachment name, that was for November 5th, 2012,

9   is that right?

10  A    That's correct.

11  Q    And if we turn to the attachment, does this appear to be

12  the capitalization table for Retrophin that you had attached

13  to this e-mail?

14  A    Yes.

15  Q    And if you could just take a look at this document, do

16  you see anywhere in this document MSMB Capital having made an

17  investment into Retrophin?

18  A    No, there doesn't appear to be one on this table.

19  Q    So now directing your attention, again, to the

20  November 2012 time period.  Do you recall getting some share

21  transfer agreement or a share transfer agreement from the

22  defendant?

23  A    Yes.

24  Q    And I am going to show you what has been marked for

25  identification as Government's Exhibits 15 through 19, and

W. Name - direct/cross - Atty                2210

1    then Exhibits 119-25 and 119-26.  And those are tabs 14

2    through 20 of your binder.

3           If you could just take a look at those documents and

4    let me know if you recognize them.

5           (Pause.)

6    A    Yes, I recognize them.

7    Q    And what are they, generally speaking?

8    A    They are e-mails and transfer of share agreements between

9    Martin Shkreli and Marek Biestek.

10   Q    And who are on the e-mail exchanges?

11   A    Evan Greebel, Katten Muchin, Corey Massella of Citrin

12   Cooperman, Susan Chew from Citrin Cooperman, myself.

13   Q    Marek Biastek, do you see him on any of the e-mail

14   chains?

15   A    Marek Biastek is on the e-mail exchange.

16   Q    And do you know for what time period this is?

17   A    This is for November 29th, 2012.

18           MS. KASULIS:  Your Honor, the government moves these

19   exhibits into evidence.

20           THE COURT:  All of these?

21           MS. KASULIS:  Yes, Your Honor.  So it's Government's

22   Exhibits 119-15 through 19, 119-25 and 119-26.

23           THE COURT:  All right, we will receive

24   Government's --

25           MR. AGNIFILO:  Judge, I'm just trying to catch up .

1          THE COURT:  Oh, sorry.

2          MR. AGNIFILO:  So 119 -- I'm sorry.

3          MS. KASULIS:  115 through 119, so 119-15 through 19.

4          MR. AGNIFILO:  All right, one second, Judge, I'm

5     sorry.

6          MS. KASULIS:  And then 119-25 and 119-26.

7          MR. AGNIFILO:  That's all fine, thank you.

8          THE COURT:  All right, those exhibits, Government

9     119-15 through 19 and 119-25 and 26 are admitted.

10          (Government's Exhibits 119-15, 119-16, 119-17,

11     119-18, 119-19, 119-25 and 119-36 were received in evidence.)

12          MS. KASULIS:  Thank you.

13     BY MS. KASULIS:

14     Q    Let's look at this first e-mail, Government

15     Exhibit 119-15.

16          (Exhibit published.)

17     Q    And what is this e-mail, Mr. Su, can you please describe

18     it?

19     A    It's a transfer, the e-mail it says Marek Biestek

20     transfer to Martin Shkreli, it's from me to Evan Greebel,

21     Corey Massella and Susan Chew.

22     Q    And the date of this e-mail is November 29th, 2012, is

23     that right?

24     A    That's correct.

25     Q    And in the subject you do state -- I'm sorry, in the

1   actually body of the e-mail:  Marek Biestek transfer to Martin

2   Shkreli attached.

3           What are you referring to there?

4   A    It's a transfer of shares between Marek Biestek and

5   Martin Shkreli.

6   Q    And there the subject is Updated Cap Table, and there

7   appears to be some attachments.  What did you attach to this

8   e-mail?

9   A    The capitalization table and the transfer agreement.

10  Q    Okay.  So let's look at the first attachment, the

11  transfer agreement.

12          (Exhibit published.)

13  Q    The first page is document ending in Bates number 810.

14  Do you see that?

15  A    Yes.

16  Q    If we look at the first paragraph, it looks like this

17  document is entitled Retrophin, LLC Transfer and Donee

18  Representation Letter, do you see that?

19  A    Yes.

20  Q    And if we look at the highlighting, the first sentence of

21  the first paragraph, it states:

22          For value received, Marek Biestek as the transferor

23  does hereby grant, sell, assign, transfer and convey unto

24  Martin Shkreli, the transferee, its successors and assigns,

25  all of his right, title and interest to 4,167 Class B common

1   units, defined as the Class B units, of Retrophin, LLC, the

2   company, a Delaware limited liability company, to have and to

3   hold forever and the transferor does hereby warrant and agree

4   to defend title to the same against the claims of any person

5   or entity.

6          Do you see that there?

7   A    Yes.

8   Q    And then let's look at the last page of this agreement.

9          And before we get there, do you have a recollection

10  of how you even were in a position to be sending this share

11  transfer agreement to the recipients; Evan Greebel, Susan Chew

12  and Corey Massella?

13  A    I'm sorry, could you repeat the question?

14  Q    Why did you send this share transfer agreement to those

15  recipients on the first page?

16  A    Because they were our accounting firm, so they had to

17  keep track.  So -- so would Evan, I mean he would need to keep

18  track because I believe he kept a cap table.  And the

19  accounting firms needed it for our books and records.

20  Q    And how did you get this share transfer agreement that

21  we're looking at now?

22  A    Martin would -- Martin Shkreli would drop it off on my

23  desk.

24  Q    And so if you then look at the last page of this share

25  transfer agreement, it ends in Bates number 812.  Do you see

1    that?

2    A    Yes.

3    Q    And it appears to be a little slanted here, but let's

4    just step through the different signators on this.

5              Up at the top, top of the page it appears to be

6    Marek Biestek.  Do you see that?

7    A    Yes.

8    Q    Do you recognize Mr. Biastek's signature?

9    A    I do not.

10   Q    And then if you look below that it appears to be Martin

11   Shkreli as the transferee.  And then just above that Marek

12   Biestek is the transferor, do you see that?

13   A    Yes.

14   Q    And then below that Martin Shkreli is the transferee, do

15   you see that?

16   A    Yes.

17   Q    And does that appear to be Mr. Shkreli's handwriting?

18   A    Yes.

19   Q    That signature?

20   A    Yes.

21   Q    So if we zoom out at the bottom of the page it says,

22   agreed and accepted, and it appears to be Retrophin, LLC with

23   Martin Shkreli as the chief executive officer.

24             Does that appear to be Mr. Shkreli's signature?

25   A    Yes.

1    Q    If we zoom back out, I want to direct your attention to

2    the top Martin Shkreli signature.

3              Do you see the date?

4              MS. KASULIS:  If you could just zoom in, Ms. Balbin.

5    BY MS. KASULIS:

6    Q    Do you see the date there next to the printed Martin

7    Shkreli name?

8    A    Yes, 11/29/2012.

9    Q    And whose handwriting is that?

10   A    That's mine.

11   Q    Why did you write this date into the share transfer

12   agreement?

13   A    The date was missing from the document, and I just dated

14   it when I received it.

15   Q    And then you scanned the document?

16   A    Yes.

17   Q    And then sent it to the recipients, along with the

18   capitalization table in the e-mail that we saw as the

19   beginning of this exhibit?

20   A    Yes.

21             THE COURT:  Can I ask a question?

22             Was Mr. Aselage the CEO at this time or was it

23   Mr. Shkreli, in November 29, 2012?

24             THE WITNESS:  It was Steve Aselage was the CEO of

25   Retrophin at that time.

W. Name - direct/cross - Atty                    2216

 1              THE COURT:  Of the LLC or the incorporated?

 2              THE WITNESS:  I don't know which one was which.  I

 3     think there was only one, and the other took place from the

 4     other.

 5              THE COURT:  I see.  When it became public, when

 6     Retrophin --

 7              THE WITNESS:  Right, so it was prior to it becoming

 8     public, it was already an Inc.

 9              THE COURT:  Okay, thank you.

10     BY MS. KASULIS:

11     Q    So to confirm, you believe that Mr. Aselage was CEO of

12     Retrophin in November of 2012 at this time?

13              MR. AGNIFILO:  I don't that was his testimony.

14     A    Yes.

15              THE COURT:  Well, I was just asking him whether

16     Mr. Aselage was on board as of November 2012, and whether he

17     was CEO?

18              THE WITNESS:  He was the CEO when he was at

19     Retrophin.  He was hired in October of 2012.

20              THE COURT:  Thank you.

21              MS. KASULIS:  Thank you.

22     BY MS. KASULIS:

23     Q    And if we look at the next, the next attachment.

24              And does this appear to be a capitalization table

25     for Retrophin?

1           (Exhibit published.)

2    A    Yes.

3    Q    And if you turn to the next page, does this appear to be

4    a stock ledger?

5    A    Yes.

6    Q    Do you see in the date column on the left-hand side, do

7    you see the February 1st, 2012 MSMB Healthcare investment

8    listed anywhere?

9    A    From February 1st, 2012 I do not.

10   Q    And that was the nine-hundred-thousand-dollar investment

11   that we had seen on the prior cap tables, is that right?

12   A    That's what appears to be missing.

13   Q    Let's look at the next document, Government

14   Exhibit 119-16.

15           And before we get to that, do you have an

16   understanding as to why Mr. Biastek was transferring Retrophin

17   shares to Mr. Shkreli?

18           (Exhibit published.)

19           MR. AGNIFILO:  Objection, he's not on the agreement,

20   Judge.

21           THE COURT:  Well, does he know why?  If you know.

22   A    I do not know why.

23   BY MS. KASULIS:

24   Q    All right, to back up very quickly, on Government

25   Exhibit 119-15 do you see the time stamp?  The time stamp on

1    this e-mail is 8:20 p.m., do you see that?

2    A    Yes.

3    Q    Do you believe that this time is accurate?

4    A    No.

5    Q    What's your recollection as to when you sent this e-mail?

6    A    It was the late afternoon of November 29th, 2012.

7    Q    Does this appear to be a time zone issue to some extent

8    with respect to the time stamp on the e-mail?

9    A    I believe so.

10   Q    If we now go to the next exhibit, Government

11   Exhibit 119-16, and if we look at the first e-mail

12   chronologically at the bottom of the page, is this the same

13   e-mail that we saw in the previous exhibit, but the time stamp

14   is 3:20 p.m., exactly five hours before that?

15            (Exhibit published.)

16   A    Yes.

17   Q    And does that appear to be in your recollection the

18   accurate time that you sent the first exhibit, that e-mail?

19   A    Yes.

20   Q    And just to be clear when I'm referring to that first

21   exhibit, it's Government Exhibit 119-15?

22   A    Correct.

23   Q    If we scroll up in this document, this e-mail appears to

24   be from Mr. Greebel to yourself with a carbon copy to Martin

25   Shkreli and Marek Biestek on the same day, November 29th,

W. Name - direct/cross - Atty                    2219

1   2012.  And the time stamp is 3:29 p.m. so approximately nine

2   minutes after you sent the first e-mail, is that right?

3   A    Yes.

4   Q    In the e-mail Mr. Greebel writes:

5            Please re-execute the transfer agreement for

6   Retrophin, Inc. and a transfer of common stock.  The one you

7   sent was for Retrophin, LLC and Class B common; however, LLC

8   has not existed since mid-September.

9            Do you see that?

10  A    Yes.

11  Q    What was your understanding with respect to what happened

12  with the Retrophin, LLC, that entity?

13  A    Just from what I read on paper here, it's Retrophin, LLC

14  stopped existing and was replaced by Retrophin, Inc.

15  Q    And that was in the mid-September 2012 time period?

16  A    According to this e-mail, yes.

17  Q    If we then scroll up in the chain, it's a response from

18  Mr. Shkreli on the same day, November 29th, 2012 at 3:43 p.m.

19  So shortly after the e-mail from Mr. Greebel.  And it's to

20  Mr. Greebel, you and with a cc to Marek Biestek.

21           Do you see that?

22           (Exhibit published.)

23  A    Yes.

24  Q    And what does Martin Shkreli write there?

25  A    That agreement was signed in June.

SAM      OCR      RMR      CRR      RPR

W. Name - direct/cross - Atty                    2220

1   Q    And if we scroll up to the last e-mail in this chain, you

2   respond on the same day to Mr. Shkreli, Mr. Greebel, with a cc

3   to Mr. Biastek.  And what you do state there?

4           (Exhibit published.)

5   A    My mistake, I'll correct date.

6   Q    The time stamp on this e-mail is 8:46 p.m.  Again, do you

7   believe that this time stamp is accurate?

8   A    No.

9   Q    What do you believe that the time actually was?

10  A    3:46.

11  Q    So the same issue that we saw, you believe, on the

12  previous exhibits?

13  A    Yes.

14  Q    And so if we can now turn to the next exhibit, Government

15  Exhibit 119-17.

16          MS. KASULIS:  Can we just zoom in a little bit?

17          (Exhibit published.)

18  BY MS. KASULIS:

19  Q    So what appears at the bottom of the chain is that

20  original e-mail that we saw at GX 119-15, do you see that?

21  A    Yes.

22  Q    And then your response from Mr. Greebel was the same

23  response we saw in GX 119-16.  Do you see that there?

24  A    Yes.

25  Q    With Mr. Shkreli's response on that same exhibit?

W. Name - direct/cross - Atty                    2221

1  A    Yes.

2  Q    And it looks like here you are sending, replying to that

3  e-mail from Mr. Shkreli on November 29th, 2012 to Mr. Shkreli,

4  Mr. Greebel and Marek Biestek.

5            Do you see that?

6  A    Yes.

7  Q    And, again, the date is 8:55 p.m. do you believe that

8  that date -- sorry, the time is 8:55 p.m., do you believe that

9  time is accurate?

10 A    No, I think it was 3:55.

11 Q    And, again, because you believe there is just a time zone

12 issue with respect to the way this that this e-mail was

13 printed?

14 A    Yes.

15 Q    And it looks like there is actually an attachment,

16 Transfer FR Marek Biastek, 4167shares.pdf, do you see that?

17 A    Yes.

18 Q    Okay, if we look to the attachment, the first page is at

19 a Bates number ending in 527.  Do you see that?

20            (Exhibit published.)

21 A    Yes.

22 Q    And if we look at the first paragraph, does this

23 paragraph appear to be the same paragraph that we read with

24 the transfer agreement attached at GX 119-15?

25 A    Yes.

1    Q    And if we look at the last page of this agreement.

2              MS. KASULIS:  If you can please zoom in, Ms. Balbin,

3    on the signatures.

4              (Exhibit published.)

5    BY MS. KASULIS:

6    Q    So if we look on the left side of the page.

7              MS. KASULIS:  And if we could actually zoom in on

8    these top two signatures.

9    Q    So, again, it appears Marek Biestek is listed as the

10   transferor.  Do you recognize that signature?

11   A    I don't.

12   Q    And then below that Martin Shkreli is the transferee.  Do

13   you see that?

14   A    Yes.

15   Q    And does that appear to be Mr. Shkreli's signature?

16   A    Yes.

17   Q    Do you see the date here on the exhibit?

18   A    Yes.

19   Q    What is your understanding of what -- what does this

20   appear to be?

21   A    Whiteout tape and a different date than the original

22   document.

23   Q    Did you write this date?

24   A    I did not, no.

25   Q    Do you know who did?

1    A    I do not, no.

2    Q    How are you in possession of this agreement?

3    A    Martin dropped it off on my desk.

4         MS. KASULIS:  And then just to zoom back out.

5    MS. KASULIS:

6    Q    The signature on the bottom left-hand side on behalf of

7    Retrophin, LLC, does that appear to be Mr. Shkreli's

8    signature?

9    A    Yes.

10   Q    We now look at the next exhibit, Government

11   Exhibit 119-18.

12        This e-mail exchange, again, it appears to be a

13   follow-up e-mail to the one that you sent as Government

14   Exhibit 119-17, and it appears to be a response to that

15   e-mail, is that right?

16   A    Yes.

17   Q    And it's from Mr. Greebel to you only, and the date is

18   November 29th, 2012 and it's 8:56 p.m.?

19        (Exhibit published.)

20   A    Yes.

21   Q    Do you believe that that time is accurate?

22   A    No.

23   Q    What do you believe that time to be?

24   A    3:56 p.m.

25   Q    And if we actually scroll to the e-mail right below that

1    one, does this appear to be the e-mail that you sent that's in

2    the prior exhibit, Government Exhibit 119-17?

3    A    Yes.

4    Q    And do you see how the time is 3:55 p.m.?

5    A    Yes.

6    Q    And so do you believe that this is, in fact, the accurate

7    time, 3:55 p.m.?

8    A    Yes.

9    Q    And then if we scroll back up, it appears that your

10   understanding is that the top e-mail is at actually 3:56 p.m.,

11   and approximately one minute later Mr. Greebel e-mails you

12   stating, Please call me.

13            Do you see that?

14   A    Yes.

15   Q    Do you recall did you have a phone conversation with

16   Mr. Greebel?

17   A    Yes.

18   Q    And do you recall that conversation?

19   A    I recall we talked about the share transfer and I recall

20   him explaining to me the difference in LLC and it was replaced

21   by the Inc. for Retrophin, and that's what I remember from the

22   conversation.

23   Q    Do you recall anything else?

24   A    From that phone call, I don't.

25   Q    And if we turn to the next exhibit, Government Exhibit

```
                   W. Name - direct/cross - Atty              2225
```

1   119-19.

2          (Exhibit published.)

3   BY MS. KASULIS:

4   Q    Does this exhibit appear to be an e-mail from you in

5   response to one of the prior e-mail chains?

6   A    Yes.

7   Q    The e-mail chain that was at 119-17, is that right, and

8   that was tab 16?

9   A    Yes.

10  Q    And that e-mail was at 9:32 p.m. that you sent to

11  Mr. Shkreli, Mr. Greebel, with a cc to Mr. Biastek.  Do you

12  see that?

13  A    Yes.

14  Q    The date -- excuse me, the time is 9:32 p.m.  Do you

15  believe that that's an accurate time stamp?

16  A    No, I believe it was 4:32.

17  Q    P.m.?

18  A    P.m.

19  Q    And you attach a document, transfer FR Marek Biastek

20  4167shares.pdf.  Do you see that?

21  A    Yes.

22  Q    And then you write in the e-mail:  Correction:  Please

23  see attached for date of transfer.  Do you see that?

24  A    Yes.

25  Q    Let's look at the attachment, start with page ending in

1   532.

2            (Exhibit published.)

3   Q    Does this, again, appear, if you look at the first

4   paragraph does this appear to be that same transfer agreement

5   from Mr. Biastek to Mr. Shkreli of 4,167 Class B units of

6   Retrophin, LLC?

7   A    Yes.

8   Q    And if you turn to the last page of the document, and do

9   you see the signatures there?

10  A    Yes.

11  Q    Let's focus on the top two signatures.  Does the top

12  signature appear to be Marek Biestek transfer or, do you see

13  that?

14  A    Yes.

15  Q    And then there is record address, that appears to be

16  blank, is that right?

17  A    Right.

18  Q    The signature below is from Martin Shkreli as transferee.

19  Do you see that?

20  A    Yes.

21  Q    And, again, the record address is blank?

22  A    Yes.

23

24            (Continued on the following page.)

25

Su - direct - Kasulis                                  2227

1   (Continuing)

2   Q    Do you recognize the top signature on the line of Marek

3   Biestek?

4   A    No.

5   Q    Do you recognize the signature above the line for Martin

6   Shkreli?

7   A    Yes.

8   Q    Whose signature is that?

9   A    Martin Shkreli.

10            MS. KASULIS:  And if we zoom back out.  The

11   signature block for Retrophin, agreed and accepted.

12   Q    And whose signature is that there?

13   A    Martin Shkreli.

14   Q    And that's for Retrophin LLC?

15   A    Yes.

16   Q    And the title is chief executive officer?

17   A    Yes.

18   Q    And if you zoom back out, it appears, what is the date

19   now on this signature page?

20   A    June 1st, 2012.

21   Q    Did you create this page, Mr. Su?

22   A    No.

23   Q    How did you come to possess this share transfer

24   agreement?

25   A    Martin dropped it off on my desk.

Su - direct - Kasulis                    2228

1          MS. KASULIS:  And if we turn to the next Exhibit,

2    Government's Exhibit 119-25.

3          I think we're having a little technical difficulty,

4    one moment.

5          (Pause in the proceedings.)

6          THE COURT:  May I ask a question while we're

7    waiting?

8          MS. KASULIS:  Yes.

9          THE COURT:  There was a e-mail exchange regarding

10   Retrophin LLC and Retrophin Inc.

11         Were these share transfer agreements ever changed to

12   reflect that it was Retrophin Incorporated rather than

13   Retrophin LLC?

14         THE WITNESS:  No.  It was always Retrophin LLC

15   according to these documents.

16         THE COURT:  Okay.  Thank you.

17         (Exhibit published to jury.)

18         MS. KASULIS:  All right, directing your attention to

19   Government's Exhibit 119-25.

20   Q    And do you recognize this Exhibit, Mr. Su?

21   A    Yes.

22         MS. KASULIS:  Zooming in on the top e-mail.

23   Q    This Exhibit, it's an e-mail from you to Susan Chew, cc

24   to Corey Massella, dated December 3rd, 2012, at 7:40 p.m.?

25   A    Yes.

1   Q    So, approximately four days or so after the prior e-mails

2   that we just reviewed?

3   A    Yes.

4   Q    And you write in the body of the e-mail:  Attached, more

5   share transfers.

6          And you list out Kevin Mulleady to Martin Shkreli.

7          Tom Fernandez to Martin Shkreli.

8          Martin Shkreli to MSMB Healthcare.

9          And then Marek Biestek to Martin Shkreli.

10          And then you stated:  I think you have this already.

11          Do you see that?

12  A    Yes.

13  Q    And there are a series of attachments to this e-mail; is

14  that correct?

15  A    Yes.

16  Q    And those appear to be, if you want to check, these

17  appear to be the share transfers that you had listed?

18  A    Yes.

19  Q    Why were you sending these share transfers to Susan Chew

20  and Corey Massella?

21  A    Any time there's a change in ownership of shares, the

22  account books and records needs to be updated and that would

23  be the accounting firm's responsibility.

24  Q    And the accounting firm here is Susan Chew and Corey

25  Massella of Citrin Cooperman?

Su - direct - Kasulis                    2230

1    A    Yes, that's correct.

2            MS. KASULIS:  And if you turn to the next Exhibit,

3    Government's Exhibit 119-26.

4            (Exhibit published to jury.)

5    Q    The e-mail at the bottom of this Exhibit appears to be

6    the same e-mail as Government's Exhibit 119-25; is that

7    correct?

8    A    Yes.

9    Q    And if we scroll up this appears to be an e-mail from

10   Susan Chew in response to you with a cc to Corey Massella.  On

11   the same day, December 3rd, 2012 at 7:55 p.m.

12           Do you see that?

13   A    Yes.

14   Q    Susan Chew writes:  What was the share transfer for

15   services, question mark, question mark.

16   A    Yes.

17   Q    Do you recall ever responding to Susan Chew?

18   A    I don't remember if I did.

19   Q    Did you have any understanding as to why there were all

20   these share transfers?

21   A    I don't know what the purpose was.

22   Q    After these share transfers, did you receive an updated

23   Retrophin capitalization table?

24   A    There would be a new capital table, yes.

25           MS. KASULIS:  I'm showing you what's been marked for

VB        OCR        CRR

1  identification as Government's Exhibit 119-24.  It's at tab

2  21.

3  Q     Do you recognize this Exhibit, Mr. Su?

4  A     Yes.

5  Q     What is it?

6  A     It's a e-mail and a capitalization table.

7  Q     Who was the e-mail from?

8  A     From Martin Shkreli to me.

9  Q     And what is the date?

10 A     December 3rd, 2012.

11           MS. KASULIS:  The Government moves this Exhibit into

12 evidence.

13           MR. AGNIFILO:  No objection.

14           THE COURT:  We receive Government's Exhibit 119-24.

15           (Government's Exhibit 119-24 received in evidence.)

16           (Exhibit published to jury.)

17           MS. KASULIS:  And if we could just look at this

18 e-mail.

19 Q     It appears to be from Mr. Shkreli to yourself, dated

20 December 3rd, 2012, and that's after -- a few days after the

21 November 29th, 2012 e-mail exchanges we just reviewed; is that

22 right?

23 A     Yes.

24 Q     And the subject is:  Retrophin capitalization table.

25           Do you see that?

1   A    Yes.

2         MS. KASULIS:  We can look at the capitalization

3   table.

4         (Exhibit published to jury.)

5   Q    And what is this attachment, Mr. Su?

6   A    It's a capitalization table with stock ledger and notes.

7         MS. KASULIS:  And if we look at this first page of

8   the table, if we could zoom in on the middle of the page

9   actually, a little farther down.

10        And if we look at the date of February 1st, 2012,

11  there's actually two entries there.

12  Q    Do you see that there are two entries at February 1st,

13  2012, Mr. Su?

14  A    Yes.

15  Q    And it appears the first line is purchased with the

16  purchaser being MSMB Healthcare LP for $900,000 investment for

17  22,500 shares.

18        Do you see that?

19  A    Yes.

20  Q    And then immediately below that on the same date, it

21  appears there's an entry for series A preferred stock with

22  the -- under the column that says disqualified MSMB

23  Healthcare LP with a $900,000 deduction and a deduction of

24  22,500 Retrophin shares.

25        Do you see that?

Su - direct - Kasulis                    2233

1   A    Yes.

2        MS. KASULIS:  If we can go to the next page of this

3   Exhibit.  And if we can look more towards the bottom of the

4   first section.

5        Thank you, Ms. Balbin.

6   Q    If we look at the very, the last two entries in this

7   section for the date July 1st, 2012.

8        Do you see that?

9   A    Yes.

10  Q    So, for July 1st, 2012, it appears class B common units

11  were transferred by Martin Shkreli.

12       Do you see that, for minus 75,000 shares?

13  A    Yes.

14  Q    And then immediately below it, on the same date July 1st,

15  2012, for class B common units.

16       Do you see here that transferred were MSMB Capital

17  Management LP 75,000 shares?

18  A    Yes.

19  Q    And had you seen MSMB Capital Management listed on the

20  cap table before this period for Retrophin?

21  A    No.

22       MS. KASULIS:  I'm showing you what's been marked for

23  identification as Government's Exhibit 119-27.  It's behind

24  tab 22.

25  Q    Do you recognize this document?

Su - direct - Kasulis                    2234

1   A    Yes.

2   Q    And what is it?

3   A    It's an e-mail between from Martin Shkreli to Evan

4   Greebel and myself and a final capitalization table.

5   Q    And what's the date?

6   A    The date of the e-mail is December 3rd, 2012.

7        MS. KASULIS:  The Government moves this Exhibit into

8   evidence.

9        MR. AGNIFILO:  No objection.

10       THE COURT:  We receive Government's Exhibit 119-27.

11       (Government's Exhibit 119-27 received in evidence.)

12       (Exhibit published to jury.)

13  Q    And for the jury, does this appear to be an e-mail from

14  Mr. Shkreli to you and Mr. Greebel sent on December 3rd, 2012,

15  at 11:11 p.m.?

16  A    Yes.

17  Q    And does it attach a document entitled:  Final

18  capitalization table?

19  A    Yes.

20       MS. KASULIS:  If we look now to the attachment.

21  Q    Do you believe that it's a capitalization table for

22  Retrophin?

23  A    Yes.

24  Q    If we look on the left side under the common stock

25  post-money post-merger section.

1        Do you see there under -- Martin Shkreli is listed

2    first with 54 percent of the common stock and then immediately

3    under him, what do you see listed there?

4    A    MSMB Capital Management LP, 600,000 shares, 5.8 percent.

5         MS. KASULIS:  And then if you go to the next section

6    below that entitled common stock pre-money and then pre- -- it

7    looks like the column's cut off.

8    Q    Do you see that the first listing a Martin Shkreli?  Do

9    you see that for:  60 percent vested plus unvested?

10   A    Yes.

11   Q    Do you see immediately below that what's listed there?

12   A    Yes.  MSMB Capital Management LP 8.1 percent.

13   Q    And how many units are listed there?

14   A    75,000.

15   Q    And that's common stock units of Retrophin?

16   A    Yes.

17        MS. KASULIS:  And if we zoom out, there's just one

18   more section of this chart.

19   Q    At the very bottom of the second column area, do you see

20   this Fearnow stock section?

21   A    Yes.

22   Q    And there appear to be four individuals listed underneath

23   that section.

24        Do you have an understanding as to what Fearnow

25   stock is?

Su - direct - Kasulis                                    2236

1   A    Yes.

2   Q    What is Fearnow stock?

3   A    Fearnow stock was a -- was part of the Desert Gateway

4   shell where there were two-and-a-half million shares that were

5   freely tradable and those were named Fearnow stock.

6   Q    And do you know why it was called the Fearnow stock?

7   A    The gentleman that had control of the shell at the time,

8   his last name was Fearnow.

9   Q    And so when you're talking about the shell, you're

10  referring to the Desert Gateway shell?

11  A    Yes, it's the Desert Gateway shell that Retrophin wanted

12  to go public.

13  Q    And that's the shell that Retrophin reverse-mergered into

14  to go public?

15  A    Yes.

16  Q    And you said that the Fearnow stock, your understanding

17  is that those were actually free trading shares?

18  A    Correct.

19  Q    And what does this mean, free trading shares?

20  A    There were no restrictions, no regulatory restrictions to

21  be able to sell the stock.

22  Q    And do you see there underneath this Fearnow stock

23  listing there's Martin Shkreli, Kevin Mulleady, Tom Fernandez

24  and -- Thomas Fernandez and Marek Biestek?

25  A    Yes.

1  Q    Do you have an understanding as to what happened to the

2  Fearnow shares after Retrophin reverse-mergered into Desert

3  Gateway?

4  A    It was distributed amongst individuals that Martin chose.

5            MS. KASULIS:  I'm showing you what's been marked for

6  identification as Government's Exhibit 119-35.  It's tab 23 in

7  your binder.

8  Q    Do you recognize this document, Mr. Su?

9  A    Yes.

10 Q    And what is it?

11 A    It is an e-mail exchange and a capitalization table.

12 Q    And what's the date on the e-mail?

13 A    December 12th, 2012.

14 Q    And who are the recipients of the e-mail?

15 A    It's from me to Evan Greebel and George Huang.

16           MS. KASULIS:  The Government moves this Exhibit into

17 evidence.

18           MR. AGNIFILO:  No objection.

19           THE COURT:  We will receive 119-35.

20           (Government's Exhibit 119-35 received in evidence.)

21           (Exhibit published to jury.)

22           MS. KASULIS:  And let's start at the bottom of this

23 e-mail chain.

24 Q    The first e-mail appears to be from Mr. Greebel to you

25 dated December 12th, 2012, at 5:17 p.m.

Su - direct - Kasulis                    2238

1           Do you see that?

2    A    Yes.

3           MS. KASULIS:  Actually, let's start at the next

4    page, earlier in the chain.  The bottom of this page, I

5    apologize.

6    Q    It's an e-mail from yourself to Mr. Greebel,

7    December 12th, 2012, at 5:07 p.m. with a carbon copy to Corey

8    Massella, Susan Chew, Ed Hackert.

9           Who is Ed Hackert again?

10   A    He's the auditor from Marcum.

11   Q    And George Huang?

12   A    He was a colleague at the time at Retrophin.

13   Q    And you write:  Evan please circulate the fully executed

14   merger agreement when available.

15          Do you know what merger agreement you're referring

16   to here?

17   A    That would be with Desert Gateway.

18   Q    Between Retrophin and Desert Gateway?

19   A    Between Retrophin and Desert Gateway, yes.

20          MS. KASULIS:  If we scroll up in the chain

21   Mr. Greebel writes to you:  Please send me a current/correct

22   cap table, the version I have has Martin getting Fearnow stock

23   which he did not.

24          And then if you scroll up.  You wrote to Martin,

25   with a cc to Mr. Greebel:  What is the split on the Fearnow

1  stock?

2  Q    Do you see that?

3  A    Yes.

4           MS. KASULIS:  If we go to the first page.  The

5  bottom e-mail, the next e-mail chronologically in the chain.

6  Mr. Greebel writes on December 12th, 2012, at 5:17 p.m. to

7  you.  And he lists a series of names here with numbers next to

8  them.

9  Q    Do you see that?

10  A    Yes.

11  Q    It appears to be Kevin Mulleady, Thomas Fernandez, Marek

12  Biestek, Timothy Pierotti, Claridge Capital LLC Andrew Vaino

13  and Edmund Sullivan.

14           Do you see that?

15  A    Yes.

16  Q    Claridge Capital LLC.

17           Do you know who controls Claridge Capital LLC?

18  A    Ron Tilles.

19  Q    And who is the last person listed there, Edmund Sullivan?

20           Are you familiar with that individual?

21  A    Yes.  He was a friend of Martin Shkreli.

22  Q    And with respect to this list, do you recall who was

23  employed by the defendant on December 12th, 2012, during this

24  time period?

25  A    Employed by which entity?

Su - direct - Kasulis                    2240

1    Q    Can you, do you have -- can you explain, of this list,

2    who was employed and by which entity, that you know?

3    A    So Kevin Mulleady worked for, raised the money for MSMB

4    and Retrophin.  He had an MSMB Capital only e-mail.

5              From my understanding, Thomas Fernandez worked for

6    MSMB Capital and only had an MSMB Capital e-mail.

7              Marek Biestek had both, worked for both, had both

8    e-mails.

9              At this moment Pierotti worked for MSMB Consumer as

10   portfolio manager and only had MSMBCapital.com e-mail.

11             Claridge Capital, Ron Tilles had a, was a

12   fund-raiser for both entities, MSMB and Retrophin, and had a

13   Retrophin e-mail.

14             Andrew Vaino worked for both.  I believe he only had

15   an MSMB Capital e-mail.

16             And Edmund Sullivan did not work for either entity.

17   Q    And the numbers listed next to each of the individuals

18   listed in this e-mail, do you have an understanding as to what

19   those numbers represent?

20   A    The breakdown for the Fearnow shares.

21   Q    So, it would be the Fearnow distribution to each of these

22   individuals, that's what you believe that this reflects?

23   A    Yes.

24             MS. KASULIS:  And if we scroll up in this chain to

25   the next e-mail chronologically.

Su - direct - Kasulis                    2241

1        You respond to Mr. Greebel at on December 12th,

2   2012, at 5:41 p.m., you state:  Missing 100K to get to 2.5M.

3   Q    What do you mean here?

4   A    There were two-and-a-half million shares of Fearnow stock

5   and what was listed below only got us to -- got me to

6   2.4 million shares and 100,000 shares were missing from the

7   breakdown.

8   Q    Do you have an understanding as to why 100,000 shares

9   were missing from the breakdown?

10  A    A hundred thousand shares was being held back by the

11  owner of the shell because Retrophin didn't have enough money

12  to pay for the full shell.

13  Q    And do you know what the shortfall was that Retrophin had

14  to make up to fully pay for the shell?

15  A    The shell was $200,000.  Retrophin paid a hundred

16  thousand and was missing a hundred thousand.

17       MS. KASULIS:  And if we scroll up in the chain.

18  Q    It appears that you respond or that Mr. Greebel writes:

19  100K was being held back.

20       Do you see that?

21  A    Yes.

22  Q    It's your understanding that that's reflective of what

23  you just spoke about, that 100,000 of the Fearnow shares were

24  being held back until Retrophin was able to pay the full

25  amount for the shell?

1  A    Yes.

2        MS. KASULIS:  And if we look at the last e-mail in

3  this chain, this is from yourself to Mr. Greebel and Mr. Huang

4  where you attach official cap table.

5  Q    Do you see that?

6  A    Yes.

7        MS. KASULIS:  And if we just look at the attachment,

8  the capitalization table, I'm just going to point you to one

9  section of the table?

10       Actually, I think I'll go ahead and point you on the

11 left -- two places.  On the left-hand side, if you can just

12 zoom in to that section.

13       And do you see in this column, it's common stock

14 pre-money pre-merger.

15 Q    Do you see MSMB Capital Management listed there?

16 A    Yes, with 75,000 shares at 8.01 percent.

17       MS. KASULIS:  And then if you look, if we zoom back

18 out, if we look on the right side of the table.  The column

19 appears to state common stock pre-money post-merger.

20       If we could just zoom in on the top portion of the

21 table.

22 Q    Do you see again there, about eight or nine down, do you

23 see MSMB Capital Management LP listed there?

24 A    Yes.  375,000 shares at 4.34 percent.

25       MS. KASULIS:  And if we zoom back out and just look

1    at the middle part of the chart, more towards the bottom.  The

2    section entitled Fearnow stock.

3    Q    And are these the individuals that we saw in that e-mail

4    from Mr. Greebel that he sent to you with the breakdown of the

5    Fearnow shares -- the recipients of that stock?

6    A    Yes.

7    Q    And at the very bottom it says DGTE Legacy.

8         Do you see that?

9    A    Yes.

10   Q    What is DGTE Legacy?

11   A    That's the Desert Gateway hundred thousand shares that

12   were held back.

13        MS. KASULIS:  Okay, we can put that aside.

14   Q    So, when did you leave MSMB Capital?

15   A    December 2012, approximately a week prior to the

16   holidays.

17   Q    And why did you leave?

18   A    I got, I got really tired of all the things that I saw

19   going on at the company.

20        The last day I was there Martin took 10,000 or

21   $10,000 out of what was left in the bank account from -- there

22   was only $20,000 left and there was only -- he took $10,000,

23   transferred 10,000 to his own personal account.  And that was

24   the last straw.

25   Q    And what bank account are you referring to?

1    A    Retrophin's bank account at Chase.

2    Q    Had you had any concerns, I think you had mentioned you

3    had some concerns, prior to leaving?

4    A    Yes.

5    Q    And did you follow up with any authorities about those

6    concerns?

7    A    I, I went to the SEC in May of 2012.

8    Q    And why did you go to the SEC?

9    A    There was no transparency in the amount of assets that

10   MSMB had, and there were variations of assets under management

11   that was verbally thrown around without any consistency, and

12   that was a red flag for me.

13             THE COURT:  I'm sorry, you went to the SEC in May of

14   what year?

15             THE WITNESS:  2012.

16   Q    And so, that was during the time period that you were

17   employed at Retrophin; is that right -- excuse me, at

18   MSMB Capital?

19   A    That's correct.

20   Q    And did you actually file some sort of a complaint with

21   the SEC?

22   A    I went to the website and filed a complaint on their

23   website.

24   Q    And were you ever contacted by the SEC?

25   A    Yes.

Su - direct - Kasulis                    2245

1   Q     And were you ever interviewed by the SEC?

2   A     A gentleman by Eric Schmidt interviewed me early June of

3   2012.

4   Q     After you left -- just to confirm, which entity were you

5   employed by when you worked for the defendant?

6   A     My employment agreement says I was employed by MSMB

7   Martin Shkreli and all its affiliates.

8   Q     And that included whom?

9   A     That included on the employment agreement MSMB Capital

10  Management, MSMB Healthcare Management, Retrophin.

11  Q     And so, after you left the employment of the defendant,

12  did you have any contact with him?

13  A     I did.

14  Q     And what did you have contact with him regarding?

15  A     Two things.  I, I asked for pay, insurance -- payback on

16  insurance, vacation days that I didn't use.

17          And a second correspondence was an e-mail he sent

18  with just my name, and his attorneys at Katten Muchin

19  attached.

20  Q     So, before we get to that.

21          Did you ever actually receive the pay and the

22  vacation days and what you had talked to the defendant about?

23  A     No.

24  Q     Did you take any action with respect to that pay?

25  A     I took -- I filed a suit against him and the companies to

VB        OCR        CRR

Su - direct - Kasulis                                    2246

1    get that back.

2    Q      And approximately when did you file that suit?

3    A      Approximately March or April of 2013.

4

5                (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MS. KASULIS:  (Continuing)

3    Q    And did that suit go to arbitration?

4    A    It went to arbitration, yes.

5    Q    And if you could step us through, what was the resolution

6    of that arbitration?

7    A    The arbitration started in 2013.  Then my attorneys were

8    negotiating with the company, and the final resolution was

9    that I had to give up my shares in the company, even though

10   that wasn't part of the suit.  Retrophin and Martin brought my

11   shares into part of the settlement agreement, which I did not

12   want.  And I said no to any settlement, but unfortunately my

13   attorney at the time agreed, vaguely, and the arbitrator found

14   that it was a bound settlement between my lawyers and theirs,

15   and I lost my shares in exchange for $150,000 when, at the

16   time, the shares were worth $900,000.  And that arbitration

17   agreement, or arbitration ruling, happened in March of 2014,

18   March or April of 2014.

19   Q    And how many shares of Retrophin are you referring to?

20   A    126,000 shares.

21   Q    How did you come to have 126,000 shares of Retrophin?

22   A    Martin transferred shares to me and several other

23   colleagues of mine in November of 2012.

24   Q    What happened with respect to the 126,000 Retrophin

25   shares?

Su - direct - Kasulis                                      2248

1    A     The arbitrator gave it to Martin.

2    Q     Had you tried to sell those shares prior to that time?

3    A     So the shares, when I received them in December, was when

4    I actually got the certificate when the company went public.

5    They had a holding period, there is a security restriction on

6    some of the stock, which is called 144 stock, and you are not

7    allowed to sell 144 stock until 12 months later.  And on the

8    12 month, I went to sell them, I deposited the certificate

9    into Charles Schwab account.  Charles Schwab went through

10   their process of verifying that I was able to sell the stock

11   through the company and through the company's attorneys.  We

12   got permission -- I got permission, or Charles Schwab got

13   permission on my behalf, and then I proceeded to sell the

14   stock.

15   Q     And when was that?

16   A     This is December and January of -- December 2013 until

17   January 2014, that was the first opportunity that I was able

18   to sell the stock.

19   Q     And what happened after that?

20   A     After I sold the stock, Charles Schwab, the brokerage

21   went to get the stock certificates released or delivered from

22   the company and the company reneged on giving me the stock.

23   So that caused a shortfall with Charles Schwab and Charles

24   Schwab closed the position with a $900,000 loss in my

25   brokerage account.  Actually, I think it was... I think it was

1   more than that actually.  I don't remember a specific number.

2   It was just around a million dollars.

3   Q     So what happened next?

4   A     Charles Schwab sued me and I had to pay them back and, at

5   the same time, my business partner and old colleague, George

6   Huang was in a similar situation and we hired an attorney and

7   basically, essentially we got sued by Charles Schwab.

8   Q     Were you able to settle with Charles Schwab?

9   A     We settled months later.  I believe it was in August of

10  2014 and -- we settled, and because of George's stock he was

11  able to get his stock back.  I didn't have any stock at the

12  point because it was given to Martin, joint stock.  He sold

13  his stock, settled with Retrophin, an agreement between

14  Retrophin, Charles Schwab, and George sold his stock and

15  George's stock just paid for my loss at the time.

16  Q     So how much did George pay for your loss?

17  A     $900,000.

18  Q     And he is currently your business partner; is that right?

19  A     Yes.

20  Q     Have you paid Mr. Huang back at all for the $900,000 that

21  he covered for you?

22  A     I have not yet.  I don't have the money.

23  Q     You still owe him that money?

24  A     I still owe him that money.

25  Q     You had mentioned that you had had some further contact

Su - direct - Kasulis                              2250

1    with the defendant after you had been speaking to him about

2    backpay, vacation days, things along those lines.  You had

3    received an e-mail from him of some kind; is that right?

4    A    Yes.  Yes.

5    Q    What were the circumstances surrounding you receiving

6    that e-mail?

7    A    Their lawyers contacted me because I posted an SEC

8    investigation letter on to a blog, at the same time that

9    Retrophin was trying to raise money.

10   Q    And when was that?

11   A    That was February of 2014.

12   Q    So was this after the shortfall with Schwab of your

13   shares?

14   A    This was after I sold my stock with Schwab, yes.

15   Q    And then you had gotten the shortfall with the shares; is

16   that right?

17   A    Yes.

18   Q    First of all, how did you have an SEC letter that you

19   posted?

20   A    It was one of the records retention that I had printed

21   out during my time at Retrophin.

22   Q    And where did you print it out from?

23   A    Home.

24   Q    Whose e-mail account did you print out the SEC letter

25   that you are referring to?

Su - direct - Kasulis                    2251

1   A    From Martin Shkreli's.

2   Q    And what did you do with that letter?

3   A    I posted it on to a web blog.

4   Q    Why did you do that?

5   A    Because there were inaccuracies in the filing while

6   Retrophin was trying to raise money in the public market.

7   Q    When you say "filing," what do you mean by filing?

8   A    SEC filings that a company needs to file with the SEC in

9   order to be able to raise money, solicit money, from the

10  investing public.

11  Q    And what was your understanding as to what the

12  inaccuracies were in that filing?

13            MR. AGNIFILO:  I object, Your Honor.

14            THE COURT:  Overruled.

15            MR. AGNIFILO:  That's the reason he filed the

16  private SEC documents?

17            THE COURT:  That's what he has testified to.

18            MR. AGNIFILO:  All right.  That's fine.

19  Q    Go ahead, Mr. Su.

20  A    I'm sorry.  Can you repeat the last question?

21  Q    What was your understanding as to what was inaccurate

22  about the SEC filing that Retrophin had filed to be able to

23  raise money?

24  A    It had asked if the company or the principals were under

25  investigation by any law enforcement or regulatory

Su - direct - Kasulis                              2252

1  authorities.

2  Q    And what was your understanding as to who was a principal

3  -- principals in Retrophin at that time?

4  A    It was Martin Shkreli.

5  Q    And so what did you believe was inaccurate about the

6  filing?

7  A    According to the SEC complaint, or the SEC letter, it was

8  Martin Shkreli that was being investigated by the SEC at the

9  time and that wouldn't be disclosed.

10  Q    So what did you do?

11  A    So I posted it on a web blog Reddit.

12  Q    What happened after that?

13  A    I got an e-mail from their attorneys telling me to take

14  it down, and I didn't take it down, and a day later it was

15  gone from the blog.

16  Q    Did you file -- did you contact the SEC again at any

17  point in time?

18  A    I made a follow-up complaint with the SEC.

19  Q    And when was that?

20  A    April/May time frame of 2014, after my shares were given

21  -- were taken back and given to Martin.

22  Q    And why did you file a follow-up complaint?

23  A    It was just things that I knew and things that I read

24  from their updated SEC filings.

25  Q    Do you hope to gain anything from filing that additional

1   SEC complaint in 2014?

2   A    I was hoping that they would overturn, if the SEC had the

3   power to overturn, that arbitration agreement so I don't have

4   to owe that money, but I don't know if they have that

5   authority to, but.

6   Q    Since you had your interview with the SEC in

7   approximately June 2012, have you had any contact with them

8   other than the filing of that supplemental complaint?

9   A    I have not.

10  Q    Since that mid 2014 time period, have you had any contact

11  with the defendant?

12  A    No.

13            MS. KASULIS:  Just one moment, Your Honor.

14            (Pause.)

15            MS. KASULIS:  I have no further questions.  Thank

16  you, Mr. Su.

17            THE COURT:  Thank you.

18            Are you ready to cross-examine, sir?

19            MR. AGNIFILO:  I am, Judge.

20            THE COURT:  Okay.

21  CROSS EXAMINATION

22  BY MR. AGNIFILO:

23  Q    Mr. Su, my name is Mark Agnifilo.  I am one of Martin

24  Shkreli's lawyers.  I am going to ask you some questions.  If

25  I ask you a question that is not clear to you, please ask me

1   to rephrase it and I will do that, okay?

2   A    Okay.

3   Q    We are going to start with this arbitration that you

4   talked about five minutes ago.  You said at one point that

5   your attorney agreed to something that you didn't agree with?

6   Did I misunderstand you?

7   A    That's what I said.

8   Q    Okay.  What exactly did your attorney agree to that you

9   didn't agree to?

10  A    The settlement.

11  Q    The entire settlement?

12  A    The entire settlement.

13  Q    And who was your lawyer?

14  A    That one was Dan Bach.

15  Q    How long had you been working with your lawyer on this

16  SEC matter prior to the settlement?

17  A    He was not the lawyer for -- he was not the same lawyer

18  that I used.

19  Q    How many -- what law firm were you using at the time?

20  A    For which case?

21  Q    The I'm talking about the arbitration, that's all I'm

22  talking about.

23  A    The arbitration, I worked with for my employment

24  agreement was Dan Bach.  I think I hired him in March of 2013.

25  Q    And the settlement that your lawyer agreed to that you

Su - cross - Agnifilo                    2255

1    didn't agree to was what exactly?

2    A    Are you talking about date?  I'm sorry.

3    Q    No, what was the settlement?  What was the substance of

4    the settlement, your settlement?

5    A    My settlement was for $150,000 in exchange for the shares

6    and the 150,000 included pay, vacation days, health insurance.

7    That's what the monetary was for, and they -- in exchange for

8    my shares in the company.

9    Q    So you were going to get $150,000; correct?

10   A    I got 150,000, yes.

11   Q    And the settlement was that you lose your 126,000 shares

12   of Retrophin; correct?

13   A    I lost 126,000 shares of Retrophin, yes.

14   Q    And that was the settlement; right?

15   A    No, there was no formal settlement sum that was signed;

16   the arbitrator just ruled.

17   Q    You agreed to arbitrate the case; right?  Or was that

18   done without your permission too?

19   A    What do you mean?

20   Q    Did you agree to an arbitrator?

21   A    It defaulted from State court to arbitration because of

22   how the employment agreement was written, so it had to go to

23   arbitration, yes, sir.

24   Q    So there was an arbitrator assigned to your matter;

25   right?

Su - cross - Agnifilo                              2256

1   A     Right.

2   Q     And you litigated the case before the arbitrator;

3   correct?

4   A     No.

5   Q     How did the arbitrator reach a decision?

6   A     They -- between my lawyer, they just filed some motions

7   with each other and I never even saw the arbitrator.  They --

8   the arbitrator basically said that, based on these e-mails,

9   your -- my lawyer bound me to the settlement agreement.

10  Q     Without your consent?

11  A     Correct.

12  Q     All right.  So without your consent, your lawyer

13  basically agreed to give away 126,000 of your shares, that's

14  what you're telling the jury?

15  A     Yes.

16  Q     And that was the order?  That was the arbitrator's order;

17  correct?

18  A     Yes.

19  Q     You had to relinquish those shares as a matter of law;

20  correct?

21  A     According to the arbitrator, yes.

22  Q     Right.  According to the arbitrator; right?  There was no

23  other decision, that was it, there was an arbitrator; correct?

24  A     Yes.

25  Q     Did you relinquish the 126,000 shares of your own

Su - cross - Agnifilo                          2257

1   volition?

2   A     No.

3   Q     You disregarded the arbitrator's decision; correct?

4   A     No.  I mean, he has the shares.

5   Q     No, no, listen to the whole question.  Of your own

6   volition, did you listen to the arbitrator's decision and

7   voluntarily, of your own volition, give over the shares

8   consistent with the arbitrator's decision or not?

9   A     No.

10  Q     You didn't; right?  Because you didn't want to listen to

11  the arbitrator; correct?

12  A     Yes.

13  Q     And you didn't listen to the arbitrator, you kept the

14  shares; correct?

15  A     Well, the shares weren't with me.

16  Q     I don't think that you walked around every day with them,

17  if that's what you think my question was.  You didn't give

18  them back, though; right?

19  A     No.

20  Q     And what you tried to do is you tried to sell them;

21  right?

22  A     No.  I already sold them.

23  Q     Were you given permission to sell them?

24  A     Yes.

25  Q     By who?

Su - cross - Agnifilo                                    2258

1  A    By Schwab through the company and the company's

2  attorneys.

3  Q    And Charles Schwab was the arbitrator in this case?

4  A    Charles Schwab is my brokerage firm.

5  Q    Okay.  The arbitrator, right, there is an arbitrator, did

6  the arbitrator allow you to sell the shares?

7  A    No, but it wasn't their decision to make.

8  Q    Listen to me, the arbitrator said you can't keep the

9  shares, that was the decision of the arbitrator; right?

10 A    That was after I already sold the shares.

11 Q    No, no.  You tried to pull a fast one, you tried to sell

12 the shares and keep the money; right?  Isn't that what you

13 tried to do?

14 A    No, I did not try to pull a fast one.

15 Q    So --

16 A    I sold the shares that was in my name.

17 Q    When did you sell them?

18 A    December of 2013.

19 Q    And when was the -- when did the lawyer reach the

20 settlement without your consent?

21 A    April 2014 was what the arbitrator ruled that I was

22 bound.

23 Q    So you had -- that's what you had a loss, because you had

24 already sold the shares; is that correct?

25 A    I'm sorry, could you -- because I don't understand.

Su - cross - Agnifilo                                    2259

1   Q    You said you sold the shares in the summer of 2013?

2   A    No.  I sold the shares in December of 2013.

3   Q    Right, summer of --

4   A    December of 2013.

5            THE COURT:  December.

6   Q    Oh, December.  December.  December of 2013 you sold the

7   shares.  Okay.

8            Now, when did this arbitration start?  When did you

9   first file suit?

10  A    March of 2013.

11  Q    All right.  So March of 2013 you filed suit.  You said,

12  on direct examination, at some point your shares got brought

13  into the lawsuit; correct?

14  A    Yes.

15  Q    When was that?

16  A    The proposed settlement by the company was summer of

17  2013.

18  Q    Okay.  So in the summer of 2013, you still had the

19  shares; correct?

20  A    Yes.

21  Q    You had not yet sold them?

22  A    Yes.  I couldn't.

23  Q    Right.  And there was a legal proceeding pending in

24  regard to those very shares; correct?

25  A    No.

1   Q    No?  There was no arbitration going on in regard to the

2   shares?

3   A    The arbitration was one way, there was no countersuit

4   regarding the shares.  It was just my pay, my vacation days

5   and my healthcare, and it was just me suing the company to get

6   that back, but it nothing to do with shares.  I would have

7   countersued with those shares.  So those shares were never in

8   dispute.

9   Q    When you said, on direct examination, that the shares

10  were brought into the matter, what did you mean?

11  A    I meant for Martin proposed to -- or, I'm sorry, the

12  company proposed that if you give me back -- if you give me

13  these shares that you own, then I'll give you the $150,000.

14  Q    And the arbitrator ended up ordering you to relinquish

15  the shares; correct?

16  A    In April of 2014.

17  Q    In April of 2014.  But you're saying the shares -- you

18  had already sold the shares?

19  A    In December of 2013, yes.

20  Q    Okay.

21       So that's why you owed Schwab $900,000 or so;

22  correct?

23  A    I owed Schwab because the permission was taken away from

24  me to sell shares.

25  Q    Now, when did you get the shares?

1    A    November of 2012.

2    Q    And you left the company how long after getting the

3    shares?

4    A    December 2012.

5    Q    December 2012.

6    A    A week before the holidays.

7    Q    Okay.  Now, you said that you left the company because of

8    something that you saw; correct?  That's what you said?

9    A    It was a combination of different things.

10   Q    All right.  But you said one of the things, you said on

11   direct examination, is I left because of things that I saw?

12   Do you remember that testimony?

13   A    Yes.

14   Q    Okay.  I'm going to ask if you could -- I don't have the

15   tab numbers, but do you still have Government Exhibit 119-35

16   in front of you?

17   A    Yes.

18   Q    And I want you to look.  It is already in evidence as

19   Government Exhibit 119-35.  I want you to look at the

20   attachment, which is -- it looks like a cap table.  I would

21   ask if you could pull it up.

22          This was extra small and I don't know if I can get

23   it on the ELMO.  I doubt I can, but I can certainly try.

24   Maybe I can.

25          THE COURT:  There is a zoom feature.

1           MR. AGNIFILO:  You are right.  You are right.  Okay.

2    Q    So here's a list of people getting the Fearnow stock;

3    right?

4    A    Yes.

5    Q    One of the things that you saw in the company is that you

6    were not on this list, were you?

7    A    On that list, I'm not, no.

8    Q    Did you get any of these Fearnow shares?

9    A    No.

10   Q    No.  And you were upset about that; correct?

11   A    I was surprised.  Upset, pretty strong, but yes, you

12   could say surprised.

13   Q    You were mad that these people got these shares and you

14   didn't; correct?

15   A    No, I wasn't mad.

16   Q    No?  Which of the people on this list came to work after

17   you did?

18   A    Came to work after --

19   Q    After you started.  January of 2012 or after.

20   A    Tim Pierotti was already there when I was there.  Kevin

21   Mulleady was already there when I was there.  Tom Fernandez

22   was not there.  Marek Biestek was there before I was.

23   Claridge Capital, Ron Tilles, he was there before I was.

24   Andrew Vaino was there before I was.  Edmund Sullivan was

25   never there.  And then DGTE Legacy was never there.

Su - cross - Agnifilo                    2263

1   Q    And you felt that you were owed these shares; correct?

2   A    Owed these shares?

3   Q    Yeah, you felt that you were owed these shares?

4   A    No.

5   Q    No?  Now, we looked at 119-35.  I am going to use another

6   e-mail for a second.  I'm actually going to give you, sir, if

7   I could -- I'm going to hand you something and I only ask if

8   it refreshes your recollection.  That's the only question that

9   I am asking you at the moment.

10            MR. AGNIFILO:  For the record, Judge, this is DX

11   2017.  Your Honor has it and the Government has it.

12            MS. KASULIS:  What was the number again?  I'm sorry.

13            MR. AGNIFILO:  2017.

14            MS. KASULIS:  Thank you.

15            MR. AGNIFILO:  One second, Judge.

16            I will let you use mine.

17   Q    I am going to ask you only if this refreshes your

18   recollection.  We just looked at the Government Exhibit we

19   just looked at and --

20            THE COURT:  Refreshes his recollection as to what?

21            MR. AGNIFILO:  I am going to ask him in a second

22   when I get back.

23   Q    We just looked at Government Exhibit 119-35; correct?

24   A    Yes.

25   Q    Okay.  You -- and 119-35, you send an e-mail to Evan

Su - cross - Agnifilo                              2264

1   Greebel and George Huang on December 12, 2012 at 11:03 p.m.;

2   correct?  I am talking about 119-35 for the moment.

3   A    11:03 p.m. on December 12, 2012.

4   Q    Now, 20 minutes before you sent that e-mail, you sent an

5   e-mail to only George Huang; correct?

6   A    You are talking about this one?

7   Q    Right.  Talking about that one.

8   A    December 12, 10:43 p.m., from me to George Huang, yes.

9   Q    Do you recall writing to George Huang:  "Really glad I

10  could help everybody else."  Right?

11  A    I'm glad we were able to help everyone else.

12  Q    Right.  And that was sarcastic on your part; correct?

13  A    I don't know what I was feeling at that time so I can't

14  recall.

15  Q    Were you genuinely saying, you know, I'm glad I could

16  help everyone else, or were you saying glad I could help

17  everyone else?  Which of the two do you think it was?

18  A    Don't recall.

19  Q    No?  Were you glad you could help everyone else?

20  A    I don't remember.

21  Q    I will take that back.  Thank you.

22        You worked hard putting this together; correct?  All

23  of the work that was done in mid December, the merger

24  agreement, the Super 8K, right, didn't you do all of that?

25  A    I was part of it.

Su - cross - Agnifilo                    2265

1   Q    Didn't you work hard doing that?

2   A    I was part of other people's work.  I mean, yes, I worked

3   hard along with everybody else.

4   Q    Right.  And you were annoyed that your work was not

5   recognized with getting any of the Fearnow shares we just

6   looked at; isn't that fair to say?

7   A    I was surprised I didn't get any of the Fearnow stock,

8   but.

9   Q    Why were you surprised?

10  A    It seemed like everybody who were at Retrophin, or part

11  of the company, had some.

12  Q    Except for you?

13  A    No.  George Huang didn't get any.  Steve Aselage didn't

14  get any.  There was a number of people that didn't get any.

15  Q    Now, when you started testifying today, you went through

16  your background.  Do you remember that?

17  A    Yes.

18  Q    Okay.  And I think you said, if I am not mistaken, that

19  you were dismissed from Goldman Sachs because you incorrectly

20  filled out a form.  Do you remember that?

21  A    Yes.

22  Q    All right.  And the form that you incorrectly filled out,

23  is a U4 Form; correct?

24  A    Yes.

25  Q    It is a FINRA -- it is an official FINRA form; correct?

Su - cross - Agnifilo                                    2266

1    A    Yes.

2    Q    And you told the jury that your case was dismissed?

3    A    My case for the felony was dismissed, yes.

4    Q    It was dismissed.  There were no charges at all?

5    A    Correct.

6    Q    So it was dismissed?  There was no conviction of any

7    sort; correct?

8    A    Correct.

9    Q    All right.  Do you remember telling the SEC that you had

10   a criminal conviction?

11   A    I didn't have a criminal conviction.

12   Q    Did you tell the SEC that you had a criminal conviction?

13   A    At what point in time?

14   Q    I will tell you.  I am going to show you what has been

15   marked as 3500-JS-31.  It is underlined.  This is just to

16   refresh your recollection.  It is maybe two-thirds of the way

17   down.  And you tell me, if you remember telling -- who was the

18   member of the SEC that you spoke to?

19   A    I spoke to Eric Schmidt and another of his colleagues

20   that was present at that meeting.  I don't remember his name.

21   Q    Do you remember telling Eric Schmidt you had a criminal

22   conviction?

23   A    I don't.

24   Q    You don't remember telling him that?

25   A    No.

Su - cross - Agnifilo                           2267

1   Q    No?  That was a pretty important interview; right?  You

2   went to the SEC?

3   A    Yes, I went to the SEC.

4   Q    I'll take it back.  Thank you.

5         And you wanted to tell them the truth about

6   everything; right?  Correct?

7   A    Yes, I was truthful with the SEC.

8   Q    All right.  And did you notice that Eric Schmidt was

9   taking notes as you were speaking to him?

10  A    I don't recall.

11  Q    And you don't recall if did you told the SEC that you had

12  a criminal conviction?

13  A    I wouldn't tell them that because I didn't have a

14  criminal conviction.

15  Q    Now, what you're saying you forgot to put on your U4 Form

16  is that you didn't know that you had been charged with a

17  felony; correct?

18  A    Yes.

19  Q    You got arrested; right?

20  A    Yes.

21  Q    You were brought in front of a judge for an arraignment;

22  correct?

23  A    Yes.

24  Q    You had a lawyer; right?

25  A    No.

Su - cross - Agnifilo                          2268

1    Q    You didn't have a lawyer?

2    A    Oh.

3    Q    You are being arraigned on a felony and you don't have a

4    lawyer?

5    A    It was in city court.  I think it was downtown.  It was

6    for a fight.  I got into a fight with a cabdriver.

7    Q    Onondaga County; right?

8    A    No.  It was in New York City.

9    Q    Yeah?

10   A    It was in New York City.

11   Q    It was in Manhattan?

12   A    In Manhattan, yes.

13   Q    Okay.  And you went in front of a judge in an arraignment

14   part in Manhattan, downtown Manhattan; right?

15   A    Right.

16   Q    And you weren't told that you were charged with a felony?

17   A    No.

18   Q    They didn't tell you that?

19   A    No.

20   Q    And you never bothered to check when you filled out the

21   U4 Form if you had been charged with a felony?

22   A    Didn't, no.

23   Q    You didn't check?

24   A    No.

25   Q    U4 Form is an important thing to fill out; correct?

Su - cross - Agnifilo                               2269

1    A    Yes.

2    Q    It has to be filled out accurately; right?

3    A    Yes.

4    Q    You would want to make sure when you fill it out you are

5    doing so based on truthful, accurate information; correct?

6    A    Of course, yes.

7    Q    And how long earlier had this arrest happened from when

8    you were filling out the U4 Form?

9    A    I can't remember.  It was 20 years ago.  I don't

10   remember.

11   Q    It was 20 years ago?

12   A    Well, this happened 20 years ago, yeah.  1997.

13   Q    When you were filling out the U4 Form, that was closer in

14   time to the events that we're talking about; correct?

15   A    Yeah, but I don't remember what the time lapse was.

16   Q    Did you check on your case to see what happened?

17   A    I showed up for every -- for the next appointment with --

18   in front of the judge.

19   Q    No, no.  In terms of when you were filling out your U-4,

20   did you go back and did you see what exactly you were charged

21   with before you represented on a U4 Form that you were not

22   charged with a felony?

23   A    No.

24   Q    You didn't bother to check?

25   A    No.

1    Q    And did you think you should check?

2    A    No.

3    Q    No?  Well, what happened as a result of not checking?

4    A    I got dismissed from Goldman.

5    Q    You got fired?

6    A    Uh-hum.

7    Q    Your first job, you got fired from Goldman Sachs; right?

8    A    Uh-hum.

9    Q    You have to answer yes or no so she can write it down.

10   A    Yes.

11   Q    You got fired from Goldman Sachs because you tried to

12   sneak it by; right?  Maybe no one will know; right?  You

13   didn't Goldman would find out; correct?

14            MS. KASULIS:  Objection.

15            THE COURT:  Sustained.

16   Q    Were you hoping Goldman wouldn't find out?

17   A    No.

18   Q    No?  And when -- when you filled out the U-4, did they

19   turn around right away and say this is false or did you work

20   there for a while?

21   A    I was there for probably two more months, three more

22   months, around that time frame.

23   Q    Okay.  And so how long did you work there in total?

24   A    From 1997, when I graduated, it was June 1997 and through

25   the end of 1998, so a little less than two years.

Su - cross - Agnifilo                    2271

1    Q    And then you got fired?

2    A    Yeah.

3    Q    And then you worked at Weiss, Peck and Greer?

4    A    Yes.

5    Q    You were saying something about a portfolio manager there

6    did something wrong and caused you to get fired?  Did I hear

7    you right?

8    A    We worked as a team and we had a trade that we

9    incorrectly bought, when we should have sold it, and then the

10   stock went down and then it was a firm error because it was my

11   error.  And then --

12   Q    Did you commit an error?

13   A    It was between me and a portfolio manager, yeah.  It was

14   miscommunication between the both of us, so it was both our

15   errors.

16   Q    Okay.  And you got fired from your second job?

17   A    They wanted to give me $10,000 to go away because I

18   refused to put the error into the client's account and instead

19   gave it to the firm.  I didn't want to do that to the client,

20   so they dismissed me, yes.

21   Q    So you were trying to do the right thing and you got

22   fired from your second job; right?

23   A    Yes.

24   Q    Okay.

25              (Continued on following page.)

1  EXAMINATION CONTINUES

2  BY MR. AGNIFILO:

3  Q    Now, you also worked at Othello, is it Othello Capital

4  Management, is that the name of your hedge fund?

5  A    Yes.

6  Q    And you said on direct examination to this jury this

7  morning that you left because you were looking for a better

8  opportunity, is that fair to say?

9  A    Yeah.

10  Q    Yeah.  Did anything happen that caused to look for a

11  better opportunity?

12  A    During that time we had a -- the brokerage firm took

13  money out of our account and used it on lawyer fees, and I

14  took -- I gave our investors their money back and went through

15  the arbitration process with them -- with them, meaning Penson

16  Financial who's our prime broker, and went to arbitration with

17  them.

18  Q    What is -- did you ever hear of a stock called Typhoon

19  Touch Technologies?

20  A    Yes.

21  Q    Why don't you tell the jury how you know Typhoon Touch

22  Technologies?

23  A    We shorted the stock, so Othello Capital is a long/short

24  equity hedge fund.  We buy stocks for it to go up or you could

25  short stocks hoping that the stock would go down and you would

Su - cross - Agnifilo                              2273

1   profit from that.  The stock went -- we invested in that stock

2   on the short side, and that's how I became -- that's why I

3   know the stock.

4   Q    You viewed -- you did a big short on Typhoon Touch

5   Technologies, correct?

6   A    It was -- no, it was relatively small.  It was under

7   5 percent of our assets at the time.

8   Q    And it was an illiquid stock, right, it was a

9   thinly-traded stock, right?

10  A    It was an illiquid stock, yes.

11  Q    And you didn't borrow the stock to do the short, right?

12  A    No, that's not correct.

13  Q    Tell us what is correct.

14  A    I borrowed the stock from Penson Financial.

15  Q    And what did Penson Financial do?

16  A    They lent me the stock.

17  Q    And so what was wrong with the trade?

18  A    There was -- the stock went up because the insiders were

19  manipulating the stock, so the stock went up.

20  Q    Did Penson fail to borrow the stock?

21  A    Yes.

22  Q    Okay.  So the stock was not borrowed for the short sale,

23  correct?

24  A    Yes.

25  Q    And you're saying you didn't do it, Penson failed to

Su - cross - Agnifilo                                2274

1    borrow the stock, right?

2    A    Correct.

3    Q    So tell us how that works, tell us how it's possible that

4    the intermediary the prime broker Penson could fail to borrow

5    the stock and put you in this position; how did it happen?

6    A    I don't know, you'd have to ask them.

7    Q    No, I'm asking you.  You do a short sale, correct?

8    A    Uh-hum.

9    Q    You have to answer yes or no.

10   A    Yes.

11   Q    All right.  On a short sale you have to borrow the stock,

12   correct?

13   A    Yes.

14   Q    All right, to cover the short, correct?

15   A    Yes.

16   Q    Okay.  You didn't do anything wrong, correct?

17   A    I didn't, I followed the process.

18   Q    Right.  What you're saying is that Penson failed to

19   borrow the stock, correct; that's what you're telling this

20   jury, right?

21   A    Yes.

22   Q    All right.  And so it's Penson's fault, correct?

23   A    Yes.

24   Q    And as a result, how much longer did your hedge fund

25   continue after this short sale?

Su - cross - Agnifilo                         2275

1    A    Three years, but very minimal, on a very minimal basis.

2    I gave my investors back their money when this occurred and we

3    were going through arbitration.

4    Q    But this was a major setback for your fund, correct?

5    A    Yes.

6    Q    And was it around this time that you interviewed for the

7    first time with Martin Shkreli?

8    A    In 2009 I interviewed with him; towards the end of 2009,

9    yes.

10   Q    So it coincides roughly with this short sale that kind of

11   went bad, correct?

12   A    Yeah.

13   Q    All right.  And did you tell Martin Shkreli that you had

14   been arrested for a felony?

15   A    No.

16   Q    Did you tell Martin Shkreli why you had been fired from

17   Goldman Sachs?

18   A    No.

19   Q    At any time before starting with Retrophin MSMB did you

20   tell them this information?

21   A    No.

22   Q    Did you think you should?

23   A    No.

24   Q    No.  Now, you went to the SEC in May of 2012, correct?

25   A    Yes.

Su - cross - Agnifilo                              2276

1    Q    So you worked with Martin for five months, right?

2    A    (No response.)

3    Q    And you went to the SEC?

4    A    Yes.

5    Q    And I think you said on direct that you went because you

6    were concerned, there were red flags, certain things were

7    concerning you, correct?

8    A    Yes.

9    Q    And I think you also said on direct that you went to the

10   SEC two separate occasions, correct?

11   A    That being the first and the second one being May 2014.

12   Q    Now, I think on direct examination you said you went to

13   the SEC because you were hoping that the SEC could undo the

14   arbitration award.

15        Do you remember telling this jury that?

16   A    Yes.

17   Q    How long have you been involved in financial matters, you

18   know, working in finances?

19   A    I graduated in 1997.  My first job -- actually prior to

20   that I interned in high school for a brokerage firm.  So since

21   I was 16, 17.

22   Q    Have you asked the SEC to overturn the arbitration award?

23   A    No.

24   Q    No?

25        So when you say that I did it hoping that the SEC

1  would overturn the arbitration award, you haven't actually

2  asked them that, correct?

3  A    No.

4  Q    You haven't filled out any paper work saying, Hey, SEC,

5  can you overturn my arbitration award, right?

6  A    No.

7  Q    But you have filled out paper work to do something else,

8  didn't you?

9  A    What do you -- I'm sorry, could you be more specific?

10 Q    You want money.  You want the SEC to give you money.  You

11 filed --

12           MS. KASULIS:  Objection.

13 BY MR. AGNIFILO:

14 Q    -- a report as a whistleblower, correct?

15           MS. KASULIS:  Objection, Your Honor.

16 Q    That's what you did?

17           THE COURT:  I beg your pardon?

18           MR. AGNIFILO:  A whistleblower.

19           Are you talking to me?

20           MS. KASULIS:  Can you repeat the question?

21           MR. AGNIFILO:  Yes.

22 BY MR. AGNIFILO:

23 Q    You filed a complaint with the SEC as a whistleblower,

24 correct?

25 A    On its website, that's the section that it took me to.  I

1    don't know what section it took me to, it just said complaint,

2    SEC complaint, and I just filled it out.

3    Q    Do you know that whistleblowers could get a percentage of

4    whatever money they cause the SEC to recover?  Is this news to

5    you?

6    A    No, I know that.

7    Q    You know that, right?

8    A    (No response.)

9    Q    So when you told the jury that you went to the SEC

10   because you want the SEC to overturn the arbitration award,

11   that's not true, is it, because you haven't asked them to do

12   that, correct?

13   A    Well, I was hoping that they'd see something in my paper

14   and say, Hey, this is wrong.  I mean --

15   Q    What they saw on paper is they saw your whistleblower

16   complaint where you could get a percentage of whatever money

17   the SEC recovers, correct?

18   A    If that was part of the program, then yes.

19   Q    Is that part of the program?

20   A    Honestly, I don't know what -- I don't know what is.

21   Q    You filled out an SEC complaint, you filled out two,

22   correct?

23   A    It was a follow-up to the first one.

24   Q    A follow-up.  How much time in between the two?

25   A    The first one was in, like I said, May 2012.

1   Q     Yes, and the follow-up was when?

2   A     The follow-up was in April of 2014.

3   Q     Yes, the follow-up being 25 months later, that was the

4   follow-up you're talking about?

5   A     Yeah.

6   Q     And so from the first report and the follow-up, 25 months

7   later, you don't know that the SEC whistleblower program could

8   result in you getting money if the SEC gets money?

9   A     I know the SEC paid whistleblowers a percentage of

10  whatever is recovered.

11        So your question is what?  I'm sorry.

12  Q     You know because you filed a whistleblower complaint that

13  you could get money, a percentage of what the SEC gets if

14  they, too, get money; correct?

15  A     Yes.

16  Q     Okay.  So when you answered the question on direct

17  examination as to why you went to the SEC and your answer to

18  this jury under oath was because you want the SEC to undue the

19  arbitration, that's not true; correct?

20  A     No, I meant -- I meant that.

21  Q     You meant what?

22  A     That if they could undo it.  I don't know if they have

23  the power to, to undue the --

24  Q     You know they don't have the power to?

25        MS. KASULIS:  Objection, Your Honor.

Su - cross - Agnifilo                    2280

1          THE COURT:  Sustained.  You are arguing with the

2     witness.

3          MR. AGNIFILO:  I apologize.

4          THE COURT:  All right.

5     BY MR. AGNIFILO:

6     Q     You think that the SEC is just without being asked going

7     to undue your arbitration, do you really think that might

8     happen?

9     A     I hope so.

10    Q     But what you actually put in motion to have happen is you

11    put in motion a way to get money if the SEC gets money, that's

12    what you actually did, right?

13    A     If that's the result.

14    Q     So tell me how this works, you file an online SEC

15    whistleblower complaint on, I want to make sure I have the

16    date right, on May 5th, 2012, correct?

17    A     (No response.)

18    Q     Do you remember that being the date?

19    A     The date, I believe, was May 2012.  I don't remember a

20    specific date.

21    Q     Okay, here is what I'll do to make it easy.  This is

22    Government's Exhibit 3500-JS-7.  I would say look one-fifth of

23    the way down, there is a date, don't read it.  Just look at

24    the date and then I'll ask you a question.

25          Right?  No, on the top.

Su - cross - Agnifilo                      2281

1    A    Submitted date you're asking?

2    Q    Yes, when did you submit it?

3    A    Submitted date is May 10th, 2012.

4    Q    Very good, sir.  We're done with that.  Thank you.

5         So May 10th, 2012 at 12:07 a.m. you file an online

6    whistleblower complaint with the SEC, correct?

7    A    Yes.

8    Q    Right.  Do you go to work the next day like nothing

9    happened?

10   A    (No response.)

11   Q    You don't stop working, right?

12   A    I didn't stop working, no.

13   Q    You go to work at MSMB Retrophin every single day,

14   correct, every single workday?

15   A    Every single workday, yes.

16   Q    All right.

17   A    And weekends, also, sometimes.

18   Q    And weekends also.  And weekends also.  And this whole

19   while you are putting yourself in a position that if a fraud

20   is uncovered and if the SEC gets money because of a fraud, you

21   get money, correct?

22   A    If those are the SEC rules, if that happened, it

23   happened.

24   Q    But it would happen because you filed a complaint, that's

25   why it would happen, right?

1    A    Yes.

2    Q    Okay.  Now, I think you said on direct examination that

3    the nature of your complaint was there wasn't enough

4    transparency.

5         Do you remember saying that to my colleague with the

6    government?

7    A    Yes.

8    Q    Okay.

9    A    That's one of the concerns.

10   Q    So you filed this whistleblower complaint and you said,

11   There's not a lot of transparency at the company where I'm

12   working; correct?

13   A    Yes.

14   Q    And do you remember specifically saying yes to the

15   question of whether the -- the SEC's question, Are you

16   submitting this tip, complaint or referral pursuant to the

17   SEC's whistleblower program; and you provided the answer yes

18   to that; do you remember?

19   A    I don't.

20   Q    Okay.  This is page 5 of the same document.  I would say

21   look two inches above the bottom and just see if it refreshes

22   your recollection.

23   A    Can I read the whole thing so --

24   Q    I will absolutely give you the whole thing.

25   A    Thank you.

Su - cross - Agnifilo                                    2283

1              THE COURT:  This is the May 2012 complaint?

2              MR. AGNIFILO:  Yes, this is May 10, 2012.  It's an

3       eight-page document.  I am going to give the whole thing to

4       the witness.

5       BY MR. AGNIFILO:

6       Q    I just want to keep it all in order because I'm terrible

7       with order sometimes.  That's page 5, so I want to stick it

8       right in there.  So let's do this.

9       A    Can you give me a moment just to read through the whole

10      thing?

11      Q    Yes, absolutely.  Take whatever time you need to read it.

12             (Pause.)

13             THE COURT:  I think the jurors might during this

14      time like a mid-afternoon break.

15             MR. AGNIFILO:  Sounds good to me.

16             THE COURT:  So, sir, you can continue reading while

17      we excuse the jurors for a few minutes.

18             Please do not talk about the case.  Thank you.

19             (Jury exits.)

20             THE COURT:  All right, you can continue reading.

21      Then if you need some time for the restroom or something

22      after, let us know.  Let's try to take a 10 to 15-minute

23      break.

24             MR. AGNIFILO:  Yes, fine.

25             THE COURT:  10 to 15 minutes just so he can read it

Su - cross - Agnifilo                    2284

1    and then if he needs to use the restroom or whatever.

2              MS. KASULIS:  Thank you, Your Honor.

3              (Recess taken.)

4              (In open court - jury not present.)

5              THE COURT:  Mr. Brafman, we will adjourn at

6    5 o'clock.  I think the jurors will appreciate that.

7              MS. KASULIS:  At 5 o'clock?

8              THE COURT:  Yes.

9              (Whereupon, there was a pause.)

10             (Jury enters.)

11             THE COURT:  All the jurors are present.  Please be

12   seated.

13             You may resume your cross, Mr. Agnifilo.

14   EXAMINATION CONTINUES

15   BY MR. AGNIFILO:

16   Q    Mr. Su, I provided you with your first SEC whistleblower

17   filing, it's in front of you, right?

18   A    Yes.

19   Q    So at any point you want to use it to refresh your

20   recollection, feel free.  All right?

21   A    Thank you.

22   Q    Now, there was a second filing you said was a follow-up,

23   correct?

24   A    Yes.

25   Q    And that was on June 5th, 2014.  Does that sound right?

Su - cross - Agnifilo                              2285

1   A    I said May, but it's around that time period, so yeah.

2   Q    Okay.  And do you remember that it was also a written

3   filing as well?

4   A    Yes, it was on -- it was online.

5   Q    Okay.  And you, obviously, want -- when you make these

6   filings, it's important to be entirely accurate, correct?

7   A    Yes.

8   Q    And do you remember in your written filing you said you

9   worked at Retrophin MSMB for about six months?

10  A    Yes.

11  Q    Did you work there about six months?

12  A    I worked at MSMB and Retrophin together since 2012,

13  January 2012.

14  Q    And so you worked there from January 2012 to June 2012?

15  A    No, throughout December -- sorry, December 2012.  So

16  January 2012 through December 2012.

17  Q    And how many months is that?

18  A    Twelve months.

19  Q    Twelve months.  Is that what you told the SEC?

20  A    On the second filing you're saying?

21  Q    Yes, the second filing.

22  A    I'm sure I did, I don't know what I --

23  Q    All right, let's refresh your recollection.  This is

24  3500-JS-8.  I am just going to show you the first page.  I am

25  going to ask you to read to yourself the first line there

Su - cross - Agnifilo                                   2286

1    that's highlighted, just to yourself.

2              (Pause.)

3    BY MR. AGNIFILO:

4    Q    You told the SEC that you worked there about six months,

5    right?

6    A    Yes.

7    Q    When you wrote that to the SEC, did you think at the time

8    that you had worked there six months?

9    A    I think I was referring to Retrophin, specifically.  I

10   can't remember what I was referring to, but no, I worked there

11   for a full twelve months.

12   Q    Yes, what you're referring to is you worked there twelve

13   months, right?

14   A    Yes, I did work there for twelve months.

15   Q    You didn't work there for six months?

16   A    No.

17             MS. KASULIS:  Objection, Your Honor.  He

18   explained --

19             THE COURT:  Sustained.

20             MS. KASULIS:  I think we're talking about two

21   different things.

22   BY MR. AGNIFILO:

23   Q    I'm sorry, I didn't let you finish.

24             Explain to the jury so they fully understand how it

25   is you filled that out and you said you worked there six

Su - cross - Agnifilo                                    2287

1  months and that's accurate.  Take all the time you need.

2  A    I'm not sure what I was referring to specifically

3  regarding the six months because Retrophin -- yeah, I'm not

4  sure which specifically I was referring to for six months at

5  Retrophin, as COO of Retrophin.

6  Q    Did you work for a COO of Retrophin for six months?

7  A    I think most of my duties started in the May/June

8  timeframe, but --

9  Q    When did you sign your employment agreement to be COO of

10 Retrophin and the other companies?

11 A    January 2012.

12 Q    Okay.

13 A    January 4th, that's when I started.

14 Q    And did you stop being COO of Retrophin at any point

15 before December of 2012?

16 A    No, no.

17 Q    Do you feel like you need any more time to explain to the

18 jury how you worked as the COO of Retrophin for six months?

19 A    No.

20 Q    Okay, then I'll take that back from you.

21        Do you still need the other one?

22 A    No.

23 Q    If you need it, you can have it.

24 A    No.

25 Q    I am going to turn our attention, if we could, to

Su - cross - Agnifilo                    2288

1    Government Exhibit 119-15.  And I apologize, I don't have the

2    government tabs memorized, so I will endeavor to put this up

3    on the screen.

4              MS. KASULIS:  It's tab 14.

5              THE COURTROOM DEPUTY:  Is it on?

6              MR. AGNIFILO:  I think it is.

7              THE COURTROOM DEPUTY:  The document.

8              MR. AGNIFILO:  The document is on there, yes.

9              THE COURT:  You have it zoomed too large.

10             MR. AGNIFILO:  Oh, I see.  There we go.  All right.

11             (Exhibit published.)

12             A JUROR:  This one isn't working (indicating).

13             THE COURT:  Oh.

14             THE COURTROOM DEPUTY:  The monitor isn't working.

15             A JUROR:  They all went out now.

16             THE COURTROOM DEPUTY:  Hold on.

17             A JUROR:  This one is out (indicating).

18             THE COURT:  Maybe there is a switch.

19             THE COURTROOM DEPUTY:  Maybe something came out.

20             THE COURT:  Is everything okay?

21             THE COURTROOM DEPUTY:  It's on.

22             THE COURT:  Can everybody see the document,

23   Government's Exhibit 119-15?

24             THE JURY:  Yes.

25   BY MR. AGNIFILO:

Su - cross - Agnifilo                         2289

1   Q    So we are just going to use this document sort of as an

2   example, 119-15.  It's an e-mail from you to Evan Greebel at

3   Katten Muchin Rosenman, LLP and Corey Massella, correct, and

4   Susan Chew, correct?

5   A    Yes.

6   Q    And during your direct testimony you testified about a

7   lot of e-mails that were between you and Mr. Greebel, correct?

8   A    Yes, I referenced some e-mails; yes --

9   Q    Right.

10  A    -- between us.

11  Q    And Evan Greebel and Corey Massella and Susan Chew appear

12  on a number of the e-mails that you talked about in your

13  direct testimony, right?

14  A    Yes.

15  Q    Evan Greebel is a partner at the law firm Katten Muchin,

16  correct?

17  A    He's an attorney at Katten Muchin.  I don't know if he's

18  a partner, but --

19  Q    Okay.  And you described him, I think, on direct

20  examination as -- I think you said he was smart, he seemed

21  professional and the relationship he had with Martin seemed

22  professional, correct?

23  A    Yes, I thought he was a capable lawyer.

24  Q    And there was another lawyer I think that you mentioned

25  that was on some of the e-mails, maybe you didn't, David

Su - cross - Agnifilo                                    2290

1    Kravitz, is that name familiar to you?

2    A    Yes.

3    Q    And David Kravitz, I think you said, worked for Evan

4    Greebel?

5    A    Yes.

6    Q    And he was at Katten as well?

7    A    Yes.

8    Q    Seemed capable to you as well?

9    A    I don't remember having a lot of dealings with him.

10   Q    You mostly dealt with Evan?

11   A    Yes.

12   Q    And you had a lot of dealings with Corey Massella, right?

13   A    Yes.

14   Q    Did Corey seem capable from your perspective?

15   A    Yes.

16   Q    And Susan Chew as well?

17   A    Yes.

18   Q    I am not going to ask about your wife, because that is

19   not my business.

20         So this is an e-mail and this e-mail attaches a

21   Retrophin, LLC transfer and donee representation letter, and

22   we talked about it on direct examination, it's admitted as

23   part of this same exhibit.  Do you remember that?

24   A    Yes.

25   Q    And just so we're all on the same page, that's this

1   document, right?

2           (Exhibit published.)

3   A    Yes.

4   Q    And I know we talked a lot about the signature page on

5   this particular document.  I am going to try to get the whole

6   thing on one page.

7           (Exhibit published.)

8   BY MR. AGNIFILO:

9   Q    It didn't appear like that to you at the time that you

10  saw it, right, it's all crooked now, but was it crooked then?

11  A    I don't remember.

12  Q    Okay.  And you said that you have Martin Shkreli sort of

13  on both sides of the transaction, correct?

14  A    He was the transferee and the Retrophin part, that's

15  two -- each side.

16  Q    Okay.  So this is -- what do you understand to be going

17  on here by virtue of this agreement, this document?

18  A    So the way it reads is shares being transferred between

19  Martin Shkreli and Marek Biastek.

20  Q    Okay.  And you said that you wrote that date in there,

21  correct, that 11/29/12, you wrote that, right?

22  A    Yes, that's my handwriting.  Yes.

23  Q    You are not one of the signatories to this document,

24  correct?

25  A    Correct.

Su - cross - Agnifilo                    2292

1   Q    And did they sign it in front of you?

2   A    No.

3   Q    Do you know when they signed it?

4   A    I don't know.

5   Q    So let me ask you, why did you put a date on it?

6   A    It was missing a date and I put a date on it.

7   Q    Is there an indication there that it needs a date?

8   A    No.

9   Q    There is no date line, correct?

10  A    Correct.

11  Q    You just decided on your own, I think this document needs

12  a date and put a date on it, right?

13  A    I don't know what I was thinking during that time.  I

14  don't know -- yes, I put the date on there.  Yeah.

15  Q    Did anybody ask you to put the date on there?

16  A    I don't remember.

17  Q    Do you think someone might have?

18  A    It's possible, but I don't remember.

19  Q    Yeah?  Because you didn't say that was possible on

20  direct, you just said you saw no date and put a date, right?

21  A    Yes.

22  Q    And I think this is one of the documents you said that

23  Martin would just sort of like leave things on your desk from

24  time to time, correct?

25  A    It was one of the things that he brought by while I was

SAM      OCR      RMR      CRR      RPR

1    there on my desk and he put it on my desk.

2    Q    Okay.  And you took it upon yourself to put the date on?

3    A    I can't remember for this specific instance, but if there

4    was a date missing on some documents I would fill in the date

5    if it was -- if it was missing -- yeah, if it was missing.

6    Q    Now, you say the date is missing, but you just decided to

7    put a date underneath Martin Shkreli's signature and above the

8    address where there is no reason to put a date, correct?

9    A    That's what it appears, I put a date underneath the

10   signature.

11   Q    Right.  And then there was a lot of back and forth about

12   that date, correct?

13   A    Yes.

14   Q    A lot of this talk going back and forth.  At one point --

15   I could show you the document if you need to refresh your

16   recollection -- Martin says, We signed this in June; do you

17   remember?

18   A    Yes.

19   Q    And this is all because you decided to take it upon

20   yourself to put a date on a document that doesn't need a date,

21   correct?

22   A    Yes.

23            MS. KASULIS:  Objection, Your Honor.

24            THE COURT:  Sustained.

25   BY MR. AGNIFILO:

1   Q    There was a lot of back and forth about the date, right?

2   A    From the e-mails, yes.

3   Q    That we all saw, we all saw, we spent 15 minutes looking

4   at e-mails about the back and forth on the date, correct?

5   A    Yes.

6   Q    Right.  The date you wrote, correct?

7   A    Yes.

8   Q    Okay.  Now, at one point after you no longer worked at --

9   well, let me back up.

10         One day in December you just decided you weren't

11  going to come back to work anymore, right?

12  A    Yes.

13  Q    You just -- you didn't tell anybody, you didn't give a

14  phone call, you didn't come and take your belongings, you just

15  didn't show up, right?

16  A    No, I told the president of MSMB, which was Tom

17  Fernandez.

18  Q    When did you tell Tom Fernandez that you were not coming

19  back to work anymore?

20  A    The day I left I walked by his office.  He saw that I was

21  distraught and I had my bag.  We walked downstairs, went to

22  the lobby across the street of the -- of another office

23  building and we sat there and I told him, I'm not coming back

24  to work.  All these things just don't add up.  And Martin took

25  10,000 out of 20,000 that was left in the bank account from

Su - cross - Agnifilo                              2295

1   Retrophin's Chase bank account and I was done.

2   Q     So you left because Martin took $10,000 out of

3   Retrophin's bank account, is that what I'm to understand?

4   A     That, including amongst other things.

5   Q     Now, you know you gained access to a great amount of

6   e-mails that were not sent to you, correct, and that you did

7   not send?

8   A     Yes, we had an e-mail archive.

9

10                 (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM       OCR       RMR       CRR       RPR

Su - cross - Agnifilo                              2296

1    (Continuing)

2    Q    And you took those e-mails and you kept them; correct?

3    A    Yes.  I printed some out from home, but yes, yeah.

4    Q    And where did you keep them for a period of time?

5    A    In my apartment.

6    Q    Did you keep them in a safe deposit box?

7    A    No.

8    Q    You didn't keep any of the E-mails in a safe deposit box?

9    A    No.

10   Q    You're sure?

11   A    Yes.

12   Q    Do you remember telling anybody that you kept the e-mails

13   in a safe deposit box?

14   A    Don't recall that.

15   Q    No?

16        MR. AGNIFILO:  Give me a second.  Hold on.

17   Q    Do you remember speaking to the FBI on the phone on

18   July 28th, 2014?

19        Do you remember that?

20   A    I'm sorry, what was the date?

21   Q    It was July 28th, 2014.

22   A    I got a call from the FBI during that time.

23   Q    Yes.  And you had a conversation with a special agent of

24   the FBI, right?

25   A    Yes, I believe his name was Chris Delzado.

1    Q    Chris Delzado, right.  You spoke with Special Agent

2    Delzado on the phone, right?

3    A    Yes.

4    Q    And you told Special Agent Delzado a lot about this very

5    case; correct?

6    A    We discussed, we did discuss this case, yes.

7    Q    All right.  And you remember telling Special Agent

8    Delzado that you retained approximately 250 e-mails in a safe

9    deposit box?

10   A    I don't.

11   Q    All right.

12          MR. AGNIFILO:  I'm going to show you page 2 of

13   Government's Exhibit 3500-JS-2.

14   Q    And my only question for the moment is whether this

15   refreshes your recollection, sir.  Right there, maybe a third

16   of the way up.

17          Do you remember telling Special Agent Delzado on the

18   phone that you kept 250 e-mails in a safe deposit box?

19   A    No.

20   Q    No?  Are you saying you didn't tell him?

21   A    Yes.

22   Q    You're saying you didn't tell him that.

23   A    In a safe deposit box, no, I didn't tell him that.

24   Q    Okay.  And so, you kept them where?

25   A    In my apartment, under my bed.

Su - cross - Agnifilo                                    2298

1   Q    All right.

2        Do you remember telling Special Agent Delzado during

3   this phone call that you kept the e-mails someplace?

4   A    In my apartment.

5   Q    Yeah.  And you're sure, positive, that you did not tell

6   him that you kept them in a safe deposit box?

7   A    Yes.

8   Q    All right.

9        Have you ever seen any of these statements before,

10  the FBI 302 reports?

11  A    No.

12  Q    No?  They've never been shown to you?

13  A    No.

14  Q    Now, many of the e-mails that you're saying you kept in

15  your apartment were e-mails that you were not on; correct?

16  A    Right.

17  Q    They were a lot of e-mails to and from Martin Shkreli;

18  correct?

19  A    Yes.

20  Q    And you're saying that you printed these e-mails out at

21  home?

22  A    Yes.

23  Q    And you're saying that you did this to see what

24  everyone's trading activity was?

25  A    It was to monitor everyone's e-mails for trading

1  activities, anything that had to do with really, the company

2  or companies.

3  Q    And were you authorized to take these e-mails to your

4  home?

5  A    We each had access, we -- at home.  We worked, a lot of

6  us had access to work from home like, from San Diego or a

7  person out in San Diego or, we just worked at home.

8  Q    Did you ask permission from anyone to do this?

9  A    To work from home?

10 Q    To take e-mails.

11        I'm not asking about working from home, just to make

12 sure we're clear.

13 A    Right.

14 Q    I'm asking about e-mails.  E-mails not to you and not

15 from you that you kept in your home.

16        Did you get permission to do that from anybody?

17 A    It fell within my job responsibilities.

18 Q    I'm not asking how you felt.

19 A    No, no, it fell.

20 Q    It fell?

21        THE COURT:  Fell within.

22        MR. AGNIFILO:  I understand, I understand.

23 Q    It fell to keep e-mails in your home?

24 A    As a part of my responsibilities, I retained e-mails,

25 yeah.  And I worked from home.

1    Q     And at the time that you were retaining e-mails, had you

2    already filed your whistle-blower complaint where you could

3    get a percentage of whatever money you get from the SEC?

4    Which came first?

5    A     The SEC complaint came first.

6    Q     So, after you filed the SEC complaint you start

7    monitoring people's e-mails and keeping them at home; correct?

8    A     It's part of my job duties, yes.

9    Q     As part of your job duties, right.

10         And you've given those e-mails to law enforcement,

11   right?

12   A     Yes.

13   Q     Okay.  As part of your job duties.

14         MS. KASULIS:  Objection, Your Honor.

15         THE COURT:  Sustained.

16         MR. AGNIFILO:  Withdrawn.  Withdrawn.

17         THE COURT:  I am going to just caution you not to

18   argue, all right?

19         MR. AGNIFILO:  That's fine, Judge.

20         THE COURT:  Please.

21         MR. AGNIFILO:  Yes, I will go back.

22   Q     You also had in your possession Martin Shkreli's personal

23   bank account information; correct?

24   A     I don't have -- I have a statement, if that was included

25   in part of the e-mails.  It was, I didn't have access to his

1   bank account, no.

2   Q    You had many of Martin Shkreli's bank statements from his

3   personal bank account; correct?

4   A    No.

5   Q    No?

6   A    I think it was two and it was used to, I think he used it

7   to secure a apartment that was he was renting at the time, at

8   December sometime.

9   Q    I'm not following you.

10        Why did you have Martin Shkreli's personal bank

11   account statements exactly?

12   A    He used it to, used it for reference for an apartment

13   that he was renting in New York City.

14   Q    And what role were you playing in this matter?

15   A    No role.

16   Q    No role.

17        And so, why again did you have bank statements from

18   Martin Shkreli's personal bank account?

19   A    I thought it was extremely low amount having only a

20   nominal amount in a bank account for a successful hedge fund

21   manager.

22   Q    And was your decision to keep Martin Shkreli's personal

23   bank account statements in any way related to your

24   whistle-blower complaint with the SEC?

25   A    Could you repeat the question, please.

Su - cross - Agnifilo                          2302

1    Q      Sure.

2           Isn't it true you would like to make money from the

3    SEC whistle-blower complaint that you filed; correct?

4    A      If it happened to go down that route, that's fine.  If it

5    doesn't, that's fine, too.

6    Q      And you kept a great deal of information not belonging to

7    you, like Martin Shkreli's personal bank account statements,

8    in your home; correct?

9    A      I had it in my home, yes.

10   Q      All right.

11          Now, at one point you said after you had no longer

12   showed up at work at Retrophin MSMB you posted an SEC

13   document; correct?

14   A      Yes.

15   Q      All right.  Tell us more about that.

16   A      Retrophin was raising money and there were misstatements

17   in the SEC filing, and I posted the SEC filing and directed

18   people to go look at that.

19   Q      Did you contact the SEC at that time?

20   A      No.

21   Q      No.  You didn't contact the SEC and say Retrophin's doing

22   something wrong, I'm worried about the investing public.

23          You deny the do that, right?

24   A      I did not.

25   Q      You, out of spite, posted a confidential SEC document,

1   fair to say?

2   A    No, it was not out of spite.

3   Q    It wasn't out of spite.

4         It was sort of to zing Martin for not giving you any

5   of the Fearnow shares?

6   A    No.

7   Q    No?

8         And the SEC contacted you; correct?

9   A    No.

10   Q    It was Martin's lawyers who contacted you?

11   A    Yes.

12   Q    And you refused to take it down; correct?

13   A    I did not take it down.

14   Q    Right.  It was taken down automatically, somehow;

15   correct?

16   A    I think I checked the day after and it was no longer

17   there.

18   Q    And did you have any contact with the SEC when you posted

19   one of their confidential documents without authorization?

20         Did they contact you?

21   A    No.

22   Q    Nothing at all.

23   A    No.

24   Q    Have you ever spoken to them about this, "them" being the

25   SEC?

Su - cross - Agnifilo                    2304

1    A    No.

2    Q    Now, what are you doing for work now?

3    A    Real estate and property management in Dallas.

4    Q    Okay.  Do you still indicate on your resume in connection

5    with your job that you were the COO of Retrophin?

6    A    Yes.

7    Q    And do you say that you have 18 years of experience in

8    the financial -- you have a successful track record.  A

9    successful track record with over 18 years of experience in

10   the financial and real estate industries?

11        Have you represented yourself that way publicly?

12   A    Yes.

13   Q    And you represent yourself that way on your website,

14   correct?

15   A    Yes.

16   Q    And you still indicate that you were the COO of

17   Retrophin; correct?

18   A    Yes.

19   Q    You don't indicate anything about your circumstances

20   leaving Goldman Sachs; correct?

21   A    No.

22   Q    You don't indicate anything about your circumstances

23   leaving Retrophin; correct?

24   A    No.

25   Q    You don't indicate anything indicating that the

Su - cross - Agnifilo                      2305

1    circumstances about the demise of your fellow hedge fund;

2    correct?

3    A    No.

4              MR. AGNIFILO:  Give me one second.

5              (Pause in the proceedings.)

6    Q    You weren't arrested in Syracuse, New York?

7    A    No.  Nope.

8    Q    You sure?

9    A    I'm not sure, since you put it that way, but I don't

10   remember.

11   Q    Nothing that maybe happened in college?

12   A    I can't remember.

13   Q    You can't remember?

14   A    Yes.

15   Q    You might have been?

16   A    I don't know, considering you put it that way, I don't

17   know.

18   Q    You're the only one who's really going to know.

19   A    I really don't know.  I don't believe I was.

20   Q    You don't believe you were?

21   A    I don't think so.

22   Q    No?  That you got arrested twice; once in Manhattan, once

23   in Syracuse?

24   A    Manhattan, I did.

25   Q    Yes.

Su - redirect - Kasulis                    2306

1    A    Syracuse... not that I remember, no.

2    Q    Not that you remember?

3              MR. AGNIFILO:  All right.

4              I have nothing else.  Thank you.

5              THE COURT:  Do you have redirect, Ms. Kasulis?

6              MS. KASULIS:  Your Honor, just briefly.

7              Your Honor, just very briefly.

8    REDIRECT EXAMINATION

9    BY MS. KASULIS:

10             MS. KASULIS:  Mr. Su, I wanted to direct your

11   attention back to tab 14 of your binder, Government's

12   Exhibit 119-15.  And this is the e-mail that then attaches the

13   first iteration of the share transfer agreement between Marek

14   Biestek and Martin Shkreli for the 4,167 shares, those

15   agreements that we've seen.

16             (Exhibit published to jury.)

17   Q    Do you recall that?

18   A    Yes.

19             MS. KASULIS:  And if you go to the actual

20   attachment, just to go back to the first page.

21   Q    Again, this is the transfer and donee representation

22   letter agreement that we've seen multiple times?

23   A    Yes.

24   Q    And before we move on, do you see a date?  The date of

25   the agreement anywhere on the first page of this document?

Su - redirect - Kasulis                    2307

1   A    Just the bottom right.  It just says company agreement,

2   but that's just referring to another agreement, but that's

3   just a date.

4   Q    Not the date of this agreement?

5   A    Correct.

6   Q    And if you turn to the next page.

7        Do you see a date for this agreement on this page?

8   A    Not for this agreement.

9   Q    And if we go to the next page.

10       I think there was testimony on direct and

11  cross-examination about this date here, the 11/29/2012 date?

12  A    Yes.

13  Q    And just again, why did you date this agreement when you

14  received it?

15  A    There was no date on it.

16  Q    And do you routinely see share transfer agreements that

17  have absolutely no date on them?

18  A    I've come across them, yes.

19  Q    And so, this agreement, you felt the need to put the date

20  in on it?

21  A    Yes.

22  Q    And why is that?

23  A    There are a lot of documents that sometimes don't have

24  dates and just through the course of receiving these

25  documents, there are dates that are missing.  That's a date,

1   and I date it, and the date that was signed.  I assume that

2   it's signed that day.

3            And then this one, there was no date.  And I just

4   put a date on there.

5            MS. KASULIS:  So, if you look at the Exhibit,

6   Government's Exhibit 119-17.

7   Q    If you turn to the actual attachment, this is another

8   iteration of this agreement; is that right?

9   A    Yes, that's right.

10  Q    And if you turn to the back page, this was the agreement

11  that had the, what you had seen you called Whiteout tape over

12  it; is that right?

13  A    Yes.

14  Q    And it's not just Whiteout tape over the date that you

15  had written in; is that right?

16  A    Yes.

17  Q    It's also puts in a date of July 1st, 2012; is that

18  right?

19  A    Yes.

20           MS. KASULIS:  And then, if you look at Government's

21  Exhibit 119-19.  And you see the attachment to this agreement.

22  Q    Again, this is the transfer agreement that we've seen

23  multiple iterations of?

24  A    Yes.

25           MS. KASULIS:  And then if you go to the back page.

Su - redirect - Kasulis                              2309

1   Q     Ow there's another date on this agreement; is that right?

2   A     Yes.

3   Q     And that's June 1st of 2012; is that right?

4   A     Yes.

5   Q     And so this last page actually now has a date on it; is

6   that correct?

7   A     Yes.

8               MS. KASULIS:  One moment, Your Honor.

9               (Pause in the proceedings.)

10              MS. KASULIS:  No further questions, Your Honor.

11              THE COURT:  Any re-cross?

12              MR. AGNIFILO:  No.  No, thank you, Judge.

13              THE COURT:  May I ask you about Government's

14   Exhibit 119-15, that last page?  It ends 12812.  It's a little

15   bit off-kilter.

16              Was the original, to the best of your recollection,

17   like this or was it squared with the page as it was in the

18   other following iterations of this document?

19              THE WITNESS:  I'm sorry, I can't remember.

20              THE COURT:  Okay.  Thank you.

21              All right.  I guess you are excused.  Thank you.

22              Does the Government have another witness?

23              MR. SRINIVASAN:  We do, Your Honor.  We call Richard

24   Kocher to the stand.

25              THE COURT:  Do you want to come gather up the

VB        OCR        CRR

Su - redirect - Kasulis                         2310

1   binders.

2           Mr. Su, did you want your water?  Otherwise I will

3   throw it away.

4           (Witness excused.)

5           (Witness enters and takes stand.)

6           THE COURT:  Sir, come on up to the witness stand

7   here.

8           THE COURTROOM DEPUTY:  Please, raise your right

9   hand.

10

11          (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   R I C H A R D    K O C H E R,

2           called as a witness having been

3           first duly sworn, was examined and testified

4           as follows:

5           THE COURTROOM DEPUTY:  Please have a seat.

6           Please, state and spell your full name for the

7   record.

8           THE WITNESS:  My name is Richard Kocher, and it's

9   KOCHER.

10          THE COURT:  Please proceed.

11          MR. SRINIVASAN:  Thank you, Your Honor.

12  DIRECT EXAMINATION

13  BY MR. SRINIVASAN:

14  Q    Good afternoon, Mr. Kocher.

15          How old are you?

16  A    I'm 65.

17  Q    Where do you live?

18  A    I live in Hoboken, New Jersey.

19  Q    How long have you lived in Hoboken?

20  A    Well, off and on for a long time, since '78, but I

21  actually just moved back from Ramsay to Hoboken about three

22  years ago.

23  Q    Are you married?

24  A    Yes, I am.

25  Q    What's your spouse's name?

1    A      Her name is Barbara Kocher.

2    Q      Does she go by any other names?

3    A      Her, yeah.  I call her Fulda and her friends call her

4    Fulda.

5    Q      Do you have any children, sir?

6    A      Yes.  I have one.

7    Q      Could you describe your educational background for the

8    jury.

9    A      I graduated from Stanford in psychology in 1974.

10   Q      What did you do after college?

11   A      I did various things, but I also went to Sanity State and

12   studied art where I met my wife.

13   Q      Were you an artist for a period of time?

14   A      Yeah, my wife is still an artist and I do art

15   occasionally, but at that time I was doing art full-time.

16   Q      Where do you work now?

17   A      Well, I'm, our office is out of Union City, but mostly I

18   work in Hoboken and Jersey City and Weehawkin.

19   Q      Do you work for a company?

20   A      Well, I have several companies.  I work for myself,

21   really, but I have Kocher Construction Company Incorporated,

22   which we founded, I think, in 1981.  And we have various other

23   LLCs that are for management and also, for other properties

24   that we develop.

25   Q      What does Kocher Construction do?

Kocher - direct - Srinivasan                    2313

1  A    Kocher Construction itself really just does contract --

2  general contracting, project management and mostly

3  construction.

4  Q    What kind of construction or contracting projects?

5  A    Well, we have two types.  One is for individuals who

6  just, home-owners that have condos or one-families in Hoboken,

7  Jersey City, Weehawkin.  So, we do contracting work for them,

8  but we also build buildings for ourselves.

9  Q    Do you run the company?

10 A    Yes.

11 Q    How does Kocher Construction finance its operations?

12 A    Well, Kocher Construction is financed by whichever

13 project we're on.  So, Kocher Construction itself doesn't get

14 financing, but I will get financing for different projects,

15 various projects from, well, from banks mostly, but also from

16 individuals.  And we finance ourselves.  So, it varies.

17 Q    Does your business keep cash on-hand?

18 A    Very little cash on-hand because if you know any small

19 developers, such as myself, that are involved with real

20 estate, most of our money is actually in real estate.  So, we

21 have very little capital, generally speaking.

22 Q    Could you explain just a little bit more what the

23 relationship is between having real estate and the cash you

24 were describing?

25 A    Sorry, ask the question differently.

VB        OCR        CRR

1  Q      Certainly.

2             In terms of the assets of your companies, what

3  percentage would you say is cash versus real estate?

4  A      Well, I would say 90 percent of it is real estate.  Maybe

5  more.  It depends.  But we're, we tend to be, you know, mostly

6  have the real estate.  We have capital only really for the

7  jobs we're doing or for jobs that we're trying to purchase.

8  So, in other words, new jobs.

9  Q      Do you make investments other than in real estate?

10 A      Very rarely.

11 Q      And what types of investments do you make?

12 A      Well, we have one property actually taken by eminent

13 domain from us and so, we actually got a cash settlement after

14 ten years.  And so, we actually had capital, that was one of

15 the few times that we did.  So, we put it in, we put it with

16 Smith Barney and we were able to borrow against it so we could

17 use the capital.  But we were essentially paying off debt at

18 that time.

19 Q      Any other types of investment other than real estate and

20 the Smith Barney one you mentioned?

21 A      That's pretty much it.  Except for when we invest with

22 MSMB.

23 Q      Do you or your businesses ever need to raise cash on

24 short notice?

25 A      Yes.

Kocher - direct - Srinivasan                    2315

1   Q     In what types of situations?

2   A     Well, we're always looking for a property to develop, so

3   usually it's a small property.  One or two lots where we can

4   build anywhere from, you know, four units to up to 20 units.

5   So, it's very hard to find property that is reasonable, so

6   when it comes available, you have to have cash to, you know,

7   put deposits down and, you know, get into contracts.

8   Q     And what are your sources for cash, if you have that kind

9   of need?

10  A     Well, we, we have very well cash on-hand, so I mean,

11  basically we try to keep some cash but, you know, if we have

12  to put down, you know, several hundred thousand dollars, then

13  we may or may not have that kind of money.  So, we either have

14  to refinance a property that we already own or borrow from,

15  you know, investors that we may get on projects.

16  Q     Do you know an individual named Martin Shkreli?

17  A     Yes.

18  Q     How were you introduced to Martin Shkreli?

19  A     I was introduced through Kevin Mulleady originally.

20

21              (Continued on following page.)

22

23

24

25

VB        OCR        CRR

1   DIRECT EXAMINATION

2   BY MR. SRINIVASAN:   (Continuing)

3   Q     Who is Kevin Mulleady?

4   A     Kevin Mulleady was my investment advisor at Smith Barney.

5   Q     And about how many years ago was that?

6   A     That was probably 2010 mand then subsequent to that he

7   moved and started working for Martin.

8   Q     So at the time that Kevin Mulleady introduced you to Mr.

9   Shkreli, what was your understanding of who Kevin Mulleady

10  worked for?

11  A     Kevin Mulleady worked for Martin.

12  Q     At a company?

13  A     Yes, at MSMB, and I'm not sure if it was MSMB Capital or

14  L.P.  There are many MSMBs, but I was never really clear on

15  which one was which.

16  Q     Did there come a time when a hedge fund called MSMB

17  Healthcare came to your attention?

18  A     Yes.

19  Q     Approximately when was that?

20  A     Early 2012.  Actually, maybe slightly before that.

21  Probably I was -- I probably had something sent to me by Kevin

22  in 2011.

23  Q     Was it Kevin Mulleady who brought MSMB Healthcare to your

24  attention?

25  A     Yes.

Kocher - direct - Srinivasan                    2317

1   Q    Did you eventually invest in MSMB Healthcare?

2   A    Yes, I did.

3   Q    So thinking back to the time when you were introduced to

4   MSMB Healthcare, what was your understanding of what it was?

5   A    Essentially that it was a healthcare hedge fund.

6   Q    What is your understanding of a hedge fund?

7   A    Honestly, I don't have a clear understanding, except for

8   it has various financial entities that they invest in.

9   Q    Before MSMB Healthcare, had you ever invested in a hedge

10  fund?

11  A    No.

12  Q    Do you have or have you had any other hedge fund

13  investments?

14  A    No.

15  Q    Before you invested, who gave you information about MSMB

16  Healthcare?

17  A    Kevin Mulleady.

18  Q    And what were you told by Kevin Mulleady about MSMB

19  Healthcare's investment strategy?

20  A    Well, I was told that they were actively involved in

21  medical companies and that they were investing in medical

22  companies, I guess, and that Martin Shkreli was very good at

23  the medical industry and that, you know, that he was someone

24  that was going to take this MSMB to a very profitable place.

25  Q    What, if anything, were you told about MSMB's portfolio

1    in terms of private or public companies?

2    A    I can't remember.

3    Q    Did you have any understanding of the types of companies

4    that MSMB Healthcare invested in?

5    A    Well, I know that they invested in things like --

6    honestly, I don't really remember, but....

7    Q    That's okay.

8         And you mentioned a minute ago that you learned a

9    little bit about Martin Shkreli?

10   A    Yes.

11   Q    Who gave you the information about him?

12   A    Most of it came from Kevin Mulleady.

13   Q    Mr. Kocher, what factors led to you investing in MSMB

14   Healthcare?

15   A    Well, it was my understanding that it was going to be

16   very profitable, for one, and that it was liquid, so that if I

17   needed money back out, because I generally don't have a lot of

18   cash on hand, that I would be able to get my money back out on

19   short notice.

20   Q    And just so that we understand, when you say the word

21   "liquid," what did you mean by that?

22   A    Basically I'm considering that to be able to be paid back

23   in cash.

24   Q    Did you have an understanding of how quickly you would be

25   able to get your investment back, if you invested?

Kocher - direct - Srinivasan                    2319

1   A    Yeah.  It was presented to me originally that I would be

2   able to get my money back within one month if I gave them a

3   head's up one month in advance.

4   Q    And was this important to your investment decision?

5   A    Yes.

6   Q    Would you still have invested in MSMB Healthcare if you

7   couldn't get your money out in a month's time?

8   A    No.  No, because, generally speaking, I have very little

9   cash, so when a project comes up, I need to be able to have

10  money on hand.

11  Q    Before you invested in MSMB Healthcare, did you learn

12  anything about any hedge funds that Martin Shkreli had run

13  before MSMB Healthcare?

14  A    At that time, no.

15  Q    Did the name Elea Capital ever come up in your

16  conversations about MSMB Healthcare?

17  A    Not that I remember.

18  Q    If Mr. Shkreli had a prior hedge fund that had performed

19  poorly, would that have been important for you to know at the

20  time you were making your investment in MSMB Healthcare?

21          MR. BRAFMAN:  Objection, Your Honor.

22          THE COURT:  Overruled.  You can answer the question.

23  A    Yes, of course, it would affect my opinion and judgment.

24  Q    Mr. Kocher, did you sign any documents in connection with

25  your investment?

1  A    Yes.

2  Q    What did you sign?

3  A    A subscription agreement.

4  Q    I am going to show you what has been marked for

5  identification as Government Exhibit 33.  Mr. Kocher, you have

6  two binders in front of you.  There is a larger one and a

7  smaller one.  If you could pull out the larger one for now,

8  and it is tab 33.  I'm sorry, tab 35 in your binder.

9        Do you recognize this document?

10 A    Yes.  This is the subscription agreement.

11 Q    For what entity?

12 A    This is MSMB Healthcare, L.P.

13 Q    Is this your subscription agreement?

14 A    I believe it is.

15        MR. SRINIVASAN:  Your Honor, we move to admit

16 Government Exhibit 33.

17        MR. AGNIFILO:  No objection.

18        THE COURT:  We will admit Government Exhibit 33.

19        (Government's Exhibit 33 was received in evidence.)

20 Q    Now, Mr. Kocher, if we can go to the last page of this

21 document, Bates stamp number R-011888.  I think that is page

22 12, the PDF.

23 A    Yes.  Page 11, actually.

24 Q    Did you sign this document?

25 A    Yes, I did.

Kocher - direct - Srinivasan                    2321

1   Q    Now, if you go back to the second page of this document

2   and focusing on the paragraph that says "subscription" in the

3   middle of the page.

4   A    This is page 2.

5   Q    Yes.  The Bates stamp number R-011878.

6   A    No, this is 79.  Okay.  78.  Okay.

7   Q    Is the amount of your investment reflected on this page?

8   A    Yes.  $100,000.

9   Q    Now, I am going to show you what has been marked for

10  identification as Government Exhibit 107-5.  That's tab No. 5

11  in your binder.  Looking at that first page, do you recognize

12  this document?

13  A    Yes.  This is an e-mail sent from Kevin Mulleady to me.

14  Q    When was it sent?

15  A    March 8, 2012.

16          MR. SRINIVASAN:  Your Honor, we move to admit

17  Government Exhibit 107-5.

18          MR. AGNIFILO:  No objection, Judge.

19          THE COURT:  We admit Government Exhibit 107-5.

20          (Government's Exhibit 107-5 was received in

21  evidence.)

22  Q    Mr. Kocher, focusing on the very top, the from, sent, to

23  section there.  Do you see that?

24  A    Yes.

25  Q    It is sent from Kevin Mulleady to

Kocher - direct - Srinivasan                    2322

1   rich@kocherconstruction.com; is that right?

2   A    It's actually -- on this one I see it to both

3   fvasquez@kocherconstruction.com and

4   eramos@kocherconstruction.com, which is both of my assistants

5   in the office.

6   Q    I see.  I think you are looking at the bottom of the

7   page.  If you want to look at the screen, Ms. Balbin has

8   pulled it up for you.

9   A    Yes.  The very top.  I see.  Yes, that's to me.

10  Q    Is that your e-mail address?

11  A    Yes, it is.

12  Q    It looks like there is a line that says "attachments."

13  A    Yes.

14  Q    And something that says, Scan 0082, PDF.  Do you see

15  that?

16  A    Yes.

17  Q    Going to the next page of this document, Bates number

18  RK-00150.  What is this document?

19  A    This is the subscription agreement, the acceptance of it

20  that was signed by Kevin Mulleady.

21  Q    And on what date was your subscription accepted?

22  A    3/8/12.

23  Q    Looking at the middle of the document?

24  A    Yes.

25  Q    Do you see that?

1  A    I see it.  It was accepted 2/1/12.  Acceptance of

2  subscription was dated later, but this one is dated on the

3  first.

4  Q    Is that the date that you invested?

5  A    Yes.

6  Q    Now, I am going to show you what has been marked for

7  identification as Government Exhibit 107-4, which is tab 4 in

8  the big binder.

9  A    Okay.

10  Q    Do you recognize this?

11  A    This is another e-mail from Kevin Mulleady to myself.

12  Q    What's the date on it?

13  A    This is February 29, 2012.

14        MR. SRINIVASAN:  Your Honor, we move to admit

15  Government Exhibit 107-4.

16        MR. AGNIFILO:  Just give me one second, Your Honor.

17  That's fine.  No objection.

18        THE COURT:  We will receive Government Exhibit

19  107-4.

20        (Government's Exhibit 107-4 was received in

21  evidence.)

22  Q    Mr. Kocher, if you go to the second page of this

23  document, Bates stamp number RK-000104.

24  A    Yes.

25  Q    And I will call your attention to the middle of that

1   page.  There is an e-mail that is dated February 29th at 1:39

2   p.m.  Do you see that?

3   A    Yes.

4   Q    Who wrote it?

5   A    This was written from me to Kevin Mulleady.

6   Q    And what did you say to Kevin Mulleady in this e-mail?

7   A    I requested a month in advance to basically have my

8   $100,000 redeemed.  Would you like me to read it?

9   Q    No, no, that's okay.

10              If we go up one e-mail in this chain.

11   A    Yes.

12   Q    It is an e-mail from Kevin Mulleady to NAV Investor

13   Services.  Do you see that?

14   A    Yes.

15   Q    And it says, Please confirm redemption notice of $100,000

16   for April 1st for Rich Kocher.  Do you see that?

17   A    Yes.

18   Q    Mr. Kocher, did you have any understanding of what NAV

19   Investor Services was?

20   A    No.

21   Q    And when it says redemption notice for $100,000, what was

22   going on in this e-mail chain?

23   A    Well, the idea was that I wanted -- I was thinking I was

24   going to need the money so I wanted to make sure I got the

25   notice in a month in advance so that I could get my cash back

1    out if needed.

2    Q    Did you, in fact, redeem your investment --

3    A    No, I did not.

4    Q    -- in February?

5         I'm sorry, I didn't hear the answer.

6    A    No, I did not.

7    Q    Thank you.

8         In the February 2012 timeframe, were you ever told

9    by Kevin Mulleady or Mr. Shkreli that you couldn't redeem your

10   investment on a month's notice?

11   A    No.  No, it was my understanding that the fund was

12   liquid.  That's what they told me, anyway, that I would be

13   able to redeem if needed.

14        MR. AGNIFILO:  I am going to object to "they."  I

15   don't know that anyone has ever spoken to Mr. Kocher other

16   than Mulleady.

17        THE COURT:  Can you identify who you conversed with

18   or who you spoke to when you described your last conversation

19   about your understanding of the liquidity?

20        THE WITNESS:  There was an original document that

21   was sent to me that talked about the fund that basically was

22   talking about it being liquid and also talking about the fact

23   that you could get your money back out within a month.  So it

24   was sent by Kevin.  I'm not sure if it was Kevin.  I think it

25   was Martin that sent this one.

Kocher - direct - Srinivasan                    2326

1   Q    Mr. Kocher, thinking back to the February 2012 timeframe,

2   did Kevin Mulleady or anyone else affiliated with MSMB

3   Healthcare tell you that you wouldn't be able to redeem your

4   investment?

5   A    No.

6   Q    On how many occasions did you invest in MSMB Healthcare?

7   A    Twice.

8   Q    How did the second investment come about?

9   A    Kevin Mulleady called me and told me that they needed --

10  that Martin needed money or that the fund needed money and

11  that -- I don't know if they needed money for investment

12  purposes or what, but they were fairly anxious about getting

13  more capital.

14  Q    Was there a timeframe for the request for money?

15  A    There were looking for it within the week.  They wanted

16  it that week.

17  Q    What factors led to you make this second investment in

18  MSMB Healthcare?

19  A    Well, mostly it was my trust with Kevin Mulleady, but it

20  was also that he felt like the Healthcare fund was going to

21  take off and that they were making good investments.

22  Q    Were there any other factors?

23  A    Well, the other factor was that they agreed to be able to

24  liquidate me within one week, so they changed the term for

25  redemption from one month down to one week.

Kocher - direct - Srinivasan                    2327

1   Q    I am going to show you Government Exhibit 34, which is

2   tab 36 in your binder marked for identification.

3          Do you have tab 36 in front of you, sir?

4   A    Yes, I do.

5   Q    What is this document?

6   A    This is an additional subscription.

7   Q    For what fund?

8   A    This is an additional investment in MSMB Healthcare, L.P.

9          MR. SRINIVASAN:  Your Honor, we move to admit

10  Government Exhibit 34.

11         MR. AGNIFILO:  No objection.

12         THE COURT:  We will admit Government Exhibit 34.

13         (Government's Exhibit 34 was received in evidence.)

14  Q    Mr. Kocher, what is the date on this document?

15  A    It is May 1, 2012.

16  Q    How much was the second investment in MSMB Healthcare?

17  A    The second investment was for an additional 100,000.

18  Q    Now, if we can go to the second page of this document,

19  Bates stamp number R-018378.  What is this document?

20  A    This is another memorandum talking about -- it is an

21  additional -- additional agreement pertaining to the -- to

22  this subscription.

23  Q    And if you look at the first paragraph.

24  A    Yes.

25  Q    I'm sorry, I meant the paragraph that starts reference.

Kocher - direct - Srinivasan                    2328

1  It says, Reference is made to the confidential private

2  offering memorandum of the fund dated October 28, 2011, the,

3  quote, memorandum.  You have attached to this letter agreement

4  your subscription documents by which you are subscribing for

5  interests in the fund and assuming satisfaction of the

6  conditions contained in the subscription documents and

7  acceptance thereof by the fund.  You will become a special

8  member of the fund and receive an exempt interest therein

9  subject to the following terms.  Do you see that?

10 A     Yes.

11 Q     If we can go down to the paragraph that starts No. 2.

12 A     Yes.

13 Q     And it reads:  Liquidity:  Notwithstanding anything to

14 the contrary set forth in the memorandum, you will be

15 permitted to redeem your exempt interest as of the final

16 business day of each calendar week  instead of the final

17 business day of each calendar month.  What did you understand

18 this language to mean?

19 A     I understood it to mean that if I needed to redeem my

20 interest in the fund that I would be paid back in cash within

21 one week.

22 Q     Was this language important to your investing decision?

23 A     Yes.

24 Q     Can you explain why it was important?

25 A     Well, it was -- again, I usually have liquidity needs, so

Kocher - direct - Srinivasan                    2329

1   giving up another $100,000 at that time meant that I had very

2   little liquidity left and I knew I was pursuing at that time

3   several different properties, so I knew I was going to need

4   money, so, essentially, I would not have invested unless I

5   knew that I could have gotten this money back quickly.

6   Q    Mr. Kocher, I am going to show you what has been marked

7   for identification as Government Exhibit 107-11.  That is tab

8   11 in your binder.  What is this document?

9   A    The original one is another e-mail from Kevin Mulleady to

10  me.

11  Q    What is the date on this document?

12  A    This is May 16, 2012.

13         MR. SRINIVASAN:  Your Honor, we offer Government

14  Exhibit 107-11 into evidence.

15         MR. AGNIFILO:  No objection.

16         THE COURT:  We will receive 107-11.

17         (Government's Exhibit 107-11 was received in

18  evidence.)

19  Q    Mr. Kocher, in the body of the e-mail, the one that is on

20  the screen, Mr. Mulleady writes to you, Here is the signed on

21  our end, copy for your records.  Thanks.  Do you see that?

22  A    Yes.

23  Q    Are there attachments to this e-mail?

24  A    Yes.

25  Q    And if you go to the next page of this document, which is

1    RK-000209.

2    A    Yes.

3    Q    What is on this page?

4    A    It's basically the additional subscription for the

5    investment, the second investment that I gave them, which was

6    for the 100,000.

7    Q    Who signed this document on the bottom?

8    A    Martin Shkreli.

9    Q    And is your signature there too?

10   A    Yes, it is.

11   Q    If we go to the next page, Government Exhibit RK-000211.

12   Do you see that?

13   A    Yes.

14   Q    Is this another copy of the memorandum you were talking

15   about a minute ago?

16   A    Yes.

17   Q    If you go to the next page, RK-000212.  Who signed this

18   document?

19   A    I signed it again and Martin also signed it.

20   Q    Mr. Kocher, you can set that document aside for now.

21         Did you receive performance updates about your

22   investment?

23   A    I did receive several, yes.

24   Q    You have a thin binder next to you.

25   A    Yes.

Kocher - direct - Srinivasan                2331

1    Q    That is labelled 83 series.  Do you have that?

2    A    I do.

3    Q    This binder has four tabs in it and the documents are

4    marked for identification as Government Exhibits 83-1 through

5    83-4.  If you take a look at those documents, do you recognize

6    them?

7    A    Yes.

8    Q    What are they?

9    A    These are account statements.

10   Q    Did you receive these?

11   A    Yes, I did.

12        MR. SRINIVASAN:  Your Honor, we move to admit

13   Government Exhibits 83-1 through 83-4.

14        MR. AGNIFILO:  No objection.

15        THE COURT:  We will receive those exhibits in

16   evidence.

17        (Government's Exhibits 83-1 through 83-4 was

18   received in evidence.)

19   Q    Now, Mr. Kocher, let's start with Government Exhibit

20   83-1, which is tab 1 in this binder.

21   A    Okay.

22   Q    Looking at the top of this e-mail, on what date was this

23   statement sent to you?

24   A    This was sent April 17, 2012.

25   Q    And for what month was this statement?

Kocher - direct - Srinivasan                2332

1   A    This was for February, 2012.

2   Q    And if we could turn to page 2, which is Bates stamp

3   number R-013419.  If we could go to the table that is in the

4   middle of the page.  A little bit further down, all the way

5   where it says, Rate of return.  That is fine.  Thank you.

6   What was your ending balance for this month according to this

7   document?

8   A    It was 98,454.78.

9   Q    And if we can scroll down in the document to the next

10  table down.  It says, Breakdown ending balance.  Do you see

11  that?

12  A    Yes.

13  Q    Do you see a line for Retrophin, LLC?

14  A    Yes, I do.

15  Q    At this point, in April of 2012, what was your

16  understanding of Retrophin?

17  A    I'm not sure at that time if I knew about it or not, but

18  at some point I knew that it was a medical company that they

19  were interested in investing in.

20  Q    And who's they?

21  A    Well, Martin and MSMB.

22  Q    And did you have any understanding of whether it was a

23  liquid or illiquid investment for the fund?

24  A    No, I didn't.

25  Q    Now, let's go to Government Exhibit 83-2, which is tab 2

Kocher - direct - Srinivasan                    2333

1   in this binder.  When was this statement sent to you?

2   A    This was September 9, 2012.

3   Q    For what month?

4   A    This was for the month of May.

5   Q    And if we go to the next page of this document.  What was

6   your ending balance according to this document?

7   A    $96,925.76.

8   Q    Let's go to Government Exhibit 83-3, which is tab three

9   in this binder.

10  A    Okay.

11  Q    Mr. Kocher, who sent this statement to you?

12  A    This was from Kevin Mulleady -- well, this was from

13  Martin.

14  Q    Now, if we go back one tab, I'm sorry, back to Government

15  Exhibit 83-1, which is in evidence, which is tab one in that

16  binder, so this e-mail is sent from

17  investorrelations@navconsulting.net.  Do you see that?

18  A    Yes.

19  Q    Do you have any understanding why this statement was sent

20  by investorrelations@navconsulting.net and the later

21  statements were sent by Martin Shkreli?

22  A    No.

23  Q    Mr. Kocher, if we go to Government Exhibit 83-4, tab 4 in

24  your binder.  For what month is this statement?

25  A    This is for July.

1  Q    And if you go to the next page, what was your ending

2  balance according to this statement?

3  A    231,161.09.

4  Q    Do you see any references to Retrophin on this statement?

5  A    No.

6  Q    Mr. Kocher, taking these four investor statements

7  together, did you believe that they were accurate?

8  A    Well, I -- at the time I thought it was pretty strange

9  that they weren't normally -- first off, there were several

10  missing.  I don't think I ever got March or April statements

11  and the one -- the original one didn't show additional 100,000

12  for May, although they did send it to me later, and then all

13  of a sudden in -- this is all -- they just gave me three

14  statements, but it's September 9th and they're giving me June

15  and July statements.

16            (Continued on following page.)

17

18

19

20

21

22

23

24

25

1   EXAMINATION CONTINUES

2   BY MR. SRINIVASAN:

3   Q    And what was your reaction to that?

4   A    And I believe May as well.

5   Q    And what was your reaction to receiving those statements

6   in September?

7   A    Well, it just seemed strange that every other, you know,

8   when I had been involved with anyone, you know, in the past I

9   would get monthly statements that month -- the next month.

10            MR. SRINIVASAN:  Your Honor, I'm at a good stopping

11   point.

12            THE COURT:  All right, let's do that.  The jurors

13   are excused for the weekend.  Thank you very much for your

14   ongoing attention.  Please avoid any media exposure to this

15   case and please do not talk about it during the week end.  I

16   will see you Monday morning at 9 o'clock and everybody enjoy

17   your weekend.  Thank you so much for your ongoing attention.

18            (Jury exits.)

19            THE COURT:  You may step down.  Enjoy your weekend.

20            THE WITNESS:  Thanks very much.

21            (Witness steps down.)

22            THE COURT:  All right , unless there is anything we

23   need to discuss, I will adjourn until Monday at 9.

24            MR. AGNIFILO:  Thank you very much.

25            MS. KASULIS:  Thank you, have a nice weekend.

Proceedings                                2336

1          MR. SRINIVASAN:  Thank you, Your Honor.

2          MS. SMITH:  Thank you.

3

4          (Proceedings adjourned to Monday, July 10, 2017 at

5     9:00 a.m. )

6

7

8

9

10

11

12

13                          ooo0ooo

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

2337

I N D E X

WITNESS                                                  PAGE

**CAROLINE STEWART**                                     2074

   DIRECT EXAMINATION BY MR. SRINIVASAN      2074

   CROSS-EXAMINATION BY MS. ZELLAN           2087

   REDIRECT EXAMINATION BY MR. SRINIVASAN    2104


**JACKSON SU**                                           2107

   DIRECT EXAMINATION BY MS. KASULIS         2107

   CROSS EXAMINATION BY MR. AGNIFILO         2253

   REDIRECT EXAMINATION BY MS. KASULIS       2306


**RICHARD KOCHER**                                       2311

   DIRECT EXAMINATION BY MR. SRINIVASAN      2311

2338

E X H I B I T S

| EXHIBIT | PAGE |
|---|---|
| Government's Exhibit 118-3 | 2077 |
| Government's Exhibit 349-A | 2081 |
| Government's Exhibit 119-11 and 119-2 | 2125 |
| Government's Exhibit 119-3 | 2159 |
| Government's Exhibit 119-4 | 2164 |
| Government's Exhibit 42 | 2169 |
| Government's Exhibit 119-5 | 2171 |
| Government's Exhibit 119-6 | 2172 |
| Government's Exhibit 119-10 | 2179 |
| Government's Exhibit 119-13 | 2184 |
| Government's Exhibit 119-36 | 2201 |
| Government's Exhibits 119-15, 119-16, 119-17, 119-18, 119-19, 119-25 and 119-36 | 2211 |
| Government's Exhibit 119-24 | 2231 |
| Government's Exhibit 119-27 | 2234 |
| Government's Exhibit 119-35 | 2237 |
| Government's Exhibit 33 | 2320 |
| Government's Exhibit 107-5 | 2321 |
| Government's Exhibit 107-4 | 2323 |
| Government's Exhibit 34 | 2327 |
| Government's Exhibit 107-11 | 2329 |
| Government's Exhibits 83-1 through 83-4 | 2331 |