UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

            v.

MARTIN SHKRELI,

             Defendant.

Case No. 15-cr-637 (KAM)

---

## MARTIN SHKRELI'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)

---

**BRAFMAN & ASSOCIATES, P.C.**
*Attorneys for Martin Shkreli*
767 3rd Avenue, 26th Fl.
New York, New York 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

Benjamin Brafman
Marc Agnifilo
Andrea Zellan
Jacob Kaplan
Teny R. Geragos
    *Of Counsel*

**Table of Contents**

PRELIMINARY STATEMENT ...................................................................................1

I.      FACTUAL BACKGROUND ...................................................................................2

II.     THE COMPASSIONATE RELEASE STATUTE .......................................................3

III.    ARGUMENT ...........................................................................................................4

        A.  The Exhaustion Requirement Should be Excused ...................................4

        B.  The Coronavirus Pandemic Presents Extraordinary and Compelling
            Reasons for Granting Compassionate Release to Mr. Shkreli ...........................10

            1.  The Unprecedented Unpredictable Public Health Threat of COVID-19 ........10

            2.  Mr. Shkreli is Not a Danger to Others ...........................................17

            3.  Mr. Shkreli's Research on COVID-19 is a Valid 3553(a) Factor ................ 17

            4.  The § 3553(a) Factors Favor Compassionate Release ....................................19

IV.    MR. SHKRELI'S PROPOSED CONDITIONS OF HOME CONFINEMENT .........20

CONCLUSION ..........................................................................................................22

## PRELIMINARY STATEMENT

Federal inmate Martin Shkreli (Register # 87850-053), through undersigned counsel, files this emergency motion, under 18 U.S.C. § 3582(c)(1)(A), for an order granting Mr. Shkreli "compassionate release" and directing him to serve the remainder of his prison sentence in home confinement with electronic monitoring and with permission to work on his research from home, or, with permission of probation, to report to a specific local workplace to perform research on a coronavirus disease (COVID-19) treatment. As set forth in greater detail below, Mr. Shkreli has been conducting significant research into developing molecules to inhibit the coronavirus RdRp protein and he would continue to do so if released.

In the event of his release, Mr. Shkreli would be subject to every condition of supervised release set forth in the Judgment in a Criminal Case. Alternatively, Mr. Shkreli moves for an Order recommending that the Federal Bureau of Prisons ("BOP") grant his § 3582(c)(1)(A) petition that was mailed and faxed to the BOP on March 30, 2020. A supplement to that petition was faxed to the BOP on April 6, 2020 and mailed to the BOP on April 7, 2020.

On March 9, 2018, Mr. Shkreli was sentenced to 84 months confinement, three years supervised release, a fine, forfeiture and restitution. (*See* Dkt. 565.) He has served half his sentence, with approximately 41 months remaining. Mr. Shkreli was sentenced to significant incarceration before the Court had any ability to know that Mr. Shkreli would also have to defend himself against a virus raging through the United States prison system. Given the recent pandemic, the high risk of infection within federal prisons, the BOP's inability to stop the spread of the virus within the inmate population as evidenced by the rapid increase in infected inmates and inmate deaths, and Mr. Shkreli's susceptibility to infection due to allergies and asthma, it is likely that he will soon be exposed to the virus and potentially become critically ill or die.

1

As noted, since learning of this fatal disease, Mr. Shkreli has spent countless hours while incarcerated researching disease treatments and possible cures for COVID-19. His current project has been well received. One company is prepared to begin working on clinical trials of Mr. Shkreli's work within weeks. (*See* Exhibit A, Email correspondence with █████ and Exhibit B, Email correspondence with ████████████ ) Certainly, Mr. Shkreli's efforts in a prison setting to try to develop a cure for the virus that has so drastically impacted so many people, including those who, like him, are incarcerated in dangerous conditions should reflect favorably on "the characteristics of the defendant" within the meaning of Section 3553.

The COVID-19 pandemic is unprecedented in our lifetime. It is referred to as a "novel coronavirus" because it is new, and as a new illness it is not long-studied or well understood. Any pretention our nation has that we  know or understand what will happened next, is belied by the events of the last five weeks. For example, the CDC itself has changed its recommendations to include wearing a face mask, and predictions of how long individuals need to stay at home to "flatten the curve" have evolved, at times, on an hourly basis. It is with this unprecedentedly deadly, disruptive, unknown and unpredictable virus as a backdrop that we implore this Court to grant compassionate release to Mr. Shkreli.

The combination of facts and circumstances outlined here comprise, most respectfully, "extraordinary and compelling reasons" for allowing Mr. Shkreli to serve the remainder of his prison sentence in home confinement. *See* 18 U.S.C. § 3582(c)(1)(A)(i).

## I.      FACTUAL BACKGROUND

Mr. Shkreli was born on March 17, 1983. (*See* Presentence Investigation Report ("PSR") at p. 2). On August 4, 2017, a jury acquitted Mr. Shkreli of five of eight counts alleged in the Indictment against him and convicted him of three counts (two counts of Securities Fraud in

violation of 15 U.S.C. 78(b), a Class C felony and one count of Conspiracy to Commit Securities Fraud in violation of 18 USC 371, a Class D felony).

On September 13, 2017, Mr. Shkreli was remanded to custody at the Metropolitan Detention Center in Brooklyn ("MDC") while awaiting sentence. From September 13, 2017, to March 9, 2018, roughly six months, Mr. Shkreli was a pre-sentence inmate at the MDC. He was detained at the MDC another two months after sentencing before being designated to FCI Fort Dix in May 2018.

On March 9, 2018 Mr. Shkreli was sentenced to eighty-four months incarceration, three years of supervised release, a $75,000.00 fine, $388,336.49 restitution and a $300.00 assessment. (*See* Dkt. 565.) He was also ordered to forfeit $7,360,450.00. In April 2019, Mr. Shkreli was transferred to FCI Allenwood Low, where he is serving the remainder of his sentence. Mr. Shkreli's projected release date is September 14, 2023.

On March 30, 2020, Mr. Shkreli mailed and faxed to the warden of FCI Allenwood Low a petition for the BOP to move this Court for Shkreli's compassionate release. (Exhibit C: BOP Petition with Proof of Filing); *see* 28 C.F.R. § 571.61(a). On April 6, 2020, a supplement to the initial petition was faxed to the warden, and it was mailed the following day (Exhibit D). There has been no response to the petition. A request for a legal call was submitted to Mr. Shkreli's unit manager via email on April 13, 2020 and on April 14, 2020 that request was denied. The unit manager advised that a legal call will only be granted if there is an imminent court date.

## II.    THE COMPASSIONATE RELEASE STATUTE

The "compassionate release" provision of 18 U.S.C. § 3582(c) provides the following:

The [sentencing] court may not modify a term of imprisonment once it has been imposed except that—-

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A). Under the Sentencing Commission's policy statement on compassionate release, the sentencing court must also find that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

## III.   ARGUMENT

### A.   The Exhaustion Requirement Should be Excused

This Court should excuse Mr. Shkreli's failure to exhaust his administrative remedies and consider the present motion. As an initial matter, § 3582(c)(1)(A)'s exhaustion requirement is not a jurisdictional bar to this Court's consideration of Mr. Shkreli's request for compassionate release. "If the Legislature clearly states that a prescription counts as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue; but when Congress does not rank a prescription as jurisdictional, courts should treat the restriction as non-jurisdictional in character." *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1850 (2019) (brackets and internal quotation marks omitted).  Section 3582(c)(1)(A) "lacks the sweeping and direct language that would indicate a jurisdictional bar rather than a mere codification of administrative exhaustion

requirements." *See Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003) (concerning the Prison Litigation Reform Act); *see also United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015) (finding that § 3582(c) is not "phrased in jurisdictional terms" and thus "the statutory indicators point against jurisdictional treatment").[1]

Although, if the Court finds that exhaustion is apparently mandated by § 3582(c)(1)(A), Mr. Shkreli satisfies each of the three exceptions to the exhaustion requirement. Just last year, the Second Circuit stated the following in *Washington v. Barr*:

> Even where exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute. The Supreme Court itself [in *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)] has recognized exceptions to the exhaustion requirement under "three broad sets of circumstances."

> First, exhaustion may be unnecessary where it would be futile . . . .

> [Second,] exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief. . . . .

> Finally, exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice. In particular, "an unreasonable or indefinite timeframe for administrative action" may sufficiently prejudice plaintiffs to justify a federal court in taking a case prior to the complete exhaustion of administrative remedies. Not every delay will be sufficiently severe to justify waiver, however. Although, in most cases, "respondents would clearly prefer an

---

[1] As a practical matter, the 30 days is no longer an issue in this specific litigation. On April 15, 2020, Mr. Shkreli's own petition to the Allenwood Warden, submitted on a BOP Form 8, for compassionate release was denied. Mr. Shkreli will file an administrative appeal but because the initial request has already been denied, it is reasonable to predict that 30 days will elapse from March 30, 2020, when counsel submitted counsel's petition for compassionate release on behalf of Mr. Shkreli, without the BOP taking any action.

The Warden's denial stated: "This is in response to your Inmate Request to Staff in which you request release to home confinement. The Bureau of Prisons has identified eight criteria for which you must meet to be considered for home confinement due to Covid-19, if you have underlying medical conditions identified by the CDC. This criteria has been developed based off of the AG Memo and the Cares Act, you must meet all of the below listed criteria;

1)Primary Offense is not violent; 2) Primary Offense is not sex offense; 3) Primary Offense is not terrorism; 4) No detainer 5) Mental Health Care Level is less than IV 6) PATTERN risk score is MIN 7) BRAVO score is LOW or MIN 8) No Incident Reports in the past 12 months

Your current PATTERN risk scores [sic] is Low, therefore you do not meet the criteria. If you have further questions or concerns, please contact a member of your Unit Team. 4/14/20 D.K. White, Warden

immediate appeal rather than the often lengthy administrative review process," a mere preference for speedy resolution is not enough.  Threatened or impending irreparable injury flowing from delay incident to following the prescribed administrative procedure militates in favor of waiving exhaustion, but only if there is a strong showing both of the inadequacy of the prescribed procedure and of impending harm."

*Washington*, 925 F.3d 109, 118 (2d Cir. 2019) (citations, ellipses, and brackets omitted); *see also McCarthy*, 503 U.S. at 147 (providing that a party "may suffer irreparable harm if unable to secure immediate judicial consideration of his claim"); *Bowen v. City of New York*, 476 U.S. 467, 483, 487 (1986) (excusing an administrative exhaustion requirement where the claimants would have been "irreparably injured were the exhaustion requirement [was] enforced against them").

Here, Mr. Shkreli satisfies all three exceptions to the exhaustion requirement (even though he need only satisfy one exception). Turning first to the undue prejudice exception, Mr. Shkreli would suffer undue prejudice if he were to exhaust his administrative remedies before seeking federal court intervention. There is an "unreasonable" and "indefinite" timeframe for the BOP to act on Shkreli's petition. The BOP "makes a motion under . . . [§] 3582(c)(1)(A) only after review of the request by the Warden, the General Counsel, and either the Medical Director for medical referrals or the Assistant Director, Correctional Programs Division for non-medical referrals, and with the approval of the Director, Bureau of Prisons." 28 C.F.R. § 571.62(a).[2] Circumstances

---

[2] Section 571.62(a) further provides the following:

(1) The Warden shall promptly review a request for consideration under [§] 3582(c)(1)(A).  If the Warden, upon an investigation of the request determines that the request warrants approval, the Warden shall refer the matter in writing with recommendation to the Office of General Counsel.

(2) If the General Counsel determines that the request warrants approval, the General Counsel shall solicit the opinion of either the Medical Director or the Assistant Director, Correctional Programs Division depending upon the nature of the basis of the request.  The General Counsel will solicit the opinion of the United States Attorney in the district in which the inmate was sentenced.  With these opinions, the General Counsel shall forward the entire matter to the Director, Bureau of Prisons, for final decision, subject to the general supervision and direction of the Attorney General and Deputy Attorney General.

caused by the current pandemic make it nearly impossible for the BOP process to move quickly enough to afford Mr. Shkreli adequate meaningful relief, especially given the recent spike in § 3582(c)(1)(A) petitions to the BOP because of the rapid rate of infection and increasing death toll among inmates. (*See* Exhibit E, Bar Graph and Tables depicting the expansion of the epidemic within BOP, prepared by Federal Defenders).

Waiting for 30 days is all the more "unreasonable" when we already know that the Warden at Allenwood has rejected Mr. Shkreli's petition (*see*, footnote. 1, *infra*), and the Warden will not be seeking to file any motion with this Court. Any administrative appeal to the BOP by Mr. Shkreli is likely to continue past April 30, 2020, which is the 30th day following the filing of Counsel's petition on Mr. Shkreli's behalf. Waiting to address this motion until that deadline risks waiting until COVID-19 has fully infiltrated Allenwood and inmates are severely ill. Despite the fact that COVID-19 has not yet swept through Allenwood, we can expect that Allenwood will soon find itself fighting the spread. By way of example, two weeks ago, Butner FCI had zero infected inmates and as of April 19, 2020, it has 48 infected inmates, 28 positive staff and 4 inmate deaths. If past is prescient, we have no time to spare—FCI Allenwood will have infected inmates soon.

In addition, any further delay from the BOP will most likely irreparably harm Mr. Shkreli. With each day that passes, the odds increase that Mr. Shkreli will contract the coronavirus and incur serious illness or death. Waiting for 30 days to lapse or even three days might prove to be too long. *See Matter of Extradition of Toledo Manrique*, No. 19-mj-71055, 2020 WL 1307109, at 1 (N.D. Cal. Mar. 19, 2020) ("[T]he government's suggestion that Toledo should wait until there

---

(3) . . . If the Director, Bureau of Prisons, grants a request under 18 U.S.C. 3582(c)(1)(A), the Director will contact the U.S. Attorney in the district in which the inmate was sentenced regarding moving the sentencing court on behalf of the Director of the Bureau of Prisons to reduce the inmate's term of imprisonment to time served.

28 C.F.R. § 571.62(a)(1)–(3).

is a confirmed outbreak of COVID-19 in Maguire [Correctional Facility] before seeking release is impractical. By then it may be too late. (citation omitted)); *cf. United States v. Sloane*, No. 19-cr-10117 (D. Mass.), ECF Doc. 647 (Mar. 19, 2020, Order) (in denying compassionate release, citing the defendant's failure to "suggest a life-threatening condition to support a claim that [§ 3582(c)(1)(A)'s] exhaustion requirements may be excused during this national [coronavirus] emergency").

Because the Warden has already denied Mr. Shkreli compassionate release, because numerous BOP officials must act on Mr. Shkreli's appeal of that denial and because the coronavirus is spreading rapidly in Pennsylvania and BOP prisons, Mr. Shkreli also satisfies the futility and inadequate-relief exceptions to the exhaustion requirement. *See Washington*, 925 F.3d at 120–21 ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile. Moreover, the relief the agency might provide could, because of undue delay, become inadequate.").

In *Mathews v. Eldridge*, the Supreme Court held that "cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." 424 U.S. 319, 330 (1976). "That reasoning explains the Second Circuit's holding [in *Washington*] that even statutory exhaustion requirements are 'not absolute.'" *United States v. Perez*, No. 17-cr-513, 2020 WL 1546422, at 2 & n.2 (S.D.N.Y. Apr. 1, 2020) (Torres, J.). Mr. Shkreli "has presented his claim to the BOP, so the situation here is analogous." *Id.* at 2 n.2 (record citation omitted).

Courts around the country have waived § 3582(c)(1)(A)'s exhaustion requirements in some circumstances during this pandemic. *See Perez*, 2020 WL 1546422, at 3 (Torres, J.) (finding that the defendant's "undisputed fragile health, combined with the high risk of contracting COVID-

19 in the MDC, justifie[d] waiver of [§ 3582(c)(1)(A)'s] exhaustion requirement"); *United States v. Colvin*, No. 19-cr-179, 2020 WL 1613943, at 2 (D. Conn. Apr. 2, 2020) (waiving § 3582(c)(1)(A)'s exhaustion requirement because, inter alia, (1) "if Defendant contracts COVID-19 before her [administrative] appeals are exhausted, that undue delay might cause her to endure precisely the catastrophic health consequences she now seeks to avoid," and (2) she "would be subjected to undue prejudice—the heightened risk of severe illness—while attempting to exhaust her appeals"); *id.* (citing a case wherein the District Court for the District of Columbia waived § 3582(c)(1)(A)'s exhaustion requirement "in light of COVID-19 pandemic and defendant's underlying health issues"); *United States v. Scparta*, No. 18-cr-578 (AJN) (S.D.N.Y.), (4/19/2020 Opinion & Order at p. 16) ("[f]or Mr. Scparta to wait an additional two weeks (until 30 days lapse under the First Step Act's exhaustion requirement) could be the difference between life and death—and if he falls seriously ill or dies, he would have suffered irreparable harm and his motion seeking release would be futile.").

Additionally, In *United States v. Haney*, Judge Jed S. Rakoff of the Southern District of New York concluded that § 3582(c)(1)(A)'s exhaustion requirement could be excused "in the extraordinary circumstances now faced by prisoners as a result of the COVID-19 virus and its capacity to spread in swift and deadly fashion." No. 19-cr-541 (S.D.N.Y.), Dkt. 27 (4/13/2020 Opinion & Order at p. 10). Judge Rakoff went on to conclude that "in the current extreme circumstances," "Congressional intent . . . actually favors such waiver, allowing courts to deal with the emergency before it is potentially too late." *Id.* at 11-12. Additionally, in *United States v. Pinto-Thomaz*, Judge Rakoff excused the failure of the codefendants to satisfy § 3582(c)(1)(A)'s exhaustion requirement "on the reasoning described in *Haney*." No. 18-cr-579 (S.D.N.Y.), ECF Doc. 189 (4/13/2020 Opinion & Order, at 3 n.2.)

9

If this Court finds that the exhaustion requirement presently precludes the granting of compassionate release, it is respectfully requested that this Court issue a recommendation to the BOP that it grant Mr. Shkreli's appeal of the denial of his petition as soon as possible. *See United States v. Knox*, No. 15-cr-445, 2020 WL 1487272, at 2 (S.D.N.Y. Mar. 27, 2020) (Engelmayer, J.) (granting the defendant's "request for a recommendation that BOP allow him to serve the remainder of his sentence with 1 month in a halfway house and 6 months in home confinement"); *United States v. Hernandez*, No. 19-cr-834 (S.D.N.Y.) (Engelmayer, J.), ECF doc. 440 (Mar. 25, 2020 Order) ("The Court . . . state[s] the following, as it may be instructive guidance to the Bureau of Prisons in considering an application by Mr. Hernandez for release on home confinement. . . . Had the Court known that sentencing Mr. Hernandez to serve the final four months of his term in a federal prison would have exposed him to a heightened health risk [from the coronavirus], the Court would have directed that these four months be served instead in home confinement.").

**B.      The Coronavirus Pandemic Presents Extraordinary and Compelling Reasons for Granting Compassionate Release to Mr. Shkreli**

1.      <u>The Unprecedented Unpredictable Public Health Threat of COVID-19</u>

The spread of the coronavirus has been exponential in the United States in the past few weeks. In the United States, as of March 27, 2020, more than 85,356 people tested positive for the coronavirus and more than 1,246 people had died from the coronavirus. As of April 19, 2020 these numbers changed astronomically; more than 789,439 people are positive for COVID-19 and 42,186 people have died.[3] As of April 19, 2020, in Pennsylvania, 32,284 people have tested positive for the coronavirus and 1,112 people have died.[4] As of March 28, 2020 Pennsylvania's border state of New Jersey had 11,124 cases and 140 deaths from the disease. As of April 15, 2020,

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[4] https://www.health.pa.gov/topics/disease/coronavirus/Pages/Coronavirus.aspx.

New Jersey had 85,301 COVID-19 cases and 4,202 deaths.[5] As of March 28, 2020, fourteen inmates and 13 staff members at BOP facilities tested positive for the COVID-19. As of April 21, 2020, 540 inmates and 323 staff tested positive and 23 inmates have died.[6] Mr. Shkreli's facility, FCI Allenwood Low does not have an individual entry on the BOP website so the status of his facility is unclear. FCI Allenwood Medium and Allenwood USP each report one infected staff member.[7]

Although the BOP has taken measures to prevent and control the spread of COVID-19 amongst the prison population,[8] those measures have been inadequate to protect many prisoners from contracting COVID-19. Prisoners live in "close living quarters" and thus "are especially vulnerable to COVID-19 and will need special attention both to minimize transmission risk and address their healthcare needs in the context of an outbreak."[9] The risk to prisoners is significantly higher than the risk to the general public due to the living quarters and the inability to control spread within those living quarters. Prisoners "also may not be able to regularly wash their hands, which may promote the spread of disease."[10]

The fact is that Mr. Shkreli is currently residing in his dorm at Allenwood Low in a 12' x 12' cubicle with two other people. Sleeping spaces within that cubicle are separated by only a few feet. Approximately two hundred men are sharing five to six functioning toilets. Access to cleaning supplies is limited. These circumstances do not permit for proper social distancing or hand washing. Computer and phone stations, inmates only way to connect with family other than mail,

---

[5] https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml
[6] https://www.bop.gov/coronavirus/index.jsp. Numbers obtained from www.bop.gov/coronavirus on a daily basis.
[7] https://www.bop.gov/coronavirus/
[8] *See* https://www.bop.gov/coronavirus/.
[9] https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf.
[10] *Id.*

are within six feet of one another and the inmates are within six feet of one another as they wait in line for their turn to use the computer or phone.

Whatever precautions the BOP has or will have in place, it is inevitable that every prisoner at Allenwood Low will come into close contact with BOP staff, other prisoners, and surfaces/objects touched by BOP staff and other prisoners. Allowing Mr. Shkreli to serve the remainder of his prison sentence in home confinement, where he will isolate himself,  in case he has been exposed, while following all CDC recommendations for social distancing, covering faces and hand hygiene will reduce the risk he becomes infected  with COVID-19 and increase the chances that he can contribute to a treatment.

State and local governments around this country have begun releasing prisoners because of the COVID-19 pandemic.[11] Courts around the country are also heeding the Attorney General's advice and releasing prisoners based on this public health crisis.[12]

---

[11] https://www.usatoday.com/story/news/politics/2020/03/26/jails-free-hundreds-prisoners-stop-coronavirus/5077204002/.

[12] *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "[I]n light of the rapidly escalating public health crisis"); *United States v. Selna*, 8:16-cr-76-JVS (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).). *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25,

Standing on its own this worldwide pandemic is a compelling circumstance worthy of compassionate release. Despite the fact that Mr. Shkreli is not in a high-risk category for death from COVID-19 as per the CDC Guidelines, COVID-19 has claimed the lives of people from every age and health category. The science is preliminary as to what causes one individual to have a mild case that can be handled without hospitalization and what causes a case to be so severe that the person requires not just hospitalization, but intubation and intensive care unit hospitalization, to have a chance at survival. The only way to mitigate the risk of contracting the illness is to follow the CDC Guidelines as to social-distancing, isolation, and handwashing. Even those Guidelines have proven insufficient, prompting the CDC to add face coverings to its recommendations. Following all of the CDC Guidelines is simply not possible in a prison environment no matter what steps the BOP takes because at Allenwood Low and many other facilities, too many people are living in too close proximity to one another to be able to prevent the infestation of the facility by this virus.

Mr. Shkreli faces possible, even likely infection, and potential death in prison due to his underlying severe allergies. (*See* PSR at ¶ 88.) It is well documented that the CDC recommends people avoid contact between hands and face to reduce opportunity for the virus to enter the body causing illness. Allergies cause sneezing, coughing and itchy eyes which results in more frequent contact between hands and face. This increased contact between hands and face increases

---

2020) (*sua sponte* inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19);*United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic").

opportunities for the virus to infiltrate your body and cause illness.[13]   This risk can be mitigated by release to strict home confinement and isolation.

These are compelling and exceptional circumstances. As Mr. Shkreli sits in prison fearing the moment the pandemic infiltrates the prison, his circumstances are made more compelling by the fact that he is a first-time offender of a non-violent offense; to force him, (or any other non-violent offender who has a release plan) to face a risk of a severe deadly illness as a part of his consequence/punishment is disproportionate to his crimes, especially given the nature and characteristics of the offense.

As reported by the CDC, inmates face a high risk of contracting the virus:[14]

> People in correctional and detention facilities are at greater risk for . . . COVID-19, because of close living arrangements with other people.  The virus is thought to spread mainly from person-to-person, through respiratory droplets produced when an infected person coughs or sneezes.  These droplets can land in the mouths or noses of people who are nearby or be launched into the air and inhaled into someone's lungs.  It is possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes; however, this is not the most likely way the virus spreads.

Indeed, the coronavirus is already wreaking "chaos" inside BOP prisons. *Basank*, 2020 WL 1481503, at 3. Moreover, "hundreds of thousands of correctional officers and correctional healthcare workers enter [prisons] every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day." (Exhibit F: Affidavit of Dr. Brie Williams ¶ 5).[15]  "Access to testing for correctional staff has been extremely limited, guards have reported

---

[13] *See*,  https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (recommending that people "avoid touching eyes, nose and mouth with unwashed hands");  and www.sinusandallergywellnesscenter.com/blog/people-with-allergies-may-be-at-greater-risk-for-covid-19-and-6-ways-to-reduce-the-risks (recommending that people "[t]ry not to scratch your eyes and nose if they itch. If you were exposed to COVID-19, you will self-infect yourself when your fingers reach mucous membranes.").
[14] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html.
[15] Dr. Williams is a "Professor of Medicine at the University of California, San Francisco ('UCSF') in the Geriatrics Division," the director of "UCSF's Amend: Changing Correctional Culture Program" and "UCSF's Criminal Justice

a short supply of protective equipment, and prisons are not routinely or consistently screening correctional officers for symptoms." (*Id.*) "Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within . . . and prisons." (*Id.* ¶ 7.) Although social distancing could help prevent the spread of the coronavirus, "[e]ffective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands." (*Id.*) "Medical treatment capacity is not at the same level in a correctional setting as it is in a hospital." (*Id.* ¶ 17.) Although Special Housing Unit cells "have solid doors to minimize the threat of viral spread in otherwise overcrowded facilities, such cells "rarely have intercoms or other ways for sick inmates to contact officers in an emergency" and "many patients with COVID-19 descend suddenly and rapidly into respiratory distress." (*Id.*)

Moreover, the BOP has not even been observing the CDC's recommendations on the coronavirus. Just a couple of weeks ago, a senior BOP officer of FCI Oakdale "transported a sick prisoner to the local community hospital for tests, spending six hours in close contact with the ailing man."[16] Although the prisoner tested positive for the coronavirus, the BOP's chief health officer ("CHO") ordered the officer "back on the job, according to an email reviewed by The Marshall Project."[17] The BOP's decision that "[o]fficers should work unless they showed symptoms . . . contradicts the recommendations the Centers for Disease Control was giving for first responders and other frontline workers and the specialized guidance it issued a day later for

---

& Health Program," and is a former "consultant for the California Department of Corrections and Rehabilitation, as well as for other state prisons." (Ex. G ¶ 2). Dr. Williams has focused his clinical research on "on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and a broader inclusion of prisoners in national health datasets and in clinical research." (*Id.*). Dr. Williams made his affidavit "in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines." (*Id.* ¶ 4).
[16] https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.
[17] *Id.*

prisons and jails, calling for people who have had close contact with a confirmed case of COVID-19 to isolate themselves at home for 14 days."[18]  As of the filing of this motion, five FCI-Oakdale prisoners have died from the coronavirus, including the prisoner who was transported by the senior BOP officer.[19]

The rapidly growing number of confirmed positive COVID-19 cases with respect to BOP inmates and staff members demonstrates that the BOP's measures are ineffective.[20]  Whatever precautions the BOP has or will have in place, it is inevitable that Mr. Shkreli will come into close contact with BOP staff, other prisoners, and surfaces/objects touched by BOP staff and other prisoners. As explained in the *New England Journal of Medicine*, international boarders have security in place. The United States implemented screening at the border in an attempt to prevent or curtail the infiltration of the virus, and failed. Prison facilities, like nations, have controlled entry, but people move back and forth across the line between prison and community bringing the community and the community's viruses and germs into the prison, and bringing viruses and germs into the community.[21]  It is not a question of "if" COVID-19 infiltrates Allenwood Low; it is a question of "when."

---

[18] *Id.*

[19] *Id.*

[20] On March 23, 2020, 32 inmates were transferred to the Allenwood Federal Correctional Complex; one of those inmates, who was placed in FCI-Low, had the coronavirus.  https://keller.house.gov/media/press-releases/after-bop-inmate-moved-fcc-allenwood-gets-tested-covid-19-congressman-fred;
https://www.pennlive.com/coronavirus/2020/03/one-of-32-federal-inmates-transferred-to-allenwood-complex-tested-for-coronavirus.html.

[21] "The boundaries between communities and correctional institutions are porous, as are the borders between countries in the age of mass human travel. Despite security at nearly every nation's border, Covid-19 has appeared in practically all countries. We can't expect to find sturdier barriers between correctional institutions and their surrounding communities in any affected country. Thus far, we have witnessed a spectrum of epidemic responses from various countries when it comes to correctional institutions. Iran, for example, orchestrated the controlled release of more than 70,000 prisoners, which may help "bend the curve" of the Iranian epidemic. Conversely, failure to calm incarcerated populations in Italy led to widespread rioting in Italian prisons. Reports have also emerged of incarceration of exposed persons for violating quarantine, a practice that will exacerbate the very problem we are trying to mitigate. To respond to this global crisis, we need to consider prisons and jails as reservoirs that could lead to epidemic resurgence if the epidemic is not adequately addressed in these facilities everywhere."
https://www.nejm.org/doi/full/10.1056/NEJMp2005687?query=RP

Allowing Mr. Shkreli to serve the remainder of his prison sentence in home confinement, where he will isolate himself, will best ensure that he will not get infected with the coronavirus. *See United States v. Resnick*, No. 14-cr-810, 2020 WL 1651508, at 8 (S.D.N.Y. Apr. 2, 2020) (McMahon, C.J.) ("[Mr. Resnick's] environment [at home] will be significantly better than Devens FMC [Federal Medical Center], where despite the BOP's best efforts, Mr. Resnick is constantly at risk from contamination both from within and without the prison walls, and where access to PPE [personal protective equipment] for inmates is essentially non-existent.").

        2.    <u>Mr. Shkreli is Not a Danger to Others</u>

Mr. Shkreli's immediate release from prison would not "pose a danger to the safety of any other person or the community." *See* BOP Program Statement 5050.50, at 2 (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. Mr. Shkreli's crimes of conviction did not involve violence, he is barred as an investment advisor by the SEC and cannot invest or manage anyone else's money.

To the extent that the Court remains concerned regarding Mr. Shkreli's social media activity in September 2017, and the possibility that he would resume social media activity might create a risk of harm, Mr. Shkreli will submit to supervision of his on-line activity by the Department of Probation while on home confinement.

        3.    <u>Mr. Shkreli's Research on COVID-19 is a Valid 3553(a) Factor</u>

As outlined above, the compassionate release provision of Section 3582 refers the Court to the sentencing factors of Section 3553(a) "to the extent that they are applicable." Within the last several months, Mr. Shkreli has devoted countless hours to developing a potential cure for COVID-19. To be clear, his work is at a preliminary stage. However, Mr. Shkreli is not coming at COVID-19 as a novice in this world. As detailed extensively in sentencing submissions, Mr.

Shkreli has committed his life's work to the life sciences and the rare disease community—developing patents and initiating drug trials to help cure those with debilitating conditions. (*See* Dkt. 538 at 26-34, 40-48.) Indeed, his release would not pose a danger to the community, but would instead potentially help those who are suffering through medical related issues through the pandemic, as he is a skilled medical researcher.

As this Court recognized at sentencing, Mr. Shkreli has a capacity to perform research to develop life-saving drugs.[22] ███████████ and Martin Shkreli are committed to conducting research focusing on a drug that could bring relief and treatment to people suffering from COVID-19 (Exhibit B, Email from ████████.) Very few companies have come forward and said they will make actual antivirals for COVID-19.  They have said they will make vaccines, but not cures for those infected. Mr. Shkreli is trying and he may succeed. But he has no chance to succeed if he remains incarcerated, in lockdown, unable to communicate and work with colleagues in the research community others.

His ideas have been made available to the public on the Prospero Pharmaceuticals home page.[23] They have been reviewed by ████████, a former colleague at Retrophin and a renowned computational chemist currently employed at ████[24] ████ is eager to work with Mr. Shkreli. Even more compelling, a pharmaceutical company █████████ is

---

[22] When recognizing Mr. Shkreli's sentencing memorandum at sentencing, this Court stated: "Similarly, when Mr. Shkreli was CEO for Retrophin, he took the time to meet directly with a family whose children had been diagnosed with a rare degenerative disease known as PKAN. Mr. Shkreli and Retrophin offered their expertise and help, including an offer of significant financial and medical aid. The children's mother wrote that the Martin I know would go to great lengths to make a difference in a person's life. When another individual, Robin Anderson, reached out to Mr. Shkreli to seek his help and advice about a specific drug, Mr. Shkreli took the time to research the drug and provide his insights on how the family might be able to request approval for treatment even though his own trial in this case was about to begin." (Dkt. 621, 3/9/18 Tr. at 105.)

[23] https://prosperopharma.com/covid19.pdf

[24] https://www.linkedin.com/in/adamkallel/?lipi=urn%3Ali%3Apage%3Ad_flagship3_messaging%3B64VrOGL5QLKDTX9HWOoDgw%3D%3D&licu=urn%3Ali%3Acontrol%3Ad_flagship3_messaging-view_profile.

preparing to contract with Prospero to conduct development testing and clinical trials of potential anti-viral drugs to treat COVID-19 based on work discussed in Mr. Shkreli's paper for Prospero. ████ specializes in the development, discovery and testing of biologics for treatment of disease.[25]

### 4.    The § 3553(a) Factors Favor Compassionate Release

Consideration of the § 3553(a) factors, "to the extent that they are applicable," weigh in favor of granting Mr. Shkreli compassionate release.  *See* 18 U.S.C. § 3582(c)(1)(A).

First, Mr. Shkreli  is a first-time offender who has a shown a commitment to fighting deadly disease throughout his professional life and has no history of violent conduct. *See* 18 U.S.C. § 3553(a)(1).  There is little to no likelihood that he will commit another crime, especially if he will be in home confinement and subject to GPS monitoring and supervised release. *See* 18 U.S.C. § 3553(a)(2)(B)-(C).  Granting Mr. Shkreli compassionate release based on the coronavirus pandemic would not send a message that white-collar crime does pay. *See* 18 U.S.C. § 3553(a)(2)(B). He has faced and continues to face serious consequences, including significant incarceration, substantial financial consequences, civil litigation from every direction and loss of reputation and friendships as a result of his conduct.

The § 3553(a)(2)(A) factor—"the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"—is largely overcome by the unreasonable threat of seriousness illness and death as well as the genuine possibility that because Mr. Shkreli could devote all of his time to developing anti-viral treatments for those suffering, he could contribute to curtailing the pandemic so that the world can be reignited and life outside homes resume. Current conditions of confinement threaten his health and life and prevent him from doing work that would contribute to the betterment of society

---

[25] *See*,  https://www.wuxibiologics.com/.

worldwide.  Because Mr. Shkreli has served nearly two and a half years and because his life would be confined to home and work,  granting his motion will not result in sentencing disparities as compared to  similarly situated defendants." *See Rodriguez*, 2020 WL 1627331, at 12 (citing 18 U.S.C. § 3553(a)(6)).[26]

In sum, resentencing Mr. Shkreli to serve the remainder of his prison sentence in home confinement with permission to work, under GPS monitoring and supervised release conditions that monitor his social media activity would provide him with a punishment that is "sufficient, but not greater than necessary" given his risk of seriousness illness or death from a coronavirus infection and his potential to contribute to a treatment for this horrible pandemic that is killing so many thousands of people.

### IV.    MR. SHKRELI'S PROPOSED CONDITIONS OF HOME CONFINEMENT

Mr. Shkreli's proposed conditions of home confinement would ensure that he will otherwise comply with the terms. Mr. Shkreli proposes to be on home confinement under GPS-enabled electronic monitoring at his fiancé's apartment in Manhattan with all the supervised release conditions that are set forth in the Judgment in a Criminal Case. (*See* Dkt. 583).[27]

If granted compassionate release, Mr. Shkreli would serve his home confinement in the home of  his fiancé ▮▮▮▮▮▮▮▮▮ at her apartment (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Exhibit G, Ltr. of ▮▮▮▮▮ ,).[28] He would be in the apartment at all times for the duration of his

---

[26] For example, Mr. Shkreli's co-defendant, Evan Greebel, has served his sentenced and was released from prison in January of 2020.

[27] Mr. Shkreli's conditions include participation in therapy and completion of 20 hours of community service, to the degree that probation allows. Mr. Shkreli would comply with these conditions using remote opportunities, or by leaving the home for limited periods as authorized by probation.

[28] Exhibit G is a letter provided by email to Counsel from Mr. Shkreli's fiancé. That letter is fully redacted to protect information about where Mr. Shkreli would reside in the event this motion is granted. Courtesy copies of this motion will be delivered by email to the Court and the Government.

sentence.[29] Mr. Shkreli does believe he would benefit from drug and alcohol treatment and would

seek permission from Probation to participate in a program deemed appropriate by Probation.

---

[29] In Mr. Shkreli's Request for Release filed with the BOP on March 30th (Exhibit C), he proposed that he would live ██████████████████████████████ At the time, the cases in New York were still increasing, and we proposed Kansas as a safer alternative. However, cases in New York now seem to be plateauing, ████████████████ ███████████████████████ However, both options remain available for Mr. Shkreli. ████████ ████████████████████████████████████████ ████████████████

## CONCLUSION

Courts around this country have been releasing prisoners (or not sending defendants to prison) based on the coronavirus pandemic.[30] For the aforementioned reasons, this Court should do the same for Mr. Shkreli and order that he be released immediately to home confinement. In the alternative, this Court should recommend to the BOP that it grant Mr. Shkreli's appeal of the denial of his petition as soon as possible. Proposed orders are attached at Exhibits H and I.

Respectfully submitted,

/s/

Benjamin Brafman
Marc Agnifilo
Andrea Zellan
Jacob Kaplan
Teny R. Geragos
**Brafman & Associates, P.C.**
767 3rd Avenue, 26th Fl.
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

---

[30] *See, e.g.*, *United States v. Marin*, 15-cr-252 (E.D.N.Y.) (Chen, J.) (Mar. 30, 2020 Order) ("The Court grants Defendant Jose Maria Marin's motion . . . for compassionate release [from FCI Allenwood Low] . . . for the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence"); https://intallaght.ie/judge-of-the-fifagate-case-authorizes-the-early-release-of-the-former-cbf-president/ (stating that Jose Maria Marin served his prison sentence at FCI Allenwood Low); *Resnick*, 2020 WL 1651508, at 8 (McMahon, C.J.) (granting compassionate release to a 65-year-old inmate with diabetes and end-stage liver disease); *Perez*, 2020 WL 1546422, at 4 ("Perez's medical condition, combined with the limited time remaining on his prison sentence and the high risk in the MDC posed by COVID-19, clears the high bar set by § 3582(c)(1)(A)(i)."); *Rodriguez*, 2020 WL 1627331, at 12 ("Mr. Rodriguez has now served the lion's share of his sentence. But his sentence did not include incurring a great and unforeseen risk of severe illness or death. For this reason, I will grant Mr. Rodriguez's motion for a sentence reduction."); *United States v. Campagna*, No. 16-cr-78, 2020 WL 1489829, at 3 (S.D.N.Y. Mar. 27, 2020) (Schofield, J.) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care within the environment of the [Brooklyn Residential Reentry Center]."); *United States v. Huneeus*, No. 19-cr-10117 (D. Mass.), ECF Doc. 642 (Mar. 17, 2020, Order) (granting the defendant compassionate release "in light of the national state of emergency due to the global COVID-19 pandemic and [his] unique health circumstances"); *United States v. Fellela*, No. 19-cr-79, 2020 WL 1457877, at 1 (D. Conn. Mar. 20, 2020) (granting compassionate release to an inmate whose "age, physical, and medical condition ma[d]e him within the highest risk group of death if he were to become infected with the COVID-19 virus").