JMK/AES
F. #2014R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        15 CR 637 (KAM)

MARTIN SHKRELI,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### THE GOVERNMENT'S MEMORANDUM OF LAW
### IN OPPOSITION TO THE DEFENDANT'S MOTION FOR RELEASE

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

JACQUELYN M. KASULIS
ALIXANDRA E. SMITH
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 2

FACTUAL BACKGROUND ................................................................................................... 3

   I.  Shkreli's Offense Conduct and Trial Conviction.................................................... 4

   II.  Shkreli's Additional Conduct That Resulted in Court Sanctions, Including Remand........ 6

   III. Shkreli's Sentencing and Appeal ......................................................................... 9

   IV. Shkreli's Disciplinary Violations During Incarceration ................................................. 10

   V.  Shkreli's Physical Health ................................................................................... 10

   VI. Shkreli's BOP Petition and Current Status of COVID-19 at FCI Allenwood Low ......... 11

ARGUMENT ....................................................................................................................... 12

   I.  Shkreli's Motion Must Be Denied for Failure to Exhaust Administrative Remedies ...... 12

      A.  The Statute's Exhaustion Requirement is Mandatory and
          Contains No Exceptions.................................................................................. 13

      B.  Shkreli's "Exceptions" Argument Fails.............................................................. 19

   II.  Shkreli Has Not Met His Burden to Demonstrate Extraordinary
      and Compelling Reasons for His Immediate Release ....................................................... 22

      A.  Applicable Law ............................................................................................. 23

      B.  The BOP's Response to the COVID-19 Pandemic.............................................. 25

      C.  Discussion .................................................................................................... 28

CONCLUSION.................................................................................................................... 37

The government respectfully submits this memorandum of law in opposition to the motion for release filed by defendant Martin Shkreli on April 22, 2020.  (See Shkreli's Motion for Release ("Shkreli Mot."), Dkt. No. 729).

## PRELIMINARY STATEMENT

Shkreli, who engaged in four sophisticated and long-running fraud schemes that defrauded investors in his hedge funds and a public company of more than $10 million, whose conviction was affirmed on appeal and who has served less than half of his 84-month sentence, who is 37 years old with no medical conditions and currently at a facility with no known cases of inmates or staff with COVID-19, and who committed multiple disciplinary violations while incarcerated, now moves this Court to release him immediately and permanently from prison, on the ground that he is at a greater risk than his fellow inmates for complications in the event that he were to get COVID-19.  That motion should be denied for multiple reasons.

As an initial matter, the Court lacks authority to order Shkreli's release at this time, because he has not exhausted his administrative remedies.  The defendant's claim that the Court may simply excuse or ignore the exhaustion requirement is wrong.  See United States v. Raia, No. 20-1033, --- F.3d ---, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020).

Moreover, Shkreli has not met his burden to demonstrate that he, personally and individually, falls into the narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release.  18 U.S.C. § 3582(c)(1)(A).  Unlike many others who have moved for release in recent days and weeks, Shkreli is young and in good health, has no documented medical conditions that could put him at increased risk of suffering complications from COVID-19 and is housed at a facility with no known cases of inmates or staff with COVID-19.

2

In any event, even if Shkreli could meet his burden to show that release is permitted—which he cannot—it would nevertheless remain unwarranted. The same Section 3553(a) factors considered at sentencing should be considered in weighing a motion for release. Here, Shkreli has served less than half his sentence for a series of serious, wide-ranging fraud schemes. He was remanded to prison for violating his bail conditions by making threats to public figures, and has continued to demonstrate his disdain for the criminal justice system while in prison, mocking his own sentencing process in emails from jail and committing disciplinary violations while incarcerated. Furthermore, there is no basis to believe Shkreli's self-serving contention that his release would benefit society because he will be able to develop a "cure" for COVID-19; to the contrary, Shkreli is best known for pricing a life-saving drug beyond the reach of ordinary Americans. Release would not be commensurate with a balancing of these Section 3553(a) factors.

## **FACTUAL BACKGROUND**

The Court is extremely familiar with the offense conduct in this case, having presided over not only Shkreli's six-week trial in the summer of 2017, but also the eleven-week trial of Shkreli's co-defendant, Evan Greebel, in the fall of 2017. In its February 26, 2018 Memorandum and Order denying Shkreli's Rule 29 motion (Dkt. No. 535), the Court detailed at length the key evidence supporting the jury's guilty verdict on Counts Three, Six and Eight, as well as the evidence demonstrating that the government proved Shkreli's guilt on Count Seven by a preponderance. In addition, a comprehensive overview of the offense conduct is set forth in the Pre-Sentence Investigation Report dated December 12, 2017 ("PSR") (see PSR ¶¶ 7-40) and in the government's sentencing submission (see Dkt. No. 549). The following is therefore intended to provide only a high-level overview of the basic facts of the four fraudulent schemes

3

with which Shkreli was charged and proven criminally culpable, either due to a jury verdict of guilty or the Court's finding that the government proved Shkreli's participation in the fraud by a preponderance of the evidence, as well as additional information about the case's procedural history as well as Shkreli's conduct leading to court sanctions, his disciplinary issues during incarceration and his health.

I.      **Shkreli's Offense Conduct and Trial Conviction**

On December 14, 2015, a grand jury in the Eastern District of New York returned an indictment against Martin Shkreli and his co-conspirator Evan Greebel.  The indictment charged Shkreli with seven counts for his participation in three fraud schemes involving MSMB Capital Management LP ("MSMB Capital Scheme"), MSMB Healthcare Management LP ("MSMB Healthcare Scheme") and Retrophin, Inc. ("Retrophin Theft Scheme").  On June 3, 2016, a grand jury in the Eastern District of New York returned a superseding indictment against Shkreli and Greebel, which charged both defendants with an additional count for their participation in a fourth fraud scheme (the "Retrophin Unrestricted Shares Scheme").

For the MSMB Capital and MSMB Healthcare Schemes, Shkreli was charged with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Counts One and Four), conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Counts Two and Five), and securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Counts Three and Six), for defrauding investors in the hedge funds MSMB Capital Management LP ("MSMB Capital") and MSMB Healthcare Management LP ("MSMB Healthcare") (together, the "MSMB Funds") by making material misrepresentations and omissions to both induce investment in, and prevent redemptions from, the MSMB Funds.  For the Retrophin Theft Scheme, Shkreli and Greebel were charged with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count

4

Seven), for defrauding the public pharmaceutical company Retrophin, Inc. ("Retrophin") by misappropriating its assets.  For the Retrophin Unrestricted Shares Scheme, Shkreli and Greebel were charged with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count Eight), for defrauding investors and potential investors in Retrophin by seeking to control the price and trading volume of Retrophin shares through Shkreli's beneficial ownership of almost all of Retrophin's unrestricted shares.

Shkreli's trial commenced on June 26, 2017.  The government introduced approximately 800 exhibits and the testimony of 24 witnesses.  The government's evidence established the following facts:

- Shkreli founded MSMB Capital in 2009, which purported to be a hedge fund focused on healthcare stocks.  Shkreli made material misrepresentations and omissions to MSMB Capital investors to induce investment and to prevent redemptions. Ultimately, Shkreli either stole or lost through unauthorized trading all of the money invested in MSMB Capital, but failed to disclose those losses to investors.  As a result of his lies to MSMB Capital investors, Shkreli obtained and retained almost $3 million.

- In February 2011, after Shkreli lost all of the money in MSMB Capital, he started another hedge fund called MSMB Healthcare.  At the same time, he started Retrophin, the pharmaceutical company.

- Shkreli made misrepresentations and omissions to MSMB Healthcare investors to induce investment in the fund and to prevent redemptions.  Shkreli's trading caused MSMB Healthcare to lose money, and he ultimately used MSMB Healthcare solely as a conduit to funnel money from MSMB Healthcare investors — who falsely believed they were investing in a long-short hedge fund — to Retrophin.  Shkreli also stole money from MSMB Healthcare for his own personal use.  As a result of these lies, Shkreli obtained and retained approximately $3.4 million in funds from MSMB Healthcare investors.

- To continue to conceal the MSMB Capital and MSMB Healthcare frauds, Shkreli, Greebel and others undertook a third fraud to pay off disgruntled MSMB Funds' investors.  That fraud involved backdating documents to give the false appearance that MSMB Capital had invested in Retrophin, and stealing money and shares from Retrophin via settlement and sham consulting agreements to give to investors.  In total, Shkreli, Greebel and others conspired to steal approximately $10.4 million in money and shares from Retrophin through the settlement and sham consulting

agreements to repay debts to investors owed solely by Shkreli, MSMB Capital and MSMB Healthcare.

- In the fourth fraud scheme, Shkreli, Greebel and others conspired to manipulate the price and trading volume of Retrophin's stock.  In December 2012, Shkreli and Greebel took Retrophin public via a reverse merger with the shell company Desert Gateway, which was selected because it came with a promissory note that would convert to 2.5 million free-trading shares following the merger.  Prior to the merger, Shkreli selected seven associates, and he and Greebel arranged for them to purchase 2.4 million of the 2.5 million free-trading shares (known as "Fearnow shares") from the holder of the note at a deeply discounted price.  Shkreli and Greebel subsequently concealed Shkreli's beneficial ownership of those shares, which they used to seek to control — and in some instances, were successful in controlling — the price and trading volume of Retrophin's stock.

On August 4, 2017, the jury returned a verdict of guilty on Counts Three, Six and Eight.  Subsequently, on February 26, 2018, the Court concluded that the government had proven Shkreli guilty of Count Seven by a preponderance of the evidence.  (See Dkt. No. 535 at 89).

## II.   Shkreli's Additional Conduct That Resulted in Court Sanctions, Including Remand

In addition to the offense conduct outlined above, there were two incidents of additional conduct that resulted in the Court sanctioning Shkreli either during or shortly after trial:  his deliberate attempts to disrupt the trial and, post-verdict, his escalating online threats to various women, including Secretary Hillary Clinton and journalist Lauren Duca, which constituted a violation of his bail conditions and resulted in Shkreli being remanded into custody.

First, since his indictment, Shkreli has consistently made public statements indicated his lack of respect for the law or the criminal justice system.  For example, in November 2016, Shkreli told the Financial Times that his plan was to make the case "more polarizing and popular" by creating a circus-like atmosphere in order to obtain an acquittal, similar to the trials of OJ Simpson, Casey Anthony and Sean "P Diddy" Combs, all of whom were found not guilty under similar circumstances.  (See Dkt. No. 160, Ex. 12).  In the same article, Shkreli stated he was "spending millions to influence the jury pool in Brooklyn."  (Id.).

Once the jury was selected and empaneled, Shkreli embarked on a campaign of disruption by commenting on trial evidence and witnesses to the press and on social media, and by making a spectacle of himself and the trial directly on the courthouse grounds.  During the lunch break on June 30, 2017, Shkreli paid a highly-publicized visit to reporters and members of the public in the overflow viewing room, which was located on the same floor of the courthouse as the trial courtroom.  Among other things, Shkreli repeatedly commented on evidence the jury had heard the day before and the credibility of testifying witnesses, and made inappropriate personal attacks on current and former prosecutors in the case.  (See Dkt. No. 261).  Following the end of the court day on June 30, 2017, Shkreli and his counsel were interviewed on camera by a journalist as they exited the door of the courthouse; during that interview, Shkreli interrupted a question posed to counsel and stated, referring to himself in the third person, "He'll do whatever he wants."  (See id.).  Subsequently, the government made a motion to limit Shkreli's extrajudicial statements in the courthouse and the Court reprimanded Shkreli for his actions, and then required Shkreli to refrain from speaking about the case during the pendency of the trial within and near the courthouse.  (See Trial Tr. at 1475-87).

Second, Shkreli made at least two public threats of violence against women.  On July 27, 2017—on the eve of the final closing arguments—Shkreli made the following statements on Facebook: "Trial's over tomorrow, bitches.  Then if I'm acquitted, I get to fuck Lauren Duca[.]"  Shkreli also stated "And Anna Kasperian, she's pretty hot," referring to a political pundit.  Shkreli's previous harassment of Duca had led to him being permanently banned from Twitter in January 2017.  Thus, just as the case was to be submitted to the jury, Shkreli made a public threat of sexual violence against two women whom he disliked and with whom he had feuded in the past.  (See Dkt. No. 362).  Shkreli's threats subsequently escalated

following his conviction.  On September 5, 2017, Shkreli posted on Facebook that he would pay $5,000 to anyone who assaulted Secretary Clinton to steal some of her hair.  Specifically, the post stated that "on HRC's book tour, try to grab a hair from her.  I must confirm the sequences I have.  Will pay $5,000 per hair obtained from Hillary Clinton.  Payment after the sequence matches.  Good luck, patrollers."  Shkreli's threat was widely circulated in the media, and was posted right before Secretary Clinton was scheduled to begin a tour to promote a new book, during which she is scheduled to make numerous public appearances.  As a result of Shkreli's threat, the Secret Service launched an investigation and expended significant additional resources to ensure Secretary Clinton's protection.  In connection with that investigation, the Secret Service sought to interview Shkreli.  He declined, and subsequently posted a message on Facebook that revealed that he did not take his actions or their consequences seriously:  "The Secret Service has requested an interview with me.  I am declining that interview—schedule is full."  (See Dkt. No. 362).

On September 13, 2017, the Court revoked Shkreli's bail and remanded him to custody of the Federal Bureau of Prisons ("BOP") for violating conditions of his release pursuant to 18 U.S.C. § 3143.  Specifically, the Court found that Shkreli could not show by clear and convincing evidence that "he does not pose a danger to the safety of any other person and the community."  (Order dated September 13, 2017, Dkt. No. 367).

Even after Shkreli was remanded, he continued to express his disdain for his conviction, the process by which he would be sentenced and the idea of expressing remorse.  For example, in an email conversation from jail in January 2018, Shkreli made the statement "fuck the feds" and joked about skipping the forfeiture hearing in the case.  (See Dkt No. 549 at 45). Similarly, an individual corresponding with Shkreli by email in November and December 2017

warned Shkreli that "Getting convicted and acting out on social media doesn't imply you're taking things very seriously."  (Id. at 46).  Shkreli responded by explaining that because he believed the loss amount for the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") would be zero, his sentence would be extremely low such that any expression of remorse was not required:  "[W]e really feel strongly there's no loss here … so all the lack of remorse in the world doesn't change the numbers.  [The judge is] not going to upward depart." (Id.).

## III.    Shkreli's Sentencing and Appeal

On March 9, 2018, the Court sentenced Shkreli to 84 months' imprisonment on Counts Three and Six and 60 months' imprisonment on Count Eight, to run concurrently, a $75,000 fine and a total forfeiture money judgment amount of $7,360,450, to be partially satisfied by various substitute assets.  The Court stated it would determine restitution at a later date.  Judgment was entered on March 26, 2018.

On April 9, 2018, the court found that Shkreli owed defrauded MSMB Healthcare investor Richard Kocher $388,336.49 in restitution.  On April 17, 2018, the court entered an amended judgment reflecting the restitution order.

Shkreli appealed his trial conviction, arguing that the Court erred by including a "no ultimate harm" jury instruction, and also challenged the Court's forfeiture calculation.  On July 18, 2019, the Second Circuit affirmed both the conviction and the order of forfeiture in a summary order, finding that there was a factual basis for the "no ultimate harm" instruction and that such instruction properly stated the law, and also finding that the Court had correctly calculated forfeiture.  (See United States v. Shkreli, 18-819 (2d Cir. Jul. 18, 2019)).

Shkreli subsequently filed for a writ of certiorari with the Supreme Court.  That writ was denied on November 18, 2019.

## IV.    Shkreli's Disciplinary Violations During Incarceration

Since Shkreli's incarceration for violating his bail conditions in September 2017,[1] he has committed several disciplinary violations.  On May 1, 2018, Shkreli was absent from an assignment, resulting in a loss of email privileges for 30 days.  (See Probation Response Memorandum dated April 27, 2020 ("Probation Resp.") at 2).  On May 2, 2018, Shkreli refused a work or program assignment and also refused a direct order, resulting in the loss of visitation privileges for 30 days.  (Id.).  On June 17, 2019, Shkreli sent mail to another inmate via a third party without authorization, resulting in loss of 15 days' good time conduct; loss of commissary privileges for three months; and loss of email privileges for one month.  (Id.).  And on August 2, 2019, Shkreli solicited funds via mail and a phone call that were funneled to another inmate, resulting in a loss of commissary and telephone privileges for three months.  (Id.).

## V.    Shkreli's Physical Health

At the time that Shkreli was sentenced by this Court in March 2018, he confirmed to Probation that he had "no history of serious medical problems."  (PSR ¶ 88).  He did not report that he currently had, or had ever previously had, asthma or any other respiratory ailment. (Id.).  Shkreli advised Probation that he took "Claritin for the treatment of allergies," but did not describe those allergies as "severe."  (Id.).

Currently, Shkreli is 37 years old and in good health, with no history "of any physical illnesses or injuries, and no history of any of the issues that are theorized to present an

---

[1] Shkreli was initially incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn, New York.  Shkreli was moved to FCI Fort Dix in New Jersey in May 2018, and subsequently moved to FCI Allentown Low in Pennsylvania in April 2019.

increased risk of contracting or having a severe reaction to COVID-19." (Probation Resp. at 1). There is no record that Shkreli reported that he had asthma, or that he was treated for asthma, while in BOP custody. (Id.). Shkreli last self-reported seasonal allergies to the BOP in September 2017, at which time his over-the-counter allergy medication was discontinued and he was referred to the prison commissary to obtain medication as needed. (Id.). A review of BOP medical records does not show Shkreli self-reporting that he has taken any such medication for allergies since that time; to the contrary, he has reported no allergies and sought no treatment for allergies.

## VI.    Shkreli's Petition to the Bureau of Prisons and Current Status of COVID-19 at FCI Allenwood Low

On March 30, 2020, counsel for Shkreli filed a petition via counsel with the warden of FCI Allenwood Low, where he is currently housed, for the BOP to move this Court for his compassionate release pursuant to 28 C.F.R. § 571.61(a); counsel subsequently supplemented that petition. (See Shkreli Mot. 3, Exhibits C & D (collectively, the "BOP Petition")).[2] The BOP Petition sought Shkreli's release based on, inter alia, the fact that he has "severe allergies" which will likely result in "more frequent contact between hands and face" and which "increases opportunities for the virus to infiltrate [Shkreli's] body and cause illness." (Id. at Exhibit C, p. 5). The BOP Petition did not contend that Shkreli suffered from asthma or any other physical condition. (Id.).

---

[2] Shkreli has represented that he also filed a separate petition for release on a BOP Form 8. (Id. at 5, n.1). Shkreli has further represented that on April 15, 2020, he received a denial of his BOP Form 8, in which he was advised that not only did he not have an underlying medical condition identified by the CDC that would make him eligible for home confinement, but even if he did have such condition, his PATTERN risk score would make him ineligible for home confinement under BOP guidelines. The BOP has not yet been able to confirm to the government the contents of Shkreli's Form 8 filing or the April 15, 2020 response to that Form 8 filing.

On April 16, 2020, the warden at FCI Allenwood Low denied the BOP Petition in a written letter to Shkreli's counsel.  That letter indicated that Shkreli was not eligible for early release under BOP Program Statement 5050.50, because he is 37 years old and does not have a "incurable, progressive illness" nor has he "suffered a debilitating injury from which [he] will not recover."  Shkreli is currently appealing the denial of the BOP Petition within the BOP. (Shkreli Mot. 5 n.1).

As of today, FCI Allenwood Low has zero inmates or staff members who have tested positive for COVID-19.  See https://www.bop.gov/coronavirus/index.jsp (last viewed April 28, 2020, at 11:00 a.m.).[3]

## **ARGUMENT**

## I.       **Shkreli's Motion Must Be Denied for Failure to Exhaust His Administrative Remedies**

Shkreli does not dispute that he has failed to exhaust his administrative remedies. The BOP Petition was filed on March 30, 2020, and while that petition was denied by the BOP on April 16, 2020, as detailed above, Shkreli has not yet completed the appeals process within the BOP.  Shkreli nevertheless asserts that the Court "should excuse [his] failure to exhaust his administrative remedies."  (Shkreli Mot. 4).  As set forth below, the law is squarely to the contrary.  Consequently, Shkreli's motion must be denied at this time for failure to exhaust his statutory remedies.

---

[3] The government also confirmed that no inmates or staff at FCI Allenwood Low have tested positive for COVID-19 via email correspondence with a BOP employee at FCI Allenwood Low on April 28, 2020.

## A.      The Statute's Exhaustion Requirement Is Mandatory and Contains No Exceptions

Shkreli's assertion that he should be "excused" (Shkreli Mot. 4) from the express,

unambiguous statutory requirement that he "fully exhaust" his administrative remedies has no

legal basis.  Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of

imprisonment once imposed, except under limited circumstances.  One such circumstance is the

so-called compassionate release provision, under which Shkreli seeks relief, which provides that

a district court "may reduce the term of imprisonment" where it finds "extraordinary and

compelling circumstances."  Id. § 3582(c)(1)(A)(i).  A motion under this provision may be made

by either the BOP or a defendant, but in the latter case only "after the defendant has fully

exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the

defendant's facility, whichever is earlier."  Id. (emphases added).  Accordingly, where, as here, a

defendant's compassionate release motion is denied by the warden of his institution within 30

days, the defendant cannot file his motion in district court, and the district court "may not"

modify his term of imprisonment, until he has "fully exhausted all administrative rights."  In

short, where a warden timely denies an inmate's request, § 3582(c)(1)(A) requires "ful[]

exhaust[ion]."[4]

The BOP Program Statement outlines the process by which a defendant can "fully

exhaust" his/her administrative rights in detail.  See Program Statement No. 5050.50,

---

[4] See, e.g., United States v. Bolino, No. 06-CR-0806 (BMC), 2020 WL 32461, at *1 (E.D.N.Y.
Jan. 2, 2020) (instructing that "[i]f the prison warden denies that request [from the inmate], the
prisoner must appeal the denial through the BOP's Administrative Remedy Procedure"); United
States v. Quashie, No. 14-CR-0376 (BMC), 2019 WL 7194211 (E.D.N.Y. Dec. 26, 2019); see
also, e.g., United States v. Leeland Eisenberg, No. 16-CR-157-LM, 2020 WL 1808844 (D.N.H.
Apr. 9, 2020) ("[B]efore a district court may consider a compassionate release motion filed directly
by a defendant, the defendant must demonstrate that he has either exhausted his administrative

Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  That statement explains that a prisoner seeking a compassionate release must first file a request with the prison warden asking the BOP to move for compassionate release on the prisoner's behalf.  See id. at 3 (citing 28 C.F.R. § 571.61).  Upon receipt of an application for compassionate release, BOP officials at the relevant facility are to conduct an extensive and thorough assessment of, among other things, the inmate's particular conditions of confinement and the stated grounds for release, including, as warranted, the inmate's health.  See id.  This assessment, and the knowledge and expertise of BOP staff, can be of great value to the parties and the Court.  If the prison warden denies an initial request, the prisoner must appeal the denial through the BOP's Administrative Remedy Procedure.  See id. at 15 (citing 28 C.F.R. § 571.63).  An appeal is considered logged on the date it is entered as received, and a response must be made timely; if a prisoner does not receive a response within the allotted time, the prisoner may consider the absence of a response

---

rights to appeal BOP's refusal to bring a motion for compassionate release on his behalf or that BOP has ignored his request for compassionate release for 30 days."); United States v. Korn, No. 11-CR-384S, 2020 WL 1808213, at *2 (W.D.N.Y. Apr. 9, 2020) (same); United States v. Brummett, No. 6: 07-103-DCR, 2020 WL 1492763, at *1 (E.D. Ky. Mar. 27, 2020) (same); United States v. Mattingley, No. 15-CR-00005, 2020 WL 974874, at *5 (W.D. Va. Feb. 28, 2020) (same); United States v. Hilton, No. 1:18CR324-1, 2020 WL 836729, at *2 (M.D.N.C. Feb. 20, 2020) (same); United States v. Nance, No. 7:92CR00135, 2020 WL 114195, at *2 (W.D. Va. Jan. 10, 2020) ("In Nance's case, the Warden did respond to his request within 30 days.  Accordingly, Nance was obligated to complete the administrative appeal process."); United States v. Miller, No. 16-CR-00269, 2020 WL 113349, at *2 (D. Idaho Jan. 8, 2020) ("It seems odd that Congress would allow a defendant to short-circuit the Bureau of Prison's administrative procedures simply by waiting 30 days after filing his request, despite the warden timely acting on that request.  In this context 'lapse' clearly means that the warden must fail to act on the defendant's request for a period of 30 days.  The 30-day period gives the warden time to respond to the inmate's request, but prevents the warden from sitting on the request for an unnecessarily long period of time." (citation omitted)).  But see United States v. Woodson, No. 18-CR-845 (PKC), 2020 WL 1673253, at *1 (S.D.N.Y. Apr. 6, 2020); United States v. York, No. 3:11-CR-76, 2019 WL 3241166, at *6 (E.D. Tenn. July 18, 2019) ("Because 30 days have passed since [the defendant's requests to BOP], the Court has authority to hear this matter under § 3582(c)(1)(A)").

to be a denial.  See 28 C.F.R. § 542.18 (detailing response times).  Only after that process is complete will a defendant be considered to have "fully exhausted" his or her administrative remedies.  Thus, requests for compassionate release follow the same exhaustion procedure as for routine administrative grievances (i.e., the use of forms BP-9 through BP-11).  See United States v. Bolino, 06-CR-806 (BMC), 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020).

Here, the warden at Shkreli's institution denied the BOP Petition within 30 days and Shkreli has not yet exhausted his administrative remedies because his appeal of the warden's denial of the BOP Petition is still pending.[5]  That ends this matter at this time.  This is so because Section 3582(c)'s exhaustion requirement is statutory, not the sort of judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions."  Ross v. Blake, 136 S. Ct. 1850, 1857 (2016).  Statutory exhaustion requirements "stand[] on a different footing."  Id.  "Congress sets the rules—and courts have a role in creating exceptions only if

---

[5] Shkreli suggests that his administrative remedies will be exhausted on April 30, 2020, which is the 30th day following the filing of the BOP Petition, and cites to United States v. Haney, No. 19-CR-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020), a case that improperly described § 3582(c)(1)(A) as imposing a mere "wait period" that gives inmates the choice to "either exhaust or wait 30 days."  (Shkreli Mot. 7, 10).  This is incorrect.  Such a reading of the statute would render the exhaustion requirement in § 3582(c)(1)(A) "wholly ineffective," because a prisoner "who does not want to participate" in BOP's administrative review can simply choose not to, and he or she can do so with "no significant sanction" for "bypass[ing] available remedies."  Woodford v. Ngo, 548 U.S. 81, 95 (2006).  This conclusion finds no support in the text of the statute or the binding authority cited above.  By contrast, the government's understanding of § 3582(c)(1)(A) is internally coherent, it gives meaning to every word in the provision, and it is consistent with the precedent discussed above.

In § 3582(c)(1)(A) Congress plainly intended to hasten the BOP's review of such requests and it did so by requiring the warden to act on them within 30 days.  If the warden does so, the inmate must "fully exhaust[] all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf."  If, however, the warden fails to act on the inmate's request within 30 days, the inmate is entitled to treat that inaction as a denial by the BOP (not just the warden) and proceed directly to district court.  The government's understanding of the statute encourages prompt BOP action and administrative review, while at the same time protecting inmates from BOP inaction by way of the "30-day" provision, which serves as a statutory futility exception.

Congress wants them to." Id.  Thus, where a statute contains mandatory exhaustion language, as it does here, the only permissible exceptions are those contained in the statute.  Id.; see also Bastek v. Fed. Crop. Ins., 145 F.3d 90, 94 (2d Cir. 1998) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text.").

As described above, Section 3582(c)(1)(A) has mandatory exhaustion language that excuses exhaustion only where the warden of the inmate's institution fails to respond to an inmate's initial request within 30 days.  In cases like Shkreli's where that exception does not apply, the language of the statute states that a court "may not" modify a sentence unless the defendant has first "fully exhausted all administrative rights."  Cf. Fry v. Napoleon Community Schools, 137 S. Ct. 743, 750 (2017) (statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims).  For this reason, this Court lacks the authority to grant the defendant's motion at this time.

In recent days and weeks, as the Court is aware, numerous defendants have cited the unusual circumstances presented by COVID-19 as a basis for compassionate release, and have argued that the exhaustion requirement should be waived or excused.  The only Court of Appeals to have addressed the question has rejected the argument and required exhaustion.  See Raia, 2020 WL 1647922.  In Raia (a case Shkreli omits from his motion), the Third Circuit recognized the serious concerns presented by COVID-19, but held that, in light of these concerns, as well as the BOP's statutory role and its "extensive and professional efforts to curtail the virus's spread, . . . strict compliance with Section 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." Id. at *2.  The vast majority of district courts that have reached the issue have also required exhaustion.  See, e.g., United States v. Roberts, 18-CR-

528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8. 2020); United States v. Canale, 17-CR-

287 (JPO), 2020 WL 1809287, at *1 (S.D.N.Y. Apr. 9, 2020); United States v. Woodson, 18-

CR- 845 (PKC), 2020 WL 1673253, at *4 (S.D.N.Y. Apr. 6, 2020); United States v. Weiland,

18-CR-273 (LGS), 2020 WL 1674137, at *1 (S.D.N.Y. Apr. 6, 2020); United States v. Johnson,

14-CR-4-0441, 2020 WL 1663360, at *1 (D. Md. Apr. 3, 2020); United States v. Carver, 19-CR-

6044, 2020 WL 1604968, at *1 (E.D. Wa. Apr. 1, 2020); United States v. Clark, 17-CR-85

(SDD), 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020); United States v. Williams, 15-CR-

646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020); United States v. Garza, 18-CR-1745,

2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); United States v. Zywotko, 19-CR-113, 2020

WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); United States v. Eberhart, 13-CR-313, 2020 WL

1450745, at *2 (N.D. Cal. Mar. 25, 2020); United States v. Gileno, 19-CR-161, 2020 WL

1307108, at *3 (D. Conn. Mar. 19, 2020); see also Bolino, 2020 WL 32461, at *1.[6]

   To be sure, COVID-19 presents unusual circumstances, in which compassionate

release decisions should be made expeditiously.  But the text of Section 3582 contains no

---

[6] But see United States v. Scparta, 18 Cr. 578 (AJN), 2020 WL 1910481, at *8 (S.D.N.Y. Apr. 20, 2020); United States v. Perez, No. 17 Cr. 513 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020); United States v. Colvin, No. 19 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020).  However, Scparta, Perez and Colvin (cited at Shkreli Mot. 9-10) all rely on Washington v. Barr, 925 F.3d 109 (2d Cir. 2019) (notably, Scparta relies heavily on Perez), which, as discussed below, is inapposite because it involves judge-made exhaustion doctrine.  Perez and Colvin are also are inapposite because each was a case where delay amounted to denial because the defendant had a very short period (less than three weeks in Perez, and eleven days in Colvin) remaining on his or her sentence.  See Perez, 2020 WL 1546422, at *3; Colvin, 2020 WL 1613943, at *2.  Similarly, in Scparta, the BOP had already agreed to release the defendant to home confinement and the defendant was merely contesting the BOP facility's decision to detain him for an additional 14-day quarantine period prior to his release.  Scparta, 2020 WL 1910481, at *8.  Shkreli omits all of these distinguishing facts from his motion, and the circumstances of his case are far different.

exigency or similar exception, and indeed, the text refutes the availability of such an exception in two respects.

First, while many statutory exhaustion provisions require exhaustion of all administrative remedies before a claim may be brought in court, Section 3582 provides an alternative: exhaustion of all administrative rights or failure of the warden to act on the inmate's request within 30 days.  18 U.S.C. § 3582(c)(1)(A).  This alternative acts as a statutory futility provision for cases—unlike Shkreli's—where the warden of an inmate's institution fails to respond within the 30 day period provided by Congress.

Second, in cases presenting the most urgent circumstance—inmates diagnosed with a terminal illness—Section 3582(d) requires the warden of an inmate's institution to process any application for compassionate release in 14 days.  That Congress allowed 14 days to process the claims of even a terminally ill inmate suggests that it could not have intended to allow a shorter period (which excusing exhaustion would effectively provide) in a case, such as this, where the potential risk to the inmate, while serious, remains potential.

As the Third Circuit recognized, the mandatory exhaustion requirement accommodates the valuable role that the BOP plays in the compassionate release process. Informed decisions about compassionate release require the collection of information, like disciplinary records, medical history, and facility details, which the BOP is uniquely suited to obtain and that will benefit both the BOP and later a court evaluating such claims.  The BOP is also well situated to make relative judgments about the merits of compassionate release requests—particularly at a time like this when many inmates, in different circumstances, are making requests advancing similar claims—and adjudicate those positions in a consistent manner.  The Court may of course review those judgments, but Congress expressed its clear

intent that such review would come second, with the benefit of the BOP's initial assessment.  See United States v. Russo, 16-CR-441 (LJL) (S.D.N.Y. Apr. 3, 2020) (Dkt. 54, at 4) (The statutory text "recognizes that the BOP is frequently in the best position to assess, at least in the first instance, a defendant's conditions, the risk presented to the public by his release, and the adequacy of a release plan.  That recognition is consistent with one of the bedrock principles underlying administrative exhaustion—to permit the agency, with its expertise and with its responsibility over the movant, to make a decision in the first instance.").

In any event, to ignore the mandatory, express, statutory exhaustion requirement, whatever its merits, would be legal error.  See Husted v. A. Philip Randolph Inst., 138 S. Ct. 1833, 1848 (2018) ("[T]his case presents a question of statutory interpretation, not a question of policy."); United States v. Ron Pair Enters., 489 U.S. 235, 241 (1989) (Where a "statute's language is plain, the sole function of the courts is to enforce it according to its terms." (internal quotation marks omitted)).

### B.    Shkreli's "Exceptions" Argument Fails

In the face of unambiguous statutory language, and numerous cases applying it in this district and elsewhere, Shkreli claims, relying principally on Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019), that this Court both may and should find that the exhaustion requirement is "excused" because he fits within certain unwritten, but allegedly applicable, "exceptions."  (Shkreli Mot. 5-7).  That claim is wrong.  The statute's plain language does not permit exceptions, and Washington is inapposite for precisely that reason.

Washington involved a judge-made, not statutory, exhaustion.  See Washington, 925 F.3d at 116 (stating that the statute in question "does not mandate exhaustion of administrative remedies" but finding that exhaustion requirement was nevertheless appropriate);

id. at 118 ("Although not mandated by Congress, [exhaustion] is consistent with congressional intent."). Thus, it was appropriate for the court to consider judge-made exceptions to the judge-made exhaustion requirement, or to put it differently, the scope of the judge-made requirement. See Ross, 136 S. Ct. at 1857. But this case involves a mandatory, express, statutory exhaustion requirement. That is entirely different. See Bastek, 145 F.3d at 95 (rejecting application of various exceptions to exhaustion requirement where clear statutory requirement exists); Theodoropoulos v. INS, 358 F.3d 162, 172 (2d Cir. 2004) (rejecting futility exception to exhaustion requirement in Immigration and Nationality Act because such an exception is "simply not available when the exhaustion requirement is statutory," as opposed to judicial).

The text of the opinion in Washington does include the following statement: "Even where exhaustion is seemingly mandated by statute or decisional law, the requirement is not absolute. The Supreme Court itself has recognized exceptions to the exhaustion requirement under 'three broad sets of categories.'" Washington, 925 F.3d at 118 (quoting McCarthy v. Madigan, 503 U.S. 140, 146 (1992)). However, the inclusion of the foregoing phrase "by statute" is not supported by the citation that follows. McCarthy is another case involving a judge-made exhaustion requirement. See McCarthy, 503 U.S. at 152 ("Congress has not required exhaustion of a federal prisoner's Bivens claim." (emphasis in original)). It thus provides no support for the notion that exhaustion mandated "by statute" is not absolute. See Bastek, 145 F.3d at 95 (rejecting application of McCarthy exceptions in a statutory case). Moreover, while Washington goes on to discuss three recognized exceptions to exhaustion, it is again describing three exceptions recognized in McCarthy in the judge-made context, and as the Supreme Court made clear in Ross, there is a critical distinction between statutory and judge-made exhaustion requirements. Given that Washington was a judge-made exhaustion case, its

unexplained statement that exhaustion mandated "by statute" is "not absolute" is dicta, and

cannot supplant the clear statements to the contrary in cases like Ross and Bastek, and the plain

language of the statute here.  See Woodson, 2020 WL 1673253, at *3 ("The passing reference to

'exhaustion [that] is seemingly mandated by statute . . . is not absolute' in [Washington] was not

necessary to the Court of Appeals' holding." (ellipsis in original)); Roberts, 2020 WL 1700032,

at *2 (rejecting argument that Washington permits excusing exhaustion under Section 3582(c);

unlike those that are judge-made, "statutory exhaustion requirements, such as those set forth in

Section 3582(c), must be strictly enforced" (internal quotation marks omitted)).[7]

---

[7] Mathews v. Eldridge, 424 U.S. 319 (1976) and Bowen v. City of New York, 476 U.S. 467 (1986) (cited at Shkreli Mot. at 5-7) are similarly inapposite.  In each case, the Supreme Court considered a provision of the Social Security Act providing that a claimant could bring a civil action challenging a decision by the Secretary of Health, Education and Welfare only after "a final decision of the Secretary made after a hearing." 42 U.S.C. § 405(g).  The Supreme Court construed this to contain two requirements: (1) a non-waivable, "jurisdictional" element that a claim shall have been brought before the Secretary, and (2) a waivable element that the remedies prescribed by the Secretary be exhausted.  Eldridge, 424 U.S. at 328.  In Eldridge, the Supreme Court concluded that the denial of the claimant's request for benefits "constitutes a final decision" for purposes of the exhaustion requirement.  Id. at 332.  Thus, Eldridge did not excuse an exhaustion requirement; it found it to have been satisfied.  See Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 15 (2000).  In Bowen, the Supreme Court used language suggesting not that the requirement of a "final decision" (and thus the exhaustion requirement) had been satisfied, but rather that it could be "excused" under the circumstances set forth in Eldridge, as well as when a court deems appropriate "as guided by the policies underlying the exhaustion requirement."  Id. at 485.  These statements in Bowen, which go beyond Eldridge and are arguably dicta, are in stark tension with Ross and other more recent Supreme Court precedents.  Indeed, they set forth precisely the sort of "freewheeling approach to exhaustion" that the Supreme Court has since repudiated.  Ross, 136 S. Ct. at 1350.

Thus, particularly in light of subsequent precedent, Eldridge and Bowen stand at most for the proposition that the specific statutory exhaustion requirement at issue in those cases can be excused by a court where the two-part Eldridge test is satisfied.  But by no means do they stand for the proposition that all statutory exhaustion requirements may be excused, let alone one as unambiguous as Section 3582(c).  Indeed, when the Supreme Court recently reiterated the two-part Eldridge test, it emphasized that exhaustion schemes should be interpreted "with a regard for the particular administrative scheme at issue" and that the Social Security Administration is "unusually protective of claimants."  Smith v. Berryhill, 139 S. Ct. 1765, 1774, 1776 (2019).

In sum, the analysis of a statutory exhaustion requirement, like any other statutory requirement, must "begin[] with the text" and utilize "ordinary interpretive techniques." Ross, 136 S. Ct. at 1856 and 1858 n.2; see also, e.g., Ron Pair Enters., 489 U.S. at 241.  The text of Section 3582(c) is unambiguous and provides for no exceptions.  "[T]he Court is not free to infer" one that is irreconcilable with that text.  Roberts, 2020 WL 1700032, at *2; see also, e.g., Woodson, 2020 WL 1673253, at *3.

## II.     Shkreli Has Not Met His Burden to Demonstrate Extraordinary and Compelling Reasons For His Immediate Release

Even if Shkreli had exhausted his administrative remedies, the Court should reject his motion on the merits, as he has not met his burden to demonstrate "extraordinary and compelling" reasons for his immediate release.  Shkreli was convicted after trial of serious fraud offenses, was remanded to prison after violating his bail conditions and correctly received a multiple-year term of imprisonment.  He appealed his conviction, and it was affirmed.  He is a healthy 37-year-old man with no documented medical conditions that put him at increased risk of contracting or developing complications from COVID-19, and is currently housed in a facility with no COVID-19 cases.  While the risk posed by COVID-19 is real, the BOP has taken and continues to take meaningful steps to mitigate that risk—and appears to have done so particularly effectively with respect to the long-term, low-security facility where Shkreli is housed.  Taken together, Shkreli's good health, his history of disciplinary violations in prison and the remaining 3553(a) factors strongly counsel against his release.

A.      **Applicable Law**

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13.  That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," id. § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," id. § 1B1.13(2); and "the reduction is consistent with this policy statement," id. § 1B1.13(3).

The Application Note describes the circumstances under which "extraordinary and compelling reasons exist":

(A) Medical Condition of the Defendant. —

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances. —

(i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Id. § 1B1.13 Application Note 1.

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, as noted above, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted.  See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

The Guidelines and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50.  Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age or a need to care for a child, spouse or registered partner.  See id.; see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009).  As the court recognized in Traynor, Congress noted that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of

the prisoner." Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); United States v. Gotti, 02-CR-743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

### B.       The BOP's Response to the COVID-19 Pandemic

The BOP has made and continues to make significant efforts to respond to the threat posed by COVID-19.

Since at least October 2012, the BOP has had a Pandemic Influenza Plan. *See* BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp.  In January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel.  See BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp.  As part of its Phase One response, the BOP began to study "where the infection was occurring and best practices to mitigate transmission."  Id.  In addition, the BOP stood up "an agency task force" to study and coordinate its response, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President.  BOP's planning is structured using the Incident Command System (ICS) framework."  Id.

On or about March 13, 2020, the BOP implemented its Phase Two response "to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." Id. These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." Id. For example, the BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." Id. In addition, the BOP implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. Id. As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." Id.

On or about March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand

and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. See BOP Update on COVID-19, at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

On or about March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. See BOP COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

On or about April 1, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. Id. All new inmates are screened, and those with any risk factors, even if asymptomatic, are quarantined. See BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp; BOP COVID-19

Action Plan: Phase Five,

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

The BOP has also "increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement." Update on COVID-19 and Home Confinement,

https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp. In addition, the BOP "has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities [with COVID-19 outbreaks] to determine which inmates are suitable for home confinement." Id.

As of today, FCI Allenwood Low, where Shkreli is housed, has zero inmates or staff members who have tested positive for COVID-19. See https://www.bop.gov/coronavirus/index.jsp (last viewed April 28, 2020, at 11:00 a.m.). Nor is FCI Allenwood Low permitting visitation. *See* https://www.bop.gov/locations/institutions/alf/; *see also* BOP COVID-19 Action Plan: Phase Five,

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

## C.    Discussion

Shkreli argues that he has met his burden to show "extraordinary and compelling circumstances" that warrant his release both because he allegedly has "severe allergies" and "asthma" that put him at an increased risk of contracting COVID-19 (Shkreli Mot. 13-14), and because the BOP's response to the COVID-19 pandemic has been inadequate as a general matter (id. at 13-16). Shkreli further argues that, having met this burden, his release is appropriate under Section 3553(a) because he is not a danger to the community and would "potentially help

others" due to his purported on a "potential cure" for COVID-19 (id. at 17-19).  He suggests to the Court that he should serve the remainder of his sentence on home confinement with electronic monitoring at the home of his fiancé in New York City (the current epicenter of the pandemic).[8]  None of these arguments are availing, and all should be rejected.

### 1.    Shkreli Has No Documented Medical Conditions that Warrant Release

In his motion, Shkreli asserts that he has "asthma" and "severe allergies," which allegedly cause him to face "possible, even likely infection, and potential death."  (Shkreli Mot. 1, 13).  But despite such a claim, Shkreli has provided no documentation of any kind of his purported medical conditions, much less documentation that they are so serious that they warrant the extraordinary relief he seeks of immediate and permanent release from prison.

With respect to his allegation that he suffers from asthma, Shkreli did not report this alleged condition to the Probation Office prior to sentencing; did not tell the Court of such an alleged condition in connection with sentencing; did not report that he allegedly had asthma to the BOP at any time; is not being treated for asthma at the BOP; did not claim that he suffered from asthma in the BOP Petition; and the government is unaware of any medical records of any

---

[8] Exhibit G, which is a letter from Shkreli's fiancé to the Court and discusses certain 3553(a) factors, was filed under seal.  While the government agrees that personal identifying information ("PII") (such as addresses and phone numbers) may be redacted from public filings, there does not appear to be a legal basis to seal the entire letter, nor has Shkreli articulated such a basis. Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 126 (2d Cir. 2006) (a "judicial document," that is, one "relevant to the performance of the judicial function and useful in the judicial process," must be filed publicly unless the court makes "specific, on-the-record findings that higher values necessitate a narrowly tailored sealing"); United States v. Johnson, No. 16 Cr. 457 (NGG), 2018 WL 1611371,at *1 (E.D.N.Y. Apr. 3, 2018) ("Both sentencing memoranda and letters of support from third parties are judicial documents to which a strong presumption of public access attaches." (internal quotation marks omitted; alteration incorporated)); United States v. Gotti, No. 17 Cr. 127 (ARR), 2017 WL 4027990, at *1 (E.D.N.Y. Oct. 30, 2017) ("documents submitted to the court for the purposes of sentencing are presumptively public"); United States v. King, No. 10 Cr. 122 (JGK), 2012 WL 2196674, at *2 (S.D.N.Y. June 15, 2012) (a "formulaic recitation" by a filer that a document allegedly implicates privacy is not sufficient to warrant wholesale filing under seal (internal quotation marks omitted)).

kind to support his claim (and there are none in his BOP medical file).  In short, his claim is both "suspiciously coincidental" and "wholly unsubstantiated."  (See Probation Resp. at 1).  With respect to Shkreli's allegations that he also suffers from "severe allergies," while he did advise Probation prior to sentencing that he took Claritin (a common and over-the-counter medication) and self-reported certain seasonal allergies to the BOP in 2017, Shkreli has not sought treatment from the BOP for allergies since that time; has not reported to the BOP during check-ups that he takes or needs any medication for such allergies; and there is no medical documentation to support his assertion that any such allergies are "severe."  (Id.).  And in any event, the Government is unaware of a basis for his suggestion that seasonable allergies, even if he had them, are a COVID-19 risk factor.

In short, the record of this case generally, and BOP records in particular, reflect that Shkreli, who is only 37 years old, is in excellent physical health and does not have a "history of any of the issues that are theorized to present an increased risk of contracting or having a severe reaction to COVID-19."  (Id.).  The Court should be deeply skeptical of Shkreli's belated, conclusory, and unsupported claim to the contrary.  See, e.g., United States v. Pinto-Thomaz, 18-CR-579 (JSR), 2020 WL 1845875, at *3 (S.D.N.Y. Apr. 13, 2020) (denying motion for release of 35-year-old defendant who submitted a doctor's letter that he had asthma as a child, after observing that the defendant had not advised Probation or the BOP of this alleged condition, but had amended his prior medical records to reflect that condition only a week prior to his release motion, noting "How convenient.").

Even if Shkreli could provide documentation to support that he has asthma and/or allergies at this time, such common conditions, standing alone, are not sufficient for Shkreli to discharge his burden to demonstrate that he—personally and individually—falls into the narrow

band of inmates who are "suffering from a serious physical or medical condition," "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13, Application Note 1(A).  See, e.g., Gileno, 2020 WL 1307108, at *4 (defendant, who allegedly suffered from high blood pressure, high cholesterol, asthma, and allergies, "has not shown that his medical issues, which remain largely the same as when he was sentenced, 'substantially diminish [his] ability . . . to provide self-care' within the correctional facility" (brackets in original)).

Nor do Shkreli's generalized complaints about the BOP's response to the COVID-19 pandemic, and his concern that he could contract COVID-19 at some point while incarcerated, furnish a basis to meet his burden.  The measures taken by the BOP, as detailed above, belie Shkreli's suggestion that the BOP is failing to address meaningfully the risk posed by COVID-19 to inmates.  (See Shkreli Mot. 11 (stating the BOP's measures "have been inadequate to protect many prisoners from contracting COVID-19"); Exhibit H).  To the contrary, they show that the BOP has taken the threat seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations.  This is particularly true at FCI Allenwood Low, where Shkreli is incarcerated, where there are currently no cases of COVID-19 at the facility among either staff or inmates.  The risk of potential exposure to COVID-19 in a BOP facility cannot alone form the basis to release a sentenced prisoner, particularly in a case such as this one where he is both young and not in a high-risk category.  See Raia, 2020 WL 1647922, at *2 ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia.  But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison

alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").  Courts considering bail applications, where, unlike here, the defendant is presumed innocent, have rejected this kind of sweeping, non-case specific argument.  See, e.g., United States v. Chambers, 20-CR-135 (JMF), 2020 WL 1530746 (S.D.N.Y. Mar. 31, 2020) (asthma); United States v. Michael Valdez, 19-CR-883 (JPO) (S.D.N.Y. Mar. 27, 2020) (asthma); United States v. Rivera, 20-CR-6 (JSR) (S.D.N.Y. Mar. 25, 2020) (asthma).  So too here.

### 2.    All Section 3553(a) Factors Weigh Against Shkreli's Release

Because Shkreli has not met his burden to show that there are "extraordinary and compelling reasons" that might permit his release at this time, the Court need not proceed to the analysis under Section 3553(a) as to whether release is indeed warranted.  See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.  However, if a Section 3553(a) analysis was conducted, it would weigh strongly against Shkreli's release.

First, Shkreli has served less than half of the 84-month sentence imposed by the Court, which imposed that sentence after carefully weighing the nature of Shkreli's crimes, his other actions, and his history and character.  The Court explained:

> Mr. Shkreli has clearly and repeatedly minimized his actions and the significance of the jury's verdict. In his letter to me, he admits not to his multitude of lies, but only that he dodged answering questions, he exaggerated if he felt that he had any basis to make the claim, and he provided answers that were only correct if put in a certain assumed context. He acknowledges that, quote, "These choices are now seen as attempts to deceive and manipulate," end of quote.

> To be clear, Mr. Shkreli's statements were not just seen as attempts to deceive and manipulate. They were actual and intentional deceptions and manipulations of his individual investors and public investors. Mr. Shkreli told investors that his hedge funds had tens of millions of dollars in assets under management and were extraordinarily successful. These were lies. None of what Mr. Shkreli characterizes as assumed context, basis for exaggeration, or alternative interpretations of facts would make them true.

32

Mr. Shkreli has also stated his expectation that, quote, he will be released with time served or in the worst case scenario get three to six more months of imprisonment.  In e-mails cited by the Government, Mr. Shkreli, in January 2018, wrote "fuck the Feds" and claimed that the Government would not be able to take all of his money.  … In another e-mail, Mr. Shkreli wrote that, quote, he had a lot of remorse but then stated that, quote, he will do  everything and anything to get the lowest sentence possible except to give up his constitutional rights. And I recognize that certainly Mr. Shkreli has every right to persist in his claim that he is innocent of the charges and to appeal his conviction, but these e-mails call into question the sincerity of his remorse in his letter to the Court …

Based on Mr. Shkreli's actions and statements, the Court cannot be confident that a minimal sentence of 12 to 18 months requested by the defense will deter Mr. Shkreli from future crimes or protect the public. The sentence I impose must therefore reflect the need to promote respect for the law and to deter Mr. Shkreli, specifically, from illegal conduct.

(Sentencing Tr. at 113-15).  The same rationale that guided the Court's initial sentence is fully applicable here.  Shkreli's statement that his offense did not involve violence (Shkreli Mot. 16) is both true and irrelevant.  The Court's sentence was imposed with a full understanding of the serious nature of Shkreli's crimes, as well as the actions he took that led the Court to impose sanctions on him, including remand for violation of his bail conditions for threatening others, and reflected a deep and well-founded concern that a shorter sentence would not properly reflect what he did or how he did it, or deter Shkreli from further illegal conduct.  Indeed, Shkreli's multiple disciplinary infractions while incarcerated—which included, as detailed above, failure to follow a direct order and two separate instances of deliberately circumventing BOP policy and deceiving BOP staff by sending money and mail through other inmates (Probation Resp. at 2)— demonstrate that Shkreli continues to believe that the rules do not apply to him.  Reducing Shkreli's sentence to less than half of what he was sentenced to serve would not in any event be warranted, but is particularly inappropriate light of this misconduct.  Cf., e.g., United States v. Credidio, No. 19 Cr. 111 (PAE), 2020 WL 1644010, at *1 (S.D.N.Y. Apr. 2, 2020) (explaining

the court denied a request to change a sentence of 33 months' imprisonment to home confinement for 72-year old defendant at MCC deemed by BOP to be at high risk of COVID-19 complications, because "a lengthy term of imprisonment is required for [the defendant] for all the reasons reviewed at sentencing"); United States v. Lisi, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *5 (S.D.N.Y. Feb. 24, 2020) (denying motion of defendant suffering from, among other things, asthma and high blood pressure; "The sentencing factors weigh heavily against the reduction of [the defendant's] sentence to time served."), reconsideration denied, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020).  Indeed, this misconduct strongly suggests that Shkreli cannot be trusted to follow any conditions of supervised release, including any that might be imposed to mitigate the risk of him not taking advantage of the COVID-19 pandemic to commit additional fraud.

Second, to the extent the Court chooses to reach Shkreli's argument that he will allegedly use his time after he is released to "develop[] a potential cure for COVID-19" that will "potentially help those who are suffering" (Shkreli Mot. 17-18), the Court should reject it.  As an initial matter, he offers no authority for the Court to conclude that such an alleged plan is a basis for release, or how it distinguishes him from any other defendant who claims that society would be better off if he were released because he will purportedly devote himself to its betterment.  In any event, Shkreli's contention that he must be released to work on a "potential cure" is belied by his own submission.  Despite his current incarceration, Shkreli claims he has already "devoted countless hours to developing a potential cure," provided the content of that work on a public web page and to a private pharmaceutical company, and communicated with that company about developing a treatment based on that work.  (Shkreli Mot. 18-19).  But

Shkreli has no formal scientific training and no experience working a laboratory setting, and he does not explain why he cannot continue to develop and discuss any ideas he may have about COVID-19 from prison, as he has.

Moreover, as Probation observes,  Shkreli's "belief that he can develop a cure for COVID-19, something that has so far eluded the best medical and scientific minds in the world working around the clock, is not only a practice in wild and completely unfounded speculation, but is indicative of the same kind of delusional self-aggrandizing behavior that underlies the defendant's conduct in the commission of the instant offense." (Probation Resp. at 2).  The government agrees.  And even if Shkreli were somehow able to develop a potential cure, there is no evidence that he would in fact use it to "contribute to the betterment of society," as he claims (Shkreli Mot. 19), rather than to enrich himself to the maximum extent possible, including by concealing his work or declining to provide such a cure to others unless he were paid an exorbitant sum.  As the evidence at trial demonstrated, Shkreli's involvement in the search for cures to diseases was primarily motivated by the potential to make tremendous profits.  (See Trial Tr. at 963-65 (testimony of investor Sarah Hassan).  This evidence is buttressed by Shkreli's track record, culminating in his decision as the CEO of Turing to inflate the price of Daraprim, which treats a deadly parasitic infection called toxoplasmosis that afflicts individuals with HIV/AIDS and transplant patients, from $13.50 per pill to $750.  Indeed, Shkreli, in reference to the company's acquisition of Daraprim, stated "$1bn here we come" in an email to the chairman of Turing's Board of Directors, in reference to the potential profit that Turing—including Shkreli and the rest of the company's shareholders—stood to

make.  (<u>See</u>  http://money.cnn.com/2016/02/03/news/shkreli-turing-daraprim-price-house-hearing/index.html).  Additionally, in December 2015, at the Forbes Healthcare Summit, Shkreli was asked about whether he would have done anything differently in relation to the Daraprim drug increase after he received significant negative publicity, and he replied, "I probably would have raised the price higher is probably what I would have done."  (<u>See</u> https://www.forbes.com/sites/matthewherper/2016/01/20/solving-pharmas-shkreli-problem/#4b0abb066be3).  He explained, "I could have raised it higher and made more profits for our shareholders."  (<u>Id.</u>).  There is no evidence that Shkreli has changed in this, or any other, respect.

        Third, despite Shkreli's repeated reference to agreeing to "serve the remainder of his prison sentence in home confinement" (Shkreli Mot. 1, 20-21), "the only way to grant [him] the relief [he] seeks (<u>i.e.</u>, release from prison) under Section 3582(c) is to reduce [his] sentence to time served—in other words, to <u>permanently</u> release [him]."  <u>Roberts</u>, 2020 WL 1700032, at *3 (emphasis in original); <u>see also</u> <u>United States v. Ogarro,</u> No. 18-CR-373 (RJS), 2020 WL 1876300, at *6 (S.D.N.Y. Apr. 14, 2020); <u>United States v. Miller</u>, No. 16-20222-1, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020); <u>United States v. Urso</u>, 03-CR-1382 (NGG), 2019 WL 5423431, at *1 (E.D.N.Y. Oct. 23, 2019); 18 U.S.C. § 3621(b).  In theory, the Court could so reduce Shkreli's sentence, and also order that he be confined to his fiancée's apartment for an additional period of time as a special condition of supervised release.  But even assuming <u>arguendo</u> that release to supervised release with a condition of home confinement after serving less than half of a prison sentence were otherwise consistent with Section 3553(a) in this case, such a condition here would be both effectively unenforceable, both because it is difficult to detect a violation generally, and for a violation to have consequences, Shkreli would have to be

returned to prison, after he has been exposed to multiple others in New York City at the height of the pandemic. [9]

## **CONCLUSION**

For the foregoing reasons, Shkreli's motion should be denied.

Dated:  New York, New York
       April 28, 2020

                                Respectfully submitted,

                                RICHARD P. DONOGHUE
                                United States Attorney

           By:    s/ Alixandra E. Smith
                              Jacquelyn M. Kasulis
                              Alixandra E. Smith
                              Assistant United States Attorneys
                              (718) 254-7000

cc:    Benjamin Brafman, Esq. (via ECF and email)
       Marc Agnifilo, Esq. (via ECF and email)
       Andrea Zellan, Esq. (via ECF and email)
       Jacob Kaplan, Esq. (via ECF and email)
       Teny Geragos, Esq. (via ECF and email)

---

[9] Moreover, Shkreli is seeking to be released from FCI Allenwood Low, where there are no cases of COVID-19 among staff or inmates, to an apartment in New York City, which is the epicenter of the COVID-19 crisis, with more than 157,700 confirmed cases and almost 12,000 deaths. (See https://www1.nyc.gov/site/doh/covid/covid-19-data.page, last visited on April 28, 2020 at 5:00 p.m.). Cf. United States v. Davenport, No. 17-CR-61 (LAP) (S.D.N.Y. Apr. 9, 2020) (Dkt. 255, at 2) (denying motion of defendant with diabetes and heart disease; explaining "that there are no current cases of COVID-19 at Schuylkill but that Haverford, the town in which [the defendant] proposes to be released, has one of the highest rates of COVID-19 infection in the Commonwealth of Pennsylvania").