# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE, 26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: ATTORNEYS@BRAFLAW.COM

BENJAMIN BRAFMAN

MARK M. BAKER
OF COUNSEL

MARC A. AGNIFILO
OF COUNSEL

ANDREA L. ZELLAN
JOSHUA D. KIRSHNER
JACOB KAPLAN
TENY R. GERAGOS
ADMITTED IN NY & CA
STUART GOLD

April 30, 2020

<u>VIA ECF</u>
Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    <u>United States v. Martin Shkreli</u>, Crim. No. 15-637 (KAM)

Dear Judge Matsumoto:

We respectfully request that the Court accept this Reply to clarify issues raised in the government's Response (Dkt. 732) to Mr. Shkreli's Motion for Compassionate Release (Dkt. 729).

<u>Exhaustion of Administrative Remedies under 18 U.S.C. § 3582(c)</u>

The government's Response argues at length against Mr. Shkreli's position that exhaustion of administrative remedies is not required in order for the Court to hear his motion for compassionate release. Given the urgent need for the Court to grant the relief requested, rather than refute the government's arguments on exhaustion, Mr. Shkreli instead directs the Court to the statute itself. The "compassionate release" provision of 18 U.S.C. § 3582(c) provides that the Court may modify a term of imprisonment upon motion of the Director of the Bureau of Prisons, upon the defendant's motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such request by the warden of the defendant's facility, whichever is earlier…" § 3582(c)(1)(A)(i).

Mr. Shkreli submitted his petition for compassionate release to Warden White on March 30, 2020, and today, April 30, 2020, marks the 30th day since that submission. The Bureau of Prisons ("BOP") has not moved this Court for Mr. Shkreli's release. Accordingly, regardless of whether or not Mr. Shkreli has exhausted his administrative remedies and regardless of whether

BRAFMAN & ASSOCIATES, P.C.

such exhaustion is required under 18 U.S.C. § 3582(c), the Court now has authority to address Mr. Shkreli's pending motion for compassionate release for the simple reason that 30 days have now passed.

Mr. Shkreli's BOP Disciplinary Record

Mr. Shkreli's disciplinary record should not stand in the way of his being released. Four infractions have been issued to Mr. Shkreli during his two and a half years of incarceration. The first two were issued in May 2018—within two days of his arrival at FCI Ft. Dix from MDC-Brooklyn. The two infractions were a result of Mr. Shkreli's misunderstanding of his work requirement once BOP placed him in the facility where he was expected to serve his sentence. Following those, his transition to FCI Ft. Dix was smooth. There have been no other infractions related to work or work requirements since those first two days at FCI Ft. Dix.

At FCI Allenwood Low, Mr. Shkreli's infractions were driven by both generosity and kindness. First, Mr. Shkreli's June 2019 infraction arose from his desire to send a friendly and harmless "miss you" to a fellow inmate. It occurred in June 2019 after his transfer to FCI Allenwood Low. He conveyed his greeting to the inmate by emailing his fiancé and asking her to share the greeting on his behalf because he could not communicate directly to his friend at Ft. Dix. He made this mistake openly and notoriously using TRULINCS which he knew to be BOP's monitored email system. That he chose to try to send a "miss you" message using a system that he knows is monitored suggests he did not realize that even a harmless greeting of this nature would be considered a violation of the BOP rules.

Second, Mr. Shkreli's most recent violation occurred in August 2019. Once again, Mr. Shkreli's conduct violated the BOP rules, but the conduct was not driven by malevolence or arrogance, or disrespect for the BOP. It was driven by an act of generosity toward someone in need. This is not the first time that Mr. Shkreli has been moved by the hardship faced by another inmate.[1] This Court may recall that at the time of his sentence, undersigned Counsel submitted numerous letters from inmates, some of whom had benefitted from Mr. Shkreli's financial generosity.[2] (*See* Dkt. 538-1 at Ex. 48, Letter of Patrick Sutherland: "Martin found out that my

---

[1] At Mr. Shkreli's sentencing, he told this Court: "Prison has been a life-changing experience. I'm not going to complaint about life in jail. The hardest part is really seeing this sad world around you. There's a very sad world around me for the first time. I took comfort in a suicidal inmate who has several felonies and incarcerated life as in showing a man who didn't attend high school that they can go from accounting to calculus if they work hard enough and have a teacher they can trust. This has been a life-changing experience for me. And having the ability to help these inmates is a silver lining. Because of the support letters, Your Honor knows I love to teach and help people in need. I have a calling that energized me far greater than any Internet or antic scam. These inmates know me. They like me and trust me. I speak their language. I grow up in similar conditions in many cases and they can identify with me." (Tr. at 66:5-20.)

[2] This Court noted Mr. Shkreli's generosity with inmates at the MDC at Mr. Shkreli's sentencing: "More recently, Mr. Shkreli has taught his fellow inmates at MDC, one of whom writes that Mr.

2

**BRAFMAN & ASSOCIATES, P.C.**

twins who were born months early was still in the NICU he had diapers, wipes and various supplies send (sic) to my girlfriend. That was the most caring gesture anyone has done for my family in these stressful times and it shows the true character of Martin Shkreli"; Ex. 42, Letter of Kenneth McCarthy; Ex. 47, Letter of Lamark Mulligan.)

To be sure Mr. Shkreli's acts of generosity violate BOP's rules. However, to suggest that this generosity or any of his other three infractions are evidence that he continues to defy all the rules, the government, and to disrespect the rule of law is unfair. On the contrary, he is paying his debt to society to the best of his ability and working hard to maintain some hope for his own future while encouraging and fomenting that hope in fellow inmates.

Mr. Shkreli's Scientific Efforts to Help Find Treatment for COVID-19

Mr. Shkreli's effort to find a treatment or vaccine for COVID-19 does not on its own constitute a basis for compassionate release. Indeed, that is not his position. His position rather is that in assessing the Section 3553(a) factors, as the compassionate release statute requires, it is appropriate for this Court to consider his "history and characteristics" and how those characteristics have manifested during incarceration since the time of his sentence. It is necessary, therefore, that the Court to consider Mr. Shkreli's past and potential future work on COVID-19.

The government and the Department of Probation suggest that Mr. Shkreli's efforts to work on COVID-19 are nothing more than "self-aggrandizing" exaggerations with the intent to capitalize on the pandemic for his own benefit. (Govt. Response at p. 36; Probation Response at p. 2.) The government forgets that at the time of sentence, Dr. Horatio Plotkin, the former Chief Medical Officer of Retrophin and Dr. Howard Trachtman, a leading pediatric nephrologist at NYU Langone Health submitted letters of support in which they applauded Mr. Shkreli's leadership in the development of treatment for orphan diseases and his scientific prowess. (*See* Dkt. 538-1 at Ex. 10, Letter of Dr. Plotkin: "On the other hand his insight in the world of science is agreed upon many scientists and clinicians. He had no formal science education or training, and maybe in part because of that, he was able to think out of the box and repurpose a drug that was developed for hypertension for the treatment of a rare kidney disease called FSGS");[3] Dkt. 553-1 at Ex. 55, Letter

---

Shkreli is an inspiring and patient teacher and has been the most positive and influential part of his experience." (Tr. at 107-108:1-3.)

[3] Dr. Plotkin's quotation referred to the drug Sparsentan, Sparsentan, according to Retrophin's website, "a novel small-molecule candidate in Phase 3 development for the treatment of focal segmental glomerulosclerosis (FSGS), a serious kidney disorder that often leads to end-stage renal disease (ESRD). The US Food and Drug Administration (FDA) and European Medicines Agency (EMA) have granted sparsentan orphan drug designation for FSGS. Retrophin also is advancing sparsentan for the treatment of immunoglobulin A nephropathy (IgAN), or Berger's disease, which also can lead to ESRD. Retrophin is examining the ability of sparsentan to slow the decline of kidney function in patients with FSGS and IgAN."
http://www.retrophin.com/content/pipeline/sparsentan.php.

BRAFMAN & ASSOCIATES, P.C.

of Dr. Trachtman: "In my professional interactions with Mr. Shkreli, I have known him to be a brilliant and innovative thinker. He has been able to come up with novel approaches to treat serious clinical conditions and implement clinical research programs to test these treatments. He has been successful even though he has no formal medical training.") Even government witness Stephen Aselage testified regarding Mr. Shkreli's impressive intellectual ability and scientific capability. (Tr. at 3307:13-14: "He was bright, articulate, energetic and I thought visionary"; Tr. at 3339:19-20: "He is a brilliant intellect and a visionary.")

When COVID-19, a novel illness with no known treatment or vaccine, appeared and began to inflict untold suffering across the world, Mr. Shkreli voluntarily turned his time, skill and intellectual energy to helping to end the suffering. Soon, Mr. Shkreli thought he had an idea worth pursuing, so he contacted former colleagues whom he believed would take him seriously. Those colleagues helped him do some initial tests of his ideas and to then make his ideas available to the public. Mr. Shkreli and his colleagues did that without pursuing any compensation for any of their work.

Mr. Shkreli understood that his efforts would be greeted with considerable skepticism. When the ideas were made public, at the end of the paper he clearly and unequivocally stated:

> For the avoidance of doubt, I have not been paid for any work on this matter or any other matter while incarcerated. *I do not expect to profit in any way, shape or form from coronavirus-related treatments*. I believe any company developing a coronavirus drug should seek to recoup its cost at most and be willing to perform the work as a civil service at the least. If the government is willing to reward industry for their work on this catastrophic situation, it will be at each company's discretion to accept, negotiate or deny such funding, including bulk purchases, cost reimbursement, tax credits and other benefits.

https://prosperopharma.com/covid19.pdf, at p. 4 (emphasis added).[4]

Mr. Shkreli unquestionably comes to the table as a man many people dislike and distrust, but he also comes with an intellect, drive and creativity that are rare—a conclusion that is readily admitted by even his most ardent detractors. Indeed, a fact that, most respectfully, was acknowledged by the Court during the sentence hearing.[5] In the face of this unprecedented worldwide health crisis, no one—not even Martin Shkreli—should be discouraged by our government from lending a hand. Mr. Shkreli has put his scientific theories forth into the world for consideration, acceptance or rejection by the public and the scientific community. He is not keeping his ideas to himself and asking us to trust him. He has reduced these concepts to writing

---

[4] Mr. Shkreli also indicated in this paper that he would be requesting that the BOP grant him a brief three-month furlough to pursue the research described by the paper. (*Id*.) Mr. Shkreli has requested a furlough in addition to appealing the denial of his compassionate release petition.

[5] This Court recognized, "I do believe that you have the capacity to make a difference in the area of orphan drugs and to help many people in need." (Tr. at 118:13-15.)

BRAFMAN & ASSOCIATES, P.C.

for the world to see and evaluate. Regardless of whether these concepts lead to a cure, they are at a minimum a serious, good faith effort to find one. Rather than belittling such good faith, transparent, verifiable efforts to cure COVID-19, one would think our government would seek to foster such efforts. It simply cannot be that Martin Shkreli is so reviled by the government that it would rather mock him and criticize his efforts than begrudgingly admit that seeking a cure for COVID-19 is something every able-bodied human should pursue, even if that person is in jail at the time.

One additional point should be made in closing this section. Mr. Shkreli is not doing this alone. Indeed, he has motivated his company and its personnel to literally survey the globe for approaches to curing this disease. Studies from all corners of the globe are being found, catalogued and reviewed. The dedicated scientists behind these studies are being contacted and are being asked how Prospero may assist them in their research. This is precisely the sort of cooperation and coordination that will eventually lead to a cure, and this is exactly what Mr. Shkreli has been doing and will continue to do, whether it be from a safe location or from his prison cell. However, there is no doubt he would be more effective from a safe location outside of prison.

The Extraordinary and Compelling Circumstance of COVID-19 and the BOP

1. Mr. Shkreli's Health

The government response attacks Mr. Shkreli's contention that he is at serious physical risk from COVID-19 by suggesting that his allergies do not constitute a health threat and that his asthma is a recent fabrication. (Govt. Response at pp. 10-11; Probation Response at p. 1.)

Regarding the government's contention that Mr. Shkreli recently fabricated his asthma, it is regrettable that Mr. Shkreli failed to apprise Probation and the BOP of his history of allergic asthma and only identified his allergies as the problem. However, when Mr. Shkreli was undergoing his psychological evaluation in 2017 prior to sentencing, he reported both significant asthma and allergies. Specifically, the Evaluation states, "[Shkreli's] medical history is significant for asthma and allergies." (*See* Report provided to Court and government on 2/7/18 at p. 1.) Counsel submitted the report to both the Court and the government.

Counsel has also confirmed with Mr. Shkreli's sister, Leonora Izerne, that as children, both she and her brother suffered episodes of allergic asthma that caused shortness of breath and required medical attention and medication. She recalls that Mr. Shkreli suffered with seasonal allergies, allergies to cleaning agents and heavy chemicals. Additionally, Counsel confirmed through telephone interviews with Mr. Shkreli's father, Pashko Shkreli, that when Mr. Shkreli was an infant, Mr. Pashko Shkreli took Mr. Shkreli to the hospital because his breathing was labored. He also recalls that more recently, in 2009 or 2010, when Mr. Shkreli was in his mid 20s, he suffered an asthma attack that was severe enough to interfere with normal breathing causing his

5

**BRAFMAN & ASSOCIATES, P.C.**

father to rush him by ambulance to New York County Hospital, located at 2525 Kings Highway in Brooklyn where he was treated and later released.[6]

2. <u>Risk Presented by COVID-19</u>

The fact that Martin Shkreli's documented health history does not place him in the highest risk category for severe complications from COVID-19 does not end the discussion as to whether extraordinary and compelling circumstances exist. According to the CDC, people with moderate to severe asthma, particularly if not well controlled, might be at higher risk of getting very sick from COVID-19.[7] As we explained in our initial motion and will not repeat here, this is a novel virus that is killing more older men but is also killing younger people too. What we know about the virus and how it infects and how it kills is evolving. No one should be considered immune or "safe" from the ravages of this virus.

In fact, on April 25, 2020 *The Washington Post* reported that "strokes in the young and middle-aged—not just at Mount Sinai, but also in many other hospitals in communities hit hard by the novel coronavirus—are the latest twist in our evolving understanding of the disease it causes. The numbers of those affected are small but nonetheless remarkable because they challenge how doctors understand the virus."[8] The article continues "[e]ven as it has infected nearly 2.8 million people worldwide and killed about 195,000 as of Friday, its biological mechanisms continue to elude top scientific minds. Once thought to be a pathogen that primarily attacks the lungs, it has turned out to be a much more formidable foe—impacting nearly every major organ system in the body."[9]

The stroke phenomenon reported by the *Post* is occurring in people in their 30s (Mr. Shkreli is in his 30s). According to Robert Stevens, a critical care doctor at Johns Hopkins Hospital in Baltimore, "strokes [are] 'one of the most dramatic manifestations' of the blood-clotting issues. 'We've also taken care of patients in their 30s with stroke and covid, and this was extremely

---

[6] As this Court may recall, government witness Mr. Steve Richardson testified at trial regarding Mr. Shkreli's frequent ill-health: "And another area was his health … He was from, you know, speaking with him and seeing his emails quite often having colds and headaches…" (Tr. at 2785:23-2786:1; "Quite often in his emails he said I have a headache. I have a headache. I have a cold." (Tr. at 3008:23-24.)
[7] https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Patients-with-Asthma.
[8] https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/.
[9] *Id. (emphasis added)*; *See also* https://www.theguardian.com/world/2020/apr/09/why-do-some-young-people-die-of-coronavirus-covid-19-genes-viral-load ("The disease generally causes serious problems only in older people. But occasionally it strikes down young, apparently fit individuals, including medical staff exposed to patients with the virus. In some cases, previously undiagnosed conditions are later revealed but in others no such explanations are available, leaving scientists struggling to find reasons for the behavior of the coronavirus.")

BRAFMAN & ASSOCIATES, P.C.

surprising,' he said."[10] On average, the COVID-19 stroke patients were 15 years younger than stroke patients without the virus.

In early April 2020, the World Health Organization ('WHO") warned young people worldwide that COVID-19 was killing younger people, not just members of the older population, and stated that more younger people in Europe were contracting the virus and dying.[11] Some of those who died had underlying conditions and some did not.[12] In addition, Maria Van Kerkhove, head of the WHO's emerging diseases and zoonosis unit, advised that "[m]uch remains unknown about the virus, including why the disease develops into a severe illness in some individuals but not others."[13]

The government is not alone in ignoring the plain truth that scientists are telling—that we are in uncharted territory. The medical and scientific community is doing its best to learn as much as it can as fast as it can, but currently, they are far from understanding how this disease kills and they are even further from a treatment or vaccine. As the evidence mounts that the disease is indiscriminate and can kill a 30-year-old or an 80 year old, a diabetic or a healthy person, kill by stroke or by heart failure, our efforts to cabin our fears by identifying one segment of the population as being in the greatest jeopardy are utter folly. Mr. Shkreli, like everyone in the world, is in jeopardy. But Mr. Shkreli's jeopardy is heightened by two facts. One, he has a respiratory ailment that may exacerbate his illness if he contracts COVID-19. And two, he is incarcerated and the disease will spread through his prison like wildfire and cause devastation just as it is doing to nursing homes.

---

[10] https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/ *See also*https://www.huffpost.com/entry/hundreds-young-people-dead.coronavirus_n_5e8ebea0c5b6b371812bf71a ("An earlier analysis by the Centers for Disease Control and Prevention found that younger Americans were making up a sizeable bulk of known coronavirus hospitalizations. Adults aged 20 to 54 accounted for 38% of those who required hospital treatment, the agency said in March. Among 121 patients known to have been admitted to the intensive care unit, 48% were under the age of 65, the CDC added.….As the Post noted this week, many young people hospitalized because of COVID-19 had preexisting conditions like hypertension and asthma. But some younger patients have suffered severe outcomes even without a history of health problems.)
*But see,* "In the vast majority of younger adults, covid-19 appears to result in mild illness with the risk of more severe consequences rising with every decade of age. According to Centers for Disease Control and Prevention data, 0.8 percent of U.S. deaths as of Apr. 18 were in people ages 25 to 34; 2 percent among those 35 to 44; and 5.4 percent among those 45 to 54." https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/
[11] https://www.cnbc.com/2020/04/03/who-says-more-and-more-young-people-are-dying-from-the-coronavirus.html
[12] *Id.*
[13] *Id.*

7

BRAFMAN & ASSOCIATES, P.C.

### 3. BOP Efforts to Protect Inmates from COVID-19 Have Failed

The BOP efforts to hold COVID-19 at bay and prevent inmate deaths are failing. When we petitioned Warden White on March 30, 2020 a single inmate had died of COVID-19. When we filed our motion for compassionate release one week ago, twenty-four inmates had died. As of April 29, 2020, seven more inmates had died, bringing the total number of inmate deaths to 31. The number of inmates who have tested positive skyrocketed from April 22, 2020 when it was 566 to April 29, 2020 when it stood at 1534. Certainly, the tripling of positive inmates has to do with the increased use and availability of testing,[14] but that does not change the fact that six weeks ago, on March 20, 2020, there were zero infected inmates. (*See* Exhibit A, Charts Prepared by Federal Defenders Tracking Infections within BOP – Updated.)

Moreover, on April 29, 2020, it was reported that over 70% of tested inmates are positive for COVID-19.[15] Given that as of April 30, 2020 there are 44,366 people in Pennsylvania who have tested positive and that 70% of the tested BOP inmate population tested positive,[16] it is unfathomable, that Allenwood has no positive inmates. The government reports that there are no positive inmates at Allenwood Low, but interestingly leaves out whether they are actually conducting tests of asymptomatic inmates and staff to determine whether there are carriers and/or infected individuals present within the facility.[17]

As detailed in our initial submission, the environment in any prison or jail, where the bare minimum measure of social distancing, cleaning hands, and regularly sanitizing shared space is not feasible, is an environment that accelerates and feeds the spread of disease.[18] Attorney General Barr directed BOP that non-violent inmates be released as a prophylactic measure to curtail spread of the disease, indicating that extraordinary and compelling circumstances exist for such offenders, even those who are not categorized as "high risk" for severe illness or death if infected. Yet here, the government adopts the position that a non-violent first-time offender, with a desire and capacity to use his skills to help stop the suffering inflicted by this pandemic, should not be granted compassionate release to home confinement to complete his sentence.

This Court sentenced Mr. Shkreli to a serious period of confinement after considerable deliberation. However, the circumstances have evolved since the imposition of that sentence and the Court is now presented with extraordinary and compelling circumstances foisted upon Mr.

---

[14] https://www.bop.gov/resources/news/20200424_expanded_testing.jsp
[15] https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f.
[16] https://www.health.pa.gov/topics/disease/coronavirus/Pages/Coronavirus.aspx.
[17] In recent days, Allenwood facilities have been removed from the detailed scroll down list of facilities found at https://www.bop.gov/coronavirus/.
[18] It was recently reported to the undersigned that staff at FCI Allenwood Low has decided not to give out anymore surgical masks. Inmates will receive 3 cloth masks that they will have to wash, like laundry. The laundry is communal laundry inmates do not find it effective. Laundry is sent out in bins, and inmates do not actually witness its washing. The idea of putting masks in laundry with our people's clothing and then wearing it one's face does not seem optimal for infection control purposes.

BRAFMAN & ASSOCIATES, P.C.

Shkreli by a pandemic fueled by a poorly understood virus. We ask the Court to consider whether a punishment that requires Mr. Shkreli to live in fear of a deadly illness and helpless to protect himself from the illness is proportionate to the crimes of conviction.[19]

Conclusion

For all the foregoing reasons and the reasons detailed in our initial submission, we think it is disproportionate to the crimes of conviction. We implore the Court to resentence Mr. Shkreli to complete the balance of his 84 months of incarceration on home confinement.[20]

We thank the Court for its courtesy and patience in this and all other matters.

Respectfully submitted,

/s/
Benjamin Brafman
Marc A. Agnifilo
Andrea L. Zellan
Teny R. Geragos

cc: Counsel for the government (via ECF)

---

[19] *See United States v. Jonathan Dillard*, No. 15-Cr-170 (SAB) (D. Idaho), ECF Doc. 71, (4/27/2020 Opinion & Order).

[20] We note that the government is concerned that Mr. Shkreli's release plan would release him to New York City—the epicenter of the pandemic in the United States. In our initial submission, we alerted the Court in footnote 29 that Mr. Shkreli has an alternative location in Kansas with his fiancé and her parents. (*See* Dkt. 729 at n. 29.) He is certainly prepared to serve his home confinement in that location in Kansas and offered New York as his first option in order to facilitate contact with attorneys in ongoing civil litigations, one pending before this Court, one before the Southern District of New York, as well as others.

9