UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        v.

MARTIN SHKRELI,

            Defendant.

Case No. 15-cr-637 (KAM)

---

**MARTIN SHKRELI'S SECOND EMERGENCY MOTION FOR
COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

---

**BRAFMAN & ASSOCIATES, P.C.**
*Attorneys for Martin Shkreli*
767 3rd Avenue, 26th Fl.
New York, New York 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

Benjamin Brafman
Andrea Zellan
Stuart Gold
     *Of Counsel*

## I.      **INTRODUCTION**

Federal inmate Martin Shkreli (BOP Register # 87850-053), through undersigned counsel, files this motion, under 18 U.S.C. § 3582(c)(1)(A), for an order granting him "compassionate release," reducing his prison sentence to time served,  and converting the unserved portion of the original prison term to a supervised release term that includes the conditions of home confinement with constant electronic monitoring, the conditions set forth in the underlying judgment of conviction, and any other liberty-restricting conditions deemed appropriate by this Court.[1]  In the alternative, Mr. Shkreli moves for an order reducing his prison term by an amount deemed appropriate by the Court and converting the unserved portion of the original prison term to a supervised release term that includes the above-mentioned conditions.

If the Court denies the remedies requested, Mr. Shkreli respectfully requests that the Court recommend that the BOP grant Mr. Shkreli unlimited telephone and/or virtual meeting access to his attorneys representing him in the FTC litigation that is currently pending in the Southern District Of New York before the Honorable Denise L. Cote.  We request that the recommendation include that the unlimited access continue through the end of the FTC litigation.  This step might mitigate the damage to Mr. Shkreli's rights caused by what is currently constitutionally inadequate access to counsel in the FTC litigation.[2]

---

[1] On April 22, 2020, Mr. Shkreli moved for compassionate release based on his susceptibility to COVID-19 illness and his ability to conduct further research on treatments for COVID-19.  (ECF No. 729).  The Court denied that motion.  (ECF No. 734).  The present motion is premised on changed circumstances in the facility where he is incarcerated, as well as different grounds than the April 2020 motion.

[2] On November 25, 2020, Mr. Shkreli moved for a stay of the discovery proceedings in the FTC litigation. (S.D.N.Y. 20-cv-706, ECF No. 317).  As of the date of the present filing, Judge Cote has not issued a decision on the stay motion.  Despite the pendency of the stay motion, Judge Cote ordered (on December 22, 2020) that Mr. Shkreli's deposition proceed on January 27 and 28, 2021.  (*Id.*, No. 367).  Accordingly,  within this motion, we argue that Mr. Shkreli's continued incarceration is resulting in the deprivation of  his constitutional rights to access counsel in the FTC proceeding and that the

The Bureau of Prisons ("BOP") facility at FCI Allenwood Low is in the midst of a severe COVID 19 outbreak. As of December 23, 2020, 136 inmates and 9 staffers at FCI Allenwood Low have tested positive for the virus.  The entire facility is on lockdown, which has put a great strain on his mental health.  Not only is Mr. Shkreli's physical and mental health in severe jeopardy,  his meaningful access to legal counsel for purposes of fighting a civil case brought against him by the Federal Trade Commission ("FTC") has been effectively stripped away by the health and safety requirements that the BOP must impose due  to this insidious pandemic.

Given the COVID-19 restrictions and staff shortages at FCI Allenwood Low, the BOP cannot protect Mr. Shkreli's constitutional right to meaningfully communicate with his attorneys in the civil case.  The FTC case has entered the fact-intensive deposition phase of pretrial proceedings and is proceeding at a rapid pace. (*See generally* Ex. 1: Decl. of Kandis L. Kovalsky). Due to the BOP's restrictions on visitation, legal calls, and video conferencing, Mr. Shkreli is suffering substantial prejudice to his defense against the action.  He has been unable to adequately and meaningfully contribute to his civil attorneys' preparation for the depositions that have already occurred or the upcoming depositions.  The resulting prejudice and harm to Mr. Shkreli's  defense against the action is now accruing daily in a case that threatens his prospective income and his professional future, and the need for him to meaningfully access counsel and defend against the action constitutes an extraordinary and compelling circumstance necessitating his release.

Reducing Mr. Shkreli's prison sentence will safeguard his health, his life, and his constitutional right of access to his civil counsel.

---

deprivation constitutes an extraordinary and compelling circumstance that, together with the current COVID-19 outbreak at FCI Allenwood Low, warrants that he be granted compassionate release at the earliest possible moment.  When Judge Cote renders a decision on the pending stay motion, we will alert the Court and the Government.

## II.    RELEVANT BACKGROUND

### A.    Mr. Shkreli's Conviction and Sentence

In August 2017, Mr. Shkreli was convicted of securities fraud and conspiracy to commit securities fraud.  (ECF No. 583 (Amended Judgment) at 1).  The Court sentenced him to 84 months of imprisonment (with credit for time served) and 3 years of supervised release, and ordered him to pay $388,336.49 in restitution, $7,360,450 in forfeiture, $300 in special assessments, and a fine of $75,000.  (*Id.* at 2–7; ECF No. 680 (Forfeiture Order)).  Mr. Shkreli has paid more than two-thirds of his forfeiture obligation and has fully satisfied the other monetary portions of his sentence. (ECF No. 741 (Satisfaction of Judgment)).

Mr. Shkreli has been incarcerated since September 13, 2017, and he is currently serving his prison sentence at the Allenwood Low Security Federal Correctional Institution ("FCI Allenwood Low") in Pennsylvania.  *See* https://www.bop.gov/inmateloc/ (last visited Dec. 23, 2020).  Based on credits for time served and good behavior in prison, Mr. Shkreli's current projected release date is September 14, 2023.  *See id.*  However,  Mr. Shkreli could be released to a halfway house as early as September 14, 2021.  (Ex. 2:  Decl. of BOP Consultant Jack T. Donson ¶ 24); *see* 18 U.S.C. § 3624(c)(1)–(2).

### B.    Mr. Shkreli's Mental Health

Mr. Shkreli suffers from ███████████████████████ disorders.  (PSR ¶¶ 89–92; Ex. 3: BOP Medical Records).  He also has erratic sleep patterns, including trouble falling asleep. (PSR ¶ 91).  Mr. Shkreli has missed several doses of his ████ disorder medication (████████) during his stay in prison, including once during a lockdown in 2017, and so "is always worried that he will miss his dose."  (*Id.* ¶ 89).  When Mr. Shkreli misses a dose of ███████ he feels "an electric shock-like sensation in the brain."  (*Id.*).

3

### C.        Mr. Shkreli's Behavior in Prison

Although Mr. Shkreli incurred several disciplinary violations during his time in prison, his disciplinary record has been clean since September 2019.  (Ex. 4: Inmate Discipline Data, dated 9/10/2020).  Moreover, the BOP has classified Mr. Shkreli as a low risk to reoffend, as reflected by his low score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Needs).[3]  (*See* Ex. 5: Inmate Request to Staff Response, dated 4/14/2020).

### D.        The Civil Antitrust Investigation and Complaint Against Mr. Shkreli

Between 2015 and 2019, the FTC and the New York Attorney General ("NYAG") investigated Mr. Shkreli, Kevin Mulleady, and two of their companies (Vyera Pharmaceuticals, LLC, and its parent company, Phoenixus AG) for possible violations of antitrust laws.[4]  As part of the five-year investigation, the FTC and NYAG gathered more than 180,000 documents, conducted 11 investigational hearings, and received testimony and a multitude of other information from dozens of third parties.  It was not until around December 20, 2019, that Mr. Shkreli learned that he was a target of the investigation.  (Ex. 1 ¶ 5).

On January 27, 2020, the FTC and New York State filed a civil complaint in the Southern District of New York against Mr. Shkreli, Mulleady, Vyera, and Phoenixus (collectively, the "FTC Defendants"), alleging that the FTC Defendants engaged in a scheme "to block lower-cost generic drug competition to Daraprim, an essential drug used to treat the potentially fatal parasitic infection

---

[3] An inmate's PATTERN score is based on (among other factors) the number of infraction convictions and the number of "beneficial programs" completed.  U.S. DEP'T OF JUSTICE, THE FIRST STEP ACT OF 2018: RISK AND NEEDS ASSESSMENT SYSTEM, at 45 (2019), *available at* https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system_1.pdf.

[4] Mr. Shkreli is the founder of both Vyera and Phoenixus, and is the largest shareholder of Phoenixus. *See Fed. Trade Comm'n v. Vyera Pharm., LLC*, No. 20-cv-706, 2020 WL 4891311, at 4 (S.D.N.Y. Aug. 18, 2020).

toxoplasmosis." (S.D.N.Y. 20-cv-706, ECF No. 4 (Compl.) ¶ 1). Six more states (California, Ohio, Pennsylvania, Illinois, North Carolina, and Virginia) were later added as plaintiffs. (*Id.*, ECF No. 91 (Amended Compl.) ¶¶ 18–23). The FTC Plaintiffs claim that the FTC Defendants violated dozens of antitrust laws, including unlawful monopoly maintenance under Section 2 of the Sherman Act (15 U.S.C. § 2), marking the first time that an individual has been charged with unlawful monopoly maintenance under the Sherman Act. (*Id.* ¶¶ 314–64). Among other forms of relief, the FTC Plaintiffs seek "equitable monetary relief," "civil penalties/forfeiture," and a permanent injunction barring Mr. Shkreli "from owning in part or whole or working for a company engaged in the pharmaceutical industry." (*Id.* at 74–78).

### E.   Mr. Shkreli's Confidential Communications With Civil Counsel Between December 20, 2019, and March 10, 2020

Between December 20, 2019 (when Mr. Shkreli learned that he was a target of the investigation) and January 27, 2020 (when the FTC Action was filed), Mr. Shkreli was allowed only two confidential legal (i.e., unmonitored) phone calls with Kandis L. Kovalsky or his other attorneys in the FTC Action (Mr. Shkreli's "Civil Counsel"). Specifically, on January 2, 2020, Mr. Shkreli and Civil Counsel had a 60-minute legal call, almost all of which was dedicated to issues relating to engagement of counsel. And on January 16, 2020, Mr. Shkreli and Civil Counsel had a 15-minute legal call, which was his first and only opportunity to confidentially discuss facts and strategy with his attorneys before the antitrust lawsuit was filed. (Ex. 1 ¶ 17 ).[5]

---

[5] At FCI Allenwood Low, legal calls are typically prioritized for imminent court deadlines and are typically limited in both duration and frequency. (Ex. 2 ¶¶ 7, 12).

Legal calls are the only adequate way for Mr. Shkreli to confer confidentially with Civil Counsel. Mr. Shkreli cannot confer privately with his attorneys via email. *See United States v. Mejia*, 655 F.3d 126, 132–35 (2d Cir. 2011) (holding that "a prisoner's communication, which the prisoner knows is being recorded by prison authorities, is [not] covered by the attorney-client privilege"). Although he could confer privately with Civil Counsel via legal mail (which is transmitted by the USPS), that is an inefficient and impractical way for an attorney to communicate with a client, especially in the fast-

On the evening of February 4, 2020 (a Tuesday), Ms. Kovalsky sent an email to two of Mr. Shkreli's BOP counselors, requesting an emergency legal call for February 5 or 6, 2020. Although Ms. Kovalsky sent a follow-up email about the request on the afternoon of February 5, 2020, she did not receive a response until February 10, 2020, when one of the counselors (Counselor Torres) emailed Ms. Kovalsky the following:

> I apologize for last week, I have not been in the Institution since last Monday. Did Rothermel [the other counselor] get back to you? For the future, Rothermel is no longer Shkreli's Unit Manager. His new Unit Manager is Angela Dewalt. Let me know what you need and I will talk with Dewalt to see what we can do for you.

Counselor Torres later granted Ms. Kovalsky a 15-minute call for February 12, 2020. Ms. Kovalsky requested a longer call, explaining that "Mr. Shkreli was recently named in a new lawsuit brought by the Federal Trade Commission," that the "matter is very serious," and that "there are a number of items that need Mr. Shkreli's immediate consent and approval." (*Id.*). Counselor Dewalt then sent Ms. Kovalsky the following email:

> Unfortunately with limited staffing, we can only accommodate legal calls if there is an urgent, and imminent court date in which a legal visit, or legal materials sent

---

paced FTC Action involving voluminous amounts of discovery and multiple upcoming depositions that will necessarily involve strategizing in real time. Mr. Shkreli's Civil Counsel need to have frequent interactions with him to have the benefit of his factual knowledge required for meaningful representation during the deposition phase of the case where he may know the facts surrounding important discovery topics, and where his factual knowledge will inform his attorneys advice and strategy for conducting depositions. Moreover, legal mail to/from Mr. Shkreli has sometimes arrived in an opened manner, meaning that BOP staff opened the mail before delivering it to him and potentially scanned it into the BOP's records.

Finally, in-person legal visits have not been viable. For all but one month, BOP policy has barred all in-person meetings since the FTC Action was filed on January 27, 2020. (*See* Ex. 1 ¶ 38). Between January 17, 2020, and February 14, 2020, Allenwood was closed due to an outbreak of norovirus. (*Id.* ¶ 43). On March 13, 2020, Allenwood—along with all other federal prisons—was closed for legal visitations because of the COVID-19 pandemic. (*Id.* ¶ 43). To this day, Mr. Shkreli has not been able to meet with Civil Counsel in person, or even via video, to discuss his defense in this case. Now, Allenwood is closed to visitors, as a result of a recent outbreak of positive cases in the Medium and the Low facilities. Risks to the health/safety of Shkreli, the BOP, other inmates, and counsel foreclose visits at this time.

via mail would not reach the inmate in a timely manner.  Our procedure is to allow
a 15 minute phone call for an attorney in order to allow all inmates access.

From my understanding, Unit Team has extended the time allotment in the past in
an effort to accommodate your client, but with the increase in appeals and filings
for all inmates, we must again return to our protocol.

Ms. Kovalsky did have a 15-minute call with Mr. Shkreli on February 12, 2020; although Ms.
Kovalsky needed to explain to Mr. Shkreli the import of the FTC complaint and discuss strategy,
she had to devote most of the short call to engagement of counsel and related matters.  Mr. Shkreli
was not granted another legal call until March 10, 2020, when he was allowed a 15-minute call
with Civil Counsel.  (Ex. 1 ¶¶ 51–60).

## F.    FCI Allenwood Low's COVID-19 Restrictions

On March 13, 2020, the BOP "deployed" several national measures to reduce the spread
of COVID-19, including two restrictions on legal visits:

**SOCIAL VISITS:** Social visits will be suspended for 30 days, at which time the
suspension will be reevaluated.  To ensure inmates maintain social ties, the BOP
will allow for additional inmate telephone communications.  Inmates will be
allowed 500 (vs. 300) telephone minutes per month.

**LEGAL VISITS:** Access to legal counsel remains a paramount requirement in the
BOP but like social visiting, the BOP is mitigating the risk of exposure created by
external visitors.  As such, while in general, legal visits will be suspended for 30
days, case-by-case accommodation will be accomplished at the local level and
confidential legal calls will be allowed in order to ensure inmates maintain access
to counsel. . . .

**MODIFIED OPERATIONS:** For the next 30 days, the BOP will implement
nationwide modified operations to maximize social distancing and limit group
gatherings in our facilities.  For example, depending on the facility's population and
physical layout, the institution may implement staggered meal times, recreation,
etc.  These modifications will be reevaluated in 30 days.

https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Subsequently, the BOP ordered that between April 1 and May 18, 2020, "inmates in every
institution will be secured in their assigned cells/quarters to decrease the spread of the virus" and

"[l]imited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access." https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last updated Mar. 31, 2020); https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (Apr. 14 2020)).

On September 30, 2020, the BOP announced the following:

[S]ocial visits are being reinstated, where possible to maintain the safety of our staff, inmates, visitors, and communities.

Each individual institution has made plans consistent with their institutional resources (including physical space) and will continuously monitor their visiting plan, and make prompt modifications, as necessary, to effectively manage COVID-19. Such modification may include limiting or postponing visitation, providing visitation by appointment, or other adjustments as appropriate.

All visits will be non-contact and social distancing between inmates and visitors will be enforced, either via the use of plexiglass, or similar barriers, or physical distancing (i.e., 6 feet apart). Inmates in quarantine or isolation will not participate in social visiting. The number of visitors allowed in the visiting room will be based on available space when utilizing social distancing. The frequency and length of visits will be established to ensure all inmates have an opportunity to visit at least twice a month. Visitors will be symptom screened and temperature checked; visitors who are sick or symptomatic will not be allowed to visit. . . .

https://www.bop.gov/resources/news/20200902_visitation.jsp.

FCI Allenwood Low reopened for visitors on October 1, 2020. It closed to all visitors on December 7, 2020. That day, the Warden issued the following operations update in an Inmate Bulletin: "Inmate movement is restricted solely to the housing-units in assigned cubicles. There is no compound movement, including work details. All meals pill line, sick-call, etc., will be conducted in the housing-units. Staff access to housing units is also limited. Phones, TRULINCS stations and showers will be made available throughout the week…. Visitation is suspended until futher notice…" (See Ex. 6: LSCI Allenwood Inmate Bulletin).

G.      **The Initial Discovery Deadline for the FTC Action**

On March 24, 2020, Judge Cote ordered document discovery to be "substantially complete" by August 28, 2020.  (S.D.N.Y. 20-cv-706, ECF No. 74 (Pretrial Sched. Order) ¶ 11).

H.      **The FTC Plaintiffs' First Set of Requests for Discovery**

On May 1, 2020, the FTC Plaintiffs requested from Mr. Shkreli the production of 29 categories of documents, including all documents:

- "relating to the acquisition of Daraprim";

- "relating to communications with any Phoenixus shareholder, investor, potential investor, lender, or other source of financing or potential financing that discuss Daraprim"

- "relating to the distribution or potential distribution of Daraprim or Authorized Generic Daraprim"

- "relating to any condition or restriction, whether considered or implemented, on the use, resale, diversion, or transfer of Daraprim that Mr. Shkreli, Mr. Mulleady, or the Corporate Defendants imposed or attempted to impose"

- "relating to any Daraprim business, marketing, distribution, advertising, or strategic plan(s), as well as any Daraprim short-term or long-range strategies and objectives, collaborations, other plans, or budgets"

- "relating to the pricing of Daraprim or Authorized Generic Daraprim"

- "from January 2016 to present relating to communications with any current or former Corporate Defendant employee, board member, or investor concerning: a) Vyera or Phoenixus business; or b) Potential investment in or development of any pharmaceutical product or business"

- "relating to each payment in cash or stock from the Corporate Defendants to Mr. Shkreli"

(S.D.N.Y. 20-cv-706, ECF No. 161-2 (Plaintiffs' First Set of Requests for Production to Martin

Shkreli)).[6]  The FTC Plaintiffs also made the following interrogatory requests to Mr. Shkreli and

gave Mr. Shkreli just 30 days, until June 1, 2020 to respond:

- "For each payment made by the Corporate Defendants to Mr. Shkreli or Mr. Mulleady, identify the form of the payment (e.g., cash, stock, or other consideration), the date of, the estimated dollar value of, and reason for the payment."

- "Separately for Martin Shkreli, Kevin Mulleady, and any other current or former employee or board member of the Corporate Defendants identified on any Defendant's Initial Disclosures, identify each email account (whether personal or company issued), cell phone number (whether personal or company sponsored), social media account, and messaging account (e.g., WhatsApp) used for any communications relating to Daraprim or other Vyera or Phoenixus business."

- "For each company for which You have held an ownership interest equal to or greater than 1% at any time from October 1, 2014 to present, identify: (a) the name of the company; (b) a brief description of the company's business; (c) the date ranges You held an ownership interest equal to or greater than 1%; (d) Your peak ownership interest; (e) Your current ownership interest; and (f) whether You serve or served on the Board of Directors or hold or held any executive position(s) with the company."

(Ex. 7: Plaintiffs' First Set of Interrogatories to Defendants).

### I.    The FTC Defendants' Motion to Stay Discovery Pending Motions to Dismiss

In a joint motion for Judge Cote to stay discovery pending the resolution of motions to

dismiss,[7] Mr. Shkreli and the other FTC Defendants explained that they would "need to conduct

significant discovery to defend themselves":

> The nature of Plaintiffs' claims is such that much of the relevant evidence rests with
> a multitude of third parties—dozens of which are identified by name in the
> Complaint.  Some of these third parties are located throughout the United States;

---

[6] "Unless otherwise indicated, these Requests cover any and all documents generated, prepared, created, sent, or received during the period from October 1, 2014 to the present."  (S.D.N.Y. 20-cv-706, ECF No. 161-2 at 1).

[7] In deciding whether to grant a motion to stay discovery pending the resolution of a motion to dismiss, a court considers (among other factors) "the breadth of discovery and the burden of responding to it."  (S.D.N.Y. 20-cv-706, ECF No. 126 at 9 (quoting *Am. Fed'n of Musicians & Employers' Pension Fund v. Atl. Recording Corp*., No. 15-cv-6267, 2016 WL 2641122, at 1 (S.D.N.Y. Jan. 8, 2016)).

many others are located overseas in jurisdictions that require adherence to strict
protocols for the taking of evidence abroad.

At a minimum, Defendants will need to take discovery from at least *forty-
three* third parties specifically identified by name in the Complaint[, including
generic pharmaceutical manufacturers, API (active pharmaceutical ingredient)
manufacturers, distributors, and data aggregating firms]. . . .

[Moreover], discovery will likely include a significant number of other
individuals and entities identified in Plaintiffs' initial disclosures as having relevant
evidence[, including firms identified as having evidence related to Daraprim's
distribution, procurement, and formulary placement]. . . . Discovery will obviously
also be necessary from Plaintiffs, including various state agencies within each
Plaintiff State.

Plaintiffs' initial sets of document requests and interrogatories, served on
Defendants on May 1, 2020, similarly reflect the breadth of forthcoming party and
third-party discovery.  By way of just one example, among their thirty-eight
document requests (with subparts, the total is in fact well in excess of 100 separate
requests), Plaintiffs seek all of Defendants' communications with "any other
pharmaceutical company, API supplier, Purchaser, or the FDA [Food and Drug
Administration] concerning Generic Daraprim."  At least some of these requests
will require notifications to be given to (and in some cases permission obtained
from) these third parties regarding the possible production of their confidential
information.
. . .

Adding further to the burden is the fact that the alleged conduct dates to
2014, requiring a broad temporal scope of discovery.  For example, the dozens of
document requests and interrogatories that Plaintiffs have served on Defendants
state that responses should be provided for the period spanning October 1, 2014
through the present. . . .

(S.D.N.Y. 20-cv-706, ECF No. 126 (5/22/2/2020 Mem. of Law in Support of Motion for Stay at

3–5, 9 (footnote omitted))).

The FTC Defendants went on to explain how their concerns were "amplified by the array

of logistical challenges stemming from the ongoing COVID-19 pandemic":

The forthcoming discovery would make for a substantial undertaking under
the best of circumstances, but of course these are not the best of circumstances.  At
present, mandatory office closures are in place around the world in connection with
the COVID-19 pandemic.  Indeed, COVID-19 has already impeded the progress of
discovery, as the FTC and the NYAG have recently informed Defendants that they
will not be able to complete their production of at least some of the documents from

11

their pre-complaint investigation (which were due May 15, 2020) until the end of
June because of understandable and valid concerns about the safety of returning to
their offices during the pandemic.  The need to conduct discovery, and perhaps even
depositions, remotely will inevitably add burden and expense to what is already
sure to be a challenging discovery process.

(*Id.* at 5, 13).  The FTC Defendants also pointed out that Mr. Shkreli's incarceration hindered him

from responding to the FTC Plaintiffs' voluminous discovery requests, particularly because

visitations were suspended, remote appearances were not available, and legal calls were available

only for imminent and urgent court dates.  (*Id.* at 10 n. 16).

Judge Cote denied the FTC Defendants' stay motion, without opinion.  (S.D.N.Y. 20-cv-

706, ECF No. 150 (Order)).

## J.    The Final Discovery Deadlines

Judge Cote set February 26, 2021, as the deadline for all fact discovery.  (S.D.N.Y. 20-cv-

706, ECF No. 137: (5/26/2020 Memorandum Endorsed Discovery Order)).

The schedule for expert discovery is as follows:

| Event | Deadline |
|---|---|
| Disclosure of identity of experts providing an opening expert report (including subject of testimony) | February 12, 2021 |
| Opening expert reports from parties bearing the burden on an issue | April 12, 2021 |
| Disclosure of identity of experts providing a rebuttal expert report (including subject of testimony) | April 27, 2021 |
| Rebuttal expert reports | June 1, 2021 |
| Disclosure of identity of experts providing a reply expert report (including subject of testimony) | June 8, 2021 |
| Reply expert reports | June 22, 2021 |
| Close of expert discovery | August 6, 2021 |

(S.D.N.Y. 20-cv-706, ECF No. 243 (9/11/2020 Memorandum Endorsed Discovery Order)).

**K.**     **Civil Counsels' Requests to Confer Privately with Mr. Shkreli During the COVID-19 Pandemic**

Between March and September 2020, the COVID-19 pandemic and FCI Allenwood Low's resulting lockdown severely restricted Mr. Shkreli's ability to confer with Civil Counsel via legal calls.  There was a flood of legal call requests (because of the visitation suspension) and a shortage of staffers (because of COVID-19), leading to limitations on both the number and length of legal calls for Mr. Shkreli.

Even once visitation resumed, there were restrictions.  Only a limited amount of inmates could visit their family members, and for only 90 minutes at a time.  Visits had to be scheduled weeks in advance and there was no guarantee that the visits would commence as scheduled because as is true at any BOP facility, security issues and now health and safety concerns can upend a planned visit minutes before it is set to begin.

On April 9, 2020, Ms. Kovalsky requested a legal call.  However, the BOP denied the request, responding that it "can only accommodate legal calls if there is an urgent, and imminent court date" given "limited staffing" and that FCI Allenwood Low's "procedure is to allow a 15 minute phone call for an attorney in order to allow all inmates access."  Ms. Kovalsky replied that Civil Counsel were preparing a document that required Mr. Shkreli's approval before filing and that legal visits were unavailable.  The BOP still denied the request, telling Ms. Kovalsky that "[a]ll legal call requests must have an imminent court deadline" and instructing her to "address [her] matters through ordinary legal mail procedures."  (Ex. 1 ¶¶ 63–64).

Since the March 10, 2020, legal call, Mr. Shkreli was not allowed another legal call with Civil Counsel until May 20, 2020, when they were allowed a 15-minute legal call.  (Ex. 1 ¶ 62).

On May 27, 2020, Ms. Kovalsky requested a legal call relating to four discovery deadlines that were approaching in the next several days (June 1st, 2nd, and 5th).  The BOP granted a 15-minute legal call for May 29, 2020.  (Ex. 1 ¶ 65).

On June 3, 2020, Ms. Kovalsky requested a legal call to (inter alia) "obtain the requisite authorizations and authority" from Mr. Shkreli with respect to a settlement conference that was scheduled for June 9, 2020.  Ms. Kovalsky was granted a 15-minute call.  (Ex. 1 ¶¶ 67–68).

On November 3, 2020, Ms. Kovalsky requested from the BOP that it allow Mr. Shkreli to have three hours of legal calls with Civil Counsel each week (beginning the week of November 15th), noting the following:

> Mr. Shkreli . . . needs to be able to confidentially communicate with his attorneys regularly.  There will be multiple depositions each week in the weeks between December 1, 2020 and February 26, 2021, and Mr. Shkreli's attorneys need to confer with him in real time between each deposition so that Mr. Shkreli can participate in his defense.  It is during this three-month period that a robust factual record will be established in the FTC Action, and the parties' pre-trial motions, including motions for summary judgment, will rely on this record.

Ms. Kovalsky also requested that BOP make accommodations to allow Mr. Shkreli to participate in remote depositions via Zoom videoconference, noting the following:

> It is imperative that Mr. Shkreli be able to participate in many, if not all, of the upcoming depositions, as is his right to do as a defendant.  If Mr. Shkreli cannot participate in the depositions, he will be at a significant disadvantage in an action where he faces losing everything, including his livelihood. . . .

> In addition to participating in the depositions . . ., Mr. Shkreli also needs to be able to confidentially communicate with his attorneys regularly.  There will be multiple depositions each week in the weeks between December 1, 2020 and February 26, 2021, and Mr. Shkreli's attorneys need to confer with him in real time between each deposition so that Mr. Shkreli can participate in his defense.  It is during this three-month period that a robust factual record will be established in the FTC Action, and the parties' pre-trial motions, including motions for summary judgment, will rely on this record.

(Ex. 1 ¶¶ 69-70).

The BOP denied Ms. Kovalsky's request regarding legal calls, stating that the facility's "staffing and the substantial increase to various legal needs, of other inmates, reduces [staffers'] availability and "offer[ed] up to one-hour legal calls on an as-needed basis."  Regarding the depositions request, the BOP refused "to agree to an open-ended request," but stated that it would do its "best to accommodate on an as-needed basis" if the FTC "agree[s]" that Mr. Shkreli "should participate in the depositions while here at Allenwood."  (Ex. 1 ¶¶ 71-72).

On November 24, 2020, Mr. Shkreli's Civil Counsel conferred with the FTC to see if it would agree to allow him to attend the depositions.  The FTC responded that before entering into such an agreement, it would need to resolve how the parties would handle confidential information during depositions—an issue addressed by a protective order that affects all of the parties in the FTC Action.  (Ex. 1 ¶ 77).

In total, Mr. Shkreli has been allowed only ten-and-a-half hours of legal calls relating to the FTC Action since the filing of the FTC complaint, which amounts to less than one hour of legal calls per month.  (Ex. 1 ¶ 51).

**L.**     **Judge Cote's Acknowledgment of Civil Counsels' Inability to Confer Privately With Mr. Shkreli**

At a teleconference held in September 2020, Civil Counsel explained that they had been unable to communicate effectively with Mr. Shkreli since January 2020:

> [S]ince COVID-19 has started, [the BOP] stopped prison visits.  So we've had no visits with Mr. Shkreli.  In fact, I've not met Mr. Shkreli.  Prior to COVID, there was a norovirus outbreak at Allenwood, which stopped visits going back to January.  That is just out.  We can't do that.  Second is unmonitored phone calls.  These are calls that counsel can arrange with the prison in advance, they're done on a very infrequent basis, and usually, always you have to have a good reason for the call.  And they're limited in time.  I've had 15-minute calls with him, I've had 30-minute calls, and you have a list of things you race through and then you're done.  You're done for a couple of weeks, frankly, so it is just not effective.  The third is legal mail.  The old fashioned U.S. Postal Service mail. I think everyone would agree, in a fast-paced litigation, that is simply impractical.

(S.D.N.Y. 20-cv-706, ECF No. 285 (Conference Tr.) at 8–10)).

Judge Cote acknowledged "the difficulties that the pandemic has posed to incarcerated defendants." (*Id.* at 14).

### M.   Current Status of Discovery in the FTC Action

The "[d]iscovery in the FTC Action is active, complex, and voluminous." (Ex. 1 ¶ 28). Discovery has already included the issuance of at least 150 subpoenas to third parties for documents and discovery (including foreign discovery subpoenas under the Hague Convention to witnesses in Japan, India, and Switzerland), and the production of more than one million pages of documents (and many more are expected to be produced). (*Id.*). The FTC Plaintiffs have already noticed nine remote depositions; the first deposition occurred on December 1, 2020, and there have been five depositions since then. There are 27 depositions noticed between now and February 26, 2021. (Ex. 1 ¶¶ 29-33). There will be up to 280 hours of on-the-record deposition time for fact witnesses. (*Id.* ¶¶ 29–30).

### N.   Mr. Shkreli's Requests to the BOP for More Access to Civil Counsel

On October 31, 2020, Mr. Shkreli requested a furlough from the BOP so that he could assist Civil Counsel in adequately preparing for the FTC Action, noting the novelty and importance of the FTC Action as well as the limited availability of legal calls. Mr. Shkreli explained that he was the only person who could give Civil Counsel "the full scope of facts and event history . . . with respect to [upcoming] depositions." The BOP denied the request, on the basis that Mr. Shkreli is "not eligible for priority home confinement placement." (Ex. 8: Furlough Request & Denial).

### O.   Mr. Shkreli's Motion to Stay the FTC Action Until His Release from Prison

On November 25, 2020, Civil Counsel moved Judge Cote to stay discovery until Mr. Shkreli is released from prison so that he could meaningfully participate in his defense, arguing

16

that his constitutional "right of access to counsel will continue to be curtailed under the current discovery schedule." (Ex. 1 ¶ 34; *see* S.D.N.Y. 20-cv-706, ECF Nos. 313–19). As of the present filing date, Judge Cote has not decided the stay motion.

**P.**     **Shkreli's Future Access to his Civil Counsel**

As of the filing of this motion, Mr. Shkreli is not permitted any visitors. Before the present COVID-19 outbreak at the facility and the resulting shutdown of all visitation, the Allenwood Low staff had advised that Mr. Shkreli would be allowed two visits per month (whether for legal, social, etc.), and each visit could last up to 90 minutes. (Ex. 9: Email Correspondence with FCI Allenwood Low). Mr. Shkreli must submit a request for a legal visit "in the week before the month starts." (*Id.*). Only six days in November, and only seven days in December, wre available for legal visits. (*Id.*). There is a single room for attorney visits, and the room is available on a first-come, first-serve basis.

FCI Allenwood Low does not "have the necessary infrastructure or staffing to accommodate the frequency and duration of legal communications needed to properly prepare Mr. Shkreli's defense" particularly because of his role "as a key technical expert for his defense." (Ex. 2 ¶ 9). Although "the BOP has done a somewhat satisfactory job at arranging communication thus far, the necessary communication needed going forward is far more extensive in duration and frequency." (*Id.* ¶ 10). Moreover, Mr. Shkreli does not appear to have the option for legal video conferencing." (*Id.* ¶ 11). COVID-19 restrictions will likely continue until a vaccine is widely distributed. (*Id.* ¶ 21).

**Q.**     **Mr. Shkreli's Compassionate Release Petition to the BOP**

In October 2020, Mr. Shkreli petitioned the BOP to move this Court to grant Mr. Shkreli compassionate release based on his inability to adequately confer with Civil Counsel for the FTC

Action and based on his worsening mental health.  The BOP denied the request, on the basis that

Mr. Shkreli is not yet 65 years old, does not have a "progressive illness, and does not "a debilitating

injury from which [he] will not recover."  (Ex. 10: BOP Petition & Response).

## III.  ARGUMENT

### A.  Legal Standard

As "in all sentencing matters," a district court has "broad" discretion in deciding

compassionate release motions.  *Brooker*, 2020 WL 5739712, at 8.

The "compassionate release" provision of 18 U.S.C. § 3582(c) provides the following:

> The [sentencing] court may not modify a term of imprisonment once it has been
> imposed except that—
>
> (1) in any case—
>
>> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon
>> motion of the defendant after the defendant has fully exhausted all
>> administrative rights to appeal a failure of the Bureau of Prisons to bring a
>> motion on the defendant's behalf or the lapse of 30 days from the receipt of
>> such a request by the warden of the defendant's facility, whichever is
>> earlier,[8] may reduce the term of imprisonment (and may impose a term of
>> probation or supervised release with or without conditions that does not
>> exceed the unserved portion of the original term of imprisonment), after
>> considering the factors set forth in section 3553(a) to the extent that they
>> are applicable, if it finds that—
>>
>>> (i) extraordinary and compelling reasons warrant such a reduction . . . .

18 U.S.C. § 3582(c)(1)(A)(i).[9]  A district court has the "discretion in determining what are

extraordinary circumstances."  *Brooker*, 2020 WL 5739712, at 5; *see also id.* at 7 ("[T]he First

---

[8] Because 30 days have passed since the warden's receipt of Mr. Shkreli's second § 3583(c)(1)(A)
petition, the "exhaustion requirement is dispensed.  *See United States v. Shkreli*, No. 15-cr-637, 2020
WL 2513521, at 1 (E.D.N.Y. May 16, 2020) (Matsumoto, J.).

[9] Although § 3582(c)(1)(A) provides that a grant of compassionate release must also be "consistent
with applicable policy statements issued by the Sentencing Commission," *see* 18 U.S.C. §
3582(c)(1)(A)(ii), the Second Circuit has recently held that the policy statement on compassionate
release (U.S.S.G. § 1B1.13) "appl[ies] only to those motions that the BOP has made," *Brooker*, 2020

Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."). "The only statutory limit on what a court may consider to be extraordinary and compelling is that 'rehabilitation alone shall not be considered an extraordinary and compelling reason.'" *Id.* at 8 (quoting 28 U.S.C. § 994(t)) (emphasis, brackets, and ellipsis omitted).

As discussed below, there are three circumstances that, in combination, warrant Mr. Shkreli's compassionate release from prison.

### B.      Mr. Shkreli's Fundamental Constitutional Right to Have Meaningful Access to Civil Counsel is Being Violated

First, the COVID-19 pandemic is preventing Mr. Shkreli from exercising his fundamental constitutional right to meaningfully confer with Civil Counsel regarding the FTC Action.

#### 1.      An Inmate's Right to Correspond With Counsel

Thirty-three years ago, the United States Supreme Court held that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). Thus, inmates have a "constitutional right of access to the courts," a right that is grounded in multiple constitutional provisions.[10] *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004). "As a corollary of his right of access, a prisoner has a right to correspond with his legal counsel." *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986).[11] A prisoner's

---

WL 5739712, at 6; *see also id.* at 6–7 ("[I]f a compassionate release motion is not brought by the BOP Director, Guideline § 1B1.13 does not, by its own terms, apply to it. . . . [Nothing] in the now-outdated version of Guideline § 1B1.13 . . . limits the district court's discretion.").

[10] *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002) ("Decisions of this Court have grounded the right of access to courts in the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses.").

[11] *See also Powell v. State of Ala.*, 287 U.S. 45, 68–69 (1932) ("The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel."); *Al-Joudi v. Bush*,

right to confer with counsel includes "the opportunity for confidential communication . . . on pending litigation and related legal issues." *Goodwin v. Oswald*, 462 F.2d 1237, 1241 (2d Cir. 1972); *see also Al-Amin v. Smith*, 511 F.3d 1317, 1331 (11th Cir. 2008) (providing that a prisoner's access to the courts "depends on confidentially communicating with his attorneys").

A prisoner's access to counsel means more than intermittent supervised phone contact. Access to counsel must be "meaningful," "adequate," and "effective." *Bounds v. Smith*, 430 U.S. 817, 823 ((1977) ("Meaningful access to the courts is the touchstone." (brackets and internal quotation marks omitted) *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) ("Prisoners have a constitutional right of access to the courts that is 'adequate, effective, and meaningful.' (quoting *Bounds v. Smith,* 430 U.S. 817, 822 (1977))); *Bellezza v. Holland*, No. 09-cv-8434, 2011 WL 2848141, at 4 (S.D.N.Y. July 12, 2011) (Sweet, J.) ("It is well established that prisoners have a constitutional right to 'adequate, effective, and meaningful' access to the courts."). [12] Thus, a "mere formal right of access to the courts does not pass constitutional muster," *Ryland v. Shapiro*, 708 F.2d 967, 972 (5th Cir. 1983), and "[a]ny deliberate impediment to access, even a delay of access, may constitute a constitutional deprivation," *Jackson v. Procunier*, 789 F.2d 307, 311 (5th Cir. 1986).

---

406 F. Supp. 2d 13, 22 (D.D.C. 2005) ("[A]ccess to the Court means nothing without access to counsel."); *Schick v. Apker*, No. 07-cv-5775, 2009 WL 2016933, at 8 (S.D.N.Y. Mar. 5, 2009) (Freeman, M.J.) ("[T]he First and 14th Amendments . . . have been interpreted to provide a right of access to counsel and the courts."), *report and recommendation adopted in part*, 2009 WL 2016926 (S.D.N.Y. July 10, 2009) (Stein, J.).

[12]  *See also Schick v. Apker*, No. 07-cv-5775, 2009 WL 2016933, at 8 (S.D.N.Y. Mar. 5, 2009) (Freeman, M.J.) ("[T]he constitutional right to adequate, effective, and meaningful access to the courts . . includes a reasonable opportunity to seek and receive the assistance of attorneys."), *report and recommendation adopted in part*, 2009 WL 2016926 (S.D.N.Y. July 10, 2009) (Stein, J.); *Brown v. Brabazon*, No. 95-cv-4183, 1998 WL 177612, at 2 (E.D.N.Y. Apr. 13, 1998) ("An inmate has a constitutional right to adequate, effective, and meaningful access to the courts, which includes a reasonable opportunity to seek and receive the assistance of attorneys.").

## 2.   The Importance of an Inmate's Right to Have Access Civil Counsel

"Access is essential to lawyers and legal assistants representing prisoner clients." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).   "Much of our system of law is based upon the presumption that one of the most important relationships for safeguarding of individual freedom is that between an individual and his or her attorney."  *Johnson v. City of Cincinnati*, 310 F.3d 484, 501 (6th Cir. 2002) (internal quotation marks omitted).

"Restrictions on speech between attorneys and their clients directly undermine the ability of attorneys to offer sound legal advice."  *Martin v. Lauer*, 686 F.2d 24, 32 (D.C. Cir. 1982).  "As the common law has long recognized, the right to confer with counsel would be hollow if those consulting counsel could not speak freely about their legal problems."  *Id.*  "Through the attorney-client privilege, the common law 'encourages full and frank discussions between attorneys and their clients and thereby promotes broader public interests in the observance of law and the administration of justice.  The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends on the lawyer being fully informed by the client.'"  *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)) (brackets omitted).[13]

The access-to-courts right "is one of the highest and most essential privileges of citizenship," *Chambers v. Baltimore & O.R. Co.*, 207 U.S. 142, 148 (1907), and deserves "rigorous protection," *Martin*, 686 F.2d at 33.  "In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government."  *Chambers v. Baltimore & O.R. Co.*, 207 U.S. 142, 148 (1907).  In fact, the "Constitution protects with special solicitude" a

---

[13] *See also Guajardo-Palma v. Martinson*, 622 F.3d 801, 802 (7th Cir. 2010) ("The attorney-client privilege is centrally concerned with confidences communicated by the client to his lawyer in order to enable the lawyer to formulate an effective litigation strategy.").

prisoner's access-to-court right.  *Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978) (internal

quotation marks omitted), *rev'd on other grounds by Bell v. Wolfish*, 441 U.S. 520 (1979).[14]

Not only is a prisoner's access-to-courts right fundamental, but the "right to the advice and

assistance of retained counsel in civil litigation . . . inheres in the very notion of an adversarial

system of justice, and is indispensable to the effective protection of individual rights."  *Mosley v.*

*St. Louis Sw. Ry.*, 634 F.2d 942, 945 (5th Cir. 1981).  In other words, a "prisoner's right of access

to the courts" is "concerned with assuring that trials are fair."  *Bourdon*, 386 F.3d at 96.  As the

District of Columbia Circuit has found:

> [E]very litigant has a powerful interest in being able to retain and consult freely
> with an attorney.  Insofar as the fair administration of justice requires that all parties
> to a controversy be fully and equally informed of their entitlements, the public has
> a similarly important interest in preserving the ability of each disputant to confer
> with his lawyer.  This public interest is reinforced by the value we place on the right
> of every litigant to participate in the process whereby justice is done—to
> understand and become involved in the proceeding, not to be compelled passively
> to await its outcome.

*Doe v. D.C.*, 697 F.2d 1115, 1119–20 (D.C. Cir. 1983).

### 3.  Mr. Shkreli's Access-to-Counsel Right Will Continue to be Violated Unless he is Granted Compassionate Release

Like the typical layman, Mr. Shkreli "lacks the skill and knowledge to adequately prepare

his case, and he requires the guiding hand of counsel at every step in the proceedings against him."

---

[14] *See also Wolfish*, 573 F.2d at 129 ("In the close and restrictive atmosphere of a prison, first amendment guarantees taken for granted in society at large assume far greater significance. . . . [C]ourts have jealously protected the inmate in his exercise of first amendment prerogatives."); *Dreher v. Sielaff*, 636 F.2d 1141, 1146 (7th Cir. 1980) ("[A]n inmate's opportunity to confer with counsel is a particularly constitutional right which the courts will not permit to be unnecessarily abridged."); *Taylor v. Sterrett*, 532 F.2d 462, 470 (5th Cir. 1976) ("[There is a] recurrent judicial attitude that the right of access to the courts is afforded special protection. . . .  [A]n inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold.  All other rights of an inmate are illusory without it." (citations, ellipsis, and internal quotation marks omitted))); *Adams v. Carlson*, 488 F.2d 619, 630 (7th Cir. 1973) ("Citation of authority is hardly needed for the proposition that an inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold.").

*See Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1118 (5th Cir. 1980).  However, the COVID-19 restrictions and staff shortages at FCI Allenwood Low have been preventing, and will continue to prevent, Mr. Shkreli from having adequate access to Civil Counsel.

Since Mr. Shkreli became aware that he was the target of the FTC investigation, he has had to rely on infrequent and severely time-limited confidential legal phone calls with Civil Counsel as they attempt to prepare for the complex FTC litigation.  Mr. Shkreli had only a little more than a dozen legal calls with Civil Counsel, and (on average) has had approximately one hour per month to confidentially speak with Civil Counsel to discuss the voluminous discovery matters, to discuss strategy, and to otherwise participate in his defense.  For the most part, Mr. Shkreli's access to counsel was limited to a mere 15 minutes at a time—despite repeated requests for more time.  At one point, Mr. Shkreli was not allowed a legal call for more than two months, from March 10 to May 20, 2020.

Now that there is an COVID-19 outbreak at FCI Allenwood Low, the health and safety requirements and associated restrictions on inmates further constricts the BOP's ability to meet Mr. Shkreli's access to counsel needs.   The best that the BOP has been able to offer is one-hour calls on an "as-needed basis," but that is still woefully inadequate for the intensive deposition preparation required by the rapid schedule set in the FTC matter.  The BOP does not or cannot offer Zoom or other document-sharing technology for legal calls (*see* Ex. 2 ¶ 11), and so Civil Counsel will not have the ability to share documents with Mr. Shkreli, a basic component of deposition preparation of nonparty witnesses and an essential component of Mr. Shkreli's preparation for his own deposition, which was recently ordered to proceed on January 27 and 28, 20201, by Judge Cote.

Clearly, less than an hour per month is not nearly sufficient time for Civil Counsel to meaningfully confer with Mr. Shkreli in the FTC Action.  It is a complex action that  resulted from a five-year investigation, is the first-ever Section 2 enforcement action against an individual and involves 150 third-party subpoenas, more than a million pages of documents (and many more expected), and approximately 50 depositions over the next 3 months that will represent almost 300 hours of testimony.  And the stakes are high for Mr. Shkreli—the FTC Plaintiffs are seeking to hold Mr. Shkreli liable for millions of dollars and to permanently bar him from owning or working for a company engaged in the pharmaceutical industry (which he has been working in for the past decade.)  FTC Plaintiffs seek extraordinary relief in a novel case, and the stakes for Mr. Shkreli are too significant for him to be foreclosed from meaningful, adequate, and effective consultation with Civil Counsel.

The COVID-19 restrictions and staff shortages at FCI Allenwood Low will compound the existing prejudice to Mr. Shkreli with respect to the upcoming depositions, during which most of the factual record will be built.  As multiple additional depositions will be noticed and taken each week between now and February 26, 2021, Mr. Shkreli will not have time with Civil Counsel to aid in their preparation, let alone time to actually participate in the depositions.

Realistically, under the current circumstances, Mr. Shkreli cannot effectively confer with his Civil Counsel in preparing for the approximately 50 depositions that will take place in the next three months and this reality is working a deprivation of his right to access counsel.  It is impossible for Civil Counsel to adequately advise and confer with  Mr. Shkreli on the numerous depositions, review and discuss with him the documents that may be relevant to those depositions, or prepare him for his own deposition—all in the next two and a half months.  And besides the access-to-

counsel issue, it remains unclear whether Mr. Shkreli will be able to exercise his privilege as a party-defendant to attend the upcoming depositions.[15]

Due to Mr. Shkreli's lack of meaningful access to Civil Counsel, he cannot direct counsel in discovery, participate in meaningful discussions to formulate his defense strategy, or freely communicate with Civil Counsel.  Indeed, even if Mr. Shkreli were provided with more time for legal calls, he would be unable to adequately participate in his defense.  *See United States v. Topps*, No. 20-cr-12, 2020 WL 5890433, at 14 (D. Alaska Oct. 1, 2020) ("[P]hone calls alone are insufficient for many inmates . . . to establish an attorney-client relationship that the defendant is then willing to rely upon when deciding whether or not to go to trial.").

Because the COVID-19 pandemic is ongoing, Mr. Shkreli's access-to-counsel right will continuously be violated.  But a grant of compassionate release would ensure that he could meaningfully confer with Civil Counsel and participate in defending himself against the complex and important FTC Action.

C.     **Mr. Shkreli's Worsening Mental Health**

The second reason for granting Mr. Shkreli compassionate release is his compromised mental health—███████████████████████ disorders.  As this Court and the Government are aware, Mr. Shkreli has lived with mental and emotional health issues since his late teens.  Although the BOP has provided Mr. Shkreli his medications to aid management and reduce symptoms of those issues, his mental health has taken a steep toll since the BOP instituted measures to combat COVID-19 for more than the past nine months, including suspension of social visits, restrictions on phone calls and computer use, and restrictions on socializing with fellow

---

[15] Even if the BOP permitted his Civil Attorneys to visit with Mr. Shkreli, it requires his attorneys to expose themselves to COVID 19 at FCI Allenwood Low.

inmates.[16]  Mr. Shkreli has not seen the outside in weeks.  He is being served peanut butter and

jelly sandwiches for many meals.  He has to confine his movements to his cubicle.  These living

circumstances would challenge any individual,  but are particularly challenging for someone with

preexisting mental health challenges like Mr. Shkreli.  *See United States v. Pina*, No. 18-cr-179,

2020 WL 3545514, at 2 (S.D.N.Y. June 29, 2020) (Rakoff, J.) ("It is . . . not surprising that Pina's

efforts to cope with his PTSD have been seriously undermined by the conditions imposed on

prisoners because of the pandemic. . . .  Pina's efforts to practice self-care in terms of his PTSD

while in prison have relied upon activities—e.g., exercise—that have been substantially curtailed

to prevent the spread of COVID-19.  More generally, his confinement to his cell for 22 hours a

day cannot help but exacerbate his ▮▮▮▮▮ and ▮▮▮▮▮  With the spread of COVID-19

continuing to accelerate nationwide, the Court has no reason to believe that FCI Allenwood (where

Pina is incarcerated) will lift its present precautions in the foreseeable future.").

    Mr. Shkreli's mental health challenges are being further exacerbated by the stress and

frustration of the rapidly moving FTC litigation and his ongoing inability to meaningfully prepare

and confer with Civil Counsel.  Because of the combined impact of  the pandemic, the onset of

new and serious civil litigation while incarcerated, the rapid progress of that same litigation while

unable to meaningfully access counsel, and the current severe outbreak in his facility, Mr. Shkreli's

pre-existing mental health challenges are worsening.    Preventing Mr. Shkreli's further mental

health deterioration  is a valid basis to grant compassionate release.  *See United States v. Galaz*,

No. 15-cr-2559, 2020 WL 4569125, at 5 (S.D. Cal. Aug. 7, 2020) ("Galaz's diagnosed depression

makes her release request especially compelling." (record citation omitted)); *United States v.*

*Rodriguez*, No. 17-cr-4477, 2020 WL 4592833, at 2 (S.D. Cal. Aug. 5, 2020) ("Ms. Rodriguez's

---

[16] And even before COVID-19 restrictions were implemented, Mr. Shkreli was not allowed visitors for
a month because of a norovirus outbreak.

combination of obesity, asthma, and major depressive disorder present extraordinary and compelling reasons to grant her compassionate release."); *United States v. Amaro*, 2020 WL 3975486, at 1 (S.D.N.Y. July 14, 2020) ("Mr. Amaro's significant co-morbidities, and his deep-seated mental health issues, taken together, constitute extraordinary and compelling reasons for his release from custody."); *United States v. Blye*, 2020 WL 3064225 (W.D. Wash. June 9, 2020) (citing the defendant's history of depression and PTSD as a basis for finding "extraordinary and compelling reasons" for his compassionate release).

Given the restrictions and staff shortages resulting from the COVID-19 pandemic, the BOP is unable to adequately address Mr. Shkreli's mental health issues. Granting Mr. Shkreli compassionate release would enable him to get the proper treatment he needs to address his mental health.

### D.   Mr. Shkreli's High Risk of COVID-19 Complications

Mr. Shkreli's risk of serious illness or death from COVID-19 also constitutes an extraordinary and compelling reason militating in favor of his release." *See United States v. Sawicz*, 453 F. Supp. 3d 601, 605 (E.D.N.Y. 2020) (Ross, J.).

First, Mr. Shkreli is at a high risk of contracting COVID-19 at FCI Allenwood Low, which has experienced a recent surge in COVID-19 infections. As of November 29, 2020, FCI Allenwood Low "had very little spread of COVID-19"—there were no confirmed COVID-19 cases among the inmates, there were only two confirmed cases among the staffers, and one inmate and one staffer had previously tested positive for COVID-19 but ultimately recovered. *United States v. Rivera*, No. 16-cr-6024, 2020 WL 7137136, at 1 (W.D.N.Y. Dec. 1, 2020). As of December 23, 2020, however, 136 inmates and 9 staff members at FCI Allenwood Low have

27

confirmed positive tests for COVID-19, and 45 inmates and 2 staffers have recovered from COVID-19. *See* https://www.bop.gov/coronavirus/ (last updated Dec. 23, 2020).[17]

Second, Mr. Shkreli is at a high risk of serious complications from a COVID-19 infection. Mr. Shkreli has several mental health disorders that weaken his immune system and thereby increase his risk of becoming severely ill or dying from COVID-19. *See Doe v. Barr*, No. 20-cv-2141, 2020 WL 1820667, at 4 (N.D. Cal. Apr. 12, 2020) ("Growing evidence demonstrates that PTSD, anxiety/stress, and depression can lead to decreased immune response and increased risk of infections. These illnesses are linked with elevated stress levels, which can impact immune responses. Depression, anxiety, and PTSD have all been found to directly stimulate production of pro-inflammatory cytokines, as well as downregulate cellular immunity leading to increased risk of acute and prolonged infection, and delayed wound healing. . . . [W]eakened immunity due to mental-health disorders can put detainees at increased risk of contracting and suffering from more severe forms of COVID-19." (footnotes and internal quotation marks omitted)).[18]

---

[17] COVID-19 has also been running rampant at the other two facilities within the Allenwood Federal Correctional Complex. At FCI Allenwood Medium and USP Allenwood, 104 inmates and 35 staffers have confirmed positive tests for COVID-19, and 394 inmates and 18 staffers have recovered from COVID-19. *See* https://www.bop.gov/coronavirus/.

[18] *See also United States v. Powell*, 468 F. Supp. 3d 398, 403 (D.D.C. 2020) ("[D]efendant suffers from depression, which can lead to compromised immunity, further increasing defendant's risk [of serious complications from COVID-19]."); *United States v. Indarte*, No. 17-cr-5554, 2020 WL 6060299, at 3 (W.D. Wash. Oct. 14, 2020) ("[T]he mental illness Indarte suffers from [major depressive order and PTSD] have been shown to impair immune function and heighten vulnerability to viral infection."); *United States v. Anello*, No. 12-cr-131, 2020 WL 3971399, at 4–5 (W.D. Wash. July 14, 2020) ("Mr. Anello . . . suffer[s] from mental illness, which renders him especially vulnerable to the effects of the COVID-19 pandemic. . . . [Mr. Anello's] doctors point out that mental illness weakens the immune system, making it easier for viruses like COVID-19 to infect the mentally ill. This mental health condition, combined with his other medical conditions, further supports the conclusion that Mr. Anello is eligible for the relief he seeks. (record citation and internal quotation marks omitted).

Mr. Shkreli's asthma adds to his risk of complications from a COVID-19 infection, even though the asthma is under control.   (ECF No. 525 (Sealed Report) at 2); *see* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  Although Mr. Shkreli's asthma is not documented in BOP medical records and was not mentioned in a prior compassionate release petition to the BOP, *see* ECF No. 734 at 7, he did report his asthma to his psychologist years before that petition was filed.  If the BOP failed to take note of his asthma, or Mr. Shkreli failed to advise the BOP of his asthma in a petition and upon admission, that should not negate the fact that Mr. Shkreli did discuss his asthma before he could have known that it would put him at higher risk of serious complications from COVID-19 infection.

### E.   Compassionate Release Would be Consistent With the § 3553(a) Factors

Mr. Shkreli recognizes that several § 3553(a) factors counsel against compassionate release.  *See* 18 U.S.C. § 3582(c)(1)(A).  For example, he was convicted of serious securities crimes and has violated several prison rules.  However, the totality of the § 3553(a) factors do not "outweigh the 'extraordinary and compelling reasons' warranting compassionate release." *See United States v. Ebbers*, No. 02-cr-1144, 2020 WL 91399, at 7 (S.D.N.Y. Jan. 8, 2020) (Caproni, J.).

First, Mr. Shkreli has "faced substantially more severe conditions during the COVID-19 pandemic than were contemplated at the time of sentencing," given "the more significant restrictions that the BOP has had to institute in its efforts to control the pandemic, including curtailing prison programs, greater restrictions on movement, and suspension of visitation for a lengthy period of time." *See United States v. Davis*, No. 15-116, 2020 WL 6785351, at 3 (D. Md. Nov. 18, 2020).  Mr. Shkreli was unable to see family members, friends or attorneys for ten

29

months.  We most respectfully submit that Mr. Shkreli's severe confinement circumstances of 2020 have transformed this single year of confinement into the punitive equivalent of two or three years incarceration, and maybe more.   We do not think that Mr. Shkreli's compassionate release to home confinement at this time will work a windfall in his favor—he has been imprisoned under conditions harsher and more challenging than this, or any Court, could have conjured at the time of his sentencing.

Second, Mr. Shkreli is now living in a facility where there is a COVID-19 outbreak and it is spreading quickly.  The risk he faces of infection, severe illness and death is palpable now that the virus has breached the facility whereas in April, when Mr. Shkreli filed his first motion for compassionate release, the pandemic had not reached the Allenwood facilities.

Third, Mr. Shkreli has a low risk of reoffending.   Although Mr. Shkreli was found to have violated prison rules in 2018 and 2019, he has been compliant with all of BOP's regulations since September 2019, despite the stress caused by the COVID-19 pandemic, the current outbreak, and the FTC litigation.

Fourth, Mr. Shkreli has served a majority of his sentence with his conditional release date approximately three years away, on September 14, 2023.  We note for the Court that Mr. Shkreli is likely to be released well before his conditional release date because he is eligible for RDAP and, assuming he is accepted to the program and that the RDAP program can function despite the pandemic (or if the pandemic sufficiently subsides that RDAP can run) the time remaining on his confinement could be significantly reduced.  (*See* Ex. 2 ¶¶ 22-28).   He has also made a significant dent in the financial penalties imposed by the Court and demonstrated that he takes that obligation seriously.   Furthermore, if compassionate release is granted, Mr. Shkreli  "will continue serving his sentence on home confinement with electronic monitoring, and will quarantine for two weeks

in his room while at his sister's home, further deterring future criminal conduct." *See United States v. Sedge*, No. 16-cr-537, 2020 WL 2475071, at 4 (E.D.N.Y. May 13, 2020) (Matsumoto, J.).   He will abide by any additional restrictions imposed by the Court and he will be spending most of his days working with Civil Counsel to defend the FTC litigation.

The public will be protected from further crimes if Mr. Shkreli is released.  In 2018 while incarcerated, Mr. Shkreli consented to a lifetime ban by the SEC from acting as an investment advisor which prevents him from committing the crimes of conviction again.    The conditions of home confinement and thereafter the conditions of supervised release will also protect the public. *United States v. Sedge*, No. 16 cr 537, 2020 WL 2475071, at 4  (E.D.N.Y. May 13, 2020) (Matsumoto, J.) "The sentence Mr. [Shkreli] has served, combined with the period of supervised release that will follow, appropriately 'reflects the seriousness of the offense,' 'promotes respect for the law,' and 'provides just punishment for the offense.'" *See United States v. Hansen*, No. 07-CR-520, 2020 WL 1703672, at *10 (E.D.N.Y. Apr. 8, 2020) (Matsumoto, J.) (quoting 18 U.S.C. § 3553(a)(2)) (brackets omitted).

Fifth, as argued in his initial motion for compassionate release, Mr. Shkreli  is a first-time offender who has a shown a commitment to fighting deadly disease throughout his professional life and has no history of violent conduct. *See* 18 U.S.C. § 3553(a)(1).  There is little to no likelihood that he will commit another crime, especially if he will be in home confinement and subject to GPS monitoring and supervised release.  *See* 18 U.S.C. § 3553(a)(2)(B)-(C).  Granting Mr. Shkreli compassionate release based on the coronavirus pandemic and his right to access to counsel would not send a message that white-collar crime does pay. *See* 18 U.S.C. § 3553(a)(2)(B). Mr. Shkreli has faced and continues to face serious consequences, including significant

incarceration, substantial financial consequences, civil litigation from every direction, and loss of reputation and friendships as a direct result of his conduct.

In sum, reducing Mr. Shkreli's sentence to time served and order him to serve the next few years on home confinement, under GPS monitoring and supervised release conditions that monitor or restrict his social media activity, would provide him with a punishment that is "sufficient, but not greater than necessary" given his risk of serious illness or death from a coronavirus infection due to the outbreak at Allenwood Low, the mental health challenges he is facing, and the deprivation of his constitutional right to access counsel to defend the FTC litigation.

These "extraordinary and compelling reasons for Mr. [Shkreli's] release undercut the possibility that a longer sentence would be necessary to reinforce principles of deterrence: the position in which [he] finds himself is both unique and unfortunate, and no right-minded observer would regard his release, at this juncture and under these circumstances, as a windfall." *See United States v. Mongelli*, No. 02-cr-307, 2020 WL 6449237, at 3 (E.D.N.Y. Nov. 3, 2020) (Garaufis, J.); *see also United States v. Moore*, No. 06-20465, 2020 WL 6440920, at 4 (E.D. Mich. Nov. 3, 2020) ("[R]eleasing Defendant under these unusual circumstances—his poor health and the COVID-19 pandemic—will not undermine the goal of general deterrence.").

### F.      Mr. Shkreli's Proposed Conditions of Home Confinement

If granted compassionate release, Mr. Shkreli would serve his home confinement in the home of his sister, Leonora Izerne, at ███████████████ Elmhurst, NY 11373. Ms. Izerne is prepared to drive to FCI Allenwood Low to pick Mr. Shkreli up and drive him directly to her apartment in Queens.  Ms. Izerne will have an ample supply of personal protective equipment, hand soap, and sanitizer in the vehicle and in her home to insure safety during and after Mr. Shkreli quarantines for two weeks.

32

Mr. Shkreli does believe he would benefit from drug and alcohol treatment and would seek permission from the Court and Probation to participate in a program deemed appropriate by Probation. [19]

**<u>CONCLUSION</u>**

We respectfully submit that since the Court's denial of Mr. Shkreli's initial Emergency Motion for Compassionate Release, circumstances have changed and evolved to a degree that no one could have predicted.  Unlike at the time when the Court denied Mr. Shkreli's first motion on May 16, 2020, he has spent nearly a year in confinement, facing the risks of a frightening virus from inside prison, incarcerated with restricted movement and no visitation, and fighting a litigation without adequate meaningful and effective access to counsel.

Despite the fantastic development of a vaccination, Mr. Shkreli and his fellow inmates at FCI Allenwood Low remain at grave risk of illness because of the current outbreak.   In addition, the restrictions that the BOP is compelled to impose in an effort to curtail the outbreak and prevent illness are affecting a deprivation of Mr. Shkreli's right to access counsel thereby causing him irreparable prejudice in the FTC action.  He is a non-violent offender who can be placed on home confinement without risk of harm to the public.  Accordingly, we beg this Court to have mercy and to grant Mr. Shkreli's motion for compassionate release.

---

[19] Mr. Shkreli's conditions of supervised release include participation in therapy and completion of community service.  To the degree that the Court and probation allows, Mr. Shkreli would comply with these conditions using remote opportunities, or by leaving the home for limited periods as authorized by probation.

Respectfully submitted,

 /s/
_____

Benjamin Brafman
Andrea Zellan
Stuart Gold
**Brafman & Associates, P.C.**
767 3rd Avenue, 26th Fl.
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906