

U.S. Department of Justice

United States Attorney
Eastern District of New York

271 Cadman Plaza East
Brooklyn, New York 11201

January 6, 2021

By ECF and Email

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Martin Shkreli
                Criminal Docket No. 15-637 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter in opposition to defendant Martin Shkreli's second motion for compassionate release[1] and/or a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i). (Dkt. No. 754 ("Second Mot.")).[2] The defendant contends that he should be granted the extraordinary remedy of immediate and permanent release from prison because he claims (1) he has not been sufficiently able to communicate with his attorneys about a civil action brought by the Federal Trade Commission ("FTC") and a number of states against the defendant for his role in an anticompetitive scheme to delay generic development of a life-saving drug, and (2) his medical conditions warrant release in light of recent COVID-19 positive cases at FCI Allenwood Low, where he is currently incarcerated.

      The defendant's motion is without merit. Since May 2020, when this Court correctly determined that in connection with the defendant's first motion for compassionate release that "[a]ll 3553(a) factors weigh against [the] defendant's release" (Order 8), nothing has changed about the sophisticated, deliberate and long-running nature of the defendant's multiple

---

[1] The government will publicly file a version of this response that redacts certain medical information about the defendant, to mirror the defendant's redactions in his motion; the government will also file Exhibit 1 under seal.

[2] The defendant previously filed a motion for compassionate release on April 22, 2020. (Dkt. No. 729 ("First Mot.")), which the government responded to on April 28, 2020 (Dkt. No. 732 ("Govt. Br."). The Court denied on that motion in a memorandum and order dated May 16, 2020. (Dkt. No. 734 ("Order")).

underlying crimes, his demonstrated disdain for the criminal justice system, both in threats of violence made against women that led to his bail revocation and his disciplinary infractions in prison, or his lack of remorse. Moreover, the defendant has not met his burden to demonstrate that he, personally and individually, falls into the narrow band of inmates for whom "extraordinary and compelling reasons" warrant release. 18 U.S.C. § 3582(c)(1)(A). As he was at the time of his last compassionate release motion, the defendant continues to be young and in good health, his medical conditions are both stable and well-treated by the Bureau of Prisons ("BOP"), and while FCI Allenwood Low has had some positive cases of COVID-19, the BOP is taking measures to control the spread of COVID-19 and no positive cases have occurred in the unit where the defendant is housed. Finally, the defendant's assertions that he has had inadequate time to confer with his civil attorneys are baseless; not only has the BOP gone out of its way to accommodate the defendant's requests for more access to his civil counsel, but the defendant and his civil counsel have failed to take advantage of existing opportunities to communicate.

For these reasons, as detailed below, the defendant's motion should be denied.

I.   Relevant Background

As the government noted in its opposition to the defendant's first motion for compassionate release, the Court is extremely familiar with defendant's offense conduct in this case; his deliberate attempts to disrupt the trial and, post-verdict, his escalating online threats to various women, which ultimately culminated in a violation of his bail conditions and his remand into custody; and the details of his sentencing and unsuccessful appeal. (Govt Br. 3-10). The government incorporates all of that information by reference here, and the following is additional information relevant to the defendant's current motion.

  A.   Current Status of COVID-19 Cases at FCI Allenwood Low

The defendant is currently incarcerated at FCI Allenwood Low, a low security BOP facility in Pennsylvania. As of January 6, 2021, there are 56 inmates (out of a total of 895 inmates) who are currently positive for COVID-19, as well as 10 staff members. (See BOP COVID-19 statistics by facility, at https://www.bop.gov/coronavirus/, last visited on January 6, 2021). To date, there have been no inmate or staff deaths at the facility, and 180 inmates and two staff members have recovered after testing positive for COVID-19. (Id.). These numbers represent a significant improvement over the numbers at the facility in December 2020 (for example, at the time the defendant filed his motion on December 23, 2020, there were 136 inmates who had tested positive for the virus), and reflect the BOP's hard work to control the spread of the virus at the facility, which has included implementing the following measures, among others: restricting inmate movement between units; increased testing; provision of hand sanitizer and masks; contact tracing; quarantining inmates who test positive for COVID-19; and quarantining inmates before arriving at or departing from the facility. Furthermore, a BOP representative has confirmed to the government that, as of January 6, 2021, there are no active or historical positive cases of COVID-19 among inmates who are in the same housing unit as the defendant.

B. The Defendant's Current Medical Condition

In the defendant's first compassionate release motion, he argued that he should be released because he "face[d] possible, even likely infection, and potential death" from COVID-19 because he suffered from "allergies and asthma." (First Mot. 1). Notably, the defendant had previously confirmed to Probation that he had "no history of serious medical problems" (Pre-Sentence Report ("PSR") ¶ 88); did not report that he ever had asthma or any other respiratory ailment (id.); advised that he took "Claritin for the treatment of allergies" but did not describe those allergies as "severe" (id.); and, once in BOP custody, did not report suffering from asthma, and sought no treatment for allergies beyond over-the-counter medication (Govt. Second Mot. 10-11).

The defendant's current motion does not seek release based on, or even mention, the defendant's "allergies." Instead, the defendant states that his "physical and mental health [is] in severe jeopardy" because there are inmates who have tested positive for COVID-19 cases at FCI Allenwood Low and because the facility is "on lockdown." (Second Mot. 2). The defendant further states that he has



The defendant further suggests that his mental health disorders "weaken his immune system" (id. at 28-29) by citing to various legal cases, but provides no medical documentation to support this assertion either generally or with respect to himself specifically. Finally, the defendant continues to contend that he has "asthma"—although he now admits that he only self-reported asthma to a psychologist, and also admits it is "under control." (Id. at 29).

C. The Defendant's Disciplinary Violations During Incarceration

Since the defendant's incarceration for violating his bail conditions in September 2017, he has committed several disciplinary violations. On May 1, 2018, the defendant was absent from an assignment, resulting in a loss of email privileges for 30 days. (See Probation Response Memorandum dated April 27, 2020 ("Probation Resp.") at 2). On May 2, 2018, the defendant refused a work or program assignment and also refused a direct order, resulting in the

loss of visitation privileges for 30 days. (Id.). On June 17, 2019, the defendant sent mail to another inmate via a third party without authorization, resulting in loss of 15 days' good time conduct; loss of commissary privileges for three months; and loss of email privileges for one month. (Id.). And on August 2, 2019, the defendant solicited funds via mail and a phone call that were funneled to another inmate, resulting in a loss of commissary and telephone privileges for three months. (Id.).

The defendant does not have any disciplinary infractions in 2020, though as the defendant notes frequently throughout his brief, inmates' movements at FCI Allenwood Low have been greatly restricted since March 2020. Moreover, the allegations in the FTC Action, detail below, strongly suggest that the defendant has been in violation of additional BOP policies during this period (e.g., the FTC Action alleges that the defendant communicated with others over non-BOP systems, such as WhatsApp, during his period of incarceration).

> D. The FTC Action Against the Defendant For An Anticompetitive Scheme to Restrict Generic Access to the Life-Saving Drug Daraprim

In January 2020, the FTC and the State of New York brought a civil action in the Southern District of New York against the defendant, the defendant's business associate, Kevin Mulleady, and two of the defendant's companies, Vyera Pharmaceuticals, LLC ("Vyera") and Phoenixus AG ("Phoenixus"). (See United States v. Shkreli et al., 20-CV-706 (DLC) (the "FTC Action"), Dkt. No. 4). An amended complaint was filed in April 2020, which included additional plaintiffs—specifically, the states of California, Illinois, North Carolina, Ohio, Pennsylvania and Virginia—and 2 allegations about the scheme. (Id., Dkt No. 86 ("Amended Compl.," attached hereto as Exhibit 2)).

The FTC Action alleges an anticompetitive scheme perpetuated by the defendant, who was the founder of Vyera and Phoenixus and the Chief Executive Officer ("CEO") of Vyera, along with others, to delay generic competition to Daraprim, a lifesaving drug used to treat the potentially fatal parasitic infection toxoplasmosis. (Id.). The pleadings detail how the defendant and others acquired the U.S. rights to Daraprim in 2015, and immediately raised the price from $17.50 to $750 per tablet, an increase of more than 4000%, resulting in significant profits. (Amended Compl. ¶ 2). The pleadings allege that the defendant and others knew that because Daraprim had no regulatory or patent protection, the massive price increase would attract generic competition; to prevent that competition, they executed a multi-part scheme to block generic entry, which included creating a complex web of contractual restrictions that prohibited distributors and purchasers from reselling Daraprim to generic companies; cutting off competitors' access to the active pharmaceutical ingredient necessary to manufacture Daraprim; and signing "data-blocking" agreements with distributors to prevent them from providing sales data to third-party data reporting companies. (Id. ¶¶ 2-7). The pleadings further explain that absent the defendant's anticompetitive conduct, Daraprim would have faced generic competition years ago; instead, toxoplasmosis patients who need Daraprim to survive have been forced to pay tens of millions of dollars a year more for this life-saving medication. (Id. ¶ 8).

Significantly, the pleadings allege that the anticompetitive scheme is ongoing, and that the defendant has continued his involvement in the scheme during the pendency of this criminal case, including while incarcerated at FCI Allenwood Low. (Id. ¶¶ 36-46). For example, the defendant has remained in regular contact with Mulleady and others involved in the scheme through phone calls, emails, in-person visits, unsanctioned WhatsApp messaging and potentially other means since his incarceration in September 2017. (Id. ¶ 44). In those communications, the defendant continues to discuss strategies to prevent generic competition to Daraprim. (Id.).

      E.      Current Status of the FTC Action

Discovery in the FTC Action opened on February 27, 2020, following the parties' Rule 26(f) conference before the Honorable Denise L. Cote. On May 22, the defendant and others filed a joint motion to stay discovery. (FTC Action Dkt. No. 126). The defendant did not assert any issues related to access to counsel as a basis for a stay. (Id.). Judge Cote denied that motion on June 15, 2020. (FTC Action Dkt. No. 150). The parties have now substantially completed their document productions and on October 30, 2020, the parties began noticing fact depositions. To date, approximately 30 depositions have been noticed, including the deposition of the defendant, which the parties initially agreed would take place on January 27, 2021 and January 28, 2021 at FCI Allenwood Low. (FTC's Response to Shkreli's Motion to Stay Discovery, FTC Action Dkt. No. 332, attached hereto as Exhibit B, at 3 n.1). The end of discovery is currently set for February 26, 2021. (FTC Action Dkt. No. 137).

On November 20, 2020, counsel for the defendant notified the FTC for the first time that he wanted to remotely attend all depositions in the case. (Exhibit B at 2). At a meet-and-confer on November 24, 2020, the FTC asked the defendant for proposals as to how this could be accomplished logistically. (Id.). Instead of engaging with the FTC, on November 25, 2020—the day before Thanksgiving—counsel for the defendant filed a motion to stay all discovery in the case until the defendant is released from jail in three years. (Id. at 2-3). In that motion, the defendant first claimed that he was unable to sufficiently communicate with his attorneys about his defense in the FTC Action due to restrictions placed by the BOP on communications with counsel as a result of the COVID-19 pandemic. (FTC Action Dkt. No. 314). Subsequently, on December 4, 2020, counsel for defendant backed out of their earlier agreement to have the defendant deposed on January 27, 2021 and January 28, 2021, citing "limitations on our access to [the defendant] as described in detail in our motion to stay discovery." (Exhibit 3 at 3 n.1, Exhibit A).

The defendant's motion to stay discovery was fully-briefed on December 11, 2020, and remains pending as of today, January 6, 2021; in the interim, discovery is ongoing in the case. Notably, on December 22, 2020—after the briefing on the motion to stay was complete—Judge Cote ordered that the defendant's deposition proceed on January 27 and January 28, 2021. (FTC Action Dkt. No. 357).

      F.      The Defendant's Communications with Civil Counsel in the FTC Action

In both the defendant's motion to stay discovery in the FTC Action and his second motion for compassionate release, the defendant claims he has been unable to adequately

communicate with his civil counsel in connection with the FTC Action.[3] To the contrary, the BOP has made special accommodations for the defendant to communicate with his civil counsel, above and beyond the access normally granted to other inmates in the same situation. In fact, a senior attorney at the BOP stated that its "accommodations to date for Mr. Shkreli have been remarkable and surpass anything [he has] seen in 10+ years" (Exhibit 3 at Ex. D), and even the defendant's own hired "prison consultant" admits that BOP has done a "somewhat satisfactory job at arranging communication thus far." Second Mot. Ex. 2 ¶ 10. Moreover, the defendant and his counsel have, in several respects, chosen not take full advantage of existing opportunities to communicate.

The following is a summary of the key facts about the defendant's communications with counsel in the FTC Action and other civil litigation. This summary is drawn largely from the FTC's December 7, 2020 filing in opposition to the defendant's motion to stay discovery in the FTC Action (attached as Exhibit 3), but the government has confirmed with a BOP representative that the information in that filing continues to be accurate, and provides any relevant updates below:

- **The defendant has the ability to meet with his civil attorneys in person at FCI Allenwood Low, and has chosen not to do so**. The defendant erroneously states that FCI Allenwood Low was "closed for legal visitations because of the COVID-19 pandemic" and that the defendant has "not been able to meet" with civil counsel in the FTC Action as a result. (Br. 6, n. 5). The defendant is wrong. While a norovirus outbreak prevented legal visits between January 17, 2020 to February 14, 2020, and the COVID-19 pandemic has placed some restrictions on legal visits, in-person legal visits have been permitted by request on an case-by-case since March 13, 2020 (including currently), and between October 2, 2020 and December 7, 2020, FCI Allenwood was open for both social and legal visits without restriction. That the defendant has not met with counsel is not because of the BOP. He conveniently fails to mention that none of his seven civil attorneys failed to request <u>any</u> in-person visits with the defendant after January 2020, including when legal visits were allowed without a prior request between October and December 2020. Indeed, on November 12, 2020, the BOP specifically welcomed the defendant's counsel to schedule a time or times to come visit. Despite these opportunities, the defendant's counsel in the FTC Action has failed to request any visit with the defendant at FCI Allenwood Low since January 2020 (during a period when the facility was closed due to the norovirus outbreak). (Notably, civil counsel for the defendant in his ongoing litigation with the Securities and Exchange Commission ("SEC") did visit the defendant at FCI Allenwood Low in October 2020). (<u>See</u> Exhibit 3 at 6-8; the government has confirmed that no visits have been requested since the FTC filing on December 7, 2020).

---

[3] According to the docket in the FTC Action, the defendant is represented, either personally or in his capacity related to Vyera and Phoenixus, by five attorneys at Duane Morris LLP and two attorneys at Kang Haggery & Fetbroyt, including Kandis Kovalsky, the attorney who submitted an affidavit in support of the defendant's motion here.

- **The defendant has been able to send and receive legal mail with his civil attorneys at FCI Allenwood Low**.  Mail at FCI Allenwood Low is typically delivered to an inmate within 24 hours and legal mail is "afforded priority," while outgoing mail is processed within 24 hours.[4]  (Exhibit 3 at 6).

- **The defendant has been permitted to communicate with his attorneys via legal phone calls at FCI Allenwood Low, and on several occasions has refused to participate in scheduled calls.**  As of December 7, 2020, the defendant had 14 legal calls with his attorneys in the FTC Action, and a total of 26 legal calls between January 2020 and December 2020 (Exhibit 3 at 8); the government has confirmed that the defendant had two additional legal calls with his attorneys in the FTC Action since December 7, 2020, one on December 22, 2020 for one hour, and one on December 30, 2020 for a half-hour.  On several additional occasions, legal calls were scheduled for the defendant, but he hung up rather than participate in them.  (Id.).  Moreover, once the BOP was notified that the defendant wanted additional legal calls, he was told that he would be allowed extra one-hour legal calls on an as-needed basis.  (Id.).

- **The defendant has been permitted to communicate with his attorneys via phone calls and emails at FCI Allenwood Low that the FTC has agreed not to review.**  In addition to dedicated legal calls with his civil counsel, the FTC has agreed not to review any communications between the defendant and his civil counsel for the FTC Action that took place, or will take place, on the BOP's monitored TRULINCS and TRUFONE systems after March 13, 2020.  (Exhibit 3 at 9; FTC Action Dkt. No. 284).[5]  As a result, the defendant may communicate as much as he likes with his counsel via these systems.[6]

---

[4] The defendant complains that his legal mail has been delayed due to general delays with the United States Postal System ("USPS"), and also occasionally that mail arrived in an "opened manner."  (Br. 6, n. 5).  To the extent that this is the case, the BOP is not responsible for USPS delays; it is not clear how the defendant has been prejudiced by such delays; and it is not clear how the fact that defendant's legal mail related to the FTC Action might have been opened by the BOP would affect his ability to communicate with counsel in that civil matter.

[5] The FTC obtained via subpoena emails and phone calls between the defendant and his civil counsel on these systems through March 13, 2020.  (FTC Action Dkt. No. 284).  Although these communications are not privileged, (see FTC Action Dkt. No. 278 ("Shkreli's communications with attorneys in BOP-monitored systems such as telephone calls and emails are not protected by the attorney-client privilege," citing United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011))), the FTC nevertheless agreed to a procedure to notify the defendant if it will seek to use any of these communications in the FTC Action, and also agreed not to request or review any further communications on those systems.  (FTC Action Dkt. No. 284).

[6] The defendant claims that legal calls are the "only adequate way" for the defendant to confer "confidentially" with his civil counsel about the FTC Action.  (Br. 5 n.5).  He fails to advise the Court that the FTC has agreed not to review communications with civil counsel for the FTC Action over the TRULINCS and TRUFONE systems, or to explain why, given that the FTC

II.      <u>Applicable Law</u>

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13. That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," <u>id.</u> § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," <u>id.</u> § 1B1.13(2); and "the reduction is consistent with this policy statement," <u>id.</u> § 1B1.13(3).

The Application Note describes the circumstances under which "extraordinary and compelling reasons" exist:

(A) Medical Condition of the Defendant. —

(i) The defendant is suffering from a terminal illness (<u>i.e.</u>, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (<u>i.e.</u>, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances. —

(i)      The death or incapacitation of the caregiver of the defendant's minor child or minor children.

---

will not review these communications, such systems are insufficient. That the prison staff can continue to monitor these communications for other purposes <u>unrelated</u> to the FTC Action is irrelevant.

8

> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Id. § 1B1.13 Application Note 1.

The Guidelines and policies set by the Bureau Of Prisons ("BOP") have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50. Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age or a need to care for a child, spouse or registered partner. See id.; see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). As the court recognized in Traynor, Congress noted that Section 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304). The Second Circuit recently held that a district court erred when it decided that the Guidelines limited a court's ability to consider releasing a defendant early, without input from the BOP, on any grounds beyond a showing of poor health, old age and family care needs, instead concluding that district courts have "discretion in determining what are extraordinary circumstances." United States v. Brooker, 976 F.3d 228, 234 (2d Cir. 2020).[7]

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, as noted above, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted. See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13. That is, even if a court finds "extraordinary and compelling reasons" making a defendant eligible for release, and even if the defendant is not a danger to the community, the 18 U.S.C. § 3553(a) factors still govern whether release is warranted. See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13. As the court in United States v. Gotti explained:

> It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence

---

[7] The government respectfully submits that Brooker was wrongly decided. As set forth in the government's brief to the Second Circuit in Brooker, in 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to define the term "extraordinary and compelling reasons." The First Step Act altered only the procedural mechanism in § 3582(c)(1) and did not revoke the authority delegated to the Commission in § 994(t), or purport to expand the basis for compassionate release beyond the categories identified by the Sentencing Commission in the application note to U.S.S.G. § 1B1.13.

> modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

No. 02-CR-743 (CM), 2020 WL 497987, at *2 (S.D.N.Y. Jan. 15, 2020); see also United States v. Soliman, No. 17-CR-007 (ERK), 2020 WL 2329266, at *2 (E.D.N.Y. May 11, 2020). Therefore, the Court must consider whether, weighed against the purported "extraordinary and compelling reasons," the following factors permit release: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a).

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist and that the 3553(a) factors warrant his or her release. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); Gotti, 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020) (defendant "has the burden of showing that 'extraordinary and compelling reasons' to reduce his sentence exist").

III. BOP's Response to COVID-19

The BOP has made and continues to make significant efforts to respond to the threat posed by COVID-19 in its facilities.

Since at least October 2012, the BOP has had a Pandemic Influenza Plan. See BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp. In January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. See BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp. As part of its Phase One response, the BOP began to study "where the infection was occurring and best practices to mitigate transmission." Id. In addition, the BOP stood up "an agency task force" to study and coordinate its response, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." Id.

On or about March 13, 2020, the BOP implemented its Phase Two response "to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." Id. These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." Id.

10

For example, the BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." Id. In addition, the BOP implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. Id. As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." Id.

On or about March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. See BOP Update on COVID-19, at
https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

On or about March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. See BOP COVID-19 Action Plan: Phase Five,
https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

On or about April 1, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. Id. All new inmates are screened, and those with any risk factors, even if asymptomatic, are quarantined. See BOP Implementing

11

Modified Operations, https://www.bop.gov/coronavirus/covid19status.jsp; BOP COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. On April 13, 2020, the BOP extended all measures implemented in Phase Five through May 18, 2020. BOP COVID-19 Action Plan: Phase Six, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf.

On or about May 18, 2020, the BOP ordered the implementation of Phase Seven of its COVID-19 Action Plan. This phase extended all measures from Phase Six through June 30, 2020, at which time the plan would be evaluated. See BOP COVID-19 Action Plan: Phase Seven, https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp. On June 30, 2020, the BOP implemented Phase Eight of its action plan and extended all measures implemented in Phase Seven through July 31, 2020, at which time the plan would be evaluated again. On or about August 5, 2020, the BOP implemented Phase Nine of its action plan and extended all measures implemented in Phase Eight through August 31, 2020. Additionally, as the facilities move closer to normal operations, Phase Nine entails: (a) offering inmates increased access to counsel and legal materials in response to more frequent court proceedings; (b) resuming full-time treatment in residential programs with social distancing and resuming non-residential programs at half capacity; (c) offering inmates increased recreation access with social distancing; (d) implementing a full 14-day pre-release quarantine prior to transferring inmates; (e) ensuring that transferred inmates undergo the same process as new inmates, including intake screening and temperature checks, COVID-19 testing, and isolation or quarantine measures upon transfer; and (f) conducting unannounced site visits to ensure that facilities are conforming to the ongoing COVID guidance.

On or about August 31, 2020, the BOP initiated the modified Phase Nine of its action plan, which extended all measures in Phase Nine. Specifically, as of October 8, 2020, social visits have been reinstated, where possible. All visits are non-contact and social distancing between inmates and visitors will be enforced, either via the use of plexiglass, or similar barriers, or physical distancing (i.e., 6 feet apart). Inmates in quarantine or isolation will not participate in social visiting. The number of visitors allowed in the visiting room will be based on available space when utilizing social distancing. The frequency and length of visits will be established to ensure all inmates have an opportunity to visit at least twice a month. Visitors will be symptom screened and temperature checked; visitors who are sick or symptomatic will not be allowed to visit. Both inmates and visitors must wear appropriate face coverings (e.g. no bandanas) at all times and will perform hand hygiene just before and after the visit. Tables, chairs and other high-touch surfaces will be disinfected between visitation groups; all areas, to include lobbies, will be cleaned following the completion of visiting each day.

In addition to screening and testing inmates, temperature checks and COVID-19 screening is being conducted for staff, contractors, and other visitors to our correctional institutions, with those who register a temperature of 100.4° Fahrenheit or higher denied access to the building. As much as possible, staff are being assigned to the same posts and not rotating, as an additional measure to mitigate the spread of the virus. See https://www.bop.gov/coronavirus/covid19_status.jsp

The BOP has also "increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement." Update on COVID-19 and Home Confinement, https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp. In addition, the BOP "has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities [with COVID-19 outbreaks] to determine which inmates are suitable for home confinement." Id.

IV. The Defendant's Second Compassionate Release Motion Should Be Denied

The defendant has failed to meet his burden to show that there are "extraordinary and compelling" reasons to warrant his immediate release. He has also failed to show that the 3553(a) analysis permits his release; to the contrary, this analysis is unchanged from May 2020, when this Court concluded that "[a]ll 3553(a) factors weigh against [the] defendant's release." (Order 8). As the defendant's motion must be denied if he fails to establish either of these requirements, his inability to do so means that his motion must be denied. See U.S.S.G. § 1B1.13(1)(A); Gotti, 2020 WL 497987, at *2.

       1. The Defendant Has Not Shown That His Circumstances Are "Extraordinary and Compelling"

The defendant has failed to establish that extraordinary and compelling circumstances require his release. As explained below, neither the defendant's conditions of confinement with respect to his ability to communicate with civil counsel in the FTC Action, nor his current medical conditions—nor the two considered together—constitute "extraordinary and compelling" circumstances that would warrant the defendant's immediate release.

            a. The Defendant's Access to Civil Counsel in the FTC Action Does Not Constitute "Extraordinary and Compelling" Circumstances

The defendant argues at great length that the conditions of his current incarceration—specifically, the BOP's regulations governing his contact with civil counsel—are "preventing [him] from exercising his fundamental constitutional right to meaningfully confer with civil counsel regarding the FTC Action," and that this constitutes an "extraordinary and compelling" circumstance warranting his release. (Second Mot. 19). This argument is factually inaccurate and legally infirm.

First, the defendant cannot demonstrate that his constitutional rights have been violated here. The defendant's argument implicates his constitutional "right of access to the courts"—rather than a criminal defendant's Sixth Amendment right to counsel—because it involves his ability to communicate with his counsel about "a matter other than his criminal prosecution or appeal." Groenow v. Williams, No. 13 Civ. 3961(PAC)(JLC), 2014 WL 941276, at *7 (S.D.N.Y. March 11, 2014). Here, the defendant specifically invokes his corollary right "to correspond with legal counsel." See Washington v. James, 782 F.2d 1134, 1138 (2d Cir. 1986) ("As a corollary of his right of access, a prisoner has a right to correspond with legal counsel.").

13

To establish that the BOP violated his right to correspond with counsel, the defendant must show that he was "prohibited from communicating with his attorney[s] by all available means." Groenow, 2014 WL 941276, at *7; see also Fisher v. Dep't of Corr., No. 92 Civ. 6037 (LAP), 1995 WL 608379, at *7 (S.D.N.Y. Oct. 16, 1995) (holding that temporary bar on legal phone calls did not unconstitutionally deny plaintiff access to counsel because he could and did still contact his attorneys through mail).[8]

The facts clearly show that the BOP has not "prohibited" the defendant from communicating with his civil counsel "by all available means." To the contrary, as set forth above in Section I.F, the defendant has multiple avenues to communicate with civil counsel: he can send and receive legal mail from civil counsel, have in-person legal visits with civil counsel, can speak to civil counsel via unmonitored legal calls, and can freely communicate with civil counsel via BOP email and phone systems without concern that the FTC will be able to access those communications. As noted above, while some of these avenues of communication are open to any inmate, a BOP official has stated that the additional accommodations that it has made for the defendant to facilitate communication with his civil counsel in connection with the FTC Action are "remarkable and surpass anything [he has] seen in 10+ years." (Exhibit 3 at Ex. D). The defendant's own hired expert admits that the BOP has done a "somewhat satisfactory job at arranging communication thus far" (Second Mot. Ex. 2 ¶ 10), making it clear that the defendant cannot demonstrate anything close to a constitutional violation here. Further undercutting his argument are the fact that the defendant and his counsel have deliberately, on multiple occasions, determined not to use the available means of communication. None of the defendant's seven civil attorneys availed themselves of the opportunity to meet with the defendant in person, even when there were no restrictions on legal visits, and the defendant himself has refused to participate in multiple scheduled legal calls. Finally, the defendant's own expert suggests that one option to improve his ability to communicate with civil counsel would be to transfer from a long-term facility to a pre-trial facility that is equipped for trial prep (Second Mot. Ex. 2 ¶¶ 7-9), but the defendant has refused to put in a request with the BOP for such a transfer (Exhibit 3 at 9). It is baffling that the defendant refuses to take advantage of the many options, including special privileges, afforded him to communicate with his counsel, but still asserts that his inability to communicate with counsel requires his compassionate release.

---

[8] The defendant cites cases that further demonstrate the high bar of establishing a constitutional violation. See, e.g., Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (prison policies that implicate constitutional rights are valid if they are "reasonably related to legitimate penological interests" (quoting Turner v. Safley, 482 U.S. 78, 89 (1987))). Many other cases he cites are inapposite as they address entirely different situations. See, e.g., Washington, 782 F.2d at 1139 (prisoner stated claim for denial of right to correspond with legal counsel because he alleged that prison "regularly" opened his outgoing legal mail "without any showing that a substantial government interest required this procedure"); Mosley v. St. Louis Sw. Ry., 634 F.2d 942, 946-47 (5th Cir. 1981) (plaintiffs stated a claim for denial of access to counsel because they were pressured into accepting a settlement without the ability to consult with counsel beforehand); Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1118 (5th Cir. 1980) (court order preventing witness from consulting with counsel during breaks in witness's trial testimony violated witness's due process right to retain counsel).

Second, even if the defendant could demonstrate that the conditions of his confinement constituted a violation of his constitutional right to access the courts—and he cannot—the appropriate avenue to challenge those conditions of confinement would not be a motion for sentence reduction under 18 U.S.C. § 3582, but rather a motion under 28 U.S.C. § 2241, brought in the district of incarceration (which is the Middle District of Pennsylvania, and not this district). See Dhinsa v. Krueger, 917 F.3d 70, 81 (2d Cir. 2019); Thompson v. Choinski, 525 F.3d 205, 209 (2d Cir. 2008); Chambers v. United States, 106 F.3d 472, 474-75 (2d Cir. 1997. This is the proper mechanism by which challenges to the conditions of confinement caused by the COVID-19 pandemic have been brought and evaluated. See United States v. Credidio, No. 19-CR-111, 2020 WL 1644010, at *2 (S.D.N.Y. Apr. 2, 2020); Basank v. Decker, No. 20-CV-2518, 2020 WL 1953847, at *2 (S.D.N.Y. Apr. 23, 2020); Lagan v. Edge, No. 20-CV-2221 (AMD), 2020 WL 3403109, at *3 (E.D.N.Y. June 19, 2020).[9] Moreover, before the defendant can challenge the BOP's regulations governing contact with his civil attorneys pursuant to 28 U.S.C. § 2241 in the appropriate district, the defendant would have to exhaust his administrative remedies, see, e.g., United States v. McGriff, 468 F. Supp. 2d 445, 447 (E.D.N.Y. 2007), and it is unclear if the defendant has done so here. Finally, even if a Section 2241 motion was brought after exhaustion, the remedy for the defendant's allegations, even if true, would not be resentencing, but would be either damages or an injunction requiring the BOP to increase access to his civil attorneys. See, e.g., O'Brien v. Terrell, No. 10-CV-03042 RRM, 2012 WL 2394809, at *3 (E.D.N.Y. June 25, 2012) (finding that the defendant's "desired remedy—a sentence reduction—is not available in a habeas petition based on conditions of confinement").

Finally, it is notable that Judge Cote, who is presiding over the FTC Action and before whom the defendant has made all of the same arguments about his ability to communicate with counsel (see FTC Action Dkt. Nos. 314, 315, 316, 346, 347), has not, to date, stayed discovery in the FTC Action, and has ordered the defendant's deposition to proceed on January 27 and January 28, 2021.

---

[9] The Brooker decision does not require a different outcome. That the district court has discretion to determine, within the context of Section 3582(c)(1)(A), what might constitute extraordinary circumstances, does not mean that a defendant can ask a district court to use the compassionate release statute to find that extraordinary circumstances exist due to complaints that are properly brought through other, existing mechanisms. See United States v. Handerhan, 789 F. App'x 924, 926 (3d Cir. 2019) (denying the defendant's request for compassionate release and explaining that Section 3582(c)(1)(A) does not provide a mechanism by which defendants may seek "release on the basis of arguments . . . that were or could have been raised on direct appeal" or in a habeas motion); United States v. Arojojoye, 806 F. App'x 475, 477-78 (7th Cir. 2020) (denying the defendant's compassionate release motion and explaining that a claim that the defendant's sentence was unfairly disparate with his codefendants "was really [an] attack [on] the length of his sentence" and should properly have been construed as a successive § 2255 petition); see also United States v. Rivernider, No. 10-CR-222, 2020 WL 597393, at *4 (D. Conn. Feb. 7, 2020) ("To my knowledge, nobody has suggested that the 'extraordinary and compelling' standard can be satisfied by claims of legal error or other alleged wrongs that are cognizable on direct appeal from a conviction or by means of a habeas corpus petition").

15

        b.        <u>The Defendant's Current Medical Conditions Do Not Constitute "Extraordinary and Compelling" Circumstances</u>

The defendant contends that his mental health is "worsening" and that he is at increased risk of COVID-19 complications due to his asthma and the fact that his mental health issues have "weaken[ed] his immune system." (Br. 25-29). These medical conditions do not constitute extraordinary and compelling circumstances for compassionate release.

As an initial matter, while there have now been documented cases of COVID-19 at FCI Allenwood Low (as detailed above), the BOP has instituted a series of procedures to combat the spread of COVID-19 in the facility; the number of active cases has significantly declined since December; and there have been no COVID-19 cases (either currently or in the past) in the specific housing unit where the defendant is located. Consequently, the risk that the defendant may contract COVID-19 remains low. Courts have found these factors significant when evaluating motions at facilities that have had similar outbreaks. See United States v. Gibson, No. 17-CR-06571 (JS), 2020 WL 7343802, at *1 (E.D.N.Y. Dec. 14, 2020) (noting that "the numbers at FCI Fort Dix have decreased significantly since [a] late-November surge, at least among the inmate population."); see also United States v. Thatcher, No. 13 CR. 847 (KMK), 2020 WL 7263288, at *1 (S.D.N.Y. Dec. 10, 2020) (denying compassionate release motion, in part, because defendant was housed in a wing at FCI Fort Dix without any positive cases); United States v. Sturgis, No. 10-CR-6022, 2020 WL 7063359, at *5 (W.D.N.Y. Nov. 24, 2020) (finding forty-eight-year-old defendant with obesity and poorly controlled hypertension detained at FCI Fort Dix failed to show "extraordinary and compelling" reasons for his release based on those medical conditions); United States v. Scronic, No. 18-CR-0043, 2020 WL 7048245, at *2 (S.D.N.Y. Nov. 30, 2020) (finding forty-nine-year-old defendant who is overweight and with high blood pressure detained at Fort Dix failed to show "extraordinary and compelling" reasons for his release). However, even if that were not the case, the defendant's conditions do not warrant release.

With respect to the defendant's physical health, the district court found in May 2020, in connection with the defendant's first compassionate release motion, that the defendant "is a 37 year old man who suffers from seasonal allergies" and has "no documented current diagnosis or treatment for asthma." (Order 7). The district court therefore concluded that there were no extraordinary and compelling circumstances. (Id.). Nothing has changed with respect to the defendant's physical condition since the Court's decision, and so no different result is required here.

With respect to the defendant's mental health, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. However, the medical records provided by the defendant and confirmed by the BOP establish that the defendant's conditions are stable and he is being provided with thorough medical care by the BOP. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

██████████████████████████████████████████████████████████████████████████ Moreover, the defendant's argument that his mental health disorders "weaken his immune system" (id. at 28-29) is unsupported by any medical documentation, either generally or with respect to himself specifically, and the CDC has not classified "mental health disorders" as a risk factor for COVID-19. Consequently, the defendant's mental health conditions do not constitute an "extraordinary and compelling" reason for his immediate release. See United States v. Hasan-Hafez, No. 16-CR-221 (KPF), 2020 WL 2836782, *4 (S.D.N.Y. June 1, 2020) (rejecting a compassionate release motion where the defendant's diabetes, hypertension and high cholesterol were all stable and managed by the BOP); United States v. Brady, No. 18-CR-316 (PAC), 2020 WL 2512100, at *3-4 (S.D.N.Y. May 15, 2020) (acknowledging serious nature of defendant's medical conditions but denying compassionate release where conditions stable and managed in BOP facility).[10]

## 2. All Section 3553(a) Factors Weigh Against Release

Because the defendant has not met his burden to show that there are "extraordinary and compelling reasons" that might permit his release at this time, the Court need not proceed to the analysis under Section 3553(a) as to whether release is indeed warranted. See 18 U.S.C. § 3582; U.S.S.G. § 1B1.13. However, if a Section 3553(a) analysis was conducted, it would weigh just as strongly against the defendant's release now as it did when the Court considered the defendant's first compassionate release motion in May 2020. (See Govt Br. 32-37, Order 8-9). At that time, the Court concluded that "[a]ll 3553(a) factors weigh against [the] defendant's release." (Order 8). Specifically, the Court concluded that:

> with regard to the nature and circumstances of his offenses, the defendant intentionally deceived and manipulated individual and public investors, and before sentencing, made disparaging remarks about the government and the sentencing process that showed little regard for the rule of law. Second, a sentence of 84 months was deemed necessary to reflect the seriousness of the offense, promote respect for the law, and deter future criminal conduct, given the defendant's disregard for the law. Reducing Mr. Shkreli's sentence by half would not further the goals of 3553(a) . . . Finally, the court provided its original sentence after considering all of the 3553(a) factors, including the defendant's needs for correctional treatment, something he would not receive if the sentence were reduced.

---

[10] The defendant cites United States v. Pina, 18-CR-179, 2020 WL 3545514, at *2 (S.D.N.Y. June 29, 2020) in support of his motion. However, the circumstances in Pina are very different from those here; in Pina, the district court heard from multiple mental health professionals who had examined the defendant in connection with the motion, and concluded based on those evaluations that the defendant—who had witnessed the murder of his father at age 5—was experiencing a serious decline in mental health and acute symptoms that had worsened during the COVID-19 lockdown. No such medical documentation has been provided here.

17

(Id. at 8-9). Nothing has changed since May 2020 that would warrant a different balancing of the 3553(a) factors, or a different conclusion.

The defendant's arguments to the contrary are unavailing.[11] The defendant claims that he has served the "majority" of his sentence (Second Mot. 30); this is not correct. He has been incarcerated since September 2017 and his conditional release date is September 2023; he has consequently served slightly more than 39 months of his 84-month sentence, and even if the conditional release date holds, he still has 33 months left to serve.[12] As the Court already concluded, such a significant reduction in his remaining sentence "would not further the goals of 3553(a)." (Order 8). That some of his period of incarceration has been during the COVID-19 pandemic and that he has been subject to increased restrictions on visitations from "family members, friends or attorneys" (Second Mot. 29) as a result is unfortunate, but makes the defendant no different than any other inmate currently incarcerated.

The defendant's contention that he has a low risk of reoffending is unpersuasive. (Second Mot. 30-32). The defendant received a significant sentence due in part to the fact that, even after his conviction, the defendant continued to act in a manner that showed "little regard for the law" (Order 8), including making "disparaging remarks about the government and the sentencing process" (id.), and making an escalating series of violent threats against women that ultimately resulted in the revocation of the defendant's bail. The defendant's multiple disciplinary infractions while incarcerated—which included, as detailed above, failure to follow a direct order and two separate instances of deliberately circumventing BOP policy and deceiving BOP staff by sending money and mail through other inmates (Probation Resp. at 2)—and the allegations contained in the FTC Action that the defendant continued to pursue his anticompetitive scheme even while incarcerated, demonstrate that the defendant continues to believe that the rules do not apply to him. Reducing the defendant's sentence to approximately half of what he was sentenced to serve would not in any event be warranted, but is particularly inappropriate light of this misconduct. Moreover, that the defendant has not been charged with any additional disciplinary infractions since his last compassionate release motion (Second Mot. 30)—during a time period when his movements have largely been restricted—is the bare minimum that is required of him, and not a fact that weighs in favor of the extraordinary remedy of early release.

---

[11] The defendant argues that the fact that FCI Allenwood Low has a COVID-19 outbreak should be considered as part of this analysis (Br. 30); however, there is no 3553(a) factor related to conditions of confinement. In any event, the defendant's arguments on this point are addressed above.

[12] The defendant's statement that his sentence is "likely to be released well before his conditional release date" is based on speculation that he will be deemed eligible for RDAP due to a short period of increased alcohol consumption following his indictment that appears to resolved itself well before his incarceration (PSR ¶ 94), and in spite of his disciplinary history, and that he will successfully complete the RDAP program and receive the expected credit off of the remainder of his sentence. (Br. 30). This is inaccurate. The defendant is not only ineligible for a sentence reduction based on BOP evaluation, but, according to the BOP, previously declined participation in RDAP on November 21, 2019.

The defendant also argues that "the public will be protected from further crimes" if he is released because he "consented to a lifetime ban by the SEC from acting as an investment advisor which prevents him from committing his crimes of conviction again." (Second Mot. 31). This is inaccurate and misleading. While the defendant did ultimately consent to a lifetime bar by the SEC from acting as an investment advisor, he did so after initially litigating the issue, only conceding after being served with deposition questions about his role in the MSMB Capital and MSMB Healthcare fraud schemes. More significantly, the defendant has refused to consent to a lifetime bar by the SEC on serving as an officer and director of a public company; the partial judgement that the defendant entered into with the SEC less than two weeks ago clearly states that the officer and director bar will be decided by this Court following a motion by the SEC, which the defendant will oppose. (See SEC v. Shkreli, 15-CR-7175 (KAM), Dkt No. 45 at 5). That bar would go squarely to significant additional crimes committed by the defendant— he was convicted of his participation a conspiracy to illegally manipulate the share price and trading volume of Retrophin stock while he was the CEO of that company, and this Court found by a preponderance that the defendant also participated in a conspiracy to steal more than $10 million from Retrophin for his own personal benefit, also during the period that he served as its CEO— and his refusal to agree to it is telling, particularly in light of the allegations of the defendant's misconduct in the FTC Action that took place, at least in part, during periods when he served as the CEO of Vyera.

Finally, despite the defendant's repeated reference to agreeing to "serve the remainder of his prison sentence in home confinement" (Second Mot. 1, 30-33), "the only way to grant [him] the relief [he] seeks (i.e., release from prison) under Section 3582(c) is to reduce [his] sentence to time served—in other words, to permanently release [him]." United States v. Roberts, 18-CR-528 (JMF), 2020 WL 1700032, at *3 (S.D.N.Y. Apr. 8. 2020); see also United States v. Ogarro, No. 18-CR-373 (RJS), 2020 WL 1876300, at *6 (S.D.N.Y. Apr. 14, 2020); United States v. Miller, No. 16-20222-1, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020); United States v. Urso, 03-CR-1382 (NGG), 2019 WL 5423431, at *1 (E.D.N.Y. Oct. 23, 2019); 18 U.S.C. § 3621(b). In theory, the Court could so reduce the defendant's sentence, and also order that he be confined to his sister's apartment for an additional period of time as a special condition of supervised release. But even assuming arguendo that release to supervised release with a condition of home confinement after serving approximately half of a prison sentence were otherwise consistent with Section 3553(a) in this case, such a condition here would be both effectively unenforceable, both because it is difficult to detect a violation generally, and for a violation to have consequences, the defendant would have to be returned to prison, after he has potentially been exposed to COVID-19 at a time when cases are on the rise nationally.

V.  Conclusion

For the foregoing reasons, the government respectfully submits that the defendant's second motion for compassionate release should be denied in its entirety.

                    Respectfully submitted,

                    SETH D. DuCHARME
                    Acting United States Attorney

By:   /s/ Alixandra Smith
       Alixandra Smith
       Assistant U.S. Attorney
       (718) 254-7000

cc:   Clerk of Court (KAM), by ECF
      Defense Counsel, by email